RYAN R. GORDON (SBN 278414)
VANESSA T. SHAKIB (SBN 287339)
**ADVANCING LAW FOR ANIMALS**
407 N. Pacific Coast Highway #267
Redondo Beach, CA 90277
Tel: (202) 996-8389
rgordon@advancinglawforanimals.org
vshakib@advancinglawforanimals.org

DANIEL J. KOLDE, ESQ.
**LAW OFFICES OF DANIEL J. KOLDE**
P.O. Box 440344
St. Louis, Missouri 63144-9998
Tel: 636.675.5383
Email: daniel.kolde.law@gmail.com
(*pro hac vice application to be filed*)

Attorneys for Plaintiffs

ADVANCING LAW FOR ANIMALS

# UNITED STATES DISTRICT COURT

## EASTERN  DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual,<br><br>                Plaintiffs,<br>    v.<br>LIEUTENANT JERRY FERNANDEZ, in his individual capacity; DETECTIVE JACOB DUNCAN, in his individual capacity; DETECTIVE JEREMY ASHBEE, in his individual capacity; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association; COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual and official capacity; BJ MACFARLANE, in his individual and official capacity; KATHIE MUSE, in her individual and official capacity, and DOES 1 through 10, | Case No. 2:22-cv-01527-DAD-AC<br><br>**DECLARATION OF VANESSA SHAKIB IN SUPPORT OF COUNTER-DEFENDANT JESSICA LONG'S ANTI-SLAPP MOTION TO STRIKE COUNTERCLAIMS OF MELANIE SILVA AND BJ MACFARLANE PURSUANT TO CAL. CIV. PROC. CODE § 425.16**<br><br>[Anti-SLAPP Motion to Strike, Request for Judicial Notice, and Declarations of Ryan Gordon and Jessica Long filed concurrently]<br><br>Date: February 20, 2024<br>Time: 1:30 pm<br>Courtroom: 4, 15th Floor<br><br>Trial Date: February 10, 2025<br><br>Action Filed: August 31, 202 |

**DECLARATION OF VANESSA SHAKIB**

I, Vanessa Shakib, declare as follows:

1.      I am an attorney at law duly licensed to practice law before all the courts of the State of California and the District of Columbia, and am admitted to practice in the United States District Court for the Eastern District of California. I am over 18 years of age. I have personal knowledge of the matters set forth herein and, if called upon, I could and would competently testify thereto. I submit this declaration in support of Plaintiff and Counter-Defendant Jessica Long's Notice of Motion and Anti-SLAPP Motion to Strike Counterclaims of Melanie Silva and B.J. Macfarlane Pursuant to California Code of Civil Procedure Section 425.16.

2.      I am the attorney of record for Plaintiff Jessica Long ("Mrs. Long") and her minor daughter, Plaintiff E.L., proceeding by and through her guardian ad litem, Mrs. Long, in the above captioned action.

3.      I am co-founder and co-director of Advancing Law for Animals ("ALA"). ALA is a nonprofit law firm that operates in the public interest and circulates press releases regarding its work. In addition to the practice of animal law, I teach animal law as an Adjunct Associate Professor of Law at Southwestern Law School in Los Angeles, California. In furtherance of animal advocacy and related public interest issues, I travel across the nation and around the world for speaking engagements regarding ALA's work. The underlying facts of this case, as well as the subsequent civil rights litigation, has captured public interest and received widespread media attention.

4.      On November 13, 2023, my office conducted the deposition of Defendant Kathie Muse ("Mrs. Muse"). Ryan Gordon and I were in attendance. The period for making deposition corrections expires on  January 1, 2024. Attached as Exhibit 1 is a true and correct copy of excerpts from Mrs. Muse's deposition.

5.      With respect to organizing the 4-H/FFA Community Barbeque ("Government Barbeque"), as referenced in the concurrently filed memorandum, Mrs. Muse testified:

> Q.      *And what did you do to -- with respect to that barbecue? Were you an organizer of it?*
>
> A.      *Correct.*

1    Ex. 1 (Muse Dep. 83:08-10).

2    6.    Regarding Cedar's ownership after the junior livestock auction, Mrs. Muse testified:

3    *Q.    .... It's your contention that the Dahles purchased it and then it became
4    property of you or -- or the 4-H barbecue?*

5    *A.    The 4-H/FFA community barbecue.*

6    *....*

7    *Q.    ...Your contention is that the barbecue became the owner because he –
8    he donated the cuts of meat whenever they arrived to the barbecue*

9    *A.    Correct.*

10   Ex. 1 (Muse Dep. 78:20-79:05).

11   7.    With respect Mrs. Muse's contention that Mrs. Long removed Cedar as a political

12   statement, as referenced in the concurrently filed memorandum, Mrs. Muse testified:

13   *Q.    Okay. So you -- okay. So you thought she was making a political
14   statement almost with animals, and -- and this was preplanned to
     accommodate that statement or something like that?*

15   *A.    That was my opinion, yes.*

16

17   *.....*

18   *Q.    Okay. So you thought it was preplanned because it was a political
     statement and -- and, of course, you disagreed with that political statement, yes -
19   - or that –*

20   *A.    Personally.*

21   *Q.    -- was your plan?*

22   *A.    Yes. (Nodding.)*

23   Ex. 1 (Muse Dep. 171:02-172:07).

24   8.    With respect to Mrs. Muse's testimony contending the Shasta Fair Association provided

25   replacement goat meat for the Government Barbeque, as referenced in the concurrently filed

26   memorandum, Mrs. Muse testified:

27

28   *Q.    Okay. So Cedar was alive till the 28th. Okay. And what -- what had hap -
     - what happened to him afterwards after he was killed?*

3

ADVANCING LAW FOR ANIMALS

ADVANCING LAW FOR ANIMALS

> *A.      He was given back to the Shasta Live- --Junior Livestock Auction board. He was given back to the Junior Livestock Auction.*
>
> *...*
>
> *They replaced it to me for the barbecue. The fair board or the Junior Livestock Auction replaced that fair to us -- or replaced Cedar so that we had a goat at the auction.*
>
> *...*
>
> *Q.      So did he even go to any of -- anyone's plate, or is he -- was he just killed to go back to Shasta -- to the fair as reimbursement?*
>
> *A.      I don't know what happened. My understanding, what I was told was he went back to somebody that had a problem with another goat that had been butchered. So we, in turn, replaced Cedar with that goat.*

Ex. 1 (Muse Dep. 204:13-205:20).

9.      With respect to who knows where Cedar's meat went following his slaughter, as referenced in the concurrently filed memorandum, Mrs. Muse testified:

> *Q.      …So he just went to an individual -- to a private -- a private party then is your understanding?*
>
> *A.      My understanding, yes.*
>
> *Q.      Okay. Do you know who that private party was?*
>
> *A.      No.*
>
> *Q.      Okay. Do you know who would know?*
>
> *A.      Probably the Shasta District Fair.*
> *....*
>
> *A.      Probably Melanie.*

Ex. 1 (Muse Dep. 235:19-236:10).

10.     On November 14, 2023, my office conducted the deposition of Defendant and Counterclaimant Melanie Silva ("Ms. Silva"). Ryan Gordon and I were in attendance. The period for making deposition corrections expires on  January 1, 2024. Attached as Exhibit 2 is a true and correct copy of excerpts from Mrs. Muse's deposition.

11.     With respect to whether or not Mrs. Long received the Local Indemnity Provision upon online entry or afterward, as referenced in the concurrently filed memorandum, Ms. Silva testified:

> Q.     *I understand. Okay. Okay. So this Accountability and Liability, this is -- this -- when Jessica registered, does she get a copy of this anywhere?*
>
> A.     *I am not sure. She could always request one.*
>
> Q.     *Is it presented to her during the log-in?*
>
> A.     *Before you sign in. Before you sign, I'm sure there's a drop -- you know, you do the drop-down.*
>
> Q.     *Are you sure or –*
>
> A.     *I'm not. I would have to look.*

Ex. 2 (Silva Dep. 294:13-294:24).

12.     With respect to participants signing up online can opt-out of or negotiate any aspect of the Local Indemnity Provision, as referenced in the concurrently filed memorandum, Ms. Silva testified:

> Q.     *Okay. When the person's going through the -- the portal and putting their information in, is there -- is there any option for them to opt out of any of these documents, like the -- the fair rules or the -- or the -- the -- accountability and liability form?*
>
> A.     *Not as far as I know.*
>
> Q.     *Okay. All right. They can't put, like, a protest or anything in there? It's just check "I agree" or don't participate?*
>
> A.     *As far as I know, there's not a way to opt out.*
>
> Q.     *Okay. Okay. Is there any way to negotiate any of the aspects of it?*
>
> A.     *No.*

Ex. 2 (Silva Dep. 298:24-299:13).

13.     With respect to whether the Local Indemnity Provision is included in the Exhibitor Handbook, as referenced in the concurrently filed memorandum, Ms. Silva testified:

> Q.     *Okay. But it's -- it's not -- to your knowledge, it's not in the guidebook?*
>
> A.     *I didn't read through the livestock to make sure it's not in that section.*

ADVANCING LAW FOR ANIMALS

**ADVANCING LAW FOR ANIMALS**

Q. *Oh, you can just take a moment and do it. I don't -- I don't believe it is. I'm not trying to make you read more rules. I just didn't -- I --just to confirm on the record, you can take a look at mine, which is -- or if you can pull up -- if you would, pull up exhibit -- because I -- I didn't see the one rule before that you skipped over also, so I do want to make sure it's not -- there's nothing I'm missing in there that is contained in that section. Again, I don't see it.*

A. *It may just be online.*

...

Q. *So you -- you said you would check with your computer person. That's how you would tell if Jessica would get a copy of this waiver, correct?*

A. *If she would be able to print one out if she wanted one, yes.*

Q. *Okay. All right. Okay. And to your knowledge, it's not -- it's not in the guidebook. It would be -- this is through the –*

A. *Portal.*

Q. *-- online register por- -- is it called -- okay. A portal. That's a better name. I should have been saying that. So it's the online portal and it's through that. And -- okay. And it -- okay. So it's your understanding it's through that. It's not in the guidebook. She might have -- and you don't know if it was e-mailed to her or if it was available for viewing during the -- during the registration process, correct?*

A. *I will ask.*

Q. *Okay. All right. But as to those other things, it's not -- it's -- you didn't see an  indemnity clause in this, correct? It's -- it's not in here anywhere?*

A. *Correct.*

Q. *And I'm -- for the record, I'm pointing to the All General Livestock Rules and Guidelines, and it's not at any other point in the guidebook, correct? It's just on the online portal?*

A. *As far as I know, yes.*

Ex. 2 (Silva Dep. 295:17-296:06; 297:15-298:13).

14. With respect to the aftermath of the Viral Instagram Post, as referenced in the concurrently filed memorandum, Ms. Silva testified:

A. *We had to forward our phones because our phones were –*

Q. *Okay.*

6

DECLARATION OF VANESSA SHAKIB IN SUPPORT OF ANTI-SLAPP MOTION

ADVANCING LAW FOR ANIMALS

A.      *-- blown up.*

Q.      *From the Instagram post.*

A.      *From the Instagram post, from any media that grabbed it.*

Ex. 2 (Silva Depo. 49:02-13).

15.     With respect to discussion with Deputy Secretary of CDFA Michael Flores referenced in the concurrently filed memorandum, Ms. Silva testified:

A.      *... It was suggested to use the sheriff's office. They deal more with the livestock on the outskirts.*

Q.      *Okay. Who suggested that?*

A.      *Michael Flores with CDFA.*

...

A.      *I talked to Michael Flores.*

Q.      *Oh, you did talk to Michael. What – and when did you talk to him?*

A.      *I don't know what time. I just know that he was the one that suggested going through the sheriff's office.*

...

Q.      *Okay. All right. And what – and he – what did Mike Flores tell you on this call?*

A.      *He suggested going with the sheriffs because they have more to do with livestock than the CHP.*

...

Q.      *And by going to the sheriffs, you mean he suggested that you call the sheriffs and – and –*

A.      *That the sheriffs get contacted.*

Ex. 2 (Silva Dep. 257:08-257:17; 260:02-260:13; 262:01-262:19).

16.     On page 196 of her deposition transcript, Ms. Silva was presented with the Exhibitor Handbook, marked as Exhibit C to the deposition, and affixed to Exhibit 2, her deposition excerpts. The Exhibitor Handbook is also concurrently filed as RJN 2. On page 269 of her deposition transcript, Ms. Silva was presented with All General Livestock Rules and Guidelines, marked as Exhibit I to the

deposition. All General Livestock Rules and Guidelines is also concurrently filed as RJN 3. Ms. Silva was questioned over these documents as they relate to the actions she pursued in response to Mrs. Long and E.L.'s removal of Cedar. With respect to whether the Forfeiture Rule, as referenced in the concurrently filed memorandum, applied, and Ms. Silva testified:

> Q.  ... But here, you see where it says RULE COMPLIANCE in all caps?
>
> ...
>
> Q.  I just wanted to -- "Rule Compliance, colon: Any -- any exhibitor who fails to conform to accepted -- accepted standards of conduct will be removed immediately with livestock from the fairgrounds and all premiums and auction proceeds forfeited, if the situation is of a serious nature?" So my question is, why wasn't this rule sufficient to just kick E.L. and -- and Jessica off the fairgrounds with -- with livestock and – and all auction proceeds forfeited?
>
> A.  She had already completed everything. She had already sold her goat.
>
> Q.  Okay. But it says "auction proceeds forfeited," so that implies that for the rule auction -- that the sale had already taken place potentially within the language of this rule?
>
> A.  I actually didn't remember that rule being in place.
>
> Q.  Okay.
>
> ...
>
> Q.  But doesn't your rule say she should have just been kicked out and all her premiums and auction proceeds forfeited?
>
> A.  Everything was already done. There was nothing for us to kick her out of. And again, like I said before, I was not a -- I did not remember about the procedures forfeited.
>
> Q.  But doesn't this rule potentially apply to her noncompliance of the rules?
>
> A.  She had already sold the goat. The project was done.
>
> Q.  I understand. But doesn't that what "auction procedures forfeited" refer to –
>
> A.  I didn't remember that rule.
>
> ...
>
> Q.  Now that you see it here, doesn't this rule potentially apply?
>
> A.  No.
>
> Q.  And why not?
>
> A.  To me, the project was already complete.

8

Q.    *Then why have auction proceeds forfeited as -- as part of this?*

A.    *I didn't -- wasn't aware of that.*

Q.    *But now that you are, so doesn't this rule -- and I'm saying potentially, so --*

A.    *Potentially --*

Q.    *Potentially --*

A.    *-- yes.*

Ex. 2 (Silva Dep. 271:08-274:02).

17.    On page 275 of her transcript deposition transcript, Ms. Silva was presented with the State Fair Rules, marked Exhibit J to the deposition, and affixed to Exhibit 2, her deposition excerpts. The State Fair Rules are concurrently filed as RJN 1. Ms. Silva was questioned over that document with respect to the actions she pursued in response to Mrs. Long and E.L.'s removal of Cedar. With respect to the actions she pursued, as referenced in the concurrently filed memorandum, Ms. Silva testified:

Q.    *... So -- and the other rules you said to apply were the -- the state rules and ...*

...

Q.    *Okay. All right. So can you go to page -- so page 7 of that document. Okay. Okay. So paragraph 2. "The fair management shall deny entry or disqualify and remove any exhibit or exhibitor that is ineligible for competition under the State or 25 Local Rules or endanger to the public or has violated State and Local Rules. The fair may require removal of exhibitor and/or -- including animals from the fairgrounds."*

...

*(As read) "Exhibitors, leaders, advisors, and parents found, after a chance to provide evidence and hearing before the Fair Management and CEO of unethical practices as set forth in the State and Local Rules or in actions inimical with the fair program shall result in the exhibit being disqualified and the for- -- forfeiture of any awards and/or privileges as may be deemed appropriate to the circumstances of the Fair Management....*

...

Q.    *Okay. So why didn't these sorts of recourses for Jessica's behavior -- why -- why weren't these employed by you?*

<div style="margin-left:auto;">

A.    *The project was done.*

Q.    *I understand that. So shouldn't she have just been banned for 4-H -- from 4-H for five years or so after a hearing. And then there's -- and then there's a -- a -- and with the funds being – or forfeited?*

A.    *That's not how we chose to handle it.*

Q.    *I understand that. But these potentially could have been -- these are in the State Rules, these potentially -- potentially could have been followed as well, correct?*

A.    *They potentially could have been, but they were not.*

</div>

Ex. 2 (Silva Dep. 275:19-278:23).

18.    On page 235 of her deposition transcript, Ms. Silva was presented with her email of June 28, 2022 to Mrs. Long, in which Ms. Silva states "[m]aking an exception for you will only teach our youth that they do not have to abide by the rules set up for all participants[,]" marked as Exhibit G to the deposition, and affixed to Exhibit 2, her deposition excerpts. Ms. Silva was questioned about the email. With respect to what rules in State Fair Rules and Exhibitor Handbook she was enforcing in response to Cedar's removal, as referenced in her email and the concurrently filed memorandum, Ms. Silva testified:

<div style="margin-left:auto;">

Q.    *...Your e-mail's saying -- which rules did you want to enforce? Are you -- you wanted to enforce -- or you needed to enforce the rules. Well, you can't find a rule on recovering stolen property, so it's this thing and it's the terminal sale portion, that's what you're enforcing, correct?*

A.    *The rules, yes.*

Q.     *Okay.*

A.    *I -- yes.*

Q.    *Okay. All right. So -- and nothing else?*

A.    *All of the rules. The whole project is what I was referring to.*

...

Q.    *Okay. Okay. Okay. So just for the record, please -- and you have it there in front of you, just so we -- we're clear because we're in a lawsuit now, we need to know which ones. Which rule specifically were you -- just this terminal sale one? And then you said everything else. So just tell us which ones so we know.*

A.    *I don't know.*

</div>

> Q.    And you may -- you don't know. Okay. Okay. You don't know. Okay. Is
>       there anything you  could do to refresh your memory on which – which
>       ones that you -- on which rules you're referring to in your e-mail?
>
> A.    No.

Ex. 2 (Silva Dep. 285:24- 287:17).

19.    On page 288 of her deposition transcript, Ms. Silva was presented with an email from her to Lieut. Fernandez, containing documents defined in the concurrently filed memorandum as Mrs. Long's Offer to Pay Damages and Notice of Civil Claim and Intention to Sue, marked as Exhibit K to the deposition, and affixed to Exhibit 2, her deposition excerpts. With respect to Lieut. Fernandez receipt these documents, as referenced in the concurrently filed memorandum, Ms. Silva tested testified:

> Q.    Ms. Silva, I'm handing you a copy of an e-mail that's dated 6/29/22. It
>       purports to be from you to Jerry Fernandez. Took take a look.
>
> (Exhibit K was marked.)
>
> ...
>
> So it was after lunch – or after noon you send this e-mail to Fernandez.
> Do you recall doing this?
>
> A.    Yes.

Ex. 2 (Silva Dep. 288:03-23).

20.    With respect to who ultimately received Cedar's meat after his slaughter, as referenced in the concurrently filed memorandum, Ms. Silva testified:

> Q.    Is that testimony accurate? Did – was Cedar's -- was Cedar's meat
>       directed back to the fair and then -- then given to another private buyer?
>
> A.    I don't know.
>
> Q.    You don't know. Who would know?
>
> A.    Kathie Muse.
>
> Q.    She would know what the fair did with Cedar's meat?
>
> A.    It did not come back to the -- like, physically come back to the
>       fairgrounds.
>
> Q.    Okay. Where did it physically go?
>
> A.    I don't know.

---

11

ADVANCING LAW FOR ANIMALS

Q.    Okay. How do you know it didn't come physically back to the fairgrounds?

A.    (Indicating.)

Q.    Do you know where it went?

A.    No.

Q.    Do you know who received it?

A.    No.

Q.    Okay. Do you know anything about Cedar's meat that happened to it after he died?

A.    No.

Ex. 2 (Silva Dep. 80:11-81:07).

21.    With respect to public reaction following the underlying civil rights litigation, as referenced in the concurrently filed memorandum, Ms. Silva testified:

A.    I have a Goat 2022 for all of my lovely e-mails.

Q.    For all your -- your e-mails?

A.    All my unfriendly e-mails, yes.

Q.    We didn't get -- we didn't get copies of them, I don't believe.

A.    You want the hostile ones that aren't to do with the Longs? I mean, they not -- they're from the Longs but –

Q.    No, I understand that. But they relate –

A.    I have, like, 5,000.

Q.    They relate to Cedar.

A.    Not -- death threats from –

Q.    Don't they –

A.    -- people?

…

Q    Okay. Okay. And these are – ok. All right. And from various days.

A.    And nothing to do with who's in the suit. It's all outside public random –

Q.    Public Random

A.    -- people.

Ex. 2 (Silva Depo. 139:19-140:19).

22.     Attached as Exhibit 3 is a true and correct copy of documents produced to my office by Shasta District Fair and Event Center and Government Employees on about November 13, 2023, comprising the auction invoice of Cedar, as confirmed in the deposition of Ms. Silva, Exhibit 2 at 215. These documents reference Cedar as Invoice 132 and/or Tag ID 367; indicate State Senator Brian Dahle and Assemblymember Megan Dahle as buyers of number 376; and indicates a donation to the Government Barbecue.

23.     Attached as Exhibit 4 is a true and correct copy of documents produced to my office by Melanie Silva on about December 18, 2023, which are correspondence between Ms. Silva and Shasta Fair Association Board of Director members.

24.     Exhibit 4 at 1 indicates, on June 28, 2022, Ms. Silva emailed Board of Director members, stating "Due to the extreme number of calls I have the phones forwarded…."

25.     Exhibit 4 at 8 indicates, on April 6, 2023, a member of the Shasta County Fair Association Board of Directors stated in an email, "With the extreme blowback recently of media (social, podcasts, local, regional and national) surrounding the goat incident, I have been included in hundreds of Twitter mentions along with Governor Newsome [sic] – [sic] as that relates to letters of complaint to Melanie and our Governor."

26.     Exhibit 4 at 8 indicates, on April 7, 2023, a member of the Shasta County Fair Association Board of Directors stated in an email, "I am pretty sure that all board members have been dragged through the mud on social media."

27.     On November 15, 2023, my office conducted the deposition of Defendant and Counterclaimant B.J. Macfarlane ("Mr. Macfarlane"). Ryan Gordon and I were in attendance. The period for making deposition corrections expires on January 1, 2024. Attached as Exhibit 5 is a true and correct copy of excerpts from Mr. Macfarlane's deposition.

28.     With respect to Mrs. Long's level of involvement in the Viral Instagram referenced in the concurrently filed memorandum, Mr. Macfarlane testified:

> Q.     *Well, that's what I'm asking. At the time, did you think that Jessica was the one, you know –*

ADVANCING LAW FOR ANIMALS

ADVANCING LAW FOR ANIMALS

> A.    *I thought she had some involvement, but I -- the Bleating Heart, I knew had some involvement, too.*
>
> Q.    *Yes, I understand. I understand you knew Bleating Hearts would have some involvement. But you also thought from what you said a moment ago –*
>
> A.    *Yeah.*
>
> Q.    *-- that Jessica also wanted people to contact the fairgrounds to help save Cedar.*
>
> A.    *Yeah.*
>
> ...
>
> Q.    *Okay. So then you -- so at the time, did you think that Jessica was potentially working with -- with people in the animal rights community?*
>
> A.    *Yeah, it's potentially -- I didn't –*
>
> Q.    *Was that -- I mean –*
>
> A.    *Potentially….*

Ex. 5 (Macfarlane Dep. 151:01-05; 155:16-24).

29.    On page 180 of his deposition transcript, Mr. Macfarlane was presented with a text chain, marked as Exhibit F in the deposition, and affixed to Exhibit 5, his deposition excerpts. With respect to a July 11 text from Mr. Macfarlane to Mrs. Muse, stating "Good morning … Talked to sheriff and he said to wait until he talks to DA before we kill goat," as referenced in the concurrently filed memorandum, Mr. Macfarlane testified:

> Q.    *…. Okay. So ... when you say the sheriff here, do you know -- "talked to sheriff." Do you know who you –*
>
> A.    *Johnson.*
>
> Q.    *Johnson. Okay. And the -- and as far as the DA here, do you know which DA you're talking about?*
>
> A.    *It's a woman. I do not know her name.*
>
> Q.    *Is it -- so if you go to the last page of that, is it Stephanie Bridgett, by chance? ...*
>
> A.    *Yeah. That would be the district attorney, yeah. I don't know her and –*
>
> Q.    *Okay. So you were waiting on the sheriff and the District -- District Attorney and the CDFA to determine what to do with -- with Cedar?*
>
> A.    *Yes.*

1    Ex. 5 (Macfarlane Dep. 204:16-205:07).

2    30.    With respect to who knows where Cedar's meat went following his slaughter, as

3    referenced in the concurrently filed memorandum, Mr. Macfarlane testified:

> *Q    Gotcha. And I forgot to ask you. So Cedar went to Bowman. What happened to Cedar's – his remains afterwards?*
>
> *A    There -- he replaced -- I didn't do the paperwork, but I believe he replaced the goat that was taken in Cedar's place from the resale animals to go to the barbecue.*
>
> *Q    Okay. So Cedar went to another bidder from the Junior Livestock Auction?*
>
> *A    Yes. Maybe. I believe that's what happened.*
>
> *Q    Who would know for sure on that?*
>
> *A    I believe Melanie would.*
>
> *Q    Okay.*

Ex. 5 (Macfarlane Dep. 215:09-217:22).

31.    With respect to public reaction following the underlying civil rights litigation, as referenced in the concurrently filed memorandum, Mr. Macfarlane testified:

> *Q.    So why -- why did you resign because of the lawsuit? You weren't -- you were not named originally.*
>
> *A.    I was not named, but the amount of social media and -- phone calls and just ridicule I got –*
>
> *Q.    Yeah.*
>
> *A.    -- from across the country was more than I ever wanted to deal with again.*
>
> *...*
>
> *... That's why I changed my phone number when they started threatening my family.*

Ex. 5 (Macfarlane Dep. 31:21 - 33:03).

32.    On November 15, 2023, my office conducted the deposition of Lieutenant Jerry Fernandez ("Lieut. Fernandez"). Ryan Gordon and I were in attendance. The period for making deposition corrections expired on  November 13, 2023 and no changes were made. Attached as Exhibit 6 is a true and correct copy of excerpts from Lieut. Fernandez's deposition.

DECLARATION OF VANESSA SHAKIB IN SUPPORT OF ANTI-SLAPP MOTION

33.     With respect to what prompted his investigation of Mrs. Long, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified:

> Q.     *Okay. So when did you first learn of Jessica removing Cedar from the -- when I say "the fair," I mean the 2022 Shasta County District Fair.*
>
> A.     *I first learned about it when -- I want to say it was either the very end of June or beginning of July.*
>
> Q.     *And who told you?*
>
> A.     *I was -- the Sheriff, Michael Johnson, told me that I needed to reach out to the fair or people from the fair in regards to a theft of a goat.*
>
> Q.     *Okay. Michael Johnson. You said the Sheriff. So he's the elected Sheriff?*
>
> A.     *He is the elected Sheriff, yes.*

Ex. 6 (Fernandez Dep. 77:10-21).

34.     On page 130 of the transcript, Lieut. Fernandez was presented documents he produced in discovery in this case, bates numbered as FERN000044 through FERN000048, and affixed to Exhibit 6, his deposition excerpts. Those documents contain correspondence defined in the concurrently filed memorandum as Mrs. Long's Notice of Civil Claim and Intention to Sue. With respect to having notice of Mrs. Long's alleged civil claim, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified he reviewed those documents, Exhibit 6 (Fernandez Dep. 130:19-131:01), and further testified:

> Q.     *It says "This letter is not a waiver of my rights. Further, while it's purpose is in anticipation of litigation. I'm equally sending this letter to resolve the matter."*
>
> A.     *The phrase "anticipation of litigation," what does that suggest to you, or what did it suggest to you at the time?*
>
> A.     *So her writing this "Further, while it's purpose is in anticipation of litigation," that's telling me that she's planning to go to court on this.*
>
> ...
>
> Q.     *She's claiming a property dispute. Yes?*
>
> A.     *She's anticipating some sort of legalities or court.*
>
> Q.     *Over the property?*
>
> A.     *Based on what she's writing.*
>
> Q.     *Yes.*

ADVANCING LAW FOR ANIMALS

A.      Yes.

Q.      But over property?

A.      Yes.

Ex. 6 (Fernandez Dep. 135:08-136:05).

35.      With respect to how Cedar came into the possession of Mr. Macfarlane, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified:

A.      And then due to the time of -- projected time of our arrival back into Shasta County, Ms. Muse requested that we leave the goat in the care and custody of Mcfarlane.

Q.      Okay. So did you speak with Kathi Muse on the phone?

A.      Yes.

Q.      Okay. What did you -- what did she say on the phone?

A.      Just -- I can't recall everything she said. I think she was excited that we got the goat and that to -- based on the time of night, to just leave it with her agent, which would have been Mcfarlane.

Ex. 6 (Fernandez Dep. 269:16-270:10).

36.      With respect to the reaction of other fair board's to Cedar's removal, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified:

A      It was a big deal with a lot of the fair boards within Shasta County.

Q      Where else was it a big deal?

A      I don't know the names of those fairs.

Q      Do you know -- do you know -- oh, well you said "fair boards."

A      Yeah.

Q.      So what other fairs? Are there other fairs in Shasta County? I thought it was one per county.

A.      No, the State of California.

Q.      The State. Okay. What other fairs was it a big deal with, if you know?

A.      I don't know those -- I don't know the particulars on that.

Q.      Who did you hear it from?

A.      The Sheriff.

Q.      The Sheriff. Okay.

A.      That people were pissed that Cedar was removed?

17

ADVANCING LAW FOR ANIMALS

> A.      *Yeah, I think it was -- or from my recollection, it was reported to him that this is -- right, that this is not -- yes, it affects Shasta District Fair and we have to investigate it, but there's other fair boards reaching out  to our fair board about this is pretty serious stuff ....*

Ex. 6 (Fernandez Dep. 277:13-279:03).

37.      On August 23, 2023, my office conducted the deposition of Defendant Detective Jeremy Ashbee ("Det. Ashbee"). Ryan Gordon and I were in attendance. The period for making deposition corrections expired on  November 18, 2023, and no changes were made. Attached as Exhibit 7 is a true and correct copy of excerpts from Det. Ashbee's deposition.

38.      With respect to applying for a search warrant, Det. Ashbee testified:

> Q.      *How did you learn of that alleged removal?*
>
> A.      *I heard from it from Lieutenant Jerry Fernandez.*
>
> ...
>
> Q.      *Why was he in your office?*
>
> A.      *To ask me to write a search warrant.*
>
> ...
>
> A       *I don't recall if he -- I don't think he handed me any documents. I think it was -- he was in the room, but he sent them.*
>
> Q       *Okay. Yeah, I believe it was email. I'll have you verify the email in just a second. I'm just seeing what you recall. Okay. So he probably emailed you the documents, but he might have been in the room with you.*
>
> A       *We -- he briefly went over the first two documents, the ones that are attached to the warrant.*
>
> ...
>
> *And he instructed that those should be attached to the warrant*
>
> ...
>
> *He -- he told me what I put into the probable cause narrative is what he had relayed to me.*

Ex. 7 (Ashbee Depo. 79:23-80:21; 83:08-84:17).

39.      On page 86 of his deposition transcript, Det. Ashbee was presented with the documents marked as Exhibit C in the deposition, and affixed to Exhibit 7, his deposition excerpts. These documents correspondence defined in the concurrently filed memorandum as Mrs. Long's Notice of

ADVANCING LAW FOR ANIMALS

1     Civil Claim and Intention to Sue. With respect to the documents Det. Ashbee reviewed for the warrant,

2     as referenced in the concurrently filed memorandum, Det. Ashbee testified:

3              Q.     *Okay. All right. And -- okay. So my next question is did your -- okay. So*

4                        *the next page is 158. This is an email from Melanie Silva. Did you review*
                       *this email?*

5              A.     *No.*

6              Q.     *Okay. Did you read it? You didn't read it on your own?*

7              A.     *No, I haven't.*

8              Q.     *Well, why do you think -- why did you not read it if Fernandez sent it to*
                       *you?*

9              A.     *He told me specifically the ones that were important to his investigation*

10                    *or that he wanted attached to the warrant.*

11              ...

12              Q.     *So the next -- the next page. Now, this is – the next one starts at 159. This*
                       *is another email, which by its face appears to be from just -- from the*

13                    *person you're investigating for criminal theft, our client, Jessica. Jessica*

14                    *Long, she signed Jessica Long. Did you read this email and the*
                   *attachment on it?*

15              A.     *Oh, was this the attachment?*

16              Q.     *Yes.*

17              A.     *No, not in its entirety.*

18              ...

19              Q.     *Do you believe you read it that day?*

20              A.     *No, I don't -- like I said, I don't think I've read it in its entirety. I think I*
                   *kind of solved this part of the attachment.*

21              Q.     *Why wouldn't you read an email from the person you're investigating?*

22                    *Isn't that an admission of something?*

23              A.     *Because I'm not --*
             ...

24              Q.     *You're not investigating, but you're still doing this.*

25              A.     *No, I'm not investigating.*

26              Q.     *Okay. You're not doing the investigating. But you're doing the -- you're*
                   *doing the Affidavit of Probable Cause, swearing everything he is telling*

27                    *you is true. So why wouldn't you read this email if it's true?*

28              A.     *Because I have no reason to believe what he's telling me is not true.*

ADVANCING LAW FOR ANIMALS

Q.      *Is it the policy of Shasta County that the word of an officer trumps written evidence?*

...

A.      *There is no policy. I'm not saying that it trumps evidence. I'm saying I have no reason to believe he is not presenting me with evidence.*

Q.      *Okay. Is there any -- Is there policy with respect to -- that requires you to read all evidence you're presented?*

Q.      *If you're filling out an a warrant?*

A.      *No, there's, no policy to that nature.*

Ex. 7 (Ashbee Dep. 97:05-17, 98:04-99:15; 131).

40.      On August 22, 2023, my office conducted the deposition of Detective Jacob Duncan ("Det. Duncan"). Ryan Gordon and I were in attendance. The period for making deposition corrections expired on  October 13, 2023 and no changes were made. Attached as Exhibit 8 is a true and correct copy of excerpts from Det. Detective's deposition.

41.      With respect to driving several hundred miles from Shasta County to Napa County to locate Cedar, but not finding him at Bleating Hearts Sanctuary, as referenced in the concurrently filed memorandum, Det. Duncan testified:.

Q.      *...  And you didn't find -- well, okay. Didn't find Cedar at her -- at Bleating Hearts, correct?*

A       *No.*

...

Q.      *Okay. All right. And -- okay. What did you do when you left their property?*

A.      *Well, in my conversation with Kristin and review of her emails, I discovered that Cedar was at Billy's Mini Goat Farm in Sonoma.*

Q.      *Okay. So you concluded that in your investigation. What did you -- so about what time -- about what time did you leave the Bleating Hearts?*

A.      *I think we left directly following when that interview ended. We went directly to Billy's Mini Goat Farm in Sonoma.*

Ex. 8 (Duncan Dep. 144:25 – 147:17).

42.     Attached as Exhibit 9 is a true and correct copy of documents produced to my office by Mrs. Muse on about November 13, 2023, which include text messages between Mr. Macfarlane and Mrs. Muse.

43.     Exhibit 9 at 2 indicates, on July 11, 2022, Mr. Macfarlane texted Mrs. Muse, explaining, "Good morning … Talked to sheriff and he said to wait until he talks to DA before we kill goat."

44.     Exhibit 9 at 3 indicates, on July 28, 2022, Mr. Macfarlane texted Mrs. Muse, "Bowman is killing goat today finally.

45.     Exhibit 9 at 6 indicates, on September 1, 2022, Mr. Macfarlane texted Mrs. Muse, stating "My phone has not stop ringing. Busllshit. [sic][.]"

46.     Exhibit 9 at 4 indicates Mrs. Muse reacted to the underlying litigation over text to Mr. Macfarlane, stating, "What a bunch of shit [angry-face emoji][.]"

47.     Exhibit 9 at 4 indicates Mr. Macfarlane responded to the text message quoted in the preceding paragraph, stating "I sent to Melanie and Jerry. Told Melanie to send to Cdfa [sic] to get this taken care of quickly in the media."

48.     Attached as Exhibit 10 is a true and correct copy of documents produced to my office by Mr. Macfarlane on about December 19, 2023, which include text messages between Mr. Macfarlane and Melanie Silva (duplicative texts in original).

49.     Exhibit 10 at 2 indicates, on July 22, Mr. Macfarlane texted Ms. Silva, "Kathy [sic] said ok but no one needs to know about this. U me and Kathy are only ones. It got killed and donated to non profit if anyone asks."

50.     Attached as Exhibit 11 is a true and correct copy of documents produced to my office Mrs. Muse on about November 13, 2023, which include correspondence from the Shasta County Office of the District Attorney to Mrs. Muse, declining prosecution of Mrs. Long.

51.     Attached as Exhibit 12 is a true and correct copy of correspondence my office received on October 20, 2023 from the Deputy Attorney General demanding indemnification.

52.     Attached as Exhibit 13 is a true and correct copy of correspondence from my office to the Deputy Attorney General, denying indemnification, outlining the legal justification for denial, stating Mrs. Long's intention to file an anti-SLAPP motion if the demand is not withdrawn, and

ADVANCING LAW FOR ANIMALS

describing the basis of the special motion to strike. This correspondence was in furtherance of pre-filing meet and confer efforts.

53.    Attached as Exhibit 14 is a true and correct copy of correspondence from the Deputy Attorney General to my office, claiming an anti-SLAPP motion is unfounded. The Government Employee's counterclaim for express indemnity asserts E.L. is a third party with respect to Mrs. Long's indemnity obligations. Ex. 14 at 1.

54.    Attached as Exhibit 15 is a true and correct copy of the print edition rendering of Sam Stanton, *9-year-old California girl wanted to save her goat from slaughter. Then came the search warrant*, THE SACRAMENTO BEE (Updated March 31, 2023, 10:22 AM), *https://www.sacbee.com/news/local/article273127820.html#storylink=cpy*. Mr. Stanton provided my office with the rendering on March 29, 2023.

55.    Attached as concurrently filed Request for Judicial Notice ("RJN") 1, and incorporated into this declaration by reference, is a true and correct copy of CAL. DEP'T OF FOOD & AGRIC., 2022 STATE RULES FOR CALIFORNIA FAIRS, *available at* *https://www.cdfa.ca.gov/FairsAndExpositions/Documents/Circular_Letters/2022/2022_State_Rules.pdf* , which I retrieved from the website listed in the citation on December 22, 2023.

56.    Attached as concurrently filed RJN 2, and incorporated into this declaration by reference, is a true and correct copy of ENTRY INFORMATION AND GUIDELINES, defined in the concurrently filed memorandum as the Exhibitor Handbook, which I retrieved from the following website on December 22, 2023: https://web.archive.org/web/20220527194342/https://www.shastadistrictfairandeventcenter.com/enter-your-stuff./. This archival website displays the contents of the Exhibitor Handbook, as it existed on the webpage on May 27, 2022. All links displayed on this page, once clicked and assembled together, comprise the Exhibitor Handbook.

57.    Attached concurrently filed RJN 3, and incorporated into this declaration by reference, is a true and correct copy of ALL GENERAL LIVESTOCK RULES AND GUIDELINES, produced to my office by Shasta District Fair and Event Center and Government Employees on about November 13, 2023.

58.     Attached as concurrently filed RJN 4, and incorporated into this declaration by reference, is a true and correct copy of the warrant obtained by Det. Ashbee, produced to my office by Det. Ashbee on about May 9, 2023.

59.     The warrant contains the Viral Instagram Post, as defined and referenced in the concurrently filed memorandum. RJN 4 at ASHB000027.

60.     Attached as concurrently filed RJN 5, and incorporated into this declaration by reference, is a true and correct copy of Nicholas Kristof, *What a Girl's Goat Teaches Us About Our Food*, THE NEW YORK TIMES (Apr. 15, 2023), https://www.nytimes.com/2023/04/15/opinion/goat-girl-slaughtered-california.html, which I retrieved from the website listed in the citation on December 22, 2023.

61.     Attached as concurrently filed RJN 6, and incorporated into this declaration by reference, is a true and correct copy of Vimal Patel, *A Fair Auctioned a Beloved Goat. Its Owners Filed a Federal Lawsuit*, THE NEW YORK TIMES (Sep. 2, 2022), https://www.nytimes.com/2022/09/02/us/goat-cedar-auction-shasta-county.html, which I retrieved from the website listed in the citation on December 22, 2023.

62.     Attached as concurrently filed RJN 7, and incorporated into this declaration by reference, is a true and correct copy of Jonathan Edwards, *A girl refused to sell her goat for slaughter. Then came law enforcement*, THE WASHINGTON POST (Apr. 3, 2023, 9:22 PM) https://www.washingtonpost.com/nation/2023/04/03/goat-slaughter-lawsuit/, which I retrieved from the website listed in the citation on December 22, 2023.

63.     Attached as concurrently filed RJN 8, and incorporated into this declaration by reference, is a true and correct copy of Salvador Hernandez, *Girl didn't want goat slaughtered; officials sent deputies*, LOS ANGELES TIMES (Updated Apr. 1, 2023, 8:01 AM), https://www.latimes.com/california/story/2023-03-30/goat-slaughter-shasta-county-fair, which I retrieved from the website listed in the citation on December 22, 2023.

64.     Attached as concurrently filed RJN 9, and incorporated into this declaration by reference, is a true and correct copy of Jon Brown, *California mother sues cops after 'sham criminal pursuit' ends in slaughter of daughter's pet goat*, FOX NEWS (Apr. 4, 2023),

https://www.foxnews.com/us/california-mom-sues-cops-after-sham-criminal-pursuit-cops-ends-slaughter-daughters-pet-goat, which I retrieved from the website listed in the citation on December 22, 2023.

65.     Attached as concurrently filed RJN 10, and incorporated into this declaration by reference, is a link to true and correct copy of *CNN Tonight* (CNN television broadcast Apr. 3, 2023), which this office uploaded at the following link: https://www.youtube.com/watch?v=hdDxa8IM8zA.

66.     Attached as concurrently filed RJN 11, and incorporated into this declaration by reference, is a true and correct copy of Dani Anguiano, *A girl wanted to keep the goat she raised for a county fair. They chose to kill it*, THE GUARDIAN (Sep. 2, 2022, 19:41 PM) https://www.theguardian.com/us-news/2022/sep/02/goat-cedar-county-fair-auction-california, which I retrieved from the website listed in the citation on December 22, 2023.

67.     Attached as concurrently filed RJN 12, and incorporated into this declaration by reference, is a true and correct copy of Michele Chandler, *A family tried to save their auctioned goat from slaughter. Now they are suing police who took it*, USA TODAY (Updated April 2, 2023, 12:23 pm), https://www.usatoday.com/story/news/nation/2022/09/03/california-family-sues-police-goat-auction-slaughter/7988288001/, which I retrieved from the website listed in the citation on December 22, 2023.

68.     Attached as concurrently filed RJN 13, and incorporated into this declaration by reference, is a true and correct copy of Sam Stanton, *A California girl wanted to keep her baby goat alive. Her county fair killed it anyway*, THE SACRAMENTO BEE (Sep. 1, 2022, 12:11 PM), https://www.sacbee.com/news/local/article265138311.html#storylink=cpy, which I retrieved from the website listed in the citation on December 22, 2023.

69.     Attached as concurrently filed RJN 14, and incorporated into this declaration by reference, is a true and correct copy of Sam Stanton, *9-year-old California girl wanted to save her goat from slaughter. Then came the search warrant*, THE SACRAMENTO BEE (Updated March 31, 2023, 10:22 AM), *https://www.sacbee.com/news/local/article273127820.html#storylink=cpy*, which I retrieved from the website listed in the citation on December 22, 2023. This news article, published on the front-page of the print edition, contributed to public debate over government and police misconduct and taxpayer waste, explaining "Officers were permitted to "utilize breaching equipment to force open

ADVANCING LAW FOR ANIMALS

doorway(s), entry doors, exit doors, and locked containers in pursuit of their target…" and explaining law enforcement "gas purchase was $32.50 more than the fair district would have received as its share of the auction proceeds for Cedar, money the lawsuit says Long offered to repay to the fair."

70.     Attached as concurrently filed RJN 15, and incorporated into this declaration by reference, is a true and correct copy of Deborah Hastings, *Saga of Cedar the Goat and Girl Who Raised Him Goes Viral After Suit Says Deputies Drove 500 Miles to Take It*, INSIDE EDITION (April 6, 2023, 12:16 PM), https://www.insideedition.com/saga-of-cedar-the-goat-and-girl-who-raised-him-goes-viral-after-suit-says-deputies-drove-500-miles, which I retrieved from the website listed in the citation on December 25, 2023. This news article contributed to public debate over government and police misconduct and taxpayer waste, stating, "A California girl was devastated after her pet goat was seized by sheriff's deputies who drove 500 miles and crossed six counties to collect the animal, which apparently ended up becoming BBQ meat[.]"

71.     Attached as concurrently filed RJN 16, and incorporated into this declaration by reference, is a true and correct copy of Charles R. Davis, *A 9-year-old girl in California tried to save her beloved pet goat from a livestock auction. Then the police were called,* BUSINESS INSIDER (April 1, 2023, 4:42 PM), https://www.insider.com/lawsuit-police-seized-girls-pet-goat-cedar-after-auction-dispute-2023-3, which I retrieved from the website listed in the citation on December 22, 2023. This news article contributed to public debate over government and police misconduct, explaining, "A lawsuit accuses police of unjustly seizing a 9-year-old girl's pet goat amid a custody dispute."

72.     Attached as concurrently filed RJN 17, and incorporated into this declaration by reference, is a link to true and correct copy of The Problem with John Stewart, *Trump Indicted*, APPLE TV+      (April      6,      2023),      https://tv.apple.com/us/episode/trump-indicted/umc.cmc.6rfh8xygjlzq7it520zxha2qn, which this office uploaded at the following link: https://www.instagram.com/reel/CvcpVQvRf2L/?igsh=MTc4MmM1YmI2Ng==.

73.     Attached as concurrently filed RJN 18, and incorporated into this declaration by reference, is a true and correct copy of Gabriel Rosenberg and Jan Dutkiewicz, *The viral story of a girl and her goat explains how the meat industry indoctrinates children*, VOX (April 5, 2023, 7:00 AM), https://www.vox.com/future-perfect/23669586/goat-girl-4-h-shasta-county-seizure,  which  I  retrieved

ADVANCING LAW FOR ANIMALS

from the website listed in the citation on December 22, 2023. This news article contributed to the public debate over government misconduct and 4-H reform, explaining, "Many Americans might assume 4-H represents an organic expression of rural civic pride, but its history is deeply interwoven with the leviathan of federal power, particularly the US Department of Agriculture's efforts to cultivate capital-intensive, debt-financed agriculture across large swaths of rural America."

74.    Attached as concurrently filed RJN 19, and incorporated into this declaration by reference, is a true and correct copy of a Tweet I retrieved at the URL included in the following citation: Julia Shumway (@JMShumway), Twitter (Mar. 31, 2023, 8:55 PM), *https://twitter.com/JMShumway/status/1642012724979986432*. As of the date of this filing, this Tweet has 11.9 million views.

75.    Attached as concurrently filed RJN 20, and incorporated into this declaration by reference, is a true and correct copy of a Tweet I retrieved at the URL included in the following citation: Dr. Robert Rohde (@RARohde), Twitter (April 3, 2023, 3:10 AM), *https://twitter.com/RARohde/status/1642832024506359809*. As of the date of this filing, this Tweet has 2.5 million views.

76.    Attached as concurrently filed RJN 21, and incorporated into this declaration by reference, is a true and correct copy of a Tweet I retrieved at the URL included in the following citation: AskAubry (@ask_aubry), Twitter (April 1, 2023, 1:16 PM), *https://twitter.com/ask_aubry/status/1642259747301740546*. As of the date of this filing, this Tweet has 1.7 million views.

77.    Attached as concurrently filed RJN 22, and incorporated into this declaration by reference, is a true and correct copy of Care2 Team, *A Little Girl's Goat Was Seized, Slaughtered, and Eaten at a Community Barbecue. Justice for Jessica and Cedar*, CARE2 PETITIONS, https://www.thepetitionsite.com/takeaction/655/468/177/, which I retrieved from the website listed in the citation on December 14, 2023. As of the date of this filing, the above-referenced petition has 79,515 supporters.

78.    Attached as concurrently filed RJN 23, and incorporated into this declaration by reference, is a true and correct copy of Lex Talamo, *SIGN: JUSTICE FOR BELOVED GOAT SEIZED*

ADVANCING LAW FOR ANIMALS

*FROM 10-YEAR-OLD GIRL AND SENT TO SLAUGHTER*, Lady Freethinker, https://ladyfreethinker.org/sign-justice-for-beloved-goat-cedar-seized-and-slaughtered, which I retrieved from the website listed in the citation on December 14, 2023.  As of the date of this filing, this petition has 43,065 supporters.

79. Attached as concurrently filed RJN 24, and incorporated into this declaration by reference, is a true and correct copy of Summer Lin, *Mom sued fair that tracked down daughter's goat for slaughter. Now state agency is suing mom*, The Los Angeles Times (Updated Nov. 9, 2023, 2:12 PM), https://www.latimes.com/california/story/2023-11-09/california-attorney-general-countersues-family-whose-goat-was-slaughtered-after-they-backed-out-of-auction, which I retrieved from the website listed in the citation on December 22, 2023. This news article contributed to public debate over the priorities of Attorney General Rob Bonta in countersuing a family over the illegal slaughter of a child's beloved pet goat with taxpayer money.

80. Attached as concurrently filed RJN 25, and incorporated into this declaration by reference, is a true and correct copy of Greg Henderson, *A Girl, a Goat and the Law: The Shasta County, CA, Boondoggle*, Drovers (April 17, 2023), https://www.drovers.com/opinion/girl-goat-and-law-shasta-county-ca-boondoggle, which I retrieved from the website listed in the citation on December 22, 2023. This news article contributed to the public debate over government misconduct and its impact of the image of food producers, stating, "It is entirely possible the Shasta County, Calif., sheriff's office and the Shasta District Fair have tarnished your image as a food producer more than any radical animal rights group."

81. Attached as concurrently filed RJN 26, and incorporated into this declaration by reference, is a true and correct copy of Sheila Pell, *4-H Goat Controversy Raises Questions About Kids and Terminal Livestock Sales*, Modern Farmer (June 27, 2023), https://modernfarmer.com/2023/06/4-h-goat-controversy/, which I retrieved from the website listed in the citation on December 22, 2023. This news article contributed to the public debate over 4-H reform, asking, "In the 4-H system, children as young as nine relinquish their animals for slaughter. Is it time the system changed?"

82. Attached as concurrently filed RJN 27, and incorporated into this declaration by reference, is a true and correct copy of Sam Stanton, *Family sues over slaughter of pet goat by Shasta*

Advancing Law for Animals

1  *fair. Now, California officials suing them*, THE SACRAMENTO BEE (Updated Nov. 8, 2023, 5:02 PM),

2  https://www.sacbee.com/news/local/article281564528.html#storylink=cpy, which I retrieved from the

3  website listed in the citation on December 22, 2023. This news article contributed to public debate over

4  the priorities of Attorney General Rob Bonta in countersuing a family over the illegal slaughter of a

5  child's beloved pet goat with taxpayer money.

6       83.    Attached as concurrently filed RJN 28, and incorporated into this declaration by

7  reference, is a link to true and correct copy of On Balance with Leland Vittert, *California AG sues 9-*

8  *year-old's family over pet goat*, NEWSNATION (Nov. 10, 2023),

9  https://www.youtube.com/watch?v=ldpMKco1m5I. This segment aired on national television and

10  contributed to the public debate the priorities of Attorney General Rob Bonta in countersuing a family

11  over the illegal slaughter of a child's beloved pet goat with taxpayer money.

12       I declare under the penalty of perjury under the laws of the United States of America that the

13  foregoing is true and correct. Executed on December 26, 2023.

16
17  Dated: December 26, 2023             By: _____

                                              Vanessa Shakib

ADVANCING LAW FOR ANIMALS

DECLARATION OF VANESSA SHAKIB IN SUPPORT OF ANTI-SLAPP MOTION