# EXHIBIT 2

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*MELANIE SILVA*
*November 14, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File M. Silva.txt
**Min-U-Script® with Word Index**

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                        SACRAMENTO DIVISION

4    E.L., a minor, by and through    )
     her general guardian, JESSICA    )
5    LONG; JESSICA LONG, an           )
     individual,                      )
6                                     )
                        Plaintiffs,   )
7                                     )
        vs.                           )  NO. 2:22-cv 01527
8                                     )  DAD-AC
     LIEUTENANT JERRY FERNANDEZ,      )
9    individually and in his          )
     individual capacity as Sheriff   )
10   for the County of Shasta;        )
     DETECTIVE JACOB DUNCAN,          )
11   individually and in his          )
     individual capacity as Sheriff   )
12   for the County of Shasta;        )
     DETECTIVE JEREMY ASHBEE,         )
13   individually and in his          )
     individual capacity as Sheriff   )
14   for the County of Shasta; SHASTA )
     DISTRICT FAIR AND EVENT CENTER,  )
15   a district agricultural          )
     association; COUNTY OF SHASTA;   )
16   SHASTA COUNTY SHERIFF'S          )
     DEPARTMENT; MELANIE SILVA, in    )
17   her individual capacity; BJ      )
     MACFARLANE, in his individual    )
18   capacity; and DOES 1 through 10, )
                                      )
19                      Defendants.   )
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
20                        ---oOo---

21              TUESDAY, NOVEMBER 14, 2023

22                      9:41 a.m.

23       VIDEOTAPED DEPOSITION OF MELANIE SILVA

24                        ---oOo---

25       Reported by:  CAROL J. CHASE, CSR No. 13538

**MELANIE SILVA**

| | |
|---|---|
| 1 | now, so it's hard to differentiate. |
| 2 | Q    May -- you don't need to agree, but I'm |
| 3 | assuming it was the Instagram post that you flagged |
| 4 | and then there's some stuff after that.  Is that |
| 10:18:57 5 | what you were referring to at that time or is |
| 6 | that -- |
| 7 | A    We had to forward our phones because our |
| 8 | phones were -- |
| 9 | Q    Okay. |
| 10:19:03 10 | A    -- blown up. |
| 11 | Q    From the Instagram post. |
| 12 | A    From the Instagram post, from any media |
| 13 | that grabbed it. |
| 14 | Q    Yeah.  Okay.  So -- okay.  So July of -- |
| 10:19:14 15 | this is 2022, this meeting July 19th.  And you -- |
| 16 | you tell them that they're -- what -- so I know I |
| 17 | asked this just a moment ago and you somewhat |
| 18 | answered it.  But what exactly did you express to |
| 19 | the board at this meeting? |
| 10:19:27 20 | A    I couldn't tell you exactly what I |
| 21 | expressed -- |
| 22 | Q    Sure.  Paraphrase. |
| 23 | A    -- but I let them know that we had an |
| 24 | incident at fair, that it was blowing up on social |
| 10:19:34 25 | media and that the news outlets were reporting it |

**MELANIE SILVA**

1    questioning, you can have running objections.  You

2    don't need to restate them on the record.  I don't

3    want any speaking objections here at this point.

4    They stand.  If I ask another question again until I

10:58:38  5    move off this, they're on the record.  I won't --

6    you don't need to --

7              MR. BRIDGES:  Okay.

8              MR. GORDON:  -- state them every time.

9    BY MR. GORDON:

10:58:43  10    Q    Is that testimony accurate?  Did -- was

11    Cedar's -- was Cedar's meat directed back to the

12    fair and then -- then given to another private

13    buyer?

14    A    I don't know.

10:58:51  15    Q    You don't know.  Who would know?

16    A    Kathie Muse.

17    Q    She would know what the fair did with

18    Cedar's meat?

19    A    It did not come back to the -- like,

10:59:04  20    physically come back to the fairgrounds.

21    Q    Okay.  Where did it physically go?

22    A    I don't know.

23    Q    Okay.  How do you know it didn't come

24    physically back to the fairgrounds?

10:59:14  25    A    (Indicating.)

**MELANIE SILVA**

1       Q       Do you know where it went?

2       A       No.

3       Q       Do you know who received it?

4       A       No.

10:59:19  5     Q       Okay.  Do you know anything about Cedar's

6       meat that happened to it after he died?

7       A       No.

8       Q       Okay.  Did you -- but you knew he was --

9       you knew he was killed at some point, correct?

10:59:26 10     A       Somebody told me that he had been.

11      Q       Okay.  And who was that?

12      A       I don't know.

13      Q       Okay.  You issued a check to the Longs for

14      800-and-some dollars for Cedar's meat, correct?

10:59:37 15     A       Yes.

16      Q       That was in August, I believe, correct?

17      A       The end of July.

18      Q       End of July.  Okay.  So you knew Cedar was

19      killed by that point in time?

10:59:43 20     A       No.

21      Q       Why did you issue the check then?

22      A       All the kids get the check at the end of

23      July for their animals.

24      Q       But if their animal wasn't sold and killed,

10:59:52 25     why would she have been getting a check at that

**MELANIE SILVA**

1        Q        -- like that?  No?  It's all hard copies?

2        A        Uh-huh.

3        Q        So you -- if you have a document issue,

4    it's never an IT person that you call?

13:22:28  5        A        Correct.

6        Q        Okay.  All right.  So does that include --

7    how do you retain e-mails then, because those are

8    obviously not in a hard copy form?

9        A        Personally, I print what I want to keep.

13:22:40 10    And then I know there's a setting in there it will

11    delete -- I'm not sure -- 90 days maybe.

12        Q        So you believe that your -- your e-mail's

13    set up to auto delete on 90 days --

14        A        Yes.  Unless it's in a folder to save.

13:22:59 15        Q        Okay.  All right.  Do you -- how do you

16    determine whether something should be saved?

17        A        If it's from, like, CDFA or legal or --

18        Q        Any other categories?

19        A        I have a Goat 2022 for all of my lovely

13:23:16 20    e-mails.

21        Q        For all your -- your e-mails?

22        A        All my unfriendly e-mails, yes.

23        Q        We didn't get -- we didn't get copies of

24    them, I don't believe.

13:23:23 25        A        You want the hostile ones that aren't to do

**MELANIE SILVA**

```
 1    with the Longs?  I mean, they not -- they're from
 2    the Longs but --
 3        Q    No, I understand that.  But they relate --
 4        A    I have, like, 5,000.
13:23:32  5        Q    They relate to Cedar.
 6        A    Not -- death threats from --
 7        Q    Don't they --
 8        A    -- people?
 9        Q    I'll talk about it with your attorney.
13:23:40 10        MR. BRIDGES:  Yeah, we can talk about it.
11        THE WITNESS:  Yeah, I apologize.  I didn't
12    know you wanted -- there's about 5,000.
13    BY MR. GORDON:
14        Q    Okay.  Okay.  And these are -- okay.  All
13:23:46 15    right.  And from various days.
16        A    And nothing to do with who's in the suit.
17    It's all outside public random --
18        Q    Public random.
19        A    -- people.
13:23:55 20        Q    Gotcha.  All right.  So you saved them.
21    Did you -- so just generally what are your rules on
22    retaining e-mails if you could let me know or your
23    rules, the rules of your company or whatever for
24    retaining e-mails, because you said they're
13:24:07 25    automatically deleted, but some of them -- you
```

MELANIE SILVA

1  the front.  I don't know -- I don't know if this is

2  missing other pages.

3          Do you know how many pages the document

4  should be?

14:25:37  5      A     No.

6      Q     So it goes up to 87.  Okay.  Okay.  But

7  subject to missing a few pages here and there,

8  because they weren't available online for whatever

9  reason -- I'm not saying anything nefarious

14:25:53 10  happened.  But subject to not having, you know, a

11  few pages here and there may be absent, this -- this

12  is the document that you would call the premium book

13  or the guidebook or the handbook, correct?

14      A     Yes.

14:26:04 15      Q     Okay.  Make that Exhibit C.

16          (Exhibit C was marked.)

17  BY MR. GORDON:

18      Q     Okay.  Does -- has anyone ever come in and

19  asked to assemble a whole book for them?

14:26:25 20      A     No.  We just ask the what sections they

21  want.  They never want the whole thing.

22      Q     Because they're -- because each section

23  contains some different event going on at --

24      A     Correct.

14:26:35 25      Q     -- the fair, right?  Okay.  So when did you

**MELANIE SILVA**

1       Q       Established.  Okay.  That's a better word.

2  There you go.

3               Okay.  All right.  So give me one moment.

4       A       One of those is a bill.

14:43:48  5    Q       Yeah.  I think they both are.  I'm just

6  trying to figure out which one is Cedar here.  I

7  think they appear to be.  So one is for Brian Dahle

8  and one is for Kathie -- one is for Megan.  Okay.

9  All right.

14:44:02 10              Okay.  So are these the bills then for

11  Cedar?  You just tell me and these, I guess, we'll

12  make -- we'll make -- what exhibit are we on?

13              MS. SHAKIB:  E.

14              MR. GORDON:  E.  So these will collectively

14:44:12 15  be E, both pages of it.

16              MR. BRIDGES:  I think so.

17              (Exhibit E was marked.)

18              THE WITNESS:  Yeah, tag 367, tag 367.

19  BY MR. GORDON:

14:44:19 20      Q       Okay.  Yeah.  So this is both of the bills

21  to the Dahles?

22       A       Because they split it.

23       Q       I understand.  I think I understand.  That

24  was my assumption.  So this will be Exhibit D [sic].

14:44:24 25              What -- what date were these bills

**MELANIE SILVA**

```
 1            And Melanie, while you're off, if you want
 2    to read the other ones so that we can just travel
 3    through the questions faster.  Just why don't you do
 4    that.  Why don't you read the whole packet.
15:00:55  5            THE VIDEOGRAPHER:  Okay.  We're off the
 6    record, and the time is 1500.
 7            (Whereupon, recess was taken
 8            from 3:00 p.m. to 3:07 p.m.)
 9            THE VIDEOGRAPHER:  We're back on the record
15:07:54 10    and the time is 1507.
11    BY MR. GORDON:
12        Q    Okay.  So Melanie -- so have you reviewed
13    all the -- I handed you a package, which is
14    Exhibit G, I believe.
15:08:05 15            Did you review all of those -- the e-mails
16    and whatnot from that exhibit?
17        A    Yes, I read through it.
18        Q    Okay.  All right.  So do you recall
19    receiving this letter from -- or this e-mail from
15:08:15 20    Jessica on the 27th of -- of June?
21        A    Yes.
22        Q    Did you read it that day?
23        A    No.
24        Q    No.  Okay.  It was 5 o'clock.  You stopped
15:08:37 25    working?
```

**MELANIE SILVA**

1          MR. GORDON:  Yeah, no, I understand.  Okay.

2     All right.  It's been involved with the sheriffs so

3     much in this it --

4          THE WITNESS:  Yeah.

15:29:00  5          MR. GORDON:  -- you know -- anyway.  Okay.

6     All right.

7     BY MR. GORDON:

8     Q     And did you call CHP at any point in time?

9     A     No.

15:29:08 10     Q     No?  Okay.  Why not?

11     A     Why not?

12     Q     Yes.

13     A     I didn't -- I -- I just didn't.  It was

14     suggested to use the sheriff's office.  They deal

15:29:24 15     more with the livestock on the outskirts.

16     Q     Okay.  Who suggested that?

17     A     Michael Flores with CDFA.

18     Q     Okay.  So it looks like the same day a few

19     hours later Mike Flores e-mails you --

15:29:41 20     A     Mike Francesconi.

21     Q     Oh, I'm sorry.  Mike -- I'm sorry --

22     Mike Fran- --

23     A     Francesconi.

24     Q     Francesconi.  Okay.  All right.  E-mailed

15:29:50 25     you.

**MELANIE SILVA**

```
  1            And did you read this e-mail that day on
  2   June 28th, or you done working for the day on
  3   June 28th if you recall?
  4       A     I don't recall.
15:30:02  5       Q     Okay.  All right.  So "Hello Melanie, I am
  6   checking with Michael Flores and I would like -- and
  7   he -- and on how he would like to proceed.  I will
  8   let you know when I learn more."  Who is
  9   Michael Flores?
15:30:14 10       A     Deputy Secretary of the California Food and
 11   Ag Department.
 12       Q     Okay.  And then you respond, it looks like,
 13   the next morning.  "Hi Mike, please call my cell
 14   number" --  it's blacked out here or redacted
15:30:39 15   here -- "when you call back.  We have the phones
 16   forwarded since they posted our number to
 17   Instagram."
 18            The second sentence is describing
 19   presumably what you talked about earlier where you
15:30:48 20   were getting inundated with phone calls, correct?
 21   Okay.
 22       A     Yes.
 23       Q     All right.  Did he call your cell phone
 24   number at any point in response to your e-mail?
15:30:56 25       A     Probably.
```

**MELANIE SILVA**

1      Q      Okay.  Probably.  Did you keep any notes on

2  that call?

3      A      I don't think so.

4      Q      Okay.  Do you keep notes on any of your

15:31:13  5  calls?

6      A      Sometimes.

7      Q      Okay.  Did you keep notes on any of the

8  calls in relation to Cedar or Jessica Long?

9      A      If it's -- if it's just -- it's just a

15:31:24 10  couple things if I did, not detailed notes like here

11  like you would want.

12      Q      Okay.  Okay.  Did you check?

13      A      Yeah.  It was just, like, little snippets,

14  like, exactly what the e-mail says.

15:31:40 15      Q      Okay.  It's still --

16      A      You know --

17      Q      -- discoverable but -- okay.

18      A      Oh.

19      Q      I will -- I'll talk with your attorney

15:31:47 20  about it afterwards.  All right.

21              And these are handwritten notes, I presume?

22      A      Yes.

23      Q      Okay.  Like just on a Post-it or something?

24      A      It's on a little scrap piece of paper.

15:31:56 25      Q      Okay.  All right.  Okay.  So what did Mike

**MELANIE SILVA**

1    tell you on this call when he -- you were asking him

2    about if he's gonna follow up with Michael Flores

3    and how to proceed, what was communicated to you?

4        A    I don't remember.  I think it was just more

15:32:16  5    of a touch base.

6        Q    Okay.  So then he gave no information on

7    what Michael Flores said?

8        A    I talked to Michael Flores.

9        Q    Oh, you did talk to Michael.  What -- and

15:32:26 10   when did you talk to him?

11       A    I don't know what time.  I just know that

12   he was the one that suggested going through the

13   sheriff's office.

14       Q    Okay.

15:32:32 15       A    Because they deal more with the livestock.

16       Q    I see.  Okay.  And that was about the same

17   day?

18       A    Somewhere in this time frame.

19       Q    Somewhere in this time frame.  Okay.  All

15:32:38 20   right.  Okay.

21            It's a good time to stop.  He needs to

22   change the real.  So take five.  I need to get some

23   water.

24            THE VIDEOGRAPHER:  We're off the record and

15:32:51 25   the time is 1532, and this is the end of the media

**MELANIE SILVA**

```
 1    number 2.
 2              (Whereupon, recess was taken
 3              from 3:32 p.m. to 3:49 p.m.)
 4              THE VIDEOGRAPHER:  We're back on the
 5    record.  The time is 1549 and this is the start of
 6    media number 3.
 7              MR. GORDON:  Okay.  So where was I?  What
 8    was my -- what was my last question?  Something
 9    about Mike Flores.
10              THE COURT REPORTER:  One moment.  Back up.
11              MR. GORDON:  I think I recall.  You don't
12    need to check.  I think that --
13              (Record read.)
14    BY MR. GORDON:
15         Q    Yes.  Okay.  So that was my -- so refresh
16    my memory, when did you talk to Michael Flores?
17         A    I don't remember the exact day.
18         Q    It was, I think --
19         A    Somewhere in all of this.
20         Q    In all of this.  Okay.  So would it have
21    been, though, after you e-mailed Mike Francesconi on
22    the 29th?  Because you're saying call me back on my
23    cell phone, blah-blah-blah.  So at that point in
24    time you hadn't yet talked to him?
25         A    I would assume so.
```

**MELANIE SILVA**

```
 1        Q      Okay.  All right.  So -- and you talked to
 2   Mike Flores on the phone?
 3        A      Yes.
 4        Q      Okay.  And not by e-mail?
15:50:11  5      A      No.
 6        Q      Okay.  And did you talk -- and did you talk
 7   to him about e-mail regarding this dispute with
 8   Jessica at any point in time?
 9        A      No.
15:50:19 10      Q      Okay.  All right.  And what -- and he --
11   what did Mike Flores tell you on this call?
12        A      He suggested going with the sheriffs
13   because they have more to do with livestock than the
14   CHP.
15:50:29 15      Q      Anything else on the call?
16        A      Not that I recall.
17        Q      And by going to the sheriffs, you mean he
18   suggested that you call the sheriffs and -- and --
19        A      That the sheriffs get contacted.
15:50:38 20      Q      Yeah, that you -- okay.  Someone at the
21   fair.  Did he tell you to contact the sheriffs?
22        A      Just in general.
23        Q      Just in general.  Okay.  All right.  Did --
24   and -- okay.  All right.  And earlier -- okay.
15:51:24 25             MR. GORDON:  Okay.  So John, I'm giving you
```

1     obviously, some of it ent- -- some of the book, the

2     guidebook entails events that she had no

3     participat- -- that the young girl had no

4     participation in --

15:56:58  5        A      Correct.

6        Q      -- so it wouldn't obviously be then.

7               So I'm just wondering which sections of the

8     book should we look to as her attorney to see what

9     potentially was breached.  I know that section, but

15:57:12 10    what else?

11       A      Probably just this section (indicating),

12    and then the --

13              MR. GORDON:  Yeah.  We can go off the

14    record.

15:57:16 15             THE VIDEOGRAPHER:  We're off the record.

16    The time is 1557.

17              (Whereupon, recess was taken

18               from 3:57 p.m. to 3:59 p.m.)

19              (Exhibit I was marked.)

15:59:20 20             THE VIDEOGRAPHER:  We're back on the record

21    and the time is 1559.

22    BY MR. GORDON:

23       Q      Okay.  So Ms. Silva, before we went off the

24    record for a moment -- or Miss Silva, I apologize --

15:59:42 25    I had asked you what, you know, if -- as, you know,

**MELANIE SILVA**

1    counsel for plaintiffs if we needed to determine

2    what rules -- when you said, you know, we can't

3    break the rules for the young girl here in your

4    e-mail.  I'm paraphrasing.  But when I asked which

15:59:58   5    rules applied, you were going to check the handbook

6    and let me -- let me know which sections.

7            So basically right now, and stop me if I'm

8    wrong, you're holding a document which is going to

9    be labeled Exhibit I which is vetted -- what would

16:00:12  10    you will call that document?

11    A      All General Livestock Rules and Guidelines.

12    Q      Okay.  And that's a portion of the

13    handbook, correct?

14    A      Yes.

16:00:18  15    Q      Okay.  All right.  And the other portion of

16    the handbook that a -- that a -- the rules that had

17    to be abided by here were --

18    A      The junior meat goats.

19    Q      And that's on page 67?

16:00:26  20    A      And 68.

21    Q      And 68.  Okay.  All right.  And then it

22    goes to junior swine.  That's, obviously, of no --

23    no meaning here, correct?

24    A      Uh-huh, yes.

16:00:36  25    Q      Okay.  All right.  Okay.  So you can --

**MELANIE SILVA**

```
 1    we're -- I'm not going to reference that -- make any
 2    reference to that one.  Put it away -- so give it
 3    back to the court reporter.  Feel free to reference
 4    it if you need to.  All right?  But I don't think
 5    you're going to need to.
 6            So -- so on -- which -- in your estimation,
 7    which rules here did -- did E.L. not abide by and --
 8    and Jessica?
 9        A    Code of Ethics, Appropriate Behavior.
10        Q    Okay.
11            THE COURT REPORTER:  For what behavior?
12            THE WITNESS:  Appropriate.
13    BY MR. GORDON:
14        Q    Okay.  Where -- which page are you looking
15    at that?
16        A    53.
17        Q    Oh, 53.  Okay.
18        A    And then I do believe there's something in
19    here about the terminal sale.
20        Q    I think it's on -- I think it's on page 50.
21    Tell me that's where you're referring to.
22        A    Auction Guidelines - This is a Terminal
23    Sale.
24        Q    Yes.  So that one and then the Code of
25    Ethics?
```

Line timestamps: 16:00:50 (5), 16:01:19 (10), 16:01:24 (15), 16:01:31 (20), 16:02:00 (25)

**MELANIE SILVA**

1          A       Uh-huh.

2          Q       Okay.  If you need to peruse through that

3     for a moment, you may.

4                  Okay.  So code of ethics and terminal sale.

16:02:26  5     So -- okay.  So scroll down to page 54 of that if

6     you wouldn't mind.

7          A       (Indicating.)

8          Q       So I'm looking at the -- it is kind of hard

9     to see, but beginning here (indicating), it looks

16:02:49 10     like a space is missing from these two.  It's the

11     middle-sized paragraph start with a completely

12     capitalized phrase.  But here, you see where it says

13     RULE COMPLIANCE in all caps?

14          A       Uh-huh.

16:03:03 15          Q       And it's on page 54.  It's says, "Any

16     exhibitors who fails to conform to accepted

17     standards of" --

18                  THE COURT REPORTER:  Wait.  Slow down.

19     BY MR. GORDON:

16:03:08 20          Q       I just wanted to -- "Rule Compliance,

21     colon:  Any -- any exhibitor who fails to conform to

22     accepted -- accepted standards of conduct will be

23     removed immediately with livestock from the

24     fairgrounds and all premiums and auction proceeds

16:03:22 25     forfeited, if the situation is of a serious nature?"

**MELANIE SILVA**

1           So my question is, why wasn't this rule

2      sufficient to just kick E.L. and -- and Jessica off

3      the fairgrounds with -- with livestock and -- and

4      all auction proceeds forfeited?

16:03:41  5      A      She had already completed everything.  She

6      had already sold her goat.

7      Q      Okay.  But it says "auction proceeds

8      forfeited," so that implies that for the rule

9      auction -- that the sale had already taken place

16:03:54 10      potentially within the language of this rule?

11      A      I actually didn't remember that rule being

12      in place.

13      Q      Okay.

14      A      And I didn't want to make the situation

16:04:07 15      worse by withholding her funds for selling of the

16      goat.

17      Q      But they said they didn't want the funds,

18      correct?

19      A      But we were withholding -- we were sticking

16:04:18 20      with the way it should be.

21      Q      But doesn't your rule say she should have

22      just been kicked out and all her premiums and

23      auction proceeds forfeited?

24      A      Everything was already done.  There was

16:04:27 25      nothing for us to kick her out of.  And again, like

MELANIE SILVA

1    I said before, I was not a -- I did not remember

2    about the procedures forfeited.

3        Q    But doesn't this rule potentially apply to

4    her noncompliance of the rules?

16:04:39   5        A    She had already sold the goat.  The project

6    was done.

7        Q    I understand.  But doesn't that what

8    "auction procedures forfeited" refer to --

9        A    I didn't remember that rule.

16:04:48  10        Q    -- that sort of situation?

11        A    I didn't...

12        Q    Now that you see it here, doesn't this rule

13    potentially apply?

14        A    No.

16:04:54  15        Q    And why not?

16        A    To me, the project was already complete.

17        Q    Then why have auction proceeds forfeited

18    as -- as part of this?

19        A    I didn't -- wasn't aware of that.

16:05:04  20        Q    But now that you are, so doesn't this

21    rule -- and I'm saying potentially, so --

22        A    Potentially --

23        Q    Potentially --

24        A    -- yes.

16:05:08  25        Q    Okay.

**MELANIE SILVA**

1       A       Potentially, yes.

2       Q       Okay.  Thank you.

3               Okay.  But you weren't aware of this rule

4    at the time?

16:05:15  5     A       No.

6       Q       And did you look at this when -- when this

7    was happening, the local rules, to see what was --

8       A       Yes, I knew that it said --

9       Q       Okay.

16:05:23 10     A       -- terminal sale and all of that.

11      Q       Did you potentially just -- this is -- this

12   is not a loaded question.  Did you potentially just

13   not see it, because whoever made this forgot to put

14   the space -- it is hard to see.  Every time I go to

16:05:34 15  see this rule, it's very difficult to find.

16      A       It's Exhibitor and Public Safety, so I

17   would have skimmed over it and not --

18      Q       But it's not Exhibitor and Public Safety.

19   That's my point.  There -- it looks like Rule

16:05:44 20  Compliance is it's own paragraph --

21      A       Uh-huh.

22      Q       -- so there should be a space.

23      A       Yes.

24      Q       Okay.  That's -- that's what I'm getting

16:05:50 25  at.  So you might just have not seen it at the time.

**MELANIE SILVA**

1        A        Correct.

2        Q        This is the first time you're seeing it?

3        A        Yes.

4        Q        Okay.  All right.  Because I understand

16:05:55  5    what you mean.  You look at the paragraph and it

6    says Exhibitor and Public Safety, and then you move

7    on to the next paragraph.

8        A        Uh-huh.

9        Q        So you think maybe that's potentially what

16:05:59 10    happened?

11        A        I still don't feel that this falls under

12    the same category because the project was complete

13    with the sale.

14        Q        I -- but again, you said it potentially

16:06:10 15    does.  So I mean, this auction proceeds forfeited,

16    it does seem to apply.  I'm not saying you think it

17    definitely does, but it potentially does, correct?

18        A        Potentially, yes.

19        Q        Okay.  Okay.  All right.  So -- and the

16:06:21 20    other rules you said to apply were the -- the state

21    rules and.  I do have a copy of those, which we

22    can -- which we can put into evidence also but

23    they're on my computer.  Because I only have one

24    copy.  And we had to go to Kinko's this morning and

16:06:35 25    it was a nightmare.  So there you go.

**MELANIE SILVA**

```
 1              (Exhibit J was marked.)
 2     BY MR. GORDON:
 3         Q     Do you need to look through it at all or
 4     anything or --
 5         A     I am not as familiar with these rules as I
 6     am with ours.  That's why I have a livestock
 7     supervisor, so...
 8         Q     Yeah.  Did you check those rules when --
 9     when -- you know, around June 29th or 27th of 2022?
10         A     Probably.
11         Q     Okay.  Probably.  Do you -- why do you say
12     "probably"?
13         A     Because I referenced them in my e-mail.
14         Q     Okay.  So you believe -- you believe you
15     reviewed them.  Okay.  All right.
16              So can you go to page -- and you need to
17     take a break?  You all right?
18         A     Yeah, I'm good.
19         Q     Okay.  All right.  So can you go to page --
20     so page 7 of that document.  Okay.  Okay.  So
21     paragraph 2.
22              "The fair management shall deny entry or
23     disqualify and remove any exhibit or exhibitor that
24     is ineligible for competition under the State or
25     Local Rules or endanger to the public or has
```

Timestamps: 16:06:47 (line 5), 16:06:58 (line 10), 16:07:07 (line 15), 16:07:21 (line 20), 16:07:46 (line 25)

**MELANIE SILVA**

1    violated State and Local Rules.  The fair may

2    require removal of exhibitor and/or -- including

3    animals from the fairgrounds."

4            Okay.  I'm going to read the next one as

16:07:55  5    well because that's paragraph 2.

6            (As read) "Exhibitors, leaders, advisors,

7    and parents found, after a chance to provide

8    evidence and hearing before the Fair Management and

9    CEO of unethical practices as set forth in the State

16:08:08  10   and Local Rules or in actions inimical with the fair

11   program shall result in the exhibit being

12   disqualified and the for- -- forfeiture of any

13   awards and/or privileges as may be deemed

14   appropriate to the circumstances of the Fair

16:08:19  15   Management.  If the judging of the exhibit has not

16   yet commenced, the exhibitor, leaders, advisors, and

17   parents may be denied entry in any exhibitions of

18   the fair, the Fair Management shall report any

19   instances of unethical or inimical behavior" --

16:08:30  20           THE COURT REPORTER:  Oh, slow down.

21   BY MR. GORDON:

22      Q    Sorry.

23           "The Fair Management shall report any such

24   instances of unethical or inimical behavior

16:08:39  25   established by the fair as provided in this rule to

**MELANIE SILVA**

1    F&E in" -- what is -- what is F&E?

2        A      Fair and Exhibitions.

3        Q      "To F&E F&E in writing and such reports may

4    become the basis for any fair to refuse entries from

16:08:51  5    the exhibitors, leaders, parents -- or -- or" -- I'm

6    sorry -- "leaders, advisors, or parents for up to

7    five years following the infraction."

8             Okay.  So why didn't these sorts of

9    recourses for Jessica's behavior -- why -- why

16:09:12 10    weren't these employed by you?

11        A      The project was done.

12        Q      I understand that.  So shouldn't she have

13    just been banned for 4-H -- from 4-H for five years

14    or so after a hearing.  And then there's -- and then

16:09:23 15    there's a -- a -- and with the funds being -- or

16    forfeited?

17        A      That's not how we chose to handle it.

18        Q      I understand that.  But these potentially

19    could have been -- these are in the State Rules,

16:09:37 20    these potentially -- potentially could have been

21    followed as well, correct?

22        A      They potentially could have been, but they

23    were not.

24        Q      Okay.  And did you make the call not to

16:09:44 25    follow them?  I know you said you didn't see the

**MELANIE SILVA**

```
 1    not --
 2        A    Correct --
 3        Q    -- in here?
 4        A    -- it's not in the rules.  I was just
 5    getting back property that was taken after it was
 6    sold.
 7        Q    Okay.  All right.  But I -- I guess --
 8    okay.  So our confusion that is you said you wanted
 9    to enforce the rules to -- in the e-mail to Jessica.
10    So when you meant you wanted to enforce the rules,
11    you meant this rule that says "this is a terminal
12    sale"?
13        A    It was sold --
14        Q    Okay.
15        A    -- and she needed to bring it back.
16        Q    So the word "sale" is what you wanted to
17    enforce.
18             Okay.  Well, why didn't you just -- just --
19    okay.  Yeah -- okay.
20             So on here is the word you wanted to
21    enforce the sale portion of the rules, because
22    it's -- you said it was sold, correct?  So it's
23    sale?
24             Your e-mail's saying -- which rules did you
25    want to enforce?  Are you -- you wanted to
```

MELANIE SILVA

1    enforce -- or you needed to enforce the rules.
2    Well, you can't find a rule on recovering stolen
3    property, so it's this thing and it's the terminal
4    sale portion, that's what you're enforcing, correct?
16:16:56  5    A    The rules, yes.
6    Q    Okay.
7    A    I -- yes.
8    Q    Okay.  All right.  So -- and nothing else?
9    A    All of the rules.  The whole project is
16:17:09  10   what I was referring to.
11   Q    The whole project.  Okay.  Okay.  Okay.
12   The whole -- the whole --
13   A    Finishing the whole project:  You sell it,
14   it's terminal sale, you've now taken back property
16:17:21  15   that's stolen --
16   Q    Are the --
17   A    -- that -- that was sold.
18   Q    Are the project rules of 4-H in here as
19   well?
16:17:26  20   A    No.
21   Q    No?  Okay.  So you're enforcing 4-H --
22   A    No.
23   Q    -- programs?
24   A    No.
16:17:31  25   Q    No?  Well, you just said it a moment ago,

**MELANIE SILVA**

1    the whole project.  What did you mean by that?

2       A    Like our whole market animal process:  You

3    show it, you sell it.

4       Q    Okay.  Okay.  Okay.  So just for the

16:17:53 5    record, please -- and you have it there in front of

6    you, just so we -- we're clear because we're in a

7    lawsuit now, we need to know which ones.  Which rule

8    specifically were you -- just this terminal sale

9    one?  And then you said everything else.  So just

16:18:06 10    tell us which ones so we know.

11       A    I don't know.

12       Q    And you may -- you don't know.  Okay.

13    Okay.  You don't know.  Okay.  Is there anything you

14    could do to refresh your memory on which -- which

16:18:22 15    ones that you -- on which rules you're referring to

16    in your e-mail?

17       A    No.

18       Q    Okay.  All right.  Okay.  So the next thing

19    I wanted to discuss with you is --

16:18:53 20       MS. SHAKIB:  Sorry.

21       MR. GORDON:  Okay.  One second.

22       So I'm going to show your -- so it's about

23    the same day chronologically.  So -- John, do you

24    want a copy of her e-mail to Fernandez?

16:19:11 25       MR. BRIDGES:  Nope.  I have it.

**MELANIE SILVA**

```
 1              MR. GORDON:  You have it.  Okay.
 2    BY MR. GORDON:
 3        Q    Ms. Silva, I'm handing you a copy of an
 4    e-mail that's dated 6/29/22.  It purports to be from
16:19:20  5    you to Jerry Fernandez.  Took take a look.
 6              (Exhibit K was marked.)
 7              MR. BRIDGES:  Just for the record, Damian,
 8    I know this deals with Fernandez.  This was the --
 9    the e-mail from her to Fernandez that you and I have
16:19:40 10    talked about before.
11              MR. NORTHCUTT:  Thank you.
12    BY MR. GORDON:
13        Q    Okay.  All right.  So this is at 12:27 p.m.
14    It looks like the last e-mail you got.  Then in the
16:20:01 15    prior exhibits we were looking to in the morning
16    like 9 -- 9 or 10 o'clock.  So now this is a little
17    later in the day on 6/27.  So you --
18        A    6/29.
19        Q    I'm sorry.  Thank you.
16:20:10 20              6/29 but at 12:27 p.m.  So it was after
21    lunch -- or after noon you send this e-mail to
22    Fernandez.  Do you recall doing this?
23        A    Yes.
24        Q    Okay.  Had you talked with him on the phone
16:20:22 25    beforehand?
```

**MELANIE SILVA**

1      Q      Okay.  Is this not -- is this an employee

2   of the fair?

3      A      It's a contracted.

4      Q      A contractor or a third party?

16:23:14  5      A      Yes.

6      Q      Okay.  Does this person handle any other

7   computer issues for you?

8      A      No.  She inputs the information for

9   ShoWorks and then tracks the entry -- the

16:23:25 10   placements.

11      Q      Okay.  Okay.  She inputs for ShoWorks and

12   then tracks the placements.

13             So "notes," it has her name and "E.L.'s

14   first year in 4-H."  So Cow Creek is the -- that's

16:23:44 15   the 4-H club she's in, correct?

16      A      Yes.

17      Q      It says "age calculated 12."  I mean, she

18   was nine at the time as you know.  Or I believe you

19   know.  Do you know her age at the time?

16:23:55 20      A      No.

21      Q      It was nine.

22             It's -- is -- is this -- oh, is the date of

23   birth, is that presumably --

24      A      They enter that.

16:24:03 25      Q      They enter that.  Okay.  Gotcha.  All

**MELANIE SILVA**

    1    right.  So "I've read the rules."  What rules is
    2    this referring to?  State and local?
    3        A    Yes.
    4        Q    Okay.
16:24:11  5       A    Yes.  And when -- if I -- if you request me
    6    to get a picture of what they signed, then I will
    7    have that for you.
    8        Q    A picture of what they sign.  You mean,
    9    like, a digital --
16:24:21 10       A    The entry -- the entry that you were asking
   11    me about.
   12        Q    Yeah.  I would like to see a picture of how
   13    it looked to her and then what -- what she signed
   14    if -- if possible.  I know you don't have it on you
16:24:29 15   today.
   16        A    I don't.
   17        Q    Okay.  But it is -- it is potentially
   18    possible.
   19        A    This is the accountability and liability.
16:24:35 20       Q    Okay.  Yeah.  So "information is true, I
   21    agree, hold" -- where it says Hold Harmless Clause,
   22    is that referring to accountability and liability
   23    page on --
   24        A    Uh-huh.
16:24:45 25       Q    -- on the next page?

**MELANIE SILVA**

1          And the other documents or the other

2     photographs -- Photography and Name Release?

3     A     I would have to make sure I looked and --

4     before I answered that.  I would want to double

16:25:02 5     check before I answered it.

6     Q     Oh, okay.  Okay.  So this -- this

7     accountability in li- -- as you know, it's now a

8     subject of a Cross-Complaint that you filed against

9     our client.  The Accountability and Liability, this

16:25:13 10     is --

11     A     I believe it's this, but I would want to

12     confirm it.

13     Q     I understand.  Okay.  Okay.  So this

14     Accountability and Liability, this is -- this --

16:25:24 15     when Jessica registered, does she get a copy of this

16     anywhere?

17     A     I am not sure.  She could always request

18     one.

19     Q     Is it presented to her during the log-in?

16:25:37 20     A     Before you sign in.  Before you sign, I'm

21     sure there's a drop -- you know, you do the

22     drop-down.

23     Q     Are you sure or --

24     A     I'm not.  I would have to look.

16:25:43 25     Q     Okay.  All right.  This isn't -- this

MELANIE SILVA

1    liability waiver, I'm assuming why it's presented

2    this way is because it's not -- it's not in the --

3    what's that called?

4        A    I requested the computer lady to print out

16:25:54  5    what -- what they have.

6        Q    I know.  But it's not -- it's not in the

7    guidebook, correct, or the exhibitor book?  This is

8    through the online registration.  This isn't present

9    in the --

16:26:02 10        A    I would have to look.

11        Q    Okay.  Where would it be in there if it

12    isn't there?  If you could look quickly just so I

13    know.  So I just want to see if it's publicly

14    available on the website.

16:26:15 15        A    I could look and see if it's on the

16    website.

17        Q    Okay.  But it's -- it's not -- to your

18    knowledge, it's not in the guidebook?

19        A    I didn't read through the livestock to make

16:26:24 20    sure it's not in that section.

21        Q    Oh, you can just take a moment and do it.

22    I don't -- I don't believe it is.  I'm not trying to

23    make you read more rules.  I just didn't -- I --

24    just to confirm on the record, you can take a look

16:26:34 25    at mine, which is -- or if you can pull up -- if you

**MELANIE SILVA**

| | |
|---|---|
| 1 | would, pull up exhibit -- because I -- I didn't see |
| 2 | the one rule before that you skipped over also, so I |
| 3 | do want to make sure it's not -- there's nothing I'm |
| 4 | missing in there that is contained in that section. |
| 16:26:54  5 | Again, I don't see it. |
| 6 | A      It may just be online. |
| 7 | Q      May just be online. |
| 8 |         MR. BRIDGES:  Can I take a look at that? |
| 9 |         THE WITNESS:  Uh-huh. |
| 16:27:02 10 |         MR. GORDON:  I don't think it's in there, |
| 11 | John. |
| 12 | BY MR. GORDON: |
| 13 | Q      At the end it's got this liability |
| 14 | insurance, highly recommend.  Why -- why does it -- |
| 16:27:15 15 | why does the fair recommend liability insurance? |
| 16 | A      It's required if you're an independent. |
| 17 | Q      Okay. |
| 18 | A      And then FFA and 4-H, I believe, covers |
| 19 | otherwise. |
| 16:27:25 20 | Q      Covers -- covers their own kids or what do |
| 21 | you mean? |
| 22 | A      Covers the members of their group, uh-huh. |
| 23 | Q      Oh, interesting.  Okay.  All right. |
| 24 |         Would you know what covers the member for |
| 16:27:40 25 | this is just general liability for injuries -- |

**MELANIE SILVA**

 1     A     I don't know.

 2     Q     -- or whatever?

 3           Have you ever looked at one of the

 4 policies?

16:27:43  5     A     No.

 6     Q     Okay.  Okay.  How -- yeah, how can you --

 7 so you said you -- you'll check with your computer

 8 person, but that would be the way you would find out

 9 if -- if --

16:28:14 10     A     Exactly.

11     Q     -- if they can get a copy --

12           THE COURT REPORTER:  One at a time, please.

13           MR. BRIDGES:  Sorry.  I'm sorry.

14 BY MR. GORDON:

16:28:18 15     Q     So you -- you said you would check with

16 your computer person.  That's how you would tell if

17 Jessica would get a copy of this waiver, correct?

18     A     If she would be able to print one out if

19 she wanted one, yes.

16:28:29 20     Q     Okay.  All right.  Okay.  And to your

21 knowledge, it's not -- it's not in the guidebook.

22 It would be -- this is through the --

23     A     Portal.

24     Q     -- online register por- -- is it called --

16:28:41 25 okay.  A portal.  That's a better name.  I should

MELANIE SILVA

```
 1    have been saying that.  So it's the online portal
 2    and it's through that.  And -- okay.
 3              And it -- okay.  So it's your understanding
 4    it's through that.  It's not in the guidebook.  She
 5    might have -- and you don't know if it was e-mailed
 6    to her or if it was available for viewing during
 7    the -- during the registration process, correct?
 8        A    I will ask.
 9        Q    Okay.  All right.  But as to those other
10    things, it's not -- it's -- you didn't see an
11    indemnity clause in this, correct?  It's -- it's not
12    in here anywhere?
13        A    Correct.
14        Q    And I'm -- for the record, I'm pointing to
15    the All General Livestock Rules and Guidelines, and
16    it's not at any other point in the guidebook,
17    correct?  It's just on the online portal?
18        A    As far as I know, yes.
19        Q    Okay.  Thank you.
20              Okay.  So is there -- when -- when the
21    person is going through the -- the -- have you ever
22    registered on the online portal?
23        A    Yes.
24        Q    Okay.  When the person's going through
25    the -- the portal and putting their information in,
```

16:28:51 (line 5)
16:29:04 (line 10)
16:29:14 (line 15)
16:29:27 (line 20)
16:29:36 (line 25)

**MELANIE SILVA**

```
 1    is there -- is there any option for them to opt out
 2    of any of these documents, like the -- the fair
 3    rules or the -- or the -- the -- accountability and
 4    liability form?
16:29:52  5        A    Not as far as I know.
 6        Q    Okay.  All right.  They can't put, like, a
 7    protest or anything in there?  It's just check "I
 8    agree" or don't participate?
 9        A    As far as I know, there's not a way to opt
16:30:05 10    out.
11        Q    Okay.  Okay.  Is there any way to negotiate
12    any of the aspects of it?
13        A    No.
14        Q    Okay.  Okay.  So I notice also the
16:30:22 15    Photography and Name Release.  That's not on this
16    form here.  Is that part and parcel of -- you have
17    whole -- I know you said you needed to check.  But
18    Hold Harmless Clause, Parent/Guardian Agrees -- I'm
19    looking at the page before that.  It says -- on the
16:30:39 20    second page of the document, you know, where it says
21    Hold Harmless Parent/Guardian Agrees.  Does the Hold
22    Harmless -- I know you said you believe it applies
23    to the accountability and liability on the third
24    page, but does that also apply to the Photography
16:30:56 25    and Name Release?  I just -- on the -- on the page
```

1                          PENALTY OF PERJURY

2

3            I, the undersigned, hereby certify that I

4    have read the foregoing deposition, that I know the

5    contents thereof, and I declare under penalty of

6    perjury under the laws of the State of California

7    that the foregoing is true and correct.

8

9            Executed on _____, 2023.

10

11

12

13          _____
                 MELANIE SILVA
14                 ---o0o---

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3        I, CAROL J. CHASE, a Certified Shorthand

 4   Reporter, licensed by the State of California,

 5   License No. 13538, being empowered to administer

 6   oaths and affirmations pursuant to Section 2093 (b)

 7   of the Code of Civil Procedure, do hereby certify:

 8        That the witness in the foregoing deposition,

 9   MELANIE SILVA, was present at the time and place

10   specified and was by me sworn to testify to the

11   truth, the whole truth, and nothing but the truth;

12        That said proceeding was taken before me in

13   shorthand writing, and was thereafter transcribed

14   under my direction by computer-aided transcription;

15        That the foregoing transcript constitutes a

16   full, true, and accurate record of the proceeding

17   which took place; That I am not of counsel or

18   attorney for any of the parties hereto, or in any

19   way interested in the event of this cause, and that

20   I am not related to any of the parties hereto.

21        IN WITNESS WHEREOF, I have hereunto subscribed

22   my signature on this 27th day of November, 2023.

23

24

25        _____
                         CAROL J. CHASE
```

REDDING, CA      CHALLE, FISHER & MORFIN      (530) 246-0942

**SILVA DEPOSITION EXHIBIT C**

Deposition document discussed in Silva Excerpts at pp. 271-274 and 295-298 described as "handbook" or "guidebook," which was labeled Exhibit C at the deposition, is not included here to save paper. That same document is attached as **Exhibit 2 the concurrently filed Request for Judicial Notice** and incorporated here by reference.

**SILVA DEPOSITION EXHIBIT G**

Deposition document containing Silva's June 28, 2022 email to
Mrs. Long, where Silva discusses rule enforcement, referenced and
discussed in Silva Excerpt at pp. 285-287.



| From: | ceo sdfeventcenter.com |
|---|---|
| To: | Francesconi, Mike@CDFA |
| Subject: | Re: Shasta District Fair |
| Date: | Wednesday, June 29, 2022 9:06:46 AM |

**CAUTION : [External Email]** - This email originated from outside of our CDFA organization. Do not click links or open attachments unless you recognize the sender and know the content is expected and is safe.

Hi Mike,

Please call my cell number ▮▮▮▮▮▮ when you call back.  We have the phones forwarded since they posted our number to instagram.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



---

**From:** Francesconi, Mike@CDFA <mike.francesconi@cdfa.ca.gov>
**Sent:** Tuesday, June 28, 2022 5:58 PM
**To:** ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
**Subject:** Re: Shasta District Fair

Hello Melanie

I am checking with Michael Flores on how he would like you to proceed.  I will let you know when I learn more.

Thanks

Mike

Get Outlook for iOS

---

**From:** ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
**Sent:** Tuesday, June 28, 2022 3:40:58 PM
**To:** Francesconi, Mike@CDFA <mike.francesconi@cdfa.ca.gov>
**Subject:** Re: Shasta District Fair

**CAUTION** : [External Email] - This email originated from outside of our CDFA organization. Do not click links or open attachments unless you recognize the sender and know the content is expected and is safe.

Hi Mike,

She is not responding to either one of us.  Should we involve CHP next?

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



**From:** Francesconi, Mike@CDFA <mike.francesconi@cdfa.ca.gov>
**Sent:** Tuesday, June 28, 2022 3:08 PM
**To:** ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
**Subject:** RE: Shasta District Fair

Hello Melanie

Did BJ go out to pick up the goat?

Thanks

Mike

Mike Francesconi
*Branch Chief*
CDFA Fairs and Expositions
Ph (916) 900-5365
mike.francesconi@cdfa.ca.gov



**From:** ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
**Sent:** Tuesday, June 28, 2022 3:07 PM
**To:** Francesconi, Mike@CDFA <mike.francesconi@cdfa.ca.gov>

**Subject:** Shasta District Fair

**CAUTION : [External Email]** - This email originated from outside of our CDFA organization. Do not click links or open attachments unless you recognize the sender and know the content is expected and is safe.

Hi Mike,

I have included the response I sent her. I have also updated my Board Member

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



---

**From:** ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
**Sent:** Tuesday, June 28, 2022 1:31 PM
**To:** Jessica Daun
**Subject:** Re: Requesting solutions for the goat that was taken

Hello Jessica,

Thank you Jessica for taking the time to contact me regarding this issue. As a mother I am not unsympathetic regarding your daughter and her love for her animal. Having said that please understand the fair industry is set up to teach our youth responsibility and for the future generations of ranchers and farmers to learn the process and effort it takes to raise quality meat. Making an exception for you will only teach out youth that they do not have to abide by the rules that are set up for all participants. Also in this era of social media this has been a negative experience for the fairgrounds as this has been all over Facebook and Instagram, not the best way to teach our youth the value of responsibility. Unfortunately this is out of my hands.

I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately. I do hope you will continue with your idea of raising and providing quality animals for the purpose you have spoken about. I support that whole heartly. Obviously the fair experience is not the best for your family.

Thank you,

Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



**From:** Jessica Daum ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, June 27, 2022 5:41 PM
**To:** ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
**Subject:** Requesting solutions for the goat that was taken

Dear Shasta County Fair Manager,

I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know what showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly

empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,


Jessica Long
Mother of ███████,
Shasta District Fair goat lot #132




Get Outlook for iOS

**SILVA DEPOSITION EXHIBIT J**

Deposition document discussed in Silva Excerpts at pp. 275-278 and described as "the State Rules," which was labeled Exhibit J at the deposition, is not included here to save paper. That same document is attached as **Exhibit 1 the concurrently filed Request for Judicial Notice** and incorporated here by reference.

**SILVA DEPOSITION EXHIBIT K**
Deposition document referenced and discussed in Silva Excerpt at
 p. 288 and at p. 295 (Accountability and Liability Form in email),
and is labeled Exhibit K in deposition transcript

ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
Wed 6/29/2022 12:27 PM
To:



- Jmfernandez@co.shasta.ca.us <Jmfernandez@co.shasta.ca.us>

Hi Lt Jerry Fernandez,

Here is the information you requested.  Let me know if you need anything else or have any questions.  My cell number is ▮▮▮▮▮▮, we have had to forward the phones to voicemail since they posted our phone number, fax number and my email on their Instagram posts.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com





**653**███                                        Long

| | | | |
|---|---|---|---|
| Address | ███ | SS# | |
| City | Redding | Date of Birth | ███9 |
| State | CA | Age Calculated | ██ |
| Zip Code | ██ | | |
| | | School | Cow Creek 4-H |
| Phone | ███ | Grade | |
| e-mail | ███ | | |
| Status | | Notes | ██ first year in 4-H |
| | | I've read the rules | I agree |

Information is true    I agree
Hold Harmless Clau    Parent/Guardian Agrees

ACCOUNTABILITY & LIABILITY: Please accept the entries (property) described herein. I certify that I am the owner of the property specified herein or the supervisor of the project with authorization to act as agent and to bind the owners of the property in all matters herein. Online submission of data requires that a person has read, understands and agrees to abide by all the rules and regulations governing the fair entries as published in the official Shasta District Fair Handbook. Under penalty of perjury, I certify that the information provided is true and I agree to defend, indemnify, and hold harmless the fair, the county, and the State of California, its officers, agents and employees from and against any liability, claim, loss or expense (including any reasonable attorney fees) arising out of any injury or damage, which is caused by, arises from or is in any way connected with participation in the program or event, excepting only that caused by the sole active negligence of the Fair. The Fair Management shall not be responsible

To enter online, you must be over 18 years of age or be the parent and/or guardian of the exhibitor if the exhibitor is under age 18, or the 4-H Leader or FFA advisor, with the authorization from the parent and/or guardian of the exhibitor, or authorization from the exhibitor if 18 years of age or older. Please type "Yes" in the box to confirm. By entering "Yes", I am confirming that I am 18 years of age or older, the owner or authorized agent for these exhibits, that I have read, understand and agree to abide by all the rules and regulations governing the Fair entries as published in the official Shasta District Fair Handbook, and that everything submitted is "true and correct". Online entries for 4-H and FFA exhibitors will not be officially accepted until approved by the 4-H leader or FFA advisor.

PHOTOGRAPHY AND NAME RELEASE: By typing "Yes" below, I/we give the Shasta District Fair and anyone acting under the authority or permission thereof, the unqualified right to use my name and/or our company name for publication and/or for distribution of photographs, videotapes and/or recordings made of me and/or my/our company representatives, that may have been taken at past Shasta District Fairs, and/or could be taken at the fair(s) subject to this contract, for any marketing, public relations, publicity and/or other lawful purpose. Further, I waive all right of inspection or approval and irrevocably release Shasta District Fair from claims or demands which I or my company may or can have on account of the use or publication or arising of such photographs or information.

https://www.shastadistrictfairandeventcenter.com/enter-your-stuff

Jessica Daum ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
Mon 6/27/2022 5:41 PM
To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Dear Shasta County Fair Manager,

I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer who contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting  our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,

Jessica Long
Mother of E██ L██,
Shasta District Fair goat lot #132

Get Outlook for iOS

Re: Requesting solutions for the goat that was taken
ceo sdfeventcenter.com
Tue 6/28/2022 1:31 PM
To:

- Jessica Daum ██████████████████

Bcc:

- Francesconi Mike@CDFA <mike.francesconi@cdfa.ca.gov>

Hello Jessica,

Thank you Jessica for taking the time to contact me regarding this issue.  As a mother I am not unsympathetic regarding your daughter and her love for her animal.  Having said that please understand the fair industry is set up to teach our youth responsibility and for the future generations of ranchers and farmers to learn the process and effort it takes to raise quality meat.   Making an exception for you will only teach out youth that they do not have to abide by the rules that are set up for all participants.  Also in this era of social media this has been a negative experience for the fairgrounds as this has been all over Facebook and Instagram, not the best way to teach our youth the value of responsibility.  Unfortunately this is out of my hands.

I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all  we have to stick to the State Rules.  You will need to bring the goat back to the Shasta District Fair immediately.  I do hope you will continue with your idea of raising and providing quality animals for the purpose you have spoken about.  I support that whole heartly.  Obviously the fair experience is not the best for your family.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



Jessica Daum ██████████████████

Wed 6/29/2022 9:49 AM

To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Please see attached.

Thank you,

Jessica Long

Get Outlook for iOS

Shasta District Fair
1890 Briggs Street
Anderson, CA 96007

**June 28, 2022**

*Re: Dispute over Cedar*

Dear Shasta District Fair;

This letter is in further response to my dispute with your organization concerning my daughter's goat, Cedar. My daughter's name is E███ L███.

On June 27, 2022, I sent an email asking that your organization withdraw its demand for the return of Cedar and offering to pay for any costs or damages you have incurred as a result of this dispute. This morning, however, I received another text message from BJ McFarlane which seemingly ignored my letter and simply demanded return of my daughter's goat.

I've had time to review the documents that BJ McFarlane sent me, and I believe your organization is not within its rights to demand return of Cedar.

While you threatened to alert the authorities I had violated California Penal Code § 487a, upon examination, I have done no such thing. That statute makes it a crime to "feloniously steal[], take[], carr[y], lead[], or drive[] away...any caprine animal...,

[1] which is the personal property of another, or [2] who fraudulently appropriates that same property which has been entrusted to him or her, or [3] who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of that same property…is guilty of grand theft." (*Id.*) I cannot possibly have done any of those things because Cedar was not your organization's personal property. To the contrary, and as the 2022 State Rules For California Fairs indicate ("State Rules"), it was my daughter's personal property. Specifically, the State Rules provide in relevant part that "exhibitors must be legal owners of all entries. Ownership must be maintained through show date(s)." (See State Rules at p. 6.) Cedar was removed during that period, so the State Rules admit he was still my daughter's personal property.

Consistent with the State Rules, your organization's All General Rules and Guidelines ("General Rules") also require that "Exhibitors must be able to show proof of ownership at any time…." (See General Rules at p. 3.) Again, Shasta District Fair was not the owner.

Finally, that your organization did not become the owner of Cedar is further confirmed by the provision in your General Rules advising the Junior Exhibitors to obtain liability insurance. (See General Rules at p. 8.)  If Cedar became your property by virtue of our entry to the fair, there would be no need for the Junior Exhibitors to obtain insurance, as the fair would be liable. In sum, Cedar was my daughter's personal property so California Penal Code § 487a is not even triggered.

Furthermore, in the event the Shasta District Fair could claim Cedar became its personal property,"[i]t is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1017, citing *People v. Butler* (1967) 65 Cal.2d 569, 573.) As I believed in good faith that Cedar was not the Shasta District Fair's personal property, no violation of Penal Code § 487a was committed.

Lastly, if anyone other than my daughter has a right to the goat, it would be Senator Brian Dahle as he was the successful bidder at auction.  But his office has represented to me that they have relinquished any rights they have to Cedar, dead or alive. As a result, not only was there no crime committed, but the Shasta District Fair now gets to keep his bid of $11.00 per pound x 82 pounds, $902.00.   Thus, the Shasta District Fair has actually profited from this event—it cannot claim any harm. For the Shasta District Fair to claim it's been damaged by this event, it would have to show some loss arising from a breach I committed. (*See, e.g., Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473 ["A breach of contract is not actionable without damage"].) But your General Rules state that the Shasta District Fair will be entitled to only "7.0% of the sale price deducted from the [Exhibitor's] check...." So, had the slaughter been accomplished, the Shasta District Fair would have collected only $63.14.  But now, it has received, and gets to keep $902.00, a profit of $838.36.  So if anything, Shasta District Fair has been unjustly enriched by this situation.

Lastly, it must be stated with clarity that, because Shasta District Fair was never the owner of Cedar, the only possible rights it has in transaction are to the monies it could have earned, i.e., $63.14, which it has more than retained. So any legal action on the matter would per se be frivolous. Nevertheless, my offer to reimburse any other reasonable costs associated with this event remains open. I cannot envision what those costs would be, but I will of course review them in good faith.

This letter is not a waiver of any rights. Further, while its purpose is in anticipation of litigation, I am equally sending this letter to resolve the matter. My daughter has/is bonded with Cedar and, had we known what a terminal auction entailed, we never would have gone down this path. Fortunately, Shasta District Fair has actually profited from this event so this dispute should be put to rest.

In your email you expressed concerns about social media postings. If we can resolve this situation with Cedar not being brought in for slaughter, I am willing to consider signing a non-disclosure agreement.

Moving forward, I request that any communications be directed to my email at Jess███████████

Sincerely,

Jessica Long
████████████████