# EXHIBIT 7

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*DETECTIVE JEREMY ASHBEE*
*August 23, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File J. Ashbee.txt
**Min-U-Script® with Word Index**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

---OOO-

E.L. a minor, by and through her general
guardian, JESSICA LONG; JESSICA LONG, an
individual,

          Plaintiffs,

                             Case No. 2:22-cv
            2:22-cv-01527

    vs.

LIEUTENANT JERRY FERNANDEZ, individually
and in his individual capacity as
Sheriff for the County of Shasta;
DETECTIVE JACOB DUNCAN, individually and
in his individual capacity as Sheriff for
the County of Shasta; DETECTIVE JEREMY
ASHBEE, individually and in his
individual capacity for the County of
Shasta; SHASTA DISTRICT FAIR AND EVENT
CENTER, a district agricultural
association; COUNTY OF SHASTA; SHASTA
COUNTY SHERIFF'S DEPARTMENT; MELANIE
SILVA, in her individual capacity; BJ
MACFARLANE, in his individual capacity;
and DOES 1 through 10,

          Defendants.

_____/

VIDEO RECORDED DEPOSITION OF

DETECTIVE JEREMY ASHBEE

WEDNESDAY, AUGUST 23, 2023

9:36 a.m.

Reported by:  JULIE BANGHART, CSR NO. 10547

**Challe, Fisher & Morfin**
**Redding, California  (530)246-0942**

**DETECTIVE JEREMY ASHBEE**

1  mark this Exhibit B, because we also have some questions

2  about it.  I know you didn't write Fernandez's report,

3  nonetheless, but we're still going to ask you some

4  questions.  So this is going to be Exhibit B, so I'm going

11:30  5  to put these there for the time being.

6        So -- oh, and you were -- the warrant is in here.  So

7  you were going to verify that July 8th is in fact the

8  correct date.  So if you want a copy of the warrant from the

9  Incident Report, is -- begins on -- well, I'll just -- I'll

11:31  10  let you look, but it begins on page 15, if you want to just

11  verify the date.  You said July 8th and you were uncertain.

12        (Exhibit B was marked.)

13  Q.    MR. GORDON:  Yes?  July 8th?

14  A.    Yes, the date was July 8th.

11:31  15  Q.    Okay.  Thank you.  You can put that aside for a

16  moment.  So on July 8th -- what did I ask?

17        Madam Court Reporter, what was my question about July

18  8th?  I know you verified the date, but before that when he

19  said he was unsure of the date.

11:32  20        COURT REPORTER:  I don't really see a question.

21        MR. GORDON:  Maybe there wasn't.  Oh, I remember what

22  it was.

23  Q.    I said when did you first hear of Jessica Long

24  removing Cedar from the fair, and you said the day of the

11:32  25  warrant which is July 8th.

**DETECTIVE JEREMY ASHBEE**

```
 1   A.     July 8th.

 2   Q.     How did you learn of that alleged removal?

 3   A.     I heard from it from Lieutenant Jerry Fernandez.

 4   Q.     Okay.  About what time?

11:32  5   A.     It was afternoon, probably about 2:00 p.m.

 6   Q.     About 2:00 p.m.

 7          In person?

 8   A.     Yes.

 9   Q.     Where at?

11:33 10   A.     In my office.

11   Q.     In your office.

12          And where is your office at?

13   A.     300 Park Marina Circle.

14   Q.     Okay.  All right.  So it's the -- isn't that just the

11:33 15   normal -- if I Google Shasta Sheriff's --

16   A.     Yes.

17   Q.     -- that's the address that pops up, 300 Park Marina

18   Circle.  Okay.  All right.

19          So -- and did he -- about 2:00.  Did you --

11:33 20          Why was he in your office?

21   A.     To ask me to write a search warrant.

22   Q.     Okay.  So he came to you?

23   A.     Yes.

24   Q.     Okay.  He came to you.

11:33 25          And what did he tell you in this conversation?
```

**DETECTIVE JEREMY ASHBEE**

```
 1  A.      In summary?  I mean, I can't tell you verbatim.

 2  Q.      Sure.

 3  A.      But in summary, he told me that Jessica Long had

 4  stolen a goat from the Shasta District Fairgrounds.  That

 5  the goat had already been purchased by Brian Dahle and

 6  donated to, it was either 4-H or FFA.  That the owner of the

 7  goat was now the -- I don't what the title -- her title

 8  would be, the President or whatever, of that program or that

 9  club, Kathi Muse.

10  Q.      He said Kathi Muse was the President of --

11  A.      I don't know what the title is.

12  Q.      She had some title with 4-H.

13  A.      She had some involvement with that club that would

14  make her --

15  Q.      Okay.  She was -- he said she was an authority

16  position in that club or --

17  A.      I believe so.

18  Q.      -- had some right to its property?

19  A.      He identified her as the owner of the goat.

20  Q.      Okay.  Did he say anything more or he just described

21  her as the owner?

22  A.      I believe he just described her as the owner.

23  Q.      Okay.  Okay.  Because of her relationship with 4-H?

24  A.      Yes.

25  Q.      But he didn't describe what the relationship was or
```

**DETECTIVE JEREMY ASHBEE**

1    did he?

2    A.    I don't believe he did.

3    Q.    Okay.  And what else did he tell you?

4    A.    He told me that that goat was stolen from the

11:34 5    fairgrounds and that it was transported or driven to a goat

6    sanctuary in Napa County.

7    Q.    Okay.  All right.  And what else -- okay.  So he told

8    you that.

9          And what else did he tell you?

11:35 10   A.    That's a basic summary of it.  He kind of gave a

11   little bit of the back story of Jessica Long's daughter was

12   raising the goat --

13   Q.    Yeah.

14   A.    -- in one of those agricultural clubs.  I don't know

11:35 15   which one.

16   Q.    4-H, but --

17   A.    4-H.

18   Q.    Okay.  Fair enough.  Okay.  Anything else?

19   A.    And that after the goat was sold, she became

11:35 20   distraught, so her mom stole the goat from the fairgrounds.

21   Q.    Okay.

22   A.    Drove it to Napa County.

23   Q.    And he used the words "stole"?

24   A.    Yeah, I believe so.

11:36 25   Q.    Okay.  All right.  Okay.  So you knew there was a

**DETECTIVE JEREMY ASHBEE**

```
         1  minor involved.

         2          He described it E.L., or he mentioned E.L.?

         3  A.     Yes.

         4  Q.     Okay.  All right.  And did -- did -- okay.  So those

11:36    5  are the facts he told you.

         6          Any other facts -- any other facts that come to mind?

         7  A.     No.  I think that's a summary of it.

         8  Q.     Okay.  Did he provide you any documents?

         9  A.     Yes.

11:36   10  Q.     Okay.  And -- in person?

        11  A.     I don't recall if he -- I don't think he handed me

        12  any documents.  I think it was -- he was in the room, but he

        13  sent them.

        14  Q.     Okay.  Yeah, I believe it was email.  I'll have you

11:36   15  verify the email in just a second.  I'm just seeing what you

        16  recall.  Okay.  So he probably emailed you the documents,

        17  but he might have been in the room with you.

        18          Did he go over the documents with you?

        19  A.     The --

11:36   20  Q.     Oh, wait.  He -- he testified he left about that

        21  time.  So did he leave with you the documents.  Then he went

        22  to get the -- then he left to go on the road to Napa?

        23  A.     We -- he briefly went over the first two documents,

        24  the ones that are attached to the warrant.

11:37   25  Q.     Okay.
```

**DETECTIVE JEREMY ASHBEE**

1  A.    And he instructed that those should be attached to

2  the warrant.

3  Q.    Okay.  Okay.  All right.  Okay.  But he mailed you --

4  he emailed you the documents, went over them with them --

11:37  5  went over the first two you, okay, and instructed they were

6  being attached to the warrant.  Okay.  So did he -- and

7  about what -- you said he's in your office at 2:00.

8         How long did this interaction take before he left,

9  let's say?

11:37  10  A.    Approximately 30 to 45 minutes.

11  Q.    Did he help you start typing up -- he asked you --

12  let me back up.  Strike all that.

13         So any other facts that come to mind before I ask the

14  next question?  Facts of what he told you about the

11:38  15  underlying alleged theft?

16  A.    He -- he told me what I put into the probable cause

17  narrative is what he had relayed to me.

18  Q.    That's what he relayed to you?  Okay.  All right.

19  A.    Yeah.  I think he mentioned something about a Napa

11:38  20  County employee had saw the goat on that property initially.

21  And then --

22  Q.    A Napa County employee saw the goat?

23  A.    Yeah, like a Napa County Sheriff's Office employee

24  saw the goat on that property.

11:38  25  Q.    How could they -- did that seem plausible to you?

## DETECTIVE JEREMY ASHBEE

1  How are you going to tell the goat from -- unless you go up

2  and check its tag?

3  A.     That knew the story.  That knew the story behind it

4  and knew that that goat was there.

11:38 5  Q.     OKay.  Do you remember the name of this employee?

6  A.     No, that wasn't relayed to me.

7  Q.     Okay.  Okay.  All right.  Interesting.  So you

8  remember him saying a Napa County employee saw the goat on

9  the property.

11:39 10         Did he tell you -- did he -- did Officer Fernandez go

11  over the -- sorry.

12         Did he go over the Penal Code provision he thought

13  was violated?

14  A.     Yes.

11:39 15  Q.     What did he tell you about that?  The reason I'm

16  asking he's the livestock investigator, so he does livestock

17  theft.

18         What did he tell you about the statute?

19  A.     He just went over what 487(a) was.  We just had a

11:39 20  brief discussion about those elements that we talked about

21  earlier.

22  Q.     Okay.  So you learned these from Fernandez, the

23  elements of it?

24         MR. NORTHCUTT:  Objection.  Misstates testimony.

11:39 25         Go ahead.

**DETECTIVE JEREMY ASHBEE**

| | |
|---|---|
| 1 | THE WITNESS:  We reviewed them. |
| 2 | Q.   MR. GORDON:  Is that the first time you had gone over |
| 3 | that particular statue? |
| 4 | A.   No. |
| 11:39 5 | Q.   You'd gone over livestock theft beforehand? |
| 6 | A.   I've reviewed that Penal Code before. |
| 7 | Q.   Oh, really.  Okay. |
| 8 | For what -- for what purpose? |
| 9 | A.   I believe it came up in the police academy. |
| 11:40 10 | Q.   Okay.  Okay.  When you were doing grand theft, I |
| 11 | presume? |
| 12 | A.   Possibly. |
| 13 | Q.   Or you don't know. |
| 14 | A.   Possibly. |
| 11:40 15 | Q.   Possibly. |
| 16 | But it came up in the -- the livestock theft came up |
| 17 | in the Penal Code -- in the POST Academy? |
| 18 | A.   Yeah. |
| 19 | Q.   Okay.  Gotcha.  All right.  So I'm going -- you think |
| 11:40 20 | he emailed them to you.  I -- I'm guessing.  That's why I'm |
| 21 | asking you. |
| 22 | Is this the email he sent you with this PDF attached? |
| 23 | With those attachments? |
| 24 | A.   Yeah, that would probably be it. |
| 11:40 25 | Q.   Okay.  Well, review the attachment.  Just make sure |

**DETECTIVE JEREMY ASHBEE**

```
 1   those are the ones you received.  I mean, I presume so.
 2   These were attached to the email, but I just want to make
 3   sure I didn't bind something wrong or something.  I believe
 4   that's it.
11:41  5   A.      That looks accurate.
 6   Q.      That's accurate.
 7           I'm going to mark it as Exhibit C.
 8           (Exhibit C was marked.)
 9   Q.      MR. GORDON:  Okay.  So in that -- you can keep that
11:42 10   in front of you for a moment.
11           Okay.  So he sent you those documents.  Detective,
12   what is the Bates stamp number that is on?  I'm just going
13   to pull up in my --
14   A.      The number at the bottom?
11:42 15   Q.      Yes.
16   A.      It's ASHB 000153.
17   Q.      153.  Thank you.
18   A.      Through 163.
19   Q.      Great.  Thank you so much.
11:42 20           So the first attachment is -- I apologize -- All
21   right.  So on 154.  So you go to Bates stamp 153 in
22   Exhibit C.  Yes.  There you go.
23           So did -- did you receive this by email from
24   Lieutenant Ashbee -- I'm sorry -- Lieutenant -- or
11:42 25   Lieutenant Fernandez?
```

**DETECTIVE JEREMY ASHBEE**

```
 1   soon.  He's almost out of tape.
 2   Q.     Okay.  But your testimony is nothing about here
 3   seemed civil to you?
 4   A.     Correct.
11:53  5   Q.     Okay.  All right.  And -- okay.  So my next question
 6   is did your -- okay.  So the next page is 158.  This is an
 7   email from Melanie Silva.
 8          Did you review this email?
 9   A.     No.
11:53 10   Q.     Okay.  Did you read it?  You didn't read it on your
11   own?
12   A.     No, I haven't.
13   Q.     Well, why do you think -- why did you not read it if
14   Fernandez sent it to you?
11:53 15   A.     He told me specifically the ones that were important
16   to his investigation or that he wanted attached to the
17   warrant.
18   Q.     Okay.  All right.
19   A.     That contained, I guess, elements of the probable
11:53 20   cause.
21   Q.     Okay.  And you didn't -- so you purposely didn't read
22   this one because he didn't tell you to?
23          MR. NORTHCUTT:  Objection.  Misstates testimony.
24          THE WITNESS:  I didn't read everything that he sent
11:53 25   me, no.
```

**DETECTIVE JEREMY ASHBEE**

1  Q.     MR. GORDON:  You didn't read everything that he sent

2  you.  Okay.  All right.  Okay.  So you didn't read this

3  one.  All right.

4         So the next -- the next page.  Now, this is -- the

11:54  5  next one starts at 159.  This is another email, which by its

6  face appears to be from just -- from the person you're

7  investigating for criminal theft, our client, Jessica.

8  Jessica Long, she signed Jessica Long.

9         Did you read this email and the attachment on it?

11:54 10  A.     Oh, was this the attachment?

11  Q.     Yes.

12  A.     No, not in its entirety.

13  Q.     But you read some of it.  What did you read?

14  A.     It looks familiar.

11:54 15  Q.     Okay.

16  A.     I don't recall how much of it I read, but it does

17  look familiar.

18  Q.     But you went through it.  Okay.

19         You read -- it looks familiar -- well, okay.  So you

11:55 20  saw it that day.

21         Do you believe you read it that day?

22  A.     No, I don't -- like I said, I don't think I've read

23  it in its entirety.  I think I kind of solved this part of

24  the attachment.

11:55 25  Q.     Why wouldn't you read an email from the person you're

**DETECTIVE JEREMY ASHBEE**

1   investigating?  Isn't that an admission of something?

2   A.    Because I'm not --

3         MR. NORTHCUTT:  It's argumentative.

4   Q.    MR. GORDON:  You're not investigating, but you're

11:55   5   still doing this.

6   A.    No, I'm not investigating.

7   Q.    Okay.  You're not doing the investigating.  But

8   you're doing the -- you're doing the Affidavit of Probable

9   Cause, swearing everything he is telling you is true.

11:55   10        So why wouldn't you read this email if it's true?

11   A.    Because I have no reason to believe what he's telling

12   me is not true.

13   Q.    Is it the policy of Shasta County that the word of an

14   officer trumps written evidence?

11:55   15        MR. NORTHCUTT:  Argumentative.

16   Q.    MR. GORDON:  If you know.

17   A.    There is no policy.  I'm not saying that it trumps

18   evidence.  I'm saying I have no reason to believe he is not

19   presenting me with evidence.

11:56   20   Q.    Okay.  Is there any -- Is there policy with respect

21   to -- that requires you to read all evidence you're

22   presented?

23        MR. NORTHCUTT:  Objection.  Vague.  Ambiguous.

24   Q.    MR. GORDON:  If you're filling out an a warrant?

11:56   25   A.    No, there's, no policy to that nature.

**DETECTIVE JEREMY ASHBEE**

1   that Cedar's there.

2          And then you must have read it because you lifted the

3   language from it.  Yes?

4   A.     Yes.

12:43  5   Q.     Okay.  So when you read it, didn't you notice that

6   hey, this doesn't say he's there?

7   A.     But it does provide some corroborating evidence to

8   the elements of the crime.

9   Q.     But does it provide corroborating evidence of

12:43 10  location?

11  A.     Potentially.  There's a photo of the goat on the

12  page.

13  Q.     And you tell by photo -- how can you tell where this

14  photo is taken?

12:43 15  A.     Well, I can't tell exactly where the photo is taken.

16  Q.     It could have been here.  Right?

17  A.     It's corroborating.

18  Q.     Okay.  But this photo could have been taken in

19  Shasta.  Yes?

12:43 20  A.     It could have been taken anywhere.

21  Q.     Yes, exactly.  It could have been taken anywhere.

22          All right.  And there's no -- you agree there's no

23  language there saying he's there.

24          Okay.  All right.  So the letter that we were mostly

12:44 25  bickering over before, which is Bate -- you know what I'm

### DETECTIVE JEREMY ASHBEE

1  talking about, Bates stamp 16 -- yes, that exhibit.

2  A.     160 to --

3  Q.     Yeah, whatever it is.  Okay.

4         Do you think there's anything into that letter that

12:44  5  the judge might have wanted to see --

6         MR. NORTHCUTT:  Objection.  Calls for speculation.

7  Q.     MR. GORDON:  -- in making a -- in issuing a warrant?

8  A.     What's important in search warrants is --

9  Q.     Yes or no question.

12:44  10  A.     -- probable cause.

11  Q.     Motion to strike.  Nonresponsive.  Yes or no, and

12  I'll ask you a follow up.

13         MR. NORTHCUTT:  He's trying to explain his answer.

14  It's not just a yes or no question.

12:44  15  Q.     MR. GORDON:  I said do you think there's anything in

16  there that the judge might have wanted to see.

17         Yes or no.  I will give you a follow up and you'll

18  have a chance to explain, but yes or no.

19  A.     I'll say no, because the elements of a crime are what

12:45  20  is necessary to form probable cause for a search warrant.

21  Q.     Okay.

22  A.     And I didn't find -- well, I didn't even read this

23  letter at the time, but from my review of it, there doesn't

24  appear to be anything that's substantial to proving those

12:45  25  elements.

**DETECTIVE JEREMY ASHBEE**

1    Q.    Okay.  So it doesn't -- it has no evidentiary value,

2    is your testimony, to a judge for issuing a warrant?

3         MR. NORTHCUTT:  Misstates testimony.

4         THE WITNESS:  It is misstating my testimony.

12:45   5    Q.    MR. GORDON:  Does it add evidentiary value for a

6    judge issuing a warrant, in your opinion, that letter?

7    A.    For issuing a warrant?

8    Q.    Yeah.

9    A.    You need probable cause.

12:45   10    Q.    I know.  Does it have any -- does it intimate one way

11    or the other -- is it any probative evidence towards

12    probable cause, one way or the other?

13    A.    Potentially, because she's discussing the goat in

14    question.

12:46   15    Q.    And it's a --

16    A.    -- and her involvement.

17    Q.    And it's a written statement from her which, I

18    believe, would be an admission.  Yes?

19    A.    It could potentially be evidential, yes.

12:46   20    Q.    Okay.  Okay.  So you don't think the judge would have

21    maybe wanted to see it?

22         MR. NORTHCUTT:  Objection.  Calls for speculation.

23    Q.    MR. GORDON:  You can answer.

24    A.    The search warrant doesn't require every piece of

12:46   25    evidence --

**DETECTIVE JEREMY ASHBEE**

1  Q.    I understand that, but do you think the judge would

2  have maybe wanted to see that one?

3  A.    -- the elements of probable cause.  And you're

4  talking over me again.

12:46  5  Q.    Okay.  Well, because -- because, sir, it's a -- it's

6  a yes or no question and I am going to give you an

7  opportunity to respond.

8        So motion to strike.  Nonresponsive.

9        I'm just asking yes or no, might the judge have

12:46 10  wanted to see that?

11        MR. NORTHCUTT:  Calls for speculation.

12  Q.    MR. GORDON:  It's -- well, let me rephrase.  Yes, no,

13  I don't know.

14  A.    I don't know what the judge would want to see.

12:46 15  Q.    Okay.  If -- if that letter she's talking about, for

16  example, if I thought it was my property, that -- that

17  negates an element of the crime.  Yes?  And you read that in

18  there.  Whether it's true or not, she's saying that.  Yes?

19        MR. NORTHCUTT:  Calls for a legal conclusion.

12:47 20  Q.    MR. GORDON:  I'm asking if he's read that in there.

21  She simply makes a statement.  I'm not asking whether it's

22  true.

23  A.    What are you asking specifically?  Can you rephrase

24  it?

12:47 25  Q.    Yeah, I'm -- well, I haven't asked the question yet,

**DETECTIVE JEREMY ASHBEE**

1    so -- Vanessa probably wrote it out.  Okay.

2            If the letter negates an element of the crime, could

3    it not negate probable cause?

4            MR. NORTHCUTT:  Objection.  Vague and ambiguous.

12:47  5    Calls for a legal conclusion.  Incomplete hypothetical.

6            Go ahead.

7    Q.    MR. GORDON:  So she says "I thought the goat was

8    mine."

9            Does that have an effect on probable cause?

12:47 10    A.    If there's probable cause to state the contrary, then

11    no, it doesn't.

12    Q.    Okay.  So it has no effect on it?

13    A.    No, it doesn't.

14    Q.    Okay.  Okay.  That's your testimony.  All right.

12:48 15            All right.  Were you concerned if that letter was

16    shown to the judge that maybe she wouldn't have issued a

17    warrant?

18            MR. NORTHCUTT:  Objection.  Vague and ambiguous as to

19    the term "concern."  It's argumentative.  Assumes facts not

12:48 20    in evidence.  Go ahead.

21            THE WITNESS:  I don't know.  I don't think -- I don't

22    think it would affect her.

23    Q.    MR. GORDON:  Okay.  But were you concerned at the

24    time?

12:48 25            MR. NORTHCUTT:  Same objections.

**DETECTIVE JEREMY ASHBEE**

1  Q.     MR. GORDON:  You said you read part of it.  Were you

2  concerned at the time?

3  A.     No, I was not concerned.

4  Q.     MR. GORDON:  Okay.  You were not concerned.

12:48  5        So you purely did not give it only because Fernandez

6  said just give A and B?

7  A.     And BECAUSE A and B seemed to be evidential.  It had

8  more evidential value.

9  Q.     Well, did you -- so you reviewed A and B.

12:48 10        Why did you -- okay.  So you just said something I

11  want to ask on.  You just said A and B seemed to be more

12  evidential.  So you're using a discretion to determine the

13  evidentiary value.

14        Why didn't you do that for the remaining documents

12:49 15  that were in the email?

16  A.     Because these are the two that he instructed me to

17  use.

18  Q.     Because Fernandez told you to use A and B then?

19  A.     Yes.

12:49 20  Q.     Okay.  That's your testimony.  All right.

21        Okay.  So I used this phrase yesterday because it --

22  it's going to sound loaded and I don't mean it to sound

23  offensive.  I just don't know how to phrase it.  This is the

24  least offensive way I can -- I can do it.  So I mean no

12:49 25  disrespect.

**DETECTIVE JEREMY ASHBEE**

1      Would you say you had no independent thought in

2   preparing this warrant with respect to the evidence?  It's

3   all Fernandez?

4      MR. NORTHCUTT:  Objection.  Vague and ambiguous.

12:49   5   Argumentative.

6      THE WITNESS:  No.  Because if I believed that what he

7   was telling me to do was wrong or fraudulent in some way,

8   then I would not do it.  It seemed that from what he told

9   me, the elements of that crime were met, so I was

12:49  10   comfortable preparing the warrant for him.

11   Q.      MR. GORDON:  Okay.  Okay.  So you had some

12   independent thought, but only with respect to what he said,

13   not with respect to the evidence he gave you?

14      MR. NORTHCUTT:  Objection.  Misstates testimony. `

12:50  15   Q.      MR. GORDON:  Is that accurate?

16   A.    No.  I have no reason to believe that he would be

17   deceptive or try to withhold something from me.

18   Q.    Yeah, well, how can you discover fraud if you don't

19   review all the evidence?

12:50  20      MR. NORTHCUTT:  Argumentative.

21   Q.      MR. GORDON:  You said you thought nothing was

22   fraudulent.

23      How can you determine something is fraudulent if you

24   don't review all the evidence?

12:50  25   A.    Because I was not investigating a fraud.

**DETECTIVE JEREMY ASHBEE**

1

2                          PENALTY OF PERJURY

3

4          I, the undersigned, hereby certify that I have read

5     the foregoing deposition, that I know the contents thereof,

6     and I declare under penalty of perjury under the laws of the

7     State of California that the foregoing is true and correct,

8     and that there are:

9

10    (Check one)                    _____   NO CORRECTIONS

11                                   _____   CORRECTIONS AS ATTACHED

12

13         Executed this _____ day of _____, 2023.

14

15

16

17

18

19                        _____

20                             Detective Jeremy Ashbee

21

22                        ---o0o---

23

24

25

1

2                          CERTIFICATE OF REPORTER

3

4          I, JULIE BANGHART, a Certified Shorthand Reporter,
     licensed by the State of California, License No. 10547,
5    being empowered to administer oaths and affirmations
     pursuant to Section 2093(b)(1) of the Code of Civil
6    Procedure, do hereby certify:

7          That the witness in the foregoing deposition,
     Detective Jeremy Ashbee, was present at the time and place
8    specified and was by me sworn to testify to the truth, the
     whole truth, and nothing but the truth;

9
           That said proceeding was taken before me in shorthand
10   writing, and was thereafter transcribed under my direction
     by computer-aided transcription;

11
           That the foregoing transcript constitutes a full,
12   true, and accurate record of the proceedings which took
     place;

13
           That I am not of counsel of attorney for any of the
14   parties hereto, or in any way interested in the event of
     this cause, and that I am not related to any of the parties
15   hereto.

16         IN WITNESS WHEREOF, I have hereunto subscribed my
     signature on this 16th day of October, 2023.

17

18

19

20

21                          _Julie Banghart_____

22                          JULIE BANGHART, CSR 10547

23

24

25

                                                                    181

**ASHBEE DEPOSITION EXHIBIT C**
(Bates No. ASH000153-163)
Deposition documents referenced and discussed in Ashbee Excerpts
on pp. 83-99, labeled as Exhibit C in deposition transcript

Exhibit
Date/Wit. _Ashbee_
Julie Banghart CSR

**Ryan Facio**

| | |
|---|---|
| **From:** | Jerry Fernandez <JMFernandez@co.shasta.ca.us> |
| **Sent:** | Friday, July 8, 2022 3:05 PM |
| **To:** | Jeremy Ashbee |
| **Attachments:** | Long Goat Fair 2022.pdf |

Lieutenant Jerry Fernandez
South County Station
Shasta County Sheriff's Office
300 Park Marina Cir
Redding CA 96001
530-225-3709

ASHB000153



Mom is
Jessica Long—

653 E

Address
City — Redding
State — CA
Zip Code
Phone
e-mail
Status

SS#
Date of Birth
Age Calculated
School — Cow Creek 4-H
Grade
Notes
I've read the rules — first year in 4-H
I agree

Information is true — I agree
Hold Harmless Clau — Parent/Guardian Agrees

ASHB000154

ACCOUNTABILITY & LIABILITY: Please accept the entries (property) described herein. I certify that I am the owner of the property specified herein or the supervisor of the project with authorization to act as agent and to bind the owners of the property in all matters herein. Online submission of data requires that a person has read, understands and agrees to abide by all the rules and regulations governing the fair entries as published in the official Shasta District Fair Handbook. Under penalty of perjury, I certify that the information provided is true and I agree to defend, indemnify, and hold harmless the fair, the county, and the State of California, its officers, agents and employees from and against any liability, claim, loss or expense (including any reasonable attorney fees) arising out of any injury or damage, which is caused by, arises from or is in any way connected with participation in the program or event, excepting only that caused by the sole active negligence of the Fair. The Fair Management shall not be responsible

To enter online, you must be over 18 years of age or be the parent and/or guardian of the exhibitor if the exhibitor is under age 18, or the 4-H Leader or FFA advisor, with the authorization from the parent and/or guardian of the exhibitor, or authorization from the exhibitor if 18 years of age or older. Please type "Yes" in the box to confirm. By entering "Yes", I am confirming that I am 18 years of age or older, the owner or authorized agent for these exhibits, that I have read, understand and agree to abide by all the rules and regulations governing the Fair entries as published in the official Shasta District Fair Handbook, and that everything submitted is "true and correct". Online entries for 4-H and FFA exhibitors will not be officially accepted until approved by the 4-H leader or FFA advisor.

PHOTOGRAPHY AND NAME RELEASE: By typing "Yes" below, I/we give the Shasta District Fair and anyone acting under the authority or permission thereof, the unqualified right to use my name and/or our company name for publication and/or for distribution of photographs, videotapes and/or recordings made of me and/or my/our company representatives, that may have been taken at past Shasta District Fairs, and/or could be taken at the fair(s) subject to this contract, for any marketing, public relations, publicity and/or other lawful purpose. Further, I waive all right of inspection or approval and irrevocably release Shasta District Fair from claims or demands which I or my company may or can have on account of the use or publication or arising of such photographs or information.

https://www.shastadistrictfairandeventcenter.com/enter-your-stuff

ASHB000155

Requesting solutions for the goat that was taken

Jessica Daum ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Mon 6/27/2022 5:41 PM

To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Dear Shasta County Fair Manager,

I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to

ASH000156

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,


Jessica Long
Mother of E███ L███
Shasta District Fair goat lot #132




Get Outlook for iOS

ASHB000157

Re: Requesting solutions for the goat that was taken
ceo sdfeventcenter.com
Tue 6/28/2022 1:31 PM
To:

- Jessica Daum ███████████████

Bcc:

- Francesconi Mike@CDFA <mike.francesconi@cdfa.ca.gov>

Hello Jessica,

Thank you Jessica for taking the time to contact me regarding this issue. As a mother I am not unsympathetic regarding your daughter and her love for her animal. Having said that please understand the fair industry is set up to teach our youth responsibility and for the future generations of ranchers and farmers to learn the process and effort it takes to raise quality meat. Making an exception for you will only teach out youth that they do not have to abide by the rules that are set up for all participants. Also in this era of social media this has been a negative experience for the fairgrounds as this has been all over Facebook and Instagram, not the best way to teach our youth the value of responsibility. Unfortunately this is out of my hands.

I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately. I do hope you will continue with your idea of raising and providing quality animals for the purpose you have spoken about. I support that whole heartly. Obviously the fair experience is not the best for your family.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



Re: Requesting solutions for the goat that was taken

Jessica Daum ████████████████████

Wed 6/29/2022 9:49 AM

To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com> ·

Please see attached.

Thank you,

Jessica Long

Get Outlook for iOS

ASHB000159

Shasta District Fair
1890 Briggs Street
Anderson, CA 96007

**June 28, 2022**

***Re: Dispute over Cedar***

Dear Shasta District Fair;

This letter is in further response to my dispute with your organization concerning my daughter's goat, Cedar. My daughter's name is E█████ I█████.

On June 27, 2022, I sent an email asking that your organization withdraw its demand for the return of Cedar and offering to pay for any costs or damages you have incurred as a result of this dispute. This morning, however, I received another text message from BJ McFarlane which seemingly ignored my letter and simply demanded return of my daughter's goat.

I've had time to review the documents that BJ McFarlane sent me, and I believe your organization is not within its rights to demand return of Cedar.

While you threatened to alert the authorities I had violated California Penal Code § 487a, upon examination, I have done no such thing.  That statute makes it a crime to "feloniously steal[], take[], carr[y], lead[], or drive[] away...any caprine animal...,

ASHB000160

[1] which is the personal property of another, or [2] who fraudulently appropriates that same property which has been entrusted to him or her, or [3] who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of that same property…is guilty of grand theft." (*Id.*) I cannot possibly have done any of those things because Cedar was not your organization's personal property. To the contrary, and as the 2022 State Rules For California Fairs indicate ("State Rules"), it was my daughter's personal property. Specifically, the State Rules provide in relevant part that "exhibitors must be legal owners of all entries. Ownership must be maintained through show date(s)." (See State Rules at p. 6.) Cedar was removed during that period, so the State Rules admit he was still my daughter's personal property.

Consistent with the State Rules, your organization's All General Rules and Guidelines ("General Rules") also require that "Exhibitors must be able to show proof of ownership at any time…." (See General Rules at p. 3.) Again, Shasta District Fair was not the owner.

Finally, that your organization did not become the owner of Cedar is further confirmed by the provision in your General Rules advising the Junior Exhibitors to obtain liability insurance. (See General Rules at p. 8.)   If Cedar became your property by virtue of our entry to the fair, there would be no need for the Junior Exhibitors to obtain insurance, as the fair would be liable. In sum, Cedar was my daughter's personal property so California Penal Code § 487a is not even triggered.

ASHB000161

Furthermore, in the event the Shasta District Fair could claim Cedar became its personal property,"[i]t is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1017, citing *People v. Butler* (1967) 65 Cal.2d 569, 573.) As I believed in good faith that Cedar was not the Shasta District Fair's personal property, no violation of Penal Code § 487a was committed.

Lastly, if anyone other than my daughter has a right to the goat, it would be Senator Brian Dahle as he was the successful bidder at auction.  But his office has represented to me that they have relinquished any rights they have to Cedar, dead or alive. As a result, not only was there no crime committed, but the Shasta District Fair now gets to keep his bid of $11.00 per pound x 82 pounds, $902.00.   Thus, the Shasta District Fair has actually profited from this event—it cannot claim any harm. For the Shasta District Fair to claim it's been damaged by this event, it would have to show some loss arising from a breach I committed. (*See, e.g., Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473 ["A breach of contract is not actionable without damage"].) But your General Rules state that the Shasta District Fair will be entitled to only "7.0% of the sale price deducted from the [Exhibitor's] check...." So, had the slaughter been accomplished, the Shasta District Fair would have collected only $63.14.  But now, it has received, and gets to keep $902.00, a profit of $838.36.  So if anything, Shasta District Fair has been unjustly enriched by this situation.

ASHB000162

Lastly, it must be stated with clarity that, because Shasta District Fair was never the owner of Cedar, the only possible rights it has in transaction are to the monies it could have earned, i.e., $63.14, which it has more than retained. So any legal action on the matter would per se be frivolous. Nevertheless, my offer to reimburse any other reasonable costs associated with this event remains open. I cannot envision what those costs would be, but I will of course review them in good faith.

This letter is not a waiver of any rights. Further, while its purpose is in anticipation of litigation, I am equally sending this letter to resolve the matter. My daughter has/is bonded with Cedar and, had we known what a terminal auction entailed, we never would have gone down this path. Fortunately, Shasta District Fair has actually profited from this event so this dispute should be put to rest.

In your email you expressed concerns about social media postings. If we can resolve this situation with Cedar not being brought in for slaughter, I am willing to consider signing a non-disclosure agreement.

Moving forward, I request that any communications be directed to my email at Jess█████@hotmail.com

Sincerely,

*Jessica Long*

Jessica Long

█████████████████

ASHB000163