RYAN R. GORDON (SBN 278414)
VANESSA T. SHAKIB (SBN 287339)
**ADVANCING LAW FOR ANIMALS**
407 N. Pacific Coast Highway #267
Redondo Beach, CA 90277
Tel: (202) 996-8389
rgordon@advancinglawforanimals.org
vshakib@advancinglawforanimals.org

DANIEL J. KOLDE, ESQ.
**LAW OFFICES OF DANIEL J. KOLDE**
P.O. Box 440344
St. Louis, Missouri 63144-9998
Tel: 636.675.5383
Email: daniel.kolde.law@gmail.com
(*pro hac vice application to be filed*)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN  DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual, <br><br>            Plaintiffs, <br>       v. <br> LIEUTENANT JERRY FERNANDEZ, in his individual capacity; DETECTIVE JACOB DUNCAN, in his individual capacity; DETECTIVE JEREMY ASHBEE, in his individual capacity; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association; COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual and official capacity; BJ MACFARLANE, in his individual and official capacity; KATHIE MUSE, in her individual and official capacity, and DOES 1 through 10, | Case No. 2:22-cv-01527-DAD-AC <br><br> **DECLARATION OF RYAN R. GORDON IN SUPPORT OF PLAINTIFF'S MOTIONS TO COMPEL (ECF Nos. 52, 54, 55, and 56)** <br><br> Date: March 20, 2024 <br> Time: 10:00 am. <br> Courtroom: 26, 8th Floor <br><br> Trial Date: March 24, 2025 <br><br> Action Filed: August 31, 202 |

ADVANCING LAW FOR ANIMALS

**ADVANCING LAW FOR ANIMALS**

## DECLARATION OF RYAN R. GORDON

I, Ryan Gordon, declare as follows:

1.      I am an attorney at law duly licensed to practice law before all the courts of the State of California, as well as admitted to practice in the United States District Courts for the Eastern and Central Districts of California. I am over 18 years of age. I have personal knowledge of the matters set forth herein and, if called upon, I could and would competently testify thereto. I made this declaration in support of Plaintiff Jessica Long's Motions To Compel (1) Production Of Subpoenaed Documents From Non-Party Vista Real Estate (**ECF 52**); (2) Production Of Subpoenaed Documents From Non-Party Verizon Related To Defendant Shasta District Fair & Event Center's Work Cell Phone For Melanie Silva (**ECF 54**); Production Of Subpoenaed Documents From Non-Party Verizon Related To Melanie Silva's Cell Phone (**ECF 55**); and Production Of Subpoenaed Documents From Non-Party Verizon Related To Kathie Muse's Cell Phone **(ECF 56.)**

2.      I am the attorney of record for Plaintiff Jessica Long ("Mrs. Long") and her minor daughter, Plaintiff E.L., proceeding by and through her guardian ad litem, Mrs. Long, in the above captioned action.

3.      Plaintiffs have brought civil rights claims following their decision to remove their goat, Cedar, from the Shasta County Fair's Junior Livestock action on June 25, 2022. They allege they bought a young goat, Cedar, who Plaintiff E.L., then nine (9), bonded with after having raised him. The auction was terminal and Cedar would have died that evening, so Plaintiffs allege they decided to save his life and hide him while they negotiated a resolution with Defendant Shasta District Fair & Event Center (SDF), which demanded his immediate return. Thereafter, officers at the Shasta County Sheriff's Department admittedly drove approximately 500 miles from Shasta County to Napa County, then to Sonoma County, where they committed a wrongful search and seizure of Cedar. Plaintiffs allege Cedar was then ultimately slaughtered without notice and opportunity to be heard in violation of their rights to Due Process, among other things. Plaintiffs' thereafter brought the instant action for claims under § 1983 claims and state law.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of an email chain produced in discovery by Defendant Melanie Silva ("Ms. Silva") between her, Ms. Long, and Mike Francesconi at

DECLARATION OF RYAN GORDON IN SUPPORT OF FILING MOTIONS TO COMPEL

the California Department of Agriculture. The email indicates the following communications took place:

    a.  The earliest email in the chain, beginning from the bottom of the email chain, is dated June 27, 2022 and was sent at 5:41 pm from my client Mrs. Long to Ms. Silva. The email discusses her daughter's bond with her goat, Cedar, and offers to pay for any damages caused by Plaintiffs' decision not to sell Cedar at the Shasta County Junior Livestock action on June 25, 2022, and their attendant removal of Cedar from the fairgrounds;

    b.  On June 28, 2022 at 1:31 pm, Ms. Silva rejected Mrs. Long's previously-emailed offer to pay damages, explaining, the "social media this has been a negative experience for the fairgrounds[,]" and stating, "I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately."

    c.  On June 28, 2022 at 3:07 pm, Ms. Silva forwarded her email exchange with Mrs. Long to Mr. Francesconi, stating, "Hi Mike, I have included the response I sent her. I have also updated my Board Member[.]"

    d.  On June 28, 2022 at 3:08 pm, Mr. Francesoni responded to Ms. Silva, "Hello Melanie Did BJ go out to pick up the goat? Thanks Mike[.]"

    e.  On June 28, 2022 at 3:40 pm, Ms. Silva responded to Mr. Francesoni, stating "Hi Mike, She is not responding to either of us. Should we involve CHP next?"

    f.  On June 28, 2022 at 5:58pm, Mr. Francesconi responded to Ms. Silva, "I am checking with Michael Flores on how he would like you to proceed. I will let you know when I learn more. Thanks Mike[.]"

    g.  On June 29, 2022 at 9:06 am, Ms. Silva emailed Mr. Francesconi, "Hi Mike, Please call my cell number [omitted] when you call back. We have the phones forwarded since they posted our number to instagram."

DECLARATION OF RYAN GORDON IN SUPPORT OF FILING MOTIONS TO COMPEL

ADVANCING LAW FOR ANIMALS

5.      On June 29, 2022, Mrs. Long again emailed Ms. Silva a second letter, stating, among other things, Cedar was Plaintiff E.L.'s personal property; SDF never owned Cedar; grand theft had no basis; and the letter was "in anticipation of litigation" of their civil dispute ("Notice of Civil Claim and Intention to Sue"). A true and correct copy of this letter, produced in discovery by Mrs. Silva, is attached hereto as **Exhibit 2**. In discovery, Mr. Macfarlane produced a text between him and Ms. Silva dated June 29, 2022, that indicates Ms. Silva texts Mr. Macfarlane that "We are contacting the Sheriff for the goat waiting for a call back[.]" A true and correct copy of this June 29, 2022 text, produced in discovery by Mr. Macfarlane, is attached hereto as **Exhibit 19.**

6.      On August 21, 2023, I conducted the deposition of Lieutenant Jerry Fernandez ("Lieut. Fernandez"). The period for making deposition corrections expired on November 13, 2023 and no changes were made. A true and correct copy of excerpts from Lieut. Fernandez's deposition is attached hereto as **Exhibit 3**.

7.      With respect to what prompted his investigation of Mrs. Long, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified:

> Q.      Okay. So when did you first learn of Jessica removing Cedar from the -- when I say "the fair," I mean the 2022 Shasta County District Fair.
>
> A.      I first learned about it when -- I want to say it was either the very end of June or beginning of July.
>
> Q.      And who told you?
>
> A.      I was -- the Sheriff, Michael Johnson, told me that I needed to reach out to the fair or people from the fair in regards to a theft of a goat.
>
> Q.      Okay. Michael Johnson. You said the Sheriff. So he's the elected Sheriff?
>
> A.      He is the elected Sheriff, yes.
>
> ...
>
> Q.      So did he give you any -- what other details did Michael Johnson give you? Sheriff Johnson. I'm not trying to be disrespectful. Whatever the proper term is.
>
> ...
>
> A.      Yes, Sheriff. Just that the goat was stolen and that because of my collateral assignment as a livestock investigator, that I needed to reach out to the people from the fair and basically conduct an investigation.

1   Ex. 3 (Lieut. Fernandez Dep. 77:10-78:14).

> Q.   All right. So Sheriff Johnson tells you to go investigate this. And you don't know who told -- do you know when he learned of this?
>
> A.   It was the same time that I conducted the -- or began the investigation. So that was the same time frame, end of June, beginning of July.
>
> Q.   Okay. And what narrative or facts did he tell you?
>
> A.   Just that the -- that the goat had been stolen and to reach out to whoever I know at the fair to basically conduct -- start the investigation.

Ex. 3 (Lieut. Fernandez Dep. 83:5-14).

8.      With respect to the reaction of other fair boards to Cedar's removal, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified:

> A    It was a big deal with a lot of the fair boards within Shasta County.
>
> Q    Where else was it a big deal?
>
> A    I don't know the names of those fairs.
>
> Q    Do you know -- do you know -- oh, well you said "fair boards."
>
> A    Yeah.
>
> Q.   So what other fairs? Are there other fairs in Shasta County? I thought it was one per county.
>
> A.   No, the State of California.
>
> Q.   The State. Okay. What other fairs was it a big deal with, if you know?
>
> A.   I don't know those -- I don't know the particulars on that.
>
> Q.   Who did you hear it from?
>
> A.   The Sheriff.
>
> Q.   The Sheriff. Okay.
>
> A.   That people were pissed that Cedar was removed?
>
> A.   Yeah, I think it was -- or from my recollection, it was reported to him that this is -- right, that this is not -- yes, it affects Shasta District Fair and we have to investigate it, but there's other fair boards reaching out  to our fair board about this is pretty serious stuff ....

Ex. 3 (Lieut. Fernandez Dep. 277:13-279:03).

ADVANCING LAW FOR ANIMALS

DECLARATION OF RYAN GORDON IN SUPPORT OF FILING MOTIONS TO COMPEL

9.    With respect to Lieut. Fernandez and Det. Duncan seizing Cedar on July 8, 2022, and, at the direction of Mrs. Muse, turning him over to Mr. Macfarlane, Lieut. Fernandez testified:

> A.    *And then due to the time of -- projected time of our arrival back into Shasta County, Ms. Muse requested that we leave the goat in the care and custody of Mcfarlane.*
>
> Q.    *Okay. So did you speak with Kathi Muse on the phone?*
>
> A.    *Yes.*
>
> Q.    *Okay. What did you -- what did she say on the phone?*
>
> A.    *Just -- I can't recall everything she said. I think she was excited that we got the goat and that to -- based on the time of night, to just leave it with her agent, which would have been Mcfarlane.*

Ex. 3 (Lieut. Fernandez Dep. 269:16-270:10).

10.    On August 22, 2023, I conducted the deposition of Detective Jacob Duncan ("Det. Duncan"). The period for making deposition corrections expired on  October 13, 2023 and no changes were made. A true and correct copy of excerpts from Det. Detective's deposition is attached as **Exhibit 4**.

11.    With respect to driving several hundred miles from Shasta County to Napa County to locate Cedar, but not finding him at Bleating Hearts Sanctuary, as referenced in the concurrently filed memorandums, Det. Duncan testified:.

> Q.    *...  And you didn't find -- well, okay. Didn't find Cedar at her -- at Bleating Hearts, correct?*
>
> A    *No.*
>
> ...
>
> Q.    *Okay. All right. And -- okay. What did you do when you left their property?*
>
> A.    *Well, in my conversation with Kristin and review of her emails, I discovered that Cedar was at Billy's Mini Goat Farm in Sonoma.*
>
> Q.    *Okay. So you concluded that in your investigation. What did you -- so about what time -- about what time did you leave the Bleating Hearts?*
>
> A.    *I think we left directly following when that interview ended. We went directly to Billy's Mini Goat Farm in Sonoma.*

Ex. 4 (Det. Duncan Dep. 144:25 – 147:17).

**ADVANCING LAW FOR ANIMALS**

12.     On November 13, 2023, I conducted the deposition of Defendant Kathie Muse ("Mrs. Muse"). The period for making deposition corrections expired on  January 1, 2024. A true and correct copy of excerpts from Mrs. Muse's deposition is attached as **Exhibit 5**.

13.     With respect to slaughtering Cedar, Mrs. Muse testified:

> Q.     *Did the DA ever tell you, greenlight, you guys can go through with the slaughter??*
>
> A.     *They did not tell me that, no.*
>
> Q.     *Did they tell B.J.?*
>
> A.     *Yes*
>
> Q.     *Okay. The DA did tell B.J.?*
>
> A.     *I don't know if it was the DA.*
>
> Q.     *Okay. But someone from law enforcement in your mind did. So either the sheriff's, the DA; is that what you're telling me?*
>
> A.     *Correct.*

Ex. 5 (Muse Dep. 199:5-15).

14.     Regarding the Sheriff's Department and DA's instructions to retain Cedar's ear tags, Mrs. Muse testified:

> Q.     *Okay. Then please "don't forget to save the ear tags." Did you -- did you ever receive Cedar's ear tags?*
>
> A.     *No.*
>
> Q.     *Who has them?*
>
> A.     *My understanding is B.J. has 'em.*
>
> Q.     *Okay. Why would -- why would you want them saved?*
>
> A.     *Because we were told to make sure we saved the ear tags.*
>
> Q.     *Who told you that?*
>
> A      *I -- I was not told that. I was told from B.J. that the DAs and the sheriffs office, I don't know which department, had told him to make sure that we save the ear tags.*
>
> ...
>
> Q.     *B.J. told you. Do you know when he told you?*
>
> A.     *No.*

ADVANCING LAW FOR ANIMALS

7

**ADVANCING LAW FOR ANIMALS**

1

> Q.    Okay. Was it -- it must have been in person or over the phone, though,
> because it's not on this text chain.

2

> A.    Yes.

3

Ex. 5 (Muse Dep. 201:19-202:08).

4

15.    With respect to Mrs. Muse's testimony contending the SDF provided replacement goat

5

meat for the July 9 Government Barbeque, as referenced in the concurrently filed memorandum, Mrs.

6

Muse testified:

7
8

> Q.    Okay. So Cedar was alive till the 28th. Okay. And what -- what had hap -
> - what happened to him afterwards after he was killed?

9
10

> A.    He was given back to the Shasta Live- --Junior Livestock Auction board.
> He was given back to the Junior Livestock Auction.
> ...

11
12

> They replaced it to me for the barbecue. The fair board or the Junior
> Livestock Auction replaced that fair to us -- or replaced Cedar so
> that we had a goat at the auction.
> ...

13
14

> Q.    So did he even go to any of -- anyone's plate, or is he -- was he just killed
> to go back to Shasta -- to the fair as reimbursement?

15
16

> A.    I don't know what happened. My understanding, what I was told was he
> went back to somebody that had a problem with another goat that had
> been butchered. So we, in turn, replaced Cedar with that goat.

17

Ex. 5 (Muse Dep. 204:13-205:20).

18

16.    With respect to who knows where Cedar's meat went following his slaughter, as

19

referenced in the concurrently filed memorandum, Mrs. Muse testified:

20
21

> Q.    ...So he just went to an individual -- to a private -- a private party then
> is your understanding?

21

> A.    My understanding, yes.

22

> Q.    Okay. Do you know who that private party was?

23

> A.    No.

24

> Q.    Okay. Do you know who would know?

25

> A.    Probably the Shasta District Fair.

26

> ....

> A.    Probably Melanie.

27

Ex. 5 (Muse Dep. 235:19-236:10).

28

DECLARATION OF RYAN GORDON IN SUPPORT OF FILING MOTIONS TO COMPEL

17.     On November 14, 2023, I conducted the deposition of Defendant Melanie Silva ("Ms. Silva"). The period for making deposition corrections expired on  January 1, 2024. A true and correct copy of excerpts from Mrs. Muse's deposition is attached as **Exhibit 6**.

18.     Ms. Silva's testified that, on June 29 at 12:27 pm, she emailed several documents to Lieut. Fernandez, which were marked as Exhibit K at the Deposition, which included Mrs. Long's Notice of Civil Claim and Intention to Sue.  See Ex. 6, Silva Dep. Vol. 1 288:03-23, Exhibit K to the deposition is included with deposition excepts attached to this Declaration as Exhibit 6.

19.     With respect to what Mrs. Silva knew about Cedar's slaughter, and the DA's involvement, she testified:

Q.      *July, August. Okay. Where is Cedar right now then?*

A       *I don't know.*

Q       *You don't know where he is. Okay. Okay. Well, you know he was slaughtered, yes?*

A       *I heard that he was slaughtered.*

Q       *When did you hear that?*

A       *I don't know -- people just talk. I don't know. I'm not trying to be difficult. I don't know.*

Q       *When did you first hear he was slaughtered?*

A       *This is hearsay. Do I say it as fact when I don't know for sure?*

Q       *It's not being introduced as evidence. Yes, you need to tell me what -- what you heard.*

A       *I just -- I don't know when I heard it. I just heard that he was back and that the permission was given to go ahead and move forward with the slaughter.*

Q       *Permission from who?*

A       *Somebody told me DA. But do I know if that's fact? I don't know if that's fact.*

...

A       *I just heard that they had Cedar and I heard that they were waiting for permission. I don't know...*

Q       *From who, though?*

A       *No.*

Q       *You said the DA before that.*

A       *I assumed it was the DA.*

ADVANCING LAW FOR ANIMALS

Q     *Why did you assume it was the DA?*

A     *Because the DA's official.*

Q     *Any other reason?*

A     *No.*

...

Q.    *Okay. Did you ask them if it was the DA?*

A     *No.*

Q     *No? Why not?*

A     *Again, I didn't have a say in the – what happens to it.*

Q     *But it's your livestock manager and fair, why did -- you must have some say?*

MR. BRIDGES: *Well, I think that still misstates testimony that she knows who told her that.*

THE WITNESS: *I don't.*

....

Q     *okay. Who told you that they were waiting?*

A      *I don't remember.*

Q     *You don't remember at all, but you heard from someone?*

A     *Yes.*

Ex. 6 (Silva Dep. Vol. 1, 66:04-10; 66:25-67:24; 68:17-22).

    20.    With respect to the DA's involvement, Ms. Silva further testified.

Q     *Okay. Did you talk to the DA –*

A     *No –*

Q     *-- at all?*

A     *-- it was not. It was the community barbecue's goat.*

Q     *Okay. But did you talk to the DA at all?*

A     *I did not.*

Q     *You did not. So you're relying on B.J. to talk to the DA?*

A     *No.*

Q     *Okay. Then -- okay.*

A     *It was -- it was the community barbecue's goat. And they are the ones that pursued it with the DA.*

Ex. 6 (Silva Dep. Vol. 1, 329:05-18).

ADVANCING LAW FOR ANIMALS

21.    With respect to her own involvement, Mrs. Silva testified she had no contact with BJ:

> Q      *Did you know that B.J. had custody of him?*
>
> A      *I just knew it was back. I didn't know exactly it went when it came back.*
>
> Q      *Did you -- did you ask B.J.?*
>
> A      *No.*
>
> Q      *Is there any reason you didn't ask B.J.?*
>
> A      *We were not in contact.*

Ex. 6 (Silva Dep. Vol. 1, 62:22 -63:03);

22.    With respect to where Cedar was held after he was returned by the Sheriff's officers, Mrs. Silva testified:

> MR. BRIDGES:      *I'm confused. I thought you said you didn't know that B.J. had custody.*
>
> THE WITNESS:      *I don't know that he had --he had custody.*
>
> MR. GORDON:       *No, she said she didn't know where he had custody. She knew –*
>
> THE WITNESS:      *I didn't know he had it. I don't -- I know it came back. I don't know where it went after that.*

Ex. 6 (Silva Dep. Vol. 1, 64:13-15);

> Q      *But you understood that B.J. and Ms. Muse had custody, correct?*
>
> A      *I heard that the sheriff brought the goat back.*
>
> Q      *To B.J.*
>
> A      *I don't know exactly. I'm assuming that it was B.J., but I don't know who.*

Ex. 6 (Silva Dep. Vol. 1, 69:18-24);

23.    With respect to her responsibility and role in Cedar's fate, Mrs. Silva testified:

> Q.     *Okay. Did you ask them if it was the DA?*
>
> A      *No.*
>
> Q      *No? Why not?*
>
> A      *Again, I didn't have a say in the – what happens to it.*
>
> Q      *But it's your livestock manager and fair, why did -- you must have some say?*
>
> MR. BRIDGES: *Well, I think that still misstates testimony that she knows who told her that.*
>
> THE WITNESS: *I don't.*

DECLARATION OF RYAN GORDON IN SUPPORT OF FILING MOTIONS TO COMPEL

ADVANCING LAW FOR ANIMALS

1  Ex. 6 (Silva Dep. Vol. 1, 68:06-07);

2       *Q*     *You didn't know Cedar was killed on July --25 on July 28th?*

3       *A*     *No.*

     *Q*     *When did you find out he was killed on July 28th?*

4       *A*     *I never knew. Right now.*

5       *Q*     *To this day you still don't know?*

6       *A*     *I did not know it was July 28th, no.*

7       *Q*     *Oh, okay. So until I represented to you today, you never heard July 28th is the date?*

8       *A Correct.*

9  Ex. 6 (Silva Dep. Vol. 1, 77:24-78:09);

10       *Q*     *...you mentioned having a conversation with Kathie Muse....*

11       *...*

12       *Q*     *...And in this conversation you discussed media and nothing else to your recollection; is that accurate?*

13       *A*     *I don't remember what else we discussed. I would know -- I do know that*

14             *it was part of the attacks in the media.*

     *Q*     *Okay. But -- but Cedar himself, his whereabouts at that moment, you --*

15             *you did not --you don't recall discussing?*

16       *A*     *I don't recall discussing that, no.*

17       *...*

18       *Q*     *So you might have discussed it?*

19       *A*     *I -- I doubt it. I just wasn't curious about it.*

     *Q*     *You were incurious about it. Okay. So you don't though think you would*

20             *have thought to ask her at the time?*

21       *A*     *Correct.*

22  Ex. 6 (Silva Dep. Vol. 1, 123:02-124:03); and

23       *Q*     *When he was retrieved, Cedar was -- so when Cedar was retrieved, you knew -- you thought he was retrieved and then slaughtered right away*

24             *and handled -- what do you mean by "handled"?*

25       *A*     *I didn't give it as much thought as you're saying.*

     *Q*     *Okay. So –*

26       *A*     *Cedar was retrieved. They handled the situation. I –*

27       *Q*     *Okay. But it's -- it was your responsibility to see that the animals sold to the auction were, in fact, sent to the slaughter. You didn't think it was*

28             *appropriate to follow up with B.J. what the status was with Cedar?*

*ADVANCING LAW FOR ANIMALS*

*A        No.*

Ex. 6 (Silva Dep. Vol. 1, 183:01-15).

24.     On November 15, 2023, I conducted the deposition of Defendant B.J. Macfarlane ("Mr. Macfarlane"). The period for making deposition corrections expired on January 1, 2024. A true and correct copy of excerpts from Mr. Macfarlane's deposition is attached as **Exhibit 7**.

25.     With respect to Mr. Macfarlane's representations to Mrs. Long that she committed a felony by removing Cedar, among other things, he testified:

> *Q.        ...So you remember speaking with her on the phone around 9:00-ish at the fairgrounds. And do you remember what you discussed with her?*
>
> *A.        Yes. I asked her that we need to get the goat back. And she said, "There's got to be some other way." And I said, "No, there's no other way that you don't own the goat at this time. It's my opinion you're stealing something over $400 of agricultural commodities. It's considered a felony," which I had to look it up.*
>
> *....*
>
> *Q        ....So you had this conversation with [Mrs. Long] on the phone. You tell her she committed a felony in your opinion or potentially committed a felony, you know –*
>
> *A.        Yeah.*

Ex. 7 (Macfarlane Dep. Vol. 1, 161:17-167:3).

26.     With respect to whether Mr. Macfarlane or Ms. Silva called Shasta County Sheriff Michael Johnson to accuse Mrs. Long of a crime after she removed Cedar from the fairgrounds, Mr. Macfarlane testified:

> *Q.        ....All right. Okay. So do you know who – so this -- this text chain begins on June 28th with the Instagram post. Do you know if the sheriffs were involved at that point in time?*
>
> *A.        I do not recall.*
>
> *Q.        I believe it's Tuesday, the 28th. Isn't it? Because 25th is Saturday, 26th, 27th, yeah, Tuesday, right?*
>
> *A.        I don't recall when the sheriffs were -- I believe I called Sheriff Johnson at some point this week and I don't remember when.*
>
> *Q.        Oh, you -- so you called –*
>
> *A.        I -- not me, yeah, somebody did.*
>
> *Q.        Somebody did. But you called Sheriff Johnson at some point?*
>
> *A        And I think it was me. Again...*

Q        Do you remember what date that was about?

A        No clue. Some -- I'm guessing sometime this week, maybe Tuesday, maybe Wednesday. I...

Ex. 7 (Macfarlane Dep. Vol. 1, 191:23-191:11; 193:04-21).

27.    With respect to the CDFA's involvement in deciding Cedar's fate, Mr. Macfarlane testified:

A        ...I was to hold on to the goat.

Q        Okay. Hold on to the goat for -- until when?

A        Until the state said what was going to happen.

Q        Till the state -- what do you mean "the state"?

A        Mike Francesconi or the lawyer. I don't know. That's -- that's above my pay grade. I was just –

Q        I understand.

A        -- housing the goat.

Q        Okay. Do you know which lawyer?

A        No.

Q        Was this the CDFA's lawyer?

A        Yes.

Q        Okay.

A        Yes, it was the CDFA's lawyer.

Ex. 7 (Macfarlane Dep. Vol. 1, 202:11-203:23).

28.    With respect to holding Cedar from July 8, 2022, until when Cedar's was killed on July 28, 2022, his conversations with Ms. Silva, and that they were also waiting on the Sheriff and the DA, Mr. Macfarlane testified:

Q        About how many times would you say you talked to Melanie through this?

A        I –

Q        Multiple times?

A        Yeah, multiple times.

...

Q.       ...when you got Cedar on July 8 through, let's say, the 28th is when it appears that he's killed or goes to slaughter, you talked to Melanie multiple times, correct?

A        Yes.

ADVANCING LAW FOR ANIMALS

…

*Q*      *did you tell Melanie that we're waiting to hear from the sheriff and the DA?*

*A*      *And I'm -- yeah, and I don't remember if she was the one talking to the sheriff. I think -- I know I did a couple times, but I want to think that -- I thought she was the one that was gearing it, so what -- with the state and the sheriff, so...*

Ex. 7 (Macfarlane Dep. Vol. 1, 208:25-209:17).

29.      With respect to his perspective that he was operating under the direction of Ms. Silva, the Sheriff, the CDFA, and the District Attorney, Mr. Macfarlane testified:

*Q.*     *...but what was your understanding of what they were waiting to determine?*

*A*      *I don't -- I think it was over if the DA was going to prosecute.*

...

*Q.*     *...Okay. So -- okay. So you -- you felt like you were -- just to clarify in your -- from your perspective, you felt like you were operating under the direction of Melanie and the sheriff –*

*A*      *Yes.*

*Q*      *-- office? Okay. And potentially the CDFA, I guess, also?*

*A*      *Yes. The CDFA.*

*Q*      *And the District Attorney? Okay. All right.*

Ex. 7 (Macfarlane Dep. Vol. 1, 209:22-211:10).

30.      With respect to a text exchange on July 11, 2022, between Mr. Macfarlane and Mrs. Muse, Macfarlane testifies

*Q.*     *...your follow-up text to -- to Kathie is: "Good morning. I'm gone till tomorrow afternoon, talked to sheriff and he said to wait until he talks to DA before we kill goat." It's per- --*

*A*      *Yeah.*

...

*Q*      *...when you say the sheriff here, do you know -- "talked to sheriff." Do you know who you –*

*A*      *Johnson.*

*Q*      *Johnson. Okay. And the -- and as far as the DA here, do you know which DA you're talking about?*

*A*      *It's a woman. I do not know her name.*

ADVANCING LAW FOR ANIMALS

| | | |
|---|---|---|
| Q | *Is it -- so if you go to the last page of that, is it Stephanie Bridgett, by chance? The very last page. This is –* |

| | | |
|---|---|---|
| A | *Yeah. That would be the district attorney, yeah. I don't know her and --* |

Ex. 7 (Macfarlane Dep. Vol. 1, 204:01-205:08).

31.     With respect to speaking with Sheriff Johnson while he was holding Cedar, Mr. Macfarlane testified:

| | |
|---|---|
| Q. | *Okay. And what did -- do you know how many times between that period you talked with Sheriff Johnson and the DA between the 11th and the 25th of July?* |
| A | *A couple times maybe. And this was – I never talked to the DA.* |
| Q | *Oh, how did you know the DA -- did the sheriffs say that he was waiting on the DA?* |
| A | *Yes.* |

Ex. 7 (Macfarlane Dep. Vol. 1, 207:10-22).

32.     With respect Cedar's ear tags, contrary to Mrs. Muse's testimony, Mr. Macfarlane testified she instructed him to hold them:

| | |
|---|---|
| Q | *Okay. And why were you supposed to save his ear tags?* |
| A | *I -- because Kathie told me to save ear tags, so I saved ear tags.* |
| Q | *Why would Kathie -- what's the purpose in saving ear tags?* |
| A | *I have no idea. She wanted ear tags* |

Ex. 7 (Macfarlane Dep. Vol. 1, 212:13-213:04).

33.     On February 9, 2024, I conducted Volume II of the continued deposition of Ms. Silva. The period for making deposition corrections expires on March 29, 2024. A true and correct copy of excerpts from Mrs. Muse's deposition is attached hereto as **Exhibit 8**.

34.     With respect to discussions with nonparty Mike Francesconi of the California Department of Agriculture, Ms. Silva testified:

| | |
|---|---|
| Q. | *Okay. And "Mike Francesconi" again. It looks like you have beneath that "6-28, 9:10 a.m." Is this another call at that time with Mike Francesconi?* |
| A. | *Yes.* |
| Q. | *Okay. All right. Regarding Cedar again?* |
| A. | *Yes.* |

Ex. 8 (Silva Dep. Vol. 2, 412:12-17); and

*ADVANCING LAW FOR ANIMALS*

DECLARATION OF RYAN GORDON IN SUPPORT OF FILING MOTIONS TO COMPEL

Q.      Okay. All right. So "pickup goat. Don't pursue charges. If large" -- what were you -- what is the direction -- there's not commas so I don't want to read it and you can tell me what you were trying to say here.

A.      "Pick up goats. Don't pursue charges. If large group, back off. Don't comment."

Q.      Okay. All right. So this is around June 28th, correct?

A.      Yes.

...

Q.      Okay. Did Mike Francesconi tell you not to pursue charges at that time?

A.      I don't know that it came up at that time.

Ex. 8 (Silva Dep. Vol. 2, 412:18-413:17).

35.     With respect to whether the Dahle's or Ms. Muse's payment of Cedar, Ms. Silva testified:

Q.      Okay. Okay. And then documents reflecting final payment of Cedar by the Dahles. Did you ever get the Dahles' payment documents for Cedar?

A.      I don't believe they paid.

Q.      You don't believe they paid?

A.      No.

Q.      Okay. Did Ms. Muse pay on their behalf?

A.      No.

Ex. 8 (Silva Dep. Vol. 2, 431:14-20).

During discovery Ms. Silva also produced an email between her and Muse, dated July 11, 2022, wherein she attaches the bills for Cedar and states "Hi Kathie, I have attached their bills. I appreciate the update!" A true and correct copy of that email is attached hereto as **Exhibit 20**.

36.     Attached hereto as **Exhibit 9** is a true and correct copy of a July 18, 2022 text thread Defendant Mr. Macfarlane produced in discovery between him and Defendant Ms. Silva. This text thread indicates that, on July 18, sometime after 10:29 am, Ms. Silva texted Mr. Macfarlane, "The word goat makes my eye twitch now 🤣🤣🤣🤣🤣🤣🤣[,]" to which Mr. Macfarlane texted Ms. Silva, "It should. Lol[.]"

37.     Attached hereto as **Exhibit 10** is a true and correct copy of a July 22, 2022 text thread Defendant Mr. Macfarlane produced in discovery between him and Defendant Ms. Silva. This text thread indicates that, on July 22, 2022, Ms. Silva and Mr. Macfarlane texted about their cover story as

ADVANCING LAW FOR ANIMALS

to Cedar's ultimate disposition wherein Mr. Macfarlane writes "What's the gals name at bowman? Kathy [sic] said ok but no one needs to know about this. U me and Kathy [sic] are only ones. It got killed and donated to non profit if anyone asks," and Ms. Silva provides the name of the relevant employee at the company who ultimately butchers Cedar and writes "We are a non profit 😳🤣🤣🤣 [.]"

38.     Attached hereto as **Exhibit 11** is a true and correct copy of a July 28, 2022 text thread Defendant Mr. Macfarlane produced in discovery between him and Defendant Ms. Silva, which indicates that on July 28, 2022, Mr. Macfarlane texted Ms. Silva, "Goat is getting butchered within the half hour. Finally."

39.     On or about January 20, 2024, I subpoenaed Mr. Macfarlane's phone records, which were produced by AT&T on or about February 7, 2024. Redacted copies of the relevant pages of the records are attached hereto as **Exhibit 12**. Please note AT&T produced records in Coordinated Universal Time, or UTC. For ease of review, in the records listed below, Plaintiffs' counsel adjusted the time to Pacific Daylight Time, or PDT, by subtracting 7 hours from UTC. The records indicate that:

   a.  On July 22, 2022, at 11:17 am (18:17 UTC), Ms. Silva (XXX XXX 6789) called Mr. Macfarlane and the two spoke for 4 minutes;

   b.  On July 22, 2022, at 11:22 am (18:22 UTC), Mr. Macfarlane called Mrs. Muse (XXX XXX 9107), and the two spoke for over 4 minutes;

   c.  On July 22, 2022, at 11:29 am (18:29 UTC), Mr. Macfarlane called Bowman Meat Company (XXX XXX 4463), and arranged for Cedar's slaughter;

   d.  On July 25, 2022 at 3:15 pm (22:15 UTC), Ms. Silva (XXX XXX 6789) called Mr. Macfarlane and the two had a short conversation; and

   e.  On July 25, 2022 at 3:31 pm (22:31 UTC), Mr. Macfarlane called Ms. Silva (XXX XXX 6789) and the two spoke for over 5 minutes.

40.     On February 9, 2024, I conducted Volume II of the continued deposition of Mr. Macfarlane. The period for making deposition corrections expires on March 29, 2024. A true and correct copy of excerpts from Mr. Macfarlane's deposition is attached hereto as **Exhibit 13**.

ADVANCING LAW FOR ANIMALS

41.    With respect to Ms. Silva and Mrs. Muse's contact with law enforcement and the District Attorney over the decision to kill Cedar, Mr. Macfarlane testified:

> Q.    *Okay. So who gave you the -- you said you were waiting on permission to -- for direction to have Cedar slaughtered, correct?*
>
> A.    *Yes.*
>
> Q.    *When it was at your house? Who ultimately gave you the direction to?*
>
> A.    *I believe it was either Melanie or Kathie.*
>
> Q.    *Melanie or Kathie. Did -- why do you believe that?*
>
> A.    *Because that's who -- I don't know. That's who the -- my boss -- it wasn't even my boss. The CEO of the fair and the owner of the goat.*
>
> Q.    *Okay. And your understanding was that they were in communication with law enforcement?*
>
> A.    *Yes.*
>
> Q.    *And by "law enforcement," I mean the sheriff's office, and you said maybe the sheriff, but it maybe it was the lieutenants as well?*
>
> MR. NORTHCUTT: *Objection. Misstates testimony. He never said it was the sheriff. He, in fact, testified he said it wasn't the sheriff. It was the sheriff's department.*
>
> MR. GORDON: Q. *He said -- I thought you said I believe -- you don't believe so, so I'm assuming you mean maybe you don't know who it was? You said they were in communication with –*
>
> A.    *The sheriff's department.*
>
> Q.    *The sheriff's department, okay. And the DA as well? Was your understanding?*
>
> A.    *Yeah.*

Ex. 13 (Macfarlane Dep. Vol. 2, 250:08-251:08).

42.    With respect to Mr. Macfarlane's testimony about Sheriff Michael Johnson's involvement, contrary his testimony in his first section, he testified:

> Q.    *Okay. And it's your testimony that you've never spoken with Michael Johnson, Sheriff Michael Johnson, regarding Cedar the goat; correct or incorrect?*
>
> A.    *Correct.*

Ex. 13 (Macfarlane Dep. Vol. 2, 269:20-23).

a.    With respect to Mr. Macfarlane's testimony about the recipient of the cuts of Cedar's meat, he testified:

ADVANCING LAW FOR ANIMALS

> Q.     Didn't you testify earlier that you didn't know who got Cedar, though?
>
> A.     I did testify earlier that I did not know who got Cedar, but I read it in the email or text messages here and that is –
>
> Q.     So that's Melanie telling you Vista Real Estate –
>
> A.     Yes.
>
> Q.     -- is getting Cedar? Okay. All right.
>
> A.     I did testify that I did not know. And I did not know until I read that.

Ex. 13 (Macfarlane Dep. Vol. 2, 349:24-350:09).

43.     Between July 15, 2022 and July 27, 2022, on behalf of Mrs. Long, I contacted both the Sheriff's and Shasta County Counsel's Office multiple times demanding to know what happened to Cedar and that he be kept alive. I spoke with Lieutenant Fernandez and Detective Duncan on the phone. Detective Duncan claimed to have no information and directed me to Lieutenant Fernandez. Lieutenant Fernandez would not disclose any information about Cedar other than saying "we turned him over to who we deemed was the rightful owner." I also had communications with attorney Adam Pressman of the Shasta County Counsel's office and he too would not provide information on Cedar's whereabouts.

44.     On or about January 19, 2024, I spoke to a Verizon representative, who stated that any subpoenas for cellular records needed to be faxed to (888) 667-0028.

45.     On or about January 20, 2024, on behalf of Plaintiffs, I served Verizon with a subpoena for Ms. Silva's work cell phone records (XXX XXX 4949), seeking records for "Any records concerning incoming or outgoing calls or texts … from June 25, 2022, through September 1, 2022, including call logs, call detail records, and text logs." Ms. Silva confirmed this is her work number in deposition. *See* Ex. 6, Silva Dep. 149:11-15. Verizon responded in writing on January 24, 2024 that it could not produce any records absent a court order. A true and correct copy of the subpoena, and Verizon's written response, is attached hereto as **Exhibit 14**.

46.     On about January 25, 2024, I spoke with representatives of Verizon in their subpoena compliance department who informed me that Verizon's written response for Ms. Silva's work cell was standard, as they do not release records of California customers absent a court order or consent.

47.     On January 30, 2024, Ms. Silva's counsel sent me an email objecting to the subpoena. A true and correct copy of his objection email is attached hereto as **Exhibit 15**.

48.     On February 20, 2024, on behalf of Plaintiffs, I served Verizon with a subpoena for Mrs. Muse's personal cell (XXX XXX 9107), seeking "Any records concerning incoming or outgoing calls or texts … from June 25, 2022, through September 1, 2022, including call logs, call detail records, and text logs." Mrs. Muse confirmed this is her cell number in deposition. *See* Ex. 5, Muse Dep. 147:4-08. Verizon did not respond to that subpoena. On March 4, 2022, I called Verizon's subpoena compliance department and an agent identified as "Richard" informed me that the subpoena had been mislabeled. He did not know if/when a response would be issued. A true and correct copy of the subpoena for Mrs. Muse's cell records is attached hereto as **Exhibit 16**. Additionally, Mrs. Muse's counsel did not object to, move to quash, or otherwise respond to Plaintiffs' counsel regarding the subpoena at issue.

49.     On or about February 26, 2024, on behalf of Plaintiffs, I served Verizon with a subpoena for what I intended to be Ms. Silva's personal cell phone records (XXX XXX 0058), seeking records for "Any records concerning incoming or outgoing calls or texts … from June 25, 2022, through September 1, 2022, including call logs, call detail records, and text logs." Ms. Silva confirmed this is her work number in deposition. *See* Ex. 6, Silva Dep. 149:22-150:01. However, the initial subpoena contained an incorrect number. I corrected it on March 5, 2024 and then Verizon responded in writing on March 6, 2024, 2024 that it could not produce any records absent a court order for Ms. Silva's personal cell phone records (XXX XXX 0058). A true and correct copy of the subpoena, and Verizon's written response, is attached hereto as **Exhibit 17**.

50.     On March 4, 2024, both me and my co-counsel Vanessa Shakib met and conferred with Attorney John Bridges, counsel for Ms. Silva. Mr. Bridges requested a protective order concerning the personal cell number. Plaintiffs do not oppose Ms. Silva's request and are currently awaiting a draft protective order from Ms. Silva's counsel to review.

51.     The subpoena to nonparty Vista Real Estate requests, "All records related to any goat meat you acquired from, or that related to, the Shasta District Fair & Event Center between June 25, 2022, and September 1, 2022. This includes records of any goat meat you acquired from the 2022 Junior Livestock Auction at the Shasta District Fair, or documents from 3rd parties such as butchers." Service was attempted on February 23, 2022. But, per the process service, Chad Phillips, the putative principal of Vista Real Estate, initially responded, but then became nonresponsive and evaded service

ADVANCING LAW FOR ANIMALS

over the following days. He was ultimately served on February 29, 2022, with both subpoena and the notice of motion. He has not responded to date. A true and correct copy of the subpoena and process server's proof of service is attached hereto as **Exhibit 18**.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 6, 2024.

By:_____/s/Ryan Gordon
          Ryan Gordon

ADVANCING LAW FOR ANIMALS

**ADVANCING LAW FOR ANIMALS**

**PROOF OF SERVICE**

I, Ryan Gordon, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 407 N. Pacific Coast Hwy. #267, Redondo Beach, CA 90277.

On March 6, 2024, I served on the interested parties in this action the following document(s) described as **DECLARATION OF RYAN R. GORDON IN SUPPORT OF PLAINTIFF'S MOTIONS TO COMPEL (ECF Nos. 52, 54, 55, and 56)**

☒ By placing ☒ a true copy thereof enclosed in a sealed envelope addressed as follows:

CHRISTOPHER M. PISANO,
christopher.pisano@bbklaw.com
DAMIAN A. NORTHCUTT,
Damian.Northcutt@bbklaw.com
JULIA HERNANDEZ
Julia.Hernandez@bbklaw.co
BEST BEST & KRIEGER LLP 300
South Grand Avenue 25th Floor
Los Angeles, California 90071

VERIZON
C/O Verizon Security Subpoena Compliance
180 Washington Valley Road
Bedminster NJ 07921
Fax: 1.888.667.0028.

JOHN C. BRIDGES
CALIFORNIA DEPARTMENT OF JUSTICE
Tort and Condemnation Section
1300 I Street, Suite 1210
Sacramento, CA,  95814
**John.Bridges@doj.ca.gov**

Kelly J. Snowden, Esq.
Kelly.snowden@rswslaw.com
Tonya.hamilton@rswslaw.com

☒  **BY FAX**:  by transmitting via facsimile the document(s) listed above to the fax number(s) set forth for Verizon at its request.

☐  **OVERNIGHT DELIVERY**:  I deposited such envelope in a facility regularly maintained by ☒ FEDERAL EXPRESS with delivery fees fully provided for or delivered the envelope to a courier or driver of ☐ FEDERAL EXPRESS authorized to receive documents at 407 N. Pacific Coast Hwy, #267, Redondo Beach, CA 90277 with delivery fees fully provided for.

☒  **BY E-MAIL OR ELECTRONIC TRANSMISSION**: The document(s) was sent from e-mail address rgordon@advancinglawforanimals.org to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒  [Federal]  I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on March 6, 2024, at Los Angeles, California.

_____
/s/Ryan Gordon
Ryan Gordon