# EXHIBIT 6

# In The Matter Of:

*LONG vs.*

*FERNANDEZ*

---

*MELANIE SILVA*

*November 14, 2023*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File M. Silva.txt

**Min-U-Script® with Word Index**

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                       SACRAMENTO DIVISION

4    E.L., a minor, by and through      )
     her general guardian, JESSICA      )
5    LONG; JESSICA LONG, an             )
     individual,                        )
6                                       )
                         Plaintiffs,    )
7                                       )
        vs.                             )   NO. 2:22-cv 01527
8                                       )   DAD-AC
     LIEUTENANT JERRY FERNANDEZ,        )
9    individually and in his           )
     individual capacity as Sheriff    )
10   for the County of Shasta;         )
     DETECTIVE JACOB DUNCAN,           )
11   individually and in his           )
     individual capacity as Sheriff    )
12   for the County of Shasta;         )
     DETECTIVE JEREMY ASHBEE,          )
13   individually and in his           )
     individual capacity as Sheriff    )
14   for the County of Shasta; SHASTA  )
     DISTRICT FAIR AND EVENT CENTER,   )
15   a district agricultural           )
     association; COUNTY OF SHASTA;    )
16   SHASTA COUNTY SHERIFF'S           )
     DEPARTMENT; MELANIE SILVA, in     )
17   her individual capacity; BJ       )
     MACFARLANE, in his individual     )
18   capacity; and DOES 1 through 10,  )
                                       )
19                       Defendants.    )
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
20                        ---oOo---

21              TUESDAY, NOVEMBER 14, 2023

22                       9:41 a.m.

23        VIDEOTAPED DEPOSITION OF MELANIE SILVA

24                        ---oOo---

25        Reported by:  CAROL J. CHASE, CSR No. 13538

**MELANIE SILVA**

1     delivered to B.J. Mcfarlane, correct?

2        A     I heard that he was in Napa and that he was

3     brought back.

4        Q     Okay.  Who did you hear that from?

10:29:52  5        A     I knew you were going to ask that.  I --

6     who told me?  I don't remember who told me.  There

7     was a lot of people that told me random information.

8        Q     Okay.

9        A     I don't remember.

10:30:20 10        Q     Do you remember if you found out he was at

11     B.J.'s from text, phone, or e-mail?

12        A     I never knew he was at B.J.'s.

13        Q     You -- didn't you just say a moment ago --

14        A     That he was back in -- they had possession

10:30:32 15     of Cedar again, yes.

16        Q     Yes.

17        A     Where exactly they took him, I do not know.

18        Q     Okay.  But you knew he was with B.J. in

19     some capacity, yes?

10:30:40 20        A     I knew that B.J. was aware that it was

21     back, yes.

22        Q     Did you know that B.J. had custody of him?

23        A     I just knew it was back.  I didn't know

24     exactly it went when it came back.

10:30:52 25        Q     Did you -- did you ask B.J.?

**MELANIE SILVA**

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Is there any reason you didn't ask B.J.? |
| 3 | A | We were not in contact. |
| 4 | Q | You were the not in contact.  Okay.  Were |
| 10:31:01 5 | | you in contact with anyone else regarding Cedar? |
| 6 | A | In, like, regular contact checking up on |
| 7 | | it?  No. |
| 8 | Q | Irregular contact, anyone at any point in |
| 9 | | the time from -- |
| 10:31:09 10 | A | Kathie Muse and I spoke once. |
| 11 | Q | When did you speak to her? |
| 12 | A | I -- I don't know.  She also has an event |
| 13 | | with a different group that has nothing to do with |
| 14 | | any of this at the fairgrounds, so I just see her |
| 10:31:23 15 | | randomly. |
| 16 | Q | Okay.  So you knew that -- that Kathie and |
| 17 | | B.J. had custody of Cedar? |
| 18 | A | Correct. |
| 19 | Q | Okay.  Okay.  And when -- do you know when |
| 10:31:32 20 | | you abouts [sic] learned about that? |
| 21 | A | No. |
| 22 | Q | No?  Was it -- so he was retrieved the 8th |
| 23 | | and -- |
| 24 | A | Of August? |
| 10:31:40 25 | Q | No.   July. |

**MELANIE SILVA**

1      A      Oh.

2      Q      And this was -- and this was -- with that

3   date in mind, did you learn immediately after?

4   Right after?

10:31:47  5      A      I don't know.  I don't know.

6      Q      A few weeks later?

7           MR. BRIDGES:  I'm confused.  I thought you

8   said you didn't know that B.J. had custody.

9           THE WITNESS:  I don't know that he had --

10:31:55 10   he had custody.

11           MR. GORDON:  No, she said she didn't know

12   where he had custody.  She knew --

13           THE WITNESS:  I didn't know he had it.  I

14   don't -- I know it came back.  I don't know where it

10:32:01 15   went after that.

16   BY MR. GORDON:

17      Q      Okay.  Okay.  So you did want know -- B.J.

18   is a livestock manager, correct?

19      A      He was, yes.

10:32:08 20      Q      At that time?

21      A      At that time.

22      Q      So he's your employee?

23      A      He was, yes.

24      Q      Okay.  So you didn't know where the

10:32:16 25   livestock manager was with the livestock; is that

**MELANIE SILVA**

```
 1    your testimony?
 2        A     At that time.
 3        Q     Okay.  At that time.  And when did you
 4    learn to the best of your memory?
 5        A     Sometime after it was back.
 6        Q     That could be till now.  In -- in July?
 7        A     I don't know.
 8        Q     Before the board meeting on the 19th; do
 9    you think you knew by then?
10        A     I don't know.
11        Q     Well, please give me your best estimate.
12        A     I -- honestly, I have no clue, July,
13    August.  I'm not sure.
14        Q     July, August.  Okay.  Where is Cedar right
15    now then?
16        A     I don't know.
17        Q     You don't know where he is.  Okay.  Okay.
18    Well, you know he was slaughtered, yes?
19        A     I heard that he was slaughtered.
20        Q     When did you hear that?
21        A     I don't know -- people just talk.  I don't
22    know.  I'm not trying to be difficult.  I don't
23    know.
24        Q     When did you first hear he was slaughtered?
25        A     This is hearsay.  Do I say it as fact when
```

Line timestamps: 10:32:26 (line 5), 10:32:38 (line 10), 10:32:48 (line 15), 10:32:58 (line 20), 10:33:13 (line 25)

**MELANIE SILVA**

1      I don't know for sure?

2          Q      It's not being introduced as evidence.

3      Yes, you need to tell me what -- what you heard.

4          A      I just -- I don't know when I heard it.  I

10:33:26  5    just heard that he was back and that the permission

6      was given to go ahead and move forward with the

7      slaughter.

8          Q      Permission from who?

9          A      Somebody told me DA.  But do I know if

10:33:40 10    that's fact?  I don't know if that's fact.

11         Q      Yeah.

12                MR. GORDON:  So off the record for just one

13     second.

14                THE VIDEOGRAPHER:  We're off the record and

10:33:47 15    the time is 10:33.

16                (Whereupon, recess was take

17                from 10:33 a.m. to 10:47 a.m.

18                (Record read.)

19                THE VIDEOGRAPHER:  We're back on the record

10:47:16 20    and the time is 10:47.

21     BY MR. GORDON:

22         Q      All right.  Where we left off, Melanie --

23     and you understand you're still under oath, correct?

24         A      Yes.

10:47:25 25        Q      Okay.  All right.  When we left off and you

**MELANIE SILVA**

1  said you heard from, I believe, Silva [sic] or

2  Macfarlane.  You were waiting on permission because

3  they had custody of Cedar.  And I said permission

4  from who and you said the DA.  When did you hear

10:47:41  5  about that?

6  　　　　　　　MR. BRIDGES:  I think that misstates her

7  testimony.

8  　　　　　　　THE WITNESS:  Yeah, it was.

9  BY MR. GORDON:

10:47:44  10  　　Q　　What did you say then?

11  　　A　　I just heard that they had Cedar and I

12  heard that they were waiting for permission.  I

13  don't know...

14  　　Q　　From who, though?

10:47:54  15  　　A　　No.

16  　　Q　　You said the DA before that.

17  　　A　　I assumed it was the DA.

18  　　Q　　Why did you assume it was the DA?

19  　　A　　Because the DA's official.

10:48:03  20  　　Q　　Any other reason?

21  　　A　　No.

22  　　Q　　Did -- did they -- either of them tell you

23  it was the DA?

24  　　A　　No.

10:48:09  25  　　Q　　No?  Okay.  Why didn't you assume it was

**MELANIE SILVA**

1    the sheriffs?

2        A      Because the DA's the legal.

3        Q      Okay.  Did you ask them if it was the DA?

4        A      No.

10:48:20 5    Q      No?  Why not?

6        A      Again, I didn't have a say in the -- what

7    happens to it.

8        Q      But it's your livestock manager and fair,

9    why did -- you must have some say?

10:48:30 10          MR. BRIDGES:  Well, I think that still

11   misstates testimony that she knows who told her

12   that.

13              THE WITNESS:  I don't.

14              MR. BRIDGES:  I don't think that was ever

10:48:36 15   established.

16   BY MR. GORDON:

17       Q      That she had -- okay.  Who told you that

18   they were waiting?

19       A      I don't remember.

10:48:40 20   Q      You don't remember at all, but you heard

21   from someone?

22       A      Yes.

23       Q      Okay.  And this was between -- he was

24   retrieved on the 8th and then apparently killed --

10:48:54 25   of July -- on the 28th.  So --

**MELANIE SILVA**

```
 1        A     I didn't know the date.
 2        Q     Okay.  But this would have been within that
 3    period of time; is that your understanding?
 4        A     Somewhere in July and August.  I don't
10:49:02  5    know.
 6        Q     Somewhere in July or August.  Okay.  And
 7    you have no recollection of who told you this?
 8        A     No.
 9        Q     Well, who else knew that Cedar was in the
10:49:10 10    custody of B.J. or -- or, uh, Ms. Muse?
11              MR. BRIDGES:  Calls for speculation and
12    misstates her testimony about who had custody of the
13    goat.
14              But if you understand --
10:49:21 15              THE WITNESS:  I don't.
16              MR. BRIDGES:  -- the question.
17    BY MR. GORDON:
18        Q     But you understood that B.J. and Ms. Muse
19    had custody, correct?
10:49:27 20        A     I heard that the sheriff brought the goat
21    back.
22        Q     To B.J.
23        A     I don't know exactly.  I'm assuming that it
24    was B.J., but I don't know who.
10:49:35 25        Q     Okay.  And --
```

**MELANIE SILVA**

1   company cut the check?

2       A       I do not.

3       Q       Okay.  So back to the -- to the -- what you

4   assumed is the DA.  So between July 8th and -- and

10:56:36   5   July 28th, are you -- you said July and August, but

6   those -- I'll represent to you those are the days

7   that he was reviewed and killed.  So it would have

8   been between those periods of time that you heard

9   that the people who had custody of Cedar were

10:56:49  10   waiting on what you assume was the DA, correct?

11      A       I assumed it.

12      Q       Yes, I understand.  Yes.

13              MR. BRIDGES:  I'll also object that the

14   timeline lacks foundation.  It calls for

10:56:58  15   speculation.  She doesn't know when -- you're making

16   representation about --

17              MR. GORDON:  Yes, I am.

18              MR. BRIDGES:  -- those dates.  She doesn't

19   know those dates.

10:57:04  20              MR. GORDON:  Okay.

21              MR. BRIDGES:  Os she thought it could be

22   July or August.

23   BY MR. GORDON:

24      Q       You didn't know Cedar was killed on July --

10:57:11  25   on July 28th?

**MELANIE SILVA**

1        A       No.

2        Q       When did you find out he was killed on

3    July 28th?

4        A       I never knew.  Right now.

10:57:16  5        Q       To this day you still don't know?

6        A       I did not know it was July 28th, no.

7        Q       Oh, okay.  So until I represented to you

8    today, you never heard July 28th is the date?

9        A       Correct.

10:57:21 10        Q       When did you assume -- or when do you

11    believe he was killed prior to today?

12        A       Like what day?

13        Q       Yes.

14        A       I don't -- I don't know.  I didn't -- I

10:57:32 15    didn't think of a specific day.

16        Q       Okay.  Did you not -- didn't his meat go

17    back to the fairgrounds after he was killed?

18        A       No.

19        Q       It did not.

10:57:42 20        A       It was not our animal.

21        Q       Okay.  Yesterday, Kathie Muse said it went

22    back to the -- went back to the fairgrounds and was

23    directed towards another private buyer that the fair

24    issued it to.

10:57:50 25               MR. BRIDGES:  I'll object.  There's no

**MELANIE SILVA**

1      Q      -- you don't know?

2              Okay.  So this -- you men- -- you mentioned

3      having a conversation with Kathie Muse, which -- at

4      the fairgrounds in person.  And you believe that was

11:55:40  5   in the same time frame.  Do you know if that con- --

6      of July and August 2022.  Do you know if that was in

7      between July 8th when he was -- when Cedar was

8      retrieved and ber- -- and when he was slaughtered?

9      A      I don't remember the exact time.

11:55:55 10   Q      Okay.  And in this conversation you

11     discussed media and nothing else to your

12     recollection; is that accurate?

13     A      I don't remember what else we discussed.  I

14     would know -- I do know that it was part of the

11:56:07 15   attacks in the media.

16     Q      Okay.  But -- but Cedar himself, his

17     whereabouts at that moment, you -- you did not --

18     you don't recall discussing?

19     A      I don't recall discussing that, no.

11:56:16 20   Q      Okay.  But -- this isn't an I gotcha.  This

21     is -- when you say you don't recall, you mean -- you

22     mean it as not that we didn't discuss it.  You mean

23     you don't remember one way or the other?

24     A      Correct.

11:56:26 25   Q      So you might have discussed it?

**MELANIE SILVA**

1        A      I -- I doubt it.  I just wasn't curious

2    about it.

3        Q      You were incurious about it.

4               Okay.  So you don't though think you would

11:56:38  5    have thought to ask her at the time?

6        A      Correct.

7        Q      Okay.  All right.  Okay.  Okay.  So what is

8    the fair's relationship with -- with -- by "the

9    fair," I mean the 27th DAA, Shasta District Fair.

11:57:04 10   What is the fair's relationship with 4-H?

11       A      What do you mean "what's the relationship"?

12       Q      What trans- -- do you engage in business

13   together?  Are there -- are there -- I mean,

14   obviously, they -- they have the -- they participate

11:57:21 15   in the fair in some capacity.  Just expand upon how

16   you --

17       A      They are members that enter into the fair

18   and show their animals.  And then they also have an

19   event before fair to help train their -- their

11:57:36 20   members.

21       Q      Okay.  All right.  Anything else come to

22   mind?

23       A      They volunteer and help serve at our buyers

24   dinner.

11:57:49 25       Q      Okay.  So what services does the -- does

**MELANIE SILVA**

```
 1        Q      -- you know, saveable.  I know that's not
 2    the right word.  You know what I'm saying.  What you
 3    should retain or not; is that accurate?
 4        A      Yes.
 5        Q      Okay.  Okay.  Okay.  Do you have a -- do
 6    you have a work phone?
 7        A      Yes.
 8        Q      Is it -- does it double as your personal
 9    cell?
10        A      No.
11        Q      Okay.  So separate work phone number?
12        A      Yes.
13        Q      And what is the -- what is the number and
14    carrier?
15        A      Verizon ███████-4949.
16        Q      All right.  Do you ever field work calls on
17    your private phone?
18        A      Occasionally.
19        Q      Occasionally.  Okay.
20        A      More event related, though.
21        Q      More event related.  Okay.  What is your --
22    what is private phone and your carrier?
23        A      Is this going to go out in the publish?
24        Q      No.  It will just be for most of the
25    documents and it is not public.
```

**MELANIE SILVA**

```
 1        A        ██████-0058, Verizon.
 2        Q       And if we do do it, certainly your
 3   attorney --
 4                 THE COURT REPORTER:  Slow down, please.
13:32:29  5   BY MR. GORDON.
 6        Q       Where if we do a document subpoena for the
 7   records, as your attorney will tell you, you'll get
 8   a copy of it and have an opportunity to object and
 9   do all those things.  So -- okay?
13:32:41 10                 All right.  So -- okay.  Is there -- oh, is
11   your -- is your work phone a -- I think you -- I
12   think I noticed you said Verizon.  But do you have a
13   work phone that's a landline also?  Is there a
14   landline?
13:32:58 15        A        An office number.
16        Q       There's an office number.  What's the
17   office number?
18        A        ██████6789.
19        Q       Okay.  All right.  Is that the number
13:33:14 20   earlier that -- that had to be forwarded to
21   voicemail?
22        A        Yes.
23        Q       That's the one?  Okay.  Okay.
24        A        The one on Instagram.
13:33:23 25        Q       That is the one on Instagram.  Okay.  All
```

**MELANIE SILVA**

1       Q       When he was retrieved, Cedar was -- so when
2    Cedar was retrieved, you knew -- you thought he was
3    retrieved and then slaughtered right away and
4    handled -- what do you mean by "handled"?
14:13:15  5       A       I didn't give it as much thought as you're
6    saying.
7       Q       Okay.  So --
8       A       Cedar was retrieved.  They handled the
9    situation.  I --
14:13:23 10      Q       Okay.  But it's -- it was your
11   responsibility to see that the animals sold to the
12   auction were, in fact, sent to the slaughter.  You
13   didn't think it was appropriate to follow up with
14   B.J. what the status was with Cedar?
14:13:33 15      A       No.
16      Q       No?  Okay.  So I've had a question on
17   another issue which is -- stuck in here.  So did
18   you -- when the -- when the animals go to the --
19   gets processed after -- after, let's say this
14:14:12 20   auction, what happened to the meat -- and some of it
21   was donated to the barbecue -- what happened to
22   animals that were slaughtered that were not donated
23   to the barbecue?
24      A       The buyers would go pick it up.
14:14:26 25      Q       Go pick it up from the plant?

**MELANIE SILVA**

| | |
|---|---|
| 1 | MR. BRIDGES:  Yes. |
| 2 | MR. GORDON:  Okay.  So I want to make sure |
| 3 | I hand these to you and in the correct order, |
| 4 | Melanie, because this is not -- there's two |
| 14:56:30 5 | different chains here and they may overlap.  I just |
| 6 | want to figure out which one was -- was first. |
| 7 | That's the problem with e-mail with the |
| 8 | chains.  There's so many chains of multiple things |
| 9 | going in.  Okay.  All right.  I -- I guess we'll |
| 14:57:13 10 | just start with this one. |
| 11 | (Pause in proceedings.) |
| 12 | MR. GORDON:  John, if you want to check, I |
| 13 | think -- this is a full chain.  I don't know if you |
| 14 | want to check. |
| 14:57:31 15 | MR. BRIDGES:  Sure. |
| 16 | MR. GORDON:  I believe so.  You tell me if |
| 17 | I'm wrong. |
| 18 | MR. BRIDGES:  Yeah.  And this -- this does |
| 19 | not include Mrs. Long's second -- |
| 14:57:49 20 | MR. GORDON:  Yes, I know. |
| 21 | MR. BRIDGES:  -- e-mail.  That -- that's -- |
| 22 | because, otherwise, that's the only thing -- |
| 23 | MR. GORDON:  I have that.  I have that |
| 24 | also, which we'll get to, of course. |
| 14:57:55 25 | MR. BRIDGES:  Yeah.  But this looks like |

**MELANIE SILVA**

          1    the chain of everything else.

          2              MR. GORDON:  I think that --

          3    chronologically, I think that -- that -- let's start

          4    with that.  Okay.

14:58:07  5              And that -- that would will be Exhibit?

          6              MS. SHAKIB:  F.

          7              MR. GORDON:  F.  Thank you, Vanessa.

          8              THE COURT REPORTER:  No.  G.

          9              MR. GORDON:  G?

14:58:14 10              THE COURT REPORTER:  Yes.  This is F.

         11              MR. GORDON:  And it's Bates stamped number?

         12              MR. BRIDGES:  21 to 25.

         13              MR. GORDON:  21 to 25.  Okay.

         14              (Exhibit G was marked.)

14:58:39 15              THE WITNESS:  Do you want to put your

         16    sticker on there?

         17              THE COURT REPORTER:  Yes, please.  Thank

         18    you.

         19    BY MR. GORDON:

14:58:44 20       Q     All right.  Let's -- Melanie, let's go just

         21    in -- I want to go in reverse order here.  So if you

         22    start at -- at the -- so you found out Monday and

         23    then -- I'm sorry.  You found out Sunday that Cedar

         24    was removed --

14:58:58 25       A     (Nodding.)

**MELANIE SILVA**

```
 1    that.
 2         Q     So the -- the DA was making decisions on
 3    what to do is your testimony?
 4         A     Yes.
17:03:33 5         Q     Okay.  Did you talk to the DA --
 6         A     No --
 7         Q     -- at all?
 8         A     -- it was not.  It was the community
 9    barbecue's goat.
17:03:38 10         Q     Okay.  But did you talk to the DA at all?
11         A     I did not.
12         Q     You did not.  So you're relying on B.J. to
13    talk to the DA?
14         A     No.
17:03:49 15         Q     Okay.  Then -- okay.
16         A     It was -- it was the community barbecue's
17    goat.  And they are the ones that pursued it with
18    the DA.
19         Q     Are you -- so you're relying on the
17:04:01 20    community barbecue or Kathie Muse to talk to the DA?
21         A     I'm letting them deal with their property
22    that was --
23         Q     Okay.  But you --
24         A     -- stolen from the fairgrounds.
17:04:07 25         Q     -- received -- you received the letter
```

1                    PENALTY OF PERJURY

2

3          I, the undersigned, hereby certify that I

4    have read the foregoing deposition, that I know the

5    contents thereof, and I declare under penalty of

6    perjury under the laws of the State of California

7    that the foregoing is true and correct.

8

9          Executed on _____, 2023.

10

11

12

13          _____
                MELANIE SILVA
14                 ---oOo---

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

1

2

3        I, CAROL J. CHASE, a Certified Shorthand

4   Reporter, licensed by the State of California,

5   License No. 13538, being empowered to administer

6   oaths and affirmations pursuant to Section 2093 (b)

7   of the Code of Civil Procedure, do hereby certify:

8        That the witness in the foregoing deposition,

9   MELANIE SILVA, was present at the time and place

10  specified and was by me sworn to testify to the

11  truth, the whole truth, and nothing but the truth;

12       That said proceeding was taken before me in

13  shorthand writing, and was thereafter transcribed

14  under my direction by computer-aided transcription;

15       That the foregoing transcript constitutes a

16  full, true, and accurate record of the proceeding

17  which took place; That I am not of counsel or

18  attorney for any of the parties hereto, or in any

19  way interested in the event of this cause, and that

20  I am not related to any of the parties hereto.

21       IN WITNESS WHEREOF, I have hereunto subscribed

22  my signature on this 27th day of November, 2023.

23

24

25  _____
                    CAROL J. CHASE

# Exhibit K to Silva Deposition, Volume 1

ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
Wed 6/29/2022 12:27 PM
To:



███████████████████████████████████

Hi Lt Jerry Fernandez,

Here is the information you requested.  Let me know if you need anything else or have any questions.  My cell number is ████-0058, we have had to forward the phones to voicemail since they posted our phone number, fax number and my email on their Instagram posts.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
████-6789 ext 104
www.ShastaDistrictFairandEventCenter.com





Mom is
Jessica long

653    Long

Address
City
State
Zip Code    96003
Phone
e-mail
Status

SS#
Date of Birth
Age Calculated

School    Cow Creek 4-H
Grade

Notes    first year in 4-H
I've read the rules    I agree

Information is true    I agree
Hold Harmless Clau    Parent/Guardian Agrees

ACCOUNTABILITY & LIABILITY: Please accept the entries (property) described herein. I certify that I am the owner of the property specified herein or the supervisor of the project with authorization to act as agent and to bind the owners of the property in all matters herein. Online submission of data requires that a person has read, understands and agrees to abide by all the rules and regulations governing the fair entries as published in the official Shasta District Fair Handbook. Under penalty of perjury, I certify that the information provided is true and I agree to defend, indemnify, and hold harmless the fair, the county, and the State of California, its officers, agents and employees from and against any liability, claim, loss or expense (including any reasonable attorney fees) arising out of any injury or damage, which is caused by, arises from or is in any way connected with participation in the program or event, excepting only that caused by the sole active negligence of the Fair. The Fair Management shall not be responsible

To enter online, you must be over 18 years of age or be the parent and/or guardian of the exhibitor if the exhibitor is under age 18, or the 4-H Leader or FFA advisor, with the authorization from the parent and/or guardian of the exhibitor, or authorization from the exhibitor if 18 years of age or older. Please type "Yes" in the box to confirm. By entering "Yes", I am confirming that I am 18 years of age or older, the owner or authorized agent for these exhibits, that I have read, understand and agree to abide by all the rules and regulations governing the Fair entries as published in the official Shasta District Fair Handbook, and that everything submitted is "true and correct". Online entries for 4-H and FFA exhibitors will not be officially accepted until approved by the 4-H leader or FFA advisor.

PHOTOGRAPHY AND NAME RELEASE: By typing "Yes" below, I/we give the Shasta District Fair and anyone acting under the authority or permission thereof, the unqualified right to use my name and/or our company name for publication and/or for distribution of photographs, videotapes and/or recordings made of me and/or my/our company representatives, that may have been taken at past Shasta District Fairs, and/or could be taken at the fair(s) subject to this contract, for any marketing, public relations, publicity and/or other lawful purpose. Further, I waive all right of inspection or approval and irrevocably release Shasta District Fair from claims or demands which I or my company may or can have on account of the use or publication or arising of such photographs or information.

https://www.shastadistrictfairandeventcenter.com/enter-your-stuff

Jessica Daum
Mon 6/27/2022 5:41 PM
To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Dear Shasta County Fair Manager,

I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and heart told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,


Jessica Long
Mother of ███ Long,
Shasta District Fair goat lot #132



Get Outlook for iOS

Re: Requesting solutions for the goat that was taken
ceo sdfeventcenter.com
Tue 6/28/2022 1:31 PM
To:

- Jessica Daum : ████████████████████

Bcc:

- Francesconi Mike@CDFA <mike.francesconi@cdfa.ca.gov>

Hello Jessica,

Thank you Jessica for taking the time to contact me regarding this issue. As a mother I am not unsympathetic regarding your daughter and her love for her animal. Having said that please understand the fair industry is set up to teach our youth responsibility and for the future generations of ranchers and farmers to learn the process and effort it takes to raise quality meat. Making an exception for you will only teach out youth that they do not have to abide by the rules that are set up for all participants. Also in this era of social media this has been a negative experience for the fairgrounds as this has been all over Facebook and Instagram, not the best way to teach our youth the value of responsibility. Unfortunately this is out of my hands.

I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately. I do hope you will continue with your idea of raising and providing quality animals for the purpose you have spoken about. I support that whole heartly. Obviously the fair experience is not the best for your family.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
████████-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



Jessica Daum ███████████████

Wed 6/29/2022 9:49 AM

To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Please see attached.
Thank you,
Jessica Long

Get Outlook for iOS

Shasta District Fair
1890 Briggs Street
Anderson, CA 96007

**June 28, 2022**

***Re: Dispute over Cedar***

Dear Shasta District Fair;

This letter is in further response to my dispute with your organization concerning my daughter's goat, Cedar. My daughter's name is ██████ Long.

On June 27, 2022, I sent an email asking that your organization withdraw its demand for the return of Cedar and offering to pay for any costs or damages you have incurred as a result of this dispute. This morning, however, I received another text message from BJ McFarlane which seemingly ignored my letter and simply demanded return of my daughter's goat.

I've had time to review the documents that BJ McFarlane sent me, and I believe your organization is not within its rights to demand return of Cedar.

While you threatened to alert the authorities I had violated California Penal Code § 487a, upon examination, I have done no such thing. That statute makes it a crime to "feloniously steal[], take[], carr[y], lead[], or drive[] away...any caprine animal...,

[1] which is the personal property of another, or [2] who fraudulently appropriates that same property which has been entrusted to him or her, or [3] who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of that same property…is guilty of grand theft." (*Id.*) I cannot possibly have done any of those things because Cedar was not your organization's personal property. To the contrary, and as the 2022 State Rules For California Fairs indicate ("State Rules"), it was my daughter's personal property. Specifically, the State Rules provide in relevant part that "exhibitors must be legal owners of all entries. Ownership must be maintained through show date(s)." (See State Rules at p. 6.) Cedar was removed during that period, so the State Rules admit he was still my daughter's personal property.

Consistent with the State Rules, your organization's All General Rules and Guidelines ("General Rules") also require that "Exhibitors must be able to show proof of ownership at any time…." (See General Rules at p. 3.) Again, Shasta District Fair was not the owner.

Finally, that your organization did not become the owner of Cedar is further confirmed by the provision in your General Rules advising the Junior Exhibitors to obtain liability insurance. (See General Rules at p. 8.) If Cedar became your property by virtue of our entry to the fair, there would be no need for the Junior Exhibitors to obtain insurance, as the fair would be liable. In sum, Cedar was my daughter's personal property so California Penal Code § 487a is not even triggered.

Furthermore, in the event the Shasta District Fair could claim Cedar became its personal property,"[i]t is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1017, citing *People v. Butler* (1967) 65 Cal.2d 569, 573.) As I believed in good faith that Cedar was not the Shasta District Fair's personal property, no violation of Penal Code § 487a was committed.

Lastly, if anyone other than my daughter has a right to the goat, it would be Senator Brian Dahle as he was the successful bidder at auction.  But his office has represented to me that they have relinquished any rights they have to Cedar, dead or alive. As a result, not only was there no crime committed, but the Shasta District Fair now gets to keep his bid of $11.00 per pound x 82 pounds, $902.00.   Thus, the Shasta District Fair has actually profited from this event—it cannot claim any harm. For the Shasta District Fair to claim it's been damaged by this event, it would have to show some loss arising from a breach I committed. (*See, e.g., Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473 ["A breach of contract is not actionable without damage"].) But your General Rules state that the Shasta District Fair will be entitled to only "7.0% of the sale price deducted from the [Exhibitor's] check...."  So, had the slaughter been accomplished, the Shasta District Fair would have collected only $63.14.  But now, it has received, and gets to keep $902.00, a profit of $838.36.  So if anything, Shasta District Fair has been unjustly enriched by this situation.

Lastly, it must be stated with clarity that, because Shasta District Fair was never the owner of Cedar, the only possible rights it has in transaction are to the monies it could have earned, i.e., $63.14, which it has more than retained. So any legal action on the matter would per se be frivolous. Nevertheless, my offer to reimburse any other reasonable costs associated with this event remains open. I cannot envision what those costs would be, but I will of course review them in good faith.

This letter is not a waiver of any rights. Further, while its purpose is in anticipation of litigation, I am equally sending this letter to resolve the matter. My daughter has/is bonded with Cedar and, had we known what a terminal auction entailed, we never would have gone down this path. Fortunately, Shasta District Fair has actually profited from this event so this dispute should be put to rest.

In your email you expressed concerns about social media postings. If we can resolve this situation with Cedar not being brought in for slaughter, I am willing to consider signing a non-disclosure agreement.

Moving forward, I request that any communications be directed to my email at ██████████████████████

Sincerely,

Jessica Long