# EXHIBIT 7

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*BRUCE JOHN 'B.J.' MACFARLANE*
*November 15, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File B.J. Macfarlane.txt
**Min-U-Script® with Word Index**

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                      SACRAMENTO DIVISION

4   E.L., a minor, by and through her   )
    general guardian, JESSICA LONG;     )
5   JESSICA LONG, an individual,        )
                                        )
6                      Plaintiffs,      )
                                        )
7      vs.                              )
                                        ) NO. 2:22-cv 01527
8   LIEUTENANT JERRY FERNANDEZ,         ) DAD-AC
    individually and in his             )
9   individual capacity as Sheriff      )
    for the County of Shasta;           )
10  DETECTIVE JACOB DUNCAN,             )
    individually and in his             )
11  individual capacity as Sheriff      )
    for the County of Shasta;           )
12  DETECTIVE JEREMY ASHBEE,            )
    individually and in his             )
13  individual capacity as Sheriff      )
    for the County of Shasta; SHASTA    )
14  DISTRICT FAIR AND EVENT CENTER, a   )
    district agricultural               )
15  association; COUNTY OF SHASTA;      )
    SHASTA COUNTY SHERIFF'S             )
16  DEPARTMENT; MELANIE SILVA, in her   )
    individual capacity; BJ             )
17  MACFARLANE, in his individual       )
    capacity; and DOES 1 through 10,    )
18                                      )
                       Defendants.      )
19  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

20                      ---oOo---
                 WEDNESDAY, NOVEMBER 15, 2023
21                     10:08 a.m.
         VIDEOTAPED DEPOSITION OF BRUCE JOHN "B.J."
22                     MACFARLANE
                       ---oOo-
23

24

25      Reported by:  CAROL J. CHASE, CSR No. 13538

**BRUCE JOHN 'B.J.' MACFARLANE**

```
 1      Q     Okay.  Did you ever consider it?
 2      A     No.  Because I was waiting to -- at this
 3   point, I'm waiting to hear from Melanie who's
 4   waiting to hear from CDFA and I'm not doing anything
 5   else.
 6      Q     Okay.  All right.
 7      A     In terms of recovering a goat, that was up
 8   to CDFA and Melanie to say yes or no if they're
 9   going to recover the goat.
10      Q     So when did you first make contact with --
11   I know we discussed -- strike that.
12            We discussed Sunday how you went back to
13   the fair and you had conversations with Melanie, but
14   you don't recall what exactly you spoke about.  Do
15   you recall if you tried to reach -- if you tried to
16   reach out to Jessica that day?  This is -- this is
17   Sunday now.
18      A     I think it was Mon- -- I might have reached
19   out to her that day, but I think it was Monday
20   before I actually talked to her.  But that's a vague
21   remembrance.
22      Q     That's fine.
23      A     Monday is when I actually talked to her.
24      Q     And did you --
25      A     But then we had a text of stuff back and
```

**BRUCE JOHN 'B.J.' MACFARLANE**

1    forth.

2         Q      Okay.  And you spoke with her on the phone,

3    correct?

4         A      (Nodding.)

13:29:14  5         Q      Do you remember about what time you spoke

6    with her on the phone?

7         A      It was mid morning maybe.  I remember,

8    again -- I don't know why I can't remember times.  I

9    remember where I was standing in the middle of the

13:29:27 10   fairgrounds, but I'm guessing mid morning 9:00-ish.

11        Q      Maybe you're spatially oriented and that's

12   why you couldn't remember -- and not temporarily

13   oriented.  I don't know.

14               So you remember speaking with her on the

13:29:40 15   phone around 9:00-ish at the fairgrounds.  And do

16   you remember what you discussed with her?

17        A      Yes.  I asked her that we need to get the

18   goat back.

19               And she said, "There's got to be some other

13:29:55 20   way."

21               And I said, "No, there's no other way that

22   you don't own the goat at this time.  It's my

23   opinion you're stealing something over $400 of

24   agricultural commodities.  It's considered a

13:30:09 25   felony," which I had to look it up.

## BRUCE JOHN 'B.J.' MACFARLANE

```
 1              MR. BRIDGES:  Stop for the second for --
 2      you good?
 3              THE COURT REPORTER:  I'm good.
 4              MR. BRIDGES:  Go ahead.  I'm sorry.
13:30:16  5     THE WITNESS:  And then she said, "There's
 6      got to be some other way to work it out," back and
 7      forth, back and forth.  And then I believe she
 8      wanted the documentation from the 4-H office and
 9      from us.  And then -- then that correspondence went
13:30:35 10     from Melanie to her.
11      BY MR. GORDON:
12         Q    Okay.  So you said you had to look at the
13      felony.  What felony did you -- I know you not an
14      attorney --
13:30:40 15        A    No, but it's --
16         Q    -- but you -- what do you recall?
17         A    Well, I just -- anything -- a stolen
18      property over $400 of agriculture commodity is
19      what...
13:30:53 20        Q    If I -- if I throw a statute out there,
21      might you recall?
22         A    No.
23         Q    487- -- Penal Code 487(a); is that
24      potentially livestock theft?
13:31:04 25        A    Yeah.  It was a livestock, yeah.  It was
```

**BRUCE JOHN 'B.J.' MACFARLANE**

1      livestock.

2          Q      I'll just show it to you, and you can tell

3      me if that's the one you were talking with her

4      about.  I'll just pull it up online.  You can read

13:31:14  5   it and tell me if it's the one.  It's the one that's

6      written all over the sheriff's investigation

7      reports.  I assume it's -- and it's the one that

8      Jessica understood you to be talking about.  But

9      I'll just see if you can tell me.  Just a second.

13:31:33 10  But maybe you have another one in mind.  It's --

11     it's a long one.  But is this generally -- take a

12     look.

13         A      Yes, I believe that's the one I --

14             MR. GORDON:  John, is this your first case

13:32:01 15  ever involving this statute in any capacity?

16             MR. BRIDGES:  Yes.

17             MR. GORDON:  Yeah.  Okay.

18             THE WITNESS:  I think that's the one I saw.

19     BY MR. GORDON:

13:32:07 20      Q      Okay.  All right.  Okay.  So and -- so you

21     told her on the phone that what she did was

22     potentially a violation of this Penal Code statute,

23     correct?

24         A      Yeah.

13:32:18 25      Q      Okay.  All right.  And had you -- again,

**BRUCE JOHN 'B.J.' MACFARLANE**

```
 1    not a judgment.  But had you had any training in law
 2    enforcement or at this point in time?
 3        A     No, sir.
 4        Q     Any training on Penal Code at this point in
13:32:29 5    time?
 6        A     No, sir.
 7        Q     No.  Okay.  Had you had any training on --
 8    I know you said -- you did not believe she was the
 9    owner, but had you had any training on contracts at
13:32:40 10    this point in time?
11        A     What kind of -- like, the fair contracts?
12        Q     Oh, like training on interpreting
13    contracts, what kind of -- you know, what contract
14    laws apply here, et cetera, like the civil code,
13:32:57 15    commercial code, things of that nature?
16        A     No.
17        Q     Okay.  All right.  But it was your
18    impression, for whatever reason, that the -- the
19    Penal Code here might apply and that she committed a
13:33:08 20    felony, correct?
21        A     Yes.
22        Q     Okay.  And you represented that to her?
23        A     Yes.
24        Q     Okay.  What was her reaction when you
13:33:17 25    represented that to her?
```

BRUCE JOHN 'B.J.' MACFARLANE

1      A      I believe it was, "There's got to be some
2  other way."  She just kept saying that.  That's what
3  I remember her saying is "There's got to be some
4  other way."
13:33:28  5      Q      Okay.  Did was seem frightened?
6      A      No.  She just was seemed she wasn't going
7  to give the goat back.
8      Q      All right.  All right.
9      A      I don't think she seemed -- I don't -- no,
13:33:41 10  I don't think she was frightened.
11      Q      You don't think she was frightened.  Okay.
12  All right.
13              Did you think -- again, I'm asking you
14  personally, did you think a felony was maybe
13:33:52 15  overkill for what happened here?
16              MR. BRIDGES:  Just object that's not
17  relevant, but if you have an opinion I guess you can
18  share it.
19  BY MR. GORDON:
13:34:02 20      Q      Yeah.
21      A      At this point, no -- I don't know.  I don't
22  know.  At -- there was a goat that was stolen and so
23  that's what I thought at that point.
24      Q      Okay.  Yeah.  I mean, the reason I'm asking
13:34:14 25  is because earlier you used the word "everyone was

**BRUCE JOHN 'B.J.' MACFARLANE**

1    shocked," so -- so shocked to the level of this is a

2    felony?

3        A    No, I just -- shocked that someone stole a

4    goat.  I mean, that's not -- felony had nothing to

13:34:31  5    do with it in my opinion.  I mean -- no.

6        Q    Well, it must have had something to do with

7    it because you said it to her.

8        A    I looked it up and I just thought -- but I

9    just wanted the stolen goat back at that point n

13:34:48  10   time.  It would make things a lot easier.

11       Q    So you looked -- whenabouts did you look

12   this -- I know it was before talking to Jessica, but

13   do you know whenabouts?

14       A    Sunday sometime maybe.

13:34:58  15       Q    Sunday.  Okay.  All right.  And -- okay.

16   So you had this conversation with Jessica on the

17   phone.  You tell her she committed a felony in your

18   opinion or potentially committed a felony, you

19   know --

13:35:08  20       A    Yeah.

21       Q    I know you're not a cop or the DA, but

22   that's what's expressed to her.  And -- and then

23   your communications pivoted just to texts, correct?

24       A    (Nodding.)

13:35:21  25       Q    Okay.  And -- okay.  So on -- also on

**BRUCE JOHN 'B.J.' MACFARLANE**

1  going to break soon, but let me ask a couple more

2  questions.

3          So this is Exhibit E.

4          And I -- could we go back to where is the

14:00:32  5  text chain of Ms. Muse?  No, not that one, B.J.  The

6  other one.  This -- this one.  If you wouldn't mind

7  pulling that up for one moment.

8          (Referring to Exhibit C.)

9  BY MR. GORDON:

14:00:49 10     Q     So give me one second.  All right.

11          So -- so you had this -- do you recall

12  this -- these texts with Ms. Muse?  This looks

13  accurate to you?  It's the same --

14     A     Yeah.

14:01:09 15     Q     -- the inverse of what you produced the

16  other day.  Same thing, correct?

17     A     Yes.

18     Q     All right.  Okay.  So do you know who -- so

19  this -- this text chain begins on June 28th with the

14:01:21 20  Instagram post.  Do you know if the sheriffs were

21  involved at that point in time?

22     A     I do not recall.

23     Q     I believe it's Tuesday, the 28th.  Isn't

24  it?  Because 25th is Saturday, 26th, 27th, yeah,

14:01:41 25  Tuesday, right?

**BRUCE JOHN 'B.J.' MACFARLANE**

1      A      I don't recall when the sheriffs were -- I
2  believe I called Sheriff Johnson at some point this
3  week and I don't remember when.
4      Q      Oh, you -- so you called --
14:01:52  5      A      I -- not me, yeah, somebody did.
6      Q      Somebody did.  But you called Sheriff
7  Johnson at some point?
8      A      And I think it was me.  Again...
9      Q      Do you remember what date that was about?
14:02:02 10      A      No clue.  Some -- I'm guessing sometime
11  this week, maybe Tuesday, maybe Wednesday.  I...
12      Q      Now could it have been -- and the reason
13  I'm asking this -- could it have been earlier than
14  that?  Could it have been the 26th?  And I'll show
14:02:25 15  you why I'm wondering that, because the -- the
16  police report for the -- the case or the sheriff's
17  report -- I'm happy to show it to you -- I believe
18  was generated on the 26th.
19      A      Okay.  Then it was the 26th.
14:02:39 20      Q      Well, let -- let me look first to make
21  sure, because I don't want to -- I want to pull it
22  up and double check and I'll show it to you.
23  Because I -- I might have -- I'm almost positive,
24  but -- because, as you can imagine, I've looked at
14:02:56 25  this police report, you know, way more than I've

**BRUCE JOHN 'B.J.' MACFARLANE**

```
 1    wanted to in life, so...

 2        A     I'm not sure if...

 3        Q     I'm sorry.  What did you say, B.J.?

 4        A     I'm not sure if -- I'm not even sure if I'm

14:03:14  5    the one that called him, but...

 6        Q     Well, you just said a moment ago you called

 7    Sheriff Johnson.

 8        A     I -- yeah, I -- I think I did.  I couldn't

 9    tell you for exact if I did or not.

14:03:25 10        Q     Well, I'm asking you to remember the exact

11    day you did.  That's what I'm trying to help you

12    with.  But you do -- you do remember calling him,

13    yes?

14        A     I believe I talked to him at one point,

14:03:37 15    yes.  I don't know if I'm the one that called

16    and ac- -- actually had the actual complaint or if

17    Melanie did.

18        Q     Okay.  That's fine.  That's fine.  But

19    you --

14:03:45 20        A     Because I do remember talking to him at

21    some point.

22        Q     I'll represent to you Fernandez testified

23    that Sheriff Johnson told him to investigate the

24    matter.  So someone told him.  You had a

14:03:58 25    conversation --
```

**BRUCE JOHN 'B.J.' MACFARLANE**

```
 1   correct?
 2       A     Yes.
 3       Q     Okay.  All right.  And about what time did
 4   they drop him off?
 5       A     It was 11:30 or something.  It was late at
 6   night.
 7       Q     Late at night.  Okay.  And did you know
 8   they were dropping him off that day?
 9       A     Yes.
10       Q     Okay.
11       A     I think Melanie -- I don't know how it went
12   down.  I don't know if Melanie called me and told me
13   they were bringing it.
14       Q     Do you about know what time she called?
15       A     No.  It would have been -- no idea.  And if
16   she -- I don't -- I do not remember how.
17       Q     Okay.  But, obviously, earlier than when
18   the sheriffs got there?
19       A     Yeah.
20       Q     Yeah.  So --
21       A     That afternoon, assuming.  I think it was
22   Melanie that afternoon said that they were going to
23   perform the search warrant or whatever warrant they
24   had.
25       Q     Uh-huh.  Okay.  So she told you in the
```

14:12:06  (line 5)
14:12:17  (line 10)
14:12:38  (line 15)
14:12:58  (line 20)
14:13:18  (line 25)

**BRUCE JOHN 'B.J.' MACFARLANE**

1    afternoon that they were going to go bring the --

2    the goat to you that night?

3         A     Yeah.

4         Q     Did she give you any instructions?

14:13:25  5    A     I don't --- that I was to hold on to the

6    goat.

7         Q     Okay.  Hold on to the goat for -- until

8    when?

9         A     Until the state said what was going to

14:13:33 10    happen.

11        Q     Till the state -- what do you mean "the

12    state"?

13        A     Mike Francesconi or the lawyer.  I don't

14    know.  That's -- that's above my pay grade.  I was

14:13:46 15    just --

16        Q     I understand.

17        A     -- housing the goat.

18        Q     Okay.  Do you know which lawyer?

19        A     No.

14:13:51 20    Q     Was this the CDFA's lawyer?

21        A     Yes.

22        Q     Okay.

23        A     Yes, it was the CDFA's lawyer.

24        Q     Okay.  So then -- I know we're getting

14:14:01 25    tight on time for today but -- but your -- your

**BRUCE JOHN 'B.J.' MACFARLANE**

1    follow-up text to -- to Kathie is:  "Good morning.

2    I'm gone till tomorrow afternoon, talked to sheriff

3    and he said to wait until he talks to DA before we

4    kill goat."  It's per- --

14:14:17  5    A    Yeah.

6    Q    Okay.  So --

7    A    And I believe the -- because I thought

8    Melanie -- we were in touch with the CDFA's lawyer

9    as well.

14:14:26 10    Q    Okay.  Do you remember what that lawyer's

11    name was?

12    A    Excuse me?

13    Q    Do you remember the lawyer's name at CDFA?

14    A    I've never dealt with them.  Melanie.

14:14:36 15    Q    Melanie would know.  Okay.  Okay.  So --

16    but you know -- when you say the sheriff here, do

17    you know -- "talked to sheriff."  Do you know who

18    you --

19    A    Johnson.

14:14:45 20    Q    Johnson.  Okay.  And the -- and as far as

21    the DA here, do you know which DA you're talking

22    about?

23    A    It's a woman.  I do not know her name.

24    Q    Is it -- so if you go to the last page of

14:15:01 25    that, is it Stephanie Bridgett, by chance?  The very

**BRUCE JOHN 'B.J.' MACFARLANE**

1    last page.  This is --

2        A      Yeah.  That would be the district attorney,

3    yeah.  I don't know her and --

4        Q      Okay.  So you were waiting on the sheriff

14:15:18  5  and the District -- District Attorney and the CDFA

6    to determine what to do with -- with Cedar?

7        A      Yes.

8        Q      Okay.  All right.  Okay.  Okay.  And

9    then -- I'm just going to finish this chain and then

14:15:36 10  we'll get out of here.  We're almost to the end of

11   it.  Go to the next page, would you?

12              MR. NORTHCUTT:  Ryan?

13              MR. GORDON:  Ys.

14              MR. NORTHCUTT:  Can we get these documents

14:15:44 15  that he's looking at now marked as an exhibit?

16              MR. GORDON:  Yes.  Well, it is marked as an

17   exhibit.  It's --

18              THE WITNESS:  C.

19              MR. GORDON:  It's Exhibit C.  It's the

14:15:56 20  e-mail chain that Kathie -- Ms. Muse produced the

21   other day, Damian.

22              MR. BRIDGES:  It's a text -- text chain.

23              MR. GORDON:  Sorry.  Thank you, John.  Text

24   chain.

14:16:01 25              MR. NORTHCUTT:  Okay.  I just want to be

**BRUCE JOHN 'B.J.' MACFARLANE**

1    Q    Okay.  How would you refresh your memory?

2    A    I --

3    Q    Is there any way you could refresh your

4    memory to remember?

14:17:26 5    A    I don't -- I don't think we did, but I'm

6    not going to -- I'm guessing we hadn't with that

7    text.

8    Q    Okay.  Uh --

9    A    I don't know.

14:17:37 10    Q    Okay.  And what did -- do you know how many

11    times between that period you talked with Sheriff

12    Johnson and the DA between the 11th and the 25th of

13    July?

14    A    A couple times maybe.  And this was -- I

14:17:59 15    never talked to the DA.

16    Q    Oh, how did you know the DA -- did the

17    sheriffs say that he was waiting on the DA?

18    A    Yes.

19    Q    Okay.  Sheriff Johnson said he's waiting on

14:18:06 20    the --

21    A    I think it was --

22    Q    -- Stephanie Bridgett.  Okay.

23         And do you know why they were waiting on --

24    were they reviewing the legality of anything or --

14:18:23 25    did -- was anything like that explained to you?

**BRUCE JOHN 'B.J.' MACFARLANE**

1      A      I have no idea.

2      Q      Okay.  Did you ask?

3             MR. BRIDGES:  Don't speculate.  But if you

4      know, you can tell him.

14:18:38  5             THE WITNESS:  I -- I don't.  I'm not

6      speculating.  I don't know.  I don't think I asked.

7      No, I didn't ask.  I don't --

8      BY MR. GORDON:

9      Q      Okay.

14:18:43 10    A      -- I was holding a goat.  I was -- I had

11     nothing to do besides I was holding a goat.

12     Q      Nah, I understand.  Okay.  So Ms. Muse --

13     so Ms. Muse writes, looks like, "Hey B.J. what did

14     you end up doing with the goat?"  And this is the

14:19:02 15    25th.  And then there's a gap of three days.

16             Were there any other communications before

17     you respond on July -- July 28th?  Were you -- were

18     you -- did you communicate with Kathie anymore

19     before that -- within that window?

14:19:16 20    A      I don't believe so.  I might have -- no, I

21     might have dealt -- been talking with Melanie, too,

22     through -- I'm talking to Melanie through this, too.

23     Q      Yes.  Okay.

24     A      But she --

14:19:27 25    Q      Yeah.  About how many times would you say

**BRUCE JOHN 'B.J.' MACFARLANE**

1   you talked to Melanie through this?

2        A      I --

3        Q      Multiple times?

4        A      Yeah, multiple times.

14:19:38  5        Q      Okay.  So this is from July 11th now.

6   I'm -- and that's the same from July -- when you got

7   Cedar on July 8 through, let's say, the 28th is when

8   it appears that he's killed or goes to slaughter,

9   you talked to Melanie multiple times, correct?

14:19:53 10        A      Yes.

11        Q      Okay.  And -- and did you tell Melanie that

12   we're waiting to hear from the sheriff and the DA?

13        A      And I'm -- yeah, and I don't remember if

14   she was the one talking to the sheriff.  I think --

14:20:04 15   I know I did a couple times, but I want to think

16   that -- I thought she was the one that was gearing

17   it, so what -- with the state and the sheriff, so...

18        Q      Okay.  And -- but it was never -- did you

19   ever ask -- well, I shouldn't -- I know you said you

14:20:23 20   didn't ask.  But what was your understanding of --

21   from talking with the sheriff?  And I know you may

22   not say precisely in legal terms, but what was your

23   understanding of what they were waiting to

24   determine?

14:20:35 25        A      I don't -- I think it was over if the DA

**BRUCE JOHN 'B.J.' MACFARLANE**

| | |
|---|---|
| 1 | was going to prosecute. |
| 2 | Q     Whether the DA was -- why would they |
| 3 | dictate whether they were going to kill Cedar or |
| 4 | not? |
| 14:20:55  5 | A     I don't -- I -- I don't know. |
| 6 | Q     Did it have anything to do with Jessica |
| 7 | potentially bringing legal claims? |
| 8 | A     That was never discussed in my knowledge. |
| 9 | I never presumed that. |
| 14:21:06 10 | Q     Okay.  Was it ever suggested at any -- I |
| 11 | know you may not have presumed it, but was it ever |
| 12 | suggested that -- |
| 13 | A     Not that I -- no. |
| 14 | Q     -- that Jessica's attorneys had called |
| 14:21:13 15 | county counsel and the sheriffs, asked -- |
| 16 | A     That was never informed to me if she did. |
| 17 | Q     Did you know Jessica's attorneys -- me -- |
| 18 | called the sheriffs and the county counsel during |
| 19 | this period? |
| 14:21:24 20 | A     No, sir. |
| 21 | Q     Okay.  All right.  Okay.  Asking for the |
| 22 | status of Cedar -- |
| 23 | A     No. |
| 24 | Q     -- among other things? |
| 14:21:32 25 | Okay.  So -- okay.  So you -- you felt like |

**BRUCE JOHN 'B.J.' MACFARLANE**

1    you were -- just to clarify in your -- from your

2    perspective, you felt like you were operating under

3    the direction of Melanie and the sheriff --

4       A     Yes.

14:21:45 5       Q     -- office?

6             Okay.  And potentially the CDFA, I guess,

7    also?

8       A     Yes.  The CDFA.

9       Q     And the District Attorney?  Okay.  All

14:21:50 10   right.

11             Okay.  So what -- Bowman is a -- is a -- a

12    slaughtering facility, yes?

13       A     Processing facility.

14       Q     Processing facility.  I apologize.

14:22:02 15          Okay.  And what is the full name if you

16    know?

17       A     Bowman Meats.

18       Q     Bowman Meats.  And where is that at?

19       A     Bowman Road, Cottonwood.

14:22:11 20       Q     Bowman Road, Cottonwood.  Okay.  So did you

21    bring Cedar to Bowman Meats on the 28th?

22       A     No.

23       Q     What day did you bring him there?

24       A     They came to my house.

14:22:29 25       Q     They came to your house.  So they came and

## BRUCE JOHN 'B.J.' MACFARLANE

1      retrieved Cedar on --  what day did that happen?

2          A     (Nodding.)  The 28th, I'm guessing.

3          Q     Okay.  Okay.  Well, did this refresh your

4      memory and you remember now it being the 28th, the

14:22:44 5      same day you wrote this text?

6          A     I don't know.  I -- I couldn't tell you the

7      dates.  I'm sorry.

8          Q     Okay.  Okay.

9          A     I can tell you the dates, because I can

14:22:51 10     look at this text message and see it was --

11         Q     Okay.

12         A     -- the 28th.

13         Q     Okay.  So is it fair to say your best

14     estimate, though --

14:22:54 15         A     Yes.

16         Q     -- is the 28th?

17             Okay.  All right.  Okay.  So were -- so

18     Kathie writes, Goods news.  Finally.  And please

19     don't forget to save the ear tags.  Did -- did you

14:23:09 20     save Cedar's ear tags?

21         A     I did at one point.  I'm not sure what

22     happened to 'em to be honest with you.

23         Q     Okay.  And why were you supposed to save

24     his ear tags?

14:23:22 25         A     I -- because Kathie told me to save ear

**BRUCE JOHN 'B.J.' MACFARLANE**

1    tags, so I saved ear tags.

2         Q    Why would Kathie -- what's the purpose in

3    saving ear tags?

4         A    I have no idea.  She wanted ear tags, and

14:23:31 5   then she never -- I might have thrown 'em away.  I

6    don't -- they were, I think, out in my barn and she

7    never asked for 'em again.  And I have no idea why

8    she wanted 'em?

9         Q    So they might be still in your barn

14:23:42 10  potentially?

11        A    Sure.

12        Q    Have you looked?

13        A    No.

14        Q    Okay.  All right.

14:23:46 15       A    But it's been --

16        Q    It's been a minute, I understand.  But they

17   might still be there.  You don't know what happened

18   to them.  Why would you have thrown 'em away?

19        A    Well, I -- I don't know if I threw 'em

14:23:58 20  away.  I don't know where they're at to be honest.

21   But they're somewhere.  Because I have a wife and

22   three kids; that's why they might not have made it.

23        Q    Okay.  All right.  So your kids would have

24   taken the ear tags?

14:24:05 25       A    Well, not on purpose.  I think -- no, they

1                         PENALTY OF PERJURY

2

3             I, the undersigned, hereby certify that I

4     have read the foregoing deposition, that I know the

5     contents thereof, and I declare under penalty of

6     perjury under the laws of the State of California

7     that the foregoing is true and correct.

8

9             Executed on _____, 2023.

10

11

12

13                    _____
                      BRUCE JOHN "B.J." MACFARLANE
14                         ---o0o---

15

16

17

18

19

20

21

22

23

24

25

1                    WITNESS' CHANGES OR CORRECTIONS

2

3     NOTE:  If you are adding to your testimony, print
      the exact words you want to add.  If you are
4     deleting from your testimony, print the exact words
      you want to delete.  Specify with "Add" or "Delete"
5     and sign this form.

6     Deposition of:  BRUCE JOHN "B.J." MACFARLANE
      Case Title:  LONG V. FERNANDEZ, ET AL.
7     Date of Deposition:  WEDNESDAY, NOVEMBER 15, 2023

8     Page   Line        Change/Add/Delete

9     _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____   _____

25    BRUCE JOHN "B.J." MACFARLANE           DATED

**CERTIFICATE OF REPORTER**

I, CAROL J. CHASE, a Certified Shorthand
Reporter, licensed by the State of California,
License No. 13538, being empowered to administer
oaths and affirmations pursuant to Section 2093 (b)
of the Code of Civil Procedure, do hereby certify:

That the witness in the foregoing deposition,
BRUCE JOHN "B.J." MACFARLANE, was present at the
time and place specified and was by me sworn to
testify to the truth, the whole truth, and nothing
but the truth;

That said proceeding was taken before me in
shorthand writing, and was thereafter transcribed
under my direction by computer-aided transcription;

That the foregoing transcript constitutes a
full, true, and accurate record of the proceeding
which took place; That I am not of counsel or
attorney for any of the parties hereto, or in any
way interested in the event of this cause, and that
I am not related to any of the parties hereto.

IN WITNESS WHEREOF, I have hereunto subscribed
my signature on this 28th day of November, 2023.

_____
                    CAROL J. CHASE

224

REDDING, CA      CHALLE, FISHER & MORFIN      (530) 246-0942