1  RYAN R. GORDON (SBN 278414)
   VANESSA T. SHAKIB (SBN 287339)
2  **ADVANCING LAW FOR ANIMALS**
   407 N. Pacific Coast Highway #267
3  Redondo Beach, CA 90277
   Tel: (202) 996-8389
4  rgordon@advancinglawforanimals.org
   vshakib@advancinglawforanimals.org
5
6  DANIEL J. KOLDE, ESQ.
   **LAW OFFICES OF DANIEL J. KOLDE**
7  P.O. Box 440344
   St. Louis, Missouri 63144-9998
8  Tel: 636.675.5383
   Email: daniel.kolde.law@gmail.com
9  (*pro hac vice application to be filed*)
10
   Attorneys for Plaintiffs
11
12          **UNITED STATES DISTRICT COURT**

13          **EASTERN  DISTRICT OF CALIFORNIA**

            **SACRAMENTO DIVISION**
14

15 | E.L., a minor, by and through her general | Case No. 2:22-cv-01527-DAD-AC
   guardian, JESSICA LONG; JESSICA LONG, an
16 individual,                                   | **DECLARATION OF RYAN R. GORDON IN**
                  Plaintiffs,                    | **SUPPORT OF PLAINTIFF'S MOTION TO**
17                                               | **COMPEL (ECF Nos. 78 and 85) AND IN**
           v.                                    | **OPPOSITION TO NONPARTY MICHAEL**
18 LIEUTENANT JERRY FERNANDEZ, in his            | **FLORES' MOTION TO QUASH AND FOR A**
   individual capacity; DETECTIVE JACOB          | **PROTECTIVE ORDER (ECF No. 87)**
19 DUNCAN, in his individual capacity;
   DETECTIVE JEREMY ASHBEE, in his
20 individual capacity; SHASTA DISTRICT FAIR     | Date: July 03, 2024
   AND EVENT CENTER, a district agricultural     | Time: 10:00 am.
21 association; COUNTY OF SHASTA; SHASTA         | Courtroom: 26, 8th Floor
   COUNTY SHERIFF'S DEPARTMENT;
22 MELANIE SILVA, in her individual and official | Trial Date: March 24, 2025
   capacity; BJ MACFARLANE, in his individual
23 and official capacity; KATHIE MUSE, in her    | Action Filed: August 31, 202
   individual and official capacity, and DOES 1
24 through 10,
25
26
27
28

Side margin: **ADVANCING LAW FOR ANIMALS**

**DECLARATION OF RYAN R. GORDON**

I, Ryan Gordon, declare as follows:

1.      I am an attorney at law duly licensed to practice law before all the courts of the State of California, as well as admitted to practice in the United States District Courts for the Eastern and Central Districts of California. I am over 18 years of age. I have personal knowledge of the matters set forth herein and, if called upon, I could and would competently testify thereto. I make this declaration in support of Plaintiff Jessica Long's Motion to Compel (1) Production of Subpoenaed Documents From Non-Party Verizon (**ECF 78, 85**); and (2) Plaintiffs' Opposition to Non-Party Michael Flores' Motion to Quash Subpoena to Verizon Wireless and for a Protective Order (**ECF 87**)

2.      I am the attorney of record for Plaintiff Jessica Long ("Mrs. Long") and her minor daughter, Plaintiff E.L., proceeding by and through her guardian ad litem, Mrs. Long, in the above captioned action.

3.      Plaintiffs have brought civil rights claims following their decision to remove their goat, Cedar, from the Shasta County Fair's Junior Livestock action on June 25, 2022. They allege they bought a young goat, Cedar, who Plaintiff E.L., then nine (9), bonded with after having raised him. The auction was terminal and Cedar would have been sent to slaughter that same evening. Plaintiffs allege they decided to exercise a minor's right to disaffirm any contract that might have existed to save his life, or alternatively, breach any contract that might have existed, and hide him while they negotiated a resolution with Defendant Shasta District Fair & Event Center (SDF), which demanded Cedar's immediate return. Plaintiffs allege they offered to pay any monies SDF requested and threatened to sue. Nonetheless, officers at the Shasta County Sheriff's Department then, admittedly, drove approximately 500 miles roundtrip from Shasta County to Napa County, then to Sonoma County, where they committed a wrongful search and seizure of Cedar. Plaintiffs allege Cedar was then ultimately slaughtered by agents of SDF and law enforcement without notice and opportunity to be heard in violation of their rights to Due Process, among other things. Plaintiffs' thereafter brought the instant action for claims under § 1983 claims and state law.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of a June 27, 2022, Instagram post produced in discovery by Defendant Lieutenant Jeremy Ashbee bearing bates number

DECLARATION OF RYAN GORDON IN SUPPORT OF ECF 78 & 85, AND IN OPPOSITION TO ECF 87

**ADVANCING LAW FOR ANIMALS**

ASHB000027 ("Viral Instagram Post"). By its terms, it was published on June 27, 2022, by nonparty Bleating Hearts Sanctuary (a goat rescue nonprofit), it states, among other things, "URGENT PLEA," and requests that the public contact Defendant SDF and ask it to spare Cedar. I also viewed this post at that time.

5.    Attached hereto as **Exhibit 2** is a true and correct copy of Defendant Melanie Silva's cell phone records (XXX-XXX-0058) subpoenaed and produced from non-party Verizon Wireless following this Court's order on a prior motions to compel. See **ECF 70** for orders.

   a.    The records produced indicate, on June 27, 2022, at 11:42 am, a call was placed from the cell phone of non-party Michael Flores (ending in 5038), the Deputy Secretary of the California Department of Food and Agriculture (CDFA) to Defendant Melanie Silva.

   b.    Note that in ¶¶ 33, 42, and 72 below, I explain how and when I took the dispositions of both Ms. Silva and Mr. Flores, and include excerpts of their deposition testimony in which those Defendants authenticate these phone numbers as their own. Ex. 12, Silva Dep. 149:22-150:01; Ex. 22, Flores Dep. 34:11-15.

6.    Attached hereto as **Exhibit 3** is a true and correct copy of an email chain produced in discovery by Defendant Melanie Silva ("Ms. Silva") between her, Ms. Long, and Mike Francesconi, the Branch Chief of the Fairs and Exposition Division at the CDFA. The email indicates the following communications took place:

   a.    The earliest email in the chain, beginning from the bottom of the email chain, is dated June 27, 2022 and was sent at 5:41 pm from my client Mrs. Long to Ms. Silva. The email discusses her daughter's bond with her goat, Cedar, and offers to pay for any damages caused by Plaintiffs' decision not to sell Cedar at the Shasta County Junior Livestock action on June 25, 2022, and their attendant removal of Cedar from the fairgrounds ("Offer to Pay Damages").

   b.    On June 28, 2022 at 1:31 pm, Ms. Silva rejected Mrs. Long's previously-emailed offer to pay damages, explaining, the "social media this has been a negative experience for the fairgrounds[,]" and stating, "I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the

State Rules. You will need to bring the goat back to the Shasta District Fair immediately."

c.  On June 28, 2022 at 3:07 pm, Ms. Silva forwarded her email exchange with Mrs. Long to Mr. Michael Francesconi, stating, "Hi Mike, I have included the response I sent her. I have also updated my Board Member[.]"

d.  On June 28, 2022 at 3:08 pm, Mr. Francesoni responded to Ms. Silva, "Hello Melanie Did BJ go out to pick up the goat? Thanks Mike[.]"

e.  On June 28, 2022 at 3:40 pm, Ms. Silva responded to Mr. Francesoni, stating "Hi Mike, She is not responding to either of us. Should we involve CHP next?"

f.  On June 28, 2022 at 5:58pm, Mr. Francesconi responded to Ms. Silva, "I am checking with Michael Flores [the Deputy Secretary at the CDFA] on how he would like you to proceed. I will let you know when I learn more. Thanks Mike[.]"

g.  On June 29, 2022 at 9:06 am, Ms. Silva emailed Mr. Francesconi, "Hi Mike, Please call my cell number [omitted] when you call back. We have the phones forwarded since they posted our number to instagram."

7.  Ms. Silva's cell phone records (0058), attached as **Exhibit 2,** indicate the following communications then took place.

a.  On June 29, 2022, At 9:22 am, a call was placed to Ms. Silva's cell phone from non-party Mike Flores, Deputy Secretary at the CDFA. The call lasted for four (4) minutes;

8.  In discovery, Mrs. Silva produced an email and letter, time stamped as June 29, 2022, at 9:49 am, purportedly from Plaintiff Jessica to Ms. Silva. A true and correct copy of an email and letter produced is attached hereto as **Exhibit 4.**  Among other things, Plaintiffs' letter asserts Cedar was Plaintiff E.L.'s personal property; SDF never owned Cedar; grand theft had no basis; and the letter was "in anticipation of litigation" of their civil dispute ("Notice of Civil Claim and Intention to Sue")..

9.  Thereafter, Ms. Silva's cell phone records, attached as **Exhibit 2,** indicate the following communications then took place on June 29, 2022.

a.  At 10:07 am, another call was placed to Ms. Silva's cell phone from non-party Mike Flores of the CDFA. The call lasted for six (6) minutes;

ADVANCING LAW FOR ANIMALS

b.  Then, at 11:04 am, yet another call was placed to Ms. Silva's cell phone from non-party Mike Flores. This call lasted for eight (8) minutes;

c.  Finally, at 11:29 am, a call was placed to Ms. Silva's cell phone from non-party Mike Francesconi, lasting four (4) minutes.

10.  In discovery, Mr. Macfarlane produced a text chain between him and Ms. Silva dated June 29, 2022. The text thread begins at 8:51 am. In a subsequent text within the same thread, *later in the day,* on June 29, 2022, Ms. Silva states to Mr. Macfarlane that "We are contacting the Sheriff for the goat waiting for a call back[.]" A true and correct copy of this June 29, 2022 text, produced in discovery by Mr. Macfarlane, is attached hereto as **Exhibit 5.**

11.  Attached hereto as **Exhibit 6** is a true and correct copy of Defendant Ms. Silva's handwritten notes related to Cedar produced in discovery. The notes contain the following language:

6/29 910A
spoke w/him next
no response
step? Will get
Back after speak[]
w/flores



Ex. 6 at 2.

Flores 6/29 Local Sheriffs[.]



Ex. 6 at 2.

12.  On August 21, 2023, I conducted the deposition of Lieutenant Jerry Fernandez ("Lieut. Fernandez"). The period for making deposition corrections expired on November 13, 2023 and no

DECLARATION OF RYAN GORDON IN SUPPORT OF ECF 78 & 85, AND IN OPPOSITION TO ECF 87

ADVANCING LAW FOR ANIMALS

changes were made. A true and correct copy of excerpts from Lieut. Fernandez's deposition is attached hereto as **Exhibit 7.**

13.    With respect to what prompted his investigation of Mrs. Long, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified:

> Q.    *Okay. So when did you first learn of Jessica removing Cedar from the -- when I say "the fair," I mean the 2022 Shasta County District Fair.*
>
> A.    *I first learned about it when -- I want to say it was either the very end of June or beginning of July.*
>
> Q.    *And who told you?*
>
> A.    *I was -- the Sheriff, Michael Johnson, told me that I needed to reach out to the fair or people from the fair in regards to a theft of a goat.*
>
> Q.    *Okay. Michael Johnson. You said the Sheriff. So he's the elected Sheriff?*
>
> A.    *He is the elected Sheriff, yes.*
>
> ...
>
> Q.    *So did he give you any -- what other details did Michael Johnson give you? Sheriff Johnson. I'm not trying to be disrespectful. Whatever the proper term is.*
>
> ...
>
> A.    *Yes, Sheriff. Just that the goat was stolen and that because of my collateral assignment as a livestock investigator, that I needed to reach out to the people from the fair and basically conduct an investigation.*

Ex. 7 (Lieut. Fernandez Dep. 77:10-78:14).

> Q.    *All right. So Sheriff Johnson tells you to go investigate this. And you don't know who told -- do you know when he learned of this?*
>
> A.    *It was the same time that I conducted the -- or began the investigation. So that was the same time frame, end of June, beginning of July.*
>
> Q.    *Okay. And what narrative or facts did he tell you?*
>
> A.    *Just that the -- that the goat had been stolen and to reach out to whoever I know at the fair to basically conduct -- start the investigation.*

Ex. 7 (Lieut. Fernandez Dep. 83:5-14).

14.    With respect to the reaction of other fair boards to Cedar's removal, as referenced in the concurrently filed memorandum, Lieut. Fernandez testified:

ADVANCING LAW FOR ANIMALS

**ADVANCING LAW FOR ANIMALS**

1

    *A     It was a big deal with a lot of the fair boards within Shasta County.*

2

    *Q     Where else was it a big deal?*

3

    *A     I don't know the names of those fairs.*

    *Q     Do you know -- do you know -- oh, well you said "fair boards."*

4

    *A     Yeah.*

5

    *Q.    So what other fairs? Are there other fairs in Shasta County? I thought it*

6
           *was one per county.*

7

    *A.    No, the State of California.*

8

    *Q.    The State. Okay. What other fairs was it a big deal with, if you know?*

    *A.    I don't know those -- I don't know the particulars on that.*

9

    *Q.    Who did you hear it from?*

10

    *A.    The Sheriff.*

11

    *Q.    The Sheriff. Okay.*

12

    *A.    That people were pissed that Cedar was removed?*

13

    *A.    Yeah, I think it was -- or from my recollection, it was reported to him that*

14
           *this is -- right, that this is not -- yes, it affects Shasta District Fair and we*
           *have to investigate it, but there's other fair boards reaching out to our*

15
           *fair board about this is pretty serious stuff ....*

16   Ex. 7 (Lieut. Fernandez Dep. 277:13-279:03).

17       15.    Attached hereto as **Exhibit 8** is a true and correct copy of a text chain between Mr.

18   Macfarlane and Ms. Silva wherein he texts her Lieutenant Fernandez's email address.

19       16.    According to Ms. Silva's phone records, **Exhibit 2**, Lieutenant Fernandez called Ms.

20   Silva on June 29 at 2:29 pm. Based on my review of Ms. Silva's phone records, which span from June

21   25, 2022 (the day Plaintiffs allegedly removed Cedar) to September 1, 2022 (the day this lawsuit was

22   filed), the June 29, 2022 call at 2:29 pm is the first call between these defendants.

23       17.    With respect to Lieut. Fernandez and Det. Duncan seizing Cedar on July 8, 2022, and, at

24   the direction of Mrs. Muse, turning him over to Mr. Macfarlane, Lieut. Fernandez testified:

25          *A.    And then due to the time of -- projected time of our arrival back into*
              *Shasta County, Ms. Muse requested that we leave the goat in the care*
26
              *and custody of Mcfarlane.*

27       *Q.    Okay. So did you speak with Kathi Muse on the phone?*

28       *A.    Yes.*

7

> Q.     *Okay. What did you -- what did she say on the phone?*
>
> A.     *Just -- I can't recall everything she said. I think she was excited that we got the goat and that to -- based on the time of night, to just leave it with her agent, which would have been Mcfarlane.*

Ex. 7 (Lieut. Fernandez Dep. 269:16-270:10).

18.     On August 22, 2023, I conducted the deposition of Detective Jacob Duncan ("Det. Duncan"). The period for making deposition corrections expired on  October 13, 2023 and no changes were made. A true and correct copy of excerpts from Det. Detective's deposition are attached as **Exhibit 9**.

19.     With respect to driving several hundred miles from Shasta County to Napa County to locate Cedar, but not finding him at Bleating Hearts Sanctuary, as referenced in the concurrently filed memorandums, Det. Duncan testified:

> Q.     *... And you didn't find -- well, okay. Didn't find Cedar at her -- at Bleating Hearts, correct?*
>
> A      *No.*
>
> ...
>
> Q.     *Okay. All right. And -- okay. What did you do when you left their property?*
>
> A.     *Well, in my conversation with Kristin and review of her emails, I discovered that Cedar was at Billy's Mini Goat Farm in Sonoma.*
>
> Q.     *Okay. So you concluded that in your investigation. What did you -- so about what time -- about what time did you leave the Bleating Hearts?*
>
> A.     *I think we left directly following when that interview ended. We went directly to Billy's Mini Goat Farm in Sonoma.*

Ex. 9 (Det. Duncan Dep. 144:25 – 147:17).

20.     Both Lieutenant Fernandez and Detective Duncan testified they were unaware what was to happen with Cedar after they dropped him off at Mr. Macfarlane's house.

a.   Lieutenant Fernandez testified:

> Q.     *Okay. Did -- okay. All right. So did you know Cedar would be -- did you have any idea that Cedar would be killed when you turned him over?*
>
> A.     *I did not know what their plans were at that point. I didn't know if it was too late, if the -- I don't know.*

8

DECLARATION OF RYAN GORDON IN SUPPORT OF ECF 78 & 85, AND IN OPPOSITION TO ECF 87

ADVANCING LAW FOR ANIMALS

...

Q.    *Did you ask Kathi what she was going to do with Cedar?*

A.    *I did not ask, no.*

Q.    *No. Okay. Did you -- what was your understanding what was going to be done with him?*

A.    *At that point whatever the owner, her, Kathi, was going to do with it. I don't know, so...*

Ex. 7 (Lieut. Fernandez Dep. 274:10-275:18).

      b.   Detective Duncan testified:

Q.    *...Did you ask if Cedar's evidence, why are we dropping him off at someplace?*
    *...*

A.    *And I also don't know what was happening with the goat when it was dropped off.*

Ex. 9 (Det. Duncan Dep. 162:6 – 15).

      21.   With respect to the Sheriff and District Attorney's involvement after Cedar was dropped off at Mr. Macfarlane's, Lieut. Fernandez testified:

A.    *There was a phone conversation with the -- with myself and the District Attorney.*

Q.    *At what point in time?*

A.    *I think it was after we had went and got the goat.*

Q.    *Okay.*

A.    *Collected the goat.*

Q.    *So like that weekend, you mean, or you mean on the call back up to Redding?*

A.    *No, no. It would have been after, like probably the next week or maybe when it started getting a lot of public attention.*

Ex. 7 (Lieut. Fernandez Dep. 165:03-14).

Q.    *....Did you tell anyone -- did you tell anyone else you were requesting charges be pressed? It's like "pressed" like they say in the movies, but you know what I mean.*

A.    *Did I talk to anyone else about the purpose?*

Q.    *Yeah, Bruce or Melanie? Anyone else?*

A.    *The Sheriff, the DA.*

Q.    *Obviously, you told the DA. You gave him the request for it.*

> A.    *Yeah, we talked about it on the phone with the Sheriff.*
>
> Q.    *When was that?*
>
> A.    *After I collected the goat. I think like within a week after collecting the goat.*

Ex. 7 (Lieut. Fernandez Dep. 285:25-286:12).

22.    At the time I deposed Lieutenant Fernandez, Lieutenant Ashbee and Detective Duncan, in August 2023, they were the only defendants in this case. Without waiver of work product, before those depositions, my co-counsel and I suspected Cedar was seized on July 8, 2022, in order to be sent to a barbeque on July 9, 2022, as we understood SDF's records to show that Senator Brian Dahle and Assemblymember Megan Dahle earmarked on their bid for Cedar that he be donated to the 4-H/FFA Community Barbeque on July 9, 2022. ("July 9 Government Barbeque") Based on testimony from Lieutenant Fernandez and Detective Duncan, Plaintiffs filed an amended complaint on October 12, 2024 adding as defendants Kathie Muse, Melanie Silva, and BJ Macfarlane. I then proceeded to take the depositions of those new defendants from November 13, 2023 to November 15, 2023. At those depositions, testimony indicated that Cedar was not killed for the July 9 Government Barbeque but, rather, was held at BJ Macfarlane's house from July 8, 2022 to July 28, 2022, when he was slaughtered. It is noteworthy that I called the Sheriff's office, and Shasta County Counsel multiple times between July 15, 2022, and July 26, 2022. Among others, I spoke with Lieut. Fernandez, Det. Duncan, and County Counsel Adam Pressman. In response to my calls, while county counsel provided me a copy of the warrant, those individuals refused to give me any information on Cedar or his whereabouts.

23.    On November 13, 2023, I conducted the deposition of Defendant Kathie Muse ("Mrs. Muse"). The period for making deposition corrections expired on  January 1, 2024. A true and correct copy of excerpts from Mrs. Muse's deposition is attached as **Exhibit 10**.

24.    On the day of her deposition, Ms. Muse produced a true and correct copy of text chain between her and Mr. Macfarlane, attached hereto as **Exhibit 11** in which those text texted each other the following messages:

a.    On July 9, 2022, at 7:13 am, Mr. Macfarlane texted Mrs. Muse "Goat is at my house;"

b. On July 11, 2022, at 8:43 am, Mr. Macfarlane texted Mrs. Muse "…[t]alked to sheriff and he said to wait until he talks to DA before we kill goat. It is perfectly fine at my house till we figure it out."

c. On July 28, 2022, at 7:47 am, Mr. Macfarlane texted Mrs. Muse "Bowman is killing goat today finally."

d. In response, on July 28, 2022, Mrs. responds to Mr. Macfarlane "Good news finally. … 🤣 don't forget to save the ear tags please."

Ex. 11.

25. With respect to slaughtering Cedar, Mrs. Muse testified:

> Q.    Did the DA ever tell you, greenlight, you guys can go through with the slaughter??
>
> A.    They did not tell me that, no.
>
> Q.    Did they tell B.J.?
>
> A.    Yes
>
> Q.    Okay. The DA did tell B.J.?
>
> A.    I don't know if it was the DA.
>
> Q.    Okay. But someone from law enforcement in your mind did. So either the sheriff's, the DA; is that what you're telling me?
>
> A.    Correct.

Ex. 10 (Muse Dep. 199:5-15).

26. Regarding the Sheriff's Department and DA's instructions to retain Cedar's ear tags, Mrs. Muse testified:

> Q.    Okay. Then please "don't forget to save the ear tags." Did you -- did you ever receive Cedar's ear tags?
>
> A.    No.
>
> Q.    Who has them?
>
> A.    My understanding is B.J. has 'em.
>
> Q.    Okay. Why would -- why would you want them saved?
>
> A.    Because we were told to make sure we saved the ear tags.
>
> Q.    Who told you that?

DECLARATION OF RYAN GORDON IN SUPPORT OF ECF 78 & 85, AND IN OPPOSITION TO ECF 87

ADVANCING LAW FOR ANIMALS

A      I -- I was not told that. I was told from B.J. that the DAs and the sheriffs
       office, I don't know which department, had told him to make sure that we
       save the ear tags.

...

Q.     B.J. told you. Do you know when he told you?

A.     No.

Q.     Okay. Was it -- it must have been in person or over the phone, though,
       because it's not on this text chain.

A.     Yes.

Ex. 10 (Muse Dep. 201:19-202:08).

27.    With respect to Mrs. Muse's testimony contending the SDF provided replacement goat

meat for the July 9 Government Barbeque, as referenced in the concurrently filed memorandum, Mrs.

Muse testified:

Q.      Okay. So Cedar was alive till the 28th. Okay. And what -- what had hap -
        - what happened to him afterwards after he was killed?

A.      He was given back to the Shasta Live- --Junior Livestock Auction board.
        He was given back to the Junior Livestock Auction.
        ...
        They replaced it to me for the barbecue. The fair board or the Junior
        Livestock Auction replaced that fair to us -- or replaced Cedar so
        that we had a goat at the auction.
        ...

Q.      So did he even go to any of -- anyone's plate, or is he -- was he just killed
        to go back to Shasta -- to the fair as reimbursement?

A.      I don't know what happened. My understanding, what I was told was he
        went back to somebody that had a problem with another goat that had
        been butchered. So we, in turn, replaced Cedar with that goat.

Ex. 10 (Muse Dep. 204:13-205:20).

28.    With respect to who knows where Cedar's meat went following his slaughter, as

referenced in the concurrently filed memorandum, Mrs. Muse testified:

Q.      …So he just went to an individual -- to a private -- a private party then
        is your understanding?

A.      My understanding, yes.

Q.      Okay. Do you know who that private party was?

A.      No.

12

> Q.    Okay. Do you know who would know?
>
> A.    Probably the Shasta District Fair.
>
> ....
>
> A.    Probably Melanie.

Ex. 10 (Muse Dep. 235:19-236:10).

29.    With respect to Mrs. Muse's communications with Senator Brian Dahle, she testified:

> Q.     No? Okay. How often do you see Brian Dahle?
>
> A.    Once every three months.
>
> Q    Sounds like that's on a schedule. Is that for something specific?
>
> A.    No, it's just -- I happen -- about once every three months, we talk on the phone.

Ex. 10 (Muse Dep. 44:10-16).

> Q    Okay. Did you have any conversations with him about for matter between the time of June 30th to, let's say, August 31st, which is the date the lawsuit was filed?
>
> A.    Conversations regarding what?
>
> Q,    Regarding Cedar, Jessica Long, anything like that? His -- the bid you were just talking about?
>
> A,.    No.

Ex. 10 (Muse Dep. 48:13-21).

30.    With respect to Mrs. Muse's communications with Assemblywoman Megan Dahle, Mrs. Muse testified:

> Q.    Okay. All right. Do you -- do you talk with her every three months or so also?
>
> A.    I probably talk to her more often than Brian. So probably one every six weeks I talk to Megan.

Ex. 10 (Muse Dep. 46:10-14).

31.    On November 14, 2023, I conducted the deposition of Defendant Melanie Silva ("Ms. Silva"). The period for making deposition corrections expired on  January 1, 2024. A true and correct copy of excerpts from Mrs. Muse's deposition is attached as **Exhibit 12**.

32.    Ms. Silva's testified that, on June 29 at 12:27 pm, she emailed several documents to Lieut. Fernandez, which were marked as Exhibit K at the Deposition, which included Mrs. Long's

Notice of Civil Claim and Intention to Sue. See Silva Dep. Vol. 1 288:03-23, Exhibit K to the deposition is included with deposition excepts attached to this Declaration as Exhibit 12.

33.   With respect to the SDF forwarding its calls following the public's reaction to the June 27, 2022, viral Instagram post, Ms. Silva testified:

> A.     *We had to forward our phones because our phones were –*
>
> Q.     *Okay.*
>
> A.      *-- blown up.*
>
> Q.     *From the Instagram post.*
>
> A.     *From the Instagram post, from any media that grabbed it.*

Ex. 12 (Silva Dep. Vol. 1, 66:04-10.)

34.   With respect to calling the Sheriff as suggested or directed by Michael Flores (the CDFA's undersecretary), Ms. Silva testified:

> Q.     *Okay. Okay. So -- so then after Mike Flores said go to the sheriffs, you went to the sheriffs?*
>
> A.     *I'm not the one that called the sheriff, but yes, the sheriffs was used.*

Ex. 12 (Silva Dep. Vol. 1, 279:21-25.)

35.   With respect to Ms. Silva talking to Lieutenant Fernandez on June 29, 2022, and then sending copies of Plaintiffs' communications, including what Plaintiffs' Second Amended Complaint describes as their "Offer to Pay" letter (ECF 25, ¶ 48) and "Notice of Civil Claim and Intention to Sue" letter (*Id*. at ¶ 52), Ms. Silva testified:

> Q.     *Ms. Silva, I'm handing you a copy of an e-mail that's dated 6/29/22. It purports to be from you to Jerry Fernandez. Took take a look.*
>             *(Exhibit K was marked.)*
>
> .....   *So it was after lunch -- or after noon you send this e-mail to Fernandez. Do you recall doing this?*
>
> A       *Yes.*
>
> Q       *Okay. Had you talked with him on the phone beforehand?*
>
> A.      *Yes.*

ADVANCING LAW FOR ANIMALS

Ex. 12 (Silva Dep. Vol. 1, 279:21-25)(Note that Ms. Silva's email and attachments to Lieutenant Fernandez, labeled as Exhibit K in the deposition are attached to Exhibit 12).

      36.     With respect to what Ms. Silva knew about Cedar's slaughter, and the District Attorney's involvement, she testified:

> *Q.*     *July, August. Okay. Where is Cedar right now then?*
>
> *A*     *I don't know.*
>
> *Q*     *You don't know where he is. Okay. Okay. We. ll, you know he was slaughtered, yes?*
>
> *A*     *I heard that he was slaughtered.*
>
> *Q*     *When did you hear that?*
>
> *A*     *I don't know -- people just talk. I don't know. I'm not trying to be difficult. I don't know.*
>
> *Q*     *When did you first hear he was slaughtered?*
>
> *A*     *This is hearsay. Do I say it as fact when I don't know for sure?*
>
> *Q*     *It's not being introduced as evidence. Yes, you need to tell me what -- what you heard.*
>
> *A*     *I just -- I don't know when I heard it. I just heard that he was back and that the permission was given to go ahead and move forward with the slaughter.*
>
> *Q*     *Permission from who?*
>
> *A*     *Somebody told me DA. But do I know if that's fact? I don't know if that's fact.*
>
> ...
>
> *A*     *I just heard that they had Cedar and I heard that they were waiting for permission. I don't know...*
>
> *Q*     *From who, though?*
>
> *A*     *No.*
>
> *Q*     *You said the DA before that.*
>
> *A*     *I assumed it was the DA.*
>
> *Q*     *Why did you assume it was the DA?*
>
> *A*     *Because the DA's official.*
>
> *Q*     *Any other reason?*
>
> *A*     *No.*
>
> ...

ADVANCING LAW FOR ANIMALS

15

| | |
|---|---|
| 1 | Q.      *Okay. Did you ask them if it was the DA?* |
| 2 | A      *No.* |
| | Q      *No? Why not?* |
| 3 | A      *Again, I didn't have a say in the – what happens to it.* |
| 4 | Q      *But it's your livestock manager and fair, why did -- you must have some say?* |
| 5 | MR. BRIDGES: *Well, I think that still misstates testimony that she knows who told* |
| 6 | *her that.* |
| 7 | THE WITNESS: *I don't.* |
| | .... |
| 8 | Q      *okay. Who told you that they were waiting?* |
| 9 | A      *I don't remember.* |
| 10 | Q      *You don't remember at all, but you heard from someone?* |
| 11 | A      *Yes.* |

Ex. 12 (Silva Dep. Vol. 1, 65:14-68:22).

       37.     With respect to the who Ms. Silva testified owned Cedar and that alleged owner's engagement with DA, Ms. Silva further testified:

| | |
|---|---|
| | Q      *Okay. Did you talk to the DA –* |
| | A      *No –* |
| | Q      *-- at all?* |
| | A      *-- it was not. It was the community barbecue's goat.* |
| | Q      *Okay. But did you talk to the DA at all?* |
| | A      *I did not.* |
| | Q      *You did not. So you're relying on B.J. to talk to the DA?* |
| | A      *No.* |
| | Q      *Okay. Then -- okay.* |
| | A      *It was -- it was the community barbecue's goat. And they are the ones that pursued it with the DA.* |

Ex. 12 (Silva Dep. Vol. 1, 329:05-18).

       38.     With respect to her own involvement, Mrs. Silva testified she had no contact with Mr. B.J. Macfarlane:

| | |
|---|---|
| | Q      *Did you know that B.J. had custody of him?* |
| | A      *I just knew it was back. I didn't know exactly it went when it came back.* |

16

*ADVANCING LAW FOR ANIMALS*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*ADVANCING LAW FOR ANIMALS*

> Q        *Did you -- did you ask B.J.?*
>
> A        *No.*
>
> Q        *Is there any reason you didn't ask B.J.?*
>
> A        *We were not in contact.*

Ex. 12 (Silva Dep. Vol. 1, 62:22 -63:03).

39.    With respect to where Cedar was held after he was returned by the Sheriff's officers,
Mrs. Silva testified:

> MR. BRIDGES:        *I'm confused. I thought you said you didn't know that B.J. had custody.*
>
> THE WITNESS:        *I don't know that he had --he had custody.*
>
> MR. GORDON:        *No, she said she didn't know where he had custody. She knew –*
>
> THE WITNESS:        *I didn't know he had it. I don't -- I know it came back. I don't know where it went after that.*

Ex. 12 (Silva Dep. Vol. 1, 64:13-15); and

> Q        *But you understood that B.J. and Ms. Muse had custody, correct?*
>
> A        *I heard that the sheriff brought the goat back.*
>
> Q        *To B.J.*
>
> A        *I don't know exactly. I'm assuming that it was B.J., but I don't know who.*

Ex. 12 (Silva Dep. Vol. 1, 69:18-24).

40.    With respect to her responsibility and role in Cedar's fate and what exactly happened to
Cedar's cuts, Mrs. Silva testified:

> Q.        *Okay. Did you ask them if it was the DA?*
>
> A        *No.*
>
> Q        *No? Why not?*
>
> A        *Again, I didn't have a say in the – what happens to it.*
>
> Q        *But it's your livestock manager and fair, why did -- you must have some say?*
>
>  MR. BRIDGES: *Well, I think that still misstates testimony that she knows who told her that.*
>
> THE WITNESS: *I don't.*

Ex. 12 (Silva Dep. Vol. 1, 68:06-07);

> Q        *You didn't know Cedar was killed on July --25 on July 28th?*

17

1    *A    No.*

2    *Q    When did you find out he was killed on July 28th?*

3    *A    I never knew. Right now.*

    *Q    To this day you still don't know?*

4    *A    I did not know it was July 28th, no.*

5    *Q    Oh, okay. So until I represented to you today, you never heard July 28th is the date?*

6    *A    Correct.*

Ex. 12 (Silva Dep. Vol. 1, 77:24-78:09);

*Q    ...you mentioned having a conversation with Kathie Muse....*

*...*

*Q    ...And in this conversation you discussed media and nothing else to your recollection; is that accurate?*

*A    I don't remember what else we discussed. I would know -- I do know that it was part of the attacks in the media.*

*Q    Okay. But -- but Cedar himself, his whereabouts at that moment, you -- you did not --you don't recall discussing?*

*A    I don't recall discussing that, no.*

*...*

*Q    So you might have discussed it?*

*A    I -- I doubt it. I just wasn't curious about it.*

*Q    You were incurious about it. Okay. So you don't though think you would have thought to ask her at the time?*

*A    Correct.*

Ex. 12 (Silva Dep. Vol. 1, 123:02-124:03); and

*Q    When he was retrieved, Cedar was -- so when Cedar was retrieved, you knew -- you thought he was retrieved and then slaughtered right away and handled -- what do you mean by "handled"?*

*A    I didn't give it as much thought as you're saying.*

*Q    Okay. So –*

*A    Cedar was retrieved. They handled the situation. I –*

*Q    Okay. But it's -- it was your responsibility to see that the animals sold to the auction were, in fact, sent to the slaughter. You didn't think it was appropriate to follow up with B.J. what the status was with Cedar?*

*A    No.*

Ex. 12 (Silva Dep. Vol. 1, 183:01-15).

ADVANCING LAW FOR ANIMALS

41.     With respect to Ms. Silva's deletion of text messages concerning Plaintiffs and Cedar, she testified:

> Q.     Did you -- did you review your text messages concerning Cedar?
>
> A.     Yes.
>
> Q.     Okay. And I don't believe any text messages were produced. Did you find any?
>
> A.     No, I did not.
>
> Q.     No. Okay. All right. Did you previously have text messages with anyone over Cedar?
>
> A.     I don't think so. I believe they were all phone calls, but I am not sure.
>
> Q.     Okay. All right. Do you routinely – how long do you save your text messages in your phone?
>
> A.     I don't know what the setting is, but there's a segment that deletes them automatically.
>
> Q.     Okay. Do you -- so -- okay. Did you review text messages about Cedar on all your phones or just your work phone?
>
> A.     My personal phone.
>
> Q.     Okay. Did you look at your work phone also?
>
> A.     There's no e-mail -- no text messages on my -- on my work phone.
>
> Q.     No text messages whatsoever on your phone?
>
> A.     No.
>
> Q.     All right. And there are text messages on your personal phone and you checked that?
>
> A.     I checked my personal phone –
>
> Q.     Okay.
>
> A.     -- nothing come up.
>
> Q.     Do you recall deleting any messages related to Cedar in the past?
>
> A.     No. But again, I have it automatically set where they delete.

Ex. 12 (Silva Dep. Vol. 1, 155:10-156:17).

42.     Lastly, Ms. Silva's confirmed her personal cell phone is XXX XXX 0058. I have only included the last four digits of the number to protect her privacy. *See* Ex. 12, Silva Dep. 149:22-150:01

ADVANCING LAW FOR ANIMALS

43.     On November 15, 2023, I conducted the deposition of Defendant B.J. Macfarlane ("Mr. Macfarlane"). The period for making deposition corrections expired on January 1, 2024. A true and correct copy of excerpts from Mr. Macfarlane's deposition is attached as **Exhibit 13**.

44.     With respect to whether Mr. Macfarlane or Ms. Silva called Shasta County Sheriff Michael Johnson to accuse Mrs. Long of a crime after she removed Cedar from the fairgrounds, Mr. Macfarlane testified:

> Q.     ....All right. Okay. So do you know who – so this -- this text chain begins on June 28th with the Instagram post. Do you know if the sheriffs were involved at that point in time?
>
> A.     I do not recall.
>
> Q.     I believe it's Tuesday, the 28th. Isn't it? Because 25th is Saturday, 26th, 27th, yeah, Tuesday, right?
>
> A.     I don't recall when the sheriffs were -- I believe I called Sheriff Johnson at some point this week and I don't remember when.
>
> Q.     Oh, you -- so you called –
>
> A.     I -- not me, yeah, somebody did.
>
> Q.     Somebody did. But you called Sheriff Johnson at some point?
>
> A     And I think it was me. Again...
>
> Q     Do you remember what date that was about?
>
> A     No clue. Some -- I'm guessing sometime this week, maybe Tuesday, maybe Wednesday. I...

Ex. 13 (Macfarlane Dep. Vol. 1, 191:23-191:11; 193:04-21).

45.     When asked how Mr. Macfarlane knew Sheriff Michael Johnson's and acquired his cell phone, Mr. Macfarlane testified

> Q     Now, are you -- are you -- how do you know Sheriff Johnson? Are you friends with him?
>
> A     No. Acquaintances -- he used to be the mayor -- or mayor -- police captain at Anderson the first year I was the CEO. So it was just acquaintances.
>
> Q     The CEO of the –
>
> A.     Fair
>
> Q.     --the Shasta Fair?
>
> ...
>
> Q.     Do you have his -- do you have his cell phone?

**ADVANCING LAW FOR ANIMALS**

20

| | |
|---|---|
| A. | *That's how I might -- somebody might have given it to me –* |
| Q. | *Okay.* |
| A. | *-- I believe.* |
| Q | *For this?* |
| A | *Yes.* |
| Q | *Okay. So someone -- who gave you his cell phone to call?* |
| A | *Might be the city manager that I knew would have it.* |
| Q | *Who's the city manager?* |
| | ... |
| A | *I can't even -- or can -- I believe it was Baron Browning City Councilman. And I don't know, but –* |
| Q | *Baron Browning of the city council.* |
| A | *He was an Anderson City Council Member.* |
| Q | *So Mr. Browning was aware of this matter?* |
| A | *Yes, I believe so.* |
| Q | *Okay. All right. And he gave you Sheriff Johnson's cell phone? But you've already –* |
| A | *I believe that's how it happened.* |
| Q | *Okay. You believe that's how?* |
| A | *Yeah.* |
| Q | *But you already also knew Sheriff Johnson slightly. You were –* |
| A | *Slightly. In passing. He was CEO -- or I was the CEO and just cordial.* |

Ex. 13 (Macfarlane Dep. Vol. 1, 198:15-200:14).

46.     With respect to the CDFA's involvement in deciding Cedar's fate, Mr. Macfarlane testified:

| | |
|---|---|
| A | *...I was to hold on to the goat.* |
| Q | *Okay. Hold on to the goat for -- until when?* |
| A | *Until the state said what was going to happen.* |
| Q | *Till the state -- what do you mean "the state"?* |
| A | *Mike Francesconi or the lawyer. I don't know. That's -- that's above my pay grade. I was just –* |
| Q | *I understand.* |
| A | *-- housing the goat.* |
| Q | *Okay. Do you know which lawyer?* |

21

1

       *A*       *No.*

2

       *Q*       *Was this the CDFA's lawyer?*

       *A*       *Yes.*

3

       *Q*       *Okay.*

4

       *A*       *Yes, it was the CDFA's lawyer.*

5

Ex. 13 (Macfarlane Dep. Vol. 1, 202:11-203:23).

6

     47.     With respect to holding Cedar from July 8, 2022, until when Cedar's was killed on July

7

28, 2022, his conversations with Ms. Silva, and that they were also waiting on the Sheriff and the DA,

8

Mr. Macfarlane testified:

9

       *Q*       *About how many times would you say you talked to Melanie through this?*

10

       *A*       *I –*

       *Q*       *Multiple times?*

11

       *A*       *Yeah, multiple times.*

12

       ...

13

       *Q.*      *...when you got Cedar on July 8 through, let's say, the 28th is when it appears that he's killed or goes to slaughter, you talked to Melanie multiple times, correct?*

14

15

       *A*       *Yes.*

16

       …

       *Q*       *did you tell Melanie that we're waiting to hear from the sheriff and the DA?*

17

18

       *A*       *And I'm -- yeah, and I don't remember if she was the one talking to the sheriff. I think -- I know I did a couple times, but I want to think that -- I thought she was the one that was gearing it, so what -- with the state and the sheriff, so...*

19

20

21

Ex. 13 (Macfarlane Dep. Vol. 1, 208:25-209:17).

22

     48.     With respect to his perspective that he was operating under the direction of Ms. Silva,

23

the Sheriff, the CDFA, and the District Attorney, Mr. Macfarlane testified:

24

       *Q.*      *...but what was your understanding of what they were waiting to determine?*

25

       *A*       *I don't -- I think it was over if the DA was going to prosecute.*

26

       ...

27

       *Q.*      *...Okay. So -- okay. So you -- you felt like you were -- just to clarify in your -- from your perspective, you felt like you were operating under the direction of Melanie and the sheriff –*

28

A       Yes.

Q       -- office? Okay. And potentially the CDFA, I guess, also?

A       Yes. The CDFA.

Q       And the District Attorney? Okay. All right.

Ex. 13 (Macfarlane Dep. Vol. 1, 209:22-211:10).

49.     With respect to a text exchange on July 11, 2022, between Mr. Macfarlane and Mrs. Muse, Macfarlane testifies

Q.      ...your follow-up text to -- to Kathie is: "Good morning. I'm gone till tomorrow afternoon, talked to sheriff and he said to wait until he talks to DA before we kill goat." It's per- --

A       Yeah.

...

Q       ...when you say the sheriff here, do you know -- "talked to sheriff." Do you know who you –

A       Johnson.

Q       Johnson. Okay. And the -- and as far as the DA here, do you know which DA you're talking about?

A       It's a woman. I do not know her name.

Q       Is it -- so if you go to the last page of that, is it Stephanie Bridgett, by chance? The very last page. This is –

A       Yeah. That would be the district attorney, yeah. I don't know her and --

Ex. 13 (Macfarlane Dep. Vol. 1, 204:01-205:08).

50.     With respect to speaking with Sheriff Johnson while he was holding Cedar, Mr. Macfarlane testified:

Q.      Okay. And what did -- do you know how many times between that period you talked with Sheriff Johnson and the DA between the 11th and the 25th of July?

A       A couple times maybe. And this was – I never talked to the DA.

Q       Oh, how did you know the DA -- did the sheriffs say that he was waiting on the DA?

A       Yes.

Ex. 13 (Macfarlane Dep. Vol. 1, 207:10-22).

51.     With respect Cedar's ear tags, contrary to Mrs. Muse's testimony, Mr. Macfarlane testified she instructed him to hold them:

23

ADVANCING LAW FOR ANIMALS

> Q        *Okay. And why were you supposed to save his ear tags?*
>
> A        *I -- because Kathie told me to save ear tags, so I saved ear tags.*
>
> Q        *Why would Kathie -- what's the purpose in saving ear tags?*
>
> A        *I have no idea. She wanted ear tags*

Ex. 13 (Macfarlane Dep. Vol. 1, 212:13-213:04).

52.    On November 20, 2022, my office sent the attached meet and confer letter to counsel for Mr. Macfarlane and Ms. Silva requesting they search for outstanding documents. A true and correct copy of excerpts from Mrs. Muse's deposition is attached hereto as **Exhibit 26**.

53.    On February 9, 2024, I conducted Volume II of the continued deposition of Ms. Silva. The period for making deposition corrections expires on March 29, 2024. A true and correct copy of excerpts from Mrs. Muse's deposition is attached hereto as **Exhibit 14**.

54.    With respect to whether the Dahle's or Ms. Muse's payment of Cedar, Ms. Silva testified:

> Q.        *Okay. Okay. And then documents reflecting final payment of Cedar by the Dahles. Did you ever get the Dahles' payment documents for Cedar?*
>
> A.        *I don't believe they paid.*
>
> Q.        *You don't believe they paid?*
>
> A.        *No.*
>
> Q.        *Okay. Did Ms. Muse pay on their behalf?*
>
> A.        *No.*

Ex. 14 (Silva Dep. Vol. 2, 431:14-20).

55.    With respect to Ms. Silva's awareness of me as reflected in her handwritten notes attached as Exhibit 6, Ms. Silva testified:

> Q.        *....You have this circled now on the right-hand side. "DA. Local sheriff." What is the word beneath that? Says trans-something?*
>
> A.        *"Transpired."*
>
> Q.        *What are you -- what are you taking note of here this circled portion of your notes?*
>
> A.        *I don't know. I don't know why I have "transpired" there.*
>
> Q.        *Okay. And "15 to 20 minutes." Do you know what that is?*
>
> A.        *No.*
>
> Q.        *"Back owner won't press charges," what does this refer to?*

ADVANCING LAW FOR ANIMALS

> *A.      I don't know. "Lawyer pro bono" is you.*

Ex. 14 (Silva Dep. Vol. 2, 410:25-411:15).

56.      During discovery Ms. Silva also produced an email between her and Muse, dated July 11, 2022, wherein she attaches the bills for Cedar and states "Hi Kathie, I have attached their bills. I appreciate the update!" A true and correct copy of that email is attached hereto as **Exhibit 15**.

57.      Attached hereto as **Exhibit 16** is a true and correct copy of a July 18, 2022 text thread Defendant Mr. Macfarlane produced in discovery between him and Defendant Ms. Silva. This text thread indicates that, on July 18, sometime after 10:29 am, Ms. Silva texted Mr. Macfarlane, "The word goat makes my eye twitch now 🤣🤣🤣🤣🤣🤣🤣[,]" to which Mr. Macfarlane texted Ms. Silva, "It should. Lol[.]"

58.      Attached hereto as **Exhibit 17** is a true and correct copy of a July 22, 2022 text thread Defendant Mr. Macfarlane produced in discovery between him and Defendant Ms. Silva. This text thread indicates that, on July 22, 2022, Ms. Silva and Mr. Macfarlane texted about their cover story as to Cedar's ultimate disposition wherein Mr. Macfarlane writes "What's the gals name at bowman? Kathy [sic] said ok but no one needs to know about this. U me and Kathy [sic] are only ones. It got killed and donated to non profit if anyone asks," and Ms. Silva provides the name of the relevant employee at the company who ultimately butchers Cedar and writes "We are a non profit 😊🤣🤣🤣[.]"

59.      Attached hereto as **Exhibit 18** is a true and correct copy of a July 28, 2022 text thread Defendant Mr. Macfarlane produced in discovery between him and Defendant Ms. Silva, which indicates that on July 28, 2022, Mr. Macfarlane texted Ms. Silva, "Goat is getting butchered within the half hour. Finally."

60.      On or about January 20, 2024, I subpoenaed Mr. Macfarlane's phone records for phone number XXX-XXX-1024, which he confirmed to be his number. Ex. 13, (Macfarlane Dep. Vol. 1, 81:23-25). AT&T produced his phone records on or about February 7, 2024. Redacted copies of the relevant pages of the records are attached hereto as **Exhibit 19**. Please note AT&T produced records in Coordinated Universal Time, or UTC. For ease of review, in the records listed below, Plaintiffs' counsel adjusted the time to Pacific Daylight Time, or PDT, by subtracting 7 hours from UTC. The records indicate that:

**ADVANCING LAW FOR ANIMALS**

DECLARATION OF RYAN GORDON IN SUPPORT OF ECF 78 & 85, AND IN OPPOSITION TO ECF 87

ADVANCING LAW FOR ANIMALS

a. On June 29, 2022, at 11:52 am (18:52 UTC), Lieutenant Fernandez (XXX XXX 8333) initiated a call to Mr. Macfarlane, which lasted 12 seconds;

b. On June 29, 2022, at 12:04 pm (19:04 UTC), Mr. Macfarlane called Lieutenant Fernandez (XXX XXX 8333) back, and the call lasted approximately 9 minutes;

c. On June 29, 2022, at 12:14 pm (19:14 UTC), Mr. Macfarlane called Ms. Silva (XXX XXX 0058) and the call lasted approximately 3 minutes;

d. On July 22, 2022, at 11:17 am (18:17 UTC), Ms. Silva (XXX XXX 6789) called Mr. Macfarlane and the two spoke for 4 minutes;

e. On July 22, 2022, at 11:22 am (18:22 UTC), Mr. Macfarlane called Mrs. Muse (XXX XXX 9107), and the two spoke for over 4 minutes;

f. On July 22, 2022, at 11:29 am (18:29 UTC), Mr. Macfarlane called Bowman Meat Company (XXX XXX 4463), and arranged for Cedar's slaughter. I googled this phone number and called it to confirm it belongs to Bowman Meat Company.

g. On July 25, 2022 at 3:15 pm (22:15 UTC), Ms. Silva (XXX XXX 6789) called Mr. Macfarlane and the two had a short conversation; and

h. On July 25, 2022 at 3:31 pm (22:31 UTC), Mr. Macfarlane called Ms. Silva (XXX XXX 6789) and the two spoke for over 5 minutes.

61.     On February 9, 2024, I conducted Volume II of the continued deposition of Mr. Macfarlane. The period for making deposition corrections expires on March 29, 2024. A true and correct copy of excerpts from Mr. Macfarlane's deposition is attached hereto as **Exhibit 21**.

62.     With respect to Ms. Silva and Mrs. Muse's contact with law enforcement and the District Attorney over the decision to kill Cedar, Mr. Macfarlane testified:

> Q.     *Okay. So who gave you the -- you said you were waiting on permission to -- for direction to have Cedar slaughtered, correct?*
>
> A.     *Yes.*
>
> Q.     *When it was at your house? Who ultimately gave you the direction to?*
>
> A.      *I believe it was either Melanie or Kathie.*
>
> Q.     *Melanie or Kathie. Did -- why do you believe that?*
>
> A.     *Because that's who -- I don't know. That's who the -- my boss -- it wasn't even my boss. The CEO of the fair and the owner of the goat.*

26

> Q.      Okay. And your understanding was that they were in communication with law enforcement?
>
> A.      Yes.
>
> Q.      And by "law enforcement," I mean the sheriff's office, and you said maybe the sheriff, but it maybe it was the lieutenants as well?
>
> MR. NORTHCUTT: Objection. Misstates testimony. He never said it was the sheriff. He, in fact, testified he said it wasn't the sheriff. It was the sheriff's department.
>
> MR. GORDON: Q. He said -- I thought you said I believe -- you don't believe so, so I'm assuming you mean maybe you don't know who it was? You said they were in communication with –
>
> A.      The sheriff's department.
>
> Q.      The sheriff's department, okay. And the DA as well? Was your understanding?
>
> A.      Yeah.

Ex. 21 (Macfarlane Dep. Vol. 2, 250:08-251:08).

63.    With respect to Mr. Macfarlane's testimony about Sheriff Michael Johnson's involvement, contrary his testimony in his first section, he testified:

> Q.      Okay. And it's your testimony that you've never spoken with Michael Johnson, Sheriff Michael Johnson, regarding Cedar the goat; correct or incorrect?
>
> A.      Correct.

Ex. 21 (Macfarlane Dep. Vol. 2, 269:20-23).

64.    With respect to Mr. Macfarlane's testimony about the recipient of the cuts of Cedar's meat, he testified:

> Q.      Didn't you testify earlier that you didn't know who got Cedar, though?
>
> A.      I did testify earlier that I did not know who got Cedar, but I read it in the email or text messages here and that is –
>
> Q.      So that's Melanie telling you Vista Real Estate –
>
> A.      Yes.
>
> Q.      -- is getting Cedar? Okay. All right.
>
> A.      I did testify that I did not know. And I did not know until I read that.

Ex. 21 (Macfarlane Dep. Vol. 2, 349:24-350:09).

ADVANCING LAW FOR ANIMALS

65.     With respect to Mr. Macfarlane's phone calls to Ms. Silva, consistent with his phone records, he testified that he spoke with her multiple times on June 29, 2022, as well as July 22, 2022 and July 25, 2022.  He testified all communications concerned Cedar. Ex. 21 (Macfarlane Dep. Vol. 2, 282, 283, 302, 309 – see highlighted testimony).

66.     With respect to who Mr. Macfarlane meant in his text message that he previously testified referred to Sheriff Johnson, Mr. Macfarlane testified

> Q.     So "Good morning. I'm gone till tomorrow afternoon. Talked to sheriff and he said to wait until he talks to DA before we kill goat." Do you see where it says that?
>
> A.     Yes, sir.
>
> Q.     When did you talk to the sheriff?
>
> A.     I don't think it was the -- I'm guessing before -- between July 9th -- maybe -- if that was our last communication, it would have been that night. So the sheriff -- the sheriff I'm referring to would have been whatever the deputy.
>
> Q.     The deputies, okay.
>
> A.      Yeah, and that's what I think I use -- used it as sheriff where I mean the sheriff department.
>
> Q.     You mean sheriff -- you're saying -- so it's your testimony, you mean Sheriff Fernandez here?
>
> A.     Yes. Dropped the goat off.
>
> ...
>
> Q.     Okay. So you believe you're referring to Fernandez?
>
> A.     Yes.

Ex. 21 (Macfarlane Dep. Vol. 2, 247:4-248:15.)

67.     With respect to Mr. Macfarlane's communications with Bruce Ross, and aide to Senator Brian Dahle (the purported bidder on Cedar), Mr. Macfarlane testified:

> Q.     Okay. So I guess in searching for documents to produce, did you check your email from anything from Bruce Ross in relation to this matter?
>
> A.     No.
>
> ...
>
> Q.     ....I'm asking for Bruce Ross because it's referencing that he's sending me a text or an email link presumably.
>
> THE WITNESS: Well, I did a search, and it didn't come up.
>
> MR. GORDON: Q. Okay. Okay. Did you delete any text messages from Bruce Ross?

DECLARATION OF RYAN GORDON IN SUPPORT OF ECF 78 & 85, AND IN OPPOSITION TO ECF 87

ADVANCING LAW FOR ANIMALS

*A.    No.*

Ex. 21 (Macfarlane Dep. Vol. 2, 329:15-330:02).

68.    Mr. Macfarlane did not produce and communications between him and Bruce Ross.

69.    Following Mr. Macfarlane's deposition, Plaintiffs cross referenced Mr. Macfarlane's phone records for the phone number he provided for Bruce Ross, XXX-XXX-3769 (Ex. 21, 330:15), and texts were found. Accordingly, on February 24, 2024, I served a subpoena on Bruce Ross requesting documents related to Cedar and Plaintiffs. In response, nonparty Mr. Ross produced a text chain between him and Mr. Macfarlane that relates Cedar and Plaintiffs. A true and correct copy of that text chain is attached hereto as **Exhibit 27**

70.    Mr. Ross also produced an email chain apparently from staff at Senator Brian Dahle's and Megan Dahle's offices  Despite deposition testimony intimating that Senator Dahle had no role in SDF's dispute with Plaintiffs, their offices nonetheless apparently received inside information regarding same. A true and correct copy of that email chain is attached hereto as **Exhibit 28**, however, names and email addresses have been redacted.

71.    On May 21 2024, I conducted the deposition of Michael Flores. The period for making deposition corrections expires on July 2, 2024. A true and correct copy of excerpts from Mr. Macfarlane's deposition is attached hereto as **Exhibit 22**.

72.    With respect to his current position, responsibilities, and the numbers of fairs and agricultural associations, he testified:

> *Q.     ....So what is your -- your current position, Mr. Flores?*
>
> *A.      Deputy secretary for the department of food and agriculture.*
>
> *Q     Okay. And what are your roles in that -- what is your role as deputy secretary?*
>
> *A     I oversee a -- fair boards and fairgrounds.*

Ex. 22 (Flores Dep. 12:08-16); and

> *Q.     So how many fair boards -- how many fair boards are there in California? Does -- does each county have one? Or can you explain just a little bit how that operates?*
>
> *A.     Sure. There are -- there are a total of 70 -- 72 fairs throughout the State of California.*
>
> *Q.     Okay.*

ADVANCING LAW FOR ANIMALS

1

        *A.      There are 52 district ag associations*

2

Ex. 22 (Flores Dep. 13:17-24).

3

    73.    With respect to Mr. Flores' supervision of nonparty Michael Francesconi, Mr. Flores

4

testified:

5

    *Q.     ...what are Michael Francesconi's responsibilities?*

    *A.     He is a branch chief for the fairs and exposition.*

6

    *...*

7

    *Q.     ...he reports to you as opposed to reporting to the secretary himself or*

8

         *herself; is that accurate?*

    *A.     Yes.*

9

10

Ex. 22 (Flores Dep. 23:22-24:09).

11

    74.    With respect to Mr. Flores' knowledge of the Viral Instagram Post (Ex. 1), he testified:

12

    *Q.     All right. Have you seen this -- now I'll represent to you this is a -- this is*
         *an Instagram post -- posted on June 27th, 2022. So have you seen this*

13

         *Instagram post*

14

    *A.     Yes.*

    *...*

15

    *Q.     when did you see it then as best you can recall?*

16

    *...*

17

    *A.     It could -- I would say probably a month after.*

18

    *...*

19

    *Q.     Were you searching for it?*

    *A.     I believe so.*

20

    *Q.     Okay. So who -- so what -- how did you learn of it to search of it?*

21

    *A.     Not -- not sure.*

22

    *Q.     Not sure. Do you think Melanie Silva or do you –*

23

    *A.     No.*

    *Q.     Might Melanie Silva have told you?*

24

    *A.     No.*

25

    *Q.     No. What about Mr. Francesconi?*

26

    *A.     Maybe.*

27

Ex. 22 (Flores Dep. 48:22-51:19).

28

75.   With respect to the number of conversations Mr. Flores had with Mr. Francesconi regarding Cedar and Plaintiffs, Mr. Flores testified:

> Q.   Okay. Okay. So about how many conversations did you have with Mike Francesconi in total regarding Cedar?
>
> ...
>
> A.   You want to give me a time frame? Are you talking about –
>
> ...
>
> Q.   Well, let's -- let's do -- let's do the, you know, June -- June 2022 to September of 2022. So in that time frame.
>
> A    Maybe 15.
>
> Q.   Maybe 15. Okay.

Ex. 22 (Flores Dep. 71:23-72:19); and

> Q.   Mr. Flores, let me ask this. In the 15 or so conversations that you had between June and September of 2022, did any of those conversations concern what to do with Cedar once -- once he was acquired?
>
> A.   No.
>
> Q.   No? Okay. All right. Did they all concern getting Cedar before he was taken into custody by the sheriffs?
>
> A    No.
>
> Q.   What did they concern then? Please elaborate.
>
> ...
>
> A.   I don't recall exactly what would have been discussed, but I can tell you the questions you asked me -- the aforementioned questions you asked, I definitely remember that not being discussed. Probably just updates as to what might have been transpiring. I -- I don't know –

Ex. 22 (Flores Dep. 74:02-22).

76.   With respect to Mr. Flores communications regarding Plaintiffs and Cedar, he testified:

> Q.   ....-- I'm going to -- you listed your three staff members at the time, which is Sofia Goss, Mike Francesconi, and Sarah Pelle, other than -- other -- and Melanie, of course. But other than those individuals and your attorneys, of course, is there anyone else you spoke to regarding Cedar or plaintiffs ever?
>
> ...
>
> A.   No one -- no one else?
>
> Q.   No one else, just your attorney. That's why I said except for your attorneys. No one else besides the people I mentioned then. So Melanie --I'm spacing. Melanie, Sofia Goss, Mike Francesconi, and Sarah Pelle, correct?

31

ADVANCING LAW FOR ANIMALS

A.      Correct.

Ex. 22 (Flores Dep. 79:21-81:08).

77.      With respect to communicating with Ms. Silva on June 27, 2022, the same day the Viral

Instagram Post was posted online, Mr. Flores testified:

Q.      *Great. All right. So we have an incoming call on June 27th at 11:42 a.m. two minutes to -- this is Melanie -- this is from Melanie Silva's cell phone records which we subpoenaed. Do you recall making this phone call? It's highlighted in green up top next to this cursor.*

A.      *Yes.*

Q.      *Okay. And what did you discuss in that call?*

....

A.      *Yeah. I don't -- I believe that call was to discuss picking up a barbecue.*

Q.      *Picking up a barbecue.*

A.      *Uh-huh.*

Q.      *Okay. So you didn't -- did you discuss Cedar at all in this call?*

A.      *I don't believe so.*

Ex. 22 (Flores Dep. 35:07-36:08).

78.      With respect to Mr. Flores' calls to Ms. Silva on June 29, 2022, the day the Sheriff's

Office was contacted, Mr. Flores testified:

Q.      *Did you speak with -- did you a discuss Cedar or plaintiffs on that June 29th call?*

A.      *Possible.*

Q.      *Possible. Okay. All right.*

A.      *As well as the barbecue.*

Q.      *What about the barbecue did you discuss on the first call on the 22nd?*

A.      *I purchased the -- purchased a giant barbecue from Ag Mechanics. And so she was storing it until I could pick it up. I had to make arrangements to go back and pick it up.*

Ex. 22 (Flores Dep. 35:07-36:08).

79.      With respect to Mr. Flores' communications with Ms. Silva regarding Plaintiffs and

Cedar, Mr. Flores testified:

Q.      *Okay. Okay. And what did you discuss about Cedar and plaintiffs?*

...

A.      *It was my recommendation that she work with local authorities. And that was it.*

Ex. 22 (Flores Dep. 38:01-14).

80.     Between July 15, 2022 and July 27, 2022, on behalf of Mrs. Long, I contacted both the Sheriff's and Shasta County Counsel's Office multiple times demanding to know what happened to Cedar and that he be kept alive. I spoke with Lieutenant Fernandez and Detective Duncan on the phone. Detective Duncan claimed to have no information and directed me to Lieutenant Fernandez. Lieutenant Fernandez would not disclose any information about Cedar other than saying "we turned him over to who we deemed was the rightful owner." I also had communications with attorney Adam Pressman of the Shasta County Counsel's office and he too would not provide information on Cedar's whereabouts.

81.     Ms. Silva's handwritten notes state:



> Mike Francesconi
> DA
> Local Sheriff
> transpired
> 15-20 min
> Back
> Owner
> wont
> press charges
> lawyer
> pro bono

Ex. 6, at 1.

82.     She testified the above reference to "pro bono lawyer" refers to me.  Ex. 14 (Silva Dep. Vol. 2, 410:25-411:15).

83.     Attached hereto as **Exhibit 23** are is a true and correct copy of text messages produced in discovery by Lieut. Fernandez.  The messages indicate that around 5:31 pm, on August 31, 2022 (the day this lawsuit was filed), Ms. Muse texted Lieut. Fernandez "Is the da going to do anything with the goat?" Then, on September 2, 2022, she texted him "Hi Jerry this is Kathie Muse did the DA decide to do anything today with the goat."

84.     On or about January 20, 2024, on behalf of Plaintiffs, I served AT&T with a subpoena for Ms. Silva's work cell phone records (XXX XXX 4949).  On or about February 26, 2024, on behalf of Plaintiffs, I served Verizon with a subpoena for Ms. Silva's personal cell phone records (XXX XXX

0058) and a subpoena for copies Ms. Silva's work cell phone for SDF (XXX XXX 6789). Ms. Silva confirmed these numbers in deposition. Ex. 12 (Silva Dep. Vol. 1, 149:05-150:18).

85.     Based on my firms' review of these records, Ms. Silva did not initiate a call to the Sheriff's department.

86.     The records indicate her first call with anyone at the Sheriff's Department occurs on June 29, 2022, at 2:29 pm, with Lieut. Fernandez at (XXX) XXX-2493. See Ex. 2. Note that the Shasta County website lists (XXX) XXX-2493 as Lieut. Fernandez's number. See Ex. 20 (true and correct copy of a screenshot from https://www.shastacounty.gov/sheriff/page/reserve-program, taken on June 18, 2024). Additionally, Plaintiffs' counsel performed a reverse look-up of the phone number ending in 8333, and identified this number as belonging to Lieutenant Fernandez. Plaintiffs' counsel sought a private investigator to confirm these findings, and in fact did.

87.     On February 20, 2024, on behalf of Plaintiffs, I subpoenaed records Mrs. Muse's personal cell, (XXX) XXX 9107. Ms. Muse testified that was her cell number. Ex. 10 (Muse Dep. 147:04-06.). A true and correct copy of her phone records are attached hereto as **Exhibit 29**. Her phone records indicate she called (XXX) XXX-3888 on June 28 at 9:51 am, 9:54 am, 10:37 am, 8:16 pm; June 29 at 4:41 pm; July 8 at 5:17 pm; July 9 at 12:02 pm; and September 1 at 6:38 pm.

    a.   The concurrently filed Declaration of Vanessa Shakib ¶ 17 establishes that (XXX) XXX-3888 belongs to Senator Brian Dahle.

88.     On about April 24, 2024, nonparty Shasta County District Attorney Stephanie Bridgett provided Plaintiffs with a declaration stating she never communicated with anyone outside her Office in June and July 2022 regarding Plaintiffs or Cedar. A true and correct copy of DA Bridgett's declaration is attached hereto as **Exhibit 24**.

89.     On about April 26, 2024, nonparty Shasta County Sheriff Michael Johnson provided Plaintiffs with a declaration stating he never communicated with anyone outside the Sheriff's Office in June and July 2022 regarding Plaintiffs or Cedar. He also asserts, contrary to Lieut. Fernandez's testimony that Sheriff Johnson instructed Lieut. Fernandez to investigate Plaintiffs and Cedar, that Lieut. Fernandez was actually the person who informed the Sheriff. A true and correct copy of Sheriff Johnson's declaration is attached hereto as **Exhibit 25**.

ADVANCING LAW FOR ANIMALS

90.     In response to this Court's order (ECF 69) directing Vista Real Estate to turnover any records it had related to Cedar, in early April 2024 I conferred with representatives of Vista Real Estate. No records in that company's possession indicated one way or the other if it received Cedar's cuts of meat post slaughter.

91.     On May 6, 2024, I issued a subpoena to nonparty Verizon Wireless for "Any records concerning incoming or outgoing calls or texts for telephone number (XXX) XXX-5038, from June 25, 2022, through July 28, 2022, including call logs, call detail records, and text logs." Mr. Flores confirmed this is his work number. Ex. 22 (Flores Dep. 34:11-15.) A true and correct copy of this subpoena is attached hereto as **Exhibit 30**.

92.     The compliance date for this subpoena May 17, 2024. See Ex. 30.

93.     At some point after I served the subpoena, I spoke with a Verizon representative who informed me Verizon would not release the records absent a court order. Verizon also represented this was a business account with hundreds of numbers.

94.     I conferred with John Bridges, the attorney representing nonparty Michael Flores with respect to the instant subpoena. We discussed this subpoena several times by phone and we discussed it over multiple emails. Counsel for Flores did not file any formal objection with Verizon to my knowledge but, instead, apparently filed a motion to quash on June 7, 2024. (ECF 87).   I also sent him a lengthy meet and confer letter explaining Plaintiffs' position on why the subpoena seeks discoverable info and why his objections were unfounded. A true and correct copy of my firm's meet and confer letter is attached hereto as **Exhibit 31**.

95.     Additionally, Plaintiffs already agreed, and continue to agree, not to disseminate Mr. Flores business phone records, and to redact all sensitive information from Court filings. For those reasons, Plaintiffs' position is that no protective order is warranted.

96.     Lastly, the parties stipulated to a discovery extension in this matter (ECF 65) for the limited purpose of determining who at the Sheriff's Office, the District Attorney's Office, and/or the CDFA partook in deciding that Cedar would be killed after he was delivered to Mr. Macfarlane's house on July 8, 2022. Fact discovery was extended from March 25, 2024, to May 24, 2022, to allow Plaintiffs discovery on that issue. (ECF 67) As the stipulation described (ECF 65), my co-counsel and I

used the extension to decipher multiple sets of phone records we received in discovery. We devoted significant resources to his endeavor, including using various "reverse number look-up" tools and a private investigator. We deemed those steps necessary in light of the testimony from Defendants Mr. Macfarlane, Ms. Silva, and Mrs. Muse, all of which suggested some combination of the Sheriff, the Sheriff's Office, the District Attorney, the District Attorney's Office, and/or individuals at the CDFA, dictated when Cedar would be killed. Despite the significant time and resources we devoted, we did not determine that the number at issue belonged to Michael Flores until May 1, 2024. I only determined it belonged to Michael Flores after finding it anonymously listed on public website next to a residential address which, after running a title report, I confirmed was registered Mr. Flores. To protect his personal information, I am not including that information in this declaration. However, I provided all such information to his attorney during the meet and confer process. Flores has since confirmed the number at issue belongs to him. My office moved as expeditiously as possible to determine the holder of the phone number at issue, meet and confer with Attorney Bridges over the records sought, and then issue the subpoena, which occurred on May 6, 2024. I was awaiting Verizon's response before filing a motion to compel. However, when Verizon did not respond, I noticed the instant motion to compel on May 24, 2024, before the close of discovery.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 19, 2024.

By:_____/s/Ryan Gordon_____
                Ryan Gordon

DECLARATION OF RYAN GORDON IN SUPPORT OF ECF 78 & 85, AND IN OPPOSITION TO ECF 87

**PROOF OF SERVICE**

I, Ryan Gordon, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 407 N. Pacific Coast Hwy. #267, Redondo Beach, CA 90277.

On June 19, 2024, I served on the interested parties in this action the following document(s) described as **DECLARATION OF RYAN R. GORDON IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL (ECF Nos. 78 and 85) AND IN OPPOSITION TO NONPARTY MICHAEL FLORES' MOTION TO QUASH AND FOR A PROTECTIVE ORDER (ECF No. 87)**
☒ By placing ☒ a true copy thereof enclosed in a sealed envelope addressed as follows:

CHRISTOPHER M. PISANO,
christopher.pisano@bbklaw.com
DAMIAN A. NORTHCUTT,
Damian.Northcutt@bbklaw.com
JULIA HERNANDEZ
Julia.Hernandez@bbklaw.co
BEST BEST & KRIEGER LLP 300
South Grand Avenue 25th Floor
Los Angeles, California 90071

VERIZON
C/O Verizon Security Subpoena Compliance
180 Washington Valley Road
Bedminster NJ 07921
Fax: 1.888.667.0028.

JOHN C. BRIDGES
CALIFORNIA DEPARTMENT OF JUSTICE
Tort and Condemnation Section
1300 I Street, Suite 1210
Sacramento, CA,  95814
**John.Bridges@doj.ca.gov**

Ian Collins, Esq.
ian.collins@rswslaw.com
Tonya.hamilton@rswslaw.com

☒   **BY FAX**:  by transmitting via facsimile the document(s) listed above to the fax number(s) set forth for Verizon at its request.

☐   **OVERNIGHT DELIVERY**:  I deposited such envelope in a facility regularly maintained by ☒ FEDERAL EXPRESS with delivery fees fully provided for or delivered the envelope to a courier or driver of ☐ FEDERAL EXPRESS authorized to receive documents at 407 N. Pacific Coast Hwy, #267, Redondo Beach, CA 90277 with delivery fees fully provided for.

☒   **BY E-MAIL OR ELECTRONIC TRANSMISSION**: The document(s) was sent from e-mail address rgordon@advancinglawforanimals.org to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒   [Federal]   I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on June 19, 2024, at Los Angeles, California.

_____/s/Ryan Gordon_____
Ryan Gordon

ADVANCING LAW FOR ANIMALS