# EXHIBIT 7

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*LIEUTENANT JERRY FERNANDEZ*
*August 21, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File J. Fernandez.txt
Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

---OOO-

E.L. a minor, by and through her general
guardian, JESSICA LONG; JESSICA LONG, an
individual,

        Plaintiffs,

                              Case No. 2:22-cv

            2:22-cv-01527

   vs.

LIEUTENANT JERRY FERNANDEZ individually
and in his individual capacity as
Sheriff for the County of Shasta;
DETECTIVE JACOB DUNCAN, individually and
in his individual capacity as Sheriff for
the County of Shasta; DETECTIVE JEREMY
ASHBEE, individually and in his
individual capacity for the County of
Shasta; SHASTA DISTRICT FAIR AND EVENT
CENTER, a district agricultural
association; COUNTY OF SHASTA; SHASTA
COUNTY SHERIFF'S DEPARTMENT; MELANIE
SILVA, in her individual capacity; BJ
MACFARLANE, in his individual capacity;
and DOES 1 through 10,

        Defendants.

_____/

VIDEO RECORDED DEPOSITION OF

LIEUTENANT JERRY FERNANDEZ

MONDAY, AUGUST 21, 2023

9:41 a.m.

Reported by:  JULIE BANGHART, CSR NO. 10547

**Challe, Fisher & Morfin**
**Redding, California  (530)246-0942**

**LIEUTENANT JERRY FERNANDEZ**

1        MR. GORDON:  Hour and 19 minutes.  All right.  Just

2    trying to get a gauge on the time here.

3    Q.    Okay.  So when we left off, Lieutenant, you said that

4    you did not know Jessica Long before the events of --

11:27  5    leading up to this case.  Correct?

6    A.    Yes, sir.

7    Q.    Nor did you know her daughter E.L.  Of course, you

8    know the daughter's name, but for the lawsuit we need to use

9    the abbreviation.

11:27 10        Okay.  So when did you first learn of Jessica

11    removing Cedar from the -- when I say "the fair," I mean the

12    2022 Shasta County District Fair.

13    A.    I first learned about it when -- I want to say it was

14    either the very end of June or beginning of July.

11:27 15    Q.    And who told you?

16    A.    I was -- the Sheriff, Michael Johnson, told me that I

17    needed to reach out to the fair or people from the fair in

18    regards to a theft of a goat.

19    Q.    Okay.  Michael Johnson.  You said the Sheriff.

11:28 20        So he's the elected Sheriff?

21    A.    He is the elected Sheriff, yes.

22    Q.    Okay.  Do you know who told him?

23    A.    I do not.

24    Q.    Okay.  Did you ask?

11:28 25    A.    I did not.

**LIEUTENANT JERRY FERNANDEZ**

1  Q.    Okay.  All right.  And this is end of July -- no, I'm

2  sorry.  I apologize -- end of June, beginning of July?

3  A.    Yes, sir.

4  Q.    Okay.  Thank you.  Okay.  So did he give you any --

11:28  5  what other details did Michael Johnson give you?  Sheriff

6  Johnson.  I'm not trying to be disrespectful.  Whatever the

7  proper term is.

8  A.    Sheriff Johnson.

9  Q.    Sheriff Johnson.

11:28  10       Is that what you call him?  Sheriff Johnson?

11  A.    Yes, Sheriff.  Just that the goat was stolen and that

12  because of my collateral assignment as a livestock

13  investigator, that I needed to reach out to the people from

14  the fair and basically conduct an investigation.

11:29  15  Q.    Okay.  So I didn't ask you this earlier, so I'm sorry

16  to bounce back chronologically.  Your collateral assignment

17  is a livestock investigator.

18       What are your other current assignments?

19  A.    So my current assignment is I'm a Station Commander

11:29  20  for the Sheriff's Office, the South County Station.

21  Q.    Okay.

22  A.    So I oversee that station.

23  Q.    Okay.  How many stations are there in Shasta?

24  A.    Three stations.

11:29  25  Q.    Which ones?  Like South, North and West or something?

**LIEUTENANT JERRY FERNANDEZ**

| | |
|---|---|
| 1 | Q.    Okay.  Okay. |
| 2 | A.    Somewhere around there. |
| 3 | Q.    You don't need to do the math. |
| 4 | A.    I'm not good at math.  I always joke about that. |
| 11:34  5 | Q.    All right.  So Sheriff Johnson tells you to go |
| 6 | investigate this.  And you don't know who told -- do you |
| 7 | know when he learned of this? |
| 8 | A.    It was the same time that I conducted the -- or began |
| 9 | the investigation.  So that was the same time frame, end of |
| 11:34 10 | June, beginning of July. |
| 11 | Q.    Okay.  And what narrative or facts did he tell you? |
| 12 | A.    Just that the -- that the goat had been stolen and to |
| 13 | reach out to whoever I know at the fair to basically |
| 14 | conduct -- start the investigation. |
| 11:34 15 | Q.    Okay.  All right.  Do you know -- did he cite any |
| 16 | Penal Code when he said that? |
| 17 | A.    No. |
| 18 | Q.    And did he tell you anything about Jessica Long in |
| 19 | that conversation? |
| 11:35 20 | A.    No. |
| 21 | Q.    No. |
| 22 |       Anything about her daughter? |
| 23 | A.    No. |
| 24 | Q.    Okay.  Did he say it was in relationship to the |
| 11:35 25 | livestock auction at the fair. |

**LIEUTENANT JERRY FERNANDEZ**

```
 1   Q.     The very last one.  Okay.  That's 68.  This one here
 2   that's black and white?  Do you see that?
 3   A.     Yeah.
 4   Q.     68.
 5   A.     So 65 through 68.
 6   Q.     65 through 68.  That's where it is.  Okay.
 7          So then at this point you're in Napa County.
 8          What time is it at this point?
 9   A.     9:00, a little after 9:00 probably.
10   Q.     A little after 9:00.  Okay.
11          And then you headed back to Redding?
12   A.     Yes, sir.
13   Q.     Okay.  And --
14   A.     Well, we headed back towards north.
15   Q.     Headed north.  Okay.
16          Were you going -- well, someplace on the way?
17   A.     Yeah.  So we were going to meet -- so at that point I
18   had notified Kathi that we had located the goat and that we
19   were on our way back, as well as BJ Mcfarlane or Bruce
20   Mcfarlane.
21   Q.     Yeah.
22   A.     And then --
23   Q.     We call him BJ.  We know who he -- that's the name --
24   A.     Yeah, that's how I've know him.
25   Q.     -- my client calls him.
```

**LIEUTENANT JERRY FERNANDEZ**

1    A.    And then due to the time of -- projected time of our

2    arrival back into Shasta County, Ms. Muse requested that we

3    leave the goat in the care and custody of Mcfarlane.

4    Q.    Okay.  So did you speak with Kathi Muse on the phone?

04:52    5    A.    Yes.

6    Q.    Okay.  What did you -- what did she say on the phone?

7    A.    Just -- I can't recall everything she said.  I think

8    she was excited that we got the goat and that to -- based on

9    the time of night, to just leave it with her agent, which

04:52    10    would have been Mcfarlane.

11    Q.    Okay.  Did she give you any -- give any documentation

12    she was -- he was her agent or she just said leave him with

13    Mcfarlane?  Did she use the term "agent"?

14    A.    No, that's my term.  Yeah.

04:52    15    Q.    All right.  All right.  And -- now, you called her?

16    A.    To the best of my recollection, yes.

17    Q.    Okay.  And about how long did you speak with her?

18    A.    Not very long, like 30 seconds, a minute.

19    Q.    Just said "We got him?"

04:52    20    A.    Yeah.  "We got him.  We're on our way back.  Probably

21    be home around midnight."

22    Q.    Okay.

23    A.    And then she -- and then I -- either she suggested

24    that I leave him with Mcfarlane, and I reached out to

04:53    25    Mcfarlane, let him know per Muse she wanted me to leave him

## LIEUTENANT JERRY FERNANDEZ

 1          That's -- that's at Bruce's house or BJ's house?

 2   A.     Yes.

 3   Q.     Okay.  All right.  And that's where he has Cedar.

 4   The look of --

04:57  5   A.     Unfortunately --

 6   Q.     -- on his face?

 7   A.     Yeah.

 8   Q.     So did you ask him what he was going to do with

 9   Cedar?

04:57 10   A.     No.

11   Q.     Did you ask Kathi what she was going to do with

12   Cedar?

13   A.     I did not ask, no.

14   Q.     No.  Okay.

04:57 15          Did you -- what was your understanding what was going

16   to be done with him?

17   A.     At that point whatever the owner, her, Kathi, was

18   going to do with it.  I don't know, so...

19   Q.     Okay.  Whatever Kathi was going to do with it.  Okay.

04:57 20          And -- okay.  So -- all right.  So then let's move

21   to -- these text messages.

22          So did you ever tell -- this is broadly speaking.

23          Did you ever make any comment to anyone that, you

24   know, something to the effect of "This is a lot of resources

04:58 25   devoted to a goat"?

**LIEUTENANT JERRY FERNANDEZ**

1  A.      Did I ever make those statements?

2  Q.      Yeah, even in jest.

3  A.      I don't think I openly said those things.  I don't

4  recall saying anything like that.

04:58  5  Q.      Did you internally think it at any point in time?

6          I know you're saying it's not the crime of the

7  century.  You used that expression a couple times.

8  A.      Right.  I've used that, yeah.  I think -- I think

9  people that were involved in the investigation, you know,

04:59  10  like Napa County made joke about "Oh, you're here for the

11  pinto," so...

12  Q.      Yeah.

13  A.      So obviously not the caper of a lifetime.  Right.

14  Q.      Yeah.  Yeah.  I assume that you've been involved in

04:59  15  murders and other pretty serious things.

16  A.      Officer involved shootings and stuff like that, so --

17  Q.      You were involved in an officer shooting?  Oh, wow.

18  A.      So these are things that I don't think -- it's not

19  really -- I mean, I could -- I could have my feelings on a

04:59  20  lot of things.

21  Q.      Sure.

22  A.      However, I have a job to do.  And as long as

23  something falls within my purview of my job then -- I answer

24  to people, too, so I have to do my job.

04:59  25  Q.      Yeah.  Okay.  All right.  Did you think when the

**LIEUTENANT JERRY FERNANDEZ**

1       Sheriff said to -- strike that.

2               Does Sheriff Michael Johnson -- is --

3       A.      That's his --

4       Q.      It is his name.  Okay.

04:59  5               Does he have any relationship that you know with the

6       Fair?

7       A.      Not that I know of, no.

8       Q.      No.

9               Or with Kathi Muse?

04:59  10      A.      Not that I'm aware of.

11      Q.      Or with, you know, the Dahles?

12      A.      Not that I'm aware of.

13      Q.      Okay.  All right.  Does he have any ties to

14      agriculture?

05:00  15      A.      He's a Sheriff, so agriculture in pretty much any

16      county you go to is one of the bigger --

17      Q.      Sure.

18      A.      I think they're going to be at the Board of

19      Supervisors tomorrow.  Usually agriculture has a lot of

05:00  20      influence within counties, but I don't know -- I can't speak

21      for my Sheriff.

22      Q.      Okay.  But you would expect -- but you would expect,

23      just because the nature of position that, you know, they

24      have his ear?

05:00  25      A.      Right.  Well, they would have his ear and --

## LIEUTENANT JERRY FERNANDEZ

```
 1          MR. NORTHCUTT:  Well, do you know one way or the
 2    other or are you speculating?
 3          THE WITNESS:  That would be a speculation.  I do know
 4    from talking with him that it wasn't just a big deal here.
 5    It was a big deal with a lot of the fair boards within
 6    Shasta County.
 7    Q.    MR. GORDON:  Where else was it a big deal?
 8    A.    I don't know the names of those fairs.
 9    Q.    Do you know -- do you know -- oh, well you said "fair
10    boards."
11    A.    Yeah.
12    Q.    So what other fairs?  Are there other fairs in Shasta
13    County?  I thought it was one per county.
14    A.    No, the State of California.
15    Q.    The State.  Okay.
16          What other fairs was it a big deal with, if you know?
17    A.    I don't know those -- I don't know the particulars on
18    that.
19    Q.    Who did you hear it from?
20    A.    The Sheriff.
21    Q.    The Sheriff.  Okay.
22          That people were pissed that Cedar was removed?
23    A.    Yeah, I think it was -- or from my recollection, it
24    was reported to him that this is -- right, that this is
25    not -- yes, it affects Shasta District Fair and we have to
```

**LIEUTENANT JERRY FERNANDEZ**

1    investigate it, but there's other fair boards reaching out

2    to our fair board about this is pretty serious stuff, and

3    that --

4    Q.    So other fair boards reached out to Shasta and

05:01  5    said --

6    A.    It sounds like it, yeah.

7    Q.    And said put your foot down on this?

8    A.    No, I won't say put your foot down, but if there's a

9    crime, investigate it.  So that's what I did.

05:02  10   Q.    Okay.  Okay.  Let's get into -- let's get into some

11   of these text messages here.

12         So, Officer, if you go to 125 they start.  There's

13   not many.

14   A.    Zero zero what?  0025?

05:02  15   Q.    Yeah, yeah.  It's the last -- last -- I'm just saying

16   125 for shorthand.  000125.

17         MR. NORTHCUTT:  I don't know if we have --

18         MR. GORDON:  Oh, I'm sorry.  No, no, no, no.

19         MR. NORTHCUTT:  The only think he's got is his

05:02  20   investigative report.

21         MR. GORDON:  We've been on that exhibit for so long.

22         THE WITNESS:  Yeah, sorry.

23         MR. GORDON:  My apologies.

24         Do you need -- Damian, do you need copies?

05:02  25         MR. NORTHCUTT:  Sure.  If you don't have enough, we

## LIEUTENANT JERRY FERNANDEZ

```
 1  A.      Yeah, we can either file or we can arrest.

 2  Q.      Okay.

 3  A.      But still file -- the case still gets filed with the

 4  court.

05:10  5  Q.      The case still goes on, regardless of whether you

 6  arrest her then.

 7  A.      There's the handful of times you arrest people and it

 8  still doesn't get filed.

 9  Q.      Yeah.

05:10 10  A.      Right.  So you get arrested and then it goes in

11  arraignment.

12  Q.      Yeah, they have a revolving door in L.A.

13  A.      Right here, too.

14  Q.      Really?

05:10 15  A.      Yeah.

16  Q.      Okay.  So -- okay.  So you told -- you told -- I'm

17  starting to lose my train of thought here.

18          You were trying to give me your best estimate of when

19  you told this to Kathi.

05:11 20  A.      Right.  And I -- I can't recall exactly when I told

21  her it was being filed.  I want to say it was before we

22  actually collected the goat though.

23  Q.      Okay.  Before you -- before you collected the goat.

24          Okay.  All right.  And did you -- okay.

05:11 25          Did you tell anyone -- did you tell anyone else you
```

**LIEUTENANT JERRY FERNANDEZ**

1  were requesting charges be pressed?  It's like "pressed"

2  like they say in the movies, but you know what I mean.

3  A.     Did I talk to anyone else about the purpose?

4  Q.     Yeah, Bruce or Melanie?  Anyone else?

05:11  5  A.     The Sheriff, the DA.

6  Q.     Obviously, you told the DA.  You gave him the request

7  for it.

8  A.     Yeah, we talked about it on the phone with the

9  Sheriff.

05:11  10  Q.     When was that?

11  A.     After I collected the goat.  I think like within a

12  week after collecting the goat.

13  Q.     Okay.  All right.  The prior question, you were

14  telling me who else you might have talked to.

05:11  15  A.     Yeah.

16  Q.     Besides Kathi Muse.

17  A.     I think Mcfarlane was -- I informed him that, yeah,

18  we would be filing charges.

19  Q.     Did you call him?

05:12  20  A.     No.  That might have been in person.

21  Q.     Where did you see him?

22  A.     At his house when I dropped the goat off.

23  Q.     Oh, you told him then you were going to.

24  A.     I'm pretty sure that's when I told him, yeah.

05:12  25  Q.     But it might have been after?

**LIEUTENANT JERRY FERNANDEZ**

1               PENALTY OF PERJURY

2

3        I, the undersigned, hereby certify that I have read

4   the foregoing deposition, that I know the contents thereof,

5   and I declare under penalty of perjury under the laws of the

6   State of California that the foregoing is true and correct,

7   and that there are:

8

9   (Check one)                    _____  NO CORRECTIONS

10                                 _____  CORRECTIONS AS ATTACHED

11

12       Executed this _____ day of _____, 2023.

13

14

15

16

17

18              _____

19                   LIEUTENANT JERRY FERNANDEZ

20

21                   ---oOo---

22

23

24

25

**LIEUTENANT JERRY FERNANDEZ**

1                           PENALTY OF PERJURY

2

3        I, the undersigned, hereby certify that I have read

4   the foregoing deposition, that I know the contents thereof,

5   and I declare under penalty of perjury under the laws of the

6   State of California that the foregoing is true and correct,

7   and that there are:

8

9   (Check one)                  _____   NO CORRECTIONS

10                               _____   CORRECTIONS AS ATTACHED

11

12       Executed this _____ day of _____, 2023.

13

14

15

16

17

18        _____

19                      LIEUTENANT JERRY FERNANDEZ

20

21                      ---oOo---

22

23

24

25

```
1                        CERTIFICATE OF REPORTER

2

3          I, JULIE BANGHART, a Certified Shorthand Reporter,
    licensed by the State of California, License No. 10547,
4   being empowered to administer oaths and affirmations
    pursuant to Section 2093(b)(1) of the Code of Civil
5   Procedure, do hereby certify:

6          That the witness in the foregoing deposition,
    LIEUTENANT JERRY FERNANDEZ, was present at the time and
7   place specified and was by me sworn to testify to the truth,
    the whole truth, and nothing but the truth;

8
           That said proceeding was taken before me in shorthand
9   writing, and was thereafter transcribed under my direction
    by computer-aided transcription;

10
           That the foregoing transcript constitutes a full,
11  true, and accurate record of the proceedings which took
    place;

12
           That I am not of counsel of attorney for any of the
13  parties hereto, or in any way interested in the event of
    this cause, and that I am not related to any of the parties
14  hereto.

15         IN WITNESS WHEREOF, I have hereunto subscribed my
    signature on this 11th day of October, 2023.

16

17

18

19

20  _____

21  JULIE BANGHART, CSR 10547

22

23

24

25

                                                            325
```

**FERNANDEZ DEPOSITION DOCUMENTS**
**FERN000044 through FERN000048**

Deposition Documents referenced in Fernandez Excerpts
on pp. 130-131, and pp. 135-136  bearing bates no. FERN000044 through
FERN000048

Re: Requesting solutions for the goat that was taken
Jessica Daum <jess███████@hotmail.com>
Wed 6/29/2022 9:49 AM
To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com> ·

Please see attached.
Thank you,
Jessica Long

Get Outlook for iOS

Shasta District Fair
1890 Briggs Street
Anderson, CA 96007

---

**June 28, 2022**

*Re: Dispute over Cedar*

Dear Shasta District Fair;

This letter is in further response to my dispute with your organization concerning my daughter's goat, Cedar. My daughter's name is E█████ L█████

On June 27, 2022, I sent an email asking that your organization withdraw its demand for the return of Cedar and offering to pay for any costs or damages you have incurred as a result of this dispute. This morning, however, I received another text message from BJ McFarlane which seemingly ignored my letter and simply demanded return of my daughter's goat.

I've had time to review the documents that BJ McFarlane sent me, and I believe your organization is not within its rights to demand return of Cedar.

While you threatened to alert the authorities I had violated California Penal Code § 487a, upon examination, I have done no such thing. That statute makes it a crime to "feloniously steal[], take[], carr[y], lead[], or drive[] away...any caprine animal...,

FERN000045

[1] which is the personal property of another, or [2] who fraudulently appropriates that same property which has been entrusted to him or her, or [3] who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of that same property...is guilty of grand theft." (*Id.*) I cannot possibly have done any of those things because Cedar was not your organization's personal property. To the contrary, and as the 2022 State Rules For California Fairs indicate ("State Rules"), it was my daughter's personal property. Specifically, the State Rules provide in relevant part that "exhibitors must be legal owners of all entries. Ownership must be maintained through show date(s)." (See State Rules at p. 6.) Cedar was removed during that period, so the State Rules admit he was still my daughter's personal property.

Consistent with the State Rules, your organization's All General Rules and Guidelines ("General Rules") also require that "Exhibitors must be able to show proof of ownership at any time...." (See General Rules at p. 3.) Again, Shasta District Fair was not the owner.

Finally, that your organization did not become the owner of Cedar is further confirmed by the provision in your General Rules advising the Junior Exhibitors to obtain liability insurance. (See General Rules at p. 8.)   If Cedar became your property by virtue of our entry to the fair, there would be no need for the Junior Exhibitors to obtain insurance, as the fair would be liable. In sum, Cedar was my daughter's personal property so California Penal Code § 487a is not even triggered.

FERN000046

Furthermore, in the event the Shasta District Fair could claim Cedar became its personal property,"[i]t is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1017, citing *People v. Butler* (1967) 65 Cal.2d 569, 573.) As I believed in good faith that Cedar was not the Shasta District Fair's personal property, no violation of Penal Code § 487a was committed.

Lastly, if anyone other than my daughter has a right to the goat, it would be Senator Brian Dahle as he was the successful bidder at auction.  But his office has represented to me that they have relinquished any rights they have to Cedar, dead or alive. As a result, not only was there no crime committed, but the Shasta District Fair now gets to keep his bid of $11.00 per pound x 82 pounds, $902.00.  Thus, the Shasta District Fair has actually profited from this event—it cannot claim any harm. For the Shasta District Fair to claim it's been damaged by this event, it would have to show some loss arising from a breach I committed. (*See, e.g., Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473 ["A breach of contract is not actionable without damage"].) But your General Rules state that the Shasta District Fair will be entitled to only "7.0% of the sale price deducted from the [Exhibitor's] check...." So, had the slaughter been accomplished, the Shasta District Fair would have collected only $63.14.  But now, it has received, and gets to keep $902.00, a profit of $838.36.  So if anything, Shasta District Fair has been unjustly enriched by this situation.

Lastly, it must be stated with clarity that, because Shasta District Fair was never the owner of Cedar, the only possible rights it has in transaction are to the monies it could have earned, i.e., $63.14, which it has more than retained. So any legal action on the matter would per se be frivolous. Nevertheless, my offer to reimburse any other reasonable costs associated with this event remains open. I cannot envision what those costs would be, but I will of course review them in good faith.

This letter is not a waiver of any rights. Further, while its purpose is in anticipation of litigation, I am equally sending this letter to resolve the matter. My daughter has/is bonded with Cedar and, had we known what a terminal auction entailed, we never would have gone down this path. Fortunately, Shasta District Fair has actually profited from this event so this dispute should be put to rest.

In your email you expressed concerns about social media postings. If we can resolve this situation with Cedar not being brought in for slaughter, I am willing to consider signing a non-disclosure agreement.

Moving forward, I request that any communications be directed to my email at Jess███████@hotmail.com

Sincerely,

Jessica Long
Jess███████@hotmail.com