# EXHIBIT 12

# In The Matter Of:

*LONG vs.*

*FERNANDEZ*

---

*MELANIE SILVA*

*November 14, 2023*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File M. Silva.txt

**Min-U-Script® with Word Index**

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3                 SACRAMENTO DIVISION

4  E.L., a minor, by and through    )
   her general guardian, JESSICA    )
5  LONG; JESSICA LONG, an           )
   individual,                      )
6                                   )
                      Plaintiffs,   )
7                                   )
      vs.                           )  NO. 2:22-cv 01527
8                                   )  DAD-AC
   LIEUTENANT JERRY FERNANDEZ,      )
9  individually and in his         )
   individual capacity as Sheriff  )
10 for the County of Shasta;        )
   DETECTIVE JACOB DUNCAN,          )
11 individually and in his         )
   individual capacity as Sheriff  )
12 for the County of Shasta;        )
   DETECTIVE JEREMY ASHBEE,         )
13 individually and in his         )
   individual capacity as Sheriff  )
14 for the County of Shasta; SHASTA )
   DISTRICT FAIR AND EVENT CENTER,  )
15 a district agricultural          )
   association; COUNTY OF SHASTA;   )
16 SHASTA COUNTY SHERIFF'S          )
   DEPARTMENT; MELANIE SILVA, in    )
17 her individual capacity; BJ      )
   MACFARLANE, in his individual    )
18 capacity; and DOES 1 through 10, )
                                    )
19                     Defendants.  )
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
20                  ---oOo---

21          TUESDAY, NOVEMBER 14, 2023

22                  9:41 a.m.

23      VIDEOTAPED DEPOSITION OF MELANIE SILVA

24                  ---oOo---

25      Reported by:  CAROL J. CHASE, CSR No. 13538

**MELANIE SILVA**

1    now, so it's hard to differentiate.

2         Q      May -- you don't need to agree, but I'm

3    assuming it was the Instagram post that you flagged

4    and then there's some stuff after that.  Is that

10:18:57  5    what you were referring to at that time or is

6    that --

7         A      We had to forward our phones because our

8    phones were --

9         Q      Okay.

10:19:03  10        A      -- blown up.

11        Q      From the Instagram post.

12        A      From the Instagram post, from any media

13    that grabbed it.

14        Q      Yeah.  Okay.  So -- okay.  So July of --

10:19:14  15    this is 2022, this meeting July 19th.  And you --

16    you tell them that they're -- what -- so I know I

17    asked this just a moment ago and you somewhat

18    answered it.  But what exactly did you express to

19    the board at this meeting?

10:19:27  20        A      I couldn't tell you exactly what I

21    expressed --

22        Q      Sure.  Paraphrase.

23        A      -- but I let them know that we had an

24    incident at fair, that it was blowing up on social

10:19:34  25    media and that the news outlets were reporting it

**MELANIE SILVA**

```
 1    delivered to B.J. Mcfarlane, correct?
 2        A     I heard that he was in Napa and that he was
 3    brought back.
 4        Q     Okay.  Who did you hear that from?
 5        A     I knew you were going to ask that.  I --
 6    who told me?  I don't remember who told me.  There
 7    was a lot of people that told me random information.
 8        Q     Okay.
 9        A     I don't remember.
10        Q     Do you remember if you found out he was at
11    B.J.'s from text, phone, or e-mail?
12        A     I never knew he was at B.J.'s.
13        Q     You -- didn't you just say a moment ago --
14        A     That he was back in -- they had possession
15    of Cedar again, yes.
16        Q     Yes.
17        A     Where exactly they took him, I do not know.
18        Q     Okay.  But you knew he was with B.J. in
19    some capacity, yes?
20        A     I knew that B.J. was aware that it was
21    back, yes.
22        Q     Did you know that B.J. had custody of him?
23        A     I just knew it was back.  I didn't know
24    exactly it went when it came back.
25        Q     Did you -- did you ask B.J.?
```

Time stamps in left margin: 10:29:52 (line 5), 10:30:20 (line 10), 10:30:32 (line 15), 10:30:40 (line 20), 10:30:52 (line 25)

**MELANIE SILVA**

1      A      No.

2      Q      Is there any reason you didn't ask B.J.?

3      A      We were not in contact.

4      Q      You were the not in contact.  Okay.  Were

10:31:01  5  you in contact with anyone else regarding Cedar?

6      A      In, like, regular contact checking up on

7   it?  No.

8      Q      Irregular contact, anyone at any point in

9   the time from --

10:31:09 10    A      Kathie Muse and I spoke once.

11     Q      When did you speak to her?

12     A      I -- I don't know.  She also has an event

13  with a different group that has nothing to do with

14  any of this at the fairgrounds, so I just see her

10:31:23 15  randomly.

16     Q      Okay.  So you knew that -- that Kathie and

17  B.J. had custody of Cedar?

18     A      Correct.

19     Q      Okay.  Okay.  And when -- do you know when

10:31:32 20  you abouts [sic] learned about that?

21     A      No.

22     Q      No?  Was it -- so he was retrieved the 8th

23  and --

24     A      Of August?

10:31:40 25    Q      No.  July.

**MELANIE SILVA**

1    A    Oh.

2    Q    And this was -- and this was -- with that

3    date in mind, did you learn immediately after?

4    Right after?

10:31:47  5    A    I don't know.  I don't know.

6    Q    A few weeks later?

7         MR. BRIDGES:  I'm confused.  I thought you

8    said you didn't know that B.J. had custody.

9         THE WITNESS:  I don't know that he had --

10:31:55 10    he had custody.

11         MR. GORDON:  No, she said she didn't know

12    where he had custody.  She knew --

13         THE WITNESS:  I didn't know he had it.  I

14    don't -- I know it came back.  I don't know where it

10:32:01 15    went after that.

16    BY MR. GORDON:

17    Q    Okay.  Okay.  So you did want know -- B.J.

18    is a livestock manager, correct?

19    A    He was, yes.

10:32:08 20    Q    At that time?

21    A    At that time.

22    Q    So he's your employee?

23    A    He was, yes.

24    Q    Okay.  So you didn't know where the

10:32:16 25    livestock manager was with the livestock; is that

**MELANIE SILVA**

```
 1    your testimony?

 2         A    At that time.

 3         Q    Okay.  At that time.  And when did you

 4    learn to the best of your memory?

 5         A    Sometime after it was back.

 6         Q    That could be till now.  In -- in July?

 7         A    I don't know.

 8         Q    Before the board meeting on the 19th; do

 9    you think you knew by then?

10         A    I don't know.

11         Q    Well, please give me your best estimate.

12         A    I -- honestly, I have no clue, July,

13    August.  I'm not sure.

14         Q    July, August.  Okay.  Where is Cedar right

15    now then?

16         A    I don't know.

17         Q    You don't know where he is.  Okay.  Okay.

18    Well, you know he was slaughtered, yes?

19         A    I heard that he was slaughtered.

20         Q    When did you hear that?

21         A    I don't know -- people just talk.  I don't

22    know.  I'm not trying to be difficult.  I don't

23    know.

24         Q    When did you first hear he was slaughtered?

25         A    This is hearsay.  Do I say it as fact when
```

10:32:26 (line 5)
10:32:38 (line 10)
10:32:48 (line 15)
10:32:58 (line 20)
10:33:13 (line 25)

**MELANIE SILVA**

1        I don't know for sure?

2        Q        It's not being introduced as evidence.

3    Yes, you need to tell me what -- what you heard.

4        A        I just -- I don't know when I heard it.  I

10:33:26  5    just heard that he was back and that the permission

6    was given to go ahead and move forward with the

7    slaughter.

8        Q        Permission from who?

9        A        Somebody told me DA.  But do I know if

10:33:40 10    that's fact?  I don't know if that's fact.

11        Q        Yeah.

12              MR. GORDON:  So off the record for just one

13    second.

14              THE VIDEOGRAPHER:  We're off the record and

10:33:47 15    the time is 10:33.

16              (Whereupon, recess was take

17              from 10:33 a.m. to 10:47 a.m.

18              (Record read.)

19              THE VIDEOGRAPHER:  We're back on the record

10:47:16 20    and the time is 10:47.

21    BY MR. GORDON:

22        Q        All right.  Where we left off, Melanie --

23    and you understand you're still under oath, correct?

24        A        Yes.

10:47:25 25        Q        Okay.  All right.  When we left off and you

**MELANIE SILVA**

1    said you heard from, I believe, Silva [sic] or
2    Macfarlane.   You were waiting on permission because
3    they had custody of Cedar.   And I said permission
4    from who and you said the DA.   When did you hear
10:47:41  5    about that?
6              MR. BRIDGES:   I think that misstates her
7    testimony.
8              THE WITNESS:   Yeah, it was.
9    BY MR. GORDON:
10:47:44  10        Q    What did you say then?
11        A    I just heard that they had Cedar and I
12    heard that they were waiting for permission.   I
13    don't know...
14        Q    From who, though?
10:47:54  15        A    No.
16        Q    You said the DA before that.
17        A    I assumed it was the DA.
18        Q    Why did you assume it was the DA?
19        A    Because the DA's official.
10:48:03  20        Q    Any other reason?
21        A    No.
22        Q    Did -- did they -- either of them tell you
23    it was the DA?
24        A    No.
10:48:09  25        Q    No?   Okay.   Why didn't you assume it was

**MELANIE SILVA**

1    the sheriffs?

2        A       Because the DA's the legal.

3        Q       Okay.  Did you ask them if it was the DA?

4        A       No.

10:48:20  5    Q       No?  Why not?

6        A       Again, I didn't have a say in the -- what

7    happens to it.

8        Q       But it's your livestock manager and fair,

9    why did -- you must have some say?

10:48:30 10           MR. BRIDGES:  Well, I think that still

11   misstates testimony that she knows who told her

12   that.

13           THE WITNESS:  I don't.

14           MR. BRIDGES:  I don't think that was ever

10:48:36 15   established.

16   BY MR. GORDON:

17       Q       That she had -- okay.  Who told you that

18   they were waiting?

19       A       I don't remember.

10:48:40 20   Q       You don't remember at all, but you heard

21   from someone?

22       A       Yes.

23       Q       Okay.  And this was between -- he was

24   retrieved on the 8th and then apparently killed --

10:48:54 25   of July -- on the 28th.  So --

**MELANIE SILVA**

1      A      I didn't know the date.

2      Q      Okay.  But this would have been within that

3   period of time; is that your understanding?

4      A      Somewhere in July and August.  I don't

10:49:02  5   know.

6      Q      Somewhere in July or August.  Okay.  And

7   you have no recollection of who told you this?

8      A      No.

9      Q      Well, who else knew that Cedar was in the

10:49:10 10   custody of B.J. or -- or, uh, Ms. Muse?

11             MR. BRIDGES:  Calls for speculation and

12   misstates her testimony about who had custody of the

13   goat.

14             But if you understand --

10:49:21 15             THE WITNESS:  I don't.

16             MR. BRIDGES:  -- the question.

17   BY MR. GORDON:

18      Q      But you understood that B.J. and Ms. Muse

19   had custody, correct?

10:49:27 20      A      I heard that the sheriff brought the goat

21   back.

22      Q      To B.J.

23      A      I don't know exactly.  I'm assuming that it

24   was B.J., but I don't know who.

10:49:35 25      Q      Okay.  And --

**MELANIE SILVA**

```
 1    company cut the check?
 2        A    I do not.
 3        Q    Okay.  So back to the -- to the -- what you
 4    assumed is the DA.  So between July 8th and -- and
 5    July 28th, are you -- you said July and August, but
 6    those -- I'll represent to you those are the days
 7    that he was reviewed and killed.  So it would have
 8    been between those periods of time that you heard
 9    that the people who had custody of Cedar were
10    waiting on what you assume was the DA, correct?
11        A    I assumed it.
12        Q    Yes, I understand.  Yes.
13             MR. BRIDGES:  I'll also object that the
14    timeline lacks foundation.  It calls for
15    speculation.  She doesn't know when -- you're making
16    representation about --
17             MR. GORDON:  Yes, I am.
18             MR. BRIDGES:  -- those dates.  She doesn't
19    know those dates.
20             MR. GORDON:  Okay.
21             MR. BRIDGES:  Os she thought it could be
22    July or August.
23    BY MR. GORDON:
24        Q    You didn't know Cedar was killed on July --
25    on July 28th?
```

**MELANIE SILVA**

1          A       No.

2          Q       When did you find out he was killed on

3    July 28th?

4          A       I never knew.  Right now.

10:57:16  5          Q       To this day you still don't know?

6          A       I did not know it was July 28th, no.

7          Q       Oh, okay.  So until I represented to you

8    today, you never heard July 28th is the date?

9          A       Correct.

10:57:21 10          Q       When did you assume -- or when do you

11    believe he was killed prior to today?

12          A       Like what day?

13          Q       Yes.

14          A       I don't -- I don't know.  I didn't -- I

10:57:32 15    didn't think of a specific day.

16          Q       Okay.  Did you not -- didn't his meat go

17    back to the fairgrounds after he was killed?

18          A       No.

19          Q       It did not.

10:57:42 20          A       It was not our animal.

21          Q       Okay.  Yesterday, Kathie Muse said it went

22    back to the -- went back to the fairgrounds and was

23    directed towards another private buyer that the fair

24    issued it to.

10:57:50 25               MR. BRIDGES:  I'll object.  There's no

**MELANIE SILVA**

```
1        Q       -- you don't know?

2                Okay.  So this -- you men- -- you mentioned

3    having a conversation with Kathie Muse, which -- at

4    the fairgrounds in person.  And you believe that was

11:55:40  5    in the same time frame.  Do you know if that con- --

6    of July and August 2022.  Do you know if that was in

7    between July 8th when he was -- when Cedar was

8    retrieved and ber- -- and when he was slaughtered?

9        A       I don't remember the exact time.

11:55:55 10      Q       Okay.  And in this conversation you

11   discussed media and nothing else to your

12   recollection; is that accurate?

13       A       I don't remember what else we discussed.  I

14   would know -- I do know that it was part of the

11:56:07 15   attacks in the media.

16       Q       Okay.  But -- but Cedar himself, his

17   whereabouts at that moment, you -- you did not --

18   you don't recall discussing?

19       A       I don't recall discussing that, no.

11:56:16 20      Q       Okay.  But -- this isn't an I gotcha.  This

21   is -- when you say you don't recall, you mean -- you

22   mean it as not that we didn't discuss it.  You mean

23   you don't remember one way or the other?

24       A       Correct.

11:56:26 25      Q       So you might have discussed it?
```

**MELANIE SILVA**

```
 1      A     I -- I doubt it.  I just wasn't curious
 2   about it.
 3      Q     You were incurious about it.
 4            Okay.  So you don't though think you would
 5   have thought to ask her at the time?
 6      A     Correct.
 7      Q     Okay.  All right.  Okay.  Okay.  So what is
 8   the fair's relationship with -- with -- by "the
 9   fair," I mean the 27th DAA, Shasta District Fair.
10   What is the fair's relationship with 4-H?
11      A     What do you mean "what's the relationship"?
12      Q     What trans- -- do you engage in business
13   together?  Are there -- are there -- I mean,
14   obviously, they -- they have the -- they participate
15   in the fair in some capacity.  Just expand upon how
16   you --
17      A     They are members that enter into the fair
18   and show their animals.  And then they also have an
19   event before fair to help train their -- their
20   members.
21      Q     Okay.  All right.  Anything else come to
22   mind?
23      A     They volunteer and help serve at our buyers
24   dinner.
25      Q     Okay.  So what services does the -- does
```

Line timestamps: 11:56:38 (line 5), 11:57:04 (line 10), 11:57:21 (line 15), 11:57:36 (line 20), 11:57:49 (line 25)

**MELANIE SILVA**

```
 1      Q      -- you know, saveable.  I know that's not
 2   the right word.  You know what I'm saying.  What you
 3   should retain or not; is that accurate?
 4      A      Yes.
 5      Q      Okay.  Okay.  Okay.  Do you have a -- do
 6   you have a work phone?
 7      A      Yes.
 8      Q      Is it -- does it double as your personal
 9   cell?
10      A      No.
11      Q      Okay.  So separate work phone number?
12      A      Yes.
13      Q      And what is the -- what is the number and
14   carrier?
15      A      Verizon ██████-4949.
16      Q      All right.  Do you ever field work calls on
17   your private phone?
18      A      Occasionally.
19      Q      Occasionally.  Okay.
20      A      More event related, though.
21      Q      More event related.  Okay.  What is your --
22   what is private phone and your carrier?
23      A      Is this going to go out in the publish?
24      Q      No.  It will just be for most of the
25   documents and it is not public.
```

**MELANIE SILVA**

1       A       ███████-0058, Verizon.

2       Q       And if we do do it, certainly your

3    attorney --

4               THE COURT REPORTER:  Slow down, please.

13:32:29  5    BY MR. GORDON.

6       Q       Where if we do a document subpoena for the

7    records, as your attorney will tell you, you'll get

8    a copy of it and have an opportunity to object and

9    do all those things.  So -- okay?

13:32:41 10              All right.  So -- okay.  Is there -- oh, is

11    your -- is your work phone a -- I think you -- I

12    think I noticed you said Verizon.  But do you have a

13    work phone that's a landline also?  Is there a

14    landline?

13:32:58 15      A       An office number.

16      Q       There's an office number.  What's the

17    office number?

18      A       ███████6789.

19      Q       Okay.  All right.  Is that the number

13:33:14 20    earlier that -- that had to be forwarded to

21    voicemail?

22      A       Yes.

23      Q       That's the one?  Okay.  Okay.

24      A       The one on Instagram.

13:33:23 25      Q       That is the one on Instagram.  Okay.  All

**MELANIE SILVA**

1          MR. BRIDGES:  I think -- I think she

2     answered you.

3          MR. GORDON:  Did she say no?  Okay.  All

4     right.

5     BY MR. GORDON:

6          Q     Okay.  You're --

7          A     Uh-huh.

8          Q     You're -- so you're certain without

9     searching.  Okay.  All right.

13:37:22 10          Did you -- did you review your text

11     messages concerning Cedar?

12          A     Yes.

13          Q     Okay.  And I don't believe any text

14     messages were produced.  Did you find any?

13:37:33 15          A     No, I did not.

16          Q     No.  Okay.  All right.  Did you previously

17     have text messages with anyone over Cedar?

18          A     I don't think so.  I believe they were all

19     phone calls, but I am not sure.

13:37:44 20          Q     Okay.  All right.  Do you routinely -- how

21     long do you save your text messages in your phone?

22          A     I don't know what the setting is, but

23     there's a segment that deletes them automatically.

24          Q     Okay.  Do you -- so -- okay.  Did you

13:37:59 25     review text messages about Cedar on all your phones

**MELANIE SILVA**

1  or just your work phone?

2      A     My personal phone.

3      Q     Okay.  Did you look at your work phone

4  also?

13:38:10  5      A     There's no e-mail -- no text messages on

6  my -- on my work phone.

7      Q     No text messages whatsoever on your phone?

8      A     No.

9      Q     All right.  And there are text messages on

13:38:18  10  your personal phone and you checked that?

11      A     I checked my personal phone --

12      Q     Okay.

13      A     -- nothing come up.

14      Q     Do you recall deleting any messages related

13:38:28  15  to Cedar in the past?

16      A     No.  But again, I have it automatically set

17  where they delete.

18      Q     Okay.  So do you know why that setting's

19  at?  Mine, for example, is on the year, I believe.

13:38:38  20      A     Thirty to 60 days, I think.  I am not sure.

21      Q     So if you were to open your cell phone

22  right now, there would be no text messages on it

23  that are older than 30 to 60 days?

24      A     I am not sure.  I don't know what I have

13:38:48  25  it -- I don't remember what I have it set at.

**MELANIE SILVA**

1        Q        When he was retrieved, Cedar was -- so when

2    Cedar was retrieved, you knew -- you thought he was

3    retrieved and then slaughtered right away and

4    handled -- what do you mean by "handled"?

14:13:15   5        A        I didn't give it as much thought as you're

6    saying.

7        Q        Okay.  So --

8        A        Cedar was retrieved.  They handled the

9    situation.  I --

14:13:23  10        Q        Okay.  But it's -- it was your

11   responsibility to see that the animals sold to the

12   auction were, in fact, sent to the slaughter.  You

13   didn't think it was appropriate to follow up with

14   B.J. what the status was with Cedar?

14:13:33  15        A        No.

16        Q        No?  Okay.  So I've had a question on

17   another issue which is -- stuck in here.  So did

18   you -- when the -- when the animals go to the --

19   gets processed after -- after, let's say this

14:14:12  20   auction, what happened to the meat -- and some of it

21   was donated to the barbecue -- what happened to

22   animals that were slaughtered that were not donated

23   to the barbecue?

24        A        The buyers would go pick it up.

14:14:26  25        Q        Go pick it up from the plant?

**MELANIE SILVA**

```
 1              MR. BRIDGES:  Yes.
 2              MR. GORDON:  Okay.  So I want to make sure
 3      I hand these to you and in the correct order,
 4      Melanie, because this is not -- there's two
14:56:30  5      different chains here and they may overlap.  I just
 6      want to figure out which one was -- was first.
 7              That's the problem with e-mail with the
 8      chains.  There's so many chains of multiple things
 9      going in.  Okay.  All right.  I -- I guess we'll
14:57:13 10      just start with this one.
11              (Pause in proceedings.)
12              MR. GORDON:  John, if you want to check, I
13      think -- this is a full chain.  I don't know if you
14      want to check.
14:57:31 15              MR. BRIDGES:  Sure.
16              MR. GORDON:  I believe so.  You tell me if
17      I'm wrong.
18              MR. BRIDGES:  Yeah.  And this -- this does
19      not include Mrs. Long's second --
14:57:49 20              MR. GORDON:  Yes, I know.
21              MR. BRIDGES:  -- e-mail.  That -- that's --
22      because, otherwise, that's the only thing --
23              MR. GORDON:  I have that.  I have that
24      also, which we'll get to, of course.
14:57:55 25              MR. BRIDGES:  Yeah.  But this looks like
```

**MELANIE SILVA**

1    the chain of everything else.

2              MR. GORDON:  I think that --

3    chronologically, I think that -- that -- let's start

4    with that.  Okay.

14:58:07  5          And that -- that would will be Exhibit?

6              MS. SHAKIB:  F.

7              MR. GORDON:  F.  Thank you, Vanessa.

8              THE COURT REPORTER:  No.  G.

9              MR. GORDON:  G?

14:58:14 10             THE COURT REPORTER:  Yes.  This is F.

11             MR. GORDON:  And it's Bates stamped number?

12             MR. BRIDGES:  21 to 25.

13             MR. GORDON:  21 to 25.  Okay.

14             (Exhibit G was marked.)

14:58:39 15             THE WITNESS:  Do you want to put your

16    sticker on there?

17             THE COURT REPORTER:  Yes, please.  Thank

18    you.

19    BY MR. GORDON:

14:58:44 20      Q    All right.  Let's -- Melanie, let's go just

21    in -- I want to go in reverse order here.  So if you

22    start at -- at the -- so you found out Monday and

23    then -- I'm sorry.  You found out Sunday that Cedar

24    was removed --

14:58:58 25      A    (Nodding.)

**MELANIE SILVA**

```
 1    other one, but did you make the call on pursuing the
 2    law enforcement?
 3        A    Yes.  With --
 4        Q    Okay.
 5        A    -- CDFA also giving me the advice in an
 6    e-mail.
 7        Q    You -- yes.  Okay.  By e-mail he gave you
 8    the advice?
 9        A    It's in the e-mail that you -- we read
10    earlier.
11        Q    Well, no, I never got the e-mail -- there's
12    an e-mail where -- you said you spoke with
13    Mike Flores on the phone and he said to call the
14    sheriffs.
15        A    Instead of the CHP.
16        Q    Instead of the CHP.  You -- you reference
17    CHP, but is there an e-mail saying that because it
18    sounds --
19        A    No.  Just the one that references the CHP
20    is what I'm talking about.  The one you have.
21        Q    Okay.  Okay.  So -- so then after
22    Mike Flores said go to the sheriffs, you went to the
23    sheriffs?
24        A    I'm not the one that called the sheriff,
25    but yes, the sheriffs was used.
```

16:09:53 (line 5)
16:10:02 (line 10)
16:10:10 (line 15)
16:10:18 (line 20)
16:10:27 (line 25)

**MELANIE SILVA**

```
 1              MR. GORDON:  You have it.  Okay.

 2      BY MR. GORDON:

 3         Q       Ms. Silva, I'm handing you a copy of an

 4      e-mail that's dated 6/29/22.  It purports to be from

 5      you to Jerry Fernandez.  Took take a look.

 6                 (Exhibit K was marked.)

 7                 MR. BRIDGES:  Just for the record, Damian,

 8      I know this deals with Fernandez.  This was the --

 9      the e-mail from her to Fernandez that you and I have

10      talked about before.

11                 MR. NORTHCUTT:  Thank you.

12      BY MR. GORDON:

13         Q       Okay.  All right.  So this is at 12:27 p.m.

14      It looks like the last e-mail you got.  Then in the

15      prior exhibits we were looking to in the morning

16      like 9 -- 9 or 10 o'clock.  So now this is a little

17      later in the day on 6/27.  So you --

18         A       6/29.

19         Q       I'm sorry.  Thank you.

20                 6/29 but at 12:27 p.m.  So it was after

21      lunch -- or after noon you send this e-mail to

22      Fernandez.  Do you recall doing this?

23         A       Yes.

24         Q       Okay.  Had you talked with him on the phone

25      beforehand?
```

**MELANIE SILVA**

```
 1        A      Yes.

 2        Q      Okay.  So what did you say to him on the

 3    phone?

 4        A      I don't remember.

 5        Q      Was it about --     (16:20:28)

 6        A      I -- he was just asking for the information

 7    to show -- the information of the entries.

 8        Q      Yeah.  So he was already aware of the

 9    situation at that point, though, correct?

10        A      Yes.     (16:20:41)

11        Q      Okay.  All right.  Do you know how he

12    became aware?

13        A      No.

14        Q      Okay.  Do you know if B.J. had called him?

15        A      I don't know.     (16:20:46)

16        Q      You don't know.  Okay.  All right.  Do --

17    did you know how Sheriff Johnson became aware?

18        A      No.

19        Q      No.  Okay.  Did you ask anyone?

20        A      No.     (16:20:54)

21        Q      Did you -- did you know that

22    Sheriff Johnson was aware?

23        A      No.

24        Q      Okay.  All right.  Okay.  So you send him a

25    series of -- a series of documents.  So what is     (16:21:03)
```

**MELANIE SILVA**

1    that.

2        Q       So the -- the DA was making decisions on

3    what to do is your testimony?

4        A       Yes.

17:03:33  5        Q       Okay.  Did you talk to the DA --

6        A       No --

7        Q       -- at all?

8        A       -- it was not.  It was the community

9    barbecue's goat.

17:03:38 10        Q       Okay.  But did you talk to the DA at all?

11        A       I did not.

12        Q       You did not.  So you're relying on B.J. to

13    talk to the DA?

14        A       No.

17:03:49 15        Q       Okay.  Then -- okay.

16        A       It was -- it was the community barbecue's

17    goat.  And they are the ones that pursued it with

18    the DA.

19        Q       Are you -- so you're relying on the

17:04:01 20    community barbecue or Kathie Muse to talk to the DA?

21        A       I'm letting them deal with their property

22    that was --

23        Q       Okay.  But you --

24        A       -- stolen from the fairgrounds.

17:04:07 25        Q       -- received -- you received the letter

1                    PENALTY OF PERJURY

2

3          I, the undersigned, hereby certify that I

4    have read the foregoing deposition, that I know the

5    contents thereof, and I declare under penalty of

6    perjury under the laws of the State of California

7    that the foregoing is true and correct.

8

9          Executed on _____, 2023.

10

11

12

13          _____

14                    MELANIE SILVA
                       ---o0o---

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2

3        I, CAROL J. CHASE, a Certified Shorthand

4    Reporter, licensed by the State of California,

5    License No. 13538, being empowered to administer

6    oaths and affirmations pursuant to Section 2093 (b)

7    of the Code of Civil Procedure, do hereby certify:

8        That the witness in the foregoing deposition,

9    MELANIE SILVA, was present at the time and place

10   specified and was by me sworn to testify to the

11   truth, the whole truth, and nothing but the truth;

12       That said proceeding was taken before me in

13   shorthand writing, and was thereafter transcribed

14   under my direction by computer-aided transcription;

15       That the foregoing transcript constitutes a

16   full, true, and accurate record of the proceeding

17   which took place; That I am not of counsel or

18   attorney for any of the parties hereto, or in any

19   way interested in the event of this cause, and that

20   I am not related to any of the parties hereto.

21       IN WITNESS WHEREOF, I have hereunto subscribed

22   my signature on this 27th day of November, 2023.

23

24

25   _____
                     CAROL J. CHASE

# Exhibit K to Silva Deposition, Volume 1

Shasta District Fair
ceo sdfeventcenter.com <ceo@sdfeventcenter.com>
Wed 6/29/2022 12:27 PM
To:



- ███████████████████████████████

Hi Lt Jerry Fernandez,

Here is the information you requested.  Let me know if you need anything else or have any questions.  My cell number is ███████-0058, we have had to forward the phones to voicemail since they posted our phone number, fax number and my email on their Instagram posts.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
████████-6789 ext 104
www.ShastaDistrictFairandEventCenter.com





Long

653

Address

City

State

Zip Code 96003

Phone

e-mail

Status

SS#

Date of Birth

Age Calculated

School   Cow Creek 4-H

Grade

Notes   first year in 4-H

I've read the rules   I agree

Information is true   I agree

Hold Harmless Clau

Parent/Guardian Agrees

Mom is Jessica Long

ACCOUNTABILITY & LIABILITY: Please accept the entries (property) described herein. I certify that I am the owner of the property specified herein or the supervisor of the project with authorization to act as agent and to bind the owners of the property in all matters herein. Online submission of data requires that a person has read, understands and agrees to abide by all the rules and regulations governing the fair entries as published in the official Shasta District Fair Handbook. Under penalty of perjury, I certify that the information provided is true and I agree to defend, indemnify, and hold harmless the fair, the county, and the State of California, its officers, agents and employees from and against any liability, claim, loss or expense (including any reasonable attorney fees) arising out of any injury or damage, which is caused by, arises from or is in any way connected with participation in the program or event, excepting only that caused by the sole active negligence of the Fair. The Fair Management shall not be responsible

To enter online, you must be over 18 years of age or be the parent and/or guardian of the exhibitor if the exhibitor is under age 18, or the 4-H Leader or FFA advisor, with the authorization from the parent and/or guardian of the exhibitor, or authorization from the exhibitor if 18 years of age or older. Please type "Yes" in the box to confirm. By entering "Yes", I am confirming that I am 18 years of age or older, the owner or authorized agent for these exhibits, that I have read, understand and agree to abide by all the rules and regulations governing the Fair entries as published in the official Shasta District Fair Handbook, and that everything submitted is "true and correct". Online entries for 4-H and FFA exhibitors will not be officially accepted until approved by the 4-H leader or FFA advisor.

PHOTOGRAPHY AND NAME RELEASE: By typing "Yes" below, I/we give the Shasta District Fair and anyone acting under the authority or permission thereof, the unqualified right to use my name and/or our company name for publication and/or for distribution of photographs, videotapes and/or recordings made of me and/or my/our company representatives, that may have been taken at past Shasta District Fairs, and/or could be taken at the fair(s) subject to this contract, for any marketing, public relations, publicity and/or other lawful purpose. Further, I waive all right of inspection or approval and irrevocably release Shasta District Fair from claims or demands which I or my company may or can have on account of the use or publication or arising of such photographs or information.

https://www.shastadistrictfairandeventcenter.com/enter-your-stuff

Jessica Daum
Mon 6/27/2022 5:41 PM
To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Dear Shasta County Fair Manager,

I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,

Jessica Long
Mother of ███ Long,
Shasta District Fair goat lot #132

Get Outlook for iOS

Re: Requesting solutions for the goat that was taken
ceo sdfeventcenter.com
Tue 6/28/2022 1:31 PM
To:

- Jessica Daum █████████████

Bcc:

- Francesconi Mike@CDFA <mike.francesconi@cdfa.ca.gov>

Hello Jessica,

Thank you Jessica for taking the time to contact me regarding this issue. As a mother I am not unsympathetic regarding your daughter and her love for her animal. Having said that please understand the fair industry is set up to teach our youth responsibility and for the future generations of ranchers and farmers to learn the process and effort it takes to raise quality meat. Making an exception for you will only teach out youth that they do not have to abide by the rules that are set up for all participants. Also in this era of social media this has been a negative experience for the fairgrounds as this has been all over Facebook and Instagram, not the best way to teach our youth the value of responsibility. Unfortunately this is out of my hands.

I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately. I do hope you will continue with your idea of raising and providing quality animals for the purpose you have spoken about. I support that whole heartly. Obviously the fair experience is not the best for your family.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
█████-6789 ext 104
www.ShastaDistrictFairandEventCenter.com



Jessica Daum ███████████████
Wed 6/29/2022 9:49 AM
To:

- ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Please see attached.
Thank you,
Jessica Long


Get Outlook for iOS

Shasta District Fair
1890 Briggs Street
Anderson, CA 96007

**June 28, 2022**

*Re: Dispute over Cedar*

Dear Shasta District Fair;

This letter is in further response to my dispute with your
organization concerning my daughter's goat, Cedar. My
daughter's name is ███ Long.

On June 27, 2022, I sent an email asking that your organization
withdraw its demand for the return of Cedar and offering to pay
for any costs or damages you have incurred as a result of this
dispute. This morning, however, I received another text message
from BJ McFarlane which seemingly ignored my letter and
simply demanded return of my daughter's goat.

I've had time to review the documents that BJ McFarlane sent
me, and I believe your organization is not within its rights to
demand return of Cedar.

While you threatened to alert the authorities I had violated
California Penal Code § 487a, upon examination, I have done no
such thing.  That statute makes it a crime to "feloniously steal[],
take[], carr[y], lead[], or drive[] away…any caprine animal…,

[1] which is the personal property of another, or [2] who fraudulently appropriates that same property which has been entrusted to him or her, or [3] who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of that same property...is guilty of grand theft." (*Id.*) I cannot possibly have done any of those things because Cedar was not your organization's personal property. To the contrary, and as the 2022 State Rules For California Fairs indicate ("State Rules"), it was my daughter's personal property. Specifically, the State Rules provide in relevant part that "exhibitors must be legal owners of all entries. Ownership must be maintained through show date(s)." (See State Rules at p. 6.) Cedar was removed during that period, so the State Rules admit he was still my daughter's personal property.

Consistent with the State Rules, your organization's All General Rules and Guidelines ("General Rules") also require that "Exhibitors must be able to show proof of ownership at any time...." (See General Rules at p. 3.) Again, Shasta District Fair was not the owner.

Finally, that your organization did not become the owner of Cedar is further confirmed by the provision in your General Rules advising the Junior Exhibitors to obtain liability insurance. (See General Rules at p. 8.)  If Cedar became your property by virtue of our entry to the fair, there would be no need for the Junior Exhibitors to obtain insurance, as the fair would be liable. In sum, Cedar was my daughter's personal property so California Penal Code § 487a is not even triggered.

Furthermore, in the event the Shasta District Fair could claim Cedar became its personal property,"[i]t is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1017, citing *People v. Butler* (1967) 65 Cal.2d 569, 573.) As I believed in good faith that Cedar was not the Shasta District Fair's personal property, no violation of Penal Code § 487a was committed.

Lastly, if anyone other than my daughter has a right to the goat, it would be Senator Brian Dahle as he was the successful bidder at auction.  But his office has represented to me that they have relinquished any rights they have to Cedar, dead or alive. As a result, not only was there no crime committed, but the Shasta District Fair now gets to keep his bid of $11.00 per pound x 82 pounds, $902.00.   Thus, the Shasta District Fair has actually profited from this event—it cannot claim any harm. For the Shasta District Fair to claim it's been damaged by this event, it would have to show some loss arising from a breach I committed. (*See, e.g., Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473 ["A breach of contract is not actionable without damage"].) But your General Rules state that the Shasta District Fair will be entitled to only "7.0% of the sale price deducted from the [Exhibitor's] check...." So, had the slaughter been accomplished, the Shasta District Fair would have collected only $63.14. But now, it has received, and gets to keep $902.00, a profit of $838.36. So if anything, Shasta District Fair has been unjustly enriched by this situation.

Lastly, it must be stated with clarity that, because Shasta District Fair was never the owner of Cedar, the only possible rights it has in transaction are to the monies it could have earned, i.e., $63.14, which it has more than retained. So any legal action on the matter would per se be frivolous. Nevertheless, my offer to reimburse any other reasonable costs associated with this event remains open. I cannot envision what those costs would be, but I will of course review them in good faith.

This letter is not a waiver of any rights. Further, while its purpose is in anticipation of litigation, I am equally sending this letter to resolve the matter. My daughter has/is bonded with Cedar and, had we known what a terminal auction entailed, we never would have gone down this path. Fortunately, Shasta District Fair has actually profited from this event so this dispute should be put to rest.

In your email you expressed concerns about social media postings. If we can resolve this situation with Cedar not being brought in for slaughter, I am willing to consider signing a non-disclosure agreement.

Moving forward, I request that any communications be directed to my email at ███████████████████████

Sincerely,

*Jessica Long*

Jessica Long

████████████████████