RYAN R. GORDON (SBN 278414)
VANESSA T. SHAKIB (SBN 287339)
**ADVANCING LAW FOR ANIMALS**
407 N. Pacific Coast Highway #267
Redondo Beach, CA 90277
Tel: (202) 996-8389
rgordon@advancinglawforanimals.org
vshakib@advancinglawforanimals.org

DANIEL J. KOLDE, ESQ.
**LAW OFFICES OF DANIEL J. KOLDE**
P.O. Box 440344
St. Louis, Missouri 63144-9998
Tel: 636.675.5383
Email: daniel.kolde.law@gmail.com
(*pro hac vice application to be filed*)

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN  DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>LIEUTENANT JERRY FERNANDEZ, individually and in his individual capacity as Sheriff for the County of Shasta; DETECTIVE JACOB DUNCAN, individually and in his individual  capacity as Sheriff for the County of Shasta; DETECTIVE JEREMY ASHBEE, individually and in his individual capacity as Sheriff for the County of Shasta; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association; COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual capacity; BJ MACFARLANE, in his individual capacity; KATHIE MUSE, in her individual and official capacity, and DOES 1 through 10,<br>　　　　　Defendants. | Case No. 2:22-cv-01527-DAD-AC<br><br><br>**PLAINTIFF JESSICA LONG'S STATEMENT OF DISCOVERY DISAGREEMENT RE PRODUCTION OF SUBPOENAED DOCUMENTS FROM NON-PARTY VERIZON (ECF 78, 85)**<br><br>[See concurrently filed Declarations of Ryan Gordon and Vanessa Shakib in ECF 89-1, 89-2]<br><br>Trial Date: March 24, 2025<br><br>Action Filed: August 31, 2022 |

STATEMENT OF DISCOVERY DISAGREEMENT

Pursuant to Local Rule 251(d), Plaintiff Jessica Long ("Mrs. Long") and non-party Michael Flores submit the following Joint Statement re Discovery Disagreement, in connection with her motion to compel non-party Verizon ("Verizon") to produce documents under Federal Rule of Civil Procedure 45. ECF 78, 85.  Mrs. Long's Position is set forth in **Part 3,** and Mr. Flores' position is set forth in **Part 4**.

## PART 1.  CONFERENCES OVER DISCOVERY DISPUTE

On May 6, 2024, Plaintiffs' counsel served Verizon with a subpoena for phone records (XXX XXX 5038), seeking "Any records concerning incoming or outgoing calls or texts … from June 25, 2022, through July 28, 2022, including call logs, call detail records, and text logs." *See* ECF 89-1, Declaration of Ryan Gordon ("Gordon Decl.") at 91, Ex. 30. Verizon never issued a response to Plaintiffs' counsel for that subpoena. *Id*. at 96.

Counsel for Mr. Flores did not file any formal objection with Verizon but did file a motion to quash on June 7, 2024, ECF 87. *Id*., at 94.  Counsel for Plaintiffs and counsel for Mr. Flores had multiple conferences about this issue. *Id*. at 94. Counsel for Plaintiffs also sent a lengthy meet and confer letter regarding the dispute. *Id*. at 94, Ex. 30. Agreement cannot be reached.

## PART 2.  NATURE OF ACTION AND INSTANT FACTUAL DISPUTE OVER DISCOVERY

On August 31, 2022, Mrs. Long and her minor daughter E.L. filed the underlying civil rights litigation, as amended on March 2, 2023, and again on October 12, 2023. ECF Nos. 1, 16, 25 (Second Amended Complaint or "SAC"). The SAC includes claims against 4-H representative Mrs. Muse, Shasta District Fair & Events Center ("SDF") CEO Ms. Silva, SDF Livestock Manager Defendant B.J. Macfarlane, and for § 1983 for violations of the Fourth Amendment, ¶¶ 105-110, violations of the Fourteenth Amendment, ¶¶ 111-115, and First Amendment Viewpoint Discrimination, ¶¶ 181-188, with additional claims against the County of Shasta, Shasta County Sheriff's Department, Lieutenant Fernandez, Detective Duncan, and Detective Ashbee for constitutional violations and other state law claims. *See generally* SAC. Plaintiffs' claims center around the wrongful search and seizure of Plaintiffs' goat, Cedar, who they allege was then ultimately slaughtered without notice and opportunity to be heard in violation of their rights to Due Process, among other things.

The instant dispute is over the cell phone records of non-party Michael Flores, the Deputy

ADVANCING LAW FOR ANIMALS

ADVANCING LAW FOR ANIMALS

1  Secretary of the California Department of Food and Agriculture ("CDFA"). Plaintiff Jessica Long

2  ("Mrs. Long") served a subpoena for his records. Although Mr. Flores' counsel did not object to the

3  subpoena, he did file a motion to quash *after* the instant motion to compel. Plaintiffs agree not to use

4  Mr. Flores' phone records outside of this case, and will redact sensitive information in filings.

5  **PART 3.   PLAINTIFFS' STATEMENT: THE COURT SHOULD COMPEL NON-PARTY**
   **VERIZON TO COMPLY WITH THE RECORDS SUBPOENA FOR PRODUCTION OF**
6  **DOCUMENTS REFLECTING CALLS AND TEXT MESSAGES**

7  **I.     Introduction**

8          Bad-faith and obstructionist discovery tactics abound in this civil rights litigation. This case

9  centers around the illegal seizure and slaughter of Plaintiffs' beloved goat, Cedar. Text messages

10  obtained in discovery reveal Defendants Ms. Melanie Silva, Mrs. Kathie Muse, and Mr. Macfarlane

11  coordinated to conceal Cedar's true fate. Ms. Silva made statements in deposition that were flat out

12  contradicted by her statements in texts produced by other Defendants and apparently spoliated

13  evidence. Multiple Defendants hid salient evidence to safeguard prominent officials. This includes

14  Mr. Macfarlane's retraction of previous deposition testimony implicating Sheriff Michael Johnson,

15  and Mr. Macfarlane and Mrs. Muse's obstructionist discovery tactics to shield Senator Brian Dahle

16  from unsavory public attention.

17          Plaintiffs have been prejudiced by these tactics. Plaintiffs' counsel has expended tremendous

18  resources seeking to offset this prejudice through subpoenaing the phone records of Ms. Silva, Mr.

19  Macfarlane, and Mrs. Muse, and serving various additional non-party subpoenas. Despite these efforts,

20  additional questions remain unanswered. To fill these gaps, Plaintiffs seek the business phone records

21  of Mr. Michael Flores, Deputy Secretary of the CDFA. Mr. Flores oversees California fairs and

22  expositions, including the Shasta District Fair in which Plaintiff E.L. participated.

23          Mr. Flores denies meaningful involvement in the events giving rise to this litigation. While

24  Plaintiffs would prefer to accept his explanation, the totality of testimony, emails, text messages, and

25  phone logs available cautions them from doing so. That evidence, taken together, suggests Mr. Flores

26  communicated with Sheriff Johnson, either directly or indirectly through the Shasta County Sheriff's

27  Department, and Sheriff Johnson then instructed Lieutenant Fernandez to call Mr. Macfarlane,

28  sparking a chain of unlawful events giving rise to Plaintiffs' legal claims. The thrust of evidence to

date supports the fact the Shasta District Fair and Event Center maintained possession of Cedar for weeks post-seizure, awaiting approval from CDFA, the Sheriff's Department, and the District Attorney to slaughter Cedar—despite repeated contact from Plaintiffs' counsel. Further, Ms. Silva's hand-written notes indicate involvement of CDFA, the Sheriff's Department, and the District Attorney in Plaintiffs' due process violations following pre-litigation contact from Plaintiffs' counsel.

Plaintiffs rightfully seek to ascertain all participants in the due process violations they suffered. Given the overall climate of bad-faith discovery tactics, Mr. Flores' business phone records are discoverable and relevant, as they help determine who at the CDFA, the Sheriff's Department, and/or the District Attorney's Office participated in Cedar's illegal seizure and slaughter, and are further relevant for impeachment purposes.

## II.     Background

Plaintiffs include the instant rather lengthy background to illustrate for the Court the manner in which Plaintiffs have been prejudiced by obstructionist and bad-faith discovery tactics; the time and resources expended by Plaintiffs' counsel to mitigate this prejudice; and underscore why Mr. Flores' phone records are necessary. For ease of the Court's review, and to streamline the volume of discovery collected to date, a master log of select relevant events is attached to the concurrently-filed *See* ECF 89-2, Declaration of Vanessa Shakib ("Shakib Decl.") ¶ 5, Ex. 32 ("Plaintiffs' Master Log").

On August 31, 2022, Plaintiff Mrs. Long and her minor daughter, Plaintiff E.L., filed the underlying civil rights litigation, as amended on March 2, 2023, and again on October 12, 2023. ECF Nos. 1, 16, 25 (Second Amended Complaint or "SAC"). The SAC includes claims against 4-H representative Mrs. Muse, Shasta District Fair & Events Center ("SDF") CEO Ms. Silva, and SDF Livestock Manager Defendant B.J. Macfarlane, and for § 1983 violations of the Fourth Amendment, ¶¶ 105-110, violations of the Fourteenth Amendment, ¶¶ 111-115, and First Amendment Viewpoint Discrimination, ¶¶ 181-188, with additional claims against the County of Shasta, Shasta County Sheriff's Department, Lieutenant Fernandez, Detective Duncan, and Detective Ashbee for constitutional violations and other state law claims. *See generally* SAC. Plaintiffs claims center around the wrongful search and seizure of Plaintiffs' beloved goat, Cedar, who they allege was slaughtered without notice and opportunity to be heard in violation of their rights to due process, among other

ADVANCING LAW FOR ANIMALS

4

things.

**A.   Plaintiffs Withdrew Cedar from SDF Youth Livestock Auction, and SDF Deferred to CDFA for Instruction**

In April 2022, Plaintiffs purchased E.L. a young male goat who E.L. named Cedar. E.L. fed and cared for Cedar every day until almost July 2022, and bonded with Cedar as if he were a puppy. SAC ¶ 20. Plaintiffs further allege that E.L. enrolled in her local 4-H chapter at that time. SAC ¶ 21. On or about June 25, 2022, pursuant to her 4-H program, E.L. exhibited Cedar in the junior livestock auction at the annual fair held by SDF. SAC ¶¶ 22-25. Plaintiffs allege that, although Defendant Mrs. Muse, on behalf of Senator Brian Dahle and Assemblywoman Megan Dahle, bid on Cedar's meat, no sale of Cedar or his meat occurred. SAC ¶¶ 27-29, 33. Although the Dahles may have intended to donate Cedar's meat to the July 9, 2022 barbecue operated by 4-H ("July 9 Government Barbecue"), because the sale of Cedar's meat did not occur, Cedar's meat was never donated. *Id*. at 40-41. Most saliently, Plaintiffs allege after E.L. participated in the auction, she became despondent and emotional. Shortly thereafter that same evening, she sobbed in Cedar's pen and told to her mother she didn't want him killed. Plaintiffs allege E.L. exercised her statutory rights as a minor under California Family Code section 6710 to disaffirm any contract of sale that might have existed, and/or, breached any contract that might have existed, and left the fair with Cedar. *Id*. at ¶¶ 35, 165.

Following Plaintiffs' removal of Cedar from SDF fairgrounds, Plaintiffs offered in writing to pay for any damages claimed by SDF. SAC ¶ 48. Nonetheless, on about June 26, 2022, Defendant Macfarlane told Mrs. Long she would be prosecuted for removing Cedar. SAC ¶ 44. On or around June 27, 2022, while Mrs. Long was trying to resolve the dispute, third party Bleating Hearts Farm posted on Instagram a photo of Mrs. Long, E.L., and Cedar, stating, among other things, "PLEASE! IF YOU ARE ABLE TO CALL AND SEND A RESPECTFUL EMAIL TO SHASTA DISTRICT FAIRGROUNDS, ASK THEN PARDON [E.L.'S] GOAT FROM SLAUGHTER. SENATOR DAHLE PURCHASED HIM AND WOULD LIKE TO PARDON HIM BACK INTO HER CARE [¶] HE IS DUE TO BE KILLED TOMORROW" (hereinafter, "Viral Instagram Post"). *See* ECF 89-1, Declaration of Ryan Gordon ("Gordon Decl.") ¶ 4, Ex. 1. Following the Viral Instagram Post, Ms. Silva testified "We had to forward our phones [for the Shasta Fair Association] because our phones

ADVANCING LAW FOR ANIMALS

were … blown up." Gordon Decl. ¶ 33, Ex. 12 (Silva Dep. 49:02-11).

**B.    Plaintiffs Contend Mr. Flores Either Called the Sheriff's Department, or Knows Who Did**

Mr. Michael Flores, appointed by Governor Newsom, is deputy secretary of CDFA. He is responsible for overseeing California fair boards and fair grounds, including fifty two (52) district agricultural associations. Gordon Decl. ¶ 72, Ex. 22 (Flores Dep. 12:08-16; 13:17-24). Among these is the 27th District Agricultural Association, which operates the SDF. Cal. Food & Agric. Code §§ 3879, 3951, 3954. Mr. Michael Francesconi serves as Fairs and Exposition Branch Chief at CDFA and reports to Mr. Flores. Gordon Decl. ¶ 73, Ex. 22 (Flores Dep. 23:22-24:09). That same day Bleating Hearts Farm made the Viral Instagram Post, Mr. Flores (5038) called Ms. Silva (0058) at 11:42 am. Gordon Decl. ¶ 5(a), Ex. 2. Later that evening, also on June 27, Mrs. Long emailed Ms. Silva, offering to pay any damages in connection with Cedar's removal ("Offer to Pay Damages"). *Id*. ¶ 6(a), Ex. 3.

On June 28 at 1:31 pm, Ms. Silva emailed Mrs. Long, rejecting Mrs. Long's previously-emailed Offer to Pay Damages, explaining, the "social media this has been a negative experience for the fairgrounds[,]" and stating, "I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately." *Id*. at ¶ 6(b), Ex. 3 at 4. Shortly thereafter, at 3:07 pm, Ms. Silva forwarded her email to Mr. Francesconi, stating, "Hi Mike, I have included the response I sent her. I have also updated my Board Member[.]" *Id*. at ¶ 6(c), Ex. 3 at 3. Mr. Francesoni responded at 3:08 pm, "Hello Melanie Did BJ go out to pick up the goat? Thanks Mike[.]" *Id*. at 6(d), Ex. 3 at 3. Ms. Silva responded within the hour requesting further direction, asking "Hi Mike, She is not responding to either of us. Should we involve CHP next?" *Id*. at ¶ 6(e), Ex. 3 at 2. Mr. Francesoni deferred to Mr. Flores, telling Ms. Silva on the evening of June 28, "I am checking with Michael Flores on how he would like you to proceed. I will let you know when I learn more. Thanks Mike[.]" *Id*. at ¶ 6(f), Ex. 3 at 1.

On June 29 at 9:06 am, Ms. Silva emailed Mr. Francesconi, "Hi Mike, Please call my cell number [omitted] when you call back. We have the phones forwarded since they posted our number

ADVANCING LAW FOR ANIMALS

to instagram." Gordon Decl. at ¶ 6(g), Ex. 3 at 1. Ms. Silva's handwritten notes state:

> 6/29 910A
> spoke w/him next
> no response
> step? Will get
> Back after speak[]
> w/flores



Gordon Decl. at ¶ 11, Ex. 6. At 9:22 am, Mr. Flores (5038) called Ms. Silva (0058). *Id.* at ¶¶ 5, 7, Ex. 2. At 9:49 am, Mrs. Long again sent Ms. Silva a second letter, stating, among other things, Cedar was Plaintiff E.L.'s personal property; SDF never owned Cedar; grand theft had no basis; and the letter was "in anticipation of litigation" of their civil dispute ("Notice of Civil Claim and Intention to Sue"). *Id.* at ¶ 8, Ex. 4.

At 10:07 am, Mr. Flores (5038) called Ms. Silva (0058) again. Gordon Decl. at ¶ 9, Ex. 2. And, at 11:04 am, Mr. Flores (5038) called Ms. Silva (0058) once more. *Id.* at ¶ 9, Ex. 2. Continuing on a June 29 text thread beginning at 8:51 am, Ms. Silva texted Mr. Macfarlane, stating, "We are contacting the Sheriff for the goat waiting for a call back[.]" *Id.* ¶ 10, Ex. 5. Ms. Silva's handwritten notes state, "Flores 6/29 Local Sheriffs[.]" *Id.* at ¶ 11, Ex. 6. At 11:29 am, Mr. Francesconi (5365) called Ms. Silva (0058). *Id.* ¶ 9(c), Ex. 2; *see also* Plaintiffs' Master Log.

Plaintiffs subpoenaed Ms. Silva's cell phone records, work landline records, and her work cell phone records. Gordon Decl. at ¶ 84. None of these records indicate she initiated a call to the Sheriff's Department. *Id.* at ¶ 85. This is consistent with her deposition testimony, where she stated, "I'm not the one that called the sheriff, but yes, the sheriffs was used. *Id.* at ¶ 34, Ex. 12 (Silva Dep. Vol. 1, 279:21-25). Since Ms. Silva herself did not initiate contact with the Sheriff's Department, Plaintiffs contend that when she texted Mr. Macfarlane, "We are contacting the Sheriff for the goat waiting for a call back[,]" she could only have meant the individual(s) with whom she was speaking. Plaintiffs contend this is likely Mr. Flores, or in the alternative, Mr. Francesconi.

Mr. Macfarlane's phone records, also subpoenaed by Plaintiffs, corroborate this theory. Analysis of Mr. Macfarlane's phone records indicate that Mr. Macfarlane did not initiate contact with the Sheriff's Department. Gordon Decl. at ¶ 60(a)-(c), Ex. 19. Rather, on June 29 at 11:52 am PDT,

7

1   Lieutenant Fernandez called Mr. Macfarlane. *Id.* This is consistent with Lieutenant Fernandez's

2   deposition testimony, where he stated Sheriff Johnson instructed him to investigate the alleged theft

3   of Cedar, and explained Cedar's removal was a "big deal" with "a lot of the fair boards" in California.

4   *Id.* at ¶¶ 12-14 , Ex. 7 (Lieut. Fernandez Dep. 77:13-25; 78:10-14; 83:05-14; 277:02-279:09). Plaintiffs

5   contend Mr. Flores communicated with Sheriff Johnson, either directly or indirectly through the Shasta

6   County Sheriff's Department, and Sheriff Johnson then instructed Lieutenant Fernandez to call Mr.

7   Macfarlane. Given Mr. Flores' role with the CDFA, he is in the best position to understand how and

8   why Cedar's removal and the subsequent Viral Instagram Post was a "big deal" with a "a lot of the

9   fair boards." Alternatively, Plaintiffs contend Mr. Flores knows who communicated with Sheriff

10  Johnson.

11      Consistent with Plaintiffs theory of the case, Lieutenant Fernandez and Mr. Macfarlane

12  exchanged phone calls multiple times on June 29, beginning at 11:52 am, and concluding at 12:13 pm.

13  *Id.* at ¶ 60(a)-(b), Ex. 19. After concluding his 12:13 pm conversation with Lieutenant Fernandez, Mr.

14  Macfarlane subsequently called Ms. Silva at 12:14 pm, and around this time, texted her Lieutenant

15  Fernandez's email address. *Id.* at ¶ 60(c), Ex. 19; ¶15, Ex. 8. On June 29 at 12:27 pm, Ms. Silva

16  emailed several documents to Lieutenant Fernandez, including Mrs. Long's Notice of Civil Claim and

17  Intention to Sue. *Id.* at ¶ 32 (Silva Vol. 1 Dep. 288:03-23, and Ex. K included in Dep. excerpts).

18  Lieutenant Fernandez called Ms. Silva for what appears to be the first time based on all phone records

19  reviewed on June 29 at 2:29 pm. *Id.* at ¶ 86, Ex. 2.

20      Although Plaintiffs contend that Mr. Flores communicated with Sheriff Johnson, or

21  alternatively, that Mr. Flores knows who did, Mr. Flores denies Plaintiffs' theory of facts. *Id.* at ¶ 76,

22  Ex. 22 (Flores Dep. 79:21-81:08). Instead, as set forth *infra* at Section II(H)(i), Mr. Flores offered

23  testimony in tension with the evidence above implicating him.

24      **C.      Lieutenant Fernandez and Detective Duncan Drove Over 500 Miles on the Evening of July 8 to Illegally Seize Cedar and Turn Him Over for Slaughter**

25      Despite receiving Plaintiffs' Notice of Civil Claim and Intention to Sue, the night before the

26  July 9 Government Barbecue, Lieutenant Fernandez and Detective Duncan drove several hundred

27  miles from Shasta County to Bleating Hearts Sanctuary in Napa County on the pretense of a crime to

28

ADVANCING LAW FOR ANIMALS

execute the warrant for Cedar's seizure. SAC ¶ 75. They discovered Cedar was not there, ascertained

Cedar's correct location from individuals at Bleating Hearts Sanctuary, and then travelled to the Billy's

Mini Farm. Gordon Decl. at ¶ 19, 20, Ex. 9 (Det. Duncan Dep. 144:25–147:17). Once there, Lieutenant

Fernandez and Detective Duncan seized Cedar, and, at the direction of Mrs. Muse, turned him over to

Mr. Macfarlane. *Id*. at ¶ 17, Ex. 7 (Fernandez Dep. 269:16-270:10). No member of law enforcement

or any defendant in this case notified Mrs. Long of Cedar's seizure. Rather, Billy's Mini Farm

informed her of Cedar's seizure on about July 15, 2022, after the July 9 Government Barbecue. ECF

39-17 at ¶ 20.

**D.** **Cedar was Not Slaughtered and Served at the July 9 Government Barbecue for Which Defendants so Fervently Claim He Was Earmarked**

Although Mr. Macfarlane received Cedar at Mrs. Muse's direction in the early morning of July

9, Cedar was not eaten at the July 9 Government Barbecue. Rather, according to Mrs. Muse, she

received replacement meat from another goat from the board of SDF. Gordon Decl. at ¶ 27, Ex. 10

(Muse Dep. 204:13-205:20).

**E.** **SDF Maintained Possession of Cedar for Weeks Post-Seizure, Awaiting Approval from CDFA, Sheriff's Department, and District Attorney to Slaughter Cedar— Despite Repeated Contact from Plaintiffs' Counsel**

Neither the Dahles nor Mrs. Muse ever paid for Cedar. Gordon Decl. at ¶ 54, Ex. 14 (Silva

Vol. 2 Dep. 431:14-20). Nonetheless, Mr. Macfarlane held Cedar until Cedar's slaughter on July 28,

2022. Mr. Macfarlane testified that, from his perspective, he was operating under the direction of Ms.

Silva, Sheriff Johnson, the CDFA, and the District Attorney Stephanie Bridgett. *Id*. at ¶ 48, Ex. 13

(Macfarlane Dep. Vol. 1, 209:22-211:10). Mr. Macfarlane stated that between July 11-25, 2022, he

spoke with Sheriff Johnson "a couple times maybe." *Id*. at ¶ 50, Ex. 13 (Macfarlane Dep. Vol. 1

207:10-22). Mr. Macfarlane's testimony is consistent with a July 11 text message he sent Mrs. Muse,

stating, "Good morning … Talked to sheriff and he said to wait until he talks to DA before we kill

goat." *Id*. at ¶ 49, Ex. 13 (Macfarlane Dep. Vol. 1, 204:01-205:08), Ex. 11. In deposition, Mr.

Macfarlane stated, in this text message, he was referring to Sheriff Michael Johnson and District

Attorney Stephanie Bridgett. *Id*. Mr. Macfarlane went into specific details concerning Sheriff Johnson,

including how he first met Sheriff Johnson and who he believes gave him Sheriff Johnson's phone

number. *Id*. at ¶ 45, Ex. 13 (Macfarlane Vol. 1 Dep. 198:15-200:23).

Mr. Macfarlane also testified he spoke to Ms. Silva "multiple times" through the period of July 8-28, 2022, as "she was the one that was gearing it, so what -- with the state and the sheriff, so…" *Id*. at ¶ 47, Ex. 13 (Macfarlane Dep. Vol. 1, 208:25-209:17). Mr. Macfarlane was clear that "I don't remember if [Ms. Silva] was the one talking to the sheriff. I think -- I know I did a couple times …." *Id*. Mr. Macfarlane further stated Ms. Silva instructed him to hold Cedar "Until the state said what was going to happen." *Id*. at ¶ 46, Ex. 13 (Macfarlane Dep. Vol. 1 202:11-203:23). He clarified by "the state" he was referring to Mr. Francesconi or the "CDFA's lawyer." *Id*.

Mrs. Muse also stated individuals at the Sheriff's Department and District Attorney's Office were involved. She testified "I was told from B.J. that the DAs and the sheriffs office, I don't know which department, had told him to make sure that we save the ear tags." *Id*. at ¶ 26, Ex. 10 (Muse Dep. 201:19-202:08).[1] Ms. Silva stated she believed Mr. Macfarlane and Ms. Muse were awaiting permission from the DA to slaughter Cedar. *Id*. at ¶ 36, 37, Ex. 10 (Silva Dep. Vol. 1, 66:04-10; 66:25-67:24; 68:17-22; 329:05-18).

Within this same period, between July 15-27, 2022, Mrs. Long's counsel contacted both the Sheriff's Department and Shasta County Counsel multiple times, demanding to know what happened to Cedar and that he be kept alive. Gordon Decl. ¶¶ 22, 80; *see also* Plaintiffs' Master Log.

**F.    Text Messages Reveal Defendants Coordinated to Conceal Cedar's True Fate**

On July 22 at 11:17 am, Ms. Silva called Mr. Macfarlane and the two spoke for 4 minutes. Gordon Decl. at ¶ 60, Ex. 19. At 11:22 am, Mr. Macfarlane called Mrs. Muse, and the two spoke for over 4 minutes. *Id*. Also at 11:22 am, Mr. Macfarlane texted Ms. Silva, "What's gals name at bowman? Kathy said ok but no one needs to know about this. U me and Kathy are only ones. It got killed and donated to non profit if anyone asks." *Id*. at ¶ 58, Ex. 17. Ms. Silva responded, "Serene[,]" then "Thank you[,]" then "We are a non profit 😳🤣🤣🤣[.]" *Id*. At 11:29 am, Mr. Macfarlane called Bowman Meat Company, and arranged for Cedar's slaughter. *Id*. at ¶ 60(c), Ex. 19; s*ee also* Plaintiffs' Master Log. According to Mr. Macfarlane, Bowman Meat Company killed Cedar on July 28. Gordon Decl.,

---

[1]    By contrast, Mr. Macfarlane testified that Mrs. Muse told him to save Cedar's ear tags. Gordon Decl. ¶ 51, Ex. 13 (Macfarlane Dep. Vol. 1, 212:13-213:04).

ADVANCING LAW FOR ANIMALS

Ex. 13 (Macfarlane Vol. 1 Dep. Vol 1. 209:05 -212:15). To date, neither Ms. Silva, Mr. Macfarlane, nor Mrs. Muse have offered any credible testimony as to who greenlit Cedar's death, or who, if anyone, received Cedar's meat. Ms. Silva, Mr. Macfarlane, and Mrs. Muse all originally stated they did not know who received Cedar's meat. Gordon Decl. ¶ 28, Ex. 10 (Muse Dep. 235:19-236:10); *id.* at ¶ 38, 39, 40, Ex. 12 (Silva Dep. Vol. 1, 62:22-63:03; 66:04-10; 66:25-67:24; 68:17-22; 329:05-18). In his second deposition, Mr. Macfarlane claimed his memory was refreshed and that Vista Real Estate received Cedar's meat. *Id.* at ¶ 64, Ex. 21 (Macfarlane Vol. 2 Dep. 349:24-350:09). This Court ordered Vista Real Estate to produce all relevant documents with respect to Cedar, but Plaintiffs found no evidence Vista Real Estate received Cedar's meat. *Id.* at ¶ 90.

### G. Hand-Written Notes Indicate Involvement of CDFA, Sheriff's Department, and District Attorney in Plaintiffs' Due Process Violation Following Pre-Litigation Contact from Plaintiffs' Counsel

Due to obstructionist discovery tactics outlined *infra* at Section II(H), gaps remain in understanding what exactly happened to Cedar, when, and why. However, Ms. Silva's handwritten notes offer a telling glimpse, stating:

<div style="display:flex">

Mike Francesconi
DA
Local Sheriff
transpired
15-20 min
Back
Owner
wont
press charges
lawyer
pro bono



</div>

Gordon Decl. at ¶ 81, Ex. 6. Plaintiffs contend these notes reflect a 15-20 minute meeting between Mr. Francesconi, Sheriff Johnson and/or Lieutenant Fernandez, and District Attorney Bridgett. This is consistent with Lieutenant Fernandez' testimony that he, Sheriff Johnson, and D.A. Bridgett had a conversation about Cedar within a week after Cedar's retrieval. *Id.* at ¶ 21, Ex. 7 (Fernandez Dep. 286:03-12; 165:03-14). Plaintiffs' contend the notes further are roughly translated as follows: "[Cedar is] back" and "Owner [Mrs. Muse] won't press charges[.]" In deposition, Ms. Silva stated that the "pro bono lawyer" she referenced in her notes was Plaintiffs' counsel, Mr. Ryan Gordon. *Id.* at ¶ 82, Ex. 14 (Silva Dep. Vol. 2, 410:25-411:15). Based on this context, Plaintiffs contend this conversation took

ADVANCING LAW FOR ANIMALS

place on or after July 15, 2022, but before the onset of this civil rights litigation on August 31, 2022. This is a logical inference because Plaintiffs' counsel contacted both the Sheriff's Department and Shasta County Counsel multiple times July 15-27, 2022, as set forth *supra* at Section II(E), so this meeting took place no earlier than July 15, 2022. At the same time, this meeting could not have taken place after the onset of this litigation because, once this case was filed on August 31, 2022, Mrs. Muse began texting Lieutenant Fernandez regarding the criminal prosecution of Mrs. Long, thereby departing from the previously documented stance that she would not press charges. *Id*. at ¶ 83, Ex. 23. Plaintiffs theory is consistent with the fact Lieutenant Fernandez  modified his original narrative for the last time on July 26 at 12:15 pm. Shakib Decl. ¶ 25, Ex. 34 at 2; s*ee also* Plaintiffs' Master Log.

Plaintiffs theory is also consistent with Mr. Flores' testimony. Mr. Flores stated that he viewed the Viral Instagram Post about one month after it was posted, sometime in July. Gordon Decl. at ¶ 74, Ex. 22 (Flores Dep. 48:22-51:19). Mr. Flores first stated he is "not sure" how he learned of the Viral Instagram Post to search it and that Ms. Silva did not tell him about it, but that "maybe" Mr. Francesconi did. *Id*. Plaintiffs contend ongoing involvement of CDFA, whether through Mr. Flores and/or Mr. Francesconi, prompted Mr. Flores to seek the Viral Instagram Post. This is consistent with Mr. Flores deposition testimony that he had approximately 15 conversations with Mr. Francesconi about Cedar from June 2022 to September 2022, where he was provided "updates as to what might have been transpiring." *Id*. at ¶ 75, Ex. 22 (Flores Dep. 71:23-72:19; 74:02-22).

The continued involvement of CDFA, the Sheriff's Department, and the District Attorney is further supported by Mr. Macfarlane's and Mrs. Muse's deposition testimony described *supra* at Section II(E). As a result, Plaintiffs contend the Sheriff's Department, the District Attorney, the CDFA, and Ms. Silva were all aware that Plaintiffs retained counsel prior to this litigation and were actively looking for Cedar; thus, Plaintiffs contend all of these parties participated in the due process violations alleged in this case. Although Sheriff Johnson and DA Bridgett deny Plaintiffs' allegations, *Id*. at ¶¶ 88, 89, Exs. 24-25, Plaintiffs contend their denials are not credible, contradict substantial evidence collected to date, and are further undermined by an overall climate of bad-faith discovery tactics.

### H. Discovery Was Extended to Determine Who at the CDFA, the Sheriff's Department, and District Attorney's Office Greenlit Cedar's Killing, But Obstructionist Discovery Tactics and Spoliation Concealed Those Facts

On March 14, 2024, the parties in this case stipulated to a discovery extension for the limited purpose of allowing Plaintiffs to determine who at the CDFA, the Sheriff's Office, and/or the District Attorney's Office gave permission for Mr. Macfarlane to slaughter Cedar—*as he initially testified. See* ECF 65, 4:19-5:15. Plaintiffs contend obstructionist discovery tactics outlined herein underscore the involvement of all parties as described above in Plaintiffs due process violations, and illustrate the need for Mr. Flores' phone records in this case.

### i. Mr. Flores' Testimony is Incongruous with Documents and Other Testimony

Plaintiffs obtained phone records for Ms. Silva from the date range June 25, 2022 to September 1, 2022. Gordon Decl.¶ 5, Ex 2. During this swath of time, based on the phone numbers currently known to Plaintiffs' counsel, Mr. Flores only contacted Ms. Silva immediately following Cedar's removal, amid public outcry over the Viral Instagram Post, and around the time Ms. Silva texted Mr. Macfarlane "We are contacting the Sheriff for the goat waiting for a call back[,]" namely, June 27 (once) and June 29 (several times). Gordon Decl. ¶¶ 9-10, Ex. 2, 5. In deposition, Mr. Flores stated that the June 27 phone call concerned "picking up a barbecue" and not Cedar. *Id.* at ¶ 72 Ex. 22 (Flores Dep. 35:07-36:08). He further stated, regarding the three phone calls he initiated to Ms. Silva on June 29, it was "possible" he discussed Cedar, as well as "a giant barbecue." *Id.* at ¶ 78 Ex. 22 (Flores Dep. 36:18-37:03). Regarding any discussion of Cedar, he stated, "It was my recommendation that she work with local authorities. And that was it." *Id.* at ¶ 79 Ex. 22 (Flores Dep. 38:1-14). Plaintiffs contend this testimony omits salient facts.

Emails indicate that Mr. Francesconi deferred to Mr. Flores, telling Ms. Silva on the evening of June 28, "I am checking with Michael Flores on how he would like you to proceed…" *Id.* at ¶ 6(f), Ex. 3 at 1. Further, Mr. Macfarlane testified he was waiting on the CDFA. Mr. Flores' lack of knowledge is at odds with this other evidence, which is why his phone records are pursued. *See also* Plaintiffs' Master Log.

### ii. Ms. Silva Perjured Herself in Deposition and Spoliated Evidence

Plaintiffs are prejudiced, as, first, Ms. Silva was dishonest in deposition, and second, Ms. Silva

ADVANCING LAW FOR ANIMALS

apparently failed to retain all text messages regarding Cedar and Plaintiffs. Gordon Decl. ¶ 41, Ex. 12 (Silva Dep. Vol. 1, 155:10-156:17). Critically, Ms. Silva testified she didn't have any contact with Mr. Macfarlane while he was in possession of Cedar, *id*. at ¶ 38, Ex. 12 (Silva Dep. Vol. 1 63:02-03); she didn't know that Mr. Macfarlane had Cedar, *id*. at ¶ 38, 39, Ex. 12 (Silva Dep. Vol. 1 62:02-24; 64:13-15; 69:18-24); she "didn't have a say" in what happened to Cedar, *id*. at ¶ 40, Ex. 12 (Silva Dep. Vol. 1 68:06-07); she "never knew" Cedar was killed on July 28, *id*.; and that she "just wasn't curious" about Cedar and "didn't give it as much thought as [Plaintiffs' counsel] is saying[,]" *id*., Ex. 12 (Silva Dep. Vol. 1 123:02-124:03; 183:01-15).

These statements are false. Ms. Silva had sustained communication with Mr. Macfarlane throughout the relevant period, and Mr. Macfarlane testified all calls reflected in his phone records with Ms. Silva concerned Cedar. Gordon Decl. ¶ 65, Ex. 21; *see generally* Plaintiffs' Master Log. On July 11—the same day Mr. Macfarlane texted Mrs. Muse "Talked to sheriff and he said to wait until he talks to DA before we kill goat"—Ms. Silva emailed Mrs. Muse the Dahle's invoice for Cedar, and wrote, "Hi Kathie, I have attached their bills. I appreciate the update!" Gordon Decl. ¶ 56, Ex. 15. Plaintiffs contend this email indicates a previous and recent conversation about Cedar. On July 18, sometime after 10:29 am, Ms. Silva texted Mr. Macfarlane, "The word goat makes my eye twitch now 🤣🤣🤣🤣🤣🤣🤣[,]" to which Mr. Macfarlane texted Ms. Silva, "It should. Lol[.]" *Id*. at ¶ 57, Ex. 16. On July 22, the phone call sequence involving Ms. Silva as described *supra* takes place. Additionally, on July 22, as described *supra*, Ms. Silva and Mr. Macfarlane text about their cover story as to Cedar's ultimate disposition, and Ms. Silva provides the name of the relevant employee at company who ultimately butchers Cedar. On July 25 at 3:15 pm, Ms. Silva called Mr. Macfarlane and the two had a short conversation. *Id*. at ¶ 60(g), Ex. 19. Later that day at 3:31 pm, Mr. Macfarlane called Ms. Silva and the two spoke for over 5 minutes. *Id*. On July 28, Mr. Macfarlane texted Ms. Silva, "Goat is getting butchered within the half hour. Finally." *Id*. at ¶ 60(h), Ex. 19. Contrary to her deposition testimony, Ms. Silva plainly knew what was happening with Cedar. S*ee generally* Plaintiffs' Master Log.

### iii. Multiple Defendants Obstructed Discovery to Safeguard Prominent Government Officials

ADVANCING LAW FOR ANIMALS

Plaintiffs contend Defendants omitted material facts in an attempt to mitigate their own liability, but also to safeguard prominent officials, including Sheriff Johnson and State Senator Dahle.

### 1. Mr. Macfarlane Retracted Previous Deposition Testimony Implicating Sheriff Michael Johnson

In the first volume of his deposition, Mr. Macfarlane stated he spoke to Sheriff Johnson "a couple times maybe" regarding Cedar, and that his July 11 text message to Mrs. Muse ("Good morning … Talked to sheriff and he said to wait until he talks to DA before we kill goat.") referred to Sheriff Johnson. *Id*. at ¶ 49, Exs. 11, 13 (Macfarlane Vol. 1 Dep. 204:01-205:08), He offered further detail, including how he met Sheriff Johnson and how he got his phone number. *Id*. at ¶ 45, Ex. 13 (Macfarlane Vol. 1 Dep. 198:15-200:23). Mr. Macfarlane never corrected his deposition testimony, and the time to do so lapsed. Gordon Decl. ¶ 43. In the second volume of his deposition, Mr. Macfarlane stated that Ms. Silva and Mrs. Muse were in contact with the Sheriff's Department and the District Attorney, and that he has never spoken with Sheriff Johnson regarding Cedar. Gordon Decl. ¶ 62, 63, Ex. 21 (Macfarlane Dep. Vol. 2, 250:08-251:08; 269:20-23). Although he stated in his first deposition sitting that the July 11 text to Mrs. Muse referred to Sheriff Johnson, in his second sitting, Mr. Macfarlane said that he meant Lieutenant Fernandez in the July 11 text, and that he was referencing a conversation that took place when Cedar was surrendered to him in the early hours of July 9. Gordon Decl. ¶ 66, Ex. 21 (Macfarlane Dep. Vol. 2, 247:4-248:15). Plaintiffs contend this retraction is incredible. If Plaintiffs are incorrect, however, this means Lieutenant Fernandez committed perjury in deposition when he stated he did not know Cedar would be killed. Gordon Decl. ¶ 20(a), Ex. 7 (Lieut. Fernandez Dep. 274:10-18).

### 2. Mr. Macfarlane and Mrs. Muse Engage in Obstructionist Discovery Tactics to Shield Senator Dahle

Both Mr. Macfarlane and Mrs. Muse engaged in obstructionist tactics regarding State Senator Dahle and his staff. Mr. Macfarlane did not produce any text messages from Bruce Ross, an employee of Senator Dahle. Gordon Decl. ¶ 68. Plaintiffs' counsel sent meet and confer correspondence, specifically requesting telecommunication with Bruce Ross. *Id*. at ¶ 52, Ex. 26. Still, none were produced. During his second deposition sitting, Mr. Macfarlane stated he did not delete any text messages from Bruce Ross. Gordon Decl. ¶ 67, Ex. 21 (Macfarlane Dep. Vol. 2, 329:15-330:02).

1   Plaintiffs subsequent review of Mr. Macfarlane's mobile phone records, however, indicated SMS text

2   messages with Bruce Ross during the relevant period. *Id*. at ¶ 69. Due to these obstructionist tactics,

3   Plaintiffs were forced to serve a non-party document subpoena on Mr. Ross to obtain these text

4   messages, which, as suspected, concerned Cedar and Plaintiffs. *Id*. at  ¶ 69, Ex. 27.

5       Similarly, Mrs. Muse testified that she speaks to Senator Brian Dahle on the phone once every

6   three months, and Assembly member Megan Dahle once every six weeks. Gordon Decl. ¶¶ 29-30, Ex.

7   10 (Muse Dep. 44:10-16; 45:14). She further stated she did not have any conversations with Senator

8   Dahle regarding Cedar from June 30, 2022 to August 31, 2022. Gordon Decl. ¶ 29, Ex. 10 (Muse Dep.

9   48:13-21). Plaintiffs' counsel subsequently subpoenaed the mobile phone records of Mrs. Muse,

10  revealing phone calls with a number Senator Dahle listed online as his cell phone (XXX-XXX-3888)

11  on June 28 at 9:51 am, 9:54 am, 10:37 am, 8:16 pm; June 29 at 4:41 pm; July 8 at 5:17 pm; July 9 at

12  12:02 pm; and September 1 at 6:38 pm. Gordon Decl. ¶ 87, Ex. 29; Shakib Decl. ¶¶ 5, 16, Ex. 32, 33.

13  These are all critical dates in the timeline of this case; on June 28-29, SDF was seeking direction from

14  CDFA and corresponding with Plaintiffs over email and text amid fallout from the Viral Instagram

15  Post; on July 8-9, the Sheriff's officers illegally seized and surrendered Cedar to Mr. Macfarlane at

16  the instruction of Mrs. Muse; and on September 1, 2022, media coverage over this litigation began,

17  implicating the Dahles and Mrs. Muse. Given the dates of those calls, Ms. Muse's claim she did not

18  speak to the Dahles about Plaintiffs is incredible. Additionally, email correspondence indicates

19  Senator Dahle's staff was kept abreast of updates regarding Cedar, with a previously-dormant email

20  chain regarding Plaintiffs and Cedar revived on August 9, with one email asking, "Birria?" and

21  another, "So is the stolen goat issues over?" Gordon Decl. ¶ 70, Ex. 28; s*ee also* Plaintiffs' Master

22  Log.

23  **III.    Argument**

24      **A.    Plaintiffs' Motion is Timely**

25      The parties stipulated to a discovery extension in this matter (ECF 65) for the limited purpose

26  of determining who at the Sheriff's Office, the District Attorney's Office, and/or the CDFA

27  participated in the illegal slaughter of Cedar. Fact discovery was extended from March 25, 2024, to

28  May 24, 2022, to allow Plaintiffs discovery on that issue. (ECF 67). After devoting significant

ADVANCING LAW FOR ANIMALS

resources to the various phone records produced in this case, Plaintiffs' research only determined the number at issue belonged to Michael Flores on May 1, 2024. Gordon Decl. ¶ 96. Plaintiffs then immediately met and conferred with Mr. Flores' counsel over the records sought, and then issued the subpoena on May 6, 2024. Plaintiffs waited as long as possible for a response from Verizon but, when none was forthcoming, they were forced to file the instant motion to compel on May 24, 2024, before the close of discovery. *Id.*

**B.      Mr. Flores' Work Phone Records are Relevant and Discoverable**

Throughout Mr. Flores' motion, he describes the records sought as his "personal records." According to Verizon, however, the cell phone at issue is a business phone with hundreds of numbers held by the account holder. Gordon Decl. ¶ 93. The subpoenaed records are not his personal records but, rather, his business records—and they are both relevant and discoverable. Any party may serve a subpoena commanding a nonparty "to attend and give testimony or to produce and permit inspection and copying of" documents. Fed. R. Civ. P. 45(a)(1)(C). Further, "At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i).

Fed. R. Civ. P. 26(b) establishes the scope of discovery and provides that all civil litigants are entitled to discovery of "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in a case." *Oppenheimer Fund, Inc., v. Sanders,* 437 U.S. 340, 351 (1978).

Cell phone records of parties, like those at issue in the instant dispute, are recognized as relevant. *See, e.g., Murray v. City of Carlsbad*, 2010 U.S. Dist. LEXIS 63933, *5 (S.D. Cal. June 25, 2010) (explaining "phone records are discoverable if for no other reason than the impeachment of Officer Luc."). The subpoena is subject to the relevance requirements set forth in Rule 26(b). The Rutter Group, Federal Civil Procedure Before Trial § 11:2305 (2005). These general discovery limitations apply with equal force to subpoenas to third parties. *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679–80 (N.D. Cal. 2006). Here, Mr. Flores' business phone records are discoverable and relevant

ADVANCING LAW FOR ANIMALS

for several reasons.

### i. The Subpoenaed Records are Relevant to Determining Who at the CDFA, Sherriff's Department, and District Attorney's Office Participated in Cedar's Illegal Seizure and Slaughter

The parties in this case engaged in significant discovery. Yet, to date, it is still unclear why Cedar's slaughter was delayed until July 28, 2022, particularly in light of calls from Plaintiffs' counsel from July 15-27, 2022 to the Sheriff's Department and Shasta County Counsel. Further, the identity of all individuals who took part in killing Cedar is also unclear. There is good cause to believe Mr. Flores' records will shed light on these issues.

Plaintiffs already know SDF, through Ms. Silva, deferred to CDFA—and specifically Mr. Flores—for instruction following Cedar's removal. *See supra* at Section II(A). When Mrs. Long did not return Cedar, Ms. Silva deferred to CDFA—and specifically Mr. Flores—for direction amid public fallout from the Viral Instagram Post. *See supra* at Section II(A). Plaintiffs have meaningful evidence supporting their theory Mr. Flores communicated with Sheriff Johnson, either directly or indirectly through the Shasta County Sheriff's Department, and Sheriff Johnson then instructed Lieutenant Fernandez to call Mr. Macfarlane. *See supra* at Section II(B). The thrust of evidence to date supports the fact SDF maintained possession of Cedar for weeks post-seizure, awaiting approval from CDFA, the Sheriff's Department, and the District Attorney to slaughter Cedar—despite repeated contact from Plaintiffs' counsel. *See supra* at Section II(E). Further, Ms. Silva's hand-written notes indicate involvement of CDFA, the Sheriff's Department, and the District Attorney in Plaintiffs' Due Process violation following pre-litigation contact from Plaintiffs' counsel. *See supra* at Section II(G).

Mr. Flores' business phone records are calculated to fill gaps in the timeline of events leading up to Plaintiffs' due process violations, including who, if anyone, Mr. Flores spoke to in law enforcement on critical dates. The business phone records are also relevant for impeachment, as set forth below.

### ii. The Subpoenaed Records are Relevant for Impeachment

"It is a legitimate purpose of discovery to obtain information for use on cross-examination and for the impeachment of witnesses." 10 Federal Procedure, Lawyers Edition § 26:135 (2024), citing

ADVANCING LAW FOR ANIMALS

*Hickman v. Taylor*, 329 U.S. 495 (1947), *Englebrick v. Worthington Industries, Inc.*, 670 F. Supp. 2d 1048 (C.D. Cal. 2009); *see also* 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2015 (3d ed. 2024) ("Discovery is commonly allowed in which the discovering party seeks information with which to impeach witnesses for the opposition"). Under 2015 amendments to Federal Rules of Civil Procedure, Rule 26, "'information that could be used to impeach a likely witness' is still discoverable pursuant to Rule 26(b)(1) if 'suitably focused,' that is, that the information sought is relevant to the parties' claims and defenses." *Strategic Partners, Inc. v. FIGS, Inc.*, 2020 WL 4354172, * 10 (C.D. Cal. May 18, 2020) (citing *IceMOS Technology Corporation v. Omron Corporation,* 2020 WL 1905736  (D. Ariz. Apr. 17, 2020)). Phone records themselves have been compelled solely for their impeachment value. *See, e.g., Murray v. City of Carlsbad,* 2010 U.S. Dist. LEXIS 63933, *5 (S.D. Cal. June 25, 2010) (explaining "phone records are discoverable if for no other reason than the impeachment of Officer Luc.").

Here, bad-faith tactics abound, including false deposition testimony and spoliation of evidence. Text messages reveal Ms. Silva, Mr. Macfarlane, and Mrs. Muse coordinated to conceal Cedar's true fate. *See supra* at Section II(F). Ms. Silva perjured herself in deposition and spoliated evidence. *See supra* at Section II(H)(ii). Multiple defendants omitted salient facts in deposition to safeguard prominent officials. This includes Mr. Macfarlane's retraction of previous deposition testimony implicating Sheriff Johnson, and Mr. Macfarlane and Mrs. Muse's obstructionist discovery tactics to shield Senator Dahle from unsavory public attention. *See supra* at Section II(H)(iii)(1)-(2).

As for Mr. Flores, Plaintiffs would prefer to adopt his narrative non-involvement but simply cannot do so given the unreliability of the nearly all other testimony in this case. *See supra* at Section II(H)(i). Further, Ms. Silva's texts and notes suggest Mr. Flores called law enforcement—which he denies. *See supra* at Section II(B). The phone records are therefore discoverable because they may not only impeach Mr. Flores' testimony, but may also impeach Sheriff Johnson and the DA Bridgett. Both Sheriff Johnson and DA Bridgett assert they played no part in Cedar's death—despite Mrs. Muse, Ms. Silva, and Mr. Macfarlane each testifying those government actors decided when it was okay to kill Cedar. Gordon Decl. ¶¶ 25- 26, Ex. 10 (Muse Dep. 199:5-15, 201:19-202:08), Ex. 36 (Silva Vol. 1 Dep. 65:14-68:22), Ex. 48-50 (Macfarlane Dep. Vol. 1, 209:22-211:10, 204:01-205:08, 207:10-22).

ADVANCING LAW FOR ANIMALS

Plaintiffs have relied on phone records and non-party subpoenas to date to counteract obstructionist discovery tactics and mitigate prejudice, and must continue to do so. As a result, Mr. Flores' business phone records are relevant and discoverable, and Mr. Flores has failed to plausibly argue otherwise.

**C.     Mr. Flores' Arguments are Untenable**

As in Mr. Flores' motion to quash, his arguments in opposition to Plaintiffs' motion to compel are flawed, for the reasons set forth below.

**i.     Although Mr. Flores' Testimony is Inconsistent with Other Evidence, Consistency in Testimony is Not Grounds to Resist Discovery**

Whether or not Mr. Flores testimony is consistent with Ms. Silva's testimony is of no moment. As stated above, impeachment evidence is sufficient grounds for the subpoena. Further, even if his testimony is consistent with Ms. Silva's, it remains at odds with other testimony and documentary evidence, as described previously. *See, e.g., supra* Section II(A)-(B).

**ii.     As a Public Employee, Mr. Flores Cannot Claim Privacy in His Business Phone Records**

"The party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections." *Bryant v. Ochoa,* 2009 WL 1390794 at * 1 (S.D.Cal. May 14, 2009) Mr. Flores has not met his burden to show there is a privacy interest in his business cell phone. Presumably, he is asserting a state right to privacy. However, he has not addressed any of the factors a court must consider. *Mohideen v. Calnet, Inc.,* 2014 WL 1028638 (S.D. Cal. March 14, 2014) (finding that any privacy interest for business records could easily be managed through a protective order).

Lastly, this is Mr. Flores' work cell phone. He is a public employee. Accordingly, "[t]he records requested are third party business records that are derived from information voluntarily conveyed to the cell phone provider. [citations]. The requested information does not contain the content of any of the calls or text messages, but merely the phone numbers and amount of time that Plaintiff spent using her cell phone. Revealing the incoming and outgoing phone calls and messages and data use of Plaintiff's cell phone during the time period of her employment is not an 'egregious'

ADVANCING LAW FOR ANIMALS

breach that would be a serious invasion of any privacy interest, should one exist." *Kamalu v. Walmart Stores, Inc.*, 2013 WL 4403903, * 5 (E.D. Cal. Aug. 15, 2013).

### iii.   The First Amendment Does Not Privilege Mr. Flores' Business Phone Records

Mr. Flores offers no authority that the First Amendment, if even it does privilege his actions, shields discovery of his phone records.  This argument wrongly holds information sought in discovery to the standards of admissibility at trial. Because discovery is much broader, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." *Frayno Crumb v. M. Hasselblad, et al.*, 2018 WL 521506, *1 (S.D. Cal. Jan. 22, 2018) (citing Fed. R. Civ. P. 26(b)(1)).

### iv.   The Underlying Subpoena is Not Intrusive

Mr. Flores claims the information at issue could have been acquired by less intrusive means. That too is not a basis to resist discovery. But, more importantly, it is also inaccurate.  Plaintiffs have deposed multiple Defendants in this case, requested all their phone records and texts, and the information they seek from Mr. Flores' phone records was simply not provided. Indeed, Ms. Silva, Mrs. Muse, and Mr. Macfarlane admit the Sheriff's Department, the District Attorney's Office, and/or the CDFA took part in deciding Cedar's fate, but none of those Defendants will name names. They all simply contend they heard those offices participated from other Defendants, or from a source they cannot recall.

### v.   The Apex Deposition Doctrine is Inapplicable

Mr. Flores claims he is a "high ranking official" and, presumably, that is grounds for resisting discovery. To the extent his argument asserts the Apex deposition doctrine, it must be rejected. The apex deposition doctrine provides that "top government executives are normally not subject to depositions." *Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 12 (D. Mass. 1990).

Mr. Flores claims the fact he sat for deposition prohibits the instant subpoena for phone records. But he has the apex deposition doctrine backwards—it operates to bar depositions, not document requests. "[C]ourts have declined to extend the apex doctrine outside the context of depositions, holding that it is not a protective shield that prohibits document discovery from high-ranking officials." *L.A. Alliance v. City of Los Angeles*, 2023 WL 5505037, * 6 (C.D. Cal. Aug. 2,

21

ADVANCING LAW FOR ANIMALS

2023) ("declin[ing] to apply the apex doctrine to Plaintiffs' RFPs"); *See In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2021 WL 10282213, at *10 (N.D. Cal. Nov. 14, 2021) (collecting cases declining to apply "Apex Witness" doctrine to the production of documents and ordering same). The cases cited by Mr. Flores do not provide otherwise.[2]

Aside from misstating the apex deposition doctrine, Mr. Flores failed to meet his burden. Plaintiffs need not overcome an apex objection at all until Mr. Flores first proves he is a high ranking official. *See Estate of Levingston v. County of Kern,* 320 F.R.D. 520 (E.D. Cal. 2017) (in regards to apex deposition, "[a]s an initial matter, an individual objecting to a deposition must first demonstrate he "is sufficiently 'high-ranking'…."), citing *Thomas v. Cate*, 715 F.Supp.2d 1012, 1049 (E.D. Cal. 2010). Mr. Flores has provided no evidence his station is "high ranking." He has not provided his own declaration nor is his attorney's declaration is insufficient on this issue. Merely declaring himself "high ranking" through his counsel does not make it so.[3]

Even if Mr. Flores proved he is a high ranking official, the apex deposition doctrine still does not apply for a host of reasons. Apex discovery is permitted when "(1) … the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case[,] and (2) … the party seeking the deposition has exhausted other less intrusive discovery methods." *Id.* Here, Mr. Flores already sat for, and admitted, he has firsthand knowledge of various material issues. Gordon Decl. ¶¶ 76, 80. Additionally, the instant document requests via subpoena *are* a species of the "less intrusive discovery

---

[2]     *See also Blankenship v. Fox News Network, LLC*, 2021 WL 2345972, at *3, n. 5 (S.D.W. Va. June 8, 2021) (apex doctrine "typically applies only to protect senior executives from attending costly and distracting depositions rather than from merely collecting and producing documents"); *Alta Devices, Inc. v. LG Elecs.*, Inc., 2019 WL 8757255, at *1 (N.D. Cal. Feb. 20, 2019) (disagreeing "that simply because a prospective custodian happens to be a senior executive, such custodian is not subject to collection of responsive ESI.")*Kyle Engineering, Co. v. Kleppe,* 600 F.2d 226, 231 (9th Cir. 1979) ("district court's order directing Kleppe to answer interrogations in lieu of a deposition does not appear unreasonable"); *Federal Deposit Ins. Corp. v. 11,950 Acres, More or Less, Located in Cameron County, Texas,* 58 F.3d 1055 (5th Cir. 1995) (declining to quash notices of deposition issued to three members of FDIC's Board of Directors); *Church of Scientology of Boston v. I.R.S.*, 138 F.R.D. 9, 12 (D. Mass. 1990)(deposition of official sought); *See Nagle v. Superior Court* (1994) 28 Cal.App.4th 1465 (depositions of officials sought).

[3]     Here, the subpoena is directed to Verizon. Mr. Flores, even if he is a high ranking official, is not bothered or harassed at all, which is the entire point of the apex doctrine. *See Apple Inc. v. Samsung Electronics Co., Ltd,* 282 F.R.D. 259, 263 (N.D. Cal. 2012) (explaining the apex doctrine exists because depositions of high ranking officials "create[] a tremendous potential for abuse or harassment").

methods" envisioned by the apex doctrine. *See L.A. Alliance v. City of Los Angeles*, 2023 WL 5505037, at *5 ("requests for production tend to be less time-consuming and distracting" under the "less intrusive" analysis). And even if apex doctrine did somehow apply to subpoenaed document requests (it doesn't), Plaintiffs need not exhaust all over avenues before pursuing such records. *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2014 WL 939287, at *1 (N.D. Cal. Mar. 6, 2014) (exhaustion of other discovery routes is an "important consideration" but not a necessary precondition under the apex doctrine).[4]

> ### vi.   Plaintiffs Will Not Disseminate Mr. Flores' Business Phone Records

Although Mr. Flores has not met his burden to resist the instant subpoena, Plaintiffs already agreed not to disseminate Mr. Flores business phone records, and to redact sensitive information from Court filings. Gordon Decl. ¶ 95. To the extent the Court wishes to issue a protective order on those bases, Plaintiffs have no objection.

<div align="center">

**ADVANCING LAW FOR ANIMALS**

</div>

Dated:  June 19, 2024              By:    /s/Ryan Gordon
                                          Ryan Gordon
                                          Vanessa Shakib
                                          Attorneys for Plaintiffs

## PART 4.  MR. FLORES' STATEMENT

The person to whom the subject cellular phone records belong is a high-ranking government official, a non-party to this case, and his employing State agency is a non-party to this case. That person submitted to a deposition voluntarily and provided substantive testimony that was consistent with that of other witnesses in the case regarding his potential involvement in the matter. His testimony

---

[4]     Mr. Flores also continuously states Plaintiff must show "exceptional circumstances," presenting that phrase as a separate requirement. It is not. It is merely how court's describe a situation when the apex doctrine elements are met, thus permitting deposition of the high ranking official. *See BAE Systems San Diego Ship Repair Inc. v. United States,* 670 F.Supp.3d 1064, 1071 (S.D. Cal. 2023) (explaining "[t]o demonstrate that *exceptional circumstances* justify deposing a … high-ranking government official, a party must demonstrate the official has unique first-hand knowledge … or that the necessary information cannot be obtained through other, less burdensome or intrusive means") (emphasis added). Plaintiffs need not show "exceptional circumstances" for the subpoenaed documents. They need only show they are relevant to their claims, which they have. Fed. R. Civ. P. 26(b).

ADVANCING LAW FOR ANIMALS

1   regarding telephone calls placed to/from other individuals in the case was further corroborated by

2   reviewing the telephone records of other witnesses in the case, namely defendant Melanie Silva. There

3   was no inconsistency in his deposition testimony that would lead to the need to further explore his

4   private records. Plaintiffs' sole basis for seeking the records is a hunch and suspicion that he is not

5   being truthful about whether or not he ever communicated with the Shasta County Sheriff, which is

6   not a sufficient legal basis for seeking to invade his privacy through a third-party subpoena. Moreover,

7   the Shasta County Sheriff, who is a party to this case, could have been asked through written discovery

8   or in a deposition whether or not he ever spoke to the subject non-party individual, but plaintiffs did

9   not do that. (See FRCP Rule 26(b)(2)(C)(i) & (ii).) They now seek to get the information by harassing

10  this non-party with an intrusive subpoena for his phone records.

11      As stated above, there are less intrusive means of obtaining the limited information sought in

12  the telephone records (namely whether any calls took place between two telephone numbers and their

13  duration, but not the content of those calls), such as deposing additional party witnesses. Plaintiffs'

14  strategic decision to forego other, less intrusive discovery does not create a sufficient basis for invading

15  the privacy of a non-party. Instead, it creates an undue burden on the non-party to have his privacy

16  invaded unnecessarily to seek information that is irrelevant to the litigation of this matter pursuant to

17  FRCP Rule 26(b)(1). Any telephone calls between this non-party and law enforcement are protected

18  by the First Amendment, even if such calls occurred (the non-party testified that they did not).

19      The intrusion into the non-party's privacy is not proportional to the needs of the case pursuant

20  to FRCP Rule 26(b)(1), as it does not relate to any issue at stake in the action, plaintiffs' had easy

21  access to the information through other alternative means, and the burden of the privacy invasion

22  vastly outweighs its likely benefit. (See FRCP Rule 26(b)(1).)

23      Finally, the records of the individual, if produced, will contain telephone numbers of other

24  high-ranking State officials from various agencies with whom he communicates regularly about State

25  business. The telephone numbers of those individuals should also remain private as they are not the

26  subject of this litigation.

27

28

**ADVANCING LAW FOR ANIMALS**

STATEMENT OF DISCOVERY DISAGREEMENT

1

Dated:  June 19, 2024                    **CALIFORNIA DEPARTMENT OF JUSTICE**

2

By:_____/s/John C. Bridges_____

3

John C. Bridges
Attorneys for nonparty Michael Flores

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A**DVANCING **L**AW FOR **A**NIMALS

STATEMENT OF DISCOVERY DISAGREEMENT

**PROOF OF SERVICE**

I, Ryan Gordon, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 407 N. Pacific Coast Hwy. #267, Redondo Beach, CA 90277.

On March 6, 2024, I served on the interested parties in this action the following document(s) described as **PLAINTIFF JESSICA LONG'S STATEMENT OF DISCOVERY DISAGREEMENT RE PRODUCTION OF SUBPOENAED DOCUMENTS FROM NON-PARTY VERIZON (ECF 78, 85)**

☒ By placing ☒ a true copy thereof enclosed in a sealed envelope addressed as follows:

CHRISTOPHER M. PISANO,
christopher.pisano@bbklaw.com
DAMIAN A. NORTHCUTT,
Damian.Northcutt@bbklaw.com
JULIA HERNANDEZ
Julia.Hernandez@bbklaw.co
BEST BEST & KRIEGER LLP 300
South Grand Avenue 25th Floor
Los Angeles, California 90071

JOHN C. BRIDGES
CALIFORNIA DEPARTMENT OF JUSTICE
Tort and Condemnation Section
1300 I Street, Suite 1210
Sacramento, CA,  95814
John.Bridges@doj.ca.gov

Kelly J. Snowden, Esq.
Kelly.snowden@rswslaw.com
Tonya.hamilton@rswslaw.com

VERIZON
C/O Verizon Security Subpoena Compliance
180 Washington Valley Road
Bedminster NJ 07921
Fax: 1.888.667.0028.

☒ **BY FAX**:  by transmitting via facsimile the document(s) listed above to the fax number(s) set forth for Verizon at its request.

☐ **OVERNIGHT DELIVERY**:  I deposited such envelope in a facility regularly maintained by ☒ FEDERAL EXPRESS with delivery fees fully provided for or delivered the envelope to a courier or driver of ☐ FEDERAL EXPRESS authorized to receive documents at 407 N. Pacific Coast Hwy, #267, Redondo Beach, CA 90277 with delivery fees fully provided for.

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION**: The document(s) was sent from e-mail address rgordon@advancinglawforanimals.org to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒ [Federal]   I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on June 19, 2024, at Los Angeles, California.

_____
/s/Ryan Gordon
Ryan Gordon

26
STATEMENT OF DISCOVERY DISAGREEMENT