# EXHIBIT D

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*JESSICA LONG*
*August 24, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File J. Long.txt
Min-U-Script® with Word Index

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3                   SACRAMENTO DIVISION

 4

 5   E.L., a minor, by and through   )
     her general guardian, JESSICA   )
 6   LONG; JESSICA LONG, an          )
     individual,                     )
 7                                   )
                 Plaintiffs,         )   Case No.
 8   vs.                             )  2:22-cv-01527-DAD-AC
                                     )
 9   LIEUTENANT JERRY FERNANDEZ      )
     individually and in his         )
10   individual capacity as Sheriff  )
     for the County of Shasta;       )
11   DETECTIVE JACOB DUNCAN,         )
     individually and in his         )
12   individual capacity as Sheriff  )
     for the County of Shasta;       )
13   DETECTIVE JEREMY ASHBEE,        )
     individually and in his         )
14   individual capacity as Sheriff  )
     for the County of Shasta;       )
15   SHASTA DISTRICT FAIR AND EVENT  )
     CENTER, a district agricultural )
16   association; COUNTY OF SHASTA;  )
     SHASTA COUNTY SHERIFF'S         )
17   DEPARTMENT; MELANIE SILVA, in   )
     her individual capacity; BJ     )
18   MACFARLANE, in his individual   )
     capacity; and DOES 1 through    )
19   10,                            )
                                     )
20               Defendants.         )

21

22

23            VIDEO DEPOSITION OF JESSICA LONG

23            THURSDAY, AUGUST 24, 2023

24

25
```

---

**Page 2**

```
 1                     APPEARANCES

 2

 3   For the Plaintiffs:  LONG, etc.

 4       ADVANCING LAW FOR ANIMALS
         407 N. Pacific Coast Highway, #267
 5       Redondo Beach, CA  90277
         (202) 996-8309
 6       rgordon@advancinglawforanimals.org
         vshakib@advancinglawforanimals.org
 7       BY:  RYAN R. GORDON, ESQ.
              VANESSA T. SHAKIB, ESQ.
 8

 9   For the Defendant:  FERNANDEZ, etc.

10       BEST, BEST & KRIEGER
         2855 East Guasti Road, Suite 400
11       Ontario, CA  91761
         (909) 989-8584
12       damian.northcutt@bbklaw.com

13       BY:  DAMIAN A. NORTHCUTT, ESQ.

14
     For the Defendant:  SHASTA DISTRICT FAIR, etc.
15
         CALIFORNIA ATTORNEY GENERAL'S OFFICE
16       DEPARTMENT OF JUSTICE
         1300 I Street
17       Sacramento, CA  95814-2963
         (916) 210-7529
18       john.bridges@doj.ca.com

19       ZOOM APPEARANCE BY:  JOHN BRIDGES, ESQ.

20
     Also present:  Terry Fox, Video Specialist
21

22

23                   ---oOo---

24

25
```

---

**Page 3**

```
 1              INDEX OF EXAMINATION

 2
     EXAMINATION BY:                              PAGE
 3

 4   DAMIAN NORTHCUTT                                7

 5   RYAN GORDON                                   199

 6

 7                   ---oOo---

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

**Page 4**

```
 1              INDEX OF EXHIBITS

 2
     Long Depo            Description            Page
 3   Exhibit No.

 4       A       Document entitled,              112
                 Attachment A,
 5               Instagram photo

 6       B       Email from Jessica Long         115
                 to Shasta County Fair
 7               Manager dated 6-27-22,
                 totaling 2 pages
 8

 9       C       One-page email from             118
                 Shasta District Fair and
10               Event Center to Jessica
                 Long dated 6-28-22

11       D       A letter from Jessica           121
                 Long to Shasta District
12               Fair, dated 6-28-22,
                 totaling 4 pages
13

14       E       One-page Shasta District        125
                 Fair and Event Center
15               document with "Accountability
                 & Liability" at the top

16       F       Screenshot with "Eliza Long's   129
                 Items" at the top
17
         G       Copies of text messages,        136
18               totaling 13 pages

19       H       A document entitled All         140
                 General Livestock Rules &
20               Guidelines, totaling 12
                 pages
21
         I       4-H Logbook, totaling 7         156
22               pages

23       J       Handwritten thank you           165
                 letter, totaling 3 pages
24
         K       One-page screenshot of text     167
25               message and pictures
```

---

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

**Page 5**

```
 1  Long Depo    Description              Page
 2  Exhibit No.
 3     1         Photographs bound separately  184
 4                and marked as confidential,
 5                totaling 26 pages
 6                    ---o0o---
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 6**

1  BE IT REMEMBERED, that on Thursday, August 24,
2  2023, commencing at the hour of 9:09 a.m., of said day,
3  at the offices of Challe, Fisher & Morfin, 1828 South
4  Street, in Redding, California, before me, Suzanna
5  Mickelson, a Certified Shorthand Reporter in and for the
6  State of California, there appeared,
7      JESSICA LONG,
8  who, being first duly sworn by me to tell the truth, was
9  examined and testified as follows:
10
11      **THE VIDEO SPECIALIST:** Ladies and gentlemen,
12  we're on video record with the deposition of Jessica
13  Long.  The date is August 24th, '23, and the time is
14  9:09 a.m.  I'm Terry Fox, the video specialist, from the
15  firm of Redding Video Productions.  This is the
16  beginning of media number one regarding case number
17  22-cv-01527-DAD-AC of the United States Eastern District
18  Court of the Sacramento Division.  This deposition is
19  being taken at the offices of Challe, Fisher and Morfin
20  at 1828 South Street in Redding, California.  The court
21  reporter is Suzanna Mickelson, CSR number 14270, also
22  associated with Challe, Fisher and Morfin.
23      Counsel will now introduce themselves, who they
24  represent, and the witness will then be sworn in by the
25  reporter.

---

**Page 7**

1      **MS. SHAKIB:** This is Vanessa Shakib, Plaintiffs'
2  counsel.
3      **MR. GORDON:** Ryan Gordon for same.
4      **MR. NORTHCUTT:** Damian Northcutt on behalf of
5  Defendants, Lieutenant Fernandez, Detective Jacob
6  Duncan, Detective Jeremy Ashbee, Shasta County Sheriff's
7  Department and the County.
8      (Whereupon, the witness was sworn by the
9      clerk.)
10
11      EXAMINATION BY MR. NORTHCUTT
12      **MR. NORTHCUTT:** Can you hear us over the phone
13  or Zoom?
14      **MR. BRIDGES:** I can, yes.  Sorry, I was still
15  muted trying to state my appearance.  This is John
16  Bridges from the State of California and the stated
17  Defendants.  Thank you.
18      **MR. NORTHCUTT:** Awesome.
19  Q.    Good morning, Ms. Long.  Is it Miss Long,
20  Mrs. Long, or how would you like me to refer to you
21  throughout this deposition?
22  A.    **Mrs. Long.**
23  Q.    Mrs. Long, okay.  I just want to make sure that
24  I've got it right.
25  A.    **Okay.**

---

**Page 8**

1  Q.    My name is Damian Northcutt, and I'm here on
2  behalf of the County Defendants.  We're going to take
3  your deposition today.  We've been doing these
4  depositions all week with the officers, and so now it's
5  your turn to get the facts from you as you understand
6  them.
7      Have you ever had your deposition taken before?
8  A.    **No.**
9  Q.    Okay.  So we'll go through some ground rules,
10  but let's first start off with your name.  Could you
11  spell it for me?
12  A.    **J-e-s-s-i-c-a.  And last name is Long, L-o-n-g.**
13  Q.    Okay.  Do you have a middle name, by any chance?
14  A.    **Elizabeth.**
15  Q.    Is it E-l-i-z-a-b-e-t-h?
16  A.    **(Nods head up and down.)**
17  Q.    Perfect.  Okay.  Have you had -- have you gone
18  by any other names in the past?
19  A.    **My maiden name is** ███████
20  Q.    How do you spell that?
21  A.    ███████
22  Q.    Okay.  So the court reporter gave you an oath
23  just a few minutes ago, and even though we're in an
24  informal setting, it carries the same penalty of perjury
25  as if you were actually sitting in front of a judge in a

---

**Page 9**

1  courtroom. So we want to get your best testimony today.
2  We want it to be honest and truthful. Do you understand
3  that you're currently under oath?
4  A.    Yes.
5  Q.    Great. We have a videographer here today who's
6  also videotaping, but we also have a court reporter
7  who's going to be writing everything down into a little
8  booklet. So to make things easier for her, we need to
9  have audible responses. So instead of -- I see you're
10  nodding your head, very good, but she can't actually
11  write that down. So when I ask you a question, if you
12  could give me an audible response in addition to any
13  sort of facial response, that would be great. So a yes
14  or no as opposed to a (nods head), understand?
15  A.    Understand.
16  Q.    Great. In normal talk we have a tendency to
17  talk over one another. That's completely normal. But
18  here since we have a court reporter and she's typing
19  everything down, we need to try to do our best to kind
20  of not talk over one another.
21       So I'll do my best to let you answer your
22  questions, and hopefully you can do your best to let me
23  ask you the questions; is that okay?
24  A.    That's okay.
25  Q.    Great. After the deposition is concluded at

**Page 10**

1  some point in the future which we're working on figuring
2  out, you'll get a copy of the transcript. It will be in
3  a little kind of booklet. You'll have a chance to
4  review the transcript with your counsel and make changes
5  to it if any are necessary.
6       I must caution you, though, that if you make a
7  substantive change such as like changing a yes to a no,
8  something of that nature, we can comment on it later.
9  It can look like you're not being truthful. So we're
10  trying to get your best testimony. Do you understand
11  that?
12  A.    Yes.
13  Q.    Great.
14       MR. GORDON: Damian, by the way, I'm looking
15  right now, it says 30 days.
16       MR. NORTHCUTT: Okay, great. So, yeah, within
17  30 days.
18  Q.    So -- and if for some reason you decide, you
19  know, you say, oh, it was on this date and you decide
20  later on during our deposition, oh, I messed up, I
21  screwed up, I meant this date, feel free to confer with
22  your counsel and if you want to correct it on the
23  record, that would be great to do it here today as
24  opposed to at a later date, understand?
25  A.    Okay.

**Page 11**

1  Q.    Perfect. If you need a break for any reason,
2  let us know. The only time you can't take a break is if
3  I ask a question. Understand?
4  A.    Yes.
5  Q.    Great. Do you understand the difference between
6  an estimate versus a guess? Let me rephrase that for
7  you.
8       So during a deposition, I'm entitled to your
9  best estimate. So if you can give me an estimate of
10  something whether it's a date, a time, whatever the case
11  may be, I'm entitled to that versus a guess.
12       So the classic example attorneys use is if I
13  said how long is this table, you might be able to
14  estimate it's about eight feet or so. If I said how
15  long is the table in my dining room, you would say I
16  have no idea because that would be completely a guess.
17  You've never seen my dining room. Do you understand the
18  difference?
19  A.    Yes.
20  Q.    And the same things goes with dates. If you
21  know it was approximately around July 4th or
22  approximately near Christmas, I'm entitled to that
23  information even if you don't know precisely the date.
24  Understand?
25  A.    Yes.

**Page 12**

1  Q.    Fantastic. Your attorney from time to time will
2  object to some of the questions that I ask. That's
3  totally normal, and he's just preserving his objections
4  for a later date when we go to court. Unless he
5  instructs you not to answer the question, I can expect
6  an answer from you. Do you understand that?
7  A.    Yes.
8  Q.    Great. And if you don't understand a question,
9  which frequently I ask bizarre questions that nobody
10  understands, go ahead and just say, "I don't understand
11  the question, it's doesn't make any sense to me, can you
12  rephrase it," whatever the case may be.
13       If I ask you a question and you do give me a
14  response, I'm going to assume that you understood the
15  question, fair enough?
16  A.    Okay.
17  Q.    Awesome. Is there any reason why I can't --
18  well, strike that.
19       Are you -- have you had anything to drink today?
20  A.    Just water.
21  Q.    Okay. Great. What about any sort of drugs?
22  A.    No.
23  Q.    Okay. Is there anything that's impacting your
24  ability to give me your best testimony today?
25  A.    No.

Case 2:22-cv-01527-DAD-AC   Document 99-6   Filed 07/31/24   Page 6 of 62

LONG vs.                                                                    JESSICA LONG
FERNANDEZ                                                                 August 24, 2023

**Page 13**

1 Q.    Okay.  What is your date of birth?
2 A.    **August 30th, 1979.**
3 Q.    And where do you currently reside?
4 A.    **Redding, California.**
5 Q.    Okay.  Is it the same address that you were
6   at -- and I'm going to refer to the incident, which
7   we're talking about I believe is June 25th, 2022.  So
8   are you currently residing at the same location that you
9   were at that time?
10 A.   **Yes.**
11 Q.   Okay.  Great.  Did you review any documents --
12   did you review any documents in preparation of your
13   deposition today?
14 A.   **The documents for production.**
15 Q.   Okay.
16 A.   **Just kind of the list.**
17 Q.   So are you referring to your -- the discovery
18   responses you provided to our office?
19 A.   **The list of just all the documents that I gave**
20   **him that he combined into one document.**
21      MR. GORDON: She means the pdf I sent you of the
22   Bates stamps 1 through 60 or something.
23      MR. NORTHCUTT: Gotcha.  Okay.  So the document
24   production.
25 Q.   Aside from that, have you reviewed any other

**Page 14**

1   documents?
2 A.    No.
3 Q.    Okay.  Have you spoke -- other than speaking
4   with your attorneys, have you spoken with anyone about
5   this deposition today?
6 A.    No.
7 Q.    Have you ever been a party to another lawsuit?
8 A.    No.
9 Q.    Have you ever sued a -- I guess you probably
10   answered this question, but I just want to be clear.
11   Have you ever sued a county before?
12 A.   No.
13 Q.   Have you ever been convicted of a felony?
14 A.   No.
15 Q.   Have you ever been arrested by the Shasta County
16   Sheriff's Department?
17 A.   No.
18 Q.   Throughout this deposition for privacy purposes,
19   we're going to refer to your daughter as E.L.  Do you
20   understand who E.L. is?
21 A.   Yes.
22 Q.   Okay.  And is that also, to your understanding,
23   one of the Plaintiffs in this case?
24 A.   Yes.
25 Q.   Okay.  Great.  Currently what age is E.L.?

**Page 15**

1 A.    [redacted]
2 Q.    And at the time of the incident which we're
3   talking about, June 25th, 2022, what would be her age at
4   that point?
5 A.    [redacted]
6 Q.    At the time -- at the time of the incident, so
7   back in June of 2022, did E.L. have any other pets other
8   than Cedar?
9 A.    **Yes.**
10 Q.   Can you tell me which pets?
11 A.   **We have an Australian Shepherd dog and a Pug**
12   **Chihuahua mix.**
13 Q.   Any others?
14 A.   **Two cats.  And approximately 10 hens, 10**
15   **chickens.**
16 Q.   Any other animals?
17 A.   **That's all.**
18 Q.   Now, at some point it's my understanding that
19   E.L. joined 4-H, correct?
20 A.   **Yes.**
21 Q.   Okay.  What is your understanding of what 4-H
22   is?  Do you know what the name means?
23 A.   **The four Hs stand for head, heart, hands and**
24   **health.**
25 Q.   Okay.  And when did she join 4-H?

**Page 16**

1 A.    **September the year before the fair.**
2 Q.    So that would have been September 2021?
3 A.    **Yes.**
4 Q.    Prior to September 2021, was she a member of any
5   farming group such as FFA or 4-H?
6 A.    **No.**
7 Q.    And did she decide to join 4-H of her own
8   volition, or was that something that you recommended or
9   somebody else recommended to her?
10 A.   **It was something I recommended for her.**
11 Q.   Why did you recommend she join 4-H?
12 A.   **I've heard positive things about it being a**
13   **youth development program.**
14 Q.   Any other reason?
15 A.   **She likes animals and learning, and it was a**
16   **club.**
17 Q.   Okay.
18 A.   **A club experience for her.**
19 Q.   Anything else?
20 A.   **I think that's it.**
21 Q.   Okay.  Were you ever involved with 4-H prior to
22   September 2021?
23 A.   **No.**
24 Q.   Okay.  And when E.L. joined 4-H, did you join as
25   well?  Can you join as an adult?

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

Page 17

1  A.      Parents can volunteer.  I didn't sign up to
2  volunteer that year.
3  Q.      Okay.  So just E.L.?
4  A.      Yes.
5  Q.      Does -- and I don't want to know their names if
6  there are any or date of birth or any identifying
7  information, but does E.L. have any brothers or sisters?
8  A.      Yes.
9  Q.      Okay.  And are -- do those brothers or sisters,
10  have they at any point belonged to 4-H?
11  A.      No.
12  Q.      What's the name of the 4-H chapter that E.L.
13  joined?
14  A.      Cow Creek.
15  Q.      And is that -- where -- do they have a
16  specific -- strike that.
17          Is there a specific location where they meet?
18  A.      Yes.
19  Q.      And where is that?
20  A.      It was in Palo Cedro.
21  Q.      I'm unfamiliar with the area.  Where is Palo
22  Cedro?
23  A.      It's a little town just east of Redding on
24  Highway 44 towards Lassen.
25  Q.      Okay.  And who -- to your knowledge, is there

---

Page 18

1  a -- is there a group leader of the Cow Creek 4-H in
2  Palo Cedro?
3  A.      Yes.
4  Q.      And what is his or her name?
5  A.      His name is Chad Fowler.
6  Q.      Anyone else?
7  A.      No.
8  Q.      And so E.L. joins the 4-H in September of 2021.
9  Can you tell me, did the -- was she -- did she attend
10  daily meetings, weekly meetings, monthly meetings?  How
11  does that all work for 4-H?
12  A.      The club meetings are monthly, one a month.
13  Q.      Okay.
14  A.      Starting in September up until the fair.
15  Q.      Okay.  And to your knowledge, from what you can
16  recall, did E.L. attend 4-H meetings monthly starting in
17  September of 2021?
18  A.      Yes.
19  Q.      I'll try to make it simple, but did she attend
20  monthly meetings all the way up to the time of the
21  incident in June of 2022?
22  A.      Yes.
23  Q.      Can you tell me generally some of the types of
24  activities 4-H talks to their members about during these
25  meetings?

---

Page 19

1          MR. GORDON: Calls for a narrative.  You can
2  answer.
3          THE WITNESS: They -- there's a bunch of club
4  requirements like they had to do a presentation, so she
5  did her first presentation.  And it was -- she did a
6  presentation on how to make cupcakes.  They also had to
7  do like a fundraiser and some type of community service.
8  They celebrated the birthdays at every meeting.
9          MR. NORTHCUTT: Q.  Do they -- do they -- do
10  they teach the 4-H members how to raise livestock?
11  A.      It depends on what project you join.
12  Q.      Okay.  Can you explain?
13  A.      So when you join the club, you just go to the
14  club meetings and then you can sign up for a project.
15  And there's all kinds of different projects.  And those
16  have separate meetings at different locations.
17  Q.      Okay.  Did E.L. sign up for any specific
18  projects in 4-H?
19  A.      Yes.
20  Q.      Okay.  And can you tell me what specific
21  projects she signed up for?
22  A.      The meat or market goat project.
23  Q.      Is it a meat or market goat, or is it -- are
24  those synonymous with each other; do you know?
25  A.      I feel like the terms were used interchangeably.

---

Page 20

1  Q.      Okay.  And how did you -- did she select that
2  kind of subgroup within 4-H or did -- or was it someone
3  else that did it for her?
4  A.      I chose it for her.
5  Q.      Okay.  And why did you pick that project in
6  particular?
7  A.      Well, several different reasons.  She wants a
8  horse one day, so I thought it would be good practice, a
9  little scaling it down.  And we had the opportunity to
10  keep him at our 4-H leader's house, which we didn't have
11  land, so I didn't know if we would get that opportunity
12  again.  And I just wanted her to have the practice being
13  responsible and caring for an animal and learning a
14  little bit about where her food comes from.
15  Q.      Was -- excuse my ignorance because I just really
16  don't know specifically enough about 4-H, but do they --
17  do you get to choose the animal that you raise in 4-H,
18  or is it assigned to you by the group leader?
19  A.      The actual animal, the individual animal?
20  Q.      Correct.
21  A.      You purchase your own animal.
22  Q.      Okay.  And as part of this meat or market goat
23  subgroup, did anyone ever give you an instruction to
24  purchase Cedar the goat, or was that your choice?
25  A.      The 4-H leader recommended.

---

Page 21

1      MR. GORDON: Objection. Compound. You can
2  answer.
3      THE WITNESS: Okay.
4      MR. NORTHCUTT: He's going to keep objecting.
5  That's fine.
6      MR. GORDON: Yeah, yeah. If, you know -- if you
7  don't understand the question or if Damian wants to
8  rephrase if he's unhappy with his question like I give
9  an objection and he's like, yeah, that was vague and he
10  rephrases, let's wait for him.
11      THE WITNESS: Okay.
12      MR. GORDON: But if I give an objection, I'm
13  preserving it on the record. But if you do understand
14  his question, you may answer. But yeah, if you don't
15  understand it, though, tell him. Or if he wants to
16  rephrase, he'll tell you.
17      THE WITNESS: Okay.
18      MR. NORTHCUTT: Can we get my prior question
19  read back and if it's not clear, I'll try to clear it
20  up. Like I said, if you don't understand, please tell
21  me.
22      THE WITNESS: Okay. Can you repeat it?
23      (Whereupon, the record was read by the
24      reporter.)
25      THE WITNESS: So I'll answer the first question,

Page 22

1  did anyone ever give instruction? The 4-H leader
2  recommended a breeder or to go find our own breeder,
3  someone who sells boar goats.
4      MR. NORTHCUTT: Q. Okay. And did you take his
5  advice and go find a breeder?
6  A.   Yes.
7  Q.   And where -- where did you ultimately end up
8  obtaining Cedar the goat?
9  A.   From a local breeder.
10  Q.   Do you recall if the breeder has a name or a
11  farm?
12  A.   Yes.
13  Q.   Okay. What was the name, if you can recall?
14  A.   Kay Deloza or Delaloza.
15  Q.   Is Kay as in K-a-y?
16  A.   I believe.
17  Q.   And do you know the Delaloza or how that's
18  spelled by any chance?
19  A.   I think it's -- I'm not completely sure. I
20  think it's D-e-l-o-z-a.
21  Q.   And do you recall approximately when you
22  purchased Cedar?
23  A.   The beginning of April, first couple days in
24  April.
25  Q.   April of 2022?

Page 23

1  A.   Yes.
2  Q.   Do you recall what you paid for Cedar?
3  A.   Yes.
4  Q.   How much was that?
5  A.   $350.
6  Q.   Were there any other expenses you paid for
7  Cedar, and I'll give you a for instance. When you
8  purchase a dog, a lot of times you have to have the
9  shots or the chips put in or whatever the case may be.
10  Was there any other incidental expenses that you paid
11  for Cedar at the -- when you purchased him in April of
12  2022?
13  A.   We paid for all of his expenses.
14  Q.   Okay. Can you explain what those expenses were?
15  A.   Food, a feed bucket. My husband and my daughter
16  built a shelter for him. We put up fencing. Water
17  bucket. They have special minerals. Baking soda. We
18  bought him milk pellets, alfalfa pellets. Alfalfa.
19  Sunflower seeds.
20  Q.   Okay. Anything else?
21  A.   I can't think of anything right now, but there
22  might have been more.
23  Q.   Did --
24  A.   His -- his show collar.
25  Q.   Okay. Anything further?

Page 24

1  A.   No.
2  Q.   Can you estimate or approximate what those
3  incidental costs that you just listed off cost you, if
4  you can give -- if you can't, that's fine. But if you
5  can think, oh, it's approximately a number?
6  A.   I think it was one or two bales of alfalfa hay
7  was $20 each, so it was 40. I want to say the feedbags
8  were like 30. Probably did four of them. So 160 about,
9  plus the buckets were probably 10 or 10 to 15 to 20. I
10  bought three of them.
11      MR. GORDON: Don't speculate if you don't
12  remember the costs.
13      THE WITNESS: Okay.
14      MR. GORDON: He's entitled to your best
15  estimate, though.
16      THE WITNESS: So best estimate, between 3 and
17  $500 is my best estimate. In addition to the cost of
18  Cedar.
19      MR. NORTHCUTT: Q. Okay. I know we've been
20  referring to Cedar. Cedar was a male goat, I'm
21  assuming, or we've been referring to him as "he"
22  throughout everything. Is that correct?
23  A.   Yes.
24  Q.   Was Cedar already named when you purchased him?
25  A.   No.

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 25

1 Q.    Did you -- did you -- strike that.
2      Did E.L. name Cedar?
3 A.    Yes.
4 Q.    Just out of curiosity, any particular reason she
5 went with Cedar?
6 A.    No.
7 Q.    Do you know approximately how old Cedar was when
8 you acquired him?
9 A.    Approximately three months.
10 Q.    Do you happen to have -- and I don't believe I
11 saw it produced in discovery.  Do you have any paperwork
12 or receipts showing your purchase of Cedar?
13 A.    No.  It was cash, and I didn't get a receipt.
14 Q.    Once you obtained Cedar, you mentioned
15 previously that your husband I think did something with
16 fencing; is that correct?
17 A.    Can you be more specific?
18 Q.    Sure.  I'm trying to figure out earlier you I
19 think you testified that Cedar could kind of be housed
20 somewhere at I believe it was the Chad Fowler's --
21 A.    Yes.
22 Q.    -- property; is that correct?
23 A.    Yes.
24 Q.    Okay.  Between 2021 and 2022, when the incident
25 occurred, is that where Cedar the goat primarily lived?

Page 26

1 A.    Yes.
2 Q.    Okay.  So not on your -- not on your property?
3 A.    No.
4 Q.    Okay.  What was your understanding -- having
5 purchased Cedar, what was your understanding in terms of
6 what you were supposed to do with Cedar in 4-H?
7      MR. GORDON: Vague as to time.
8      MR. NORTHCUTT: In 2021 and 2022.
9      THE WITNESS: Can you repeat?
10      MR. NORTHCUTT: Sure.  So E.L. has been enrolled
11 in the meat or market goat subprogram.  The -- somebody
12 from 4-H recommended that you go to, and correct me if
13 I'm saying anything wrong here, somebody from 4-H
14 recommended you find a local breeder.  You went to Kay
15 Deloza and obtained Cedar.  And now is the -- what was
16 your understanding of what you were supposed to do with
17 Cedar, now that you've obtained him, what was -- what
18 was your understanding that 4-H wanted you to do with
19 Cedar?
20      MR. GORDON: Objection.  Just vague as to time,
21 Damian.  Do you mean the time she purchased him or
22 subsequently?
23      MR. NORTHCUTT: Q.  Well, we can take it from
24 the beginning.  So we're in, what was it, September when
25 she was purchased?  I mean he.

Page 27

1 A.    April.
2 Q.    April.  Okay.  He's purchased in April of 2022,
3 correct?
4 A.    Yes.
5 Q.    At that time once you purchased the goat, was
6 there some sort of expectation in your mind that 4-H
7 expected you to do something with this goat?
8 A.    She was to care for him daily, to feed him
9 daily.
10 Q.    Okay.
11 A.    Make sure he had water.  And then be able to --
12 she had to be able to handle him and hold him and walk
13 him for the fair.  And if he had any diseases come up
14 along the way, she was to take care of those.
15 Q.    Was there a requirement from 4-H that when -- if
16 you purchased a goat under their program that they --
17 that you had to enter it into a fair at a later date?
18 A.    To complete the project, you had to enter into
19 the fair and to earn a little star or that you've
20 completed the project.
21 Q.    Okay.  So in April of 2022, through June of
22 2022, and maybe I've asked this, I'm not trying to
23 repeat myself, Cedar was housed at Chad Fowler's
24 property, correct?
25 A.    Yes.

Page 28

1 Q.    Okay.  And during that time, so we're talking
2 about it was between April and June of 2022, did E.L.
3 feed Cedar?
4 A.    Yes.  Every day except for probably two or three
5 days.
6 Q.    On those two or three days when she did not feed
7 him, do you know who did?
8 A.    I did one day.  She was just really sick.  And
9 then I think one or two days we went out of town, and I
10 asked Mr. Fowler to.
11 Q.    Aside from E.L., you and Chad Fowler feeding
12 Cedar, are you aware of anyone else who fed Cedar during
13 that time period?
14 A.    No.
15 Q.    Are there any other activities that E.L. did
16 with Cedar between April and June of 2022?
17      MR. GORDON: Vague as to "activities."
18      THE WITNESS: She -- I had her walk him every
19 day.  I would point to a spot down the driveway and tell
20 her to walk across the field and asked her to walk him
21 there and back to make sure that she could handle him
22 and he couldn't get away from her.
23      MR. NORTHCUTT: Q.  How far away is Chad
24 Fowler's property versus where you were living at that
25 time?

Page 29

1  A.    Approximately 15-minute drive.
2  Q.    And did Chad Fowler give you his consent to come
3  on to the property and take care of Cedar during this
4  time period?
5  A.    Yes.
6  Q.    Okay.  So we talked about E.L. feeding Cedar
7  during this time period and walking Cedar during this
8  time period.  Were there other activities, I know vague,
9  that she did with Cedar during this time period?
10 A.    She touched him every day and touched his legs
11 so that he wouldn't flinch.  And then she practiced it's
12 called bracing where they position them for the judges
13 to look at their body and their stance.  So she
14 practiced bracing him.
15 Q.    You mentioned him flinching.  It's difficult to
16 probably describe, but for example, if you have a dog
17 that is aggressive towards people, you could probably
18 say, well, the demeanor of the dog is aggressive, stay
19 away from the dog.
20        What would you -- can you give an overall kind
21 of like what you believe kind of Cedar's demeanor was
22 during this time period, so we're talking April of '22
23 to June '22?
24 A.    He was just sweet.  He was just sweet.  You
25 know, at first he was scared, and then he would like run

Page 30

1  up to her.  He was friendly.  He was very, very dog-like
2  but -- more dog-like than I expected.  But yeah, he had
3  a very nice demeanor.
4  Q.    Have you before Cedar ever owned a goat?
5  A.    No.
6  Q.    What about E.L.?
7  A.    No.
8  Q.    How about anyone in your family, in your
9  immediate family in your house?
10 A.    No.
11 Q.    Do you need to take a break?
12 A.    No.  I think I'm okay.
13 Q.    If you ever need to take a break, just let me
14 know.
15 A.    Okay.  Thank you.
16 Q.    We've talked about E.L. taking Cedar for walks.
17 Was there anyone else that took Cedar for walks during
18 this timeframe?  And I keep saying "timeframe."  I'm
19 referring to April 2022 to June 2022.
20 A.    Okay.  Most of the time I would take her.  And
21 then in the beginning she held him by like his collar,
22 and I held the leash behind her to make sure that if he
23 pulled away that I still had him and we weren't chasing
24 him everywhere.  So I helped her, and then my husband
25 also took her sometimes to feed Cedar, and he helped her

Page 31

1  also.
2  Q.    Okay.  When -- can you give me an estimate --
3  you said E.L. basically took care of Cedar daily during
4  this timeframe; is that correct?
5  A.    Yes.
6  Q.    Okay.  And during that timeframe, can you give
7  me an estimate of how long E.L. would go over to Chad
8  Fowler's property to take care of Cedar?
9  A.    Anywhere between like 15 minutes and an hour
10 each day.
11 Q.    To your knowledge, were there other members of
12 this meat or market goat subgroup in the 4-H?
13 A.    Yes.
14 Q.    Do you know how many others?
15 A.    Can you be more specific like all of Shasta
16 County or --
17 Q.    Cow Creek.  The Cow Creek 4-H.
18 A.    Cow Creek.  I estimate between like three to
19 five other kids with goats.
20 Q.    Did you ever --
21 A.    Actually I believe five other kids in addition
22 to Eliza.
23 Q.    Did you ever research or look into the meat or
24 market subgroup what the purpose of that group was?
25        MR. GORDON:  Vague as to time.

Page 32

1        MR. NORTHCUTT: Prior to joining it.
2        THE WITNESS: Prior to joining?
3        MR. NORTHCUTT: Yes.
4        THE WITNESS: No.
5        MR. NORTHCUTT: Do you have an understanding of
6  what a meat or market goat is?
7        MR. GORDON: Vague as to time.  You mean now?
8        MR. NORTHCUTT: Q.  Let's start with back then
9  when you acquired Cedar.
10 A.    No.  We joined to learn.
11 Q.    No one told you what a market goat was at that
12 time?
13 A.    I knew he would be sold at auction.
14 Q.    Okay.  Did you understand what he'd be sold for?
15 A.    I knew we were learning about him for meat and
16 that he would most likely be sold for meat but not with
17 certainty.  I didn't know with certainty.
18 Q.    In addition to feeding Cedar and taking him for
19 walks, were there any other activities that E.L. did
20 with him between April 2022 and June 2022?
21 A.    Yes.
22 Q.    And can you tell me what those activities were?
23 A.    She took him to an event called ag field day.
24 Q.    Can you tell me what ag field day is?
25 A.    I believe it was like a -- it's an event that's

Page 33

1  kind of like a preparation for the fair.  They can show
2  their animals and practice showing the animals.
3  Q.     Okay.  Anything else you can think of that E.L.
4  did with Cedar during that timeframe?
5  A.     As we got closer to fair she -- she washed him
6  and then she shaved him.
7  Q.     Was there -- so is that -- would you classify
8  that as grooming?
9  A.     Yes.
10  Q.     Was there anyone else that also groomed Cedar
11  during this timeframe?
12  A.     Another child in 4-H helped her learn how to
13  shave him and wash him.
14  Q.     Did -- strike that.
15         Were there any -- any particular members of 4-H
16  that kind of regularly assisted E.L. with feeding Cedar
17  or grooming Cedar?  I know those are two different
18  questions.  We'll start with feeding Cedar during the
19  timeframe.
20         MR. GORDON:  Time period around ag field day
21  or --
22         MR. NORTHCUTT:  Q.  April 2022 to June 2022.
23  A.     Yes.  My daughter fed him every afternoon.
24  Q.     Okay.
25  A.     And so we didn't have to make two trips there

Page 34

1  every day --
2  Q.     Okay.
3  A.     -- Mr. Fowler fed him in the mornings.
4  Q.     Okay.  No, I mean any other members of 4-H so
5  any other --
6  A.     Any other kids feed Cedar?
7  Q.     Yeah.  Did she have a friend that they both went
8  together daily?
9  A.     She had a friend from the neighborhood that
10  would go sometimes with her to feed Cedar, but that
11  little girl didn't have her own goat.
12  Q.     Okay.  I assume if I ask for that girl's name
13  that we're under the protective order.  That's
14  confidential, and it's not going to be disclosed because
15  we had everyone sign it.
16         MR. GORDON:  That's my assumption.
17         MR. NORTHCUTT:  Q.  Do you know the girl's name
18  that we just discussed that helped your daughter?
19  A.     ███████
20  Q.     Do you know a last name?
21  A.     ███████
22  Q.     Anyone else you can think of?
23  A.     That helped feed Cedar?
24  Q.     Right.
25  A.     No.

Page 35

1  Q.     Okay.
2  A.     At the fair I believe some of the other kids
3  helped.
4  Q.     We'll get to the fair at a later point.
5  A.     Okay.
6  Q.     What about grooming, did any other -- does she
7  have any other members in 4-H that helped her with that
8  or friends in the neighborhood?  We can take it one at a
9  time.  Members in 4-H?
10  A.     Yes.  Another child in 4-H helped show her how
11  to groom him.
12  Q.     Do you know her name or his name?
13  A.     ███████
14  Q.     Okay.  Do you have a last name?
15  A.     ███████
16  Q.     Is that a daughter of ███████?
17  A.     Yes.
18  Q.     Anyone else you can think of?
19  A.     No.
20  Q.     When did you decide to enter Cedar into the
21  Shasta District Fair which occurred it was in late June
22  of 2022?
23  A.     I believe I signed him up for the fair around
24  mid-May.
25  Q.     Did -- was that your decision or did -- was that

Page 36

1  your decision to do that?
2  A.     It was part of the 4-H process, and then, yeah.
3  Q.     Can you explain what you mean by that, "part of
4  the 4-H process"?
5  A.     To take your animal to the fair at the end.
6  Q.     Okay.  But I mean you signed Cedar up for the
7  fair, correct?
8  A.     Yes.
9  Q.     Okay.  Did -- was that your decision, or was
10  that something E.L. wanted you to do or both?
11  A.     Around that point she had started bonding with
12  him, so I started looking for other places to keep him.
13  But --
14         MR. GORDON:  Jessica, answer his question,
15  though.  Whose decision was to sign up for the fair?
16  Did both you and E.L. both talk about it?
17         THE WITNESS:  It was both of our decisions.
18         MR. NORTHCUTT:  Q.  Okay.  You just referenced
19  wanting to find other places to keep him.  Why were you
20  looking for other places to keep him?  Cedar?  During
21  this timeframe?
22  A.     Because I didn't know who would buy him at the
23  auction and what would happen to him.
24  Q.     This is in mid-May, right, of --
25  A.     Yes.

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

Page 37

1 Q. -- 2022?

2 A. Yes.

3 Q. Was one of your concerns at that time in May of
4 2022, that Cedar would be sold and slaughtered for meat?

5 A. Yes.

6 Q. Did you actually reach out to any individual to
7 try to find a different location for Cedar?

8 A. Yes.

9 Q. Where did you reach out to?

10 A. I had a coworker with land, and I asked him if
11 he was interested in having Cedar there. I also met a
12 lady at a feed store.

13 Q. The coworker, does that person have a name?

14 A. Yes.

15 Q. What is his or her name?

16 A. Lee.

17 Q. And what's the last name?

18 A. Mosier.

19 Q. Do you know how that's spelled?

20 A. M-o-s-i-e-r.

21 Q. Do you know where Lee Mosier currently works or
22 how we can get in contact with that person?

23 A. He works for the Bureau of Reclamation.

24 Q. Okay. So you mentioned Lee Mosier, and you also
25 spoke with a woman at a feed store; is that correct?

---

Page 38

1 A. Yes.

2 Q. Do you know that woman's name?

3 A. I can't remember her name. But I feel like it
4 might be Deanna, but that's a guess. I don't
5 specifically remember.

6 Q. Okay. Don't guess. That's fine.

7 A. Okay.

8 Q. Do you know the feed store -- the name of the
9 feed store?

10 A. Yes. It was the Palo Cedro Feed. But she was
11 a -- she was just shopping there. She wasn't an
12 employee there.

13 Q. Okay. When you reached out to Lee Mosier
14 regarding -- strike that.

15 What did you say to Lee Mosier about Cedar in
16 May of 2022?

17 A. I said that my daughter had joined 4-H and
18 didn't feel good about the outcome of the auction, and
19 we were looking for a different place for him so we
20 wouldn't have to go to the fair.

21 Q. And what did Lee say in response to that?

22 A. He said that he wasn't really interested in
23 having a goat and there's mountain lions around where he
24 lives so it probably wasn't safe on his property.

25 Q. Okay. The woman that you spoke with at Palo

---

Page 39

1 Cedro Feed, is that the right name?

2 A. Uh-huh.

3 Q. When you spoke with her in May of 2022, about
4 Cedar, what did she say, or what was the conversation?

5 A. Again, that my daughter had joined 4-H and had
6 bonded with a goat and didn't feel good about taking him
7 to the fair and knowing he could be auctioned off most
8 likely for meat.

9 And I don't know, she told us about someone she
10 knew that had goats and liked goats and that might be
11 interested in taking him. So I --

12 Q. Did -- did -- did she give you the name of
13 anyone that might be able to house Cedar?

14 A. No. No.

15 Q. In addition to these two individuals, did you
16 speak with anyone about a different location for to
17 house Cedar in May of 2022?

18 A. No. But there was one other person in June.

19 Q. Okay. What's that person's name?

20 A. Mike Cary.

21 Q. And do you know how you spell his last name?

22 A. C-a-r-y.

23 Q. And what did you discuss with Mike Cary
24 regarding Cedar in June of 2022?

25 A. I believe it was the day before the fair before

---

Page 40

1 she had to bring Cedar to the fair.

2 Q. Okay.

3 A. And she was out delivering her packet for the
4 bidders, and it was the mechanic that I go to.

5 Q. Can you tell me what the bidders is?

6 A. People who attend auction that bid on the
7 animals.

8 Q. Oh, it's bidders. I thought it was -- I was
9 picturing bitter like tasting something bitter.

10 A. Oh, okay. Sorry. My speech wasn't clear.

11 Q. No, no. I need a hearing aid.

12 Okay. So the day before the fair you spoke with
13 Mike Cary and where -- do you have any sort of contact
14 information for Mike Cary if we wanted to talk with him?

15 A. It's Cary's Automotive on Lake Boulevard.

16 Q. And is that in --

17 A. Redding.

18 Q. Redding? Okay. And what did you say to Mike
19 Cary about Cedar the goat in June of 2022, the day
20 before the fair?

21 A. Just that she was taking him to the fair and
22 that people could purchase him. And he -- he told a
23 story about a goat that he had that it sounded like he
24 had bonded with. He talked about like how the goat put
25 his, you know, paws — hooves on his shoulders. And I

---

Challe, Fisher & Morfin
Redding, California   (530)246-0942

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

Page 41

1   don't know, he -- so we just kind of talked about, you
2   know, the friendliness of goats.  Of these goats.  Of
3   our goats.
4           And we asked if he would want to keep him alive,
5   and if so, we would give him to him and not go to the
6   fair.
7   Q.    Take your time.
8   A.    So --
9   Q.    Should we take a break?
10          MR. GORDON: Yeah, let's take a break.  I have
11   to use the restroom anyway.
12          MR. NORTHCUTT: Okay. We can go off the record.
13          THE VIDEO SPECIALIST: We're off the record, and
14   the time is 10:01.
15          (Whereupon, a break was taken from 10:01
16          till 10:14 a.m.)
17          THE VIDEO SPECIALIST: We're back on the record,
18   and the time is 10:14.
19          MR. NORTHCUTT: Q.  We were just on a short
20   break.  We're back on the record.  Ms. Long, you
21   understand that -- or Mrs. Long, sorry, you understand
22   that we are still under penalty of perjury under oath
23   proceeding, correct?
24   A.    Yes.
25   Q.    Great.  So we spoke about your conversation with

---

Page 42

1   Lee Mosier and with the coworker of Palo Cedro Feed.  I
2   believe we left off with talking your conversation with
3   Mike Cary.
4           And if I'm getting this incorrect, did you --
5   did you ask Mike Cary if he could take Cedar the goat to
6   his property?
7   A.    Yes.
8   Q.    And what was his response to that?
9   A.    He wanted to, but he was having surgery so
10   didn't think he could care for him.
11   Q.    Aside from talking with Lee Mosier and the
12   feed -- was it employee or was it a --
13   A.    It was just a customer.
14   Q.    Okay.  Feed customer.  Did you know that
15   customer?
16   A.    No.  We just started talking in the aisle.
17   Q.    Okay.  Then you don't know that person's name?
18   A.    Well, I gave you my guess, and you said don't
19   guess so I don't -- I don't know for sure.
20   Q.    No guessing.  That's fine.
21   A.    So no.
22   Q.    And so aside from Lee Mosier, the woman in the
23   feed store and Mike Cary, did you have any conversations
24   with -- about placing Cedar at another location in May
25   of 2022?  Or we'll start with May, and then we'll go to

---

Page 43

1   June.  In May of 2022?
2   A.      Eliza's friend's mom, they had land, and the
3   girls were friends.  And as I realized he was easy --
4   easier to walk, like he was being trained basically to
5   be friendly around humans, so I texted her.  I had
6   learned about you can train goats to pull carts just
7   like ponies.  So I was learning about the carts, and I
8   just thought that would be a nice next step since he was
9   trained to be friendly and to walk on a leash.
10          So I had texted her and asked her if, you know,
11   if she'd be interested in keeping the goats, and we can
12   have the girls learn how to cart train them next.  And
13   she just kind of did a laugh emoji symbol, I believe.
14   Q.    Okay.
15   A.    So she wasn't interested.
16   Q.    What was her name?
17   A.    ████████████
18   Q.    ████████████
19   A.    ████████████
20   Q.    ████████████
21   A.    ████████████
22   Q.    Do you know where she resides?
23   A.    She's in Manton.  It's about an hour drive from
24   here towards Mt. Lassen.
25   Q.    Do you know how you spell Manton?

---

Page 44

1   A.    M-a-n-t-o-n.
2   Q.    Okay.  Okay.  So other than ████████, Lee
3   Mosier, the woman in the feed store or Mike Cary, can
4   you recall having conversations with anyone in May or
5   June of 2022, regarding placing Cedar at another
6   location?
7   A.    No.
8   Q.    Did -- did you -- aside from Cedar being entered
9   in the fair, did you enter any other animals into the
10   Shasta Fair in June of 2022?
11   A.    No.
12   Q.    What about E.L., did she enter any other
13   animals?
14   A.    No.
15   Q.    How about in your immediate household, were
16   there any other animals entered in the fair?
17   A.    No.
18   Q.    You mentioned earlier that at 4-H there were
19   monthly meetings essentially from when E.L. signed up
20   until the date of the -- until approximately June of
21   2022, correct?
22   A.    Yes.
23   Q.    Okay.  During those monthly meetings, was it
24   ever discussed that the animals being raised would
25   ultimately be part of a terminal sale?

---

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 45

1  A.    No.
2  Q.    Not once?
3  A.    Not that I remember.
4  Q.    Was it ever mentioned that any of the animals as
5  part of the program would ultimately be slaughtered for
6  their meat?
7  A.    Not with certainty.
8  Q.    Okay.  What do you mean by "not with certainty"?
9  A.    That most likely people would be buying them for
10  meat, but I didn't know that they would be killed
11  immediately after the fair.
12  Q.    Who at 4-H informed you of the fact that they
13  would most likely be sold for meat?
14  A.    I believe Chad Fowler did.
15  Q.    And do you know approximately when Chad Fowler
16  informed you?
17  A.    Probably in September or October of is that
18  2021?
19  Q.    September or October 2021?
20  A.    Yes.
21  Q.    Did you ever ask Chad Fowler if they had to
22  be -- that the animals entered in the 4-H program if
23  there was an alternative to them being slaughtered for
24  the meat?
25  A.    No.

Page 46

1  Q.    Did you --
2  A.    I -- I mean, I just -- they just said they would
3  be sold at auction.  It wasn't till a few weeks before
4  that I learned that they all left on a truck to the
5  slaughterhouse as soon as the fair was over.
6  Q.    But I think you previously testified that you --
7  Chad Fowler informed you in September or October of
8  2021, that they would be sold for meat but you -- but
9  you didn't know with -- you didn't know precisely that
10  it would be immediately thereafter; is that correct?
11  A.    I knew that they would be -- he said they would
12  be sold at auction and most -- you know, and most likely
13  people buy them for meat.
14  Q.    Okay.
15  A.    But I thought people were buying a live animal
16  that they could choose to do what they wanted with.
17  Q.    Did -- aside from Chad Fowler mentioning that
18  the animals could be used for meat, did anyone else at
19  4-H ever talk to you about the terminal sales of
20  livestock?
21  A.    No.  I didn't see the word, "terminal," until I
22  read the fair rules at the fair.  That's when I had
23  time.  I was sitting there in the barn, and that's when
24  I read the rules and saw the word, "terminal."
25  Q.    Okay.  Well, we'll get to the fair in just a

Page 47

1  little bit here.
2        Prior to going to the fair on June 25th, 2022,
3  did you ever contact anyone with the Shasta District
4  Fair and Event Center about removing Cedar from the
5  auction?
6  A.    Prior to the fair?
7  Q.    Correct.
8  A.    No, because -- no.
9  Q.    Did you, prior to the fair, so let's say in June
10  of 2022, did you ever speak with anyone at 4-H about not
11  proceeding with the fair with presenting Cedar at the
12  fair?
13  A.    No.
14  Q.    And when I say talk with, I also mean did you
15  send any writings to anyone at 4-H regarding removing
16  Cedar from the fair prior to June 25th, 2022?
17  A.    Was he -- can you say that again?
18  Q.    Sure.  So you mentioned there was no
19  communications.  I'm asking did you write anyone from --
20  at 4-H prior to the fair about removing Cedar from
21  proceeding at the fair?
22  A.    Wasn't he at the fair on June 25th?
23  Q.    I'm asking before that.  So in June of that
24  year.
25  A.    Before --

Page 48

1  Q.    Before the fair before he actually -- before
2  Cedar's actually at the fair, did you ever write anyone
3  at 4-H asking if you could remove Cedar from the fair?
4  A.    No.
5  Q.    Okay.  Same question but instead of 4-H, we're
6  talking about the Shasta District Fair.  Did you ever
7  write anyone there and ask if he could be removed from
8  the fair prior to presenting Cedar at the fair?
9  A.    No.
10  Q.    Did anyone at 4-H ever specifically tell you
11  that Cedar has to participate in the fair in June of
12  2022?
13  A.    We were told that the project wouldn't be
14  completed if they don't participate at fair.
15  Q.    Okay.  But did anyone specifically say to you
16  Cedar the goat as part of this 4-H project, he has to be
17  in the fair?
18  A.    As part of the 4-H project, well, you could
19  quit.
20  Q.    Okay.  And did anyone ever tell you you couldn't
21  quit?
22  A.    Once you're at -- I was told once you're at the
23  fair, you can't leave.  You can't quit once you're
24  there.
25  Q.    Did you ever -- earlier you testified that you

Page 49

1  were concerned that Cedar might be used for meat, and
2  you spoke with a few people, Lee Mosier, the woman at
3  the feed store, Mike Cary. Since you had that concern,
4  did you ever think, let's say in May of 2022, why not
5  quit 4-H and just not go forward with the fair?
6  A.    I didn't have a place to keep him.
7  Q.    What about in June, did you ever think to
8  yourself I'll just quit 4-H and Cedar won't have to be
9  in the fair?
10 A.    Yes.
11 Q.    And why didn't you quit 4-H?
12 A.    Because I couldn't find a place to keep him.
13 And I couldn't keep him at my home per the zoning and
14 the laws of the city.
15 Q.    Was, to the best of your knowledge, was Eliza
16 ever aware that if Cedar went to auction at the Shasta
17 District Fair in June 2022, that he would ultimately end
18 up being slaughtered for meat?
19 A.    At what point in time?
20 Q.    At any point between when you purchased the goat
21 in April and June of 2022.
22        MR. GORDON: Vague as to time. Damian, you
23 said -- I'm sorry. Damian, are you saying prior to the
24 fair?
25        MR. NORTHCUTT: Prior to the fair.

Page 50

1        THE WITNESS: I'm sorry, can you repeat it
2  again?
3        MR. NORTHCUTT: Q. Sure. So prior to the fair
4  at any point, so we're talking about between April of
5  2022 and June of 2022, what to your knowledge, was --
6  did E.L. have any understanding that her goat would
7  ultimately be put up -- sold for meat if it -- if it was
8  presented and bid upon at the fair?
9  A.    Not with certainty.
10 Q.    Did you ever have a discussion with her about
11 it?
12 A.    Yes. I told her that I couldn't find a place
13 for him to stay, so I couldn't let her quit because I
14 didn't have a place for him. And then at that point we
15 knew there was no way getting out of it once you're at
16 the fair.
17 Q.    When -- this conversation you described, do you
18 recall on what day or approximately what day you spoke
19 with her about?
20 A.    The day before the fair -- the day before we
21 dropped him off I told her I was sorry I didn't find a
22 place for him and that we couldn't keep him.
23 Q.    And do you need to take a break?
24 A.    No.
25 Q.    Did -- what was E.L's response to that?

Page 51

1  A.    She was sad but she knew -- she knew I couldn't
2  keep him in the backyard. So we tried to make the best
3  of it and stay positive.
4  Q.    Prior to the day before the fair, did you have
5  any conversations with E.L. about Cedar being a terminal
6  sale?
7  A.    I talked to her about it about two weeks, two
8  weeks before when I found out that they leave
9  immediately after the fair on a processing truck to the
10 slaughterhouse. So I told her that people can't buy
11 them and keep them, that they all leave immediately. So
12 I did tell her when I learned that.
13 Q.    And what was her response to that?
14 A.    She was sad.
15 Q.    Let's talk about the actual day of the fair. So
16 this is June 25th, 2022. Can you describe to me kind of
17 how the day started? Did you -- what time did you wake
18 up?
19        MR. GORDON: Objection as to "day of the fair."
20        THE WITNESS: It's a week long.
21        MR. NORTHCUTT: Q. I apologize. Let's talk
22 about one of the days of the fair, June 25th, 2022.
23 What time did you wake up?
24 A.    June 25th, was that Saturday?
25 Q.    I don't know off the top of my head here. I can

Page 52

1  figure that out.
2  A.    I think I remember --
3  Q.    June 25th, 2022, was a Monday. Does that sound
4  right?
5        MR. GORDON: June 5th or 25th?
6        MR. NORTHCUTT: Oh, I'm in July. I apologize.
7  25th, it's a Saturday.
8        MR. GORDON: Saturday, I believe.
9        MR. NORTHCUTT: Q. It's a Saturday, yeah.
10 A.    So that was the last day of the fair.
11 Q.    Okay. What time did you wake up?
12 A.    I don't remember.
13 Q.    Okay. Do you have an approximate estimate you
14 can give me?
15 A.    I believe we had to be at the fair at around 8
16 or 9, so I woke up in time to get to the fair.
17 Q.    Okay. What's the first thing you did when you
18 woke up?
19        I can do this one of two ways. I can go step by
20 step like tell me, you know, what time you ate
21 breakfast, what happened next. Or I can just ask you
22 walk me through the day of the fair, which I'm going to
23 get an objection that I'm calling for a narrative. But
24 I can go either way, so.
25 A.    Step by step is fine.

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 53

1 Q.    So approximately what time did you wake up, if
2 you can recall?
3 A.    Approximately 7 a.m.
4 Q.    And then what was the first thing you did after
5 you woke up?
6 A.    Probably went to the bathroom. But that's a
7 guess. So I don't know.
8 Q.    Can you tell me approximately what time E.L.
9 woke up?
10 A.    Approximately 7 a.m.
11 Q.    Okay. And do you know what E.L. did first thing
12 after she woke up, if you know?
13 A.    I don't -- I don't remember.
14 Q.    Okay. So after you used the restroom, what was
15 the next step you took on that day?
16 A.    I don't remember.
17 Q.    Okay. At any point -- okay. Strike that.
18      What time did you leave for the fair on June
19 25th, 2022?
20 A.    Leave to go to the fair?
21 Q.    Correct.
22 A.    Well, I think we had to be there approximately
23 around 8 or 9 to feed him, so we probably left 30
24 minutes before that. So 7:30 or 8 is my estimate on
25 when we left.

Page 54

1 Q.    Okay. And that's the morning or the evening?
2 A.    The morning.
3 Q.    So you left approximately 7:30, 8 in the
4 morning. Did you go to Chad Fowler's to pick up the
5 goat and then go to the fair?
6 A.    No.
7 Q.    Did you go -- okay. Did you go directly to the
8 fair?
9 A.    Yes.
10 Q.    And how far away is the fair from your home?
11 A.    Approximately 30 minutes.
12 Q.    Okay. And how did Cedar the goat get to the
13 fair?
14 A.    He was already at the fair on the 25th.
15 Q.    Okay. How did he get to the fair on the 25th?
16 A.    We dropped him off --
17      MR. GORDON: Damian, I think there's -- he's
18 been there -- Cedar's been at the fair for like four
19 days at this point.
20      THE WITNESS: They stay overnight there.
21      MR. NORTHCUTT: Q. Okay. Do you know who
22 brought Cedar to the fair earlier?
23 A.    I brought Cedar to the fair when it was the
24 check-in time, and then you leave them overnight there.
25 Q.    Okay. So what was the check-in time?

Page 55

1 A.    My estimate is it was 4 p.m. on the Tuesday
2 prior to Saturday the 25th.
3 Q.    So if it was Tuesday prior to the 25th, that
4 looks like it would be the 21st. Does that sound about
5 right?
6 A.    Yes.
7 Q.    So you drop Cedar off at the fairgrounds on
8 Tuesday, June 21st, to your knowledge?
9 A.    Yes.
10 Q.    Okay. So Cedar was there on the 22nd?
11 A.    Yes.
12 Q.    And he was there on the 23rd?
13 A.    Yes.
14 Q.    And the 24th?
15 A.    Yes.
16 Q.    And then the 25th?
17 A.    Yes.
18 Q.    At any time between the Tuesday when you dropped
19 him off and the -- before the Tuesday the 21st and let's
20 say Friday the 24th, did you visit Cedar?
21 A.    Every day.
22 Q.    And what about E.L.?
23 A.    Every day.
24 Q.    And when you did it every day, how long did you
25 stay with Cedar?

Page 56

1 A.    All day.
2 Q.    All day?
3 A.    From 7 or 8 in the morning to probably 5 or 6 at
4 night.
5 Q.    And what did you do with Cedar during those
6 days?
7 A.    She fed him. She changed his water. She
8 cleaned his pen. They had practices for the show. They
9 had shows.
10 Q.    We talked about earlier that you had had a
11 discussion with E.L. about it being a terminal fair
12 before the fair, that you were aware of that. And he's
13 at the fair Tuesday, June 21st approximately. Did you
14 ever think to yourself let's just not go through with
15 the fair? Let's just keep Cedar?
16 A.    At what point in time?
17 Q.    Let's say between Tuesday, June 21st and the
18 24th of June.
19 A.    Yes.
20 Q.    And is there a reason you didn't remove Cedar
21 from the fair?
22 A.    We were told that -- I asked -- I asked around,
23 and people said nobody ever leaves the fair while you're
24 here when you're checked in and that you can't.
25 Q.    Who specifically did you ask?

Page 57

1  A.    I believe it was Chad Fowler I asked if we could
2  leave.
3  Q.    And what was his response?
4  A.    I don't remember specifically, but I think he
5  said, "I don't know.  Nobody's ever left before."
6  Q.    Okay.  Do you know what day you had that
7  conversation with Chad Fowler?
8  A.    It was -- we checked him in on the Tuesday, I
9  believe, and it was -- I believe it was right before --
10  right before one of the shows maybe on Wednesday at
11  around 10 a.m. is my best estimate.
12  Q.    Did you -- did you -- what -- what was your --
13  what was the sum or substance of your conversation with
14  him?  What did you talk to him about?
15        MR. GORDON:  Asked and answered.  You can
16  answer.  I'm putting my objection.  Asked and answered.
17        THE WITNESS:  Oh, asked and answered?
18        MR. GORDON:  Yeah, but he's asking again, but
19  you can answer again.
20        MR. NORTHCUTT:  Q.  I just want to make sure
21  that I'm clear.  You mentioned something about he said
22  something like no one's ever -- I'm not sure.  No one's
23  ever done -- what I'm trying to figure out is what
24  specifically did you say to him?
25  A.    It wasn't a long conversation.  I just asked if

Page 58

1  we could leave and take him.  I thought I had mentioned
2  that I finally found a place that we could keep him.
3  Q.    Had you found a place that you could keep him?
4  A.    Yeah.
5  Q.    Okay.  Where?  Where?
6  A.    It was the night she turned him over to the fair
7  I just felt really bad still.  Felt bad that I wasn't
8  able to find a place for him.  But I just remember I
9  laid down and I was just looking at my phone and I just
10  thought I wonder if there's a goat rescue that would
11  take him, and I searched goat rescues.
12  Q.    So this is the night before the --
13  A.    This was the night when she turned him in.  You
14  know, that she entered him into the fair.
15  Q.    So is that June 21st, 2022?
16  A.    I believe.
17  Q.    Okay.  So on June 21st, 2022, you're looking on
18  your phone to see if there's another place that you
19  could possibly put him such as a goat rescue; is that
20  correct?
21  A.    (Nods head up and down.)
22  Q.    Okay.  And did you contact any goat rescue on
23  June 21st, 2022?
24  A.    When I -- yes.
25  Q.    Okay.  Which one?

Page 59

1  A.    Bleating Hearts Farm.
2  Q.    And when you spoke with Bleating Hearts Farm,
3  who did you speak to there?
4  A.    I didn't speak with anyone.
5  Q.    Did you email or text somebody?
6  A.    I emailed.
7  Q.    Okay.  Who did you email?
8  A.    I don't remember the specific address.  It might
9  have been Bleating Hearts Farm or --
10  Q.    Okay.  Fair enough.  And did somebody respond to
11  your email?
12  A.    The next -- I believe it was the next day, and
13  that was right before the show.
14  Q.    Okay.  So you -- so you -- let me just for
15  chronological purposes, you emailed someone from
16  Bleating Hearts Farm on June 21st, 2022; is that
17  correct?
18  A.    I believe that was the date, yes.
19  Q.    And then you got a response from someone at
20  Bleating Hearts Farm on June 22nd; is that correct?
21  A.    I think it was about a day later.  It might have
22  been two.
23  Q.    And do you know who responded to your email?
24  A.    Kristin Starkey.
25  Q.    What -- what was -- tell me what the substance

Page 60

1  of your email to Bleating Hearts Farms was on June 21st,
2  2022.
3  A.    I haven't reviewed it in a while, but I believe
4  I just told her that we had entered 4-H in the fair and
5  my daughter, we were feeling bad about it, and wanted to
6  find a different solution.
7  Q.    When you say you were feeling bad about it, why
8  were you feeling bad about it?
9  A.    Because my daughter bonded with Cedar.
10  Q.    And you were worried that he would be a terminal
11  sale, correct?
12  A.    Yes.
13  Q.    Okay.  So in response to that, Kristin Starkey
14  wrote you back approximately a day or two later, and
15  what was her response then?
16  A.    I don't remember exactly but that she -- she
17  could help me find a solution or that she might -- it
18  might have been that she knew someone who could take
19  him.
20  Q.    Okay.  So this is in -- this is approximately if
21  you emailed on the 21st, and she got back to you a day
22  or two later, you're talking about the 22nd or 23rd; is
23  that correct?
24  A.    Yes.
25  Q.    So around the 22nd or 23rd Kristin Starkey is

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 61

1 emailing you saying we might have found a solution,
2 right?
3 A.    Yes.
4 Q.    Okay. Did you think to yourself at that point,
5 hey, we might have a possible location for Cedar. Would
6 you pull him out of this fair?
7 A.    Yes.
8 Q.    And did you decide to pull him out of the fair?
9 A.    Well, I wanted to. I started reviewing the fair
10 rules. I started trying to find the fair rules to see
11 exactly what I had signed up for and if there was like
12 an exit clause or a way to leave once you were there.
13 Q.    Okay. When you say, "the rules," do you recall
14 what the rules you were reviewing were called? Is there
15 a name?
16 A.    I reviewed both the state rules and then the
17 county rules over the next couple days. I was just
18 trying to read them and understand them and find out how
19 I could leave.
20 Q.    After Kristin Starkey responded, did you have
21 a -- did you write her again another email after that?
22 A.    Yes.
23 Q.    And approximately what day was that on, do you
24 know, if she responded on the 22nd or 23rd?
25 A.    I think we emailed back and forth a couple times

Page 62

1 after that on those days.
2 Q.    Do you recall what your -- the sum and substance
3 of your email was?
4 A.    She was also reviewing the rules and looking for
5 a way that he could leave or be disqualified or find a
6 way out.
7 Q.    Okay. I may have asked this already, and if I
8 did, I apologize. I'm sure I'll get an objection. But
9 if you -- did you at any point between June 21st and
10 June 25th, 2022, did you ever contact the Shasta
11 District Fair and say, hey, we don't want to be involved
12 in this sale and -- involved in the sale of Cedar?
13 A.    I went to the fair office and asked to see the
14 contract that I had signed.
15 Q.    What day is this?
16 A.    My estimate is after I heard back from Kristin.
17 Q.    So approximately --
18 A.    Wednesday or Thursday. Probably approximately
19 Wednesday.
20 Q.    When you went to the fair office, is there -- do
21 you have an address for that office; do you know? Or a
22 location?
23 A.    It's the fair -- well, if you just search Shasta
24 County fairgrounds I think, and there's like a big
25 parking lot in front and like a little office to the

Page 63

1 side and the fields and barns and stuff behind.
2 Q.    Do you recall who you spoke with at the Shasta
3 District Fair?
4 A.    No.
5 Q.    Do you recall what you told the person at the
6 fair? Did you say, hey, I need a copy of the contract
7 or --
8 A.    Yes.
9 Q.    -- did you say I want to withdrawal Cedar from
10 the fair or what?
11 A.    I asked the front desk for a copy of the
12 contract.
13 Q.    Did you at any point tell them that you were
14 thinking of withdrawing Cedar from the fair?
15 A.    No. Because I thought you couldn't. The fair
16 rules said that he has to stay through the entire fair
17 show and just --
18 Q.    Did you speak with anyone else from the fair
19 besides -- between June 21st and June 24th besides that
20 person that you asked for the copy of the contract?
21 A.    No. I didn't know who to ask. It was just a
22 lot of barns and a lot of people. I didn't see like a
23 designated area.
24 Q.    Could you describe the person that you spoke
25 with at the fair about getting a copy of the contract?

Page 64

1 Do you know what that person looks like? I know you
2 probably don't know a name, but.
3 A.    A white female, middle-aged.
4 Q.    Okay. Tall, short?
5 A.    I don't remember.
6 Q.    You'd be guessing, okay.
7 A.    Average height.
8 Q.    Brown hair, blond hair?
9 A.    I don't remember.
10 Q.    Black hair?
11 A.    I don't remember.
12 Q.    Okay. All right.
13      MR. GORDON: How much more time on the tape
14 before you change? I just have to use the restroom
15 again. But I'll wait if we're close.
16      THE VIDEO SPECIALIST: We got about 30 minutes.
17      MR. GORDON: Thirty minutes left. Can I take a
18 minute?
19      MR. NORTHCUTT: Yeah, we can take a minute.
20 Let's go off the record.
21      THE VIDEO SPECIALIST: We're off the record, and
22 the time is 10:49.
23      (Whereupon, a break was taken from 10:49
24      till 11:00 a.m.)
25      THE VIDEO SPECIALIST: We're back on the record,

Page 65

1   and the time is 11 a.m.
2         MR. NORTHCUTT: Q.  So last time we were
3   talking, I believe this is kind of where we left off,
4   you had mentioned that you had gone to the fair office
5   on approximately Wednesday or Thursday, June 22nd, 3rd
6   to get a copy of the contract.  Does that sound fair,
7   sound right?
8   A.    Yes.
9   Q.    Okay.  And I think you indicated that you didn't
10  speak with anyone else about -- or didn't speak with
11  anyone at the fair about actually removing Cedar from
12  the fair; is that correct?
13  A.    No.
14  Q.    Okay.  Who did you speak with?
15  A.    Other parents.
16  Q.    Okay.  Are these parents, to your knowledge,
17  employees or employed by the district fair and event
18  center?
19  A.    No.
20  Q.    Okay.  So do you know if you actually spoke with
21  anyone specifically as like an employee of the Shasta
22  District Fair Center -- Fair and Event Center about
23  removing Cedar from the auction?
24  A.    No.
25  Q.    So we're kind of in that window between June

Page 66

1   21st and June 24th.  You had mentioned that you spoke
2   with Kristin Starkey via email.  You believe that she
3   had basically said something to the effect of we'll find
4   a place to place him.  We'll help out, or we'll get
5   something taken care of.
6         After she wrote that email, you said there were
7   a couple other emails that you sent.  Do you know, do
8   you recall what the substance of those emails was or
9   were?
10  A.    I thought I already answered that.
11  Q.    Okay.  Can you refresh my memory?
12  A.    Okay.
13  Q.    Sorry, I'm not trying to ask trick questions.
14  A.    Okay.  No.  She was also reading the rules and
15  trying to help me look for a way that we could get out
16  of the fair.
17  Q.    Okay.  And during the same time period, so we're
18  talking June 21st to June 24th, did you have any
19  conversations, and what I mean written or verbal, with
20  any other goat rescue organizations?
21  A.    No.
22  Q.    So just Bleating Hearts?
23  A.    Yes.
24  Q.    Is there a reason you specifically chose to
25  communicate with Bleating Hearts Farm as opposed to some

Page 67

1   other goat rescue?
2   A.    Yes.
3   Q.    What was that reason?
4   A.    When I searched the Internet, it was the closest
5   one to where we were.
6   Q.    And prior to your first email to Bleating
7   Hearts, did you have any relationship with Kristin
8   Starkey?
9   A.    No.
10  Q.    Okay.  Prior to that first email around June
11  21st, did you have any relationship with Bleating Hearts
12  Farm?
13  A.    No.
14  Q.    Or anyone who works there?
15  A.    No.
16  Q.    Did you consider any other goat sanctuaries?
17  A.    No.  I didn't even know there were goat
18  sanctuaries.  I just searched it.
19  Q.    After you spoke with Kristin Starkey about
20  possibly having a place to place Cedar, did you talk
21  with -- did you relay that fact to E.L.?
22  A.    Yes.
23  Q.    Do you know what day you spoke to E.L. and told
24  her, hey, we might have a place to put Cedar?
25  A.    I want to say it was that Wednesday is my best

Page 68

1   estimate.
2   Q.    What was her response?
3   A.    She was happy.  She felt relieved.
4   Q.    Did Kristin Starkey at some point ever tell you
5   that she thought she had found a way to get Cedar out of
6   the auction?
7   A.    No.
8   Q.    During the days that you were there between the
9   June 21st and June 25th, you had mentioned you had spent
10  the days with Cedar there at the fair, correct?
11  A.    Yes.
12  Q.    Okay.  During that time, was Cedar in a pen and
13  couldn't be removed from that pen, or could you actually
14  physically take Cedar out of the pen?
15  A.    He was in the pen, and you could open the gate.
16  Q.    But could you physically take him out of the pen
17  and walk him around?
18  A.    Yes.
19  Q.    The pen where Cedar was located at the fair,
20  were the adjoining pens all -- how do I put this?  Were
21  the adjoining pens the other animals from the same 4-H
22  meat market subgroup, to your knowledge?
23  A.    Can you say that again?
24  Q.    Sure.  So E.L. is in kind of a subgroup of the
25  4-H, the meat and market goats, correct?

Page 69

1  A.    Yes.
2  Q.    Okay.  So she has -- you mentioned I think
3  previously there were three to five other members
4  approximately?
5  A.    Yes.
6  Q.    Did those four or five other members have their
7  pens next to Cedar's?
8  A.    Yes.
9  Q.    Okay.  So during that time between June 21st and
10 June 24th when you're visiting Cedar every day all day
11 long, is E.L. running into the other members of the 4-H
12 program that she's involved with?
13 A.    Yes.
14 Q.    Okay.  What about were there any other parents
15 there as well?
16 A.    Yes.
17 Q.    Okay.  Did at any point between the 21st and
18 24th, did you speak with any of the other parents and
19 say, hey, I'm afraid this is a terminal fair.  I want to
20 get Cedar out of here?
21 A.    Yes.
22 Q.    Who did you speak with?
23 A.    Jennifer ▇▇▇▇▇▇
24 Q.    Is that ▇▇▇▇▇▇▇▇▇▇?
25 A.    Yes.

Page 70

1  Q.    She's, to your understanding, she's a parent of
2  a member of the 4-H?
3  A.    Yes.
4  Q.    Okay.  And when you spoke with her, on what day
5  did you speak with her?
6  A.    I believe it was Tuesday or Wednesday.
7  Q.    And can you tell me what you recall saying to
8  her?
9  A.    She said, "I'm going to buy my daughter's goat
10 and bring it home."  And I said, "You can't."  I said,
11 "I just found that out a few weeks ago, but you can't."
12 Q.    And do you recall what her response to that was?
13 A.    She kind of just shrugged her shoulders and
14 said, "Oh well then."
15 Q.    And did you say anything about Cedar or wanting
16 to remove him from the fair?
17 A.    Yes.
18 Q.    What did you specifically say?  If you can
19 remember.
20 A.    I don't remember specifically what I said.  But
21 I believe I sent her an email with either the fair rules
22 or something because I started looking for a way out.
23 Q.    Okay.
24 A.    But she didn't seem interested.  She was fine
25 with finding out that she couldn't buy her animal and

Page 71

1  take it home.
2  Q.    Okay.  Did you speak with any other parents
3  besides Jennifer ▇▇▇▇▇▇▇▇▇?
4  A.    I don't remember.
5  Q.    Okay.  So going to June 25th, 2022, at
6  approximately what time did you get to the fair?
7  A.    June -- are you talking about every day of the
8  week, 25th --
9  Q.    No.  The last day, the 25th, so.
10 A.    Oh.  Probably between 8 and 9.
11 Q.    Okay.  And then --
12       MR. GORDON: Damian, which day did you want?
13 I'm sorry.
14       MR. NORTHCUTT: June 25th, the day of the
15 auction.
16 Q.    So you arrive at the fair at 8 to approximately
17 9 a.m. on June 25th.  What's the first thing you do
18 after that?
19 A.    Have my daughter make sure Cedar has food and
20 water.
21 Q.    Okay.  Besides you and E.L. going to the fair
22 together, I assume you drove together?
23 A.    Yes.
24 Q.    Was there somebody else that drove with you as
25 well?

Page 72

1  A.    I believe I brought my son that day.
2  Q.    How old's your son?
3  A.    ▇▇▇▇▇▇
4  Q.    What's his name?
5  A.    ▇▇▇▇▇▇
6        MR. GORDON: Just give abbreviations.
7        THE WITNESS: M.L.
8        MR. GORDON: If you wouldn't mind, Damian.
9        MR. NORTHCUTT: Q. Sure.  Okay.  So it's you,
10 E.L. and M.L., correct?
11 A.    E.L. and M.L.  Yes.
12 Q.    E.L. and M.L., right?
13 A.    (Nods head up and down.)
14 Q.    Just want to make sure.  Anyone else?
15 A.    I know my son had a friend there.  I can't
16 remember if I brought the friend or we met him there.
17 Q.    Okay.  So you drove together to the fair
18 arriving around 8 or 9.  You spoke with E.L. or somehow
19 conveyed to her to check on Cedar and make sure he's
20 fed, correct?
21 A.    Uh-huh.
22 Q.    And what's the next thing that you did?
23 A.    She cleaned -- probably cleaned his pen --
24 Q.    Okay.
25 A.    -- to make sure there's no droppings in there so

Page 73

1    it looked clean and nice for people at the fair.
2    Q.      Okay.  And then what was the next step that
3    occurred?
4    A.      I think trying to find the list of the auction
5    times.
6    Q.      Are there different auction times?
7    A.      There was over 500 animals there, so they're
8    grouped into different groups.
9    Q.      Were you able to find the auction time?
10   A.      Yes.
11   Q.      Okay.
12   A.      Well, the approximate -- it was her number and
13   they go in order, so you have to pay attention to the
14   order.
15   Q.      Is it numerical order?
16   A.      Yes.
17   Q.      Okay.  Do you remember her number?
18   A.      Well, I don't know if they -- they did groups,
19   so I don't know if they did them all exactly in
20   numerical order.
21   Q.      Okay.  Do you know, did they do E.L's group
22   together from the -- from her 4-H division in their meat
23   and market group?
24   A.      They were split up a bit.
25   Q.      Okay.  So were you able to ultimately determine

Page 74

1    what auction Cedar would be in, the time?
2    A.      Yes.
3    Q.      Okay.  After you determined the time, what was
4    the next step that you took?
5    A.      I don't remember.
6    Q.      Okay.  So do you recall what time Cedar was
7    supposed to be auctioned?
8    A.      I believe it was afternoon or early -- or sorry,
9    late morning or early afternoon.
10   Q.      Okay.
11   A.      Somewhere in there.
12   Q.      So you mentioned E.L. fed the goat and cleaned
13   up the pen.  Any other things you can recall about
14   events that occurred on June 25th prior to the actual
15   beginning of the auction itself?
16   A.      She spent time in the pen with him petting him.
17   And she spent time playing with her friends, and she met
18   another friend there that she showed him to.
19   Q.      Did you at any point the morning of June 25th,
20   2022, prior to the actual auction, did you at any point
21   think to yourself, you know what, let's just not go
22   forward with the auction here and remove Cedar from the
23   fair?
24       MR. GORDON: Asked and answered.
25       THE WITNESS: Yeah, I didn't think you could.

Page 75

1        MR. NORTHCUTT: Q.  When -- on June 25th, the
2    day of the fair, did you have any conversations with
3    E.L. about the fact that it was a terminal fair?
4    A.      No.
5    Q.      On June 25th, 2022, did you talk with any
6    employee or Shasta District Fair and Event Center
7    employee about not proceeding with the fair?
8        MR. GORDON: Objection.  Misstates testimony.
9    Damian, I believe you just said "June 5th."
10       MR. NORTHCUTT: June 25th.
11       MR. GORDON: Did you say "June 25th"?  My
12   apologies.
13       MR. NORTHCUTT: Sorry.
14       THE WITNESS: Can you repeat?
15       MR. NORTHCUTT: Q.  Sure.  So on June 25th the
16   fair is going on.  The bidding is going to take place.
17   Did you ever speak to anyone at the fair about removing
18   Cedar at that point?
19   A.      No.
20   Q.      Did you speak with anyone besides E.L. on June
21   25th about removing Cedar from the fair?
22   A.      No.
23   Q.      To your knowledge, was there anything preventing
24   you from removing Cedar on June 25th, 2022, aside from
25   your reading of the regulations?

Page 76

1        MR. GORDON: Vague as to "prevent."  Do you mean
2    like physically obstructing her?
3        MR. NORTHCUTT: I mean just her general sense.
4    Did she have -- did she have a sense that there was
5    anything that either physically or in any other way
6    prevented her from removing the goat.
7        MR. GORDON: Vague.  But answer if you can.
8        THE WITNESS: Again, the fair rules said you had
9    to stay through the show dates, and people said nobody's
10   ever left.  You can't leave.  So I was afraid -- I was
11   afraid if I just left, somebody would stop -- stop us.
12       MR. NORTHCUTT: Q.  Did someone actually say,
13   "You can't leave" to you?  At any point?
14   A.      I can't remember.
15   Q.      Now, kind of help me picture this in my mind.
16   At the fair, so do they call Cedar's number for him to
17   be presented for the auction?  Is that how it works?
18   A.      Yes.
19   Q.      Okay.  And then he, along with other goats, are
20   presented for bidding; is that correct?
21   A.      Yes.
22   Q.      Is it as kind of a group or one at a time?
23   A.      One at a time.  It's like a line.
24   Q.      Okay.  And they -- and so did E.L. take Cedar
25   kind of up to a certain location for bidders to bid on

Page 77

1  the goat?
2  A.    Yes.
3  Q.    And when -- again, I know nothing of 4-H. I
4  know nothing of auctions.  So when she takes the goat up
5  for bidding, does she present the goat?  Does she make
6  the goat do tricks?  Or what exactly does she do when
7  she's presenting the goat?
8  A.    She tries to brace him.
9  Q.    Okay.  And you mentioned bracing is when the --
10  A.    They just kind of stand them up.  They push
11  against their leg a little bit.
12  Q.    Is there anything else that she did with Cedar?
13  A.    She was in a little, they called it a show ring,
14  but it was probably about half the size of this room.
15  So she just brought him in there and braced him for a
16  couple seconds and --
17  Q.    Do you know approximately how long the bidding
18  took place on Cedar?
19  A.    10 to 15 seconds.  10 to 20 seconds.
20  Q.    Is it -- is it like an actual auction where
21  there's a bunch of people with like paddles that put
22  their hand up, or how do they bid?
23  A.    It was my first time.  I was overwhelmed by it
24  all.  It was my first -- there was people everywhere.
25  There was that little ring that she was in.  There was

Page 78

1  lines of people coming out.  And just the stands and
2  then chairs.  And so I didn't even see who actually --
3  but there were people with paddles and stuff, but I was
4  focused on her.
5  Q.    Okay.  And you said she was approximately up
6  there for how long?
7  A.    Less than a minute.
8  Q.    Okay.  And then after that, what did E.L. do?
9  A.    She took him back to his pen.
10  Q.    Okay.  Was it your understanding that after that
11  minute that there was a winning bid for Cedar?
12  A.    Yes.
13       MR. GORDON: Objection as to "winning bid."
14  Vague as to "winning bid."
15       MR. NORTHCUTT: Okay.  You had previously before
16  the actual auction read the county rules of the fair,
17  correct?  That's what you testified earlier?
18       MR. GORDON: Vague as to "county rules."
19       MR. NORTHCUTT: Q.  Well, you had mentioned
20  earlier that you had previously looked at I believe you
21  said the state rules and the county rules.  Is that not
22  correct?
23  A.    That's correct.
24  Q.    Okay.  What's your understanding, or do you have
25  an understanding of who placed the highest bid for

Page 79

1  Cedar?
2       MR. GORDON: Vague as to time.
3       MR. NORTHCUTT: Q.  On June 25th, 2022.
4  A.    I was confused at the time because I went and
5  asked someone in a blue shirt that looked like a fair
6  representative where -- right outside that little place
7  that she auctioned him, and I saw someone in a blue
8  shirt and a clipboard and I asked who had bid on Cedar
9  and he said the Brian Dahle campaign.
10  Q.    Okay.  Do you know who Brian Dahle is?  Or did
11  you -- at that time did you know who he was?
12  A.    I knew he's a local politician.
13  Q.    Did you have any conversations with E.L.
14  immediately after the bidding was over?
15  A.    Yes.
16  Q.    And what did you discuss?
17  A.    Well, I walked her back to her pen and she got
18  like really limp and soft and just kind of -- he was
19  laying down and she was just kind of laying with him and
20  he was nibbling her hair and she was crying.  And I just
21  watched it, and I was crying too because I thought it
22  was really sad.
23  Q.    Did you actually have a conversation with her
24  or --
25  A.    I think I just hugged her.  She had to give a

Page 80

1  letter to the bidder who bid on Cedar.  And I didn't
2  know.  So I had her get her letter to go give the thank
3  you letter to the bidder.
4  Q.    Okay.  Do you know approximately when the
5  auction ended?
6  A.    I believe it was most of the day.  Maybe two or
7  three in the afternoon.
8       MR. NORTHCUTT: I believe our videographer is
9  going to have to change out his tape or whatever the
10  equivalent is, so I think this will be a good point to
11  go off the record.
12       THE VIDEO SPECIALIST: We're off the record.
13  The time is 11:23, and this is the end of media number
14  one.
15       (Whereupon, a break was taken from 11:23
16       till 11:38 a.m.)
17       THE VIDEO SPECIALIST: We're back on the record.
18  The time is 11:38, and this is the start of media number
19  two.
20       MR. NORTHCUTT: Q.  So we're back on the record,
21  Mrs. Long.  You understand you're still under oath and
22  penalty of perjury and all that, correct?
23  A.    Yes.
24  Q.    Okay.  Fantastic.  So last we had spoke
25  basically, if I recall, you -- the bidding had ended.

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

Page 81

1  Q.   You'd gone back to the pen with E.L. and Cedar.  And
2  then tell me essentially what the next step was after
3  that.  How long -- how long were you at the pen after
4  the bidding was over?
5  A.   I don't remember.
6  Q.   Can you give an estimate?
7  A.   She was back and forth from the pen all day, so
8  I don't know.
9  Q.   When you say, "she," you're talking about E.L.?
10  A.   Uh-huh.
11  Q.   But after the bidding was over, was she still
12  back and forth from the pen all day for the rest of the
13  day?
14  A.   No.  She -- yes.  Well, the focus was getting
15  the bidder thank you letter.
16  Q.   Okay.
17  A.   And then she was back and forth from the pen the
18  rest of the day.  She would go ride rides and then go to
19  the pen and see how he was doing, make sure he had
20  water.
21  Q.   Anything else E.L. did besides ride rides and
22  check on Cedar?
23  A.   She got an icy snow cone.  We got food at one of
24  the vendor booths and sat down and had food.
25  Q.   And I think I asked, but I don't know if I got

---

Page 82

1  an answer.  Was there -- can you estimate how long that
2  period of time was between the actual end of the bidding
3  and I guess --
4  MR. GORDON: The withdrawal you're saying?
5  MR. NORTHCUTT: No.  No.
6  MR. GORDON: Okay.
7  MR. NORTHCUTT: Q.  At the end of the bidding
8  and -- I was trying to figure out how to phrase this.
9  Give me a second.
10  The end of the bidding and essentially when you
11  decided to remove Cedar from the fair.
12  A.   The end of her bidding was probably, I want to
13  say, like I said, late morning or early afternoon.  And
14  then there was other animals that probably went till 2
15  or 3 in the afternoon.  That was the end of the bidding.
16  Q.   Okay.  And but let's say from the time that E.L.
17  returned to the pen after the bidding to the time that
18  you decided to remove Cedar from the fairgrounds, can
19  you give me an estimate of that amount of time?
20  A.   I decided to remove him from the fairgrounds at
21  around 9 p.m.
22  Q.   9 p.m.  And you said the bidding was over at
23  approximately sometime in the morning, early afternoon
24  you said?
25  A.   Yes.

---

Page 83

1  Q.   Do you know, can you give me a timeframe?
2  A.   Her bidding or the bidding --
3  Q.   Her bidding.
4  A.   Like I said, late morning or early afternoon was
5  when her time was.
6  Q.   Besides -- did you go on any of the rides at the
7  fair after the bidding was over?
8  A.   No.
9  Q.   Just E.L.?
10  A.   Yes.
11  Q.   Okay.  And you mentioned she got a snow -- icy?
12  A.   Yes.  Something like that.  A snow cone or
13  something.
14  Q.   Anything else that you guys did together after
15  the -- after the bidding was over for Cedar?
16  A.   At one point we walked around and looked at the
17  other exhibits.  I can't remember if we did that that
18  day or -- I think it was that day, but.  They had
19  buildings with things inside like jams and eggs and
20  photographs and quilts.
21  Q.   Okay.  Anything else?
22  A.   I think they had another building with archery.
23  We went and looked at that.
24  Q.   Did E.L. participate in some sort of archery?
25  A.   No.

---

Page 84

1  Q.   So besides the couple buildings we just
2  mentioned, the rides, the icy or snow cone of some sort,
3  anything else that you both did the afternoon of June
4  25th, 2022?
5  A.   Not that I recall.
6  Q.   So let's kind of move forward now.  It's
7  approximately 9 p.m. on June 25th, 2022.  Multiple hours
8  have passed since the bidding ended.  What at that point
9  made you decide you know what, I'm going to take Cedar,
10  and we're just going to leave the fairgrounds for Cedar?
11  A.   That was shortly after 9 p.m.
12  Q.   Right.  But I'm asking there's a period of time
13  between the bidding ended and between 9 p.m.  What at
14  approximately 9 p.m. made you think to yourself, hey,
15  you know what, I'm just going to get Cedar out of here?
16  What at that particular moment made you think that?
17  A.   I picked up his leash.
18  Q.   Okay.  Did you -- walk me through the next step.
19  After you picked --
20  A.   We're at 9 p.m. now?
21  Q.   Uh-huh.  You picked up his leash, and then what
22  did you do?
23  A.   I just realized we weren't going to need it
24  again.  So I handed it to her.  And I just thought, you
25  know, I spent all week just trying to find a way out,

---

Case 2:22-cv-01527-DAD-AC   Document 99-6   Filed 07/31/24   Page 24 of 62

LONG vs.                                                                    JESSICA LONG
FERNANDEZ                                                                    August 24, 2023

Page 85

1    and I felt like I hadn't found a way out, so.  But at
2    that point I felt like I just started thinking logically
3    like this is a kid's club, supposed to be fun,
4    everybody's crying, she loves her goat.  And so I handed
5    her the leash and I said -- we were packing stuff up to
6    carry out the gate and I handed her the leash and I
7    said, "Eliza, you don't have to do this."  I said, "You
8    could put the leash on, and we could just leave."
9    Q.      What was her response when you said that?
10   A.      She said, "What about the person who placed the
11   bid on him?"  And I said, "I don't think they even
12   really want his meat."  I was like, "We could buy them
13   more meat.  We can offer to pay to make it right."  I
14   was like he's a -- "He's just donating it to the
15   barbecue.  He doesn't even want it."
16   Q.      Okay.
17   A.      Go ahead.
18   Q.      I'm sorry.  I interrupted.
19   A.      And then she said, "Well, I don't think we can
20   go out the gate," because there's a security guard there
21   that we walk by every day coming in.  And I said, "Well,
22   we can try.  If he turns us around, we'll just come back
23   and put him in the pen.  But you can try."  I said,
24   "You'll probably never be able to do 4-H again.  You
25   probably won't be able to do the fair.  Is he worth it

Page 86

1    to you?"  And she said, "Yes."  She put the leash on,
2    and we walked out of the gate.
3    Q.      Did anyone try to stop you?
4    A.      (Shakes head side to side.)
5    Q.      No?
6    A.      No.  I didn't look back.  We just walked out.
7    Q.      Once you walked out of the gate with Cedar and
8    E.L., tell me what happened next.
9    A.      The gate -- his pen was kind of close to the
10   gate that was kind of close to the parking lot, so just
11   walked out the gate and then to my car.  And I still had
12   the carrier in that I had brought him in, a big dog
13   crate, and I put him in the dog crate and we left.
14   Q.      Now, when you left, it was just you, E.L. and
15   Cedar, correct?
16   A.      Yes.
17   Q.      And approximately do you know what time you
18   left?  I think you said you made the decision around 9?
19   A.      So 9:15 or so by the --
20   Q.      And then I think you previously testified it
21   takes, what, 30 minutes to get to your house?
22   A.      Uh-huh.
23   Q.      Did you go to your house directly from the fair?
24   A.      Yes.
25   Q.      And so is this approximately around 9:45ish,

Page 87

1    somewhere in there?
2    A.      (Nods head up and down.)
3    Q.      Is that a yes?
4    A.      Yes.
5    Q.      Okay.  Sorry.  She's still typing.
6    A.      That's okay.  Yes.
7    Q.      So we're at 9:45.  You're at the house.  You're
8    with E.L. and Cedar.  Anyone else there with you?
9    A.      No.
10   Q.      Okay.  At that point what did you -- what was
11   the next step you took?
12   A.      We left him in the car, and we took a shower.
13   Q.      Okay.
14   A.      Because it was like over 100 degrees all day.
15   It was just hot.
16   Q.      Okay.
17   A.      And then, yeah.
18   Q.      Okay.  So you took a shower.  And what happened
19   next?
20   A.      Got a bowl of water for Cedar.
21   Q.      Okay.  And then?
22   A.      I went and grabbed sleeping bags out of the
23   garage.
24   Q.      Okay.  And then what happened after you got the
25   sleeping bags?

Page 88

1    A.      I put them in the car, and we left.
2    Q.      Where did you decide to leave to?
3    A.      I just wanted to get out of there at that point.
4    And so I made -- drove to Sacramento, and I called my
5    mom and asked if we could stay in the backyard with him
6    for the night.
7    Q.      You said, "your mom."  She's -- she lives down
8    in Sacramento?
9    A.      Yes.
10   Q.      Was she -- after you spoke with your mom, you
11   drove down to her house; is that correct?
12   A.      Yes.
13   Q.      And was she present at her house when you
14   arrived?
15   A.      Yes.
16   Q.      Okay.  Did you speak with her about taking Cedar
17   from the fair?
18   A.      I think I just said we took him.
19   Q.      Okay.  Do you recall her response?
20   A.      I think she seemed happy.
21   Q.      Okay.  Did she verbally say anything to you?
22   A.      I can't remember exactly.
23   Q.      Did she ever say you shouldn't have done that or
24   anything of that nature?
25   A.      No.  During -- earlier in the week I had talked

Page 89

1  to her and I was upset and she said, "Your kid's club
2  doesn't sound very fun to me."  And so -- I was
3  realizing it wasn't.
4  Q.    So when you arrived down at your mom's house,
5  tell me what happened next.
6  A.    I asked her if we could sleep in the backyard
7  because if he's alone, he makes -- when that type of
8  breed of goat is sad, it makes like a -- it sounds like
9  a human yelling or a human crying.  And I had heard it
10 because as we cared for Cedar through those three
11 months, he was in a pen next to two other goats and he
12 would visit through the fence.  But when the sun went
13 down, the other goats went into their little barn, and
14 he would start making that noise because he felt alone.
15        So I knew if we just put him in the backyard and
16 slept in the house, he -- it would cause alarm for the
17 neighbors, so.
18 Q.    Okay.  What time did you arrive at your mom's
19 house approximately, if you know?
20 A.    It was after midnight.  Probably, I want to say
21 it was around 1.
22 Q.    Did you stop anywhere on the way, or did you
23 just go directly to your mom's?
24 A.    I can't remember if I needed gas.  I don't
25 remember.  I might have stopped for gas, but other than

Page 90

1  that, directly there.
2  Q.    Okay.  So you're at your mom's house at
3  approximately 1 a.m. on June 26, right, the next day?
4  A.    (Nods head up and down.)
5  Q.    You spend the night at her house?
6  A.    Yes.
7  Q.    Anyone else present besides your mother?
8  A.    No.
9  Q.    And after you spend the night, you woke up.  Can
10 you tell me what you did after you woke up?  Your next
11 step.
12 A.    I messaged Ray to see if I could drop him off.
13 Q.    Who is Ray?
14 A.    He --
15 Q.    I mean, what's his -- do you know his full name
16 by any chance?
17 A.    Is it Raymond Allen?
18 Q.    Is it Raymond Allen?
19 A.    (Nods head up and down.)
20 Q.    Okay.  How do you know Raymond Allen?
21 A.    Kristin Starkey introduced me to him.
22 Q.    When did she introduce you to him?
23 A.    When I had contacted her and asked if she had a
24 place Cedar could stay.
25 Q.    Correct me if I'm wrong, but I thought you

Page 91

1  had -- she had emailed you and said something like we'll
2  try to find a place.  Did she later send another email
3  that said, hey, Raymond Allen can help?
4  A.    Yeah.  At some point during the fair.
5  Q.    Okay.  And before Cedar was auctioned, did you
6  ever communicate with Raymond Allen at all?
7  A.    Yes.
8  Q.    So is this -- okay.  When did you speak with
9  Raymond Allen in June of 2022, if you know?
10 A.    After Kristin had told me about -- about his
11 farm, I waited till like that night I think, and I
12 called him either Wednesday or Thursday night.
13 Q.    Okay.  And when you spoke with Raymond Allen on
14 that Wednesday or Thursday, what did you speak to him
15 about?
16 A.    Placing Cedar there.
17 Q.    Okay.  And when you spoke with him about placing
18 Cedar there, did you mention that he was -- did you
19 mention to him that Cedar was planned to be auctioned?
20 A.    Yes.
21 Q.    Did you mention that it was a terminal fair?
22 A.    Yes.
23 Q.    Did Raymond Allen -- what did Raymond Allen tell
24 you he could do for Cedar?
25 A.    I said, "He's already checked into the fair.  I

Page 92

1  don't know how I can get him out, but if I can, can I
2  bring him there?"  And I think he suggested like giving
3  Cedar some medicine because if the goats have medicine,
4  they can't be processed.  So it was a way to get
5  disqualified.
6  Q.    Did you at any point give Cedar medicine as
7  Raymond Allen had kind of indicated?
8  A.    No.
9  Q.    Was there something you wanted to add?
10 A.    No.
11 Q.    Okay.  Is there a reason you didn't take Mr.
12 Allen's advice regarding the medicine?
13 A.    I didn't know who would see me give him medicine
14 like or I just didn't know that that -- I didn't think
15 it would look very good if I went up to him and started
16 giving him medicine right there.  It would have caused
17 like a scene or.
18 Q.    When he relayed this information to you, was it
19 over the phone or like through email?
20 A.    It was over the phone.
21 Q.    And did he say anything else to you over the
22 phone?
23 A.    Not that I remember.
24 Q.    Did he say if you get Cedar out of there or
25 something, you know, he's got a place -- I've got a

Page 93

1  place I can put him?
2  A.   He said something along those lines, yeah.
3  Q.   Did you --
4  A.   If I could get him out in a -- yeah.  Like a --
5  yeah.  Like by getting disqualified or finding a way to
6  leave.
7  Q.   Okay.  Did you at any point tell him you went
8  and thought about physically removing Cedar yourself
9  from the fair?
10 A.   No.  I hadn't thought about that yet.  Wasn't
11 till I picked up the leash.  And I knew if I didn't do
12 something, he was going to die.
13 Q.   Did Raymond Allen say anything else to you
14 besides what we just discussed?
15 A.   Not that I -- no.
16 Q.   Prior -- all right.  So let's -- we're back at
17 your mom's house.  You woke up the following morning.
18 It's June 26, 2022.  I think did you drive to another
19 location after that?
20 A.   No.  I just drove from my mom's to his farm.
21 Q.   Directly?
22 A.   Yes.
23 Q.   Did you at any point stop at Bleating Hearts
24 Farm in Napa?
25 A.   No.

Page 94

1  Q.   Did you at any point have a conversation with
2  Starkey on June 25th, 2022, about removing the goat from
3  the fair?
4  A.   I don't believe so, no.
5  Q.   What about June 26, the next day when you're
6  planning on taking him over to --
7  A.   Yes.
8  Q.   Okay.  What did -- tell me about that
9  conversation.  Did you call -- did you call her?  Did
10 she call you?
11 A.   I never talked to her on the phone.  She only
12 emailed.
13 Q.   Okay.  So did you email her?
14 A.   Uh-huh.
15 Q.   And what did you say in that email?
16 A.   I asked -- I told her that I was going to be
17 bringing Cedar to Raymond Allen's, and I asked if I
18 could meet her along the way because it was close by.
19 Q.   And did she provide you with a response to that
20 email?
21 A.   She said she couldn't.  She had something going
22 on.
23 Q.   Okay.  Anything else she said in response?
24 A.   Not that I recall.
25 Q.   Did you mention you had taken the goat at that

Page 95

1  point?
2  A.   Yes.
3  Q.   Okay.  And she -- there was no comment from her
4  on that?
5  A.   I don't know.  It was in emails.
6  Q.   Okay.  How long did it take you -- well, when
7  did you leave your mother's house to go to Raymond
8  Allen's farm?
9  A.   I want to say it was like 8 or 9 in the morning.
10 Q.   And how long do you think it took if you can
11 give an estimate to -- you left at --
12 A.   Three hours.  A three-hour drive or so.  Be
13 three and a half from Sacramento to Petaluma.
14 Q.   So you're looking at anywhere between 11:30 or
15 12:30 approximately when you got to his farm.  Does that
16 sound about right?
17 A.   I think it was after, so 12 -- between 12 and 1.
18 Q.   Okay.
19 A.   Is my guess.
20 Q.   And sorry if I asked this, you didn't stop
21 anywhere along the way, just straight shot to Raymond
22 Allen's?
23 A.   Unless it was for gas.  I don't remember if I
24 pulled over for gas or not.
25 Q.   So when you got to Raymond Allen's farm, was

Page 96

1  Raymond present?
2  A.   Yes.
3  Q.   Can you kind of -- let's go step by step.  You
4  arrive at his farm.  What's the first thing you do after
5  that?
6  A.   Open the trunk and let Cedar out to go to the
7  bathroom.
8  Q.   Is Cedar -- what kind of car are you driving
9  this whole time?
10 A.   A Honda Pilot.  So the hatch lifts up.
11 Q.   So it's not like a trunk trunk.  It's like a --
12 it's not like when you think of the old-school trunks?
13 A.   No.  Like --
14 Q.   Gotcha.
15 A.   The hatch lifts up, and then there's room for
16 storage back there.
17 Q.   Okay.  So you open up the trunk.  The
18 goat comes out.  Cedar comes out.  And then what
19 happened?  What was the next step?
20 A.   He just started peeing, and it was taking a
21 while.  I believe Raymond's wife, wife and kids came
22 out, and they were just kind of looking at him.
23 Q.   What's -- do you know Raymond's -- Raymond
24 Allen's wife's name?
25 A.   No.

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 97

1 Q.    Anyone besides his wife and his kids at that
2 moment?
3 A.    No.
4 Q.    Okay.  So it's his wife, his kids -- Raymond
5 Allen's wife, kids, you, E.L., and Cedar's going to the
6 bathroom, correct?
7 A.    Uh-huh.
8 Q.    After Cedar's done doing his business, take me
9 to the next step.  What did you do then?
10 A.    We took Cedar out to the field to introduce to
11 his other animals.
12 Q.    Before you actually spoke with Mr. Allen,
13 Raymond, did you first -- did you just go directly to
14 his backyard, or I mean, did you have a conversation
15 with his wife or him first?
16 A.    Oh, I'm sure -- I'm sure I said hello and this
17 is Cedar.
18 Q.    Okay.  When you're saying hello and this is
19 Cedar, are you saying that to Mrs. Allen or to Raymond,
20 himself?  Do you recall?
21 A.    I'm sure -- I talked to him first, and then
22 there was introduction to his wife.
23 Q.    Do you recall when you spoke with Mr. Allen what
24 you said to him?  Did you have a conversation with him?
25 A.    I don't remember.  I mean, I don't remember

Page 98

1 everything we said.
2 Q.    Do you remember anything he said to you?
3 A.    We talked about Cedar and introducing him to the
4 animals.
5 Q.    On June 25th -- sorry, strike that.
6        On June 26, 2022, when you're at Raymond Allen's
7 farm, did you ever tell Raymond Allen that you were
8 donating Cedar to him?
9 A.    No.
10 Q.    Did you ever indicate that you were donating it
11 to -- donating Cedar to his farm?
12 A.    I told him I was going to work it out with the
13 fair since I had left and not talked to anybody.  I was
14 going to work it out with the fair and then come up with
15 a solution with him later.
16 Q.    Did you ever use the word, "donating," or
17 "donation" with Mr. -- with Raymond Allen?
18 A.    I said we might donate him if I could work it
19 out with the fair.
20 Q.    But you never actually stated that you are
21 donating him to Raymond Allen; is that correct?
22 A.    No.  Not at that point.  It was all up in the
23 air.
24 Q.    Did -- let me try to phrase it maybe a bigger
25 picture.  Have you at any point ever said to Raymond

Page 99

1 Allen, "I'm donating" or "I've now donated Cedar to you
2 or your farm"?
3 A.    I told him that I might want to donate him, but
4 I wanted to work it out with the fair and the Dahles
5 first and that I would get back to him in a few weeks.
6 Q.    Okay.
7 A.    My husband was supposed to come home from sea in
8 a few weeks and we were going to bring Eliza to go see
9 Cedar and then come up with a more permanent solution
10 then but we hadn't gotten to that point.
11 Q.    Okay.  I understand that.  I appreciate your
12 honesty.  What I'm asking is not whether you asked
13 him -- you told him at one point whether you might
14 donate him, but whether you actually specifically said
15 that you are -- that you are donating to Mr. Allen?
16        MR. GORDON: She said no.
17        MR. NORTHCUTT: Did she say no?
18        MR. GORDON: She said no.
19        THE WITNESS: I can't remember the specific
20 words.  The plan was that I was going to come back and
21 reassess.  I said that we might donate him.
22        MR. NORTHCUTT: Okay.
23        THE WITNESS: But I had to work it out with the
24 fair first.
25        MR. NORTHCUTT: Q.  So it's your testimony you

Page 100

1 don't recall specifically saying, "I'm donating
2 Cedar" --
3 A.    Yes.
4 Q.    -- "to you or your farm"?
5 A.    Yes.
6 Q.    Correct?
7 A.    Yes.
8 Q.    Okay.  So we're now -- how long approximately
9 are you speaking with Raymond Allen when you arrive at
10 the farm?
11 A.    15 to 20 minutes.
12 Q.    And you don't recall any of that conversation
13 that you spoke for 15 to 20 minutes?
14 A.    No.  We let Cedar -- we were focused -- we were
15 all focused on Cedar.  We let him out.  We laughed
16 because he peed.  And then we -- it wasn't in his back
17 yard.  It was you drive up the driveway, his house was
18 here, and the fields were on the other side.  So we
19 never went into his house or his backyard.
20        So we drove up, parked, and the gate was right
21 across the driveway from, and we opened the gate, and I
22 was surprised.  He just took him off the leash right
23 away and let him go.  And I just remember, you know,
24 laughing because Cedar was like so much cleaner.  He'd
25 just been shaved and washed and looked really good.  And

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 101

1 his -- you know, they've been rolling around fields and
2 dirt. His were all kind of ragged and dirty.
3          And so all the other animals, he had llamas, he
4 had all kinds of breeds of goats, they all just kind of
5 stopped what they were doing and looked at Cedar. So we
6 focused on like just watching Cedar interact with all
7 these new animals.
8 Q.    Okay. And then how long were you watching the
9 interaction of the animals?
10 A.    15 or 20 minutes.
11 Q.    And then tell me what happened after that. What
12 was the next step?
13 A.    I said, "Well, now I have to go resolve it with
14 the fair and work it out with the fair, and I'll be in
15 touch. I'll let you know what happens." And he --
16 yeah.
17 Q.    Did he have a response to that?
18 A.    He said okay.
19 Q.    Okay. And then so give me an estimate of the
20 total time you spent from the time you dropped off Cedar
21 to the time you left Raymond Allen's farm, if you could.
22 A.    15 to 30 minutes.
23 Q.    Did he ever ask you how you were able to come
24 into possession of Cedar after the fair had already
25 occurred?

Page 102

1 A.    Yes.
2 Q.    And what was your response to that?
3 A.    I said that she just left. We just left with
4 him.
5 Q.    And did he have a response to that?
6 A.    No. Not then. Not then.
7 Q.    Okay. I'm assuming then he had a response at
8 some point later; is that correct?
9 A.    Yes.
10 Q.    Okay. When -- so you spent approximately 15 to
11 30 minutes, is that correct, at the farm?
12 A.    Uh-huh.
13 Q.    And then kind of walk me through, what's the
14 next step? Where did you -- where did you go after you
15 left his farm?
16 A.    We hadn't really eaten anything, and he was
17 right by the ocean, so we, my daughter and I, drove up
18 to Bodega Bay and had lunch.
19 Q.    Okay. How long did it take to get to Bodega
20 Bay?
21 A.    I think it took longer than I thought. I might
22 have made some wrong turns or something. About an hour,
23 30 minutes to an hour. I just kind of drove along the
24 coast since we were -- we live four hours away from the
25 coast here, so I wanted to go along the coast a little

Page 103

1 bit.
2 Q.    Okay. And did you stop anywhere else between
3 Raymond Allen's farm and Bodega Bay?
4 A.    No. Well, just the place for lunch.
5 Q.    Okay. So once you got to Bodega Bay, you had
6 lunch there; is that correct?
7 A.    Uh-huh.
8 Q.    And did you --
9 A.    We might have stopped at some beach in Petaluma.
10 I don't remember if it was Petaluma or Bodega Bay. But
11 she played on the beach a little bit. We found an ocean
12 somewhere.
13 Q.    Do you know approximately how long you were --
14 how long you were playing on the beach?
15 A.    An hour.
16 Q.    And then after that did you decide to drive
17 somewhere else?
18 A.    No. It was a long drive home. So we drove
19 home.
20 Q.    Okay. So at approximately what time are you
21 leaving Bodega Bay?
22 A.    Just remember the sun was setting like when we
23 were on I-5 heading home like maybe it was around Chico
24 or some place between Chico and Redding. I remember the
25 sun was setting, so.

Page 104

1 Q.    Okay. Do you know, did you drive directly home
2 from Bodega Bay?
3      MR. GORDON: Asked and answered.
4      THE WITNESS: Yes.
5      MR. NORTHCUTT: Q. After you had dropped off
6 Cedar at Raymond Allen's farm on June 26, did you have
7 any conversations with E.L. about Cedar? So this is
8 after the farm.
9 A.    Yeah. Yes. I just told her I have to work it
10 out with the fair now and that we would go back and see
11 him in a few weeks when her dad got home.
12 Q.    And what was her response to that, if any?
13 A.    She was happy to come back and see him. She was
14 sad that, you know, she wouldn't get to see him daily
15 anymore at this point but was looking forward to seeing
16 him again.
17 Q.    Do you know is Raymond Allen's farm is called
18 Billy's Farm?
19 A.    Yes.
20 Q.    Is that 3440 Roblar Road in Petaluma?
21 A.    I believe Roblar sounds familiar.
22 Q.    What about 2244 Cape Coral Court in Elverta,
23 California?
24 A.    That's my mom's house.
25 Q.    So she lives in Elverta not Sacramento?

Page 105

1  A.    Yes.
2  Q.    Or is that kind of a suburb of Sacramento?
3  A.    It's a suburb. It's just north of Sacramento.
4  Q.    Could you have kept Cedar at your mom's house
5  or --
6  A.    No.
7  Q.    -- is it like a residential?
8  A.    She's residential too. That's why we stayed out
9  in the backyard with him so we didn't make noise for the
10 neighbors.
11 Q.    At what point later on -- we mentioned briefly
12 you had talked about you had a discussion with Raymond
13 Allen after you dropped off the goat; is that correct?
14 A.    Uh-huh.
15 Q.    And when did you have that conversation? Do you
16 recall the date approximately? Or --
17 A.    Maybe the next day. I believe I told him that
18 they were accusing me of felony livestock stealing.
19 Q.    Okay. And what was his response to that?
20 A.    He wanted me to meet him in Sacramento and to
21 give Cedar back to me.
22 Q.    Okay. And what was your response when he said
23 that?
24 A.    I said okay and that I would go get Cedar.
25 Q.    And so did you actually end up going and getting

Page 106

1  Cedar?
2  A.    No.
3  Q.    Why not?
4  A.    Because I had written a letter to the Dahles who
5  I thought were the bidders, Brian Dahle, and I explained
6  the situation and offered to make him whole or pay back
7  any inconvenience backing out of the deal this late in
8  the game would be. And I hand-delivered it to his
9  office to make sure he got it. And can --
10 Q.    Let's get to that in just a sec. Did you tell
11 him -- you told him over the phone that you would bring
12 Cedar back to him in Sacramento?
13 A.    Yes.
14 Q.    And this is approximately the following day; is
15 that right?
16 A.    Yes.
17 Q.    So it would be approximately June 27th?
18 A.    Yes.
19 Q.    Does that sound right? Okay.
20 A.    It might have been the next -- it might have
21 been the 28th, but I think it was the 27th.
22 Q.    Okay. That's fine. And did he give you like a
23 time to meet?
24 A.    Uh-huh.
25 Q.    And did he give you a location to meet?

Page 107

1  A.    Not an exact address. He gave me a time in
2  Sacramento. I think he was going to be there with his
3  animals or had a project in Sacramento, and it was a
4  good halfway point, so he suggested a time.
5  Q.    What -- do you recall what time he said you guys
6  should meet?
7  A.    No. I don't recall what time.
8  Q.    Did he --
9  A.    Afternoon.
10 Q.    And this is all done via telephone?
11 A.    Uh-huh.
12 Q.    Okay. So a call. And then you said you did not
13 show up to that. So did he call you at a later date?
14 A.    I told him -- once I wrote the letter to the
15 Dahles and delivered it to the office and they came back
16 and said you're good with us, I relayed that message to
17 him. I talked to him on the phone and said the Dahles
18 are okay with it. And then he's, like, well then let's
19 not meet tomorrow then, so.
20 Q.    Okay.
21 A.    Because we thought since the bidders were fine
22 with it that any charges of any accusations of the
23 felony were over.
24 Q.    1480 Atajo; is that right?
25 A.    Atajo.

Page 108

1  Q.    Atajo?
2  A.    Uh-huh.
3  Q.    Is that --
4  A.    That's where I live.
5       MR. NORTHCUTT: Good. So does everyone want to
6  keep going or do we want to take a break or what works?
7       MR. GORDON: Let's take a break. I'm getting
8  hungry actually.
9       MR. NORTHCUTT: Okay. Let's go ahead and take
10 a -- go off the record.
11      THE VIDEO SPECIALIST: We're off the record.
12 The time is 12:14.
13      (Whereupon, a break was taken from 12:14
14 till 1:22 p.m.)
15      THE VIDEO SPECIALIST: We're back on the record.
16 The time is 13:22, and we're still on media number two.
17      MR. NORTHCUTT: Q. Mrs. Long, thank you for
18 being here further. We just got off the break. You
19 understand we're still under oath, penalty of perjury?
20 A.    Yes.
21 Q.    Yes? Okay. Great. Earlier I had mentioned to
22 you with Raymond Allen whether or not you donated the
23 goat to him. You had indicated that you -- you said you
24 might in the future. You had to work some stuff out
25 with the fair. Did you ever use a different word such

Page 109

1  as "I'm giving you the goat"?
2  A.  I don't remember.
3  Q.  Okay.
4  A.  I know I intended to possibly do that, so.  But
5  I -- I let him know that I wanted to work everything out
6  with the fair first.
7  Q.  Okay.  But when you dropped Cedar off at his
8  farm, you -- was it your opinion at that time that Cedar
9  was still your goat; is that correct?
10 A.  Yes.
11 Q.  Okay.  I've got some documents we can go through
12 and kind of hopefully you can either explain things that
13 I don't understand or clarify and I'll just go one by
14 one.  I apologize, I don't have copies for everyone, so
15 you'll have to share with your counsel here.
16 A.  Okay.
17     MR. GORDON: Are these presumably ones we've
18 seen all week?
19     MR. NORTHCUTT: Or they've been produced by her.
20     MR. GORDON: Yeah.  So I have them is what I'm
21 getting at on my computer to look at?
22     MR. NORTHCUTT: Correct.
23     MR. GORDON: If you just give me the Bates stamp
24 numbers is what I'm getting at, Damian.
25     MR. NORTHCUTT: First one is Fern00027.  It was

Page 110

1  attachment A to the warrant.
2      MR. GORDON: Give me a moment.  The big one that
3  we looked at.  The Instagram post is what you're
4  referring to?
5      MR. NORTHCUTT: Yes.
6      MR. GORDON: Give me one moment to pull it up.
7  You said 127?
8      MR. NORTHCUTT: 00027.  It's the Instagram post.
9      MR. GORDON: I know.  I'm just navigating to it.
10 Sorry.  It's a big file.  There.
11     MR. NORTHCUTT: Q.  Have you seen this document
12 before?
13 A.  I believe Ryan shared it with me for the first
14 time.
15 Q.  Okay.  Have you -- is that a picture you, E.L.
16 and Cedar?
17 A.  Yes.
18 Q.  Do you know who took that photograph?
19 A.  Raymond Allen took that photograph.
20 Q.  Do you know when it was taken?
21 A.  In the 15 or 20 minutes we were at his farm.
22 Q.  And that would have been on approximately June
23 26 --
24 A.  Yes.
25 Q.  -- '22?  Okay.  Do you know who posted this

Page 111

1  picture online?
2  A.  Kristin posted it.
3  Q.  Kristin?
4  A.  Bleating Hearts Farm.  Starkey, I think.
5      MR. GORDON: Jessica, FYI, did you see her post
6  it or did you -- do you know that, or are you assuming
7  that?
8      THE WITNESS: Yeah.  I guess I was assuming it
9  because she didn't tell me she did it.  And I didn't
10 have Instagram on my phone.
11     MR. NORTHCUTT: Q.  You didn't ask Kristin
12 Starkey to post that online for you?
13 A.  No.
14 Q.  Did you ask Raymond Allen to post that online
15 for you?
16 A.  No.  I asked him to take a picture of Eliza, me
17 and Cedar because I realized that I didn't have any
18 pictures of the three of us.  I just had pictures of
19 Eliza and Cedar.
20 Q.  Did -- sorry, go ahead.
21 A.  So I asked him to take the picture because I
22 didn't have any.
23 Q.  Did you share that photograph with Kristin
24 Starkey?
25 A.  Yes.  I emailed it to her.

Page 112

1  Q.  Do you know on what date approximately?
2  A.  Either the -- maybe the 26th or 27th is my best
3  estimate.
4  Q.  Did Kristin Starkey at any point indicate to you
5  that she was going to make a post regarding Cedar?
6  A.  No.
7  Q.  I'm going to have the court reporter mark this
8  as Exhibit A.
9      (Whereupon, Defendant's Exhibit A, document
10     entitled Attachment A, the Instagram photo,
11     was marked for identification.)
12 Q.  The next document, Ryan, is Fern00028, so
13 attachment B.
14     MR. GORDON: The email?
15     MR. NORTHCUTT: The email, correct.
16     MR. GORDON: By the way, is there a clearer copy
17 by chance that you have, Damian?  This one is rather
18 hard to read.
19     MR. NORTHCUTT: Yeah.  The clear one I have I'm
20 going to hand here to Mrs. Long.
21     MR. GORDON: Okay.
22     MR. NORTHCUTT: It's Fern41 if you're looking
23 for a clearer version of it.
24     MR. GORDON: Thank you.
25     MR. NORTHCUTT: Here you go.  Take a look at

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 113

1  that document for a second, if you would.
2      MR. GORDON: Slightly clearer, yeah.
3      MR. NORTHCUTT: A couple of these just didn't
4  turn out that great. I don't know --
5      MR. GORDON: I don't think it's you. I think
6  it's because they scan them on their end or something.
7  I don't know.
8      (Pause in proceedings.)
9      MR. NORTHCUTT: Q. Have you seen this document
10 before?
11 A.    Yes.
12 Q.    Did you write this document?
13 A.    Yes.
14 Q.    Is that your -- is that your email address up at
15 the top there?
16 A.    Yes.
17 Q.    Okay. Do you see paragraph one, two, three,
18 four, five, six, seven, eight, starts out with "I
19 have" -- well, I'll just read it.
20      "I have communicated with the buyer, Senator
21 Brian Dahle's office. They brought the goat to support
22 the community and are okay with the alternative solution
23 of the goat getting to be donated to a farm that does
24 weed abatement." Do you see that language there?
25 A.    Yes.

Page 114

1  Q.    Did you write that?
2  A.    Yes.
3  Q.    On the second page it says, the second paragraph
4  down says, "If the only solution is to" -- "the only
5  solution" -- perhaps you could read it for me. My
6  copy's not --
7  A.    What --
8  Q.    Sccond -- starts off with, "It's the only
9  solution."
10 A.    Oh, okay. So that's the first -- okay. "If the
11 only solution is to return the goat for slaughter and
12 barbecue meat, then I will return it so that I am not
13 charged with a felony."
14 Q.    Okay. Can you tell me why you wrote that
15 sentence?
16 A.    Because the livestock manager was texting me and
17 accusing me of felony livestock stealing.
18 Q.    At any point were you -- so any point after the
19 fair on the 25th, were you asked to return Cedar to the
20 fair?
21 A.    Yes.
22 Q.    Okay. And this sentence says that you would
23 return Cedar to avoid being charged with a felony. Did
24 you make any effort to actually return Cedar to the fair
25 at any point after the fair?

Page 115

1  A.    No.
2  Q.    Okay. Go ahead and if I can get that back from
3  you there.
4  A.    Sure.
5  Q.    I'll have this attached as Exhibit B, please.
6      (Whereupon, Defendant's Exhibit B, email
7      from Jessica Long to Shasta County Fair
8      Manager dated 6-27-22, totaling 2 pages,
9      was marked for identification.)
10 Q.    Can you take a look at this document?
11      MR. GORDON: Did you say 43 and -- so you're
12 looking at -- she's looking at two separate emails now?
13      MR. NORTHCUTT: Let me see. Sorry.
14      THE WITNESS: It's one email.
15      MR. GORDON: I think they're separate emails,
16 Damian.
17      MR. NORTHCUTT: Are they?
18      MR. GORDON: Yeah. The other one's a cover page
19 to the email -- the letter Jessica sent which she
20 attached to that email.
21      MR. NORTHCUTT: All right. Well, let's just do
22 43 then.
23      MR. GORDON: Yeah.
24      MR. NORTHCUTT: My apologies.
25      MR. GORDON: No worries. Long week.

Page 116

1      (Pause in proceedings.)
2      THE WITNESS: Okay.
3      MR. NORTHCUTT: Q. Have you -- can I take a
4  look at it real quick?
5  A.    Yes.
6  Q.    Have you seen this document before?
7  A.    Yes.
8  Q.    Okay. Is this your email address at the top
9  here? The Jessica --
10 A.    Yes.
11 Q.    What's your understanding of this document?
12      MR. GORDON: Vague as to "understanding."
13      THE WITNESS: My understanding of this document?
14 Can you be more specific?
15      MR. NORTHCUTT: Q. Sure. You received this
16 email, correct?
17 A.    Yes.
18 Q.    And when you read it, what was your thought as
19 to what -- as to what the email said?
20 A.    She said, "The fair experience is not the best
21 for your family." So I thought it was her opinion.
22 Q.    Okay. Do you see the -- do you see at the end
23 here it says, "You will need to bring the goat back to
24 the Shasta District Fair immediatcly"? See that
25 language?

---

Page 117

1  A.  Yes.
2  Q.  Did you share this email with anyone?
3  A.  I did share it with -- yes.
4  Q.  Okay.  Who did you share it with?
5  A.  Kristin Starkey.
6  Q.  Okay.  Anyone else?
7      MR. GORDON: Just so there's no confusion, you
8  mean Kristin Stover, yes?
9      THE WITNESS: Is that her last name?
10     MR. NORTHCUTT: I'm messing up the names here?
11     MR. GORDON: I think so.
12     MS. SHAKIB: I believe it's Kristin Starkey and
13  Kristin Stover.
14     THE WITNESS: I never learned their last names.
15     MR. NORTHCUTT: Well, when we're talking about
16  Kristin, we're talking about --
17     MR. GORDON: Yeah.  But there might have been a
18  few times when only the last names have gone by.  So
19  anyway.  She probably meant Stover.  I mean, I could be
20  wrong, but if you check the --
21     THE WITNESS: I never learned her last name.
22     MR. NORTHCUTT: I've got it here.  Hold on a
23  second.  It's Kristin Stover.  Okay.  So any time we had
24  previously mentioned Kristin or Starkey, we were
25  referring to Kristin Stover and not her husband.

---

Page 118

1      MR. GORDON: I believe so because you didn't
2  speak with --
3      THE WITNESS: I never talked to her husband.
4      MR. NORTHCUTT: Q.  Okay.  So just for
5  clarification, so we're talking about Kristin Stover
6  here.
7      Okay.  You shared this email with Kristin Stover
8  then?
9  A.  Yes.
10 Q.  Okay.  And did you have any communications with
11  her about the email?
12 A.  I think I sent it to her in an email.
13 Q.  Did she respond to that email?
14 A.  I believe she did.  I'm not -- I don't have the
15  email memorized.
16 Q.  Okay.  Do you have a general sense of what she
17  said in her response?
18 A.  I think she was upset by some parts of it.
19 Q.  Anything else?
20 A.  No.
21 Q.  Okay.  So we'll mark this as Exhibit C.
22     (Whereupon, Defendant's Exhibit C, a
23      one-page email from Shasta District Fair
24      and Event Center to Jessica Long dated
25      6-28-22, was marked for identification.)

---

Page 119

1  Q.  This is Fern45 through 48.  I'll let you take a
2  look at that for a second.
3      (Pause in proceedings.)
4  A.  Okay.
5  Q.  Have you seen this document before?
6  A.  Yes.
7  Q.  Okay.  It's dated June 28, 2022, regarding
8  dispute over Cedar.  Is this your signature on Fern48
9  here?
10 A.  Yes.
11 Q.  Okay.  Did you draft this document?
12     MR. GORDON: Calls for attorney-client
13  privilege.
14     MR. NORTHCUTT: Okay.  I'm not asking for the
15  substance of any attorney-client communication.  I'm
16  just asking if she drafted the document.
17     MR. GORDON: Let me go off the record.  I'm not
18  going to -- let me just go off the record if you don't
19  mind.
20     MR. NORTHCUTT: Okay.  Off the record.
21     THE VIDEO SPECIALIST: We're off the record, and
22  the time is 13:37.
23     (Whereupon, a break was taken from 1:37
24      till 1:41 p.m.)
25     THE VIDEO SPECIALIST: We're back on the record,

---

Page 120

1  and the time is 13:41.
2      MR. NORTHCUTT: Q.  Mrs. Long, you understand
3  you're still under oath?
4  A.  Yes.
5  Q.  Great.  So last time we talked, my question,
6  I'll ask the court reporter to read it back to you,
7  concerning the June 28th, 2022 letter that's before you.
8      MR. GORDON: So I'm asserting an attorney-client
9  privilege.  Without any waiver of the privilege, I'm
10  allowing her to make the following statement about the
11  letter.
12     MR. NORTHCUTT: Well, let's let the court
13  reporter read back the question.
14     MR. GORDON: Oh, sorry.
15     (Whereupon, the record was read by the
16      reporter.)
17     MR. GORDON: Same thing.  I'm asserting
18  attorney-client privilege instructing her not to answer
19  without waiver of any privilege only to say the
20  following.
21     THE WITNESS: I drafted it with the help of an
22  attorney.
23     MR. NORTHCUTT: Okay.
24     THE WITNESS: And I wanted to state that I still
25  had an interest, a property interest, in Cedar, that I

---

Page 121

1  had not committed a crime, and it was in anticipation of
2  litigation.
3       MR. NORTHCUTT: Q.  Okay.  Aside from any
4  attorneys that helped draft you this, did you share this
5  document with anyone else?  Other than obviously sending
6  it to the Shasta District Fair?
7  A.    No.
8  Q.    Okay.  Are we at D?  We'll have this marked as
9  Exhibit D, please.
10      (Whereupon, Defendant's Exhibit D, a letter
11      from Jessica Long to Shasta District Fair,
12      dated 6-28-22, totaling 4 pages, was marked
13      for identification.)
14  Q.    With respect to Exhibit D, which we just marked,
15  I'm sure I'm going to get a strong objection on this,
16  but I just am curious, is -- and I'm not asking for
17  attorney-client actual information, what was
18  communicated, but was the attorney firm that helped you
19  draft that letter your current counsel?  I'm not asking
20  for communications.  Just --
21      MR. GORDON: One second.
22      MR. NORTHCUTT: Sure.
23      (Pause in proceedings.)
24      MR. GORDON: Without waiver of any
25  attorney-client privilege, you may answer that question.

Page 122

1       THE WITNESS: Yes.
2       MR. NORTHCUTT: Q.  Let's move on.  Fern39,
3  Fern40.  Have you seen either of these documents before?
4  It may be -- it might not just be --
5  A.    Do you want to look at them separately or?
6  Q.    Sure.  We can do them separately if you want.
7  So Fern39 to begin with.
8       It may not be a document.  It may be a
9  screenshot.  Have you ever seen what's presented to you
10  before?
11      MR. GORDON: You mean other than -- do you mean
12  at the time or just at any point in time?
13      MR. NORTHCUTT: At any point in time.
14      MR. GORDON: Okay.
15      (Pause in proceedings.)
16      THE WITNESS: I don't remember typing yes to
17  anything.  This language does look like something that
18  might have been on the fair when I entered, but I -- I'm
19  not certain.
20      MR. NORTHCUTT: Okay.
21      THE WITNESS: I might have clicked a box.
22      MR. GORDON: Jessica, he hasn't asked you a
23  question yet.  He asked if you had seen it before.
24      MR. NORTHCUTT: Q.  When do you think you saw
25  this document?  Or if it's not a document if it's on a

Page 123

1  screen, whatever the case may be, when you saw this
2  language before?
3  A.    Likely when I enrolled her in the fair.
4  Q.    Do you know approximately when you enrolled her
5  in the fair?  And if I've already asked this question, I
6  apologize.
7       MR. GORDON: Asked and answered, but you may
8  answer.
9       THE WITNESS: Around the middle of May.
10      MR. NORTHCUTT: Q.  How did you register Cedar
11  for the fair in May 2022?  Was it 2022?  Yes.
12  A.    '21.  No.
13  Q.    '22?
14  A.    '22, correct.
15  Q.    Okay.  How did you register Cedar for the fair?
16  A.    Online.
17  Q.    And when you did it online, did you see -- was
18  this document one of the things that you saw?
19  A.    I don't know if it doesn't look familiar to me
20  because it's not on the website.  I mean, I've never
21  seen it as a document like that.
22  Q.    But the language of it?
23  A.    I don't know the specific language, but that
24  looks like something that would have been on there when
25  I --

Page 124

1       MR. GORDON: Don't speculate, Jessica.  If you
2  remember seeing it at the time or if you don't remember
3  seeing it at the time or if you're not sure.
4       THE WITNESS: I'm not sure because it's in a
5  different format.
6       MR. NORTHCUTT: Do you remember seeing -- when
7  you signed up Cedar for -- Cedar online for the fair, do
8  you remember there being an accounting and liability
9  provision even if it doesn't look the same as this exact
10  document?
11      MR. GORDON: One that she read or one that she
12  just saw?
13      MR. NORTHCUTT: We'll do both.  Saw first.
14      MR. GORDON: All right.  Objection.  Sorry.  I
15  should have objected.  I meant vague, and I was
16  explaining why.
17      THE WITNESS: I don't remember reading.  I just
18  clicked and filled out the boxes.
19      MR. NORTHCUTT: Q.  So in response to -- in your
20  response to special interrogatory set one, question 13,
21  special interrogatory 13, said, "Did you agree to the
22  waiver prior to the exhibition of Cedar at the Shasta
23  District Fair?"  This I believe was the document that we
24  ended up attaching as the waiver.  And your response to
25  that after the objections was, "Responding party does

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 125

1   not recall whether or not she reviewed the waiver, but
2   she recalls selecting a box on an electronic
3   registration for the fair that said, 'I agree.'"  Is
4   that your understanding?
5 A.   Yes.
6 Q.   Are we up to E?  We'll have this Fern39 marked
7   as Exhibit E.
8       (Whereupon, Defendant's Exhibit E, a
9   one-page Shasta District Fair and Event
10   Center document with "Accountability &
11   Liability" at the top, was marked for
12   identification.)
13 Q.   Fern40 is the next one.  Have you ever seen this
14   document?
15       MR. GORDON: Again, Damian, objection.  Vague as
16   to time.  Do you mean at the time at issue?  I'm
17   assuming the fair registration or during this case?
18       MR. NORTHCUTT: Well, I can go back.  Let me see
19   here.
20       MR. GORDON: Well, the reason I ask, Damian,
21   someone handwrote, "Mom is Jessica Long."
22       MR. NORTHCUTT: Oh, we're talking about this
23   document?  I thought you were going backwards.  Okay.
24   Go ahead.
25       THE WITNESS: I've never seen this document.

Page 126

1       MR. NORTHCUTT: Okay.
2       THE WITNESS: Yeah.
3       MR. NORTHCUTT: That's fine.  So I'm not sure if
4   we need to mark this as an exhibit or not.  But I'll
5   just hand this to you.
6       As part of you discovery responses, you provided
7   a copy of the 2022 State Rules for California Fairs.
8   It's PLT0001 through PLT0036.  I'll hand that to you
9   there.  You don't obviously have to read every page of
10   it.
11       MR. GORDON: We can sit here and do that.
12       MR. NORTHCUTT: We can.  We have till 8:30
13   tonight, so.
14       MR. GORDON: No, we don't.  We have to be at the
15   airport and turn in and do all that stuff.
16       THE WITNESS: Yes.  I'm familiar with the
17   document.
18       MR. NORTHCUTT: Q.  How are you familiar with
19   the document?
20 A.   I printed it out, and I read parts of it.
21 Q.   Okay.  When did you read parts of it?
22 A.   During the fair.
23 Q.   Okay.  Had you read that prior to the day of the
24   fair?
25 A.   No.

Page 127

1 Q.   Would you, without spending a lot of time, be
2   able to identify the parts that you did read?
3 A.   I think I went through the whole thing and
4   skimmed the whole thing.
5 Q.   This was the date of the fair that you skimmed
6   this document; is that correct?
7 A.   The fair -- one -- couple days during the fair.
8 Q.   Okay.  Was it prior to the actual day of the
9   auction?
10 A.   Yes.
11 Q.   Can I take a look at it for one second?
12   I knew I shouldn't have taken off my stickies
13   here.  That makes things harder.
14   When you were reviewing the county fair rules
15   that we're looking at here, did you happen to take a
16   look at it's page PLT0007 number five --
17       MR. GORDON: Damian, which -- I don't have the
18   Bates stamps for whatever reason on this pdf file.
19       MR. NORTHCUTT: Sure. You want me to tell what
20   the paragraph starts with or --
21       MR. GORDON: No, the actual page number.
22       MR. NORTHCUTT: Q. Page seven, paragraph five.
23   So I can just read it.  It just says, "The exhibitor
24   agrees to defend, indemnify and hold harmless the fair,
25   the county and the State of California from and against

Page 128

1   any liability, claim, loss or expense including
2   reasonable attorneys' fees arising out of any injury or
3   damage which is caused by, arises from or is in any way
4   connected with the participation in the program or
5   event, excepting only that caused by the sole active
6   negligence of the fair."
7       Did you read that provision by chance before the
8   day of the auction?
9 A.   I can't remember.
10 Q.   Page 17 under "Market Animals," it's PLT000172,
11   it reads, "If the fair requires a terminal sale, the
12   local rules must state it in the exhibitor handbook.
13   Exhibitors and their parents or guardians must agree
14   that upon entry into market competition and
15   qualification by the market judge, the animals will be
16   sold and processed."
17       Did you read that provision by chance before the
18   day of the actual auction?
19 A.   I think so.
20 Q.   I don't see a Bates stamp number on this, but
21   maybe that's just because it's fogged up.
22       MR. GORDON: Which ones are they, Damian?
23       MR. NORTHCUTT: It looks like it's this.
24       MR. GORDON: Just saw --
25       MR. NORTHCUTT: You see the Bates stamp number

Page 129

1  on this anywhere?
2        MR. GORDON: That is severely blown up. The
3  Bates stamp number would have been five more sheets on
4  that down in the right on the corner to meet the full
5  pdf. I don't know why they printed that way.
6        MR. NORTHCUTT: Q. I'm just going to show this
7  to you really quickly. Do you have any understanding
8  what this is? And if you don't, that's fine.
9  A.    No. A little bit of understanding.
10 Q.    Okay. What's your understanding of what this
11 document is in front of you?
12 A.    4-H meat goat showmanship and 4-H market goat.
13 Q.    Is this from a phone? Is this picture from a
14 mobile device?
15 A.    I believe so. I think it's a screen capture.
16 Q.    What's your understanding of what the screen
17 capture -- why does it say "meat goat showmanship" or
18 "market goat"?
19 A.    It looks like it's part of the entry to the
20 fair.
21 Q.    Okay. We'll go ahead and mark this as Exhibit
22 F.
23       (Whereupon, Defendant's Exhibit F,
24       screenshot with "Eliza Long's items" at the
25       top, was marked for identification.)

Page 130

1        MR. GORDON: Putting an objection that it's not
2  a complete document, but other than that, proceed.
3        MR. NORTHCUTT: Q. I'm going to try to keep
4  these all together collectively as one exhibit. I'm
5  just going to have you go through them with me, tell me
6  yes, no, these are yours. Might have a couple
7  questions.
8        So this is PLT00058 through PLT00070. These
9  were produced in discovery.
10       (Pause in proceedings.)
11 Q.    Have you seen those messages before?
12 A.    Yes.
13 Q.    Okay. Are those messages -- obviously they're
14 not all written by you, but is that communication that
15 you're having with Kristin Stover?
16 A.    No.
17 Q.    The first page looks like it's dealing with, it
18 says, "We're calling from the Shasta District Fair
19 regarding a missing goat from your club." And the
20 response looks like, "Hi, I tried calling and the
21 mailbox is full. I took the goat and would like to
22 figure out how to make it right with the fair and the
23 buyer."
24       Is that communication between you and the Shasta
25 Fair?

Page 131

1  A.    I believe so. They didn't state their name, so
2  I don't know who exactly it was.
3  Q.    Here. I'll let you take a look at that.
4        (Pause in proceedings.)
5  A.    Okay.
6  Q.    It continues kind of on here. Sorry, I don't
7  have extra copies.
8  A.    That's okay.
9  Q.    On page 61, see here it says, "The fair has
10 instructed me to contact you to get the goat to the
11 fairgrounds by 10 a.m., Wednesday, June 29th. If this
12 does not happen, they will be forced to contact
13 authorities." Do you see that text message?
14 A.    Yes.
15 Q.    Is it your understanding that that came from the
16 Shasta District Fair?
17 A.    Yes.
18 Q.    And did you -- did you get Cedar to the
19 fairgrounds by 10 a.m. on Wednesday, June 29th?
20 A.    No.
21 Q.    Page 64, "Thank you so much. I only talked to
22 one person who was helping me find the solution. I
23 guess she got the word out. I'll ask her to direct the
24 energy to the fairgrounds. Please thank the senator for
25 us."

Page 132

1        Is that a text message that you sent?
2  A.    Yes.
3  Q.    "The one person who is helping me," can you tell
4  me who that is? Who you're referring to in that text
5  message?
6  A.    Kristin Stover.
7  Q.    Okay. What -- what does that mean, "I guess she
8  got the word out"? What were you saying when you used
9  those words?
10 A.    That's when I found out that she had done the
11 Instagram post. She didn't ask me or tell me she was
12 doing it.
13 Q.    Okay. See here on this next text message says,
14 "I went through and read all the state and local rules
15 again. It says that the ownership is the," says, "be
16 maintained by the person entering the fair throughout
17 the fair period. So I believe the transfer was from the
18 goat owners to the buyers."
19       MR. GORDON: Damian, where are you reading?
20 Sorry.
21       MR. NORTHCUTT: 64. The large center text,
22 second paragraph.
23       What did you mean to say when you say, "I
24 believe the transfer was from the goat owners to the
25 buyers"?

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

Page 133

1        MR. GORDON: Calls for expert opinion.
2        THE WITNESS: I meant the winning bidder.
3        MR. NORTHCUTT: Q. Okay. At some point you
4   contacted Senator Brian Dahle's office according to
5   these text messages. Can you tell me on what day you
6   did?
7   A.    It was the letter -- I dropped off the letter
8   the day after the fair -- Monday.
9   Q.    And you did it actually at his office?
10  A.    Uh-huh.
11  Q.    And that's in which town?
12  A.    Right here in Redding.
13  Q.    Okay. And from the discovery responses it
14  appears you got a response to that letter at some point;
15  is that correct?
16  A.    Yes.
17  Q.    Okay. When did you get the response, if you
18  recall?
19  A.    They either texted or called --
20  Q.    Okay.
21  A.    -- later that day or the next day.
22  Q.    And would that -- do you know approximately how
23  many days we're talking about after the -- this is
24  before -- this is before the auction or after the
25  auction that you did this?

---

Page 134

1   A.    After.
2   Q.    Okay. So how many days after the auction was it
3   when you contacted Senator Dahle's office? The next
4   day, right? You said --
5   A.    The first Monday after the auction.
6   Q.    The auction was Saturday. You contacted on
7   Monday. When did you get a response from his office?
8   A.    Either Monday afternoon or Tuesday.
9   Q.    And was the response verbal over the phone or
10  did they -- did they send you something in writing?
11  A.    He called me. The Bruce -- Bruce Ross called
12  me.
13  Q.    Who is Bruce Ross?
14  A.    I believe he's a representative for the senator
15  or an employee.
16  Q.    And what did Bruce Ross tell you?
17  A.    He just said, "You're good with the Dahles.
18  It's not up to them. It's up to the fair."
19  Q.    Did you ask what that meant?
20  A.    No.
21  Q.    Okay. PLT00068, the bottom there, do you see
22  this? It says, "Good morning, this is who has your goat
23  and they came to my house and confiscated it."
24        Do you know who wrote that?
25  A.    Raymond Allen.

---

Page 135

1   Q.    Was that message to you?
2   A.    Yes.
3   Q.    And then there's a copy of a Shasta County
4   Sheriff's Office business card. Was that sent by him to
5   you as well?
6   A.    Yes.
7   Q.    Below that down there, "I wish he would have
8   called. I had a lawyer helping." I'm assuming that's
9   you back to him sending that text message?
10  A.    Yes.
11       MR. GORDON: Damian, what page are you? What
12  Bates stamp?
13       MR. NORTHCUTT: PLT0069. Under 6.
14       MR. GORDON: Under 6, okay, thank you.
15       MR. NORTHCUTT: Q. Number 8, "If you have any
16  more questions, reach out to Detective Jacob Duncan."
17  Is that from Raymond Allen to you, if you know? This is
18  under 8.
19  A.    Yes.
20  Q.    Okay. Did you ever reach out to Jacob Duncan
21  after Raymond Allen gave you his information?
22  A.    No.
23       MR. GORDON: Well, off the record for one
24  second.
25       THE VIDEO SPECIALIST: We're off the record.

---

Page 136

1   The time is 14:12.
2        (Whereupon, a break was taken from 2:12
3        till 2:18 p.m.)
4        THE VIDEO SPECIALIST: We're back on the record,
5   and the time is 14:18.
6        MR. NORTHCUTT: Q. Mrs. Long, we're back on the
7   record. We're still under oath, penalty of perjury,
8   understand that?
9   A.    Yes.
10  Q.    Fantastic. All right. So before we went off
11  the record, I had asked you a question regarding a text
12  message that appeared to indicate that from Ray Billy's
13  Mini Farm, I guess we all know who we're talking about
14  here. It essentially said if you have any further
15  questions, go ahead and reach out to Detective Jacob
16  Duncan. And my question was to you did you actually
17  reach out to Jacob Duncan per the recommendation of the
18  text?
19  A.    My attorney did for me.
20  Q.    Okay. Fair enough. We'll attach this as
21  Exhibit G.
22        (Whereupon, Defendant's Exhibit G, copies
23        of text messages totaling 13 pages, was
24        marked for identification.)
25  Q.    I'm assuming this is part of this. We'll get to

---

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 137

1  that.
2       PLT, I'm just going to say the last numbers, 102
3  through 109. I'm going to hand you this document here.
4  Give you a chance to take a look at it.
5       (Pause in proceedings.)
6       MR. GORDON: You said 102?
7       MR. NORTHCUTT: 102 to 109.
8       (Pause in proceedings.)
9       MR. NORTHCUTT: Q. Have you ever seen that
10 document before?
11 A.    Yes.
12 Q.    Can you tell me what your understanding of that
13 document is?
14      MR. GORDON: Vague as to "understanding." Calls
15 for a legal conclusion.
16      MR. NORTHCUTT: Well, she can read the document
17 and give me her opinion of what she thinks it is.
18      MR. GORDON: Sure.
19      THE WITNESS: The local rules for the fair.
20      MR. NORTHCUTT: Okay.  Shasta Fair?
21      THE WITNESS: Yes.
22      MR. NORTHCUTT: Q.  Did you ever review those
23 rules prior to June 25th, 2022?
24 A.    Yes.
25 Q.    Can I take a look at the document real quick?

Page 138

1       To your knowledge, did you ever, and I can go
2  step through step if you want, but agree to be bound by
3  these rules by entering Cedar into the fair?
4       MR. GORDON: Calls for a legal conclusion.
5       THE WITNESS: I agreed -- I clicked the "I
6  agree" box, but I hadn't read the rules yet.
7       MR. NORTHCUTT: Q.  You said you entered Cedar
8  in approximately mid-May to the fair, correct?
9  A.    Yes.
10 Q.    Okay.  You clicked the "I agree" box without
11 reading these rules; is that correct?
12 A.    Yes.
13 Q.    Between the time that you entered Cedar in the
14 fair and the actual fair itself, did you ever take a
15 look at this document ever again?
16 A.    No.
17 Q.    Okay.  You didn't review it on the day of the
18 fair itself?
19 A.    I did --
20      MR. GORDON: Vague as "day of the fair."
21      MR. NORTHCUTT: June 25th, 2022.
22      THE WITNESS: Can you rephrase that?
23      MR. NORTHCUTT: Q.  Sure.  Did you review this
24 document on June 25th, 2022, before the bidding of -- on
25 Cedar?

Page 139

1  A.    I didn't review it on June 25th.
2  Q.    Okay.  Can you tell me what date you reviewed it
3  on?
4  A.    Possibly the 21st to the 24th is when I reviewed
5  the rules.
6  Q.    Okay.  When reviewing the rules, did you happen
7  to note here on page 50, see in bold letters it says,
8  "Auction Guidelines.  This is a terminal sale." Did you
9  see that language?
10 A.    I did see that.
11 Q.    Okay.  So is it your understanding that if Cedar
12 was bid on at the fair and sold, it would be a terminal
13 sale; is that correct?
14 A.    I didn't understand what they meant by terminal
15 sale.  There was no definition.
16 Q.    But you mentioned earlier that as early as two
17 weeks earlier on, you already were concerned that he
18 would be sold and slaughtered, and that's why you were
19 looking for other people to possibly give him a
20 different home, correct?
21 A.    Yes.
22 Q.    So you must have had some understanding of what
23 terminal sale means, correct?
24 A.    Yes.
25      Did you see on page 51, this is PLT004 -- 104, I

Page 140

1  apologize, under "All Animals," where it also says, it
2  says, "All animals including meat goats," it says right
3  there, "that are entered in the market classes and
4  qualifying for the junior livestock auction must be
5  sold," in bold letters.  Do you see that language there?
6  A.    Yes.
7  Q.    Did you read that prior to the day of the
8  auction, June 25th, 2022?
9  A.    Yes.
10 Q.    And did you also read the following paragraph, it
11 says, "All animals sold in the Shasta junior
12 livestock auction must go to processing directly from
13 the fairgrounds and will be transferred on the trucks
14 provided by the fair on Saturday, June 25th, 2022." Did
15 you read that provision as well?
16 A.    Yes.
17 Q.    Okay.  And you read that prior to the actual
18 bidding of Cedar on June 25th, 2022?
19 A.    Yes.
20 Q.    Go ahead and have that as Exhibit H, I believe,
21 marked, please.
22      (Whereupon, Defendant's Exhibit H, a
23      document entitled, All General Livestock
24      Rules & Guidelines, totaling 12 pages, was
25      marked for identification.)

Page 141

1  Q.     As part of your discovery responses, this is
2  PLT114.
3         MR. GORDON: Give me one second.
4         MR. NORTHCUTT: Sure. Take your time. Let me
5  know when you're there.
6  Q.     I probably don't even need to read from it, but
7  on June 26, so this is the day after the fair, did you
8  speak with anyone from the fair regarding returning
9  Cedar to the fair, if that makes any sense?
10 A.     Was that Sunday?
11 Q.     That is Sunday, yes. Let me refresh your
12 recollection if I — maybe if I can here.
13        So according to this, this is a — you can take
14 a look at this. This is part of a claim that was
15 submitted on your behalf. I'm assuming your counsel,
16 whoever prepared this, got the facts from you. But if
17 you start there, this is PLT114, it says, "Specifically
18 on or about June 26, BJ Macfarlane." So maybe take a
19 look at that and if that refreshes your recollection,
20 let me know.
21        (Pause in proceedings.)
22 A.     Yes.
23 Q.     Okay. Having read that, do you recall having a
24 conversation with BJ Macfarlane on that Saturday?
25        And when I say, "recall," I mean actually

Page 142

1  recall —
2         MR. GORDON: Well, the 26th.
3         MR. NORTHCUTT: The 26th is Sunday.
4         MR. GORDON: Sunday, yes.
5         MR. NORTHCUTT: Q. I'm not — I know you can
6  read it to me, but I'm saying can you actually recall
7  it?
8  A.     I can't remember if he — if I only talked to
9  him through text or called or talked to him on the
10 phone.
11 Q.     Okay.
12 A.     Actually, I think I do remember talking to him.
13 Q.     Okay. Do you in general terms remember what you
14 talked with him about?
15 A.     I was asking to see the contract that I had
16 signed.
17 Q.     Okay. Anything else?
18 A.     And he was asking me to return Cedar to the
19 fair.
20 Q.     Okay. And when you — he asked you to return
21 Cedar to the fair, what was your response to that?
22 A.     I wanted to know more about what I had signed
23 and wanted to see the contract.
24 Q.     Okay. And how did that conversation end? I
25 mean, did you say send me the contract, I'll look at it

Page 143

1  and get back to you?
2  A.     I believe he said the contract is with 4-H and
3  that by enrolling in the fair, I was agreeing to the
4  fair rules.
5  Q.     Okay.
6  A.     And then he sent me the fair rules over text
7  later.
8  Q.     Did you ever after the fair, so June 25th, 2022,
9  ever follow up with 4-H to see if there was some sort of
10 contract that you had with them?
11 A.     No.
12 Q.     This is PLT119. I just want you to tell me what
13 this document is, if you know. Actually I guess it
14 probably goes hand in hand with 120. If you know what
15 these two documents are. We're not going to attach
16 them. I just want to know what I'm looking at.
17        PLT120 and 120 — wait. 119 and 120, right?
18 A.     Yes.
19        (Pause in proceedings.)
20 A.     This looks like the online entry to the fair.
21 Q.     Okay. Did you have to pay $15 to enter the
22 fair, to your knowledge?
23 A.     You had to pay — yes.
24 Q.     I'm assuming since a lot of these kids that are
25 entering the fair are under 18 that they — that in

Page 144

1  order to enter the fair, they need to have a guardian or
2  parent act on their behalf. Is that your understanding
3  as well?
4         MR. GORDON: Calls for expert opinion. Calls
5  for a legal conclusion.
6         THE WITNESS: Can you rephrase?
7         MR. NORTHCUTT: Q. Sure. I mean, I can
8  actually probably find the language here. Exhibit E, so
9  we were talking about this accountability and liability
10 form, and you said it kind of maybe looked familiar, but
11 you weren't sure because of the formatting.
12        One of the things here it says, "To enter
13 online, you must be over the age of 18 years of" — "to
14 enter online, you must be over 18 years of age or be the
15 parent and or guardian of the exhibitor if the exhibitor
16 is under the age of 18, or you need the 4-H leader or
17 FFA advisor to authorize it."
18        Is that your understanding as well? In order to
19 enter the fair, you had to — I mean, I don't — let me
20 put it this way. I don't think Eliza — E.L. could sign
21 up for a credit card. I don't think E.L. can sign up
22 for fairs by herself. She probably needed you to sign
23 up on her behalf. Is that your understanding?
24 A.     Yes.
25 Q.     Okay. Did you have any conversations with

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 145

1  Lieutenant Jerry Fernandez prior to the -- prior to the
2  date of the fair, June 25th, 2022?
3  A.    No.
4  Q.    How about afterwards?
5  A.    No.
6  Q.    And we talked briefly about Detective Jacob
7  Duncan. I believe you mentioned that your counsel
8  reached out to him after the fair, correct?
9  A.    Yes.
10 Q.    Did you at any point in your individual capacity
11 not with your counsel reach out to Detective Jacob
12 Duncan before the fair?
13 A.    No.
14 Q.    How about after the fair?
15 A.    No.
16 Q.    What about same thing in your individual
17 capacity not with your counsel, at any time prior to the
18 county fair, did you -- did you reach out to Detective
19 Jeremy Ashbee?
20 A.    No.
21 Q.    How about after the fair?
22 A.    No.
23 Q.    Okay. So you had no communications with any of
24 those three individuals?
25 A.    No.

Page 146

1  Q.    These are various documents, but for the sake of
2  just having less exhibits, I'm going to collectively
3  attach them, but we can refer to them by Bate number
4  which will make it a little bit easier.
5        MR. GORDON: Damian, you might just make it even
6  easier to just refer to it as the logbook.
7        MR. NORTHCUTT: But it's not. They're various
8  different documents.
9        MR. GORDON: Oh, they are, okay. I assumed they
10 were all one.
11       MR. NORTHCUTT: Q. This is PLT154 through 160.
12 Could you please take a look at these for me?
13       (Pause in proceedings.)
14 Q.    Okay. Can you tell me what the first page is
15 here? This is PLT154.
16 A.    They were -- the kids were required to have a
17 record book, and that was her cover page.
18 Q.    The next page, PLT155, can you tell me what
19 these -- what the -- let's talk about the first picture
20 on the top here.
21       What are these two items with looks like a 4-H
22 clovers on them?
23 A.    Those are tickets to the barbecue.
24 Q.    And what's this, looks like a thank you. What
25 is that?

Page 147

1  A.    It's a thank you note.
2  Q.    To who?
3  A.    The bidder that had bid on Cedar.
4  Q.    Who prepared the thank you note?
5  A.    E.L. did.
6  Q.    Okay. And where did these tickets come from?
7  A.    I purchased them.
8  Q.    Okay. For the barbecue?
9  A.    It was a requirement to give the winning bidder
10 tickets to the barbecue, two tickets to the barbecue.
11 Q.    Okay.
12 A.    It was a 4-H requirement.
13 Q.    Did -- do you know -- did you take this picture?
14 A.    Yes.
15 Q.    And do you know when it was taken?
16 A.    After she wrote the letter.
17 Q.    Okay. Do you know when she wrote the letter?
18 A.    The night before the auction.
19 Q.    And so can you give me an estimate of time as to
20 when this photo was taken after the -- you said it was
21 after she wrote the letter which was the night before
22 the auction, right?
23 A.    What was your question again?
24 Q.    You said that this photograph was taken after
25 she wrote the thank you card. And I believe you

Page 148

1  testified that the thank you card was written the night
2  before the auction; is that correct?
3  A.    Yes.
4  Q.    So can you give me an estimate of when this
5  photograph was taken because you said it was after the
6  night before the auction, so it has to have been --
7  A.    11 -- 11 p.m., the night before the auction.
8  Q.    That's when you took the photograph?
9  A.    Yes.
10 Q.    Is there any reason that you took the
11 photograph?
12 A.    To put it in her record book for part of her
13 documents.
14 Q.    Can you -- I'm not very good with the
15 handwriting here. Can you tell me on the second
16 photograph here, this looks to be some sort of
17 handwritten card. Is that correct?
18 A.    Yes.
19 Q.    And do you recognize the writing on that card?
20 A.    Yes.
21 Q.    And whose writing is that?
22 A.    Eliza's.
23 Q.    E.L.?
24 A.    Yes.
25 Q.    Okay. Sorry.

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 149

1  A.    Sorry.  Thank you.
2  Q.    Can you -- can you tell me what it reads because
3  there's certain words that I'm not good with.
4  A.    She got a little behind in her writing during
5  COVID, so I might have trouble with it too.
6  Q.    My children are terrible, so no biggy.
7  A.    "Dear buyer, I really appreciate what you have
8  done for me.  I hope you really enjoy the goat.  I have
9  put a lot of time and work and energy into the goat.
10 Have a great rest of your day.  Live a good life."
11 Q.    Okay.  And so ultimately, was this -- is the
12 second photo the inside of the thank you card?
13 A.    Yes.
14 Q.    Okay.  From the top.  And was this photograph
15 taken at the same time as the top photograph?
16 A.    Yes.
17 Q.    The night before?
18 A.    Uh-huh.
19 Q.    Okay.  The auction.  And do you know ultimately,
20 I think you testified earlier, but correct me if I'm
21 wrong, did E.L. actually deliver this handwritten note
22 and the tickets to someone from Senator Dahle's office?
23 A.    No.
24 Q.    Okay.  Did she end up delivering it to somebody
25 else?

Page 150

1  A.    Yes.
2  Q.    Who did she deliver it to?
3  A.    A lady named Kathie Muse.
4  Q.    What's your understanding of who Kathie Muse is?
5  A.    I didn't know who she was.
6       MR. GORDON:  Vague as to time.  When do you
7  mean?
8       MR. NORTHCUTT:  Q.  Okay.  Let's -- did you know
9  who Kathie Muse was before the district fair?
10 A.    No.
11 Q.    Did you -- obviously you're familiar with her
12 name now?
13 A.    Yes.
14 Q.    Okay.  What's your understanding of why E.L.
15 provided the thank you card and barbecue tickets to
16 Kathie Muse when Brian Dahle was the highest bidder for
17 Cedar?
18 A.    The 4-H leader had pointed to a lady over there
19 and said, "That's the winning bidder."
20 Q.    Okay.  And so she, to your understanding, she
21 gave these tickets and the thank you card to Kathie
22 Muse?
23 A.    Yes.
24 Q.    Had you had any conversations with Kathie
25 Muse -- had you had any conversations with Kathie Muse

Page 151

1  prior to the bidding on Cedar?
2  A.    No.
3  Q.    Okay.  What about afterwards?  Have you had any
4  conversations with her since then?
5  A.    No.
6  Q.    PLT156, can you tell me what this document is?
7  A.    It's part of their 4-H record book.
8  Q.    Is the next page part of that as well?  It's
9  just blank.
10 A.    Yes.
11 Q.    At any -- so this is part of the 4-H record
12 book?
13 A.    Yes.
14 Q.    Okay.  And I assume these activities are
15 different activities that -- so it's like -- it looks
16 like there's a lot of back-to-back dates or close dates
17 in time.  So you see it looks like 5-21, 5-6.  It looks
18 like more than the one-month meetings that we talked
19 about earlier.
20 A.    Okay.
21 Q.    Is this -- are these things that she's doing
22 separate from those once-a-month meetings at the 4-H?
23 A.    I believe that's the second page of her records.
24 Q.    Right.  But you see how there's like one, two,
25 three, four, five different entries, and they all appear

Page 152

1  to be in the month of May?
2  A.    Yes.
3  Q.    Am I missing something, or does that seem
4  correct to you?
5  A.    That's correct.
6  Q.    Okay.  So are these things that are separate
7  from the monthly meetings because you mentioned you said
8  the 4-H meets once a month?
9  A.    Minimum once a month.  It says, "Learning
10 experiences.  Explain what you learned and what you did
11 and what skills you gained."
12 Q.    So these are outside of the one month -- I
13 mean --
14 A.    Once-a-month meetings, yes.
15 Q.    Okay.  PLT158.  I assume these are receipts that
16 you have for expenses related to Cedar such as I think
17 the pellets you might have discussed or the buckets or
18 whatever the case may be?
19 A.    Yes.
20 Q.    Is that correct?
21 A.    Yes.
22 Q.    Does this encompass all the expenses that you
23 believe you have with respect to Cedar the goat setting
24 aside any sort of other damages?  I'm talking about like
25 actual expenses that you paid for Cedar.

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

Page 153

1  A.    No.  Those were just the receipts that I had
2  saved.
3  Q.    Are there more documents or more receipts that
4  you have that you haven't produced?
5  A.    No.
6  Q.    Okay.  So like for the goat, right, you said
7  there was no receipt.  That's why I think you probably
8  wrote down 350 bucks right there?
9  A.    Yes.
10 Q.    Okay.
11 A.    I might have purchased something off of Amazon
12 like his feed bucket or something.
13 Q.    Okay.  159, PLT159.  So this is another one of
14 these learning experiences or looks like it is.  Is that
15 a part --
16 A.    Yes.
17 Q.    -- of the annual project report here?
18 A.    Yes.
19 Q.    Okay.  So this is -- you see right there it
20 says, "1-9-2022"?
21 A.    Yes.
22 Q.    What does she say here?
23 A.    "We ate goat, Dairyland Drive."
24 Q.    Would -- as part of the 4-H, did any of the
25 goats raised or other animals raised, were they ever

---

Page 154

1  slaughtered and fed to the members as part of the kind
2  of 4-H experience?
3  A.    Yes.
4  Q.    Where was -- were you ever present for one of
5  those lunches where they served an animal that they had
6  raised?
7  A.    Yes.  I was present that day.
8  Q.    Okay.  So at that time were you aware that the
9  animal had been raised as part of the 4-H program and
10 had been slaughtered for the meal?
11 A.    Yes.
12 Q.    Was E.L. aware of that fact, to your knowledge?
13 A.    I don't know if that specific goat was part of
14 the 4-H program or if they just had goat meat.
15 Q.    Okay.  But there were instances where you were
16 aware that it was an animal that had been raised as part
17 of the 4-H program, slaughtered and was fed to its
18 members, right?
19 A.    Can you be more specific?
20 Q.    Okay.  She's in a program from -- when did she
21 start the program?  September?
22 A.    Yes.
23 Q.    September to June.  With at least monthly
24 meetings?
25 A.    Yes.

---

Page 155

1  Q.    At some of those monthly meetings, according to
2  at least this one, they eat some sort of livestock?
3  A.    Yes.
4  Q.    At any of those meetings, did they announce,
5  hey, this is livestock that we raised or that, you know,
6  Little Kid A raised, and we've raised it and now we're
7  all going to eat it together?  Something to that?
8  A.    They never announced which kid and whose goat it
9  was.  They just said it was goat meat.
10 Q.    Okay.  But did they say that it had been raised
11 by a 4-H member?
12 A.    I don't recall.
13 Q.    Okay.
14 A.    It was at a lady's house that has like the --
15 they had 4-H meetings there.  It was her meat.  I don't
16 know where she got it from.
17 Q.    Okay.  This is 160, "Certificate of Completion,
18 4-24-22."  Can you tell me what's this certificate of
19 completion about?
20 A.    Youth for the Quality Treatment of Animals.
21 Q.    I see that.  What does that -- what is that?  Is
22 that a program?
23 A.    It was a required online course, a couple-hour
24 course.
25 Q.    Does any -- does any part of that course involve

---

Page 156

1  the slaughtering of goats or other animals?
2  A.    Not that I recall.
3  Q.    Okay.  Does any part of that course talk about
4  terminal fairs or raising meat?
5  A.    Not that I can recall.
6  Q.    Exhibit I.
7        (Whereupon, Defendant's Exhibit I, 4-H
8        Logbook, totaling 7 pages, was marked for
9        identification.)
10 Q.    I'm going to have you take a look at this real
11 quick.  It's very blurry, I understand.  Do your best.
12 We'll also have some clearer pictures as we go through
13 this, but this is Fern79 through 81.
14        (Pause in proceedings.)
15 Q.    I'm sorry, before we get to this and before I
16 lose my train of thought on it, did you ever receive a
17 voicemail from Lieutenant Jerry Fernandez at any point
18 regarding Cedar?
19 A.    Yes.
20 Q.    Okay.  What day was that, if you recall?
21 A.    I don't remember.  It was after the fair was
22 over.  I don't remember exactly what day.
23 Q.    Okay.  Do you remember what specifically -- not
24 specifically.  I guess if you know specifically, what he
25 said or even generally what he said on the voicemail?

---

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

---

Page 157

1 A.    I don't remember the specifics of it, but he
2 asked to call back is what I remember.
3 Q.    Okay.  Was that pretty much it?
4 A.    From what I remember.  I haven't listened to it
5 in a year, so I don't remember.
6 Q.    Do you still have it, the voicemail on your
7 phone?
8 A.    No.
9 Q.    Okay.  Any other calls from Lieutenant Jerry
10 Fernandez that you're aware of?
11 A.    He also called my husband.
12 Q.    Did he speak with your husband?
13 A.    No.  He was at sea.  It went to voicemail.
14 Q.    Okay.  Did you -- did you ever get a chance to
15 listen to that voicemail?
16 A.    I believe I did when my husband came home.
17 Q.    Okay.  Do you recall kind of what the voicemail
18 was about?
19 A.    He might have said there's a missing goat,
20 please call back, something along those lines.
21 Q.    Does your husband keep his voicemails?
22 A.    No.
23 Q.    So you wouldn't have a copy of that voicemail?
24 A.    No.
25 Q.    Okay.

---

Page 158

1 A.    I thought I sent it to you when it happened.
2        MR. GORDON:  Did you?  I don't know.  I'll check
3 my records if we have -- maybe I have it.
4        MR. NORTHCUTT:  Okay.  If you do, we'd
5 appreciate a copy.
6        MR. GORDON:  Sure.
7        MR. NORTHCUTT:  Q.  So this is Fern79 through
8 Fern81.  Looking at the first page, have you ever seen
9 this picture?
10 A.    Yes.
11 Q.    What is this picture of?
12 A.    E.L. and Cedar.
13 Q.    What -- can you read what it says there, by any
14 chance?  I know -- I'm sorry this is such a terrible
15 copy.
16 A.    "Cow Creek 4-H Shasta County 2022."
17 Q.    Can you tell me who took this picture?
18 A.    I took this picture.
19 Q.    Is that your hand in the picture?
20 A.    No.
21 Q.    Okay.  Is that E.L's hand?
22 A.    No.
23 Q.    Somebody else's hand?
24 A.    Uh-huh.
25 Q.    Whose hand is this?

---

Page 159

1 A.    I don't know.  I can make a guess.
2 Q.    Okay.  If you don't know, I don't need -- that's
3 fine.  I don't want you to guess at any questions.
4        All right.  So what is this card, or what is
5 this picture?  What is this, to your understanding?
6 A.    One of the requirements for doing the 4-H
7 project was to give potential bidders the bidder letter
8 and then to include a picture with the bidder letter.
9 Q.    Is it called a bidder letter, or have you ever
10 heard of it as a buyer letter?
11 A.    They -- the terms are kind of interchangeable.
12 They did use buyer more often in the letter.
13 Q.    Okay.  Okay.  Bidder, buyer.  Starts with a B.
14 It's a letter.  Okay.
15        Are you able to -- whose handwritten is this on
16 the following page here?
17 A.    E.L.'s.
18 Q.    This is Fern80 and 81.  This is E.L's
19 handwriting?
20 A.    Yes.
21 Q.    And can you read this?
22 A.    Yes.
23 Q.    Okay.  Can you read this to me?
24 A.    "Dear buyer, hello, my name is E.L.  I am in Cow
25 Creek 4-H.  This is my first year in 4-H.  I have

---

Page 160

1 decided to" --
2        MR. GORDON:  "Raise," Jessica.
3        THE WITNESS:  "Raise," okay.  "Raise a meat goat
4 whether for my project.  He" -- "His name is Cedar.  In
5 this year I have learned how to feed a," maybe it says
6 "whether," I don't know.  "Feed a" something.
7        MR. NORTHCUTT:  Just do your best.
8        THE WITNESS:  "I have learned how to cure goat
9 diseases.  This year I have learned how to take care of
10 meat goat."
11        MR. GORDON:  I don't know.  Could be.
12        THE WITNESS:  "My goat is a very great and he
13 will be very good palin and in tacos and every other way
14 he will be very good and tasty."
15        MR. NORTHCUTT:  Okay.
16        THE WITNESS:  "The Shasta County Fair starts at
17 8 a.m.  The day of the fair is June 22nd at the Shasta
18 County fairgrounds.  Sincerely, E.L."
19        MR. NORTHCUTT:  Could "palin" be plain?  Or
20 would you just be guessing?
21        THE WITNESS:  I don't know.  I'd be guessing.
22        MR. NORTHCUTT:  Let's pick this up in a minute.
23 Our videographer needs to change the media.  Okay, let's
24 go off the record for a second.
25        MR. GORDON:  Sure.

---

Page 161

1    THE VIDEO SPECIALIST: We're off the record.
2  The time is 14:55, and this is the end of media two.
3    (Whereupon, a break was taken from 2:55
4  till 3:03 p.m.)
5    THE VIDEO SPECIALIST: We're back on the record.
6  The time is 15:03, and this is the start of media number
7  three.
8    MR. NORTHCUTT: Q. When -- before we went off
9  the record, we were discussing the bidders buyers letter
10  that's before you. We're back on the record now.
11  Please understand you're still under oath. Correct?
12 A.    Yes.
13 Q.    Great. By the way, it's your first deposition?
14 A.    Yes.
15 Q.    Doing great.
16 A.    Thank you.
17 Q.    Okay. So you took this picture. We've got a
18  mystery hand in here. When did you take this picture?
19  We're talking about --
20    MR. GORDON: The picture -- objection.
21  Misstates evidence. Sorry, Damian. You mean picture
22  within the picture?
23    MR. NORTHCUTT: That's exactly what I'm
24  referring. I'm referring to what we've talked about
25  the --

Page 162

1    MR. GORDON: The mystery hand would be her
2  probably.
3    MR. NORTHCUTT: Right. The mystery bidder.
4    MR. GORDON: The letter within the picture.
5    MR. NORTHCUTT: Right. No, the hand isn't hers.
6    MR. GORDON: Yes. You mean the picture within
7  the picture?
8    MR. NORTHCUTT: The picture within -- the
9  picture of E.L.
10    MR. GORDON: Yeah.
11    MR. NORTHCUTT: Okay. So we're all on the same
12  page.
13 Q.    The picture of E.L., do you know when you took
14  that?
15 A.    My best guess is about a month before the fair.
16 Q.    So would you say May of 2022?
17 A.    Yes.
18 Q.    Now, did -- walk me through this. Did you
19  end up -- you took the picture. Were you the one that
20  ultimately made this bidder's letter, buyer's letter?
21 A.    I made the card. It was a card.
22 Q.    Okay. And how did you make that?
23 A.    I sent in the pictures to Shutterfly and used
24  there was a discounted Christmas card format.
25 Q.    Okay.

Page 163

1 A.    Someone else helped to write the buyer letter.
2  I didn't help her write the buyer bidder letter.
3 Q.    When you say somebody else helped her write the
4  bidder buyer letter, do you mean physically helped her
5  handwrite it or do you mean -- what do you mean by that?
6 A.    No. E.L. wrote it with her own handwriting.
7 Q.    Okay.
8 A.    Another 4-H parent helped formulate the words
9  for it.
10 Q.    Okay. So this whole -- earlier you mentioned
11  that there were -- strike that.
12    Do you know which 4-H parent or -- strike that.
13    Do you know who helped her write this language?
14 A.    Yes.
15 Q.    Who did that?
16 A.    It was also the breeder who sold Cedar to us.
17 Q.    What's that person's name again?
18 A.    Kay Delaloza. Deloza.
19 Q.    Is Kay Deloza in, like is he involved with 4-H?
20 A.    She.
21 Q.    She. I apologize.
22 A.    Yes.
23 Q.    What's your understanding of what her role is
24  with 4-H or if she has one?
25 A.    They're breeders, and I believe their children

Page 164

1  had participated in 4-H. I'm not sure if she was ever a
2  leader or volunteer, but.
3 Q.    All right. So is it your testimony that
4  although -- that this is the writing of E.L., but that
5  the language in the document itself was drafted by Kay
6  Deloza?
7 A.    I believe it was co-drafted with my daughter. I
8  believe Kay probably guided her.
9 Q.    Is there a reason that -- that E.L. worked with
10  Kay Deloza on this as opposed to with you?
11 A.    She had time with her. Kay also worked at the
12  place my daughter goes to tutoring with, and there was
13  extra time. It was like an afternoon before I picked
14  her up.
15 Q.    Do you -- can you tell me which sections were --
16  you referenced it as co-drafted with her daughter. Can
17  you -- can you tell me which sections would have been
18  your daughter's sections as opposed to those drafted by
19  Kay Deloza?
20 A.    I don't know because I didn't watch them do it
21  together, so I don't know.
22    It's -- this is kind of the procedure that all
23  the kids do is kind of a standard format just to
24  introduce yourself, and so it was just part of the
25  procedure to write these letters and give them out to

Page 165

1 the bidders.

2 Q.   Okay.  But this language isn't drafted by -- I
3 mean, it's not like a template that 4-H hands the kids
4 and says like fill this out, slap it on there, right?

5 A.   No.

6 Q.   Okay.  This is co-drafted between Kay Deloza and
7 your daughter?

8 A.   Yes.

9 Q.   Okay.  Do you know when this buyer letter that's
10 photographed here was written?

11 MR. GORDON: Asked and answered.  You can answer
12 again.

13 THE WITNESS: Within about like two weeks before
14 the fair is my guess.

15 MR. NORTHCUTT: Go ahead and mark that as
16 Exhibit J.

17 (Whereupon, Defendant's Exhibit J,
18 handwritten thank you letter, totaling 3
19 pages, was marked for identification.)

20 MR. NORTHCUTT: Fern54.  This is a screenshot.

21 MR. GORDON: Damian, give me a moment.  The
22 Bates stamps are very concealed here because of the dark
23 color on the side for us.  Got it.

24 MR. NORTHCUTT: Q.  Do you recognize that?  It
25 looks -- appears to me at least to be messages back and

Page 166

1 forth on a cell phone of some sort.

2 A.   Yes.

3 Q.   Do you recognize those messages?

4 A.   Looks like an email I sent to Kristin Stover.
5 Is that her last name?

6 Q.   Yeah.  June 26, is that the date there, appears
7 to be?

8 A.   Yes.

9 Q.   It reads, "I just attached four pictures.  We
10 made it down there and back.  Now to deal with the
11 consequences," dot, dot, dot.  "Thanks again for your
12 help finding him a nice farm and family where he will be
13 valued."  And then I don't know, it's some sort of emoji
14 or something.  Did you write that?

15 A.   Yes.

16 Q.   What did you mean by "now to deal with the
17 consequences," dot, dot, dot, when you wrote that?

18 A.   I thought my daughter would be kicked out of 4-H
19 or not be able to participate in the fair.  And I had
20 offered to pay for any inconvenience backing out of the
21 sale this late in the game caused, so I thought that I
22 would have to pay someone for inconveniences that it
23 caused.

24 Q.   Did you also think that perhaps you'd be charged
25 criminally for taking Cedar from the fair?

Page 167

1 A.   No.  I didn't think I would be.

2 Q.   Okay.  Even though in that earlier message you
3 had mentioned if I have to return Cedar in order to
4 avoid being given a felony --

5 MR. GORDON: Misstates testimony.

6 MR. NORTHCUTT: I'm just summarizing.

7 MR. GORDON: It's not an earlier message because
8 the message postdates this date.

9 THE WITNESS: I responded this to her first.
10 And then I talked to the fairgrounds, and they started
11 accusing me of a felony.

12 MR. NORTHCUTT: Q.  Okay.  So this -- this is
13 dealing with your worrying about the response from the
14 district fair and the response from 4-H?

15 A.   And the bidders, yeah.

16 Q.   Okay.  Exhibit K, please.

17 (Whereupon, Defendant's Exhibit K, a
18 one-page screenshot of text message and
19 pictures, was marked for identification.)

20 Q.   I'm just going to shoot off some names, and if
21 we haven't talked about them before, let's just talk just
22 really briefly about them, then we can get to the final
23 section here.

24 A.   Okay.

25 Q.   Eric Long, is that your husband?

Page 168

1 A.   Yes.

2 Q.   Okay.  Is he represented by your office?
3 Because it says he can be contacted through counsel.

4 MR. GORDON: Yeah.  I mean, he can be contacted
5 through us.  For the time being, let's just say yes.

6 MR. NORTHCUTT: Q.  Chad Fowler, we discussed
7 him.  Raymond Allen, we discussed him.  Kristin Stover,
8 lots of discussions on that. ▮▮▮▮▮▮▮, who is that?

9 A.   That was another parent in Cow Creek 4-H.

10 Q.   Did you have discussions with her about Cedar
11 the goat?

12 A.   Yes.

13 Q.   Okay.  How about with respect to discussions
14 with respect to Cedar the goat being entered into a
15 terminal fair?

16 A.   No.

17 Q.   What about -- well, I can keep asking what kind
18 of -- what conversations did you have with Heather Orso
19 regarding Cedar the goat?

20 A.   We --

21 MR. GORDON: Objection.  Asked and answered.

22 MR. NORTHCUTT: No, she didn't answer it.

23 MR. GORDON: Didn't she say --

24 THE WITNESS: She was another parent, so we
25 talked about all the things like -- all the things that

Page 169

1  we had to do in 4-H.  We coordinated and --
2      MR. NORTHCUTT: Q.  Did you ever -- did you ever
3  talk with her about removing Cedar from the fair?
4  A.    No.
5  Q.    Okay.  ████████████ Who is she?
6  A.    The little girl who went with my daughter to
7  feed Cedar.  It's her parents.
8  Q.    ████████████ is the mother?
9  A.    Yes.
10  Q.    Okay.  Did you have any conversations with her
11  at any time about removing Cedar from the fair?
12  A.    I told her after.
13  Q.    After.  Okay.  Approximately what day?
14  A.    I don't know, maybe a week later.
15  Q.    Okay.  Have you talked on the phone?
16  A.    No.  She lives down the street.
17  Q.    Okay.  So it's in person?
18  A.    Yes.
19  Q.    Okay.  Can you tell me the sum and substance of
20  your conversation?
21  A.    I told her that I had removed Cedar from the
22  fair.  And then a few days later I had found out that
23  they were accusing me of felony livestock charges, and I
24  asked her if she would be able to take care of Eliza if
25  I was arrested.

Page 170

1  Q.    And what was her response to that?
2  A.    Yes.
3  Q.    Did she say anything else to you?
4  A.    She was scared for me.
5  Q.    Anything else you can recall?
6  A.    About what?
7  Q.    Did she make any comments such as you shouldn't
8  have taken Cedar from the fair?
9  A.    No.  I think they were -- they knew Eliza was
10  sad about Cedar, so.
11  Q.    BJ Macfarlane, we talked about his -- your
12  conversation with him on June 26, 2022.  Do you recall
13  any other conversations with BJ Macfarlane after the
14  bidding and the auction on the 25th?
15      MR. GORDON: Vague as to "conversations."
16      MR. NORTHCUTT: I don't -- emails, phone calls,
17  I don't care.
18      THE WITNESS: I believe I had the initial phone
19  conversation with him and then it was text.
20      MR. NORTHCUTT: Q.  Okay.  And those texts have
21  been produced, I assume?
22  A.    Yes.
23  Q.    Melanie Silva.  We had that one document
24  earlier.  I believe she responded to you.  Aside from
25  that email, do you recall having any other conversations

Page 171

1  with her about the removal of Cedar from the county fair
2  on June 25th, 2022?
3  A.    No.  I've never talked to her in person.  It was
4  just the emails.
5  Q.    Nothing over the phone?
6  A.    No.
7  Q.    Brian Dahle's office we've talked about.  Dahle.
8  ████████████, who is that?
9  A.    That is my daughter's friend's father.
10  Q.    Okay.  Have you had any conversations with ████
11  ████████ about removing Cedar from the district fair on
12  June 25th, 2022?
13  A.    Yes.
14  Q.    Okay.  Can you tell me the sum and substance of
15  those conversations?
16  A.    He was there.
17  Q.    Can you explain what that means?
18  A.    My daughter was riding the rides with his kid.
19  And then it was time to go and we were walk -- when I
20  handed her the leash, they witnessed it.
21  Q.    Okay.  So they were there when you handed the
22  leash to your daughter shortly before you --
23  A.    Left.
24  Q.    -- left the goat, took the goat from the fair,
25  correct?

Page 172

1  A.    Yes.
2  Q.    Did you have a conversation with him?
3  A.    No.  But I asked them to help carry my chairs to
4  the car.
5  Q.    Okay.  So they also walked out with you and E.L.
6  and the goat when you left the fair; is that correct?
7  A.    They walked out next to us, yes.
8  Q.    And you had no discussion during that time when
9  you were all walking out together about the removal of
10  Cedar, did you?
11  A.    I did.  I said that I was going to take him to
12  the farm.
13  Q.    Okay.  And what was David Presley's response to
14  that?
15  A.    They looked sad while Eliza was crying, so.
16  Q.    Did he verbally say anything to you?
17  A.    I don't remember exactly what he said.
18  Q.    After he helped carry the chairs to the car; is
19  that correct?
20  A.    Yes.
21  Q.    Since then, have you had any conversations with
22  him about removing Cedar from the fair?
23  A.    I can't remember specifically.
24  Q.    Okay.  Let's start off with do you recall
25  actually having any conversations with him?  Not the

Page 173

1  substance of it, just do you recall having any phone
2  calls with him?
3  A.  Yes.
4  Q.  Okay.  And do you recall any of the substance of
5  any of those phone calls that you had with him after
6  Cedar was removed from the fair?
7  **MR. GORDON:** Objection.  Broad.
8  **MR. NORTHCUTT:** As to Cedar's removal.
9  **THE WITNESS:** I can't remember, but I think I
10  probably told him that I took him to the farm and
11  that --
12  **MR. GORDON:** Don't speculate, Jessica.  If you
13  remember, tell him something you remember.  If you don't
14  remember --
15  **MR. NORTHCUTT:** Q.  Do you not remember or are
16  you guessing or do you actually kind of recall what
17  you're testifying to?
18  A.  **I know that I talked to him.  I don't remember**
19  **specifically what I told him.**
20  Q.  Okay.  Do you know generally what you told him?
21  A.  **I believe I told them that the sheriff was**
22  **coming after me accusing me of a felony and I -- again,**
23  **my husband was at sea and I was terrified so I gave him**
24  **phone numbers to our neighbor's parents just in case I**
25  **was arrested, there were people that could look out for**

Page 174

1  **them while my husband was gone.**
2  **So I did tell him that there was a possibility**
3  **that I might be arrested.**
4  Q.  Okay.  _____, is that his wife? _____
5  wife?
6  A.  Yes.
7  Q.  Okay.  Any conversations with her after -- or I
8  mean let's start with any -- was she there at the fair
9  when you decided to remove Cedar?
10  A.  Yes.
11  Q.  And was she assisting her husband in helping you
12  with the chairs out to the car?
13  A.  **She had -- she was -- she may have been.  She**
14  **had her kids with her too, so.**
15  Q.  Okay.
16  A.  **I don't remember exactly who carried the chairs**
17  **or the cooler.  Somebody carried something for me.**
18  Q.  Did you have a conversation when you were --
19  when you were taking Cedar from the fair with her about
20  the removal of Cedar?
21  A.  **She witnessed a conversation I had with my**
22  **daughter.  And then as we were going, as we were**
23  **leaving, I was quiet to the car.**
24  **And then I just said that I was like nervous and that I**
25  **wanted to go take him to the farm.**

Page 175

1  Q.  That's what you told her?
2  A.  Yes.
3  Q.  And what did she say in response?
4  A.  **They didn't say much.  They just looked like**
5  **they were sad for Eliza when she was crying.  And just,**
6  **you know, they looked happy that it wasn't going to be**
7  **her crying anymore.  But I don't remember --**
8  Q.  Has anyone from the time that you took Cedar the
9  goat from the fair to now -- strike that.
10  From the time you took Cedar the goat from the
11  fair to, let's say August of 2022, did anyone -- I mean,
12  do you recall anyone ever telling you like, hey, that
13  probably wasn't a good idea to take Cedar from the fair?
14  A.  Yes.
15  Q.  Okay.  Who told you that?
16  A.  _____
17  Q.  Anyone else?
18  A.  **They said it was embarrassing for the Cow Creek**
19  **4-H group, and I shouldn't have done it.  The other**
20  **moms.  The one mom just blocked me on her phone**
21  **immediately.**
22  Q.  Who is that?
23  A.  **Her name was _____**
24  Q.  Do you know how to spell her last name?
25  A.  _____ I believe.

Page 176

1  Q.  Okay.  Anyone else?
2  A.  **Who told me I shouldn't have done it?**
3  Q.  Yeah.
4  A.  **Well, and it's in the newspapers.  There was a**
5  **newspaper article where they said I shouldn't have done**
6  **it, and they felt bad for the CEO of the fair.  The Red**
7  **Bluff Daily or something.**
8  Q.  I'm talking about people you've actually
9  communicated with or had interaction with directly.
10  A.  No.
11  Q.  Okay.  So just Melissa Magana and --
12  A.  **She didn't even say I shouldn't have done that.**
13  **She just blocked me.**
14  Q.  And _____ though, did say that?
15  A.  Yeah.
16  Q.  Okay.  And no one else other than those two,
17  aside from any sort of media coverage?
18  A.  **My daughter's kindergarten teacher made a post**
19  **that I shouldn't have done it.**
20  Q.  Okay.  What's her name?
21  A.  **I don't remember.  Let me think.  I don't know**
22  **why her name's not coming to me.  Oh, _____.**
23  **She didn't say it to my face but she posted it and we're**
24  **friends so I saw it.**
25  Q.  Do you know what school she teaches at?

Case 2:22-cv-01527-DAD-AC   Document 99-6   Filed 07/31/24   Page 47 of 62

LONG vs.                                                                JESSICA LONG
FERNANDEZ                                                            August 24, 2023

Page 177

1  A.    [redacted]
2  Q.    Do you know how that's spelled?
3  A.    [redacted]
4  Q.    What town is that in?
5  A.    [redacted]
6  Q.    Anyone else?
7  A.    That's all I can think of.
8  Q.    Okay.  Fair enough.  Jackie [redacted] is your former
9  name?  Or no.
10 A.    That's my sister.
11 Q.    That's you sister, okay.  Sorry.  I apologize.
12       Did you have conversations with her about
13 removing Cedar from the fair?
14 A.    Afterwards I told her.
15 Q.    And do you recall approximately when you told
16 her?
17 A.    I don't know.  Probably within a week.
18 Q.    And do you recall the sum and substance of what
19 you guys talked about?
20 A.    I told her that it was really sad and that Eliza
21 didn't want to do it and I didn't make her.  And that I
22 offered to reimburse any expenses pulling out of the
23 contract caused, but the sheriffs were still coming
24 after me.
25 Q.    Okay.  And did -- what was her response to that?

Page 178

1  A.    She couldn't believe -- I also told her when
2  they hunted him down and killed him, and she couldn't
3  believe that a sheriff would do that.
4  Q.    Okay.  Any other --
5  A.    As part of a kid's club.
6  Q.    Anything else you can recall?
7  A.    No.
8  Q.    Okay.  Brenda Ferguson, who is she?
9  A.    That's my friend from college.
10 Q.    Did you speak with her about removing Cedar from
11 the fair?
12 A.    I told her afterwards.
13 Q.    Okay.  What did you -- I mean, did you just say,
14 hey, I removed the goat from the fair?
15 A.    No.  I can't remember.  It was a year ago, but I
16 mean, I told her that --
17 Q.    That's fine if you don't remember.  Do you
18 remember anything at all about that conversation you
19 had?
20 A.    No.
21 Q.    Okay.  Salvador Hernandez, LA Times; Vimal
22 Patel, New York Times; Nicholas Kristof, New York Times.
23 Are these -- these were identified as people in response
24 to special interrogatory 19.  It says, "Identify all" --
25 aside from your attorney, so not dealing with these two

Page 179

1  fine people here, "Please identify all persons with whom
2  you've communicated about Cedar since June 24, 2022."
3       Is it fair to say that you've spoken with
4  Salvador Hernandez at the LA Times about Cedar?
5  A.    Yes.
6  Q.    When did you speak with him?
7  A.    Shortly after we filed the lawsuit.
8  Q.    Okay.
9  A.    So in September of 2022.
10 Q.    Without -- without any sort of discussions
11 between your counsel, did you decide to contact Salvador
12 Hernandez of your own volition, or were you encouraged
13 to do so by somebody else?
14       MR. GORDON: Objection.  Assumes she contacted
15 him at all.
16       MR. NORTHCUTT: She just said she did.
17       MR. GORDON: She said she spoke with him.
18       MR. NORTHCUTT: Yeah.  Contacted, communicated,
19 spoke with.
20       MR. GORDON: Contact implies like affirmatively
21 reaching out.
22       MR. NORTHCUTT: I can rephrase the question.
23       MR. GORDON: Please do.
24       MR. NORTHCUTT: Did you decide to call Salvador
25 Hernandez of the Los Angeles Times about Cedar of your

Page 180

1  own volition, or did someone encourage you to do it?
2       MR. GORDON: Again, assumes -- she did not --
3  assumes she called him on her own volition as opposed to
4  him calling her or us.
5       MR. NORTHCUTT: Okay.  Did you -- let's go back.
6       MR. GORDON: There you go.
7       MR. NORTHCUTT: I'm trying not to make this --
8       MR. GORDON: No, no, no.  I know you don't want
9  to go there, yeah, I understand.
10      MR. NORTHCUTT: But Salvador Hernandez, did he,
11 from the Los Angeles times, after the lawsuit was filed,
12 did he contact you, or did you contact him?  And when I
13 say "contact," I mean telephone.
14      MR. GORDON: Yes.
15      THE WITNESS: He called me.
16      MR. NORTHCUTT: He called you.  Okay.
17      THE WITNESS: And him.
18      MR. GORDON: Yes.  It's not a communication.  He
19 called us.
20      THE WITNESS: He called us.
21      MR. NORTHCUTT: Q.  You didn't reach out to him
22 first?
23 A.    No.
24 Q.    Same questions.  Vimal Patel, New York Times,
25 did he call you regarding your removal of Cedar the

Page 181

1   goat?
2   A.      He called us --
3           MR. GORDON: I'm just going to jump in. Same
4   answer.
5           MR. NORTHCUTT: Q.  Is it the same answer?
6   A.      Yes.
7   Q.      He called you?
8   A.      Yes.
9   Q.      You didn't reach out to him first?
10  A.      No.
11  Q.      Nicholas Kristof, New York Times, same thing, he
12  reached out to you first by phone?
13  A.      Yes.
14  Q.      Okay.  And I assume they all, and correct me if
15  I'm wrong, I assume they all just wanted to know the
16  story about Cedar so that they could put something in
17  their newspapers, correct?
18  A.      Yes.
19  Q.      Okay.  All right.  Have you directly independent
20  of your counsel ever reached out to any media outlet
21  regarding the story of Cedar --
22  A.      No.
23  Q.      -- and his removal?  Okay.
24          Do you know one way or the other if Raymond,
25  forgetting his last name here, Allen, permitted the

Page 182

1   Shasta -- if he permitted sheriffs from the Shasta
2   County Sheriff's Department to go on to his property,
3   obtain Cedar and return him?
4   A.      He texted me that they had confiscated my goat
5   from his property.
6   Q.      Did you -- did he explain to you what he meant
7   by confiscated?
8   A.      No.
9   Q.      Did he ever tell you that he allowed the
10  officers to go on to his property to obtain Cedar?
11  A.      No.
12  Q.      Earlier you had mentioned that he at one point
13  had indicated that, I'm talking about Raymond Allen
14  here, that he indicated he wanted to give you the
15  goat -- give you Cedar back, meet in Sacramento, I think
16  he proposed a time.  Is that all correct?
17  A.      Yes.
18  Q.      But you didn't show for that; is that correct?
19  A.      No.
20  Q.      Okay.  He proposed a time, right?
21  A.      Yes.
22  Q.      Did you actually show up at that time to give
23  him Cedar the goat?
24  A.      No.  He cancelled the plan.
25  Q.      He cancelled the plan.  Okay.  And that's after

Page 183

1   you told him everything's square with the Dahles,
2   correct?
3   A.      Yes.
4           MR. NORTHCUTT: Okay.  These next documents were
5   produced pursuant to the confidential documents, so
6   pursuant to the terms of the protective order, which
7   we've had our court reporter and our videographer sign,
8   I'm going to ask these be bound collectively as one
9   exhibit and be bound separately, fair enough?
10          MR. GORDON: Yep.  Thank you.
11          MR. NORTHCUTT: Okay.  We're nearing the end,
12  folks.  Don't worry.



LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023



Challe, Fisher & Morfin
Redding, California   (530)246-0942

Page 193

Page 195





Page 197

Page 199

1
2
3
4
5
6   EXAMINATION BY MR. GORDON
7      **MR. GORDON:** I'm writing dates wrong.
8   Jessica, one question and hopefully we'll get
9   out of here.  On June 25th at 9 p.m., when you had
10  removed Cedar from the fair, was it your belief that you
11  could modify, cancel or rescind any contract that might
12  have existed?
13     **MR. NORTHCUTT:** Objection.  Calls for a legal
14  conclusion, but if it's as to her personal belief --
15     **MR. GORDON:** Yes.
16     **THE WITNESS:** Yes.
17     **MR. GORDON:** No further questions.
18     **MR. NORTHCUTT:** So I'd like to just say, can we
19  do the same stipulation with respect to a certified copy
20  can be used for all purposes in this case including up
21  to and at the time of trial as the same as the original?
22     **MR. GORDON:** Yeah.
23     **MR. NORTHCUTT:** So stipulated?
24     **MR. GORDON:** So stipulated.
25     **MS. SHAKIB:** So stipulated.

Page 200

1      **MR. NORTHCUTT:** Okay.
2      **THE VIDEO SPECIALIST:** Before going off the
3   record, I know that both counsels have ordered the
4   videos.  Would you like to tell the court reporter what
5   you want as far as the manuscript goes for today?
6      **MR. NORTHCUTT:** Hard copy and electronic,
7   please.
8      **MR. GORDON:** Same.
9      **THE COURT:** Okay.  This is the end of the
10  deposition of Jessica Long.  All original videos will be
11  retained at the offices of Redding Video Productions at
12  8954 Old Oregon Trail.  We're off the record, and the
13  time is 16:10.
14      (Whereupon, the deposition concluded at
15      4:10 p.m.)
16          ---oOo---
17
18
19
20
21
22
23
24
25

LONG vs.
FERNANDEZ

JESSICA LONG
August 24, 2023

Page 201

1                    PENALTY OF PERJURY

2        Please be advised I have read the foregoing

3        deposition, and I hereby state there are:

4

5        (Check one) _____ no corrections

6                    _____ corrections attached

7

8        Executed on _____

9                          Date

10

11

12                   JESSICA LONG

13

14                       ---oOo---

15

16

17

18

19

20

21

22

23

24

25

Page 202

1              DEPONENT'S CHANGES OR CORRECTIONS

2    Note:  If you are adding to your testimony, print the
     exact words you want to add.  If you are deleting from
3    your testimony, print the exact words you want to
     delete.  Specify with "Add" or "Delete" before each
4    entry.  Please sign and date this form.

5    Deposition of:  JESSICA LONG
     Name of Case:  LONG vs. FERNANDEZ, etc.
6    Date of Deposition:  AUGUST 24, 2023

7    I, _____, have made the
8    following changes in my deposition:

9    PAGE      LINE      ADD/DELETE

10   ____      ____      _____

11   ____      ____      _____

12   ____      ____      _____

13   ____      ____      _____

14   ____      ____      _____

15   ____      ____      _____

16   ____      ____      _____

17   ____      ____      _____

18   ____      ____      _____

19   ____      ____      _____

20   ____      ____      _____

21   ____      ____      _____

22   ____      ____      _____

23   ____      ____      _____

24   ____      ____      _____

25   SIGNATURE _____ DATE _____

Page 203

1                  REPORTER'S CERTIFICATE

2

3            I hereby certify that the witness in the

4    foregoing deposition was duly sworn by me to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause; that said deposition was taken at

7    the time and place herein named; and that the testimony

8    of said witness was reported by me, a duly certified

9    shorthand reporter and disinterested person, and was

10   thereafter transcribed under my direction by

11   computer-assisted transcription.

12           I further certify that I am not of counsel or

13   attorney for either or any of the parties to said

14   deposition, nor in any way interested in the outcome of

15   the case named in said caption.

16           IN WITNESS WHEREOF, I have hereunto set my

17   hand.

18

19           DATED:  SEPTEMBER 12, 2023

20

21

22

23   _____
             SUZANNA MICKELSON, CSR No. 14270

24                   State of California

25

```
 1                   REPORTER'S CERTIFICATE

 2

 3           I hereby certify that the witness in the

 4    foregoing deposition was duly sworn by me to tell the

 5    truth, the whole truth, and nothing but the truth in the

 6    within-entitled cause; that said deposition was taken at

 7    the time and place herein named; and that the testimony

 8    of said witness was reported by me, a duly certified

 9    shorthand reporter and disinterested person, and was

10    thereafter transcribed under my direction by

11    computer-assisted transcription.

12           I further certify that I am not of counsel or

13    attorney for either or any of the parties to said

14    deposition, nor in any way interested in the outcome of

15    the case named in said caption.

16           IN WITNESS WHEREOF, I have hereunto set my

17    hand.

18

19           DATED:  SEPTEMBER 12, 2023

20

21

22    _____

23           SUZANNA MICKELSON, CSR No. 14270

24                  State of California

25
```

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

**ATTACHMENT "A"**



 bleatingheartsfarm · Follow
henrymoodie · Original Audio

 bleatingheartsfarm UPDATE: Senator Brian D;
problem allowing Eliza to keep her goat and v
donate him back to her care. The fairgrounds
pardon him from slaughter and drop charges.
her forgiveness and to please pardon this bab

Shatsa District Fair
PH: 530-378-6789
FX: 530-378-6788
ceo@sdfeventcenter.com

We desperately need the help of our commur
this goat from a baby and fell absolutely in lo\
nor her mother had any idea that entering hir
a terminal auction until it was too late. Her go
senator Brian Dahle @briandahleca. Her moth
everything she possibly could to keep him saf
him hours away to find him a new home, knov
have been fees involved, but had no idea that
felony.

We are asking for Shasta District Fairgrounds '
their heart to forgive this family for trying to k
give him a better life, and show their daughte
in the world, that love will prevail. This little gi
best for him.

Her goat is now back on the way to the fairgr
fairgrounds he will be slaughtered as fast as p
in their possession. Please find it in your heart
goat. Please help be the change to allow for li
wants him to go into fire prevention for our b
him live out his 15+ years. Please.

  

268 likes

 Add a comment..

EXHIBIT
A
Jessica Long

Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

**SEARCH WARRANT AND AFFIDAVIT**

Page 13 of 15

FERN000027



EXHIBIT 8/24/23
B
Jessica Long

Requesting solutions for the goat that was taken
Jessica Daum < ▇▇▇▇▇▇▇▇ >
Mon 6/27/2022 5:41 PM
To:

• ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Dear Shasta County Fair Manager,

I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who use them for fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to

FERN000041

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,

Jessica Long
Mother of Eliza Long,
Shasta District Fair goat lot #132

Get Outlook for iOS

FERN000042

Re: Requesting solutions for the goat that was taken
ceo sdfeventcenter.com
Tue 6/28/2022 1:31 PM
To:

- Jessica Daum < ▮▮▮▮▮▮▮▮▮▮ >

Bcc:

- Francesconi Mike@CDFA < ▮▮▮▮▮▮▮▮▮▮ >

Hello Jessica,

Thank you Jessica for taking the time to contact me regarding this issue. As a mother I am not unsympathetic regarding your daughter and her love for her animal. Having said that please understand the fair industry is set up to teach our youth responsibility and for the future generations of ranchers and farmers to learn the process and effort it takes to raise quality meat. Making an exception for you will only teach out youth that they do not have to abide by the rules that are set up for all participants. Also in this era of social media this has been a negative experience for the fairgrounds as this has been all over Facebook and Instagram, not the best way to teach our youth the value of responsibility. Unfortunately this is out of my hands.

I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately. I do hope you will continue with your idea of raising and providing quality animals for the purpose you have spoken about. I support that whole heartly. Obviously the fair experience is not the best for your family.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
(530)378-6789 ext 104
www.ShastaDistrictFairandEventCenter.com





Shasta District Fair
1890 Briggs Street
Anderson, CA 96007

---

**June 28, 2022**

*Re: Dispute over Cedar*

Dear Shasta District Fair;

This letter is in further response to my dispute with your organization concerning my daughter's goat, Cedar. My daughter's name is Eliza Long.

On June 27, 2022, I sent an email asking that your organization withdraw its demand for the return of Cedar and offering to pay for any costs or damages you have incurred as a result of this dispute. This morning, however, I received another text message from BJ McFarlane which seemingly ignored my letter and simply demanded return of my daughter's goat.

I've had time to review the documents that BJ McFarlane sent me, and I believe your organization is not within its rights to demand return of Cedar.

While you threatened to alert the authorities I had violated California Penal Code § 487a, upon examination, I have done no such thing. That statute makes it a crime to "feloniously steal[], take[], carr[y], lead[], or drive[] away...any caprine animal...,



FERN000045

[1] which is the personal property of another, or [2] who fraudulently appropriates that same property which has been entrusted to him or her, or [3] who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of that same property…is guilty of grand theft." (*Id.*) I cannot possibly have done any of those things because Cedar was not your organization's personal property. To the contrary, and as the 2022 State Rules For California Fairs indicate ("State Rules"), it was my daughter's personal property. Specifically, the State Rules provide in relevant part that "exhibitors must be legal owners of all entries. Ownership must be maintained through show date(s)." (See State Rules at p. 6.) Cedar was removed during that period, so the State Rules admit he was still my daughter's personal property.

Consistent with the State Rules, your organization's All General Rules and Guidelines ("General Rules") also require that "Exhibitors must be able to show proof of ownership at any time…." (See General Rules at p. 3.) Again, Shasta District Fair was not the owner.

Finally, that your organization did not become the owner of Cedar is further confirmed by the provision in your General Rules advising the Junior Exhibitors to obtain liability insurance. (See General Rules at p. 8.)   If Cedar became your property by virtue of our entry to the fair, there would be no need for the Junior Exhibitors to obtain insurance, as the fair would be liable. In sum, Cedar was my daughter's personal property so California Penal Code § 487a is not even triggered.

FERN000046

Furthermore, in the event the Shasta District Fair could claim Cedar became its personal property,"[i]t is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1017, citing *People v. Butler* (1967) 65 Cal.2d 569, 573.) As I believed in good faith that Cedar was not the Shasta District Fair's personal property, no violation of Penal Code § 487a was committed.

Lastly, if anyone other than my daughter has a right to the goat, it would be Senator Brian Dahle as he was the successful bidder at auction. But his office has represented to me that they have relinquished any rights they have to Cedar, dead or alive. As a result, not only was there no crime committed, but the Shasta District Fair now gets to keep his bid of $11.00 per pound x 82 pounds, $902.00. Thus, the Shasta District Fair has actually profited from this event—it cannot claim any harm. For the Shasta District Fair to claim it's been damaged by this event, it would have to show some loss arising from a breach I committed. (*See, e.g., Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473 ["A breach of contract is not actionable without damage"].) But your General Rules state that the Shasta District Fair will be entitled to only "7.0% of the sale price deducted from the [Exhibitor's] check...." So, had the slaughter been accomplished, the Shasta District Fair would have collected only $63.14. But now, it has received, and gets to keep $902.00, a profit of $838.36. So if anything, Shasta District Fair has been unjustly enriched by this situation.

Lastly, it must be stated with clarity that, because Shasta District Fair was never the owner of Cedar, the only possible rights it has in transaction are to the monies it could have earned, i.e., $63.14, which it has more than retained. So any legal action on the matter would per se be frivolous. Nevertheless, my offer to reimburse any other reasonable costs associated with this event remains open. I cannot envision what those costs would be, but I will of course review them in good faith.

This letter is not a waiver of any rights. Further, while its purpose is in anticipation of litigation, I am equally sending this letter to resolve the matter. My daughter has/is bonded with Cedar and, had we known what a terminal auction entailed, we never would have gone down this path. Fortunately, Shasta District Fair has actually profited from this event so this dispute should be put to rest.

In your email you expressed concerns about social media postings. If we can resolve this situation with Cedar not being brought in for slaughter, I am willing to consider signing a non-disclosure agreement.

Moving forward, I request that any communications be directed to my email at Jessicadaum@hotmail.com

Sincerely,

Jessica Long
Jessicadaum@hotmail.com