EXHIBIT G

# In The Matter Of:

*LONG vs.*

*FERNANDEZ*

---

*JESSICA LONG*

*Vol. 2*

*February 8, 2024*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File J. Long.txt

Min-U-Script® with Word Index

Page 204

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
                  SACRAMENTO DIVISION

                       ---oOo---


   E.L., a minor, by and through her
   general guardian, JESSICA LONG;
   JESSICA LONG, an individual,

                  Plaintiffs,

   vs.                          Case No.
                           2:22-CV-01527 DAD AC
   LIEUTENANT JERRY FERNANDEZ, in
   his individual capacity;
   DETECTIVE JACOB DUNCAN, in his
   individual; DETECTIVE JEREMY
   ASHBEE, in his individual
   capacity; and DOES 1 through
   10,

                  Defendants.
   _____/



              DEPOSITION OF JESSICA LONG

                    VOLUME II

            Thursday, February 8, 2024

                  1:04 p.m. PST



   Reported by:  STACY A. SHORT, CSR NO. 7446
```

Page 206

```
 1                    I N D E X

 2

 3             INDEX OF EXAMINATION(S)

 4

 5  WITNESS:  JESSICA LONG                      PAGE

 6
      Examination by Mr. Bridges . . . . . . . .  208
 7
      Examination by Mr. Northcutt . . . . . . .  306
 8
      Further Examination by Mr. Bridges . . . .  314
 9
      Examination by Mr. Gordon. . . . . . . . .  316
10
      Further Examination by Mr. Northcutt . . .  319
11
      Further Examination by Mr. Bridges . . . .  320
12

13                   ---oOo---

14

15

16             INDEX OF EXHIBIT(S)

17

18  EXHIBIT(S)        DESCRIPTION              PAGE

19
      Exhibit L     Transaction Summary for Shasta
20                  District Fair, Confirmation ID
                    shasta-2137095739380
21                  (two pages)                   220

22    Exhibit M     E-mails between Melanie M. Silva
                    and Jessica Long dated June 28,
23                  2022 and August 1, 2022
                    (one page)                    267
24

25  ///
```

Page 205

```
 1             A P P E A R A N C E S

 2

 3     For the Plaintiffs E.L., a minor, by and through
       her general guardian JESSICA LONG; JESSICA LONG:
 4
           ADVANCING LAW FOR ANIMALS
 5         407 N. Pacific Coast Highway, #267
           Redondo Beach, CA  90277
 6         PH:  202-996-8389
           EM:  rgordon@advancinglawforanimals.org
 7
       BY:  RYAN R. GORDON
 8

 9
       For the Defendants COUNTY OF SHASTA; SHASTA COUNTY
10     SHERIFF'S DEPARTMENT; LIEUTENANT JERRY FERNANDEZ;
       DETECTIVE JACOB DUNCAN; DETECTIVE JEREMY ASHBEE:
11
           BEST BEST & KRIEGER LLP
12         2855 E. Guasti Road, Suite 400
           Ontario, California  91761
13         PH:  909-466-4903
           EM:  damian.northcutt@bbklaw.com
14
       BY:  DAMIAN NORTHCUTT
15         (present via Zoom videoconference)

16

17     For the Defendants STATE OF CALIFORNIA, by and
       through the 27th District Agricultural Association;
18     MELANIE SILVA; B.J. MACFARLANE:

19         STATE OF CALIFORNIA
           DEPARTMENT OF JUSTICE
20         OFFICE OF THE ATTORNEY GENERAL
           1300 I Street, Suite 125
21         Sacramento, CA  95814
           PH:  916-210-7529
22         EM:  John.Bridges@doj.ca.gov

23     BY:  JOHN C. BRIDGES

24

25  ///
```

Page 207

```
 1             I N D E X  (continued)

 2

 3        INDEX OF UNANSWERED QUESTION(S)

 4

 5  QUESTION(S)                           PAGE   LINE

 6
    "Okay.  How many times?"              213     7
 7
    "How long did you talk to your
 8  attorneys for to prepare for your
    deposition today?"                    213    17
 9
    "When did you speak to your attorneys
10  to prepare for your deposition today?" 213    24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  ///
```

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 208

1    DEPOSITION OF JESSICA LONG, VOLUME II, taken on
2  behalf of the Defendants State of California, by and
3  through the 27th District Agricultural Association,
4  Melanie Silva, and B.J. MacFarlane, at the offices of
5  Challe, Fisher & Morfin, Certified Shorthand Reporters,
6  1828 South Street, Redding, California 96001, on
7  Thursday, the 8th day of February, 2024, commencing at
8  the hour of 1:04 p.m. Pacific Standard Time (PST),
9  before STACY A. SHORT, a Certified Shorthand Reporter of
10  the State of California, License No. 7446, taken
11  pursuant to Notice.
12              ---o0o---
13
14          JESSICA LONG,
15       being first duly sworn, was examined
16          and testified as follows:
17
18    THE WITNESS: I do.
19
20       EXAMINATION BY MR. BRIDGES
21    MR. BRIDGES: Q. All right. Good afternoon.
22  Is it okay to refer to you as Mrs. Long?
23  A.    Yes.
24  Q.    Okay. I introduced myself informally off the
25  record, but for the record, my name is John Bridges.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 209

1  I'm with the California Attorney General's office, and I
2  represent the Shasta District Fair, Melanie Silva, and
3  B.J. MacFarlane.
4       You were deposed on August 24th of last year in
5  this case; is that correct?
6  A.    Yes.
7  Q.    Okay. And do you recall giving deposition
8  testimony at that time?
9  A.    Yes.
10  Q.    Do you recall the -- that there were some
11  admonitions, the ground rules that were provided to you
12  at the beginning of that deposition?
13  A.    Mm-hmm. Yes.
14  Q.    Okay. Thank you. I'll just remind you of a
15  couple of them just to make sure things go smoothly
16  today.
17       Just remember you're -- you're under oath, so
18  the testimony you give today has the same effect as if
19  you were testifying before a judge and jury. You
20  understand that?
21  A.    Yes.
22  Q.    All of your responses have to be verbal and out
23  loud.
24  A.    Yes.
25  Q.    Okay. So if you shake your head or shrug your

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 210

1  shoulders, I might ask you, "Is what a 'yes' or is that
2  a 'no'?" I'm not trying to give you a hard time. I
3  just want to make sure we have a clear record. Okay?
4  A.    Okay.
5       MR. GORDON: John, may -- and ask the court
6  reporter one thing while you're doing this. Some of the
7  depositions the court reporters have wrote "nodding" or
8  "indicating" --
9       MR. BRIDGES: Mm-hmm.
10       MR. GORDON: -- or something like that, so
11  answer audibly, but -- do you do that as well?
12       THE REPORTER: Yes, I do.
13       MR. GORDON: Okay. Okay.
14       MR. BRIDGES: Q. And I -- all of your answers
15  have to be -- oh, no. I already said that one.
16       Only one person can speak at time, which is
17  maybe the most -- maybe the most important one because
18  it will become more conversational as we go, and it's
19  important that the court reporter can type down what
20  everyone is saying. Okay?
21  A.    Okay.
22  Q.    I don't want you to guess or speculate about
23  anything today, but if you are able to give me your best
24  estimate, I am entitled to that. Okay?
25  A.    Yes.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 211

1  Q.    Are you comfortable with the difference between
2  a guess and an estimate?
3  A.    Yes.
4  Q.    And the last thing I'll say is just because your
5  attorney objects, which I'm sure he will object to -- to
6  several questions of mine today, you still have to
7  answer unless he instructs you not to answer. Okay?
8  A.    Okay.
9       MR. GORDON: But if it -- again, if she -- if
10  you don't understand something though, you can ask him
11  to rephrase.
12       MR. BRIDGES: That was going to be the -- I
13  realize I said that I only had one more, and that was
14  going to be one -- one more. Lawyers always do that.
15       MR. GORDON: Mm-hmm.
16       MR. BRIDGES: We say it's the last question --
17       MR. GORDON: Yeah.
18       MR. BRIDGES: -- then we have four more.
19       MR. GORDON: Yeah.
20       MR. BRIDGES: Same with admonitions, I guess.
21  Q.    (By Mr. Bridges) If I ask you a question and you
22  don't understand the question, please let me know. I
23  don't want you to assume that you are answering the
24  question that I'm trying to ask. I want to make sure
25  we're on the same page so you are answering the question

LONG vs.
FERNANDEZ

JESSICA LONG - Vol. 2
February 8, 2024

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 212

1  that I intend to ask. Does that make sense?
2  **A.    Yes.**
3  Q.    So I can put the question in context, ask it a
4  different way, just to make sure that we're on the same
5  page. Okay?
6  **A.    Okay.**
7  Q.    Have you reviewed any documents to prepare for
8  your deposition today?
9  **A.    Yes.**
10 Q.    What have you reviewed?
11 **A.    The docu- -- the documents that --**
12     **MR. GORDON:** Yeah. She won't be able to name
13 them all, John, but it's the -- we -- the documents on
14 the -- the -- produced.
15     **MR. BRIDGES:** Okay.
16 Q.    (By Mr. Bridges) Anything else?
17 **A.    No.**
18 Q.    Did you review your deposition transcript from
19 the August deposition?
20 **A.    Yes.**
21 Q.    When did you do that?
22 **A.    About a week ago.**
23 Q.    Okay. And I -- well, we'll get to the documents
24 in a minute. Have you spoken to anyone other than your
25 attorneys to prepare for your deposition today?

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 213

1  **A.    No.**
2  Q.    Okay. Have you spoken to your attorneys to
3  prepare for your deposition today?
4      **MR. GORDON:** You can answer "yes," but you just
5  can't talk about content.
6      **THE WITNESS:** Yes.
7      **MR. BRIDGES:** Q. Okay. How many times?
8      **MR. GORDON:** I -- I object. Don't -- I don't
9  want her answering the -- the number of times.
10     **MR. BRIDGES:** On what grounds?
11     **MR. GORDON:** Attorney-client privilege.
12     **MR. BRIDGES:** I'm not asking her about the
13 content of any communication.
14     **MR. GORDON:** Yeah, I know. I'm still
15 instructing her not to answer. I -- I know you're not,
16 but --
17     **MR. BRIDGES:** Q. How long did you talk to your
18 attorneys for to prepare for your deposition today?
19     **MR. GORDON:** Same objection.
20     **MR. BRIDGES:** Okay. Are you instructing her not
21 to answer then?
22     **MR. GORDON:** Yes.
23     **MR. BRIDGES:** Okay.
24 Q.    (By Mr. Bridges) When did you speak to your
25 attorneys to prepare for your deposition today?

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 214

1      **MR. GORDON:** Same objection.
2      **MR. BRIDGES:** Are you instructing her not to
3  answer?
4      **MR. GORDON:** Yes. Yes. Yes.
5      **MR. BRIDGES:** Q. And you're following the
6  instruction?
7  **A.    Yes.**
8  Q.    Okay. I served a notice of deposition in this
9  case that had a request for production of documents in
10 it, and your attorney at the beginning of the deposition
11 handed me a flash drive, so I haven't had a chance to
12 see what's on here, but I wanted to go through the list
13 of documents that we requested and just see what
14 documents exist and don't exist, and if you are able to
15 tell me if they're on the flash drive or not. Okay?
16 **A.    Okay.**
17 Q.    The first thing that we requested were any and
18 all written communications between you and any employee,
19 agent, and/or representative of the Shasta District
20 Fair, including but not limited to Melanie Silva and/or
21 B.J. MacFarlane prior to June 26th of 2022. Do you know
22 if there were any written communications with anybody
23 from the fair before June 26th?
24 **A.    No.**
25 Q.    Okay. The second is any and all documents

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 215

1  related to the purchase of Cedar by you. And in
2  reviewing your previous deposition transcript, my
3  understanding is that there were no documents. You paid
4  cash for the goat, and there were no documents that
5  evidenced the purchase; is that true?
6  **A.    I didn't receive any documents. The person that**
7  **sold him to me had a logbook that I watched them fill**
8  **out.**
9  Q.    Okay. Do you have a copy of the logbook in your
10 possession?
11 **A.    (Shakes head.) They never gave me anything.**
12 Q.    Okay. And would that be Kay Deloza {sic} --
13 **A.    Yes.**
14 Q.    -- or -- or Delaloza?
15 **A.    Yes. Mm-hmm. I -- I think they put it in their**
16 **records.**
17 Q.    Okay.
18     **MR. GORDON:** And John, one qualification --
19 sorry. I didn't mean to interrupt. I apologize. I
20 know you -- it is occurring to me when I assembled the
21 documents, the communications that weren't prior to the
22 26th, I gave you the ones anyway for post 26th, which
23 you probably have, but --
24     **MR. BRIDGES:** Sure.
25     **MR. GORDON:** -- I gave them again because -- I

---

1   don't know.  Anyway.
2       **MR. BRIDGES:** That's fine.  Okay.
3   Q.    (By Mr. Bridges) The third one is any and all
4   documents related to the maintenance of Cedar by you,
5   and the examples I gave were feed expenses, boarding
6   costs, veterinary care, hoof trimming, things like that.
7   I know in your previous deposition you produced some
8   receipts from Tractor Supply; is that -- is that right?
9   **A.     There were several receipts.**
10  Q.    Okay.  And those were --
11  **A.     Some were from Tractor Supply, I believe.**
12  Q.    Are those the only receipts you have?
13  **A.     I thought there were some maybe from Palo Cedro**
14  **Feed, or I -- I think I bought a few things from Amazon.**
15  Q.    Do you still have the receipts for all those
16  items that you purchased?
17  **A.     I -- those are the only ones I saved.**
18  Q.    Okay.  So whatever you have you've provided to
19  your attorney who has provided them to us?
20  **A.     Yes.**
21  Q.    Okay.
22      **MR. GORDON:** And again, John, I believe I put
23  all the receipts on there.  I'll check again, but it's
24  a -- I believe that is all of them, so --
25      **MR. BRIDGES:** Okay.

1   Q.    (By Mr. Bridges) The fourth item is -- are any
2   and all documents related to E.L.'s contract
3   disaffirmance as identified in Paragraph 35 of the
4   second amended complaint.  We'll -- we'll cross that
5   bridge when we get there.  I know we're going to talk
6   about that a little bit later in the deposition, so
7   we'll -- we'll move on.
8           The next two requests are similar.  One's for
9   you, and one's for -- for your daughter.  It's for any
10  and all medical records related to psychological
11  treatment and/or counseling received by you or by her
12  that you claim was incurred as a result of the
13  circumstances identified in the second amended
14  complaint.  Do you know if any such records exist?
15  **A.     No.**
16  Q.    So is it fair to say you don't have any records
17  like that in your possession?
18  **A.     Yes, that's -- that's true.**
19  Q.    Okay.  And then the seventh area that I asked
20  for were copies of any government claims submitted
21  essentially to the state as identified in Paragraph 90
22  of the second amended complaint.  Do you know what a
23  government claim is?
24  **A.     Sort of.**
25  Q.    Okay.  It -- it's really a request probably more

1   for your lawyer than it is for you, but maybe he can
2   tell us.  Is --
3       **MR. GORDON:** It is there, yes.
4       **MR. BRIDGES:** Okay.
5       **MR. GORDON:** It's the two of the two -- now, I
6   didn't give the ones that -- because remember, John, I
7   sent out -- I did not know if I was supposed to send
8   them to General Services or to the fair directly, so I
9   gave you the ones to General Services --
10      **MR. BRIDGES:** Okay.
11      **MR. GORDON:** -- but they're there.
12      **MR. BRIDGES:** Are they the same?
13      **MR. GORDON:** They're the same.
14      **MR. BRIDGES:** Okay.
15      **MR. GORDON:** Yeah, yeah.
16      **MR. BRIDGES:** So the one --
17      **MR. GORDON:** Aside from the fact that the
18  General Services has the form.
19      **MR. BRIDGES:** Mm-hmm.
20      **MR. GORDON:** I didn't use the form for the fair,
21  but they're otherwise the same.
22      **MR. BRIDGES:** But the substance of the claim
23  is --
24      **MR. GORDON:** Substance is the same, yeah.
25      **MR. BRIDGES:** Okay.  Okay.

1       **MR. GORDON:** Well, I -- I not -- I should -- I'm
2   almost positive.  I'd have to double-check, but I don't
3   know why they would be different.  I think I just
4   confirmed the fair -- Melanie would have a copy, or I
5   can dig up the one I have, but I think I just converted
6   the same substance and put it as an attachment to the
7   form, I believe, but it -- yeah, it's got to be the
8   same, so --
9       **MR. BRIDGES:** Okay.
10  Q.    (By Mr. Bridges) All right.  We'll -- I want to
11  start off by asking you some questions about the entry
12  into the fair, when you entered your daughter into the
13  fair to show Cedar.  Okay?
14  **A.     Okay.**
15  Q.    You entered E.L. into the market goat division,
16  right, for the Shasta County -- or Shasta District Fair
17  in 2022; is that correct?
18  **A.     Yes.**
19  Q.    Are you sure?  Sounded like you were asking a
20  question mark at the end.
21  **A.     I think there was like two categories that I**
22  **entered.**
23  Q.    Okay.  And I'll -- let me show you some
24  documents here that might -- might help.  What I'm
25  showing you is Exhibit F from your last deposition.  Do

LONG vs.
FERNANDEZ

JESSICA LONG - Vol. 2
February 8, 2024

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 220

1  you recognize this document?
2  **A.   Yes.**
3  Q.    Okay.  Now let me show you something else here
4  which we'll mark as next in order, which is Exhibit L.
5     **MR. GORDON:** That was going to be my question,
6  John.  You're -- you're going -- you're picking up where
7  she left off for exhibits?
8     **MR. BRIDGES:** Yes.
9     **MR. GORDON:** Okay.
10    **MR. BRIDGES:** In terms of the lettered exhibits
11 at least.  There was Exhibit Number 1 at the end which
12 is 26 photographs which were attached with a
13 confidential designation.
14    **MR. GORDON:** Okay.  I don't remember, but --
15    **MR. BRIDGES:** Yeah.
16    **MR. GORDON:** -- sure.  Whatever.
17    **MR. BRIDGES:** So I'm going just with the letters
18 continuing from there.
19    **MR. GORDON:** No, that's fine.  We're going with
20 the letters.  All right.
21    (Defendants' Exhibit L marked for identification.)
22    **MR. BRIDGES:** Q.  All right.  Showing you what's
23 been marked as Exhibit L, do you recognize this?
24    (Pause while witness reviews document.)
25    **THE WITNESS:** Yes.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 221

1     **MR. BRIDGES:** Q.  Okay.  And what is this?
2  **A.   Looks like the online confirmation receipt from**
3  **entering the fair online.**
4  Q.    Okay.
5     **MR. GORDON:** Yeah.  Just a belated objection.
6  Document speaks for itself, but you still answer.
7     **MR. BRIDGES:** Q.  And if you look at the second
8  page of Exhibit L, is that the same as Exhibit --
9  Exhibit F except it's zoomed out so you can see the
10 entire page?
11    (Pause while witness reviews document.)
12    **THE WITNESS:** Yes.
13    **MR. BRIDGES:** Q.  Okay.  So from looking at
14 Exhibit L, it looks like the transaction time, so is
15 that the time that you went online and entered her into
16 the fair, would have been May 17th, 2022 at 9:57 a.m.?
17 Is that your understanding from looking at that
18 document?  The first page, yeah.
19    **MR. GORDON:** It's a little hard to see.  Where
20 you looking at, John?
21    **THE WITNESS:** (Indicating.)
22    **MR. GORDON:** Oh, okay.  I'm sorry.
23    **THE WITNESS:** Yes, it looks like it's 9:57 a.m.
24 I don't know if it was a weekday or a weekend.  I would
25 think if it was a weekend if I was doing it at 10:00.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 222

1  I'm not sure.
2     **MR. BRIDGES:** Q.  Okay.  And you paid $15 to
3  enter her into the fair?
4  **A.   Yes.**
5  Q.    Okay.  And from looking at the second page, you
6  entered her into the meat goat showmanship and the
7  market goat division, I guess for lack of a better term.
8  Is that -- is that correct?  Are those the two entries
9  you made?
10 **A.   Yes.**
11 Q.    Okay.  How did you enter her into the fair?  I
12 mean, how did you -- how did the process go?
13    **MR. GORDON:** Vague, but answer as best you can.
14    **THE WITNESS:** At what point in time?  The day we
15 physically brought him?
16    **MR. BRIDGES:** Q.  When you filled out the --
17 whatever form there was or whatever you did to enter her
18 into the fair, how did you physically do that?  Did you
19 go to a website to do it?
20 **A.   Yes.**
21 Q.    Okay.  How did you know what website to go to?
22 **A.   I think somebody forwarded me the link and said**
23 **this is where you enter.  I -- I -- I don't remember**
24 **specifically how I got the website.**
25 Q.    Okay.  So what happened when you went to the

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 223

1  website?
2  **A.   I don't remember.**
3  Q.    It was an online form?
4  **A.   Yes.**
5  Q.    Was there any part of it that you were supposed
6  to print and fill out by hand and then submit?
7  **A.   I don't think so, but I don't remember for sure.**
8  Q.    Okay.  Do you recall if there were any boxes
9  that you had to click as part of the entry form?
10 **A.   I think -- I believe there was a box.**
11 Q.    Do you remember what the box referred to?
12 **A.   No.**
13 Q.    Okay.
14 **A.   Just to enter.**
15 Q.    Do you recall if the box indicated that you
16 agreed with something in the application form?
17 **A.   I don't remember for sure, but that sounds**
18 **right.**
19 Q.    Do you know if there was a link to some other
20 document that was referenced when you entered her into
21 the -- into the fair?
22 **A.   I can't remember.**
23 Q.    Okay.  If you -- I believe you said in your
24 previous deposition that you -- you thought you clicked
25 a box that said "I agree" to some terms.  Is that your

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 224

1  understanding?
2  A.    Yes.
3  Q.    Okay.  Do you -- what terms were you agreeing
4  to?
5  A.    I -- I don't remember specifically, but whatever
6  needed to be done to enter the fair.
7  Q.    Okay.  Do you know if it was agreeing to the --
8  the state rules for the fair?
9  A.    I can't remember specifically, but I'm thinking
10  probably yes.
11  Q.    Do you know if it was the local rules for the
12  fair?
13  A.    I can't remember if it was the -- it was
14  probably local.
15  Q.    Okay.  I don't want you to guess.  If you
16  don't -- if you don't know or you don't remember, that's
17  okay.
18       MR. GORDON: It's vague as to "local rules," but
19  I think we're all talking about the same thing, is
20  the -- the livestock -- the handbook stuff.  Okay.
21       MR. BRIDGES: Q.  Do you recall when you clicked
22  "I agree" if you actually read any other documents, like
23  if you read the state rules or anything like that?
24  A.    I hadn't read the state rules, but -- at that
25  point in time.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 225

1  Q.    Okay.  Okay.  The first time you read the state
2  rules was during the fair; is that right?
3  A.    Yes.
4  Q.    Okay.  When you entered E.L. as an exhibitor in
5  the fair, did you enter on her behalf?
6  A.    Yes.
7  Q.    Okay.  I mean, in other words, she didn't
8  physically log onto the website with you and click any
9  boxes or anything like that, did she?
10  A.    No.
11  Q.    When you entered her as an exhibitor in the
12  fair, did you communicate with anyone from the Shasta
13  District Fair about -- with any questions about the
14  exhibitor application or exhibitor agreement?
15  A.    No.
16  Q.    Okay.  You weren't reading through it, and you
17  had a question about something, and you contacted
18  someone from the Shasta District Fair to -- to ask a
19  question about it; is that true?
20  A.    At what point in time?
21  Q.    When you were applying -- or filling out the
22  application for her to participate in the fair.
23  A.    Can you repeat the question?
24  Q.    Yes.  When you entered E.L. as an exhibitor in
25  the fair, did you communicate with anyone from the

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 226

1  Shasta District Fair to ask any questions about the
2  exhibitor agreement that you were agreeing to?
3  A.    No.
4  Q.    Did -- when you entered E.L. as an exhibitor in
5  the fair, did anyone from the Shasta District Fair
6  pressure you up to agree to the terms of the exhibitor
7  agreement?
8  A.    No.
9  Q.    Is it fair to say that you didn't have to enter
10  the fair as an exhibitor?
11  A.    Yes.
12  Q.    What was the point of entering the fair?  Why
13  did you enter your daughter into the fair?
14  A.    It -- it was all just part of the process, and
15  we had signed up in September, and I didn't have a place
16  to keep him, so I felt like we had to do the fair since
17  we didn't have a place to keep him.
18  Q.    Okay.  In other words, was the point of entering
19  the fair to sell Cedar?
20  A.    I don't think that's the only reason.
21  Q.    What were the other reasons?
22  A.    To experience fair, and, you know, she had --
23  yeah.  To experience the fair experience was the end of
24  the project.
25  Q.    Okay.  For practical reasons you needed a place

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 227

1  to place Cedar after the fair; isn't that true?
2       MR. GORDON: Objection to "for practical
3  reasons."
4       MR. BRIDGES: Q.  You -- you were not able to
5  take Cedar home at the end of the fair, were you, even
6  if that had been an option?
7  A.    No.
8  Q.    So you needed to sell him to someone else at the
9  auction at the fair; is that true?
10  A.    I'm not sure because I didn't know what would
11  happen if nobody bought him.  Nobody talked about what
12  would happen if nobody buys your goat, so I didn't know
13  for sure if he'd be sold.
14  Q.    Did you ask anyone what would happen if no one
15  bought the goat at the auction?
16  A.    No.  I -- I didn't think of that till later.  I
17  just didn't know.
18  Q.    Okay.  When you entered her -- well, let me ask
19  you this:  Did anyone from the Shasta District Fair
20  prevent you from selling Cedar to someone else before
21  the fair began?
22  A.    Nobody prevented me.
23  Q.    Okay.  When you entered E.L. as an exhibitor in
24  the fair, did anyone from the Shasta District Fair
25  threaten you in order to get you to agree to the terms

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 228

1 of the exhibitor agreement?

2 A.    No.

3 Q.    I believe -- and don't take my word for it.

4 It's only if you remember this. But you testified

5 previously that you didn't understand the term "terminal

6 sale" and that that meant that the goat could only be

7 sold for meat at the -- at the auction; is that true?

8 A.    I believe that's what it means, yes.

9 Q.    Is it true that you didn't understand that that

10 was the -- what you were agreeing to when you entered

11 her into the fair?

12 A.    I didn't read the word "terminal" until I was at

13 the fair reading the instructions. Nobody used the word

14 "terminal" before.

15 Q.    Okay. So you had never seen the term "terminal

16 sale" until you were at the fair?

17 A.    Yes.

18 Q.    Okay. Would you have entered -- this is a

19 hypothetical for you. Would you have entered E.L. into

20 the fair if you had known that all market goats entered

21 into the fair had to be sold for meat?

22    MR. GORDON: Improper hypothetical.

23    THE WITNESS: What did you say?

24    MR. GORDON: I'm just objecting. Improper

25 hypothetical.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 229

1    THE WITNESS: Okay. Can you say it again?

2    MR. BRIDGES: Q. Of course. Would you have

3 entered E.L. into the fair if you had known that all

4 market goats entered into the fair had to be sold for

5 meat?

6 A.    I found that out about two weeks before. So can

7 you say your question again?

8 Q.    If you had known that say on May 17th of 2022

9 when you entered her into the fair, would you have still

10 entered her?

11 A.    I'm not sure.

12 Q.    Okay. What -- what aren't you sure about?

13    Well, let me ask it this way: Why are you

14 unsure?

15    MR. GORDON: Objection. Improper hypothetical.

16    THE WITNESS: Why am I unsure if I would have

17 entered him on May 17th if I would have known it was a

18 terminal fair?

19    MR. BRIDGES: Yes.

20    THE WITNESS: I think I probably would have

21 entered as a backup plan, but I would have started

22 looking for another place to keep him on May 17th

23 knowing with certainty that he was going to load up on a

24 truck and go to a slaughterhouse right from the fair.

25    MR. BRIDGES: Q. Okay. So if you wouldn't have

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 230

1 entered Cedar into the fair, if you had known that it

2 was a terminal sale and you had not entered him, what

3 would you have done with him?

4    MR. GORDON: Improper hypothetical.

5    MR. BRIDGES: Q. My understanding is you

6 couldn't have taken him home, so what would you have

7 done if you had not entered him?

8 A.    I would have tried to find a place locally where

9 we could keep him and go see him.

10 Q.    Okay.

11 A.    I -- I don't know. Maybe board -- board him

12 somewhere like you board a horse or find a friend that

13 would take him.

14 Q.    Okay. In fact you did try to do those things;

15 right?

16 A.    (Nods head.)

17 Q.    Is that a "yes"?

18 A.    Yes.

19    MR. GORDON: Well, misstates testimony. I don't

20 think she tried boarding, but I know -- think I know

21 what you're talking about.

22    THE WITNESS: Okay. Yes. I tried -- I tried to

23 find a place close by.

24    MR. BRIDGES: Q. Okay. You did try to find

25 another -- well, try to find someone who could take him

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 231

1 so you didn't have to take him --

2 A.    Slaughter him.

3 Q.    -- to the fair. Okay. And that was before the

4 fair that you tried to find an alternative; right?

5 A.    Mm-hmm.

6 Q.    Is that a "yes"?

7 A.    Yes.

8 Q.    Okay. Isn't it true that you -- you expected

9 that Cedar would be slaughtered for meat when you

10 entered E.L. into the fair?

11 A.    Not when I entered on May 17th. I thought there

12 was a -- a cha- --

13    MR. GORDON: Belated objection. Asked and

14 answered from the prior depo, but you -- yeah.

15    THE WITNESS: So on May 17th when we entered, at

16 that point I thought they're bred to be meat goats, but

17 some people would buy them and keep them to mow their

18 lawn or, you know, variety of reasons, so I didn't know

19 with certainty on May 17th.

20    MR. BRIDGES: Q. Okay. When you took Cedar to

21 the fair at the beginning of the fair, wasn't it your

22 expectation at that time that he would likely be

23 slaughtered?

24 A.    Yes.

25 Q.    Okay. And in fact that's why you were trying to

LONG vs.
FERNANDEZ

JESSICA LONG - Vol. 2
February 8, 2024

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 232

1  find someone else to take him; correct?
2  A.    Yes.
3  Q.    Because you wanted to avoid taking him to the
4  fair.
5  A.    Yes.
6  Q.    Okay. Did anyone from the Shasta District Fair
7  make any representations to you at the time you agreed
8  to the terms in the exhibitor agreement?
9  A.    What is the representation?
10 Q.    Well, I think you said a moment ago that you
11 didn't speak to anybody from the fair when you entered
12 her into the fair; correct?
13 A.    That's true. I didn't speak to anybody when I
14 entered online.
15 Q.    So it's -- I just want to make sure. It's not
16 like you called the fair office, and someone there said,
17 "Well, it says terminal fair -- or terminal sale, but
18 you can just ignore that because you don't have to
19 comply with that." Something like that never happened;
20 right?
21 A.    No. I -- and I didn't see anywhere where it
22 says terminal sale on the entry form.
23 Q.    Okay. Before you agreed to the terms of the
24 exhibitor agreement, did anyone from the Shasta District
25 Fair tell you that by entering E.L. in the fair, you did

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 233

1  not have to sell Cedar for meat?
2      MR. GORDON: Objection. Asked and answered kind
3  of, but go ahead.
4      THE WITNESS: Can you say that question again?
5      MR. BRIDGES: Q. I can. Before you agreed to
6  the terms of the exhibitor agreement, did anyone from
7  the Shasta District Fair tell you that by entering E.L.
8  in the fair, you did not have to sell Cedar for meat?
9  A.    No.
10 Q.    Okay. Was it your understanding that when he
11 was sold, you and E.L. would no longer be his legal
12 owners?
13     MR. GORDON: Objection as to "sell" and when
14 since that's in dispute.
15     THE WITNESS: Can you say --
16     MR. BRIDGES: Q. Yeah. Before the fair, when
17 you took Cedar to the fair, you -- you planned to go
18 through the auction; right?
19 A.    Yes.
20 Q.    I mean, your daughter sent out buyers' letters;
21 right?
22 A.    Yes.
23 Q.    Okay. I mean, you had an interest in trying to
24 sell him at the -- at the auction at the fair; true?
25 A.    Yes.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 234

1  Q.    Okay. So was it your understanding --
2      MR. GORDON: Vague as to "interest," but --
3  belated -- belated objection. Sorry.
4      MR. BRIDGES: Sure.
5  Q.    (By Mr. Bridges) Was it your understanding that
6  when Cedar was sold, even before he was going through
7  the auction, say two days before that -- was it your
8  understanding that once the sale went -- once he was
9  sold at the auction, once the high bid was placed and
10 the gavel dropped, for lack of a better term, that you
11 and your daughter would no longer be his owners?
12 A.    No. The fair rules said he was hers until he
13 arrived at the slaughterhouse --
14 Q.    Okay.
15 A.    -- until he was converted to meat for whoever
16 bought his meat.
17 Q.    Okay. When did you see that in the fair rules?
18 A.    When I was reading them during the fair days.
19 Q.    Okay. Was it your understanding that after
20 Cedar was sold at auction -- and I know you dispute
21 maybe that he was sold at auction, but this is a
22 hypothetical.
23     MR. GORDON: Yeah. Just give me a running
24 objection on that if you don't --
25     MR. BRIDGES: That's fine.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 235

1      MR. GORDON: -- mind, John, so I don't have to
2  stop and interrupt.
3      MR. BRIDGES: That's fine.
4      MR. GORDON: Yeah.
5      MR. BRIDGES: Q. Was it your understanding that
6  after he was sold, you would have a right to determine
7  what the new owners did with him?
8  A.    Can you -- can you say that again?
9  Q.    Was it your understanding that after Cedar was
10 sold, you had a right to determine what the new owners
11 did with him?
12 A.    Up until two weeks before the fair, I thought
13 the new owners could do whatever they wanted with him
14 and keep him alive. It was only two weeks before the
15 fair that I found out new owners don't have any rights
16 to do anything with them except accept them as meat.
17 Q.    Okay. But nevertheless, you contacted
18 Senator Dahle's office; correct?
19 A.    Yes.
20 Q.    Okay. And you believe that he didn't have to
21 just accept the meat; isn't that true?
22 A.    I didn't know what I believed. I hoped that he
23 would be understanding.
24 Q.    Why did you ask Senator Dahle's office to let
25 you keep Cedar?

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 236

1  A.    I -- I -- I -- I'm -- did you read the le- -- I
2  wrote a whole letter about why.
3  Q.    But -- I understand what the letter said, why
4  you wanted him to allow you to keep Cedar, but why did
5  you ask him? Why did you ask him at all?
6  A.    Because I was just trying to resolve it in a
7  peaceful way with him and the fairgrounds.
8  Q.    Okay. A moment ago you said in the fair rules
9  that Senator Dahle essentially didn't own Cedar because
10 he hadn't been converted to meat yet; isn't that true?
11 A.    That's true.
12 Q.    So why did you need his permission to do
13 anything?
14 A.    Because he was the highest bidder.
15 Q.    Okay. But you said that he didn't own Cedar or
16 have a right to Cedar.
17 A.    Not at that point. If Cedar would have died on
18 the truck and they couldn't give him meat, then we were
19 still responsible for him.
20 Q.    Okay. What -- what is that based upon? Why did
21 you believe that?
22 A.    Because people don't usually have to pay for
23 things that they don't receive, so I just didn't think
24 the transaction was complete.
25 Q.    Okay. Are you saying today that you believe

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 237

1  that Cedar was never Senator Dahle's property?
2      MR. GORDON: Calls for legal conclusion.
3      THE WITNESS: Yes. I feel like it's like a
4  house in escrow. I felt like Cedar was in escrow.
5  There's an agreement, but agreements sometimes don't
6  work out or fall through just like if you buy -- try and
7  purchase a house.
8      MR. BRIDGES: Q. Okay. At any time before the
9  auction did you want to retain ownership of Cedar after
10 the fair?
11 A.    Yes.
12 Q.    Okay. When did you want to -- did you want to
13 do that?
14 A.    When I felt like she was starting to bond with
15 him and we were getting to know him, which I feel like
16 kind of started around ag field day. Yeah. When we
17 didn't want to kill him, and we got to know him, I would
18 have liked to have kept him for her.
19 Q.    Was it ever an option to -- to keep Cedar at
20 your property?
21 A.    No. I looked into the civil code or whatever,
22 and you have to have two acres of land, and we don't.
23 We have a normal subdivision tract.
24 Q.    If you wanted to retain ownership of Cedar after
25 the fair and you were concerned about finding a place

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 238

1  for him, is there a reason you didn't bid on him at the
2  fair?
3  A.    At that point I was afraid even if I had bought
4  him they were still just going to turn him to meat
5  because I had found out that you can't -- you can't take
6  them home alive, so I -- I definitely didn't want his
7  meat.
8  Q.    Okay.
9      MR. GORDON: Do you need a second?
10     THE WITNESS: No. I'm okay.
11     MR. BRIDGES: Q. Okay. This is a little bit
12 more of a sensitive area that I'm about to ask you
13 about. Okay? So take your time. It's essentially have
14 you received any counseling or therapy as a result of
15 the incident giving rise to this lawsuit?
16 A.    No.
17 Q.    Okay. Has your daughter received any counseling
18 or therapy as a result of this lawsuit?
19 A.    No.
20 Q.    Okay.
21     MR. GORDON: Well, do -- just object. Do you
22 mean -- John, are you referring to a mental health
23 professor [sic] -- professional or something just --
24     MR. BRIDGES: Yeah. Counselor, social worker,
25 psychologist, psychiatrist, therapist, anything like

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 239

1  that.
2      THE WITNESS: I was just trying to keep her mind
3  off of it because it was upsetting for her, and I have
4  taken her to horseback riding to distract her, so I was
5  just trying to replace the negative experience with
6  positive experiences.
7      MR. BRIDGES: Q. Okay. But you haven't
8  specifically taken her to like a mental health provider
9  to counsel her or give her a consultation about her
10 feelings related to this incident?
11 A.    No.
12 Q.    Do you know someone named Diana Everstine?
13 A.    The name's familiar.
14 Q.    Okay. Have you ever spoken to Dr. Everstine?
15 A.    No.
16 Q.    Okay. Do you know if E.L. has ever spoken to
17 Dr. Everstine?
18 A.    No, she hasn't.
19 Q.    Okay. Do you have any plans to speak to
20 Dr. Everstine?
21     MR. GORDON: "Yes" is the answer. I mean, feel
22 free to say it.
23     THE WITNESS: Yes.
24     MR. GORDON: We haven't really discussed it yet.
25     MR. BRIDGES: Q. Okay. And why would you talk

1 to Dr. Everstine?

2 **A.    To find out, you know, how this has impacted her**
3 **and -- and find solutions for healing still.**

4 Q.    Is there a reason you haven't sought that
5 treatment yet?

6 **A.    I was -- like I said, I was just trying to keep**
7 **her mind off of it, and I work full-time, and I've been**
8 **taking her to horses. I know horses are therapeutic, so**
9 **that's what I've been doing on Saturdays, so --**

10 Q.    Okay. And then when I asked that last question,
11 I didn't mean just Dr. Everstine. I mean is there a
12 reason you haven't sought any sort of mental health
13 intervention for your daughter since June of 2022?

14 **A.    Another reason that I've been nervous is just**
15 **here --**

16       MR. GORDON: Asked and answered, but --

17       THE WITNESS: -- here in town like a lot of
18 people just like me, so it's like -- because I chose to
19 do that, and I'm just nervous to talk to a psychologist.
20 I don't know what they're going to think because
21 everybody in town already -- you know. There's a lot of
22 people who have made it clear they don't like me, and I
23 should have just made her do it, so I was afraid to
24 talk -- like I don't know.

25       MR. BRIDGES: Q.  Okay. In the same vein, do

1 you plan to seek treatment with Dr. Everstine to talk
2 about any issues that you've had since -- since the
3 incident occurred?

4 **A.    Probably. It's a possibility.**

5 Q.    Okay. Okay. But nothing's been scheduled yet;
6 is that true?

7 **A.    No.**

8 Q.    I think we're doing a double negative. It's --

9 **A.    Nothing has been scheduled yet.**

10 Q.    Thank you. Okay. That -- that clears it up.
11 Do you need a moment?

12 **A.    Maybe. Sure.**

13 Q.    Let's just -- yeah, let's just take a
14 five-minute break --

15       MR. GORDON: Okay.

16       MR. BRIDGES: -- and regroup.

17       THE WITNESS: Thank you.

18       MR. GORDON: All right.

19       (Recess taken from 1:40 to 1:44 p.m.)

20       MR. BRIDGES: Q.  All right. We're back on the
21 record. Are you okay to continue your deposition?

22 **A.    Yes.**

23 Q.    Okay. I want to ask you about your interactions
24 with Raymond Allen. You know Raymond Allen?

25 **A.    Yes.**

1 Q.    And he owned Billy's Mini Farm? Is that what
2 it's called?

3 **A.    I believe so.**

4 Q.    Okay. My understanding is you communicated with
5 Raymond Allen about his taking Cedar during the first
6 few days of the fair. Not him taking Cedar during the
7 first few days, but you spoke to him during the first
8 few days about his capacity to take Cedar for you; is
9 that true?

10 **A.    Yes.**

11 Q.    Okay. Do you recall what day it was?

12 **A.    Not exactly. It was maybe -- my best guess is**
13 **Wednesday --**

14 Q.    Okay.

15 **A.    -- of the fair.**

16 Q.    How did he contact you?

17 **A.    I called him.**

18 Q.    Was it on the telephone?

19 **A.    Yes.**

20 Q.    Okay. Did you ever communicate in any other way
21 during the fair?

22 **A.    I don't think so. I think it was just the one**
23 **phone call during the fair.**

24 Q.    Okay. And during that phone call did he tell
25 you that he would be able to take Cedar?

1 **A.    Yes.**

2 Q.    Is there a reason you didn't take Cedar out of
3 the fair when he told you that?

4       MR. GORDON: Asked and answered in the prior
5 depo.

6       THE WITNESS: I didn't think I could leave the
7 fair with him. I had asked our 4-H leader, and he said
8 nobody's ever left the fair once they've entered.

9       MR. BRIDGES: Q.  Okay. You understand the fair
10 rules hadn't changed between when Raymond Allen told you
11 he could take Cedar and when you took Cedar out of the
12 fair the night of the auction; is that true?

13       MR. GORDON: Calls for a legal conclusion,
14 but if you know.

15       MR. BRIDGES: Q.  Well, just --

16 **A.    Can you say it again?**

17 Q.    Yeah. The fair rules, the ones you're referring
18 to where you can't take the goat out of the fair once
19 you're entered -- had those changed between when
20 Raymond Allen told you he could take Cedar on the
21 Wednesday of the fair and the night of the auction when
22 you took Cedar out -- off the fairgrounds?

23       THE REPORTER: Are you saying "when you took
24 Cedar" or "when he took Cedar"?

25       MR. BRIDGES: "When you took Cedar," yeah.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 244

1  Q.   (By Mr. Bridges) Do you know if the rules had
2  changed?
3  A.   I remem--- I think the rules just said that the
4  animals had to stay at the fair within the show dates,
5  but it was verbally talking to someone that said that
6  nobody ever leaves, so I don't know if that was a
7  specific fair rule.
8  Q.   Okay.
9  A.   But whatever the rules said, they -- I didn't
10  hear that they changed during that period.
11  Q.   Okay.  Was there something in the fair rules
12  that said that you could not take Cedar out of the fair
13  on the Wednesday of the fair?
14      MR. GORDON:  Well, it calls for a legal
15  conclusion.
16      THE WITNESS:  I don't remember -- I read,
17  looking at the fair rules for a way to get out, and
18  there was nothing in there that said if you feel like
19  quitting at any time or if this isn't right for you,
20  this is how you leave the fair.  Just said you can't
21  leave.
22      MR. BRIDGES:  Q  Okay.  So what changed on the
23  night of the auction?
24  A.   My daughter had spent a week with him, another
25  40 hours bonding with him --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 245

1  Q.   Mm-hmm.
2  A.   -- and the whole week I just felt worse and
3  worse, and -- and that was the last opportunity we had
4  to save him, and I knew I was breaking a fair rule, but
5  I didn't think I was breaking the law.
6  Q.   Okay.
7  A.   So I didn't want to break a fair rule.  I wanted
8  to find a way out, and I -- I felt -- I felt like
9  I could -- I didn't find a way.
10  Q.   Okay.  When you took Cedar to Raymond Allen's
11  property after the fair, his place in Petaluma, you
12  claimed in your previous deposition testimony that you
13  did not donate Cedar to Mr. Allen; is that correct?
14  A.   Yes.
15  Q.   Okay.  Why didn't you donate Cedar to him?
16  A.   Because it was still all up in the air, and I
17  might have donated later, but I told him I needed to
18  work it out with the highest bidder and the fairgrounds.
19  Q.   What -- I'm having a hard time understanding
20  what was up in the air.  What were the options that you
21  were faced with?
22  A.   I thought I might have to go get him and bring
23  him back.
24  Q.   Get him from Mr. Allen and bring him back to the
25  fair?

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 246

1  A.   Yes.
2  Q.   Okay.  What -- were there only two options at
3  that point?  One was to donate Cedar to Mr. Allen, and
4  one was to take him back to the fair to go to slaughter?
5  A.   No.  I mean, I -- I had spoke to Raymond later,
6  and -- and I told him they accused me of felony
7  livestock stealing, and he -- so he asked me to come get
8  Cedar back.  Like I said, it was all up in the air
9  still, and I started making plans to go get Cedar back,
10  so -- and then I would have tried to place him somewhere
11  different until I resolved it with the fair or the -- so
12  everything was still in the air.
13  Q.   Okay.  Maybe I'm not understanding.  So let me
14  just try to clarify this.
15      So you -- you took him to Mr. Allen's farm, but
16  you didn't intend to necessarily leave him there
17  permanently because you thought that you might have to
18  take Cedar back to the fair for slaughter if you
19  couldn't resolve the dispute, or you thought that if
20  Mr. Allen didn't want to be involved if there were some
21  criminal charges pending that you would have to find
22  somewhere else to put him in the meantime because
23  Mr. Allen didn't want to keep him; is that correct?  Am
24  I understanding that?
25  A.   Yes.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 247

1  Q.   Okay.  But ultimately you did not get Cedar back
2  from Mr. Allen; correct?
3  A.   No.
4  Q.   Okay.  How would you describe your agreement
5  with Raymond Allen about handling Cedar when you -- when
6  you dropped him off at his farm?
7  A.   My -- I told him my husband was going to be back
8  from sea in a few weeks, and we would come back and
9  reassess, and so that [E.L.] -- my daughter could see
10  him again, and I told him I would be in touch as I tried
11  to resolve it with the -- the fair and the bidder.
12  Q.   Okay.  Do you recall when your husband was
13  supposed to return from sea?
14  A.   Approximately two weeks afterwards.
15  Q.   Okay.  So like the -- well, you dropped him off
16  at Raymond Allen's farm on the twenty- -- was it the
17  26th or the 27th?
18  A.   It was Sunday.
19  Q.   Sunday.  Okay.
20  A.   Sunday after the fair.
21  Q.   Okay.  So your -- your husband was supposed to
22  return -- I don't know -- like the -- between the 10th
23  and the 12th of July, something like that?
24  A.   Somewhere around there, but it's always
25  unpredictable.  I don't remember the exact dates.

LONG vs.
FERNANDEZ

JESSICA LONG - Vol. 2
February 8, 2024

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 248

1 Q.   Okay.  What does he do for a living?

2 A.   **He's in the Merchant Marine.  He's a chief**
3 **mate.**

4 Q.   Okay.  So how -- how does his schedule generally
5 work?

6 A.   **There is no schedule.**

7 Q.   Okay.

8 A.   **It's pretty hard to adapt to his un-schedule.**

9 Q.   Okay.  So he'll just be gone for like a couple
10 weeks at a time or months at a time?

11 A.   **Usually months.**

12 Q.   Okay.  But you had an expectation in June of
13 2022 that he would be returning within a couple of
14 weeks?

15 A.   **Yes.**

16 Q.   Okay.  My understanding, and I could have the
17 dates wrong, is that Raymond Allen sent you a text
18 message on July 15th saying that the goat had been taken
19 by I believe it was Detective Duncan.  Is that your
20 understanding?

21 A.   **I think he said Lieutenant Fernandez.**

22 Q.   Was it Fernandez?  Okay.

23        **MR. GORDON:** No.  I think it's Duncan, and he
24 sent his card.

25        **THE WITNESS:** Sent a card?

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 249

1        **MR. GORDON:** Yeah.

2        **MR. BRIDGES:** Q.  But is that date correct?  It
3 was July 15th, or do you not remember?

4 A.   **I don't remember the exact date.**

5 Q.   Okay.

6 A.   **Probably around then.**

7 Q.   When did you communicate with Raymond Allen
8 about needing to get Cedar back from him?  I know
9 there was -- you were trying to coordinate picking him
10 up in -- picking Cedar up in Sacramento.  Do you recall
11 when that was?

12 A.   **I believe it was the Tuesday after the fair.**

13 Q.   Okay.  After those communications when you
14 decided not to meet and get Cedar back from him, did you
15 have any communications with Raymond Allen again before
16 receiving the text message saying that Cedar had been
17 taken by someone from the Shasta County Sheriff's
18 Department?

19 A.   **I believe I -- I called him a couple times when**
20 **I had heard that they went and got Cedar, so maybe a few**
21 **days before the 15th I called him --**

22 Q.   You --

23 A.   **-- or I messaged him or something, and I didn't**
24 **hear back.**

25 Q.   So you talked to him before the sheriff's

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 250

1 department took Cedar back from him?

2 A.   **No.  I -- at what point?**

3 Q.   Okay.  A couple days after the fair you talked
4 to Raymond Allen or you were messaging him about meeting
5 up so you could get Cedar back from him; right?

6 A.   Mm-hmm.

7 Q.   Is that a "yes"?

8 A.   **Yes.**

9 Q.   Okay.  And then you decided that you weren't
10 going to meet up because it looked like there weren't
11 going to be criminal charges, or something -- something
12 changed in the circumstances, and you didn't need to
13 take Cedar back from him; is that true?

14 A.   **No.  At that point I had -- I thought it was**
15 **resolved with --**

16        MR. GORDON:  Yeah.  Misstates testimony, but go
17 ahead.

18        **THE WITNESS:** -- with the -- with the bidder,
19 with the Dahles, but the fair still seemed upset, so I
20 didn't feel like we had a resolution with them.

21        **MR. BRIDGES:** Q.  Okay.  So you had -- at that
22 point in time, a few days after the fair, you had
23 Raymond Allen continue to keep Cedar at his property.

24 A.   Yes.

25 Q.   Okay.  So between then, when you decided not to

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 251

1 meet with Raymond Allen to get Cedar back, and when you
2 received the text message from him saying that the goat
3 had been taken by the sheriff's department --

4 A.   Mm-hmm.

5 Q.   -- had you talked to him in that period of time?

6 A.   **I don't believe so.**

7 Q.   Okay.  Is there a reason you didn't contact him
8 to ask for updates on how Cedar was doing?

9        **MR. GORDON:** Well, misstates testimony.  She
10 said she called him, but I -- had contact or -- I don't
11 know if she communicated with him.  Did you -- I'm
12 trying to help you out here.  Did -- did you --

13        **MR. BRIDGES:** Well, let me ask that then.

14 Q.   (By Mr. Bridges)  You called him in that period
15 of time before the goat was recovered by the sheriff's
16 department, or was it after?  That's what I can't figure
17 out.

18 A.   **I called him several times.  I -- I don't**
19 **remember exactly what -- what day or time before, what**
20 **day or time after.**

21 Q.   But did you call him before he told you that the
22 goat had been taken by the sheriff's department?

23 A.   **At what point before?**

24 Q.   After you decided not to meet up with him to get
25 Cedar back.

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 252

1  A.    I can't remember if I talked to him again after
2  that. It was -- it was leading up into -- well, I
3  was -- I was still waiting to hear back from the
4  fairgrounds for my second letter, and then it was a
5  holiday weekend, and I went out of town, and I didn't
6  have good cell reception, and then my son broke his arm,
7  so -- and required surgery, so there was -- there was a
8  gap where I didn't call and ask how Cedar was.
9  Q.    Okay. Did you try to make any arrangements to
10 go see Cedar during that period of time before the
11 sheriff's department took him?
12 A.    No. I was still trying to resolve it with the
13 fair. I was waiting for their response to my second
14 letter.
15 Q.    Okay. Did you have any written agreement with
16 Raymond Allen about boarding Cedar while you tried to
17 work out the dispute with the fair?
18 A.    No.
19 Q.    Did you pay him to take Cedar for you?
20 A.    No.
21 Q.    Did you provide him with feed or any other
22 maintenance supplies?
23 A.    No.
24 Q.    If Cedar had had a medical issue while he was
25 with Raymond Allen, was there some understanding about

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 253

1  who would be making the veterinary decisions?
2  A.    No. We didn't get that detailed.
3  Q.    Okay. Did you have an expectation of who would
4  be contacted or who would make those decisions?
5  A.    I thought that he would keep in touch, and --
6  and he -- yeah. It sounded like he would keep in touch,
7  and I agreed that I was going to keep -- you know, keep
8  him up to date with what I was resolving with the fair.
9  Q.    Okay. When you left Cedar with Mr. Allen,
10 you -- you told him that it was possible that you would
11 donate Cedar to him if you were able to resolve the
12 dispute with the fair; isn't that correct?
13 A.    Yes.
14 Q.    Okay. At that time, what did you believe were
15 your options for Cedar? I know a moment ago you said
16 there were three -- three options; right? But if the --
17 if the criminal option was off the table, was it that
18 you would either return Cedar to the fair or donate
19 Cedar to Mr. Allen, or were there other options
20 available to you at that time?
21 A.    If the criminal option was off the table. What
22 do you mean by that?
23 Q.    Well, when you were supposed to get Cedar back
24 from Mr. Allen a couple days after the fair, you decided
25 not to do that because you said you had worked it out

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 254

1  with the Dahles.
2  A.    Mm-hmm. Well, I didn't decide. He decided that
3  I didn't need to go at that point.
4  Q.    Okay. So at that point in time did you intend
5  to still just leave Cedar with Mr. Allen?
6  A.    I intended to come back --
7      MR. GORDON: Asked and answered. Go ahead.
8      THE WITNESS: -- when my husband came back from
9  sca.
10     MR. BRIDGES: Mm-hmm.
11     THE WITNESS: We were going to go as a family
12 again and reassess.
13     MR. BRIDGES: Okay.
14     MR. GORDON: Just give me a moment to object.
15     THE WITNESS: Sorry.
16     MR. BRIDGES: Q. And I'm just trying to figure
17 out what were you reassessing for? What were you --
18 what were you trying to decide at that point in time?
19 A.    A permanent place for Cedar, whether it was for
20 him or we find a place closer to home so that we could
21 spend more time with him.
22 Q.    In the time between the auction at the fair and
23 when you -- and when Mr. Allen sent you the message
24 saying the sheriff's department had taken Cedar, okay,
25 so mid July --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 255

1  A.    Wait. Sorry. Can you say that again?
2  Q.    From the auction, the day of the auction until
3  mid July when Mr. Allen told you that the sheriff's
4  department had come to get Cedar --
5  A.    Mm-hmm.
6  Q.    -- had you looked for another place to locate
7  Cedar that was closer to your home?
8  A.    No. I was still trying to resolve the issue
9  with the fair.
10 Q.    Were you concer- --
11 A.    I was afraid I was going to be arrested.
12 Q.    Okay.
13 A.    They were threatening to arrest me. My husband
14 was at sea. I was trying to find people to take care of
15 my kids if they were going to arrest me --
16 Q.    Okay.
17 A.    -- which I didn't understand how it could be
18 even considered a felony or any -- I mean, I found out
19 later that the sheriff who took him was involved in 4-H,
20 so he knows my daughter never got paid for him. He
21 knows the transaction was never complete --
22 Q.    Okay.
23 A.    -- so --
24 Q.    And my question is specifically about trying to
25 find an alternative location for Cedar. I mean, you

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 256

1  said that you planned after a couple of weeks for your
2  husband and your daughter and you to go back to
3  Raymond Allen's farm and determine if there was another
4  place to take Cedar, so what I'm wondering is did you
5  look for --
6  A.     **I -- I didn't have time to look for a place**
7  **because I was trying to resolve it with the fair. I was**
8  **getting out of town. I was trying not to be arrested.**
9  **My son broke his arm. I was taking care of kids and**
10 **working full-time by myself. So no, I didn't have time**
11 **to look for another place during all of that.**
12 Q.     Okay. And just to be clear, Mrs. Long, I'm
13 not -- I'm not judging you for anything that happened
14 here. Okay? I just need to know the facts of what
15 happened. Okay? So I'm sorry if it's -- if this is
16 upsetting for you to talk about. Okay?
17       MR. GORDON: Do you need -- one moment. Do you
18 need another break, Jess? Want to take a break?
19       THE WITNESS: Sure.
20       MR. GORDON: Let's take five.
21       MR. BRIDGES: That's fine.
22       (Recess taken from 2:01 to 2:05 p.m.)
23       MR. BRIDGES: Q. All right. Okay. We're back
24 on the record. Are you okay to continue?
25 A.     Yes.

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 257

1  Q.     Okay. Just shifting gears here. You stated
2  before, and correct me if I'm wrong, that you believed
3  that Cedar was still technically your property, or your
4  property or your daughter's property, after you took him
5  from the fairgrounds; is that correct?
6  A.     **I believe legally he was still our property.**
7  Q.     Okay. Did you take any steps to establish the
8  ownership of Cedar after the fair?
9  A.     **Yes.**
10 Q.     What did you do?
11 A.     **I -- I texted an employee and B.J. MacFarlane**
12 **and -- and told them she still wanted to keep them -- to**
13 **keep Cedar. I messaged the -- or I sent an e-mail to**
14 **the fairgrounds, Melanie Silva.**
15 Q.     Did you personally initiate any legal
16 proceedings to establish ownership?
17 A.     **I started searching for legal help.**
18 Q.     Okay. But did you do any research into
19 self-help, anything that you could personally file
20 without a lawyer?
21 A.     **No.**
22 Q.     Okay. Have you ever heard of something called a
23 temporary restraining order?
24 A.     **Yes.**
25 Q.     Okay. What is your understanding of what that

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 258

1  is?
2  A.     **A temporary --**
3        MR. GORDON: Calls for legal conclusion, but you
4  can tell him what your understanding is.
5        THE WITNESS: Temporary to keep someone away.
6  That's all -- I don't know the legal definition, but --
7        MR. BRIDGES: Q. Did you do any research into
8  temporary restraining orders after you took Cedar from
9  the fair to see if you could prevent him from being
10 slaughtered?
11 A.     **No. I didn't know what options I had, so I**
12 **started seeking legal counsel.**
13 Q.     Okay. Do you know if any attorneys initiated
14 any legal proceedings to prevent Cedar's slaughter?
15 A.     **I believe so.**
16 Q.     Okay. What -- what -- what is your
17 understanding of what was filed on your behalf to
18 prevent him from being slaughtered?
19       MR. GORDON: I -- I think the confusion, John --
20 let me interject.
21       MR. BRIDGES: Mm-hmm.
22       MR. GORDON: I think she's referring to me
23 calling County Counsel and the sheriffs. That's not a
24 legal proc- -- he's focusing on the word "proceeding."
25 No, we didn't file a case if that's -- you just tell him

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024    Page 259

1  you didn't file any lawsuit, you know, at that point in
2  time.
3        MR. BRIDGES: Q. Okay. So as far as you know,
4  no law firm, whether it's your counsel now or any other
5  lawyers, filed any legal paperwork like in the Shasta
6  County Superior Court to prevent Cedar's slaughter?
7  A.     **No.**
8  Q.     Okay. Do you know if any attorneys filed any
9  legal proceedings to establish your ownership of Cedar?
10 A.     **No. I didn't even know those were options or**
11 **how to go about this whole situation.**
12 Q.     Have you ever heard of the term "permanent
13 injunction"?
14       MR. GORDON: Calls for a legal conclusion, calls
15 for expert testimony.
16       THE WITNESS: I've -- I've only heard the term
17 "temporary injunction."
18       MR. BRIDGES: Q. Okay. Do you have any
19 understanding of what that means?
20 A.     **Well, I think a temporary injunction is like a**
21 **pause, a legal pause.**
22 Q.     Okay. Do you know if any attorneys or law firms
23 ever sought a permanent injunction to establish
24 ownership of Cedar?
25 A.     **No.**

---

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 260

1  Q.     And do you know if any attorneys ever sought a
2  temporary restraining order to prevent Cedar's
3  slaughter?
4  A.     No. I didn't think any of that was necessary
5  because I was being honest with them and trying to work
6  it out, and Cedar was 200 miles away.
7  Q.     Okay. What about after Raymond Allen told you
8  that Cedar had been taken by the sheriff's department?
9  Do you know if any legal proceedings were initiated to
10  try to prevent him from being slaughtered?
11  A.     No. I thought he was probably slaughtered so
12  that he could be served at the barbecue the next day --
13  Q.     Okay.
14  A.     -- so I -- I -- nobody told me they were going
15  to go get him. Nobody arrested me. I didn't know -- I
16  didn't know the sheriff's office would drive 500 miles
17  to go kill my little girl's goat. So no, I didn't do
18  any of those things.
19  Q.     Okay. After Raymond Allen contacted you to say
20  that someone from the sheriff's department had taken
21  Cedar, what did you do next?
22  A.     I called --
23  Q.     Not -- not seeking attorney-client --
24        MR. GORDON: Yeah.
25        MR. BRIDGES: Q. -- communications, but --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 261

1        MR. GORDON: Yeah.
2        MR. BRIDGES: Q. -- other than contacting your
3  lawyers, did you do anything else?
4  A.     Cried, tried to figure out the right time to
5  tell my daughter.
6  Q.     Okay. Okay. What did you tell your daughter?
7  A.     I had to wait a while because I knew it would
8  ruin her day. I think I told her after like she went to
9  a summer camp or something.
10  Q.     Okay. One of the claims you're making in this
11  case -- and it's -- it's a legal claim, but I just want
12  to know if you have an understanding of it. Okay? Not
13  as a lawyer but just as Jessica Long. One of your
14  claims is that your daughter disaffirmed the exhibitor
15  agreement with the fair. Is that a claim that you're
16  making?
17  A.     Yes.
18        MR. GORDON: I'm just going to object for -- I
19  don't know how long -- how long you're going to go on
20  it, but I'll try to keep them to a minimum unless --
21  yeah. Expert testimony, calls for legal conclusion.
22        MR. BRIDGES: Okay. That's fine.
23  Q.     (By Mr. Bridges) What is your understanding of
24  the term "disaffirmance"? Do you have an understanding
25  what that means?

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 262

1  A.     To cancel, or the opposite of affirm is to
2  disaffirm.
3  Q.     And I would say in your deposition in August --
4  and I have a quote here. It's Page 193, Lines 6 and 7.
5  Okay. So it -- it says, quote -- you were discussing
6  the check from the fair for Cedar's sale, and you said,
7  quote, "I told them I wouldn't be taking that check.
8  She quit the fair and disaffirmed the contract."
9  Do you have a recollection of saying that?
10  A.     Can you read the whole thing again?
11  Q.     Yeah. "I told them I wouldn't be taking that
12  check. She quit the fair and disaffirmed the contract."
13  A.     Who's that to?
14  Q.     That's a statement you made in your last
15  deposition.
16  A.     Okay.
17  Q.     My que- -- I guess the question isn't did you
18  say that. The question is is that true? Is it your
19  understanding that your daughter quit the fair and
20  disaffirmed the contract?
21  A.     Yes.
22  Q.     What did you mean by that?
23  A.     Same thing I've repeated over and over, that she
24  didn't want to do it. I didn't make her. I -- I tried
25  to resolve it with the fair and the bidder. I offered

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 263

1  to make them whole. I didn't think people would make a
2  big deal out of it. I didn't think people would come
3  hunt him down and kill him, so --
4  Q.     When you say she disaffirmed the contract, what
5  contract were you talking about?
6  A.     Whatever contract I had with the fair.
7  Q.     Was it the exhibitor agreement?
8  A.     I guess so.
9  Q.     How did your daughter disaffirm the contract?
10  A.     She cried and said she didn't want to kill him.
11  She broke down crying. She didn't want to leave him at
12  the fair, and so I --
13        MR. GORDON: Asked and answered in the last
14  depo.
15        THE WITNESS: I told her she --
16        MR. GORDON: If you want to repeat it again as
17  best you can remember.
18        THE WITNESS: I just started thinking logically
19  about all of this, and it was a kids' club. It's
20  supposed to be fun, and it wasn't fun. It was
21  upsetting, and I didn't think it was -- the best thing
22  to do was to teach her to kill an animal she loves for
23  money, and she -- I told her she didn't have to do it,
24  and she loved Cedar. She might be banned and never be
25  able to do it again, and I asked her if he was worth it

1  to you, and she said yes, and she put the leash on, and
2  she walked out, so that's quitting the fair and
3  disaffirming, and then I followed up, and I told them
4  she didn't want to do it, and I supported her in that,
5  and how can I make it whole? "How can I make you whole
6  of any money that you've been out?" I didn't know what
7  incidental costs would have been, but I wanted to make
8  it -- to make it right for cancelling, letting her quit
9  at the last minute.
10      MR. BRIDGES: Q.  You said that obviously she
11  expressed to you that she did not want Cedar to go to
12  market; right?
13  A.   No.  She wanted to keep him.
14  Q.   Was it her idea to take Cedar off the
15  fairgrounds?
16  A.   No.  I don't think she thought she could.  She
17  didn't think she could.
18  Q.   Okay.  Do --
19  A.   I presented it as an option.
20  Q.   Okay.  Did your daughter -- as far as you know
21  did she ever communicate with anyone from the Shasta
22  District Fair about disaffirming the contract?
23  A.   She communicated to me.  She -- she doesn't have
24  her own e-mail account or cell phone, so she couldn't
25  call anyone.  No.

1  Q.   That -- that's what I would assume.  I just want
2  to make sure that that is true.  You -- I mean, you
3  weren't -- I don't know -- at the fair walking through
4  the gate, and some fair employee was there and said,
5  "Where are you going," and your daughter looked at the
6  person and said, "I'm taking the goat out because I'm
7  disaffirming the contract"?  I mean, she didn't express
8  it to anyone who worked at the fair as far as you know;
9  is that true?
10  A.   True.
11  Q.   Okay.  You communicated with the people from the
12  Shasta District Fair on her behalf; right?
13  A.   Yes.
14  Q.   Okay.  And you communicated with them about
15  disaffirming the contract in the e-mails that you sent
16  to Melanie Silva in the days following the fair; is that
17  fair to say?
18  A.   Yes.
19  Q.   That's a lot of "fairs" in that -- in that
20  question.
21  A.   Mm-hmm.
22  Q.   Do you know what happened to Cedar after he was
23  taken from Billy's Mini Farm?
24      MR. GORDON: I mean, it lacks personal
25  knowledge.  That's what we've been deposing people

1  about.
2      MR. BRIDGES: Well, that's the question is --
3      MR. GORDON: Yeah.
4      MR. BRIDGES: -- does she have --
5      THE WITNESS: Nobody --
6      MR. BRIDGES: -- personal knowledge of it.
7      THE WITNESS: No-- nobody ever -- nobody ever
8  told me.  I found out a little through Ryan.
9      MR. BRIDGES: Q.  And I don't want you to
10  disclose any attorney-client communications, but what
11  did you learn about what happened to Cedar?  I mean,
12  what is your understanding of happened to him?
13      MR. GORDON: You mean -- vague as to time.  You
14  mean now, John?
15      MR. BRIDGES: At any time.
16      MR. GORDON: Well, obviously it's changed,
17  but --
18      MR. BRIDGES: Yeah.
19      THE WITNESS: That they ignored our e-mails, and
20  they kept him for 20 days, and they debated what to do
21  with him, and then they finally killed him.
22      MR. BRIDGES: Q.  When did you learn that Cedar
23  has been slaughtered?
24  A.   Through the discovery process, recently.
25  Sometime during the lawsuit.

1  Q.   Okay.  So when the lawsuit was filed, you
2  weren't sure if he had been slaughtered or not; correct?
3  A.   No.  I thought he had been.  Nobody -- nobody
4  told me anything.  Nobody told me.  They just went and
5  took him.
6  Q.   You suspected that he had been, but you weren't
7  sure one way or the other?
8  A.   I -- yes.  I thought they -- they rushed down to
9  get him so they could serve him at the barbecue because
10  that's where -- the Dahles were donating him to the
11  barbecue, and the lady was insistent on him going to the
12  barbecue.
13  Q.   Okay.  Let me show you something.  We'll mark it
14  as Exhibit -- M?
15      THE REPORTER: M.
16      MR. BRIDGES: I'll do the alphabet in my head,
17  see where we are.  Show you that.  Do you need to tag it
18  now, or you want to -- okay.
19      THE REPORTER: Let me stick my sticker on it.
20  Thank you.
21      (Defendants' Exhibit M marked for identification.)
22      MR. BRIDGES: Q.  And just briefly, do you
23  recognize the e-mail at the top of this page that I've
24  shown you?
25  A.   Yes.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 268

1   Q.     Okay. And it's an e-mail dated August 1st of
2   2022. Looks like it's from you to Melanie Silva; is
3   that correct?
4   A.     Yes.
5   Q.     And it says, "It is my understanding that Cedar
6   was returned. I'd like to know if he is still alive and
7   what happened to him? Thank you, Jessica Long."
8          Did I read that correctly?
9   A.     Yes.
10  Q.     Okay. Did anyone respond to this e-mail?
11  A.     No.
12  Q.     Okay. There was this Instagram post that was
13  attached as Exhibit A to your last deposition, so we
14  don't need to mark that. It's already been marked, but
15  I'll -- I'll show you a copy of that. You're -- you're
16  familiar -- familiar with this post; right?
17  A.     Yeah.
18  Q.     Okay. Did you have anything to do with creating
19  this post?
20  A.     No.
21  Q.     Okay. You sent Ms. Stover a copy of the picture
22  that was used in the post; correct?
23  A.     Yes.
24  Q.     Okay. And presumably the information that
25  appears in the post is information that she obtained

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 269

1   from you; is that fair to say?
2   A.     No, not all of it.
3   Q.     Okay. But some of it?
4   A.     Let me read it again, and I'll be more specific.
5   Q.     Of course. Take your time.
6          (Pause while witness reviews document.)
7          MR. BRIDGES: Q. And I can just ask another
8   question if it would --
9   A.     Sure.
10  Q.     -- make it easier because I -- I mean, my
11  understanding is, as you said before, you didn't help
12  her create the post.
13  A.     No.
14  Q.     Did you instruct her to post this on Instagram?
15  A.     Nope.
16  Q.     Did she ever ask for your permission to post it?
17  A.     No.
18  Q.     And in fact you didn't know that she had posted
19  it until after it was done; isn't that true?
20  A.     Yes.
21  Q.     Okay. Do you wish she hadn't posted it?
22  A.     Yeah.
23  Q.     Okay.
24         MR. GORDON: No, no. It's fine. I'm just going
25  to say something. I don't know if she's -- I'm not

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 270

1   trying to influence her or not, but I know at the time
2   she instructed her to take it down when we found out
3   about it --
4          MR. BRIDGES: Okay.
5          MR. GORDON: -- so I don't know if you want to
6   ask her that question, and she'll testify to it.
7          MR. BRIDGES: That -- that's fair.
8   Q.     (By Mr. Bridges) Did you ask her to take it down
9   after she posted it?
10  A.     Yes.
11  Q.     Okay. And is it fair to say that you were
12  unhappy that she posted this without your permission?
13  A.     Yes.
14  Q.     Have you posted anything on social media
15  regarding the circumstances that gave rise to this
16  lawsuit?
17  A.     No.
18  Q.     Have you written any blogs or articles in any
19  publication --
20  A.     No.
21  Q.     -- about this?
22         This is going to be a long line of questions
23  here, so bear with me, but have you attended any
24  protests or demonstrations advocating for Cedar's return
25  to you and your daughter?

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 271

1   A.     No.
2   Q.     Have you attended any protests or demonstrations
3   advocating for changes to the Shasta District Fair's
4   rules regarding terminal sales for market animals?
5   A.     No.
6          MR. GORDON: John, before you go on, I'm
7   genuinely curious. Have there been protests?
8          MR. BRIDGES: I don't believe so, but I -- I
9   don't know.
10         MR. GORDON: Oh, okay. Okay. Well, no. I
11  thought -- I thought -- yeah. Okay. All right.
12         MR. BRIDGES: You would know better than me,
13  so --
14         MR. GORDON: You'd think that, but you'd be
15  surprised, but -- okay. I didn't know. Fair enough.
16         MR. BRIDGES: And I don't know. That's why I'm
17  asking. I -- I don't know.
18         MR. GORDON: Okay.
19         MR. BRIDGES: And it could be a protest of just,
20  you know, two people. I don't know, but --
21  Q.     (By Mr. Bridges) Have you attended any protests
22  or demonstrations advocating for changes to 4-H youth
23  market livestock programs?
24  A.     No.
25  Q.     Have you spoken publically at any demonstrations

LONG vs.
FERNANDEZ

JESSICA LONG -  Vol. 2
February 8, 2024

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 272

1    or forums about the circumstances giving rise to this
2    lawsuit?
3  A.      No.
4  Q.      My understanding is you have given at least one
5    or maybe a few interviews to the media as a result of
6    this?
7  A.      Yes.
8  Q.      Do you know how many interviews you've given?
9  A.      Three.
10 Q.      Okay.
11 A.      I declined a lot more than that too.
12 Q.      Understood.
13      MR. GORDON: Fox News, CNN.
14      MR. BRIDGES: Q. Have -- have --
15      THE REPORTER: Say that again.
16      MR. GORDON: I said Fox News, CNN.  She didn't
17    go on any of them.
18      MR. BRIDGES: Q. Have any of these interviews
19    taken place before you filed the lawsuit?
20 A.      No.
21 Q.      Okay.  Do you recall what publications
22    interviewed you?
23      MR. GORDON: John, if she -- I'm not -- ask your
24    question, but I think -- and I'll send you the 26(f)
25    disclosure of the name --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 273

1      MR. BRIDGES: Mm-hmm.
2      MR. GORDON: -- of the reporters.
3      MR. BRIDGES: Yeah, I've -- I've seen it.  I
4    just want to know --
5      MR. GORDON: Oh, okay.
6      MR. BRIDGES: -- if she remembers.
7      MR. GORDON: Oh, I don't know if she remembers
8    that.  All right.  If you remember.  I don't even
9    remember.
10      THE WITNESS: I think New York Times, Sacramento
11    Bee, and one in Southern California.
12      MR. BRIDGES: Q. Were these interviews done in
13    person or over the phone?
14 A.      Over the phone.
15 Q.      Was your daughter interviewed by any of these
16    people?
17 A.      No.
18 Q.      Was she present when you were interviewed?
19 A.      No.
20 Q.      Was anyone else present when you were
21    interviewed?
22      MR. GORDON: By "present" you mean on the phone?
23      MR. BRIDGES: Yeah.  In person or on the phone.
24    Just -- yeah.
25      MR. GORDON: They were all remote.  I -- I think

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 274

1    I was probably -- me or Vanessa were probably on the
2    phone with her.  I don't remember.
3      MR. BRIDGES: Okay.
4  Q.      (By Mr. Bridges) Did you reach out to any of
5    these media sources to -- to arrange for these
6    interviews, or did they contact you?
7  A.      They contacted me.
8  Q.      Okay.  Have you reviewed the press about the
9    case -- about this case in which you gave interviews?
10    Any of these three articles, have you reviewed them?
11 A.      Yes.
12 Q.      Did you see any inaccuracies in any quotes or
13    statements that were attributed to you by the press?
14 A.      Oh, I think the last article was Redding
15    Searchlight, and they said that I worked as a city
16    engineer in Redding, which was wrong.
17 Q.      Okay.
18 A.      I mean, I saw a few discrepancies like that.
19    That's all I can think of, but --
20 Q.      And in terms specifically of the ones in -- the
21    three in which you gave interviews, were there any --
22    strike that.  I'm sorry.
23      Were you misquoted in any of those three
24    interviews?
25 A.      I haven't read the articles in a

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 275

1    year-and-a-half, so I'm not sure.
2  Q.      As we sit here today, you don't have a
3    recollection of reading the article and saying, "I
4    didn't say that," or anything along those lines?
5  A.      Well, the only thing that jumped out is the --
6    you know, that I was a city engineer.
7  Q.      Okay.  Well, let me ask you this:  Was the city
8    engineer story -- was that one in which you were
9    interviewed?
10 A.      That was a -- yes, I was interviewed, and that
11    was a mistake that they wrote.
12 Q.      Okay.  And you said that was the Redding
13    Searchlight?
14 A.      I think so.
15      MR. GORDON: I think I might be able to clear up
16    the confusion.  I may be wrong on this, but a lot of the
17    media outlets reprinted from other outlets, so she -- it
18    might have been one of the ones that just -- that
19    migrated to --
20      MR. BRIDGES: Okay.
21      MR. GORDON: -- that, but I don't -- I don't
22    know that for sure, John.
23      MR. BRIDGES: Q. Do you specifically recall
24    talking to a journalist from the Redding Searchlight?
25 A.      I think I did, but I don't remember the name.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 276

1  Q.   Okay.  Was that also after you filed the
2  lawsuit?
3  A.   **Yes.**
4  Q.   Okay.  Are you a vegan?
5  A.   **No.**
6  Q.   Are you a vegetarian?
7  A.   **No.**
8  Q.   Okay.  Have you ever eaten chevon?
9  A.   **What's chevon?**
10  Q.   Goat meat.
11  A.   **I think I tasted it at the -- during the 4-H**
12  **process I think I had a little taste.  I didn't eat much**
13  **of it.**
14  Q.   Okay.  Do you know if your daughter tasted it?
15  A.   **She did.**
16  Q.   Was that the only time you've eaten goat meat?
17  A.   **Mm-hmm.**
18  Q.   Is that a "yes"?
19  A.   **Yes.**
20  Q.   Okay.  Do you recall where that was?
21  A.   **It was at a private residence.**
22  Q.   Was it like a barbecue or something put on as
23  part of the 4-H program?
24  A.   **I think they slow-cooked the meat and just had**
25  **tortillas with it or something.**

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 277

1  Q.   Okay.
2  A.   **Wasn't like a full-on barbecue.  Was more like a**
3  **meeting with a --**
4  Q.   Okay.  Do you know if your daughter, E.L., has
5  any social media accounts?
6  A.   **I don't think she does.**
7  Q.   Okay.
8  A.   **Yeah.  There's --**
9  Q.   Not you're aware of?
10  A.   **There's games -- there's games that she plays,**
11  **but I don't think those are social media.**
12  Q.   Okay.  Do you know if your daughter has
13  expressed her view that Cedar should not be killed on
14  any online forum or social media site?
15  A.   **Not that I know of, but --**
16  Q.   Okay.  Is it fair to say that you don't hold the
17  viewpoint that goats should not be used for meat?
18  A.   **I'm sorry.  Can you say that again?**
19  Q.   Yeah.  Do you hold the viewpoint that goats
20  should not be used for meat?
21  A.   **No.**
22  Q.   Is it fair to say your -- your view is simply
23  that Cedar specifically should not have been used for
24  meat?
25  A.   **My view is that we had ownership and had the**

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 278

1  **right to do what we wanted with him.**
2  Q.   Okay.  Are you aware of any other social media
3  posts other than -- I know there were some media
4  articles and the Instagram post from Kristin Stover.
5  Are you aware of any other social media posts that
6  mention the circumstances that gave rise to this
7  lawsuit?
8  A.   **I've seen other posts from strangers -- I don't**
9  **know -- that read articles like on Instagram or whatever**
10  **or just searching the internet if you --**
11  Q.   Okay.  Have you been involved in any way in
12  creating or posting those messages?
13  A.   **No.**
14  Q.   Okay.  Did Melanie Silva, B.J. MacFarlane, or
15  anyone else from the Shasta District Fair do anything to
16  limit your ability to speak freely about the
17  circumstances that give rise to this lawsuit?
18  A.   **Can you say that again?**
19  Q.   Yeah.  Did -- did the Shasta County Fair or any
20  of its employees, including Silva and MacFarlane, do
21  anything to limit your ability to speak freely about the
22  circumstances of Cedar?
23  A.   **Threaten to arrest me with a felony.**
24  Q.   For talking about it?  I mean specifically
25  speaking, speaking about it.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 279

1  A.   **No.**
2  Q.   Did they tell you not to speak publicly about
3  the situation?
4  A.   **No.**
5  Q.   Did they ever tell you that if you spoke
6  publically about the situation, they would kill Cedar?
7  A.   **No.**
8  Q.   As we sit here today, do you feel at this point
9  in time that you were unable to speak freely about the
10  situation in a public setting?
11  A.   **I think she did say, "In this era of social**
12  **media this has been a negative experience for the**
13  **fairgrounds as this has been all over Facebook and**
14  **Instagram, not the best way to teach our youth the value**
15  **of responsibility," so I feel like that's her showing**
16  **that she didn't like that there was a post about it, and**
17  **maybe that was even more motivation to want to kill him.**
18  Q.   What's that based upon?
19  A.   **What's what based upon?**
20  Q.   Your belief that that was motivation for them to
21  kill Cedar.  When --
22  A.   **Because they -- she didn't find another way to**
23  **resolve it.**
24  Q.   Do you have any reason to believe that Cedar was
25  taken to market because of Kristin Stover's Instagram

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 280

1  post?
2  A.    Ye- --
3       MR. GORDON: Vague as to "taken to market." Do
4  you mean slaughtered, John --
5       MR. BRIDGES: Yes.
6       MR. GORDON: -- or retrieved?  Okay.
7       MR. BRIDGES: Slaughtered.
8       MR. GORDON: Okay.
9       MR. BRIDGES: Q.  You said "yes"?
10 A.    Can you repeat the question one more time?
11 Q.    Yes.  Do you have any reason to believe that
12 Cedar was slaughtered because of Kristin Stover's
13 Instagram post?
14 A.    I think it contributed to it.
15 Q.    Okay.
16 A.    First of all, they wouldn't have known where he
17 was if she didn't post that, and then I don't think the
18 fairgrounds liked that he was -- that she's a sanctuary.
19 I think that upset them more.
20 Q.    Why do you believe that?
21 A.    Well, I didn't know at the time, but I feel like
22 I've seen enough discussions and newspaper articles and
23 that -- since then that there's a -- looks like there's
24 a clash between sanctuaries and fairgrounds.  After this
25 all happened I saw an article where Howard Stern bought

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 281

1  a pig and wanted to keep it, and they -- they said
2  absolutely not, and they made sure to turn it into meat
3  and give it to him even though he didn't -- he wanted to
4  keep it alive, so I see now that there's a culture or a
5  pattern where there's not really any -- any space for
6  mercy.
7  Q.    When you say "they" in re- -- in regards to the
8  Howard Stern situation, you're not talking about the
9  employees of the Shasta District Fair?
10 A.    No.  It was another fairground.
11 Q.    Okay.  So I guess the question I have is what --
12 I mean, what is it based -- what is your opinion based
13 upon that they would not have slaughtered Cedar if
14 Kristin Stover had not made the Instagram post?  What --
15 what evidence would you have of that?
16 A.    Can you repeat it, please?
17 Q.    Yes.  What is your opinion based upon when
18 you say that you believe the employees of the Shasta
19 District Fair slaughtered Cedar because of
20 Kristin Stover's Instagram post?
21 A.    They wouldn't have known where he was.
22 Q.    Did -- is it your understanding that employees
23 of the Shasta District Fair went and found him?
24 A.    I believe they worked with the sheriff, and I
25 know the sheriff's -- one of the sheriff's daughters

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 282

1  were in 4-H that year, and his wife is a 4-H leader, so
2  I think they all kind of talked together and figured it
3  out together.
4  Q.    And what's that belief based upon?
5       MR. GORDON: Asked and answered.  Didn't she
6  just say it was them --
7       MR. BRIDGES: She said she believes they talked
8  about it --
9       MR. GORDON: Yeah.
10      MR. BRIDGES: -- and then she believes they were
11 talking about working together.
12 Q.    (By Mr. Bridges) But you believe that.  Do you
13 have any evidence that that happened?  I'm trying --
14 A.    There's -- there's text messages, isn't there?
15 Q.    That you have seen?  I'm specifically asking
16 what you know, like what is your personal knowledge of
17 the motivation?  Because you're claiming now that they
18 were motivated by this Instagram post to kill Cedar, so
19 I'm --
20 A.    I didn't --
21 Q.    -- wondering what is that belief based upon?
22 Did anyone tell you that that's why they did it?
23 A.    No.  They said it's to teach her a lesson.
24 That's what they -- that's the reason they gave.
25 Q.    When did they say it's to teach her a lesson?

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 283

1  A.    "...not the best way to teach our youth the
2  value of responsibility."
3  Q.    Okay.  Do you -- do you disagree with that
4  statement?
5  A.    What statement?
6  Q.    The statement that allowing you and E.L. to keep
7  Cedar was not a good way to teach other kids about
8  responsibility.
9  A.    I felt like that was her opinion, and it's not
10 the law.
11 Q.    Okay.  But did you disagree with that statement?
12 A.    I think it's best not to back out of a contract
13 if you -- if you don't have to, but sometimes, like if
14 you're buying a house and you discover during inspection
15 that things aren't what you think they are, that you
16 have the right to back out, so sometimes that's how it
17 goes.  And -- and so no, I don't agree that every time
18 you have to do everything blindly just to teach youth
19 the value of responsibility without asking questions --
20 Q.    Okay.
21 A.    -- or you get into something, and you don't
22 exactly know.  I mean, they didn't advertise all this on
23 the 4-H pamphlets.  They show happy kids.
24 Q.    Mm-hmm.
25 A.    They don't show crying kids, and -- and -- and I

1   didn't even know there were terminal and nonterminal
2   fairs until I was involved in it all, so I -- I don't
3   know about the -- what lessons they're taught here.
4   Q.      And just to go back to my previous question
5   because, respectfully, I don't think it's been answered.
6   What evidence do you have to support your belief that
7   Cedar was taken to slaughter by the employees of the
8   Shasta District Fair because of Kristin Stover's
9   Instagram post?
10  A.      Like I said, they wouldn't have known where to
11  go get him.
12  Q.      How -- how would -- go ahead.
13          MR. GORDON: Keep your question. May I -- can I
14  have five with her? I understand what you're getting
15  at --
16          MR. BRIDGES: Yeah.
17          MR. GORDON: -- so let me --
18          MR. BRIDGES: Can I ask this one question before
19  we do that though?
20          MR. GORDON: Yeah. I'm going to -- what I mean
21  is I'll -- I'll explain, so you --
22          MR. BRIDGES: No. Of course.
23          MR. GORDON: Yeah.
24          MR. BRIDGES: Q. Just something related to
25  that. From looking at Kristin Stover's Instagram post,

1   how do you know where Cedar is located?
2           (Pause while witness reviews document.)
3           THE WITNESS: It says -- well, it -- she doesn't
4   say where he's located, but it says Bleating Hearts
5   Farm.
6           MR. BRIDGES: Q. You testified earlier that it
7   helped -- that this post helped them find Cedar, and I'm
8   wondering how did it help find Cedar if it doesn't say
9   where he is?
10  A.      Because they showed up on her doorstep with a
11  warrant to search her house, and then she told them
12  where he was.
13  Q.      Okay. So -- okay. All right. You want to take
14  five?
15          MR. GORDON: Yeah. What was your question just
16  so I can --
17          MR. BRIDGES: Just -- just what evidence is
18  there --
19          MR. GORDON: Rather than you trying to rephrase
20  it, I can -- I can --
21          MR. BRIDGES: Yeah.
22          MR. GORDON: I can -- let me -- what evidence
23  was there --
24          MR. BRIDGES: That -- that the Instagram post
25  motivated them taking him --

1           MR. GORDON: Yeah, I understand. I understand
2   what you're getting at --
3           MR. BRIDGES: -- to slaughter.
4           MR. GORDON: -- here in relation to claim. Let
5   me follow up.
6           MR. BRIDGES: Yeah. Just wondering is it -- is
7   it just speculation, or is it --
8           MR. GORDON: No. No.
9           MR. BRIDGES: -- is there something -- something
10  really there.
11          MR. GORDON: Yeah. No, I understand. Yeah.
12  Yeah. I understand what you're getting at.
13          MR. BRIDGES: Yeah.
14          (Recess taken from 2:38 to 2:44 p.m.)
15          MR. BRIDGES: Q. Okay. We're back on the
16  record. Okay. Well, before we went on the break, I
17  asked you if you have -- what is your opinion based upon
18  that employees of the Shasta District Fair took Cedar
19  for slaughter because of Kristin Stover's Instagram
20  post?
21  A.      I'm inferring it based on messages and e-mails,
22  but I don't have any specific evidence that that's why
23  they did it.
24  Q.      Okay. And in terms of Exhibit -- well, I'm
25  calling it Exhibit M. There's the -- the e-mail from

1   Melanie Silva to you, which is actually I think a
2   separate exhibit as well.
3           MR. GORDON: Boy, I don't remember.
4           MR. BRIDGES: Q. But in that -- in that e-mail
5   she references Facebook and Instagram posts, but she
6   doesn't specifically reference Kristin Stover's post,
7   does she?
8   A.      No, but that was the only post that had been
9   made.
10  Q.      Okay. On Instagram or anywhere?
11  A.      I believe anywhere. I -- I didn't have
12  Instagram or Facebook on my phone for a year during
13  COVID, so I had accounts, but I wasn't posting on it, so
14  I didn't know she had done that.
15  Q.      All right. Do --
16  A.      But she was the only one who knew what was
17  happening, so I think that was the only post at the
18  time, the only message or post.
19  Q.      And this is -- the next question is a similar
20  question. It's just about your personal knowledge.
21  Okay? I don't want you to guess or speculate, but if
22  you have a basis for the information, let me know.
23          Do you have any reason to believe that employees
24  of the Shasta District Fair would not have taken Cedar
25  for slaughter if Ms. Stover had not made the Instagram

1  post?
2  **A.    I don't know what they would have done.**
3  Q.    Okay.  There was an e-mail -- let me show you
4  this.  It was Exhibit B to your previous deposition, so
5  we don't need to mark that, but have you seen this
6  before?
7       **MR. GORDON:** It's the first e-mail, John?
8       **MR. BRIDGES:** Yes.
9       **MR. GORDON:** All right.
10      **MR. BRIDGES:** Q.  I -- I believe it's your first
11  e-mail to Melanie Silva the day after the auction; is
12  that correct?
13 **A.    Yes.**
14 Q.    Okay.  How did you get the e-mail address for
15  Melanie Silva?
16 **A.    I believe I looked it up on the website.**
17 Q.    Had you tried e-mailing that e-mail address
18  before the auction to find out if there was an option of
19  taking Cedar out of the fair?
20 **A.    No.**
21 Q.    At the time that you sent this e-mail, had you
22  ever heard of Melanie Silva?
23 **A.    No.**
24 Q.    And from looking at the top of the e-mail, it
25  says, "Dear Shasta County Fair Manager."  Is it fair to

1  say you didn't know who -- who was responsible for the
2  e-mail address that you used?
3  **A.    That's true.**
4  Q.    Okay.  And I don't want to rehash this whole
5  letter.  I just had I think one question for you.  Well,
6  two questions.  First of all, you wrote this e-mail by
7  yourself; correct?
8  **A.    Yes.**
9  Q.    Okay.  In the first paragraph you say, "If you
10  can't come up with any other solution, I will bring the
11  goat back for slaughter."
12       Do you see where you said that?  The first
13  paragraph.
14       (Pause while witness reviews document.)
15       **THE WITNESS:** Yes.
16       **MR. BRIDGES:** Q.  When you wrote that, did you
17  mean it?
18 **A.    I meant -- I meant it legally.  If legally he**
19 **was still mine, then I wasn't going to bring him back.**
20 **If she could prove that legally he wasn't mine anymore,**
21 **then I -- I -- I don't know what I would have done,**
22 **but --**
23 Q.    Would you agree that -- that you did not reach a
24  solution with Ms. Silva or anybody else from the Shasta
25  District Fair about how to handle Cedar?

1       (Pause while witness reviews document.)
2       **MR. BRIDGES:** Q.  In other words, would you
3  agree that no solution was ever reached?
4  **A.    They didn't try and reach a solution with me.**
5  **They just went and got him and ignored my e-mail.**
6  Q.    Okay.  Well, Ms. Silva responded to your e-mail,
7  didn't she?
8  **A.    Not the second one.**
9  Q.    But this one that you're looking at now,
10  Exhibit B, she responded to that; right?
11 **A.    Yes --**
12 Q.    Okay.
13 **A.    -- with Exhibit M.**
14 Q.    Okay.  And she told you that they -- that she
15  had spoken with the California Department of Food and
16  Agriculture, and they informed her that they had to
17  stick to the state rules.  Is that what she said in
18  Exhibit M?
19       (Pause while witness reviews document.)
20       **THE WITNESS:** She said, "...they have informed
21  me that for the good of all we have to stick to the
22  State Rules."
23       **MR. BRIDGES:** Q.  And then she said, "You will
24  need to bring the goat back to the Shasta District Fair
25  immediately;" right?

1  **A.    Yes, she said that.**
2  Q.    And when you e-mailed her before, the first
3  e-mail that you sent to her in that first paragraph, you
4  said that, "If we can't come up with any other solution,
5  I will bring the goat back for slaughter," and I was
6  asking before, did you ever come up with a solution?
7  **A.    No, because they worked with the sheriffs and**
8  **got him and brought him back to the fairgrounds where he**
9  **stayed at a fairground employee's home.**
10 Q.    If you stated to Ms. Silva in the first
11  paragraph of Exhibit B that you would bring the goat
12  back to slaughter if you couldn't come up with any other
13  solution, and she told you a few days later that no
14  solution could be reached and you had to bring the goat
15  back, is there a reason you didn't do that?
16 **A.    I -- because I didn't think fair rules trump the**
17 **law, and we still had an ownership interest in him.**
18 Q.    Okay.  So -- so you never intended to bring the
19  goat back to the fair for slaughter; is that true?
20 **A.    I knew that I was breaking a fair rule by**
21 **letting her keep him, but I didn't think I was breaking**
22 **the law.**
23 Q.    Okay.  And I'm not asking you about the law.
24  This isn't a legal issue necessarily, but where you
25  said, "If we can't come up with any other solution, I

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 292

1  will bring the goat back for slaughter," so it sounds
2  like you never did come up with any other solution
3  because --
4  **A.    Because she stopped communicating with me and**
5  **wouldn't -- and took him.**
6  Q.    Before they went and took him, meaning the
7  sheriff's department, is there a reason you didn't bring
8  the goat back to the fair for slaughter?
9  **A.    Because the -- the legality of who owned him had**
10  **never been confirmed, and I thought I still owned him.**
11  Q.    Did you think you still owned him when you wrote
12  this e-mail on June 27th to Ms. Silva?
13  **A.    I thought most likely, but I wasn't a hundred**
14  **percent positive.**
15  Q.    Okay. So when you said, "If we can't come up
16  with any other solution," what solution were you talking
17  about? What were you hoping could be accomplished?
18  **A.    That I could pay for any inconvenience I caused,**
19  **or maybe she would be banned or whatever repercussions**
20  **there are for breaking the fair rules, to accept those.**
21  Q.    Okay.
22  **A.    She didn't present anything else. She just --**
23  **she ignored my e-mails, and they went and got him.**
24  Q.    And when you say "they," you don't mean
25  Ms. Silva went and got them -- went and got Cedar, do

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 293

1  you?
2  **A.    They worked -- the fairgrounds worked with the**
3  **sheriffs to get him, but the sheriffs picked him up.**
4  Q.    Okay. So -- and I'm sorry. It's still just
5  unclear to me. When you say, "If we can't come up with
6  any other solution, I will bring the goat back for
7  slaughter," what you were -- what I understood you to
8  say a moment ago is that if the fair had been able to
9  establish legal ownership of the goat, you would have
10  brought him back, but you expected them to prove to you
11  that they had a right to the goat before you would do
12  that? Is that -- am I understanding that correctly?
13  **A.    I don't know what I would have done, but**
14  **possibly if they could prove that they were the legal**
15  **owners, but I didn't think they -- they were because she**
16  **still had possession of him. She never -- my daughter**
17  **never got paid, and the fair rules said he was hers**
18  **until he went to the slaughterhouse, and he hadn't gone**
19  **to the slaughterhouse.**
20  Q.    You -- you said a moment ago your daughter had
21  never been paid. My understanding from your last
22  deposition is that there was a check for her for the
23  sale of the goat, and you rejected it as part of the
24  disaffirmance. Is that true?
25  **A.    There was -- there -- the check came much later**

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 294

1  **than this date of 6/27, my e-mail to her.**
2  Q.    Okay. So -- fair enough. You're saying that as
3  of 6/27 when you sent this e-mail that is Exhibit B, no
4  money had exchanged hands between the fair and your
5  daughter?
6  **A.    Yes.**
7  Q.    Okay. At any point in time did you believe -- I
8  know you said that the fair hadn't established legal
9  ownership, or -- or anyone had established legal
10  ownership of the goat other than you, but did you
11  believe that the -- the law enforcement response
12  supported the fair's argument that you didn't own the
13  goat?
14  **A.    No.**
15  Q.    Okay. You thought law enforcement was just
16  doing something on their own?
17  **A.    A special favor for friends.**
18  Q.    Okay.
19  **A.    Possibly. I don't know. But I know that the**
20  **law -- they're involved -- the whole family is involved**
21  **in 4-H, so --**
22  Q.    Okay.
23  **A.    I mean, that's all I can think of. Why when**
24  **there's drugs and rapists and murderers all through town**
25  **would the sheriffs -- and the -- a whole floor of the**

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 295

1  **jail was shut down at the time, but they -- they went to**
2  **get him, so it must have been a special -- special favor**
3  **because it doesn't make any sense, especially when I**
4  **said if legally he's not mine, I would bring him back.**
5  Q.    Okay.
6  **A.    But they stopped talking to me, and they just**
7  **strong-armed me with -- with their friends in law**
8  **enforcement.**
9  Q.    Throughout the e-mail that is Exhibit B -- and
10  you can look it over, read it if you need to, but you
11  discuss donating Cedar to a farm for fire abatement.
12  You say that multiple times throughout the e-mail; is
13  that true?
14  **A.    Yes.**
15  Q.    Okay.
16  **THE REPORTER:** Hold on one moment. What does
17  that say on the screen?
18  **MR. BRIDGES:** "Deposition of E.L. in five
19  minutes." That's the --
20  (Discussion off the record.)
21  **MR. BRIDGES:** Q. So again, as of June 27th when
22  you sent this e-mail to Ms. Silva, if she had written
23  back and said, "Fine. You can pay us back for costs
24  incurred," or whatever you were proposing, "and you can
25  keep Cedar," was it your plan then to donate him to

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 296

1  Billy's Mini Farm for fire abasement?
2  **A.      It was a possibility, but I wasn't sure yet.**
3  Q.      Okay.  But nevertheless, you would have donated
4  him to some third party if you had been allowed to keep
5  him?
6  **A.      I might have possibly boarded him somewhere if I**
7  **found a place closer to home.  I didn't know what --**
8  **I -- I didn't know what was going to happen at this**
9  **point.**
10 Q.      Okay.  But you were certain at that point in
11 time that you would not be able to take Cedar to your
12 home; correct?
13 **A.      Yes.**
14 Q.      Okay.  And then there's this e-mail -- it's
15 Exhibit D to your last deposition -- which is the second
16 e-mail that -- or it's not an e-mail.  Looks like it's a
17 letter that you sent.
18      MR. GORDON: It was attached to an e-mail, John.
19      MR. BRIDGES: Yeah.
20 Q.      (By Mr. Bridges) You've seen that before?
21 **A.      Let me refresh.**
22 Q.      Please take your time.
23      (Pause while witness reviews document.)
24      MR. BRIDGES: Do you want to take a few minutes
25 and read the entire letter?  I just don't want --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 297

1      MR. GORDON: You want to give -- I'm going to
2  use the restroom, so if you don't mind --
3      MR. BRIDGES: Yeah.  Let's just take --
4      MR. GORDON: -- we can do that.
5      MR. BRIDGES: Let's just take a five-minute
6  break and give her an opportunity to review it.
7      (Recess taken from 2:57 to 3:06 p.m.)
8      MR. BRIDGES: Q.  We're back on the record.
9  When we went off the record you were reviewing Exhibit D
10 from your -- your last deposition, which was a letter
11 that was attached to an e-mail that is dated June 28th,
12 2022 that is from you to -- well, to Melanie Silva, I
13 think, or some representative of the Shasta District
14 Fair; is that correct?
15 **A.      Yes.  It's to -- I titled it to Dear Shasta**
16 **District Fair.**
17 Q.      Okay.
18      MR. GORDON: I believe however, John, I believe
19 it was sent the 29th.  Just --
20      MR. BRIDGES: Okay.
21      MR. GORDON: -- if that really matters, but --
22      MR. BRIDGES: No problem.  Okay.  I just want to
23 make sure we're talking about the same document --
24      MR. GORDON: Yeah.
25      MR. BRIDGES: -- so yeah, that's fine.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 298

1  Q.      (By Mr. Bridges) You said in that letter that --
2  and you can see -- I think -- I think somewhere in that
3  second paragraph, you say, "This morning, however, I
4  received another text message from BJ McFarlane which
5  seemingly ignored my letter and simply demanded return
6  of my daughter's goat."
7      Do you see that?
8  **A.      Yes.**
9  Q.      Was it your understanding when you received the
10 text message from B.J. MacFarlane, the one you're
11 referring to in this letter, that the fair was not
12 willing to accept your proposed solution of donating the
13 goat for fire abatement?
14 **A.      I thought it was still up for discussion.**
15 Q.      Okay.  You also say in that letter -- I can't
16 recall exactly where it is, but you say, "Lastly, if
17 anyone other than my daughter has a right to the goat,
18 it would be Senator Brian Dahle as he was the successful
19 bidder at auction."
20      Do you see that in there?
21 **A.      Mm-hmm.  Yes.**
22 Q.      Were you aware when you -- when you wrote this
23 letter that Senator Dahle had donated the goat to the
24 4-H FFA community barbecue upon winning -- upon placing
25 the winning bid for Cedar?

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 299

1  **A.      During the auction they -- they announced that**
2  **Cedar would be donated.  The highest bidder was going to**
3  **donate him to the barbecue.**
4  Q.      Okay.  So who did you believe -- well, I know
5  there's a dispute about ownership; right?  But I'm
6  trying to think of the best word to use because I don't
7  want to discount your contention here, but who did you
8  believe had the right to Cedar as a result of the
9  auction?  Did you believe it was Senator Dahle, or did
10 you believe that it was the barbecue?  And I don't
11 mean -- I understand there's a dispute about the
12 transfer of ownership, but on the other side of the
13 equation, who do you believe thought that they owned
14 Cedar at that point in time?  Does that make sense?
15 **A.      Yes.  I thought --**
16      MR. GORDON: John, again you're asking at this
17 point in time, correct --
18      MR. BRIDGES: Yes.
19      MR. GORDON: -- when she wrote letter?
20      THE WITNESS: I thought that's why I went to the
21 Dahles' office because I thought that he had own -- you
22 know.  If it wasn't me, it was -- it was -- he was --
23 was the highest bidder.  I thought he was paying for it.
24      MR. BRIDGES: Q.  Do you have any -- well,
25 strike that.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 300

1      You were aware though that Kathie Muse had
2   actually placed the winning bid on Senator Dahle's
3   behalf at the auction; isn't that true?
4 A.    Yes.
5 Q.    Okay.  I believe you said in your last
6   deposition that you had E.L. bring some tickets to a
7   barbecue or some sort of a thank-you to Kathie Muse at
8   the auction; correct?
9 A.    Yes.
10 Q.    Okay.  Shifting gears again here.
11 A.    I -- I thought she was the representative and
12   that she would deliver it.
13 Q.    Okay.
14 A.    I just thought she was a representative.  I
15   didn't know she ran the barbecue.
16 Q.    You said you did not know that she ran the
17   barbecue?
18 A.    No.
19 Q.    Okay.
20 A.    I just thought she was a friend of his or
21   something in his place.
22 Q.    Okay.  Did anyone from the Shasta County
23   Sheriff's Department ever come to your home as part of
24   the investigation in this case?
25 A.    Shasta County --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 301

1 Q.    Sheriff's Department.
2 A.    Yes.
3 Q.    They came to your home?
4 A.    Yes.
5 Q.    What happened when they came to your home?
6 A.    I wasn't home, but I saw on the Ring camera
7   Sheriff Fernandez came up to the door.  He knocked at
8   the door.  Nobody was home, so he walked along the front
9   of the house.  My guess was that he peeked through the
10   gate, side gate to see if there was a goat back there.
11   Then he walked along the far edge of our driveway, the
12   far edge of our property to his vehicle.
13 Q.    Did he ever walk onto your property other than
14   coming up to the front door?
15 A.    What do you mean?
16 Q.    I mean did he go into your backyard or side
17   yard, anything like that?
18 A.    Well, it was the side yard that you could look
19   into the backyard, and I don't have cameras on the other
20   side of the houses on the street, so I don't know if he
21   drove around and looked over there.  I -- I don't know.
22   That's -- I just have the camera of that one --
23 Q.    Okay.
24 A.    -- incident, so I don't know how much he looked
25   at our property while he was there.

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 302

1 Q.    Do you know if any law enforcement officer from
2   any agency searched the inside of your home as part of
3   the investigation into Cedar?
4 A.    Not that I'm aware of.
5 Q.    Do you know if they ever searched you
6   personally?
7 A.    No.
8 Q.    Did they ever search your daughter?
9 A.    No.
10 Q.    Do you know if any law enforcement officer ever
11   searched your vehicle as part of the investigation into
12   Cedar?
13 A.    No.
14 Q.    And you were never arrested for taking Cedar
15   from the fair; is that correct?
16 A.    No.
17 Q.    It's not correct?
18 A.    It is correct, yes.
19 Q.    You were never --
20 A.    I was never arrested.
21 Q.    Okay.  Thank you.  Were you ever questioned in
22   person by any law enforcement officer as part of an
23   investigation into Cedar?
24 A.    No.
25 Q.    What about your daughter?  Was she ever

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024     Page 303

1   questioned in person?
2 A.    No.
3 Q.    Was she ever questioned at all?
4 A.    By a law enforcement?
5 Q.    By law enforcement.
6 A.    No.
7 Q.    So just to be clear, as part of this lawsuit
8   the only property that you allege was seized by law
9   enforcement was Cedar himself; is that correct?
10 A.    Yes.
11 Q.    Okay.  The only area that I want to cover with
12   you, and again, it's one that might be difficult for you
13   to talk about, is generally what have you seen in --
14   what changes have you seen in your daughter since this
15   incident happened?  How has the incident with Cedar
16   taken a toll on her?
17 A.    When it first happened she ran into her room and
18   cried and was there most of the night, and she was --
19   she was upset for a long time after that.  She still
20   gets upset and cries when -- when you talk about him.
21   I've just tried to keep her distracted, and I've taken
22   her to lot -- lots of horseback riding experiences.
23 Q.    Mm-hmm.
24 A.    I think some of her friends where she goes to
25   school, they do 4-H too, so I think she feels kind of

1  left out because they all do it, and one even made a
2  comment to her when she was -- the little girl was mad
3  at my daughter, and she said, "At least I don't steal
4  things," so kids -- kids make comments her.
5      One kid said, "The Devil made you take Cedar."
6  So she's had, you know, reoccurring events to -- that
7  make her upset.
8  Q.    Mm-hmm.  Has she had any physical symptoms
9  related to the incident?  For example -- I mean other
10  than crying.  I mean -- I don't know.  Has she had
11  difficulty sleeping or --
12  A.    She's had a --
13  Q.    -- anything like that?
14  A.    -- few night terrors.  She's woken up a couple
15  times screaming.
16  Q.    Do you attribute that to the issue with Cedar?
17  A.    Possibly.
18      MR. GORDON: Call -- just object that it calls
19  for expert --
20      MR. BRIDGES: Sure.
21      MR. GORDON: Calls for expert testimony, but she
22  can -- her understanding, yeah.
23      MR. BRIDGES: Q.  Has E.L. told you that she had
24  nightmares that had to do with goats or the 4-H project,
25  anything like that?

1  A.    No.
2  Q.    Okay.  Has she struggled academically in school
3  since -- since the incident with Cedar?
4  A.    I'm not sure.  She's -- she doesn't really like
5  school work and has trouble focusing, but I'm -- you
6  know.  I don't -- kids don't really like school, so I
7  don't -- I don't know.  She has gained a little bit of
8  weight too, so I don't know if that's due to stress or
9  her upset from it.  I don't know.
10  Q.    Do you know or have you observed her
11  relationship with her other family members like your
12  husband or her siblings be affected at all since the
13  issue with Cedar?
14  A.    I don't think so.
15  Q.    Okay.  I had another question, and it just
16  completely slipped my mind.  I hate it when that
17  happens.  It was a good one too.
18      Why don't -- I might have a follow-up if I
19  remember what that question was, so I don't know if -- I
20  think Damian had just a couple questions to ask.  Is
21  that --
22      MR. GORDON: Yeah, that's fine.  Yeah.  I mean,
23  we're still -- yeah.  I do want to get -- grab Vanessa,
24  but yeah.
25      MR. NORTHCUTT: I can keep it nice and short

1  here.
2      MR. GORDON: Yeah.  Thanks, Damian.  I might
3  have one or two, but --
4
5      EXAMINATION BY MR. NORTHCUTT
6      MR. NORTHCUTT: Q.  Hello, Mrs. Long.  This is
7  Damian Northcutt.  You probably remember -- remember me
8  from earlier.
9  A.    Hello.
10  Q.    Thank you for sitting with us today.
11      So I got just a few follow-up questions.  We
12  talked earlier -- you mentioned that throughout the
13  course of this 4-H program with Cedar that your daughter
14  bonded with Cedar; correct?
15  A.    Yes.
16  Q.    Did you also during this 4-H program bond with
17  Cedar?
18  A.    I think a little bit but not to the extent that
19  she did.  She did most of the handling of him, so -- but
20  yes, I -- I did grow to love him too and valued him more
21  than meat.
22  Q.    But -- but you would say overall she had a
23  stronger bond with Cedar than you did; is that correct?
24  A.    Yes.  Yes.
25  Q.    We had a -- we had the deposition of

1  Kay Delaloza, I think her name is.  Is she -- do you
2  recall, is -- is she the woman that sold you Cedar
3  earlier?
4  A.    Yes.
5  Q.    Okay.  During her deposition -- and I can
6  represent to you that she said at some point she was
7  involved in kind of like a -- I want to say an
8  afterschool program that your -- your daughter was
9  attending on a -- on a regular basis.  Does that -- does
10  that sound correct to you?
11  A.    Yes, that's correct.
12  Q.    Okay.  And during the deposition, at some point
13  she said that she -- I believe it was in May of 2022,
14  she said that your daughter made a comment, and it was
15  to the effect of, "Oh, I'm so tired of Cedar.  I can't
16  wait to sell him at the fair."  During the deposition
17  she said you were present when that comment was made.
18      Was that -- was there a comment to such effect
19  made, to your recollection?
20      MR. GORDON: Misstates testimony, but if --
21      MR. NORTHCUTT: I can -- I can pull up the
22  deposition transcript.
23      MR. GORDON: Yeah.  Yeah.  Was that -- no,
24  Damian.  Maybe I'm confused as to time.  Anyway, finish
25  your question.  It's fine.

1    **MR. NORTHCUTT:** Hold -- hold on real quick here.
2  I can pull -- I'll just pull it up, and I'll read the
3  actual page and line for you.
4        **MR. GORDON:** That could be good, but in what
5  context is she -- what time is she talking about?
6        **MR. NORTHCUTT:** It's -- it's May of 2022.
7        **MR. GORDON:** And the -- oh, okay.  No, I think
8  you're correct.  So this was in school she -- she --
9  just -- if you want to read it to her and just give her
10  context again.  I'm sorry.  I'm trying to actively
11  recall it.  I haven't looked -- I haven't looked at the
12  depo in a while.
13       **MR. NORTHCUTT:** Q.  So this is Page 36 of her
14  deposition starting at Line 11.  "Question: When you
15  were assisting at Roots Farm and you were interacting
16  with E.L. on a daily basis between I guess it was
17  February of 2022 and June of 2022, did E.L. ever
18  indicate that you -- she was hoping to finish her work
19  with 4-H?"
20       "Yes."
21       "Can you tell me, do you -- "
22       "Answer:  Yes."
23       "Question:  Can you tell me, do you recall
24  having a conversation about that?"
25       "Answer:  Her mom was talking to me, and E.L.

1  walked up to me in front of her mom and said, quote,
2  'Oh, I'm so tired of Cedar.  I can't wait till I sell
3  him at the fair.'"
4        "Question:  Do you recall when this conversation
5  was?"
6        "Answer:  It was sometime in May."
7        "Question:  May of 2022?"
8        "Answer:  Yes."
9        This is Page 36, Lines 11 through 25.
10       **MR. GORDON:** Yeah, I believe you.  What's your
11  question?
12       **MR. NORTHCUTT:** Q.  My question is do you recall
13  her making those statements?
14  A.    **No.  I don't ever remember her saying that in**
15  **front of Kay or anything like that.  I do -- [E.L.] did**
16  **complain about having to feed him, and it hurt to walk**
17  **him because his horns had been cut off, and he would put**
18  **them back, and they would go into her hand, so there was**
19  **some points where she didn't -- she didn't enjoy walking**
20  **him or feeding him or -- same way she doesn't like**
21  **filling up the dog bowl of food and water or picking up**
22  **dog poop.  The comments that [E.L.] makes were very**
23  **similar, but I don't remember that specific comment from**
24  **Kay.**
25  Q.    Did -- did -- did -- did E.L. ever make any

1  comments to you that she was looking forward to selling
2  Cedar at the fair?
3  A.    **Not that I remember.**
4  Q.    On July 15th, 2022 I believe you got a text from
5  Raymond Allen.  It was the -- probably -- I believe he
6  said it was the last text that he sent, or -- or -- I'm
7  sorry.  There was a text that you sent to Raymond Allen
8  about whether or not the sheriffs had a warrant, and I
9  believe in response to that Raymond Allen said for you
10  to reach out to Detective Jeremy Duncan.  Do you recall
11  that, those texts?
12  A.    **Something along those lines.  I don't know --**
13  **you didn't specifically say them, so --**
14  Q.    Okay.
15  A.    **But I did inquire to -- to Cedar, and he -- he**
16  **took a picture of a business card and said, "This is who**
17  **has your goat.  They came and confiscated him."**
18  Q.    Okay.
19  A.    **There was a text like that.**
20  Q.    So -- so July 8th, 2022 was when Cedar was
21  obtained by the sheriff's department, and from that
22  point on -- and I know -- I'm not talking about what
23  your counsel did.  I'm talking about specifically what
24  you did.  Did you ever reach out directly to
25  Detective Jeremy Duncan about Cedar's whereabouts?

1  A.    **No.  I didn't -- I didn't see Duncan's name**
2  **until the -- he texted the picture of the card.  I**
3  **didn't know law enforcement was seriously involved with**
4  **it.  I mean, there were threats that they were going to**
5  **call law enforcement, but --**
6  Q.    Okay.  Same question.  Did you ever reach out
7  directly to Lieutenant Jerry Fernandez about Cedar's
8  whereabouts after July 8th, 2022?  Not your counsel.
9  Just you.
10  A.    **No.**
11  Q.    And did you ever -- same question -- reach out
12  to Detective Ashbee about Cedar's whereabouts after
13  July 8th, 2022?
14  A.    **No.**
15  Q.    Did you ever reach out directly to the sheriff
16  himself to determine Jess- -- to determine Cedar's
17  whereabouts after July 8th, 2022?
18       **MR. GORDON:** Damian, could you repeat the
19  question?  Sorry.
20       **MR. NORTHCUTT:** The question is did -- did
21  Mrs. Long ever reach out to the sheriff himself about
22  Cedar's whereabouts after he was attained on July 8th,
23  2022.
24       **MR. GORDON:** You mean, again, her personally,
25  not through me.

1    MR. NORTHCUTT: Her personally.
2    MR. GORDON: Yeah.
3    THE WITNESS: No.  I -- I was afraid.
4    MR. NORTHCUTT: Q.  Did -- did you ever reach
5    out to anyone at the sheriff's department at any time
6    directly between the time of the fair and -- between the
7    time of the fair itself and let's say any time up until
8    the end of July of 2022?
9    A.    No.  I was afraid of them, and I -- I wanted
10   legal help, so I was afraid to talk directly to them.
11   Q.    There's a letter that you sent on June 28th,
12   2024, kind of --
13   A.    Wait.  June 28th, 2024 hasn't happened yet.
14   Q.    Oh, sorry.  June 28th, 2022 --
15   A.    Okay.
16   Q.    -- in which you talked about -- I think it was
17   essentially the steps that -- we've been talking about
18   the steps you would do to bring Cedar back, and you
19   talked about kind of like your position on your -- on
20   whether you believed you owned Cedar or -- or whether
21   Senator Dahle might be the owner.  We've discussed --
22   A.    Was it the first or second letter I sent to the
23   fairgrounds?
24   Q.    It's the second letter --
25   A.    Okay.

1    Q.    -- which may or may not be some sort of, you
2    know, essentially a claim of ownership.  Did you -- did
3    you ever actually present a claim of ownership to either
4    the fair or to the sheriff's department at any given
5    time in 2022?
6    MR. GORDON: Vague as to "claim of ownership."
7    THE WITNESS: I've never heard of that before.
8    MR. NORTHCUTT: Q.  Did you ever like
9    specifically send any sort of document to the sheriff's
10   department saying, "Cedar is my property, and I expect
11   him to be returned to me"?  You, not -- not -- not
12   anything your counsel has done for you.
13   A.    No.  I don't know what document that would have
14   been.  I didn't have any -- you know.  I don't -- I
15   don't have a document that says I own my dogs.  I
16   don't -- I don't know what document that would have
17   been.  So no, I didn't send anything.
18   MR. NORTHCUTT: I think that wraps it up on my
19   end.  John, do you have any further questions, or
20   Ryan?
21   MR. BRIDGES: I did --
22   MR. GORDON: I might have recross.  John, you
23   can finish up.
24   MR. BRIDGES: Yeah, I did think of the questions
25   I had for you.

1    FURTHER EXAMINATION BY MR. BRIDGES
2    MR. BRIDGES: Q.  In some of the correspondence
3    you mentioned that three of E.L.'s grandparents had
4    passed away --
5    A.    Yes.
6    Q.    -- at some point in time before the fair?
7    A.    Yes.
8    Q.    Whose parents were those?
9    A.    My dad, and my husband's mom, and my husband's
10   stepdad who raised him since he was a little boy.
11   Q.    Okay.  And when did -- when did your father pass
12   away?
13   A.    On my birthday, the -- August 30th.
14   Q.    Of 2021?
15   A.    (Nods head.)
16   Q.    Okay.
17   MR. GORDON: Do you need a moment, Jess?  Okay.
18   You need to continue with that, or -- it's not -- it's
19   not a fiction if that's what you're --
20   MR. BRIDGES: No, I don't think it is.  No, I'm
21   not saying that.  I'm just -- I do have some questions
22   about E.L.'s relationship with them.
23   THE WITNESS: Is there a tissue somewhere?
24   MR. GORDON: Um --
25   MR. BRIDGES: There's some up there on the --

1    that red box.
2    THE WITNESS: Thank you.
3    MR. GORDON: Sure.  Do you need another one?  I
4    can grab more.  I'll just grab the box.
5    MR. BRIDGES: And I only have maybe two
6    questions about this, so I'm sorry.
7    THE WITNESS: Okay.
8    MR. BRIDGES: Q.  Are you able to continue?
9    A.    Mm-hmm.  Yes.
10   Q.    Okay.  And when did your -- your in-laws pass
11   away?  Was that within two years of the fair?
12   A.    My dad was in August 2021, my husband's mom was
13   in November, and my husband's dad was in March of 2021.
14   They were all in the -- 2021.
15   Q.    Okay.  How would you describe E.L.'s
16   relationship with those three grandparents?
17   A.    She wasn't close with them because my dad
18   lived in Oregon --
19   Q.    Mm-hmm.
20   A.    -- and my husband's parents lived in Washington,
21   and then they lived -- but she saw how upset we were,
22   and she was upset for us, but -- and she was sad.  She
23   was sad too that her grandparents were gone.
24   Q.    Okay.  In -- let's say from the beginning of
25   2021 through today, has E.L. experienced any other --

LONG vs.
FERNANDEZ

JESSICA LONG - Vol. 2
February 8, 2024

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 316

1  I'm going to use the word "trauma," for lack of a better
2  term, but any other trauma besides the death of her
3  three grandparents and the Cedar situation?  Anything
4  that you're aware of?
5  **A.    No.**
6      MR. BRIDGES: Okay.  That's all I have.  Thank
7  you.
8      MR. GORDON: Give me just two -- let me just --
9  I'm going to call Vanessa, go over my notes.  I might
10 have recross.  I'm not sure.
11     MR. BRIDGES: Yeah, we can take a break.  That's
12 fine.
13     MR. GORDON: Yeah.  Okay.
14     (Recess taken from 3:29 to 3:41 p.m.)
15
16        EXAMINATION BY MR. GORDON
17     MR. GORDON: Q.  So your second letter, which
18 was Exhibit B, was the June 28th one --
19     MR. BRIDGES: Do you need to see it?
20     MR. GORDON: No.  I think we're okay.  It's just
21 a quick question, John.
22 Q.    (By Mr. Gordon) So do --
23 **A.    Was it Exhibit B, or was it something different?**
24 Q.    Think it was B, wasn't it?  In your first
25 depos- --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 317

1      MR. BRIDGES: Do you --
2      MR. GORDON: Maybe, just -- just to verify that
3  I'm not saying -- thank you, John.
4      MR. BRIDGES: D.
5      MR. GORDON: D.  Oh --
6      MR. BRIDGES: D.
7      MR. GORDON: -- okay.  Yeah.
8      MR. BRIDGES: B was the first e-mail.
9      THE WITNESS: Okay.
10     MR. GORDON: B was the first e-mail.  Your
11 second letter, D.  Okay.
12 Q.    (By Mr. Gordon) You -- Mr. Northcutt was
13 questioning you about that, questioning you about that a
14 few minutes ago, Ms. Long.  Your understanding when you
15 sent -- was your understanding when you sent the second
16 letter that -- that you and [E.L.] were asserting some
17 sort of property interest and threatening to sue;
18 correct?
19 **A.    Yes.**
20 Q.    And earlier in the deposition Mr. Bridges asked
21 you -- or was asking about the times you spoke with
22 Ray Allen, and I believe you -- was the 27th -- correct
23 me if I'm wrong -- was some calls on the 27th that you
24 testified to, and then there was a text message the
25 15th, on the 15th, and you had -- and he asked if had --

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 318

1  you had spoken [sic] -- spoken to him beforehand at any
2  point in time, and I don't remember if you said yes or
3  no.  This is why I'm clearing this up.  But did you
4  speak with Ray Allen before the 15th --
5  **A.    Yes.**
6  Q.    -- or did you try -- okay.  And did you call
7  him?
8  **A.    Yes.**
9  Q.    And you just called him.  You know what date you
10 called him?
11 **A.    A few days before the 15th.**
12 Q.    Okay.  And that was just to check up on Cedar,
13 et cetera, on -- a few days before the 15th?
14 **A.    Yes.  I think I might have just left a message.**
15 **I'm not for sure if I talked to him, but --**
16 Q.    Okay.  All right.  So --
17 **A.    -- I did call.**
18 Q.    Okay.  So any other communications you can think
19 of between that period?
20 **A.    No.**
21 Q.    Okay.  All right.  And then -- and then the last
22 question, you didn't -- earlier Mr. Bridges was asking
23 you why you didn't seek injunctive relief in court.  I
24 know you're not an attorney and don't know what
25 injunctive relief is, but is there any rea- -- I -- any

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024   Page 319

1  reason you didn't -- you know, or what other reasons, I
2  should say, you did not immediately file suit the next
3  day after you -- after this dispute started with the
4  fair, the first week after the fair or so?
5  **A.    Sorry.  Can you say it again?**
6  Q.    Sure.  John earlier was just inquiring why you
7  didn't file your own action, you know, I guess the week
8  of the -- the week after the fair or thereabouts, so is
9  there any reason you didn't immediately, you know, run
10 to court and file your own action?
11 **A.    I was worried about criminal charges against me,**
12 **and I was looking for legal help and calling different**
13 **lawyers, and I just thought Cedar was safe at that**
14 **point.**
15 Q.    Okay.  So no urgency is -- in that moment in
16 time, aside -- the criminal charges were the most urgent
17 in your mind at that time?
18 **A.    Yes.**
19     MR. GORDON: Okay.  That's all.  No further
20 questions.
21     MR. BRIDGES: I don't have anything further.  Do
22 you have anything, Damian?
23
24     FURTHER EXAMINATION BY MR. NORTHCUTT
25     MR. NORTHCUTT: Q.  You just stated that you

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 320

1  thought Cedar was safe. What timeframe are you
2  referring to right then?
3      **MR. GORDON:** My question, Damian, was the -- you
4  can ask her, but I think I said in the question why she
5  didn't run in to court the week after the fair, but if
6  you want to ask her a different timeframe --
7      **THE WITNESS:** I thought he was safe at
8  Raymond Allen's.
9      **MR. GORDON:** But Damian's asking you what
10  timeframe was -- do you mean by that?
11      **MR. NORTHCUTT:** That's fine. That clarifies --
12      **MR. GORDON:** That's fine? Okay.
13      **MR. NORTHCUTT:** -- it for me. I --
14      **MR. GORDON:** Okay.
15
16      FURTHER EXAMINATION BY MR. BRIDGES
17      **MR. BRIDGES:** Q. So you thought he was safe
18  until you received the text message from Raymond Allen
19  saying that law enforcement had taken him?
20 A.  Yes.
21      **MR. BRIDGES:** Okay.
22      **MR. GORDON:** All right. That's it.
23      **MR. BRIDGES:** All right.
24      **MR. GORDON:** Okay. Fair. Do -- Damian, what is
25  the stip we've been doing? I don't remember. Do you

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 321

1  remember the stip we've been doing?
2      **MR. NORTHCUTT:** I think we've just been
3  basically saying that we all stipulate that a conformed
4  copy of the transcript or a -- you know, a copy of the
5  transcript can be used the same as an original at
6  tri- -- for purposes of discovery at the time of trial.
7      **MR. GORDON:** Okay.
8      **MR. BRIDGES:** Okay.
9      **MR. GORDON:** Okay. That's fine. So stipulated.
10      **MR. NORTHCUTT:** I'd like a copy of the
11  transcript, please, and then -- I don't know. Did you
12  guys video -- video this or not?
13      **MR. BRIDGES:** We did not, no.
14      **MR. NORTHCUTT:** Okay. All right. Then just the
15  transcript. Thanks.
16      (Deposition was concluded at 3:46 p.m. PST.)
17      ---o0o---
18
19
20
21
22
23
24
25

DEPOSITION OF JESSICA LONG, VOLUME II, 2/8/2024      Page 322

1           PENALTY OF PERJURY
2
3      I, the undersigned, hereby certify that I have
4  read the foregoing deposition, that I know the contents
5  thereof, and I declare under penalty of perjury under
6  the laws of the State of California that the foregoing
7  is true and correct, and that there are;
8
9  (Check one)          _____  NO CORRECTIONS
10                _____  CORRECTIONS AS ATTACHED
11
12      Executed this _____ day of _____,
13  20_____.
14
15
16
17      _____
18      JESSICA LONG
19
20      ---o0o---
21
22
23
24
25

Page 323

1           CERTIFICATE OF REPORTER
2
3      I, STACY A. SHORT, a Certified Shorthand Reporter,
licensed by the State of California, License No. 7446,
being empowered to administer oaths and affirmations
pursuant to Section 2093(b)(1) of the California Code of
4   5  Civil Procedure, do hereby certify:
6      That the witness in the foregoing deposition,
JESSICA LONG, was present at the date, time, and place
specified and was by me sworn to testify to the truth,
7   8  the whole truth, and nothing but the truth;
9      That said proceeding was taken before me in
shorthand writing, and was thereafter transcribed under
my direction by computer-aided transcription;
10      11  That the foregoing transcript constitutes a full,
true, and accurate record of the proceedings which took
12  place;
13      That I am not of counsel or attorney for any of the
parties hereto, nor in any way interested in the event
of this cause, and that I am not related to any of the
14  parties hereto.
15      IN WITNESS WHEREOF, I have hereunto subscribed my
name this 15th day of FEBRUARY, 2024.
16
17
18
19      _____
20      STACY A. SHORT, CSR
21
22
23
24
25

LONG vs.
FERNANDEZ

JESSICA LONG – Vol. 2
February 8, 2024

Page 324

1           DEPONENT'S CHANGES AND/OR CORRECTIONS

2     INSTRUCTIONS:  Upon reading the transcript, please note
      any changes or corrections on this sheet.  DO NOT make
3     any marks or notations on the actual transcript.  Use
      additional pages if needed.  If there are no changes,
4     write "No Changes."  SIGN AND DATE THIS FORM BELOW.

5     DEPOSITION OF:      JESSICA LONG, VOLUME II
      CASE NAME:          E.L., ET AL., VS LIEUTENANT JERRY
6                         FERNANDEZ, ET AL.
      DEPOSITION DATE:    THURSDAY, FEBRUARY 8, 2024
7

8     PAGE LINE            CHANGE/CORRECTION

9     ____ ____  _____

10    ____ ____  _____

11    ____ ____  _____

12    ____ ____  _____

13    ____ ____  _____

14    ____ ____  _____

15    ____ ____  _____

16    ____ ____  _____

17    ____ ____  _____

18    ____ ____  _____

19    ____ ____  _____

20    ____ ____  _____

21    ____ ____  _____

22
          I, JESSICA LONG, have read my deposition of
23    February 8, 2024, and hereby affix my signature that
      same is true and correct, except as noted above.
24

25        _____          _____
             SIGNATURE                      DATE

CERTIFICATE OF REPORTER

I, STACY A. SHORT, a Certified Shorthand Reporter, licensed by the State of California, License No. 7446, being empowered to administer oaths and affirmations pursuant to Section 2093(b)(1) of the California Code of Civil Procedure, do hereby certify:

That the witness in the foregoing deposition, JESSICA LONG, was present at the date, time, and place specified and was by me sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceeding was taken before me in shorthand writing, and was thereafter transcribed under my direction by computer-aided transcription;

That the foregoing transcript constitutes a full, true, and accurate record of the proceedings which took place;

That I am not of counsel or attorney for any of the parties hereto, nor in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 15th day of FEBRUARY, 2024.


_____

STACY A. SHORT, CSR

**$**

**$15 (1)**
222:2

**[**

**[EL] (4)**
247:9;309:15,22;
317:16
**[sic] (2)**
238:23;318:1

**{**

**{sic] (1)**
215:12

**A**

**abasement (1)**
296:1
**abatement (2)**
295:11;298:13
**ability (2)**
278:16,21
**able (11)**
210:23;212:12;
214:14;227:4;242:25;
253:11;263:25;275:15;
293:8;296:11;315:8
**absolutely (1)**
281:2
**academically (1)**
305:2
**accept (4)**
235:16,21;292:20;
298:12
**accomplished (1)**
292:17
**account (1)**
264:24
**accounts (2)**
277:5;287:13
**accused (1)**
246:6
**acres (1)**
237:22
**action (2)**
319:7,10
**actively (1)**
308:10
**actual (1)**
308:3
**actually (4)**
224:22;287:1;300:2;
313:3
**adapt (1)**
248:8
**address (3)**
288:14,17;289:2
**admonitions (2)**

209:11;211:20
**advertise (1)**
283:22
**advocating (3)**
270:24;271:3,22
**affected (1)**
305:12
**affirm (1)**
262:1
**afraid (6)**
238:3;240:23;
255:11;312:3,9,10
**afternoon (1)**
208:21
**afterschool (1)**
307:8
**afterwards (1)**
247:14
**ag (1)**
237:16
**again (28)**
211:9;215:25;
216:22,23;229:1,7;
233:4;235:8;243:16;
247:10;249:15;252:1;
254:12;255:1;262:10;
263:16,25;269:4;
272:15;277:18;278:18;
295:21;299:16;300:10;
303:12;308:10;311:24;
319:5
**against (1)**
319:11
**agency (1)**
302:2
**agent (1)**
214:19
**ago (7)**
212:22;232:10;
236:8;253:15;293:8,
20;317:14
**agree (7)**
223:25;224:22;
226:6;227:25;283:17;
289:23;290:3
**agreed (5)**
223:16;232:7,23;
233:5;253:7
**agreeing (4)**
224:3,7;226:2;
228:10
**agreement (12)**
225:14;226:2,7;
228:1;232:8,24;233:6;
237:5;247:4;252:15;
261:15;263:7
**agreements (1)**
237:5
**Agricultural (1)**
208:3
**Agriculture (1)**
290:16
**ahead (4)**

233:3;250:17;254:7;
284:12
**air (4)**
245:16,20;246:8,12
**alive (4)**
235:14;238:6;268:6;
281:4
**allege (1)**
303:8
**Allen (34)**
241:24,24;242:5;
243:10,20;245:13,24;
246:3,20,23;247:2,5;
248:17;249:7,15;
250:4,23;251:1;
252:16,25;253:9,19,24;
254:5,23;255:3;260:7,
19;310:5,7,9;317:22;
318:4;320:18
**Allen's (5)**
245:10;246:15;
247:16;256:3;320:8
**allow (1)**
236:4
**allowed (1)**
296:4
**allowing (1)**
283:6
**almost (1)**
219:2
**along (4)**
275:4;301:8,11;
310:12
**alphabet (1)**
267:16
**alternative (2)**
231:4;255:25
**always (2)**
211:14;247:24
**Amazon (1)**
216:14
**amended (3)**
217:4,13,22
**and/or (3)**
214:19,20;217:11
**animal (1)**
263:22
**animals (2)**
244:4;271:4
**announced (1)**
299:1
**answered (8)**
231:14;233:2;
240:16;243:4;254:7;
263:13;282:5;284:5
**anymore (1)**
289:20
**apologize (1)**
215:19
**appears (1)**
268:25
**application (1)**
223:16;225:14,22

applying (1)
225:21
**Approximately (1)**
247:14
**area (3)**
217:19;238:12;
303:11
**argument (1)**
294:12
**arm (1)**
252:6;256:9
**around (4)**
237:16;247:24;
249:6;301:21
**arrange (1)**
274:5
**arrangements (1)**
252:9
**arrest (3)**
255:13,15;278:23
**arrested (5)**
255:11;256:8;
260:15;302:14,20
**arrived (1)**
234:13
**article (3)**
274:14;275:3;280:25
**articles (6)**
270:18;274:10,25;
278:4,9;280:22
**Ashbee (1)**
311:12
**Aside (2)**
218:17;319:16
**assembled (1)**
215:20
**asserting (1)**
317:16
**assisting (1)**
308:15
**Association (1)**
208:3
**assume (2)**
211:23;265:1
**attached (5)**
220:12;268:13;
296:18;297:11;322:10
**attachment (1)**
219:6
**attained (1)**
311:22
**attended (3)**
270:23;271:2,21
**attending (1)**
307:9
**Attorney (5)**
209:1;211:5;214:10;
216:19;318:24
**Attorney-client (3)**
213:11;260:23;
266:10
**attorneys (8)**
212:25;213:2,18,25;

258:13;259:8,22;260:1
**attribute (1)**
304:16
**attributed (1)**
274:13
**auction (23)**
227:9,15;228:7;
233:18,24;234:7,9,20,
21;237:9;243:12,21;
244:23;254:22;255:2,
2;288:11,18;298:19;
299:1,9;300:3,8
**audibly (1)**
210:11
**August (6)**
209:4;212:19;262:3;
268:1;314:13;315:12
**available (1)**
253:20
**avoid (1)**
232:3
**aware (5)**
277:9;278:2,5;
298:22;300:1;302:4;
316:4
**away (5)**
258:5;260:6;314:4,
12;315:11

**B**

**back (47)**
241:20;245:23,24;
246:4,8,9,18;247:1,7,8;
249:8,14,24;250:1,5,
13;251:1,25;252:3;
253:23;254:6,8;256:2,
23;283:12,16;284:4;
286:15;289:11,19;
290:24;291:5,8,12,15,
19;292:1,8;293:6,10;
295:4,23,23;297:8;
301:10;309:18;312:18
**backup (1)**
229:21
**backyard (2)**
301:16,19
**banned (2)**
263:24;292:19
**barbecue (12)**
260:12;267:9,11,12;
276:22;277:2;298:24;
299:3,10;300:7,15,17
**based (10)**
236:20;279:18,19;
281:12,12,17;282:4,21;
286:17,21
**basically (1)**
321:3
**basis (3)**
287:22;307:9;308:16
**bear (1)**
270:23

**become (1)**
210:18
**Bee (1)**
273:11
**beforehand (1)**
318:1
**began (1)**
227:21
**beginning (4)**
209:12;214:10;
231:21;315:24
**behalf (5)**
208:2;225:5;258:17;
265:12;300:3
**belated (4)**
221:5;231:13;234:3,
3
**belief (4)**
279:20;282:4,21;
284:6
**believes (2)**
282:7,10
**besides (1)**
316:2
**best (9)**
210:23;222:13;
242:12;263:17,21;
279:14;283:1,12;299:6
**better (4)**
222:7;234:10;
271:12;316:1
**bid (4)**
234:9;238:1;298:25;
300:2
**bidder (8)**
236:14;245:18;
247:11;250:18;262:25;
298:19;299:2,23
**big (1)**
263:2
**Billy's (3)**
242:1;265:23;296:1
**birthday (1)**
314:13
**bit (4)**
217:6;238:11;305:7;
306:18
**BJ (7)**
208:4;209:3;214:21;
257:11;278:14;298:4,
10
**Bleating (1)**
285:4
**blindly (1)**
283:18
**blogs (1)**
270:18
**board (3)**
230:11,11,12
**boarded (1)**
296:6
**boarding (3)**
216:5;230:20;252:16

**bond (3)**
237:14;306:16,23
**bonded (1)**
306:14
**bonding (1)**
244:25
**bought (6)**
216:14;227:11,15;
234:16;238:3;280:25
**bowl (1)**
309:21
**box (6)**
223:10,11,15,25;
315:1,4
**boxes (2)**
223:8;225:9
**Boy (2)**
287:3;314:10
**break (7)**
241:14;245:7;
256:18,18;286:16;
297:6;316:11
**breaking (5)**
245:4,5;291:20,21;
292:20
**bred (1)**
231:16
**Brian (1)**
298:18
**bridge (1)**
217:5
**BRIDGES (186)**
208:20,21,25;210:9,
14;211:12,16,18,20,21;
212:15,16;213:7,10,12,
17,20,23,24;214:2,5;
215:24;216:2,3,25;
217:1;218:4,10,12,14,
16,19,22,25;219:9,10;
220:8,10,15,17,22;
221:1,7,13;222:2,16;
224:21;227:4;229:2,
19,25;230:5,24;
231:20;233:5,16;
234:4,5,25;235:3,5;
237:8;238:11,24;
239:7,25;240:25;
241:16,20;243:9,15,25;
244:1,22;249:2;
250:21;251:13,14;
254:10,13,16;256:21,
23;258:7,21;259:3,18;
260:25;261:2,22,23;
264:10;266:2,4,6,9,15,
18,22;267:16,22;
269:7;270:4,7,8;271:8,
12,16,19,21;272:14,18;
273:1,3,6,12,23;274:3,
4;275:20,23;280:5,7,9;
282:7,10,12;284:16,18,
22,24;285:6,17,21,24;
286:3,6,9,13,15;287:4;
288:8,10;289:16;

290:2,23;295:18,21;
296:19,20,24;297:3,5,
8,20,22,25;298:1;
299:18,24;304:20,23;
313:21,24;314:1,2,20,
25;315:5,8;316:6,11,
19;317:1,4,6,8,20;
318:22;319:21;320:16,
17,21,23;321:8,13
**briefly (1)**
267:22
**bring (15)**
245:22,24;289:10,
19;290:24;291:5,11,14,
18;292:1,7;293:6;
295:4;300:6;312:18
**broke (3)**
252:6;256:9;263:11
**brought (3)**
222:15;291:8;293:10
**business (1)**
310:16
**buy (2)**
231:17;237:6
**buyers' (1)**
233:20
**buying (1)**
283:14
**buys (1)**
227:12

---

**C**

**California (7)**
208:2,6,10;209:1;
273:11;290:15;322:6
**call (10)**
242:23,24;251:21;
252:8;264:25;304:18;
311:5;316:9;318:6,17
**called (12)**
232:16;242:2,17;
249:19,21;251:10,14,
18;257:22;260:22;
318:9,10
**calling (3)**
258:23;286:25;
319:12
**Calls (10)**
237:2;243:13;
244:14;258:3;259:14,
14;261:21;304:18,21;
317:23
**came (6)**
254:8;293:25;301:3,
5,7;310:17
**camera (2)**
301:6,22
**cameras (1)**
301:19
**camp (1)**
261:9
**can (58)**

210:16,19;211:10;
212:3;213:4;218:1;
219:5;221:9;222:13;
225:23;229:1,6;
232:18;233:4,5,15;
235:8,8;243:16;255:1;
258:4;262:10;263:17;
264:5,5;269:7;274:19;
277:18;278:18;280:10;
281:16;284:13,18;
285:16,20,20,22;
294:23;295:10,23,24;
297:4;298:2;304:22;
305:25;307:5,21,21;
308:2,21,23;313:23;
315:4;316:11;318:18;
319:5;320:4;321:5
**cancel (1)**
262:1
**cancelling (1)**
264:8
**capacity (1)**
242:8
**card (4)**
248:24,25;310:16;
311:2
**care (3)**
216:6;255:14;256:9
**case (7)**
209:5;214:9;258:25;
261:11;274:9,9;300:24
**cash (1)**
215:4
**categories (1)**
219:21
**caused (1)**
292:18
**Cedar (149)**
215:1;216:4;219:13;
226:19;227:1,5,20;
230:1;231:9,20;233:1,
8,17;234:6,20;235:9,
25;236:4,9,15,16,17;
237:1,4,9,19,24;242:5,
6,8,25;243:2,11,11,20,
22,24,24,25;244:12;
245:10,13,15;246:3,8,
9,18;247:1,5;249:8,10,
14,16,20;250:1,5,13,
23;251:1,8,25;252:8,
10,16,19,24;253:9,11,
15,18,19,23;254:5,19,
24;255:4,7,25;256:4;
257:3,8,13;258:8;
259:9,24;260:6,8,21;
263:24;264:11,14;
265:22;266:11,22;
268:5;277:13,23;
278:22;279:6,21,24;
282:18;283:7;284:7;
285:1,7,8;286:18;
287:24;288:19;289:25;

292:25;295:11,25;
296:11;298:25;299:2,
8,14;302:3,12,14,23;
303:9,15;304:5,16;
305:3,13;306:13,14,17,
23;307:2,15;309:2;
310:2,15,20;312:18,20;
313:10;316:3;318:12;
319:13;320:1
**Cedar's (10)**
258:14;259:6;260:2;
262:6;270:24;310:25;
311:7,12,16,22
**Cedro (1)**
216:13
**cell (2)**
252:6;264:24
**certain (1)**
296:10
**certainty (2)**
229:23;231:19
**Certified (2)**
208:5,9
**certify (1)**
322:3
**cetera (1)**
318:13
**cha- (1)**
231:12
**Challe (1)**
208:5
**chance (1)**
214:11
**changed (7)**
243:10,19;244:2,10,
22;250:12;266:16
**changes (3)**
271:3,22;303:14
**charges (4)**
246:21;250:11;
319:11,16
**check (8)**
216:23;262:6,7,12;
293:22,25;318:12;
322:9
**chevon (2)**
276:8,9
**chief (1)**
248:2
**chose (1)**
240:18
**circumstances (7)**
217:13;250:12;
270:15;272:1;278:6,
17,22
**city (3)**
274:15;275:6,7
**civil (1)**
237:21
**claim (9)**
217:12,23;218:22;
261:11,15;286:4;
313:2,3,6

**claimed (1)**
245:12
**claiming (1)**
282:17
**claims (3)**
217:20;261:10,14
**clarifies (1)**
320:11
**clarify (1)**
246:14
**clash (1)**
280:24
**clear (5)**
210:3;240:22;
256:12;275:15;303:7
**clearing (1)**
318:3
**clears (1)**
241:10
**click (2)**
223:9;225:8
**clicked (2)**
223:24;224:21
**close (2)**
230:23;315:17
**closer (3)**
254:20;255:7;296:7
**club (1)**
263:19
**CNN (2)**
272:13,16
**code (1)**
237:21
**comfortable (1)**
211:1
**coming (1)**
301:14
**commencing (1)**
208:7
**comment (5)**
304:2;307:14,17,18;
309:23
**comments (3)**
304:4;309:22;310:1
**communicate (5)**
225:12,25;242:20;
249:7;264:21
**communicated (5)**
242:4;251:11;
264:23;265:11,14
**communicating (1)**
292:4
**communication (1)**
213:13
**communications (8)**
214:18,22;215:21;
249:13,15;260:25;
266:10;318:18
**community (1)**
298:24
**complain (1)**
309:16
**complaint (3)**

217:4,14,22
**complete (2)**
236:24;255:21
**completely (1)**
305:16
**comply (1)**
232:19
**concer- (1)**
255:10
**concerned (1)**
237:25
**concluded (1)**
321:16
**conclusion (6)**
237:2;243:13;
244:15;258:3;259:14;
261:21
**confidential (1)**
220:13
**confirmation (1)**
221:2
**confirmed (2)**
219:4;292:10
**confiscated (1)**
310:17
**conformed (1)**
321:3
**confused (1)**
307:24
**confusion (2)**
258:19;275:16
**considered (1)**
255:18
**consultation (1)**
239:9
**contact (2)**
242:16;251:7,10;
274:6
**contacted (5)**
225:17;235:17;
253:4;260:19;274:7
**contacting (1)**
261:2
**content (2)**
213:5,13
**contention (1)**
299:7
**contents (1)**
322:4
**context (3)**
212:3;308:5,10
**continue (5)**
241:21;250:23;
256:24;314:18;315:8
**continuing (1)**
220:18
**contract (3)**
217:2;262:8,12,20;
263:4,5,6,9;264:22;
265:7,15;283:12
**contributed (1)**
280:14
**conversation (2)**

308:24;309:4
**conversational (1)**
210:18
**converted (3)**
219:5;234:15;236:10
**coordinate (1)**
249:9
**copies (1)**
217:20
**copy (7)**
215:9;219:4;268:15,
21;321:4,4,10
**CORRECTIONS (2)**
322:9,10
**correctly (2)**
268:8;293:12
**correspondence (1)**
314:2
**costs (3)**
216:6;264:7;295:23
**counsel (7)**
239:9;258:12,23;
259:4;310:23;311:8;
313:12
**counseling (3)**
217:11;238:14,17
**Counselor (1)**
238:24
**County (8)**
219:16;249:17;
258:23;259:6;278:19;
288:25;300:22,25
**couple (9)**
209:15;248:9,13;
249:19;250:3;253:24;
256:1;304:14;305:20
**course (4)**
229:2;269:5;284:22;
306:13
**court (7)**
210:5,7,19;259:6;
318:23;319:10;320:5
**cover (1)**
303:11
**COVID (1)**
287:13
**create (1)**
269:12
**creating (2)**
268:18;278:12
**Cried (3)**
261:4;263:10;303:18
**cries (1)**
303:20
**criminal (6)**
246:21;250:11;
253:17,21;319:11,16
**cross (1)**
217:4
**crying (3)**
263:11;283:25;
304:10
**culture (1)**

281:4
**curious (1)**
271:7
**cut (1)**
309:17

---

**D**

---

**dad (4)**
314:9;315:12,13,17
**Dahle (5)**
236:9;298:18,23;
299:9;312:21
**Dahles (3)**
250:19;254:1;267:10
**Dahles' (1)**
299:21
**Dahle's (4)**
235:18,24;237:1;
300:2
**daily (1)**
308:16
**Damian (8)**
305:20;306:2,7;
307:24;311:18;319:22;
320:3,24
**Damian's (1)**
320:9
**date (5)**
249:2,4;253:8;294:1;
318:9
**dated (2)**
268:1;297:11
**dates (3)**
244:4;247:25;248:17
**daughter (34)**
217:9;219:12;
226:13;233:20;234:11;
238:17;240:13;244:24;
247:9;255:20;256:2;
261:5,6,14;262:19;
263:9;264:20;265:5;
270:25;273:15;276:14;
277:4,12;293:16,20;
294:5;298:17;302:8,
25;303:14;304:3;
306:13;307:8,14
**daughters (1)**
281:25
**daughter's (2)**
257:4;298:6
**day (12)**
208:7;222:14;
237:16;242:11;251:19,
20;255:2;260:12;
261:8;288:11;319:3;
322:12
**days (14)**
234:7,18;242:6,7,8;
249:21;250:3,22;
253:24;265:16;266:20;
291:13;318:11,13
**deal (1)**

263:2
**Dear (2)**
288:25;297:15
**death (1)**
316:2
**debated (1)**
266:20
**decide (2)**
254:2,18
**decided (6)**
249:14;250:9,25;
251:24;253:24;254:2
**decisions (2)**
253:1,4
**declare (1)**
322:5
**declined (1)**
272:11
**Defendants (1)**
208:2
**Defendants' (2)**
220:21;267:21
**definitely (1)**
238:6
**definition (1)**
258:6
**Delaloza (2)**
215:14;307:1
**deliver (1)**
300:12
**Deloza (1)**
215:12
**demanded (1)**
298:5
**demonstrations (4)**
270:24;271:2,22,25
**Department (18)**
249:18;250:1;251:3,
16,22;252:11;254:24;
255:4;260:8,20;
290:15;292:7;300:23;
301:1;310:21;312:5;
313:4,10
**depo (4)**
231:14;243:5;
263:14;308:12
**depos- (1)**
316:25
**deposed (1)**
209:4
**deposing (1)**
265:25
**DEPOSITION (37)**
208:1;209:7,12;
212:8,18,19,25;213:3,
18,25;214:8,10;215:2;
216:7;217:6;219:25;
223:24;241:21;245:12;
262:3,15;268:13;
288:4;293:22;295:18;
296:15;297:10;300:6;
306:25;307:5,12,16,22;
308:14;317:20;321:16;

322:4
**depositions (1)**
210:7
**describe (2)**
247:4;315:15
**designation (1)**
220:13
**detailed (1)**
253:2
**Detective (4)**
248:19;310:10,25;
311:12
**determine (5)**
235:6,10;256:3;
311:16,16
**Devil (1)**
304:5
**Diana (1)**
239:12
**died (1)**
236:17
**difference (1)**
211:1
**different (6)**
212:4;219:3;246:11;
316:23;319:12;320:6
**difficult (1)**
303:12
**difficulty (1)**
304:11
**dig (1)**
219:5
**directly (6)**
218:8;310:24;311:7,
15;312:6,10
**disaffirm (2)**
262:2;263:9
**disaffirmance (3)**
217:3;261:24;293:24
**disaffirmed (5)**
261:14;262:8,12,20;
263:4
**disaffirming (4)**
264:3,22;265:7,15
**disagree (2)**
283:3,11
**disclose (1)**
266:10
**disclosure (1)**
272:25
**discount (1)**
299:7
**discover (1)**
283:14
**discovery (2)**
266:24;321:6
**discrepancies (1)**
274:18
**discuss (1)**
295:11
**discussed (2)**
239:24;312:21
**discussing (1)**

262:5
**Discussion (2)**
295:20;298:14
**discussions (1)**
280:22
**dispute (8)**
233:14;234:20;
246:19;252:17;253:12;
299:5,11;319:3
**distract (1)**
239:4
**distracted (1)**
303:21
**District (27)**
208:3;209:2;214:19;
219:16;225:13,18;
226:1,5;227:19,24;
232:6,24;233:7;
264:22;265:12;271:3;
278:15;281:9,19,23;
284:8;286:18;287:24;
289:25;290:24;297:13,
16
**division (2)**
219:15;222:7
**docu- (1)**
212:11
**document (17)**
220:1,24;221:6,11,
18;223:20;269:6;
285:2;289:14;290:1,
19;296:23;297:23;
313:9,13,15,16
**documents (16)**
212:7,11,13,23;
214:9,13,14,25;215:3,
4,6,21;216:4;217:2;
219:24;224:22
**dog (2)**
309:21,22
**dogs (1)**
313:15
**donate (7)**
245:13,15;246:3;
253:11,18;295:25;
299:3
**donated (4)**
245:17;296:3;
298:23;299:2
**donating (3)**
267:10;295:11;
298:12
**done (10)**
224:6;230:3,7;
269:19;273:12;287:14;
288:2;289:21;293:13;
313:12
**door (3)**
301:7,8,14
**doorstep (1)**
285:10
**double (1)**
241:8

**double-check (1)**
219:2
**down (7)**
210:19;263:3,11;
267:8;270:2,8;295:1
**Dr (6)**
239:14,17,20;240:1,
11;241:1
**drive (3)**
214:11,15;260:16
**driveway (1)**
301:11
**dropped (2)**
234:10;247:6,15
**drove (1)**
301:21
**drugs (1)**
294:24
**due (1)**
305:8
**duly (1)**
208:15
**Duncan (4)**
248:19,23;310:10,25
**Duncan's (1)**
311:1
**during (20)**
225:2;234:18;242:5,
6,7,21,23,24;244:10;
252:10;256:11;266:25;
276:11;283:14;287:12;
299:1;306:16;307:5,
12,16

**E**

**earlier (7)**
285:6;306:8,12;
307:3;317:20;318:22;
319:6
**easier (1)**
269:10
**eat (1)**
276:12
**eaten (2)**
276:8,16
**edge (2)**
301:11,12
**effect (3)**
209:18;307:15,18
**either (2)**
253:18;313:3
**EL (22)**
219:15;225:4,24;
226:4;227:23;228:19;
229:3;231:10;232:25;
233:7,11;239:16;
277:4;283:6;295:18;
300:6;304:23;308:16,
17,25;309:25;315:25
**EL's (4)**
217:2;314:3,22;
315:15

**else (11)**
212:16;220:3;227:8,
20;232:1;246:22;
261:3;273:20;278:15;
289:24;292:22
**e-mail (32)**
257:13;264:24;
267:23;268:1,10;
286:25;287:4;288:3,7,
11,14,17,21,24;289:2,
6;290:5,6;291:3;
292:12;294:1,3;295:9,
12,22;296:14,16,18;
297:11;317:8,10
**e-mailed (1)**
291:2
**e-mailing (1)**
288:17
**e-mails (4)**
265:15;266:19;
286:21;292:23
**employee (3)**
214:18;257:11;265:4
**employees (7)**
278:20;281:9,18,22;
284:7;286:18;287:23
**employee's (1)**
291:9
**end (6)**
219:20;220:11;
226:23;227:5;312:8;
313:19
**enforcement (12)**
294:11,15;295:8;
302:1,10,22;303:4,5,9;
311:3,5;320:19
**engineer (3)**
274:16;275:6,8
**enjoy (1)**
309:19
**enough (3)**
271:15;280:22;294:2
**enter (9)**
222:3,11,17,23;
223:14;224:6;225:5;
226:9,13
**entered (32)**
219:12,15,22;
221:15;222:6;223:20;
225:4,11,24;226:4;
227:18,23;228:10,18,
19,20;229:3,4,9,10,17,
21;230:1,2,7;231:10,
11,15;232:11,14;243:8,
19
**entering (5)**
221:3;226:12,18;
232:25;233:7
**entire (2)**
221:10;296:25
**entitled (1)**
210:24
**entries (1)**

222:8
**entry (3)**
219:11;223:9;232:22
**equation (1)**
299:13
**era (1)**
279:11
**escrow (2)**
237:4,4
**especially (1)**
295:3
**essentially (5)**
217:21;236:9;
238:13;312:17;313:2
**establish (5)**
257:7,16;259:9,23;
293:9
**established (2)**
294:8,9
**estimate (2)**
210:24;211:2
**et (1)**
318:13
**even (10)**
227:5;234:6;238:3;
255:18;259:10;273:8;
279:17;281:3;284:1;
304:1
**events (1)**
304:6
**Everstine (7)**
239:12,14,17,20;
240:1,11;241:1
**everybody (1)**
240:21
**everyone (1)**
210:20
**evidence (6)**
281:15;282:13;
284:6;285:17,22;
286:22
**evidenced (1)**
215:5
**exact (2)**
247:25;249:4
**exactly (4)**
242:12;251:19;
283:22;298:16
**EXAMINATION (6)**
208:20;306:5;314:1;
316:16;319:24;320:16
**examined (1)**
208:15
**example (1)**
304:9
**examples (1)**
216:5
**except (2)**
221:9;235:16
**exchanged (1)**
294:4
**Executed (1)**
322:12

LONG vs.
FERNANDEZ

JESSICA LONG - Vol. 2
February 8, 2024

**Exhibit (26)**
219:25;220:4,11,21,
23;221:8,8,9,14;
267:14,21;268:13;
286:24,25;287:2;
288:4;290:10,13,18;
291:11;294:3;295:9;
296:15;297:9;316:18,
23
**exhibitor (16)**
225:4,11,14,14,24;
226:2,4,6,10;227:23;
228:1;232:8,24;233:6;
261:14;263:7
**exhibits (2)**
220:7,10
**exist (3)**
214:14,14;217:14
**expect (1)**
313:10
**expectation (3)**
231:22;248:12;253:3
**expected (2)**
231:8;293:10
**expenses (1)**
216:5
**experience (5)**
226:22,23,23;239:5;
279:12
**experienced (1)**
315:25
**experiences (2)**
239:6;303:22
**expert (4)**
259:15;261:21;
304:19,21
**explain (1)**
284:21
**express (1)**
265:7
**expressed (2)**
264:11;277:13
**extent (1)**
306:18

---

**F**

**Facebook (3)**
279:13;287:5,12
**faced (1)**
245:21
**fact (4)**
218:17;230:14;
231:25;269:18
**facts (1)**
256:14
**Fair (186)**
209:2;214:20,23;
217:16;218:8,20;
219:4,12,13,16;221:3,
16;222:3,11,18;
223:21;224:6,8,12;
225:2,5,12,13,18,22,

25;226:1,5,5,9,10,12,
13,16,19,22,23;227:1,
5,9,19,21,24,24;
228:11,13,16,20,21;
229:3,4,9,18,24;230:1;
231:3,4,10,12,21;
232:4,6,11,12,16,17,25,
25;233:7,8,16,17,24;
234:12,17,18;235:12,
15;236:8;237:10,25;
238:2;242:6,15,21,23;
243:3,7,8,9,12,17,18,
21;244:4,7,11,12,13,
17,20;245:4,7,11,25;
246:4,11,18;247:11,20;
249:12;250:3,19,22;
252:13,17;253:8,12,18,
24;254:22;255:9;
256:7;257:8;258:9;
261:15;262:6,8,12,19,
25;263:6,12;264:2,22;
265:3,4,8,12,16,17;
269:1;270:7,11;
271:15;277:16,22;
278:15,19;281:9,19,23;
284:8;286:18;287:24;
288:19,25,25;289:25;
290:24;291:16,19,20;
292:8,20;293:8,17;
294:2,4,8;297:14,16;
298:11;302:15;307:16;
310:2;312:6,7;313:4;
314:6;315:11;319:4,4,
8;320:5,24
**fair' (1)**
309:3
**fairground (2)**
281:10;291:9
**fairgrounds (13)**
236:7;243:22;
245:18;252:4;257:5,
14;264:15;279:13;
280:18,24;291:8;
293:2;312:23
**fairs (2)**
265:19;284:2
**Fair's (2)**
271:3;294:12
**fall (1)**
237:6
**familiar (3)**
239:13;268:16,16
**family (3)**
254:11;294:20;
305:11
**far (5)**
259:3;264:20;265:8;
301:11,12
**Farm (10)**
242:1;246:15;247:6,
16;256:3;265:23;
285:5;295:11;296:1;
308:15

**father (1)**
314:11
**favor (1)**
294:17;295:2
**February (2)**
208:7;308:17
**feed (4)**
216:5,14;252:21;
309:16
**feeding (1)**
309:20
**feel (8)**
237:3,15;239:21;
244:18;250:20;279:8,
15;280:21
**feelings (1)**
239:10
**feels (1)**
303:25
**felony (3)**
246:6;255:18;278:23
**felt (7)**
226:16;237:4,14;
245:2,8,8;283:9
**Fernandez (4)**
248:21,22;301:7;
311:7
**few (16)**
216:14;242:6,7,8;
247:8;249:20;250:22;
272:5;274:18;291:13;
296:24;304:14;306:11;
317:14;318:11,13
**FFA (1)**
298:24
**fiction (1)**
314:19
**field (1)**
237:16
**figure (3)**
251:16;254:16;261:4
**figured (1)**
282:2
**file (6)**
257:19;258:25;
259:1;319:2,7,10
**filed (6)**
258:17;259:5,8;
267:1;272:19;276:1
**fill (2)**
215:7;223:6
**filled (1)**
222:16
**filling (2)**
225:21;309:21
**finally (1)**
266:21
**find (19)**
230:8,12,23,24,25;
231:4;232:1;240:2,3;
245:8,9;246:21;
254:20;255:14,25;
279:22;285:7,8;288:18

**finding (1)**
237:25
**fine (15)**
216:2;220:19;
234:25;235:3;256:21;
261:22;269:24;295:23;
297:25;305:22;307:25;
316:12;320:11,12;
321:9
**finish (3)**
307:24;308:18;
313:23
**fire (3)**
295:11;296:1;298:13
**firm (1)**
259:4
**firms (1)**
259:22
**first (22)**
208:15;214:17;
221:18;225:1;242:5,7,
7;280:16;288:7,10;
289:6,9,12;291:2,3,10;
303:17;312:22;316:24;
317:8,10;319:4
**Fisher (1)**
208:5
**five (4)**
256:20;284:14;
285:14;295:18
**five-minute (2)**
241:14;297:5
**flash (2)**
214:11,15
**floor (1)**
294:25
**focusing (2)**
258:24;305:5
**follow (1)**
286:5
**followed (1)**
264:3
**following (2)**
214:5;265:16
**follows (1)**
208:16
**follow-up (2)**
305:18;306:11
**Food (2)**
290:15;309:21
**foregoing (1)**
322:4,6
**form (8)**
218:18,20;219:7;
222:17;223:3,9,16;
232:22
**forum (1)**
277:14
**forums (1)**
272:1
**forward (1)**
310:1
**forwarded (1)**

222:22
**found (8)**
229:6;235:15;238:5;
255:18;266:8;270:2;
281:23;296:7
**four (1)**
211:18
**fourth (1)**
217:1
**Fox (2)**
272:13,16
**free (1)**
239:22
**freely (3)**
278:16,21;279:9
**friend (2)**
230:12;300:20
**friends (3)**
294:17;295:7;303:24
**front (4)**
301:8,14;309:1,15
**full-on (1)**
277:2
**full-time (2)**
240:7;256:10
**fun (2)**
263:20,20
**further (6)**
313:19;314:1;
319:19,21,24;320:16

---

**G**

**gained (1)**
305:7
**games (2)**
277:10,10
**gap (1)**
252:8
**gate (3)**
265:4;301:10,10
**gave (10)**
215:11,22,25;216:5;
218:9;270:15;274:9,
21;278:6;282:24
**gavel (1)**
234:10
**gears (2)**
257:1;300:10
**General (3)**
218:8,9,18
**generally (2)**
248:4;303:13
**General's (1)**
209:1
**genuinely (1)**
271:7
**gets (1)**
303:20
**girl (1)**
304:2
**girl's (1)**
260:17

**given (3)**
277:4,8;313:4
**giving (3)**
209:7;238:15;272:1
**goat (36)**
215:4;219:15;222:6,
7;227:12,15;228:6;
243:18;248:18;251:2,
15,22;260:17;265:6;
276:10,16;289:11;
290:24;291:5,11,14,19;
292:1,8;293:6,9,11,23;
294:10,13;298:6,13,17,
23;301:10;310:17
**goats (6)**
228:20;229:4;
231:16;277:17,19;
304:24
**goes (2)**
283:17;303:24
**Good (6)**
208:21;252:6;283:7;
290:21;305:17;308:4
**GORDON (163)**
210:5,10,13;211:9,
15,17,19;212:12;213:4,
8,11,14,19,22;214:1,4;
215:18,25;216:22;
218:3,5,11,13,15,17,20,
24;219:1;220:5,9,14,
16,19;221:5,19,22;
222:13;224:18;227:2;
228:22,24;229:15;
230:4,19;231:13;
233:2,13;234:2,23;
235:1,4;237:2;238:9,
21;239:21,24;240:16;
241:15,18;243:4,13;
244:14;248:23;249:1;
250:16;251:9;254:7,
14;256:17,20;258:3,19,
22;259:14;260:24;
261:1,18;263:13,16;
265:24;266:3,13,16;
269:24;270:5;271:6,
10,14,18;272:13,16,23;
273:2,5,7,22,25;
275:15,21;280:3,6,8;
282:5,9;284:13,17,20,
23;285:15,19,22;286:1,
4,8,11;287:3;288:7,9;
296:18;297:1,4,18,21,
24;299:16,19;304:18,
21;305:22;306:2;
307:20,23;308:4,7;
309:10;311:18,24;
312:2;313:6,22;
314:17,24;315:3;
316:8,13,16,17,20,22;
317:2,5,7,10,12;
319:19;320:3,9,12,14,
22,24;321:7,9
**government (2)**

217:20,23
**grab (3)**
305:23;315:4,4
**grandparents (4)**
314:3;315:16,23;
316:3
**ground (1)**
209:11
**grounds (1)**
213:10
**grow (1)**
306:20
**guess (13)**
210:22;211:2,20;
222:7;224:15;242:12;
262:17;263:8;281:11;
287:21;301:9;308:16;
319:7
**guys (1)**
321:12

## H

**hand (2)**
223:6;309:18
**handbook (1)**
224:20
**handed (1)**
214:11
**handle (1)**
289:25
**handling (2)**
247:5;306:19
**hands (1)**
294:4
**happen (4)**
227:11,12,14;296:8
**happened (14)**
222:25;232:19;
256:13,15;265:22;
266:11,12;268:7;
280:25;282:13;301:5;
303:15,17;312:13
**happening (1)**
287:17
**happens (1)**
305:17
**happy (1)**
283:23
**hard (4)**
210:2;221:19;
245:19;248:8
**hate (1)**
305:16
**head (5)**
209:25;215:11;
230:16;267:16;314:15
**healing (1)**
240:3
**health (3)**
238:22;239:8;240:12
**hear (3)**
244:10;249:24;252:3

**heard (6)**
249:20;257:22;
259:12,16;288:22;
313:7
**Hearts (1)**
285:4
**Hello (2)**
306:6,9
**help (7)**
219:24;251:12;
257:17;269:11;285:8;
312:10;319:12
**helped (2)**
285:7,7
**hereby (1)**
322:3
**high (1)**
234:9
**highest (4)**
236:14;245:18;
299:2,23
**himself (3)**
303:9;311:16,21
**hold (5)**
277:16,19;295:16;
308:1,1
**holiday (1)**
252:5
**home (14)**
227:5;230:6;238:6;
254:20;255:7;291:9;
296:7,12;300:23;
301:3,5,6,8;302:2
**honest (1)**
260:5
**hoof (1)**
216:6
**hoped (1)**
235:22
**hoping (2)**
292:17;308:18
**horns (1)**
309:17
**horse (1)**
230:12
**horseback (2)**
239:4;303:22
**horses (2)**
240:8,8
**hour (1)**
208:8
**hours (1)**
244:25
**house (5)**
237:4,7;283:14;
285:11;301:9
**houses (1)**
301:20
**Howard (2)**
280:25;281:8
**hundred (1)**
292:13
**hunt (1)**

263:3
**hurt (1)**
309:16
**husband (7)**
247:7,12,21;254:8;
255:13;256:2;305:12
**husband's (5)**
314:9,9;315:12,13,
20
**hypothetical (6)**
228:19,22,25;
229:15;230:4;234:22

## I

**idea (1)**
264:14
**identification (2)**
220:21;267:21
**identified (3)**
217:3,13,21
**ignore (1)**
232:18
**ignored (4)**
266:19;290:5;
292:23;298:5
**II (1)**
208:1
**immediately (3)**
290:25;319:2,9
**impacted (1)**
240:2
**important (2)**
210:17,19
**Improper (4)**
228:22,24;229:15;
230:4
**inaccuracies (1)**
274:12
**incident (8)**
238:15;239:10;
241:3;301:24;303:15,
15;304:9;305:3
**incidental (1)**
264:7
**including (2)**
214:20;278:20
**inconvenience (1)**
292:18
**incurred (2)**
217:12;295:24
**indicate (1)**
308:18
**indicated (1)**
223:15
**indicating (2)**
210:8;221:21
**inferring (1)**
286:21
**influence (1)**
270:1
**informally (1)**
208:24

**information (3)**
268:24;25;287:22
**informed (2)**
290:16,20
**initiate (1)**
257:15
**initiated (2)**
258:13;260:9
**injunction (4)**
259:13,17,20,23
**injunctive (2)**
318:23,25
**in-laws (1)**
315:10
**inquire (1)**
310:15
**inquiring (1)**
319:6
**inside (1)**
302:2
**insistent (1)**
267:11
**inspection (1)**
283:14
**Instagram (18)**
268:12;269:14;
278:4,9;279:14,25;
280:13;281:14,20;
282:18;284:9,25;
285:24;286:19;287:5,
10,12,25
**instruct (1)**
269:14
**instructed (1)**
270:2
**instructing (3)**
213:15,20;214:2
**instruction (1)**
214:6
**instructions (1)**
228:13
**instructs (1)**
211:7
**intend (3)**
212:1;246:16;254:4
**intended (2)**
254:6;291:18
**interacting (1)**
308:15
**interactions (1)**
241:23
**interest (4)**
233:23;234:2;
291:17;317:17
**interject (1)**
258:20
**internet (1)**
278:10
**interrupt (2)**
215:19;235:2
**intervention (1)**
240:13
**interviewed (6)**

272:22;273:15,18,
21;275:9,10
**interviews (8)**
272:5,8,18;273:12;
274:6,9,21,24
**into (33)**
219:12,12,15;
221:15;222:3,6,11,18;
223:20,21;226:13;
228:11,19,21;229:3,4,
9;230:1;231:10;
232:12;237:21;252:2;
257:18;258:7;281:2;
283:21;301:16,19;
302:3,11,23;303:17;
309:18
**introduced (1)**
208:24
**investigation (4)**
300:24;302:3,11,23
**involved (8)**
246:20;255:19;
278:11;284:2;294:20,
20;307:7;311:3
**issue (5)**
252:24;255:8;
291:24;304:16;305:13
**issues (1)**
241:2
**item (1)**
217:1
**items (1)**
216:16

## J

**jail (1)**
295:1
**Jeremy (2)**
310:10,25
**Jerry (1)**
311:7
**Jess (2)**
256:18;314:17
**Jess- (1)**
311:16
**JESSICA (5)**
208:1,14;261:13;
268:7;322:18
**John (25)**
208:25;210:5;
212:13;215:18;216:22;
218:6;220:6;221:20;
235:1;238:22;258:19;
266:14;271:6;272:23;
275:22;280:4;288:7;
296:18;297:18;299:16;
313:19,22;316:21;
317:3;319:6
**journalist (1)**
275:24
**judge (1)**
209:19

**judging (1)**
256:13
**July (12)**
247:23;248:18;
249:3;254:25;255:3;
310:4,20;311:8,13,17,
22;312:8
**jumped (1)**
275:5
**June (12)**
214:21,23;240:13;
248:12;292:12;295:21;
297:11;308:17;312:11,
13,14;316:18
**jury (1)**
209:19

## K

**Kathie (2)**
300:1,7
**Kay (4)**
215:12;307:1;
309:15,24
**keep (31)**
226:16,17;229:22;
230:9;231:17;235:14,
25;236:4;237:19;
239:2;240:6;246:23;
250:23;253:5,6,7,7;
257:12,13;258:5;
261:20;264:13;281:1,
4;283:6;284:13;
291:21;295:25;296:4;
303:21;305:25
**kept (2)**
237:18;266:20
**kid (1)**
304:5
**kids (8)**
255:15;256:9;283:7,
23,25;304:4,4;305:6
**kids' (1)**
263:19
**kill (9)**
237:17;260:17;
263:3,10,22;279:6,17,
21;282:18
**killed (2)**
266:21;277:13
**kind (7)**
233:2;237:16;282:2;
303:25;307:7;312:12,
19
**knew (4)**
245:4;261:7;287:16;
291:20
**knocked (1)**
301:7
**knowing (1)**
229:23
**knowledge (4)**
265:25;266:6;

282:16;287:20
**known (8)**
228:20;229:3,8,17;
230:1;280:16;281:21;
284:10
**knows (2)**
255:20,21
**Kristin (9)**
278:4;279:25;
280:12;281:14,20;
284:8,25;286:19;287:6

## L

**lack (3)**
222:7;234:10;316:1
**lacks (1)**
265:24
**lady (1)**
267:11
**land (1)**
237:22
**last (17)**
209:4;211:4,16;
219:25;240:10;245:3;
262:14;263:13;264:9;
268:13;274:14;293:21;
296:15;297:10;300:5;
310:6;318:21
**Lastly (1)**
298:16
**later (7)**
217:6;227:16;
245:17;246:5;255:19;
291:13;293:25
**law (20)**
245:5;259:4,22;
283:10;291:17,22,23;
294:11,15,20;295:7;
302:1,10,22;303:4,5,8;
311:3,5;320:19
**lawn (1)**
231:18
**laws (1)**
322:6
**lawsuit (12)**
238:15,18;259:1;
266:25;267:1;270:16;
272:2,19;276:2;278:7,
17;303:7
**lawyer (3)**
218:1;257:20;261:13
**Lawyers (4)**
211:14;259:5;261:3;
319:13
**le- (1)**
236:1
**leader (2)**
243:7;282:1
**leading (1)**
252:2
**learn (2)**
266:11,22

**leash (1)**
264:1
**least (3)**
220:11;272:4;304:3
**leave (6)**
243:6;244:20,21;
246:16;254:5;263:11
**leaves (1)**
244:6
**left (5)**
220:7;243:8;253:9;
304:1;318:14
**legal (25)**
233:11;237:2;
243:13;244:14;257:15,
17;258:3,6,12,14,24;
259:5,9,14,21;260:9;
261:11,21;291:24;
293:9,14;294:8,9;
312:10;319:12
**legality (1)**
292:9
**legally (5)**
257:6;289:18,18,20;
295:4
**lesson (2)**
282:23,25
**lessons (1)**
284:3
**letter (20)**
236:2,3;252:4,14;
289:5;296:17,25;
297:10;298:1,5,11,15,
23;299:19;312:11,22,
24;316:17;317:11,16
**lettered (1)**
220:10
**letters (3)**
220:17,20;233:20
**letting (2)**
264:8;291:21
**License (1)**
208:10
**Lieutenant (2)**
248:21;311:7
**liked (2)**
237:18;280:18
**likely (2)**
231:22;292:13
**limit (2)**
278:16,21
**limited (1)**
214:20
**line (3)**
270:22;308:3,14
**Lines (4)**
262:4;275:4;309:9;
310:12
**link (2)**
222:22;223:19
**list (1)**
214:12
**little (10)**

**leash (1)**... 

**LONG** ...

217:6;221:19;
238:11;260:17;266:8;
276:12;304:2;305:7;
306:18;314:10
**lived (3)**
315:18,20,21
**livestock (3)**
224:20;246:7;271:23
**living (1)**
248:1
**load (1)**
229:23
**local (3)**
224:11,14,18
**locally (1)**
230:8
**locate (1)**
255:6
**located (2)**
285:1,4
**location (1)**
255:25
**log (1)**
225:8
**logbook (2)**
215:7,9
**logically (1)**
263:18
**LONG (15)**
208:1,14,22;213:17;
256:12;261:13,19,19;
268:7;270:22;303:19;
306:6;311:21;317:14;
322:18
**longer (2)**
233:11;234:11
**look (6)**
221:7;256:5,6,11;
295:10;301:18
**looked (9)**
237:21;250:10;
255:6;265:5;288:16;
301:21,24;308:11,11
**looking (11)**
221:13,17,20;222:5;
229:22;244:17;284:25;
288:24;290:9;310:1;
319:12
**Looks (6)**
221:2,14,23;268:2;
280:23;296:16
**lot (6)**
240:17,21;265:19;
272:11;275:16;303:22
**lots (1)**
303:22
**loud (1)**
209:23
**love (1)**
306:20
**loved (1)**
263:24
**loves (1)**

263:22

## M

MacFarlane (7)
208:4;209:3;214:21;
257:11;278:14,20;
298:10
mad (1)
304:2
maIntenance (2)
216:4;252:22
makes (1)
309:22
making (5)
246:9;253:1;261:10,
16;309:13
Manager (1)
288:25
many (2)
213:7;272:8
March (1)
315:13
Marine (1)
248:2
mark (5)
219:20;220:4;
267:13;268:14;288:5
marked (4)
220:21,23;267:21;
268:14
market (9)
219:15;222:7;
228:20;229:4;264:12;
271:4,23;279:25;280:3
mate (1)
248:3
matters (1)
297:21
may (16)
210:5;221:16;229:8,
17,22;231:11,15,19;
275:16;284:13;307:13;
308:6;309:6,7;313:1,1
maybe (16)
210:17,17;216:13;
218:1;230:11;234:21;
241:12;242:12;246:13;
249:20;272:5;279:17;
292:19;307:24;315:5;
317:2
McFarlane (1)
298:4
mean (40)
215:19;222:12;
225:7;233:20,23;
238:22;239:21;240:11,
11;246:5;253:22;
255:18,25;262:22;
265:2,7,24;266:11,13,
14;269:10;273:22;
274:18;278:24;280:4;
281:12;283:22;284:20;

289:17;292:24;294:23;
299:11;301:15,16;
304:9,10;305:22;
311:4,24;320:10
meaning (1)
292:6
means (3)
228:8;259:19;261:25
meant (3)
228:6;289:18,18
meantIme (1)
246:22
meat (24)
222:6;228:7,21;
229:5;231:9,16;233:1,
8;234:15,16;235:16,
21;236:10,18;238:4,7;
276:10,16,24;277:17,
20,24;281:2;306:21
media (11)
270:14;272:5;274:5;
275:17;277:5,11,14;
278:2,3,5;279:12
medical (2)
217:10;252:24
meet (4)
249:14;250:10;
251:1,24
meeting (2)
250:4;277:3
Melanie (13)
208:4;209:2;214:20;
219:4;257:14;265:16;
268:2;278:14;287:1;
288:11,15,22;297:12
members (1)
305:11
mental (3)
238:22;239:8;240:12
mention (1)
278:6
mentioned (2)
306:12;314:3
Merchant (1)
248:2
mercy (1)
281:6
message (10)
248:18;249:16;
251:2;254:23;287:18;
298:4,10;317:24;
318:14;320:18
messaged (2)
249:23;257:13
messages (3)
278:12;282:14;
286:21
messaging (1)
250:4
mid (2)
254:25;255:3
mIght (17)
210:1;219:24,24;

245:17,22;246:17;
263:24;275:15,18;
296:6;303:12;305:18;
306:2;312:21;313:22;
316:9;318:14
migrated (1)
275:19
miles (2)
260:6,16
mind (6)
235:1;239:2;240:7;
297:2;305:16;319:17
mine (4)
211:6;289:19,20;
295:4
Mini (3)
242:1;265:23;296:1
minimum (1)
261:20
minute (2)
212:24;264:9
minutes (3)
295:19;296:24;
317:14
misquoted (1)
274:23
misstates (4)
230:19;250:16;
251:9;307:20
mistake (1)
275:11
Mm-hmm (22)
209:13;210:9;
211:15;215:15;218:19;
231:5;245:1;250:6;
251:4;254:2,10;255:5;
258:21;265:21;273:1;
276:17;283:24;298:21;
303:23;304:8;315:9,19
mom (4)
308:25;309:1;314:9;
315:12
moment (11)
232:10;236:8;
241:11;253:15;254:14;
256:17;293:8,20;
295:16;314:17;319:15
money (3)
263:23;264:6;294:4
months (2)
248:10,11
more (15)
210:18;211:13,14,
18;217:25;238:12;
254:21;269:4;272:11;
277:2;279:17;280:10,
19;306:20;315:4
Morfin (1)
208:5
morning (1)
298:3
most (6)
210:17,17;292:13;

303:18;306:19;319:16
motivated (2)
282:18;285:25
motivation (3)
279:17,20;282:17
move (1)
217:7
mow (1)
231:17
Mrs (4)
208:22;256:12;
306:6;311:21
much (3)
276:12;293:25;
301:24
multiple (1)
295:12
murderers (1)
294:24
Muse (2)
300:1,7
must (1)
295:2
myself (2)
208:24;256:10

## N

name (6)
208:25;212:12;
272:25;275:25;307:1;
311:1
named (1)
239:12
name's (1)
239:13
necessarily (2)
246:16;291:24
necessary (1)
260:4
need (17)
236:12;238:9;
241:11;250:12;254:3;
256:14,17,18;267:17;
268:14;288:5;290:24;
295:10;314:17,18;
315:3;316:19
needed (4)
224:6;226:25;227:8;
245:17
needing (1)
249:8
negative (3)
239:5;241:8;279:12
nervous (2)
240:14,19
nevertheless (2)
235:17;296:3
new (5)
235:7,10,13,15;
273:10
News (2)
272:13,16

newspaper (1)
280:22
next (6)
217:8;220:4;260:12,
21;287:19;319:2
nice (1)
305:25
night (5)
243:12,21;244:23;
303:18;304:14
nightmares (1)
304:24
no' (1)
210:2
No- (1)
266:7
nobody (15)
227:11,11,12,22;
228:13;244:6;260:14,
15;266:5,7,7;267:3,3,4;
301:8
nobody's (1)
243:8
nodding (1)
210:7
Nods (2)
230:16;314:15
nonterminal (1)
284:1
Nope (1)
269:15
normal (1)
237:23
NORTHCUTT (22)
305:25;306:5,6,7;
307:21;308:1,6,13;
309:12;311:20;312:1,
4;313:8,18;317:12;
319:24,25;320:11,13;
321:2,10,14
notes (1)
316:9
nothing's (1)
241:5
Notice (2)
208:11;214:8
November (1)
315:13
number (2)
213:9;220:11

## O

o0o- (3)
208:12;321:17;
322:20
oath (1)
209:17
object (6)
211:5;213:8;238:21;
254:14;261:18;304:18
objecting (1)
228:24

**objection (10)**
213:19;214:1;221:5;
227:2;229:15;231:13;
233:2,13;234:3,24
**objects (1)**
211:5
**observed (1)**
305:10
**obtained (2)**
268:25;310:21
**obviously (2)**
264:10;266:16
**occurred (1)**
241:3
**occurring (1)**
215:20
**off (14)**
208:24;219:11;
220:7;239:3;240:7;
243:22;247:6,15;
253:17,21;264:14;
295:20;297:9;309:17
**offered (1)**
262:25
**office (6)**
209:1;232:16;
235:18,24;260:16;
299:21
**officer (1)**
302:1,10,22
**offices (1)**
208:4
**once (5)**
234:8,8,9;243:8,18
**one (41)**
210:6,15,16,17;
211:13,14,14;215:18;
216:3;218:16;219:5;
227:14;242:22;246:3,
4;256:17;261:10,13;
267:7;272:4;273:11;
275:8,18;280:10;
281:25;284:18;287:16;
289:5;290:8,9;295:16;
298:10;301:22;303:12;
304:1,5;305:17;306:3;
315:3;316:18;322:9
**ones (1)**
215:22;216:17;
218:6,9;243:17;
274:20;275:18
**One's (2)**
217:8,9
**online (6)**
221:2,3,15;223:3;
232:14;277:14
**Only (19)**
210:16;211:13;
216:12,17;226:20;
228:4,6;235:14;246:2;
259:16;275:5;276:16;
287:8,16,17,18;303:8,
11;315:5

**onto (2)**
225:8;301:13
**opinion (4)**
281:12,17;283:9;
286:17
**opportunity (2)**
245:3;297:6
**opposite (1)**
262:1
**option (6)**
227:6;237:19;
253:17,21;264:19;
288:18
**options (7)**
245:20;246:2;
253:15,16,19;258:11;
259:10
**order (4)**
220:4;227:25;
257:23;260:2
**orders (1)**
258:8
**Oregon (1)**
315:18
**original (1)**
321:5
**otherwise (1)**
218:21
**out (52)**
209:22;215:8;218:7;
221:9;222:16;223:6;
225:21;229:6;233:20;
235:15;237:6;238:5;
240:2;243:2,11,18,22;
244:12,17;245:8,18;
251:12,17;252:5,17;
253:25;254:17;255:18;
256:8;260:6;261:4;
263:2;264:2,6;265:6;
266:8;270:2;274:4;
275:5;282:3;283:12,
16;288:18,19;304:1;
310:10,24;311:6,11,15,
21;312:5
**outlets (2)**
275:17,17
**over (8)**
262:23,23;273:13,
14;279:13;295:10;
301:21;316:9
**overall (1)**
306:22
**own (9)**
236:9,15;264:24;
294:12,16;299:21;
313:15;319:7,10
**owned (6)**
242:1;292:9,10,11;
299:13;312:20
**owner (1)**
312:21
**owners (7)**
233:12;234:11;

235:7,10,13,15;293:15
**ownership (16)**
237:9,24;257:8,16;
259:9,24;277:25;
291:17;293:9;294:9,
10;299:5,12;313:2,3,6

**P**

**Pacific (1)**
208:8
**page (11)**
211:25;212:5;221:8,
10,18;222:5;262:4;
267:23;308:3,13;309:9
**paid (5)**
215:3;222:2;255:20;
293:17,21
**Palo (1)**
216:13
**pamphlets (1)**
283:23
**paperwork (1)**
259:5
**Paragraph (7)**
217:3,21;289:9,13;
291:3,11;298:3
**parents (2)**
314:8;315:20
**part (10)**
223:5,9;226:14;
276:23;293:23;300:23;
302:2,11,22;303:7
**participate (1)**
225:22
**party (1)**
296:4
**pass (2)**
314:11;315:10
**passed (1)**
314:4
**pattern (1)**
281:5
**Pause (10)**
220:24;221:11;
259:21,21;269:6;
285:2;289:14;290:1,
19;296:23
**pay (4)**
236:22;252:19;
292:18;295:23
**paying (1)**
299:23
**peaceful (1)**
236:7
**peeked (1)**
301:9
**PENALTY (2)**
322:1,5
**pending (1)**
246:21
**people (1)**
231:17;236:22;

240:18,22;255:14;
263:1,2;265:11,25;
271:20;273:16
**percent (1)**
292:14
**period (5)**
244:10;251:5,14;
252:10;318:19
**PERJURY (2)**
322:1,5
**permanent (1)**
254:19;259:12,23
**permanently (1)**
246:17
**permission (3)**
236:12;269:16;
270:12
**person (7)**
210:16;215:6;265:6;
273:13,23;302:22;
303:1
**personal (4)**
265:24;266:6;
282:16;287:20
**personally (5)**
257:15,19;302:6;
311:24;312:1
**Petaluma (1)**
245:11
**phone (9)**
242:23,24;264:24;
273:13,14,22,23;274:2;
287:12
**photographs (1)**
220:12
**physical (1)**
304:8
**physically (3)**
222:15,18;225:8
**picked (1)**
293:3
**picking (4)**
220:6;249:9,10;
309:21
**picture (3)**
268:21;310:16;311:2
**pig (1)**
281:1
**place (19)**
226:15,17,25;227:1;
229:22;230:8,23;
237:25;245:11;246:10;
254:19,20;255:6;
256:4,6,11;272:19;
296:7;300:21
**placed (2)**
234:9;300:2
**placing (1)**
298:24
**plan (3)**
229:21;241:1;295:25
**planned (2)**
233:17;256:1

**plans (2)**
239:19;246:9
**plays (1)**
277:10
**please (4)**
211:22;281:16;
296:22;321:11
**pm (7)**
208:8;241:19;
256:22;286:14;297:7;
316:14;321:16
**point (29)**
222:14;224:25;
225:20;226:12,18;
231:16;236:17;238:3;
246:3;250:2,14,22;
251:23;254:3,4,18;
259:1;279:8;294:7;
296:9,10;299:14,17;
307:6,12;310:22;
314:6;318:2;319:14
**points (1)**
309:19
**poop (1)**
309:22
**position (1)**
312:19
**positive (3)**
219:2;239:6;292:14
**possession (3)**
215:10;217:17;
293:16
**possibility (2)**
241:4;296:2
**possible (1)**
253:10
**possibly (4)**
293:14;294:19;
296:6;304:17
**post (27)**
215:22;268:12,16,
19,22,25;269:12,14,16;
278:4;279:16;280:1,
13,17;281:14,20;
282:18;284:9,25;
285:7,24;286:20;
287:6,8,17,18;288:1
**posted (5)**
269:18,21;270:9,12,
14
**posting (2)**
278:12;287:13
**posts (4)**
278:3,5,8;287:5
**practical (2)**
226:25;227:2
**prepare (5)**
212:7,25;213:3,18,
25
**present (6)**
273:18,20,22;
292:22;307:17;313:3
**presented (1)**

264:19
**press (2)**
274:8,13
**pressure (1)**
226:6
**presumably (1)**
268:24
**pretty (1)**
248:8
**prevent (7)**
227:20;258:9,14,18;
259:6;260:2,10
**prevented (1)**
227:22
**previous (6)**
215:2;216:7;223:24;
245:12;284:4;288:4
**previously (1)**
228:5
**print (1)**
223:6
**prior (4)**
214:21;215:21;
231:14;243:4
**private (1)**
276:21
**privilege (1)**
213:11
**probably (12)**
215:23;217:25;
224:10,14;229:20;
241:4;249:6;260:11;
274:1,1;306:7;310:5
**problem (1)**
297:22
**proc- (1)**
258:24
**proceeding (1)**
258:24
**proceedings (4)**
257:16;258:14;
259:9;260:9
**process (4)**
222:12;226:14;
266:24;276:12
**produced (2)**
212:14;216:7
**production (1)**
214:9
**professional (1)**
238:23
**professioner (1)**
238:23
**program (4)**
276:23;306:13,16;
307:8
**programs (1)**
271:23
**project (2)**
226:24;304:24
**property (14)**
237:1,20;245:11;
250:23;257:3,4,4,6;

301:12,13,25;303:8;
313:10;317:17
**proposed (1)**
298:12
**proposing (1)**
295:24
**protest (1)**
271:19
**protests (4)**
270:24;271:2,7,21
**prove (3)**
289:20;293:10,14
**provide (1)**
252:21
**provided (3)**
209:11;216:18,19
**provider (1)**
239:8
**PST (2)**
208:8;321:16
**psychiatrist (1)**
238:25
**psychological (1)**
217:10
**psychologist (2)**
238:25;240:19
**public (1)**
279:10
**publically (2)**
271:25;279:6
**publication (1)**
270:19
**publications (1)**
272:21
**publicly (1)**
279:2
**pull (3)**
307:21;308:2,2
**purchase (3)**
215:1,5;237:7
**purchased (1)**
216:16
**purposes (1)**
321:6
**pursuant (1)**
208:11
**put (8)**
212:3;215:15;
216:22;219:6;246:22;
264:1;276:22;309:17

**Q**

**qualification (1)**
215:18
**que- (1)**
262:17
**quick (2)**
308:1;316:21
**quit (4)**
262:8,12,19;264:8
**quitting (2)**
244:19;264:2

**quote (4)**
262:4,5,7;309:1
**quotes (1)**
274:12

**R**

**raised (1)**
314:10
**ran (3)**
300:15,16;303:17
**rapists (1)**
294:24
**Rather (1)**
285:19
**Ray (2)**
317:22;318:4
**Raymond (25)**
241:24,24;242:5;
243:10,20;245:10;
246:5;247:5,16;
248:17;249:7,15;
250:4,23;251:1;
252:16,25;256:3;
260:7,19;310:5,7,9;
320:8,18
**re- (1)**
281:7
**rea- (1)**
318:25
**reach (10)**
274:4;289:23;290:4;
310:10,24;311:6,11,15,
21;312:4
**reached (2)**
290:3;291:14
**read (17)**
224:22,23,24;225:1;
228:12;236:1;244:16;
262:10;268:8;269:4;
274:25;278:9;295:10;
296:25;308:2,9;322:4
**reading (4)**
225:16;228:13;
234:18;275:3
**real (1)**
308:1
**realize (1)**
211:13
**really (7)**
217:25;239:24;
281:5;286:10;297:21;
305:4,6
**reason (15)**
226:20;238:1;240:4,
12,14;243:2;251:7;
279:24;280:11;282:24;
287:23;291:15;292:7;
319:1,9
**reasons (5)**
226:21,25;227:3;
231:18;319:1
**reassess (2)**

247:9;254:12
**reassessing (1)**
254:17
**recall (18)**
209:7,10;223:8,15;
224:21;242:11;247:12;
249:10;272:21;275:23;
276:20;298:16;307:2;
308:11,23;309:4,12;
310:10
**receipt (1)**
221:2
**receipts (5)**
216:8,9,12,15,23
**receive (2)**
215:6;236:23
**received (7)**
217:11;238:14,17;
251:2;298:4,9;320:18
**receiving (1)**
249:16
**recently (1)**
266:24
**reception (1)**
252:6
**Recess (5)**
241:19;256:22;
286:14;297:7;316:14
**recognize (3)**
220:1,23;267:23
**recollection (3)**
262:9;275:3;307:19
**record (9)**
208:25,25;210:3;
241:21;256:24;286:16;
295:20;297:8,9
**records (4)**
215:16;217:10,14,16
**recovered (1)**
251:15
**recross (2)**
313:22;316:10
**red (1)**
315:1
**Redding (5)**
208:6;274:14,16;
275:12,24
**refer (1)**
208:22
**reference (1)**
287:6
**referenced (1)**
223:20
**references (1)**
287:5
**referred (1)**
223:11
**referring (5)**
238:22;243:17;
258:22;298:11;320:2
**refresh (1)**
296:21
**regarding (2)**

270:15;271:4
**regards (1)**
281:7
**regroup (1)**
241:16
**regular (1)**
307:9
**rehash (1)**
289:4
**rejected (1)**
293:23
**related (7)**
215:1;216:4;217:2,
10;239:10;284:24;
304:9
**relation (1)**
286:4
**relationship (3)**
305:11;314:22;
315:16
**relief (2)**
318:23,25
**remem- (1)**
244:3
**remember (35)**
209:17;218:6;
220:14;222:23;223:2,
7,11,17,22;224:5,9,13,
16;228:4;244:16;
247:25;249:3,4;
251:19;252:1;263:17;
273:8,9;274:2;275:25;
287:3;305:19;306:7,7;
309:14,23;310:3;
318:2;320:25;321:1
**remembers (2)**
273:6,7
**remind (1)**
209:14
**remote (1)**
273:25
**reoccurring (1)**
304:6
**repeat (5)**
225:23;263:16;
280:10;281:16;311:18
**repeated (1)**
262:23
**repercussions (1)**
292:19
**rephrase (2)**
211:11;285:19
**replace (1)**
239:5
**Reporter (9)**
208:9;210:6,12,19;
243:23;267:15,19;
272:15;295:16
**Reporters (3)**
208:5;210:7;273:2
**represent (2)**
209:2;307:6
**representation (1)**

LONG vs.
FERNANDEZ

JESSICA LONG – Vol. 2
February 8, 2024

232:9
**representations (1)**
232:7
**representative (4)**
214:19;297:13;
300:11,14
**reprinted (1)**
275:17
**request (2)**
214:9;217:25
**requested (2)**
214:13,17
**requests (1)**
217:8
**required (1)**
252:7
**research (2)**
257:18;258:7
**residence (1)**
276:21
**resolution (1)**
250:20
**resolve (9)**
236:6;246:19;
247:11;252:12;253:11;
255:8;256:7;262:25;
279:23
**resolved (2)**
246:11;250:15
**resolving (1)**
253:8
**respectfully (1)**
284:5
**respond (1)**
268:10
**responded (2)**
290:6,10
**response (3)**
252:13;294:11;310:9
**responses (1)**
209:22
**responsibility (4)**
279:15;283:2,8,19
**responsible (2)**
236:19;289:1
**restraining (3)**
257:23;258:8;260:2
**restroom (1)**
297:2
**result (5)**
217:12;238:14,18;
272:5;299:8
**retain (2)**
237:9,24
**retrieved (1)**
280:6
**return (5)**
247:13,22;253:18;
270:24;298:5
**returned (2)**
268:6;313:11
**returning (1)**
248:13

**review (2)**
212:18;297:6
**reviewed (4)**
212:7,10;274:8,10
**reviewing (2)**
215:2;297:9
**reviews (8)**
220:24;221:11;
269:6;285:2;289:14;
290:1,19;296:23
**riding (2)**
239:4;303:22
**right (47)**
208:21;216:8;
219:10,16;220:20,22;
223:18;225:2;229:24;
230:15;231:4;232:20;
233:18,21;235:6,10;
236:16;241:18,20;
244:19;250:5;253:16;
256:23;261:4;264:8,
12;265:12;268:16;
271:11;273:8;278:1;
283:16;285:13;287:15;
288:9;290:10,25;
293:11;298:17;299:5,
8;318:16,21;320:2,22,
23;321:14
**rights (1)**
235:15
**Ring (1)**
301:6
**rise (5)**
238:15;270:15;
272:1;278:6,17
**room (1)**
303:17
**Roots (1)**
308:15
**ruin (1)**
261:8
**rule (4)**
244:7;245:4,7;
291:20
**rules (23)**
209:11;224:8,11,18,
23,24;225:2;234:12,
17;236:8;243:10,17;
244:1,3,9,11,17;271:4;
290:17,22;291:16;
292:20;293:17
**run (2)**
319:9;320:5
**running (1)**
234:23
**rushed (1)**
267:8
**Ryan (2)**
266:8;313:20

**S**

**Sacramento (2)**

249:10;273:10
**sad (2)**
315:22,23
**safe (4)**
319:13;320:1,7,17
**sale (8)**
228:6,16;230:2;
232:17,22;234:8;
262:6;293:23
**sales (1)**
271:4
**same (21)**
209:18;211:20,25;
212:4;213:19;214:1;
218:12,13,21,24;219:6,
8;221:8;224:19;
240:25;262:23;297:23;
309:20;311:6,11;321:5
**sanctuaries (1)**
280:24
**sanctuary (1)**
280:18
**Saturdays (1)**
240:9
**save (1)**
245:4
**saved (1)**
216:17
**saw (4)**
274:18;280:25;
301:6;315:21
**saying (16)**
210:20;236:25;
243:23;248:18;249:16;
251:2;254:24;262:9;
275:3;294:2;309:14;
313:10;314:21;317:3;
320:19;321:3
**schedule (2)**
248:4,6
**scheduled (2)**
241:5,9
**school (5)**
303:25;305:2,5,6;
308:8
**screaming (1)**
304:15
**screen (1)**
295:17
**sea (4)**
247:8,13;254:9;
255:14
**search (2)**
285:11;302:8
**searched (3)**
302:2,5,11
**searching (2)**
257:17;278:10
**Searchlight (3)**
274:15;275:13,24
**second (17)**
214:25;217:4,13,22;
221:7;222:5;238:9;

252:4,13;290:8;
296:15;298:3;312:22,
24;316:17;317:11,15
**seek (2)**
241:1;318:23
**seeking (2)**
258:12;260:23
**seemed (1)**
250:19
**seemingly (1)**
298:5
**seized (1)**
303:8
**self-help (1)**
257:19
**sell (8)**
226:19;227:8;233:1,
8,13,24;307:16;309:2
**selling (2)**
227:20;310:1
**Senator (9)**
235:18,24;236:9;
237:1;298:18,23;
299:9;300:2;312:21
**send (4)**
218:7;272:24;313:9,
17
**sense (3)**
212:1;295:3;299:14
**sensitive (1)**
238:12
**sent (21)**
218:7;233:20;
248:17,24,25;254:23;
257:13;265:15;268:21;
288:21;291:3;294:3;
295:22;296:17;297:19;
310:6,7;312:11,22;
317:15,15
**separate (1)**
287:2
**September (1)**
226:15
**seriously (1)**
311:3
**serve (1)**
267:9
**served (2)**
214:8;260:12
**Services (3)**
218:8,9,18
**setting (1)**
279:10
**seventh (1)**
217:19
**several (3)**
211:6;216:9;251:18
**shake (1)**
209:25
**Shakes (1)**
215:11
**Shasta (33)**
209:2;214:19;

219:16,16;225:12,18;
226:1,5;227:19,24;
232:6,24;233:7;
249:17;259:5;264:21;
265:12;271:3;278:15,
19;281:9,18,23;284:8;
286:18;287:24;288:25;
289:24;290:24;297:13,
15;300:22,25
**sheriff (5)**
255:19;281:24;
301:7;311:15,21
**sheriffs (6)**
258:23;291:7;293:3,
3;294:25;310:8
**Sheriff's (20)**
249:17,25;251:3,15,
22;252:11;254:24;
255:3;260:8,16,20;
281:25,25;292:7;
300:23;301:1;310:21;
312:5;313:4,9
**shifting (2)**
257:1;300:10
**SHORT (2)**
208:9;305:25
**Shorthand (2)**
208:5,9
**shoulders (1)**
210:1
**show (10)**
219:13,23;220:3;
244:4;267:13,17;
268:15;283:23,25;
288:3
**showed (1)**
285:10
**showing (3)**
219:25;220:22;
279:15
**showmanship (1)**
222:6
**shown (1)**
267:24
**shrug (1)**
209:25
**shut (1)**
295:1
**siblings (1)**
305:12
**side (5)**
299:12;301:10,16,
18,20
**signed (1)**
226:15
**Silva (19)**
208:4;209:2;214:20;
257:14;265:16;268:2;
278:14,20;287:1;
288:11,15,22;289:24;
290:6;291:10;292:12,
15;295:22;297:12
**similar (3)**

217:8;287:19;309:23
**simply (2)**
277:22;298:5
**sit (2)**
275:2;279:8
**site (1)**
277:14
**sitting (1)**
306:10
**situation (6)**
259:11;279:3,6,10;
281:8;316:3
**Slaughter (17)**
231:2;246:4,18;
258:14;259:6;260:3;
284:7;286:3,19;
287:25;289:11;291:5,
12,19;292:1,8;293:7
**slaughtered (13)**
231:9,23;258:10,18;
260:10,11;266:23;
267:2;280:4,7,12;
281:13,19
**slaughterhouse (4)**
229:24;234:13;
293:18,19
**sleeping (1)**
304:11
**slipped (1)**
305:16
**slow-cooked (1)**
276:24
**smoothly (1)**
209:15
**social (8)**
238:24;270:14;
277:5,11,14;278:2,5;
279:11
**sold (13)**
215:7;227:13;228:7,
21;229:4;233:11;
234:6,9,20,21;235:6,
10;307:2
**solution (14)**
289:10,24;290:3,4;
291:4,6,13,14,25;
292:2,16,16;293:6;
298:12
**solutions (1)**
240:3
**somebody (1)**
222:22
**someone (11)**
225:18;227:8,20;
230:25;232:1,16;
239:12;244:5;249:17;
258:5;260:20
**Sometime (2)**
266:25;309:6
**sometimes (3)**
237:5;283:13,16
**somewhere (7)**
230:12;246:10,22;

247:24;296:6;298:2;
314:23
**son (2)**
252:6;256:9
**sorry (15)**
215:19;221:22;
234:3;254:15;255:1;
256:15;274:22;277:18;
293:4;308:10;310:7;
311:19;312:14;315:6;
319:5
**Sort (6)**
217:24;240:12;
300:7;313:1,9;317:17
**sought (4)**
240:4,12;259:23;
260:1
**sound (1)**
307:10
**Sounded (2)**
219:19;253:6
**sounds (2)**
223:17;292:1
**sources (1)**
274:5
**South (1)**
208:6
**Southern (1)**
273:11
**space (1)**
281:5
**speak (10)**
210:16;213:24;
232:11,13;239:19;
278:16,21;279:2,9;
318:4
**speaken (1)**
318:1
**speaking (2)**
278:25,25
**speaks (1)**
221:6
**special (3)**
294:17;295:2,2
**specific (4)**
244:7;269:4;286:22;
309:23
**specifically (14)**
222:24;224:5,9;
239:8;255:24;274:20;
275:23;277:23;278:24;
282:15;287:6;310:13,
23;313:9
**speculate (2)**
210:22;287:21
**speculation (1)**
286:7
**spend (1)**
254:21
**spent (1)**
244:24
**spoke (4)**
242:7;246:5;279:5;

317:21
**spoken (7)**
212:24;213:2;
239:14,16;271:25;
290:15;318:1
**STACY (1)**
208:9
**Standard (1)**
208:8
**start (1)**
219:11
**started (7)**
229:21;237:16;
246:9;257:17;258:12;
263:18;319:3
**starting (2)**
237:14;308:14
**State (10)**
208:2,10;217:21;
224:8,23,24;225:1;
290:17,22;322:6
**stated (3)**
257:1;291:10;319:25
**statement (5)**
262:14;283:4,5,6,11
**statements (2)**
274:13;309:13
**stay (1)**
244:4
**stayed (1)**
291:9
**steal (1)**
304:3
**stealing (1)**
246:7
**stepdad (1)**
314:10
**steps (3)**
257:7;312:17,18
**Stern (2)**
280:25;281:8
**stick (3)**
267:19;290:17,21
**sticker (1)**
267:19
**still (29)**
211:6;213:14;
216:15;221:6;229:9;
236:19;238:4;240:3;
245:16;246:9,12;
250:19;252:3,12;
254:5;255:8;257:3,6,
12;268:6;289:19;
291:17;292:10,11;
293:4,16;298:14;
303:19;305:23
**stip (2)**
320:25;321:1
**stipulate (1)**
321:3
**stipulated (1)**
321:9
**stop (1)**

235:2
**stopped (2)**
292:4;295:6
**story (1)**
275:8
**Stover (4)**
268:21;278:4;
281:14;287:25
**Stover's (7)**
279:25;280:12;
281:20;284:8,25;
286:19;287:6
**strangers (1)**
278:8
**Street (2)**
208:6;301:20
**stress (1)**
305:8
**strike (2)**
274:22;299:25
**strong-armed (1)**
295:7
**stronger (1)**
306:23
**struggled (1)**
305:2
**stuff (1)**
224:20
**subdivision (1)**
237:23
**submit (1)**
223:6
**submitted (1)**
217:20
**substance (3)**
218:22,24;219:6
**successful (1)**
298:18
**sue (1)**
317:17
**suit (1)**
319:2
**summer (1)**
261:9
**Sunday (3)**
247:18,19,20
**super (1)**
315:17
**Superior (1)**
259:6
**supplies (1)**
252:22
**Supply (2)**
216:8,11
**support (1)**
284:6
**supported (2)**
264:4;294:12
**supposed (6)**
218:7;223:5;247:13,
21;253:23;263:20
**sure (34)**
209:15;210:3;211:5,

24;212:4;215:24;
219:19;220:16;222:1;
223:7,17;227:10,13;
229:11,12;232:15;
234:4;241:12;256:19;
265:2;267:2,7;269:9;
275:1,22;281:2;296:2;
297:23;304:20;305:4;
315:3;316:10;318:15;
319:6
**surgery (1)**
252:7
**surprised (1)**
271:15
**suspected (1)**
267:6
**sworn (1)**
208:15
**symptoms (1)**
304:8

---

**T**

**table (2)**
253:17,21
**tag (1)**
267:17
**talk (11)**
213:5,17;217:5;
239:25;240:19,24;
241:1;256:16;303:13,
20;312:10
**talked (11)**
227:11;249:25;
250:3;251:5;252:1;
282:2,7;306:12;
312:16,19;318:15
**talking (16)**
224:19;230:21;
244:5;263:5;275:24;
278:24;281:8;282:11;
292:16;295:6;297:23;
308:5,25;310:22,23;
312:17
**taste (1)**
276:12
**tasted (2)**
276:11,14
**taught (1)**
284:3
**teach (7)**
263:22;279:14;
282:23,25;283:1,7,18
**technically (1)**
257:3
**telephone (1)**
242:18
**temporary (7)**
257:23;258:2,5,8;
259:17,20;260:2
**term (8)**
222:7;228:5,15;
234:10;259:12,16;

261:24;316:2
**terminal (11)**
 228:5,12,14,15;
 229:18;230:2;232:17,
 17,22;271:4;284:1
**terms (10)**
 220:10;223:25;
 224:3;226:6;227:25;
 232:8,23;233:6;
 274:20;286:24
**terrors (1)**
 304:14
**testified (4)**
 208:16;228:4;285:6;
 317:24
**testify (1)**
 270:6
**testifying (1)**
 209:19
**testimony (10)**
 209:8,18;230:19;
 245:12;250:16;251:9;
 259:15;261:21;304:21;
 307:20
**texted (2)**
 257:11;311:2
**texts (1)**
 310:11
**Thanks (2)**
 306:2;321:16
**thank-you (1)**
 300:7
**therapeutic (1)**
 240:8
**therapist (1)**
 238:25
**therapy (2)**
 238:14,18
**thereabouts (1)**
 319:8
**thereof (1)**
 322:5
**thinking (2)**
 224:9;263:18
**third (2)**
 216:3;296:4
**though (4)**
 211:10;281:3;
 284:19;300:1
**thought (32)**
 216:13;223:24;
 231:11,16;235:12;
 245:22;246:17,19;
 250:14;253:5;260:11;
 264:16;267:3,8;
 271:11,11;292:10,13;
 294:15;298:14;299:13,
 15,20,21,23;300:11,14,
 20;319:13;320:1,7,17
**threaten (2)**
 227:25;278:23
**threatening (2)**
 255:13;317:17

**threats (1)**
 311:4
**three (9)**
 253:16,16;272:9;
 274:10,21,23;314:3;
 315:16;316:3
**Throughout (3)**
 295:9,12;306:12
**Thursday (1)**
 208:7
**tickets (1)**
 300:6
**till (2)**
 227:16;309:2
**timeframe (3)**
 320:1,6,10
**times (8)**
 213:7,9;249:19;
 251:18;273:10;295:12;
 304:15;317:21
**tired (2)**
 307:15;309:2
**tissue (1)**
 314:23
**titled (1)**
 297:15
**today (14)**
 209:16,18;210:23;
 211:6;212:8,25;213:3,
 18,25;236:25;275:2;
 279:8;306:10;315:25
**together (3)**
 282:2,3,11
**told (26)**
 243:3,10,20;245:17;
 246:6;247:7,10;
 251:21;253:10;255:3;
 257:12;260:7,14;
 261:8;262:7,11;
 263:15,23;264:3;
 266:8;267:4,4;285:11;
 290:14;291:13;304:23
**toll (1)**
 303:16
**took (19)**
 231:20;233:17;
 243:11,22,23,24,25;
 245:10;246:15;250:1;
 252:11;255:19;257:4;
 258:8;267:5;286:18;
 292:5,6;310:16
**top (2)**
 267:23;288:24
**tortillas (1)**
 276:25
**touch (3)**
 247:10;253:5,6
**town (5)**
 240:17,21;252:5;
 256:8;294:24
**tract (1)**
 237:23
**Tractor (2)**

216:8,11
**transaction (3)**
 221:14;236:24;
 255:21
**transcript (7)**
 212:18;215:2;
 307:22;321:4,5,11,15
**transfer (1)**
 299:12
**trauma (2)**
 316:1,2
**treatment (3)**
 217:11;240:5;241:1
**tri- (1)**
 321:6
**trial (1)**
 321:6
**tried (12)**
 230:8,20,22,22;
 231:4;246:10;247:10;
 252:16;261:4;262:24;
 288:17;303:21
**trimming (1)**
 216:6
**trouble (1)**
 305:5
**truck (2)**
 229:24;236:18
**true (28)**
 215:5;217:18;
 225:19;227:1,9;228:7,
 9;231:8;232:13;
 233:24;235:21;236:10,
 11;241:6;242:9;
 243:12;250:13;262:18;
 265:2,9,10;269:19;
 289:3;291:19;293:24;
 295:13;300:3;322:7
**trump (1)**
 291:16
**try (10)**
 230:14,24,25;237:6;
 246:14;252:9;260:10;
 261:20;290:4;318:6
**trying (24)**
 210:2;211:24;
 231:25;233:23;236:6;
 239:2,5;240:6;249:9;
 251:12;252:12;254:16,
 18;255:8,14,24;256:7,
 8;260:5;270:1;282:13;
 285:19;299:6;308:10
**Tuesday (1)**
 249:12
**turn (2)**
 238:4;281:2
**twenty- (1)**
 247:16
**two (18)**
 217:8;218:5,5;
 219:21;222:8;229:6;
 234:7;235:12,14;
 237:22;246:2;247:14;

271:20;289:6;306:3;
 315:5,11;316:8
**type (1)**
 210:19

**U**

**ultimately (1)**
 247:1
**Um (1)**
 314:24
**unable (1)**
 279:9
**unclear (1)**
 293:5
**under (3)**
 209:17;322:5,5
**undersigned (1)**
 322:3
**Understood (2)**
 272:12;293:7
**unhappy (1)**
 270:12
**unless (2)**
 211:7;261:20
**unpredictable (1)**
 247:25
**un-schedule (1)**
 248:8
**unsure (2)**
 229:14,16
**up (45)**
 219:5;220:6;226:15;
 229:23;235:12;241:10;
 245:16,20;246:8;
 249:10,10;250:5,10;
 251:24;252:2;253:8;
 264:3;275:15;285:10;
 286:5;288:16;289:10;
 291:4,6,12,25;292:2,
 15;293:3,5;298:14;
 301:7,14;304:14;
 307:21;308:2;309:1,
 21,21;312:7;313:18,
 23;314:25;318:3,12
**updates (1)**
 251:8
**upon (10)**
 236:20;279:18,19;
 281:13,17;282:4,21;
 286:17;298:24,24
**upset (8)**
 250:19;280:19;
 303:19,20;304:7;
 305:9;315:21,22
**upsetting (3)**
 239:3;256:16;263:21
**urgency (1)**
 319:15
**urgent (1)**
 319:16
**use (4)**
 218:20;297:2;299:6;

316:1
**used (7)**
 228:13;268:22;
 277:17,20,23;289:2;
 321:5
**usually (2)**
 236:22;248:11

**V**

**Vague (6)**
 222:13;224:18;
 234:2;266:13;280:3;
 313:6
**value (3)**
 279:14;283:2,19
**valued (1)**
 306:20
**Vanessa (3)**
 274:1;305:23;316:9
**variety (1)**
 231:18
**vegan (1)**
 276:4
**vegetarian (1)**
 276:6
**vehicle (2)**
 301:12;302:11
**vein (1)**
 240:25
**verbal (1)**
 209:22
**verbally (1)**
 244:5
**verify (1)**
 317:2
**veterinary (2)**
 216:6;253:1
**video (2)**
 321:12,12
**view (3)**
 277:13,22,25
**viewpoint (2)**
 277:17,19
**VOLUME (1)**
 208:1

**W**

**Wait (5)**
 255:1;261:7;307:16;
 309:2;312:13
**waiting (2)**
 252:3,13
**walk (2)**
 301:13;309:16
**walked (4)**
 264:2;301:8,11;
 309:1
**walking (2)**
 265:3;309:19
**warrant (2)**
 285:11;310:8

LONG vs.
FERNANDEZ

JESSICA LONG - Vol. 2
February 8, 2024

**Washington (1)**
315:20
**watched (1)**
215:7
**water (1)**
309:21
**way (14)**
212:4;229:13;236:7;
242:20;244:17;245:8,
9;267:7;278:11;
279:14,22;283:1,7;
309:20
**website (6)**
222:19,21,24;223:1;
225:8;288:16
**Wednesday (3)**
242:13;243:21;
244:13
**week (7)**
212:22;244:24;
245:2;319:4,7,8;320:5
**weekday (1)**
221:24
**weekend (3)**
221:24,25;252:5
**weeks (8)**
229:6;235:12,14;
247:8,14;248:10,14;
256:1
**weight (1)**
305:8
**weren't (7)**
215:21;225:16;
250:9,10;265:3;267:2,
6
**what's (7)**
214:12;220:22;
276:9;279:18,19;
282:4;309:10
**whereabouts (5)**
310:25;311:8,12,17,
22
**whole (10)**
236:2;245:2;259:11;
262:10;263:1;264:5,5;
289:4;294:20,25
**Who's (1)**
262:13
**Whose (1)**
314:8
**wife (1)**
282:1
**willing (1)**
298:12
**winning (3)**
298:24,25;300:2
**wish (1)**
269:21
**within (3)**
244:4;248:13;315:11
**without (3)**
257:20;270:12;
283:19

**WITNESS (56)**
208:18;213:6;
220:24,25;221:11,12,
21,23;222:14;228:23;
229:1,16,20;230:22;
231:15;233:4,15;
237:3;238:10;239:2,
23;240:17;241:17;
243:6;244:16;248:25;
250:18;254:8,11,15;
256:19;258:5;259:16;
263:15,18;266:5,7,19;
269:6;273:10;285:2,3;
289:14,15;290:1,19,20;
296:23;299:20;312:3;
313:7;314:23;315:2,7;
317:9;320:7
**woken (1)**
304:14
**woman (1)**
307:2
**wondering (4)**
256:4;282:21;285:8;
286:6
**word (6)**
228:3,12,13;258:24;
299:6;316:1
**words (3)**
225:7;226:18;290:2
**work (8)**
237:6;240:7;245:18;
248:5;252:17;260:5;
305:5;308:18
**worked (7)**
253:25;265:8;
274:15;281:24;291:7;
293:2,2
**worker (1)**
238:24
**working (2)**
256:10;282:11
**worried (1)**
319:11
**worse (2)**
245:2,3
**worth (1)**
263:25
**wraps (1)**
313:18
**written (5)**
214:18,22;252:15;
270:18;295:22
**wrong (5)**
248:17;257:2;
274:16;275:16;317:23
**wrote (8)**
210:7;236:2;275:11;
289:6,16;292:11;
298:22;299:19

**Y**

**yard (2)**

301:17,18
**Ye- (1)**
280:2
**year (3)**
209:4;282:1;287:12
**year-and-a-half (1)**
275:1
**years (1)**
315:11
**yes' (1)**
210:1
**York (1)**
273:10
**youth (4)**
271:22;279:14;
283:1,18

**Z**

**zoomed (1)**
221:9

**1**

**1 (1)**
220:11
**1:04 (1)**
208:8
**1:40 (1)**
241:19
**1:44 (1)**
241:19
**10:00 (1)**
221:25
**10th (1)**
247:22
**11 (2)**
308:14;309:9
**12th (1)**
247:23
**15th (9)**
248:18;249:3,21;
310:4;317:25,25;
318:4,11,13
**17th (7)**
221:16;229:8,17,22;
231:11,15,19
**1828 (1)**
208:6
**193 (1)**
262:4
**1st (1)**
268:1

**2**

**2:01 (1)**
256:22
**2:05 (1)**
256:22
**2:38 (1)**
286:14
**2:44 (1)**

286:14
**2:57 (1)**
297:7
**20 (1)**
266:20
**20_ (1)**
322:13
**200 (1)**
260:6
**2021 (5)**
314:14;315:12,13,
14,25
**2022 (22)**
214:21;219:17;
221:16;229:8;240:13;
248:13;268:2;297:12;
307:13;308:6,17,17;
309:7;310:4,20;311:8,
13,17,23;312:8,14;
313:5
**2024 (3)**
208:7;312:12,13
**24th (1)**
209:4
**25 (1)**
309:9
**26 (1)**
220:12
**26f (1)**
272:24
**26th (5)**
214:21,23;215:22,
22;247:17
**27th (6)**
208:3;247:17;
292:12;295:21;317:22,
23
**28th (5)**
297:11;312:11,13,
14;316:18
**29th (1)**
297:19

**3**

**3:06 (1)**
297:7
**3:29 (1)**
316:14
**3:41 (1)**
316:14
**3:46 (1)**
321:16
**30th (1)**
314:13
**35 (1)**
217:3
**36 (2)**
308:13;309:9

**4**

**40 (1)**

244:25
**4-H (15)**
243:7;255:19;
271:22;276:11,23;
282:1,1;283:23;
294:21;298:24;303:25;
304:24;306:13,16;
308:19

**5**

**500 (1)**
260:16

**6**

**6 (1)**
262:4
**6/27 (2)**
294:1,3

**7**

**7 (1)**
262:4
**7446 (1)**
208:10

**8**

**8th (6)**
208:7;310:20;311:8,
13,17,22

**9**

**9:57 (2)**
221:16,23
**90 (1)**
217:21
**96001 (1)**
208:6