# EXHIBIT I

**In The Matter Of:**

*LONG vs.*

*FERNANDEZ*

---

*DETECTIVE JACOB DUNCAN*

*August 22, 2023*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File J. Duncan.txt

Min-U-Script® with Word Index

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF CALIFORNIA
 3                  SACRAMENTO DIVISION
 4
 5   E.L., a minor, by and through   )
     her general guardian, JESSICA   )
 6   LONG; JESSICA LONG, an          )
     individual,                     )
 7                                   )
             Plaintiffs,             )   Case No.
 8   vs.                             )  2:22-cv-01527-DAD-AC
 9   LIEUTENANT JERRY FERNANDEZ      )
     individually and in his         )
10   individual capacity as Sheriff  )
     for the County of Shasta;       )
11   DETECTIVE JACOB DUNCAN,         )
     individually and in his         )
12   individual capacity as Sheriff  )
     for the County of Shasta;       )
13   DETECTIVE JEREMY ASHBEE,        )
     individually and in his         )
14   individual capacity as Sheriff  )
     for the County of Shasta;       )
15   SHASTA DISTRICT FAIR AND EVENT  )
     CENTER, a district agricultural )
16   association; COUNTY OF SHASTA;   )
     SHASTA COUNTY SHERIFF'S         )
17   DEPARTMENT; MELANIE SILVA, in   )
     her individual capacity; BJ     )
18   MACFARLANE, in his individual   )
     capacity; and DOES 1 through    )
19   10,                            )
                                     )
20           Defendants.             )
                                     )
21   _____
22
23      VIDEO DEPOSITION OF DETECTIVE JACOB DUNCAN
24          TUESDAY, AUGUST 22, 2023
25
```

## Page 2

```
 1                    APPEARANCES
 2
 3   For the Plaintiffs:  LONG, etc.
 4        ADVANCING LAW FOR ANIMALS
          407 N. Pacific Coast Highway, #267
 5        Redondo Beach, CA  90277
          (202) 996-8389
 6        rgordon@advancinglawforanimals.org
          vshakib@advancinglawforanimals.org
 7   BY:  RYAN R. GORDON, ESQ.
          VANESSA T. SHAKIB, ESQ.
 8
 9   For the Defendant:  FERNANDEZ, etc.
10        BEST, BEST & KRIEGER
          2855 East Guasti Road, Suite 400
11        Ontario, CA  91761
          (909) 989-8584
12        damian.northcutt@bbklaw.com
13   BY:  DAMIAN A. NORTHCUTT, ESQ.
14
15   For the Defendant:  SHASTA DISTRICT FAIR, etc.
16        CALIFORNIA ATTORNEY GENERAL'S OFFICE
          DEPARTMENT OF JUSTICE
17        1300 I Street
          Sacramento, CA  95814-2963
18        (916) 210-7529
          john.bridges@doj.ca.com
19   TELEPHONIC APPEARANCE BY:  JOHN BRIDGES, ESQ.
20
21   Also Present:  Terry Fox, Video Specialist
22
23                    ---oOo---
24
25
```

## Page 3

INDEX OF EXAMINATION

| EXAMINATION BY: | PAGE |
|---|---|
| RYAN GORDON | 6, 185 |
| DAMIAN NORTHCUTT | 183 |

---oOo---

## Page 4

INDEX OF EXHIBITS

| Duncan Depo Exhibit No. | Description | Page |
|---|---|---|
| A | Shasta County Sheriff's Office Incident Report, totaling 68 pages | 77 |
| B | A copy of Penal Code section 1536 | 105 |
| C | A copy of Penal Code section 1407 | 111 |
| D | A copy of Penal Code section 1408 | 112 |
| E | One-Page aerial map | 125 |
| F | Audio Recording | 191 |
| G | A document entitled, 2022 State Rules for California Fairs, totaling 33 pages | 175 |
| H | Shasta District Fair brochure | 176 |

---oOo---

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 4 of 74

LONG vs.                                                                DETECTIVE JACOB DUNCAN
FERNANDEZ                                                               August 22, 2023

---

Page 5

1         BE IT REMEMBERED, that on Tuesday, August 22,
2    2023, commencing at the hour of 9:34 a.m., of said day,
3    at the offices of Challe, Fisher & Morfin, 1828 South
4    Street, in Redding, California, before me, Suzanna
5    Mickelson, a Certified Shorthand Reporter in and for the
6    State of California, there appeared,
7              DETECTIVE JACOB DUNCAN,
8    who, being first duly sworn by me to tell the truth, was
9    examined and testified as follows:
10
11        **THE VIDEO SPECIALIST:** Ladies and gentlemen,
12   we're on video record with the deposition of Detective
13   Jacob Duncan.  The date is August 22nd, 2023, and the
14   time is 9:34 a.m.  I'm Terry Fox, the video specialist,
15   from the firm of Redding Video Productions.  This is the
16   beginning of media number one regarding case number
17   22-cv-01527-DAD-AC of the United States Eastern District
18   Court of the Sacramento Division.  This deposition is
19   being taken at the offices of Challe Fisher and Morfin
20   at 1828 South Street, Redding, California.  The court
21   reporter is Suzanna Mickelson, CSR number 14270
22   associated with Challe, Fisher and Morfin.
23        Counsel will now introduce themselves, who they
24   represent, and the witness will then be sworn in by the
25   court reporter.

---

Page 6

1         **MR. NORTHCUTT:** Damian Northcutt appearing on
2    behalf of Detective Duncan and the other county
3    defendants.
4         **MR. GORDON:** John, do you want to chime in and
5    put your name on the record?
6         **MR. BRIDGES:** Yeah, this is John Bridges on
7    behalf of the State of California through the 27th
8    District Agricultural Association, Melanie Silva and
9    B.J. Macfarlane.
10        **MR. GORDON:** Ryan Gordon for Plaintiffs.
11        **MS. SHAKIB:** Vanessa Shakib, Plaintiffs'
12   counsel.
13        (Whereupon, the witness was sworn by the
14        court reporter at this time.)
15
16        EXAMINATION BY MR. GORDON
17        **MR. GORDON:** Q.  All right.  Please state your
18   name for the record.
19   A.   **Detective Jacob Duncan.**
20   Q.   Okay.  Do you have a middle name?
21   A.   **Ryan.**
22   Q.   Ryan, okay.  Jacob Ryan Duncan, all right.
23   A.   **Yes, sir.**
24   Q.   Could you spell your name?
25   A.   **J-a-c-o-b.  R-y-a-n.  D-u-n-c-a-n.**

---

Page 7

1    Q.   Have you ever gone by any other names?
2    A.   **Jake.**
3    Q.   Jake.  Okay.
4    A.   **My first name.**
5    Q.   People colloquially call you Jake?
6    A.   **Yes.**
7    Q.   Are you -- any other any nicknames?
8    A.   **No.**
9    Q.   No, okay.  No one calls you JD or Jay Man?
10   A.   **I have been called JD in the past.  Not a**
11   **commonly accepted nickname.**
12   Q.   Yeah.  Okay.  All right.  All right.  So have
13   you ever been a defendant in a lawsuit before?
14   A.   **Yes.  Yes.**
15   Q.   Okay.  And when was this?
16   A.   **I think I was a defendant in a lawsuit a year**
17   **and a half ago approximately.**
18   Q.   Okay.  Was this individually or as an officer?
19   A.   **As an officer.**
20   Q.   As an officer?
21   A.   **Yes.**
22   Q.   Okay.  Have you -- what was the suit about?
23   A.   **A traffic collision.**
24   Q.   Okay.  Is this the same -- were you in a --
25   yesterday Officer Fernandez testified about a lawsuit

---

Page 8

1    regarding a traffic collision.  Was it the same lawsuit?
2    A.   **I was employed by the Anderson Police Department**
3    **during that time.**
4    Q.   So it would not have been?
5    A.   **No.**
6    Q.   All right.  What was the resolution?
7    A.   **It was dismissed with prejudice, and I was**
8    **cleared.**
9    Q.   Okay.  Gotcha.  And -- okay.  So have you -- so
10   have you been deposed before?
11   A.   **No.**
12   Q.   No.  This is the first time you've been deposed
13   ever?
14   A.   **Yes.**
15   Q.   All right.  So I'm going to go through -- your
16   attorney likely did this, but I'm going to go through
17   the ground rules for a deposition.
18   A.   **Of course.**
19   Q.   So let's try not to talk over each other.
20   Probably will happen a few times.  Let's try not to.
21   The court reporter's transcribing everything you're
22   saying.  So if I answer a question, it's important that
23   you say "yes," "no," or "I don't understand" or your
24   narrative of an answer, whatever, whatever it might be,
25   so she can transcribe it accurately.

---

Page 9

1  And I guess the punch line here is you want to
2  give a verbal response. We're on -- you're on a camera
3  but, you know, she -- a nod of the head or, you know,
4  she needs to write something down for your response.
5  A.    Of course.
6  Q.    All right, so you understand. All right. So
7  I'm going to ask you about some things and you might not
8  remember clearly, but I'm entitled to your best
9  estimate. So what that means -- do you understand the
10  difference between an estimate and a guess?
11  A.    Yes.
12  Q.    Okay. What is your understanding?
13  A.    So an estimate would be based off of my
14  recollection, training, experience, different things
15  like that that may come into play. Whereas, a guess is
16  not going to be based off any factual or --
17  Q.    Maybe. I don't know if it would be based off
18  your experience. But your -- some -- some -- you're a
19  percipient witness --
20  A.    Some type of parameters.
21  Q.    Well, here's the example attorneys always give.
22  So if you're ever in a depo again, you're probably going
23  to get this example. So if you look at this table, you
24  can estimate the size of it because you're sitting in
25  front of it. You know, this is eight, eight and a half

Page 10

1  feet, something like that.
2  But if I ask you to estimate the table at my
3  house, you'd just be guessing.
4  A.    Yeah.
5  Q.    Be speculating. So anyway. So I'm entitled to
6  your best estimate. So if you know something happened
7  at a certain time but you don't know when but you
8  remember -- you remember if it was between like, you
9  know, five -- it was between -- it was between
10  Thanksgiving and Christmas. So I'm entitled to know
11  that even though you might not remember the precise
12  date. So your best estimate, all right?
13  A.    Of course.
14  Q.    Understand?
15  A.    Yeah.
16  Q.    All right. Okay. So even though we're in an
17  informal setting, this is not -- there's no judge here.
18  You're under oath, though, nonetheless, so your
19  testimony has the same effect as if you were in a
20  courtroom even though there's -- even though this is an
21  informal setting in, you know, a law firm and a
22  mediation office, so you understand?
23  A.    Yeah.
24  Q.    So I'm going to ask questions and you're going
25  to give your response, but your attorney might interpose

Page 11

1  objections to the questions. And that's fine. He's
2  putting his objections on the record. You still need to
3  answer the question. So he's preserving his objections.
4  If he instructs you not to answer, then yeah,
5  then, you know, it's up to you if you want to follow
6  your attorney's advice. I presume you will. But you
7  know, if you understand what I'm asking even though he
8  says, "Objection," you know, "Vague" or "Objection.
9  It's argumentative," you know, if you know what I mean,
10  answer the question.
11  A.    Okay.
12  Q.    Okay. Nothing here is going into evidence yet
13  so he's -- it's -- the objections are just saving them
14  for later basically, all right. Because I'm going to
15  ask you stuff that might not even be -- like right now
16  we're having a conversation that's completely irrelevant
17  to what we're talking about in the complaint; but
18  nonetheless, you're still under oath to answer the
19  questions, and I'm entitled to give you instructions and
20  ask other questions related to your background,
21  etcetera.
22  A.    Of course.
23  Q.    All right. Okay. So -- and if you don't
24  understand something, please let me know because you
25  know how a conversation goes.

Page 12

1  A.    Yeah.
2  Q.    It's not -- you know, we don't always say things
3  precisely as you'd write them out if you were, you know,
4  putting something in a formal document. So I'll try my
5  best, but tell me if, you know, I don't understand what
6  you're talking about.
7  A.    Sounds good.
8  Q.    Okay. So are you on any meds?
9  A.    No.
10  Q.    No, okay. Did you have a drink today?
11  A.    No.
12  Q.    Alcohol. I'm sure you had a drink of something
13  today.
14  A.    No.
15  Q.    All right. Any drugs?
16  A.    No.
17  Q.    Okay. So is there any reason you can't give
18  your best testimony today?
19  A.    No.
20  Q.    Okay. All right. Okay. So where do you
21  reside?
22  A.    Within Shasta County.
23  Q.    Yeah. Here in Shasta County. Okay. All right.
24  How long have you lived here?
25  A.    I have lived in Shasta County -- I moved to

Page 13

1 Shasta County when I was seven years old and --
2 approximately. And then I moved back down to San Diego
3 where I'm from for about two years, three years when I
4 turned 18.
5 Q.   Okay.  So you were born in San Diego, moved to
6 Shasta at seven?
7 A.   Uh-huh.
8 Q.   And then 18 went back down to San Diego?
9 A.   Correct. And then I moved -- then I moved back
10 here in the end of 2015.
11 Q.   Okay.  Why'd you move to San Diego?
12 A.   That's where my family lives.
13 Q.   Oh, okay.  Okay.  What part of San Diego?
14 A.   Escondido.
15 Q.   Escondido.  It's nice there.
16 A.   Yeah.
17 Q.   I like San Diego.  I live in south Orange
18 County.
19 A.   A lot cooler.
20 Q.   Cooler, you mean temperature-wise?
21 A.   Yeah.  It's a lot cooler there.
22 Q.   Yeah, no.  I didn't realize it got so warm up
23 here.  I thought it would be -- close to the Oregon
24 border, I thought you'd be, you know, 75, 80 right now.
25 I don't know, I mean.

Page 14

1 A.   Yeah.
2 Q.   Anyway.  So all right.  So you moved back you
3 said in 2015 to Redding?
4 A.   Yes.
5 Q.   Right.  Okay.  Gotcha.  And you've been here
6 since?
7 A.   Yes.
8 Q.   Okay.  And what is your highest education level?
9 A.   I think I have 60 units in college but no actual
10 degree.
11 Q.   Okay.  And where did you go get these units
12 from?
13 A.   Shasta College, Palomar College and Butte
14 College.
15 Q.   You said Palomar College?
16 A.   Yes.
17 Q.   And Butte College.  Like Butte like B-u-t-e or
18 B-u-t-t-e?
19 A.   B-u-t-t-e.
20 Q.   Like Butte, Montana?  There's a -- is that a
21 city there?
22 MR. NORTHCUTT: Yeah.
23 MR. GORDON: Q.  Butte, Montana, okay.  Okay.
24 All right.  So and when did you -- when did you last
25 complete those courses?  When was the last point in time

Page 15

1 you were taking college courses?
2 A.   Actively through law enforcement training some
3 of them count for college credits, so it would be hard
4 for me to say the last time I obtained a college unit.
5 But the last time I was actually in college full time
6 would be during my law enforcement academy in January of
7 2016 through June of 2016.
8 Q.   Okay.  Gotcha.  All right.  So you're still
9 taking -- I presume over time you're still taking --
10 A.   Yes.
11 Q.   -- college courses?  Okay.  All right.  For like
12 continuing education credits or something?
13 A.   Well, when you go to training in law
14 enforcement, some of them count as units, but I do have
15 intentions to finish my degree, but.  Yeah.
16 Q.   All right.  You can go into as much debt as me
17 then maybe.  That'd be great.
18 All right.  So did you go to high school in
19 Redding then?
20 A.   Yes.
21 Q.   Okay.
22 A.   Palo Cedro.
23 Q.   All right.  And so -- and you went presumably to
24 junior high, middle school here too?
25 A.   Yes.

Page 16

1 Q.   All right.  And when did you get into law
2 enforcement?
3 A.   January of 2016.
4 Q.   January of 2016?
5 A.   When I started the Butte Law Enforcement Academy
6 sponsored by the Anderson Police Department.
7 Q.   Okay.  So you were hired by the Anderson law
8 enforcement -- or tell me about that.
9 A.   Yeah, I don't know if technically I was an
10 employee.  I think they -- it was considered a
11 sponsorship.  Myself and one other person were there for
12 sponsorship.  They hadn't done it in a really long time,
13 so I don't think we were officially employees until we
14 graduated in June of 2016.
15 Q.   But you were --
16 A.   Received monthly stipends --
17 Q.   To go get training to become an employee?
18 A.   They paid for our law enforcement academy, and
19 we wore their patches in the academy.  And you know, we
20 got stipends from them.
21 Q.   Okay.
22 A.   But they weren't designated as an employee
23 until we actually became a sworn peace officer.
24 Q.   I see.  So Anderson is the city itself of
25 Redding?

Page 17

1 A.    Yes.
2 Q.    Okay.  Like, I don't know, two of the major
3 cities.  There's -- I saw it on a map, I believe.  But
4 it's that way?
5 A.    Yes.
6 Q.    All right.  So Anderson Police Department.
7 Wasn't sheriff's department.  It was just their -- they
8 have a city police department?
9 A.    Yep.
10 Q.    Okay.  And what was your -- so how long were you
11 in -- you said you started in January 2016 for a
12 training program.  What term did you use?  You said it
13 wasn't --
14 A.    The police academy.
15 Q.    Police academy, thank you.  I should know that
16 at least from the Police Academy movies.
17        Okay.  So you were in police academy in January
18 2016.  And then for how long did the police academy
19 last?
20 A.    Through June of 2016.
21 Q.    What are the basic courses they teach you in
22 police academy?
23 A.    It's going essentially --
24 Q.    You, specifically.  Not generally, but the ones
25 you went through.

Page 18

1 A.    The academy I went through is going to be pretty
2 similar to the general police academies.  They have to
3 do with Penal Codes, California procedures, the typical
4 policies you'll encounter and functions of being a
5 police officer, arrest and control and driving.
6 Q.    Okay.  Is there a set, you know, a set of
7 required courses that all have the -- you know, that you
8 took?  Or is this just generally over time they taught
9 you these skills?
10 A.    California peace officer standards.  California
11 POST.  They're going to guide the -- they're going to
12 have the guidelines of what a police academy is going to
13 look like.
14 Q.    Okay.  Okay.  So would each of these have their
15 own course?  Was there a course on Penal Codes and a
16 course on procedure, course on arrest and control,
17 course in driving?
18 A.    To the best of my recollection, yes.
19 Q.    Okay.  And they all lasted the entirety of
20 June -- January through June?
21 A.    Yes.  For the most part.  There'd be like some
22 courses that I imagine would be completed within a week
23 or two weeks, and they'd move on to the next, but for
24 the most part they were generally reestablished,
25 reaffirmed throughout the academy.

Page 19

1 Q.    Okay.  How much time did they -- do they take
2 for, you know, let's say Penal Codes?  How long is that
3 one?
4 A.    Penal Codes are going to be addressed pretty
5 much on a regular basis throughout the police academy.
6 Q.    Okay.  It's a big code.
7 A.    Yeah.
8 Q.    A lot to read in it, okay.  All right.
9        And what about procedures, how long did that --
10 was that addressed throughout it too, or was it a
11 shorter course?
12 A.    What do you mean by procedures?
13 Q.    Well, you said California procedures.  You said
14 Penal Codes, California procedures.
15 A.    I think when I refer to that, I probably am
16 referring to like how generally how to do police work
17 and what police works looks like.
18 Q.    Okay.  So you weren't -- you weren't -- you were
19 not referring to like criminal procedure like in a
20 court, for example?
21 A.    No.  But that was part of the academy as well.
22 Q.    That was part of it as well?
23 A.    Yes.
24 Q.    And that was -- that went through the pendency
25 of the academy?

Page 20

1 A.    Yes.
2 Q.    Okay.  Throughout.  Okay.  All right.  And I'm
3 assuming do they test you in these skills, knowledge
4 bases at the end of it?
5 A.    Yes.
6 Q.    Yes, okay.  All right.  Presumably passed all
7 the tests?
8 A.    Yes.
9 Q.    Okay.  All right.  First time?
10 A.    Yes.
11 Q.    All right.  Okay.  So then you joined the police
12 academy -- or I'm sorry, you joined the Anderson Police
13 Department?  It's Anderson PD?
14 A.    Yes.  So I was -- as I became a sworn police
15 officer, I was sworn in as an employee with the Anderson
16 Police Department immediately following my academy.  I
17 think I had a week or two weeks off.
18 Q.    Okay.  And what was your first title?
19 A.    I was a police officer.
20 Q.    Just police officer, okay.
21 A.    Yes, sir.
22 Q.    Okay.  All right.  And how long did you have
23 that role as police officer?
24 A.    I think I was a police officer until December of
25 '2018, when I was promoted to a detective for the

Page 21

1  Anderson Police Department.
2  Q.    Okay. All right. So December '18, you became a
3  detective. How did the -- what were your roles -- let
4  me backtrack.
5        What were your duties as a police officer?
6  A.    Generally responding to calls for service and
7  enforcing criminal law within the Anderson -- city of
8  Anderson.
9  Q.    How many calls a day do you generally get? When
10 you were a cop, police officer?
11 A.    Anderson Police Department would fluctuate.
12 It's a small city. Sometimes depended on what shift you
13 worked. I've worked graveyard shift and dayshift. We
14 could go all the way from, you know, only five calls to
15 on a busy day shift, 40 or 50 calls.
16 Q.    More calls in a dayshift generally?
17 A.    Yes. Generally.
18 Q.    All right. Are the calls worse at night? Like
19 something as far as the level of crime?
20 A.    It depends. Law enforcement I think, you know,
21 you never know what you're going to encounter.
22 Q.    Sure.
23 A.    And as soon as you think you have it down,
24 graveyards are always worse, your dayshifts are always
25 worse, then you encounter the complete opposite the next

Page 22

1  day.
2  Q.    Okay. So you did both shifts, graveyard and --
3  obviously not back to back because you need to sleep,
4  but I'm assuming you -- how long -- how long were you
5  on -- was there, you know, some years you were only on
6  dayshifts and then later nightshifts?
7  A.    I actually think I was pretty equally on
8  dayshift and nightshift, to the best of my recollection.
9  Q.    Like each week?
10 A.    No, no. We had three-month rotations.
11 Q.    I see.
12 A.    I believe it was three months. Might have been
13 four months.
14 Q.    Okay. So you'd be on dayshift for three months,
15 and then you'd get nightshift for three months and
16 then --
17 A.    Not necessarily. It would be a shift pick, so
18 you get to pick your next rotation. So I think there
19 was a couple times I spent two rotations on graveyard or
20 two rotations on dayshift. So I don't recall
21 specifically.
22 Q.    Okay. So some officers want the nightshift then
23 I was assuming. That'd be one of the ones they would
24 want. Some people would just pick it, and there's not
25 even an issue?

Page 23

1  A.    Yeah. I think as a newer officer, you like to
2  work the graveyard shift. You get an opportunity to be
3  a little bit more proactive.
4  Q.    Oh, interesting. What do you mean by proactive?
5  A.    As in you get to go and enforce the criminal
6  violations or look for criminal violations rather than
7  respond for calls for service.
8  Q.    Is that because more -- you've just got --
9  there's less calls coming in, so you've got more time to
10 drive around at night?
11 A.    Yes.
12 Q.    All right. Interesting. And so then 2018, you
13 became a detective. And so what were your -- how did
14 your duties change once you became a detective?
15 A.    Well, I would say they vastly changed. It went
16 from responding to calls for service to investigating
17 cases that were afforded to me from patrol.
18 Q.    So what -- okay. So you investigated cases for
19 patrol. But you were investigating cases as a police
20 officer also, yes?
21 A.    Yes.
22 Q.    Okay. What's the difference -- how did the --
23 how did the quality of your investigations differ?
24 A.    So as a police officer, typically you're only
25 going to do an initial investigation. And if it's a

Page 24

1  smaller level case like, for example, misdemeanor case,
2  you may complete the case to its entirety as a patrol
3  officer. And the major cases like a sex crime or a
4  serious felony case, that would most likely be forwarded
5  to the detective to work.
6  Q.    I see. Okay. Is it -- is there -- so the
7  police officers, are they -- can they only investigate
8  misdemeanors to completion, or can they do some
9  felonies?
10 A.    No. I think the Anderson -- one of the things I
11 got out of the Anderson Police Department was you had
12 the ability to work most of your cases to completion if
13 you wanted to. The detective was more so there as a
14 generally they work the cases that require follow-up.
15 Q.    Okay.
16 A.    But if you're a driven young officer, then you
17 can still work your own cases.
18 Q.    I see. So you've been working felonies since
19 2016?
20 A.    Yes.
21 Q.    All the way back to its inception, okay.
22       And as detective, could you -- at Anderson --
23 could you -- I mean, if some -- if a police officer was
24 investigating a case, can you, you know, put your foot
25 in and say no, no, no, no, that one, I want to do that

Page 25

1  one, it's my wheelhouse?
2  **A.    I feel like that's a rare circumstance, but yes,**
3  **there has been situations where a police officer may be**
4  **investigating something that was maybe a little bit**
5  **above their head and then it gets, you know, turned over**
6  **to detectives.**
7  Q.    Okay.  So how did you -- did you select your
8  cases then as a detective, or did they just, this is
9  yours, falls on your desk?
10 A.    **Generally they were given to me by a superior**
11 **officer.  So I was supervised by a lieutenant.  So my**
12 **cases would be routed from patrol through the lieutenant**
13 **and then assigned to me.**
14 Q.    Okay.  Interesting.  All right.  So how long
15 were you at Anderson PD as a detective?
16 A.    **Until I think it was March of 2022.**
17 Q.    Okay.  So about --
18 A.    **Four years.**
19 Q.    Four years.
20 A.    **Little over four years as detective.**
21 Q.    Okay.  What was your clearance rate, if you kept
22 track of that?  I don't know.
23 A.    **What do you mean?**
24 Q.    How many of the -- how many of the
25 investigations that you solved and, I guess, brought to

Page 26

1  prosecution?
2  A.    **I don't know how many were specifically brought**
3  **to prosecution.  I do know that myself and my partner,**
4  **there was I believe one year where it was, you know,**
5  **over 100 cases.  And then, you know, another year might**
6  **have been less.  There was -- there's dips and flows to**
7  **it.**
8  Q.    Yeah.
9  A.    **I don't know of any specific cases that I left**
10 **open when I left.**
11 Q.    Yeah.
12 A.    **I try to make sure all my cases were closed or**
13 **had some resolution prior to my departure.**
14 Q.    Is that a lot of cases for one person?  A
15 hundred seems like a lot to me.
16 A.    **Over a year, I would consider that a busy year**
17 **for the Anderson Police Department.**
18 Q.    Yeah.  Okay.  What sorts of -- can you give me a
19 flavor of what types of cases they are?
20 A.    **The Shasta County I would say primarily the**
21 **majority of the cases you're going to work --**
22 Q.    Well, let's just stick with Anderson for a
23 second.
24 A.    **So Anderson Police Department included in that.**
25 **Primarily the majority of the cases you're going to work**

Page 27

1  are sex crimes.
2  Q.    Oh, interesting.  Is that a particular problem
3  in this area or is -- in your expert opinion on that?
4  A.    **Yes.  I think that it's a combination of sex**
5  **crimes are typically the most difficult cases to work,**
6  **so they're the less likely to stay with patrol.**
7  Q.    Yeah.
8  A.    **I wouldn't say that they're the only felony**
9  **crime that happens.**
10 Q.    Sure.
11 A.    **It just requires typically the most amount of**
12 **experience or expertise.**
13 Q.    Uh-uh.
14 A.    **So that's typically what we end up working as**
15 **detectives.**
16 Q.    So when you say sex crimes, do you mean like
17 prostitution rings or what do you -- what does that
18 umbrella cover?
19 A.    **That's included in that, but that's going to be**
20 **essentially any type of sexual assault or sex-crime-type**
21 **allegation, child molestation typically, things like**
22 **that.**
23 Q.    Okay.  Okay.  Gotcha.  All right.  Interesting.
24 All right.  So you're a detective at Anderson PD until
25 2022, March of 2022, and then where did you go for

Page 28

1  employment after that?
2  A.    **There was a lateral position that opened up at**
3  **Shasta County Sheriff's Office for a major crimes**
4  **detective spot that I applied for and got.  That I got**
5  **the position for.**
6  Q.    When did you start working -- is that your
7  current position?
8  A.    **Yes.**
9  Q.    Okay.  And when did you start working there?
10 A.    **I believe it was March of 2022.**
11 Q.    Didn't take a break at all?  Just hopped right
12 over?
13 A.    **May have taken a week off.  I'm not completely**
14 **sure.**
15 Q.    Sounds like a stressful job.  Okay.  So could
16 you give the title one more time?  You're a major crimes
17 detective did you say?
18 A.    **I'm a detective with the major crimes unit.**
19 Q.    What type of crimes does the major crimes unit
20 investigate?
21 A.    **So we're all generals, so it spans from anything**
22 **from property crimes, financial crimes, sex crimes,**
23 **homicide, human trafficking.**
24 Q.    All right.  All right.  Interesting.  How many
25 homicides happen a year in Shasta, let's say?

Page 29

1  A.      I think we had 11 last year.
2  Q.      Eleven last year.  Okay.  Is that a lot for a
3  county this size?
4  A.      I think we consider that a busy year.
5  Q.      A busy year?
6  A.      Yeah.
7  Q.      Interesting.  Interesting.  So of this
8  breakdown, do you know what percentage of crimes takes
9  up -- you know, what types of crimes take up what
10 percentage of your time?  Like I'm spending 50 percent
11 of my time doing property crimes.  I'm spending 10
12 percent of the time doing financial.  Do you generally
13 know?  Can you give an estimate?
14 A.      I would say the majority of my time is spent
15 doing when I'm investigating cases under that scope,
16 it's going to be sex crimes.
17 Q.      Sex crimes, okay.  Interesting.  Usually with
18 kids?
19 A.      Typically the most of our sex crimes.  It would
20 be hard to give you a percentage, but I'd say the
21 majority of those are going to have to do with children.
22 Q.      Interesting, all right.  Okay.  So -- wow.  All
23 right.  So I don't really have a follow-up question to
24 that.  I didn't -- just shear morbid curiosity.
25         All right.  So a lot of your work then

Page 30

1  involves -- involves some work with criminal -- crimes
2  related to minors?
3  A.      Yes.
4  Q.      All right.  Okay.  So how many cases do you
5  handle day to day on average?
6  A.      That's a hard question to answer.  It'd be hard
7  for me to say how many cases I handled day to day.  Is
8  there a different way you can phrase that?
9  Q.      How many cases are you investigating right now?
10 A.      I think I have about 10 different -- 10 to 15
11 different investigations that I'm currently actively
12 working.
13 Q.      Is that typical, or is there usually more or
14 less?
15 A.      That's typical.
16 Q.      That's typical, all right.  So would you say 10
17 to 15 is your typical caseload?
18 A.      Yes.
19 Q.      Okay.  All right.  Have you ever been
20 disciplined in your role as an officer, either detective
21 or officer?
22 A.      Yes.
23 Q.      When was this?
24 A.      It'd be hard for me to specifically say like
25 specific instances.  I just know generally I've been

Page 31

1  disciplined.  And when I say disciplined, I mean like
2  verbally said, hey, you know, don't do that again.
3  Q.      Okay.  No formal write-ups or anything like
4  that?
5  A.      I think I got a formal letter back when I first
6  became a police officer.
7  Q.      Okay.  When you first -- so back in like 2016?
8  A.      Yeah.  I don't recall the specific year.
9  Q.      Okay.  But about then when you first became a
10 police officer, I'm assuming 2016, 2017 thereabouts?
11 A.      Yes.
12 Q.      Okay.  And what came of that?  Is it just a
13 formal write-up, and then that's that?
14 A.      Yeah, I don't even want to say -- I don't even
15 remember if it was a formal write-up.  It was more of
16 a -- I think the specific verbiage was like a documented
17 verbal counseling.  It was just a long time ago, and it
18 wasn't something that was --
19 Q.      What did you do?
20 A.      It was --
21 Q.      Or not do?
22 A.      It was a traffic incident.  I was responding to
23 a call for service that was a hot call.  And myself and
24 my partner were in the center median, and I followed him
25 into a parking lot.  And the lady that was oncoming

Page 32

1  traffic struck my front quarter panel of the vehicle.
2  Q.      Oh, okay.  So were you technically at fault in
3  the accident then?
4  A.      I believe -- it's --
5  Q.      No judgment.
6  A.      Yeah.  Hundred percent.  They actually never
7  told me the result of it, but because I received a
8  documented verbal counseling that said, hey, don't do
9  this again, I'm pretty sure that, yeah, the result of
10 that was I was deemed at fault.
11 Q.      I see.  I see.  I see.  Okay.  Interesting.  All
12 right.  Okay.  But that's the only time you've been
13 disciplined?
14 A.      Other outside of like, hey, you know, don't do
15 this again, that's -- just verbal.
16 Q.      And what you're describing now, tell me if this
17 is -- you mean just something where one of your
18 superiors informally calls you into your office and
19 says, hey, don't be -- don't do XYZ, that was dumb or
20 something like that?
21 A.      Yes.
22 Q.      Okay.  All right.  How often does that happen?
23 A.      I don't feel like that happened very much with
24 me, but I know there's been occurrences that that's
25 happened.  I think specifically I was working graveyard

LONG vs.
FERNANDEZ

DETECTIVE JACOB DUNCAN
August 22, 2023

Page 33

1   shift, and I missed a court date or missed a court
2   appearance and I was told, hey, don't do that again.
3 Q.   Yeah. All right. Ever had your superior pull
4   you in and say I'm sick of defending you to the
5   commissioner for all the chaos you're causing around
6   town like the movies?
7 A.   No. Never had that happen. Never had that
8   happen.
9 Q.   All right, I gotcha. So most of your time is
10   spent you said now you're a detective, property crimes,
11   financial crimes, homicide if they happen. Have you
12   investigated a homicide?
13 A.   Yes.
14 Q.   Oh. I'm sure it's tragic, but it also must be
15   interesting, no?
16 A.   The facts of the case typically with homicides
17   are interesting.
18 Q.   Yeah, yeah, yeah, yeah. How do you choose -- so
19   the 10 to 15 cases you have a day, how do you pick what
20   time to allot for per case?
21 A.   I think there's a varying amount of principles
22   as far as like the severity of the case, also the
23   immediacy of the case so if there is a suspect
24   outstanding and there's a victim in danger. So I think
25   there's generally several factors that comes into play.

Page 34

1 Q.   Okay.
2 A.   Or if there's maybe a court date coming up for
3   the case, deadlines, things like that.
4 Q.   I see. Okay. So it's a constellation of issues
5   that you have to look through. And then I'm assuming
6   you just exercise your discretion then on what is
7   appropriate at the time?
8 A.   Yes.
9 Q.   Okay. There's no flowchart in your office of
10   that they hand out to detectives say prioritize this,
11   prioritize this, prioritize this?
12 A.   No. I mean, there's definitely situations where
13   your superior will come up to you and say, hey, I need
14   this done right now. And then obviously when that
15   happens, then that needs to be done right now.
16 Q.   Sure. Is there like a -- do they have a written
17   policy of what is to be prioritized?
18 A.   No.
19 Q.   No. Okay. So it's discretion based on your
20   caseload, the types of cases you have?
21 A.   Yes.
22 Q.   I gotcha. All right. I'm assuming some days
23   you have a case that -- I shouldn't say -- some days do
24   you have cases where there's just nothing to do?
25 A.   I don't think I've ever had that at the

Page 35

1   sheriff's office.
2 Q.   Really? Okay. So it's not like while I'm
3   waiting for some evidence to come in and I can't do XYZ
4   till that comes in?
5 A.   I've never had one of those days at the
6   sheriff's office.
7 Q.   Interesting. No, I didn't mean nothing to do in
8   total. I meant nothing to do for a specific case.
9 A.   For a specific case, yes.
10 Q.   Yeah.
11 A.   I've never -- I was just specifying like when it
12   comes to a day, I've never had a day where there's not
13   something to do.
14 Q.   Yeah, okay. Makes sense. Thank you. All
15   right. So have you -- I think that catches us up on
16   where you've been, so. No disciplines except for the
17   letter you received for traffic collision. And then you
18   were named in one lawsuit, and you don't know how it was
19   resolved, but it also involved traffic?
20 A.   I am named in a second lawsuit.
21 Q.   Oh, okay. What's this other lawsuit?
22 A.   The other lawsuit's an ongoing criminal
23   investigation that I can't discuss.
24 Q.   Understood. It's pending?
25 A.   Yes.

Page 36

1 Q.   Okay. All right. Okay. Well, you mean, but
2   it's -- you're named in a lawsuit, so it's -- you mean
3   you're a defendant in the criminal -- like in a
4   criminal -- like you're being charged with a crime or?
5   I'm not going to ask the specifics, but. Or is this a
6   civil case involving -- involving your role as a police
7   officer?
8 A.   It's a civil case in a criminal investigation
9   we're conducting.
10 Q.   Okay. Gotcha. I'll stop there. You sound very
11   sensitive to it.
12 A.   No, no. I just want to make sure we're clear
13   that I'm -- I'm not criminally being investigated.
14 Q.   Yeah, you're not -- you're -- but you're a
15   defendant in the case?
16 A.   Yes.
17 Q.   Gotcha. But it's another civil case?
18 A.   Yes.
19 Q.   Okay. All right. Gotcha. Okay. So have you
20   ever been involved in any cases involving -- have you
21   ever investigated, in either role, detective or, I don't
22   want to say patrolman. Police officer. Sorry, is
23   patrolman synonymous with police officer?
24 A.   Sure.
25 Q.   Okay.

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 12 of 74

LONG vs.                                                          DETECTIVE JACOB DUNCAN
FERNANDEZ                                                              August 22, 2023

Page 37

1  A.      I've heard it similar --
2  Q.      I don't know if that's the majority.  Anyway.
3  So have you ever been -- in your role in law
4  enforcement, have you ever been involved in cases
5  investigating animals for anything?
6  A.      Yes.
7  Q.      Yes.  Apart from this -- the case we're going to
8  talk about today?  So it could be, you know, an animal
9  theft.  It could be animal abuse.
10 A.      I believe so, yes.
11 Q.      Okay.  How many cases?
12 A.      Well, it's difficult for me to remember.
13 Q.      You can estimate.
14 A.      So I would imagine it's probably on the lower
15 end of the spectrum.
16 Q.      Yeah.
17 A.      As a patrol officer, if you're counting like dog
18 bite reports, different things like that, then it would
19 be more.  As far as in my capacity as a detective, I
20 would say probably less than 10.
21 Q.      How many dog bite reports did you respond to
22 when you were a police officer?
23 A.      That would be a hard number to estimate.  I
24 think that's a common call for service.  However, what
25 we actually respond to or what we would actually go and

Page 38

1  investigate would probably be also in the lower end of
2  the spectrum, probably less than like 10.
3  Q.      Less than -- less than 10?
4  A.      Yeah.
5  Q.      Okay.  All right.  So more than five do you
6  think?
7  A.      Yeah.  I would say somewhere around five would
8  probably be more of a reasonable number.  Again, that's
9  a hard number for me to estimate.
10 Q.      Because it was years ago?
11 A.      Yes.
12 Q.      But you think at least five, maybe 10, somewhere
13 between there but probably closer to five?
14 A.      Yes.
15 Q.      Okay.  All right.  And do you remember how any
16 of those cases were resolved?
17 A.      Again, those are mostly as patrol officer that I
18 handled those that's going to be more of just resolving
19 the situation, talking to both parties, and there's
20 typically not going to be a criminal proceeding that
21 comes from that.
22 Q.      Yeah, there's a -- there's an administrative
23 proceeding with the county where they do a dangerous dog
24 designation, etcetera, etcetera.  Are you familiar with
25 that?

Page 39

1  A.      I am, but we don't handle that, so to be honest
2  with you, I don't even know how those would resolve
3  because the county is --
4  Q.      Yeah, no, I understand.  So did you ever just
5  report this to whatever county agency handles those
6  hearings?  I'm assuming it's -- I don't know what agency
7  would, but did you ever report it to that -- report
8  these dog bites to that agency?
9  A.      I'm trying to remember exactly how we handled.
10 To the best of my recollection our protocol at the
11 Anderson Police Department when I was working patrol was
12 to call Haven Humane or animal control, and they would
13 take care of that referral.
14 Q.      Okay.  Okay.  Were you aware that there is --
15 there is like -- were you aware that there is some sort
16 of admin procedure to determine whether the dog should
17 be euthanized or taken away?
18 A.      Yes.
19 Q.      Okay.  Yeah, years ago I was -- they're
20 apparently very hard to win and I actually at trial
21 was -- a few attorneys called me up a year later.  I
22 think, you know, one of or one of only two that
23 miraculously got a German Shepherd was accused of biting
24 and it was -- anyway.  But I was like, you know, I was
25 just out of law school for a year, so I was very proud

Page 40

1  of myself.
2  A.      Yeah.
3  Q.      But did you -- how bad are these dog bites, by
4  the way, do you remember that?  Did you ever tell
5  anyone, look, you're fine?
6  A.      No.  I don't think I've ever actually
7  encountered one very serious, so it was more of a
8  typical, hey, we got to make sure both parties are
9  satisfied here, and then we're going to go through the
10 proper reporting procedure through animal control and
11 that's it.
12 Q.      Was it always a pit bull?  And that's no
13 judgment because I have one, but.
14 A.      I don't know.  I couldn't recall.
15 Q.      You don't recall the breed?
16 A.      No.  No.  I can't -- I just, to be honest with
17 you, recalling those specific incidents, the majority of
18 my career is spent as detective, so.
19 Q.      Yeah.  I'm not knocking pit bulls.  I mean, I
20 love my dog, if anyone has one, but I do have to watch
21 him sometimes, of course.  He's never bitten anybody,
22 but they still want to play.  You know, he sees a
23 squirrel, and he looks at it.
24 A.      Yeah.
25 Q.      All right.  Okay.  All right.  So did you ever

Page 41

1  do -- so you've done some dog -- you said as a PO or
2  police officer, you did some dog bite cases that was
3  involved with animals, or that was your involvement with
4  animals for them.  Did you ever do any cases related
5  to -- apart from the incident case we're going to talk
6  about, anything related to livestock?
7  A.    I don't believe so.
8  Q.    No, okay.  All right.  So you don't believe so.
9  Maybe?
10 A.    To the best of my recollection, no.
11 Q.    No.  Okay.  So you said as detective, you
12 investigated some animal cases also, no?
13 A.    No.  I think I was -- you said police officer
14 and detective.
15 Q.    Yeah.
16 A.    So I think I was generally referring to my time
17 as a police officer.  I'm trying to remember if I've
18 handled anything that's animal related as -- to be
19 transparent, I have handled things that are animal
20 related, but when we talk about animal-related crimes in
21 the scope of being a detective, we're probably going to
22 be talking about sex-related crimes.
23 Q.    Oh, interesting.  Tell me about it.  What have
24 you handled for that?
25 A.    Well, there has been instances of bestiality

Page 42

1  that have been investigated or evidence we found on
2  different people's electronic devices.
3  Q.    Really?
4  A.    Yes.
5  Q.    Interesting.  Terrible, but interesting.
6        A few weeks ago a professor at -- I mean a month
7  or two ago a professor at Penn State, which I went to
8  Penn State, was apparently found in the woods having his
9  way with his dog, and it's on film, so.  I think he
10 resigned.
11 A.    Yeah.
12 Q.    But interesting.  How many cases of bestiality
13 have you investigated?
14 A.    To specify, the bestiality statutes aren't going
15 to be probably as heinous as the statutes that are the
16 underlying investigation.  I think it's common to find
17 that child molesters or sexual deviants have that type
18 of content on their devices, so it's common stuff we
19 find.  So I would say --
20 Q.    Oh, I see.  So you haven't investigated
21 instances of bestiality per se.  You're just finding
22 evidence of it on the phone or video of some parties not
23 under investigation doing it?
24 A.    Yes.  And I'm currently investigating a case
25 that there is a component of bestiality in it, but

Page 43

1  that's not the underlying charges that are being
2  investigated.
3  Q.    I see.  I see.  I see.  Is the bestiality that
4  you're investigating now livestock, or is it like a
5  companion animal?
6  A.    Companion animal.
7  Q.    Dog, cat?
8        MR. NORTHCUTT: Is this an ongoing
9  investigation?
10       THE WITNESS: Yes.
11       MR. GORDON: I'm not going to ask him names.
12 Q.    All right.  Okay.  But so no cases involving
13 livestock other than the current one we're going to talk
14 about?
15 A.    If you're referencing specific livestock
16 investigations, no.
17 Q.    No, okay.  Gotcha.  All right.  How many
18 warrants have you executed in your career, would you
19 say?  As a detective and as a police officer?
20 A.    Probably several hundred.
21 Q.    Several hundred.  And do you know the difference
22 between -- what is your understanding of the difference
23 between criminal and civil for -- criminal dispute
24 versus a civil dispute?
25 A.    Well, a criminal dispute is going to have to do

Page 44

1  with an actual criminal violation of criminal code.
2  Where civil issue is going to be more of a private party
3  dispute over property or residency or something similar
4  to that.
5  Q.    Okay.  So one's private, one's public?
6  A.    Yes.
7  Q.    Gotcha.  How often do you investigate a case
8  and -- or have you in the past investigated a case where
9  you deemed, oh, this is not criminal, this is civil?
10 A.    Yes.
11 Q.    How -- okay.  So you have.  Is there a
12 particular case in mind you're thinking of?
13 A.    I think it's a common call for service as a
14 police officer and sometimes the detective where you
15 encounter situations that are deemed civil not criminal.
16       So I would say there's, as a police officer and
17 detective, there's probably hundreds of different calls
18 for service which, you know, are technically
19 investigation where we may deem something civil versus
20 criminal.
21 Q.    Okay.  Can you think of any time where you --
22 where you deemed something that's civil, I'm not
23 bothering with it?
24 A.    Mostly landlord tenant issues.
25 Q.    Interesting.  They get heated.  I used to

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 14 of 74

LONG vs.                                                    DETECTIVE JACOB DUNCAN
FERNANDEZ                                                              August 22, 2023

Page 45

1   mediate landlord stuff in LA. Interesting.
2        So you get calls from tenants or landlords?
3   A.   **Both.**
4   Q.   Both. So they want you to help with an eviction
5   or something beforehand?
6   A.   **They typically they want us to tell somebody to**
7   **leave outside of the scope of when they can tell**
8   **somebody to leave, and they haven't gone through the**
9   **proper court process.**
10  Q.   Yeah, like the three-day notice to quit and all
11  those -- are you familiar with the procedure to do an
12  unlawful detainer?
13  A.   **I am -- I am not a specialist in --**
14  Q.   But you know it exists?
15  A.   **Yes.**
16  Q.   Yeah, yeah, and then you just say, look, you got
17  to go through this court procedure to handle it?
18  A.   **Yes.**
19  Q.   All right. All right. Have you ever been
20  involved in a criminal dispute between a buyer and
21  seller? Of anything?
22  A.   **Of just property?**
23  Q.   Yeah.
24  A.   **Yes.**
25  Q.   Well, not -- there's property, and there's

Page 46

1   people. Have you been involved in that? Is there like
2   human trafficking going on in Shasta?
3   A.   **Yes.**
4   Q.   Interesting. Okay. All right. I mean
5   terrible, but interesting. Okay. I guess that's
6   ubiquitous. I guess it happens everywhere on some
7   level, right?
8   A.   **Yes, it does.**
9   Q.   Okay. So did you say -- I'm sorry. Did you say
10  you have been involved in a criminal dispute between a
11  buyer and seller?
12  A.   **Yes.**
13  Q.   Okay. What was the dispute about?
14  A.   **I don't know specifically, but I know that we've**
15  **dealt with mostly we're going to be talking about**
16  **vehicle theft.**
17  Q.   Yeah.
18  A.   **And disputes over whether or not the vehicle was**
19  **owned or not owned or borrowed or not borrowed.**
20  Q.   I see.
21  A.   **And those are going to be typically the cases**
22  **where we make a determination that it's going to be a**
23  **civil issue and not a criminal issue.**
24  Q.   I see. How often -- how often have you made
25  such a determination in let's say an automobile

Page 47

1   ownership dispute?
2   A.   **On patrol? That was --**
3   Q.   Sure.
4   A.   **-- probably a regular call, so I would say that**
5   **we'd get that every couple months or so. Maybe every**
6   **couple weeks. So over the span of my two years as a**
7   **patrol officer full time, and I would cover patrol**
8   **shifts on occasion at Anderson Police Department, so**
9   **it's hard to estimate, but I'd probably say close to**
10  **100.**
11  Q.   Oh, wow.
12  A.   **It was a common -- a common thing.**
13  Q.   Yeah. Interesting. Yesterday Fernandez, I
14  believe he said -- I'm going to say what I think he
15  said, and you tell me if it was -- I'm not trying to
16  misstate him, but I believe he said that, you know, when
17  there's auto theft cases, you know, you don't -- maybe
18  he was talking about active pursuit, but you don't
19  actively pursue them. I guess you just let it go and
20  investigate it later if someone steals a car?
21       MR. NORTHCUTT: I believe he said over county
22  lines.
23       MR. GORDON: Over -- okay. I thought he --
24  okay. All right. Okay.
25  Q.   What is the policy if there's a -- what is the

Page 48

1   typical standard operating, SOP, as he would say, for
2   when there's a car dispute? Of a stolen car, let's say?
3   A.   **Are you referencing the pursuit, or are you**
4   **referencing just a stolen car dispute?**
5   Q.   Yeah, someone reports a stolen car.
6   A.   **We're going to call that party. Typically when**
7   **we see the civil thing that you're speaking of --**
8   Q.   Yeah.
9   A.   **-- what we'll see happen is that we'll also see**
10  **the other party call in --**
11  Q.   So you got two people saying --
12  A.   **Separate, different things.**
13  Q.   Different things, okay. And then you say it's a
14  civil?
15  A.   **Based on once you actually get the facts of the**
16  **case. And so say the other party who is accused of**
17  **stealing it has some evidence to say I didn't steal it,**
18  **you know, look, I paid for it or --**
19  Q.   Yeah.
20  A.   **-- they allowed me permission to borrow it.**
21  Q.   Yeah.
22  A.   **I would say the most common thing you see is**
23  **that somebody will lend somebody their car.**
24  Q.   Yeah.
25  A.   **And then they no longer want them to have**

Page 49

1 possession of their car, so then they'll report it as
2 stolen. And the other party said, no, they lawfully
3 allowed me to use it, and so now it's a civil issue.
4 Q.   I see.
5 A.   Yeah.
6 Q.   All right. Okay. Interesting. All right. So
7 what did you review to prep for this deposition today?
8 A.   I reviewed my report and -- yeah, pretty much
9 that's what I did for my deposition today.
10 Q.   All right. Did you review the complaint?
11 A.   Yes.
12 Q.   In the matter? Okay. For the -- you mean you
13 read it, or do you mean you reviewed it for today?
14 A.   I reviewed it for today. I think I reviewed the
15 actual complaint items that looked like they had to do
16 with the actions that, you know, had to do with me.
17 Q.   Yeah. Okay. Just admit everything on camera.
18 All right. Okay. So do you have -- do you have
19 any -- I mean, yesterday here's how I posed the question
20 to Fernandez. He knew what I meant, so same thing to
21 you.
22      Do you have any -- in your life have you had any
23 involvement with agriculture? Did you grow up on a
24 farm? Did you -- do you own livestock?
25 A.   We had horses as a child.

Page 50

1 Q.   Oh. Did you ride?
2 A.   Yep.
3 Q.   Cool. Do you still have horses?
4 A.   No.
5 Q.   No. Lot of work?
6 A.   I was tasked with cleaning up the horse manure
7 as a child, and I didn't want to do it any longer as an
8 adult.
9 Q.   But I will say this. I've been around -- I have
10 not lived with livestock, but I've had -- been a lot
11 around in my role doing animal stuff been around enough
12 livestock and rescues and whatnot. On the hierarchy of
13 animal crap, horses is not the worst. I mean --
14 A.   That's fair.
15 Q.   It's mainly hay, you know, so. All right. So
16 you cleaned up a lot of horse crap, and you don't want any
17 more livestock.
18      Okay. So were you in 4-H as a child?
19 A.   No.
20 Q.   Okay. FFA?
21 A.   No.
22 Q.   Are you married?
23 A.   Yes.
24 Q.   Does your wife have any involvement with 4-H or
25 FFA?

Page 51

1 A.   Not to my knowledge.
2 Q.   Not to your knowledge. But maybe? Or you just
3 never asked her?
4 A.   I've never specifically asked her if she did 4-H
5 or FFA.
6 Q.   It's not dinner table conversation?
7 A.   No.
8 Q.   Gotcha. What about your kids, are they involved
9 in 4-H or FFA?
10 A.   No children.
11 Q.   No children. Okay. All right. Me neither.
12 Constant source of argument with my wife because I want
13 them. But I'm older than you. How old are you, by the
14 way?
15 A.   28.
16 Q.   28. All right. Just gets worse. I'm 43, so.
17      All right. 28, so you were -- what year were
18 you born then? What year were you born?
19 A.   1995.
20 Q.   So you never even saw the 80s?
21 A.   No.
22 Q.   You can just --
23 A.   Just on movies.
24 Q.   You can look at Stranger Things and say that
25 looks pretty cool. Let me tell you, I remember it. It

Page 52

1 was pretty cool. Everything was happy, then the 90s
2 came and it just, you know, everything seemed somber.
3 Anyway. All right.
4      Okay. So are you -- do you know a person by the
5 name of Kathie Muse?
6 A.   I know the name.
7 Q.   You know the name. Have you met her?
8 A.   I don't recall if I specifically met her.
9 Q.   You don't recall if you specifically met her?
10 A.   I don't remember a specific circumstance where I
11 met her. I go to public functions, so I wouldn't be
12 surprised if I have, but I don't specifically remember
13 if I've ever met her.
14 Q.   Okay. So you might have -- you might have met
15 her?
16 A.   I may have.
17 Q.   You may have, okay. May have, whatever you want
18 to phrase it, okay.
19      And how long have you known of her?
20 A.   I don't even know if I can estimate that. I've
21 just known --
22 Q.   Let me ask it this way. Did you know her before
23 this case?
24 A.   Yes.
25 Q.   Before the investigation you conducted that's at

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 16 of 74

LONG vs.                                                    DETECTIVE JACOB DUNCAN
FERNANDEZ                                                        August 22, 2023

Page 53

1  issue in this case?
2  A.  Yes.
3  Q.  Yes.  Okay.  All right.  And so is it just -- do
4  you know her simply because of -- well, Muse Trucking,
5  is that her company?
6  A.  I don't even know how I -- I just know she's a
7  popular figure within the public.
8  Q.  She's a local celebrity?
9  A.  Yes.
10 Q.  Okay.  Interesting.  Is that an accurate -- I
11 was making that up.  Is that -- would you say that's an
12 accurate term?  She's a -- how would you describe her,
13 her role?
14 A.  The context I would say where I would say a
15 local celebrity would be just somebody where most people
16 know the name.  I don't know necessarily the context of
17 what she does or anything like that.
18 Q.  But you are generally aware of her?
19 A.  Yes.
20 Q.  Are most people in your experience do you think
21 in Shasta generally aware of her?
22      MR. NORTHCUTT: Objection.  Calls for
23 speculation.
24      MR. GORDON: You can speculate.
25      THE WITNESS: I would say that I'm involved in a

Page 54

1  lot of non-profits, things like that, and so I wouldn't
2  say everybody does.  I generally hear a lot more of
3  names of people that are involved in the public, so it
4  would be hard for me to speculate whether or not --
5      MR. GORDON: Q.  Would you say she's a public
6  figure?
7  A.  I don't -- I wouldn't -- I don't know.
8  Q.  Pushing it too much maybe?
9  A.  Yeah.
10 Q.  Okay.  But people know her.  She's -- more than
11 the average person?
12 A.  Yes.
13 Q.  Okay.
14 A.  I would say so.
15 Q.  All right.  Okay.  All right.  So you said
16 you're involved in some non-profits.  What non-profits
17 are you involved in?
18 A.  I'm on the board of Pathways to Hope for
19 Children.
20 Q.  What is that?  I think I've heard of that, but I
21 don't know.  Something with a similar name at least.
22 A.  They run the teen centers here, and they also
23 provide assistance to parents that essentially need
24 assistance for children.  It's specifically --
25 specifically tasked with providing resources for

Page 55

1  children 12 to 17.
2  Q.  Oh, that's great.  So are these kids
3  underprivileged youth, or do you have like -- are they
4  sick or is it just --
5  A.  I would say the target is for children that are
6  in adverse circumstances.  However, we help out kids --
7  Q.  Like adverse like they're going to be hauled
8  into juvenile court on a 300 petition or -- you know
9  what that is, I presume, right?
10 A.  That's included.  I would say it's also, you
11 know, maybe an upbringing from poverty or also maybe
12 poor parents, addicted parents.  There's a spectrum of
13 resources.  I think the program does a really good job
14 of trying to address children's needs 360 degrees.
15 Q.  Yeah.  That's great.  Good for you.  Any other
16 non-profits?
17 A.  I also do a lot of work with the Children's
18 Legacy Center.
19 Q.  What's that?
20 A.  They provide forensic interviews for children of
21 various different crimes.
22 Q.  Oh, okay.
23 A.  They also now do foster care and providing
24 mental health services to those victims that we identify
25 in our cases as well.

Page 56

1  Q.  Oh, wow.  How many -- interesting.  How many
2  kids are these, you know, non-profits providing services
3  for this year?  Just out of curiosity.
4  A.  I would say hundreds.
5  Q.  Hundreds?  Wow.
6  A.  They're both very successful organizations.
7  Q.  That's really great.  Good for you.  And you're
8  on the board of both?
9  A.  I'm on the board for Pathways to Hope.  I was an
10 MDT, or multiple disciplinary team member, for CLC.
11 Q.  Okay.  You're making it hard for me to dislike
12 you, Detective.  Just kidding.
13      All right.  So you know -- let's get back to the
14 more pertinent issues.  You know who Kathie Muse is.
15 You knew who she was beforehand.  You probably haven't
16 met her, but you might have, but you don't remember ever
17 having a conversation with her?
18 A.  Yes.
19 Q.  What about her husband?  Ever meet him?
20 A.  That would probable be the same answer.  I don't
21 know if I've ever specifically met him.
22 Q.  Does he have quite as much panache as her around
23 town?  Is he as known?  Or is it just Kathie is the one
24 who is known?
25 A.  I don't know his name, so.

Page 57

1 Q.    So is that the answer? No, he doesn't.
2 Everyone knows Kathie but not the husband?
3 A.    Yeah. I would say that I don't know his name,
4 but I do know Kathie Muse's name.
5 Q.    Interesting. Okay. Okay. All right. And were
6 you aware of her involvement with 4-H or relationship --
7 shouldn't say "involvement," whatever it is, but her
8 relationship with 4-H?
9 A.    I knew that a relationship existed. I don't
10 know the involvement or what she actually does with 4-H.
11 And that's going to be based on my limited knowledge of
12 4-H in general --
13 Q.    Yeah, okay. Okay. Did you ever attend any
14 livestock auctions or 4-H programs? That's a terrible
15 question. Strike that.
16       Did you ever attend any livestock auctions?
17 A.    -- I've never specifically attended a livestock
18 auction. I think that when I've attended like the
19 Shasta Fair, they've been going on, and I've, you know,
20 seen them, but I haven't actually gone to the
21 fairgrounds specifically for a livestock auction.
22 Q.    So like most people, I've gone to county fairs
23 too. You know, it's out of sight, out of mind. Just
24 going there for a funnel cake.
25 A.    Yeah.

Page 58

1 Q.    So. Okay. All right. So -- okay. What was
2 the other question I asked? I asked about livestock
3 auctions.
4       Oh yeah, have you ever attended any 4-H
5 activities or sponsored activities by 4-H? Or FFA?
6 A.    I think as an association, I was the Anderson
7 Police Officer's Association president for several
8 years, and I'm currently on the board for the Deputy
9 Sheriff's Association. I know that we have donated in
10 the past to those, but I don't know specifically which
11 ones.
12 Q.    Were you determining if the donations went
13 there?
14 A.    No. No. The board chair of the board doesn't
15 typically make those decisions themselves. It's going
16 to be on a vote from the actual membership as a whole.
17 Q.    I see. Did you vote for them to go there?
18 A.    I most likely did.
19 Q.    Most likely did, okay. Okay. All right. So it
20 would be maybe reflected in meeting minutes somewhere
21 and this is -- I understand it. That's probably not
22 seeming like something material to remember in the
23 moment, no, because you've voted on a lot of things, I
24 presume?
25 A.    Yes.

Page 59

1 Q.    Do you remember -- okay. So you were -- and
2 this was you said was Anderson PD Association did you
3 say?
4 A.    Yeah. I'm talking generally as in like I know
5 there's been times where we've given presentations for
6 children say they're associated with 4-H. I can't
7 recall specific instances that that would have happened.
8 Q.    But this is all when you were at Anderson?
9 A.    No. I think it's also happened at the Deputy
10 Sheriff's Association as well.
11 Q.    Okay. So you've done -- have you done -- so
12 you've been involved in presentations with the sheriff's
13 department that -- explain -- I'm just confused.
14       So the kids come and do a presentation, or you
15 go and do a presentation at some 4-H-sponsored activity?
16 A.    No. Typically 4-H will come and solicit
17 donations from one of the respective associations.
18 Q.    So 4-H will come to solicit donations from the
19 sheriff's department?
20 A.    No. The Deputy Sheriff's Association.
21 Q.    Oh, okay. Okay. So it's a sheriff's
22 association associated with the sheriff's department?
23 A.    So sheriff's association is going to be the
24 labor union or the union that's going to represent --
25 Q.    It's your public union?

Page 60

1 A.    Yes.
2 Q.    Gotcha. Gotcha. Okay. So they solicit
3 donations occasionally from your public union?
4 A.    It's going to be under the scope of something
5 similar to can you sponsor a dinner or something along
6 those lines.
7 Q.    Ever ask you to bid on animals?
8 A.    I don't believe so.
9 Q.    No. Okay. Okay. Have they -- do they come up
10 and personally ask you for a donation like, hey,
11 Detective Duncan, can you sponsor XYZ?
12 A.    I've never been personally asked.
13 Q.    Okay. So they just come to -- is there a public
14 meeting for your union, and they come to that?
15 A.    I don't know if it's public meeting, but it's a
16 meeting for our membership.
17 Q.    Okay. Okay. Okay. All right. Gotcha.
18 Interesting. And this happens yearly?
19 A.    I wouldn't be able to estimate. I just know
20 it's happened before.
21 Q.    Does it happen around -- did it happen this June
22 or so?
23 A.    To my knowledge, it did not happen around when
24 this happened.
25 Q.    No, no, no. I meant there's an annual fair each

Page 61

1  year at Shasta, right?  Or in June and July of each year
2  there's a state fair, Shasta County Fair.  Does it
3  happen around that?
4  A.      No.  I actually think the last time that I
5  recall receiving any type of solicitation for a donation
6  was 4-H mentioned a dinner in October, I believe.  But
7  that's also based on my recollection.  It wasn't
8  something that was significant to me, so.
9  Q.    Yeah.  Okay.  All right.  Okay.  All right.  Do
10  you know -- so your only connection to 4-H or -- is that
11  the same for FFA?  Are they coming and soliciting
12  donations?
13  A.      Well, to be honest with you, I'm not familiar --
14  very familiar with 4-H or FFA, so when I tell you that
15  it might, I'm using them interchangeably.  So when I say
16  4-H came and did that, it might have been FFA.
17  Q.    You don't know, okay.  Okay.  All right.
18  Gotcha.  And any other -- and any other -- are you
19  lumping in any other potential youth farming
20  organizations?
21  A.    Not to my knowledge.
22  Q.    Okay.  Do you know of any others?
23  A.    No.
24  Q.    Okay.  I don't know if there is or not.  Maybe
25  there is.  Okay.  So -- interesting.

Page 62

1      So to your best of your memory, that's your only
2  connection to any of those youth farming organizations
3  is potentially they're soliciting donations from your
4  public union?
5  A.    Yeah, we'll have some kids that come in that
6  say, hey, can you help us out with sponsoring a dinner.
7  Q.    Yeah, okay.
8  A.    And that's not uncommon from any group of
9  children that come in from an organization asking us --
10  Q.    Lots of kids come in for -- asking for cash.
11  All right.  Interesting.
12      Do you know a gentleman named Bruce Macfarlane?
13  A.    The only way or only reason I know that name is
14  because it was brought up to me today.
15  Q.    Interesting.  Okay.
16      MR. NORTHCUTT: No discussions of any
17  conversations that we've had.
18      MR. GORDON: Yeah, yeah, yeah.  Don't tell me
19  what you talked about with him.
20      MR. NORTHCUTT: Have you ever heard the name,
21  Bruce Macfarlane, other than today?
22      THE WITNESS: No.
23      MR. GORDON: Q.  Interesting.  Okay.  Okay.
24  We'll get to that.
25      All right.  So -- do you -- have you ever heard

Page 63

1  the name, Melanie Silva?
2  A.      Not -- no, I haven't.
3  Q.    You mean not before today or not ever?
4  A.      Prior to today and let me -- let me specify.
5  Q.    Yes, please.
6  A.    I reviewed a report, and I believe their names
7  were in it.  It wasn't something that stood out to me,
8  but.
9  Q.    So you did see Macfarlane's name prior to today?
10  A.    Yeah, that's what I'm specifying.
11  Q.    Yeah, please do.
12  A.    I do believe I read his name in our report
13  prior.  But I -- as far as his involvement or who he is,
14  I've never actually taken measures to identify who he
15  is.
16  Q.    Okay.  But -- okay.  But you know -- you know
17  who I'm referring to?
18  A.    Yes.
19  Q.    Okay.  It's not a gotcha.  I just want to make
20  sure we're on the same page.
21  A.    I know.
22  Q.    But you --okay.  But you only know of him from
23  the -- from the investigative summary of the case we're
24  here to discuss today?
25  A.      The only reason why I know either of those names

Page 64

1  is because of the report drafted by Lieutenant
2  Fernandez.
3  Q.    Okay.  So you've never met Bruce Macfarlane?
4  A.    I believe I have met Bruce Macfarlane, but I
5  didn't know who he was when I met him.
6  Q.    Didn't know his name, I understand.  Okay.  All
7  right.  And when did you first meet him?
8  A.    I believe, and I might -- I'm hoping I'm not
9  misquoting the report, but I believe that's who we
10  dropped --
11  Q.    I'll show you the report shortly, but.
12  A.    I believe that's who the goat was dropped off
13  to.
14  Q.    Okay.  So the reason I'm not showing you the
15  report is I'm entitled to know what you actually
16  remember and what you know.  It's not meant to trip you
17  up because we can both read from the report.  It says
18  what it says, right?  So the report might say XYZ, but I
19  need to know what you remember.  And I can show it to
20  you to refresh your memory, which I will, and maybe it
21  will jog your memory on some things, but right now I'm
22  just trying to see what you know, what you can actively
23  recall.
24  A.    Yeah.
25  Q.    If you don't really know anything, maybe --

---

Page 65

1  maybe you say, I don't know that, then you see it later,
2  you can tell me, hey, this is -- this just jogged my
3  memory. You know, what I said earlier, let me -- let me
4  fix that because I did know XYZ.
5  A.     And that's what I was trying to establish is
6  that I recognize his name as mentioned in the report.
7  Q.     Yeah, you didn't know his name, but you've met
8  him or you -- did you have any words with him?
9  A.     I don't recall the conversation that happened.
10  I don't recall specifically me saying anything to him.
11  Q.     Okay. You don't recall, but you were -- but a
12  conversation was had?
13  A.     I imagine --
14  Q.     Not just pleasantries, but a conversation was
15  had?
16  A.     I imagine there was a conversation had just
17  based on, you know, the human communication.
18  Q.     Yeah, yeah, yeah. We're not --
19  A.     We're not going to silently encounter --
20  Q.     Everything communicates. Even mole rats, I'm
21  sure they're saying something to each other. Okay. All
22  right. My cats communicate to each other. My dogs
23  communicate to each other. All right. Okay.
24        So you met him one time, but you didn't know --
25  you were not aware of him. Did you by any chance know

Page 66

1  his name as BJ Macfarlane?
2  A.     No.
3  Q.     You weren't trying to do a gotcha with I never
4  knew Bruce, but I knew BJ?
5  A.     No. No. I'm not trying to do a gotcha.
6  Q.     All right. Okay. And so Melanie Silva, you did
7  know who she was?
8  A.     No. Same type of circumstance.
9  Q.     Okay. Okay. Have you ever met Melanie Silva?
10  A.     I don't believe so.
11  Q.     Ever spoke with her on the phone?
12  A.     I don't believe so.
13  Q.     Ever communicated with her in any way?
14  A.     I don't believe so.
15  Q.     Okay. Do you ever -- did you ever attend the
16  Shasta District Fair?
17  A.     Yes. I've attended the Shasta County Fair
18  before.
19  Q.     Do you recall if it's the Shasta County Fair or
20  if it's the Shasta District Fair?
21  A.     Well, I think that --
22  Q.     I don't know why they call it Shasta District
23  Fair.
24  A.     I think it's more proper to say Shasta District
25  Fair, but.

Page 67

1  Q.     But you know what I'm talking about?
2  A.     Yeah.
3  Q.     Yeah. When I was trying to figure out how to
4  serve them, you know, because it's an organization
5  created by the state, and I couldn't -- anyway.
6        The Shasta District or Shasta County, because
7  it's a nonprofit but a similar name, I was confused.
8  Every other county is X County Fair. Why is this one
9  different.
10  A.     Yeah.
11  Q.     All right. Okay. So you've attended the fair
12  before?
13  A.     Yes.
14  Q.     Okay. How often?
15  A.     I believe I've only attended the Shasta District
16  Fair a couple times.
17  Q.     Do you know what years?
18  A.     I do not.
19  Q.     It's only once a year, right? I mean, it's a
20  few days, but it's annually, to your knowledge, it's
21  like in June or July of every year?
22  A.     I believe so.
23  Q.     Do you know what years you would attend? They
24  don't have a Shasta Fair in December?
25  A.     I don't believe so. That gives a scope of how

Page 68

1  well I -- how often I've gone. I don't remember.
2  Q.     Yeah, yeah, yeah, yeah. To be honest, I don't
3  know. I think -- I think annual fairs in the state are
4  just once a year. But I have not examined this, so.
5        MR. NORTHCUTT: I think annual means once a year
6  too.
7        MR. GORDON: Yeah, you're right. Yeah, I
8  answered my own question. But I don't know if they're
9  all annual. I don't know if they're biannual. I just
10  know they have -- you know, it seems to be in the summer
11  around this time.
12        THE WITNESS: Yeah.
13        MR. GORDON: Q. So you attended -- do you
14  remember what years you attended?
15  A.     I do not.
16  Q.     Okay. Did you attend this prior year? Or this
17  year, let's say, a few months ago?
18  A.     I actually -- I actually believe I was at the
19  last fair because I was a working recruitment booth --
20  Q.     I see.
21  A.     -- at that fair.
22  Q.     Recruitment for?
23  A.     The Shasta County Sheriff's Office.
24  Q.     Okay. Yesterday Fernandez said you were looking
25  to hire I think he said four; is that accurate?

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 20 of 74

LONG vs.                                                                    DETECTIVE JACOB DUNCAN
FERNANDEZ                                                                        August 22, 2023

Page 69

1  A.    I think so.
2  Q.    So out of -- 75 would be full he said, and you
3  were down, I think he said, four?
4  A.    I believe so, yeah.
5  Q.    Okay.  So you were at this year's fair at the
6  recruitment booth?
7  A.    Last year's.
8  Q.    Oh, 2022 you said?
9  A.    I believe it was last year.
10 Q.    You didn't attend the fair this year?
11 A.    Not to my knowledge.
12 Q.    So but this year's fair was only what month?
13 Are we in August?  Okay.  So it would have only been
14 six, seven weeks ago?  You don't remember attending
15 then?  You can't confirm you didn't attend?
16 A.    I did not.
17 Q.    You did not.  Do you remember you attended 2021
18 fair?
19 A.    I don't recall.
20 Q.    Any other years that you recall?
21 A.    I can't recall specific years.  And just to
22 provide context, there's a lot of events that happen at
23 the Shasta District Fair, and I'm not really privy to
24 know -- not necessarily privy but it's -- I can't
25 differentiate if I went to Shasta District Fair or if I

Page 70

1  went there for the fireworks, but I know I've only been
2  there for an event only a couple times.
3  Q.    To the fairgrounds you mean?
4  A.    Yes.
5  Q.    All right.  So you might have been there for the
6  fair.  You might have been there for fireworks.  You
7  might have been there for -- they have multiple events
8  per year?
9  A.    Yes.
10 Q.    Okay.  Gotcha.  And you don't know what years
11 you were there?
12 A.    I do not.
13 Q.    But it was -- you were at the fair in 2022, at a
14 booth, and you've been there other times, but you just
15 don't recall when?
16 A.    Yes.
17 Q.    All right.  Did you -- did you ever attend any
18 of the livestock auctions at the fair?
19 A.    I believe I previously answered that.
20 Q.    You did.  You can answer again.
21 A.    Okay.  I never specifically attended a livestock
22 auction.  I believe I've gone when there is livestock
23 auctions going on.
24 Q.    Okay.  So you never bid at any livestock auction
25 then?

Page 71

1  A.    No.
2  Q.    Okay.  All right.  That's fine.  So do you know
3  of anyone -- do you know who sits on the Shasta Fair's
4  board of directors?
5  A.    No.
6  Q.    So you -- has anyone ever told you of anyone who
7  sits on the board of directors?
8  A.    Not to my knowledge.
9  Q.    Okay.  So you've never met anyone who sits on
10 the board of directors, to your knowledge?
11 A.    I don't know their identities, so I can't answer
12 whether or not --
13 Q.    Yeah, that's why I said, "to your knowledge."
14 You don't --
15 A.    Yeah.
16 Q.    Okay.  All right.  Okay.  Do you know who
17 Jessica Long is?
18 A.    Yes.
19 Q.    Did you -- prior to your investigation that
20 we're going to talk about today, had you ever met her?
21 A.    No.
22 Q.    Okay.  Did you ever meet her daughter?
23 A.    No.
24 Q.    Okay.  Did you ever meet Chad Fowler?
25 A.    I have difficulty at the time even like

Page 72

1  remembering who Chad Fowler is, so I'm going to say no.
2  Q.    So you're not familiar with the name, Chad
3  Fowler?
4  A.    I know he's mentioned in the report.  I don't
5  necessarily know his identity.
6  Q.    Okay.  You can't place a face with the name?
7  A.    No.
8  Q.    Okay.  All right.  So you don't think you've
9  ever met him?
10 A.    No, I don't believe I've ever met him.
11 Q.    Okay.  All right.  It's not meant to be a
12 gotcha.
13 A.    No.
14 Q.    Okay.  Let me -- mind if we take a bathroom
15 break?
16 MR. NORTHCUTT:  Sure.
17 THE VIDEO SPECIALIST:  We're off the record, and
18 the time is 10:43.
19 (Whereupon, a break was taken from 10:43
20 till 10:54 a.m.)
21 THE VIDEO SPECIALIST:  We're back on the record,
22 and the time is 10:54.
23 MR. GORDON:  Q.  Okay.  All right.  So you
24 understand you're still under oath?
25 A.    Yes.

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 21 of 74

LONG vs.                                                    DETECTIVE JACOB DUNCAN
FERNANDEZ                                                          August 22, 2023

Page 73

1   Q.   All right. Slowing it down. A moment ago you
2   mentioned off the record, so I forgot to ask about this
3   earlier, but you've testified in criminal trials before,
4   yes?
5   A.   Yes.
6   Q.   How many times have you testified?
7   A.   Probably close to 100, I'd say.
8   Q.   Close to 100, okay. And this is since your --
9   since 2016?
10  A.   Yes.
11  Q.   Okay. Interesting. Okay. All right. That's
12  it. Just curious. Okay.
13       All right. Okay. So I'm going to hand you a
14  document, which based off Fernandez's testimony
15  yesterday, I believe is complete. So do you want a
16  copy, or are you good?
17       MR. NORTHCUTT: I have a copy.
18       MR. GORDON: You have a copy. There you go.
19  Q.   So take a look through that and tell me if it's
20  complete.
21  A.   Is this the copy of the report?
22  Q.   It is. And the -- so the way Fernandez
23  explained it to me that if someone goes and asks for a
24  copy of the report, the day the -- you know, of the
25  investigation, this is what they would receive

Page 74

1   basically. So it would be what I'm describing as, you
2   know, the report, the summary with the evidence that is
3   there -- that is attached to it.
4        So I realize, however, there's an audio file
5   which I believe is also in your evidence which obviously
6   is not attached to that, so. But the paper report, that
7   is -- that is -- just tell me if that is verified as the
8   document?
9        (Pause in proceedings.)
10  A.   And just to specify, he is the case agent, so if
11  there's something that would be missing from there, that
12  would be him to say that. I would not be the one to
13  verify the completeness of it.
14  Q.   I understand. Yesterday he testified, and your
15  lawyer's not correcting me so you can assume it's true,
16  that what I'm giving you now, assuming it goes up to
17  page 68, would be the complete report. If that is the
18  word we're going to use.
19  A.   Okay.
20  Q.   If you have a different word, I'm happy to use
21  it, but that's just the shorthand that I'm using.
22       MR. NORTHCUTT: You mind if I ask a question?
23       MR. GORDON: Sure.
24       MR. NORTHCUTT: Can you verify one way or the
25  other if this is the complete report --

Page 75

1        THE WITNESS: No.
2        MR. NORTHCUTT: -- or is that something only
3   Lieutenant Fernandez would be able to tell us?
4        THE WITNESS: I would not know whether or not
5   this is a complete report. That would be -- I'm just
6   reviewing it to see the contents of it.
7        MR. GORDON: That's fine. Keep going.
8        (Pause in proceedings.)
9        THE WITNESS: So just so you're also aware, this
10  is the first time I'm seeing many of these attachments.
11       MR. GORDON: Okay.
12       (Pause in proceedings.)
13       MR. GORDON: Q. I don't know if those are in
14  the order you screenshotted them.
15  A.   I don't know. I recognize these.
16  Q.   Yeah, I figured you'd recognize them. That's
17  why I'm volunteering my two cents here. But that was
18  the order they were produced in discovery, so.
19       (Pause in proceedings.)
20  A.   Everything that was part of my investigation
21  that I'm aware of is in here outside of an email I
22  received from Raymond Allen's attorney that said
23  something similar to I appreciate our conversation. If
24  you need anything else from us, please let me know.
25  Q.   Did you produce that in discovery, the email? I

Page 76

1   don't think I've seen that.
2   A.   I don't know. I know I emailed it over to my
3   attorney.
4   Q.   Okay. Did --
5        MR. NORTHCUTT: I don't recall seeing that, but
6   maybe we can get a copy of it.
7        THE WITNESS: Yeah. I could easily get a copy.
8        MR. GORDON: Q. Yeah. But the contents of it
9   were just can you paraphrase or to the best of your
10  memory?
11  A.   The contents of it are going to be something
12  similar to thank you for the conversation, you know,
13  with my client. If you need anything else, here's his
14  information, and here's my information.
15  Q.   Okay. What conversation --
16       MR. NORTHCUTT: We'll get you a copy.
17       MR. GORDON: Okay. I appreciate that.
18  Q.   What conversation was he referring to in the
19  email?
20  A.   He called me and introduced himself as his
21  attorney the day prior to that email. And I don't know
22  the specific date.
23  Q.   Do you know about when the email was sent?
24  A.   No. I don't.
25  Q.   Okay. Oh, yeah. You did -- you did produce it.

**Page 77**

1   MR. NORTHCUTT: Okay.

2   MR. GORDON: All right. Okay. So we'll get to

3   it then in the package I have. Whatever reason, it

4   didn't register. All right. We'll get to that then.

5   Great.

6   Okay. So -- so I'm going to mark this Exhibit

7   A.

8   (Whereupon, Plaintiff's Exhibit A, Shasta

9   County Sheriff's Office Incident Report,

10   totaling 68 pages, was marked for

11   identification.)

12   MR. GORDON: Q. All right. So what is -- how

13   would you describe the document before you? What is

14   that?

15 A.   That appears to be the report for the incident

16   in question and also attachments from the investigation.

17 Q.   Okay. So you testified that you had never --

18   when was the first time you heard of Jessica Long?

19 A.   On the date of this incident when I was told

20   that I was going to be assisting with an investigation.

21 Q.   And who told you you were going to be assisting

22   with an investigation?

23 A.   I believe at first it was my lieutenant, who is

24   Chris Edwards. But that was through Lieutenant Jerry

25   Fernandez.

**Page 78**

1 Q.   Okay. So did Chris Edwards report to Fernandez?

2 A.   No.

3 Q.   Okay. They're both lieutenants?

4 A.   Yes.

5 Q.   Okay. So it's your understanding that Fernandez

6   asked Edwards to ask you to assist in the investigation?

7 A.   I don't think it was more of an ask. It was

8   like, hey, you're going to be helping out with this

9   investigation.

10 Q.   A command. Okay. Okay. Gotcha. All right.

11   So you had no choice to assist?

12 A.   The only ask I was posed was what are you doing

13   tonight. And are you available. To which I said, yes,

14   I am available. And then I was told, okay, you're going

15   to be helping Lieutenant Fernandez with this, and he'll

16   brief you on it.

17 Q.   Okay. All right. So -- and that's -- and this

18   is Chris Edwards speaking to you at that time?

19 A.   Yes.

20 Q.   Okay. All right. And so what did he tell you

21   you were going to be helping out with?

22 A.   Well, that was a conversation from memory from

23   my recollection because it was a verbal conversation.

24   There's no recording of it.

25   So what I can recall, best of my memory is

**Page 79**

1   specifically what I just said is that he asked what my

2   availability was for that day, and I said I was

3   available. And then he said you're going to be

4   assisting Lieutenant Fernandez with the investigation.

5   And I don't believe he told me what that investigation

6   was.

7 Q.   Okay. So what did you do next?

8 A.   I believe I called Lieutenant Fernandez. And I

9   don't believe -- I don't even believe we had a phone

10   conversation. I think he told me to meet him at the

11   sheriff's office patrol office, patrol ops. And I met

12   him there in person, and he briefed me on the incident

13   there.

14 Q.   And what date is this?

15 A.   I believe it was the date on the report which

16   would be -- well, it wouldn't -- I believe it was July

17   8th. If you want me to refer to it, I can tell you the

18   specific date, but.

19 Q.   You may refer to it if it refreshes your memory.

20   I mean, don't -- you can refer to it to look at it to

21   jog your memory. Don't refer and say, "This says July

22   8th."

23 A.   Of course, yeah. It was July 8th.

24 Q.   Okay. July 8th. What time did Chris Edwards

25   tell you this on July 8th, back to his conversation?

**Page 80**

1 A.   I don't recall a specific time. Estimation, it

2   would probably be in the afternoon because I was -- I

3   knew I was close to getting off work.

4 Q.   Okay. So three o'clock, four o'clock?

5 A.   Somewhere around probably three or four o'clock

6   in the afternoon.

7 Q.   And were you familiar -- so this investigation

8   predates that day, July 8th. It was started earlier,

9   that's your understanding, yes?

10 A.   I didn't know that at the time. I do -- I know

11   that now, but that's just based on reviewing the

12   reports.

13 Q.   Okay. So -- okay. So what did -- so when Chris

14   Edwards told you to, you know, contact Fernandez, you're

15   helping out with this investigation, you knew no facts

16   of this investigation?

17 A.   I don't believe so.

18 Q.   You didn't hear there's a missing goat?

19 A.   No.

20 Q.   You didn't hear Jessica Long's name?

21 A.   I don't believe I knew anything about this

22   investigation until I was told about it by Lieutenant

23   Fernandez.

24 Q.   You didn't hear that Kathie Muse is going to

25   rain hellfire or anything like that?

Page 81

1  A.    No, I did not.
2  Q.    Okay. All right. Okay. So you meet at the
3  sheriff's patrol office. What time did you meet
4  Fernandez at the sheriff's patrol office?
5  A.    I think it was closer to when I was supposed to
6  be off work, somewhere around 4:30 or 5. That's an
7  estimation. I don't know specifically what time.
8  Q.    That's fine. Yeah, best estimate. So 4:35 you
9  meet Fernandez at the sheriff's patrol office. Did you
10  have any idea at that point in time what you were going
11  to be doing with respect to the investigation?
12  A.    I think he told me it was a livestock
13  investigation.
14  Q.    No, no. Before you even spoke to him, did you
15  have any idea what you were going to?
16  A.    I don't believe so. I can't recall if I went by
17  our major crimes unit prior to going there because I
18  know Detective Ashbee was aware of the investigation
19  because he was briefed on having to write a search
20  warrant.
21  Q.    Yeah.
22  A.    But as far as the order of events, I know I went
23  to patrol operations. I met with Lieutenant Fernandez.
24  But I might have also gone -- I can't recall if I went
25  to major crimes unit before or after meeting with

Page 82

1  Lieutenant Fernandez. So I can't recall if I first
2  heard about the incident from Jeremy Ashbee or Jerry
3  Fernandez.
4  Q.    Okay. So Chris Edwards says contact Fernandez.
5  You might have gone to major crimes after that and spoke
6  with Ashbee, or you might have just gone to see
7  Fernandez?
8  A.    I know that I went to major crimes unit. I just
9  can't remember if I did it before or after going to the
10  patrol operations.
11  Q.    Okay. All right. So -- okay. Well, let's do
12  one at a time.
13         So you went to the patrol office at 4:30, 5
14  p.m., you assume?
15  A.    Yes.
16  Q.    Or you estimate. And you speak with Fernandez
17  there. What do you two discuss?
18  A.    Something similar to I need your help coming
19  down with me to conduct a livestock investigation.
20  Q.    Okay. Did he give you any other details?
21  A.    I think he was very general. It was essentially
22  there was a lady who had stolen a goat from the county
23  fair. And --
24  Q.    Okay. This is what he told you?
25  A.    Yes.

Page 83

1  Q.    Yeah, he used the term, "stolen"?
2  A.    Yes. Yes. It was my understanding that the
3  goat was stolen from the county fair.
4  Q.    All right.
5  A.    And, again, it was the -- my understanding of it
6  was very general. He didn't tell me a huge amount of
7  details on it. And I knew that there was the
8  possibility the goat was then dropped off at a goat
9  sanctuary down in Napa.
10  Q.    Yeah. So what other -- so what -- okay.
11  Generally, you said. What other details -- you said he
12  didn't tell you many details. What details did he tell
13  you?
14  A.    To the best of my recollection, what I knew is
15  there was a goat stolen from the county fair and that it
16  was dropped off at a goat sanctuary. He -- I imagine he
17  told me the name of Jessica Long. I don't even know if
18  he really mentioned the daughter at this point.
19  Q.    Do you believe he did?
20  A.    He could have because I know I'm aware of that
21  there was a minor female involved. But I don't know
22  when I learned of that fact.
23  Q.    Okay. Okay. Okay. Do you remember your
24  reaction to hearing we're going to Napa to investigate a
25  goat?

Page 84

1  A.    I remember just specifically asking what the
2  time allotment was going to be so I knew how long I was
3  going to be gone. But at that point, you know, I was
4  told it was a livestock investigation, and I knew
5  Lieutenant Fernandez was livestock investigator, so.
6  Q.    Did you say -- did you comment I have sex crimes
7  to investigate?
8  A.    I did not.
9  Q.    Okay. Did you make any comment that I have
10  other investigations pending?
11  A.    I did not.
12  Q.    Did you think that?
13  A.    I do not recall or remember what I actually
14  specifically was thinking about at that time.
15  Q.    Okay. You don't recall? That thought might not
16  have gone through your head?
17         MR. NORTHCUTT: Objection. Asked and answered.
18         MR. GORDON: You can answer.
19         THE WITNESS: I don't recall specifically what I
20  was thinking about at the time.
21         MR. GORDON: Q. Okay. All right. Okay. So
22  and this is at 4:30, 5. How long was your conversation
23  with Officer -- sorry, Lieutenant Fernandez?
24  A.    It was very limited.
25  Q.    Very limited. Like two minutes, five minutes?

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 24 of 74

LONG vs.                                                            DETECTIVE JACOB DUNCAN
FERNANDEZ                                                                    August 22, 2023

Page 85

1 A.      Yeah.  It was probably closer to somewhere
2 around five minutes because I think there was -- he was
3 trying to start driving down there.  Like there was --
4 Q.      There was an urgency?
5 A.      I don't know if it was urgency.  I think he's a
6 very timely person so, you know, he likes -- he doesn't
7 like to sit around.  He likes to get things done.  So it
8 was a matter of I believe there was some direction of we
9 need to go get this specific animal control vehicle.
10        And as I said, I'm trying to recall specific
11 conversation, and it wasn't something that -- there
12 wasn't anything specific about the conversation that
13 stands out to me.
14 Q.      Okay.  So he just relayed in his words there was
15 a goat, I'm paraphrasing, there was a goat stolen, and
16 we're going to go to Napa to retrieve it?
17 A.      Yes.
18 Q.      Okay.  And he might have mentioned a minor; you
19 don't recall?
20 A.      And to be honest with you, when I'm telling you
21 my recollection of it, it's -- I am estimating what a
22 logical conversation looked like because I don't
23 specifically recall the conversation.
24 Q.      Okay.  So you have no memory of this
25 conversation.  This is just all assumptions?

Page 86

1 A.      I don't have specific recollections of what was
2 specifically said.  Just the actual items that came out
3 of that conversation.
4 Q.      Okay.  Okay.  So you remember the bottom line,
5 but you don't remember how you got there?
6 A.      Yes.
7 Q.      Okay.  All right.  Whenever anybody says in a
8 deposition "I'm going to be honest with you," well, were
9 you BS'ing me the whole time, like, what do you mean?
10 A.      Yeah.  "Let me clarify," I'll use that.
11 Q.      Yeah, that's better.  That's fine.  Officer
12 Fernandez did yesterday also, and I might have said on
13 the record, he said, "Do you want me to be 100 percent
14 transparent with you?"  And I think I said, "No, I want
15 you to bullshit me, Jerry."
16 A.      That's fine.
17 Q.      It might have ended up on the record.  Anyway.
18 All right.
19        Okay.  So and he wanted to leave quickly?  Or
20 promptly?
21 A.      Yeah.  I believe that's just his nature in
22 general.  He's a prompt person.
23 Q.      Okay.  All right.  But afterwards you still had
24 to go to major crimes unit?
25 A.      That's where I don't specifically recall if I

Page 87

1 went there before or after or --
2 Q.      Why or what was the purpose of going there?
3 A.      Well, I had my patrol vehicle -- not my patrol
4 vehicle, my detective vehicle.  And I don't remember if
5 I left that at our county patrol station or I left it at
6 major crimes.
7 Q.      What's the difference between a detective
8 vehicle and -- just one's unmarked?  Or one's not in --
9 doesn't say "police" on the side?
10 A.      Yeah.  I have an unmarked vehicle that doesn't
11 look like a police car.
12 Q.      Gotcha.  Okay.  So you might have gone there
13 before.  You don't remember.  What did you do when you
14 got to major crimes either before or after the patrol
15 office?
16 A.      I don't recall why I went there.  I can imagine
17 my -- knowing me and specifically why I could have gone
18 there, it could have been to grab my lunch that I have.
19 It could have been to grab my work-issued laptop.  It
20 could have been to park my vehicle because I was going
21 to be riding with him.  There's a multitude of reasons I
22 could have gone there.  I don't specifically recall why
23 I went there on this day.
24 Q.      Did you speak with Detective Ashbee when you
25 were there?

Page 88

1 A.      I imagine I did.  I believe so.
2 Q.      What did you discuss with him?
3        MR. NORTHCUTT:  Hold on one second.  When you
4 say, "I imagine," do you recall speaking with him, or is
5 this just kind of a guess?
6        MR. GORDON:  Q.  You said -- you said, "I
7 imagine," then you said, "I did," I believe.
8 A.      I believe so.  I believe I did.
9 Q.      You said you believe?
10 A.      I don't have a specific recollection of it, but
11 I do remember vaguely that him and I talking about his
12 search warrant, so I can conclude, you know, that we
13 talked about it at some point.
14 Q.      Yeah.  You got a kernel of memory there.  So
15 what did you talk about with the search warrant?
16 A.      Just the general facts of the goat sanctuary and
17 the goat theft investigation.  I believe he was busy at
18 the time, so it wasn't something where we had an
19 in-depth conversation.
20 Q.      Did you -- did he have anything on the warrant
21 drafted at that point?
22 A.      I did not read any of -- any of the warrant at
23 that time.
24 Q.      Okay.  Did you read any of the investigative
25 summary at that point in time?

**Page 89**

1 A.    No.

2 Q.    Okay. All right. Okay. So this is all word of
3 mouth at this moment in the day?

4 A.    Yes.

5 Q.    Okay. So then after you speak with Fernandez
6 and then Ashbee, or the other way around, what happens
7 next?

8 A.    Lieutenant Fernandez and I began driving down to
9 Napa County.

10 Q.    And what time of the day was this?

11 A.    Well, my report I believe it's documented that
12 we got there around 7:30.

13 Q.    Do you remember what time you left thereabouts?

14 A.    No. I don't. I would estimate that it's going
15 to be --

16 Q.    Can you -- did you -- was it in -- in his
17 narrative? Would that refresh your memory?

18 A.    I don't know if it's in his narrative, but I can
19 refer to it.

20 Q.    Yeah, you can refer to it. Maybe just check,
21 see maybe if it will jog your memory.

22    (Pause in proceedings.)

23 A.    I don't believe it says when we left. It just
24 says that we -- we arrived.

25 Q.    Doesn't say. I wasn't trying to put you on a

**Page 90**

1 wild goose chase. I just assume it would have been
2 there.

3 A.    No. I believe it says when we arrived down in
4 Napa at 7:30, but it doesn't say when we -- when we
5 left. But I believe it takes about two hours or so to
6 get down there.

7 Q.    Gotcha. All right. Okay. So -- so you arrived
8 there around 7:30?

9 A.    Yes.

10 Q.    Okay. So you would have left likely two -- you
11 estimate likely two hours beforehand, so 5:30? Five
12 o'clock thereabouts?

13 A.    I believe so.

14 Q.    And you were in the animal -- what's the name of
15 the car?

16 A.    Animal regulations or animal control. It's a
17 vehicle that has animal compartments.

18 Q.    Yeah, like -- okay. It's like a flatbed truck
19 with them built onto the sides, and you open them. Is
20 that --

21 A.    Yes.

22 Q.    Gotcha. Okay. What did Fernandez tell you --
23 so you've got a 200-mile drive down there or so. Yeah,
24 it's about -- isn't it almost 200 miles to Napa? How
25 did you just get there in two hours in a truck? Were

**Page 91**

1 you going 100 miles an hour?

2 A.    I'm estimating. So I believe it is probably
3 around 200 miles. So it was probably closer to three
4 hours.

5 Q.    Okay. So you -- okay. So you might have left a
6 little -- does that --

7 A.    I'm providing you with an estimation, so.

8 Q.    No, I understand. Look, this isn't two trains
9 leave from a -- you know, it's not one of those math
10 problems from high school, so I'm just trying to get
11 your best estimate here.

12    Okay. So you had a long car trip with him. Did
13 you discuss the case in the car?

14 A.    I don't actually think we really did. I think
15 we talked mostly just about, you know -- I didn't know
16 Lieutenant Fernandez very well at this point. I think
17 I'd only been employed with the sheriff's office for a
18 couple months.

19 Q.    Yeah. You said December -- not December.
20 March?

21 A.    March.

22 Q.    Of 2022. So at this point it's four months
23 roughly?

24 A.    Yeah. So I think it was more of just a personal
25 conversation.

**Page 92**

1 Q.    Yeah. Did he -- did he mention anything about
2 the case in the car?

3 A.    I don't recall specifically him talking about
4 the case or the investigation other than I know he told
5 me when the warrant was signed, or the warrant was
6 completed, and that I knew we were going down and
7 meeting with the Napa County deputies and somebody down
8 there.

9 Q.    Did you hear any of his conversations with him
10 on the phone?

11 A.    If I did, I don't recall any specifics of the
12 conversation.

13 Q.    Okay. Do you recall -- do you recall that he
14 did call them en route?

15 A.    I don't even recall him calling him, so I
16 wouldn't --

17 Q.    But he might have?

18 A.    I wouldn't deny that he did, but I don't recall
19 the conversation.

20 Q.    Okay. Okay. And did he mention Kathie Muse in
21 the car?

22 A.    Not to my knowledge, no.

23 Q.    Not to your knowledge. Did he mention -- did he
24 mention Bruce Macfarlane in the car?

25 A.    Not to my knowledge.

Page 93

1 Q.    Did he mention -- did he mention any facts about
2 this auction in the car?
3 A.    Just that it existed and that the -- I knew the
4 goat was stolen from -- or he told me the goat was
5 stolen from the auction or the state fair.
6 Q.    Okay.  What did he -- what did he -- you mean
7 county fair?
8 A.    County fair, sorry.
9 Q.    Because I think there is -- I think there is an
10 actual state fair, Cal Expo, yeah, yeah.  No, it's fine.
11    Did he mention how it was stolen?
12 A.    Approximately.
13 Q.    Did he mention anything about how it was stolen?
14 A.    I think it was just assumed that she took it
15 from the fair.
16 Q.    Okay.  Did he give any facts beyond that?  Did
17 he say there was a bid?  Did he mention the Dahles?
18 A.    No.  Just that the fair -- or that the goat was
19 possibly dropped off at a goat sanctuary.
20 Q.    Okay.  And just for the record, Dahle is
21 D-a-h-l-e-s.  It's people.
22    So he didn't mention any of the players involved
23 in the transaction?  He just said the goat's stolen from
24 the fair and -- and it -- and we're going to retrieve
25 it?

Page 94

1 A.    He mentioned that it was -- I knew that he
2 identified Jessica Long as a suspect.  But again, we
3 didn't have an in-depth conversation about, you know,
4 her as the suspect or what her background was.
5 Q.    Yeah.  Okay.  Did -- did you -- you said you
6 didn't know if he called Napa PD or sheriffs -- I
7 apologize, sheriff's department in the car.  Did he call
8 anyone in the car?
9 A.    Like I said, I'm not going to deny he did.  I
10 just don't recall any specific phone conversations he
11 had other than I think he got a phone call from
12 Detective Ashbee when the warrant was completed.
13 Q.    Okay.  But did -- were there any calls made to
14 anyone in the car?
15 A.    I don't recall any specific conversations other
16 than the --
17 Q.    You don't have to recall -- sorry.
18    You don't need to recall the conversation, but
19 do you recall the phone -- phone calls were made to
20 anyone?
21 A.    That's what I'm trying to say.  I don't recall
22 any phone conversations or phone calls other than I
23 specifically recall either Jeremy Ashbee calling him or
24 him calling Jeremy Ashbee and him saying the warrant was
25 completed.

Page 95

1 Q.    Okay.  Okay.  All right.  Okay.  And how --
2 okay.  So you, at this point in time, you didn't -- did
3 you do any investigation of -- did you read the report
4 or anything?  Was that available to you in the car?
5 A.    I don't believe the -- I mean, if you look at
6 the report, a lot of it was written after the fact, so I
7 don't believe the report was completed at this point.
8 Q.    It didn't exist at that time.  So did any of
9 the -- did any of the -- did you take a look at any of
10 the evidence that was allegedly showing that she stole
11 the goat at that time like such as the goat Bates stamp
12 number -- so Bates stamps are the little -- you see the
13 little numbers in the bottom right-hand corner?
14 A.    The D-U-N-C00?
15 Q.    Yeah.  Yeah.  It's a term we use.  It used to be
16 a machine, and they called it a Bates stamp, correct me
17 if I'm wrong.
18    MR. NORTHCUTT: When I first started practicing.
19    MR. GORDON: You had an actual Bates stamp?
20    MR. NORTHCUTT: When I was like a law clerk a
21 long time ago, we had an actually old-school Bates
22 stamper.
23    MR. GORDON: Did it say "Bates machine" on it?
24    MR. NORTHCUTT: No.
25    MR. GORDON: No?  Okay.  Where does the term

Page 96

1 "Bates" come from?  Not Norman?
2    MR. NORTHCUTT: It's a question for another
3 deposition.
4    MR. GORDON: Q.  All right.  All right.  Anyway.
5 So did he show you -- so it would be like let's go to
6 Bates stamp number in Exhibit A, so 38.  Did he show you
7 this document?
8 A.    This is the first time I've seen this document.
9 Q.    First time.  So you never looked at it before?
10 A.    No.
11 Q.    Did he show you 39?
12 A.    This the first time I've seen that document.
13 Q.    Did he show you 40?
14 A.    This the first time I've seen this document.
15 Q.    Okay.  And 41 and 42?  It's an email.
16 A.    Also the first time I've seen this.
17 Q.    And 43?
18 A.    Also the first time I've seen this.
19 Q.    And then 44 through 48?  So 44 by its face is an
20 email from Jessica Long, purports to be, with an
21 attachment.  The attachment is the remaining pages, so
22 45 to 48.  So did you see that beforehand?
23 A.    No.
24 Q.    Okay.  All right.  Did you do any investigation
25 of this case before assisting in the -- in this trip to

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 27 of 74

LONG vs.                                          DETECTIVE JACOB DUNCAN
FERNANDEZ                                                   August 22, 2023

Page 97

1   Napa?
2   A.    No.
3   Q.    Okay.  So you were relying on Fernandez's and
4   Ashbee's narrative of events?
5   A.    Lieutenant Fernandez who was the case agent.
6   Q.    Okay.  So did Ashbee tell you anything, anything
7   that you recall, about the case that would have --
8   sorry.
9         Yeah, I guess you spoke to him earlier.  Did he
10  tell -- I might have asked you this, and I apologize.
11  Did he tell you anything about the case?
12  A.    I don't believe I learned any new facts from him
13  other than maybe the name of the goat sanctuary.
14  Q.    The Bleating Hearts?
15  A.    Yes.
16  Q.    Okay.  All right.  Okay.  All right.  And so is
17  it common to assist in an investigation or a
18  confiscation without reviewing all the evidence?
19  A.    Yes.
20        MR. NORTHCUTT: Objection.  Vague and ambiguous.
21        MR. GORDON: Q.  Yes.  Okay.  So you've done
22  this before?
23  A.    Yes.
24  Q.    Okay.  And -- okay.  All right.  So why -- why
25  did you need to go to assist in this?  Why couldn't

Page 98

1   Fernandez have just gone solo is basically my question.
2   A.    I think that's typical practice on any
3   investigation that we do.  We try and have two people
4   that go just because you don't know what you're going to
5   encounter.  I wouldn't say that was specific to this
6   case.  It's just a matter of common practice we
7   typically have two people go conduct any type of
8   investigation.
9         I would say for detectives, we have more
10  availability.  We're not assigned to a patrol shift.  We
11  don't have to work a patrol shift the next day.  So we
12  are sometimes asked to help with things that, you know,
13  aren't always or that really have more to do with our
14  schedule and our availability to help than to do with
15  like, hey, we're the case agents on this.
16  Q.    Okay.  And by "case agent," what do you mean by
17  that?
18  A.    The primary officer that's in charge of the
19  investigation.
20  Q.    Okay.  Okay.  Is that the same as the responding
21  officer?  That term is used in that document.
22  A.    Oh, I don't know.  No, it's not the same.
23  Typically it could be, but it doesn't mean that is what
24  it is.
25  Q.    Okay.  So the responder, is that the person who

Page 99

1   first gets the case, and they do a -- they may do a
2   handoff later?
3   A.    Yes.  But it's also the system.  Sometimes you
4   never know who's going to get put down as.  Common
5   practice what it should be is the initial responding
6   officer or the person initially has it when its call is
7   generated, but that doesn't always how it works out.
8   Q.    I see.  So going down there, you were reliant on
9   Fernandez's narrative.  And did you ask why -- well, let
10  me ask you this.  Strike that.
11        Why couldn't Napa PD have simply removed Cedar
12  for, you know, on behalf of at your request, let's say?
13  A.    I don't know.  That was Lieutenant Fernandez who
14  arranged that.
15  Q.    Okay.  Did you -- did you speak with anyone at
16  Napa PD?
17  A.    I know that we went down there, and we met with
18  Napa County.  I think it was Napa County not Napa Police
19  Department.
20  Q.    You're correct.  Napa sheriffs, yeah.
21  A.    Yes.
22  Q.    Okay.  Have you spoke to -- have you spoken to
23  anyone there about this since the July 8th?
24  A.    No.
25  A.    No.  Okay.  So you get down -- just to recap,

Page 100

1   you didn't review any of the documents for this
2   investigation.  Your supervisor, Lieutenant Chris, what
3   was his last name?
4   A.    Edwards.
5   Q.    Thank you.  Chris Edwards.  He, is it fair to
6   say, instructed you to go, to call Fernandez?
7   A.    Yes.  It felt more of like an instruction than a
8   request.  I'm sure if I would have had something that
9   was pressing or I couldn't or if I posed some type of I
10  don't want to do this, that would have been respected,
11  but I didn't do that.
12  Q.    It would have been respected but frowned upon?
13  A.    I can't speculate as far as the way it felt.
14        MR. NORTHCUTT: Objection.  Argumentative.
15        MR. GORDON: Q.  Okay.  So you arrive at 7:30 in
16  Napa.  Do you go -- what do you do when you go to Napa?
17  Do you go see the sheriff's department first?
18  A.    Yes.
19  Q.    Okay.  And where did you meet them?
20  A.    At the Napa County Sheriff's Office.
21  Q.    They just have one office there?
22  A.    I don't know if they have more than one office
23  or two offices.
24  Q.    One of their offices you went to?
25  A.    Yes.

Page 101

1 Q.   Okay.  And who did you speak to there?
2 A.   I don't know their specific names.  I believe
3 they're mentioned in Lieutenant Fernandez's report.
4 Q.   If you check, will it jog your memory?
5 A.   I didn't specifically speak to any of them.
6 That was his arrangement.  He spoke to them, and I was
7 there just --
8 Q.   Did you sit in the car?
9 A.   What do you mean?
10 Q.   Did you -- did he just go speak with them, and
11 you waited in the car for him?
12 A.   No.  I went inside with him.
13 Q.   Oh, you went inside with him.  What did he say
14 to them?
15 A.   I don't recall the specific conversation other
16 than I would speculate that he, and like I said, I would
17 speculate that --
18      MR. NORTHCUTT: Let's not speculate.
19      MR. GORDON: Yeah.  Don't speculate, but.
20      MR. NORTHCUTT: If you remember something,
21 great.  If you don't, don't speculate.
22      THE WITNESS: I don't remember the specific
23 conversation.
24      MR. GORDON: Q.  Okay.  But it must have
25 concerned the goat?

Page 102

1 A.   If you want me to speculate, yes, I would
2 imagine it would have something to do with --
3      MR. NORTHCUTT: Belated objection.  Asked and
4 answered.  He said he didn't recall.
5      MR. GORDON: You can -- belated objection is
6 accepted.
7 Q.   So -- okay.  All right.  So you're at the Napa
8 police station.  And how many people did he speak to in
9 this conversation?  Do you remember how many were
10 present?
11 A.   My recollection there was three people.
12 Q.   Three people.  Male, female?  Breakdown?
13 A.   I believe there's three males.
14 Q.   Three males, okay.  All right.  And do you
15 remember their stations?  Were they lieutenants?  Were
16 they sheriffs or deputies?  What were they?
17 A.   I remember there was one supervisor and I
18 believe -- I don't know -- I actually don't know the
19 rank of the other two, but I believe everybody was in
20 plain clothes.
21 Q.   Everyone was in plain clothes.  Which would
22 signal that they're detectives, or what does that signal
23 if they're in plain clothes?
24 A.   Or administrators or assigned to a specialty.
25 Q.   I see.  Okay.  So not -- is patrolman the right

Page 103

1 word?  In sheriffs it's -- what's the --
2 A.   Deputies.
3 Q.   Deputy.  Thank you.  All right.  Okay.  So about
4 what time is this?
5 A.   It's documented in the report that we got to the
6 house at 7:30, so I imagine it was probably 10 or 15
7 minutes prior to when we arrived at the house.
8 Q.   Okay.  So it was about 10 or 15 minutes prior to
9 getting to the house.
10      And so you next go to the Starky's residence or
11 the Bleating Heart Sanctuary?
12 A.   Yes.
13 Q.   Okay.  All right.  And did -- what happens
14 there?
15 A.   We made contact with Justin Starkey and Kristin
16 Stover.
17 Q.   Okay.  "We made contact."  Did you both make
18 contact with both of them or did -- was there -- did you
19 talk to -- who introduced -- which of -- strike all
20 that.
21      Did you introduce yourselves to them first, or
22 did Fernandez?
23 A.   I don't recall specifically.
24 Q.   You don't recall, all right.  So -- okay.  You
25 introduced yourselves to the Starky -- Kristin Starkey

Page 104

1 or Kristin Stover and then Justin Starkey.  And then
2 what happens?
3 A.   And then they informed us the goat was not on
4 the property.  And then we informed them we had a search
5 warrant.
6 Q.   Okay.  Did you review the warrant?
7 A.   I don't believe I saw the search warrant until
8 after the actual investigation.
9 Q.   Is it -- have you ever done an investigation
10 before that in reviewing the warrant beforehand?
11 A.   Yes.
12 Q.   How do you know what you're capable of searching
13 if you don't review the warrant beforehand?
14 A.   Because I -- the superior officer is the one who
15 informed me, you know, he reviewed the warrant, and he's
16 the one who's the case agent for the property.  I'm not
17 by myself.  I'm acting on behalf of the case agent, so.
18 Q.   Okay.  So you're taking orders from Fernandez at
19 this point; is that accurate?
20 A.   Yes.
21 Q.   So are you familiar -- okay.  Well, are you
22 familiar with your obligations under Penal Code 1536?
23      MR. NORTHCUTT: Objection.  Vague and ambiguous
24 as to "obligations."  Calls for a legal conclusion.  Go
25 ahead.

Page 105

1    **THE WITNESS:** Is that the specific Penal Code
2  having to do with search warrants?
3    **MR. GORDON:** It has to do with search warrants,
4  yes.
5    **THE WITNESS:** I don't know the actual code. I
6  do know it has to do with search warrants.
7    **MR. GORDON:** Q. Okay. All right. Let me
8  just -- I'll show you a copy of it, and you can tell me
9  if you ever read it -- have you ever read it before?
10 A.  **I'm sure I have.**
11 Q.  Okay. And presumably in training or --
12 A.  **Training or in the scope of writing search**
13   **warrants and authoring search warrants.**
14 Q.  But you see it referenced in warrants. You just
15  said that. You see it when you're writing search
16  warrants, okay. Give me one moment.
17    Okay. We can just mark this Exhibit B.
18    (Whereupon, Plaintiff's Exhibit B, a copy
19    of Penal Code section 1536, was marked for
20    identification.)
21 Q.  All right. Take a look at it, and let me know
22  if you've read it.
23    (Pause in proceedings.)
24 A.  **Yes.**
25 Q.  So you've known of this -- I guess you first

Page 106

1  learned about it when you were at the academy?
2 A.  **I don't recall specifically when I first learned**
3   **about it, but I know I've learned of the scope of this**
4   **Penal Code when writing search warrants.**
5 Q.  Okay. And how long have you been writing search
6  warrants?
7 A.  **Probably since my first year as being a police**
8   **officer.**
9 Q.  Okay. So you've known about this for some time
10  then for, what, 2016, so eight years or so?
11 A.  **Approximately seven. Seven and a half.**
12   **Tomato/tomato.**
13 Q.  Yeah, yeah. All right. Okay. All right. So
14  what is your understanding of your obligations under
15  this?
16    **MR. NORTHCUTT:** Objection. Vague and ambiguous
17  as to "obligations." Calls for a legal conclusion. Go
18  ahead.
19    **THE WITNESS:** Well, the code says all property
20  or things taken under the scope of a warrant or taken on
21  a warrant have to be brought to the court for
22  essential -- for essentially legal proceedings.
23    **MR. GORDON:** Q. So it's your understanding that
24  if something's seized under a warrant, you have to take
25  it for -- you have to hold it for additional legal

Page 107

1  proceedings; is that fair?
2 A.  **Yes.**
3 Q.  Thank you. All right. Okay. So you're
4  executing the search warrant, but you didn't review it
5  beforehand. You were -- what did -- what did Fernandez
6  tell you you were searching for under the warrant?
7 A.  **A goat.**
8 Q.  A goat, okay. Did he give you any facts beyond
9  that?
10 A.  **I was shown -- I know I was shown a picture of**
11   **the goat at some point, I don't recall when, so I knew**
12   **what specific goat we were looking for that was included**
13   **in the warrant. And I knew it included that specific**
14   **residence.**
15 Q.  Is the picture -- where did Fernandez get a
16  picture from?
17 A.  **I don't know. I just -- I specifically recall**
18   **seeing a picture of it. I don't know in what manner I**
19   **was shown that picture.**
20 Q.  Was it the picture in the warrant. So maybe
21  take a look. I can give you the Bates number. You
22  might find it first. But if you go to the warrant, it's
23  in the write-up. There's an Instagram post. Give me a
24  moment.
25 A.  **Are you talking about the picture with the --**

Page 108

1    **with Jessica and --**
2 Q.  Yes.
3 A.  **-- Eliza Long?**
4 Q.  Yes. Yes, yes, yes. This is 27, the Bates
5  stamp number.
6 A.  **No. I don't recall -- I don't even know if I've**
7   **seen this picture before.**
8 Q.  So you didn't see the Instagram post that was
9  posted on June 27th?
10 A.  **No. It was a different picture. I don't recall**
11   **specifically. Which picture -- I do recognize the goat**
12   **in this picture as being the goat in question, but.**
13 Q.  I understand. So there's another photo that did
14  not migrate into this evidence packet somewhere?
15 A.  **I'm not sure.**
16 Q.  Well, you just said you saw another photo, but
17  it's not that one.
18 A.  **I did see -- I know it's not that one. I don't**
19   **know specific which photo it was.**
20 Q.  It was my understanding the other photos in here
21  were taken subsequent to the confiscation?
22 A.  **No, I understand that.**
23 Q.  So there's a rogue photo out there somewhere
24  that presumably Fernandez had of --
25    **MR. NORTHCUTT:** Objection. Misstates his

Page 109

1 testimony.
2    MR. GORDON: You can answer. It's fine.
3    THE WITNESS: I specifically --
4    MR. GORDON: It's colorful language, I
5 understand.
6    THE WITNESS: I know. I know it wasn't this
7 picture. I don't specifically remember which picture I
8 was shown.
9    MR. GORDON: Okay. Okay.
10    THE WITNESS: Or that I saw.
11    MR. GORDON: Q. Do you know where Fernandez got
12 the photo?
13 A.    No. Again, I don't even know the medium which I
14 was shown it. I just know it wasn't that picture.
15 Q.    Who was in the photo besides Cedar?
16 A.    Again, I don't specifically recall the picture
17 other than the fact I know it's not that picture.
18 Q.    I understand, but did he show it to you on the
19 phone?
20 A.    As I previously answered, I don't -- I don't
21 recall the specific medium which I was shown it. I just
22 know it wasn't that picture.
23 Q.    It wasn't that picture. So it's -- do you
24 recall anyone in the picture?
25    MR. NORTHCUTT: Objection. Asked and answered.

Page 110

1    THE WITNESS: I do not.
2    MR. GORDON: Q. Eliza's not in the photo?
3 A.    I don't recall.
4 Q.    Okay. Do you recall approximately what age
5 Cedar was in the photo? Or was he small, big?
6 A.    The picture accurately depicts how Cedar looks
7 in the other picture.
8 Q.    So it's about around the same time you would
9 estimate based on -- the goat was of the same size as
10 the photo you looked at?
11 A.    It appears so.
12 Q.    Okay. All right. It wasn't a picture of him as
13 a baby is what I mean?
14 A.    No, not to my knowledge.
15 Q.    Okay. I don't know if "baby" is even the right
16 term.
17    Okay. So Fernandez had some other photo. Okay.
18    Actually, yeah, we can go off the record because
19 he has to change out the film.
20    THE VIDEO SPECIALIST: Okay. We're off the
21 record. The time is 11:37, and this is the end of media
22 number one.
23    (Whereupon, a break was taken from 11:37
24    till 11:53 a.m.)
25    THE VIDEO SPECIALIST: We're back on the record,

Page 111

1 and the time is 11:53, and this is the start of media
2 number two.
3    MR. GORDON: Q. Okay. So the last exhibit I
4 handed you was Exhibit B, which was a copy of -- from
5 West's Law Penal Code 1536, and you said you're familiar
6 with it. And are you familiar with Penal Code 1407?
7 A.    I don't know it specifically, no.
8 Q.    All right. I'm going to just show you a copy.
9 You can tell me. You never heard of that provision
10 before?
11 A.    No, I have. I just don't know specifically the
12 contents of it.
13 Q.    Do you know generally the contents?
14 A.    No. I imagine it goes with a search warrant,
15 but no.
16 Q.    My apologies. It's bent. So Madame Court
17 Reporter, this will be Exhibit C.
18    (Whereupon, Plaintiff's Exhibit C, a copy
19    of Penal Code section 1407, was marked for
20    identification.)
21 Q.    You said you're aware of 1407. You don't know
22 its contents. Same with 1408, are you aware of that?
23 A.    It's going to be the same answer. Don't know
24 specific content.
25 Q.    So this is -- the one on top is C, and the one

Page 112

1 below is D.
2    (Whereupon, Plaintiff's Exhibit D, a copy
3    of Penal Code section 1408, was marked for
4    identification.)
5 Q.    Oh, and moving forward on the record, I made the
6 error, so have you, we need to refer to the daughter as
7 E.L. for the locals and court.
8 A.    Okay. Yeah.
9 Q.    They have a local -- I know. Everyone knows
10 their name, not everyone, but they want us to keep the
11 minor's name as anonymous as possible.
12 A.    Of course.
13 Q.    So abbreviations, E.L., that's what the court
14 file is saying, so. Anyway. I know it wasn't
15 intentional.
16 A.    No. Agreed. Would you like me to review these?
17 Q.    Yes, please. It's short.
18    (Pause in proceedings.)
19 A.    Okay.
20 Q.    Okay. So -- and you've said you've seen these
21 provisions before. Where have you seen them?
22 A.    I just I have probably seen them within the
23 scope of my training. They do look familiar.
24 Q.    Have you seen them in warrants before?
25 A.    I'm not sure. They're probably cited in

**Page 113**

1 warrants. I don't know if specifically they're cited in
2 the warrant we did.
3 Q. They are.
4 A. Okay.
5 Q. Okay. But you are aware of them. You were
6 aware of them. You had education on these at some point
7 in time?
8 A. Yes. I know they exist.
9 Q. Okay. Gotcha. And what is your understanding
10 of your obligations, if any, under them?
11 MR. NORTHCUTT: Objection. That's vague and
12 ambiguous as to the term, "obligations." Calls for a
13 legal conclusion. Go ahead.
14 THE WITNESS: That essentially that if there's
15 stolen property that's in question whether or not it's
16 stolen or not that it needs to be kept until there's
17 essentially further investigation or legal proceedings.
18 MR. GORDON: Q. Okay. Where does it -- you
19 said if stolen property -- how do you phrase it?
20 Questionably stolen property?
21 A. So these, specifically, if you want me to cite
22 on -- it says, "alleged." When property alleged to have
23 been stolen.
24 Q. Alleged. Okay, that's what you went by
25 questionably, okay, gotcha. So if allegedly -- if

**Page 114**

1 property is allegedly stolen, and it's in your custody,
2 you're supposed to retain it for some traditional
3 proceeding to adjudicate ownership, yes?
4 A. Yes.
5 Q. All right. And Cedar was alleged to be stolen,
6 yes?
7 A. Yes.
8 Q. And it's your understanding that 1407 and 1408,
9 they apply. There's no warrant requirement for them?
10 They can -- and even in the absence of a warrant?
11 A. If they're in the warrant, it's my understanding
12 they apply to the search warrant. As far as how they
13 apply outside of the search warrant, you know, I'd be
14 speculating on that, but I do believe they just -- from
15 the contents of it, it sounds like they just exist
16 independent of the search warrant.
17 Q. That's my understanding as well. Okay. So and
18 Cedar was alleged to be stolen, so I presume so he
19 should be subject to these provisions, yes?
20 MR. NORTHCUTT: Objection. Vague and ambiguous.
21 And calls for a legal conclusion.
22 MR. GORDON: Yeah. Just your understanding.
23 THE WITNESS: If you're using Cedar as an
24 example of stolen property and applying the Penal Code,
25 it appears that if it's within the Penal Code.

**Page 115**

1 MR. GORDON: Okay. These provisions that we're
2 looking at?
3 MR. NORTHCUTT: Same objection.
4 THE WITNESS: Yes.
5 MR. GORDON: Q. Thank you. Okay. So we're I
6 think in the timeline you had just arrived at -- you had
7 just arrived at the Starky's was the last question I
8 asked you. And you had introduced yourself with
9 Starky -- sorry, Bleating Hearts, my apologics. You
10 arrive, and this is about 7:30 we discussed, yes?
11 A. Yes.
12 Q. Okay. So and you said that you and Fernandez
13 introduced yourself to the people there; although, you
14 don't remember who introduced either of you to them,
15 etcetera. But what -- you were going to say something?
16 A. Yeah. I was going to say that's accurate. Then
17 I was also going to ask to clarify something as well.
18 Q. Sure.
19 A. When you're specifically referencing "these," I
20 want to make sure that we're on the same page that
21 "these" apply to my current understanding of Cedar in
22 that moment when we're at Bleating Hearts.
23 So later on we determined or made the
24 determination that Cedar was donated to a separate farm
25 and no longer, you know, was in -- or still met that

**Page 116**

1 criteria.
2 Q. Okay. You determined -- we'll get to that, but
3 you determined he was -- you determined he was
4 donated --
5 A. And we were provided consent to retrieve the
6 goat.
7 Q. Yeah, we'll get to that. I know that's in your
8 complaint.
9 A. I just want to make sure we clarify that my
10 understandings and all that were based on the situation
11 at the time, and that changed based on the facts of the
12 case.
13 Q. But you were still there investigating stolen
14 property, no, at all times?
15 A. Yes. Yes.
16 Q. Even -- even when -- even when you got to Ray's
17 later, still stolen property, yes?
18 A. It was a stolen property investigation, yes.
19 Q. Okay. All right. And the statute says
20 stolen -- allegedly stolen property?
21 A. This statute does say allegedly stolen property.
22 Q. Because it's an investigation here of Jessica
23 Long who allegedly stole property?
24 A. Yes.
25 Q. And Cedar is evidence of that investigation,

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 32 of 74

LONG vs.                                                    DETECTIVE JACOB DUNCAN
FERNANDEZ                                                              August 22, 2023

Page 117

1  yes?
2  A.    I would believe so.
3  Q.    Okay.  Thank you.  All right.  So we're at the
4  Starky's, and so what happens first?  Who do you speak
5  to first?  Justin or Kristin?
6  A.    I don't recall who we spoke to -- actually, I
7  believe that based on the way my report is drafted, we
8  spoke to Justin Starkey first because I believe Kristin
9  Stover came out after the fact.
10 Q.    I see.  Okay.  Okay.  And so what did you speak
11 with -- did you speak with Justin first?
12       MR. GORDON: Off the record.
13       THE VIDEO SPECIALIST: We're off the record.
14 The time is 12:01.
15       (Pause in proceedings.)
16       THE VIDEO SPECIALIST: We're back on the record.
17 The time is 12:02.
18       MR. GORDON: Q.  All right.  So I believe my
19 last question was what did you speak with Justin Starkey
20 about?
21 A.    I believe the conversation from my recollection
22 was that we informed him of the search warrant, asked
23 him if he had knowledge of that specific goat, Cedar,
24 and if it was on his property.
25 Q.    Okay.  And how did he respond?

Page 118

1  A.    No.  The goat was not there.
2  Q.    Okay.  All right.  And what else do you remember
3  about your conversation with him?
4  A.    That he provided us -- we had a search warrant
5  for his property, which we informed him, but he also
6  told us was very cordial and compliant with allowing us
7  to search his property.
8  Q.    Okay.  Did he say anything about Jessica?
9  A.    I'm sure he did.  I don't recall specifically
10 what he said about Jessica.
11 Q.    Okay.  Did he say anything about E.L.?
12 A.    Again, same answer.
13 Q.    Okay.  Now, there's an audio recording of when
14 you got to the property, yes, you turned your audio
15 recording on?
16 A.    Yes.
17 Q.    Okay.  Have you listened to that in review of
18 your deposition today?
19 A.    I listened to probably three-quarters of it.
20 Q.    First three-quarters or second --
21 A.    The first three-quarters.  I've listened to it
22 prior too.
23 Q.    Okay.  How many times have you listened to it
24 prior?
25 A.    Probably twice when I was drafting my report.

Page 119

1  Q.    Okay.  Did you listen to it after your report
2  was drafted at all?
3  A.    I don't believe so.  Other than recently when I
4  was preparing for my deposition.
5  Q.    Okay.  So -- okay.  So you listened to --
6  anything else you listen -- because I think earlier you
7  said you looked at the complaint, and you looked at your
8  investigative summary.  You didn't mention the audio
9  recording.
10 A.    No.  That was included in my like my
11 investigative summary report is that I also listened to
12 my audio because that's part of the investigation.
13 Q.    Gotcha.  Okay.
14 A.    So I apologize for that.
15 Q.    No, that's fine.  And arguably, on page four of
16 the report it mentions your -- is this actually -- can
17 you go to page four of Exhibit --
18 A.    A?
19 Q.    Yes, please.  I'm basing what I'm about to this
20 leading question on what I'm about to ask from Fernandez
21 yesterday, so.
22 A.    The Bleating Hearts -- the report titled,
23 "Bleating Hearts Goat Sanctuary."
24 Q.    No.  On page four.  So it would be Duncan004.
25 A.    Yep.  Got it.

Page 120

1  Q.    Audio CD interview.  Is that the audio
2  recording?
3  A.    The one that says "interview"?
4  Q.    Yes.
5  A.    Yes.
6  Q.    Okay.  So that's the other report?
7  A.    Yes.
8  Q.    Okay.  All right.  So when you read your report
9  to prep for your depo today, you also listened to your
10 audio recording?
11 A.    Most of it, yes.
12 Q.    Why'd you stop?
13 A.    It was -- to be honest with you, I read my
14 report.  I drafted -- or looked at it, refreshed my
15 recollection and I listened to the audio recording last
16 and I just ran out of time.
17 Q.    Was this like this morning?
18 A.    Last night or I think this morning.
19 Q.    Gotcha.  All right.  Okay.  Did you read
20 Fernandez's -- or Lieutenant Fernandez's summary?
21 A.    Yes.
22 Q.    Okay.  On the day of July 8th, was any of this
23 summary then in existence?
24 A.    The only summary that I would know, I don't -- I
25 didn't actually see it, but I would draw a conclusion

Page 121

1 that it was was the summary drafted to be able to obtain
2 the search warrant.
3 Q.    Okay. So some summary on here would have been
4 in existence. You just didn't see it?
5 A.    To be able to obtain the search warrant, there
6 has to be an investigative summary that was included in
7 the search warrant.
8 Q.    Okay. Even if the summary in the search warrant
9 differs from the summary here?
10 A.    All I'm saying is that I know there's an
11 existence of a summary, but I don't know about the
12 report.
13 Q.    Okay. So for Exhibit -- Exhibit A, some --
14 that's -- that summary, some iteration of that for any
15 search warrant has to exist?
16 A.    To clarify, I just know there has to be some
17 investigative summary of what's happened so far to be
18 able to obtain a search warrant. I don't know what was
19 drafted the report on July 8th.
20 Q.    Okay. Gotcha. All right. So when you -- so go
21 to page 10 of Exhibit A. I apologize, eight.
22 A.    Page eight.
23 Q.    Yes. You got it?
24 A.    Yep.
25 Q.    Okay. So it says, "Supplemental Narrative"

Page 122

1 towards the bottom. It's got a date, July 12th, 2022?
2 A.    Yes.
3 Q.    "10 a.m., at 12 minutes, 57 seconds, Duncan
4 Jacob." This is -- so does this -- what does this
5 indicate?
6 A.    I actually am not, honest with you, I don't
7 know -- to clarify, not to be honest. To clarify, I'm
8 not sure if that's when it was created or when it was
9 submitted.
10 Q.    Okay. So you might have written -- does that
11 mean you at least -- you at least -- obviously it was --
12 strike that.
13       Okay. So you -- this was either -- this
14 investigative narrative that you have below that was
15 either created or submitted at that time?
16 A.    Yeah, I believe it's when it was created but --
17 yeah, I believe the date at the top is when it was
18 created.
19 Q.    Okay. Okay. So have you ever -- have you ever
20 gone to one of these investigative supplemental
21 narratives or narratives and so you open an entry, you
22 complete it and go back into it and add to it?
23 A.    Yes.
24 Q.    Okay. You don't just start a new narrative?
25 A.    Every single time I open it up?

Page 123

1 Q.    I mean, it appears you did here.
2 A.    I -- that was just the manner of how I draft
3 reports, but no. You can go in there and continue to
4 edit your narrative until you submit it.
5 Q.    Okay. Okay. So does -- why did you elect to do
6 supplemental -- multiple supplemental narratives here on
7 page, let's see, Bates stamp Duncan8, 9, 10?
8 A.    Just as a manner of my detective work, I like to
9 separate out how I conduct my investigations. It's
10 easier for me to refer to in the future for testimony.
11 Q.    Okay. Do you ever go back and change something
12 in a prior narrative?
13 A.    Not after it's submitted.
14 Q.    Not after it's submitted. Can you after it's
15 submitted?
16 A.    I don't believe so. I haven't tried, but I
17 don't believe you can.
18 Q.    Okay. Okay. Okay. So you just start a new
19 narrative then for -- well, strike that. Okay.
20       Okay. Anyway, so your -- once you're at the
21 Starky's Bleating Hearts Farm, walk me through -- you
22 spoke with Justin first, then Kristin comes out of the
23 house. Is that what you said?
24 A.    I believe she comes out of the house.
25 Q.    She comes out of the house. And what does --

Page 124

1 does she introduce herself or do you -- well, what
2 happens first?
3 A.    Yeah. She introduced herself. And then I think
4 I primarily spoke to her while Lieutenant Fernandez and
5 Justin Starkey searched the property, or he showed
6 Lieutenant Fernandez the property, and he primarily
7 spoke to Justin Starkey.
8 Q.    Okay. So were you in earshot of him at this
9 time?
10 A.    No. And I think I was more focused on her
11 conversation and talking to her than what they were
12 talking about.
13 Q.    Okay. Well, were you in earshot, or were you
14 not in earshot?
15 A.    I don't recall.
16 Q.    You don't recall. But they were searching the
17 property?
18 A.    Yes.
19 Q.    And you stayed with her?
20 A.    Yes.
21 Q.    Were the goats right, you know, near you at the
22 time?
23 A.    There were animals near us, yes.
24 Q.    Did you go anywhere on the property with her?
25 A.    I don't believe so. I think her and I were

Page 125

1  pretty confined to just hanging out in one area in the
2  backyard, and Lieutenant Fernandez was shown the
3  property by Justin Starkey.
4  Q.    Okay.  So if you -- if you can point out to me,
5  because I believe in the warrant there is -- spatially,
6  I can see this.  There's on -- so Bates stamp number 20.
7  So I'm going to give you -- you don't need to mark that
8  up, but I have one which you can mark mine up, so.
9         (Whereupon, Plaintiff's Exhibit E, one-page
10        aerial map, was marked for identification.)
11 Q.    All right.  So here's their property, right?
12 A.    Uh-huh.
13 Q.    Third Street.  And where did you -- if you want
14 to just point, where did you and him pull up?
15 A.    We pulled up, I believe, right here.
16 Q.    Right here.  So just put entrance there -- or
17 enter, rather.
18        Okay.  And at this point where is Justin
19 Starkey?
20 A.    I believe we had to knock on the door.  I don't
21 think he --
22 Q.    He wasn't just out?
23 A.    I don't believe so.
24 Q.    Okay.  I assume he saw the cars come up and then
25 came out to greet?

Page 126

1  A.    I don't remember if he came out or we had to
2  knock on the door.
3  Q.    Okay.  Gotcha.  All right.  Didn't -- yesterday
4  when you listened to the recording, didn't that say it
5  or that refresh your memory?
6  A.    I'm trying to -- yeah, I'm trying to recall
7  exactly what happened.  I want to -- I want to say he --
8  he came out, but I don't specifically recall.  There
9  was -- there was -- I think there was two Napa County
10 guys and then us two.  So from the recording without
11 actually hearing it, again, I don't know if somebody
12 went up to the door, or he just came out because I think
13 that when we pulled, somebody -- one of our cars made a
14 noise, and like he heard that we were there.
15 Q.    Okay.  Okay.  And where were the Napa people at
16 this time?  Is that even evident on this map?  The Napa
17 sheriffs?
18 A.    They came in with us so I --
19 Q.    Okay.
20 A.    -- want to say that I don't know if we pulled
21 ahead or they were in front of us, but we pulled into
22 the driveway.
23 Q.    So you're all in this area?
24 A.    We might have continued pulling forward because
25 it's a loop.

Page 127

1  Q.    You were all in the driveway?
2  A.    Yes.  We were all in the driveway.
3  Q.    Okay.  So Fernandez -- and you may knock on the
4  door and then -- or Justin came out, one or the other?
5  A.    Yeah.
6  Q.    And so Fernandez went to do an investigation or
7  went to look for Cedar, correct?
8  A.    Yes.  We all went into the bark yard.
9  Q.    You all went into the backyard?
10 A.    Yes.
11 Q.    Okay.  So where back here?
12 A.    Generally right here.
13 Q.    Generally right here.
14 A.    Yeah.
15 Q.    Okay.  So and you stay in this spot with
16 Kristin?
17 A.    Yes.  During the time I was there, I believe I
18 spent with Kristin back there.
19 Q.    Okay.  Where were you on the other part -- apart
20 from walking back there?
21 A.    I don't -- I'm trying to remember.  I don't know
22 if I actually went and saw any of this back -- any of
23 these stalls back here.
24 Q.    But Fernandez did?
25 A.    Yes.

Page 128

1  Q.    So you weren't in earshot of them the whole
2  time?
3  A.    No.
4  Q.    Okay.  Okay.  So Fernandez is back here for some
5  portion of it?
6  A.    He went to look at the -- or Justin showed him
7  the whole property, yes.
8  Q.    Okay.  Justin showed him the whole property, and
9  you were, let the record show, you were basically -- I
10 guess I'll turn this into an exhibit even though it's
11 not of great use, but I'll try.
12        Okay.  So Fernandez goes to the -- do we know --
13 do we know what direction, north, south, east and west,
14 is on here?
15 A.    I don't know.
16 Q.    I don't either.  Okay.  But let's assume --
17 let's not assume, but okay.
18        On this piece of paper, the Third Street is
19 running, you know, up and down in the paper, and the
20 parcel is running, you know, horizontally with it, yeah.
21 So there towards the back of the parcel.
22        Okay.  And how long was Fernandez back there
23 with Justin?
24 A.    To estimate, I would say we were probably there
25 like 20 minutes.

---

**Page 129**

1 Q. Yeah. I believe the recording is 23 minutes --
2 A. Yeah.
3 Q. -- so you're close. Okay. And was the
4 recording on the whole time you were there?
5 A. Pretty much it was.
6 Q. Okay. It appeared to be.
7 A. Yeah.
8 Q. But I'm not there, so I don't know.
9 So after the recording was turned off, did you
10 have any further conversations with him?
11 A. No, not to my knowledge. We would have --
12 common practice is we would have ended the recording
13 when we were done with the contact with him.
14 Q. Okay. All right. So and I'll play the
15 recording or portions of it shortly, so maybe that will
16 refresh your memory.
17 So you stayed with Kristin basically in the
18 backyard close to the house furthest -- further away
19 from the goat pens? The goat pens are down the property
20 further from the house?
21 A. Yes. But there's also goats wandering the
22 property because I think there's like one point where
23 the goat like came up to Kristin and I. So even though
24 there's goat pens, like there's also just animals
25 roaming the backyard of the property.

---

**Page 130**

1 Q. How many goats are -- how many animals are
2 there?
3 A. I couldn't tell you.
4 Q. 50?
5 A. No. There wasn't 50.
6 Q. But there's a lot. It's a menagerie.
7 A. There's a good amount of animals there, yes.
8 Q. 20, 30?
9 A. I would probably say 20. 10 to 20 is an
10 estimation. More than 10. It's probably 20.
11 Q. Okay. All goats?
12 A. No. I think they had other things other than
13 goats as well.
14 Q. Okay. All right. Okay. All right. So and you
15 were with her for the whole 20 minutes you were there or
16 23 minutes --
17 A. Just the majority of the contact.
18 Q. The majority of the contact, okay. All right.
19 Okay. And Napa PD remained back at the driveway on the
20 opposite side of the house the entire time?
21 A. I actually don't recall where they were.
22 Q. I thought you said they pulled in behind --
23 A. I did. I just mean as far as I don't know if
24 they stayed there or if they came back with us.
25 Q. Okay. All right. Okay. Well, they didn't

---

**Page 131**

1 proceed with you to Ray's afterwards, no?
2 A. No.
3 Q. No. Okay. All right. Okay. I'm just going to
4 mark this as an Exhibit E.
5 Okay. You just want your own copies?
6 MR. NORTHCUTT: That's fine. I just need it for
7 a second.
8 MR. GORDON: Q. All right. Okay. I'm going to
9 play -- if I play portions of this audio, do you need to
10 hear the whole thing to answer questions about it or
11 will you recall?
12 A. I don't think so. I should be able to recall
13 because I'm familiar with it. But if there is, I will
14 let you know.
15 Q. Your attorney might object and then I'm going to
16 have to play the whole thing and it's 23 minutes long.
17 I don't know if you want to sit for the whole thing
18 which I'm happy to play. But if you remember well
19 enough, then I'll just play the portions I want to play.
20 A. I'm comfortable answering questions with the
21 portions you want to play. And if I don't feel
22 comfortable answering in the context, I'll let you know.
23 Q. Okay. All right.
24 MR. NORTHCUTT: That's fine. I think we did
25 that yesterday.

---

**Page 132**

1 MR. GORDON: We did. I just didn't -- I should
2 have asked beforehand but it's -- you didn't object, but
3 he seemed like he knew, so.
4 MR. NORTHCUTT: If the detective doesn't feel
5 comfortable answering, then we can play the whole thing,
6 I guess.
7 MR. GORDON: Yeah. Then we'll play the whole
8 thing, so we'll go off the record and we'll just listen
9 to it.
10 THE WITNESS: Sounds good.
11 MR. GORDON: Just get my timestamps.
12 MR. NORTHCUTT: Are you going to email the
13 portions of the exhibit?
14 MR. GORDON: I'm just going to email the whole
15 thing and give the timestamps on the record like
16 yesterday. I still haven't -- I still haven't emailed
17 the one yesterday, and they asked me about it, so I will
18 do that at the break. Okay.
19 (The audio is being played at this time.)
20 MR. GORDON: Q. That your voice?
21 A. That is my voice.
22 Q. It almost sounded like Fernandez there.
23 A. I always hate listening to my own voice.
24 Q. Yeah, no one likes listening to it. I loathe
25 hearing mine as well.

---

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 36 of 74

LONG vs.                                        DETECTIVE JACOB DUNCAN
FERNANDEZ                                              August 22, 2023

Page 133

1      Okay.  So I'm going to rewind a little bit
2  before the relevant part just so you can frame where
3  you're at.
4  A.      Yeah.  Of course.
5      (The audio is being played at this time.)
6  Q.      So is that you talking, or is that Fernandez?
7  A.      That's me.
8  Q.      That's you.  What did you mean, "Obviously we
9  know you're associated with some agency here"?
10 A.      Justin Starkey was believed to be an employee --
11  or I was told that he was an employee with Napa County
12  Sheriff.
13 Q.      When did you learn that?
14 A.      I believe we learned that sometime prior to when
15  we got there, so I imagine it was during our meeting
16  with or briefing with the Napa County deputies.
17 Q.      Okay.  All right.  So do you remember that in
18  the conversation?
19 A.      No.  I just know I remember knowing that fact.
20  I don't remember specifically when or the conversation
21  happened.  I know we were told that.
22 Q.      Any reason you didn't tell us earlier that --
23  when I said tell us all the facts you knew, you know, of
24  what you were going down there to do?
25 A.      Well, specifically you told me to tell you the

Page 134

1  details of the conversation, but I don't remember the
2  specific details of the conversations.
3  Q.      Okay.
4  A.      So now that you're bringing that up, obviously I
5  know that I knew that beforehand.  I don't recall
6  specifically when that was told to me.
7  Q.      All right.  But you knew it.  You must
8  have -- did you learn it that day?
9  A.      Yeah.  I did not know it prior to that day.
10 Q.      You did not know.  You're certain of that?
11 A.      Yes.
12 Q.      I believe you.  I'm just, you know.  Okay.
13      (The audio is being played at this time.)
14 Q.      This is still you speaking at this point?
15 A.      Yes.
16 Q.      At this point where is Fernandez?
17 A.      I think he is out with Justin Starkey, and
18  Justin Starkey is showing him the property.
19 Q.      So the first -- just for the record, the first
20  timestamp I went to was at 2:20, started playing there.
21  And then the second timestamp was at six minutes.  So
22  yeah.
23      (The audio is being played at this time.)
24 Q.      Okay.  So the first question, I couldn't -- and
25  I'll replay it because I can't quite understand what

Page 135

1  you're saying.  You mention -- do you say, "We have a
2  search warrant to search your phone"?
3  A.      No.  I said I -- I was telling her I don't want
4  to ask any further where we have to write a search
5  warrant for her phone.
6  Q.      Okay.  All right.  I wasn't sure if you said,
7  "We have a search warrant for your phone."
8  A.      No, no.
9  Q.      Because the search warrant didn't --
10 A.      Did not --
11 Q.      Yeah, did not allow to search the phone?
12 A.      To my knowledge, I didn't have -- I wasn't aware
13  the search warrant we had included her cell phone, no.
14 Q.      Okay.  Okay.  All right.  All right.  And then
15  she mentions -- then she mentions that she had spoken to
16  a lawyer.  Did you relay that --
17 A.      I think she had spoken to --
18 Q.      Not her --
19 A.      Jessica Long, yeah.
20 Q.      Let me rephrase.  Strike my last question.
21  Doesn't mean it's actually struck.  It just means I get
22  to rephrase it, and you're now answering this one.  It's
23  still going to show up on the transcript as a terrible
24  question, just it will be unanswered.
25      So I only say that because someone once told me

Page 136

1  I was at this deposition, it wasn't an attorney, and
2  this lawyer just kept saying, "strike it," "strike it,"
3  "they're manipulating the record."  Like that's not what
4  that means.
5  A.      Yeah.
6  Q.      Anyway.  So me asking a stupid question is
7  memorialized.
8      Anyway, so Kristin mentioned that Jessica had
9  spoken with a lawyer?
10 A.      That was my interpretation of what she said,
11  yeah.
12 Q.      Yes.  Okay.  And did you -- did that set off any
13  alarm bells with you?
14      MR. NORTHCUTT: Objection.  Vague and ambiguous
15  as to "alarm bells."
16      THE WITNESS: I don't recall actually thinking
17  or reading into too much of what she said.
18      MR. GORDON: Q.  Okay.  So that didn't make --
19  give you pause one way or the other?
20 A.      I don't recall what I thought at that moment,
21  but I imagine if it was something significant, I would
22  remember it.
23 Q.      Okay.  So you had no independent thought after
24  that comment.  You just -- you just went on with the
25  search?

Page 137

1    MR. NORTHCUTT: Objection. Asked and answered.
2    MR. GORDON: You can answer.
3    MR. NORTHCUTT: Misstates his testimony.
4    MR. GORDON: He's putting objections on the
5  record. You still can answer. You know what I mean.
6    THE WITNESS: I'll just let him finish.
7    MR. GORDON: That's fine.
8    THE WITNESS: Yeah. As I said, I don't recall
9  anything specifically -- or I don't recall remembering
10 anything specifically about what I thought about that.
11   MR. GORDON: Q. Okay. All right. Have there
12 been other cases where someone says that -- someone
13 you're investigating that they have a lawyer?
14 A.    Or they've talked to a lawyer?
15 Q.    Yeah.
16 A.    Yeah. I'd say that happens all the time where
17 people say they've talked to a lawyer or they, you know,
18 they consulted an attorney or looked the law up online
19 or anything of that nature.
20 Q.    When they say they have -- what about -- sorry,
21 I can't speak. Strike the mumbling I just did.
22       When it's a property seizure, has anyone said to
23 you in one of those cases that someone who has claimed
24 this property has a lawyer?
25   MR. NORTHCUTT: Objection. Vague and ambiguous.

Page 138

1  Overbroad as to time. Relevance.
2    MR. GORDON: Since 2016.
3    THE WITNESS: It happens regularly where we're
4  doing an investigation including property disputes where
5  somebody says I've retained a lawyer or I'd like a
6  lawyer or different things like that.
7    MR. GORDON: Q. Okay. All right. And -- okay.
8  All right. So you've heard it before?
9  A.    Yes.
10 Q.    Did you tell Lieutenant Fernandez that Kristin
11 said Jessica has a lawyer?
12 A.    I don't recall.
13 Q.    Think you did?
14 A.    I, honestly, I don't recall if I told them that
15 or not.
16 Q.    Okay. Okay. Okay. So -- okay. So did at any
17 time -- earlier in our deposition you had mentioned
18 vehicle disputes where two people are claiming
19 ownership. Did at any point in time this strike you as
20 a dispute between ownership especially given that
21 Jessica, you were notified that she had a lawyer?
22 A.    The facts of the case --
23   MR. NORTHCUTT: Objection. Vague and ambiguous
24 as to "dispute." Calls for a legal conclusion. Go
25 ahead.

Page 139

1    THE WITNESS: The facts of the case that I was
2  presented was that Jessica Long had stolen the goat from
3  the fair.
4    MR. GORDON: I know, but you were just presented
5  with a new fact that she had an attorney. Did that
6  suggest anything other than that she was taking issue
7  with what happened?
8    MR. NORTHCUTT: Objection. Misstates evidence.
9  Assumes facts not in evidence.
10   THE WITNESS: She presented the statement that
11 Jessica had spoke to a lawyer not that she had retained
12 a lawyer.
13   MR. GORDON: Q. But you're still on notice that
14 she's talking to an attorney; is that yes?
15 A.    She said that she had spoke to a lawyer, yes.
16 Q.    Okay. All right. Now, did that indicate to you
17 that there might be any sort of property dispute here?
18   MR. NORTHCUTT: Same objections.
19   THE WITNESS: No. The facts remained for me
20 still that what I knew was that Jessica Long had stolen
21 a goat from the fair. That's what I was given.
22   MR. GORDON: Q. Not what you knew; what you
23 were told?
24 A.    That's the information I was provided.
25 Q.    So this didn't register as altering or

Page 140

1  significant -- this didn't register as anything
2  important to you one way or the other whether or not she
3  talked to an attorney?
4    MR. NORTHCUTT: Objection. Asked and answered.
5    THE WITNESS: We're regularly told that people
6  talk to lawyers or look things up online, so no, it is
7  not significant that somebody were to have told me
8  somebody spoke to a lawyer.
9    MR. GORDON: Q. Okay. So no?
10 A.    No.
11 Q.    Okay. It's not a gotcha. Just trying to -- you
12 think it is, but.
13   MR. NORTHCUTT: Although he would say every
14 third sentence it's not a gotcha. I think there's a lot
15 of gotchas.
16   MR. GORDON: Well, because when everyone -- as
17 you know, when people are getting deposed, they're very
18 nervous with the -- I'm not saying you're a nervous
19 person but you're -- I'm just confirming stuff for the
20 record, so. That's your position, that's your position.
21 That's fine. Your testimony is your testimony. If
22 that's what you thought, that's what you thought, so.
23       All right. So next I just started playing at
24 8:22, for the record.
25       (The audio is being played at this time.)

Page 141

1    **MR. GORDON:** Q. All right. So well, first
2  question, earlier you did say that you had no thought
3  one way or the other about this is, you know, ridiculous
4  to drive down there and get the goat, but you seemed to
5  make a comment there to her like --
6    **MR. NORTHCUTT:** Objection. Argumentative.
7    **MR. GORDON:** Q. -- you know, over a goat. Did
8  you have that thought at the time?
9  **A.    So I think that's a common thing that I do in**
10 **most cases as an interviewer is trying to mirror what I**
11 **think that person's going to think to elicit**
12 **conversation, which obviously worked because she**
13 **continued to talk to me and build rapport. So I**
14 **wouldn't necessarily say that was my opinion; however,**
15 **that is what I probably thought she thought, and so I**
16 **reflected that. And it obviously worked because she --**
17 **her and I had an amicable relationship throughout that**
18 **conversation.**
19 Q.    Okay. So you did not have that opinion?
20 **A.    I don't recall having that opinion at the time,**
21 **no.**
22 Q.    Okay. You recall having no independent thought
23 about whether it was a good use of time or resources to
24 drive 200 miles plus not round -- one way to get a goat?
25    **MR. NORTHCUTT:** Objection. Assumes facts not in

Page 142

1  evidence. It's argumentative. It's asked and answered.
2  Go ahead.
3    **THE WITNESS:** No.
4    **MR. GORDON:** Q. Thank you. Okay. Okay. So
5  then you also mentioned she started talking about
6  hijacking and the fairgrounds. Do you know any of those
7  facts at that point?
8  **A.    I think, to be honest with you, a lot of that**
9  **stuff I learned from her talking to me. I don't**
10 **remember exactly what I learned beforehand or I learned**
11 **of because, as I said, I know I know this information,**
12 **but a lot of that stuff I think she told me which I**
13 **gained from talking to her.**
14 Q.    Okay. So Fernandez on the ride down didn't
15 mention anything about the fair. She took it out of the
16 fair?
17 **A.    I knew the goat was stolen from the fair and**
18 **that there was an auction, yeah, as I previously**
19 **testified.**
20 Q.    Oh, did you previously testify to that?
21 **A.    Yes.**
22 Q.    Okay. All right. Again, not a gotcha. I don't
23 recall. So if you said --
24 **A.    I remember the --**
25 Q.    It will be on the record if you said that, okay.

Page 143

1    All right. So -- interesting. So next I'm
2  going to timestamp -- let's go 20 minutes and 50 seconds
3  into the audio, for the record. Actually not. I'm
4  going to go a little bit further. So 21 minutes and 10
5  seconds, we're going to start there.
6    (The audio is being played at this time.)
7  Q.    This is still you talking, yes?
8  **A.    Yes.**
9  Q.    I'm going to go ahead just five seconds because
10 we don't need to hear social security numbers. We're
11 starting at 21:32.
12    (The audio is being played at this time.)
13 Q.    When you relistened to the video, did you think
14 "fart in the wind" is this woman's favorite expression?
15 **A.    I didn't even catch her saying it.**
16 Q.    She says it like eight times.
17 **A.    Oh, does she?**
18 Q.    Anyway. So my question is what did you mean
19 when you said, "Because of your husband's position," you
20 know, "maybe don't" -- "maybe don't contact" -- "maybe
21 don't contact Jessica"?
22 **A.    I think on a human level I thought both of them**
23 **were nice people and that limiting their involvement in**
24 **a criminal investigation would probably be the best for**
25 **him being involved in law enforcement.**

Page 144

1  Q.    Okay. Did you -- okay. Do you think that was
2  perceived as threatening to his job potentially?
3  **A.    No. I think my conversation with her the entire**
4  **time was amicable, and it came across as a human level**
5  **like, hey --**
6  Q.    You were just trying to help her?
7  **A.    Yes. Honestly, yeah, I was.**
8  Q.    Okay. I will email you a copy of the audio.
9  And then however you would like to incorporate or make
10 it an exhibit to the -- I guess we should make it an
11 exhibit. We did that yesterday, yes? So the audio
12 would be Exhibit F.
13    **MR. GORDON:** Exhibit F. So okay. All right.
14 Go off the record for a moment.
15    **THE VIDEO SPECIALIST:** We're off the record, and
16 the time is 12:35.
17    (Whereupon, a break was taken from 12:35
18    till 1:00 p.m.)
19    **THE VIDEO SPECIALIST:** We're back on the record,
20 and the time is 1300.
21    **MR. GORDON:** Q. Okay. So we are -- we went
22 through -- we last went through the audio recording of
23 Kristin Stover.
24 **A.    Yes.**
25 Q.    And your conversation with her. Okay. And you

Page 145

1  didn't find -- well, okay. Didn't find Cedar at her --
2  at Bleating Hearts, correct?
3  A.    No.
4  Q.    Okay. Did -- do -- did you -- apart from -- did
5  Fernandez tell you what he discussed with -- with Justin
6  while they were on the backside of the property in the
7  pens?
8  A.    No. To my recollection, he just told me that
9  the goat was not there.
10  Q.    Okay. And you couldn't -- he was too far away
11  to be heard at that point in time so you don't -- or is
12  that accurate?
13  A.    Yes. I believe so.
14  Q.    Okay. And that's when they were actively
15  looking for Cedar on the property?
16  A.    Yeah. Justin knew Cedar wasn't there, but
17  Justin was showing Lieutenant Fernandez the property,
18  yes.
19  Q.    Okay. Okay. And then you -- then you -- what
20  happened next? What did you do while you were with
21  Kristin?
22  A.    So Kristin and I were, as you previously played,
23  just conversing.
24  Q.    Yeah.
25  A.    And I was asking her about Cedar. And while she

Page 146

1  was looking for I believe Jessica's phone number, she
2  was standing close to me and I could see her scrolling
3  through some emails and I pointed that fact out to her
4  and she said, yeah, I got some emails here or something
5  along those lines, it's in the recording, but she said
6  something similar and I asked her if I could see them
7  and she said some form of "yeah" and handed me the phone
8  to view those.
9  Q.    So that was her mistake, right? You would not
10  have --
11  A.    I think she was -- I think she was a
12  good-natured person. I think my opinion is that she was
13  nervous just talking to law enforcement, but she had
14  intentions to be cooperative. So she obviously lied
15  throughout our contact.
16  Q.    Yeah.
17  A.    But I -- you know. So.
18  Q.    Okay. Why do you think she didn't say where
19  Cedar was?
20        MR. NORTHCUTT: Objection. Calls for
21  speculation. Go ahead.
22        THE WITNESS: Based on the context of what we
23  were saying, I think that she was trying to limit her
24  involvement while also she has a goat sanctuary, so I
25  imagine she probably obviously cared about Cedar as well

Page 147

1  and didn't want us to obtain Cedar.
2        MR. GORDON: Q. Yeah. Okay. Okay. So about
3  how long -- the recording is 23 minutes. Is that about
4  how long -- or 23 minutes and change. Is that about how
5  long you were at Kristin's and Justin's property?
6  A.    Yes. I believe so.
7  Q.    Okay. All right. And -- okay. What did you do
8  when you left their property?
9  A.    Well, in my conversation with Kristin and review
10  of her emails, I discovered that Cedar was at Billy's
11  Mini Goat Farm in Sonoma.
12  Q.    Okay. So you concluded that in your
13  investigation. What did you -- so about what time --
14  about what time did you leave the Bleating Hearts?
15  A.    I think we left directly following when that
16  interview ended. We went directly to Billy's Mini Goat
17  Farm in Sonoma.
18  Q.    Do you remember approximately what time that
19  was?
20  A.    Well, we got there at 7:30, and the recording is
21  23 minutes. I would say probably around eight o'clock
22  that night.
23  Q.    So at Bleating Hearts -- or Ray's Farm where
24  you -- where you concluded Cedar was, that was not in
25  Napa County, right?

Page 148

1  A.    It was in Sonoma County.
2  Q.    Why didn't you -- so when do you decide to -- so
3  strike all that.
4        So it's about eight o'clock at this point when
5  you're leaving and you turn your recorder off so I can't
6  hear what's happening next, of course.
7  A.    Yeah.
8  Q.    So did you -- what do you and Fernandez discuss
9  after you turn the recorder off while you're still on
10  Starky's property?
11  A.    I think we discussed whether or not we were
12  going to go back to Shasta County or to attempt to make
13  contact with the owner of Billy's Goat Farm.
14  Q.    Why would you have gone back to Shasta? Just to
15  conclude the investigation or for some other purpose?
16  A.    Yeah. To like we tried to go down, we tried to
17  look at Billy's and -- I mean at Bleating Hearts. Cedar
18  wasn't there, so we discussed whether or not we should
19  go back or make contact with Billy's Mini Goat Farm.
20  Q.    Okay. And what did you conclude?
21  A.    That we were in a close vicinity to Billy's Mini
22  Goat Farm, so we would at least try and make contact
23  with the owner there and see what, you know, what that
24  side of it was.
25  Q.    Why didn't you get a warrant for that location?

Case 2:22-cv-01527-DAD-AC   Document 99-11   Filed 07/31/24   Page 40 of 74

LONG vs.                                                                    DETECTIVE JACOB DUNCAN
FERNANDEZ                                                                        August 22, 2023

Page 149

1  A.      Because we were already down there and it was
2  more of like we were going to have a discussion with
3  that person, see what the situation was and if we needed
4  to obtain a warrant that we could obtain a warrant at
5  that time.
6  Q.      Okay.
7  A.      And to further clarify, the only thing I had
8  seen as far as probable cause at that point is the
9  emails.  So if we got there and spoke to the owner or if
10  we were able to build any additional probable cause,
11  that would be important for our search warrant.
12  Q.      Didn't Kristin say that he was -- that Cedar was
13  there?
14  A.      The email said that, yes.
15  Q.      Email said that, okay.  And that -- and that --
16  that wasn't enough probable cause that he was there?
17  A.      It probably would have been.
18  Q.      Probably would have been, okay.  Because the
19  Instagram post apparently was for the warrant, and that
20  doesn't even say he's at Bleating Hearts, correct?
21  A.      Yeah.  I mean, there's different people write
22  different warrants.  You know, I was the one who found
23  that, and the discussion was we're already close by, not
24  close by, but closer, so we go there and at least
25  verify, put eyes on the property and see, you know, what

Page 150

1  there is to see.
2  Q.      Okay.  So before you went there, did you contact
3  anyone else?
4  A.      I believe Lieutenant Fernandez called Sonoma
5  County and just gave them a heads-up we were going to be
6  there.
7  Q.      Okay.  Did Sonoma County, what was their
8  response?
9  A.      They sent I believe two deputies to meet us
10  outside of the residence, outside of the driveway,
11  and they came with us to the property.
12  Q.      Okay.  Do you remember these deputies' names?
13  A.      No.
14  Q.      Was it a male, female?
15  A.      I believe it was two males.
16  Q.      Two males.  Approximate age?
17  A.      Younger.  Probably 20s to 30s.
18  Q.      20s, 30s.  Were they black, white, Latino?
19  A.      I don't remember.
20  Q.      Asian?  You don't remember, okay.  Okay.  And
21  about what time do you arrive at Ray's?
22  A.      I want to say it was like another 45 minutes,
23  something along those lines, to get to Billy's Mini Goat
24  Farm.  30 to 40 minutes.
25  Q.      30 to 40 minutes, okay.  All right.  So it was

Page 151

1  probably 8:45ish when you got there?
2  A.      I would imagine sometime around then.
3  Q.      Sometime around then.  Okay.  And what happened
4  when you arrived at Ray's?
5  A.      I called the property owner and -- well, we -- I
6  think we attempted contact, and nobody answered the
7  door.
8  Q.      So would -- does that mean you just went and
9  knocked on the door or rang a doorbell?
10  A.      Yeah.  I think we tried to make contact at the
11  residence first.  I know I called the property owner.  I
12  don't remember if we tried to make contact with him at
13  the residence before we called him, but I know we called
14  the property owner.  Or I called the property owner.
15  Q.      Okay.  All right.  So you go up, he's not home
16  and you -- you got the number of the property owner from
17  the emails that Kristin showed you?
18  A.      From the website.
19  Q.      From the website, okay.  So you checked the
20  website before you went?
21  A.      Yes, I did.
22  Q.      Okay.  All right.  And why did you call and not
23  Fernandez?
24  A.      I think it was just a matter of, you know, I
25  took the initiative to call them.  You know, I don't

Page 152

1  think there was a specific purpose of he called them or
2  I called them.
3  Q.      Okay.  But you didn't, according to you, didn't
4  really know much about the case other than there was a
5  goat allegedly stolen by Fernandez?
6  A.      Yeah.
7  Q.      Okay.  So you called.  Was the gentleman's name
8  Ray?
9  A.      Yes.  I think he identified himself as Raymond
10  Allen.
11  Q.      Raymond Allen.  And what did you say to Raymond
12  Allen?
13  A.      I explained that we were conducting an
14  investigation into a stolen goat and that we had reason
15  to believe that a female -- I don't know if I identified
16  her as Jessica or not, but a female subject had dropped
17  the goat off at his residence.
18  Q.      Okay.  So and you used the word, "stolen," to
19  Ray?
20  A.      Yes.  I believe I told him that it was a stolen
21  goat investigation.
22  Q.      Did you tell him that it hadn't been adjudicated
23  by a judge yet?
24  A.      No.
25  Q.      You just told him it was an investigation?

LONG vs.
FERNANDEZ

DETECTIVE JACOB DUNCAN
August 22, 2023

---

Page 153

1　A.　　Yes.

2　Q.　　Okay. So presumably he understood it to be an
3　open investigation?

4　A.　　I can't speculate as far as what he thought, but
5　I can tell you what I told him which is I told him it
6　was a stolen goat investigation.

7　Q.　　You used the word, "investigation," for sure?

8　A.　　I don't know if I used the word,
9　"investigation," or if I said, "I'm investigating a
10　stolen goat," but it was somewhere along those lines.

11　Q.　　Okay. Gotcha. And what did he say?

12　A.　　He told me specifically that a female subject
13　had come and donated the goat. He knew what goat I was
14　talking about. He said that recently a female had came
15　and donated the goat to him and that it still had the
16　fair tags on its ears, and he said he didn't want
17　anything to do with it and that we had permission to
18　retrieve the goat and told me exactly where the goat was
19　on his property.

20　Q.　　Okay. Did you ask him why there were tags on --
21　yeah, did you ask him why there were still tags on it?

22　A.　　Well, he said it was from the fair.

23　Q.　　But if it's a donation, why didn't he presume it
24　was his goat at that point in time?

25　A.　　I agree with you. However, what I can tell you

---

Page 154

1　is he told me the tags were still on there. I construed
2　that like he was aware it was from the fair because
3　it still had tags on it. But I didn't -- I didn't do
4　a -- inquire as far as like why he did this or why he
5　didn't do this.

6　Q.　　And I notice you emphasized the word, "donate,"
7　twice. Did he -- he definitely used the word, "donate"?

8　A.　　He definitely used the word, "donate."

9　Q.　　So why does that word stick out to you in the
10　conversation versus your inability to remember all the
11　other conversations you had that day?

12　MR. NORTHCUTT: Objection. Argumentative.

13　MR. GORDON: That's a fair question.

14　THE WITNESS: Specifically I know that he said
15　"donate" because for me, my job is to do the
16　investigation. I may not be in charge of the actual
17　whole investigation, but I'm a detective, so my
18　detective brain is thinking about what allows us to take
19　things off of a property, what doesn't allow us to take
20　things off of property, who has rights or ownership to
21　the property. And so him using the specific verbiage,
22　"donate," is what gives him standing over that goat and
23　allows him to then give us the goat.

24　MR. GORDON: Q. Did you call Jessica to see if
25　it was a donation?

---

Page 155

1　A.　　I did not.

2　Q.　　All right. So you determined it was definitely
3　a donation as a matter of law?

4　MR. NORTHCUTT: Objection. Misstates the
5　testimony. Calls for a legal conclusion.

6　THE WITNESS: I determined that his mindset, his
7　mindset specifically, was that it was a donation. It
8　was donated to him.

9　MR. GORDON: Q. All right. All right. Okay.
10　Okay. So -- okay. So he used the word -- so and then
11　what happened? You went into the backyard and fetched
12　Cedar?

13　A.　　There was a side pen that was on the property.
14　It was where he described Cedar to be. And we went and
15　retrieved Cedar the goat.

16　Q.　　So at this time were you aware that Jessica was
17　claiming an ownership interest in Cedar?

18　A.　　No.

19　Q.　　Okay. You hadn't yet reviewed the warrant at
20　this point in the day?

21　A.　　No.

22　Q.　　Okay. All right. Did Raymond know he had a
23　choice not to surrender Cedar?

24　A.　　I didn't tell him he didn't have a choice not to
25　surrender Cedar. I told him that we're doing a stolen

---

Page 156

1　goat investigation and his basically -- I wouldn't say
2　he cut me off, but he was very insinuative or apparent
3　that he didn't want anything to do with it and that the
4　goat was a donation, so he didn't have really any
5　interest in the goat, so.

6　Q.　　All right. Did you ask if Jessica still had an
7　interest in the goat?

8　A.　　I did not.

9　Q.　　And at this point were you aware -- well, I
10　guess you were because you discussed that it was from --
11　that Cedar was from an auction, yes?

12　A.　　I knew that Cedar the goat was stolen from the
13　fair and that there was an auction that had taken place.

14　Q.　　You were told he was stolen from the fair, and
15　you weren't there, correct?

16　A.　　You're right. I was told that it was stolen.

17　Q.　　But you didn't review any of the investigative
18　materials in the warrant or in the -- that Fernandez had
19　at that point that are attached in Exhibit A, which is
20　like the sale invoice or the emails that Jessica sent?

21　A.　　No. I was acting on the information that was
22　provided to me.

23　Q.　　Okay. So okay. So what happened after -- what
24　happened after you -- you found Cedar, right? I don't
25　want to cut you off. Tell me -- tell me what happened.

---

LONG vs.
FERNANDEZ

DETECTIVE JACOB DUNCAN
August 22, 2023

---

Page 157

1 You said there was a side pen?
2 A. Yeah. And we found Cedar and we retrieved Cedar
3 and placed Cedar in the animal compartment of the
4 vehicle and we left.
5 Q. Did he cooperate? Cedar?
6 A. I don't remember there being a struggle.
7 Q. Okay. So he just walked him out of there. All
8 right. And what did you do next?
9 A. We drove back to Shasta County.
10 Q. Okay. And yesterday I had asked Fernandez if he
11 was on the clock on this and he said he was -- or
12 Lieutenant Fernandez. I mean no disrespect. I asked
13 Lieutenant Fernandez if he was on the clock for this,
14 and he said he was salaried. But he testified you
15 received overtime for this; is that accurate?
16 A. I don't get salary, so anything I do in a work
17 capacity is overtime.
18 Q. Is overtime, okay. Okay. How many hours OT was
19 this?
20 A. Anything that was worked outside of 5 p.m.
21 Q. Five p.m. your shift cut off?
22 A. Yeah. So whatever time we got back, which I
23 don't recall a specific time, but anything from 5 p.m.
24 to when we got back.
25 Q. Okay. Do you remember approximately when you

---

Page 158

1 got back?
2 A. I don't, but I can deduce if we were there
3 around 9 or 9:30, we probably got back sometime around
4 midnight. So midnight or 1.
5 Q. Okay. Did your wife make any comments about you
6 going all the way to Napa then Sonoma and coming back
7 for a goat?
8 A. My wife makes comments about any time I'm
9 working late.
10 Q. This one in particular?
11 A. No. She makes comments any time I'm working
12 late, so I imagine she probably said something to the
13 effect of missed you for dinner or something like that.
14 Q. All right. Gotcha. All right. But no comments
15 come to mind on this particular date?
16 A. No.
17 Q. Okay. So the only comment that you can remember
18 making light of the situation would be your -- the one
19 that you recorded on with Ms. Starkey saying I can't
20 believe we came down here for a goat?
21 A. When I was empathizing with her to try and
22 create a rapport.
23 Q. Mirroring with her?
24 A. Yes.
25 Q. Are you mirroring right now?

---

Page 159

1 A. Yes. Of course.
2 Q. You can't turn it off, all right. Just tell me
3 what I want to hear. If that's the case, we need to
4 redo some of your answers.
5 Okay. Okay. So you got -- you retrieved Cedar,
6 and then you head back to -- did you stop anyplace on
7 the way?
8 A. We did stop and get gas at some point. I
9 don't -- I want to say it was dark, so it was probably
10 on our way back.
11 Q. Okay. Was Cedar cooperate -- was he acting up?
12 Was he making sounds?
13 A. No. I don't recall.
14 Q. Seem scared?
15 A. I don't recall anything significant about Cedar
16 at that point.
17 Q. Okay. All right. And so where did you go when
18 you came back to -- where did you -- where did you take
19 him?
20 A. I don't know where we took Cedar. I know that
21 Cedar was taken to --
22 Q. What's your understanding of where you took him?
23 A. Somewhere in Shasta County. Lieutenant
24 Fernandez knew exactly where he was going. It was 1
25 o'clock in the morning. I think I was falling asleep.

---

Page 160

1 So as far as where exactly we went, I don't know.
2 Q. On the ride up, did Lieutenant Fernandez call
3 Bruce Macfarlane?
4 A. Yes. I do believe he -- no, actually I'll
5 retract that. I don't think he called him or if he did
6 try and call him, he wasn't successful. I think he was
7 texting, maybe talking to him or something along those
8 lines. I don't remember if he called or texted or some
9 form of that.
10 Q. Okay. So he did communicate with him one way?
11 A. Yes.
12 Q. But you don't recall a conversation?
13 A. No.
14 Q. Did he call or text Kathie Muse?
15 A. Just to clarify, I don't know who he was calling
16 or texting. I'm just saying I know he was communicating
17 with somebody because they -- we got the goat -- we got
18 the goat to somebody. I don't know specifically who he
19 was communicating with.
20 Q. So he was communicating we got the goat to
21 somebody?
22 A. Yeah, because we dropped him off to somebody's
23 house.
24 Q. Sure.
25 A. Yeah.

---

LONG vs.
FERNANDEZ

DETECTIVE JACOB DUNCAN
August 22, 2023

Page 161

1 Q.     Okay.  And what did he tell you about where you
2 were dropping him off?
3 A.     **Nothing.**
4 Q.     Nothing.  Okay.  Nothing.  Nothing at all?  You
5 just don't remember, or he literally said nothing?
6 A.     **No, I don't.  I don't believe he told me who we**
7 **were dropping the goat off to other than a**
8 **representative of the fair.**
9 Q.     You didn't ask?
10 A.     **No.  I did not.**
11 Q.     Okay.  Why not?
12 A.     **Because he was the case agent in charge of the**
13 **investigation.**
14 Q.     But he said you were representing -- you were
15 dropping him off to a representative of the fair?
16 A.     **I do remember -- I do remember knowing like**
17 **whoever we were dropping it off to was a representative**
18 **of the fair, yes.**
19 Q.     Okay.  All right.  Did he say what was going to
20 happen to Cedar?
21 A.     **No.**
22 Q.     Did you ask?
23 A.     **No.**
24 Q.     Did you -- you knew Cedar was sold to be killed
25 at this point, though, yes?

Page 162

1 A.     **To be honest with you, I don't really know much**
2 **about 4-H or FFFA, so I didn't even know that, you know,**
3 **necessarily it's a terminal, you know, auction or**
4 **anything like that until this whole lawsuit**
5 **investigation came up, so no, I did not.**
6 Q.     Okay.  So you didn't know Cedar was -- okay.
7    Did you ask if Cedar's evidence, why are we
8 dropping him off at someplace?
9 A.     My understanding at the time was that the legal
10 standing with Cedar was Cedar was donated to Billy's
11 Mini Goat Farm and that that was then -- we were given
12 that consent from the owner to retain that goat or to
13 take that goat.
14 Q.     But he's still evidence in the case as you
15 testified to earlier?
16 A.     **And I also don't know what was happening with**
17 **the goat when it was dropped off.**
18 Q.     Okay.  But if -- how do you ordinarily store
19 evidence?
20 A.     **Ordinarily we store evidence at the Shasta**
21 **County Sheriff's Office property.**
22 Q.     Okay.  What -- you don't store it, though.
23 There's a clerk that logs it in presumably?
24 A.     **Yeah.**
25 Q.     Okay.  All right.  Do you always log your

Page 163

1 evidence in or do you always -- do you always submit
2 evidence that's allegedly stolen to this clerk?
3    MR. NORTHCUTT: Objection.  Vague and ambiguous.
4    THE WITNESS: No.  We -- so there's times where
5 we turn over evidence or stolen property back to their
6 owners when there's specific court orders that allow us
7 to do that.
8    MR. GORDON: Q.  Okay.  When there's court
9 orders.  But there wasn't a court order, though, here,
10 correct?
11 A.     **I didn't review the entirety of the search**
12 **warrant, so I don't know.**
13 Q.     Have there been other instances where you've
14 turned over -- where you've turned over property, you
15 know, with or without a warrant, but to who you believe
16 is the rightful owner?
17 A.     **After I make a determination who the rightful**
18 **owner is, yes.**
19 Q.     You're allowed to make a determination of
20 rightful.  That's your understanding of the law?
21 A.     **So if we have stolen property that's reported**
22 **stolen and we have a court order that says we're allowed**
23 **to return that stolen property to the owner once it's**
24 **determined to be stolen or embezzled, yes, I've done**
25 **that.**

Page 164

1 Q.     After a court order?
2 A.     **In a search warrant, yes.**
3 Q.     Okay.  So a search warrant can -- if the -- if
4 the -- if the Penal Code provisions we discussed
5 earlier, 1407, 1408, 1536, if they say property needs to
6 be held and they're in a search warrant and they're
7 codified rather, a judge can override them and say you
8 don't need to do this?
9    MR. NORTHCUTT: Objection.  Calls for a legal
10 conclusion.
11    MR. GORDON: It does.  But I'm asking for his
12 understanding.
13    THE WITNESS: Yes.  That is common practice in
14 search warrants where there is court orders that
15 establish that if we, say, find a house that has a bunch
16 of stolen property in it or find stolen property in a
17 location where we've written the search warrant, there's
18 specific court orders that allow us to return that
19 stolen property to the rightful owner.
20    MR. GORDON: Q.  Okay.  If it's found on the --
21 where the search warrant is, yes?
22 A.     **In this example that we're talking about, yes.**
23 Q.     But there's no search warrant for Bleating
24 Hearts?
25 A.     **There was a search warrant for Bleating Hearts.**

Page 165

1    There wasn't --
2  Q.     No search warrant for Ray's, I apologize.
3  A.     **There was no search warrant for Ray's.**
4  Q.     Okay.  Okay.  So why doesn't, 1408 or 1407 says
5  you have to hold stolen property in your custody, why
6  doesn't that apply here?
7         MR. NORTHCUTT: Objection.  Calls for a legal
8  conclusion.
9         MR. GORDON: Your understanding.
10        THE WITNESS: As I previously stated, I wasn't
11  the one who made the determination where Cedar was
12  going.  I wasn't, in my opinion, the custodian of Cedar.
13  That was Lieutenant Fernandez.  And he was the one who
14  was aware of the search warrant.  I was not.  So I
15  didn't make any legal conclusions other than the fact
16  that the standing we had to be on Billy's Goat Farm and
17  the standing we had to collect Billy from -- or collect
18  Cedar from Billy's Mini Goat Farm.
19        MR. GORDON: Q.  Okay.  So you're hands off in
20  your mind.  This wasn't your call.  This was just you
21  were following orders basically?
22  A.     Yes.
23  Q.     Okay.  How do you know who the rightful owner is
24  without the court making an adjudication?
25        MR. NORTHCUTT: Objection.  Vague and ambiguous.

Page 166

1  Calls for a legal conclusion.
2         THE WITNESS: As I previously stated, I didn't
3  make a determination who the lawful owner was.  I made a
4  determination of our standing on the property and us
5  being able to remove Cedar from the property based on
6  the owner's consent.
7         MR. GORDON: Is Fernandez allowed to make a
8  determination of who the rightful owner is, or is that a
9  question for a judge?
10        MR. NORTHCUTT: Same objections.
11        MR. GORDON: Or a court, rather?
12        THE WITNESS: It would be based on the contents
13  of the search warrant and the scope of what he thought
14  he was able to do.
15        MR. GORDON: Q.  What do you do when a search
16  warrant says, as this one does, 1536 applies, hold the
17  property and dispose of it and 1408 and 1407 applies, I
18  can point to the page if you like, but it also says in
19  the back in the -- not in the portion the judge signs,
20  but in the affidavit of probable cause where it says,
21  you know, we -- you know, we want to return him to his
22  rightful owner?  Seemingly, there's a conflict there,
23  yes?
24  A.     So my opinion, that --
25  Q.     Yes, please.

Page 167

1  A.     -- that codified language in the bottom is
2  what's in all of our warrants.  It's a template.  We
3  can't remove that 1536, 1408 language --
4  Q.     Yeah.
5  A.     -- that's in there.  However, we have the
6  ability to override many things with additional court
7  orders essentially like CalECPA.  I can do a
8  nondisclosure order that a judge orders even though
9  California requires us to do electronic disclosures.  So
10  there's many times where a judge can order something
11  that conflicts with the law or conflicts with what may
12  be codified.
13  Q.     Okay.  So here there are exemptions -- what are
14  the exemptions under these facts for not holding Cedar
15  as evidence?
16  A.     Again, I'm not going --
17        MR. NORTHCUTT: Objection.  Objection.  Vague
18  and ambiguous.  Calls for a legal conclusion.  I don't
19  even understand the question.
20        MR. GORDON: Well, he's saying we don't have
21  to -- we don't have to hold Cedar, correct?  The judge
22  okayed it.
23        THE WITNESS: No, you're asking me to say that,
24  and I'm telling you I'm not going to testify to that
25  because I have no conclusion on why we didn't hold Cedar

Page 168

1  or why we did.
2         MR. GORDON: Q.  No, that wasn't my question.
3  That wasn't my question.
4         Okay.  My question is here, the -- here, Cedar
5  is evidence, yes?  You testified to that earlier, so.
6  A.     I would -- I would say Cedar is evidence, yes.
7  Q.     Cedar is evidence, okay.  And there's some
8  provisions in the Penal Code that say you have to hold
9  evidence, yes?
10  A.    Okay.  Yeah.
11  Q.     And you're saying you didn't have to here.  I'm
12  asking what exemptions apply to these facts?
13        MR. NORTHCUTT: Same objection.  Calls for a
14  legal --
15        MR. GORDON: If he knows.
16        THE WITNESS: I think you're misquoting me.  I'm
17  not saying that in this circumstance we didn't have to
18  hold Cedar.  You asked me to talk about search warrants
19  in general, and so I'm telling you there are certain
20  exemptions to search warrants that apply.
21        I didn't make the determination for Cedar, so
22  I'm not saying whether or not we did or not.  That was
23  on Lieutenant Fernandez's ability to make that
24  determination.
25        MR. GORDON: Q.  I see.  So you're unaware of

Page 169

1  whether an exemption applies here.  Is that your
2  testimony?
3  A.    Yes.
4  Q.    Okay.  If there's a legal duty, again, your
5  understanding.
6  A.    Uh-huh.
7  Q.    If there's a legal, and I understand you might
8  feel uncomfortable with some of these questions.
9  A.    No, you're okay.
10  Q.    I apologize.
11  A.    You're fine.
12  Q.    If there's a legal duty, do you have -- so for
13  example, 1407 we contend is a legal duty.  If there's a
14  legal duty, do you have to do it regardless of what your
15  superior says?
16        MR. NORTHCUTT: Objection.  Vague and ambiguous
17  as to "regardless of what your superior says."  Calls
18  for a legal conclusion.  Calls for some sort of
19  speculation.  If you understand his question, you can
20  try to answer it.
21        THE WITNESS: To my understanding, he was acting
22  within the law.  To my understanding what he told me, he
23  was acting within the realm of what he was supposed to
24  do.  So there was nothing where I had a question of
25  whether or not we're violating the law or not based on

Page 170

1  the information he told me.
2        MR. GORDON: Okay.  So if there's a statute
3  like -- okay.  So if 1407 says to hold -- maintain
4  custody of allegedly stolen property and your superior
5  says we don't need to do that, that's -- that's
6  permissible within -- that's not a violation of your
7  duties?
8        MR. NORTHCUTT: Objection.  Vague and ambiguous.
9  Incomplete hypothetical.  Assumes facts not in evidence.
10  Calls for a legal conclusion and any other objections I
11  just made to the prior question.  And I will also add
12  asked and answered but go ahead if you can answer.
13        THE WITNESS: Can you repeat the question?
14        MR. GORDON: Okay.  Yeah.  Let's just give you a
15  standing objection on that so you don't need to say it
16  again.
17  Q.    I think I said 1407 says to hold stolen property
18  if there's a legal procedure to bring it before a judge,
19  etcetera, 1407, 1408.  If your superior says you don't
20  need to do that, is that a violation of your duties?
21  What's your understanding of it, that's all.
22        MR. NORTHCUTT: Same objections.
23        MR. GORDON: They stand.  I'm not -- they're
24  preserved.  You will never hear me say they're not
25  preserved.  You've preserved them ad nauseam.  I'm

Page 171

1  asking what his understanding is.
2        THE WITNESS: That did not happen under the
3  circumstances.  You know, he didn't say that we have
4  stolen property, and you know, we're not retaining this
5  and, you know, this --
6        MR. GORDON: Q.  Okay.  So you were unaware he
7  wasn't being retained?
8  A.    I had no idea what was happening with Cedar
9  after he was dropped off or who he was dropped off with
10  at the time.
11  Q.    But you knew that it wasn't being dropped off
12  in, you know, it wasn't dropped off to the evidence
13  clerk?
14  A.    Yes.  I did know that.
15  Q.    Okay.  So you -- did you understand when you
16  dropped him off that you -- that the sheriff's office
17  was relinquishing -- relinquishing its possession or
18  custody of Cedar?
19  A.    Yes.  That was my understanding.
20        MR. GORDON: Okay.  And Damian, your same
21  objections stand for this one that I'm about to ask, so
22  there's no need to repeat them.  I'm just asking what
23  his understanding is, but they stand.
24        MR. NORTHCUTT: Same objection as the last.
25        MR. GORDON: Yeah, same objections as to the

Page 172

1  last two or three times.  You're not going to -- I'm not
2  going to fight you on them in court, oh, you missed one
3  of them.  So again, I'm just asking for your
4  understanding.
5  Q.    Can your superior -- can a superior or can your
6  superior order you to break a legal duty?
7  A.    No.
8  Q.    Okay.  Thank you.  All right.  So I may have
9  asked this before, and I'm sorry if I did.  I'm not
10  trying to browbeat you, but we've asked a lot of
11  questions today.  Although, this is moving much faster
12  than yesterday.  So I think I did.
13        MR. NORTHCUTT: The day is still young.
14        MR. GORDON: The day is still young, yeah.
15  Q.    Have you -- you said you had taken and
16  returned -- have you ever taken and returned property to
17  its owner without a warrant before?
18  A.    Yes.
19  Q.    Okay.  Thank you.  So in that case there was no
20  judge involved?
21  A.    Yes.
22  Q.    Okay.  What types and times has that happened?
23  A.    I can't recall specific circumstance, but if we
24  have like some little girl who had her bicycle stolen
25  and we found, you know, some --

Page 173

1 Q.    You find the bike?
2 A.    **We find the bike, and we would return that**
3 **stolen bike to the little girl.**
4 Q.    Okay.  Okay.  Is there -- I'm assuming there's
5 chop shops around here for the bikes?
6 A.    **Yeah.  We encounter stolen property on a regular**
7 **basis, and we do our best to try and send that back to**
8 **the owner.**
9 Q.    Yeah.  My friend bought a bike and he lived in
10 Marina Del Rey and it was stolen within hours and then
11 he found it on Craigslist and went to get it and the
12 cops, this is not a criticism of the cop, but for
13 whatever they couldn't help.  They did not do that.
14 A.    **Yeah.**
15 Q.    We can't help you out.  What are we supposed to
16 do, fight this meth head basically.  Anyway.
17     So, okay.  So there's been other instances where
18 you've made a property determination outside of a
19 warrant and returned the property to who you knew was
20 the owner?
21 A.    **Yes.**
22 Q.    And how often -- how many times has that
23 occurred?
24 A.    **I would say --**
25 Q.    For you?

Page 174

1 A.    **I would say it happens often in law enforcement**
2 **work.  As primarily as a patrol officer, you're dealing**
3 **with stolen property.**
4 Q.    Yeah, yeah.  Fernandez yesterday put it as
5 there's a practical reality to policing I think is what
6 he said.
7 A.    **That's a good way to phrase it.**
8 Q.    Okay.  All right.  So did you review -- I know
9 you said you didn't review the sale invoice or --
10 A.    **I did not.**
11 Q.    -- the -- did you review the local rules?  I'm
12 calling them local rules, but if you go to --
13 A.    **The county -- the county rules or the fair --**
14 Q.    Yeah, the fair livestock auction -- here we go.
15 I'll just go to the page.  Whether we can figure out
16 what the name of these things are --
17 A.    **I did not.  I did not review the general**
18 **livestock rules and guidelines.**
19 Q.    Okay.  You did not.  Okay.  And did
20 you -- okay.  So you -- did you review the -- there's
21 also -- and I have a copy of them somewhere.  Give me a
22 moment, Officer.  Or Detective.
23     All right.  Did you review, and Miss, I'm going
24 to mark this as Exhibit G.  Did you review -- so these,
25 I'll just tell you what they are.  They're

Page 175

1 self-explanatory also, but these are the 2022 state
2 rules for California fairs.  Did you review -- do you
3 want to take a look?
4 A.    **No.  Because I know I didn't read them.**
5 Q.    Have you ever seen them before?
6 A.    **No.**
7 Q.    Review them during the case?
8 A.    **No.**
9 Q.    No, okay.  No interest in learning about
10 livestock rules?
11 A.    **I'm not a livestock specialist.**
12 Q.    This is your chance.  I'm kidding.
13     (Whereupon, Plaintiff's Exhibit G, a
14     document entitled, 2022 State Rules for
15     California Fairs, totaling 33 pages, was
16     marked for identification.)
17 Q.    So this will be Exhibit H.
18 A.    **Okay.**
19 Q.    Well, that's G.  But did you review -- I
20 wouldn't know how to title this document.  This is
21 apparently -- I'll represent to you this is apparently
22 something my -- our client received at the fair.  It was
23 being handed out.  Has some other auction terms to
24 adhere to.  Did you review this document?
25 A.    **No.**

Page 176

1 Q.    You don't even want to take a look?  Please take
2 a look and just say you haven't seen them before just
3 for the record.
4 A.    **Of course.  I did not review this.**
5 Q.    A lot of this stuff is me just we're trying to
6 just so we know what facts are at issue at trial.  So
7 some of these might seem like -- but a lot of it is just
8 check the box, okay, so we can -- me and your attorney
9 don't need to fight over what we need to have you
10 testify to at trial.
11 A.    **We marked this as Exhibit H.**
12     (Whereupon, Plaintiff's Exhibit H, Shasta
13     District Fair brochure, was marked for
14     identification.)
15 Q.    Did you review any other documents related to
16 contracts like the California Commercial Code, Civil
17 Code, anything like that?
18 A.    **No.**
19 Q.    Have you had any training in contracts?
20 A.    **No.**
21 Q.    Privately or in your role as a public servant?
22 A.    **I don't deal with contracts very often other**
23 **than maybe if it had to do with a vehicle sale or**
24 **something like that.  But typically any time that I**
25 **encounter a contract, it's going to be outside the scope**

Page 177

1 of what I deal with, so.
2 Q. Do you -- if you do encounter, do you consult
3 county counsel or an attorney or I don't know -- you
4 have county counsel and staff, I presume, right?
5 A. I would imagine you do. I don't recall a
6 specific time where I've had to deal with a contract
7 other than may have been I was a patrol officer dealing
8 with, you know, vehicle sales or things like that, so.
9 Q. Did you -- did you consult an attorney there
10 just to see XYZ on the contract?
11 A. I don't believe so.
12 Q. Okay. All right. So earlier you brought up,
13 you know, I asked how many cases you had and you said 10
14 to 15 and I asked how you prioritized -- how you
15 prioritized, you know, what you handled that particular
16 day, you know. And what factors, if any, went into
17 assisting with this seizure with your priority of your
18 caseload?
19 A. Because I was asked to do it by my superior
20 officer.
21 Q. Because you were asked, okay. Did this
22 interfere with your other work?
23 A. I would say it was at the end of the day, so it
24 interfered very little with my work I had to do at that
25 time.

Page 178

1 Q. Interfered with your Friday night?
2 A. Of course I didn't get my Friday night, no.
3 Q. Okay. Was your wife upset about that?
4 A. My wife's always upset when I miss Friday night
5 at home.
6 Q. Okay. All right. So you can't recall any
7 comments? "You're leaving me for Friday night for a
8 goat"?
9 A. No. I don't recall any specific comments, no.
10 Q. Since then?
11 A. No.
12 Q. No. All right. Okay. So in this case would
13 you say when you were asked to go down there, you --
14 this is going to sound loaded. It's not meant to be. I
15 don't know how to technically phrase it. But you didn't
16 exercise your independent judgment for this case? You
17 just followed what Fernandez wanted you to do?
18 MR. NORTHCUTT: Objection. Misstates facts.
19 Misstates the evidence. Misstates the witness's
20 testimony. Go ahead and answer.
21 THE WITNESS: I'd only been employed at this
22 agency for four months. I had no reason to doubt what
23 he was telling me. I had no reason to doubt his
24 judgment as far as legally what he was doing or what
25 should or he shouldn't do.

Page 179

1 MR. GORDON: Q. So you were -- I mean, yes or
2 no. So no, because you were deferring to his judgment;
3 is that fair?
4 A. I was deferring to his judgment, yes.
5 Q. Okay. So no, yes? All right. Yes? Or no?
6 Yes, correct? No, correct?
7 A. I don't even remember the question.
8 Q. I was saying you weren't exercising your
9 independent judgment in this case because you were
10 deferring to --
11 A. No, I was not.
12 Q. -- Fernandez? Thank you. Okay. And you -- oh,
13 when I asked if you reviewed a series of code provisions
14 like commercial code, etcetera, you'd said no to them.
15 Did you -- are you familiar with a minor's right to
16 rescind a contract -- or I apologize, a minor's right to
17 disaffirm a contract --
18 A. No.
19 Q. -- in California? Although it functions
20 basically the same. You're not aware of that?
21 A. No.
22 Q. All right. Okay. Okay. We'll take a break for
23 a moment.
24 A. Yeah.
25 THE VIDEO SPECIALIST: We're off the record.

Page 180

1 The time is 13:37.
2 (Whereupon, a break was taken from 1:37
3 till 1:39 p.m.)
4 THE VIDEO SPECIALIST: We're back on the record.
5 The time is 13:39.
6 MR. GORDON: Q. All right. So these will be
7 the fun questions. You'll get why in a moment.
8 A. Okay.
9 Q. So did -- so you retrieved him on, Cedar, on
10 July 8th, correct?
11 A. Yes.
12 Q. Okay. And were you aware of the -- you were
13 aware of the fair in -- what year did you attend it?
14 You said it was 2022, you did the booth?
15 A. Yeah. I believe I did a -- I did a recruitment
16 booth. And I don't -- I don't -- I'm pretty sure it was
17 during the state -- sorry, the district fair. But like
18 I said, we also attend different functions so it may
19 have been during a different function but I think it was
20 during the district fair.
21 Q. So that would be the fair actually in question
22 here. Because this was 2020 -- am I losing my mind?
23 Yeah, 2022.
24 A. Yeah. So I don't know if the fair extended that
25 weekend and I also worked the fair that weekend, but I

Page 181

1    may have.  It's completely possible.
2  Q.    Okay.  Okay.  Okay.  It really didn't occur to
3  me at the time it was the same fair.
4        Okay.  So were you aware there was a 4-H
5  community barbecue on July 9th?
6  A.    No.
7  Q.    Okay.  All right.  So did anyone tell you Cedar
8  was being taken for the barbecue?
9  A.    No.  I did not know that.
10 Q.    Okay.  Did you attend the barbecue?
11 A.    No.  I did not attend the barbecue.
12 Q.    And your wife attend the barbecue?
13 A.    No.
14 Q.    And your -- and your kid -- you don't have kids.
15 A.    I don't have kids.
16 Q.    Apologize.  That is not meant to be offensive if
17 you want them and don't, so my apologies.  I'm 43.  I
18 don't have them, and I want them, so hopefully that will
19 happen.
20       Anyway.  So and did Fernandez attend the
21 barbecue?
22 A.    I can't say whether he did or not.
23 Q.    Okay.  So if -- okay.  Did -- so you don't know
24 if he -- he testified he did not but -- I believe he
25 testified he did not, but maybe I'll have to follow up.

Page 182

1  Yesterday's almost a blur.
2        Did -- so if we subpoena court records -- or not
3  court records.  If we subpoena records from the fair on
4  their photos from the barbecue, we're not going to see
5  you in any of them, yes?
6  A.    No.  I did not attend the barbecue.
7  Q.    Okay.  Okay.  And -- okay.  So when you
8  were getting Cedar, it was not your understanding that
9  you were racing him back to be barbecued?
10 A.    No.  I did not know what was going to happen to
11 Cedar.
12 Q.    Okay.  But you -- when did you find out he died?
13       MR. NORTHCUTT:  Go ahead if you know the answer.
14       THE WITNESS:  I don't even know what happened to
15 Cedar, I'll be completely honest with you.
16       MR. GORDON:  Okay, okay, okay.  Did you guys --
17 okay, you don't know what happened.  Okay.  Yeah.
18       Okay.  And let me talk with her for one more
19 second.
20       THE WITNESS:  Okay.
21       MR. GORDON:  Off the record.
22       THE VIDEO SPECIALIST:  We're off the record, and
23 the time is 13:42.
24       (Discussion off the record from 1:42 till
25       1:45 p.m.)

Page 183

1        THE VIDEO SPECIALIST:  We're back on the record.
2  The time is 13:45.
3
4        EXAMINATION BY MR. NORTHCUTT
5        MR. NORTHCUTT:  Q.  Detective, earlier you
6  testified that Kristin Stover lied when she was speaking
7  with you; is that correct?
8  A.    Yes.
9  Q.    Okay.  So can you give me your overall
10 impression with how cooperative she was with you?
11       MR. GORDON:  Objection.  Vague.
12       MR. NORTHCUTT:  Do you feel like she was
13 providing -- I mean, based off of the fact that you had
14 to learn about Cedar's location from her phone, would
15 you consider her to be a credible witness?
16       MR. GORDON:  Objection.  Leading.
17       THE WITNESS:  I believe that she was
18 uncooperative initially in providing us information, and
19 she lied multiple times.
20       MR. NORTHCUTT:  Q.  Okay.  And given the fact
21 that she lied multiple times, do you have one way or
22 another of knowing whether her statements about Jessica
23 Long speaking with an attorney were true?
24 A.    That's accurate.
25 Q.    Okay.  There was three statutory provisions.

Page 184

1  They're Exhibit C, D and E -- no, I'm sorry, B, C and D.
2  1536, 1407, and 1408.  1536 states, "All property or
3  things taken on a warrant must be retained by the
4  officer."
5        1536 says, "All property or things taken on a
6  warrant must be retained by the officer in his custody
7  subject to the order of the court," blah, blah, blah,
8  and it continues.
9        To your knowledge, was Cedar in this case taken
10 on a warrant, or was he taken at a later time?
11 A.    Taken at a later time.
12 Q.    And was that because I believe you testified
13 earlier Raymond Allen donated the goat -- or I'm sorry,
14 Raymond Allen said that Jessica Long had donated the
15 goat to him?
16 A.    Yes.
17 Q.    1408 talks about -- Penal Code 1408, Exhibit D,
18 talks about "On the application of the owner and on
19 satisfactory proof of his ownership of the property
20 after reasonable notice and opportunity to be heard has
21 been given to the person from whom custody of the
22 property was taken and any other person as required by
23 the magistrate, the magistrate before whom the complaint
24 is laid or who examines the charge against the person
25 accused of stealing or embezzling it, shall order it to

Page 185

1  be delivered without prejudice to the state, to the
2  owner, on his paying the necessary expenses."
3        Do you know in this particular case if Jessica
4  Long ever made such an application?
5  **A.    I was not aware of her doing so.**
6  Q.    Are you aware if Jessica Long ever provided
7  satisfactory proof of ownership of Cedar to a
8  magistrate?
9  **A.    I was not aware of that.**
10  Q.    Did, to date, are you aware that she's ever done
11  either of those two things?
12  **A.    No, I'm not aware of that.**
13  Q.    Do you know one way or the other, and maybe it's
14  already been asked, and if it has, I'm sorry.  Do you
15  know one way or the other if Cedar actually was
16  terminated at some point?
17  **A.    I do not know what happened to Cedar the goat.**
18        **MR. NORTHCUTT:** That's it.
19
20        FURTHER EXAMINATION BY MR. GORDON
21        **MR. GORDON:** Q.  Oh, yes.  Oh, first of all, one
22  follow-up to his question.  Do you -- how -- how could
23  Jessica make an application if Cedar wasn't retained
24  before the magistrate?
25  **A.    I just testified on the fact that I'm not aware**

Page 186

1  **of that.  I didn't clarify as far as if I looked or how**
2  **she would or how she'd go about doing that, so.**
3  Q.    Okay.  All right.  It's a leading question.  The
4  statute says what it says, but you don't know.
5        Okay.  And I'm not going to ask you specifics,
6  but I know you said you're involved in another civil
7  lawsuit.  Did that involve a due process allegation?
8  I'm not asking whether it's true or false, but did
9  someone make a due process or constitution allegation in
10  that other lawsuit?
11        **MR. NORTHCUTT:** I'm going to object.  The
12  investigation is still going on, and it's completely
13  irrelevant to this litigation.  I'm going to instruct
14  him not to answer.
15        **MR. GORDON:** Damian, it's a publicly filed
16  lawsuit.  I can ask for the case number even.
17        **MR. NORTHCUTT:** Okay.  Well, I'm still
18  instructing him not to answer.
19        **MR. GORDON:** On what basis?
20        **MR. NORTHCUTT:** On just the objections I just
21  made.
22        **MR. GORDON:** Those are completely improper.
23  They're not -- it's not a privilege.
24        **MR. NORTHCUTT:** Well, we can go ahead and meet
25  and confer about it but --

Page 187

1        **MR. GORDON:** Okay.  We'll meet and confer.  Are
2  you not going to answer?
3        **THE WITNESS:** No.
4        **MR. GORDON:** Okay.  All right.  Okay.  Okay.
5  Then I guess we're -- then I guess we're done.  So I'm
6  reserving the rest of our time.  We'll fight about it
7  later.
8        **MR. NORTHCUTT:** County counsel was on the line a
9  moment ago, but I think he dropped off.  He made an
10  interesting point which is essentially that you're
11  entitled seven hours of deposition or one day.
12        For the record, we've continued this deposition
13  multiple weeks, maybe multiple months, I think.  We've
14  all had a chance to amply prepare for these depositions.
15  My client is here.  Detective Duncan is ready to
16  testify.
17        It's our position there shouldn't be any further
18  continuances since essentially he's available right now.
19  So we can meet and confer on that later.
20        **MR. GORDON:** We can.  We also continued to
21  accommodate you the last time, but we don't need to put
22  an argument on the record.  We'll confer over it.  If I
23  have any follow-up, and discovery is ongoing still
24  because we're still within the discovery timeframe, so
25  there might be other follow-up, so.

Page 188

1        **MR. NORTHCUTT:** I don't know, and I don't know
2  if we want to -- unfortunately, county counsel isn't
3  here to discuss this either.  I don't know if --
4        **MR. GORDON:** He's not even in the case yet.
5  He's not served.
6        **MR. NORTHCUTT:** All right.  Well, I didn't know
7  if he wanted to state something as well.
8        **MR. GORDON:** I mean --
9        **MR. NORTHCUTT:** Because he did raise the issue
10  when we talked.
11        **MR. GORDON:** Yeah, yeah, yeah.  I'm sure he
12  doesn't want me going back and if he thinks --
13        **MR. NORTHCUTT:** I guess we can all meet and
14  confer on it.
15        **MR. GORDON:** Yeah.  When he enters the case.
16  Maybe, I mean, yeah, before we sign off, I guess we
17  should have him.  Just out of courtesy, we should -- let
18  me call him.  Can we go off the record for a moment?
19        **THE VIDEO SPECIALIST:** We're off the record, and
20  the time is 13:51.
21        (Discussion off the record.)
22        **THE VIDEO SPECIALIST:** We are back on the
23  record, and the time is 13:52.
24        **MR. GORDON:** Okay.  All right.  So a moment ago
25  county counsel -- not county counsel.  John Bridges who

Page 189

1   is counsel for the fair and Melanie Silva and Bruce
2   Macfarlane are not yet -- have not yet appeared yet in
3   the case has been on court call.  He was disconnected.
4   Or not court call.  The conference call in the room.
5       He was disconnected, and he sent me a text, "Hi,
6   Ryan.  The phone in the room went to a weird dial tone
7   and kicked me off again," comma, "but please continue
8   without me," period, space.  "I won't have any
9   questions."
10      So we're just going to finish up then.  So how
11  far into the -- how many minutes have we done in the
12  depo?  Approximately?
13      **THE VIDEO SPECIALIST:** About three and a half
14  hours.
15      **MR. GORDON:** Okay.  So that means there's -- I
16  have a seven-hour limit subject to your objection, of
17  course.  We've used about, you said three and a half?
18      **THE VIDEO SPECIALIST:** Yeah.
19      **MR. GORDON:** Yeah.  About halfway through.  Our
20  remaining time, whatever it might be down to the precise
21  minute, if we have any follow-up questions, we're --
22  Plaintiff is reserving her rights or their rights to
23  further question Detective Duncan.  But we'll confer --
24  we're reserving our rights to it, and we'll confer if
25  there's an issue if a need arises, so.  Okay.

Page 190

1       **MR. NORTHCUTT:** Okay.
2       **THE WITNESS:** Sounds good.
3       **MR. GORDON:** Oh, I don't think I said this
4   earlier to you, but you're going to be given a copy of
5   what you've said here today.  And you're going to have X
6   amount of time, which you didn't check for how much time
7   he has, did you?
8       **MR. NORTHCUTT:** We'll make sure we get --
9       **MR. GORDON:** I didn't check.  You're going to
10  have X amount of days, in state court it's 30 days, to
11  review your answers to say, you know, make sure it's
12  accurate.  And then you can make any changes in it you
13  want; however, if you make any changes, I mean, you're
14  on video, it's transcribed, I'm going to be able to
15  comment on it like, hey, why did this -- you said this.
16  This is not a good thing to say.  Why are you changing
17  it now.  Going to make you look like you're full of it.
18  I can comment on that at trial.
19      **THE WITNESS:** Of course.
20      **MR. GORDON:** So but then you'll sign I presume
21  under penalty of perjury, and then it's final, but you
22  will have a time period to do that, so.
23      **MR. NORTHCUTT:** Same thing, a certified copy can
24  be used as an original?
25      **MR. GORDON:** Yeah.  You want to say it?

Page 191

1       **MR. NORTHCUTT:** We stipulate that a certified
2   copy of the deposition transcript can be used the same
3   as the original for all purposes in this litigation
4   including the trial.
5       **MR. GORDON:** Yes.  So stipulated.
6       **MS. SHAKIB:** Stipulated.
7       **MR. GORDON:** Okay.  I can't do it on behalf of
8   John, but we'll see what he says.  Unless that gives me
9   his proxy.  If it does, then so stipulated, but.  Okay.
10  All right.  That's it.
11      **THE VIDEO SPECIALIST:** We're done?
12      **MR. GORDON:** Yes.  We're done.
13      **THE VIDEO SPECIALIST:** This is the end of the
14  deposition of Jacob Duncan.  All video originals will be
15  retained at the offices of Redding Video Productions at
16  8954 Old Oregon Trail in Redding, California, and the
17  time is 13:55.
18      (Whereupon, the deposition concluded at
19      1:55 p.m.)
20      (Whereupon, Plaintiff's Exhibit F, Audio
21      Recording, was marked for identification.)
22      ---oOo---
23
24
25

Page 192

1                   PENALTY OF PERJURY
2   Please be advised I have read the foregoing
3   deposition, and I hereby state there are:
4
5   (Check one)    _____ no corrections
6                  _____ corrections attached
7
8   Executed on _____
9                       Date
10
11
            DETECTIVE JACOB DUNCAN
12
13
14              ---oOo---
15
16
17
18
19
20
21
22
23
24
25

Page 193

1                    DEPONENT'S CHANGES OR CORRECTIONS

2    Note:  If you are adding to your testimony, print the
     exact words you want to add.  If you are deleting from
3    your testimony, print the exact words you want to
     delete.  Specify with "Add" or "Delete" before each
4    entry.  Please sign and date this form.

5    Deposition of:  DETECTIVE JACOB DUNCAN
     Name of Case:  LONG vs. FERNANDEZ, etc.
6    Date of Deposition:  AUGUST 22, 2023

7
     I, _____, have made the
8    following changes in my deposition:

9    PAGE      LINE      ADD/DELETE

10   ____      ____      _____

11   ____      ____      _____

12   ____      ____      _____

13   ____      ____      _____

14   ____      ____      _____

15   ____      ____      _____

16   ____      ____      _____

17   ____      ____      _____

18   ____      ____      _____

19   ____      ____      _____

20   ____      ____      _____

21   ____      ____      _____

22   ____      ____      _____

23   ____      ____      _____

24   ____      ____      _____

25   SIGNATURE _____ DATE _____

Page 194

1                    REPORTER'S CERTIFICATE

2

3              I hereby certify that the witness in the

4    foregoing deposition was duly sworn by me to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause; that said deposition was taken at

7    the time and place herein named; and that the testimony

8    of said witness was reported by me, a duly certified

9    shorthand reporter and disinterested person, and was

10   thereafter transcribed under my direction by

11   computer-assisted transcription.

12             I further certify that I am not of counsel or

13   attorney for either or any of the parties to said

14   deposition, nor in any way interested in the outcome of

15   the case named in said caption.

16             IN WITNESS WHEREOF, I have hereunto set my

17   hand.

18

19        DATED:  SEPTEMBER 2, 2023

20

21

22        _____

23             SUZANNA MICKELSON, CSR No. 14270

24                State of California

25

1                    REPORTER'S CERTIFICATE

2

3              I hereby certify that the witness in the

4     foregoing deposition was duly sworn by me to tell the

5     truth, the whole truth, and nothing but the truth in the

6     within-entitled cause; that said deposition was taken at

7     the time and place herein named; and that the testimony

8     of said witness was reported by me, a duly certified

9     shorthand reporter and disinterested person, and was

10    thereafter transcribed under my direction by

11    computer-assisted transcription.

12             I further certify that I am not of counsel or

13    attorney for either or any of the parties to said

14    deposition, nor in any way interested in the outcome of

15    the case named in said caption.

16             IN WITNESS WHEREOF, I have hereunto set my

17    hand.

18

19             DATED:  SEPTEMBER 2, 2023

20

21

22    _____

23             SUZANNA MICKELSON, CSR No. 14270

24                   State of California

25

# A

**abbreviations (1)**
112:13
**ability (3)**
24:12;167:6;168:23
**able (10)**
60:19;75:3;121:1,5,
18;131:12;149:10;
166:5,14;190:14
**above (1)**
25:5
**absence (1)**
114:10
**abuse (1)**
37:9
**academies (1)**
18:2
**academy (19)**
15:6;16:5,18,19;
17:14,15,16,17,18,22;
18:1,12,25;19:5,21,25;
20:12,16;106:1
**accepted (2)**
7:11;102:6
**accident (1)**
32:3
**accommodate (1)**
187:21
**according (1)**
152:3
**accurate (9)**
53:10,12;68:25;
104:19;115:16;145:12;
157:15;183:24;190:12
**accurately (2)**
8:25;110:6
**accused (3)**
39:23;48:16;184:25
**across (1)**
144:4
**acting (5)**
104:17;156:21;
159:11;169:21,23
**actions (1)**
49:16
**active (1)**
47:18
**Actively (5)**
15:2;30:11;47:19;
64:22;145:14
**activities (2)**
58:5,5
**activity (1)**
59:15
**actual (10)**
14:9;44:1;49:15;
58:16;86:2;93:10;
95:19;104:8;105:5;
154:16
**actually (34)**
15:5;16:23;22:7;

32:6;37:25,25;39:20;
40:6;48:15;57:10,20;
61:4;63:14;64:15;
68:18,18;84:13;91:14;
95:21;102:18;110:18;
117:6;119:16;120:25;
122:6;126:11;127:22;
130:21;135:21;136:16;
143:3;160:4;180:21;
185:15
**ad (1)**
170:25
**add (2)**
122:22;170:11
**addicted (1)**
55:12
**additional (3)**
106:25;149:10;167:6
**address (1)**
55:14
**addressed (2)**
19:4,10
**adhere (1)**
175:24
**adjudicate (1)**
114:3
**adjudicated (1)**
152:22
**adjudication (1)**
165:24
**admin (1)**
39:16
**administrative (1)**
38:22
**administrators (1)**
102:24
**admit (1)**
49:17
**adult (1)**
50:8
**adverse (2)**
55:6,7
**advice (1)**
11:6
**aerial (1)**
125:10
**affidavit (1)**
166:20
**afforded (1)**
23:17
**afternoon (2)**
80:2,6
**afterwards (2)**
86:23;131:1
**again (20)**
9:22;31:2;32:9,15;
33:2;38:8,17;70:20;
83:5;94:2;109:13,16;
118:12;126:11;142:22;
167:16;169:4;170:16;
172:3;189:7
**against (1)**
184:24

**age (2)**
110:4;150:16
**agency (5)**
39:5,6,8;133:9;
178:22
**agent (6)**
74:10;97:5;98:16;
104:16,17;161:12
**agents (1)**
98:15
**ago (12)**
7:17;31:17;38:10;
39:19;42:6,7;68:17;
69:14;73:1;95:21;
187:9;188:24
**agree (1)**
153:25
**Agreed (1)**
112:16
**Agricultural (1)**
6:8
**agriculture (1)**
49:23
**ahead (12)**
104:25;106:18;
113:13;126:21;138:25;
142:2;143:9;146:21;
170:12;178:20;182:13;
186:24
**alarm (2)**
136:13,15
**Alcohol (1)**
12:12
**allegation (1)**
27:21;186:7,9
**alleged (5)**
113:22,22,24;114:5,
18
**allegedly (9)**
95:10;113:25;114:1;
116:20,21,23;152:5;
163:2;170:4
**Allen (5)**
152:10,11,12;
184:13,14
**Allen's (1)**
75:22
**allot (1)**
33:20
**allotment (1)**
84:2
**allow (4)**
135:11;154:19;
163:6;164:18
**allowed (5)**
48:20;49:3;163:19,
22;166:7
**allowing (1)**
118:6
**allows (2)**
154:18,23
**almost (3)**
90:24;132:22;182:1

**along (5)**
60:5;146:5;150:23;
153:10;160:7
**altering (1)**
139:25
**although (4)**
115:13;140:13;
124:16;171:19
**always (12)**
9:21;12:2;21:24,24;
40:12;98:13;99:7;
132:23;162:25;163:1,
1;178:4
**ambiguous (13)**
97:20;104:23;
106:16;113:12;114:20;
136:14;137:25;138:23;
163:3;165:25;167:18;
169:16;170:8
**amicable (2)**
141:17;144:4
**amount (6)**
27:11;33:21;83:6;
130:7;190:6,10
**amply (1)**
187:14
**Anderson (25)**
8:2;16:6,7,24;17:6;
20:12,13,15;21:1,7,8,
11;24:10,11,22;25:15;
26:17,22,24;27:24;
39:11;47:8;58:6;59:2,8
**animal (17)**
37:8,9;39:12;40:10;
41:12,18,19;43:5,6;
50:11,13;85:9;90:14,
16,16,17;157:3
**animal-related (1)**
41:20
**animals (8)**
37:5;41:3,4;60:7;
124:23;129:24;130:1,7
**annual (4)**
60:25;68:3,5,9
**annually (1)**
67:20
**anonymous (1)**
112:11
**answered (11)**
68:8;70:19;84:17;
102:4;109:20,25;
137:1;140:4;142:1;
151:6;170:12
**anyplace (1)**
159:6
**Apart (4)**
37:7;41:5;127:19;
145:4
**apologies (3)**
111:16;115:9;181:17
**apologize (8)**
94:7;97:10;119:14;
121:21;165:2;169:10;

179:16;181:16
**apparent (1)**
156:2
**apparently (5)**
39:20;42:8;149:19;
175:21,21
**appearance (1)**
33:2
**appeared (3)**
5:6;129:6;189:2
**appearing (1)**
6:1
**appears (4)**
77:15;110:11;
114:25;123:1
**application (3)**
184:18;185:4,23
**applied (1)**
28:4
**applies (3)**
166:16,17;169:1
**apply (7)**
114:9,12,13;115:21;
165:6;168:12,20
**applying (1)**
114:24
**appreciate (2)**
75:23;76:17
**appropriate (1)**
34:7
**Approximate (1)**
150:16
**approximately (8)**
7:17;13:2;93:12;
106:11;110:4;147:18;
157:25;189:12
**area (3)**
27:3;125:1;126:23
**arguably (1)**
119:15
**argument (2)**
51:12;187:22
**argumentative (5)**
11:9;100:14;141:6;
142:1;154:12
**arises (1)**
189:25
**around (26)**
23:10;33:5;38:7;
50:9,11,11;56:22;
60:21,23;61:3;68:11;
80:5;81:6;85:2,7;89:6,
12;90:8;91:3;110:8;
147:21;151:2,3;158:3,
3;173:5
**arranged (1)**
99:14
**arrangement (1)**
101:6
**arrest (2)**
18:5,16
**arrive (3)**
100:15;115:10;

150:21
arrived (7)
89:24;90:3,7;103:7;
115:6,7;151:4
Ashbee (9)
81:18;82:2,6;87:24;
89:6;94:12,23,24;97:6
Ashbee's (1)
97:4
Asian (1)
150:20
asleep (1)
159:25
assault (1)
27:20
assigned (3)
25:13;98:10;102:24
assist (4)
78:6,11;97:17,25
assistance (2)
54:23,24
assisting (5)
77:20,21;79:4;96:25;
177:17
associated (4)
5:22;59:6,22;133:9
Association (9)
6:8;58:6,7,9;59:2,10,
20,22,23
associations (1)
59:17
assume (6)
74:15;82:14;90:1;
125:24;128:16,17
assumed (1)
93:14
Assumes (3)
139:9;141:25;170:9
assuming (9)
20:3;22:4,23;31:10;
34:5,22;39:6;74:16;
173:4
assumptions (1)
85:25
attached (3)
74:3,6;156:19
attachment (2)
96:21,21
attachments (2)
75:10;77:16
attempt (1)
148:12
attempted (1)
151:6
attend (15)
57:13,16;66:15;
67:23;68:16;69:10,15;
70:17;180:13,18;
181:10,11,12,20;182:6
attended (10)
57:17,18;58:4;66:17;
67:11,15;68:13,14;
69:17;70:21

attending (1)
69:14
attorney (15)
8:16;10:25;75:22;
76:3,21;131:15;136:1;
137:18;139:5,14;
140:3;176:8;177:3,9;
183:23
attorneys (2)
9:21;39:21
attorney's (1)
11:6
auction (12)
57:18,21;70:22,24;
93:2,5;142:18;156:11,
13;162:3;174:14;
175:23
auctions (5)
57:14,16;58:3;70:18,
23
audio (22)
74:4;118:13,14;
119:8,12;120:1,1,10,
15;131:9;132:19;
133:5;134:13,23;
140:25;143:3,6,12;
144:8,11,22;191:20
August (3)
5:1,13;69:13
authoring (1)
105:13
auto (1)
47:17
automobile (1)
46:25
availability (3)
79:2;98:10,14
available (5)
78:13,14;79:3;95:4;
187:18
average (2)
30:5;54:11
aware (29)
39:14,15;53:18,21;
57:6;65:25;75:9,21;
81:18;83:20;111:21,
22;113:5,6;135:12;
154:2;155:16;156:9;
165:14;179:20;180:12,
13;181:4;185:5,6,9,10,
12,25
away (3)
39:17;129:18;145:10

—B—

baby (2)
110:13,15
back (47)
13:2,8,9;14:2;22:3,3;
24:21;31:5,7;56:13;
72:21;79:25;110:25;
117:16;122:22;123:11;

127:11,18,20,22,23;
128:4,21,22;130:19,24;
144:19;148:12,14,19;
157:9,22,24;158:1,3,6;
159:6,10,18;163:5;
166:19;173:7;180:4;
182:9;183:1;188:12,22
background (2)
11:20;94:4
backside (1)
145:6
backtrack (1)
21:4
backyard (5)
125:2;127:9;129:18,
25;155:11
bad (1)
40:3
barbecue (8)
181:5,8,10,11,12,21;
182:4,6
barbecued (1)
182:9
bark (1)
127:8
based (19)
9:13,16,17;34:19;
48:15;57:11;61:7;
65:17;73:14;80:11;
110:9;116:10,11;
117:7;146:22;166:5,
12;169:25;183:13
bases (1)
20:4
basic (1)
17:21
basically (9)
11:14;74:1;98:1;
128:9;129:17;156:1;
165:21;173:16;179:20
basing (1)
119:19
basis (3)
19:5;173:7;186:19
Bates (12)
95:11,12,16,19,21,
23;96:1,6;107:21;
108:4;123:7;125:6
bathroom (1)
72:14
became (7)
16:23;20:14;21:2;
23:13,14;31:6,9
become (1)
16:17
beforehand (10)
45:5;56:15;90:11;
96:22;104:10,13;
107:5;132:2;134:5;
142:10
began (1)
89:8
beginning (1)

5:16
behalf (5)
6:2,7;99:12;104:17;
191:7
behind (1)
130:22
Belated (2)
102:3,5
bells (2)
136:13,15
below (2)
112:1;122:14
bent (1)
111:16
besides (1)
109:15
best (17)
9:8;10:6,12;12:5,18;
18:18;22:8;39:10;
41:10;62:1;76:9;78:25;
81:8;83:14;91:11;
143:24;173:7
bestiality (6)
41:25;42:12,14,21,
25;43:3
better (1)
86:11
beyond (2)
93:16;107:8
biannual (1)
68:9
bicycle (1)
172:24
bid (3)
60:7;70:24;93:17
big (2)
19:6;110:5
bike (4)
173:1,2,3,9
bikes (1)
173:5
Billy (1)
165:17
Billy's (10)
147:10,16;148:13,
17,19,21;150:23;
162:10;165:16,18
bit (4)
23:3;25:4;133:1;
143:4
bite (3)
37:18,21;41:2
bites (2)
39:8;40:3
biting (1)
39:23
bitten (1)
40:21
BJ (3)
6:9;66:1,4
black (1)
150:18
blah (3)

184:7,7,7
Bleating (14)
97:14;103:11;115:9,
22;119:22,23;123:21;
145:2;147:14,23;
148:17;149:20;164:23,
25
blur (1)
182:1
board (9)
54:18;56:8,9;58:8,
14,14;71:4,7,10
booth (5)
68:19;69:6;70:14;
180:14,16
border (1)
13:24
born (3)
13:5;51:18,18
borrow (1)
48:20
borrowed (2)
46:19,19
both (12)
22:2;38:19;40:8;
45:3,4;56:6,8;64:17;
78:3;103:17,18;143:22
bothering (1)
44:23
bottom (4)
86:4;95:13;122:1;
167:1
bought (1)
173:9
box (1)
176:8
brain (1)
154:18
break (9)
28:11;72:15,19;
110:23;132:18;144:17;
172:6;179:22;180:2
breakdown (2)
29:8;102:12
breed (1)
40:15
BRIDGES (3)
6:6,6;188:25
brief (1)
78:16
briefed (2)
79:12;81:19
briefing (1)
133:16
bring (1)
170:18
bringing (1)
134:4
brochure (1)
176:13
brought (5)
25:25;26:2;62:14;
106:21;177:12

**browbeat (1)**
172:10
**Bruce (8)**
62:12,21;64:3,4;
66:4;92:24;160:3;
189:1
**BS'ing (1)**
86:9
**build (2)**
141:13;149:10
**built (1)**
90:19
**bull (1)**
40:12
**bulls (1)**
40:19
**bullshit (1)**
86:15
**bunch (1)**
164:15
**busy (5)**
21:15;26:16;29:4,5;
88:17
**B-u-t-e (1)**
14:17
**Butte (6)**
14:13,17,17,20,23;
16:5
**B-u-t-t-e (2)**
14:18,19
**buyer (2)**
45:20;46:11

**C**

**cake (1)**
57:24
**Cal (1)**
93:10
**CalECPA (1)**
167:7
**California (15)**
5:4,6,20;6:7;18:3,10,
10;19:13,14;167:9;
175:2,15;176:16;
179:19;191:16
**call (26)**
7:5;31:23,23;37:24;
39:12;44:13;47:4;48:6,
10;66:22;92:14;94:7,
11;99:6;100:6;151:22,
25;154:24;160:2,6,14;
165:20;188:18;189:3,
4,4
**called (17)**
7:10;39:21;76:20;
79:8;94:6;95:16;150:4;
151:5,11,13,13,14;
152:1,2,7;160:5,8
**calling (5)**
92:15;94:23,24;
160:15;174:12
**calls (32)**

7:9;21:6,9,14,15,16,
18;23:7,9,16;32:18;
44:17;45:2;53:22;
94:13,19,22;104:24;
106:17;113:12;114:21;
138:24;146:20;155:5;
164:9;165:7;166:1;
167:18;168:13;169:17,
18;170:10
**came (19)**
31:12;52:2;61:16;
86:2;117:9;125:25;
126:1,8,12,18;127:4;
129:23;130:24;144:4;
150:11;153:14;158:20;
159:18;162:5
**camera (2)**
9:2;49:17
**can (85)**
8:25;9:24;15:16;
24:7,8,17,24;26:18;
29:13;30:8;37:13;
44:21;45:7;51:22,24;
52:20;53:24;60:5,11;
62:6;64:17,19,22;65:2;
70:20;74:15,24;76:6,9;
78:25;79:17,20;84:18;
87:16;88:12;89:16,18,
20;102:5;105:8,17;
107:21;109:2;110:18;
111:9;114:10;119:16;
123:3,14,17;125:4,6,8;
132:5;133:2;137:2,5;
153:5,25;158:2,17;
164:3,7;166:18;167:7,
10;169:19;170:12,13;
172:5,5,5;174:15;
176:8;183:9;186:16,
24;187:19,20;188:13,
18;190:12,18,23;191:2
**capable (1)**
104:12
**capacity (2)**
37:19;157:17
**car (21)**
47:20;48:2,2,4,5,23;
49:1;87:11;90:15;
91:12,13;92:2,21,24;
93:2;94:7,8,14;95:4;
101:8,11
**care (2)**
39:13;55:23
**cared (1)**
146:25
**career (2)**
40:18;43:18
**cars (2)**
125:24;126:13
**case (60)**
5:16;24:1,1,2,4,24;
33:16,20,22,23;34:3,
23;35:8,9;36:6,8,15,17;
37:7;41:5;42:24;44:7,

8,12;48:16;52:23;53:1;
63:23;74:10;91:13;
92:2,4;96:25;97:5,7,
11;98:6,15,16;99:1;
104:16,17;116:12;
138:22;139:1;152:4;
159:3;161:12;162:14;
172:19;175:7;178:12,
16;179:9;184:9;185:3;
186:16;188:4,15;189:3
**caseload (3)**
30:17;34:20;177:18
**cases (40)**
23:17,18,19;24:3,12,
14,17;25:8,12;26:5,9,
12,14,19,21,25;27:5;
29:15;30:4,7,9;33:19;
34:20,24;36:20;37:4,
11;38:16;41:2,4,12;
42:12;43:12;46:21;
47:17;55:25;137:12,
23;141:10;177:13
**cash (1)**
62:10
**cat (1)**
43:7
**catch (1)**
143:15
**catches (1)**
35:15
**cats (1)**
65:22
**cause (4)**
149:8,10,16;166:20
**causing (1)**
33:5
**CD (1)**
120:1
**Cedar (70)**
99:11;109:15;110:5,
6;114:5,18,23;115:21,
24;116:25;117:23;
127:7;145:1,15,16,25;
146:19,25;147:1,10,24;
148:17;149:12;155:12,
14,15,17,23,25;156:11,
12,24;157:2,2,3,5;
159:5,11,15,20,21;
161:20,24;162:6,10,10;
165:11,12,18;166:5;
167:14,21,25;168:4,6,
7,18,21;171:8,18;
180:9;181:7;182:8,11,
15;184:9;185:7,15,17,
23
**Cedar's (2)**
162:7;183:14
**Cedro (1)**
15:22
**celebrity (2)**
53:8,15
**cell (1)**
135:13

**center (2)**
31:24;55:18
**centers (1)**
54:22
**cents (1)**
75:17
**certain (3)**
10:7;134:10;168:19
**Certified (3)**
5:5;190:23;191:1
**Chad (3)**
71:24;72:1,2
**chair (1)**
58:14
**Challe (3)**
5:3,19,22
**chance (3)**
65:25;175:12;187:14
**change (4)**
23:14;110:19;
123:11;147:4
**changed (2)**
23:15;116:11
**changes (2)**
190:12,13
**changing (1)**
190:16
**chaos (1)**
33:5
**charge (4)**
98:18;154:16;
161:12;184:24
**charged (1)**
36:4
**charges (1)**
43:1
**chase (1)**
90:1
**check (5)**
89:20;101:4;176:8;
190:6,9
**checked (1)**
151:19
**child (5)**
27:21;42:17;49:25;
50:7,18
**children (10)**
29:21;51:10,11;
54:19,24;55:1,5,20;
59:6;62:9
**children's (2)**
55:14,17
**chime (1)**
6:4
**choice (3)**
78:11;155:23,24
**choose (1)**
33:18
**chop (1)**
173:5
**Chris (8)**
77:24;78:1,18;79:24;
80:13;82:4;100:2,5

**Christmas (1)**
10:10
**circumstance (5)**
25:2;52:10;66:8;
168:17;172:23
**circumstances (2)**
55:6;171:3
**cite (1)**
113:21
**cited (2)**
112:25;113:1
**cities (1)**
17:3
**city (5)**
14:21;16:24;17:8;
21:7,12
**civil (16)**
36:6,8,17;43:23,24;
44:2,9,15,19,22;46:23;
48:7,14;49:3;176:16;
186:6
**claimed (1)**
137:23
**claiming (2)**
138:18;155:17
**clarify (9)**
86:10;115:17;116:9;
121:16;122:7,7;149:7;
160:15;186:1
**CLC (1)**
56:10
**cleaned (1)**
50:16
**cleaning (1)**
50:6
**clear (1)**
36:12
**clearance (1)**
25:21
**cleared (1)**
8:8
**clearly (1)**
9:8
**clerk (4)**
95:20;162:23;163:2;
171:13
**client (3)**
76:13;175:22;187:15
**clock (2)**
157:11,13
**close (11)**
13:23;47:9;73:7,8;
80:3;129:3,18;146:2;
148:21;149:23,24
**closed (1)**
26:12
**closer (5)**
38:13;81:5;85:1;
91:3;149:24
**clothes (3)**
102:20,21,23
**code (21)**
19:6;44:1;104:22;

105:1,5,19;106:4,19;
111:5,6,19;112:3;
114:24,25;164:4;
168:8;176:16,17;
179:13,14;184:17
**Codes (5)**
18:3,15;19:2,4,14
**codified (3)**
164:7;167:1,12
**collect (2)**
165:17,17
**college (11)**
14:9,13,13,14,15,17;
15:1,3,4,5,11
**collision (3)**
7:23;8:1;35:17
**colloquially (1)**
7:5
**colorful (1)**
109:4
**combination (1)**
27:4
**comfortable (3)**
131:20,22;132:5
**coming (5)**
23:9;34:2;61:11;
82:18;158:6
**comma (1)**
189:7
**command (1)**
78:10
**commencing (1)**
5:2
**comment (7)**
84:6,9;136:24;141:5;
158:17;190:15,18
**comments (6)**
158:5,8,11,14;178:7,
9
**Commercial (2)**
176:16;179:14
**commissioner (1)**
33:5
**common (13)**
37:24;42:16,18;
44:13;47:12,12;48:22;
97:17;98:6;99:4;
129:12;141:9;164:13
**commonly (1)**
7:11
**communicate (3)**
65:22,23;160:10
**communicated (1)**
66:13
**communicates (1)**
65:20
**communicating (3)**
160:16,19,20
**communication (1)**
65:17
**community (1)**
181:5
**companion (2)**

43:5,6
**company (1)**
53:5
**compartment (1)**
157:3
**compartments (1)**
90:17
**complaint (6)**
11:17;49:10,15;
116:8;119:7;184:23
**complete (9)**
14:25;21:25;24:2;
73:15,20;74:17,25;
75:5;122:22
**completed (5)**
18:22;92:6;94:12,25;
95:7
**completely (6)**
11:16;28:13;181:1;
182:15;186:12,22
**completeness (1)**
74:13
**completion (2)**
24:8,12
**compliant (1)**
118:6
**component (1)**
42:25
**concerned (1)**
101:25
**conclude (3)**
88:12;148:15,20
**concluded (3)**
147:12,24;191:18
**conclusion (14)**
104:24;106:17;
113:13;114:21;120:25;
138:24;155:5;164:10;
165:8;166:1;167:18,
25;169:18;170:10
**conclusions (1)**
165:15
**conduct (3)**
82:19;98:7;123:9
**conducted (1)**
52:25
**conducting (2)**
36:9;152:13
**confer (7)**
186:25;187:1,19,22;
188:14;189:23,24
**conference (1)**
189:4
**confined (1)**
125:1
**confirm (1)**
69:15
**confirming (1)**
140:19
**confiscation (2)**
97:18;108:21
**conflict (1)**
166:22

**conflicts (2)**
167:11,11
**confused (2)**
59:13;67:7
**connection (2)**
61:10;62:2
**consent (3)**
116:5;162:12;166:6
**consider (3)**
26:16;29:4;183:15
**considered (1)**
16:10
**Constant (1)**
51:12
**constellation (1)**
34:4
**constitution (1)**
186:9
**construed (1)**
154:1
**consult (2)**
177:2,9
**consulted (1)**
137:18
**contact (18)**
80:14;82:4;103:15,
17,18;129:13;130:17,
18;143:20,21;146:15;
148:13,19,22;150:2;
151:6,10,12
**contend (1)**
169:13
**content (2)**
42:18;111:24
**contents (8)**
75:6;76:8,11;111:12,
13,22;114:15;166:12
**context (5)**
53:14,16;69:22;
131:22;146:22
**continuances (1)**
187:18
**continue (2)**
123:3;189:7
**continued (4)**
126:24;141:13;
187:12,20
**continues (1)**
184:8
**continuing (1)**
15:12
**contract (5)**
176:25;177:6,10;
179:16,17
**contracts (3)**
176:16,19,22
**control (6)**
18:5,16;39:12;40:10;
85:9;90:16
**conversation (45)**
11:16,25;51:6;56:17;
65:9,12,14,16;75:23;
76:12,15,18;78:22,23;

79:10,25;84:22;85:11,
12,22,23,25;86:3;
88:19;91:25;92:12,19;
94:3,18;101:15,23;
102:9;117:21;118:3;
124:11;133:18,20;
134:1;141:12,18;
143:3,25;147:9;
154:10;160:12
**conversations (8)**
62:17;92:9;94:10,15,
22;129:10;134:2;
154:11
**conversing (1)**
145:23
**Cool (3)**
50:3;51:25;52:1
**cooler (3)**
13:19,20,21
**cooperate (2)**
157:5;159:11
**cooperative (2)**
146:14;183:10
**cop (2)**
21:10;173:12
**copies (1)**
131:5
**cops (1)**
173:12
**copy (19)**
73:16,17,18,21,24;
76:6,7,16;105:8,18;
111:4,8,18;112:2;
144:8;174:21;190:4,
23;191:2
**cordial (1)**
118:6
**corner (1)**
95:13
**correcting (1)**
74:15
**Counsel (9)**
5:23;6:12;177:3,4;
187:8;188:2,25,25;
189:1
**counseling (2)**
31:17;32:8
**count (2)**
15:3,14
**counting (1)**
37:17
**county (52)**
6:2;12:22,23,25;
13:1,18;26:20;28:3;
29:3;38:23;39:3,5;
47:21;57:22;61:2;
66:17,19;67:6,8,8;
68:23;77:9;82:22;83:3,
15;87:5;89:9;92:7;
93:7,8;99:18,18;
100:20;126:9;133:11,
16;147:25;148:1,12;
150:5,7;157:9;159:23;

162:21;174:13,13;
177:3,4;187:8;188:2,
2
**couple (6)**
22:19;47:5,6;67:16;
70:2;91:18
**course (20)**
8:18;9:5;10:13;
11:22;18:15,15,16,16,
17;19:11;40:21;79:23;
112:12;133:4;148:6;
159:1;176:4;178:2;
189:17;190:19
**courses (6)**
14:25;15:1,11;17:21;
18:7,22
**Court (33)**
5:18,20,25;6:14;
8:21;19:20;33:1,1;
34:2;45:9,17;55:8;
106:21;111:16;112:7,
13;163:6,8,9,22;164:1,
14,18;165:24;166:11;
167:6;172:2;182:2,3;
184:7;189:3,4;190:10
**courtesy (1)**
188:17
**courtroom (1)**
10:20
**cover (2)**
27:18;47:7
**Craigslist (1)**
173:11
**crap (2)**
50:13,16
**create (1)**
158:22
**created (5)**
67:5;122:8,15,16,18
**credible (1)**
183:15
**credits (2)**
15:3,12
**crime (4)**
21:19;24:3;27:9;
36:4
**crimes (31)**
27:1,5,16;28:3,16,18,
19,19,22,22,22;29:8,9,
11,16,17,19;30:1;
33:10,11;41:20,22;
55:21;81:17,25;82:5,8;
84:6;86:24;87:6,14
**criminal (23)**
19:19;21:7;23:5,6;
30:1;35:22;36:3,4,8;
38:20;43:23,23,25;
44:1,1,9,15,20;45:20;
46:10,23;73:3;143:24
**criminally (1)**
36:13
**criteria (1)**
116:1

**criticism (1)**
173:12
**CSR (1)**
5:21
**curiosity (2)**
29:24;56:3
**curious (1)**
73:12
**current (3)**
28:7;43:13;115:21
**currently (3)**
30:11;42:24;58:8
**custodian (1)**
165:12
**custody (6)**
114:1;165:5;170:4;
171:18;184:6,21
**cut (3)**
156:2,25;157:21

**D**

**Dahle (1)**
93:20
**Dahles (1)**
93:17
**D-a-h-l-e-s (1)**
93:21
**Damian (3)**
6:1;171:20;186:15
**danger (1)**
33:24
**dangerous (1)**
38:23
**dark (1)**
159:9
**date (13)**
5:13;10:12;33:1;
34:2;76:22;77:19;
79:14,15,18;122:1,17;
158:15;185:10
**daughter (3)**
71:22;83:18;112:6
**day (29)**
5:2;21:9,15;22:1;
30:5,5,7,7;33:19;35:12,
12;73:24;76:21;79:2;
80:8;87:23;89:3,10;
98:11;120:22;134:8,9;
154:11;155:20;172:13,
14;177:16,23;187:11
**days (6)**
34:22,23;35:5;67:20;
190:10,10
**dayshift (5)**
21:13,16;22:8,14,20
**dayshifts (2)**
21:24;22:6
**deadlines (1)**
34:3
**deal (2)**
176:22;177:1,6
**dealing (2)**

174:2;177:7
**dealt (1)**
46:15
**debt (1)**
15:16
**December (5)**
20:24;21:2;67:24;
91:19,19
**decide (1)**
148:2
**decisions (1)**
58:15
**deduce (1)**
158:2
**deem (1)**
44:19
**deemed (4)**
32:10;44:9,15,22
**defendant (4)**
7:13,16;36:3,15
**defendants (1)**
6:3
**defending (1)**
33:4
**deferring (3)**
179:2,4,10
**definitely (4)**
34:12;154:7,8;155:2
**degree (2)**
14:10;15:15
**degrees (1)**
55:14
**Del (1)**
173:10
**delivered (1)**
185:1
**deny (2)**
92:18;94:9
**Department (20)**
8:2;16:6;17:6,7,8;
20:13,16;21:1,11;
24:11;26:17,24;39:11;
47:8;59:13,19,22;94:7;
99:19;100:17
**departure (1)**
26:13
**depended (1)**
21:12
**depends (1)**
21:20
**depicts (1)**
110:6
**depo (3)**
9:22;120:9;189:12
**deposed (3)**
8:10,12;140:17
**deposition (16)**
5:12,18;8:17;49:7,9;
86:8;96:3;118:18;
119:4;136:1;138:17;
187:11,12;191:2,14,18
**depositions (1)**
187:14

**deputies (5)**
92:7;102:16;103:2;
133:16;150:9
**deputies' (1)**
150:12
**Deputy (4)**
58:8;59:9,20;103:3
**describe (2)**
53:12;77:13
**described (1)**
155:14
**describing (2)**
32:16;74:1
**designated (1)**
16:22
**designation (1)**
38:24
**desk (1)**
25:9
**details (7)**
82:20;83:7,11,12,12;
134:1,2
**detainer (1)**
45:12
**DETECTIVE (44)**
5:7,12;6:2,19;20:25;
21:3;23:13,14;24:5,13,
22;25:8,15,20;27:24;
28:4,17,18;30:20;
33:10;36:21;37:19;
40:18;41:11,14,21;
43:19;44:14,17;56:12;
60:11;81:18;87:4,7,24;
94:12;123:8;132:4;
154:17,18;174:22;
183:5;187:15;189:23
**detectives (5)**
25:6;27:15;34:10;
98:9;102:22
**determination (12)**
46:22,25;115:24;
163:17,19;165:11;
166:3,4,8;168:21,24;
173:18
**determine (1)**
39:16
**determined (7)**
115:23;116:2,3,3;
155:2,6;163:24
**determining (1)**
58:12
**deviants (1)**
42:17
**devices (2)**
42:2,18
**dial (1)**
189:6
**died (1)**
182:12
**Diego (6)**
13:2,5,8,11,13,17
**differ (1)**
23:23

**difference (5)**
9:10;23:22;43:21,22;
87:7
**different (18)**
9:14;30:8,10,11;
37:18;42:2;44:17;
48:12,13;55:21;67:9;
74:20;108:10;138:6;
149:21,22;180:18,19
**differentiate (1)**
69:25
**differs (1)**
121:9
**difficult (2)**
27:5;37:12
**difficulty (1)**
71:25
**dinner (5)**
51:6;60:5;61:6;62:6;
158:13
**dips (1)**
26:6
**direction (2)**
85:8;128:13
**directly (2)**
147:15,16
**directors (3)**
71:4,7,10
**disaffirm (1)**
179:17
**disciplinary (1)**
56:10
**disciplined (4)**
30:20;31:1,1;32:13
**disciplines (1)**
35:16
**disclosures (1)**
167:9
**disconnected (2)**
189:3,5
**discovered (1)**
147:10
**discovery (4)**
75:18,25;187:23,24
**discretion (2)**
34:6,19
**discuss (7)**
35:23;63:24;82:17;
88:2;91:13;148:8;
188:3
**discussed (6)**
115:10;145:5;
148:11,18;156:10;
164:4
**discussion (4)**
149:2,23;182:24;
188:21
**discussions (1)**
62:16
**dislike (1)**
56:11
**dismissed (1)**
8:7

**dispose (1)**
166:17
**dispute (13)**
43:23,24,25;44:3;
45:20;46:10,13;47:1;
48:2,4;138:20,24;
139:17
**disputes (3)**
46:18;138:4,18
**disrespect (1)**
157:12
**District (13)**
5:17;6:8;66:16,20,
22,24;67:6,15;69:23,
25;176:13;180:17,20
**Division (1)**
5:18
**document (12)**
12:4;73:14;74:8;
77:13;96:7,8,12,14;
98:21;175:14,20,24
**documented (4)**
31:16;32:8;89:11;
103:5
**documents (2)**
100:1;176:15
**dog (11)**
37:17,21;38:23;39:8,
16;40:3,20;41:1,2;
42:9;43:7
**dogs (1)**
65:22
**donate (5)**
154:6,7,8,15,22
**donated (9)**
58:9;115:24;116:4;
153:13,15;155:8;
162:10;184:13,14
**donation (7)**
60:10;61:5;153:23;
154:25;155:3,7;156:4
**donations (6)**
58:12;59:17,18;60:3;
61:12;62:3
**done (16)**
16:12;34:14,15;41:1;
59:11,11;85:7;97:21;
104:9;129:13;163:24;
185:10;187:5;189:11;
191:11,12
**door (6)**
125:20;126:2,12;
127:4;151:7,9
**doorbell (1)**
151:9
**doubt (2)**
178:22,23
**down (29)**
9:4;13:2,8;21:23;
69:3;73:1;82:19;83:9;
85:3;89:8;90:3,6,23;
92:6,7;99:4,8,17,25;
128:19;129:19;133:24;

141:4;142:14;148:16;
149:1;158:20;178:13;
189:20
**draft (1)**
123:2
**drafted (7)**
64:1;88:21;117:7;
119:2;120:14;121:1,19
**drafting (1)**
118:25
**draw (1)**
120:25
**driuk (2)**
12:10,12
**drive (4)**
23:10;90:23;141:4,
24
**driven (1)**
24:16
**driveway (5)**
126:22;127:1,2;
130:19;150:10
**driving (4)**
18:5;17;85:3;89:8
**dropped (14)**
64:10,12;83:8,16;
93:19;152:16;160:22;
162:17;171:9,9,11,12,
16;187:9
**dropping (5)**
161:2,7,15,17;162:8
**drove (1)**
157:9
**drugs (1)**
12:15
**due (2)**
186:7,9
**duly (1)**
5:8
**dumb (1)**
32:19
**D-U-N-C00 (1)**
95:14
**DUNCAN (10)**
5:7,13;6:2,19,22;
60:11;122:3;187:15;
189:23;191:14
**D-u-n-c-a-n (1)**
6:25
**Duncan004 (1)**
119:24
**Duncan8 (1)**
123:7
**during (8)**
8:3;15:6;127:17;
133:15;175:7;180:17,
19,20
**duties (4)**
21:5;23:14;170:7,20
**duty (5)**
169:4,12,13,14;
172:6

**E**

**earlier (15)**
65:3;73:3;80:8;97:9;
119:6;133:22;138:17;
141:2;162:15;164:5;
168:5;177:12;183:5;
184:13;190:4
**ears (1)**
153:16
**earshot (4)**
124:8,13,14;128:1
**easier (1)**
123:10
**easily (1)**
76:7
**east (1)**
128:13
**Eastern (1)**
5:17
**edit (1)**
123:4
**education (3)**
14:8;15:12;113:6
**Edwards (9)**
77:24;78:1,6,18;
79:24;80:14;82:4;
100:4,5
**effect (2)**
10:19;158:13
**eight (8)**
9:25,25;106:10;
121:21,22;143:16;
147:21;148:4
**either (11)**
30:20;36:21;63:25;
87:14;94:23;115:14;
122:13,15;128:16;
185:11;188:3
**EL (3)**
112:7,13;118:11
**elect (1)**
123:5
**electronic (2)**
42:2;167:9
**Eleven (1)**
29:2
**elicit (1)**
141:11
**Eliza (1)**
108:3
**Eliza's (1)**
110:2
**else (5)**
75:24;76:13;118:2;
119:6;150:3
**email (12)**
75:21,25;76:19,21,
23;96:15,20;132:12,
14;144:8;149:14,15
**emailed (2)**
76:2;132:16

**emails (6)**
146:3,4;147:10;
149:9;151:17;156:20
**embezzled (1)**
163:24
**embezzling (1)**
184:25
**empathizing (1)**
158:21
**emphasized (1)**
154:6
**employed (3)**
8:2;91:17;178:21
**employee (6)**
16:10,17,22;20:15;
133:10,11
**employees (1)**
16:13
**employment (1)**
28:1
**en (1)**
92:14
**cncounter (9)**
18:4;21:21,25;44:15;
65:19;98:5;173:6;
176:25;177:2
**encountered (1)**
40:7
**end (8)**
13:10;20:4;27:14;
37:15;38:1;110:21;
177:23;191:13
**ended (3)**
86:17;129:12;147:16
**enforce (1)**
23:5
**enforcement (12)**
15:2,6,14;16:2,5,8,
18;21:20;37:4;143:25;
146:13;174:1
**enforcing (1)**
21:7
**enough (3)**
50:11;131:19;149:16
**enter (1)**
125:17
**enters (1)**
188:15
**entire (2)**
130:20;144:3
**entirety (3)**
18:19;24:2;163:11
**entitled (7)**
9:8;10:5,10;11:19;
64:15;175:14;187:11
**entrance (1)**
125:16
**entry (1)**
122:21
**equally (1)**
22:7
**error (1)**
112:6

**Escondido (2)**
13:14,15
**especially (1)**
138:20
**essential (1)**
106:22
**essentially (10)**
17:23;27:20;54:23;
82:21;106:22;113:14,
17;167:7;187:10,18
**establish (2)**
65:5;164:15
**estimate (21)**
9:9,10,13,24;10:2,6,
12;29:13;37:13,23;
38:9;47:9;52:20;60:19;
81:8;82:16;89:14;
90:11;91:11;110:9;
128:24
**estimating (2)**
85:21;91:2
**Estimation (4)**
80:1;81:7;91:7;
130:1
**etcetera (6)**
11:21;38:24,24;
115:15;170:19;179:14
**euthanized (1)**
39:17
**even (40)**
10:11,16,20,20;11:7,
15;22:25;31:14,14;
39:2;51:20;52:20;53:6;
65:20;71:25;79:9;
81:14;83:17;92:15;
108:6;109:13;110:15;
114:10;116:16,16,16;
121:8;126:16;128:10;
129:23;143:15;149:20;
162:2;167:8,19;176:1;
179:7;182:14;186:16;
188:4
**event (1)**
70:2
**events (4)**
69:22;70:7;81:22;
97:4
**everybody (2)**
54:2;102:19
**Everyone (5)**
57:2;102:21;112:9,
10;140:16
**everywhere (1)**
46:6
**eviction (1)**
45:4
**evidence (29)**
11:12;35:3;42:1,22;
48:17;74:2,5;95:10;
97:18;108:14;116:25;
139:8,9;142:1;162:7,
14,19,20;163:1,2,5;
167:15;168:5,6,7,9;

**Escondido continued**

**170:9;171:12;178:19**
**evident (1)**
126:16
**exactly (6)**
39:9;126:7;142:10;
153:18;159:24;160:1
**EXAMINATION (3)**
6:16;183:4;185:20
**examined (1)**
5:9;68:4
**examines (1)**
184:24
**example (7)**
9:21,23;19:20;24:1;
114:24;164:22;169:13
**except (1)**
35:16
**executed (1)**
43:18
**executing (1)**
107:4
**exemption (1)**
169:1
**exemptions (4)**
167:13,14;168:12,20
**exercise (2)**
34:6;178:16
**exercising (1)**
179:8
**Exhibit (31)**
77:6,8;96:6;105:17,
18;111:3,4,17,18;
112:2;119:17;121:13,
13,21;125:9;128:10;
131:4;132:13;144:10,
11,12,13;156:19;
174:24;175:13,17;
176:11,12;184:1,17;
191:20
**exist (4)**
95:8;113:8;114:15;
121:15
**existed (2)**
57:9;93:3
**existence (3)**
120:23;121:4,11
**exists (1)**
45:14
**expenses (1)**
185:2
**experience (4)**
9:14,18;27:12;53:20
**expert (1)**
27:3
**expertise (1)**
27:12
**explain (1)**
59:13
**explained (2)**
73:23;152:13
**Expo (1)**
93:10
**expression (1)**

143:14
**extended (1)**
  180:24
**eyes (1)**
  149:25

## F

**face (2)**
  72:6;96:19
**fact (11)**
  83:22;95:6;109:17;
  117:9;133:19;139:5;
  146:3;165:15;183:13,
  20;185:25
**factors (2)**
  33:25;177:16
**facts (21)**
  33:16;48:15;80:15;
  88:16;93:1,16;97:12;
  107:8;116:11;133:23;
  138:22;139:1,9,19;
  141:25;142:7;167:14;
  168:12;170:9;176:6;
  178:18
**factual (1)**
  9:16
**fair (66)**
  50:14;57:19;60:25;
  61:2,2,66:16,17,19,20,
  23,25;67:8,11,16,24;
  68:19,21;69:5,10,12,
  18,23,25;70:6,13,18;
  82:23;83:3,15;93:5,7,8,
  10,15,18,24;100:5;
  107:1;139:3,21;
  142:15,16,17;153:16,
  22;154:2,13;156:13,
  14;161:8,15,18;174:13,
  14;175:22;176:13;
  179:3;180:13,17,20,21,
  24,25;181:3;182:3;
  189:1
**fairgrounds (3)**
  57:21;70:3;142:6
**fairs (4)**
  57:22;68:3;175:2,15
**Fair's (1)**
  71:3
**falling (1)**
  159:25
**falls (1)**
  25:9
**false (1)**
  186:8
**familiar (13)**
  38:24;45:11;61:13,
  14;72:2;80:7;104:21,
  22;111:5,6;112:23;
  131:13;179:15
**family (1)**
  13:12
**far (17)**

21:19;33:22;37:19;
63:13;81:22;100:13;
114:12;121:17;130:23;
145:10;149:8;153:4;
154:4;160:1;178:24;
186:1;189:11
**farm (13)**
  49:24;115:24;
  123:21;147:11,17,23;
  148:13,19,22;150:24;
  162:11;165:16,18
**farming (2)**
  61:19;62:2
**fart (1)**
  143:14
**faster (1)**
  172:11
**fault (2)**
  32:2,10
**favorite (1)**
  143:14
**feel (6)**
  25:2;32:23;131:21;
  132:4;169:8;183:12
**feet (1)**
  10:1
**felonies (2)**
  24:9,18
**felony (2)**
  24:4;27:8
**felt (2)**
  100:7,13
**female (7)**
  83:21;102:12;
  150:14;152:15,16;
  153:12,14
**Fernandez (75)**
  7:25;47:13;49:20;
  64:2;68:24;73:22;75:3;
  77:25;78:1,5,15;79:4,
  8;80:14,23;81:4,9,23;
  82:1,3,4,7,16;84:5,23;
  86:12;89:5,8;90:22;
  91:16;97:5;98:1;99:13;
  100:6;103:22;104:18;
  107:5,15;108:24;
  109:11;110:17;115:12;
  119:20;124:4,6;125:2;
  127:3,6,24;128:4,12,
  22;132:22;133:6;
  134:16;138:10;142:14;
  145:5,17;148:8;150:4;
  151:23;152:5;156:18;
  157:10,12,13;159:24;
  160:2;165:13;166:7;
  174:4;178:17;179:12;
  181:20
**Fernandez's (7)**
  73:14;97:3;99:9;
  101:3;120:20,20;
  168:23
**fetched (1)**
  155:11

**few (5)**
  8:20;39:21;42:6;
  67:20;68:17
**FFA (8)**
  50:20,25;51:5,9;
  58:5;61:11,14,16
**FFFA (1)**
  162:2
**fight (4)**
  172:2;173:16;176:9;
  187:6
**figure (4)**
  53:7;54:6;67:3;
  174:15
**figured (1)**
  75:16
**file (2)**
  74:4;112:14
**filed (1)**
  186:15
**film (2)**
  42:9;110:19
**final (1)**
  190:21
**financial (3)**
  28:22;29:12;33:11
**find (10)**
  42:16,19;107:22;
  145:1,1;164:15,16;
  173:1,2;182:12
**finding (1)**
  42:21
**fine (15)**
  11:1;40:5;71:2;75:7;
  81:8;86:11,16;93:10;
  109:2;119:15;131:6,
  24;137:7;140:21;
  169:11
**finish (3)**
  15:15;137:6;189:10
**fireworks (2)**
  70:1,6
**firm (2)**
  5:15;10:21
**first (41)**
  5:8;7:4;8:12;20:9,
  18;31:5,7,9;64:7;
  75:10;77:18,23;82:1;
  95:18;96:8,9,12,14,16,
  18;99:1;100:17;
  103:21;105:25;106:2,
  7;107:22;117:4,5,8,11;
  118:20,21;123:22;
  124:2;134:19,19,24;
  141:1;151:11;185:21
**Fisher (3)**
  5:3,19,22
**five (11)**
  10:9;21:14;38:5,7,
  12,13;84:25;85:2;
  90:11;143:9;157:21
**fix (1)**
  65:4

**flatbed (1)**
  90:18
**flavor (1)**
  26:19
**flowchart (1)**
  34:9
**flows (1)**
  26:6
**fluctuate (1)**
  21:11
**focused (1)**
  124:10
**follow (2)**
  11:5;181:25
**followed (2)**
  31:24;178:17
**following (3)**
  20:16;147:15;165:21
**follows (1)**
  5:9
**follow-up (6)**
  24:14;29:23;185:22;
  187:23,25;189:21
**foot (1)**
  24:24
**forensic (1)**
  55:20
**forgot (1)**
  73:2
**form (2)**
  146:7;160:9
**formal (5)**
  12:4;31:3,5,13,15
**forward (2)**
  112:5;126:24
**forwarded (1)**
  24:4
**foster (1)**
  55:23
**found (8)**
  42:1,8;149:22;
  156:24;157:2;164:20;
  172:25;173:11
**four (13)**
  22:13;25:18,19,20;
  68:25;69:3;80:4,5;
  91:22;119:15,17,24;
  178:22
**Fowler (3)**
  71:24;72:1,3
**Fox (1)**
  5:14
**frame (1)**
  133:2
**Friday (4)**
  178:1,2,4,7
**friend (1)**
  173:9
**front (3)**
  9:25;32:1;126:21
**frowned (1)**
  100:12
**full (4)**

15:5;47:7;69:2;
190:17
**fun (1)**
  180:7
**function (1)**
  180:19
**functions (4)**
  18:4;52:11;179:19;
  180:18
**funnel (1)**
  57:24
**further (10)**
  113:17;129:10,18,
  20;135:4;143:4;149:7;
  185:20;187:17;189:23
**furthest (1)**
  129:18
**future (1)**
  123:10

## G

**gained (1)**
  142:13
**gas (1)**
  159:8
**gave (1)**
  150:5
**general (8)**
  18:2;57:12;82:21;
  83:6;86:22;88:16;
  168:19;174:17
**generally (22)**
  17:24;18:8,24;19:16;
  21:6,9,16,17;24:14;
  25:10;29:12;30:25;
  33:25;41:16;53:18,21;
  54:2;59:4;83:11;
  111:13;127:12,13
**generals (1)**
  28:21
**generated (1)**
  99:7
**gentleman (1)**
  62:12
**gentleman's (1)**
  152:7
**gentlemen (1)**
  5:11
**German (1)**
  39:23
**gets (3)**
  25:5;51:16;99:1
**girl (2)**
  172:24;173:3
**given (8)**
  25:10;59:5;138:20;
  139:21;162:11;183:20;
  184:21;190:4
**gives (3)**
  67:25;154:22;191:8
**giving (1)**
  74:16

Challe, Fisher & Morfin
Redding, California   (530)246-0942

(7) extended - giving

**goat (87)**
64:12;80:18;82:22;
83:3,8,8,15,16,25;
85:15,15;88:16,17;
93:4,4,18,19;95:11,11;
97:13;101:25;104:3;
107:7,8,11,12;108:11,
12;110:9;116:6;
117:23;118:1;119:23;
129:19,19,23,24;139:2,
21;141:4,7,24;142:17;
145:9;146:24;147:11,
16;148:13,19,22;
150:23;152:5,14,17,21;
153:6,10,13,13,15,18,
18,24;154:22,23;
155:15;156:1,4,5,7,12;
158:7,20;160:17,18,20;
161:7;162:11,12,13,17;
165:16,18;178:8;
184:13,15;185:17
**goats (5)**
124:21;129:21;
130:1,11,13
**goat's (1)**
93:23
**goes (5)**
11:25;73:23;74:16;
111:14;128:12
**good (11)**
12:7;55:13,15;56:7;
73:16;130:7;132:10;
141:23;174:7;190:2,16
**good-natured (1)**
146:12
**goose (1)**
90:1
**GORDON (125)**
6:4,10,10,16,17;
14:23;43:11;47:23;
53:24;54:5;62:18,23;
68:7,13;72:23;73:18;
74:23;75:7,11,13;76:8,
17;77:2,12;84:18,21;
88:6;95:19,23,25;96:4;
97:21;100:15;101:19,
24;102:5;105:3,7;
106:23;109:2,4,9,11;
110:2;111:3;113:18;
114:22;115:1,5;
117:12,18;131:8;
132:1,7,11,14,20;
136:18;137:2,4,7,11;
138:2,7;139:4,13,22;
140:9,16;141:1,7;
142:4;144:13,21;
147:2;154:13,24;
155:9;163:8;164:11,
20;165:9,19;166:7,11,
15;167:20;168:2,15,
25;170:2,14,23;171:6,
20,25;172:14;179:1;
180:6;182:16,21;

183:11,16;185:20,21;
186:15,19,22;187:1,4,
20;188:4,8,11,15,24;
189:15,19;190:3,9,20,
25;191:5,7,12
**Gotcha (36)**
8:9;14:5;15:8;27:23;
33:9;34:22;36:10,17,
19;43:17;44:7;51:8;
60:2,2,17;61:18;63:19;
66:3,5;70:10;72:12;
78:10;87:12;90:7,22;
113:9,25;119:13;
120:19;121:20;126:3;
140:11,14;142:22;
153:11;158:14
**gotchas (1)**
140:15
**grab (2)**
87:18,19
**graduated (1)**
16:14
**graveyard (5)**
21:13;22:2,19;23:2;
32:25
**graveyards (1)**
21:24
**great (7)**
15:17;55:2,15;56:7;
77:5;101:21;128:11
**greet (1)**
125:25
**ground (1)**
8:17
**group (1)**
62:8
**grow (1)**
49:23
**guess (18)**
9:1,10,15;25:25;
46:5,6;47:19;88:5;
97:9;105:25;128:10;
132:6;144:10;156:10;
187:5,5;188:13,16
**guessing (1)**
10:3
**guide (1)**
18:11
**guidelines (2)**
18:12;174:18
**guys (2)**
126:10;182:16

## H

**half (5)**
7:17;9:25;106:11;
189:13,17
**halfway (1)**
189:19
**hand (2)**
34:10;73:13
**handed (3)**

111:4;146:7;175:23
**handle (3)**
30:5;39:1;45:17
**handled (7)**
30:7;38:18;39:9;
41:18,19,24;177:15
**handles (1)**
39:5
**handoff (1)**
99:2
**hands (1)**
165:19
**hanging (1)**
125:1
**happen (16)**
8:20;28:25;32:22;
33:7,8,11;48:9;60:21,
21,23;61:3;69:22;
161:20;171:2;181:19;
182:10
**happened (22)**
10:6;32:23,25;59:7,
9;60:20,24;65:9;
121:17;126:7;133:21;
139:7;145:20;151:3;
155:11;156:23,24,25;
172:22;182:14,17;
185:17
**happening (3)**
148:6;162:16;171:8
**happens (12)**
27:9;34:15;46:6;
60:18;89:6;103:13;
104:2;117:4;124:2;
137:16;138:3;174:1
**happy (3)**
52:1;74:20;131:18
**hard (11)**
15:3;29:20;30:6,6,
24;37:23;38:9;39:20;
47:9;54:4;56:11
**hate (1)**
132:23
**hauled (1)**
55:7
**Haven (1)**
39:12
**hay (1)**
50:15
**head (5)**
9:3;25:5;84:16;
159:6;173:16
**heads-up (1)**
150:5
**health (1)**
55:24
**hear (10)**
54:2;80:18,20,24;
92:9;131:10;143:10;
148:6;159:3;170:24
**heard (11)**
37:1;54:20;62:20,25;
77:18;82:2;111:9;

126:14;138:8;145:11;
184:20
**hearing (3)**
83:24;126:11;132:25
**hearings (1)**
39:6
**Heart (1)**
103:11
**Hearts (13)**
97:14;115:9,22;
119:22,23;123:21;
145:2;147:14,23;
148:17;149:20;164:24,
25
**heated (1)**
44:25
**heinous (1)**
42:15
**held (1)**
164:6
**hellfire (1)**
80:25
**help (9)**
45:4;55:6;62:6;
82:18;98:12,14;144:6;
173:13,15
**helping (4)**
78:8,15,21;80:15
**here's (5)**
9:21;49:19;76:13,14;
125:11
**herself (2)**
124:1,3
**hey (14)**
31:2;32:8,14,19;
33:2;34:13;40:8;60:10;
62:6;65:2;78:8;98:15;
144:5;190:15
**Hi (1)**
189:5
**hierarchy (1)**
50:12
**high (3)**
15:18,24;91:10
**highest (1)**
14:8
**hijacking (1)**
142:6
**himself (2)**
76:20;152:9
**hire (1)**
68:25
**hired (1)**
16:7
**Hold (10)**
88:3;106:25;165:5;
166:16;167:21,25;
168:8,18;170:3,17
**holding (1)**
167:14
**home (2)**
151:15;178:5
**homicide (3)**

126:14;138:8;145:11;
184:20
**homicides (2)**
28:25;33:16
**honest (12)**
39:1;40:16;61:13;
68:2;85:20;86:8;
120:13;122:6,7;142:8;
162:1;182:15
**honestly (2)**
138:14;144:7
**Hope (2)**
54:18;56:9
**hopefully (1)**
181:18
**hoping (1)**
64:8
**hopped (1)**
28:11
**horizontally (1)**
128:20
**horse (2)**
50:6,16
**horses (3)**
49:25;50:3,13
**hot (1)**
31:23
**hour (2)**
5:2;91:1
**hours (8)**
90:5,11,25;91:4;
157:18;173:10;187:11;
189:14
**house (12)**
10:3;103:6,7,9;
123:23,24,25;129:18,
20;130:20;160:23;
164:15
**huge (1)**
83:6
**human (5)**
28:23;46:2;65:17;
143:22;144:4
**Humane (1)**
39:12
**hundred (4)**
26:15;32:6;43:20,21
**hundreds (3)**
44:17;56:4,5
**husband (2)**
56:19;57:2
**husband's (1)**
143:19
**hypothetical (1)**
170:9

## I

**idea (3)**
81:10,15;171:8
**identification (8)**
77:11;105:20;
111:20;112:4;125:10;
175:16;176:14;191:21

**identified (3)**
94:2;152:9,15
**identify (2)**
55:24;63:14
**identities (1)**
71:11
**identity (1)**
72:5
**imagine (18)**
18:22;37:14;65:13,
16;83:16;87:16;88:1,4,
7;102:2;103:6;111:14;
133:15;136:21;146:25;
151:2;158:12;177:5
**immediacy (1)**
33:23
**immediately (1)**
20:16
**important (3)**
8:22;140:2;149:11
**impression (1)**
183:10
**improper (1)**
186:22
**inability (1)**
154:10
**inception (1)**
24:21
**incident (7)**
31:22;41:5;77:9,15,
19;79:12;82:2
**incidents (1)**
40:17
**included (8)**
26:24;27:19;55:10;
107:12,13;119:10;
121:6;135:13
**including (2)**
138:4;191:4
**Incomplete (1)**
170:9
**incorporate (1)**
144:9
**independent (5)**
114:16;136:23;
141:22;178:16;179:9
**in-depth (2)**
88:19;94:3
**indicate (2)**
122:5;139:16
**individually (1)**
7:18
**informal (2)**
10:17,21
**informally (1)**
32:18
**information (7)**
76:14,14;139:24;
142:11;156:21;170:1;
183:18
**informed (5)**
104:3,4,15;117:22;
118:5

**initial (2)**
23:25;99:5
**initially (2)**
99:6;183:18
**initiative (1)**
151:25
**inquire (1)**
154:4
**inside (2)**
101:12,13
**insinuative (1)**
156:2
**Instagram (3)**
107:23;108:8;149:19
**instances (6)**
30:25;41:25;42:21;
59:7;163:13;173:17
**instruct (1)**
186:13
**instructed (1)**
100:6
**instructing (1)**
186:18
**instruction (1)**
100:7
**instructions (1)**
11:19
**instructs (1)**
11:4
**intentional (1)**
112:15
**intentions (2)**
15:15;146:14
**interchangeably (1)**
61:15
**interest (3)**
155:17;156:5,7;
175:9
**interesting (35)**
23:4,12;25:14;27:2,
23;28:24;29:7,7,17,22;
32:11;33:15,17;35:7;
41:23;42:5,5,12;44:25;
45:1;46:4,5;47:13;
49:6;53:10;56:1;57:5;
60:18;61:25;62:11,15,
23;73:11;143:1;187:10
**interfere (1)**
177:22
**interfered (2)**
177:24;178:1
**interpose (1)**
10:25
**interpretation (1)**
136:10
**interview (3)**
120:1,3;147:16
**interviewer (1)**
141:10
**interviews (1)**
55:20
**into (20)**
9:15;11:12;15:16;

16:1;31:25;32:18;
33:25;55:8;108:14;
122:22;126:21;127:8,
9;128:10;136:17;
143:3;152:14;155:11;
177:16;189:11
**introduce (3)**
5:23;103:21;124:1
**introduced (7)**
76:20;103:19,25;
115:8,13,14;124:3
**investigate (7)**
24:7;28:20;38:1;
44:7;47:20;83:24;84:7
**investigated (10)**
23:18;33:12;36:13,
21;41:12;42:1,13,20;
43:2;44:8
**investigating (12)**
23:16,19;24:24;25:4;
29:15;30:9;37:5;42:24;
43:4;116:13;137:13;
153:9
**investigation (61)**
23:25;35:23;36:8;
42:16,23;43:9;44:19;
52:25;71:19;73:25;
75:20;77:16,20,22;
78:6,9;79:4,5;80:7,15,
16,22;81:11,13,18;
82:19;84:4;88:17;92:4;
95:3;96:24;97:17;98:3,
8,19;100:2;104:8,9;
113:17;116:18,22,25;
119:12;127:6;138:4;
143:24;147:13;148:15;
152:14,21,25;153:3,6,
7,9;154:16,17;156:1;
161:13;162:5;186:12
**investigations (6)**
23:23;25:25;30:11;
43:16;84:10;123:9
**investigative (9)**
63:23;88:24;119:8,
8,11;121:6,17;122:14,
20;156:17
**investigator (1)**
84:5
**invoice (2)**
156:20;174:9
**involve (1)**
186:7
**involved (18)**
35:19;36:20;37:4;
41:3;45:20;46:1,1,10;
51:8;53:25;54:3,16,17;
59:12;83:21;93:22;
143:25;172:20;186:6
**involvement (7)**
41:3;49:23;50:24;
57:6,7,10;63:13;
143:23;146:24
**involves (2)**

30:1,1
**involving (4)**
36:6,6,20;43:12
**irrelevant (2)**
11:16;186:13
**issue (10)**
22:25;44:2;46:23,23;
49:3;53:1;139:6;176:6;
188:9;189:25
**issues (3)**
34:4;44:24;56:14
**items (2)**
49:15;86:2
**iteration (1)**
121:14

**J**

**JACOB (6)**
5:7,13;6:19,22;
122:4;191:14
**J-a-c-o-b (1)**
6:25
**Jake (3)**
7:2,3,5
**January (6)**
15:6;16:3,4;17:11,
17;18:20
**Jay (1)**
7:9
**JD (2)**
7:9,10
**Jeremy (3)**
82:2;94:23,24
**Jerry (3)**
77:24;82:2;86:15
**Jessica (28)**
71:17;77:18;80:20;
83:17;94:2;96:20;
108:1;116:22;118:8,
10;135:19;136:8;
138:11,21;139:2,11,20;
143:21;152:16;154:24;
155:16;156:6,20;
183:22;184:14;185:3,
6,23
**Jessica's (1)**
146:1
**job (4)**
28:15;55:13;144:2;
154:15
**jog (4)**
64:21;79:21;89:21;
101:4
**jogged (1)**
65:2
**John (4)**
6:4,6;188:25;191:8
**joined (2)**
20:11,12
**judge (10)**
10:17;152:23;164:7;
166:9,19;167:8,10,21;

170:18;172:20
**judgment (7)**
32:5;40:13;178:16,
24;179:2;4,9
**July (14)**
61:1;67:21;79:16,21,
23,24,25;80:8;99:23;
120:22;121:19;122:1;
180:10;181:5
**June (9)**
15:7;16:14;17:20;
18:20,20;60:21;61:1;
67:21;108:9
**junior (1)**
15:24
**Justin (21)**
103:15;104:1;117:5,
8,11,19;123:22;124:5,
7;125:3,18;127:4;
128:6,8,23;133:10;
134:17,18;145:5,16,17
**Justin's (1)**
147:5
**juvenile (1)**
55:8

**K**

**Kathie (8)**
52:5;56:14,23;57:2,
4;80:24;92:20;160:14
**Keep (2)**
75:7;112:10
**kept (3)**
25:21;113:16;136:2
**kernel (1)**
88:14
**kicked (1)**
189:7
**kid (1)**
181:14
**kidding (2)**
56:12;175:12
**kids (10)**
29:18;51:8;55:2,6;
56:2;59:14;62:5,10;
181:14,15
**killed (1)**
161:24
**kind (1)**
88:5
**knew (31)**
49:20;56:15;57:9;
66:4,4;80:3,15,21;83:7,
14;84:2,4;92:6;93:3;
94:1;107:11,13;132:3;
133:23;134:5,7;
139:20,22;142:17;
145:16;153:13;156:12;
159:24;161:24;171:11;
173:19
**knock (3)**
125:20;126:2;127:3

**knocked (1)**
151:9
**knocking (1)**
40:19
**knowing (4)**
87:17;133:19;
161:16;183:22
**knowledge (19)**
20:3;51:1,2;57:11;
60:23;61:21;67:20;
69:11;71:8,10,13;
92:22,23,25;110:14;
117:23;129:11;135:12;
184:9
**known (6)**
52:19,21;56:23,24;
105:25;106:9
**knows (3)**
57:2;112:9;168:15
**Kristin (19)**
103:15,25;104:1;
117:5,8;123:22;
127:16,18;129:17,23;
136:8;138:10;144:23;
145:21,22;147:9;
149:12;151:17;183:6
**Kristin's (1)**
147:5

## L

**LA (1)**
45:1
**labor (1)**
59:24
**Ladies (1)**
5:11
**lady (2)**
31:25;82:22
**laid (1)**
184:24
**landlord (2)**
44:24;45:1
**landlords (1)**
45:2
**language (3)**
109:4;167:1,3
**laptop (1)**
87:19
**last (22)**
14:24,25;15:4,5;
17:19;29:1,2;61:4;
68:19;69:7,9;100:3;
111:3;115:7;117:19;
120:15,18;135:20;
144:22;171:24;172:1;
187:21
**lasted (1)**
18:19
**late (2)**
158:9,12
**later (12)**
11:14;22:6;39:21;

**47:20;65:1;99:2;**
115:23;116:17;184:10,
11;187:7,19
**lateral (1)**
28:2
**Latino (1)**
150:18
**law (23)**
10:21;15:2,6,13;
16:1,5,7,18;21:7,20;
37:3;39:25;95:20;
111:5;137:18;143:25;
146:13;155:3;163:20;
167:11;169:22,25;
174:1
**lawful (1)**
166:3
**lawfully (1)**
49:2
**lawsuit (12)**
7:13,16,25;8:1;
35:18,20,21;36:2;
162:4;186:7,10,16
**lawsuit's (1)**
35:22
**lawyer (15)**
135:16;136:2,9;
137:13,14,17,24;138:5,
6,11,21;139:11,12,15;
140:8
**lawyers (1)**
140:6
**lawyer's (1)**
74:15
**leading (3)**
119:20;183:16;186:3
**learn (3)**
133:13;134:8;183:14
**learned (9)**
83:22;97:12;106:1,2,
3;133:14;142:9,10,10
**learning (1)**
175:9
**least (7)**
17:16;38:12;54:21;
122:11,11;148:22;
149:24
**leave (5)**
45:7,8;86:19;91:9;
147:14
**leaving (2)**
148:5;178:7
**left (12)**
26:9,10;87:5,5;
89:13,23;90:5,10;91:5;
147:8,15;157:4
**Legacy (1)**
55:18
**legal (25)**
104:24;106:17,22,
25;113:13,17;114:21;
138:24;155:5;162:9;
164:9;165:7,15;166:1;

**167:18;168:14;169:4,**
7,12,13,14,18;170:10,
18;172:6
**legally (1)**
178:24
**lend (1)**
48:23
**less (3)**
23:9;26:6;27:6;
30:14;37:20;38:2,3,3
**letter (2)**
31:5;35:17
**level (6)**
14:8;21:19;24:1;
46:7;143:22;144:4
**lied (4)**
146:14;183:6,19,21
**lieutenant (33)**
25:11,12;64:1;75:3;
77:23,24;78:15;79:4,8;
80:22;81:23;82:1;84:5,
23;89:8;91:16;97:5;
99:13;100:2;101:3;
120:20;124:4,6;125:2;
138:10;145:17;150:4;
157:12,13;159:23;
160:2;165:13;168:23
**lieutenants (2)**
78:3;102:15
**life (1)**
49:22
**light (1)**
158:18
**likely (7)**
8:16;24:4;27:6;
58:18,19;90:10,11
**likes (3)**
85:6,7;132:24
**limit (2)**
146:23;189:16
**limited (1)**
57:11;84:24,25
**limiting (1)**
143:23
**line (3)**
9:1;86:4;187:8
**lines (6)**
47:22;60:6;146:5;
150:23;153:10;160:8
**listen (3)**
119:1,6;132:8
**listened (9)**
118:17,19,21,23;
119:5,11;120:9,15;
126:4
**listening (2)**
132:23,24
**literally (1)**
161:5
**litigation (2)**
186:13;191:3
**little (11)**
23:3;25:4,20;91:6;

**95:12,13;133:1;143:4;**
172:24;173:3;177:24
**live (1)**
13:17
**lived (4)**
12:24,25;50:10;
173:9
**lives (1)**
13:12
**livestock (25)**
41:6;43:4,13,15;
49:24;50:10,12,17;
57:14,16,17,21;58:2;
70:18,21,22,24;81:12;
82:19;84:4,5;174:14,
18;175:10,11
**loaded (1)**
178:14
**loathe (1)**
132:24
**local (5)**
53:8,15;112:9;
174:11,12
**locals (1)**
112:7
**location (3)**
148:25;164:17;
183:14
**log (1)**
162:25
**logical (1)**
85:22
**logs (1)**
162:23
**long (36)**
12:24;16:12;17:10,
18;19:2,9;20:22;22:4,
4;25:14;31:17;52:19;
71:17;77:18;83:17;
84:2,22;91:12;94:2;
95:21;96:20;106:5;
108:3;116:23;128:22;
131:16;135:19;139:2,
20;147:3,4,5;183:23;
184:14;185:4,6
**longer (3)**
48:25;50:7;115:25
**Long's (1)**
80:20
**look (25)**
9:23;18:13;23:6;
34:5;40:5;45:16;48:18;
51:24;73:19;79:20;
87:11;91:8;95:5,9;
105:21;107:21;112:23;
127:7;128:6;140:6;
148:17;175:3;176:1,2;
190:17
**looked (9)**
49:15;85:22;96:9;
110:10;119:7,7;
120:14;137:18;186:1
**looking (5)**

**68:24;107:12;115:2;**
145:15;146:1
**looks (4)**
19:17;40:23;51:25;
110:6
**loop (1)**
126:25
**losing (1)**
180:22
**lot (24)**
13:19,21;19:8;26:14,
15;29:2,25;31:25;50:5,
10,16;54:1,2;55:17;
58:23;69:22;95:6;
130:6;140:14;142:8,
12;172:10;176:5,7
**Lots (1)**
62:10
**love (1)**
40:20
**lower (2)**
37:14;38:1
**lumping (1)**
61:19
**lunch (1)**
87:18

## M

**Macfarlane (9)**
6:9;62:12,21;64:3,4;
66:1;92:24;160:3;
189:2
**Macfarlane's (1)**
63:9
**machine (2)**
95:16,23
**Madame (1)**
111:16
**magistrate (4)**
184:23,23;185:8,24
**mainly (1)**
50:15
**maintain (1)**
170:3
**major (13)**
17:2;24:3;28:3,16,
18,19;81:17,25;82:5,8;
86:24;87:6,14
**majority (8)**
26:21,25;29:14,21;
37:2;40:17;130:17,18
**Makes (1)**
35:14;158:8,11
**making (5)**
53:11;56:11;158:18;
159:12;165:24
**Male (2)**
102:12;150:14
**males (4)**
102:13,14;150:15,16
**Man (1)**
7:9

**manipulating (1)**
136:3
**manner (3)**
107:18;123:2,8
**manure (1)**
50:6
**many (28)**
21:9;25:24,24;26:2;
28:24;30:4,7,9;37:11,
21;42:12;43:17;56:1,1;
73:6;75:10;83:12;
102:8,9;118:23;130:1,
1;157:18;167:6,10;
173:22;177:13;189:11
**map (1)**
17:3;125:10;126:16
**March (5)**
25:16;27:25;28:10;
91:20,21
**Marina (1)**
173:10
**mark (6)**
77:6;105:17;125:7,8;
131:4;174:24
**marked (9)**
77:10;105:19;
111:19;112:3;125:10;
175:16;176:11,13;
191:21
**married (1)**
50:22
**material (1)**
58:22
**materials (1)**
156:18
**math (1)**
91:9
**matter (3)**
49:12;85:8;98:6;
151:24;155:3
**may (17)**
9:15;24:2;25:3;
28:13;44:19;52:16,17,
17;79:19;99:1;127:3;
154:16;167:11;172:8;
177:7;180:18;181:1
**Maybe (32)**
9:17;15:17;25:4;
34:2;38:12;41:9;47:5,
17;51:2;54:8;55:11,11;
58:20;61:24;64:20,25;
65:1;76:6;89:20,21;
97:13;107:20;129:15;
143:20,20,20;160:7;
176:23;181:25;185:13;
187:13;188:16
**MDT (1)**
56:10
**mean (48)**
11:9;13:20,25;19:12;
23:4;24:23;25:23;
27:16;31:1;32:17;
34:12;35:7;36:1,2;

40:19;42:6;46:4;49:12,
13,19;50:13;63:3;
67:19;70:3;79:20;86:9;
93:6;95:5;98:16,23;
101:9;110:13;122:11;
123:1;130:23;133:8;
135:21;137:5;143:18;
148:17;149:21;151:8;
157:12;179:1;183:13;
188:8,16;190:13
**means (5)**
9:9;68:5;135:21;
136:4;189:15
**meant (7)**
35:8;49:20;60:25;
64:16;72:11;178:14;
181:16
**measures (1)**
63:14
**media (3)**
5:16;110:21;111:1
**median (1)**
31:24
**mediate (1)**
45:1
**mediation (1)**
10:22
**medium (2)**
109:13,21
**meds (1)**
12:8
**meet (14)**
56:19;64:7;71:22,24;
79:10;81:2,3,9;100:19;
150:9;186:24;187:1,
19;188:13
**meeting (7)**
58:20;60:14,15,16;
81:25;92:7;133:15
**Melanie (5)**
6:8;63:1;66:6,9;
189:1
**member (1)**
56:10
**membership (2)**
58:16;60:16
**memorialized (1)**
136:7
**memory (16)**
62:1;64:20,21;65:3;
76:10;78:22,25;79:19,
21;85:24;88:14;89:17,
21;101:4;126:5;129:16
**menagerie (1)**
130:6
**mental (1)**
55:24
**mention (13)**
92:1,20,23,24;93:1,1,
11,13,17,22;119:8;
135:1;142:15
**mentioned (11)**
61:6;65:6;72:4;73:2;

83:18;85:18;94:1;
101:3;136:8;138:17;
142:5
**mentions (3)**
119:16;135:15,15
**met (22)**
52:7,8,9,11,13,14;
56:16,21;64:3,4,5;65:7,
24;66:9;71:9,20;72:9,
10;79:11;81:23;99:17;
115:25
**meth (1)**
173:16
**Mickelson (2)**
5:5,21
**middle (2)**
6:20;15:24
**midnight (2)**
158:4,4
**might (37)**
8:24;9:7;10:11,25;
11:15;22:12;26:5;
52:14,14;56:16;61:15,
16;64:8,18;70:5,6,7;
81:24;82:5,6;84:15;
85:18;86:12,17;87:12;
91:5;92:17;97:10;
107:22;122:10;126:24;
131:15;139:17;169:7;
176:7;187:25;189:20
**migrate (1)**
108:14
**miles (4)**
90:24;91:1,3;141:24
**mind (7)**
44:12;57:23;72:14;
74:22;158:15;165:20;
180:22
**mindset (2)**
155:6,7
**mine (2)**
125:8;132:25
**Mini (7)**
147:11,16;148:19,
21;150:23;162:11;
165:18
**minor (2)**
83:21;85:18
**minors (1)**
30:2
**minor's (3)**
112:11;179:15,16
**minute (1)**
189:21
**minutes (22)**
58:20;84:25,25;85:2;
103:7,8;122:3;128:25;
129:1;130:15,16;
131:16;134:21;143:2,
4;147:3,4,21;150:22,
24,25;189:11
**miraculously (1)**
39:23

**mirror (1)**
141:10
**Mirroring (2)**
158:23,25
**misdemeanor (1)**
24:1
**misdemeanors (1)**
24:8
**misquoting (2)**
64:9;168:16
**Miss (2)**
174:23;178:4
**missed (4)**
33:1,1;158:13;172:2
**missing (2)**
74:11;80:18
**misstate (1)**
47:16
**Misstates (7)**
108:25;137:3;139:8;
155:4;178:18,19,19
**mistake (1)**
146:9
**mole (1)**
65:20
**molestation (1)**
27:21
**molesters (1)**
42:17
**moment (14)**
58:23;73:1;89:3;
105:16;107:24;115:22;
136:20;144:14;174:22;
179:23;180:7;187:9;
188:18,24
**Montana (2)**
14:20,23
**month (2)**
42:6;69:12
**monthly (1)**
16:16
**months (10)**
22:12,13,14,15;47:5;
68:17;91:18,22;
178:22;187:13
**morbid (1)**
29:24
**More (29)**
21:16;23:3,8,9;
24:13;28:16;30:13;
31:15;37:19;38:5,8,18;
40:7;44:2;50:17;54:2,
10;56:14;66:24;78:7;
91:24;98:9,13;100:7,
22;124:10;130:10;
149:2;182:18
**Morfin (3)**
5:3,19,22
**morning (3)**
120:17,18;159:25
**most (16)**
18:21,24;24:4,12;
27:5,11;29:19;33:9;

48:22;53:15,20;57:22;
58:18,19;120:11;
141:10
**mostly (4)**
38:17;44:24;46:15;
91:15
**mouth (1)**
89:3
**move (2)**
13:11;18:23
**moved (6)**
12:25;13:2,5,9,9;
14:2
**movies (3)**
17:16;33:6;51:23
**moving (2)**
112:5;172:11
**much (13)**
15:16;19:1,5;32:23;
49:8;54:8;56:22;129:5;
136:17;152:4;162:1;
172:11;190:6
**multiple (7)**
56:10;70:7;123:6;
183:19,21;187:13,13
**multitude (1)**
87:21
**mumbling (1)**
137:21
**Muse (6)**
52:5;53:4;56:14;
80:24;92:20;160:14
**Muse's (1)**
57:4
**must (5)**
33:14;101:24;134:7;
184:3,6
**Myself (5)**
16:11;26:3;31:23;
40:1;104:17

**N**

**name (34)**
6:5,18,20,24;7:4;
52:5,6,7;53:16;54:21;
56:25;57:3,4;62:13,20;
63:1,9,12;64:6;65:6,7;
66:1;67:7;72:2,6;
80:20;83:17;90:14;
97:13;100:3;112:10,
11;152:7;174:16
**named (4)**
35:18,20;36:2;62:12
**names (7)**
7:1;43:11;54:3;63:6,
25;101:2;150:12
**Napa (27)**
83:9,24;85:16;89:9;
90:4,24;92:7;94:6;
97:1;99:1,11,16,18,18,
18,20;100:16,16,20;
102:7;126:9,15,16;

130:19;133:11,16;
147:25;158:6
**narrative (11)**
8:24;89:17,18;97:4;
99:9;121:25;122:14,
24;123:4,12,19
**narratives (3)**
122:21,21;123:6
**nature (2)**
86:21;137:19
**nauseam (1)**
170:25
**near (2)**
124:21,23
**necessarily (6)**
22:17;53:16;69:24;
72:5;141:14;162:3
**necessary (1)**
185:2
**need (26)**
11:2;22:3;34:13;
54:23;64:19;75:24;
76:13;82:18;85:9;
94:18;97:25;112:6;
125:7;131:6,9;143:10;
159:3;164:8;170:5,15,
20;171:22;176:9,9;
187:21;189:25
**needed (1)**
149:3
**needs (5)**
9:4;34:15;55:14;
113:16;164:5
**neither (1)**
51:11
**nervous (3)**
140:18,18;146:13
**new (4)**
97:12;122:24;
123:18;139:5
**newer (1)**
23:1
**next (12)**
18:23;21:25;22:18;
79:7;89:7;98:11;
103:10;140:23;143:1;
145:20;148:6;157:8
**nice (2)**
13:15;143:23
**nickname (1)**
7:11
**nicknames (1)**
7:7
**night (8)**
21:18;23:10;120:18;
147:22;178:1,2,4,7
**nightshift (3)**
22:8,15,22
**nightshifts (1)**
22:6
**nobody (1)**
151:6
**nod (1)**

9:3
**noise (1)**
126:14
**nondisclosure (1)**
167:8
**nonetheless (2)**
10:18;11:18
**nonprofit (1)**
67:7
**non-profits (5)**
54:1,16,16;55:16;
56:2
**Norman (1)**
96:1
**north (1)**
128:13
**NORTHCUTT (85)**
6:1,1;14:22;43:8;
47:21;53:22;62:16,20;
68:5;72:16;73:17;
74:22,24;75:2;76:5,16;
77:1;84:17;88:3;95:18,
20,24;96:2;97:20;
100:14;101:18,20;
102:3;104:23;106:16;
108:25;109:25;113:11;
114:20;115:3;131:6,
24;132:4,12;136:14;
137:1,3,25;138:23;
139:8,18;140:4,13;
141:6,25;146:20;
154:12;155:4;163:3;
164:9;165:7,25;
166:10;167:17;168:13;
169:16;170:8,22;
171:24;172:13;178:18;
182:13;183:4,5,12,20;
185:18;186:11,17,20,
24;187:8;188:1,6,9,13;
190:1,8,23;191:1
**notice (4)**
45:10;139:13;154:6;
184:20
**notified (1)**
138:21
**number (16)**
5:16,16,21;37:23;
38:8,9;95:12;96:6;
107:21;108:5;110:22;
111:2;125:6;146:1;
151:16;186:16
**numbers (2)**
95:13;143:10

---

**O**

**oath (3)**
10:18;11:18;72:24
**object (3)**
131:15;132:2;186:11
**Objection (41)**
11:8,8;53:22;84:17;
97:20;100:14;102:3,5;

104:23;106:16;108:25;
109:25;113:11;114:20;
115:3;136:14;137:1,
25;138:23;139:8;
140:4;141:6,25;
146:20;154:12;155:4;
163:3;164:9;165:7,25;
167:17;168:13;
169:16;170:8,15;
171:24;178:18;183:11,
16;189:16
**objections (12)**
11:1,2,3,13;137:4;
139:18;166:10;170:10,
22;171:21,25;186:20
**obligations (6)**
104:22,24;106:14,
17;113:10,12
**obtain (6)**
121:1,5,18;147:1;
149:4,4
**obtained (1)**
15:4
**obviously (10)**
22:3;34:14;74:5;
122:11;133:8;134:4;
141:12,16;146:14,25
**occasion (1)**
47:8
**occasionally (1)**
60:3
**occur (1)**
181:2
**occurred (1)**
173:23
**occurrences (1)**
32:24
**o'clock (7)**
80:4,4,5;90:12;
147:21;148:4;159:25
**October (1)**
61:6
**off (56)**
9:13,16,17;20:17;
28:13;64:12;72:17;
73:2,14;80:3;81:6;
83:8,16;93:19;110:18,
20;117:12,13;129:9;
132:8;136:12;144:14,
15;148:5,9;152:17;
154:19,20;156:2,25;
157:21;159:2;160:22;
161:2,7,15,17;162:8,
17;165:19;171:9,9,11,
12,16;179:25;182:21,
22,24;183:13;187:9;
188:16,18,19,21;189:7
**offensive (1)**
181:16
**office (21)**
10:22;28:3;32:18;
34:9;35:1,6;68:23;
77:9;79:11,11;81:3,4,

9;82:13;87:15;91:17;
100:20,21,22;162:21;
171:16
**officer (52)**
7:18,19,20,25;16:23;
18:5,10;20:15,19,20,
23,24;21:5,10;23:1,20,
24;24:3,16,23;25:3,11;
30:20,21;31:6,10;36:7,
22,23;37:17,22;38:17;
41:2,13,17;43:19;
44:14,16;47:7;84:23;
86:11;98:18,21;99:6;
104:14;106:8;174:2,
22;177:7,20;184:4,6
**officers (2)**
22:22;24:7
**Officer's (1)**
58:7
**offices (5)**
5:3,19;100:23,24;
191:15
**officially (1)**
16:13
**often (9)**
32:22;44:7;46:24,24;
67:14;68:1;173:22;
174:1;176:22
**okayed (1)**
167:22
**old (3)**
13:1;51:13;191:16
**older (1)**
51:13
**old-school (1)**
95:21
**once (8)**
23:14;48:15;67:19;
68:4,5;123:20;135:25;
163:23
**oncoming (1)**
31:25
**one (71)**
5:16;7:9;16:11;19:3;
22:23;24:10,25;25:1;
26:4,14;28:16;32:17;
35:5,18;39:22,22;40:7,
13,20;43:13;56:23;
59:17;65:24;67:8;
74:12,24;82:12;88:3;
91:9;100:21,22,24;
102:17;104:14,16;
105:16;108:17,18;
110:22;111:25,25;
120:3;122:20;125:1,8;
126:13;127:4;129:22;
132:17,24;135:22;
136:19;137:23;140:2;
141:3,24;149:22;
158:10,18;160:10;
165:11,13;166:16;
171:21;172:2;182:18;
183:21;185:13,15,21;

187:11
**one-page (1)**
125:9
**ones (3)**
17:24;22:23;58:11
**one's (4)**
44:5,5;87:8,8
**ongoing (3)**
35:22;43:8;187:23
**online (2)**
137:18;140:6
**only (27)**
21:14;22:5;23:24;
24:7;27:8;32:12;39:22;
61:10;62:1,13,13;
63:22,25;67:15,19;
69:12,13;70:1,2;75:2;
78:12;91:17;120:24;
135:25;149:7;158:17;
178:21
**onto (1)**
90:19
**oOo- (1)**
191:22
**open (5)**
26:10;90:19;122:21,
25;153:3
**opened (1)**
28:2
**operating (1)**
48:1
**operations (2)**
81:23;82:10
**opinion (7)**
27:3;141:14,19,20;
146:12;165:12;166:24
**opportunity (2)**
23:2;184:20
**opposite (1)**
21:25;130:20
**ops (1)**
79:11
**Orange (1)**
13:17
**order (11)**
75:14,18;81:22;
163:9,22;164:1;167:8,
10;172:6;184:7,25
**orders (8)**
104:18;163:6,9;
164:14,18;165:21;
167:7,8
**ordinarily (2)**
162:18,20
**Oregon (2)**
13:23;191:16
**organization (2)**
62:9;67:4
**organizations (3)**
56:6;61:20;62:2
**original (2)**
190:24;191:3
**originals (1)**

191:14
**OT (1)**
157:18
**others (1)**
61:22
**out (44)**
12:3;24:11;34:10;
39:25;55:6;56:3;57:23,
23;62:6;63:7;67:3;
69:2;78:8,21;80:15;
85:13;86:2;99:7;
108:23;110:19;117:9;
120:16;123:9,22,24,25;
125:1,4,22,25;126:1,8,
12;127:4;134:17;
142:15;146:3;154:9;
157:7;173:15;174:15;
175:23;182:12;188:17
**outside (9)**
32:14;45:7;75:21;
114:13;150:10,10;
157:20;173:18;176:25
**outstanding (1)**
33:24
**over (21)**
8:19;15:9;18:8;25:5,
20;26:5,16;28:12;44:3;
46:18;47:6,21,23;76:2;
141:7;154:22;163:5,
14,14;176:9;187:22
**overall (1)**
183:9
**Overbroad (1)**
138:1
**override (2)**
164:7;167:6
**overtime (3)**
157:15,17,18
**own (6)**
18:15;24:17;49:24;
68:8;131:5;132:23
**owned (2)**
46:19,19
**owner (22)**
148:13,23;149:9;
151:5,11,14,14,16;
162:12;163:16,18,23;
164:19;165:23;166:3,
8,22;172:17;173:8,20;
184:18;185:2
**owners (1)**
163:6
**owner's (1)**
166:6
**ownership (8)**
47:1;114:3;138:19,
20;154:20;155:17;
184:19;185:7

**P**

**package (1)**
77:3

**packet (1)**
108:14
**page (11)**
63:20;74:17;115:20;
119:15,17,24;121:21,
22;123:7;166:18;
174:15
**pages (3)**
77:10;96:21;175:15
**paid (2)**
16:18;48:18
**Palo (1)**
15:22
**Palomar (2)**
14:13,15
**panache (1)**
56:22
**panel (1)**
32:1
**paper (3)**
74:6;128:18,19
**parameters (1)**
9:20
**paraphrase (1)**
76:9
**paraphrasing (1)**
85:15
**parcel (2)**
128:20,21
**parents (3)**
54:23;55:12,12
**park (1)**
87:20
**parked (1)**
126:13
**parking (1)**
31:25
**part (9)**
13:13;18:21,24;
19:21,22;75:20;
119:12;127:19;133:2
**particular (6)**
27:2;44:12;158:10,
15;177:15;185:3
**parties (3)**
38:19;40:8;42:22
**partner (2)**
26:3;31:24
**party (5)**
44:2;48:6,10,16;49:2
**passed (1)**
20:6
**past (3)**
7:10;44:8;58:10
**patches (1)**
16:19
**Pathways (2)**
54:18;56:9
**patrol (27)**
23:17,19;24:2;25:12;
27:6;37:17;38:17;
39:11;47:2,7,7;79:11,
11;81:3,4,9,23;82:10,

13;87:3,3,5,14;98:10,
11;174:2;177:7
**patrolman (3)**
36:22,23;102:25
**Pause (9)**
74:9;75:8,12,19;
89:22;105:23;112:18;
117:15;136:19
**paying (1)**
185:2
**PD (8)**
20:13;25:15;27:24;
59:2;94:6;99:11,16;
130:19
**peace (2)**
16:23;18:10
**pen (2)**
155:13;157:1
**Penal (18)**
18:3,15;19:2,4,14;
104:22;105:1,19;
106:4;111:5,6,19;
112:3;114:24,25;
164:4;168:8;184:17
**penalty (1)**
190:21
**pendency (1)**
19:24
**pending (2)**
35:24;84:10
**Penn (2)**
42:7,8
**pens (4)**
129:19,19,24;145:7
**People (23)**
7:5;22:24;46:1;
48:11;53:15,20;54:3,
10;57:22;93:21;98:3,7;
102:8,11,12;115:13;
126:15;137:17;138:18;
140:5,17;143:23;
149:21
**people's (1)**
42:2
**per (3)**
33:20;42:21;70:8
**perceived (1)**
144:2
**percent (4)**
29:10,12;32:6;86:13
**percentage (3)**
29:8,10,20
**percipient (1)**
9:19
**period (2)**
189:8;190:22
**perjury (1)**
190:21
**permissible (1)**
170:6
**permission (2)**
48:20;153:17
**person (15)**

16:11;26:14;52:4;
54:11;79:12;85:6;
86:22;98:25;99:6;
140:19;146:12;149:3;
184:21,22,24
**personal (1)**
91:24
**personally (2)**
60:10,12
**person's (1)**
141:11
**pertinent (1)**
56:14
**petition (1)**
55:8
**phone (20)**
42:22;66:11;79:9;
92:10;94:10,11,19,19,
22,22;109:19;135:2,5,
7,11,13;146:1,7;
183:14;189:6
**photo (10)**
108:13,16,19,23;
109:12,15;110:2,5,10,
17
**photos (2)**
108:20;182:4
**phrase (5)**
30:8;52:18;113:19;
174:7;178:15
**pick (4)**
22:17,18,24;33:19
**picture (22)**
107:10,15,16,18,19,
20,25;108:7,10,11,12;
109:7,7,14,16,17,22,23,
24;110:6,7,12
**piece (1)**
128:18
**pit (2)**
40:12,19
**place (2)**
72:6;156:13
**placed (1)**
157:3
**plain (3)**
102:20,21,23
**Plaintiff (1)**
189:22
**Plaintiffs (1)**
6:10
**Plaintiffs' (1)**
6:11
**Plaintiff's (8)**
77:8;105:18;111:18;
112:2;125:9;175:13;
176:12;191:20
**play (13)**
9:15;33:25;40:22;
129:14;131:9,9,16,18,
19,19,21;132:5,7
**played (8)**
132:19;133:5;

134:13,23;140:25;
143:6,12;145:22
**players (1)**
93:22
**playing (2)**
134:20;140:23
**pleasantries (1)**
65:14
**Please (10)**
6:17;11:24;63:5,11;
75:24;112:17;119:19;
166:25;176:1;189:7
**plus (1)**
141:24
**pm (8)**
82:14;144:18;
157:20,21,23;180:3;
182:25;191:19
**PO (1)**
41:1
**point (35)**
14:25;81:10;83:18;
84:3;88:13,21,25;
91:16,22;95:2,7;
104:19;107:11;113:6;
125:4,14,18;129:22;
134:14,16;138:19;
142:7;145:11;148:4;
149:8;153:24;155:20;
156:9,19;159:8,16;
161:25;166:18;185:16;
187:10
**pointed (1)**
146:3
**Police (56)**
8:2;16:6;17:6,8,14,
15,16,17,18,22;18:2,5,
12;19:5,16,17;20:11,
12,14,16,19,20,23,24;
21:1,5,10,11;23:19,24;
24:7,11,23;25:3;26:17,
24;31:6,10;36:6,22,23;
37:22;39:11;41:2,13,
17;43:19;44:14,16;
47:8;58:7;87:9,11;
99:18;102:8;106:7
**policies (1)**
18:4
**policing (1)**
174:5
**policy (2)**
34:17;47:25
**poor (1)**
55:12
**popular (1)**
53:7
**portion (2)**
128:5;166:19
**portions (5)**
129:15;131:9,19,21;
132:13
**posed (2)**
49:19;78:12;100:9

**position (7)**
28:2,5,7;140:20,20;
143:19;187:17
**possession (2)**
49:1;171:17
**possibility (1)**
83:8
**possible (2)**
112:11;181:1
**possibly (1)**
93:19
**POST (4)**
18:11;107:23;108:8;
149:19
**posted (1)**
108:9
**potential (1)**
61:19
**potentially (2)**
62:3;144:2
**poverty (1)**
55:11
**practical (1)**
174:5
**practice (5)**
98:2,6;99:5;129:12;
164:13
**practicing (1)**
95:18
**precise (2)**
10:11;189:20
**precisely (1)**
12:3
**predates (1)**
80:8
**prejudice (2)**
8:7;185:1
**prep (2)**
49:7;120:9
**prepare (1)**
187:14
**preparing (1)**
119:4
**present (1)**
102:10
**presentation (2)**
59:14,15
**presentations (2)**
59:5,12
**presented (3)**
139:2,4,10
**preserved (3)**
170:24,25,25
**preserving (1)**
11:3
**president (1)**
58:7
**pressing (1)**
100:9
**presumably (6)**
15:23;20:6;105:11;
108:24;153:2;162:23
**presume (8)**

11:6;15:9;55:9;
58:24;114:18;153:23;
177:4;190:20
**pretty (10)**
18:1;19:4;22:7;32:9;
49:8;51:25;52:1;125:1;
129:5;180:16
**previously (7)**
70:19;109:20;
142:18,20;145:22;
165:10;166:2
**primarily (5)**
26:20,25;124:4,6;
174:2
**primary (1)**
98:18
**principles (1)**
33:21
**prior (16)**
26:13;63:4,9,13;
68:16;71:19;76:21;
81:17;103:7,8;118:22,
24;123:12;133:14;
134:9;170:11
**prioritize (3)**
34:10,11,11
**prioritized (3)**
34:17;177:14,15
**priority (1)**
177:17
**private (2)**
44:2,5
**Privately (1)**
176:21
**privilege (1)**
186:23
**privy (2)**
69:23,24
**proactive (2)**
23:3,4
**probable (5)**
56:20;149:8,10,16;
166:20
**Probably (43)**
8:20;9:22;19:15;
37:14,20;38:1,2,8,13;
41:21;42:15;43:20;
44:17;47:4,9;56:15;
58:21;73:7;80:2,5;
85:1;91:2,3;103:6;
106:7;112:22,25;
118:19,25;128:24;
130:9,10;141:15;
143:24;146:25;147:21;
149:17,18;150:17;
151:1;158:3,12;159:9
**problem (1)**
27:2
**problems (1)**
91:10
**procedure (7)**
18:16;19:19;39:16;
40:10;45:11,17;170:18

**procedures (5)**
18:3;19:9,12,13,14
**proceed (1)**
131:1
**proceeding (3)**
38:20,23;114:3
**proceedings (11)**
74:9;75:8,12,19;
89:22;105:23;106:22;
107:1;112:18;113:17;
117:15
**process (3)**
45:9;186:7,9
**produce (2)**
75:25;76:25
**produced (1)**
75:18
**Productions (2)**
5:15;191:15
**professor (2)**
42:6,7
**program (2)**
17:12;55:13
**programs (1)**
57:14
**promoted (1)**
20:25
**prompt (1)**
86:22
**promptly (1)**
86:20
**proof (2)**
184:19;185:7
**proper (3)**
40:10;45:9;66:24
**property (84)**
28:22;29:11;33:10;
44:3;45:22,25;104:4,
16;106:19;113:15,19,
20,22;114:1,24;116:14,
17,18,20,21,23;117:24;
118:5,7,14;124:5,6,17,
24;125:3,11;128:7,8;
129:19,22,25;134:18;
137:22,24;138:4;
139:17;145:6,15,17;
147:5,8;148:10;
149:25;150:11;151:5,
11,14,14,16;153:19;
154:19,20,21;155:13;
162:21;163:5,14,21,23;
164:5,16,16,19;165:5;
166:4,5,17;170:4,17;
171:4;172:16;173:6,
18,19;174:3;184:2,5,
19,22
**prosecution (2)**
26:1,3
**prostitution (1)**
27:17
**protocol (1)**
39:10
**proud (1)**

39:25
**provide (3)**
54:23;55:20;69:22
**provided (5)**
116:5;118:4;139:24;
156:22;185:6
**providing (6)**
54:25;55:23;56:2;
91:7;183:13,18
**provision (1)**
111:9
**provisions (7)**
112:21;114:19;
115:1;164:4;168:8;
179:13;183:25
**proxy (1)**
191:9
**public (11)**
44:5;52:11;53:7;
54:3,5;59:25;60:3,13,
15;62:4;176:21
**publicly (1)**
186:15
**pull (2)**
33:3;125:14
**pulled (4)**
125:15;126:20,21;
130:22
**pulling (1)**
126:24
**punch (1)**
9:1
**purports (1)**
96:20
**purpose (3)**
87:2;148:15;152:1
**purposes (1)**
191:3
**pursue (1)**
47:19
**pursuit (2)**
47:18;48:3
**Pushing (1)**
54:8
**put (8)**
6:5;24:24;89:25;
99:4;125:16;149:25;
174:4;187:21
**putting (3)**
11:2;12:4;137:4

**Q**

**quality (1)**
23:23
**quarter (1)**
32:1
**Questionably (2)**
113:20,25
**quickly (1)**
86:19
**quit (1)**
45:10

**quite (2)**
56:22;134:25

**R**

**racing (1)**
182:9
**rain (1)**
80:25
**raise (1)**
188:9
**ran (1)**
120:16
**rang (1)**
151:9
**rank (1)**
102:19
**rapport (2)**
141:13;158:22
**rare (1)**
25:2
**rate (1)**
25:21
**rather (4)**
23:6;125:17;164:7;
166:11
**rats (1)**
65:20
**Ray (2)**
152:8,19
**Raymond (7)**
75:22;152:9,11,11;
155:22;184:13,14
**Ray's (7)**
116:16;131:1;
147:23;150:21;151:4;
165:2,3
**reaction (1)**
83:24
**read (7)**
19:8;49:13;63:12;
64:17;88:22,24;95:3;
105:9,9,22;120:8,13,
19;175:4
**reading (1)**
136:17
**ready (1)**
187:15
**reaffirmed (1)**
18:25
**reality (1)**
174:5
**realize (2)**
13:22;74:4
**really (15)**
16:12;29:23;35:2;
42:3;55:13;56:7;64:25;
69:23;83:18;91:14;
98:13;152:4;156:4;
162:1;181:2
**realm (1)**
169:23
**reason (9)**

12:17;62:13;63:25;
64:14;77:3;133:22;
152:14;178:22,23
**reasonable (2)**
38:8;184:20
**reasons (1)**
87:21
**recall (88)**
22:20;31:8;40:14,15;
52:8,9;59:7;61:5;
64:23;65:9,10,11;
66:19;69:19,20,21;
70:15;76:5;78:25;80:1;
81:16,24;82:1;84:13,
15,19;85:10,19,23;
86:25;87:16,22;88:4;
92:3,11,13,13,15,18;
94:10,15,17,18,19,21,
23;97:7;101:15;102:4;
103:23,24;106:2;
107:11,17;108:6,10;
109:16,21,24;110:3,4;
117:6;118:9;124:15,
16;126:6,8;130:21;
131:11,12;134:5;
136:16,20;137:8,9;
138:12,14;141:20,22;
142:23;157:23;159:13,
15;160:12;172:23;
177:5;178:6,9
**recalling (1)**
40:17
**recap (1)**
99:25
**receive (1)**
73:25
**Received (6)**
16:16;32:7;35:17;
75:22;157:15;175:22
**receiving (1)**
61:5
**recently (2)**
119:3;153:14
**recognize (4)**
65:6;75:15,16;
108:11
**recollection (14)**
9:14;18:18;22:8;
39:10;41:10;61:7;
78:23;83:14;85:21;
88:10;102:11;117:21;
120:15;145:8
**recollections (1)**
86:1
**record (43)**
5:12;6:5,18;11:2;
72:17,21;73:2;86:13,
17;93:20;110:18,21,
25;112:5;117:12,13,
16;128:9;132:8,15;
134:19;136:3;137:5;
140:20,24;142:25;
143:3;144:14,15,19;

176:3;179:25;180:4;
182:21,22,24;183:1;
187:12,22;188:18,19,
21,23
**recorded (1)**
158:19
**recorder (2)**
148:5,9
**recording (19)**
78:24;118:13,15;
119:9;120:2,10,15;
126:4,10;129:1,4,9,12,
15;144:22;146:5;
147:3,20;191:21
**records (3)**
182:2,3,3
**recruitment (4)**
68:19,22;69:6;
180:15
**Redding (8)**
5:4,15,20;14:3;
13:19;16:25;191:15,16
**redo (1)**
159:4
**reestablished (1)**
18:24
**refer (9)**
19:15;79:17,19,20,
21;89:19,20;112:6;
123:10
**referenced (1)**
105:14
**referencing (4)**
43:15;48:3,4;115:19
**referral (1)**
39:13
**referring (5)**
19:16,19;41:16;
63:17;76:18
**reflected (2)**
58:20;141:16
**refresh (4)**
64:20;89:17;126:5;
129:16
**refreshed (1)**
120:14
**refreshes (1)**
79:19
**regarding (2)**
5:16;8:1
**regardless (2)**
169:14,17
**register (3)**
77:4;139:25;140:1
**regular (3)**
19:5;47:4;173:6
**regularly (2)**
138:3;140:5
**regulations (1)**
90:16
**related (7)**
11:20;30:2;41:4,6,
18,20;176:15

**relationship (4)**
57:6,8,9;141:17
**relay (1)**
135:16
**relayed (1)**
85:14
**Relevance (1)**
138:1
**relevant (1)**
133:2
**reliant (1)**
99:8
**relinquishing (2)**
171:17,17
**relistened (1)**
143:13
**relying (1)**
97:3
**remained (2)**
130:19;139:19
**remaining (2)**
96:21;189:20
**remember (64)**
9:8;10:8,8,11;31:15;
37:12;38:15;39:9;40:4;
41:17;51:25;52:10,12;
56:16;58:22;59:1;
64:16,19;68:1,14;
69:14,17;82:9;83:23;
84:1,13;86:4,5;87:4,
13;88:11;89:13;
101:20,22;102:9,15,17;
109:7;115:14;118:2;
126:1;127:21;131:18;
133:17,19,20;134:1;
136:22;142:10,24;
147:18;150:12,19,20;
151:12;154:10;157:6,
25;158:17;160:8;
161:5,16,16;179:7
**REMEMBERED (1)**
5:1
**remembering (2)**
72:1;137:9
**remove (2)**
166:5;167:3
**removed (1)**
99:11
**repeat (2)**
170:13;171:22
**rephrase (2)**
135:20,22
**replay (1)**
134:25
**report (43)**
39:5,7,7;49:1,8;63:6,
12;64:1,9,11,15,17,18;
65:6;72:4;73:21,24;
74:2,6,17,25;75:5;77:9,
15;78:1;79:15;89:11;
95:3,6,7;101:3;103:5;
117:7;118:25;119:1,
11,16,22;120:6,8,14;

121:12,19
**reported (1)**
163:21
**Reporter (5)**
5:5,21,25;6:14;
111:17
**reporter's (1)**
8:21
**reporting (1)**
40:10
**reports (5)**
37:18,21;48:5;80:12;
123:3
**represent (3)**
5:24;59:24;175:21
**representative (3)**
161:8,15,17
**representing (1)**
161:14
**request (2)**
99:12;100:8
**require (1)**
24:14
**required (2)**
18:7;184:22
**requirement (1)**
114:9
**requires (2)**
27:11;167:9
**rescind (1)**
179:16
**rescues (1)**
50:12
**reserving (3)**
187:6;189:22,24
**reside (1)**
12:21
**residence (6)**
103:10;107:14;
150:10;151:11,13;
152:17
**residency (1)**
44:3
**resigned (1)**
42:10
**resolution (2)**
8:6;26:13
**resolve (1)**
39:2
**resolved (2)**
35:19;38:16
**resolving (1)**
38:18
**resources (3)**
54:25;55:13;141:23
**respect (1)**
81:11
**respected (2)**
100:10,12
**respective (1)**
59:17
**respond (4)**
23:7;37:21,25;

117:25
**responder (1)**
98:25
**responding (5)**
21:6;23:16;31:22;
98:20;99:5
**response (4)**
9:2,4;10:25;150:8
**rest (1)**
187:6
**result (2)**
32:7,9
**retain (2)**
114:2;162:12
**retained (7)**
138:5;139:11;171:7;
184:3,6;185:23;191:15
**retaining (1)**
171:4
**retract (1)**
160:5
**retrieve (4)**
85:16;93:24;116:5;
153:18
**retrieved (4)**
155:15;157:2;159:5;
180:9
**return (4)**
163:23;164:18;
166:21;173:2
**returned (3)**
172:16,16;173:19
**review (25)**
49:7,10;100:1;104:6,
13;107:4;112:16;
118:17;147:9;156:17;
163:11;174:8,9,11,17,
20,23,24;175:2,7,19,
24;176:4,15;190:11
**reviewed (8)**
49:8,13,14,14;63:6;
104:15;155:19;179:13
**reviewing (4)**
75:6;80:11;97:18;
104:10
**rewind (1)**
133:1
**Rey (1)**
173:10
**ride (3)**
50:1;142:14;160:2
**ridiculous (1)**
141:3
**riding (1)**
87:21
**right (228)**
6:17,22;7:12,12;8:6,
15;9:6,6;10:12,16;
11:14,15,23;12:15,20,
23;13:24;14:2,5,24;
15:8,11,16,18,23;16:1;
17:6;19:8;20:2,6,9,11,
22;21:2,18;23:2;

25:14;27:23,24;28:11,
24,24;29:22,23,25;
30:4,9,16,19;32:12,22;
33:3,9;34:14,15,22;
35:15;36:1,19;38:5,15;
40:25,25;41:8;43:12,
17;45:19,19;46:4,7;
47:24;49:6,6,10,18;
50:15;51:11,16,17;
52:3;53:3;54:15,15;
55:9;56:13;57:5;58:1,
19;60:17;61:1,9,9,17;
62:11,25;64:7,18,21;
65:22,23;66:6;67:11,
19;68:7;70:5,17;71:2,
16;72:8,11,23;73:1,11,
13;77:2,4,12;78:10,17,
20;81:2;82:11;83:4;
84:21;86:7,18,23;89:2;
90:7;95:1;96:4,4,24;
97:16,16,24;102:7,14,
25;103:3,13,24;105:7,
21;106:13,13;107:3;
110:12,15;111:8;
114:5;116:19;117:3,
18;118:2;120:8,19;
121:20;124:21;125:11,
11,15,16;126:3;127:12,
13;129:14;130:14,14,
18,25;131:3,8,23;
133:17;134:7;135:6,
14,14;137:11;138:7,8;
139:16;140:23;141:1;
142:22;143:1;144:13;
146:9;147:7,25;
150:25;151:15,22;
155:2,9,9,22;156:6,16,
24;157:8;158:14,14,
25;159:2,17;161:19;
162:25;172:8;174:8,
23;177:4,12;178:6,12;
179:5,15,16,22;180:6;
181:7;186:3;187:4,18;
188:6,24;191:10

**rightful (7)**
163:16,17,20;
164:19;165:23;166:8,
22

**right-hand (1)**
95:13

**rights (4)**
154:20;189:22,22,24

**rings (1)**
27:17

**roaming (1)**
129:25

**rogue (1)**
108:23

**role (8)**
20:23;30:20;36:6,21;
37:3;50:11;53:13;
176:21

**roles (1)**

21:3

**room (2)**
189:4,6

**rotation (1)**
22:18

**rotations (3)**
22:10,19,20

**roughly (1)**
91:23

**round (1)**
141:24

**route (1)**
92:14

**routed (1)**
25:12

**rules (8)**
8:17;174:11,12,13,
18;175:2,10,14

**run (1)**
54:22

**running (2)**
128:19,20

**Ryan (5)**
6:10,21,22,22;189:6

**R-y-a-n (1)**
6:25

**S**

**Sacramento (1)**
5:18

**salaried (1)**
157:14

**salary (1)**
157:16

**sale (3)**
156:20;174:9;176:23

**sales (1)**
177:8

**same (28)**
7:24;8:1;10:19;
49:20;56:20;61:11;
63:20;66:8;98:20,22;
110:8,9;111:22,23;
115:3,20;118:12;
139:18;166:10;168:13;
170:22;171:20,24,25;
179:20;181:3;190:23;
191:2

**San (6)**
13:2,5,8,11,13,17

**sanctuary (8)**
83:9,16;88:16;93:19;
97:13;103:11;119:23;
146:24

**satisfactory (2)**
184:19;185:7

**satisfied (1)**
40:9

**saving (1)**
11:13

**saw (7)**
17:3;51:20;104:7;

108:16;109:10;125:24;
127:22

**saying (19)**
8:22;48:11;65:10,21;
94:24;112:14;121:10;
135:1;136:2;140:18;
143:15;146:23;158:19;
160:16;167:20;168:11,
17,22;179:8

**scared (1)**
159:14

**schedule (1)**
98:14

**school (4)**
15:18,24;39:25;
91:10

**scope (11)**
29:15;41:21;45:7;
60:4;67:25;105:12;
106:3,20;112:23;
166:13;176:25

**screenshotted (1)**
75:14

**scrolling (1)**
146:2

**se (1)**
42:21

**search (52)**
81:19;88:12,15;
104:4,7;105:2,3,6,12,
13,15;106:4,5;107:4;
111:14;114:12,13,16;
117:22;118:4,7;121:2,
5,7,8,15,18;135:2,2,4,7,
9,11,13;136:25;
149:11;163:11;164:2,
3,6,14,17,21,23,25;
165:2,3,14;166:13,15;
168:18,20

**searched (1)**
124:5

**searching (3)**
104:12;107:6;124:16

**second (7)**
26:23;35:20;88:3;
118:20;131:7;134:21;
182:19

**seconds (4)**
122:3;143:2,5,9

**section (3)**
105:19;111:19;112:3

**security (1)**
143:10

**seeing (3)**
75:10;76:5;107:18

**Seem (2)**
159:14;176:7

**seemed (3)**
52:2;132:3;141:4

**seeming (1)**
58:22

**Seemingly (1)**
166:22

**seems (2)**
26:15;68:10

**sees (1)**
40:22

**seized (1)**
106:24

**seizure (2)**
137:22;177:17

**select (1)**
25:7

**self-explanatory (1)**
175:1

**seller (2)**
45:21;46:11

**send (1)**
173:7

**sense (1)**
35:14

**sensitive (1)**
36:11

**sent (4)**
76:23;150:9;156:20;
189:5

**sentence (1)**
140:14

**Separate (3)**
48:12;115:24;123:9

**series (1)**
179:13

**serious (2)**
24:4;40:7

**servant (1)**
176:21

**serve (1)**
67:4

**served (1)**
188:5

**service (7)**
21:6;23:7,16;31:23;
37:24;44:13,18

**services (2)**
55:24;56:2

**set (3)**
18:6,6;136:12

**setting (2)**
10:17,21

**seven (6)**
13:1,6;69:14;106:11,
11;187:11

**seven-hour (1)**
189:16

**several (4)**
33:25;43:20,21;58:7

**severity (1)**
33:22

**sex (9)**
24:3;27:1,4,16;
28:22;29:16,17,19;
84:6

**sex-crime-type (1)**
27:20

**sex-related (1)**
41:22

**sexual (2)**
27:20;42:17

**SHAKIB (3)**
6:11,11;191:6

**shall (1)**
184:25

**Shasta (35)**
12:22,23,25;13:1,6;
14:13;26:20;28:3,25;
46:2;53:21;57:19;61:1,
2;66:16,17,19,20,22,
24;67:6,6,15,24;68:23;
69:23,25;71:3;77:8;
148:12,14;157:9;
159:23;162:20;176:12

**shear (1)**
29:24

**Shepherd (1)**
39:23

**Sheriff (1)**
133:12

**sheriffs (5)**
94:6;99:20;102:16;
103:1;126:17

**sheriff's (24)**
17:7;28:3;35:1,6;
58:9;59:10,12,19,20,
21,22,23;68:23;77:9;
79:11;81:3,4,9;91:17;
94:7;100:17,20;
162:21;171:16

**shift (9)**
21:12,13,15;22:17;
23:2;33:1;98:10,11;
157:21

**shifts (2)**
22:2;47:8

**shops (1)**
173:5

**short (1)**
112:17

**shorter (1)**
19:11

**Shorthand (2)**
5:5;74:21

**shortly (2)**
64:11;129:15

**show (11)**
64:11,19;96:5,6,11,
13;105:8;109:18;
111:8;128:9;135:23

**showed (4)**
124:5;128:6,8;
151:17

**showing (4)**
64:14;95:10;134:18;
145:17

**shown (7)**
107:10,10,19;109:8,
14,21;125:2

**sick (2)**
33:4;55:4

**side (5)**

87:9;130:20;148:24;
155:13;157:1
**sides (1)**
90:19
**sight (1)**
57:23
**sign (2)**
188:16;190:20
**signal (2)**
102:22,22
**signed (1)**
92:5
**significant (5)**
61:8;136:21;140:1,7;
159:15
**signs (1)**
166:19
**silently (1)**
65:19
**Silva (5)**
6:8;63:1;66:6,9;
189:1
**similar (10)**
18:2;37:1;44:3;
54:21;60:5;67:7;75:23;
76:12;82:18;146:6
**simply (2)**
53:4;99:11
**single (1)**
122:25
**sit (3)**
85:7;101:8;131:17
**sits (3)**
71:3,7,9
**sitting (1)**
9:24
**situation (4)**
38:19;116:10;149:3;
158:18
**situations (3)**
25:3;34:12;44:15
**six (2)**
69:14;134:21
**size (3)**
9:24;29:3;110:9
**skills (2)**
18:9;20:3
**sleep (1)**
22:3
**Slowing (1)**
73:1
**small (2)**
21:12;110:5
**smaller (1)**
24:1
**social (1)**
143:10
**sold (1)**
161:24
**solicit (3)**
59:16,18;60:2
**solicitation (1)**
61:5

**soliciting (2)**
61:11;62:3
**solo (1)**
98:1
**solved (1)**
25:25
**somber (1)**
52:2
**somebody (14)**
45:6,8;48:23,23;
53:15;92:7;126:11,13;
138:5;140:7,8;160:17,
18,21
**somebody's (1)**
160:22
**someone (8)**
47:20;48:5;73:23;
135:25;137:12,12,23;
186:9
**someplace (1)**
162:8
**something's (1)**
106:24
**sometime (4)**
133:14;151:2,3;
158:3
**Sometimes (5)**
21:12;40:21;44:14;
98:12;99:3
**somewhere (11)**
38:7,12;58:20;80:5;
81:6;85:1;108:14,23;
153:10;159:23;174:21
**Sonoma (6)**
147:11,17;148:1;
150:4,7;158:6
**soon (1)**
21:23
**SOP (1)**
48:1
**sorry (14)**
20:12;36:22;46:9;
84:23;93:8;94:17;97:8;
115:9;137:20;172:9;
180:17;184:1,13;
185:14
**sort (3)**
39:15;139:17;169:18
**sorts (1)**
26:18
**sound (2)**
36:10;178:14
**sounded (1)**
132:22
**Sounds (6)**
12:7;28:15;114:15;
132:10;159:12;190:2
**source (1)**
51:12
**South (4)**
5:3,20;13:17;128:13
**space (1)**
189:8

**span (1)**
47:6
**spans (1)**
28:21
**spatially (1)**
125:5
**speak (13)**
82:16;87:24;89:5;
99:15;101:1,5,10;
102:8;117:4,10,11,19;
137:21
**speaking (6)**
48:7;78:18;88:4;
134:14;183:6,23
**SPECIALIST (22)**
5:11,14;45:13;72:17,
21;110:20,25;117:13,
16;144:15,19;175:11;
179:25;180:4;182:22;
183:1;188:19,22;
189:13,18;191:11,13
**specialty (1)**
102:24
**specific (41)**
26:9;30:25;31:8,16;
35:8,9;40:17;43:15;
52:10;59:7;69:21;
76:22;79:18;80:1;85:9,
10,12;86:1;88:10;
94:10,15;98:5;101:2,
15,22;105:1;107:12,
13;108:19;109:21;
111:24;117:23;134:2;
152:1;154:21;157:23;
163:6;164:18;172:23;
177:6;178:9
**specifically (54)**
17:24;22:21;26:2;
30:24;32:25;46:14;
51:4;52:8,9,12;54:24,
25;56:21;57:17,21;
58:10;65:10;70:21;
79:1;81:7;84:1,14,19;
85:23;86:2,25;87:17,
22;92:3;94:23;101:5;
103:23;106:2;107:17;
108:11;109:3,7,16;
111:7,11;113:1,21;
115:19;118:9;126:8;
133:20,25;134:6;
137:9,10;153:12;
154:14;155:7;160:18
**specifics (3)**
36:5;92:11;186:5
**specify (3)**
42:14;63:4;74:10
**specifying (2)**
35:11;63:10
**spectrum (3)**
37:15;38:2;55:12
**speculate (10)**
53:24;54:4;100:13;
101:16,17,18,19,21;

102:1;153:4
**speculating (2)**
10:5;114:14
**speculation (3)**
53:23;146:21;169:19
**spell (1)**
6:24
**spending (2)**
29:10,11
**spent (5)**
22:19;29:14;33:10;
40:18;127:18
**spoke (15)**
66:11;81:14;82:5;
97:9;99:22;101:6;
117:6,8;123:22;124:4,
7;139:11,15;140:8;
149:9
**spoken (4)**
99:22;135:15,17;
136:9
**sponsor (2)**
60:5,11
**sponsored (2)**
16:6;58:5
**sponsoring (1)**
62:6
**sponsorship (2)**
16:11,12
**spot (2)**
28:4;127:15
**squirrel (1)**
40:23
**staff (1)**
177:4
**stalls (1)**
127:23
**stamp (7)**
95:11,16,19;96:6;
108:5;123:7;125:6
**stamper (1)**
95:22
**stamps (1)**
95:12
**stand (3)**
170:23;171:21,23
**standard (1)**
48:1
**standards (1)**
18:10
**standing (7)**
146:2;154:22;
162:10;165:16,17;
166:4;170:15
**stands (1)**
85:13
**Starkey (14)**
103:15,25,25;104:1;
117:8,19;124:5,7;
125:3,19;133:10;
134:17,18;158:19
**Starky (1)**
115:9

**Starky's (5)**
103:10;115:7;117:4;
123:21;148:10
**start (7)**
28:6,9;85:3;111:1;
122:24;123:18;143:5
**started (7)**
16:5;17:11;80:8;
95:18;134:20;140:23;
142:5
**starting (1)**
143:11
**State (16)**
5:6;6:7,17;42:7,8;
61:2;67:5;68:3;93:5,
10;175:1,14;180:17;
185:1;188:7;190:10
**stated (2)**
165:10;166:2
**statement (1)**
139:10
**statements (1)**
183:22
**States (2)**
5:17;184:2
**station (2)**
87:5;102:8
**stations (1)**
102:15
**statute (4)**
116:19,21;170:2;
186:4
**statutes (2)**
42:14,15
**statutory (1)**
183:25
**stay (2)**
27:6;127:15
**stayed (3)**
124:19;129:17;
130:24
**steal (1)**
48:17
**stealing (2)**
48:17;184:25
**steals (1)**
47:20
**stick (2)**
26:22;154:9
**still (33)**
11:2,18;15:8,9;
24:17;40:22;50:3;
72:24;86:23;115:25;
116:13,17;132:16,16;
134:14;135:23;137:5;
139:13,20;143:7;
148:9;153:15,21;
154:1,3;156:6;162:14;
172:13,14;186:12,17;
187:23,24
**stipends (2)**
16:16,20
**stipulate (1)**

191:1
**stipulated (3)**
191:5,6,9
**stole (2)**
95:10;116:23
**stolen (60)**
48:2,4,5;49:2;82:22;
83:1,3,15;85:15;93:4,5,
11,13,23;113:15,16,19,
20,23;114:1,5,18,24;
116:13,17,18,20,20,21;
139:2,20;142:17;
152:5,14,18,20;153:6,
10;155:25;156:12,14,
16;163:2,5,21,22,23,
24;164:16,16,19;
165:5;170:4,17;171:4;
172:24;173:3,6,10;
174:3
**stood (1)**
63:7
**stop (4)**
36:10;120:12;159:6,
8
**store (3)**
162:18,20,22
**Stover (5)**
103:16;104:1;117:9;
144:23;183:6
**Stranger (1)**
51:24
**Street (4)**
5:4,20;125:13;
128:18
**stressful (1)**
28:15
**Strike (11)**
57:15;99:10;103:19;
122:12;123:19;135:20;
136:2,2;137:21;
138:19;148:3
**struck (2)**
32:1;135:21
**struggle (1)**
157:6
**stuff (8)**
11:15;42:18;45:1;
50:11;140:19;142:9,
12;176:5
**stupid (1)**
136:6
**subject (5)**
114:19;152:16;
153:12;184:7;189:16
**submit (2)**
123:4;163:1
**submitted (5)**
122:9,15;123:13,14,
15
**subpoena (2)**
182:2,3
**subsequent (1)**
108:21

**successful (2)**
56:6;160:6
**suggest (1)**
139:6
**suit (1)**
7:22
**summary (16)**
63:23;74:2;88:25;
119:8,11;120:20,23,24;
121:1,3,6,8,9,11,14,17
**summer (1)**
68:10
**superior (12)**
25:10;33:3;34:13;
104:14;169:15,17;
170:4,19;172:5,5,6;
177:19
**superiors (1)**
32:18
**supervised (1)**
25:11
**supervisor (2)**
100:2;102:17
**Supplemental (4)**
121:25;122:20;
123:6,6
**supposed (4)**
81:5;114:2;169:23;
173:15
**sure (32)**
12:12;21:22;26:12;
27:10;28:14;32:9;
33:14;34:16;36:14,24;
40:8;47:3;63:20;65:21;
72:16;74:23;100:8;
105:10;108:15;112:25;
115:18,20;116:9;
118:9;122:8;135:6;
153:7;160:24;180:16;
188:11;190:8,11
**surprised (1)**
52:12
**surrender (2)**
155:23,25
**suspect (3)**
33:23;94:2,4
**Suzanna (2)**
5:4,21
**sworn (6)**
5:8,24;6:13;16:23;
20:14,15
**synonymous (1)**
36:23
**system (1)**
99:3

**T**

**table (3)**
9:23;10:2;51:6
**tags (5)**
153:16,20,21;154:1,
3

**talk (12)**
8:19;37:8;41:5,20;
43:13;71:20;88:15;
103:19;140:6;141:13;
168:18;182:18
**talked (7)**
62:19;88:13;91:15;
137:14,17;140:3;
188:10
**talking (23)**
11:17;12:6;38:19;
41:22;46:15;47:18;
59:4;67:1;88:11;92:3;
107:25;124:11,12;
133:6;139:14;142:5,9,
13;143:7;146:13;
153:14;160:7;164:22
**talks (2)**
184:17,18
**target (1)**
55:5
**tasked (2)**
50:6;54:25
**taught (1)**
18:8
**teach (1)**
17:21
**team (1)**
56:10
**technically (4)**
16:9;32:2;44:18;
178:15
**teen (1)**
54:22
**telling (5)**
85:20;135:3;167:24;
168:19;178:23
**temperature-wise (1)**
13:20
**template (1)**
167:2
**tenant (1)**
44:24
**tenants (1)**
45:2
**term (8)**
17:12;53:12;83:1;
95:15,25;98:21;
110:16;113:12
**terminal (1)**
162:3
**terminated (1)**
185:16
**terms (1)**
175:23
**Terrible (4)**
42:5;46:5;57:14;
135:23
**Terry (1)**
5:14
**test (1)**
20:3
**testified (15)**

5:9;7:25;73:3,6;
74:14;77:17;142:19;
157:14;162:15;168:5;
181:24,25;183:6;
184:12;185:25
**testify (4)**
142:20;167:24;
176:10;187:16
**testimony (11)**
10:19;12:18;73:14;
109:1;123:10;137:3;
140:21,21;155:5;
169:2;178:20
**tests (1)**
20:7
**texted (1)**
160:8
**texting (2)**
160:7,16
**Thanksgiving (1)**
10:10
**That'd (2)**
15:17;22:23
**theft (4)**
37:9;46:16;47:17;
88:17
**thereabouts (3)**
31:10;89:13;90:12
**There'd (1)**
18:21
**thinking (5)**
44:12;84:14,20;
136:16;154:18
**Third (3)**
125:13;128:18;
140:14
**though (12)**
10:11,16,18,20,20;
11:7;128:10;129:23;
161:25;162:22;163:9;
167:8
**thought (18)**
13:23,24;47:23;
84:15;130:22;136:20,
23;137:10;140:22,22;
141:2,8,15,15,22;
143:22;153:4;166:13
**threatening (1)**
144:2
**three (15)**
13:3;22:12,14,15;
80:4,5;91:3;102:11,12,
13,14;172:1;183:25;
189:13,17
**three-day (1)**
45:10
**three-month (1)**
22:10
**three-quarters (3)**
118:19,20,21
**throughout (6)**
18:25;19:5,10;20:2;
141:17;146:15

**till (6)**
35:4;72:20;110:24;
144:18;180:3;182:24
**timeframe (1)**
187:24
**timeline (1)**
115:6
**timely (1)**
85:6
**times (17)**
8:20;22:19;59:5;
67:16;70:2,14;73:6;
116:14;118:23;143:16;
163:4;167:10;172:1,
22;173:22;183:19,21
**timestamp (3)**
134:20,21;143:2
**timestamps (2)**
132:11,15
**title (3)**
20:18;28:16;175:20
**titled (1)**
119:22
**today (19)**
12:10,13,18;37:8;
49:7,9,13,14;62:14,21;
63:3,4,9,24;71:20;
118:18;120:9;172:11;
190:5
**told (41)**
32:7;33:2;71:6;
77:19,21;78:14;79:5,
10;80:14,22;81:12;
82:24;83:17;84:4;92:4;
93:4;118:6;133:11,21,
25;134:6;135:25;
138:14;139:23;140:5,
7;142:12;145:8;
152:20,25;153:5,5,12,
18;154:1;155:25;
156:14,16;161:6;
169:22;170:1
**Tomato/tomato (1)**
106:12
**tone (1)**
189:6
**tonight (1)**
78:13
**took (6)**
18:8;93:14;142:15;
151:25;159:20,22
**top (2)**
111:25;122:17
**total (1)**
35:8
**totaling (2)**
77:10;175:15
**towards (2)**
122:1;128:21
**town (2)**
33:6;56:23
**track (1)**
25:22

**traditional (1)**
114:2
**traffic (6)**
7:23;8:1;31:22;32:1;
35:17,19
**trafficking (2)**
28:23;46:2
**tragic (1)**
33:14
**Trail (1)**
191:16
**training (9)**
9:14;15:2,13;16:17;
17:12;105:11,12;
112:23;176:19
**trains (1)**
91:8
**transaction (1)**
93:23
**transcribe (1)**
8:25
**transcribed (1)**
190:14
**transcribing (1)**
8:21
**transcript (2)**
135:23;191:2
**transparent (2)**
41:19;86:14
**trial (5)**
39:20;176:6,10;
190:18;191:4
**trials (1)**
73:3
**tried (5)**
123:16;148:16,16;
151:10,12
**trip (3)**
64:16;91:12;96:25
**truck (2)**
90:18,25
**Trucking (1)**
53:4
**true (3)**
74:15;183:23;186:8
**truth (1)**
5:8
**try (11)**
8:19,20;12:4;26:12;
98:3;128:11;148:22;
158:21;160:6;169:20;
173:7
**trying (23)**
39:9;41:17;47:15;
55:14;64:22;65:5;66:3,
5;67:3;85:3,10;89:25;
91:10;94:21;126:6,6;
127:21;140:11;141:10;
144:6;146:23;172:10;
176:5
**Tuesday (1)**
5:1
**turn (5)**

128:10;148:5,9;
159:2;163:5
**turned (6)**
13:4;25:5;118:14;
129:9;163:14,14
**twice (1)**
118:25;154:7
**two (31)**
13:3;17:2;18:23;
20:17;22:19,20;39:22;
42:7;47:6;48:11;75:17;
82:17;84:25;90:5,10,
11,25;91:8;98:3,7;
100:23;102:19;111:2;
126:9,10;138:18;
150:9,15,16;172:1;
185:11
**type (8)**
9:20;27:20;28:19;
42:17;61:5;66:8;98:7;
100:9
**types (4)**
26:19;29:9;34:20;
172:22
**typical (8)**
18:3;30:13,15,16,17;
40:8;48:1;98:2
**typically (16)**
23:24;27:5,11,14,21;
29:19;33:16;38:20;
45:6;46:21;48:6;58:15;
59:16;98:7,23;176:24

---

**U**

**ubiquitous (1)**
46:6
**Uh-uh (1)**
27:13
**umbrella (1)**
27:18
**unanswered (1)**
135:24
**unaware (2)**
168:25;171:6
**uncomfortable (1)**
169:8
**uncommon (1)**
62:8
**uncooperative (1)**
183:18
**under (15)**
10:18;11:18;29:15;
42:23;60:4;72:24;
104:22;106:14,20,24;
107:6;113:10;167:14;
171:2;190:21
**underlying (2)**
42:16;43:1
**underprivileged (1)**
55:3
**understandings (1)**
116:10

**Understood (2)**
35:24;153:2
**unfortunately (1)**
188:2
**union (6)**
59:24,24,25;60:3,14;
62:4
**unit (7)**
15:4;28:18,19;81:17,
25;82:8;86:24
**United (1)**
5:17
**units (3)**
14:9,11;15:14
**unlawful (1)**
45:12
**Unless (1)**
191:8
**unmarked (2)**
87:8,10
**up (38)**
11:5;13:22;27:14;
28:2;29:9,9;34:2,13;
35:15;39:21;49:23;
50:6;53:11;60:9;62:14;
64:17;74:16;86:17;
122:25;125:8,8,14,15,
24;126:12;128:19;
129:23;134:4;135:23;
137:18;140:6;151:15;
159:11;160:2;162:5;
177:12;181:25;189:10
**upbringing (1)**
55:11
**upon (1)**
100:12
**upset (2)**
178:3,4
**urgency (2)**
85:4,5
**use (8)**
17:12;49:3;74:18,20;
86:10;95:15;128:11;
141:23
**used (13)**
44:25;83:1;95:15;
98:21;152:18;153:7,8;
154:7,8;155:10;
189:17;190:24;191:2
**using (4)**
61:15;74:21;114:23;
154:21
**Usually (2)**
29:17;30:13

---

**V**

**Vague (15)**
11:8;97:20;104:23;
106:16;113:11;114:20;
136:14;137:25;138:23;
163:3;165:25;167:17;
169:16;170:8;183:11

**vaguely (1)**
88:11
**Vanessa (1)**
6:11
**various (1)**
55:21
**varying (1)**
33:21
**vastly (1)**
23:15
**vehicle (15)**
32:1;46:16,18;85:9;
87:3,4,4,8,10,20;90:17;
138:18;157:4;176:23;
177:8
**verbal (5)**
9:2;31:17;32:8,15;
78:23
**verbally (1)**
31:2
**verbiage (2)**
31:16;154:21
**verified (1)**
74:7
**verify (3)**
74:13,24;149:25
**versus (3)**
43:24;44:19;154:10
**vicinity (1)**
148:21
**victim (1)**
33:24
**victims (1)**
55:24
**VIDEO (27)**
5:11,12,14,15;42:22;
72:17,21;110:20,25;
117:13,16;143:13;
144:15,19;179:25;
180:4;182:22;183:1;
188:19,22;189:13,18;
190:14;191:11,13,14,
15
**view (1)**
146:8
**violating (1)**
169:25
**violation (3)**
44:1;170:6,20
**violations (2)**
23:6,6
**voice (3)**
132:20,21,23
**volunteering (1)**
75:17
**vote (2)**
58:16,17
**voted (1)**
58:23

---

**W**

**waited (1)**

101:11
**waiting (1)**
35:3
**walk (1)**
123:21
**walked (1)**
157:7
**walking (1)**
127:20
**wandering (1)**
129:21
**warm (1)**
13:22
**warrant (71)**
81:20;88:12,15,20,
22;92:5,5;94:12,24;
104:5,6,7,10,13,15;
106:20,21,24;107:4,6,
13,20,22;111:14;
113:2;114:9,10,11,12,
13,16;117:22;118:4;
121:2,5,7,8,15,18;
125:5;135:2,5,7,9,13;
148:25;149:4,4,9,19;
155:19;156:18;163:12,
15;164:2,3,6,7;166:13,
16;172:17;173:19;
184:3,6,10
**warrants (17)**
43:18;105:2,3,6,13,
13,14,16;106:4,6;
112:24;113:1;149:22;
164:14;167:2;168:18,
20
**watch (1)**
40:20
**way (27)**
17:4;21:14;24:21;
30:8;40:4;42:9;51:14;
52:22;62:13;66:13;
73:22;74:24;89:6;
100:13;117:7;136:19;
140:2;141:3,24;158:6;
159:7,10;160:10;
174:7;183:21;185:13,
15
**website (3)**
151:18,19,20
**week (4)**
18:22;20:17;22:9;
28:13
**weekend (2)**
180:25,25
**weeks (6)**
18:23;20:17;42:6;
47:6;69:14;187:13
**weird (1)**
189:6
**weren't (7)**
16:22;19:18,18;66:3;
128:1;156:15;179:8
**west (1)**

128:13
**West's (1)**
  111:5
**whatnot (1)**
  50:12
**What's (11)**
  23:22;35:21;55:19;
  87:7;90:14;103:1;
  121:17;148:6;159:22;
  167:2;170:21
**wheelhouse (1)**
  25:1
**Whenever (1)**
  86:7
**Whereas (1)**
  9:15
**Whereupon (14)**
  6:13;72:19;77:8;
  105:18;110:23;111:18;
  112:2;125:9;144:17;
  175:13;176:12;180:2;
  191:18,20
**white (1)**
  150:18
**whole (15)**
  58:16;86:9;128:1,7,
  8;129:4;130:15;
  131:10,16,17;132:5,7,
  14;154:17;162:4
**who's (2)**
  99:4;104:16
**Why'd (2)**
  13:11;120:12
**wife (6)**
  50:24;51:12;158:5,8;
  178:3;181:12
**wife's (1)**
  178:4
**wild (1)**
  90:1
**win (1)**
  39:20
**wind (1)**
  143:14
**Within (11)**
  12:22;18:22;21:7;
  53:7;112:22;114:25;
  169:22,23;170:6;
  173:10;187:24
**without (7)**
  97:18;126:10;
  163:15;165:24;172:17;
  185:1;189:8
**witness (54)**
  5:24;6:13;9:19;
  43:10;53:25;62:22;
  68:12;75:1,4,9;76:7;
  84:19;101:22;105:1,5;
  106:19;109:3,6,10;
  110:1;113:14;114:23;
  115:4;132:10;136:16;
  137:6,8;138:3;139:1,
  10,19;140:5;142:3;

146:22;154:14;155:6;
163:4;164:13;165:10;
166:2,12;167:23;
168:16;169:21;170:13;
171:2;178:21;182:14,
20;183:15,17;187:3;
190:2,19
**witness's (1)**
  178:19
**woman's (1)**
  143:14
**woods (1)**
  42:8
**word (12)**
  74:18,20;89:2;103:1;
  152:18;153:7,8;154:6,
  7,8,9;155:10
**words (2)**
  65:8;85:14
**wore (1)**
  16:19
**work (21)**
  19:16;23:2;24:5,12,
  14,17;26:21,25;27:5;
  29:25;30:1;50:5;55:17;
  80:3;81:6;98:11;123:8;
  157:16;174:2;177:22,
  24
**worked (6)**
  21:13,13;141:12,16;
  157:20;180:25
**working (10)**
  24:18;27:14;28:6,9;
  30:12;32:25;39:11;
  68:19;158:9,11
**work-issued (1)**
  87:19
**works (2)**
  19:17;99:7
**worse (2)**
  21:18,24,25;51:16
**worst (1)**
  50:13
**wow (4)**
  29:22;47:11;56:1,5
**write (5)**
  9:4;12:3;81:19;
  135:4;149:21
**write-up (3)**
  31:13,15;107:23
**write-ups (1)**
  31:3
**writing (4)**
  105:12,15;106:4,5
**written (4)**
  34:16;95:6;122:10;
  164:17
**wrong (1)**
  95:17

**X**

**XYZ (6)**

32:19;35:3;60:11;
64:18;65:4;177:10

**Y**

**yard (1)**
  127:8
**year (29)**
  7:16;26:4,5,16,16;
  28:25;29:1,2,4,5;31:8;
  39:21,25;51:17,18;
  56:3;61:1,1;67:19,21;
  68:4,5,16,17;69:9,10;
  70:8;106:7;180:13
**yearly (1)**
  60:18
**years (18)**
  13:1,3,3;22:5;25:18,
  19,20;38:10;39:19;
  47:6;58:8;67:17,23;
  68:14;69:20,21;70:10;
  106:10
**year's (3)**
  69:5,7,12
**Yep (4)**
  17:9;50:2;119:25;
  121:24
**yesterday (16)**
  7:25;47:13;49:19;
  68:24;73:15;74:14;
  86:12;119:21;126:3;
  131:25;132:16,17;
  144:11;157:10;172:12;
  174:4
**Yesterday's (1)**
  182:1
**young (3)**
  24:16;172:13,14
**Younger (1)**
  150:17
**youth (3)**
  55:3;61:19;62:2

**1**

**1 (2)**
  158:4;159:24
**1:00 (1)**
  144:18
**1:37 (1)**
  180:2
**1:39 (1)**
  180:3
**1:42 (1)**
  182:24
**1:45 (1)**
  182:25
**1:55 (1)**
  191:19
**10 (18)**
  29:11;30:10,10,16;
  33:19;37:20;38:2,3,12;
  103:6,8;121:21;122:3;

123:7;130:9,10;143:4;
177:13
**10:43 (1)**
  72:18
**10:54 (2)**
  72:20,22
**100 (6)**
  26:5;47:10;73:7,8;
  86:13;91:1
**11 (1)**
  29:1
**11:37 (1)**
  110:21
**11:53 (2)**
  110:24;111:1
**12 (2)**
  55:1;122:3
**12:01 (1)**
  117:14
**12:02 (1)**
  117:17
**12:35 (1)**
  144:16
**12th (1)**
  122:1
**13:37 (1)**
  180:1
**13:39 (1)**
  180:5
**13:42 (1)**
  182:23
**13:45 (1)**
  183:2
**13:51 (1)**
  188:20
**13:52 (1)**
  188:23
**13:55 (1)**
  191:17
**1300 (1)**
  144:20
**1407 (12)**
  111:6,19,21;114:8;
  164:5;165:4;166:17;
  169:13;170:3,17,19;
  184:2
**1408 (11)**
  111:22;112:3;114:8;
  164:5;165:4;166:17;
  167:3;170:19;184:2,
  17,17
**14270 (1)**
  5:21
**15 (6)**
  30:10,17;33:19;
  103:6,8;177:14
**1536 (9)**
  104:22;105:19;
  111:5;164:5;166:16;
  167:3;184:2,2,5
**17 (1)**
  55:1
**18 (3)**

13:4,8;21:2
**1828 (2)**
  5:3,20
**1995 (1)**
  51:19

**2**

**2:20 (1)**
  134:20
**20 (8)**
  125:6;128:25;130:8,
  9,9,10,15;143:2
**200 (3)**
  90:24;91:3;141:24
**200-mile (1)**
  90:23
**2015 (2)**
  13:10;14:3
**2016 (14)**
  15:7,7;16:3,4,14;
  17:11,18,20;24:19;
  31:7,10;73:9;106:10;
  138:2
**2017 (1)**
  31:10
**2018 (2)**
  20:25;23:12
**2020 (1)**
  180:22
**2021 (1)**
  69:17
**2022 (12)**
  25:16;27:25,25;
  28:10;69:8;70:13;
  91:22;122:1;175:1,14;
  180:14,23
**2023 (2)**
  5:2,13
**20s (2)**
  150:17,18
**21 (1)**
  143:4
**21:32 (1)**
  143:11
**22 (1)**
  5:1
**22-cv-01527-DAD-AC (1)**
  5:17
**22nd (1)**
  5:13
**23 (6)**
  129:1;130:16;
  131:16;147:3,4,21
**27 (1)**
  108:4
**27th (2)**
  6:7;108:9
**28 (3)**
  51:15,16,17

**3**

**30 (4)**
130:8;150:24,25;
190:10
**300 (1)**
55:8
**30s (2)**
150:17,18
**33 (1)**
175:15
**360 (1)**
55:14
**38 (1)**
96:6
**39 (1)**
96:11

**4**

**4:30 (3)**
81:6;82:13;84:22
**4:35 (1)**
81:8
**40 (4)**
21:15;96:13;150:24,
25
**41 (1)**
96:15
**42 (1)**
96:15
**43 (3)**
51:16;96:17;181:17
**44 (2)**
96:19,19
**45 (2)**
96:22;150:22
**48 (2)**
96:19,22
**4-H (20)**
50:18,24;51:4,9;
57:6,8,10,12,14;58:4,5;
59:6,16,18;61:6,10,14,
16;162:2;181:4
**4-H-sponsored (1)**
59:15

**5**

**5 (5)**
81:6;82:13;84:22;
157:20,23
**5:30 (1)**
90:11
**50 (5)**
21:15;29:10;130:4,5;
143:2
**57 (1)**
122:3

**6**

**60 (1)**
14:9
**68 (2)**

74:17;77:10

**7**

**7:30 (7)**
89:12;90:4,8;100:15;
103:6;115:10;147:20
**75 (2)**
13:24;69:2

**8**

**8:22 (1)**
140:24
**8:45ish (1)**
151:1
**80 (1)**
13:24
**80s (1)**
51:20
**8954 (1)**
191:16
**8th (10)**
79:17,22,23,24,25;
80:8;99:23;120:22;
121:19;180:10

**9**

**9 (2)**
123:7;158:3
**9:30 (1)**
158:3
**9:34 (2)**
5:2,14
**90s (1)**
52:1
**9th (1)**
181:5