EXHIBIT M

**In The Matter Of:**
*LONG vs.*
*FERNANDEZ*

---

*DETECTIVE JEREMY ASHBEE*
*August 23, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File J. Ashbee.txt
Min-U-Script® with Word Index

Page 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

---oOo---

E.L. a minor, by and through her general
guardian, JESSICA LONG; JESSICA LONG, an
individual,

                    Plaintiffs,

          vs.                      Case No. 2:22-cv
                                   2:22-cv-01527

LIEUTENANT JERRY FERNANDEZ, individually
and in his individual capacity as
Sheriff for the County of Shasta;
DETECTIVE JACOB DUNCAN, individually and
in his individual capacity as Sheriff for
the County of Shasta; DETECTIVE JEREMY
ASHBEE, individually and in his
individual capacity for the County of
Shasta; SHASTA DISTRICT FAIR AND EVENT
CENTER, a district agricultural
association; COUNTY OF SHASTA; SHASTA
COUNTY SHERIFF'S DEPARTMENT; MELANIE
SILVA, in her individual capacity; BJ
MACFARLANE, in his individual capacity;
and DOES 1 through 10,

                    Defendants.
_____/

VIDEO RECORDED DEPOSITION OF

DETECTIVE JEREMY ASHBEE

WEDNESDAY, AUGUST 23, 2023

9:36 a.m.

Reported by:  JULIE BANGHART, CSR NO. 10547

Page 2

A P P E A R A N C E S

For The Plaintiffs E.L. and JESSICA LONG:

          ADVANCING LAW FOR ANIMALS
          BY:  RYAN R. GORDON, ESQ.
          BY:  VANESSA T. SHAKIB, ESQ.
          407 N. Pacific Coast Highway #267
          Redondo Beach, CA  90277
          (202) 996-8389
          Tgordon@advancinglawforanimals.Org
          Vshakib@advancinglawforanimals.Org

For The Defendant LIEUTENANT JERRY FERNANDEZ
DETECTIVE JACOB DUNCAN; DETECTIVE JEREMY ASHBEE
and SHASTA COUNTY:

          BEST BEST & KRIEGER
          BY:  DAMIAN A. NORTHCUTT, ESQ.
          2855 East Guasti Road, Suite 400
          Ontario, CA  91761
          (909) 989-8584
          Damian.Northcutt@bbklaw.Com

For The Defendant SHASTA DISTRICT FAIR:

          (Present via telephone.)

          CALIFORNIA ATTORNEY GENERAL'S OFFICE
          BY:  JOHN C. BRIDGES, ESQ.
          1300 I Street
          Sacramento, CA 95814-2963
          (916) 210-7529
          John.Bridges@doj.Ca.Gov

ALSO PRESENT:   TERRY FOX
                REDDING VIDEO PRODUCTIONS

Page 4

I N D E X

WITNESS:  LIEUTENANT JERRY FERNANDEZ

INDEX OF EXAMINATION(S)                         PAGE

Examination by Ryan Gordon . . . . . . . . . .     6

Examination by Damian A. Northcutt . . . . . .   176

INDEX OF EXHIBIT(S)

EXHIBITS    DESCRIPTION                          PAGE

A           Search Warrant and Affidavit          76

B           Incident Report 6/29/22               79

C           Emails ASB000153 - ASB000163          87

D           Email to Eamon Fitzgerald from       165
            Jeremy Ashbee Attaching Photos
            to Search Warrant
            July 8, 2022

E           Email to Eamon Fitzgerald from       167
            Jeremy Ashbee Attaching Photos
            to Search Warrant
            July 8, 2022

F           Search Warrant and Affidavit         173
            July 8, 2022

**THE VIDEOGRAPHER:** Ladies and gentlemen, we are on video record with the deposition of Detective Jeremy Ashbee. The date is August 23rd, 2023, and the time is 9:36 a.m.

I'm Terry Fox, the Video Specialist from the firm of Redding Video Productions. This is the beginning of Media No. 1 regarding Case No. 22-cv-01527-DAD-AC of the United States Eastern District Court of the Sacramento Division.

This deposition is being taken at the offices of Challe Fisher & Morfin, at 12828 South Street, Redding California. The Court Reporter is Julie Banghart, associated with Challe Fisher & Morfin.

Counsel will now introduce themselves, who they represent and the witness will then be sworn in by the Court Reporter.

Do we have the gentleman on the phone?

**MR. GORDON:** John, are you there?

**MR. BRIDGES:** I am here, yes.

**MR. GORDON:** Do you want to introduce yourself.

**MR. BRIDGES:** Would you like me to identify myself first?

**MR. GORDON:** Yes, please.

**MR. BRIDGES:** This is John Bridges on behalf of the State California, by and through the 22nd District Agricultural Association, and Defendants Silva and Macfarlane.

---

Page 5

1    **MR. NORTHCUTT:** Damian Northcutt on behalf -- on
2 behalf of Detective Ashbee, as well as the other County
3 Defendants.
4    **MR. GORDON:** Ryan Gordan for Plaintiffs.
5    **MS. SHAKIB:** Vanessa Shakib, Plaintiff's counsel.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 6

1    VIDEO RECORDED DEPOSITION OF DETECTIVE JEREMY
2 ASHBEE, taken on behalf of the Plaintiff, at Challe Fisher
3 and Morfin Deposition Reporters, 1828 South Street, Redding,
4 California 96001, on Wednesday, the 23rd of August, 2023,
5 commencing at the hour of 9:36 a.m., before JULIE BANGHART,
6 a Certified Shorthand Reporter of the State of California,
7 License No. 10547, taken pursuant to notice.
8                 ---o0o---
9
10              DETECTIVE JEREMY ASHBEE
11         being first duly sworn, was examined and
12              testified as follows:
13
14           EXAMINATION BY Mr. GORDON
15 Q.   Would you state and spell your name for the record.
16 A.   **Jeremy Ashbee, J-E-R-E-M-Y, A-S-H-B-E-E.**
17 Q.   Do you have a middle name?
18 A.   **Robert.**
19 Q.   Robert, R-O-B-E-R-T?
20 A.   **Yes.**
21 Q.   Have you ever gone by any other names?
22 A.   **No.**
23 Q.   No nicknames?
24 A.   **No.**
25 Q.   People call you, you know, Ashman or something?

---

Page 7

1 A.   **No.**
2 Q.   No nicknames. Okay. Gotcha. All right. Okay.
3      Have you ever been a defendant in a lawsuit before?
4 A.   **No.**
5 Q.   No. Okay.
6      Have you ever been deposed before?
7 A.   **No.**
8 Q.   You testified many times, I presume, at trials and
9    various other hearings?
10 A.  **Yes, sir.**
11 Q.  About how many times?
12 A.  **I don't have an exact number, but --**
13 Q.  You can -- you can -- we'll get to estimates.
14 A.  **20 to 30, perhaps.**
15 Q.  Oh, okay. I was at a higher number in my head, but
16   okay. All right.
17      So the ground rules are largely the same. I'm going
18   to go over them nonetheless. Your attorney likely has done
19   this already, but I'll repeat them. So we're not going to
20   talk over each other. That happens with me fairly
21   frequently, so -- but I'll do my best not to, but you also.
22   So if I'm talking, you know, if I'm talking -- if you're
23   talking, I'll shut up.
24      And you need to give an audible answer to the
25   questions, "Yes, no, correct," you know, or whatever

---

Page 8

1 explanation or narrative the question calls for, say it
2 verbally because she's got to transcribe everything
3 accurately. So a nod of the head, like you're doing now,
4 don't do that. You can do it, but just also give something
5 verbal.
6      All right. Do you understand?
7 A.   **Yes.**
8 Q.   All right. Okay. So I might ask you about certain
9 things that you don't remember precisely, but I'm entitled
10 to your best estimate.
11      So have you, in any of your testimony at trials, have
12 you been told the difference between a guess and an
13 estimate?
14 A.   **I'm sure that I have, but go ahead and just explain
15   it to me.**
16 Q.   All right. So the classic lawyer example is you can
17 estimate the size of this table. If I asked you how large
18 is this table, you might say "Oh, it's
19 eight-and-a-half-by-four," or something like that. I don't
20 know. But if I asked you to estimate the size of the table
21 at my house, if I asked you what the size of the table at my
22 house is, you'd be -- it would be -- you would just be
23 guessing. All right. So -- and so that's the difference
24 between an estimate and a guess.
25      The same with time. If I say this -- you know, when

---

Page 9

1  did something happen, and you're like "Oh, geez. I don't --
2  I don't -- I don't remember, but I think..." you know. But
3  if you remember it was between Thanksgiving and Christmas,
4  then I'm entitled to know that or whatever time frame you
5  can narrow it down to. I know it was -- the same thing with
6  how long something took. "Well, it was 20 minutes." I
7  don't need -- you don't have to say it was 22 minutes and
8  such and such seconds, but if you think it was about 10
9  minutes, 20 minutes, I'm entitled to your best estimate.
10      Do you understand?
11 A.    **Understood.**
12 Q.    All right. So at the end of the deposition you're
13  going to be given a booklet that's going to have your
14  statements in it written down question, answer. Your
15  attorney's probably going to provide it to you. And you're
16  going to have an opportunity to read everything you said --
17  or read my questions, read everything you said and change
18  any answers you think you that you -- I didn't -- that's not
19  correct or whatever.
20      You can't change my questions, but you can change --
21  you can update your answers. And you'll have a period of
22  time to do that. Your attorney will advise you how long it
23  is. I'm not holding it from you. I don't remember. It's
24  different in federal court. We have to verify that. So --
25  or it may be different in federal court.

Page 10

1      But if you make any changes to your deposition
2  testimony, I get to comment on that and it could prove
3  embarrassing at trial or detrimental to the case. So it's
4  important that you give your best testimony today.
5      Do you understand?
6 A.    **Yes.**
7 Q.    All right. So your attorney is going to object
8  occasionally. So I'll ask the question. He'll say that's
9  vague or whatever, but in how a normal conversation goes,
10  you know, language is imprecise, but generally we know what
11  each person means.
12      If you understand what I mean, just answer the
13  question. He's going to say "Objection." You can still
14  answer the question. He's preserving his objections for
15  later. It's unlike -- it's unlike at trial where they give
16  an objection and the judge rules on the spot and makes him
17  rephrase.
18      So here you just -- we just keep going. If you
19  really don't know what I mean, yeah, then -- then -- but
20  then you can say "Hey can you say it a different way," or "I
21  don't understand that," which is fine. But he's not --
22  you're not supposed to -- so if he says "Objection. Vague,"
23  but you understand, just answer it.
24      Speaking objections are illegal, which would be where
25  you're basically coaching your client, like "Vague. Calls

Page 11

1  for a legal conclusion," and the person will go "I don't
2  understand it." You know, we'll all be out of here sooner.
3  We know what each other means. Just proceed.
4      All right. So -- do you understand?
5 A.    **Yes, yes.**
6 Q.    All right. So are you on any meds?
7 A.    **No.**
8 Q.    No. Okay.
9      Did you drink today?
10 A.   **No.**
11 Q.   No. Okay.
12      And any drugs?
13 A.   **No.**
14 Q.   Is there any reason you cannot give your best
15  testimony today?
16 A.   **No.**
17 Q.   Okay. All right. So background. I'm going to try
18  to get through this quickly though, because I know we do
19  have another deposition set.
20      So where do you reside?
21 A.   **In Redding.**
22 Q.   In Redding. Okay.
23      And are you from Redding?
24 A.   **No.**
25 Q.   Where are you from?

Page 12

1 A.    **I was born and grew up in Bakersfield, California.**
2 Q.    Okay. And when did you move to Redding?
3 A.    **2006.**
4 Q.    2006.
5      And did you live in Bakersfield before 2006 for your
6  entire life?
7 A.    **Yes.**
8 Q.    Okay. All right. So you lived in Redding since
9  2006. All right.
10      What is your highest level of education?
11 A.   **I have a Bachelor's Degree.**
12 Q.   In what?
13 A.   **In Multi-cultural Studies.**
14 Q.   Multi-cultural Studies.
15      Where did you get your degree?
16 A.   **Simpson University in Redding.**
17 Q.   All right. And when did you graduate or receive your
18  degree?
19 A.   **2010.**
20 Q.   2010.
21      And what other education do you have? Let me --
22  rephrase let me that.
23      So where did you go to high school?
24 A.   **In Bakersfield.**
25 Q.   Bakersfield.

Page 13

1  A.    **Ridgeview High School.**
2  Q.    Okay.  And did you go right to college after
3  Bakersfield?
4  A.    **No.**
5  Q.    Okay.  And what did you do after college for -- did
6  you go to work after college or did you just --
7  A.    **After college?**
8  Q.    After college -- I'm sorry -- after high school.  I
9  apologize.
10 A.    **Yes.**
11 Q.    After high school there's a gap between college.
12 Okay.
13 A.    **Yes.**
14 Q.    What kind of work did you go into?
15 A.    **I was working at an elementary school.**
16 Q.    Okay.
17 A.    **I was like a tutor.**
18 Q.    Okay.
19 A.    **I was working at a pizza parlor and I worked -- for a**
20 **time being my sister and I ran a pet store.**
21 Q.    Okay.  All right.  Great.  So -- and what year did
22 you start at Simpson University?
23 A.    **2006.**
24 Q.    Oh, I thought you -- oh, that's when you -- that's
25 when you started?  I thought that's when you said you

Page 14

1  graduated?
2  A.    **2006 I started.  2010.**
3  Q.    You graduated.  Gotcha.  Okay.  All right.
4      So after you graduate college, what did you do first
5  for employment?
6  A.    **I was working for the school as a public safety**
7  **officer.**
8  Q.    For the university?
9  A.    **For the university.**
10 Q.    All right.  As a public safety officer.
11     And what training did you have to become a public
12 safety officer?
13 A.    **It was all at the school and then there was a guard**
14 **course through the State of California.**
15 Q.    Oh, what course was that, if you recall.  By the way,
16 all these questions are if you recall, so...
17 A.    **Yeah, yeah.  I don't recall the name of the course.**
18 **It's essentially a course to obtain a guard card that lets**
19 **you work in some security fashion in the state.**
20 Q.    Okay.  So if you're like out at a bar or something
21 and you see someone with a patch that says "guard" is that
22 what you're referring to?
23 A.    **Yes.**
24 Q.    Okay.  Gotcha.  All right.  And how long were you a
25 guard at the school?

Page 15

1  A.    **For about three years.**
2  Q.    Three years.  So until about 2013?
3  A.    **Yes.**
4  Q.    All right.  Were you ever disciplined as a guard at
5  the school?
6  A.    **No.**
7  Q.    No.  Okay.
8      Verbally?
9  A.    **I don't think so, no.**
10 Q.    You don't think so.  Okay.  All right.
11     And so in 2013 did you resign or were you terminated?
12 A.    **I resigned.**
13 Q.    You resigned.  Okay.
14     And what did you do for employment after that?
15 A.    **Well, it would be the very end of 2013 is when I**
16 **applied to work for the Shasta County Sheriff's Office.**
17 Q.    Okay.  And what -- for what job did you apply at the
18 Shasta County Sheriff's Office in 2013?
19 A.    **I applied for -- well, I ended up -- I applied for a**
20 **couple jobs, but I ended up receiving an offer for a job as**
21 **an Animal Regulations Officer.**
22 Q.    Okay.  Did you apply for that job also, or was
23 that just offered to you in --
24 A.    **Yes.**
25 Q.    You applied for that one.  Okay.

Page 16

1      Okay.  And what -- so when did you start as an Animal
2  Regulations Officer?
3  A.    **February of 2014.**
4  Q.    February of 2014.  Okay.
5      And what training were you provided as an Animal
6  Regulations Officer?
7  A.    **On-the-job training.**
8  Q.    Just on-the-job training?
9  A.    **Yes.**
10 Q.    Is an Animal Regulations Officer -- do you have the
11 same duties as a Sheriff's deputy?
12 A.    **No.  And to clarify your other question, now that I**
13 **think about it, there was a -- I think it's called PC832,**
14 **an arrest and control class.**
15 Q.    And this is for the Animal Regulation Officer?
16 A.    **Yeah, yeah.  I think it was a week-long class.**
17 Q.    PC832.
18     Okay.  Where was the class at?
19 A.    **In Sacramento.**
20 Q.    Sacramento.  A week-long class.
21     And this is for your Animal Regulation Officer
22 training?
23 A.    **Yes.**
24 Q.    And you said it was Resist and Control?
25 A.    **I think it was called Arrest and Control.**

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

Page 17

1 Q.     Arrest and Control.  I'm sorry.
2       As an Animal Regulations Officer, did -- what law
3 enforcement powers did you have?  Could you make arrests?
4 Were you carrying a firearm?  You know, did you --
5 A.     We didn't carry firearms.  I believe it was peace
6 officer powers while we were on duty, so we could enforce
7 some laws.  We could file crime -- file cases with the
8 courts.  We could issue citations.
9 Q.     Okay.  Okay.  But if there was a misdemeanor or
10 felony, what did you do?
11 A.     We would defer those cases to deputies.
12 Q.     Okay.  Okay.  So you wouldn't arrest the person for,
13 you know, violation of PC597 for animal cruelty, for
14 example?
15 A.     No.  I would write a case.  I would file that case
16 with the DA's Office.
17 Q.     Yeah.
18 A.     And then if a warrant is issued, someone else would
19 handle it at that point.
20 Q.     What if -- well, what if, for example, you saw active
21 abuse?  Like you saw someone, you know, really striking
22 their animal or whatever.
23       Can you arrest them in those conditions?
24 A.     No, we were hands-off.  We wouldn't make arrests.
25 Q.     Okay.

Page 18

1 A.     I could contact a deputy, explain the situation.
2 Q.     Why did the -- what's the point of the 832 course
3 then if -- wasn't that arrest and control?
4 A.     I think it was so that we could file cases and we
5 could write citations.
6 Q.     Oh, okay.  So what -- what -- in the PC 832 class,
7 what training was provided then, aside from -- the name
8 is -- you received more education than merely arrest and
9 control in that case?
10 A.     Honestly, it was so long ago, I don't remember like
11 the exact contents of the class.
12 Q.     Okay.  Is it -- does the class still go by the same
13 name, PC 832?
14 A.     Yes.
15 Q.     Okay.  So if we were to check, we could figure out
16 what is taught in that class by, you know, somehow we could
17 investigate it online or something presumably?
18 A.     Yes.
19 Q.     Okay.  Okay.  So how many cases were you involved as
20 an Animal Control Officer involving -- well, it was all
21 animal cases.  Yes?
22 A.     Yes.
23 Q.     How many cases were you involved -- well, let me ask
24 this.
25       How long were you an Animal Regulation Officer?

Page 19

1 A.     For three years.
2 Q.     Three years.
3       So is it fair to say you -- you had cases that you
4 were investigating, or was it you -- you know, you had
5 lodged -- how many -- or do you just respond to calls each
6 day and then turn it over?
7 A.     We predominantly were responding to calls, complaints
8 from citizens about other people's animals.
9 Q.     Okay.  Okay.  So you didn't -- after you responded to
10 a call, you didn't -- did you do any investigation
11 afterwards or did you just simply turn it over to a Deputy
12 Sheriff or someone, you know, in -- outside of -- a non
13 Animal Regulation Officer to a deputy or other position?
14 A.     It depends on the case.  Some cases would require
15 some investigation.  Others are simply complaints that you
16 address.
17 Q.     Yeah.  Okay.  Okay.  When it required some
18 investigation, would you do it?
19 A.     Yes.
20 Q.     Okay.  All right.  How many -- how many cases would
21 you say you had -- you were investigating on a day-to-day
22 basis?
23 A.     Cases that are actively -- I was investigating on a
24 day-to-day basis?
25 Q.     Not calls.  Just cases you were investigating on a

Page 20

1 day-to-day basis.
2 A.     I couldn't give you an exact number, but estimate --
3 Q.     You can estimate, yeah, your best estimate.
4 A.     A handful of investigations.
5 Q.     Yes.
6 A.     Would be a handful a month, two or three a month.
7 Q.     Two or three a month.  Okay.  So --
8 A.     More dealing with complaints.
9 Q.     Oh, yeah.  That's what I -- that was going to be my
10 next question.
11       How many calls were you responding to per day?
12 A.     I couldn't give you a number.  It varies --
13 Q.     It varies.
14 A.     -- day to day.
15 Q.     It varies from day to day.
16       What would a busy day look like?
17 A.     A busy day.  A busy day would probably take you all
18 over the county.
19 Q.     Yeah.
20 A.     It's a large county.
21 Q.     Sure.
22 A.     It could be 10 to 12 calls.
23 Q.     10 to 12 calls.  Okay.
24       But then some days you had no calls, I presume?
25 A.     Some days it would be, yeah, two or three calls.

Page 21

1 Q.   Yeah.  Okay.  Ever zero?
2 **A.   I don't know.**
3 Q.   Always something to do.
4 **A.   I think there's always something to do.**
5 Q.   Okay.  All right.  How many of these cases involved
6 livestock?
7 **A.   Maybe 10 to 20 percent.**
8 Q.   Of that 10 to 20 percent, what would you estimate
9 would be the predominant complaint of livestock?  Theft or
10 cow knocking over someone's fence or what were you usually
11 responding to?
12 **A.   Predominantly animals getting out.**
13 Q.   Animals getting out.
14 **A.   Cows getting out in the roadway.**
15 Q.   Gotcha.  All right.
16      So your -- in your career then, you've been since
17 twenty -- okay.  So after an Animal Regulation Officer, you
18 were that for three years, and what was your -- where --
19 where did you -- what was your next position?
20 **A.   Deputy Sheriff.**
21 Q.   Deputy Sheriff.  Okay.
22      And what were your roles as a Deputy Sheriff?  And
23 this is -- strike that.
24      This -- your position as Deputy Sheriff was still
25 with the Shasta Sheriff's Department.  Yes?

Page 22

1 **A.   Yes.**
2 Q.   Okay. And what were your roles as Deputy Sheriff?
3 **A.   I'm currently a Deputy Sheriff, but I started out as**
4 **a patrol officer in the City of Shasta Lake, predominantly**
5 **is where I worked, which is a contract city for the county.**
6 Q.   Contract.
7      Oh, so they contract for your police force to use.
8 They don't have their own police force as -- they don't have
9 a city police force?
10 **A.   Correct.**
11 Q.   Gotcha.
12      All right.  And how long were you a -- I may have
13 just asked you this, but how long were you a patrol officer?
14 **A.   For about three years.**
15 Q.   For about three years.  Okay.
16      So this is up till like 2020 or so?
17 **A.   Yes.**
18 Q.   Okay.  Okay.  And what were your duties as a patrol
19 officer?
20 **A.   I worked in a patrol capacity responding to calls for**
21 **service.**
22 Q.   And were you making arrests?
23 **A.   Yes.**
24 Q.   Investigating cases?
25 **A.   Yes.**

Page 23

1 Q.   Okay.  All right.  How did you determine when -- so
2 if you had a case you're investigating, how would you
3 determine if you were going to do the whole investigation
4 or, you know, turn it over to a detective or someone
5 superior to you?
6 **A.   It would typically be a supervisor's decision that**
7 **would determine whether a case I'm working is severe enough.**
8 Q.   Yeah.
9 **A.   Most of our sex crimes would be worked by detectives.**
10 Q.   Okay.
11 **A.   Obviously, major things like homicides would be**
12 **worked by detectives.**
13 Q.   Yeah.  What was the most severe case you worked on as
14 a PO?
15 **A.   As a what?**
16 Q.   As a -- sorry.  As a patrol officer.  Isn't that a
17 shorthand for it?  Do you know?  Or maybe I'm wrong.
18      That's parole officer usually.  Isn't it?
19 **A.   Yeah.  Typically I understand that to mean probation**
20 **officer.**
21 Q.   Probation officer.  Sorry.  Probation.  My apologies.
22      So as a patrol officer, what's the most severe crime
23 you would have done?
24 **A.   I've responded to homicides, like initial -- initial**
25 **response to homicides.**

Page 24

1 Q.   Yeah.  Yeah.  Okay.  Interesting.  So until 2020
2 you're a patrol officer.
3      After 2020 what was your next role?
4 **A.   A detective.**
5 Q.   Detective.  Okay.
6      Have you been in that role since?
7 **A.   Yes.**
8 Q.   Now, are there different -- is detective just the
9 sole station or is there like different tiers of a
10 detective?
11 **A.   For our agency, all of our detectives are what are**
12 **known as generalists.**
13 Q.   Okay.
14 **A.   So we are all at the same level and we all work every**
15 **kind of case.**
16 Q.   Okay.  So -- all right.  You said as an Animal
17 Regulation Officer, about 20 percent of your cases involved
18 livestock usually getting out.
19      Was it ever livestock theft also?
20 **A.   No.  We didn't -- we didn't handle theft calls.  I**
21 **believe that there's typically a deputy that's assigned to**
22 **agricultural type crimes of that nature.**
23 Q.   Okay.  Did you handle any livestock theft as a patrol
24 officer?
25 **A.   Not that I can think of, no.**

Page 25

1 Q.   Okay.  What about as a -- what about as a detective,
2  other than the incident case that we're going to talk about?
3 A.   No.
4 Q.   No.  Okay.  This is the only one.  All right.  Yes?
5      The case we're about to talk about today involving
6  Jessica Long is the only alleged livestock theft case you've
7  been involved in?
8 A.   Correct.
9 Q.   Okay.  Have you ever declined to investigate a case
10  that you thought might be civil versus criminal?
11      MR. NORTHCUTT: Objection.  Incomplete hypothetical.
12  Go ahead.
13      THE WITNESS: No, I can't say that it's ever come up.
14 Q.   MR. GORDON:  It's never -- okay.  All right.
15      So you've never had a property dispute where you said
16  to whoever one of the involved parties was, this is a civil
17  matter, you know, go file a civil action or contact an
18  attorney?
19 A.   As a detective?
20      MR. NORTHCUTT: Same objection.
21 Q.   MR. GORDON:  As a patrol officer or detective.
22 A.   As a patrol officer, yes, that comes up sometimes.
23 Q.   That comes up sometimes.
24      How often did it come up when you were a patrol
25  officer?

Page 26

1 A.   I couldn't put a number on it.
2 Q.   Okay.  Everyday?
3 A.   No, probably not everyday.
4 Q.   Every month?
5 A.   Yeah.
6 Q.   Every month.  Okay.
7      What types of cases were they?
8 A.   There's all different types of civil disputes.
9 Q.   Of course.
10 A.   Sometimes involving custody, property.
11 Q.   For the property, what sort of property disputes did
12  you -- did you instruct whoever was reporting the alleged
13  property dispute to, what sorts of property disputes did you
14  find to be civil?  Anything specific come to mind?
15 A.   Well, I mean, what comes to mind are things like
16  landlord, tenant issues.
17 Q.   Yeah.  Anything else?
18 A.   I mean, that's what comes to mind.
19 Q.   That's what comes to mind.
20      Any car theft that you ever said this was -- look,
21  this is a civil matter.
22      MR. NORTHCUTT: Objection.  Incomplete hypothetical.
23  Go ahead.
24      THE WITNESS: No specific examples that I can think
25  of.

Page 27

1 Q.   MR. GORDON:  Okay.  But landlord, tenant ones you can
2  think of specific issues then?
3 A.   Yes.
4 Q.   Okay.  Okay.  All right.  What is the difference
5  between a criminal and a civil dispute, in your mind?
6      MR. NORTHCUTT: Objection.  Calls for a legal
7  conclusion.
8      THE WITNESS: In a criminal dispute, elements of a
9  crime have been met.  Civil dispute is a dispute between two
10  parties over a civil contract of some sort.
11 Q.   MR. GORDON:  Okay.  What are the -- okay.  Okay.  But
12  you are aware that civil cases also have elements.  Yes?
13 A.   Yes.
14 Q.   Okay.  So do you -- have you been trained on
15  determining when something's a civil versus criminal matter?
16 A.   Yes.
17 Q.   Okay.  What training do you receive?
18 A.   That is covered in the POST Academy, police academy.
19      Give me a moment.  The chicken scratch is becoming
20  illegible on my outline.
21      The police academy.
22      What POST course is it?
23 A.   They call it learning domains.  I couldn't tell
24  you --
25 Q.   Learning domains.  Okay.

Page 28

1      So if I just do a -- when I want to investigate this
2  myself, I would just go Google "L POST," you know.  Then
3  "LD" something, civil?  I don't know.
4      What key words would you use if you were going to
5  figure out what course it was?
6 A.   I imagine that would work if you were to search.
7 Q.   You imagine that would.
8      Okay.  It's the first time I've heard the term
9  "learning domain."
10 A.   Yeah, it's what it's called in the POST Academy.
11 Q.   Okay.  So POST courses are called learning domains.
12  Okay.  All right.  Gotcha.
13      So how many -- so one of the POST courses went over.
14  You just don't recall which one?
15 A.   Well, it would be the POST Police Academy, the basic
16  academy.
17 Q.   Oh, there's not different courses within -- within --
18  explain it to me.
19 A.   So the Police Academy is a six-month course.
20 Q.   Okay.
21 A.   And within that academy there are what are referred
22  to as learning domains --
23 Q.   Okay.
24 A.   -- where an instructor comes in and covers a topic.
25 Q.   Okay.

Page 29

1 A.    So the academy is broken up into -- that would be
2 your courses or your learning domains.
3 Q.    Ah, okay.
4 A.    I'm certain there's one on civil versus criminal
5 matters or civil components.
6 Q.    Okay. Yeah. It's not a gotcha. I don't know how it
7 works, so...
8       All right. Okay. So one of these courses at the
9 academy. And is it -- is it -- people say "POST Academy."
10 Is that -- is that -- did you use that term?
11 A.   I called it a POST academy.
12 Q.   You called it. Is that --
13 A.   It's a Peace Officers Standards and Training. Okay.
14 Okay. So POST Academy. All right.
15      Where was your POST Academy at?
16 A.   Butte College.
17 Q.   Butte College. I believe Duncan's was there, too.
18 Butte College.
19      And it's a six-month course or six-month --
20 A.   Approximately, yes.
21 Q.   Yeah. Learning domains. All right. One of them
22 explains civil. Gotcha.
23      Okay. Any -- are there any -- okay. So that was
24 your training.
25      Any other training you received since the academy on

Page 30

1 civil versus contractual disputes?
2 A.    Probably on-the-job training as well.
3 Q.    On-the-job training.
4       What on-the-job training did you receive?
5 A.    We complete what's called an FTO program, a Field
6 Training Program, where we are assigned to a field training
7 officer, training officer, who basically covers all of our
8 responsibilities on patrol.
9 Q.    Okay. Is it just one officer you are assigned to for
10 this or did you have multiple field training officers?
11 A.   I had three.
12 Q.   Who were they?
13 A.   It would be Kody Bodner. That's Kody with a "K."
14 Q.   All right. How do you spell the last name?
15 A.   B-O-D-N-E-R.
16 Q.   All right.
17 A.   Marcus Miyasato.
18 Q.   That's a mouthful.
19      How do you spell the last name, if you remember?
20 A.   M-I-Y-A-S-A-T-O.
21 Q.   A-T-O. All right.
22      And the third one?
23 A.   And it would be Steve Grashoff.
24 Q.   Grashoff. How do you spell Grashoff?
25 A.   G-R-A-S-H-O-F-F.

Page 31

1 Q.    Which one, of either Bodner, Miyasato or Grashoff,
2 who went over this on-the-job training for you for civil
3 versus contractual disputes?
4 A.    I'm sure they've all probably talked about it.
5 Q.    They all talked about it. Gotcha. All right.
6       When did you have -- what was your -- strike that.
7       When was your field training with each of these
8 officers?
9 A.    I couldn't tell you. I couldn't tell you dates.
10 Q.   Can you tell me years?
11 A.   It's a, I'll say, a 16-week program. I could tell
12 you the order --
13 Q.   Sure.
14 A.   -- in which I started with Deputy Bodner.
15 Q.   All right.
16 A.   My second field training officer was Steve Grashoff.
17 My third was Marcus Miyasato. And then I concluded the
18 program with Kody Bodner.
19 Q.   So this was -- okay. In my head when you said it,
20 and perhaps wrong, I was assuming this was like, you know,
21 every few years you did field training with one of them.
22      This was -- this was back to back to back?
23 A.   Yes.
24 Q.   Okay. Gotcha. So this was this time ago?
25 A.   Yes.

Page 32

1 Q.    Like when you became a -- when you became a -- I
2 guess when you were -- right after you left the academy,
3 presumably?
4 A.    Yes.
5 Q.    Gotcha. Okay. So before you go out on your own,
6 they put up through this field training officer program?
7 A.    Correct.
8 Q.    Understood.
9       All right. Was there any written materials provided
10 for on the field training program?
11 A.   There is a field training program binder.
12 Q.   Do you still have your binder?
13 A.   I don't know.
14 Q.   You don't know.
15      Maybe?
16 A.   Maybe.
17 Q.   Okay. All right. Maybe you kept it as a keepsake or
18 something.
19      Does the binder -- does the binder discuss civil
20 versus contractual disputes?
21 A.   Honestly, I don't remember.
22 Q.   You don't remember. If you don't remember if you
23 have it, you probably don't remember the specifics about it.
24 I understand. Curious. All right. Okay.
25      So was your -- that's your -- FTO or field training

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

---

Page 33

1  on-the-job training where they went over many things,
2  including civil versus contractual disputes, okay, and the
3  POST Academy you went over it also.
4       Anything since then on training on civil versus
5  contractual disputes?
6  A.   I don't think so.
7  Q.   You don't think so.  Okay.
8       One other question about this field training officer
9  binder.
10      Is this -- is it a general binder for everyone that
11  goes -- any person from any department that goes through a
12  POST program, or is it specific to Shasta?  Like does Shasta
13  have its own field training officer binder?
14  A.   Yes, it's specific to our agency.
15  Q.   Specific to your agency.  Gotcha.  Okay.  Okay.
16      And since then, no training on contract -- civil
17  disputes, contracts, etcetera?
18  A.   Correct.
19  Q.   There's no -- there's no memos in your office or
20  guidelines or policies on this matter?
21  A.   I can't think of any off the top of my head that are
22  on civil matters.
23  Q.   That are on civil matters.
24      And none that you've been trained on.  Correct?
25  A.   Correct.

---

Page 34

1  Q.   Okay.  Might there be and you're just not thinking of
2  it?
3       MR. NORTHCUTT: Objection.  Calls for speculation.
4       THE WITNESS: There could be a lot of things I'm not
5  thinking of at the moment.
6  Q.   MR. GORDON:  Sure.  But you haven't been trained on
7  any is what you're saying?  Or presented with any?
8  A.   There aren't any that I recall.
9  Q.   There aren't any that you recall.  Okay.
10      So you're not getting -- there's -- what sort of --
11  okay.  So you learn a variety of things when you go through
12  POST.
13      What are some of the core courses they take you
14  through?
15  A.   In the POST -- in the academy?
16  Q.   Yeah, in the academy, yeah, or the LDs, whatever you
17  call them.
18  A.   I'm trying to think of what some of the titles were.
19  That was some time ago.
20  Q.   Well, let me interrupt for one second.
21      Is it -- which one -- were any of them involving the
22  Fourth Amendment?
23  A.   Yes.
24  Q.   Yes.  Okay.
25      And due process also?

---

Page 35

1  A.   Yes.
2  Q.   Gotcha.  All right.
3       So what training did you have outside -- so the POST
4  Academy is where you first had training on that, I presume.
5  Yes?
6  A.   Yes.
7  Q.   Okay.  And afterwards was it included in your FTO
8  program as well?
9  A.   Yes.
10  Q.   Any training on that since FTO or -- or the POST?
11  A.   Yes.  I have -- I believe I did an online POST course
12  on search and seizure and I've also attended -- it's called
13  the ICI Detective Core Course that covers search and seizure
14  as an element of that course.
15  Q.   Okay.  ICI, what is that an acronym for?
16  A.   Institute of Criminal Investigations.  It's based out
17  of Sacramento, I believe.
18  Q.   Institute of Criminal Investigations.  Okay.
19      Did you do that privately or did your department, the
20  Sheriff's Office, did they --
21  A.   The department sent me.
22  Q.   They sent you.
23      They paid, of course?
24  A.   Yes.
25  Q.   All right.  Gotcha.

---

Page 36

1       How long was that course?
2  A.   80 hours.
3  Q.   80 hours.
4       And when did you take it?
5  A.   I think that was 2021.
6  Q.   2021.  So -- okay.  Fairly recently then?
7  A.   Yes.
8  Q.   Yeah.  Okay.  Anything since?
9  A.   Any training since?
10  Q.   Yeah, training since.  I apologize.
11      Any training on Fourth Amendment or due process
12  issues since -- since the, you said, another POST course you
13  took online, you said, and then this ICI detective core
14  course?
15  A.   None that specifically cover that topic.
16  Q.   When was the POST -- the online POST course you took?
17  A.   Oh, I don't -- I don't recall what time it was.
18  Q.   Some time ago?
19  A.   I can picture it in my head the image, the icon, the
20  search and seizure icon.
21  Q.   Gotcha.  Like an estimate though.  So was it, you
22  know, within the last five years?
23  A.   It was -- well, probably within the last five years.
24  It was probably while I was still a deputy.
25  Q.   Patrol.

---

Page 37

1 A.   Deputy.
2 Q.   As a patrol.
3      So it predates your role as a detective?
4 A.   Yes, I believe so.
5 Q.   So sometime between -- what did you say you were
6 patrolman? 2016 to 2020?
7 A.   Yeah, about.
8 Q.   So as a patrolman.
9      Closer to the beginning or closer to the end?
10 A.  I can't accurately answer that question. I don't
11 know.
12 Q.  But sometime in there. All right.
13      Was it -- did you take any of these courses in
14 response to -- did you take any in response to being accused
15 of any unlawful seizure or Fourth Amendment violation?
16 A.  No.
17 Q.  Okay. Are these courses -- who advised you to take
18 these courses?
19 A.  The detective course is one that I was sent to by the
20 agency because I'm a detective and --
21 Q.  Sure.
22 A.  -- they wanted to get us through those courses.
23 Q.  Mandatory?
24 A.  I don't -- I don't know it it's --
25 Q.  Maybe not by law, but you were told to do it?

Page 38

1 A.   Yeah, yeah. I was -- I was signed up for it.
2 Q.   Okay. Okay. So you were instructed to do it by some
3 superior?
4 A.   Yes.
5 Q.   Okay. Okay. So -- and you had -- just to recap, you
6 have -- you had a POST -- so I'm going to do it globally
7 here.
8      You had a POST course or a POST training, whatever
9 phrase you're more comfortable with, for a Fourth Amendment
10 due process, and you've had -- and you've had -- and also
11 civil versus criminal. And then afterwards, you had FTO
12 on-the-job training on both -- I guess that's redundant if I
13 say FTO, and then on the job. The acronym basically means
14 it.
15      And then you had -- and there's a -- there was a
16 binder for that and you took -- there's -- you took some
17 online -- another course for -- as patrolman for POST
18 between 2016 and 2020 that related to Fourth Amendment due
19 process. The police had some guidance on it in there.
20      And then you had an ICI detective core course, which
21 you also did in 2021, but you can't -- you don't know of
22 any -- you don't know of any -- I don't remember how you
23 described it, but afterwards or, you know, policies or
24 like local rules regarding -- regarding civil or criminal
25 disputes resolving them.

Page 39

1      All correct so far?
2 A.   Yes.
3      Are there -- are there any local Shasta rules or,
4 again, a -- I'm saying a memorandum because I don't know
5 what you're hanging in your office. I don't know.
6      What term do you use on something in your office like
7 a letter? Brief? A memorandum? What do you --
8 A.   We call them -- we call them memos.
9 Q.   Memos. Okay. Memos? Policies?
10 A.  Policies, yeah.
11 Q.  And you can't -- and there's none for -- there are no
12 local ones for Fourth Amendment or due process either.
13      MR. NORTHCUTT: Objection. Calls for speculation.
14 Misstates testimony.
15      I think he said he didn't --
16      THE WITNESS: Didn't know of any.
17 Q.  MR. GORDON: Didn't know of any, not that there
18 weren't any.
19      Mr. NORTHCUTT: Oh, okay.
20 Q.  MR. GORDON: He doesn't know of any, but there might
21 be some.
22 A.  As far as our -- the department's policies?
23 Q.  Yes.
24 A.  I'm certain there's probably -- I'm certain there's a
25 policy on it. I can't tell you the policy off the top of my

Page 40

1 head, but I'm certain there's something in policy about
2 responding to civil.
3 Q.  Okay. There's something in policy.
4      Is it written or --
5 A.  Yes.
6 Q.  -- is this just you've been trained on something?
7      It's written.
8 A.  There's probably a -- I'm assuming that there is a
9 written policy somewhere on it.
10      MR. NORTHCUTT: Don't -- don't assume anything.
11      Do you know one way or the other or are you
12 speculating?
13 A.  I'm speculating.
14      MR. NORTHCUTT: Okay. Don't speculate. We don't
15 want any guessing here.
16 Q.  MR. GORDON: So if you were presented with a criminal
17 versus civil dispute today, something that it could be
18 either, what would you do to -- you've -- you're not aware
19 if there's -- there's any policy to dictate what to do on
20 that?
21 A.  No. It would probably come down to the individual
22 deputy to make that decision.
23 Q.  Okay. So there's no policy they would -- that you
24 would -- that you would turn to?
25 A.  Right.

Page 41

1 Q.   Okay.  Okay.  Oh, yeah.  Maybe we're confused.
2      Did you say there is -- did you say there is a memo
3  or a policy on the Fourth Amendment?
4      MR. NORTHCUTT: If you know.
5      THE WITNESS: I don't know.
6  Q.   MR. GORDON: You don't know.  Okay.  All right.
7      You have not been trained on it presumably or else
8  you would know?
9  A.   There are a lot of policies in -- through the
10 Sheriff's Office, policies and procedures.  I haven't
11 reviewed them recently.
12 Q.   When is the last time you reviewed them?
13 A.   In its entirety?  Probably when I was hired as a
14 deputy.
15 Q.   Gotcha.  And -- okay.
16     Is there training on -- so it's called policies and
17 procedures or is it -- I was asking do they use the term
18 memo or what?  Local rules?
19 A.   When you mentioned "memo," I assumed you were
20 referring to like training emails or memos that go out --
21 Q.   Yeah.
22     (Undecipherable overlapping speakers.)
23 Q.   Okay.
24 A.   That's the -- that's what I understood you meant by
25 that.

Page 42

1  Q.   I see.  Okay.  So there are local policies, but you
2  haven't read them since 2016.
3      And did they give you -- I'm assuming you got some
4  training on them when you started -- when you started?
5  A.   Yes.
6  Q.   All right.  Tell me about the training on them.
7  A.   That is incorporated in the field training program.
8  Q.   Okay.  So in the field training program they give
9  you -- they give you training on the Shasta policies and
10 procedures, and that was 2016.
11 A.   Yes.
12 Q.   This might be a question you remember.
13     Since you don't remember it was in the binder, were
14 the policies in the binder?
15 A.   No.  The policies are in a separate platform.  I
16 think it's all electronic now.
17 Q.   I see.
18     Was it electronic then?
19 A.   Yes.
20 Q.   Okay.  I figured.  It's 2016, not 1980.
21     Okay.  So -- and you had training in -- but no
22 training on them since 2016.  Correct?
23 A.   There are periodically updates to policies, but I
24 can't think of -- recall any update to that specific --
25 Q.   Do you recall --

Page 43

1  A.   -- to a specific policy on civil issues.
2  Q.   Gotcha.
3      How are the updates delivered to you?
4  A.   Through email notification.
5  Q.   You said a moment ago you didn't recall any updates
6  to the policy on criminal versus civil issues.
7      Do you recall what -- so you recall the criminal
8  versus civil policy.  Can you paraphrase it?
9  A.   If there is one.
10 Q.   If there is one.  Okay.
11     You're not sure if there is one?
12 A.   I'm not certain.
13 Q.   Gotcha.  Okay.  And -- I'm not trying to repeat a
14 question I did a moment ago.  I haven't taken notes.  I
15 don't remember if I asked.
16     Are you not sure if there's one on the Fourth
17 Amendment and due process either?  A policy?  A local
18 policy?  Shasta policy.  Sorry.
19 A.   And I think I answered that already.
20 Q.   Yeah, you might have.  I'm asking again, because I
21 don't -- I didn't take notes on it.
22 A.   I can't say for sure.
23 Q.   You can't say.  So the same as --
24 A.   If there is specifically a policy on that.
25 Q.   But you had training on this back in 2016?

Page 44

1  A.   Yes.
2  Q.   Presumably, if you would have known it then, it would
3  have been fresh in your head.  Maybe.  Okay.  All right.
4      Okay.  So how many -- I think -- I did ask that.
5  Your training, you receive periodic updates via email for
6  changes to the policy.
7      But any other -- any other training where there's
8  courses where they go through it periodically or is it just
9  the email updates?
10 A.   I can't think of any.
11 Q.   Refresher courses even or anything?
12 A.   There are refresher courses, yes.
13 Q.   Okay.
14 A.   Yeah.
15 Q.   But you -- since you said you did this in 2016, I
16 presume you have not taken a refresher course?  It didn't
17 refresh you very much if you don't recall.
18 A.   Well, that refreshes me a little bit.  I did do a
19 refresher course for search and seizure in -- it was while I
20 was a detective.
21 Q.   Since 2020?
22 A.   It would have been 2020 or 2021.
23 Q.   Okay.  So you did a refresher course on the Fourth
24 Amendment aspect of your local policy since '20 -- in '20 or
25 '21?

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

Page 45

1  A.   Yes.

2  Q.   Yes, okay.  2020 or 2021.  Gotcha.

3       Was due process also involved in that refresher

4  course or is it just Fourth Amendment?

5  A.   I believe it was just Fourth Amendment.

6  Q.   Gotcha.  Did they update you on latest case law or is

7  it just we made it our policy to this.  Here's what you do?

8  A.   It wasn't so much about changes to policy.  It was

9  just a refresher --

10 Q.   Just a refresher.

11 A.   -- on the policy.

12 Q.   Gotcha.

13 A.   And I do think that they did go over some case laws,

14 but I can't recall what they were.

15 Q.   Yeah, no.  Look, the case law is what it is.  I was

16 just curious if they say "Hey, you know, the Ninth Circuit

17 made this ruling," or whatever.  It might have done some

18 case law, but you don't recall the case law.

19 A.   Correct.

20 Q.   I don't recall the case law and I have to read it.

21 So that's fine.

22      All right.  So how many warrants have you issued in

23 your career?  Strike that.

24      How many warrants have you been involved with in your

25 career?

Page 46

1  A.   I would estimate 40 to 50.

2  Q.   Okay.  Do you -- this is just so I can figure out how

3  to frame my next question.

4       Did you -- did you have more warrants as a detective

5  that you were involved with or as a patrol officer?

6  A.   Almost all of them as a detective.

7  Q.   Really.  Okay.  Okay.  Interesting.

8       So when you were a patrol officer, you weren't

9  helping execute warrants?

10 A.   I was helping execute, but you said written.

11 Q.   No, I said how many were you -- have you been

12 involved with, like either you're helping to execute the

13 warrant or you prepared it.  You have a role with respect to

14 a warrant.

15 A.   I understood your question as written.

16 Q.   No.

17 A.   Written, approximately 40 to 50.  I've probably been

18 involved in the service and execution of over a hundred.

19 Q.   Over a hundred.  Okay.

20      More than that?  Like just over a hundred, 200 or

21 closer to the 100 range?

22 A.   Probably closer to the hundred range.

23 Q.   Okay.  So what training have you had on warrants?

24 A.   I've taken a search warrant writing class.

25 Q.   Oh, interesting.

Page 47

1  A.   It was an online class through the California POST

2  portal, training portal.  It's also a subject matter in the

3  ICI detective core course.

4  Q.   So it's still in the 80-hour course you took?

5  A.   Yes.  I believe it is also touched on briefly in

6  other detective courses that I've completed.

7  Q.   Oh, which ones?

8  A.   Like the ICI child abuse, ICI homicide.

9  Q.   When did you take those courses?

10 A.   I believe both of those courses were last year.

11 Q.   Oh, so fairly recently then.

12 A.   Yes.

13 Q.   How many hours were they?

14 A.   Both of those courses are 40-hour courses.

15 Q.   Forty-hour courses.

16 A.   Homicide -- no, homicide might be 80 hours.

17 Q.   Gotcha.

18      So apart from the course, you mentioned the online

19 one and the -- and the -- covering these two ICI courses you

20 mentioned.

21      What other training have you had on warrants?

22 Anything else?

23 A.   On-the-job training.

24 Q.   On-the-job training.

25      In your FTO training they put over warrants, too?

Page 48

1  A.   No.

2  Q.   Okay.  For the -- for the homicide and the child

3  abuse one, how many hours in those courses were devoted to

4  warrants?

5  A.   I believe in those classes that it's just touched on.

6  It's not a significant portion of those classes.

7  Q.   Okay.

8  A.   It's more covered in the core course.

9  Q.   The POST --

10 A.   The detective core, ICI core.

11 Q.   Oh, the ICI core course.  Gotcha.  All right.

12      Okay.  And those were -- you said -- which one was

13 the search warrant writing course?  That was the POST

14 course.  Yes?  That was for actually writing them out?

15 Learning how to write them?

16 A.   Yes, there's a POST training portal online class.

17 Q.   Okay.  And when did you take that?

18 A.   I took that to prepare for my detective interview, so

19 it would have been 2019 or 2020.

20 Q.   Gotcha.  All right.  Okay.  All right.

21      Now, does this go -- are these -- so it's -- in your

22 training for how to write a warrant, is the training on how

23 to write a warrant to get it approved or is it training on

24 the legality of warrants?

25 A.   I believe both.  It's on the kind of the legality

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

---

Page 49

1  what a search warrant is, what an affidavit is and the
2  process of how to obtain.
3  Q.    Okay.  All right.  So what steps do you take in your
4  training -- what steps do you take to draft a warrant?
5  A.    So I would download the form from the Court's
6  website.
7  Q.    And just to clarify, that form is the -- it's --
8  is it CF0060?  Is that it?
9  A.    I don't know the numbers, but it's a search warrant
10  and affidavit.
11  Q.    I'm going to show you one on my computer.  You can
12  tell me if it's it.
13  A.    Sure.
14  Q.    I believe I have the correct one.  I should have
15  printed you a copy, but -- but I did not, so my apologies.
16       So is it this form?
17  A.    Yes.
18  Q.    Just to verify for the record, the form at the
19  bottom -- I downloaded this form, what I'm showing from the
20  Shasta County website.  It is -- it says in the bottom
21  left-hand footer "Form Approved for Actual Use.  Shasta
22  County Superior Court."  CF-0060.  It has the date of
23  September 5, 2019, and it's a blank template for a search
24  warrant and affidavit.  Correct?
25  A.    Correct.

---

Page 50

1  Q.    All right.  So fire away.  You download this form?
2  A.    Fill out the form.
3  Q.    Okay.  Anything else?  Do you review evidence?  Do
4  you -- what do you --
5  A.    It depends on if I'm writing it for my own case.
6  Obviously, I'm out going to be outlining the evidence that
7  I've investigated in that.  If I'm writing a warrant for
8  somebody else to help somebody else, then I typically will
9  get a brief from that person.  They'll brief me on the facts
10  of the case and I'll include those facts in the warrant.
11  Q.    Okay.
12  A.    Our warrants then go to the District Attorney's
13  office where they are reviewed by an attorney.
14  Q.    All right.
15  A.    The attorney approves of the warrant, they send it
16  back and then we submit those warrants via DocuSign to a
17  judge.
18  Q.    But you sign the Statement of Probable Cause?  Yes?
19  A.    Yes.  That's part of the DocuSign process.
20  Q.    Okay.  You are signing under, what, penalty of
21  perjury --
22  A.    Yes.
23  Q.    -- that you've reviewed everything in there?
24  Everything's correct?
25  A.    That I believe that to be true, yes.

---

Page 51

1  Q.    Okay.  All right.  So do you -- when you're filling
2  out a warrant for yourself, how do you -- this is your
3  investigation.
4       How do you -- do you put all the evidence you have in
5  it or how do you select what goes into it?  Is this your own
6  discretion what you think is pertinent?
7  A.    Generally, between me and the attorney that's working
8  with me.
9  Q.    Yeah.  So you -- do you work with an attorney each
10  time a search warrant is executed?
11  A.    Yes, every time a search warrant is executed.
12  Q.    Or prepared, I should say.  Right?
13  A.    Prepared, yes.
14  Q.    Because you're working with him beforehand.  He signs
15  off on it and -- okay.  All right.
16       Do you work with one particular attorney or is it
17  anyone at the DA's Office, I presume?
18  A.    Yes.
19  Q.    Okay.  Okay.  Anyone at the DA's Office.
20       All right.  Do you see them in person or do you see
21  them -- or is this just through email?
22  A.    Usually through email.
23  Q.    Usually through email.  Okay.
24       Do you call them on the phone to discuss it?
25  A.    Sometimes.

---

Page 52

1  Q.    Sometimes.
2  A.    If they need to discuss it further.
3  Q.    Okay.  All right.  Do you -- so you send them the
4  information.  You say -- with your write-up, I presume.  You
5  have already written a narrative and the warrant at this
6  point when you send it to them and say --
7  A.    Yes.
8  Q.    Do you ever call them beforehand and say "Hey, this
9  is what I want to write a warrant for.  How do I frame
10  this?"
11  A.    No, I wouldn't ask how to frame it.
12  Q.    You wouldn't ask how to frame it.  Okay.
13       Do you ever ask "Okay.  This is the situation.  Are
14  there any land mines to avoid before I submit this to the
15  judge?"
16  A.    No.  I usually send them the warrant and they'll either
17  email me or call me if they have any issue with it.
18  Q.    If they say there is an issue, is that -- is that
19  game over or do you go back and reassess and change
20  something on the warrant?
21  A.    Usually reassess things.
22  Q.    Okay.  Okay.
23  A.    It depends on the issue.
24  Q.    Sure.  What would be an issue that would just full
25  stop?  There's no warrant?

---

Page 53

1 A.   It hasn't happened.
2 Q.   It hasn't happened?
3 A.   But if, you know, there's not probable cause and they
4   tell me there's not probable cause --
5 Q.   Yeah.
6 A.   -- then that would be game over.
7 Q.   Gotcha. Okay.
8      If you need one, yeah, we can, if you need a break,
9 yeah.
10     MR. NORTHCUTT: I can use one as well.
11     THE VIDEOGRAPHER: We're off the record and the time
12 is 10:34.
13     (Off the record.)
14     THE VIDEOGRAPHER: We're back on the record and the
15 time is 10:50.
16 Q.   MR. GORDON: All right. Officer, we're back on the
17 record.
18     You understand you are still under oath, of course?
19 A.   Yes.
20 Q.   The same duties apply. Okay. All right. Okay.
21 Where did we leave off. We were going over search warrants.
22     Okay. So when you -- when you're going over -- we
23 were talking about your training -- a variety of topics
24 really to warrants, your training, your discretion for what
25 goes into a warrant, you know, for -- yeah, that's what we

Page 54

1 were discussing. So I'm refreshing my own memory as I'm
2 saying this.
3      So when you're writing a -- when you're writing a
4 warrant or -- sorry. You don't write the warrant. You
5 write the narrative of probable cause, correct, which
6 attaches to a warrant that the judge signs. Yes?
7 A.   Yes.
8 Q.   Okay. When you -- so if -- if I may, let me actually
9 pull up -- I'm going to pull up that search warrant again,
10 the blank one that we -- that you -- that we looked at
11 earlier, just so -- maybe I should -- no, I don't need to
12 make a copy of this. I think we can -- we can make -- we
13 can get by. It's not that complicated. I was thinking
14 maybe it would be easier for you if you had a paper copy,
15 but --
16     MR. NORTHCUTT: Of his actual warrant?
17     MR. GORDON: No, no, no, no, no. Of the template
18 warrant.
19     MR. NORTHCUTT: Gotcha.
20 Q.   MR. GORDON: The form -- which I'll just call for
21 this deposition the template warrant.
22     Do you know what I mean by that? Or a blank --
23 A.   I do.
24 Q.   What do you call it usually? A blank warrant or
25 template warrant?

Page 55

1 A.   A template.
2 Q.   A template. You call it temperate. Okay. Gotcha.
3      So on the template warrant we got -- we got page 1,
4 Search Warrant and Affidavit. Here's the -- here's the
5 affidavit. You signed this top part, right, your name?
6 We're looking at page 1 of 6 of the warrant. At the top it
7 says "State of California, County of Shasta Search Warrant
8 and Affidavit." And then it has in brackets underneath
9 "Affidavit." Below that it says "Name of Affiant."
10     So here, if you're filling out one, you put your
11 name. Correct?
12 A.   Yes.
13 Q.   Okay. And then there's some other boxes to check,
14 "Sealing requested" and "No" or "Yes." "Statement of
15 Probable Cause, Confidential Attachment."
16     So you select these -- depending on whatever you're
17 filling out. Correct? The judge doesn't pick what these
18 things are.
19     These are -- this top portion is you. Yes?
20 A.   Yes.
21 Q.   Okay. And so down here where it says "Search
22 Warrant" is in brackets. We're still on page 1 of this
23 template warrant. So, again, it says "The People of the
24 State of California, to any Sheriff, police officer or peace
25 officer in the County of Shasta, proof by affidavit is made

Page 56

1 to me -- made -- been made before me by" and name of -- and
2 it has name of affiant.
3      So, again, it would be your name there if you are
4 filling out the warrant. Correct?
5 A.   Yes.
6 Okay. Now, below that there's several boxes to check, "The
7 property was stolen or embezzeled. The property or things
8 was used as the means of committing a felony. The property
9 or things are in possession of any person with the intent to
10 use them as a means of committing a public offense or in the
11 possession of another," yadda, yadda, yadda.
12     So -- and we're still on page 1 of this template
13 warrant. And these boxes go into page also -- or page 2
14 also with a variety of options or paragraphs with a box to
15 check next to them.
16     Do you select -- do you check off these boxes, too,
17 or does the judge do that?
18 A.   I do.
19 Q.   You do. Okay. Understood.
20     So then on page 3 of 6, so there's some more language
21 it says "You are therefore commanded to search."
22     Do you leave that blank or does the judge -- the
23 judge fill that out or do you -- do you write something in
24 there?
25 A.   I fill in the location.

Page 57

1 Q.   You fill in the location.

2 A.   **Yes.**

3 Q.   Okay.  Just the location or do you fill in anything

4 else?

5 A.   **There could be a description of the location.**

6 Q.   Description.

7 A.   **We have descriptions.**

8 Q.   Okay.  Okay.  Okay.  Okay.

9 A.   **Photos of the location, if we have photos.**

10 Q.   Does -- okay.  Does the judge ever add anything to

11 this section where, "You are therefore commanded to search"?

12 A.   **No.**

13 Q.   No.  Okay.

14       Does she get this document in Word form?  Is it in a

15 Word document or do you just convert it into a PDF so that

16 you can't write it in easily?

17 A.   **It's through DocuSign, however they do it.  I don't**

18 **think they can alter that.**

19 Q.   You don't think they -- so what you give them is what

20 they -- what they sign?

21 A.   **Yes.**

22 Q.   Yes.  Okay.  All right.  Okay.

23       And then so if it's -- this is "You are therefore

24 commanded to search for the following property or person."

25       Okay.  In -- do you fill out this section, too, where

Page 58

1 it says "For the follow property or person"?

2 A.   **Yes.**

3 Q.   Okay.  Okay.  All right.  So I was just curious if

4 the judge filled it out.

5       So you are trained on how to fill these sections out,

6 and you proceed to do that for each warrant --

7 A.   **Yes.**

8 Q.   -- that you fill out?

9       Okay.  Gotcha.  And these items here, are -- so it

10 says "And if you find" -- so we're on page 3 of the template

11 still.

12       "And if you find the same or any part thereof to hold

13 such property in your possession under Penal Code 1536 or

14 any alternative to institute, federal or state asset

15 forfeiture proceedings against any and all assets seized

16 during the execution of search warrant and believed to be

17 derived from narcotic -- narcotics trafficking activity."

18       You've -- this paragraph and the one below it, which

19 is "It is further ordered that upon the cases against the

20 defendants in this action, including the resolution of any

21 and all appeals and written concurrence of the Shasta County

22 District Attorney, the property be disposed of in accordance

23 with the procedure set forth in California Penal Code

24 1407 -- Section 1407 to 1422, without the necessity of

25 further court order issued pursuant to Penal Code 1536."

Page 59

1       So those -- that language, this is in every warrant?

2 Yes?

3 A.   **Yes.**

4 Q.   Okay.  And do you ever change it?

5 A.   **It can't be changed.**

6 Q.   It can't be changed.  Well, I -- I suppose it could

7 if it's a Word doc.  Right?  If I hit a button here, it's

8 going to add something?  But you're not supposed to change

9 it, you mean?

10 A.   **You can try.**

11 Q.   You can try.

12 A.   **You cannot add to that.**

13 Q.   Oh, it's locked.

14 A.   **You cannot change that.**

15 Q.   So the document is locked.  I understand.

16 A.   **Yes.**

17 Q.   Someone said that the other day, and in my head I

18 thought "But it's a word document.  You can just type

19 something in it."  But no it the answer.  It's locked.

20       Okay.  All right.  Okay.  So then below here, "The

21 search warrant and incorporated affidavit were sworn to me

22 -- we're still on page 4 now.  "The search warrant and

23 incorporated affidavit were sworn to as true and subscribed

24 before me.  Wherefore, I find probable cause for the

25 issuance of the search warrant and do issue it.

Page 60

1 Additionally."

2       "And do issue it," period.  And then the next line

3 down says "Additionally" and there's a colon.

4       Is this a space for the judge to add anything else?

5 A.   **Perhaps.  I don't know.  I've never seen anything --**

6 Q.   It's not letting me type.

7 A.   **I've never seen anything --**

8 Q.   You've never seen a judge add anything there.

9 A.   **No.**

10 Q.   Okay.  All right.  But it would suggest it, I guess.

11 It's the first time I'm seeing it, too.  Okay.  I didn't

12 know you couldn't write in this thing.  I assumed this was a

13 Word document and you guys can just, you know, go acapella

14 with it, so.

15       All right.  So then does she -- does the judge --

16 well, I'm saying "she" because in this case it was a she,

17 obviously.  But whoever the judge is, he or she, there's

18 these boxes here, "Sealing ordered, yes" -- or "no, yes."

19 "Statement of Probable Cause."

20       Do they check these boxes?

21 A.   **Yes.**

22 Q.   They -- okay.  So this is the portion the judge fills

23 out.  Okay.  And they put their signature.  I'm saying

24 "magistrate" and "judge" interchangeably, but you know what

25 I mean.

Page 61

1 Okay. All right. And then -- this -- below that it
2 says "This Search Warrant, Affidavit and Incorporated
3 Statement of Probable Cause have been reviewed and approved
4 as to -- by the Shasta County District Attorney." For the
5 record, again, I'm still on page 4 of this template.
6 So the DA signs here if they're approving the
7 warrant?
8 A.   Yes.
9 Q.   Do they always sign it?
10 A.   Typically, or they'll ask me to sign it for them.
11 Q.   Okay. So you can sign for the DA, but -- but that's
12 obviously -- you're not signing it. I know what you mean.
13 You're -- he's giving you authority, yeah, put my signature
14 on it. Okay.
15 A.   Yes.
16 Q.   All right. Okay. So then below that, we're going to
17 go to page 5 of 6 of the warrant now -- of the template
18 warrant. My apologies. It has these -- I'm going to call
19 them default headings.
20 Is that what you usually call them?
21 No name for them. This is just what's on the
22 template.
23 A.   Yeah. That's the --
24 Q.   Okay. "Education and Experience of Affiant."
25 So here, I assume, this let's you add your -- in

Page 62

1 these sections you can make additions. Yes?
2 A.   Yes.
3 Q.   Okay. All right. Introduction and background
4 investigation and code sections believe violated. Narrative
5 of probable cause. Evidence sought. What you want to look
6 for. Description of locations. Concluding opinion. Night
7 Service and Sealing Order.
8 So -- okay. So in your training, you're taught to
9 fill out these paragraphs?
10 A.   We don't have to use those exact headers, but yeah,
11 we are taught to use that area to fill out our affidavit.
12 Q.   Okay. And the Affidavit of Probable Cause is so the
13 judge can issue orders in page 1, 2, 3 and 4. Correct?
14 A.   Yes.
15 Q.   Okay. So the orders are up here and then below is --
16 this is your -- this is your, I don't want to say it,
17 opinion. I don't mean that, you know, offensively. I don't
18 know what the word to use is.
19 But this is your opinion as an investigator, the
20 person, the affiant, that there's probable cause to
21 investigate a crime or seize evidence?
22 A.   Yes.
23 Q.   Okay. I shouldn't say "investigate a crime."
24 It's probable cause to seize a person or evidence --
25 or search, search a person or evidence and seize a person or

Page 63

1 evidence. Yes?
2 A.   Yes.
3 Q.   Okay. All right. Okay. Okay. All right. So page
4 5 -- okay. Page 1 to 4 is the judge's orders. Page 5
5 is the -- of the template is your Statement of Probable
6 Cause. But when you fill it out, of course, it gets much
7 longer than page 5. It will be multiple pages potentially.
8 What's the longest search warrant you ever wrote, out
9 of curiosity?
10 A.   I don't know.
11 Q.   You don't know.
12 Ten pages? Twenty pages?
13 A.   I don't know.
14 Q.   You don't know. All right. We'll probably come back
15 to this.
16 Should we make it -- Vanessa, should we make this
17 template an exhibit?
18 MS. SHABIK: Sure.
19 MR. GORDON: We probably should. On a break I'm
20 going to print it and do it, so that will be an exhibit.
21 But let me print it first and we'll see where we are in the
22 rotation.
23 Q.   Okay. So when you're filling out a warrant on the
24 narrative of probable cause, do you go through the elements
25 of each crime? That is, the warrant seeks to, you know, not

Page 64

1 investigate, but the warrant seems to be, for whatever,
2 search and seizure that there's probable cause for whatever
3 crime's at issue, do you go through the -- do you go through
4 the elements of each -- of that particular crime in your
5 narrative of probable cause?
6 MR. NORTHCUTT: Objection. Vague and ambiguous.
7 Go ahead and answer.
8 Q.   MR. GORDON: If you know.
9 A.   Are you asking if I verify that the elements are met?
10 Q.   Yes, yes.
11 A.   I make sure that the elements are included, yes.
12 Q.   Okay. You make sure the elements are.
13 So you'll -- what do you do to do that?
14 A.   I just review what I'm writing to ensure that the
15 elements are there.
16 Q.   Do you -- do you go to the Penal Code and say "This
17 is for this particular crime," look at it, and "I meet this
18 element of the crime," and whatever. Let's use 487 because
19 that's what we're going to talk about.
20 Do you -- did you review 487 before writing the
21 warrant at issue today?
22 A.   No, I didn't. I didn't review the Penal Code prior
23 to writing that.
24 Q.   Okay. So let's maybe use one for warrants you're
25 more comfortable with, because I'm just trying to understand

Page 65

1  the procedure here.
2      So what -- what is the most common crime you're
3  getting -- you're drafting a warrant for?
4  A.   Most of them are probably written for --
5  Q.   That you're writing them for.
6  A.   Yeah, that I'm writing probably for homicide cases
7  because we write the most warrants for those cases.
8  Q.   Really. Interesting. Okay.
9      So where is -- I'm not a -- I don't do wrongful
10  death, or anything like that, cases, but where is homicide
11  codified in the Penal Code? What provision is it? Do you
12  know?
13  A.   There's several sections, but 187.
14  Q.   Okay. 187. Okay. I've heard people say 187 for
15  slang.
16      So do you then pull up 187 and say this element --
17  you know, this element of the -- of it's met. This -- you
18  know, when you're writing the affidavit of probable cause
19  and go through what elements are met?
20  A.   No.
21  Q.   No. Okay. All right.
22      Well, earlier you said you know the elements are met,
23  but -- so do you -- what do you mean by that then? You said
24  you make sure the elements are met when you're writing the
25  narrative of probable cause. If you're not -- you just said

Page 66

1  a moment ago, but you don't -- you know, for homicides you
2  don't show that they're met.
3  A.   Right. I don't specifically look at the code section
4  every time I write a warrant.
5  Q.   Gotcha. Do you -- okay.
6      I assume for Penal Code 187 you know that section
7  pretty well. You've been doing warrants for a long time, so
8  you can kind of just, I know, write whatever the -- what are
9  the elements of it, for 187?
10  A.   It's somebody is dead. Unlawful death.
11  Q.   Unlawful death.
12      Okay. Anything else?
13  A.   Those are the basics.
14  Q.   The basic ones. Is there like a mens rea element,
15  actus rea element or anything like that?
16  A.   I don't know what that means.
17  Q.   Yeah. Okay. You don't know what that means. Okay.
18  It's for the DA. All right.
19      So you just -- for that it just there's a -- there's
20  a body and nothing else? Okay. Yes?
21  A.   There's a body and the circumstances are suspicious.
22  Q.   There's a body and the circumstances are suspicious.
23      If it's a crime that you haven't written a warrant
24  before, do you check the Penal Code then?
25  A.   Yes.

Page 67

1  Q.   Yes. Okay. All right.
2      But you didn't here for the 487 one?
3  A.   No.
4  Q.   Okay. Have you for -- have you written elements for
5  grand theft before?
6  A.   Yes.
7  Q.   So what are the elements of 487(a)? Penal Code
8  487(a)?
9  A.   487(a)?
10  Q.   Yes, 487(a). Yes. For the warrant in question,
11  yeah.
12  A.   Okay. So that is the theft of livestock.
13  Q.   Yeah.
14  A.   And it's grand theft of livestock is the unlawful
15  taking of a livestock animal that is not yours and a value
16  greater of 450.
17  Q.   Oh, is there a value on it? I'm not -- I'm not --
18  this isn't a gotcha. I don't remember. I did not think
19  there's a value determination on it. Maybe there is.
20  A.   There might not be.
21  Q.   For regular grand it's what? 950?
22  A.   It's 950.
23  Q.   I don't know that there is for this one.
24  A.   There not might be.
25  Q.   But okay.

Page 68

1  A.   It's the unlawful taking of --
2  Q.   Of livestock. And there might be a value of 450.
3  You don't -- look, it says what it says. There might be
4  one. This is just going off your memory. There might be
5  one. There might not be. Okay.
6      Okay. So what is "unlawful taking" mean then?
7  A.   It sounds pretty self-explanatory.
8  Q.   What's your understanding of it?
9  A.   Unlawful. It's illegal. Taking something that is
10  not yours.
11  Q.   Okay. All right. How do you determine whose it is?
12  You said it's not -- it's not yours.
13  A.   If there is a known owner.
14  Q.   A known owner.
15      How is an owner known?
16  A.   Through some form of investigation.
17  Q.   Okay. Okay. But it's your statement of probable
18  cause. So in this -- in this case with the warrant we're
19  going to talk about how did you determine the owner?
20  A.   Oh, through the brief I received from Lieutenant
21  Jerry Fernandez.
22  Q.   Okay. Is his brief evidence?
23  A.   It is a statement from a Lieutenant in my department.
24  Q.   Yeah. Okay. But is that evidence?
25      MR. NORTHCUTT: Objection. Calls for a legal

Page 69

1 conclusion.
2 Q.   MR. GORDON: Look, in your mind if it is, it is. I
3 just want whether you think it is or not. It's not -- you
4 know.
5 **A.   Yeah, I think that the statement from a law**
6 **enforcement officer can be evidence.**
7 Q.   Can be evidence. Okay. If -- sorry. Okay. We're
8 going to come back to this. I'm going to present you with
9 the warrant, so you can see what you wrote, obviously,
10 but -- so I have some more back ground questions, which I
11 didn't mean to jump to the warrant so quickly. It's just we
12 got to the template and we were talking about that.
13      Okay. So are you -- I know you said you grew up in
14 Bakersfield, but did you have any involvement -- growing up
15 did you have any involvement with agriculture?
16 **A.   No.**
17 Q.   You didn't grow up on a farm?
18 **A.   No.**
19 Q.   A ranch or anything like that? I guess it's the same
20 thing. I don't know.
21      Did you participate in 4-H?
22 **A.   No.**
23 Q.   FFA?
24 **A.   No.**
25 Q.   Were you in any youth farmer organization?

Page 70

1 **A.   No.**
2 Q.   Is your wife or kids involved in 4-H at all?
3 **A.   No.**
4 Q.   Or FFA or any other youth farming organization?
5 **A.   Nope.**
6 Q.   Okay. Do you make any donations to 4-H or FFA or any
7 youth farming organization?
8 **A.   No.**
9 Q.   No. Okay. All right.
10      Are you -- do you know a person by the name of Kathi
11 Muse?
12 **A.   I know the name.**
13 Q.   You know the name.
14 **A.   I don't know the person.**
15 Q.   How do you know the name?
16 **A.   Through this investigation.**
17 Q.   Did you know her name prior to the investigation?
18 **A.   No.**
19 Q.   No. Okay.
20      Did you know her husband's name prior to the
21 investigation?
22 **A.   I don't know her husband's name now.**
23 Q.   Okay. That's fine. To be honest, I don't either. I
24 believe the testimony was she's married, so. Okay. Which
25 is why I didn't give the name.

Page 71

1      All right. Do you know a gentleman by the name of
2 Bruce Macfarlane?
3 **A.   No.**
4 Q.   Okay. So -- but you know him from this
5 investigation, I presume?
6 **A.   I've seen the name. I'm not sure I could tell you**
7 **who he is.**
8 Q.   Okay. All right. So do you know -- so you've never
9 met him?
10 **A.   No.**
11 Q.   Yeah. Okay. All right. But you've seen his name in
12 this investigation. Okay.
13      And do you know Melanie Silva?
14 **A.   No.**
15 Q.   Okay. All right. But you know her name from the --
16 this lawsuit, I presume?
17 **A.   Yes.**
18 Q.   Okay. You never met her, etcetera. Okay.
19      All right. And did you know her -- you only knew --
20 you answered. I'm sorry. You don't know her. You didn't
21 know her before the lawsuit or know of her before the
22 lawsuit?
23 **A.   That's correct.**
24 Q.   Okay. And do you have any relationship with the
25 Shasta District Fair?

Page 72

1 **A.   No.**
2 Q.   No. Okay. All right. Any relationship -- do you
3 know who sits on its Board of Directors?
4 **A.   No clue.**
5 Q.   No clue. All right.
6      Okay. Have you know known -- do you know anyone
7 who's ever sat on its Board of Directors?
8 **A.   Not that I know of. I don't know anybody who --**
9 Q.   You might have. Okay. You don't -- okay. But I
10 know what you're saying.
11      You don't know one way or the other. Yes?
12 **A.   Yes.**
13 Q.   You meant -- you mentioned it that way because you
14 might have met someone who was, but you're not aware of it?
15 **A.   Correct.**
16 Q.   Okay. All right. Okay. Or might be aware of
17 someone who was or met them. Gotcha.
18      Okay. So have you ever been to the Shasta District
19 Fair?
20 **A.   Yes.**
21 Q.   Okay. When? What year? When did you go?
22 **A.   I think '22. Last year we went.**
23 Q.   Okay. So the year with the incident at issue, you
24 might have went that year, you think?
25 **A.   It was either last year or the year before.**

LONG vs.
FERNANDEZ

Page 73

1 Q. So either '22 or '21?

2 A. **Yeah.**

3 Q. Gotcha. Any previous years?

4 A. **We went one previous year. We've been two or three**

5 **times since we've lived here.**

6 Q. Yeah.

7 A. **So I couldn't tell you the exact years, but yeah.**

8 Q. Do you go to the livestock auctions there?

9 A. **No.**

10 Q. No.

11 Just doing the rides with your kids?

12 A. **Yeah.**

13 Q. Okay. All right. Did you go to any of the fairs in

14 Bakersfield when you were there?

15 A. **Yeah, I went to a couple of the Kern County fairs.**

16 Q. That was my next question. Bakersfield in Kern

17 County, so it would be the Kern County Fair. Gotcha.

18 Okay. Okay. Oh, correct? You were nodding your

19 head, but correct?

20 A. **Yes. Are you asking a question?**

21 Q. Yeah. It's --

22 A. **Yes.**

23 Q. -- irrelevant. It just -- because I didn't -- I said

24 "Bakersfield Fair." And I'm -- in my head as soon as I said

25 it, I said it's probably not the name he'd know it by

Page 74

1 because it would be the Kern County Fair. Correct?

2 A. **Correct.**

3 Q. Okay. But you might have gone to that, too?

4 A. **I have gone to that a couple times, yes.**

5 Q. You have.

6 A. **Yes.**

7 Q. Any livestock auctions there?

8 A. **No, I've never been to a livestock auction.**

9 Q. Oh, interesting. Okay. Me neither.

10 All right. And do you know who Jessica Long is?

11 A. **Only from this case.**

12 Q. Okay. And so if I say the name "Cedar the goat" you

13 know who I'm -- or Cedar, or Cedar the goat, you know the

14 animal I'm referring to?

15 A. **From this case?**

16 Q. From this case, yes. Yeah. Okay. Yeah.

17 Not like a Disney --

18 A. **No personal relationship.**

19 Q. No. Yeah, I didn't think you -- yeah, I didn't you

20 met Cedar. Gotcha. All right. All right.

21 And if I say "E.L.," you -- do you know Jessica

22 Long's daughter, E.L.? We're using this acronym in this

23 case because it's a minor.

24 A. **Yes.**

25 Q. So when did you first learn of Jessica Long removing

Page 75

1 Cedar from the -- Jessica Long removing Cedar from the

2 Shasta District Fair?

3 A. **It would be the day that that warrant was issued.**

4 Q. Okay. So July 8th?

5 A. **That sounds accurate. I don't know off the top of my**

6 **head.**

7 Q. Would the -- seeing the warrant refresh your memory

8 of it?

9 A. **Absolutely, it would, yes.**

10 Q. I'll just give you a copy.

11 I want to get a clip for you because it's a big

12 packet that I'm going to give you.

13 Can we go off the record for a moment?

14 **THE VIDEOGRAPHER:** Sure. We're off the record and

15 the time is 11:14.

16 (Off the record.)

17 **THE VIDEOGRAPHER:** We're back on the record and the

18 time is 11:26.

19 MR. GORDON: So I'm marking the template warrant that

20 we reviewed as Exhibit A, Detective.

21 Just verify it's the correct template that we

22 reviewed on my computer and that all -- everything we asked

23 earlier in the depo related to that applies to that

24 Exhibit A or any, you know, template like it you can

25 download online.

Page 76

1 It's the correct one?

2 A. **That's correct.**

3 **(Exhibit A was marked.)**

4 Q. MR. GORDON: You can retain that. I don't know if

5 we'll refer to it again. Maybe.

6 So when we broke a few moments ago, I was going to

7 give you a -- well, before we do that, I just want you to

8 verify -- so your -- through your attorney you turned over

9 this stack of documents. I have -- I just want you to --

10 well, I'm going to ask you some questions about the

11 production in a second, but I want to show it to you so you

12 can see it, of course.

13 But it's Bates stamped from Ashbee -- so 000001

14 through, I believe, 198. So about 200 pages.

15 Is that accurate, Damian? I think it was --

16 **MR. NORTHCUTT:** That sounds about right.

17 **MR. GORDON:** I don't -- I don't think -- let me --

18 let me double check on my computer on the PDF you sent me,

19 but I don't think I'm missing any pages.

20 **MR. NORTHCUTT:** I think the categories are quite

21 broad, so a lot --

22 **MR. GORDON:** Yes.

23 **MR. NORTHCUTT:** So you'll see some documents produced

24 in -- for Duncan that are also produced for Fernandez --

25 **MR. GORDON:** Yes. It's very duplicative.

Case 2:22-cv-01527-DAD-AC   Document 99-15   Filed 07/31/24   Page 22 of 67

LONG vs.                                                                    DETECTIVE JEREMY ASHBEE
FERNANDEZ                                                                              August 23, 2023

Page 77

1       MR. NORTHCUTT: -- that are also produced for Ashbee.
2       MR. GORDON: Yeah, yeah. No. I understand. Give me
3  one second. I just want to make sure. In my head I thought
4  it was 200 pages, but 198. I don't want to be -- have any
5  stragglers. Yeah, I'm right. It's 200. Did I drop a page?
6       All right. It should be complete now. So it's -- I
7  have the final two pages. Make sure I'm not losing my mind.
8  198.
9  Q.   All right. So this is the stack of documents you
10 produced. Hold on to it for a moment. I'm going to put
11 them in the back because I'm going to make copies in a
12 second, but I just want you to verify that.
13      Is that -- your attorney can help you, too, but
14 that's what you produced?
15      MR. NORTHCUTT: It looks familiar. I don't have the
16 actual document production in front of me, but if it's got
17 the Bates stamps --
18      MR. GORDON: It does.
19      MR. NORTHCUTT: -- it should be accurate.
20      MR. GORDON: 1 through 100. 1 through 200.
21      THE WITNESS: So is this -- this is all the documents
22 produced --
23      MR. GORDON: Yeah, that were --
24      THE WITNESS: -- from everybody?
25 Q.   MR. GORDON: No, from the discovery directed to you.

Page 78

1  So your production was the largest.
2  A.   I see. You know, there's a lot of this that I've
3  never seen or don't know.
4  Q.   Yeah, some of it post dates the warrant, but
5  nonetheless, you produced it. That's all I'm just trying to
6  verify at the moment. You -- and I'll ask you a couple
7  questions about individual ones in a moment.
8  A.   Okay. Yeah, there's a lot I haven't seen, but I
9  guess we'll get to that.
10 Q.   We'll get to that. Yeah, yeah. Okay. But -- but
11 that's what you produced. Yes? Okay. So -- because
12 there's emails in here I do have some questions about, text
13 messages, etcetera, so.
14      Okay. So I'm going to mark this -- so the last two
15 days I've spoke with, as you know, Lieutenant Fernandez and
16 Detective Duncan. Yes? You are aware that they were
17 deposed the prior two days?
18 A.   Yes.
19 Q.   So they've been referring to this as the report or
20 the Incident Report, and it -- it goes to page sixty -- I'm
21 sorry -- 68. Bates stamped 68. So the bottom right-hand
22 corners, I'm saying Bates stamped, are these numbers. So
23 you might have known that. If you didn't, there you know.
24 But I assume you knew it.
25      This is the complete Incident Report, so I'm going to

Page 79

1  mark this Exhibit B, because we also have some questions
2  about it. I know you didn't write Fernandez's report,
3  nonetheless, but we're still going to ask you some
4  questions. So this is going to be Exhibit B, so I'm going
5  to put these there for the time being.
6       So -- oh, and you were -- the warrant is in here. So
7  you were going to verify that July 8th is in fact the
8  correct date. So if you want a copy of the warrant from the
9  Incident Report, is -- begins on -- well, I'll just -- I'll
10 let you look, but it begins on page 15, if you want to just
11 verify the date. You said July 8th and you were uncertain.
12      (Exhibit B was marked.)
13 Q.   MR. GORDON: Yes? July 8th?
14 A.   Yes, the date was July 8th.
15 Q.   Okay. Thank you. You can put that aside for a
16 moment. So on July 8th -- what did I ask?
17      Madam Court Reporter, what was my question about July
18 8th? I know you verified the date, but before that when he
19 said he was unsure of the date.
20      COURT REPORTER: I don't really see a question.
21      MR. GORDON: Maybe there wasn't. Oh, I remember what
22 it was.
23 Q.   I said when did you first hear of Jessica Long
24 removing Cedar from the fair, and you said the day of the
25 warrant which is July 8th.                    .

Page 80

1  A.   July 8th.
2  Q.   How did you learn of that alleged removal?
3  A.   I heard from it from Lieutenant Jerry Fernandez.
4  Q.   Okay. About what time?
5  A.   It was afternoon, probably about 2:00 p.m.
6  Q.   About 2:00 p.m.
7       In person?
8  A.   Yes.
9  Q.   Where at?
10 A.   In my office.
11 Q.   In your office.
12      And where is your office at?
13 A.   300 Park Marina Circle.
14 Q.   Okay. All right. So it's the -- isn't that just the
15 normal -- if I Google Shasta Sheriff's --
16 A.   Yes.
17 Q.   -- that's the address that pops up, 300 Park Marina
18 Circle. Okay. All right.
19      So -- and did he -- about 2:00. Did you --
20      Why was he in your office?
21 A.   To ask me to write a search warrant.
22 Q.   Okay. So he came to you?
23 A.   Yes.
24 Q.   Okay. He came to you.
25      And what did he tell you in this conversation?

Page 81

1  A.    In summary? I mean, I can't tell you verbatim.
2  Q.    Sure.
3  A.    But in summary, he told me that Jessica Long had
4  stolen a goat from the Shasta District Fairgrounds. That
5  the goat had already been purchased by Brian Dahle and
6  donated to, it was either 4-H or FFA. That the owner of the
7  goat was now the -- I don't what the title -- her title
8  would be, the President or whatever, of that program or that
9  club, Kathi Muse.
10 Q.    He said Kathi Muse was the President of --
11 A.    I don't know what the title is.
12 Q.    She had some title with 4-H.
13 A.    She had some involvement with that club that would
14 make her --
15 Q.    Okay. She was -- he said she was an authority
16 position in that club or --
17 A.    I believe so.
18 Q.    -- had some right to its property?
19 A.    He identified her as the owner of the goat.
20 Q.    Okay. Did he say anything more or he just described
21 her as the owner?
22 A.    I believe he just described her as the owner.
23 Q.    Okay. Okay. Because of her relationship with 4-H?
24 A.    Yes.
25 Q.    But he didn't describe what the relationship was or

Page 82

1  did he?
2  A.    I don't believe he did.
3  Q.    Okay. And what else did he tell you?
4  A.    He told me that that goat was stolen from the
5  fairgrounds and that it was transported or driven to a goat
6  sanctuary in Napa County.
7  Q.    Okay. All right. And what else -- okay. So he told
8  you that.
9        And what else did he tell you?
10 A.    That's a basic summary of it. He kind of gave a
11 little bit of the back story of Jessica Long's daughter was
12 raising the goat --
13 Q.    Yeah.
14 A.    -- in one of those agricultural clubs. I don't know
15 which one.
16 Q.    4-H, but --
17 A.    4-H.
18 Q.    Okay. Fair enough. Okay. Anything else?
19 A.    And that after the goat was sold, she became
20 distraught, so her mom stole the goat from the fairgrounds.
21 Q.    Okay.
22 A.    Drove it to Napa County.
23 Q.    And he used the words "stole"?
24 A.    Yeah, I believe so.
25 Q.    Okay. All right. Okay. So you knew there was a

Page 83

1  minor involved.
2        He described it E.L., or mentioned E.L.?
3  A.    Yes.
4  Q.    Okay. All right. And did -- did -- okay. So those
5  are the facts he told you.
6        Any other facts -- any other facts that come to mind?
7  A.    No. I think that's a summary of it.
8  Q.    Okay. Did he provide you any documents?
9  A.    Yes.
10 Q.    Okay. And -- in person?
11 A.    I don't recall if he -- I don't think he handed me
12 any documents. I think it was -- he was in the room, but he
13 sent them.
14 Q.    Okay. Yeah, I believe it was email. I'll have you
15 verify the email in just a second. I'm just seeing what you
16 recall. Okay. So he probably emailed you the documents,
17 but he might have been in the room with you.
18       Did he go over the documents with you?
19 A.    The --
20 Q.    Oh, wait. He -- he testified he left about that
21 time. So did he leave with you the documents. Then he went
22 to get the -- then he left to go on the road to Napa?
23 A.    We -- he briefly went over the first two documents,
24 the ones that are attached to the warrant.
25 Q.    Okay.

Page 84

1  A.    And he instructed that those should be attached to
2  the warrant.
3  Q.    Okay. Okay. All right. Okay. But he mailed you --
4  he emailed you the documents, went over them with them --
5  went over the first two you, okay, and instructed they were
6  being attached to the warrant. Okay. So did he -- and
7  about what -- you said he's in your office at 2:00.
8        How long did this interaction take before he left,
9  let's say?
10 A.    Approximately 30 to 45 minutes.
11 Q.    Did he help you start typing up -- he asked you --
12 let me back up. Strike all that.
13       So any other facts that come to mind before I ask the
14 next question? Facts of what he told you about the
15 underlying alleged theft?
16 A.    He -- he told me what I put into the probable cause
17 narrative is what he had relayed to me.
18 Q.    That's what he relayed to you? Okay. All right.
19 A.    Yeah. I think he mentioned something about a Napa
20 County employee had saw the goat on that property initially.
21 And then --
22 Q.    A Napa County employee saw the goat?
23 A.    Yeah, like a Napa County Sheriff's Office employee
24 saw the goat on that property.
25 Q.    How could they -- did that seem plausible to you?

---

Page 85

1 How are you going to tell the goat from -- unless you go up
2 and check its tag?
3 A.   **That knew the story.  That knew the story behind it**
4 **and knew that that goat was there.**
5 Q.   OKay.  Do you remember the name of this employee?
6 A.   **No, that wasn't relayed to me.**
7 Q.   Okay.  Okay.  All right.  Interesting.  So you
8 remember him saying a Napa County employee saw the goat on
9 the property.
10      Did he tell you -- did he -- did Officer Fernandez go
11 over the -- sorry.
12      Did he go over the Penal Code provision he thought
13 was violated?
14 A.   **Yes.**
15 Q.   What did he tell you about that?  The reason I'm
16 asking he's the livestock investigator, so he does livestock
17 theft.
18      What did he tell you about the statute?
19 A.   **He just went over what 487(a) was.  We just had a**
20 **brief discussion about those elements that we talked about**
21 **earlier.**
22 Q.   Okay.  So you learned these from Fernandez, the
23 elements of it?
24      **MR. NORTHCUTT:** Objection.  Misstates testimony.
25      Go ahead.

---

Page 86

1      **THE WITNESS:** We reviewed them.
2 Q.   MR. GORDON:  Is that the first time you had gone over
3 that particular statue?
4 A.   **No.**
5 Q.   You'd gone over livestock theft beforehand?
6 A.   **I've reviewed that Penal Code before.**
7 Q.   Oh, really.  Okay.
8      For what -- for what purpose?
9 A.   **I believe it came up in the police academy.**
10 Q.   Okay.  Okay.  When you were doing grand theft, I
11 presume?
12 A.   **Possibly.**
13 Q.   Or you don't know.
14 A.   **Possibly.**
15 Q.   Possibly.
16      But it came up in the -- the livestock theft came up
17 in the Penal Code -- in the POST Academy?
18 A.   **Yeah.**
19 Q.   Okay.  Gotcha.  All right.  So I'm going -- you think
20 he emailed them to you.  I -- I'm guessing.  That's why I'm
21 asking you.
22      Is this the email he sent you with this PDF attached?
23 With those attachments?
24 A.   **Yeah, that would probably be it.**
25 Q.   Okay.  Well, review the attachment.  Just make sure

---

Page 87

1 those are the ones you received.  I mean, I presume so.
2 These were attached to the email, but I just want to make
3 sure I didn't bind something wrong or something.  I believe
4 that's it.
5 A.   **That looks accurate.**
6 Q.   That's accurate.
7      I'm going to mark it as Exhibit C.
8      (Exhibit C was marked.)
9 Q.   MR. GORDON:  Okay.  So in that -- you can keep that
10 in front of you for a moment.
11      Okay.  So he sent you those documents.  Detective,
12 what is the Bates stamp number that is on?  I'm just going
13 to pull up in my --
14 A.   **The number at the bottom?**
15 Q.   Yes.
16 A.   **It's ASHB 000153.**
17 Q.   153.  Thank you.
18 Q.   **Through 163.**
19 Q.   Great.  Thank you so much.
20      So the first attachment is -- I apologize -- All
21 right.  So on 154.  So you go to Bates stamp 153 in
22 Exhibit C.  Yes.  There you go.
23      So did -- did you receive this by email from
24 Lieutenant Ashbee -- I'm sorry -- Lieutenant -- or
25 Lieutenant Fernandez?

---

Page 88

1      What is your understanding of what this document is
2 before you?
3 A.   **I don't know what this document is.**
4 Q.   Okay.  Gotcha.
5      Did you review it beforehand?
6 A.   **This isn't a document that Lieutenant Fernandez went**
7 **over with me.**
8 Q.   Okay.  Gotcha.  All right.  And the next page.
9      Did you -- well, that wasn't my question.
10      Did you review it beforehand though, that document?
11 I know Fernandez didn't go over it with you, but did you
12 review it when you received it before drafting the warrant?
13 A.   **Before drafting the warrant?**
14 Q.   Yes.
15 A.   **No.**
16 Q.   Okay.  That's fine.  So same question with this one.
17      Did you -- did Fernandez -- Lieutenant Fernandez go
18 over that page with you, which is page 1 -- what is it --
19 155?
20 A.   **No, we did not go over this page.**
21 Q.   And did you review this page?
22 A.   **No.**
23      **MR. NORTHCUTT:** What -- what's the date of the email?
24 Do you know?
25      **MR. GORDON:** Yeah, we can put it on the record.  It's

---

---

**Page 89**

1   July 8th, at 3:00 p.m.-ish, Damian?

2       THE WITNESS: 3:05 p.m.

3   Q.   MR. GORDON: Okay. So and then go to the next page.

4   So did -- so the next page is -- what are we at, 156,

5   although it's -- the Bates stamp is somewhat obscured by

6   the -- by the writing in the email, but you see on the

7   bottom 156, Officer. This email starts on that page and

8   goes to 157.

9       Did -- did you review this email prior to the

10  drafting the warrant?

11  A.   Yes.

12  Q.   Drafting the Statement of Probable Cause in the

13  warrant. Okay. You did. Okay.

14      And you read the whole thing?

15  A.   Yes.

16  Q.   Okay. So it mentions the -- it mentions the Dahles

17  in it, which is, "I have communicated with the" -- it's down

18  here.

19      "I have communicated with the buyer, Senator Brian

20  Dahle. They bought the goat to support the community and

21  are okay with the alternative solution of the goat getting

22  to be donated to a farm that does weed abatement."

23      Did you see that statement?

24  A.   Yes.

25  Q.   Okay. All right. And did you have any thoughts on

---

**Page 90**

1   that statement at the time?

2   A.   Well, from my conversation with Lieutenant Fernandez,

3   I understand the goat was donated by Brian Dahle to 4-H

4   or FFA, one of those programs.

5   Q.   Okay. But this letter is in fact saying -- saying

6   that he agreed that she could take it out of the auction

7   basically and donate it to another farm, if possible?

8       MR. NORTHCUTT: Objection. Assumes facts not in

9   evidence.

10      THE WITNESS: This is -- appears to be a letter from

11  her --

12  Q.   MR. GORDON: Yes.

13  A.   -- to the Shasta District Fairgrounds.

14  Q.   Yes.

15  A.   And she is telling them her statement that she

16  contacted Brian Dahle's office.

17  Q.   That is correct.

18      But you're -- but this does communicate that there is

19  a potential dispute and that Brian Dahle maybe said "I don't

20  want the goat." Yes? I'm not saying it's true. I'm saying

21  it's saying it, so you're aware of the possibility.

22  A.   From what I understand, the goat was donated, and at

23  the time of the search warrant that it didn't belong to

24  Brian Dahle.

25  Q.   Okay. We'll get to that. We'll get to that.

---

**Page 91**

1       Do you know if Senator Fernandez called Brian Dahle?

2   A.   Senator Fernandez?

3   Q.   I'm sorry. You're correct. It's not Senator

4   Fernandez. It's Lieutenant Fernandez.

5       Do you know if he contacted Brian Dahle?

6   A.   I do not know what investigative steps or measures.

7   This is his investigation --

8   Q.   I understand.

9   A.   -- as a livestock officer.

10  Q.   Did you ask him if he contacted Brian Dahle?

11  A.   No, I did not.

12  Q.   Okay. But you read this sentence?

13  A.   Yes.

14  Q.   Okay. And it didn't put off any possible red flags

15  to "We're seizing property that is -- does not belong to

16  this person claiming to it"?

17      MR. NORTHCUTT: Objection. Vague and ambiguous.

18  Asked and answered.

19      THE WITNESS: No, because I had information that the

20  goat had been donated already to somebody else.

21  Q.   MR. GORDON: And WHAT information did you have for

22  that?

23  A.   That would be Lieutenant Fernandez's statement to me.

24  Q.   His statement. Okay. Okay. So his statement

25  gotcha. Okay.

---

**Page 92**

1       So the -- she also says in here -- where is it.

2   Maybe I don't even need to read it out.

3       But did you review this email before -- in

4   preparation for today?

5   A.   Yes.

6   Q.   Okay. So do you know in this email that she offers

7   to pain for any damages or any issues that might have arisen

8   from removing the goat from the fair?

9       You're aware that says it in this email. Right? I

10  can find it, but if you read it for today, you know it does

11  say it somewhere. Right?

12  A.   Yes.

13  Q.   I don't know where it says it, but it says it and

14  it's a long email. But it says it in here. Okay.

15      So she's offering to pay. Yes?

16  A.   Yeah, there is a point in this email where she does

17  offer to pay.

18  Q.   Okay. And -- and does -- and she also says that

19  Brian Dahle let her -- approved her of -- you know, is it

20  okay with what she did basically.

21      So doesn't that indicate to you a potential property

22  dispute?

23  A.   No.

24  Q.   No, that doesn't. Okay.

25      Why not?

---

Page 93

1  A.    From this email it was clear to me that she -- I
2  mean, she even admits in this email that she took the goat,
3  understood there would be consequences for taking the goat.
4  She indicates that Brian Dahle bought the goat. That it was
5  no longer her property. That it had been purchased by
6  somebody else.
7  Q.    Okay.
8  A.    And then I had knowledge, too, that that goat had
9  been donated and didn't belong to Brian Dahle.
10 Q.    Okay.
11 A.    It also mentioned in this email that she's aware of
12 the criminal ramifications of what she did. And she
13 specifically mentions "If the only solution is to return the
14 goat for slaughter and barbecue meat, then I will return it
15 so I am not charged with a felony."
16 Q.    Yes. So she's still claiming a possessory interest
17 at that point.
18 A.    It doesn't sound like she's claiming a possessory
19 interest, it sounds like.
20 Q.    Well, how could she return it?
21     MR. NORTHCUTT: Objection. Argumentative.
22     THE WITNESS: She had taken the goat.
23 Q.    MR. GORDON: Yes, but she's claiming she can return
24 it.
25     She still has some possessory interest at that point

Page 94

1  in time, yes, if she's capable of returning it?
2  A.    Just as anybody who takes property.
3  Q.    Yes, but they still have a possessory interest at
4  that time.
5     MR. NORTHCUTT: Asked and answered.
6  Q.    MR. GORDON: Okay. All right. So what -- so you're
7  saying this says it was sold. Okay.
8     What in California determines if property or goods is
9  sold?
10     MR. NORTHCUTT: Objection. Calls for a legal
11 conclusion.
12     THE WITNESS: I'm not a lawyer.
13 Q.    MR. GORDON: Okay.
14 A.    My opinion? Do you want my opinion?
15 Q.    What your understanding is.
16 A.    My understanding would be that there was an exchange
17 of money, goods or services for.
18 Q.    Do you know if there was an exchange here that my
19 client received?
20 A.    I was informed that the goat was sold. I don't know.
21 Q.    Do you know if she received money?
22 A.    I don't know if she did or how much.
23 Q.    Okay. So you don't know if she received money.
24     Okay. But that's important to a sale, yes, because
25 you said exchange is required.

Page 95

1  A.    Yes.
2  Q.    Okay. Correct. Okay. Do you know -- were you --
3     In your training did they teach you on when title
4  transfers?
5  A.    No, I don't know.
6  Q.    In a sale. It's fine. It's fine. I had to look it
7  up, too.
8     So did they teach you -- did you review -- I
9  understand you probably didn't because you said Fernandez
10 told you, but I'm just checking off the boxes here.
11     Did you review the California Commercial Code prior
12 to writing up this warrant or the California Civil Code?
13 A.    No.
14 Q.    Are you aware that those provisions contain --
15 potentially govern sales of goods at auctions?
16     MR. NORTHCUTT: Objection. Calls for a legal
17 conclusion. Assumes facts not in evidence.
18 Q.    MR. GORDON: I'm asking if he's aware.
19 A.    I'm not aware.
20 Q.    Okay. All right. Okay. All right. Okay. So --
21 but this letter, to you, did not indicate a property
22 dispute?
23 A.    Correct.
24 Q.    Okay. That's your testimony. Okay.
25     What -- have you ever received -- earlier you

Page 96

1  testified -- or did you testify, I'm not sure you did.
2     Did you mention that you had been involved in
3  property disputes before that were civil in nature?
4  A.    Yeah, I think the example I gave is like I've dealt
5  with landlord, tenant issues.
6  Q.    Yeah, that was the example you gave me, yes.
7     And what indicated -- what about them indicated to
8  you that they were -- that they were civil in nature?
9  A.    Where they appeared to be a dispute over their rental
10 agreement or some sort of contract, and there wasn't --
11 there weren't criminal elements to what they were
12 complaining about.
13 Q.    Okay. Well, with landlord, tenant there could be.
14 There could be criminal elements.
15 A.    Well, you're asking specifically.
16 Q.    Yeah, for the ones, yeah. That's correct.
17     But here there's also -- there's an auction contract.
18 Right? There presumably is an auction contract, a sale
19 invoice. It involves -- it involves someone who raised a
20 goat in a kids club.
21     This doesn't -- this didn't strike you as a potential
22 property dispute?
23     MR. NORTHCUTT: Asked and answered. He already said
24 he didn't view it that way.
25     MR. GORDON: Yeah, I understand. We're on break

---

Page 97

1  soon. He's almost out of tape.
2  Q.  Okay. But your testimony is nothing about here
3  seemed civil to you?
4  **A.  Correct.**
5  Q.  Okay. All right. And -- okay. So my next question
6  is did your -- okay. So the next page is 158. This is an
7  email from Melanie Silva.
8       Did you review this email?
9  **A.  No.**
10  Q.  Okay. Did you read it? You didn't read it on your
11  own?
12  **A.  No, I haven't.**
13  Q.  Well, why do you think -- why did you not read it if
14  Fernandez sent it to you?
15  **A.  He told me specifically the ones that were important**
16  **to his investigation or that he wanted attached to the**
17  **warrant.**
18  Q.  Okay. All right.
19  **A.  That contained, I guess, elements of the probable**
20  **cause.**
21  Q.  Okay. And you didn't -- so you purposely didn't read
22  this one because he didn't tell you to?
23       **MR. NORTHCUTT:** Objection. Misstates testimony.
24       **THE WITNESS:** I didn't read everything that he sent
25  me, no.

---

Page 98

1  Q.  MR. GORDON: You didn't read everything that he sent
2  you. Okay. All right. Okay. So you didn't read this
3  one. All right.
4       So the next -- the next page. Now, this is -- the
5  next one starts at 159. This is another email, which by its
6  face appears to be from just -- from the person you're
7  investigating for criminal theft, our client, Jessica.
8  Jessica Long, she signed Jessica Long.
9       Did you read this email and the attachment on it?
10  **A.  Oh, was this the attachment?**
11  Q.  Yes.
12  **A.  No, not in its entirety.**
13  Q.  But you read some of it. What did you read?
14  **A.  It looks familiar.**
15  Q.  Okay.
16  **A.  I don't recall how much of it I read, but it does**
17  **look familiar.**
18  Q.  But you went through it. Okay.
19       You read -- it looks familiar -- well, okay. So you
20  saw it that day.
21       Do you believe you read it that day?
22  **A.  No, I don't -- like I said, I don't think I've read**
23  **it in its entirety. I think I kind of solved this part of**
24  **the attachment.**
25  Q.  Why wouldn't you read an email from the person you're

---

Page 99

1  investigating? Isn't that an admission of something?
2  **A.  Because I'm not --**
3       **MR. NORTHCUTT:** It's argumentative.
4  Q.  MR. GORDON: You're not investigating, but you're
5  still doing this.
6  **A.  No, I'm not investigating.**
7  Q.  Okay. You're not doing the investigating. But
8  you're doing the -- you're doing the Affidavit of Probable
9  Cause, swearing everything he is telling you is true.
10       So why wouldn't you read this email if it's true?
11  **A.  Because I have no reason to believe what he's telling**
12  **me is not true.**
13  Q.  Is it the policy of Shasta County that the word of an
14  officer trumps written evidence?
15       **MR. NORTHCUTT:** Argumentative.
16  Q.  MR. GORDON: If you know.
17  **A.  There is no policy. I'm not saying that it trumps**
18  **evidence. I'm saying I have no reason to believe he is not**
19  **presenting me with evidence.**
20  Q.  Okay. Is there any -- Is there policy with respect
21  to -- that requires you to read all evidence you're
22  presented?
23       **MR. NORTHCUTT:** Objection. Vague. Ambiguous.
24  Q.  MR. GORDON: If you're filling out an a warrant?
25  **A.  No, there's, no policy to that nature.**

---

Page 100

1  Q.  Okay. All right. Okay. So in this letter -- did
2  you review it in preparation for today?
3  **A.  No.**
4  Q.  Okay. So you don't know what it says?
5  **A.  No.**
6  Q.  So on page -- on page 161 where it says "The State
7  rules admit Cedar was still my daughter's personal
8  property."
9       If you -- does that indicate a property dispute to
10  you?
11  **A.  I'm sorry. Where are you reading on page 161?**
12  Q.  The bottom of this paragraph, the last sentence after
13  the comma. So "The state rules admit he was still my
14  daughter's personal property."
15       Does that indicate a property dispute to you?
16       **MR. NORTHCUTT:** Are you -- are you asking him as he
17  currently reads it now? Because he testified earlier --
18  Q.  MR. GORDON: Yeah, I'm asking as he reads it now.
19  **A.  I'm trying to find what you were referring to on this**
20  **page.**
21  Q.  Am I not pointing to the write spot?
22  **A.  You didn't point to a spot. I'm sorry.**
23  Q.  I said -- I said the last paragraph, first one.
24  **A.  Oh, the last paragraph?**
25  Q.  No, no. First paragraph, last sentence. I'm sorry.

---

Page 101

1  I'm screwing you up.
2  A.  Oh, "Cedar was removed during that period, so the
3  state rules admit he was still my daughter's personal
4  property."
5      I'm not -- I'm not a lawyer and I'm not familiar with
6  the state rules.
7  Q.  It doesn't matter.
8  A.  I haven't looked any of that up.
9  Q.  Understood.
10 A.  Per her own statement, this is what she is saying in
11 this letter, yes.
12 Q.  Yes. Okay. I'm talking about notice. Doesn't that
13 notify you of a potential property dispute?
14     MR. NORTHCUTT: Objection. Calls for a legal
15 conclusion.
16 Q.  MR. GORDON: As you sit here today, does not -- I
17 know you didn't read it at the time.
18     Doesn't that notify you of a potential property
19 dispute?
20 A.  Not necessarily.
21 Q.  What else would it notify you of? It doesn't have to
22 be true. She doesn't have to be correct.
23     But doesn't if notify you of a -- focus on the word
24 "potential," potential property dispute.
25     MR. NORTHCUTT: Objection. Asked and answered and

Page 102

1  argumentative. He's already told you.
2      MR. GORDON: Okay. I'm asking if it's potential.
3  That's all.
4      MR. NORTHCUTT: And it's an incomplete
5  hypothetical.
6      MR. GORDON: No, it's -- it's -- I'm asking as he
7  reads it today. Does that language indicate a potential
8  property dispute.
9      MR. NORTHCUTT: What relevance is it if he didn't
10 read it at the time.
11     MR. GORDON: Damian, I asked my question. I want an
12 answer.
13     MR. NORTHCUTT: He had an answer.
14     THE WITNESS: I said not necessarily.
15 Q.  MR. GORDON: And why not?
16 A.  Because people lie.
17 Q.  Okay. That isn't the question. I said "potential."
18     You know what potential means, a possibility.
19     Have you met Jessica?
20 A.  Then there's a potential for everything.
21 Q.  Okay. So isn't there potential that Fernandez was
22 lying, too, at the same token?
23     I'm asking you. It just put you on notice if this
24 language would put you on notice of a potential property
25 dispute. It's a simple question.

Page 103

1      MR. NORTHCUTT: Asked and answered. Argumentative.
2  Q.  MR. GORDON: You don't want to answer it.
3  A.  I have no reason to believe that he would lie to me.
4  Q.  MR. GORDON: Okay. But, sir, that -- with respect,
5  and I do have a lot of respect for you, and I really do mean
6  it. I'm being sincere. I really do have respect for what
7  you guys do.
8      I'm just asking if the language of the sentence puts
9  you on -- as an officer of the law on notice of a
10 potential property dispute?
11     MR. NORTHCUTT: Same objections. Asked and answered
12 for the tenth time and argumentative.
13     THE WITNESS: It's fine. So you're using --
14 Q.  MR. GORDON: Yes or no?
15 A.  So, to be vague, there's a potential for everything,
16 so, yes.
17 Q.  Thank you. Okay. If you want to say it that way,
18 fine. It's technically a legal issue, but I just want to
19 hear you say it. Thank you.
20     We're going to go off the record because he has to
21 change out the tape.
22     THE VIDEOGRAPHER: We're off the record and the time
23 is 11:59. This is the end of Media No. 1.
24     (Off the record.)
25     THE VIDEOGRAPHER: We're back on the record, the time

Page 104

1  is 12:17 and this is the start of Media No. 2.
2  Q.  MR. GORDON: Thank you.
3      Detective you've just read pages 160 of Exhibit C, I
4  believe it's Exhibit C, Bate stamps 160 to 163 of Exhibit C.
5  Correct?
6  A.  Yes.
7  Q.  Okay. Thank you.
8      And does this -- earlier you said you had read some
9  of the letter. You hadn't read the whole thing. Now you've
10 read the whole thing.
11     Does this change your understanding of what our
12 client claimed occurred that day?
13 A.  No.
14 Q.  No. This tells you nothing new?
15     MR. NORTHCUTT: Objection. Argumentative.
16     THE WITNESS: What this letter appears to be is her
17 opinion.
18 Q.  MR. GORDON: Anything else?
19 A.  But she had -- I mean, has already in her other
20 letter, you know, admitted that what she did she knew was
21 wrong and --
22 Q.  She doesn't deny taking the goat in this letter.
23 A.  Also, in the other one admits that it was, you know,
24 could constitute a felony.
25 Q.  Okay.

Page 105

1 A.    In this letter it's just her.
2 Q.    Is she a lawyer?
3 A.    Not that I know of.  I don't know if --
4 Q.    Earlier you said you weren't a lawyer, so you
5 couldn't give any -- make any conclusions on what
6 constitutes a sale.
7        As a lay person with even less training, can she make
8 any conclusions on what constitutes a felony?
9        MR. NORTHCUTT: Objection. Calls for speculation.
10 Q.    MR. GORDON:  It's his statements.
11 A.    I don't know -- I don't know what she does.
12 Q.    Okay.  So if someone says "I committed a felony" or
13 "I might have committed a felony," they might have --
14 they're -- do you take their word for it?
15        MR. NORTHCUTT: Objection. Vague and ambiguous.
16 Incomplete hypothetical.
17 Q.    MR. GORDON:  In her letter when she -- the prior
18 letter, which you were just referring to, the earlier email,
19 when she says "I was unaware it could be a felony," that
20 tells you that's an admission that she committed a felony?
21 A.    That tells me that she's acknowledging she may have
22 committed a felony.
23 Q.    Sure.  Okay.  Is this also an acknowledgment that it
24 may still be her property --
25        MR. NORTHCUTT: Objection.

Page 106

1 Q.    MR. GORDON:  -- on the letter from 161 to -- all
2 right, if you want to say asked and answered on that, yes,
3 he did answer that.  He said "yes."
4        MR. NORTHCUTT: Right. I believe we just had a whole
5 back and forth on this.
6        MR. GORDON: We did.  We did.  We did.
7 Q.    Okay.  So on the last page of the letter -- and I'm
8 happy with his answer.  He said "Yes."  So fine.  I'm not
9 trying -- really wasn't trying to browbeat there.
10        All right.  So this letter is not a waiver --
11 Officer, on the last page, so it's Bates stamped 163.  Yes?
12 A.    Yes.
13 Q.    Do you see the paragraph that starts "This letter is
14 not a waiver of any rights.  Further, while it's purpose is
15 in anticipation of litigation."
16        Does that not indicate a potential property dispute
17 also?
18        MR. NORTHCUTT: Objection. Vague and ambiguous.
19 Calls for a legal conclusion. I'm going to say it goes to
20 the same issue of asked and answered.
21 Q.    MR. GORDON:  If he wants to adopt his former answer
22 and to say "yes," it's fine.  We can move past it.
23        I said "potential property dispute."
24 A.    I'm not a lawyer, but it tells me that she could be
25 pursuing a lawsuit.

Page 107

1 Q.    Yes.
2 A.    When I see --
3 Q.    And what are law -- what are law -- this would be a
4 lawsuit concerning theft of a goat, which is property.  Yes?
5 A.    That's what it would --
6        MR. NORTHCUTT: Objection. Calls for a legal
7 conclusion. He's saying he's not a lawyer.
8        MR. GORDON: Damian, you want me to get out of here
9 faster.  Giving speaking objections is not helping.
10        MR. NORTHCUTT: Okay.  But I -- at the same time,
11 asking the same question over and over --
12        MR. GORDON: Because it's a very -- we all know it's
13 a very simple yes, this -- this is notice of her claiming a
14 property right, and I just need him to check off the box so
15 I can move on.
16        MR. NORTHCUTT: You want him to give you an answer,
17 but he's entitled to give what his answer is.
18        MR. GORDON: That's very true, but -- that's very
19 true.  Okay.
20        MR. NORTHCUTT: So let him answer.
21        MR. GORDON: I'm trying -- okay.
22 Q.    Sir, as --
23        MR. NORTHCUTT: Let me insert my objections and we
24 can --
25        MR. GORDON: It's the same objections as you just did

Page 108

1 a moment ago.  Yes?  They still stand.  You don't need to
2 repeat them.
3        MR. NORTHCUTT: Okay.  And also asks for a legal
4 conclusion, yes.  Asked and answered.  Vague and ambiguous,
5 all the usual --
6 Q.    MR. GORDON:  Asked and answered?
7        "Anticipation of litigation," that doesn't indicate a
8 potential lawsuit over Cedar?
9 A.    We've already come to that conclusion, yes.
10 Q.    I didn't hear you say "yes," so this isn't -- you
11 said "yes"?
12 A.    Yes.  I said it could mean that she's pursuing a
13 lawsuit over the goat.
14 Q.    All right.  Thank you.  I appreciate it.  Thank you.
15 Okay.  I really didn't hear you phrase it.  I'm sorry.
16        Okay.  And -- and earlier you said this -- well, you
17 already said it.  You said this didn't change your
18 understanding of what happened that day.
19 A.    Correct.
20 Q.    Okay.  Okay.  What -- okay.  What could she have said
21 that would have changed your understanding?
22        MR. NORTHCUTT: Objection. Calls for an incomplete
23 hypothetical. Asking him to speculate. Asking him to --
24 it's vague and ambiguous.
25        Go ahead.

Page 109

1      THE WITNESS: I don't -- I don't know what she could
2  have said that would change my perspective.
3  Q.    MR. GORDON: Yeah.
4  A.    I had information already through a person who
5  investigated the case that the felony had been committed.
6  People say all kinds of things --
7  Q.    Yeah.
8  A.    -- to try to justify their actions.
9  Q.    Yeah.
10 A.    So I don't know. I can't -- I can't tell you what
11 she could have said.
12 Q.    Yeah. So she said "I wasn't paid on anything."
13 A.    I didn't know that.
14 Q.    Okay. But -- what if she showed you the -- you know,
15 what if the fair said yeah, I wasn't paid -- she wasn't
16 paid? Does that change anything?
17      MR. NORTHCUTT: Objection. Incomplete hypothetical.
18 Assumes facts not in evidence.
19      MR. GORDON: Damian, I'm just going to give you a
20 running objection and I'll assume improper hypothetical for
21 all the ones I'm about to ask. You got it.
22      MR. NORTHCUTT: And vague and ambiguous. We'll just
23 add that.
24      MR. GORDON: Sure, you can add that, too, in. See,
25 if it's the most specific question, I'll -- it's fine.

Page 110

1      MR. NORTHCUTT: I'll just say same objection, same
2  objection.
3      MR. GORDON: You don't even need to say that. So
4  they stand. Running objection for the next -- until the
5  next four minutes, let's say. I'll rattle through these.
6  All right?
7      MR. NORTHCUTT: Starting now.
8      MR. GORDON: Yeah, starting now. Put your clock on.
9      THE WITNESS: Maybe I can a save you some time by
10 saying if the fairgrounds or if, you know, some -- some
11 other entity had provided some actual physical evidence --
12 Q.    MR. GORDON: Yeah.
13 A.    -- that contradicted what my Lieutenant believed or
14 what told me, then that could have changed things, yes.
15 Q.    Oh, thank you. That could have changed things.
16 Okay. Did you -- did you -- okay.
17      But you didn't pursue any of that evidence before you
18 signed the warrant under penalty of perjury. Yes?
19 A.    No, I did not. I did not pursue any of that evidence
20 because I wasn't actively investigating this case.
21 Q.    But -- okay. But you still signed under penalty of
22 perjury?
23 A.    Yes, that I believed what was in the warrant was
24 true.
25 Q.    Okay. Okay. All right. So should Fernan -- should

Page 111

1  this have alerted Fernandez of a property dispute?
2  A.    I'm sorry. What was the question?
3  Q.    Should this letter have alerted Fernandez to a
4  property dispute?
5      MR. NORTHCUTT: Add in calls for speculation.
6      THE WITNESS: I don't know what Fernandez was
7  thinking. Obviously, he was investigating, so he knew more
8  of the details than I did.
9  Q.    MR. GORDON: I understand that. But should this
10 letter have alerted him to a property dispute?
11      MR. NORTHCUTT: Asked and answered.
12      THE WITNESS: I can't -- I can't answer that. I
13 don't know what he was thinking.
14 Q.    MR. GORDON: Okay.
15 A.    I can't -- I can't tell you what he knew at the time,
16 if this letter, you know, could have alerted that or not.
17 If he had evidence that contradicts this letter, I don't
18 know.
19 Q.    If you were the investigating officer on this case
20 and received a letter saying "In anticipation of litigation
21 and this is my daughter's property," what would you have
22 done?
23 A.    If I had evidence that contradicted this letter, then
24 it wouldn't change my opinion.
25 Q.    What evidence contradicts the letter that you

Page 112

1  received?
2  A.    I didn't investigate this case.
3  Q.    I know. I just said if you were the investigator and
4  received a letter stating "In anticipation of litigation and
5  this is my daughter's personal property," what would you
6  have done?
7      MR. NORTHCUTT: Same objections.
8      THE WITNESS: I already answered the question.
9  Q.    MR. GORDON: No, you did not.
10 A.    I did.
11 Q.    I said if you were the investigator and you received
12 a letter saying -- do you pursue the search warrant if you
13 received that letter or do you say this is a civil dispute?
14 A.    It depends on the circumstances.
15 Q.    The circumstances.
16 A.    If I have evidence that shows the contrary, then I
17 would pursue a search warrant.
18 Q.    Okay. And what -- okay. Let me show you. So here's
19 the evidence presumably to the contrary. Let's go to...
20      Did you receive -- did he give you a copy of the
21 Sales Invoice?
22 A.    No.
23 Q.    No.
24      Why didn't you ask for it if you're telling the judge
25 it was sold?

Page 113

1  A.   I'm sorry. What was the question?
2  Q.   Why did you not request the Sales Invoice if
3  you're -- if you're swearing under penalty of perjury to the
4  judge that the goat was sold?
5  A.   The same answer as before. I have no reason to
6  believe that he would lie to me.
7  Q.   But where is the evidence of the sale? It's your
8  statement under penalty of perjury. You haven't seen the
9  Sale Invoice.
10 A.   The evidence is he told me.
11 Q.   That's right. Earlier you said his statements amount
12 to evidence. Okay. All right.
13       Did he give you a sworn statement on it?
14 A.   I didn't swear him in.
15 Q.   I'm just checking off the box. I know you didn't.
16 You didn't swear him in. He just -- he told you casually in
17 his -- in your office?
18 A.   Yes.
19 Q.   Okay. All right. Okay. All right. Let's get in --
20 so we're going to get into your -- some of the narrative of
21 probable cause in the warrant.
22       Have you seen the Sale Invoice, by the way?
23 A.   No.
24 Q.   No. You never saw it.
25       Okay. You didn't review it in preparation for today?

Page 114

1  A.   I didn't know it existed. I know --
2  Q.   I'm calling it a Sale Invoice. It said "Sale
3  Invoice" at the top.
4  A.   I didn't have access to the documents.
5  Q.   You didn't have access to those documents.
6        Okay. Is it customary for officers to swear under
7  penalty of perjury that certain events occurred when they
8  haven't been given proof of it?
9        MR. NORTHCUTT: Vague and ambiguous as to
10 "customary."
11       THE WITNESS: The --
12 Q.   MR. GORDON: Let me rephrase so it's less offensive
13 to you.
14       Is it customary for -- because you don't want -- I
15 know you want to say Fernandez was the proof.
16       Is it customary to swear under penalty of perjury
17 based solely on the word -- that evidence exists based
18 solely on the word and interpretation of another officer?
19       MR. NORTHCUTT: Objection. Vague and ambiguous and
20 it's argumentative.
21       THE WITNESS: It's not uncommon to author a search
22 warrant based off of statements of another sworn officer.
23 Q.   MR. GORDON: Okay. Is it ever a statement from
24 another sworn officer completely enough?
25 A.   Yes.

Page 115

1  Q.   Yes. Okay. All right.
2  A.   Yes.
3  Q.   Why doesn't that officer then make the affidavit
4  probable cause themself?
5  A.   It could be that they don't know how --
6  Q.   Okay.
7  A.   -- or it could be that they are not familiar with the
8  forms, the process.
9  Q.   Okay. Do you ask Fernandez why he couldn't do the
10 affidavit or probable cause or statement -- you know when I
11 say affidavit or probable cause for statement of probable --
12 same thing. Right?
13 A.   Yes.
14 Q.   Okay. Why he couldn't do it here?
15 A.   I did not ask him that.
16 Q.   You did not ask him that. Okay.
17       Why not?
18 A.   He's my Lieutenant and he asked me to do something.
19 Q.   Okay. So it was because he's your superior?
20 A.   Yes.
21 Q.   Yes. All right. Okay. So let's do some questions
22 about your Statement of Probable Cause. All right. So
23 let's go to --
24 A.   This?
25 Q.   Yes, Officer. If you want to take the clip off, you

Page 116

1  can. Just be mindful of the order for when you give it back
2  to the Court Reporter.
3  A.   This will work.
4  Q.   Okay. Did you review this warrant in preparation for
5  today?
6  A.   Yes.
7  Q.   I figured. It was -- really was your only
8  involvement with the case was the warrant. Yes?
9  A.   Yeah.
10 Q.   Yes. Okay.
11       Why didn't -- you weren't asked to go with them or
12 you had to stay behind to do the warrant?
13 A.   Yes. I stayed to do the warrant and Detective Duncan
14 was asked to go with him.
15 Q.   Did they say why they had to leave that day?
16 A.   They did not say why.
17 Q.   No. Okay. All right.
18       Have you asked him why since?
19 A.   No.
20 Q.   No. Okay. All right.
21       Why not?
22 A.   Huh?
23 Q.   Doesn't it seem strange to drive 500 miles round trip
24 for a goat?
25       MR. NORTHCUTT: Objection. Argumentative. Vague and

Page 117

1  ambiguous to the term "strange." I don't really see the
2  relevance of it.
3  Q.     MR. GORDON:  You can answer.
4  A.     I didn't.  I just --
5  Q.     You thought nothing of it.
6  A.     I didn't think anything of it, no.
7         MR. NORTHCUTT: Argumentative.  He gave you an
8  answer.  You don't get to do this.
9         MR. GORDON: I'm allowed to talk.  All right.  Put
10 your objection.  It's fine.  I appreciate it.
11 Q.     All right.  So have you ever -- has anyone else to
12 your knowledge traveled 500 miles for stolen -- allegedly
13 stolen property of a value under 400 bucks?
14        MR. NORTHCUTT: Assumes facts not in evidence.
15 Q.     MR. GORDON:  In the Shasta Department?
16 A.     None that I'm aware of.
17 Q.     None that you're aware of.
18        Okay.  I assume bikes are stolen around here
19 frequently.  Yes?  You don't ever go out of the -- what's
20 the farthest ever anyone -- what's the farthest you've ever
21 gone to retrieve a bike?
22        MR. NORTHCUTT: Are you talking about a bicycle or a
23 motorcycle?
24 Q.     MR. GORDON:  Bicycle.  Bicycle.  Yeah, no.  Bicycle.
25 Not motorcycle.  Yeah, they can get expensive.

Page 118

1  A.     I don't know that I've -- that I've worked a bicycle
2  theft case.
3  Q.     What sorts of cases have you worked with property
4  values of, say, under 400?
5  A.     Oh, to answer your question, I don't think I've
6  driven out of the county to recover stolen property --
7  Q.     Ever.
8  A.     -- personally.  No.
9  Q.     Okay.  Okay.  All right.  Has it ever been out of the
10 county and you said like, "Ah, it's too far"?
11 A.     I don't think I've been faced with those
12 circumstances, but, no.
13 Q.     That's fine.  Just curious.  All right.  Okay.
14        All right.  So on Friday, July 8th, 2022, Kathi Muse
15 reported a livestock theft.
16        What time did she do that?
17 A.     I do not know.
18 Q.     You do not know.  Okay.
19 A.     No.
20 Q.     Do you know she, in fact, reported one that day?
21 A.     That's what was relayed to me.
22 Q.     Okay.  Do you now have any evidence that she didn't
23 report one that day?
24 A.     Not that I know of.
25 Q.     Okay.  So what if I told you Fernandez said she did

Page 119

1  not call that day?
2         MR. NORTHCUTT: Assumes facts not in evidence.
3         MR. GORDON: It was his testimony.
4         THE WITNESS: I don't know.  I don't know.  That is
5  what he relayed to me.
6  Q.     MR. GORDON:  Well, he said this is a false statement,
7  because she did not in fact report anything that day.
8         Should that statement there -- should you have asked
9  him is that true, if it turned out to be false?
10 A.     That is what I believed at the time the document was
11 offered.
12 Q.     Okay.  But now that I've represented to you that --
13 well, I don't know if it's true or false.  Fernandez
14 testified that she did not call that day.
15        So given that this was the same day, do you have any
16 reason -- do you know why or any reason to understand why he
17 would tell you she called when she didn't?
18 A.     No.  No, I don't know why he would.  It could be a
19 miscommunication, but I don't know why he would lie about
20 anything like that.
21 Q.     Okay.  But he told you she did call that day.  Okay.
22 All right.  And you just assumed it was true.  You don't --
23        At this point in time this is the first you've heard
24 of Kathi Muse?
25 A.     Yes.

Page 120

1  Q.     Okay.  All right.  Is it spelled with an "I", her
2  last name, or is it with a "Y", if you know?
3  A.     I think what was shared with me had an "I", but I'm
4  not certain.
5  Q.     You're not certain.  Because you didn't -- you didn't
6  know who she was.
7  A.     Yeah.
8  Q.     All right.  Okay.  Okay.  So -- and she -- it looks
9  like she reported it -- oh, wait.  I thought it said Shasta
10 County fair.
11        According to Muse, Brian Dahle -- Brian Dahle
12 purchasing a goat for auction at the fair for $902.
13        And you didn't see -- you didn't see any sort of
14 proof that there was a purchase of $902 other than -- other
15 than his statement?
16 A.     Yes.
17 Q.     Okay.  Okay.  And donated the animal to Muse for a
18 4-H community barbecue.  Yes?
19 A.     Yes.
20 Q.     Okay.  All right.  After the sale was finalized, how
21 did -- how did Lieutenant Fernandez tell you the sale was
22 finalized?  What made it final?  Or did he just tell you a
23 sale occurred?
24 A.     He told me that the animal was sold --
25 Q.     Okay.

Page 121

1 A. -- and donated.
2 Q. Okay. And nothing -- those are the only words he
3 used?
4 A. Yes. I don't know -- I don't know --
5 Q. Some verbiage.
6 A. I don't know the process is that the fairground does.
7 If the auction -- if somebody buys an animal and donates
8 it --
9 Q. Yeah.
10 A. -- I think it's fair to assume that the animal is
11 sold.
12 Q. Well, you're swearing under penalty of perjury
13 though, so that means you have to know. Yes?
14 A. And I think it's fair to believe that, yes.
15 Q. That the sale was finalized --
16 A. It's my understanding of the word "buy."
17 Q. Well, you didn't check the Commercial Code, the Civil
18 Code, for transfer of title of sales. Fernandez didn't
19 check it. And you're on notice that she's saying, you know,
20 that: A. I'll pay back. B. The Dahles said -- the Dahles
21 said yeah, I don't want the goat. And C. She's saying it's
22 my property for XYZ reasons, whether they're true or not.
23 So wouldn't that tell you to look into how a sale
24 occurred?
25 MR. NORTHCUTT: Objection. Vague and ambiguous.

Page 122

1 THE WITNESS: I mean, I --
2 Q. MR. GORDON: So I also have a question. So the
3 answer to that, I assume, is "I don't know," and I'm just
4 going to move past it because it was a terrible question,
5 and I already asked it basically with the other one.
6 So -- and it says "Slaughtered by the new owner."
7 Was Kathi Muse going to slaughter this animal?
8 A. I don't know what Kathi Muse was going to do. That
9 is why -- that is why -- I was told that is why she took the
10 goat from the fairgrounds.
11 Q. I see. Okay. Okay. And so Fernandez said Kathi
12 Muse was going to slaughter Cedar?
13 A. No. That's what the letter says from Jessica Long.
14 She didn't know.
15 Q. Is that what the -- okay. So you lifted the language
16 from her -- the email you're referring.
17 Is that what you're saying?
18 A. Yeah, I believe that language is in that letter that
19 she wrote.
20 Q. And it might be something -- there might be something
21 similar.
22 A. There was concern that it was a terminal auction
23 versus a non terminal auction.
24 Q. Yes, that she was concerned of that, yes. I'm not
25 sure if she said "slaughtered by the new owner."

Page 123

1 And you don't know or -- but you said it might be in
2 the letter, but otherwise, you don't know why he said it?
3 A. The word "slaughtered"?
4 Q. "By the new owner."
5 A. "By the new owner"?
6 Q. Yeah.
7 Let me ask you this. Let me ask you this. Forget
8 about that question.
9 Did you ask who was going to slaughter the goat?
10 A. No.
11 Q. Okay. Did you ask -- okay. No. All right.
12 Did you understand what a terminal auction was when
13 you saw that term in the letter?
14 A. Yes.
15 Q. Okay. So you're familiar with that term before?
16 A. Well, I think it's self-explanatory, but the word
17 "terminal" verses "non terminal."
18 Q. Well, maybe it meant no -- all of sales final or
19 something. I don't know. But you understood it as --
20 A. I understood it as that they were sold for meat --
21 Q. For meat.
22 A. -- consumption.
23 Q. Did you understand it to mean they were -- they were
24 sold for meat consumption immediately after the fair?
25 A. No, I don't -- I don't know what the timeline is.

Page 124

1 Q. Okay. But you -- you understood that they were sold
2 for meat at some point?
3 A. It was my understanding, yes.
4 Q. Okay. So going down, it says -- now this is your
5 narrative of probable cause.
6 And you see in this language under here, it says "You
7 are authorized to use additional sworn and non-sworn
8 personnel to assist with the service of the search warrant
9 and the collection of evidence."
10 Oh, yeah. Okay. Before we get to that, I'm going to
11 ask you a question that I skipped. Let's go to Exhibit A
12 for a second.
13 A. Which is the search warrant?
14 Q. Exhibit A in the exhibit, not -- not the depo's
15 Exhibit A. Exhibit A attached in the -- to the search
16 warrant. So which is the Instagram post. It's Bates
17 stamped 27.
18 A. Oh, sorry. I thought you were referring to --
19 Q. No, no. That was vague because I thought you wanted
20 to go to the...
21 A. Okay.
22 Q. Yeah. Are you at it?
23 A. Yes.
24 Q. Okay. So on your -- so maybe have page 22 handy as
25 well, because in it you say "This Exhibit A admits Cedar

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

Page 125

1   is in their -- was in their custody."
2       Where does it say that on Exhibit A?
3   A.   Sorry.  I'm reading page 22.
4   Q.   Yeah.  It's the paragraph after the one we were
5   looking at, "Long drove the goat to the sanctuary Bleating
6   Hearts."
7   A.   So that -- the information that there was a post that
8   admitted that the goat was there is information that was
9   relayed to me by Lieutenant Fernandez.  Reviewing this post,
10  the admissions would be that there is a photo of the goat
11  potentially at this place in Napa County.  And then --
12  Q.   How do you know that photo is from Napa County?
13  A.   I don't know.  I don't know.
14  Q.   Okay.
15  A.   And that the goat was -- there's the information that
16  the goat was taken and driven out of county.
17  Q.   Where -- okay.  And does it say on here that it was
18  driven out of county?
19  A.   I'm trying to recall this.
20      No, perhaps not out of county.
21  Q.   Okay.  So how does this -- how does this -- how does
22  this Attachment A suggest that she drove Bleating -- Cedar
23  to Bleating Hearts?
24  A.   Again, this is partial -- part of this information is
25  information that was relayed to me by Lieutenant Fernandez,

Page 126

1   and then he shared with me this post.
2   Q.   I understand.  But do you -- your --
3   A.   I'm not saying the entirety --
4   Q.   Your affidavit of probable cause says this -- says
5   that.  And I just -- if it's not there, it's not there.
6   It's not there?  Where it says -- where it says -- to your
7   reading, you don't see it in this Exhibit A where anything
8   is stated that Cedar is at Bleating Hearts?
9   A.   Not solely in the Attachment A, no.
10  Q.   And it also says "He will be" -- hold on a sec.
11      Doesn't it also suggest at the bottom in the last
12  paragraph that the goat is not only not there at Bleating
13  Hearts, but definitely not there because it says "Her goat
14  is now back on the way to the fairgrounds.  It will be
15  slaughtered as fast as possible."  I believe it's cut off on
16  the attachment you provided.
17  A.   It does -- it does say that in that last paragraph.
18  Q.   Okay.  So he's on the way back with --
19  A.   I was -- can I finish my question?
20  Q.   Sorry.  Your answer, yes.
21      Go ahead.
22  A.   And I was informed by Lieutenant Fernandez that that
23  was incorrect.  The goat was not back.
24  Q.   Okay.  So then what -- then -- okay.  So he told you
25  it's not on its way back, but he also told you this says

Page 127

1   that Cedar's there.
2       And then you must have read it because you lifted the
3   language from it.  Yes?
4   A.   Yes.
5   Q.   Okay.  So when you read it, didn't you notice that
6   hey, this doesn't say he's there?
7   A.   But it does provide some corroborating evidence to
8   the elements of the crime.
9   Q.   But does it provide corroborating evidence of
10  location?
11  A.   Potentially.  There's a photo of the goat on the
12  page.
13  Q.   And you tell by photo -- how can you tell where this
14  photo is taken?
15  A.   Well, I can't tell exactly where the photo is taken.
16  Q.   It could have been here.  Right?
17  A.   It's corroborating.
18  Q.   Okay.  But this photo could have been taken in
19  Shasta.  Yes?
20  A.   It could have been taken anywhere.
21  Q.   Yes, exactly.  It could have been taken anywhere.
22      All right.  And there's no -- you agree there's no
23  language there saying he's there.
24      Okay.  All right.  So the letter that we were mostly
25  bickering over before, which is Bate -- you know what I'm

Page 128

1   talking about, Bates stamp 16 -- yes, that exhibit.
2   A.   160 to --
3   Q.   Yeah, whatever it is.  Okay.
4       Do you think there's anything into that letter that
5   the judge might have wanted to see --
6       MR. NORTHCUTT: Objection.  Calls for speculation.
7   Q.   MR. GORDON:  -- in making a -- in issuing a warrant?
8   A.   What's important in search warrants is --
9   Q.   Yes or no question.
10  A.   -- probable cause.
11  Q.   Motion to strike.  Nonresponsive.  Yes or no, and
12  I'll ask you a follow up.
13      MR. NORTHCUTT: He's trying to explain his answer.
14  It's not just a yes or no question.
15  Q.   MR. GORDON:  I said do you think there's anything in
16  there that the judge might have wanted to see.
17      Yes or no.  I will give you a follow up and you'll
18  have a chance to explain, but yes or no.
19  A.   I'll say no, because the elements of a crime are what
20  is necessary to form probable cause for a search warrant.
21  Q.   Okay.
22  A.   And I didn't find -- well, I didn't even read this
23  letter at the time, but from my review of it, there doesn't
24  appear to be anything that's substantial to proving those
25  elements.

---

**Page 129**

1  Q.   Okay.  So it doesn't -- it has no evidentiary value,
2  is your testimony, to a judge for issuing a warrant?
3      **MR. NORTHCUTT:** Misstates testimony.
4      **THE WITNESS:** It is misstating my testimony.
5  Q.   MR. GORDON: Does it add evidentiary value for a
6  judge issuing a warrant, in your opinion, that letter?
7  **A.   For issuing a warrant?**
8  Q.   Yeah.
9  **A.   You need probable cause.**
10 Q.   I know.  Does it have any -- does it intimate one way
11 or the other -- is it any probative evidence towards
12 probable cause, one way or the other?
13 **A.   Potentially, because she's discussing the goat in**
14 **question.**
15 Q.   And it's a --
16 **A.   -- and her involvement.**
17 Q.   And it's a written statement from her which, I
18 believe, would be an admission.  Yes?
19 **A.   It could potentially be evidential, yes.**
20 Q.   Okay.  Okay.  So you don't think the judge would have
21 maybe wanted to see it?
22     **MR. NORTHCUTT:** Objection.  Calls for speculation.
23 Q.   MR. GORDON: You can answer.
24 **A.   The search warrant doesn't require every piece of**
25 **evidence --**

**Page 130**

1  Q.   I understand that, but do you think the judge would
2  have maybe wanted to see that one?
3  **A.   -- the elements of probable cause.  And you're**
4  **talking over me again.**
5  Q.   Okay.  Well, because -- because, sir, it's a -- it's
6  a yes or no question and I am going to give you an
7  opportunity to respond.
8      So motion to strike.  Nonresponsive.
9      I'm just asking yes or no, might the judge have
10 wanted to see that?
11     **MR. NORTHCUTT:** Calls for speculation.
12 Q.   MR. GORDON: It's -- well, let me rephrase.  Yes, no,
13 I don't know.
14 **A.   I don't know what the judge would want to see.**
15 Q.   Okay.  If -- if that letter she's talking about, for
16 example, if I thought it was my property, that -- that
17 negates an element of the crime.  Yes?  And you read that in
18 there.  Whether it's true or not, she's saying that.  Yes?
19     **MR. NORTHCUTT:** Calls for a legal conclusion.
20 Q.   MR. GORDON: I'm asking if he's read that in there.
21 She simply makes a statement.  I'm not asking whether it's
22 true.
23 **A.   What are you asking specifically?  Can you rephrase**
24 **it?**
25 Q.   Yeah, I'm -- well, I haven't asked the question yet,

**Page 131**

1  so -- Vanessa probably wrote it out.  Okay.
2      If the letter negates an element of the crime, could
3  it not negate probable cause?
4      **MR. NORTHCUTT:** Objection.  Vague and ambiguous.
5  Calls for a legal conclusion.  Incomplete hypothetical.
6  Go ahead.
7  Q.   MR. GORDON: So she says "I thought the goat was
8  mine."
9      Does that have an effect on probable cause?
10 **A.   If there's probable cause to state the contrary, then**
11 **no, it doesn't.**
12 Q.   Okay.  So it has no effect on it?
13 **A.   No, it doesn't.**
14 Q.   Okay.  Okay.  That's your testimony.  All right.
15     All right.  Were you concerned if that letter was
16 shown to the judge that maybe she wouldn't have issued a
17 warrant?
18     **MR. NORTHCUTT:** Objection.  Vague and ambiguous as to
19 the term "concern."  It's argumentative.  Assumes facts not
20 in evidence.  Go ahead.
21     **THE WITNESS:** I don't know.  I don't think -- I don't
22 think it would affect her.
23 Q.   MR. GORDON: Okay.  But were you concerned at the
24 time?
25     **MR. NORTHCUTT:** Same objections.

**Page 132**

1  Q.   MR. GORDON: You said you read part of it.  Were you
2  concerned at the time?
3  **A.   No, I was not concerned.**
4  Q.   MR. GORDON: Okay.  You were not concerned.
5      So you purely did not give it only because Fernandez
6  said just give A and B?
7  **A.   And BECAUSE A and B seemed to be evidential.  It had**
8  **more evidential value.**
9  Q.   Well, did you -- so you reviewed A and B.
10     Why did you -- okay.  So you just said something I
11 want to ask on.  You just said A and B seemed to be more
12 evidential.  So you're using a discretion to determine the
13 evidentiary value.
14     Why didn't you do that for the remaining documents
15 that were in the email?
16 **A.   Because these are the two that he instructed me to**
17 **use.**
18 Q.   Because Fernandez told you to use A and B then?
19 **A.   Yes.**
20 Q.   Okay.  That's your testimony.  All right.
21     Okay.  So I used this phrase yesterday because it --
22 it's going to sound loaded and I don't mean it to sound
23 offensive.  I just don't know how to phrase it.  This is the
24 least offensive way I can -- I can do it.  So I mean no
25 disrespect.

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

---

Page 133

1    Would you say you had no independent thought in
2 preparing this warrant with respect to the evidence? It's
3 all Fernandez?
4    **MR. NORTHCUTT:** Objection. Vague and ambiguous.
5 Argumentative.
6    **THE WITNESS:** No. Because if I believed that what he
7 was telling me to do was wrong or fraudulent in some way,
8 then I would not do it. It seemed that from what he told
9 me, the elements of that crime were met, so I was
10 comfortable preparing the warrant for him.
11 Q.   **MR. GORDON:** Okay. Okay. So you had some
12 independent thought, but only with respect to what he said,
13 not with respect to the evidence he gave you?
14    **MR. NORTHCUTT:** Objection. Misstates testimony.
15 Q.   **MR. GORDON:** Is that accurate?
16 A.   **No. I have no reason to believe that he would be**
17 **deceptive or try to withhold something from me.**
18 Q.   Yeah, well, how can you discover fraud if you don't
19 review all the evidence?
20    **MR. NORTHCUTT:** Argumentative.
21 Q.   **MR. GORDON:** You said you thought nothing was
22 fraudulent.
23    How can you determine something is fraudulent if you
24 don't review all the evidence?
25 A.   **Because I was not investigating a fraud.**

---

Page 134

1 Q.   I understand, but you just used the term "fraud."
2 That's why I'm using it. I know you weren't investigating
3 fraud, but -- but let's say that -- let's say the word
4 mistaken. Maybe that's a better word, because I think
5 that's what meant, right? You had nothing -- no reason to
6 know what he said may have been mistaken.
7    How do you know -- since you're the one signing under
8 penalty of perjury, how do you know if something is mistaken
9 if you don't review the evidence?
10    **MR. NORTHCUTT:** Incomplete hypothetical.
11    **THE WITNESS:** I reviewed the evidence that had
12 probable cause that he showed me.
13 Q.   **MR. GORDON:** But not -- but not the remaining -- but
14 not the other two or three pieces of evidence in the chain
15 that he sent you?
16 A.   **In -- no I did not review --**
17 Q.   So you have no independent thought on those -- on
18 those -- again, I mean no disrespect for that term. I don't
19 know what else to use.
20    You had no -- you had no independent thought upon the
21 other ones in that email you received.
22    **MR. NORTHCUTT:** Asked and answered. Vague and
23 ambiguous.
24    **THE WITNESS:** I didn't -- I didn't investigate
25 that.

---

Page 135

1 Q.   **MR. GORDON:** All right. I understand. I understand.
2 Most of this is just checking off boxes, so we know what
3 facts are established at trial. So -- because he and I are
4 going to argue what you have to go testify to at trial and
5 what other people testified to, or we're going to say no, we
6 can agree on this, this and this. And then we're going to
7 know -- he's going to call you up to say XYZ, and I'm going
8 to -- and then I'm going to cross-examine you maybe, you
9 know. Most of this is just determining what we actually
10 have to put in front of a jury. So -- okay. Anyway. All
11 right.
12    Okay. Let's go through this. These ones.
13    All right. So, Detective, can you go to page 22
14 of -- Bates stamped 22. So, I guess, that will be in
15 Exhibit B of the warrant.
16 A.   **Yeah, I'm there.**
17 Q.   You're there. Gotcha. You're already there.
18    All right. So on the bottom here it says "You are
19 authorized to:" There's three of them. Yes?
20 A.   **Yes.**
21 Q.   And you see it. Okay.
22    And you added these, correct, when you typed up the
23 warrant?
24 A.   **Yes.**
25 Q.   Where did you get the language -- is this language

---

Page 136

1 you always add?
2 A.   **This is standard language when you're writing a**
3 **search warrant for a location.**
4 Q.   Okay. Okay. It's standard language.
5    Okay. So how do you know if the judge authorizes
6 this language, if it's not in the warrant portion? Because
7 earlier you testified that this is the Statement of Probable
8 Cause, and then what the judge orders is in page -- I think
9 in the template it was 1 through 5 or 1 through 4. You know
10 what I'm talking about. Right? The portion that -- what
11 the judge signs off on.
12    If this -- how do you know if the judge signs off on
13 "You are authorized to," these requests. You're saying a
14 standard language, but just by putting them in here, if the
15 judge signs the warrant, does that mean this is authorized?
16 A.   **Yes.**
17 Q.   Okay. All right. Well, why -- just out of
18 curiosity, so you know, the portion of the word that says
19 "You are commanded to search," right?
20 A.   **Uh-huh.**
21 Q.   Why doesn't this -- or in -- the part where the
22 judge's signature is, "You are commanded," and it has
23 another additionally.
24    Shouldn't these portions be in there, if that's what
25 the judge signing -- is signing off on? Because this is

---

Page 137

1  just your Statement of Probable Cause. This isn't a judge's
2  order. Correct?
3  A.   **This is all provided to the judge.**
4  Q.   Yeah.
5  A.   **She had all this.**
6  Q.   It's all one packet.
7  A.   **Yeah. She had all of it. It's all one document.**
8  Q.   Okay. It's all one document. Okay. All right.
9        So it's your understanding if you put this in there,
10  the judge signs the warrant, you guys get to do this?
11  A.   **Yes.**
12  Q.   Okay. OKay. Has -- has there ever been a case
13  you've been involved, in or any of your officers, where, you
14  know, you used breaching equipment for -- I know it didn't
15  happen here -- but where breaching equipment's used and the
16  judge says "I didn't authorize this."
17        And you're like "Well, it's here on the Statement of
18  Probable Cause."
19        "Yeah, but it's not in the portion of the warrant
20  that I signed."
21  A.   **That -- that hasn't come up as far as I know.**
22  Q.   Hasn't come up as far as you know. Okay. All right.
23  Okay.
24        So -- and -- so Cedar here was the evidence of the
25  crime to be taken. Yes?

Page 138

1  A.   **Yes.**
2  Q.   Cedar's the evidence.
3        And are you familiar with -- you know this question's
4  coming.
5        Are you familiar with your obligations under Penal
6  Code 1536?
7  A.   **Yes.**
8  Q.   Yes. Okay.
9        Can you explain them to me as you understand them?
10  A.   **Yes. I mean, we read it earlier. It's in every**
11  **search warrant.**
12  Q.   Yeah, but what is it? I understand it's in the
13  warrant?
14  A.   **Evidence that is seized under a search warrant shall**
15  **be head -- or held by the agency or the officer until it is**
16  **presented -- brought before a magistrate.**
17  Q.   Brought before a magistrate. Or a judge. Right?
18  A.   **Sure.**
19  Q.   Or whatever, yeah, okay. All right. Anyway.
20        And so what are the obligations under -- because this
21  warrant has a default, as you said. The portion you
22  couldn't change is also 1407 to 1422.
23        So what are the obligations -- I know you don't
24  recite verbatim, but under 1407, that chapter, that are your
25  obligations under 1407?

Page 139

1  A.   **1407 is similar. It's in regards to the stolen**
2  **property.**
3  Q.   Yeah.
4  A.   **But -- alleged stolen property.**
5  Q.   But there's no warrant required for that. Yes? It's
6  just --
7  A.   **Correct.**
8  Q.   -- anything that comes into your custody.
9  A.   **It's anything that is disputed stolen property.**
10  Q.   Well, it says -- yeah, allegedly. I guess you're
11  right. It's not a gotcha. It says, I think, "allegedly
12  stolen"?
13  A.   **Yeah.**
14  Q.   Right. Okay. But there's no determination of what's
15  stolen. That's because that's what a trial is for. Yes?
16  A.   **Or the investigation, yes.**
17  Q.   So it's your position that the investigators can
18  resolve when property is stolen?
19  A.   **It happens all the time in regards to like somebody**
20  **has proof that their property -- we'll take a motorcycle or**
21  **a car, for example, where I can see proof that, you know,**
22  **they have the registration of the vehicle. It's their**
23  **vehicle.**
24  Q.   Yeah.
25  A.   **You know, it's missing from their driveway.**

Page 140

1  Q.   Yeah.
2  A.   **I can put that in the stolen vehicle system.**
3  Q.   Sure.
4  A.   **It can be recovered.**
5  Q.   Okay. Okay. So what if there's an ownership dispute
6  though in those instances with like the -- let's use the
7  stolen car example you just gave.
8        MR. NORTHCUTT: Objection. Incomplete hypothetical.
9        THE WITNESS: If there's a dispute between a stolen
10  vehicle?
11        MR. GORDON: Yeah.
12  A.   **If you can see --**
13  Q.   Do you resolve -- do you resolve that? That's a
14  terrible question. You don't need to object. I'm going to
15  rephrase it.
16        Can the Sheriffs resolve that on their own or does
17  that need to go before a judge?
18  A.   **I imagine ultimately, yeah, it's going to go before a**
19  **judge.**
20  Q.   Okay. All right. Okay. So here -- all right.
21        So I'm on page 23, Detective.
22  A.   **Okay.**
23  Q.   All right. So it says "Due to the fact that items to
24  be seized include living animals, deputies shall secure the
25  property in a humane and appropriate location, and the

Page 141

1  rightful owner of said property shall be notified of the
2  location.  The property may be released to the owner upon
3  seizure."
4       Did you add this language?
5  A.   Yes, I did.
6  Q.   Did Fernandez tell you to add this language?
7  A.   My lieutenant, Lieutenant Chris Edwards, advised me
8  to add this language.
9  Q.   Chris Edwards advised you to add the language.
10      Did he say why?
11 A.   So that the evidence could be released to the owner.
12 Q.   Okay.  Did you say, hey, this conflicts with 1536?
13 A.   We've done this before with evidence in the search
14 warrants, as been instructed by our DA's office, that if
15 we --
16 Q.   Instructed by the DA's office?
17 A.   Advised, yeah.  They've given us that advice that we
18 can add this language to a warrant to have certain evidence
19 items released back to owners.
20 Q.   Okay.
21 A.   Especially in unique circumstances, like a living
22 animal.
23 Q.   Now, the way Fernandez -- Lieutenant Fernandez.
24 Again, I mean no disrespect -- described this, he said,
25 because as you know, I'm sure you've discussed it with your

Page 142

1  attorney.  I'm not asking, but we've, you know, gone over
2  this.
3       The way he explained it was -- I believe the phrase
4  used is there's a practical reality the police -- and this
5  is basically what you're referring to?  Would you agree with
6  that, that sometimes you can't log all the evidence?
7  Sometimes, you know, there's -- there's too much.  You
8  have -- there's a practical reality to it.  Sometimes you
9  know who the owner is.  Yes, it's just -- they're the owner.
10      MR. NORTHCUTT: Objection.  Incomplete
11 hypothetical.
12      Go ahead.
13 Q.   MR. GORDON: Fill me in if I'm wrong or correct me or
14 course correct me what you think he meant by "practical
15 reality."
16      MR. NORTHCUTT: Objection.  Calls for speculation.
17 Q.   MR. GORDON: You can speculate.  Yeah.
18 A.   I don't know what -- I don't know what he was trying
19 to say to you.
20 Q.   Yeah.  That's fair.  All right.
21      But you -- but you've also have been in situations
22 where the police, the Sheriffs, resolve the ownership on
23 their own without going to court?
24 A.   Yes.
25 Q.   And sometimes advised by the DA to put language like

Page 143

1  this in the warrant?
2  A.   Yes, I've been advised.
3  Q.   By "language like this," I mean, I've used the VCs.
4  They include living animals, etcetera, etcetera.
5  A.   I haven't added that specific, living animals.  This
6  is the first for that.
7  Q.   Okay.  Did -- okay.  Are you aware of any --
8  well, actually -- so did Chris say he used that language
9  before or the -- I'm sorry -- Lieutenant Edwards.  Is it
10 Lieutenant Edwards?
11 A.   Lieutenant Edwards.
12 Q.   Lieutenant Edwards.
13      Did Lieutenant Edwards say he had used that language
14 before?
15 A.   I didn't ask.
16 Q.   Okay.  Was Lieutenant Edwards familiar with this
17 case?
18 A.   He -- yes.
19 Q.   Did he give you any -- what did he say about the
20 case?
21 A.   Well, I know he was familiar because he was present
22 during the briefing with Lieutenant Fernandez.
23 Q.   Why didn't he fill out the warrant?
24 A.   Good question.  I don't know.
25 Q.   You don't know.  You didn't ask?  Okay.  All right.

Page 144

1  A.   Because he's -- because he's the boss.
2  Q.   He's the boss.  Okay.  Just curious.
3       All right.  So did the DA -- here the DA didn't
4  advise to add this language though.  Yes?  Or was it
5  already -- did the DA sign off on this warrant?
6  A.   Yes.
7  Q.   Okay.  And -- yeah, that's right.  I saw it in your
8  email.
9  A.   Well, Deputy DA, yes.
10 Q.   Deputy DA did that, Eamon, E-A-M-O-N.
11 A.   Yes.
12 Q.   Okay.
13 A.   Eamon Fitzgerald.
14 Q.   Eamon Fitzgerald.  Okay.
15      Why didn't he sign it, out of curiosity?
16 A.   I don't know.
17 Q.   You don't know.  Okay.
18      Okay.  But I believe there is an email from him where
19 it says you have probable cause.
20 A.   Yes.
21 Q.   Okay.  All right.  I think I've seen that.  So --
22 okay.  That's -- all right.  So Chris Edwards told you to
23 add that.
24      Do you know if Chris Edwards okay'd it with the DA,
25 this language?

Page 145

1 A.    Specifically for this case?

2 Q.    Yeah.

3 A.    I don't know.

4 Q.    You don't know. Okay. All right.

5       So did it strike you that this language might

6 potentially conflict with 1536?

7 A.    Well, as mentioned, in previous cases we've used

8 similar language.

9 Q.    I understand that. But did it strike you here that

10 the language might potentially conflict?

11       MR. NORTHCUTT: Objection. Asked and answered.

12       THE WITNESS: Did not strike me.

13 Q.    MR. GORDON: Thank you.

14       All right. So -- yeah. Are you aware of any -- is

15 there any Shasta policy or, again, memorandum or whatever,

16 or local guideline -- remember, we had this conversation

17 before and you said -- you used the word "policies," but you

18 also said there's -- said there's written policies, but you

19 also said there's -- you occasionally get emails on updates.

20 Yes?

21 A.    Yes.

22 Q.    Okay. Anything in any of those categories that

23 allows you to deviate from 1536?

24 A.    Not that I'm aware of.

25 Q.    Not that you're aware of. Okay.

Page 146

1       Did the DA see the second letter from Jessica? The

2 one we were fighting over, bickering over, whatever term you

3 want to use.

4       MR. NORTHCUTT: Objection. Calls for speculation.

5       THE WITNESS: I don't know.

6 Q.    MR. GORDON: Did you show it to him?

7 A.    What was provided is what is on the warrant.

8 Q.    Okay. So you didn't provide the DA --

9 A.    Attachment A and Attachment B.

10 Q.    Okay. You didn't provide the DA?

11 A.    No, I did not.

12 Q.    Thank you. That's all I wanted to hear.

13       All right. And the same reasons as why it wasn't

14 provided to the judge? We went over it before, Fernandez

15 basically?

16 A.    Yes.

17 Q.    Yeah. Okay. All right. Thank you.

18       It looks like -- oh, well let me ask also. It also

19 appears -- let's do rapid fire. The same questions, but I'm

20 going to it to 1407.

21       This -- this paragraph that Chris Edwards asked you

22 to add, "Due to the evidence to be seized, include animals,"

23 blah, blah, blah, that paragraph, did -- did it alert you

24 that might potentially conflict with 1407 and 1408 of the

25 Penal Code?

Page 147

1       MR. NORTHCUTT: Objection. Calls for a legal

2 conclusion. Vague and ambiguous as to "might possibly

3 conflict."

4 Q.    MR. GORDON: I'll rephrase.

5       Did it alert you that it does conflict?

6 A.    Again, I'm not a lawyer, but no, it did not alert me.

7 Q.    Okay. Thank you. That's all.

8       And so on page 26, your concluding opinion. So on

9 here it says "It is my opinion that a search of the above

10 mentioned property will allow deputies to locate and

11 recovery the aforementioned stolen property and return that

12 property to its rightful owner." Yes?

13 A.    Yes.

14 Q.    Okay. So it was your understanding when this warrant

15 was written, that Cedar, even though he's evidence of a

16 crime, was going to be seized and turned over to a

17 citizen -- or a -- whoever.

18 A.    Yeah, it's F -- FFA, 4-H, one of those, yeah.

19 Q.    Well, isn't the rightful owner Kathi Muse?

20 A.    Or Kathi Muse, yeah.

21 Q.    Okay. It's going to be turned over. It's not going

22 to be left in an evidence locker somewhere. I know you

23 wouldn't leave a goat in an evidence locker.

24 A.    Correct.

25 Q.    Isn't that where you -- where do you usually leave

Page 148

1 evidence? I don't watch TV, so assume I'm an idiot here.

2 A.    Evidence lockers work for other evidence, but I

3 wouldn't put a goat in it.

4 Q.    You wouldn't put a goat in there.

5       Where do you usually put goats or animals?

6 A.    I don't know. I've never taken a goat.

7 Q.    You've never taken a goat. All right.

8       Has anyone ever taken a goat that you know of? I

9 assume it's a first, but just more curiosity.

10 A.    I don't know. There is a Humane Society that like

11 our animal control will use for like stray animals.

12 Q.    Yeah. Where do they put the animals when they

13 confiscate them?

14 A.    The Humane Society.

15 Q.    Oh, the officers put them with the Humane Society?

16 A.    The animal regulations, yeah.

17 Q.    Okay. Okay. But regardless of what the evidence

18 retention policies are, Cedar was not going to retained?

19 A.    Correct.

20 Q.    Okay. Okay. All right. Yeah.

21       So if you weren't going to -- not you, whoever

22 executes the warrant. Yeah, I knew you weren't going. I

23 mean, maybe you, too, because you're part of the Police

24 Department, but if -- or Sheriff's Department.

25       When Cedar was seized, if he wasn't going to be held,

Page 149

1  what was the -- what evidentiary value did he have?
2      **MR. NORTHCUTT:** Objection. Calls for a legal
3  conclusion.
4  Q.    MR. GORDON: Well, we agreed the warrant said he's
5  evidence. It says it in the warrant. Evidence is seized.
6      If he wasn't going to be held, what evidentiary value
7  did he have?
8      **MR. NORTHCUTT:** Same objections.
9      **THE WITNESS:** To determine that he was indeed the
10  property that was there. Confirmation that he had been
11  transported there. Corroborating --
12  Q.    MR. GORDON: Well, you can get confirmation he was
13  transported there without seizing him.
14  **A.    Corroborating and then returning to the owner.**
15  Q.    Okay. All right. What evidentiary value does that
16  have in a case against Jessica for alleged theft?
17  **A.    It shows that she transport that -- she took that**
18  **animal and transported it.**
19  Q.    She admitted she took him out of there. Why did he
20  need to be seized if that was what needed to be proved?
21  **A.    I wasn't -- you know, I wasn't the one investigating**
22  **the case, so I don't know if I can answer why he --**
23  Q.    Well, you wrote the warrant though.
24  **A.    -- why he needed to be seized.**
25      **To return the animal to its owner.**

Page 150

1  Q.    Okay. But the warrant also says "evidence of a
2  crime"?
3  **A.    Yes.**
4  Q.    So both?
5  **A.    Yes.**
6  Q.    Okay. All right. Okay. So if the warrant -- if
7  your obligations under a warrant are to, as you said, hold
8  the property and bring it before the magistrate, and your
9  obligations under, you know, 1407 or 1408, regardless of a
10  warrant's custody, stolen property, you know, to bring
11  before a magistrate, which are -- you know, those are the
12  one -- the provisions you can't change in the warrant, but
13  they're there. Right?
14  **A.    Uh-huh.**
15  Q.    They're there, nonetheless there. And then there's
16  this other provision that we just put -- two of them, your
17  concluding opinion and the paragraph that Chris Edwards
18  asked -- told you to add, where it says no, you don't need
19  to hold him. You can turn him over. If there's conflicting
20  provisions in the warrant, how determine which ones apply?
21      **MR. NORTHCUTT:** Objection. Calls for a legal
22  conclusion.
23      **THE WITNESS:** Again, I'm not a lawyer, but it's my
24  understanding that a judge can order whatever a judge wants
25  to order. I mean, a judge can order --

Page 151

1  Q.    MR. GORDON: I understand, but nonetheless there's
2  two provisions. But the judge also ordered 1536 and
3  fifteen -- assuming the judge did order what paragraphs you
4  added. But in the order it also says 1536 and 1407,
5  1408.
6      If they're in conflict, how do you determine which
7  ones apply? Do you just exercise you discretion or how
8  does -- how do you determine?
9      **MR. NORTHCUTT:** Same objections.
10      **THE WITNESS:** Personally, I would say what was added
11  would supercede was language that I cannot alter or change.
12  Q.    MR. GORDON: Doesn't language that you can't alter or
13  change suggest this is -- this is permanent. This is
14  ironclad? This is the law?
15      **MR. NORTHCUTT:** Objection. Vague and ambiguous.
16      **THE WITNESS:** Again, it's my understanding that a
17  judge can order --
18      **MR. GORDON:** So your understanding --
19      **THE WITNESS:** -- something other than that language.
20  Q.    MR. GORDON: Okay. I didn't mean to talk over you.
21  I apologize.
22      So your understanding is if it's added in a statement
23  of probable cause, that trumps. Yes?
24  **A.    Yes.**
25  Q.    Okay. Yeah. So if you have a question about a

Page 152

1  warrant you're asked to write -- do you ever have questions
2  about a warrant you are asked to write?
3  **A.    Yes.**
4  Q.    Okay. Because you said you've authored personally 40
5  to 50 on your own, and then you've -- you executed like a
6  hundred total. Right?
7  **A.    Right.**
8  Q.    Right. Okay. So of the ones that you authored on
9  your own, 40 to 50, were you -- how many of them were you
10  asked to write?
11  **A.    Those are all authored by me -- oh, specifically**
12  **something being asked --**
13  Q.    Yeah. Yeah, when another whoever asks you to write
14  one. You may estimate, of course.
15  **A.    Yeah, very few.**
16  Q.    Very few.
17  **A.    Four or five.**
18  Q.    So this is the exception?
19  **A.    Yeah.**
20  Q.    Yeah. Okay. All right.
21      What are you supposed to do when there's a -- when
22  you have a question in the warrant about conflicting terms?
23  **A.    I can contact our -- an attorney from our District**
24  **Attorney's office.**
25  Q.    Okay. Have you ever done that?

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

---

Page 153

1  A.    As far as conflicting language?

2  Q.    Yeah.

3  A.    No.

4  Q.    And you didn't do that here.  Correct?

5  A.    No, I did not.

6  Q.    Okay.  Any reason why?

7  A.    Well, I provided the warrant to an attorney for

8  review, but I didn't specifically ask about that conflicting

9  language.

10  Q.    That conflicting language.  Okay.  All right.  Okay.

11       All right.  And there's no reason why you didn't.

12  You just didn't -- it didn't --

13  A.    You asked earlier.  It didn't strike me.

14  Q.    I didn't strike you.  It just didn't occur to you.

15       Okay.  All right.  Okay.  Do you have a -- is a --

16  do you have an assigned -- you have an assigned work phone.

17  Yes?

18  A.    Yes.

19  Q.    Okay.  And does everyone have an assigned work phone?

20  A.    In my unit, yes.

21  Q.    In your unit.

22       What about the whole Sheriff's Department?  All

23  the -- let's say all law enforcement officers in it.  I know

24  there's people in the Sheriff's Department who don't -- who

25  aren't peace officers.  Yes?

---

Page 154

1  A.    Correct.

2  Q.    Yeah.

3  A.    I don't think that everybody has one.  I think some,

4  for example, patrol deputies are not assigned their own work

5  phones.

6  Q.    Okay.  And do you have your -- a computer assigned to

7  you?

8  A.    Yes.

9  Q.    Okay.  Do you -- okay.  And you keep your files in

10  that computer, I presume.  Right?

11  A.    Yes, I do.

12  Q.    Correlated with your phone -- cross-referenced --

13  that's terrible, terrible.  You know, when they're synced.

14  A.    The only thing that's synced to my phone is email.

15  Q.    Okay.  Okay.  So the files are maintained on your

16  computer?

17  A.    Yes.

18  Q.    Do you know if they're backed up?

19  A.    Most files are on a network drive.

20  Q.    Okay.  Who maintains the network drive?

21  A.    Probably the county IT.

22  Q.    The county IT.  All right.

23       What's your evidence retention policy.  That's a --

24  strike that completely.  What -- that wasn't the question I

25  had in mind.  I'm losing my phraseology.

---

Page 155

1       Do you have any -- do you keep any written notes of

2  any of your cases?

3  A.    I do not keep written notes, no.

4  Q.    Any reason why not?

5  A.    Just becomes a lot to manage and maintain.  So

6  usually once a report is documented electrically, once I

7  write it in the computer, I'll get rid of the notes.

8  Q.    Okay.  Okay.  So your procedure is to just get rid of

9  any written memorandums you have because they've all been

10  memorialized?

11  A.    Yes.

12  Q.    Do you retain any of them?

13  A.    No.

14  Q.    How often do you delete emails?  Obviously, on your

15  work computer.  I don't mean on your private computer.

16  A.    Not very often.  I'll delete regularly emails that

17  are like spam or inconsequential.

18  Q.    Yeah, sure.

19  A.    But I don't just go through and just cleanse it.

20  Q.    Okay.  What's the -- what is the policy on the email

21  retention?

22  A.    I don't know what the policy on email retention is.

23  Q.    Okay.  All right.  What is the -- is there one?

24  A.    I don't know.

25  Q.    Okay.  There might be.  You have not been trained on

---

Page 156

1  it or gotten a memo it or anything?

2  A.    Not that I'm aware of.

3  Q.    Okay.  Well, how do you know when you're deleting

4  emails whether you're violating company policy or not?

5  A.    I don't know.

6  A.    Maybe you might be.

7  A.    Maybe I am.

8  Q.    Maybe you are.  Okay.  All right.

9       So you don't keep written notes.

10       Do you keep any -- do you keep any written notes or

11  just generally you don't, but sometimes you do?

12  A.    I think you already asked that.  No, I don't keep any

13  written notes.

14  Q.    Okay.  No.  I thought you meant as a matter of

15  procedure you tend to not, but maybe for some particularly

16  heinous cases you do.

17  A.    No, I don't.

18  Q.    Okay.  All right.  Okay.  And what did you do to

19  respond to -- we gave a document request to your attorney

20  and you produced, you know, the big stack I gave you

21  earlier.

22       What did you do to respond to that request?

23  A.    I searched through my email, my computer, my work

24  phone for anything that could be pertaining to this.

25  Q.    Okay.  All right.  Okay.  Have you ever -- I should

---

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

Page 157

1  have gone over this. We might have asked some of these
2  similar questions earlier, but I'm not -- I don't recall
3  because I've done three days of this at this point.
4      Have you -- have you ever been disciplined related to
5  any fourth alleged fourth -- alleged, I mean it happened,
6  alleged Fourth Amendment violations?
7  **A.  No.**
8  Q.  Even in your role as a guard for the university. Is
9  that a public university?
10 **A.  No, private.**
11 Q.  Private. Okay.
12     All right. And have you ever been disciplined in
13 relation to evidence retention?
14 **A.  No.**
15 Q.  No. Okay.
16     All right. What about any alleged due process
17 violations? Again, I don't mean they happened, but someone
18 said?
19 **A.  No.**
20 Q.  No. Okay. All right.
21     Did anyone -- has there -- well, I'm implying formal
22 ones there.
23     Have you had any like informal verbal disciplinary
24 actions? You know, someone calls you and says, hey, you did
25 this seizure wrong or something like that?

Page 158

1  **A.  No.**
2  Q.  Okay. All right. The same thing with due process.
3  Like, no, hey, get in my office. You did -- do this next
4  time?
5  **A.  No.**
6  Q.  Okay. Nothing informal. You got a clean record.
7  Okay. Gotcha.
8      Did -- I know you know this question's coming. Did
9  you attend the 4-H barbecue on July 9th, which Cedar was, we
10 believe, brought back for --
11 **A.  No.**
12 Q.  -- for slaughter?
13 **A.  And I wasn't expecting that question.**
14 Q.  Really. Oh, okay. It's so sensationalized, I
15 thought that would, you know -- okay.
16     So did anyone mention a barbecue on July 9th?
17 **A.  No.**
18 Q.  Well, you knew there would be a barbecue because you
19 knew he was donated to that?
20 **A.  I knew that they had a barbecue and that's what it**
21 **was donate for. I didn't know when.**
22 Q.  You didn't know when.
23     And -- so if we -- well, when we subpoena photos from
24 the event from the public agency, we're not going to see
25 your picture in them. Yes?

Page 159

1      No. Okay.
2      Did your wife or kids attend it?
3  **A.  No.**
4  Q.  You said you didn't know about agriculture, so I
5  didn't think so. Just checking the boxes.
6      Okay. And did Kathi Muse call you at all while
7  writing the warrant for any updates or anything?
8  **A.  No, I've never spoken to Kathi.**
9  Q.  Okay. Okay. So you got the warrant done, and then
10 about what -- did you -- and you can refresh your memory
11 with your document production, if you want to, but about
12 what time did you get your first draft of the warrant done?
13 **A.  Let's see. It was about -- is the email in here?**
14 **Because the email --**
15 Q.  Yeah, you may check. Go ahead, check, refresh your
16 memory.
17     Well, no, it might not -- your email might not --
18 that might not be in there, because I'm assuming you mean an
19 email that you sent to -- because you sent a draft to
20 someone?
21 **A.  The DA. Because that would be when it was completed.**
22 Q.  Okay.
23 **A.  Is when I sent that to Eamon.**
24 Q.  Okay. Now, did you -- did you -- yesterday Duncan
25 testified that a warrant narrative and probable cause is

Page 160

1  usually based off the investigative report.
2      Is that your understanding?
3  **A.  A what?**
4  Q.  A narrative of probable cause in your statement of
5  probable cause is typically derived from a -- or is derived
6  from an investigative summary. Yes?
7  **A.  It can be, if you have an investigative summary**
8  **handy.**
9  Q.  Yeah. Was that investigative summary in front of
10 you, was any that completed at the time?
11 **A.  Not that I know of.**
12 Q.  Did you check?
13 **A.  No.**
14 Q.  So it might have been, but you don't know.
15 **A.  I can tell you when it was completed -- or when it**
16 **was written.**
17 Q.  I have a question about that because Fernandez was
18 unclear.
19     So the date and time stamp you just pointed to on
20 page -- could you go back to that? What is the Bates stamp
21 number of that page? Yes.
22 **A.  0004.**
23 Q.  Okay. Yes.
24     Do you see the 7/26 up top?
25 **A.  Yes.**

---

Page 161

1  Q.   Is that the date -- does that -- is that the date he
2  last worked in it or is that the date it was submitted?
3  What does that mean?
4  A.   It's either when this was generated or when it was
5  submitted.  I don't know --
6  Q.   So it's possible he didn't start writing his probable
7  cause statement until that date?
8  A.   This isn't a probable cause statement.
9  Q.   No, no, investigative summary.  I apologize.
10 A.   This is an investigative summary.
11 Q.   Investigative summary, yes.  I apologize.
12 A.   This is his report narrative.
13 Q.   Okay.  Okay.  So you didn't review that before
14 writing the warrant?
15 A.   No.
16 Q.   Okay.  So I'm going to give you -- this is the rest
17 of your document production.  You can look -- it's not very
18 firmly put together, so I do apologize.
19       Can you look through here and tell me what time you
20 finished your first draft of the warrant and when you sent
21 it to the DA and kind of walk me through those steps?
22 A.   Sure.
23 Q.   I think they're in order.  My apologies if they're
24 not.
25       THE VIDEOGRAPHER: Can we take a break real quick?

---

Page 162

1       MR. GORDON: Yeah.
2       THE VIDEOGRAPHER: We're off the record and the time
3  is 13:22.
4       (Off the record.)
5       THE VIDEOGRAPHER: We're back on the record and the
6  time is 13:32.
7  Q.   MR. GORDON: All right.  So we're back on the record
8  and trying to finish up quick here for you.
9       So before the break I had asked you to review -- I'd
10 asked you to review what sequence of events in which you
11 completed the warrant and sent it for, you know, to.  I
12 guess -- what time did you complete the warrant or your
13 draft of the warrant?
14 A.   It would be approximately the time that I sent it to
15 the DA's office for review.
16 Q.   What time was that?
17 A.   I notified Lieutenant Fernandez --
18 Q.   Don't just read from it.  Tell me if this is your --
19 A.   At 4:08 p.m.?
20 Q.   4:08 p.m.
21 A.   That the warrant was with the DA's office.
22 Q.   Okay.  Is there an email in here where you sent it
23 to?  I have no doubt that that is true, but what email in
24 here is yours sending it to the DA's office?
25 A.   There is an email.

---

Page 163

1  Q.   Can you give me the Bates stamp number off it?
2  A.   Zero -- I'm sorry 180.
3  Q.   180.  So Bates Stamp No. 180.  Can I have that for
4  sec?  I'm just going to enter that into evidence, whenever
5  you're ready.
6  A.   Oh, you want this one?
7  Q.   Yes, please.
8  A.   Oh, yes.
9  Q.   Which -- so there's two emails on 180.  Which one
10 is --
11 A.   It's an email chain, so the lower one would be the
12 earlier email and the one up above would be the latest.
13 Q.   Okay.  "Please see attached.  I add some photos of
14 the property where the goat is currently located.  Sometimes
15 that messes with formatting.  Let me know."
16       Okay.  So you attached a copy of the warrant,
17 presumably, to this email?
18 A.   Yes.
19 Q.   I don't see the attachments.  I know it says you say
20 attachment, but you know, usually there's the little paper
21 clip sign near the subject.
22       Is there -- do you use some other system where
23 there's -- where attachments are different?
24 A.   We use Outlook.  I don't why --
25 Q.   Outlook.  No, I'm just curious.

---

Page 164

1  A.   -- how it shows whether or not there's an attachment
2  on there.  I don't know.
3  Q.   Okay.  Understood.  All right.
4       So -- and that was at 4:00.  And then what's this
5  follow up?  Did -- did he -- take a look.  Did Eamon
6  Fitzgerald respond to you after your 4:00 a.m. email -- or
7  4:00 p.m. email?  Because your next email at 4:16 says "I
8  fixed Attachment A so it fits better, and I added the
9  residence, including all rooms," you know.
10      Did -- did you have a conversation with him between
11 the emails being sent?
12 A.   No.  I think I was reviewing the formatting of what I
13 had sent previously and saw some things that could be fixed.
14 Q.   Okay.
15 A.   And so I fixed some things and let him know.
16 Q.   Okay.  So hadn't commented on anything at this point
17 in time.
18 A.   No.
19 Q.   And to the location, "LOL."  What's the LOL for?
20 A.   It means laughing out loud.
21 Q.   What's it in reference to?
22 A.   I've never had to write a warrant to seize a goat.
23 Q.   Oh, so you found it humorous.  I do, too.  Gotcha.
24      What time did he get back to you after 4:16?
25      May I have that, because I'm going to enter that into

---

Page 165

1  evidence, 182 that we were just going over.
2  **A.    180?**
3  Q.    Yeah -- was it 180?  I'm sorry.
4  **A.    182 is what we're on now.**
5  Q.    My apology.  You're correct.  Okay.
6      Madam Court Reporter, what exhibit are we on?
7      **COURT REPORTER:** We're on D.
8      (Exhibit D was marked.)
9  Q.    MR. GORDON: Exhibit D is going to be -- for the
10  deposition is going to be Bates stamps 180 to 181.
11      Okay.  And so 182 is when he got back to you,
12  Detective?
13  **A.    Yes.**
14  Q.    Okay.  And he says "You have probable cause.  Sign
15  and date it for me and send it to the judge."
16      You didn't sign it and date it for him.  I think I
17  asked you before.  Any reason why?
18  **A.    I -- I must have forgot or not saw that he asked me**
19  **to do that.**
20  Q.    Okay.  All right.  So at what point in time did you
21  send it to the judge?
22  **A.    That would be on DocuSign.  So the way DocuSign works**
23  **is when you send that folder -- I don't know if you've used**
24  **DocuSign, but when you send that folder, it has you do**
25  **things like date and sign when it's sent.  So if we look at**

Page 166

1  **those warrants --**
2  Q.    So you're -- let me look at the -- which one am I
3  looking at here?
4  **A.    So the first -- there should be a first draft in the**
5  **revised one.**
6  Q.    First draft in the revised one?
7  **A.    So the first draft would have been after --**
8  Q.    Is this 183?  That page?
9  **A.    I think it was 5:15 was when the first one was.**
10  Q.    Well, I see -- so if you go to Bates stamp 183, I see
11  a 4:00 p.m.  It's an email between you and -- oh, this is
12  the one we went over earlier.  This is also 183.  So this
13  is -- so I'm going to enter this into evidence.  So 183
14  to --
15  **A.    And that one says "Attachment" for you.**
16  Q.    Ah, yes.  Great.  Thank you.
17      Okay.  So the first version you sent over, it looks
18  the complete version was at -- that you sent was at 4:00
19  p.m.  We already went over this, so I'm just going to enter
20  the complete thing into evidence.  I'm not going to ask you
21  questions about it, I don't believe.
22      May I have that stack for a moment?  I'm just going
23  to get -- so it's Bates stamped 181 to 198.  And I will --
24  it's -- just confirm that is -- I'll pull it out and show it
25  to you, Officer.

Page 167

1  **A.    I have 182.  I'm trying to find what exhibit number.**
2  Q.    It's okay.  It's 183.  I'm losing my mind.  183 to --
3  it starts at 182 and it goes to 198.
4  **A.    182 to 198.**
5  Q.    So this is with the package you sent Eamon.  Just
6  confirm.
7      Is that accurate?  That's at 4:00 p.m.?
8  **A.    Yes.**
9  Q.    And he got back to you at 5:00 saying you have
10  probable cause and that was the other message we looked at a
11  moment ago, I believe.
12      Hold on a second.  I'm on Exhibit E.
13      (Exhibit E was marked.)
14  Q.    MR. GORDON: So you were telling me about the
15  DocuSign timing?
16  **A.    Uh-huh.**
17  Q.    So if this -- if the warrant says it was DocuSigned
18  by you at 6:25 p.m., is that the time you sent it to the
19  judge?
20  **A.    Yes.**
21  Q.    Okay.  Gotcha.  And you hadn't sent any prior
22  versions.  Correct?
23  **A.    There was one sent at 5:15, I believe, the time was.**
24  Q.    To the judge?
25  **A.    Yes.**

Page 168

1  Q.    Okay.  Is there an email for that in here that you
2  produced?  Was it sent by email?
3  **A.    It was sent by DocuSign.**
4  Q.    By DocuSign.  So you don't have a --
5      **MR. NORTHCUTT:** Didn't you confirm it in the text
6  messages?
7      **THE WITNESS:** The text message said 5:15 with Judge
8  Mckee.  And at 5:23 it said "signed" in the text message.
9  Q.    MR. GORDON: Why does the DocuSign time on her time
10  stamp say 6:33?
11  **A.    It would be the second draft, the revised search**
12  **warrant.**
13  Q.    The revised search warrant.
14  **A.    Yes.**
15  Q.    What was revised in it?
16  **A.    The first search warrant -- earlier in our**
17  **conversation I had mentioned Lieutenant Fernandez had**
18  **informed me that an employee of Napa County Sheriff's Office**
19  **knew the story and knew that the goat was at that location.**
20  **This search warrant was also provided to a Lieutenant at**
21  **Napa County Sheriff's Office, who didn't believe that was**
22  **the case.  There was a miscommunication.  And so I removed**
23  **that language and sent the warrant back to the judge.**
24  Q.    So the judge did not comment on it.  When you -- you
25  sent it to the judge at 5:15?

Page 169

1  A.   Yes.

2  Q.   And she made no comment on it at that point in time.

3  And you just -- she made no comment on it before you gave a

4  subsequent version of the warrant?

5  A.   What do you mean when you say "she made no comment on

6  it"?

7  Q.   Well, she didn't say well, there is probable cause,

8  there's not probable cause.  You hadn't -- did you

9  communicate with her before you sent the subsequent warrant?

10  A.   She -- she signed the warrant.

11  Q.   Oh, she signed it?

12  A.   Yes.

13  Q.   She signed an earlier version of it?

14  A.   She signed an earlier version.

15  Q.   Okay.

16  A.   And then I -- when I learned there was information

17  that was a miscommunication, I removed that language and

18  sent it back to her.

19  Q.   Okay.  Okay.  Interesting.  Okay.

20       Did you -- did you produce a copy of the earlier

21  warrant?

22  A.   I believe that I did.  When talking --

23       MR. NORTHCUTT: If it's not in there, then we'll get

24  you a copy.

25       MR. GORDON: Yeah, sure.  I'm just curious.  I'm

Page 170

1  not -- I'm not saying it was going to be a giant piece of

2  evidence, but I didn't know it was produced, so.  But I

3  would like to see it.

4       MS. SHAKIB: That addresses my question where is that

5  version if we had it.

6       MR. GORDON: Yeah.

7       MS. SHAKIB: Because we'll need to look at the

8  differences.

9       MR. GORDON: Yeah, yeah, yeah.

10       MR. NORTHCUTT: I could -- I might have it in my

11  emails.  Do you want me to search for it?

12       MR. GORDON: You might have given it to us, Damian,

13  and it might have just looked the same to me and I didn't

14  realize it was different.

15       MS. SHAKIB: It would be nice to look, because I

16  know, Damian, you might want to fight us on ever doing

17  follow-up depositions and using our full time, and just to

18  avoid that back and forth.

19       MR. NORTHCUTT: Let me see what I've got here.

20       MR. GORDON: I could go print a copy.  Yeah, I mean,

21  there's so many versions of the warrant in here.

22       MR. NORTHCUTT: It's -- do you get emails on your

23  computer?

24       MR. GORDON: Yes.  I don't know if wifi is working.

25  My battery is low.

Page 171

1       MR. NORTHCUTT: I don't know if I could send this,

2  but --

3       MR. GORDON: Good to go.

4       MR. NORTHCUTT: I'm just going to call it "First

5  Warrant."  I don't know.

6       MR. GORDON: That's fine.

7       MR. NORTHCUTT: We can always have this -- I don't

8  know if you want a supplemental response and put in that if

9  it wasn't produced -- I don't know.  It might be in the 200

10  pages.

11       MR. GORDON: Yeah, it might be.

12       MR. NORTHCUTT: Did it go?  Did you get it?  Did it

13  happen to go through?

14       MR. GORDON: I don't have it yet.  I don't have it

15  yet.

16       MR. NORTHCUTT: 1.6 megabytes.

17       MR. GORDON: I'm going to do a Control F search on

18  what you did produce to see if -- I don't believe this is --

19  I don't think we what you produced.  I don't think what you

20  produced is OCR'd, so I don't think I can text search it

21  anyway.

22       MR. NORTHCUTT: I apologize.  I don't have a laptop,

23  but you could always view it on my phone and tell him what

24  the difference is.

25       COURT REPORTER: You can send it to our office and

Page 172

1  have them print it pretty quick.

2       MR. NORTHCUTT: That might work, too.  What's the

3  email address here?

4       Did it come through?

5       MR. GORDON: All the ones I'm seeing were DocuSigned

6  by detective at 6:25, so I don't know.

7  Q.   Obviously, the one you -- the first one you gave was

8  DocuSigned earlier was DockSigned earlier.  Yes?

9  A.   Yes.

10  Q.   I don't know if there's a time zone thing or

11  something.  I don't know.  Double check.

12       There's a blank one that's not DocuSigned by you and

13  that's what you sent to Eamon.  Correct?

14  A.   Yes.

15  Q.   You're not on the record.  This is just so I can --

16  persisting in finding it --

17       THE VIDEOGRAPHER: We are on the record.

18       MR. GORDON: Oh, we are on the record.  Okay.  All

19  right.  So you're on the record.  Okay.

20       MR. NORTHCUTT: Do we have that email address?

21       MR. GORDON: We can just go off the record for a

22  moment if you're going to go print that.

23       THE VIDEOGRAPHER: We're off the record and the time

24  is 13:45.

25       (Off the record.)

Page 173

1    THE VIDEOGRAPHER: We are back on the record and the
2  time is 13:50.
3    MR. GORDON: Okay. So, Officer, you have been handed
4  what I'm going to mark as exhibit -- Madam Court Reporter,
5  can I have your stamp?
6    THE WITNESS: It's right here.
7    MR. GORDON: Sorry. Long day. Long week. May I
8  have that back? I'm going to hand it back to you, Officer,
9  but may I have that for a moment? What we just received.
10 A.   This one.
11 Q.   Yes, correct. The 5:15 warrant you submitted to the
12  judge. Yes?
13 A.   Yes, 5:15.
14    (Exhibit F was marked.)
15 Q.   MR. GORDON: Okay. What is different from this
16  warrant versus the one that was ultimately executed?
17 A.   There's a line, it's like the third paragraph,
18  "Deputies with the Napa County Sheriff's Office conducted a
19  consent search of the Bleating Hearts Farm and confirmed the
20  stolen goat was at the location."
21    I received a phone call from Lieutenant Fernandez
22  after I sent him and the Lieutenant from Napa County this
23  warrant, and Lieutenant Fernandez informed me that that was
24  a miscommunication, that nobody from Napa County had saw the
25  goat there. So I removed that.

Page 174

1 Q.   Okay. So is there a reason why some information
2  here, such as this, Fernandez was fact checked, but other
3  information was not? The Dahles weren't called, for
4  example.
5 A.   I'm sorry. What's your question?
6 Q.   Well, the Dahles weren't called, so that wasn't fact
7  checked, whether they were okay with my client keeping the
8  goat.
9    Why was the warrant fact -- why didn't you and
10  Fernandez fact check this contention in the warrant that it
11  had been at others?
12 A.   It clearly didn't, because this was signed. And then
13  when it was sent to Lieutenant Fernandez and --
14 Q.   But you signed it though.
15 A.   Yes, and the judge signed this. So I didn't fact
16  check this, and it turned out to be incorrect, so I amended
17  it.
18 Q.   Gotcha. Okay.
19    So do we know who -- I know it was removed, but who
20  had supposedly gone by --
21 A.   I do --
22 Q.   -- and done the consent search?
23 A.   I do not know.
24 Q.   Okay. So earlier when you testified you thought
25  someone had gone by and saw the goat there, this -- you were

Page 175

1  referring to "and did a consent search." So they would have
2  reached out to such and such, the Starkeys -- or do you know
3  who resided there?
4 A.   I have no idea. That was information that was
5  relayed to me initially, what I believed he was relaying to
6  me, and Obviously, there's a miscommunication somewhere
7  along the line --
8 Q.   All right.
9 A.   -- because it wasn't true.
10 Q.   So -- and then she signed this one at -- what time
11  did the judge sign it? Here's her signature. 5:22. So she
12  signed it -- she signed it seven minutes later.
13 A.   Yes.
14 Q.   Did you talk to her at all?
15 A.   No.
16 Q.   Okay. And when you sent the subsequent warrant, you
17  didn't talk to her then either?
18 A.   I -- at that point it was after hours. I called the
19  after hours number, which is like the on-call judge number.
20  I explained that I needed to amend the warrant.
21 Q.   Okay.
22 A.   And I sent her the new copy.
23 Q.   Okay. All right. So there's no particular
24  reason that -- well, how do I phrase this. Okay.
25    Can we go off the record for a second?

Page 176

1    MR. NORTHCUTT: Yeah.
2    MR. GORDON: We're off the record for a moment.
3    THE VIDEOGRAPHER: We're off the record and the time
4  13:54.
5    (Off the record.)
6    THE VIDEOGRAPHER: We're back on the record, and the
7  time is 13:56.
8    MR. GORDON: I'm done with my questioning. I'm going
9  to reserve my remainder of time for whatever rights I do
10  have to that. I know you have an objection on it. That's
11  why I phrased it that way.
12    EXAMINATION BY MR. NORTHCUTT
13 Q.   Okay. Detective, as a detective, is it common for
14  detectives in your department, let's say, to rely on the
15  statements of superior officers in preparing their warrants?
16    MR. GORDON: Objection. Vague.
17    THE WITNESS: Yes, if the circumstances involve a
18  supervisor being involved in that case, then absolutely.
19 Q.   MR. NORTHCUTT: So -- so in your experience as a
20  detective and obviously dealing with other detectives, is it
21  commonplace or routine for a detective to fill out a
22  warrant, even though they're not the ones who are primarily
23  investigating that case?
24 A.   Yes, that's --
25    MR. GORDON: Objection. Vague.

LONG vs.
FERNANDEZ

**DETECTIVE JEREMY ASHBEE**
**August 23, 2023**

---

Page 177

1    **THE WITNESS:** That is -- that is common.

2  Q.    MR. NORTHCUTT: The documents you attached to the --

3    to the warrant, Exhibits A and B, those documents, were

4    provided to you by Lieutenant Fernandez as part of his

5    investigation?

6  A.    Yes.

7  Q.    Does a Statement of Probable Cause have to include

8    every document that's been part of the investigation?

9        **MR. GORDON:** Calls for a legal conclusion, expert

10   opinion.

11       **THE WITNESS:** No. It only requires the elements be

12   met.

13 Q.    MR. NORTHCUTT: And in terms of your experience as a

14   detective, do you always look up or is it routine for you to

15   look up the Penal Code section before writing the -- your

16   probable cause statements?

17       **MR. GORDON:** Vague as to "routine."

18       **THE WITNESS:** No, that is not common for me to look

19   up Penal Code sections.

20 Q.    MR. NORTHCUTT: Is that because you're familiar with

21   the elements of certain Penal Code sections?

22 A.    Yes.

23       **MR. GORDON:** Objection. Leading.

24 Q.    MR. NORTHCUTT: Did -- I think you testified earlier

25   you didn't read the entire letter from Jessica Long that was

---

Page 178

1    dated June 28, '22, before executing the warrant; is that

2    correct?

3  A.    Yes.

4  Q.    We've talked about your warrant for multiple hours

5    now.

6        Do you have an understanding one way or the other

7    whether Cedar the goat was eventually obtained pursuant to

8    your warrant?

9  A.    **I was informed by Detective Duncan, by Lieutenant**

10   **Fernandez that the Cedar the goat was not found at the**

11   **location in the warrant and that no evidence was seized**

12   **pursuant to the search warrant.**

13       **MR. NORTHCUTT:** That's all I got.

14       Oh, I do want to just put on the record the same

15   objection we did yesterday with Detective Duncan that

16   pursuant to Federal Rules of Procedure 30(e) you're entitled

17   to one day of seven hours of testimony. And since we

18   presented our witness, who is available to testify, and

19   since plaintiff has had an opportunity to take his

20   deposition, that this deposition has been concluded in

21   defendant's position.

22       Do you want to stipulate as to -- do you have some --

23       **MR. GORDON:** Yeah, I'm just going to say -- yes. I

24   put it on the record yesterday we're preserving our rights

25   to whatever time we have left, since discovery is ongoing,

---

Page 179

1    and I get additional questioning, given that we have a

2    discovery deadline. But, yes, your objection is preserved.

3    Mine is preserved. You may -- we can do the same

4    stipulation for certified -- the one you're referring to.

5        **MR. NORTHCUTT:** Right. A certified copy can be used

6    as an original for all purposes of this litigation,

7    including at the time of trial.

8        **MR. GORDON:** Yes.

9        **MR. NORTHCUTT:** So stipulated.

10       **MR. GORDON:** So stipulated.

11       **MS. SHAKIB:** So stipulated.

12       **MR. GORDON:** John, do you have anything?

13       **MR. BRIDGES:** No, nothing from me. It all sounds

14   good. Thanks.

15       **THE VIDEOGRAPHER:** This is the end of the deposition

16   of Jeremy Ashbee. All video originals will be retained at

17   the offices of Redding Video Productions at 8954 Old Oregon

18   Train, Redding, California.

19       We're off the record and the time is 14:00.

20       **COURT REPORTER:** Can I please get any transcript

21   orders at this time?

22       **MR. GORDON:** We want a copy.

23       **MR. NORTHCUTT:** We'll want a copy, both of the

24   transcript and of the video.

25       (The deposition adjourned at 2:01 p.m.)

---

Page 180

1

2              PENALTY OF PERJURY

3

4        I, the undersigned, hereby certify that I have read

5    the foregoing deposition, that I know the contents thereof,

6    and I declare under penalty of perjury under the laws of the

7    State of California that the foregoing is true and correct,

8    and that there are:

9

10   (Check one)              _____  NO CORRECTIONS

11                            _____  CORRECTIONS AS ATTACHED

12

13   Executed this _____ day of _____, 2023.

14

15

16

17

18

19

20            _____

20            Detective Jeremy Ashbee

21

22            ---o0o---

23

24

25

---

LONG vs.
FERNANDEZ

DETECTIVE JEREMY ASHBEE
August 23, 2023

Page 181

1
2                    CERTIFICATE OF REPORTER
3
4        I, JULIE BANGHART, a Certified Shorthand Reporter,
   licensed by the State of California, License No. 10547,
5  being empowered to administer oaths and affirmations
   pursuant to Section 2093(b)(1) of the Code of Civil
6  Procedure, do hereby certify:
7        That the witness in the foregoing deposition,
   Detective Jeremy Ashbee, was present at the time and place
8  specified and was by me sworn to testify to the truth, the
   whole truth, and nothing but the truth;
9
         That said proceeding was taken before me in shorthand
10 writing, and was thereafter transcribed under my direction
   by computer-aided transcription;
11
         That the foregoing transcript constitutes a full,
12 true, and accurate record of the proceedings which took
   place;
13
         That I am not of counsel of attorney for any of the
14 parties hereto, or in any way interested in the event of
   this cause, and that I am not related to any of the parties
15 hereto.
                                              02:00
16       IN WITNESS WHEREOF, I have hereunto subscribed my
   signature on this 16th day of October, 2023.
17
18
19
20
21       _____
22                    JULIE BANGHART, CSR 10547
23
24
25

Page 182

1               DEPONENT'S CHANGES OR CORRECTIONS
2  INSTRUCTIONS:  Upon reading the transcript, please note any
   changes or corrections on this sheet.  DO NOT make any marks
3  or notations on the actual transcript.  Use additional pages
   if needed.  If there are no changes, write "No Changes."
4  SIGN AND DATE THIS FORM BELOW.
5  DEPOSITION OF:       Detective Jeremy Ashbee
   CASE NAME:           E.L. vs. Jerry Fernandez, et al.
6  DEPOSITION DATE:     Wednesday, August 23, 2023
7  PAGE    LINE    CHANGE/CORRECTION
8  ____    ____    _____
9  ____    ____    _____
10 ____    ____    _____
11 ____    ____    _____
12 ____    ____    _____
13 ____    ____    _____
14 ____    ____    _____
15 ____    ____    _____
16 ____    ____    _____
17 ____    ____    _____
18 ____    ____    _____
19 ____    ____    _____
20 ____    ____    _____
21
22       I, Detective Jeremy Ashbee have read my deposition
   of August 23, 2023, and hereby affix my signature that
23 same is true and correct, except as noted above
24 _____          _____
       SIGNATURE                      DATE
25

1

2                         CERTIFICATE OF REPORTER

3

4           I, JULIE BANGHART, a Certified Shorthand Reporter,
     licensed by the State of California, License No. 10547,
5    being empowered to administer oaths and affirmations
     pursuant to Section 2093(b)(1) of the Code of Civil
6    Procedure, do hereby certify:

7           That the witness in the foregoing deposition,
     Detective Jeremy Ashbee, was present at the time and place
8    specified and was by me sworn to testify to the truth, the
     whole truth, and nothing but the truth;

9
            That said proceeding was taken before me in shorthand
10   writing, and was thereafter transcribed under my direction
     by computer-aided transcription;

11
            That the foregoing transcript constitutes a full,
12   true, and accurate record of the proceedings which took
     place;

13
            That I am not of counsel of attorney for any of the
14   parties hereto, or in any way interested in the event of
     this cause, and that I am not related to any of the parties
15   hereto.

16          IN WITNESS WHEREOF, I have hereunto subscribed my
     signature on this 16th day of October, 2023.

17

18

19

20

21                         _Julie Banghart_____

22                         JULIE BANGHART, CSR 10547

23

24

25

                                                              181

**$**

**$902 (2)**
120:12,14

**A**

**abatement (1)**
89:22
**above (2)**
147:9;163:12
**Absolutely (2)**
75:9;176:18
**abuse (3)**
17:21;47:8;48:3
**academy (22)**
27:18,18,21;28:10,
15,16,19,21;29:1,9,9,
11,14,15,25;32:2;33:3;
34:15,16;35:4;86:9,17
**acapella (1)**
60:13
**access (2)**
114:4,5
**accordance (1)**
58:22
**According (1)**
120:11
**accurate (7)**
75:5;76:15;77:19;
87:5,6;133:15;167:7
**accurately (2)**
8:3;37:10
**accused (1)**
37:14
**acknowledging (1)**
105:21
**acknowledgment (1)**
105:23
**acronym (3)**
35:15;38:13;74:22
**action (2)**
25:17;58:20
**actions (2)**
109:8;157:24
**active (1)**
17:20
**actively (2)**
19:23;110:20
**activity (1)**
58:17
**Actual (4)**
49:21;54:16;77:16;
110:11
**actually (4)**
48:14;54:8;135:9;
143:8
**actus (1)**
66:15
**add (21)**
57:10;59:8,12;60:4,
8;61:25;109:23,24;

111:5;129:5;136:1;
141:4,6,8,9,18;144:4,
23;146:22;150:18;
163:13
**added (6)**
135:22;143:5;151:4,
10,22;164:8
**additional (2)**
124:7;179:1
**Additionally (3)**
60:1,3;136:23
**additions (1)**
62:1
**address (4)**
19:16;80:17;172:3,
20
**addresses (1)**
170:4
**adjourned (1)**
179:25
**admission (3)**
99:1;105:20;129:18
**admissions (1)**
125:10
**admit (3)**
100:7,13;101:3
**admits (3)**
93:2;104:23;124:25
**admitted (3)**
104:20;125:8;149:19
**adopt (1)**
106:21
**advice (1)**
141:17
**advise (2)**
9:22;144:4
**advised (6)**
37:17;141:7,9,17;
142:25;143:2
**affect (1)**
131:22
**Affiant (4)**
55:9;56:2;61:24;
62:20
**affidavit (19)**
49:1,10,24;55:4,5,8,
9,25;59:21,23;61:2;
62:11,12;65:18;99:8;
115:3,10,11;126:4
**aforementioned (1)**
147:11
**afternoon (1)**
80:5
**afterwards (3)**
19:11;35:7;38:11
**again (16)**
39:4;43:20;54:9;
55:23;56:3;61:5;76:5;
125:24;130:4;134:18;
141:24;145:15;147:6;
150:23;151:16;157:17
**against (3)**
58:15,19;149:16

**agency (6)**
24:11;33:14,15;
37:20;138:15;158:24
**ago (10)**
18:10;31:24;34:19;
36:18;43:5,14;66:1;
76:6;108:1;167:11
**agree (3)**
127:22;135:6;142:5
**agreed (2)**
90:6;149:4
**agreement (1)**
96:10
**Agricultural (3)**
4:24;24:22;82:14
**agriculture (2)**
69:15;159:4
**Ah (3)**
29:3;118:10;166:16
**ahead (11)**
8:14;25:12;26:23;
64:7;85:25;108:25;
126:21;131:6,20;
142:12;159:15
**alert (3)**
146:23;147:5,6
**alerted (4)**
111:1,3,10,16
**alleged (10)**
25:6;26:12;80:2;
84:15;139:4;149:16;
157:5,5,6,16
**allegedly (3)**
117:12;139:10,11
**allow (1)**
147:10
**allowed (1)**
117:9
**allows (1)**
145:23
**Almost (2)**
46:6;97:1
**along (1)**
175:7
**alter (3)**
57:18;151:11,12
**alternative (2)**
58:14;89:21
**although (1)**
89:5
**Always (7)**
21:3,4;61:9;136:1;
171:7,23;177:14
**ambiguous (18)**
64:6;91:17;99:23;
105:15;106:18;108:4,
24;109:22;114:9,19;
117:1;121:25;131:4,
18;133:4;134:23;
142:1;151:15
**amend (1)**
175:20
**amended (1)**

174:16
**Amendment (12)**
34:22;36:11;37:15;
38:9,18;39:12;41:3;
43:17;44:24;45:4,5;
157:6
**amount (1)**
113:11
**Animal (27)**
15:21;16:1,5,10,15,
21;17:2,13,22;18:20,
21,25;19:13;21:17;
24:16;67:15;74:14;
120:17,24;121:7,10;
122:7;141:22;148:11,
16;149:18,25
**animals (10)**
19:8;21:12,13;
140:24;143:4,5;
146:22;148:5,11,12
**answered (16)**
43:19;71:20;91:18;
94:5;96:23;101:25;
103:1,11;106:2,20;
108:4,6;111:11;112:8;
134:22;145:11
**anticipation (4)**
106:15;108:7;
111:20;112:4
**apart (1)**
47:18
**apologies (4)**
23:21;49:15;61:18;
161:23
**apologize (8)**
13:9;36:10;87:20;
151:21;161:9,11,18;
171:22
**apology (1)**
165:5
**appeals (1)**
58:21
**appear (1)**
128:24
**appeared (1)**
96:9
**appears (4)**
90:10;98:6;104:16;
146:19
**applied (4)**
15:16,19,19,25
**applies (1)**
75:23
**apply (5)**
15:17,22;53:20;
150:20;151:7
**appreciate (2)**
108:14;117:10
**appropriate (1)**
140:25
**approved (4)**
48:23;49:21;61:3;
92:19

**approves (1)**
50:15
**approving (1)**
61:6
**Approximately (4)**
29:20;46:17;84:10;
162:14
**area (1)**
62:11
**argue (1)**
135:4
**Argumentative (13)**
93:21;99:3,15;102:1;
103:1,12;104:15;
114:20;116:25;117:7;
131:19;133:5,20
**arisen (1)**
92:7
**around (1)**
117:18
**arrest (7)**
16:14,25;17:1,12,23;
18:3,8
**arrests (3)**
17:3,24;22:22
**ASHB (1)**
87:16
**Ashbee (10)**
4:2;5:2;6:2,10,16;
76:13;77:1;87:24;
179:16;180:20
**A-S-H-B-E-E (1)**
6:16
**Ashman (1)**
6:25
**aside (2)**
18:7;79:15
**aspect (1)**
44:24
**asset (1)**
58:14
**assets (1)**
58:15
**assigned (8)**
24:21;30:6,9;153:16,
16,19;154:4,6
**assist (1)**
124:8
**associated (1)**
4:11
**Association (1)**
4:24
**assume (10)**
40:10;61:25;66:6;
78:24;109:20;117:18;
121:10;122:3;148:1,9
**assumed (3)**
41:19;60:12;119:22
**Assumes (6)**
90:8;95:17;109:18;
117:14;119:2;131:19
**assuming (5)**
31:20;40:8;42:3;

151:3;159:18
**A-T-O (1)**
30:21
**attached (11)**
83:24;84:1,6;86:22;
87:2;97:16;124:15;
163:13,16;177:2;
180:11
**attaches (1)**
54:6
**Attachment (15)**
55:15;86:25;87:20;
98:9,10,24;125:22;
126:9,16;146:9,9;
163:20;164:1,8;166:15
**attachments (3)**
86:23;163:19,23
**attend (2)**
158:9;159:2
**attended (1)**
35:12
**attorney (17)**
7:18;9:22;10:7;
25:18;50:13,15;51:7,9,
16;58:22;61:4;76:8;
77:13;142:1;152:23;
153:7;156:19
**attorney's (3)**
9:15;50:12;152:24
**auction (9)**
74:8;90:6;96:17,18;
120:12;121:7;122:22,
23;123:12
**auctions (3)**
73:8;74:7;95:15
**audible (1)**
7:24
**August (2)**
4:3;6:4
**author (1)**
114:21
**authored (3)**
152:4,8,11
**authority (2)**
61:13;81:15
**authorize (1)**
137:16
**authorized (4)**
124:7;135:19;
136:13,15
**authorizes (1)**
136:5
**available (1)**
178:18
**avoid (2)**
52:14;170:18
**aware (18)**
27:12;40:18;72:14,
16;78:16;90:21;92:9;
93:11;95:14,18,19;
117:16,17;143:7;
145:14,24,25;156:2
**away (1)**

50:1

**B**

**Bachelor's (1)**
12:11
**back (38)**
31:22,22,22;43:25;
50:16;52:19;53:14,16;
63:14;69:8,10;75:17;
77:11;82:11;84:12;
103:25;106:5;116:1;
121:20;126:14,18,23,
25;141:19;158:10;
160:20;162:5,7;
164:24;165:11;167:9;
168:23;169:18;170:18;
173:1,8,8;176:6
**backed (1)**
154:18
**background (2)**
11:17;62:3
**Bakersfield (9)**
12:1,5,24,25;13:3;
69:14;73:14,16,24
**Banghart (2)**
4:10;6:5
**bar (1)**
14:20
**barbecue (6)**
93:14;120:18;158:9,
16,18,20
**based (5)**
35:16;114:17,17,22;
160:1
**basic (3)**
28:15;66:14;82:10
**basically (8)**
10:25;30:7;38:13;
90:7;92:20;122:5;
142:5;146:15
**basics (1)**
66:13
**basis (3)**
19:22,24;20:1
**Bate (2)**
104:4;127:25
**Bates (17)**
76:13;77:17;78:21,
22;87:12,21;89:5;
106:11;124:16;128:1;
135:14;160:20;163:1,
3;165:10;166:10,23
**battery (1)**
170:25
**became (3)**
32:1,1;82:19
**become (1)**
14:11
**becomes (1)**
155:5
**becoming (1)**
27:19

**beforehand (5)**
51:14;52:8;86:5;
88:5,10
**beginning (2)**
4:5;37:9
**begins (2)**
79:9,10
**behalf (4)**
4:22;5:1,2;6:2
**behind (2)**
85:3;116:12
**belong (3)**
90:23;91:15;93:9
**Below (7)**
55:9;56:6;58:18;
59:20;61:1,16;62:15
**best (6)**
7:21;8:10;9:9;10:4;
11:14;20:3
**better (2)**
134:4;164:8
**bickering (2)**
127:25;146:2
**bicycle (5)**
117:22,24,24,24;
118:1
**big (2)**
75:11;156:20
**bike (1)**
117:21
**bikes (1)**
117:18
**bind (1)**
87:3
**binder (10)**
32:11,12,19,19;33:9,
10,13;38:16;42:13,14
**bit (2)**
44:18;82:11
**blah (3)**
146:23,23,23
**blank (6)**
49:23;54:10,22,24;
56:22;172:12
**Bleating (5)**
125:5,22,23;126:12;
173:19
**Bleeding (1)**
126:8
**Board (2)**
72:3,7
**Bodner (4)**
30:13;31:1,14,18
**B-O-D-N-E-R (1)**
30:15
**body (3)**
66:20,21,22
**booklet (1)**
9:13
**born (1)**
12:1
**boss (2)**
144:1,2

**both (6)**
38:12;47:10,14;
48:25;150:4;179:23
**bottom (8)**
49:19,20;78:21;
87:14;89:7;100:12;
126:11;135:18
**bought (2)**
89:20;93:4
**box (3)**
56:14;107:14;113:15
**boxes (9)**
55:13;56:6,13,16;
60:18,20;95:10;135:2;
159:5
**brackets (2)**
55:8,22
**breaching (2)**
137:14,15
**break (5)**
53:8;63:19;96:25;
161:25;162:9
**Brian (14)**
81:5;89:19;90:3,16,
19,24;91:1,5,10;92:19;
93:4,9;120:11,11
**BRIDGES (5)**
4:17,19,22,22;
179:13
**Brief (6)**
39:7;50:9,9;68:20,
22;85:20
**briefing (1)**
143:22
**briefly (2)**
47:5;83:23
**bring (2)**
150:8,10
**broad (1)**
76:21
**broke (1)**
76:6
**broken (1)**
29:1
**brought (3)**
138:16,17;158:10
**browbeat (1)**
106:9
**Bruce (1)**
71:2
**bucks (1)**
117:13
**busy (3)**
20:16,17,17
**Butte (3)**
29:16,17,18
**button (1)**
59:7
**buy (1)**
121:16
**buyer (1)**
89:19
**buys (1)**

121:7

**C**

**California (15)**
4:10,23;6:4,6;12:1;
14:14;47:1;55:7,24;
58:23;94:8;95:11,12;
179:18;180:7
**call (21)**
6:25;19:10;27:23;
34:17;39:8,8;51:24;
52:8;17;54:20,24;55:2;
61:18,20;119:1,14,21;
135:7;159:6;171:4;
173:21
**called (14)**
16:13,25;28:10,11;
29:11,12;30:5;35:12;
41:16;91:1;119:17;
174:3,6;175:18
**calling (1)**
114:2
**calls (36)**
8:1;10:25;19:5,7,25;
20:11,22,23,24,25;
22:20;24:20;27:6;34:3;
39:13;68:25;94:10;
95:16;101:14;105:9;
106:19;107:6;108:22;
111:5;128:6;129:22;
130:11,19;131:5;
142:16;146:4;147:1;
149:2;150:21;157:24;
177:9
**came (5)**
80:22,24;86:9,16,16
**can (100)**
7:13,13;8:4,16;9:5,
20,21;10:13,20,20;
17:23;20:3;24:25;
26:24;27:1;31:10;
36:19;43:8;46:2;49:11;
53:8,10;54:12,12,13;
57:18;59:10,11,18;
60:13;61:11;62:1,13;
66:8;69:6,7,9;75:13,
24;76:4,12;77:13;
79:15;87:9;88:25;
92:10;93:23;105:7;
106:22;107:15,24;
109:24;110:9;116:1;
117:3,25;126:19;
127:13;129:23;130:23;
132:24,24;133:18,23;
135:6,13;138:9;
139:17,21;140:2,4,12,
16;141:18;142:17;
149:12,22;150:19,24,
25;151:17;152:23;
159:10;160:7,15;
161:17,19,25;163:1,3;
171:7,20,25;172:15,21;

173:5;175:25;179:3,5,
20
**capable (1)**
94:1
**capacity (1)**
22:20
**car (3)**
26:20;139:21;140:7
**card (1)**
14:18
**career (3)**
21:16;45:23,25
**carry (1)**
17:5
**carrying (1)**
17:4
**Case (43)**
4:6;10:3;17:15,15;
18:9;19:14;23:2,7,13;
24:15;25:2,5,6,9;45:6,
13,15,18,18,20;50:5,
10;60:16;68:18;74:11,
15,16,23;109:5;
110:20;111:19;112:2;
116:8;118:2;137:12;
143:17,20;145:1;
149:16,22;168:22;
176:18,23
**cases (24)**
17:7,11;18:4,19,21,
23;19:3,14,20,23,25;
21:5;22:24;24:17;26:7;
27:12;58:19;65:6,7,10;
118:3;145:7;155:2;
156:16
**casually (1)**
113:16
**categories (2)**
76:20;145:22
**Cause (55)**
50:18;53:3,4;54:5;
55:15;59:24;60:19;
61:3;62:5,12,20,24;
63:6,24;64:2,5;65:18,
25;68:18;84:16;89:12;
97:20;99:9;113:21;
115:4,10,11,22;124:5;
126:4;128:10,20;
129:9,12;130:3;131:3,
9,10;134:12;136:8;
137:1,18;144:19;
151:23;159:25;160:4,
5;161:7,8;165:14;
167:10;169:7,8;177:7,
16
**Cedar (21)**
74:12,13,13,20;75:1,
1;79:24;100:7;101:2;
108:8;122:12;124:25;
125:22;126:8;137:24;
147:15;148:18,25;
158:9;178:7,10
**Cedar's (2)**

127:1;138:2
**certain (11)**
8:8;29:4;39:24,24;
40:1;43:12;114:7;
120:4,5;141:18;177:21
**Certified (3)**
6:6;179:4,5
**certify (1)**
180:4
**CF0060 (1)**
49:8
**CF-0060 (1)**
49:22
**chain (2)**
134:14;163:11
**Challe (3)**
4:9,11;6:2
**chance (1)**
128:18
**change (17)**
9:17,20,20;52:19;
59:4,8,14;103:21;
104:11;108:17;109:2,
16;111:24;138:22;
150:12;151:11,13
**changed (5)**
59:5,6;108:21;
110:14,15
**changes (3)**
10:1;44:6;45:8
**chapter (1)**
138:24
**charged (1)**
93:15
**check (19)**
18:15;55:13;56:6,15,
16;60:20;66:24;76:18;
85:2;107:14;121:17,
19;159:15,15;160:12;
172:11;174:10,16;
180:10
**checked (2)**
174:2,7
**checking (4)**
95:10;113:15;135:2;
159:5
**chicken (1)**
27:19
**child (2)**
47:8;48:2
**Chris (7)**
141:7,9;143:8;
144:22,24;146:21;
150:17
**Christmas (1)**
9:3
**Circle (2)**
80:13,18
**Circuit (1)**
45:16
**circumstances (7)**
66:21,22;112:14,15;
118:12;141:21;176:17

**citations (2)**
17:8;18:5
**citizen (1)**
147:17
**citizens (1)**
19:8
**City (3)**
22:4,5,9
**civil (36)**
25:10,16,17;26:8,14,
21;27:5,9,10,12,15;
28:3;29:4,5,22;30:1;
31:2;32:19;33:2,4,16,
22,23;38:11,24;40:2,
17;43:1,6,8;95:12;
96:3,8;97:3;112:13;
121:17
**claimed (1)**
104:12
**claiming (5)**
91:16;93:16,18,23;
107:13
**clarify (2)**
16:12;49:7
**class (11)**
16:14,16,18,20;18:6,
11,12,16;46:24;47:1;
48:16
**classes (2)**
48:5,6
**classic (1)**
8:16
**clean (1)**
158:6
**cleanse (1)**
155:19
**clear (1)**
93:1
**clearly (1)**
174:12
**client (5)**
10:25;94:19;98:7;
104:12;174:7
**clip (3)**
75:11;115:25;163:21
**clock (1)**
110:8
**Closer (4)**
37:9,9;46:21,22
**club (4)**
81:9,13,16;96:20
**clubs (1)**
82:14
**clue (2)**
72:4,5
**coaching (1)**
10:25
**Code (23)**
58:13,23,25;62:4;
64:16,22;65:11;66:3,6,
24;67:7;85:12;86:6,17;
95:11,12;111:17,18;
138:6;146:25;177:15,

19,21
**codified (1)**
65:11
**collection (1)**
124:9
**college (10)**
13:2,5,6,7,8,11;14:4;
29:16,17,18
**colon (1)**
60:3
**comfortable (3)**
38:9;64:25;133:10
**coming (2)**
138:4;158:8
**comma (1)**
100:13
**commanded (5)**
56:21;57:11,24;
136:19,22
**commencing (1)**
6:5
**comment (5)**
10:2;168:24;169:2,3,
5
**commented (1)**
164:16
**Commercial (2)**
95:11;121:17
**committed (5)**
105:12,13,20,22;
109:5
**committing (2)**
56:8,10
**common (4)**
65:2;176:13;177:1,
18
**commonplace (1)**
176:21
**communicate (2)**
90:18;169:9
**communicated (2)**
89:17,19
**community (2)**
89:20;120:18
**company (1)**
156:4
**complaining (1)**
96:12
**complaint (1)**
21:9
**complaints (3)**
19:7,15;20:8
**complete (6)**
30:5;77:6;78:25;
162:12;166:18,20
**completed (5)**
47:6;159:21;160:10,
15;162:11
**completely (2)**
124:24;154:24
**complicated (1)**
54:13
**components (1)**

19,21
**computer (11)**
49:11;75:22;76:18;
154:6,10,16;155:7,15,
15;156:23;170:23
**concern (2)**
122:22;131:19
**concerned (6)**
122:24;131:15,23;
132:2,3,4
**concerning (1)**
107:4
**concluded (2)**
31:17;178:20
**Concluding (3)**
62:6;147:8;150:17
**conclusion (16)**
11:1;27:7;69:1;
94:11;95:17;101:15;
106:19;107:7;108:4,9;
130:19;131:5;147:2;
149:3;150:22;177:9
**conclusions (2)**
105:5,8
**concurrence (1)**
58:21
**conditions (1)**
17:23
**conducted (1)**
173:18
**Confidential (1)**
55:15
**confirm (3)**
166:24;167:6;168:5
**Confirmation (2)**
149:10,12
**confirmed (1)**
173:19
**confiscate (1)**
148:13
**conflict (6)**
145:6,10;146:24;
147:3,5;151:6
**conflicting (5)**
150:19;152:22;
153:1,8,10
**conflicts (1)**
141:12
**confused (1)**
41:1
**consent (3)**
173:19;174:22;175:1
**consequences (1)**
93:3
**constitute (1)**
104:24
**constitutes (2)**
105:6,8
**consumption (2)**
123:22,24
**contact (3)**
18:1;25:17;152:23
**contacted (3)**

90:16;91:5,10
**contain (1)**
  95:14
**contained (1)**
  97:19
**contention (1)**
  174:10
**contents (2)**
  18:11;180:5
**contract (8)**
  22:5,6,7;27:10;
  33:16;96:10,17,18
**contracts (1)**
  33:17
**contractual (5)**
  30:1;31:3;32:20;
  33:2,5
**contradicted (2)**
  110:13;111:23
**contradicts (2)**
  111:17,25
**contrary (3)**
  112:16,19;131:10
**control (9)**
  16:14,24,25;17:1;
  18:3,9,20;148:11;
  171:17
**conversation (6)**
  10:9;80:25;90:2;
  145:16;164:10;168:17
**convert (1)**
  57:15
**copies (1)**
  77:11
**copy (14)**
  49:15;54:12,14;
  75:10;79:8;112:20;
  163:16;169:20,24;
  170:20;175:22;179:5,
  22,23
**core (9)**
  34:13;35:13;36:13;
  38:20;47:3;48:8,10,10,
  11
**corners (1)**
  78:22
**CORRECTIONS (2)**
  180:10,11
**Correlated (1)**
  154:12
**corroborating (5)**
  127:7,9,17;149:11,
  14
**Counsel (2)**
  4:12;5:5
**County (38)**
  5:2;15:16,18;20:18,
  20;22:5;49:20,22;55:7,
  25;58:21;61:4;73:15,
  17,17;74:1;82:6,22;
  84:20,22,23;85:8;
  99:13;118:6,10;
  120:10;125:11,12,16,

18,20;154:21,22;
168:18,21;173:18,22,
24
**couple (4)**
  15:20;73:15;74:4;
  78:6
**course (38)**
  14:14,15,17,18;18:2;
  26:9;27:22;28:5,19;
  29:19;35:11,13,14,23;
  36:1,12,14,16;37:19;
  38:8,17,20;44:16,19,
  23;45:4;47:3,4,18;
  48:8,11,13,14;53:18;
  63:6;76:12;142:14;
  152:14
**courses (21)**
  28:11,13,17;29:2,8;
  34:13;37:13,17,18,22;
  44:8,11,12;47:6,9,10,
  14,14,15,19;48:3
**Court (16)**
  4:7,10,13;9:24,25;
  49:22;58:25;79:17,20;
  116:2;142:23;165:6,7;
  171:25;173:4;179:20
**courts (1)**
  17:8
**Court's (1)**
  49:5
**cover (1)**
  36:15
**covered (2)**
  27:18;48:8
**covering (1)**
  47:19
**covers (3)**
  28:24;30:7;35:13
**cow (1)**
  21:10
**Cows (1)**
  21:14
**crime (19)**
  17:7;23:22;27:9;
  62:21,23;63:25;64:4,
  17,18;65:2;66:23;
  127:8;128:19;130:17;
  131:2;133:9;137:25;
  147:16;150:2
**crimes (2)**
  23:9;24:22
**crime's (1)**
  64:3
**criminal (16)**
  25:10;27:5,8,15;
  29:4;35:16,18;38:11,
  24;40:16;43:6,7;93:12;
  96:11,14;98:7
**cross-examine (1)**
  135:8
**cross-referenced (1)**
  154:12
**cruelty (1)**

17:13
**curiosity (4)**
  63:9;136:18;144:15;
  148:9
**Curious (7)**
  32:24;45:16;58:3;
  118:13;144:2;163:25;
  169:25
**currently (3)**
  22:3;100:17;163:14
**custody (4)**
  26:10;125:1;139:8;
  150:10
**customary (4)**
  114:6,10,14,16
**cut (1)**
  126:15

### D

**DA (15)**
  61:6,11;66:18;
  142:25;144:3,3,5,9,10,
  24;146:1,8,10;159:21;
  161:21
**Dahle (13)**
  81:5;89:20;90:3,19,
  24;91:1,5,10;92:19;
  93:4,9;120:11,11
**Dahles (5)**
  89:16;121:20,20;
  174:3,6
**Dahle's (1)**
  90:16
**damages (1)**
  92:7
**Damian (8)**
  5:1;76:15;89:1;
  102:11;107:8;109:19;
  170:12,16
**DA's (8)**
  17:16;51:17,19;
  141:14,16;162:15,21,
  24
**date (16)**
  4:3;49:22;79:8,11,
  14,18,19;88:23;
  160:19;161:1,1,2,7;
  165:15,16,25
**dated (1)**
  178:1
**dates (2)**
  31:9;78:4
**daughter (2)**
  74:22;82:11
**daughter's (5)**
  100:7,14;101:3;
  111:21;112:5
**day (27)**
  19:6;20:11,14,14,15,
  15,16,17,17;59:17;
  75:3;79:24;98:20,21;
  104:12;108:18;116:15;

118:20,23;119:1,7,14,
15,21;173:7;178:17;
180:13
**days (5)**
  20:24,25;78:15,17;
  157:3
**day-to-day (3)**
  19:21,24;20:1
**dead (1)**
  66:10
**deadline (1)**
  179:2
**dealing (2)**
  20:8;176:20
**dealt (1)**
  96:4
**death (3)**
  65:10;66:10,11
**deceptive (1)**
  133:17
**decision (2)**
  23:6;40:22
**declare (1)**
  180:6
**declined (1)**
  25:9
**default (2)**
  61:19;138:21
**defendant (1)**
  7:3
**Defendants (3)**
  4:24;5:3;58:20
**defendant's (1)**
  178:21
**defer (1)**
  17:11
**definitely (1)**
  126:13
**Degree (3)**
  12:11,15,18
**delete (2)**
  155:14,16
**deleting (1)**
  156:3
**delivered (1)**
  43:3
**deny (1)**
  104:22
**Department (11)**
  21:25;33:11;35:19,
  21;68:23;117:15;
  148:24,24;153:22,24;
  176:14
**department's (1)**
  39:22
**depending (1)**
  55:16
**depends (4)**
  19:14;50:5;52:23;
  112:14
**depo (1)**
  75:23
**depo's (1)**

124:14
**deposed (2)**
  7:6;78:17
**deposition (14)**
  4:2,8;6:1,3;9:12;
  10:1;11:19;54:21;
  165:10;178:20,20;
  179:15,25;180:5
**depositions (1)**
  170:17
**deputies (5)**
  17:11;140:24;
  147:10;154:4;173:18
**deputy (18)**
  16:11;18:1;19:11,13;
  21:20,21,22,24;22:2,3;
  24:21;31:14;36:24;
  37:1;40:22;41:14;
  144:9,10
**derived (3)**
  58:17;160:5,5
**describe (1)**
  81:25
**described (5)**
  38:23;81:20,22;83:2;
  141:24
**description (3)**
  57:5,6;62:6
**descriptions (1)**
  57:7
**details (1)**
  111:8
**Detective (42)**
  4:2;5:2;6:1,10;23:4;
  24:4,5,8,10;25:1,19,21;
  35:13;36:13;37:3,19,
  20;38:20;44:20;46:4,6;
  47:3,6;48:10,18;75:20;
  78:16;87:11;104:3;
  116:13;135:13;140:21;
  165:12;172:6;176:13,
  13,20,21;177:14;178:9,
  15;180:20
**detectives (5)**
  23:9,12;24:11;
  176:14,20
**determination (2)**
  67:19;139:14
**determine (11)**
  23:1,3,7;68:11,19;
  132:12;133:23;149:9;
  150:20;151:6,8
**determines (1)**
  94:8
**determining (2)**
  27:15;135:9
**detrimental (1)**
  10:3
**deviate (1)**
  145:23
**devoted (1)**
  48:3
**dictate (1)**

40:19
**difference (4)**
  8:12,23;27:4;171:24
**differences (1)**
  170:8
**different (10)**
  9:24,25;10:20;24:8,
  9;26:8;28:17;163:23;
  170:14;173:15
**directed (1)**
  77:25
**Directors (2)**
  72:3,7
**disciplinary (1)**
  157:23
**disciplined (3)**
  15:4;157:4,12
**discover (1)**
  133:18
**discovery (3)**
  77:25;178:25;179:2
**discretion (4)**
  51:6;53:24;132:12;
  151:7
**discuss (3)**
  32:19;51:24;52:2
**discussed (1)**
  141:25
**discussing (2)**
  54:1;129:13
**discussion (1)**
  85:20
**Disney (1)**
  74:17
**disposed (1)**
  58:22
**dispute (28)**
  25:15;26:13;27:5,8,
  9,9;40:17;90:19;92:22;
  95:22;96:9,22;100:9,
  15;101:13,19,24;102:8,
  25;103:10;106:16,23;
  111:1,4,10;112:13;
  140:5,9
**disputed (1)**
  139:9
**disputes (11)**
  26:8,11,13;30:1;
  31:3;32:20;33:2,5,17;
  38:25;96:3
**disrespect (3)**
  132:25;134:18;
  141:24
**distraught (1)**
  82:20
**District (11)**
  4:7,23;50:12;58:22;
  61:4;71:25;72:18;75:2;
  81:4;90:13;152:23
**Division (1)**
  4:7
**doc (1)**
  59:7

**DockSigned (1)**
  172:8
**document (17)**
  57:14,15;59:15,18;
  60:13;77:16;88:1,3,6,
  10;119:10;137:7,8;
  156:19;159:11;161:17;
  177:8
**documented (1)**
  155:6
**documents (17)**
  76:9,23;77:9,21;
  83:8,12,16,18,21,23;
  84:4;87:11;114:4,5;
  132:14;177:2,3
**DocuSign (10)**
  50:16,19;57:17;
  165:22,22,24;167:15;
  168:3,4,9
**DocuSigned (4)**
  167:17;172:5,8,12
**domain (1)**
  28:9
**domains (6)**
  27:23,25;28:11,22;
  29:2,21
**donate (2)**
  90:7;158:21
**donated (9)**
  81:6;89:22;90:3,22;
  91:20;93:9;120:17;
  121:1;158:19
**donates (1)**
  121:7
**donations (1)**
  70:6
**done (12)**
  7:18;23:23;45:17;
  111:22;112:6;141:13;
  152:25;157:3;159:9,
  12;174:22;176:8
**double (2)**
  76:18;172:11
**doubt (1)**
  162:23
**down (7)**
  9:5,14;40:21;55:21;
  60:3;89:17;124:4
**download (3)**
  49:5;50:1;75:25
**downloaded (1)**
  49:19
**draft (9)**
  49:4;159:12,19;
  161:20;162:13;166:4,
  6,7;168:11
**drafting (5)**
  65:3;88:12,13;89:10,
  12
**drink (1)**
  11:9
**drive (3)**
  116:23;154:19,20

**driven (4)**
  82:5;118:6;125:16,
  18
**driveway (1)**
  139:25
**drop (1)**
  77:5
**Drove (1)**
  82:22;125:5,22
**drugs (1)**
  11:12
**due (11)**
  34:25;36:11;38:10,
  18;39:12;43:17;45:3;
  140:23;146:22;157:16;
  158:2
**duly (1)**
  6:11
**Duncan (6)**
  76:24;78:16;116:13;
  159:24;178:9,15
**Duncan's (1)**
  29:17
**duplicative (1)**
  76:25
**during (3)**
  58:16;101:2;143:22
**duties (3)**
  16:11;22:18;53:20
**duty (1)**
  17:6

## E

**Eamon (7)**
  144:10,13,14;
  159:23;164:5;167:5;
  172:13
**E-A-M-O-N (1)**
  144:10
**earlier (26)**
  54:11;65:22;75:23;
  85:21;95:25;100:17;
  104:8;105:4,18;
  108:16;113:11;136:7;
  138:10;153:13;156:21;
  157:2;163:12;166:12;
  168:16;169:13,14,20;
  172:8,8;174:24;177:24
**easier (1)**
  54:14
**easily (1)**
  57:16
**Eastern (1)**
  4:7
**education (4)**
  12:10,21;18:8;61:24
**Edwards (12)**
  141:7,9;143:9,10,11,
  12,13,16;144:22,24;
  146:21;150:17
**effect (2)**
  131:9,12

**eight-and-a-half-by-four (1)**
  8:19
**either (12)**
  31:1;39:12;40:18;
  43:17;46:12;52:16;
  70:23;72:25;73:1;81:6;
  161:4;175:17
**EL (4)**
  74:21,22;83:2,2
**electrically (1)**
  155:6
**electronic (2)**
  42:16,18
**element (8)**
  35:14;64:18;65:16,
  17;66:14,15;130:17;
  131:2
**elementary (1)**
  13:15
**elements (26)**
  27:8,12;63:24;64:4,
  9,11,12,15;65:19,22,
  24;66:9;67:4,7;85:20,
  23;96:11;147:19;
  127:8;128:19,25;
  130:3;133:9;177:11,21
**else (21)**
  17:18;26:17;41:7;
  47:22;50:3,8,8;57:4;
  60:4;66:12,20;82:3,7,9,
  18;91:20;93:6;101:21;
  104:18;117:11;134:19
**email (58)**
  43:4;44:5,9;51:21,
  22,23;52:17;83:14,15;
  86:22;87:2,23;88:23;
  89:6,7,9;92:3,6,9,14,
  16;93:1,2,11;97:7,8;
  98:5,9,25;99:10;
  105:18;122:16;132:15;
  134:21;144:8,18;
  154:14;155:20,22;
  156:23;159:13,14,17,
  19;162:22,23,25;
  163:11,12,17;164:6,7,
  7;166:11;168:1,2;
  172:3,20
**emailed (3)**
  83:16;84:4;86:20
**emails (10)**
  41:20;78:12;145:19;
  155:14,16;156:4;
  163:9;164:11;170:11,
  22
**embarrassing (1)**
  10:3
**embezeled (1)**
  56:7
**employee (6)**
  84:20,22,23;85:5,8;
  168:18
**employment (2)**
  14:5;15:14

**end (5)**
  9:12;15:15;37:9;
  103:23;179:15
**ended (2)**
  15:19,20
**enforce (1)**
  17:6
**enforcement (3)**
  17:3;69:6;153:23
**enough (3)**
  23:7;82:18;114:24
**ensure (1)**
  64:14
**enter (4)**
  163:4;164:25;
  166:13,19
**entire (2)**
  12:6;177:25
**entirety (4)**
  41:13;98:12,23;
  126:3
**entitled (5)**
  8:9;9:4,9;107:17;
  178:16
**entity (1)**
  110:11
**equipment (1)**
  137:14
**equipment's (1)**
  137:15
**Especially (1)**
  141:21
**essentially (1)**
  14:18
**established (1)**
  135:3
**estimate (13)**
  8:10,13,17,20,24;
  9:9;20:2,3,3;21:8;
  36:21;46:1;152:14
**estimates (1)**
  7:13
**etcetera (5)**
  33:17;71:18;78:13;
  143:4,4
**even (9)**
  44:11;92:2;93:2;
  105:7;110:3;128:22;
  147:15;157:8;176:22
**event (1)**
  158:24
**events (2)**
  114:7;162:10
**eventually (1)**
  178:7
**everybody (2)**
  77:24;154:3
**Everyday (2)**
  26:2,3
**everyone (1)**
  33:10;153:19
**Everything's (1)**
  50:24

**evidence (73)**
50:3,6;51:4;62:5,21,
24,25;63:1;68:22,24;
69:6,7;90:9;95:17;
99:14,18,19,21;109:18;
110:11,17,19;111:17,
23,25;112:16,19;113:7,
10,12;114:17;117:14;
118:22;119:2;124:9;
127:7,9;129:11,25;
131:20;133:2,13,19,24;
134:9,11,14;137:24;
138:2,14;141:11,13,18;
142:6;146:22;147:15,
22,23;148:1,2,2,17;
149:5,5;150:1;154:23;
157:13;163:4;165:1;
166:13,20;170:2;
178:11
**evidential (4)**
129:19;132:7,8,12
**evidentiary (6)**
129:1,5;132:13;
149:1,6,15
**exact (5)**
7:12;18:11;20:2;
62:10;73:7
**exactly (2)**
127:15,21
**EXAMINATION (2)**
6:14;176:12
**examined (1)**
6:11
**example (10)**
8:16;17:14,20;96:4,
6;130:16;139:21;
140:7;154:4;174:4
**examples (1)**
26:24
**exception (1)**
152:18
**exchange (3)**
94:16,18,25
**execute (3)**
46:9,10,12
**executed (5)**
51:10,11;152:5;
173:16;180:13
**executes (1)**
148:22
**executing (1)**
178:1
**execution (2)**
46:18;58:16
**exercise (1)**
151:7
**exhibit (32)**
63:17,20;75:20,24;
76:3;79:1,4,12;87:7,8,
22;104:3,4,4;124:11,
14,14,15,15,25;125:2;
126:7;128:1;135:15;
165:6,8,9;167:1,12,13;

173:4,14
**Exhibits (1)**
177:3
**existed (1)**
114:1
**exists (1)**
114:17
**expecting (1)**
158:13
**expensive (1)**
117:25
**Experience (3)**
61:24;176:19;177:13
**expert (1)**
177:9
**explain (6)**
8:14;18:1;28:18;
128:13,18;138:9
**explained (2)**
142:3;175:20
**explains (1)**
29:22
**explanation (1)**
8:1

## F

**face (1)**
98:6
**faced (1)**
118:11
**fact (10)**
79:7;90:5;118:20;
119:7;140:23;174:2,6,
9,10,15
**facts (14)**
50:9,10;83:5,6,6;
84:13,14;90:8;95:17;
109:18;117:14;119:2;
131:19;135:3
**fair (17)**
19:3;71:25;72:19;
73:17,24;74:1;75:2;
79:24;82:18;92:8;
109:15;120:10,12;
121:10,14;123:24;
142:20
**fairground (1)**
121:6
**Fairgrounds (7)**
81:4;82:5,20;90:13;
110:10;122:10;126:14
**fairly (3)**
7:20;36:6;47:11
**fairs (2)**
73:13,15
**false (3)**
119:6,9,13
**familiar (12)**
77:15;98:14,17,19;
101:5;115:7;123:15;
138:3,5;143:16,21;
177:20

**far (6)**
39:1,22;118:10;
137:21,22;153:1
**farm (4)**
69:17;89:22;90:7;
173:19
**farmer (1)**
69:25
**farming (2)**
70:4,7
**farthest (2)**
117:20,20
**fashion (1)**
14:19
**fast (1)**
126:15
**faster (1)**
107:9
**February (2)**
16:3,4
**federal (4)**
9:24,25;58:14;
178:16
**felony (11)**
17:10;56:8;93:15;
104:24;105:8,12,13,19,
20,22;109:5
**fence (1)**
21:10
**Fernan (1)**
110:25
**Fernandez (50)**
68:21;76:24;78:15;
80:3;85:10,22;87:25;
88:6,11,17,17;90:2;
91:1,2,4,4;95:9;97:14;
102:21;111:1,3,6;
114:15;115:9;118:25;
119:13;120:21;121:18;
122:11;125:9,25;
126:22;132:5,18;
133:3;141:6,23,23;
143:22;146:14;160:17;
162:17;168:17;173:21,
23;174:2,10,13;177:4;
178:10
**Fernandez's (2)**
79:2;91:23
**few (4)**
31:21;76:6;152:15,
16
**FFA (6)**
69:23;70:4,6;81:6;
90:4;147:18
**Field (14)**
30:5,6,10;31:7,16,
21;32:6,10,11,25;33:8,
13;42:7,8
**fifteen (1)**
151:3
**fight (1)**
170:16
**fighting (1)**

146:2
**figure (3)**
18:15;28:5;46:2
**figured (2)**
42:20;116:7
**file (5)**
17:7,7,15;18:4;25:17
**files (3)**
154:9,15,19
**Fill (14)**
50:2;56:23,25;57:1,
3,25;58:5,8;62:9,11;
63:6;142:13;143:23;
176:21
**filled (1)**
58:4
**filling (6)**
51:1;55:10,17;56:4;
63:23;99:24
**fills (1)**
60:22
**final (3)**
77:7;120:22;123:18
**finalized (3)**
120:20,22;121:15
**find (8)**
26:14;58:10,12;
59:24;92:10;100:19;
128:22;167:1
**finding (1)**
172:16
**fine (14)**
10:21;45:21;70:23;
88:16;95:6,6;103:13,
18;106:8,22;109:25;
117:10;118:13;171:6
**finish (2)**
126:19;162:8
**finished (1)**
161:20
**fire (2)**
50:1;146:19
**firearm (1)**
17:4
**firearms (1)**
17:5
**firm (1)**
4:4
**firmly (1)**
161:18
**first (29)**
4:20;6:11;14:4;28:8;
35:4;60:11;63:21;
74:25;79:23;83:23;
84:5;86:2;87:20;
100:23,25;119:23;
143:6;148:9;159:12;
161:20;166:4,4,6,7,9,
17;168:16;171:4;172:7
**Fisher (3)**
4:9,11;6:2
**fits (1)**
164:8

**Fitzgerald (3)**
144:13,14;164:6
**five (3)**
36:22,23;152:17
**fixed (3)**
164:8,13,15
**flags (1)**
91:14
**focus (1)**
101:23
**folder (2)**
165:23,24
**follow (4)**
58:1;128:12,17;
164:5
**following (1)**
57:24
**follows (1)**
6:12
**follow-up (1)**
170:17
**footer (1)**
49:21
**force (3)**
22:7,8,9
**foregoing (2)**
180:5,7
**forfeiture (1)**
58:15
**Forget (1)**
123:7
**forgot (1)**
165:18
**form (12)**
49:5,7,16,18,19,21;
50:1,2;54:20;57:14;
68:16;128:20
**formal (1)**
157:21
**formatting (2)**
163:15;164:12
**former (1)**
106:21
**forms (1)**
115:8
**forth (3)**
58:23;106:5;170:18
**Forty-hour (1)**
47:15
**found (2)**
164:23;178:10
**four (3)**
110:5;152:17
**Fourth (14)**
34:22;36:11;37:15;
38:9,18;39:12;41:3;
43:16;44:23;45:4,5;
157:5,5,6
**Fox (1)**
4:4
**frame (5)**
9:4;46:3;52:9,11,12
**fraud (4)**

LONG vs.
FERNANDEZ

133:18,25;134:1,3
**fraudulent (3)**
133:7,22,23
**frequently (2)**
7:21;117:19
**fresh (1)**
44:3
**Friday (1)**
118:14
**front (4)**
77:16;87:10;135:10;
160:9
**FTO (7)**
30:5;32:25;35:7,10;
38:11,13;47:25
**full (2)**
52:24;170:17
**further (4)**
52:2;58:19,25;
106:14

## G

**game (2)**
52:19;53:6
**gap (1)**
13:11
**gave (10)**
82:10;96:4,6;117:7;
133:13;140:7;156:19,
20;169:3;172:7
**geez (1)**
9:1
**general (1)**
33:10
**generalists (1)**
24:12
**generally (3)**
10:10;51:7;156:11
**generated (1)**
161:4
**gentleman (2)**
4:15;71:1
**gentlemen (1)**
4:1
**gets (1)**
63:6
**giant (1)**
170:1
**given (6)**
9:13;114:8;119:15;
141:17;170:12;179:1
**giving (2)**
61:13;107:9
**globally (1)**
38:6
**goat (67)**
74:12,13;81:4,5,7,
19;82:4,5,12,19,20;
84:20,22,24;85:1,4,8;
89:20,21;90:3,20,22;
91:20;92:8;93:2,3,4,8,
14,22;94:20;96:20;

104:22;107:4;108:13;
113:4;116:24;120:12;
121:21;122:10;123:9;
125:5,8,10,15,16;
126:12,13,23;127:11;
129:13;131:7;147:23;
148:3,4,6,7,8;163:14;
164:22;168:19;173:20,
25;174:8,25;178:7,10
**goats (1)**
148:5
**goes (9)**
10:9;33:11,11;51:5;
53:25;78:20;89:8;
106:19;167:3
**Good (3)**
143:24;171:3;179:14
**goods (3)**
94:8,17;95:15
**Google (2)**
28:2;80:15
**Gordan (1)**
5:4
**GORDON (148)**
4:16,18,21;5:4;6:14;
25:14,21;27:1,11;34:6;
39:17,20;40:16;41:6;
53:16;54:17,20;63:19;
64:8;69:2;75:19;76:4,
17,22,25;77:2,18,20,
23,25;79:13,21;86:2;
87:9;88:25;89:3;90:12;
91:21;93:23;94:6,13;
95:18;96:25;98:1;99:4,
16,24;100:18;101:16;
102:2,6,11,15;103:2,4,
14;104:2,18;105:10,
17;106:1,6,21;107:8,
12,18,21,25;108:6;
109:3,19,24;110:3,8,
12;111:9,14;112:9;
114:12,23;117:3,9,15,
24;119:3,6;122:2;
128:7,15;129:5,23;
130:12,20;131:7,23;
132:1,4;133:11,15,21;
134:13;135:1;140:11;
142:13,17;145:13;
146:6;147:4;149:4,12;
151:1,12,18,20;162:1,
7;165:9;167:14;168:9;
169:25;170:6,9,12,20,
24;171:3,6,11,14,17;
172:5,18,21;173:3,7,
15;176:2,8,16,25;
177:9,17,23;178:23;
179:8,10,12,22
**Gotcha (44)**
7:2;14:3,24;21:15;
22:11;28:12;29:6,22;
31:5,24;32:5;33:15;
35:2,25;36:21;41:15;
43:2,13;45:2,6,12;

47:17;48:11,20;53:7;
54:19;55:2;58:9;66:5;
67:18;72:17;73:3,17;
74:20;86:19;88:4,8;
91:25;135:17;139:11;
158:7;164:23;167:21;
174:18
**govern (1)**
95:15
**graduate (2)**
12:17;14:4
**graduated (2)**
14:1,3
**grand (4)**
67:5,14,21;86:10
**Grashoff (5)**
30:23,24,24;31:1,16
**G-R-A-S-H-O-F-F (1)**
30:25
**Great (3)**
13:21;87:19;166:16
**greater (1)**
67:16
**grew (2)**
12:1;69:13
**ground (2)**
7:17;69:10
**grow (1)**
69:17
**growing (1)**
69:14
**guard (6)**
14:13,18,21,25;15:4;
157:8
**guess (11)**
8:12,24;32:2;38:12;
60:10;69:19;78:9;
97:19;135:14;139:10;
162:12
**guessing (3)**
8:23;40:15;86:20
**guidance (1)**
38:19
**guideline (1)**
145:16
**guidelines (1)**
33:20
**guys (3)**
60:13;103:7;137:10

## H

**hand (1)**
173:8
**handed (2)**
83:11;173:3
**handful (2)**
20:4,6
**handle (3)**
17:19;24:20,23
**hands-off (1)**
17:24
**handy (2)**

124:24;160:8
**hanging (1)**
39:5
**happen (3)**
9:1;137:15;171:13
**happened (5)**
53:1,2;108:18;157:5,
17
**happens (2)**
7:20;139:19
**happy (1)**
106:8
**head (13)**
7:15;8:3;31:19;
33:21;36:19;40:1;44:3;
59:17;73:19,24;75:6;
77:3;138:15
**headers (1)**
62:10
**headings (1)**
61:19
**hear (5)**
79:25;103:19;
108:10,15;146:12
**heard (4)**
28:8;65:14;80:3;
119:23
**hearings (1)**
7:9
**Hearts (5)**
125:6,23;126:8,13;
173:19
**heinous (1)**
156:16
**held (3)**
138:15;148:25;149:6
**help (3)**
50:8;77:13;84:11
**helping (4)**
46:9,10,12;107:9
**hereby (1)**
180:4
**Here's (5)**
45:7;55:4,4;112:18;
175:11
**Hey (7)**
10:20;45:16;52:8;
127:6;141:12;157:24;
158:3
**high (4)**
12:23;13:1,8,11
**higher (1)**
7:15
**highest (1)**
12:10
**hired (1)**
41:13
**hit (1)**
59:7
**hold (6)**
58:12;77:10;126:10;
150:7,19;167:12
**holding (1)**

9:23
**homicide (6)**
47:8,16,16;48:2;
65:6,10
**homicides (4)**
23:11,24,25;66:1
**honest (1)**
70:23
**Honestly (2)**
18:10;32:21
**hour (1)**
6:5
**hours (9)**
36:2,3;47:13,16;
48:3;175:18,19;178:4,
17
**house (2)**
8:21,22
**Huh (1)**
116:22
**humane (4)**
140:25;148:10,14,15
**humorous (1)**
164:23
**hundred (5)**
46:18,19,20,22;
152:6
**husband's (2)**
70:20,22
**hypothetical (11)**
25:11;26:22;102:5;
105:16;108:23;109:17,
20;131:5;134:10;
140:8;142:11

## I

**ICI (10)**
35:13,15;36:13;
38:20;47:3,8,8,19;
48:10,11
**icon (2)**
36:19,20
**idea (1)**
175:4
**identified (1)**
81:19
**identify (1)**
4:19
**idiot (1)**
148:1
**illegal (2)**
10:24;68:9
**illegible (1)**
27:20
**image (1)**
36:19
**imagine (3)**
28:6,7;140:18
**immediately (1)**
123:24
**implying (1)**
157:21

**important (4)**
10:4;94:24;97:15;
128:8
**imprecise (1)**
10:10
**improper (1)**
109:20
**incident (5)**
25:2;72:23;78:20,25;
79:9
**include (5)**
50:10;140:24;143:4;
146:22;177:7
**included (2)**
35:7;64:11
**including (4)**
33:2;58:20;164:9;
179:7
**Incomplete (10)**
25:11;26:22;102:4;
105:16;108:22;109:17;
131:5;134:10;140:8;
142:10
**inconsequential (1)**
155:17
**incorporated (4)**
42:7;59:21,23;61:2
**incorrect (2)**
126:23;174:16
**indeed (1)**
149:9
**independent (4)**
133:1,12;134:17,20
**indicate (7)**
92:21;95:21;100:9,
15;102:7;106:16;108:7
**indicated (2)**
96:7,7
**indicates (1)**
93:4
**individual (2)**
40:21;78:7
**informal (2)**
157:23;158:6
**information (13)**
52:4;91:19,21;109:4;
125:7,8,15,24,25;
169:16;174:1,3;175:4
**informed (5)**
94:20;126:22;
168:18;173:23;178:9
**initial (2)**
23:24,24
**initially (2)**
84:20;175:5
**insert (1)**
107:23
**Instagram (1)**
124:16
**instances (1)**
140:6
**Institute (3)**
35:16,18;58:14

**instruct (1)**
26:12
**instructed (6)**
38:2;84:1,5;132:16;
141:14,16
**instructor (1)**
28:24
**intent (1)**
56:9
**interaction (1)**
84:8
**interchangeably (1)**
60:24
**interest (4)**
93:16,19,25;94:3
**Interesting (7)**
24:1;46:7,25;65:8;
74:9;85:7;169:19
**interpretation (1)**
114:18
**interrupt (1)**
34:20
**interview (1)**
48:18
**intimate (1)**
129:10
**into (15)**
13:14;29:1;51:5;
53:25;56:13;57:15;
84:16;113:20;121:23;
128:4;139:8;163:4;
164:25;166:13,20
**introduce (2)**
4:12,18
**Introduction (1)**
62:3
**investigate (8)**
18:17;25:9;28:1;
62:21,23;64:1;112:2;
134:24
**investigated (2)**
50:7;109:5
**investigating (18)**
19:4,21,23,25;22:24;
23:2;98:7;99:1,4,6,7;
110:20;111:7,19;
133:25;134:2;149:21;
176:23
**investigation (17)**
19:10,15,18;23:3;
51:3;62:4;68:16;70:16,
17,21;71:5,12;91:7;
97:16;139:16;177:5,8
**investigations (3)**
20:4;35:16,18
**investigative (8)**
91:6;160:1,6,7,9;
161:9,10,11
**investigator (4)**
62:19;85:16;112:3,
11
**investigators (1)**
139:17

**invoice (7)**
96:19;112:21;113:2,
9,22;114:2,3
**involve (1)**
176:17
**involved (16)**
18:19,23;21:5;24:17;
25:7,16;45:3,24;46:5,
12,18;70:2;83:1;96:2;
137:13;176:18
**involvement (5)**
69:14,15;81:13;
116:8;129:16
**involves (2)**
96:19,19
**involving (4)**
18:20;25:5;26:10;
34:21
**ironclad (1)**
151:14
**irrelevant (1)**
73:23
**issuance (1)**
59:25
**issue (13)**
17:8;52:17,18,23,24;
59:25;60:2;62:13;64:3,
21;72:23;103:18;
106:20
**issued (5)**
17:18;45:22;58:25;
75:3;131:16
**issues (7)**
26:16;27:2;36:12;
43:1,6;92:7;96:5
**issuing (1)**
128:7;129:2,6,7
**items (3)**
58:9;140:23;141:19

**Jeremy (6)**
4:2;6:1,10,16;
179:16;180:20
**J-E-R-E-M-Y (1)**
6:16
**Jerry (2)**
68:21;80:3
**Jessica (16)**
25:6;74:10,21,25;
75:1;79:23;81:3;82:11;
98:7,8,8;102:19;
122:13;146:1;149:16;
177:25
**job (4)**
15:17,20,22;38:13
**jobs (1)**
15:20
**John (3)**
4:16,22;179:12
**judge (59)**
10:16;50:17;52:15;

54:6;55:17;56:17,22,
23;57:10;58:4;60:4,8,
15,17,22,24;62:13;
112:24;113:4;128:5,
16;129:2,6,20;130:1,9,
14;131:16;136:5,8,11,
12,15,25;137:3,10,16,
138:17;140:17,19;
146:14;150:24,24,25;
151:2,3,17;165:15,21;
167:19,24;168:7,23,24,
25;173:12;174:15;
175:11,19
**judge's (3)**
63:4;136:22;137:1
**Julie (2)**
4:10;6:5
**July (13)**
75:4;79:7,11,13,14,
16,17,25;80:1;89:1;
118:14;158:9,16
**jump (1)**
69:11
**June (1)**
178:1
**jury (1)**
135:10
**justify (1)**
109:8

**Kathi (12)**
70:10;81:9,10;
118:14;119:24;122:7,
8,11;147:19,20;159:6,8
**keep (9)**
10:18;87:9;154:9;
155:1,3;156:9,10,10,12
**keeping (1)**
174:7
**keepsake (1)**
32:17
**kept (1)**
32:17
**Kern (4)**
73:15,16,17;74:1
**key (1)**
28:4
**kids (4)**
70:2;73:11;96:20;
159:2
**kind (7)**
13:14;24:15;48:25;
66:8;82:10;98:23;
161:21
**kinds (1)**
109:6
**knew (15)**
71:19;78:24;82:25;
85:3,3,4;104:20;111:7,
15;148:22;158:18,19,
20;168:19,19

**knocking (1)**
21:10
**knowledge (2)**
93:8;117:12
**known (7)**
24:12;44:2;68:13,14,
15;72:6;78:23
**Kody (3)**
30:13,13;31:18

## L

**Ladies (1)**
4:1
**Lake (1)**
22:4
**land (1)**
52:14
**landlord (4)**
26:16;27:1;96:5,13
**language (39)**
10:10;56:20;59:1;
102:7,24;103:8;
122:15,18;124:6;
127:3,23;135:25,25;
136:2,4,6,14;141:4,6,8,
9,18;142:25;143:3,8,
13;144:4,25;145:5,8,
10;151:11,12,19;153:1,
9,10;168:23;169:17
**laptop (1)**
171:22
**large (2)**
8:17;20:20
**largely (1)**
7:17
**largest (1)**
78:1
**last (19)**
30:14,19;36:22,23;
41:12;47:10;72:22,25;
78:14;100:12,23,24,25;
106:7,11;120:2;
126:11,17;161:2
**later (2)**
10:15;175:12
**latest (2)**
45:6;163:12
**laughing (1)**
164:20
**law (13)**
17:2;37:25;45:6,15,
18,18,20;69:5;103:9;
107:3,3;151:14;153:23
**laws (3)**
17:7;45:13;180:6
**lawsuit (8)**
7:3;71:16,21,22;
106:25;107:4;108:8,13
**lawyer (9)**
8:16;94:12;101:5;
105:2,4;106:24;107:7;
147:6;150:23

**lay (1)**
105:7
**LD (1)**
28:3
**LDs (1)**
34:16
**Leading (1)**
177:23
**learn (3)**
34:11;74:25;80:2
**learned (2)**
85:22;169:16
**learning (8)**
27:23,25;28:9,11,22;
29:2,21;48:15
**least (1)**
132:24
**leave (6)**
53:21;56:22;83:21;
116:15;147:23,25
**left (6)**
32:2;83:20,22;84:8;
147:22;178:25
**left-hand (1)**
49:21
**legal (16)**
11:1;27:6;68:25;
94:10;95:16;101:14;
103:18;106:19;107:6;
108:3;130:19;131:5;
147:1;149:2;150:21;
177:9
**legality (2)**
48:24,25
**less (2)**
105:7;114:12
**lets (1)**
14:18
**letter (40)**
39:7;90:5,10;95:21;
100:1;101:11;104:9,
16,20,22;105:1,17,18;
106:1,7,10,13;111:3,
10,16,17,20,23,25;
112:4,12,13;122:13,18;
123:2,13;127:24;
128:4,23;129:6;
130:15;131:2,15;
146:1;177:25
**letting (1)**
60:6
**level (2)**
12:10;24:14
**License (1)**
6:7
**lie (4)**
102:16;103:3;113:6;
119:19
**Lieutenant (37)**
68:20,23;78:15;80:3;
87:24,24,25;88:6,17;
90:2;91:4,23;110:13;
115:18;120:21;125:9,

25;126:22;141:7,7,23;
143:9,10,11,12,13,16,
22;162:17;168:17,20;
173:21,22,23;174:13;
177:4;178:9
**life (1)**
12:6
**lifted (2)**
122:15;127:2
**likely (1)**
7:18
**line (3)**
60:2;173:17;175:7
**litigation (5)**
106:15;108:7;
111:20;112:4;179:6
**little (3)**
44:18;82:11;163:20
**live (1)**
12:5
**lived (2)**
12:8;73:5
**livestock (19)**
21:6,9;24:18,19,23;
25:6;67:12,14,15;68:2;
73:8;74:7,8;85:16,16;
86:5,16;91:9;118:15
**living (4)**
140:24;141:21;
143:4,5
**loaded (1)**
132:22
**local (8)**
38:24;39:3,12;41:18;
42:1;43:17;44:24;
145:16
**locate (1)**
147:10
**located (1)**
163:14
**location (13)**
56:25;57:1,3,5,9;
127:10;136:3;140:25;
141:2;164:19;168:19;
173:20;178:11
**locations (1)**
62:6
**locked (3)**
59:13,15,19
**locker (2)**
147:22,23
**lockers (1)**
148:2
**lodged (1)**
19:5
**log (1)**
142:6
**LOL (2)**
164:19,19
**long (24)**
9:6,22;14:24;18:10,
25;22:12,13;25:6;36:1;
66:7;74:10,25;75:1;

79:23;81:3;84:8;92:14;
98:8,8;122:13;125:5;
173:7,7;177:25
**longer (2)**
63:7;93:5
**longest (1)**
63:8
**Long's (2)**
74:22;82:11
**look (32)**
20:16;26:20;45:15;
62:5;64:17;66:3;68:3;
69:2;79:10;95:6;98:17;
121:23;161:17,19;
164:5;165:25;166:2;
170:7,15;177:14,15,18
**looked (4)**
54:10;101:8;167:10;
170:13
**looking (3)**
55:6;125:5;166:3
**looks (7)**
77:15;87:5;98:14,19;
120:8;146:18;166:17
**losing (3)**
77:7;154:25;167:2
**lot (7)**
34:4;41:9;76:21;
78:2,8;103:5;155:5
**loud (1)**
164:20
**low (1)**
170:25
**lower (1)**
163:11
**lying (1)**
102:22

**M**

**Macfarlane (2)**
4:25;71:2
**Madam (3)**
79:17;165:6;173:4
**magistrate (5)**
60:24;138:16,17;
150:8,11
**mailed (1)**
84:3
**maintain (1)**
155:5
**maintained (1)**
154:15
**maintains (1)**
154:20
**major (1)**
23:11
**makes (2)**
10:16;130:21
**making (2)**
22:22;128:7
**manage (1)**
155:5

**Mandatory (1)**
37:23
**many (19)**
7:8,11;18:19,23;
19:5,20,20;20:11;21:5;
28:13;33:1;44:4;45:22,
24;46:11;47:13;48:3;
152:9;170:21
**Marcus (2)**
30:17;31:17
**Marina (2)**
80:13,17
**mark (4)**
78:14;79:1;87:7;
173:4
**marked (6)**
76:3;79:12;87:8;
165:8;167:13;173:14
**marking (1)**
75:19
**married (1)**
70:24
**materials (1)**
32:9
**matter (7)**
25:17;26:21;27:15;
33:20;47:2;101:7;
156:14
**matters (3)**
29:5;33:22,23
**may (14)**
9:25;22:12;54:8;
105:21,24;134:6;
141:2;152:14;159:15;
164:25;166:22;173:7,
9;179:3
**Maybe (29)**
21:7;23:17;32:15,16,
17;37:25;41:1;44:3;
54:11,14;64:24;67:19;
76:5;79:21;90:19;92:2;
110:9;123:18;124:24;
129:21;130:2;131:16;
134:4;135:8;148:23;
156:6,7,8,15
**Mckee (1)**
168:8
**mean (38)**
10:12,19;23:19;
26:15,18;54:22;59:9;
60:25;61:12;62:17;
65:23;68:6;69:11;81:1;
87:1;93:2;103:5;
104:19;108:12;122:1;
123:23;132:22,24;
134:18;136:15;138:10;
141:24;143:3;148:23;
150:25;151:20;155:15;
157:5,17;159:18;
161:3;169:5;170:20
**means (10)**
10:11;11:3;38:13;
56:8,10;66:16,17;

102:18;121:13;164:20
**meant (6)**
41:24;72:13;123:18;
134:5;142:14;156:14
**measures (1)**
91:6
**meat (5)**
93:14;123:20,21,24;
124:2
**Media (3)**
4:5;103:23;104:1
**meds (1)**
11:6
**meet (1)**
64:17
**megabytes (1)**
171:16
**Melanie (2)**
71:13;97:7
**memo (4)**
41:2,18,19;156:1
**memorandum (4)**
38:23;39:4,7;145:15
**memorandums (1)**
155:9
**memorialized (1)**
155:10
**memory (5)**
54:1;68:4;75:7;
159:10,16
**memos (5)**
33:19;39:8,9,9;41:20
**mens (1)**
66:14
**mention (2)**
96:2;158:16
**mentioned (10)**
41:19;47:18,20;
72:13;83:2;84:19;
93:11;145:7;147:10;
168:17
**mentions (3)**
89:16,16;93:13
**merely (1)**
18:8
**message (3)**
167:10;168:7,8
**messages (2)**
78:13;168:6
**messes (1)**
163:15
**met (15)**
27:9;64:9;65:17,19,
22,24;66:2;71:9,18;
72:14,17;74:20;
102:19;133:9;177:12
**middle (1)**
6:17
**might (49)**
8:8,18;25:10;34:1;
39:20;42:12;43:20;
45:17;47:16;67:20,24;
68:2,3,4,5;72:9,14,16,

24;74:3;78:23;83:17;
92:7;105:13,13;
122:20,20;123:1;
128:5,16;130:9;145:5,
10;146:24;147:2;
155:25;156:6;157:1;
159:17,17,18;160:14;
170:10,12,13,16;171:9,
11;172:2
**miles (2)**
116:23;117:12
**mind (11)**
26:14,15,18,19;27:5;
69:2;77:7;83:6;84:13;
154:25;167:2
**mindful (1)**
116:1
**mine (2)**
131:8;179:3
**mines (1)**
52:14
**minor (2)**
74:23;83:1
**minutes (7)**
9:6,7,9,9;84:10;
110:5;175:12
**miscommunication (5)**
119:19;168:22;
169:17;173:24;175:6
**misdemeanor (1)**
17:9
**missing (2)**
76:19;139:25
**Misstates (5)**
39:14;85:24;97:23;
129:3;133:14
**misstating (1)**
129:4
**mistaken (3)**
134:4,6,8
**Miyasato (3)**
30:17;31:1,17
**M-I-Y-A-S-A-T-O (1)**
30:20
**mom (1)**
82:20
**moment (17)**
27:19;34:5;43:5,14;
66:1;75:13;77:10;78:6,
7;79:16;87:10;108:1;
166:22;167:11;172:22;
173:9;176:2
**moments (1)**
76:6
**money (3)**
94:17,21,23
**month (5)**
20:6,6,7;26:4,6
**more (14)**
18:8;20:8;38:9;46:4,
20;48:8;56:20;64:25;
69:10;81:20;111:7;
132:8,11;148:9

**Morfin (3)**
4:9,11;6:3
**Most (10)**
23:9,13,22;65:2,4,7;
109:25;135:2,9;154:19
**mostly (1)**
127:24
**Motion (2)**
128:11;130:8
**motorcycle (3)**
117:23,25;139:20
**mouthful (1)**
30:18
**move (4)**
12:2;106:22;107:15;
122:4
**much (7)**
44:17;45:8;63:6;
87:19;94:22;98:16;
142:7
**Multi-cultural (2)**
12:13,14
**multiple (3)**
30:10;63:7;178:4
**Muse (13)**
70:11;81:9,10;
118:14;119:24;120:11,
17;122:7,8,12;147:19,
20;159:6
**must (2)**
127:2;165:18
**myself (2)**
4:19;28:2

## N

**name (30)**
6:15,17;14:17;18:7,
13;30:14,19;55:5,9,11;
56:1,2,3;61:21;70:10,
12,13,15,17,20,22,25;
71:1,6,11,15;73:25;
74:12;85:5;120:2
**names (1)**
6:21
**Napa (14)**
82:6,22;83:22;84:19,
22,23;85:8;125:11,12;
168:18,21;173:18,22,
24
**narcotic (1)**
58:17
**narcotics (1)**
58:17
**narrative (13)**
8:1;52:5;54:5;62:4;
63:24;64:5;65:25;
84:17;113:20;124:5;
159:25;160:4;161:12
**narrow (1)**
9:5
**nature (4)**
24:22;96:3,8;99:25

**near (1)**
163:21
**necessarily (2)**
101:20;102:14
**necessary (1)**
128:20
**necessity (1)**
58:24
**need (16)**
7:24;9:7;52:2;53:8,
8;54:11;92:2;107:14;
108:1;110:3;129:9;
140:14,17;149:20;
150:18;170:7
**needed (3)**
149:20,24;175:20
**negate (1)**
131:3
**negates (2)**
130:17;131:2
**neither (1)**
74:9
**network (2)**
154:19,20
**new (6)**
104:14;122:6,25;
123:4,5;175:22
**next (20)**
20:10;21:19;24:3;
46:3;56:15;60:2;73:16;
84:14;88:8;89:3,4;
97:5,6;98:4,4,5;110:4,
5;158:3;164:7
**nice (1)**
170:15
**nicknames (2)**
6:23;7:2
**Night (1)**
62:6
**Ninth (1)**
45:16
**nobody (1)**
173:24
**nod (1)**
8:3
**nodding (1)**
73:18
**non (3)**
19:12;122:23;123:17
**none (5)**
33:24;36:15;39:11;
117:16,17
**nonetheless (5)**
7:18;78:5;79:3;
150:15;151:1
**Nonresponsive (2)**
128:11;130:8
**non-sworn (1)**
124:7
**Nope (1)**
70:5
**normal (2)**
10:9;80:15

**NORTHCUTT (121)**
5:1,1;25:11,20;
26:22;27:6;34:3;39:13,
19;40:10,14;41:4;
53:10;54:16,19;64:6;
68:25;76:16,20,23;
77:1,15,19;85:24;
88:23;90:8;91:17;
93:21;94:5,10;95:16;
96:23;97:23;99:3,15,
23;100:16;101:14,25;
102:4,9,13;103:1,11;
104:15;105:9,15,25;
106:4,18;107:6,10,16,
20,23;108:3,22;109:17,
22;110:1,7;111:5,11;
112:7;114:9,19;
116:25;117:7,14,22;
119:2;121:25;128:6,
13;129:3,22;130:11,
19;131:4,18,25;133:4,
14,20;134:10,22;
140:8;142:10,16;
145:11;146:4;147:1;
149:2,8;150:21;151:9,
15;168:5;169:23;
170:10,19,22;171:1,4,
7,12,16,22;172:2,20;
176:1,12,19;177:2,13,
20,24;178:13;179:5,9,
23
**notes (8)**
43:14,21;155:1,3,7;
156:9,10,13
**notice (8)**
6:7;101:12;102:23,
24;103:9;107:13;
121:19;127:5
**notification (1)**
43:4
**notified (2)**
141:1;162:17
**notify (4)**
101:13,18,21,23
**number (12)**
7:12,15;20:2,12;
26:1;87:12,14;160:21;
163:1;167:1;175:19,19
**numbers (2)**
49:9;78:22

## O

**o0o- (2)**
6:8;180:22
**oath (1)**
53:18
**object (2)**
10:7;140:14
**Objection (58)**
10:13,16,22;25:11,
20;26:22;27:6;34:3;
39:13;64:6;68:25;

85:24;90:8;91:17;
93:21;94:10;95:16;
97:23;99:23;101:14,
25;104:15;105:9,15,
25;106:18;107:6;
108:22;109:17,20;
110:1,2,4;114:19;
116:25;117:10;121:25;
128:6;129:22;131:4,
18;133:4,14;140:8;
142:10,16;145:11;
146:4;147:1;149:2;
150:21;151:15;176:10,
16,25;177:23;178:15;
179:2
**objections (10)**
10:14,24;103:11;
107:9,23,25;112:7;
131:25;149:8;151:9
**obligations (6)**
138:5,20,23,25;
150:7,9
**obscured (1)**
89:5
**obtain (2)**
14:18;49:2
**obtained (1)**
178:7
**Obviously (10)**
23:11;50:6;60:17;
61:12;69:9;111:7;
155:14;172:7;175:6;
176:20
**occasionally (2)**
10:8;145:19
**occur (1)**
153:14
**occurred (4)**
104:12;114:7;
120:23;121:24
**OCR'd (1)**
171:20
**off (39)**
33:21;39:25;51:15;
53:11,13,21;56:16;
68:4;75:5,13,14,16;
91:14;95:10;103:20,
22,24;107:14;113:15;
114:22;115:25;126:15;
135:2;136:11,12,25;
144:5;160:1;162:2,4;
163:1;172:21,23,25;
175:25;176:2,3,5;
179:19
**offense (1)**
56:10
**offensive (3)**
114:12;132:23,24
**offensively (1)**
62:17
**offer (2)**
15:20;92:17
**offered (2)**

15:23;119:11
**offering (1)**
   92:15
**offers (1)**
   92:6
**Office (30)**
   15:16,18;17:16;
   33:19;35:20;39:5,6;
   41:10;50:13;51:17,19;
   80:10,11,12,20;84:7,
   23;90:16;113:17;
   141:14,16;152:24;
   158:3;162:15,21,24;
   168:18,21;171:25;
   173:18
**officer (58)**
   14:7,10,12;15:21;
   16:2,6,10,15,21;17:2,6;
   18:20,25;19:13;21:17;
   22:4,13,19;23:16,18,
   20,21,22;24:2,17,24;
   25:21,22,25;30:7,7,9;
   31:16;32:6;33:8,13;
   46:5,8;53:16;55:24,25;
   69:6;85:10;89:7;91:9;
   99:14;103:9;106:11;
   111:19;114:18,22,24;
   115:3,25;138:15;
   166:25;173:3,8
**Officers (9)**
   29:13;30:10;31:8;
   114:6;137:13;148:15;
   153:23,25;176:15
**offices (2)**
   4:8;179:17
**often (3)**
   25:24;155:14,16
**okay'd (1)**
   144:24
**Old (1)**
   179:17
**on-call (1)**
   175:19
**once (2)**
   155:6,6
**one (89)**
   15:25;25:4,16;28:13,
   14;29:4,8,21;30:9,22;
   31:1,21;33:8;34:20,21;
   37:19;40:11;43:9,10,
   11,16;47:19;48:3,12;
   49:11,14;51:16;53:8,
   10;54:10;55:10;58:18;
   64:24;67:2,23;68:4,5;
   72:11;73:4;76:1;77:3;
   82:14,15;88:16;90:4;
   97:22;98:3,5;100:23;
   104:23;118:20,23;
   122:5;125:4;129:10,
   12;130:2;134:7;137:6,
   7,8;146:2;147:18;
   149:21;150:12;152:14;
   154:3;155:23;163:6,9,

11,12;166:2,5,6,9,12,
15;167:23;172:7,7,12;
173:10,16;175:10;
178:6,17;179:4;180:10
**ones (18)**
   27:1;39:12;47:7;
   66:14;78:7;83:24;87:1;
   96:16;97:15;109:21;
   134:21;135:12;150:20;
   151:7;152:8;157:22;
   172:5;176:22
**ongoing (1)**
   178:25
**online (9)**
   18:17;35:11;36:13,
   16;38:17;47:1,18;
   48:16;75:25
**only (12)**
   25:4,6;71:19;74:11;
   93:13;116:7;121:2;
   126:12;132:5;133:12;
   154:14;177:11
**On-the-job (10)**
   16:7,8;30:2,3,4;31:2;
   33:1;38:12;47:23,24
**opinion (12)**
   62:6,17,19;94:14,14;
   104:17;111:24;129:6;
   147:8,9;150:17;177:10
**opportunity (3)**
   9:16;130:7;178:19
**options (1)**
   56:14
**order (12)**
   31:12;58:25;62:7;
   116:1;137:2;150:24,
   25,25;151:3,4,17;
   161:23
**ordered (3)**
   58:19;60:18;151:2
**orders (5)**
   62:13,15;63:4;136:8;
   179:21
**Oregon (1)**
   179:17
**organization (3)**
   69:25;70:4,7
**original (1)**
   179:6
**originals (1)**
   179:16
**Others (2)**
   19:15;174:11
**otherwise (1)**
   123:2
**out (54)**
   11:2;14:20;18:15;
   21:12,13,14;22:3;
   24:18;28:5;32:5;35:16;
   41:20;46:2;48:14;50:2,
   6;51:2;55:10,17;56:4,
   23;57:25;58:4,5,8;
   60:23;62:9,11;63:6,8,

23;90:6;92:2;97:1;
99:24;103:21;107:8;
117:19;118:6,9;119:9;
125:16,18,20;131:1;
136:17;143:23;144:15;
149:19;164:20;166:24;
174:16;175:2;176:21
**outline (1)**
   27:20
**outlining (1)**
   50:6
**Outlook (1)**
   163:24,25
**outside (2)**
   19:12;35:3
**over (55)**
   7:18,20;19:6,11;
   20:18;21:10;23:4;
   27:10;28:13;31:2;33:1,
   3;45:13;46:18,19,20;
   47:25;52:19;53:6,21,
   22;76:8;83:18,23;84:4,
   5;85:11,12,19;86:2,5;
   88:7,11,18,20;96:9;
   107:11,11;108:8,13;
   127:25;130:4;142:1;
   146:2,2,14;147:16,21;
   150:19;151:20;157:1;
   165:1;166:12,17,19
**overlapping (1)**
   41:22
**own (13)**
   22:8;32:5;33:13;
   50:5;51:5;54:1;97:11;
   101:10;140:16;142:23;
   152:5,9;154:4
**owner (21)**
   68:13,14,15,19;81:6,
   19,21,22;122:6,25;
   123:4,5;141:1,2,11;
   142:9,9;147:12,19;
   149:14,25
**owners (1)**
   141:19
**ownership (2)**
   140:5;142:22

**P**

**package (1)**
   167:5
**packet (2)**
   75:12;137:6
**page (45)**
   55:3,6,22;56:12,13,
   13,20;58:10;59:22;
   61:5,17;62:13;63:3,4,4,
   7;77:5;78:20;79:10;
   88:8,18,18,20,21;89:3,
   4,7;97:6;98:4;100:6,6,
   11,20;106:7,11;
   124:24;125:3;127:12;
   135:13;136:8;140:21;

147:8;160:20,21;166:8
**pages (9)**
   63:7,12,12;76:14,19;
   77:4,7;104:3;171:10
**paid (4)**
   35:23;109:12,15,16
**pain (1)**
   92:7
**paper (2)**
   54:14;163:20
**paragraph (13)**
   58:18;100:12,23,24,
   25;106:13;125:4;
   126:12,17;146:21,23;
   150:17;173:17
**paragraphs (3)**
   56:14;62:9;151:3
**paraphrase (1)**
   43:8
**Park (2)**
   80:13,17
**parlor (1)**
   13:19
**parole (1)**
   23:18
**part (10)**
   50:19;55:5;58:12;
   98:23;125:24;132:1;
   136:21;148:23;177:4,8
**partial (1)**
   125:24
**participate (1)**
   69:21
**particular (5)**
   51:16;64:4,17;86:3;
   175:23
**particularly (1)**
   156:15
**parties (2)**
   25:16;27:10
**past (2)**
   106:22;122:4
**patch (1)**
   14:21
**patrol (17)**
   22:4,13,18,20;23:16,
   22;24:2,23;25:21,22,
   24;30:8;36:25;37:2;
   46:5,8;154:4
**patrolman (3)**
   37:6,8;38:17
**pay (3)**
   92:15,17;121:20
**PC (2)**
   18:6,13
**PC597 (1)**
   17:13
**PC832 (2)**
   16:13,17
**PDF (3)**
   57:15;76:18;86:22
**peace (4)**
   17:5;29:13;55:24;

153:25
**Penal (17)**
   58:13,23,25;64:16,
   22;65:11;66:6,24;67:7;
   85:12;86:6,17;138:5;
   146:25;177:15,19,21
**penalty (11)**
   50:20;110:18,21;
   113:3,8;114:7,16;
   121:12;134:8;180:2,6
**People (8)**
   6:25;29:9;55:23;
   65:14;102:16;109:6;
   135:5;153:24
**people's (1)**
   19:8
**per (2)**
   20:11;101:10
**percent (3)**
   21:7,8;24:17
**perhaps (4)**
   7:14;31:20;60:5;
   125:20
**period (3)**
   9:21;60:2;101:2
**periodic (1)**
   44:5
**periodically (2)**
   42:23;44:8
**perjury (11)**
   50:21;110:18,22;
   113:3,8;114:7,16;
   121:12;134:8;180:2,6
**permanent (1)**
   151:13
**persisting (1)**
   172:16
**person (22)**
   10:11;11:1;17:12;
   33:11;50:9;51:20;56:9;
   57:24;58:1;62:20,24,
   25,25;70:10,14;80:7;
   83:10;91:16;98:6,25;
   105:7;109:4
**personal (5)**
   74:18;100:7,14;
   101:3;112:5
**personally (3)**
   118:8;151:10;152:4
**personnel (1)**
   124:8
**perspective (1)**
   109:2
**pertaining (1)**
   156:24
**pertinent (1)**
   51:6
**pet (1)**
   13:20
**phone (9)**
   4:15;51:24;153:16,
   19;154:12,14;156:24;
   171:23;173:21

LONG vs.
FERNANDEZ

**phones (1)**
154:5
**photo (7)**
125:10,12;127:11,
13,14,15,18
**Photos (4)**
57:9,9;158:23;
163:13
**phrase (6)**
38:9;108:15;132:21,
23;142:3;175:24
**phrased (1)**
176:11
**phraseology (1)**
154:25
**physical (1)**
110:11
**pick (1)**
55:17
**picture (2)**
36:19;158:25
**piece (2)**
129:24;170:1
**pieces (1)**
134:14
**pizza (1)**
13:19
**place (1)**
125:11
**Plaintiff (2)**
6:2;178:19
**Plaintiffs (1)**
5:4
**Plaintiff's (1)**
5:5
**platform (1)**
42:15
**plausible (1)**
84:25
**please (4)**
4:21;163:7,13;
179:20
**pm (11)**
80:5,6;89:2;162:19,
20;164:7;166:11,19;
167:7,18;179:25
**pm-ish (1)**
89:1
**PO (1)**
23:14
**point (14)**
17:19;18:2;52:6;
92:16;93:17,25;
100:22;119:23;124:2;
157:3;164:16;165:20;
169:2;175:18
**pointed (1)**
160:19
**pointing (1)**
100:21
**police (13)**
22:7,8,9;27:18,21;
28:15,19;38:19;55:24;

86:9;142:4,22;148:23
**policies (16)**
33:20;38:23;39:9,10,
22;41:9,10,16;42:1,9,
14,15,23;145:17,18;
148:18
**policy (29)**
39:25,25;40:1,3,9,19,
23;41:3;43:1,6,8,17,18,
18,24;44:6,24;45:7,8,
11;99:13,17,20,25;
145:15;154:23;155:20,
22;156:4
**pops (1)**
80:17
**portal (3)**
47:2,2;48:16
**portion (8)**
48:6;55:19;60:22;
136:6,10,18;137:19;
138:21
**portions (1)**
136:24
**position (6)**
19:13;21:19,24;
81:16;139:17;178:21
**possession (3)**
56:9,11;58:13
**possessory (4)**
93:16,18,25;94:3
**possibility (2)**
90:21;102:18
**possible (4)**
90:7;91:14;126:15;
161:6
**Possibly (4)**
86:12,14,15;147:2
**POST (35)**
27:18,22;28:2,10,11,
13,15;29:9,11,14,15;
33:3,12;34:12,15;35:3,
10,11;36:12,16,16;
38:6,8,8,17;47:1;48:9,
13,16;78:4;86:17;
124:16;125:7,9;126:1
**potential (19)**
90:19;92:21;96:21;
101:13,18,24,24;102:2,
7,17,18,20,21,24;
103:10,15;106:16,23;
108:8
**potentially (9)**
63:7;95:15;125:11;
127:11;129:13,19;
145:6,10;146:24
**powers (2)**
17:3,6
**practical (3)**
142:4,8,14
**precisely (1)**
8:9
**predates (1)**
37:3

**predominant (1)**
21:9
**predominantly (3)**
19:7;21:12;22:4
**preparation (4)**
92:4;100:2;113:25;
116:4
**prepare (1)**
48:18
**prepared (3)**
46:13;51:12,13
**preparing (3)**
133:2,10;176:15
**present (2)**
69:8;143:21
**presented (5)**
34:7;40:16;99:22;
138:16;178:18
**presenting (1)**
99:19
**preserved (2)**
179:2,3
**preserving (2)**
10:14;178:24
**President (2)**
81:8,10
**presumably (7)**
18:17;32:3;41:7;
44:2;96:18;112:19;
163:17
**presume (11)**
7:8;20:24;35:4;
44:16;51:17;52:4;71:5,
16;86:11;87:1;154:10
**pretty (3)**
66:7;68:7;172:1
**previous (3)**
73:3,4;145:7
**previously (1)**
164:13
**primarily (1)**
176:22
**print (5)**
63:20,21;170:20;
172:1,22
**printed (1)**
49:15
**prior (8)**
64:22;70:17,20;
78:17;89:9;95:11;
105:17;167:21
**private (3)**
155:15;157:10,11
**privately (1)**
35:19
**Probable (56)**
50:18;53:3,4;54:5;
55:15;59:24;60:19;
61:3;62:5,12,20,24;
63:5,24;64:2,5;65:18,
25;68:17;84:16;89:12;
97:19;99:8;113:21;
115:4,10,11,11,22;

124:5;126:4;128:10,
20;129:9,12;130:3;
131:3,9,10;134:12;
136:7;137:1,18;
144:19;151:23;159:25;
160:4,5;161:6,8;
165:14;167:10;169:7,
8;177:7,16
**probably (25)**
9:15;20:17;26:3;
30:2;31:4;32:23;36:23,
24;39:24;40:8;21;
41:13;46:17,22;63:14,
19;65:4,6;73:25;80:5;
83:16;86:24;95:9;
131:1;154:21
**probation (3)**
23:19,21,21
**probative (1)**
129:11
**procedure (5)**
58:23;65:1;155:8;
156:15;178:16
**procedures (3)**
41:10,17;42:10
**proceed (2)**
11:3;58:6
**proceedings (1)**
58:15
**process (13)**
34:25;36:11;38:10,
19;39:12;43:17;45:3;
49:2;50:19;115:8;
121:6;157:16;158:2
**produce (2)**
169:20;171:18
**produced (14)**
76:23,24;77:1,10,14,
22;78:5,11;156:20;
168:2;170:2;171:9,19,
20
**production (5)**
76:11;77:16;78:1;
159:11;161:17
**Productions (2)**
4:5;179:17
**program (12)**
30:5,6;31:11,18;
32:6,10,11;33:12;35:8;
42:7,8;81:8
**programs (1)**
90:4
**proof (6)**
55:25;114:8,15;
120:14;139:20,21
**property (66)**
25:15;26:10,11,11,
13,13;56:7,7,8;57:24;
58:1,13,22;81:18;
84:20,24;85:9;91:15;
92:21;93:5;94:2,8;
95:21;96:3,22;100:8,9,
14,15;101:4,13,18,24;

102:8,24;103:10;
105:24;106:16,23;
107:4,14;111:1,4,10,
21;112:5;117:13;
118:3,6;121:22;
130:16;139:2,4,9,18,
20;140:25;141:1,2;
147:10,11,12;149:10;
150:8,10;163:14
**prove (1)**
10:2
**proved (1)**
149:20
**provide (6)**
9:15;83:8;127:7,9;
146:8,10
**provided (11)**
16:5;18:7;32:9;
110:11;126:16;137:3;
146:7,14;153:7;
168:20;177:4
**proving (1)**
128:24
**provision (3)**
65:11;85:12;150:16
**provisions (4)**
95:14;150:12,20;
151:2
**public (6)**
14:6,10,11;56:10;
157:9;158:24
**pull (5)**
54:9,9;65:16;87:13;
166:24
**purchase (1)**
120:14
**purchased (2)**
81:5;93:5
**purchasing (1)**
120:12
**purely (1)**
132:5
**purpose (2)**
86:8;106:14
**purposely (1)**
97:21
**purposes (1)**
179:6
**pursuant (5)**
6:7;58:25;178:7,12,
16
**pursue (4)**
110:17,19;112:12,17
**pursuing (2)**
106:25;108:12
**put (31)**
26:1;32:6;47:25;
51:4;55:10;60:23;
61:13;77:10;79:5,15;
84:16;88:25;91:14;
102:23,24;110:8;
117:9;135:10;137:9;
140:2;142:25;148:3,4,

**Challe, Fisher & Morfin**
**Redding, California   (530)246-0942**

5,12,15;150:16;
161:18;171:8;178:14,
24
puts (1)
103:8
putting (1)
136:14

## Q

question's (2)
138:3;158:8
quick (3)
161:25;162:8;172:1
quickly (2)
11:18;69:11
quite (1)
76:20

## R

raised (1)
96:19
raising (1)
82:12
ramifications (1)
93:12
ran (1)
13:20
ranch (1)
69:19
range (2)
46:21,22
rapid (1)
146:19
rattle (1)
110:5
rea (2)
66:14,15
reached (1)
175:2
read (42)
9:16,17,17;42:2;
45:20;89:14;91:12;
92:2,10;97:10,10,13,
21,24;98:1,2,9,13,13,
16,19,21,22,25;99:10,
21;101:17;102:10;
104:3,8,9,10;127:2,5;
128:22;130:17,20;
132:1;138:10;162:18;
177:25;180:4
reading (3)
100:11;125:3;126:7
reads (3)
100:17,18;102:7
ready (1)
163:5
real (1)
161:25
reality (3)
142:4,8,15
realize (1)

170:14
really (14)
10:19;17:21;46:7;
53:24;65:8;79:20;86:7;
103:5,6;106:9;108:15;
116:7;117:1;158:14
reason (16)
11:14;85:15;99:11,
18;103:3;113:5;
119:16,16;133:16;
134:5;153:6,11;155:4;
165:17;174:1;175:24
reasons (2)
121:22;146:13
reassess (2)
52:19,21
recall (21)
14:15,16,17;28:14;
34:8,9;36:17;42:24,25;
43:5,7,7;44:17;45:14,
18,20;83:11,16;98:16;
125:19;157:2
recap (1)
38:5
receive (6)
12:17;27:17;30:4;
44:5;87:23;112:20
received (17)
18:8;29:25;68:20;
87:1;88:12;94:19,21,
23;95:25;111:20;
112:1,4,11,13;134:21;
173:9,21
receiving (1)
15:20
recently (3)
36:6;41:11;47:11
recite (1)
138:24
record (38)
4:2;6:15;49:18;
53:11,13,14,17;61:5;
75:13,14,16,17;88:25;
103:20,22,24,25;158:6;
162:2,4,5,7;172:15,17,
18,19,21,23,25;173:1;
175:25;176:2,3,5,6;
178:14,24;179:19
RECORDED (1)
6:1
recover (1)
118:6
recovered (1)
140:4
recovery (1)
147:11
red (1)
91:14
Redding (11)
4:5,9;6:3;11:21,22,
23;12:2,8,16;179:17,18
redundant (1)
38:12

refer (1)
76:5
reference (1)
164:21
referred (1)
28:21
referring (11)
14:22;41:20;74:14;
78:19;100:19;105:18;
122:16;124:18;142:5;
175:1;179:4
refresh (4)
44:17;75:7;159:10,
15
Refresher (8)
44:11,12,16,19,23;
45:3,9,10
refreshes (1)
44:18
refreshing (1)
54:1
regarding (3)
4:6;38:24,24
regardless (2)
148:17;150:9
regards (2)
139:1,19
registration (1)
139:22
regular (1)
67:21
regularly (1)
155:16
Regulation (6)
16:15,21;18:25;
19:13;21:17;24:17
Regulations (6)
15:21;16:2,6,10;
17:2;148:16
related (3)
38:18;75:23;157:4
relation (1)
157:13
relationship (5)
71:24;72:2;74:18;
81:23,25
relayed (8)
84:17,18;85:6;
118:21;119:5;125:9,
25;175:5
relaying (1)
175:5
released (3)
141:2,11,19
relevance (2)
102:9;117:2
rely (1)
176:14
remainder (1)
176:9
remaining (2)
132:14;134:13
remember (19)

8:9;9:2,3,23;18:10;
30:19;32:21,22,22,23;
38:22;42:12,13;43:15;
67:18;79:21;85:5,8;
145:16
removal (1)
80:2
removed (5)
101:2;168:22;
169:17;173:25;174:19
removing (4)
74:25;75:1;79:24;
92:8
rental (1)
96:9
repeat (3)
7:19;43:13;108:2
rephrase (7)
10:17;12:22;114:12;
130:12,23;140:15;
147:4
report (10)
78:19,20,25;79:2,9;
118:23;119:7;155:6;
160:1;161:12
reported (3)
118:15,20;120:9
Reporter (11)
4:10,14;6:6;79:17,
20;116:2;165:6,7;
171:25;173:4;179:20
Reporters (1)
6:3
reporting (1)
26:12
represent (1)
4:13
represented (1)
119:12
request (3)
113:2;156:19,22
requested (1)
55:14
requests (1)
136:13
require (2)
19:14;129:24
required (3)
19:17;94:25;139:5
requires (2)
99:21;177:11
reserve (1)
176:9
reside (1)
11:20
resided (1)
175:3
residence (1)
164:9
resign (1)
15:11
resigned (2)
15:12,13

Resist (1)
16:24
resolution (1)
58:20
resolve (5)
139:18;140:13,13,
16;142:22
resolving (1)
38:25
respect (9)
46:13;99:20;103:4,5,
6;133:2,12,13
respond (5)
19:5;130:7;156:19,
22;164:6
responded (2)
19:9;23:24
responding (5)
19:7;20:11;21:11;
22:20;40:2
response (4)
23:25;37:14,14;
171:8
responsibilities (1)
30:8
rest (1)
161:16
retain (2)
76:4;155:12
retained (2)
148:18;179:16
retention (5)
148:18;154:23;
155:21,22;157:13
retrieve (1)
117:21
return (6)
93:13,14,20,23;
147:11;149:25
returning (2)
94:1;149:14
review (27)
50:3;64:14,20,22;
86:25;88:5,10,12,21;
89:9;92:3;95:8,11;
97:8;100:2;113:25;
116:4;128:23;133:19,
24;134:9,16;153:8;
161:13;162:9,10,15
reviewed (11)
41:11,12;50:13,23;
61:3;75:20,22;86:1,6;
132:9;134:11
Reviewing (2)
125:9;164:12
revised (5)
166:5,6;168:11,13,
15
rid (2)
155:7,8
rides (1)
73:11
Ridgeview (1)

13:1
**right (213)**
7:2,16;8:6,8,16,23;
9:12;10:7;11:4,6,17;
12:8,9,17;13:2,21;14:3,
10,24;15:4,10;19:20;
21:5,15;22:12;23:1;
24:16;25:4,14;27:4;
28:12;29:8,14,21;
30:14,16,21;31:5,15;
32:2,9,17,24;35:2,25;
37:12;40:25;41:6;42:6;
44:3;45:22;48:11,20,
20;49:3;50:1,14;51:1,
12,15,20;52:3;53:16,
20;55:5;57:22;58:3;
59:7,20;60:10,15;61:1,
16;62:3;63:3,3,14;
65:21;66:3,18;67:1;
68:11;70:9;71:1,8,11,
15,19;72:2,5,16;73:13;
74:10,20,20;76:16;
77:5,6,9;80:14,18;
81:18;82:7,25;83:4;
84:3,18;85:7;86:19;
87:21;88:8;89:25;92:9,
11;94:6;95:20,20;
96:18;97:5,18;98:2,3;
100:1;106:2,4,10;
107:14;108:14;110:6,
25;113:11,12,19,19;
115:1,12,21,22;116:17,
20;117:9,11;118:9,13,
14;119:22;120:1,8,20;
123:11;127:16,22,24;
131:14,15;132:20;
134:5;135:1,11,13,18;
136:10,17,19;137:8,22;
138:17,19;139:11,14;
140:20,20,23;142:20;
143:25;144:3,7,21,22;
145:4,14;146:13,17;
148:7,20;149:15;
150:6,13;152:6,7,8,20;
153:10,11,15;154:10,
22;155:23;156:8,18,
25;157:12,16,20;
158:2;162:7;164:3;
165:20;172:19;173:6;
175:8,23;179:5
**rightful (3)**
141:1;147:12,19
**right-hand (1)**
78:21
**rights (3)**
106:14;176:9;178:24
**road (1)**
83:22
**roadway (1)**
21:14
**Robert (2)**
6:18,19
**R-O-B-E-R-T (1)**

6:19
**role (5)**
24:3,6;37:3;46:13;
157:8
**roles (2)**
21:22;22:2
**room (2)**
83:12,17
**rooms (1)**
164:9
**rotation (1)**
63:22
**round (1)**
116:23
**routine (3)**
176:21;177:14,17
**rules (10)**
7:17;10:16;38:24;
39:3;41:18;100:7,13;
101:3,6;178:16
**ruling (1)**
45:17
**running (2)**
109:20;110:4
**Ryan (1)**
5:4

**S**

**Sacramento (4)**
4:7;16:19,20;35:17
**safety (3)**
14:6,10,12
**sale (14)**
94:24;95:6;96:18;
105:6;113:7,9,22;
114:2,2;120:20,21,23;
121:15,23
**sales (5)**
95:15;112:21;113:2;
121:18;123:18
**same (33)**
7:17;8:25;9:5;16:11;
18:12;24:14;25:20;
43:23;53:20;58:12;
69:19;88:16;102:22;
103:11;106:20;107:10,
11,25;110:1,1;112:7;
113:5;115:12;119:15;
131:25;146:13,19;
149:8;151:9;158:2;
170:13;178:14;179:3
**sanctuary (2)**
82:6;125:5
**sat (1)**
72:7
**save (1)**
110:9
**saw (14)**
17:20,21;84:20,22,
24;85:8;98:20;113:24;
123:13;144:7;164:13;
165:18;173:24;174:25

**saying (30)**
34:7;39:4;54:2;
60:16,23;72:10;78:22;
85:8;90:5,5,20,20,21;
94:7;99:17,18;101:10;
107:7;110:10;111:20;
112:12;121:19,21;
122:17;126:3;127:23;
130:18;136:13;167:9;
170:1
**school (9)**
12:23;13:1,8,11,15;
14:6,13,25;15:5
**scratch (1)**
27:19
**screwing (1)**
101:1
**Sealing (3)**
55:14;60:18;62:7
**search (57)**
28:6;35:12,13;36:20;
44:19;46:24;48:13;
49:1,9,23;51:10,11;
53:21;54:9;55:4,7,21;
56:21;57:11,24;58:16;
59:21,22,25;61:2;
62:25,25;63:8;64:2;
80:21;90:23;112:12,
17;114:21;124:8,13,
15;128:8,20;129:24;
136:3,19;138:11,14;
141:13;147:9;168:11,
13,16,20;170:11;
171:17,20;173:19;
174:22;175:1;178:12
**searched (1)**
156:23
**sec (2)**
126:10;163:4
**second (11)**
31:16;34:20;76:11;
77:3,12;83:15;124:12;
146:1;167:12;168:11;
175:25
**seconds (1)**
9:8
**section (6)**
57:11,25;58:24;66:3,
6;177:15
**sections (6)**
58:5;62:1,4;65:13;
177:19,21
**secure (1)**
140:24
**security (1)**
14:19
**seeing (4)**
60:11;75:7;83:15;
172:5
**seeks (1)**
63:25
**seem (2)**
84:25;116:23

**seemed (4)**
97:3;132:7,11;133:8
**seems (1)**
64:1
**seize (4)**
62:21,24,25;164:22
**seized (10)**
58:15;138:14;
140:24;146:22;147:16;
148:25;149:5,20,24;
178:11
**seizing (2)**
91:15;149:13
**seizure (8)**
35:12,13;36:20;
37:15;44:19;64:2;
141:3;157:25
**select (3)**
51:5;55:16;56:16
**self-explanatory (2)**
68:7;123:16
**Senator (4)**
89:19;91:1,2,3
**send (10)**
50:15;52:3,6,16;
165:15,21,23,24;171:1,
25
**sending (1)**
162:24
**sensationalized (1)**
158:14
**sent (38)**
35:21,22;37:19;
76:18;83:13;86:22;
87:11;97:14,24;98:1;
134:15;159:19,19,23;
161:20;162:11,14,22;
164:11,13;165:25;
166:17,18;167:5,18,21,
23;168:2,3,23,25;
169:9,18;172:13;
173:22;174:13;175:16,
22
**sentence (4)**
91:12;100:12,25;
103:8
**separate (1)**
42:15
**September (1)**
49:23
**sequence (1)**
162:10
**service (4)**
22:21;46:18;62:7;
124:8
**services (1)**
94:17
**set (2)**
11:19;58:23
**seven (2)**
175:12;178:17
**several (2)**
56:6;65:13

**severe (3)**
23:7,13,22
**sex (1)**
23:9
**SHABIK (1)**
63:18
**SHAKIB (6)**
5:5,5;170:4,7,15;
179:11
**shall (3)**
138:14;140:24;141:1
**shared (2)**
120:3;126:1
**Shasta (26)**
15:16,18;21:25;22:4;
33:12,12;39:3;42:9;
43:18;49:20,21;55:7,
25;58:21;61:4;71:25;
72:18;75:2;80:15;81:4;
90:13;99:13;117:15;
120:9;127:19;145:15
**Sheriff (8)**
19:12;21:20,21,22,
24;22:2,3;55:24
**Sheriffs (2)**
140:16;142:22
**Sheriff's (14)**
15:16,18;16:11;
21:25;35:20;41:10;
80:15;84:23;148:24;
153:22,24;168:18,21;
173:18
**Shorthand (2)**
6:6;23:17
**show (6)**
49:11;66:2;76:11;
112:18;146:6;166:24
**showed (2)**
109:14;134:12
**showing (1)**
49:19
**shown (1)**
131:16
**shows (3)**
112:16;149:17;164:1
**shut (1)**
7:23
**sign (12)**
50:18;57:20;61:9,10,
11;144:5,15;163:21;
165:14,16,25;175:11
**signature (4)**
60:23;61:13;136:22;
175:11
**signed (7)**
38:1;55:5;98:8;
110:18,21;137:20;
168:8;169:10,11,13,14;
174:12,14,15;175:10,
12,12
**significant (1)**
48:6
**signing (5)**

50:20;61:12;134:7;
136:25,25
**signs (7)**
51:14;54:6;61:6;
136:11,12,15;137:10
**Silva (3)**
4:24;71:13;97:7
**similar (4)**
122:21;139:1;145:8;
157:2
**simple (2)**
102:25;107:13
**simply (3)**
19:11,15;130:21
**Simpson (2)**
12:16;13:22
**sincere (1)**
103:6
**sister (1)**
13:20
**sit (1)**
101:16
**sits (1)**
72:3
**situation (2)**
18:1;52:13
**situations (1)**
142:21
**six-month (3)**
28:19;29:19,19
**sixty (1)**
78:20
**size (3)**
8:17,20,21
**skipped (1)**
124:11
**slang (1)**
65:15
**slaughter (5)**
93:14;122:7,12;
123:9;158:12
**Slaughtered (4)**
122:6,25;123:3;
126:15
**Society (3)**
148:10,14,15
**sold (11)**
82:19;94:7,9,20;
112:25;113:4;120:24;
121:11;123:20,24;
124:1
**sole (1)**
24:9
**solely (3)**
114:17,18;126:9
**solution (2)**
89:21;93:13
**solved (1)**
98:23
**somebody (7)**
50:8,8;66:10;91:20;
93:6;121:7;139:19
**somehow (1)**

18:16
**someone (14)**
14:21;17:18,21;
19:12;23:4;59:17;
72:14,17;96:19;
105:12;157:17,24;
159:20;174:25
**someone's (1)**
21:10
**something's (1)**
27:15
**sometime (2)**
37:5,12
**sometimes (11)**
25:22,23;26:10;
51:25;52:1;142:6,7,8,
25;156:11;163:14
**somewhat (1)**
89:5
**somewhere (4)**
40:9;92:11;147:22;
175:6
**soon (2)**
73:24;97:1
**sooner (1)**
11:2
**sorry (26)**
13:8;17:1;23:16,21;
43:18;54:4;69:7;71:20;
78:21;85:11;87:24;
91:3;100:11,22,25;
108:15;111:2;113:1;
124:18;125:3;126:20;
143:9;163:2;165:3;
173:7;174:5
**sort (5)**
26:11;27:10;34:10;
96:10;120:13
**sorts (2)**
26:13;118:3
**sought (1)**
62:5
**sound (3)**
93:18;132:22,22
**sounds (5)**
68:7;75:5;76:16;
93:19;179:13
**South (2)**
4:9;6:3
**space (1)**
60:4
**spam (1)**
155:17
**speakers (1)**
41:22
**Speaking (2)**
10:24;107:9
**Specialist (1)**
4:4
**specific (10)**
26:14,24;27:2;33:12,
14,15;42:24;43:1;
109:25;143:5

**specifically (10)**
36:15;43:24;66:3;
93:13;96:15;97:15;
130:23;145:1;152:11;
153:8
**specifics (1)**
32:23
**speculate (3)**
40:14;108:23;142:17
**speculating (2)**
40:12,13
**speculation (9)**
34:3;39:13;105:9;
111:5;128:6;129:22;
130:11;142:16;146:4
**spell (4)**
6:15;30:14,19,24
**spelled (1)**
120:1
**spoke (1)**
78:15
**spoken (1)**
159:8
**spot (3)**
10:16;100:21,22
**stack (4)**
76:9;77:9;156:20;
166:22
**stamp (11)**
87:12,21;89:5;128:1;
160:19,20;163:1,3;
166:10;168:10;173:5
**stamped (7)**
76:13;78:21,22;
106:11;124:17;135:14;
166:23
**stamps (3)**
77:17;104:4;165:10
**stand (2)**
108:1;110:4
**standard (3)**
136:2,4,14
**Standards (1)**
29:13
**Starkeys (1)**
175:2
**start (5)**
13:22;16:1;84:11;
104:1;161:6
**started (6)**
13:25;14:2;22:3;
31:14;42:4,4
**Starting (2)**
110:7,8
**starts (4)**
89:7;98:5;106:13;
167:3
**State (14)**
4:23;6:6,15;14:14,
19;55:7,24;58:14;
100:6,13;101:3,6;
131:10;180:7
**stated (1)**

126:8
**Statement (35)**
50:18;55:14;60:19;
61:3;63:5;68:17,23;
69:5;89:12,23;90:1,15;
91:23,24,24;101:10;
113:8,13;114:23;
115:10,11,22;119:6,8;
120:15;129:17;130:21;
136:7;137:1,17;
151:22;160:4;161:7,8;
177:7
**statements (6)**
9:14;105:10;113:11;
114:22;176:15;177:16
**States (1)**
4:7
**stating (1)**
112:4
**station (1)**
24:9
**statue (1)**
86:3
**statute (1)**
85:18
**stay (1)**
116:12
**stayed (1)**
116:13
**steps (4)**
49:3,4;91:6;161:21
**Steve (2)**
30:23;31:16
**still (23)**
10:13;18:12;21:24;
32:12;36:24;47:4;
53:18;55:22;56:12;
58:11;59:22;61:5;79:3;
93:16,25;94:3;99:5;
100:7,13;101:3;
105:24;108:1;110:21
**stipulate (1)**
178:22
**stipulated (3)**
179:9,10,11
**stipulation (1)**
179:4
**stole (2)**
82:20,23
**stolen (19)**
56:7;81:4;82:4;
117:12,13,18;118:6;
139:1,4,9,12,15,18;
140:2,7,9;147:11;
150:10;173:20
**stop (1)**
52:25
**store (1)**
13:20
**story (4)**
82:11;85:3,3;168:19
**stragglers (1)**
77:5

**strange (2)**
116:23;117:1
**stray (1)**
148:11
**Street (2)**
4:9;6:3
**strike (13)**
21:23;31:6;45:23;
84:12;96:21;128:11;
130:8;145:5,9,12;
153:13,14;154:24
**striking (1)**
17:21
**Studies (2)**
12:13,14
**subject (2)**
47:2;163:21
**submit (2)**
50:16;52:14
**submitted (3)**
161:2,5;173:11
**subpoena (1)**
158:23
**subscribed (1)**
59:23
**subsequent (3)**
169:4,9;175:16
**substantial (1)**
128:24
**suggest (4)**
60:10;125:22;
126:11;151:13
**summary (10)**
81:1,3;82:10;83:7;
160:6,7,9;161:9,10,11
**supercede (1)**
151:11
**superior (5)**
23:5;38:3;49:22;
115:19;176:15
**supervisor (1)**
176:18
**supervisor's (1)**
23:6
**supplemental (1)**
171:8
**support (1)**
89:20
**suppose (1)**
59:6
**supposed (3)**
10:22;59:8;152:21
**supposedly (1)**
174:20
**sure (32)**
8:14;20:21;31:4,13;
34:6;37:21;43:11,16,
22;49:13;52:24;63:18;
64:11,12;65:24;71:6;
75:14;77:3,7;81:2;
86:25;87:3;96:1;
105:23;109:24;122:25;
138:18;140:3;141:25;

155:18;161:22;169:25
**suspicious (2)**
66:21,22
**swear (4)**
113:14,16;114:6,16
**swearing (3)**
99:9;113:3;121:12
**sworn (8)**
4:13;6:11;59:21,23;
113:13;114:22,24;
124:7
**synced (2)**
154:13,14
**system (2)**
140:2;163:22

**T**

**table (4)**
8:17,18,20,21
**tag (1)**
85:2
**talk (9)**
7:20;25:2,5;64:19;
68:19;117:9;151:20;
175:14,17
**talked (4)**
31:4;5;85:20;178:4
**talking (12)**
7:22,22,23;53:23;
69:12;101:12;117:22;
128:1;130:4,15;
136:10;169:22
**tape (2)**
97:1;103:21
**taught (3)**
18:16;62:8,11
**teach (2)**
95:3,8
**technically (1)**
103:18
**telling (6)**
90:15;99:9,11;
112:24;133:7;167:14
**tells (4)**
104:14;105:20,21;
106:24
**temperate (1)**
55:2
**template (20)**
49:23;54:17,21,25;
55:1,2,3,23;56:12;
58:10;61:5,17,22;63:5,
17;69:12;75:19,21,24;
136:9
**Ten (1)**
63:12
**tenant (4)**
26:16;27:1;96:5,13
**tend (1)**
156:15
**tenth (1)**
103:12

**term (11)**
28:8;29:10;39:6;
41:17;117:1;123:13,
15;131:19;134:1,18;
146:2
**terminal (5)**
122:22,23;123:12,
17,17
**terminated (1)**
15:11
**terms (2)**
152:22;177:13
**terrible (4)**
122:4;140:14;
154:13,13
**Terry (1)**
4:4
**testified (11)**
6:12;7:8;83:20;96:1;
100:17;119:14;135:5;
136:7;159:25;174:24;
177:24
**testify (3)**
96:1;135:4;178:18
**testimony (18)**
8:11;10:2,4;11:15;
39:14;70:24;85:24;
95:24;97:2,23;119:3;
129:2,3,4;131:14;
132:20;133:14;178:17
**Thanks (1)**
179:14
**Thanksgiving (1)**
9:3
**Theft (19)**
21:9;24:19,20,23;
25:6;26:20;67:5,12,14;
84:15;85:17;86:5,10,
16;98:7;107:4;118:2,
15;149:16
**therefore (3)**
56:21;57:11,23
**thereof (2)**
58:12;180:5
**thinking (5)**
34:1,5;54:13;111:7,
13
**third (3)**
30:22;31:17;173:17
**though (10)**
11:18;36:21;88:10;
121:13;140:6;144:4;
147:15;149:23;174:14;
176:22
**thought (20)**
13:24,25;25:10;
59:18;77:3;85:12;
117:5;120:9;124:18,
19;130:16;131:7;
133:1,12,21;134:17,20;
156:14;158:15;174:24
**thoughts (1)**
89:25

**three (15)**
15:1,2;19:1,2;20:6,7,
25;21:18;22:14,15;
30:11;73:4;134:14;
135:19;157:3
**tiers (1)**
24:9
**till (1)**
22:16
**timeline (1)**
123:25
**times (4)**
7:8,11;73:5;74:4
**timing (1)**
167:15
**title (6)**
81:7,7,11,12;95:3;
121:18
**titles (1)**
34:18
**today (13)**
10:4;11:9,15;25:5;
40:17;64:21;92:4,10;
100:2;101:16;102:7;
113:25;116:5
**together (1)**
161:18
**token (1)**
102:22
**told (24)**
8:12;37:25;81:3;
82:4,7;83:5;84:14,16;
95:10;97:15;102:1;
110:14;113:10,16;
118:25;119:21;120:24;
122:9;126:24,25;
132:18;133:8;144:22;
150:18
**took (11)**
9:6;36:13,16;38:16,
16;47:4;48:18;93:2;
122:9;149:17,19
**top (8)**
33:21;39:25;55:5,6,
19;75:5;114:3;160:24
**topic (2)**
28:24;36:15
**topics (1)**
53:23
**total (1)**
152:6
**touched (2)**
47:5;48:5
**towards (1)**
129:11
**trafficking (1)**
58:17
**Train (1)**
179:18
**trained (7)**
27:14;33:24;34:6;
40:6;41:7;58:5;155:25
**training (66)**

14:11;16:5,7,8,22;
18:7;27:17;29:13,24,
25;30:2,3,4,6,6,7,10;
31:2,7,16,21;32:6,10,
11,25;33:1,4,8,13,16;
35:3,4,10;36:9,10,11;
38:8,12;41:16,20;42:4,
6,7,8,9,21,22;43:25;
44:5,7;46:23;47:2,21,
23,24,25;48:16,22,22,
23;49:4;53:23,24;62:8;
95:3;105:7
**transcribe (1)**
8:2
**transcript (2)**
179:20,24
**transfer (1)**
121:18
**transfers (1)**
95:4
**transport (1)**
149:17
**transported (4)**
82:5;149:11,13,18
**traveled (1)**
117:12
**trial (6)**
10:3,15;135:3,4;
139:15;179:7
**trials (2)**
7:8;8:11
**trip (1)**
116:23
**true (19)**
50:25;59:23;90:20;
99:9,10,12;101:22;
107:18,19;110:24;
119:9,13,22;121:22;
130:18,22;162:23;
175:9;180:7
**trumps (3)**
99:14,17;151:23
**try (5)**
11:17;59:10,11;
109:8;133:17
**trying (13)**
34:18;43:13;64:25;
78:5;100:19;106:9,9;
107:21;125:19;128:13;
142:18;162:8;167:1
**turn (5)**
19:6,11;23:4;40:24;
150:19
**turned (5)**
76:8;119:9;147:16,
21;174:16
**tutor (1)**
13:17
**TV (1)**
148:1
**twenty (2)**
21:17;63:12
**two (16)**

20:6,7,25;27:9;
47:19;73:4;77:7;78:14,
17;83:23;84:5;132:16;
134:14;150:16;151:2;
163:9
**type (3)**
24:22;59:18;60:6
**typed (1)**
135:22
**types (2)**
26:7,8
**typically (6)**
23:6,19;24:21;50:8;
61:10;160:5
**typing (1)**
84:11

**U**

**ultimately (2)**
140:18;173:16
**unaware (1)**
105:19
**uncertain (1)**
79:11
**unclear (1)**
160:18
**uncommon (1)**
114:21
**Undecipherable (1)**
41:22
**under (23)**
50:20;53:18;58:13;
110:18,21;113:3,8;
114:6,16;117:13;
118:4;121:12;124:6;
134:7;138:5,14,20,24,
25;150:7,9;180:6,6
**underlying (1)**
84:15
**underneath (1)**
55:8
**undersigned (1)**
180:4
**Understood (11)**
9:11;32:8;41:24;
46:15;56:19;93:3;
101:9;123:19,20;
124:1;164:3
**unique (1)**
141:21
**unit (2)**
153:20,21
**United (1)**
4:6
**University (6)**
12:16;13:22;14:8,9;
157:8,9
**unlawful (7)**
37:15;66:10,11;
67:14;68:1,6,9
**unless (1)**
85:1

**unlike (2)**
10:15,15
**unsure (1)**
79:19
**up (45)**
7:23;12:1;15:19,20;
22:16;25:13,22,23,24;
29:1;32:6;38:1;54:9,9;
62:15;65:16;69:13,14,
17;80:17;84:11,12;
85:1;86:9,16,16;87:13;
95:7,12;101:1,8;
128:12,17;135:7,22;
137:21,22;154:18;
160:24;162:8;163:12;
164:5;177:14,15,19
**update (15)**
9:21;42:24;45:6
**updates (7)**
42:23;43:3,5;44:5,9;
145:19;159:7
**upon (3)**
58:19;134:20;141:2
**use (22)**
22:7;28:4;29:10;
39:6;41:17;49:21;
53:10;56:10;62:10,11,
18;64:18,24;124:7;
132:17,18;134:19;
140:6;146:3;148:11;
163:22,24
**used (15)**
56:8;82:23;121:3;
132:21;134:1;137:14,
15;142:4;143:3,8,13;
145:7,17;165:23;179:5
**using (5)**
74:22;103:13;
132:12;134:2;170:17
**usual (1)**
108:5
**usually (14)**
21:10;23:18;24:18;
51:22,23;52:16,21;
54:24;61:20;147:25;
148:5;155:6;160:1;
163:20

**V**

**vague (26)**
10:9,22,25;64:6;
91:17;99:23;103:15;
105:15;106:18;108:4,
24;109:22;114:9,19;
116:25;121:25;124:19;
131:4,18;133:4;
134:22;147:2;151:15;
176:16,25;177:17
**value (12)**
67:15,17,19;68:2;
117:13;129:1,5;132:8,
13;149:1,6,15

**values (1)**
118:4
**Vanessa (3)**
5:5;63:16;131:1
**varies (3)**
20:12,13,15
**variety (3)**
34:11;53:23;56:14
**various (1)**
7:9
**VCs (1)**
143:3
**vehicle (4)**
139:22,23;140:2,10
**verbal (2)**
8:5;157:23
**verbally (2)**
8:2;15:8
**verbatim (2)**
81:1;138:24
**verbiage (1)**
121:5
**verified (1)**
79:18
**verify (10)**
9:24;49:18;64:9;
75:21;76:8;77:12;78:6;
79:7,11;83:15
**verses (1)**
123:17
**version (6)**
166:17,18;169:4,13,
14;170:5
**versions (2)**
167:22;170:21
**versus (14)**
25:10;27:15;29:4;
30:1;31:3;32:20;33:2,
4;38:11;40:17;43:6,8;
122:23;173:16
**via (2)**
44:5;50:16
**video (7)**
4:2,4,5;6:1;179:16,
17,24
**VIDEOGRAPHER (16)**
4:1;53:11,14;75:14,
17;103:22,25;161:25;
162:2,5;172:17,23;
173:1;176:3,6;179:15
**view (2)**
96:24;171:23
**violated (2)**
62:4;85:13
**violating (1)**
156:4
**violation (2)**
17:13;37:15
**violations (2)**
157:6,17

**W**

**wait (2)**
83:20;120:9
**waiver (2)**
106:10,14
**walk (1)**
161:21
**wants (2)**
106:21;150:24
**warrant (172)**
17:18;46:13,14,24;
48:13,22,23;49:1,4,9,
24;50:7,10,15;51:2,10,
11;52:5,9,16,20,25;
53:25;54:4,4,6,9,16,18,
21,24,25;55:3,4,6,7,22,
23;56:4,13;58:6,16;
59:1,21,22,25;61:2,7,
17,18;63:8,23,25;64:1,
21;65:3;66:4,23;67:10;
68:18;69:9,11;75:3,7,
19;78:4;79:6,8,25;
80:21;83:24;84:2,6;
88:12,13;89:10,13;
90:23;95:12;97:17;
99:24;110:18,23;
112:12,17;113:21;
114:22;116:4,8,12,13;
124:8,13,16;128:7,20;
129:2,6,7,24;131:17;
133:2,10;135:15,23;
136:3,6,15;137:10,19;
138:11,13,14,21;139:5;
141:18;143:1,23;
144:5;146:7;147:14;
148:22;149:4,5,23;
150:1,6,7,12,20;152:1,
2,22;153:7;159:7,9,12,
25;161:14,20;162:11,
12,13,21;163:16;
164:22;167:17;168:12,
13,16,20,23;169:4,9,
10,21;170:21;171:5;
173:11,16,23;174:9,10;
175:16,20;176:22;
177:3;178:1,4,8,11,12
**warrants (20)**
45:22,24;46:4,9,23;
47:21,25;48:4,24;
50:12,16;53:21,24;
64:24;65:7;66:7;128:8;
141:14;166:1;176:15
**warrant's (1)**
150:10
**watch (1)**
148:1
**way (20)**
10:20;14:15;40:11;
72:11,13;96:24;
103:17;113:22;126:14,
18,25;129:10,12;
132:24;133:7;141:23;
142:3;165:22;176:11;
178:6

**website (2)**
49:6,20
**Wednesday (1)**
6:4
**weed (1)**
89:22
**week (1)**
173:7
**week-long (2)**
16:16,20
**weren't (10)**
39:18;46:8;96:11;
105:4;116:11;134:2;
148:21,22;174:3,6
**what's (18)**
18:2;23:22;30:5;
61:21;63:8;68:8;88:23;
117:19,20;128:8;
139:14;154:23;155:20;
164:4,19,21;172:2;
174:5
**whenever (1)**
163:4
**Wherefore (1)**
59:24
**whole (6)**
23:3;89:14;104:9,10;
106:4;153:22
**who's (1)**
72:7
**whose (1)**
68:11
**wife (2)**
70:2;159:2
**wifi (1)**
170:24
**withhold (1)**
133:17
**within (5)**
28:17,17,21;36:22,
23
**without (3)**
58:24;142:23;149:13
**witness (48)**
4:13;25:13;26:24;
27:8;34:4;39:16;41:5;
77:21,24;86:1;89:2;
90:10;91:19;93:22;
94:12;97:24;102:14;
103:13;104:16;109:1;
110:9;111:6,12;112:8;
114:11,21;119:4;
122:1;129:14;131:21;
133:6;134:11,24;
140:9;145:12;146:5;
149:9;150:23;151:10,
16,19;168:7;173:6;
176:17;177:1,11,18;
178:18
**Word (18)**
57:14,15;59:7,18;
60:13;62:18;99:13;
101:23;105:14;114:17,

18;121:16;123:3,16;
134:3,4;136:18;145:17
**words (3)**
28:4;82:23;121:2
**work (16)**
13:6,14;14:19;15:16;
24:14;28:6;51:9,16;
116:3;148:2;153:16,
19;154:4;155:15;
156:23;172:2
**worked (9)**
13:19;22:5,20;23:9,
12,13;118:1,3;161:2
**working (9)**
13:15,19;14:6;23:7;
51:7,14;170:24
**works (2)**
29:7;165:22
**write (23)**
17:15;18:5;48:15,22,
23;52:9;54:4,5;56:23;
57:16;60:12;65:7;66:4,
8;79:2;80:21;100:21;
152:1,2,10,13;155:7;
164:22
**write-up (1)**
52:4
**writing (21)**
46:24;48:13,14;50:5,
7;54:3,3;64:14,20,23;
65:5,6,18,24;89:6;
95:12;136:2;159:7;
161:6,14;177:15
**written (24)**
9:14;32:9;40:4,7,9;
46:10,15,17;52:5;
58:21;65:4;66:23;67:4;
99:14;129:17;145:18;
147:15;155:1,3,9;
156:9,10,13;160:16
**wrong (7)**
23:17;31:20;87:3;
104:21;133:7;142:13;
157:25
**wrongful (1)**
65:9
**wrote (5)**
63:8;69:9;122:19;
131:1;149:23

**X**

**XYZ (2)**
121:22;135:7

**Y**

**yadda (3)**
56:11,11,11
**year (9)**
13:21;47:10;72:21,
22,23,24,25,25;73:4
**years (13)**

LONG vs.
FERNANDEZ

15:1,2;19:1,2;21:18;
22:14,15;31:10,21;
36:22,23;73:3,7
**yesterday (4)**
132:21;159:24;
178:15,24
**youth (3)**
69:25;70:4,7

**Z**

**zero (2)**
21:1;163:2
**zone (1)**
172:10

**0**

**000001 (1)**
76:13
**000153 (1)**
87:16
**0004 (1)**
160:22

**1**

**1 (13)**
4:6;55:3,6,22;56:12;
62:13;63:4;77:20,20;
88:18;103:23;136:9,9
**1.6 (1)**
171:16
**10 (5)**
9:8;20:22,23;21:7,8
**10:34 (1)**
53:12
**10:50 (1)**
53:15
**100 (2)**
46:21;77:20
**10547 (1)**
6:7
**11:14 (1)**
75:15
**11:26 (1)**
75:18
**11:59 (1)**
103:23
**12 (2)**
20:22,23
**12:17 (1)**
104:1
**12828 (1)**
4:9
**13:22 (1)**
162:3
**13:32 (1)**
162:6
**13:45 (1)**
172:24
**13:50 (1)**
173:2

**13:54 (1)**
176:4
**13:56 (1)**
176:7
**14:00 (1)**
179:19
**1407 (10)**
58:24,24;138:22,24,
25;139:1;146:20,24;
150:9;151:4
**1408 (3)**
146:24;150:9;151:5
**1422 (2)**
58:24;138:22
**15 (1)**
79:10
**153 (2)**
87:17,21
**1536 (8)**
58:13,25;138:6;
141:12;145:6,23;
151:2,4
**154 (1)**
87:21
**155 (1)**
88:19
**156 (2)**
89:4,7
**157 (1)**
89:8
**158 (1)**
97:6
**159 (1)**
98:5
**16 (1)**
128:1
**160 (3)**
104:3,4;128:2
**161 (3)**
100:6,11;106:1
**163 (3)**
87:18;104:4;106:11
**16-week (1)**
31:11
**180 (7)**
163:2,3,3,9;165:2,3,
10
**181 (2)**
165:10;166:23
**182 (6)**
165:1,4,11;167:1,3,4
**1828 (1)**
6:3
**183 (6)**
166:8,10,12,13;
167:2,2
**187 (6)**
65:13,14,14,16;66:6,
9
**198 (6)**
76:14;77:4,8;166:23;
167:3,4
**1980 (1)**

42:20

**2**

**2 (3)**
56:13;62:13;104:1
**2:00 (4)**
80:5,6,19;84:7
**2:01 (1)**
179:25
**20 (8)**
7:14;9:6,9;21:7,8;
24:17;44:24,24
**200 (6)**
46:20;76:14;77:4,5,
20;171:9
**2006 (6)**
12:3,4,5,9;13:23;
14:2
**2010 (3)**
12:19,20;14:2
**2013 (4)**
15:2,11,15,18
**2014 (2)**
16:3,4
**2016 (8)**
37:6;38:18;42:2,10,
20,22;43:25;44:15
**2019 (2)**
48:19;49:23
**2020 (9)**
22:16;24:1,3;37:6;
38:18;44:21,22;45:2;
48:19
**2021 (5)**
36:5,6;38:21;44:22;
45:2
**2022 (1)**
118:14
**2023 (3)**
4:3;6:4;180:13
**21 (2)**
44:25;73:1
**22 (8)**
9:7;72:22;73:1;
124:24;125:3;135:13,
14;178:1
**22-cv-01527-DAD-AC (1)**
4:6
**22nd (1)**
4:23
**23 (1)**
140:21
**23rd (2)**
4:3;6:4
**26 (1)**
147:8
**27 (1)**
124:17
**28 (1)**
178:1

**3**

**3 (3)**
56:20;58:10;62:13
**3:00 (1)**
89:1
**3:05 (1)**
89:2
**30 (2)**
7:14;84:10
**300 (2)**
80:13,17
**30e (1)**
178:16

**4**

**4 (5)**
59:22;61:5;62:13;
63:4;136:9
**4:00 (6)**
164:4,6,7;166:11,18;
167:7
**4:08 (2)**
162:19,20
**4:16 (2)**
164:7,24
**40 (4)**
46:1,17;152:4,9
**400 (2)**
117:13;118:4
**40-hour (1)**
47:14
**45 (1)**
84:10
**450 (2)**
67:16;68:2
**487 (3)**
64:18,20;67:2
**487a (5)**
67:7,8,9,10;85:19
**4-H (12)**
69:21;70:2,6;81:6,
12,23;82:16,17;90:3;
120:18;147:18;158:9

**5**

**5 (6)**
49:23;61:17;63:4,4,
7;136:9
**5:00 (1)**
167:9
**5:15 (6)**
166:9;167:23;168:7,
25;173:11,13
**5:22 (1)**
175:11
**5:23 (1)**
168:8
**50 (4)**
46:1,17;152:5,9

**500 (2)**
116:23;117:12

**6**

**6 (3)**
55:6;56:20;61:17
**6:25 (2)**
167:18;172:6
**6:33 (1)**
168:10
**68 (2)**
78:21,21

**7**

**7/26 (1)**
160:24

**8**

**80 (3)**
36:2,3;47:16
**80-hour (1)**
47:4
**832 (3)**
18:2,6,13
**8954 (1)**
179:17
**8th (11)**
75:4;79:7,11,13,14,
16,18,25;80:1;89:1;
118:14

**9**

**9:36 (2)**
4:3;6:5
**950 (2)**
67:21,22
**96001 (1)**
6:4
**9th (2)**
158:9,16