# EXHIBIT N

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                        SACRAMENTO DIVISION

4

5

6    E.L., A MINOR, BY AND THROUGH HER    )
     GENERAL GUARDIAN, JESSICA LONG;       )
7    JESSICA LONG, AN INDIVIDUAL,          )
                                           )
8              Plaintiffs,                 )
                                           )
9        vs.                               ) No. 2:22-CV-
                                           ) 01527-DAD-AC
10   LIEUTENANT JERRY FERNANDEZ, IN HIS    )
     INDIVIDUAL CAPACITY; DETECTIVE JACOB  )
11   DUNCAN, IN HIS INDIVIDUAL CAPACITY;   )
     DETECTIVE JEREMY ASHBEE, IN HIS       )
12   INDIVIDUAL CAPACITY; AND DOES 1       )
     THROUGH 10,                           )
13                                         )
               Defendants.                 )
14   _____)

15

16

17        DEPOSITION BY ZOOM OF RAYMOND ALLEN, a witness

18        herein, noticed by Best Best & Krieger, LLP, at

19        2:01 p.m., on Monday, November 6, 2023, before

20        Jana Ruiz, CSR 12837.

21

22

23

24

25

                                                   Page  1

1  APPEARANCES OF COUNSEL:

2

3  For Plaintiffs:

4  ADVANCING LAW FOR ANIMALS

5  BY RYAN GORDON and VANESSA T. SHAKIB

6  407 North Pacific Coast Highway, Suite 267

7  Redondo Beach, California 90277

8  (202)996-8389

9  ryan.robert.gordon@gmail.com

10

11  For Defendants LIEUTENANT JERRY FERNANDEZ; DETECTIVE

12  JACOB DUNCAN; DETECTIVE JEREMY ASHBEE; COUNTY OF SHASTA;

13  and SHASTA COUNTY SHERIFF'S DEPARTMENT:

14  BEST BEST & KRIEGER, LLP

15  BY DAMIAN A. NORTHCUTT

16  1801 Von Karman Avenue, Suite 1000

17  Irvine, California 92612

18  (949)263-2600

19  damian.northcutt@bbklaw.com

20

21      (Continued on following page.)

22

23

24

25

Page 2

---

1  For Defendant SHASTA COUNTY FAIR:

2  CALIFORNIA DEPARTMENT OF JUSTICE

3  TORT AND CONDEMNATION SECTION

4  BY JOHN BRIDGES, Deputy Attorney General IV

5  1300 I Street, Suite 1210

6  Sacramento, California 95814

7  (916)210-7529

8  john.bridges@doj.ca.gov

9

10  Also Present: STEVEN DUDEN, SIA Investigations Agency -

11       California

12

13

14             I N D E X

15  WITNESS: RAYMOND ALLEN

16  EXAMINATION BY:            PAGE

17  MR. NORTHCUTT           5

18  MR. GORDON              34, 75

19  MR. BRIDGES             70

20

21

22

23

24

25

Page 3

---

1                E X H I B I T S

2  DEFENSE     DESCRIPTION         IDENTIFIED  MARKED

3  EXHIBIT A   Notice of Deposition     11      77

4  EXHIBIT B   Text messages            12      77

5  EXHIBIT C   Attachment A             69      77

6  EXHIBIT D   Attachment B             69      77

7  EXHIBIT E   Text messages            69      77

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

---

1            RAYMOND ALLEN,

2  a witness herein, having been sworn, testifies as

3  follows:

4

5      THE REPORTER:  My name is Jana Ruiz with Veritext,

6  located at 3960 Howard Hughes Parkway, Las Vegas,

7  Nevada.  I am located in Chino Hills, California.

8  Today's date is November 6, 2023, at approximately

9  2:01 p.m.  The witness today is Raymond Allen.  Present

10  on the Zoom are Mr. Northcutt, Mr. Bridges, Mr. Gordon,

11  and Ms. Shakib.

12

13            -EXAMINATION-

14

15  BY MR. NORTHCUTT:

16      Q.  Good afternoon, Mr. Allen.  My name is

17  Damian Northcutt, and I'm an attorney with Best Best &

18  Krieger.  We represent the County of Shasta and its

19  sheriff's department in a lawsuit that was filed against

20  it by Jessica Long and her daughter Eliza Long, who, for

21  the purposes of this deposition, we're going to refer to

22  only as E.L. to try to keep her name as minimally used

23  as possible since she's a minor.

24      I appreciate you being here today.  This lawsuit

25  essentially concerns civil rights violations that

Page 5

2 (Pages 2 - 5)

1 plaintiffs have asserted against my clients as well as
2 the Shasta County Fair and some other individuals as
3 well essentially stemming from an incident relating to
4 the retrieval of a goat by the name of Cedar.
5     I assume you're probably familiar with some of the
6 facts of the case?
7     A. Yes.
8     Q. Great.
9     I think earlier, before we got going, you said
10 going by Ray instead of Raymond is fine; is that
11 correct?
12     A. Yeah.
13     That's fine. My legal name is Raymond, but Ray's
14 fine.
15     Q. Have you ever had your deposition taken before?
16     A. Yes.
17     Q. And when was that?
18     A. Approximately seven years ago.
19     Q. So it's been a little while. Let me break down
20 the rules to kind of familiarize yourself with this.
21     So essentially, a deposition is just a meeting,
22 really, with the attorneys present. We've got a court
23 reporter present. She's typing down everything you're
24 saying on a transcript. At some point at a later date,
25 you'll get a chance to review that transcript and check

Page 6

1 it for accuracy.
2     If there are any issues with the transcript, such
3 as you said yes, but you meant no, you can go ahead and
4 change it, but it might reflect later on on your
5 testimony as to your credibility. So we want your best
6 testimony today.
7     So if, for example, you say yes at the beginning,
8 but later on realize, oh, no, I meant no later, go ahead
9 and take a break, come back, correct it today, and let's
10 have the best testimony we can.
11     Do you understand?
12     A. Yes, I do.
13     Q. Great.
14     You're doing a great job of just listening to me
15 talk and then answering thereafter. In normal speech,
16 we have a tendency to talk over one another, but today,
17 we have a court reporter present and she's typing down
18 everything that we're saying.
19     So give me an opportunity to answer -- ask my
20 questions and I'll give you an opportunity to answer
21 them, and hopefully, we won't talk over one another.
22     Is that understood?
23     A. Yes.
24     Q. Perfect.
25     If, for whatever reason, you need to take a break

Page 7

1 whatsoever, go ahead and let me know, and we can do
2 that.
3     The only time that I ask that you do not do that is
4 if I've posed the question to you. I'd like to hear
5 your response, and then we can take a break after; okay?
6     A. Okay, yes.
7     Q. I'm entitled to your best estimate of events.
8     So for example, if you can give me a time frame and
9 say it was around November or Thanksgiving, that's
10 perfectly okay.
11     Obviously, some of these events occurred years ago,
12 and you may not remember a precise date or time. That
13 being the case, I don't want you to guess at any of my
14 questions. So if you don't understand what I'm saying,
15 please let me know, and I'll rephrase the question.
16     The attorneys usually describe it as such: So if I
17 ask you to go ahead and give me an estimate of how long
18 your table is that you're sitting at -- I'm assuming at
19 a table there -- you probably can give me an estimate in
20 terms of feet.
21     However, if I ask you to give me an estimate of my
22 dining table at home, you'd have to just guess at it
23 because you've never been to my home and you've never
24 seen that table. So there's a difference between an
25 estimate and a guess.

Page 8

1     Do you understand that differentiation?
2     A. I do.
3     Q. Fantastic.
4     There may be, from time to time, objections that
5 are asserted by plaintiff's counsel or counsel for the
6 fair. That's completely normal and it's just to
7 preserve those objections for a later date, where
8 basically we can discuss those in front of a judge.
9     If you understand my question and you go ahead and
10 answer, I'm going to assume that you understood my
11 question.
12     Is that fair?
13     A. That is.
14     Q. Okay.
15     I understand that you're there with Steven Duden?
16     A. Duden.
17     Q. Okay.
18     Steve, if you're there, would you mind just stating
19 your title for the record.
20     MR. DUDEN: Yes.
21     My name is Steven Duden. I'm a criminal defense
22 investigator licensed with the State of California,
23 248866.
24     MR. NORTHCUTT: Thank you.
25     Q. And so, Raymond, if we need to contact you at

Page 9

3 (Pages 6 - 9)

1  some point in the future, is there a good address that
2  we can reach you at?
3     A. You can reach Steve Duden.
4     Q. Okay.
5     And, Steve, can you give us for the record the best
6  address to reach you at if we want to contact Mr. Allen.
7     MR. DUDEN:  Yes.
8  ███████████████████████████████████
9     MR. NORTHCUTT:
10    Q. Now, Raymond, if we need to contact you in the
11 future, whether it be via phone or via email, I assume
12 are you wanting us to go through your representative
13 Steven?
14    A. That's correct.
15    MR. NORTHCUTT:  And so, Steve, if you wouldn't mind
16 for the record, is there a good phone number for us to
17 reach you at regarding Mr. Allen if we need to at some
18 later date?
19    MR. DUDEN:  Yes.
20    It's the same phone number you have on file, the
21 (209)534-9879.
22    MR. NORTHCUTT:  And an email address?
23    MR. DUDEN:  ███████████████████████,
24 ███████████████████████.
25    MR. NORTHCUTT:  Great, thank you.

*Page 10*

1     Q. Just to be clear from the get-go here, you are
2  not named as a defendant in this lawsuit.  You are not a
3  party to this lawsuit.  No one is saying you've done
4  anything wrong in this case, and there's no one -- no
5  one's making that point.
6     We're here -- at least I'm here -- to flush out the
7  facts that we've heard so far, kind of get a sense of
8  some of the accuracy of it, and have your understanding
9  of the events as well.
10    On or about October 23rd, 2023, we sent out a
11 notice of taking remote deposition of Raymond Allen and
12 request for production of documents at deposition.  I'm
13 going to have the court reporter mark this as Exhibit A.
14    (Whereupon the document referred to is marked by
15 the reporter as EXHIBIT A for identification.)
16    MR. NORTHCUTT:  Everyone should have a copy.
17    Q. Mr. Allen, have you ever seen this document or
18 has -- I'm sorry it's awfully blurry.
19    A. Yes.
20    I have that one.
21    Q. Okay, great.
22    Hopefully, Steve provided you a copy, or you have a
23 copy.
24    On page 3 of that document, there's kind of, on the
25 line 18, it starts with documents requested and then

*Page 11*

1  there's 11 categories of documents.
2     Did you bring with you any documents today to the
3  deposition?
4     A. Yes, I did, text messages that I printed off.
5     Q. Let's go ahead and kind of talk about, I'll go
6  category by category real quick, and then you can just
7  either say yes, there are some, or no, there aren't any,
8  and then we can kind of just quickly go through that.
9     So Category 1 says, "All documents consisting of or
10 relating to any communications you had with plaintiffs
11 regarding Cedar, including, but not limited to, cell
12 phone text messages."
13    I believe you just said there were text messages;
14 is that correct?
15    A. That's correct.
16    Q. And you brought those with you today?
17    A. Yes.
18    Q. Great.
19    Can we go ahead and have those marked as Exhibit B
20 by the court reporter, and can you, Steve, provide a
21 copy of those to the court reporter or my office to have
22 it attached?
23    (Whereupon the document referred to is marked by
24 the reporter as EXHIBIT B for identification.)
25    MR. DUDEN:  Yes.

*Page 12*

1     MR. NORTHCUTT:  Great.
2     Q. How many text messages are there that you have?
3     A. There's 11 total pages that I printed out of
4  it.
5     Q. And can you just give me a general overview who
6  the text messages are with?
7     Is it with one person, multiple people?
8     A. Yes, one person, Jessica.
9     Q. Okay.
10    Jessica Long?
11    A. Yes.
12    Q. And that's all of the text messages you have?
13    A. Yes.
14    Q. Great.
15    Moving on to Number 2, all documents consisting of
16 or relating to any communications you had with any third
17 party regarding Cedar, including, but not limited to,
18 cell phone text messages.  So that would be anybody
19 besides Jessica.
20    A. No.
21    Q. None?
22    A. None.
23    Q. Okay.
24    Category 3, all documents related to Cedar.
25    I'm assuming, are the text messages the only things

*Page 13*

4 (Pages 10 - 13)

1  that you have?
2      A.  That's correct.
3      Q.  So there's none for 3; correct?
4      A.  Correct.
5      Q.  All photographs, videos, films, or images of
6  Cedar.
7      Do you have any?
8      This is 4.
9      A.  No.
10      Q.  Okay.
11      Number 5, all documents involving Lieutenant
12  Jerry Fernandez and plaintiffs or Cedar.
13      Do you have any of those?
14      A.  No.
15      Q.  How about Number 6 which is all documents
16  involving Detective Jacob Duncan and plaintiffs or
17  Cedar?
18      A.  No.
19      Q.  Nice and easy.  You seem like a pro at this.
20  It seems like you've done depositions.
21      How about Number 7, all documents involving
22  Detective Jeremy Ashbee and plaintiffs or Cedar?
23      A.  No.
24      Q.  Great.
25      How about Number , all documents involving County

Page 14

1      fair and take Cedar to another location.
2      Are you aware of those facts?
3      A.  No.
4      Q.  Okay.
5      When did you first learn of Jessica Long?
6      A.  Sometime in June.
7      Q.  Of 2022?
8      A.  Yes.
9      Q.  And how did you come across her name?
10      A.  My information was given to her by a sanctuary,
11  a goat sanctuary.
12      Q.  Is the name of that -- what is the name of that
13  goat sanctuary, if you know?
14      A.  Bleating Hearts.
15      Q.  Is it your understanding that's a -- strike
16  that.
17      Do you know who are the owners of Bleating Hearts
18  farms?
19      A.  No.
20      Q.  Does the name Kristin Stover ring a bell?
21      A.  Not necessarily.
22      Q.  Have you ever heard that name before?
23      A.  Possibly.
24      Q.  How about Ted Russell?
25      A.  No.

Page 16

1  of Shasta and plaintiffs or Cedar?
2      A.  None.
3      Q.  Okay.
4      All documents involving Shasta County Sheriff's
5  Department and plaintiffs or Cedar?
6      A.  None.
7      Q.  How about 10, any social media communications
8  made by you related to plaintiffs or Cedar?
9      A.  None.
10      Q.  And lastly, Number 11, any social media
11  communication made by you related to Shasta County
12  Sheriff's Department, including any deputy, officer, or
13  employees of that department?
14      A.  None.
15      MR. NORTHCUTT:  Can we go off the record for just
16  one second here.
17      (Interruption in proceedings.)
18      MR. NORTHCUTT:  Let's go back on the record.
19      Q.  So the events we're going to discuss,
20  Mr. Allen, concerns, obviously, Cedar, the goat, and the
21  Shasta fair which, my understanding, this took place
22  June 22nd of 2022 to June 25th of 2022.
23      I don't know if you're familiar with some of the
24  facts of the case, but at a later point during the fair,
25  plaintiff Jessica Long decided to remove Cedar from the

Page 15

1      Q.  Okay.
2      So in June of 2022, you learned of Jessica Long.
3  Your information was given to her by Bleating Hearts
4  Farm; is that correct?
5      A.  Yes.
6      Q.  Did Jessica reach out to you in June?  Did she
7  try to call you?
8      A.  I believe it was through text message.
9      Q.  Do you recall the first time, the date of the
10  first time she tried to text you in June?
11      A.  No.
12      Q.  You recall what her first text message, like
13  the substance of it was?
14      A.  I have a goat that I would like to donate to
15  you.
16      Q.  Okay.
17      You say that you've got 11 pages of text messages
18  with you; correct?
19      A.  That's correct.
20      Q.  Is that first communication that you're talking
21  about within those 11 pages?
22      A.  Yes.
23      Q.  Do you know if that first communication that
24  you just indicated, did she actually use the word
25  "donate" to you?

Page 17

1    A. Yes.
2    Q. It's okay if you want to look at your documents
3  that you got with you to refresh your recollection.
4    A. Okay.
5    Q. If you wouldn't mind, maybe take a look at that
6  and then you can tell me if you're able to recall the
7  date that she sent it and your response to it.
8    A. It says here June 26, 2022, and my response
9  was, I gave her my address.
10   Q. Okay.
11   Did you respond the same day?
12   A. Yes.
13   Q. When you gave her your address, why did you
14  give her your address?
15   A. So I can get a goat donated to me.
16   Q. Understood.
17   Now, you have experience with goats; is that
18  correct?
19   A. Yes.
20   Q. You currently have your own goat sanctuary?
21   A. No.
22   Q. Do you have a goat grazing service?
23   A. That's correct.
24   Q. Is it called Billy's Mini Farm?
25   A. Yes.

Page 18

1    Q. Okay.
2    Was that the name of it back in 2022 in June?
3    A. Yes.
4    Q. And is that located at 3440 Roblar Road in
5  Petaluma, California?
6    A. Yes.
7    Q. I'm sure I'm butchering all the names. I
8  apologize if I am.
9    What, just for layman's purposes, what is it -- I
10  mean, I assume a goat grazing service, you provide the
11  goats for a fee and they will eat all the growth around
12  on the land and create less of a fire hazard, or what's
13  the purpose of goat grazing?
14   A. That's correct just like you said it.
15   Q. Did you respond the first day to the first
16  text, to Jessica Long's text?
17   A. Yes.
18   Q. On June 26?
19   A. Correct.
20   Q. And that was the very first contact you had
21  with her?
22   A. Yes.
23   Q. Great.
24   After you provided her the address in the response
25  text, did she respond to that?

Page 19

1    A. Yes.
2    Q. Do you recall or you can again look at your
3  notes, do you know when her next text to you was?
4    A. It doesn't show a time line here.
5    Q. Okay.
6    Do you recall what that next text, the substance of
7  it was?
8    A. She text back, said, "Okay, thank you."
9    Q. And do you recall replying to that text?
10   A. I did, and I put, "I won't be home for
11  three hours."
12   Q. Do you believe or I mean -- strike that.
13   You may not see a time stamp, but is it your
14  understanding that it would have been -- that those
15  texts would have been around the same period, the
16  June 26, 2022?
17   A. Yes.
18   Q. After you said you wouldn't be home for a
19  period of three hours, did you get any further
20  communications from Jessica Long?
21   A. Yes.
22   Q. And when was the next one that you received?
23   A. There's no time line, but it says, "Okay. It's
24  an hour-forty plus traffic."
25   Q. And did you respond to that text?

Page 20

1    A. I did.
2    Q. And what time was that, do you know?
3    A. There's no time line on it. It just shows the
4  beginning.
5    Q. And what was your response to her?
6    A. "Okay, perfect."
7    Q. And did you receive a text after that from
8  Ms. Jessica Long?
9    A. Yes.
10   Q. And what was the substance of that
11  conversation?
12   A. That one says, "We could also stop along the
13  way and meet Kristin from Bleating Heart Farms who gave
14  us your information. I've emailed her, but she may not
15  be there."
16   Q. Does that have a date or something that you
17  recall the date and time on that?
18   A. Just June 26th of '22.
19   Q. And did you respond to Jessica Long to that
20  text?
21   A. I did.
22   Q. What was the -- what was your response?
23   A. "I don't have her number, but it is the
24  weekend. She might not be open."
25   Q. And after that text communication, do you have

Page 21

6 (Pages 18 - 21)

1  further correspondence with Jessica Long?
2      A.  Yes.
3      Q.  Did you send another text to her, or did she
4  send another text to you or both?
5      A.  She sent -- it was back and forth.  She sent
6  one.  Then I sent one.  She sent one.  I sent one.
7      Q.  Would it be easier for you to just kind of go
8  through those text messages and we can kind of discuss
9  them, or would you prefer me breaking them down?
10     A.  Sure.
11         Would probably make it faster for you to understand
12  it all.
13     Q.  Go for it.  So start off where we left off.
14         You indicated something about she could stop along
15  the way?
16     A.  Yep.
17     Q.  Go ahead.
18     A.  And then she responded back after I said, "It's
19  on the weekend, she might not be open."  She said, "Okay
20  thanks."
21         Then I responded back, "I will be home in
22  30 minutes."
23         Then she responded back, "We are about an hour
24  away."
25         And then I responded back, "Text me when you're

Page 22

1  ten minutes away."
2      She responded back, "Okay."
3      Then I responded back, "I will be in a gray Prius."
4      Then she responded back.  This is on a different
5  day now after I received the goat on July 15th, 2022,
6  "Did the sheriff who took him have a warrant?  I am
7  talking with a lawyer, and he thinks this may be a
8  violation of our Fourth Amendment right, illegal search
9  and seizure.  All the fair documents show that I am the
10  owner until it arrives at the processing plant."
11         And I responded back, "If you have any more
12  questions, reach out to Detective Jacob Duncan," and
13  then I sent her a picture of the sheriff's card that he
14  left at my house.
15     Q.  Was that your final communication with her?
16     A.  Yes.
17     Q.  And since that July 15th, 2022, set of text
18  messages, have you received any further communication
19  from Jessica Long?
20     A.  No.
21     Q.  Have you ever spoken with -- remember I
22  mentioned a daughter by the name of E.L. at the
23  beginning of the deposition?
24         I can state --
25     A.  Yes.

Page 23

1      I remember the name.  Yes, I remember you saying
2  that.
3      Q.  Have you ever had any communications with her?
4      A.  Just the only time when they dropped off the
5  goat.
6      Q.  Okay.
7         And we'll get to that in just a second, but no
8  actual communications via social media, text, phone,
9  anything like that?
10     A.  No.
11     Q.  So let's talk about the date Jessica Long
12  dropped off Cedar.  I believe it was July 8th of 2022.
13         Does that sound fair?  Does that sound correct to
14  you?
15     A.  I don't recall the date.
16     Q.  Do you recall if it was in July of 2022?
17     A.  I don't.
18     Q.  So you're the owner of Billy's Mini Farm Goat
19  Grazing Services; correct?
20     A.  Yes.
21     Q.  Okay, great.
22         So at some point -- and correct me if I'm wrong --
23  at some point, Jessica Long comes to Billy's Mini Farm
24  with Cedar, the goat; is that correct?
25     A.  That's correct.

Page 24

1      Q.  You don't recall if that's on July 8th, or can
2  you give me an estimate of time?
3         Do you recall if it was in the summer of 2022?
4      A.  Yeah.
5         It was in the summer.
6      Q.  So when she arrives at your grazing services,
7  was anyone with her?
8      A.  Her daughter.
9      Q.  And when you say "her daughter," are you
10  referring to E.L.?
11     A.  Yes.
12     Q.  Was anyone else with her?
13     A.  No.
14     Q.  Okay.
15         And did she have possession -- or strike that.
16         Was Cedar, the goat, with Jessica Long and E.L. at
17  that time?
18     A.  Yes.
19     Q.  Can you tell me how they transported Cedar to
20  your property?
21     A.  In their vehicle.
22     Q.  And what kind of vehicle was that?
23     A.  An SUV of some sort.
24     Q.  Okay.
25         Cedar wasn't in a separate trailer or anything of

Page 25

7 (Pages 22 - 25)

1   that nature?
2       A. No.
3       Q. And you recall what time of day they arrived at
4   your property?
5       A. Best of my knowledge, in the morning or
6   afternoon time.
7       Q. And you were there present; right?
8       A. Yes.
9       Q. Was anyone else with you at that time?
10      A. My wife and my two daughters.
11      Q. So can you kind of walk me through the day.
12      So I'll try to simplify as best I can.
13  Jessica Long and her daughter and Cedar show up at your
14  property sometime during the morning or the afternoon.
15      Can you tell me what's the first thing you see them
16  do?
17      A. Drive through my gate.
18      Q. And after they drive through your gate, do they
19  stop at some point?
20      A. Yes.
21      Q. Where do they stop?
22      A. On the inside of my gate.
23      Q. And you were expecting them to come to your
24  property based on your prior text; is that correct?
25      A. That's correct.

Page 26

1       Q. So you had coordinated for her to bring Cedar
2   to your property; correct?
3       A. Yes.
4       Q. Once they arrived and stopped, what was the
5   next thing you saw Jessica Long do?
6       A. She got out and took the goat out of the
7   vehicle.
8       Q. And after she took the goat out of the vehicle,
9   what was the next thing that you saw?
10      A. I took the goat by the lead and put it into my
11  field.
12      Q. You said you took the goat by the lead?
13      A. Uh-huh.
14      Q. And put the goat where?
15      A. In my field.
16      Q. Did the goat have any tags on it at that point?
17      A. Not that I recall.
18      Q. Now, what was your understanding of why Jessica
19  was giving you Cedar?
20      A. To donate it to me.
21      Q. And did she say anything to you when she was
22  giving you Cedar?
23      A. Not that I recall.
24      Q. And you again -- strike that.
25      So after you took Cedar and put him on your

Page 27

1   property, can you tell me what happens next?
2       Did you have a conversation with Jessica Long?
3       A. I think we exchanged thank yous, and she went
4   on her way.
5       Q. Did she ever indicate to you that she was just
6   lending you the goat for a period of time?
7       A. No.
8       Q. Did she ever indicate -- I'm saying "she." Of
9   course, I'm referring to Jessica Long.
10      Did she ever indicate to you she would come collect
11  Cedar at a later date?
12      A. No.
13      Q. Now, I know you're not an expert in human
14  emotions or anything of that nature and we'll probably
15  have to have an expert talk about this at a later date,
16  but just from a general perspective seeing both
17  Jessica Long and her daughter E.L., did either of them
18  seem emotionally distraught giving you Cedar?
19      A. Not that I recall.
20      Q. Do you know how long Jessica and her daughter
21  were on your property?
22      A. I'd say approximately five minutes.
23      Q. And just to be completely clear, was it your
24  understanding that Jessica Long and E.L., I guess, were
25  donating the goat to you?

Page 28

1       A. Yes.
2       Q. That was some sort of a gift; correct?
3       A. Yes.
4       Q. Was it your intention to -- strike that.
5       What was your intention -- strike that.
6       What were your plans for Cedar, the goat?  I guess,
7   were you planning on also having Cedar be part of the
8   grazing services?
9       A. That's correct.
10      Q. And correct me if I'm wrong, did you say they
11  were only on your property for about five minutes?  Is
12  that right?
13      A. That's what I would estimate.
14      Q. So earlier, you testified that I think in
15  response to Jessica Long's July 15th text regarding a
16  search, you provided a copy of a sheriff's business
17  card; is that correct?
18      A. That's correct.
19      Q. What was the name of the person on that
20  business card?
21      A. Jake Duncan, detective of Shasta County
22  Sheriff's Office.
23      Q. So I can represent to you that on July 8th,
24  2022, members of the sheriff's department and Shasta
25  went to retrieve Cedar from Bleating Hearts Farm and

Page 29

8 (Pages 26 - 29)

1    Sanctuary.  Based on testimony that we've received from
2    other individuals, ultimately, I guess some information
3    was disclosed that the goat was on your property instead
4    of at that location.
5        Did you, on July 8th, 2022, or thereabouts, did you
6    receive a telephone call from anyone from the
7    Shasta County Sheriff's Department?
8        A.  Yes.
9        Q.  And do you recall approximately -- do you
10   recall on what phone number that call was received?
11       A.  My phone.
12       Q.  Okay.
13       And was that your personal, like a personal phone
14   or work phone?
15       A.  Personal cell phone.
16       Q.  And can you tell me approximately when you
17   received that call?
18       A.  I don't recall the time.
19       Q.  Can you give me an estimate, morning, noon,
20   night?
21       A.  I'd say more towards the nighttime.
22       Q.  And when you received that call, can you tell
23   me, do you know who made that call to you?
24       A.  When I answered, it was someone from a
25   sheriff's department, they stated.

Page 30

1        Q.  Can you tell me what else they stated to you?
2        A.  That we're here to pick up a goat.
3        Q.  Okay.
4        Did they say anything else to you during that
5    conversation?
6        A.  Not that I recall.
7        Q.  Do you recall if the person from the sheriff's
8    department asked if they had consent to retrieve Cedar
9    from your property?
10       A.  Yes.
11       Q.  And did you give them consent to retrieve Cedar
12   from your property?
13       A.  Yes.
14       Q.  Did you at some point tell them where Cedar was
15   to be located on your property?
16       A.  Yes.
17       Q.  And do you know if Cedar ultimately was
18   retrieved by the sheriff's department from your
19   property?
20       A.  Yes, he was.
21       Q.  When Jessica Long first donated Cedar to you
22   back when she first visited your property, was it your
23   understanding that from that point forward, Cedar was
24   your property?
25       A.  Correct.

Page 31

1        Q.  Were you present when Cedar -- when the
2    sheriff's department ultimately located Cedar on your
3    property?
4        Were you present at why you are property?
5        A.  No.
6        Q.  Was anyone else, do you know?
7        A.  No.
8        Q.  Did you subsequently receive any phone calls or
9    communications from the sheriff's department after that
10   initial phone call?
11       A.  Not that I recall.
12       Q.  Do you know if the person you were speaking
13   with from the sheriff's department, did they ever
14   identify themselves or do you believe it's Jacob Duncan?
15       A.  I don't know the exact name they gave me, but
16   they said they were from the sheriff, Shasta county.
17       Q.  Okay.
18       Was there anything else you can recall regarding
19   that conversation that you had with him?
20       A.  No.
21       Q.  Have you ever spoken with a Lieutenant
22   Jerry Fernandez?
23       A.  Not that I recall.
24       Q.  And aside from the call that we've -- well,
25   strike that.

Page 32

1        Have you ever spoken with Detective Jacob Duncan,
2    if you know?
3        A.  It's hard to say.  I don't recall, yeah.
4    Someone called from the sheriff's department.  I don't
5    remember the name that they gave me.
6        Q.  Okay.
7        I'm just going to go down a list.  If you can
8    recall, that's great.  If not, that's fine.  I don't
9    want you to guess if you don't know the answer.  It's
10   completely okay to say "yes" or "no" or "I don't know."
11       Detective Jeremy Ashbee, have you ever had any
12   conversations or communications with him, do you know?
13       A.  I don't know.
14       Q.  We talked about Jessica Long already and E.L.
15       Have you ever had any communications, to your
16   knowledge, with anyone from the Shasta fair concerning
17   Cedar, the goat?
18       A.  I don't know.
19       MR. NORTHCUTT:  I think that's the majority of my
20   questions.  I'm going to let the other counsel on the
21   call go ahead and if they have some questions for you.
22   I may have some follow-up, but otherwise, I'm just going
23   to review my notes while if they have any questions.
24       MR. GORDON:  Yeah.
25       Let's take five and be back, and then I do have

Page 33

9 (Pages 30 - 33)

1    some questions.
2        MR. NORTHCUTT: Okay.
3        Can we go off the record.
4        (A recess is taken.)
5
6            -EXAMINATION-
7
8    BY MR. GORDON:  Back on the record.
9        Q. So, Mr. Allen, do you understand you're still
10   under oath; right?
11       A. Yes.
12       Q. So my name's Ryan Gordon.  I'm an attorney.
13   I'm with Vanessa Shakib.  We represent plaintiff in this
14   matter.  So that's Jessica Long and her daughter E.L.
15       Have you examined the lawsuit by chance, the
16   complaint?
17       A. No, no.
18       Q. But you generally know what it's about?  I
19   assume you saw in the papers and whatnot?
20       A. Yes.
21       Q. Okay.
22       So I'm going to ask you some background questions
23   also, which we will -- but I will also have some
24   questions on follow up of on what Damian said.  Okay.
25       So you run -- is it Ray's Mini Goat Farm or
                                                    Page 34

1    Billy Ray's?
2        A. Billy's Mini Farm.
3        Q. Billy's Mini Farm, okay.  I'm sorry, I keep
4    calling it Ray's Mini Farm.
5        And is Billy another name for you, or is it just
6    because billy goats.
7        A. Like billy goats.
8        Q. Is that a separate company, or is it a DBA of
9    you personally?
10       Do you understand --
11       A. I don't know what you mean, no.
12       Q. Like doing business as.
13       So have you set up a corporation for it or an LLC,
14   or is it just you, but you operate under the name --
15       A. That's correct.
16       Q. Gotcha, all right.
17       And what clients do you service?  Are they public
18   or private?
19       A. Both.
20       Q. Any government agencies you provide services
21   for?
22       A. Maybe Cal Fire.  That's considered a government
23   one.
24       Q. Any other ones?
25       A. Not that I'm aware of, no.
                                                    Page 35

1        Q. And then you said both.
2        So private citizens retain you to clear their yards
3    or their properties with the goats?
4        A. Yes, that's correct.
5        Q. Okay.
6        Does your service, does it -- does this require a
7    state license, or is this just as one goes?
8        A. I believe it's as one goes.
9        Q. So you're fine without a license, all right.  I
10   don't know.  I'm just curious.  All right.
11       And were you ever involved or are you currently
12   involved in 4-H or FFA in any capacity?
13       A. Yes.
14       Q. What capacities are they?
15       Let's start with 4-H --
16       A. My daughter.
17       Q. Your daughter, all right.  She's in 4-H.
18       And this is in Sonoma County, I presume?
19       A. Correct.
20       Q. Is it just your -- you have more than one kid,
21   yes?
22       A. Yes.
23       Q. Are they all in 4-H or just your daughter?
24       A. Both my daughters.
25       Q. Both your daughters, okay.  If you said that,
                                                    Page 36

1    I'm sorry.  I didn't hear you.
2        And were you involved in 4-H at all growing up or
3    now?
4        A. No.
5        Q. What about FFA?
6        A. No.
7        Q. Any other family members involved besides your
8    daughters?
9        A. No.
10       Q. Okay.
11       Your website -- I don't have it in front of me, but
12   it mentions something about ag field day.
13       Do you provide services for the Sonoma fair for an
14   ag field day they have?
15       A. I think one time, we did it at the fairgrounds.
16       Q. When was that?
17       A. Probably 12, 13 years ago.
18       Q. So your daughters are in 4-H, but do you know
19   what programs they're in?  Are they in a livestock
20   program?  Are they -- I mean, 4-H is a lot of programs.
21       A. Baking.
22       Q. I'm sorry?
23       A. Baking.
24       Q. Baking, okay.
25       Anything else?
                                                    Page 37

1    A. Outdoor adventures. I believe that's it.
2    Q. What is the age ranges for those programs, just
3  out of curiosity, if you know?
4    A. I don't know.
5    Q. It's something for younger children, though;
6  right?
7    I'm assuming 9, 10. I'm going by the name, outdoor
8  adventures. That sounds like something for a young kid.
9    A. I'm not sure what the age requirements are for
10 it.
11   Q. All right.
12   Do you have any relationship with the Shasta fair?
13   A. No.
14   Q. You know what I mean by Shasta fair, yes?
15   A. The fairgrounds.
16   Q. Yes.
17   A. No.
18   I don't have any relations with them.
19   Q. Have you ever attended it?
20   A. No.
21   Q. And never provided any sort of services for it?
22   A. No.
23   Q. Do you know anyone on their board of directors?
24   A. No.
25   Q. And do you know any officer or employee?

Page 38

1    A. I don't recall how many I have.
2    Q. You don't recall how many you have.
3    Can you give an estimate?
4    A. Maybe 50.
5    Q. Fifty, okay. All right.
6    Are they all goats, or are there other animals as
7  well?
8    A. Goats.
9    Q. And did you purchase all the goats at the mini
10 goat farm?
11   A. No.
12   Q. How did you acquire them?
13   A. Some get donated to us.
14   Q. Okay.
15   A. Some, we buy, and some are born on the farm.
16   Q. Can you approximate or give us an estimate of
17 what percentages or how many have you bought, how many
18 have you -- how many have you -- you know, how many have
19 been donated, and how many have been born there?
20   A. I couldn't give you that number.
21   Q. Well, would you say you bought more than
22 50 percent of them?
23   A. I don't know.
24   Q. You have no estimate at all?
25   Because, look, you might not know specifically, but

Page 40

1    A. No.
2    Q. So how many -- and you don't know anyone by the
3  name of BJ McFarlane, do you?
4    A. No.
5    Q. You don't recognize the name from the lawsuit,
6  I'm assuming, that you saw on the news?
7    A. No.
8    I don't recognize the name.
9    Q. What about Melanie Silva?
10   A. No.
11   Q. What about Lieutenant Jerry Fernandez?
12   A. No.
13   Q. Sheriff's department, okay.
14   But Detective Jacob Duncan, you're familiar with
15 that name?
16   A. To a certain extent.
17   Q. But you're familiar with it, yes, okay.
18   A. Yes.
19   Q. What about the person by the name of
20 Kathie Muse?
21   A. No.
22   Q. You ever heard of Muse Trucking?
23   A. No.
24   Q. And how many animals do you have at Billy's
25 Mini Goat Farm?

Page 39

1  you have to give me your best estimate.
2    A. Sure.
3    Let's go with that.
4    Q. Is that your best estimate, about 50 percent?
5    A. Yes.
6    Q. Okay.
7    And so that would leave the rest being born and
8  then some being donated.
9    How many of the remaining 50 percent would you say
10 have been born there versus donated?
11   A. I'd say 40 percent born.
12   Q. Born, okay. Forty percent born, and then the
13 remaining 10 percent or so donated, okay.
14   A. Yes.
15   Q. And what types of -- okay.
16   So of the donations, what do you provide to
17 memorialize to whoever the donors are? What do you
18 provide to memorialize the donations?
19   A. What do you mean by that?
20   Q. Like do you give them a receipt? Do you -- you
21 know, do they sign something?
22   A. No.
23   Q. No, okay.
24   Have you ever had someone sign something?
25   A. No.

Page 41

11 (Pages 38 - 41)

1    Q.  So no paperwork?
2    A.  No.
3    Q.  And how do you -- so if you're accepting
4  donation, this is your DBA, it's not a corporation or a
5  nonprofit, but you're accepting donations, how do you
6  account for them for tax purposes?
7    A.  I don't know about the tax part of that.
8    Q.  So you've got no -- it's not a gotcha.
9    So there's no particular thing you do or don't do?
10   A.  No, that's correct.
11   Q.  And do you keep their tags on when you receive
12  them?
13   A.  I don't recall any tags being on goats.
14   Q.  On any goats, okay.
15   And do owners or the donors ever come and visit the
16  animals?
17   A.  No.
18   Q.  No, okay.
19   What do you do with the animals when they're no
20  longer -- are they allowed to just live out on your
21  farm, or do you send them to slaughter?
22   What's their fate?
23   A.  They live out on my farm.
24   Q.  And then they just seemingly die of old age
25  some day, and you find a body in a field, I presume?

Page 42

1    A.  That's correct.
2    Q.  All right.
3    And so no owners -- what sorts of reasons do people
4  donate them to you for?
5    A.  I'm not sure, whatever the reasons may be.
6    Q.  That's what I'm asking you, whatever the --
7  they ever tell you?
8    A.  Not necessarily, no.
9    Q.  Can you recall an instance of anyone ever
10  telling you why they were donating a goat?
11   A.  People move away and they can't care for them
12  anymore.
13   Q.  Anything else?
14   A.  Got too old and they can't care for them.
15   Q.  All right.
16   And earlier, Damian asked you about your
17  relationship with Bleating Hearts, and you are familiar
18  with that organization, yes?
19   A.  Yes.
20   Q.  But you don't recall Kristin Stover, a person
21  by that name?
22   A.  I'm not good with names.  I don't really recall
23  the names, but I do know Bleating Hearts Sanctuary.
24   Q.  And what do you know of that or what --
25   A.  That they have -- that they take care of goats.

Page 43

1    Q.  Have they ever placed any goats with you
2  before?
3    A.  Yes.
4    Q.  And who do you deal with at Bleating Hearts?
5    A.  There's a man there that we deal with.
6    Q.  Is that man Justin Starkey?
7    A.  I don't recall his name.
8    Q.  You don't recall his name, okay.
9    You might not recall his name, but does
10  Justin Starkey sound familiar?
11   A.  Not really, no.
12   Q.  Not really, no.  Okay.
13   And did anyone at Bleating Hearts talk to you about
14  Jessica Long or Cedar or E.L.?
15   A.  No.
16   Q.  So Jessica reached out to you -- it's your
17  testimony Jessica reached out to you first; correct?
18   So Bleating Hearts did not tell you of Jessica.
19  She reached out to you first.
20   Is that accurate?
21   A.  That's correct.
22   Q.  So what was your understanding of why she was
23  placing him at your farm or dropping him off at your
24  farm?
25   A.  She wanted to donate us a goat.

Page 44

1    Q.  Anything else?
2    A.  No.
3    Q.  No.
4    Did you ask her any -- did you ask her why she was
5  there?
6    A.  I knew why she was there.  She was donating us
7  a goat.
8    Q.  So you didn't ask her, "Why are you donating a
9  goat?"
10   A.  No.
11   Q.  Did your wife ask her why they're donating a
12  goat?
13   A.  No.
14   Q.  Your kids?
15   A.  No.
16   Q.  She was just there for five minutes or so?
17   A.  Approximately, yes.
18   Q.  She took a lot of video at your farm for just
19  being there five minutes.  I will say that.
20   So she didn't mention anything about being in 4-H?
21   A.  Yes, she did.
22   Q.  Oh, she did mention something about being in
23  4-H.
24   What did she say?
25   A.  That her daughter's in 4-H.

Page 45

12 (Pages 42 - 45)

1    Q. Anything else?
2    A. Not that I recall.
3    Q. She didn't say this is from the livestock
4  auction at a fair?
5    A. Not that I recall.
6    Q. Not that I recall, okay.
7       So it's your testimony the only thing you remember
8  her saying is that she was donating Cedar and nothing
9  else?
10    A. That's correct.
11    Q. But except that her daughter was in 4-H, so
12  those two things?
13    A. Yes.
14    Q. Can you recall her saying anything else?
15    A. Not that I remember, no.
16    Q. After she left, did you speak with her again?
17    A. Just through the text messages.
18    Q. No phone calls?
19    A. Not that I remember.
20    Q. Do you only use your cell phone, or do you have
21  a house phone?
22    A. Cell phone.
23    Q. Do you recall speaking with Jessica on the
24  phone about going to Sacramento to meet her there to
25  return Cedar?

1    If Jessica wanted to come back and see him, would
2  you have let her?
3    A. No.
4    Q. No, okay.  All right.
5       If Jessica wanted to retrieve Cedar, would you have
6  let her?
7    A. No.
8    Q. Why not?
9    A. Because she donated the goat to me for my
10  business.
11    Q. But you didn't know of any -- you didn't know
12  of any issue with the fair when she donated it.  You
13  just thought, This is my goat?
14    A. That's correct.
15    Q. Why did you give it to the cops, then, when
16  they said -- when they came knocking?
17       It's your goat.
18    A. It's law enforcement.
19    Q. So?  It's your property, in your mind?
20    A. That's correct, but it's law enforcement and
21  they told me they're here to retrieve a goat, and I
22  complied with them.
23    Q. Did you ask to see a warrant?
24    A. I wasn't home.
25    Q. But did you ask?

1    A. Not that I remember, no.
2    Q. Not that you remember, okay.  All right.
3       And so -- give me a moment.
4       So you never spoke with Jessica on the phone a few
5  days afterwards about returning Cedar in Sacramento
6  because it was a good halfway point between your
7  location and hers?
8    A. I don't recall the detail.
9    Q. You remember something, though?
10    A. I don't recall what -- what I was talking or if
11  it was through a phone call or text message.
12    Q. Tell me what you do remember with respect to
13  meeting her in Sacramento?
14    A. I don't really remember anything about it.
15    Q. You remember it occurring.  You just don't
16  remember any details.
17       Is that what you're saying?
18    A. I remember text-messaging with her, but I don't
19  recall phone calls with her.
20    Q. You recall anything about meeting her in
21  Sacramento?
22    A. Not that I'm aware of, no.
23    Q. Yeah, all right.  Okay.
24       So Jessica drops him off and on approximately -- I
25  think it was the 26th of June.

1    A. No.
2    Q. Did you demand any proof of anything they were
3  saying?
4    A. No.
5    Q. But again, it's your goat.
6       So why did you just let them take it, then, if, in
7  your mind, it's your goat?
8       MR. NORTHCUTT:  Objection.
9       THE WITNESS:  Because it was law enforcement.
10       MR. GORDON:  Okay.
11    Q. Because you felt because it was law
12  enforcement, you had to do what they said; is that
13  correct?
14    A. That's correct.
15       It's just good faith on my part for law
16  enforcement.
17    Q. Okay.  Okay.
18       Did you understand that Jessica was placing Cedar
19  on your property so he wouldn't be killed?
20    A. No.
21    Q. No, okay.
22       Did you ask her?
23       I believe I did ask this before, so my apologies.
24  You did not ask her why she was placing him there.
25       Is that your testimony?

```
 1        A. Yeah.
 2        I don't recall asking her why she was placing him
 3    there.
 4        Q. You don't recall or she didn't, or you just --
 5        A. I just don't remember.
 6        Q. Did you speak with Detective -- you only spoke
 7    with Detective Duncan, you say; correct?
 8        A. Yes.
 9        Q. You didn't speak with Lieutenant Fernandez at
10    all?
11        A. I don't believe so.
12        Q. Okay. All right.
13        Give me a moment. Detective Duncan's notes say
14    that they found Cedar because he had his ear tag on him
15    still. I'll represent to you that that's what they
16    said.
17        If Cedar was a donation, why did you leave his ear
18    tags on him?
19        A. I don't remember him having an ear tag.
20        Q. Is Detective Duncan mistaken in his report?
21        MR. NORTHCUTT: Objection. Calls for speculation.
22        MR. DUDEN: Yeah.
23        Thank you, Counsel.
24        MR. GORDON:
25        Q. So you don't recall one way or the other?
```
Page 50

```
 1        A. No.
 2        Q. Is it your practice to remove ear tags if the
 3    goat comes with them?
 4        A. No.
 5        Q. No, it's not, okay.
 6        So you keep ear tags on?
 7        A. If they come with them, yes.
 8        Q. If they come with them on, okay. All right.
 9        But you don't remember if Cedar had them, or you
10    do --
11        A. No, I don't.
12        Q. You don't remember one way or the other, okay.
13        If he didn't have them on, how would you have
14    directed Detective Duncan to find him?
15        A. The same way I directed him with an ear tag.
16        Q. Well, that doesn't make sense. If you're
17    directing someone with an ear tag, you say, "It's this
18    tag number." If they don't have an ear tag, you have to
19    say something else.
20        A. There's -- I don't keep track of ear tag
21    numbers. So I wouldn't direct him one way or the other
22    with an ear tag.
23        Q. You don't keep track of ear tag numbers, okay.
24        A. No.
25        Q. Give me one moment.
```
Page 51

```
 1        If you don't keep track of ear tag numbers, how do
 2    you know they got the right goat?
 3        MR. DUDEN: Objection. Calls for speculation.
 4        MR. NORTHCUTT: Joined.
 5        MR. GORDON: You can answer.
 6        That doesn't mean don't answer. He's just putting
 7    an objection on the record.
 8        MR. DUDEN: You can answer.
 9        THE WITNESS: At that time, I only had a couple
10    goats in the field, and some were big with big horns on
11    them and different colors.
12        MR. GORDON: All right.
13        THE WITNESS: And he was the only goat that looked
14    like that.
15        MR. GORDON: Okay.
16        Q. So you knew what Cedar looked like.
17        Is that what you're saying?
18        A. Yes.
19        And I assume that they did too.
20        Q. I'm going to show you -- give us one moment,
21    guys. I'm trying to figure out. I have to put some
22    exhibits up, but they're on my computer, and I want to
23    get them to this one. Just give us off the record just
24    two minutes, guys.
25        (A recess is taken.)
```
Page 52

```
 1        MR. GORDON: Back on the record.
 2        Q. So, Mr. Allen, you understand you're still
 3    under oath, yes?
 4        A. Yes.
 5        Q. Right.
 6        And so I'm going to ask one more time, you don't
 7    recall ever speaking with Jessica on the phone after
 8    Cedar was dropped off?
 9        Is that your testimony?
10        A. Yes.
11        Q. Can you give us your usual cell, your personal
12    cell. What is your personal cell phone number?
13        We're going to have to subpoena your phone records.
14        A. That's my cell phone and -- my personal cell
15    phone and my business phone.
16        Q. Sure.
17        What is the number?
18        MR. DUDEN: Objection.
19        MR. GORDON: What's the objection?
20        MR. DUDEN: Cell phones require a warrant, Counsel.
21        MR. GORDON: No.
22        We're able to subpoena records.
23        Are you an attorney, sir?
24        MR. DUDEN: No.
25        I'm not attorney.
```
Page 53

14 (Pages 50 - 53)

1    MR. GORDON: Then you can't put an objection on.
2    It's unauthorized --
3    MR. DUDEN: I can as his representative.
4    MR. GORDON: No, you're not. You're not an
5    attorney. That's unauthorized practice of the law. You
6    can't.
7    Q. What is your cell phone number, sir?
8    We need to subpoena your records. We are entitled
9    to do that. It's the law. We get to put out a
10   subpoena. You can object to the subpoena after we do
11   it.
12   MR. DUDEN: Now you explained it, go ahead and give
13   it to him.
14   THE WITNESS: ████████.
15   MR. GORDON: ████████, thank you.
16   Q. And who is your carrier?
17   A. I believe it's ████.
18   Q. Okay, thank you.
19   So we're going to show you a few documents, by the
20   way. I'm going to try to do this correctly. So is it
21   already working? All right, screen-share. I don't know
22   if that's going to work.
23   MS. SHAKIB: Click on what you want to open.
24   MR. GORDON: It's going to open it, but not in the
25   attachment. We have to do your PDF.

Page 54

1    MR. NORTHCUTT: Ryan, can you just make sure that
2    anything we're screen-sharing gets attached?
3    MR. GORDON: Yeah.
4    I will send it to the -- I will send it. Actually,
5    Vanessa, can you email all three to the court reporter
6    right now. That way, we don't need to worry about it.
7    Give us a second, guys.
8    MS. SHAKIB: We're going to go off the record and
9    email these to the court reporter.
10   MR. GORDON: So give us 120 seconds, two minutes.
11   (Interruption in proceedings.)
12   MR. GORDON: Back on the record.
13   Q. Mr. Allen, earlier, when you testified that
14   Jessica had been on your property for, you know,
15   five minutes or so, do you know if she -- did you assist
16   her in taking any photos on your property?
17   A. Yes.
18   I believe she took some photos and a couple videos.
19   Q. You remember that now, okay.
20   And so this photo, can you pull up the document.
21   This will be Exhibit C. It just says "IG photo."
22   THE REPORTER: I can't actually share during the
23   depo. I thought you were just emailing them to me to
24   attach.
25   MR. GORDON: Oh, you can't share. I got to figure

Page 55

1    it out. Okay, it's becoming a pain in the ass. Give me
2    one second, guys.
3    Does everyone see this PDF that's up?
4    THE WITNESS: Yes.
5    MR. GORDON: John, do you see it? You're shaking
6    your head. Breaking the rules of depo, all right.
7    Q. Mr. Allen, do you recognize this photo?
8    A. Yes.
9    I recognize the people in it and the goat.
10   Q. Is that your property?
11   A. Yes.
12   Q. All right.
13   And did you take that photo?
14   A. I believe I did, yes.
15   Q. And then was -- you can't see it very well
16   here. This is from the sheriff's warrant, but at the
17   bottom, it says June 27th. So this was apparently
18   posted on Instagram by Bleating Hearts, as you see up
19   here, on June 27th.
20   Did you see this post at that time?
21   A. No, I did not.
22   Q. But this is your property, and you recall the
23   photo?
24   A. Yes, just not all the stuff that's printed on
25   the photo. I don't recall that.

Page 56

1    Q. I understand, okay.
2    So obviously, you didn't take it and take a photo
3    that had letters and words floating in the air in the
4    ether in front of you on your property?
5    A. That's correct.
6    Q. So and you recall her taking photos now and
7    being on the property.
8    You still think that was just five minutes, though?
9    A. Yeah, approximately five minutes or so. It
10   didn't seem like it was a long time.
11   Q. Okay. All right.
12   A. But I didn't time it as well.
13   Q. I understand. Okay.
14   Did your wife or your daughter at all talk --
15   daughters, apologize, talk with Jessica or E.L. or --
16   A. No.
17   Q. Or strike that. Okay. No, they did not.
18   So you read some text chains earlier, and you're
19   aware that Cedar was related to a 4-H auction, but you
20   didn't have any other details.
21   That's your testimony; correct?
22   A. Yes.
23   Q. So you received a text message from Jessica
24   on -- pull it up. Give me one second.
25   Do you still have your text chain in front of you?

Page 57

15 (Pages 54 - 57)

1  A. Yes, I do.
2  Q. Did you receive a text message from Jessica on
3  Monday, June 27th, at 6:41 p.m. that says, "Dear
4  Shasta County Fair Manager"?
5  A. Yes.
6  It's there.
7  Q. Did you read that text chain, not now --
8  A. Are you asking you want me to read it?
9  Q. Oh, no, no, no.
10  You read her text at the time, yes?
11  A. I believe I did.
12  Q. Okay.
13  So that is -- I know you're looking at a piece of
14  paper. So you can't expand the text, but is the whole
15  text in the version you have?
16  It's a long email.
17  A. Yeah, I think it is.
18  Q. Okay.
19  A. Yes.
20  Q. Yes, it is. Okay.
21  So can you -- it's really hard to -- so I have
22  what's up on the screen here, which appears to be the
23  same language.
24  See on the PDF, it says, "Dear Shasta County Fair
25  Manager"?

Page 58

1  A. Yes, I see that.
2  Q. But it's the same. She copy and pasted it into
3  a text to you?
4  A. Okay.
5  Q. And so in this text, she's talking about, "I
6  took the goat out. I'll pay for any costs. I want to
7  make this right with the buyer," blah, blah, blah blah.
8  "The dollies, they said, 'We're okay with this.'"
9  And at the end, she said, "I can get the goat back
10  if I need to." She said -- where is it? They're
11  threatening her with a felony at this point in time.
12  So now you see this text, do you remember Jessica
13  telling you about the situation earlier on?
14  A. I don't think she got into detail of it.
15  Q. This language is pretty detailed.
16  You don't recall any of it?
17  MR. NORTHCUTT: Objection. Asked and answered.
18  MR. GORDON: Doesn't mean you don't answer, Ray.
19  Q. Did this refresh any of your memory about your
20  conversations with Jessica about her removing Cedar from
21  the fair?
22  A. From what the text messages show here, I really
23  didn't read the caption of it all. It looked like it
24  was just like a note from 4-H or something like that.
25  Q. A note from 4-H that opens up with, "I am the

Page 59

1  mom who removed the goat from the fair"?
2  MR. NORTHCUTT: Objection. Argumentative.
3  MR. GORDON: It is argumentative.
4  THE WITNESS: Because I see 4-H in here.
5  MR. GORDON:
6  Q. But how could it be a message -- how is it a
7  message from 4-H if it is, "I'm the mom who took my
8  daughter's goat from the fairgrounds"?
9  A. I'm not sure why I said that, because it just
10  shows 4-H right below that in the next sentence. So I
11  probably just associated it with being 4-H.
12  Q. Give me one moment. I need to follow up.
13  So -- give me one moment, sorry. I'm trying to find
14  something.
15  A. And I didn't reply to that message either.
16  Q. Okay.
17  We'll get to that.
18  Hey, guys, let's go off the record for just one
19  second because I'm not sure I have the correct exhibit.
20  (Interruption in proceedings.)
21  MR. GORDON: Back on the record.
22  Q. So, Mr. Allen, we were looking at this PDF
23  which you received by text, basically, the same
24  substance, anyway.
25  First sentence, "I'm the mom who took my goat" --

Page 60

1  "my daughter's goat from the fairgrounds. I wanted to
2  explain myself and look for solutions with you. If we
3  can't come up with any other solution, I will bring the
4  goat back for slaughter." So you received this text.
5  Why didn't you respond to Jess you won't bring the
6  goat back, it's not your goat?
7  A. I don't really read the lengthy text messages
8  like this. It looked like it was a chain text message.
9  So I didn't read it.
10  Q. You remember now not reading it?
11  A. I remember now and then not reading it.
12  Q. Okay.
13  You forget everything else that you spoke about,
14  but you remember not reading this text?
15  MR. NORTHCUTT: Objection. Argumentative. Please,
16  Ryan.
17  MR. GORDON: You don't remember anything, all
18  right.
19  Q. So let me show another email here. Earlier,
20  when you were going through text messages also, I
21  noticed you skipped past this one. So after this text
22  on, it looks like, the next one in the chain, you write,
23  "Good morning. This is who has your goat. They came to
24  my house and confiscated it." This is on July 15th.
25  So what prompted you to send that text?

Page 61

16 (Pages 58 - 61)

1    Because in the text chain, there's a big gap.
2  Looks like there's no text between June 27th and, all of
3  a sudden, July 15th.
4    A. There must have been a text asking --
5    Q. Was there one that I don't have?
6    A. Yeah.
7  I'm looking here.
8    Q. Because I know I don't have your records, but I
9  have Jessica's, and I don't see one.
10    A. What date did you say that was?
11    Q. July 15th.
12    A. So it looks like, "I wish you would have
13  called. I had a lawyer helping" --
14    Q. That's -- you're reading --
15    A. What's that?
16    Q. You're reading texts that come afterwards,
17  though.
18  I'm asking, this text that you sent on July 15th at
19  10:49 a.m., why did you send that text at that time?
20  What motivated you to?
21    A. And it said right here July 15th, 2022, "Did
22  the sheriff who took him have a warrant?"
23  And I said, "If you have any questions, reach out
24  to Detective Jacob Duncan."
25    Q. Yes.

Page 62

1  goat," but you said "your goat"?
2    A. And then do you have a copy of that on there?
3  It looks like you do on this page. It's the same
4  picture of mine, but I don't have any record of it.
5    Q. I'm confused.
6  You don't have any record of what?
7    A. I have it right here. It says, "Good morning,
8  your goat." Yeah, I don't know why I put "your goat."
9    Q. Okay.
10  So was it because it was, in fact, her goat?
11    A. No.
12  It was my goat because she donated it to me.
13    Q. Okay.
14    A. It could have been a bad choice of words that I
15  used.
16    Q. And why did you text her at all?
17    A. She was probably trying to reach out to me with
18  a phone call or text message. I'm not quite sure.
19    Q. Okay.
20    A. But then I texted her the sheriff's card and
21  said, "This is who you need to contact. This is who has
22  the goat."
23    Q. Okay.
24  Hold on one second.
25    A. And when I do Siri, this could have been, "This

Page 64

1    I understand that, right. You're not answering the
2  question, though.
3  You texted her on July 15th. She had not texted
4  you on July 15th. You're texting her. You know, on the
5  text chain, you know, her last text to you was -- it
6  appears to be June 27th. So then there's a gap, and
7  then you text her on July 15th.
8  Why did you, out of the blue, text her on
9  July 15th?
10    A. She may have called me.
11    Q. She may have called you, okay.
12  Do you remember her calling you?
13    A. Not that I recall.
14    Q. So you're speculating?
15    A. Yes.
16    Q. You also say "your goat."
17  Why are you saying "your goat" if it's your
18  testimony that it was your goat?
19    A. Maybe wrong choice of words, spellcheck on the
20  phone when I use the Siri to say it.
21    Q. A spellcheck?
22    A. Possibly, because I use Siri to do my text
23  messages.
24    Q. So you're saying you said -- you're saying you
25  meant to say, "Good morning, this is who came to take my

Page 63

1  is who has our goat," being referring to my and my
2  family's goat, but it came out as "your."
3    Q. Oh, yes, I see. All right, makes perfect
4  sense.
5  So why would she be calling you, though, if it was
6  your goat?
7    A. I don't know. You'd have to ask her that.
8    Q. But you don't know if she called you. You
9  might have just texted her out of the blue; correct?
10    A. I object to that.
11    Q. That's not how this works.
12  You might have just -- you might have just texted
13  her because they took her goat, yes?
14    A. That could be, yes.
15    Q. Okay, thank you. All right.
16  If she didn't know that -- alerted her that Cedar
17  was taken. She didn't know. You understood that from
18  her response when she wrote, "When," exclamation point,
19  yes?
20    A. I'm not sure.
21  Like I said, she could have called and said,
22  "Hey" -- a number of things could have happened, but,
23  obviously, I responded back to something. I wouldn't
24  just text her out of the blue for that. She, obviously,
25  contacted me somehow through a phone call or something

Page 65

17 (Pages 62 - 65)

1  of some sort.
2      Q.  Yeah, I know.  Okay.  Well, I guess we'll see
3  from the phone log if she called you or not.
4      Did the sheriffs -- did the sheriffs tell you not
5  to contact her?
6      A.  No.
7      Q.  Did they ask you not to contact her?
8      A.  No.
9      Q.  Okay.  All right.
10     So she would have reached -- so you believe she
11 likely reached out to you by phone and then you texted
12 her?
13     A.  Yes.
14     Q.  Why wouldn't you just call her back?
15     A.  No reason.
16     Q.  When people donate goats to you, how often do
17 you give updates to them afterwards?
18     A.  I don't give updates.
19     Q.  You don't do updates, okay.  All right.
20     Has anyone ever asked for one?
21     A.  Not that I'm aware of.
22     Q.  Oh, so then why did you even give Jessica an
23 update if it's not your policy to give updates?
24     A.  No particular reason.
25     Q.  You just felt like it?

Page 66

1      Q.  And did you have an attorney speak with -- your
2  attorney, I apologize, not the gentleman who is there
3  today who is not an attorney, but did you have your
4  attorney speak with Detective Duncan?
5      A.  No.
6      Q.  His notes indicate an attorney called him.
7      Is it the gentleman who is with you today?
8      A.  I'm not sure.  I'd have to ask him.
9      Q.  Did you ask him to call as your attorney to
10 Detective Duncan?
11     A.  No.
12     He's not my attorney.
13     Q.  No, I understand.
14     But you're aware that someone did call claiming to
15 be your attorney?
16     A.  No, I didn't.
17     Q.  I mean, I wasn't there.  It's in his report,
18 and it says it.  So okay.
19     Guys, we might -- let me go confer with Vanessa for
20 a few minutes and off the record for five minutes.
21 Thank you.
22     (A recess is taken.)
23     MR. GORDON:  Back on the record.
24     So the exhibits we went through, so if I'm going
25 out of order, someone stop me, but the IG photo we did

Page 68

1      A.  It's not my policy one way or the other.
2      Q.  Are you at all concerned about being added as a
3  defendant in this case?
4      MR. NORTHCUTT:  Objection.  Argumentative.
5      MR. GORDON:  That's a fair question, Damian.  I'm
6  not arguing.
7      MR. NORTHCUTT:  I think you're kind of threatening
8  him a little bit.
9      MR. GORDON:  It's not a threat.
10     THE WITNESS:  It felt like a threat to me.  It's
11 intimidation.
12     MR. GORDON:  Do not take it as a threat.  No, no,
13 no.
14     THE WITNESS:  I took that as intimidating.
15     MR. GORDON:  Okay.  All right.
16     It's not intimidation.  It's a fair question
17 because there will be relevant follow-up in a moment.
18     Q.  So has that been a concern to you at all over
19 the last few months?
20     A.  No.
21     Q.  Not at that time, at any point in time, okay.
22 All right.
23     So it's not coloring your testimony today? is my
24 question.
25     A.  No.

Page 67

1  first, that will be Exhibit C, and then I'm going by the
2  names, the PDF titles, for the court reporter, and the
3  one that says "IG photo PDF," that will be Exhibit C.
4      (Whereupon the document referred to is marked by
5  the reporter as EXHIBIT C for identification.)
6      MR. GORDON:  The next one that says "6_27 email,"
7  that PDF that will be Exhibit D, and that's also the one
8  that Jessica texted to Mr. Allen.
9      (Whereupon the document referred to is marked by
10 the reporter as EXHIBIT D for identification.)
11     MR. GORDON:  And then the last one, it just says
12 "Ray Allen.pdf," and that will be Exhibit E.
13     (Whereupon the document referred to is marked by
14 the reporter as EXHIBIT E for identification.)
15     MR. GORDON:  Is that clear, Madam Court Reporter?
16     THE REPORTER:  Yes.
17     MR. GORDON:
18     Q.  We just had one last question.  You said Siri
19 auto-corrected from "your" to "ours."
20     Why did you use the word "ours"?
21     Because ours still implies it's both yours and
22 Jessica's goat.
23     A.  No.
24     I meant me and my family's as ours.  This is who
25 has our goat.

Page 69

18 (Pages 66 - 69)

1    Q. You're certain of that?
2    A. What's that?
3    Q. It was a Siri mistake. It wasn't just you were
4  being sloppy with your language?
5    A. No.
6    I'm not sloppy with my language. It was a Siri
7  mistake.
8    MR. GORDON: All right.
9    A Siri mistake, I see. No further questions.
10    MR. NORTHCUTT: John?
11
12    -EXAMINATION-
13
14  BY MR. BRIDGES: Yeah.
15    Q. I have a few questions for you. My name is
16  John Bridges. I represent the Shasta County Fair and
17  some of their employees who are defendants in this case.
18    Can you hear me okay?
19    A. Yeah.
20    Q. I'm going to jump around really quick, but I
21  don't have many questions. So I'll try to be quick.
22    My question is, what type of goat was Cedar? Was
23  it a Nubian, a Boer?
24    A. A Boer goat.
25    Q. What is your understanding of who owned Cedar

Page 70

1    Q. You said earlier that you bought -- I think
2  your estimate was about 50 percent of the goats on your
3  farm.
4    Is that a fair estimate?
5    A. Yes.
6    Q. In your experience, how do you determine the
7  fair market value of a goat that you would buy?
8    A. I go off whatever the price is told to me. If
9  I can afford it, I'll buy it.
10    Q. Hypothetically, how much would you have paid
11  for a goat like Cedar if you had to pay for him?
12    A. Maybe $25 to $50.
13    Q. My understanding is -- I mean, he's a buck. So
14  he has no value for dairy purposes; is that correct?
15    A. He was a wether. He wasn't a buck.
16    Q. Oh, wether, right.
17    But he was male. So he had no dairy value; right?
18    A. Correct.
19    MR. GORDON: Objection. Calls for -- John, give me
20  a moment. I'm going to let him answer, of course.
21  Calls for expert opinion. Just give me a rolling
22  objection for this line of questioning on this so I
23  don't have to keep interrupting.
24    MR. BRIDGES: Sure, fine.
25    Q. You said he was a wether.

Page 72

1  before he was donated to you?
2    A. I don't have an understanding who owned it.
3    Q. Do you believe from your interactions with
4  Jessica Long that it was her goat, or it was your
5  understanding it was her daughter's goat?
6    What is your understanding of who owned it --
7    A. The best understanding would be her goat,
8  Jessica's.
9    Q. What is that based on?
10    A. Just her donating it to me.
11    Q. Okay.
12    A. Just communication with her.
13    Q. Sure, okay.
14    And from what you've said earlier, I know you said
15  you were not holding the goat for them; correct?
16    A. Yes.
17    Q. As far as you understood, they transferred
18  ownership of the goat to you when they donated it to
19  you; is that correct?
20    A. Correct.
21    Q. Do you ever give away your goats to anyone
22  else?
23    A. No.
24    Q. Have you ever sold any of your goats?
25    A. No.

Page 71

1  So he had no breeding value; right?
2    A. He has no breeding value or milk value. He
3  needs teats to give milk, and he has no sperm to give
4  more offspring.
5    Q. Right.
6    And he wasn't going to be sold for meat. So he had
7  no meat value either; correct?
8    A. Correct.
9    Q. What do you do to maintain -- or let me ask you
10  this. Let me start over again.
11    What maintenance costs do you have for the goats
12  that you maintain on your farm?
13    A. Different amounts per goat.
14    Q. Do you pay for feed for the goats, or is there
15  enough grazing land that you don't have to pay for feed?
16    A. Both. I pay for feed and grazing land.
17    Q. Do you vaccinate your goats?
18    A. Yes.
19    Q. Do you give them minerals or supplements,
20  anything like that, in addition to whatever feed you
21  give them?
22    A. Yes.
23    Q. Do you have an estimate about how much it would
24  cost per year to take care of a goat like Cedar?
25    A. No.

Page 73

19 (Pages 70 - 73)

1    Q.  Would it cost you more than a hundred dollars?
2    A.  Yes.
3    Q.  More than $500?
4    A.  No.
5    Q.  Okay.
6    What's the life expectancy of a Boer goat like
7  Cedar?
8    A.  I don't know.
9    Q.  When -- well, let me ask you this.
10    Did you have an agreement, any sort of agreement
11  with Jessica Long or her daughter about whether they
12  could visit your farm and see Cedar after they donated
13  him to you?
14    A.  No.
15    Q.  Did you have any agreement to send them
16  pictures or send them videos to show them how he was
17  doing?
18    A.  No.
19    Q.  When they gave you the goat, was it your
20  expectation that the Longs would ever see the goat
21  again?
22    A.  No.
23    Q.  Do you have an estimate of how long you had him
24  in your possession?  Was it about two or three weeks?
25    A.  Approximately somewhere around that, maybe

Page 74

1  less.
2    Q.  In that time, did the Longs ever come to visit
3  your farm to see the goat?
4    A.  No.
5    Q.  Did they ever reach out to you to ask how he
6  was doing or ask for pictures or videos of him?
7    A.  No.
8    MR. BRIDGES:  Okay.
9    Those are all the questions I have.  Thank you very
10  much, Mr. Allen.
11
12    -EXAMINATION-
13
14  BY MR. GORDON:  I have a follow-up.
15    Q.  I thought your testimony, Mr. Allen, was you
16  didn't recall whether she called you or not afterwards?
17    A.  Repeat the question.
18    Q.  Well, counsel Bridges just asked you if they
19  ever reached out, and your testimony throughout this
20  entire deposition is you don't remember talking to her
21  after she dropped her off.
22    So how do you know if they reached out one way or
23  the other?
24    You just said --
25    A.  That would be the same answer, no, I don't know

Page 75

1  and I don't recall.
2    Q.  You don't recall?
3    A.  I don't know is the same thing.
4    Q.  You don't recall if she reached out?
5    A.  No.
6    MR. GORDON:  Okay, that's it.
7    MR. NORTHCUTT:  If no one has any further
8  questions, we appreciate your time here today,
9  Mr. Allen.  As I mentioned earlier, we'll go ahead and
10  we'll get a copy of the transcript to you through your,
11  I guess, your representative who is with you, who that's
12  okay to send it to him for you; correct?
13    THE WITNESS:  That's correct, yes.
14    MR. NORTHCUTT:  And you will be reviewing that.
15  You'll have a chance to take a look at it.  If there's
16  any changes that need to be made, you can make them, and
17  if not, then you need to sign the document and then
18  return it.
19    Is it going to be returned to my office, I guess?
20  I assume so.  In any event, just make sure you have an
21  opportunity to review it and sign it, and we will use it
22  from there.
23    Going forward, we have the same stip which is
24  essentially that a certified copy of the deposition
25  transcript can be used as an original throughout all

Page 76

1  proceedings and at the time of trial.
2    If other counsel is okay with that, please
3  stipulate, gentlemen.
4    MR. GORDON:  Yeah, I'm good.
5    MR. BRIDGES:  That's fine.
6    MR. NORTHCUTT:  Thank you, Mr. Allen.  Again, we
7  appreciate your time on this, and that will conclude the
8  end of the deposition and relieve the court reporter.
9    THE REPORTER:  Did anybody want a copy?
10    MR. BRIDGES:  Yes, please.
11    MR. GORDON:  Yes, please.
12    (The proceedings concluded at 3:58 p.m.)
13    ***

Page 77

20 (Pages 74 - 77)

1   I, Jana Ruiz, CSR 12837, do hereby declare:
2       That, prior to being examined, the witness named in
the foregoing deposition was by me duly sworn pursuant
3   to Section 30(f)(1) of the Federal Rules of Civil
Procedure and the deposition is a true record of the
4   testimony given by the witness.
5       That said deposition was taken down by me remotely
in shorthand at the time and place therein named and
6   thereafter reduced to text under my direction.
7       _____ That the witness was requested to review the
transcript and make any changes to the
8       transcript as a result of that review
pursuant to Section 30(e) of the Federal
9       Rules of Civil Procedure.
10      _____ No changes have been provided by the witness
during the period allowed.
11
        _____ The changes made by the witness are appended
12      to the transcript.
13      _____ No request was made that the transcript be
reviewed pursuant to Section 30(e) of the
14      Federal Rules of Civil Procedure.
15      I further declare that I have no interest in the
event of the action.
16
        I declare under penalty of perjury under the laws
17   of the United States of America that the foregoing is
true and correct.
18
        _____ 21st day of November, 2023.
19
20   *[signature: Jana Ruiz]*
21
22   Jana Ruiz, CSR 12837
23
24
25
                                                    Page 78

1   STEVEN DUDEN
2   ███████████████████████████
3                           NOVEMBER 21, 2023
4   RE:  E.L. vs. LIEUTENANT JERRY FERNANDEZ
5   NOVEMBER 6, 2023, RAYMOND ALLEN, JOB NO. 6272551
6
7   The above-referenced transcript has been completed by
8   Veritext Legal Solutions and review of the transcript is being
9   handled as follows:
10
11   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
12      to schedule a time to review the original transcript at
13      a Veritext office.
14
15   __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
16      Transcript - The witness should review the transcript and
17      make any necessary corrections on the errata pages included
18      below, notating the page and line number of the corrections.
19      The witness should then sign and date the errata and penalty
20      of perjury pages and return the completed pages to all
21      appearing counsel within the period of time determined at
22      the deposition or provided by the Code of Civil Procedure.
23
24
25
                                                    Page 79

1   __ Waiving the CA Code of Civil Procedure per Stipulation of
2      Counsel - Original transcript to be released for signature
3      as determined at the deposition.
4
5   __ Signature Waived – Reading & Signature was waived at the
6      time of the deposition.
7
8   XX Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
9      Transcript - The witness should review the transcript and
10     make any necessary corrections on the errata pages included
11     below, notating the page and line number of the corrections.
12     The witness should then sign and date the errata and penalty
13     of perjury pages and return the completed pages to all
14     appearing counsel within the period of time determined at
15     the deposition or provided by the Federal Rules.
16
17   __ Federal R&S Not Requested - Reading & Signature was not
18     requested before the completion of the deposition.
19
20
21
22
23
24
25
                                                    Page 80

1   E.L. vs. LIEUTENANT JERRY FERNANDEZ
2   RAYMOND ALLEN, JOB NO. 6272551
3
4       E R R A T A   S H E E T
5   PAGE _____ LINE _____ CHANGE _____
6   _____
7   REASON _____
8   PAGE _____ LINE _____ CHANGE _____
9   _____
10  REASON _____
11  PAGE _____ LINE _____ CHANGE _____
12  _____
13  REASON _____
14  PAGE _____ LINE _____ CHANGE _____
15  _____
16  REASON _____
17  PAGE _____ LINE _____ CHANGE _____
18  _____
19  REASON _____
20  PAGE _____ LINE _____ CHANGE _____
21  _____
22  REASON _____
23
24  _____   _____
25  WITNESS                     DATE
                                                    Page 81

21 (Pages 78 - 81)

1        I, Jana Ruiz, CSR 12837, do hereby declare:
2        That, prior to being examined, the witness named in
the foregoing deposition was by me duly sworn pursuant
3   to Section 30(f)(1) of the Federal Rules of Civil
Procedure and the deposition is a true record of the
4   testimony given by the witness.
5        That said deposition was taken down by me remotely
in shorthand at the time and place therein named and
6   thereafter reduced to text under my direction.
7        _____   That the witness was requested to review the
transcript and make any changes to the
8                transcript as a result of that review
pursuant to Section 30(e) of the Federal
9                Rules of Civil Procedure.
10       _____   No changes have been provided by the witness
during the period allowed.
11
_____   The changes made by the witness are appended
12               to the transcript.
13       _____   No request was made that the transcript be
reviewed pursuant to Section 30(e) of the
14               Federal Rules of Civil Procedure.
15       I further declare that I have no interest in the
event of the action.
16
I declare under penalty of perjury under the laws
17  of the United States of America that the foregoing is
true and correct.
18
WITNESS my hand this 21st day of November, 2023.
19
20
21
Jana Ruiz, CSR 12837
22
23
24
25

                                              Page  78

**[& - added]**

| & |
|---|
| **&**   1:18 2:14<br>5:17 80:5,17 |

| 0 |
|---|
| **01527**   1:9 |

| 1 |
|---|

**1**   1:12 12:9
78:3 80:8
**10**   1:12 15:7
38:7 41:13
**1000**   2:16
**10:49**   62:19
**11**   4:3 12:1
13:3 15:10
17:17,21
**12**   4:4 37:17
**120**   55:10
**1210**   3:5
**12837**   1:20
78:1,21
**13**   37:17
**1300**   3:5
**15th**   23:5,17
29:15 61:24
62:3,11,18,21
63:3,4,7,9
**18**   11:25
**1801**   2:16

| 2 |
|---|

**2**   13:15
**202**   2:8
**2022**   15:22,22
16:7 17:2 18:8
19:2 20:16

23:5,17 24:12
24:16 25:3
29:24 30:5
62:21
**2023**   1:19 5:8
11:10 78:18
79:3,5
**2025.520**   79:11
79:15
**209**   10:21
**21**   79:3
**210-7529**   3:7
**21st**   78:18
**22**   21:18
**22nd**   15:22
**23rd**   11:10
**248866**   9:23
**25**   72:12
**25th**   15:22
**26**   18:8 19:18
20:16
**263-2600**   2:18
**267**   2:6
**26th**   21:18
47:25
**27**   69:6
**27th**   56:17,19
58:3 62:2 63:6
**2:01**   1:19 5:9
**2:22**   1:9

| 3 |
|---|

**3**   11:24 13:24
14:3
**30**   22:22 78:3,8
78:13 80:8

**31735**   78:21
**34**   3:18
**3440**   19:4
**3960**   5:6
**3:58**   77:12

| 4 |
|---|

**4**   14:8 36:12,15
36:17,23 37:2
37:18,20 45:20
45:23,25 46:11
57:19 59:24,25
60:4,7,10,11
**40**   41:11
**407**   2:6

| 5 |
|---|

**5**   3:17 14:11
**50**   40:4,22 41:4
41:9 72:2,12
**500**   74:3
**534-9879**   10:21
**579198**   10:8

| 6 |
|---|

**6**   1:19 5:8
14:15 69:6
79:5
**6272551**   79:5
81:2
**69**   4:5,6,7
**6:41**   58:3

| 7 |
|---|

**7**   14:21
**70**   3:19
**707**   54:14,15

**721-7781**   54:14
54:15
**75**   3:18
**77**   4:3,4,5,6,7

| 8 |
|---|

**8th**   24:12 25:1
29:23 30:5

| 9 |
|---|

**9**   38:7
**90277**   2:7
**916**   3:7
**92612**   2:17
**949**   2:18
**95357**   10:8
**95814**   3:6
**996-8389**   2:8

| a |
|---|

**a.m.**   62:19
**able**   18:6 53:22
**above**   79:7
**ac**   1:9
**accepting**   42:3
42:5
**account**   42:6
**accuracy**   7:1
11:8
**accurate**   44:20
**acquire**   40:12
**action**   78:15
**actual**   24:8
**actually**   17:24
55:4,22
**added**   67:2

Page 1

**[addition - back]**

addition   73:20
address   10:1,6
   10:22 18:9,13
   18:14 19:24
advancing   2:4
adventures
   38:1,8
afford   72:9
afternoon   5:16
   26:6,14
ag   37:12,14
age   38:2,9
   42:24
agencies   35:20
agency   3:10
ago   6:18 8:11
   37:17
agreement
   74:10,10,15
ahead   7:3,8 8:1
   8:17 9:9 12:5
   12:19 22:17
   33:21 54:12
   76:9
air   57:3
alerted   65:16
allen   1:17 3:15
   5:1,9,16 10:6
   10:17 11:11,17
   15:20 34:9
   53:2 55:13
   56:7 60:22
   69:8 75:10,15
   76:9 77:6 79:5
   81:2

allen.pdf   69:12
allowed   42:20
   78:10
amendment
   23:8
america   78:17
amounts   73:13
animals   2:4
   39:24 40:6
   42:16,19
answer   7:19,20
   9:10 33:9 52:5
   52:6,8 59:18
   72:20 75:25
answered
   30:24 59:17
answering   7:15
   63:1
anybody   13:18
   77:9
anymore   43:12
anyway   60:24
apologies   49:23
apologize   19:8
   57:15 68:2
apparently
   56:17
appearances
   2:1
appearing
   79:21 80:14
appears   58:22
   63:6
appended
   78:11

appreciate   5:24
   76:8 77:7
approximate
   40:16
approximately
   5:8 6:18 28:22
   30:9,16 45:17
   47:24 57:9
   74:25
arguing   67:6
argumentative
   60:2,3 61:15
   67:4
arrived   26:3
   27:4
arrives   23:10
   25:6
ashbee   1:11
   2:12 14:22
   33:11
aside   32:24
asked   31:8
   43:16 59:17
   66:20 75:18
asking   43:6
   50:2 58:8 62:4
   62:18
ass   56:1
asserted   6:1 9:5
assist   55:15
associated
   60:11
assume   6:5
   9:10 10:11
   19:10 34:19

52:19 76:20
assuming   8:18
   13:25 38:7
   39:6
attach   55:24
attached   12:22
   55:2
attachment   4:5
   4:6 54:25
attended   38:19
attorney   3:4
   5:17 34:12
   53:23,25 54:5
   68:1,2,3,4,6,9
   68:12,15
attorneys   6:22
   8:16
auction   46:4
   57:19
auto   69:19
avenue   2:16
aware   16:2
   35:25 47:22
   57:19 66:21
   68:14
awfully   11:18

**b**

b   4:1,4,6 12:19
   12:24 80:8
back   7:9 15:18
   19:2 20:8 22:5
   22:18,21,23,25
   23:2,3,4,11
   31:22 33:25
   34:8 48:1 53:1

**[back - cedar]**

55:12 59:9
60:21 61:4,6
65:23 66:14
68:23
**background**
34:22
**bad** 64:14
**baking** 37:21
37:23,24
**based** 26:24
30:1 71:9
**basically** 9:8
60:23
**bbklaw.com**
2:19
**beach** 2:7
**becoming** 56:1
**beginning** 7:7
21:4 23:23
**believe** 12:13
17:8 20:12
24:12 32:14
36:8 38:1
49:23 50:11
54:17 55:18
56:14 58:11
66:10 71:3
**bell** 16:20
**best** 1:18,18
2:14,14 5:17
5:17 7:5,10 8:7
10:5 26:5,12
41:1,4 71:7
**big** 52:10,10
62:1

**billy** 35:1,5,6,7
**billy's** 18:24
24:18,23 35:2
35:3 39:24
**bit** 67:8
**bj** 39:3
**blah** 59:7,7,7,7
**bleating** 16:14
16:17 17:3
21:13 29:25
43:17,23 44:4
44:13,18 56:18
**blue** 63:8 65:9
65:24
**blurry** 11:18
**board** 38:23
**body** 42:25
**boer** 70:23,24
74:6
**born** 40:15,19
41:7,10,11,12
41:12
**bottom** 56:17
**bought** 40:17
40:21 72:1
**box** 10:8
**break** 6:19 7:9
7:25 8:5
**breaking** 22:9
56:6
**breeding** 73:1,2
**bridges** 3:4,19
5:10 70:14,16
72:24 75:8,18
77:5,10

**bring** 12:2 27:1
61:3,5
**brought** 12:16
**buck** 72:13,15
**business** 29:16
29:20 35:12
48:10 53:15
**butchering**
19:7
**buy** 40:15 72:7
72:9
**buyer** 59:7

**c**

**c** 4:5 55:21 69:1
69:3,5
**ca** 79:11,15
80:1
**cal** 35:22
**california** 1:2
2:7,17 3:2,6,11
5:7 9:22 10:8
19:5
**call** 17:7 30:6
30:10,17,22,23
32:10,24 33:21
47:11 64:18
65:25 66:14
68:9,14
**called** 18:24
33:4 62:13
63:10,11 65:8
65:21 66:3
68:6 75:16
**calling** 35:4
63:12 65:5

**calls** 32:8 46:18
47:19 50:21
52:3 72:19,21
**capacities**
36:14
**capacity** 1:10
1:11,12 36:12
**caption** 59:23
**card** 23:13
29:17,20 64:20
**care** 43:11,14
43:25 73:24
**carrier** 54:16
**case** 6:6 8:13
11:4 15:24
67:3 70:17
**categories** 12:1
**category** 12:6,6
12:9 13:24
**ccp** 79:11,15
**cedar** 6:4 12:11
13:17,24 14:6
14:12,17,22
15:1,5,8,20,25
16:1 24:12,24
25:16,19,25
26:13 27:1,19
27:22,25 28:11
28:18 29:6,7
29:25 31:8,11
31:14,17,21,23
32:1,2 33:17
44:14 46:8,25
47:5 48:5
49:18 50:14,17

**[cedar - corrections]**

51:9 52:16
53:8 57:19
59:20 65:16
70:22,25 72:11
73:24 74:7,12
**cell**  12:11 13:18
30:15 46:20,22
53:11,12,12,14
53:14,20 54:7
**certain**  39:16
70:1
**certified**  76:24
**chain**  57:25
58:7 61:8,22
62:1 63:5
**chains**  57:18
**chance**  6:25
34:15 76:15
**change**  7:4 81:5
81:8,11,14,17
81:20
**changes**  76:16
78:7,10,11
**check**  6:25
**children**  38:5
**chino**  5:7
**choice**  63:19
64:14
**citizens**  36:2
**civil**  5:25 78:3
78:9,14 79:22
80:1
**claiming**  68:14
**clear**  11:1
28:23 36:2

69:15
**click**  54:23
**clients**  6:1
35:17
**coast**  2:6
**code**  79:11,15
79:22 80:1
**collect**  28:10
**coloring**  67:23
**colors**  52:11
**com**  10:24
**come**  7:9 16:9
26:23 28:10
42:15 48:1
51:7,8 61:3
62:16 75:2
**comes**  24:23
51:3
**communication**
15:11 17:20,23
21:25 23:15,18
71:12
**communicati...**
12:10 13:16
15:7 20:20
24:3,8 32:9
33:12,15
**company**  35:8
**complaint**
34:16
**completed**  79:7
79:20 80:13
**completely**  9:6
28:23 33:10

**completion**
80:18
**complied**  48:22
**computer**
52:22
**concern**  67:18
**concerned**  67:2
**concerning**
33:16
**concerns**  5:25
15:20
**conclude**  77:7
**concluded**
77:12
**condemnation**
3:3
**confer**  68:19
**confiscated**
61:24
**confused**  64:5
**consent**  31:8,11
**considered**
35:22
**consisting**  12:9
13:15
**contact**  9:25
10:6,10 19:20
64:21 66:5,7
79:11
**contacted**
65:25
**continued**  2:21
**conversation**
21:11 28:2
31:5 32:19

**conversations**
33:12 59:20
**coordinated**
27:1
**cops**  48:15
**copy**  11:16,22
11:23 12:21
29:16 59:2
64:2 76:10,24
77:9
**corporation**
35:13 42:4
**correct**  6:11
7:9 10:14
12:14,15 14:2
14:3,4 17:4,18
17:19 18:18,23
19:14,19 24:13
24:19,22,24,25
26:24,25 27:2
29:2,9,10,17,18
31:25 35:15
36:4,19 42:10
43:1 44:17,21
46:10 48:14,20
49:13,14 50:7
57:5,21 60:19
65:9 71:15,19
71:20 72:14,18
73:7,8 76:12
76:13 78:17
**corrected**  69:19
**corrections**
79:17,18 80:10
80:11

Litigation Services
A Veritext Company                    www.veritext.com

**[correctly - discuss]**

**correctly** 54:20
**corresponden...**
  22:1
**cost** 73:24 74:1
**costs** 59:6
  73:11
**counsel** 2:1 9:5
  9:5 33:20
  50:23 53:20
  75:18 77:2
  79:21 80:2,14
**county** 2:12,13
  3:1 5:18 6:2
  14:25 15:4,11
  29:21 30:7
  32:16 36:18
  58:4,24 70:16
**couple** 52:9
  55:18
**course** 28:9
  72:20
**court** 1:1 6:22
  7:17 11:13
  12:20,21 55:5
  55:9 69:2,15
  77:8
**create** 19:12
**credibility** 7:5
**criminal** 9:21
**csr** 1:20 78:1
  78:21
**curiosity** 38:3
**curious** 36:10
**currently** 18:20
  36:11

**cv** 1:9

**d**

**d** 3:14 4:6 69:7
  69:10
**dad** 1:9
**dairy** 72:14,17
**damian** 2:15
  5:17 34:24
  43:16 67:5
**damian.north...**
  2:19
**date** 5:8 6:24
  8:12 9:7 10:18
  17:9 18:7
  21:16,17 24:11
  24:15 28:11,15
  62:10 79:19
  80:12 81:25
**daughter** 5:20
  23:22 25:8,9
  26:13 28:17,20
  34:14 36:16,17
  36:23 46:11
  57:14 74:11
**daughter's**
  45:25 60:8
  61:1 71:5
**daughters**
  26:10 36:24,25
  37:8,18 57:15
**day** 18:11
  19:15 23:5
  26:3,11 37:12
  37:14 42:25
  78:18

**days** 47:5
**dba** 35:8 42:4
**deal** 44:4,5
**dear** 58:3,24
**decided** 15:25
**declare** 78:1,15
  78:16
**defendant** 3:1
  11:2 67:3
**defendants**
  1:13 2:11
  70:17
**defense** 4:2
  9:21
**demand** 49:2
**department**
  2:13 3:2 5:19
  15:5,12,13
  29:24 30:7,25
  31:8,18 32:2,9
  32:13 33:4
  39:13
**depo** 55:23
  56:6
**deposition** 1:17
  4:3 5:21 6:15
  6:21 11:11,12
  12:3 23:23
  75:20 76:24
  77:8 78:2,3,5
  79:22 80:3,6
  80:15,18
**depositions**
  14:20

**deputy** 3:4
  15:12
**describe** 8:16
**description** 4:2
**detail** 47:8
  59:14
**detailed** 59:15
**details** 47:16
  57:20
**detective** 1:10
  1:11 2:11,12
  14:16,22 23:12
  29:21 33:1,11
  39:14 50:6,7
  50:13,20 51:14
  62:24 68:4,10
**determine** 72:6
**determined**
  79:21 80:3,14
**die** 42:24
**difference** 8:24
**different** 23:4
  52:11 73:13
**differentiation**
  9:1
**dining** 8:22
**direct** 51:21
**directed** 51:14
  51:15
**directing** 51:17
**direction** 78:6
**directors** 38:23
**disclosed** 30:3
**discuss** 9:8
  15:19 22:8

**[distraught - exclamation]**

distraught
  28:18
district   1:1,2
division   1:3
document
  11:14,17,24
  12:23 55:20
  69:4,9,13
  76:17
documents
  11:12,25 12:1
  12:2,9 13:15
  13:24 14:11,15
  14:21,25 15:4
  18:2 23:9
  54:19
doing   7:14
  35:12 74:17
  75:6
doj.ca.gov   3:8
dollars   74:1
dollies   59:8
donate   17:14
  17:25 27:20
  43:4 44:25
  66:16
donated   18:15
  31:21 40:13,19
  41:8,10,13
  48:9,12 64:12
  71:1,18 74:12
donating   28:25
  43:10 45:6,8
  45:11 46:8
  71:10

donation   42:4
  50:17
donations
  41:16,18 42:5
donors   41:17
  42:15
dot   10:24
drive   26:17,18
dropped   24:4
  24:12 53:8
  75:21
dropping   44:23
drops   47:24
duden   3:10
  9:15,16,20,21
  10:3,7,19,23
  12:25 50:22
  52:3,8 53:18
  53:20,24 54:3
  54:12 79:1
duly   78:2
duncan   1:11
  2:12 14:16
  23:12 29:21
  32:14 33:1
  39:14 50:7,20
  51:14 62:24
  68:4,10
duncan's   50:13

**e**

e   3:14 4:1,7
  10:24 69:12,14
  78:8,13 79:11
  79:15 80:8
  81:4,4,4

e.l.   1:6 5:22
  23:22 25:10,16
  28:17,24 33:14
  34:14 44:14
  57:15 79:4
  81:1
ear   50:14,17,19
  51:2,6,15,17,18
  51:20,22,23
  52:1
earlier   6:9
  29:14 43:16
  55:13 57:18
  59:13 61:19
  71:14 72:1
  76:9
easier   22:7
eastern   1:2
easy   14:19
eat   19:11
either   12:7
  28:17 60:15
  73:7
eliza   5:20
email   10:11,22
  55:5,9 58:16
  61:19 69:6
emailed   21:14
emailing   55:23
emotionally
  28:18
emotions   28:14
employee   38:25
employees
  15:13 70:17

enforcement
  48:18,20 49:9
  49:12,16
entire   75:20
entitled   8:7
  54:8
errata   79:17,19
  80:10,12
essentially   5:25
  6:3,21 76:24
estimate   8:7,17
  8:19,21,25
  25:2 29:13
  30:19 40:3,16
  40:24 41:1,4
  72:2,4 73:23
  74:23
ether   57:4
event   76:20
  78:15
events   8:7,11
  11:9 15:19
exact   32:15
examination
  3:16 5:13 34:6
  70:12 75:12
examined
  34:15 78:2
example   7:7
  8:8
except   46:11
exchanged   28:3
exclamation
  65:18

Litigation Services
A Veritext Company                    www.veritext.com

**[exhibit - generally]**

**exhibit** 4:3,4,5
 4:6,7 11:13,15
 12:19,24 55:21
 60:19 69:1,3,5
 69:7,10,12,14
**exhibits** 52:22
 68:24
**expand** 58:14
**expectancy**
 74:6
**expectation**
 74:20
**expecting**
 26:23
**experience**
 18:17 72:6
**expert** 28:13,15
 72:21
**explain** 61:2
**explained**
 54:12
**extent** 39:16

**f**

**f** 78:3
**fact** 64:10
**facts** 6:6 11:7
 15:24 16:2
**fair** 3:1 6:2 9:6
 9:12 15:21,24
 16:1 23:9
 24:13 33:16
 37:13 38:12,14
 46:4 48:12
 58:4,24 59:21
 60:1 67:5,16

70:16 72:4,7
**fairgrounds**
 37:15 38:15
 60:8 61:1
**faith** 49:15
**familiar** 6:5
 15:23 39:14,17
 43:17 44:10
**familiarize**
 6:20
**family** 37:7
**family's** 65:2
 69:24
**fantastic** 9:3
**far** 11:7 71:17
**farm** 17:4
 18:24 24:18,23
 29:25 34:25
 35:2,3,4 39:25
 40:10,15 42:21
 42:23 44:23,24
 45:18 72:3
 73:12 74:12
 75:3
**farms** 16:18
 21:13
**faster** 22:11
**fate** 42:22
**federal** 78:3,8
 78:14 80:8,15
 80:17
**fee** 19:11
**feed** 73:14,15
 73:16,20

**feet** 8:20
**felony** 59:11
**felt** 49:11 66:25
 67:10
**fernandez** 1:10
 2:11 14:12
 32:22 39:11
 50:9 79:4 81:1
**ffa** 36:12 37:5
**field** 27:11,15
 37:12,14 42:25
 52:10
**fifty** 40:5
**figure** 52:21
 55:25
**file** 10:20
**filed** 5:19
**films** 14:5
**final** 23:15
**find** 42:25
 51:14 60:13
**fine** 6:10,13,14
 33:8 36:9
 72:24 77:5
**fire** 19:12 35:22
**first** 16:5 17:9
 17:10,12,20,23
 19:15,15,20
 26:15 31:21,22
 44:17,19 60:25
 69:1
**five** 28:22
 29:11 33:25
 45:16,19 55:15
 57:8,9 68:20

**floating** 57:3
**flush** 11:6
**follow** 33:22
 34:24 60:12
 67:17 75:14
**following** 2:21
**follows** 5:3
 79:9
**foregoing** 78:2
 78:17
**forget** 61:13
**forth** 22:5
**forty** 20:24
 41:12
**forward** 31:23
 76:23
**found** 50:14
**fourth** 23:8
**frame** 8:8
**frcp** 80:8
**front** 9:8 37:11
 57:4,25
**further** 20:19
 22:1 23:18
 70:9 76:7
 78:15
**future** 10:1,11

**g**

**gap** 62:1 63:6
**gate** 26:17,18
 26:22
**general** 1:6 3:4
 13:5 28:16
**generally** 34:18

Page 7

**[gentleman - h]**

| | | | |
|---|---|---|---|
| **gentleman** 68:2 | **goat** 6:4 15:20 | 73:17 | **gotcha** 35:16 |
| 68:7 | 16:11,13 17:14 | **goes** 36:7,8 | 42:8 |
| **gentlemen** 77:3 | 18:15,20,22 | **going** 5:21 6:9 | **government** |
| **gift** 29:2 | 19:10,13 23:5 | 6:10 9:10 | 35:20,22 |
| **give** 7:19,20 8:8 | 24:5,18,24 | 11:13 15:19 | **gray** 23:3 |
| 8:17,19,21 | 25:16 27:6,8 | 33:7,20,22 | **grazing** 18:22 |
| 10:5 13:5 | 27:10,12,14,16 | 34:22 38:7 | 19:10,13 24:19 |
| 18:14 25:2 | 28:6,25 29:6 | 46:24 52:20 | 25:6 29:8 |
| 30:19 31:11 | 30:3 31:2 | 53:6,13 54:19 | 73:15,16 |
| 40:3,16,20 | 33:17 34:25 | 54:20,22,24 | **great** 6:8 7:13 |
| 41:1,20 47:3 | 39:25 40:10 | 55:8 61:20 | 7:14 10:25 |
| 48:15 50:13 | 43:10 44:25 | 68:24 69:1 | 11:21 12:18 |
| 51:25 52:20,23 | 45:7,9,12 48:9 | 70:20 72:20 | 13:1,14 14:24 |
| 53:11 54:12 | 48:13,17,21 | 73:6 76:19,23 | 19:23 24:21 |
| 55:7,10 56:1 | 49:5,7 51:3 | **good** 5:16 10:1 | 33:8 |
| 57:24 60:12,13 | 52:2,13 56:9 | 10:16 43:22 | **growing** 37:2 |
| 66:17,18,22,23 | 59:6,9 60:1,8 | 47:6 49:15 | **growth** 19:11 |
| 71:21 72:19,21 | 60:25 61:1,4,6 | 61:23 63:25 | **guardian** 1:6 |
| 73:3,3,19,21 | 61:6,23 63:16 | 64:7 77:4 | **guess** 8:13,22 |
| **given** 16:10 | 63:17,18 64:1 | **gordon** 2:5 | 8:25 28:24 |
| 17:3 78:4 | 64:1,8,8,10,12 | 3:18 5:10 | 29:6 30:2 33:9 |
| **giving** 27:19,22 | 64:22 65:1,2,6 | 33:24 34:8,12 | 66:2 76:11,19 |
| 28:18 | 65:13 69:22,25 | 49:10 50:24 | **guys** 52:21,24 |
| **gmail.com** 2:9 | 70:22,24 71:4 | 52:5,12,15 | 55:7 56:2 |
| **go** 7:3,8 8:1,17 | 71:5,7,15,18 | 53:1,19,21 | 60:18 68:19 |
| 9:9 10:12 11:1 | 72:7,11 73:13 | 54:1,4,15,24 | |
| 12:5,5,8,19 | 73:24 74:6,19 | 55:3,10,12,25 | **h** |
| 15:15,18 22:7 | 74:20 75:3 | 56:5 59:18 | |
| 22:13,17 33:7 | **goats** 18:17 | 60:3,5,21 | **h** 4:1 10:24 |
| 33:21 34:3 | 19:11 35:6,7 | 61:17 67:5,9 | 36:12,15,17,23 |
| 41:3 54:12 | 36:3 40:6,8,9 | 67:12,15 68:23 | 37:2,18,20 |
| 55:8 60:18 | 42:13,14 43:25 | 69:6,11,15,17 | 45:20,23,25 |
| 68:19 72:8 | 44:1 52:10 | 70:8 72:19 | 46:11 57:19 |
| 76:9 | 66:16 71:21,24 | 75:14 76:6 | 59:24,25 60:4 |
| | 72:2 73:11,14 | 77:4,11 | 60:7,10,11 |
| | | | 81:4 |

Litigation Services
A Veritext Company                    www.veritext.com

**[halfway - jessica]**

**halfway** 47:6
**hand** 78:18
**handled** 79:9
**happened**
  65:22
**happens** 28:1
**hard** 33:3
  58:21
**hazard** 19:12
**head** 56:6
**hear** 8:4 37:1
  70:18
**heard** 11:7
  16:22 39:22
**heart** 21:13
**hearts** 16:14,17
  17:3 29:25
  43:17,23 44:4
  44:13,18 56:18
**helping** 62:13
**hey** 60:18
  65:22
**highway** 2:6
**hills** 5:7
**hold** 64:24
**holding** 71:15
**home** 8:22,23
  20:10,18 22:21
  48:24
**hopefully** 7:21
  11:22
**horns** 52:10
**hour** 20:24
  22:23

**hours** 20:11,19
**house** 23:14
  46:21 61:24
**howard** 5:6
**hughes** 5:6
**huh** 27:13
**human** 28:13
**hundred** 74:1
**hypothetically**
  72:10

**i**

**identification**
  11:15 12:24
  69:5,10,14
**identified** 4:2
**identify** 32:14
**ig** 55:21 68:25
  69:3
**illegal** 23:8
**images** 14:5
**implies** 69:21
**incident** 6:3
**included** 79:17
  80:10
**including** 12:11
  13:17 15:12
**indicate** 28:5,8
  28:10 68:6
**indicated** 17:24
  22:14
**individual** 1:7
  1:10,11,12
**individuals** 6:2
  30:2

**information**
  16:10 17:3
  21:14 30:2
**initial** 32:10
**inside** 26:22
**instagram**
  56:18
**instance** 43:9
**intention** 29:4
  29:5
**interactions**
  71:3
**interest** 78:15
**interrupting**
  72:23
**interruption**
  15:17 55:11
  60:20
**intimidating**
  67:14
**intimidation**
  67:11,16
**investigations**
  3:10
**investigator**
  9:22
**involved** 36:11
  36:12 37:2,7
**involving** 14:11
  14:16,21,25
  15:4
**irvine** 2:17
**issue** 48:12
**issues** 7:2

**iv** 3:4

**j**

**jacob** 1:10 2:12
  14:16 23:12
  32:14 33:1
  39:14 62:24
**jake** 29:21
**jana** 1:20 5:5
  78:1,21
**jeremy** 1:11
  2:12 14:22
  33:11
**jerry** 1:10 2:11
  14:12 32:22
  39:11 79:4
  81:1
**jess** 61:5
**jessica** 1:6,7
  5:20 13:8,10
  13:19 15:25
  16:5 17:2,6
  19:16 20:20
  21:8,19 22:1
  23:19 24:11,23
  25:16 26:13
  27:5,18 28:2,9
  28:17,20,24
  29:15 31:21
  33:14 34:14
  44:14,16,17,18
  46:23 47:4,24
  48:1,5 49:18
  53:7 55:14
  57:15,23 58:2
  59:12,20 66:22

Litigation Services
A Veritext Company                    www.veritext.com

**[jessica - long]**

69:8 71:4
74:11
**jessica's** 62:9
69:22 71:8
**job** 7:14 79:5
81:2
**john** 3:4 56:5
70:10,16 72:19
**john.bridges**
3:8
**joined** 52:4
**judge** 9:8
**july** 23:5,17
24:12,16 25:1
29:15,23 30:5
61:24 62:3,11
62:18,21 63:3
63:4,7,9
**jump** 70:20
**june** 15:22,22
16:6 17:2,6,10
18:8 19:2,18
20:16 21:18
47:25 56:17,19
58:3 62:2 63:6
**justice** 3:2
**justin** 44:6,10

**k**

**karman** 2:16
**kathie** 39:20
**keep** 5:22 35:3
42:11 51:6,20
51:23 52:1
72:23

**kid** 36:20 38:8
**kids** 45:14
**killed** 49:19
**kind** 6:20 11:7
11:24 12:5,8
22:7,8 25:22
26:11 67:7
**knew** 45:6
52:16
**knocking** 48:16
**know** 8:1,15
15:23 16:13,17
17:23 20:3
21:2 28:13,20
30:23 31:17
32:6,12,15
33:2,9,10,12,13
33:18 34:18
35:11 36:10
37:18 38:3,4
38:14,23,25
39:2 40:18,23
40:25 41:21
42:7 43:23,24
48:11,11 52:2
54:21 55:14,15
58:13 62:8
63:4,5 64:8
65:7,8,16,17
66:2 71:14
74:8 75:22,25
76:3
**knowledge**
26:5 33:16

**krieger** 1:18
2:14 5:18
**kristin** 16:20
21:13 43:20

**l**

**land** 19:12
73:15,16
**language** 58:23
59:15 70:4,6
**las** 5:6
**lastly** 15:10
**law** 2:4 48:18
48:20 49:9,11
49:15 54:5,9
**laws** 78:16
**lawsuit** 5:19,24
11:2,3 34:15
39:5
**lawyer** 23:7
62:13
**layman's** 19:9
**lead** 27:10,12
**learn** 16:5
**learned** 17:2
**leave** 41:7
50:17
**left** 22:13 23:14
46:16
**legal** 6:13 79:8
**lending** 28:6
**lengthy** 61:7
**letters** 57:3
**license** 36:7,9
**licensed** 9:22

**lieutenant** 1:10
2:11 14:11
32:21 39:11
50:9 79:4 81:1
**life** 74:6
**likely** 66:11
**limited** 12:11
13:17
**line** 11:25 20:4
20:23 21:3
72:22 79:18
80:11 81:5,8
81:11,14,17,20
**list** 33:7
**listening** 7:14
**little** 6:19 67:8
**live** 42:20,23
**livestock** 37:19
46:3
**llc** 35:13
**llp** 1:18 2:14
**located** 5:6,7
19:4 31:15
32:2
**location** 16:1
30:4 47:7
**locked** 79:15
80:8
**log** 66:3
**long** 1:6,7 5:20
5:20 8:17
13:10 15:25
16:5 17:2
20:20 21:8,19
22:1 23:19

Litigation Services
A Veritext Company                    www.veritext.com

**[long - name]**

24:11,23 25:16
26:13 27:5
28:2,9,17,20,24
31:21 33:14
34:14 44:14
57:10 58:16
71:4 74:11,23
**long's** 19:16
29:15
**longer** 42:20
**longs** 74:20
75:2
**look** 18:2,5
20:2 40:25
61:2 76:15
**looked** 52:13
52:16 59:23
61:8
**looking** 58:13
60:22 62:7
**looks** 61:22
62:2,12 64:3
**lot** 37:20 45:18

**m**

**m** 10:24
**madam** 69:15
**made** 15:8,11
30:23 76:16
78:11,13
**maintain** 73:9
73:12
**maintenance**
73:11
**majority** 33:19

**make** 22:11
51:16 55:1
59:7 76:16,20
78:7 79:17
80:10
**makes** 65:3
**making** 11:5
**male** 72:17
**man** 44:5,6
**manager** 58:4
58:25
**mark** 11:13
**marked** 4:2
11:14 12:19,23
69:4,9,13
**market** 72:7
**matter** 34:14
**mcfarlane** 39:3
**mean** 19:10
20:12 35:11
37:20 38:14
41:19 52:6
59:18 68:17
72:13
**meant** 7:3,8
63:25 69:24
**meat** 73:6,7
**media** 15:7,10
24:8
**meet** 21:13
46:24
**meeting** 6:21
47:13,20
**melanie** 39:9

**members** 29:24
37:7
**memorialize**
41:17,18
**memory** 59:19
**mention** 45:20
45:22
**mentioned**
23:22 76:9
**mentions** 37:12
**message** 17:8
17:12 47:11
57:23 58:2
60:6,7,15 61:8
64:18
**messages** 4:4,7
12:4,12,13
13:2,6,12,18,25
17:17 22:8
23:18 46:17
59:22 61:7,20
63:23
**messaging**
47:18
**milk** 73:2,3
**mind** 9:18
10:15 18:5
48:19 49:7
**mine** 64:4
**minerals** 73:19
**mini** 18:24
24:18,23 34:25
35:2,3,4 39:25
40:9

**minimally** 5:22
**minor** 1:6 5:23
**minutes** 22:22
23:1 28:22
29:11 45:16,19
52:24 55:10,15
57:8,9 68:20
68:20
**mistake** 70:3,7
70:9
**mistaken** 50:20
**modesto** 10:8
**mom** 60:1,7,25
**moment** 47:3
50:13 51:25
52:20 60:12,13
67:17 72:20
**monday** 1:19
58:3
**months** 67:19
**morning** 26:5
26:14 30:19
61:23 63:25
64:7
**motivated**
62:20
**move** 43:11
**moving** 13:15
**multiple** 13:7
**muse** 39:20,22

**n**

**n** 3:14
**name** 5:5,16,22
6:4,13 9:21
16:9,12,12,20

**[name - okay]**

16:22 19:2
23:22 24:1
29:19 32:15
33:5 35:5,14
38:7 39:3,5,8
39:15,19 43:21
44:7,8,9 70:15
**name's** 34:12
**named** 11:2
78:2,5
**names** 19:7
43:22,23 69:2
**nature** 26:1
28:14
**necessarily**
16:21 43:8
**necessary**
79:17 80:10
**need** 7:25 9:25
10:10,17 54:8
55:6 59:10
60:12 64:21
76:16,17
**needs** 73:3
**nevada** 5:7
**never** 8:23,23
38:21 47:4
**news** 39:6
**nice** 14:19
**night** 30:20
**nighttime**
30:21
**nonprofit** 42:5
**noon** 30:19

**normal** 7:15
9:6
**north** 2:6
**northcutt** 2:15
3:17 5:10,15
5:17 9:24 10:9
10:15,22,25
11:16 13:1
15:15,18 33:19
34:2 49:8
50:21 52:4
55:1 59:17
60:2 61:15
67:4,7 70:10
76:7,14 77:6
**notating** 79:18
80:11
**note** 59:24,25
**notes** 20:3
33:23 50:13
68:6
**notice** 4:3
11:11
**noticed** 1:18
61:21
**november** 1:19
5:8 8:9 78:18
79:3,5
**nubian** 70:23
**number** 10:16
10:20 13:15
14:11,15,21,25
15:10 21:23
30:10 40:20
51:18 53:12,17

54:7 65:22
79:18 80:11
**numbers** 51:21
51:23 52:1

---

**o**

**o** 10:23
**oath** 34:10 53:3
**object** 54:10
65:10
**objection** 49:8
50:21 52:3,7
53:18,19 54:1
59:17 60:2
61:15 67:4
72:19,22
**objections** 9:4
9:7
**obviously** 8:11
15:20 57:2
65:23,24
**occurred** 8:11
**occurring**
47:15
**october** 11:10
**office** 12:21
29:22 76:19
79:13
**officer** 15:12
38:25
**offspring** 73:4
**oh** 7:8 45:22
55:25 58:9
65:3 66:22
72:16

**okay** 8:5,6,10
9:14,17 10:4
11:21 13:9,23
14:10 15:3
16:4 17:1,16
18:2,4,10 19:1
20:5,8,23 21:6
22:19 23:2
24:6,21 25:14
25:24 30:12
31:3 32:17
33:6,10 34:2
34:21,24 35:3
36:5,25 37:10
37:24 39:13,17
40:5,14 41:6
41:12,13,15,23
42:14,18 44:8
44:12 46:6
47:2,23 48:4
49:10,17,17,21
50:12 51:5,8
51:12,23 52:15
54:18 55:19
56:1 57:1,11
57:13,17 58:12
58:18,20 59:4
59:8 60:16
61:12 63:11
64:9,13,19,23
65:15 66:2,9
66:19 67:15,21
68:18 70:18
71:11,13 74:5
75:8 76:6,12

Litigation Services
A Veritext Company                    www.veritext.com

**[okay - plus]**

77:2
**old**  42:24 43:14
**once**  27:4
**one's**  11:5
**ones**  35:24
**open**  21:24
  22:19 54:23,24
**opens**  59:25
**operate**  35:14
**opinion**  72:21
**opportunity**
  7:19,20 76:21
**order**  68:25
**organization**
  43:18
**original**  76:25
  79:12 80:2
**outdoor**  38:1,7
**overview**  13:5
**own**  18:20
**owned**  70:25
  71:2,6
**owner**  23:10
  24:18
**owners**  16:17
  42:15 43:3
**ownership**
  71:18

| **p** |
|---|

**p**  10:23,23,24
**p.m.**  1:19 5:9
  58:3 77:12
**pacific**  2:6
**page**  2:21 3:16
  11:24 64:3

79:18 80:11
  81:5,8,11,14,17
  81:20
**pages**  13:3
  17:17,21 79:17
  79:20,20 80:10
  80:13,13
**paid**  72:10
**pain**  56:1
**paper**  58:14
**papers**  34:19
**paperwork**
  42:1
**parkway**  5:6
**part**  29:7 42:7
  49:15
**particular**  42:9
  66:24
**party**  11:3
  13:17
**past**  61:21
**pasted**  59:2
**pay**  59:6 72:11
  73:14,15,16
**pdf**  54:25 56:3
  58:24 60:22
  69:2,3,7 79:15
  80:8
**penalty**  78:16
  79:19 80:12
**people**  13:7
  43:3,11 56:9
  66:16
**percent**  40:22
  41:4,9,11,12,13

72:2
**percentages**
  40:17
**perfect**  7:24
  21:6 65:3
**perfectly**  8:10
**period**  20:15,19
  28:6 78:10
  79:21 80:14
**perjury**  78:16
  79:20 80:13
**person**  13:7,8
  29:19 31:7
  32:12 39:19
  43:20
**personal**  30:13
  30:13,15 53:11
  53:12,14
**personally**  35:9
**perspective**
  28:16
**petaluma**  19:5
**phone**  10:11,16
  10:20 12:12
  13:18 24:8
  30:10,11,13,14
  30:15 32:8,10
  46:18,20,21,22
  46:24 47:4,11
  47:19 53:7,12
  53:13,14,15,15
  54:7 63:20
  64:18 65:25
  66:3,11

**phones**  53:20
**photo**  55:20,21
  56:7,13,23,25
  57:2 68:25
  69:3
**photographs**
  14:5
**photos**  55:16
  55:18 57:6
**pick**  31:2
**picture**  23:13
  64:4
**pictures**  74:16
  75:6
**piece**  58:13
**place**  15:21
  78:5
**placed**  44:1
**placing**  44:23
  49:18,24 50:2
**plaintiff**  15:25
  34:13
**plaintiff's**  9:5
**plaintiffs**  1:8
  2:3 6:1 12:10
  14:12,16,22
  15:1,5,8
**planning**  29:7
**plans**  29:6
**plant**  23:10
**please**  8:15
  61:15 77:2,10
  77:11
**plus**  20:24

Litigation Services
A Veritext Company                    www.veritext.com

**[po - real]**

po   10:8
point   6:24 10:1
   11:5 15:24
   24:22,23 26:19
   27:16 31:14,23
   47:6 59:11
   65:18 67:21
policy   66:23
   67:1
posed   8:4
possession
   25:15 74:24
possible   5:23
possibly   16:23
   63:22
post   56:20
posted   56:18
practice   51:2
   54:5
precise   8:12
prefer   22:9
present   3:10
   5:9 6:22,23
   7:17 26:7 32:1
   32:4
preserve   9:7
presume   36:18
   42:25
pretty   59:15
price   72:8
printed   12:4
   13:3 56:24
prior   26:24
   78:2

prius   23:3
private   35:18
   36:2
pro   14:19
probably   6:5
   8:19 22:11
   28:14 37:17
   60:11 64:17
procedure   78:3
   78:9,14 79:22
   80:1
proceedings
   15:17 55:11
   60:20 77:1,12
processing
   23:10
production
   11:12
program   37:20
programs
   37:19,20 38:2
prompted
   61:25
proof   49:2
properties   36:3
property   25:20
   26:4,14,24
   27:2 28:1,21
   29:11 30:3
   31:9,12,15,19
   31:22,24 32:3
   32:4 48:19
   49:19 55:14,16
   56:10,22 57:4
   57:7

provide   12:20
   19:10 35:20
   37:13 41:16,18
provided   11:22
   19:24 29:16
   38:21 78:10
   79:22 80:15
public   35:17
pull   55:20
   57:24
purchase   40:9
purpose   19:13
purposes   5:21
   19:9 42:6
   72:14
pursuant   78:2
   78:8,13
put   20:10 27:10
   27:14,25 52:21
   54:1,9 64:8
putting   52:6

**q**

question   8:4,15
   9:9,11 63:2
   67:5,16,24
   69:18 70:22
   75:17
questioning
   72:22
questions   7:20
   8:14 23:12
   33:20,21,23
   34:1,22,24
   62:23 70:9,15
   70:21 75:9

76:8
quick   12:6
   70:20,21
quickly   12:8
quite   64:18

**r**

r   10:23,24 81:4
   81:4
r&s   80:8,17
ranges   38:2
ray   6:10 59:18
   69:12
ray's   6:13
   34:25 35:1,4
raymond   1:17
   3:15 5:1,9 6:10
   6:13 9:25
   10:10 11:11
   79:5 81:2
reach   10:2,3,6
   10:17 17:6
   23:12 62:23
   64:17 75:5
reached   44:16
   44:17,19 66:10
   66:11 75:19,22
   76:4
read   57:18 58:7
   58:8,10 59:23
   61:7,9
reading   61:10
   61:11,14 62:14
   62:16 80:5,17
real   12:6

**[realize - response]**

realize  7:8
really  6:22
  43:22 44:11,12
  47:14 58:21
  59:22 61:7
  70:20
reason  7:25
  66:15,24 81:7
  81:10,13,16,19
  81:22
reasons  43:3,5
recall  17:9,12
  18:6 20:2,6,9
  21:17 24:15,16
  25:1,3 26:3
  27:17,23 28:19
  30:9,10,18
  31:6,7 32:11
  32:18,23 33:3
  33:8 40:1,2
  42:13 43:9,20
  43:22 44:7,8,9
  46:2,5,6,14,23
  47:8,10,19,20
  50:2,4,25 53:7
  56:22,25 57:6
  59:16 63:13
  75:16 76:1,2,4
receipt  41:20
receive  21:7
  30:6 32:8
  42:11 58:2
received  20:22
  23:5,18 30:1
  30:10,17,22

57:23 60:23
  61:4
recess  34:4
  52:25 68:22
recognize  39:5
  39:8 56:7,9
recollection
  18:3
record  9:19
  10:5,16 15:15
  15:18 34:3,8
  52:7,23 53:1
  55:8,12 60:18
  60:21 64:4,6
  68:20,23 78:3
records  53:13
  53:22 54:8
  62:8
redondo  2:7
reduced  78:6
refer  5:21
referenced  79:7
referred  11:14
  12:23 69:4,9
  69:13
referring  25:10
  28:9 65:1
reflect  7:4
refresh  18:3
  59:19
regarding
  10:17 12:11
  13:17 29:15
  32:18

related  13:24
  15:8,11 57:19
relating  6:3
  12:10 13:16
relations  38:18
relationship
  38:12 43:17
released  80:2
relevant  67:17
relieve  77:8
remaining  41:9
  41:13
remember  8:12
  23:21 24:1,1
  33:5 46:7,15
  46:19 47:1,2,9
  47:12,14,15,16
  47:18 50:5,19
  51:9,12 55:19
  59:12 61:10,11
  61:14,17 63:12
  75:20
remote  11:11
remotely  78:5
remove  15:25
  51:2
removed  60:1
removing
  59:20
repeat  75:17
rephrase  8:15
reply  60:15
replying  20:9
report  50:20
  68:17

reporter  5:5
  6:23 7:17
  11:13,15 12:20
  12:21,24 55:5
  55:9,22 69:2,5
  69:10,14,15,16
  77:8,9
represent  5:18
  29:23 34:13
  50:15 70:16
representative
  10:12 54:3
  76:11
request  11:12
  78:13
requested
  11:25 78:7
  80:8,17,18
require  36:6
  53:20
requirements
  38:9
respect  47:12
respond  18:11
  19:15,25 20:25
  21:19 61:5
responded
  22:18,21,23,25
  23:2,3,4,11
  65:23
response  8:5
  18:7,8 19:24
  21:5,22 29:15
  65:18

Litigation Services
A Veritext Company                    www.veritext.com

**[rest - shasta]**

rest   41:7
result   78:8
retain   36:2
retrieval   6:4
retrieve   29:25
   31:8,11 48:5
   48:21
retrieved   31:18
return   46:25
   76:18 79:20
   80:13
returned   76:19
returning   47:5
review   6:25
   33:23 76:21
   78:7,8 79:8,12
   79:16 80:9
reviewed   78:13
reviewing
   76:14
right   23:8 26:7
   29:12 34:10
   35:16 36:9,10
   36:17 38:6,11
   40:5 43:2,15
   47:2,23 48:4
   50:12 51:8
   52:2,12 53:5
   54:21 55:6
   56:6,12 57:11
   59:7 60:10
   61:18 62:21
   63:1 64:7 65:3
   65:15 66:9,19
   67:15,22 70:8

72:16,17 73:1
   73:5
rights   5:25
ring   16:20
road   19:4
roblar   19:4
rolling   72:21
ruiz   1:20 5:5
   78:1,21
rules   6:20 56:6
   78:3,9,14
   80:15
run   34:25
russell   16:24
ryan   2:5 34:12
   55:1 61:16
ryan.robert.g...
   2:9

**s**

s   4:1 10:23,24
   81:4
sacramento   1:3
   3:6 46:24 47:5
   47:13,21
sanctuary
   16:10,11,13
   18:20 30:1
   43:23
saw   27:5,9
   34:19 39:6
saying   6:24
   7:18 8:14 11:3
   24:1 28:8 46:8
   46:14 47:17
   49:3 52:17

63:17,24,24
says   12:9 18:8
   20:23 21:12
   55:21 56:17
   58:3,24 64:7
   68:18 69:3,6
   69:11
schedule   79:12
screen   54:21
   55:2 58:22
search   23:8
   29:16
second   15:16
   24:7 55:7 56:2
   57:24 60:19
   64:24
seconds   55:10
section   3:3 78:3
   78:8,13
see   20:13 26:15
   48:1,23 56:3,5
   56:15,18,20
   58:24 59:1,12
   60:4 62:9 65:3
   66:2 70:9
   74:12,20 75:3
seeing   28:16
seem   14:19
   28:18 57:10
seemingly
   42:24
seems   14:20
seen   8:24 11:17
seizure   23:9

send   22:3,4
   42:21 55:4,4
   61:25 62:19
   74:15,16 76:12
sense   11:7
   51:16 65:4
sent   11:10 18:7
   22:5,5,6,6,6
   23:13 62:18
sentence   60:10
   60:25
separate   25:25
   35:8
service   18:22
   19:10 35:17
   36:6
services   24:19
   25:6 29:8
   35:20 37:13
   38:21
set   23:17 35:13
seven   6:18
shakib   2:5 5:11
   34:13 54:23
   55:8
shaking   56:5
share   54:21
   55:22,25
sharing   55:2
shasta   2:12,13
   3:1 5:18 6:2
   15:1,4,11,21
   29:21,24 30:7
   32:16 33:16
   38:12,14 58:4

**[shasta - sworn]**

| | | | |
|---|---|---|---|
| 58:24 70:16 | **slaughter** 42:21 | **sperm** 73:3 | **stopped** 27:4 |
| **sheriff** 23:6 | 61:4 | **spoke** 47:4 50:6 | **stover** 16:20 |
| 32:16 62:22 | **sloppy** 70:4,6 | 61:13 | 43:20 |
| **sheriff's** 2:13 | **social** 15:7,10 | **spoken** 23:21 | **street** 3:5 |
| 5:19 15:4,12 | 24:8 | 32:21 33:1 | **strike** 16:15 |
| 23:13 29:16,22 | **sold** 71:24 73:6 | **spymyheart** | 20:12 25:15 |
| 29:24 30:7,25 | **solution** 61:3 | 10:23 | 27:24 29:4,5 |
| 31:7,18 32:2,9 | **solutions** 61:2 | **spymyheart.c...** | 32:25 57:17 |
| 32:13 33:4 | 79:8 | 79:2 | **stuff** 56:24 |
| 39:13 56:16 | **sonoma** 36:18 | **stamp** 20:13 | **subpoena** |
| 64:20 | 37:13 | **starkey** 44:6,10 | 53:13,22 54:8 |
| **sheriffs** 66:4,4 | **sorry** 11:18 | **start** 22:13 | 54:10,10 |
| **shorthand** 78:5 | 35:3 37:1,22 | 36:15 73:10 | **subsequently** |
| **show** 20:4 23:9 | 60:13 | **starts** 11:25 | 32:8 |
| 26:13 52:20 | **sort** 25:23 29:2 | **state** 9:22 | **substance** |
| 54:19 59:22 | 38:21 66:1 | 23:24 36:7 | 17:13 20:6 |
| 61:19 74:16 | 74:10 | 79:11,15 | 21:10 60:24 |
| **shows** 21:3 | **sorts** 43:3 | **stated** 30:25 | **sudden** 62:3 |
| 60:10 | **sound** 24:13,13 | 31:1 | **suite** 2:6,16 3:5 |
| **sia** 3:10 | 44:10 | **states** 1:1 78:17 | **summer** 25:3,5 |
| **sign** 41:21,24 | **sounds** 38:8 | **stating** 9:18 | **supplements** |
| 76:17,21 79:19 | **speak** 46:16 | **stemming** 6:3 | 73:19 |
| 80:12 | 50:6,9 68:1,4 | **steve** 9:18 10:3 | **support** 10:23 |
| **signature** 78:21 | **speaking** 32:12 | 10:5,15 11:22 | 79:2 |
| 80:2,5,5,17 | 46:23 53:7 | 12:20 | **sure** 19:7 22:10 |
| **silva** 39:9 | **specifically** | **steven** 3:10 | 38:9 41:2 43:5 |
| **simplify** 26:12 | 40:25 | 9:15,21 10:13 | 53:16 55:1 |
| **sir** 53:23 54:7 | **speculating** | 79:1 | 60:9,19 64:18 |
| **siri** 63:20,22 | 63:14 | **stip** 76:23 | 65:20 68:8 |
| 64:25 69:18 | **speculation** | **stipulate** 77:3 | 71:13 72:24 |
| 70:3,6,9 | 50:21 52:3 | **stipulation** | 76:20 |
| **sitting** 8:18 | **speech** 7:15 | 80:1 | **suv** 25:23 |
| **situation** 59:13 | **spellcheck** | **stop** 21:12 | **sworn** 5:2 78:2 |
| **skipped** 61:21 | 63:19,21 | 22:14 26:19,21 | |
| | | 68:25 | |

**[t - took]**

| t | | | |
|---|---|---|---|
| **t**  2:5 4:1 10:23 10:24 81:4,4 | **tell**  18:6 25:19 26:15 28:1 30:16,22 31:1 31:14 43:7 44:18 47:12 66:4 | 60:23 61:4,7,8 61:14,20,21,25 62:1,2,4,18,19 63:5,5,7,8,22 64:16,18 65:24 78:6 | **thinks**  23:7 |

**t**  2:5 4:1 10:23
  10:24 81:4,4
**table**  8:18,19
  8:22,24
**tag**  50:14,19
  51:15,17,18,18
  51:20,22,23
  52:1
**tags**  27:16
  42:11,13 50:18
  51:2,6
**take**  7:9,25 8:5
  16:1 18:5
  33:25 43:25
  49:6 56:13
  57:2,2 63:25
  67:12 73:24
  76:15
**taken**  6:15 34:4
  52:25 65:17
  68:22 78:5
**talk**  7:15,16,21
  12:5 24:11
  28:15 44:13
  57:14,15
**talked**  33:14
**talking**  17:20
  23:7 47:10
  59:5 75:20
**tax**  42:6,7
**teats**  73:3
**ted**  16:24
**telephone**  30:6

**tell**  18:6 25:19
  26:15 28:1
  30:16,22 31:1
  31:14 43:7
  44:18 47:12
  66:4
**telling**  43:10
  59:13
**ten**  23:1
**tendency**  7:16
**terms**  8:20
**testified**  29:14
  55:13
**testifies**  5:2
**testimony**  7:5,6
  7:10 30:1
  44:17 46:7
  49:25 53:9
  57:21 63:18
  67:23 75:15,19
  78:4
**text**  4:4,7 12:4
  12:12,13 13:2
  13:6,12,18,25
  17:8,10,12,17
  19:16,16,25
  20:3,6,8,9,25
  21:7,20,25
  22:3,4,8,25
  23:17 24:8
  26:24 29:15
  46:17 47:11,18
  57:18,23,25
  58:2,7,10,14,15
  59:3,5,12,22

60:23 61:4,7,8
61:14,20,21,25
62:1,2,4,18,19
63:5,5,7,8,22
64:16,18 65:24
78:6
**texted**  63:3,3
  64:20 65:9,12
  66:11 69:8
**texting**  63:4
**texts**  20:15
  62:16
**thank**  9:24
  10:25 20:8
  28:3 50:23
  54:15,18 65:15
  68:21 75:9
  77:6
**thanks**  22:20
**thanksgiving**
  8:9
**thereabouts**
  30:5
**thing**  26:15
  27:5,9 42:9
  46:7 76:3
**things**  13:25
  46:12 65:22
**think**  6:9 28:3
  29:14 33:19
  37:15 47:25
  57:8 58:17
  59:14 67:7
  72:1

**thinks**  23:7
**third**  13:16
**thought**  48:13
  55:23 75:15
**threat**  67:9,10
  67:12
**threatening**
  59:11 67:7
**three**  20:11,19
  55:5 74:24
**time**  8:3,8,12
  9:4,4 17:9,10
  20:4,13,23
  21:2,3,17 24:4
  25:2,17 26:3,6
  26:9 28:6
  30:18 37:15
  52:9 53:6
  56:20 57:10,12
  58:10 59:11
  62:19 67:21,21
  75:2 76:8 77:1
  77:7 78:5
  79:12,21 80:6
  80:14
**title**  9:19
**titles**  69:2
**today**  5:9,24
  7:6,9,16 12:2
  12:16 67:23
  68:3,7 76:8
**today's**  5:8
**told**  48:21 72:8
**took**  15:21 23:6
  27:6,8,10,12,25

**[took - whatsoever]**

45:18 55:18
59:6 60:7,25
62:22 65:13
67:14
**tort**   3:3
**total**   13:3
**towards**   30:21
**track**   51:20,23
52:1
**traffic**   20:24
**trailer**   25:25
**transcript**   6:24
6:25 7:2 76:10
76:25 78:7,8
78:12,13 79:7
79:8,12,16,16
80:2,9,9
**transferred**
71:17
**transported**
25:19
**trial**   77:1
**tried**   17:10
**trucking**   39:22
**true**   78:3,17
**try**   5:22 17:7
26:12 54:20
70:21
**trying**   52:21
60:13 64:17
**two**   26:10
46:12 52:24
55:10 74:24
**type**   70:22

**types**   41:15
**typing**   6:23
7:17

**u**

**u**   10:23
**uh**   27:13
**ultimately**   30:2
31:17 32:2
**unauthorized**
54:2,5
**under**   34:10
35:14 53:3
78:6,16,16
**understand**
7:11 8:14 9:1,9
9:15 22:11
34:9 35:10
49:18 53:2
57:1,13 63:1
68:13
**understanding**
11:8 15:21
16:15 20:14
27:18 28:24
31:23 44:22
70:25 71:2,5,6
71:7 72:13
**understood**
7:22 9:10
18:16 65:17
71:17
**united**   1:1
78:17
**update**   66:23

**updates**   66:17
66:18,19,23
**use**   17:24 46:20
63:20,22 69:20
76:21
**used**   5:22 64:15
76:25
**usual**   53:11
**usually**   8:16

**v**

**vaccinate**   73:17
**value**   72:7,14
72:17 73:1,2,2
73:7
**vanessa**   2:5
34:13 55:5
68:19
**vegas**   5:6
**vehicle**   25:21
25:22 27:7,8
**veritext**   5:5
79:8,11,13
**verizon**   54:17
**version**   58:15
**versus**   41:10
**video**   45:18
**videos**   14:5
55:18 74:16
75:6
**violation**   23:8
**violations**   5:25
**visit**   42:15
74:12 75:2
**visited**   31:22

**von**   2:16
**vs**   1:9 79:4 81:1

**w**

**waived**   80:5,5
**waiving**   80:1
**walk**   26:11
**want**   7:5 8:13
10:6 18:2 33:9
52:22 54:23
58:8 59:6 77:9
**wanted**   44:25
48:1,5 61:1
**wanting**   10:12
**warrant**   23:6
48:23 53:20
56:16 62:22
**way**   21:13
22:15 28:4
50:25 51:12,15
51:21 54:20
55:6 67:1
75:22
**we've**   6:22 11:7
30:1 32:24
**website**   37:11
**weekend**   21:24
22:19
**weeks**   74:24
**went**   28:3
29:25 68:24
**wether**   72:15
72:16,25
**whatnot**   34:19
**whatsoever**   8:1

Page 19

**[wife - zoom]**

| | |
|---|---|
| **wife** 26:10 | 57:9 58:17 |
| 45:11 57:14 | 62:6 64:8 66:2 |
| **wish** 62:12 | 70:14,19 77:4 |
| **witness** 1:17 | **year** 73:24 |
| 3:15 5:2,9 49:9 | **years** 6:18 8:11 |
| 52:9,13 54:14 | 37:17 |
| 56:4 60:4 | **yep** 22:16 |
| 67:10,14 76:13 | **young** 38:8 |
| 78:2,4,7,10,11 | **younger** 38:5 |
| 78:18 79:16,19 | **yous** 28:3 |
| 80:9,12 81:25 | **z** |
| **word** 17:24 | **zoom** 1:17 5:10 |
| 69:20 | |
| **words** 57:3 | |
| 63:19 64:14 | |
| **work** 30:14 | |
| 54:22 | |
| **working** 54:21 | |
| **works** 65:11 | |
| **worry** 55:6 | |
| **write** 61:22 | |
| **wrong** 11:4 | |
| 24:22 29:10 | |
| 63:19 | |
| **wrote** 65:18 | |
| **x** | |
| **x** 3:14 4:1 | |
| **xx** 80:8 | |
| **y** | |
| **y** 10:24,24 | |
| **yards** 36:2 | |
| **yeah** 6:12 25:4 | |
| 33:3,24 47:23 | |
| 50:1,22 55:3 | |

Litigation Services
A Veritext Company                    www.veritext.com

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.