COURTESY COPY

# EXHIBIT "D"

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*B.J. MACFARLANE*
*Vol. 2*
*February 9, 2024*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File B.J. Macfarlane, Vol II.txt
Min-U-Script® with Word Index

**Page 225**

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA

3      SACRAMENTO DIVISION

4

5   E.L., a minor, by and through     )
    her general guardian, JESSICA     )
6   LONG; JESSICA LONG, an            )
    individual,                       )
7                                     )
        Plaintiffs,         )   Case No.
8   vs.                     )  2:22-cv-01527-DAD-AC
                            )
9   LIEUTENANT JERRY FERNANDEZ        )
    individually and in his          )
10  individual capacity as Sheriff   )
    for the County of Shasta;        )
11  DETECTIVE JACOB DUNCAN,          )
    individually and in his          )
12  individual capacity as Sheriff   )
    for the County of Shasta;        )
13  DETECTIVE JEREMY ASHBEE,         )
    individually and in his          )
14  individual capacity as Sheriff   )
    for the County of Shasta;        )
15  SHASTA DISTRICT FAIR AND EVENT   )
    CENTER, a district agricultural  )
16  association; COUNTY OF SHASTA;   )
    SHASTA COUNTY SHERIFF'S          )
17  DEPARTMENT; MELANIE SILVA, in    )
    her individual capacity; BJ      )
18  MACFARLANE, in his individual    )
    capacity; and DOES 1 through     )
19  10,                              )
                                     )
20      Defendants.                  )

21

22      VIDEO DEPOSITION OF BJ MACFARLANE

23      PAGE 225-391, VOLUME II

24      FRIDAY, FEBRUARY 9, 2024

25

---

**Page 226**

1      APPEARANCES

2

3   For the Plaintiffs:  LONG, etc.

4      ADVANCING LAW FOR ANIMALS
       407 N. Pacific Coast Highway, #267
5      Redondo Beach, CA  90277
       (202) 996-8389
6      rgordon@advancinglawforanimals.org
       vshakib@advancinglawforanimals.org
7      BY:  RYAN R. GORDON, ESQ.
            VANESSA T. SHAKIB, ESQ.
8

9   For the Defendant:  LIEUTENANT FERNANDEZ, etc.

10     BEST, BEST & KRIEGER
       2855 East Guasti Road, Suite 400
11     Ontario, CA  91761
       (909) 989-8584
12     damian.northcutt@bbklaw.com

13     ZOOM APPEARANCE BY:  DAMIAN A. NORTHCUTT, ESQ.

14  For the Defendant:  SHASTA DISTRICT FAIR, etc.

15     CALIFORNIA ATTORNEY GENERAL'S OFFICE
       DEPARTMENT OF JUSTICE
16     1300 I Street
       Sacramento, CA  95814-2963
17     (916) 210-7529
       john.bridges@doj.ca.com
18

19     BY:  JOHN BRIDGES, ESQ.

20  Also Present:  Terry Fox, Video Specialist

21

22

23      ---oOo---

24

25

---

**Page 227**

1      INDEX OF EXAMINATION

2

3   EXAMINATION BY:                              PAGE

4   RYAN GORDON                              230, 385

5   DAMIAN NORTHCUTT                              383

6

7            ---oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 228**

1      INDEX OF EXHIBITS

2
3   Macfarlane Depo        Description            Page
    Exhibit No.

4   G                      Invoice from A & R      254
5                          Custom Butchering,
                           totaling 2 pages
6

7   H                      AT&T Phone records      275
                           dated 6-25-22 through
8                          9-1-22

9   I                      Text chain between BJ   320
10                         Macfarlane and Melanie
                           Silva, date range 7-28-22
11                         through 2-15-23, totaling
                           9 pages

12
13  J                      Text chain between BJ   340
                           Macfarlane and Melanie
14                         Silva, date range 6-28-22
                           through 7-18-22, totaling
15                         8 pages

16  K                      Text chain between BJ   362
17                         Macfarlane and Melanie
                           Silva, date range 6-27-22
18                         through 6-28-22, totaling
                           8 pages

19
20  L                      Text chain between BJ   366
                           Macfarlane and Melanie
21                         Silva, date range 6-25-22
                           through 6-27-22, totaling
22                         6 pages

23

24            ---oOo---

25

**Page 229**

1      BE IT REMEMBERED, that on Friday, February 9,
2 2024, commencing at the hour of 8:06 a.m., of said day,
3 at the offices of Challe, Fisher & Morfin, 1828 South
4 Street, in Redding, California, before me, Suzanna
5 Mickelson, a Certified Shorthand Reporter in and for the
6 State of California, there appeared,
7      BJ MACFARLANE,
8 who, being first duly sworn by me to tell the truth, was
9 examined and testified as follows:
10      THE VIDEO SPECIALIST: Ladies and gentlemen,
11 we're on video record with the deposition of BJ
12 Macfarlane. The date's February 9th, 2024, and the time
13 is 8:06 a.m. I'm Terry Fox, the video specialist, from
14 the firm of Redding Video Productions. This is the
15 beginning of media number one regarding case number
16 22-cv-01527-DAD-AC of the United States District Court
17 for the Eastern District of California. This deposition
18 is being taken at Challe, Fisher and Morfin at 1828
19 South Street, Redding, California. The court reporter
20 is Suzanna Mickelson, 14270, associated with Challe,
21 Fisher and Morfin.
22      Counsel will now introduce themselves, who they
23 represent, and the witness will then be sworn in by the
24 court reporter.
25      **MR. GORDON:** Ryan Gordon for Plaintiffs.

**Page 230**

1      **MS. SHAKIB:** Vanessa Shakib for Plaintiffs.
2      **MR. BRIDGES:** John Bridges for Defendants Shasta
3 District Fair, BJ Macfarlane and Melanie Silva.
4      **MR. GORDON:** And counsel for the sheriffs
5 defendants, Damian Northcutt, will make an appearance
6 later, just noting for the record. And okay, shall we
7 begin?
8      (Whereupon, the witness was sworn in by the
9      court reporter.)
10
11      EXAMINATION BY MR. GORDON
12      **MR. GORDON:** Q. Okay. Good morning, Mr.
13 Macfarlane.
14 A.    **Good morning.**
15 Q.    Thank you again for being here, much
16 appreciated.
17      So you remember the beginning of our last
18 deposition I went over some ground rules. I'm going to
19 go through them again quickly so just so you remember.
20 I know that you haven't been deposed before except for
21 that time we went over several things before, so.
22      So some of the rules are there's the court
23 reporter as last time. She's going to transcribe
24 everything you say, and so it's important we give
25 audible answers. You know, "yes," "no," "I don't know"

**Page 231**

1 or whatever the response calls for. Try to avoid
2 nodding or, you know, "um" or pointing, you know. As
3 best you can, use your words.
4      And we don't talk -- we'll try not to talk over
5 each other. You know, a conversational cadence begins,
6 and we did that the last time, not rudely, but it just
7 happens, so we should both try to I'll give you an
8 opportunity to respond. I silence myself or shut up
9 during that period. You do the same for me. Give your
10 attorney an opportunity to object, etcetera.
11      So do you understand everything I'm saying?
12 A.    Yes, sir.
13 Q.    And if you don't understand something, let me
14 know and -- let me know, and I'll rephrase it. If your
15 attorney gives an objection, unless he instructs you not
16 to answer, he's simply preserving for the record. If
17 you understand what I'm saying, you still answer.
18      But of course, if you don't understand what I'm
19 saying, please tell me. If you don't tell me, I'm going
20 to assume you understand what I'm saying and proceed
21 with the question, so.
22      What else? And you remember I'm entitled to
23 your best estimate. I think I gave you the table
24 example last time which is you can estimate -- if I
25 asked you to estimate -- estimate the size of this

**Page 232**

1 table, you could do it. But if I asked you to estimate
2 the size of the table at my house, you couldn't. You'd
3 just be guessing. So you understand the distinction,
4 correct?
5 A.    Yes.
6 Q.    And no drugs in the last -- that are interfering
7 with your ability to testify today?
8 A.    No.
9 Q.    No alcohol?
10 A.    No.
11 Q.    Okay, great. And are you on any meds today that
12 would affect anything?
13 A.    No.
14 Q.    Okay, great. All right. And no reason you
15 can't go forward with your depo today that you can think
16 of?
17 A.    No.
18 Q.    Great. All right. Okay. So the last time we
19 went through vaguely a timeline of events what happened
20 in our last deposition, so I just want to go through
21 some of that again just for foundation so we're clear as
22 I understood your testimony, so.
23      So I'm basically just going to give you some dates
24 and events, my description of them as I believe you
25 testified, you can tell me "correct" or "yes" or correct

Case 2:22-cv-01527-DAD-AC    Document 118-4    Filed 11/15/24    Page 5 of 60

LONG vs.                                                                    B.J. MACFARLANE - Vol. 2
FERNANDEZ                                                                       February 9, 2024

Page 233

1  me if I'm wrong if that makes sense, so.
2       So to your memory, Jessica removed Cedar from
3  the fair on July -- Saturday, July 25th, and you found
4  out late that evening, correct?
5  A.   Yes.
6  Q.   And there was -- you worked with --
7       MS. SHAKIB: June.
8       MR. GORDON: Q. I'm sorry. June 25th, yeah.
9  Good call. June 25th. It was a Saturday evening and
10  you -- thank you, Vanessa. And you and several other
11  employees at that time were searching to find him, and
12  you did not find him at the fair, correct?
13  A.   Yes.
14  Q.   And you I believe you said you spoke with Chad
15  Fowler it was either that evening or the next morning,
16  thereabouts, you could not remember precisely when and
17  he said he believed Ms. Long and her daughter had taken
18  Cedar, correct?
19  A.   Yes.
20  Q.   Okay. And so then the next morning I believe
21  you testified you also had a conversation with Jessica
22  on the phone where she, I paraphrasing, said I didn't
23  want -- her and her daughter didn't want to do it and
24  were looking at bringing the goat back, correct?
25  A.   **Looking to do what?**

Page 234

1  Q.   To not bring the goat back, correct?
2  A.   Yes.
3  Q.   Okay. And that's about the morning after, so I
4  guess that's June 26 where you had this conversation
5  with Ms. Long and about her -- someone pop in? One
6  second, BJ.
7       Damian, do you want to put yourself on the
8  record while you're here?
9       Good morning, Damian. Do you want to put
10  yourself on the record? I don't know if he can hear us.
11      MR. NORTHCUTT: Hi everyone. Sorry I'm late.
12      MR. BRIDGES: No problem. Would you like to put
13  your name on the record, and we'll keep going.
14      MR. NORTHCUTT: Sure. Damian Northcutt
15  appearing on behalf of the Shasta County Sheriff's
16  Department and the officers in this case.
17      MR. GORDON: Okay, great. Okay. So where was
18  I?
19  Q.   Okay. So you had -- you speak with Chad Fowler,
20  and he says something about he thinks Ms. Long and
21  Jessica took Cedar. Then the next morning at 6:26 you
22  have a conversation with Jessica on the phone and she
23  tells you, you know, we don't -- me and my daughter
24  don't want to do this and doesn't want to bring the goat
25  back, and that's the morning of the 26th still. Am I

Page 235

1  right so far?
2  A.   **I think so.**
3  Q.   Okay. And then after that did you -- you
4  engaged in several text messages with her for several
5  days at that point in time, correct?
6  A.   Yes.
7  Q.   Which I think we went over some of them the last
8  time but we'll -- and -- we do have them.
9       So at this point in time did you -- so this is
10  June 26th or so the goat's already been taken. Had you
11  reviewed the state or local rules for procedurally what
12  to do at that point in time?
13  A.   **No. I don't recall if I looked at the rules or
14  not. It's -- I don't recall if I -- if I did or not. I
15  don't recall.**
16  Q.   Okay. And that goes for either the -- when I
17  say, "state and local," I'm saying the 2022 CDFA rules
18  for state fairs. We've been calling them the state
19  rules. And then the local rules I guess would be the
20  exhibitor handbook or whatever else they handed to the
21  exhibitors for the participation in the auction at the
22  Shasta Fair.
23       So you know what I'm referring to, correct?
24  A.   Yes.
25  Q.   Okay. All right. All right. And it's your

Page 236

1  understanding that Ms. Silva is, because she's the CEO,
2  it's your understanding that she is responsible for
3  enforcement of the rules at that point in time?
4  A.   Yes.
5  Q.   Okay. All right. All right. So and then so
6  several days pass and I believe -- I'll represent to
7  you, you can tell me if you remember this, but Ms. Silva
8  sent Lieutenant Fernandez I believe on 6 -- on June 29th
9  an email containing -- several emails from Jessica and
10  communications from Jessica and I guess some documents
11  from the auction itself. Do you -- is that your memory?
12  A.   Yes.
13  Q.   Okay. All right. And had you talked to
14  Lieutenant Fernandez before that point, before 6-29, if
15  you can recall?
16      MR. BRIDGES: Do you mean about this case?
17      MR. GORDON: Yes. Yeah, yeah. Thank you.
18      THE WITNESS: I do not recall.
19      MR. GORDON: Q. You don't recall, okay. And do
20  you -- so as far as do you remember reporting the
21  removal of Cedar to the sheriffs, or do you remember
22  that being Melanie?
23  A.   **I remember it being Melanie.**
24  Q.   Okay. All right. So and then -- okay.
25       So the last communication you had with Ms. Long

Page 237

1  was by -- or the only -- after the phone -- strike that.
2      You had a phone call with her, but the remainder
3  of your communications is over text, correct?
4  A.   I believe so.
5  Q.   You believe so, okay. That's my understanding
6  too.
7      Okay. So your last text would have been about,
8  we have them, and I can get them out if we need to, but
9  I believe it's about June 29th or so thereabouts so
10 midweek.
11 A.   Yes.
12 Q.   Yeah. And so after -- after your last text
13 about the same time Melanie presumably reports it to
14 the -- reports the removal to the sheriff's department
15 and then -- so after she reports it, what did you do?
16 Were you just waiting on the sheriffs at that point in
17 time?
18 A.   Yeah. I was waiting on to hear anything from
19 Melanie or whoever.
20 Q.   Okay. Okay. Okay. That's fine. So -- so then
21 flash forward the Cedar gets delivered to your house on
22 July 8th, correct, late -- I don't know about what -- is
23 that correct?
24 A.   Yes. I don't recall the date, but yes, it was
25 late at night.

Page 238

1  Q.   Friday, July 8th? Or is it Saturday July --
2      MS. SHAKIB: I believe it was Friday late at
3  night. It could even have been very early Saturday
4  morning.
5      MR. GORDON: Q. Well, was the date -- let me
6  check with the records. It was the day before the
7  community barbecue. I don't know if that's usually held
8  on -- yeah, so Friday, July -- so yes, it's a Friday.
9  Okay. That's your memory, late at night on Friday, July
10 8th.
11     So did -- when they -- when -- now, did you talk
12 to Lieutenant Duncan or just Fernandez when Cedar was
13 dropped off?
14 A.   There was somebody with him. I thought it was a
15 detective.
16 Q.   Yes, Lieutenant Fernandez and Detective Duncan.
17 I'm sorry.
18 A.   Yeah.
19 Q.   It was a younger gentleman, brown hair. Yeah,
20 okay.
21     And did you speak with both of them?
22 A.   Yes.
23 Q.   Okay. Did any of them give you any instructions
24 with respect to Cedar?
25 A.   I don't recall. I said I would take care of it

Page 239

1  until somebody told me what else was going to go on.
2  Q.   Okay. Did -- who would -- did they tell you to
3  wait for someone to tell you what was going on?
4  A.   I don't know. I could not recall our
5  conversation that night. I don't recall. I was taking
6  care of the goat.
7      MR. BRIDGES: You've answered.
8      THE WITNESS: Yeah.
9      MR. GORDON: Q. Okay. So as far as you
10 remember, they just said take care of the goat?
11 A.   Yes.
12 Q.   Okay. Who were you waiting on for further
13 instructions?
14 A.   Either Melanie or Kathie. I don't --
15 Q.   Okay. Okay. Do you recall the last time we
16 went over your text messages where you were -- it stated
17 you were waiting on the sheriff and the DA?
18 A.   Yes.
19 Q.   Do you want me to pull the text out again?
20 A.   I do remember that text after reading it.
21 Q.   Okay. Okay. And you testified that it was
22 Sheriff Johnson you were referring to, correct?
23 A.   No.
24     MR. BRIDGES: Just object. It misstates his
25 testimony.

Page 240

1      MR. NORTHCUTT: Join in the objection.
2      THE WITNESS: I don't -- I don't believe it was
3  Johnson. I don't recall that.
4      MR. GORDON: Well, let me get your transcript
5  out so I can read it.
6      (Pause in proceedings.)
7      MR. GORDON: Q. Okay. So the text -- I'm
8  reading from the transcript when I read you the text,
9  and I can show you the text if you -- if want to see it,
10 but I'll just repeat it. If they give an objection I'm
11 misstating the text, I'm going to pull the text out
12 again.
13     The text read, "Good morning. I'm gone till
14 tomorrow" -- hold on one second.
15     "Good morning. I'm gone till tomorrow
16 afternoon," comma, "talk to sheriff and he said to wait
17 until he talks to DA before we kill goat. It's pair --
18 and you said, "And I believe because I thought Melanie
19 we were in touch with CDFA's lawyer as well."
20     Okay. And then I ask -- when you say, "the
21 sheriff" here, do you know -- "talk to sheriff," do you
22 know who you, and you say, "Johnson." I said, "Johnson.
23 Okay. And as far as the DA here, do you know which DA
24 you're talking about? It's the woman. I don't know her
25 name."

Page 241

1   So at that point in time you're saying for that
2   text is referring to Sheriff Johnson, correct?
3   MR. BRIDGES: Well, I object. It misstates
4   testimony. That's not what -- just briefly, the
5   question you asked was, "Do you know who you," and the
6   answer he said was, "Johnson." Do you know who you,
7   what? I don't think the question was completed.
8   MR. GORDON: That's fine, but.
9   MR. NORTHCUTT: Join in the objection.
10   MR. GORDON: That's fine, but.
11   Q.   So at that point in time you did not -- you were
12   not referring to Sheriff Johnson on your July 11 text?
13   A.   I don't believe so, no.
14   Q.   Okay. What sheriff were you referring to in the
15   text?
16   A.   I don't recall.
17   Q.   You testified -- okay. You don't recall.
18   A.   I don't recall.
19   Q.   Okay. You testified that you did have Sheriff
20   Johnson's cell phone, correct?
21   A.   I do not. I might have, but I -- I don't.
22   Q.   Do you now currently have his cell phone number?
23   A.   I don't believe so. I looked after the
24   deposition the first time, and I don't think I do.
25   Q.   Okay. But you recall testifying that you had,

Page 242

1   correct?
2   A.   I thought I had it.
3   MR. BRIDGES: Just -- can you tell me where it
4   is that he said he had it? I'm not saying you're wrong.
5   I just would like to read it.
6   MR. GORDON: Sure.
7   MR. BRIDGES: Because you're asking him about a
8   220-page deposition transcript. I don't even know if
9   he's reviewed the transcript since -- well, ever
10   reviewed it, but.
11   MR. GORDON: We'll go off the record.
12   (Discussion off the record.)
13   THE VIDEO SPECIALIST: We're off the record.
14   The time is 8:23.
15   MR. GORDON: Back on the record.
16   THE VIDEO SPECIALIST: We're back on the record,
17   and the time is 8:24.
18   MR. GORDON: Q. Okay. On your -- so Mr.
19   Macfarlane, did you have Sheriff Johnson's cell phone
20   number at some point in time between June 25th, 2022 and
21   July 28th, 2022?
22   A.   I do not recall. I don't -- I don't recall.
23   And that's what I think --
24   Q.   Okay. Okay. You don't recall? Does that mean
25   you don't know?

Page 243

1   A.   I don't -- I don't know. I don't recall.
2   Q.   Let me -- do you -- there's -- I'm making a
3   distinction. Do you mean you don't recall you might
4   have or you don't know -- do you mean I don't recall as
5   I don't remember?
6   A.   I don't remember if I have his number or not.
7   Q.   No, not now. At that time?
8   A.   No, I don't recall.
9   Q.   Okay. So you -- on page 207 of your deposition
10   transcript I asked, "Do you know how many times between
11   that period you talked with Johnson and the DA between
12   the 11th and the 25th of July?"
13   Answer, "A couple of times. And this was -- I
14   never talked to the DA."
15   So talked to the sheriff a few times between
16   that period?
17   A.   I don't recall who -- if Melanie did or if I
18   did. I do not recall. I -- I don't recall.
19   Q.   Okay. You don't recall. Why did you reference
20   the sheriff in your text message?
21   MR. BRIDGES: Well, I think that misstates what
22   his text message said. He didn't --
23   MR. GORDON: He referenced the sheriff in his
24   text message.
25   MR. BRIDGES: The sheriff?

Page 244

1   MR. GORDON: It says "sheriff." I'm saying --
2   and I'll ask him whatever sheriff it is.
3   MR. BRIDGES: Okay.
4   MR. GORDON: Q. He said, "this sheriff." He
5   didn't say "sheriff's deputy." Why do you reference
6   "the sheriff" in your text message?
7   A.   It was I'm guessing the sheriff's department. I
8   don't think it was necessarily the sheriff.
9   Q.   Okay.
10   A.   From -- I don't -- I don't know.
11   Q.   So when --
12   A.   I don't believe I would say "the sheriff." It
13   wasn't the sheriff. I guess in common, just common, or
14   my saying the sheriff, I guess I should complete it the
15   sheriff's department. I don't --
16   Q.   Is there any reason -- is there any reason you
17   said "I believe so" when I asked you if it was Sheriff
18   Johnson?
19   A.   I -- that timeframe is -- I was -- and I think I
20   testified that I don't recall a lot of details. It
21   was -- it was a very busy time. I was extremely sleep
22   deprived. I don't remember who I contacted or if
23   Melanie contacted them.
24   Q.   So one of you might have -- one of you contacted
25   the sheriff, is that your testimony, you just don't know

LONG vs.
FERNANDEZ

B.J. MACFARLANE - Vol. 2
February 9, 2024

Page 245

1  if it was you or Melanie?
2       MR. BRIDGES: What are you saying --
3       THE WITNESS: I don't know if the sheriff. The
4  sheriffs -- I guess I stated it wrong. The sheriff's
5  department.
6       MR. GORDON: Q. Okay. So after -- after -- so
7  on July 28th -- or I'm sorry, June 8th -- I'm confusing
8  myself here.
9       On July 8th, Cedar is dropped off. And then
10  he's kept at your house until, you said, until you're
11  waiting for directions. Presumably to send him to
12  slaughter, correct?
13  A.    Yes.
14  Q.    Okay. Who were you waiting for directions from
15  at that point in time?
16       MR. BRIDGES: Asked and answered. You can
17  answer again.
18       THE WITNESS: Melanie. Melanie or Kathie who
19  are under -- Melanie or Kathie.
20       MR. GORDON: Melanie or Kathie, okay.
21       THE WITNESS: Anybody of authority.
22       MR. GORDON: Q. Okay. So someone at the
23  sheriff's also potentially?
24  A.    Whoever. But my -- I would wait to hear from
25  them talking to Melanie or Kathie because at that point

Page 246

1  Kathie I believe was the rightful owner, so that's what
2  I was waiting for was her.
3  Q.    Okay. So and how many times did you talk with
4  Melanie between -- that you can recall, of course, and
5  the phone records will tell it, but how many times did
6  you talk with Melanie between July 8th and July 28th?
7  A.    I do not know.
8  Q.    Okay. So how did you know based on your text
9  message because you'd said -- let me just pull it out
10  here.
11       (Pause in proceedings.)
12  Q.    BJ, this is a deposition -- or an exhibit at
13  your last deposition. Just going to use it again.
14  Although, I don't remember what exhibit number it was.
15       MS. SHAKIB: I'll be able to find it.
16       MR. GORDON: Q. Now -- okay. It's Exhibit C.
17  Okay. Okay.
18       So this is Exhibit C to your last deposition.
19  I'm not -- I'm not going to make it an exhibit here, but
20  so do you want to take a look at it again? Make sure
21  you recall it.
22       It was Kathie Muse's text chain between you.
23  And you produced the same text chain just flipped, but
24  we're going with hers.
25       Do you recall this, yes?

Page 247

1  A.    Yes.
2  Q.    Okay, great. So can you go to the second page
3  here.
4       So "Good morning. I'm gone till tomorrow
5  afternoon. Talked to sheriff and he said to wait until
6  he talks to DA before we kill goat." Do you see where
7  it says that?
8  A.    Yes, sir.
9  Q.    When did you talk to the sheriff?
10  A.    I don't think it was the -- I'm guessing
11  before -- between July 9th -- maybe -- if that was our
12  last communication, it would have been that night. So
13  the sheriff -- the sheriff I'm referring to would have
14  been whatever the deputy.
15  Q.    The deputies, okay.
16  A.    Yeah, and that's what I think I use -- used it
17  as sheriff where I mean the sheriff department.
18  Q.    You mean sheriff -- you're saying -- so it's
19  your testimony, you mean Sheriff Fernandez here?
20  A.    Yes. Dropped the goat off.
21  Q.    Okay.
22  A.    Because if --
23       MR. NORTHCUTT: Ryan, there's no Sheriff
24  Fernandez.
25       MR. GORDON: Sorry, I apologize, Damian. That's

Page 248

1  honestly inadvertent. You mean Lieutenant Fernandez?
2       THE WITNESS: Yes.
3       MR. GORDON: Q. Okay. But you also testified
4  that you had talked to the sheriff, we read it a few
5  minutes ago, several times between -- I gave two dates.
6  I can pull it back up again.
7  A.    And again, I believe that's my -- just as you
8  called him Sheriff Fernandez, that's what I called the
9  sheriffs the sheriff. The department. I don't say the
10  sheriff. I didn't mean it the sheriff. I don't --
11  especially this instance here. It's not the sheriff.
12  It's the sheriff's department.
13  Q.    Okay. So you believe you're referring to
14  Fernandez?
15  A.    Yes.
16  Q.    In this context? Okay.
17       So now do you have the same belief when I asked
18  you do you know how many times between that period you
19  talked with Sheriff Johnson between the 11th and the
20  25th of July, and you said a couple of times maybe?
21  A.    I believe it was not Johnson.
22  Q.    Not Johnson, okay. Do you know -- so were you
23  possibly -- after -- let me ask you this.
24       After you -- after Fernandez dropped off Cedar
25  on July 8th, and then between July 8th and July 28th,

LONG vs.
FERNANDEZ

**Page 249**

1  how many times did you speak with Fernandez?
2  **A.   Same as Melanie. I do not recall.**
3  Q.   You do not recall. But did you speak with him
4  between that period?
5  **A.   I do not recall.**
6  **MR. BRIDGES:** You answered. That's fine. You
7  don't remember.
8  **MR. GORDON:** Q. Okay. So -- yeah, I prefer you
9  say "I do not recall" if you don't remember as opposed
10  to "I don't know" because "I do not recall" means I
11  don't recall.
12  **A.   Okay.**
13  Q.   Okay. And do you have -- you have Lieutenant
14  Fernandez's cell phone number, correct?
15  **A.   I do not.**
16  Q.   You do not now, or you did not then?
17  **A.   I think I had it then. I don't have it now. I**
18  **don't know if -- I don't know his number.**
19  Q.   Okay.
20  **A.   It's not in my --**
21  Q.   It's not in your current phone is what you're
22  saying?
23  **A.   No.**
24  Q.   Do you have the same -- did you delete his
25  number?

**Page 250**

1  **A.   I never added him, I don't believe, as a**
2  **contact. I have not seen it. I lost a lot of stuff**
3  **when I changed my phone number here in -- I don't know.**
4  Q.   Okay. So who gave you the -- you said you were
5  waiting on permission to -- for direction to have Cedar
6  slaughtered, correct?
7  **A.   Yes.**
8  Q.   When it was at your house? Who ultimately gave
9  you the direction to?
10  **A.   I believe it was either Melanie or Kathie.**
11  Q.   Melanie or Kathie. Did -- why do you believe
12  that?
13  **A.   Because that's who -- I don't know. That's who**
14  **the -- my boss -- it wasn't even my boss. The CEO of**
15  **the fair and the owner of the goat.**
16  Q.   Okay. And your understanding was that they were
17  in communication with law enforcement?
18  **A.   Yes.**
19  Q.   And by "law enforcement," I mean the sheriff's
20  office, and you said maybe the sheriff, but it maybe it
21  was the lieutenants as well?
22  **MR. NORTHCUTT:** Objection. Misstates testimony.
23  He never said it was the sheriff. He, in fact,
24  testified he said it wasn't the sheriff. It was the
25  sheriff's department.

**Page 251**

1  **MR. GORDON:** Q. He said -- I thought you said I
2  believe -- you don't believe so, so I'm assuming you
3  mean maybe you don't know who it was? You said they
4  were in communication with --
5  **A.   The sheriff's department.**
6  Q.   The sheriff's department, okay. And the DA as
7  well? Was your understanding?
8  **A.   Yeah.**
9  Q.   Why did you believe that Melanie was in
10  communication with the sheriff's department?
11  **A.   Because she was the CEO. She was the one --**
12  Q.   Did she tell that to you?
13  **A.   I don't know. I don't recall.**
14  Q.   So you're assuming because she's the CEO that
15  she was in communication with the sheriff's department?
16  **A.   Yes.**
17  Q.   Okay. So Melanie or Kathie Muse ultimately gave
18  you authority to kill -- have Cedar sent to slaughter?
19  **A.   I believe so.**
20  Q.   You believe so. About what date did they do
21  that?
22  **A.   I don't recall.**
23  Q.   Where did you -- what date did you arrange for
24  Cedar's slaughter?
25  **A.   I do not recall.**

**Page 252**

1  Q.   All right. One second. Let me -- so maybe this
2  will --
3  **A.   I believe it's in there --**
4  Q.   -- refresh your memory, yeah. So read the
5  second page of text. Said, "Bowman is killing the goat
6  today."
7  **A.   July 28th.**
8  Q.   Okay. So that's the date Bowman Meats came out
9  to your property to kill -- to do Cedar? Okay.
10  So do you remember about -- did you arrange with
11  Bowman's to come out?
12  **A.   Yes.**
13  Q.   Okay. And who did you speak with at Bowman's?
14  **A.   I don't remember her name. Gal in our --**
15  Q.   Serene? Is that her name?
16  **A.   Could be.**
17  Q.   Okay. Is there another woman at Bowman's
18  besides Serene?
19  **A.   I'm not familiar with them, so.**
20  Q.   How often -- you're not familiar with them,
21  okay.
22  How often have you done business with Bowman's
23  prior to this slaughter?
24  **A.   Personally, never. Through the fair, I've**
25  **talked to, I'm guessing the same woman, I talked to her**

Page 253

1  on the phone for the fair.  Years prior.  I don't
2  remember her name.
3  Q.    Okay.  But it might have been Serene?
4  A.    Could have been.
5  Q.    Okay.  Do you know a Serene there?
6  A.    I do not know.
7  Q.    Okay.  All right.
8  A.    I don't know a Serene.  If I saw them on the
9  street, I do not know a Serene.
10 Q.    Okay.  So I just want to be clear for the record
11 here.  So you definitely do not remember speaking with
12 Sheriff Johnson at any point in time between July 8th
13 when Cedar was dropped off and then July 28th when he
14 was killed?
15 A.    No.
16 Q.    Okay.  No memory.  Okay.  And do you remember
17 speaking with him at any point in time before July 8th?
18 A.    I do not remember.
19 Q.    Okay.  But you might have?  Is that what you're
20 saying?
21 A.    No.
22       MR. BRIDGES: Just to clarify, you mean about
23 this case?
24       MR. GORDON: Yes, about this case.
25 Q.    So I'm just curious, BJ, might you have or do

Page 254

1  you --
2  A.    I don't think so.
3  Q.    Okay.  All right.  Okay.  So after Cedar was
4  slaughtered by Bowman's, do you know where his meat
5  went?
6  A.    I think it was a replacement for a goat at the
7  fair.
8  Q.    I understand.  I believe you testified to that
9  before but who -- this produced in discovery.
10       All right.  BJ, that was produced in discovery.
11 I'm not sure if it was produced by you or Ms. Silva, but
12 nonetheless, take a look at it.  We're going to make it
13 G.
14       (Whereupon, Plaintiff's Exhibit G, Invoice
15       from A & R Custom Butchering, totaling 2
16       pages, was marked for identification.)
17       (Pause in proceedings.)
18 Q.    All right.  Are you -- do you understand what
19 that document is?
20 A.    Yeah.
21 Q.    Okay.  All right.  So how would you describe
22 that document?
23 A.    The first one -- I don't know what the first one
24 is, the first bill here.
25 Q.    Okay.

Page 255

1  A.    19.6, is that pounds for goat?
2        Then the second one is kill -- kill charge on
3  August 10th.
4  Q.    Okay.  So is this kill --
5  A.    It says 9-22.  August 10th.
6  Q.    Yeah.  Is this potential -- is this the charge
7  for killing Cedar on your property for -- I know it's --
8  the invoice might be dated 8-10, but is this your
9  understanding this is the --
10 A.    This would be, but it's dated August 10th.
11 Q.    Okay.  Was -- did Bowman kill another goat at
12 your property on August 10th?
13 A.    No, sir.  I do not have any goats.
14 Q.    Okay.  All right.  Oh, you don't have any goats
15 on your property?
16 A.    No.  That was the only one.
17 Q.    All right.  So but this is the company, correct?
18 A.    Yes.
19 Q.    Bowman Meat?
20 A.    Yes.  Well, the front one's A & R.
21 Q.    No, I understand that, but the second page,
22 Bowman Meat.
23 A.    Okay.
24 Q.    Sorry, that was confusing.  The first page --
25 are you familiar with the company, A & R Butchering?

Page 256

1  A.    Yes.
2  Q.    Okay.  Is your understanding that they receive
3  Cedar's cuts after Bowman slaughtered him?
4  A.    No.
5  Q.    No?  Why not?
6  A.    Because the -- trying to remember.  Because the
7  customer who wanted the goat that got replaced was a
8  Bowman Meats customer.
9  Q.    Okay.
10 A.    That bought a goat at the fair that -- however
11 the -- it was their customer, so I believe Bowman did
12 the processing all the way through to when the customer
13 picked up the meat.  My belief.  I didn't --
14 Q.    And how do -- why do you believe that?
15 A.    It was their customer.
16 Q.    I know, but why do you believe that?  What
17 prompted you to believe that?
18 A.    Because the -- I believe Melanie had told me
19 that the customer goat was missing that was supposed --
20 that was -- that customer was supposed to get the goat
21 to Bowman because the way it happens if you buy a goat
22 at the fair -- an animal at the fair, you put what
23 facility you would want it processed at and that
24 customer put they wanted it processed at Bowman Meats.
25 Q.    I see.  Okay.

Page 257

1  A.    So that's where it would.
2  Q.    Do you know what customer this was, though?
3  A.    I do not recall.  No.
4  Q.    How would you find out if you wanted to -- if
5    you wanted to figure that out?
6  A.    Look at the sale records.
7  Q.    Okay.  Did you look at the sale records?
8  A.    No.
9  Q.    Well, how do you know what the customer wanted
10   that -- how do you know the customer wanted this meat to
11   go to Bowman's if you didn't look at the sale records?
12  A.    Because Melanie did.
13  Q.    Melanie did?
14  A.    Yes.  Because at that point I'm not -- I'm never
15   in the office.  I don't have those records with me on
16   me.  Those are her records at that point.  As soon as
17   the fair's over and she's the one that deals with the --
18   and I was just helping out.
19        She deals with the -- there's lots of -- not
20   lots.  There's a few mistakes that happen in
21   recordkeeping along the way in terms of getting the
22   animals to where they need to be so she's the one that
23   has to deal with that and she's the one that told me
24   about this goat missing.
25  Q.    Okay.

Page 258

1  A.    The gentleman not getting his goat.
2  Q.    Okay.  Did she give you the name at the time?
3  A.    I don't.
4  Q.    You don't recall?
5  A.    Don't recall.
6  Q.    Okay.  So Melanie told you then to contact
7    Bowman's to have the goat slaughtered at -- have Cedar
8    slaughtered at your property?
9  A.    To replace it, yes.
10  Q.    Okay.  And it's a mobile slaughter, correct?
11  A.    Yes.
12  Q.    Do you remember if a gentleman by the name of
13   Tennessee came out?
14  A.    I don't recall.
15  Q.    Do you know someone with a mobile slaughter
16   truck named Tennessee?
17  A.    No.
18  Q.    No?  Okay.  All right.  So -- okay.
19        So on the 28th, what happened after Bowman's
20   comes out and slaughters Cedar on your property, then
21   what happens with his cuts?
22  A.    They apparently contacted him, and I have no
23   record of -- I don't -- it's in their hands at that
24   point.
25  Q.    But Cedar was, in fact, killed on your property,

Page 259

1    correct?
2  A.    Yes.
3  Q.    Okay.  And Bowman's took his body?
4  A.    Correct.
5  Q.    Okay.  All right.  And would Bowman's have
6    butchered him or cut him up?  Is that their job as well?
7  A.    Process them, yes.
8  Q.    Process them as well.  Slaughter and process,
9    okay.  All right.  Okay.
10        So -- all right.  I have a question and I asked
11   you -- I know we went over the sheriff thing several
12   times but when I asked you -- when I asked you how many
13   times, it's on page 207 of your deposition, "Do you know
14   how many times between that period you talked with
15   Sheriff Johnson and the DA between the 11th and 25th,"
16   and you responded, "A couple of times," is there any
17   reason you didn't correct that testimony afterwards in
18   your transcript?
19        MR. BRIDGES: Did you -- let me just ask.  Did
20   you ever review your transcript for the opportunity to
21   make changes?
22        THE WITNESS: No.
23        MR. BRIDGES: Yeah, I don't think I ever sent it
24   to him to even do that because I figured we were coming
25   back here and you'd be able to talk to him and the

Page 260

1    deposition's not concluded yet, so.  So that's me not
2    him.
3        MR. GORDON: Okay.  Okay.  Legally, I think
4    that's -- I understand you get an opportunity for today,
5    but legally, that's still final testimony.
6        MR. BRIDGES: I understand, but I'm just saying
7    I don't think I gave him the opportunity to make the
8    change is my point.
9        MR. GORDON: Okay.  All right.
10        MR. BRIDGES: So blame me for it.  It's not him.
11        MR. GORDON: Q.  Okay.  So after Bowman's
12   slaughtered Cedar, did you contact Melanie or Kathie to
13   let them know it was done?
14  A.    I believe I did, yeah.
15  Q.    Okay.  You believe you did?
16  A.    By reading this text, yes.
17  Q.    Okay.  Did you call Kathie and let her know it
18   was done?
19  A.    Looks like it was a text message.  I could have
20   called her too.  I do not recall.
21  Q.    Okay.  If Kathie -- I have a question, though.
22   Kathie received a replacement goat, correct, for the
23   barbecue?
24  A.    No.  Not to my -- that's not my -- I don't
25   believe so.

Page 261

1 Q.   Well, let me ask you.  Cedar wasn't going to
2 Kathie, you testified to that, correct?
3 A.   No.
4 Q.   So why at this point in time --
5 A.   Yes.  I'm -- yes, the goat did not go to Kathie.
6 Q.   Okay.  So why at this point in time did you
7 believe Kathie was the owner?
8 A.   Because she was -- that goat was destined for
9 the barbecue.  And she was the coordinator, or I'm not
10 sure her position, but she was the one in charge of
11 that.  And that's why --
12 Q.   Did Kathie direct you to give this goat to
13 another person then?
14 A.   She was fine with that.  Melanie might have
15 talked to her.  I think somebody was -- yeah, she was
16 fine with it.
17 Q.   So you're not aware of Kathie getting
18 replacement meat for the barbecue?
19 A.   No.
20 Q.   Okay.  But earlier you said that Cedar was
21 replacement meat for someone who bought at the auction?
22 A.   I'd have to -- trying to recall.  Yes.
23 That's -- which I'm not sure of how that took place.
24 Q.   Okay.
25 A.   On Kathy's end.

Page 262

1 Q.   You understood that Cedar was someone's
2 replacement meat, but you also understood that Kathie
3 was the owner, correct?
4 A.   Yes.
5 Q.   Okay.  Okay.  And did you ever talk to -- your
6 text mentions the DA as well.  Did you ever talk to the
7 DA?
8 A.   No.
9 Q.   Okay.  Do you know who the DA is or was at the
10 time?
11 A.   It was a woman.
12 Q.   Okay.  And you never spoke to on the phone?
13 A.   No.
14 Q.   Okay.  All right.  So when your text here
15 mentions waiting on permission from -- one moment.
16 I know that you when you say waiting on
17 permission -- wait -- sorry, I beg your pardon.  Talk to
18 sheriff.  To wait until he talks to DA.
19 So your -- I know you testified that this -- you
20 didn't know what sheriff you were referring to was
21 probably Fernandez, you believe.  But -- and this is G
22 I'm pointing to right now.
23 So it was your understanding that whichever
24 sheriff -- person from the sheriff's department you were
25 speaking to was waiting to talk to the DA at that time?

Page 263

1 A.   And that's what I believe --
2 MR. NORTHCUTT: Objection.  Misstates the
3 testimony.
4 MR. GORDON: What was your understanding?
5 MR. BRIDGES: Did you have an understanding, or
6 are you just guessing?
7 THE WITNESS: That's why I'm saying I'm guessing
8 that that night when he dropped it off, he said to hold
9 on to it till --
10 MR. GORDON: Q.  But -- okay.  BJ, this text is
11 three days after he dropped it off, though.  So at that
12 point in time what was your understanding?
13 A.   To wait till I hear from Kathie or Melanie or
14 somebody of authority.
15 Q.   Okay.  Was it your understanding that Kathie or
16 Melanie were talking with the sheriffs for permission
17 for you to have Cedar killed?  When I say, "sheriffs," I
18 mean the department.
19 MR. NORTHCUTT: Ryan, are you saying the
20 sheriff's department or --
21 MR. GORDON: Yeah.  Yeah, I just said that at
22 the end, Damian, when you started talking.  Sheriffs
23 broadly I mean on that question.
24 Q.   Was it your understanding that Kathie --
25 Kathie -- or that Kathie and Melanie were waiting on

Page 264

1 permission from the sheriffs, broadly speaking, to --
2 and the DA to -- for permission to kill Cedar?
3 A.   Yes.
4 Q.   Okay.  All right.  So after July 11th, did you
5 talk to anyone at the sheriff's department?
6 A.   I don't recall.
7 Q.   Okay.  But you might have?
8 A.   There's a possibility, yes.  But I have no --
9 when the goat was killed July -- what was the date,
10 28th.
11 Q.   Okay.
12 A.   I don't recall.
13 Q.   Okay.  You don't recall.  So how did you know
14 when to call Bowman's to set up the slaughter?
15 A.   I think it was between Melanie and Kathie.
16 Q.   Okay.
17 A.   Touching bases with each other.  And --
18 MR. BRIDGES: You've answered.  Go ahead.
19 MR. GORDON: Q.  So you knew to call because it
20 was between Melanie and Kathie touching bases with each
21 other, correct?
22 A.   Yes.
23 Q.   And did any of them tell you that the sheriff
24 had -- by sheriff, Damian, don't need to object.  I'm
25 saying sheriffs broadly.  Had given a green light to

Page 265

1   kill Cedar?
2   A.      That would --
3           MR. NORTHCUTT: Can we use sheriff's department
4   instead of sheriffs broadly?
5           MR. GORDON: Sure.  Sure.  Anyone at the
6   sheriffs -- did anyone at the sheriff's department -- is
7   it your understanding that -- that someone at the
8   sheriff's department told Melanie or Kathie that it's
9   okay to proceed with slaughtering Cedar?
10          MR. BRIDGES: Calls for speculation.  If you
11  have a basis for it, you can answer.
12          MR. GORDON: I'm not asking him to speculate.
13  I'm asking if it's his understanding.
14          THE WITNESS: I don't know.
15          MR. GORDON: Q.  Well, why did you mention in
16  your text waiting on them if that wasn't -- if you
17  weren't -- if you --
18  A.      Because I believe the sheriff's department was
19  in contact with Melanie or Kathie.
20  Q.      Okay.  How could -- now, you updated Kathie on
21  the slaughter date, correct, on the 28th?
22  A.      (Nods head up and down.)
23  Q.      So how could Kathie have -- why are you updating
24  Kathie on what day he's going to be slaughtered if she
25  told you to go ahead and do it?

Page 266

1   A.      I was just letting her know.  Because it was a
2   couple days that we were waiting, I believe.
3   Q.      But shouldn't she already know if -- if Kathie
4   already is the one talking to the sheriff and Melanie,
5   shouldn't she already know that you can go ahead and
6   slaughter him?
7   A.      I think we were waiting -- the dates -- Bowman
8   couldn't get to it for several, a week maybe.  I don't
9   remember the timeline, but they could not get to it
10  right away.
11  Q.      So you, based on what you said, did you get a --
12  and I'm saying -- you know what I mean by green light,
13  permission.  Did you get permission from Kathie or
14  Melanie a week -- strike that.
15          Cedar was slaughtered on the 28th, correct?
16  A.      Yes.
17  Q.      Okay.  And did you get permission from Kathie or
18  Melanie, is it your testimony, that it was approximately
19  a week beforehand?
20  A.      A guesstimate, yes.
21  Q.      Yes, okay.  That's fine.  That's your best
22  estimate --
23  A.      Yes.
24  Q.      -- a week beforehand?
25          So it's your testimony that sometime between

Page 267

1   July 11th and July 28th, Melanie or Kathie told you to
2   have Cedar slaughtered?
3   A.      Yes.
4   Q.      Okay.  But likely, a week before July 28th
5   because you needed to arrange with Bowman's?
6   A.      Yes.
7   Q.      I think I -- I think I asked you this, but feel
8   free to answer again just so I'm clear.  So is it your
9   testimony that between July 11 and July 28th, you did
10  not speak with anyone at the sheriff's department?  Or
11  the DA's office -- well, let's start with the sheriff's
12  department.
13          MS. SHAKIB: Can you restate the question?
14          MR. GORDON: Is it your testimony that between
15  July 11th and July 28th, you did not speak with anyone
16  at the sheriff's department?
17          MR. BRIDGES: Asked and answered.  Go ahead.
18          THE WITNESS: I don't recall.
19          MR. GORDON: Okay.  Is it your testimony that
20  between July 11 and July 28th, you did not speak with
21  anyone at the DA's office?
22          MR. BRIDGES: Asked and answered.  Go ahead.
23          THE WITNESS: No.
24          MR. NORTHCUTT: Join.
25          MR. GORDON: Q.  By -- and you said "no."  Is

Page 268

1   that what you --
2   A.      The DA's office.
3   Q.      By "no," you mean, no, I did not speak with
4   someone, or, no, that is not my testimony, I did speak
5   with someone?  There's a double negative there.
6   A.      I do not recall speaking to anyone from the DA's
7   office.
8   Q.      During that time period of July 11 to July 28th?
9   A.      Yes.
10  Q.      Okay.  But what about prior to July 11th?
11  A.      No.  Do not recall speaking with anyone at the
12  DA's office.
13          MR. GORDON: Okay.  Okay.  Let's take five.
14          THE VIDEO SPECIALIST: We're off the record, and
15  the time is 8:56.
16          (Whereupon, a break was taken from 8:56
17  till 9:07 a.m.)
18          THE VIDEO SPECIALIST: We're back on the record,
19  and the time is 9:07.
20          MR. GORDON: Q.  All right.  Mr. Macfarlane, so
21  just trying to clean up some of the testimony here, so
22  I'd prefer if you answer "correct" or "incorrect" as
23  opposed to -- I know your answer earlier was "I don't
24  know," but these are going to be phrased as "correct" or
25  "incorrect" if I'm clarifying your testimony correctly,

Case 2:22-cv-01527-DAD-AC   Document 118-4   Filed 11/15/24   Page 14 of 60

LONG vs.                                                                B.J. MACFARLANE - Vol. 2
FERNANDEZ                                                                        February 9, 2024

Page 269

1   all right?
2       Okay.  So it's your testimony that after Cedar
3   was dropped off at your house on the evening of July
4   8th, and between July 8th and July 28th, either Melanie
5   or Kathie told you to have Cedar slaughtered, correct?
6   A.    Correct.
7   Q.    All right.  So it's your testimony that after
8   Cedar was dropped off at your house on the evening of
9   July 8th, between that date and July 28th, you did not
10  speak with anyone at the sheriff's department; correct
11  or incorrect?
12  A.    Incorrect.  Say that again.
13  Q.    Okay.  So between the time that Cedar was
14  dropped off on July 8th through July 28th, it's your
15  testimony that you did not speak with anyone at the
16  sheriff's department; correct or incorrect?
17  A.    Incorrect.  I believe I said I don't recall.
18  Q.    So you might have?
19  A.    Yes.
20  Q.    Okay.  And it's your testimony that you've never
21  spoken with Michael Johnson, Sheriff Michael Johnson,
22  regarding Cedar the goat; correct or incorrect?
23  A.    Correct.
24  Q.    And it's your testimony that you do not know who
25  received Cedar's meat; correct or incorrect?

Page 270

1   A.    Correct.
2   Q.    Do you know by chance who -- I know you said you
3   don't know who received it, but are you thinking of it's
4   an individual human being that received it, or is it a
5   company?  What is your understanding?
6   A.    That's -- there's 300, 400 buyers.  I don't --
7   it could be a company.  It could be a person.
8   Q.    Okay.  So you don't know who ultimately ate
9   Cedar?
10  A.    No.
11  Q.    Okay.  All right.  So it's your testimony that
12  you do not know what happened with Cedar after he was
13  slaughtered and removed from your property by Bowman's;
14  correct or incorrect?
15  A.    Correct.
16  Q.    So is it your testimony or is it -- it's your
17  testimony that everything you have done with respect to
18  Cedar was at the direction of either Lieutenant
19  Fernandez, Kathie Muse or Melanie Silva; correct or
20  incorrect?
21  A.    MR. NORTHCUTT: Objection.  Misstates the
22  testimony.
23  THE WITNESS: Sheriff's department.  I don't --
24  MR. GORDON: Q.  Well, who else at the sheriff's

Page 271

1   department besides Lieutenant Fernandez?
2   A.    I don't know.  I don't -- do not recall.
3   Q.    Who else might it have been?
4   A.    Well, to my recollection, it would be Kathie or
5   Melanie.
6   Q.    Okay.  But a moment ago I just said it's your
7   testimony that everything you've done in connection with
8   Cedar was at the direction of either Lieutenant
9   Fernandez, Melanie or Kathie, and you said, "correct"?
10  A.    Yes.
11  Q.    And Mr. Northcutt objected to Fernandez.  Is
12  it -- should Fernandez not be included in that then?
13  MR. BRIDGES: Well, other than what he testified
14  to before about when Fernandez dropped him off?  And
15  told him --
16  MR. GORDON: Yeah, that's why I said everything
17  with respect to Cedar.
18  THE WITNESS: That night, yeah.
19  MR. GORDON: Q.  Okay.  And Fernandez gave you
20  no directions afterwards?
21  A.    No.
22  Q.    Okay.  Is it your testimony that the only time
23  you ever spoke with anyone at the sheriff's department
24  about Cedar was at the drop-off when he was dropped off
25  at your house?  On July 8th?

Page 272

1   A.    I do not recall.  I know it was that night.  I
2   don't recall.
3   Q.    Did you speak -- that's what I'm asking.
4       Is it your testimony that you spoke with someone
5   at the sheriff's office at some other point in time?
6   A.    I do not recall.
7   Q.    So, no, it's not your testimony?  What I'm
8   asking is it your testimony that you spoke with anyone
9   at the sheriff's department at some point other than the
10  drop-off?
11  A.    I don't recall if I did.
12  Q.    So John, do you want to help him out here?  It's
13  not your testimony then?
14  MR. BRIDGES: Well, I think that's what he's
15  saying.
16  MR. GORDON: When he's saying, "I don't recall,"
17  he's not answering the question, so move to strike,
18  nonresponsive.  Is it -- if you --
19  MR. BRIDGES: I think the issue is -- I'm not
20  trying to argue with you about this.  He doesn't have to
21  answer the question the way you want him to.  I think
22  you asked, and he said he doesn't recall.  He is
23  giving -- he's trying to give you the answer.
24  MR. GORDON: Well, it's a yes or no question, so
25  maybe you don't need to say "correct" or "incorrect,"

Page 273

1  but "yes" or "no" is fine too.
2       So is it your -- is it your testimony that you
3  did not speak with anyone at the sheriff's department
4  apart from when Fernandez dropped off Cedar at your
5  property?
6       MR. BRIDGES: Is that your testimony?  Are you
7  saying --
8       THE WITNESS: No.
9       MR. GORDON: Q.  No.  Well, no, stop at "no,"
10 okay.  And so what are you saying?  Are you saying you
11 might have spoken to someone at some other point in
12 time?  Is that accurate?
13 A.    Possibility.
14 Q.    Okay.  So you don't recall speaking with a lot
15 of people.  But you do -- you do know for sure you
16 didn't speak with Sheriff Johnson; is that accurate?
17 A.    To my recollection.  Correct.
18 Q.    Let's go through some -- so Mr. Macfarlane, I'm
19 going to hand you -- I'm going to hand you some phone
20 records, and I've highlighted some numbers here.
21      So John, the full packet is like 180 pages.  I
22 only picked out the pages where I could find numbers
23 that I'm aware of.  So I'll send you the whole thing, of
24 course.
25      But BJ, these are your phone records from AT&T

Page 274

1  from a subpoena that went out.  We're not going to let
2  all your calls go out.  This will be redacted, but we're
3  going to -- so don't worry about that.  So and I don't
4  quite frankly care who you talk to aside from this case
5  at all.
6       So but I do want to go over some dates and times
7  of people that you spoke with.  So I know this doesn't
8  say the person but I'm going to -- I know whose numbers
9  they are from testimony, so we're going to go over a few
10 of them, okay.
11      So I'm going to hand you -- Madame Court
12 Reporter, we're going to make this an exhibit.  However,
13 I would -- if this is possible, I'm going to, I spoke
14 with John about this, redact all the numbers on here and
15 then send it to you if that's okay.  So this is going to
16 be Exhibit H, and I'll send it to him beforehand so he
17 can say, yes, that's the exhibit.
18      But it will be -- so she's not taking this home
19 with her today.  Or you can.  You can have the paper, it
20 doesn't matter, but I'm going to send you a digital
21 version that will have everything redacted except the
22 numbers we discussed.
23      MR. BRIDGES: Can we just go off the record?
24      MR. GORDON: Sure.
25      MR. BRIDGES: Do you have to read us off if we

Page 275

1  do that?  I was just going to ask if the court reporter
2  it's easier for her to take the paper copy today just so
3  she has a placeholder.
4       MR. GORDON: Yeah.
5       MR. BRIDGES: If that's necessary, that's fine.
6  We can just replace it later.
7       MR. GORDON: I don't care.  That's fine.  I'll
8  send you a replacement one later.
9       MR. BRIDGES: Whatever's easier.
10      (Whereupon, Exhibit H, AT&T Phone records
11      dated 6-25-22 through 9-1-22, was marked
12      for identification.)
13      MR. GORDON: Q.  Okay.  So Mr. Macfarlane, I'm
14 going to go over these in order, and here you go.
15      So you'll see highlights on them, so you'll see
16 incoming, outgoing.  So you recognize your cell phone at
17 the time and then another number to call, correct?
18 A.    Yes.
19 Q.    All right.  So the 005 -- the number highlighted
20 here, the 0058 number, do you see that?  That's the last
21 four digits?
22 A.    Yeah.
23 Q.    Okay.  That's Ms. Muse's cell phone number.  Is
24 that -- that's what he testified to that that is her
25 cell phone number.  Does that look familiar to you?  You

Page 276

1  can check your phone if you want to.
2  A.    Yes.
3  Q.    All right.  One second.
4       MR. BRIDGES: Do you have your cell phone with
5  you?
6       THE WITNESS: Yeah.
7       MR. BRIDGES: Okay.  Just make sure if he asks
8  you any questions about numbers, if you need to
9  reference your phone, I'm sure that's okay just to
10 confirm who people are if you need to do that.
11      MR. GORDON: Q.  Sure.  So if you want to check
12 her cell phone number to verify.  At least at the time
13 it was 0058, and I can pull up her deposition transcript
14 so there's no objection.
15 A.    That's not the number I have.
16 Q.    The 530-903-0058?  I don't know if it's her
17 cell, but it's one of her numbers.
18 A.    It's her business.
19 Q.    The business, okay.  That is -- you recognize
20 that as her number?
21 A.    Yeah.
22 Q.    Okay.  Okay.  So you spoke with her on it looks
23 like July 25th.  And this would have been the day Cedar
24 was removed.  The timestamp -- the first timestamp on
25 page two is earlier in the day.

Page 277

1  A.     Yeah.
2  Q.     So --
3         MR. BRIDGES: Just real quick. June 25th.
4         MR. GORDON: I'm sorry. Yes, June 25th.
5         MR. BRIDGES: You just said, "the 25th." I want
6  to make sure we're --
7         MR. GORDON: Yeah, June 25th. I don't know if I
8  said "July."
9  Q.     Okay. So this gel with your memory, you
10  speaking with her on it would have been the Saturday of
11  the fair?
12  A.     Yeah. It says I did. I don't recall.
13  Q.     And then you spoke with her, if you want to flip
14  the page, looks like there's another highlight at the
15  bottom, you spoke with her later in the evening as well.
16  It's the very last entry on the page.
17  A.     Yeah.
18  Q.     You would have been speaking with her at that
19  time because of the fair frequently, though, yes?
20  A.     Yeah. Something about the sale.
21  Q.     Okay. All right. So and the next page as well,
22  looks like you had a few more contacts with her the same
23  day, June 25th, correct?
24  A.     Yeah.
25  Q.     Next page. So this is, again, Ms. Silva's

Page 278

1  number. This is -- now this is the next -- this is the
2  looks like the morning about 3 a.m. you tried calling
3  her?
4         MR. BRIDGES: You just said, "Ms. Silva's
5  number." Do you mean Ms. Muse?
6         MR. GORDON: No, no, Ms. Silva's. We're still
7  on Silva's number, the 0058.
8         THE WITNESS: I need to -- I thought you said
9  that was Muse's number.
10         MR. GORDON: Did I say Muse's? I thought I said
11  Silva.
12         MR. BRIDGES: I was confused, I'm sorry.
13         THE WITNESS: I was looking up Kathie Muse's
14  number. Yes, that is Melanie Silva's number.
15         MR. GORDON: Q. Melanie Silva's number, okay.
16  Okay. So for the record, all the numbers we've been
17  looking at are Ms. Silva, okay.
18         So looks like you're speaking with her, you
19  know, early in the morning, or at least you called her
20  early in the morning, on it would have been
21  Sunday, a few hours after Cedar was removed?
22  A.     I called her about the goat, I'm guessing.
23  Q.     Okay. Do you remember if you spoke with her, it
24  would have been 4 a.m. or so; do you remember?

Page 279

1  A.     Do not recall.
2  Q.     Flip the page, BJ. So looks like we're on the
3  15th now. So this is a different number. This is -- do
4  you see the number I have highlighted, BJ?
5  A.     On page 15?
6  Q.     Yeah. Now, the last four digits are 6789. It's
7         ▓▓▓▓▓▓▓. Looks like that number called you. That
8  is the office line for the fair, correct?
9  A.     Yeah.
10  Q.     If you need to check, you can go -- you can go
11  check. I believe that's the office number of the fair.
12         MS. SHAKIB: Mr. Macfarlane, is your copy
13  showing highlights?
14         THE WITNESS: Yeah. It's faded, but.
15         MS. SHAKIB: Okay.
16         MR. GORDON: Q. All right. So on 6-27 you
17  had -- do you recall having a conversation with Ms.
18  Silva on 6-27?
19  A.     I don't recall. It shows I did, but I do not
20  recall.
21  Q.     But you remember talking with her around that
22  time regarding Cedar, correct?
23  A.     I'm sure I did. I do not recall our -- we
24  talked -- I think it was frantic at that point. Yeah,
25  it shows that I did talk to her, yes, but I don't

Page 280

1  recall.
2  Q.     But that's consistent with your memory that you
3  spoke with her on -- on or about June 27th --
4  A.     Yes.
5  Q.     -- regarding Cedar, correct?
6         And you testified, or is it your testimony that
7  you were at this time keeping her apprised of everything
8  that was going on with your communications with Ms. Long
9  and Cedar?
10  A.     Yes.
11  Q.     So go to the next page, which I believe is page
12  19. This is June 28th now. It looks like the first
13  two calls highlighted, which are the item 299 and 300
14  were from the office line again.
15         And then looks like you've got the following two
16  ones, entry 301 and 302, are calls between you and --
17  Ms. Silva and you from her cell phone, her business
18  number, whatever the 0058 number.
19         So do you recall speaking with Ms. Silva on the
20  28th? Of June?
21  A.     I'm sure I did, yes.
22  Q.     And you would have been discussing the Cedar
23  situation, correct?
24  A.     As -- yeah. Yeah.
25  Q.     Yes?

Page 281

1  A.    Yes.
2  Q.    That's fine.  Okay.  And looks like on 307 you
3  had another call with her.  Entry item number 307.  This
4  is the office line now.  So another call with her.  The
5  same deal.  You're just keeping her apprised of what's
6  going on, correct?
7  A.    And we have -- it's -- it's common that after
8  junior livestock auction trying to get everything done
9  in the show there's other conversations as well.
10 Q.    Okay.  All right.  And so same testimony, the
11 next page you have another call with her on looks like
12 about 6 p.m. on June 28th.  And again, you're -- you're
13 keeping her apprised of Cedar at this time and maybe
14 some other issues with the auction, correct?
15 A.    Yes.
16 Q.    Next page.  Same -- same thing.  It's another
17 call with Melanie Silva, item 331.
18        So same testimony, you're still just keeping her
19 apprised of Cedar and the other issues of the livestock
20 auction?
21 A.    Yes.
22 Q.    Were there any other issues by 6-28 with the
23 livestock auction?  To discuss with her?
24 A.    Nothing as major as this, no.
25 Q.    So it was mainly the Cedar conversations?

Page 282

1  A.    Yes.
2  Q.    Do you recall anything she told you during these
3  phone calls?
4  A.    No.
5  Q.    But do you know at this time that she was
6  talking with CDFA?
7  A.    Yes.
8  Q.    Okay.  Okay.  You can go to the next page.
9        So this is -- now we're on -- we're on June 29th
10 now.  Looks like you've got several calls with Ms. Silva
11 on the 0058 number.  And June 29th -- I'm sorry, we're
12 on June 29th.  It's item 415, 416, 417, 418.
13        Now, on June 29th, Ms. Silva reported -- or sent
14 Fernandez documents for the investigation, that's your
15 understanding, correct?
16 A.    Yes.
17 Q.    So on this date and time would you have been
18 talking with Ms. Silva again about the Cedar situation
19 on June 29th, 2022?
20      MR. BRIDGES: Calls for speculation.  If you
21 remember, go ahead.
22      THE WITNESS: I assume so.
23      MR. GORDON: Q. Okay.  You believe so because
24 that was the only -- that was the only outstanding issue
25 with the fair at this point in time that you were

Page 283

1  working for for the 2022 fair?
2  A.    I assume so, yes.
3  Q.    Yes?  Okay.  Go to the next page.  Again, more
4  calls.  Now this looks like 5 p.m. or so.  Your
5  understanding is you're just discussing Cedar with her
6  again at this point in time?  This is on -- again, more
7  calls on June 29th.  I'm looking at item 436, 437, 438.
8  More calls to Ms. Silva about the same, Cedar most
9  likely, correct?
10 A.    Most likely.
11 Q.    But that's your best estimate, correct?
12 A.    Correct.
13 Q.    All right.  Next page.  All right.  So we have
14 another call with -- on the 29th with -- between Ms.
15 Silva.  It's the 0058 number again.  So again, more
16 Cedar conversations is your best estimate, correct?
17 A.    Correct.
18 Q.    Next page.  All right.  So then we flash forward
19 to July 8th.  Is that the dates you're looking at for
20 highlights, BJ?
21 A.    Yeah.
22 Q.    So now this [ ] number, who is this?  Is that
23 Kathy's number, BJ, [ ] I believe it is, but you tell
24 me.
25 A.    Yeah.

Page 284

1  Q.    Yeah, okay.  All right.  So on July 8th you're
2  talking with Ms. Muse by cell phone looks like.  Do you
3  recall the content of that conversation, looking at item
4  648 on the phone records?  Do you recall the content of
5  this conversation with Kathie Muse?
6  A.    That would have been -- the content would have
7  been over the goat.
8  Q.    Okay.  And did she -- what instructions, if any,
9  did Ms. Muse provide you in this conversation?
10 A.    I do not recall.
11 Q.    What do you believe them to be?
12 A.    I couldn't even guesstimate what this call was
13 about, I mean.
14 Q.    Well, this is -- I'll refresh your memory.  This
15 is the date -- July 8th is the date Cedar was delivered
16 to your house so -- so do you recall her telling you
17 that the sheriffs were going to acquire Cedar that day
18 and bring him to you?
19 A.    I assume that's what the conversation was.
20 Q.    Okay.
21 A.    That was the date.
22 Q.    That was the date.  Do you have a memory of that
23 conversation?  Doesn't have to be crystal clear your
24 memory but your best estimate is that conversation
25 occurred and it would have been around this time; is

Page 285

1   that correct?
2 A.   Yes.
3 Q.   Okay.  So this phone call is -- you believe this
4   phone call is when that occurred, correct?
5 A.   Yes.
6 Q.   Okay.  All right.  Go to the next page.  Okay.
7   So same number.  This is July 8th again.  I'm looking at
8   item 682.  You're on page 43?
9 A.   43.
10 Q.   Yeah, okay.  So looks like this call is Kathie
11   late at night.  It's 11:18 or so.  So she called you.
12   Do you remember what she was telling you at that call?
13 A.   No.
14 Q.   Did it concern dropping Cedar off at your house?
15 A.   I would assume so if it was at 11 o'clock at
16   night.
17 Q.   Do you remember having a call regarding -- late
18   at night when Kathie Muse regarding Cedar at some -- on
19   some date around this time?
20 A.   No.  I don't recall.  It's here in front of me,
21   I can see that, but I do not recall the exact phone
22   call.
23 Q.   Okay.  But this call would have been about the
24   delivery of Cedar to your property, correct?
25 A.   Yes.

Page 286

1 Q.   Okay.  Do you recall at that -- about the time
2   that Cedar was delivered to your property what
3   instructions Ms. Muse gave you?
4 A.   I believe it was just taking care of it.
5 Q.   I understand.
6 A.   Yeah.
7 Q.   Is that all -- is the only instruction -- so is
8   the only instruction she gave you was to take care of it
9   at that point in time?
10 A.   I believe so.
11 Q.   Okay.  Did -- what instructions did you have
12   from Melanie Silva at that point in time?
13 A.   To house the goat.
14 Q.   Okay.  And did they give you any other
15   instructions?
16 A.   Not that I recall.
17 Q.   Did they tell you -- but they did tell you to
18   wait on them for directions from them on what to do with
19   it, correct?
20 A.   Yes.
21 Q.   Okay.  So you can go to the next page, BJ.  So
22   July 9th looks like you have another conversation with
23   Kathie Muse.  This -- more discussions about Cedar
24   presumably.  Is that your recollection?
25 A.   Yes.

Page 287

1 Q.   Okay.  And this is -- I'm referring to item 711,
2   to 715, 716, 717 and then 718.  It's all Kathie Muse
3   calls.  So you were talking with her on the 9th about
4   Cedar, correct?
5 A.   Correct.
6 Q.   Okay.  And then on July -- you can flip the
7   page, BJ.  Looks like you have another call with Ms.
8   Muse on July 11th.  And so this is now you've had Cedar
9   for a few days by July 11th.  Do you see the item number
10   725 on the highlight, BJ?  Do you see that?
11 A.   Yes.
12 Q.   Do you recall what this conversation concerned
13   on July 11th, 2022?
14 A.   I'm assuming it's over the goat.
15 Q.   Your best memory is it's over Cedar?
16 A.   Yeah.
17 Q.   Okay.  And did Ms. Muse give you any
18   instructions with respect to Cedar on this call?
19 A.   No.  I don't believe so.
20 Q.   But previously had she given you instructions to
21   just hold him?  Is that your memory?
22 A.   That's my memory.
23 Q.   Okay.  So at this point in time are you just
24   giving her updates?
25 A.   I don't recall.

Page 288

1 Q.   But it would have concerned Cedar is your best
2   estimate?
3 A.   Yes.
4 Q.   Go to the next page.  So 7 -- we're now on July
5   13th.  Again, you're speaking with Ms. Muse.  And do you
6   recall this conversation on July 13th?
7 A.   I do not recall.
8 Q.   At this point in time, though, Ms. -- it's your
9   understanding that Ms. Muse and Ms. Silva are in
10   communication, correct?
11 A.   Yes.
12 Q.   Okay.  And it's also your understanding that
13   they're in communication with someone at the sheriff and
14   the DA's office, correct?
15     MR. BRIDGES: Calls for speculation.  But if you
16   know, you can answer.
17     MR. GORDON: I'm just asking his understanding.
18     MR. NORTHCUTT: I'm going to join that
19   objection.
20     THE WITNESS: I have no -- I have no
21   recollection of them being in contact with them.  I have
22   no idea if they were or not.
23     MR. GORDON: BJ, I'm not asking if you witnessed
24   a call.  I'm saying at this point in time when you made
25   this call, it was your understanding that they were.

LONG vs.
FERNANDEZ

---

Page 289

1   MR. BRIDGES: I think that is calling for
2   speculation. You're asking him to -- you're asking him
3   to speculate about what he thinks these other people
4   were doing.
5   MR. GORDON: He texted it earlier on -- two days
6   earlier that -- so he had information from somewhere.
7   I'm asking what his understanding was.
8   MR. BRIDGES: Okay.
9   MR. GORDON: Your understanding at this point in
10  time was that Silva and Muse were in communication with
11  someone at the sheriff's office and the DA, correct?
12  MR. NORTHCUTT: I'm going to join in the
13  speculation objection.
14  MR. BRIDGES: Just to be clear, Ryan, I'm more
15  concerned that he's speculating without realizing what
16  it is you're trying to get from him.
17  MR. GORDON: I'm just asking what his
18  understanding was at the time. Not to speculate now as
19  to what happened. I'm saying at the time what did you
20  think.
21  MR. BRIDGES: Okay.
22  THE WITNESS: At the time I thought -- I mean, I
23  guess the whole time it was Kathie Muse's goat.
24  MR. GORDON: Q. Okay. But did you
25  understand -- at the time you were under the impression

---

Page 290

1   that it was -- that Kathie and Ms. Silva were
2   communicating with the sheriff's department?
3   A.   I do not know.
4   Q.   You did not have any impression at that time one
5   way or the other about that?
6   A.   No.
7   Q.   BJ, why did you put it in a text message then?
8   A.   That's what the sheriff's office told me that
9   night I'm guessing. That's --
10  Q.   Okay. So you put this in the text message three
11  days after Cedar was dropped off because you -- based on
12  something Lieutenant Fernandez said that evening?
13  A.   Yes. Because I was -- yeah. We did -- I
14  don't --
15  MR. BRIDGES: I think the confusion here is
16  you're asking him was it your belief that they were
17  talking to each other. His answer is he has no personal
18  knowledge of whether they were or not which I think
19  you're just talking cross purposes.
20  MR. GORDON: Okay. I'm not asking -- I'm just
21  asking what his belief was. I'm not asking -- I'm not
22  asking what -- you know, and if it was based off
23  something Fernandez said that evening like hold it, you
24  know, I'll talk with Melanie and the sheriff himself or
25  the DA, whoever, I don't know who, but did you have a

---

Page 291

1   belief that, and it could be based off something that
2   Fernandez said, but did you have a belief when you're
3   talking to Kathie Muse during these conversations on
4   July 13th, July 11th that we've been going over that
5   Muse and Silva were in communication with the sheriff's
6   department -- someone at the sheriff's department and
7   DA?
8   THE WITNESS: I have no recollection. I don't
9   know.
10  MR. GORDON: Q. You don't recall if you
11  believed it at the time?
12  A.   I think I -- I believed that Kathie Muse owned
13  this goat is what I --
14  Q.   But did you believe they were waiting from
15  someone at the sheriff's department, for example, to
16  give them the green light to have Cedar killed?
17  A.   They could have been.
18  Q.   But was that your understanding at the time?
19  That's all I'm asking, BJ.
20  A.   They could have been, yeah. I --
21  Q.   So, yes, that was your understanding?
22  A.   It could have been.
23  Q.   That they could have been, okay.
24  So -- so is this text message then from
25  something -- based off something -- I'm looking now, for

---

Page 292

1   the record, I'm pointing to the July 11th text message.
2   Is this from -- your statement here about talk to
3   sheriff and he said to wait until he talks to DA before
4   we kill goat, is this based off something Fernandez said
5   to you on July 8th? Is that your testimony?
6   A.   I believe so, yes.
7   Q.   Okay. So that is your testimony, yes?
8   A.   (Nods head up and down.)
9   Q.   Okay. What did he say to you that evening?
10  A.   To hold the goat. That's -- I was housing the
11  goat. I housed it.
12  Q.   Hold the goat until you hear from --
13  A.   I was housing it till I heard further from
14  either Kathie or Melanie.
15  Q.   Okay. So he told you to house the goat until
16  you heard further from Kathie or Melanie? That's your
17  testimony, correct?
18  A.   Yes.
19  Q.   Okay. Is there -- why did you wait three days
20  to share that information with Kathie by text?
21  A.   Because I believe I was out of town. July -- I
22  could have been out of town. I was -- I don't know.
23  Q.   You were out of town, but you had Cedar under
24  your care?
25  A.   Yes.

---

Page 293

1 Q.   Who was taking care of him?
2 A.   **My father.**
3 Q.   Okay.
4 A.   **At the house right next to him.**
5 Q.   Okay.  So you spoke with Ms. Muse, we just went
6 through the call log --
7 A.   **Yeah.**
8 Q.   -- several times before this -- while you had
9 Cedar before -- after -- strike that.
10      You spoke with Ms. Muse several times after
11 Cedar was dropped off between sending this text on July
12 11th, though, correct?
13 A.   **Yes.**
14 Q.   By phone, correct?
15 A.   **(Nods head up and down.)**
16 Q.   Why didn't you tell her this content over --
17 over the phone?
18 A.   **I might have.  I don't know.**
19 Q.   Doesn't this suggest a new conversation, though,
20 because you would have already told her all your
21 conversations with Fernandez?
22 A.   **I do not recall why.**
23      MR. BRIDGES: You answered.
24      MR. GORDON: Q.  Okay, you do not recall.  So
25 this -- this testimony might refer to a new conversation

Page 294

1 with the sheriff -- someone at the sheriff's department
2 or DA, though, correct?  Because you had already had --
3 you had already had several conversations on the phone
4 with Ms. Muse after Cedar was dropped off, and you're
5 texting with Ms. Muse in this text chain.  So might this
6 refer to a new conversation with someone at the
7 sheriff's department or the DA?
8 A.   **I do not recall.  I do not recall.**
9 Q.   Move to strike.  I'm asking if it might refer to
10 one.
11      MR. BRIDGES: It calls for speculation.
12      MR. NORTHCUTT: Asked and answered.  Calls for
13 speculation.
14      MR. GORDON: That's fine.  I'm not asking him to
15 speculate, but might it refer -- if you don't recall,
16 might it refer to a new conversation?
17      MR. NORTHCUTT: He says he doesn't recall, Ryan.
18      MR. BRIDGES: You are asking him to speculate.
19      MR. GORDON: Q.  All right.  So BJ, you do not
20 recall after Cedar was dropped off telling Ms. Muse that
21 you had instructions from someone at the sheriff's
22 office to hold him, correct?  You spoke with her -- you
23 spoke with Ms. Muse on July 8th, 9th by phone.  Do you
24 recall during any of those conversations on phone, on
25 the phone, telling her -- or that you were told to hold

Page 295

1 the goat by -- until further notice from the sheriff's
2 department?
3 A.   **I do not recall.**
4      MR. NORTHCUTT: Misstates his testimony.  He
5 didn't say that he -- he didn't testify that to hold the
6 goat until further instructions from the sheriff's
7 department.  He said -- he testified earlier that he
8 said to hold the goat for either -- for either Kathie or
9 Melanie.
10      MR. GORDON: I didn't say he testified to that,
11 Damian.  I said do you recall.
12      MR. NORTHCUTT: No, you said -- your question
13 said that basically that he had said that -- I can have
14 the court reporter read it back.
15      MR. GORDON: That's fine.  I'll do it again
16 without your -- with your objection in mind.
17      MR. NORTHCUTT: Okay.  Let's do it again.
18      MR. GORDON: All right.  Although, I'm
19 forgetting what I asked.
20      MR. NORTHCUTT: We can have her read it back.
21      MR. GORDON: No, no.  It's fine.  Just give me a
22 moment, Damian.
23 Q.   Okay.  Okay.  So we went over your calls a
24 moment ago, BJ.  You spoke with Ms. Muse on July 8th and
25 July 7th, you had several calls with her, correct?

Page 296

1 A.   **Yes.**
2 Q.   Okay.  On any of those calls do you tell her
3 that you were instructed to hold the -- to hold Cedar
4 by -- sorry.  Strike that.
5      You testified that you spoke with Ms. Muse
6 several times on July 8th and July 9th by -- on the
7 phone, correct?
8 A.   **(Nods head up and down.)**
9 Q.   All right.  And this is after -- this is after
10 Lieutenant Fernandez dropped Cedar off on the -- on your
11 property, correct?
12 A.   **Yes.**
13 Q.   Okay.  Did you at any point in those calls tell
14 Ms. Muse any of the instructions Lieutenant Fernandez
15 provided you?
16 A.   **I do not recall.**
17 Q.   You do not recall, okay, all right.
18      So it's your testimony that even though you had
19 numerous conversations with Ms. Muse by phone, this text
20 message is the first time you communicated with her on
21 July -- strike that.
22      So it's your testimony that although you had
23 numerous phone calls with Kathie Muse between July 8th
24 and July 11th, the first time you told her someone from
25 the sheriff's office told you to hold Cedar before

Page 297

1 killing was on -- was this text by July 8th. Is that
2 your testimony?
3     **MR. BRIDGES:** I think it misstates --
4     **MS. SHAKIB:** July 11th.
5     **MR. GORDON:** I'm sorry, July 11th.
6     **MR. BRIDGES:** Misstates his testimony.
7     **MR. GORDON:** That's why I'm asking if that's his
8 testimony.
9     **MR. NORTHCUTT:** Join.
10     **MS. SHAKIB:** I think the question got confused.
11 If we can clarify the question.
12     **MR. GORDON:** Sure. So it's your testimony that
13 although you had several calls with Ms. Muse between
14 July 8th and July 11th, the first time you told her that
15 someone from the sheriff's office told you to hold off
16 on killing Cedar was this July 11th text. Is that your
17 testimony?
18     **MR. NORTHCUTT:** Objection. Misstates the
19 testimony.
20     **MR. GORDON:** Damian, let me finish my question.
21 Is that -- is that -- I'm going to read it again. Wait
22 till I'm done, Damian, because I don't think it's as
23 objectionable as you think.
24     So is it your testimony that although you had
25 numerous phone calls with Kathie Muse between July 8th

Page 298

1 and July 11th, the first time you told her someone from
2 the sheriff's office told you to hold off on killing
3 Cedar was this text message. Is that your testimony?
4     **MR. NORTHCUTT:** Okay. Hold on before we start
5 answering questions here, I'm going to object again
6 because I think it misstates the prior testimony. He
7 never testified that somebody from the sheriff's
8 department told him to hold off on killing Cedar.
9     He testified that they told him to hold the goat
10 for Kathie or for Melanie. And I think BJ can go ahead
11 and testify and clarify that point.
12     Am I mishearing something here?
13     **MR. GORDON:** I'll ask him again. I'm not -- I'm
14 not sure.
15     **MR. BRIDGES:** Well, just also to be clear, he
16 said he didn't remember what they talked about on the
17 phone before that. He might have told her before this
18 text message. He doesn't really recall.
19     **MR. GORDON:** Q. So BJ, what did you mean by, so
20 we're clear for the record, "Talked to sheriff and he
21 said to wait until he talks to DA before we kill goat"?
22 A.    **Would you say that again?**
23 Q.    What did you mean by this statement, "Talked to
24 sheriff and he said to wait until he talks to DA before
25 we kill goat"?

Page 299

1 A.    **That is my recollection of what he told me**
2     **Saturday night when he dropped the goat off.**
3 Q.    And by, "he" --
4 A.    **Or it could have been detective too. Both of**
5     **them were there. One or the other.**
6 Q.    And you spoke with both of them?
7 A.    **Yes.**
8 Q.    Okay. All right. So either Fernandez or
9     Detective Duncan made that statement to you?
10 A.    **That's my recollection of where I -- yes.**
11 Q.    Okay. All right. So and the first time that
12 you communicated that information to Ms. Muse was this
13 July 11th text. Is that your testimony?
14     **MR. BRIDGES:** Misstates his testimony. You can
15 answer again.
16     **THE WITNESS:** I don't recall I mentioned it to
17 her on the phone or not.
18     **MR. GORDON:** Q. Okay. So you might have
19 mentioned it to her on the phone is your testimony,
20 correct?
21 A.    **(Nods head up and down.)**
22 Q.    You might have mentioned that to her on the
23     phone as well, correct?
24 A.    **Yes.**
25 Q.    Okay. Any reason you would have -- if you did

Page 300

1 mention it on the phone, why would you send a follow-up
2 text of the same information?
3 A.    **I have no idea.**
4 Q.    Okay. All right. Okay. All right. Let's go
5 back to the phone records which are going to be Exhibit
6 H. BJ, what page are you on?
7 A.    **I'm on 49.**
8 Q.    Okay. Okay. And that's the July 11th call you
9     had with Ms. Muse is highlighted there, correct?
10 A.    **July 13th.**
11 Q.    July 13th, sorry. Okay. And you -- we did go
12 over -- BJ, could you flashback to -- the next one is
13 46, right?
14 A.    **Yes.**
15 Q.    And that was a call you had with Ms. Muse as
16 well, correct, on July 11th?
17 A.    **Yes.**
18 Q.    Okay. Okay. All right. So let's go to the
19 next page in order, which looks like 54. So this is Ms.
20 Muse again you're speaking with on July 14th. Do you
21 see this highlight?
22 A.    **Yeah.**
23 Q.    Do you recall this conversation?
24 A.    **No.**
25 Q.    Would it have been about Cedar again?

LONG vs.
FERNANDEZ

**B.J. MACFARLANE - Vol. 2**
**February 9, 2024**

Page 301

1  A.    I assume so.
2  Q.    Okay.  Because this is the only thing you were
3  speaking about with Ms. Muse during this timeframe?
4  A.    Well, more than likely, yes.
5  Q.    Yes?  Okay.  All right.  Go to the next page.
6  This is July 16th, another call with Ms. Muse.  So do
7  you recall this conversation on July 16th?
8  A.    I do not.
9  Q.    Okay.  What would you -- what is your best
10  estimate of what you would have been -- or what you were
11  talking about with -- strike that.
12        What is your best estimate of what you were
13  likely talking with Ms. Muse about on July 16th?
14  A.    I'm guessing the goat.
15  Q.    The goat, okay.  Would she have -- do you have
16  any recollection of her giving you instructions in this
17  period of time?
18  A.    No.  No.
19  Q.    Okay.  All right.  Do you know if Ms. -- at this
20  point in time was it your understanding that Ms. Muse
21  was in communication with someone at the sheriff's
22  office or the DA?
23  A.    I don't -- I do not know.
24  Q.    You do not.  Did you ask her?
25  A.    I do not recall.

Page 302

1  Q.    Okay.  You do not recall asking her?
2  A.    No.
3  Q.    All right.  You can go to the next page, BJ.
4  Again, more conversations with Kathie on July 16th.  So
5  same answer as before, these are still Cedar
6  conversations?
7  A.    Correct.
8  Q.    Okay.  So you can go to the next page, BJ.  So
9  looks like -- looks like the very bottom of the page,
10  it's the last one is highlighted.  It's item 1099.  This
11  looks like a conversation with the fair office.
12        So is it your understanding that you were speaking
13  with Melanie Silva this day on July 22nd?
14  A.    Yes.
15  Q.    Would this conversation have also been about
16  Cedar?
17  A.    Yes.  More than likely.
18  Q.    And what instructions would -- do you recall
19  receiving from this conversation?
20  A.    I do not recall.
21  Q.    Does the date refresh your memory on a
22  conversation you would have had with Melanie Silva
23  around that time?  Mind you, this is, you know, about a
24  week before, six days before Cedar is slaughtered, so.
25  A.    Yeah.  Cedar the goat, and possibly at some

Page 303

1  point we talked about that missing goat.  So it's both
2  of them.
3  Q.    What missing -- there's a different missing --
4  A.    The one that Cedar replaced.
5  Q.    Okay.  Okay.  But that's still in -- the missing
6  goat was in relation to Cedar, correct?  You're only
7  talking about the missing goat because of Cedar,
8  correct?  Or the replacement goat, rather, because of
9  Cedar?
10  A.    Yes.
11  Q.    Okay.  All right.  So you can go to the next
12  page, BJ.
13        All right.  So this is more conversations it
14  looks like with Ms. Silva and Ms. Muse.  Looks like you
15  had conversations with the both of them that day.  Do
16  you recall having -- are you -- so you have a call looks
17  like with -- so your first call is with, you know,
18  little after 1800, at 18:22, is with -- is with Ms.
19  Muse, the ████ number.  Then you -- then you looks like
20  you call the ████ number, which is I believe Bowman
21  Meats.  Is that your understanding?
22  A.    Yes.
23  Q.    All right.  So was 7-22 the day when you would
24  have gotten instructions to kill Cedar?  Or when you did
25  get instructions to kill Cedar?

Page 304

1  A.    I don't recall the date.
2  Q.    Looking at these phone records, does that
3  refresh your memory as that being the date?  Because it
4  looks like you -- it looks like you speak with -- it
5  looks like you speak with Muse and then call Bowman's.
6  Looks like you speak with the fair office then Muse and
7  then call Bowman's?
8  A.    You could -- yeah, you can assume that, I guess.
9  Q.    Is that -- does that gel with your memory?
10        MR. BRIDGES:  We don't want you to assume, so.
11        THE WITNESS:  I don't recall the exact -- the
12  conversation.
13        MR. GORDON:  Q.  I understand that, BJ.  You
14  might not recall the exact words that were expressed,
15  but you recall getting permission from -- because you
16  see the phone records.  It looks like you called the
17  fair office on July 22nd.  Then you called Ms. Muse, and
18  then you called Bowman's.  So does this refresh your
19  memory of getting permission from the fair then Kathie
20  then calling Bowman's for slaughter of Cedar?
21  A.    It could, yes.
22  Q.    Yes is your answer?
23  A.    It could.
24  Q.    Is that your -- is that your best -- does
25  that -- is that your, let's say, best estimate of events

Page 305

1  of what happened based off refreshing your memory from
2  these phone records?
3  A.      **From looking at the phone records, it definitely**
4  **could be.**
5  Q.      What else could it have been?
6  A.      **But I don't recall our conversation, so that's**
7  **what I'm --**
8  Q.      But you generally remember the order of events,
9  correct?  You might not recall the exact conversations,
10 but you generally remember the order of events, correct?
11 A.      **Yes.**
12 Q.      So your testimony was that you were waiting for
13 permission from Melanie and Kathie, correct?
14 A.      **Yes.**
15 Q.      All right.  And they at some point gave you
16 permission, correct?
17 A.      **Yes.**
18 Q.      Okay.  And it was about -- you said it took
19 Bowman's a week to get out there, correct?
20 A.      **Yes.**
21 Q.      So on 7-22 you called the fair and had a
22 conversation with Kathie.  Is that -- and then -- or had
23 a conversation with Ms. Muse and then had a -- then
24 spoke with Kathie, and then you called Bowman's?
25 A.      **Is that 7 at night?**

Page 306

1  Q.      Would have been -- yeah, the -- the last call?
2  A.      **Military time, isn't that 7:22?  Yeah.**
3  A.      **Yes.  Yes.**
4  A.      **I called them it seems late, but.**
5  Q.      You called 'em?
6  A.      **Yeah.**
7  Q.      So but that gels with your memory that they each
8  gave you permission around -- around that time, 7:22,
9  and then you called Bowman's to arrange for the
10 slaughter, correct?
11 A.      **Yes.  I called them to arrange for slaughter.**
12 Q.      Okay.  All right.  But after speaking with --
13 A.      **Yes.**
14 Q.      -- Kathie and Melanie to get the okay?
15 A.      **Yes.**
16 Q.      Correct?
17 A.      **Yes.**
18 Q.      Okay.  All right.  So you can go to the next
19 page, BJ.  So this is -- this is now -- so if they gave
20 you the okay, was it your understanding at the time that
21 the -- someone at the sheriff's department or the DA had
22 approved the killing?
23         MR. BRIDGES: Calls for speculation.
24         MR. NORTHCUTT: Calls for speculation.  Join.
25         MR. GORDON: I'm just asking what his

Page 307

1  understanding at the time was.  I'm not asking him to
2  speculate as to what they did.  I'm asking him what his
3  understanding at the time was.
4          THE WITNESS: My understanding is it was Kathy's
5  goat and she -- I don't know if she -- who she talked
6  to, but she wanted the goat processed is what my
7  understanding is.
8          MR. GORDON: Okay.  But did you understand that
9  you were holding the goat until they had coordinated
10 with someone at the sheriff's or the DA's office at this
11 point in time?
12         MR. BRIDGES: Still calls for speculation.  He's
13 just asking you to assume.  What were you assuming at
14 the time?
15         THE WITNESS: That Kathie --
16         MR. NORTHCUTT: Same objection.
17         MR. GORDON: Yeah, I'm asking what was in his
18 head at the time not necessarily -- I don't want you to
19 assume now what you were assuming at the time.  I'm
20 asking in your head at the time were you under the
21 impression that they were -- that Kathie and Melanie
22 were waiting for some approval or some direction from
23 the sheriff's department or the DA?
24         MR. NORTHCUTT: Same objection.
25         MR. GORDON: Q.  They can object, BJ.  You can

Page 308

1  still answer.  I'm just asking what was in your head at
2  the time.
3  A.      **If you're asking what was in my head is it was**
4  **Kathy's goat.**
5  Q.      I understand that, but did you think Kathie was
6  waiting to hear something from the sheriff's department
7  or the DA?
8          MR. NORTHCUTT: Asked and answered.
9          MR. GORDON: Then I move to strike his answer as
10 nonresponsive because I'm just asking if he understands
11 that Kathie was waiting to hear something from the DA or
12 sheriff.  That's all I'm asking what his understanding
13 was at the time.
14         MR. NORTHCUTT: Same objection.
15         THE WITNESS: I'm not sure what her -- because
16 in my head at that time it was Kathy's goat.
17         MR. GORDON: Q.  What did you -- then why delay
18 slaughtering him for three weeks?  And why text that you
19 were waiting for the sheriff -- for -- why -- why your
20 text on July 11th?
21 A.      **Because that's what I was told and we -- I'm**
22 **assuming they were, yes.  I guess, yes, I'm assuming**
23 **they were, but I'm assuming.**
24 Q.      Yeah.  That's all I'm -- at the time it was in
25 your head -- yeah, that's fine.  That's all I'm asking.

Page 309

1    At the time you were under the impression that
2 they were waiting for the sheriff or the DA, correct?
3 A.    Yes.
4    MR. NORTHCUTT: Asked and answered.
5    MR. GORDON: Q. Okay. Okay. All right. So
6 then you have some more calls with -- BJ, what page are
7 you on?
8 A.    74.
9 Q.    Okay, that's what I'm on too. So this is July
10 25th now. So looks like you have some more calls with
11 Ms. Muse. And then -- several calls with Ms. Muse. And
12 then at around 10 o'clock at night at the very bottom of
13 the page looks like you have a call with the fair, so on
14 the same date. Do you have any recollection of these
15 calls?
16 A.    I do not.
17 Q.    Would they have concerned Cedar as well?
18 A.    Yes.
19 Q.    And then it looks like the -- you can go to the
20 next page, BJ. It's another one at 7-25. Looks like
21 another -- another call with the fair office. So you
22 spoke with -- or you were keeping Melanie apprised at
23 this point in time of events as well? This is now July
24 25th.
25 A.    Yes.

Page 310

1 Q.    Yes, okay. All right. Go to the next page.
2    And by keeping apprised of events, I mean keeping her
3 apprised of what was going on with Cedar and the
4 slaughter, etcetera, correct?
5 A.    Yes.
6 Q.    Okay. All right. So you had another call
7 with -- what page are you on, BJ?
8 A.    78.
9 Q.    78. Okay. So this is now July 27th. Looks
10 like you have a call with Bowman's. This is the ▮▮▮▮▮
11 number. And this -- was this call, this would have
12 concerned the slaughter of Cedar on July 27th; is that
13 correct?
14 A.    Yes.
15 Q.    Okay. All right. And that's both calls at the
16 bottom there.
17    All right. So you can go to the next page.
18 July 28th, this is another call with Bowman's. This is,
19 again, concerning the slaughter of Cedar?
20 A.    Yes.
21 Q.    Okay. The very bottom on line 126 there, item
22 1276 there's also another call with Bowman's. Again,
23 concerning Cedar?
24 A.    Yes.
25 Q.    Okay. And BJ, you said you do not have -- you

Page 311

1 were -- do you have the Bowman's number on your phone?
2 Do they -- you don't keep that on?
3 A.    (Shakes head side to side.)
4 Q.    Okay. Do you have another number for Bowman's
5 by chance?
6 A.    I don't have it, no.
7 Q.    No? Okay. And you don't have the sheriff's
8 number in there, either?
9 A.    No.
10    MR. BRIDGES: Real quick, you mean Sheriff
11 Johnson?
12    MR. GORDON: Sheriff Johnson, yes. I was being
13 careful with my words there, the actual sheriffs. But I
14 see why you'd ask because that would have been a gotcha.
15 Q.    I mean Sheriff Johnson, you don't have his phone
16 number?
17 A.    No.
18 Q.    And do you have -- I do have a number for
19 Fernandez but you -- do you have a number -- I want to
20 see if it's the same number. Do you have any number for
21 Fernandez in your phone?
22 A.    No.
23 Q.    No? Okay. Do you want to just check really
24 quick?
25    (Pause in proceedings.)

Page 312

1 A.    No.
2    MR. GORDON: No. Okay. All right. Okay.
3 Let's -- I have to use the restroom, so let's take five.
4    THE VIDEO SPECIALIST: I'm at 1:41. Another 10
5 minutes you're going to have to change, so should I
6 change now?
7    MR. GORDON: Yeah, I guess so. Well, yeah,
8 that's fine you can change now. All right.
9    THE VIDEO SPECIALIST: We're off the record.
10 The time is 10 o'clock, and we are at the end of DVD
11 media number one.
12    (Whereupon, a break was taken from 10:00
13    till 10:15 a.m.)
14    THE VIDEO SPECIALIST: We're back on the record.
15 The time is 10:15, and this is the start of media number
16 two.
17    MR. GORDON: All right. BJ, we're still --
18    THE WITNESS: We're muted.
19    MR. BRIDGES: Sorry about that. Damian, we're
20 about to go back on, okay.
21    MR. NORTHCUTT: Sounds good.
22    MR. GORDON: Q. All right. So BJ, we're just
23 going to finish up the phone records really quick. So
24 you're on page 95?
25 A.    Yeah.

Page 313

1  Q.    All right.  So we're now in August, so this is
2  August 8th -- or I'm sorry, August 9th.  Looks like
3  you're having a conversation with Melanie Silva again
4  and then -- a few of them that day on August 9th.  Would
5  this -- would this concern Cedar at this time?
6  A.    **I don't remember any other -- again, I don't**
7  **remember any other issues, so I assume so.**
8  Q.    Okay.  All right.  And what's the next page you
9  got there?  You want to flip it?
10 A.    **127.**
11 Q.    All right.  Now, this is next call with looks
12 like the ▮▮▮ number that's Kathie Muse.  So this is
13 August 31st.  That was the date that this lawsuit was
14 filed.  Did this call concern that lawsuit?
15 A.    **Yes.**
16 Q.    We're on page 127 on item 225.  That's your
17 understanding, correct?
18 A.    **Correct.**
19 Q.    BJ, what's the next page?
20 A.    **130.**
21 Q.    Now, this is a September 1st call you had with
22 Melanie Silva again, the ▮▮▮ number, on September 1st.
23 I'm looking at item 2084.  Would this again have
24 concerned the lawsuit that was filed the preceding day?
25        MR. BRIDGES: Just object it lacks foundation

Page 314

1  and maybe calls for speculation.  But to the extent that
2  you recall or you know --
3        MR. GORDON: I'll rephrase the question.  This
4  nine -- September 1st call on -- with Melanie Silva, the
5  ▮▮▮ number, it's item 2084 on the phone records, did
6  that conversation concern the lawsuit that -- this
7  lawsuit that was filed the preceding day?
8        MR. BRIDGES: Still lacks foundation that he --
9  I just said there hasn't been any questioning about
10 whether or not he knew a lawsuit had been filed or how
11 he found out or anything like that.
12        MR. GORDON: Fair enough.
13 Q.    BJ, were you aware that a lawsuit was filed on
14 August 31st, 2022?
15 A.    **Yeah.  Yes.  Yes.  I don't know the exact date,**
16 **but I knew when it happened because --**
17 Q.    You were texting about it that --
18 A.    **That's when I started getting my -- the threats.**
19 Q.    Okay.  All right.  Okay.  So -- so this
20 conversation you had on September 1st, 2022, with
21 Melanie Silva concerned the lawsuit, correct?
22 A.    **Yes.**
23 Q.    Okay.  And then you had a -- that's the office
24 number for the fair.  So it looks like you had another
25 conversation, you can go to page 131, on September 1st.

Page 315

1  So this is, again, would have concerned the lawsuit?
2  A.    **And the -- it was because of the lawsuit, but**
3  **both of us were getting extreme threats at that time.**
4  **That's when --**
5  Q.    The day it was filed?
6  A.    **Was that the day it was filed?**
7  Q.    It was filed August 31st, so this is the
8  following day.
9  A.    **So maybe not.  It was to do with the lawsuit,**
10 **but I thought at some point -- what -- I'd have to look**
11 **at a calendar.  So that was -- started getting them when**
12 **I went to the Inter-Mountain Fair.  That's right around**
13 **there.**
14 Q.    Okay.  All right.  We can go off the -- if you
15 want to give -- you can give this stack to the court
16 reporter.  And this will just be a placeholder.  I'll
17 send you redacted versions, and then you can toss that
18 or whatever, so.
19        John, so it doesn't lack foundation, I am,
20 however, going to send the entirety of the records
21 redacted.
22        MR. BRIDGES: Okay.  All 180 pages or whatever?
23        MR. GORDON: Yes.  Just so you don't -- unless
24 you're going to say you're not going to object to the
25 piecemeal.

Page 316

1        MR. BRIDGES: I don't have a problem with
2  piecemeal as long as the other phone numbers that we
3  haven't testified about are redacted.
4        MR. GORDON: Yes.
5        MR. BRIDGES: But that's fine.  If you want to
6  just produce the ones that he talked about today, that's
7  fine.
8        MR. GORDON: Yes.  That would only be the ones
9  that he -- now if there's other -- but if there's
10 other -- I'll redact them, of course, but if there's --
11 I'm not waiving any rights to numbers that are redacted
12 because he hasn't testified to them today.  There might
13 be other numbers in the log that concern other people
14 that I don't have -- that I don't have the phone numbers
15 to at this point.
16        MR. BRIDGES: Okay.  But for the purposes of the
17 deposition --
18        MR. GORDON: His deposition, yes, it will be
19 only the ones we talked about.  The rest will be
20 redacted.
21        MR. BRIDGES: Correct.
22        MR. GORDON: Okay.  All right.  Okay.
23 Q.    BJ, we're going to go through some text messages
24 now, which were produced from -- they purport to be text
25 messages from you to -- between you and Ms. Silva.  And

Page 317

1  you recall producing these text messages?
2  **A.   Yes.**
3  Q.   Okay. I'll give you the first stack. Okay.
4       BJ, so it says December 15th, 20 -- I'm looking
5  at -- I gave you a stack of text messages. We'll turn
6  them into an exhibit, but it says December 15th at 3:40
7  p.m. Do you see this text message?
8  **A.   Yes.**
9  Q.   Do you know what year this was? You can check
10 your phone if you need to.
11 **A.   I assume 2022.**
12      **(Pause in proceedings.)**
13 **A.   2022.**
14 Q.   Okay. All right. Some of these dates are
15 missing in here, so you might have to help me order --
16 put this in the correct order, so I'm going to work with
17 you on that.
18      Okay. So December 15th, 2022. And then the
19 February 15th. So we'll put this here.
20      And then so do you know, and this is December
21 11th, this next page. So this would be -- preceded
22 that, correct, so this would go here?
23 **A.   Yeah.**
24 Q.   The pages are out of order, so I'm just trying
25 to help you -- me get them in order.

Page 318

1       So and then we have a September 1st -- and these
2  are September 1st -- and these are 2022 you say,
3  correct, the December dates, BJ, that you're looking at
4  here, the December 15th?
5  **A.   2022.**
6  Q.   2022. So here's 2022 as well, this "CDFA needs
7  to nip this in the butt." So this is right after the
8  lawsuit's filed, and I'll ask you specific questions
9  about them in a moment. I'm just trying to have you
10 help me get this in correct order.
11      So -- so this would go here, correct?
12      And then do you know what date -- do you know
13 this "Bruce Ross sent this to me."
14 **A.   That's the next one.**
15 Q.   That's the next one, okay. So are these just
16 backwards or?
17 **A.   Yeah.**
18 Q.   Okay. Okay. All right. Hard for me to tell.
19      All right. So then this one -- supposedly this
20 one would go here on top of it?
21 **A.   What's the date?**
22 Q.   There's no dates on this one. That's my
23 confusion.
24      You're talking about comments, so I presume this
25 is also about the lawsuit and Sam Stanton calling,

Page 319

1  etcetera. We'll go over specifically in a moment, so
2  but I'm just trying to have you help me order these.
3  **A.   Yeah. I'm trying to find it.**
4  Q.   Okay.
5  **A.   That's me saying --**
6  Q.   Yes. That's probably midtext, though, BJ.
7       BJ, I think the text started this way.
8       BJ, take a look. You wrote your name, "BJ, good
9  morning." So I'm assuming this goes like this. And
10 these are just backwards and this goes above but you
11 tell me.
12 **A.   Yes. The 31st.**
13 Q.   All right. So then is this still going
14 backwards in time with -- this should be above this?
15 **A.   That's next.**
16 Q.   Okay. All right. John, feel free to jump in.
17 Are these just all backwards?
18      **MR. BRIDGES:** I think it's just reverse
19 chronological, yes.
20      **MR. GORDON:** Q. Okay. All right. So this here
21 like this?
22 **A.   Next. That's a duplicate.**
23 Q.   Duplicate, okay. So this is -- okay. So this
24 stops there. There's two sets of texts in here for
25 whatever reason. Looks like the same thing.

Page 320

1       This is from one of the pdf's you sent us, so.
2       Yeah, I think it's this.
3       It's the same. Although this may go back -- BJ,
4  you might want to keep your phone out. This chain might
5  go back -- this one looks like it goes back further. Or
6  no, it's the same thing.
7  **A.   August 1st.**
8  Q.   It's the same thing just repeating three times
9  in a row, okay. All right. I think these are all the
10 same, but.
11      Yeah. Okay. I'll double check that.
12      Let's go -- so this will be -- this will be
13 Exhibit I. BJ, keep them in order.
14      So these appear to be the same. Let me just
15 reverse order this once, then I'll go through it with
16 you.
17      (Whereupon, Exhibit I, text chain between
18 BJ Macfarlane and Melanie Silva, date range
19 7-28-22 through 2-15-23, totaling 9 pages,
20 was marked for identification.)
21 Q.   Okay. So BJ, this text looks like it starts off
22 with, we're on Exhibit I, and do you know what this --
23 for the record, BJ, what are you holding right now?
24 **A.   Text message from Melanie.**
25 Q.   Between you and Melanie Silva?

Page 321

1 A.    Yes.
2 Q.    And the first text it looks like your writing on
3 the right hand -- the text on the right-hand side of
4 yours, correct?
5 A.    Yes.
6 Q.    Okay. Says, "Goat is getting butchered within
7 the half hour." So did that tell you that you must have
8 sent this text on July 28th, correct?
9 A.    Yes.
10 Q.    Okay. And then she responds, "I'm going to come
11 by" -- and you write, "I'm going to come by tomorrow if
12 you are around after kids doctors appointment. Can I
13 use Zoom one more time."
14      And then Melanie responds, "Yes you can. I
15 should be here trying to figure out 3K and add-ons and
16 where it should go. I hate figuring that out."
17      Okay. So the top text where it says, "Goat is
18 getting butchered within the half hour," you were just
19 explaining to Melanie -- the goat -- strike that.
20      The goat here is Cedar, correct?
21 A.    Yes.
22 Q.    And you were explaining to Melanie that he's
23 getting butchered within that day by -- and that, you
24 know -- what time of day would this have been, if you
25 know?

Page 322

1 A.    1:05 p.m.
2 Q.    1:05 p.m. Okay. All right. Okay. And when
3 you say, "I'm going to come by tomorrow if the kids are
4 around," what were you referring to?
5      After the kids -- "I'm going to come by tomorrow
6 if you are around after kids doctors appointments."
7 A.    I'm not sure why I wrote that.
8 Q.    Did you bring Cedar's meat to Melanie the next
9 day?
10 A.    No.
11 Q.    No? Okay.
12      MR. BRIDGES: Just --
13      MR. GORDON: That's why I was asking.
14      MR. BRIDGES: Yeah, he said he didn't know what
15 happened to the meat.
16      MR. GORDON: Yeah. I wasn't saying he testified
17 to it. I was asking looking at this text.
18 Q.    Okay. All right. You respond on the bottom of
19 that page, "Can you send me buyers list with addresses
20 in Excel." What were you referring to there, BJ?
21 A.    I think I was lining up the pictures for her
22 because after that we do pictures for the buyers.
23 Q.    Okay. Did this -- did that text have anything
24 to do with Cedar?
25 A.    No.

Page 323

1 Q.    No?
2 A.    That had to do with getting -- time-consuming
3 bad process, but we had to line up the buyers with the
4 pictures so we can give them to the buyers.
5 Q.    Did you already have the pictures at this time?
6 A.    No. The photographer did.
7 Q.    Okay. All right. So you weren't asking for a
8 buyers list to determine where Cedar went?
9 A.    No. I was completing the pictures.
10 Q.    All right. Okay. So August 17th Cedar's dead
11 at that point, so you write, "Good evening. Did you by
12 chance forget us?" What were you referring to here?
13 A.    Carcass contest.
14 Q.    Carcass contest?
15 A.    Beef carcass contest.
16 Q.    Okay. All right. So BJ, let's go forward to it
17 will be there's a text from you, the one that starts,
18 "BJ good morning."
19 A.    Yeah.
20 Q.    BJ -- any reason you wrote your name on a text
21 you were sending?
22 A.    Probably one I copied.
23 Q.    Oh, you -- what do you mean, one you copied?
24 A.    Sam.
25 Q.    Because you sent this text to Melanie --

Page 324

1 A.    Yes.
2 Q.    -- so when I first read it, I thought she was
3 saying -- talking to you and it's from her, but it's
4 from you to her?
5 A.    Yeah.
6 Q.    Correct? So you just wrote your name just to
7 let her know it was you? Or you said -- you copy and
8 pasted from something?
9 A.    I don't know why that is.
10 Q.    Did you get a -- did you get a -- did you copy
11 this text from someone else?
12 A.    Not that I remember, no.
13 Q.    So no one sent you a text saying, "BJ good
14 morning," that you copied from?
15 A.    Not that I recall.
16 Q.    A moment ago you did say copy and paste or
17 uttered those words.
18 A.    I don't recall who sent that to me.
19 Q.    But someone sent it to you?
20 A.    I'm guessing so, yeah. I don't recall.
21 Q.    Okay. So is it possible you wrote it yourself?
22 A.    Possible.
23 Q.    Did you get a call from Sam Stanton on August
24 31st?
25 A.    I don't remember the day, but yes, I did.

**Page 325**

1 Q.   Okay. It says, "we." Would you have referred
2 to yourself as we, or do you mean your livestock
3 company?
4 A.   **My livestock company would have nothing to do**
5 **with this.**
6 Q.   No, but I didn't know if someone called
7 Macfarlane Livestock, and you meant we as in the
8 livestock company?
9 A.   **Could have been.**
10 Q.   Okay. So you might have written this?
11 A.   **Yes.**
12 Q.   Okay. Any reason you -- well, who did you
13 understand we to be then? Or who do you understand we
14 to be?
15 A.   **I don't recall.**
16 Q.   You and the fair? If they were -- if Sam
17 Stanton was, for example, calling for comment, I'm
18 assuming --
19 A.   **It could have been the fair.**
20 Q.   Okay. And what did you mean by "PETA friends"?
21 A.   **I guess people that -- somebody that was**
22 **involved in PETA, I guess.**
23 Q.   Okay. Did you have knowledge that anyone in
24 this case involving Cedar was with PETA?
25 A.   **No.**

**Page 326**

1 Q.   Okay. You were assuming --
2 A.   **Just assuming. Gross generalization.**
3 Q.   It's fine, okay. Why did you -- just -- why do
4 you assume it?
5 A.   **Because of the -- I'm guessing because of the**
6 **outcry on -- the sanctuary they were at.**
7 Q.   Okay. That's right. The sanctuary when she --
8 Jessica removed Cedar and the -- and you thought
9 partially because it was, correct me if I'm wrong, but
10 because he was delivered to Bleating Hearts and you
11 looked at their website and you thought this -- you
12 thought the whole thing was some sort of animal rights
13 stunt, correct?
14 A.   **Yes.**
15 Q.   Okay. And then the next page, BJ, you write,
16 "Sam says you are named in the complaint though you are
17 not a defendant. Would you have any interest in talking
18 to a reporter?"
19     So Sam, you mean Sam Stanton at the Sacramento
20 Bee?
21 A.   **I believe so.**
22 Q.   Okay. All right. And you're asking Melanie if
23 she would have any interest in talking to a reporter?
24 A.   **Yeah.**
25 Q.   Okay. Okay. So moving down, Melanie responds

**Page 327**

1 to you, "He called here already. I have no comments for
2 him though." Did you forward that message from someone?
3     So I guess same question, did you forward that
4 message from someone else? Or do you believe you wrote
5 it? The above message I'm referring to where you talk
6 about the "BJ, comma, "good morning."
7 A.   **I do not recall.**
8 Q.   But you think you might have written it?
9 A.   **Yes.**
10 Q.   Okay. All right. All right. And then she
11 says, "It's all in law enforcement's hands." What did
12 you understood her to mean by that?
13 A.   **As it states. I'm not sure of the context. I**
14 **mean, I guess I --**
15 Q.   Well, it's a civil lawsuit, so the law
16 enforcement isn't, you know, prosecuting anything. Did
17 you have -- what did you interpret that to mean at the
18 time?
19 A.   **That it was in law enforcement's hands. I'm not**
20 **privy -- I mean, I'm not knowledgeable enough to -- I**
21 **just generalization just like calling the sheriff.**
22 Q.   Yeah.
23 A.   **I just don't know the court systems, don't know**
24 **any of it. Just thought it was --**
25 Q.   Okay. All right. And then -- and then you

**Page 328**

1 write, "Bruce Ross sent that to me." Are you
2 referring -- now that you -- do you see the next page it
3 says, "Bruce Ross sent that to me." Are you referring
4 to the link below or --
5 A.   **Yes.**
6 Q.   You're not referring to the message copy and
7 pasted previously because she asked I believe did
8 someone forward that message to you, so what's it that
9 you're responding to? When you say, "Bruce Ross," do
10 you mean Bruce Ross -- strike all that. I'll ask again.
11     **MR. BRIDGES:** Make sure you go one at a time.
12 You started talking over him before he finished.
13     **MR. GORDON:** Q.   Yeah. Previously, BJ, you have
14 a text message that starts, "BJ," comma, "good morning,"
15 and Melanie asks you, "Did you forward that message from
16 someone?" You see that?
17 A.   **Yes.**
18 Q.   And then you respond, "Bruce Ross sent that to
19 me." So did Bruce Ross send you the message above where
20 it says, "BJ good morning," or did you type that? Or
21 alternatively, are you referring to the link below where
22 it says, "Lawsuit filed"?
23 A.   **I thought it was the link below.**
24 Q.   Okay. So you think you typed the text, and
25 Bruce Ross sent you the "lawsuit filed" link?

Page 329

1 **A.    I remember him sending me this.  The link -- I**
2 **remember him sending me the link of this.  I don't**
3 **recall.**
4 Q.    Okay.  How did Bruce Ross send the link?  Did he
5 email it to you or text it to you?
6 **A.    I don't recall.**
7 Q.    Okay.  Did you check your email to see if you
8 have an email from Bruce Ross?
9 **A.    No.  I -- no.**
10 Q.    Okay.  So I guess in searching for documents to
11 produce, did you check your email from anything from
12 Bruce Ross in relation to this matter?
13 **A.    No.**
14 Q.    No?  Okay.
15        **MR. BRIDGES:** Did you search for anything
16 directly from Bruce Ross?  I mean, if you did a search
17 procedure and it might have come up from Bruce Ross, is
18 that what you're asking specifically for something from
19 Bruce Ross?
20        **MR. GORDON:** I'm asking for Bruce Ross because
21 it's referencing that he's sending me a text or an email
22 link presumably.
23        **THE WITNESS:** Well, I did a search, and it
24 didn't come up.
25        **MR. GORDON:** Q.  Okay.  Okay.  Did you delete

Page 330

1 any text messages from Bruce Ross?
2 **A.    No.**
3 Q.    Okay.  So you would still have them.  Did you
4 delete any emails from Bruce Ross?
5 **A.    I don't believe so.**
6 Q.    You don't believe so, okay.  Okay.  Well, we'll
7 refer with your counsel afterwards to see if he has
8 that.  I mean, not right now, John.  I just mean when
9 this is done.  Because we have a meet and confer letter
10 stating it.
11        By the way, do you have Bruce Ross's cell phone
12 number?
13 **A.    Yes.**
14 Q.    And what is that?
15 **A.    ▮▮▮▮▮▮▮▮▮**
16 Q.    Okay.  And Bruce Ross is a -- does he work for
17 Senator Dahle; is that accurate?
18 **A.    I believe so.**
19 Q.    And how long have you known Bruce Ross?
20 **A.    Not very long.  I mean, at this time, since**
21 **COVID is the first time I believe I met him.**
22 Q.    Okay.  All right.
23        **MR. BRIDGES:** Real quick, just to be clear, in
24 his first deposition he did reference the email from
25 Bruce Ross.  I think that was produced.

Page 331

1        **MR. GORDON:** Not with this link attached to it,
2 though, I don't believe.  That's what I'm referring to,
3 John.  But I'll check it again, but I don't -- I don't
4 believe it was with this link so but I will -- I'm
5 prepared to be wrong on that.  Obviously a lot's been
6 produced.  I can't recall everything.
7 Q.    Okay.  So next page, BJ, the text, you write --
8 you write to Melanie, "CDFA needs to nip this in the
9 butt right now."  I assume you mean bud, but you wrote,
10 "butt."  Has the same effect, right?
11 **A.    That's how I say it.**
12 Q.    All right.  And you meant -- by that, did you
13 mean you wanted CDFA to take steps so this didn't --
14 wasn't perceived negatively in the public?  The lawsuit,
15 that is.
16 **A.    I believe I was talking about the threats that I**
17 **was getting.  That's what made me send that message.**
18 Q.    Were you getting threats on September 1st?
19 Within hours --
20 **A.    I believe so.**
21 Q.    Within hours of this getting filed?
22 **A.    I believe so.**
23 Q.    Before any news stories were printed?
24 **A.    I'll go back and look at the calendar, but I do**
25 **remember being at the Inter-Mountain Fair helping my**

Page 332

1 brother, which was August or September.  September 1st
2 was a Thursday, so, yes, Thursday.
3 Q.    What threat did you get on September 1st?
4 **A.    Several phone calls.**
5 Q.    Did you save any of these calls?
6 **A.    I'm not sure if I saved these ones, no.**
7 Q.    Okay.
8 **A.    The next round I did.**
9 Q.    Okay.  So it's your testimony that right here,
10 "CDFA needs to nip this in the butt" because -- was --
11 explain to me again.  What did you mean by that?
12 **A.    I believe it was because I was getting calls of**
13 **death threats and hate that I wanted -- somehow -- I**
14 **don't know how or why.  Again, I'm not privy or**
15 **knowledgeable enough in any of this, but somehow get**
16 **ahold of this.**
17 Q.    And by "get ahold of this," do you mean keep the
18 lawsuit from being publicly known?
19 **A.    I don't know about being publicly known.  Yeah,**
20 **I don't know -- I just wanted it to stop is all I**
21 **wanted.**
22 Q.    Yes, I understand.  But because -- and if you
23 need a moment, I'm happy to give you one.
24        But by "stop," you mean you wanted -- this was
25 now in public domain and you wanted -- you wanted news

Page 333

1 of the lawsuit not to spread, correct, because you
2 thought it was leading to threats for you?
3 A.    Yes.
4 Q.    Okay. All right. Okay. Okay. And then she
5 responds, "I will forward the info. Thanks. Sheesh."
6 What -- and that was -- this is September 1st still.
7 What did you -- actually one second.
8        Actually, BJ, it looks like this text where you
9 said, "CDFA needs to nip this in the butt right now,"
10 that looks like that's an August 31st text. Tell me if
11 I'm wrong.
12 A.    Yes. Yes.
13 Q.    Okay. So the day it was filed, you had already
14 gotten threatening phone calls that day?
15 A.    Yes.
16 Q.    The same day it was filed?
17 A.    (Nods head up and down.)
18 Q.    Okay. All right. That's your testimony. Okay.
19 And you said 10 calls that day?
20        MS. SHAKIB: I don't think there was a clear
21 answer on the record.
22        MR. GORDON: Q. Oh, okay. All right. So your
23 testimony is the day the lawsuit was filed you were
24 receiving threatening calls?
25 A.    Yes.

Page 334

1 Q.    Okay. And that is August 31st?
2 A.    (Nods head up and down.)
3 Q.    And how many calls did you about receive that
4 day?
5 A.    I don't recall. Roughly five to ten
6 threatening -- threatening me and my family.
7 Q.    Okay. Did you -- now, when you say calls, and
8 I'm sorry if you need a moment if it's hard to talk
9 about but did -- were these voicemails, or did you speak
10 with people on the phone?
11 A.    I didn't -- I don't make it a habit of answering
12 calls I don't know. But this has made it even worse.
13 So I -- it was all voicemails.
14 Q.    Okay.
15 A.    I might have answered the first one, but after
16 that I stopped answering my phone.
17 Q.    Okay. Did you retain those voicemails?
18 A.    I don't believe so.
19 Q.    Okay. All right. But you think it was about 10
20 voicemails?
21 A.    Five to ten. I do not recall.
22 Q.    And this would have been on the number that we
23 went through earlier with the phone records?
24 A.    Yes.
25 Q.    Okay. All right. Okay. And the next day you

Page 335

1 talked with Melanie again. "Have you heard anything
2 from CDFA? I'm going to call them if not. My name is
3 getting mentioned in this bullshit."
4        Did you -- did you call -- then the next -- your
5 next text, "I'm calling Mike" -- how do I say that?
6 A.    That's spelled wrong, but it's Francesconi.
7 Q.    Francesconi, okay. Did you call Mike
8 Francesconi?
9 A.    Yes, I did.
10 Q.    Okay. And what did -- did you speak with him?
11 A.    I believe I did not, no. I left a message.
12 Q.    Okay. What -- do you have his phone number so I
13 can cross-reference on the phone records at some point?
14 A.    I do not. He's not in my contacts.
15 Q.    Did you call his cell or did you -- did you call
16 his cell?
17 A.    I don't recall, but if I didn't have his
18 contact, I probably just called CDFA.
19 Q.    Okay. So it was either CDFA or his cell if you
20 had it at the time?
21 A.    Yeah.
22 Q.    Correct?
23 A.    Yes.
24 Q.    The next page says, "I left" -- from a flip, BJ.
25 "I left Mike a message and talked to Sarah." Who are

Page 336

1 you talking about with Sarah?
2 A.    She's somebody that works at CDFA. I don't know
3 her job title. I think she's second in charge maybe.
4 Q.    So are these two separate calls, or did Sarah
5 take a message from Mike?
6 A.    I believe I called Sarah afterwards. And it was
7 not a -- I called Sarah after that.
8 Q.    Okay. And what did you talk about with Sarah?
9 A.    That I was getting threats. I don't have her
10 number.
11 Q.    What is her last name?
12 A.    I do not recall.
13 Q.    Do you kind of remember what it might have
14 sounded like?
15 A.    There's three or four gals that worked in there.
16 I don't remember her last name.
17 Q.    Okay. All right.
18 A.    Yeah, I don't remember.
19 Q.    Okay. All right. Well -- and then did you
20 ever -- you talked with Sarah. After this text message,
21 this is now, I believe this is September 1st text
22 message, did Mike ever get back to you?
23 A.    No.
24 Q.    No? Did Sarah ever get back to you?
25 A.    Yes, because I talked to her.

Page 337

1  Q.      Was that your only conversation with her?
2  A.      I do not know.  I do not recall.
3  Q.      What steps did Sarah say CDFA would take to nip
4  this in the butt when you talked with her?
5  A.      I don't recall.
6  Q.      You don't recall what she said or you do not
7  recall -- you don't recall the steps, or you don't
8  recall --
9  A.      I don't recall what she said.  I was highly
10  upset at that point in time.
11  Q.      All right.  Okay.  And then going to the next
12  page.  So now we're going to go to February -- sorry.
13          Let's go to the December 15th, the very last
14  page of the text chain.  "Hi, BJ.  I really need to talk
15  to you if you could call me back please."  Do you know
16  what Melanie is referring to here?
17  A.      I believe wanting me to come back to the
18  livestock.  I'm pretty sure it was wanting me to come
19  back and help with the livestock.
20  Q.      Okay.  To the next text, "Hi BJ.  I get we are
21  probably the last people you want to talk to but can you
22  give me a call back please."  Why would you be the less
23  people -- why would they, you know, the fair, we, be the
24  last people you want to talk to?
25          MR. BRIDGES: Calls for speculation.  If you

Page 338

1  know.
2          MR. GORDON: If you know.
3          THE WITNESS: I have no idea.
4          MR. GORDON: Q.  What did you understand her to
5  mean at the time?
6  A.      I couldn't tell you.  Guessing over the goat.
7  Q.      Okay.  The situation with Cedar was upsetting so
8  you -- did -- you did not want to deal with the fair at
9  that time?
10  A.      Correct.
11  Q.      Okay.  All right.  Did you think the fair -- she
12  says, "We are probably the last people you would want to
13  talk to."  Is there any reason that you can think of
14  that -- or let me ask you this.  Strike that.
15          At that time were you upset at the way the fair
16  handled the goat matter?
17  A.      No.
18  Q.      No?  Why would you believe that -- why would
19  she -- well, why did she have the impression you would
20  probably be the last people you would want to talk to?
21          MR. BRIDGES: Calls for speculation.
22          THE WITNESS: I don't know.  Over the goat I
23  said.
24          MR. GORDON: Over the goat, okay.  All right.
25  Let's go to the next.  John, before I go through the

Page 339

1  entire exercise with him again, are these other ones
2  just backwards as well?
3          MR. BRIDGES: I don't know which ones you're
4  looking at, so.
5          MR. GORDON: I'm looking at set -- I'll tell you
6  in a second.  Do you know what they are in order?
7          MR. BRIDGES: I do not.
8          MR. GORDON: You do not, okay.  Why are you
9  asking which ones we're looking at?
10          MR. BRIDGES: Well, I don't know which ones
11  you're looking at anyway.
12          MR. GORDON: No, no, no, I understand.
13  Sorry, did you want a copy?  This is just what
14  we were going over.
15          MR. BRIDGES: Oh, those ones I saw.
16          MR. GORDON: Well, I assume you've seen all of
17  them, but.
18  So BJ, help me reorder these ones as well.
19  Maybe they are -- this is text messages dash two pdf,
20  John.
21  So BJ, are these just backwards?  I don't know
22  if you want to take a look and tell me if it's the same
23  as before.  This is the exhibit whichever one we were
24  just on, Madame Court Reporter.
25  BJ, keep this in order for the court reporter.

Page 340

1          Are they just backwards again, BJ?
2          THE WITNESS: There's two copies here.
3          MR. GORDON: Are there?  There might be.  If
4  there is, you want to give me the second copy and you
5  keep the first?
6          (Pause in proceedings.)
7          THE WITNESS: Sorry.
8          MR. GORDON: That's fine.
9          (Pause in proceedings.)
10          THE WITNESS: This is an extra page.
11          MR. GORDON: That's an extra page, okay.  All
12  right.  Okay.  So this will be Exhibit J.
13  BJ, this will be Exhibit J.
14          (Whereupon, Exhibit J, text chain between
15  BJ Macfarlane and Melanie Silva, date range
16  6-28-22 through 7-18-22, totaling 8 pages,
17  was marked for identification.)
18          MR. GORDON: So let me really quickly I'm just
19  going to rearrange the exhibit in my pdf so I can --
20          (Pause in proceedings.)
21          MR. GORDON: Q.  Looks like it's just backwards
22  again.  No, it's not.
23          All right.  I'll just go -- so BJ, give you this
24  one.  So the first page, do you know about what date
25  this was?  The way this -- on this exhibit it says, "You

Page 341

1  all right with sending goat lady that she has till
2  tomorrow morning at 8 or authorities are going to be
3  contacting her," what date that is? Check your phone if
4  you need to.
5  A.    **June 28th.**
6  Q.    Okay. So June 28th this begins. And we're on
7  Exhibit J. This is Exhibit J. June 28th it begins. At
8  what time?
9  A.    **5:41 p.m.**
10  Q.    Okay. All right. Okay. So what is the next
11  page?
12        Now, actually before we change, BJ, who is -- it
13  says, "I just saw voicemail" -- at the bottom, Ms.
14  Silva, she writes, "I just saw voicemail. I emailed
15  Orlando list Monday." What list is being referred to
16  here?
17  A.    **Orland Butcher.**
18  Q.    For -- okay, for Cedar?
19  A.    **No. Nothing to do with this.**
20  Q.    Okay. All right. What I suspected, but I'm
21  just confirming.
22        All right. So let's go to the next page. And
23  what's the top of the next page says, "Yes"?
24  A.    **"Yes."**
25  Q.    Okay. "Yes. I emailed Mike and left voice" --

Page 342

1  that same one? Okay. All right. Yeah.
2        "Good morning. Any word from our goat lady?"
3  So you were asking as of June 29th if she had heard from
4  Ms. Long presumably, correct?
5  A.    **Yes.**
6  Q.    All right. And then at the bottom of that you
7  write, "Kathie is pissed now too because," and then --
8  and then where is -- what's the next page after this?
9  A.    **Sorry, I'm out of order.**
10  Q.    You're out of order. So one second. Which one
11  is that?
12        "She owns the goat. Do you want me to call CHP
13  or you want me to" -- or it says, "Do you want to call
14  CHP or you want me to?" Where did you get the idea to
15  call CHP?
16  A.    **Because it's the state fairgrounds. They have
17  jurisdiction over the state fairgrounds.**
18  Q.    Understood. Okay. And this is -- the date of
19  this text is what? This is the 29th?
20  A.    **June 29th.**
21  Q.    29th, okay. Okay. All right. And then at that
22  point in time you had Jessica's phone labeled as "goat
23  thief" it appears?
24  A.    **Yes.**
25  Q.    We are -- and then she responds, "We are

Page 343

1  contacting the sheriff for the goat." What is the next?
2        Hold on a second. Mine is out of order. You
3  give a thumbs-up. All right. What's the next page?
4  A.    **"We need something"** --
5  Q.    I'm going to give it right back to you. Not the
6  whole stack. Just going to buzz through this.
7        (Pause in proceedings.)
8  Q.    Okay. So -- so the next one -- did Jerry -- it
9  says or -- she writes, "or Jerry Fernandez is going to
10  call you for" -- do you want to read that?
11  A.    **"Or Jerry Fernandez is going to call you for
12  info on goat. Please pick up if you can."**
13  Q.    Okay.
14  A.    **Lieutenant Jerry Fernandez of the sheriff's
15  office.**
16  Q.    Okay. And did Mr. Fernandez -- or Lieutenant
17  Fernandez call you that day?
18  A.    **I do not recall.**
19  Q.    Okay. Then you populated his email. Where did
20  you get his email from?
21  A.    **I've searched. I have no idea. I've searched
22  that on the phone. I don't know where I got it.**
23  Q.    Okay. Do you know who might have given it to
24  you? Do you have any idea?
25  A.    **No.**

Page 344

1  Q.    Did he call you and give you the email?
2  A.    **He could have called me and gave it to me
3  because I can't find it in anything else.**
4  Q.    For what it's worth, I couldn't find his email
5  either in the beginning when I was trying to track down
6  Cedar, so, all right. Or having trouble finding it.
7        Okay. What's the next page here?
8  A.    **From A & R.**
9  Q.    Can I see this? Sorry, BJ. It wasn't in order
10  on my end. I need to put it in order. So I'm looking
11  at ones that are out of order.
12        (Pause in proceedings.)
13  Q.    All right. Here you go, BJ, sorry.
14        All right. So the preceding page, what is "from
15  and R"? What are you referring to at the top of this?
16  A.    **A & R.**
17  Q.    A & R. And what is that?
18  A.    **Butcher shop in Red Bluff.**
19  Q.    Okay. Isn't that the one you said earlier you
20  were unfamiliar with?
21  A.    **I never said -- A & R Butcher Shop in Red Bluff
22  I'm very familiar with.**
23  Q.    Very familiar with, okay. Not trying to put
24  words in your mouth.
25        All right. Okay. "Thank you. I will

Page 345

1  investigate and call.  Still have to have phones
2  forwarded due to goat calls."  So this is presumably in
3  response to the Instagram post at that time for Bleating
4  Hearts?
5  **A.    Yes.**
6  Q.     Okay.  So do you know what she's referring to
7  here?  The next one down says, "I'm sorry to bother you.
8  I have a" -- a July 1st text.  "I have a goat that was
9  supposed to go to Bowman's Meats for Vista Real Estate."
10 Do you know what this is being referred to?
11 **A.    That's this goat.**
12 Q.     That's this goat?
13 **A.    Yes.**
14 Q.     Okay.  All right.  So this goat is not Cedar?
15 **A.    Yes.**
16 Q.     Yes, it's not?
17 **A.    This is the one we replaced.**
18 Q.     Okay.  So this is not -- this is not an invoice
19 for Cedar's slaughter.  Or is Bowman's -- Bowman's is,
20 but this one isn't -- I'll rephrase.
21       So on Exhibit G, the top page, the invoice for A
22 & R, that is not an invoice for Cedar's -- anything to
23 do with Cedar, correct?
24 **A.    Correct.  I believe I said that before.**
25 Q.     Okay.  I misunderstood you if you did.  Okay.

Page 346

1  But Bowman's, which is the second page of Exhibit G,
2  that is in relation to Cedar or referring to Cedar?
3  **A.    Yes.**
4  Q.     Okay.  All right.  And how do you know by
5  looking at the paper on Exhibit G?
6        **MR. BRIDGES:** How do you know what?
7        **MR. GORDON:** How can he tell it's not for Cedar?
8  Do you --
9        **THE WITNESS:** I'm guessing this -- A & R tried
10 to replace the goat with another goat, and they got a
11 tiny one that is not sufficient.  So that's -- the fair
12 ate this one and replaced it with Cedar.
13       **MR. GORDON:** Okay.
14       **MR. BRIDGES:** You don't mean actually ate it?
15       **THE WITNESS:** Sorry.
16       **MR. BRIDGES:** Do you?
17       **THE WITNESS:** No.  The fair -- the fair had
18 to --
19       **MR. BRIDGES:** Took the loss?
20       **THE WITNESS:** Took the loss on this 19-pound
21 goat.
22       **MR. GORDON:** Okay.
23       **MR. BRIDGES:** Just want to make sure we're clear
24 the fair staff didn't eat the other goat.
25       **MR. GORDON:** Q.  Now, BJ, how do you know that

Page 347

1  from looking at -- strike that.
2        Did you already know those facts before looking
3  at this paper and this paper -- on Exhibit G?  Do you
4  remember -- strike that again.
5        Do you remember those occurrences that you just
6  testified to with respect to A & R?
7  **A.    Yes.**
8  Q.     Okay.  And this Exhibit G is just confirming
9  that in your -- in your brain?
10 **A.    Yes.**
11 Q.     Okay.  So there's nothing on Exhibit G that's
12 telling you this is not Cedar?
13 **A.    Yeah.  On Exhibit G.**
14 Q.     Page one?
15 **A.    Page one.  I have laid eyes on Cedar and her**
16 **carcass would have been -- or its carcass would have**
17 **been more than 19.6 pounds for a whole goat.**
18       **MR. BRIDGES:** I think he also testified A & R
19 didn't process Cedar, so.
20       **MR. GORDON:** Q.  Okay.  All right.  Okay.  So
21 next page on here, which is -- may I see it for one
22 second?
23       Okay.  So, all right, here we go.
24       So "The word goat makes my eyes twitch now."  Do
25 you know what was meant by that?  Let me strike that.

Page 348

1        Is that text, did you understand that to refer
2  to Cedar because you were having a lot of issues with
3  Cedar around that point in time?
4  **A.    Yes.**
5  Q.     Okay.  Now, this is -- do you know the date of
6  that text?
7  **A.    July 28th.  Or July 18th, I'm sorry.  July 18th.**
8  Q.     Okay.  So the next text on here you have -- it
9  goes to July 22nd, and you have "FOF pig 263 pounds."
10 That has nothing to do with Cedar, correct?
11 **A.    No.**
12 Q.     And FOF is just Friends of Fair?
13 **A.    Yeah.**
14 Q.     Okay, thanks.  And then you respond, "What's
15 gal's name at Bowman?  Kathie said okay but no one needs
16 to know about this.  You and me are the" -- "and Kathie
17 are the only ones" -- "are only ones."  This is
18 referring to Cedar, yes?
19 **A.    Yes.**
20 Q.     Okay.  "It got killed and donated to nonprofit
21 if anyone asks."
22       Why would -- why would there be -- why did you
23 say this should have been donated to a nonprofit if
24 anyone asks?
25 **A.    Because the -- I think Kathie's the one that**

Page 349

1 said that, and I probably agreed that no one needs to
2 know where that -- that we didn't want to cause that guy
3 that got the goat any grief.
4 Q.     Why would that guy get grief?
5 A.     For having that goat that Melanie and I have
6 gotten phone calls and death threats before. I think
7 the guy that got the meat would get that.
8 Q.     Okay. Was this person -- and to be clear, you
9 don't know what guy this is?
10 A.    Well, we saw Vista. Vista Real Estate.
11 Q.    Vista Real Estate is who got Cedar?
12 A.    That's what I believe is what's written here and
13 that's --
14 Q.    Okay. That's -- okay. So may I see that text
15 for one second? "Vista Real Estate got marked" -- "got
16 Cedar." Okay. That's your understanding. Okay. So
17 it's a company?
18 A.    Yes.
19 Q.    Some company? Okay. Vista Real Estate got
20 Cedar.
21        Okay. And so you were doing this to protect
22 Vista Real Estate?
23 A.    Yes.
24 Q.    Didn't you testify earlier that you didn't know
25 who got Cedar, though?

Page 350

1 A.     I did testify earlier that I did not know who
2 got Cedar, but I read it in the email or text messages
3 here and that is --
4 Q.     So that's Melanie telling you Vista Real
5 Estate --
6 A.     Yes.
7 Q.     -- is getting Cedar? Okay. All right.
8 A.     I did testify that I did not know. And I did
9 not know until I read that.
10 Q.    Okay. All right. All right. And then the next
11 page Melanie -- Melanie texts you, "Thank you. We are a
12 nonprofit." What did that -- how do you interpret that?
13 A.    As it reads. We are a nonprofit.
14 Q.    What does she mean by "we," if you know?
15 A.    The junior livestock auction.
16 Q.    Okay. So reading that in conjunction with the
17 prior text for Kathie when she said, "Tell anyone that
18 Cedar was donated to a nonprofit," and Melanie saying
19 the junior livestock auction, doesn't that imply that
20 Cedar was donated to the junior livestock auction?
21        MR. BRIDGES: Calls for speculation about what
22 Melanie meant, but if you know, you can answer.
23        THE WITNESS: No, I don't -- I think she was
24 making light of the situation of a nonprofit. I have no
25 idea, though, no clue what was she thinking.

Page 351

1        MR. GORDON: Q. Okay. So you wanted to spare
2 Vista -- what was the name of it?
3 A.     Real Estate.
4 Q.     Vista Real Estate. You wanted to spare them
5 death threats?
6 A.     Yeah, any backlash that could happen. And I
7 thought it was quite evident that they would. The fair
8 and myself were getting death threats.
9 Q.     Well, wasn't this -- what is the date of this
10 text, though, July 22nd or so?
11 A.    Yeah.
12 Q.    This is before the lawsuit is filed. So what --
13 was there death threats at that point in time or threats
14 of violence at that point in time?
15 A.    No, there wasn't actually.
16        MR. BRIDGES: You mean specifically to him?
17 Right?
18        MR. GORDON: Him or the fair, any that he's
19 aware of.
20        THE WITNESS: I do not recall. I guess I wanted
21 to spare him of any backlash that could come, I guess.
22 Or I -- Kathie --
23        MR. GORDON: Kathie told you to --
24        THE WITNESS: Yes.
25        MR. GORDON: Q. Kathie is the one that came

Page 352

1 up -- strike that.
2        So it's your testimony that Kathie made the
3 suggestion that we -- that you, Melanie and her tell
4 anyone that the goat was donated to a nonprofit if
5 anyone asked?
6 A.     Yeah. It was a -- I don't know if it was her
7 sole idea but --
8 Q.     Whose other idea was it? Was it yours?
9 A.     Yeah. It could have been mine too.
10 Q.    Okay. Both of you might have had this idea?
11 A.    (Nods head up and down.)
12        MR. BRIDGES: Do you know, or are you just
13 making it up? That's what I can't figure out. Are you
14 speculating, or do you actually know? Because he's
15 asking what you know, so you need to be sure if you're
16 telling him that you know that.
17        THE WITNESS: I do not know that.
18        MR. GORDON: Q. Okay. But it -- let's go back
19 to the page again.
20        "It got killed and donated to nonprofit if
21 anyone asks." Do you see that in the text, BJ?
22 A.    Yes.
23 Q.    You wrote that text, correct?
24 A.    Yes.
25 Q.    Why did you put that language there?

Page 353

1     **MR. BRIDGES:** It's asked and answered about
2 Kathie Muse telling him to do that.
3     **MR. GORDON:** Well, he just said he didn't
4 remember a moment ago, John.
5     **THE WITNESS:** Well, the way I read it on this is
6 Kathie said okay but no one needs to know, so I'm taking
7 it that's how she wanted it to go.
8     **MR. GORDON:** Q. Okay. So did Kathie tell you
9 to say if it -- if it got -- if got killed, Cedar, if
10 Cedar was killed, tell anyone who asks that he was
11 donated to a nonprofit?
12 A.    I do not recall.
13 Q.    You don't recall her saying it, but you believe
14 she did based upon the content of the text message?
15     **MR. BRIDGES:** Answer it.
16     **THE WITNESS:** I don't recall. I couldn't --
17     **MR. GORDON:** Q. Well, I'm asking -- I'm not
18 asking what -- now I'm not asking what you recall from
19 the time. I'm asking a moment ago -- you wrote it, so
20 do you believe you wrote it because she told it to you?
21 Because Kathie told you that at the time?
22 A.    I don't recall.
23 Q.    Okay.
24 A.    I mean --
25 Q.    BJ, why do you suspect you wrote it then?

Page 354

1 A.    "Kathie said okay, but no one needs to know."
2 That's what's making me -- I don't know.
3 Q.    That's what I'm asking. So are you inferring
4 that Kathie told you because of what you wrote in the
5 text earlier that Kathie said, "Okay, but no one needs
6 to know about this"?
7     I'm just asking if that's what's making you say
8 it now? Not a right or wrong answer to this. I'm just
9 asking what's motivating your statement.
10     **MR. BRIDGES:** You're overthinking it.
11     **MR. GORDON:** Yeah, I'm not trying -- I'm not
12 trying to trick you. I'm not trying to trick you.
13     **THE WITNESS:** Yes. Yes.
14     **MR. GORDON:** Q. Okay. So Kathie -- so you
15 think because you wrote, "Kathie said no one needs to
16 know about this" that you then, yourself, said -- or
17 maybe she told you that -- or actually you're inferring
18 that you wrote, "It got killed and donated to a
19 nonprofit if anyone asks," you're inferring that you
20 wrote that statement because immediately preceding that,
21 Kathie said no one needs to know about this?
22 A.    I don't -- I don't recall what -- I'm guessing,
23 yes, because that's what I wrote.
24 Q.    Okay. But you have no memory at the time of
25 actually why you wrote the statement. You're just

Page 355

1 guessing it from the content of the text now?
2 A.    Yes.
3 Q.    Okay. All right. Okay.
4     **THE VIDEO SPECIALIST:** Can we take a quick
5 break?
6     **MR. GORDON:** Yeah. Let me ask one more
7 question. So are you, Melanie and Kathie the only
8 people that know of the -- of the recipient of Cedar's
9 meat?
10     **MR. BRIDGES:** You mean as of today or at the
11 time?
12     **MR. GORDON:** At the time.
13     **THE WITNESS:** And Bowman Meats.
14     **MR. GORDON:** Q. Bowman Meats would know, okay.
15 And what about Vista?
16 A.    I don't believe so. I could be wrong. Bowman
17 Meats, that was their customer, they could have said
18 something, I guess.
19 Q.    I understand. But obviously Vista Real would
20 know too if they got -- that they received meat,
21 correct?
22 A.    Yes.
23 Q.    Okay.
24     **MR. BRIDGES:** Just not necessarily that it was
25 this particular goat's meat.

Page 356

1     **MR. GORDON:** Yeah, maybe not. I don't know
2 that. Okay. All right. You're asking for a break.
3     **THE VIDEO SPECIALIST:** We're off the record, and
4 the time is 11:19.
5     (Whereupon, a break was taken from 11:19
6     till 11:30 a.m.)
7     **THE VIDEO SPECIALIST:** We're back on the record,
8 and the time is 11:30.
9     **MR. GORDON:** Q. All right. So BJ, a moment ago
10 you testified that now after reading this text chain,
11 you believe Cedar went to Vista Real Estate, correct?
12 Vista Real Estate, sorry.
13 A.    Yes.
14 Q.    Okay. So I'm looking at this July 1st text. It
15 says -- from Melanie to you. Starts with, "I'm sorry to
16 bother you." It's cut off at the bottom of the page.
17 A.    Yeah.
18 Q.    Okay. All right. And this is July 1st,
19 correct?
20 A.    Yes.
21 Q.    "I have a goat that was supposed to go to Bowman
22 Meats for Vista Real Estate." Why are you inferring
23 this was -- she's referring to Cedar. She says, "I have
24 a goat that was supposed to go to Bowman Real Estate."
25 It's July 1st. She doesn't have Cedar in her possession

Page 357

1  at that point.  She's saying "a goat" not "the goat."
2  **A.      It was just a goat.**
3  Q.     Okay.  But did she have Cedar at that time?
4  **A.      No.**
5  Q.     Okay.  So why do you think this was the -- I
6  guess I'm confused as to what she's saying here.
7  **A.      Because we replaced the miss -- the goat that**
8  **Vista Real Estate was supposed to get got put I believe**
9  **in, I think I testified to this before, that goat that**
10 **Vista Real Estate was supposed to get got put towards --**
11 **I don't know how it went.  But that goat -- I don't**
12 **remember.**
13 **Vista Real Estate's goat -- Melanie would know.**
14 **Trying to think.**
15         MR. BRIDGES: Don't think.  Just answer the
16 question.
17         THE WITNESS: It was a replacement goat.  It was
18 a replacement goat for -- Cedar ended up being a
19 replacement goat for this goat.
20         MR. GORDON: Q.  Okay.  And you're certain of
21 that?
22 **A.      Yes.**
23 Q.     Okay.  And you're certain of that because of
24 this text, or you now have -- you now independently
25 remember?

Page 358

1  **A.      I do remember conversations with that A & R Meat**
2  **bill that the fair got and this that that's -- Cedar**
3  **replaced this goat.**
4  Q.     Okay.  So what Melanie's telling you, "Sorry to
5  bother you.  I have a goat," the goat she's referring to
6  is not Cedar there.  It's a replacement goat?
7  **A.      I think in this text, "I have a goat," means**
8  **that she doesn't have a goat.  It says that she's -- it**
9  **was supposed to go to Bowman's Meats that went somewhere**
10 **else.**
11 Q.     Okay.  Okay.  So to be clear, you're saying
12 Vista Real Estate received Cedar's meat.  That's your
13 testimony now?
14 **A.      Yes.  It has been.**
15 Q.     Okay.  Okay.  So well, at first you didn't
16 recall.  Now you recall?  Because at first you didn't
17 recall who received Cedar's meats, but now you do
18 recall, correct?
19 **A.      Correct.  I remember -- I know it went to**
20 **somebody, but it's Vista Real Estate.**
21 Q.     Okay.  All right.  And do you know anyone at
22 Vista Real Estate?
23 **A.      Do not.**
24 Q.     Do not.  So you and Kathie and Melanie agreed to
25 hide the ultimate transfer of Cedar if anyone asks,

Page 359

1  correct?
2         MR. BRIDGES: I'll object to the term, "hide,"
3  but you can answer if you want.
4         MR. GORDON: Well, John, you're going to object
5  to the term.  I mean, the expression I want to use,
6  which I'll use it, and you can object.
7  Q.     But BJ, do you know what the term, "noble lie,"
8  is?
9  **A.      No.**
10 Q.     Okay.  So basically, and you can jump if you
11 want, John, it basically means where people say like
12 we're going to agree to -- or one person or several
13 people, we're going to agree to not tell the truth, but
14 it's for this greater good, something like that,
15 so.
16         So it's your testimony that essentially you,
17 Kathie and Melanie agreed to create up -- to create a
18 lie of where Cedar went if anyone asks to protect
19 Bowman's?  Not Bowman's, I'm sorry.  To protect Vista
20 Real Estate?
21 **A.      Yes.**
22 Q.     Okay.  All right.  And have there been any other
23 fabrications created to protect anyone else in relation
24 to Cedar?
25 **A.      No.**

Page 360

1  Q.     None that you can think of?  Or know?  None that
2  you know of?
3  **A.      No.**
4  Q.     No, okay.  So if Vista Real Estate got Cedar,
5  what documents should they have showing that receipt?
6         MR. BRIDGES: Calls for speculation.  If you
7  know.
8         THE WITNESS: I don't -- whatever Bowman Meats,
9  between them and Bowman Meats.
10        MR. GORDON: Q.  Okay.  So Bowman Meats would
11 potentially have records, and Vista Real Estate would
12 potentially have a receipt or something, correct?
13 **A.      Of a goat.**
14 Q.     Of a goat, yeah.  I understand it would not say
15 "Cedar" on it.  Well, it might but not necessarily.
16 **A.      (Shakes head side to side.)**
17 Q.     Okay.  Would Melanie or the fair have records of
18 this transaction?
19        MR. BRIDGES: Calls for speculation.  If you
20 know.
21        THE WITNESS: I don't know.
22        MR. GORDON: Q.  Okay.  When -- you were
23 previously CEO of the fair, correct?
24 **A.      (Nods head up and down.)**
25 Q.     So it's the same --

LONG vs.
FERNANDEZ

B.J. MACFARLANE - Vol. 2
February 9, 2024

Page 361

1  A.    Yes.  Sorry.
2  Q.    Had the same situation happened when you were
3  CEO, would you have expected to get records from
4  Bowman's in that situation?
5  A.    Yeah.
6  Q.    Yes?  Okay.  All right.  So then there's a good
7  chance the fair should have -- there's a -- I don't want
8  to say -- "good" might be too loaded for John but
9  there's a -- there's a likelihood that the -- that the
10  fair has some -- should have some record of receipt of
11  where Cedar's meats went.  Is that your understanding?
12      MR. BRIDGES: Calls for speculation and
13  misstates his testimony about what the fair actually
14  would have received from Bowman Meats.  And you said
15  would you have expected to receive something from Bowman
16  not did you --
17      MR. GORDON:  Yeah.  I'll rephrase it.  I'll
18  rephrase it.
19  Q.    So you would expect the fair now then to have
20  received something from Bowman's Meats as well with
21  respect to Cedar's slaughter and delivery, correct?
22  A.    Yes.
23  Q.    Okay.  Okay.  All right.  Let's keep going.
24      So you ordered these text messages, correct, BJ?
25  A.    Yes.

Page 362

1  Q.    So let's put that one back the way it was.
2      May I have another set here?
3      All right.  So what were these then?  Extra
4  pages or?
5  A.    Yeah.  These are from -- these are the same
6  thing.  It was ones I sent before that were in daylight
7  or daytime.
8  Q.    Okay.  Okay, BJ, so is there any reason this
9  text chain was produced as a separate -- and this might
10  be a question for your attorney too, but John, why
11  wasn't this one long string, if you know?
12      MR. BRIDGES: I do not know.
13      THE WITNESS: It looks like screenshots.
14      MR. GORDON:  Okay.  All right.  It's fine.  I
15  was just curious.  Duplicate page here.
16  Q.    All right.  So BJ, let's go to this one.  And
17  this will be Exhibit K.
18      (Whereupon, Exhibit K, text chain between
19      BJ Macfarlane and Melanie Silva, date range
20      6-27-22 through 6-28-22, totaling 8 pages,
21      was marked for identification.)
22  Q.    Okay.  Do you know what you're referring to in
23  the first text in this chain?  It looks like there's
24  something on Orland, Brian Pacheco auctioneer.  Do you
25  know what's being discussed there?

Page 363

1  A.    Paying auctioneer.
2  Q.    Paying the auctioneer.  For the junior livestock
3  auction?
4  A.    Yes.
5  Q.    Okay.  I'll come back to you in a moment.
6      So on July, looks like July 28th -- or I'm
7  sorry, June 28th, I'm sorry, Melanie says, "Please call
8  me asap."  Do you see that text?
9  A.    Yeah.
10  Q.    Did you call her after that?
11  A.    I don't recall.
12  Q.    Okay.  You might have.  It would be on the call
13  records, presumably.
14  A.    Yeah.
15  Q.    So but you send her a screenshot.  It looks
16  like -- this is a screenshot of it looks like something
17  regarding Cedar, correct?
18  A.    Yes.
19  Q.    Okay.  All right.  So then after that you write,
20  "This livestock shit sucks huh.  A & R needs info" -- "A
21  & R needs info."  And then it gets cut off on my end.
22      Okay.  I'm not sure.
23      Oh, yeah.  Okay.  "Info on a pig.  Also I need
24  the buyer information for tag 714.  It's a pig."  So
25  none of this has to do with Cedar, correct?

Page 364

1  A.    No.
2  Q.    "Second one is what you sent me."  What are you
3  referring to there?  "Second one is what he sent me."
4  A.    Where are we at?  "Second one is what he sent
5  me."  It looks like -- animals are supposed to go to A &
6  R.
7  Q.    Okay.  All right.  So and then what's the next
8  page?  This page, okay.
9      "I called Kathie and it's going to A & R now."
10  What is that referring to?
11  A.    Another animal.  Those animals are there.
12  Q.    Okay.  That isn't referring to a replacement
13  goat for Cedar?
14  A.    No.  No.  Kathie has lots of animals.
15  Q.    Okay.  Okay.  What is this below from Melanie?
16  Looks like two photos of a --
17  A.    Something to do with pigs.
18  Q.    Is that a girl giving the pig beer or something?
19  I don't know why she would sending it.  Not judging.
20  Just curious what it is.
21  A.    Yes.  I was judging.  I wasn't very happy.
22  Q.    You weren't happy with it, gotcha.  And what was
23  your response?  "You got to be fucking kidding me."
24  What is that in reference to?
25  A.    That picture.  The pig picture.

Page 365

1  Q.    The pig picture.  I assume that's frowned upon
2  giving the pigs beer?
3  A.    Yes.
4  Q.    Okay.  All right.  "Any word on the goat," is
5  this in reference to Cedar?
6  A.    Yes.
7  Q.    This is the next page of the text.  Okay.
8      And she writes, "Nope.  I responded and heard
9  nothing from her.  Mike with CDFA" -- and what's the
10  date?  BJ, do you know the date of this text from her?
11  This text that says, "Nope.  I responded and," dot, dot,
12  dot, I'm referring to that text.  What is the date?
13  A.    June 28th.
14  Q.    June 28th.  Okay.  All right.  Okay.  And you
15  state, "I guess CHP needs to be contacted," correct?
16  A.    Yes.
17  Q.    Did you contact CHP?
18  A.    I don't believe I did.
19  Q.    Okay.
20  A.    Because that --
21  Q.    And Melanie responds, "You don't want to get it
22  anymore."  This is in reference to Cedar?  As you
23  understood it?
24  A.    Yes.
25  Q.    Okay.  All right.  And "Yes, I do but she is not

Page 366

1  replying to you or to me."  Is that in reference to
2  Jessica?
3  A.    Yes.
4  Q.    And Melanie responds, "Oh gotcha."
5      Okay.  And then you send a voicemail.  Do you
6  know what this is?
7  A.    No.
8  Q.    No?  Okay.  All right.  And what is the other
9  text chain you ordered for me?
10      (Pause in proceedings.)
11  Q.    Okay.  So I'll hand them back in a moment.
12      (Pause in proceedings.)
13  Q.    All right.  BJ, I'm going to hand this back to
14  you.  So this is L.  This will be Exhibit L, BJ.  And
15  ask you to take a look.
16      (Whereupon, Exhibit L, text chain between
17      BJ Macfarlane and Melanie Silva, date range
18      6-25-22 through 6-27-22, totaling 6 pages,
19      was marked for identification.)
20  Q.    Now, this is another text message between you
21  and Melanie Silva, correct, or a text chain between you
22  and Melanie Silva, correct?
23  A.    Yes.
24  Q.    Now, this is not on a separate phone number.
25  These are all the same -- the texts we've been reviewing

Page 367

1  to -- reviewing, the several pages of exhibits, these
2  are all the same chain, correct?
3  A.    Yes.
4  Q.    So I could put them in one giant long text
5  chain, correct?
6  A.    Yes.
7  Q.    Okay.  All right.  So the -- let's go to -- all
8  right.  Let's go to this next page.  This page.
9      So, you know, the text I'm pointing to right
10  now, the top of the pdf says, "I bet you are" -- "I bet
11  you were exhausted," so we're looking at this page of
12  this text chain.  And this is Melanie writing to you.
13  "So what do I do with that," question mark, "or you want
14  to chat about it tomorrow," question mark.  Okay.
15      So what is Melanie referring to in that text as
16  you understood it?
17  A.    This one?
18  Q.    Yeah.  You might have to check -- you may have
19  to check the preceding page.
20  A.    "I bet you were" -- it's an overlap.
21  Q.    Okay.  Well, what does she want to chat -- it
22  says, "Or you want to chat tomorrow about it."  What is
23  the "it"?  Cedar again?  Cedar issues?
24  A.    Yes.
25  Q.    Okay.  All right.  And calling the authorities

Page 368

1  at that point in time?
2  A.    "That they texted the clerks this afternoon that
3  they confessed to taking the goat."
4  Q.    Okay.  So she's talking about -- do you know
5  what dates these --
6  A.    June 26th.
7  Q.    Okay.  And what is the date of this?
8  A.    June 26th.
9  Q.    Still June 26th, okay.
10  A.    Yes.
11  Q.    Okay.  So you write, "We can chat but if" -- or
12  do you want to read what you wrote, BJ?  Why don't you
13  do that.
14  A.    "We can chat but if they haven't called you, I'm
15  going to contact them tonight and get the goat tomorrow.
16  Kenny will take it as resale which I took a resale to
17  replace it.  The goat taken was donated to the barbecue
18  thank god.  My thoughts are we don't press charges and
19  they don't ever show again.  Not sure, never had this
20  happen."
21  Q.    Okay.  And so who is Kenny?
22  A.    The gentleman that bought the resale goats.
23  Q.    What is a resale -- I don't know, what is a
24  resale goat?
25  A.    It's one that somebody doesn't want to --

Page 369

1 they're just helping the kids out and they get -- they
2 pay 10 bucks a pound for the goat. The kid gets 10
3 bucks a pound. And they don't want the meat, so then
4 Kenny buys the goat for a lesser price and takes the
5 meat.
6 Q.    I see. I see. So someone's basically just
7 doing charity for the child?
8 A.    Yes.
9 Q.    And then -- but they really don't want the
10 animal or the cuts of the animal, and then Kenny buys it
11 at a discount?
12 A.    (Nods head up and down.)
13 Q.    So the fair gets two -- or the -- someone's
14 getting paid twice, I guess? Is that -- or is the fair
15 selling it to the -- anyway, don't even worry about
16 that.
17        Okay. All right. But the goat's getting sold
18 twice basically --
19 A.    Yes.
20 Q.    -- correct? All right. Okay. Okay. So and
21 "My thoughts is" -- "My thoughts are we don't press
22 charges and they don't ever show again." And you're
23 referring to the Longs at that point in time, correct?
24 Cedar's --
25 A.    Yes.

Page 370

1 Q.    Okay. And why is Melanie asking you for your
2 thoughts on this? Or why are you volunteering your
3 thoughts on this, rather?
4 A.    Because I was livestock superintendant, I guess.
5 Q.    So you were aiding in decisionmaking on this
6 issue?
7 A.    No.
8 Q.    No?
9 A.    I didn't have that authority.
10 Q.    Okay. But this is what you were suggesting?
11 A.    Yeah.
12 Q.    Okay. All right. So did you -- so did you not
13 think at the time this was worth pressing charges over?
14 A.    I believe at the time she had mentioned that we
15 were going to get goat back, and I was just going to
16 grab the goat and be all over. She was going to bring
17 it back to me.
18 Q.    Okay. So if she brought it back to you, no
19 charges would be -- you did not want to pursue any
20 criminal charges, and they would never show in the fair
21 again?
22 A.    Yes.
23 Q.    Okay. But the plan for Kenny to take it never
24 arose because you didn't get Cedar back the next day,
25 correct?

Page 371

1 A.    Correct.
2 Q.    Now, for the phrase here you wrote, "and they
3 don't ever show again." Why did you write that, or why
4 did you think that? As a --
5 A.    Because they stole the goat.
6 Q.    Okay. I understand that you're saying they did
7 something wrong but did you -- was -- was precluding
8 them from ever showing at the fair again something you
9 thought appropriate, or did you read it in the rules,
10 for example?
11 A.    I don't know if it's in the rules. It's just
12 something I said. I don't know. Has no -- no bearing.
13 Q.    You independently came up with it?
14 A.    Yes. Yes.
15 Q.    Have you ever read the rules, the local rules,
16 or the fair rules, for what happens when someone
17 violates -- when a child or an exhibitor or parent
18 violates them?
19 A.    It's up to discretion, I believe.
20 Q.    But have you ever read them?
21 A.    No.
22 Q.    Okay. Did you read them before taking any
23 action in relation to Cedar?
24 A.    No.
25 Q.    I mean the local rules or the state rules?

Page 372

1 A.    I don't recall.
2 Q.    You don't recall one way or the other?
3 A.    I don't recall reading them right before this or
4 at this. I've read them several times in my lifetime.
5 Q.    Okay. Okay. All right. When was the last time
6 you recall reading them?
7 A.    No idea.
8 Q.    No idea. Last five years?
9 A.    Yeah.
10 Q.    Within the last five. Now, would that have been
11 when you were the CEO?
12 A.    Yes.
13 Q.    And just refresh my memory, BJ. When -- it's
14 been several years. When were you CEO? I know you
15 answered this before in your earlier depo. I'm just
16 trying to see if I have any follow-up in relation to
17 that date. It was before Melanie, correct?
18 A.    Yes. '18 to '22 maybe.
19 Q.    '18 to '22?
20 A.    '21. '18 to '21.
21 Q.    So you would have read the rules at that time
22 period? Or you believe you read the rules during that
23 time period?
24 A.    Yes.
25 Q.    Okay. All right. And by "rules," I'm talking

Page 373

1  about the state rules and the whatever local rules were
2  then in existence.
3      Okay.  So you haven't read the rules -- they're
4  updated yearly, though, correct?
5  **A.   Yes.**
6  Q.    Okay.  So you haven't -- you did not read the --
7  for this fair would have been the 2022 rules.  You did
8  not read those rules, correct?
9  **A.   I believe I did because the updates they**
10 **highlight when they send them out.**
11 Q.    I remember you said that before, yeah.
12 **A.   So the highlights I did read.**
13 Q.    You read the highlights, and the rest you
14 presume is the same?
15 **A.   Same.**
16 Q.    Okay.  All right.  Okay.  Okay.  Now, when --
17 these are just some other little questions we have.
18     BJ, I'm going to hand you a meet and confer
19 letter.  John, I believe you said -- I believe you said
20 you forwarded the letter to them, told that to me and
21 Vanessa, so I think he's already seen it, but I'm
22 assuming you did.
23     MR. BRIDGES: I don't know what letter you're
24 talking about.
25     MR. GORDON: It's a meet and confer letter that

Page 374

1  we gave for discovery.
2      MR. BRIDGES: Oh, okay.
3      MR. GORDON: Okay.  All right.  If you need to
4  take a look.  I remember you at the time saying I just
5  forwarded to them the other documents, so there's not
6  like anything in it.  It's stuff we've already
7  discussed, but it's just so I can go over this with him.
8  Q.    BJ, I'm assuming you saw this document before?
9  **A.   I don't recall.**
10 Q.    Okay.  That's fine.  I just have some questions.
11 So start on page five.
12     Okay.  There's just a list of names at the
13 bottom.  So this was our letter to your attorney just
14 for some other documents we were looking for.  And I
15 know you've given text chains and perhaps some other
16 documents, but I just want to see maybe if specifically
17 what you looked for on other matters here, okay.
18     So let's start on page -- so page six.  And this
19 will be Exhibit L.
20     MR. BRIDGES: I'll just object to the use of
21 this.  It's not evidence.  It's just correspondence
22 between two attorneys.  So I don't know why it's being
23 attached to a deposition.
24     MR. GORDON: Okay, that's fine.  We don't need
25 to attach it.  That's fine, John.  That's fine.  But I'm

Page 375

1  just going to over -- this is just for the names so I
2  can go over it with him but we don't need to -- we don't
3  need to attach it then.  That's fine.
4  Q.    So BJ, you reviewed for and you testified to
5  this earlier.  I'm just checking it off my list for due
6  diligence.  You looked for all -- for all your texts and
7  emails concerning Cedar?
8  **A.   Yes.**
9  Q.    And what steps did you undertake to do that?
10 **A.   Jessica Long, Cedar, goat.**
11 Q.    Now you're saying terms.  Are you trying to
12 communicate that you searched for -- used those as
13 search terms on your computer and phone?
14 **A.   Yes.**
15 Q.    And did you look at any other places other than
16 your computer and phone?
17 **A.   No.**
18 Q.    Okay.  All right.  And did you look for any
19 correspondence of Baron Browning?
20 **A.   No.**
21 Q.    Okay.  You did not, okay.  We'll talk about that
22 with your attorney afterwards because we're -- I believe
23 you testified at your previous deposition that he might
24 have given you -- that you thought he may have given you
25 Sheriff Michael Johnson's number.

Page 376

1      Now, did you look for Cedar's ear tags?
2  **A.   No.**
3  Q.    No?  Okay.  Do you think you still have them?
4  **A.   Possibly.**
5  Q.    Possibly.  Okay.  All right.  Well, they should
6  probably be produced or should be produced.  Okay.
7      So there's a list of names here too.  So Melanie
8  Silva you gave us.  I saw your text messages.  Did you
9  search for emails from her?
10 **A.   Yes.**
11 Q.    And no emails?
12 **A.   No emails.**
13 Q.    And for Kathie Muse, did you have any other text
14 messages with Kathie Muse?
15 **A.   No.**
16 Q.    No?  Did you look?
17 **A.   Yeah.**
18 Q.    Okay.  Any emails from her?
19 **A.   No.**
20 Q.    Okay.  All right.  And we already asked Baron
21 Browning.  Mike Flores, any text messages or emails with
22 him?
23 **A.   I don't believe so.**
24 Q.    Okay.  Did you look?
25 **A.   Yes.**

LONG vs.
FERNANDEZ

B.J. MACFARLANE - Vol. 2
February 9, 2024

Page 377

1 Q.    Okay.
2 A.    **Not specifically his name.**
3 Q.    Oh, so you didn't really look?
4 A.    **Well, I looked for goat, Cedar.**
5 Q.    Okay.  But there might have been something not
6 captured by that.  You didn't look for his name?
7 A.    **Correct.**
8 Q.    And Mike Francesconi, same question, you looked
9 for -- you didn't look for him specifically in relation
10 to Cedar?
11 A.    **Yes.**
12 Q.    Okay.  And Sheriff Michael Johnson, did you look
13 for anything with him in relation to Cedar?
14 A.    **Yes.**
15 Q.    His name specifically?
16 A.    **His name specifically.**
17 Q.    Okay.  And what about Fernandez?
18 A.    **Yes.  I looked specifically for Fernandez.**
19 Q.    Okay, gotcha.  And Detective Duncan?
20 A.    No.
21 Q.    Okay.  You did not look for Duncan?
22 A.    No.
23 Q.    All right.  And what about Detective Ashbee?
24 A.    No.
25 Q.    No?  Okay.  All right.  And -- okay.

Page 378

1       Yeah, the date ranges, BJ, do you know what date
2 ranges you searched for, if you recall?
3 A.    **Yeah.  Forever.  Whatever's on the phone.**
4 Q.    Forever?  Okay.  So that would have -- did
5 you -- forever.  So you didn't restrict your date range
6 at all is what you're saying?
7 A.    No.
8 Q.    So at any point in time you looked.  Okay.
9       Okay.  Did you look specifically for just date
10 ranges -- did you look for -- did you do any searches
11 that were not by key terms but just by date ranges?  So
12 for example, June 22nd to like September 19th, so you
13 just looked for everything coming in and outgoing there?
14 A.    **Yes.**
15 Q.    Okay.  Okay.  And same thing from March 29th to
16 April 22nd, did you look for everything incoming and
17 outgoing for those dates?
18 A.    No.
19 Q.    Because sometimes a key term won't capture
20 something that's relevant.  So you did not for March
21 29th to April 22nd?
22       Okay.  And what about November 7th through
23 November 15th, 2023, did you look through?
24 A.    No.
25 Q.    Okay, that's fine.

Page 379

1       **MR. BRIDGES:** You mean specifically -- not just,
2 as he said, he did a general search for all these
3 things, but he didn't specifically do a search limited
4 to those date ranges.
5       **MR. GORDON:** Yeah, those dates for no terms.
6 Just like maybe something fell through that a term
7 didn't capture just to look at those dates.  That's all
8 I'm asking.
9       So it's just the first date you testified the
10 22nd to the 19th of June -- that date you did, but the
11 other days you did not, okay.
12 A.    **Yeah.**
13 Q.    Oh, we didn't finish the names here.
14       And did you -- did you search for any email
15 address -- emails or email addresses for any employee or
16 personnel at the district attorney's office?
17 A.    No.
18 Q.    You didn't search for that?
19 A.    No.
20 Q.    Okay.  Do you know any employees at the district
21 attorney's office?
22 A.    **I do not.**
23 Q.    No, okay.  So when you said the woman before,
24 you're referring to whoever the DA is, but you don't
25 know the name; is that correct?

Page 380

1 A.    **Correct.**
2 Q.    Okay.  That's fine.  All right.  And you
3 searched for -- I believe you testified there was a
4 Jessica at the fair that worked there, but you didn't
5 know the last name.  Did you search for any
6 communications with her in relation to Cedar?
7 A.    **Just my general search.**
8 Q.    Just your general search, okay, but not her
9 specifically.
10      What about Andrea Thomas, any emails from her?
11 A.    No.
12 Q.    Or texts?
13 A.    **I did not search for the rest of these.**
14 Q.    Okay.  All right.  Okay, that's fine.  All
15 right.
16      The same thing for text messages for those
17 people like Brian Dahle, Megan Dahle, you did not search
18 for emails or texts from them?
19 A.    No.
20 Q.    Or Lori Murchi (phonetic spelling).  I don't
21 know if I'm saying that correctly.  I think you just
22 said a moment ago you didn't search for anything for
23 her, okay.
24      And Bruce Ross, there might be -- he was
25 mentioned in your text chain.  He might have sent you

Page 381

1 something, but you didn't specifically search for him?
2 A.   I did not.
3 Q.   Okay.
4     MR. BRIDGES: Just to be clear, we did
5 previously produce at least one email from Bruce Ross.
6     MR. GORDON: Yeah, yeah. John, it's just that
7 looked like it might have been referencing something
8 else. Maybe it's the same email, I'm not sure. Okay.
9     All right. Give me one second. We're trying to
10 wrap up for you, BJ.
11 Q.   So this is -- might be -- I'm going to jump
12 around maybe a little, but I think I have a few hanging
13 questions.
14     So just to be clear, when you had -- and I know
15 the answer to this, and you know the answer to this.
16 This is just confirming for the record, so don't think
17 I'm trying to trick you.
18     When you had Cedar at your house, you had no
19 court order permitting you to have Cedar at the house,
20 correct?
21 A.   No.
22 Q.   No, okay. Thank you. And when he was there,
23 you nor anyone else at the fair that you know of gave
24 notice to Jessica that he was there?
25 A.   No.

Page 382

1 Q.   No, okay. Let me talk to Vanessa for a moment
2 and back in one second.
3     THE VIDEO SPECIALIST: Off the record?
4     MR. BRIDGES: Yes. Go off the record.
5     THE VIDEO SPECIALIST: We're off the record, and
6 the time is 12:03.
7     (Whereupon, a break was taken from 12:03
8     till 12:06 p.m.)
9     THE VIDEO SPECIALIST: We're back on the record,
10 and the time is 12:06.
11     MR. GORDON: We're back on the record. So we're
12 going to -- we're going to end the deposition today.
13     John, we believe we're probably done with him,
14 but we're just reserving any rights if he has any more
15 documents for the few minutes we have left on the depo.
16 I know we'll probably fight about it later but we're
17 still reserving rights if he finds more documents if I
18 have any questions about them but that's it.
19     MR. BRIDGES: I mean, I won't agree to that, but
20 I understand.
21     MR. GORDON: Understand, yeah. Okay. That's
22 fine. So because he doesn't have them today and there's
23 some of them he's saying he might not have looked for.
24 But, you know, and maybe they're not even salient but
25 once he performs a search and talks to you about so if

Page 383

1 anything else is even absent.
2     Okay. That's it for today. Damian, go ahead.
3 It for me unless I have recross.
4     MR. NORTHCUTT: I just have a couple questions
5 here.
6
7     EXAMINATION BY MR. NORTHCUTT
8     MR. NORTHCUTT: Q.  Good afternoon, Mr.
9 Macfarlane. My name's Damian Northcutt. You may recall
10 me from the last deposition. We represent the sheriff's
11 office. I just have a couple follow-up questions
12 regarding your testimony I just want to make sure I'm
13 clear on.
14     Earlier you testified that you've never spoken
15 with Sheriff Johnson regarding Cedar the goat. I want
16 to follow up with that. I'm assuming since you've never
17 spoken with him that -- can you tell me, did Sheriff
18 Johnson ever instruct you to kill Cedar the goat at any
19 time?
20 A.   No.
21 Q.   Has anyone from the Shasta County sheriff's
22 department ever instructed you at any time to kill Cedar
23 the goat?
24 A.   Not to my recollection.
25 Q.   There was a conversation that you had earlier

Page 384

1 where I think you testified between July 8th and July
2 28th, I think it's 2022, you did not recall actually
3 speaking with anyone from the sheriff's department. You
4 mentioned that it could have been a possibility. So is
5 it fair to say it's also a possibility that you didn't
6 have any phone calls with the sheriff's department
7 during that timeframe?
8 A.   It's a possibility.
9 Q.   Okay. You also testified that, and again, I'm
10 paraphrasing here, so if anything's incorrect, please
11 correct me, but since you were waiting on Melanie or
12 Kathie as to what to do with Cedar the goat, and you
13 have testified that you assumed that they were in
14 communication with the sheriff's department. I think
15 you actually said they could have been. Was that just
16 an assumption on your behalf?
17 A.   It was an assumption.
18 Q.   Okay. So you don't have -- did you have any
19 sort of direct knowledge whether or not they actually
20 were in communications calls with the sheriff's department in
21 July, after July 8th?
22     MR. GORDON: Vague as to direct knowledge.
23     THE WITNESS: I have no direct knowledge that I
24 can recollect.
25     MR. NORTHCUTT: Q.  Okay. There was a

Case 2:22-cv-01527-DAD-AC   Document 118-4   Filed 11/15/24   Page 43 of 60

LONG vs.                                                          B.J. MACFARLANE - Vol. 2
FERNANDEZ                                                              February 9, 2024

Page 385

1  conversation that occurred I guess between you and
2  either Lieutenant Fernandez or Detective Duncan on the
3  evening of July 8th or the morning of July 9th when
4  Cedar the goat was actually being turned over to you.
5  Do you actually recall specifically the conversation you
6  had with either of those officers?
7  A.    Not specifically, no.
8  Q.    Do you actually recall what they said to you
9  or --
10 A.    I thought I recalled them just told me to hold
11 on to the goat till --
12 Q.    Did they say anything further other than to hold
13 on to the goat, or was it just for you to hold on to the
14 goat?
15 A.    I don't recall. I mean, I --
16        MR. NORTHCUTT: All right. Yeah, it's fine. If
17 you don't recall, you don't recall.
18        I think that's it on my end.
19        MR. GORDON: Okay. Just one or two follow-ups
20 really quick.
21
22        FURTHER EXAMINATION BY MR. GORDON
23        MR. GORDON: Q.  So BJ, a moment ago you
24 testified that you had no direct knowledge of
25 communications between anyone at the sheriff's

Page 386

1  department and the fair, correct?
2  A.    Correct.
3  Q.    Did you have any -- and Kathie Muse, correct?
4  A.    Correct.
5  Q.    Do you have any indirect knowledge of that? So
6  just maybe one of the -- Melanie or -- or Silva said
7  something in passing that you can recall?
8  A.    I do not recall.
9  Q.    So you might have heard something, but you don't
10 recall?
11 A.    I don't recall.
12 Q.    Is that a yes then? You might have heard
13 something, but you don't recall?
14 A.    I don't remember hearing anything.
15 Q.    I understand that. But you don't remember
16 hearing anything one way or the other, correct?
17 A.    Yes.
18 Q.    Okay. All right.
19        MR. NORTHCUTT: I think he said it was an
20 assumption on his part, but. Anyway, that's it from us
21 on our end here.
22        I'd like a copy of the transcript, please, and a
23 video copy as well.
24        And Ryan, do you want to do the same
25 stipulation?

Page 387

1        MR. GORDON: Yeah. I'm just debating if we have
2  one more.
3  Q.    Yeah, so just, BJ real quick. So you don't
4  recall talking with any of the -- this is just so the
5  record's clear. You don't recall talking with Fernandez
6  or anyone else at the sheriff's office after Cedar was
7  delivered. You don't recall -- you might have had
8  conversations, but you don't recall, correct?
9  A.    Yes.
10 Q.    But you definitely know you did not talk to
11 Sheriff Johnson, correct?
12 A.    Yes.
13        MR. GORDON: Okay.
14        MR. BRIDGES: Nothing.
15        THE VIDEO SPECIALIST: Is that it?
16        MR. GORDON: That's it, yeah. Damian, go ahead
17 and read your stip. That's fine.
18        MR. NORTHCUTT: We'll stipulate that a copy of
19 the transcript can be used the same as the original in
20 discovery and at the time of trial.
21        MR. BRIDGES: Just for the record, I will take a
22 copy, please. Thank you. Not the video. Just the
23 written.
24        THE VIDEO SPECIALIST: That answered my
25 question.

Page 388

1        MR. NORTHCUTT: Is everyone on board with that
2  stip?
3        MR. GORDON: That a certified copy can be used
4  at the trial, is that what you said, Damian?
5        MR. NORTHCUTT: Yeah, a certified copy can be
6  used the same as the original for discovery and at the
7  time of trial.
8        MR. GORDON: Yeah, so stipulated.
9        MR. BRIDGES: Yes.
10        MS. SHAKIB: And we'd like a copy of the
11 transcript also. Thank you.
12        MR. BRIDGES: Stipulate.
13        THE VIDEO SPECIALIST: Okay. This is the end of
14 the deposition of BJ Macfarlane. All video originals
15 will be retained at the offices of Redding Video
16 Productions at 8954 Old Oregon Trail. We're off the
17 record, and the time is 12:13.
18        (Whereupon, the deposition concluded at
19 12:13 p.m.)
20                    ---oOo---
21
22
23
24
25

Page 389

1        PENALTY OF PERJURY
2        Please be advised I have read the foregoing
3    deposition, and I hereby state there are:
4
5    (Check one)    _____ no corrections
6                   _____ corrections attached
7
8    Executed on _____
9              Date
10
11   _____
12   BJ MACFARLANE
13
14              ---oOo---
15
16
17
18
19
20
21
22
23
24
25

Page 390

1        DEPONENT'S CHANGES OR CORRECTIONS
2    Note:  If you are adding to your testimony, print the
     exact words you want to add.  If you are deleting from
3    your testimony, print the exact words you want to
     delete.  Specify with "Add" or "Delete" before each
4    entry.  Please sign and date this form.
5    Deposition of:  BJ MACFARLANE
     Name of Case:  LONG vs. FERNANDEZ, etc.
6    Date of Deposition:  FEBRUARY 9, 2023
7
     I, _____, have made the
8    following changes in my deposition:
9    PAGE     LINE     ADD/DELETE
10   _____    _____    _____
11   _____    _____    _____
12   _____    _____    _____
13   _____    _____    _____
14   _____    _____    _____
15   _____    _____    _____
16   _____    _____    _____
17   _____    _____    _____
18   _____    _____    _____
19   _____    _____    _____
20   _____    _____    _____
21   _____    _____    _____
22   _____    _____    _____
23   _____    _____    _____
24   _____    _____    _____
25   SIGNATURE _____DATE _____

Page 391

1        REPORTER'S CERTIFICATE
2
3        I hereby certify that the witness in the
4    foregoing deposition was duly sworn by me to tell the
5    truth, the whole truth, and nothing but the truth in the
6    within-entitled cause; that said deposition was taken at
7    the time and place herein named; and that the testimony
8    of said witness was reported by me, a duly certified
9    shorthand reporter and disinterested person, and was
10   thereafter transcribed under my direction by
11   computer-assisted transcription.
12       I further certify that I am not of counsel or
13   attorney for either or any of the parties to said
14   deposition, nor in any way interested in the outcome of
15   the case named in said caption.
16       IN WITNESS WHEREOF, I have hereunto set my
17   hand.
18
19       DATED:  FEBRUARY 25, 2024
20
21
22   _____
23       SUZANNA MICKELSON, CSR No. 14270
24           State of California
25

# A

**ability (1)**
232:7
**able (2)**
246:15;259:25
**above (4)**
319:10,14;327:5;
328:19
**absent (1)**
383:1
**accurate (3)**
273:12,16;330:17
**acquire (1)**
284:17
**action (1)**
371:23
**actual (1)**
311:13
**actually (15)**
333:7,8;341:12;
346:14;351:15;352:14;
354:17,25;361:13;
384:2,15,19;385:4,5,8
**added (1)**
250:1
**add-ons (1)**
321:15
**address (1)**
379:15
**addresses (2)**
322:19;379:15
**affect (1)**
232:12
**afternoon (4)**
240:16;247:5;368:2;
383:8
**afterwards (5)**
259:17;271:20;
330:7;336:6;375:22
**again (57)**
230:15,19;232:21;
239:19;240:12;245:17;
246:13,20;248:6,7;
267:8;269:12;277:25;
280:14;281:12;282:18;
283:3,6,6,15,15;285:7;
288:5;295:15,17;
297:21;298:5,13,22;
299:15;300:20,25;
302:4;310:19,22;
313:3,6,22,23;315:1;
328:10;331:3;332:11,
14;335:1;339:1;340:1;
22;347:4;352:19;
367:23;368:19;369:22;
370:21;371:3,8;384:9
**ago (9)**
248:5;271:6;295:24;
324:16;353:4,19;
356:9;380:22;385:23
**agree (3)**

359:12,13;382:19
**agreed (3)**
349:1;358:24;359:17
**ahead (9)**
264:18;265:25;
266:5;267:17,22;
282:21;298:10;383:2;
387:16
**ahold (2)**
332:16,17
**aiding (1)**
370:5
**alcohol (1)**
232:9
**along (1)**
257:21
**alternatively (1)**
328:21
**Although (6)**
246:14;295:18;
296:22;297:13,24;
320:3
**Andrea (1)**
380:10
**animal (5)**
256:22;326:12;
364:11;369:10,10
**animals (4)**
257:22;364:5,11,14
**answered (14)**
239:7;245:16;249:6;
264:18;267:17,22;
293:23;294:12;308:8;
309:4;334:15;353:1;
372:15;387:24
**anymore (1)**
365:22
**anything's (1)**
384:10
**apart (1)**
273:4
**apologize (1)**
247:25
**apparently (1)**
258:22
**appear (1)**
320:14
**appearance (1)**
230:5
**appeared (1)**
229:6
**appearing (1)**
234:15
**appears (1)**
342:23
**appointment (1)**
321:12
**appointments (1)**
322:6
**appreciated (1)**
230:16
**apprised (7)**
280:7;281:5,13,19;

309:22;310:2,3
**appropriate (1)**
371:9
**approval (1)**
307:22
**approved (1)**
306:22
**approximately (1)**
266:18
**April (2)**
378:16,21
**argue (1)**
272:20
**arose (1)**
370:24
**around (13)**
279:21;284:25;
285:19;302:23;306:8,
8;309:12;315:12;
321:12;322:4,6;348:3;
381:12
**arrange (5)**
251:23;252:10;
267:5;306:9,11
**asap (1)**
363:8
**Ashbee (1)**
377:23
**aside (1)**
274:4
**associated (1)**
229:20
**assume (16)**
231:20;282:22;
283:2;284:19;285:15;
301:1;304:8,10;
307:13,19;313:7;
317:11;326:4;331:9;
339:16;365:1
**assumed (1)**
384:13
**assuming (15)**
251:2,14;287:14;
307:13,19;308:22,22,
23;319:9;325:18;
326:1,2;373:22;374:8;
383:16
**assumption (3)**
384:16,17;386:20
**AT&T (2)**
273:25;275:10
**ate (3)**
270:8;346:12,14
**attach (2)**
374:25;375:3
**attached (2)**
331:1;374:23
**attorney (5)**
231:10,15;362:10;
374:13;375:22
**attorneys (1)**
374:22
**attorney's (2)**

379:16,21
**auction (11)**
235:21;236:11;
261:21;281:8,14,20,23;
350:15,19,20;363:3
**auctioneer (3)**
362:24;363:1,2
**audible (1)**
230:25
**August (17)**
255:3,5,10,12;313:1,
2,2,4,13;314:14;315:7;
320:7;323:10;324:23;
332:1;333:10;334:1
**authorities (2)**
341:2;367:25
**authority (4)**
245:21;251:18;
263:14;370:9
**avoid (1)**
231:1
**aware (4)**
261:17;273:23;
314:13;351:19
**away (1)**
266:10

# B

**back (37)**
233:24;234:1,25;
242:15,16;248:6;
259:25;268:18;295:14,
20;300:5;312:14,20;
320:3,5,5;331:24;
336:22,24;337:15,17,
19,22;343:5;352:18;
356:7;362:1;363:5;
366:11,13;370:15,17,
18,24;382:2,9,11
**backlash (2)**
351:6,21
**backwards (8)**
318:16;319:10,14,
17;339:2,21;340:1,21
**bad (1)**
323:3
**barbecue (5)**
238:7;260:23;261:9,
18;368:17
**Baron (2)**
375:19;376:20
**based (9)**
246:8;266:11;
290:11,22;291:1,25;
292:4;305:1;353:14
**bases (2)**
264:17,20
**basically (6)**
232:23;295:13;
359:10,11;369:6,18
**basis (1)**
265:11

**bearing (1)**
371:12
**Bee (1)**
326:20
**Beef (1)**
323:15
**beer (2)**
364:18;365:2
**beforehand (3)**
266:19,24;274:16
**beg (1)**
262:17
**begin (1)**
230:7
**beginning (3)**
229:15;230:17;344:5
**begins (3)**
231:5;341:6,7
**behalf (2)**
234:15;384:16
**belief (6)**
248:17;256:13;
290:16,21;291:1,2
**below (4)**
328:4,21,23;364:15
**besides (2)**
252:18;271:1
**best (12)**
231:3,23;266:21;
283:11,16;284:24;
287:15;288:1;301:9,
12;304:24,25
**bet (3)**
367:10,10,20
**bill (2)**
254:24;358:2
**BJ (99)**
229:7,11;230:3;
234:6;246:12;253:25;
254:10;263:10;273:25;
279:2,4;283:20,23;
286:21;287:7,10;
288:23;290:7;291:19;
294:19;295:24;298:10,
19;300:6,12;302:3,8;
303:12;304:13;306:19;
307:25;309:6,20;
310:7,25;312:17,22;
313:19;314:13;316:23;
317:4;318:3;319:6,7,8,
8;320:3,13,18,21,23;
322:20;323:16,18,20;
324:13;326:15;327:6;
328:13,14,20;331:7;
333:8;335:24;337:14,
20;339:18,21,25;340:1,
13,15,23;341:12;344:9,
13;346:25;352:21;
353:25;356:9;359:7;
361:24;362:8,16,19;
365:10;366:13,14,17;
368:12;372:13;373:18;
374:8;375:4;378:1;

381:10;385:23;387:3;
388:14
**blame (1)**
260:10
**Bleating (2)**
326:10;345:3
**Bluff (2)**
344:18,21
**board (1)**
388:1
**body (1)**
259:3
**boss (2)**
250:14,14
**both (9)**
231:7;238:21;299:4,
6;303:1,15;310:15;
315:3;352:10
**bother (3)**
345:7;356:16;358:5
**bottom (10)**
277:15;302:9;
309:12;310:16,21;
322:18;341:13;342:6;
356:16;374:13
**bought (3)**
256:10;261:21;
368:22
**Bowman (23)**
252:5,8;255:11,19,
22;256:3,8,11,21,24;
266:7;303:20;348:15;
355:13,14,16;356:21,
24;360:8,9,10;361:14,
15
**Bowman's (35)**
252:11,13,17,22;
254:4;257:11;258:7,
19;259:3,5;260:11;
264:14;267:5;270:13;
304:5,7,18,20;305:19,
24;306:9;310:10,18,
22;311:1,4;345:9,19,
19;346:1;358:9;
359:19,19;361:4,20
**brain (1)**
347:9
**break (6)**
268:16;312:12;
355:5;356:2,5;382:7
**Brian (2)**
362:24;380:17
**BRIDGES (108)**
230:2,2;234:12;
236:16;239:7,24;
241:3;242:3,7;243:21,
25;244:3;245:2,16;
249:6;253:22;259:19,
23;260:6,10;263:5;
264:18;265:10;267:17,
22;271:13;272:14,19;
273:6;274:23,25;
275:5,9;276:4,7;277:3,

5;278:4,12;282:20;
288:15;289:1,8,14,21;
290:15;293:23;294:11,
18;297:3,6;298:15;
299:14;304:10;306:23;
307:12;311:10;312:19;
313:25;314:8;315:22;
316:1,5,16,21;319:18;
322:12,14;328:11;
329:15;330:23;337:25;
338:21;339:3,7,10,15;
346:6,14,16,19,23;
347:18;350:21;351:16;
352:12;353:1,15;
354:10;355:10,24;
357:15;359:2;360:6,
19;361:12;362:12;
373:23;374:2,20;
379:1;381:4;382:4,19;
387:14,21;388:9,12
**briefly (1)**
241:4
**bring (5)**
234:1,24;284:18;
322:8;370:16
**bringing (1)**
233:24
**broadly (4)**
263:23;264:1,25;
265:4
**brother (1)**
332:1
**brought (1)**
370:18
**brown (1)**
238:19
**Browning (2)**
375:19;376:21
**Bruce (23)**
318:13;328:1,3,9,10,
18,19,25;329:4,8,12,
16,17,19,20;330:1,4,
11,16,19,25;380:24;
381:5
**bucks (2)**
369:2,3
**bud (1)**
331:9
**bullshit (1)**
335:3
**business (4)**
252:22;276:18,19;
280:17
**busy (1)**
244:21
**Butcher (3)**
341:17;344:18,21
**butchered (4)**
259:6;321:6,18,23
**Butchering (2)**
254:15;255:25
**butt (6)**
318:7;331:9,10;

332:10;333:9;337:4
**buy (1)**
256:21
**buyer (1)**
363:24
**buyers (6)**
270:6;322:19,22;
323:3,4,8
**buys (2)**
369:4,10
**buzz (1)**
343:6

**C**

**cadence (1)**
231:5
**calendar (2)**
315:11;331:24
**California (4)**
229:4,6,17,19
**call (63)**
233:9;237:2;260:17;
264:14,19;275:17;
281:3,4,11,17;283:14;
284:12;285:3,4,10,12,
17,22,23;287:7,18;
288:24,25;293:6;
300:8,15;301:6;
303:16,17,20;304:5,7;
306:1;309:13,21;
310:6,10,11,18,22;
313:11,14,21;314:4;
324:23;335:2,4,7,15,
15;337:15,22;342:12,
13,15;343:10,11,17;
344:1;345:1;363:7,10,
12
**called (25)**
248:8,8;260:20;
278:19,21,23;279:7;
285:11;304:16,17,18;
305:21,24;306:4,5,9,
11;325:6;327:1;
335:18;336:6,7;344:2;
364:9;368:14
**calling (9)**
235:18;278:2;289:1;
304:20;318:25;325:17;
327:21;335:5;367:25
**calls (50)**
231:1;265:10;274:2;
280:13,16;282:3,10,20;
283:4,7,8;287:3;
288:15;294:11,12;
295:23,25;296:2,13,23;
297:13,25;306:23,24;
307:12;309:6,10,11,15;
310:15;314:1;332:4,5,
12;333:14,19,24;334:3,
7,12;336:4;337:25;
338:21;345:2;349:6;
350:21;360:6,19;

361:12;384:6
**came (4)**
252:8;258:13;
351:25;371:13
**can (80)**
231:3,24;232:15,25;
234:10;236:7,15;
237:8;240:5,9;242:3;
245:16;246:4;247:2;
248:6;265:3,11;266:5;
267:13;274:17,19,19,
23;275:6;276:1,1,13;
279:10,10;282:8;
285:21;286:21;287:6;
286:16;295:13,20;
297:11;298:10;299:14;
302:3,8;303:11;304:8;
306:18;307:25,25;
309:19;310:17;312:8;
314:25;315:14,15,17;
317:9;321:12,14;
322:19;323:4;335:13;
337:21;338:13;340:19;
343:12;344:9;346:7;
350:22;355:4;359:3,6,
10;360:1;368:11,14;
374:7;375:2;383:17;
384:24;386:7;387:19;
388:3,5
**capture (2)**
378:19;379:7
**captured (1)**
377:6
**Carcass (5)**
323:13,14,15;
347:16,16
**care (9)**
238:25;239:6,10;
274:4;275:7;286:4,8;
292:24;293:1
**careful (1)**
311:13
**case (7)**
229:15;234:16;
236:16;253:23,24;
274:4;325:24
**cause (1)**
349:2
**CDFA (13)**
235:17;282:6;318:6;
331:8,13;332:10;
333:9;335:2,18,19;
336:2;337:3;365:9
**CDFA's (1)**
240:19
**Cedar (162)**
233:2,18;234:21;
236:21;237:21;238:12,
24;245:9;248:24;
250:5;251:18;252:9;
253:13;254:3;255:7;
258:7,20,25;260:12;
261:1,20;262:1;

263:17;264:2;265:1,9;
266:15;267:2;269:2,5,
8,13,22;270:9,12,18;
271:8,17,24;273:4;
276:23;278:22;279:22;
280:5,9,22;281:13,19,
25;282:18;283:5,8,16;
284:15,17;285:14,18,
24;286:2,23;287:4,8,
15,18;288:1;290:11;
291:16;292:23;293:9,
11;294:4,20;296:3,10,
25;297:16;298:3,8;
300:25;302:5,16,24,25;
303:4,6,7,9,24,25;
304:20;309:17;310:3,
12,19,23;313:5;
321:20;322:24;323:8;
325:24;326:8;338:7;
341:18;344:6;345:14,
23;346:2,2,7,12;
347:12,15,19;348:2,3,
10,18;349:11,16,20,25;
350:2,7,18,20;353:9,
10;356:11,23,25;357:3,
18;358:2,6,25;359:18,
24;360:4,15;363:17,
25;364:13;365:5,22;
367:23,23;370:24;
371:23;375:7,10;
377:4,10,13;380:6;
381:18,19;383:15,18,
22;384:12;385:4;387:6
**Cedar's (14)**
251:24;256:3;
269:25;322:8;323:10;
345:19,22;355:8;
358:12,17;361:11,21;
369:24;376:1
**cell (16)**
241:20,22;242:19;
249:14;275:16,23,25;
276:4,12,17;280:17;
284:2;330:11;335:15,
16,19
**CEO (8)**
236:1;250:14;
251:11,14;360:23;
361:3;372:11,14
**certain (1)**
357:20,23
**Certified (3)**
229:5;388:3,5
**Chad (2)**
233:14;234:19
**chain (18)**
246:22,23;294:5;
320:4,17;337:14;
340:14;356:10;362:9,
18,23;366:9,16,21;
367:2,5,12;380:25
**chains (1)**
374:15

**Challe (3)**
229:3,18,20
**chance (4)**
270:2;311:5;323:12;
361:7
**change (5)**
260:8;312:5,6,8;
341:12
**changed (1)**
250:3
**changes (1)**
259:21
**charge (4)**
255:2,6;261:10;
336:3
**charges (5)**
368:18;369:22;
370:13,19,20
**charity (1)**
369:7
**chat (5)**
367:14,21,22;
368:11,14
**check (14)**
238:6;276:1,11;
279:10,11;311:23;
317:9;320:11;329:7,
11;331:3;341:3;
367:18,19
**checking (1)**
375:5
**child (2)**
369:7;371:17
**CHP (5)**
342:12,14,15;
365:15,17
**chronological (1)**
319:19
**civil (1)**
327:15
**clarify (3)**
253:22;297:11;
298:11
**clarifying (1)**
268:25
**clean (1)**
268:21
**clear (16)**
232:21;253:10;
267:8;284:23;289:14;
298:15,20;330:23;
333:20;346:23;349:8;
358:11;381:4,14;
383:13;387:5
**clerks (1)**
368:2
**clue (1)**
350:25
**coming (2)**
259:24;378:13
**comma (3)**
240:16;327:6;328:14
**commencing (1)**

229:2
**comment (1)**
325:17
**comments (2)**
318:24;327:1
**common (3)**
244:13,13;281:7
**communicate (1)**
375:12
**communicated (2)**
296:20;299:12
**communicating (1)**
290:2
**communication (12)**
236:25;247:12;
250:17;251:4,10,15;
288:10,13;289:10;
291:5;301:21;384:14
**communications (6)**
236:10;237:3;280:8;
380:6;384:20;385:25
**community (1)**
238:7
**company (9)**
255:17,25;270:5,7;
325:3,4,8;349:17,19
**complaint (1)**
326:16
**complete (1)**
244:14
**completed (1)**
241:7
**completing (1)**
323:9
**computer (2)**
375:13,16
**concern (5)**
285:14;313:5,14;
314:6;316:13
**concerned (8)**
287:12;288:1;
289:15;309:17;310:12;
313:24;314:21;315:1
**concerning (3)**
310:19,23;375:7
**concluded (2)**
260:1;388:18
**confer (3)**
330:9;373:18,25
**confessed (1)**
368:3
**confirm (1)**
276:10
**confirming (3)**
341:21;347:8;381:16
**confused (3)**
278:12;297:10;357:6
**confusing (2)**
245:7;255:24
**confusion (2)**
290:15;318:23
**conjunction (1)**
350:16

**connection (1)**
271:7
**consistent (1)**
280:2
**contact (8)**
250:2;258:6;260:12;
265:19;288:21;335:18;
365:17;368:15
**contacted (5)**
244:22,23,24;
258:22;365:15
**contacting (2)**
341:3;343:1
**contacts (2)**
277:22;335:14
**containing (1)**
236:9
**content (6)**
284:3,4,6;293:16;
353:14;355:1
**contest (3)**
323:13,14,15
**context (2)**
248:16;327:13
**conversation (36)**
233:21;234:4,22;
239:5;279:17;284:3,5,
9,19,23,24;286:22;
287:12;288:6;293:19,
25;294:6,16;300:23;
301:7;302:11,15,19,22;
304:12;305:6,22,23;
313:3;314:6,20,25;
337:1;383:25;385:1,5
**conversational (1)**
231:5
**conversations (15)**
281:9,25;283:16;
291:3;293:21;294:3,
24;296:19;302:4,6;
303:13,15;305:9;
358:1;387:8
**coordinated (1)**
307:9
**coordinator (1)**
261:9
**copied (3)**
323:22,23;324:14
**copies (1)**
340:2
**copy (15)**
275:2;279:12;324:7,
10,16;328:6;339:13;
340:4;386:22,23;
387:18,22;388:3,5,10
**correctly (2)**
268:25;380:21
**correspondence (2)**
374:21;375:19
**Counsel (3)**
229:22;230:4;330:7
**County (2)**
234:15;383:21

**couple (6)**
243:13;248:20;
259:16;266:2;383:4,11
**course (4)**
231:18;246:4;
273:24;316:10
**Court (13)**
229:16,19,24;230:9,
22;274:11;275:1;
295:14;315:15;327:23;
339:24,25;381:19
**COVID (1)**
330:21
**create (2)**
359:17,17
**created (1)**
359:23
**criminal (1)**
370:20
**cross (1)**
290:19
**cross-reference (1)**
335:13
**crystal (1)**
284:23
**curious (3)**
253:25;362:15;
364:20
**current (1)**
249:21
**currently (1)**
241:22
**Custom (1)**
254:15
**customer (12)**
256:7,8,11,12,15,19,
20,24;257:2,9,10;
355:17
**cut (3)**
259:6;356:16;363:21
**cuts (3)**
256:3;258:21;369:10

**D**

**DA (30)**
239:17;240:17,23,
23;243:11,14;247:6;
251:6;259:15;262:6,7,
9,18,25;264:2;289:11;
290:25;291:7;292:3;
294:2,7;298:21,24;
301:22;306:21;307:23;
308:7,11;309:2;379:24
**Dahle (3)**
330:17;380:17,17
**Damian (16)**
230:5;234:7,9,14;
247:25;263:22;264:24;
295:11,22;297:20,22;
312:19;383:2,9;
387:16;388:4
**DA's (7)**

267:11,21;268:2,6,
12;288:14;307:10
**dash (1)**
339:19
**date (44)**
237:24;238:5;
251:20,23;252:8;
264:9;265:21;269:9;
282:17;284:15,15,21,
22;285:19;302:21;
304:1,3;309:14;
313:13;314:15;318:12,
21;320:18;340:15,24;
341:3;342:18;348:5;
351:9;362:19;365:10,
10,12;366:17;368:7;
372:17;378:1,1,5,9,11;
379:4,9,10
**dated (3)**
255:8,10;275:11
**dates (12)**
232:23;248:5;266:7;
274:6;283:19;317:14;
318:3,22;368:5;
378:17;379:5,7
**date's (1)**
229:12
**daughter (3)**
233:17,23;234:23
**day (29)**
229:2;238:6;265:24;
276:23,25;277:23;
284:17;302:13;303:15,
23;313:4,24;314:7;
315:5,6,8;321:23,24;
322:9;324:25;333:13,
14,16,19,23;334:4,25;
343:17;370:24
**daylight (1)**
362:6
**days (10)**
235:5;236:6;263:11;
266:2;287:9;289:5;
290:11;292:19;302:24;
379:11
**daytime (1)**
362:7
**dead (1)**
323:10
**deal (3)**
257:23;281:5;338:8
**deals (2)**
257:17,19
**death (5)**
332:13;349:6;351:5,
8,13
**debating (1)**
387:1
**December (7)**
317:4,6,18,20;318:3,
4;337:13
**decisionmaking (1)**
370:5

**defendant (1)**
326:17
**Defendants (2)**
230:2,5
**definitely (3)**
253:11;305:3;387:10
**delay (1)**
308:17
**delete (3)**
249:24;329:25;330:4
**delivered (5)**
237:21;284:15;
286:2;326:10;387:7
**delivery (2)**
285:24;361:21
**Department (49)**
234:16;237:14;
244:7,15;245:5;
247:17;248:9,12;
250:25;251:5,6,10,15;
262:24;263:18,20;
264:5;265:3,6,8,18;
267:10,12,16;269:10,
16;270:24;271:1,23;
272:9;273:3;290:2;
291:6,6,15;294:1,7;
295:2,7;298:8;306:21;
307:23;308:6;383:22;
384:3,6,14,20;386:1
**depo (3)**
232:15;372:15;
382:15
**deposed (1)**
230:20
**deposition (21)**
229:11,17;230:18;
232:20;241:24;242:8;
243:9;246:12,13,18;
259:13;276:13;316:17,
18;330:24;374:23;
375:23;382:12;383:10;
388:14,18
**deposition's (1)**
260:1
**deprived (1)**
244:22
**deputies (1)**
247:15
**deputy (2)**
244:5;247:14
**describe (1)**
254:21
**description (1)**
232:24
**destined (1)**
261:8
**details (1)**
244:20
**detective (7)**
238:15,16;299:4,9;
377:19,23;385:2
**determine (1)**
323:8

**different (2)**
279:3;303:3
**digital (1)**
274:20
**digits (2)**
275:21;279:6
**diligence (1)**
375:6
**direct (5)**
261:12;384:19,22,
23;385:24
**direction (5)**
250:5,9;270:18;
271:8;307:22
**directions (4)**
245:11,14;271:20;
286:18
**directly (1)**
329:16
**discount (1)**
369:11
**discovery (5)**
254:9,10;374:1;
387:20;388:6
**discretion (1)**
371:19
**discuss (1)**
281:23
**discussed (3)**
274:22;362:25;374:7
**discussing (2)**
280:22;283:5
**Discussion (1)**
242:12
**discussions (1)**
286:23
**distinction (2)**
232:3;243:3
**District (5)**
229:16,17;230:3;
379:16,20
**doctors (2)**
321:12;322:6
**document (3)**
254:19,22;374:8
**documents (9)**
236:10;282:14;
329:10;360:5;374:5,
14,16;382:15,17
**domain (1)**
332:25
**donated (9)**
348:20,23;350:18,
20;352:4,20;353:11;
354:18;368:17
**done (9)**
252:22;260:13,18;
270:17;271:7;281:8;
297:22;330:9;382:13
**dot (3)**
365:11,11,12
**double (2)**
268:5;320:11

**down (13)**
265:22;292:8;
293:15;296:8;299:21;
326:25;333:17;334:2;
344:5;345:7;352:11;
360:24;369:12
**drop-off (2)**
271:24;272:10
**dropped (19)**
238:13;245:9;
247:20;248:24;253:13;
263:8,11;269:3,8,14;
271:14,24;273:4;
290:11;293:11;294:4,
20;296:10;299:2
**dropping (1)**
285:14
**drugs (1)**
232:6
**due (2)**
345:2;375:5
**duly (1)**
229:8
**Duncan (6)**
238:12,16;299:9;
377:19,21;385:2
**duplicate (3)**
319:22,23;362:15
**during (8)**
231:9;268:8;282:2;
291:3;294:24;301:3;
372:22;384:7
**DVD (1)**
312:10

**E**

**ear (1)**
376:1
**earlier (15)**
261:20;268:23;
276:25;289:5,6;295:7;
334:23;344:19;349:24;
350:1;354:5;372:15;
375:5;383:14,25
**early (4)**
238:3;278:19,20,21
**easier (2)**
275:2,9
**Eastern (1)**
229:17
**eat (1)**
346:24
**effect (1)**
331:10
**either (16)**
233:15;235:16;
239:14;250:10;269:4;
270:18;271:8;292:14;
295:8,8;299:8;311:8;
335:19;344:5;385:2,6
**else (15)**
231:22;235:20;

239:1;270:25;271:3;
305:5;324:11;327:4;
344:3;358:10;359:23;
381:8,23;383:1;387:6
**em (1)**
306:5
**email (16)**
236:9;329:5,7,8,11,
21;330:24;343:19,20;
344:1,4;350:2;379:14,
15;381:5,8
**emailed (2)**
341:14,25
**emails (11)**
236:9;330:4;375:7;
376:9,11,12,18,21;
379:15;380:10,18
**employee (1)**
379:15
**employees (2)**
233:11;379:20
**end (9)**
261:25;263:22;
312:10;344:10;363:21;
382:12;385:18;386:21;
388:13
**ended (1)**
357:18
**enforcement (4)**
236:3;250:17,19;
327:16
**enforcement's (2)**
327:11,19
**engaged (1)**
235:4
**enough (3)**
314:12;327:20;
332:15
**entire (1)**
339:1
**entirety (1)**
315:20
**entitled (1)**
231:22
**entry (3)**
277:16;280:16;281:3
**especially (1)**
248:11
**essentially (1)**
359:16
**Estate (21)**
345:9;349:10,11,15,
19,22;350:5;351:3,4;
356:11,12,22,24;357:8,
10;358:12,20,22;
359:20;360:4,11
**Estate's (1)**
357:13
**estimate (13)**
231:23,24,25,25;
232:1;266:22;283:11,
16;284:24;288:2;
301:10,12;304:25

**etcetera (3)**
231:10;310:4;319:1
**even (10)**
238:3;242:8;250:14;
259:24;284:12;296:18;
334:12;369:15;382:24;
383:1
**evening (11)**
233:4,9,15;269:3,8;
277:15;290:12,23;
292:9;323:11;385:3
**events (7)**
232:19,24;304:25;
305:8,10;309:23;310:2
**everyone (2)**
234:11;388:1
**evidence (1)**
374:21
**evident (1)**
351:7
**exact (5)**
285:21;304:11,14;
305:9;314:15
**EXAMINATION (3)**
230:11;383:7;385:22
**examined (1)**
229:9
**example (5)**
231:24;291:15;
317:15;371:10;378:12
**Excel (1)**
322:20
**except (2)**
230:20;274:21
**exercise (1)**
339:1
**exhausted (1)**
367:11
**exhibit (35)**
246:12,14,16,18,19;
254:14;274:12,16,17;
275:10;300:5;317:6;
320:13,17,22;339:23;
340:12,13,14,19,25;
341:7,7;345:21;346:1,
5;347:3,8,11,13;
362:17,18;366:14,16;
374:19
**exhibitor (2)**
235:20;371:17
**exhibitors (1)**
235:21
**exhibits (1)**
367:1
**existence (1)**
373:2
**expect (1)**
361:19
**expected (2)**
361:3,15
**explain (1)**
332:11
**explaining (2)**

321:19,22
expressed (1)
304:14
expression (1)
359:5
extent (1)
314:1
extra (3)
340:10,11;362:3
extreme (1)
315:3
extremely (1)
244:21
eyes (2)
347:15,24

**F**

fabrications (1)
359:23
facility (1)
256:23
fact (2)
250:23;258:25
facts (1)
347:2
faded (1)
279:14
Fair (58)
230:3;233:3,12;
235:22;250:15;252:24;
253:1;254:7;256:10,
22,22;277:11,19;279:8,
11;282:25;283:1;
302:11;304:6,17,19;
305:21;309:13,21;
314:12,24;315:12;
325:16,19;331:25;
337:23;338:8,11,15;
346:11,17,17,24;
348:12;351:7,18;
358:2;360:17,23;
361:7,10,13,19;369:13,
14;370:20;371:8,16;
373:7;380:4;381:23;
384:5;386:1
fairgrounds (2)
342:16,17
fairs (1)
235:18
fair's (1)
257:17
familiar (6)
252:19,20;255:25;
275:25;344:22,23
family (1)
334:6
far (4)
235:1;236:20;239:9;
240:23
father (1)
293:2
February (4)

229:1,12;317:19;
337:12
feel (2)
267:7;319:16
fell (1)
379:6
Fernandez (40)
236:8,14;238:12,16;
247:19,24;248:1,8,14,
24;249:1;262:21;
270:19;271:1,9,11,12,
14,19;273:4;282:14;
290:12,23;291:2;
292:4;293:21;296:10,
14;299:8;311:19,21;
343:9,11,14,16,17;
377:17,18;385:2;387:5
Fernandez's (1)
249:14
few (10)
243:15;248:4;
257:20;274:9;277:22;
278:22;287:9;313:4;
381:12;382:15
fight (1)
382:16
figure (3)
257:5;321:15;352:13
figured (1)
259:24
figuring (1)
321:16
filed (16)
313:14,24;314:7,10,
13;315:5,6,7;318:8;
328:22,25;331:21;
333:13,16,23;351:12
final (1)
260:5
find (8)
233:11,12;246:15;
257:4;273:22;319:3;
344:3,4
finding (1)
344:6
finds (1)
382:17
fine (32)
237:20;241:8,10;
249:6;261:14,16;
266:21;273:1;275:5,7;
281:2;294:14;295:15,
21;308:25;312:8;
316:5,7;326:3;340:8;
362:14;374:10,24,25,
25;375:3;378:25;
380:2,14;382:22;
385:16;387:17
finish (3)
297:20;312:23;
379:13
finished (1)
328:12

firm (1)
229:14
first (26)
229:8;241:24;
254:23,23,24;255:24;
276:24;280:12;296:20,
24;297:14;298:1;
299:11;303:17;317:3;
321:2;324:2;330:21,
24;334:15;340:5,24;
358:15,16;362:23;
379:9
Fisher (3)
229:3,18,21
five (7)
268:13;312:3;334:5,
21;372:8,10;374:11
flash (2)
237:21;283:18
flashback (1)
300:12
flip (5)
277:13;279:2;287:6;
313:9;335:24
flipped (1)
246:23
Flores (1)
376:21
FOF (2)
348:9,12
follow (2)
383:16
following (2)
280:15;315:8
follows (1)
229:9
follow-up (3)
300:1;372:16;383:11
follow-ups (1)
385:19
Forever (3)
378:3,4,5
forget (1)
323:12
forgetting (1)
295:19
forward (9)
232:15;237:21;
283:18;323:16;327:2,
3;328:8,15;333:5
forwarded (3)
345:2;373:20;374:5
found (2)
233:3;314:11
foundation (4)
232:21;313:25;
314:8;315:19
four (3)
275:21;279:6;336:15
Fowler (2)
233:15;234:19
Fox (1)
229:13

Francesconi (4)
335:6,7,8;377:8
frankly (1)
274:4
frantic (1)
279:24
free (2)
267:8;319:16
frequently (1)
277:19
Friday (6)
229:1;238:1,2,8,8,9
friends (2)
325:20;348:12
front (2)
255:20;285:20
frowned (1)
365:1
fucking (1)
364:23
full (1)
273:21
further (8)
239:12;292:13,16;
295:1,6;320:5;385:12,
22

**G**

Gal (1)
252:14
gals (1)
336:15
gal's (1)
348:15
gave (17)
231:23;248:5;250:4,
8;251:17;260:7;
271:19;286:3,8;
305:15;306:8,19;
317:5;344:2;374:1;
376:8;381:23
gel (2)
277:9;304:9
gels (1)
306:7
general (3)
379:2;380:7,8
generalization (2)
326:2;327:21
generally (2)
305:8,10
gentleman (4)
238:19;258:1,12;
368:22
gentlemen (1)
229:10
gets (4)
237:21;363:21;
369:2,13
giant (1)
367:4
girl (1)

364:18
given (6)
264:25;287:20;
343:23;374:15;375:24,
24
gives (1)
231:15
giving (5)
272:23;287:24;
301:16;364:18;365:2
goat (127)
233:24;234:1,24;
239:6,10;240:17;
247:6,20;250:15;
252:5;254:6;255:1,11;
256:7,10,19,20,21;
257:24;258:1,7;
260:22;261:5,8,12;
264:9;269:22;278:23;
284:7;286:13;287:14;
289:23;291:13;292:4,
10,11,12,15;295:1,6,8;
298:9,21,25;299:2;
301:14,15;302:25;
303:1,6,7,8;307:5,6,9;
308:4,16;321:6,17,19,
20;338:6,16,22,24;
341:1;342:2,12,22;
343:1,12;345:2,8,11,
12,14;346:10,10,21,24;
347:17,24;349:3,5;
352:4;356:21,24;
357:1,1,2,7,9,11,13,17,
18,19,19;358:3,5,5,6,7,
8;360:13,14;364:13;
365:4;368:3,15,17,24;
369:2,4;370:15,16;
371:5;375:10;377:4;
383:15,18,23;384:12;
385:4,11,13,14
goats (3)
255:13,14;368:22
goat's (3)
235:10;355:25;
369:17
god (1)
368:18
goes (5)
235:16;319:9,10;
320:5;348:9
Good (20)
230:12,14;233:9;
234:9;240:13,15;
247:4;312:21;319:8;
323:11,18;324:13;
327:6;328:14,20;
342:2;359:14;361:6,8;
383:8
GORDON (168)
229:25,25;230:4,11,
12;233:8;234:17;
236:17,19;238:5;
239:9;240:4,7;241:8,

10;242:6,11,15,18;
243:23;244:1,4;245:6,
20,22;246:16;247:25;
248:3;249:8;251:1;
253:24;260:3,9,11;
263:4,10,21;264:19;
265:5,12,15;267:14,19,
25;268:13,20;270:25;
271:16,19;272:16,24;
273:9;274:24;275:4,7,
13;276:11;277:4,7;
278:6,10,15;279:16;
282:23;288:17,23;
289:5,9,17,24;290:20;
291:10;293:24;294:14,
19;295:10,15,18,21;
297:5,7,12,20;298:13,
19;299:18;304:13;
306:25;307:8,17,25;
308:9,17;309:5;
311:12;312:2,7,17,22;
314:3,12;315:23;
316:4,8,18,22;319:20;
322:13,16;328:13;
329:20,25;331:1;
333:22;338:2,4,24;
339:5,8,12,16;340:3,8,
11,18,21;346:7,13,22,
25;347:20;351:1,18,23,
25;352:18;353:3,8,17;
354:11,14;355:6,12,14;
356:1,9;357:20;359:4;
360:10,22;361:17;
362:14;373:25;374:3,
24;379:5;381:6;
382:11,21;384:22;
385:19,22,23;387:1,13,
16;388:3,8
**gotcha (4)**
311:14;364:22;
366:4;377:19
**grab (1)**
370:16
**great (5)**
232:11,14,18;
234:17;247:2
**greater (1)**
359:14
**green (3)**
264:25;266:12;
291:16
**grief (2)**
349:3,4
**Gross (1)**
326:2
**ground (1)**
230:18
**guess (23)**
234:4;235:19;
236:10;244:13,14;
245:4;289:23;304:8;
308:22;312:7;325:21,
22;327:3,14;329:10;

351:20,21;355:18;
357:6;365:15;369:14;
370:4;385:1
**guessing (15)**
232:3;244:7;247:10;
252:25;263:6,7;
278:23;290:9;301:14;
324:20;326:5;338:6;
346:9;354:22;355:1
**guesstimate (2)**
266:20;284:12
**guy (4)**
349:2,4,7,9

**H**

**habit (1)**
334:11
**hair (1)**
238:19
**half (2)**
321:7,18
**hand (7)**
273:19,19;274:11;
321:3;366:11,13;
373:18
**handbook (1)**
235:20
**handed (1)**
235:20
**handled (1)**
338:16
**hands (3)**
258:23;327:11,19
**hanging (1)**
381:12
**happen (3)**
257:20;351:6;368:20
**happened (8)**
232:19;258:19;
270:12;289:19;305:1;
314:16;322:15;361:2
**happens (4)**
231:7;256:21;
258:21;371:16
**happy (3)**
332:23;364:21,22
**Hard (2)**
318:18;334:8
**hate (2)**
321:16;332:13
**head (18)**
265:22;292:8;
293:15;296:8;299:21;
307:18,20;308:1,3,16,
25;311:3;333:17;
334:2;352:11;360:16,
24;369:12
**hear (7)**
234:10;237:18;
245:24;263:13;292:12;
308:6,11
**heard (7)**

292:13,16;335:1;
342:3;365:8;386:9,12
**hearing (2)**
386:14,16
**Hearts (2)**
326:10;345:4
**held (1)**
238:7
**help (7)**
272:12;317:15,25;
318:10;319:2;337:19;
339:18
**helping (3)**
257:18;331:25;369:1
**here's (1)**
318:6
**Hi (3)**
234:11;337:14,20
**hide (2)**
358:25;359:2
**highlight (4)**
277:14;287:10;
300:21;373:10
**highlighted (6)**
273:20;275:19;
279:4;280:13;300:9;
302:10
**highlights (5)**
275:15;279:13;
283:20;373:12,13
**highly (1)**
337:9
**himself (1)**
290:24
**hold (22)**
240:14;263:8;
287:21;290:23;292:10,
12;294:22,25;295:5,8;
296:3,3,25;297:15;
298:2,4,8,9;343:2;
385:10,12,13
**holding (2)**
307:9;320:23
**home (1)**
274:18
**honestly (1)**
248:1
**hour (3)**
229:2;321:7,18
**hours (3)**
278:22;331:19,21
**house (14)**
232:2;237:21;
245:10;250:8;269:3,8;
271:25;284:16;285:14;
286:13;292:15;293:4;
381:18,19
**housed (1)**
292:11
**housing (2)**
292:10,13
**huh (1)**
363:20

**human (1)**
270:4

**I**

**idea (12)**
288:22;300:3;338:3;
342:14;343:21,24;
350:25;352:7,8,10;
372:7,8
**identification (6)**
254:16;275:12;
320:20;340:17;362:21;
366:19
**immediately (1)**
354:20
**imply (1)**
350:19
**important (1)**
230:24
**impression (5)**
289:25;290:4;
307:21;309:1;338:19
**inadvertent (1)**
248:1
**included (1)**
271:12
**incoming (2)**
275:16;378:16
**incorrect (12)**
268:22,25;269:11,
12,16,17,22,25;270:14,
20;272:25;384:10
**independently (2)**
357:24;371:13
**indirect (1)**
386:5
**individual (1)**
270:4
**inferring (4)**
354:3,17,19;356:22
**info (5)**
333:5;343:12;
363:20,21,23
**information (5)**
289:6;292:20;
299:12;300:2;363:24
**Instagram (1)**
345:3
**instance (1)**
248:11
**instead (1)**
265:4
**instruct (1)**
383:18
**instructed (2)**
296:3;383:22
**instruction (2)**
286:7,8
**instructions (15)**
238:23;239:13;
284:8;286:3,11,15;
287:18,20;294:21;

295:6;296:14;301:16;
302:18;303:24,25
**instructs (1)**
231:15
**interest (2)**
326:17,23
**interfering (1)**
232:6
**Inter-Mountain (2)**
315:12;331:25
**interpret (2)**
327:17;350:12
**into (1)**
317:6
**introduce (1)**
229:22
**investigate (1)**
345:1
**investigation (1)**
282:14
**Invoice (5)**
254:14;255:8;
345:18,21,22
**involved (1)**
325:22
**involving (1)**
325:24
**issue (3)**
272:19;282:24;370:6
**issues (6)**
281:14,19,22;313:7;
348:2;367:23
**item (14)**
280:13;281:3,17;
282:12;283:7;284:3;
285:8;287:1,9;302:10;
310:21;313:16,23;
314:5

**J**

**Jerry (4)**
343:8,9,11,14
**Jessica (11)**
233:2,21;234:21,22;
236:9,10;326:8;366:2;
375:10;380:4;381:24
**Jessica's (1)**
342:22
**job (2)**
259:6;336:3
**John (19)**
230:2;272:12;
273:21;274:14;315:19;
319:16;330:8;331:3;
338:25;339:20;353:4;
359:4,11;361:8;
362:10;373:19;374:25;
381:6;382:13
**Johnson (24)**
239:22;240:3,22,22;
241:2,6,12;243:11;
244:18;248:19,21,22;

253:12;259:15;269:21,
21;273:16;311:11,12,
15;377:12;383:15,18;
387:11
**Johnson's (3)**
241:20;242:19;
375:25
**Join (7)**
240:1;241:9;267:24;
288:18;289:12;297:9;
306:24
**judging (2)**
364:19,21
**July (116)**
233:3,3;237:22;
238:1,1,8,9;241:12;
242:21;243:12;245:7,
9;246:6,6;247:11;
248:20,25,25,25;252:7;
253:12,13,17;264:4,9;
267:1,1,4,9,9,15,15,20,
20;268:8,8,10;269:3,4,
4,9,9,14,14;271:25;
276:23;277:8;283:19;
284:1,15;285:7;
286:22;287:6,8,9,13;
288:4,6;291:4,4;292:1,
5,21;293:11;294:23;
295:24,25;296:6,6,21,
23,24;297:1,4,5,14,14,
16,25;298:1;299:13;
300:8,10,11,16,20;
301:6,7,13;302:4,13;
304:17;308:20;309:9,
23;310:9,12,18;321:8;
345:8;348:7,7,7,9;
351:10;356:14,18,25;
363:6,6;384:1,1,21,21;
385:3,3
**jump (3)**
319:16;359:10;
381:11
**June (36)**
233:7,8,9;234:4;
235:10;236:8;237:9;
242:20;245:7;277:3,4,
7,23;280:3,12,20;
281:12;282:9,11,12,13,
19;283:7;341:5,6,7;
342:3,20;363:7;
365:13,14;368:6,8,9;
378:12;379:10
**junior (5)**
281:8;350:15,19,20;
363:2
**jurisdiction (1)**
342:17

## K

**Kathie (95)**
239:14;245:18,19,
20,25;246:1,22;250:10,

11;251:17;260:12,17,
21,22;261:2,5,7,12,17;
262:2;263:13,15,24,25,
25;264:15,20;265:8,19,
20,23,24;266:3,13,17;
267:1;269:5;270:19;
271:4,9;278:13;284:5;
285:10,18;286:23;
287:2;289:23;290:1;
291:3,12;292:14,16,20;
295:8;296:23;297:25;
298:10;302:4;304:19;
305:13,22,24;306:14;
307:15,21;308:5,11;
313:12;342:7;348:15,
16;350:17;351:22,23,
25;352:2;353:2,6,8,21;
354:1,4,5,14,15,21;
355:7;358:24;359:17;
364:9,14;376:13,14;
384:12;386:3
**Kathie's (1)**
348:25
**Kathy's (5)**
261:25;283:23;
307:4;308:4,16
**keep (8)**
234:13;311:2;320:4,
13;332:17;339:25;
340:5;361:23
**keeping (7)**
280:7;281:5,13,18;
309:22;310:2,2
**Kenny (5)**
368:16,21;369:4,10;
370:23
**kept (1)**
245:10
**key (2)**
378:11,19
**kid (1)**
369:2
**kidding (1)**
364:23
**kids (5)**
321:12;322:3,5,6;
369:1
**kill (17)**
240:17;247:6;
251:18;252:9;255:2,2,
4,11;264:2;265:1;
292:4;298:21,25;
303:24,25;383:18,22
**killed (10)**
253:14;258:25;
263:17;264:9;291:16;
348:20;352:20;353:9,
10;354:18
**killing (7)**
252:5;255:7;297:1,
16;298:2,8;306:22
**kind (1)**
336:13

**knew (3)**
264:19;314:10,16
**knowledge (7)**
290:18;325:23;
384:19,22,23;385:24;
386:5
**knowledgeable (2)**
327:20;332:15
**known (3)**
330:19;332:18,19

## L

**labeled (1)**
342:22
**lack (1)**
315:19
**lacks (2)**
313:25;314:8
**Ladies (1)**
229:10
**lady (2)**
341:1;342:2
**laid (1)**
347:15
**language (1)**
352:25
**last (32)**
230:17,23;231:6,24;
232:6,18,20;235:7;
236:25;237:7,12;
239:15;246:13,18;
247:12;275:20;277:16;
279:6;302:10;306:1;
336:11,16;337:13,21,
24;338:12,20;372:5,8,
10;380:5;383:10
**late (9)**
233:4;234:11;
237:22,25;238:2,9;
285:11,17;306:4
**later (5)**
230:6;275:6,8;
277:15;382:16
**law (5)**
250:17,19;327:11,
15,19
**lawsuit (20)**
313:13,14,24;314:6,
7,10,13,21;315:1,2,9;
318:25;327:15;328:22,
25;331:14;332:18;
333:1,23;351:12
**lawsuit's (1)**
318:8
**lawyer (1)**
240:19
**leading (1)**
333:2
**least (3)**
276:12;278:19;381:5
**left (5)**
335:11,24,25;

341:25;382:15
**Legally (2)**
260:3,5
**less (1)**
337:22
**lesser (1)**
369:4
**letter (6)**
330:9;373:19,20,23,
25;374:13
**letting (1)**
266:1
**lie (2)**
359:7,18
**Lieutenant (15)**
236:8,14;238:12,16;
248:1;249:13;270:18;
271:1,8;290:12;
296:10,14;343:14,16;
385:2
**lieutenants (1)**
250:21
**lifetime (1)**
372:4
**light (4)**
264:25;266:12;
291:16;350:24
**likelihood (1)**
361:9
**likely (6)**
267:4;283:9,10;
301:4,13;302:17
**limited (1)**
379:3
**line (5)**
279:8;280:14;281:4;
310:21;323:3
**lining (1)**
322:21
**link (10)**
328:4,21,23,25;
329:1,2,4,22;331:1,4
**list (8)**
271:12;322:19;
323:8;341:15,15;
374:12;375:5;376:7
**little (3)**
303:18;373:17;
381:12
**livestock (15)**
281:8,19,23;325:2,4,
7,8;337:18,19;350:15,
19,20;363:2,20;370:4
**loaded (1)**
361:8
**local (6)**
235:11,17,19;
371:15,25;373:1
**log (2)**
293:6;316:13
**Long (12)**
233:17;234:5,20;
236:25;280:8;316:2;

330:19,20;342:4;
362:11;367:4;375:10
**Longs (1)**
369:23
**look (27)**
246:20;254:12;
257:6,7,11;275:25;
315:10;319:8;331:24;
339:22;366:15;374:4;
375:15,18;376:1,16,24;
377:3,6,9,12,21;378:9,
10,16,23;379:7
**looked (12)**
235:13;241:23;
326:11;374:17;375:6;
377:4,8,18;378:8,13;
381:7;382:23
**looking (26)**
233:24,25;278:13,
17;283:7,19;284:3;
285:7;291:25;304:2;
305:3;313:23;317:4;
318:3;322:17;339:4,5,
9,11;344:10;346:5;
347:1,2;356:14;
367:11;374:14
**Looks (53)**
260:19;276:22;
277:14,22;278:2,18;
279:2,7;280:12,15;
281:2,11;282:10;
283:4;284:2;285:10;
286:22;287:7;300:19;
302:9,9,11;303:14,14,
16,19;304:4,4,5,6,16;
309:10,13,19,20;310:9;
313:2,11;314:24;
319:25;320:5,21;
321:2;333:8,10;
340:21;362:13,23;
363:6,15,16;364:5,16
**Lori (1)**
380:20
**loss (2)**
346:19,20
**lost (1)**
250:2
**lot (4)**
244:20;250:2;
273:14;348:2
**lots (3)**
257:19,20;364:14
**lot's (1)**
331:5

## M

**MACFARLANE (16)**
229:7,12;230:3,13;
242:19;268:20;273:18;
275:13;279:12;320:18;
325:7;340:15;362:19;
366:17;383:9;388:14

**Madame (2)**
274:11;339:24
**mainly (1)**
281:25
**major (1)**
281:24
**makes (2)**
233:1;347:24
**making (5)**
243:2;350:24;
352:13;354:2,7
**many (8)**
243:10;246:3,5;
248:18;249:1;259:12,
14;334:3
**March (2)**
378:15,20
**mark (2)**
367:13,14
**marked (7)**
254:16;275:11;
320:20;340:17;349:15;
362:21;366:19
**matter (3)**
274:20;329:12;
338:16
**matters (1)**
374:17
**may (7)**
320:3;347:21;
349:14;362:2;367:18;
375:24;383:9
**maybe (22)**
247:11;248:20;
250:20,20;251:3;
252:1;266:8;272:25;
281:13;314:1;315:9;
336:3;339:19;354:17;
356:1;372:18;374:16;
379:6;381:8,12;
382:24;386:6
**mean (53)**
236:16;242:24;
243:3,4;247:17,18,19;
248:1,10;250:19;
251:3;253:22;263:18,
23;266:12;268:3;
278:5;284:13;289:22;
298:19,23;310:2;
311:10,15;323:23;
325:2,20;326:19;
327:12,14,17,20;
328:10;329:16;330:8,
8,20;331:9,13;332:11,
17,24;338:5;346:14;
350:14;351:16;353:24;
355:10;359:5;371:25;
379:1;382:19;385:15
**means (3)**
249:10;358:7;359:11
**meant (4)**
325:7;331:12;
347:25;350:22

**meat (19)**
254:4;255:19,22;
256:13;257:10;261:18,
21;262:2;269:25;
322:8,15;349:7;355:9,
20,25;358:1,12;369:3,5
**Meats (17)**
252:8;256:8,24;
303:21;345:9;355:13,
14,17;356:22;358:9,
17;360:8,9,10;361:11,
14,20
**media (3)**
229:15;312:11,15
**meds (1)**
232:11
**meet (3)**
330:9;373:18,25
**Megan (1)**
380:17
**Melanie (105)**
230:3;236:22,23;
237:13,19;239:14;
240:18;243:17;244:23;
245:1,18,18,19,20,25;
246:4,6;249:2;250:10,
11;251:9,17;256:18;
257:12,13;258:6;
260:12;261:14;263:13,
16,25;264:15,20;265:8,
19;266:4,14,18;267:1;
269:4;270:19;271:5,9;
278:14,15;281:17;
286:12;290:24;292:14,
16;295:9;298:10;
302:13,22;305:13;
306:14;307:21;309:22;
313:3,22;314:4,21;
320:18,24,25;321:14,
19,22;322:8;323:25;
326:22,25;328:15;
331:8;335:1;337:16;
340:15;349:5;350:4,
11,11,18,22;352:3;
355:7;356:15;357:13;
358:24;359:17;360:17;
362:19;363:7;364:15;
365:21;366:4,17,21,22;
367:12,15;370:1;
372:17;376:7;384:11;
386:6
**Melanie's (1)**
358:4
**memory (21)**
233:2;236:11;238:9;
252:4;253:16;277:9;
280:2;284:14,22,24;
287:15,21,22;302:21;
304:3,9,19;305:1;
306:7;354:24;372:13
**mention (2)**
265:15;300:1
**mentioned (7)**

299:16,19,22;335:3;
370:14;380:25;384:4
**mentions (2)**
262:6,15
**message (31)**
243:20,22,24;244:6;
246:9;260:19;290:7,
10;291:24;292:1;
296:20;298:3,18;
317:7;320:24;327:2,4,
5;328:6,8,14,15,19;
331:17;335:11,25;
336:5,20,22;353:14;
366:20
**messages (14)**
235:4;239:16;
316:23,25;317:1,5;
330:1;339:19;350:2;
361:24;376:8,14,21;
380:16
**met (1)**
330:21
**Michael (4)**
269:21,21;375:25;
377:12
**Mickelson (2)**
229:5,20
**midtext (1)**
319:6
**midweek (1)**
237:10
**might (50)**
241:21;243:3;
244:24;253:3,19,25;
255:8;261:14;264:7;
269:18;271:3;273:11;
293:18,25;294:5,9,15,
16;298:17;299:18,22;
304:14;305:9;316:12;
317:15;320:4,4;
325:10;327:8;329:17;
334:15;336:13;340:3;
343:23;352:10;360:15;
361:8;362:9;363:12;
367:18;375:23;377:5;
380:24,25;381:7,11;
382:23;386:9,12;387:7
**Mike (9)**
335:5,7,25;336:5,22;
341:25;365:9;376:21;
377:8
**Military (1)**
306:2
**mind (2)**
295:16;302:23
**Mine (2)**
343:2;352:9
**minutes (3)**
248:5;312:5;382:15
**mishearing (1)**
298:12
**miss (1)**
357:7

**missing (8)**
256:19;257:24;
303:1,3,3,5,7;317:15
**misstates (13)**
239:24;241:3;
243:21;250:22;263:2;
270:22;295:4;297:3,6,
18;298:6;299:14;
361:13
**misstating (1)**
240:11
**mistakes (1)**
257:20
**misunderstood (1)**
345:25
**mobile (2)**
258:10,15
**moment (17)**
262:15;271:6;
295:22,24;318:9;
319:1;324:16;332:23;
334:8;353:4,19;356:9;
363:5;366:11;380:22;
382:1;385:23
**Monday (1)**
341:15
**more (19)**
277:22;283:3,6,8,15;
286:23;289:14;301:4;
302:4,17;303:13;
309:6,10;321:13;
347:17;355:6;382:14,
17;387:2
**Morfin (3)**
229:3,18,21
**morning (25)**
230:12,14;233:15,
20;234:3,9,21,25;
238:4;240:13,15;
247:4;278:2,19,20,21;
319:9;323:18;324:14;
327:6;328:14,20;
341:2;342:2;385:3
**most (2)**
283:8,10
**motivating (1)**
354:9
**mouth (1)**
344:24
**move (3)**
272:17;294:9;308:9
**moving (1)**
326:25
**much (1)**
230:15
**Murchi (1)**
380:20
**Muse (51)**
251:17;270:19;
278:5;284:2,5,9;286:3,
23;287:2,8,17;288:5,9;
289:10;291:3,5,12;
293:5,10;294:4,5,20,

23;295:24;296:5,14,19,
23;297:13,25;299:12;
300:9,15,20;301:3,6,
13,20;303:14,19;304:5,
6,17;305:23;309:11,
11;313:12;353:2;
376:13,14;386:3
**Muse's (6)**
246:22;275:23;
278:9,10,13;289:23
**must (1)**
321:7
**muted (1)**
312:18
**myself (3)**
231:8;245:8;351:8

---

## N

**name (21)**
234:13;240:25;
252:14,15;253:2;
258:2,12;319:8;
323:20;324:6;335:2;
336:11,16;348:15;
351:2;377:2,6,15,16;
379:25;380:5
**named (2)**
258:16;326:16
**names (2)**
374:12;375:1;376:7;
379:13
**name's (1)**
383:9
**necessarily (4)**
244:8;307:18;
355:24;360:15
**necessary (1)**
275:5
**need (21)**
237:8;257:22;
264:24;272:25;276:8,
10;278:8;279:10;
317:10;332:23;334:8;
337:14;341:4;343:4;
344:10;352:15;363:23;
374:3,24;375:2,3
**needed (1)**
267:5
**needs (14)**
318:6;331:8;332:10;
333:9;348:15;349:1;
353:6;354:1,5,15,21;
363:20,21;365:15
**negative (1)**
268:5
**negatively (1)**
331:14
**new (4)**
293:19,25;294:6,16
**news (2)**
331:23;332:25
**next (63)**

233:15,20;234:21;
277:21,25;278:1;
280:11;281:11,16;
282:8;283:3,13,18;
285:6;286:21;288:4;
293:4;300:12,19;
301:5;302:3,8;303:11;
306:18;309:20;310:1,
17;313:8,11,19;
317:21;318:14,15;
319:15,22;322:8;
326:15;328:2;331:7;
332:8;334:25;335:4,5,
24;337:11,20;338:25;
341:10,22,23;342:8;
343:1,3,8;344:7;345:7;
347:21;348:8;350:10;
364:7;365:7;367:8;
370:24

**night (15)**
237:25;238:3,9;
239:5;247:12;263:8;
271:18;272:1;285:11,
16,18;290:9;299:2;
305:25;309:12

**nine (1)**
314:4

**nip (5)**
318:7;331:8;332:10;
333:9;337:3

**noble (1)**
359:7

**nodding (1)**
231:2

**Nods (10)**
265:22;292:8;
293:15;296:8;299:21;
333:17;334:2;352:11;
360:24;369:12

**None (3)**
360:1,1;363:25

**nonetheless (1)**
254:12

**nonprofit (10)**
348:20,23;350:12,
13,18,24;352:4,20;
353:11;354:19

**nonresponsive (2)**
272:18;308:10

**Nope (2)**
365:8,11

**nor (1)**
381:23

**Northcutt (42)**
230:5;234:11,14,14;
240:1;241:9;247:23;
250:22;263:2,19;
265:3;267:24;270:22;
271:11;288:18;289:12;
294:12,17;295:4,12,17,
20;297:9,18;298:4;
306:24;307:16,24;
308:8,14;309:4;

312:21;383:4,7,8,9;
384:25;385:16;386:19;
387:18;388:1,5

**notice (2)**
295:1;381:24

**noting (1)**
230:6

**November (2)**
378:22,23

**number (61)**
229:15,15;241:22;
242:20;243:6;246:14;
249:14,18,25;250:3;
275:17,19,20,23,25;
276:12,15,20;278:1,5,
7,9,14,14,15;279:3,4,7,
11;280:18,18;281:3;
282:11;283:15,22,23;
285:7;287:9;303:19,
20;310:11;311:1,4,8,
16,18,19,20,20;312:11,
15;313:12,22;314:5,
24;330:12;334:22;
335:12;336:10;366:24;
375:25

**numbers (12)**
273:20,22;274:8,14,
22;276:8,17;278:16;
316:2,11,13,14

**numerous (3)**
296:19,23;297:25

## O

**object (12)**
231:10;239:24;
241:3;264:24;298:5;
307:25;313:25;315:24;
359:2,4,6;374:20

**objected (1)**
271:11

**objection (15)**
231:15;240:1,10;
241:9;250:22;263:2;
270:22;276:14;288:19;
289:13;295:16;297:18;
307:16,24;308:14

**objectionable (1)**
297:23

**Obviously (2)**
331:5;355:19

**occurred (3)**
284:25;285:4;385:1

**occurrences (1)**
347:5

**o'clock (3)**
285:15;309:12;
312:10

**off (45)**
238:13;242:11,12,
13;245:9;247:20;
248:24;253:13;263:8,
11;268:14;269:3,8,14;

271:14,24;273:4;
274:23,25;285:14;
290:11,22;291:1,25;
292:4;293:11;294:4,
20;296:10;297:15;
298:2,8;299:2;305:1;
312:9;315:14;320:21;
356:3,16;363:21;
375:5;382:3,4,5;
388:16

**office (31)**
250:20;257:15;
267:11,12;268:2,7,12;
272:5;279:8,11;
280:14;281:4;288:14;
289:11;290:8;294:22;
296:25;297:15;298:2;
301:22;302:11;304:6,
17;307:10;309:21;
314:23;343:15;379:16,
21;383:11;387:6

**officers (2)**
234:16;385:6

**offices (2)**
229:3;388:15

**often (2)**
252:20,22

**Old (1)**
388:16

**once (2)**
320:15;382:25

**one (88)**
229:15;234:5;
240:14;244:24,24;
251:11;252:1;254:23,
23;255:2,16;257:17,22,
23;261:10;262:15;
266:4;275:8;276:3,17;
290:4;294:10;299:5;
300:12;302:10;303:4;
309:20;312:11;318:14,
15,19,20,22;320:1,5;
321:13;323:17,22,23;
324:13;328:11;332:23;
333:7;334:15;339:23;
340:24;342:1,10,10;
343:8;344:19;345:7,
17,20;346:11,12;
347:14,15,21;348:15,
25;349:1,15;351:25;
353:6;354:1,5,15,21;
355:6;359:12;362:1,
11,16;364:2,3,4;367:4,
17;368:25;372:2;
381:5,9;382:2;385:19;
386:6,16;387:2

**ones (15)**
280:16;316:6,8,19;
332:6;339:1,3,9,10,15,
18;344:11;348:17,17;
362:6

**one's (1)**
255:20

**only (16)**
237:1;255:16;
271:22;273:22;282:24,
24;286:7,8;301:2;
303:6;316:8,19;337:1;
348:17,17;355:7

**oOo- (1)**
388:20

**opportunity (5)**
231:8,10;259:20;
260:4,7

**opposed (2)**
249:9;268:23

**order (21)**
275:14;300:19;
305:8,10;317:15,16,24,
25;318:10;319:2;
320:13,15;339:6,25;
342:9,10;343:2;344:9,
10,11;381:19

**ordered (2)**
361:24;366:9

**Oregon (1)**
388:16

**original (2)**
387:19;388:6

**originals (1)**
388:14

**Orland (2)**
341:17;362:24

**Orlando (1)**
341:15

**out (33)**
233:4;237:8;239:19;
240:5,11;246:9;252:8,
11;257:4,5,18;258:13,
20;272:12;273:22;
274:1,2;292:21,22,23;
305:19;314:11;317:24;
320:4;321:15,16;
342:9,10;343:2;
344:11;352:13;369:1;
373:10

**outcry (1)**
326:6

**outgoing (3)**
275:16;378:13,17

**outstanding (1)**
282:24

**over (32)**
230:18,21;231:4;
235:7;237:3;239:16;
257:17;259:11;274:6,
9;275:14;284:7;
287:14,15;291:4;
293:16,17;295:23;
300:12;319:1;328:12;
338:6,22,24;339:14;
342:17;370:13,16;
374:7;375:1,2;385:4

**overlap (1)**
367:20

**overthinking (1)**

**only (16)**
354:10

**owned (1)**
291:12

**owner (4)**
246:1;250:15;261:7;
262:3

**owns (1)**
342:12

## P

**Pacheco (1)**
362:24

**packet (1)**
273:21

**page (82)**
243:9;247:2;252:5;
255:21,24;259:13;
276:25;277:14,16,21,
25;279:2,5;280:11,11;
281:11,16;282:8;
283:3,13,18;285:6,8;
286:21;287:7;288:4;
300:6,19;301:5;302:3,
8,9;303:12;306:19;
309:6,13,20;310:1,7,
17;312:24;313:8,16,
19;314:25;317:21;
322:19;326:15;328:2;
331:7;335:24;337:12,
14;340:10,11,24;
341:11,22,23;342:8;
343:3;344:7,14;
345:21;346:1;347:14,
15,21;350:11;352:19;
356:16;362:15;364:8;
8;365:7;367:8,8,11,19;
374:11,18,18

**pages (11)**
254:16;273:21,22;
315:22;317:24;320:19;
340:16;362:4,20;
366:18;367:1

**paid (1)**
369:14

**pair (1)**
240:17

**paper (5)**
274:19;275:2;346:5;
347:3,3

**paraphrasing (2)**
233:22;384:10

**pardon (1)**
262:17

**parent (1)**
371:17

**part (1)**
386:20

**partially (1)**
326:9

**participation (1)**
235:21

**particular (1)**

355:25
**pass (1)**
  236:6
**passing (1)**
  386:7
**paste (1)**
  324:16
**pasted (2)**
  324:8;328:7
**Pause (12)**
  240:6;246:11;
  254:17;311:25;317:12;
  340:6,9,20;343:7;
  344:12;366:10,12
**pay (1)**
  369:2
**Paying (2)**
  363:1,2
**pdf (3)**
  339:19;340:19;
  367:10
**pdf's (1)**
  320:1
**people (16)**
  273:15;274:7;
  276:10;289:3;316:13;
  325:21;334:10;337:21,
  23,24;338:12,20;
  355:8;359:11,13;
  380:17
**perceived (1)**
  331:14
**performs (1)**
  382:25
**perhaps (1)**
  374:15
**period (10)**
  231:9;243:11,16;
  248:18;249:4;259:14;
  268:8;301:17;372:22,
  23
**permission (14)**
  250:5;262:15,17;
  263:16;264:1,2;
  266:13,13,17;304:15,
  19;305:13,16;306:8
**permitting (1)**
  381:19
**person (6)**
  261:13;262:24;
  270:7;274:8;349:8;
  359:12
**personal (1)**
  290:17
**Personally (1)**
  252:24
**personnel (1)**
  379:16
**PETA (3)**
  325:20,22,24
**phone (76)**
  233:22;234:22;
  237:1,2;241:20,22;

242:19;246:5;249:14,
21;250:3;253:1;
262:12;273:19,25;
275:10,16,23,25;276:1,
4,9,12;280:17;282:3;
284:2,4;285:3,4,21;
293:14,17;294:3,23,24,
25;296:7,19,23;
297:25;298:17;299:17,
19,23;300:1,5;304:2,
16;305:2,3;311:1,15,
21;312:23;314:5;
316:2,14;317:10;
320:4;330:11;332:4;
333:14;334:10,16,23;
335:12,13;341:3;
342:22;343:22;349:6;
366:24;375:13,16;
378:3;384:6
**phones (1)**
  345:1
**phonetic (1)**
  380:20
**photographer (1)**
  323:6
**photos (1)**
  364:16
**phrase (1)**
  371:2
**phrased (1)**
  268:24
**pick (1)**
  343:12
**picked (2)**
  256:13;273:22
**picture (3)**
  364:25,25;365:1
**pictures (5)**
  322:21,22;323:4,5,9
**piecemeal (1)**
  315:25;316:2
**pig (6)**
  348:9;363:23,24;
  364:18,25;365:1
**pigs (2)**
  364:17;365:2
**pissed (1)**
  342:7
**place (1)**
  261:23
**placeholder (2)**
  275:3;315:16
**places (1)**
  375:15
**Plaintiffs (2)**
  229:25;230:1
**Plaintiff's (1)**
  254:14
**plan (1)**
  370:23
**please (8)**
  231:19;337:15,22;
  343:12;363:7;384:10;

386:22;387:22
**pm (8)**
  281:12;283:4;317:7;
  322:1,2;341:9;382:8;
  388:19
**point (52)**
  235:5,9,12;236:3,14;
  237:16;241:1,11;
  242:20;245:15,25;
  253:12,17;257:14,16;
  258:24;260:8;261:4,6;
  263:12;272:5,9;
  273:11;279:24;282:25;
  283:6;286:9,12;
  287:23;288:8,24;
  289:9;296:13;298:11;
  301:20;303:1;305:15;
  307:11;309:23;315:10;
  316:15;323:11;335:13;
  337:10;342:22;348:3;
  351:13,14;357:1;
  368:1;369:23;378:8
**pointing (4)**
  231:2;262:22;292:1;
  367:9
**pop (1)**
  234:5
**populated (1)**
  343:19
**position (1)**
  261:10
**possession (1)**
  356:25
**possibility (5)**
  264:8;273:13;384:4,
  5,8
**possible (5)**
  274:13;324:21,22
**possibly (4)**
  248:23;302:25;
  376:4,5
**post (1)**
  345:3
**potential (1)**
  255:6
**potentially (3)**
  245:23;360:11,12
**pound (2)**
  369:2,3
**pounds (3)**
  255:1;347:17;348:9
**preceded (1)**
  317:21
**preceding (5)**
  313:24;314:7;
  344:14;354:20;367:19
**precisely (1)**
  233:16
**precluding (1)**
  371:7
**prefer (2)**
  249:8;268:22
**prepared (1)**

331:5
**preserving (1)**
  231:16
**press (2)**
  368:18;369:21
**pressing (1)**
  370:13
**presumably (7)**
  237:13;245:11;
  286:24;329:22;342:4;
  345:2;363:13
**presume (2)**
  318:24;373:14
**pretty (1)**
  337:18
**previous (1)**
  375:23
**previously (5)**
  287:20;328:7,13;
  360:23;381:5
**price (1)**
  369:4
**printed (1)**
  331:23
**prior (5)**
  252:23;253:1;
  268:10;298:6;350:17
**privy (2)**
  327:20;332:14
**probably (11)**
  262:21;319:6;
  323:22;335:18;337:21;
  338:12,20;349:1;
  376:6;382:13,16
**problem (2)**
  234:12;316:1
**procedurally (1)**
  235:11
**procedure (1)**
  329:17
**proceed (2)**
  231:20;265:9
**proceedings (12)**
  240:6;246:11;
  254:17;311:25;317:12;
  340:6,9,20;343:7;
  344:12;366:10,12
**Process (5)**
  259:7,8,8;323:3;
  347:19
**processed (3)**
  256:23,24;307:6
**processing (1)**
  256:12
**produce (3)**
  316:6;329:11;381:5
**produced (10)**
  246:23;254:9,10,11;
  316:24;330:25;331:6;
  362:9;376:6,6
**producing (1)**
  317:1
**Productions (2)**

229:14;388:16
**prompted (1)**
  256:17
**property (12)**
  252:9;255:7,12,15;
  258:8,20,25;270:13;
  273:5;285:24;286:2;
  296:11
**prosecuting (1)**
  327:16
**protect (4)**
  349:21;359:18,19,23
**provide (1)**
  284:9
**provided (1)**
  296:15
**public (2)**
  331:14;332:25
**publicly (2)**
  332:18,19
**pull (5)**
  239:19;240:11;
  246:19;248:6;276:13
**purport (1)**
  316:24
**purpose (1)**
  359:14
**purposes (2)**
  290:19;316:16
**pursue (1)**
  370:19
**put (16)**
  234:7,9,12;256:22,
  24;290:7,10;317:16,
  19;344:10,23;352:25;
  357:8,10;362:1;367:4

**Q**

**quick (8)**
  277:3;311:10,24;
  312:23;330:23;355:4;
  385:20;387:3
**quickly (2)**
  230:19;340:18
**quite (2)**
  274:4;351:7

**R**

**range (5)**
  320:18;340:15;
  362:19;366:17;378:5
**ranges (2)**
  378:1,2,10,11;379:4
**rather (2)**
  303:8;370:3
**read (29)**
  240:5,8,13;242:5;
  248:4;252:4;274:25;
  295:14,20;297:21;
  324:2;343:10;350:2,9;
  353:5;368:12;371:9,

15,20,22;372:4,21,22;
373:3,6,8,12,13;387:17
reading (7)
239:20;240:8;
260:16;350:16;356:10;
372:3,6
reads (1)
350:13
real (27)
277:3;311:10;
330:23;345:9;349:10,
11,15,19,22;350:4;
351:3,4;355:19;
356:11,12,22,24;357:8,
10,13;358:12,20,22;
359:20;360:4,11;387:3
realizing (1)
289:15
really (8)
298:18;311:23;
312:23;337:14;340:18;
369:9;377:3;385:20
rearrange (1)
340:19
reason (10)
232:14;244:16,16;
259:17;299:25;319:25;
323:20;325:12;338:13;
362:8
recall (167)
235:13,14,15;
236:15,18,19;237:24;
238:25;239:4,5,15;
240:3;241:16,17,18,25;
242:22,22,24;243:1,3,
4,8,17,18,18,19;
244:20;246:4,21,25;
249:2,3,5,9,10,11;
251:13,22,25;257:3;
258:4,5,14;260:20;
261:22;264:6,12,13;
267:18;268:6,11;
269:17;271:2;272:1,2,
6,11,16,22;273:14;
277:12;278:20;279:1,
17,19,20,23;280:1,19;
282:2;284:3,4,10,16;
285:20,21;286:1,16;
287:12,25;288:6,7;
291:10;293:22,24;
294:8,8,15,17,20,24;
295:3,11;296:16,17;
298:18;299:16;300:23;
301:7,25;302:1,18,20;
303:16;304:1,11,14,15;
305:6,9;314:2;317:1;
324:15,18,20;325:15;
327:7;329:3,6;331:6;
334:5,21;335:17;
336:12;337:2,5,6,7,7,8,
9;343:18;351:20;
353:12,13,16,18,22;
354:22;358:16,16,17,

18;363:11;372:1,2,3,6;
374:9;378:2;383:9;
384:2;385:5,8,15,17,
17;386:7,8,10,11,13;
387:4,5,7,8
recalled (1)
385:10
receipt (3)
360:5,12;361:10
receive (3)
256:2;334:3;361:15
received (9)
260:22;269:25;
270:3,4;355:20;
358:12,17;361:14,20
receiving (2)
302:19;333:24
recipient (1)
355:8
recognize (2)
275:16;276:19
recollect (1)
384:24
recollection (10)
271:4;273:17;
286:24;288:21;291:8;
299:1,10;301:16;
309:14;383:24
record (34)
229:11;230:6;
231:16;234:8,10,13;
242:11,12,13,15,16;
253:10;258:23;268:14,
18;274:23;278:16;
292:1;298:20;312:9,
14;320:23;333:21;
356:3,7;361:10;
381:16;382:3,4,5,9,11;
387:21;388:17
recordkeeping (1)
257:21
records (25)
238:6;246:5;257:6,7,
11,15,16;273:20,25;
275:10;284:4;300:5;
304:2,16;305:2,3;
312:23;314:5;315:20;
334:23;335:13;360:11,
17;361:3;363:13
record's (1)
387:5
recross (1)
383:3
Red (2)
344:18,21
redact (2)
274:14;316:10
redacted (7)
274:2,21;315:17,21;
316:3,11,20
Redding (4)
229:4,14,19;388:15
refer (7)

293:25;294:6,9,15,
16;330:7;348:1
reference (8)
243:19;244:5;276:9;
330:24;364:24;365:5,
22;366:1
referenced (1)
243:23
referencing (2)
329:21;381:7
referred (3)
325:1;341:15;345:10
referring (33)
235:23;239:22;
241:2,12,14;247:13;
248:13;262:20;287:1;
322:4,20;323:12;
327:5;328:2,3,6,21;
331:2;337:16;344:15;
345:6;346:2;348:18;
356:23;358:5;362:22;
364:3,10,12;365:12;
367:15;369:23;379:24
refresh (6)
252:4;284:14;
302:21;304:3,18;
372:13
refreshing (1)
305:1
regarding (9)
229:15;269:22;
279:22;280:5;285:17,
18;363:17;383:12,15
relation (9)
303:6;329:12;346:2;
359:23;371:23;372:16;
377:9,13;380:6
relevant (1)
378:20
remainder (1)
237:2
remember (55)
230:17,19;231:22;
233:16;236:7,20,21,23;
239:10,20;243:5,6;
244:22;246:14;249:7,
9;252:10,14;253:2,11,
16,18;256:6;258:12;
266:9;278:24,25;
279:21;282:21;285:12,
17;298:16;305:8,10;
313:6,7;324:12,25;
329:1,2;331:25;
336:13,16,18;347:4,5;
353:4;357:12,25;
358:1,19;373:11;
374:4;386:14,15
REMEMBERED (1)
229:1
removal (2)
236:21;237:14
removed (5)
233:2;270:13;

276:24;278:22;326:8
reorder (1)
339:18
repeat (1)
240:10
repeating (1)
320:8
rephrase (5)
231:14;314:3;
345:20;361:17,18
replace (4)
258:9;275:6;346:10;
368:17
replaced (6)
256:7;303:4;345:17;
346:12;357:7;358:3
replacement (12)
254:6;260:22;
261:18,21;262:2;
275:8;303:8;357:17,
18,19;358:6;364:12
replying (1)
366:1
reported (1)
282:13
Reporter (13)
229:5,19,24;230:9,
23;274:12;275:1;
295:14;315:16;326:18,
23;339:24,25
reporting (1)
236:20
reports (3)
237:13,14,15
represent (3)
229:23;236:6;383:10
resale (5)
368:16,16,22,23,24
reserving (2)
382:14,17
respect (6)
238:24;270:17;
271:17;287:18;347:6;
361:21
respond (4)
231:8;322:18;
328:18;348:14
responded (3)
259:16;365:8,11
responding (1)
328:9
responds (7)
321:10,14;326:25;
333:5;342:25;365:21;
366:4
response (3)
231:1;345:3;364:23
responsible (1)
236:2
rest (3)
316:19;373:13;
380:13
restate (1)

267:13
restrict (1)
378:5
restroom (1)
312:3
retain (1)
334:17
retained (1)
388:15
reverse (2)
319:18;320:15
review (1)
259:20
reviewed (4)
235:11;242:9,10;
375:4
reviewing (2)
366:25;367:1
right (178)
232:14,18;235:1,25,
25;236:5,5,5,13,24;
252:1;253:7;254:3,10,
18,21;255:14,17;
258:18;259:5,9,10;
260:9;262:14,22;
264:4;266:10;268:20;
269:1,7;270:11;
275:19;276:3;277:21;
279:16;281:10;283:13,
13,18;284:1;285:6;
293:4;294:19;295:18;
296:9,17;299:8,11;
300:4,4,13,18;301:5,
19;302:3;303:11,13,
23;305:15;306:12,18;
309:5;310:1,6,15,17;
312:2,8,17,22;313:1,8,
11;314:19;315:12,14;
316:22;317:14;318:7,
18,19;319:13,16,20;
320:9,23;321:3;322:2,
18;323:7,10,16;326:7,
22;327:10,10,25;330:8,
22;331:9,10,12;332:9;
333:4,9,18,22;334:19,
25;336:17,19;337:11;
338:11,24;340:12,23;
341:1,10,20,22;342:1,
6,21;343:3,5;344:6,13,
14,25;345:14;346:4;
347:20,23;350:7,10,10;
351:17;354:8;355:3;
356:2,9,18;358:21;
359:22;361:6,23;
362:3,14,16;363:19;
364:7;365:4,14,25;
366:8,13;367:7,8,9,25;
369:17,20;370:12;
372:3,5,25;373:16;
374:3;375:18;376:5,
20;377:23,25;380:2,14,
15;381:9;385:16;
386:18

**rightful (1)**
246:1
**right-hand (1)**
321:3
**rights (4)**
316:11;326:12;
382:14,17
**Ross (22)**
318:13;328:1,3,9,10,
18,19,25;329:4,8,12,
16,17,19,20;330:1,4,
16,19,25;380:24;381:5
**Ross's (1)**
330:11
**Roughly (1)**
334:5
**round (1)**
332:8
**row (1)**
320:9
**rudely (1)**
231:6
**rules (23)**
230:18,22;235:11,
13,17,19,19;236:3;
371:9,11,15,15,16,25,
25;372:21,22,25;373:1,
1,3,7,8
**Ryan (6)**
229:25;247:23;
263:19;289:14;294:17;
386:24

**S**

**Sacramento (1)**
326:19
**sale (4)**
257:6,7,11;277:20
**salient (1)**
382:24
**Sam (7)**
318:25;323:24;
324:23;325:16;326:16,
19,19
**same (47)**
231:9;237:13;
246:23;248:17;249:2,
24;252:25;277:20;
281:5,10,16,16,18;
283:8;285:7;300:2;
302:5;307:16,24;
308:14;309:14;311:20;
319:25;320:3,6,8,10,
14;327:3;331:10;
333:16;339:22;342:1;
360:25;361:2;362:5;
366:25;367:2;373:14,
15;377:8;378:15;
380:16;381:8;386:24;
387:19;388:6
**sanctuary (2)**
326:6,7

**Sarah (9)**
335:25;336:1,4,6,7,8,
20,24;337:3
**Saturday (6)**
233:3,9;238:1,3;
277:10;299:2
**save (1)**
332:5
**saved (1)**
332:6
**saw (7)**
253:8;339:15;
341:13,14;349:10;
374:8;376:8
**saying (40)**
231:11,17,19,20;
235:17;241:1;242:4;
244:1,14;245:2;
247:18;249:22;253:20;
260:6;263:7,19;
264:25;266:12;272:15,
16;273:7,10,10;
288:24;289:19;319:5;
322:16;324:3,13;
350:18;353:13;357:1,
6;358:11;371:6;374:4;
375:11;378:6;380:21;
382:23
**screenshot (2)**
363:15,16
**screenshots (1)**
362:13
**search (17)**
329:15,16,23;
375:13;376:9;379:2,3,
14,18;380:5,7,8,13,17,
22;381:1;382:25
**searched (5)**
343:21,21;375:12;
378:2;380:3
**searches (1)**
378:10
**searching (2)**
233:11;329:10
**second (22)**
234:6;240:14;247:2;
252:1,5;255:2,21;
276:3;333:7;336:3;
339:6;340:4;342:10;
343:2;346:1;347:22;
349:15;364:2,3,4;
381:9;382:2
**seems (1)**
306:4
**selling (1)**
369:15
**Senator (1)**
330:17
**send (16)**
245:11;273:23;
274:15,16,20;275:8;
300:1;315:17,20;
322:19;328:19;329:4;

331:17;363:15;366:5;
373:10
**sending (7)**
293:11;323:21;
329:1,2,21;341:1;
364:19
**sense (1)**
233:1
**sent (20)**
236:8;251:18;
259:23;282:13;318:13;
320:1;321:8;323:25;
324:13,18,19;328:1,3,
18,25;362:6;364:2,3,4;
380:25
**separate (3)**
336:4;362:9;366:24
**September (14)**
313:21,22;314:4,20,
25;318:1,2;331:18;
332:1,1,3;333:6;
336:21;378:12
**Serene (6)**
252:15,18;253:3,5,8,
9
**set (3)**
264:14;339:5;362:2
**sets (1)**
319:24
**several (22)**
230:21;233:10;
235:4,4;236:6,9;248:5;
259:11;266:8;282:10;
293:8,10;294:3;
295:25;296:6;297:13;
309:11;332:4;359:12;
367:1;372:4,14
**Shakes (2)**
311:3;360:16
**SHAKIB (12)**
230:1,1;233:7;238:2;
246:15;267:13;279:12,
15;297:4,10;333:20;
388:10
**shall (1)**
230:6
**share (1)**
292:20
**Shasta (4)**
230:2;234:15;
235:22;383:21
**Sheesh (1)**
333:5
**sheriff (74)**
239:17,22;240:16,
21,21;241:2,12,14,19;
242:19;243:15,20,23,
25;244:1,2,4,6,8,12,13,
14,17,25;245:3;247:5,
9,13,13,17,17,18,19,23;
248:4,8,9,10,10,11,19;
250:20,23,24;253:12;
259:11,15;262:18,20,

24;264:23,24;266:4;
269:21;273:16;288:13;
290:24;292:3;294:1;
298:20,24;308:12,19;
309:2;311:10,12,15;
327:21;343:1;375:25;
377:12;383:15,17;
387:11
**sheriffs (14)**
230:4;236:21;
237:16;245:4;248:9;
263:16,17,22;264:1,25;
265:4,6;284:17;311:13
**Sheriff's (62)**
234:15;237:14;
244:5,7,15;245:4,23;
248:12;250:19,25;
251:5,6,10,15;262:24;
263:20;264:5;265:3,6,
8,18;267:10,11,16;
269:10,16;270:24,25;
271:23;272:5,9;273:3;
289:11;290:2,8;291:5,
6,15;294:1,7,21;295:1,
6;296:25;297:15;
298:2,7;301:21;
306:21;307:10,23;
308:6;311:7;343:14;
383:10,21;384:3,6,14,
20;385:25;387:6
**shit (1)**
363:20
**shop (2)**
344:18,21
**Shorthand (1)**
229:5
**show (6)**
240:9;281:9;368:19;
369:22;370:20;371:3
**showing (3)**
279:13;360:5;371:8
**shows (2)**
279:19,25
**shut (1)**
231:8
**side (5)**
311:3,3;321:3;
360:16,16
**silence (1)**
231:8
**Silva (39)**
230:3;236:1,7;
254:11;270:19;278:11,
17;279:18;280:17,19;
281:17;282:10,13,18;
283:8,15;286:12;
288:9;289:10;290:1;
291:5;302:13,22;
303:14;313:3,22;
314:4,21;316:25;
326:15,20;340:15;
341:14;362:19;366:17,
21,22;376:8;386:6

**Silva's (6)**
277:25;278:4,6,7,14,
15
**simply (1)**
231:16
**situation (6)**
280:23;282:18;
338:7;350:24;361:2,4
**six (2)**
302:24;374:18
**size (2)**
231:25;232:2
**slaughter (18)**
245:12;251:18,24;
252:23;258:10,15;
259:8;264:14;265:21;
266:6;304:20;306:10,
11;310:4,12,19;
345:19;361:21
**slaughtered (12)**
250:6;254:4;256:3;
258:7,8;260:12;
265:24;266:15;267:2;
269:5;270:13;302:24
**slaughtering (2)**
265:9;308:18
**slaughters (1)**
258:20
**sleep (1)**
244:21
**sold (1)**
369:17
**sole (1)**
352:7
**somebody (9)**
238:14;239:1;
261:15;263:14;298:7;
325:21;336:2;358:20;
368:25
**somehow (2)**
332:13,15
**someone (31)**
234:5;239:3;245:22;
258:15;261:21;265:7;
268:4,5;272:4;273:11;
288:13;289:11;291:6,
15;294:1,6,21;296:24;
297:15;298:1;301:21;
306:21;307:10;324:11,
19;325:6;327:2,4;
328:8,16;371:16
**someone's (3)**
262:1;369:6,13
**sometime (1)**
266:25
**sometimes (1)**
378:19
**somewhere (2)**
289:6;358:9
**soon (1)**
257:16
**sorry (32)**
233:8;234:11;

238:17;245:7;247:25;
255:24;262:17;277:4;
278:12;282:11;296:4;
297:5;300:11;312:19;
313:2;334:8;337:12;
339:13;340:7;342:9;
344:9,13;345:7;
346:15;348:7;356:12,
15;358:4;359:19;
361:1;363:7,7
sort (2)
326:12;384:19
sounded (1)
336:14
Sounds (1)
312:21
South (2)
229:3,19
spare (3)
351:1,4,21
speak (20)
234:19;238:21;
249:1,3;252:13;
267:10,15,20;268:3,4;
269:10,15;272:3;
273:3,16;304:4,5,6;
334:9;335:10
speaking (17)
253:11,17;262:25;
264:1;268:6,11;
273:14;277:10,18;
278:18;280:19;288:5;
300:20;301:3;302:12;
306:12;384:3
SPECIALIST (18)
229:10,13;242:13,
16;268:14,18;312:4,9,
14;355:4;356:3,7;
382:3,5,9;387:15,24;
388:13
specific (1)
318:8
specifically (16)
319:1;329:18;
351:16;374:16;377:2,
9,15,16,18;378:9;
379:1,3;380:9;381:1;
385:5,7
speculate (6)
265:12;289:3,18;
294:15,18;307:2
speculating (2)
289:15;352:14
speculation (17)
265:10;282:20;
288:15;289:2,13;
294:11,13;306:23,24;
307:12;314:1;337:25;
338:21;350:21;360:6,
19;361:12
spelled (1)
335:6
spelling (1)

380:20
spoke (21)
233:14;262:12;
271:23;272:4,8;274:7,
13;276:22;277:13,15;
278:24;280:3;293:5,
10;294:22,23;295:24;
296:5;299:6;305:24;
309:22
spoken (4)
269:21;273:11;
383:14,17
spread (1)
333:1
stack (4)
315:15;317:3,5;
343:6
staff (1)
346:24
Stanton (4)
318:25;324:23;
325:17;326:19
start (5)
267:11;298:4;
312:15;374:11,18
started (5)
263:22;314:18;
315:11;319:7;328:12
starts (4)
320:21;323:17;
328:14;356:15
State (10)
229:6;235:11,17,18,
18;342:16,17;365:15;
371:25;373:1
stated (2)
239:16;245:4
statement (6)
292:2;298:23;299:9;
354:9,20,25
States (2)
229:16;327:13
stating (1)
330:10
steps (4)
331:13;337:3,7;
375:9
still (18)
231:17;234:25;
260:5;278:6;281:18;
302:5;303:5;307:12;
308:1;312:17;314:8;
319:13;330:3;333:6;
345:1;368:9;376:3;
382:17
stip (2)
387:17;388:2
stipulate (2)
387:18;388:12
stipulated (1)
388:8
stipulation (1)
386:25

stole (1)
371:5
stop (3)
273:9;332:20,24
stopped (1)
334:16
stops (1)
319:24
stories (1)
331:23
Street (3)
229:4,19;253:9
strike (16)
237:1;266:14;
272:17;293:9;294:9;
296:4,21;301:11;
308:9;321:19;328:10;
338:14;347:1,4,25;
352:1
string (1)
362:11
stuff (2)
250:2;374:6
stunt (1)
326:13
subpoena (1)
274:1
sucks (1)
363:20
sufficient (1)
346:11
suggest (1)
293:19
suggesting (1)
370:10
suggestion (1)
352:3
Sunday (1)
278:22
superintendant (1)
370:4
supposed (9)
256:19,20;345:9;
356:21,24;357:8,10;
358:9;364:5
supposedly (1)
318:19
Sure (30)
234:14;242:6;
246:20;254:11;261:10,
23;265:5,5;273:15;
274:24;276:7,9,11;
277:6;279:23;280:21;
297:12;298:14;308:15;
322:7;327:13;328:11;
332:6;337:18;346:23;
352:15;363:22;368:19;
381:8;383:12
suspect (1)
353:25
suspected (1)
341:20
Suzanna (2)

229:4,20
sworn (3)
229:8,23;230:8
systems (1)
327:23

T

table (3)
231:23;232:1,2
tag (1)
363:24
tags (1)
376:1
talk (29)
231:4,4;238:11;
240:16,21;246:3,6;
247:9;259:25;262:5,6,
17,25;264:5;274:4;
279:25;290:24;292:2;
327:5;334:8;336:8;
337:14,21,24;338:13,
20;375:21;382:1;
387:10
talked (24)
236:13;243:11,14,
15;247:5;248:4,19;
252:25;255:2;259:14;
261:15;279:24;298:16,
20,23;303:1;307:5;
316:6,19;335:1,25;
336:20,25;337:4
talking (28)
240:24;245:25;
263:16,22;266:4;
279:21;282:6,18;
284:2;287:3;290:17,
19;291:3;301:11,13;
303:7;318:24;324:3;
326:17,23;328:12;
331:16;336:1;368:4;
372:25;373:24;387:4,5
talks (7)
240:17;247:6;
262:18;292:3;298:21,
24;382:25
telling (9)
284:16;285:12;
294:20,25;347:12;
350:4;352:16;353:2;
358:4
tells (1)
234:23
ten (2)
334:5,21
Tennessee (2)
258:13,16
term (5)
359:2,5,7;378:19;
379:6
terms (5)
257:21;375:11,13;
378:11;379:5

Terry (1)
229:13
testified (36)
229:9;232:25;
233:21;239:21;241:17,
19;244:20;248:3;
250:24;254:8;261:2;
262:19;271:13;275:24;
280:6;295:7,10;296:5;
298:7,9;316:3,12;
322:16;347:6,18;
356:10;357:9;375:4,
23;379:9;380:3;
383:14;384:1,9,13;
385:24
testify (6)
232:7;295:5;298:11;
349:24;350:1,8
testifying (1)
241:25
testimony (66)
232:22;239:25;
241:4;244:25;247:19;
250:22;259:17;260:5;
263:3;266:18,25;
267:9,14,19;268:4,21,
25;269:2,7,15,20,24;
270:11,16,17,23;271:7,
22;272:4,7,8,13;273:2,
6;274:9;280:6;281:10,
18;292:5,7,17;293:25;
295:4;296:18,22;
297:2,6,8,12,17,19,24;
298:3,6;299:13,14,19;
305:12;332:9;333:18,
23;352:2;358:13;
359:16;361:13;383:12
texted (2)
289:5;368:2
texting (2)
294:5;314:17
texts (6)
319:24;350:11;
366:25;375:6;380:12,
18
Thanks (2)
333:5;348:14
thereabouts (2)
233:16;237:9
thief (1)
342:23
thinking (2)
270:3;350:25
Thomas (1)
380:10
though (17)
257:2;260:21;
263:11;277:19;288:8;
293:12,19;294:2;
296:18;319:6;326:16;
327:2;331:2;349:25;
350:25;351:10;373:4
thought (19)

238:14;240:18;
242:2;251:1;278:8,10;
289:22;315:10;324:2;
326:8,11,12;327:24;
328:23;333:2;351:7;
371:9;375:24;385:10
**thoughts (5)**
368:18;369:21,21;
370:2,3
**threat (1)**
332:3
**threatening (4)**
333:14,24;334:6,6
**threats (12)**
314:18;315:3;
331:16,18;332:13;
333:2;336:9;349:6;
351:5,8,13,13
**three (6)**
263:11;290:10;
292:19;308:18;320:8;
336:15
**thumbs-up (1)**
343:3
**Thursday (2)**
332:2,2
**till (13)**
240:13,15;247:4;
263:9,13;268:17;
292:13;297:22;312:13;
341:1;356:6;382:8;
385:11
**time-consuming (1)**
323:2
**timeframe (3)**
244:19;301:3;384:7
**timeline (2)**
232:19;266:9
**times (19)**
243:10,13,15;246:3,
5;248:5,18,20;249:1;
259:12,13,14,16;274:6;
293:8,10;296:6;320:8;
372:4
**timestamp (2)**
276:24,24
**tiny (1)**
346:11
**title (1)**
336:3
**today (13)**
232:7,11,15;252:6;
260:4;274:19;275:2;
316:6,12;355:10;
382:12,22;383:2
**told (32)**
239:1;256:18;
257:23;258:6;265:8,
25;267:1;269:5;
271:15;282:2;290:8;
292:15;293:20;294:25;
296:24,25;297:14,15;
298:1,2,8,9,17;299:1;

308:21;351:23;353:20,
21;354:4,17;373:20;
385:10
**tomorrow (10)**
240:14,15;247:4;
321:11;322:3,5;341:2;
367:14,22;368:15
**tonight (1)**
368:15
**took (7)**
234:21;259:3;
261:23;305:18;346:19,
20;368:16
**top (6)**
318:20;321:17;
341:23;344:15;345:21;
367:10
**toss (1)**
315:17
**totaling (5)**
254:15;320:19;
340:16;362:20;366:18
**touch (1)**
240:19
**Touching (2)**
264:17,20
**towards (1)**
357:10
**town (3)**
292:21,22,23
**track (1)**
344:5
**Trail (1)**
388:16
**transaction (1)**
360:18
**transcribe (1)**
230:23
**transcript (11)**
240:4,8;242:8,9;
243:10;259:18,20;
276:13;386:22;387:19;
388:11
**transfer (1)**
358:25
**trial (3)**
387:20;388:4,7
**trick (3)**
354:12,12;381:17
**tried (2)**
278:2;346:9
**trouble (1)**
344:6
**truck (1)**
258:16
**truth (2)**
229:8;359:13
**Try (3)**
231:1,4,7
**trying (22)**
256:6;261:22;
268:21;272:20,23;
281:8;289:16;317:24;

318:9;319:2,3;321:15;
344:5,23;354:11,12,12;
357:14;372:16;375:11;
381:9,17
**turn (1)**
317:5
**turned (1)**
385:4
**twice (2)**
369:14,18
**twitch (1)**
347:24
**two (14)**
248:5;276:25;
280:13;289:5;
312:16;319:24;336:4;
339:19;340:2;364:16;
369:13;374:22;385:19
**type (1)**
328:20
**typed (1)**
328:24

**U**

**ultimate (1)**
358:25
**ultimately (3)**
250:8;251:17;270:8
**um (1)**
231:2
**under (5)**
245:19;289:25;
292:23;307:20;309:1
**understands (1)**
308:10
**understood (7)**
232:22;262:1,2;
327:12;342:18;365:23;
367:16
**undertake (1)**
375:9
**unfamiliar (1)**
344:20
**United (1)**
229:16
**unless (3)**
231:15;315:23;383:3
**up (32)**
231:8;248:6;256:13;
259:6;264:14;265:22;
268:21;276:13;278:13;
292:8;293:15;296:8;
299:21;312:23;322:21;
323:3;329:17,24;
333:17;334:2;343:12;
352:1,11,13;357:18;
359:17;360:24;369:12;
371:13,19;381:10;
383:16
**updated (2)**
265:20;373:4
**updates (2)**

287:24;373:9
**updating (1)**
265:23
**upon (2)**
353:14;365:1
**upset (2)**
337:10;338:15
**upsetting (1)**
338:7
**use (9)**
231:3;246:13;
247:16;265:3;312:3;
321:13;359:5,6;374:20
**used (5)**
247:16;375:12;
387:19;388:3,6
**usually (1)**
238:7
**uttered (1)**
324:17

**V**

**Vague (1)**
384:22
**vaguely (1)**
232:19
**Vanessa (4)**
230:1;233:10;
373:21;382:1
**verify (1)**
276:12
**version (1)**
274:21
**versions (1)**
315:17
**VIDEO (24)**
229:10,11,13,14;
242:13,16;268:14,18;
312:4,9,14;355:4;
356:3,7;382:3,5,9;
386:23;387:15,22,24;
388:13,14,15
**violates (2)**
371:17,18
**violence (1)**
351:14
**Vista (24)**
345:9;349:10,10,11,
15,19,22;350:4;351:2,
4;355:15,19;356:11,12,
22;357:8,10,13;358:12,
20,22;359:19;360:4,11
**voice (1)**
341:25
**voicemail (3)**
341:13,14;366:5
**voicemails (4)**
334:9,13,17,20
**volunteering (1)**
370:2

**W**

**wait (13)**
239:3;240:16;
245:24;247:5;262:17,
18;263:13;286:18;
292:3,19;297:21;
298:21,24
**waiting (23)**
237:16,18;239:12,
17;245:11,14;246:2;
250:5;262:15,16,25;
263:25;265:16;266:2,
7;291:14;305:12;
307:22;308:6,11,19;
309:2;384:11
**waiving (1)**
316:11
**way (13)**
256:12,21;257:21;
272:21;290:5;319:7;
330:11;338:15;340:25;
353:5;362:1;372:2;
386:16
**website (1)**
326:11
**week (7)**
266:8,14,19,24;
267:4;302:24;305:19
**weeks (1)**
308:18
**weren't (3)**
265:17;323:7;364:22
**Whatever's (2)**
275:9;378:3
**what's (17)**
281:5;313:8,19;
318:21;328:8;341:23;
342:8;343:3;344:7;
348:14;349:12;354:2,
7,9;362:25;364:7;
365:9
**Whereupon (12)**
230:8;254:14;
268:16;275:10;312:12;
320:17;340:14;356:5;
362:18;366:16;382:7;
388:18
**whichever (2)**
262:23;339:23
**whole (5)**
273:23;289:23;
326:12;343:6;347:17
**whose (2)**
274:8;352:8
**within (6)**
321:6,18,23;331:19,
21;372:10
**without (2)**
289:15;295:16
**witness (54)**
229:23;230:8;

236:18;239:8;240:2;
245:3,18,21;248:2;
259:22;263:7;265:14;
267:18,23;270:24;
271:18;273:8;276:6;
278:8,13;279:14;
282:22;288:20;289:22;
291:8;299:16;304:11;
307:4,15;308:15;
312:18;329:23;338:3,
22;340:2,7,10;346:9,
15,17,20;350:23;
351:20,24;352:17;
353:5,16;354:13;
355:13;357:17;360:8,
21;362:13;384:23
**witnessed (1)**
288:23
**woman (5)**
240:24;252:17,25;
262:11;379:23
**word (3)**
342:2;347:24;365:4
**words (5)**
231:3;304:14;
311:13;324:17;344:24
**work (2)**
317:16;330:16
**worked (3)**
233:6;336:15;380:4
**working (1)**
283:1
**works (1)**
336:2
**worry (2)**
274:3;369:15
**worse (1)**
334:12
**worth (2)**
344:4;370:13
**wrap (1)**
381:10
**write (10)**
321:11;323:11;
326:15;328:1;331:7,8;
342:7;363:19;368:11;
371:3
**writes (3)**
341:14;343:9;365:8
**writing (2)**
321:2;367:12
**written (4)**
325:10;327:8;
349:12;387:23
**wrong (10)**
233:1;242:4;245:4;
326:9;331:5;333:11;
335:6;354:8;355:16;
371:7
**wrote (19)**
319:8;322:7;323:20;
324:6,21;327:4;331:9;
352:23;353:19,20,25;

354:4,15,18,20,23,25;
368:12;371:2

**Y**

**year (1)**
317:9
**yearly (1)**
373:4
**Years (3)**
253:1;372:8,14
**younger (1)**
238:19

**Z**

**Zoom (1)**
321:13

**0**

**005 (1)**
275:19
**0058 (8)**
275:20;276:13;
278:7;280:18;282:11;
283:15;313:22;314:5

**1**

**1:05 (2)**
322:1,2
**1:41 (1)**
312:4
**10 (7)**
309:12;312:4,10;
333:19;334:19;369:2,2
**10:00 (1)**
312:12
**10:15 (2)**
312:13,15
**1099 (1)**
302:10
**10th (4)**
255:3,5,10,12
**11 (5)**
241:12;267:9,20;
268:8;285:15
**11:18 (1)**
285:11
**11:19 (2)**
356:4,5
**11:30 (2)**
356:6,8
**11th (24)**
243:12;248:19;
259:15;264:4;267:1,
15;268:10;287:8,9,13;
291:4;292:1;293:12;
296:24;297:4,5,14,16;
298:1;299:13;300:8,
16;308:20;317:21
**12:03 (2)**

382:6,7
**12:06 (2)**
382:8,10
**12:13 (2)**
388:17,19
**126 (1)**
310:21
**127 (2)**
313:10,16
**1276 (1)**
310:22
**130 (1)**
313:20
**131 (1)**
314:25
**13th (5)**
288:5,6;291:4;
300:10,11
**14270 (1)**
229:20
**14th (1)**
300:20
**15 (1)**
279:5
**15th (8)**
279:3;317:4,6,18,19;
318:4;337:13;378:23
**16th (4)**
301:6,7,13;302:4
**17th (1)**
323:10
**18 (3)**
372:18,19,20
**18:22 (1)**
303:18
**180 (2)**
273:21;315:22
**1800 (1)**
303:18
**1828 (2)**
229:3,18
**18th (2)**
348:7,7
**19 (1)**
280:12
**19.6 (2)**
255:1;347:17
**19-pound (1)**
346:20
**19th (2)**
378:12;379:10
**1st (17)**
313:21,22;314:4,20,
25;318:1,2;320:7;
331:18;332:1,3;333:6;
341:25;345:8;356:14,
18,25

**2**

**2 (1)**
254:15
**20 (1)**

317:4
**2022 (17)**
235:17;242:20,21;
282:19;283:1;287:13;
314:14,20;317:11,13,
18;318:2,5,6,6;373:7;
384:2
**2023 (1)**
378:23
**2024 (2)**
229:2,12
**207 (2)**
243:9;259:13
**2084 (2)**
313:23;314:5
**21 (2)**
372:20,20
**2-15-23 (1)**
320:19
**22 (2)**
372:18,19
**220-page (1)**
242:8
**225 (1)**
313:16
**22-cv-01527-DAD-AC (1)**
229:16
**22nd (8)**
302:13;304:17;
348:9;351:10;378:12,
16,21;379:10
**25th (15)**
233:3,8,9;242:20;
243:12;248:20;259:15;
276:23;277:3,4,5,7,23;
309:10,24
**26 (1)**
234:4
**263 (1)**
348:9
**26th (5)**
234:25;235:10;
368:6,8,9
**27th (3)**
280:3;310:9,12
**28th (33)**
242:21;245:7;246:6;
248:25;252:7;253:13;
258:19;264:10;265:21;
266:15;267:1,4,9,15,
20;268:8;269:4,9,14;
280:12,20;281:12;
310:18;321:8;341:5,6,
7;348:7;363:6,7;
365:13,14;384:2
**299 (1)**
280:13
**29th (15)**
236:8;237:9;282:9,
11,12,13,19;283:7,14;
342:3,19,20,21;378:15,
21

**3**

**3 (1)**
278:2
**3:40 (1)**
317:6
**300 (2)**
270:6;280:13
**301 (1)**
280:16
**302 (1)**
280:16
**307 (2)**
281:2,3
**31st (7)**
313:13;314:14;
315:7;319:12;324:24;
333:10;334:1
**331 (1)**
281:17
**3K (1)**
321:15

**4**

**4 (1)**
278:25
**400 (1)**
270:6
**415 (1)**
282:12
**416 (1)**
282:12
**417 (1)**
282:12
**418 (1)**
282:12
**43 (2)**
285:8,9
**436 (1)**
283:7
**437 (1)**
283:7
**438 (1)**
283:7
**4463 (2)**
303:20;310:10
**46 (1)**
300:13
**49 (1)**
300:7

**5**

**5 (1)**
283:4
**5:41 (1)**
341:9
**530-229-3769 (1)**
330:15
**530-387-6789 (1)**
279:7

**530-903-0058 (1)**
  276:16
**54 (1)**
  300:19

---

**6**

---

**6 (3)**
  236:8;281:12;366:18
**6:26 (1)**
  234:21
**6-25-22 (2)**
  275:11;366:18
**6-27 (2)**
  279:16,18
**6-27-22 (2)**
  362:20;366:18
**6-28 (1)**
  281:22
**6-28-22 (2)**
  340:16;362:20
**6-29 (1)**
  236:14
**648 (1)**
  284:4
**6789 (1)**
  279:6
**682 (1)**
  285:8

---

**7**

---

**7 (2)**
  288:4;305:25
**7:22 (2)**
  306:2,8
**711 (1)**
  287:1
**714 (1)**
  363:24
**715 (1)**
  287:2
**716 (1)**
  287:2
**717 (1)**
  287:2
**718 (1)**
  287:2
**7-18-22 (1)**
  340:16
**7-22 (2)**
  303:23;305:21
**725 (1)**
  287:10
**7-25 (1)**
  309:20
**7-28-22 (1)**
  320:19
**74 (1)**
  309:8
**78 (2)**
  310:8,9
**7th (2)**

295:25;378:22

---

**8**

---

**8 (3)**
  340:16;341:2;362:20
**8:06 (2)**
  229:2,13
**8:23 (1)**
  242:14
**8:24 (1)**
  242:17
**8:56 (2)**
  268:15,16
**8-10 (1)**
  255:8
**8954 (1)**
  388:16
**8th (31)**
  237:22;238:1,10;
  245:7,9;246:6;248:25,
  25;253:12,17;269:4,4,
  9,14;271:25;283:19;
  284:1,15;285:7;292:5;
  294:23;295:24;296:6,
  23;297:1,14,25;313:2;
  384:1,21;385:3

---

**9**

---

**9 (2)**
  229:1;320:19
**9:07 (2)**
  268:17,19
**9107 (4)**
  283:22,23;303:19;
  313:12
**9-1-22 (1)**
  275:11
**9-22 (1)**
  255:5
**95 (1)**
  312:24
**9th (9)**
  229:12;247:11;
  286:22;287:3;294:23;
  296:6;313:2,4;385:3