1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  CATHERINE WOODBRIDGE, State Bar No. 186186
   Supervising Deputy Attorney General
3  JOHN C. BRIDGES, State Bar No. 248553
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone:  (916) 210-7529
6    Fax:  (916) 322-8288
     E-mail:  John.Bridges@doj.ca.gov
7  *Attorneys for Defendants State of California, by and
   through the 27th District Agricultural Association,*
8  *Melanie Silva, and B.J. MacFarlane*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

14  **E.L., a minor, by and through her general
    guardian, JESSICA LONG; JESSICA
15  LONG, an individual,**

16                                        Plaintiffs,

17  **v.**

18  **LIEUTENANT JERRY FERNANDEZ, in
    his individual capacity; DETECTIVE
19  JACOB DUNCAN, in his individual;
    DETECTIVE JEREMY ASHBEE, in his
20  individual capacity; SHASTA DISTRICT
    FAIR AND EVENT CENTER, a district
21  agricultural association, COUNTY OF
    SHASTA; SHASTA COUNTY SHERIFF'S
22  DEPARTMENT; MELANIE SILVA, in her
    individual capacity; BJ MACFARLANE, in
23  his individual capacity; and DOES 1
    through 10,**

24
                                        **Defendants.**
25

| | |
|---|---|
| 2:22-CV-01527 DAD AC | |

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, SUMMARY
ADJUDICATION**

Date:        January 6, 2025
Time:        1:30 pm
Courtroom:   4
Judge:       Honorable Dale A. Drozd
Trial Date:  March 24, 2025
Action Filed: August 31, 2022

26

27

28

# TABLE OF CONTENTS

**Page**

Memorandum of points and authorities ......................................................................... 1

I.  Introduction ................................................................................................. 1

II.  Factual Summary ......................................................................................... 2

III.  Standard of Review on Summary Judgment ................................................ 8

IV.  Argument ..................................................................................................... 9

    A.  Plaintiffs' Third, Fourth, Seventh, Eighth, Tenth, Twelfth, and Thirteenth Causes of Action Fail Because Plaintiffs Did Not Have any Property Rights in the Livestock After the Junior Livestock Auction. ............................................................................... 9

    B.  Plaintiffs' First Amendment Claim Fails Because They Were Not Engaged in a Constitutionally-Protected Activity. ..................... 16

    C.  Defendants Silva and Macfarlane are Entitled to Qualified Immunity. ........................................................................................... 18

    D.  The Eleventh Amendment Bars Actions Against the State of California. ......................................................................................... 20

    E.  Plaintiffs' Claims for Violations of the California Constitution, Articles 7 and 13, do not Provide Private Causes of Action. ............... 21

    F.  Plaintiffs' Claim Against the Shasta District Fair for Conversion Fails Because Plaintiffs Had No Ownership Interest in the Animal at the Time of the Alleged Conversion. ...................................... 22

    G.  Plaintiffs' Claim Against the Shasta District Fair for Negligence Fails Because Plaintiffs Had No Ownership Interest in the Animal at the Time of the Alleged Negligence. ...................................... 23

    H.  Plaintiffs' Claim Against the Shasta District Fair for Intentional Infliction of Emotional Distress Fails Because Defendants' Conduct was not Extreme and Outrageous. .......................................... 23

    I.  The Court Does Not Have Jurisdiction to Provide the Requested Declaratory Relief in the Second Amended Complaint. ............... 25

V.  Conclusion .................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

4

CASES

5

*Aaris v. Las Virgenes Unified School Dist.*
  64 Cal.App.4th 1112 (1998)........................................................... 12

6

7

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ........................................................... 8, 9, 19

8

*Benson v. State Bd. of Parole & Prob.*
  384 F.2d 238 (9th Cir. 1967)........................................................... 25

9

10

*Blossom v. Railroad Co.*
  70 U.S. (3 Wall.) 196 (1865)........................................................... 12

11

12

*Boquist v. Courtney*
  32 F.4th 764 (9th Cir. 2022)........................................................... 17

13

14

*Bostock v. Clayton Cnty.*
  140 S. Ct. 1731 (2020) ........................................................... 17

15

*Bottorff v. Ault*
  374 F.2d 832, 835 (7th Cir.1967 ........................................................... 12

16

17

*Brant v. California Dairies, Inc.*
  4 Cal.2d 128 (1935) ........................................................... 15

18

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*
  149 F.3d 971 (9th Cir. 1998)........................................................... 10

19

20

*Brooks v. Sulphur Springs Valley Elec. Coop.*
  951 F.2d 1050 (9th Cir. 1991)........................................................... 20

21

22

*Cabral v. Cnty. of Glenn*
  624 F. Supp. 2d 1184 (E.D. Cal. 2009)........................................................... 22

23

*Carroll v. Carmen*
  574 U.S. ___ (2014) ........................................................... 19

24

25

*Celli v. Sports Car Club of America, Inc.*
  (1972) 29 Cal.App.3d 511........................................................... 14

26

27

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ........................................................... 8, 9

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Christensen v. Superior Court*
    54 Cal.3d 868 (1991) ........................................................................................... 24

4

5

*Doyle v. Giuliucci*
    (1965) 62 Cal.2d 606 ........................................................................................... 14

6

*Hartman v. Moore*
    547 U.S. 250 (2006) ............................................................................................ 17

7

8

*Hohe v. San Diego Unified Sch. Dist.*
    (1990), 224 Cal. App. 3d 1559 ........................................................................... 14

9

*Holland v. Universal Underwriters Ins. Co.*
    (1969) 270 Cal.App.2d 417 ................................................................................. 14

10

*Hughes v. Pair*
    46 Cal.4th 1035 (2009) ....................................................................................... 24

11

12

*Hunter v. Bryant*
    502 U.S. 22 (1991) .............................................................................................. 18

13

14

*In Est. of F.R. v. Cnty. of Yuba*
    No. 223CV00846WBSCKD, 2023 WL 6130049 (E.D. Cal. Sept. 19, 2023) ....... 22

15

16

*In re Oracle Corp. Sec. Litig.*
    627 F.3d 376 (9th Cir. 2010) ................................................................................ 9

17

18

*Jackson v. Hayakawa*
    682 F.2d 1344 (9th Cir. 1982) ............................................................................ 20

19

*Katzberg v. Regents of Univ. of Cal.*
    29 Cal. 4th 300 (2002) ................................................................................... 21, 22

20

21

*King v. Stanley*
    32 Cal.2d 584 (1948) .................................................................................... 10, 14

22

23

*Koala v. Khosla*
    931 F.3d 887 (9th Cir. 2019) .............................................................................. 16

24

25

*KRL v. Estate of Moore*
    512 F.3d 1184 (9th Cir. 2008) ............................................................................ 18

26

*L.F. v. Lake Wash. Sch. Dist.*
    947 F.3d 621 (9th Cir. 2020) ................................................................................ 9

27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Lavan v. City of Los Angeles*
693 F.3d 1022 (9th Cir. 2012)..................................................................................... 9

*Lawrence Paper Co. v. Rosen & Co.*
939 F.2d 376 (6th Cir.1991)...................................................................................... 12

*Malley v. Briggs*
475 U.S. 335 (1986) .................................................................................................. 18

*Manning v. City of Rohnert Park*
No. C 06-03435 SBA, 2007 U.S. Dist. LEXIS 31301, at *2, 2007 WL
1140434, at *1 (N.D.Cal. April 17, 2007). .............................................................. 21

*Mount Healthy City School Dist. Bd. of Educ*, 429 U.S. at 280, 50 L. Ed. 2d 471,
97 S. Ct. 568 (1977 ................................................................................................... 20

*Pennhurst State School and Hosp. v. Halderman*
465 U.S. 89 (1984) .................................................................................................... 20

*Pietrelli v. Peacock*
13 Cal.App.4th 943 (1993)........................................................................................ 12

*Plotnik v. Meihaus*
208 Cal.App.4th 1590 (2012).................................................................................... 24

*R.H. v. Los Gatos Unified School Dist.*
33 F.Supp.3d 1138 (N.D. Cal. 2014) ....................................................................... 11

*Reese-Bey v. Ochoa*
No. CV 20-06693, 2020 WL 11767431 (C.D. Cal. Sept. 29, 2020)........................ 22

*Reynolds v. County of San Diego*
84 F.3d 1162 (9th Cir. 1996), (9th Cir. 1997) .......................................................... 8

*Rutledge v. Arizona Bd. of Regents*
660 F.2d 1345 (9th Cir. 1981)................................................................................... 20

*Saldate v. Wilshire Credit Corp.*
686 F. Supp. 2d 1051, 1062 (E.D. Cal. 2010).......................................................... 23

*Saucier v. Katz*
533 U.S. 194 (2001) .................................................................................................. 18

*Sloman v. Tadlock*
21 F.3d 1462 (9th Cir. 1994)..................................................................................... 16

iv

1

## TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

*United States v. Conrad*
    619 F.Supp. 1319 ......................................................................................................... 12

4

5

*United States v. Jacobsen*
    466 U.S. 109 (1984) ....................................................................................................... 9

6

7

*Waters v. Churchill*
    511 U.S. 661 (1994) ..................................................................................................... 17

8

*Wigfall v. City & County of San Francisco*
    No. C 06-4968 VRW, 2007 U.S. Dist. Lexis 82047 (N.D.Cal. Jan. 22, 2007) ..................... 21

9

*Windsor Mills, Inc. v. Collins & Aikman Corp.*
    25 Cal.App.3d 987 (Cal. App. 2d Dist. 1972) ......................................................................... 11

10

11

**STATUTES**

12

28 U.S.C. § 2201 ............................................................................................................. 25

13

28 U.S.C. § 2201(a) ......................................................................................................... 25

14

California Civil Code
    § 1550 ............................................................................................................................ 10
    § 1812.601 ..................................................................................................................... 13

15

16

California Family Code § 6710 ........................................................................................ 12

17

California Food & Agriculture Code
    § 3879 ............................................................................................................................ 20
    § 3951 ............................................................................................................................ 20
    § 3953 ............................................................................................................................ 20
    § 3954 ............................................................................................................................ 20
    § 3955 ............................................................................................................................ 20
    § 3962 ............................................................................................................................ 20
    § 4051.2 ......................................................................................................................... 21
    § 4051(a)(10)-(12) ......................................................................................................... 21
    § 4501-4513 ................................................................................................................... 21

18

19

20

21

22

23

Penal Code § 487(a) .......................................................................................................... 5

24

Uniform Commercial Code § 2-328 ................................................................................ 13

25

Uniform Commercial Code § 2-328:6 ............................................................................. 13

26

27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

California Constitution, Article I
  § 7.................................................................................................................... 1, 21
  § 7(a) ............................................................................................................... 21, 22
  § 13................................................................................................................... 1, 21
  § 13................................................................................................................. 21, 22

California Constitution, Article 7 ........................................................................... 21

California Constitution, Article 13 ......................................................................... 21

U.S. Constitution
  First Amendment................................................................................ 1, 16, 17, 18
  Fourth Amendment................................................................................... 1, 9, 13
  Eleventh Amendment.................................................................................. 20, 21
  Fourteenth Amendment................................................................................ *passim*

**COURT RULES**

Federal Rules of Civil Procedure
  56(a) ..................................................................................................................... 8
  56(e) ..................................................................................................................... 9
  57......................................................................................................................... 25

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.     INTRODUCTION**

3       This litigation arises from the unauthorized removal of livestock from the Shasta District

4  Fair on June 25, 2022. Following an auction and sale of a market goat that was expressly

5  authorized by plaintiff Jessica Long, including signing a contract allowing for the auction and sale

6  of the goat, plaintiff Long unlawfully removed the goat from the fairgrounds and took the goat to

7  a third-party farm in Sonoma County. According to the owner of the farm, plaintiffs donated the

8  goat to him and had no intention of returning to retrieve it.

9       The lawful purchaser of the goat contacted the Shasta County Sheriff's Department to

10  report the theft of the goat from the fairgrounds. Deputies with the Shasta County Sheriff's

11  Department conducted an investigation and located the animal at the farm in Petaluma, from

12  which they took the animal with the consent of the farm's owner. At the direction of the goat's

13  auction purchaser, the Shasta County Sheriff's Deputies gave the animal to an employee of the

14  Shasta District Fair to arrange for its processing. That employee, defendant Bruce "B.J."

15  Macfarlane, kept the goat at his property until Sheriff's Deputies and the Shasta County District

16  Attorney's Office gave him permission to arrange for the slaughter of the livestock, which

17  occurred a few weeks after the Deputies delivered the animal to defendant Macfarlane. The

18  animal went to market on or about July 28, 2022.

19       In their Second Amended Complaint (ECF No. 25), plaintiffs allege claims against the

20  Shasta District Fair for violations of California Constitution, Article I, § 7 (due process and equal

21  protection clauses) and § 13 (unreasonable search and seizure), conversion, negligence, and

22  intentional infliction of emotional distress. They allege claims against individual defendants

23  Melanie Silva and B.J. Macfarlane for violations of the First, Fourth, and Fourteenth

24  Amendments of the United States Constitution. Plaintiffs also seek declaratory relief against all

25  moving defendants.

26       Summary judgment is appropriate for each of these claims because the undisputed material

27  facts establish that plaintiffs did not have a property interest in the livestock at the time of its

28  slaughter, nor were plaintiffs engaged in any constitutionally-protected activity at the time of its

1

1   slaughter. Each of their constitutional claims, as well as their common law claims, fail against the
2   moving defendants.

3   **II.   FACTUAL SUMMARY**

4         Plaintiff Jessica Long entered her daughter, plaintiff E.L., in the market goat program of the
5   Cow Creek 4-H club in Shasta County, California, in October of 2021. (Def. SUMF No. 1)
6   Plaintiff Long wanted her daughter to learn how to care for livestock, as well as it being a great
7   opportunity for her to learn about where food comes from and the effort it takes to raise quality
8   meat products. (Def. SUMF No. 2) Plaintiff Long purchased the goat in April of 2022. (Def.
9   SUMF No. 3) From September 2021 to May 2022, plaintiffs participated in monthly 4-H
10  meetings and learned about raising meat goats. (Def. SUMF No. 4) When plaintiff Long signed
11  E.L. up for 4-H, she signed her up for the meat or market goat project. (Def. SUMF No. 5) They
12  ate goat meat during the program orientation prior to purchasing their goat. (Def. SUMF No. 6)
13  They learned that meat goats are raised to be used as meat, and that their goat would be used for
14  meat. (Def. SUMF No. 7) In September or October of 2021, the 4-H club leader told plaintiff
15  Long that the goats would be sold at auction and most likely would be purchased for meat. (Def.
16  SUMF No. 8) The 4-H club leader told plaintiffs that the goats in the program were being raised
17  for meat. (Def. SUMF No. 9) E.L.'s understanding is that she was raising the goat for meat. (Def.
18  SUMF No. 10)

19        On May 17, 2022, plaintiff Long entered E.L. into the "market goat" division and "meat
20  goat showmanship" programs for the 2022 Shasta District Fair. (Def. SUMF No. 11) At that time,
21  plaintiff Long knew that the animal would be sold at the auction at the end of the fair, and she
22  intended that the animal be sold at the auction. (Def. SUMF No. 12) At the time she entered E.L.
23  as an exhibitor at the fair, she believed that the goat would be sold at the auction for meat. (Def.
24  SUMF No. 13)

25         The online entry form indicated that plaintiffs would be bound by the exhibitor rules for
26  the fair, which were hyperlinked on the form. (Def. SUMF No. 14) Plaintiff Long selected a box
27  stating "I agree" to comply with the exhibitor rules and submitted the form without reading the
28  rules. (Def. SUMF No. 15) Those rules contained the following provisions:

**"AUCTION GUIDELINES – THIS IS A TERMINAL SALE"**

**"ALL ANIMALS** (Steers – Replacement Heifers – Swine – Lambs – Meat Goats – Rabbit Meat Pens) ENTERED IN MARKET CLASSES & QUALIFYING FOR THE JUNIOR LIVESTOCK AUCTION **MUST BE SOLD** as listed on the Sale Order."

"ALL ANIMALS sold in the Shasta Junior Livestock Auction sale MUST go to processing, directly from the Fairgrounds and will be transported on the trucks provided by the Fair on Saturday, June 25, 2022." (Def. SUMF No. 16)

Plaintiff Long submitted the entry form along with a $15.00 entry fee. (Def. SUMF No. 17) She did not speak with anyone from the Shasta District Fair at the time she entered into the contract, nor did she speak to anyone from the Fair prior to entering into the contract. (Def. SUMF No. 18)

At no time did Ms. Long contact anyone from the Shasta District Fair to modify and/or revoke her consent to the contract. (Def. SUMF No. 19) The first time she contacted anyone from the Shasta District Fair about her allegedly withdrawn consent to participate in the auction was June 27, 2022, two days <u>after</u> the auction. (Def. SUMF No. 20)

Shortly before the Fair, E.L. drafted a buyer's letter encouraging prospective buyers to come to the Fair and bid on her animal. E.L.'s buyer letter stated, in part:

"Dear buyer, hello, my name is E.L. I am in Cow Creek 4-H. This is my first year in 4-H. I have decided to raise a meat got [SIC] whether for my project…This year I have learned how to take care of meat goat. My goat is very great and he will be very good palin [SIC] and in tacos and every other way he will be very good and tasty…" (Def. SUMF No. 21)

Plaintiffs participated in the Shasta District Fair during the week of June 20, 2022, culminating with the Junior Livestock Auction on Saturday, June 25, 2022. (Def. SUMF No. 22) On the second day of the fair, plaintiff Long heard from a farm to which they could donate the goat where it would clear land for fire prevention. (Def. SUMF No. 23) At no time during the

3

1  week of the Fair did either plaintiff contact anyone from the Shasta District Fair about removing

2  the animal from the fairgrounds. (Def. SUMF No. 24) On June 25, 2022, E.L. participated in the

3  Junior Livestock Auction. (Def. SUMF No. 25) California State Senator Brian Dahle, by and

4  through his representative Kathie Muse, placed the winning bid for plaintiffs' animal at the

5  auction, which was $902. (Def. SUMF No. 26) Sen. Dahle had previously arranged for the

6  livestock to be donated to the local 4-H/FFA Community BBQ to use at its annual fundraiser

7  event. (Def. SUMF No. 27) After placing the winning bid, E.L. delivered a "thank you" letter to

8  Ms. Muse to thank her for placing the winning bid on her goat, thereby acknowledging that Ms.

9  Muse had purchased her animal. (Def. SUMF No. 28)

10         Later that evening, when the 4-H livestock was being loaded for transport from the

11  fairgrounds pursuant to the Exhibit Rules (see above), plaintiff Long convinced E.L. that they

12  should take the animal from the fairgrounds. (Def. SUMF No. 29) E.L. did not think that

13  removing the animal from the fairgrounds was even an option, but plaintiff Long loaded the goat

14  into the back of her car, drove to Sacramento, and made arrangements to deliver the animal to a

15  private farm in Petaluma. (Def. SUMF No. 30) The following day, plaintiffs took the animal to

16  Petaluma and gave it to Raymond Allen, the owner of Billy's Mini Farm. (Def. SUMF No. 31)

17  Plaintiff Long texted Mr. Allen that morning, stating, "Hi, it's Jessica Long. I called earlier this

18  week about a 4-H goat that we'd like to donate to your farm." (Def. SUMF No. 32) Mr. Allen's

19  understanding of why plaintiff Long was giving the goat to him was "to donate it to me," and

20  "she wanted to donate us a goat." (Def. SUMF No. 33) His understanding was that plaintiffs

21  transferred ownership of the goat to him when they donated it to him. (Def. SUMF No. 34) Mr.

22  Allen estimated that it would cost him more than $100 per year to take care of a goat like the one

23  donated to him by the plaintiffs. (Def. SUMF No. 35) Additionally, E.L. understood that they

24  were going to leave the goat with Mr. Allen for the rest of the goat's life. (Def. SUMF No. 36)

25         On Monday, June 27, 2022, plaintiff Long contacted Melanie Silva, the CEO of the Shasta

26  District Fair, by email. Plaintiff Long stated that she "decided to break the rules and take the goat

27  that night and deal with the consequences later." (Def. SUMF No. 37) She stated that she wanted

28  to "donate my daughter's goat to where he could clear land for fire prevention…We just want to

1   give him to a farm that does fire clearing and make things right with the fair…I hope that I will

2   gain your support to donate our goat to a fire clearing team…" (Def. SUMF No. 38)

3          On or about June 29, 2022, Lieutenant Jerry Fernandez ("Lt. Fernandez") with the Shasta

4   County Sheriff's Office, was contacted regarding the theft of livestock from the District Fair.

5   (Def. SUMF No. 39) Lt. Fernandez reached out to Bruce MacFarlane ("BJ MacFarlane"), the

6   livestock manager for the District Fair, and was informed that the livestock had been stolen

7   during the end of the Junior Livestock Auction. (Def. SUMF No. 40) The defendants only

8   involvement in the Shasta County Sheriff's Office's investigation into the goat's whereabouts

9   was to cooperate by providing Lieutenant Fernandez with information at his request.

10         Lt. Fernandez initiated an investigation into the theft of the goat and learned that Kathie

11  Muse, the head of the 4-H/FFA Community BBQ, had first reported the livestock theft. ((Def.

12  SUMF No. 41) According to Kathie Muse, State Senator Dahle had purchased the meat goat at

13  the District Fair paying $902.00. (Def. SUMF No. 26) The Senator then donated the animal to her

14  for the 4-H/FFA Community BBQ. (Def. SUMF No. 27)

15         In the course of his investigation, Lt. Fernandez reviewed communications from Jessica

16  Long, the sales invoice for the auction, social media posts, the District Fair local/state rules, as

17  well as the terms of the contract between the District Fair and Jessica Long. (Def. SUMF No. 42)

18  Based on the information presented to him, Lt. Fernandez, in his capacity as a law enforcement

19  officer, determined that Jessica Long had committed grand theft under Penal Code § 487(a). (Def.

20  SUMF No. 43) He relayed this information to Shasta County Sheriff's Detective Jeremy Ashbee

21  ("Detective Ashbee") who prepared several warrants for the retrieval of goat. (Def. SUMF No.

22  44)

23         Detective Ashbee drafted search warrants to permit a search Bleating Hearts Farm and

24  Sanctuary, located at 1132 3rd Avenue, Napa, CA 94558 (Bleating Hearts). (Def. SUMF No. 45)

25  It was believed the goat was at Bleating Hearts because of social media posts and facts obtained

26  in the investigation. (Def. SUMF No. 46) The operative and final warrant included language

27  signed by the Magistrate stating "Due to the fact the item(s) to be seized include living animals,

28  Deputies shall secure the property in a humane and appropriate location, and the rightful owner of

5

1   said property shall be notified of the location of the property. The property may be released to the

2   owner upon seizure." (Def. SUMF No. 47)

3         On July 8, 2022, Lieutenant Fernandez recruited Detective Jacob Duncan ("Detective

4   Duncan") to accompany him to serve the operative and final warrant at Bleating Hearts Farm in

5   Napa, California. (Def. SUMF No. 48)

6         Upon arriving at Bleating Hearts, Lieutenant Fernandez and Detective Duncan were unable

7   to locate the goat. (Def. SUMF No. 49) They interviewed the owners, Justin Starky and Kristin

8   Stover who both denied knowing the location of the goat. (Def. SUMF No. 50) In interviewing

9   Kristin Stover, Detective Duncan became suspicious that she was not being honest about not

10  knowing the location of the goat. (Def. SUMF No. 51) He pressed her on the issue and she

11  ultimately acknowledged that she did know the goat's location. (Def. SUMF No. 52) Kristin

12  Stover gave Detective Duncan consent to view texts on her phone which confirmed the goat was

13  located at Billy's Mini Farm in Petaluma, California. (Def. SUMF No. 53) Since Billy's Mini

14  Farm was only approximately 37 miles from Bleating Hearts, Lt. Fernandez and Detective

15  Duncan decided to go to there instead of immediately returning to Shasta County. (Def. SUMF

16  No. 54)

17        Prior to arriving at Billy's Mini Farm, Detective Duncan learned the Raymond Allen was

18  the owner of the farm. (Def. SUMF No. 55) He was able to locate Raymond Allen's telephone

19  number and called him on his cell phone. (Def. SUMF No. 56) Detective Duncan explained that

20  they were investigating the possible theft of a goat and asked if the animal was at his property.

21  (Def. SUMF No. 57) Raymond Allen stated that the goat had been donated to him by plaintiffs

22  and that the goat was his property. (Def. SUMF No. 58) Raymond Allen gave consent to

23  Detective Duncan to search his farm and locate the animal on his property. (Def. SUMF No. 59)

24        On the evening of July 8, 2022, the goat was identified at Billy's Mini Farm and taken into

25  possession by Lieutenant Fernandez and Detective Duncan. (Def. SUMF No. 60) They drove the

26  goat back to Shasta County where they delivered it to BJ MacFarlane, who was acting as an agent

27  for Kathie Muse, at the request of Kathie Muse. (Def. SUMF No. 61)

28

1    On approximately July 28, 2022, the goat was killed by a meat processing facility in

2    compliance with the exhibitor rules. (Def. SUMF No. 62) A check was subsequently issued by

3    the Shasta District Fair to plaintiff E.L. for the sale of the goat at the Junior Livestock Auction.

4    (Def. SUMF No. 63)

5    Plaintiff Long's first public comments about the situation occurred *after* the goat had been

6    slaughtered. (SSUMF No. 64) The only public comment about the goat that occurred between the

7    auction and the slaughter was an Instagram post made by a third-party. (SSUMF No. 65)

8    Plaintiffs did not have anything to do with the creation of the post. Plaintiffs did not instruct the

9    third-party to generate the post, nor did they give her permission to make the post. (SSUMF No.

10   66) Plaintiffs were not aware that it had been posted until after-the-fact. Plaintiffs were unhappy

11   that the post had been made and wanted the third-party to take down the post. (SSUMF No. 67)

12   BJ MacFarlane housed the subject goat for approximately twenty days after Lieutenant

13   Fernandez delivered the goat to him. (Def. SUMF No. 64) During this time, Defendant

14   Macfarlane housed the goat at the direction of the Shasta County Sheriff's Office, who told him

15   to keep the goat alive in case the Shasta County District Attorney needed it as part of its potential

16   prosecution of plaintiff Long. (Def. SUMF No. 65) During the time defendant Macfarlane was

17   housing the goat, he was told that the District Attorney's Office did not need the goat for any

18   reason, and he could proceed with arranging for the slaughter of the goat. (Def. SUMF No. 66)

19   He was also told that he needed to keep the goat's ear tags in case they were needed for a future

20   prosecution, which he did. (Def. SUMF No. 67) Defendant Macfarlane helped Kathie Muse

21   arrange for the slaughter of the livestock because he believed that the goat was sold to her at the

22   Junior Livestock Auction, he was told that she was the legal owner of the animal by Lieutenant

23   Fernandez, and the exhibitor rules require that all market animals sold at auction are slaughtered

24   for meat. (Def. SUMF No.68)

25   During the time that defendant Macfarlane housed the goat, defendant Silva had no

26   involvement in the maintenance or slaughter of the animal. (Def. SUMF No. 69) Defendant Silva

27   was aware that defendant Macfarlane was waiting to receive approval from the Shasta County

28   Sheriff's Office and the Shasta County District Attorney's Office prior to the goat's slaughter,

7

and she was aware that defendant Macfarlane had received that approval prior to the goat's slaughter. (Def. SUMF No. 70) The exhibitor rules require that all market goats sold at the Junior Livestock Auction be slaughtered for meat. (Def. SUMF No. 71) The subject goat was slaughtered pursuant to the exhibitor rules. (Def. SUMF No. 72) At the 2022 Shasta District Fair, 42 market goats were sold at the Junior Livestock Auction, and all of them, without exception, were slaughtered for meat in accordance with the exhibitor rules. (Def. SUMF No. 73) Additionally, defendant Silva believed that the subject goat was sold to a third party at the Junior Livestock Auction, and that the plaintiffs no longer owned the animal at any time after the auction. (Def. SUMF No. 74)

## III.   STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  Questions of fact regarding immaterial issues cannot defeat a motion for summary judgment.  *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168-70 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian Associates, Inc.* (9th Cir. 1997) (en banc). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

1  specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations
2  omitted).

3  Once the burden shifts to the non-moving party, that party must go beyond the pleadings
4  and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine
5  issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party "must show more than the mere
6  existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.
7  2010) (citing *Anderson*, 477 U.S. at 252). "[T]he non-moving party must come forth with
8  evidence from which a jury could reasonably render a verdict in the non-moving party's favor."
9  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a
10  matter of law." *Celotex Corp.*, 477 U.S. at 323.

11  A court's obligation to view evidence in the light most favorable to the non-movant does
12  not require it to ignore undisputed evidence produced by the movant. *L.F. v. Lake Wash. Sch.
13  Dist.*, 947 F.3d 621, 625 (9th Cir. 2020). "[T]he mere existence of *some* alleged factual dispute
14  between the parties will not defeat an otherwise properly supported motion for summary
15  judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S
16  at 247-248 (emphasis in original).

17  **IV.   ARGUMENT**

18       **A.   Plaintiffs' Third, Fourth, Seventh, Eighth, Tenth, Twelfth, and Thirteenth
            Causes of Action Fail Because Plaintiffs Did Not Have any Property Rights
19           in the Livestock After the Junior Livestock Auction.**

20  The predicate to plaintiffs' claims for Fourth and Fourteenth Amendment violations under
21  the U.S. Constitution (Plaintiffs' Third and Fourth cause of action) is that their rights were
22  violated by Defendants Silva and Macfarlane *as related to their property interests*. Specifically,
23  plaintiffs' only have viable claims for Fourth Amendment and Fourteenth Amendment violations
24  *if* they have ownership and/or possessory interests in the subject property that was seized or to
25  which they were not afforded due process. "A 'seizure' of property only occurs when there is
26  some meaningful interference with an individual's possessory interests in that property." *Lavan
27  v. City of Los Angeles*, 693 F.3d 1022, 1027, 1030-33 (9th Cir. 2012) (quoting *United States v.
28  Jacobsen*, 466 U.S. 109, 113 (1984). Likewise, a procedural due process claim has two distinct

9

elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. (*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). In this case, plaintiffs had no property interest in the goat because they entered into a binding contract with the Shasta District Fair that resulted in the transfer of ownership of the subject goat to a third party through the sale of the animal at auction. Thus, plaintiffs' claims for Fourth and Fourteenth Amendment violations are barred as a matter of law.

### i.  Plaintiffs Entered Into a Binding Contract With the Fair.

"It is essential to the existence of a contract that there should be: (1) Parties capable of contracting; (2) Their consent; (3) A lawful object; and, (4) A sufficient cause or consideration." (Cal. Civ. Code § 1550.) In this case, there is no dispute that the Shasta District Fair and Jessica Long were parties capable of contracting, the participation in the Fair and sale of the goat were a lawful object, and the plaintiff Jessica Long paid an entry fee for her daughter to participate in the Fair, which constitutes sufficient consideration. Moreover, the contractual opportunity to sell the goat for money was additional consideration.

Regarding the consent requirement, plaintiff Jessica Long voluntarily entered into the contract with the Fair by submitting an online entry agreement on May 17, 2022. (SSUMF No. 11) The entry was for "meat goat showmanship" and the "market goat" division. Plaintiff Long knew that the goat would be sold at auction at the end of the fair, and in fact, prior to the fair she intended that he be sold at the auction. (SSUMF No. 12) At the time she entered the contract, she believed that the goat would most likely be sold for meat. (SSUMF No. 13) The online entry form indicated that plaintiffs would be bound by the exhibitor rules for the fair, which were hyperlinked on the form, but she selected "I agree" and submitted the form without reading the rules. (SSUMF Nos. 14 and 15) Subjective consent to the terms of the contract are not required for the contract to be binding and enforceable. "[T]he terms of a contract ordinarily are to be determined by an external, not an internal, standard; the outward manifestation or expression of assent is the controlling factor." *King v. Stanley*, 32 Cal.2d 584, 591 (1948). "[A]n offeree, knowing that an offer has been made to him but not knowing all of its terms may be held to have

10

accepted, by his conduct, whatever terms the offer contains." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App.3d 987, 992 (Cal. App. 2d Dist. 1972). Here, Plaintiff Long's conduct in clicking the box "I agree" provided an objective, outward manifestation of her consent to the terms of the contract.

The Exhibitor Rules that were incorporated into the contract contained the following provisions:

"AUCTION GUIDELINES – THIS IS A TERMINAL SALE"

"**ALL ANIMALS** (Steers – Replacement Heifers – Swine – Lambs – Meat Goats – Rabbit Meat Pens) ENTERED IN MARKET CLASSES & QUALIFYING FOR THE JUNIOR LIVESTOCK AUCTION **<u>MUST BE SOLD</u>** as listed on the Sale Order."

"ALL ANIMALS sold in the Shasta Junior Livestock Auction sale MUST go to processing, directly from the Fairgrounds and will be transported on the trucks provided by the Fair on Saturday, June 25, 2022." (SSUMF No. 16)

Plaintiff Long submitted the entry form along with a $15.00 entry fee. (SSUMF No. 17) She did not speak with anyone from the Fair at the time she entered into the contract, nor did she speak to anyone from the Fair prior to entering into the contract. (SSUMF No. 18)

The undisputed material facts establish that plaintiff Jessica Long entered into a valid, enforceable contract with the Shasta District Fair on May 17, 2022, the terms of which included that the market goat would be sold in a terminal auction and would be sent for processing directly from the fairgrounds following the auction. (SSUMF Nos. 16)

Because plaintiff Long entered into a binding contract on behalf of her minor daughter, E.L., it was also binding on E.L. It is well established that, when parents sign as a representative, or on behalf of their child, that child is bound by that contract along with the parent signatory. (*See R.H. v. Los Gatos Unified School Dist.*, 33 F.Supp.3d 1138 (N.D. Cal. 2014) (explaining released signed by father also bound son in their dual action against school for

11

son's wrestling injuries); *Pietrelli v. Peacock*, 13 Cal.App.4th 943, 947 (1993) ("It has long been the law that a parent has the power to bind a minor child to arbitration of claim arising from the minor's health care contract."); *Aaris v. Las Virgenes Unified School Dist.*, 64 Cal.App.4th 1112, 1120 (1998) (explaining mother's release bound child injured at cheerleading, as "a parent may execute a release on behalf of his or her child.") As a result, both E.L. and Jessica Long were contractually bound to the terminal auction at the conclusion of the fair. Moreover, the fact that Jessica Long entered the contract on behalf of her daughter undermines any claims plaintiffs may make regarding E.L.'s supposed "disaffirmance" of the contract pursuant to California Family Code § 6710. Both plaintiffs were bound by the contract.

**ii.  Plaintiffs Sold the Goat at Auction Which Constituted a Binding Contract.**

Plaintiffs also had no possessory right to the goat because by selling their goat at an auction they entered into a binding contract that transferred the ownership of the goat to the successful bidder. General principles of auction law provide a baseline rule that the close of an auction-the fall of the hammer-signals acceptance of the offer and creates a binding contract between the seller and the high bidder. (*Blossom v. Railroad Co.,* 70 U.S. (3 Wall.) 196, 206, 18 L.Ed. 43 (1865) ("[A]s soon as the hammer is struck down ... the bargain is considered as concluded, and the seller has no right afterwards to accept a higher bid nor the buyer to withdraw from the contract.") (footnote and citations omitted); *Lawrence Paper Co. v. Rosen & Co.*, 939 F.2d 376, 378–79 (6th Cir.1991) ("'The contract becomes complete only when the bid is accepted, this being ordinarily denoted by the fall of a hammer.'") (quoting 7 AM.JUR.2D Auctions & Auctioneers § 16 (1980 & Supp.1991)); *Bottorff v. Ault*, 374 F.2d 832, 835 (7th Cir.1967) ("The sales here were at auction. They were completed when the hammer fell or when the auctioneer said 'sold.'") (citation omitted); *United States v. Conrad*, 619 F.Supp. 1319, 1321 (M.D. Fla. 1985) ("It has long been settled that a bid constitutes an offer and the fall of the hammer signifies acceptance."). As "soon as the hammer is struck down, says the same author, the bargain is considered as concluded, and the seller has no right afterwards to accept a higher bid nor the buyer to withdraw from the contract*." Blossom,* 70 U.S. at 206. A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary

manner. U.C.C. § 2-328. An auction is a public sale by competitive bidding where the seller invites competition and sells to the highest bidder. Auction sale as a contract, 3A Anderson U.C.C. § 2-328:6 (3d. ed.) An auction sale results in the making of a contract in which the bid is the offer and the action of the auctioneer in accepting the bid is the acceptance of the offer which results in the formation of a contract. (*Id.*)

In California, "auction" means a sale transaction conducted by means of oral or written exchanges, which include exchanges made in person or through electronic media, between an auctioneer and the members of his or her audience, which exchanges consist of a series of invitations for offers for the purchase of goods made by the auctioneer and offers to purchase made by members of the audience and culminate in the acceptance by the auctioneer of the highest or most favorable offer made by a member of the participating audience. (Cal. Civ. Code § 1812.601.)

The undisputed facts establish the goat was properly sold at the auction severing Plaintiff's possessory right to the goat. Plaintiffs placed the goat up for auction on June 25, 2022. At all times prior to and during the auction they participated in the auction without complaint. State Senator Dahle won the auction as the highest bidder. (SSUMF Nos. 25, 26, and 27) At that point, there had been an offer and acceptance and the contract to sell the goat had been consummated. Therefore, neither Jessica Long nor E.L. had any possessory or ownership interest in the goat thereafter. Accordingly, Plaintiffs have no standing to assert a Fourth Amendment claim for unlawful search and seizure because the goat was not their property after the auction. Plaintiffs are not asserting any other unlawful search or seizure claims under the Fourth Amendment.

Plaintiffs will contend that E.L. was the owner of the goat and that she had the right to disaffirm any contract she allegedly had with the District Fair. However, the facts clearly show that plaintiff Long entered the goat into the auction on E.L.'s behalf. (SSUMF Nos. 11, 12, 13, 14, 15, 16, 17, and 18) Under such circumstances, Plaintiff E.L. cannot disaffirm the contract that ultimately led to the auction of the goat, because the contract was between Jessica Long and the District Fair.

1    In *Hohe v. San Diego Unified Sch. Dist.* (1990), 224 Cal. App. 3d 1559, 1564–65, the

2    Court explained:

3        "It is true, with certain limited exceptions, a minor can disaffirm his or her
         contract. Civil Code section 35 provides, in relevant part, "the contract of a minor
4        may be disaffirmed by the minor himself, either before his majority or within a
         reasonable time afterwards...." (*Doyle v. Giuliucci* (1965) 62 Cal.2d 606, 609, 43
5        Cal.Rptr. 697, 401 P.2d 1.) The purpose of Civil Code section 35 is to protect the
         minor from his own improvidence. It is often said, "he who affirmatively deals
6        with a minor, does so at his peril." (*Holland v. Universal Underwriters Ins. Co.*
         (1969) 270 Cal.App.2d 417, 422, 75 Cal.Rptr. 669.) However, the releases signed
7        here were signed on Hohe's behalf by her parent. A parent may contract on behalf
         of his or her children. Civil Code section 35 was not intended to affect contracts
8        entered into by adults on behalf of their children. (*Doyle v. Giuliucci*, *supra*, 62
         Cal.2d at p. 609, 43 Cal.Rptr. 697, 401 P.2d 1.) The court in *Celli v. Sports Car
9        Club of America, Inc.* (1972) 29 Cal.App.3d 511, 517, 105 Cal.Rptr. 904, found a
         release signed by a nine-year-old invalid because, among other reasons, the
10       minor's signature was the only signature on the release. We therefore hold Hohe
         cannot disaffirm the release based on her minority. [Emphasis added.]
11

12

13   In this case, Jessica Long entered Cedar into the District Fair on behalf of her daughter.

14   Thus, E.L. cannot disaffirm the contract that was entered by her mother on her behalf.

15   As a result of the contract and subsequent sale and transfer of ownership of the goat at

16   auction, plaintiffs no longer had an ownership and/or possessory interest in the animal for

17   purposes of maintaining a Fourth and/or Fourteenth Amendment claim. Accordingly, plaintiffs'

18   Third and Fourth causes of action against Defendants Silva and Macfarlane are subject to

19   summary adjudication.

20   **iii.  Plaintiffs Donated the Goat to a Third Party.**

21   Even if plaintiffs maintained some property interest in the goat after selling it at the auction

22   pursuant to the contract with the Shasta District Fair, they abandoned any property rights to it

23   when they donated it to a third party.

24   As stated above, "[T]he terms of a contract ordinarily are to be determined by an external,

25   not an internal, standard; the outward manifestation or expression of assent is the controlling

26   factor." *King v. Stanley*, 32 Cal.2d 584, 591 (1948). "[I]t is now a settled principle of the law of

27   contract that the undisclosed intentions of the parties are, in the absence of mistake, fraud, etc.,

28

1   immaterial; and that the outward manifestation or expression of assent is controlling." *Brant v.*

2   *California Dairies, Inc.* 4 Cal.2d 128, 133 (1935).

3       Here, plaintiff Long sent a text message to Raymond Allen, the owner of Billy's Mini

4   Farm, on June 26, 2022 (the day after the auction), stating, "Hi, it's Jessica Long. I called earlier

5   this week about a 4-H goat that we'd like to donate to your farm." (SSUMF No. 32) Mr. Allen's

6   understanding of why plaintiff Long was giving the goat to him was "to donate it to me," and

7   "she wanted to donate us a goat." (SSUMF No. 33) His understanding was that plaintiffs

8   transferred ownership of the goat to him when they donated it to him. (SSUMF No. 34)

9       In addition to plaintiff Long's text message to Mr. Allen indicating the intent to donate the

10   animal to him, her email to defendant Silva on Monday, June 27, 2022, corroborates that intent.

11   Plaintiff Long stated that she wanted to "donate my daughter's goat to where he could clear land

12   for fire prevention…We just want to give him to a farm that does fire clearing and make things

13   right with the fair…I hope that I will gain your support to donate our goat to a fire clearing

14   team…" (SSUMF Nos. 37 and 38)

15       In terms of consideration for the transfer of ownership, Mr. Allen estimated that it would

16   cost him more than $100 per year to take care of a goat like the one donated to him by the

17   plaintiffs. (SSUMF No. 35) Thus, the requirements for a contractual transfer of ownership were

18   met.

19       This transfer of ownership was pertinent to the Shasta County Sheriff's Department

20   investigation into the whereabouts of the animal. Detective Jacob Duncan testified that he

21   specifically recalls Raymond Allen telling him that plaintiff Long "donated" the goat to his farm.

22   This was critical to the seizure of the animal because it established a good-faith belief by the

23   deputies that Raymond Allen had legal standing over the animal that allowed him to give it to

24   them.

25       Without a valid property interest in the livestock, plaintiffs' claims for violations of the

26   Fourth and Fourteenth Amendment fail. Whether the goat was sold at auction to a third party or

27   subsequently donated to a third party, the plaintiffs did not own the animal at the time it was

28   seized by law enforcement and returned to the moving defendants.

15

**B.   Plaintiffs' First Amendment Claim Fails Because They Were Not Engaged in a Constitutionally-Protected Activity.**

Plaintiffs have no claim under the First Amendment because they did not engage in protected activity prior to defendants' acts. Plaintiffs allege that they expressed a view on social media that the goat was more than cuts of meat and deserved to live, and that defendants Silva and Macfarlane were unlawfully motivated by their disagreement with plaintiffs over this viewpoint. ECF No. 25, ¶¶ 183-184. However, the undisputed facts establish that plaintiffs did not express this viewpoint publicly until *after* the goat was slaughtered. (SSUMF No. 64)

Under the First Amendment to the United States Constitution, a citizen has the right to be free from governmental action taken to retaliate against the citizen's exercise of First Amendment rights or to deter the citizen from exercising those rights in the future. *Sloman v. Tadlock,* 21 F.3d 1462, 1469-70 (9th Cir. 1994). "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct— i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Id.*; *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019).

Here, plaintiffs fail to establish the first and third elements of a First Amendment retaliation claim. The undisputed facts are that the plaintiffs did not express their viewpoint publicly and were therefore not engaged in constitutionally protected activity. Jessica Long's first public comments about the situation occurred *after* the goat had been slaughtered. (SSUMF No. 64) The only public comment about the goat that occurred between the auction and the slaughter was an Instagram post made by a third-party. (SSUMF No. 65) Plaintiffs did not have anything to do with the creation of the post. Plaintiffs did not instruct the third-party to generate the post, nor did they give her permission to make the post. (SSUMF No. 66) Plaintiffs were not aware that it had been posted until after-the-fact. Plaintiffs were unhappy that the post had been made and wanted the third-party to take down the post. (SSUMF No. 67) Thus, plaintiffs, by their own admission, were not engaged in a constitutionally-protected activity giving rise to the alleged retaliation.

16

1   Moreover, the belief that the specific goat that plaintiffs entered into the 2022 Shasta

2   District Fair should not be slaughtered after it was sold at auction is not a constitutionally-

3   protected viewpoint. Plaintiffs admit that they do not hold general feelings about the slaughter of

4   goats or other livestock for meat, but that their views are limited to this one particular animal.

5   Having an opinion about the slaughter of one particular livestock animal does not create a

6   constitutionally-protected right as opposed to a personal matter. In *Waters v. Churchill*, 511 U.S.

7   661 (1994), the court held that, as long as the government employer (1) had reasonably believed

8   that the employee's conversation had involved personal matters, not matters of public concern,

9   and (2) had dismissed the employee because of that mistaken belief, the dismissal did not violate

10   the First Amendment. *Id.* at 679-680. In this case, defendants reasonably believed that the

11   plaintiffs' desire to prevent the slaughter of the goat they sold at auction was a personal matter,

12   not a matter of public concern. While the defendants had the animal slaughtered in an effort to

13   comply with the exhibitor rules for the Fair, even if they had slaughtered the animal in response

14   to plaintiffs' personal views about the specific animal, that act does not violate the First

15   Amendment.

16   If plaintiffs do establish a prima facie claim for retaliation, "the burden shifts to the

17   defendant official to demonstrate that even without the impetus to retaliate he would have taken

18   the action complained of." *Hartman v. Moore*, 547 U.S. 250, 260 (2006). In conducting this

19   burden-shifting analysis, courts apply the "but-for" causation standard, under which causation is

20   "established whenever a particular outcome would not have happened but for the purported

21   cause." *Boquist v. Courtney,* 32 F.4th 764, 778 (9th Cir. 2022) (quoting *Bostock v. Clayton Cnty.*,

22   140 S. Ct. 1731, 1739 (2020)). "If there is a finding that retaliation was not the but-for cause of

23   the [adverse action], the claim fails for lack of causal connection between unconstitutional motive

24   and resulting harm, despite proof of some retaliatory animus in the official's mind." *Hartman*,

25   547 U.S. at 260. "Conversely, if the government officials would have taken the same adverse

26   action even in the absence of their animus or retaliatory motive arising from the plaintiff's speech,

27   then the officials' animus was not a but-for cause of the adverse action, and there was no violation

28   of the plaintiff's constitutional rights." *Boquist*, 32 F.4th at 778.

17

In this case, even if plaintiffs are able to state a prima facie case of First Amendment retaliation, defendants have met their burden in demonstrating that the goat would have been slaughtered regardless of the "impetus to retaliate." The exhibitor rules state that market animals will be sold at auction and all market animals are subject to the terminal nature of the fair, meaning that all market animals will be slaughtered for meat. Defendants' motivation in slaughtering the subject goat was to fulfill compliance with the fair rules. (SSUMF Nos. 72, 75, 76, 77, and 78) Their unwillingness to make an exception to these rules does not give rise to a First Amendment retaliation claim.

In the present case, plaintiffs did not engage in a constitutionally-protected activity. Moreover, defendants' decision to have the goat slaughtered after it was recovered by law enforcement was not the but-for cause of the action because that particular outcome would have happened regardless of the plaintiffs' First Amendment activities. As such, summary adjudication should be granted in favor of defendants Silva and Macfarlane regarding plaintiffs' Fifteenth cause of action.

## C.   Defendants Silva and Macfarlane are Entitled to Qualified Immunity.

Defendants Silva and Macfarlane are entitled to qualified immunity for plaintiffs'" *Malley v. Briggs,* 475 U.S. 335, 341 (1986). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) (quoting *Hunter v. Bryant*, 502 U.S. 22 (1991) (per curiam)).

A public employee sued under § 1983 is entitled to qualified immunity unless plaintiffs show that it would be obvious to a reasonable public employee, similarly situated, that his/her behavior is unconstitutional. *KRL v. Estate of Moore,* 512 F.3d 1184, 1191 (9th Cir. 2008). If reasonable minds could differ, under the circumstances, as to whether the behavior was Constitutionally permissible, then qualified immunity is appropriate. *Id.*

1  A government official is entitled to qualified immunity unless (1) the official's conduct violated a

2  constitutional right, and (2) that right was clearly established at the time of the challenged

3  conduct. *Carroll v. Carmen,* 574 U.S. ___, ___ (2014) (slip op., at p. 3). A right is "clearly

4  established only if its contours are sufficiently clear that a 'reasonable official would understand

5  that what he is doing violates that right.'" *Id.* (slip op. at pp. 3-4) (quoting *Anderson*, 483 U.S. at

6  640.

7          In this case, Defendants Silva and Macfarlane were aware of the plaintiffs' contract to

8  participate in the Fair and be bound by the exhibitor rules, which included the requirement that

9  the goat be sold at auction and slaughtered. (SSUMF Nos. 68, 71, 72, 73, and 74) Defendants

10  were aware that plaintiff E.L. participated in the auction, and that the animal was sold at auction

11  to a third-party buyer. Defendants were aware that the Shasta County Sheriff's Department and its

12  deputies had recovered the animal from another third party, and that the Shasta County Sheriff's

13  Deputies had told them that the animal was recovered on behalf of its legal owner, Kathie Muse

14  (not the plaintiffs). (SSUMF Nos. 64, 65, 66, 67, 68, and 70) Defendants were aware that the

15  Shasta County District Attorney's Office had advised them that they were free to slaughter the

16  goat. (SSUMF Nos. 66 and 70) Thus, in relying upon representations by law enforcement and the

17  local District Attorney's Office, defendants proceeded to enforce the exhibitor rules and have the

18  animal slaughtered. They did so at the request of Kathie Muse based on a good faith belief that

19  the animal belonged to Kathie Muse, who purchased the animal at the Junior Livestock Auction.

20  (SSUMF Nos. 68 and 74) They did not know, nor could they have known, that doing so would

21  potentially violate plaintiffs' constitutional rights. Even if their actions potentially violated

22  plaintiffs' constitutional rights, plaintiffs' alleged property interest in the animal was not clearly

23  established to make it sufficiently clear to either defendant that arranging for the animal's

24  slaughter would violate their rights. In fact, it was sufficiently clear to defendants that the

25  plaintiffs had *no* property interest in the animal. As such, defendants are entitled to qualified

26  immunity as to plaintiffs' Third and Fourth causes of action.

27

28

**D.    The Eleventh Amendment Bars Actions Against the State of California.**

Plaintiffs' Seventh, Eighth, Tenth, Twelfth, and Thirteen causes of action allege various claims against the Shasta District Fair, which is formally known as the 27th District Agricultural Association. The Second Amended Complaint alleges that the 27th District Agricultural Association "is a state entity authorized by statute known as a Shasta Fair Association. Cal. Food & Agric. Code §§ 3879, 3951, 3954." (Second Amended Complaint at ¶ 10.)

The Eleventh Amendment provides "[t]he judicial power of the United States shall not be construed to extend to any suit ... against one of the United States by citizens of another State, or by citizens or subjects of any foreign State."  It bars suit in federal court by a citizen against his own state.  *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984).  "The Eleventh Amendment jurisdictional bar covers suits naming state agencies and departments as defendants, and applies whether the relief sought is legal or equitable in nature."  *Brooks v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1053 (9th Cir. 1991); citing *Pennhurst*, 465 U.S. at 104.

To determine whether a governmental agency is an arm of the state, the following factors must be examined: whether a money judgment would be satisfied out of state funds, whether the entity performs central governmental functions, whether the entity may sue or be sued, whether the entity has the power to take property in its own name or only the name of the state, and the corporate status of the entity. *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982). To determine these factors, the court looks to the way state law treats the entity. *Mount Healthy City School Dist. Bd. of Educ*, 429 U.S. at 280, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977); *Rutledge v. Arizona Bd. of Regents*, 660 F.2d 1345, 1349 (9th Cir. 1981), *aff'd. sub nom. Kush v. Rutledge*, 460 U.S. 719, 75 L. Ed. 2d 413, 103 S. Ct. 1483 (1983). The Shasta District Fair is an arm of the State of California. California Food & Agric. Code § 3953, which applies to District Agricultural Associations generally, states that "each association is a state institution." Cal. Food & Agric. Code § 3962 states that "the directors are state officers." Additionally, Cal. Food & Agric. Code § 3955 requires a prospective plaintiff to file a claim against an association with the Department of General Services as a prerequisite to filing a lawsuit, as is required of all state agencies.

1   Cal Food & Agric. Code §§ 4501-4513 provide that county and district fairs are supervised

2   and overseen by the Department of Food and Agriculture. Pursuant to Cal Food & Agric. Code §

3   4051.2, any settlement agreement involving a District Agricultural Association that exceeds

4   $100,000 must be approved by the Department of Food and Agriculture. Pursuant to Cal. Food &

5   Agric. Code § 4051(a)(10)-(12), District Agricultural Associations may own real property, lease

6   real property, or make capital improvements to real property only with the approval of the

7   Department of General Services. Additionally, the California Department of Justice defends

8   District Agricultural Associations in litigation, which it does not do for non-state entities. The

9   27th DAA is "the State of California" for purposes of the Eleventh Amendment, and state law

10  treats it as such. Thus, based on principles of sovereign immunity, the Shasta District Fair is

11  immune from suit in federal court, and plaintiffs Seventh, Eighth, Tenth, Twelfth, and Thirteen

    causes of action should be dismissed.

12  ### E.   Plaintiffs' Claims for Violations of the California Constitution, Articles 7
13  and 13, do not Provide Private Causes of Action.

14  Plaintiffs' Seventh and Eighth causes of action seek damages from the Shasta District Fair

15  for violations of California Constitution, Art. I, § 7 (due process and equal protection clauses) and

16  § 13 (unreasonable search and seizure). Defendant is entitled summary judgment under California

17  Constitution, Art. I, § 7 and § 13 as there is no private right of action for damages available.

18  Plaintiffs cannot bring a claim for damages directly under California Constitution, Art. I, §

19  7 and § 13, in part because alternative statutory and/or common law causes of action may be

20  available to redress their grievances. See *Katzberg v. Regents of Univ. of Cal.,* 29 Cal. 4th 300,

21  303, 127 Cal. Rptr. 2d 482, 58 P.3d 339 (2002) (no private right of action of the due process and

22  equal protection clauses under California Constitution, Art. I, § 7(a)); *see also Wigfall v. City &*

23  *County of San Francisco,* No. C 06-4968 VRW, 2007 U.S. Dist. Lexis 82047, 2007 WL 174434

24  (N.D.Cal. Jan. 22, 2007) (providing a *Katzberg* analysis on the availability of damages under

25  California Constitution, Art. I, § 13). "Neither the plain language of the article I, section 13, nor

26  the available legislative history indicate an intent on behalf of the California Legislature to permit

27  the recovery of monetary damages for its violation." *Manning v. City of Rohnert Park,* No. C 06-

28  03435 SBA, 2007 U.S. Dist. LEXIS 31301, at *2, 2007 WL 1140434, at *1 (N.D.Cal. April 17,

21

1    2007). Essentially, there is no private cause of action under Article I, Section 13. (*See, In Est. of*

2    *F.R. v. Cnty. of Yuba*, No. 223CV00846WBSCKD, 2023 WL 6130049, at *7 (E.D. Cal. Sept. 19,

3    2023), ["The court therefore concludes that no private cause of action is available under Article I,

4    Section 13."]

5        This same principle applies to both the Seventh and Eighth causes of action in the Second

6    Amended Complaint. In *Katzberg*, 29 Cal.4th at 328, the Court stated: "The availability of

7    meaningful alternative remedies leads us to decline to recognize a constitutional tort to remedy

8    the asserted violation of article I, section 7(a) in the case before us." In *Reese-Bey v. Ochoa*, No.

9    CV 20-06693, 2020 WL 11767431, at *5 (C.D. Cal. Sept. 29, 2020), the Court stated, "It is

10   undisputed that the California Constitution does not provide a direct cause of action for damages

11   for either equal protection or a due process liberty interest violation." [Emphasis added.] (*See also*

12   *Cabral v. Cnty. of Glenn*, 624 F. Supp. 2d 1184, 1196 (E.D. Cal. 2009) ("Article I, § 7(a) does not

13   "afford a right to seek damages to remedy the asserted violation of the due process liberty

14   interest.").

15       Additionally, even if these provisions of the California Constitution provided a remedy to

16   the plaintiffs, these claims are barred by the fact that plaintiffs had no ownership interest in the

17   goat at the time of the alleged violations as outlined above. Thus, summary judgment should be

18   entered in favor of defendant Shasta District Fair as to plaintiffs' Seventh and Eighth causes of

19   action.

20       **F.    Plaintiffs' Claim Against the Shasta District Fair for Conversion Fails**

21           **Because Plaintiffs Had No Ownership Interest in the Animal at the Time of the Alleged Conversion.**

22       The elements of a conversion count in California are: (1) the plaintiff's ownership or right

23   to possession of the property at the time of the conversion; (2) the defendant's conversion by a

24   wrongful act or disposition of property rights; and (3) damages. *Ito v. Brighton/Shaw, Inc.,* No. 06

25   CV 01135 AWI DLB, 2008 WL 2339557, at *3 (E.D. Cal. June 4, 2008). In order for a

26   plaintiff to bring a conversion claim, they must establish their ownership or right to possession.

27   (*Id.*)

28

1   Here, Plaintiffs cannot establish their claim for conversion because, as indicated above, they did

2   not own the goat after the Senator Dahle placed the highest bid on behalf of the 4-H/FFA BBQ,

3   and/or after donating the animal to Billy's Mini Farm. Having no ownership interest in the goat or

4   right to possession, Plaintiffs cannot establish the first element of their claim for conversion, and

5   summary judgment/summary adjudication should be entered in favor of the Shasta District Fair.

6   **G.     Plaintiffs' Claim Against the Shasta District Fair for Negligence Fails Because Plaintiffs Had No Ownership Interest in the Animal at the Time of the Alleged Negligence.**

7

8   Plaintiffs' Twelfth cause of action against the Shasta District Fair is for negligence. "The

9   elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach

10  of that duty, and (3) proximate [or legal] cause between the breach and (4) the plaintiff's injury.

11  The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing

12  a claim for negligence. The existence of a duty of care toward an interest of another worthy of

13  legal protection is the essential prerequisite to a negligence cause of action, determined as a

14  matter of law by the court. The existence of a legal duty to use reasonable care in a particular

15  factual situation is a question of law for the court to decide." *Saldate v. Wilshire Credit Corp.*,

16  686 F. Supp. 2d 1051, 1062 (E.D. Cal. 2010) [Internal citations and quotation marks omitted.]

17  In this case, Plaintiffs cannot establish any duty on the part of the Shasta District Fair, let

18  alone a breach of said duty. Plaintiffs did not own the goat after the auction, and/or after they

19  donated it to Billy's Mini Farm. The Shasta District Fair did not breach any duty as its employees

20  did no more than accept the return of the goat from law enforcement on behalf of its rightful

21  owner, and oversee the slaughtering of the animal at the request of its rightful owner.

22  **H.     Plaintiffs' Claim Against the Shasta District Fair for Intentional Infliction of Emotional Distress Fails Because Defendants' Conduct was not Extreme and Outrageous.**

23

24  Plaintiffs' Thirteenth Cause of Action alleges intentional infliction of emotional distress

25  against the Shasta District Fair. "A cause of action for intentional infliction of emotional distress

26  exists when there is '(1) extreme and outrageous conduct by the defendant with the intention of

27  causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's

28

23

suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' And the defendant's conduct must be 'intended to inflict injury or engaged in with the realization that injury will result.'" *Hughes v. Pair*, 46 Cal.4th 1035, 1050–1051 (2009). It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen v. Superior Court*, 54 Cal.3d 868, 903-904 (1991). "[T]he trial court initially determines whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Where reasonable men can differ, the jury determines whether the conduct has been extreme and outrageous to result in liability. Otherwise stated, the court determines whether severe emotional distress can be found; the jury determines whether on the evidence it has, in fact, existed." *Plotnik v. Meihaus*, 208 Cal.App.4th 1590, 1614 (2012).

In this case, the act of arranging for the slaughter of market livestock that was raised and sold with the express purpose of being used for meat is not extreme and outrageous. Plaintiffs participated in the 4-H market goat program knowing that the animal would likely be used for meat. The terms of the contract with the Shasta District Fair state that the fair is "terminal" and that all animals will be transported for processing following the Junior Livestock Auction. Defendants arranged for the slaughter of the goat to comply with the Exhibitor Rules at the express request of the livestock buyer, Kathie Muse. Using a meat animal for meat does not "exceed all bounds of that usually tolerated in a civilized community." This is particularly true when the livestock is lawfully and voluntarily sold at auction by the plaintiffs, which occurred in this case. Moreover, the act of arranging the slaughter of the animal was not directed at the plaintiffs, nor did it take place in the presence of the plaintiffs. Thus, plaintiffs' Thirteenth Cause of Action for intentional infliction of emotional distress fails.

1    **I.    The Court Does Not Have Jurisdiction to Provide the Requested**
2         **Declaratory Relief in the Second Amended Complaint.**

3        In their Second Amended Complaint, plaintiffs make a claim for declaratory relief.

4   "Plaintiffs seek a declaration from this Court that E.L. may, during minority, disaffirm any

5   contract or obligation to participate in any livestock auction she enters at Shasta Fair Association

6   and may also disaffirm any contract or obligation to sell any livestock she owns through such an

7   auction." (SAC, ¶ 180.)

8        Federal Rule of Civil Procedure 57 provides that, "These rules govern the procedure for

9   obtaining a declaratory judgment under 28 U.S.C. § 2201." That statute, known as the

10  Declaratory Judgment Act, provides that any court of the United States may provide declaratory

11  relief "[i]n a case of actual controversy *within its jurisdiction*." 28 U.S.C. § 2201(a) (emphasis

12  added). "This Act, however, does not confer jurisdiction where none otherwise exists." *Benson v.*

13  *State Bd. of Parole & Prob.*, 384 F.2d 238, 239 (9th Cir. 1967).

14       In this case, plaintiffs' request for declaratory relief seeks a remedy that is not within the

15  jurisdiction of this Court. Whether plaintiff E.L. may disaffirm any contract or obligation to

16  participate in any future livestock auctions at the Shasta District Fair does not involve a federal

17  question. Given this lack of jurisdiction, summary adjudication is appropriate for the Fourteenth

18  Cause of Action.

19  **V.   CONCLUSION**

20       Plaintiffs Jessica Long and E.L. knowingly and voluntarily participated in the market goat

21  program at the 2022 Shasta District Fair, with the knowledge that their livestock would be sold at

22  the Junior Livestock Auction and be used for meat. Jessica Long entered into a valid contract with

23  the Shasta District Fair prior to selling the goat at auction, agreeing that the goat would be sold,

24  would be transported for processing after the auction, and that the auction constituted a terminal

25  sale. She made no attempts to withdraw or revoke her consent to the contract until after the

26  animal was sold and its ownership legally transferred to a third-party, by both the contractual

27  agreement with the Shasta District Fair, as well as the voluntarily participation in the auction at

28  which the animal was sold. Moreover, even after plaintiffs unlawfully removed the animal from

25

1   the fairgrounds, they donated it to a third-party, thereby further relinquishing any property rights.

2   Defendants' involvement was simply cooperating with local law enforcement's investigation into

3   the animal's whereabouts, caring for the animal after it was recovered by law enforcement at the

4   request of its legal owner, and arranging for the slaughter of the animal at the request of its legal

5   owner and in compliance with the contract entered into between Jessica Long and the Shasta

6   District Fair. Each and every one of plaintiffs' claims fail, and for that reason defendants

7   respectfully request that this Court grant summary judgment in their favor.

8   Dated:  November 15, 2024                 Respectfully submitted,

9

10                                   ROB BONTA
Attorney General of California
CATHERINE WOODBRIDGE
Supervising Deputy Attorney General

11

12                                   /s/ John C. Bridges

13                                   JOHN C. BRIDGES
Deputy Attorney General

14                                   *Attorneys for Defendants State of California,
by and through the 27th District Agricultural
Association, Melanie Silva, and B.J.
MacFarlane*

15

16   SA2023302187
95602972

17

18

19

20

21

22

23

24

25

26

27

28