1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  CATHERINE WOODBRIDGE, State Bar No. 186186
   Supervising Deputy Attorney General
3  JOHN C. BRIDGES, State Bar No. 248553
   Deputy Attorney General
4    1300 I Street, Suite 125
     P.O. Box 944255
5    Sacramento, CA 94244-2550
     Telephone:  (916) 210-7529
6    Fax:  (916) 322-8288
     E-mail: John.Bridges@doj.ca.gov
7  *Attorneys for Defendants State of California, by and*
   *through the 27th District Agricultural Association,*
8  *Melanie Silva, and B.J. MacFarlane*

9             IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| **E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual,** | 2:22-CV-01527 DAD AC |
| Plaintiffs, | **DECLARATION OF JOHN C. BRIDGES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| v. | |
| **LIEUTENANT JERRY FERNANDEZ, in his individual capacity; DETECTIVE JACOB DUNCAN, in his individual; DETECTIVE JEREMY ASHBEE, in his individual capacity; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association, COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual capacity; BJ MACFARLANE, in his individual capacity; and DOES 1 through 10,** | Action Filed:  August 31, 2022 |
| Defendants. | |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

I, John C. Bridges, declare:

1.   I am a United States citizen over the age of 18 years. I am an attorney duly admitted to practice before this Court. I am a Deputy Attorney General with the California Department of Justice, attorneys for Defendants State of California, by and through the 27th District Agricultural Association (Shasta District Fair), Melanie Silva, and B.J. Macfarlane. I have personal knowledge of each of the matters set forth below and if called as a witness could competently testify thereto.

2.   This declaration is made and submitted in support of Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication.

3.   From October 30, 2024 to November 7, 2024, I engaged several meet and confer communications with counsel for plaintiffs Jessica Long and E.L. about the grounds for this motion in compliance with this Court's standing order. Despite the parties' best efforts and good faith exchanges of our respective arguments, we were unable to arrive at a consensus that would have resolved the issues raised in the motion.

4.   Attached hereto as Exhibit A are true and correct copies of the pertinent portions of the deposition transcript of Chad Fowler.

5.   Attached hereto as Exhibit B are true and correct copies of the pertinent portions of the deposition transcript of plaintiff Jessica Long, Volumes I and II, with the exhibits referenced in Defendants' motion.

6.   Attached hereto as Exhibit C are true and correct copies of the pertinent portions of the deposition transcript of plaintiff E.L.

7.   Attached hereto as Exhibit D are true and correct copies of the pertinent portions of the deposition transcript of Kay Delaloza.

8.   Attached hereto as Exhibit E are true and correct copies of the pertinent portions of the deposition transcript of Kathie Muse.

9.   Attached hereto as Exhibit F are true and correct copies of the pertinent portions of the deposition transcript of Lieutenant Jerry Fernandez.

10. Attached hereto as Exhibit G are true and correct copies of the pertinent portions of the deposition transcript of Raymond Allen.

2

11. Attached hereto as Exhibit H are true and correct copies of Lieutenant Fernandez's Responses to Plaintiff's Request for Production of Documents, Set One, Exhibit "A".

12. Attached hereto as Exhibit I are true and correct copies of the pertinent portions of the deposition transcript of Jeremy Ashbee.

13. Attached hereto as Exhibit J are true and correct copies of the pertinent portions of the deposition transcript Jacob Duncan.

14. Attached hereto as Exhibit K are true and correct copies of the pertinent portions of the deposition transcript of B.J. Macfarlane, Volumes I and II.

I declare under penalty of perjury under the laws of the State of California and the United States that the forgoing is true and correct.

Executed this 15th day of November 15, 2024, at Sacramento, California.

/s/ *John C. Bridges*

John C. Bridges

# EXHIBIT A

```
 1                    UNITED STATE DISTRICT COURT

 2                  EASTERN DISTRICT OF CALIFORNIA

 3                      SACRAMENTO DIVISION

 4

 5    E.L., a minor, by and through  )
      her general guardian, JESSICA  )
 6    LONG; JESSICA LONG, an          )
      individual,                     )
 7                                     )
                      Plaintiffs,     )
 8                                     )
              vs.                      ) No. 2:22-cv-01527-DAD-AC
 9                                     )
      LIEUTENANT JERRY FERNANDEZ,     )
10    in his individual capacity;     )
      DETECTIVE JACOB DUNCAN, in      )
11    his individual; DETECTIVE       )
      JEREMY ASHBEE, in his           )
12    individual capacity; and        )
      DOES 1 through 10,              )
13                                     )
                      Defendants.     )
14    _____)

15

16

17           Remote Deposition of CHAD FOWLER, taken on

18        behalf of Defendants, at 22209 Oak Tree Lane,

19        Palo Cedro, California, beginning at 3:32 P.M.

20        and ending at 4:41 P.M. on Tuesday, November 7,

21        2023, before SALLY HENRY-SMITH, Certified

22        Shorthand Reporter No. 4810.

23

24

25
```

**Litigation Services**
**A Veritext Company**                    www.veritext.com

1     A     Yes.  Yes.

2     Q     So back in 2022, it's my understanding that the

3   fair went from June 22nd of 2022 to June 25, 2022.

4          Does that sound --

5     A     That sounds right, yes.

6     Q     At that time were you community leader for the

7   Cow Creek 4-H?

8     A     Yes.

9     Q     Earlier I mentioned the name Jessica Long.

10         Do you know who that person is?

11    A     Yes.

12    Q     How do you know who that person is?

13    A     Her daughter is -- was registered in Cow Creek

14  4-H Community Club.  And she was, as well -- I'm a

15  project leader within Cow Creek 4-H, and she was signed

16  up under the meat goat project.  And I also know her

17  because El█, E.L., was in my tutoring group at our

18  learning center.

19    Q     Do you recall approximately when E.L. signed up

20  for the -- for your 4-H group, Cow Creek?

21    A     Likely October.

22         It would have had to have been prior to

23  November 30th.  So we usually start our year in

24  September with our first meeting, and they typically

25  enroll, you know, prior -- anywhere from that first

Litigation Services
A Veritext Company                         www.veritext.com

1    September meeting, which is the first Wednesday of the

2    month, and they need to be enrolled by November 30th in

3    order to participate in the fair.

4        Q    So would that be October of 2021, then?

5        A    Yes.

6        Q    Now, you mentioned the meat goat project;

7    correct?  That's one of the projects that the 4-H has?

8        A    Yes.

9        Q    Can you describe to me kind of in detail what

10   the meat goat project is?

11       A    So there are many different animals that the

12   kids can choose from.  Like I said, some kids choose to

13   take a pig to the fair --

14            (Technical difficulties.)

15            MR. NORTHCUTT:  We're having some feedback from

16   your microphone.  I don't know if it would help to log

17   out and log back in.

18            Do you think we'll have the same problem?

19            THE WITNESS:  I can try it.

20            MR. GORDON:  Sounds good right now.

21            THE WITNESS:  There is nothing going on in here

22   really.  Unless it is the internet.  You guys are a bit

23   choppy too.  It could be the internet here in this

24   building.  But I could try that if you think this will

25   work.

Litigation Services
A Veritext Company                    www.veritext.com

1           And I said, Yes.

2           And she said, Can you bring it to me or bring

3     it in, or can I get that from you, whatever it was.

4     Q     But there was a check issued to her, she just

5     never collected it; is that correct?

6     A     Correct.

7     Q     And do you recall approximately the amount of

8     that check?

9     A     I want to say it was around $800, somewhere --

10    you know, not over 900.   Somewhere in the $800 range, if

11    I remember correctly.

12    Q     Have you spoken with anyone about Cedar since

13    June of 2022?  Obviously aside from the conversations we

14    just mentioned that you had with Jessica Long where she

15    called you up and told you she was filing a lawsuit.

16    A     And that's a serious question, I presume.   Only

17    because I would say a thousand -- I mean, literally

18    probably 800 people.

19    Q     Let's go through them one -- I'm kidding.

20    A     So they know that I'm the community leader;

21    right?  And they hear that this person is from my club.

22    Born and raised in this county, I used to show 4-H as a

23    kid.  Like I said, my girls were in a different club for

24    nine years, I know a lot of people in the community just

25    because things that I do and being around.   So

                                              Page 33

1

2          I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, do hereby certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth; that

6    any witnesses in the foregoing proceedings, prior to

7    testifying, were duly sworn; that a record of the

8    proceedings was made by me using machine shorthand which

9    was thereafter transcribed under my direction; that the

10   foregoing transcript is a true record of the testimony

11   given.

12         Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal Case,

14   before completion of the proceedings, review of the

15   transcript [x] was [ ] was not requested.

16         I further certify I am neither financially

17   interested in the action, nor a relative or employee of

18   any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21   Dated: November 9 2023

22

23

24

25                    SALLY HENRY-SMITH, CSR No. 4810

                                        Page 45

# EXHIBIT B

# In The Matter Of:
## *LONG vs.*
## *FERNANDEZ*

---

*JESSICA LONG*
*August 24, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File J. Long.txt
Min-U-Script® with Word Index

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                       SACRAMENTO DIVISION

4

5   E.L., a minor, by and through      )
    her general guardian, JESSICA      )
6   LONG; JESSICA LONG, an             )
    individual,                        )
7                                      )
            Plaintiffs,                )   Case No.
8   vs.                                )   2:22-cv-01527-DAD-AC
                                       )
9   LIEUTENANT JERRY FERNANDEZ         )
    individually and in his           )
10  individual capacity as Sheriff    )
    for the County of Shasta;         )
11  DETECTIVE JACOB DUNCAN,           )
    individually and in his           )
12  individual capacity as Sheriff    )
    for the County of Shasta;         )
13  DETECTIVE JEREMY ASHBEE,          )
    individually and in his           )
14  individual capacity as Sheriff    )
    for the County of Shasta;         )
15  SHASTA DISTRICT FAIR AND EVENT    )
    CENTER, a district agricultural   )
16  association; COUNTY OF SHASTA;    )
    SHASTA COUNTY SHERIFF'S           )
17  DEPARTMENT; MELANIE SILVA, in     )
    her individual capacity; BJ       )
18  MACFARLANE, in his individual     )
    capacity; and DOES 1 through      )
19  10,                               )
                                      )
20          Defendants.               )
    _____)

21

22              VIDEO DEPOSITION OF JESSICA LONG

23              THURSDAY, AUGUST 24, 2023

24

25

**JESSICA LONG**

09:29:54AM 1    did anyone ever give instruction?  The 4-H leader

09:30:00AM 2    recommended a breeder or to go find our own breeder,

09:30:04AM 3    someone who sells boar goats.

09:30:08AM 4            MR. NORTHCUTT:  Q.  Okay.  And did you take his

09:30:13AM 5    advice and go find a breeder?

09:30:15AM 6    A.      Yes.

09:30:16AM 7    Q.      And where -- where did you ultimately end up

09:30:21AM 8    obtaining Cedar the goat?

09:30:23AM 9    A.      From a local breeder.

09:30:26AM 10   Q.      Do you recall if the breeder has a name or a

09:30:29AM 11   farm?

09:30:30AM 12   A.      Yes.

09:30:31AM 13   Q.      Okay.  What was the name, if you can recall?

09:30:34AM 14   A.      Kay Deloza or Delaloza.

09:30:42AM 15   Q.      Is Kay as in K-a-y?

09:30:44AM 16   A.      I believe.

09:30:45AM 17   Q.      And do you know the Delaloza or how that's

09:30:51AM 18   spelled by any chance?

09:30:52AM 19   A.      I think it's -- I'm not completely sure.  I

09:30:55AM 20   think it's D-e-l-o-z-a.

09:30:58AM 21   Q.      And do you recall approximately when you

09:31:04AM 22   purchased Cedar?

09:31:06AM 23   A.      The beginning of April, first couple days in

09:31:14AM 24   April.

09:31:14AM 25   Q.      April of 2022?

**JESSICA LONG**

| | | |
|---|---|---|
| 09:31:16AM | 1 | A.      Yes. |
| 09:31:18AM | 2 | Q.      Do you recall what you paid for Cedar? |
| 09:31:25AM | 3 | A.      Yes. |
| 09:31:27AM | 4 | Q.      How much was that? |
| 09:31:28AM | 5 | A.      $350. |
| 09:31:30AM | 6 | Q.      Were there any other expenses you paid for |
| 09:31:38AM | 7 | Cedar, and I'll give you a for instance.  When you |
| 09:31:43AM | 8 | purchase a dog, a lot of times you have to have the |
| 09:31:45AM | 9 | shots or the chips put in or whatever the case may be. |
| 09:31:48AM | 10 | Was there any other incidental expenses that you paid |
| 09:31:50AM | 11 | for Cedar at the -- when you purchased him in April of |
| 09:31:53AM | 12 | 2022? |
| 09:31:54AM | 13 | A.      We paid for all of his expenses. |
| 09:31:59AM | 14 | Q.      Okay.  Can you explain what those expenses were? |
| 09:32:02AM | 15 | A.      Food, a feed bucket.  My husband and my daughter |
| 09:32:10AM | 16 | built a shelter for him.  We put up fencing.  Water |
| 09:32:18AM | 17 | bucket.  They have special minerals.  Baking soda.  We |
| 09:32:28AM | 18 | bought him milk pellets, alfalfa pellets.  Alfalfa. |
| 09:32:37AM | 19 | Sunflower seeds. |
| 09:32:41AM | 20 | Q.      Okay.  Anything else? |
| 09:32:42AM | 21 | A.      I can't think of anything right now, but there |
| 09:32:47AM | 22 | might have been more. |
| 09:32:48AM | 23 | Q.      Did -- |
| 09:32:51AM | 24 | A.      His -- his show collar. |
| 09:32:54AM | 25 | Q.      Okay.  Anything further? |

**JESSICA LONG**

09:23:50AM 1    a -- is there a group leader of the Cow Creek 4-H in

09:23:53AM 2    Palo Cedro?

09:23:53AM 3    A.      Yes.

09:23:54AM 4    Q.      And what is his or her name?

09:23:56AM 5    A.      His name is Chad Fowler.

09:23:58AM 6    Q.      Anyone else?

09:24:00AM 7    A.      No.

09:24:02AM 8    Q.      And so E.L. joins the 4-H in September of 2021.

09:24:11AM 9    Can you tell me, did the -- was she -- did she attend

09:24:20AM 10   daily meetings, weekly meetings, monthly meetings?   How

09:24:24AM 11   does that all work for 4-H?

09:24:26AM 12   A.      The club meetings are monthly, one a month.

09:24:30AM 13   Q.      Okay.

09:24:30AM 14   A.      Starting in September up until the fair.

09:24:33AM 15   Q.      Okay.   And to your knowledge, from what you can

09:24:40AM 16   recall, did E.L. attend 4-H meetings monthly starting in

09:24:48AM 17   September of 2021?

09:24:49AM 18   A.      Yes.

09:24:49AM 19   Q.      I'll try to make it simple, but did she attend

09:24:55AM 20   monthly meetings all the way up to the time of the

09:24:58AM 21   incident in June of 2022?

09:25:03AM 22   A.      Yes.

09:25:03AM 23   Q.      Can you tell me generally some of the types of

09:25:13AM 24   activities 4-H talks to their members about during these

09:25:18AM 25   meetings?

**JESSICA LONG**

09:25:19AM 1          MR. GORDON:  Calls for a narrative.  You can

09:25:23AM 2    answer.

09:25:24AM 3          THE WITNESS:  They -- there's a bunch of club

09:25:28AM 4    requirements like they had to do a presentation, so she

09:25:32AM 5    did her first presentation.  And it was -- she did a

09:25:37AM 6    presentation on how to make cupcakes.  They also had to

09:25:40AM 7    do like a fundraiser and some type of community service.

09:25:47AM 8    They celebrated the birthdays at every meeting.

09:25:50AM 9          MR. NORTHCUTT:  Q.  Do they -- do they -- do

09:25:55AM10    they teach the 4-H members how to raise livestock?

09:26:00AM11    A.      It depends on what project you join.

09:26:05AM12    Q.      Okay.  Can you explain?

09:26:06AM13    A.      So when you join the club, you just go to the

09:26:15AM14    club meetings and then you can sign up for a project.

09:26:19AM15    And there's all kinds of different projects.  And those

09:26:24AM16    have separate meetings at different locations.

09:26:28AM17    Q.      Okay.  Did E.L. sign up for any specific

09:26:33AM18    projects in 4-H?

09:26:34AM19    A.      Yes.

09:26:34AM20    Q.      Okay.  And can you tell me what specific

09:26:39AM21    projects she signed up for?

09:26:40AM22    A.      The meat or market goat project.

09:26:43AM23    Q.      Is it a meat or market goat, or is it -- are

09:26:50AM24    those synonymous with each other; do you know?

09:26:53AM25    A.      I feel like the terms were used interchangeably.

**JESSICA LONG**

1   Q.      Okay.  Was that also after you filed the

2   lawsuit?

3   A.      Yes.

4   Q.      Okay.  Are you a vegan?

5   A.      No.

6   Q.      Are you a vegetarian?

7   A.      No.

8   Q.      Okay.  Have you ever eaten chevon?

9   A.      What's chevon?

10  Q.      Goat meat.

11  A.      I think I tasted it at the -- during the 4-H

12  process I think I had a little taste.  I didn't eat much

13  of it.

14  Q.      Okay.  Do you know if your daughter tasted it?

15  A.      She did.

16  Q.      Was that the only time you've eaten goat meat?

17  A.      Mm-hmm.

18  Q.      Is that a "yes"?

19  A.      Yes.

20  Q.      Okay.  Do you recall where that was?

21  A.      It was at a private residence.

22  Q.      Was it like a barbecue or something put on as

23  part of the 4-H program?

24  A.      I think they slow-cooked the meat and just had

25  tortillas with it or something.

**JESSICA LONG**

| | | |
|---|---|---|
| 09:45:34AM | 1 | MR. NORTHCUTT:  Prior to joining it. |
| 09:45:37AM | 2 | THE WITNESS:  Prior to joining? |
| 09:45:39AM | 3 | MR. NORTHCUTT:  Yes. |
| 09:45:40AM | 4 | THE WITNESS:  No. |
| 09:45:41AM | 5 | MR. NORTHCUTT:  Do you have an understanding of |
| 09:45:42AM | 6 | what a meat or market goat is? |
| 09:45:45AM | 7 | MR. GORDON:  Vague as to time.  You mean now? |
| 09:45:47AM | 8 | MR. NORTHCUTT:  Q.  Let's start with back then |
| 09:45:50AM | 9 | when you acquired Cedar. |
| 09:45:52AM | 10 | A.     No.  We joined to learn. |
| 09:45:57AM | 11 | Q.     No one told you what a market goat was at that |
| 09:46:01AM | 12 | time? |
| 09:46:01AM | 13 | A.     I knew he would be sold at auction. |
| 09:46:05AM | 14 | Q.     Okay.  Did you understand what he'd be sold for? |
| 09:46:08AM | 15 | A.     I knew we were learning about him for meat and |
| 09:46:22AM | 16 | that he would most likely be sold for meat but not with |
| 09:46:25AM | 17 | certainty.  I didn't know with certainty. |
| 09:46:28AM | 18 | Q.     In addition to feeding Cedar and taking him for |
| 09:46:46AM | 19 | walks, were there any other activities that E.L. did |
| 09:46:51AM | 20 | with him between April 2022 and June 2022? |
| 09:46:55AM | 21 | A.     Yes. |
| 09:46:55AM | 22 | Q.     And can you tell me what those activities were? |
| 09:46:58AM | 23 | A.     She took him to an event called ag field day. |
| 09:47:09AM | 24 | Q.     Can you tell me what ag field day is? |
| 09:47:11AM | 25 | A.     I believe it was like a -- it's an event that's |

**JESSICA LONG**

| | | |
|---|---|---|
| 10:19:31AM | 1 | A.      No. |
| 10:19:32AM | 2 | Q.      Not once? |
| 10:19:34AM | 3 | A.      Not that I remember. |
| 10:19:37AM | 4 | Q.      Was it ever mentioned that any of the animals as |
| 10:19:43AM | 5 | part of the program would ultimately be slaughtered for |
| 10:19:47AM | 6 | their meat? |
| 10:19:48AM | 7 | A.      Not with certainty. |
| 10:19:51AM | 8 | Q.      Okay.  What do you mean by "not with certainty"? |
| 10:19:54AM | 9 | A.      That most likely people would be buying them for |
| 10:19:59AM | 10 | meat, but I didn't know that they would be killed |
| 10:20:03AM | 11 | immediately after the fair. |
| 10:20:05AM | 12 | Q.      Who at 4-H informed you of the fact that they |
| 10:20:11AM | 13 | would most likely be sold for meat? |
| 10:20:13AM | 14 | A.      I believe Chad Fowler did. |
| 10:20:18AM | 15 | Q.      And do you know approximately when Chad Fowler |
| 10:20:21AM | 16 | informed you? |
| 10:20:21AM | 17 | A.      Probably in September or October of is that |
| 10:20:33AM | 18 | 2021? |
| 10:20:33AM | 19 | Q.      September or October 2021? |
| 10:20:35AM | 20 | A.      Yes. |
| 10:20:47AM | 21 | Q.      Did you ever ask Chad Fowler if they had to |
| 10:20:58AM | 22 | be -- that the animals entered in the 4-H program if |
| 10:21:04AM | 23 | there was an alternative to them being slaughtered for |
| 10:21:08AM | 24 | the meat? |
| 10:21:09AM | 25 | A.      No. |

**JESSICA LONG**

10:21:10AM  1   Q.      Did you --

10:21:18AM  2   A.      I -- I mean, I just -- they just said they would

10:21:22AM  3   be sold at auction.   It wasn't till a few weeks before

10:21:26AM  4   that I learned that they all left on a truck to the

10:21:31AM  5   slaughterhouse as soon as the fair was over.

10:21:34AM  6   Q.      But I think you previously testified that you --

10:21:37AM  7   Chad Fowler informed you in September or October of

10:21:41AM  8   2021, that they would be used for meat but you -- but

10:21:46AM  9   you didn't know with -- you didn't know precisely that

10:21:49AM 10   it would be immediately thereafter; is that correct?

10:21:51AM 11   A.      I knew that they would be -- he said they would

10:21:55AM 12   be sold at auction and most -- you know, and most likely

10:22:01AM 13   people buy them for meat.

10:22:02AM 14   Q.      Okay.

10:22:03AM 15   A.      But I thought people were buying a live animal

10:22:06AM 16   that they could choose to do what they wanted with.

10:22:09AM 17   Q.      Did -- aside from Chad Fowler mentioning that

10:22:24AM 18   the animals could be used for meat, did anyone else at

10:22:30AM 19   4-H ever talk to you about the terminal sales of

10:22:41AM 20   livestock?

10:22:41AM 21   A.      No.  I didn't see the word, "terminal," until I

10:22:46AM 22   read the fair rules at the fair.  That's when I had

10:22:51AM 23   time.  I was sitting there in the barn, and that's when

10:22:54AM 24   I read the rules and saw the word, "terminal."

10:22:56AM 25   Q.      Okay.  Well, we'll get to the fair in just a

**JESSICA LONG**

1        MR. BRIDGES:  Q.  Okay.  And what is this?

2    A.      Looks like the online confirmation receipt from

3    entering the fair online.

4    Q.      Okay.

5        MR. GORDON:  Yeah.  Just a belated objection.

6    Document speaks for itself, but you still answer.

7        MR. BRIDGES:  Q.  And if you look at the second

8    page of Exhibit L, is that the same as Exhibit --

9    Exhibit F except it's zoomed out so you can see the

10   entire page?

11           (Pause while witness reviews document.)

12           THE WITNESS:  Yes.

13           MR. BRIDGES:  Q.  Okay.  So from looking at

14   Exhibit L, it looks like the transaction time, so is

15   that the time that you went online and entered her into

16   the fair, would have been May 17th, 2022 at 9:57 a.m.?

17   Is that your understanding from looking at that

18   document?  The first page, yeah.

19           MR. GORDON:  It's a little hard to see.  Where

20   you looking at, John?

21           THE WITNESS:  (Indicating.)

22           MR. GORDON:  Oh, okay.  I'm sorry.

23           THE WITNESS:  Yes, it looks like it's 9:57 a.m.

24   I don't know if it was a weekday or a weekend.  I would

25   think if it was a weekend if I was doing it at 10:00.

**JESSICA LONG**

1  I'm not sure.

2       MR. BRIDGES:  Q.  Okay.  And you paid $15 to

3  enter her into the fair?

4  A.       Yes.

5  Q.       Okay.  And from looking at the second page, you

6  entered her into the meat goat showmanship and the

7  market goat division, I guess for lack of a better term.

8  Is that -- is that correct?  Are those the two entries

9  you made?

10  A.       Yes.

11  Q.       Okay.  How did you enter her into the fair?  I

12  mean, how did you -- how did the process go?

13       MR. GORDON:  Vague, but answer as best you can.

14       THE WITNESS:  At what point in time?  The day we

15  physically brought him?

16       MR. BRIDGES:  Q.  When you filled out the --

17  whatever form there was or whatever you did to enter her

18  into the fair, how did you physically do that?  Did you

19  go to a website to do it?

20  A.       Yes.

21  Q.       Okay.  How did you know what website to go to?

22  A.       I think somebody forwarded me the link and said

23  this is where you enter.  I -- I -- I don't remember

24  specifically how I got the website.

25  Q.       Okay.  So what happened when you went to the

**JESSICA LONG**

| | | |
|---|---|---|
| 09:45:34AM | 1 | MR. NORTHCUTT:  Prior to joining it. |
| 09:45:37AM | 2 | THE WITNESS:  Prior to joining? |
| 09:45:39AM | 3 | MR. NORTHCUTT:  Yes. |
| 09:45:40AM | 4 | THE WITNESS:  No. |
| 09:45:41AM | 5 | MR. NORTHCUTT:  Do you have an understanding of |
| 09:45:42AM | 6 | what a meat or market goat is? |
| 09:45:45AM | 7 | MR. GORDON:  Vague as to time.  You mean now? |
| 09:45:47AM | 8 | MR. NORTHCUTT:  Q.  Let's start with back then |
| 09:45:50AM | 9 | when you acquired Cedar. |
| 09:45:52AM | 10 | A.     No.  We joined to learn. |
| 09:45:57AM | 11 | Q.     No one told you what a market goat was at that |
| 09:46:01AM | 12 | time? |
| 09:46:01AM | 13 | A.     I knew he would be sold at auction. |
| 09:46:05AM | 14 | Q.     Okay.  Did you understand what he'd be sold for? |
| 09:46:08AM | 15 | A.     I knew we were learning about him for meat and |
| 09:46:22AM | 16 | that he would most likely be sold for meat but not with |
| 09:46:25AM | 17 | certainty.  I didn't know with certainty. |
| 09:46:28AM | 18 | Q.     In addition to feeding Cedar and taking him for |
| 09:46:46AM | 19 | walks, were there any other activities that E.L. did |
| 09:46:51AM | 20 | with him between April 2022 and June 2022? |
| 09:46:55AM | 21 | A.     Yes. |
| 09:46:55AM | 22 | Q.     And can you tell me what those activities were? |
| 09:46:58AM | 23 | A.     She took him to an event called ag field day. |
| 09:47:09AM | 24 | Q.     Can you tell me what ag field day is? |
| 09:47:11AM | 25 | A.     I believe it was like a -- it's an event that's |

**JESSICA LONG**

01:46:16PM 1  screen, whatever the case may be, when you saw this

01:46:18PM 2  language before?

01:46:19PM 3  A.      Likely when I enrolled her in the fair.

01:46:24PM 4  Q.      Do you know approximately when you enrolled her

01:46:27PM 5  in the fair?  And if I've already asked this question, I

01:46:30PM 6  apologize.

01:46:31PM 7          MR. GORDON:  Asked and answered, but you may

01:46:32PM 8  answer.

01:46:33PM 9          THE WITNESS:  Around the middle of May.

01:46:35PM10          MR. NORTHCUTT:  Q.  How did you register Cedar

01:47:29PM11  for the fair in May 2022?  Was it 2022?  Yes.

01:47:35PM12  A.      '21.  No.

01:47:36PM13  Q.      '22?

01:47:37PM14  A.      '22, correct.

01:47:38PM15  Q.      Okay.  How did you register Cedar for the fair?

01:47:41PM16  A.      Online.

01:47:43PM17  Q.      And when you did it online, did you see -- was

01:47:47PM18  this document one of the things that you saw?

01:47:49PM19  A.      I don't know if it doesn't look familiar to me

01:47:53PM20  because it's not on the website.  I mean, I've never

01:47:56PM21  seen it as a document like that.

01:47:58PM22  Q.      But the language of it?

01:48:00PM23  A.      I don't know the specific language, but that

01:48:03PM24  looks like something that would have been on there when

01:48:05PM25  I --

**JESSICA LONG**

01:48:06PM 1        MR. GORDON:  Don't speculate, Jessica.  If you

01:48:08PM 2   remember seeing it at the time or if you don't remember

01:48:09PM 3   seeing it at the time or if you're not sure.

01:48:12PM 4        THE WITNESS:  I'm not sure because it's in a

01:48:14PM 5   different format.

01:48:16PM 6        MR. NORTHCUTT:  Do you remember seeing -- when

01:48:27PM 7   you signed up Cedar for -- Cedar online for the fair, do

01:48:31PM 8   you remember there being an accounting and liability

01:48:35PM 9   provision even if it doesn't look the same as this exact

01:48:38PM10   document?

01:48:39PM11        MR. GORDON:  One that she read or one that she

01:48:42PM12   just saw?

01:48:43PM13        MR. NORTHCUTT:  We'll do both.  Saw first.

01:48:46PM14        MR. GORDON:  All right.  Objection.  Sorry.  I

01:48:48PM15   should have objected.  I meant vague, and I was

01:48:51PM16   explaining why.

01:48:52PM17        THE WITNESS:  I don't remember reading.  I just

01:48:56PM18   clicked and filled out the boxes.

01:49:11PM19        MR. NORTHCUTT:  Q.  So in response to -- in your

01:49:17PM20   response to special interrogatory set one, question 13,

01:49:22PM21   special interrogatory 13, said, "Did you agree to the

01:49:25PM22   waiver prior to the exhibition of Cedar at the Shasta

01:49:29PM23   District Fair?"  This I believe was the document that we

01:49:31PM24   ended up attaching as the waiver.  And your response to

01:49:34PM25   that after the objections was, "Responding party does

**JESSICA LONG**

01:49:37PM  1    not recall whether or not she reviewed the waiver, but

01:49:40PM  2    she recalls selecting a box on an electronic

01:49:44PM  3    registration for the fair that said, 'I agree.'"  Is

01:49:46PM  4    that your understanding?

01:49:47PM  5    A.      Yes.

01:49:48PM  6    Q.      Are we up to E?  We'll have this Fern39 marked

01:50:05PM  7    as Exhibit E.

            8            (Whereupon, Defendant's Exhibit E, a

            9            one-page Shasta District Fair and Event

01:50:06PM 10            Center document with "Accountability &

           11            Liability" at the top, was marked for

           12            identification.)

01:50:15PM 13    Q.      Fern40 is the next one.  Have you ever seen this

01:50:18PM 14    document?

01:50:20PM 15            MR. GORDON:  Again, Damian, objection.  Vague as

01:50:22PM 16    to time.  Do you mean at the time at issue?  I'm

01:50:25PM 17    assuming the fair registration or during this case?

01:50:29PM 18            MR. NORTHCUTT:  Well, I can go back.  Let me see

01:50:34PM 19    here.

01:50:35PM 20            MR. GORDON:  Well, the reason I ask, Damian,

01:50:37PM 21    someone handwrote, "Mom is Jessica Long."

01:50:39PM 22            MR. NORTHCUTT:  Oh, we're talking about this

01:50:40PM 23    document?  I thought you were going backwards.  Okay.

01:50:44PM 24    Go ahead.

01:50:45PM 25            THE WITNESS:  I've never seen this document.

**JESSICA LONG**

1 | website?

2 | A.      I don't remember.

3 | Q.      It was an online form?

4 | A.      Yes.

5 | Q.      Was there any part of it that you were supposed

6 | to print and fill out by hand and then submit?

7 | A.      I don't think so, but I don't remember for sure.

8 | Q.      Okay.  Do you recall if there were any boxes

9 | that you had to click as part of the entry form?

10 | A.      I think -- I believe there was a box.

11 | Q.      Do you remember what the box referred to?

12 | A.      No.

13 | Q.      Okay.

14 | A.      Just to enter.

15 | Q.      Do you recall if the box indicated that you

16 | agreed with something in the application form?

17 | A.      I don't remember for sure, but that sounds

18 | right.

19 | Q.      Do you know if there was a link to some other

20 | document that was referenced when you entered her into

21 | the -- into the fair?

22 | A.      I can't remember.

23 | Q.      Okay.  If you -- I believe you said in your

24 | previous deposition that you -- you thought you clicked

25 | a box that said "I agree" to some terms.  Is that your

**JESSICA LONG**

1  understanding?

2  A.        Yes.

3  Q.        Okay.  Do you -- what terms were you agreeing

4  to?

5  A.        I -- I don't remember specifically, but whatever

6  needed to be done to enter the fair.

7  Q.        Okay.  Do you know if it was agreeing to the --

8  the state rules for the fair?

9  A.        I can't remember specifically, but I'm thinking

10 probably yes.

11 Q.        Do you know if it was the local rules for the

12 fair?

13 A.        I can't remember if it was the -- it was

14 probably local.

15 Q.        Okay.  I don't want you to guess.  If you

16 don't -- if you don't know or you don't remember, that's

17 okay.

18           MR. GORDON:  It's vague as to "local rules," but

19 I think we're all talking about the same thing, is

20 the -- the livestock -- the handbook stuff.  Okay.

21           MR. BRIDGES:  Q.  Do you recall when you clicked

22 "I agree" if you actually read any other documents, like

23 if you read the state rules or anything like that?

24 A.        I hadn't read the state rules, but -- at that

25 point in time.

**JESSICA LONG**

1   I'm not sure.

2          MR. BRIDGES:  Q.  Okay.  And you paid $15 to

3   enter her into the fair?

4   A.      Yes.

5   Q.      Okay.  And from looking at the second page, you

6   entered her into the meat goat showmanship and the

7   market goat division, I guess for lack of a better term.

8   Is that -- is that correct?  Are those the two entries

9   you made?

10  A.      Yes.

11  Q.      Okay.  How did you enter her into the fair?  I

12  mean, how did you -- how did the process go?

13          MR. GORDON:  Vague, but answer as best you can.

14          THE WITNESS:  At what point in time?  The day we

15  physically brought him?

16          MR. BRIDGES:  Q.  When you filled out the --

17  whatever form there was or whatever you did to enter her

18  into the fair, how did you physically do that?  Did you

19  go to a website to do it?

20  A.      Yes.

21  Q.      Okay.  How did you know what website to go to?

22  A.      I think somebody forwarded me the link and said

23  this is where you enter.  I -- I -- I don't remember

24  specifically how I got the website.

25  Q.      Okay.  So what happened when you went to the

**JESSICA LONG**

1   find someone else to take him; correct?

2   A.      Yes.

3   Q.      Because you wanted to avoid taking him to the

4   fair.

5   A.      Yes.

6   Q.      Okay.  Did anyone from the Shasta District Fair

7   make any representations to you at the time you agreed

8   to the terms in the exhibitor agreement?

9   A.      What is the representation?

10  Q.      Well, I think you said a moment ago that you

11  didn't speak to anybody from the fair when you entered

12  her into the fair; correct?

13  A.      That's true.  I didn't speak to anybody when I

14  entered online.

15  Q.      So it's -- I just want to make sure.  It's not

16  like you called the fair office, and someone there said,

17  "Well, it says terminal fair -- or terminal sale, but

18  you can just ignore that because you don't have to

19  comply with that."  Something like that never happened;

20  right?

21  A.      No.  I -- and I didn't see anywhere where it

22  says terminal sale on the entry form.

23  Q.      Okay.  Before you agreed to the terms of the

24  exhibitor agreement, did anyone from the Shasta District

25  Fair tell you that by entering E.L. in the fair, you did

**JESSICA LONG**

| | |
|---|---|
| 11:00:32AM 1 | and the time is 11 a.m. |
| 11:00:35AM 2 | MR. NORTHCUTT:  Q.  So last time we were |
| 11:00:53AM 3 | talking, I believe this is kind of where we left off, |
| 11:00:56AM 4 | you had mentioned that you had gone to the fair office |
| 11:00:59AM 5 | on approximately Wednesday or Thursday, June 22nd, 3rd |
| 11:01:05AM 6 | to get a copy of the contract.  Does that sound fair, |
| 11:01:08AM 7 | sound right? |
| 11:01:08AM 8 | A.     Yes. |
| 11:01:09AM 9 | Q.     Okay.  And I think you indicated that you didn't |
| 11:01:11AM 10 | speak with anyone else about -- or didn't speak with |
| 11:01:16AM 11 | anyone at the fair about actually removing Cedar from |
| 11:01:20AM 12 | the fair; is that correct? |
| 11:01:21AM 13 | A.     No. |
| 11:01:27AM 14 | Q.     Okay.  Who did you speak with? |
| 11:01:29AM 15 | A.     Other parents. |
| 11:01:33AM 16 | Q.     Okay.  Are these parents, to your knowledge, |
| 11:01:37AM 17 | employees or employed by the district fair and event |
| 11:01:41AM 18 | center? |
| 11:01:41AM 19 | A.     No. |
| 11:01:42AM 20 | Q.     Okay.  So do you know if you actually spoke with |
| 11:01:45AM 21 | anyone specifically as like an employee of the Shasta |
| 11:01:51AM 22 | District Fair Center -- Fair and Event Center about |
| 11:01:54AM 23 | removing Cedar from the auction? |
| 11:01:57AM 24 | A.     No. |
| 11:01:58AM 25 | Q.     So we're kind of in that window between June |

**JESSICA LONG**

02:51:51PM 1    A.      I don't know.  I can make a guess.

02:51:56PM 2    Q.      Okay.  If you don't know, I don't need -- that's

02:51:59PM 3    fine.  I don't want you to guess at any questions.

02:52:01PM 4            All right.  So what is this card, or what is

02:52:04PM 5    this picture?  What is this, to your understanding?

02:52:07PM 6    A.      One of the requirements for doing the 4-H

02:52:12PM 7    project was to give potential bidders the bidder letter

02:52:20PM 8    and then to include a picture with the bidder letter.

02:52:23PM 9    Q.      Is it called a bidder letter, or have you ever

02:52:26PM 10   heard of it as a buyer letter?

02:52:27PM 11   A.      They -- the terms are kind of interchangeable.

02:52:31PM 12   They did use buyer more often in the letter.

02:52:35PM 13   Q.      Okay.  Okay.  Bidder, buyer.  Starts with a B.

02:52:38PM 14   It's a letter.  Okay.

02:52:39PM 15           Are you able to -- whose handwritten is this on

02:52:46PM 16   the following page here?

02:52:48PM 17   A.      E.L's.

02:52:49PM 18   Q.      This is Fern80 and 81.  This is E.L's

02:52:58PM 19   handwriting?

02:52:58PM 20   A.      Yes.

02:52:59PM 21   Q.      And can you read this?

02:53:00PM 22   A.      Yes.

02:53:01PM 23   Q.      Okay.  Can you read this to me?

02:53:03PM 24   A.      "Dear buyer, hello, my name is E.L.  I am in Cow

02:53:12PM 25   Creek 4-H.  This is my first year in 4-H.  I have

**JESSICA LONG**

02:53:18PM 1   decided to" --

02:53:25PM 2           MR. GORDON:  "Raise," Jessica.

02:53:27PM 3           THE WITNESS:  "Raise," okay.  "Raise a meat goat

02:53:30PM 4   whether for my project.  He" -- "His name is Cedar.  In

02:53:39PM 5   this year I have learned how to feed a," maybe it says

02:53:51PM 6   "whether," I don't know.  "Feed a" something.

02:53:53PM 7           MR. NORTHCUTT:  Just do your best.

02:53:56PM 8           THE WITNESS:  "I have learned how to cure goat

02:53:59PM 9   diseases.  This year I have learned how to take care of

02:54:08PM 10   meat goat."

02:54:10PM 11           MR. GORDON:  I don't know.  Could be.

02:54:13PM 12           THE WITNESS:  "My goat is a very great and he

02:54:25PM 13   will be very good palin and in tacos and every other way

02:54:38PM 14   he will be very good and tasty."

02:54:42PM 15           MR. NORTHCUTT:  Okay.

02:54:44PM 16           THE WITNESS:  "The Shasta County Fair starts at

02:54:47PM 17   8 a.m.  The day of the fair is June 22nd at the Shasta

02:54:56PM 18   County fairgrounds.  Sincerely, E.L."

02:55:00PM 19           MR. NORTHCUTT:  Could "palin" be plain?  Or

02:55:20PM 20   would you just be guessing?

02:55:22PM 21           THE WITNESS:  I don't know.  I'd be guessing.

02:55:26PM 22           MR. NORTHCUTT:  Let's pick this up in a minute.

02:55:28PM 23   Our videographer needs to change the media.  Okay, let's

02:55:33PM 24   go off the record for a second.

02:55:34PM 25           MR. GORDON:  Sure.

**JESSICA LONG**

10:40:01AM 1  we could leave and take him.  I thought I had mentioned

10:40:09AM 2  that I finally found a place that we could keep him.

10:40:11AM 3  Q.      Had you found a place that you could keep him?

10:40:14AM 4  A.      Yeah.

10:40:14AM 5  Q.      Okay.  Where?  Where?

10:40:17AM 6  A.      It was the night she turned him over to the fair

10:40:25AM 7  I just felt really bad still.  Felt bad that I wasn't

10:40:28AM 8  able to find a place for him.  But I just remember I

10:40:31AM 9  laid down and I was just looking at my phone and I just

10:40:34AM 10  thought I wonder if there's a goat rescue that would

10:40:37AM 11  take him, and I searched goat rescues.

10:40:39AM 12  Q.      So this is the night before the --

10:40:41AM 13  A.      This was the night when she turned him in.  You

10:40:45AM 14  know, that she entered him into the fair.

10:40:47AM 15  Q.      So is that June 21st, 2022?

10:40:50AM 16  A.      I believe.

10:40:50AM 17  Q.      Okay.  So on June 21st, 2022, you're looking on

10:40:54AM 18  your phone to see if there's another place that you

10:40:57AM 19  could possibly put him such as a goat rescue; is that

10:41:00AM 20  correct?

10:41:00AM 21  A.      (Nods head up and down.)

10:41:01AM 22  Q.      Okay.  And did you contact any goat rescue on

10:41:11AM 23  June 21st, 2022?

10:41:11AM 24  A.      When I -- yes.

10:41:14AM 25  Q.      Okay.  Which one?

**JESSICA LONG**

| | | |
|---|---|---|
| 10:41:16AM | 1 | A.        Bleating Hearts Farm. |
| 10:41:18AM | 2 | Q.        And when you spoke with Bleating Hearts Farm, |
| 10:41:23AM | 3 | who did you speak to there? |
| 10:41:25AM | 4 | A.        I didn't speak with anyone. |
| 10:41:26AM | 5 | Q.        Did you email or text somebody? |
| 10:41:28AM | 6 | A.        I emailed. |
| 10:41:29AM | 7 | Q.        Okay.  Who did you email? |
| 10:41:31AM | 8 | A.        I don't remember the specific address.  It might |
| 10:41:35AM | 9 | have been Bleating Hearts Farm or -- |
| 10:41:36AM | 10 | Q.        Okay.  Fair enough.  And did somebody respond to |
| 10:41:39AM | 11 | your email? |
| 10:41:40AM | 12 | A.        The next -- I believe it was the next day, and |
| 10:41:43AM | 13 | that was right before the show. |
| 10:41:47AM | 14 | Q.        Okay.  So you -- so you -- let me just for |
| 10:41:51AM | 15 | chronological purposes, you emailed someone from |
| 10:41:55AM | 16 | Bleating Hearts Farm on June 21st, 2022; is that |
| 10:42:00AM | 17 | correct? |
| 10:42:00AM | 18 | A.        I believe that was the date, yes. |
| 10:42:02AM | 19 | Q.        And then you got a response from someone at |
| 10:42:05AM | 20 | Bleating Hearts Farm on June 22nd; is that correct? |
| 10:42:09AM | 21 | A.        I think it was about a day later.  It might have |
| 10:42:12AM | 22 | been two. |
| 10:42:13AM | 23 | Q.        And do you know who responded to your email? |
| 10:42:15AM | 24 | A.        Kristin Starkey. |
| 10:42:19AM | 25 | Q.        What -- what was -- tell me what the substance |

**JESSICA LONG**

| | | |
|---|---|---|
| 10:42:25AM | 1 | of your email to Bleating Hearts Farms was on June 21st, |
| 10:42:32AM | 2 | 2022. |
| 10:42:32AM | 3 | A.     I haven't reviewed it in a while, but I believe |
| 10:42:36AM | 4 | I just told her that we had entered 4-H in the fair and |
| 10:42:42AM | 5 | my daughter, we were feeling bad about it, and wanted to |
| 10:42:49AM | 6 | find a different solution. |
| 10:42:51AM | 7 | Q.     When you say you were feeling bad about it, why |
| 10:42:54AM | 8 | were you feeling bad about it? |
| 10:42:55AM | 9 | A.     Because my daughter bonded with Cedar. |
| 10:42:57AM | 10 | Q.     And you were worried that he would be a terminal |
| 10:43:04AM | 11 | sale, correct? |
| 10:43:04AM | 12 | A.     Yes. |
| 10:43:06AM | 13 | Q.     Okay.  So in response to that, Kristin Starkey |
| 10:43:09AM | 14 | wrote you back approximately a day or two later, and |
| 10:43:12AM | 15 | what was her response then? |
| 10:43:14AM | 16 | A.     I don't remember exactly but that she -- she |
| 10:43:19AM | 17 | could help me find a solution or that she might -- it |
| 10:43:24AM | 18 | might have been that she knew someone who could take |
| 10:43:27AM | 19 | him. |
| 10:43:27AM | 20 | Q.     Okay.  So this is in -- this is approximately if |
| 10:43:33AM | 21 | you emailed on the 21st, and she got back to you a day |
| 10:43:36AM | 22 | or two later, you're talking about the 22nd or 23rd; is |
| 10:43:39AM | 23 | that correct? |
| 10:43:39AM | 24 | A.     Yes. |
| 10:43:40AM | 25 | Q.     So around the 22nd or 23rd Kristin Starkey is |

**JESSICA LONG**

11:09:31AM 1    take it home.

11:09:32AM 2    Q.      Okay.  Did you speak with any other parents

11:09:41AM 3    besides Jennifer Amsbaugh?  Amsbaugh?

11:09:47AM 4    A.      I don't remember.

11:09:51AM 5    Q.      Okay.  So going to June 25th, 2022, at

11:10:01AM 6    approximately what time did you get to the fair?

11:10:03AM 7    A.      June -- are you talking about every day of the

11:10:10AM 8    week, 25th --

11:10:11AM 9    Q.      No.  The last day, the 25th, so.

11:10:14AM 10   A.      Oh.  Probably between 8 and 9.

11:10:16AM 11   Q.      Okay.  And then --

11:10:20AM 12           MR. GORDON:  Damian, which day did you want?

11:10:23AM 13   I'm sorry.

11:10:23AM 14           MR. NORTHCUTT:  June 25th, the day of the

11:10:25AM 15   auction.

11:10:26AM 16   Q.      So you arrive at the fair at 8 to approximately

11:10:31AM 17   9 a.m. on June 25th.  What's the first thing you do

11:10:34AM 18   after that?

11:10:35AM 19   A.      Have my daughter make sure Cedar has food and

11:10:41AM 20   water.

11:10:42AM 21   Q.      Okay.  Besides you and E.L. going to the fair

11:10:46AM 22   together, I assume you drove together?

11:10:49AM 23   A.      Yes.

11:10:50AM 24   Q.      Was there somebody else that drove with you as

11:10:53AM 25   well?

**JESSICA LONG**

11:17:14AM 1          MR. GORDON:  Vague as to "prevent."  Do you mean

11:17:17AM 2    like physically obstructing her?

11:17:19AM 3          MR. NORTHCUTT:  I mean just her general sense.

11:17:21AM 4    Did she have -- did she have a sense that there was

11:17:23AM 5    anything that either physically or in any other way

11:17:26AM 6    prevented her from removing the goat.

11:17:29AM 7          MR. GORDON:  Vague.  But answer if you can.

11:17:32AM 8          THE WITNESS:  Again, the fair rules said you had

11:17:39AM 9    to stay through the show dates, and people said nobody's

11:17:44AM 10   ever left.  You can't leave.  So I was afraid -- I was

11:17:48AM 11   afraid if I just left, somebody would stop -- stop us.

11:17:53AM 12         MR. NORTHCUTT:  Q.  Did someone actually say,

11:17:54AM 13   "You can't leave" to you?  At any point?

11:17:57AM 14   A.     I can't remember.

11:17:58AM 15   Q.     Now, kind of help me picture this in my mind.

11:18:04AM 16   At the fair, so do they call Cedar's number for him to

11:18:09AM 17   be presented for the auction?  Is that how it works?

11:18:12AM 18   A.     Yes.

11:18:13AM 19   Q.     Okay.  And then he, along with other goats, are

11:18:18AM 20   presented for bidding; is that correct?

11:18:20AM 21   A.     Yes.

11:18:21AM 22   Q.     Is it as kind of a group or one at a time?

11:18:24AM 23   A.     One at a time.  It's like a line.

11:18:27AM 24   Q.     Okay.  And they -- and so did E.L. take Cedar

11:18:33AM 25   kind of up to a certain location for bidders to bid on

**JESSICA LONG**

| | | |
|---|---|---|
| 11:18:37AM | 1 | the goat? |
| 11:18:37AM | 2 | A.      Yes. |
| 11:18:38AM | 3 | Q.      And when -- again, I know nothing of 4-H.  I |
| 11:18:46AM | 4 | know nothing of auctions.  So when she takes the goat up |
| 11:18:49AM | 5 | for bidding, does she present the goat?  Does she make |
| 11:18:55AM | 6 | the goat do tricks?  Or what exactly does she do when |
| 11:18:59AM | 7 | she's presenting the goat? |
| 11:19:00AM | 8 | A.      She tries to brace him. |
| 11:19:03AM | 9 | Q.      Okay.  And you mentioned bracing is when the -- |
| 11:19:06AM | 10 | A.      They just kind of stand them up.  They push |
| 11:19:09AM | 11 | against their leg a little bit. |
| 11:19:10AM | 12 | Q.      Is there anything else that she did with Cedar? |
| 11:19:12AM | 13 | A.      She was in a little, they called it a show ring, |
| 11:19:15AM | 14 | but it was probably about half the size of this room. |
| 11:19:19AM | 15 | So she just brought him in there and braced him for a |
| 11:19:22AM | 16 | couple seconds and -- |
| 11:19:24AM | 17 | Q.      Do you know approximately how long the bidding |
| 11:19:27AM | 18 | took place on Cedar? |
| 11:19:28AM | 19 | A.      10 to 15 seconds.  10 to 20 seconds. |
| 11:19:33AM | 20 | Q.      Is it -- is it like an actual auction where |
| 11:19:37AM | 21 | there's a bunch of people with like paddles that put |
| 11:19:39AM | 22 | their hand up, or how do they bid? |
| 11:19:42AM | 23 | A.      It was my first time.  I was overwhelmed by it |
| 11:19:45AM | 24 | all.  It was my first -- there was people everywhere. |
| 11:19:47AM | 25 | There was that little ring that she was in.  There was |

**JESSICA LONG**

| | | |
|---|---|---|
| 11:19:51AM | 1 | lines of people coming out.  And just the stands and |
| 11:19:54AM | 2 | then chairs.  And so I didn't even see who actually -- |
| 11:20:00AM | 3 | but there were people with paddles and stuff, but I was |
| 11:20:03AM | 4 | focused on her. |
| 11:20:04AM | 5 | Q.    Okay.  And you said she was approximately up |
| 11:20:08AM | 6 | there for how long? |
| 11:20:09AM | 7 | A.    Less than a minute. |
| 11:20:10AM | 8 | Q.    Okay.  And then after that, what did E.L. do? |
| 11:20:14AM | 9 | A.    She took him back to his pen. |
| 11:20:17AM | 10 | Q.    Okay.  Was it your understanding that after that |
| 11:20:21AM | 11 | minute that there was a winning bid for Cedar? |
| 11:20:26AM | 12 | A.    Yes. |
| 11:20:31AM | 13 | MR. GORDON:  Objection as to "winning bid." |
| 11:20:35AM | 14 | Vague as to "winning bid." |
| 11:20:37AM | 15 | MR. NORTHCUTT:  Okay.  You had previously before |
| 11:20:41AM | 16 | the actual auction read the county rules of the fair, |
| 11:20:48AM | 17 | correct?  That's what you testified earlier? |
| 11:20:50AM | 18 | MR. GORDON:  Vague as to "county rules." |
| 11:20:53AM | 19 | MR. NORTHCUTT:  Q.  Well, you had mentioned |
| 11:20:54AM | 20 | earlier that you had previously looked at I believe you |
| 11:20:57AM | 21 | said the state rules and the county rules.  Is that not |
| 11:21:00AM | 22 | correct? |
| 11:21:00AM | 23 | A.    That's correct. |
| 11:21:01AM | 24 | Q.    Okay.  What's your understanding, or do you have |
| 11:21:14AM | 25 | an understanding of who placed the highest bid for |

**JESSICA LONG**

| | | |
|---|---|---|
| 11:21:17AM | 1 | Cedar? |
| 11:21:18AM | 2 | MR. GORDON:  Vague as to time. |
| 11:21:19AM | 3 | MR. NORTHCUTT:  Q.  On June 25th, 2022. |
| 11:21:24AM | 4 | A.      I was confused at the time because I went and |
| 11:21:30AM | 5 | asked someone in a blue shirt that looked like a fair |
| 11:21:33AM | 6 | representative where -- right outside that little place |
| 11:21:39AM | 7 | that she auctioned him, and I saw someone in a blue |
| 11:21:44AM | 8 | shirt and a clipboard and I asked who had bid on Cedar |
| 11:21:48AM | 9 | and he said the Brian Dahle campaign. |
| 11:21:53AM | 10 | Q.      Okay.  Do you know who Brian Dahle is?  Or did |
| 11:21:57AM | 11 | you -- at that time did you know who he was? |
| 11:22:00AM | 12 | A.      I knew he's a local politician. |
| 11:22:03AM | 13 | Q.      Did you have any conversations with E.L. |
| 11:22:13AM | 14 | immediately after the bidding was over? |
| 11:22:17AM | 15 | A.      Yes. |
| 11:22:20AM | 16 | Q.      And what did you discuss? |
| 11:22:21AM | 17 | A.      Well, I walked her back to her pen and she got |
| 11:22:28AM | 18 | like really limp and soft and just kind of -- he was |
| 11:22:33AM | 19 | laying down and she was just kind of laying with him and |
| 11:22:36AM | 20 | he was nibbling her hair and she was crying.  And I just |
| 11:22:40AM | 21 | watched it, and I was crying too because I thought it |
| 11:22:43AM | 22 | was really sad. |
| 11:22:44AM | 23 | Q.      Did you actually have a conversation with her |
| 11:22:47AM | 24 | or -- |
| 11:22:49AM | 25 | A.      I think I just hugged her.  She had to give a |

**JESSICA LONG**

11:40:21AM 1   an answer.  Was there -- can you estimate how long that

11:40:24AM 2   period of time was between the actual end of the bidding

11:40:29AM 3   and I guess --

11:40:34AM 4          MR. GORDON:  The withdrawal you're saying?

11:40:36AM 5          MR. NORTHCUTT:  No.  No.

11:40:37AM 6          MR. GORDON:  Okay.

11:40:38AM 7          MR. NORTHCUTT:  Q.  At the end of the bidding

11:40:42AM 8   and -- I was trying to figure out how to phrase this.

11:40:50AM 9   Give me a second.

11:40:51AM 10          The end of the bidding and essentially when you

11:40:54AM 11   decided to remove Cedar from the fair.

11:40:57AM 12   A.      The end of her bidding was probably, I want to

11:41:08AM 13   say, like I said, late morning or early afternoon.  And

11:41:14AM 14   then there was other animals that probably went till 2

11:41:18AM 15   or 3 in the afternoon.  That was the end of the bidding.

11:41:21AM 16   Q.      Okay.  And but let's say from the time that E.L.

11:41:27AM 17   returned to the pen after the bidding to the time that

11:41:31AM 18   you decided to remove Cedar from the fairgrounds, can

11:41:34AM 19   you give me an estimate of that amount of time?

11:41:36AM 20   A.      I decided to remove him from the fairgrounds at

11:41:41AM 21   around 9 p.m.

11:41:43AM 22   Q.      9 p.m.  And you said the bidding was over at

11:41:47AM 23   approximately sometime in the morning, early afternoon

11:41:50AM 24   you said?

11:41:51AM 25   A.      Yes.

**JESSICA LONG**

02:37:38PM 1  testified that the thank you card was written the night

02:37:40PM 2  before the auction; is that correct?

02:37:41PM 3  A.      Yes.

02:37:42PM 4  Q.      So can you give me an estimate of when this

02:37:46PM 5  photograph was taken because you said it was after the

02:37:49PM 6  night before the auction, so it has to have been --

02:37:52PM 7  A.      11 -- 11 p.m., the night before the auction.

02:37:54PM 8  Q.      That's when you took the photograph?

02:37:56PM 9  A.      Yes.

02:37:56PM 10  Q.      Is there any reason that you took the

02:37:58PM 11  photograph?

02:37:58PM 12  A.      To put it in her record book for part of her

02:38:04PM 13  documents.

02:38:06PM 14  Q.      Can you -- I'm not very good with the

02:38:10PM 15  handwriting here.  Can you tell me on the second

02:38:12PM 16  photograph here, this looks to be some sort of

02:38:16PM 17  handwritten card.  Is that correct?

02:38:17PM 18  A.      Yes.

02:38:18PM 19  Q.      And do you recognize the writing on that card?

02:38:22PM 20  A.      Yes.

02:38:23PM 21  Q.      And whose writing is that?

02:38:25PM 22  A.      El█████.

02:38:26PM 23  Q.      E.L.?

02:38:27PM 24  A.      Yes.

02:38:27PM 25  Q.      Okay.  Sorry.

**JESSICA LONG**

02:38:28PM 1   A.        Sorry.  Thank you.

02:38:29PM 2   Q.        Can you -- can you tell me what it reads because

02:38:33PM 3   there's certain words that I'm not good with.

02:38:36PM 4   A.        She got a little behind in her writing during

02:38:43PM 5   COVID, so I might have trouble with it too.

02:38:46PM 6   Q.        My children are terrible, so no biggy.

02:38:49PM 7   A.        "Dear buyer, I really appreciate what you have

02:38:55PM 8   done for me.  I hope you really enjoy the goat.  I have

02:39:02PM 9   put a lot of time and work and energy into the goat.

02:39:12PM 10  Have a great rest of your day.  Live a good life."

02:39:18PM 11  Q.        Okay.  And so ultimately, was this -- is the

02:39:25PM 12  second photo the inside of the thank you card?

02:39:27PM 13  A.        Yes.

02:39:28PM 14  Q.        Okay.  From the top.  And was this photograph

02:39:33PM 15  taken at the same time as the top photograph?

02:39:35PM 16  A.        Yes.

02:39:36PM 17  Q.        The night before?

02:39:37PM 18  A.        Uh-huh.

02:39:38PM 19  Q.        Okay.  The auction.  And do you know ultimately,

02:39:42PM 20  I think you testified earlier, but correct me if I'm

02:39:45PM 21  wrong, did E.L. actually deliver this handwritten note

02:39:49PM 22  and the tickets to someone from Senator Dahle's office?

02:39:54PM 23  A.        No.

02:39:57PM 24  Q.        Okay.  Did she end up delivering it to somebody

02:40:01PM 25  else?

**JESSICA LONG**

02:40:02PM 1    A.      Yes.

02:40:02PM 2    Q.      Who did she deliver it to?

02:40:04PM 3    A.      A lady named Kathie Muse.

02:40:06PM 4    Q.      What's your understanding of who Kathie Muse is?

02:40:10PM 5    A.      I didn't know who she was.

02:40:13PM 6            MR. GORDON:  Vague as to time.  When do you

02:40:15PM 7    mean?

02:40:15PM 8            MR. NORTHCUTT:  Q.  Okay.  Let's -- did you know

02:40:17PM 9    who Kathie Muse was before the district fair?

02:40:20PM 10   A.      No.

02:40:21PM 11   Q.      Did you -- obviously you're familiar with her

02:40:24PM 12   name now?

02:40:25PM 13   A.      Yes.

02:40:26PM 14   Q.      Okay.  What's your understanding of why E.L.

02:40:32PM 15   provided the thank you card and barbecue tickets to

02:40:34PM 16   Kathie Muse when Brian Dahle was the highest bidder for

02:40:38PM 17   Cedar?

02:40:38PM 18   A.      The 4-H leader had pointed to a lady over there

02:40:47PM 19   and said, "That's the winning bidder."

02:40:49PM 20   Q.      Okay.  And so she, to your understanding, she

02:40:54PM 21   gave these tickets and the thank you card to Kathie

02:40:56PM 22   Muse?

02:40:56PM 23   A.      Yes.

02:40:56PM 24   Q.      Had you had any conversations with Kathie

02:41:01PM 25   Muse -- had you had any conversations with Kathie Muse

**JESSICA LONG**

1   to you, and she said yes, and she put the leash on, and

2   she walked out, so that's quitting the fair and

3   disaffirming, and then I followed up, and I told them

4   she didn't want to do it, and I supported her in that,

5   and how can I make it whole?  "How can I make you whole

6   of any money that you've been out?"  I didn't know what

7   incidental costs would have been, but I wanted to make

8   it -- to make it right for cancelling, letting her quit

9   at the last minute.

10          MR. BRIDGES:  Q.  You said that obviously she

11  expressed to you that she did not want Cedar to go to

12  market; right?

13  A.      No.  She wanted to keep him.

14  Q.      Was it her idea to take Cedar off the

15  fairgrounds?

16  A.      No.  I don't think she thought she could.  She

17  didn't think she could.

18  Q.      Okay.  Do --

19  A.      I presented it as an option.

20  Q.      Okay.  Did your daughter -- as far as you know

21  did she ever communicate with anyone from the Shasta

22  District Fair about disaffirming the contract?

23  A.      She communicated to me.  She -- she doesn't have

24  her own e-mail account or cell phone, so she couldn't

25  call anyone.  No.

**JESSICA LONG**

| | | |
|---|---|---|
| 11:48:34AM | 1 | A.       I put them in the car, and we left. |
| 11:48:36AM | 2 | Q.       Where did you decide to leave to? |
| 11:48:40AM | 3 | A.       I just wanted to get out of there at that point. |
| 11:48:45AM | 4 | And so I made -- drove to Sacramento, and I called my |
| 11:48:48AM | 5 | mom and asked if we could stay in the backyard with him |
| 11:48:52AM | 6 | for the night. |
| 11:48:53AM | 7 | Q.       You said, "your mom."  She's -- she lives down |
| 11:49:05AM | 8 | in Sacramento? |
| 11:49:06AM | 9 | A.       Yes. |
| 11:49:07AM | 10 | Q.       Was she -- after you spoke with your mom, you |
| 11:49:16AM | 11 | drove down to her house; is that correct? |
| 11:49:17AM | 12 | A.       Yes. |
| 11:49:18AM | 13 | Q.       And was she present at her house when you |
| 11:49:21AM | 14 | arrived? |
| 11:49:21AM | 15 | A.       Yes. |
| 11:49:22AM | 16 | Q.       Okay.  Did you speak with her about taking Cedar |
| 11:49:27AM | 17 | from the fair? |
| 11:49:28AM | 18 | A.       I think I just said we took him. |
| 11:49:32AM | 19 | Q.       Okay.  Do you recall her response? |
| 11:49:36AM | 20 | A.       I think she seemed happy. |
| 11:49:41AM | 21 | Q.       Okay.  Did she verbally say anything to you? |
| 11:49:44AM | 22 | A.       I can't remember exactly. |
| 11:49:46AM | 23 | Q.       Did she ever say you shouldn't have done that or |
| 11:49:50AM | 24 | anything of that nature? |
| 11:49:51AM | 25 | A.       No.  During -- earlier in the week I had talked |

**JESSICA LONG**

03:45:25PM 1          Through -- so the rest of the photographs of the

03:45:27PM 2   confidential section after the picture of E.L. with your

03:45:30PM 3   mother, please take a look at these and just -- I'm

03:45:34PM 4   assuming they're all the same location, but.

03:45:41PM 5          (Pause in proceedings.)

03:45:55PM 6   A.    Yeah.

03:45:56PM 7   Q.    Okay.  Have you seen these photographs before?

03:45:59PM 8   A.    I took them.

03:46:00PM 9   Q.    Okay.  And where were they taken?

03:46:03PM10   A.    Raymond Allen's.

03:46:05PM11   Q.    And was that on -- was that when you dropped

03:46:10PM12   Cedar off there after the fair?

03:46:11PM13   A.    Yes.

03:46:12PM14   Q.    Do you know the date approximately?

03:46:16PM15   A.    Sunday.  Was it the 26th?

03:46:20PM16   Q.    What's the gentleman here down here?

03:46:23PM17   A.    That's Raymond Allen.

03:46:28PM18   Q.    And I assume this is his wife and kids in the

03:46:31PM19   other photograph --

03:46:32PM20   A.    Yes.

03:46:33PM21   Q.    -- that you're referring to?  The llamas?

03:46:36PM22   A.    They spit on Cedar.

03:46:39PM23   Q.    Is this -- is this you and E.L. here in this

03:46:42PM24   photograph?

03:46:42PM25   A.    Yes.

**JESSICA LONG**

01:24:21PM 1  attachment A to the warrant.

01:24:23PM 2          MR. GORDON:  Give me a moment.  The big one that

01:24:27PM 3  we looked at.  The Instagram post is what you're

01:24:30PM 4  referring to?

01:24:31PM 5          MR. NORTHCUTT:  Yes.

01:24:31PM 6          MR. GORDON:  Give me one moment to pull it up.

01:24:43PM 7  You said 127?

01:24:45PM 8          MR. NORTHCUTT:  00027.  It's the Instagram post.

01:24:54PM 9          MR. GORDON:  I know.  I'm just navigating to it.

01:25:04PM 10  Sorry.  It's a big file.  There.

01:25:09PM 11          MR. NORTHCUTT:  Q.  Have you seen this document

01:25:11PM 12  before?

01:25:12PM 13  A.      I believe Ryan shared it with me for the first

01:25:16PM 14  time.

01:25:17PM 15  Q.      Okay.  Have you -- is that a picture you, E.L.

01:25:22PM 16  and Cedar?

01:25:22PM 17  A.      Yes.

01:25:23PM 18  Q.      Do you know who took that photograph?

01:25:26PM 19  A.      Raymond Allen took that photograph.

01:25:29PM 20  Q.      Do you know when it was taken?

01:25:31PM 21  A.      In the 15 or 20 minutes we were at his farm.

01:25:35PM 22  Q.      And that would have been on approximately June

01:25:42PM 23  26 --

01:25:42PM 24  A.      Yes.

01:25:43PM 25  Q.      -- '22?  Okay.  Do you know who posted this

**JESSICA LONG**

01:25:53PM 1   picture online?

01:25:56PM 2   A.        Kristin posted it.

01:25:59PM 3   Q.        Kristin?

01:26:01PM 4   A.        Bleating Hearts Farm.   Starkey, I think.

01:26:04PM 5            MR. GORDON:   Jessica, FYI, did you see her post

01:26:07PM 6   it or did you -- do you know that, or are you assuming

01:26:11PM 7   that?

01:26:12PM 8            THE WITNESS:   Yeah.   I guess I was assuming it

01:26:16PM 9   because she didn't tell me she did it.   And I didn't

01:26:19PM10   have Instagram on my phone.

01:26:21PM11            MR. NORTHCUTT:   Q.   You didn't ask Kristin

01:26:23PM12   Starkey to post that online for you?

01:26:25PM13   A.        No.

01:26:25PM14   Q.        Did you ask Raymond Allen to post that online

01:26:28PM15   for you?

01:26:28PM16   A.        No.   I asked him to take a picture of El███ me

01:26:31PM17   and Cedar because I realized that I didn't have any

01:26:34PM18   pictures of the three of us.   I just had pictures of

01:26:38PM19   El██ and Cedar.

          20   Q.        Did -- sorry, go ahead.

01:26:39PM21   A.        So I asked him to take the picture because I

01:26:42PM22   didn't have any.

01:26:43PM23   Q.        Did you share that photograph with Kristin

01:26:52PM24   Starkey?

01:26:52PM25   A.        Yes.   I emailed it to her.

**JESSICA LONG**

1  or forums about the circumstances giving rise to this

2  lawsuit?

3  A.      No.

4  Q.      My understanding is you have given at least one

5  or maybe a few interviews to the media as a result of

6  this?

7  A.      Yes.

8  Q.      Do you know how many interviews you've given?

9  A.      Three.

10  Q.      Okay.

11  A.      I declined a lot more than that too.

12  Q.      Understood.

13          MR. GORDON:  Fox News, CNN.

14          MR. BRIDGES:  Q.  Have -- have --

15          THE REPORTER:  Say that again.

16          MR. GORDON:  I said Fox News, CNN.  She didn't

17  go on any of them.

18          MR. BRIDGES:  Q.  Have any of these interviews

19  taken place before you filed the lawsuit?

20  A.      No.

21  Q.      Okay.  Do you recall what publications

22  interviewed you?

23          MR. GORDON:  John, if she -- I'm not -- ask your

24  question, but I think -- and I'll send you the 26(f)

25  disclosure of the name --

**JESSICA LONG**

1    Q.      Okay.  And it's an e-mail dated August 1st of
2    2022.  Looks like it's from you to Melanie Silva; is
3    that correct?
4    A.      Yes.
5    Q.      And it says, "It is my understanding that Cedar
6    was returned.  I'd like to know if he is still alive and
7    what happened to him?  Thank you, Jessica Long."
8            Did I read that correctly?
9    A.      Yes.
10   Q.      Okay.  Did anyone respond to this e-mail?
11   A.      No.
12   Q.      Okay.  There was this Instagram post that was
13   attached as Exhibit A to your last deposition, so we
14   don't need to mark that.  It's already been marked, but
15   I'll -- I'll show you a copy of that.  You're -- you're
16   familiar -- familiar with this post; right?
17   A.      Yeah.
18   Q.      Okay.  Did you have anything to do with creating
19   this post?
20   A.      No.
21   Q.      Okay.  You sent Ms. Stover a copy of the picture
22   that was used in the post; correct?
23   A.      Yes.
24   Q.      Okay.  And presumably the information that
25   appears in the post is information that she obtained

JESSICA LONG

1   from you; is that fair to say?

2   A.      No, not all of it.

3   Q.      Okay.  But some of it?

4   A.      Let me read it again, and I'll be more specific.

5   Q.      Of course.  Take your time.

6           (Pause while witness reviews document.)

7           MR. BRIDGES:  Q.  And I can just ask another

8   question if it would --

9   A.      Sure.

10  Q.      -- make it easier because I -- I mean, my

11  understanding is, as you said before, you didn't help

12  her create the post.

13  A.      No.

14  Q.      Did you instruct her to post this on Instagram?

15  A.      Nope.

16  Q.      Did she ever ask for your permission to post it?

17  A.      No.

18  Q.      And in fact you didn't know that she had posted

19  it until after it was done; isn't that true?

20  A.      Yes.

21  Q.      Okay.  Do you wish she hadn't posted it?

22  A.      Yeah.

23  Q.      Okay.

24          MR. GORDON:  No, no.  It's fine.  I'm just going

25  to say something.  I don't know if she's -- I'm not

**JESSICA LONG**

1    trying to influence her or not, but I know at the time

2    she instructed her to take it down when we found out

3    about it --

4              MR. BRIDGES:  Okay.

5              MR. GORDON:  -- so I don't know if you want to

6    ask her that question, and she'll testify to it.

7              MR. BRIDGES:  That -- that's fair.

8    Q.        (By Mr. Bridges) Did you ask her to take it down

9    after she posted it?

10   A.        Yes.

11   Q.        Okay.  And is it fair to say that you were

12   unhappy that she posted this without your permission?

13   A.        Yes.

14   Q.        Have you posted anything on social media

15   regarding the circumstances that gave rise to this

16   lawsuit?

17   A.        No.

18   Q.        Have you written any blogs or articles in any

19   publication --

20   A.        No.

21   Q.        -- about this?

22             This is going to be a long line of questions

23   here, so bear with me, but have you attended any

24   protests or demonstrations advocating for Cedar's return

25   to you and your daughter?



EXHIBIT 8 (2/1/23)

3

Jessica Long

Requesting solutions for the goat that was taken
Jessica Daum <jessicadaum@hotmail.com>
Mon 6/27/2022 5:41 PM
To:

• ceo sdfeventcenter.com <ceo@sdfeventcenter.com>

Dear Shasta County Fair Manager,

i am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,

Jessica Long
Mother of Eliza Long,
Shasta District Fair goat lot #132

Get Outlook for iOS

FERN000042

# EXHIBIT C

## In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*E.L.*
*August 13, 2024*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File E.L..txt
Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA DIVISION

---OOO-

E.L., a minor, by and through her
general guardian, JESSICA LONG;
JESSICA LONG, an individual,

        Plaintiffs,

                                    Case No.
                                    2:22-cv-01527-DAD-AC

      vs.

LIEUTENANT JERRY FERNANDEZ, in
his individual capacity;
DETECTIVE JACOB DUNCAN, in his
individual; DETECTIVE JEREMY
ASHBEE, in his individual
capacity, and DOES 1 through 10,

        Defendants.
_____/

VIDEO-RECORDED REMOTE DEPOSITION OF E.L.

TUESDAY, AUGUST 13, 2024

10:10 A.M.

Reported by:  JULIE BANGHART, CSR NO. 10547

E.L.

|   |   |
|---|---|
| | 1 | think that's 30th, of 2021, for example, you went to Goat |
| | 2 | Days in Red Bluff where you learned about breeds of goats; |
| | 3 | is that right? |
| | 4 | A.     Yes. |
| 10:35 | 5 | Q.     Okay.  Now, this is all before you got Cedar.  Right? |
| | 6 | Not -- let me ask that in a better way.  I'm sorry.  That |
| | 7 | was a bad question. |
| | 8 |        If you look down here at the item the second from the |
| | 9 | bottom, it looks like it's April, I think it's 3rd, of 2022. |
| 10:35 | 10 |        Is that what this date is that I'm circling with my |
| | 11 | curser? |
| | 12 | A.     Yes. |
| | 13 | Q.     It says "Bought boer goat." |
| | 14 |        Is that the day that you bought Cedar, if you can |
| 10:35 | 15 | remember? |
| | 16 | A.     I don't remember. |
| | 17 | Q.     Okay.  Does that sound about right, that you got |
| | 18 | Cedar about two-to-three months before the fair? |
| | 19 | A.     I don't remember. |
| 10:35 | 20 | Q.     The question I should have asked you earlier, is this |
| | 21 | your handwriting on this form? |
| | 22 | A.     Yes. |
| | 23 | Q.     Okay.  One thing up here, it looks like it's January |
| | 24 | 9th of 2022, it says "We ate goat at Dairyland Drive." |
| 10:36 | 25 |        Do you remember eating goat in January of 2022? |

**E.L.**

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Where is Dairyland Drive? |
| 3 | | Is that at Mr. Fowler's house? |
| 4 | A. | No. |
| 10:36  5 | Q. | Do you know where that is? |
| 6 | A. | No. |
| 7 | Q. | Was it a 4-H event, like a barbecue or something, |
| 8 | where you ate the goat? | |
| 9 | A. | It was a meeting. |
| 10:36  10 | Q. | A 4-H meeting? |
| 11 | A. | Yes. |

12    Q.    Okay.  And then going up to the second page of this
13    document I'm showing you, there's some dates in May of 2022,
14    and it looks like this talks about the things you learned
10:37  15    about the goats, like how to walk in the show ring.  You
16    learned about the round robin.  You learned how to pass the
17    assessments in the ring and how to handle a goat.
18         Do you remember learning those things?
19    A.    Yes.
10:37  20    Q.    I'm going to stop sharing my screen now, if I can
21    figure out how to do that.  Okay.  All right.
22         When you would go to 4-H meetings for the goat club,
23    would your mom go with you?
24    A.    Yes.
10:37  25    Q.    Did your dad ever go with you?

**E.L.**

```
 1  A.      No.

 2          MR. GORDON:  John -- El███, do you need a break?

 3          THE WITNESS:  Yes.

 4          MR. GORDON:  Okay.  John, take five.

 5          MR. BRIDGES:  That's fine.  Okay.  Let us know when

 6  you're ready.

 7          THE VIDEOGRAPHER:  Our time is 11:32 and we are off

 8  the record.

 9          (Off the record.)

10          THE VIDEOGRAPHER:  Okay.  This is video session

11  number six in the deposition of E.L.  Our time is 11:49 and

12  we are on the record.

13  Q.      MR. BRIDGES:  All right.  Before I forget, there was

14  a question that I wanted to ask you from earlier.

15          Did Mr. Fowler ever tell you or your mom during any

16  of the 4-H meetings that the goats in the program were being

17  raised for meat?

18  A.      Yes.

19  Q.      Do you recall what he told you about that?

20  A.      I don't remember.

21  Q.      When you got Cedar as part of the market goat

22  program, what did you think you were raising Cedar for?

23  A.      I don't remember.

24  Q.      Do you have an understanding now of what you were

25  raising Cedar for?
```

Timestamps in left margin: 11:32 (line 5), 11:49 (line 10), 11:49 (line 15), 11:49 (line 20), 11:50 (line 25)

**E.L.**

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    What's that? |
| 3 | A.    Meat. |
| 4 | Q.    I understand this next -- these next questions I'm |
| 11:50  5 | going to ask you might be difficult to talk about, but do |
| 6 | you know what happened to Cedar? |
| 7 | A.    Yes. |
| 8 | Q.    How did you find out what happened to Cedar? |
| 9 | A.    My mom told me. |
| 11:50  10 | Q.    Okay.  Do you remember when you found out? |
| 11 | A.    No. |
| 12 | Q.    Was it within the last year, if you remember, or you |
| 13 | really just have no idea? |
| 14 | A.    I don't know. |
| 11:51  15 | Q.    Okay.  Do you have any social media accounts? |
| 16 | A.    No. |
| 17 | Q.    Have you ever talked with anyone about Cedar online? |
| 18 | A.    No. |
| 19 | Q.    Do you know someone named Melanie Silva? |
| 11:51  20 | A.    No. |
| 21 | Q.    Do you know someone named BJ McFarland? |
| 22 | A.    No. |
| 23 | Q.    Have you ever heard of or do you know someone named |
| 24 | Kathie Muse? |
| 11:51  25 | A.    Yes. |

**E.L.**

|    |    |
|----|----|
| 1  | A.      I don't remember. |
| 2  | Q.      Did you actually present Cedar at the auction on the |
| 3  | last day of the fair? |
| 4  | A.      Yes. |
| 11:20 5 | Q.      What was your understanding of the auction?  What is |
| 6  | an auction?  Do you know what happens at an auction? |
| 7  | A.      Yes. |
| 8  |         MR. GORDON:  I'm sorry.  I was saying compound, but |
| 9  | proceed. |
| 11:21 10 | Q.      MR. BRIDGES:  So what is your understanding of what |
| 11 | happens at an auction? |
| 12 | A.      Something is placed on auction for people to bid on, |
| 13 | and whoever has the highest bid gets to take the item home. |
| 14 | Q.      Do you know if there was a high builder at the |
| 11:21 15 | auction when you were showing Cedar? |
| 16 | A.      I don't remember. |
| 17 | Q.      Was it your understanding that Cedar was actually |
| 18 | sold at the auction? |
| 19 | A.      Yes. |
| 11:21 20 | Q.      Do you know who was bidding on Cedar? |
| 21 |         MR. GORDON:  Actually that calls for a legal |
| 22 | conclusion, but -- sorry.  I didn't mean to talk over you |
| 23 | John. |
| 24 |         Objection.  Calls for a legal conclusion, but |
| 11:21 25 | proceed. |

E.L.

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | Q.     Was it -- when you were at Mr. Allen's house, was it    |
|       | 2  | your understanding that you were going to leave Cedar there    |
|       | 3  | with Mr. Allen for the rest of Cedar's life?                   |
|       | 4  | A.     Yes.                                                    |
| 11:29 | 5  | Q.     Did your mom tell you anything about seeing Cedar       |
|       | 6  | again when you were at Mr. Allen's house?                      |
|       | 7  | A.     I don't remember.                                       |
|       | 8  | Q.     Have you ever talked to anyone -- let me ask this.      |
|       | 9  |        Do you know what the Shasta County Sheriff's            |
| 11:29 | 10 | Department is?                                                 |
|       | 11 | A.     No.                                                     |
|       | 12 | Q.     Okay.  Let me ask the question a different way then.    |
|       | 13 |        Have you ever talked to any police officer, anyone      |
|       | 14 | from the police, about Cedar?                                  |
| 11:29 | 15 | A.     No.                                                     |
|       | 16 | Q.     Have you ever met any policeman, police officer, with   |
|       | 17 | respect to Cedar?  Anything that had to do with Cedar?  Did    |
|       | 18 | you ever meet with any police officer?                         |
|       | 19 | A.     No.                                                     |
| 11:30 | 20 | Q.     Did you and your mom talk about taking Cedar out of     |
|       | 21 | the fair before the auction happened?                          |
|       | 22 | A.     I don't remember.                                       |
|       | 23 | Q.     After you took Cedar to Mr. Allen's farm -- okay.       |
|       | 24 | You took Cedar to Sacramento and then you took Cedar to Mr.    |
| 11:30 | 25 | Allen's farm.                                                  |

1                    CERTIFICATE OF REPORTER

2

3          I, JULIE BANGHART, a Certified Shorthand Reporter,
   licensed by the State of California, License No. 10547,
4  being empowered to administer oaths and affirmations
   pursuant to Section 2093(b)(1) of the Code of Civil
5  Procedure, do hereby certify:

6          That the witness in the foregoing deposition, E.L.,
   was present at the time and place specified and was by me
7  sworn to testify to the truth, the whole truth, and nothing
   but the truth;

8

9          That said proceeding was taken before me in shorthand
   writing, and was thereafter transcribed under my direction
   by computer-aided transcription;

10

11         That the foregoing transcript constitutes a full,
   true, and accurate record of the proceedings which took
   place;

12

13         That I am not of counsel of attorney for any of the
   parties hereto, or in any way interested in the event of
   this cause, and that I am not related to any of the parties
14 hereto.

15         IN WITNESS WHEREOF, I have hereunto subscribed my
   signature on this 27th of August, 2024.

16

17

18

19

20

21         _____

22              JULIE BANGHART, CSR 10547

23

24

25

# EXHIBIT D

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                  SACRAMENTO DIVISION

4

5

6    E.L., A MINOR, BY AND THROUGH HER     )
     GENERAL GUARDIAN, JESSICA LONG;       )
7    JESSICA LONG, AN INDIVIDUAL,          )
                                           )
8              Plaintiffs,                 )
                                           )
9        vs.                               )  No. 2:22-CV-
                                           )  01527-DAD-AC
10   LIEUTENANT JERRY FERNANDEZ, IN HIS    )
     INDIVIDUAL CAPACITY; DETECTIVE JACOB  )
11   DUNCAN, IN HIS INDIVIDUAL CAPACITY;   )
     DETECTIVE JEREMY ASHBEE, IN HIS       )
12   INDIVIDUAL CAPACITY; AND DOES 1       )
     THROUGH 10,                           )
13                                         )
               Defendants.                 )
14   _____)

15

16

17        DEPOSITION BY ZOOM OF KAY DELALOZA, a witness

18        herein, noticed by Best Best & Krieger, LLP, at

19        9:53 a.m., on Friday, November 17, 2023, before

20        Jana Ruiz, CSR 12837.

21

22

23

24

25

                                              Page 1

1          Q.   All right.

2          So I'm going to try to do my best here to -- let's

3      do it this way.

4          Can you see the image, it's marked 80?

5          It looks like it's a handwritten letter.

6          Do you see that?

7          A.   Yes.

8          Q.   Can you either zoom in or zoom out to the point

9      where you can actually read the writing on it?

10         A.   I can read it.   Well, some of it.

11         Q.   Can you read, to the best of your ability, what

12     it says on the --

13         A.   On this page?   It says --

14         Q.   Start with the one with more writing on it and

15     then go to --

16         A.   It says, "Hello," and I can't read what that

17     says.   It says, "Hello, my name is" -- I think it's her

18     name, and it says, "I am" -- I could barely read it.

19     Says, "Cow Creek 4-H.   This is my first year in 4-H.   I

20     have" -- something -- "to have a meat goat wether for my

21     project.   His name is Cedar.   In this year, I have

22     learned how to" -- I think it says, "feed and I have

23     learned how to cure goat diseases.   This is" -- "this is

24     how I have learned how to take of my meat goat.

25         "My goat is a very" -- I'm not sure what that word

                                              Page  27

1    is, "and he will be very good," and then I'm not sure

2    what that word is, and I think, "in tacos and every

3    other way will be very good and tasty.  The Shasta

4    county fair starts at 8:00 a.m. the day of June 22 at

5    the Shasta County fairgrounds.  Sincerely, E.L."

6         Q.  Have you seen this letter before?

7         A.  Yes.

8         Q.  Where have you seen it?

9         A.  I helped her write it.

10         Q.  Is it called a buyers letter?

11         A.  Yes.

12         Q.  And can you tell me briefly what a buyers

13    letter is.

14         A.  You do a letter for the buyers, and you take it

15    to different kind of companies, your friends, your

16    family, and then they can bid on your goat or buy your

17    goat or your wether.

18         Q.  So you helped her write it.

19         Was that your testimony?

20         A.  There was -- I don't remember if there was two

21    or three other 4-H members that were selling goats, and

22    so one day, we didn't have nothing to do, and on the

23    chalkboard, I just wrote, well, okay, let's work on your

24    letters, and I just gave them ideas.

25         Q.  So do you recall approximately when this buyers

Page 28

1        I, Jana Ruiz, CSR 12837, do hereby declare:

2        That, prior to being examined, the witness named in
the foregoing deposition was by me duly sworn pursuant

3    to Section 30(f)(1) of the Federal Rules of Civil
Procedure and the deposition is a true record of the

4    testimony given by the witness.

5        That said deposition was taken down by me in
shorthand at the time and place therein named and

6    thereafter reduced to text under my direction.

7        _____   That the witness was requested to review the
transcript and make any changes to the

8               transcript as a result of that review
pursuant to Section 30(e) of the Federal

9               Rules of Civil Procedure.

10       _____   No changes have been provided by the witness
during the period allowed.

11

         _____   The changes made by the witness are appended

12               to the transcript.

13       _____   No request was made that the transcript be
reviewed pursuant to Section 30(e) of the

14               Federal Rules of Civil Procedure.

15       I further declare that I have no interest in the
event of the action.

16

         I declare under penalty of perjury under the laws

17   of the United States of America that the foregoing is
true and correct.

18

         WITNESS my hand this 5th day of December, 2023.

19

20

21

22

23

24   Jana Ruiz, CSR 12837

25

                                              Page 48

EXHIBIT E

**In The Matter Of:**

*LONG vs.*

*FERNANDEZ*

---

*KATHIE MUSE*

*November 13, 2023*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File K. Muse.txt

Min-U-Script® with Word Index

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                       SACRAMENTO DIVISION

4    E.L., a minor, by and through      )
     her general guardian, JESSICA      )
5    LONG; JESSICA LONG, an             )
     individual,                        )
6                                       )
                       Plaintiffs,      )
7                                       )   NO. 2:22-cv-01527-
        vs.                             )   DAD-AC
8                                       )
     LIEUTENANT JERRY FERNANDEZ,        )
9    individually and in his           )
     individual capacity as Sheriff    )
10   for the County of Shasta;         )
     DETECTIVE JACOB DUNCAN,            )
11   individually and in his           )
     individual capacity as Sheriff    )
12   for the County of Shasta;         )
     DETECTIVE JEREMY ASHBEE,           )
13   individually and in his           )
     individual capacity as Sheriff    )
14   for the County of Shasta;         )
     SHASTA DISTRICT FAIR AND EVENT     )
15   CENTER, a district agricultural   )
     association; COUNTY OF SHASTA;     )
16   SHASTA COUNTY SHERIFF'S            )
     DEPARTMENT; Melanie Silva, in      )
17   her individual capacity; BJ        )
     MACFARLANE, in his individual     )
18   capacity; and DOES 1 through       )
     10,                                )
19                                      )
                       Defendants.      )
20   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
                          ---oOo-
21              MONDAY, NOVEMBER 13, 2023

22                       9:03 a.m.

23        VIDEOTAPED DEPOSITION OF KATHIE MUSE

24                      ---oOo---

25      Reported by:  CAROL J. CHASE, CSR No. 13538

**KATHIE MUSE**

```
 1        Q      Actually, I don't.  It's fine.
 2               Did -- did you fill out --
 3        A      There's about 26 other people.
 4        Q      Did you fill out this form for any of them
 5   or --
 6        A      No.
 7        Q      -- had any of them -- so none of them did.
 8               Did you get phone calls from all of them?
 9        A      Most of them, yes.
10        Q      But some of you didn't?
11        A      Some of 'em had -- some of 'em might have
12   texted me.  I mean, I bid for people.  I may have
13   called them.  Most of the people I bid for are
14   previous people that have bid before.
15        Q      Okay.  When was the last time that you
16   filled out one of these forms or when one of the
17   buyers filled out one of these forms for you?
18        A      I don't recall.
19        Q      You don't recall.  Within the last five
20   years of auction?
21        A      I -- it all depends and if it's a new
22   buyer.  I -- I don't recall.
23        Q      Well, so you bid for Brian Dahle these --
24   before this year?
25        A      Yes.
```

10:09:09  (line 5)
10:09:14  (line 10)
10:09:27  (line 15)
10:09:38  (line 20)
10:09:47  (line 25)

**KATHIE MUSE**

| | |
|---|---|
| 1 | Q    Okay.  When did you first start -- |
| 2 | A    Before this year? |
| 3 | Q    Sorry, yeah.  No, you're correct.  Before |
| 4 | the 2022 year. |
| 10:09:50 5 | A    Yes. |
| 6 | Q    Okay.  How many times have you bid for him |
| 7 | prior to that year? |
| 8 | A    Approximately four. |
| 9 | Q    Approximately four.  Okay.  And same for |
| 10:09:57 10 | Megan? |
| 11 | A    No. |
| 12 | Q    You -- more bids for her? |
| 13 | A    No.  More bids for Brian. |
| 14 | Q    Okay.  How many for Megan? |
| 10:10:06 15 | A    Approximately two. |
| 16 | Q    Approximately two.  Okay.  Okay. |
| 17 | (Vibrating phone interruption.) |
| 18 | BY MR. GORDON: |
| 19 | Q    Is that you?  Okay.  You needed to take it? |
| 10:10:19 20 | A    No. |
| 21 | Q    You sure?  Okay. |
| 22 | Did you -- did the Dahles fill out this |
| 23 | form for you in any other years? |
| 24 | A    I don't recall. |
| 10:10:51 25 | Q    Don't recall.  Okay.  So they might not |

**KATHIE MUSE**

| | |
|---|---|
| 1 | A      Approximately the same amount of time. |
| 2 | Q      Did you meet them at the same time? |
| 3 | A      Yes. |
| 4 | Q      Okay.  Through -- you can't recall but |
| 09:41:05  5 | presumably some fundraiser? |
| 6 | A      Yes. |
| 7 | Q      Okay.  All right.  And same thing.  Social |
| 8 | relationship, you're friends with her? |
| 9 | A      Correct. |
| 09:41:16  10 | Q      Okay.  All right.  Do you -- do you talk |
| 11 | with her every three months or so also? |
| 12 | A       I probably talk to her more often than |
| 13 | Brian.  So probably one every six weeks I talk to |
| 14 | Megan. |
| 09:41:30  15 | Q      Okay.  Have you have spoken to them about |
| 16 | this case?  Or let's say, have you spoken to |
| 17 | Brian Dahle about this case? |
| 18 | A      Yes. |
| 19 | Q      What did you discuss? |
| 09:41:43  20 | A      When it first happened, I first told him |
| 21 | that he was the one who purchased the animal. |
| 22 | Q      You told him he was the one that purchased |
| 23 | the animal. |
| 24 | A      And then donated it back to the barbecue. |
| 09:41:57  25 | Q      Okay.  What was his reaction? |

**KATHIE MUSE**

1    I apologize, Ms. Muse.

2          You did bid for Senator Brian Dahle,

3    correct?

4    A    Correct.

12:01:47  5    Q    All right.  All right.  Okay.  And what

6    else?

7          And on paragraph 40 you did claim to be the

8    owner of Cedar on behalf of -- on behalf of 4-H,

9    correct?

12:02:12 10    A    No.

11    Q    Or the barbecue -- 4-H -- okay.  4-H

12    Community Barbecue?

13    A    4-H/FFA --

14    Q    Okay.

12:02:18 15    A    -- Community Barbecue.

16    Q    Is there -- if I say 4-H Community

17    Barbecue, is there another -- is that separate than

18    the 4-H/FFA Community Barbecue?

19    A    No.  It's the same.  You just keep

12:02:27 20    forgetting FFA on there.

21    Q    I know.  You heard -- that's what I'm

22    referring to.  I don't think anyone will be

23    confused.  I -- what I was asking you because if

24    there's another one and that's why you're so

12:02:36 25    sensitive to the naming.

**KATHIE MUSE**

1    Jerry Fernandez -- Lieutenant Jerry Fernandez that I
2    wanted to press charges.
3        Q     And when -- when day was?
4        A     I can't recall which day that was.
11:44:52  5        Q     Okay.  Give me your best estimate, please?
6        A     It happened on the 25th.  I'd say about the
7    29th or 30th.
8        Q     29th.  So --
9        A     Of June.
11:45:02 10        Q     Yeah, I understand.  So that was
11    a Wednesday, I believe.  Midweek.
12        A     (Indicating.)
13        Q     Okay.  Your estimate?
14        A     Yeah.
11:45:11 15        Q     That's the 29th?  Okay.  I was just giving
16    the date in case that refreshed your memory more.
17        A     No.
18        Q     No.  Okay.  So midweek you, about that time
19    the 29TH, you called Fernandez.  Did you call him on
11:45:21 20    his cell?
21        A     I believe we did talk on his cell -- well,
22    he might have been at the office.  I don't know.
23        Q     You don't know.  Okay.  Was this during
24    business hours or after business hours?
11:45:32 25        A     During business hours.

**KATHIE MUSE**

1    Q    And what did you say to him when you called
2    him?
3    A    I don't know if I called him.  I know we
4    talked.
11:45:40 5    Q    Okay.  What did you say to --
6    A    But I don't know on that particular day.
7    Q    Okay.  What did you say whenever you talked
8    on the conversation that you're referring to,
9    whenever that happened, the day -- the 29th or
11:45:53 10    within a few days of that, whenever it was?
11    A    That they were not going to bring the goat
12    back.  Did I want to press charges?  And I said,
13    yes.
14    Q    Okay.  And so then you had a subsequent
11:46:03 15    call with someone you didn't know who -- who, again,
16    was following up and you said you wanted to press
17    charges?
18    A    Correct.
19    Q    Okay.  So two calls.  All right.
11:46:21 20    Why didn't you just go file a civil action
21    and get a Writ of Possession?
22    A    I don't know what that is.
23    Q    Was it ever offered to you or did anyone
24    say to you just go to court and file your own
11:46:34 25    lawsuit?

**KATHIE MUSE**

1        Q        That was the day, yes.

2        A        Then I do -- I did have contact with them.

3        Q        Okay.  And you -- so for B.J., you spoke

4    with him at least once.  Do you think it was

11:39:39  5    probably more than once, though?

6        A        Yes.

7        Q        Okay.  And same thing with Fernandez,

8    probably more than once?

9        A        Yes.

11:39:44 10        Q        Okay.  All right.  Okay.  And Fernandez

11    testified that you instructed him to turn over Cedar

12    to B.J.  Is that something you discussed with

13    Fernandez on the phone that day?

14        A        That was my suggestion was to turn him on

11:40:02 15    over to B.J. because B.J. had a place for him, yes.

16        Q        Okay.  Okay.  And that would have been that

17    date, do you believe, or beforehand?

18        A        It was -- was before they picked Cedar

19    up --

11:40:10 20        Q        No, I understand that.  It went national,

21    yeah.  But was it -- the 8th, the day of is to your

22    recollection that's when that con- -- that's --

23        A        Yes.

24        Q        -- when you would have talked to --

11:40:17 25        A        Yes.

**KATHIE MUSE**

1          Q      That's fine.  Okay.  Let's take five for a

2     moment.

3                 THE VIDEOGRAPHER:  We're off the record.

4     The time is 1438.

14:39:04  5                 (Whereupon, recess was taken from

6                 2:38 p.m. to 2:46 p.m.)

7                 THE VIDEOGRAPHER:  We're back on the record

8     and the time is 1446.

9     BY MR. GORDON:

14:46:46 10          Q      Okay.  So just so I have the timeline

11     correctly, Cedar's taken into custody by the

12     sheriffs on July 8th.  At some point that day, you

13     tell Fernandez that he can -- he can drop him off --

14     or drop Cedar off after B.J.'s house for you to

14:47:12 15     B.J.'s and then B.J. is going to keep him for some

16     period of time, correct?

17          A      Correct.

18          Q      So -- and Cedar didn't go anywhere else

19     after he was dropped off at B.J.'s, correct --

14:47:20 20          A      Correct.

21          Q      -- to your knowledge?  Okay.

22          A      To my knowledge, no.

23          Q      Okay.  All right.  Okay.  So basically when

24     he was at B.J.'s property, B.J. was keeping him

14:47:29 25     there for you while the two of you waited for some

CERTIFICATE OF REPORTER

1

2

3       I, CAROL J. CHASE, a Certified Shorthand

4   Reporter, licensed by the State of California,

5   License No. 13538, being empowered to administer

6   oaths and affirmations pursuant to Section 2093 (b)

7   of the Code of Civil Procedure, do hereby certify:

8       That the witness in the foregoing deposition,

9   KATHIE MUSE, was present at the time and place

10  specified and was by me sworn to testify to the

11  truth, the whole truth, and nothing but the truth;

12      That said proceeding was taken before me in

13  shorthand writing, and was thereafter transcribed

14  under my direction by computer-aided transcription;

15  That the foregoing transcript constitutes a full,

16  true, and accurate record of the proceeding which

17  took place; That I am not of counsel or attorney for

18  any of the parties hereto, or in any way interested

19  in the event of this cause, and that I am not

20  related to any of the parties hereto.

21      IN WITNESS WHEREOF, I have hereunto subscribed

22  my signature on this 25th day of November, 2023.

23

24

25                    _____
                        CAROL J. CHASE

# EXHIBIT F

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*LIEUTENANT JERRY FERNANDEZ*
*August 21, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File J. Fernandez.txt
**Min-U-Script® with Word Index**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

---OOO-

E.L. a minor, by and through her general
guardian, JESSICA LONG; JESSICA LONG, an
individual,

             Plaintiffs,

                              Case No. 2:22-cv
               2:22-cv-01527

    vs.

LIEUTENANT JERRY FERNANDEZ individually
and in his individual capacity as
Sheriff for the County of Shasta;
DETECTIVE JACOB DUNCAN, individually and
in his individual capacity as Sheriff for
the County of Shasta; DETECTIVE JEREMY
ASHBEE, individually and in his
individual capacity for the County of
Shasta; SHASTA DISTRICT FAIR AND EVENT
CENTER, a district agricultural
association; COUNTY OF SHASTA; SHASTA
COUNTY SHERIFF'S DEPARTMENT; MELANIE
SILVA, in her individual capacity; BJ
MACFARLANE, in his individual capacity;
and DOES 1 through 10,

             Defendants.

_____/

VIDEO RECORDED DEPOSITION OF

LIEUTENANT JERRY FERNANDEZ

MONDAY, AUGUST 21, 2023

9:41 a.m.

Reported by:  JULIE BANGHART, CSR NO. 10547

**Challe, Fisher & Morfin**
**Redding, California  (530)246-0942**

**LIEUTENANT JERRY FERNANDEZ**

1   A.      So at that point we had learned Ms. Stover admitted
2   that she had communicated with Jessica and suggested -- I
3   remember the name of the farm was like Billy's Mini Farm,
4   something like that, which was located in Sonoma County.
04:09   5   Q.      Yeah.
6   A.      So while we were on scene, we looked up that farm.
7   We were able to find an address in Petaluma.
8   Q.      Okay.
9   A.      We were also able to find a contact information phone
04:09  10   number.
11   Q.      Okay.
12   A.      So at that time I thanked everyone for, you know, the
13   inconvenience, obviously.  And then --
14   Q.      Yeah, she sounded like she was having a borderline
04:09  15   panic attack.
16   A.      Yeah.  I mean, she wasn't really forthcoming with us
17   in the beginning.  Luckily, Detective Duncan pried a little
18   bit deeper and was able to figure out where it was.  So then
19   we researched where the location was through like Google
04:09  20   Earth or Maps.
21   Q.      Yeah.
22   A.      I determined that it was roughly like 40 minutes
23   away, 45 minutes away.
24   Q.      Yeah.
04:09  25   A.      So we decided to leave there and drive towards that

**LIEUTENANT JERRY FERNANDEZ**

1   Q.     All right.  And basically through school activities

2   that might have involved both your children?

3   A.     Yes.

4   Q.     Okay.  All right.  Okay.  Does -- does Bruce have

11:38  5   children?

6   A.     Yes.

7   Q.     Yes.  Okay.  All right.

8          Are they involved in 4-H also or FFA?

9   A.     They're -- no, I don't -- I think they show

11:38  10   independent.

11   Q.     Independently.

12          So they go around to other non 4-H auctions and show?

13   A.     No, they show at the fair, but they're independent.

14   So you can show 4-H, FFA or independent.

11:38  15   Q.     Okay.  I remember seeing something like that in the

16   rules.

17          So you called Bruce Macfarlane.  You already had his

18   number.  And he was the first person you called?

19   A.     Back then?

11:38  20   Q.     No, no, for the investigation.

21   A.     Yes.  So we're back on the investigation.

22   Q.     It's like a movie.  We're jumping through different

23   times.  My apologies.  If you get confused, tell me.

24          So he was the first person you called.

11:39  25          And do you remember what day you called him?

**LIEUTENANT JERRY FERNANDEZ**

1    A.    I can't remember.  I'd have to refer to a report as
2    far as when I actually called him.
3    Q.    Okay.  We'll get to that.  I think I know the report
4    you're referring to.  I just want to see what you recall.
11:39  5    Do you remember what he told you when you spoke with
6    him?
7    A.    I recall him saying that they were -- the day of the
8    sale, which was June 25th of 2022, they were loading up the
9    animals that were auctioned at the sale that day, and it was
11:39 10    roughly like 10:00 or 10:30 in the evening they had learned
11    that they were missing a goat.  And then through the course
12    of that conversation, he had reached out to the community
13    leader, Chad Fowler, who advised that the goat that was
14    missing belonged to E.L. and Jessica Long and that he
11:40 15    suspected that the mom had stolen the goat.
16    Q.    Okay.  That Fouler suspected it?
17    A.    Right.  And that obviously now Mr. Macfarlane was
18    suspecting that she had stolen the goat.  Obviously, the
19    goat was stolen off of the property or missing from the
11:40 20    property.  It was missing from the property.
21    Q.    Yeah.  Okay.  All right.  All right.  All right.
22    Okay.  Anything else?
23    A.    Yeah.  We had talked about he had mentioned that --
24    because by this time there was already communication between
11:40 25    Ms. Long and the fair via email.  So he told me about an

**LIEUTENANT JERRY FERNANDEZ**

1    email.  She admitted to stealing -- or stealing the goat.

2    Q.      Removing.  But it's fine.

3    A.      In the email she admits to taking the goat from the

4    fair and that was basically trying to see if the fair would

11:41  5    allow them to keep the goat or come up with some other

6    option.  He had told me that they had responded and said no,

7    that the goat, right, based on rules and everything else and

8    the law, needed to be returned immediately.  Obviously, she

9    didn't, which is why then law enforcement was notified.

11:41  10         So at that point that was my recollection of that

11    conversation.  I asked him to please provide me with any

12    documentations from the fair and any documentations that

13    Ms. Long had sent them.

14    Q.      Okay.

11:41  15    A.      Which he did later that -- within a day or two or

16    that same day.  I can't remember.

17    Q.      What -- what did he provide you?

18    A.      He provided me with a -- so there was the email from

19    Ms. Long, the initial email from Ms. Long.

11:41  20    Q.      The long one.  Not in her last name, but it's fairly

21    lengthy.

22    A.      Yes.  So a lengthy one where she -- so he provided me

23    with that first email.

24    Q.      Okay.

11:41  25    A.      He provided me with Ms. Silva's response to that

**LIEUTENANT JERRY FERNANDEZ**

```
 1   email.
 2   Q.      Okay.
 3   A.      He provided me with the liability, accountability
 4   waiver information as well as the online registration form
11:42 5  that was completed by Ms. Long.
 6   Q.      Okay.
 7   A.      And then he provided me with the bill of sale from
 8   the auction.
 9   Q.      When you say "bill of sale," do you mean the --
11:42 10 A.      The sale invoice.
11   Q.      -- sales invoice on top?
12   A.      Yeah, the sales invoice.
13   Q.      All right.
14   A.      Excuse me.
11:42 15 Q.      Do you want to get some water?
16   A.      No.  I probably should have ate breakfast this
17   morning.
18   Q.      I never eat breakfast.
19   A.      It's hard sometimes.
11:42 20 Q.      I do that time-restricted eating thing.
21   A.      Oh, yeah.  You're on that.
22   Q.      A few years, yeah.  You get -- you actually -- it's
23   not effective after a certain point because you get used to
24   just not eating and then it -- you want to like shock your
11:43 25 body.  So I'm supposed to be uncomfortable, but I -- I'll go
```

**LIEUTENANT JERRY FERNANDEZ**

1    off.

2    Q.    Okay.  Fair enough.  All right.

3          So either Silva or Macfarlane gave it to you, gave

4    you those documents?

11:44  5    A.    Correct.

6    Q.    Okay.  And -- all right.  So they gave you those

7    documents and what did you do next?

8    A.    So I, obviously, I perused through those documents.

9    Q.    And this is still the same day when they --

11:44  10   A.    I wouldn't say the same day.  At some point after I

11   received them, I started going through the documents.

12   Q.    Yeah.

13   A.    I can't say if it was the same day.  Obviously, I

14   read them.

11:44  15   Q.    About the same day?

16   A.    Yeah, same time frame.

17   Q.    Okay.  All right.

18   A.    So I reviewed the documentation that I received.

19   Q.    Okay.

11:44  20   A.    And then I also went online and pulled the fair

21   rules, the handbook for the fair, and basically put all that

22   together and then documented, based on everything, my

23   investigation.

24   Q.    And your conclusion?

11:45  25   A.    Yeah, and my conclusion.

**LIEUTENANT JERRY FERNANDEZ**

```
       1   Q.     The very last one.  Okay.  That's 68.  This one here
       2   that's black and white?  Do you see that?
       3   A.     Yeah.
       4   Q.     68.
04:50  5   A.     So 65 through 68.
       6   Q.     65 through 68.  That's where it is.  Okay.
       7          So then at this point you're in Napa County.
       8          What time is it at this point?
       9   A.     9:00, a little after 9:00 probably.
04:51 10   Q.     A little after 9:00.  Okay.
      11          And then you headed back to Redding?
      12   A.     Yes, sir.
      13   Q.     Okay.  And --
      14   A.     Well, we headed back towards north.
04:51 15   Q.     Headed north.  Okay.
      16          Were you going -- well, someplace on the way?
      17   A.     Yeah.  So we were going to meet -- so at that point I
      18   had notified Kathi that we had located the goat and that we
      19   were on our way back, as well as BJ Mcfarlane or Bruce
04:51 20   Mcfarlane.
      21   Q.     Yeah.
      22   A.     And then --
      23   Q.     We call him BJ.  We know who he -- that's the name --
      24   A.     Yeah, that's how I've know him.
04:51 25   Q.     -- my client calls him.
```

**LIEUTENANT JERRY FERNANDEZ**

1  A.      And then due to the time of -- projected time of our

2  arrival back into Shasta County, Ms. Muse requested that we

3  leave the goat in the care and custody of Mcfarlane.

4  Q.      Okay.  So did you speak with Kathi Muse on the phone?

04:52  5  A.      Yes.

6  Q.      Okay.  What did you -- what did she say on the phone?

7  A.      Just -- I can't recall everything she said.  I think

8  she was excited that we got the goat and that to -- based on

9  the time of night, to just leave it with her agent, which

04:52  10  would have been Mcfarlane.

11  Q.    Okay.  Did she give you any -- give any documentation

12  she was -- he was her agent or she just said leave him with

13  Mcfarlane?  Did she use the term "agent"?

14  A.    No, that's my term.  Yeah.

04:52  15  Q.    All right.  All right.  And -- now, you called her?

16  A.    To the best of my recollection, yes.

17  Q.    Okay.  And about how long did you speak with her?

18  A.    Not very long, like 30 seconds, a minute.

19  Q.    Just said "We got him?"

04:52  20  A.    Yeah.  "We got him.  We're on our way back.  Probably

21  be home around midnight."

22  Q.    Okay.

23  A.    And then she -- and then I -- either she suggested

24  that I leave him with Mcfarlane, and I reached out to

04:53  25  Mcfarlane, let him know per Muse she wanted me to leave him

**LIEUTENANT JERRY FERNANDEZ**

```
 1  with him.  I know that that was worked out between the three
 2  of us, and then --
 3  Q.    When was that worked out between the three of you?
 4  Before you went down?
```
04:53
```
 5  A.    No.  It's on the way back.
 6  Q.    On your way back.  Okay.
 7  A.    Yeah.
 8  Q.    Did you merge the calls, so they all spoke at once?
 9  A.    No, no.
```
04:53
```
10  Q.    So you called Kathi first and then you called
11  Bruce --
12  A.    Yep.
13  Q.    -- afterwards?
14  A.    Yes, sir.
```
04:53
```
15  Q.    Okay.  And Bruce said was okay with receiving Cedar
16  late at night, presumably?
17  A.    Yes.
18  Q.    What time did you get to Mcfarlane's?
19        Roughly like 12:30 or -- yeah, 12:30.  00:30 hours in
```
04:53
```
20  the morning.  So that would have been Saturday morning.
21  Q.    Okay.  Did Kathi mention to you on that call or any
22  of the prior calls that -- that she wanted him back by that
23  date for the FFA 4-H barbecue?
24  A.    No.
```
04:53
```
25  Q.    Was that your understanding that she wanted him back
```

1                    CERTIFICATE OF REPORTER

2

3         I, JULIE BANGHART, a Certified Shorthand Reporter,
   licensed by the State of California, License No. 10547,
4  being empowered to administer oaths and affirmations
   pursuant to Section 2093(b)(1) of the Code of Civil
5  Procedure, do hereby certify:

6         That the witness in the foregoing deposition,
   LIEUTENANT JERRY FERNANDEZ, was present at the time and
7  place specified and was by me sworn to testify to the truth,
   the whole truth, and nothing but the truth;

8

9         That said proceeding was taken before me in shorthand
   writing, and was thereafter transcribed under my direction
   by computer-aided transcription;

10

11        That the foregoing transcript constitutes a full,
   true, and accurate record of the proceedings which took
   place;

12

13        That I am not of counsel of attorney for any of the
   parties hereto, or in any way interested in the event of
   this cause, and that I am not related to any of the parties
14 hereto.

15        IN WITNESS WHEREOF, I have hereunto subscribed my
   signature on this 11th day of October, 2023.

16

17

18

19

20                     _____

21                     JULIE BANGHART, CSR 10547

22

23

24

25

# EXHIBIT G

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                       SACRAMENTO DIVISION

4

5

6       E.L., A MINOR, BY AND THROUGH HER      )
        GENERAL GUARDIAN, JESSICA LONG;        )
7       JESSICA LONG, AN INDIVIDUAL,           )
                                               )
8                    Plaintiffs,               )
                                               )
9           vs.                                )   No. 2:22-CV-
                                               )   01527-DAD-AC
10      LIEUTENANT JERRY FERNANDEZ, IN HIS     )
        INDIVIDUAL CAPACITY; DETECTIVE JACOB   )
11      DUNCAN, IN HIS INDIVIDUAL CAPACITY;    )
        DETECTIVE JEREMY ASHBEE, IN HIS        )
12      INDIVIDUAL CAPACITY; AND DOES 1        )
        THROUGH 10,                            )
13                                             )
                     Defendants.               )
14      _____)

15

16

17           DEPOSITION BY ZOOM OF RAYMOND ALLEN, a witness

18           herein, noticed by Best Best & Krieger, LLP, at

19           2:01 p.m., on Monday, November 6, 2023, before

20           Jana Ruiz, CSR 12837.

21

22

23

24

25

                                                    Page 1

1          Q.  Okay.

2          So in June of 2022, you learned of Jessica Long.

3     Your information was given to her by Bleating Hearts

4     Farm; is that correct?

5          A.  Yes.

6          Q.  Did Jessica reach out to you in June?  Did she

7     try to call you?

8          A.  I believe it was through text message.

9          Q.  Do you recall the first time, the date of the

10    first time she tried to text you in June?

11         A.  No.

12         Q.  You recall what her first text message, like

13    the substance of it was?

14         A.  I have a goat that I would like to donate to

15    you.

16         Q.  Okay.

17         You say that you've got 11 pages of text messages

18    with you; correct?

19         A.  That's correct.

20         Q.  Is that first communication that you're talking

21    about within those 11 pages?

22         A.  Yes.

23         Q.  Do you know if that first communication that

24    you just indicated, did she actually use the word

25    "donate" to you?

Page 17

1    A.   Yes.

2    Q.   It's okay if you want to look at your documents

3    that you got with you to refresh your recollection.

4    A.   Okay.

5    Q.   If you wouldn't mind, maybe take a look at that

6    and then you can tell me if you're able to recall the

7    date that she sent it and your response to it.

8    A.   It says here June 26, 2022, and my response

9    was, I gave her my address.

10   Q.   Okay.

11   Did you respond the same day?

12   A.   Yes.

13   Q.   When you gave her your address, why did you

14   give her your address?

15   A.   So I can get a goat donated to me.

16   Q.   Understood.

17   Now, you have experience with goats; is that

18   correct?

19   A.   Yes.

20   Q.   You currently have your own goat sanctuary?

21   A.   No.

22   Q.   Do you have a goat grazing service?

23   A.   That's correct.

24   Q.   Is it called Billy's Mini Farm?

25   A.   Yes.

Litigation Services

A Veritext Company                    www.veritext.com

1              Q.   So you had coordinated for her to bring Cedar

2        to your property; correct?

3              A.   Yes.

4              Q.   Once they arrived and stopped, what was the

5        next thing you saw Jessica Long do?

6              A.   She got out and took the goat out of the

7        vehicle.

8              Q.   And after she took the goat out of the vehicle,

9        what was the next thing that you saw?

10             A.   I took the goat by the lead and put it into my

11       field.

12             Q.   You said you took the goat by the lead?

13             A.   Uh-huh.

14             Q.   And put the goat where?

15             A.   In my field.

16             Q.   Did the goat have any tags on it at that point?

17             A.   Not that I recall.

18             Q.   Now, what was your understanding of why Jessica

19       was giving you Cedar?

20             A.   To donate it to me.

21             Q.   And did she say anything to you when she was

22       giving you Cedar?

23             A.   Not that I recall.

24             Q.   And you again -- strike that.

25             So after you took Cedar and put him on your

                                                    Page  27

```
 1              Q.   Have they ever placed any goats with you
 2       before?
 3              A.   Yes.
 4              Q.   And who do you deal with at Bleating Hearts?
 5              A.   There's a man there that we deal with.
 6              Q.   Is that man Justin Starkey?
 7              A.   I don't recall his name.
 8              Q.   You don't recall his name, okay.
 9              You might not recall his name, but does
10       Justin Starkey sound familiar?
11              A.   Not really, no.
12              Q.   Not really, no.  Okay.
13              And did anyone at Bleating Hearts talk to you about
14       Jessica Long or Cedar or E.L.?
15              A.   No.
16              Q.   So Jessica reached out to you -- it's your
17       testimony Jessica reached out to you first; correct?
18              So Bleating Hearts did not tell you of Jessica.
19       She reached out to you first.
20              Is that accurate?
21              A.   That's correct.
22              Q.   So what was your understanding of why she was
23       placing him at your farm or dropping him off at your
24       farm?
25              A.   She wanted to donate us a goat.
```

Page  44

1      before he was donated to you?

2          A.  I don't have an understanding who owned it.

3          Q.  Do you believe from your interactions with

4      Jessica Long that it was her goat, or it was your

5      understanding it was her daughter's goat?

6          What is your understanding of who owned it --

7          A.  The best understanding would be her goat,

8      Jessica's.

9          Q.  What is that based on?

10         A.  Just her donating it to me.

11         Q.  Okay.

12         A.  Just communication with her.

13         Q.  Sure, okay.

14         And from what you've said earlier, I know you said

15     you were not holding the goat for them; correct?

16         A.  Yes.

17         Q.  As far as you understood, they transferred

18     ownership of the goat to you when they donated it to

19     you; is that correct?

20         A.  Correct.

21         Q.  Do you ever give away your goats to anyone

22     else?

23         A.  No.

24         Q.  Have you ever sold any of your goats?

25         A.  No.

Page 71

1          So he had no breeding value; right?

2          A.  He has no breeding value or milk value.  He

3     needs teats to give milk, and he has no sperm to give

4     more offspring.

5          Q.  Right.

6          And he wasn't going to be sold for meat.  So he had

7     no meat value either; correct?

8          A.  Correct.

9          Q.  What do you do to maintain -- or let me ask you

10    this.  Let me start over again.

11         What maintenance costs do you have for the goats

12    that you maintain on your farm?

13         A.  Different amounts per goat.

14         Q.  Do you pay for feed for the goats, or is there

15    enough grazing land that you don't have to pay for feed?

16         A.  Both.  I pay for feed and grazing land.

17         Q.  Do you vaccinate your goats?

18         A.  Yes.

19         Q.  Do you give them minerals or supplements,

20    anything like that, in addition to whatever feed you

21    give them?

22         A.  Yes.

23         Q.  Do you have an estimate about how much it would

24    cost per year to take care of a goat like Cedar?

25         A.  No.

Litigation Services
A Veritext Company                    www.veritext.com

1      Q.   Would it cost you more than a hundred dollars?

2      A.   Yes.

3      Q.   More than $500?

4      A.   No.

5      Q.   Okay.

6           What's the life expectancy of a Boer goat like

7      Cedar?

8      A.   I don't know.

9      Q.   When -- well, let me ask you this.

10          Did you have an agreement, any sort of agreement

11     with Jessica Long or her daughter about whether they

12     could visit your farm and see Cedar after they donated

13     him to you?

14     A.   No.

15     Q.   Did you have any agreement to send them

16     pictures or send them videos to show them how he was

17     doing?

18     A.   No.

19     Q.   When they gave you the goat, was it your

20     expectation that the Longs would ever see the goat

21     again?

22     A.   No.

23     Q.   Do you have an estimate of how long you had him

24     in your possession?  Was it about two or three weeks?

25     A.   Approximately somewhere around that, maybe

Page 74

1          Sanctuary.  Based on testimony that we've received from

2          other individuals, ultimately, I guess some information

3          was disclosed that the goat was on your property instead

4          of at that location.

5                 Did you, on July 8th, 2022, or thereabouts, did you

6          receive a telephone call from anyone from the

7          Shasta County Sheriff's Department?

8                 A.  Yes.

9                 Q.  And do you recall approximately -- do you

10         recall on what phone number that call was received?

11                A.  My phone.

12                Q.  Okay.

13                And was that your personal, like a personal phone

14         or work phone?

15                A.  Personal cell phone.

16                Q.  And can you tell me approximately when you

17         received that call?

18                A.  I don't recall the time.

19                Q.  Can you give me an estimate, morning, noon,

20         night?

21                A.  I'd say more towards the nighttime.

22                Q.  And when you received that call, can you tell

23         me, do you know who made that call to you?

24                A.  When I answered, it was someone from a

25         sheriff's department, they stated.

Litigation Services
A Veritext Company              www.veritext.com

1        Q.   Can you tell me what else they stated to you?

2        A.   That we're here to pick up a goat.

3        Q.   Okay.

4        Did they say anything else to you during that

5   conversation?

6        A.   Not that I recall.

7        Q.   Do you recall if the person from the sheriff's

8   department asked if they had consent to retrieve Cedar

9   from your property?

10       A.   Yes.

11       Q.   And did you give them consent to retrieve Cedar

12  from your property?

13       A.   Yes.

14       Q.   Did you at some point tell them where Cedar was

15  to be located on your property?

16       A.   Yes.

17       Q.   And do you know if Cedar ultimately was

18  retrieved by the sheriff's department from your

19  property?

20       A.   Yes, he was.

21       Q.   When Jessica Long first donated Cedar to you

22  back when she first visited your property, was it your

23  understanding that from that point forward, Cedar was

24  your property?

25       A.   Correct.

                                        Page 31

1          I, Jana Ruiz, CSR 12837, do hereby declare:

2          That, prior to being examined, the witness named in
the foregoing deposition was by me duly sworn pursuant

3      to Section 30(f)(1) of the Federal Rules of Civil
Procedure and the deposition is a true record of the

4      testimony given by the witness.

5          That said deposition was taken down by me remotely
in shorthand at the time and place therein named and

6      thereafter reduced to text under my direction.

7          _____  That the witness was requested to review the
transcript and make any changes to the

8                 transcript as a result of that review
pursuant to Section 30(e) of the Federal

9                 Rules of Civil Procedure.

10         _____  No changes have been provided by the witness
during the period allowed.

11

           _____  The changes made by the witness are appended
12                 to the transcript.

13         _____  No request was made that the transcript be
reviewed pursuant to Section 30(e) of the

14                 Federal Rules of Civil Procedure.

15         I further declare that I have no interest in the
event of the action.

16

           I declare under penalty of perjury under the laws
17     of the United States of America that the foregoing is
true and correct.

18

           WITNESS my hand this 21st day of November, 2023.

19

20         Jana Ruiz

21

       Jana Ruiz, CSR 12837

22

23

24

25

                                              Page 78

# EXHIBIT H

Exhibit *B* 89/33
Date/Wit: *Julianne*
Julie Banghart CSR





# Shasta County Sheriff's Office

Incident # : 22S019984

Reporting Officer: Fernandez, Jerry

Report Time: 06/29/2022 11:00:00

## Incident

| Incident Nature | Address | Occurred From |
|---|---|---|
| GRAND THEFT REPORT | ███████████ | 25/2022 09:00:00 |

| Occurred To | Received By | How Received |
|---|---|---|
| 06/25/2022 22:30:00 | Severson, Reed | On View |

| Contact | Disposition | |
|---|---|---|
| | Closed Case | |

| Disposition Date | Cleared | |
|---|---|---|
| 07/08/2022 | N | |

| Cleared Date | Clearance | Cargo Theft Related |
|---|---|---|
| | Report Required | N |

Responding Officer(s)
Fernandez, Jerry

## Offenses

### All Other Larceny

| Completed? | Method Of Entry | Gambling Motivated? |
|---|---|---|
| C | | |

| Premises Entered? | Location Type | Cargo Theft Related? |
|---|---|---|
| | 39 | |

| Statute | Description | Category |
|---|---|---|
| 487A(A) PC F (23248) | GRAND THEFT ANIMAL | PC |

Bias Motivation

88

Offender Used

N

## Persons

## FOWLER, CHAD A
## Witness



| Address | Phone | DOB |
|---|---|---|

| Race | Sex | Ethnicity |
|---|---|---|
| White | M | |

| Height | Weight | |
|---|---|---|
| 5'10" | 195 | |

## LONG, JESSICA E
## Suspect



| Address | Phone | | DOB |
|---|---|---|---|

| Race | | Ethnicity | |
|---|---|---|---|

| Height | Weight | |
|---|---|---|

## STOVER, KRISTIN E
## Witness



| Address | Phone | DOB |
|---|---|---|

| Race | Sex | Ethnicity |
|---|---|---|

| Height | Weight | |
|---|---|---|

## ALLEN, RAYMOND J
## Witness



| Address | Phone | DOB |
|---|---|---|
| PETALUMA California 94975 | | |

| Race | Sex | Ethnicity |
|---|---|---|

| Height | Weight | |
|---|---|---|

## STARKEY, JUSTIN A
**Witness**

| Address | Phone | DOB |
|---|---|---|
| ███████████████████████ | | █████ |

| Race | Sex | Ethnicity |
|---|---|---|
| ████████████ | | |

| Height | Weight | |
|---|---|---|
| ████████████ | | |

## MACFARLANE, BRUCE J
**Witness**

| Address | Phone | DOB |
|---|---|---|
| ███████████████████████ | | ████ |

| Race | Sex | Ethnicity |
|---|---|---|
| ████████████ | | |

| Height | Weight | |
|---|---|---|
| ████████████ | | |

## MAIDEN, DONALD
**Witness**

| Address | Phone | DOB |
|---|---|---|
| ██████████ | | |

| Race | Sex | Ethnicity |
|---|---|---|
| | M | |

| Height | Weight | |
|---|---|---|
| | 0 | |

## MUSE, KATHERINE R
**Victim**

| Address | Phone | DOB |
|---|---|---|
| ███████████████████████ | | ████ |

| Race | Sex | Ethnicity |
|---|---|---|
| ████████████ | | |

| Height | Weight | |
|---|---|---|
| ████████████ | | |

## Property

## Audio CD                                    Evidence

Brand                           Model                       Serial Number
378/1 Interview

Color                           Quantity                    Total Value
                                1                           $0.00

Measurement                     Amount Recovered            Date Recovered
                                $0.00

Status                          Owner

## Data CD                                     Evidence

Brand                           Model                       Serial Number
378/2 Emails

Color                           Quantity                    Total Value
                                1                           $0.00

Measurement                     Amount Recovered            Date Recovered
                                $0.00

Status                          Owner

## CD-ROM                                      Evidence

Brand                           Model                       Serial Number

Color                           Quantity                    Total Value
                                1                           $0.00

Measurement                     Amount Recovered            Date Recovered
                                $0.00

Status                          Owner

## Narratives

## Original Narrative                          07/26/2022 12:14:17

I. INVESTIGATIVE NARRATIVE

On Wednesday, June 29, 2022 at about 1150 hours, I contacted Shasta District Fairgrounds Livestock Superintendent Bruce MacFarlane regarding a theft of a goat. MacFarlane provided me with the following statement in summary.

MacFarlane stated on Saturday, 6-25-22 at about 2230 hours, fair staff along with volunteers found a goat missing from the goat barn at the Shasta District Fairgrounds, located at 1890 Briggs Street Anderson. Staff found the goat missing while they were attempting to load livestock for transportation. MacFarlane advised the goat was sold earlier in the day during the Junior Livestock Auction. In the process of trying to locate the goat MacFarlane determined the goat was from the

FERN000004

Cow Creek 4-H Club. MacFarlane contacted Chad Fowler who is the Community Leader and Goat Leader for the Cow Creek 4-H Club. MacFarlane stated based on his conversation with Fowler, Fowler suspected the mother of the junior exhibitor stole the goat from the fairground to prevent it from being transported and slaughtered.

At about this time, MacFarlane informed me the junior exhibitor was ██████ and her mother was Jessica Long. MacFarlane advised Jessica had sent an email to the fairgrounds office on Monday, 6-27-22 admitting she had taken the goat from the fairgrounds. Jessica was requesting to resolve this incident and the CEO of the Shasta District Fair, Melanie Silva, responded in an email informing Jessica she needed to return the goat. Jessica responded by sending an email correspondence on the morning of Wednesday 6-29-22 and has not returned the goat.

At this time, I provided MacFarlane with my department email address and requested any and all documentation be forwarded to me regarding the sale of the goat and emails from Jessica Long and the Shasta District Fair.

On 6-29-22 at about 1230 hours, Silva emailed me the following items:

* Shasta District Fair Sale Invoice
* Fair entry form
* email correspondence from Jessica Long and Shasta District Fair CEO Silva.

I reviewed the documents Silva sent me. In regard to the Sale Invoice, I noted the date of the invoice was for June 25, 2022. The sale order was 132 and the ear tag number for the market goat was 367. The seller name was ██████ and the goat weighed 82 pounds and sold for $11.00 per pound, for a total of $902. There were two buyers listed on the invoice, Brian Dahle and Megan Dahle. who donated the goat to the 4-H and FFA Community BBQ. Based on this invoice, at the time of the sale Kathie Muse became the responsible owner of the market goat. Refer to the attached invoice for further detail.

Upon reviewing the fair entry form and Shasta District Fair accountability and liability form, I noted the following. By completing the entry form you agree to the following. You certify that you are the owner of the property specified or the supervisor of the project with authorization to act as agent and to bind the owners of the property in all matters herein. Online submission of data requires that a person has read, understands and agrees to abide by all the rules and regulations governing the fair entries as published in the official Shasta District Fair Handbook. Under penalty of perjury, you certify that the information provided is true and agree to defend, indemnify, and hold harmless the fair, the county, and the State of California, its officers, agents and employees from and against any liability, claim, loss or expense (including any reasonable attorney fees) arising out of any injury or damage, which is caused by, arises from or is in any way connected with the participation in the program or event, excepting only that caused by the sole active negligence of the Fair. The Fair Management shall not be responsible.

To enter online, you must be over 18 years of age or be the parent and/or guardian of the exhibitor if the exhibitor is under the age 18, or the 4-H Leader or FFA advisor, with the authorization from the parent and/or guardian of the exhibitor, or authorization from the exhibitor if 18 years of age or older. In addition to confirming you are one of the aforementioned, you must also confirm that you have read, understand and agree to abide by all the rules and regulations governing the Fair entries as published in the official Shasta District Fair Handbook, and that everything submitted is "true and correct."

On the entry form it listed ██████ as the exhibitor with personal identifying information. On the form it states "I've read the rules" with "I Agree." The form asks if the "Information is true" with "I Agree." The form also states "Hold Harmless Clau" with "Parent/Guardian Agrees."

Based on this entry form and accountability and liability wavier, Jessica Long who is the parent of ██████ agreed to all rules and regulations set forth and published in the Shasta District Fair Handbook. Refer to the attached entry form and accountability and liability form for further detail.

I then reviewed emails from Jessica Long and the CEO of the Shasta District Fair, Melanie Silva. The first email was sent on Monday 6-27-22 at 1741 hours. The subject line of the email stated "Requesting solutions for the goat that was taken." The following is a summary of the email Jessica sent.

The first paragraph of the email stated, "I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with any other solution, I will bring the goat back for slaughter." Jessica goes on to explain that this was her daughters first year in 4-H and that they had joined 4-H so that she could learn how to properly take care of livestock. In addition to caring for livestock, her daughter would learn where her food comes from and the effort it takes to raise quality meat products. Jessica then talked about how she was made aware of how the animals were loaded after the sale and that this process didn't sit well with her. Jessica further advised that when she learned of this process several weeks ago, she began looking for another solution. Due to not having property to maintain and take care of the goat she began asking people she knew if she could give them the goat so it didn't have to be sold for slaughter. Jessica advised she eventually heard back from someone willing to take the goat, but it was the second day of fair. Jessica further advised that she spent the next couple of days reviewing the fair rules looking for a way out of the fair. Jessica stated she couldn't find any rules that would allow her to quite once at the fair. On Saturday night, 6-25-22, at about 2100 hours, Jessica advised her daughter was saying her final goodbyes and she was sobbing in the pen with her goat. Jessica explained the goat barn was mostly empty and at the last minute she decided to break the rules and take the goat. Jessica further stated she would deal with the consequences later. Jessica stated she would pay the for the goat and any other expenses and that she didn't fully understand that there are terminal and non-terminal fairs. Jessica further advised that she had been contacted by the livestock manager of the fair who had threatened to have her arrested for a felony for stealing the goat if she did not return it immediately. Jessica advises near the end of her email that if the only solution is to return the goat then she will return it to avoid being charged.

SDF CEO Silva responded to Jessica's email on Tuesday, 6-28-22, at about 1331 hours. Silva explained to Jessica that she had spoken with the California Department of Food and Agriculture and that the fair has to adhere to state rules. Silva informed Jessica she needed to bring the goat back to the Shasta District Fair immediately.

On Wednesday, 6-29-22 at about 0949 hours, Jessica sent another email to Silva. The email contained an attachment which was a letter regarding Dispute over Cedar (cedar is the goat). In this letter, Jessica stated she received another text message from BJ McFarlane (Bruce MacFarlane livestock superintendent) demanding the return of the goat. Jessica goes on to state that she has not violated CA PC 487a due to it not belonging to the organization (Shasta District Fair). Jessica further talks about the fair rules, the legality of ownership, and agrees to compensate the fair. She further explains that her daughter had bonded with the goat and had she known what a terminal auction entailed, she would have never gone down this path.

Based on this last email from Jessica, it was apparent she was not going to return the goat and based on her interpretation of the law she felt she had not committed any crime. Refer to the attached emails for further details.

At this time, I reviewed the Shasta District Fair & Event Center Livestock Rules, which is located on the SDF website. On page 51 of All General Livestock Rules and Guidelines it states the following.

"ALL ANIMALS (Steers - Replacement Heifers - Swine - Lambs - Meat Goats - Rabbit Meat Pens) ENTERED IN MARKET CLASSES & QUALIFYING FOR THE JUNIOR LIVESTOCK AUCTION MUST BE SOLD as listed on the Sale Order. There will be no set prices (or STOPS) AND NO "NO-SALES" at any time during the Sale."

"ALL ANIMALS sold in the Shasta Junior Livestock Auction sale MUST go to processing, directly from the Fairgrounds and will be transported on the trucks provided by the Fair on Saturday, June 25, 2022. No Junior Exhibitors will be allowed in barns while the animals are loading, failure to leave the barn when asked may result in the loss of premiums." Refer to the attached guidelines for

further.

On 6-29-22 at about 1720 hours, I responded to Jessica's residence, located at ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ n an attempt to contact her regarding this incident. I attempted contact at the front door of the residence; however, no one responded to my knocks and I suspected no one was home. I entered my patrol vehicle and attempted to contact Jessica via cell phone at about 1724 hours. Jessica did not answer her phone and I left her a message requesting she contact me regarding the theft of the goat. The phone number I called was▮▮▮▮▮

On 6-29-22 at about 1735 hours, I contacted Chad Fowler via cell phone. Fowler was the Cow Creek 4-H Community Leader and Goat Leader for ▮▮▮▮▮▮▮. The following is a summary of my phone conversation with Fowler.

Fowler advised he had learned that Jessica had taken the goat from the SDF and had taken the goat out of the area. Fowler stated he had allowed Jessica and Eliza to keep the goat at his property prior to the fair due to them not being able to have the goat at their residence. Fowler advised Jessica's claims about not knowing that the SDF required the animals be transported and slaughtered wasn't true. Fowler advised they had numerous meetings regarding the entire project to include that the animal would be butchered after the sale at the fair. Fowler further advised at one of the meetings, the 4-H members even ate goat to better explain/ demonstrate the importance of raising quality meat for buyers. When asked Fowler advised he didn't know where Jessica had taken the goat. This concluded my contact with Fowler.

On 6-30-22 at about 1741 hours, I again attempted to contact Jessica via cell phone. When I tried calling this time, her voicemail box was full and would not accept any new message.

On 7-7-21 SDF CEO Silva informed me of a post on social media. The social media post was made on Instagram from Bleatingheartsfarm. In the post the goat is pictured with an SDF ear tag and Scrapie ear tag. A Scrapie ear tag is a breeder ear tag that identifies the flock and the individual animal number. Silva advised Bleating Hearts Farm was located in Napa CA. I asked Silva to contact the breeder of the goat that was taken and obtain the Scrapie ear tag number. Silva later provided me with a Scrapie ear tag number of called CAL0ZA0700. The SDF ear tag number was 367.

On 7-8-22 I contacted Lieutenant Donald Maiden with the Napa County Sheriff's Office. I informed Lieutenant Maiden of my investigation and believed the goat was located in his jurisdiction. I was requesting his office respond to the address listed for Bleating Hearts Farm, located at ▮▮▮▮▮ ▮▮▮▮, Napa CA., and determine if the goat was there and to take custody of the goat. While talking to Lieutenant Maiden on the phone, he checked his local database and determined the owners for Bleating Hearts Farm was Justin Starky. Lieutenant Maiden determined Starky worked for the Napa County Sheriff's Office in the records unit.

Based on this information, I contacted Detective Ashbee and provided him with a summary of events regarding this investigation. Detective Ashbee authored a Search Warrant for the location in Napa CA, which was signed by Superior Court Judge Monique McKee. As the warrant was being authored and signed, Detective Duncan and I responded to the Napa County Sheriff's Office, where we met with Lieutenant Maiden. At about 1932 hours, Detective Duncan, Lieutenant Maiden and two other Napa County Sheriff's Office employee's arrived at 1142 3rd Avenue, Napa CA to serve the warrant. Upon arrival, we contacted Justin Starky and Kristin Stover. We informed them of the reason why we were at their residence and provided them with a copy of the warrant. Starky and Stover advised the goat in question was not at their residence nor had it ever been at their residence. Starky and Stover then accompanied us to the back of the property were goats were located. I searched the property for the goat; however, was unable to locate the goat in question.

While in the back yard of the property, I conducted an interview with Starky. Starky advised he was contacted by Jessica via email and she was asking if he and Stover could take the goat. Starky informed Jessica they could facilitate taking the goat, but once he found out it was a terminal fair and the authorities were getting involved he refused the goat. Starky advised the goat never came to his property and he had no idea were Jessica took the goat.

While I was interviewing Starky, Detective Duncan was interviewing Stover. Detective Duncan informed me that Stover had admitted to knowing where the goat was taken to. Detective Duncan advised he also read email conversations between Stover and Jessica. Duncan advised the goat was located a a property in Sonoma County at Billy's Mini Farm. We located an address for this farm, which was located at ███████████████████ Refer to Detective Duncan's supplemental report for further.

At about 2100 hours, Detective Duncan and I responded to the Roblar Road address and were accompanied by two Sonoma County Deputy Sheriffs. Upon arriving at the residence, I attempted contact at the front door to the residence, but it appeared as if no one was home. Detective Duncan had a phone number for Billy's Mini Goat Farm and called the number listed. Detective Duncan contacted a Raymond Allen. Detective Duncan talked with Allen for several minutes then got off the phone. Detective Duncan advised he had informed Allen of the reason why we were at his property. Allen advised he didn't know the goat was stolen and that we had his permission to retrieve the goat. Allen further advised that the goat still had both ear tags in it's ears.

We responded to the back of the property where there were pens with numerous goats located. I was able to identify the goat in question and retrieved it from the pen. Prior to leaving the property, I took digital photos of the goat and of the ear tags. The goat had the correct ear tags and distinct coloring/marks matched.

On 7-9-22 at about 0030 hours, I met with Bruce MacFarlane and turned the goat over into his care and control per Kathie Muse's request. I took digital photos of the goat in MacFarlane's custody.

In conclusion, Jessica Long signed her daughter ███████ up to be an exhibitor at the Shasta District Fair. By doing so she agreed to all the rules and terms of this fair. Jessica claims in emails that she didn't know that the SDF was a terminal (animals for slaughter/butcher) fair; however, she contradicts herself in emails and did know weeks in advance. Jessica further claims she did not violate any laws; however, once the goat was sold at the Junior Livestock Auction on 6-25-22 in the morning hours the goat became the property of Kathie Muse. Jessica in fact violated CA PC 487a (a) grand theft when she decided to knowingly violate the rules of the fair and state when she stole the goat at about 2100 hours on 6-25-22. Jessica admits to this theft via email and then went through great lengths to conceal the goat by taken it to a property in Petaluma CA. To further conceal where the goat was, Kristin Stover from Bleating Hearts Farm made posts on social media indicating the goat was safe at their location. If Jessica sincerely did not want to move forward with the sale of the goat at a terminal fair then she should have never have registered ███ as an exhibitor in the fair and should have never taken the goat to the fair.

Based on the totality of the circumstances, I am requesting Jessica Long be charged with 487a(a) PC Grand Theft.

II. CASE STATUS: Closed

## Supplemental Narrative          07/12/2022 10:12:57 Duncan, Jacob

I. INVESTIGATIVE NARRATIVE - Bleating Hearts Goat Sanctuary

On Friday, July 8th, 2022, I was assigned to assist Lt. Fernandez with this investigation. At approximately 1932 hours, we arrived on the ███████ ███████ in Napa, CA, to serve a search warrant related to a stolen goat. Refer to Lt. Fernandez's report for additional information on the initial report and investigation. We contacted Justin Starkey and his wife, Kristin Stover, in front of the residence. It should be noted both of these subjects were the

owners of the on-site Goat Sanctuary, "Bleating Hearts." Our initial conversation with both of them as well as my interview with Kristin Stover was recorded on my department-issued recording device. Below is a summary of that conversation:

We introduced ourselves and stated our purpose was to serve them with a search warrant and retrieve a stolen goat. Lt. Fernandez asked Justin if he knew anything about the goat. He responded that he knew someone had reached out to his wife regarding the goat. Justin stated he did not know who the person was. Justin stated the goat was not at his residence and he would take us to check the property. At this point, Kristin walked up and overheard us talking about the goat. She stated the goat's name was Cedar and stated Cedar was not at the residence. They both claimed Cedar had never been at their residence.

Kristin stated the lady with Cedar was named "Jessica." I believed she was referencing the suspect of this investigation, Jessica Long. Kristin reiterated she did not know where the goat was and all they knew was the goat was safe. They both then allowed us to go with them to check the property. I asked what kind of communication Kristin has had with Jessica. Kristin began to tell me but then stopped and apologized and stated she had autism. I told Kristin she was giving me indicators of being deceitful. Kristin attributed her indicators to being nervous and having autism. Kristin told me she last heard from Jessica about a week ago in June. Kristin told me she could call Jessica and try and figure out where the goat was. Kristin claimed that all she heard was that Jessica drove the goat "hours away." Kristin stated if she found out where the goat was she would let us know.

I asked Kristin if she had Jessica's phone number. Kristin stated she did and it was written down in their house. Kristin stated she did not text Jessica and only spoke to her via phone call. Kristin stated again she did not know where the goat was. Kristin began looking through her phone and located Jessica's phone number. She began providing me with the phone number and I observed she was reading it from an email exchange she had with Jessica. I cut her off and asked her what the emails were. I asked her if I could see the emails. Kristin stated, "Yeah, go ahead," and she handed me her cellphone. As she handed me the cellphone she told me she had actually suggested "Billy's Mini Farm" to Jessica. I observed there were emails between Kristin and Jessica where Jessica told Kristin she had dropped the goat off at this location. I told Kristin my belief she had lied to me. I read through the emails with her and Kristin blamed not being forthcoming on her autism. She provided me consent to photograph these conversations via email and I did so with my department cellphone. I returned Kristin's cellphone to her. The emails indicated Jessica had dropped off the goat at Billy's Mini Farm in Petaluma, CA, on June 26th, 2022, in accordance with Kristin's suggestion. Kristin and I discussed where Billy's Mini Farm was located. I located the farm's website which included its contact information.

I was able to locate an address for Billy's Mini Farm off Roblar Road in Petaluma, CA, as well as, the contact information for one of the owners, Raymond Allen.  Refer to my supplemental narrative regarding our contact with Billy's Mini Farm for additional information. I collected Kristin's identifying information and asked her not to contact Jessica and inform her we would be going to Billy's Mini Farm in an attempt to retrieve the goat.

**End of Interview**

A copy of my interview was booked into SCSO evidence under 378/1 and a copy of the photographed emails was booked into SCSO evidence under 378/2.

II. CASE STATUS: Open.

J. DUNCAN #378

## Supplemental Narrative          07/12/2022 10:24:19 Duncan, Jacob

I. INVESTIGATIVE NARRATIVE - Billy's Mini Goat Farm

On Friday, July 8th, 2022, at approximately 2100 hours, Lt. Fernandez and I, along with deputies with the Sonoma County Sheriff's Office arrived at Billy's Mini Goat Farm located off Roblar Road in Petaluma, CA. We attempted contact at the residence with negative results. I called the number listed on the website, 707-721-7781, and a subject identified as Raymond Allen answered the phone. Raymond stated he was not currently at the residence and was currently unable to meet us there. I asked if he knew anything about the stolen goat in question. Raymond stated a female subject had dropped the goat off a couple of weeks ago and told him it was a donation. I explained the goat was stolen and we were at his residence in an attempt to retrieve the stolen property. Raymond stated he was unaware of the goat being stolen and provided us with permission to retrieve the goat from his property. Raymond stated the goat still had its ear tag on and was located in the rear of his property.

Lt. Fernandez and I located the goat in the rear of Raymond's property and we were able to successfully recover the stolen goat. I left my business card at Raymond's residence in case he needed to further contact me. Lt. Fernandez and I transported the goat back to Shasta County. Refer to Lt. Fernandez's supplemental report for further details on the recovery of the stolen goat.

II. CASE STATUS: Open.

J. DUNCAN #378

## Supplemental Narrative          07/13/2022 07:38:32 Duncan, Jacob

I. INVESTIGATIVE NARRATIVE - Emails Between Jessica and Kristin

The purpose of this supplemental report is to document the email exchange between Jessica Long and Kristin Stover. These emails are currently booked into SCSO evidence under 378/2. Below is a summary of these emails:

-Jessica emailed Kristin on June 21st and told Kristin she wanted to drop their goat off at their sanctuary that weekend. Jessica detailed how the auction was coming up on that following Saturday and they did not want the goat auctioned to be used as meat. Jessica provided Kristin with her contact information and signed the end of the email with her and her daughter's full names, "Jessica and ▮▮▮▮▮." Jessica also included an image of ▮▮▮▮ and the goat.

-On June 22nd, Kristin responded to the email and stated they would be happy to facilitate taking the goat in and adopting the goat out to a weed abatement company around the Napa County area.

-On June 22nd, Kristin sent Jessica another email stating she could send Jessica Billy's Mini Goat Farm contact information to receive updates on the goat.

-On June 22nd, Jessica responded stating she learned the fair was a "terminal fair" and there would be fines associated with taking the goat. Jessica asked Kristin if she had any options to get the goat out of there.

-On June 22nd, Kristin responded and asked Jessica what she had signed. Kristin also informed her that after it was on the fairgrounds property and the goat was signed over, "It gets hard." Kristin sent two other additional emails that contained fair rules and possible ways to get out of the goat being slaughtered. This included the goat having horns, being under the weight requirement, having any scurs

-On June 26th, Jessica emailed Kristin and told her that she and her daughter had the goat and were in Sacramento with plans to drive to Napa the following morning. Jessica stated they were dropping the goat off at Billy's Mini Farm. Jessica indicated she wanted to stop by and meet Kristin to see her rescue. Jessica provided Kristin with her phone number ████████████ Later on, on the same day, Jessica told Kristin they made it down there and back. Jessica also stated, "Now to deal with the consequences." Jessica thanked Kristin for helping her with a farm for the goat. Jessica also attached four pictures of the goat at Billy's Mini Farm.

**End of Emails**

II. CASE STATUS: Open.

J. DUNCAN #378

FERN000011
11/22/2022

## STEPHANIE A. BRIDGETT - SHASTA COUNTY DISTRICT ATTORNEY
## CRIMINAL COMPLAINT WORKSHEET

### ------------------*LAW ENFORCMENT USE ONLY*---------------------

NO _1___ OF _1___

| DEF. NAME: LONG, JESSICA ELIZABETH | CASE/CITE #: 22S019984 |
|---|---|
| DOB: ███████ | SS#: UNKOWN |
| IN CUSTODY: NO | BAIL/OR Date: NONE |

| DATE(S) | Fel/Misd /Inf/Enh | CODE SECTION | MISC. CHARGE INFORMATION | VICTIM NAME(S) |
|---|---|---|---|---|
| 6/25/2022 | FEL | 487a(a) PC | | Katherine Muse |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### --------------DISTRICT ATTORNEY USE ONLY------------------

DA ASSIGNED:_____

☐ WARRANT            ☐ CITE LETTER            ☐ PROPERTY/EVIDENCE
☐ BOOK NOTIFY        ☐ STAY AWAY ORDER        ☐ Firearm Dispo Req'd
☐ PROB. VIOL.                                 ☐ Marijuana Dispo Req'd

☐ ORDER DMV PACKET   ☐ ORDER PRIORS   ☐ ORDER 969B PRISON PACKET – CDC #

COMMENTS: ☐ ON PAROLE _____ PAS _____ E-PAS _____ TOX

| Photos _____ |
|---|
| Audio _____ |
| Shascom _____ |
| Video _____ |

☐ DECLINED (SEE ATTACHED FORM)

ISSUING ATTORNEY:                              DATE:

PX:

FERN000012

S115: OHAMNI - Name: LONG, JESSICA ELIZABETH DOB:



```
RECORD #              NAM                    DOB     S R HGT EYE HAI TYP
             LONG,JESSICA
             LONG,JESSICA
             LONG,JESSICA
             LONG,JESSICA
             LONG,JESSICA
             LONG,JESSICA
             LONG,JESSICA
A24917546    LONG,JESSICA

  *    *    *    *    *    *     END OF MESSAGE   *   *   *   *   *   *   *
```

 S115: CA DRIV LIC - Name: LONG, JESSICA ELIZABETH
DOB: ███████



Search More

FERN000014
Page 1 of 1

2022

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

SW No. 2022 - _____



**STATE OF CALIFORNIA**
**COUNTY OF SHASTA**
**SEARCH WARRANT AND AFFIDAVIT**
**(AFFIDAVIT)**

__Detective Jeremy Ashbee__    swears under penalty of perjury that the facts expressed by him/her in this **Search**
(Name of Affiant)

**Warrant** and **Affidavit** and in the attached and incorporated herein **Statement of Probable Cause** are true and correct
and that based thereon upon his/her experience and expertise that he/she has probable cause to believe and does believe
that the property and/or person described below is lawfully seizable pursuant to Penal Code § 1524, as indicated below,
and is now located at the locations set forth below.  Wherefore, affiant requests that this Search Warrant be issued.

*DocuSigned by:*
*Jeremy Ashbee*
SAC917 (Signature of Affiant)

7/8/2022 | 6:25 PM PDT

Date / Time(s)

**SEALING REQUESTED:**    ☒ **No**    ☐ **Yes**

☐ **Statement of Probable Cause**

☐ **Confidential Attachment**

**NIGHT SEARCH REQUESTED:**   ☒ **No**   ☐ **Yes**

### (SEARCH WARRANT)

**THE PEOPLE OF THE STATE OF CALIFORNIA TO ANY SHERIFF, POLICE OFFICER, OR PEACE**
**OFFICER IN THE COUNTY OF SHASTA:**  proof by affidavit having been made before me by
__Detective Jeremy Ashbee__    that there is probable cause to believe that the property and/or person described
(Name of Affiant)
herein may be found at the locations set forth herein and is lawfully seizable pursuant to Penal Code § 1524 as indicated
below by "X"(s) in that:

☒    the property was stolen or embezzled.

☐    the property or things were used as the means of committing a felony.

☐    the property or things are in the possession of any person with the intent to use them as a means of
     committing a public offense, or in the possession of another to whom he or she may have delivered them for the
     purpose of concealing them or preventing them from being discovered.

☐    the property or things to be seized consist of an item, or constitute evidence that tends to show a
     felony has been committed, or tends to show that a particular person has committed a felony.

☐    the property or things to be seized consist of evidence that tends to show that sexual exploitation of a
     child, in violation of California Penal Code § 311.3, or possession of matter depicting sexual conduct of a person
     under the age of 18 years, in violation of California Penal Code § 311.11, has occurred or is occurring.

☐    there is a warrant to arrest a person.

Form Approved for Optional Use
Shasta County Superior Court
CF-0060 [September 5, 2019]

**SEARCH WARRANT AND AFFIDAVIT**

Page 1 of 15

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

☐   a provider of electronic communication service or remote computing service has records or evidence, as specified in California Penal Code § 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery.

☐   the property or things to be seized include an item or any evidence that tends to show a violation of California Labor Code § 3700.5, or tends to show that a particular person has violated California Labor Code § 3700.5.

☐   the property or things to be seized include a firearm or any other deadly weapon at the scene of, or at the premises occupied or under the control of the person arrested in connection with, a domestic violence incident involving a threat to human life or a physical assault as provided in California Penal Code § 18250.

☐   the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to § 6389 of the Family Code, if a prohibited firearm is possessed, owned, in the custody of, or controlled by a person against whom a protective order has been issued pursuant to § 6218 of the Family Code, the person has been lawfully served with that order, and the person failed to relinquish the firearm as required by law.

☐   the information to be received from the use of a tracking device constitutes evidence that tends to show that either a felony, a misdemeanor violation of the Fish and Game Code, or misdemeanor violation of the Public Resources Code has been committed or is being committed, tends to show that a particular person has committed a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or will assist in locating an individual who has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code.  A tracking device search warrant issued pursuant to this paragraph shall be executed in a manner meeting the requirements specified in subdivision (b) of § 1534.

☐   the property or things to be seized are firearms or ammunition or both that are owned by, in the possession of, or in the custody or control of a person who is the subject of a gun violence restraining order that has been issued pursuant to Division 3.2 (commencing with § 18100) of Title 2 of Part 6, if a prohibited firearm or ammunition or both is possessed, owned, in the custody of, or controlled by a person against whom a gun violence restraining order has been issued, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

☐   the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to § 29800 or 29805, and the court has made a finding pursuant to subdivision (c) of § 29810 that the person has failed to relinquish the firearm as required by law.

☐   the property or things to be seized are controlled substances or a device, contrivance, instrument, or paraphernalia used for unlawfully using or administering a controlled substance pursuant to the authority described in §11472 of the Health and Safety Code.

Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

**SEARCH WARRANT AND AFFIDAVIT**

Page 2 of 15

FERN000016

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

☐ all of the following apply:

(i) A sample of the blood of a person constitutes evidence that tends to show a violation of subdivision (b), (c), (d), (e), or (f) of § 655 of the Harbors and Navigation Code.

(ii) The person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by § 655.1 of the Harbors and Navigation Code.

(iii) The sample will be drawn from the person in a reasonable, medically approved manner.

(B) This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

☐ the property or things to be seized consists of evidence that tends to show that a violation of paragraph (1), (2), or (3) of subdivision (j) of § 647 has occurred or is occurring.

☐ the property or things to be seized include a firearm or other deadly weapon that is owned by, or in the possession of, or in the custody or control of, a person described in subdivision (a) of Section 8102 of the Welfare and Institutions Code.

## YOU ARE THEREFORE COMMANDED TO SEARCH:

██████████████████

The location is a single family residence in a rural residential area. The property has a tan colored residence with a brown composite style roof. The front door and attached garage of the residence face west towards 3ʳᵈ Ave. The number "1142" are posted vertically in bold black colored lettering on a white colored column to the left of the attached garage. There is a "U" shaped pull through driveway in front of the residence. Refer to the below photographs for further information.

The residence, including all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, sheds, storage rooms, and outbuildings of any kind large enough to accommodate a small goat.

Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

SEARCH WARRANT AND AFFIDAVIT

Page 3 of 15

FERN000017

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21



Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

SEARCH WARRANT AND AFFIDAVIT

Page 4 of 15

FERN000018

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21



Form Approved for Optional Use
Shasta County Superior Court

SEARCH WARRANT AND AFFIDAVIT

Page 5 of 15

CF-0060 [September 5, 2019]

FERN000019

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21



**FOR THE FOLLOWING PROPERTY/PERSON:**

FERN000020

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

One white and brown colored, Boer type goat named, "Cedar." Having a purple colored ear tag marked Shasta District Fair "**SDF 367**" and a yellow colored breeder ID Tag marked "**CALOZA0700**"

And if you find the same or any part thereof, to hold such property in your possession under California Penal Code § 1536 or, in the alternative, to institute Federal or State asset forfeiture proceedings against any and all assets seized during the execution of this search warrant and believed to be derived from narcotics trafficking activity.

It is further ordered that upon adjudication of the case(s) against all defendant(s) in this action, including the resolution of any and all appeals, and the written concurrence of the Shasta County District Attorney's Office, the property be disposed of in accordance with the procedures set forth in California Penal Code § 1407-1422, without the necessity of a further Court Order issued pursuant to California Penal Code § 1536.

This **Search Warrant** and incorporated **Affidavit** were sworn to as true and subscribed before me.

Wherefore, I find probable cause for the issuance of this **Search Warrant** and do issue it.

Additionally:

| | | |
|---|---|---|
| **SEALING ORDERED:** | ☒ **No** | ☐ **Yes** |
| | | ☐ **Statement of Probable Cause** |
| | | ☐ **Confidential Attachment** |
| **NIGHT SEARCH APPROVED:** | ☒ **No** | ☐ **Yes** |

DocuSigned by:

*Monique McFee*

6F22395A75C1414...

**Monique Mckee**

(Signature of Magistrate)

7/8/2022 | 6:33 PM PDT

Date / Time

(Print Name of Magistrate)

**Judge of the Superior Court of the State of California, County of Shasta**

---

This Search Warrant, Affidavit, and incorporated Statement of Probable Cause have been reviewed and approved as to form by the Shasta County District Attorney.

Name of District Attorney Approving Warrant

Date and Time Approved

---

Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

**SEARCH WARRANT AND AFFIDAVIT**

Page 7 of 15

FERN000021

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

# STATE OF CALIFORNIA
# COUNTY OF SHASTA
## (Statement of Probable Cause)

## I.    EDUCATION AND EXPERIENCE OF AFFIANT

**Detective Jeremy Ashbee** of the **Shasta County Sheriff's Office** states that the following facts are true and that there is probable cause to believe, and does believe, that the designated articles, property, information, and/or persons are now in the described locations, including all rooms, buildings, and structures used in connection with the premises and buildings adjoining them, the vehicles, and the persons described in the search warrant:

Your Affiant became a sworn peace officer in December of 2016. Your affiant possesses an Intermediate POST Certificate through the California Peace Officer Standards and Training. Your Affiant has completed 1,553 training hours through the California Peace Officers Standards and Training, which included the Basic POST Police Academy and holds a Bachelor of Arts Degree from Simpson University. Your affiant has also completed the 80-hour Robert Presley Institute of Criminal Investigations (ICI) Investigators Core Course. Your Affiant has been conducting investigations involving burglaries, grand and petty thefts, fraud, identity thefts, stolen vehicles, narcotics, embezzlements, robberies, homicides, rapes, child molestations, felony batteries, traffic collisions and other related crimes for the past five years.

During this time Your Affiant has participated in hundreds of criminal filings and/or arrests of individuals regarding various crimes. Your Affiant has continued to keep current in both required and optional training provided by Peace Officer Standards and Training Organization.

## II.    NARRATIVE OF PROBABLE CAUSE

On Friday, July 8th, 2022, Kathi Muse reported a livestock theft to the Shasta County Sheriff's Office. According to Muse, Brian Dahle purchasing a goat for auction at the Shasta District Fair Livestock Auction for $902, and donated the animal to Muse for the 4H and FFA Community BBQ. The seller of the auctioned goat, Jessica Long, took the goat from the fairgrounds, after the sale was finalized, to prevent the animal from being slaughtered by the new owner.

Long drove the goat to an animal sanctuary (Bleating Hearts Farm and Sanctuary) in Napa, CA, to hide the animal from the new owner. Bleating Hearts Farm created an Instagram post, admitting the goat was in their custody, and asking the Shasta District Fairgrounds to pardon the goat from being slaughtered. In the Instagram post, it states, "Her mother [Jessica Long] has tried everything she possibly could to keep him [the goat] safe had even driven him hours away to find him a new home, knowing there may have been fees involved, but had no idea that it could be a felony." Refer to Attachment "A" Bleating Hearts Farm Instagram post for additional details.

The Shasta District Fairgrounds provided a letter sent to them by Long, in which she admits she intentionally took the goat from the fairgrounds. Refer to Attachment "B" Letter from Long to the Shasta District Fairgrounds for additional details.

**YOU ARE AUTHORIZED TO:** Utilize additional sworn and non-sworn personnel to assist with the service of this search warrant and the collection of evidence.

**YOU ARE AUTHORIZED TO:** Utilize breaching equipment to force open doorway(s), entry doors, exit doors, and locked containers during the service of this search warrant.

**YOU ARE AUTHORIZED** to photograph and/or videotape each and every location, vehicle, item or person authorized to be searched or seized pursuant to this warrant

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

**YOU ARE FURTHER AUTHORIZED TO:**

Use person(s) who are not peace officers to accompany the Peace Officers during the execution of this search warrant for the purpose of assisting in the service of this search warrant as provided for under California Penal Code Section 1530.

**AND TO SEIZE THE DESCRIBED ITEM(S) OR PROPERTY OR ANY PART THEREOF,** and bring evidence of those items seized forthwith before this Court, or to any other Court in which the offense in respect to which the property or things seized is triable, or retain such property in the custody of the seizing agency, subject to further order of this Court pursuant to Section 1536 of the Penal Code, or as otherwise specifically authorized by this search warrant.

Due to the fact the item(s) to be seized include living animals, Deputies shall secure the property in a humane and appropriate location, and the rightful owner of said property shall be notified of the location of the property. The property may be released to the owner upon seizure.

### III.    EVIDENCE SOUGHT
One white and brown colored, Boer type goat named, "Cedar." Having a purple colored ear tag marked Shasta District Fair **"SDF 367"** and a yellow colored breeder ID Tag marked "**CALOZA0700**"

### IV.    DESCRIPTION OF LOCATION(S)
**Bleating Hearts Farm and Sanctuary**
**1142 3rd Avenue,**
**Napa, CA 94558**

The location is a single family residence in a rural residential area. The property has a tan colored residence with a brown composite style roof. The front door and attached garage of the residence face west towards 3rd Ave. The number "**1142**" are posted vertically in bold black colored lettering on a white colored column to the left of the attached garage. There is a "U" shaped pull through driveway in front of the residence. Refer to the below photographs for further information.

The residence, including all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, sheds, storage rooms, and outbuildings of any kind large enough to accommodate a small goat.

Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

SEARCH WARRANT AND AFFIDAVIT

Page 9 of 15

FERN000023

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21



Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

SEARCH WARRANT AND AFFIDAVIT

Page 10 of 15

FERN000024

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21



Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

**SEARCH WARRANT AND AFFIDAVIT**

Page 11 of 15

FERN000025

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21



## V.    CONCLUDING OPINION

Based on information provided by the Napa County Sheriff's Office, the stolen goat is currently located at the above location. It is my opinion that a search of the above mentioned property will allow deputies to locate and recover the aforementioned stolen property and return that property to its rightful owner. Furthermore, location of the stolen animal, will provided evidence to assist deputies and detectives with the 487A(a) PC investigation.

FERN000026

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

**ATTACHMENT "A"**



 bleatingheartsfarm · Follow
henrymcodie · Original Audio

 bleatingheartsfarm UPDATE: Senator Brian Da
problem allowing ████ keep her goat and w
donate him back to her care. The fairgrounds
pardon him from slaughter and drop charges.
her forgiveness and to please pardon this bab

Shatsa District Fair
PH: 530-378-6789
FX: 530-378-6788
ceo@sdfeventcenter.com

We desperately need the help of our commur
this goat from a baby and fell absolutely in lo
nor her mother had any idea that entering hir
a terminal auction until it was too late. Her go
senator Brian Dahle @briandahleca Her moth
everything she possibly could to keep him saf
him hours away to find him a new home, knev
have been fees involved, but had no idea that
felony.

We are asking for Shasta District Fairgrounds
their heart to forgive this family for trying to k
give him a better life, and show their daughte
in the world, that love will prevail. This little gi
best for him.

Her goat is now back on the way to the fairgr
fairgrounds he will be slaughtered as fast as p
in their possession. Please find it in your heart
goat. Please help be the change to allow for li
wants him to go into fire prevention for our b
him live out his 15+ years. Please,

  

268 likes

 Add a comment..

Form Approved for Optional Use
Shasta County Superior Court
CF-0060 [September 5, 2019]

SEARCH WARRANT AND AFFIDAVIT

Page 13 of 15

FERN000027

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

## ATTACHMENT "B"

Requesting solutions for the goat that was taken

Jessica Daum <███████████████>

Mon 6/27/2022 5:41 PM

To:

- ceo sdfeventcenter.com ████████████

Dear Shasta County Fair Manager,

I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. It we can't come up with any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goat was to feed the quall, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to rid errides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one year each at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to send it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

SEARCH WARRANT AND AFFIDAVIT

Page 14 of 15

FERN000028

DocuSign Envelope ID: C6741AE2-FC13-4809-B586-98FB2FAB7D21

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meal, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,

Jessica L█
Mother of █████
Shasta District Fair goat lot #132

Form Approved for Optional Use
Shasta County Superior Court

CF-0060 [September 5, 2019]

**SEARCH WARRANT AND AFFIDAVIT**

Page 15 of 15

FERN000029

# ALL GENERAL LIVESTOCK RULES & GUIDELINES

*Please Consult Local Rules (Dates and times subject to change due to COVID)*

## ENTRY INFORMATION

ALL LIVESTOCK ENTRIES ARE DUE BY MAY 20, 2022: ALL ENTRIES WILL BE ONLY ACCEPTED ONLINE. We will have several computers to do entries on in the office starting April 1st.   All livestock (including rabbits) entry forms must be accompanied by an online signed Exhibitor Liability Waiver. All market animal will need a Certificate of Animal Medication when their animal is weighed at the fair.

OPEN DIVISION ANIMAL LIMITS: All livestock Exhibitors in the Open Division will be limited to exhibiting not more than two (2) breeds in each Division. Sheep will be limited to sixteen (16) animals in Registered Classes. Dairy Goats will be limited to fourteen (14) entries per Division and no more than two (2) entries per class.

JUNIOR LIVESTOCK LIMITS: Junior livestock Exhibitors are limited to one (1) market animal per Exhibitor, and are allowed to bring only one (1) market animal onto the Fairgrounds (this includes Large Animal and Small Animal) also limited to two (2) breeds of fourteen (14) animals in Registered Classes of Sheep. Goats will be limited to fourteen (14) entries per Division and no more than two (2) entries per class.  The Fair has the ability to consider combining age classes within 4-H and FFA when there are not adequate entries to provide ample competition.

****Beginning January 1, 2021, the Fairs and Exposition Branch (F&E) will require all California Fairs (County, Citrus & District Agricultural Associations) junior livestock (large and small animal) exhibitors to annually participate in the Youth for the Quality Care of Animals (YQCA) program or a quality assurance program established by their local fair and approved by CDFA. For more information on the YQCA program, please visit www.yqca.org.
Junior Livestock Exhibitors must complete course to participate in the 2022 Shasta District Fair. Certificate must be turned in with entries by May 20, 2022. You can complete the class online or attend a live training (TBA).

ENTRY REFUNDS: No refund of entry fees will be made except for accidental injury or sickness of animals. Refunds will be made only after a Veterinarian's Certificate is submitted proving such injury or sickness.

## STATE RULES: All Local & State Rules, Health Rules, and Score Cards for Judging, as prescribed by the Division of Fairs and Expositions, available online at www.cdfa.ca.gov/fe/Fair_Information/State_Rules_for_California_Fairs.asp, apply to all entries of this Fair. State Rules are available for viewing in the Fairgrounds Main Office and Livestock Office.

EXTENDED DIVISIONS: Shall be limited to the State of California except the extended divisions in the Horse Show, which are open to the World.

## LIVESTOCK GENERAL RULES & REGULATIONS

LIVESTOCK OFFICE HOURS: The Livestock Office will open June 18, 2022; from 9 AM to 5 PM. Starting June 21, 2022 the hours will be 7 AM-7 PM through the end of Fair.

LIVESTOCK ARRIVALS: Non-Market Livestock will be accepted on the grounds on Monday, June 20, 7 AM to 8 PM and Tuesday, June 21, 6 AM to 8 PM. Market Animals will arrive per specie and be weighed off of the trailer. See Livestock Schedule for species and times.

BEDDING: Shasta District Fair will NOT provide any bedding.  Exhibitors must provide their own bedding. See livestock office for bedding requirements. Straw shall be for breeding animals only.  Please notify the Livestock Office prior to fair if you intend to use straw for the safety of market animals that may be near your pens.

CLEAN PENS & STALLS: All pens and stalls must be cleaned before 8:00 AM each day and maintained in a clean condition to the satisfaction of the Fair Management in order to be eligible for awards.  This rule will be strictly enforced. Clean barn duties are the responsibility of the Junior Livestock Exhibitor, not the parents, leaders, etc. Violators will be excluded from consideration in Clean Stall Awards. Clean Stall Awards will be judged randomly throughout the day.

REGISTRATION PAPERS: Registration papers on all registered livestock must be checked in the Livestock Office before 7 PM, Tuesday, June 21, 2022.

MUZZLES: Muzzles will not be allowed on animals during their stay at the Fair.

***REMINDER*** Must pre-enter in showmanship to participate except Jr. Market Swine exhibitors.
Swine judge will pick exhibitors during market class to come back for showmanship

Exhibitor Guidebook & Entry Forms Now available on-line
www.shastadistrictfairandeventcenter.com

revised 1/14/2022   FERN000030

# ALL GENERAL LIVESTOCK RULES & GUIDELINES
*Please Consult Local Rules (Dates and times subject to change due to COVID)*

All entries in Showmanship MUST be entered by the exhibit deadline; exhibitors CANNOT enter the day of the show. Exhibitors shall be on hand and ready to exhibit at the time called for judging. A Novice is an exhibitor that has never competed in any showmanship class, whether large or small livestock, in Fair competition. An exhibiter will no longer be eligible for any novice showmanship class in subsequent years. Date of birth for Grange and Independent Exhibitors MUST be on the entry form.

## AUCTION GUIDELINES – THIS IS A TERMINAL SALE - Date: Saturday, June 25, 2022, 8AM

The sale will begin promptly at 8:00 AM with the sale of Market Acceptable lots. We will rotate the market animals periodically as we sell them. The champions will sell at 10:00 AM. Breakfast will be available for purchase starting at 6:30 AM while supplies last. Lunch will be provided to all registered buyers from 11:30 AM - 1:00 PM. After the sale of champions, we will continue selling our Market Ready animals in a similar rotation as the morning.

Sale checks will be written when sufficient funds are collected from the buyers.

SALE QUALIFICATIONS: The Shasta District Fair Junior Livestock Auction and Market Classes are open ONLY to those 4-H, FFA, Grange and Independent Exhibitors that reside in the valley are of Shasta County or have Cottonwood, Manton or Platina address (zip codes 96022, 96059, 96076) who meet the minimum age requirements and those who graduated from high school in 2022. Each Junior Exhibitor, who meets the above qualifications, will be allowed to enter and sell one (1) market animal. Exhibitors who have entered a market animal at any other District or County Fair in a calendar year are not eligible to sell at the Shasta District Fair in the same calendar year.

STEER/REPLACEMENT FEMALE EXHIBITORS: NEW FOR 2022, steers will need to be completely halter broke at weigh-ins. Any steer that is not able to be led on the scale by the exhibitor will not be tagged and not eligible for the 2022 Junior Livestock Show and Sale.

ANIMAL ELIGIBILITY: Only animals entered and shown in the market classes may be sold at the Auction. Only Market Steers, Market Lambs, Market Goats, and Market Swine grading Market Ready will be eligible to sell. Only Replacement Heifers grading group 1 or 2 will be eligible to sell. Only the rabbit meat pens that meet Market Ready will be eligible to sell. All Champion and Reserve Champion animals, who's Exhibitors qualify under the above qualification rule, MUST sell at the Auction on Saturday, June 26, 2021.

LIVESTOCK OWNERSHIP: Junior Exhibitors MUST prove ownership of animals to be able to exhibit in the Junior Livestock Department. Lease agreements are acceptable in Horse Department Only. All breeding animals must be owned at least 30 days. All horses must be owned or leased at least 120 days. Proof of lease or ownership for horses must be on file with the 4-H office. *All beef animals must be owned by the exhibitor by tagging day or 120 days prior to fair whichever date comes first.*

OWNERSHIP & MANDATORY TAGGING DATES:
All Junior Livestock Animals must be owned and under the control and supervision of the Exhibitor by the below listed dates. (This means someone else in a location other than your home area is not feeding, breaking to lead, and caring for the Exhibitor's animal.) All Exhibitors and animals must be present at tagging day. Heifers do not need to come to tagging day however fairgrounds must have received a copy of ownership papers & picture of heifer by February 21, 2021.

| Type | Ownership Date | Tagging Date | Tagging Time | Location |
|---|---|---|---|---|
| Steers | Feb. 20, 2022 | Feb. 20, 2022 | 9:00AM - 11:00AM | Shasta Livestock |
| Steers | Feb. 20, 2022 | Feb. 20, 2022 | 1:00PM -  3:00PM | Shasta College Farm |
| Heifers | Feb. 20, 2022 | N/A | N/A | N/A |
| Swine | April 20, 2022 | N/A | N/A | N/A |
| Lambs | April 20, 2022 | N/A | N/A | N/A |
| Meat Goats | April 20, 2022 | N/A | N/A | N/A |
| Rabbit Meat Pens | May 20, 2022 | N/A | N/A | N/A |

LIVESTOCK WEIGH-IN: Fair weights for Market Animals for the 2022 Shasta District Fair are as follows: All Junior Market Animal Exhibitors MUST take their own animals across the scales. No one else will take these animals to the scales for

Exhibitor Guidebook & Entry Forms Now available on-line
## www.shastadistrictfairandeventcenter.com
revised 1/14/FERN000031

# ALL GENERAL LIVESTOCK RULES & GUIDELINES
## *Please Consult Local Rules (Dates and times subject to change due to COVID)*

the Junior Exhibitor without prior permission from the Fair. After all market animals are weighed, each species weight classes will be made-up and will be posted as soon as convenient. The animals will be weighed at the designated times ONLY. There will be no Swine weighed after the beginning of Beef weighing and no Beef weighed after the beginning of Sheep weighing, no Sheep after the beginning of the Goat weighing. If any animal does not make weight, it will be removed from the scale, the scales will be re-balanced, and the animal immediately re-weighed. The second weight will be final. Heifers will be sold by the head and Chickens and Rabbits will be sold by the pen not by the pound.

| SPECIES | Min.Wt. | Max.Wt. | Time | Date |
|---|---|---|---|---|
| Swine | 220# | 285# | 8:00AM | TBD |
| Beef | 1,050# | 1,450# | following Swine | TBD |
| Sheep | 115# | 160# | following Beef | TBD |
| Meat Goat | 65# | 110# | following Sheep | TBD |
| Rabbit Meat Pens | 3.5# ea | 5# ea | 8:00 AM | TBD |

Exhibitors are only allowed to bring one market animal across the scales. All decisions regarding backups must be made before the animal arrives at the Fairgrounds.

WEIGHT SIFTED ANIMALS: Animals that do not meet weight requirements of their class will be required to leave the Fairgrounds after weigh-ins.

LIVESTOCK OWNERSHIP PAPERS: The Bill of Sale, Brand Inspection or Out-billing from a Sales Yard MUST be made out to the Junior Exhibitor, showing at least a 120-day ownership for Steers/Heifers and 60-day ownership for Sheep, goats and Swine or a signed statement that the animal was born from the Exhibitor's breeding project and was raised by the Exhibitor. Exhibitors must be able to show proof of ownership at any time should the question arise.

EAR TAGS: All Steers belonging to FFA, 4-H, Grange and Independent Exhibitors MUST come to the Fairground with an official Shasta District Fair Ear Tag in their ear that is identified to the Exhibitor. Replacement heifers will be tagged Tuesday, June 21, 2022 at Vet Check at the fairgrounds, after market animals are finished at the scales. Sheep, Goats and Swine will be tagged prior to fair. Advisors and Leaders will be given tags from the fair to tag animals. Independent Exhibitors will need to contact the Shasta District Fair office to obtain tags.

MARKET ANIMALS SIFTED BY THE JUDGE: Market animals sifted in the judging arena may remain on the grounds if they are to be shown in showmanship. They must be removed no later than 8PM.

SELLING FEES: 7.0% of the sale price will be deducted from Seller's check to defray auction costs and the establishment of a Contingency Fund. A National Pork Board check-off fee of .004% of the value of each Swine marketed in the Junior Livestock Sale will be deducted from the check of the Swine Exhibitor/Seller. A Sheep check off fee of .007% of the value of each Sheep marketed in the Jr. Livestock Sale will be deducted from the check of the Sheep Exhibitors. $3.25 will be deducted from all Steer checks for brand inspection and beef promotion. *NO SHOW PREMIUMS WILL BE PAID ON MARKET ANIMALS.*

IMPORTANT: *All 4-H, FFA, Grange and Independent Exhibitors MUST be ready with animal and in the line as listed on Sales Order when called for the Junior Livestock Auction. If exhibitor is not ready, dressed in uniform & in line they will not be allowed to sell.*

ALL ANIMALS (Steers - Replacement Heifers - Swine - Lambs - Meat Goats – Rabbit Meat Pens) ENTERED IN MARKET CLASSES & QUALIFYING FOR THE JUNIOR LIVESTOCK AUCTION MUST BE SOLD as listed on the Sale Order. There will be no set prices (or STOPS) and no "NO-SALES" at any time during the Sale.

ALL ANIMALS sold in the Shasta Junior Livestock Auction sale MUST go to processing, directly from the Fairgrounds and will be transported on the trucks provided by the Fair on Saturday, June 25, 2022. No Junior Exhibitors will be allowed in barns while the animals are loading, failure to leave the barn when asked may result in the loss of premiums.

ALL REPLACEMENT HEIFERS will be released to the new owners at 5:00 pm on Saturday, June 25, 2022.

RABBIT MEAT PEN: The disposition of the Rabbit Pens will be at the discretion of the Buyer. The Market Ready meat pens will sell at the Junior Livestock Auction.

"FOR SALE": "For Sale" Signs are NOT allowed to be posted in any area of the Fairgrounds, including the Livestock and Horse Departments, until AFTER the Junior Livestock Auction, on Saturday, June 25, 2022.

Exhibitor Guidebook & Entry Forms Now available on-line
www.shastadistrictfairandeventcenter.com

revised 1/13/2022    RN000032

# ALL GENERAL LIVESTOCK RULES & GUIDELINES
*Please Consult Local Rules (Dates and times subject to change due to COVID)*

## ANIMAL HEALTH AND SAFETY

WATER: A visible source of water must be in every pen that contains livestock until Sunday, June 26, 2022, 8:00 AM. Failure to comply will result in the loss of premiums and/or sale proceeds.

VETERINARIAN: A Veterinarian will be on call or present at the Fairgrounds at all times. If you need vet services or wish to ask questions, contact the Livestock Supervisor. Any professional fees or medical expenses will be billed to the Exhibitor.

SHEEP & GOAT HEALTH RULES: In accordance with the State rules, the following rules regarding Sheep and Goats will be in affect:

1. All Sheep and Goats entering Fairs require individual identification. All official identification will be kept on the animals. The official identification may be official USDA individual identification ear tags, premises ear tags, Scrapie Flock Certification Program ear tags, registration tattoos if accompanied by registration papers, or other methods approved by the California Department of Food & Agriculture.

2. All Sheep & Goats from out of state require official individual identification, a certificate of veterinary inspection and a California entry permit.

3. Fairs will not accept Sheep & Goats from scrapie non-compliant flocks, or animals that are scrapie positive or scrapie suspects.

4. Fairs will not accept Sheep & Goats from scrapie-infected or source flocks, or animals that have been exposed to scrapie unless they have been evaluated and approved for exhibition by the State Scrapie Epidemiologist.

5. Fairs will keep records of the consignor, buyer, and animal identification for 5 years when animals change ownership at the Fair.

6. Fairs will try to accommodate Scrapie Flock Certification Program Members with separate space if practical. Breeding animals should be housed in separate enclosures or locations from animals that are not in the certifications program, if practical.

7. Sheep or Goats within 30 days of pre- or post-parturition, or with vaginal discharge, shall if practical, be kept separate from animals from different flocks and in an area that can be properly cleaned and disinfected.

8. Rams/Bucks older than 6 months require a negative Brucella Ovis test within 30 days of entry into California.

In an effort to prevent the spread of disease, Shasta District Fair will not allow Sheep or Goats within 30 days of pre- or post-parturition, or with vaginal discharge from entering in the Fair.

SLICK SHORN: All market Sheep will be clean and slick shorn from the knees up (including head) prior to being weighed. Sheep with excessive wool will not be weighed until shorn to the satisfaction of Show Management. Any sheep not meeting these requirements will not be eligible to show or sell.

SHEEP TAIL DOCK: To qualify for exhibit market Sheep must be docked such that the tail (dock) is healed and can be lifted from the exterior. Sheep that have no dock will not be eligible. Acceptable tail dock is determined by placing a ¼" round stock (like a pencil) beneath the Sheep's dock. When pressure is applied and the tail lifted up, some resistance should be felt due to the presence of tailbone (vertebrae). All Sheep will be checked prior to weighing by Fair designated veterinarian. Animals that do not meet this test will be sifted by the Fair designated veterinarian. All decisions are final.

SURVEILLANCE OF SHEEP: All Sheep will be checked during the weigh in process by a Veterinarian for any evidence of Club Lamb Fungus and Heavy Muscled (Callipyce) Mutation. These Sheep have no ready market value and are deemed undesirable; therefore, they must be removed immediately from the Fairgrounds. If any discrepancies arise on the Club Lamb Fungus and the Callipyge Mutation Lamb, a Fair designated veterinarian's decision will be final. All sheep and goats will be checked for yearling teeth.

MUZZLES: All animal muzzles are prohibited at the Fair. Muzzles are unnecessary for animal well-being.

## FAIRGROUND AND BARN REGULATIONS

UNLOADING ANIMALS: Livestock (other than Horses) will be permitted to enter Fairgrounds through Gate No. 3. Immediately after unloading, trucks and trailers will be removed from the grounds to the Northwest corner outside the Fairgrounds. Trailers are not allowed to park in the West Parking Lot (Lot #2) by gates 3 & 4. Trailer parking is in the North Parking Lot (Lot #4).

Exhibitor Guidebook & Entry Forms Now available on-line
www.shastadistrictfairandeventcenter.com
52                    revised 1/13/2022   FERN000033

# ALL GENERAL LIVESTOCK RULES & GUIDELINES

*Please Consult Local Rules (Dates and times subject to change due to COVID)*

STABLING: *All livestock must be stabled according to the space allocated by the Livestock Superintendent. Changing of livestock from one stall to another positively will not be permitted.* All animals, feed and equipment must be housed in the barn within their pen area. Barn curfew Wednesday - Saturday is 10 PM. All Exhibitors and patrons must be out of barn area at that time. Barn Curfews will be strictly enforced. No sleeping/camping will be allowed in the barn area.

ELECTRICAL EQUIPMENT: There will be NO electric cords or electric fans plugged in the Fair electrical lines unless first approved by the State Fire Marshal or the Fair Electrician. Extension cords used to distribute power to each electrical apparatus shall be rated 15 AMPS minimum and contain ground wire. Cords not meeting these requirements shall be confiscated for the duration of the Fair. ALSO, all fans must be approved UL devices. We will be checking these by order of the OFFICE OF THE STATE FIRE MARSHAL.

LIVESTOCK RELEASE: Conditions permitting, the livestock barns will release in the following schedule on June 26, 2022
Barn A - Jr. Breeding Beef on Sunday at 8:00 AM until 12 NOON.
Barn C - Breeding Sheep on Sunday at 8:00 AM until 12 NOON.
Barn D - all tack items may be carried out starting on Sunday at 8:00 AM until 12 NOON.
Barn E - Jr./Sr. Goats/Cattle starting on Sunday at 8:00 AM until 12 NOON.

Please note:  Fair Management may deem it necessary to alter the schedule.
              All animals will be released by 12:00 NOON.

All weight sifted animals must be removed from the grounds immediately after weigh-in. Livestock release papers may be obtained in the livestock office. Market animals sifted in the judging arena may remain on the grounds if they are to be shown in showmanship. They must be removed no later than 8pm after participating in showmanship. NO SICK animals will be released unless a Veterinarian's Certificate & an approved Livestock Release Slip have been obtained in advance. Any animal removed from the grounds prior to release times, without permission and proper release forms will forfeit all premiums and awards.

DECORATIONS, SUPPLIES, ANIMALS AND EDUCATIONAL DISPLAYS: May NOT be taken down or removed from the grounds prior to Sunday, June 26, 2022 according to the release times shown above (Premiums will be forfeited if any are removed early). Items left behind are left at your own risk.

FEED DELIVERY:  No vehicles will be allowed on the Fairgrounds for daily feed delivery, unless authorized by management. The Fair has designated a 20-minute unloading area at Gate 3 for the convenience of Exhibitors. This zone is for unloading of feed, kids, etc. The 20-minute time limit will be strictly enforced. Vehicles left longer than 20 minutes will be ticketed by the City of Anderson Police. Appropriate livestock parking pass must be displayed on the windshield of the vehicle at ALL times. ANY VEHICLE PARKED IN ANY LOT WITHOUT PASS VISIBLE WILL BE TOWED AWAY AT THE OWNER'S EXPENSE.

LARGE TRUCK & TRAILER PARKING: All trucks (larger than pick-ups) and trailers will be parked at the Northwest end of the North Parking lot (Lot #4) in the designated area. PLEASE DO NOT park trucks anywhere other than in the designated area. NO stock trailers or trailers of any sort will be allowed in the West Parking Lot (Lot #2) by gates 3 & 4 after Tuesday, June 21, 2022 at 5 PM. If a trailer is found in the parking lot after that time it will towed at owners' expense.

## ETHICS, COURTESY & PUBLIC SAFETY

'CODE OF ETHICS': Under no conditions may any Exhibitor use drugs or any artificial means to stimulate an animal so that it may be shown to a better advantage. This shall include, but not be limited to, injections, forced liquid intake, or any unethical or inhumane treatment of animals. Violators and/or animals in violation of any of the General Rules above will be required to leave the Fairgrounds immediately upon notice.

APPROPRIATE BEHAVIOR:  All Exhibitors, leaders, volunteers, and parents participating in the Fair, must act appropriately while in the barn area. Exhibitors are expected to always act appropriately while on the grounds. A physical altercation involving an Exhibitor may result in the Exhibitor being disqualified and all premiums and sales proceeds forfeited.

ANIMAL GROOMING: Parents, teachers, advisors, other adults, or individuals not exhibiting in the Shasta District Fair Junior Livestock show may not provide any physical assistance in fitting; grooming and/or showing of market animals whatsoever (see state rules). Assistance may come from junior Exhibitor entered in the Fair ONLY. An advisor, leader, or parent may hold animals while an Exhibitor works, for safety reasons only. This rule applies to all FFA, 4-H and Independent Exhibitors.

Exhibitor Guidebook & Entry Forms Now available on-line
www.shastadistrictfairandeventcenter.com
53                     revised 1/13/2022 PERN000034

# ALL GENERAL LIVESTOCK RULES & GUIDELINES

### *Please Consult Local Rules (Dates and times subject to change due to COVID)*

NO change of the major color pattern of the animal by painting or dyeing will be allowed. Any grooming material that allows color to come off of any animal will not be allowed. Club members may share in feeding of animals and the cleaning and maintaining of pens.

**EXHIBITOR AND PUBLIC SAFETY:** Any livestock exhibit (including horses) that cannot be handled by the Exhibitor while on the Fairgrounds will be removed from the Fairgrounds, disqualified and all premiums will be forfeited.

**RULE COMPLIANCE:** Any Exhibitor, who fails to conform to accepted standards of conduct, will be removed immediately (with livestock) from the Fairgrounds and all premiums and auction proceeds forfeited, if the situation is of a serious nature.

**AWARDS:** All Exhibitors will be required to provide an appropriate Thank You note prior to receiving their award. The Thank You note must be in an <u>unsealed, addressed envelope with appropriate postage affixed.</u> Every award has the sponsor information attached to it. All awards and premiums will be held until the thank you is received.

## RV RULES AND GUIDELINES

Senior Livestock Exhibitors desiring to remain on the Fairgrounds at night must complete a RV parking application Form. RV parking will be limited to Senior Livestock Exhibitors living outside a 50-mile radius from the Fairgrounds. Please review all RV rules and limitations listed on the application form.

**RV FEES:** A fee of $180.00 per space will be charged for all RV trailer units (Tuesday - Sunday). RV space is available starting Sunday prior to and following Fair at $30.00/night. All fees are to be paid in advance. A permit will be issued and a space assigned. No camp units will be allowed in camping area without a permit. No tent units or sleeping bag only units will be allowed.

**CAMPGROUND CURFEW:** The campground curfew is midnight, and this curfew will be strictly enforced. Exhibitors must be in their beds by midnight. No disturbances will be tolerated. There will be NO drinking and/or loud parties. <u>No alcoholic beverages may be brought on the grounds - for camp area or other area. Anyone with alcoholic beverages of any kind will be asked to leave the grounds and not allowed to return.</u> Violators of these rules will be removed from the campgrounds and their premiums may be withheld.

**CAMPER RELEASE:** All camp units - trailers, pick-up campers, etc., MUST remain on the Fairgrounds in their camp space until the time livestock is released by the Fair Management. There will be NO EXCEPTIONS.

## GENERAL LIVESTOCK PASS & PARKING POLICIES

The following credential policy will be used during the 2022 Shasta District Fair. This credential policy is for the Livestock Exhibitor's convenience and is a courtesy of the Shasta District Fair Board of Directors. The Fair has the final decision of who will or will not receive passes. Please do not abuse this policy.

If any Exhibitor loses their wristband, there will be a $25 fee to replace it. Without the credentials Exhibitor must pay full admission price to get in the gate.

**JUNIOR EXHIBITORS:** Junior Livestock Exhibitors will be issued 1 wristband. The wristband will serve as your pass into the Fair. Market animal Exhibitors will receive their wristband when their animal is weighed, Tuesday, June 21, 2022. Parking credentials and other tickets may be purchased at the main office, please bring your 2022 Livestock Parent Pass Request Form with you.

**SENIOR EXHIBITORS:** Senior Livestock Exhibitors will be issued a wristband. The wristband will serve as your pass into the Fair. Senior Exhibitors may pick up their wristband in the livestock office. One (1) additional wristband may be purchased for the livestock handler for $19.00 and one parking pass can be purchased in the main office, please bring your 2022 Senior Livestock Pass Request Form with you.

**PARENT COURTESY TICKETS:** May be purchased by parents (only) of Junior Livestock Exhibitors at a reduced rate of $19.00 each, parents are limited to two (2) books of 4 admission credentials per family. Parent Credentials must be pre-ordered and on the parent pass form and can be purchased at the main office through June 17, 2022, please bring your Livestock Parent Pass Request Form. Be sure to get your hand stamped for re-entry if you leave the grounds for any reason.

Exhibitor Guidebook & Entry Forms Now available on-line
### www.shastadistrictfairandeventcenter.com

# ALL GENERAL LIVESTOCK RULES & GUIDELINES
*Please Consult Local Rules (Dates and times subject to change due to COVID)*

**4-H LEADERS:** The 4-H Office will be allocated Fair passes to be distributed to Community & Project Leaders actively involved in the Fair. No passes for 4-H Leaders will be distributed from the Fair Office.

**PARKING:** No parking passes will be provided to livestock exhibitors. Senior and Junior Livestock exhibitors may purchase up to two (2) Parking Passes for $18.00 Each. These passes are only valid in Lots 2, 3 & 4. Parking passes must be pre-ordered on the Livestock Parent Pass Request and can be purchased at the main office through June 17, 2022, please bring your form.

## JUNIOR LIVESTOCK
## ELIGIBILITY REQUIREMENTS

<u>**FFA MEMBERS:**</u> FFA members may participate in breeding classes and may exhibit to the end of the calendar year following the year of graduation from high school.

All Future Farmers of America Exhibitors of livestock must wear the official uniform of their organization while showing their animals. The official FFA show uniform to be worn by all FFA Exhibitors and by helpers in individual and chapter groups while showing at Fairs and livestock shows shall consist of white trousers, white dress shirt (short or long sleeves) with the FFA emblem attached to the left pocket and the official FFA four-in-hand necktie. The official FFA jacket is optional; if worn, the shirt emblem is not required. Hats or headgear of any kind shall not be worn with the official show uniform while showing. If the Exhibitor does not have the official jacket on due to heat, the shirt worn must have capped sleeves or long sleeves. No tank tops allowed.

<u>**4-H MEMBERS:**</u> A 4-H member may enroll on his/her fifth birthday. Large breeding animals may be exhibited by a full member at age 9, until the end of the calendar year in which the member becomes age 19. <u>Youth under 9 years of age as of midnight on December 31, 2020 may not enter large animals or participate in auction. Exhibitor must be 9 years old as of December 31, 2020, to sell at auction.</u> See Junior. Livestock Sale eligibility under Sale Qualifications paragraph.
4-H Primary members (ages 5 thru 8) are not allowed to enter or show animals by which their size and/or nature are unsuitable for a young handler. These include: Horses, Beef Cattle, Dairy Cattle, Swine, Sheep, Goats (except Pygmy and Nigerian Dwarf Goats) of all classes. Upon conclusion of judging of each species, primary Exhibitors are allowed to participate in a discussion type setting with the judge. Primary Exhibitors are not judged but do receive a participation ribbon. Primary Exhibitors may only enter in primary classes. All other membership and project requirements must also be satisfied prior to showing a 4-H project animal.

4-H Exhibitors of livestock must wear 4-H hat, appropriate color, white/off white slacks or jeans (ankle length, belt should be worn if belt loops available), with white sleeved blouse or white sleeved shirt tucked in with 4-H tie or collar (girls) while showing and selling their animals. The 4-H uniform must be worn by all 4-H members and helpers. Appropriate footwear must be worn. 4-H Exhibitors must abide by rules set forth by the Shasta County 4-H office to qualify as a 4-H Exhibitor.

<u>**INDEPENDENT/GRANGE JUNIOR EXHIBITORS:**</u> Independent/Grange Junior Exhibitors may participate in the Junior Still Exhibits Department, ONLY, upon entering kindergarten or age 5 and not older than 18 years of age as of January 1, 2022. In the Livestock Department Independent Exhibitors must be at least 9 years of age and must not be older than 18 years of age on January 1, 2022. Independent/Grange Exhibitors may participate until the summer after completion of High School regardless of age. Independent/Grange Exhibitors must meet all ownership requirements. Independent/Grange Exhibitors must enter in an open Junior or Independent/Grange class unless one is not available. If an open or Independent/Grange class is not available, Junior Exhibitors may enter an appropriate 4-H or FFA Class. Advisor, leader, teacher, or parent/guardian signature on the entry form is required by the Fair to certify that: projects have been under their direct supervision in accordance with the rules and regulations of the organization and the Fair; and the entry is the project of the Exhibitor and is eligible for exhibit. Failure or refusal of such advisor, leader, or parent/guardian to sign the required entry form will prevent the Exhibitor from entering that particular class (es). Juniors who have been 4-H, FFA or Grange project member within 60 days (120 days for horse and market beef) prior to the Fair are not eligible to compete in that project as Independent Juniors. All Independent/Grange Exhibitors must have project management records and proof of supervision available as to the length of the project. Independent/Grange Junior Exhibitors entering market animals must provide Fair management with a picture of their animal, appropriate proof of ownership, permanent ear tag, tattoo and /or Swine ear notch information 120 days prior to the Fair for beef and 60 days for Sheep, goats or Swine. All Independent/Grange Exhibitors must have "on grounds" supervision by a responsible adult. The names of the responsible adult(s) must be on file with the livestock office. All Independent/Grange Exhibitors must participate in barn

Exhibitor Guidebook & Entry Forms Now available on-line
www.shastadistrictfairandeventcenter.com
55                                                    revised 1/13/2022
FERN000036

# ALL GENERAL LIVESTOCK RULES & GUIDELINES
## *Please Consult Local Rules (Dates and times subject to change due to COVID)*

duty.  The show "uniform" for all Independent Exhibitors will be dark black pants and a white button-down shirt with sleeves.  The show "uniform" for all Grange Exhibitors will be dark black pants, a white button-down shirt with sleeves and the Grange vest.  Independent & Grange exhibitors Ages 9 – 13 enter in 4-H Classes and Ages 14 - 18 enter in FFA Classes.

LIABILITY INSURANCE: County, District and State Fairs cannot legally carry liability insurance covering Junior Exhibitors and/or their exhibits.  Liability insurance is the responsibility and at the discretion of the Junior Exhibitor.  The Shasta District Fair <u>highly recommends</u> all livestock Exhibitors carry liability insurance.  Liability insurance can be added to a homeowner's policy or can be purchased through the Fairgrounds.  Please call the Fairgrounds, 530-378-6789, for more information.

INSURANCE COVERAGE FOR INDEPENDENT JUNIORS:  Independent Exhibitors shall provide insurance coverage as required by the Fair.  Independent Exhibitors must provide the Fair office with a certificate of insurance showing proof of one million dollars ($1,000,000) liability coverage on the animal to be exhibited.

revised 1/13/22 SERN000037

*Missing / Leader Contacts*

## Sale Invoice
### Shasta District Fair
**JUNE 25, 2022**

**Invoice:** 132
**Sale Order:** 132

| Sale Order (lot) | Entry # | Tag ID | Division | Division # |
|---|---|---|---|---|
| 132 | 1543 | 367 | 4-H Market Goat | 706 |

**Floor Amount (Market Value)**

| | |
|---|---|
| Price: | $3.40 |
| Weight: | 82 |
| Total: | $278.80 |

Floor this amount:

**Seller Name:** ▮▮▮▮
**Exhibitor Name:** ▮▮▮▮

***4-H MARKET GOAT***

Sale Weight (units): 82

Price per lb.

**Total Amount of Sale:**

**CUSTOM FEE:**
GOATS and LAMBS - $95.00
HOGS - $78.00
STEERS - $200.00

**BUYER :** _____

### *** NOTE: THIS IS A TERMINAL SALE- NO LIVE PICKUP (except rabbits)***

BUYER # 920   BUYER NAME _____ AMOUN _____

BUYER # 919   BUYER NAME _____ AMOUNT _____

BUYER # _____   BUYER NAME _____ AMOUNT _____

**Please MARK ONE:** _____ Consigned for **RESALE** at market price, bill buyer for difference

DONATE to _____ 4-H & FFA Community BBQ (Kents Meats)

_____ New Rescue Mission

_____ One Safe Place

_____ **PROCESS** & Deliver to selected locker below for cut & wrap

_____ A&R Custom Butcher (530) 527-6483        _____ Country Market**(530) 357-3830

_____ Bowman Meat (530) 347-4463        _____ Kents Meats (530) 365-4322

_____ Clear Creek Market (530) 246-9044        **Country Market accepts only current customer

**I CERTIFY THAN I AM AUTHORIZED TO SIGN FOR THIS PURCHASE AND ACCEPT RESPONSIBILITY FOR TOTAL PAYMENT DUE AND/OR THE COLLECTION OF THE TOTAL AMOUNT DUE.**

_____   Printed Name _____   Signature _____   Date _____

Buyer #

FERN000038

ACCOUNTABILITY & LIABILITY: Please accept the entries (property) described herein. I certify that I am the owner of the property specified herein or the supervisor of the project with authorization to act as agent and to bind the owners of the property in all matters herein. Online submission of data requires that a person has read, understands and agrees to abide by all the rules and regulations governing the fair entries as published in the official Shasta District Fair Handbook. Under penalty of perjury, I certify that the information provided is true and I agree to defend, indemnify, and hold harmless the fair, the county, and the State of California, its officers, agents and employees from and against any liability, claim, loss or expense (including any reasonable attorney fees) arising out of any injury or damage, which is caused by, arises from or is in any way connected with participation in the program or event, excepting only that caused by the sole active negligence of the Fair. The Fair Management shall not be responsible

To enter online, you must be over 18 years of age or be the parent and/or guardian of the exhibitor if the exhibitor is under age 18, or the 4-H Leader or FFA advisor, with the authorization from the parent and/or guardian of the exhibitor, or authorization from the exhibitor if 18 years of age or older. Please type "Yes" in the box to confirm. By entering "Yes", I am confirming that I am 18 years of age or older, the owner or authorized agent for these exhibits, that I have read, understand and agree to abide by all the rules and regulations governing the Fair entries as published in the official Shasta District Fair Handbook, and that everything submitted is "true and correct". Online entries for 4-H and FFA exhibitors will not be officially accepted until approved by the 4-H leader or FFA advisor.

PHOTOGRAPHY AND NAME RELEASE: By typing "Yes" below, I/we give the Shasta District Fair and anyone acting under the authority or permission thereof, the unqualified right to use my name and/or our company name for publication and/or for distribution of photographs, videotapes and/or recordings made of me and/or my/our company representatives, that may have been taken at past Shasta District Fairs, and/or could be taken at the fair(s) subject to this contract, for any marketing, public relations, publicity and/or other lawful purpose. Further, I waive all right of inspection or approval and irrevocably release Shasta District Fair from claims or demands which I or my company may or can have on account of the use or publication or arising of such photographs or information.

https://www.shastadistrictfairandeventcenter.com/enter-your-stuff

FERN000039



Mom is Jessica Long~

**653  Eliza**                    **Long**

| | | |
|---|---|---|
| Address | ███████ | SS# | | Information is true | I agree |
| City | ████ | Date of Birth | ████ | Hold Harmless Clau | Parent/Guardian Agrees |
| State | █ | Age Calculated | █ | | |
| Zip Code | █ | | | | |
| | | School | ████ | | |
| Phone | █████ | Grade | | | |
| e-mail | ███████ | | | | |
| Status | | Notes | ██████ | | |
| | | I've read the rules | I agree | | |

FERN000040

**Requesting solutions for the goat that was taken**

Jessica Daum <████████████████████>

Mon 6/27/2022 5:41 PM

To:

- ceo sdfeventcenter.com <████████████████>

Dear Shasta County Fair Manager,

I am the mom wh~~~~pk my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you. If we can't come up with~~~~ any other solution, I will bring the goat back for slaughter.

My daughter is 9-year-old and like most little girls she wants a horse someday. We hope to have land in the near future and hope that she gets a chance to have a horse. We joined 4-H for the opportunity for her to learn how to care for livestock, as well as it being a great opportunity for her to learn about where her food comes from and the effort it takes to raise quality meat products. Our 4-H leader said that we could keep the goat on his property since we live in a residential neighborhood and couldn't keep it at ours. Every afternoon since the beginning of April, she fed her goat and walked it, and practiced bracing. At first the goat ran from her and she didn't like her goat. A few months later he was running up to the gate to see her and she was walking him around like a dog.

I wouldn't have signed her up for the project if I thought she'd get attached. I thought the goal was to feed the goat, and that was about it. I didn't know that showmanship was a part of 4-H until she got her goat and started working with it. It was that daily interaction that created a bond that I wasn't expecting from a goat. Being brand new to 4-H we had so much to learn.

A few weeks before fair, I was told by another parent to send my daughter off to ride rides after the sale because all the goats and lambs are put into one area before loading and start fighting because they aren't used to each other. This didn't sit right with me, and felt like I would be deceiving my child. The point of our 4-H experience was for her to participate and learn how to care for livestock, not hide her from ugly parts. On the last day of fair two of my forty-year-old friends retold their experiences of doing a pig one last year at fair. They both said that it changed fair for them and they had sad memories. The theme of fair this year was Sunshine and Smiles, but there were a lot of broken hearts and tears all over the fair barns.

A few weeks ago, when I learned that the goats are taken from their pens and loaded in a way that is upsetting for the animals and the people watching, I started looking for another solution. We don't own land so couldn't keep the goat. I started asking people if I could give the goat to them so we didn't have to sell it for slaughter.

I wasn't able to find a solution until the second day of fair. I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. The farmer has contracts with CalFire, elementary schools, and other important agencies. This resonated strongly with us as a beautiful solution since we moved here shortly before the Carr Fire and almost lost our home to it. I asked people if we could leave fair and donate him to help support farmers that do brush clearing. They said it was too late since we were already at fair. I spent the next several days pouring over the fair rules looking for a way out. I couldn't find anything in the rules that said how to quit once we were at the fairgrounds.

The last night of fair at 9 pm, it was time to say her final goodbyes. My daughter sobbed in her pen with her goat. It was heart breaking. Like my friends who had only done a market animal once, I knew that this was our last time doing a market animal. The barn was mostly empty and at the last minute I decided to break the rules and take the goat that night and deal with the consequences later. I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds.

I have communicated with the buyer, Senator Brian Dahle's office. They bought the goat to support the community and are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement. They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered.

Our daughter lost three grandparents within the last year and our family has had so much heartbreak and sadness that I couldn't bear the thought of the following weeks of sadness after the slaughter of her first livestock animal. Please help find a solution that is a happy ending for my daughter and for our community.

I can understand that you have to pursue this situation in a way that discourages others from doing what I did. But, please also think of what positive changes can be made for the kids. The 4-H pledge says to lead with your head and your heart. Our head and hearts told us that our animal would be important and beneficial to use the animal for fire clearing. We didn't join 4-H to make money, and we didn't take him for any monetary reasons. We just want to give him to a farm that does fire clearing and to make things right with the fair.

I will pay you back for the goat and any other expenses I caused. I would like to ask for your support in finding a solution. I have been inspired to start a goat program where kids can raise goats and donate them to farmers who run fire clearing teams. So many kids were disappointed at fair when their goats didn't make weight, and some enjoyed raising the goats, but were upset that this is a terminal fair.

I didn't fully understand that there are terminal and non-terminal fairs and that at some fairs kids have to kill the goat that they just spent 3 months or more working with and training daily, while at there are other solutions at a non-terminal fair. I am so thankful for meat and farmers, but I am also inspired to help our youth support farmers who do fire clearing for our communities. I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options.

The live stock manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. I am asking for your grace, forgiveness, and support in creating another solution and making positive changes for the future to

FERN000041

support solutions in clearing land to prevent fires.

If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony. I hope that I will gain your support to donate our goat to a fire clearing team and to provide another valuable farming solution for our kids that care for livestock.

Thank you so much again for supporting our 4-H kids and our farmers. Thank you for considering helping me find a solution to prevent my daughter's broken heart, a way to support fire management efforts, and to give other kids other options.

Sincerely,

Jessica Long
Mother of ████████
████████ 32

Get Outlook for iOS

Re: Requesting solutions for the goat that was taken
ceo sdfeventcenter.com
Tue 6/28/2022 1:31 PM
To:

- Jessica Daum ◀ ███████████████

███

- Francesconi Mike@CDFA ◀ █████████████

Hello Jessica,

Thank you Jessica for taking the time to contact me regarding this issue.  As a mother I am not unsympathetic regarding your daughter and her love for her animal.  Having said that please understand the fair industry is set up to teach our youth responsibility and for the future generations of ranchers and farmers to learn the process and effort it takes to raise quality meat.  Making an exception for you will only teach out youth that they do not have to abide by the rules that are set up for all participants.  Also in this era of social media this has been a negative experience for the fairgrounds as this has been all over Facebook and Instagram, not the best way to teach our youth the value of responsibility.  Unfortunately this is out of my hands.

I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all  we have to stick to the State Rules.  You will need to bring the goat back to the Shasta District Fair immediately.  I do hope you will continue with your idea of raising and providing quality animals for the purpose you have spoken about.  I support that whole heartly.  Obviously the fair experience is not the best for your family.

Thank you,
Melanie M Silva
CEO
Shasta District Fair & Event Center
Fair Dates June 22-25, 2022
████
www.ShastaDistrictFairandEventCenter.com



Re: Requesting solutions for the goat that was taken
Jessica Daum <████████████████████
Wed 6/29/2022 9:49 AM
To:

- ceo sdfeventcenter.com <████████████████████ ·

Please see attached.
Thank you,
Jessica Long

Get Outlook for iOS



June 28, 2022

*Re: Dispute over Cedar*

Dear Shasta District Fair;

This letter is in further response to my dispute with your organization conc_____y daughter's goat, Cedar. My daughter's name is ████.

On June 27, 2022, I sent an email asking that your organization withdraw its demand for the return of Cedar and offering to pay for any costs or damages you have incurred as a result of this dispute. This morning, however, I received another text message from BJ McFarlane which seemingly ignored my letter and simply demanded return of my daughter's goat.

I've had time to review the documents that BJ McFarlane sent me, and I believe your organization is not within its rights to demand return of Cedar.

While you threatened to alert the authorities I had violated California Penal Code § 487a, upon examination, I have done no such thing. That statute makes it a crime to "feloniously steal[], take[], carr[y], lead[], or drive[] away…any caprine animal…,

FERN000045

[1] which is the personal property of another, or [2] who fraudulently appropriates that same property which has been entrusted to him or her, or [3] who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of that same property...is guilty of grand theft." (*Id.*) I cannot possibly have done any of those things because Cedar was not your organization's personal property. To the contrary, and as the 2022 State Rules For California Fairs indicate ("State Rules"), it was my daughter's personal property. Specifically, the State Rules provide in relevant part that "exhibitors must be legal owners of all entries. Ownership must be maintained through show date(s)." (See State Rules at p. 6.) Cedar was removed during that period, so the State Rules admit he was still my daughter's personal property.

Consistent with the State Rules, your organization's All General Rules and Guidelines ("General Rules") also require that "Exhibitors must be able to show proof of ownership at any time...." (See General Rules at p. 3.) Again, Shasta District Fair was not the owner.

Finally, that your organization did not become the owner of Cedar is further confirmed by the provision in your General Rules advising the Junior Exhibitors to obtain liability insurance. (See General Rules at p. 8.)   If Cedar became your property by virtue of our entry to the fair, there would be no need for the Junior Exhibitors to obtain insurance, as the fair would be liable. In sum, Cedar was my daughter's personal property so California Penal Code § 487a is not even triggered.

FERN000046

Furthermore, in the event the Shasta District Fair could claim Cedar became its personal property, "[i]t is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1017, citing *People v. Butler* (1967) 65 Cal.2d 569, 573.) As I believed in good faith that Cedar was not the Shasta District Fair's personal property, no violation of Penal Code § 487a was committed.

Lastly, if anyone other than my daughter has a right to the goat, it would be Senator Brian Dahle as he was the successful bidder at auction. But his office has represented to me that they have relinquished any rights they have to Cedar, dead or alive. As a result, not only was there no crime committed, but the Shasta District Fair now gets to keep his bid of $11.00 per pound x 82 pounds, $902.00. Thus, the Shasta District Fair has actually profited from this event—it cannot claim any harm. For the Shasta District Fair to claim it's been damaged by this event, it would have to show some loss arising from a breach I committed. (*See, e.g., Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 473 ["A breach of contract is not actionable without damage"].) But your General Rules state that the Shasta District Fair will be entitled to only "7.0% of the sale price deducted from the [Exhibitor's] check…." So, had the slaughter been accomplished, the Shasta District Fair would have collected only $63.14. But now, it has received, and gets to keep $902.00, a profit of $838.36. So if anything, Shasta District Fair has been unjustly enriched by this situation.

FERN000047

Lastly, it must be stated with clarity that, because Shasta District Fair was never the owner of Cedar, the only possible rights it has in transaction are to the monies it could have earned, i.e., $63.14, which it has more than retained. So any legal action on the matter would per se be frivolous. Nevertheless, my offer to reimburse any other reasonable costs associated with this event remains open. I cannot envision what those costs would be, but I will of course review them in good faith.

This letter is not a waiver of any rights. Further, while its purpose is in anticipation of litigation, I am equally sending this letter to resolve the matter. My daughter has/is bonded with Cedar and, had we known what a terminal auction entailed, we never would have gone down this path. Fortunately, Shasta District Fair has actually profited from this event so this dispute should be put to rest.

In your email you expressed concerns about social media postings. If we can resolve this situation with Cedar not being brought in for slaughter, I am willing to consider signing a non-disclosure agreement.

Moving forward, I request that any communications be directed to my email at Jessicadaum@hotmail.com

Sincerely,

7:48 📷 🎙 ♪ •                    🔕 🔇 LTE ..ll 58%◼

←                    ⬇    🗑    ✉    ⋮

**Kristin Starkey** Jun 22               ↩    ⋮
to Jess ⌄

Hiya Jessica and ▮▮▮

Thank you so very much for considering an alternative
outcome for your wether, that is such a very kind and selfless
thing to do for him.

We would be more than happy to take him in, as have an
approved adopter who does weed abatement around here for
Napa County.

If this still is what you would wish for him, let me know and I
will send you our address or we can figure out transportation
for him. 😅

Best wishes,
Kristin

Show quoted text

**Kristin Starkey** Jun 22               ↩    ⋮
to Jess ⌄

Hiya again,

I will actually send your information to Billy's Mini, who is the
weed abatement company that we work with closely. That
way you can maintain contact and get updates of him. 😅

Best wishes,
Kristin

Ring                                    📷 ✕ 📶 .ll 58% 🔋

**ring** Ring   7:48 PM

**There is motion at your Front Door**

Best wishes,
Kristin

Show quoted text

(K)   **Kristin Starkey** Jun 22                    ↩   ⋮
      to Jess ⌄

Hiya again,

I will actually send your information to Billy's Mini, who is the
weed abatement company that we work with closely.  That
way you can maintain contact and get updates of him. 😄

Best wishes,
Kristin

Show quoted text

(J)   **Jess Daisy** Jun 22                         ↩   ⋮
      to me ⌄

We would love to do it. We are learning that this is a terminal
fair and there could be big fines if we take him. Do you have
any options to get him out of here?

Sent from Proton Mail for iOS

Show quoted text



⚠ billysminifarm.com

## Billy's Mini Farm Goat Grazing Services  707-721-7781



● HOME ● ABOUT US ● SERVICES ● SAMPLES OF OUR WORK ● TESTIMONIALS ● CONTACT US



### Testimonials

"Thank you for taking care of the star thistle in my horse field it was so bad I couldn't even let my horses in that pen because the star thistle is poisonous to horses but your goats were able to eat it with no problem I am so happy with the outcome and after two seasons the goats have rid me of my star thistle problem"

**Janine**
**Napa, CA**

**References include: Corinne Barclay fire inspector Petaluma Fire Dept, Virginia Sargent-Victoria HOA**



West Haven HOA Petaluma CA

We really enjoyed renting a herd of ten goats from Ray and Virginia.  The goats are so well socialized with people, making the time spent with us a lot of fun.  We got to know the goats by their names and they were very friendly to us and everyone we brought out to see them.

Not only were they fun to have here, they were non stop workers clearing lots of overgrown blackberry vines and witches broom that had grown unattended for years and they cleaned out the creek that was overgrown with blackberries.  Our property looked like a well groomed park when they finished their work.

Ray set up the electric fencing, water, and shelter promptly and came to check on them periodically.  The goats seemed used to moving to new properties and settled right in to work.  He handled the goats with expertise and it is obvious the goats are a part of his and Virginia's family.

**Jackie**
**Napa, CA**

FERN 0005



C5DBA373-...61601A.jpg

0F807F06-...78B1C1.jpg

**Jess Daisy** Jun 22
to me ⌄

Just checking in to see if you got my message and if you have any solutions or ideas to help?

Sent from Proton Mail for iOS

Show quoted text

**Kristin Starkey** Jun 22
to Jess ⌄

Hiya Jessica and ▮

Thank you so very much for considering an alternative outcome for your wether, that is such a very kind and selfless thing to do for him.



7:49

Well, my daughter and I have him and are in Sacramento with plans to drive to Napa tomorrow to drop him off at Billy's mini farm. Would love to stop by and meet you and see your rescue goats afterwards. My number is ▓▓▓▓▓▓▓ Please text so we can set up a time if you are free!

Sent from Proton Mail for iOS

Show quoted text

**Jess Daisy** Jun 26
Hi, We drove to Sacramento last night and have the goat and want to head to napa/Petaluma. Do

**Kristin Starkey** Jun 26
to Jess ∨

Hiya Jess

My apologies for the delay. I have a slew of medical appointments today and my husband is working OT.

Here is Billy's Mini's phone number. His name is Ray. ▓▓▓▓▓▓▓ I sent a message to his wife aswell.

Show quoted text

**Jess Daisy** Jun 26
I contacted him! Thank you!



7:48             58%

# 4-H Boer Goer Rescue Request ☆

`External`   Inbox

**Jess Daisy** Jun 21
to me ∨

Hello,

My nine year old daughter did 4H in Shasta County for the first time this year and has a Boer goat whether. We love him and didn't know that people couldn't buy them and keep them for things other than meat. The auction is on this Saturday and and we would rather give him up for adoption. We live in a neighborhood and don't have land, other wise we would keep him ourselves! If there is a possibility we can bring him to you this weekend, please let us know!

I love that part of your mission is to try and change the 4-H rules so people can buy them for things other than meat. It seems like such a huge shame to raise him to be friendly with humans, then only use him for meat. Would love to see him clearning land and preventing fires some where!

My cell phone number is ▮▮▮▮▮▮▮. Please text message me first because I only answer numbers I recognize. Or respond to this email to let us know if it's a possibility that we can bring him to your rescue.

Thank you for considering!
Jessica and ▮▮▮▮▮▮

Sent from Proton Mail for iOS



C5DBA373-...61601A.jpg

**Jess Daisy** Jun 26
Hi, We drove to Sacramento last night and have the goat and want to head to napa/Petaluma. Do

**Kristin Starkey** Jun 26
to Jess ⌄

Hiya Jess

My apologies for the delay. I have a slew of medical appointments today and my husband is working OT.

███████ s Mini's phone number. His name is Ray. ████ I sent a message to his wife aswell.

Show quoted text

**Jess Daisy** Jun 26
I contacted him! Thank you!

**Jess Daisy** Jun 26
to me ⌄

I just attached 4 pictures.
We made it down there and back!
Now to deal with the consequences...

Thanks again for your help finding him a nice farm and family where he will be valued! 💓

Sent from Proton Mail for iOS

7:48        58%

←        ⬇   🗑   ✉   ⋮

I do believe I found one.

"V. PROTEST
1. Protests will be considered only if there has been a violation of State or Local Rules that have not
been enforced. Decisions of judges, veterinarians, weighmasters, breed callers, tail dock officials and
timers cannot be protested and are final.
2. All Protests must be accompanied by a deposit of $500.00 (cash, money order or certified check made
payable to the fair). NOTE: The deposit will be returned if the protest is upheld. If the protest is upheld,
the violator may be held liable for any portion of the direct costs incurred by the fair in the course of the
protest resolution. Failure to reimburse the fair shall be cause for disallowing future entries in any of
the network of California fairs."

If he doesn't meet the weight requirement, has any scurs from disbudding, as technically he would still have horns, clumppy fecal could possibly be coccidiosis or illness, so a vet could stop from slaughter for thay reason.

As for the fee, we may be able to assist with that, as making both your daughter and her buddy happy is our ultimate goal.

On Wed, Jun 22, 2022, 1:08 PM Jess Daisy
< ███████████████ wrote:

Show quoted text

**K**    **Kristin Starkey** Jun 22      ↩   ⋮
        to Jess ⌄

Show quoted text

III      ◯      ＜

7:48

Show quoted text



📄 F2021-01_S...A_GF_4.pdf

**Kristin Starkey** Jun 22
to Jess ⌄

My friends in 4H said if you enter the livestock auction, the animal goes to slaughter. But you can show a 'meat animal' and not enter the auction portion. They also suggested reading the fair guide on it and to reach out to your 4H leader, who many have some advice on how to pull out.

Show quoted text

**Jess Daisy** Jun 22
to me ⌄

I attached a picture. His horns are kinda growing in We already had to trim him once

Sent from Proton Mail for iOS



I attached a picture. His horns are kinda growing in
We already had to trim him once

Sent from Proton Mail for iOS

Show quoted text

BB89A43E–...5351E6.jpg

**Jess Daisy** Jun 26
to me ⌄

Well, my daughter and I have him and are in Sacramento with
plans to drive to Napa tomorrow to drop him off at Billy's mini
farm. Would love to stop by and meet you and see your rescue
goats afterwards. My number is ▮▮▮▮▮. Please text
so we can set up a time if you are free!

Sent from Proton Mail for iOS

Show quoted text

Hiya Jessica,

Oh boy! When they are on fair ground property is when it becomes tricky. Was anything signed allowing the fair to own him? I believe there is a way, but it involves being unable to show animals at that fair again.

What is the fee for removal?

There are a few fair offices that have actually hung up on me for asking about live sales, not even mentioning rescue.

If you are able to send any papers about legalities, I can try my best to find a loophole.

But once they're on property and signed over, it gets hard.

Show quoted text

**Jess Daisy** Jun 22
to me ⌄

Yes, please! Send my info

Sent from Proton Mail for iOS

Show quoted text

**Kristin Starkey** Jun 22
to Jess ⌄

Hiya again

Yes, please! Send my info

Sent from Proton Mail for iOS

Show quoted text

**Kristin Starkey** Jun 22
to Jess ⌄

Hiya again,

I do believe I found one.

"V. PROTEST
1. Protests will be considered only if there has been a violation of State or Local Rules that have not
been enforced. Decisions of judges, veterinarians, weighmasters, breed callers, tail dock officials and timers cannot be protested and are final.
2. All Protests must be accompanied by a deposit of $500.00 (cash, money order or certified check made
payable to the fair). NOTE: The deposit will be returned if the protest is upheld. If the protest is upheld,
the violator may be held liable for any portion of the direct costs incurred by the fair in the course of the
protest resolution. Failure to reimburse the fair shall be cause for disallowing future entries in any of
the network of California fairs."

If he doesn't meet the weight requirement, has any scurs from disbudding, as technically he would still have horns, clumppy fecal could possibly be coccidiosis or illness, so a vet could stop from slaughter for thay reason.

As for the fee, we may be able to assist with that, as making both your daughter and her buddy happy is our ultimate goal.

On Wed, Jun 22, 2022, 1:08 PM Jess Daisy

7:48 🕐 · 📶 58%

←     📥 🗑 ✉ ⋮

**Jess Daisy** Jun 22     ↩ ⋮
to me ⌄

We would love to do it. We are learning that this is a terminal fair and there could be big fines if we take him. Do you have any options to get him out of here?

Sent from Proton Mail for iOS

Show quoted text

**Kristin Starkey** Jun 22     ↩ ⋮
to Jess ⌄

Hiya Jessica,

Oh boy! When they are on fair ground property is when it becomes tricky. Was anything signed allowing the fair to own him? I believe there is a way, but it involves being unable to show animals at that fair again.

What is the fee for removal?

There are a few fair offices that have actually hung up on me for asking about live sales, not even mentioning rescue.

If you are able to send any papers about legalities, I can try my best to find a loophole.

But once they're on property and signed over, it gets hard.

Show quoted text

**Jess Daisy** Jun 22



FERN000084



FERN000065







# EXHIBIT I

**In The Matter Of:**

*LONG vs.*

*FERNANDEZ*

---

*DETECTIVE JEREMY ASHBEE*

*August 23, 2023*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File J. Ashbee.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

---oOo-

E.L. a minor, by and through her general
guardian, JESSICA LONG; JESSICA LONG, an
individual,

          Plaintiffs,

                                  Case No. 2:22-cv
               2:22-cv-01527

    vs.

LIEUTENANT JERRY FERNANDEZ, individually
and in his individual capacity as
Sheriff for the County of Shasta;
DETECTIVE JACOB DUNCAN, individually and
in his individual capacity as Sheriff for
the County of Shasta; DETECTIVE JEREMY
ASHBEE, individually and in his
individual capacity for the County of
Shasta; SHASTA DISTRICT FAIR AND EVENT
CENTER, a district agricultural
association; COUNTY OF SHASTA; SHASTA
COUNTY SHERIFF'S DEPARTMENT; MELANIE
SILVA, in her individual capacity; BJ
MACFARLANE, in his individual capacity;
and DOES 1 through 10,

          Defendants.
_____/


VIDEO RECORDED DEPOSITION OF

DETECTIVE JEREMY ASHBEE

WEDNESDAY, AUGUST 23, 2023

9:36 a.m.


Reported by:  JULIE BANGHART, CSR NO. 10547

**Challe, Fisher & Morfin**
**Redding, California  (530)246-0942**

**DETECTIVE JEREMY ASHBEE**

1  mark this Exhibit B, because we also have some questions

2  about it.  I know you didn't write Fernandez's report,

3  nonetheless, but we're still going to ask you some

4  questions.  So this is going to be Exhibit B, so I'm going

11:30  5  to put these there for the time being.

6       So -- oh, and you were -- the warrant is in here.  So

7  you were going to verify that July 8th is in fact the

8  correct date.  So if you want a copy of the warrant from the

9  Incident Report, is -- begins on -- well, I'll just -- I'll

11:31 10  let you look, but it begins on page 15, if you want to just

11  verify the date.  You said July 8th and you were uncertain.

12       (Exhibit B was marked.)

13  Q.    MR. GORDON:  Yes?  July 8th?

14  A.    Yes, the date was July 8th.

11:31 15  Q.    Okay.  Thank you.  You can put that aside for a

16  moment.  So on July 8th -- what did I ask?

17       Madam Court Reporter, what was my question about July

18  8th?  I know you verified the date, but before that when he

19  said he was unsure of the date.

11:32 20       COURT REPORTER:  I don't really see a question.

21       MR. GORDON:  Maybe there wasn't.  Oh, I remember what

22  it was.

23  Q.    I said when did you first hear of Jessica Long

24  removing Cedar from the fair, and you said the day of the

11:32 25  warrant which is July 8th.

**DETECTIVE JEREMY ASHBEE**

| | | |
|---|---|---|
| 1 | A. | July 8th. |
| 2 | Q. | How did you learn of that alleged removal? |
| 3 | A. | I heard from it from Lieutenant Jerry Fernandez. |
| 4 | Q. | Okay.  About what time? |
| 11:32  5 | A. | It was afternoon, probably about 2:00 p.m. |
| 6 | Q. | About 2:00 p.m. |
| 7 | | In person? |
| 8 | A. | Yes. |
| 9 | Q. | Where at? |
| 11:33 10 | A. | In my office. |
| 11 | Q. | In your office. |
| 12 | | And where is your office at? |
| 13 | A. | 300 Park Marina Circle. |
| 14 | Q. | Okay.  All right.  So it's the -- isn't that just the |
| 11:33 15 | | normal -- if I Google Shasta Sheriff's -- |
| 16 | A. | Yes. |
| 17 | Q. | -- that's the address that pops up, 300 Park Marina |
| 18 | | Circle.  Okay.  All right. |
| 19 | | So -- and did he -- about 2:00.  Did you -- |
| 11:33 20 | | Why was he in your office? |
| 21 | A. | To ask me to write a search warrant. |
| 22 | Q. | Okay.  So he came to you? |
| 23 | A. | Yes. |
| 24 | Q. | Okay.  He came to you. |
| 11:33 25 | | And what did he tell you in this conversation? |

**DETECTIVE JEREMY ASHBEE**

```
     1   A.      In summary?  I mean, I can't tell you verbatim.

     2   Q.      Sure.

     3   A.      But in summary, he told me that Jessica Long had

     4   stolen a goat from the Shasta District Fairgrounds.  That

11:33 5   the goat had already been purchased by Brian Dahle and

     6   donated to, it was either 4-H or FFA.  That the owner of the

     7   goat was now the -- I don't what the title -- her title

     8   would be, the President or whatever, of that program or that

     9   club, Kathi Muse.

11:34 10  Q.      He said Kathi Muse was the President of --

    11   A.      I don't know what the title is.

    12   Q.      She had some title with 4-H.

    13   A.      She had some involvement with that club that would

    14   make her --

11:34 15  Q.      Okay.  She was -- he said she was an authority

    16   position in that club or --

    17   A.      I believe so.

    18   Q.      -- had some right to its property?

    19   A.      He identified her as the owner of the goat.

11:34 20  Q.      Okay.  Did he say anything more or he just described

    21   her as the owner?

    22   A.      I believe he just described her as the owner.

    23   Q.      Okay.  Okay.  Because of her relationship with 4-H?

    24   A.      Yes.

11:34 25  Q.      But he didn't describe what the relationship was or
```

**DETECTIVE JEREMY ASHBEE**

1    did he?

2    A.      I don't believe he did.

3    Q.      Okay.  And what else did he tell you?

4    A.      He told me that that goat was stolen from the

11:34  5    fairgrounds and that it was transported or driven to a goat

6    sanctuary in Napa County.

7    Q.      Okay.  All right.  And what else -- okay.  So he told

8    you that.

9            And what else did he tell you?

11:35  10    A.      That's a basic summary of it.  He kind of gave a

11    little bit of the back story of Jessica Long's daughter was

12    raising the goat --

13    Q.      Yeah.

14    A.      -- in one of those agricultural clubs.  I don't know

11:35  15    which one.

16    Q.      4-H, but --

17    A.      4-H.

18    Q.      Okay.  Fair enough.  Okay.  Anything else?

19    A.      And that after the goat was sold, she became

11:35  20    distraught, so her mom stole the goat from the fairgrounds.

21    Q.      Okay.

22    A.      Drove it to Napa County.

23    Q.      And he used the words "stole"?

24    A.      Yeah, I believe so.

11:36  25    Q.      Okay.  All right.  Okay.  So you knew there was a

**DETECTIVE JEREMY ASHBEE**

1  Q.    Okay.  All right.  Is it spelled with an "I", her

2  last name, or is it with a "Y", if you know?

3  A.    I think what was shared with me had an "I", but I'm

4  not certain.

12:33  5  Q.    You're not certain.  Because you didn't -- you didn't

6  know who she was.

7  A.    Yeah.

8  Q.    All right.  Okay.  Okay.  So -- and she -- it looks

9  like she reported it -- oh, wait.  I thought it said Shasta

12:33  10  County fair.

11         According to Muse, Brian Dahle -- Brian Dahle

12  purchasing a goat for auction at the fair for $902.

13         And you didn't see -- you didn't see any sort of

14  proof that there was a purchase of $902 other than -- other

12:34  15  than his statement?

16  A.    Yes.

17  Q.    Okay.  Okay.  And donated the animal to Muse for a

18  4-H community barbecue.  Yes?

19  A.    Yes.

12:34  20  Q.    Okay.  All right.  After the sale was finalized, how

21  did -- how did Lieutenant Fernandez tell you the sale was

22  finalized?  What made it final?  Or did he just tell you a

23  sale occurred?

24  A.    He told me that the animal was sold --

12:34  25  Q.    Okay.

**DETECTIVE JEREMY ASHBEE**

1    A.      -- and donated.

2    Q.      Okay.  And nothing -- those are the only words he

3    used?

4    A.      Yes.  I don't know -- I don't know --

12:34   5    Q.      Some verbiage.

6    A.      I don't know the process is that the fairground does.

7    If the auction -- if somebody buys an animal and donates

8    it --

9    Q.      Yeah.

12:35   10    A.      -- I think it's fair to assume that the animal is

11    sold.

12    Q.      Well, you're swearing under penalty of perjury

13    though, so that means you have to know.  Yes?

14    A.      And I think it's fair to believe that, yes.

12:35   15    Q.      That the sale was finalized --

16    A.      It's my understanding of the word "buy."

17    Q.      Well, you didn't check the Commercial Code, the Civil

18    Code, for transfer of title of sales.  Fernandez didn't

19    check it.  And you're on notice that she's saying, you know,

12:35   20    that:  A.  I'll pay back.  B.  The Dahles said -- the Dahles

21    said yeah, I don't want the goat.  And C.  She's saying it's

22    my property for XYZ reasons, whether they're true or not.

23           So wouldn't that tell you to look into how a sale

24    occurred?

12:35   25           MR. NORTHCUTT:  Objection.  Vague and ambiguous.

**DETECTIVE JEREMY ASHBEE**

1    A.      Yes.

2    Q.      And she made no comment on it at that point in time.

3    And you just -- she made no comment on it before you gave a

4    subsequent version of the warrant?

01:41    5    A.      What do you mean when you say "she made no comment on

6    it"?

7    Q.      Well, she didn't say well, there is probable cause,

8    there's not probable cause.  You hadn't -- did you

9    communicate with her before you sent the subsequent warrant?

01:42   10    A.      She -- she signed the warrant.

11    Q.      Oh, she signed it?

12    A.      Yes.

13    Q.      She signed an earlier version of it?

14    A.      She signed an earlier version.

01:42   15    Q.      Okay.

16    A.      And then I -- when I learned there was information

17    that was a miscommunication, I removed that language and

18    sent it back to her.

19    Q.      Okay.  Okay.  Interesting.  Okay.

01:42   20         Did you -- did you produce a copy of the earlier

21    warrant?

22    A.      I believe that I did.  When talking --

23         MR. NORTHCUTT:  If it's not in there, then we'll get

24    you a copy.

01:42   25         MR. GORDON:  Yeah, sure.  I'm just curious.  I'm

**DETECTIVE JEREMY ASHBEE**

1          THE VIDEOGRAPHER:  We are back on the record and the

2    time is 13:50.

3          MR. GORDON:  Okay.  So, Officer, you have been handed

4    what I'm going to mark as exhibit -- Madam Court Reporter,

01:50  5    can I have your stamp?

6          THE WITNESS:  It's right here.

7          MR. GORDON:  Sorry.  Long day.  Long week.  May I

8    have that back?  I'm going to hand it back to you, Officer,

9    but may I have that for a moment?  What we just received.

01:50 10   A.     This one.

11   Q.     Yes, correct.  The 5:15 warrant you submitted to the

12   judge.  Yes?

13   A.     Yes, 5:15.

14          (Exhibit F was marked.)

01:50 15   Q.     MR. GORDON:  Okay.  What is different from this

16   warrant versus the one that was ultimately executed?

17   A.     There's a line, it's like the third paragraph,

18   "Deputies with the Napa County Sheriff's Office conducted a

19   consent search of the Bleating Hearts Farm and confirmed the

01:50 20   stolen goat was at the location."

21          I received a phone call from Lieutenant Fernandez

22   after I sent him and the Lieutenant from Napa County this

23   warrant, and Lieutenant Fernandez informed me that that was

24   a miscommunication, that nobody from Napa County had saw the

01:51 25   goat there.  So I removed that.

**DETECTIVE JEREMY ASHBEE**

```
 1   Q.     Yeah.
 2   A.     I can put that in the stolen vehicle system.
 3   Q.     Sure.
 4   A.     It can be recovered.
```
12:56
```
 5   Q.     Okay.  Okay.  So what if there's an ownership dispute
 6   though in those instances with like the -- let's use the
 7   stolen car example you just gave.
 8          MR. NORTHCUTT:  Objection.  Incomplete hypothetical.
 9          THE WITNESS:  If there's a dispute between a stolen
```
12:57
```
10   vehicle?
11   Q.     MR. GORDON:  Yeah.
12   A.     If you can see --
13   Q.     Do you resolve -- do you resolve that?  That's a
14   terrible question.  You don't need to object.  I'm going to
```
12:57
```
15   rephrase it.
16          Can the Sheriffs resolve that on their own or does
17   that need to go before a judge?
18   A.     I imagine ultimately, yeah, it's going to go before a
19   judge.
```
12:57
```
20   Q.     Okay.  All right.  Okay.  So here -- all right.
21          So I'm on page 23, Detective.
22   A.     Okay.
23   Q.     All right.  So it says "Due to the fact that items to
24   be seized include living animals, deputies shall secure the
```
12:58
```
25   property in a humane and appropriate location, and the
```

**DETECTIVE JEREMY ASHBEE**

1    rightful owner of said property shall be notified of the

2    location.   The property may be released to the owner upon

3    seizure."

4          Did you add this language?

12:58  5    A.     Yes, I did.

6    Q.     Did Fernandez tell you to add this language?

7    A.     My lieutenant, Lieutenant Chris Edwards, advised me

8    to add this language.

9    Q.     Chris Edwards advised you to add the language.

12:58  10          Did he say why?

11    A.     So that the evidence could be released to the owner.

12    Q.     Okay.   Did you say, hey, this conflicts with 1536?

13    A.     We've done this before with evidence in the search

14    warrants, as been instructed by our DA's office, that if

12:58  15    we --

16    Q.     Instructed by the DA's office?

17    A.     Advised, yeah.   They've given us that advice that we

18    can add this language to a warrant to have certain evidence

19    items released back to owners.

12:59  20    Q.     Okay.

21    A.     Especially in unique circumstances, like a living

22    animal.

23    Q.     Now, the way Fernandez -- Lieutenant Fernandez.

24    Again, I mean no disrespect -- described this, he said,

12:59  25    because as you know, I'm sure you've discussed it with your

**DETECTIVE JEREMY ASHBEE**

```
 1   A.      Because he's -- because he's the boss.
 2   Q.      He's the boss.  Okay.  Just curious.
 3           All right.  So did the DA -- here the DA didn't
 4   advise to add this language though.  Yes?  Or was it
 5   already -- did the DA sign off on this warrant?
 6   A.      Yes.
 7   Q.      Okay.  And -- yeah, that's right.  I saw it in your
 8   email.
 9   A.      Well, Deputy DA, yes.
10   Q.      Deputy DA did that, Eamon, E-A-M-O-N.
11   A.      Yes.
12   Q.      Okay.
13   A.      Eamon Fitzgerald.
14   Q.      Eamon Fitzgerald.  Okay.
15           Why didn't he sign it, out of curiosity?
16   A.      I don't know.
17   Q.      You don't know.  Okay.
18           Okay.  But I believe there is an email from him where
19   it says you have probable cause.
20   A.      Yes.
21   Q.      Okay.  All right.  I think I've seen that.  So --
22   okay.  That's -- all right.  So Chris Edwards told you to
23   add that.
24           Do you know if Chris Edwards okay'd it with the DA,
25   this language?
```

1

2                    CERTIFICATE OF REPORTER

3

4          I, JULIE BANGHART, a Certified Shorthand Reporter,
    licensed by the State of California, License No. 10547,
02:00  5   being empowered to administer oaths and affirmations
02:00      pursuant to Section 2093(b)(1) of the Code of Civil
6    Procedure, do hereby certify:

7          That the witness in the foregoing deposition,
    Detective Jeremy Ashbee, was present at the time and place
8    specified and was by me sworn to testify to the truth, the
    whole truth, and nothing but the truth;

9
           That said proceeding was taken before me in shorthand
02:00  10  writing, and was thereafter transcribed under my direction
02:00      by computer-aided transcription;
11
           That the foregoing transcript constitutes a full,
12   true, and accurate record of the proceedings which took
     place;
13
           That I am not of counsel of attorney for any of the
14   parties hereto, or in any way interested in the event of
     this cause, and that I am not related to any of the parties
02:00  15  hereto.
02:00
16         IN WITNESS WHEREOF, I have hereunto subscribed my
    signature on this 16th day of October, 2023.
17

18

19

02:00  20
                                _____
21

22                             JULIE BANGHART, CSR 10547

23

24

25

**Challe, Fisher & Morfin**                     181
**Redding, California  (530)246-0942**

# EXHIBIT J

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*DETECTIVE JACOB DUNCAN*
*August 22, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File J. Duncan.txt
Min-U-Script® with Word Index

1          UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA

3             SACRAMENTO DIVISION

4

5   E.L., a minor, by and through      )
    her general guardian, JESSICA      )
6   LONG; JESSICA LONG, an             )
    individual,                        )
7                                      )
              Plaintiffs,              )   Case No.
8   vs.                                )   2:22-cv-01527-DAD-AC
                                       )
9   LIEUTENANT JERRY FERNANDEZ         )
    individually and in his           )
10  individual capacity as Sheriff    )
    for the County of Shasta;         )
11  DETECTIVE JACOB DUNCAN,           )
    individually and in his           )
12  individual capacity as Sheriff    )
    for the County of Shasta;         )
13  DETECTIVE JEREMY ASHBEE,          )
    individually and in his           )
14  individual capacity as Sheriff    )
    for the County of Shasta;         )
15  SHASTA DISTRICT FAIR AND EVENT    )
    CENTER, a district agricultural   )
16  association; COUNTY OF SHASTA;    )
    SHASTA COUNTY SHERIFF'S           )
17  DEPARTMENT; MELANIE SILVA, in     )
    her individual capacity; BJ       )
18  MACFARLANE, in his individual     )
    capacity; and DOES 1 through      )
19  10,                               )
                                       )
20            Defendants.             )
    _____)
21

22

        VIDEO DEPOSITION OF DETECTIVE JACOB DUNCAN
23
              TUESDAY, AUGUST 22, 2023
24

25

**DETECTIVE JACOB DUNCAN**

```
1              MR. NORTHCUTT:  Okay.

2              MR. GORDON:  All right.  Okay.  So we'll get to

3     it then in the package I have.  Whatever reason, it

4     didn't register.  All right.  We'll get to that then.

5     Great.

6              Okay.  So -- so I'm going to mark this Exhibit

7     A.

8              (Whereupon, Plaintiff's Exhibit A, Shasta

9              County Sheriff's Office Incident Report,

10             totaling 68 pages, was marked for

11             identification.)

12             MR. GORDON:  Q.  All right.  So what is -- how

13    would you describe the document before you?  What is

14    that?

15    A.       That appears to be the report for the incident

16    in question and also attachments from the investigation.

17    Q.       Okay.  So you testified that you had never --

18    when was the first time you heard of Jessica Long?

19    A.       On the date of this incident when I was told

20    that I was going to be assisting with an investigation.

21    Q.       And who told you you were going to be assisting

22    with an investigation?

23    A.       I believe at first it was my lieutenant, who is

24    Chris Edwards.  But that was through Lieutenant Jerry

25    Fernandez.
```

**DETECTIVE JACOB DUNCAN**

1    Q.      Okay.   So did Chris Edwards report to Fernandez?

2    A.      No.

3    Q.      Okay.   They're both lieutenants?

4    A.      Yes.

5    Q.      Okay.   So it's your understanding that Fernandez

6    asked Edwards to ask you to assist in the investigation?

7    A.      I don't think it was more of an ask.   It was

8    like, hey, you're going to be helping out with this

9    investigation.

10   Q.      A command.  Okay.  Okay.  Gotcha.  All right.

11   So you had no choice to assist?

12   A.      The only ask I was posed was what are you doing

13   tonight.  And are you available.  To which I said, yes,

14   I am available.  And then I was told, okay, you're going

15   to be helping Lieutenant Fernandez with this, and he'll

16   brief you on it.

17   Q.      Okay.  All right.  So -- and that's -- and this

18   is Chris Edwards speaking to you at that time?

19   A.      Yes.

20   Q.      Okay.  All right.  And so what did he tell you

21   you were going to be helping out with?

22   A.      Well, that was a conversation from memory from

23   my recollection because it was a verbal conversation.

24   There's no recording of it.

25           So what I can recall, best of my memory is

**DETECTIVE JACOB DUNCAN**

1    yes?

2    A.      I would believe so.

3    Q.      Okay.  Thank you.  All right.  So we're at the

4    Starky's, and so what happens first?  Who do you speak

5    to first?  Justin or Kristin?

6    A.      I don't recall who we spoke to -- actually, I

7    believe that based on the way my report is drafted, we

8    spoke to Justin Starkey first because I believe Kristin

9    Stover came out after the fact.

10   Q.      I see.  Okay.  Okay.  And so what did you speak

11   with -- did you speak with Justin first?

12          MR. GORDON:  Off the record.

13          THE VIDEO SPECIALIST:  We're off the record.

14   The time is 12:01.

15          (Pause in proceedings.)

16          THE VIDEO SPECIALIST:  We're back on the record.

17   The time is 12:02.

18          MR. GORDON:  Q.  All right.  So I believe my

19   last question was what did you speak with Justin Starkey

20   about?

21   A.      I believe the conversation from my recollection

22   was that we informed him of the search warrant, asked

23   him if he had knowledge of that specific goat, Cedar,

24   and if it was on his property.

25   Q.      Okay.  And how did he respond?

**DETECTIVE JACOB DUNCAN**

1    A.        No.    The goat was not there.

2    Q.        Okay.  All right.  And what else do you remember

3    about your conversation with him?

4    A.        That he provided us -- we had a search warrant

5    for his property, which we informed him, but he also

6    told us was very cordial and compliant with allowing us

7    to search his property.

8    Q.        Okay.  Did he say anything about Jessica?

9    A.        I'm sure he did.  I don't recall specifically

10   what he said about Jessica.

11   Q.        Okay.  Did he say anything about E.L.?

12   A.        Again, same answer.

13   Q.        Okay.  Now, there's an audio recording of when

14   you got to the property, yes, you turned your audio

15   recording on?

16   A.        Yes.

17   Q.        Okay.  Have you listened to that in review of

18   your deposition today?

19   A.        I listened to probably three-quarters of it.

20   Q.        First three-quarters or second --

21   A.        The first three-quarters.  I've listened to it

22   prior too.

23   Q.        Okay.  How many times have you listened to it

24   prior?

25   A.        Probably twice when I was drafting my report.

**DETECTIVE JACOB DUNCAN**

1  does she introduce herself or do you -- well, what

2  happens first?

3  A.      Yeah.  She introduced herself.  And then I think

4  I primarily spoke to her while Lieutenant Fernandez and

5  Justin Starkey searched the property, or he showed

6  Lieutenant Fernandez the property, and he primarily

7  spoke to Justin Starkey.

8  Q.      Okay.  So were you in earshot of him at this

9  time?

10  A.      No.  And I think I was more focused on her

11  conversation and talking to her than what they were

12  talking about.

13  Q.      Okay.  Well, were you in earshot, or were you

14  not in earshot?

15  A.      I don't recall.

16  Q.      You don't recall.  But they were searching the

17  property?

18  A.      Yes.

19  Q.      And you stayed with her?

20  A.      Yes.

21  Q.      Were the goats right, you know, near you at the

22  time?

23  A.      There were animals near us, yes.

24  Q.      Did you go anywhere on the property with her?

25  A.      I don't believe so.  I think her and I were

**DETECTIVE JACOB DUNCAN**

1  didn't find -- well, okay.  Didn't find Cedar at her --

2  at Bleating Hearts, correct?

3  A.      No.

4  Q.      Okay.  Did -- do -- did you -- apart from -- did

5  Fernandez tell you what he discussed with -- with Justin

6  while they were on the backside of the property in the

7  pens?

8  A.      No.  To my recollection, he just told me that

9  the goat was not there.

10  Q.      Okay.  And you couldn't -- he was too far away

11  to be heard at that point in time so you don't -- or is

12  that accurate?

13  A.      Yes.  I believe so.

14  Q.      Okay.  And that's when they were actively

15  looking for Cedar on the property?

16  A.      Yeah.  Justin knew Cedar wasn't there, but

17  Justin was showing Lieutenant Fernandez the property,

18  yes.

19  Q.      Okay.  Okay.  And then you -- then you -- what

20  happened next?  What did you do while you were with

21  Kristin?

22  A.      So Kristin and I were, as you previously played,

23  just conversing.

24  Q.      Yeah.

25  A.      And I was asking her about Cedar.  And while she

**DETECTIVE JACOB DUNCAN**

1  was looking for I believe Jessica's phone number, she
2  was standing close to me and I could see her scrolling
3  through some emails and I pointed that fact out to her
4  and she said, yeah, I got some emails here or something
5  along those lines, it's in the recording, but she said
6  something similar and I asked her if I could see them
7  and she said some form of "yeah" and handed me the phone
8  to view those.
9  Q.      So that was her mistake, right?  You would not
10  have --
11  A.      I think she was -- I think she was a
12  good-natured person.  I think my opinion is that she was
13  nervous just talking to law enforcement, but she had
14  intentions to be cooperative.  So she obviously lied
15  throughout our contact.
16  Q.      Yeah.
17  A.      But I -- you know.  So.
18  Q.      Okay.  Why do you think she didn't say where
19  Cedar was?
20          MR. NORTHCUTT:  Objection.  Calls for
21  speculation.  Go ahead.
22          THE WITNESS:  Based on the context of what we
23  were saying, I think that she was trying to limit her
24  involvement while also she has a goat sanctuary, so I
25  imagine she probably obviously cared about Cedar as well

**DETECTIVE JACOB DUNCAN**

 1  and didn't want us to obtain Cedar.

 2          MR. GORDON:  Q.  Yeah.  Okay.  Okay.  So about

 3  how long -- the recording is 23 minutes.  Is that about

 4  how long -- or 23 minutes and change.  Is that about how

 5  long you were at Kristin's and Justin's property?

 6  A.      Yes.  I believe so.

 7  Q.      Okay.  All right.  And -- okay.  What did you do

 8  when you left their property?

 9  A.      Well, in my conversation with Kristin and review

10  of her emails, I discovered that Cedar was at Billy's

11  Mini Goat Farm in Sonoma.

12  Q.      Okay.  So you concluded that in your

13  investigation.  What did you -- so about what time --

14  about what time did you leave the Bleating Hearts?

15  A.      I think we left directly following when that

16  interview ended.  We went directly to Billy's Mini Goat

17  Farm in Sonoma.

18  Q.      Do you remember approximately what time that

19  was?

20  A.      Well, we got there at 7:30, and the recording is

21  23 minutes.  I would say probably around eight o'clock

22  that night.

23  Q.      So at Bleating Hearts -- or Ray's Farm where

24  you -- where you concluded Cedar was, that was not in

25  Napa County, right?

**DETECTIVE JACOB DUNCAN**

1    probably 8:45ish when you got there?

2    A.        I would imagine sometime around then.

3    Q.        Sometime around then.  Okay.  And what happened

4    when you arrived at Ray's?

5    A.        I called the property owner and -- well, we -- I

6    think we attempted contact, and nobody answered the

7    door.

8    Q.        So would -- does that mean you just went and

9    knocked on the door or rang a doorbell?

10   A.        Yeah.  I think we tried to make contact at the

11   residence first.  I know I called the property owner.  I

12   don't remember if we tried to make contact with him at

13   the residence before we called him, but I know we called

14   the property owner.  Or I called the property owner.

15   Q.        Okay.  All right.  So you go up, he's not home

16   and you -- you got the number of the property owner from

17   the emails that Kristin showed you?

18   A.        From the website.

19   Q.        From the website, okay.  So you checked the

20   website before you went?

21   A.        Yes, I did.

22   Q.        Okay.  All right.  And why did you call and not

23   Fernandez?

24   A.        I think it was just a matter of, you know, I

25   took the initiative to call them.  You know, I don't

**DETECTIVE JACOB DUNCAN**

1  think there was a specific purpose of he called them or
2  I called them.
3  Q.       Okay.  But you didn't, according to you, didn't
4  really know much about the case other than there was a
5  goat allegedly stolen by Fernandez?
6  A.       Yeah.
7  Q.       Okay.  So you called.  Was the gentleman's name
8  Ray?
9  A.       Yes.  I think he identified himself as Raymond
10  Allen.
11  Q.       Raymond Allen.  And what did you say to Raymond
12  Allen?
13  A.       I explained that we were conducting an
14  investigation into a stolen goat and that we had reason
15  to believe that a female -- I don't know if I identified
16  her as Jessica or not, but a female subject had dropped
17  the goat off at his residence.
18  Q.       Okay.  So and you used the word, "stolen," to
19  Ray?
20  A.       Yes.  I believe I told him that it was a stolen
21  goat investigation.
22  Q.       Did you tell him that it hadn't been adjudicated
23  by a judge yet?
24  A.       No.
25  Q.       You just told him it was an investigation?

**DETECTIVE JACOB DUNCAN**

1   A.      Yes.

2   Q.      Okay.  So presumably he understood it to be an

3   open investigation?

4   A.      I can't speculate as far as what he thought, but

5   I can tell you what I told him which is I told him it

6   was a stolen goat investigation.

7   Q.      You used the word, "investigation," for sure?

8   A.      I don't know if I used the word,

9   "investigation," or if I said, "I'm investigating a

10  stolen goat," but it was somewhere along those lines.

11  Q.      Okay.  Gotcha.  And what did he say?

12  A.      He told me specifically that a female subject

13  had come and donated the goat.  He knew what goat I was

14  talking about.  He said that recently a female had came

15  and donated the goat to him and that it still had the

16  fair tags on its ears, and he said he didn't want

17  anything to do with it and that we had permission to

18  retrieve the goat and told me exactly where the goat was

19  on his property.

20  Q.      Okay.  Did you ask him why there were tags on --

21  yeah, did you ask him why there were still tags on it?

22  A.      Well, he said it was from the fair.

23  Q.      But if it's a donation, why didn't he presume it

24  was his goat at that point in time?

25  A.      I agree with you.  However, what I can tell you

**DETECTIVE JACOB DUNCAN**

1   is he told me the tags were still on there.  I construed

2   that as like he was aware it was from the fair because

3   it still had tags on it.  But I didn't -- I didn't do

4   a -- inquire as far as like why he did this or why he

5   didn't do this.

6   Q.      And I notice you emphasized the word, "donate,"

7   twice.  Did he -- he definitely used the word, "donate"?

8   A.      He definitely used the word, "donate."

9   Q.      So why does that word stick out to you in the

10  conversation versus your inability to remember all the

11  other conversations you had that day?

12          MR. NORTHCUTT:  Objection.  Argumentative.

13          MR. GORDON:  That's a fair question.

14          THE WITNESS:  Specifically I know that he said

15  "donate" because for me, my job is to do the

16  investigation.  I may not be in charge of the actual

17  whole investigation, but I'm a detective, so my

18  detective brain is thinking about what allows us to take

19  things off of a property, what doesn't allow us to take

20  things off of property, who has rights or ownership to

21  the property.  And so him using the specific verbiage,

22  "donate," is what gives him standing over that goat and

23  allows him to then give us the goat.

24          MR. GORDON:  Q.  Did you call Jessica to see if

25  it was a donation?

**DETECTIVE JACOB DUNCAN**

1  You said there was a side pen?

2  A.        Yeah.   And we found Cedar and we retrieved Cedar

3  and placed Cedar in the animal compartment of the

4  vehicle and we left.

5  Q.        Did he cooperate?   Cedar?

6  A.        I don't remember there being a struggle.

7  Q.        Okay.   So he just walked him out of there.   All

8  right.   And what did you do next?

9  A.        We drove back to Shasta County.

10 Q.        Okay.   And yesterday I had asked Fernandez if he

11 was on the clock on this and he said he was -- or

12 Lieutenant Fernandez.   I mean no disrespect.   I asked

13 Lieutenant Fernandez if he was on the clock for this,

14 and he said he was salaried.   But he testified you

15 received overtime for this; is that accurate?

16 A.        I don't get salary, so anything I do in a work

17 capacity is overtime.

18 Q.        Is overtime, okay.   Okay.   How many hours OT was

19 this?

20 A.        Anything that was worked outside of 5 p.m.

21 Q.        Five p.m. your shift cut off?

22 A.        Yeah.   So whatever time we got back, which I

23 don't recall a specific time, but anything from 5 p.m.

24 to when we got back.

25 Q.        Okay.   Do you remember approximately when you

**DETECTIVE JACOB DUNCAN**

1  got back?

2  A.       I don't, but I can deduce if we were there

3  around 9 or 9:30, we probably got back sometime around

4  midnight.  So midnight or 1.

5  Q.       Okay.  Did your wife make any comments about you

6  going all the way to Napa then Sonoma and coming back

7  for a goat?

8  A.       My wife makes comments about any time I'm

9  working late.

10 Q.       This one in particular?

11 A.       No.  She makes comments any time I'm working

12 late, so I imagine she probably said something to the

13 effect of missed you for dinner or something like that.

14 Q.       All right.  Gotcha.  All right.  But no comments

15 come to mind on this particular date?

16 A.       No.

17 Q.       Okay.  So the only comment that you can remember

18 making light of the situation would be your -- the one

19 that you recorded on with Ms. Starkey saying I can't

20 believe we came down here for a goat?

21 A.       When I was empathizing with her to try and

22 create a rapport.

23 Q.       Mirroring with her?

24 A.       Yes.

25 Q.       Are you mirroring right now?

REPORTER'S CERTIFICATE

1

2

3      I hereby certify that the witness in the
4  foregoing deposition was duly sworn by me to tell the
5  truth, the whole truth, and nothing but the truth in the
6  within-entitled cause; that said deposition was taken at
7  the time and place herein named; and that the testimony
8  of said witness was reported by me, a duly certified
9  shorthand reporter and disinterested person, and was
10  thereafter transcribed under my direction by
11  computer-assisted transcription.

12      I further certify that I am not of counsel or
13  attorney for either or any of the parties to said
14  deposition, nor in any way interested in the outcome of
15  the case named in said caption.

16      IN WITNESS WHEREOF, I have hereunto set my
17  hand.

18

19      DATED:  SEPTEMBER 2, 2023

20

21

22  _____

23          SUZANNA MICKELSON, CSR No. 14270

24                State of California

25

# EXHIBIT K

**In The Matter Of:**

*LONG vs.*

*FERNANDEZ*

---

*BRUCE JOHN 'B.J.' MACFARLANE*

*November 15, 2023*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File B.J. Macfarlane.txt

Min-U-Script® with Word Index

```
 1                    UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF CALIFORNIA

 3                       SACRAMENTO DIVISION

 4   E.L., a minor, by and through her  )
     general guardian, JESSICA LONG;    )
 5   JESSICA LONG, an individual,       )
                                        )
 6                      Plaintiffs,     )
                                        )
 7      vs.                             )
                                        ) NO. 2:22-cv 01527
 8   LIEUTENANT JERRY FERNANDEZ,        ) DAD-AC
     individually and in his           )
 9   individual capacity as Sheriff    )
     for the County of Shasta;         )
10   DETECTIVE JACOB DUNCAN,           )
     individually and in his           )
11   individual capacity as Sheriff    )
     for the County of Shasta;         )
12   DETECTIVE JEREMY ASHBEE,          )
     individually and in his           )
13   individual capacity as Sheriff    )
     for the County of Shasta; SHASTA  )
14   DISTRICT FAIR AND EVENT CENTER, a )
     district agricultural             )
15   association; COUNTY OF SHASTA;    )
     SHASTA COUNTY SHERIFF'S           )
16   DEPARTMENT; MELANIE SILVA, in her )
     individual capacity; BJ          )
17   MACFARLANE, in his individual     )
     capacity; and DOES 1 through 10,  )
18                                      )
                        Defendants.     )
19   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

20                        ---oOo---
                  WEDNESDAY, NOVEMBER 15, 2023
21                        10:08 a.m.
          VIDEOTAPED DEPOSITION OF BRUCE JOHN "B.J."
22                       MACFARLANE
                         ---oOo-
23

24

25        Reported by:  CAROL J. CHASE, CSR No. 13538
```

**BRUCE JOHN 'B.J.' MACFARLANE**

1              And, B.J., we're not going to be publishing
2       anyone's --
3          A     I know.
4          Q     -- phone numbers.  It's just in case we
14:10:57  5       need to get in touch --
6          A     (530) 776-4964.
7          Q     4964.  Okay.  All right.
8          A     He's going to get a lot of spams.
9          Q     Okay.  All right.  So back to this e-mail
14:11:13 10       chain for a moment.  So Kathie responds, "Thanks.
11       Keep me updated."  She testified that J was a typo
12       that -- she didn't mean your nickname J instead of
13       B.J.
14              And -- so then there's a -- there's a --
14:11:27 15       that's June 29th.  And then there's a -- then
16       there's a -- a gap.  And the next one is June 9 --
17       July 9th at 7:13 a.m.  I'm sorry.  You respond,
18       "Will do."  I'm assuming that is in -- your response
19       to, "Keep me post- -- updated"?
14:11:45 20          A     Yeah.
21          Q     So then, it looks like, July 9th, "Goat is
22       at my house."
23              So the -- the sheriffs or several of
24       sheriff -- Lieutenant Fernandez and Duncan dropped
14:11:58 25       the goat off the preceding evening at your house,

**BRUCE JOHN 'B.J.' MACFARLANE**

1    correct?

2        A       Yes.

3        Q       Okay.  All right.  And about what time did

4    they drop him off?

14:12:06  5        A       It was 11:30 or something.  It was late at

6    night.

7        Q       Late at night.  Okay.  And did you know

8    they were dropping him off that day?

9        A       Yes.

14:12:17 10        Q       Okay.

11        A       I think Melanie -- I don't know how it went

12    down.  I don't know if Melanie called me and told me

13    they were bringing it.

14        Q       Do you about know what time she called?

14:12:38 15        A       No.  It would have been -- no idea.  And if

16    she -- I don't -- I do not remember how.

17        Q       Okay.  But, obviously, earlier than when

18    the sheriffs got there?

19        A       Yeah.

14:12:58 20        Q       Yeah.  So --

21        A       That afternoon, assuming.  I think it was

22    Melanie that afternoon said that they were going to

23    perform the search warrant or whatever warrant they

24    had.

14:13:18 25        Q       Uh-huh.  Okay.  So she told you in the

**BRUCE JOHN 'B.J.' MACFARLANE**

|   |   |
|---|---|
| 1 | you were -- just to clarify in your -- from your |
| 2 | perspective, you felt like you were operating under |
| 3 | the direction of Melanie and the sheriff -- |
| 4 | A    Yes. |
| 14:21:45  5 | Q    -- office? |
| 6 | Okay.  And potentially the CDFA, I guess, |
| 7 | also? |
| 8 | A    Yes.  The CDFA. |
| 9 | Q    And the District Attorney?  Okay.  All |
| 14:21:50 10 | right. |
| 11 | Okay.  So what -- Bowman is a -- is a -- a |
| 12 | slaughtering facility, yes? |
| 13 | A    Processing facility. |
| 14 | Q    Processing facility.  I apologize. |
| 14:22:02 15 | Okay.  And what is the full name if you |
| 16 | know? |
| 17 | A    Bowman Meats. |
| 18 | Q    Bowman Meats.  And where is that at? |
| 19 | A    Bowman Road, Cottonwood. |
| 14:22:11 20 | Q    Bowman Road, Cottonwood.  Okay.  So did you |
| 21 | bring Cedar to Bowman Meats on the 28th? |
| 22 | A    No. |
| 23 | Q    What day did you bring him there? |
| 24 | A    They came to my house. |
| 14:22:29 25 | Q    They came to your house.  So they came and |

**BRUCE JOHN 'B.J.' MACFARLANE**

1    retrieved Cedar on --  what day did that happen?

2       A      (Nodding.)  The 28th, I'm guessing.

3       Q      Okay.  Okay.  Well, did this refresh your

4    memory and you remember now it being the 28th, the

14:22:44  5    same day you wrote this text?

6       A      I don't know.  I -- I couldn't tell you the

7    dates.  I'm sorry.

8       Q      Okay.  Okay.

9       A      I can tell you the dates, because I can

14:22:51 10    look at this text message and see it was --

11       Q      Okay.

12       A      -- the 28th.

13       Q      Okay.  So is it fair to say your best

14    estimate, though --

14:22:54 15       A      Yes.

16       Q      -- is the 28th?

17              Okay.  All right.  Okay.  So were -- so

18    Kathie writes, Goods news.  Finally.  And please

19    don't forget to save the ear tags.  Did -- did you

14:23:09 20    save Cedar's ear tags?

21       A      I did at one point.  I'm not sure what

22    happened to 'em to be honest with you.

23       Q      Okay.  And why were you supposed to save

24    his ear tags?

14:23:22 25       A      I -- because Kathie told me to save ear

```
1                    CERTIFICATE OF REPORTER

2

3          I, CAROL J. CHASE, a Certified Shorthand

4     Reporter, licensed by the State of California,

5     License No. 13538, being empowered to administer

6     oaths and affirmations pursuant to Section 2093 (b)

7     of the Code of Civil Procedure, do hereby certify:

8          That the witness in the foregoing deposition,

9     BRUCE JOHN "B.J." MACFARLANE, was present at the

10    time and place specified and was by me sworn to

11    testify to the truth, the whole truth, and nothing

12    but the truth;

13         That said proceeding was taken before me in

14    shorthand writing, and was thereafter transcribed

15    under my direction by computer-aided transcription;

16         That the foregoing transcript constitutes a

17    full, true, and accurate record of the proceeding

18    which took place; That I am not of counsel or

19    attorney for any of the parties hereto, or in any

20    way interested in the event of this cause, and that

21    I am not related to any of the parties hereto.

22         IN WITNESS WHEREOF, I have hereunto subscribed

23    my signature on this 28th day of November, 2023.

24
                      _____
25                         CAROL J. CHASE
```

# In The Matter Of:

*LONG vs.*

*FERNANDEZ*

---

*B.J. MACFARLANE*

*Vol. 2*

*February 9, 2024*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California  96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File B.J. Macfarlane, Vol II.txt

**Min-U-Script® with Word Index**

1                   UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                       SACRAMENTO DIVISION

4

5   E.L., a minor, by and through    )
    her general guardian, JESSICA     )
6   LONG; JESSICA LONG, an            )
    individual,                       )
7                                     )
               Plaintiffs,            )   Case No.
8   vs.                               )   2:22-cv-01527-DAD-AC
                                      )
9   LIEUTENANT JERRY FERNANDEZ        )
    individually and in his          )
10  individual capacity as Sheriff   )
    for the County of Shasta;        )
11  DETECTIVE JACOB DUNCAN,          )
    individually and in his          )
12  individual capacity as Sheriff   )
    for the County of Shasta;        )
13  DETECTIVE JEREMY ASHBEE,         )
    individually and in his          )
14  individual capacity as Sheriff   )
    for the County of Shasta;        )
15  SHASTA DISTRICT FAIR AND EVENT   )
    CENTER, a district agricultural  )
16  association; COUNTY OF SHASTA;   )
    SHASTA COUNTY SHERIFF'S          )
17  DEPARTMENT; MELANIE SILVA, in    )
    her individual capacity; BJ      )
18  MACFARLANE, in his individual    )
    capacity; and DOES 1 through     )
19  10,                              )
                                      )
20             Defendants.           )
    _____ )

21

22           VIDEO DEPOSITION OF BJ MACFARLANE

23              PAGE 225-391, VOLUME II

24            FRIDAY, FEBRUARY 9, 2024

25

**B.J. MACFARLANE**

| | |
|---|---|
| 08:35:52AM 1 | Q.      All right.  One second.  Let me -- so maybe this |
| 08:36:04AM 2 | will -- |
| 08:36:04AM 3 | A.      I believe it's in there -- |
| 08:36:05AM 4 | Q.      -- refresh your memory, yeah.  So read the |
| 08:36:08AM 5 | second page of text.  Said, "Bowman is killing the goat |
| 08:36:12AM 6 | today." |
| 08:36:12AM 7 | A.      July 28th. |
| 08:36:13AM 8 | Q.      Okay.  So that's the date Bowman Meats came out |
| 08:36:17AM 9 | to your property to kill -- to do Cedar?   Okay. |
| 08:36:21AM 10 |         So do you remember about -- did you arrange with |
| 08:36:24AM 11 | Bowman's to come out? |
| 08:36:25AM 12 | A.      Yes. |
| 08:36:25AM 13 | Q.      Okay.  And who did you speak with at Bowman's? |
| 08:36:28AM 14 | A.      I don't remember her name.  Gal in our -- |
| 08:36:32AM 15 | Q.      Serene?  Is that her name? |
| 08:36:35AM 16 | A.      Could be. |
| 08:36:35AM 17 | Q.      Okay.  Is there another woman at Bowman's |
| 08:36:38AM 18 | besides Serene? |
| 08:36:39AM 19 | A.      I'm not familiar with them, so. |
| 08:36:41AM 20 | Q.      How often -- you're not familiar with them, |
| 08:36:44AM 21 | okay. |
| 08:36:44AM 22 |         How often have you done business with Bowman's |
| 08:36:46AM 23 | prior to this slaughter? |
| 08:36:47AM 24 | A.      Personally, never.  Through the fair, I've |
| 08:36:54AM 25 | talked to, I'm guessing the same woman, I talked to her |

**B.J. MACFARLANE**

11:09:38AM 1        Is that text, did you understand that to refer

11:09:41AM 2    to Cedar because you were having a lot of issues with

11:09:43AM 3    Cedar around that point in time?

11:09:45AM 4    A.      Yes.

11:09:47AM 5    Q.      Okay.  Now, this is -- do you know the date of

11:09:50AM 6    that text?

11:09:50AM 7    A.      July 28th.  Or July 18th, I'm sorry.  July 18th.

11:10:11AM 8    Q.      Okay.  So the next text on here you have -- it

11:10:17AM 9    goes to July 22nd, and you have "FOF pig 263 pounds."

11:10:22AM 10   That has nothing to do with Cedar, correct?

11:10:24AM 11   A.      No.

11:10:24AM 12   Q.      And FOF is just Friends of Fair?

11:10:27AM 13   A.      Yeah.

11:10:28AM 14   Q.      Okay, thanks.  And then you respond, "What's

11:10:30AM 15   gal's name at Bowman?  Kathie said okay but no one needs

11:10:33AM 16   to know about this.  You and me are the" -- "and Kathie

11:10:37AM 17   are the only ones" -- "are only ones."  This is

11:10:39AM 18   referring to Cedar, yes?

11:10:40AM 19   A.      Yes.

11:10:41AM 20   Q.      Okay.  "It got killed and donated to nonprofit

11:10:44AM 21   if anyone asks."

11:10:47AM 22           Why would -- why would there be -- why did you

11:10:51AM 23   say this should have been donated to a nonprofit if

11:10:55AM 24   anyone asks?

11:10:56AM 25   A.      Because the -- I think Kathie's the one that

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I hereby certify that the witness in the

 4    foregoing deposition was duly sworn by me to tell the

 5    truth, the whole truth, and nothing but the truth in the

 6    within-entitled cause; that said deposition was taken at

 7    the time and place herein named; and that the testimony

 8    of said witness was reported by me, a duly certified

 9    shorthand reporter and disinterested person, and was

10    thereafter transcribed under my direction by

11    computer-assisted transcription.

12           I further certify that I am not of counsel or

13    attorney for either or any of the parties to said

14    deposition, nor in any way interested in the outcome of

15    the case named in said caption.

16           IN WITNESS WHEREOF, I have hereunto set my

17    hand.

18

19           DATED:  FEBRUARY 25, 2024

20

21

22    _____

23           SUZANNA MICKELSON, CSR No. 14270

24                   State of California

25
```