RYAN R. GORDON (SBN 278414)
VANESSA T. SHAKIB (SBN 287339)
**ADVANCING LAW FOR ANIMALS**
407 N. Pacific Coast Highway #267
Redondo Beach, CA 90277
Tel: (202) 996-8389
rgordon@advancinglawforanimals.org
vshakib@advancinglawforanimals.org

DANIEL J. KOLDE, ESQ.
**LAW OFFICES OF DANIEL J. KOLDE**
P.O. Box 440344
St. Louis, Missouri 63144-9998
Tel: 636.675.5383
Email: daniel.kolde.law@gmail.com
(*pro hac vice application to be filed*)

Attorneys for Plaintiffs

ADVANCING LAW FOR ANIMALS

# UNITED STATES DISTRICT COURT

## EASTERN  DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual,<br><br>           Plaintiffs,<br><br>   v.<br><br>LIEUTENANT JERRY FERNANDEZ, in his individual capacity; DETECTIVE JACOB DUNCAN, in his individual capacity; DETECTIVE JEREMY ASHBEE, in his individual capacity; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association; COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual and official capacity; BJ MACFARLANE, in his individual and official capacity; KATHIE MUSE, in her individual and official capacity, and DOES 1 through 10, | Case No. 2:22-cv-01527-DAD-AC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS MELANIE SILVA AND B.J. MACFARLANE; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Plaintiffs' Request for Judicial Notice and Declarations of Ryan Gordon and Jessica Long filed concurrently]<br><br>Date: January 7, 2025<br>Time: 1:30 pm<br>Courtroom: 4, 15th Floor<br><br>Trial Date: March 24, 2025<br><br>Action Filed: August 31, 2022 |

**TO THE COURT, THE PARTIES, AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 7, 2025, at 1:30 pm in Courtroom 4 of the United States District Court for the Eastern District of California, located on the 15th Floor in the Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, CA 95814, Plaintiffs Jessica Long ("Mrs. Long") and her minor daughter, E.L. (collectively, "Plaintiffs") will and do move this Court, pursuant to Federal Rules of Civil Procedure, Rule 56, for an order granting partial summary judgment against Defendant B.J. Macfarlane ("Mr. Macfarlane") and/or Defendant Melanie Silva ("Ms. Silva") as follows:

1. On the issue of liability as alleged in Plaintiffs' Third Cause of Action for Wrongful Search and Seizure brought under 42 U.S. Code § 1983, that partial summary judgment be granted against Mr. Macfarlane finding him liable for violating Plaintiffs' rights under the Fourth Amendment. The amount of damages for such liability will later be determined at trial;

2. On the issue of liability as alleged in Plaintiffs' Third Cause of Action for Wrongful Search and Seizure brought under 42 U.S. Code § 1983, that partial summary judgment be granted against Ms. Silva finding her liable for violating Plaintiffs' rights under the Fourth Amendment. The amount of damages for such liability will later be determined at trial;

3. On the issue of liability as alleged in Plaintiffs' Fourth Cause of Action for Violations of Due Process brought under 42 U.S. Code § 1983, that partial summary judgment be granted against Mr. Macfarlane finding him liable for violating Plaintiffs' rights under the Fourteenth Amendment. The amount of damages for such liability will later be determined at trial; and

4. On the issue of liability as alleged in Plaintiffs' Fourth Cause of Action for Violations of Due Process brought under 42 U.S. Code § 1983, that partial summary judgment be granted against Ms. Silva finding her liable for violating Plaintiffs' rights under the Fourteenth Amendment. The amount of damages for such liability will later be determined at trial.

This motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Request for Judicial Notice ("RJN"), the concurrently-filed Declaration of Jessica Long ("Long Decl."), and the concurrently-filed Declaration of Ryan Gordon ("Gordon Decl.), all additional matters of which this Court must or may take judicial notice, all

ADVANCING LAW FOR ANIMALS

pleadings and records on file in this action, and on such further authority, evidence, or argument as may be presented at or before the hearing on this motion.

Counsel for Plaintiffs certify the parties engaged in pre-filing meet and confer efforts. Correspondence exchanged in furtherance of these efforts is reflected in ¶ 46 to concurrently-filed Declaration of Ryan Gordon.

**ADVANCING LAW FOR ANIMALS**

Dated:  November 15, 2024          By:____/s/Ryan Gordon_____
                                   Ryan Gordon
                                   Vanessa Shakib
                                   Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ................................... 2

       A.    Plaintiffs Purchased Cedar for the Shasta Fair Junior Livestock Auction ................. 2

       B.    Local Rules, State Rules, and Bidder's Rules Governed the Shasta Fair Junior
             Livestock Auction ................................................................................................. 3

       C.    Following the Auction, E.L. Decided Not to Sell Cedar and Plaintiffs
             Removed Him from the Shasta Fair ...................................................................... 4

       D.    Plaintiffs Notified Fair Defendants They Did Not Want to Sell Cedar, Offered
             to Pay Damages, and Memorialized Their Intent to Sue ........................................ 5

       E.    Shasta County Sheriff's Officers Seized Cedar and Turned Him Over to the
             Fair Defendants and Mrs. Muse ............................................................................ 6

       F.    Fair Defendants Secretly Held Cedar for Weeks, Ultimately Slaughtering him
             on July 28, 2022, Without Any Judicial Authorization or Notice to Plaintiffs ........... 6

       G.    Discovery Confirmed No Bidder Ever Paid for Cedar ............................................ 7

III.   LEGAL STANDARD FOR SUMMARY JUDGMENT ..................................... 8

IV.    THE LONGS RETAINED CONSTITUTIONALLY PROTECTED INTERESTS IN
       CEDAR AFTER THE JUNIOR LIVESTOCK AUCTION .............................. 8

       A.    No Auction Sale Occurred Because No Bidder Ever Paid for Cedar ........................ 9

       B.    Title Remained With Plaintiffs as a Matter of Auction Law .................................. 10

       C.    Any Sales Contract Was Canceled by E.L.'s Absolute Statutory Right to
             Disaffirmation, or the Longs' Right to Efficient Breach ....................................... 11

       D.    Even Disputed Property Interests Are Protected by the Constitution ...................... 14

V.     FAIR DEFENDANTS ARE PUBLIC EMPLOYEES AND ACTED UNDER
       COLOR OF LAW ............................................................................................. 16

VI.    FAIR DEFENDANTS VIOLATED PLAINTIFFS' CLEARLY ESTABLISHED
       DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT ...... 17

       A.    Mr. Macfarlane Detained and Destroyed Plaintiffs' Property Interests in Cedar
             Without Notice or Hearing ................................................................................. 17

       B.    Ms. Silva Participated as Mr. Macfarlane's Supervisor in Detaining and
             Destroying Plaintiffs' Property Interests in Cedar Without Notice or Hearing ........ 19

ADVANCING LAW FOR ANIMALS

C.    Plaintiffs Would Have Prevailed Had They Been Given Notice of Cedar's
      Seizure ........................................................................................................... 21

VII.  FAIR DEFENDANTS VIOLATED PLAINTIFFS' CLEARLY ESTABLISHED
      RIGHTS UNDER THE FOURTH AMENDMENT ............................................. 21

A.    Mr. Macfarlane and Ms. Silva Seized Cedar When They Slaughtered Him.............. 22

B.    Cedar's Warrantless Seizure Lacked Judicial Authorization and Did Not Fall
      Within Any Well-Defined Exception....................................................................... 23

VIII. CONCLUSION ................................................................................................. 25

ADVANCING LAW FOR ANIMALS

# TABLE OF AUTHORITIES

ADVANCING LAW FOR ANIMALS

**Federal Cases**

*Abbott v. Latshaw*
    164 F.3d 141 (3rd Cir. 1998)……………………………………………….14

*Aegis Software, Inc. v. 22nd District Agricultural Association*
    WL 4542360 (S.D. Cal. August 31, 2016)………………………………….16

*Altman v. City of High Point, N.C.*
    330 F.3d 194 (4th Cir. 2003)…………………………………….………..22

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ………………………………………………..……….8

*Archer v. Gipson*
    108 F. Supp. 3d 895 (E.D. Cal. 2015)… ………………………….…….... 23

*Armijo v. Pacheco*
    2015 WL 13662794 (D.N.M. July 22, 2015)… …………………………..…..14

*Board of Regents of State Colleges v. Roth*
    408 U.S. 564 (1972)…… …………………………………………………….18

*Brazier v. California Dept. of Correction and Rehabilitation*
    523 Fed.Appx. 477 (9th Cir. 2013)…… ……………………..……….14, 15

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*
    149 F.3d 971 (9th Cir. 1998)… …………………………………...8, 17, 18

*Brown v. Muhlenberg Township*
    269 F.3d 205 (3d Cir. 2001)… ……………………………………….…..22

*California Association for Preservation of Gamefowl v. Stanislaus County*
    2023 WL 1869010 (E.D. Cal. Feb. 9, 2023) …………………………..………17

*Carrera v. Bertaini*
    63 Cal.App.3d 721 (5th Dist.1976)… …………………………………….17

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ……………………………………………...……….8

*Criscuolo v. Grant Cnty.*
    540 F. App'x 562 (9th Cir. 2013)…..……………………………………...…21

*Dixon v. Lowery*
    302 F.3d 857 (8th Cir. 2002)… …………………………………..…14, 23, 24

*Dubner v. City & Cnty. of San Francisco*
    266 F.3d 959 (9th Cir.2001)… …………………………………………..20

*Filarsky v. Delia*
    566 U.S. 377 (2012)… ………………………………………….…………16

*Fontenot v. Upjohn Co.*
    780 F2d 1190 (5th Cir. 1986)… ……………………………………….19

ADVANCING LAW FOR ANIMALS

*Fuentes v. Shevin*
407 U.S. 67 (1972)………………………………………………...……1, 14, 15, 21

*Fuller v. Vines*
36 F.3d 65 (9th Cir.1994)………………………………………………21, 22

*Graham v. Connor*
490 U.S. 386 (1989)………………………………………………...………24

*Harrell v. City of New York*
138 F.Supp.3d 479 (S.D.N.Y. 2015)………………………………...…14

*Hollandsworth v. City and County of Honolulu,*
489 F.Supp.3d 1085 (D. Hawaii 2020) ………………………………...……14

*In re Western States Wire Corp.*
490 F.2d 1065 (9th Cir. 1974)………………………………………....10

*Kailin v. Village of Gurnee*
77 F.4th 476 (7th Cir. 2023) ………………………………...………22

*La Jolla Cove Investors, Inc. v. Sultan Corp. Ltd.*
2011 WL 4916138 (S.D. Cal. Oct. 17, 2011) ………………………………13

*LaLonde v. Cnty. of Riverside*
204 F.3d 947 (9th Cir. 2000)………………………………………………24

*Lesher v. Reed*
12 F.3d 148 (8th Cir. 1994) ……………………………………………14, 22

*Logan v. Zimmerman Brush Co.*
455 U.S. 422 (1982) ………………………………………………….......18

*Lyall v. City of Los Angeles*
807 F.3d 1178 (9th Cir. 2015) …………………………………...……….9

*Maldonado v. Fontanes*
568 F.3d 263 (1st Cir. 2009) ………………………………………………22

*Mathews v. Eldridge*
424 U.S. 319 (1976)…………………………………………...…………18

*Maxwell v. County of San Diego*
708 F.3d 1075 (9th Cir. 2013) …………………………………………….20

*Mayfield v. Bethards*
826 F.3d 1252 (10th Cir. 2016)…………………………………………….22

*Naffe v. Frey*
789 F.3d 1030 (9th Cir. 2015) …………………………………………16

*OSJ PEP Tennesse LLC v. Harris*
2014 WL 4988070 (C.D. Cal. Oct. 7, 2014)……………………………...…14, 22

*Patel v. Kent Sch. Dist.*
648 F.3d 965 (9th Cir. 2011) …………………………………………….16

ADVANCING LAW FOR ANIMALS

*Reese v. BP Exploration (Alaska) Inc.,*
    643 F.3d 681 (9th Cir. 2011)… ……………………………………………………13

*San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*
    402 F.3d 962 (9th Cir. 2005)… ………………………………………………21, 22, 24

*Sanders v. City of San Diego*
    93 F.3d 1423 (9th Cir. 1996)… ……………………………………………………14

*Sodal v. Cook Cty., Ill.*
    506 U.S. 56 (1992)………………………………………………………8, 22, 23

*Starr v. Baca*
    652 F.3d 1202 (9th Cir. 2011)… ………………………………………...……19, 20

*State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*
    138 F.3d 772 (9th Cir. 1998)… ………………………………………………….8

*United States v. Classic*
    313 U.S. 299 (1941) …………………………………………..……………...16

*United States v. James Daniel Good Real Prop.*
    510 U.S. 43 (1993)…… …………………………………………………………24

*United States v. JP Morgan Chase Bank Acct. No. Ending*
*8215 in Name of Ladislao v. Samaniego, VL: $446,377.36,*
    835 F.3d 1159 (9th Cir. 2016)… …………………………………….……….22

*United States v. Page*
    302 F.2d 81 (9th Cir. 1962) ……………………………………………………24

*United States v. Place*
    462 U.S. 696 (1983)… …………………………………..…………………………23

*Viilo v. Eyre*
    547 F.3d 707 (7th Cir. 2008)… …………………………………………………22

*Watkins v. City of Oakland*
    145 F.3d 1087 (9th Cir.1998)……………………………………………………20

*West v. Atkins*
    487 U.S. 42 (1988)… ……………………………………………..……...……16

**California Cases**

*Aaris v. Las Virgenes Unified School Dist.*
    64 Cal.App.4th 1112 (2nd Dist. 1998)………..………………………………...13

*Consolidated World Investments, Inc., v. Lido Preferred Ltd.*
    9 Cal.App.4th 373 (2nd. Dist. 1992)…………………..……………………………9

*Coughenour v. Del Taco, LLC*
    57 Cal.App.5th 740 (4th Dist. 2020)……...…………………………………..11

*B. K. K. Co. v. Schultz*
    7 Cal.App.3d 786 (App. 2 Dist. 1970)………………………………………………9

ADVANCING LAW FOR ANIMALS

*Berg v. Traylor*
     148 Cal.App.4th 809 (2nd App. 2007) …….…………………………………..12

*B & L Productions, Inc. v. 22nd District Agricultural Association*
     394 F.Supp.3d 1226 (S.D. Cal. 2019)…………….………………………………16

*Doyle v. Giuliucci*
     62 Cal.2d 606 (1965)… …….…………….……………….……….…...…..12

*Eriksson v. Nunnink*
     233 Cal.App.4th 708 (4th Dist. 2015)……….……………………..……………12

*Hohe v. San Diego Unified Sch. Dist.*
     224 Cal.App.3d 1559 (4th Dist. 1990)……….…………………………………12

*Huynh v. Vu*
     111 Cal.App.4th 1183 (1st Dist. 2003) …….…………………………………13

*Johnson v. Kaeser*
     196 Cal. 686 (1925)… …….…………………………………………………..9

*Pearson v. Superior Court*
     202 Cal.App.4th 1333 (App. 2 Dist. 2012)……….……………………………..11

*Pereira v. Toscano*
     84 Cal.App. 526 (App. 3 Dist. 1927)… …….………….……………………….11

**Federal Laws**

42 U.S.C. § 1983…………………………………………..…………………….....15, 16

U.S. Const. Amend. IV…………………………………………………………...……21

U.S. Const. Amend. XIV…………………………………………………….....…...18

**California Statutes**

Cal. Bus. & Prof. Code § 19620(a) …………………………………..…………....…3

Cal. Bus. & Prof. Code § 19418.1………………………………………………………3

Cal. Bus. & Prof. Code § 19622.2………………………………………………………3

Cal. Com. Code § 2301………………………………………………..…………9

Cal. Com. Code § 2401………………………………………………..……………10

Cal. Com. Code § 2703……………………………………………….....………9

Cal. Fam. Code § 6710…………………………………………………..…………10

Cal. Fam. Code § 6712……………………………………………………………11

Cal. Food & Agric. Code § 3953…………………………………………….....………16

**Secondary Sources**

California Civil Practice Business Litigation, *Auction Sales, § 41:6. Passage of Title*…………10

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

This case is about a little girl and her mother removing their goat Cedar from a junior livestock auction that would have sent him to slaughter. Despite Plaintiffs' desire to keep their beloved animal, their multiple offers to pay damages and assertions of property rights, and even their threat to sue, Defendants B.J. Macfarlane and Melanie Silva (together, "Fair Defendants") secretly detained Cedar for *weeks* under color of state law, coordinated to conceal his slaughter, and then illegally killed him in Mr. Macfarlane's backyard. They did all of this without providing any notice to Plaintiffs—the touchstone of  due process—despite full knowledge of their property rights. And they did all of this without judicial authorization. Plaintiffs E.L. and Mrs. Long now move for partial summary judgment against Mr. Macfarlane and Ms. Silva to establish their liability, but not damages, on (1) Plaintiffs' third cause of action for wrongful seizure under the Fourth Amendment, and (2) Plaintiffs' fourth cause of action for violating Plaintiffs' rights to due process under the Fourteenth Amendment.

At root, in removing Cedar from the junior livestock auction, Plaintiffs simply quit a kid's club. They had the right to efficiently breach any agreement to sell Cedar and pay damages, and E.L. had an unconditional statutory right as a minor to disaffirm any contract of sale for her goat. And as the putative bidder for Cedar never paid anyway, Plaintiffs' rights were that much stronger. Given the obvious civil nature of this dispute, the story should have ended when Plaintiffs left with Cedar. The Fair Defendants, however, would not relent and accused Mrs. Long of grand theft livestock, a felony. Multiple Shasta County Sheriff's Officers then drove approximately 500 miles to seize Cedar and turned him over to the Fair Defendants.

Thereafter, Mr. Macfarlane ultimately had Cedar slaughtered in his backyard, under Ms. Silva's supervision, effectively specifically enforcing an auction contract that Plaintiffs had the absolute legal right to cancel, *for the benefit of bidders who never even paid.* They did so because, in Ms. Silva's own words, E.L. had to learn "responsibility." And they did so despite the fact that rules governing the fair deemed the penalty for Plaintiffs' removal of Cedar to be merely loss of auction proceeds—which Plaintiffs were more than amenable to.

Partial summary judgment on these claims is appropriate because they are based on

ADVANCING LAW FOR ANIMALS

straightforward and undisputed facts. It is undisputed that Plaintiffs owned Cedar and, after E.L. exhibited him during a junior livestock auction hosted by the 27th District Agricultural Association ("Shasta Fair Association"), Plaintiffs removed him. It is undisputed after Mr. Macfarlane, Shasta Fair Association livestock manager, and Ms. Silva, Shasta Fair Association CEO, held Cedar and killed him despite multiple written and oral notices that he was Plaintiffs' property. It is also undisputed that, despite being aware of Plaintiffs' property claims, neither Mr. Macfarlane, nor Ms. Silva, ever provided Plaintiffs with any notice or hearing in connection with their dispute. Such actions plainly violate Plaintiffs' due process rights and rights against wrongful seizure.

The Fair Defendants' primary defense is that Plaintiffs' property interests in Cedar were disputed. But whether or not Plaintiffs' property rights were disputed is of no moment. It is well-established that the constitution protects even disputed property interests. *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 86 (1972). So, while this case involves a great deal of disputed discovery, finger pointing, malicious conduct, and inconsistent testimony, the core facts above—memorialized in the Fair Defendants' own written communications or statements at deposition—remain undisputed. Consequently, Plaintiffs are entitled to partial summary judgment against Mr. Macfarlane and Ms. Silva. A jury can determine damages, including punitive damages, which this case merits.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

The material facts below are supported by Plaintiffs' concurrently-filed Statement of Undisputed Facts in Support of Partial Summary Judgment (hereinafter, "SUF"). Some additional facts are offered in the section below merely to provide helpful, but not dispositive, context. All material facts necessary to establish the Fair Defendants' liability are contained in the SUF.

### A.   Plaintiffs Purchased Cedar for the Shasta Fair Junior Livestock Auction

In September 2021, Mrs. Long enrolled her daughter E.L. in a local 4-H junior livestock program. SUF 1, 2. This 4-H program culminated with a junior livestock auction, where minor participants would auction off animals they raised. SUF 3; Long Decl. ¶ 6. For the year in which E.L. participated, the junior livestock auction was held at the 2022 Shasta District Fair, hosted by 27th District Agricultural Association, doing business as Shasta District Fair and Event Center ("27th DAA" or "Shasta Fair Association"). SUF 3; Long Decl. ¶ 6.

On or about April 1, 2022, Mrs. Long used her funds to purchase a young goat for E.L., whom E.L. named Cedar. SUF 1. On about May 15, 2022, consistent with the 4-H junior livestock program, Ms. Long registered E.L. as an exhibitor in the June 25, 2022 Shasta Fair Association junior livestock auction. SUF 6. At that time, the Shasta Fair Association and 4-H also had scheduled an annual 4-H/FFA barbeque at the Shasta Fair Association fairgrounds on July 9, 2022 ("Government Barbecue"). SUF 7. Defendant Kathie Muse ("Mrs. Muse"), as a 4-H volunteer, organized the Government Barbecue. ECF No. 39-1 at ¶ 15 (citing Muse Dep. 83:08-10).

**B.    Local Rules, State Rules, and Bidder's Rules Governed the Shasta Fair Junior Livestock Auction**

The  2022 Shasta District Fair junior livestock auction was governed by (1) All General Livestock Rules and Guidelines ("Local Rules") contained in a local exhibitor handbook published by the Shasta Fair Association,[1] (2) 2022 State Rules for California Fairs ("State Fair Rules") published by CDFA,[2] and (3) a bidder's brochure containing additional rules ("Bidder's Rules"). SUF 8. The State Fair Rules explicitly provide "[i]f a local rule is not printed in the exhibitor handbook the applicable State Rule will apply." RJN 1 at 4 ¶ 8.

Of importance, both the Local Rules and the State Rules require that junior exhibitors own the animals they exhibit. RJN 1 at 6 ("...owners must be legal owners of all entries"); RJN 2 at 50 ("LIVESTOCK OWNERSHIP: Junior Exhibitors MUST prove ownership of animals," "All Junior Livestock Animals must be owned and under the control and supervision of the Exhibitor…."). Both the Local Rules and State Rules include provisions applicable to the removal of animals from the fairgrounds. Specifically, the Local Rules provide, "Any animals removed from the grounds prior to the release times without permission and proper release forms will forfeit all premiums and awards." RJN 2  at 53. Further, "ANIMALS … May NOT be … removed from the grounds prior to Sunday June 26, 2022 … Premiums will be forfeited if any are removed early." RJN 2  at 53. The Local Rules

---

[1]    The State Rules define the Exhibitor Handbook as "[a]n entry book, prize list, contest book or other publication specifying rules and awards for fair contests." RJN 1 at 6, ¶ 19.

[2]    "[CDFA] is responsible for … providing oversight of activities carried out by each California fair[,]" including the 27th DAA. Cal. Bus. & Prof. Code § 19620(a); § 19418.1. The 27th DAA must "meet all applicable [CDFA] standards" and must comply with annually-published State Rules. *Id.*, § 19622.2.

ADVANCING LAW FOR ANIMALS

include the following catchall: "RULE COMPLIANCE: Any Exhibitor, who fails to conform to accepted standards of conduct, will be removed immediately (*with livestock*) from the Fairgrounds and all premiums and auction proceeds forfeited, if the situation is of a serious nature." RJN 2 at 54. (emphasis added).[3] Similarly, the State Rules provided that "Exhibitors … and parents found, after a chance to provide evidence and heard before the Fair Management [] of unethical practices as set forth in the State and Local Rules or in actions inimical with the fair program shall result in the exhibit being disqualified and the forfeiture of any awards and/or privileges …." RJN 1 at 7.

Additionally, the Local Rules provided that the junior livestock auction was "terminal," RJN 1 at 50, and that auction animals "go to processing, directly from the Fairgrounds and will be transported on the trucks provided by the Fair*,*" RJN 1 at 51. Also relevant, the Bidder's Rules provided that "Members of 4-H are responsible for animals until they reach the processing plant. This includes feeding and care following the sale." RJN 3 at 2.

### C.   Following the Auction, E.L. Decided Not to Sell Cedar and Plaintiffs Removed Him from the Shasta Fair

On June 25, 2022, E.L. participated in the junior livestock auction. SUF 9. California State Senator and then Republican gubernatorial candidate Brian Dahle and California Assembly member Megan Dahle, through their agent Mrs. Muse, placed the highest bid for Cedar, $902. SUF 10. Of that amount, Shasta Fair Association was entitled to $63.14, with the remainder to E.L. SUF 11. The Dahles directed Cedar's meat be donated to the Government Barbeque. SUF 12.

However, after the auction, E.L. became despondent at the thought of Cedar's slaughter. Accordingly, on June 25, 2022, shortly after the auction and while Plaintiffs and E.L. were still in possession of, and caring for Cedar, E.L. communicated to her mother that she did not want to proceed with selling Cedar. SUF 13. Mrs. Long and E.L. then physically removed Cedar from the Shasta District Fair grounds. SUF 14. The next morning, June 26, 2022, Plaintiffs temporarily placed Cedar over 200 miles away at third party Billy's Mini Farm for safe keeping while she attempted to work matters out with the Shasta Fair Association and the bidders. Long Decl. ¶ 17.

---

[3]   Parallel rules exist in State Fair Rules, RJN 1 at 7 ¶¶ 2-3, as well as additional rules regarding notice and hearing, *id*. at 11 ¶ 14.

ADVANCING LAW FOR ANIMALS

**D.      Plaintiffs Notified Fair Defendants They Did Not Want to Sell Cedar, Offered to Pay Damages, and Memorialized Their Intent to Sue**

Also on about June 26, 2022, Defendant Mr. Macfarlane and Mrs. Long spoke on the phone. Mr. Macfarlane demanded Cedar's return, and told Mrs. Long she would be prosecuted for livestock theft for removing Cedar. SUF 15. Mrs. Long responded that her and E.L. did not want to go through with the sale and that "they were going to do this a different way." SUF 15.

On or around June 27, 2022, third party Bleating Hearts Farm published on Instagram a picture of Mrs. Long, E.L., and Cedar (hereinafter, "Viral Instagram Post"). SUF 16. The Viral Instagram Post also requested members of the public reach out to the Dahles and the Shasta Fair Association to pardon Plaintiffs' removal of Cedar, stating "[Cedar's] family is willing to do anything to keep him safe for their daughter. She is now facing felony charges for trying to save his life." SUF 16. Per Ms. Silva, the Viral Instagram Post was so disruptive the Shasta Fair Association had to forward its phones. Gordon Decl. ¶ 10; SUF 17.

That same morning, Mrs. Long delivered a letter to Senator Dahle's office (hereinafter, "First Offer to Pay Damages"), stating after the auction E.L. "sobbed in her pen with [Cedar,]" and "It was heart breaking[,]" so they "decided to break the rules and take [Cedar.]" Mrs. Long further stated, "I will pay you back for [Cedar] and any expenses." SUF 18. Senator Dahle's office sent Mrs. Long's letter to Mr. Macfarlane the same day. SUF 19. Later that evening, also on June 27, Mrs. Long emailed Ms. Silva, explaining her daughter's bond with Cedar, asking to resolve the situation, and offering to pay any damages in connection with his removal ("Second Offer to Pay Damages"). SUF 20.

In response, on June 28 at 1:31 pm, Ms. Silva emailed Mrs. Long, rejecting Plaintiffs' Second Offer to Pay Damages, stating [E.L] must learn "responsibility[,]"explaining the "social media [] has been a negative experience for the fairgrounds[,]" and asserting, "for the good of all we have to stick to the State Rules. You will need to bring the goat back to the Shasta District Fair immediately." SUF 21. On June 29, 2022, Mrs. Long sent another follow-up letter to Ms. Silva (hereinafter, "Notice of Civil Claim and Intention to Sue"), stating E.L. owned Cedar, explaining grand theft under Cal. Penal Code § 487a had no legal basis, offering to reimburse any monetary damages caused, confirming the civil nature of the dispute, and stating the letter was "in anticipation of litigation." SUF 22.

ADVANCING LAW FOR ANIMALS

These undisputed facts show, in no uncertain terms, that the Fair Defendants were plainly aware of, and on notice of, Plaintiffs' asserted property interests in Cedar, and Plaintiffs' intention to cancel any contract of sale.

**E.      Shasta County Sheriff's Officers Seized Cedar and Turned Him Over to the Fair Defendants and Mrs. Muse**

Because Plaintiffs failed to return Cedar, Newsom-appointed Deputy Secretary of California Department of Food and Agriculture Michael Flores suggested Ms. Silva contact the Shasta County Sheriff's Office. ECF No. 39-1 at ¶ 15 (citing Silva Dep. 257:08-257:17; 260:02-260:13; 262:01-262:19). At some point on June 29, 2022, Ms. Silva forwarded several documents to Lieutenant Fernandez of the Shasta County Sheriff's Office, including Mrs. Long's Second Offer to Pay Damages and Notice of Civil Claim and Intention to Sue. ECF No. 39-1 at ¶ 19 (citing Silva Dep. 288:03-23). On July 8, 2022, the day before the Government Barbeque for which Cedar was purportedly earmarked, Lieutenant Fernandez and Detective Ashbee drove hundreds of miles and ultimately seized Cedar from Billy's Mini Farm. ECF No. 39-1 at ¶ 41 (citing Duncan Dep. 144:25 – 147:17). Once there, Lieutenant Fernandez and Detective Duncan seized Cedar, and turned him over to Mr. Macfarlane. ECF No. 39-9 at ¶ 35 (citing Fernandez Dep. 269:16-270:10).

As this Court knows, Plaintiffs recently settled with the County of Shasta, Shasta County Sheriff's Office, Lieutenant Fernandez, Detective Duncan, and Detective Ashbee. This Court approved the settlement with respect to E.L. ECF No. 113.

**F.      Fair Defendants Secretly Held Cedar for Weeks, Ultimately Slaughtering him on July 28, 2022, Without Any Judicial Authorization or Notice to Plaintiffs**

When Mr. Macfarlane came into possession of Cedar on July 8, 2022, neither he, nor Ms. Silva, nor any other affiliate of the Shasta Fair Association, ever contacted Mrs. Long or E.L. about their possession or seizure of Cedar. SUF 29, 30; Long Decl. ¶ 20. Rather, Mrs. Long was informed by Billy's Mini Farm on about July 12, 2022, that the Shasta Sheriff's Office took Cedar. Long Decl. ¶ 20. Because Mrs. Long believed her civil rights had been violated, she formally retained counsel. Long Decl. ¶ 21.

All told, beginning on July 8, 2022, Mr. Macfarlane held Cedar in the capacity as the livestock

ADVANCING LAW FOR ANIMALS

manager for the Shasta Fair Association until July 28, 2022, when he had Cedar slaughtered. SUF 5, 28. During that period, Ms. Silva continued to supervise Mr. Macfarlane, and he continued to give her updates. SUF 28; Gordon Decl. ¶¶ 8, 23, 36. Mr. Macfarlane admittedly held Cedar while waiting for direction from Ms. Silva and Mrs. Muse to kill Cedar. SUF 28; Gordon Decl. ¶ 39. Text messages between Mr. Macfarlane and Ms. Silva confirm they both participated in Cedar's slaughter. Specifically, on July 22, 2022, Mr. Macfarlane texted Ms. Silva expressly to arrange, *and conceal*, the slaughter of Cedar, using Bowman's Meats as the slaughtering company. Mr. Macfarlane texted Mrs. Silva "What's gals name at bowman? [Defendant] Kath[ie] [Muse] said ok but no one needs to know about this. U me and Kathy [sic] are only ones. It got killed and donated to non profit if anyone asks." SUF 25. Ms. Silva responded approvingly, stating "Serene[,]" then "Thank you[,]" then "We are a non profit 😳🤣🤣🤣[.]" *Id.* Although already apparent from text itself, both Mr. Macfarlane and Ms. Silva nevertheless confirmed this text chain referred to Cedar.  SUF 25; Gordon Decl. ¶ 24.

Then, on July 28, Mr. Macfarlane texted Ms. Silva that "Goat is getting butchered within the half hour. Finally. I am going to come by tomorrow if you are and after kids appts. [sic] Can I use your zoom one more time?" SUF 26. In response, despite being his supervisor, Ms. Silva does not direct Mr. Macfarlane to halt Cedar's slaughter until a neutral judge weighs in or until Plaintiffs are given notice. SUF 4. Instead Ms. Silva responds "Yes you can[.] I should be here trying to figure out 3k in addons and where it should go 😭 I hate figuring that out." SUF 26. Thereafter, on July 28, 2022, Bowman Meat Company came to Mr. Macfarlane's property and slaughtered Cedar, as admitted by Mr. Macfarlane in deposition. SUF 27.

On August 1, 2022, Mrs. Long reached out to Ms. Silva personally for answers. Ms. Long emailed Ms. Silva:

> It is my understanding that Cedar was returned. I'd like to know if he is still alive and what happened to him?
>
> Thank you,
> Jessica Long

Long Decl. ¶ 27. Despite Mrs. Long's plea, Ms. Silva did not respond and has never responded.

### G.  Discovery Confirmed No Bidder Ever Paid for Cedar

When Plaintiffs removed Cedar on June 25, 2022, no bidder had paid the Shasta Fair

Association for Cedar, nor had Shasta Fair Association paid E.L. anything for Cedar. SUF 29; Long Decl. ¶ 16. The Bidder's Rules stated bidders should make payment at the time of sale, but no later than July 15, 2022. RJN 3 at 2. The Shasta Fair Association's invoices to the Dahles and Mrs. Muse required payment by July 20, 2022. Gordon Decl., at Ex. 8. While the Fair Defendants' Answer contends Cedar was sold, ECF No. 29 at ¶¶ 40, 42, discovery divulged that *no bidder ever paid for Cedar at any time* – not Senator Dahle, Assemblywoman Megan Dahle, their proxy bidder, Defendant Mrs. Muse. SUF 29. These undisputed facts show the Fair Defendants killed Cedar to enforce a sales contract in favor of bidders who did not perform.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted to a moving party who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248. A dispute concerning any such fact is "genuine" only where the evidence is such that the trier-of-fact could find in favor of the non-moving party. *Id.* The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. *State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

## IV.    THE LONGS RETAINED CONSTITUTIONALLY PROTECTED INTERESTS IN CEDAR AFTER THE JUNIOR LIVESTOCK AUCTION

The Longs' pending motion seeks to establish the Fair Defendants' liability for failing to provide Plaintiffs due process under Fourteenth Amendment, and committing a wrongful seizure of Cedar under the Fourth Amendment. For Plaintiffs' due process claim, they must show a "property interest" in Cedar. *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). For Plaintiffs' wrongful seizure claim, they must show "possessory interests" in Cedar. *See Sodal v. Cook Cty., Ill.*, 506 U.S. 56, 61 (1992). They may also show ownership interests.

ADVANCING LAW FOR ANIMALS

*See Lyall v. City of Los Angeles,* 807 F.3d 1178, 1186 (9th Cir. 2015) ("The Fourth Amendment shields … actual owners").

Based on the parties' meet and confer, Fair Defendants concede Plaintiffs had sufficient interests in Cedar until the junior livestock auction on June 25, 2022. The Fair Defendants claim, however, that Plaintiffs sold Cedar at that auction and therefore had no interests in him when the wrongful seizure (i.e., the Fair Defendants' detention and slaughter of Cedar) and due process violations occurred from July 8, 2022 through July 28, 2022. But the undisputed facts show that Fair Defendants are wrong for several reasons: no auction sale occurred because no bidder ever paid for Cedar; title remained with Plaintiffs as a matter of auction law; any sales contract was cancelled based on E.L.'s statutory right to disaffirmation or the Long's right to efficient breach; and, finally, even disputed property interests are protected by the Constitution.

### A.  No Auction Sale Occurred Because No Bidder Ever Paid for Cedar

The undisputed facts show that neither the Dahles, nor their proxy bidder Mrs. Muse, ever paid for Cedar, *at any time*. SUF 29. Accordingly, no sale occurred as a matter of law. And because no bidder ever paid for Cedar, and therefore, no sale occurred, Plaintiffs never lost their property interests in him. *See, e.g., B. K. K. Co. v. Schultz*, 7 Cal.App.3d 786, 793 (App. 2 Dist. 1970) ("The classic statement of the remedies of the unpaid seller is found in *Johnson v. Kaeser* (1925) 196 Cal. 686, 694 [and provides] 'It is settled by an unbroken line of decisions that, as to such a contract, it is optional with the seller, upon default by the purchaser in complying with any of the vital terms of the agreement, [] to treat the contract as involving a conditional sale and retake possession of the property ….'"); *see also* Cal. Com. Code § 2703 (providing that a seller may "cancel" a contract for nonpayment). That no sale occurred is black letter law and the Fair Defendants had no basis to specifically enforce a contract for the benefit of bidders who did not perform. *See, e.g., Consolidated World Investments, Inc., v. Lido Preferred Ltd.,* 9 Cal.App.4th 373, 380 (2nd. Dist. 1992) (explaining "[i]t is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance"); Cal. Com. Code § 2301 (for sales, a buyer is obligated to "pay in accordance with the contract").

**B.  Title Remained With Plaintiffs as a Matter of Auction Law**

The undisputed facts also show that title could not have passed to the Dahles or Mrs. Muse by virtue of the auction sale. The Ninth Circuit has held, as to auction sales specifically, that "completion of the sale is not determinative of when title passes." *In re Western States Wire Corp.*, 490 F.2d 1065, 1068 (9th Cir. 1974). Instead, "when the concept of title is material, the provisions of [Commercial Code] section 2401 control." *Id.*[4] The applicable subdivisions of section 2401 state "[i]f the contract requires delivery at destination, title passes on tender there." Cal. Com. Code § 2401(2)(b).

Here, the Local Rules provided that auction animals were to "go to processing, directly from the Fairgrounds and will be transported on the trucks provided by the Fair." RJN 2 at 51. The Bidder's Rules also provided that "Members of 4-H are responsible for animals until they reach the processing plant. This includes feeding and care following the sale." RJN 3 at 2. Additionally, the Bidder's Rules provided bidders could "have [their] purchased animals processed and delivered to their local locker plant…," or "resell" the animal. RJN 3 at 2. Cedar's bidders, the Dahles, elected to have Cedar processed for the Government Barbecue, meaning Cedar was to be delivered to the slaughterhouse in accordance with the Local Rules. SUF 12. Because the Local Rules and Bidders Rules required Cedar to be shipped to the slaughterhouse, "the contract [thus] requires delivery at destination [and] title passes on tender there." Cal. Com. Code § 2401. Title for Cedar (and risk of loss) remaining with Plaintiffs is also consistent with the Bidder's Rules, which state 4-H members "are responsible for animals until they reach the processing plant. This includes feeding and care following the sale." RJN 3 at 2.

Here, undisputed evidence shows Cedar never made it the processing facility. That fact, as well as the fact that no bidder ever paid for Cedar *at any time*, compels the legal conclusion that the Longs were never divested of title to Cedar at the junior livestock auction.

---

[4]     *See also* California Civil Practice Business Litigation, Auction Sales*,* § 41:6. Passage of Title ("Completion of the auction sale does not determine when title to the item passes from the seller to the buyer. When the passage of title is material, the provisions of Cal. Com. Code § 2401 govern.").

ADVANCING LAW FOR ANIMALS

ADVANCING LAW FOR ANIMALS

**C.  Any Sales Contract Was Canceled by E.L.'s Absolute Statutory Right to Disaffirmation, or the Longs' Right to Efficient Breach**

Even if the Court deems the auction sale triable, indisputable facts that took place after the auction show Plaintiffs still maintained their interests in Cedar for two reasons: E.L.'s absolute statutory right as a minor to disaffirm a contract, and the Longs' rights to efficient breach.

With respect to the former, California Family Code section 6710 states "a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards." The purpose of this statute is to "protect a minor against [her]self and [her] indiscretions and immaturity as well as against the machinations of other people…." *Pearson v. Superior Court,* 202 Cal.App.4th 1333, 1339 (App. 2 Dist. 2012). "No specific language is required to communicate an intent to disaffirm. 'A contract (or conveyance) of a minor may be avoided by any act or declaration disclosing an unequivocal intent to repudiate its binding force and effect.'" *Coughenour v. Del Taco, LLC,* 57 Cal.App.5th 740, 748 (4th Dist. 2020). Oral notice of disaffirmation is also sufficient. *Pereira v. Toscano* 84 Cal.App. 526 (App. 3 Dist. 1927). Here, the Shasta Fair Association's Local Rules and State Rules concede E.L. was Cedar's owner, RJN 1 at 50,[5] RJN 1 at 6,[6] and the undisputed facts show E.L. wanted to back out of the sale. SUF 13-23. She told her mother she wanted to leave with Cedar. SUF 13. Through tears at deposition, E.L. confirmed she wanted to leave with Cedar. SUF 13-18, 20, 22, 23. Mrs. Long communicated E.L.'s desire to save Cedar to the Fair Defendants, both orally and in writing, and the Longs offered in writing to pay. SUF 14, 18-23. Further, E.L.'s mere act of exiting the fair with Cedar constituted an "act" of constructive notice that she wished to disaffirm the contract. *Coughenour v. Del Taco, LLC,* 57, *supra*, at 748 (disaffirmation can be accomplished through "any act" showing repudiation). These facts are undisputed and they plainly show disaffirmation as a matter of law.

However, the Fair Defendants' position, as stated during meet and confer, is that disaffirmation is not authorized when a parent enters into a contract on behalf of the minor. The Fair

---

[5]    The Local Rules state, on page 50, "LIVESTOCK OWNERSHIP: Junior Exhibitors MUST prove ownership of animals," "All Junior Livestock Animals must be owned and under the control and supervision of the Exhibitor…."

[6]    The State Rules provide that "owners must be legal owners of all entries."

Defendants are not only wrong on the law, they are confusing agreements. E.L. communicated she wanted to back out of the *auction sale* to the Dahles on June 25, 2022; that is a different contract than the junior livestock auction registration forms Mrs. Long signed on E.L.'s behalf in May 2022. *See* Gordon Decl. at Ex. 7 (June 25, 22 invoice listing exhibitor as seller, redacted for E.L.'s anonymity); *cf.* Gordon Decl. ¶ 45, Ex. 22 at 2-3 (May 2022 fair registration forms).

But even if Mrs. Long had signed for a sale on E.L.'s behalf, that caveat still does not bar disaffirmation under the statute[7] or case law, which expressly holds that children *can* disaffirm even when their parents sign on their behalf. *See, e.g., Berg v. Traylor*, 148 Cal.App.4th 809 (2nd App. 2007) (after "[parent] signed the agreement and wrote [minor child's] name on the signature page," court held child had right to disaffirm both that agreement, as well as arbitration agreement signed by parent "on behalf of" minor). The only departures in case law, which the Fair Defendants presumably intimate, involve (1) a minor's right disaffirm an arbitration agreement in a medical services agreement entered into by his/her parent[8] and (2) a minor's "right to disaffirm … a release of [future] liability signed by a parent on behalf of the minor" to participate in recreational activities with a risk of injury.[9] Disaffirmation is not permitted in those instances. Those limited departures, however, rest on firm policy grounds; if children could disaffirm medical contracts, then doctors would avoid providing medical services to children,[10] and if releases of future liability (i.e., assumption of risk

---

[7]     The only statutory exceptions to a minor's right to disaffirm are codified in Family Code § 6712 and are inapplicable here. For example, a minor may not disaffirm a " contract … to pay the reasonable value of things necessary for the support of the minor or the minor's family" that "is entered into by the minor when not under the care of a parent … able to provide for the minor…." Such exceptions are irrelevant—this was a livestock auction for a kid's club, not a purchase of necessary family goods.

[8]     *Doyle v. Giuliucci*, 62 Cal.2d 606 (1965) (California Supreme Court, in interpreting predecessor disaffirmation statute, Civ. Code § 35, held minor could not disaffirm contract for medical services agreed to by parent on minor's behalf after services were provided on basis it had arbitration clause).

[9]     *Eriksson v. Nunnink*, 233 Cal.App.4th 708, 721 (4th Dist. 2015) (mother's signature on release of liability between equestrian coach and minor rider precluded mother from disaffirming release on behalf of minor after minor's death during equestrian competition on wrongful death action); *Hohe v. San Diego Unified Sch. Dist*., 224 Cal.App.3d 1559 (4th Dist. 1990) (parents' and teenager's release of liability in connection with teen's participation in school hypnosis demonstration where teen was injured could not be disaffirmed in order to sue for damages).

[10]     *Doyle v. Giuliucci*, 62 Cal.2d 606, 610 (1965) ("Since minors can usually disaffirm their own contracts to pay for medical services, it is unlikely that medical groups would contract directly with them. They can be assured the benefits of group medical service only if parents can contract on their behalf. Unless such contracts unreasonably restrict minors' rights, they should be sustained.").

contracts) were not enforced, participants could be sued for risks inherent in the activity subject to the release.[11] The contract E.L. disaffirmed, however, was not a contract for medical services or an assumption of risk for future damages – *it was a sales contract over a goat that the Local Rules stated she owned*. *See* RJN 2 at 50 ("All Junior Livestock Animals must be owned and under the control and supervision of the Exhibitor…."). The right to disaffirm such a contract is simply not barred by statute or any case law, nor would any policy reason justify barring a child from doing so here.

Because E.L.'s right to disaffirm is absolute under these facts, Plaintiffs maintained property interests in Cedar even after the auction. Further, given what happened here, and given the predictable sentiment a 9-year old girl would hold for an animal she raised, no reasonable jury would believe E.L. did not want to disaffirm the alleged sale agreement to save Cedar. There is no reason for her testify again on this issue and it would be indecent of the Fair Defendants to force her do so.

But even without a minor's statutory right to disaffirmation, the Longs still maintained their interests in Cedar after the auction because a contracting party always has the right to commit an efficient breach of the contract and offer to pay damages, which is precisely what the Longs did. *See Reese v. BP Exploration (Alaska) Inc.,* 643 F.3d 681, 691 (9th Cir. 2011) ("The concept of 'efficient breach' is built into our system of contracts…."); *Huynh v. Vu,* 111 Cal.App.4th 1183, 1198 (1st Dist. 2003) ("the right of a contracting party to breach a contract and pay damages …, instead of being required by law to perform, [is known as] efficient breach."). Here, the undisputed facts show Mrs. Long offered three times, in writing, to pay for any damages caused by Plaintiffs' decision to not sell Cedar. SUF 18-20, 22. By purposefully breaching and offering to pay, Plaintiffs conserved all their property rights in Cedar, and neither the Fair Defendants, nor any bidder, had any right to force Plaintiffs to specifically perform; Cedar was *not* unique property in a legal sense, so damages were sufficient. *La Jolla Cove Investors, Inc. v. Sultan Corp. Ltd*., 2011 WL 4916138, *2 (S.D. Cal. Oct. 17, 2011) ("The general rule for invoking specific performance in the context of a breach of agreement is that an agreement to transfer personal property will not justify specific performance,

---

[11]   *Aaris v. Las Virgenes Unified School Dist.,* 64 Cal.App.4th 1112, 1117 (2nd Dist. 1998) (injured cheerleader's release/assumption of risk contract to participate in cheerleading upheld as "sports participants 'generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself'").

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

ADVANCING LAW FOR ANIMALS

except in case of unique chattels such as heirlooms, or shares of stock not obtainable in the open market.") (internal citations omitted).

### D.  Even Disputed Property Interests Are Protected by the Constitution

Lastly, and most foundationally, even if this Court were to deem all the reasons above triable, Plaintiffs had *disputed* property interests in Cedar – and that is enough for constitutional protections. Indeed, the "due process … protections of the Fourteenth Amendment apply … even if there is a dispute over ownership." *Brazier v. California Dept. of Correction and Rehabilitation,* 523 Fed.Appx. 477, 478 (9th Cir. 2013); *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972) ("The [14th] Amendment's protection of 'property' … has never been interpreted to safeguard only the rights of undisputed ownership"); *Hollandsworth v. City and County of Honolulu*, 489 F.Supp.3d 1085, 1095 (D. Hawaii 2020) (finding plaintiff had colorable due process claim after official sided with competing owner in "dispute over the ownership" of horse and committed "confrontational retrieval of a horse" because a government official's "belief that he correctly determined legal ownership is not [an exception to due process]"); *Abbott v. Latshaw,* 164 F.3d 141, 149 (3rd Cir. 1998) ("it is the domain of the courts, and citizens are to have a meaningful opportunity to be heard as to their rights before they are finally deprived of possession of property [, not the officer's] curbside courtroom").

Because a "seizure implicates two explicit textual source[s] of constitutional protection: the Fourth Amendment … and the Due Process Clause" (*Harrell v. City of New York* 138 F.Supp.3d 479, 492 (S.D.N.Y. 2015)), it follows that, just as the Due Process Clause protects disputed ownership, so does the Fourth Amendment. It is now well-established that "the Fourth Amendment protects against unlawful searches and seizures even when title to the property is unclear." *OSJ PEP Tennese LLC v. Harris*, 2014 WL 4988070, * 9 (C.D. Cal. Oct. 7, 2014) (holding government assertion of superior title did not defeat plaintiff's Fourth Amendment claim); *Lesher v. Reed,* 12 F.3d 148, 150 (8th Cir. 1994) (Fourth Amendment applied to seizure "regardless of the disputed ownership of [the] dog"). The Ninth Circuit has even stated "the seizure of property believed to be stolen must comply with both the Fourth Amendment and procedural due process." *Sanders v. City of San Diego*, 93 F.3d 1423, 1428 (9th Cir. 1996); *see also Dixon v. Lowery,* 302 F.3d 857 (8th Cir. 2002) (Fourth Amendment protects "arguable property interests")*; Armijo v. Pacheco*, 2015 WL 13662794, *8 (D.N.M. July 22,

ADVANCING LAW FOR ANIMALS

2015) (holding plaintiff had wrongful seizure claim under Fourth Amendment despite government's evidence that third party had superior title, noting "The Supreme Court does not require an unqualified right to property").

Here, there can be no doubt Plaintiffs had arguable, or disputed, property interests in Cedar. When Plaintiffs removed Cedar, they were not paid.[12] Undisputed facts also show no bidder ever paid for Cedar. SUF 29. Mrs. Long memorialized her position in writing, sending her First Offer to Pay Damages to Senator Dahle's staffer, who forwarded it to Mr. Macfarlane, and sending her Second Offer to Pay Damages and Notice of Civil Claim and Intent to Sue to Ms. Silva. SUF 18-23. Such facts demonstrate, at the very least, that Plaintiffs held disputed property interests in Cedar, for which the Fair Defendants both had notice. Similarly, while the Fair Defendants (wrongly) dispute Plaintiffs exercised their rights to disaffirm or efficiently breach the sales contract, what the Fair Defendants cannot contest is that Plaintiffs' actions *arguably* show disaffirmation and efficient breach. The fact that there objectively existed the potential that Plaintiffs disaffirmed or effectively canceled any sales contract is enough for constitutional protection. *See Brazier v. California Dept. of Correction and Rehabilitation,* 523 Fed.Appx. at 478 (the constitution protects property rights "even if there is a dispute over ownership"); *Fuentes v. Shevin*, 407 U.S. at 86 ("The [14th] Amendment's protection of 'property,' however, has never been interpreted to safeguard only the rights of undisputed ownership"). Additionally, when the Fair Defendants demanded Cedar's return, the Plaintiffs orally effectively repudiated the sale, stating "they were going to do this a different way." SUF 15. Plaintiffs then sent the Fair Defendants letters, which not only offered to pay (thus establishing efficient breach), but also stated they were waiving no rights and were going to sue over Cedar. SUF 22. Lastly, Plaintiffs' action of removing Cedar, by itself, asserts an arguable disputed property interest in him. Such undisputed actions, individually and certainly in the aggregate, establish that Plaintiffs had disputed property interests in Cedar sufficient for constitutional protection as a matter of law.

_____

[12] Around late July 2022, the Shasta District Fair apparently did issue its own check, from its own funds, that E.L.'s 4-H group leader, Chad Fowler acquired, to cover the $902.00 the Dahles bid on Cedar. Gordon Decl. ¶ 18. However, the Longs did not accept that check, so Mr. Fowler apparently returned it to the Shasta Fair Association. *Id*. The Shasta District Fair's use of its own funds for the check violated its own Local Rules, which state "Sale checks will be written when sufficient funds are collected from the buyers." RJN 2.

ADVANCING LAW FOR ANIMALS

**V.   FAIR DEFENDANTS ARE PUBLIC EMPLOYEES AND ACTED UNDER COLOR OF LAW**

"To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). "An individual acts under color of state law when he or she exercises power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Naffe v. Frey*, 789 F.3d 1030, 1036 (9th Cir. 2015) (citing *United States v. Classic,* 313 U.S. 299, 326 (1941)). "This test is generally satisfied when a state employee…wrongs someone 'while acting in his official capacity or while exercising his responsibilities pursuant to state law.'" *Id.* (citing *West v. Atkins,* 487 U.S. 42, 50 (1988)).

At all relevant times, Mr. Macfarlane was the livestock manager for the Shasta District Fair, a district agricultural association. SUF 5, 28. "Each [district agricultural] association is a state institution" by the statute. Food & Agric. Code § 3953. Existing case law recognizes that employees of district agricultural associations, like the Shasta District Fair, are public employees operating under color of law for section 1983 claims. *See, e.g., B & L Productions, Inc. v. 22nd District Agricultural Association*, 394 F.Supp.3d 1226 (S.D. Cal. 2019) (district agricultural association's president and vice-president were government actors permitted to assert qualified immunity under § 1983 claims); *Aegis Software, Inc. v. 22nd District Agricultural Association,* WL 4542360, *7 (S.D. Cal. August 31, 2016) (holding that district agricultural association was a government entity operating in "a governmental capacity"). Here, when Mr. Macfarlane held and killed Cedar, he did so as the livestock manager for a government entity, SUF 5, 28, and therefore acted under color of law. *See Filarsky v. Delia,* 566 U.S. 377, 383 (2012) (holding that "[a]nyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983").

Like Mr. Macfarlane, Ms. Silva also acted under color of law.  She was and remains the CEO of the Shasta District Fair, a district agricultural association. Here, when Ms. Silva participated with Mr. Macfarlane and Mrs. Muse in killing Cedar, she did so as the CEO for a government entity SUF 4, and therefore acted under color of law. *See Filarsky v. Delia,* 566 U.S. 377, 383 (2012) (holding

ADVANCING LAW FOR ANIMALS

that "[a]nyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983").

## VI.   FAIR DEFENDANTS VIOLATED PLAINTIFFS' CLEARLY ESTABLISHED DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT

### A.   Mr. Macfarlane Detained and Destroyed Plaintiffs' Property Interests in Cedar Without Notice or Hearing

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood.*, 149 F.3d 971, 982 (9th Cir. 1998). Here, the undisputed facts show both elements are easily satisfied.

As to the first element, Plaintiffs' had a constitutionally protected property interest in Cedar before *and after* the junior livestock auction. "Principles of due process apply to all takings of non de minimus property, including such disparate objects as farm animals." *California Association for Preservation of Gamefowl v. Stanislaus County,* 2023 WL 1869010, * 24 (E.D. Cal. Feb. 9, 2023) (citing *Carrera v. Bertaini*, 63 Cal.App.3d 721 (5th Dist.1976) (finding farm animals seized pursuant to ordinance violated plaintiff's due process rights, as they had no reasonable opportunity for hearing before or after seizure). State Defendants dispute Plaintiffs' interests in Cedar *after* the livestock auction, claiming a sale occurred that divested Plaintiffs of all property interests. But that objection is both mistaken and irrelevant. For the reasons more fully explained *supra*, Section IV (a) no bidder ever paid for Cedar so no sale, or ownership transfer, could have occurred; (b) under California auction law and the relevant contracts, title to Cedar could not have passed to any bidder because he was never delivered to the slaughterhouse; (c) even if a sale did occur, Plaintiffs canceled any such sale based on E.L.'s statutory right to disaffirmation and/or Plaintiffs right to efficient breach; and (d) regardless of any of the foregoing, the Due Process Clause expressly protects *even contested* property interests.

The first element is further satisfied because Plaintiffs suffered "a deprivation" of their constitutionally protected property interest in Cedar. The Due Process Clause of the Fourteenth Amendment prevents the state from "depriv[ing] any person of life, liberty, or property, without due

ADVANCING LAW FOR ANIMALS

process of law." U.S. Const. Amend. XIV. Here, Mr. Macfarlane took possession of Cedar on July 8, 2022. SUF 24. He was on notice of Plaintiffs' interests in Cedar, as Mrs. Long memorialized her position in writing, sending her First Offer to Pay Damages to Senator Dahle's staffer, who forwarded it to Mr. Macfarlane. SUF 18, 19. Mrs. Long further told Mr. Macfarlane that her and E.L. did not want to go through with the sale and that "they were going to do this a different way," effectively repudiating any applicable agreement. SUF 15. Mr. Macfarlane also saw the Viral Instagram Post stating Plaintiffs wanted to save Cedar. SUF 16, 17. Nonetheless, despite this civil property dispute, after deliberating with Ms. Silva, Mr. Macfarlane ordered Cedar's slaughter on July 28, 2022, SUF 26, 27, permanently depriving Plaintiffs of their interests in him. These undisputed facts show the first element of a due process claim is satisfied in full.

As to the second element, "denial of adequate procedural protections," that too is easily satisfied. *See Brewster v. Bd. of Educ. of Lynwood.*, 149 F.3d 971, 982 (9th Cir. 1998). "[T]o put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). While the amount of process that is due depends on the specific interest, balanced against the government interest at stake, *at a minimum*, the procedural safeguards must include "an opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976); *Brewster*, 149 F.3d at 984. Indeed, "it has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest." *Logan*, 455 U.S. 422, 433 (emphasis in original, citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570-71, n.8 (1972)).

Here, Fair Defendants utterly failed to provide Plaintiffs with any notice or opportunity to be heard. SUF 30, 31. They simply killed Cedar despite knowing of Plaintiffs' interests, conspired to hide their killing, then joked about it over text. SUF 25. Fair Defendants did not even meet the minimum requirements the provisions in their own Local Rules and State Rules concerning exhibitor removal of animals from the fairgrounds. The Local Rules demand the penalty for breaking the rules be

ADVANCING LAW FOR ANIMALS

merely forfeiture of proceeds,[13] *not killing the animal of the child these public officials purport to provide services for, in an employee's backyard.* Whereas, the State Rules not only mandated forfeiture of proceeds as the penalty, but also that Plaintiffs be provided some sort of evidentiary hearing beforehand.[14] All told, despite the Fair Defendants' edicts to Plaintiffs about "following the rules," the Fair Defendants themselves did not follow their own rules and violated their constitutional duty to provide some form of notice or hearing before killing Cedar. Because absolutely no notice or hearing were provided, the final element of Plaintiffs' due process claim is satisfied. As Plaintiffs have provided sufficient evidence and authority for "*all* of the essential elements of [their due process] claim," except for damages, partial summary judgment establishing liability is in order. *See Fontenot v. Upjohn Co.,* 780 F2d 1190, 1194 (5th Cir. 1986).

### B. Ms. Silva Participated as Mr. Macfarlane's Supervisor in Detaining and Destroying Plaintiffs' Property Interests in Cedar Without Notice or Hearing

While Ms. Silva denies directly participating in Cedar's slaughter, the undisputed evidence shows she did. As set forth *supra* at Section VI(A), the two elements of Plaintiffs' due process claim—a deprivation of a constitutionally protected liberty or property interest, and a denial of adequate procedural protections—are satisfied as to Mr. Macfarlane. The undisputed facts also show that Ms. Silva too deprived Plaintiffs of their constitutionally protected interest through her capacity as supervisor over Mr. Macfarlane.

 "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d

---

[13]     The Local Rules provide, "Any animals removed from the grounds prior to the release times without permission and proper release forms will forfeit all premiums and awards" RJN 2  at 53, and that "ANIMALS … May NOT be … removed from the grounds prior to Sunday June 26, 2022 … Premiums will be forfeited if any are removed early." RJN 2  at 53. The Local Rules also include the following catchall: "RULE COMPLIANCE: Any Exhibitor, who fails to conform to accepted standards of conduct, will be removed immediately (*with livestock*) from the Fairgrounds and all premiums and auction proceeds forfeited, if the situation is of a serious nature." RJN 2 at 54.

[14]     The State Rules provide that "Exhibitors … and parents found, after a chance to provide evidence and heard before the Fair Management [] of unethical practices as set forth in the State and Local Rules or in actions inimical with the fair program shall result in the exhibit being disqualified and the forfeiture of any awards and/or privileges …." RJN 1 at 7.

1202, 1207 (9th Cir. 2011). "The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right." *Id*. "The requisite causal connection can be established ... by setting in motion a series of acts by others…, or by 'knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Id*. at 1207-1208 (citing *Dubner v. City & Cnty. of San Francisco,* 266 F.3d 959, 968 (9th Cir.2001)). Thus, a supervisor can be held liable in his or her individual capacity if he or she "knew of the violations and failed to act to prevent them." *Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013). This includes "culpable action or inaction [or] for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208; *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.1998).

Ms. Silva testified under oath she was Mr. Macfarlane's supervisor at all times relevant. SUF 28. She received written correspondence from Mrs. Long both offering to pay damages and giving notice of civil claim and intention to sue. SUF 20, 22, 23. The "requisite causal connection" is established because Ms. Silva "'knowingly refus[ed] to terminate a series of acts by others, which [Ms. Silva] knew or reasonably should have known would cause others to inflict a constitutional injury[,]'" when she acquiesced to Mr. Macfarlane's constitutional deprivations in writing, multiple times. *See Starr*, 652 F.3d at 1207-1208. Specifically, texts between Mr. Macfarlane and Ms. Silva on July 22, 2022 expressly show them conspiring to keep Cedar's killing secret, stating "[Mrs. Muse] said ok but no one needs to know about this. U me and [Mrs. Muse] are only ones. It got killed and donated to non profit if anyone asks." SUF 25. Ms. Silva agreed, responding, "We are a non profit 🙄 🤣🤣🤣." SUF 25. Not only did Ms. Silva fail to halt Mr. Macfarlane's killing of Cedar, but her reaction shows "reckless or callous indifference to the rights of others." *See Starr*, 652 F.3d at 1207. Making matters worse, Mr. Macfarlane again reported to Ms. Silva, as his supervisor, on the day he completed Cedar's slaughter, texting her, "Goat is getting butchered within the half hour. Finally. I am going to come by tomorrow if you are and after kids apppts. [sic] Can I use your zoom one more time?" SUF 26. Again, Ms. Silva does not direct Mr. Macfarlane to halt Cedar's slaughter pending notice and hearing to Plaintiffs. She simply responds, "Yes you can[.] I should be here trying to figure

ADVANCING LAW FOR ANIMALS

out 3k in addons and where it should go 😜 I hate figuring that out." SUF 26. This evidence indisputably refers to Cedar, and it indisputably shows Ms. Silva's acquiescence to Cedar's slaughter by Mr. Macfarlane—despite knowing full well that Plaintiffs claimed interests in him. No trier of fact could find otherwise, making partial summary judgment for Ms. Silva's liability for due process violations appropriate.

C.     **Plaintiffs Would Have Prevailed Had They Been Given Notice of Cedar's Seizure**

For a due process claim, although "[t]he right to be heard does not depend upon an advance showing that one will surely prevail at the hearing," it is important to recognize that, here, Plaintiffs' rights were not a mere abstraction. *See Fuentes v. Shevin*, 407 U.S. 67, 87 (1972). Had the Fair Defendants given Plaintiffs notice that they had Cedar, Plaintiffs would have prevailed at whatever hearing came next and Cedar would still be alive. E.L.'s right as a minor to disaffirmation is absolute, as is Plaintiffs' rights to efficient breach. *See supra* at Section IV(C). Plaintiffs could have, and would have, asserted such rights had they received timely notice, as Mrs. Long notified Ms. Silva in writing that she planned to bring a lawsuit. SUF 22. Fair Defendants would have no defenses to those positions, nor could Fair Defendants even show any bidder ever paid for Cedar. SUF 29. In sum, the loss of Plaintiffs' rights is not academic in this case—had Plaintiffs received notice, Cedar would be alive. That is noteworthy, although it has no impact on the elements of Plaintiffs' present claims.

VII.   **FAIR DEFENDANTS VIOLATED PLAINTIFFS' CLEARLY ESTABLISHED RIGHTS UNDER THE FOURTH AMENDMENT**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …." U.S. Const. Amend. IV. In the Ninth Circuit, animals are "effects" within the meaning of the Fourth Amendment. *Fuller v. Vines,* 36 F.3d 65, 68 (9th Cir.1994), *overruled on other grounds,* (holding a dog is an "effect" or "property" which can be seized"); *Criscuolo v. Grant Cnty.*, 540 F. App'x 562, 564 (9th Cir. 2013); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). Because animals like Cedar are considered "effects" within the law, the Fourth Amendment inquiry turns on whether the actions at issue constituted "seizure" of Cedar and, if so, whether those seizures were constitutionally permissible.

ADVANCING LAW FOR ANIMALS

**A.       Mr. Macfarlane and Ms. Silva Seized Cedar When They Slaughtered Him**

A Fourth Amendment property seizure "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Sodal v. Cook Cty., Ill.*, 506 U.S. 56, 61 (1992) (internal quotation marks and citations omitted). A possessory interest involves "the fact of having or holding property in one's power; the exercise of dominion over property." *United States v. JP Morgan Chase Bank Acct. No. Ending 8215 in Name of Ladislao v. Samaniego, VL: $446,377.36,* 835 F.3d 1159, 1165-66 (9th Cir. 2016). To that end, the Ninth Circuit has clearly established that killing an animal is a seizure within the meaning of the Fourth Amendment. *See Fuller v. Vines,* 36 F.3d 65, 68 (9th Cir.1994) (holding the killing of a dog is a destruction recognized as a seizure under the Fourth Amendment); *San Jose Charter of Hells Angels Motorcycle Club* at 975 (same).[15] Of particular relevance, "the Fourth Amendment protects against unlawful searches and seizures even when title to the property is unclear." *OSJ PEP Tennesse LLC v. Harris*, 2014 WL 4988070, * 9 (C.D. Cal. Oct. 7, 2014) (holding government assertion of superior title did not defeat Fourth Amendment claim).

Here, Plaintiffs' retained constitutionally protected property interests in Cedar. *See supra* at Section IV. Those same property interests, "even [though Defendants dispute Plaintiffs'] title to the property," are sufficient for Plaintiffs' Fourth Amendment challenges to the search and seizure of Cedar. *See OSJ PEP Tennesse LLC v. Harris*, 2014 WL 4988070, * 9 (C.D. Cal. Oct. 7, 2014). Mr. Macfarlane took possession of Cedar on July 8, 2022, SUF 24, and, after deliberating with Ms. Silva, ordered Cedar's slaughter on July 28, 2022, SUF 26, 27, thereby "meaningful[ly] interfere[ing] with [Plaintiffs'] possessory interests in [Cedar]." *Sodal*, 506 U.S. at 61; *see also Kailin v. Village of Gurnee*, 77 F.4th 476, 477, fn. 1 (7th Cir. 2023) ("The killing of a pet constitutes a seizure within the

---

[15]      The First, Third, Fourth, Seventh, Eighth, and Tenth Circuits have also concluded animals are protected by the Fourth Amendment. *See Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016) (stating dog fit within meaning of "effects" under Fourth Amendment); *Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009) (government raid of public housing to seize dogs and cats and kill is a "seizure" within the meaning of the Fourth Amendment)*; Viilo v. Eyre*, 547 F.3d 707 (7th Cir. 2008); *Altman v. City of High Point, N.C.*, 330 F.3d 194, 203 (4th Cir. 2003) (reviewing "the strength of the Constitution's text, of history, and of precedent" and holding "privately owned dogs were 'effects' subject to the protections of the Fourth Amendment"); *Brown v. Muhlenberg Township,* 269 F.3d 205, 209–10 (3d Cir. 2001) (holding that dogs are "effects"); *Lesher v. Reed,* 12 F.3d 148, 150–51 (8th Cir.1994) (dogs are property subject to Fourth Amendment seizure requirements).

ADVANCING LAW FOR ANIMALS

meaning of the Fourth Amendment, and the use of deadly force ... is reasonable only if the pet poses an immediate danger and the use of force is unavoidable."). For the same reasons Ms. Silva participated as Mr. Macfarlane's supervisor in detaining and destroying Plaintiffs' property interests in Cedar without notice, Ms. Silva also participated as Mr. Macfarlane's supervisor in illegally seizing Cedar. *See supra* at Section VI(B). She was aware he had custody of Cedar, she was aware of Plaintiffs' asserted rights, and, with reckless disregard of Plaintiffs' rights, she allowed Mr. Macfarlane to kill Cedar.

Notably, "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 68 (1992).[16] Stated otherwise, search and seizures are distinct; "If searches are perception, seizures are reception." *Archer v. Gipson*, 108 F. Supp. 3d 895, 909 (E.D. Cal. 2015). As a result, the undisputed facts show Fair Defendants face Fourth Amendment liability even though they conducted an unlawful seizure, without conducting an underlying search.

## B. Cedar's Warrantless Seizure Lacked Judicial Authorization and Did Not Fall Within Any Well-Defined Exception

Fair Defendants' seized Cedar, and did so without a warrant. SUF 24-28. In order for Fair Defendants' seizure of Cedar to be constitutional, the seizure must have been "reasonable." A seizure of personal property conducted without a warrant is presumptively unreasonable. *United States v. Place,* 462 U.S. 696, 701 (1983) (stating that "the Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized"); *see also Dixon v. Lowery*, 302 F.3d 857, 862 (8th Cir. 2002) (explaining "[i]t is well settled that a seizure carried out without judicial authorization is per se unreasonable unless it falls within a well-defined exception to this requirement").

"Although it is Defendants' burden to justify the warrantless seizure[,]" here, State Defendants cannot do so. *See Archer v. Gipson*, 108 F. Supp. 3d 895, 910 (E.D. Cal. 2015). Absent exigent

---

[16]     For example, "generally, an officer who happens to come across an individual's property in a public area could seize it only if Fourth Amendment standards are satisfied—for example, if the items are evidence of a crime or contraband." *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 68 (1992).

ADVANCING LAW FOR ANIMALS

circumstances or a valid consent, prior to the state assisting in depriving a party of possession, a neutral officer or magistrate must determine whether there is probable cause to believe that the claiming party is entitled to the relief requested. *Dixon v. Lowery*, 302 F.3d 857, 862 (8th Cir. 2002) (citing *Soldal*, 506 U.S. at 66). After all, "[a]uthorizing governmental seizures to be carried out without a determination by a judicial officer could lead to improper seizures and 'would make a nullity and mockery of the Fourth and Fifth Amendment guarantees' and '[t]his we refuse to do.'" *Dixon v. Lowery*, 302 F.3d 857, 862 (8th Cir. 2002). This requirement extends beyond the police. Indeed, "the Fourth Amendment applies to searches and seizures in the civil context" as well. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 51 (1993).

Here, Fair Defendants conducted a warrantless seizure of Cedar, making the seizure presumptively unreasonable. Fair Defendants are unable to overcome this presumption, because they cannot assert an exception to the warrant requirement; namely, they cannot assert the exceptions of exigent circumstances or valid consent. *See LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000). Exigent circumstances embrace conditions where government actors are "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving...." *See San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 978 (9th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989). Undisputedly, no such conditions existed here. Fair Defendants held Cedar for weeks, beginning on the early morning of July 9, without any cogent explanation as to why. SUF 24-28. Fair Defendants slaughtered Cedar on July 28, without any cogent explanation as to why. The undisputed evidence shows Fair Defendants sought to cover up the ultimate destination and use of Cedar's body. SUF 25. These facts hardly rise to threshold of conditions forcing a split-second judgment. Nor did Fair Defendants obtain valid consent from Plaintiffs. "Because of the importance of preserving constitutional rights," consent must be "unequivocal and specific" and "freely and intelligently given." *United States v. Page*, 302 F.2d 81, 83 (9th Cir. 1962) (internal citations omitted). Under this standard, "Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Id.* Here, Plaintiffs did not consent to Cedar's seizure; the opposite, Plaintiffs undertook every effort available to keep Cedar alive.

In sum, the Fair Defendants violated the Fourth Amendment. They killed Cedar with no warrant and without exception to the warrant requirement, making their actions per se unreasonable. The facts supporting that conclusion are undeniable and no jury would find otherwise. Partial summary judgment on liability for the Fourth Amendment claim is appropriate. All that is left is for a jury to determine damage.

## VIII.   CONCLUSION

The Fair Defendants' liability for violations of the Fourth and Fourteenth Amendments is clear and supported by undisputed facts: Fair Defendants' own texts and admissions at deposition establish that Mr. Macfarlane took possession of Cedar on July 8, 2022, agreed to slaughter him with Ms. Silva on July 22, 2022, and ultimately killed Cedar on July 28, 2022, with the consent of Ms. Silva. Plaintiffs should therefore be granted partial summary judgment on their third and fourth causes action on the issue of liability. A jury can then determine the damages at trial.

**ADVANCING LAW FOR ANIMALS**

Dated:  November 15, 2024

By:___/s/Ryan Gordon_____
Ryan Gordon
Vanessa Shakib
Attorneys for Plaintiffs