RYAN R. GORDON (SBN 278414)
VANESSA T. SHAKIB (SBN 287339)
**ADVANCING LAW FOR ANIMALS**
407 N. Pacific Coast Highway #267
Redondo Beach, CA 90277
Tel: (202) 996-8389
rgordon@advancinglawforanimals.org
vshakib@advancinglawforanimals.org

DANIEL J. KOLDE, ESQ.
**LAW OFFICES OF DANIEL J. KOLDE**
P.O. Box 440344
St. Louis, Missouri 63144-9998
Tel: 636.675.5383
Email: daniel.kolde.law@gmail.com
(*pro hac vice application to be filed*)

Attorneys for Plaintiffs

ADVANCING LAW FOR ANIMALS

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual,<br>Plaintiffs,<br>v.<br>LIEUTENANT JERRY FERNANDEZ, in his individual capacity; DETECTIVE JACOB DUNCAN, in his individual capacity; DETECTIVE JEREMY ASHBEE, in his individual capacity; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association; COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual and official capacity; BJ MACFARLANE, in his individual and official capacity; KATHIE MUSE, in her individual and official capacity, and DOES 1 through 10, | Case No. 2:22-cv-01527-DAD-AC<br><br>**DECLARATION OF RYAN R. GORDON IN SUPPORT OF PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 7, 2025<br>Time: 1:30 pm<br>Courtroom: 4, 15th Floor<br><br>Trial Date: March 24, 2025<br><br>Action Filed: August 31, 202 |

ADVANCING LAW FOR ANIMALS

**DECLARATION OF RYAN R. GORDON**

I, Ryan Gordon, declare as follows:

1. I am an attorney at law duly licensed to practice law before all the courts of the State of California, as well as admitted to practice in the United States District Courts for the Eastern and Central Districts of California. I am over 18 years of age. I have personal knowledge of the matters set forth herein and, if called upon, I could and would competently testify thereto. I make this declaration in support of the Plaintiffs Jessica Long ("Mrs. Long") and her minor daughter, E.L.'s (E.L.) (collectively "Plaintiffs") Motion for Partial Summary Judgment.

2. I am the attorney of record for Mrs. Long and E.L., proceeding by and through her guardian ad litem, Mrs. Long, in the above captioned action.

3. On November 14, 2023, I conducted the deposition of Defendant Melanie Silva ("Ms. Silva"). The period for making deposition corrections expired on January 1, 2024. A true and correct copy of excerpts from Mrs. Silva's deposition is attached as **Exhibit 1**.

4. With respect to the Ms. Silva's employment with Defendant, the 27th District Agricultural Association ("Shasta Fair Association"), Ms. Silva testified:

*Q.* *Okay. All right. Okay. And what is your current position?*

*A.* *CEO at Shasta District Fair, the 27th DAA.*

....

*Q.* *...How long have you been CEO?*

*A.* *Since August of 2021.*

**Ex. 1** (Silva Dep. Vol. 1, 15:6-8, 16:11-12).

5. With respect to what rules governed Plaintiffs' conduct at the 2022 Shasta District Fair, Ms. Silva testified:

*Q.* *So you said earlier that the -- the -- the fair rules apply -- the local rules, which I'll show you a copy of what I think you mean by that in a moment, and the state rules both applied, correct?*

*A.* *Correct.*

**Ex. 1**. (Silva Dep. Vol. 1, 266:15-21).

6. Ms. Silva confirmed that the "state rules" that applied were the document marked in her deposition as Exhibit J, entitled 2022 State Rules for California Fairs:

> *Q.* *Okay. Okay. All right. So -- and the other rules you said to apply were the -- the state rules and. I do have a copy of those, which we can -- which we can put into evidence also but they're on my computer. Because I only have one copy. And we had to go to Kinko's this morning and it was a nightmare. So there you go.*
>
> *(Exhibit J was marked.)*
>
> *Q.* *Do you need to look through it at all or anything or –*
>
> *A.* *I am not as familiar with these rules as I am with ours. That's why I have a livestock supervisor, so...*
>
> *Q.* *Yeah. Did you check those rules when --when -- you know, around June 29th or 27th of 2022?*
>
> *A.* *Probably.*
>
> *Q.* *Okay. Probably. Do you -- why do you say "probably"?*
>
> *A.* *Because I referenced them in my e-mail.*

**Ex. 1** (Silva Dep. Vol. 1, 275:19 – 276:13). A true and correct copy of Exhibit J from Ms. Silva's deposition, defined in the concurrently-filed motion as State Rules, is attached to **Exhibit 2.**

7. In addition to the State Rules, I presented Ms. Silva with a document marked Exhibit I at her deposition, referred to as the guidebook or premium book. She testified that, within that book, the two sections that applied were entitled "All General Livestock Rules and Guidelines" and "Junior Meat Goats." She testified:

> *Q.* *when I asked which rules applied, you were going to check the handbook and let me -- let me know which sections. So basically right now, and stop me if I'm wrong, you're holding a document which is going to be labeled Exhibit I which is vetted -- what would you will call that document?*
>
> *A.* *All General Livestock Rules and Guidelines.*
>
> *Q* *Okay. And that's a portion of the handbook, correct?*
>
> *A* *Yes.*

ADVANCING LAW FOR ANIMALS

*Q* *Okay. All right. And the other portion of the handbook that a -- that a -- the rules that had to be abided by here were –*

*A* *The junior meat goats.*

*Q* *And that's on page 67?*

*A.* *And 68.*

**Ex. 1** (Silva Dep. Vol. 1, 269:4-21.) A true and correct copy of Exhibit I from Ms. Silva's deposition, Vol. 1. (i.e., the section titled All General Livestock Rules and Guidelines, described in the concurrently-filed motion as "Local Rules") is attached hereto to **Exhibit 3**.

8. With respect to Ms. Silva's supervisory authority over Mr. Macfarlane, she testified:

*Q* *You had supervis- -- supervisory duties with respect to Macfarlane, though, correct?*

*A* *Yes.*

**Ex. 1** (Silva Dep. Vol. 1, 204:4-6).

9. With respect to Instagram post described as the "Viral Instagram Post" in the concurrently-filed memorandum, Ms. Silva was presented with a text chain marked as Exhibit L to Volume 1 of her deposition and testified.

*Q* *All right. Melanie, so go to the – the first page you, of course, recognize because it's the Instagram -- the infamous Instagram post, correct?*

*A* *Uh-huh.*

*Q* *All right. And it's just about June –June 27th. So it looks like B.J. is forwarding it to Kathie at that time. Did he forward it to you around that time also?*

*A* *Somebody did. I don't know who.*

**Ex. 1** (Silva Dep. Vol. 1, 317:21-318:11). A true and correct copy of the text chain marked as Exhibit L to Volume 1 of Ms. Silva's deposition is attached hereto as **Exhibit 4**.

10. With respect to the impact the Viral Instagram Post published by nonparty Bleating Hearts on the Shasta Fair Association, Ms. Silva testified:

ADVANCING LAW FOR ANIMALS

*A* *We had to forward our phones because our phones were --*
*Q* *Okay.*
*A* *-- blown up.*
*Q* *From the Instagram post.*
*A* *From the Instagram post, from any media that grabbed it.*

**Ex. 1** (Silva Dep. Vol. 1, 49:7-13).

11. With respect to receiving and reviewing the email from Plaintiff Jessica Long, defined in Plaintiffs' Second Amended Complaint as Offer to Pay letter, ECF No. 25, ¶ 48, and defined in the concurrently-filed motion as Second Offer to Pay Damages, that email was marked as Exhibit G to Ms. Silva's deposition and she testified to receiving it and reviewing it as follows:

*Q.* *And that -- that would will be Exhibit?*
*...*
*COURT REPORTER: ... G.*
*MR. GORDON:* *G?*
*....*
*MR. GORDON:* *And it's Bates stamped number?*
*MR. BRIDGES:* *21 to 25.*
*MR. GORDON:* *21 to 25. Okay.*
*(Exhibit G was marked.)*
*....*
*Q* *Okay. You didn't think to reach out to the Dahles during any of this?*
*A* *No.*
*Q* *No? Okay. All right. Okay. So do you want to -- so the next morning -- or actually, it's the next evening rather, 5:41 p.m., looks like Jessica sends you -- this is your e-mail, correct, at CEO@SDFeventcenter.com?*
*A* *Yes.*
*Q* *Okay. All right. And do you recall ever receiving this e-mail from her?*
*A* *Yes.*
*...*
*Q* *Okay. So Melanie -- so have you reviewed all the -- I handed you a package, which is Exhibit G, I believe. Did you review all of those -- the e-mails and whatnot from that exhibit?*
*A* *Yes, I read through it.*

ADVANCING LAW FOR ANIMALS

Q *Okay. All right. So do you recall receiving this letter from -- or this e-mail from Jessica on the 27th of -- of June?*

A *Yes*

Q *Did you read it that day?*

A *No.*

Q *No. Okay. It was 5 o'clock. You stopped working?*

A *The Monday after fair, probably.*

Q *Probably. Okay. Okay. Do you know – did you check your e-mail -- your work e-mail at home, too?*

A *No.*

Q *...So you didn't -- so then you did not see this e-mail till presumably Tuesday is your testimony?*

A *Yes.*

*....*

Q. *....And you -- she offers also -- this is on Bates stamp number 0025, the next page. "I will pay you back for the goat and any other expenses I caused." Did you -- did you see that?*

A *Yes, I read through the e-mail.*

*...*

Q *And what was your reaction to her offering to pay back anything?*

A *My e-mail that I responded back with her.*

*...*

Q *Okay. Okay. But did you -- okay. So you didn't want to accept her offer to pay any expenses for anything she might have caused is the bottom line, correct?*

A *Correct.*

**Ex. 1** (Silva Dep. Vol. 1, 232:3-237:20). A true and correct copy of Exhibit G from Ms. Silva's deposition, Vol. 1., defined in the concurrently-filed motion as Second Offer to Pay Damages, is attached hereto to **Exhibit 5** at Bates 24-25.

12. With respect to Ms. Silva's June 28, 2022 email responding to Mrs. Long's Second Offer to Pay Damages, discussed in Plaintiffs' Second Amended Complaint, ECF 25, ¶ 51, and incorporated in Exhibit 4 at Bates 23-24, Ms. Silva was unsure how much time she deliberated over sending her response email, but testified at length about the letter's substance.

*Q* *Okay. Okay. But did you -- okay. So you didn't want to accept her offer to pay any expenses for anything she might have caused is the bottom line, correct? Okay. All right. All right. So the next day you -- not the next day. Tuesday. Because you read the -- you read Jessica's e-mail on Tuesday and then you respond -- you respond at, it appears here 1:31 p.m. Did you know about -- does that help you determine when you would have read her e-mail? Because your response is at 1:31 p.m., so did you read it -- her e-mail in the morning, think about it for a while or why -- can't speak -- think about it for a while and then respond or did you just immediately respond to her?*

*A* *I don't know.*

**Ex. 1** (Silva Dep. Vol. 1, 239:21-240:7.) A true and correct copy Ms. Silva's response email to Mrs. Long is contained within Exhibit G to her deposition, Vol. 1., attached hereto to **Exhibit 5** at Bates 23-24.

13. Ms. Silva then proceeded to testify about what she meant by the various statements in her June 28, 2022, email to Mrs. Long. *See, generally,* **Ex. 1** (Silva Dep. Vol. 1, 240-249).

14. With respect to Ms. Silva's receipt of Plaintiffs' Notice of Civil Claim and Intention to Sue, defined in the concurrently-filed motion and described in Plaintiffs' Second Amended Complaint at ¶ 52, that letter was contained within the document marked as Exhibit H to the deposition of Ms. Silva. She testified she received that letter on June 29, 2022 and read it at that time:

*MR. BRIDGES:* *It looks like it is. Is this going to be next in order?*

*MR. GORDON:* *Yes.*

*MR. BRIDGES:* *And it's Bates stamped page 6 through 13.*

*COURT REPORTER:* *Thank you.*

*(Exhibit H was marked.)*

*THE WITNESS:* *Oh.*

*BY MR. GORDON:*

*Q* *All right. Do you recognize this e-mail chain, Melanie?*

*A* *Yes.*

*....*

*Q* *So Jessica sent a follow-up e-mail, it looks like, on Wednesday June 29th at 9:48 a.m. So this is after your -- in the prior exhibit, your last communication with Mike at CDFA was at 9:06 a.m. according to the*

*timestamp. So it looks like Jessica on the exhibit -- on the exhibit you have in front of you sent another e-mail that morning at 9:48 a.m.*

*A Gotcha.*

*Q And is that this letter that's attached to it, 10 to 13?*

*15 A Yes.*

*Q Okay. All right. And you read the letter at the time?*

*A At the time, yes.*

**Ex. 1** (Silva Dep. Vol. 1, 263:6-264:18). A true and correct copy of the documents marked as Exhibit H to the deposition of Ms. Silva, Vol. 1., are attached hereto as **Exhibit 6**, with Plaintiffs' Notice of Civil Claim and Intention to Sue at Bates 6, 10-13.

15. With respect to Ms. Silva's understanding that Plaintiffs' Notice of Civil Claim and Intention to Sue Letter, included in Exhibit H to her deposition, asserted Plaintiffs' property rights over Cedar and threatened to sue, Ms. Silva testified:

*Q So when you read this letter, did you understand at the time that they were – that Ms. Long and her -- or plaintiffs, let's say, were making a claim that Cedar was -- was their personal property, correct?*

*A My understanding was that she didn't agree with what we were doing.*

*Q I understand. But then you understand she is also saying this is -- this is our property, we did not commit a felony, correct? It might be wrong with that, I'm guessing –*

*A I understand that that's what she believed.*

*Q Okay. Okay. And then at the end, she writes, "This letter is not in waiver of any – any rights while -- and it's purpose is in anticipation of litigation." When -- when you read that, did you understand she was thinking of bringing a lawsuit?*

*A Where is that?*

*Q Um. You have it?*

*MS. SHAKIB: (Indicating.)*

*THE WITNESS: I believe she was threatening a lawsuit.*

**Ex. 1** (Silva Dep. Vol. 1, 305:15-306:12). A true and correct copy of the documents marked as Exhibit H to the deposition of Ms. Silva, Vol. 1., are attached hereto as **Exhibit 6**, with Plaintiffs' Notice of Civil Claim and Intention to Sue at Bates 6, 10-13.

ADVANCING LAW FOR ANIMALS

16. With respect to Senator Brian Dahle and Assemblywoman Megan Dahle bidding on Cedar through Mrs. Muse on June 25, 2022, Ms. Silva testified that Mrs. Muse filled out a document entitled "sales invoice," marked as Exhibit D in her deposition, that same day.

> *Q.* *Okay. So this is Cedar. Do you know about what day this document was filled out by anyone on here?*
> *A.* *The day of the sale.*
> *Q* *So this would be –*
> *A* *That's what the buyers sell -- sign.*
> *Q* *Okay. So did they physically sign this that day?*
> *A* *Kathie was their representative and she signed it that day.*
> *Q* *Okay. Did she fill out this (indicating)?*
> *A* *The -- when they bid, every buyer had a number.*
> *Q* *Okay.*
> *A* *And so when she bid and split it, then that gets written in. And then it gets taken to the buyer and then they sign it.*
> *Q* *Okay. So this was filled out the 25th and -- where Kathie signed on it that day?*
> *A* *Correct. So they -- they bid and they immediately do the paperwork and take it to the buyer as the other buyers are going –*
> *…*
> *Q* *…Okay. All right. So what exhibit are we on?*
> *A* *D.*
> *Q* *D. This will be -- this will be Exhibit D.*

**Ex. 1** (Silva Dep. Vol. 1, 212:5-213:15.) A true and correct copy of Exhibit D from Ms. Silva's deposition, Vol. 1, the sales invoice, is also attached hereto to **Exhibit 7.**

17. With respect to the final bills/invoices the Shasta Fair Association generated on July 6, 2022 and sent to Senator Brian Dahle and Assemblywoman Megan Dahle for Cedar, marked as Exhibit E to Ms. Silva's deposition, she testified:.

> *Q.* *Yeah. I think they both are. I'm just trying to figure out which one is Cedar here. I think they appear to be. So one is for Brian Dahle and one is for Kathie -- one is for Megan. Okay. All right.* ***Okay. So are these the bills then for Cedar?*** *You just tell me and these, I guess, we'll make -- we'll make -- what exhibit are we on?*

*MS. SHAKIB:* *E.*
*MR. GORDON:* *E. So these will collectively be E, both pages of it.*
*MR. BRIDGES:* *I think so.*
*(Exhibit E was marked.)*
*THE WITNESS:* ***Yeah, tag 367, tag 367****.*
*A.* *The day of the sale.*
*Q* *Okay. Yeah. So this is both of the bills to the Dahles?*
*A* *Because they split it.*
*...*
*Q* *What date day were these bills generated?*
*A* *I generated them on the 6th.*
*Q* *Okay. So as of the 6th, the Dahles still hadn't paid, correct?*
*A* *The 6th, the bill just went out, yes.*
*Q* *Of -- not just. You mean of -- you don't mean just now. You mean –*
*A* *Of -- no. Of 2022.*

**Ex. 1** (Silva Dep. Vol. 1, 215:4-216:13). A true and correct copy of Exhibit E from Ms. Silva's deposition, Vol. 1, the final invoice, is also attached hereto to **Exhibit 8.**

18. With respect to the Shasta Fair Association's issuance of a check to the 4-H leader on July 25, 2022, from the fair's own funds, which 4-H returned to the fair, Ms. Silva testified:

*A* *That's the top of E.L.'s check for her animal.*
*...*
*Q.* *... would this just mean that the issue date of the check was 7/25?*
*A* *That's when it was printed.*
*...*
*Q* *And it's your testimony you would have issued the check regardless if they paid?*
*A* *Correct.*
*Q* *Of -- not just. You mean of -- you don't mean just now. You mean –*
*A* *Of -- no. Of 2022.*
*...*
*Q* *....-- it's your understanding the Longs did not ever cash that check, correct?*

A *They never went to the 4-H leader and picked it up, so I have it in our safe.*

Q *Oh, you have –*

A *4-H returned it to us, because they didn't go to the leader and pick it up.*

Q *Okay.*

A *So I put it in our safe and it's just sitting there.*

*…*

Q. *You didn't mail the check?*

A *It goes to the 4-H office, the 4-H office then spreads it out to the leaders, and then the child and the parent is supposed to go to the leaders and pick it up.*

**Ex. 1** (Silva Dep. Vol. 1, 217:5-219:12).

19. With respect to the Dahles donation of Cedar's meat to the 4-H/FFA community barbecue, defined in the concurrently-filed motion as Government Barbecue, as indicated by Exhibit D to Ms. Silva's Deposition, and attached hereto as **Exhibit 6**, Ms. Silva testified:

Q *What was the group that owned it in your mind?*

A *The 4-H/FFA Community Barbecue where it was donated.*

**Ex. 1** (Silva Dep. Vol. 1, 70:22-25).

Q *And you didn't think to contact Senator Brian Dahle's office?*

A *It was no longer his goat. He donated it to the community barbecue.*

Q *Okay. And in your mind legally the donation amounted to a instantaneous transfer of title?*

A *Yes.*

**Ex. 1** (Silva Dep. Vol. 1, 266:2-9).

20. On February 9, 2024, I conducted Volume II of the continued deposition of Ms. Silva. The period for making deposition corrections expired on March 29, 2024. A true and correct copy of excerpts from Ms. Silva's deposition is attached hereto as **Exhibit 9**

21. With respect to whether the Dahles or Mrs. Muse ever paid for Cedar, Ms. Silva testified:

Q. *Okay. Okay. And then documents reflecting final payment of Cedar by the Dahles. Did you ever get the Dahles' payment documents for Cedar?*

A. *I don't believe they paid.*

Q. *You don't believe they paid?*

ADVANCING LAW FOR ANIMALS

*A.* *No.*

*Q.* *Okay. Did Ms. Muse pay on their behalf?*

*A.* *No.*

**Ex. 9** (Silva Dep. Vol. 2, 431:14-20).

22. With respect to the Government Barbecue, Ms. Silva confirmed it occurred on July 9, 2022:

*Q.* *So earlier there was a community barbecue, correct, July 9th, 2022?*

*A.* *Okay.*

**Ex. 9** (Silva Dep. Vol. 2, 422:19-21).

23. With respect to Mr. Macfarlane acting as an employee of the Shasta Fair Association when holding and arranging for Cedar's slaughter, Ms. Silva testified:

*Q.* *Okay. Why was BJ, who's the livestock manager and employee of the fair at this time, why is he handling the logistics of slaughter for Kathie Muse in your understanding?*

*MR. BRIDGES:* *Calls for speculation but go ahead.*

*THE WITNESS:* *Why?*

*MR. GORDON:* *Yes.*

*THE WITNESS:* *I don't know.*

*MR. GORDON:*

*Q.* *But he's your employee, correct?*

*A.* *Yes.*

*Q.* *Okay. So why was -- okay. He's your employee, but is he acting as your employee in that capacity with Cedar?*

*MR.BRIDGES:* *Calls for speculation.*

*MR. GORDON:* *It's okay. You can answer.*

*MR. BRIDGES:* *If you know, you can answer.*

*THE WITNESS:* *I don't know.*

*MR. GORDON:*

*Q.* *Okay. You don't know if BJ was acting as your employee at the time. Is that your testimony?*

*A.* *As livestock supervisor, I would imagine he was finishing out his job concerning the animal. That was part of the fair.*

*Q.* *I believe you testified to that the last time. It's not a gotcha. So he's holding Cedar at least in some portion as an employee of the fair, correct?*

ADVANCING LAW FOR ANIMALS

A. *Correct.*

Q. *Okay. All right. So –*

MR. BRIDGES: *I mean, so the question is did you authorize him -- I mean, were you as the CEO of the fair okay with him doing this?*

THE WITNESS: *Yes.*

…

Q. *… So you're okay with him organizing the slaughter and working with Ms. Silva -- Ms. Muse at the time to do so, correct?*

A. *Yes.*

**Ex. 9** (Silva Dep. Vol. 2, 391:11 – 393:7).

24. With respect to the July 22, 2022, text message exchange between Ms. Silva and Mr. Macfarlane referenced in the concurrently-filed memorandum, that exchange was contained within a text chain produced by Mr. Macfarlane in discovery. The full text chain was marked as Exhibit O to Volume 2 of Ms. Silva's deposition. As to the July 22, 2022 text chain, Ms. Silva testified:

Q. *You're on the correct page, so. You see where it says July 22nd, some texts start, July 22nd at 11:22 a.m. Do you see that timestamp, Ms. Silva?*

A. *I do.*

…

Q. *Okay. You write, "Thanks." Then BJ texts, "What's gal's name at Bowman? Kathie said okay but no one needs to know about this. You, me, Kathie are only ones. It got killed and donated to nonprofit if anyone asks." What is being communicated to you here as you understood it?*

MR. BRIDGES: *Object it calls for BJ's state of mind. But to the extent that you understand what he was trying to tell you, you can go ahead and answer.*

MR. GORDON: *Yeah, I'm asking what she believed this meant. Or what she believed was being communicated to her at the time.*

THE WITNESS: *I'm assuming that he's talking about Cedar.*

….

Q. *…All right. So we'll mark that O.*

**Ex. 9** (Silva Dep. Vol. 2, 374:23 – 375:20, 382:10). A true and correct copy of Exhibit O from Ms. Silva's deposition, Vol. 2, containing text messages, is also attached hereto to **Exhibit 10.**

25. With respect to the July 22, 2022, text chain, Ms. Silva also confirmed "Serene" referred to the woman at Bowman Meat Company."

ADVANCING LAW FOR ANIMALS

*Q. Okay. All right. So the next page it looks like it's cut off, but I think that says "Serene" at the top?*

*A. Yes.*

*Q. And she's the woman at Bowman's Meat, correct?*

*A. Yes.*

**Ex. 9** (Silva Dep. Vol. 2, 376:22 – 377:2). A true and correct copy of Exhibit O from Ms. Silva's deposition, Vol. 2, containing text messages, is also attached hereto to **Exhibit 10.**

26. With respect to the July 28, 2022 text message exchange between Ms. Silva and Mr. Macfarlane referenced in the concurrently-filed memorandum, that exchange was contained within a text chain produced my Mr. Macfarlane to my office in discovery. That text chain was marked as Exhibit P to Volume 2 of Ms. Silva's deposition. As to the July 28, 2022, text chain, Ms. Silva testified:

*Q. Do you recall getting this text from BJ, "Goat is getting butchered within the half hour finally. I'm going to come by tomorrow if you are around after kids doctors appointments. Can I use Zoom one more time?" Do you recall getting that text from BJ?*

*A. Do I remember it, no.*

*Q. Okay. Do you remember him communicating with you one way or another that Cedar was getting slaughtered on about July 28th?*

*A. I do remember him saying that the goat was going to be butchered, yes.*

**Ex. 9** (Silva Dep. Vol. 2, 382:23 – 383:8, 401:407). A true and correct copy of Exhibit P from Ms. Silva's deposition, Vol. 2, containing text messages, is also attached hereto to **Exhibit 11**.

27. On November 15, 2023, I conducted the deposition of Mr. Macfarlane. The period for making deposition corrections expired on January 1, 2024. A true and correct copy of excerpts from Mr. Macfarlane's deposition is attached as **Exhibit 12**.

28. With respect to being hired as the livestock manager for the Shasta Fair Association for the 2022 Shasta District Fair, Mr. Macfarlane testified:

*Q. Yeah. Okay. So then after you became CEO you worked as the livestock manager, correct, for the fair?*

*A. When I was done with CEO?*

*Q Yes.*

*A Yes, I was hired back that year.*

ADVANCING LAW FOR ANIMALS

....

*Q.* *So then Melanie asked you to come help out with the 2022 fair in spring. And you –*

*A* *Yes.*

*Q* *-- accepted, okay, as livestock manager? Okay. And you resigned around August, you said, correct?*

*A* *That's my rough guesstimate of when I resigned.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 26:20-25, 29:10-18).

29. With respect to Mr. Macfarlane's representations to Mrs. Long that she committed a felony by removing Cedar, among other things, he testified:

*Q.* *...So you remember speaking with her on the phone around 9:00-ish at the fairgrounds. And do you remember what you discussed with her?*

*A.* *Yes. I asked her that we need to get the goat back. And she said, "There's got to be some other way." And I said, "No, there's no other way that you don't own the goat at this time. It's my opinion you're stealing something over $400 of agricultural commodities. It's considered a felony," which I had to look it up.*

....

*Q* *....So you had this conversation with [Mrs. Long] on the phone. You tell her she committed a felony in your opinion or potentially committed a felony, you know –*

*A.* *Yeah.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 161:17-167:3).

30. With respect to Jessica's oral statements to Mr. Macfarlane, he testified:

*Q.* *I mean, I know at some point in time you likely read her e-mails and you knew why she did. But on the conversation itself, did she tell you, my daughter, you know, really loves Cedar, bonded with him, and we -- she, you know -- we -- she didn't want him to get killed?*

*A.* *That doesn't -- that doesn't stick out in my brain. I'm not saying we didn't, but that sticks out in my brain of just the back and forth of we're going to do this a different way and I disagreed.*

*Q.* *You said we're going to do this a different way –*

*A.* *She said she was going to do this a different way. She just kept telling me, we got to do this -- there has to be another way, there has to be another way, there has to be another way. That's what I remember of that conversation.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 176:14-177:5).

31. With respect to Instagram post defined as the Viral Instagram Post in the concurrently-filed memorandum, marked as Exhibit B in the deposition of Mr. Macfarlane, Mr. Macfarlane testified:

*Q.* *So this will be Bates stamp number 17 from the public records. So take a look at that and let me get you -- that is the Instagram post you're referring to, right --*

*A.* *Yes.*

*Q* *-- which we'll mark as Exhibit B?*

*....*

*Q* *Okay. And did you -- did you talk about the post with Melanie Silva at all?*

*A* *I'm sure we did, yeah.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 145:14-20, 159:5-7). A true and correct copy of Exhibit B from Mr. Macfarlane's deposition, Vol. 1, the Viral Instagram Post, is attached hereto to **Exhibit 13.**

32. With respect to Mr. Macfarlane's understanding that the Viral Instagram Post was purposed at saving Cedar's life, he testified:

*Q.* *Yes. I understand that, but what I'm asking you is this Instagram because it contains -- it contains pleas to contact the fairgrounds and whatnot?*

*A.* *Uh-huh.*

*Q* *Did you think Jessica was -- had posted this to get people to contact the fairgrounds to, you know, plea for her -- her, you know, being able to save Cedar or something to that effect?*

*A* *Yeah.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 150:11-20).

33. With respect to when Mr. Macfarlane first saw the Viral Instagram Post, he testified he first saw it on July 28, 2022, based on text messages marked as Exhibit C to his deposition. Mr. Macfarlane testified:

*Q* *...So -- so this will --we'll mark this Exhibit C. And before I hand it to you, it is the -- this is the same Instagram post as you on the front.*

*A* *Yeah.*

*(Exhibit C was marked.)*

*BY MR. GORDON:*

*Q* *And it says June 28th at 6:16 p.m. So I'm wondering if that is when –*

*A* *Yes. Okay. So it was then.*

ADVANCING LAW FOR ANIMALS

Q *Okay. So –*

A *Just -- I could not remember when – for some reason it stuck in the back in my mind. I didn't see it for a few days, but apparently not.*

Q *No. That's fine. For and so -- okay. So you learned about it first on 6/28. Is this about –*

A *Yeah.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 147:24 - 148:16). A true and correct copy of Exhibit C from Mr. Macfarlane's deposition, Vol. 1, containing text messages, is also attached hereto to **Exhibit 14**.

34. With respect to communication Mr. Macfarlane received from State Senator Brian Dahle's office on June 27, 2022, including the letter that Mrs. Long sent to Senator Brian Dahle defined in the concurrently-filed motion as First Offer to Pay Damages, and marked as Exhibit D to Mr. Macfarlane's deposition, Mr. Macfarlane testified as follows:

Q *Okay. Okay. So this is Exhibit D. Did you review this in preparation for today?*

A *Yes.*

Q *Okay. What is this an e-mail chain of if you could just describe it?*

A *Bruce Ross who is Brian Dahle's assistant, or I'm not sure, his district director, e-mailed me this.*

*...*

Q *Okay. And so you saw on the second page, it looks like -- do you know what this paragraph is on the second page that was forwarded to you?*

A *I'm guessing it was from Jessica.*

Q *Okay. So at the -- at the time, though, you understood this paragraph to be from Jessica, correct?*

A *Yes.*

Q *Okay.*

A *I mean, I -- I don't -- that's what it implies to me.*

Q *No, I understand. Yeah, I'm just asking what you understood at the time, B.J., so –*

A *Yeah.*

Q *-- it's -- so she offers in it -- and you read this at the time. So you saw that she offered,"I will pay you back for the goat and any other expenses I caused"?*

A *Yes.*

ADVANCING LAW FOR ANIMALS

> *Q* *Okay. And -- and did you have any reaction to that at the time why -- her offer to pay?*
>
> *A* *No, I'm -- no. Because the owners – there was new owners so there's no -- in my opinion, there's no one to pay. It sold.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 168:12 - 170:16). A true and correct copy of Exhibit D from Mr. Macfarlane's deposition, Vol. 1, First Offer to Pay Damages, is also attached hereto to **Exhibit 15**.

35. With respect to receiving possession of Cedar on July 8, 2022, while reviewing the text chain marked as Exhibit C at his deposition, Mr. Macfarlane testified as follows:

> *Q* *And -- so then there's a -- there's a -- that's June 29th. And then there's a – then there's a -- a gap. And the next one is June 9 --July 9th at 7:13 a.m. I'm sorry. You respond, "Will do." I'm assuming that is in -- your response to, "Keep me post- -- updated"?*
>
> *A* *Yeah.*
>
> *Q* *So then, it looks like, July 9th, "Goat is at my house." So the -- the sheriffs or several of sheriff -- Lieutenant Fernandez and Duncan dropped the goat off the preceding evening at your house, correct?*
>
> *A* *Yes.*
>
> *Q* *Okay. All right. And about what time did they drop him off?*
>
> *A* *It was 11:30 or something. It was late at night.*
>
> *Q* *Late at night. Okay. And did you know they were dropping him off that day?*
>
> *A* *Yes.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 201:14 - 170:16). A true and correct copy of Exhibit D from Mr. Macfarlane's deposition, Vol. 1, containing text messages, is also attached hereto to **Exhibit 14**.

36. With respect to holding Cedar from July 8, 2022, until his July 28, 2022 slaughter, and conversations with Ms. Silva during that period, Mr. Macfarlane testified:

> *Q* *About how many times would you say you talked to Melanie through this?*
>
> *A* *I –*
>
> *Q* *Multiple times?*
>
> *A* *Yeah, multiple times.*
>
> …
>
> *Q.* *...when you got Cedar on July 8 through, let's say, the 28th is when it appears that he's killed or goes to slaughter, you talked to Melanie multiple times, correct?*
>
> *A* *Yes.*

ADVANCING LAW FOR ANIMALS

Ex. 13 (Macfarlane Dep. Vol. 1, 208:25-209:10).

37. With respect to Bowman Meats slaughtering Cedar on July 28, 2022, Mr. Macfarlane reviewed the text chain marked as Exhibit C in his deposition and testified:

> *Q.* *Okay. So what -- Bowman is a -- is a – a slaughtering facility, yes?*
>
> *A* *Processing facility.*
>
> *Q* *Processing facility. I apologize. Okay. And what is the full name if you know?*
>
> *A* *Bowman Meats.*
>
> *Q* *Bowman Meats. And where is that at?*
>
> *A* *Bowman Road, Cottonwood.*
>
> *Q* *Bowman Road, Cottonwood. Okay. So did you bring Cedar to Bowman Meats on the 28th?*
>
> *A* *No.*
>
> *Q* *What day did you bring him there?*
>
> *A* *They came to my house.*
>
> *Q* *They came to your house. So they came and retrieved Cedar on -- what day did that happen?*
>
> *A* *(Nodding.) The 28th, I'm guessing.*
>
> *Q* *Okay. Okay. Well, did this refresh your memory and you remember now it being the 28th, the same day you wrote this text?*
>
> *A* *I don't know. I -- I couldn't tell you the dates. I'm sorry.*
>
> *Q* *Okay. Okay.*
>
> *A* *I can tell you the dates, because I can look at this text message and see it was –*
>
> *Q* *Okay.*
>
> *A* *-- the 28th.*
>
> *Q* *Okay. So is it fair to say your best estimate, though –*
>
> *A* *Yes.*

**Ex. 12** (Macfarlane Dep. Vol. 1, 211:11 - 212:15) A true and correct copy of Exhibit C from Mr. Macfarlane's deposition, Vol. 1, is also attached hereto to **Exhibit 14**.

38. On February 9, 2024, I conducted Volume II of the continued deposition of Mr. Macfarlane. The period for making deposition corrections expired on March 29, 2024. A true and correct copy of excerpts from Mr. Macfarlane's deposition is attached hereto as **Exhibit 16**.

39. With respect to Ms. Silva's directions as CEO of the Shasta Fair Association, Mr. Macfarlane testified:

> *Q. Okay. So who gave you the -- you said you were waiting on permission to -- for direction to have Cedar slaughtered, correct?*
>
> *A. Yes.*
>
> *Q. When it was at your house? Who ultimately gave you the direction to?*
>
> *A. I believe it was either Melanie or Kathie.*
>
> *Q. Melanie or Kathie. Did -- why do you believe that?*
>
> *A. Because that's who -- I don't know. That's who the -- my boss -- it wasn't even my boss. The CEO of the fair and the owner of the goat.*

**Ex. 16** (Macfarlane Dep. Vol. 2, 250:08-15).

40. With respect to the text chain marked as Exhibit J in Mr. Macfarlane's deposition between him and Ms. Silva, produced by Mr. Macfarlane in discovery, contains a July 22, 2022 text thread between him and Ms. Silva. This text thread indicates that, on July 22, 2022, Ms. Silva and Mr. Macfarlane texted about their cover story as to Cedar's ultimate disposition; Mr. Macfarlane wrote "What's the gals name at bowman? Kathy [sic] said ok but no one needs to know about this. U me and Kathy [sic] are only ones. It got killed and donated to non profit if anyone asks," and Ms. Silva provides the name of the relevant employee at the company who ultimately butchers Cedar and writes "We are a non profit 😳🤣🤣🤣[.]" Mr. Macfarlane testified this text refers to Cedar:

> *Q. ...And we're on Exhibit J. This is Exhibit J.*
>
> *A. Yes.*
>
> ....
>
> *Q. Okay. So the next text on here you have – it goes to July 22nd, and you have "FOF pig 263 pounds." That has nothing to do with Cedar, correct?*
>
> *A. No.*
>
> *Q. And FOF is just Friends of Fair?*
>
> *A. Yeah.*
>
> *Q. Okay, thanks. And then you respond, "What's gal's name at Bowman? Kathie said okay but no one needs to know about this. You and me are the" -- "and Kathie are the only ones" -- "are only ones." This is referring to Cedar, yes?*
>
> *A. Yes.*

ADVANCING LAW FOR ANIMALS

**Ex. 16** (Macfarlane Dep. Vol. 2, 341:6, 348:8-19). A true and correct copy of Exhibit J from Mr. Macfarlane's deposition, Vol. 2, a text chain, is also attached hereto to **Exhibit 17.**

41. With respect to the text chain between Mr. Macfarlane and Ms. Silva, marked as Exhibit I in Mr. Macfarlane's deposition and produced by him in discovery, it contains a July 28, 2022 text thread from Mr. Macfarlane stating, "Goat is getting butchered within the half hour. Finally." Mr. Macfarlane testified this text with Ms. Silva refers to Cedar:

> *Q.* *So BJ, this text looks like it starts off with, we're on Exhibit I, and do you know what this -- for the record, BJ, what are you holding right now?*
>
> *A.* *Text message from Melanie.*
>
> *Q.* *Between you and Melanie Silva?*
>
> *A.* *Yes*
>
> *Q.* *And the first text it looks like your writing on the right hand -- the text on the right-hand side of yours, correct?*
>
> *A.* *Yes.*
>
> *Q.* *Okay. Says, "Goat is getting butchered within the half hour." So did that tell you that you must have sent this text on July 28th, correct?*
>
> *A.* *Yes.*
>
> *Q.* *... Okay. So the top text where it says, "Goat is getting butchered within the half hour," you were just explaining to Melanie -- the goat -- strike that. The goat here is Cedar, correct?*
>
> *A.* *Yes.*
>
> *Q.* *And you were explaining to Melanie that he's getting butchered within that day by -- and that, you know -- what time of day would this have been, if you know?*
>
> *A.* *1:05 p.m.*

**Ex. 16** (Macfarlane Dep. Vol. 2, 341:6, 348:8-19). A true and correct copy of Exhibit I from Mr. Macfarlane's deposition, Vol. 2, containing text messages, is attached hereto to **Exhibit 18.**

42. On August 13, 2024, the Fair Defendants deposed minor Plaintiff E.L.. I attended and represented E.L. in this deposition. The period for making deposition corrections expired on September 30, 2024. A true and correct copy of excerpts from E.L.'s deposition is attached hereto as **Exhibit 19**.

43. With respect to E.L. telling her mother, Mrs. Long, that she did not want to proceed with selling Cedar after the auction, E.L. testified:

*Q.* *Did you ever tell your mom that you didn't want Cedar to be used for meat?*

*A.* *Yes.*

*Q.* *When did you tell her that?*

*A.* *Right after the auction..*

**Ex. 19** (E.L. Dep. 27:23 – 28:2).

44. With respect to removing Cedar from the auction, E.L. testified:

*Q.* *MR. BRIDGES: Okay. You said a few minutes ago that after the auction you told your mom that you didn't want Cedar to go to market, so you and your mom took him from the fairgrounds and took him to Sacramento. Do you remember saying that?*

*A.* *Yes.*

*Q.* *Was it your idea to remove Cedar from the fairgrounds?*

*A.* *Yes*

**Ex. 19** (E.L. Dep. 33:12 – 20).

45. With respect to the fair registration forms that Mrs. Long filled on in mid-May 2022 so E.L. could participate in the 2022 Shasta District Fair, Ms. Silva testified:

*Q.* *Ms. Silva, I'm handing you a copy of an e-mail that's dated 6/29/22. It purports to be from you to Jerry Fernandez. Took take a look.*

*(Exhibit K was marked.)*

....

*Q.* *...So what is this document that I'm looking at right here, which is the second page of it –*

*A.* *This is the entry information from our ShoWorks program that does the online entries.*

...

*Q.* *Okay. All right. So is there -- so is this the form that she would have seen and at the --on that day, Miss -- Jessica, that is, if – with the data, you know, not on there. So it would say address, blank, city, blank, ZIP code, blank. You know what I mean? Was there -- or how was she presented with these questions?*

*A.* *I believe this was the side we see, but yes, she would have a list of questions she would answer.*

*Q.* *Do you know what questions they are?*

*A.* *Just address, city –*

ADVANCING LAW FOR ANIMALS

*Q.* *Same -- so it's just these things in order? Okay. Just your address, e-mail, phone number?*

*A.* *Uh-huh.*

*...*

*Q.* *... So this Accountability and Liability, this is -- this -- when Jessica registered, does she get a copy of this anywhere?*

*A.* *I am not sure. She could always request one.*

*Q.* *Is it presented to her during the log-in?*

*A.* *Before you sign in. Before you sign, I'm sure there's a drop -- you know, you do the drop-down.*

**Ex. 1** (Silva Dep. Vol. 1, 288:3- 294). A true and correct copy of the email marked as Exhibit K to Volume 1 of Ms. Silva's deposition, including fair registration or entry forms purportedly signed by Mrs. Long, is attached hereto as **Exhibit 22** at 2-3.

46. Regarding meet and confer requirements, Mr. Bridges and I discussed the legal issues in this motion and could not resolve them.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 15, 2024.

By:_____/s/Ryan Gordon_____________________
Ryan Gordon