# EXHIBIT 1

# Gordon Declaration

# (Excerpts of Silva Dep., Vol. 1)

**In The Matter Of:**

*LONG vs.*

*FERNANDEZ*

---

*MELANIE SILVA*

*November 14, 2023*

---

*Challle, Fisher & Morfin*

*1828 South Street*

*Redding, California 96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File M. Silva.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual,

Plaintiffs,

vs.

LIEUTENANT JERRY FERNANDEZ, individually and in his individual capacity as Sheriff for the County of Shasta; DETECTIVE JACOB DUNCAN, individually and in his individual capacity as Sheriff for the County of Shasta; DETECTIVE JEREMY ASHBEE, individually and in his individual capacity as Sheriff for the County of Shasta; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association; COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual capacity; BJ MACFARLANE, in his individual capacity; and DOES 1 through 10,

Defendants.

NO. 2:22-cv 01527 DAD-AC

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

---oOo---

TUESDAY, NOVEMBER 14, 2023

9:41 a.m.

VIDEOTAPED DEPOSITION OF MELANIE SILVA

---oOo---

Reported by: CAROL J. CHASE, CSR No. 13538
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Q All right. And any other education?
A No.
Q Or any other trade school or classes or anything -- anything like that?
09:48:10 A No.
Q Okay. All right. Okay. And what is your current position?
A CEO at Shasta District Fair, the 27th DAA.
THE COURT REPORTER: Repeat the last part, please.
09:48:13
THE WITNESS: Shasta District Fair, the 27th DAA.
MR. BRIDGES: Make sure you speak up and speak slowly so she can hear and --
09:48:26 THE WITNESS: Okay.
MR. BRIDGES: -- type down everything that you're saying. Okay?
THE WITNESS: All right. Nerves.
BY MR. GORDON:
09:48:32 Q That's fine. Okay. So you're currently -- the DAA is short for District Agricultural Association?
A Yes.
Q Okay. That's -- people usually say just the DAA?
09:48:41

A Yes.
Q Gotcha. All right. Okay. Anyone ever get confused when you say DAA that you work at the DA's office?
09:48:50 A No.
Q No. Okay. All right. Okay. So before being the CEO, where -- where did you work?
A Shasta District Fair as the business assistant.
09:48:58 Q Okay. How long did you -- well, let me go back for a moment. How long have you been CEO?
A Since August of 2021.
Q All right. And when you were the business assistant, how long did you have that role?
09:49:16 A October of 2005.
Q Okay. And prior to working for the fair as business assistant, what was your employment before that?
A Ralph Andrews CPA office.
09:49:30 Q Were you working as a CPA?
A No.
Q Okay. Okay. What -- okay. All right. So have you -- you somewhat answered this before, but you've never been involved in a lawsuit before?
09:49:48 A Correct.

now, so it's hard to differentiate.
Q May -- you don't need to agree, but I'm assuming it was the Instagram post that you flagged and then there's some stuff after that. Is that what you were referring to at that time or is that --
A We had to forward our phones because our phones were --
Q Okay.
A -- blown up.
Q From the Instagram post.
A From the Instagram post, from any media that grabbed it.
Q Yeah. Okay. So -- okay. So July of -- this is 2022, this meeting July 19th. And you -- you tell them that they're -- what -- so I know I asked this just a moment ago and you somewhat answered it. But what exactly did you express to the board at this meeting?
A I couldn't tell you exactly what I expressed --
Q Sure. Paraphrase.
A -- but I let them know that we had an incident at fair, that it was blowing up on social media and that the news outlets were reporting it

A I don't know where it went when it came back.

Q You do not know where it went when it came back.

10:49:39 A Yeah.

Q But you -- I'm not asking for location, but you know with which people. So it would be B.J. and Kathie; that was your understanding, correct?

MR. BRIDGES: Asked and answered and

10:49:47 misstates testimony.

Go ahead.

THE WITNESS: I don't know.

BY MR. GORDON:

Q You don't know. Who do you think then?

10:49:52 A I assumed it was B.J. and Kathie.

Q Okay. You assumed. Okay.

And you -- why did you assume that -- those two?

A Because B.J. was the livestock supervisor

10:50:01 and Kathie is representative of the group that owned it.

Q What was the group that owned it in your mind?

A The 4-H/FFA Community Barbecue where it was

10:50:12 donated.

Q Supervised. Okay. You had no supervisory duties with respect to these employees?
A Huh-uh.
14:33:33 Q You had supervis- -- supervisory duties with respect to Macfarlane, though, correct?
A Yes.
Q Does he -- does he report to you regularly or when he was working there?
A No.
14:33:43 Q No? What did you do to supervise him?
A If he had an issue he would come to me.
Q Yeah.
A But he just ran the livestock fair.
14:33:57 Q Okay. All right. So you didn't have, like, weekly meetings set up or anything like that?
A No.
Q Okay. Was he only running the livestock show? What other duties did he have?
A The whole livestock area.
14:34:06 Q The whole livestock area. Okay.
How often are -- are livestock kept on the fairgrounds outside of fair?
A No.
14:34:17 Q No? Okay. So were his duties just with respect to the fair basically?

that you sent me, so -- it doesn't matter. So we won't worry about that one. It's just some other poor lamb that became lamb chops.

BY MR. GORDON:

14:41:27 Q Okay. So this is Cedar. Do you know about what day this document was filled out by anyone on here?

A The day of the sale.

Q So this would be --

14:41:34 A That's what the buyers sell -- sign.

Q Okay. So did they physically sign this that day?

A Kathie was their representative and she signed it that day.

14:41:41 Q Okay. Did she fill out this (indicating)?

A The -- when they bid, every buyer had a number.

Q Okay.

A And so when she bid and split it, then that gets written in. And then it gets taken to the buyer and then they sign it.

14:41:53

Q Okay. So this was filled out the 25th and -- where Kathie signed on it that day?

A Correct. So they -- they bid and they immediately do the paperwork and take it to the

14:42:04

buyer as the other buyers are going --
Q Okay.
A -- as the other animals are going.
Q Okay. And that's what's been explained to me. I just want to make sure with you.
Okay. So this was from the 25th. Okay. So even though Kathie didn't -- didn't date it that day, but it's your understanding that she likely signed it that day?
A Yes.
Q Yes. All right. All right.
Okay. All right. So what exhibit are we on?
A D.
Q D. This will be -- this will be Exhibit D.
(Exhibit D was marked.)
BY MR. GORDON:
Q And what -- does she have to -- she's claiming -- you said she's waddling a paddle and she's claiming she's bidding for the -- the Dahles, Megan and Brian. Does she have to present any evidence that she's there to bid for them?
A She's been doing bidding for other people for longer than I've been there.
Q And I understand.

Q Established. Okay. That's a better word. There you go.

Okay. All right. So give me one moment.

A One of those is a bill.

14:43:48 Q Yeah. I think they both are. I'm just trying to figure out which one is Cedar here. I think they appear to be. So one is for Brian Dahle and one is for Kathie -- one is for Megan. Okay. All right.

14:44:02 Okay. So are these the bills then for Cedar? You just tell me and these, I guess, we'll make -- we'll make -- what exhibit are we on?

MS. SHAKIB: E.

MR. GORDON: E. So these will collectively

14:44:12 be E, both pages of it.

MR. BRIDGES: I think so.

(Exhibit E was marked.)

THE WITNESS: Yeah, tag 367, tag 367.

BY MR. GORDON:

14:44:19 Q Okay. Yeah. So this is both of the bills to the Dahles?

A Because they split it.

Q I understand. I think I understand. That was my assumption. So this will be Exhibit D [sic].

14:44:24 What -- what date were these bills

generated?

THE COURT REPORTER: E.

MR. GORDON: I'm sorry. E. This will be Exhibit E. Thank you.

14:44:31 BY MR. GORDON:

Q What date day were these bills generated?

A I generated them on the 6th.

Q Okay. So as of the 6th, the Dahles still hadn't paid, correct?

14:44:43 A The 6th, the bill just went out, yes.

Q Of -- not just. You mean of -- you don't mean just now. You mean --

A Of -- no. Of 2022.

Q Okay. Okay. The fair wasn't that long

14:44:55 ago. When you said this just went out. I -- I thought --

A Oh, no. '22.

Q I thought you meant of this year. I was going to say it was longer than that.

14:45:00 Okay. So these went out -- okay. So as of July 6th, no funds -- Cedar had not been paid for yet by the Dahles, correct?

A Correct.

Q Okay. Thank you.

14:45:13 This will just be -- there you go.

Exhibit E.

Okay. And do you know what -- what this document is? How would you just -- what is that? Turn it over and --

14:45:27 A That's the top of E.L.'s check for her animal.

Q This is -- oh, this is the top of her check for the animal?

A Yes, like the information.

14:45:37 Q I see. Okay. So this would -- there would have been a check under this that would have been?

A For the 838, is it?

Q Something like that, yeah. 838.86.

A Uh-huh.

14:45:46 Q Okay. So and you -- it doesn't say -- is there any -- would this just mean that the issue date of the check was 7/25?

A That's when it was printed.

Q That's when it was printed.

14:45:55 A Uh-huh.

Q Okay. So this would have been the top to her check on 7/25. Okay. And we'll make this Exhibit F.

A F.

14:46:01 (Exhibit F was marked.)

BY MR. GORDON:

Q Do you have any records reflecting the date the Dahles actually paid?

A I would have to look at the receipt book.

14:46:14 Q Okay. So you don't know if they, in fact, did pay before issuing the check?

A I don't remember.

Q And it's your testimony you would have issued the check regardless if they paid?

14:46:32 A Correct.

Q Okay. All right. So I'm trying to think if I want to ask you any other questions about these documents. So that's -- oh, they did not -- it's your understanding the Longs did not ever cash that 14:46:52 check, correct?

A They never went to the 4-H leader and picked it up, so I have it in our safe.

Q Oh, you have --

A 4-H returned it to us, because they didn't 14:47:02 go to the leader and pick it up.

Q Okay.

A So I put it in our safe and it's just sitting there.

Q Okay. Okay. So the money has been still 14:47:08 in your operating account. I know money --

A The live- -- Junior Livestock account.
Q Yeah, yeah, yeah. Okay. It has a separate account?
A Yes.
14:47:14 Q All right. Okay. When you sent the check to the Longs at that point in time, did you --
A I didn't mail the check.
Q You didn't mail the check?
A It goes to the 4-H office, the 4-H office
14:47:30 then spreads it out to the leaders, and then the child and the parent is supposed to go to the leaders and pick it up.
Q Okay. And so you mailed that to the 4-H office?
14:47:38 A They came and picked it up, yes.
Q They came and picked it up. Do you know who came and picked it up from the 4-H office?
A Erin Paradis.
Q Okay. And that's the -- that's the local
14:47:52 4-H office in town, correct?
A Uh-huh.
Q The ex- -- extension office, some term like that?
A (Nodding.)
14:47:57 Q Okay. Okay. Why did you send -- cut

MR. BRIDGES: Yes.

MR. GORDON: Okay. So I want to make sure I hand these to you and in the correct order, Melanie, because this is not -- there's two different chains here and they may overlap. I just want to figure out which one was -- was first.

That's the problem with e-mail with the chains. There's so many chains of multiple things going in. Okay. All right. I -- I guess we'll just start with this one.

(Pause in proceedings.)

MR. GORDON: John, if you want to check, I think -- this is a full chain. I don't know if you want to check.

MR. BRIDGES: Sure.

MR. GORDON: I believe so. You tell me if I'm wrong.

MR. BRIDGES: Yeah. And this -- this does not include Mrs. Long's second --

MR. GORDON: Yes, I know.

MR. BRIDGES: -- e-mail. That -- that's -- because, otherwise, that's the only thing --

MR. GORDON: I have that. I have that also, which we'll get to, of course.

MR. BRIDGES: Yeah. But this looks like

the chain of everything else.

MR. GORDON: I think that -- chronologically, I think that -- that -- let's start with that. Okay.

14:58:07 And that -- that would will be Exhibit?

MS. SHAKIB: F.

MR. GORDON: F. Thank you, Vanessa.

THE COURT REPORTER: No. G.

MR. GORDON: G?

14:58:14 THE COURT REPORTER: Yes. This is F.

MR. GORDON: And it's Bates stamped number?

MR. BRIDGES: 21 to 25.

MR. GORDON: 21 to 25. Okay.

(Exhibit G was marked.)

14:58:39 THE WITNESS: Do you want to put your sticker on there?

THE COURT REPORTER: Yes, please. Thank you.

BY MR. GORDON:

14:58:44 Q All right. Let's -- Melanie, let's go just in -- I want to go in reverse order here. So if you start at -- at the -- so you found out Monday and then -- I'm sorry. You found out Sunday that Cedar was removed --

14:58:58 A (Nodding.)

14:59:05
14:59:15
14:59:23
14:59:31
14:59:39

Q -- at some point? I'm presuming in the morning. You're not telling me I'm wrong but some -- likely in the morning?
A I don't know.
Q Okay. Anyway, but you -- regardless of the time, you tell B.J. to pursue it.
A (Nodding.)
Q Okay. Is there anything else that happened with Cedar that day that you recall or Jessica --
A Not that I recall.
Q -- about conversations?
No. Okay. Did -- did Kathie Muse call that day at all that you recall?
A Not that I recall.
Q Did the Dahles call at all?
A No.
Q Did the Dahles ever call you about this?
A No.
Q Okay. Any -- any of their representatives or handlers ever call?
A Not to me, no.
Q Not to you, but to people that you're in conversation with, presumably, like Kathie Muse?
A Well, I'm assuming Kathie was talking to them, but I don't know.

Q Okay. Okay. But they never talked to you and they never talked to the fair?
A Correct.
Q Do you know if they called any -- any one of the board of directors? Either of them?
14:59:45
A Not as far as I know.
Q Not as far as -- did you ask?
A No.
Q Okay. You didn't think to reach out to the Dahles during any of this?
14:59:52
A No.
Q No? Okay. All right. Okay. So do you want to -- so the next morning -- or actually, it's the next evening rather, 5:41 p.m., looks like Jessica sends you -- this is your e-mail, correct, at CEO@SDFeventcenter.com?
15:00:05
A Yes.
Q Okay. All right. And do you recall ever receiving this e-mail from her?
A Yes.
15:00:16
Q Okay. All right.
A Do I remember everything that it says? No.
Q No, no. I'm -- feel free to read it.
Let's go off the record for a while while she's reading. It is -- it is a long e-mail.
15:00:45

And Melanie, while you're off, if you want to read the other ones so that we can just travel through the questions faster. Just why don't you do that. Why don't you read the whole packet.

15:00:55 THE VIDEOGRAPHER: Okay. We're off the record, and the time is 1500.

(Whereupon, recess was taken from 3:00 p.m. to 3:07 p.m.)

THE VIDEOGRAPHER: We're back on the record

15:07:54 and the time is 1507.

BY MR. GORDON:

Q Okay. So Melanie -- so have you reviewed all the -- I handed you a package, which is Exhibit G, I believe.

15:08:05 Did you review all of those -- the e-mails and whatnot from that exhibit?

A Yes, I read through it.

Q Okay. All right. So do you recall receiving this letter from -- or this e-mail from

15:08:15 Jessica on the 27th of -- of June?

A Yes.

Q Did you read it that day?

A No.

Q No. Okay. It was 5 o'clock. You stopped

15:08:37 working?

A The Monday after fair, probably.
Q Probably. Okay. Okay. Do you know -- did you check your e-mail -- your work e-mail at home, too?
15:08:45 A No.
Q No? So you're home, you're off limits.
Okay. So you didn't -- so then you did not see this e-mail till presumably Tuesday is your testimony?
15:08:53 A Yes.
Q Okay. All right. Okay. So you see in the e-mail a few salient points? You see that she offers to bring the goat back, correct?
A I did see that, yes.
15:09:06 Q Okay. So she's -- she's -- in your understanding, she's claiming she can still get you the goat. She's obviously afraid of the supposed criminal charges at that point. But she's offering to bring the goat back. That was your
15:09:18 understanding.
And you -- she offers also -- this is on Bates stamp number 0025, the next page. "I will pay you back for the goat and any other expenses I caused." Did you -- did you see that?
15:09:31 A Yes, I read through the e-mail.

Q And you saw it at that time, too?
A Yes.
Q And what was your reaction to her offering to pay back anything?
15:09:39 A My e-mail that I responded back with her.
Q Okay. Did -- in your head, did you -- did you ever -- did you tell the fair board or anything that she offered to pay?
A No.
15:09:49 Q No. Okay. So did you -- we'll get you to your response in a moment, but did you -- did you just not want to -- did you feel that money wouldn't satisfy the issue here? Her offering to pay?
A I felt that we needed to follow the
15:10:06 procedures that were in place.
Q Okay. Okay. But did you -- okay. So you didn't want to accept her offer to pay any expenses for anything she might have caused is the bottom line, correct?
15:10:16 A Correct.
Q Okay. All right. And again, at the end, she says, "If the only solution is to return Cedar for barbecue" -- she doesn't say Cedar, I'm saying Cedar -- "If the only solution is to return Cedar
15:10:28 for barbecue meat, then I'll return it so I'm not

something she's offering to pay back?

MR. BRIDGES: Objection. Argumentative. Irrelevant.

You can answer it.

15:11:28 BY MR. GORDON:

Q Yeah. You can answer.

A No. She stole property that wasn't hers.

Q Okay. Okay. You're -- okay. And you -- you determined it wasn't hers by talking to the 15:11:39 board, going through a contractual analysis, none of that, correct? It was just your -- your opinion that it was not hers, correct?

A Because it was sold at auction.

Q Okay. What is the definition of a sale?

15:11:50 MR. BRIDGES: Calls for a legal conclusion.

MR. GORDON: She's making one.

THE WITNESS: A sale --

BY MR. GORDON:

Q You can say, "I don't know." It's fine.

15:11:59 A I don't know.

Q Okay. All right. All right. So the next day you -- not the next day. Tuesday. Because you read the -- you read Jessica's e-mail on Tuesday and then you respond -- you respond at, it appears here 15:12:16 1:31 p.m. Did you know about -- does that help you

determine when you would have read her e-mail? Because your response is at 1:31 p.m., so did you read it -- her e-mail in the morning, think about it for a while or why -- can't speak -- think about it for a while and then respond or did you just immediately respond to her?

15:12:30

A I don't know.

Q You don't know. Okay. So -- and you write, "As a mother I am not unsympathetic regarding your daughter and her love for her animal." So at that point in time, had you not heard that -- earlier you testified you thought E.L. was happy Cedar got slaughtered; is that your testimony?

15:12:45

A No.

Q What is your testimony, because you mentioned something earlier about not -- about E.L. not -- you didn't believe that she didn't want Cedar to get slaughtered because she didn't have to feed him every day or something to that effect?

15:12:59

A I heard that she was okay with the sale because she no longer had to feed him. She was glad she didn't have to feed him every day.

15:13:15

Q Okay. As of June 28th, had you heard that?

A No.

Q Okay. So at this point in time, you've --

15:13:25

were you under the impression that Jessica and E.L. were being -- or Jessica and her representations about her daughter loving the animal were sincere?

A Did I believe it was sincere?

15:13:40 Q Yes.

A Yes.

Q Okay. Okay. So having said that please understand the fair industry's the set -- is set --

THE COURT REPORTER: I'm sorry.

15:13:49 MR. GORDON: I apologize. Am I going too fast?

THE COURT REPORTER: Yeah.

BY MR. GORDON:

Q Next sentence. "Having said that please

15:13:54 understand that -- please understand the fair industry is set up to teach our youth responsibility for the future generations of ranchers and farmers to learn and -- the process and effort it takes to raise quality meat. Making an exception for you

15:14:08 will only teach our" -- it says "out youth," but I'm assuming you meant "our youth."

A Yes.

Q Okay. "Teach our youth that they do not have to abide by the rules that are set up for all

15:14:21 participants." Okay. Let's stop there for a

moment.

So "the fair industry is set up to teach our youth responsibility." What did you -- what did you mean by that?

15:14:33 A On how to raise animals.

Q Anything else?

A Responsibility of caring for an animal and raising it, so that it will feed your family.

Q Okay. So -- but hadn't she already -- at 15:15:00 that -- at this point in time, though, Cedar was already raised -- raised. So it was responsibility for something other than -- other than raising him here? Because she already raised him at this point.

A Just the -- the responsibility of owning -- 15:15:26 of having the animal and raising it.

Q Anything else?

A I -- I don't know what you're looking for from me. I have nothing --

Q The responsibility of -- of killing him 15:15:33 also?

A Just --

Q Taking him to slaughter also?

A They don't do the killing.

Q I understand. But they send him to 15:15:41 slaughter. They auction 'em off and it's a terminal

auction, correct?
A Correct.
Q So is that part of their responsibility?
A They don't do the slaughter.
15:15:48 Q No, I understand. But they -- they send the animal off to slaughter. Is that component of it part of the responsibility?
A Of knowing, yes.
Q Okay. Okay. "And -- and for the future
15:16:02 generations of ranchers and farmers to learn the process and effort it takes to raise quality meat." Was it your understanding that E.L. was going to be a rancher or farmer in the future?
A I would have no way of knowing that.
15:16:16 Q Okay. Well, you wrote it here, and -- but is she supposed to learn responsibility for that -- that it -- for the future generations of ranchers and farmers?
A I don't know what you're asking me.
15:16:37 Q Well, you mentioned generations of ranchers and farmers and the -- the fair industry is to set up to teach our youth responsibility. The "our youth" includes E.L., correct?
A Yes.
15:16:51 Q Okay. All right. And she needs to learn

this for the future generations of ranchers and farmers. Did you understand that she was going to be a rancher or a farmer in the future?

A She could be.

15:17:03 Q She could be. But did you have any evidence at the time that she was going to be?

A I had no evidence either way.

Q Okay. Did you investigate this before making this statement?

15:17:11 A I did not.

Q Okay. And Jessica's letter didn't mention that her daughter wanted to be a -- a rancher or a farmer?

A She said she wanted to raise horses in her

15:17:23 letter.

Q Okay. All right. Is a -- is a -- raising horses a farmer?

A It's part of ranching.

Q Okay. All right. Do -- do people that are

15:17:32 raising horses send their animals to slaughter here? Is that part of a 4-H program?

A I have no idea. You would have to ask them.

Q Okay. All right. Okay. So -- so that

15:17:52 sentence you're basically communicated to Jessica

that you need to teach a responsibility or a lesson, correct, for -- about farming and responsibility for raising animals?

A It was an, in general, all of the kids that are in the livestock program.

Q But directed to E.L. -- and I said her name and I shouldn't have -- but directed to E.L. in the contents of this letter, correct -- or in the context of this letter? You didn't -- you didn't send this letter to anyone other than -- other children, did you?

A I do not.

Q Okay. Just to Jessica with the implication being your daughter --

A You -- just to Jessica.

Q Just with the implication being your daughter needs to learn a lesson, correct?

A You're putting it harsher than it was meant, but yes.

Q Okay. Okay. So -- so making an exception will only teach our youth that they do not have to abide by the rules that are set up for all participants. Okay. So has any of the -- have any other children ever removed their animals from a livestock auction before?

A Not as far as I know.

Q Not as far as you know. So nothing on your -- on your watch as CEO?

A No.

15:19:08 Q Anything during --

A If they don't want to sell 'em, they just don't bring them.

Q For sure. Okay. Anything when you were -- what was your -- your --

15:19:16 A Business assistant.

Q Thank you.

Anything during that period?

A Not that I'm aware of.

Q Okay. All right. Any -- what about at any

15:19:22 other fairs?

A I wouldn't know.

Q I'm not asking if you would know through your -- through your position. I'm just asking if you have any knowledge in -- in any way?

15:19:32 A I don't.

Q You don't. Okay. What about in 2023? Did anyone remove any animals that year? No one made an attempt to --

A No.

15:19:41 Q Okay. So what happened here didn't catch

fire?

A No.

Q Become a -- become, like, a -- you know, I don't know. Sometimes kids start imitating other kids in weird ways. Nothing happened like that here?

A No.

Q Okay. All right. Okay. "Also in this era of social media, there's been a negative experience for the fairgrounds as this has all been over Facebook and Instagram." Now, we saw the Instagram post earlier floating around somewhere. Were there -- were there Facebook posts as well?

A I -- I don't know.

Q But at the time you believed it?

A Yes.

Q Okay. All right. Had -- had you seen one at the time?

A I didn't go looking for them. I heard about them.

Q Okay. So you heard about them. Okay. I -- I've seen the Instagram one. I -- I haven't seen the Facebook one.

A There's many of -- yes.

Q Okay. All right. So "ultimately this is

out of my hands." So -- so why was it out of your hands at this point in time? You were -- you're responsible for the livestock going to slaughter, you're responsible for the fair. Why is it out of your hands at this time?

15:20:48

A Because I have to follow the rules.

Q Okay. Who enforces the rules?

A I do. The state does.

Q You -- but you do?

15:21:02

A Yes.

Q You do con -- and the state does, you mean?

A Uh-huh.

Q Okay. All right. Was this -- did you -- okay. "I've spoken with the California Department of Agricultural." Did you, in fact, speak with the Department of Agriculture by the time you wrote this e-mail?

15:21:11

A The e-mails were attached.

Q I know but that's -- those are subsequent. So had you speak -- so had you speak -- as of 1:31 p.m. had you spoken with the -- to the CDFA that day?

15:21:19

A Yes.

Q Yes. By -- by phone or by e-mail?

15:21:37

A Both.

15:21:46
15:21:55
15:22:01
15:22:11
15:22:24

Q Where's the e-mail before --
A Right here (indicating).
Q -- you sent this one out?
A June 28 from CEO to Mike.
Q For what time is that e-mail?
A 3:07.
Q Okay. But your e-mail to Jessica is at 1:31 p.m. so it's before that. So had you spoken -- before you spoke -- sent this e-mail to Jessica, did you --
A Yes.
Q By -- by e-mail or by phone --
A Phone.
Q -- or text?
Okay. Who did you call there?
A Mike Francesconi.
Q Okay. So Mike you had already -- this --
A I gave him a heads-up.
Q You called him on the phone beforehand. Okay. And what did Mike tell you?
A To follow state rules.
Q Okay. Anything else?
A I don't remember the exact conversation.
Q Did he say to call the cops, this is a felony?

another e-mail chain. If you want to verify it's the whole e-mail chain.

MR. BRIDGES: Okay.

MR. GORDON: I believe it is but just double check.

MR. BRIDGES: It looks like it is. Is this going to be next in order?

MR. GORDON: Yes.

MR. BRIDGES: And it's Bates stamped page 6 through 13.

THE COURT REPORTER: Thank you.

(Exhibit H was marked.)

THE WITNESS: Oh.

BY MR. GORDON:

Q All right. Do you recognize this e-mail chain, Melanie?

A Yes.

Q Okay. All right. Okay. So in it, it has Jessica's original e-mail, it looks like, at the very back from Monday, June 27th, which you said you hadn't read till Tuesday which you responded to at about 1:30 p.m. on Tuesday. And it also has a follow-up letter on the -- on the 29th. And did you -- so which appears to be Bates stamped -- I'm assuming, the follow-up letter was -- is Bates

stamped number 10 to 13. Is that your understanding?

A I'm sorry. What?

Q So Jessica sent a follow-up e-mail, it looks like, on Wednesday June 29th at 9:48 a.m. So this is after your -- in the prior exhibit, your last communication with Mike at CDFA was at 9:06 a.m. according to the timestamp. So it looks like Jessica on the exhibit -- on the exhibit you have in front of you sent another e-mail that morning at 9:48 a.m.

A Gotcha.

Q And is that this letter that's attached to it, 10 to 13?

A Yes.

Q Okay. All right. And you read the letter at the time?

A At the time, yes.

Q Okay. Did you forward the letter to Mr. Macfarlane at the time?

A No.

Q Okay. Did Mr. Macfarlane see the letter at all at the time?

A I don't believe so.

Q You don't think Mr. Macfarlane ever saw

A I did.

Q And you didn't think to contact Senator Brian Dahle's office?

15:55:01 A It was no longer his goat. He donated it to the community barbecue.

Q Okay. And in your mind legally the donation amounted to an instantaneous transfer of title?

A Yes.

15:55:07 Q Okay. All right. Okay. But you didn't verify that with -- that's just your impression. You didn't verify that with any attorneys or -- or do any research on your own, correct?

A Correct.

15:55:18 Q All right. Okay. So and in your -- let me show you the other document. So you said earlier that the -- the -- the fair rules apply -- the local rules, which I'll show you a copy of what I think you mean by that in a moment, and the state rules

15:55:39 both applied, correct?

A Correct.

Q So when you say the -- the -- the Shasta rules or the local rules, are you referring to -- are you referring to this document?

15:55:55 A That is part of it, yes.

counsel for plaintiffs if we needed to determine what rules -- when you said, you know, we can't break the rules for the young girl here in your e-mail. I'm paraphrasing. But when I asked which rules applied, you were going to check the handbook and let me -- let me know which sections.

So basically right now, and stop me if I'm wrong, you're holding a document which is going to be labeled Exhibit I which is vetted -- what would you will call that document?

A All General Livestock Rules and Guidelines.

Q Okay. And that's a portion of the handbook, correct?

A Yes.

Q Okay. All right. And the other portion of the handbook that a -- that a -- the rules that had to be abided by here were --

A The junior meat goats.

Q And that's on page 67?

A And 68.

Q And 68. Okay. All right. And then it goes to junior swine. That's, obviously, of no -- no meaning here, correct?

A Uh-huh, yes.

Q Okay. All right. Okay. So you can --

A Correct.
Q This is the first time you're seeing it?
A Yes.
Q Okay. All right. Because I understand what you mean. You look at the paragraph and it says Exhibitor and Public Safety, and then you move on to the next paragraph.
A Uh-huh.
Q So you think maybe that's potentially what happened?
A I still don't feel that this falls under the same category because the project was complete with the sale.
Q I -- but again, you said it potentially does. So I mean, this auction proceeds forfeited, it does seem to apply. I'm not saying you think it definitely does, but it potentially does, correct?
A Potentially, yes.
Q Okay. Okay. All right. So -- and the other rules you said to apply were the -- the state rules and. I do have a copy of those, which we can -- which we can put into evidence also but they're on my computer. Because I only have one copy. And we had to go to Kinko's this morning and it was a nightmare. So there you go.

(Exhibit J was marked.)

BY MR. GORDON:

Q Do you need to look through it at all or anything or --

16:06:47 A I am not as familiar with these rules as I am with ours. That's why I have a livestock supervisor, so...

Q Yeah. Did you check those rules when -- when -- you know, around June 29th or 27th of 2022?

16:06:58 A Probably.

Q Okay. Probably. Do you -- why do you say "probably"?

A Because I referenced them in my e-mail.

Q Okay. So you believe -- you believe you

16:07:07 reviewed them. Okay. All right.

So can you go to page -- and you need to take a break? You all right?

A Yeah, I'm good.

Q Okay. All right. So can you go to page --

16:07:21 so page 7 of that document. Okay. Okay. So paragraph 2.

"The fair management shall deny entry or disqualify and remove any exhibit or exhibitor that is ineligible for competition under the State or

16:07:46 Local Rules or endanger to the public or has

MR. GORDON: You have it. Okay.
BY MR. GORDON:
Q Ms. Silva, I'm handing you a copy of an e-mail that's dated 6/29/22. It purports to be from you to Jerry Fernandez. Took take a look.
16:19:20
(Exhibit K was marked.)
MR. BRIDGES: Just for the record, Damian, I know this deals with Fernandez. This was the -- the e-mail from her to Fernandez that you and I have talked about before.
16:19:40
MR. NORTHCUTT: Thank you.
BY MR. GORDON:
Q Okay. All right. So this is at 12:27 p.m. It looks like the last e-mail you got. Then in the prior exhibits we were looking to in the morning
16:20:01
like 9 -- 9 or 10 o'clock. So now this is a little later in the day on 6/27. So you --
A 6/29.
Q I'm sorry. Thank you.
16:20:10
6/29 but at 12:27 p.m. So it was after lunch -- or after noon you send this e-mail to Fernandez. Do you recall doing this?
A Yes.
Q Okay. Had you talked with him on the phone beforehand?
16:20:22

A Yes.

Q Okay. So what did you say to him on the phone?

A I don't remember.

16:20:28 Q Was it about --

A I -- he was just asking for the information to show -- the information of the entries.

Q Yeah. So he was already aware of the situation at that point, though, correct?

16:20:41 A Yes.

Q Okay. All right. Do you know how he became aware?

A No.

Q Okay. Do you know if B.J. had called him?

16:20:46 A I don't know.

Q You don't know. Okay. All right. Do -- did you know how Sheriff Johnson became aware?

A No.

Q No. Okay. Did you ask anyone?

16:20:54 A No.

Q Did you -- did you know that Sheriff Johnson was aware?

A No.

Q Okay. All right. Okay. So you send him a series of -- a series of documents. So what is

16:21:03

this -- so let's -- you're already on it. Never mind.

So what is this document that I'm looking at right here, which is the second page of it --

16:21:14 A This is the entry information from our ShoWorks program that does the online entries.

Q Now -- okay. So what -- the ShoWorks program that does the online entries. So would this have been what -- when E.L. was registered in the -- 16:21:38 in the fair -- and I'm just speaking to generally. She was registered for the 2022 fair. That would have been the website that it would -- the registration would have been entered on?

A Uh-huh.

16:21:48 Q Okay. All right. So is there -- so is this the form that she would have seen and at the -- on that day, Miss -- Jessica, that is, if -- with the data, you know, not on there. So it would say address, blank, city, blank, ZIP code, blank. You 16:22:10 know what I mean? Was there -- or how was she presented with these questions?

A I believe this was the side we see, but yes, she would have a list of questions she would answer.

16:22:20 Q Do you know what questions they are?

A Just address, city --

Q Same -- so it's just these things in order? Okay. Just your address, e-mail, phone number?

A Uh-huh.

16:22:30 Q Is -- okay. Is there a way to get a copy of what the platform -- you said ShoWorks -- what it looked like to her on that day?

A I can ask our computer person if she can get 2022s.

16:22:42 Q So it might exist?

A Might.

Q So when she -- when Jessica signs on to the platform, do you know any of the content that it -- that it says there?

16:22:50 A Not off the top of my head, no.

Q Not off the top out of your head. Okay. All right. But your the IT person might be able to retrieve what -- what was stated and --

A Possibly, yes.

16:23:01 Q Possibly there. Okay.

Oh, I thought -- I thought you said you had no IT person?

A I don't. It's -- you said "IT." I didn't. I said computer person, the lady that does our ShoWorks.

16:23:09

Q Okay. Is this not -- is this an employee of the fair?

A It's a contracted.

Q A contractor or a third party?

16:23:14 A Yes.

Q Okay. Does this person handle any other computer issues for you?

A No. She inputs the information for ShoWorks and then tracks the entry -- the placements.

16:23:25

Q Okay. Okay. She inputs for ShoWorks and then tracks the placements.

So "notes," it has her name and "E.L.'s first year in 4-H." So Cow Creek is the -- that's the 4-H club she's in, correct?

16:23:44

A Yes.

Q It says "age calculated 12." I mean, she was nine at the time as you know. Or I believe you know. Do you know her age at the time?

16:23:55 A No.

Q It was nine.

It's -- is -- is this -- oh, is the date of birth, is that presumably --

A They enter that.

16:24:03 Q They enter that. Okay. Gotcha. All

right. So "I've read the rules." What rules is this referring to? State and local?

A Yes.

Q Okay.

16:24:11 A Yes. And when -- if I -- if you request me to get a picture of what they signed, then I will have that for you.

Q A picture of what they sign. You mean, like, a digital --

16:24:21 A The entry -- the entry that you were asking me about.

Q Yeah. I would like to see a picture of how it looked to her and then what -- what she signed if -- if possible. I know you don't have it on you

16:24:29 today.

A I don't.

Q Okay. But it is -- it is potentially possible.

A This is the accountability and liability.

16:24:35 Q Okay. Yeah. So "information is true, I agree, hold" -- where it says Hold Harmless Clause, is that referring to accountability and liability page on --

A Uh-huh.

16:24:45 Q -- on the next page?

And the other documents or the other photographs -- Photography and Name Release?

A I would have to make sure I looked and -- before I answered that. I would want to double check before I answered it.

16:25:02

Q Oh, okay. Okay. So this -- this accountability in li- -- as you know, it's now a subject of a Cross-Complaint that you filed against our client. The Accountability and Liability, this is --

16:25:13

A I believe it's this, but I would want to confirm it.

Q I understand. Okay. Okay. So this Accountability and Liability, this is -- this -- when Jessica registered, does she get a copy of this anywhere?

16:25:24

A I am not sure. She could always request one.

Q Is it presented to her during the log-in?

A Before you sign in. Before you sign, I'm sure there's a drop -- you know, you do the drop-down.

16:25:37

Q Are you sure or --

A I'm not. I would have to look.

Q Okay. All right. This isn't -- this

16:25:43

didn't want to read the text messages with the -- with the ostensible rule breaker at that time?

A That is correct.

Q Okay. Okay. So -- and again mentions -- it again mentions the Dahles. You didn't reach out -- upon receiving this second e-mail, you did not reach out to the Dahles, correct?

A Correct.

Q Okay. So on the second to the last page, it -- this -- the bottom paragraph, it says, (as read) "As I believed in good faith the Cedar was not the Shasta District Fair's personal property, no violation of 487 was committed." Do you see that?

A Okay.

Q Okay. So when you read this letter, did you understand at the time that they were -- that Ms. Long and her -- or plaintiffs, let's say, were making a claim that Cedar was -- was their personal property, correct?

A My understanding was that she didn't agree with what we were doing.

Q I understand. But then you understand she is also saying this is -- this is our property, we did not commit a felony, correct? It might be wrong with that, I'm guessing --

A I understand that that's what she believed.

Q Okay. Okay. And then at the end, she writes, "This letter is not in waiver of any -- any rights while -- and it's purpose is in anticipation of litigation."

16:42:51

When -- when you read that, did you understand she was thinking of bringing a lawsuit?

A Where is that?

Q Um. You have it?

16:43:13

MS. SHAKIB: (Indicating.)

THE WITNESS: I believe she was threatening a lawsuit.

BY MR. GORDON:

Q Yes. You believed she was threatening a lawsuit. Okay. Did you -- when you say "threatening," are you implying that you didn't think she was going to go through with it?

16:43:19

A I didn't know whetter she would or not.

Q Okay. But you're -- she's -- you're aware that she was making a --

16:43:27

A A threat.

Q -- threat? A threat of a lawsuit. Okay. All right.

So at that point, why didn't you tell -- why -- why didn't you get attorneys involved at that

16:43:34

PENALTY OF PERJURY

I, the undersigned, hereby certify that I have read the foregoing deposition, that I know the contents thereof, and I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on ________________________, 2023.

______________________________
MELANIE SILVA

---o0o---

**CERTIFICATE OF REPORTER**

I, CAROL J. CHASE, a Certified Shorthand Reporter, licensed by the State of California, License No. 13538, being empowered to administer oaths and affirmations pursuant to Section 2093 (b) of the Code of Civil Procedure, do hereby certify:

That the witness in the foregoing deposition, MELANIE SILVA, was present at the time and place specified and was by me sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceeding was taken before me in shorthand writing, and was thereafter transcribed under my direction by computer-aided transcription;

That the foregoing transcript constitutes a full, true, and accurate record of the proceeding which took place; That I am not of counsel or attorney for any of the parties hereto, or in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

IN WITNESS WHEREOF, I have hereunto subscribed my signature on this 27th day of November, 2023.

____________________________________

CAROL J. CHASE