# EXHIBIT 12
# Gordon Declaration

# (Excerpts of Macfarlane Dep., Vol. 1)

**In The Matter Of:**

*LONG vs.*

*FERNANDEZ*

---

*BRUCE JOHN 'B.J.' MACFARLANE*

*November 15, 2023*

---

*Challe, Fisher & Morfin*

*1828 South Street*

*Redding, California 96001*

*(530)246-0942*

*cfmdepos@att.net*

Original File B.J. Macfarlane.txt

**Min-U-Script® with Word Index**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

E.L., a minor, by and through her general guardian, JESSICA LONG; JESSICA LONG, an individual,

Plaintiffs,

vs.

LIEUTENANT JERRY FERNANDEZ, individually and in his individual capacity as Sheriff for the County of Shasta; DETECTIVE JACOB DUNCAN, individually and in his individual capacity as Sheriff for the County of Shasta; DETECTIVE JEREMY ASHBEE, individually and in his individual capacity as Sheriff for the County of Shasta; SHASTA DISTRICT FAIR AND EVENT CENTER, a district agricultural association; COUNTY OF SHASTA; SHASTA COUNTY SHERIFF'S DEPARTMENT; MELANIE SILVA, in her individual capacity; BJ MACFARLANE, in his individual capacity; and DOES 1 through 10,

Defendants.

NO. 2:22-cv 01527 DAD-AC

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

---oOo---

WEDNESDAY, NOVEMBER 15, 2023

10:08 a.m.

VIDEOTAPED DEPOSITION OF BRUCE JOHN "B.J." MACFARLANE

---oOo-

Reported by: CAROL J. CHASE, CSR No. 13538
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

for it?

A (Nodding.)

Q Okay. All right. And you were offered CEO, you said, in 2018. And -- and your last year as CEO was?

10:32:58

A It had to be '21.

Q '21. Okay.

A What year was COVID? The heat of COVID was '20?

10:33:08

Q Yeah --

A So '21 --

Q -- yeah, '20, '21 was really taking over --

THE COURT REPORTER: One at a time, please.

BY MR. GORDON:

10:33:13

Q I just said '20 and '21 was when it was really affected.

THE COURT REPORTER: Sorry. It's cross-talk a lot.

BY MR. GORDON:

10:33:21

Q Yeah. Okay. So then after you became CEO you worked as the livestock manager, correct, for the fair?

A When I was done with CEO?

Q Yes.

10:33:30

A Yes, I was hired back that year.

Q Okay.
A The following year.
Q Gotcha. Do you remember abouts [sic] when you were hired as livestock manager?
10:33:38 A I -- I do --
Q Is it --
A Sometime between, like, I think I resigned in August-ish --
Q Uh-huh.
10:33:53 A -- and the spring, so somewhere in that time Melanie and I talked -- or no. I don't know how quick she got hired, but we talked and I agreed --
Q Okay.
10:34:04 A -- to do that.
Q Sometime in the spring for the fair that year.
A For that fair that year.
Q Okay. So there's not a livestock manager
10:34:11 for the fair year round because there's no livestock on --
A No.
Q -- it's just for the fair. So it's a -- it's a temporary position. And you -- you -- you
10:34:20 resigned -- what -- why did you resign as CEO just

out of curiosity?

A Like I had mentioned earlier, the job that I have now gives more time to do things that I like to do.

10:34:33 Q Yeah.

A And to be honest with you, COVID took a lot out of me.

Q Okay. Okay. How did COVID affect the fair?

10:34:40 A Substantially. We didn't have a fair that year.

Q In -- in '21 or '20 or both years perhaps?

A '20. '20 we had -- we only had a Junior Livestock Auction and nothing else on the fair,

10:34:58 which is close to our -- most of our -- all of our income comes --

Q Yeah.

A -- from that fair.

Q Okay.

10:35:03 A And then '21 we had a fair.

Q Okay. All right.

A So it was -- it helped the thing for a little bit because people were wanting out of their house.

10:35:15 Q Sure. Okay. So you -- it was just too

much work and you wanted to resign, and this other job was better suited for you --

A Not too much.

Q Okay.

10:35:24 THE COURT REPORTER: What was the answer?

THE WITNESS: Not too much work. It was just the type of work.

BY MR. GORDON:

Q Type of work. Understood.

10:35:40 So then Melanie asked you to come help out with the 2022 fair in spring. And you --

A Yes.

Q -- accepted, okay, as livestock manager?

Okay. And you resigned around August, you 10:35:54 said, correct?

A That's my rough guesstimate of when I resigned.

Q All right. Okay. All right. And why did you resign?

10:36:01 A Just the -- to do what I said the -- go to work at the bull sale --

Q Okay.

A -- on my own -- I was able to do some of my own stuff.

10:36:17 Q Gotcha. When you -- when you resigned as

Q I know they're somewhere. I can show 'em to you but just generally.

So you -- when did you -- you texted Jessica Long, I believe, on the -- the -- I should -- before I get to that, let me ask you about the Instagram post because that's popped up a few times. So let me get the -- this -- I'll find the date it came out, too, just for a time frame.

MR. GORDON: John, I'm just using your public records again. So you have them? I don't need them to --

MR. BRIDGES: No, that's fine.

BY MR. GORDON:

Q So this will be Bates stamp number 17 from the public records. So take a look at that and let me get you -- that is the Instagram post you're referring to, right --

A Yes.

Q -- which we'll mark as Exhibit B?

THE COURT REPORTER: B.

BY MR. GORDON:

Q B, yes.

B.J., let me get you -- I'll show you a better look at it, just so we can agree on the date because it's not on that public records. But it was

Maybe it was sooner. I have no idea.

Q Well, I'll -- I'll try to refresh your memory. So --

A I could.

13:10:07 Q No. I -- yeah. I hear you. That's fine.

So this is -- and I've already talked this through with your attorney. So you know Ms. Muse produced the text chain. So it's slightly fuller than the one you have -- by "fuller," I mean there's 13:10:21 more to see on it. So I'm going to use hers, but it's the same --

A Yeah.

Q -- it's the same -- it's just what she's produced. It's just -- so this would be the 13:10:30 inverse --

A Okay.

Q So, you know, she's in the dark shaded and you're -- or these -- you're presumably --

A Yes.

13:10:32 Q -- on these unless --

A Yes.

Q -- you tell me this isn't you texting in the -- the -- you know, on the other -- left side of the -- of the -- of the page. So -- so this will -- 13:10:44 we'll mark this Exhibit C. And before I hand it to

you, it is the -- this is the same Instagram post as you on the front.

A Yeah.

(Exhibit C was marked.)

13:10:50 BY MR. GORDON:

Q And it says June 28th at 6:16 p.m. So I'm wondering if that is when --

A Yes. Okay. So it was then.

Q Okay. So --

13:10:58 A Just -- I could not remember when -- for some reason it stuck in the back in my mind. I didn't see it for a few days, but apparently not.

Q No. That's fine. For and so -- okay. So you learned about it first on 6/28. Is this

13:11:22 about --

A Yeah.

Q Okay. Did you immediately text it to Kathie Muse right afterwards?

A I don't know that. I don't remember the

13:11:34 time frame, but I probably did because, at that point, we knew that she was involved in it.

Q Okay.

A She bought it.

Q I know it's -- who is --

13:11:43 A Bid on it.

you know, so people would call the fairgrounds and -- and, you know --

A Yeah, somebody -- yeah.

Q I know. I know someone did, but did you --

13:12:44 A Yes, I -- yeah, but that information's readily available.

Q Yes.

A Yeah. Yeah, I guess it would -- she took the goat to Napa is what I -- that's what I presumed

13:12:54 is she took the goat over there.

Q Yes. I understand that, but what I'm asking you is this Instagram because it contains -- it contains pleas to contact the fairgrounds and whatnot?

13:13:04 A Uh-huh.

Q Did you think Jessica was -- had posted this to get people to contact the fairgrounds to, you know, plea for her -- her, you know, being able to save Cedar or something to that effect?

13:13:17 A Yeah.

Q You thought -- okay. So you thought -- I know Bleating Hearts is doing it, but you thought they were doing it at the behest of Jessica, for example, like she wanted this thing to go --

13:13:26 A I'm not sure who wanted it to go.

maybe working with people in the animal rights community, something like that, correct so far? Yes?

A Yes.

13:26:01 Q Okay. And did you -- did you talk about the post with Melanie Silva at all?

A I'm sure we did, yeah.

Q Do you remember what you discussed?

A The -- I remember -- we knew where the -- 13:26:14 the goat was somewhere in Napa maybe. That's about the gist I can remember of talking about it.

Q Did you fill Melanie in on -- on what kind of organization Bleating Hearts was at that time?

A Yeah. If she hadn't known already, I told 13:26:33 her it was an animal sanctuary.

Q Okay. Okay. So she also knew what type of -- it's your understanding that she also knew what type of --

A I --

13:26:43 Q -- organization it was at that time?

A Yeah, I'm not -- I don't remember. I don't recall these conversations at all, but I'm -- I'm guessing that's what our conversations were.

Q Okay. Okay. Did she ever make any 13:26:55 comments about, oh, she's, you know, run off with --

Q Okay. Did you ever consider it?
A No. Because I was waiting to -- at this point, I'm waiting to hear from Melanie who's waiting to hear from CDFA and I'm not doing anything else.
13:28:18
Q Okay. All right.
A In terms of recovering a goat, that was up to CDFA and Melanie to say yes or no if they're going to recover the goat.
13:28:32
Q So when did you first make contact with -- I know we discussed -- strike that.
We discussed Sunday how you went back to the fair and you had conversations with Melanie, but you don't recall what exactly you spoke about. Do you recall if you tried to reach -- if you tried to reach out to Jessica that day? This is -- this is Sunday now.
13:28:45
A I think it was Mon- -- I might have reached out to her that day, but I think it was Monday before I actually talked to her. But that's a vague remembrance.
13:28:57
Q That's fine.
A Monday is when I actually talked to her.
Q And did you --
A But then we had a text of stuff back and
13:29:08

forth.

Q Okay. And you spoke with her on the phone, correct?

A (Nodding.)

13:29:14 Q Do you remember about what time you spoke with her on the phone?

A It was mid morning maybe. I remember, again -- I don't know why I can't remember times. I remember where I was standing in the middle of the fairgrounds, but I'm guessing mid morning 9:00-ish. 13:29:27

Q Maybe you're spatially oriented and that's why you couldn't remember -- and not temporarily oriented. I don't know.

So you remember speaking with her on the 13:29:40 phone around 9:00-ish at the fairgrounds. And do you remember what you discussed with her?

A Yes. I asked her that we need to get the goat back.

And she said, "There's got to be some other 13:29:55 way."

And I said, "No, there's no other way that you don't own the goat at this time. It's my opinion you're stealing something over $400 of agricultural commodities. It's considered a 13:30:09 felony," which I had to look it up.

MR. BRIDGES: Stop for the second for -- you good?

THE COURT REPORTER: I'm good.

MR. BRIDGES: Go ahead. I'm sorry.

13:30:16 THE WITNESS: And then she said, "There's got to be some other way to work it out," back and forth, back and forth. And then I believe she wanted the documentation from the 4-H office and from us. And then -- then that correspondence went

13:30:35 from Melanie to her.

BY MR. GORDON:

Q Okay. So you said you had to look at the felony. What felony did you -- I know you not an attorney --

13:30:40 A No, but it's --

Q -- but you -- what do you recall?

A Well, I just -- anything -- a stolen property over $400 of agriculture commodity is what...

13:30:53 Q If I -- if I throw a statute out there, might you recall?

A No.

Q 487- -- Penal Code 487(a); is that potentially livestock theft?

13:31:04 A Yeah. It was a livestock, yeah. It was

livestock.

13:31:14

13:31:33

13:32:01

13:32:07

13:32:18

Q I'll just show it to you, and you can tell me if that's the one you were talking with her about. I'll just pull it up online. You can read it and tell me if it's the one. It's the one that's written all over the sheriff's investigation reports. I assume it's -- and it's the one that Jessica understood you to be talking about. But I'll just see if you can tell me. Just a second. But maybe you have another one in mind. It's -- it's a long one. But is this generally -- take a look.

A Yes, I believe that's the one I --

MR. GORDON: John, is this your first case ever involving this statute in any capacity?

MR. BRIDGES: Yes.

MR. GORDON: Yeah. Okay.

THE WITNESS: I think that's the one I saw.

BY MR. GORDON:

Q Okay. All right. Okay. So and -- so you told her on the phone that what she did was potentially a violation of this Penal Code statute, correct?

A Yeah.

Q Okay. All right. And had you -- again,

not a judgment. But had you had any training in law enforcement or at this point in time?

A No, sir.

Q Any training on Penal Code at this point in time?

13:32:29

A No, sir.

Q No. Okay. Had you had any training on -- I know you said -- you did not believe she was the owner, but had you had any training on contracts at this point in time?

13:32:40

A What kind of -- like, the fair contracts?

Q Oh, like training on interpreting contracts, what kind of -- you know, what contract laws apply here, et cetera, like the civil code, commercial code, things of that nature?

13:32:57

A No.

Q Okay. All right. But it was your impression, for whatever reason, that the -- the Penal Code here might apply and that she committed a felony, correct?

13:33:08

A Yes.

Q Okay. And you represented that to her?

A Yes.

Q Okay. What was her reaction when you represented that to her?

13:33:17

A I believe it was, "There's got to be some other way." She just kept saying that. That's what I remember her saying is "There's got to be some other way."

13:33:28 Q Okay. Did was seem frightened?

A No. She just was seemed she wasn't going to give the goat back.

Q All right. All right.

A I don't think she seemed -- I don't -- no,

13:33:41 I don't think she was frightened.

Q You don't think she was frightened. Okay. All right.

Did you think -- again, I'm asking you personally, did you think a felony was maybe

13:33:52 overkill for what happened here?

MR. BRIDGES: Just object that's not relevant, but if you have an opinion I guess you can share it.

BY MR. GORDON:

13:34:02 Q Yeah.

A At this point, no -- I don't know. I don't know. At -- there was a goat that was stolen and so that's what I thought at that point.

Q Okay. Yeah. I mean, the reason I'm asking

13:34:14 is because earlier you used the word "everyone was

shocked," so -- so shocked to the level of this is a felony?

A No, I just -- shocked that someone stole a goat. I mean, that's not -- felony had nothing to do with it in my opinion. I mean -- no.

13:34:31

Q Well, it must have had something to do with it because you said it to her.

A I looked it up and I just thought -- but I just wanted the stolen goat back at that point n time. It would make things a lot easier.

13:34:48

Q So you looked -- whenabouts did you look this -- I know it was before talking to Jessica, but do you know whenabouts?

A Sunday sometime maybe.

13:34:58

Q Sunday. Okay. All right. And -- okay. So you had this conversation with Jessica on the phone. You tell her she committed a felony in your opinion or potentially committed a felony, you know --

13:35:08

A Yeah.

Q I know you're not a cop or the DA, but that's what's expressed to her. And -- and then your communications pivoted just to texts, correct?

A (Nodding.)

13:35:21

Q Okay. And -- okay. So on -- also on

Monday morning you produced this in discovery. So I'm going to give you -- John, do you need a copy of this? It's the goat theft at fair. You sent this to us.

13:35:37 MR. BRIDGES: I don't need to see it.

MR. GORDON: So this will be exhibit -- exhibit -- what are we at?

THE COURT REPORTER: D.

MR. GORDON: D. All right.

13:35:47 (Exhibit D was marked.)

BY MR. GORDON:

Q Okay. Okay. So this is Exhibit D. Did you review this in preparation for today?

A Yes.

13:35:54 Q Okay. What is this an e-mail chain of if you could just describe it?

A Bruce Ross who is Brian Dahle's assistant, or I'm not sure, his district director, e-mailed me this.

13:36:12 Q He e-mailed you -- okay. So he -- trying to find when the chain starts. Okay.

A Bruce Ross to bjherefords. The front page. I don't know where -- that's where it ended but --

Q So I see the earlier text chain's

13:36:27 June 27th, 12:21. I'm looking at the bottom of the

first page.

A Okay.

Q And that's the -- that's the first chain -- although this --

13:36:33 A I don't know who Sheldon Fort is.

Q Yeah, I think this is just something that's left off -- or something from -- he forwarded you an e-mail that he had received. That's, I guess, what happened here.

13:36:44 But so Fort Sheldon -- or Sheldon Fort -- I'm sorry -- looks like initiated this e-mail on June 27th at 12:21 p.m., goes the Bruce Ross, and then Bruce Ross sends it to you at 12:41 p.m. the same day.

13:37:00 Okay. So did you read this e-mail at the time?

A Yes.

Q Okay. And so you saw on the second page, it looks like -- do you know what this paragraph is

13:37:17 on the second page that was forwarded to you?

A I'm guessing it was from Jessica.

Q Okay. So at the -- at the time, though, you understood this paragraph to be from Jessica, correct?

13:37:27 A Yes.

Q Okay.
A I mean, I -- I don't -- that's what it implies to me.
Q No, I understand. Yeah, I'm just asking what you understood at the time, B.J., so --
13:37:36
A Yeah.
Q -- it's -- so she offers in it -- and you read this at the time. So you saw that she offered, "I will pay you back for the goat and any other expenses I caused"?
13:37:49
A Yes.
Q Okay. And -- and did you have any reaction to that at the time why -- her offer to pay?
A No, I'm -- no. Because the owners -- there was new owners so there's no -- in my opinion, there's no one to pay. It sold.
13:38:06
Q Okay. Do you know about when -- for an animal or goods in general, do you know when -- when -- how title transfers to determine ownership? Have you ever -- have you ever been trained on that?
13:38:23
A No.
Q Are you familiar with -- you may be now, because I'm sure you've read the Complaint. But at the time were you familiar with a minor's right to disaffirm a contract?
13:38:40

A Yeah.
Q -- that's your best estimate.
A My best estimate is I -- I believe -- I would guess we talked about this, yes.
13:44:03 Q Okay. All right. Okay. And if I may --
THE COURT REPORTER: May I? Thank you.
BY MR. GORDON:
Q Okay. So on your -- on your phone conversation with Jes- -- with Jessica, she told you
13:45:02 that -- and I know you kept saying there must be another way. Did she tell you -- or did -- did you discuss why she removed the -- Cedar?
A That doesn't stick out in my brain.
Q I mean, I know at some point in time you
13:45:24 likely read her e-mails and you knew why she did. But on the conversation itself, did she tell you, my daughter, you know, really loves Cedar, bonded with him, and we -- she, you know -- we -- she didn't want him to get killed?
13:45:39 A That doesn't -- that doesn't stick out in my brain. I'm not saying we didn't, but that sticks out in my brain of just the back and forth of we're going to do this a different way and I disagreed.
Q You said we're going to do this a different
13:45:52 way --

A She said she was going to do this a different way. She just kept telling me, we got to do this -- there has to be another way, there has to be another way, there has to be another way. That's what I remember of that conversation.

13:45:57

Q So she was essentially pleading?

A Yes.

Q Okay. All right. Okay. I'm going to show you an e-mail from Melanie Silva. You're not cc'd on it, but there's some other attachments in it.

13:46:06

Okay. So have you seen -- so this was sent -- all right.

MR. GORDON: John, these are the Bates stamped number 6 to 13, so yesterday you agreed that was one complete e-mail chain.

13:46:27

MR. BRIDGES: (Nodding.)

BY MR. GORDON:

Q So have you seen this -- these e-mails before? And feel free to take a look. The top two -- just to help orient you through it faster, B.J. the -- the top two are from -- from Kathie to people at CDFA. And the other ones are Jessica's letters which I believe you have seen.

13:46:40

A Jessica's letters?

Q Well, a moment ago you said you saw her

13:46:55

And, B.J., we're not going to be publishing anyone's --

A I know.

Q -- phone numbers. It's just in case we need to get in touch --

14:10:57

A (530) 776-4964.

Q 4964. Okay. All right.

A He's going to get a lot of spams.

Q Okay. All right. So back to this e-mail chain for a moment. So Kathie responds, "Thanks. Keep me updated." She testified that J was a typo that -- she didn't mean your nickname J instead of B.J.

14:11:13

And -- so then there's a -- there's a -- that's June 29th. And then there's a -- then there's a -- a gap. And the next one is June 9 -- July 9th at 7:13 a.m. I'm sorry. You respond, "Will do." I'm assuming that is in -- your response to, "Keep me post- -- updated"?

14:11:27

A Yeah.

14:11:45

Q So then, it looks like, July 9th, "Goat is at my house."

So the -- the sheriffs or several of sheriff -- Lieutenant Fernandez and Duncan dropped the goat off the preceding evening at your house,

14:11:58

correct?
A Yes.
Q Okay. All right. And about what time did they drop him off?
14:12:06 A It was 11:30 or something. It was late at night.
Q Late at night. Okay. And did you know they were dropping him off that day?
A Yes.
14:12:17 Q Okay.
A I think Melanie -- I don't know how it went down. I don't know if Melanie called me and told me they were bringing it.
Q Do you about know what time she called?
14:12:38 A No. It would have been -- no idea. And if she -- I don't -- I do not remember how.
Q Okay. But, obviously, earlier than when the sheriffs got there?
A Yeah.
14:12:58 Q Yeah. So --
A That afternoon, assuming. I think it was Melanie that afternoon said that they were going to perform the search warrant or whatever warrant they had.
14:13:18 Q Uh-huh. Okay. So she told you in the

And, B.J., we're not going to be publishing anyone's --
A I know.
Q -- phone numbers. It's just in case we need to get in touch --
14:10:57
A (530) 776-4964.
Q 4964. Okay. All right.
A He's going to get a lot of spams.
Q Okay. All right. So back to this e-mail chain for a moment. So Kathie responds, "Thanks. Keep me updated." She testified that J was a typo that -- she didn't mean your nickname J instead of B.J.
14:11:13
And -- so then there's a -- there's a -- that's June 29th. And then there's a -- then there's a -- a gap. And the next one is June 9 -- July 9th at 7:13 a.m. I'm sorry. You respond, "Will do." I'm assuming that is in -- your response to, "Keep me post- -- updated"?
14:11:27
A Yeah.
14:11:45
Q So then, it looks like, July 9th, "Goat is at my house."
So the -- the sheriffs or several of sheriff -- Lieutenant Fernandez and Duncan dropped the goat off the preceding evening at your house,
14:11:58

correct?

A Yes.

Q Okay. All right. And about what time did they drop him off?

14:12:06 A It was 11:30 or something. It was late at night.

Q Late at night. Okay. And did you know they were dropping him off that day?

A Yes.

14:12:17 Q Okay.

A I think Melanie -- I don't know how it went down. I don't know if Melanie called me and told me they were bringing it.

Q Do you about know what time she called?

14:12:38 A No. It would have been -- no idea. And if she -- I don't -- I do not remember how.

Q Okay. But, obviously, earlier than when the sheriffs got there?

A Yeah.

14:12:58 Q Yeah. So --

A That afternoon, assuming. I think it was Melanie that afternoon said that they were going to perform the search warrant or whatever warrant they had.

14:13:18 Q Uh-huh. Okay. So she told you in the

A I have no idea.
Q Okay. Did you ask?
MR. BRIDGES: Don't speculate. But if you know, you can tell him.
14:18:38 THE WITNESS: I -- I don't. I'm not speculating. I don't know. I don't think I asked. No, I didn't ask. I don't --
BY MR. GORDON:
Q Okay.
14:18:43 A -- I was holding a goat. I was -- I had nothing to do besides I was holding a goat.
Q Nah, I understand. Okay. So Ms. Muse -- so Ms. Muse writes, looks like, "Hey B.J. what did you end up doing with the goat?" And this is the
14:19:02 25th. And then there's a gap of three days.
Were there any other communications before you respond on July -- July 28th? Were you -- were you -- did you communicate with Kathie anymore before that -- within that window?
14:19:16 A I don't believe so. I might have -- no, I might have dealt -- been talking with Melanie, too, through -- I'm talking to Melanie through this, too.
Q Yes. Okay.
A But she --
14:19:27 Q Yeah. About how many times would you say

you talked to Melanie through this?

A I --

Q Multiple times?

A Yeah, multiple times.

14:19:38 Q Okay. So this is from July 11th now. I'm -- and that's the same from July -- when you got Cedar on July 8 through, let's say, the 28th is when it appears that he's killed or goes to slaughter, you talked to Melanie multiple times, correct?

14:19:53 A Yes.

Q Okay. And -- and did you tell Melanie that we're waiting to hear from the sheriff and the DA?

A And I'm -- yeah, and I don't remember if she was the one talking to the sheriff. I think -- 14:20:04 I know I did a couple times, but I want to think that -- I thought she was the one that was gearing it, so what -- with the state and the sheriff, so...

Q Okay. And -- but it was never -- did you ever ask -- well, I shouldn't -- I know you said you 14:20:23 didn't ask. But what was your understanding of -- from talking with the sheriff? And I know you may not say precisely in legal terms, but what was your understanding of what they were waiting to determine?

14:20:35 A I don't -- I think it was over if the DA

you were -- just to clarify in your -- from your perspective, you felt like you were operating under the direction of Melanie and the sheriff --

A Yes.

14:21:45 Q -- office?

Okay. And potentially the CDFA, I guess, also?

A Yes. The CDFA.

Q And the District Attorney? Okay. All

14:21:50 right.

Okay. So what -- Bowman is a -- is a -- a slaughtering facility, yes?

A Processing facility.

Q Processing facility. I apologize.

14:22:02 Okay. And what is the full name if you know?

A Bowman Meats.

Q Bowman Meats. And where is that at?

A Bowman Road, Cottonwood.

14:22:11 Q Bowman Road, Cottonwood. Okay. So did you bring Cedar to Bowman Meats on the 28th?

A No.

Q What day did you bring him there?

A They came to my house.

14:22:29 Q They came to your house. So they came and

retrieved Cedar on -- what day did that happen?

A (Nodding.) The 28th, I'm guessing.

Q Okay. Okay. Well, did this refresh your memory and you remember now it being the 28th, the same day you wrote this text?

A I don't know. I -- I couldn't tell you the dates. I'm sorry.

Q Okay. Okay.

A I can tell you the dates, because I can look at this text message and see it was --

Q Okay.

A -- the 28th.

Q Okay. So is it fair to say your best estimate, though --

A Yes.

Q -- is the 28th?

Okay. All right. Okay. So were -- so Kathie writes, Goods news. Finally. And please don't forget to save the ear tags. Did -- did you save Cedar's ear tags?

A I did at one point. I'm not sure what happened to 'em to be honest with you.

Q Okay. And why were you supposed to save his ear tags?

A I -- because Kathie told me to save ear

PENALTY OF PERJURY

I, the undersigned, hereby certify that I have read the foregoing deposition, that I know the contents thereof, and I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on ________________________, 2023.

________________________________
BRUCE JOHN "B.J." MACFARLANE

---o0o---

WITNESS' CHANGES OR CORRECTIONS

NOTE: If you are adding to your testimony, print the exact words you want to add. If you are deleting from your testimony, print the exact words you want to delete. Specify with "Add" or "Delete" and sign this form.

Deposition of: BRUCE JOHN "B.J." MACFARLANE
Case Title: LONG V. FERNANDEZ, ET AL.
Date of Deposition: WEDNESDAY, NOVEMBER 15, 2023

Page Line Change/Add/Delete

_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________
_____ _____ ___________________________________

_______________________________ ________________

BRUCE JOHN "B.J." MACFARLANE DATED

**CERTIFICATE OF REPORTER**

I, CAROL J. CHASE, a Certified Shorthand Reporter, licensed by the State of California, License No. 13538, being empowered to administer oaths and affirmations pursuant to Section 2093 (b) of the Code of Civil Procedure, do hereby certify:

That the witness in the foregoing deposition, BRUCE JOHN "B.J." MACFARLANE, was present at the time and place specified and was by me sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceeding was taken before me in shorthand writing, and was thereafter transcribed under my direction by computer-aided transcription;

That the foregoing transcript constitutes a full, true, and accurate record of the proceeding which took place; That I am not of counsel or attorney for any of the parties hereto, or in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

IN WITNESS WHEREOF, I have hereunto subscribed my signature on this 28th day of November, 2023.

___________________________________
CAROL J. CHASE