

# EXHIBIT "A"

# In The Matter Of:

*LONG vs.*
*FERNANDEZ*

---

*KATHIE MUSE*
*November 13, 2023*

---

*Challe, Fisher & Morfin*
*1828 South Street*
*Redding, California  96001*
*(530)246-0942*
*cfmdepos@att.net*

Original File K. Muse.txt
Min-U-Script® with Word Index

## Page 1

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA

3    SACRAMENTO DIVISION

4  E.L., a minor, by and through        )
   her general guardian, JESSICA        )
5  LONG; JESSICA LONG, an               )
   individual,                          )
6                                       )
              Plaintiffs,               )
7  vs.                                  )  NO. 2:22-cv-01527-
                                        )  DAD-AC
8  LIEUTENANT JERRY FERNANDEZ,          )
9  individually and in his             )
   individual capacity as Sheriff      )
10 for the County of Shasta;           )
   DETECTIVE JACOB DUNCAN,             )
11 individually and in his             )
   individual capacity as Sheriff      )
12 for the County of Shasta;           )
   DETECTIVE JEREMY ASHBEE,            )
13 individually and in his             )
   individual capacity as Sheriff      )
14 for the County of Shasta;           )
   SHASTA DISTRICT FAIR AND EVENT       )
15 CENTER, a district agricultural     )
   association; COUNTY OF SHASTA;       )
16 SHASTA COUNTY SHERIFF'S             )
   DEPARTMENT; Melanie Silva, in       )
17 her individual capacity; BJ         )
   MACFARLANE, in his individual        )
18 capacity; and DOES 1 through        )
   10,                                  )
19                                      )
              Defendants.               )
20 ------------------------------

21           ---oOo---

            MONDAY, NOVEMBER 13, 2023

22             9:03 a.m.

23    VIDEOTAPED DEPOSITION OF KATHIE MUSE

24           ---oOo---

25    Reported by:  CAROL J. CHASE, CSR No. 13538

## Page 2

1              INDEX

2

3  WITNESS:  KATHIE MUSE

4

5  EXAMINATION:                          PAGE

6  By Mr. GORDON................................    9

7

8           ---oOo---

9

## Page 3

1              E X H I B I T S

2

3  Exhibit                                    Page
   Exhibit A   Kathie Muse Subpoena, Proof of   28
4              Service, Request for Production of
               Documents, 8 pages
5
   Exhibit B   2022 Shasta District Junior      60
6              Livestock Auction brochure, 2 pages
7  Exhibit C   Shasta District Fair invoices for  72
               Assemblywoman Megan Dahle and
8              Senator Brian Dahle, bill date
               7/5/22, 2 pages
9
   Exhibit D   Shasta District Fair Sale Invoice  76
10             listing donation to 4-H/FFA BBQ,
               6/25/22, Bates 0004, 1 page
11
   Exhibit E   27th DAA Junior Livestock          80
12             Association #8317 check stub for
               $838.86, Bates 0005, 1 page
13
   Exhibit F   17th Annual 4-H/FFA Community BBQ  83
14             invitation, 1 page
15 Exhibit G   E-mail chain with attached letter, 107
               Bates 0006-9, Bates 0006-9, 4 pages
16
   Exhibit H   Letter RE: Dispute over Cedar,    117
17             dated 6/28/22, 4 pages
18 Exhibit I   Second Amended Complaint for       152
               Damages, 31 pages
19
   Exhibit J   Text messages from 8/31 to 9/23,  157
20             Bates FERN000129, 127, 125, 3 pages
21 Exhibit K   Kathie's Facebook comment RE:     168
               Redbluffdailynews.com article,
22             1 page
23 Exhibit L   Text messages (color) with from   176
               6/28/22 to 9/6/22, 7 pages

## Page 4

1              E X H I B I T S

2

3  Exhibit                                    Page
   Exhibit M   Letter from Shasta County District 227
4              Attorneys office to Ms. Muse dated
               4/13/23, 1 page
5
   Exhibit N   WLJ article - County fair seizure  232
6              makes national headlines, 5/5/23,
               6 pages
7
8           ---oOo---

**Page 5**

APPEARANCES:

For Plaintiffs E.L., a minor, by and through her general guardian, Jessica Long; Jessica Long, an individual:

    ADVANCING LAW FOR ANIMALS
    BY:  RYAN R. GORDON, ESQ.
    BY:  VANESSA T. SHAKIB, ESQ.
    407 N. Pacific Coast Highway #267
    Redondo Beach, California 90277
    202-996-8389
    rgordon@advancinglawforanimals.org
    vshakib@advancinglawforanimals.org

For Defendants Shasta District Fair and Event Center; B.J. Macfarlane; Melanie Silva:

    (Present via telephone)

    CALIFORNIA DEPARTMENT OF JUSTICE
    Tort and Condemnation Section
    BY:  JOHN C. BRIDGES, ESQ.
    1300 I Street, Suite 1210
    Sacramento, California 95814
    916-210-7529
    916-322-8288 Fax
    John.Bridges@doj.ca.gov

For Defendant/Deponent Kathie Muse:

    REESE SMALLEY WISEMAN & SCHWEITZER, LLP
    BY:  KELLY J. SNOWDEN, ESQ.
    1265 Willis Street
    Redding California 96001
    530-241-1611
    530-364-1645 Fax
    kelly.snowden@rswslaw.com

**Page 6**

APPEARANCES (Continued):

For Defendants Shasta County; Shasta County Sheriff's Department; Lieutenant Jerry Fernandez; Detective Jacob Duncan; Detective Jeremy Ashbee:

    (Present Via Zoom)

    BEST BEST & KRIEGER LLP
    BY:  DAMIAN A. NORTHCUTT, ESQ.
    2855 East Guasti Road, Suite 400
    Ontario, California 91761
    909-989-8584
    Damian.Northcutt@bbklaw.com

Videographer:

    TERRY FOX, REDDING VIDEO PRODUCTIONS

    ---oOo-

**Page 7**

VIDEOTAPED DEPOSITION OF KATHIE MUSE, taken on behalf of the Plaintiffs, at the offices of Challe, Fisher & Morfin, 1828 South Street, Redding, California, on MONDAY, NOVEMBER 13, 2023, commencing at the hour of 9:03 a.m., before CAROL J. CHASE, a Certified Shorthand Reporter of the State of California, taken pursuant to Notice.

    ---oOo---

THE VIDEOGRAPHER:  Ladies and gentlemen, we're on record with the video deposition of Kathie Muse.  The date is November 13th, 2022, and the time is 9:03 a.m.  I'm Terry Fox, a video specialist with the firm of Redding Video Productions.  This is the beginning of media number 1 regarding case number 22-cv-01527-DAD-AC for the Unites States District Court for the Eastern District of California.  This deposition is being taken at the offices of Challe, Fisher and Morfin at 1828 South Street in Redding.  The California the court reporter is associated with Challe, Fisher and Morfin.

    Counsel will now introduce themselves, who they represent and the witness will be sworn in by the court reporter.

    MR. GORDON:  Sure.  Ryan Gordon for

**Page 8**

Plaintiffs.

    MS. SHAKIB: Vanessa Shakib, Plaintiffs' Counsel.

    MR. SNOWDEN: Kelly Snowden on behalf of Ms. Muse.

    MR. NORTHCUTT: Damian Northcutt --

    MR. BRIDGES: Good morning, this is --

    MR. NORTHCUTT: -- on behalf of the Sheriff's Department and the sheriff officers in this case.

    MR. BRIDGES: Good morning.  This is John Bridges on behalf of the Shasta District Fair, B.J. Macfarlane, and Melanie Silva.

    MR. NORTHCUTT: I'm also here on behalf of the County as well.

    THE COURT REPORTER: Ms. Muse, please raise your right hand to be sworn.

    KATHIE MUSE,
being first duly sworn, testified as follows:

    THE WITNESS: I do.

    THE COURT REPORTER: Thank you.
/// 
///

Page 9

**EXAMINATION**
**BY Mr. GORDON:**

1
2
3  Q   All right.  Thank you for being here today,
4  Ms. Muse.
5      So can you please state your full name for
6  the record?
7  A   Kathie Muse.
8  Q   And can you spell it?
9  A   K A-T-H-I-E, M-U-S-E.
10  Q   All right.  Have you ever been gone by any
11  other names?
12  A   My real name is Katherine.
13  Q   Katherine.  Okay.  And are -- I'm
14  assuming -- are you married?
15  A   Yes.
16  Q   Maiden name at some point?
17  A   Yes.  Schmitt.
18  Q   Schmitt.  Okay.
19  A   Uh-huh.
20  Q   Okay.  All right.  And do you -- are you
21  known commonly by any other name, like a nickname or
22  anything?
23  A   No.
24  Q   No.  Okay.  All right.  Called KM or
25  anything like that?

Page 10

1  A   (Witness shaking head.)
2  Q   All right.  Have you ever been a defendant
3  in a lawsuit before?
4  A   Yes.
5  Q   How many times?
6  A   Twice.
7  Q   Okay.  And can you just tell me generally
8  what those were about?
9  A   Business related.
10  Q   Business related.  Your business --
11  A   Yes.
12  Q   -- I presume?
13      What kind of business do you run?
14  A   Trucking company.
15  Q   Trucking company.  Okay.  All right.  And
16  were you -- are those cases still pending or they --
17  A   No.
18  Q   -- over?
19      MR. SNOWDEN: You need to slow down --
20      THE WITNESS: Okay.
21      MR. SNOWDEN: -- and wait for his entire
22  question --
23      THE WITNESS: Question.
24      MR. SNOWDEN: -- to be asked before you
25  start to answer.

Page 11

1      THE WITNESS: Okay.
2      MR. SNOWDEN: Okay?  Number 1, because you
3  need to understand what you're being asked.  And
4  number 2, because the reporter has to take it down
5  as she hears it and it's going to be break, break,
6  break, break in the transcript and no one will know
7  any idea what anyone is saying.  Okay?  So try to
8  take your time.  Okay?
9  BY MR. GORDON:
10  Q   Yeah.  Okay.  I -- I speak fast also.  So
11  we'll have to keep each other in check.  So -- all
12  right.  Of course, no one understands what is being
13  said in the transcript.  That's just towards us.
14      So anyway -- all right.  So -- I asked this
15  a moment ago, but I'm not sure if you answered.  But
16  have you ever been deposed before?
17  A   No.
18  Q   No.  Never been deposed before.  All right.
19  So two lawsuits and you weren't deposed.  All right.
20      So I'm going to go over some ground rules
21  for the deposition.  All right.  So, as your counsel
22  just said, we don't talk over each other, basically
23  because she's transcribing everything.  And it is
24  recorded, so maybe any error could be fixed later,
25  but nonetheless, make her -- let's make her life

Page 12

1  easy and not talk over each other.  She can get a
2  clear record.
3      So it's also -- it's also important that
4  you give a verbal response, not a "uh-huh," because
5  again it's being transcribed.  So I'm going to ask
6  you about certain things and I'm entitled to -- you
7  may not remember completely, but I'm entitled to
8  your best estimate.  Now do you understand -- not a
9  guess but an -- your best estimate.  So do you
10  understand the difference between a guess and an
11  estimate?
12  A   No.
13  Q   That's fine.  The example lawyers always
14  give, which is if you're ever in a deposition again
15  they'll give this example most certainly, they'll
16  say -- because you're at a table.  So if I was -- if
17  I was to ask you to estimate the length of this
18  table, you could -- you could say, oh, it's eight
19  feet or whatever, you know.  But if I asked you to
20  tell me the length of the table in my house, you
21  couldn't estimate it.  You would just have to guess
22  because you haven't seen my table.
23      So same thing with the dates.  If you
24  know -- you know, if you know something happened
25  around last Thanksgiving, you know, but you don't

Page 13

1  know the date, like, oh, it's between -- it was
2  around Thanksgiving or Black Friday, you know, I'm
3  entitled to your best estimate so -- but don't, you
4  know, speculate completely but, if you have an idea,
5  I'm entitled to what the idea is. Understood?
6  A    Yes.
7  Q    All right. So at the -- at the end of
8  deposition you're going to receive a booklet.
9  You'll presumably go to your attorney and it will be
10 all your testimony. And you will have an
11 opportunity to change any of your answers. You
12 can't change my questions, but you can -- you can
13 change your answers. But if you do that, it -- you
14 know, it can be used against you at trial or look
15 bad and credibility will go down and things of that
16 nature. So it's important that we get your best
17 testimony today. Understood?
18 A    Yes.
19 Q    Okay. All right. So your attorney might
20 object to questions. It happens all the time. The
21 other attorneys, Mr. Northcutt and Mr. Bridges,
22 might also object. They're putting objections on
23 the record. It doesn't mean you don't answer so --
24 and unless your attorney instructs you not to
25 answer.

Page 14

1       But if someone says, vague or whatever, you
2  know, leading, if you understand what I'm saying,
3  answer my question. There -- nothing here today is
4  getting introduced into evidence, so they're just
5  preserving the records for later. So -- but unless
6  your attorney instructs you not to answer, then --
7  then you -- as long as you understand me, you can
8  answer -- you can answer the question.
9       If you truly don't understand what I'm
10 saying, then, well, that's -- I don't know what
11 you're talking about, tell me. I'll rephrase it.
12 All right?
13 A    Okay.
14 Q    Okay. Okay. So are you on any meds?
15 A    What --
16      MR. SNOWDEN: Hold on a second. I'm going
17 to object. It invades her privacy.
18      Let me ask it this way. Are you taking any
19 medication that you believe affects your ability to
20 understand questions or remember facts?
21      THE WITNESS: No.
22      MR. SNOWDEN: Okay.
23      MR. GORDON: That's fine. Thank you.
24 ///
25 ///

Page 15

1  BY MR. GORDON:
2  Q    Okay. So similarly, did you, for the same
3  reasons, did you have a drink today? Alcohol?
4  A    No.
5  Q    No. Okay. All right. So is there any
6  reason you can think of why you cannot go forward
7  with your deposition today?
8  A    No.
9  Q    No. Okay. Other than just generally
10 probably not wanting to be here but I understand.
11 Okay. All right. So -- all right.
12      Do you live in Shasta County?
13 A    Yes.
14 Q    How long have you lived here?
15 A    Sixty-four years.
16 Q    Sixty-four years. Is that your whole life
17 presumably?
18 A    Yes.
19 Q    All right. And where did you go to --
20 where did you go to school, let's say, public --
21 high school?
22 A    High school?
23 Q    Yeah, sure.
24 A    Shasta High School.
25 Q    Shasta High School. Okay. And did you go

Page 16

1  to college?
2  A    Just a class here or there.
3  Q    Class here or there. Which college is that
4  at?
5  A    Shasta College.
6  Q    Shasta College. Okay. Any other
7  education?
8  A    No.
9  Q    Okay. All right. Okay. And you said you
10 run a trucking company. What is that name of that
11 company.
12 A    Muse, M-U-S-E, Trucking.
13 Q    And your position at the company?
14 A    President.
15 Q    President. How long have you been
16 president of Muse Trucking?
17 A    Approximately 23 years.
18 Q    Twenty-three years. Since inception or
19 some -- did you take over someone?
20 A    Since inception.
21 Q    Okay. All right. Is it -- is it a family
22 business?
23 A    Yes.
24 Q    Is it -- so do you work with your -- your
25 husband or your children there presumably?

| | Page 17 |
|---|---|

1　A　Yes.
2　Q　Okay. Which ones?
3　A　Son and husband.
4　Q　Okay. Okay. And what's your -- what's
5　your husband's name?
6　A　Frank.
7　Q　Frank.
8　A　Muse.
9　Q　Okay. All right. And what's his position
10　at the trucking company?
11　A　Vice president.
12　Q　All right. Have you both held those
13　positions since inception basically?
14　A　Yes.
15　Q　Okay. All right. All right. And earlier,
16　I asked you when you were involved in some other
17　lawsuits. What -- and they were business lawsuits.
18　What -- do you remember generally what -- when they
19　were -- when those suits occurred? Let's start with
20　the first one.
21　A　I couldn't recall. It's been quite a while
22　ago.
23　Q　Like in the 2000s, do you think?
24　A　Yes.
25　Q　Okay. Like to past 2010?

| | Page 18 |
|---|---|

1　A　Yes.
2　Q　Like past 2015?
3　A　Yes.
4　Q　Okay. And, like, so 2017? 2018?
5　A　I -- it was a truck accident.
6　Q　Truck accident.
7　A　Yeah.
8　Q　Okay. So one of your drivers hits one
9　someone or --
10　A　Somebody hit my driver.
11　Q　Somebody hit your driver. Okay. Okay.
12　All right. All right. And I presume insurance just
13　resolved it?
14　A　Yes.
15　Q　Okay. And what was the second case?
16　A　Same thing.
17　Q　Same thing. Someone hit your driver?
18　A　Uh-huh.
19　Q　And insurance resolved it?
20　A　Yes.
21　Q　Was that you case more recently?
22　A　I -- I --
23　Q　You don't know. Okay. Were they -- okay.
24　All right. That's fine. Just curious.
25　　Okay. So -- at -- all right. So what sort

| | Page 19 |
|---|---|

1　of involvement have you had in your life with 4-H?
2　A　What do you mean by "involvement"?
3　Q　Well, what is -- okay. You are currently a
4　volunteer for 4-H, correct?
5　A　Yes.
6　Q　Okay. And how long have you been a
7　volunteer?
8　A　I'm -- are you talking about recently or
9　in -- way in the past?
10　Q　Tell me. Go ahead. Start in the
11　beginning.
12　A　I was a leader for 4-H approximately
13　30 years ago.
14　Q　Okay.
15　A　And then I took a break as a leader, was
16　only a parent, and then I revolunteered for 4-H
17　approximately four years ago.
18　Q　Okay. How long did you take a break for?
19　Well, I guess you told me that, 30 years ago, and
20　then so you took a break for -- you took a 26-year
21　break; is that correct or --
22　A　Well, I was a parent in between then until
23　my children got old enough --
24　Q　I see.
25　A　-- and were no longer in 4-H.

| | Page 20 |
|---|---|

1　Q　I see. Okay. So your children were in
2　4-H.
3　　Were you in 4-H as a child?
4　A　No.
5　Q　No. Okay. All right. So your children --
6　what year -- so 30 -- I'm just trying to do the
7　math. So 30 years ago, so in the '90s your children
8　were -- or you were a leader in 4-H then. And then
9　your children participated subsequently to that?
10　A　Yes.
11　Q　Okay. All right. And what -- what was
12　your role as a leader?
13　A　I was the horse leader.
14　Q　Horse leader. What did that entail?
15　A　Helping the kids learn -- the girls --
16　children learn about horses.
17　Q　Okay. Do they --
18　A　We did horse shows, parades.
19　Q　Okay. Do they learn how to ride or just
20　take care of horses? Can you describe it?
21　A　Most of them already learned -- or most of
22　the children already had horses.
23　Q　Okay.
24　A　We just had monthly meetings.
25　Q　Okay.

---

**Page 21**

1  A    We all got together and showed their
2  horses.
3  Q    Okay. Okay. All right. Was there
4  something that at the end they had to do to pass
5  the -- you know, get a certificate from the program
6  or grad- -- you know?
7  A    You do have to do a record book.
8  Q    A record book. Anything else?
9  A    No.
10  Q    No. Okay. All right. Okay. So you were
11  a horse leader. And then was there a name of the --
12  so, you know, here in this case, it involves, you
13  know, Cow Creek 4-H. Did yours have a similar name,
14  you know, Cow Creek Horse or something or, I guess,
15  Horse Creek or something? I don't know. I'm making
16  it up. But do you understand what I'm asking?
17  A    Happy Valley.
18  Q    Happy Valley. Okay. Is that is a nickname
19  for this area?
20  A    No.
21  Q    Happy Valley?
22      Okay. I went to Penn State for undergrad
23  and the area is called Happy Valley. I'm curious if
24  it was ever used -- anyway, or maybe Penn State took
25  it from here. I don't know. Anyway.

**Page 22**

1      All right. So do you -- what is your
2  understanding of how 4-H operates with respect to,
3  you know, funding, and who -- who, you know, the
4  structure of it, let's say. What is your
5  understanding of the structure of 4-H in relation to
6  the government?
7  A    All I know is that they are part of, I
8  believe, U.C. Davis -- or not U.C. Davis --
9  University of California --
10  Q    Uh-huh.
11  A    -- for the Agriculture Department.
12  Q    Yeah. But I think you're correct. I think
13  Davis is the main university that operates that,
14  so -- and there's a -- there's an office in town
15  also that coordinates with -- with the university,
16  correct?
17  A    Yes.
18  Q    Okay. All right. Do you -- do you know
19  anyone at that office?
20  A    Yes.
21  Q    Okay. And who do you know there?
22  A    Do I know their names --
23  Q    Yes.
24  A    -- or their positions?
25  Q    Both, yeah.

**Page 23**

1  A    I talked to Mary. And I couldn't tell you
2  Mary's last name.
3  Q    That's fine.
4  A    Erin Paradis, Nate Canton.
5  Q    Erin Paradis?
6  A    Uh-huh.
7  Q    And what is Mary's role if you know?
8  A    She's their secretary.
9  Q    Secretary. And Erin's role?
10  A    I believe she's the 4-H advisor.
11  Q    Okay. And Nate Can- -- Nate Canton, you
12  said?
13  A    Uh-huh.
14  Q    What's his role?
15  A    He was the 4-H advisor previously. I --
16  and he got moved up. I don't know what his title
17  is.
18  Q    All right. Okay. Anyone else at the
19  office?
20  A    Larry Forero.
21  Q    Larry Forero. And do you know what his
22  role is?
23  A    No, I do not.
24  Q    Okay. Fair enough. Okay. And what sorts
25  of matters do you -- do you -- you said you talked

**Page 24**

1  to these people. And what sorts of matters are you
2  talking with them about?
3  A    4-H program.
4  Q    Okay. Like you're a volunteer -- you're
5  volunteering at a program, those sorts of thing?
6  A    Yes.
7  Q    Okay. And do they give you any directions
8  or -- I mean, or -- or are you kind of on your own?
9  A    Directions as a volunteer --
10  Q    Yes.
11  A    -- projects I do?
12  Q    Yes.
13  A    Yes, I do. Because I'm the treasurer
14  advisor for Happy Valley 4-H.
15  Q    So you handle the funding for that local
16  group?
17  A    Yes.
18  Q    Yeah, okay. All right. Okay. All right.
19  Do you have to -- who do you report to then as a
20  treasurer?
21  A    In my club or the 4-H organization?
22  Q    Both, yeah.
23  A    The club, I com- -- I -- a member of the
24  community -- or community director. We have a
25  community person that does Happy Valley 4-H.

---

**Page 25**

1 Q Okay. And who's the community director?
2 A Cheryl Rolland -- or excuse me,
3 Cheryl Best.
4 Q Cheryl Best. B-E-S-T?
5 A B-E-S-T.
6 Q Is Rolland her former name?
7 A That's her husband's name.
8 Q Her husband's name. Okay. Okay. And who
9 do you report to -- you asked who -- if I meant the
10 local a community group or the office, who do you
11 report to at the office then?
12 A Erin Paradis.
13 Q Erin Paradis. Okay. And you -- you have
14 to give general accountings of funds for this group
15 presumably?
16 A Yes.
17 Q Okay. All right. Okay. And how long have
18 you had this role as secretary -- or I'm sorry, I
19 apologize -- treasurer?
20 A Four years.
21 Q Four years. Okay. All right. Okay. And
22 do you have a -- do they give you a business card
23 with your name on it or anything like that?
24 A No.
25 Q No. Okay. All right. And do you deal

**Page 26**

1 with any of the -- as treasurer and volunteer, are
2 you -- are you active with the children's
3 participation in the program?
4 A What do you mean by "active in the
5 children's program"?
6 Q Interacting with the kids on any of their
7 projects or anything like that?
8 A Not with their projects, no.
9 Q Okay. All right. Did you receive any
10 training to -- to work as a volunteer at 4-H from
11 4-H?
12 A Yes.
13 Q What sort of training did you receive?
14 A It's an online chid abuse/sexual harassment
15 case that you had to take every year.
16 Q Okay. Anything else?
17 A No.
18 Q Okay. So this is a -- your project for
19 Happy Valley, this is -- is that group still focused
20 on horses?
21 A No.
22 Q No. What is it focused on?
23 A You mean for animals?
24 Q Yes. What animal is the focus of your
25 group?

**Page 27**

1 A Swine, goat, sheep, market goat, steers --
2 or beef --
3 Q Uh-huh.
4 A -- and rabbit.
5 Q Okay. All right. Did you have -- have
6 you -- in your role as a volunteer for that group,
7 have you received any education or training through
8 4-H with respect to those types of animals?
9 A No.
10 Q No. Okay. Okay.
11 (Vibrating phone interruption.)
12 BY MR. GORDON:
13 Q Someone's phone? Do you have to get that,
14 Ms. Muse?
15 A No.
16 Q We can go off the record if you have to
17 talk.
18 And similar questions for FFA. Have you
19 ever been involved in -- in FFA?
20 A No.
21 Q No. Okay. Never a volunteer?
22 A No.
23 Q Didn't participate as a child?
24 A No.
25 Q Or any of your family participates in it?

**Page 28**

1 A No.
2 Q No. Okay. So I -- let's -- one second.
3 I'm going to hand you -- this will be -- this will
4 be Exhibit A. You've seen it before. It's your --
5 the subpoena to be here today.
6 I made two copies, Kelly, so --
7 MR. SNOWDEN: I have it.
8 MR. GORDON: You have a copy? Okay.
9 Great. So we asked you to bring a few documents.
10 (Exhibit A was marked.)
11 BY MR. GORDON:
12 Q And I just want to make sure to see what
13 you have and what you don't have.
14 THE COURT REPORTER: Can I mark that,
15 please? Here we are. Thanks.
16 (Pause in proceedings.)
17 BY MR. GORDON:
18 Q Okay. So you've given -- this morning,
19 your attorney gave us, it looks like, two documents:
20 A flyer for community barbecue and then a text
21 chain. So I'm just going to go through this list
22 and you tell me what these are responsive to, okay,
23 as best you can.
24 So any and all documents related to
25 Jessica Long. Anything outside of this?

---

---

**Page 29**

1  A   No.
2  Q   No? Okay. Any -- any and all documents
3  related to her daughter?
4  A   No.
5  Q   No. Okay. Any and all documents related
6  to Cedar? And just this?
7  A   No.
8  Q   Well, these (indicating).
9  A   Yes.
10 Q   Those ones, the text chain.
11     Documents related to the Shasta District
12 Fair and Event Center that concerned Jessica Long?
13 A   No.
14 Q   Okay. Same thing, documents related to
15 Shasta District Fair and Event Center that concerned
16 her daughter?
17 A   No.
18 Q   All documents related to Shasta District
19 Fair and Event Center that concerned Cedar? That's
20 just this text chain?
21 A   (Indicating.)
22 Q   Okay. And then any and all documents
23 related to Shasta Sheriff's Department that
24 concerned Jessica Long?
25 A   No.

**Page 30**

1  Q   But there was a letter from the DA in here,
2  but that's not the sheriff's department, so okay.
3  All right.
4      Same thing. Any documents related to the
5  Shasta County Sheriff's Department that concerned
6  her daughter?
7  A   No.
8  Q   Okay. And then documents related to the
9  sheriff's department that concerned Cedar; just what
10 you have here?
11 A   Just what's in there.
12 Q   All right. And then all documents related
13 to Lieutenant Fernandez that concerned Jessica Long.
14 Nothing?
15 A   No.
16 Q   No. No e-mails, text messages, nothing
17 like that?
18 A   I'm not sure if Fernandez is mentioned in
19 one of those text messages but, other than that, no
20 (indicating).
21 Q   No other -- no other text messages. Okay.
22 All right. Have you deleted any e-mails or text
23 messages since this time?
24 A   No.
25 Q   No? Okay. All right.

**Page 31**

1      Same thing. All documents related to
2  Fernandez that concerned the daughter. Assuming no
3  again?
4  A   No.
5  Q   No. All right.
6      And then all documents of Fernandez that
7  concerned Cedar. Same thing? No?
8  A   Correct, none.
9  Q   And all documents related to
10 Detective Duncan that concerned Jessica Long? None.
11 A   None.
12 Q   Do you know Detective Duncan?
13 A   No.
14 Q   No. Okay. All right. You know of him,
15 though, obviously, but you've never met him,
16 correct?
17 A   I don't know of him besides this case.
18 Q   Yes. I mean, you know of him from the
19 case --
20 A   Yes.
21 Q   -- I presume?
22 A   Yes.
23 Q   Yeah. All right. Okay. So no
24 communications with him concerning or related to him
25 that concern the daughter either?

**Page 32**

1  A   No.
2  Q   All right. No documents through him that
3  concern Cedar?
4  A   No.
5  Q   Al right. And Detective Ashbee -- and do
6  you know Detective Ashbee?
7  A   No.
8  Q   You know of him, though, again by the
9  same -- in the same way you know of Duncan?
10 A   Yes.
11 Q   Yeah. Okay. All right. And no documents
12 related to him that concern Ms. Long?
13 A   No.
14 Q   And no documents related to him that
15 concern the daughter?
16 A   No.
17 Q   All right. No documents related to him
18 that concerned Cedar?
19 A   No.
20 Q   All right. Go on to request 19. Just for
21 the record, I'm going through this requests just to
22 get her responses. So if I'm putting anyone to
23 sleep on the call. My apologies.
24     All right. Any documents related to
25 Melanie Silva that concerned Jessica Long?

Page 33

1   A   No.
2   Q   No?  All right.  Any documents related to
3   Melanie Silva that concerned the daughter?
4   A   No.
5   Q   All right.  Any documents related to
6   Melanie Silva that concerned Cedar?
7   A   No.
8   Q   Any documents related to Bruce Macfarlane
9   that concerned Jessica Long; just the text chain
10  there?
11  A   Text chain.
12  Q   Is -- is this text chain with Macfarlane?
13  A   Yes.
14  Q   All right.  So then the next three for
15  Long, the daughter, and Cedar, I'm just going to put
16  yes.  So it's all documents related to
17  Bruce Macfarlane concerning Jessica -- the daughter,
18  so that's 20- -- 23.
19      Any and all documents related to
20  Bruce Macfarlane that concerned Cedar, 24.
21      Yes on those three.  All right.
22      Any and all documents relating to
23  Brian Dahle that concerned Jessica Long?
24  A   No.
25  Q   And all documents related to Brian Dahle

Page 34

1   that concerned the daughter?
2   A   None.
3   Q   None.  And all documents related to
4   Brian Dahle that concerned Cedar?
5   A   No.
6   Q   Okay.  All right.  All documents related to
7   Megan Dahle that concerned Jessica Long?
8   A   No.
9   Q   All right.  All documents related to
10  Megan Dahle that concerned the daughter?
11  A   No.
12  Q   And all documents related to Megan Dahle
13  that concerned Cedar?
14  A   No.
15  Q   Okay.  And you had no e-mails with them or
16  text messages that might have been deleted since,
17  you know, since, you know -- since July -- or
18  June 25th, 2022?
19  A   Regarding this case?
20  Q   Yes, regarding this.
21  A   No.
22  Q   Or regarding the event, not necessarily the
23  case.
24  A   No.
25  Q   No?  Okay.  All right.  Okay.  So any

Page 35

1   documents related to the barbecue; just this?
2   A   Correct, yes.
3   Q   And there's no other documents you keep a
4   record of attendees or anything like that?
5   A   No.
6   Q   No?  Okay.  No other e-mails or ticket sale
7   rosters or anything like that?
8   A   No.
9   Q   No.  All right.  Okay.  Would anyone else
10  be in custody of them or just you?
11  A   We do have a person that handles the
12  checking account and she possibly would have a list
13  of what club sold tickets.
14  Q   I see.  Okay.  And what's that person's
15  name?
16  A   Sherry Pendergrass.
17  Q   Pendergrass.  Okay.  Any and all documents
18  related to any social media communications
19  concerning Cedar; any of that?
20  A   No.
21  Q   No?  Okay.  Any and all documents related
22  to social media concerning Jessica Long?
23  A   No.
24  Q   All right.  And then same thing, social
25  media concerning the daughter?

Page 36

1   A   No.
2   Q   None.  All right.  Okay.  All right.
3       (Pause in proceedings.)
4   BY MR. GORDON:
5   Q   What is -- are you familiar with a group --
6   now, Lieutenant Fernandez testified that you
7   operated a group called Friends of the Fair; is that
8   accurate?
9   A   No.
10  Q   No?  Okay.  Do you know what he might have
11  meant by that if he meant something similar?
12  A   I have -- I have nothing to do with Friends
13  of the Fair on my --
14  Q   Okay.  It is a group?
15  A   Yes.
16  Q   Okay.  All right.  But it has nothing to do
17  with you?
18  A   No.
19  Q   You're not a -- not a volunteer?
20  A   No.
21  Q   Officer?  Board member?
22  A   No.
23  Q   No.  Okay.  All right.  Have you ever been?
24  A   No.
25  Q   No?  Okay.  All right.  All right.

Page 37

1 And have you ever -- what is the
2 relationship, as you understand it, between -- so
3 the fair every year has a Junior Livestock Auction,
4 correct? And it's -- it's the -- the children of
5 4-H are the exhibitors in it, correct?
6 A Yes.
7 Q And -- and what is your understanding of
8 the relationship between 4-H and the -- and the
9 fair? Like do they -- are they both doing the
10 auction together? Or what is -- how they -- what is
11 your understanding of who -- of that relationship?
12 A I don't understand what you mean.
13 Q Well, is the fair throwing the Junior
14 Livestock Auction or is, for example, or is -- or is
15 4-H throwing it with the permission of the fair?
16 A The Junior Livestock Auction --
17 Q Yeah.
18 A -- Board is respons- -- this is my
19 understanding --
20 Q Yeah, that's fine, yeah.
21 A -- is responsible of the auction.
22 Q Okay. And the Junior Livestock
23 Auc- -- board -- is that a board at the fair to your
24 knowledge?
25 A Yes.

Page 38

1 Q Okay. Do you know anyone who sits on that
2 board?
3 A No.
4 Q No? Okay. Do you -- let me ask again. Do
5 you know who does sit on the board, whether or not
6 you know them personally?
7 A All I know is it -- I'm not -- I think --
8 believe that B.J. Mcfarlane was one of 'em.
9 Q Okay.
10 A And I know Melanie was, because it still is
11 associated with the Shasta District Fair.
12 Q Okay. So you do know people on it then --
13 on the board?
14 A Yeah.
15 Q Okay.
16 A Yes.
17 Q Well, a moment ago you said you didn't, but
18 you do. Okay.
19 A (Indicating.)
20 Q All right. Okay. And how do you know
21 B.J. Mcfarlane?
22 A Through the Junior Livestock Auction.
23 Q Okay. How long have you known him?
24 A Approximately four years.
25 Q Approximately four years. Okay. And is

Page 39

1 the relationship professional? Are you social?
2 A Professional.
3 Q Professional. Okay. Do you ever see him
4 out -- do you ever see socialize with him?
5 A If we're at an event together and it's the
6 same event, yes.
7 Q Okay.
8 A I will go up and say hi to him.
9 Q Okay. Do you ever go out to dinner? Have
10 a drink? Or anything like that?
11 A Can you repeat that?
12 Q Have you ever gone out to dinner with him?
13 You and your husband, for example?
14 A No.
15 Q Been to his house?
16 A No.
17 Q Okay. Do you know where he lives?
18 A No.
19 Q No. Okay. All right. Okay. And you said
20 that -- well, that you were involved with 4-H
21 30 years ago -- or beginning 30 years ago, correct,
22 as a -- a community leader, correct?
23 A No.
24 Q No, you didn't say that?
25 A No.

Page 40

1 Q What did you say?
2 A I've never been the community leader.
3 Q Well, if --
4 A I was a parent and then I was a horse
5 leader.
6 Q Horse leader. Okay. I'm sorry. That's --
7 I'm not trying to trip you up. Horse leader. It
8 was some leader. Okay. All right. And that was
9 about 30 years ago.
10 Fernandez testified that -- that you would
11 frequently -- you know, kids would -- would present
12 to you -- you know, come to your business and
13 whatever and ask you to bid for their -- throughout
14 the years, he said this has been going on for
15 decades. Does that -- what he's describing predate
16 this -- your involvement as a -- a -- what was the
17 term? What leader at Happy Valley?
18 A Horse leader.
19 Q Horse. Thank you. As a horse leader at
20 4-H?
21 A They used to go to my parents' business
22 before that, so yes, it could predate that that I've
23 known of the auction.
24 Q Okay. So you've -- you've been bidding --
25 how long have you been bidding at these auctions?

Page 41

1  A   Thirty years approximately.
2  Q   Okay. So it -- it overlaps then with your
3  involvement? Okay.
4  A   Correct.
5  Q   Okay. All right. Okay. And how long have
6  you known Melanie Silva?
7  A   I don't -- whenever she first started
8  working at the fairgrounds.
9  Q   Do you know about when that was?
10  A   No.
11  Q   No. Okay. But it was when she started --
12  first started working?
13  A   Correct.
14  Q   Okay. Fair enough. And is it your
15  understanding that -- because she's the CEO now,
16  correct?
17  A   I believe so.
18  Q   Okay. Was B.-- was it your understanding
19  that B.J. Mcfarlane was her predecessor as CEO? Is
20  that -- I thought I saw it on- --
21  A   I believe so.
22  Q   -- online.
23      Okay. And same question with
24  Melanie Silva. Is your relationship purely, I
25  guess, professional, involved -- related to these

Page 42

1  activities at the fair with the 4-H?
2  A   Professional.
3  Q   Okay. All right. You don't ever go out to
4  dinner with her or socialize outside of that domain?
5  A   No.
6  Q   Okay. All right. Okay. Do you know
7  anyone who -- do you know who -- there's a board of
8  supervisors for the fair. Do you know anyone who's
9  on the board?
10  A   Now?
11  Q   Yes.
12  A   No.
13  Q   No? Okay.
14      You said now, so I'm assuming you used to
15  know people on the board?
16  A   Yes.
17  Q   Okay. When -- who do you know and when?
18  A   How far back do you want to go?
19  Q   Uh -- when did you -- okay. It's a lot of
20  people.
21  A   A lot of people that were associated on the
22  fair board were also business people that we knew or
23  my family knew.
24  Q   I see. Okay. So this could potentially go
25  back 30 years you've known people on the board

Page 43

1  there?
2  A   Yes.
3  Q   Okay. But you don't know anyone now?
4  A   No.
5  Q   No. Okay. All right. Okay. What is your
6  relationship with Brian Dahle?
7  A   Friends.
8  Q   You're friends? Okay. How long have you
9  been friends with him?
10  A   Approximately ten years.
11  Q   How did you meet him?
12  A   I can't recall.
13  Q   Okay. Was it -- was it through business
14  potentially?
15  A   I -- I can't recall.
16  Q   You don't have any recollection?
17  A   I mean, I don't -- I don't know if it was a
18  fundraiser event when he was running for office.
19  Q   Yeah.
20  A   I don't know when I first met him.
21  Q   Okay. So you might have met him at a
22  fundraiser?
23  A   Yes.
24  Q   Okay. All right. Okay. And you have you
25  ever campaigned for him?

Page 44

1  A   What do you mean by "campaigned"?
2  Q   I don't know. Campaign is a broad
3  definition, going out and trying to wrangle up votes
4  for him, vote for Dahle, hand people flyers,
5  anything like that?
6  A   I've hung a -- a banner up.
7  Q   Yeah. Okay. Did you work in his campaign
8  office ever?
9  A   No.
10  Q   No? Okay. How often do you see
11  Brian Dahle?
12  A   Once every three months.
13  Q   Sounds like that's on a schedule. Is that
14  for something specific?
15  A   No, it's just -- I happen -- about once
16  every three months, we talk on the phone.
17  Q   I see. I see. Okay. And -- okay. But
18  your relationship, you'd say, is -- is social?
19  You're not doing any business with him or anything
20  like that?
21  A   Correct.
22  Q   Okay. Are you friends with his wife
23  also?
24  A   Yes.
25  Q   Okay. How long have you known her?

---

Page 45

1 A Approximately the same amount of time.
2 Q Did you meet them at the same time?
3 A Yes.
4 Q Okay. Through -- you can't recall but
5 presumably some fundraiser?
6 A Yes.
7 Q Okay. All right. And same thing. Social
8 relationship, you're friends with her?
9 A Correct.
10 Q Okay. All right. Do you -- do you talk
11 with her every three months or so also?
12 A I probably talk to her more often than
13 Brian. So probably one every six weeks I talk to
14 Megan.
15 Q Okay. Have you have spoken to them about
16 this case? Or let's say, have you spoken to
17 Brian Dahle about this case?
18 A Yes.
19 Q What did you discuss?
20 A When it first happened, I first told him
21 that he was the one who purchased the animal.
22 Q You told him he was the one that purchased
23 the animal.
24 A And then donated it back to the barbecue.
25 Q Okay. What was his reaction?

---

Page 46

1 A To what?
2 Q You saying that.
3 A The reaction to that he is purchased the
4 animal?
5 Q Yeah. How did he respond to your statement
6 when you said -- you told him?
7 A As long it helped a child that needed help
8 selling her animal, that was great.
9 Q Did he -- what else did you say to him on
10 this call?
11 A When it fir- -- when I first told him, that
12 was all that was said then because we didn't know
13 that it was --
14 Q Oh, you didn't know there was an issue at
15 that point?
16 A Correct.
17 Q Gotcha. Okay. Did you speak with him
18 after -- well, that's what I said, did you speak to
19 him about the case.
20 Okay. So what was your next communication
21 with him related to this event?
22 A When we -- say that again.
23 Q Sure. You said you spoke with him that --
24 that he had made a purchase of the animal. I
25 assumed that was around, you know, June 25th, 2022.

---

Page 47

1 And you said it was just informing him that he made
2 a purchase and letting him know. And -- but
3 afterwards, obviously, Cedar was removed, did you
4 have any conversations with at that point him about
5 that?
6 A Yes, I did.
7 Q Okay. What did he -- what did you tell him
8 and what did he say to you?
9 A I told him technically he didn't at the
10 time own the animal because it was signed off to the
11 community barbecue.
12 Q Okay. All right. And what did he say?
13 A I can't recall what he said after that.
14 Q So he had no -- okay. Did he agree with
15 you?
16 A Yes.
17 Q You don't -- you just mean you don't know
18 his exact verbiage, but he communicated agreement in
19 some way or another?
20 A Correct.
21 Q Okay. And what date was that?
22 A Approximately five days after that incident
23 happened.
24 Q So it would have been like June 30th or so.
25 Okay? Did you -- okay.

---

Page 48

1 So did you have any conversations with him
2 after that point about this matter?
3 A Possibly. I -- we talk about quite a few
4 things.
5 Q Do you remember any?
6 A I just told him it was still an ongoing
7 case.
8 Q An ongoing case. What do you -- what did
9 you mean by that?
10 A He asked me if anything had happened with
11 it, and I said it's still ongoing last I heard, and
12 that was approximately four months ago.
13 Q Okay. Did you have any conversations with
14 him about for matter between the time of June 30th
15 to, let's say, August 31st, which is the date the
16 lawsuit was filed?
17 A Conversations regarding what?
18 Q Regarding Cedar, Jessica Long, anything
19 like that? His -- the bid you were just talking
20 about?
21 A No.
22 Q No? Okay. So from June 30th to the date
23 the suit was filed, no conversations with him?
24 A Not that I recall.
25 Q Okay. Did you have any conversations with

---

Page 49

1 him after the lawsuit was filed about -- about the
2 matter?
3 **A   We had one conversation, yes, and I told**
4 **him the lawsuit had been filed.**
5 Q   Did you say anything else?
6 **A   No.**
7 Q   So you just called him up and said, "the
8 lawsuit's filed," hung up?
9 **A   We talked about other things in between**
10 **that about different things, not just the lawsuit.**
11 Q   Okay.
12 **A   But I said, yes, the lawsuit has been**
13 **filed.**
14 Q   And what was his response?
15     You said, "yes." Did he ask you a question
16 about it?
17 **A   No.  I -- that's what I --**
18 Q   You just volunteered it.
19 **A   Yes.**
20 Q   Okay.  And what was his reaction?
21 **A   I don't recall exactly what his words were.**
22 Q   You don't recall.  Okay.  Can you estimate
23 what his words were?
24 **A   No.**
25 Q   No.  Okay.  All right.  Was it glee or --

Page 50

1 **A   No.**
2 Q   No?  Okay.  You seem sure about that.  Did
3 he --
4 **A   I -- I -- no.  Yes, it was not glee.**
5 Q   It was not glee.  Was he upset?
6 **A   I -- I don't recall if he was upset or not.**
7 Q   Okay.  But you recall he wasn't gleeful.
8 **A   Correct.**
9 Q   Okay.  All right.  Okay.  But no other --
10 no other facts pop out about -- about the call?
11 **A   No.**
12 Q   Okay.  All right.  Okay.  And did you speak
13 with Megan Dahle after -- let's say -- you said you
14 spoke with -- about June 30th about the bid with
15 Brian Dahle.  Did you speak with her at the same
16 time saying -- because she was a bidder as well,
17 correct?
18 **A   Correct.**
19 Q   Okay.  So did you speak with her about the
20 same time to inform her of the bid?
21 **A   No.**
22 Q   No.  Okay.  And did you speak with her
23 after Cedar -- after the dispute arose, let's say,
24 after Cedar was removed, did you -- did you speak
25 with Megan Dahle then at all?

Page 51

1 **A   I believe they were both on speaker phone**
2 **with me.**
3 Q   Okay.  Did you typically talk with them on
4 speaker phone?
5 **A   Its depends on the time of day I call 'em.**
6 Q   I see.  Okay.  Okay.  And did you have any
7 conversations with Megan Dahle since the lawsuit was
8 filed about the lawsuit?
9 **A   Yes.**
10 Q   Okay.  And when were they?
11 **A   I can't recall exactly which days.**
12 Q   Okay.  Give me your -- give me your best
13 estimates.
14 **A   I couldn't even give you an estimate.  It**
15 **was similar to the same thing with Brian.**
16 Q   Well, that's an estimate.  So about -- so
17 sometime in August of 2022 --
18 **A   Correct.**
19 Q   -- or September of 2022?
20     Okay.  All right.  Look, you might not
21 remember exactly correctly, but you have to tell me
22 your best estimate.
23     So August of 2022 or September of 2022 you
24 spoke with Megan Dahle.  And did you speak with her
25 and Brian at the same time?

Page 52

1 **A   Yes.**
2 Q   And did she -- what was her reaction?
3 **A   I can't recall.**
4 Q   Okay.  But was it not gleeful?
5 **A   It was not gleeful.**
6 Q   Okay.  Was -- no comments come to mind at
7 all?
8 **A   No.**
9 Q   Okay.  Okay.  All right.  Okay.  And no --
10 did you say anything like this is -- this is bogus
11 or this is not true or this is inaccurate, anything
12 like that?
13 **A   I told him it was very inaccurate because**
14 **the goat was stolen.**
15 Q   The goat was stolen.  Okay.  All right.  So
16 you did tell them something?  What did they say to
17 that?
18 **A   They agreed.**
19 Q   They agreed the goat was stolen.  Okay.
20 All right.  And did they say anything else after
21 agreeing that the goat was stolen?
22 **A   No.**
23 Q   Okay.  All right.  So how long have you
24 known Lieutenant Jerry Fernandez?
25 **A   I met Jerry Fernandez during this**

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

Page 53

1  investigation.
2  Q    You didn't know him beforehand?
3  A    No.
4  Q    Okay.  All right.  You knew his wife,
5  though, correct?
6  A    Correct.
7  Q    Okay.  But you did not know him?
8  A    No.
9  Q    You knew of him?
10  A   I didn't even know his name.
11  Q   But you knew she -- okay.  So you didn't
12  know --
13  A   I --
14  Q   -- her husband was in law enforcement?
15  A   No.
16  Q   Okay.  All right.  Okay.  So you met him
17  during this investigation?
18  A   Yes.
19  Q   Have you talked to him since -- -- since
20  you met him about the -- strike that.
21        When was the last time you spoke with him?
22  A   July.  July -- mid July.
23  Q   Mid July.  Okay.  Of this -- of this year?
24  A   '22.
25  Q   '22.  Okay.  You haven't spoken to him

Page 54

1  since?
2  A   No.
3  Q   Okay.  All right.  And where did you speak
4  with him mid July of 2022?
5  A   Did you say "where"?
6  Q   Yeah.
7  A   Where was he?  Where was I?
8  Q   Yeah.
9  A   I couldn't tell you where I was at.
10  Q   Okay.  All right.
11  A   It was on the phone.
12  Q   It was on the phone.  Okay.  He testified
13  he spoke to you at the fair briefly this year, but
14  it was not --
15  A   I --
16  Q   -- nonsubstantive?
17  A   Correct.
18  Q   Okay.  And you have to --
19  A   I -- I apologize.  I forgot I saw him at
20  the fair.
21  Q   Okay.  Any other times?
22  A   No.
23  Q   Okay.  All right.  And what did you say to
24  him at the fair?
25  A   I can't recall what I told -- what I talked

Page 55

1  to him about at the fair.
2  Q    Did you try and talk to him about this
3  case?
4  A    I don't believe so.
5  Q    You don't believe.  He thought you did?
6  A    I -- I don't recall.
7  Q    All right.  Okay.  You don't recall.  But
8  you recall that you did speak with him and it was a
9  short conversation?
10  A   Yes.
11  Q   Okay.  Fair enough.  Was anyone else there?
12  A   When we were speaking?
13  Q   Yes.
14  A   Yes, there was.
15  Q   Who else was there?
16  A   I -- there was other people standing there.
17  I don't --
18  Q   But not in your immediate conversation?
19  A   No.
20  Q   Okay.  Husband wasn't there?
21  A   No.
22  Q   Kids weren't there?
23  A   No.
24  Q   His wife wasn't there?
25  A   Not that I recall, no.

Page 56

1  Q    Okay.  All right.  His kids weren't there?
2  A    I don't recall seeing his children right
3  there, no.
4  Q    Okay.  All right.  Okay.  And what is your
5  relationship with Sheriff Michael Johnson?
6  A    I don't know him.
7  Q    You do not know him?
8  A    No.
9  Q    Okay.  But you know who he is, but --
10  A   Yes.  I -- I don't know him.
11  Q   You've never met him.  Okay?
12        THE COURT REPORTER: Can you slow down a
13  little, please?
14        MR. GORDON: Yes.
15  BY MR. GORDON:
16  Q    You've never spoken with him on the phone
17  or sent him an e-mail or anything like that?
18  A    No.
19  Q    No.  Okay.  And I think I asked you this
20  before, but you didn't -- you've never met
21  Detective Duncan, correct?
22  A    Correct, I have not met him.
23  Q    Okay.  But you know of him because of the
24  lawsuit, no doubt?
25  A    Correct.

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

---

Page 57

1   Q   And same with Jeremy Ashbee, you've never
2   met him but you know him because of the lawsuit?
3   A   Correct.
4   Q   Okay.  All right.  Okay.  Does anyone else
5   in the sheriff's department that you are -- that you
6   have a relationship with, business or social?
7   A   I don't think so.
8   Q   You don't think so.  Any -- you don't know
9   any --
10  A   There's a lot of sheriff's department.
11  I -- I --
12  Q   In Shasta.
13  A   But there's a lot of officers in that
14  sheriff's department.
15  Q   Well, do you know some of them?
16  A   I -- not off the top of my head, no.
17  Q   Not off the top of your head.  Okay.  Okay.
18  And have you ever met Jessica Long personally?
19  A   Not that I can recall.
20  Q   Okay.  Did you ever meet her daughter
21  personally?
22  A   Not that I know of.
23  Q   Okay.  Have you ever reviewed the Complaint
24  in this matter?
25  A   The Complaint that I was served with?

---

Page 58

1   Q   Yes.
2   A   Yes.
3   Q   Yes.  Okay.  You reviewed that.
4       And you reviewed -- did you review any
5   prior versions before you were served?
6   A   No.
7   Q   No?  Okay.  All right.  So --
8   A   Yes.
9   Q   Okay.
10  A   There was one -- I believe there was one on
11  the Record Searchlight.
12  Q   Okay.  You -- and you read that Complaint?
13  A   And I read that, yes.
14  Q   Okay.  All right.  Okay.  Okay.  All right.
15  Why don't we take five and use the restroom.
16      THE VIDEOGRAPHER: We're off the record and
17  the time is 9:53.
18      (Whereupon, recess was taken from
19      9:53 a.m. to 10:02 a.m.)
20      THE VIDEOGRAPHER: We're back on the record
21  and the time is 10:02.
22      MR. GORDON: Give me one moment, guys.
23  Okay.
24      What was my last question, Miss Madam
25  Reporter?

---

Page 59

1       MR. SNOWDEN: You asked whether the witness
2   had seen the Complaint, she indicated that she had
3   read the Complaint when it was served on her, and
4   she had also seen a prior version in the Record
5   Searchlight.
6       MR. GORDON: Are you transcribing
7   everything --
8       THE COURT REPORTER: Correct?
9       MR. SNOWDEN: I take notes.
10      MR. GORDON: Really good.  Good for you.
11  Were you a court reporter before?
12      MR. SNOWDEN: I've just been at this a long
13  time.
14      MR. GORDON: Yeah, but still -- that's --
15  all right.  Good for you.
16  BY MR. GORDON:
17  Q   All right.  Okay.  So the 2022 fair goes on
18  for several days, correct?  It's, I think, it's June
19  21st through the 25th or thereabouts.  Did you
20  attend every day?
21  A   No.
22  Q   Okay.  What days did you attend?
23  A   Saturday, whatever day that was.
24  Q   So just for the Junior Livestock Auction?
25  A   Correct.

---

Page 60

1   Q   Okay.  And did you register to bid?
2   A   Yes.
3   Q   Okay.  Did you fill out -- do you remember
4   what form you filled out?
5   A   For who?
6   Q   Well, I mean, just have you seen document
7   before?  This will be Exhibit B.
8   A   Yep.  Yes.
9   Q   All right.  And did you -- Kelly, do you
10  need to see it?
11      MR. SNOWDEN: I can look it up.
12      MR. GORDON: Okay.  You can have that copy.
13  This is Exhibit B if you want.
14      (Exhibit B was marked.)
15  BY MR. GORDON:
16  Q   All right.  On the second page, there's
17  a -- there's an absentee buyer form.
18  A   Yes.
19  Q   Do you know if the Dahle's filled that out?
20  A   No.
21  Q   Okay.  You don't know or they did not?
22  A   I did not fill one out for them, no.
23  Q   Okay.  All right.  Any particular reason?
24  A   No.
25  Q   All right.  Okay.  But they let you bid

---

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

Page 61

1  nonetheless --
2  **A   Yes.**
3  Q   -- on their behalf?  Okay.  All right.
4      So how -- walk me through this if you
5  understand.  How is the proper procedure?  The
6  Dahle's fill this out and then you are deemed their
7  bidder at the -- at the auction?  Is that how it's
8  supposed to work?  You're smiling.  What's so funny?
9  **A   Do you want me to elaborate a little bit?**
10  Q   Yes.  Oh, you're asking him.
11  **A   No.**
12      MR. SNOWDEN: To the extent you can respond
13  to the question, go ahead.
14      THE WITNESS: Some people I bid for do not
15  have that filled out.
16  BY MR. GORDON:
17  Q   Okay.  Okay.  Were the Dahle's supposed to
18  fill this out?
19      MR. SNOWDEN: Question may lack foundation.
20  Calls for speculation.
21      If you understand the question, I don't
22  know who would dictate that but, if you do, go
23  ahead.
24      THE WITNESS: If they're previous buyers,
25  I'm responsible at the fair for whoever I buy for.

Page 62

1  If they don't pay for the animal, I have to.  So the
2  people I know and trust, a majority of 'em, I do not
3  have -- I do not fill the second page out and give
4  it to the fairgrounds.
5  BY MR. GORDON:
6  Q   Okay.  So this was your judgment call
7  then --
8  **A   Correct.**
9  Q   -- because you trusted the Dahles is what
10  you're saying?
11  **A   Correct.**
12  Q   Did they give you any -- have the Dahles --
13  strike that.
14      What did the Dahle's provide to you -- to
15  you that provided you -- what did the Dahle's
16  provide to you that gave you authority to bid for
17  them?
18  **A   A phone call.**
19  Q   A phone call.  Anything else?
20  **A   No.**
21  Q   When was this phone call?
22  **A   I believe it was the day before the**
23  **auction.**
24  Q   Okay.  Who did you speak to?  Brian or
25  Megan?

Page 63

1  **A   I believe I spoke to Eric.**
2  Q   Who's Eric?
3  **A   Megan's -- I don't know what his title is.**
4  **He works for Megan.**
5  Q   Like a handler or something or -- I don't
6  know.  What is -- what is his role?
7  **A   He -- he works for Megan in the -- in the**
8  **Assembly.**
9  Q   He works for Megan in the Assembly.
10  **A   Yes, he is her right-hand person in her**
11  **business.  I don't know what his title is.**
12  Q   Okay.  Gotcha.  Someone like her chief of
13  staff or something like that?
14  **A   Correct.**
15  Q   That is his title?
16  **A   I believe so.**
17  Q   Okay.  So Eric told you this.  You didn't
18  actually speak with Megan?
19  **A   No.**
20  Q   Okay.  What about for -- what gave you
21  authority to bid for Brian?
22  **A   Eric.**
23  Q   He's both their chief of staff?
24  **A   Not.  But he gave me authority for both of**
25  **them.**

Page 64

1  Q   How did he do that?  He doesn't work for
2  him.
3  **A   Because Brian told him to tell me to go**
4  **ahead and bid for him, too.**
5  Q   How do you know -- he told you Brian
6  said --
7  **A   Yes.**
8  Q   -- Brian told me to tell you.
9  **A   Yes.**
10  Q   Okay.  You remember that detail?
11  **A   I do remember that detail.**
12  Q   Okay.  All right.  But you don't remember
13  your conversations with Brian other than he
14  wasn't -- wasn't gleeful.
15      MR. SNOWDEN: Well, hold on.  That's not to
16  question.  That's a statement.
17      MR. GORDON: Yeah.
18      MR. SNOWDEN: Do you have a question you
19  want to ask her?
20  BY MR. GORDON:
21  Q   I'm getting to it.
22      Okay.  So they gave you authority to bid in
23  your mind and -- and -- okay.
24      Did you fill out this absentee buyer form
25  for anyone that you bid for ever?

Page 65

1    A    Are you talking about since I originally
2 started --
3    Q    Yeah.  Yeah.  Have you ever filled out this
4 form?
5    A    Yes.
6    Q    Is it the same every year?
7    A    Yes.  Well, I believe it is.  I --
8    Q    Oh, sure.  Yeah, I know you don't have
9 every form there.  But, in substance, it's basically
10 the same every year?
11   A    Yes.
12   Q    Did you fill it out for any other -- well,
13 let me see.  Did you bid -- were you bidding for
14 anyone else this year apart from the Dahles?
15       MR. SNOWDEN: Let me.  When you say "this
16 year," this is --
17 BY MR. GORDON:
18   Q    Sorry.  You're correct.  Okay.  I'll
19 rephrase.
20       At the Junior Livestock Auction of 2022
21 where this event occurred, did you bid on anyone
22 else's behalf except for the Dahles --
23   A    Correct.
24   Q    -- or besides the Dahles?  Who else?
25   A    You want to names of all of them?

Page 66

1    Q    Actually, I don't.  It's fine.
2        Did -- did you fill out --
3    A    There's about 26 other people.
4    Q    Did you fill out this form for any of them
5 or --
6    A    No.
7    Q    -- had any of them -- so none of them did.
8        Did you get phone calls from all of them?
9    A    Most of them, yes.
10   Q    But some of you didn't?
11   A    Some of 'em had -- some of 'em might have
12 texted me.  I mean, I bid for people.  I may have
13 called them.  Most of the people I bid for are
14 previous people that have bid before.
15   Q    Okay.  When was the last time that you
16 filled out one of these forms or when one of the
17 buyers filled out one of these forms for you?
18   A    I don't recall.
19   Q    You don't recall.  Within the last five
20 years of auction?
21   A    I -- it all depends and if it's a new
22 buyer.  I -- I don't recall.
23   Q    Well, so you bid for Brian Dahle these --
24 before this year?
25   A    Yes.

Page 67

1    Q    Okay.  When did you first start --
2    A    Before this year?
3    Q    Yeah.  No, you're correct.  Before
4 the 2022 year.
5    A    Yes.
6    Q    Okay.  How many times have you bid for him
7 prior to that year?
8    A    Approximately four.
9    Q    Approximately four.  Okay.  And same for
10 Megan?
11   A    No.
12   Q    You -- more bids for her?
13   A    No.  More bids for Brian.
14   Q    Okay.  How many for Megan?
15   A    Approximately two.
16   Q    Approximately two.  Okay.  Okay.
17       (Vibrating phone interruption.)
18 BY MR. GORDON:
19   Q    Is that you?  Okay.  You needed to take it?
20   A    No.
21   Q    You sure?  Okay.
22   Q    Did you -- did the Dahles fill out this
23 form for you in any other years?
24   A    I don't recall.
25   Q    Don't recall.  Okay.  So they might not

Page 68

1 have?
2        MR. SNOWDEN: Don't guess or speculate if
3 you don't know.  But did you have a recollection,
4 you can you provide it.
5        THE WITNESS: I don't recall if I've ever
6 filled one out for them or not.
7 BY MR. GORDON:
8    Q    Okay.  All right.  That wasn't -- so they
9 might not have then, correct?
10   A    Correct.
11   Q    Okay.  Where do the signed forms go?  Do
12 you know?  Do you --
13   A    I believe they go to the fairgrounds
14 office.
15   Q    Okay.  So there's -- okay.  So you don't
16 restrain this for your -- do you retain any of these
17 forms when someone fills 'em out for you to bid?
18   A    Yes.
19   Q    Okay.  So you have --
20   A    Sometimes I retain 'em.  I don't turn 'em
21 in.
22   Q    Sometimes you retain them and don't turn
23 them in.
24   A    Correct.
25   Q    How does the fair know then that you're

---

Page 69

1  supposed to bid on someone's behalf?
2  **A    Because I tell them I am and they trust**
3  **that I --**
4  Q    And they trust you?
5  **A    -- am and I sign for it.**
6  Q    Okay.  And they just -- they just trust
7  you?  Okay.
8  **A    Correct.**
9  Q    Okay.  So the fair -- the fair at this
10  point knows who you are --
11  **A    Correct.**
12  Q    -- is what you're saying?  Okay.  Okay.
13       Did you -- you said you might -- is there a
14  place that -- oh.  You mentioned that you saved some
15  of these forms.  Is it possible you still have the
16  original form that you filled out for the Dahles?
17  **A    No.**
18  Q    No?  And what -- how do you know if you
19  haven't checked?
20  **A    I -- I don't keep 'em.**
21  Q    You said a moment ago you keep them
22  sometimes.
23  **A    No, I -- well, you didn't ask me for how**
24  **long.**
25  Q    How -- how long do you keep them?

---

Page 70

1  **A    I -- I don't.  After the fair when**
2  **everybody gets their bills, if everybody's fine with**
3  **their bills, I chuck everything.**
4  Q    Okay.  So by "keep them," you meant that
5  you just -- you retain them during the fair and
6  just --
7  **A    Correct.**
8  Q    -- don't turn them into the office?
9  **A    Correct.**
10  **THE COURT REPORTER:** Okay.  Slow down a
11  little, please.
12  BY MR. GORDON:
13  Q    Sure.
14       Are they saved by your knowledge -- or to
15  your knowledge by the fair at all if they are turned
16  in?
17  **A    I have no knowledge.**
18  Q    You have no -- okay.  All right.  Okay.
19       All right.  So on the day of the fair, you
20  said you bid for -- you bid for -- you said it 26
21  people; is that what you said?
22  **A    Which fair?**
23  Q    The '22 fair.  I'm only talking about the
24  '22 fair, so assume that I am.  On the record, I'm
25  only -- if it's a different fair, I will specify.

---

Page 71

1  We don't need to say -- you know, slow things down
2  with that.
3       In the '22 fair, did you -- you bid for --
4  did you say, 26 other people?
5  **A    Approximately.**
6  Q    Approximately 26 other people.  Okay.  All
7  right.  And you bid for -- and you bid on Cedar,
8  correct?
9  **A    Yes.**
10  Q    Did you know going into the fair you were
11  going to bid on him?
12  **A    No.**
13  Q    No.  Okay.  Was there anything special or
14  unique about him?
15  **A    No.**
16  Q    No?  Just a goat.  Okay.
17  **A    Correct.**
18  Q    Okay.  All right.  Did you bid on any other
19  goats that day?
20  **A    Yes.**
21  Q    Were you the successful bidder on all of
22  'em?
23  **A    Not all of 'em, no.**
24  Q    Oh, you got outbid, huh?  All right.
25       Okay.  So I'm going to show you some

---

Page 72

1  documents.  Start with -- start with these -- this
2  one.  So this -- this is -- your name is on it.
3  It's from the fair.  I just want to make sure I give
4  you the correct one.  Six, seven -- okay.  All
5  right.  I think these go in tandem.  You tell me if
6  you disagree.  But this will be -- these will be
7  Exhibit -- what are we on -- C?
8       **THE COURT REPORTER:** C.
9       (Exhibit C was marked.)
10       MR. GORDON:  Yeah.  All right.  Kelly, I
11  will give you a copy in a moment.
12       MR. SNOWDEN:  Sure.
13  BY MR. GORDON:
14  Q    Now these are Bates stamped 00001.  They're
15  not from any defendants in this matter.  They're
16  from a public records request, but I believe they
17  were also in -- in the sheriffs's production as
18  well.
19       Do you recognize these documents, Ms. Muse?
20  **A    Yes.**
21  Q    Were you privy to them the day of the fair
22  or have you just seen them since?
23  **A    We don't have a bill at the day of the**
24  **fair.**
25  Q    Okay.  All right.  All right.  So were

---

Page 73

1 these sent to you afterwards?
2 A   Correct.
3 Q   Okay.  So these were actually sent to you.
4 Can you describe to me what they are?
5 A   Yeah.  Looks like a -- bill for the
6 Junior Livestock Auction on the animals that Brian
7 and Megan Dahle bought.
8 Q   Okay.  And this is dated July 5th.  On both
9 of them it says July 5th.  Did you receive this bill
10 around July 5th?
11 A   The print date is July 6th, so I couldn't
12 have received it on the 5th.
13 Q   Fair point.  Did you -- okay.  Did you
14 receive -- but you received copies of these
15 presumably in the mail?
16 A   Those, I believe, I would've gotten an
17 e-mail because my address isn't on 'em.
18 Q   Okay.  So you would have gotten these
19 e-mailed.  Okay.
20 A   Possibly, yes.
21 Q   Did you save that e-mail at all?
22 A   I -- I don't even know if they were
23 e-mailed to me.  I might have picked them up at the
24 fairgrounds office.
25 Q   Okay.  Okay.

Page 74

1 A   But I have I seen the bills, yes.
2 Q   When would you have picked these up at
3 the fairgrounds office?
4 A   I do not believe it's in July.  It would
5 have been more like August.
6 Q   Okay.  All right.  So at that -- so
7 these are for -- looks like it's a blend of bids
8 here, right?  So Cedar is 367, correct?
9 A   I don't know which one Cedar is.
10 Q   Well, I'll represent to you that he's 367.
11 So there's more than one animal being sold
12 on these bills, correct?
13 A   Correct.
14 Q   Okay.  All right.  So as of July 6th,
15 you -- what day do you pay these bills?
16 A   I have not paid these bills.
17 Q   You have not paid these bills?
18 A   No.
19 Q   So you --
20 A   I would have sent those to Brian Dahle's
21 office.
22 Q   I'm sorry.  Explain what you mean.  You --
23 A   They would have gave -- given me the bills
24 because there's no address on them --
25 Q   Okay.

Page 75

1 A   -- and I would have forward them to the
2 Dahles for the Dahles to pay the bill.
3 Q   As of this date then the Dahles had not
4 paid the bill then, correct?
5 A   I don't know.
6 Q   You don't know.
7 A   I -- I'm not --
8 Q   You wouldn't know.
9 A   -- the bookkeeper.
10 Q   I understand that.  But if they're still
11 outstanding on this date, this would communicate to
12 you that the bill was still outstanding as of
13 July 6th, correct?
14 A   Well, as of July 6th, yes, it was
15 outstanding, yes.
16 Q   Okay.  Okay.  So Cedar hadn't been
17 purchased -- or the bid hadn't been paid for by that
18 date.  That's all I'm asking.  It's not a trick
19 question.
20 A   I'm -- I'm assuming since it was a print
21 date that says there's a balance due, yes.
22 Q   Okay.  Okay.  All right.  That's fine.
23 Okay.
24       All right.  I'm going to give you another
25 document.  Same document.  Give me one second,

Page 76

1 Ms. Muse -- Mrs. Muse.  I'm sorry.
2       (Pause in proceedings.)
3       MR. GORDON: All right.  I don't think
4 that -- I don't know what that document is so --
5 okay.  So I'm going to hand you another document.  I
6 should get one for your attorney also.
7       Madam Court Reporter, what exhibit are we
8 up to?
9       THE COURT REPORTER: D.
10       MR. GORDON: D.  So this will be Exhibit D.
11       (Exhibit D was marked.)
12 BY MR. GORDON:
13 Q   Have you seen this document before?
14       Yes.
15 Q   Okay.  Did you fill that document out?
16 A   Which portion?
17 Q   Any portion.
18 A   Yes.
19 Q   What did you fill out on there?
20 A   I circled donate to the FFA/4-H Barbecue --
21 Q   Okay.
22 A   -- and I wrote my name.
23 Q   Okay.  And you wrote your name.
24       Who filled out the top part?  Senator
25 Brian Dahle and Assemblywoman Megan Dahle?

Page 77

1   A   I don't know who filled it out.
2   Q   So someone just handed this -- when you
3   filled the bottom out, do you know what date that
4   was?
5   A   It would be the date of the auction.
6   Q   The date of the auction? Okay.
7   A   Uh-huh.
8   Q   All right. So someone handed this to you
9   that day?
10  A   Yes.
11  Q   Okay. All right. Do you remember who
12  handed it to you that day?
13  A   One of the runners for the Junior Livestock
14  Auction.
15  Q   Okay. One of the -- do you remember which
16  one?
17  A   No, I don't.
18  Q   No. Okay. All right. And -- okay. So
19  they hand these out the days of the fair,
20  presumably, to everybody bidding?
21  A   They hand it out as soon as the animal
22  sold.
23  Q   Okay. Gotcha. So you -- so after that,
24  you circled this and signed your name. Okay. All
25  right.

Page 78

1       Did you retain a copy of this sales
2   invoice?
3   A   For how long?
4   Q   Well, you tell me. How long did you retain
5   it?
6   A   Approximately two weeks.
7   Q   Approximately two weeks. Okay. All right.
8   So you don't have it any longer?
9   A   No.
10  Q   Okay. All right. Okay. Did you -- how
11  did you -- this is an e-mail to you, correct? This
12  is just a hard copy?
13  A   That's a hard copy I received at the fair.
14  Q   Did you receive an e-mail at all --
15  A   No.
16  Q   -- as well?
17      Okay. Fair enough. How did you discard
18  it? Just throw it away?
19  A   Yep.
20  Q   Okay. Moving right along. So on the
21  bottom here -- now, when the dispute arose, it's
22  your contention that -- you tell me if I'm wrong.
23  It's your contention that the Dahles purchased it
24  and then it became property of you or -- or the 4-H
25  barbecue?

Page 79

1   A   The 4-H/FFA community barbecue.
2   Q   All right. That's what I'm talking about.
3   Okay. So it became that -- that property
4   instantaneously. That's your --
5   A   Correct.
6   Q   Okay. That's your understanding. Okay.
7   And so you, when you did this work, because the
8   bottom of this document says you're authorized --
9   you're authorized to sign and purchase for it. It
10  doesn't mean that you're the owner. By the
11  signature line at the bottom, it says, "I certify I
12  am authorized to sign for this purchase and accept
13  responsibility for total payment due and/or
14  collection of the total amount due."
15      So your contention is not that by signing
16  you became the owner. Your contention is that the
17  barbecue became the owner because he -- he donated
18  the cuts of meat whenever they arrived to the
19  barbecue --
20  A   Correct.
21  Q   -- that's correct?
22      Okay. All right. Okay. So have you had
23  any training in law of assignments?
24  A   No.
25  Q   How about contracts in general?

Page 80

1   A   No.
2   Q   Okay. Are you familiar with a minor's
3   right to disaffirm a contract?
4   A   No.
5   Q   You never -- you never heard of that?
6   A   No.
7   Q   Okay. You're familiar with the concept of
8   efficient breach?
9   A   No.
10  Q   Okay. All right.
11      THE COURT REPORTER: Can you repeat that
12  one again?
13      MR. GORDON: I said, are you familiar with
14  the concept of efficient breach?
15  BY MR. GORDON:
16  Q   Okay. A few other fair documents for you.
17  If you can maybe tell me what they are.
18      I apologize, Mrs. Muse. I'm just trying to
19  figure out something on the document before I hand
20  it to you. Ah. Okay.
21      All right. So -- here, take a look at this
22  document. That will be Exhibit E.
23      (Exhibit E was marked.)
24  BY MR. GORDON:
25  Q   Have you seen the document before?

**Page 81**

1  A   No.

2  Q   No?  Okay.  All right.

3      MR. SNOWDEN:  Did you need to describe it

4  on the record?

5      MR. GORDON:  Yeah, I'm gonna.  In fact, I'm

6  handing you a copy now, Kelly.

7  BY MR. GORDON:

8  Q   I just handed a document, Exhibit E.  It --

9  it purports to be some document from the Shasta

10  Fair.  Ms. Muse is saying she hasn't seen it.

11      If you go to Exhibit D that I handed you a

12  moment ago, Ms. Muse, you'll notice the entry number

13  on that is 1543.

14      So the entry on the document I just gave

15  you as Exhibit D is also 1543.  Would that -- would

16  suggest it applies to -- that Cedar is 1543.  It

17  suggests this is some -- the document -- Exhibit E

18  is some entry from the fair with respect to Cedar.

19  That's how I -- I read that.  Is -- are the amounts

20  that you paid for -- that you bid for Cedar, the

21  $419.43, is that times two?  I don't know.  What's

22  that?  Eight-thirty- -- what's it come out to?

23  838.86, that was the bid amount for Cedar, correct?

24  A   Yes.

25      Okay.  All right.  But this document is --

**Page 82**

1  but you've never seen this before.  They don't send

2  this to you?  The Exhibit E?

3  A   No.

4  Q   All right.  Okay.  That's fine.  Okay.  Did

5  you -- so you brought in -- you brought in this

6  document, which is a flyer from the 4-H Community

7  Barbecue fair.  Let's make this Exhibit --

8  Exhibit G.

9      I have a copy already, Kelly, so...

10      MR. SNOWDEN:  We don't have F yet.

11      MR. GORDON:  You're right; I skipped F.

12  Exhibit F.  Thank you.

13  BY MR. GORDON:

14  Q   And are these one document, Ms. Muse, these

15  two pages?

16  A   These are the tickets.

17  Q   These are the tickets.

18  A   This is the flyer.

19  Q   Okay.  All right.  So you just made copies

20  of the tickets?

21  A   Yes.

22  Q   All right.  Understood.  So --

23      THE COURT REPORTER:  Which do you want to

24  mark?  Is that F then?

25      MR. GORDON:  This will be F, yes.

**Page 83**

1      THE COURT REPORTER:  Okay.

2      (Exhibit F was marked.)

3  BY MR. GORDON:

4  Q   Okay.  So what did you -- so Cedar -- it's

5  your position Cedar was donated to that barbecue

6  that is referenced on Exhibit F, correct?

7  A   Correct.

8  Q   And what did you do to -- with respect to

9  that barbecue?  Were you an organizer of it?

10  A   Correct.

11  Q   Okay.  Who else organized it with you?

12  A   You want their names?

13  Q   Yes, please.

14  A   Larry Forero, John Paradis, and myself.

15  Q   Earlier, you mentioned Forero.  He -- and

16  he works at the 4-H office, correct?

17  A   I don't know if he works for the 4-H, but

18  he works for the university.

19  Q   Hmm.  At the extension center.

20  A   Yes.

21  Q   That's what it's called?  Okay.

22      And Paradis also, is he at that office?

23  A   No.

24  Q   No?  Where is he?

25  A   I believe he's retired.

**Page 84**

1  Q   Retired.  Okay.  So is he a volunteer like

2  you?

3  A   Yes.

4  Q   Okay.  Okay.  So -- so just you three,

5  that's it, that were organizing the barbecue?

6  A   And Sherry Pendergrass.  She's the

7  bookkeeper.

8  Q   Okay.  Who do you -- who did you report to

9  in organizing this?  Do you have a superior?

10  A   No.

11  Q   No?  Okay.  So you were in charge of it?

12  A   It's just the three of us.

13  Q   Okay.  All right.  All co-equal in your

14  organizational --

15  A   Correct.

16  Q   -- responsibilities and decisionmaking

17  authority?

18  A   Correct.

19  Q   Okay.  So you all -- so based off the

20  flyer, you all sold tickets for it, correct?

21  A   Correct.

22  Q   And you sold them at your -- at Muse

23  Trucking at the office?

24  A   Yes.

25  Q   Yeah.  Okay.  All right.  And where does

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

---

Page 85

1  the money go?  I'm not accusing you of pocketing it.
2  I'm just curious where it goes.
3      A    It goes to all the 4-H clubs and FFA clubs
4  that participate in the barbecue and sell tickets.
5      Q    Gotcha.  All right.  So here, some would
6  have gone to Cow Creek, some would have gone to the
7  whole list of the -- how many --
8      A    Correct.
9      Q    -- seven or eight were there, something
10  like that.
11      A    I believe there was eight or nine 4-H
12  groups, and there was four FFA groups.
13      Q    Okay.  Okay.  So they get the money for
14  their --
15      A    Correct.
16      Q    Okay.  All right.  Does the -- do you know
17  who -- the barbecue is at the fairgrounds, though,
18  yes?
19      A    That particular year?
20      Q    Yeah.
21      A    Yes.
22      Q    Is it not there other years?
23      A    No, it's there.
24      Q    It's -- it's there every year?
25      A    Has been in the past, yes.

---

Page 86

1      Q    Okay.  All right.  Does the -- do you sign
2  something with the fair as organizer of this
3  barbecue to have it there?
4      A    We rent the facility.
5      Q    You rent the facility.  Okay.  So 4-H rents
6  the facility and FFA.
7      A    No.  The 4-H/FFA Community Barbecue rents
8  the facility.
9      Q    Is that a separate entity?
10      A    It's not associated with 4- -- it's only
11  associated with 4-H and FFA because of the clubs
12  that participate.  It is not ran by the 4-H office.
13      Q    It's not ran by the 4-H office.
14      A    No.
15      Q    Okay.  But it's the -- it's ran by -- okay.
16  That's interesting.  Okay.  So the clubs get
17  together -- the clubs that are -- are run by the 4-H
18  offices get together on their own and they -- they
19  rent out the space to have the barbecue.
20      A    No.  The 4-H/FFA Community Barbecue --
21      Q    Okay.
22      A    -- rents the facility.
23      Q    I know.  But who -- who is running the
24  4-H/FFA Community Barbecue?  Just you three?
25      A    Correct.

---

Page 87

1      Q    Okay.  But -- okay.  But is it an entity
2  like an LLC or something, the 4-H Community
3  Barbecue, or it is just a DBA of you personally?
4      A    It's just -- it's a nonprofit for -- for --
5  for them.
6      Q    It's a -- oh, that is a nonprofit?
7      A    Yes.
8      Q    Okay.  A 501(c)(3)?
9      A    Yes.
10      Q    Okay.  Interesting.  All right.  Do you
11  have the EIN number?
12      A    No.
13      Q    But you have it somewhere presumably?
14      A    Somewhere, but I don't ever it in my head,
15  no.
16      Q    Okay.  Gotcha.  Okay.  And it's a
17  California corporation?
18      A    Yes.
19      Q    Okay.  And are you -- what's your -- are
20  you an officer of it?
21      A    No.
22      Q    No?  Who are the officers?
23      A    I don't know.
24      Q    You -- you don't know.  Okay.
25      A    I -- I -- when this got started, I was

---

Page 88

1  not -- I was just the person helping them.
2      Q    Helping who?
3      A    The barbecue to get going.
4      Q    Okay.
5      A    I'm not on the checking account.  I'm not
6  on any of that.
7      Q    Who's on the checking?  Who's the treasurer
8  of the checking?
9      A    I believe that's Sherry Pendergrass.
10      Q    Okay.  So you do know the officers or at
11  least --
12      A    I don't know whether they're officers or
13  not.
14      Q    Well, a treasurer is an officer.
15      A    I don't know if they're an officer.
16      Q    Well, by law a treasurer is -- a CEO ---
17      A    I don't know what their titles are.
18      Q    You just said she's a treasurer.  That's an
19  officer.
20      A    I did not say "treasurer."
21      Q    Didn't you just say -- I just asked you who
22  the treasurer was and you said she was.
23      A    No.  You asked me who signed the checking
24  account.
25      Q    Oh, okay.  So you don't know if -- okay.

---

Challe, Fisher & Morfin
Redding, California   (530)246-0942

Page 89

1  You just know she has authority over the checking
2  account, but --
3  A   Right.
4  Q   -- you don't know what her role is.
5      Okay.  So you have no who -- who else --
6  okay.  Who else is affiliated potentially as
7  employees or agents of the 4-H barbecue?
8  A   There are no employees.
9  Q   Oh, okay.  Who is -- then since -- an
10 agent?  You said Sherry is, right?  She's got the
11 checking account.  Anyone else?
12 A   That would consider themselves an agent?
13 Not that I know of.  They consider us volunteers.
14 Q   Okay.  Who was making decisions for the 4-H
15 Community Barbecue then?
16 A   The three people I mentioned earlier.
17 Q   No one else?
18 A   Not that I know of.
19 Q   Okay.  All right.  Do you know if the name
20 is spelled exactly like that if I was to look up who
21 is who on the Secretary of State website?
22 A   That's how we've always had it on our
23 flyers.
24 Q   Okay.  Interesting.  Nothing's -- I can't
25 find an entity of that name on the Secretary of

Page 90

1  State website, which I'm currently looking for.
2      All right.  So you don't know anyone else
3  who has any affiliation with that group whatsoever?
4  A   No.
5  Q   That's your testimony.  No one else.  Just
6  those two.
7  A   There might be other volunteers.
8  Q   Who are the other volunteers?
9  A   I -- we could go all day long and I could
10 mention names.
11 Q   Spit 'em out.
12 A   Do you want all my volunteer barbecues,
13 too?
14 Q   Just for -- let's just say for the '22
15 year.
16 A   Do you want all my -- the barbecue people
17 and everybody that worked?
18 Q   Sure.
19 A   I'd have to sit down and that would take me
20 a while to make a list.
21 Q   Well, we can go -- I'm mainly just looking
22 for --
23 A   We probably only have -- we probably have
24 50 to 60 people who volunteer at that barbecue.
25 Q   I thought you just said it was just you

Page 91

1  three.  There's like 50 to 60 people.
2  A   You asked me for the volunteers.
3  Q   You said three of them.  Now there's 50 to
4  60.
5  A   There's three people that organize it, but
6  you asked me for the volunteers.
7  Q   Okay.  All right.  Now -- well, maybe we
8  could eliminate some of this.  The volunteers were
9  people that you brought in to help operate it?
10 A   We all bring in volun- -- all of us -- we
11 have other people that are involved in this, because
12 it's the community event.
13 Q   I see.  Okay.  But -- well, then let's --
14 I'm just trying to streamline this.
15      Who would be not volunteers that are just
16 coming in to help out for the day, but who would be
17 more permanent individuals affiliated with that
18 group?  Now, I'm looking for officers or people that
19 are potentially on the board.
20 A   John Paradis, Larry Forero, Kathie Muse,
21 and Sherry Pendergrass.
22 Q   Okay.  But you're not an officer for it --
23 A   No.
24 Q   -- for the group?  Okay.
25      Yeah.  How did -- how did you become an

Page 92

1  organizer for this barbecue?
2  A   What do you mean by "how did I become
3  an" --
4  Q   Yeah.  Did you approach someone and ask
5  them?
6  A   Pardon me?
7  Q   Did you approach someone and ask them?
8  A   No.
9  Q   No?  How did that happen?
10 A   We went to another county that did the same
11 thing.
12 Q   Okay.
13 A   And we kind of went to our county and said
14 that it would be a good fundraiser for our 4-H and
15 FFA groups.
16 Q   Okay.  So you -- okay.  When -- when about
17 was that?
18 A   When about?  Year?
19 Q   Yeah.
20 A   That was our 17th in '22 so whatever 17
21 years from that is.
22 Q   Okay.  All right.  So minus 17.  So -- and
23 you were involved in that?
24 A   Yes.
25 Q   Okay.  So the 4-H Community Barbecue

Page 93

1  nonprofit didn't exist before that point?
2  **A     Correct.**
3  Q     Who formed it?
4  **A     Who formed what?**
5  Q     The nonprofit.
6  **A     Would be Larry Forero and Kathie Muse**
7  **and -- and John Paradis --**
8  Q     You're talking about yourself in the third
9  person. You --
10  **A     Yes.**
11  Q     You formed the --
12  **A     Yes.**
13  Q     -- nonprofit?
14  **A     Yes.**
15  Q     But you're not an officer --
16  **A     No.**
17  Q     -- on it?
18       Okay. Okay. It's funny you didn't mention
19  forming it. Okay. So you formed it and -- 17 years
20  ago --
21  **A     I started it.**
22  Q     You started it. Okay. So what was your
23  role when you started it?
24  **A     Just one of the organizers.**
25  Q     Okay. You weren't CEO?

Page 94

1  **A     No.**
2  Q     President?
3  **A     No.**
4  Q     Treasurer?
5  **A     No.**
6  Q     Okay. What was your title for it?
7  **A     I didn't have a title.**
8  Q     You didn't have a title?
9       Okay. Who was the president when you
10  formed it?
11  **A     We didn't have a president when we formed**
12  **it. And we didn't form it. We started it.**
13  Q     Did you form a corporation with the
14  Secretary of State?
15  **A     No, we have not.**
16  Q     Then why are you calling it a nonprofit and
17  saying it's Happy Valley?
18  **A     Because it is. We were using Happy**
19  **Valley's 4-H ID number when we first started it.**
20  Q     Okay. Happy Valley. All right. So that's
21  the corporation it's under, Happy -- Happy Valley --
22  **A     4-H.**
23  Q     -- which is a 4-H.
24       Okay. And to this day, it's still gets run
25  under that EIN -- or that corporation presumably?

Page 95

1  **A     As of the last barbecue, yes.**
2  Q     Okay. And the 2022 year also?
3  **A     Correct.**
4  Q     Okay. All right. Happy Valley. Okay.
5  And that's a -- Happy Valley is a 501(c)(3) is your
6  understanding?
7  **A     It's -- it's a 4-H group, yes.**
8  Q     Are they all 501(c)- -- I generally --
9  **A     I don't know.**
10  Q     Okay.
11  **A     We used their number at the time we started**
12  **it.**
13  Q     To rent the space or --
14  **A     We didn't, no.**
15  Q     I'm sorry. I'm jumping ahead. Okay.
16       Who signed the -- okay. So when you rented
17  out the space from the fair for the year at issue,
18  the '22 year, you -- you signed a rental
19  agreement with -- not you -- but that company --
20  well, maybe you did, but someone for that 4-H/FFA
21  Community Barbecue signed a rental agreement with
22  the fair, correct?
23  **A     I don't know if John signed --**
24  **Jonathan Paradis signed one or not. I know he's the**
25  **one that set up a -- having -- renting it from them.**

Page 96

1  Q     Okay. Okay. All right. But so the rental
2  agreement wouldn't -- would've been with, to your
3  understanding, is -- is between Happy Valley --
4  **A     No.**
5  Q     -- and --
6       **MR. SNOWDEN:** Hold on. Just try and be
7  patient.
8       **THE WITNESS:** Yes, yes, I know.
9       **MR. SNOWDEN:** And wait for the entire
10  question.
11       **THE WITNESS:** Correct.
12       **MR. SNOWDEN:** Number 1, so we can get it on
13  the record; and number 2, so we're clear on what
14  you're being asked. Okay?
15       **THE WITNESS:** Uh-huh.
16  **BY MR. GORDON:**
17  Q     Okay. I'm very confused. Because you said
18  the 4-H Community Barbecue, the nonprofit you're
19  referring to that runs that is Happy Valley,
20  correct?
21  **A     They do not run it. We only use their ID**
22  **number.**
23  Q     So they give you your ID number. But in
24  your mind, it's separate, but it's -- you use
25  their -- when you say ID, you mean their -- their

Page 97

1  EIN number?
2  **A    Correct.**
3  Q    Okay.  So that is -- so this is an
4  organization that is not an official organization.
5  It's just you and a few other people, and you
6  appropriate the ID number for Happy Valley and use
7  that to do business; is that correct?
8  **A    Correct.**
9  Q    Okay.  All right.  So you're doing business
10  under Happy Valley's umbrella calling yourself
11  something else, fair?
12  **A    Correct.**
13  Q    Okay.  Thank you.
14      Okay.  All right.  So the money for the --
15  that generated from the barbecue, though, that --
16  that returns to -- that money, though, doesn't stay
17  with you three.  It goes back to the 4-H cause for
18  the barbecue, right?  You sell the tickets, the
19  money goes back -- any money generated goes back to
20  the various 4-H clubs.
21  **A    All -- all the net proceeds go back to**
22  **4-H --**
23  Q    Yes.
24  **A    -- and FFA.**
25  Q    Sure.  No, I'm not accusing you of

Page 98

1  misappropriating --
2  **A    No, I understand.**
3  Q    -- the funds.
4  **A    Yeah.**
5  Q    I'm just trying to figure out what is
6  actually going on here.  This is a strange -- this
7  is a strange business arrangement.  I'm not -- I
8  don't -- I mean, there are -- maybe strange isn't
9  the right word.  Hard to follow.  If you'd just spit
10  it out easier, we would be through this point
11  already, but -- okay.  All right.
12      Now, of these three people, I know you're a
13  volunteer for 4-H, but it's also the 4-H/FFA
14  barbecue.  Is there anyone -- anyone associated with
15  FFA that's helping you out with the barbecue?
16  **A    Helping out where?**
17  Q    By organizing with you.  You mentioned
18  three names:  You, Larry --
19  **A    No.**
20  Q    No?  Okay.  All right.  Okay.  So you --
21  and then for the actual barbecue you had far more
22  volunteers.  I know you said there were like 60 or
23  so, something like that.
24  **A    Correct.**
25  Q    All right.  Okay.  Is the barbecue, it's

Page 99

1  open to the public, though?  Anyone can buy a ticket
2  or do you have to be associated with 4-H or anything
3  like that?
4  **A    It's open to the public.**
5  Q    Okay.  All right.  So when did you -- so
6  when did you first learn of Jessica removing Cedar
7  from the fair?
8  **A    Do you want to know when I knew it was her**
9  **name or that --**
10  Q    Yeah.  Yeah.  All right.  That's a good
11  point.  When did you first learn Cedar was removed
12  from the fair?
13  **A    I didn't know it was Cedar that was removed**
14  **from the fair when I first heard it.**
15  Q    Okay.  Just explain to me what you first
16  heard.
17  **A    That when I went down there to see how many**
18  **animals were donated to the barbecue --**
19  Q    Uh-huh.
20  **A    -- I was told that there was one goat**
21  **missing.**
22  Q    Who told you that?
23  **A    B.J. Mcfarlane.**
24  Q    And this is on which -- the same evening?
25  **A    Sunday --**

Page 100

1  Q    About --
2  **A    -- the day after.**
3  Q    -- what time?  Okay.  About what time?
4  **A    Approximately 9:30 a.m.**
5  Q    The day after.  Okay.
6  **A    Yes.**
7  Q    All right.  What did you say to him when he
8  told you that?
9  **A    When he told me what?**
10  Q    There was a goat missing?
11  **A    I said, "You're kidding."**
12  Q    Okay.  Did -- did -- anything else?  Did
13  you just --
14  **A    At the time, no, I did not know that**
15  **somebody had taken the goat off the premises.**
16  Q    Okay.  About what point in time did you --
17  about what point in time did you learn that someone
18  had taken the goat off the premises?
19  **A    I believe it was later on that afternoon.**
20  Q    What did you think happened to the goat if
21  you didn't -- if you didn't think some- -- I know he
22  said one's missing, but what did you suspect
23  happened?
24  **A    They miscounted.**
25  Q    Ah-ha.  I see.  Okay.  They didn't think

---

Page 101

1  the goat just made a run for it and hopped the
2  fence. Can a goat hop one of those fences? The
3  pens? Can a goat --
4  A    Depends on which fence.
5  Q    The pens they were in, could they get out
6  of them?
7  A    No.
8  Q    Okay. All right. How tall were the pens?
9  A    For the goats, I believe they were, like,
10 three, four foot.
11 Q    They can't hop a three- or four-foot pen?
12 A    I don't believe --
13 Q    I mean, I --
14 A    I've never seen --
15 Q    You have more experience with goats than
16 me. I'm just --
17 A    I've never seen them.
18 Q    I'm just genuinely -- genuinely curious.
19 Okay. Interesting. All right. All right.
20      So B.J. tells you 9:30 a.m. there's a goat
21 missing. You just think they miscount. Okay. And
22 you went about your day then?
23 A    Yes.
24 Q    Okay. When did you find out that a -- that
25 a -- that the goal was removed?

---

Page 102

1  A    Later that afternoon on Sunday.
2  Q    Who told you that?
3  A    B.J.
4  Q    Did he call you?
5  A    Yes. Or I could have called him. I forgot
6  which way it went.
7  Q    Would you have just called him --
8  A    To see if we found the goat.
9  Q    I see.
10 A    Because I was trying to figure out how many
11 animals I needed.
12 Q    I see. Okay. Okay. And he told you one
13 was -- what else did he tell you?
14 A    All -- he just told me that it was removed
15 from the premises.
16 Q    Okay. Did he tell you by who?
17 A    No.
18 Q    What did he tell him to do?
19 A    Well, I told him -- I don't know at that
20 particular minute what I told him.
21 Q    Okay. You didn't -- you didn't --
22 A    I told him at one time, I said, "Well, the
23 barbecue, it was theirs because it was donated to
24 them.
25 Q    Uh-huh.

---

Page 103

1  A    -- and I thought they could be prosecuted."
2  Q    Okay. All right. When did you tell him
3  that?
4  A    I believe it was Sunday afternoon or
5  Monday.
6  Q    What did he say?
7  A    I couldn't recall exact his words -- his
8  exact words.
9  Q    Did -- okay. And that was Sunday
10 afternoon. So that would be the --
11 A    Could have been Monday. I don't know
12 exactly which day it was.
13 Q    Okay. Sunday or Monday, 26th or 27th.
14 Okay. All right. And did they know which goat it
15 was at that point in time?
16 A    Yes.
17 Q    Did you know who removed it at that point
18 in time?
19 A    No.
20 Q    Okay. When did you find out you who
21 removed it?
22 A    I can't recall the exact time when I found
23 that out.
24 Q    Can you give me your best estimate?
25 A    Approximately Sunday or Monday I found out

---

Page 104

1  that the -- it was the owner of the goat had -- at
2  that time -- it wasn't the owner -- the person who
3  sold the goat was the one that removed it, that the
4  mother did.
5  Q    So the mother. Okay. So the daughter's
6  the owner of the -- it's the exhibitor sells the
7  property, correct?
8  A    I --
9  Q    That's your understanding?
10 A    Yes. According to which you -- I don't
11 know, because I don't know what the contract reads.
12 I don't know exactly how the --
13 Q    Well, the fair rules say the exhibitor has
14 to be the owner, correct?
15 A    I -- I don't know because I haven't seen --
16 Q    You never looked at them? Okay.
17 A    No.
18 Q    Okay. All right. You never looked at the
19 fair rules?
20 A    Not since my kids quit selling animals down
21 there, no.
22 Q    Okay. When was that? When did they quit
23 selling animals down there?
24 A    Twenty-two years ago.
25 Q    Twenty-two years ago. Okay. So you have

---

Case 2:22-cv-01527-DAD-AC   Document 125-4   Filed 11/19/24   Page 29 of 82

LONG vs.                                                    KATHIE MUSE
FERNANDEZ                                             November 13, 2023

Page 105

1  not looked at the fair rules since then?
2  A   No.
3  Q   You didn't -- why didn't you look at them
4  at this point in time to see what your remedy was?
5  A   I don't need to look at the fair rules. I
6  mean, I -- I just didn't think to look at the fair
7  rules.
8  Q   You just didn't think to look at them.
9  Okay. So you don't know if they've changed in 22 --
10 it could be the same rules. You don't know.
11 A   Don't have 'em. I don't know.
12 Q   I don't have the rules from 22 years ago --
13 A   I don't.
14 Q   -- so I can't verify. I'm just curious if
15 you remember.
16      Okay. So when you told B.J. that -- that
17 whoever took the goat should be prosecuted. Did he
18 agree?
19 A   I believe my comment was, "either return
20 the goat or they should be prosecuted."
21 Q   Hmm. Okay. And that was your comment to
22 him?
23 A   Yes.
24 Q   So did you instruct him to communicate with
25 Jessica to return the goat?

Page 106

1  A   I did not instruct him to do that, no.
2  Q   Did you ask him to?
3  A   No.
4  Q   Okay. Okay. What else did you say to him
5  in this conversation?
6  A   I don't recall exact conversation.
7  Q   Do you recall generally?
8  A   No.
9  Q   Okay. Was it a short conversation? A long
10 conversation?
11 A   Short.
12 Q   Okay. And this is the Sun- -- Sunday
13 afternoon on the --
14 A   Or it could have been Monday. I --
15 Q   Could have been Monday --
16 A   -- don't know which day it was.
17 Q   But at this point in time, you knew that
18 Jessica was the person that removed the -- the --
19 Cedar, correct?
20 A   I knew it was the mother.
21 Q   You knew it was the mother. Okay. All
22 right. I'm going to show you a letter or two.
23      MR. GORDON: So actually -- I'm going to
24 use the restroom. Let's go off the record for a
25 moment.

Page 107

1      THE VIDEOGRAPHER: We're off the record and
2  the time is 10:48.
3      (Whereupon, recess was taken from
4      10:48 a.m. to 10:56 a.m.)
5      THE VIDEOGRAPHER: We're back on the
6  record. The time is 10:56.
7      MR. GORDON: Okay. We're on Exhibit G or
8  is it --
9      THE COURT REPORTER: G.
10     MR. GORDON: G. Okay. All right. I'm
11 going to -- this will be Exhibit G.
12     (Exhibit G was marked.)
13     MR. GORDON: Take a look at that. Kelly.
14     MR. SNOWDEN: Thank you.
15 BY MR. GORDON:
16 Q   So I just handed you Exhibit G, Ms. Muse.
17 This is an e-mail chain from the fair. And I have a
18 few questions about it. It goes -- obviously,
19 the -- the pages at the end are where it starts, and
20 then it -- more -- the more recent e-mails are in
21 the beginning, rather, on the first few pages.
22      So on the first page, it says -- this is --
23 appears to be Melanie Silva e-mailing someone at the
24 California Department of Agriculture, Mike Fran- --
25 Francesconi: "Hi Mike. Here's the e-mail from

Page 108

1  Jessica." It has a Bates stamp of 006 on this for
2  Exhibit G, still, same page.
3      "Here's the e-mail from Jessica. I also
4  just found out Kathie Muse, 4-H/FFA Community
5  Barbecue, has contacted her lawyers regarding the
6  theft of the doat [sic]-- doat -- the goat donated
7  to the barbecue."
8      Had you talked to Melanie Silva
9  around that -- this is June 29th. Did you talk to
10 Melanie Silva on that day?
11 A   I can't recall if I did or not.
12 Q   You can't recall if you did or not. Do you
13 know if your lawyers talked to her that day?
14 A   I couldn't tell you if my lawyers did or
15 not either.
16 Q   Okay. All right. Okay. So did you -- do
17 you know if you -- did you talk to Kat- --
18 Melanie Silva at any point in time -- actually,
19 strike that.
20      Did you talk to Melanie Silva from -- at
21 any point in time between June 25th and, let's say,
22 July 8th regarding Cedar or Jessica or the removal,
23 et cetera?
24 A   Yes.
25 Q   When?

Page 109

1   A   I don't recall what date it was.
2   Q   How many times did you talk to her?
3   A   I couldn't tell you how many times I talked
4   to her.
5   Q   But you recall talking to her?
6   A   Yes.
7   Q   Okay.  All right.  What did you talk about?
8   A   I mean, like, specifically?
9   Q   Yeah.
10  A   We probably talked about the auction, we
11  probably talked about the stolen goat, what I
12  thought was good with the auction and bad with the
13  auction.  It's something we talk about every time
14  after -- after an auction.
15  Q   Oh, so you have con- -- after an auction
16  you have conversations with her generally about how
17  the auction goes?
18  A   Uh-huh, yes.
19  Q   Okay.  Okay.  All right.  Did you this --
20  did you for this year as well?  The 2023 year?
21  A   Yes.
22  Q   Okay.  All right.  And did you -- okay.
23  Yeah.  Okay.  All right.  Did -- so were -- if --
24  this is on June 29th at -- in the morning.  Okay.
25  So you might have talked with Melanie Silva before

Page 110

1   this point in time regarding this theft, you just
2   don't recall -- or alleged theft?
3   A   Correct.
4   Q   Okay.  All right.  And did your lawyer
5   reach out to Melanie Silva for you or the FFA -- or
6   4-H/FFA Barbecue?
7   A   I don't believe my lawyer even reached out
8   to them.  I don't know.
9   Q   Okay.  All right.  So you don't
10  know -- did you tell Melanie Silva that your -- that
11  your lawyer was -- that you've contacted lawyers
12  about the theft of the goat?
13  A   Yes, I did.
14  Q   Okay.  All right.  Okay.  Yeah.  Okay.  Did
15  you retain a lawyer on your behalf then or on behalf
16  of the 4-H/FFA Community Barbecue?
17  A   My behalf.
18  Q   Your behalf.  Why your behalf if it's the
19  4-H/FFA Community Barbecue's goat if you don't mind?
20  A   I don't know.
21  Q   Okay.  But it was your understanding when
22  you -- that you were seeking legal assistance to
23  help out with the getting the goat back for the
24  barbecue, correct?
25  A   I think that's between me and my attorney.

Page 111

1   Q   No.  I'm you saying your understanding.
2   I'm not asking for your communications.
3   A   Okay.  That is part of my communications
4   with my attorney.
5       MR. SNOWDEN:  So we don't want you to
6   disclose anything you spoke to an attorney about.
7   The question what was in your mind when you decided
8   to seek --
9       THE WITNESS:  Oh, seek.  Okay.
10      MR. GORDON:  Yes.  Thank you.
11      THE WITNESS:  No.  It was -- it wasn't just
12  done on my behalf.  It was on behalf of the
13  community barbecue, too.
14  BY MR. GORDON:
15  Q   Okay.  That's all the question is.
16  A   Yeah.
17  Q   Yeah.  I -- I'm not asking what you talked
18  about.  I mean, I --
19  A   Okay.
20  Q   -- assume it was Kelly, but I'm not going
21  to ask what you discussed obviously, so -- was
22  there -- well, was it Kelly?  Was a different
23  attorney involved at that time?
24  A   Yes.
25  Q   It was a different attorney?  Okay.  Yes,

Page 112

1   there was?
2   A   Yes.
3   Q   All right.  Who was the attorney?
4   A   Dan Maire.
5   Q   Dan Maire.
6   A   Same office.
7   Q   Same -- okay.  Okay.  All right.  So you
8   sought counsel on behalf of 4-H/FFA, correct?
9   A   Correct.
10  Q   Okay.  Thank you.
11      MR. SNOWDEN:  Well, let me -- let me
12  object.  I think that misstates her testimony.  On
13  what -- on whose behalf did you decide to speak to
14  someone?
15      THE WITNESS:  When I called and talked to
16  Dan, it was regarding me and the barbecue.
17      MR. SNOWDEN:  The barbecue, not 4-H or FFA.
18  It's the 4-H/FFA Community Barbecue --
19      THE WITNESS:  Barbecue.
20      MR. GORDON:  Isn't that what I said?
21      MR. SNOWDEN:  You just -- you stopped at
22  4-H/FFA.
23      MR. GORDON:  I meant the barbecue.  Okay.
24      MR. SNOWDEN:  I just want to make sure --
25      MR. GORDON:  Okay.  All right.

Page 113

1    MR. SNOWDEN: -- because those are entities
2  that are distinct.
3    MR. GORDON: 4-H and FFA are entities that
4  are distinct, yeah.  Okay.
5    MR. SNOWDEN: From the barbecue.
6    MR. GORDON: From the barbe- -- well, the
7  barbecue is apparently not even an entity so -- but
8  okay.
9  BY MR. GORDON:
10   Q   Who paid?  Was it the 4-H/FFA Community
11  Barbecue?
12   A   Who paid what?
13   Q   The -- who is -- who paid these legal
14  costs?
15   A   I haven't paid any legal costs yet.
16   Q   Ah, okay.  Gotcha.  Okay.  Is 4-H, as an
17  entity, indemnifying you in this matter?
18   A   I have no idea what you mean by that.
19   Q   Okay.  Are they -- are they covering your
20  defense?
21   A   No.  I don't work for 4-H.
22   Q   That doesn't mean that they're not covering
23  your defense.
24   A   No, they're not.
25   Q   Okay.  All right.  Is the -- is the

Page 114

1  barbecue?  The 4-H/FFA Community Barbecue?
2   A   No.
3   Q   Okay.  All right.  Okay.  So if you could
4  go to page, I guess, bottom of 7, the second page,
5  Ms. Muse -- Mrs. Muse.  It's a letter from
6  Jessica -- or an e-mail from Jessica on June 27th,
7  2022.  And it starts with "Dear Shasta County Fair
8  Manager."  Have you seen this e-mail before?
9   A   No.
10   Q   Never?
11   A   I've seen portions of it that they had
12  printed in the paper.
13   Q   Okay.  But you've never actually seen this
14  e-mail?
15   A   No.
16   Q   All right.  Melanie Silva didn't show it to
17  you?
18   A   No.
19   Q   What did Melanie -- did Melanie Silva --
20  Silva tell you that Jessica offered to pay for
21  everything?
22   A   I don't recall.
23   Q   You don't recall.  Okay.  If you knew that,
24  would you have accepted the money?
25   A   No.

Page 115

1   Q   No?  Okay.  Did -- did you see the e-mail
2  above it from Melanie Silva where she writes --
3   A   Can I back up on that question one more
4  time?
5   Q   Sure.
6   A   I, myself, would have said no.  But as for
7  the community, if the barbecue accepting it, that
8  would have to go before the other people also.  That
9  would not be my decision only to make.
10   Q   I see.  Did you being it up with the other
11  people at the barbecue that she had offered to pay?
12   A   We weren't offered to pay.  Nobody gave us
13  an offer.
14   Q   The fair didn't say she said she'll pay for
15  any damages?
16   A   No, not to my knowledge --
17   Q   They never told --
18   A   Not to my knowledge.
19   Q   Okay.  All right.  Yeah.  So if -- if you
20  had known Jessica offered to pay, who would have --
21  and you said you needed to bring it before the other
22  people at the community barbecue.  Who were the --
23  who would have been the people that would have
24  decided whether to accept that offer or not?
25   A   That would have been John Paradis,

Page 116

1  Sherry Pendergrass, and Larry Forero.
2   Q   Okay.
3   A   Those would have been the people I would
4  have asked.
5   Q   Okay.  But you didn't ask them.
6   A   I wasn't -- no.
7   Q   No.  Okay.  You said John Paradis,
8  Larry Forero, and Sherry?
9   A   Pendergrass.
10   Q   Pendergrass.  Okay.  The e-mail above that,
11  have you seen this e-mail before?
12   A   The e-mail above what?
13   Q   So the one that I just sent you -- that you
14  started reading with Jessica that you said you had
15  never seen before except portions of it in the paper
16  on --
17   A   The one above that --
18   Q   Yeah.
19   A   -- from Melanie?
20   Q   From Melanie.  Have you seen this e-mail
21  before?
22   A   No.
23   Q   You've never seen this e-mail where --
24  that -- teaching the kid the lesson?
25   A   No.

---

Page 117

1  Q   No. Never. You seen portions of it in the
2  papers or anything?
3  A   I don't believe so.
4  Q   No? Okay. All right. Okay. All right.
5  Okay. It's your testimony you've never seen it.
6  All right.
7       Okay. Did you see -- so -- so have you
8  seen -- so this was a letter that Jessica sent to
9  the fair -- followup -- the following day. It's
10 dated June 28th, but I believe it would have arrived
11 the twenty- -- I will represent to you it arrived
12 the 29th. This will be Exhibit H we are on?
13      THE COURT REPORTER: Yes.
14      MR. GORDON: Kelly, this is for you.
15      (Exhibit H was marked.)
16 BY MR. GORDON:
17 Q   Have you seen this letter before?
18 A   No.
19 Q   No? How do you know --
20 A   I've never seen any letters from --
21 Q   You've never seen any letters?
22 A   No.
23 Q   Okay. All right. The fair never shared
24 with you any letters? They never said Jessic- --
25 we're in communication with Jessica?

---

Page 118

1  A   They never showed me --
2  Q   B.J. Mcfarlane never said he was in
3  communication with Jessica?
4  A   You asked me two different questions.
5  Which one you want answered?
6  Q   Well, you were shaking your head. You were
7  shaking your head.
8  A   No, you can asked me two different
9  questions.
10 Q   Answer -- well, answer the first one then.
11 A   Okay. There were two parts to that first
12 one.
13 Q   Okay. I'm going to start over so --
14 A   Thank you.
15 Q   -- strike the other questions.
16      The first the e-mail from Jessica, you
17 testified you never saw that before, correct?
18 A   Correct.
19 Q   And the one before you right now, which is
20 Exhibit G, you never saw that before, correct?
21 A   Correct.
22 Q   Did B.J. Mcfarlane ever tell you that he
23 was in communication with Jessica?
24 A   Yes.
25 Q   Okay. What did he tell you?

---

Page 119

1  A   I can't tell you his exact words that he
2  told me.
3  Q   Okay.
4  A   But I knew that they were in communication.
5  Q   Did Melanie Silva ever tell you she was in
6  communication with Jessica?
7  A   Yes.
8  Q   Okay. And neither of them told you that
9  Jessica had wanted to -- Jessica wanted to save
10 Cedar and pay you your costs? That's your
11 testimony?
12 A   I knew that she had said she was going to
13 pay back the fairgrounds is what I was underneath
14 the impression of, not to the barbecue. I was
15 never given an offer from the barbecue.
16 Q   So your position is when she said she'll
17 pay any costs, that didn't apply -- that only
18 applied to the fairgrounds, not to you?
19 A   I didn't know what costs were involved.
20 Q   Well, did you ask when they said she had
21 made an offer to pay the fairgrounds? Did you have
22 any followup?
23 A   No.
24 Q   No, you weren't curious?
25 A   No.

---

Page 120

1  Q   But you wouldn't have accepted the money
2  anyway.
3  A   It was up to my other people that helped me
4  with the barbecue of whether they would have
5  accepted it or not.
6  Q   And you -- did you ever present to them,
7  the other people that helped you with the barbecue,
8  that there has been an offer to repay the
9  fairgrounds. Should we follow up on this?
10 A   No.
11 Q   Okay. Why not?
12 A   Because the offer was never made to us to
13 reimburse --
14 Q   But you were aware that she was willing to
15 pay money back?
16 A   Yes.
17 Q   Okay. How do you know about the offers if
18 you didn't see the e-mails?
19 A   They verbally told me.
20 Q   They verbally told you. Both of them,
21 Melanie Silva and B.J. Mcfarlane?
22 A   Correct.
23 Q   Okay. Okay. All right. Okay. Do you
24 remember about what time they -- the dates when they
25 told you?

Page 121

1  A   No.
2  Q   No? Was it before -- was it before
3  July 8th?
4  A   I don't know.
5  Q   Okay. It was before you -- before Cedar
6  was retrieved, yes?
7  A   I -- I don't -- I don't recall.
8  Q   This could have been yesterday when they
9  told you.
10  A   I don't recall.
11  Q   Can you give me a time frame? I don't know
12  the exact dates but --
13  A   It's -- I don't know -- I don't the exact
14  time frame.
15  Q   Let's work through it. Before you talked
16  to any of the police about this; before then?
17  A   No. It was after I talked to -- it was
18  after -- in fact, I really didn't even talk to the
19  police. No, I don't -- I don't -- it could have
20  been within the -- the three weeks.
21  Q   Within three weeks. Okay. That's helpful.
22  Thank you.
23      Within three weeks. So sometime between --
24  sometime between, you know, the 25th of -- three
25  weeks from the 25th of June 2022, is that -- that's

Page 122

1  the three-week frame you mean, correct?
2  A   Correct.
3  Q   So whenever that comes out to be, July 18th
4  or so. Okay. All right. Was it before Cedar was
5  returned or found and returned, though?
6  A   I don't recall if it was before or not.
7  Q   You don't recall if it was before or not.
8  Okay. Maybe one of them will recall tomorrow.
9      All right. Could you have of gotten -- how
10  many -- so how many animals were sold for the --
11  for -- were used at the barbecue? Do you know?
12  A   That were donated?
13  Q   Donated. Yeah. How many animals?
14  A   Approximately 50.
15  Q   Okay. All right. Could you have just
16  gotten a replacement goat for Cedar?
17  A   At that time, we did get a replacement
18  goat.
19  Q   Oh, okay. Okay. All right. Were there
20  leftovers afterwards?
21  A   Of what?
22  Q   Anything?
23  A   Yes.
24  Q   Okay. Meat?
25  A   Which species?

Page 123

1  Q   Goat meat.
2  A   No.
3  Q   No. Goat meat sold out. Okay.
4      So by virtue of -- of the -- of the bid,
5  you put to the Dahles, the barbecue -- the barbecue
6  didn't receive Cedar. It just received -- it was to
7  receive cuts of meat, correct? But you didn't get
8  any other parts of him, right? It would just be
9  cuts of meat?
10  A   Correct.
11  Q   Okay. Where did you get the replacement
12  goat --
13  A   From the --
14  Q   -- for the barbecue?
15  A   From the Junior Livestock Board.
16  Q   Okay. Okay. Okay. So the barbecue was
17  not short on goat meat or any other type of meats
18  absent Cedar because you got a replacement goat,
19  correct?
20  A   Yes, we were still short.
21  Q   You were still short. Okay. But you would
22  have been short anyway then presumably if you had
23  Cedar?
24  A   Correct.
25  Q   Okay. All right. Okay. So is -- all

Page 124

1  right. This is going to be really tedious, and I
2  preemptively apologize. I just want to go date by
3  date to remember what you did up to the seizure.
4  You might not remember anything. I just want to
5  cross the dates off the calendar so I know of
6  nothing happened of importance that day. So it's
7  very boring. I apologize. I painfully apologize.
8      THE VIDEOGRAPHER: Before you start that,
9  should we go ahead and change the --
10      MR. GORDON: Oh, yeah. No. Because I
11  suspect that she's just going to say "I don't
12  remember," but let's see here.
13      THE VIDEOGRAPHER: Yeah.
14      MR. GORDON: But we'll try, so...
15  BY MR. GORDON:
16  Q   I'm going to ask you on each date -- I'm
17  going to start with 6/26 what you did with respect
18  to -- with respect to Cedar or what actions you took
19  in relation to this case. All right?
20      So I'm going to start with 6/26, although
21  you somewhat gave me some of them already with --
22  with B.J. -- should I recall him Bruce or B.J.? How
23  do you go -- how do you -- what do you call him?
24  A   I call him B.J.
25  Q   You call him B.J. Okay. All right.

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

---

Page 125

1  So 6/26, apart from taking with B.J., did
2  you and any other action -- did you take any other
3  actions that day with respect to Cedar or
4  Jessica Long?
5  A  No.
6  Q  Talk to anyone? Okay. All right. Didn't
7  call the cops that day?
8  A  No.
9  Q  The 27th? Anything come to mind? Did you
10  talk to anyone about Cedar that day? Did you call
11  the cops?
12  A  (Nodding.)
13  MR. SNOWDEN: You're nodding your --
14  MR. GORDON: Yeah.
15  MR. SNOWDEN: -- your head, but you need to
16  speak out loud.
17  THE WITNESS: No.
18  BY MR. GORDON:
19  Q  Also, I need to know this is your
20  testimony --
21  A  I don't recall.
22  Q  -- because at trial if all of a sudden you
23  remember but you don't remember now. So -- all
24  right.
25  So 6/28, do you recall doing anything that

---

Page 126

1  day in relation to Cedar? Talk to Melanie Silva?
2  Talk to B.J.? Talk to any of the police?
3  A  I -- I could have talked to Melanie Silva.
4  I could have talked to B.J.
5  Q  Okay.
6  A  I -- I don't recall.
7  Q  Okay. Well, I know you could have. I'm
8  not asking you to speculate. Do you think you might
9  have that -- those days.
10  A  Do you think if I might have? I might have
11  talked to B.J. --
12  Q  You might have -- okay.
13  A  -- and I may have talked to Melanie.
14  Q  Okay. The 28th you might --
15  THE COURT REPORTER: One at a time, please.
16  BY MR. GORDON:
17  Q  Okay. Same thing with six -- on 6/29, when
18  you've talked to one of those two again --
19  A  Yes.
20  Q  -- one of those days? All right.
21  And the police and/or the sheriffs, did you
22  speak with any of them those days?
23  A  I did talk to the sheriff's department, but
24  I couldn't tell you what day I talked to 'em.
25  Q  Okay. All right. 6/30, same questions.

---

Page 127

1  Would you have talked with Melanie Silva on those
2  days or B.J. or anyone else in relation to this?
3  A  Possibly.
4  Q  Possibly. Do you have any recollection?
5  A  No.
6  Q  Okay. Okay. July 1st, any recollection of
7  talking with them those days?
8  A  Possibly, I could have talked to 'em.
9  Q  Possibly. Possibly you could have talked
10  to who? Which ones?
11  A  I could have talked to B.J. I could have
12  talked to the sheriff's department. I could have
13  talked to Melanie.
14  Q  Were there any other people you were
15  talking about this -- at -- any of these dates so
16  far potentially?
17  A  Mainly it was those three.
18  Q  Mainly who -- who -- apart from the people
19  mainly, anyone else?
20  A  Possibly my attorney.
21  Q  Okay. Okay. Did you call any -- anyone at
22  4-H about it or -- or on any of these --
23  A  No.
24  Q  -- or anyone at the Department of --
25  A  No.

---

Page 128

1  Q  -- Agriculture?
2  A  No.
3  Q  Okay. All right. Ever?
4  A  Not to my recollection, no.
5  Q  Okay. Okay. So on July 2nd, same
6  question. Did you have any conversations with --
7  with -- about Cedar with any of those parties on
8  those days?
9  A  Possibly.
10  Q  Possibly. Okay.
11  THE VIDEOGRAPHER: We're going to have to
12  take a break.
13  MR. GORDON: All right. We'll take a
14  break. That's fine. That's fine.
15  THE VIDEOGRAPHER: All right. We're off
16  the record. The time is 11:17 and this is the end
17  of the media number 1.
18  (Whereupon, recess was taken from
19  11:17 a.m. to 11:36 a.m.)
20  THE VIDEOGRAPHER: We're back on the
21  record. The time is 11:36 and this is the start of
22  media number 2.
23  BY MR. GORDON:
24  Q  All right. Okay. Ms. Muse, we were
25  tediously going through a series of dates to see if

---

Challe, Fisher & Morfin
Redding, California  (530)246-0942

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

---

Page 129

1  you could remember on those days. We were halfway
2  through, I suppose. And I think on -- you last
3  testified that I asked on if July 2nd you had spoken
4  to anyone, Melanie or B.J. or any of the sheriffs
5  about Cedar or took any -- or took any actions
6  related to Cedar; you said possibly on that date.
7  Do you have any recollection one way or the other?
8  **A    Possibly I did talk to him on the day.**
9  Q    I understand possibly, but do you have a
10  recollection in your -- in your --
11  **A    No.**
12  Q    No. Okay. Okay. Same thing with
13  July 3rd. Did you speak with any of those
14  individuals or take any actions with respect to
15  Cedar that date if you recall?
16  **A    If I recall, no. Possibly, I could have,**
17  **though.**
18  Q    Okay. But you do not recall. Okay.
19        Do you keep a calendar? Anything like
20  that?
21  **A    No.**
22  Q    No? Okay. And you checked. There's no
23  e-mails related to any of this?
24  **A    There is no e-mails.**
25  Q    Okay. And you checked your e-mail?

---

Page 130

1  **A    Yes, I did.**
2  Q    Okay. All right. Okay. Okay. The same
3  question. On 7/5 -- or 7/4, the Fourth of July, I
4  presume on that day you did not do anything with
5  respect to this case. You do -- do you recall the
6  Fourth of July --
7  **A    I -- I did not talk to 'em on the day.**
8  Q    You knew 'cause the holiday. You remember
9  the holiday. Okay. All right.
10        And by "him," who were you referring to
11  there? Fernandez?
12  **A    "By them."**
13  Q    By them.
14  **A    I meant by --**
15  Q    Any of them?
16  **A    Yes.**
17  Q    Okay. What about the 5th, the day after
18  the 4th?
19  **A    Do not recall, but I possibly could have**
20  **talked to him.**
21  Q    Okay. But you have no memory one way or
22  the other?
23  **A    No.**
24  Q    Okay. And the 6th, no --
25  **A    No memory of it, but I possibly could have**

---

Page 131

1  **talked to either -- any of them on the phone.**
2  Q    On the phone.
3  **A    Or text.**
4  Q    Or the phone or text. Okay. I thought you
5  said earlier you checked your texts and you didn't
6  have any.
7  **A    I -- you guys have a text --**
8  Q    Oh, so this text -- this text you're
9  referring to?
10  **A    Yes.**
11  Q    Gotcha. And the 8th of -- of -- of July,
12  the day Cedar was -- was seized so -- or confiscated
13  or taken into custody, whatever term you want to
14  use. So you --
15  **A    Yeah, I did -- I did speak to B.J. and I --**
16  **we believe I talked to Mr. -- or Lieutenant**
17  **Fernandez also on the 8th.**
18  Q    On the phone. Do you remember what time
19  you spoke with B.J.?
20  **A    No, I do not.**
21  Q    Speak with him more than once that day?
22  **A    I could not recall. I was right in the**
23  **middle of getting ready for the barbecue.**
24  Q    Okay. All right. So you --
25  **A    And I do -- if it was that day that the --**

---

Page 132

1  Q    That was the day, yes.
2  **A    Then I do -- I did have contact with them.**
3  Q    Okay. And you -- so for B.J., you spoke
4  with him at least once. Do you think it was
5  probably more than once, though?
6  **A    Yes.**
7  Q    Okay. And same thing with Fernandez,
8  probably more than once?
9  **A    Yes.**
10  Q    Okay. All right. Okay. And Fernandez
11  testified that you instructed him to turn over Cedar
12  to B.J. Is that something you discussed with
13  Fernandez on the phone that day?
14  **A    That was my suggestion was to turn him on**
15  **over to B.J. because B.J. had a place for him, yes.**
16  Q    Okay. Okay. And that would have been that
17  date, do you believe, or beforehand?
18  **A    It was -- was before they picked Cedar**
19  **up --**
20  Q    No, I understand that. It went national,
21  yeah. But was it -- the 8th, the day of is to your
22  recollection that's when that con- -- that's --
23  **A    Yes.**
24  Q    -- when you would have talked to --
25  **A    Yes.**

---

Challe, Fisher & Morfin
Redding, California  (530)246-0942

| Page 133 | Page 135 |
|---|---|

**Page 133**

1    Q    -- Fernandez?
2    A    Yes.
3    Q    All right. Okay. And B.J. was agreeable
4 to having him come there?
5    A    Yes.
6    Q    Okay. All right. So you spoke with B.J.
7 before Fernandez?
8    A    I don't know which one I talked to first.
9    Q    Okay. But if B.J. was -- already would
10 have known presumably, right? You couldn't have --
11 B.J. must have known that he -- you were going to
12 have him dropped off there before you told
13 Fernandez.
14    A    I don't know if B.J. told Fernandez first
15 or if I talked to -- I don't know. I don't know
16 which --
17    Q    You don't remember.
18    A    I don't remember which one I talked to
19 first.
20    Q    Okay. But at some point in time that
21 day --
22    A    That was a way for --
23    Q    -- you and B.J. --
24      MR. SNOWDEN: Be patient.
25      THE WITNESS: Yes.

**Page 134**

1 BY MR. GORDON:
2    Q    Yeah. But at some point that day, you and
3 B.J. came to an understanding that Cedar would go
4 there and either you or B.J. communicated that to
5 Fernandez?
6    A    Correct.
7    Q    Okay. Thank you.
8      Okay. And then 7/9, the day of the
9 barbecue, did you speak with any of these actors --
10 actors -- lawyer term, sorry -- B.J., Melanie, any
11 of -- Lieutenant Fernandez, anyone else? Did you
12 speak with any of them that day?
13    A    I -- I don't know because I was right in
14 the middle of doing the barbecue that day, so I
15 couldn't tell you if I talked to 'em that day or
16 not.
17    Q    Okay. All right. You just don't recall.
18    A    I don't recall.
19    Q    Okay. Did you speak with 'em that weekend?
20    A    I don't recall.
21    Q    Okay. Did any of 'em attend the barbecue?
22    A    Pardon me?
23    Q    Did any of them attend the barbecue?
24    A    I have -- I don't know. It was a
25 drive-through.

**Page 135**

1    Q    Oh, it was a drive-through. Okay. So you
2 don't know who the attendees are?
3    A    No.
4    Q    Why did they need a ticket if it's a
5 drive-through?
6    A    Because you have to have a ticket to --
7    Q    A ticket to get in the line for the
8 drive-through.
9    A    Correct.
10    Q    Okay. Okay. I don't know. I've never
11 been to one.
12    A    No, you give 'em a ticket and you get
13 dinner to go.
14    Q    Ah, to go. Okay. Oh, so it's not people
15 at the fair hanging out. It's a drive-through, and
16 then they --
17    A    Correct.
18    Q    -- go -- okay.
19    A    This particular year was, yes.
20    Q    Okay. But some years it's a hang-out
21 thing.
22    A    Yes.
23    Q    Okay. Gotcha. All right. Why a
24 drive-through? COVID that year? Is that why?
25    A    No.

**Page 136**

1    Q    No? No. What was the reason for a
2 drive-through?
3    A    I couldn't get the animals processed in
4 time to do it for Anderson Explodes on the 3rd of
5 July. That's what day it used to always be.
6    Q    Oh, okay. So it was extended, so it was
7 later that particular year?
8    A    Correct.
9    Q    Okay. Gotcha. All right. Okay. So do
10 you -- all right. Did you file a police report ever
11 in this matter, like walk into the sheriff's office
12 and fill out a police report?
13    A    No. I did not file one in person.
14    Q    Okay. Over the phone?
15    A    Yes.
16    Q    Do you remember what day you did that?
17    A    No.
18    Q    Was it possibly July 8th?
19    A    I couldn't tell you which day it was.
20    Q    Well, can you give me your best estimate
21 when it was?
22    A    I -- I thought it was earlier than that.
23    Q    Earlier. That's fine. That's fine. Okay.
24      Fernandez, in the -- in his investigative
25 summary, I'll represent to you that it states on

Page 137

1  July 8th you did, but he was uncertain if it was
2  actually that day. So that's why I'm trying to
3  figure out --
4  A    Yeah, I don't know which day it was filed.
5  Q    But at some point in time you did call and
6  make a complaint to the police?
7  A    The -- they called me and wanted to know --
8  the sheriff's department called me --
9  Q    Okay.
10 A    -- and I filed the complaint.
11 Q    Okay. And what -- do you remember who
12 called you?
13 A    No.
14 Q    No. Okay. Male? Female?
15 A    I believe it was a male.
16 Q    Okay. So they called you. Okay. And --
17 and when they called you, they -- what did they say?
18 A    They were following up with me on -- on if
19 I wanted to press charges.
20 Q    Okay. Following up. So you had talked to
21 them beforehand?
22 A    I don't believe I did, no.
23 Q    Okay. Do you know if anyone did
24 beforehand?
25 A    I believe it -- I mentioned it to

Page 138

1  Jerry Fernandez -- Lieutenant Jerry Fernandez that I
2  wanted to press charges.
3  Q    And when -- when day was?
4  A    I can't recall which day that was.
5  Q    Okay. Give me your best estimate, please?
6  A    It happened on the 25th. I'd say about the
7  29th or 30th.
8  Q    29th. So --
9  A    Of June.
10 Q    Yeah, I understand. So that was
11 a Wednesday, I believe. Midweek.
12 A    (Indicating.)
13 Q    Okay. Your estimate?
14 A    Yeah.
15 Q    That's the 29th? Okay. I was just giving
16 the date in case that refreshed your memory more.
17 A    No.
18 Q    No. Okay. So midweek you, about that time
19 the 29TH, you called Fernandez. Did you call him on
20 his cell?
21 A    I believe we did talk on his cell -- well,
22 he might have been at the office. I don't know.
23 Q    You don't know. Okay. Was this during
24 business hours or after business hours?
25 A    During business hours.

Page 139

1  Q    And what did you say to him when you called
2  him?
3  A    I don't know if I called him. I know we
4  talked.
5  Q    Okay. What did you say to --
6  A    But I don't know on that particular day.
7  Q    Okay. What did you say whenever you talked
8  on the conversation that you're referring to,
9  whenever that happened, the day -- the 29th or
10 within a few days of that, whenever it was?
11 A    That they were not going to bring the goat
12 back. Did I want to press charges? And I said,
13 yes.
14 Q    Okay. And so then you had a subsequent
15 call with someone you didn't know who -- who, again,
16 was following up and you said you wanted to press
17 charges?
18 A    Correct.
19 Q    So two calls. All right.
20     Why didn't you just go file a civil action
21 and get a Writ of Possession?
22 A    I don't know what that is.
23 Q    Was it ever offered to you or did anyone
24 say to you just go to court and file your own
25 lawsuit?

Page 140

1  A    I -- no.
2  Q    No one ever discussed that with you?
3  A    No.
4  Q    No? Okay. All right. Did it you ever
5  occur to you that you could file your own suit?
6  A    No.
7  Q    No? You've been involved in lawsuits
8  before, though. You know you can file your own
9  lawsuit, yes?
10 A    Yes.
11 Q    Okay. But it never just popped into your
12 brain to do it this time?
13 A    No.
14 Q    Okay. All right. Okay. All right. So I
15 just want to clarify some of your -- your former
16 responses. So it's your testimony that the only --
17 I'm going to say -- association involved in the --
18 with the barbecue was the 4-H/FFA Community
19 Barbecue.
20     I'm using the term "association," Esther --
21 Kelly, if you want to -- just so she feels
22 comfortable with it. It doesn't mean a formal
23 corporate entity, so that's why I'm using the word
24 "association."
25     So the only association or group for the

Page 141

1 4-H/FFA Community Barbecue was that association,
2 correct?  There wasn't -- there wasn't any other
3 groups involved with the barbecue, like another
4 4-H -- you mentioned the one EIN, Happy Valley.
5 That was -- you used the EIN to rent the space
6 for -- were there any other 4-H groups involved?
7 **A     Their EIN was not used to rent the space.**
8 Q     Okay.  What was their EIN used for?
9 Refresh my memory.
10 **A     E- -- for anybody that made taxable**
11 **donations to 'em because it was a nonprofit.  Their**
12 **EIN did not have a --**
13 Q     Okay.  Okay.  So the space is rented then,
14 just the 4-H/FFA Community Barbecue?
15 **A     Correct.**
16 Q     Okay.  Any other -- were there any other
17 entities or with an EIN or other associations
18 involved with the barbecue?
19 **A     I don't understand what you mean.**
20 Q     Well, you're using this other one's EIN for
21 donations, so that has a relationship to the
22 barbecue for the 4-H/FFA barbecue.  Are there any
23 other entities that have this sort of relationship
24 with that -- with what you're calling the 4-H/FFA
25 Community Barbecue?

Page 142

1 **A     No.**
2 Q     No?  Not at all?  Okay.
3       Is the 27th District Agricultural
4 Association involved at all with the barbecue?
5 **A     No.**
6 Q     Just rent the space and...
7 **A     Correct.**
8 Q     Okay.  Okay.  So it has that involvement
9 but no other involvement?
10 **A     Correct.**
11 Q     Okay.  All right.  All right.  And earlier,
12 I handed you two exhibits.  They were two different
13 e-mails.  I believe one was Exhibit G and the other
14 one was H.  I think I screwed up the exhibits.  So
15 at the top one on there, Ms. Muse -- Mrs. Muse --
16 **A     Is H.**
17 Q     And that is H.  And you -- I just want to
18 confirm.  You've never seen that document before?
19 **A     No.**
20 Q     No.  Okay.  And the e-mail that Jessica
21 sent that I flagged in the exhibit beforehand was
22 the --
23 **A     (Indicating.)**
24 Q     Yes.  That exhibit, which is Exhibit G, the
25 e-mail beginning on -- Bates stamped number 7 at the

Page 143

1 bottom, which is the next page, which is -- starts
2 with Dear Shasta Fair -- something like that.  Can
3 you --
4 **A     Her --**
5 Q     Yes, her e-mail.  Was it --
6 **A     Shasta -- Shasta County Fair Manager?**
7 Q     Yeah.  Okay.  You've never seen --
8 **A     I've never --**
9 Q     You've never seen --
10 **A     No.**
11 Q     -- this e-mail either?
12 **A     No.**
13 Q     Okay.  All right.  And -- okay.  So you've
14 never seen -- and nor the other contents in
15 Exhibit G, which is Melanie Silva's -- an e-mail
16 afterwards were dated -- dated June 28th.  It's an
17 e-mail to Jessica Long between Melanie Silva and
18 Jessica Long.  You haven't seen that e-mail,
19 correct?
20 **A     I have not seen that e-mail, correct.**
21 Q     Okay.  All right.
22       **MR. SNOWDEN:** And just to clarify the
23 testimony I believe with regard to the prior e-mail
24 the witness previously stated there may have been
25 excerpts in the news.

Page 144

1       **MR. GORDON:** Yeah, okay.  Okay.  Well, I'm
2 going to rephrase this.  Thank you.
3 **BY MR. GORDON:**
4 Q     You had -- you did not see either of these
5 two writing -- G -- I'm sorry.  Exhibit H or
6 exhibit -- Jessica's e-mail in Exhibit G that begins
7 Dear Shasta County Fair Manager, you saw -- between
8 June 25th and July 8th, let's say, you did not see
9 either of these two communications during that
10 period?
11 **A     No.**
12 Q     Okay.  All right.  Okay.  And you might
13 have seen portions of one since, but it's been in
14 the news or the Complaint or --
15 **A     Correct.**
16 Q     -- something like that?  All right.  Okay.
17       Can you clarify your -- so you said you're
18 a volunteer for 4-H, correct, currently?
19 **A     Correct.**
20 Q     Okay.  What are your duties as a volunteer?
21 **A     Now?**
22 Q     Yes.  Let's say as of June and July 2022,
23 what were your duties as a volunteer?
24 **A     I was -- for 4-H?**
25 Q     Yeah.

LONG vs.
FERNANDEZ

---

Page 145

1　A　I was of their treasury advisor for Happy
2　Valley 4-H club.
3　Q　Okay. And what were your duties as
4　treasury advisor?
5　A　Collect any monies that come, which usually
6　doesn't, and pay bills for the project -- projects.
7　Q　Okay. By "projects," do you mean the
8　children's projects for whatever their enrolled in?
9　A　Correct.
10　Q　So can you give me some examples of
11　projects?
12　A　Swine, food group, pig, steer -- beef,
13　goats. And then you have you market goats, and it
14　would have been lamb, and I believe they had a
15　rabbit group then.
16　Q　Okay. Okay. People raise rabbits?
17　A　Uh-huh.
18　Q　How interesting. What do they do with the
19　rabbits?
20　A　They go to --
21　Q　It's food, too?
22　A　Uh-huh.
23　Q　Okay. Okay. I knew that they eat it
24　somewhere. I just didn't know, you know -- all
25　right. Interesting. Okay. All right.

---

Page 146

1　　Any other duties you can think of?
2　A　No.
3　Q　No? All right. And did you -- okay.
4　　What -- what sorts of -- what sorts of
5　bills are due for the projects? Like food and
6　things like that or --
7　A　If they have food at the fair, then the
8　projects give me the bills and it comes out of their
9　project fund. They have T-shirts that have their
10　club names on them.
11　Q　Okay. So pay for those sorts of items?
12　A　Correct.
13　Q　Okay. Gotcha. All right. All right.
14　　So -- and you testified earlier you were --
15　you -- you organized the barbecue along with three
16　other people or -- or thereabouts, and the idea came
17　up when you saw a similar barbecue 17 or 18 years
18　ago, correct?
19　A　Correct.
20　Q　Okay. All right. All right. So
21　throughout this time you made -- you testified that
22　you made a few phone calls to these various people,
23　but you don't know the dates. Can you -- is your --
24　you gave this text chain earlier. Is this your cell
25　phone -- no, it's not your cell phone number.

---

Page 147

1　　What is your cell phone number and your
2　carrier?
3　A　My personal cell phone?
4　Q　Whoever you were speaking with about these
5　events, whatever number you used?
6　A　(530) 510-9107.
7　Q　Okay. And what's your carrier?
8　A　Verizon.
9　Q　Verizon. Okay. Okay. All right. Did you
10　ever speak with a Chad Fowler in -- in relation to
11　Jessica removing Cedar?
12　A　No.
13　Q　No. You know who he is, though, correct?
14　A　Yes.
15　Q　Okay. All right. Have you ever met him?
16　A　Yes.
17　Q　Okay. All right. And you re- -- did you
18　reach out to him at all?
19　A　Yes.
20　Q　Okay. And did he not respond?
21　A　I did talk to him once.
22　Q　You just testified a moment ago you didn't
23　speak with him. You did speak with him.
24　A　No. That's not what you asked me when you
25　asked me did I speak with him.

---

Page 148

1　Q　Yeah. About this event with the --
2　A　You didn't say "this event," I don't
3　believe, on the question.
4　Q　Okay. So did you -- you said you spoke
5　with Chad Fowler about the removal of Cedar?
6　A　No. I did not speak to Chad Fowler about
7　the removal of Cedar.
8　Q　What did you talk to him about then?
9　A　I talked to him about Cedar, but it was not
10　the removal of Cedar.
11　Q　Ah, okay. When -- I understand. So when
12　was that conversation?
13　A　I don't know -- I can't --
14　Q　Did --
15　A　-- recall.
16　Q　Did it precede the auction?
17　A　No.
18　Q　So you talked to him after the auction?
19　A　Correct.
20　Q　But it didn't have anything to do with
21　removing -- the removal of Cedar?
22　A　I talked to him after the auction.
23　Q　Okay. What -- about what?
24　A　It wasn't just the removal of Cedar. It
25　was more of information of the daughter --

---

Page 149

1  Q   Oh.
2  A   -- and did he know that they were the ones
3  that took him.
4  Q   Okay.  Okay.  Anything else?
5  A   No.
6  Q   What he did tell you about the -- the
7  daughter?
8  A   That he didn't know that they had taken the
9  goat at the time, that he didn't know that they were
10 planning on it.
11 Q   Okay.
12 A   And that she hadn't been in -- out there a
13 lot to raise the animal.
14 Q   That she hadn't been out there a lot to
15 raise the animal?
16 A   Correct.  And --
17 Q   He testified --
18 A   -- that was the end of the conversation.
19 Q   So it's your testimony that Chad Fowler
20 said she hadn't been there a lot to raise the
21 animal?
22 A   Correct.
23 Q   Any reason the other day that he testified
24 she was there every day?
25 A   I have reason -- I -- I'm just telling you

Page 150

1  what he told my.
2  Q   Interesting.  Okay.  All right.  And he
3  told you that she -- that she planned it?
4  A   No.  She had not said anything about
5  planning it.
6  Q   Ah, okay.  Okay.  Okay.  Now, I see.
7       Anything else you guys discussed on the
8  phone?
9  A   No.
10 Q   Okay.  Did you tell him you were going to
11 make a police report?
12 A   I don't recall.
13 Q   Okay.  Did he tell you Jessica made any
14 offers to pay?
15 A   I don't recall.
16 Q   Okay.  All right.  Have you ever spoken
17 with somebody by the name of Ray Allen?
18 A   Not that I know of.
19 Q   Okay.  I didn't think so actually.  All
20 right.
21      (Pause in proceedings.)
22 BY MR. GORDON:
23 Q   Did you speak with Chad Fowler -- I -- his
24 wife's name is escaping me.  Did you speak with his
25 wife at all about --

Page 151

1  A   No.
2  Q   -- the same topics?
3       No?  What about his kids?
4  A   No.
5  Q   No.  Okay.  Okay.  I'm going to hand you --
6  I'm sorry.
7       Actually, I'm going to get a -- off the
8  record for just one second.  I'm going to get a clip
9  so --
10      THE VIDEOGRAPHER: We're off the record and
11 the time is 11:58.
12      (Whereupon, recess was taken
13       from 11:58 a.m. to 11:59 a.m.)
14      THE VIDEOGRAPHER: We're back on the record
15 and the time is 11:59.
16 BY MR. GORDON:
17 Q   Okay.  Ms. Muse, I'm handing you a copy of
18 Second Amended Complaint in this.  I know you've
19 seen it.
20      MR. GORDON: But, Kelly, I only have one
21 copy so -- oh, you have a copy?  Great.  Okay.  This
22 will be Exhibit I, I believe, we're on.  Correct?
23      THE COURT REPORTER: Yes.
24 ///
25 ///

Page 152

1  BY MR. GORDON:
2  Q   All right.  And you've seen this before,
3  correct?
4  A   Yes.
5       (Exhibit I was marked.)
6  BY MR. GORDON:
7  Q   All right.  Give me one moment and I'll ask
8  you a question or two.  We're not going to go
9  through the whole thing.  You'd be here all day on
10 that, but I do have a few questions, so...
11      So in this matter you -- you filed a
12 general denial which we -- we sent a letter through
13 counsel stating that that -- we believe that to be
14 improper.  So I just want to ask a few questions
15 here.  We're not going to go through a whole thing.
16 But if you go to paragraph 15.
17      You do -- you do reside in Shasta County,
18 correct?
19 A   Yes.
20 Q   Okay.  All right.  Okay.  And you are
21 affiliated or a representative of 4-H, correct?
22 You're a volunteer.
23 A   Correct, I'm a volunteer.
24 Q   Okay.  All right.  And you did in
25 paragraph 29 -- I'm sorry.  I'm jumping around here.

Page 153

1  I apologize, Ms. Muse.
2      You did bid for Senator Brian Dahle,
3  correct?
4  A    Correct.
5  Q    All right. All right. Okay. And what
6  else?
7      And on paragraph 40 you did claim to be the
8  owner of Cedar on behalf of -- on behalf of 4-H,
9  correct?
10 A    No.
11 Q    Or the barbecue -- 4-H -- okay. 4-H
12 Community Barbecue?
13 A    4-H/FFA --
14 Q    Okay.
15 A    -- Community Barbecue.
16 Q    Is there -- if I say 4-H Community
17 Barbecue, is there another -- is that separate than
18 the 4-H/FFA Community Barbecue?
19 A    No. It's the same. You just keep
20 forgetting FFA on there.
21 Q    I know. You heard -- that's what I'm
22 referring to. I don't think anyone will be
23 confused. I -- what I was asking you because if
24 there's another one and that's why you're so
25 sensitive to the naming.

Page 154

1  A    No.
2  Q    No. Okay. That's just the only barbecue.
3  Okay.
4      It's enough for that one. All right. All
5  right. Yeah. Give it to the court reporter for
6  tagging.
7      I just have a few more questions, then
8  we'll break for lunch. And then after lunch, we'll
9  have a few more follow-up, I think, but -- okay.
10     Give us a moment if you don't mind. Off
11 the record.
12     THE VIDEOGRAPHER: We're off the record and
13 the time is 12:03.
14     (Whereupon, recess for lunch was.
15     taken from 12:03 p.m. to 1:09 p.m.)
16     THE VIDEOGRAPHER: We're back on the
17 record. The time is 1309.
18 BY MR. GORDON:
19 Q    Ms. Muse, we're back on the record. You
20 understand you're still under oath, correct?
21 A    Yes.
22 Q    All right. So earlier you -- we went
23 over -- there's documents that we requested that you
24 produce today. We went over -- through the
25 categories and you said what you had and didn't

Page 155

1  have. So I'm going to ask some follow-up.
2      So specifically, what efforts did you take
3  to look for documents under this request that we
4  gave you?
5  A    I looked to see if I had any e-mails.
6  Q    Okay. How -- I'm sorry. Go ahead.
7  A    I looked in my text messages to see if I
8  had any text messages.
9  Q    Okay. Okay. And how many e-mails
10 addresses do you use?
11 A    Two.
12 Q    Two. And what are they?
13 A    My primary one is kathie, K-A-T-H-I-E
14 @musetrucking.com.
15 Q    Okay.
16 A    And I have one other one that I use for
17 another company I'm involved with, and it's kathie,
18 K-A-T-H-I-E, @SCLCexpo.com.
19 Q    Okay. All right. Okay. And you don't
20 have -- I mean, they appear to be business
21 addresses, but you use these personally, too?
22 A    One of them, yes.
23 Q    Which one is that?
24 A    The @musetrucking.com is also my personal
25 one.

Page 156

1  Q    Gotcha. Okay. All right. Okay. So you
2  checked all your e-mail address -- or your e-mails.
3  And you earlier testified you hadn't deleted any
4  e-mails, correct?
5  A    Pertaining to this?
6  Q    Yes.
7  A    No.
8  Q    Yeah, okay. And same thing, how many
9  phones do you use? I --
10 A    One landline and one cell phone.
11 Q    Okay. Obviously, you can't check the
12 landline. So one cell phone. You don't have a
13 company cell phone or anything like that that's --
14 A    No.
15 Q    -- separate? No.
16     Okay. And so you checked all -- you
17 checked all your text messages presumably?
18 A    Yes.
19 Q    And you hadn't deleted any, correct?
20 A    Pertaining to this case, no.
21 Q    Okay. All right. Okay. So we're
22 going to go through some of the documents you have
23 here so -- and some other ones that we have.
24     So first off, now you're certain you
25 haven't deleted any text messages, correct?

Page 157

1  A    Not pertaining to this case. Not to my
2  knowledge, I have not.
3  Q    Have you seen these before? These were
4  produced by Fer- --- Lieutenant Fernandez. We'll
5  mark these as Exhibit --
6      MS. SHAKIB: J.
7      MR. GORDON: -- J.
8      (Exhibit J was marked.)
9  BY MR. GORDON:
10  Q    Those -- any reason you didn't produce
11  these texts?
12  A    Well, as it states in here, I had a problem
13  with my phone, so they may not have been on my
14  phone. If you look on page 3, it says, "I've had a
15  problem with my phone and just got it fixed," so
16  it's possibly that when I was having a problem with
17  my phone it's no longer there.
18  Q    Hmm. Are your other text messages from
19  this period, did any of them disappear?
20  A    I don't know, because I got multiple texts,
21  business and personal, on this phone.
22  Q    Okay. Okay. So if you were to open your
23  phone now, would you have texts from -- from anyone
24  back at this period?
25  A    Yes, I did. I produced the ones I had to

Page 158

1  B.J.
2  Q    But -- oh, that's correct, you did. But
3  then these -- this particular thread is not on your
4  phone?
5  A    Correct.
6  Q    Did you check for it?
7  A    Yes, I did.
8  Q    Okay. Were you aware that you -- that you
9  had a text chain with Fernandez?
10  A    I was -- not at that time -- this time.
11  No, I completely forgot that I did -- was texting
12  with him about that.
13  Q    Okay. Okay. All right. So does this
14  refresh your -- so let's go through this.
15  So on August -- this is August 31st, so
16  this is presumably the -- this is the day that the
17  lawsuit was first filed. You -- it looks like you
18  texted him, is the DA going to do anything with the
19  goat? Did you recall doing that?
20  A    I'm looking at it, so yes.
21      MR. SNOWDEN: Well, that's a different
22  question. We know what the paper says. It --
23      THE WITNESS: Do I remember it?
24      MR. SNOWDEN: Well, let me -- let me
25  finish. Do you recall sending the text? That's the

Page 159

1  question.
2      THE WITNESS: No, I don't recall it.
3  BY MR. GORDON:
4  Q    Can you -- Ms. Muse, can you -- and with
5  your attorney, he can look over your shoulder, can
6  you check your phone to see in any of this text is
7  still in there? And then rely on his representation
8  or not.
9  A    (Indicating.) I don't even have Jerry --
10  Jerry's number in my phone.
11  Q    Did you ever have his number saved in your
12  phone?
13  A    Yes, I did.
14  Q    Okay. But it's not saved anymore?
15  A    No.
16  Q    Is B.J. Mcfarlane's number saved in your
17  phone?
18  A    His old number was, yes.
19  Q    What about Melanie Silva?
20  A    Yes.
21  Q    Okay. And the -- the Dahles are both in
22  your phone --
23  A    Yes.
24  Q    -- also. But Fernandez wasn't -- is
25  Fernandez's wife saved in your phone?

Page 160

1  A    No.
2  Q    Okay. What about the Michael Johnson, the
3  sheriff?
4  A    No.
5  Q    No? All right. Okay. So you -- as your
6  counsel's explained, we know what this says but do
7  you -- you do not recall sending this text?
8  A    No.
9  Q    Okay. All right. He responded same day,
10  "Hey, are you available for a phone call
11  mid-morning?"
12  You respond, "Yeah." Do you remember
13  having a -- oh, and then he says, "Sounds good.
14  Call you tomorrow." Do you remember if you had any
15  phone call?
16  A    No.
17  Q    Okay. He responds, I just -- I haven't
18  forgotten to -- this is the next day, Thursday,
19  September 1st. "I haven't forgotten to call you.
20  Just busy I will call you as soon as I can.
21  Thanks."
22  And you respond, "No problem whenever you
23  get a chance." And so it's like -- did you -- did
24  you ever get a call from him that you recall on that
25  date?

Page 161

1   A   No.
2   Q   Okay. September 2nd, "Hi Jerry this is
3   Kathie Muse did the DA decide to do anything with
4   the goat?"
5        So at this point in time you're -- you --
6   you wanted the DA to prosecute Jessica for the --
7   for -- for a criminal violation, yes?
8   A   I'm assuming that's what I wanted.
9   Q   Is there a reason that you could think of
10  that you did not want that at that time? You're
11  asking for it.
12  A   No. I mean, I'm assuming. I don't
13  remember making the text, so...
14  Q   Okay. Okay. But you remember at the time
15  you wanted her prosecuted, correct?
16  A   Yes.
17  Q   Okay. Okay. And he responds: "Not at
18  work today. I will have a bitter answer Tuesday
19  next week." I'm assuming better answer, I believe
20  you did testify to that. "Have a good weekend."
21       All right. And then you follow-up a few
22  weeks later. "Hi Jerry hate to bother you on a
23  weekend eve but did the DA do anything?" So this is
24  now Friday, September 9th.
25       He responds, "I will call you in a little

Page 162

1   bit."
2        So at that point in time, you still
3   thought -- you still thought prosecution was
4   appropriate, correct?
5   A   Yes.
6   Q   Okay. Is there any reason you followed up
7   so much -- multiple times over prosecution?
8   A   I wanted to know if the DA was going to be
9   doing anything with the case.
10  Q   Did you call the DA at all personally?
11  A   I didn't know what officer was doing it --
12  what officer was doing it at the DA's office, so no.
13  Q   Okay. Okay. Do you know anyone at the
14  DA's office?
15  A   No.
16  Q   No. Okay. So at this point, though, the
17  barbecue is over. Why did you still -- why were you
18  still adamant about the prosecution?
19  A   Because I believe something should have
20  happened with it.
21  Q   I see. All right. And then, "Hi Jerry,"
22  this is the next page September 15th. "Hi Jerry any
23  word on the DA? I just had the Sacramento Bee
24  call." Do you know who called you from the
25  Sacramento Bee?

Page 163

1   A   No. I did not take the call.
2   Q   Who did take the call?
3   A   My office staff did.
4   Q   Okay. What did they say to the Sacramento
5   Bee?
6   A   I don't know. I wasn't there.
7   Q   Okay. What did they tell you they said?
8   A   They just said that the Sacramento Bee
9   called and left a phone number.
10  Q   I see. For -- they called for you?
11  A   Yes.
12  Q   Okay. Okay.
13       (Whereupon, Mr. Bridges dropped from Zoom.)
14       THE COURT REPORTER: Someone dropped off
15  the line. Mr. Bridges.
16       MR. GORDON: Oh, he'll be back.
17       THE COURT REPORTER: Okay.
18  BY MR. GORDON:
19  Q   So at this point in time, the barbecue's
20  over, Cedar is confiscated. You really wanted
21  Jessica to be prosecuted for this, she's a mother,
22  over this even though she offered to pay?
23  A   Yes.
24  Q   Okay. Now when the Sacramento Bee called,
25  they asked for you. Did you call back?

Page 164

1   A   No.
2   Q   No? All right. Any reason you didn't call
3   back?
4   A   I didn't want to call 'em back.
5   Q   You just didn't want -- but why?
6   A   Because I did not want an interview with
7   them, and I had nothing to say.
8   Q   Okay. Okay.
9       (Whereupon, Mr. Bridges rejoined the Zoom.)
10      MR. GORDON: He's come back on.
11      THE COURT REPORTER: Give me one moment.
12      (Pause in proceedings.)
13      MR. GORDON: Case settled, John. You're
14  out.
15  BY MR. GORDON:
16  Q   Okay. So September 15th, it's "Afternoon.
17  Someone from the DA office should be calling you and
18  giving you an update." And you write, (as read)
19  "Thank you very much."
20       Did anyone from the DA's office call you?
21  A   No.
22  Q   No? Did you ever follow-up with Fernandez
23  that "Why didn't the DA call me?"
24  A   No.
25  Q   No? You're certain of that? Not just in

Page 165

1 text. Did you talk to him --
2 **A   Well, I --**
3 Q   -- on the phone?
4 **A   -- I may have asked him. But after a**
5 **while, it was, like, okay, nobody's going to do**
6 **anything and I got busy doing other things.**
7 Q   Okay. You followed up a bunch of times --
8 **A   Uh-huh.**
9 Q   -- no one said there were going to do
10 anything, and you were moving on presumably; is
11 that --
12 **A   No one said they were not doing anything.**
13 **Obviously, they weren't doing anything, so I just --**
14 Q   You didn't want to push anymore.
15 **A   I just proceeded with what I was doing. I**
16 **was busy at work.**
17 Q   Gotcha. Okay. All right. Okay. And then
18 there's where you mention your -- your phone issue.
19   So is this -- was it "Hi Jerry can you call
20 me back I was having problems with my phone and got
21 it fixed thanks Kathie Muse."
22   Did he ever call you back on the 23rd?
23 **A   I don't believe so.**
24 Q   Did he call you back in -- in response to
25 that text at any time?

Page 166

1 **A   No.**
2 Q   So from the 23rd, when was the next time
3 you spoke with Jerry Fernandez after the 23rd?
4 **A   I couldn't recall.**
5 Q   Couldn't recall. Okay. So have you spoken
6 with him since the 23rd up till now?
7 **A   Yeah. I talked to him at the fair this**
8 **last --**
9 Q   It --
10 **A   -- year.**
11 Q   Yeah. But at any other point in time?
12 **A   No.**
13 Q   No. Okay. So just the fair. Okay.
14   Okay. So you didn't delete this text
15 chain. You just happened to not have it on your
16 phone. You don't know why?
17 **A   Yes.**
18 Q   Did you --
19 **A   I mean, I don't even have this phone number**
20 **in my phone anymore, so --**
21 Q   Did you -- and you did not delete his phone
22 number?
23 **A   I didn't.**
24 Q   You did not?
25 **A   But I had a whole bunch of phone numbers**

Page 167

1 **get deleted.**
2 Q   Okay. Okay. All right. Okay. So -- what
3 exhibit was that?
4   THE COURT REPORTER: That is J.
5 **BY MR. GORDON:**
6 Q   J. Okay. All right. Did you also check
7 your -- you use social media?
8 **A   Yes.**
9 Q   Did you check your social media accounts
10 for any communications?
11 **A   I have looked at the past ones that if I**
12 **would have done anything, and I don't see any -- I**
13 **mean --**
14 Q   Did you look?
15 **A   The only thing I look at is Facebook.**
16 Q   Okay. Did you check your Facebook to see
17 if you have any --
18 **A   Yes, I did.**
19 Q   Okay. How far back did you -- did you go
20 back to this time period?
21 **A   Yes, I did.**
22 Q   Okay. All right. Okay. And did you
23 delete anything?
24 **A   It automatically gets to where you can't go**
25 **back and see some stuff. I'm not computer savvy on**

Page 168

1 **how far to go back and look at that.**
2 Q   Okay. So I'm going to give you -- this
3 will be Exhibit K.
4   (Exhibit K was marked.)
5 **BY MR. GORDON:**
6 Q   This is your social media, correct? Is
7 that you?
8 **A   Uh-huh.**
9   **MR. SNOWDEN:** Thanks.
10 **BY MR. GORDON:**
11 Q   All right. Okay. So you posted -- it
12 looks like you posted -- this is your post. This is
13 "Kathie's post" at the top although the screen
14 didn't capture everything, but "My heart goes out to
15 the -- to Shasta District Fair staff and
16 exhibitors." It's a Red Bluff Daily News article.
17 So you recall reposting that?
18 **A   Yes, I do.**
19 Q   Okay. All right. And your comment below,
20 the part that they are not reporting -- I'm reading
21 it -- (as read) "The bad part that they are not
22 reporting she sold the goat at the auction and took
23 the goat. It was all preplanned." What do you mean
24 it was all -- what did you mean when you said it was
25 all preplanned?

Page 169

1 A   She had a place to take the goat out of the
2 county so, to me, that meant that it was preplanned
3 before she took the goat from the fairgrounds.
4 Q   Okay.  So she took it back to her -- if she
5 took it back to her house, for example, would that
6 have been preplanned?
7 A   Yes.
8 Q   Okay.  So just taking the goat at all
9 anywhere would be preplanned under this logic?
10 A   Correct.
11 Q   It sounds like you're are referring to
12 something else?
13 A   No.
14 Q   No.  Just taking the goat is preplanned?
15 A   Yes.
16 Q   I don't have a follow-up, because that
17 doesn't make sense.
18    MR. GORDON: Do you have anything to add to
19 that?
20 By MR. GORDON:
21 Q   So it sounds like you're implying that --
22 that she took this goat and it was all part of
23 some -- part of some master plan to get press or
24 something like that.  Is that --
25 A   That wasn't -- it had nothing to do with

Page 170

1 the press.
2 Q   Did you have a suspicion -- or attention,
3 for example?
4 A   To me, where the goat went, it had to be
5 preplanned to take the goat there, but that was my
6 opinion.
7 Q   Okay.  Preplanned for what purpose?
8 A   I don't know what her purpose was.
9 Q   Okay.  Okay.  So preplanned for some
10 purpose?
11 A   Correct.
12 Q   Okay.  But you don't know what pur- -- what
13 purpose did you suspect?
14 A   Of taking the goat?
15 Q   Yeah.  What purpose did you sus- --
16 suspect?
17 A   I don't know.
18 Q   That's --
19 A   I know --
20 Q   What were your suspicions at the time?  You
21 must have had thoughts?
22 A   That it was preplanned to take the goat,
23 because they didn't like the 4-H.
24 Q   Because then like -- okay.  So you thought
25 she was retaliating against 4-H?

Page 171

1 A   And any other groups that sell animals.
2 Q   Okay.  So you -- okay.  So you thought she
3 was making a political statement almost with
4 animals, and -- and this was preplanned to
5 accommodate that statement or something like that?
6 A   That was my opinion, yes.
7 Q   Okay.  All right.  Okay.  I want to go
8 through -- so, by the way, when you said on here --
9 it says "whooo is me," I'm assuming you mean "woe is
10 me"?
11 A   Yes.
12 Q   "Woe is me."  Okay.  Is that how you spell
13 "woe"?  I'm not criticizing.
14 A   No, I don't believe that is.
15 Q   I don't know how to spell woe is me.  Okay.
16 I didn't know if you meant like --
17    MR. SNOWDEN: W-O-E.
18    MR. GORDON: Is that how you spell it?
19 W-O-E?  Okay.  Okay.  Like whoa.  All right.  Makes
20 sense.
21 BY MR. GORDON:
22 Q   I thought maybe you meant like -- like "Who
23 me?  I did it?"
24 A   No.
25 Q   Like in that.

Page 172

1    Okay.  So you thought it was preplanned
2 because it was a political statement and -- and, of
3 course, you disagreed with that political statement,
4 yes -- or that --
5 A   Personally.
6 Q   -- was your plan?
7 A   Yes.  (Nodding.)
8 Q   Okay.  Okay.
9    MR. GORDON: So, Kelly, you gave us three
10 copies of this text chain, but one of them is going
11 to evidence, one has my chicken scratch on it, and I
12 would like to keep one fresh.  Do you need one at
13 the moment?
14    MR. SNOWDEN: I think I still have one.
15    MR. GORDON: You have one.  Okay.  So you
16 don't mind if I -- I'm going to give this to -- or
17 Vanessa has one.  Well, I'm going to keep a fresh
18 one for just me for the exhibits.  So thank you.
19 BY MR. GORDON:
20 Q   So, Ms. Muse, I'm going to give you a copy
21 of the text chain that you produced today.  Now,
22 this is -- this is a -- this is going to sound like
23 a weird law expression, but you've been working in
24 it for a while so you probably know.
25    That -- that is a true and correct copy --

LONG vs.
FERNANDEZ

Page 173

1  I'm asking you now. This is a statement. That's a
2  true and correct copy of the text chain you had with
3  B.J. Mcfarlane on your phone, yes?
4  **A   At that time period, yes.**
5  Q   Yes. Okay. So you'd had text messages or
6  communications with him since related to this?
7  **A   No.**
8  Q   No? Okay. When did you stop?
9  **A   I don't know the specific date.**
10  Q   Thereabouts, when did you know?
11  **A   He go -- he -- I haven't had any contact**
12  **with B.J. except one phone call since.**
13  Q   When was that?
14  **A   Approximately three weeks ago.**
15  Q   Okay. Did you discuss your depo, I
16  presume?
17  **A   I just told him I was going in for a depo.**
18  Q   Okay. All right. And when was this?
19  **A   And we lost -- and we lost phone**
20  **connection. He was out of town traveling --**
21  Q   I see.
22  **A   -- and I have not talked to him since.**
23  Q   Well, before that, when was the last time
24  you had spoken with him?
25  **A   I don't recall.**

Page 174

1  Q   Okay. Did you speak with him within the
2  last year before that?
3  **A   Possibly because I believe that there was**
4  **another fair after that, and I purchased an animal**
5  **and he purchased it for me because I couldn't be**
6  **there.**
7  Q   Which fair was that?
8  **A   I believe it was McArthur.**
9  Q   Is that a county?
10  **A   Town -- town.**
11  Q   A town. Okay. It's in Shasta?
12  **A   Yes.**
13  Q   Okay. But it's not a -- is it one of the
14  state fairs?
15  **A   No. It's a county fair.**
16  Q   A county fair. All right. McArthur. How
17  do you spell McArthur? Is it M-A-C- --
18  **A   A-R-T-H-U-R.**
19  Q   So he might have bid on you -- at another
20  fair. When was the McArthur fair if you know?
21  **A   It would have been Labor Day whatever Labor**
22  **Day was of '22.**
23  Q   Okay. So last September or so thereabouts
24  you spoke with him. And did you speak with him
25  after that point?

Page 175

1  **A   I don't believe so.**
2  Q   Did he get you a -- did he successfully bid
3  on your behalf on any animals at that fair?
4  **A   Yes, he did.**
5  Q   Okay. So you spoke with him after the
6  bidding, but once the fair -- you mean at -- after
7  that fair was over and his bidding was done and the
8  animals were delivered, presumably, you haven't
9  spoken with him?
10  **A   Correct.**
11  Q   Okay. Okay. After the lawsuit was filed,
12  did you speak with him then?
13  **A   The orig- -- the original lawsuit?**
14  Q   Yes.
15  **A   I don't recall.**
16  Q   But apar- -- okay. Well, we'll wait for
17  that. Okay. But since then, you're confident no
18  communication since the McArthur fair, rather, up to
19  three weeks ago when you spoke -- when you spoke
20  to --
21  **A   Yeah, I might have talked to him a week**
22  **after the McArthur fair, but it would not have been**
23  **nothing in between then.**
24  Q   Yeah. So it was just generally that time
25  period --

Page 176

1  **A   Uh-huh.**
2  Q   -- then three weeks ago you speak to him
3  after you presumably were served with a deposition
4  subpoena --
5  **A   Correct.**
6  Q   -- about four weeks ago, whenever it was.
7  And then -- and then you haven't spoke with him --
8  did you speak with him after that?
9  **A   No.**
10  Q   No. Okay. So you didn't discuss your depo
11  or his upcoming depo --
12  **A   No.**
13  Q   Okay. All right. Okay. So let's --
14  let's -- if you go to your -- you have it in front
15  of you. So this will be Exhibit --
16  **THE COURT REPORTER: L.**
17  **MR. GORDON: Or L. All right. Exhibit L.**
18  All right.
19  (Exhibit L was marked.)
20  **MR. GORDON: Okay.**
21  **MR. SNOWDEN: What was K?**
22  **MS. SHAKIB: Facebook posts.**
23  **THE WITNESS: The Facebook posts.**
24  **MR. GORDON: Did I not hand that to you,**
25  Kelly? Yeah, right there. All right.

---

Page 177

1    MR. SNOWDEN: I just didn't make a note.
2    MR. GORDON: Oh, good.
3  BY MR. GORDON:
4    Q    All right.  So the first post on here looks
5  like June 28th, 2022, and it's -- it's a -- it's
6  a -- a post that was on Instagram.  You -- you
7  understand that, correct?
8    A    I don't know where -- if somebody just sent
9  that to me.
10   Q    So B.J. sent this to you.  What did you
11  understood it was at the time?
12   A    It was a post to where the goat was.
13   Q    Of where -- okay.  Where the goat was.
14  Okay.  Okay.  And did you read this at the time?
15   A    Yes.
16   Q    Okay.  So you understood that they were
17  trying to save Cedar as of June 28th, correct?  By
18  "they," I mean the plaintiffs, the mother and the
19  daughter, correct?
20   A    Yes.
21   Q    Okay.  Okay.  And -- okay.  And then you
22  respond -- you don't give any commentary to that,
23  but you -- you say you saw it, so that's good.
24  So did this -- oh -- yeah.  So the -- the posts on
25  here mention -- did -- did you see -- did you see --

---

Page 178

1  all right.  I'm not sure.
2    Can I have a copy of the post actually?
3  Sorry.
4    (Pause in proceedings.)
5    MR. GORDON: Did I give you that yesterday?
6  All right.  I -- I can't find the piece of paper I'm
7  looking for but -- okay.
8  BY MR. GORDON:
9    Q    Yeah.  So you saw this post.  You see that
10  they're trying to save Cedar.  Did you have any
11  reaction to this post?
12   A    To who?
13   Q    Yourself internally.  What were your -- how
14  did you react to seeing it?
15   A    I -- I -- I don't know.
16   Q    Were you angry that they were trying to
17  save Cedar?
18   A    I was not angry they were trying to save
19  Cedar.
20   Q    Okay.  How would you describe it then?
21   A    I was probably more angry over the
22  situation of her taking the goat after it sold
23  at the auction.
24   Q    Okay.  All right.  Okay.  So you -- you
25  were angry at with what Jessica did?

---

Page 179

1    A    Yes.
2    Q    Okay.  All right.  And the full -- this was
3  a post, I'll represent to you, on Instagram that had
4  mentioned the Dahles in it.  Did you alert the
5  Dahles to this post at all?
6    A    I believe they al- -- had already been
7  alerted.
8    Q    Okay.  And why do you believe that?
9    A    Because when I talked to 'em, and I don't
10  know exactly when the date was, they already knew
11  it.
12   Q    They already knew it.  Okay.  And what did
13  he say?  And this is Brian you spoke to?
14   A    Uh-huh.
15   Q    Okay.  And what did he say to you?
16   A    He said he'd already known about it.
17   Q    Okay.  Anything else?
18   A    No, not to my recollection.
19   Q    Not to your recollection.  He didn't say,
20  "Let 'em -- let 'em pay me back and move on,"
21  anything like that?
22   A    That, I know he did not say.
23   Q    Okay.  To you?
24   A    To me.
25   Q    Okay.  Yeah.  Are you aware that Jessica

---

Page 180

1  hand-delivered a letter to Brian Dahle's office on
2  the morning of the 26th, I believe -- or, I'm sorry,
3  27th, the day after, Monday morning, and offered to
4  pay everything back, et cetera?
5    A    Was I aware of when?  I mean, now?  Back
6  then?
7    Q    Yeah.  Let's say at the time of this -- so
8  as of June 28th, were you aware of it at that point
9  in time?
10   A    No.
11   Q    When did you become aware of it?
12   A    I really can't recall the exact date that I
13  heard that -- I had heard that she had con- -- had
14  called them, but I couldn't tell you what date it
15  was I heard that.
16   Q    Okay.  Was it in -- was it in June or is
17  it --
18   A    It was in June.
19   Q    In June, okay, of '22.  Okay.
20    Were you aware that his office told my
21  client that they were -- he was generally okay with
22  Cedar living, something to that effect?
23   A    No.
24   Q    No?  Okay.  Did you ask him?
25   A    I was not aware of the conversation.

---

Case 2:22-cv-01527-DAD-AC   Document 125-4   Filed 11/19/24   Page 48 of 82

LONG vs.                                                                    KATHIE MUSE
FERNANDEZ                                                            November 13, 2023

Page 181

1  Q   Okay.  Did you ask?
2  A   No.
3  Q   No.  Why not?
4  A   Because he didn't own the goat.  He had
5  signed the goat already over to the barbecue -- the
6  4-H/FFA Community Barbecue.
7  Q   Okay.  As of what date are you talking
8  about?
9  A   As of the date of the auction.
10  Q   Okay.  But he hadn't paid as of that date,
11  though, too, correct?
12  A   I have no clue if he paid or not.
13  Q   Well, you saw the invoices earlier and you
14  said that suggests that he hadn't, correct?
15  A   I have no idea how they do their
16  bookkeeping down there.
17  Q   I understand that.  But the invoices
18  earlier you said suggest he did not, correct?
19  A   To me --
20      MR. SNOWDEN: Misstates testimony.
21      But go ahead, you can answer.
22      THE WITNESS: To me, when you get an
23  invoice, you could still have already paid it --
24  ///
25  ///

Page 182

1  BY MR. GORDON:
2  Q   Sure.
3  A   -- and it got crossed in the mail, so I
4  don't know.
5  Q   Did you ask if he had paid?
6  A   No.
7  Q   Why not?
8  A   Because I knew he'd always handled his
9  bills.
10  Q   Okay.  Okay.  So you did not -- okay.  But
11  you did not know at this time whether plaintiffs had
12  been paid or had not been paid when the goat was
13  taken, correct, as of June the 28th, 2022?
14  A   The plaintiffs being the Longs?
15  Q   Yes.  Yes.
16  A   My dealings with 4-H are always that they
17  are paid -- the child's paid for the animals usually
18  a month after the fair.
19  Q   Okay.
20  A   I don't deal with that with the
21  fairgrounds.  I have nothing to do with that, with
22  the checks or anything, so I -- I don't know.
23  Q   So -- but you're -- from what you just
24  said, you suspected that they were not paid at that
25  point in time.

Page 183

1  A   I don't know when they got paid.
2  Q   Okay.  And I understand you don't know.
3  But you just said your dealings with the
4  fairgrounds, that usually comes afterwards, so --
5  A   I know when the other 4-H groups receive
6  their checks, I'm assuming, but I --
7  Q   Yeah.
8  A   -- don't -- I'm not their --
9  Q   Did you ask -- did you ask anyone if they
10  were paid at that point in time?
11  A   When?
12  Q   As of June 28th when this Instagram --
13  A   June 28th, the child has not received their
14  check yet.
15  Q   Okay.  But do you -- okay.  So they did not
16  receive their check.  Okay.  There's no question.
17  A   The -- on that date, no.  The children, in
18  all the past history I've been involved with, the
19  child -- the child does not get their check the day
20  of the fair or the day after.  It's usually within a
21  month.
22  Q   Okay.  So it stands to reason then that the
23  Longs were not paid at the -- as of June 28th or in
24  June at all, correct?
25  A   That's my -- that's the way I've dealt with

Page 184

1  my club that -- I know our club was not paid for
2  their animals yet.
3  Q   Okay.  Okay.  All right.  And you didn't
4  follow up to see if they were an exception to see if
5  they were actually paid by that point in time?
6  A   No.
7  Q   Okay.  All right.  And who gives the in- --
8  earlier we -- when I showed you some invoices, do
9  you know who provides invoices to the Dahles?
10  A   I provide the invoice to the Dahles.
11  Q   You provide the invoice to the Dahles?
12  A   That's what I testified.
13  Q   Oh, so the documents that you -- you
14  provided them to the Dahles?
15  A   Yes.
16  Q   Oh, so you --
17  A   That's why there's no address on there
18  because the fairgrounds didn't have a --
19  Q   So that was --
20  A   I --
21  Q   -- generated by you?
22  A   No.  The invoice was generated by the
23  fairgrounds.
24  Q   Okay.
25  A   And since I'm the buyer for them --

Page 185

1  Q   Okay.
2  A   -- they sent me -- they sent me the bill
3  because I did not know their addresses in
4  Sacramento.
5  Q   Okay.
6  A   And I got the address, because I had it at
7  my office and mailed it to 'em.
8  Q   Okay.  So the print date of the those
9  invoices was July 6th.  And do you know about when
10  you provided them to the Dahles?
11  A   I would have done it within a week.
12  Q   Okay.  So you knew at that point in time
13  the -- Cedar had not been paid for to the fair,
14  correct?
15  A   To the fairgrounds, yes.
16  Q   Okay.  All right.  Okay.  By you or the
17  Dahles?
18  A   I don't know if the Dahles would have sent
19  one first.  I don't know.
20  Q   Did you -- but did you ask?
21  A   No.  I just mailed the bill.
22  Q   Okay.  All right.  Okay.  Okay.  All right.
23  So you see this post and you don't respond to it.
24  It looks like the next day you respond to -- to B.J.
25  and you give -- I'm assuming this number is Chad.

Page 186

1  Is that Chad Fowler?
2  A   I would assume so.
3  Q   I'm asking you is it Chad Fowler?
4  A   I don't his phone number off the top of my
5  head, so I don't know.
6  Q   Is there another Chad you would have been
7  dealing with --
8  A   I have a couple of other Chads.
9  Q   Who -- what other Chads could this have
10  been?
11  A   It could have been Chad Amen was Shasta
12  Farm.
13  Q   Chad Amen from Shasta Farm.
14  A   Uh-huh.
15  Q   And what -- what relevance would he have
16  had to this dispute?
17  A   I don't know because that was back in June.
18  And that may not have had anything to do with the
19  dispute.  I may have just texted him a phone number.
20  Q   Do you suspect this is Chad Fowler, though?
21  A   I don't know.
22  Q   Okay.  That's why I'm saying, do you
23  suspect it was Chad Fowler.
24  A   I -- I --
25  Q   So you're saying 50/50 it could be

Page 187

1  Chad Amen also.
2  A   50/50, it could be another Chad I know.
3  I --
4  Q   So 30/30/30 -- it's one-third, one-third,
5  one-third.
6  A   I mean, I don't know either one of their
7  numbers by heart.
8  Q   I understand that.  But I'm saying, do you
9  suspect this is Chad Fowler?
10  A   I don't know.
11  Q   Did you have a conversation with
12  B.J. Mcfarlane is about Chad Fowler?
13  A   I cannot recall.
14  Q   Okay.  All right.  Okay.  And this doesn't
15  refresh your memory whether -- what Chad this was?
16  A   No.
17  Q   Okay.  All right.  Okay.  All right.  So he
18  responds "Sheriffs r working on it now."  Do you
19  know which sheriffs he's talking about?
20  A   No.
21  Q   Do you know if B.J. called the sheriffs
22  first?
23  A   I don't know who called the sheriff's
24  department first.
25  Q   Okay.  So "Thanks jKeep me up updated."  Is

Page 188

1  the --
2  A   It's misspelled.
3  Q   -- J a mistake?
4  Okay.  Then you don't call him J as a short
5  for B.J. or anything like that?
6  A   No.  It's a misspelling.
7  Q   Okay.  Okay.  "Will do."  Okay.  July 9th,
8  "Goat is at my house."  So this is B.J. instructing
9  you the goat is at his house, correct?
10  A   Yes.
11  Q   And the goat is Cedar, yes?
12  A   I'm assuming.
13  Q   Okay.  Did you all -- talk to B.J. on the
14  phone after that?
15  A   I couldn't recall.
16  Q   You don't have any rec- -- recollection you
17  talked to him on the phone?
18  A   I may have.  I -- I don't know.
19  Q   Do you think you did?
20  A   Possibly.
21  Q   Possibly.  I know it's possible.  That's
22  why I'm asking you --
23  A   I -- I don't know that --
24  Q   This is why we're subpoenaing your phone
25  records.  You cannot remember any calls.

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

---

Page 189

1       MR. SNOWDEN: Be patient. Let the question
2   come out. Go ahead and try to answer it if you can.
3   BY MR. GORDON:
4   Q   Yes. Now, do you recall speaking to him on
5   the phone in response to this text where it says,
6   "Goat is at my house"?
7   A   Possibly.
8   Q   Okay. Okay. Possibly. Why are you saying
9   "possibly"? You think you -- you think you did --
10  A   Because --
11      MR. SNOWDEN: Let the question come out,
12  please, or our reporter is going to strangle me.
13      THE WITNESS: This has been over a year and
14  a half ago.
15  BY MR. GORDON:
16  Q   I understand.
17  A   I don't know if I did. And that was the
18  day of the barbecue.
19  Q   Yes.
20  A   I was really busy --
21  Q   Okay.
22  A   -- the day of and two days afterwards.
23  That's all I do is work the barbecue stuff. I don't
24  know if I talked to him specifically after that text
25  on the phone.

---

Page 190

1   Q   Okay. I'm not necessarily limiting it to
2   that day. So he's texts "Goat is at my house." Is
3   the next -- the next text you have is on here is
4   June 11th -- or July 11th, I apologize. So did you
5   speak with him at any point in time on the phone
6   between July 9th and July 11th the next
7   communication?
8   A   It is possible, yes.
9   Q   It is possible. Okay. Do you think it's
10  likely?
11  A   Possibly, yes.
12  Q   Well, which one?
13  A   I don't know.
14  Q   Okay. All right. Okay. We're just going
15  to have to subpoena your phone records and have to
16  do it the hard way.
17      All right. So B.J. responds -- okay. Did
18  you ever have a conversation about -- with B.J.
19  about Cedar being at his house at any point in time?
20  A   Yes.
21  Q   When?
22  A   I don't recall exactly what date it was.
23  Q   Okay. Was it around this time?
24  A   Yes.
25  Q   Okay. And what did you discuss on the

---

Page 191

1   phone?
2   A   That he was able to take care of Cedar.
3   Q   Okay. So he -- that he -- okay. So food,
4   water, et cetera?
5   A   Uh-huh.
6   Q   Okay. All right. All right. So then B.J.
7   responds on July 11th, (as read) "Good morning. I
8   am gone till tomorrow afternoon, talked to sheriff
9   and he said to wait -- he said to wait until he
10  talks to DA before we kill the goat. It's perfectly
11  fine at my house till we figure it out. Just wanted
12  to touch base with you."
13      So do you know which sheriff he spoke to?
14  A   No.
15  Q   Did he tell you on the phone?
16  A   No.
17  Q   So it could have been -- it could have been
18  the actual Sheriff Michael Johnson for all you know?
19  A   Well, I assumed it wasn't the sheriff's
20  department because it says he talks to the DA.
21  Q   He says, "Talked to sheriff and he said to
22  wait until he talks to --
23  A   Oh.
24  Q   -- he talks to the DA."
25  A   Don't know what sheriff.

---

Page 192

1   Q   Do you -- do you suspect it was
2   Jerry Fernandez?
3       MR. NORTHCUTT: Objection. Calls for
4   speculation.
5   BY MR. GORDON:
6   Q   It's his client so he can object.
7       But do you suspect?
8   A   I don't know who he was talking to.
9   Q   That's why I'm asking, do you suspect. You
10  received this text, yes? You recall receiving it?
11  A   Uh-huh.
12  Q   Who do you think he was talking about?
13  A   I don't know. There was more than one --
14  there was more than Fernandez involved in it.
15  Q   Okay. So you thought it could be Fernandez
16  or Duncan?
17  A   Or it could have been the sheriff.
18  Q   One of those three. Anyone else?
19  A   Or it could have been our sheriff sheriff.
20  Q   Our sheriff sheriff.
21  A   Whoever you said is our sheriff, Ander- --
22  Q   Michael -- Michael Johnson is the sheriff.
23  Yeah.
24  A   It could have been Michael Johnson. I
25  don't know.

---

Page 193

1  Q   Okay.  Okay.  But that's what I'm asking.
2  Who did you sus- -- who did you read this at the
3  time of thinking it was?
4  A   **Probably the sheriff.**
5  Q   The actual sheriff?
6  A   **The actual sheriff.**
7  Q   Okay.  All right.  Any reason you didn't
8  think it would have been Fernandez?
9  A   **No.  Because I had -- did not have a clue**
10 **who -- which sheriff he was talking to.**
11 Q   Does B.J. talk to the sheriff?
12 A   **I don't know.**
13 Q   Do you know if he knows Michael Johnson?
14 A   **I don't know.**
15 Q   Okay.  All right.  So he said to -- so
16 some- -- someone, the sheriff, said to wait until he
17 talks to DA before you kill the goat.  Who -- yeah.
18 What did you think the sheriff had to talk to DA
19 about?
20 A   **Whether we had permission to dispose of the**
21 **goat, because there is a time limit on 4-H and FFA**
22 **animals in certain feeds to keep them in the prime**
23 **condition of what they were raised for.**
24 Q   So if it's your -- but why are you waiting
25 until he talks to the DA if it's -- if it's your

Page 194

1  property -- or the -- or 4-H barbecue's property or
2  whoever's property is it.  Why are you waiting
3  before the DA tells you what to do?
4  A   **Because we were told not to depose of the**
5  **goat until they told us to.**
6  Q   Who told you had not to dispose of the
7  goat?
8  A   **The sheriff's and the DA's office.**
9  Q   They told you not to dispose of the goat?
10 A   **Correct.**
11 Q   Okay.  And when about was that?
12 A   **I don't know.**
13 Q   Before this text?
14 A   **I'm assuming it was before the text,**
15 **because it was after the barbecue.**
16 Q   Okay.  Okay.  So sometime between July 9th
17 and July 11th you're told by the sheriff and the DA
18 not to -- not to kill Cedar?
19 A   **Correct.**
20 Q   Okay.  Okay.  Did they tell you or B.J.?
21 A   **B.J.**
22 Q   B.J.  Okay.  And he communicated to you.
23 Okay.  Okay.  All right.  Okay.  So -- so -- okay.
24     Did you know of that through any other way
25 other than this text?

Page 195

1  A   No.
2  Q   Phone?
3      Okay.  So -- okay.  Did you talk with him
4  about the text after receiving it?
5  A   **I don't believe so.**
6  Q   Okay.  All right.  Okay.  So the next --
7  the next -- the next text looks from you to B.J.,
8  (as read) "Jeff at Kent's said he -- it probably
9  would be a week before he can get the goat.  Will
10 they be okay if -- if -- if not, I can come -- or I
11 can find a temporary home."
12     Okay.  Jeff.  Jeff at Kent's is that a -- is that
13 a butcher?
14 A   **Yes.**
15 Q   Okay.  Do they do the slaughtering -- is --
16 does Jeff do the slaughtering?
17 A   **No.**
18 Q   No.  Who -- who -- who does?
19 A   **They hire somebody.**
20 Q   They hire someone.  Okay.
21     So had you kept Cedar at your house at any
22 point in time?
23 A   **No.**
24 Q   No.  Okay.  So the next -- next response,
25 it looks like it's from B.J.  He responds, "He's a

Page 196

1  good at my place."  So he just -- so B.J. just kept
2  Cedar at his place for this period of time, correct?
3  Is that your understanding?
4  A   **Yes.**
5  Q   Okay.  And then on the 25th you write, "Hey
6  B.J. what did you end up doing with the goat?"
7      Was there something he was supposed to be
8  doing?  What -- what are you asking here in this
9  question?
10 A   **What did they end up telling -- or do we**
11 **still keep the goat?  Do you need -- you know, if**
12 **you're -- still got the goat, do I need to give you**
13 **money for food?**
14 Q   Oh, I see.  I see.  I see.  Okay.  Were
15 you -- were you asking -- would -- possibly asking
16 what the status was with the sheriffs and the DA at
17 this point in time also?
18 A   **Yes.**
19 Q   Okay.  Okay.  So if you -- but if you owned
20 the goat for the barbecue or the -- the 4-H/FFA -- I
21 know you're very sensitive of the name.  The 4-H/FFA
22 Community Barbecue, if that was the owner of the
23 goat, what are you talking with B.J. about it for?
24 A   **Because somebody had to reimburse B.J. for**
25 **the feed and everything.  He was feeding the goat.**

---

Page 197

1   Q   I see.  Okay.  Now if you had just asked
2   Jessica, I'm sure she would have paid --
3   A   I don't know --
4   Q   -- at the time.
5   A   -- Jessica.
6   Q   Yeah.  Okay.  Why didn't you -- why didn't
7   you deal with the -- the sheriffs and the DA
8   directly?
9   A   I didn't know which sheriff's department --
10  which sheriff's office that they were working with
11  exclusively on this one, and I didn't know which DA
12  it was.
13  Q   Okay.  But you tried to a few weeks later,
14  correct, because you were texting Fernandez to -- to
15  what the status of the DA, et cetera?
16  A   Correct.
17  Q   Okay.  All right.  So at this point in time
18  you just hadn't tried to yet?
19  A   Correct.
20  Q   Okay.  So is any particular -- why did
21  you -- why did you use B.J., is there any particular
22  reason, to -- to -- to store Cedar?
23  A   He had a place for him.
24  Q   Okay.  Just room.
25  A   Uh-huh.

---

Page 198

1   Q   Okay.  Fair enough.  All right.  Okay.  So
2   the next -- on July 28th now, this is -- so I have a
3   question.  So on July 25th and the next -- net one
4   comes up July 28th, did anyone tell you at this
5   point in time that Ms. Long's attorney had, you
6   know, had called the sheriffs office asking where
7   Cedar was?
8   A   No.
9   Q   No?  Okay.  All right.  B.J. -- Fernandez
10  didn't tell you?
11  A   No.
12  Q   No?  Okay.  All right.  Okay.  So what
13  was -- to your knowledge, the text on July 11th --
14  11th where you're asking for the status of DA and
15  the sheriff, so what were they -- what was -- what
16  was the DA determining in this period of time to
17  your knowledge before the --
18  A   I --
19      MR. SNOWDEN:  I'll object.  That calls for
20  speculation.  So he's only -- he's only asking if
21  you know.
22  BY MR. GORDON:
23  Q   Yeah, if you know.
24  A   I -- I don't know.
25  Q   Was he -- do you know -- okay.  What did

---

Page 199

1   you assume he was -- was figuring out before --
2   A   I --
3   Q   -- you went?
4   A   -- have no clue.
5   Q   Okay.  Did the DA ever tell you, green
6   light, you guys can go through with the slaughter?
7   A   They did not tell me that, no.
8   Q   Did they tell B.J.?
9   A   Yes.
10  Q   Okay.  The DA did tell B.J.?
11  A   I don't know if it was the DA.
12  Q   Okay.  But someone from law enforcement in
13  your mind did.  So either the sheriff's, the DA; is
14  that what you're telling me?
15  A   Correct.
16  Q   Okay.  Did you think at that point in time
17  if they had to do all of that that ownership might
18  be in question?
19  A   No.
20  Q   No?  Why not?
21  A   Because I -- in my mind in my opinion, the
22  barbecue was the one who owned the goat.
23  Q   Okay.  But if they had -- if the DA and the
24  sheriffs presumably had to go through some analysis
25  to figure out who did, did that -- did that tell you

---

Page 200

1   at the time, well, this is still -- there's still a
2   question here?
3   A   No.
4   Q   No.  Okay.  All right.  Did you ever think
5   to call Jessica?
6   A   No.
7   Q   Reach out to her at all?
8   A   I have no -- I don't even know the lady.
9   Q   I understand.  Did you ever consider doing
10  it?
11  A   No.
12  Q   No.  Okay.  All right.  Okay.  And so the
13  next text on July 28th.  "Bowman is killing goat
14  today."  This is Cedar, yes?
15  A   I'm assuming.
16  Q   Okay.  Did you have any reason to think it
17  isn't?
18  A   I'm assuming it was Cedar.
19  Q   Yes.  Thank you.  Okay.
20      "They are such a shit show."  What is --
21  what does that mean?  I know what the expression
22  means, but what's he -- what does he mean here?
23  A   Bowman Meats --
24  Q   But what --
25  A   -- is -- it's just the way that they run

---

Page 201

1 their company.
2 Q    Oh, why -- why is it a shit show?
3 A    Because they're very disorganized.
4 Q    Okay. All right. Okay. All right. And
5 then you write, "Good news finally." Yes, Cedar is
6 dead. Awesome.
7 A    No, that's not what I thought.
8 Q    What did you mean by that "Good news
9 finally" then?
10 A    That there was going to be finally an end
11 to this.
12 Q    Ah, okay. All right. "Yes, they have been
13 that way" -- now, you're talking about Bowman's
14 here, right? "They have been that way for years
15 always amazed they are still in business." Okay.
16 You are -- the second sentence is talking about
17 Bowman, I assume, yes?
18 A    Yes.
19 Q    Okay. Then please "don't forget to save
20 the ear tags." Did you -- did you ever receive
21 Cedar's ear tags?
22 A    No.
23 Q    Who has them?
24 A    My understanding is B.J. has 'em.
25 Q    Okay. Why would -- why would you want them

Page 202

1 saved?
2 A    Because we were told to make sure we saved
3 the ear tags.
4 Q    Who told you that?
5 A    I -- I was not told that. I was told from
6 B.J. that the DAs and the sheriffs office, I don't
7 know which department, had told him to make sure
8 that we save the ear tags.
9 Q    Okay. Do you know when the sheriffs told
10 him that?
11 A    No.
12 Q    Okay. How were you told?
13 A    B.J. told me.
14 Q    B.J. told you. Do you know when he told
15 you?
16 A    No.
17 Q    Okay. Was it -- it must have been in
18 person or over the phone, though, because it's not
19 on this text chain.
20 A    Yes.
21 Q    About -- this is July 28th. Do you know
22 about how much before this period of time you
23 knew -- knew that?
24 A    I was assuming that it was when they told
25 us that we could have the -- the goat butchered.

Page 203

1 Q    Okay. And do you know about when that was?
2 A    No.
3 Q    Okay. Well, it would have been before this
4 date obviously. Sometime between July 11th and the
5 28th. Do you know if -- do you know closer to the
6 28th, or did you wait several weeks?
7 A    No, we did not wait several weeks.
8 Q    Okay. So it would have been within a few
9 days preceding the 28th then, I presume?
10 A    I am assuming, yes.
11 Q    Okay. But do you recall? One or two days
12 beforehand?
13 A    I don't know when he got the call.
14 Q    Okay. When did B.J. tell you, though?
15 A    July 28th.
16 Q    So this is the first time you learned of
17 it?
18 A    That Bowman was going to do it, yes.
19 Q    Okay. But no, when did you learn
20 that the DA and the sheriffs gave you the green
21 light, though? That's what I'm asking.
22 A    I'm assuming I knew it on the 28th.
23 Q    Okay. So you read this text -- you
24 hadn't -- you don't recall speaking to him over the
25 phone and you're telling me -- it's your testimony

Page 204

1 that you learned -- or you inferred from this
2 statement that the DA was okay with it. Is that
3 your testimony?
4 A    Yes.
5 Q    Okay. So B.J. never told you over the
6 phone. Fernandez never told you. Sheriff never --
7 A    Not that I recall, no.
8 Q    -- told you. None of the DAs ever told
9 you. Okay. All right. Okay. All right.
10       And B.J. still has the ear tags to your
11 knowledge?
12 A    To my knowledge, yes.
13 Q    Okay. So Cedar was alive till the 28th.
14 Okay. And what -- what had hap -- what happened to
15 him afterwards after he was killed?
16 A    He was given back to the Shasta Live- --
17 Junior Livestock Auction board. He was given back
18 to the Junior Livestock Auction.
19 Q    What? As cuts?
20 A    I'm assuming.
21 Q    Well, it's your -- you're claiming it's
22 your goat for the fair. What happened to your
23 property or to the fair's property?
24 A    They replaced it to me for the barbecue.
25 The fair board or the Junior Livestock Auction

---

Page 205

1 replaced that fair to us -- or replaced Cedar so
2 that we had a goat at the auction.
3  Q  I see. So Cedar was just given back. Is
4 he in a freezer somewhere or was he served or --
5  A  I have no --
6  Q  -- what?
7  A  And he was not served --
8  Q  So he --
9  A  -- at the barbecue.
10  Q  So did he even go to any of -- anyone's
11 plate, or is he -- was he just killed to go back to
12 Shasta -- to the fair as reimbursement?
13  A  I don't know what happened. My
14 understanding, what I was told was he went back to
15 somebody that had a problem with another goat that
16 had been butchered. So we, in turn, replaced Cedar
17 with that goat.
18  Q  Okay. So Cedar went out -- was replacement
19 meat for someone else?
20  A  Yes.
21  Q  Okay. When you say that the Junior
22 Livestock Auction, you -- you mean the -- you mean
23 the -- the fair, correct?
24  A  Well, I call it the Junior Livestock
25 Auction. I don't know how they -- I don't know what

Page 206

1 they do; two different in entities or not.
2  Q  Well, you said there's a livestock auction
3 board, but the fair's -- that that's under the
4 umbrella of the fair, correct?
5  A  I believe so.
6  Q  Okay. So Cedar went back to the -- the
7 fair in some capacity?
8  A  Yes.
9  Q  Okay. Okay. On the 28th. All right.
10  Okay. I -- I had a big shake at lunch. I
11 need to use the restroom. Go off the record.
12  THE VIDEOGRAPHER: We're off the record.
13 The time is 13:57.
14  (Whereupon, recess was taken from
15  1:57 p.m. to 2:07 p.m.)
16  THE VIDEOGRAPHER: We're back on the
17 record. The time is 1407.
18 BY MR. GORDON:
19  Q  Okay. All right. Ms. Muse, so we're still
20 going through the -- the text chain you had here
21 which was marked as, I believe it's, Exhibit L. So
22 I think we left off at ear tag.
23  So B.J. has the ear tags pursuant to
24 instructions from the sheriff and the DA or law
25 enforcement or something is your understanding,

Page 207

1 correct?
2  A  Yes.
3  Q  All right. And -- okay. So the next page,
4 this is -- looks like from the bottom, it says,
5 August 31st, so that makes sense. So this lawsuit's
6 filed. And then -- that's at the top of the page.
7 It's Sheriff's Deputies Broke the Law to Hunt Down
8 Child's Beloved Goat for Slaughter, and then it has
9 our firm's website. And then it says your response,
10 "What a bunch of shit, angry face." Pardon my
11 French. What part was a bunch of shit or what are
12 you referring to here?
13  A  The lawsuit.
14  Q  The lawsuit. Okay. The lawsuit is a bunch
15 of -- any particular aspect?
16  A  It's just how I feel.
17  Q  Gotcha. All right. Okay. And the -- so
18 you were angry at the time assuming from the angry
19 emoji?
20  A  Possibly.
21  Q  Okay. All right. So did you talk with
22 B.J. on the phone after sending that text at all?
23  A  No.
24  Q  No? Okay. Did you talk to anyone on the
25 phone after sending that text?

Page 208

1  A  I don't recall.
2  Q  Did you ever talk to anyone on the phone
3 ever about that lawsuit apart from your attorney?
4  A  My husband.
5  Q  Yeah. Okay. Okay. Anyone else?
6  A  Probably my mother.
7  Q  Okay. Probably -- okay. All right. Did
8 your mother also think it was a bunch of shit?
9  A  Yes.
10  Q  Okay. Did she use that colorful language?
11  A  Yes.
12  Q  All right. So what part of it made
13 you angry? You weren't sued in the -- at this point
14 in time you were not named as a defendant, so what
15 particular part upset you?
16  A  My opinion only, and it's my opinion --
17  Q  Of course, yes.
18  A  -- I think it's a waste of time.
19  Q  Sure. Do you think driving 500 miles round
20 trip for a goat that she offered to reimburse was
21 also a waste of time?
22  A  No.
23  Q  Why not?
24  A  Because I'm for the principle of the fact.
25  Q  Okay. Even Cal- -- even though in

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

Page 209

1  California a minor can disaffirm a contract if they
2  offer to pay anything back?
3  **A    I don't know anything about the laws on**
4  **that.**
5  Q    You don't know anything about the laws on
6  that.
7       Did you ask any- -- when you saw that in
8  the -- in the Complaint that a minor -- because you
9  read the Complaint presumably -- and you saw that a
10 minor can -- can back out of a contrat, did you have
11 any thoughts on that?
12 **A    I had my own thoughts, yes.**
13 Q    Which were?
14 **A    There was a contract signed by the parent**
15 **also.**
16 Q    Okay.  Okay.  That's not my question.  But
17 do you have any thoughts on -- in particular, a
18 minor's right in California to disaffirm?
19 **A    I wouldn't let my kids do that, so that's**
20 **my opinion.**
21 Q    I understand.  Okay.  So you think that
22 should not be the law in California?
23 **A    I think that's my opinion.**
24 Q    That -- you're -- and you're free to it --
25 **A    I don't --**

Page 210

1  Q    -- yes.  If you don't think it's -- hey,
2  preach.  I just want to -- so you think that
3  shouldn't be the case in California.  I mean, it --
4  it is but you --
5  **A    Every case --**
6  Q    -- think that shouldn't be the case?
7  That's fine.
8  **A    Every case is different.**
9  Q    I understand.  Okay.  Most -- sidebar.
10      Most -- I think -- I believe every state
11 does have that rule.  It's either a common law or
12 it's codified just 'cause it's a minor.  Anyway, I
13 digress.
14      So the next -- so -- or -- well, are you
15 angry you're sued now by the same token?
16 **A    No.**
17 Q    No?  Okay.  All right.  Third lawsuits.
18 Three times a charm.  Well, you weren't sued in the
19 other one, you said, right?  It was the company.
20 You weren't --
21 **A    Correct.**
22 Q    -- personally named then.  Okay.  All
23 right.
24      Okay.  So the next -- this is presumably
25 the same day or I read the text the same day,

Page 211

1  August 31st, you -- B.J. responds, "I sent to
2  Melanie and Jerry."  So "Melanie" being
3  Melanie Silva, yes?
4  **A    I am assuming.**
5  Q    Okay.  And "Jerry" being Jerry Fernandez?
6  **A    I am assuming.**
7  Q    Okay.  All right.  "Told Melanie to send
8  the CDFA to get this taken care of quickly in the
9  media."  What did you understand that to mean when
10 B.J. said that to you?
11 **A    Before the media gets it and completely**
12 **makes it out of proposition.**
13 Q    I see.  Okay.  So you didn't want our
14 client going to the media then, because you thought
15 it would be taken out of -- you know, spun or taken
16 out of proposition or -- use your words.
17 **A    In my -- my personal opinion, yes.**
18 Q    Okay.  So did he -- did he ever -- okay.
19      Did you call B.J. at all after receiving
20 that text?  I know you responded below but did --
21 **A    I don't believe so.**
22 Q    -- you have a conversation with him about
23 CDFA and getting it taken care of quickly in the
24 media?
25 **A    I don't believe do.**

Page 212

1  Q    Okay.  So -- and with your -- I know
2  you're -- he's responding to your angry emoji.  Were
3  you -- were you respond -- were you upset that it
4  was, you know, online in general and being
5  advertised?  The lawsuit?
6  **A    In my -- yes.**
7  Q    Okay.  And you write, "Yup."  And so your
8  response to getting it taken care of quickly in the
9  media, you respond, "Yup because it is probably all
10 ready out."  So do you mean probably already out,
11 like, in the media?
12 **A    Yes.**
13 Q    Okay.  All right.  Okay.  So I -- I
14 understand you think this is a waste of taxpayer
15 dollars.  So you think she shouldn't have filed a
16 lawsuit at all?
17 **A    In my opinion, yes.**
18 Q    Okay.  All right.  So are you upset that
19 she filed the lawsuit?
20      **MR. SNOWDEN:** Asked and answered.
21      You can answer it again.
22      **THE WITNESS:** I'm not now.  I was --
23 **BY MR. GORDON:**
24 Q    But you were --
25 **A    -- at the time.**

LONG vs.
FERNANDEZ

Page 213

1  Q   Okay.  All right.  Okay.  So the next --
2  next page, August 31st still, you respond, "Any word
3  from Jerry?"  Did -- did you mean Jerry Fernandez?
4  A   Yes.
5  Q   Okay.  Do you ever call him Lieutenant
6  Fernandez or always -- always Jerry?
7  A   (Indicating.)
8  Q   Do you ever call -- refer to him as
9  Lieutenant Fernandez or is it always just Jerry?
10  A   It's always Jerry because it's easier to
11  type.
12  Q   That is easier to type.  Yeah, okay.
13       All right.  Is it also because you do
14  somewhat of a -- I don't want to go too strong on
15  the word, but you do have somewhat of a -- a more
16  personal relationship with him than law enforcement;
17  you know him on an individual basis?
18  A   I only know him through this case.
19  Q   Oh, you didn't testify to that earlier.
20  Okay.  I thought you -- okay.  Okay.  So you only
21  know him through this case.  You hadn't talked to
22  him -- you've never talked to him before this?
23  A   No.
24  Q   But you knew his -- I'm not trying to put
25  words in your mouth.  I promise.  But did you know

Page 214

1  his wife before this case?
2  A   Yes.
3  Q   Or -- okay.  But you didn't know -- that's
4  what you testified.  You testified that you knew his
5  wife, but you didn't know him or that he was in law
6  enforcement until this case, correct?
7  A   Correct.
8  Q   Okay.  Were you friends -- or friends.  Did
9  you know the prior livestock investigator at the
10  sheriff's department before Mr. Fernandez?
11  A   No.
12  Q   No?  Okay.  Do you know who it was?
13  A   No.
14  Q   No.  Okay.  All right.  Okay.  If -- if the
15  4-H/FFA Community Barbecue was the owner of Cedar,
16  why were you speaking through B.J. to -- to talk to
17  the sheriffs and the DA?
18  A   Because I didn't know who he was dealing
19  with at the DA's office.
20  Q   Okay.  And did you ask him?
21  A   No.
22  Q   No.  Okay.  Okay.  But you -- you knew
23  Jerry at the time, because you had already spoken
24  with him earlier?
25  A   Yes.

Page 215

1  Q   Any reason you didn't just go to Jerry
2  directly until -- and I know you did a few days
3  subsequent from here, but before -- before
4  August 31st at any time, any reason why you didn't
5  communicate with Jerry before you started on that
6  text chain?
7  A   No.
8  Q   No?  Just didn't occur to you?  Okay.  All
9  right.  Okay.  So B.J. represents that Jerry and it
10  says "he."  He said, "He's not worried, period."  18
11  page federal suit" or "suite" he writes, I'm
12  assuming he means suit, "which is all bullshit."
13  Okay.  So he in this -- you understood that to be
14  Jerry Fernandez, correct?
15  A   Yes.
16  Q   So the B.J. spoke with Jerry Fernandez
17  sometime around August 31st or served thereabouts in
18  response to the lawsuit.  The lawsuit was filed that
19  day, so I guess you -- you understood that he talked
20  with Jerry that day.
21  A   I'm assuming.
22  Q   Okay.  All right.  Okay.  And then you ask,
23  "Is the DA going to do anything?"  Why are you
24  asking B.J. if the DA is going to do anything?  Oh,
25  okay.  You're still talking through -- he's still

Page 216

1  getting your information at this point in time?
2  A   Correct.
3  Q   B.J. is.  Okay.  Okay.  I'm not
4  thinking very good -- so -- okay.  So -- all right.
5  I'm not -- is the DA going -- "Is the DA going to do
6  anything?"  Okay.
7       And then at this point in time you -- there
8  was not a particular DA that you knew was working on
9  it.  You just meant the DA generally?
10  A   Correct.
11  Q   Okay.  All right.  And so B.J. is dealing
12  with the DA for you at this point in time is your
13  understanding?
14  A   He was getting more information than I was.
15  Q   Okay.  He was getting more -- okay.
16  What -- were you relaying information for him to
17  give on your behalf?
18  A   No.  He -- he had had all the information.
19  The DA's office was always going to contact me and I
20  never -- I never heard from the DA.
21  Q   Okay.  Because you wanted him -- did B.J.
22  want him prosecuted -- wanted Jessica prosecuted or
23  was it you --
24  A   I --
25  Q   -- who wanted the prosecution?

LONG vs.
FERNANDEZ

Page 217

1  A   I don't know what B.J. wanted.
2  Q   Okay. But you wanted the -- you --
3  certainly, you testified that you wanted the
4  prosecution, because you thought it was a theft,
5  correct?
6  A   Correct.
7  Q   Okay. Okay. He responds, "I was not
8  thinking very straight when I talked to him I forgot
9  to ask him."
10     Okay. All right. Okay. I guess -- I
11 guess he -- did you just interpret that to mean he
12 just had a brain fart and forgot? "I was not
13 thinking very straight when I talked to him."
14 "Talked to him," he means the DA, yes, that's how
15 you understood it?
16 A   No.
17 Q   "I forgot to ask him." You don't -- B.J.'s
18 not referring to talking to a DA?
19 A   I -- I had got that -- that he had forgot
20 to ask Jerry if the DA was going to prosecute --
21 Q   Oh, okay. Understood. So the "him" here
22 was Jerry?
23 A   That's what I assumed.
24 Q   No, I understand. I understood. Okay.
25 "Okay thanks. Jerry will call me in the morning,"

Page 218

1  and you give a thumbs up [sic]. Okay.
2      MR. SNOWDEN: Well, just to clarify. That
3  thumbs up is probably from the other person in
4  the --
5      MR. GORDON: You're on the ball. Yeah,
6  you're right.
7      MR. SNOWDEN: Yeah, people do it to me
8  sometimes.
9      MR. GORDON: Yeah, yeah. Okay. All right.
10 BY MR. GORDON:
11 Q   Okay. So he gave you a thumbs up. Jerry
12 said he would call.
13     So you spoke with Jerry -- it's the 30- --
14 this is now -- I can't tell if -- is this on --
15 Kelly, maybe you know. The September 1st date, does
16 that apply to the text above it -- all the texts
17 above it? I guess so. Yeah. All right.
18     MR. SNOWDEN: I suspect not.
19     MR. GORDON: You -- okay. So the
20 August 31st going down would be...
21     MR. SNOWDEN: That's how I would read it,
22 but...
23     MS. SHAKIB: I agree.
24 ///
25 ///

Page 219

1  BY MR. GORDON:
2  Q   Okay. So August -- okay. So on
3  August 31st, then you write the B.J., "Jerry said he
4  would call me to remember a.m. mid morning." So you
5  must have spoken to Jerry on this date then,
6  August 31st, correct?
7  A   I don't recall.
8  Q   Okay. But does this imply you did, this
9  text that you wrote this? Is that what you meant by
10 that?
11 A   I assuming that somehow I talked to Jerry,
12 yes.
13 Q   Okay. All right.
14     MR. SNOWDEN: And just to clarify, could it
15 be this text message from Mr. Fernandez apparently
16 produced?
17     THE WITNESS: It could be.
18     MR. SNOWDEN: Which is the same day.
19     THE WITNESS: Yeah, it is same day.
20     MR. GORDON: Yeah. Okay. All right.
21 Makes sense.
22 BY MR. GORDON:
23 Q   See. Not everything's a gotcha. I'm just
24 trying to get the fact pattern here. All right.
25     Okay. The whole -- the next day,

Page 220

1  September 1st, you write to B.J., (as read) "The
2  whole lawsuit is on KRCR site front page pretty full
3  of BS." And BS is short for bullshit?
4  A   Yes.
5  Q   Okay. Just making sure.
6      Whole -- so is KRCR, is that a news
7  organization?
8  A   It's our local TV station.
9  Q   Local TV station. Okay. Okay. "Yes, my
10 phone has not stopped" -- so it's the next page now
11 of your text message with B.J. Mcfarlane. He
12 responds, "Yes. My phone has not stopped ringing.
13 Busllshit [sic]," but he spells it wrong. But and
14 then -- okay.
15     So "Yeah, I don't think they're going to
16 lay off for a bit" is your response. Were you
17 getting phone calls as well?
18 A   No.
19 Q   Okay. And what did you mean by "Yeah and I
20 don't think they're going to lay off for a bit"?
21 A   I didn't think the media was going to lay
22 off.
23 Q   Okay. And this is September 1st or
24 thereabouts -- but yes, still September 1st. Okay.
25     Okay. Do you -- and you didn't get any

Page 221

1  calls on that date?
2  **A   Not to my knowledge, no.**
3  Q   Not to my knowledge. Okay. All right.
4       So the next one below is a voicemail. It's
5  a voicemail. It says voicemail-22- -- 2267.m4. So
6  do you know what that was? I mean, so this is on
7  paper so I can't tell. This is -- did he send you a
8  voicemail or did you send him something? What --
9  what is this audio recording that's referenced here
10 on --
11 **A   It was a threat that he received on his**
12 **voicemail, and he sent it to me so I could listen to**
13 **it.**
14 Q   Do you still have it?
15 **A   No.**
16 Q   No? Okay. Was it you deleted?
17 **A   I -- I might have it on there. I don't**
18 **know.**
19 Q   Can you check? I mean, it's --
20 **A   Yeah, I mean, it's probably there.**
21 Q   Yeah, you could e-mail it to us if so.
22 **A   It was just a threat against him and his**
23 **family.**
24 Q   Oh, well, lovely.
25 **A   Oh, crap. This old phone.**

Page 222

1       MR. SNOWDEN: So that has the correct date
2  on it.
3       MR. NORTHCUTT: It's going to be on here.
4       MR. SNOWDEN: That's going to be it right
5  there.
6       MR. GORDON: Kelly, can you help her
7  forward that to us? I can give you my e-mail, if
8  so.
9       MR. SNOWDEN: I will endeavor to do that.
10      (Whereupon, voicemail played briefly.)
11      MR. SNOWDEN: Let me see if I can e-mail
12 it.
13      THE WITNESS: Do the mail.
14      MR. SNOWDEN: Okay. I'm going to put me in
15 here just so I also --
16      MR. GORDON: That's fine.
17      MR. SNOWDEN: Actually -- I have to do --
18      THE WITNESS: I should.
19      MR. SNOWDEN: There it is. Okay. And then
20 give me -- what I sent to you.
21      MR. GORDON: It's a -- it's a mouthful. So
22 do you --
23      MR. SNOWDEN: It's okay.
24      MR. GORDON: rgordon, G-O-R-D-O-N,
25 @advancing lawfor, F-O-R, animals -- plural -- .org?

Page 223

1       MS. SHAKIB: It should autopopulate in your
2  e-mail now that we've...
3       MR. GORDON: Except I think they're on
4  Ms. Muse's phone.
5       MR. SNOWDEN: Okay. And I'm going to --
6       MR. GORDON: Ms. Muse, feel free to e-mail
7  me anytime now that you have my e-mail in there.
8       MR. SNOWDEN: It's doing something very
9  bizarre.
10      THE WITNESS: I know, I'm watching it.
11      THE VIDEOGRAPHER: I've got about
12 25 minutes left before we have to change again, so I
13 don't know if --
14      MR. GORDON: Okay. Do you want to stop now
15 while they're doing this to save a moment or two?
16      THE VIDEOGRAPHER: Just off.
17      MR. GORDON: Yes.
18      THE VIDEOGRAPHER: All right. We're off
19 the record and the time is 1424.
20      (Whereupon, recess was taken from
21      2:24 p.m. to 2:28 p.m.)
22      THE VIDEOGRAPHER: We're back on the
23 record. The time is 1428.
24      MR. GORDON: All right. So counsel for
25 Ms. Muse is going to -- going to play a -- a -- a

Page 224

1  voicemail that is referenced in -- that
2  B.J. Mcfarlane sent to Kathie Muse on about
3  September 1st that's referenced in her e-mail. I
4  mean, it's referenced in the text chain. So he's
5  going to play it. So go ahead.
6       (Whereupon, voicemail was played.)
7  BY MR. GORDON:
8  Q   Okay. All right. You know, I'm not going
9  to lie. I thought that would be a lot juicier. I
10 thought she was going to make a threat on his life
11 or something like that. Okay. So your rea- -- do
12 you have a different reaction here than what you
13 wrote? "All I can say is I hope to God you've got
14 the number she's going to be dead meat that is a
15 pure threat."
16      I'm assuming you're -- you're referring to
17 that woman, yes?
18 **A   Correct.**
19 Q   Okay. All right. Her phone number and he
20 writes "blocked." Do you know who that is?
21 **A   No.**
22 Q   Did you look into it?
23 **A   It wasn't on my phone.**
24 Q   Okay. Do you know if B.J. looked into it?
25 **A   I don't know.**

Page 225

1  Q   Okay. All right. Yeah, I thought it was
2  going to be -- you know, I thought it was just a --
3  make some threat on his life or something like that
4  from your response here, but -- okay. Then you
5  respond and he writes "blocked." And your phone,
6  "Okay that made it okay. POD." What does "POD"
7  mean?
8  A   **Go to the next page.**
9  Q   "POS." What do you mean by "POS"?
10 A   **Piece of shit.**
11 Q   Ah, okay. You know, lawyers, because we
12 always put proofs of service on anything. POS is
13 the abbreviation for that, so I really didn't know
14 what you were talking about here. All right. So
15 piece of shit. Gotcha.
16     Okay. Okay. Shouldn't it be capital P,
17 lower case o, upper case S? Just saying. All
18 right.
19     So September 2nd then you respond to B.J.
20 again. I hope your -- did you have a conversation
21 with him after that voicemail?
22 A   **I don't believe so.**
23 Q   No? Do you -- did you ever talk to him
24 about the voicemail other than here?
25 A   **It -- did I what?**

Page 226

1  Q   Did you ever speak with him about that
2  voice message other than --
3  A   **No.**
4  Q   -- the text chain?
5     Do you know if he reported that voicemail
6  to anyone?
7  A   **I have no idea.**
8  Q   Okay. All right. Okay. Okay. So your
9  next text message, "I hope you're still surviving
10 today in Kevin Broderick from Bejac get ahold of you
11 about buying him a" -- what is this referring to?
12 A   **This is referring to the McArthur fair.**
13 Q   Okay. Gotcha. All right. So Kevin
14 Broderick has nothing to do with -- who -- who's he?
15 A   **He's with a local company.**
16 Q   Okay. So this is nothing to do with
17 Cedar --
18 A   **No.**
19 Q   -- at all?
20     Okay. "Yes. And your order is half beef
21 and pig for Kent's correct?" Kent's, I'm assuming,
22 is Kent's butcher?
23 A   **Yes.**
24 Q   But again, this has nothing to do with --
25 this has nothing to do with -- with Cedar, correct?

Page 227

1  A   **Correct.**
2  Q   All right. (As read) "And if you need I
3  will take back the whole beef and give back resell
4  to the bull gel- -- gelding -- I'm assuming it's
5  gelding for sale." Again, nothing to do with Cedar
6  there, correct?
7  A   **Correct.**
8  Q   All right. Okay. "Perfect. Thanks." All
9  right. So that's the end of that text chain.
10     So at the end of -- the next thing --
11 actually, if you could -- Ms. Muse, if you could
12 take that last page off for the court reporter,
13 because this will be a new exhibit. Thank you so
14 much.
15     **MR. GORDON:** Because this will be
16 Exhibit -- what are we on? M?
17     **THE COURT REPORTER:** Yes.
18     **MR. GORDON:** All right. This will be
19 Exhibit M.
20     (Exhibit M was marked.)
21 **BY MR. GORDON:**
22 Q   So here we have what appears to be a letter
23 from the DA of April 13th of this year declining
24 prosecution. Is that your understanding?
25 A   **Yes.**

Page 228

1  Q   Okay. Did you follow up with the DA on
2  this letter?
3  A   **I left two or three message.**
4  Q   Oh, wow. For anyone in particular?
5  A   **I called the phone number and gave 'em the
6  case number and never got a phone call back.**
7  Q   Okay. Do you remember who you spoke to?
8  A   **It was an answering ser- -- machine.**
9  Q   Oh, it's not a real person?
10 A   **Huh-uh.**
11 Q   It's just -- okay. So you never spoken
12 with Stephanie Bridgett --
13 A   **Nope.**
14 Q   -- DA or Benjamin Hanna Chief Deputy DA?
15     Yes, you did not?
16 A   **No.**
17 Q   Okay. All right. And how did you receive
18 this letter?
19 A   **Through the mail.**
20 Q   Through the mail? Okay.
21     Okay. Were you upset that they weren't
22 going to prosecute?
23 A   **Yes.**
24 Q   Okay. Even now knowing that a -- a child
25 can disaffirm a contract and she offered to pay in

Page 229

1 writing multiple times, you're still upset that they
2 didn't prosecute?
3 A   Yes.
4 Q   Okay.  If she had -- oh, Kelly, I just got
5 your e-mail by the way.  Thank you.
6   MR. SNOWDEN: Sure.
7 BY MR. GORDON:
8 Q   All right.  Should -- so should you --
9 should Jessica have -- have -- what should her -- I
10 know you're not a lawyer here, but what do you think
11 her punishment should have been?  Should she have
12 done, like, jail time for this?
13 A   I don't know.
14 Q   That's why I'm asking you what you think.
15 A   I -- I -- I think jail -- jail time may
16 have been too much, but I think that it should have
17 been publicly said that she took the animal after it
18 was sold at an auction to somebody else --
19 Q   Yeah.
20 A   -- and she changed her mind.
21 Q   So she should be in jail for -- because she
22 changed her --
23 A   I don't know if she should have been --
24 Q   Okay.  Sorry.
25 A   -- in jail at all, but she should have been

Page 230

1 punished.
2 Q   Criminally charged for changing her mind.
3 A   Yes.
4 Q   Okay.  All right.  Have you ever changed
5 your mind in a contract?
6 A   Not after I've sold something.
7 Q   Okay.  Have you done any research on when
8 title transfers in a sale?
9 A   No, I have not.
10 Q   Okay.  Okay.  Okay.  Did you ever speak to
11 anyone else at the sheriff's office about Cedar or
12 Ms. Long or the daughter other than Fernandez?
13 A   I don't believe so, no.
14 Q   Okay.  You said you don't believe so.  Do
15 you think you might have, like just as a memory --
16 A   I might -- I might have, yes.
17 Q   Okay.  Do you -- so you -- okay.  So you've
18 had a memory of maybe speaking to someone else.  Do
19 you have any -- any information who it might have
20 been?
21 A   No.
22 Q   No?  Do you know --
23 A   I do remember getting a phone call that
24 wanted to know my name, address and information on
25 filing charges.

Page 231

1 Q   Okay.  I see.  And you said it was a male?
2 A   Yeah, but I don't --
3 Q   You didn't --
4 A   -- know who it was.
5 Q   Okay.  You didn't get a badge number --
6 A   No.
7 Q   -- or anything -- anything like that?
8 Okay.  All right.  And this was -- do you remember
9 about when that would have been?
10 A   No.
11 Q   No.  Okay.  Before this -- it would have
12 been before -- well before this letter, though,
13 correct?
14 A   Which letter?
15 Q   The -- the DA letter of August [sic] 13 of
16 2023?
17 A   Yes, it was before then.
18 Q   Okay.  So was it before Cedar was retrieved
19 by the sheriffs?
20 A   I don't recall if it was before.
21 Q   Might have been after that --
22 A   Could have been.
23 Q   -- but within that same, you know,
24 August -- that time or would you say July -- between
25 July and August 2022, some- -- somewhere in that

Page 232

1 time frame?
2 A   Yes.
3 Q   Okay.  All right.  Okay.  All right.  Do
4 you remember -- but you don't remember if it was
5 before or after it was retrieved?
6 A   I believe it was before.
7 Q   You believe it was before.  Okay.  All
8 right.  Okay.  Another -- have you ever talked with
9 anyone in the media about this?
10 A   No.
11 Q   No?  Okay.  So I'll give you another
12 exhibit here.  Is that N?
13   THE COURT REPORTER: N, yes.
14   (Exhibit N was marked.)
15   MR. GORDON: This will be N.
16 Kelly, here you go.
17   MR. SNOWDEN: Thank you.
18 BY MR. GORDON:
19 Q   So have you read this article before?
20 A   Yes, I have.
21 Q   Okay.  Reference is an anonymous source.
22 Are you that anonymous source?
23 A   No.
24 Q   You're not?  Okay.  Do you know who is?
25 A   No.

Page 233

1   Q   Okay. Do you know the author?
2   A   No.
3   Q   Charles Wallace?
4       But you know the publication WLJ?
5   A   Yes.
6   Q   Okay. All right. Did you read this when
7   it came out?
8   A   Yes.
9   Q   Okay. All right. Okay. How did you find
10  this article to -- and when -- when was it
11  published? How did you come -- come across it?
12  Have you -- is this a publication you subscribe to?
13  A   No.
14  Q   No? You were just googling or popped up on
15  a news hit or something?
16  A   Popped up on a news hit.
17  Q   Okay. All right. Okay. Okay. Do you
18  have any suspicion of who the anonymous source here
19  would be?
20  A   No.
21  Q   Any reason to think it's anyone else named
22  in this case?
23  A   I have no idea --
24  Q   Okay.
25  A   -- who the au- --

Page 234

1   Q   That's fine. Okay. Let's take five for a
2   moment.
3       THE VIDEOGRAPHER: We're off the record.
4   The time is 1438.
5       (Whereupon, recess was taken from
6       2:38 p.m. to 2:46 p.m.)
7       THE VIDEOGRAPHER: We're back on the record
8   and the time is 1446.
9   BY MR. GORDON:
10  Q   Okay. So just so I have the timeline
11  correctly, Cedar's taken into custody by the
12  sheriffs on July 8th. At some point that day, you
13  tell Fernandez that he can -- he can drop him off --
14  or drop Cedar off after B.J.'s house for you to
15  B.J.'s and then B.J. is going to keep him for some
16  period of time, correct?
17  A   Correct.
18  Q   So -- and Cedar didn't go anywhere else
19  after he was dropped off at B.J.'s, correct --
20  A   Correct.
21  Q   -- to your knowledge? Okay.
22  A   To my knowledge, no.
23  Q   Okay. All right. Okay. So basically when
24  he was at B.J.'s property, B.J. was keeping him
25  there for you while the two of you waited for some

Page 235

1   green light to move forward with a slaughter or --
2   or something from the -- the DA, correct -- or the
3   DA or the sheriff's, correct?
4   A   Correct.
5   Q   All right. And I might have asked you this
6   and I'm sorry. But what barbecue, if it was a
7   barbecue, I'm not sure, but what barbecue did Cedar
8   ultimately get swapped out for? If it wasn't a
9   barbecue, correct me, but you said he was swapped
10  out for some other event with -- do you recall what
11  I'm talking about? You said -- I said where did his
12  cuts go, and you said he was swapped in because some
13  other goat wasn't available.
14  A   To one of the buyers at the Junior
15  Livestock Auction.
16  Q   Oh, it was a buyer --
17  A   Yeah.
18  Q   -- not an actual event?
19      Okay. Okay. I'm sorry. I thought -- I
20  misunderstood. I thought it was another barbecue or
21  something like that. Okay. So he just went to an
22  individual -- to a private -- a private party then
23  is your understanding?
24  A   My understanding, yes.
25  Q   Okay. Do you know who that private party

Page 236

1   was?
2   A   No.
3   Q   Okay. Do you know who would know?
4   A   Probably the Shasta District Fair.
5   Q   Okay. Do you know who there would know in
6   particular at the fair --
7   A   Excuse me. Can you say that again?
8   Q   Who at the fair would be -- what person at
9   the fair would know?
10  A   Probably Melanie.
11  Q   Probably Melanie. All right. Okay. So
12  and then you -- your first text chain that we have
13  with the -- the ones that are not on your phone
14  beginning on August 31st with Fernandez and that was
15  the first -- those are the first -- were there any
16  texts before that point that you can recall?
17  A   I don't remember.
18  Q   Okay. All right. Okay. So prior to that
19  point in time -- prior to August 31st, which is the
20  day the lawsuit was filed, you were -- I'm assuming
21  during that time you were having B.J. speak with
22  either the sheriff -- we didn't know which
23  sheriff -- but you're -- you're having B.J. speak
24  with the sheriff for you or the DA and you didn't
25  reach out to them beforehand before --

Page 237

1    A    No.  I was asking B.J. to but --
2    Q    You're right.  Okay.  That's fine.
3         And then -- okay.  As you sit here today do
4    you wish you would have handled anything
5    differently?
6    A    No.
7    Q    No?  Okay.  That's all I have.
8         THE VIDEOGRAPHER: Okay.
9         MR. GORDON: I'll reserve time for recross
10   if there's anything that -- but that's all we have,
11   Damian and -- and John.
12        THE VIDEOGRAPHER: Okay.  Before going off
13   the record --
14        MR. SNOWDEN: Does anyone have any -- I'm
15   sorry.  I don't mean to interrupt you.
16        THE VIDEOGRAPHER: Yeah.  Go ahead.
17        MR. SNOWDEN: Does anyone have any
18   questions?
19        MR. NORTHCUTT: This is Damian Northcutt.
20   I don't have any questions.
21        MR. GORDON: John, do you have any
22   questions?
23        MR. BRIDGES: This is John.  I don't
24   have -- I don't have any questions.  Thank you.
25        MR. GORDON: Okay.  Great.

Page 238

1         MR. SNOWDEN: Sorry about that.
2         THE VIDEOGRAPHER: No.  That's all right.
3    I understand.
4         Before going off the record, would anyone
5    like a copy of the video?  I know Mr. Gordon's
6    getting a copy --
7         MR. GORDON: Yeah.
8         THE VIDEOGRAPHER: -- of it.  What about on
9    the Zoom?
10        MR. NORTHCUTT: This is Damian Northcutt.
11   I'll take a copy of the video and a hard copy of the
12   transcript, please.
13        THE VIDEOGRAPHER: Okay.  This is the
14   end --
15        THE COURT REPORTER: Anyone else?
16        THE VIDEOGRAPHER: Any- -- anybody else?
17        MS. SHAKIB: We want a hard copy of the
18   transcript.
19        MR. BRIDGES: Sorry.  I would not like a
20   copy of the video, but I would like a copy of the
21   transcript, please.
22        THE COURT REPORTER: And Mr. Snowden?
23        MR. SNOWDEN: The transcript, please, and
24   I'll find out about the video and let you know.
25        THE VIDEOGRAPHER: Right.  Okay.

Page 239

1         MR. GORDON: Carol, we've been -- we've
2    been doing stips of just certified copy in lieu of
3    original if you're if you want to -- if you're okay
4    with that.
5         MR. SNOWDEN: Yeah.  You can just send the
6    version for the witness to my office and I'll get it
7    to her.
8         THE COURT REPORTER: Okay.  Would you like
9    to read and sign?
10        MR. SNOWDEN: Yeah, like I said, if you
11   want to send it to me and I'll get it --
12        THE COURT REPORTER: Because it's a federal
13   case.
14        MR. SNOWDEN: You know if that's whatever
15   complies with the statutes is fine.
16        THE COURT REPORTER: You'd like to read and
17   sign?
18        THE WITNESS: Whatever --
19        MR. SNOWDEN: Yes.  It gives you an
20   opportunity to review it and make changes that you
21   deem appropriate, so I think opportunity prudent for
22   you to do that.
23        THE COURT REPORTER: Okay.  And I am a Code
24   compliant shorthand reporter and I don't stipulate
25   to forgo my duties under the Code.

Page 240

1         MR. GORDON: Okay.
2         THE COURT REPORTER: Okay.
3         MR. GORDON: Okay.  We'll just -- I'll wait
4    for the mailed copies then.  All right.  Okay.
5         MR. SNOWDEN: Are there any spellings or
6    anything you need assistance with.
7         THE COURT REPORTER: I think I got them
8    all.  Thank you.
9         THE VIDEOGRAPHER: All right.  This is the
10   end of the deposition of Kathie Muse.  All vigil- --
11   video originals will be retained at the offices of
12   Redding Video Productions at 8954 Old Oregon Trail.
13   We're off the record and the time is 1452.
14        (Videotaped deposition concluded at 2:52 p.m.)
15                  ---oOo---

LONG vs.
FERNANDEZ

KATHIE MUSE
November 13, 2023

Page 241

1                    PENALTY OF PERJURY

2

3          I, the undersigned, hereby certify that I

4    have read the foregoing deposition, that I know the

5    contents thereof, and I declare under penalty of

6    perjury under the laws of the State of California

7    that the foregoing is true and correct.

8

9          Executed on _____, 2023.

10

11

12

13                    _____

14                    KATHIE MUSE
                      ---oOo---

15

16

17

18

19

20

21

22

23

24

25

Page 242

1              WITNESS' CHANGES OR CORRECTIONS

2

3    NOTE:  If you are adding to your testimony, print
     the exact words you want to add.  If you are

4    deleting from your testimony, print the exact words
     you want to delete.  Specify with "Add" or "Delete"

5    and sign this form.

6    Deposition of:  KATHIE MUSE
     Case Title:  LONG V. FERNANDEZ, ET AL.

7    Date of Deposition:  MONDAY, NOVEMBER 13, 2023

8    Page   Line       Change/Add/Delete

9    ____   ____       _____

10   ____   ____       _____

11   ____   ____       _____

12   ____   ____       _____

13   ____   ____       _____

14   ____   ____       _____

15   ____   ____       _____

16   ____   ____       _____

17   ____   ____       _____

18   ____   ____       _____

19   ____   ____       _____

20   ____   ____       _____

21   ____   ____       _____

22   ____   ____       _____

23   ____   ____       _____

24   ____   ____       _____  _____

25   KATHIE MUSE                        DATED

Page 243

1                  CERTIFICATE OF REPORTER

2

3          I, CAROL J. CHASE, a Certified Shorthand

4    Reporter, licensed by the State of California,

5    License No. 13538, being empowered to administer

6    oaths and affirmations pursuant to Section 2093 (b)

7    of the Code of Civil Procedure, do hereby certify:

8          That the witness in the foregoing deposition,

9    KATHIE MUSE, was present at the time and place

10   specified and was by me sworn to testify to the

11   truth, the whole truth, and nothing but the truth;

12         That said proceeding was taken before me in

13   shorthand writing, and was thereafter transcribed

14   under my direction by computer-aided transcription;

15   That the foregoing transcript constitutes a full,

16   true, and accurate record of the proceeding which

17   took place; That I am not of counsel or attorney for

18   any of the parties hereto, or in any way interested

19   in the event of this cause, and that I am not

20   related to any of the parties hereto.

21         IN WITNESS WHEREOF, I have hereunto subscribed

22   my signature on this 25th day of November, 2023.

23

24

25                    _____
                      CAROL J. CHASE

**$**

**$419.43 (1)**
81:21

**/**

**/// (10)**
8:24,25;14:24,25;
151:24,25;181:24,25;
218:24,25

**@**

**@advancing (1)**
222:25
**@musetruckingcom (2)**
155:14,24
**@SCLCexpocom (1)**
155:18

**[**

**[sic] (3)**
218:1;220:13;231:15
**[sic]- (1)**
108:6

**A**

**abbreviation (1)**
225:13
**ability (1)**
14:19
**able (1)**
191:2
**above (6)**
115:2;116:10,12,17;
218:16,17
**absent (1)**
123:18
**absentee (2)**
60:17;64:24
**abuse/sexual (1)**
26:14
**accept (2)**
79:12;115:24
**accepted (3)**
114:24;120:1,5
**accepting (1)**
115:7
**accident (2)**
18:5,6
**accommodate (1)**
171:5
**According (1)**
104:10
**account (5)**
35:12;88:5,24;89:2,
11
**accountings (1)**
25:14

**accounts (1)**
167:9
**accurate (1)**
36:8
**accusing (2)**
85:1;97:25
**across (1)**
233:11
**action (2)**
125:2;139:20
**actions (4)**
124:18;125:3;129:5,
14
**active (2)**
26:2,4
**activities (1)**
42:1
**actors (2)**
134:9,10
**actual (5)**
98:21;191:18;193:5,
6;235:18
**actually (14)**
63:18;66:1;73:3;
98:6;106:23;108:18;
114:13;137:2;150:19;
151:7;178:2;184:5;
222:17;227:11
**adamant (1)**
162:18
**add (1)**
169:18
**address (6)**
73:17;74:24;156:2;
184:17;185:6;230:24
**addresses (3)**
155:10,21;185:3
**advertised (1)**
212:5
**advisor (5)**
23:10,15;24:14;
145:1,4
**affects (1)**
14:19
**affiliated (3)**
89:6;91:17;152:21
**affiliation (1)**
90:3
**afternoon (7)**
100:19;102:1;103:4,
10;106:13;164:16;
191:8
**afterwards (7)**
47:3;73:1;122:20;
143:16;183:4;189:22;
204:15
**again (15)**
12:5,14;31:3;32:8;
38:4;46:22;80:12;
126:18;139:15;212:21;
223:12;225:20;226:24;
227:5;236:7
**against (3)**

13:14;170:25;221:22
**agent (2)**
89:10,12
**agents (1)**
89:7
**ago (24)**
11:15;17:22;19:13,
17,19;20:7;38:17;
39:21,21;40:9;48:12;
69:21;81:12;93:20;
104:24,25;105:12;
146:18;147:22;173:14;
175:19;176:2,6;189:14
**agree (3)**
47:14;105:18;218:23
**agreeable (1)**
133:3
**agreed (2)**
52:18,19
**agreeing (1)**
52:21
**agreement (4)**
47:18;91:9,21;96:2
**Agricultural (1)**
142:3
**Agriculture (3)**
22:11;107:24;128:1
**Ah (7)**
80:20;113:16;
135:14;148:11;150:6;
201:12;225:11
**ahead (11)**
19:10;61:13,23;64:4;
95:15;124:9;155:6;
181:21;189:2;224:5;
237:16
**Ah-ha (1)**
100:25
**ahold (1)**
226:10
**AI (1)**
32:5
**al- (1)**
179:6
**Alcohol (1)**
15:3
**alert (1)**
179:4
**alerted (1)**
179:7
**alive (1)**
204:13
**alleged (1)**
110:2
**Allen (1)**
150:17
**almost (1)**
171:3
**along (2)**
78:20;146:15
**although (2)**
124:20;168:13
**always (12)**

12:13;89:22;136:5;
182:8,16;201:15;
213:6,6,9,10;216:19;
225:12
**amazed (1)**
201:15
**Amen (3)**
186:11,13;187:1
**Amended (1)**
151:18
**amount (3)**
45:1;79:14;81:23
**amounts (1)**
81:19
**analysis (1)**
199:24
**and/or (2)**
79:13;126:21
**Ander- (1)**
192:21
**Anderson (1)**
136:4
**angry (10)**
178:16,18,21,25;
207:10,18,18;208:13;
210:15;212:2
**animal (15)**
26:24;45:21,23;46:4,
8,24;47:10;62:1;74:11;
77:21;149:13,15,21;
174:4;229:17
**animals (18)**
26:23;27:8;73:6;
99:18;102:11;104:20,
23;122:10,13;136:3;
171:1,4;175:3,8;
182:17;184:2;193:22;
222:25
**anonymous (3)**
232:21,22;233:18
**answered (3)**
11:15;118:5;212:20
**any- (2)**
209:7;238:16
**anymore (3)**
159:14;165:14;
166:20
**apar- (1)**
175:16
**apart (4)**
65:14;125:1;127:18;
208:3
**apologies (1)**
32:23
**apologize (8)**
25:19;54:19;80:18;
124:2,7,7;153:1;190:4
**apparently (2)**
113:7;219:15
**appear (1)**
155:20
**appears (2)**
107:23;227:22

**applied (1)**
119:18
**applies (1)**
81:16
**apply (2)**
119:17;218:16
**approach (2)**
92:4,7
**appropriate (3)**
97:6;162:4;239:21
**Approximately (22)**
16:17;19:12,17;
38:24,25;41:1;43:10;
45:1;47:22;48:12;67:8,
9,15,16;71:5,6;78:6,7;
100:4;103:25;122:14;
173:14
**April (1)**
227:23
**area (2)**
21:19,23
**arose (2)**
50:23;78:21
**around (8)**
12:25;13:2;46:25;
73:10;108:9;152:25;
190:23;215:17
**arrangement (1)**
98:7
**arrived (3)**
79:18;117:10,11
**A-R-T-H-U-R (1)**
174:18
**article (3)**
168:16;232:19;
233:10
**Ashbee (3)**
32:5,6;57:1
**aspect (1)**
207:15
**Assembly (2)**
63:8,9
**Assemblywoman (1)**
76:25
**assignments (1)**
79:23
**assistance (2)**
110:22;240:6
**associated (6)**
38:11;42:21;86:10,
11;98:14;99:2
**association (6)**
140:17,20,24,25;
141:1;142:4
**associations (1)**
141:17
**assume (5)**
70:24;111:20;186:2;
199:1;201:17
**assumed (3)**
46:25;191:19;217:23
**assuming (28)**
9:14;31:2;42:14;

75:20;161:8,12,19;
171:9;183:6;185:25;
188:12;194:14;200:15,
18;202:24;203:10,22;
204:20;207:18;211:4,
6;215:12,21;219:11;
224:16;226:21;227:4;
236:20
**A-T-H-I-E (1)**
9:9
**attend (4)**
59:20,22;134:21,23
**attendees (2)**
35:4;135:2
**attention (1)**
170:2
**attorney (16)**
13:9,19,24;14:6;
28:19;76:6;110:25;
111:4,6,23,25;112:3;
127:20;159:5;198:5;
208:3
**attorneys (1)**
13:21
**au- (1)**
233:25
**Auc- (1)**
37:23
**Auction (37)**
37:3,10,14,16,21;
38:22;40:23;59:24;
61:7;62:23;65:20;
66:20;73:6;77:5,6,14;
109:10,12,13,14,15,17;
148:16,18,22;168:22;
178:23;181:9;204:17,
18,25;205:2,22,25;
206:2;229:18;235:15
**auctions (1)**
40:25
**audio (1)**
221:9
**August (20)**
48:15;51:17,23;74:5;
158:15,15;207:5;
211:1;213:2;215:4,17;
218:20;219:2,3,6;
231:15,24,25;236:14,
19
**author (1)**
233:1
**authority (6)**
62:16;63:21,24;
64:22;84:17;89:1
**authorized (3)**
79:8,9,12
**automatically (1)**
167:24
**autopopulate (1)**
223:1
**available (2)**
160:10;235:13
**aware (8)**

120:14;158:8;
179:25;180:5,8,11,20,
25
**away (1)**
78:18
**Awesome (1)**
201:6

# B

**B- (1)**
41:18
**back (51)**
42:18,25;45:24;
58:20;97:17,19,19,21;
107:5;110:23;115:3;
119:13;120:15;128:20;
139:12;151:14;154:16,
19;157:24;163:16,25;
164:3,4,10;165:20,22,
24;167:19,20,25;
168:1;169:4,5;179:20;
180:4,5;186:17;
204:16,17;205:3,11,14;
206:6,16;209:2,10;
223:22;227:3,3;228:6;
234:7
**bad (3)**
13:15;109:12;168:21
**badge (1)**
231:5
**balance (1)**
75:21
**ball (1)**
218:5
**banner (1)**
44:6
**barbe- (1)**
113:6
**barbecue (107)**
28:20;35:1;45:24;
47:11;76:20;78:25;
79:1,17,19;82:7;83:5,
9;84:5;85:4,17;86:3,7,
19,20,24;87:3;88:3;
89:7,15;90:16,24;92:1,
25;95:1,21;96:18;
97:15,18;98:14,15,21,
25;99:18;102:23;
108:5,7;110:6,16,24;
111:13;112:16,17,18,
19,23;113:5,7,11;
114:1,1;115:7,11,22;
119:14,15;120:4,7;
122:11;123:5,5,14,16;
131:23;134:9,14,21,23;
140:18,19;141:1,3,14,
18,22,22,25;142:4;
146:15,17;153:11,12,
15,17,18;154:2;
162:17;181:5,6;
189:18,23;194:15;
196:20,22;199:22;

204:24;205:9;214:15;
235:6,7,7,9,20
**barbecues (1)**
90:12
**Barbecue's (3)**
110:19;163:19;194:1
**base (1)**
191:12
**based (1)**
84:19
**basically (4)**
11:22;17:13;65:9;
234:23
**basis (1)**
213:17
**Bates (3)**
72:14;108:1;142:25
**became (4)**
78:24;79:3,16,17
**become (3)**
91:25;92:2;180:11
**Bee (5)**
162:23,25;163:5,8,
24
**beef (4)**
27:2;145:12;226:20;
227:3
**beforehand (7)**
53:2;132:17;137:21,
24;142:21;203:12;
236:25
**beginning (5)**
19:11;39:21;107:21;
142:25;236:14
**begins (1)**
144:6
**behalf (20)**
8:4,8,12,14;61:3;
65:22;69:1;110:15,15,
17,18,18;111:12,12;
112:8,13;153:8,8;
175:3;216:17
**Bejac (1)**
226:10
**Beloved (1)**
207:8
**below (3)**
168:19;211:20;221:4
**Benjamin (1)**
228:14
**besides (2)**
31:17;65:24
**best (12)**
12:8,9;13:3,16;25:3,
4;28:23;51:12,22;
103:24;136:20;138:5
**B-E-S-T (2)**
25:4,5
**better (1)**
161:19
**bid (35)**
40:13;48:19;50:14,
20;60:1,25;61:14;

62:16;63:21;64:4,22,
25;65:13,21;66:12,13,
14,23;67:6;68:17;69:1;
70:20,20;71:3,7,7,11,
18;75:17;81:20,23;
123:4;153:2;174:19;
175:2
**bidder (3)**
50:16;61:7;71:21
**bidding (6)**
40:24,25;65:13;
77:20;175:6,7
**bids (3)**
67:12,13;74:7
**big (1)**
206:10
**bill (8)**
72:23;73:5,9;75:2,4,
12;185:2,21
**bills (12)**
70:2,3;74:1,12,15,16,
17,23;145:6;146:5,8;
182:9
**bit (4)**
61:9;162:1;220:16,
20
**bitter (1)**
161:18
**bizarre (1)**
223:9
**BJ (96)**
8:13;38:8,21;41:19;
99:23;101:20;102:3;
105:16;118:2,22;
120:21;124:22,22,24,
25;125:1;126:2,4,11;
127:2,11;129:4;
131:15,19;132:3,12,15,
15;133:3,6,9,11,14,23;
134:3,4,10;158:1;
159:16;173:3,12;
177:10;185:24;187:12,
21;188:5,8,13;190:17,
18;191:6;193:11;
194:20,21,22;195:7,25;
196:1,6,23,24;197:21;
198:9;199:8,10;
201:24;202:6,13,14;
203:14;204:5,10;
206:23;207:22;211:1,
10,19;214:16;215:9,16,
24;216:3,11,21;217:1;
219:3;220:1,11;224:2,
24;225:19;234:15,24;
236:21,23;237:1
**BJ's (5)**
217:17;234:14,15,
19,24
**Black (1)**
13:2
**blend (1)**
74:7
**blocked (2)**

224:20;225:5
**Bluff (1)**
168:16
**Board (17)**
36:21;37:18,23,23;
38:2,5,13;42:7,9,15,22,
25;91:19;123:15;
204:17,25;206:3
**bogus (1)**
52:10
**book (2)**
21:7,8
**bookkeeper (2)**
75:9;84:7
**bookkeeping (1)**
181:16
**booklet (1)**
13:8
**boring (1)**
124:7
**both (10)**
17:12;22:25;24:22;
37:9;51:1;63:23,24;
73:8;120:20;159:21
**bother (1)**
161:22
**bottom (5)**
77:3;78:21;79:8,11;
114:4;143:1;207:4
**bought (1)**
73:7
**Bowman (3)**
200:13,23;201:17;
203:18
**Bowman's (1)**
201:13
**brain (2)**
140:12;217:12
**breach (2)**
80:8,14
**break (11)**
11:5,5,6,6;19:15,18,
20,21;128:12,14;154:8
**Brian (24)**
33:23,25;34:4;43:6;
44:11;45:13,17;50:15;
51:15,25;62:24;63:21;
64:3,5,8,13;66:23;
67:13;73:6;74:20;
76:25;153:2;179:13;
180:1
**BRIDGES (9)**
8:7,11,12;13:21;
163:13,15;164:9;
237:23;238:19
**Bridgett (1)**
228:12
**briefly (2)**
54:13;222:10
**bring (4)**
28:9;91:10;115:21;
139:11
**broad (1)**

44:2
**Broderick (2)**
226:10,14
**Broke (1)**
207:7
**brought (3)**
82:5,5;91:9
**Bruce (4)**
33:8,17,20;124:22
**BS (2)**
220:3,3
**bull (1)**
227:4
**bullshit (2)**
215:12;220:3
**bunch (6)**
165:7;166:25;
207:10,11,14;208:8
**Business (23)**
10:9,10,10,13;16:22;
17:17;25:22;40:12,21;
42:22;43:13;44:19;
57:6;63:11;97:7,9;
98:7;138:24,24,25;
155:20;157:21;201:15
**Busllshit (1)**
220:13
**busy (4)**
160:20;165:6,16;
189:20
**butcher (2)**
195:13;226:22
**butchered (2)**
202:25;205:16
**buy (2)**
61:25;99:1
**buyer (5)**
60:17;64:24;66:22;
184:25;235:16
**buyers (3)**
61:24;66:17;235:14
**buying (1)**
226:11

**C**

**Cal- (1)**
208:25
**calendar (2)**
124:5;129:19
**California (7)**
22:9;87:17;107:24;
209:1,18,22;210:3
**call (50)**
32:23;46:10;50:10;
51:5;62:6,18,19,21;
102:4;124:23,24,25;
125:7,10;127:21;
137:5;138:19;139:15;
160:10,14,15,19,20,24;
161:25;162:10,24;
163:1,2,25;164:2,4,20,
23;165:19,22,24;

173:12;188:4;200:5;
203:13;205:24;211:19;
213:5,8;217:25;
218:12;219:4;228:6;
230:23
**Called (26)**
9:24;21:23;36:7;
49:7;66:13;83:21;
102:5,7;112:15;137:7,
8,12,16,17;138:19;
139:1,3;162:24;163:9,
10,24;180:14;187:21,
23;198:6;228:5
**calling (4)**
94:16;97:10;141:24;
164:17
**Calls (9)**
61:20;66:8;139:19;
146:22;188:25;192:3;
198:19;220:17;221:1
**came (3)**
134:3;146:16;233:7
**Campaign (2)**
44:2,7
**campaigned (2)**
43:25;44:1
**can (70)**
9:5,8;10:7;12:1;
13:12,12,14,14;7,8;
15:6;20:20;27:16;
28:14,23;39:11;49:22;
56:12;57:19;60:11,12;
61:12;68:4;73:4;80:11,
17;90:21;96:12;99:1;
101:2,3;103:24;115:3;
118:8;121:11;136:20;
140:8;143:2;144:17;
145:10;146:1,23;
159:4,4,5,5;160:20;
165:19;178:2;181:21;
189:2;192:6;195:9,10,
11;199:6;209:1,10,10;
212:21;221:19;222:6,
7,11;224:13;228:25;
234:13,13;236:7,16;
239:5
**Can- (1)**
23:11
**Canton (2)**
23:4,11
**capacity (1)**
206:7
**capital (1)**
225:16
**capture (1)**
168:14
**card (1)**
25:22
**care (5)**
20:20;191:2;211:8,
23;212:8
**Carol (1)**
239:1

**carrier (2)**
147:2,7
**case (35)**
8:10;18:15,21;21:12;
26:15;31:17,19;34:19,
23;45:16,17;46:19;
48:7,8;55:3;124:19;
130:5;138:16;156:20;
157:1;162:9;164:13;
210:3,5,6,8;213:18,21;
214:1,6;225:17,17;
228:6;233:22;239:13
**cases (1)**
10:16
**categories (1)**
154:25
**cause (3)**
97:17;130:8;210:12
**CDFA (2)**
211:8,23
**Cedar (91)**
29:6,19;30:9;31:7;
32:3,18;33:6,15,20;
34:4,13;35:19;47:3;
48:18;50:23,24;71:7;
74:8,9;75:16;81:16,18,
20,23;83:4,5;99:6,11,
13;106:19;108:22;
119:10;121:5;122:4,
16;123:6,18,23;
124:18;125:3,10;
126:1;128:7;129:5,6,
15;131:12;132:11,18;
134:3;147:11;148:5,7,
9,10,21,24;153:8;
163:20;177:17;178:10,
17,19;180:22;185:11;
188:11;190:19;191:2;
194:18;195:21;196:2;
197:22;198:7;200:14,
18;201:5;204:13;
205:1,3,16,18;206:6;
214:15;226:17,25;
227:5;230:11;231:18;
234:14,18;235:7
**Cedar's (2)**
201:21;234:11
**cell (9)**
138:20,21;146:24,
25;147:1,3;156:10,12,
13
**Center (4)**
29:12,15,19;83:19
**CEO (4)**
41:15,19;88:16;
93:25
**certain (4)**
12:6;156:24;164:25;
193:22
**certainly (2)**
12:15;217:3
**certificate (1)**
21:5

**certified (1)**
239:2
**certify (1)**
79:11
**cetera (4)**
108:23;180:4;191:4;
197:15
**Chad (18)**
147:10;148:5,6;
149:19;150:23;185:25;
186:1,3,6,11,13,20,23;
187:1,2,9,12,15
**Chads (2)**
186:8,9
**chain (20)**
28:21;29:10,20;33:9,
11,12;107:17;146:24;
158:9;166:15;172:10,
21;173:2;202:19;
206:20;215:6;224:4;
226:4;227:9;236:12
**chance (1)**
160:23
**change (5)**
13:11,12,13;124:9;
223:12
**changed (4)**
105:9;229:20,22;
230:4
**changes (1)**
239:20
**changing (1)**
230:2
**charge (1)**
84:11
**charged (1)**
230:2
**charges (5)**
137:19;138:2;
139:12,17;230:25
**Charles (1)**
233:3
**charm (1)**
210:18
**check (11)**
11:11;156:11;158:6;
159:6;167:6,9,16;
183:14,16,19;221:19
**checked (7)**
69:19;129:22,25;
131:5;156:2,16,17
**checking (7)**
35:12;88:5,7,8,23;
89:1,11
**checks (2)**
182:22;183:6
**Cheryl (1)**
25:2,3,4
**chicken (1)**
172:11
**chid (1)**
26:14
**chief (3)**

63:12,23;228:14
**child (7)**
20:3;27:23;46:7;
183:13,19,19;228:24
**children (11)**
16:25;19:23;20:1,5,
7,9,16,22;37:4;56:2;
183:17
**children's (3)**
26:2,5;145:8
**child's (2)**
182:17;207:8
**chuck (1)**
70:3
**circled (2)**
76:20;77:24
**civil (1)**
139:20
**claim (1)**
153:7
**claiming (1)**
204:21
**clarify (5)**
140:15;143:22;
144:17;218:2;219:14
**class (2)**
16:2,3
**clear (2)**
12:2;96:13
**client (3)**
180:21;192:6;211:14
**clip (1)**
151:8
**closer (1)**
203:5
**club (7)**
24:21,23;35:13;
145:2;146:10;184:1,1
**clubs (6)**
85:3,3;86:11,16,17;
97:20
**clue (3)**
181:12;193:9;199:4
**Code (2)**
239:23,25
**codified (1)**
210:12
**co-equal (1)**
84:13
**Collect (1)**
145:5
**collection (1)**
79:14
**college (4)**
16:1,3,5,6
**colorful (1)**
208:10
**com- (1)**
24:23
**comfortable (1)**
140:22
**coming (1)**
91:16

comment (3)
105:19,21;168:19
commentary (1)
177:22
comments (1)
52:6
common (1)
210:11
commonly (1)
9:21
communicate (3)
75:11;105:24;215:5
communicated (3)
47:18;134:4;194:22
communication (8)
46:20;117:25;118:3,
23;119:4,6;175:18;
190:7
communications (7)
31:24;35:18;111:2,3;
144:9;167:10;173:6
community (40)
24:24,24,25;25:1,10;
28:20;39:22;40:2;
47:11;79:1;82:6;86:7,
20,24;87:2;89:15;
91:12;92:25;95:21;
96:18;108:4;110:16,
19;111:13;112:18;
113:10;114:1;115:7,
22;140:18;141:1,14,
25;153:12,15,16,18;
181:6;196:22;214:15
company (12)
10:14,15;16:10,11,
13;17:10;95:19;
155:17;156:13;201:1;
210:19;226:15
Complaint (11)
57:23,25;58:12;59:2,
3;137:6,10;144:14;
151:18;209:8,9
completely (4)
12:7;13:4;158:11;
211:11
compliant (1)
239:24
complies (1)
239:15
computer (1)
167:25
con- (3)
109:15;132:22;
180:13
concept (2)
80:7,14
concern (4)
31:25;32:3,12,15
concerned (22)
29:12,15,19,24;30:5,
9,13;31:2,7,10;32:18,
25;33:3,6,9,20,23;34:1,
4,7,10,13

concerning (5)
31:24;33:17;35:19,
22,25
concluded (1)
240:14
condition (1)
193:23
confident (1)
175:17
confirm (1)
142:18
confiscated (2)
131:12;163:20
confused (2)
96:17;153:23
connection (1)
173:20
consider (3)
89:12,13;200:9
contact (3)
132:2;173:11;216:19
contacted (2)
108:5;110:11
contention (4)
78:22,23;79:15,16
contents (1)
143:14
contract (6)
80:3;104:11;209:1,
14;228:25;230:5
contracts (1)
79:25
contrat (1)
209:10
conversation (15)
49:3;55:9,18;106:5,
6,9,10;139:8;148:12;
149:18;180:25;187:11;
190:18;211:22;225:20
conversations (10)
47:4;48:1,13,17,23,
25;51:7;64:13;109:16;
128:6
coordinates (1)
22:15
copies (5)
28:6;73:14;82:19;
172:10;240:4
cops (2)
125:7,11
copy (23)
28:8;60:12;72:11;
78:1,12,13;81:6;82:9;
151:17,21,21;172:20,
25;173:2;178:2;238:5,
6,11,11,17,20,20;239:2
corporate (1)
140:23
corporation (4)
87:17;94:13,21,25
correctly (2)
51:21;234:11
costs (5)

113:14,15;119:10,
17,19
Counsel (5)
8:3;11:21;112:8;
152:13;223:24
counsel's (1)
160:6
County (13)
8:15;15:12;30:5;
92:10,13;114:7;143:6;
144:7;152:17;169:2;
174:9,15,16
couple (1)
186:8
course (3)
11:12;172:3;208:17
COURT (35)
8:16,23;28:14;56:12;
59:8,11;70:10;72:8;
76:7,9;80:11;82:23;
83:1;107:9;117:13;
126:15;139:24;151:23;
154:5;163:14,17;
164:11;167:4;176:16;
227:12,17;232:13;
238:15,22;239:8,12,16,
23;240:2,7
covering (2)
113:19,22
COVID (1)
135:24
Cow (3)
21:13,14;85:6
crap (1)
221:25
credibility (1)
13:15
Creek (4)
21:13,14,15;85:6
criminal (1)
161:7
Criminally (1)
230:2
criticizing (1)
171:13
cross (1)
124:5
crossed (1)
182:3
curious (6)
18:24;21:23;85:2;
101:18;105:14;119:24
currently (3)
19:3;90:1;144:18
custody (3)
35:10;131:13;234:11
cuts (5)
79:18;123:7,9;
204:19;235:12

30:1;158:18;161:3,6,
23;162:8,10,23;164:17,
23;191:10,20,24;
193:17,18,25;194:3;17;
196:16;197:7,11,15;
198:14,16;199:5,10,11,
13,23;203:20;204:2;
206:24;214:17;215:23,
24;216:5,5,8,9,12,20;
217:14,18,20;227:23;
228:1,14,14;231:15;
235:2,3;236:24
Dahle (20)
33:23,25;34:4,7,10,
12;43:6;44:4,11;45:17;
50:13,15,25;51:7,24;
66:23;73:7;76:25,25;
153:2
Dahles (22)
62:9,12;65:14,22,24;
67:22;69:16;75:2,2,3;
78:23;123:5;159:21;
179:4,5;184:9,10,11,
14;185:10,17,18
Dahle's (7)
60:19;61:6,17;62:14,
15;74:20;180:1
Daily (1)
168:16
damages (1)
115:15
Damian (2)
8:6;237:11,19;
238:10
Dan (3)
112:4,5,16
DAs (2)
202:6;204:8
DA's (6)
162:12,14;164:20;
194:8;214:19;216:19
date (36)
13:1;47:21;48:15,22;
73:11;75:3,11,18,21;
77:3,5,6;109:1;124:2,3,
16;129:6,15;132:17;
138:16;160:25;173:9;
179:10;180:12,14;
181:7,9,10;183:17;
185:8;190:22;203:4;
218:15;219:5;221:1;
222:1
dated (4)
73:8;117:10;143:16,
16
dates (7)
12:23;120:24;
121:12;124:5;127:15;
235:16;146:23
daughter (17)
29:3,16;30:6;31:2,
25;32:15;33:3,15,17;
34:1,10;35:25;57:20;

148:25;149:7;177:19;
230:12
daughter's (1)
104:5
Davis (3)
22:8,8,13
day (77)
51:5;59:20,23;62:22;
70:19;71:19;72:21,23;
74:15;77:9,12;90:9;
91:16;94:24;100:2,5;
101:22;103:12;106:16;
108:10,13;117:9;
124:6;125:3,7,10;
126:1,24;129:8;130:4,
7,17;131:12,21,25;
132:1,13,21;133:21;
134:2,8,12,14,15;
136:5,16,19;137:2,4;
138:3,4;139:6,9;
149:23,24;152:9;
158:16;160:9,18;
174:21,22;180:3;
183:19,20;185:24;
189:18,22;190:2;
210:25,25;215:19,20;
219:18,19,25;234:12;
236:20
days (17)
47:22;51:11;59:18,
22;77:19;126:9,20,22;
127:2,7;128:8;129:1;
139:10;189:22;203:9,
11;215:2
DBA (1)
87:3
dead (2)
201:6;224:14
deal (3)
25:25;182:20;197:7
dealing (3)
186:7;214:18;216:11
dealings (2)
182:16;183:3
dealt (1)
183:25
Dear (3)
114:7;143:2;144:7
decades (1)
40:15
decide (2)
112:13;161:3
decided (2)
111:7;115:24
decision (1)
115:9
decisionmaking (1)
84:16
decisions (1)
89:14
declining (1)
227:23
deem (1)

## D

DA (52)

239:21
**deemed (1)**
61:6
**defendant (2)**
10:2;208:14
**defendants (1)**
72:15
**defense (2)**
113:20,23
**definition (1)**
44:3
**delete (3)**
166:14,21;167:23
**deleted (7)**
30:22;34:16;156:3,
19,25;167:1;221:16
**delivered (1)**
175:8
**denial (1)**
152:12
**Department (19)**
8:9;22:11;29:23;
30:2,5,9;57:5,10,14;
107:24;126:23;127:12,
24;137:8;187:24;
191:20;197:9;202:7;
214:10
**depends (3)**
51:5;66:21;101:4
**depo (4)**
173:15,17;176:10,11
**depose (1)**
194:4
**deposed (3)**
11:16,18,19
**deposition (7)**
11:21;12:14;13:8;
15:7;176:3;240:10,14
**Deputies (1)**
207:7
**Deputy (1)**
228:14
**describe (4)**
20:20;73:4;81:3;
178:20
**describing (1)**
40:15
**detail (2)**
64:10,11
**Detective (5)**
31:10,12;32:5,6;
56:21
**determining (1)**
198:16
**dictate (1)**
61:22
**difference (1)**
12:10
**different (11)**
49:10;70:25;111:22,
25;118:4,8;142:12;
158:21;206:1;210:8;
224:12

**differently (1)**
237:5
**digress (1)**
210:13
**dinner (4)**
39:9,12;42:4;135:13
**directions (2)**
24:7,9
**directly (2)**
197:8;215:2
**director (2)**
24:24;25:1
**disaffirm (4)**
80:3;209:1,18;
228:25
**disagree (1)**
72:6
**disagreed (1)**
172:3
**disappear (1)**
157:19
**discard (1)**
78:17
**disclose (1)**
111:6
**discuss (4)**
45:19;173:15;
176:10;190:25
**discussed (4)**
111:21;132:12;
140:2;150:7
**disorganized (1)**
201:3
**dispose (3)**
193:20;194:6,9
**dispute (4)**
50:23;78:21;186:16,
19
**distinct (2)**
113:2,4
**District (8)**
8:12;29:11,15,18;
38:11;142:3;168:15;
236:4
**doat (2)**
108:6,6
**document (19)**
60:6;75:25,25;76:4,
5,13,15;79:8;80:19,22,
25;81:8,9,14,17,25;
82:6,14;142:18
**documents (42)**
28:9,19,24;29:2,5,11,
14,18,22;30:4,8,12;
31:1,6,9;32:2,11,14,17,
24;33:2,5,8,16,19,22,
25;34:3,6,9,12;35:1,3,
17,21;72:1,19;80:16;
154:23;155:3;156:22;
184:13
**dollars (1)**
212:15
**domain (1)**

42:4
**donate (1)**
76:20
**donated (8)**
45:24;79:17;83:5;
99:18;102:23;108:6;
122:12,13
**donations (2)**
141:11,21
**done (6)**
111:12;167:12;
175:7;185:11;229:12;
230:7
**doubt (1)**
56:24
**down (13)**
10:19;11:4;13:15;
56:12;70:10;71:1;
90:19;99:17;104:20,
23;181:16;207:7;
218:20
**drink (2)**
15:3;39:10
**driver (3)**
18:10,11,17
**drivers (1)**
18:8
**drive-through (7)**
134:25;135:1,5,8,15,
24;136:2
**driving (1)**
208:19
**drop (2)**
234:13,14
**dropped (4)**
133:12;163:13,14;
234:19
**due (4)**
75:21;79:13,14;
146:5
**duly (1)**
8:20
**Duncan (5)**
31:10,12;32:9;56:21;
192:16
**during (7)**
52:25;53:17;70:5;
138:23,25;144:9;
236:21
**duties (5)**
144:20,23;145:3;
146:1;239:25

**E**

**E- (1)**
141:10
**ear (7)**
201:20,21;202:3,8;
204:10;206:22,23
**earlier (16)**
17:15;83:15;89:16;
131:5;136:22,23;

142:11;146:14,24;
154:22;156:3;181:13,
18;184:8;213:19;
214:24
**easier (3)**
98:10;213:10,12
**easy (1)**
12:1
**eat (1)**
145:23
**education (2)**
16:7;27:7
**effect (1)**
180:22
**efficient (2)**
80:8,14
**efforts (1)**
155:2
**eight (3)**
12:18;85:9,11
**Eight-thirty- (1)**
81:22
**EIN (10)**
87:11;94:25;97:1;
141:4,5,7,8,12,17,20
**either (12)**
31:25;105:19;
108:15;131:1;134:4;
143:11;144:4,9;187:6;
199:13;210:11;236:22
**elaborate (1)**
61:9
**eliminate (1)**
91:8
**else (42)**
21:8;23:18;26:16;
35:9;46:9;49:5;52:20;
55:11,15;57:4;62:19;
65:14,24;83:11;89:5,6,
11,17;90:2,5;97:11;
100:12;102:13;106:4;
127:2,19;134:11;
149:4;150:7;153:6;
169:12;179:17;192:18;
205:19;208:5;229:18;
230:11,18;233:21;
234:18;238:15,16
**else's (1)**
65:22
**em (29)**
38:8;51:5;62:2;
66:11,11;68:17,20,20;
69:20;71:22,23;73:17;
90:11;105:11;126:24;
127:8;130:7;134:15,
19,21;135:12;141:11;
164:4;179:9,20,20;
185:7;201:24;228:5
**e-mail (38)**
56:17;73:17,21;
78:11,14;107:17,25;
108:3;114:6,8,14;
115:1;116:10,11,12,20,

23;118:16;129:25;
142:20,25;143:5,11,15,
17,18,20,23;144:6;
156:2;221:21;222:7,
11;223:2,6,7;224:3;
229:5
**e-mailed (2)**
73:19,23
**e-mailing (1)**
107:23
**e-mails (13)**
30:16,22;34:15;35:6;
107:20;120:18;129:23,
24;142:13;155:5,9;
156:2,4
**emoji (2)**
207:19;212:2
**employees (2)**
89:7,8
**end (12)**
13:7;21:4;107:19;
128:16;149:18;196:6,
10;201:10;227:9,10;
238:14;240:10
**endeavor (1)**
222:9
**enforcement (5)**
53:14;199:12;
206:25;213:16;214:6
**enough (7)**
19:23;23:24;41:14;
55:11;78:17;154:4;
198:1
**enrolled (1)**
145:8
**entail (1)**
20:14
**entire (2)**
10:21;96:9
**entities (5)**
113:1,3;141:17,23;
206:1
**entitled (4)**
12:6,7;13:3,5
**entity (6)**
86:9;87:1;89:25;
113:7,17;140:23
**entry (3)**
81:12,14,18
**Eric (4)**
63:1,2,17,22
**Erin (4)**
23:4,5;25:12,13
**Erin's (1)**
23:9
**error (1)**
11:24
**escaping (1)**
150:24
**Esther (1)**
140:20
**estimate (14)**
12:8,9,11,17,21;

13:3;49:22;51:14,16,
22;103:24;136:20;
138:5,13
estimates (1)
51:13
et (4)
108:23;180:4;191:4;
197:15
eve (1)
161:23
even (14)
51:14;53:10;73:22;
110:7;113:7;121:18;
159:9;163:22;166:19;
200:8;205:10;208:25,
25;228:24
evening (1)
99:24
Event (14)
29:12,15,19;34:22;
39:5,6;43:18;46:21;
65:21;91:12;148:1,2;
235:10,18
events (1)
147:5
everybody (3)
70:2;77:20;90:17
everybody's (1)
70:2
everything's (1)
219:23
evidence (2)
14:4;172:11
exact (9)
47:18;103:7,8,22;
106:6;119:1;121:12,
13;180:12
exactly (8)
49:21;51:11,21;
89:20;103:12;104:12;
179:10;190:22
EXAMINATION (1)
9:1
example (6)
12:13,15;37:14;
39:13;169:5;170:3
examples (1)
145:10
except (4)
65:22;116:15;
173:12;223:3
exception (1)
184:4
excerpts (1)
143:25
exclusively (1)
197:11
excuse (2)
25:2;236:7
Exhibit (55)
28:4,10;60:7,13,14;
72:7,9;76:7,10,11;
80:22,23;81:8,11,15,

17;82:2,7,8,12;83:2,6;
107:7,11,12,16;108:2;
117:12,15;118:20;
142:13,21,24,24;
143:15;144:5,6,6;
151:22;152:5;157:5,8;
167:3;168:3,4;176:15,
17,19;206:21;227:13,
16,19,20;232:12,14
exhibitor (2)
104:6,13
exhibitors (2)
37:5;168:16
exhibits (3)
142:12,14;172:18
exist (1)
93:1
experience (1)
101:15
Explain (2)
74:22;99:15
explained (1)
160:6
Explodes (1)
136:4
expression (2)
172:23;200:21
extended (1)
136:6
extension (1)
83:19
extent (1)
61:12

**F**

face (1)
207:10
Facebook (4)
167:15,16;176:22,23
facility (5)
86:4,5,6,8,22
fact (4)
81:5;121:18;208:24;
219:24
facts (2)
14:20;50:10
Fair (100)
8:12;23:24;29:12,15,
19;36:7,13;37:3,9,13,
15,23;38:11;41:14;
42:1,8,22;54:13,20,24;
55:1,11;59:17;61:25;
68:25;69:9,9;70:1,5,15,
19,22,23,24,25;71:3,
10;72:3,21,24;73:13;
77:19;78:13,17;80:16;
81:10,18;82:7;86:2;
95:17,22;97:11;99:7,
12,14;104:13,19;105:1,
5,6;107:17;114:7;
115:14;117:9,23;
135:15;143:2,6;144:7;

146:7;166:7,13;
168:15;174:4,7,15,16,
20,20;175:3,6,7,18,22;
182:18;183:20;185:13;
198:1;204:22,25;
205:1,12,23;206:4,7;
226:12;236:4,6,8,9
fairgrounds (16)
41:8;62:4;68:13;
73:24;74:3;85:17;
119:13,18,21;120:9;
169:3;182:21;183:4;
184:18,23;185:15
fairs (1)
174:14
fair's (2)
204:23;206:3
familiar (1)
36:5;80:2,7,13
family (4)
16:21;47:25;42:23;
221:23
far (5)
42:18;98:21;127:16;
167:19;168:1
Farm (2)
186:12,13
fart (1)
217:12
fast (1)
11:10
federal (2)
215:11;239:12
feed (1)
196:25
feeding (1)
196:25
feeds (1)
193:22
feel (2)
207:16;223:6
feels (1)
140:21
feet (1)
12:19
Female (1)
137:14
fence (2)
101:2,4
fences (1)
101:2
Fer- (1)
157:4
Fernandez (46)
30:13,18;31:2,6;
36:6;40:10;52:24,25;
130:11;131:17;132:7,
10,13;133:1,7,13,14;
134:5,11;136:24;
138:1,1,19;157:4;
158:9;159:24;164:22;
166:3;192:2,14,15;
193:8;197:14;198:9;

204:6;211:5;213:3,6,9;
214:10;215:14,16;
219:15;230:12;234:13;
236:14
Fernandez's (1)
159:25
few (16)
28:9;48:3;80:16;
97:5;107:18,21;
139:10;146:22;152:10,
14;154:7,9;161:21;
197:13;203:8;215:2
FFA (14)
27:18,19;85:3,12;
86:6,11;92:15;97:24;
98:15;110:5;112:17;
113:3;153:20;193:21
FFA/4-H (1)
76:20
figure (6)
80:19;98:5;102:10;
137:3;191:11;199:25
figuring (1)
199:1
file (6)
136:10,13;139:20,
24;140:5,8
filed (17)
48:16,23;49:1,4,8,
13;51:8;137:4,10;
152:11;158:17;175:11;
207:6;212:15,19;
215:18;236:20
filing (1)
230:25
fill (13)
60:3,22;61:6,18;
62:3;64:24;65:12;66:2,
4;67:22;76:15,19;
136:12
filled (11)
60:4,19;61:15;65:3;
66:16,17;68:6;69:16;
76:24;77:1,3
fills (1)
68:17
finally (3)
201:5,9,10
find (7)
89:25;101:24;
103:20;178:6;195:11;
233:9;238:24
fine (19)
12:13;14:23;18:24;
23:3;37:20;66:1;70:2;
75:22;82:4;128:14,14;
136:23,23;191:11;
210:7;222:16;234:1;
237:2;239:15
finish (1)
158:25
fir- (1)
46:11

firm's (1)
207:9
first (32)
8:20;17:20;41:7,12;
43:20;45:20,20;46:11;
67:1;94:19;99:6,11,14,
15;107:21,22;118:10,
11,16;133:8,14,19;
156:24;158:17;177:4;
185:19;187:22,24;
203:16;236:12,15,15
five (4)
47:22;58:15;66:19;
234:1
fixed (3)
11:24;157:15;165:21
flagged (1)
142:21
flyer (4)
28:20;82:6,18;84:20
flyers (2)
44:4;89:23
focus (1)
26:24
focused (2)
26:19,22
follow (4)
98:9;120:9;184:4;
228:1
followed (2)
162:6;165:7
following (4)
117:9;137:18,20;
139:16
follows (1)
8:20
followup (2)
117:9;119:22
follow-up (5)
154:9;155:1;161:21;
164:22;169:16
food (6)
145:12,21;146:5,7;
191:3;196:13
foot (1)
101:10
F-O-R (1)
222:25
Forero (8)
23:20,21;83:14,15;
91:20;93:6;116:1,8
forget (1)
201:19
forgetting (1)
153:20
forgo (1)
239:25
forgot (7)
54:19;102:5;158:11;
217:8,12,17,19
forgotten (2)
160:18,19
form (10)

60:4,17;64:24;65:4,
9;66:4;67:23;69:16;
94:12,13
**formal (1)**
140:22
**formed (6)**
93:3,4,11,19;94:10,
11
**former (2)**
25:6;140:15
**forming (1)**
93:19
**forms (5)**
66:16,17;68:11,17;
69:15
**forward (4)**
15:6;75:1;222:7;
235:1
**found (5)**
102:8;103:22,25;
108:4;122:5
**foundation (1)**
61:19
**four (11)**
19:17;25:20,21;
38:24,25;48:12;67:8,9;
85:12;101:10;176:6
**four-foot (1)**
101:11
**Fourth (2)**
130:3,6
**Fowler (11)**
147:10;148:5,6;
149:19;150:23;186:1,
3,20,23;187:9,12
**frame (4)**
121:11,14;122:1;
232:1
**Fran- (1)**
107:24
**Francesconi (1)**
107:25
**Frank (2)**
17:6,7
**free (2)**
209:24;223:6
**freezer (1)**
205:4
**French (1)**
207:11
**frequently (1)**
40:11
**fresh (2)**
172:12,17
**Friday (2)**
13:2;161:24
**Friends (9)**
36:7;12;43:7,8,9;
44:22;45:8;214:8,8
**front (2)**
176:14;220:2
**full (3)**
9:5;179:2;220:2

**fund (1)**
146:9
**funding (2)**
22:3;24:15
**fundraiser (4)**
43:18,22;45:5;92:14
**funds (2)**
25:14;98:3
**funny (2)**
61:8;93:18

## G

**gave (15)**
28:19;62:16;63:20,
24;64:22;74:23;81:14;
115:12;124:21;146:24;
155:4;172:9;203:20;
218:11;228:5
**gel- (1)**
227:4
**gelding (2)**
227:4,5
**general (4)**
25:14;79:25;152:12;
212:4
**generally (9)**
10:7;15:9;17:18;
95:8;106:7;109:16;
175:24;180:21;216:9
**generated (4)**
97:15,19;184:21,22
**genuinely (2)**
101:18,18
**gets (4)**
70:2;94:24;167:24;
211:11
**girls (1)**
20:15
**given (6)**
28:18;74:23;119:15;
204:16,17;205:3
**gives (2)**
184:7;239:19
**giving (2)**
138:15;164:18
**glee (3)**
49:25;50:4,5
**gleeful (4)**
50:7;52:4,5;64:14
**goal (1)**
101:25
**goat (84)**
27:1,1;52:14,15,19,
21;71:16;99:20;
100:10,15,18,20;101:1,
2,3,20;102:8;103:14;
104:1,3;105:17,20,25;
108:6;109:11;110:12,
19,23;122:16,18;123:1,
3,12,17,18;139:11;
149:9;158:19;161:4;
168:22,23;169:1,3,8,

14,22;170:4,5,14,22;
177:12,13;178:22;
181:4,5;182:12;188:8,
9,11;189:6;190:2;
191:10;193:17,21;
194:5,7,9;195:9;196:6,
11,12,20,23,25;199:22;
200:13;202:25;204:22;
205:2,15,17;207:8;
208:20;235:13
**goats (5)**
71:19;101:9,15;
145:13,13
**God (1)**
224:13
**goes (9)**
59:17;85:2,3;97:17,
19,19;107:18;109:17;
168:14
**gonna (1)**
81:5
**Good (17)**
8:7,11;59:10,10,15;
92:14;99:10;109:12;
160:13;161:20;177:2,
23;191:7;196:1;201:5,
8;216:4
**googling (1)**
233:14
**GORDON (136)**
9:2;11:9;14:23;15:1;
27:12;28:8,11,17;36:4;
56:14,15;58:22;59:6,
10,14,16;60:12,15;
61:16;62:5;64:17,20;
65:17;67:18;68:7;
70:12;72:10,13;76:3,
10,12;80:13,15,24;
81:5,7;82:11,13,25;
83:3;96:16;106:23;
107:7,10,13,15;111:10,
14;112:20,23,25;113:3,
6,9;117:14,16;124:10,
14,15;125:14,18;
126:16;128:13,23;
134:1;144:1,3;150:22;
151:16,20;152:1,6;
154:18;157:7,9;159:3;
163:16,18;164:10,13,
15;167:5;168:5,10;
169:18,20;171:18,21;
172:9,15,19;176:17,20,
24;177:2,3;178:5,8;
182:1;189:3,15;192:5;
198:22;206:18;212:23;
218:5,9,10,19;219:1,
20,22;222:6,16,21,24;
223:3,6,14,17,24;
224:7;227:15,18,21;
229:7;232:15,18;
234:9;237:9,21,25;
238:7;239:1;240:1,3
**G-O-R-D-O-N (1)**

222:24
**Gordon's (1)**
238:5
**Gotcha (16)**
46:17;63:12;77:23;
85:5;87:16;113:16;
131:11;135:23;136:9;
146:13;156:1;165:17;
207:17;219:23;225:15;
226:13
**government (1)**
22:6
**grad- (1)**
21:6
**Great (4)**
28:9;46:8;151:21;
237:25
**green (3)**
199:5;203:20;235:1
**ground (1)**
11:20
**group (19)**
24:16;25:10,14;
26:19,25;27:6;36:5,7,
14;90:3;91:18,24;95:7;
140:25;145:12,15
**groups (7)**
85:12,12;92:15;
141:3,6;171:1;183:5
**guess (12)**
12:9,10,21;19:19;
21:14;41:25;68:2;
114:4;215:19;217:10,
11;218:17
**guys (4)**
58:22;131:7;150:7;
199:6

## H

**half (2)**
189:14;226:20
**halfway (1)**
129:1
**hand (9)**
8:17;28:3;44:4;76:5;
77:19,21;80:19;151:5;
176:24
**hand-delivered (1)**
180:1
**handed (7)**
77:2,8,12;81:8,11;
107:16;142:12
**handing (2)**
81:6;151:17
**handle (1)**
24:15
**handled (2)**
182:8;237:4
**handler (1)**
63:5
**handles (1)**
35:11

**hanging (1)**
135:15
**hang-out (1)**
135:20
**Hanna (1)**
228:14
**hap (1)**
204:14
**happen (2)**
44:15;92:9
**happened (14)**
12:24;45:20;47:23;
48:10;100:20,23;
124:6;138:6;139:9;
162:20;166:15;204:14,
22;205:13
**happens (1)**
13:20
**Happy (21)**
21:17,18,21,23;
24:14,25;26:19;40:17;
94:17,18,20,21,21;
95:4,5;96:3,19;97:6,
10;141:4;145:1
**harassment (1)**
26:14
**hard (6)**
78:12,13;98:9;
190:16;238:11,17
**hate (1)**
161:22
**head (8)**
10:1;57:16,17;87:14;
118:6,7;125:15;186:5
**heard (9)**
48:11;80:5;99:14,16;
153:21;180:13,13,15;
216:20
**hears (1)**
11:5
**heart (2)**
168:14;187:7
**held (1)**
17:12
**help (5)**
46:7;91:9,16;110:23;
222:6
**helped (3)**
46:7;120:3,7
**helpful (1)**
121:21
**Helping (5)**
20:15;88:1,2;98:15,
16
**Here's (2)**
107:25;108:3
**Hey (5)**
160:10;196:5;210:1
**hi (7)**
39:8;107:25;161:2,
22;162:21,22;165:19
**high (4)**
15:21,22,24,25

LONG vs.
FERNANDEZ

hire (2)
195:19,20
history (1)
183:18
hit (5)
18:10,11,17;233:15,
16
hits (1)
18:8
Hmm (3)
83:19;105:21;157:18
Hold (3)
14:16;64:15;96:6
holiday (2)
130:8,9
home (1)
195:11
hop (2)
101:2,11
hope (3)
224:13;225:20;226:9
hopped (1)
101:1
horse (12)
20:13,14,18;21:11,
14,15;40:4,6,7,18,19,
19
horses (5)
20:16,20,22;21:2;
26:20
hours (3)
138:24,24,25
house (11)
12:20;39:15;169:5;
188:8,9;189:6;190:2,
19;191:11;195:21;
234:14
huh (1)
71:24
Huh-uh (1)
228:10
hung (2)
44:6;49:8
Hunt (1)
207:7
husband (6)
16:25;17:3;39:13;
53:14;55:20;208:4
husband's (3)
17:5;25:7,8

**I**

ID (5)
94:19;96:21,23,25;
97:6
idea (8)
11:7;13:4,5;113:18;
146:16;181:15;226:7;
233:23
immediate (1)
55:18
imply (1)

219:8
implying (1)
169:21
importance (1)
124:6
important (2)
12:3;13:16
impression (1)
119:14
improper (1)
152:14
in- (1)
184:7
inaccurate (2)
52:11,13
inception (3)
16:18,20;17:13
incident (1)
47:22
indemnifying (1)
113:17
indicated (1)
59:2
indicating (8)
29:8,21;30:20;38:19;
138:12;142:23;159:9;
213:7
individual (2)
213:17;235:22
individuals (2)
91:17;129:14
inferred (1)
204:1
inform (1)
50:20
information (7)
148:25;216:1,14,16,
18;230:19,24
informing (1)
47:1
Instagram (3)
177:6;179:3;183:12
instantaneously (1)
79:4
instruct (2)
105:24;106:1
instructed (1)
132:11
instructing (1)
188:8
instructions (1)
206:24
instructs (2)
13:24;14:6
insurance (2)
18:12,19
Interacting (1)
26:6
interesting (7)
86:16;87:10;89:24;
101:19;145:18,25;
150:2
internally (1)

178:13
interpret (1)
217:11
interrupt (1)
237:15
interruption (2)
27:11;67:17
interview (1)
164:6
into (9)
14:4;70:8;71:10;
131:13;136:11;140:11;
224:22,24;234:11
introduced (1)
14:4
invades (1)
14:17
investigation (2)
53:1,17
investigative (1)
136:24
investigator (1)
214:9
invoice (5)
78:2;181:23;184:10,
11,22
invoices (5)
181:13,17;184:8,9;
185:9
involved (17)
17:16;27:19;39:20;
41:25;91:11;92:23;
111:23;119:19;140:7,
17;141:3,6,18;142:4;
155:17;183:18;192:14
involvement (6)
19:1,2;40:16;41:3;
142:8,9
involves (1)
21:12
issue (3)
46:14;95:17;165:18
items (1)
146:11

**J**

jail (5)
229:12,15,15,21,25
Jeff (3)
195:8,12,16
Jeremy (1)
57:1
Jerry (35)
52:24,25;138:1,1;
159:9;161:2,22;
162:21,22;165:19;
166:3;192:2;211:2,5,5;
213:3,3,6,9,10;214:23;
215:1,5,9,14,16,20;
217:20,22,25;218:11,
13;219:3,5,11
Jerry's (1)

159:10
Jessic- (1)
117:24
Jessica (47)
28:25;29:12,24;
30:13;31:10;32:25;
33:9,17,23;34:7;35:22;
48:18;57:18;99:6;
105:25;106:18;108:1,
3,22;114:6,6,20;
115:20;116:14;117:8,
25;118:3,16,23;119:6,
9,9;125:4;142:20;
143:17,18;147:11;
150:13;161:6;163:21;
178:25;179:25;197:2,
5;200:5;216:22;229:9
Jessica's (1)
144:6
jKeep (1)
187:25
John (11)
8:12;83:14;91:20;
93:7;95:23;115:25;
116:7;164:13;237:11,
21,23
Johnson (6)
56:5;160:2;191:18;
192:22,24;193:13
Jonathan (1)
95:24
judgment (1)
62:6
juicier (1)
224:9
July (48)
34:17;53:22,22,22,
23;54:4;73:8,9,10,11;
74:4,14;75:13,14;
108:22;121:3;122:3;
127:6;128:5;129:3,13;
130:3,6;131:11;136:5,
18;137:1;144:8,22;
185:9;188:7;190:4,6,6;
191:7;194:16,17;
198:2,3,4,13;200:13;
202:21;203:4,15;
231:24,25;234:12
jumping (2)
95:15;152:25
June (30)
34:18;46:25;47:24;
48:14,22;50:14;59:18;
108:9,21;109:24;
114:6;117:10;121:25;
138:9;143:16;144:8,
22;177:5,17;180:8,16,
18,19;182:13;183:12,
13,23,24;186:17;190:4
Junior (16)
37:3,13,16,22;38:22;
59:24;65:20;73:6;
77:13;123:15;204:17,

18,25;205:21,24;
235:14

**K**

Kat- (1)
108:17
Katherine (2)
9:12,13
KATHIE (11)
8:19;9:7;91:20;93:6;
108:4;155:13,17;
161:3;165:21;224:2;
240:10
K-A-T-H-I-E (2)
155:13,18
Kathie's (1)
168:13
keep (13)
11:11;35:3;69:20,21,
25;70:4;129:19;
153:19;172:12,17;
193:22;196:11;234:15
keeping (1)
234:24
Kelly (18)
8:4;28:6;60:9;72:10;
81:6;82:9;107:13;
111:20,22;117:14;
140:21;151:20;172:9;
176:25;218:15;222:6;
229:4;232:16
Kent's (5)
195:8,12;226:21,21,
22
kept (2)
195:21;196:1
Kevin (2)
226:10,13
kid (1)
116:24
kidding (1)
100:11
kids (8)
20:15;26:6;40:11;
55:22;56:1;104:20;
151:3;209:19
kill (3)
191:10;193:17;
194:18
killed (2)
204:15;205:11
killing (1)
200:13
kind (3)
10:13;24:8;92:13
KM (1)
9:24
knew (25)
42:22,23;53:4,9,11;
99:8;106:17,20,21;
114:23;119:4,12;
130:8;145:23;179:10,

12;182:8;185:12;
202:23,23;203:22;
213:24;214:4,22;216:8
**knowing (1)**
228:24
**knowledge (15)**
37:24;70:14,15,17;
115:16,18;157:2;
198:13,17;204:11,12;
221:2,3;234:21,22
**known (11)**
9:21;38:23;40:23;
41:6;42:25;44:25;
52:24;115:20;133:10,
11;179:16
**knows (2)**
69:10;193:13
**KRCR (2)**
220:2,6

## L

**Labor (2)**
174:21,21
**lack (1)**
61:19
**lady (1)**
200:8
**lamb (1)**
145:14
**landline (2)**
156:10,12
**language (1)**
208:10
**Larry (8)**
23:20,21;83:14;
91:20;93:6;98:18;
116:1,8
**last (14)**
12:25;23:2;48:11;
53:21;58:24;66:15,19;
95:1;129:2;166:8;
173:23;174:2,23;
227:12
**later (7)**
11:24;14:5;100:19;
102:1;136:7;161:22;
197:13
**law (11)**
53:14;79:23;88:16;
172:23;199:12;206:24;
207:7;209:22;210:11;
213:16;214:5
**lawfor (1)**
222:25
**laws (2)**
209:3,5
**lawsuit (26)**
10:3;48:16;49:1,4,
10,12;51:7,8;56:24;
57:2;139:25;140:9;
158:17;175:11,13;
207:13,14,14;208:3;

212:5,16,19;215:18,18;
220:2;236:20
**lawsuits (5)**
11:19;17:17,17;
140:7;210:17
**lawsuit's (2)**
49:8;207:5
**lawyer (6)**
110:4,7,11,15;
134:10;229:10
**lawyers (6)**
12:13;108:5,13,14;
110:11;225:11
**lay (3)**
220:16,20,21
**leader (16)**
19:12,15;20:8,12,13,
14;21:11;39:22;40:2,5,
6,7,8,17,18,19
**leading (1)**
14:2
**learn (7)**
20:15,16,19;99:6,11;
100:17;203:19
**learned (3)**
20:21;203:16;204:1
**least (2)**
88:11;132:4
**left (4)**
163:9;206:22;
223:12;228:3
**leftovers (1)**
122:20
**legal (3)**
110:22;113:13,15
**length (2)**
12:17,20
**lesson (1)**
116:24
**letter (13)**
30:1;106:22;114:5;
117:8,17;152:12;
180:1;227:22;228:2,
18;231:12,14,15
**letters (3)**
117:20,21,24
**letting (1)**
47:2
**lie (1)**
224:9
**lieu (1)**
239:2
**Lieutenant (9)**
30:13;36:6;52:24;
131:16;134:11;138:1;
157:4;213:5,9
**life (5)**
11:25;15:16;19:1;
224:10;225:3
**light (3)**
199:6;203:21;235:1
**likely (1)**
190:10

**limit (1)**
193:21
**limiting (1)**
190:1
**line (3)**
79:11;135:7;163:15
**list (4)**
28:21;35:12;85:7;
90:20
**listen (1)**
221:12
**little (4)**
56:13;61:9;70:11;
161:25
**live (1)**
15:12
**Live- (1)**
204:16
**lived (1)**
15:14
**lives (1)**
39:17
**Livestock (18)**
37:3,14,16,22;38:22;
59:24;65:20;73:6;
77:13;123:15;204:17,
18,25;205:22,24;
206:2;214:9;235:15
**living (1)**
180:22
**LLC (1)**
87:2
**local (5)**
24:15;25:10;220:8,9;
226:15
**logic (1)**
169:9
**long (38)**
14:7;15:14;16:15;
19:6,18;25:17;28:25;
29:12,24;30:13;31:10;
32:12,25;33:9,15,23;
34:7;35:22;38:23;
40:25;41:5;43:8;44:25;
46:7;48:18;52:23;
57:18;59:12;69:24,25;
78:3,4;90:9;106:9;
125:4;143:17,18;
230:12
**longer (3)**
19:25;78:8;157:17
**Longs (2)**
182:14;183:23
**Long's (1)**
198:5
**look (17)**
13:14;51:20;60:11;
80:21;89:20;105:3,5,6,
8;107:13;155:3;
157:14;159:5;167:14,
15;168:1;224:22
**looked (7)**
104:16,18;105:1;

155:5,7;167:11;224:24
**looking (5)**
90:1,21;91:18;
158:20;178:7
**looks (10)**
28:19;73:5;74:7;
158:17;168:12;177:4;
185:24;195:7,25;207:4
**lost (2)**
173:19,19
**lot (8)**
42:19,21;57:10,13;
149:13,14,20;224:9
**loud (1)**
125:16
**lovely (1)**
221:24
**lower (1)**
225:17
**lunch (4)**
154:8,8,14;206:10

## M

**M-A-C- (1)**
174:17
**Macfarlane (5)**
8:13;33:8,12,17,20
**machine (1)**
228:8
**Madam (2)**
58:24;76:7
**Maiden (1)**
9:16
**mail (5)**
73:15;182:3;222:13;
228:19,20
**mailed (3)**
185:7,21;240:4
**main (1)**
22:13
**mainly (4)**
90:21;127:17,18,19
**Maire (2)**
112:4,5
**majority (1)**
62:2
**Makes (4)**
171:19;207:5;
211:12;219:21
**making (5)**
21:15;89:14;161:13;
171:3;220:5
**Male (3)**
137:14,15;231:1
**Manager (3)**
114:8;143:6;144:7
**many (13)**
10:5;67:6,14;85:7;
99:17;102:10;109:2,3;
122:10,10,13;155:9;
156:8
**mark (3)**

28:14;82:24;157:5
**marked (15)**
28:10;60:14;72:9;
76:11;80:23;83:2;
107:12;117:15;152:5;
157:8;168:4;176:19;
206:21;227:20;232:14
**market (2)**
27:1;145:13
**married (1)**
9:14
**Mary (1)**
23:1
**Mary's (2)**
23:2,7
**master (1)**
169:23
**math (1)**
20:7
**matter (8)**
48:2,14;49:2;57:24;
72:15;113:17;136:11;
152:11
**matters (2)**
23:25;24:1
**may (11)**
12:7;61:19;66:12;
126:13;143:24;157:13;
165:4;186:18,19;
188:18;229:15
**maybe (10)**
11:24;21:24;80:17;
91:7;95:20;98:8;122:8;
171:22;218:15;230:18
**McArthur (7)**
174:8,16,17,20;
175:18,22;226:12
**Mcfarlane (11)**
38:8,21;41:19;99:23;
118:2,22;120:21;
173:3;187:12;220:11;
224:2
**Mcfarlane's (1)**
159:16
**mean (57)**
13:23;19:2;24:8;
26:4,23;31:18;37:12;
43:17;44:1;47:17;48:9;
60:6;66:12;74:22;
79:10;92:2;96:25;98:8;
101:13;105:6;109:8;
111:18;113:18,22;
122:1;140:22;141:19;
145:7;155:20;161:12;
166:19;167:13;168:23,
24;171:9;175:6;
177:18;180:5;187:6;
200:21,22;201:8;
205:22,22;210:3;
211:9;212:10;213:3;
217:11;220:19;221:6,
19,20;224:4;225:7,9;
237:15

means (3)
200:22;215:12;
217:14
meant (11)
25:9;36:11,11;70:4;
112:23;130:14;169:2;
171:16,22;216:9;219:9
meat (9)
79:18;122:24;123:1,
3,7,9,17;205:19;224:14
meats (2)
123:17;200:23
media (16)
35:18,22,25;128:17,
22;167:7,9;168:6;
211:9,11,14,24;212:9,
11;220:21;232:9
medication (1)
14:19
meds (1)
14:14
meet (3)
43:11;45:2;57:20
meetings (1)
20:24
Megan (17)
34:7,10,12;45:14;
50:13,25;51:7,24;
62:25;63:4,7,9,18;
67:10,14;73:7;76:25
Megan's (1)
63:3
Melanie (39)
8:13;32:25;33:3,6;
38:10;41:6,24;107:23;
108:8,10,18,20;109:25;
110:5,10;114:16,19,19;
115:2;116:19,20;
119:5;120:21;126:1,3,
13;127:1,13;129:4;
134:10;143:15,17;
159:19;211:2,2,3,7;
236:10,11
member (2)
24:23;36:21
memory (7)
130:21,25;138:16;
141:9;187:15;230:15,
18
mention (4)
90:10;93:18;165:18;
177:25
mentioned (8)
30:18;69:14;83:15;
89:16;98:17;137:25;
141:4;179:4
message (5)
219:15;220:11;
226:2,9;228:3
messages (11)
30:16,19,21,23;
34:16;155:7,8;156:17,
25;157:18;173:5

met (12)
31:15;43:20,21;
52:25;53:16,20;56:11,
20,22;57:2,18;147:15
Michael (7)
56:5;160:2;191:18;
192:22,22,24;193:13
mid (4)
53:22,23;54:4;219:4
middle (2)
131:23;134:14
mid-morning (1)
160:11
Midweek (2)
138:11,18
might (31)
13:19,22;34:16;
36:10;43:21;51:20;
66:11;67:25;68:9;
69:13;73:23;90:7;
109:25;124:4;126:8,
10,10,12,14;138:22;
144:12;174:19;175:21;
199:17;221:17;230:15,
16,16,19;231:21;235:5
Mike (2)
107:24,25
miles (1)
208:19
mind (13)
52:6;64:23;96:24;
110:19;111:7;125:9;
154:10;172:16;199:13,
21;229:20;230:2,5
minor (4)
209:1,8,10;210:12
minor's (2)
80:2;209:18
minus (1)
92:22
minute (1)
102:20
minutes (1)
223:12
misappropriating (1)
98:1
miscount (1)
101:21
miscounted (1)
100:24
Miss (1)
58:24
missing (4)
99:21;100:10,22;
101:21
misspelled (1)
188:2
misspelling (1)
188:6
misstates (2)
112:12;181:20
mistake (1)
188:3

misunderstood (1)
235:20
moment (14)
11:15;38:17;58:22;
69:21;72:11;81:12;
106:25;147:22;152:7;
154:10;164:11;172:13;
223:15;234:2
Monday (7)
103:5,11,13,25;
106:14,15;180:3
money (10)
85:1,13;97:14,16,19,
19;114:24;120:1,15;
196:13
monies (1)
145:5
month (2)
182:18;183:21
monthly (1)
20:24
months (4)
44:12,16;45:11;
48:12
more (25)
18:21;45:12;67:12,
13;74:5,11;91:17;
98:21;101:15;107:20,
20;115:3;131:21;
132:5,8;138:16;
148:25;154:7,9;
178:21;192:13,14;
213:15;216:14,15
morning (9)
8:7,11;28:18;109:24;
180:2,3;191:7;217:25;
219:4
most (7)
12:15;20:21,21;66:9,
13;210:9,10
mother (8)
104:4,5;106:20,21;
163:21;177:18;208:6,8
mouth (1)
213:25
mouthful (1)
222:21
move (2)
179:20;235:1
moved (1)
23:16
Moving (2)
78:20;165:10
Mrs (4)
76:1;80:18;114:5;
142:15
much (5)
162:7;164:19;
202:22;227:14;229:16
multiple (3)
157:20;162:7;229:1
Muse (39)
8:5,16,19;9:4,7;

16:12,16;17:8;27:14;
72:19;76:1,1;80:18;
81:10,12;82:14;84:22;
91:20;93:6;107:16;
108:4;114:5,5;128:24;
142:15,15;151:17;
153:1;154:19;159:4;
161:3;165:21;172:20;
206:19;223:6,25;
224:2;227:11;240:10
M-U-S-E (2)
9:9;16:12
Muse's (1)
223:4
must (4)
133:11;170:21;
202:17;219:5
myself (2)
83:14;115:6

## N

name (26)
9:5,12,16,21;16:10;
17:5;21:11,13;23:2;
25:6,7,8,23;35:15;
53:10;72:2;76:22,23;
77:24;89:19,25;99:9;
150:17,24;196:21;
230:24
named (3)
208:14;210:22;
233:21
names (7)
9:11;22:22;65:25;
83:12;90:10;98:18;
146:10
naming (1)
153:25
Nate (3)
23:4,11,11
national (1)
132:20
nature (1)
13:16
necessarily (2)
34:22;190:1
need (15)
10:19;11:3;60:10;
71:1;81:3;105:5;
125:15,19;135:4;
172:12;196:11,12;
206:11;227:2;240:6
needed (4)
46:7;67:19;102:11;
115:21
neither (1)
119:8
net (2)
97:21;198:3
new (2)
66:21;227:13
news (8)

143:25;144:14;
168:16;201:5,8;220:6;
233:15,16
next (30)
33:14;46:20;143:1;
160:18;161:19;162:22;
166:2;185:24;190:3,3,
6;195:6,7,7,24,24;
198:2,3;200:13;207:3;
210:14,24;213:1,2;
219:25;220:10;221:4;
225:8;226:9;227:10
nickname (2)
9:21;21:18
nine (1)
85:11
Nobody (1)
115:12
nobody's (1)
165:5
Nodding (3)
125:12,13;172:7
none (8)
31:8,10,11;34:2,3;
36:2;66:7;204:8
nonetheless (2)
11:25;61:1
nonprofit (8)
87:4,6;93:1,5,13;
94:16;96:18;141:11
nonsubstantive (1)
54:16
Nope (1)
228:13
nor (1)
143:14
NORTHCUTT (11)
8:6,6,8,14;13:21;
192:3;222:3;237:19,
19;238:10,10
note (1)
177:1
notes (1)
59:9
Nothing's (1)
89:24
notice (1)
81:12
Number (33)
11:2,4;81:12;87:11;
94:19;95:11;96:12,13,
22,23;97:15,18;128:17,
22;142:25;146:25;
147:1,5;159:10,11,16,
18;163:9;166:19,22;
185:25;186:4,19;
224:14,19;228:5,6;
231:5
numbers (2)
166:25;187:7

## O

oath (1)
154:20
object (6)
13:20,22;14:17;
112:12;192:6;198:19
Objection (1)
192:3
objections (1)
13:22
obviously (7)
31:15;47:3;107:18;
111:21;156:11;165:13;
203:4
occur (2)
140:5;215:8
occurred (2)
17:19;65:21
off (36)
27:16;47:10;57:16,
17;58:16;84:19;
100:15,18;106:24;
107:1;124:5;128:15;
133:12;151:7,10;
154:10,12;156:24;
163:14;186:4;206:11,
12,22;220:16,20,22;
223:16,18;227:12;
234:3,13,14,19;237:12;
238:4;240:13
offer (7)
115:13,24;119:15,
21;120:8,12;209:2
offered (9)
114:20;115:11,12,
20;139:23;163:22;
180:3;208:20;228:25
offers (2)
120:17;150:14
office (36)
22:14,19;23:19;
25:10,11;43:18;44:8;
68:14;70:8;73:24;74:3,
21;83:16,22;84:23;
86:12,13;112:6;
136:11;138:22;162:12,
14;163:3;164:17,20;
180:1,20;185:7;194:8;
197:10;198:6;202:6;
214:19;216:19;230:11;
239:6
Officer (9)
36:21;87:20;88:14,
15,19;91:22;93:15;
162:11,12
officers (6)
8:9;57:13;87:22;
88:10,12;91:18
offices (2)
86:18;240:11
official (1)
97:4
often (2)
44:10;45:12

old (4)
19:23;159:18;
221:25;240:12
on- (1)
41:20
Once (8)
44:12,15;131:21;
132:4,5,8;147:21;
175:6
one (103)
11:6,12;17:20;18:8,
8;28:2;30:19;38:8;
45:13,21,22;49:3;
58:10,10,22;60:22;
66:16,16,17;68:6;72:2,
4;74:9,11;75:25;76:6;
77:13,15,16;80:12;
82:14;89:17;90:5;
93:24;95:24,25;99:20;
101:2;102:12,22;
104:3;115:3;116:13,
17;118:5,10,12,19;
122:8;126:15,18,20;
129:7;130:21;133:8,
18;135:11;136:13;
140:2;141:4;142:13,
14,15;144:13;151:8,
20;152:7;153:24;
154:4;155:13,16,16,22,
23,25;156:10,10,12;
164:11;165:9,12;
172:10,11,12,12,14,15,
17,18;173:12;174:13;
185:19;187:6;190:12;
192:13,18;197:11;
198:3;199:22;203:11;
210:19;221:4;235:14
ones (8)
17:2;29:10;127:10;
149:2;156:23;157:25;
167:11;236:13
one's (2)
100:22;141:20
one-third (3)
187:4,4,5
ongoing (3)
48:6,8,11
online (3)
26:14;41:22;212:4
only (18)
19:16;70:23,25;
86:10;90:23;96:21;
115:9;119:17;140:16,
25;151:20;154:2;
167:15;198:20,20;
208:16;213:18,20
oOo- (1)
240:15
open (3)
99:1,4;157:22
operate (1)
91:9
operated (1)

36:7
operates (2)
22:2,13
opinion (9)
170:6;171:6;199:21;
208:16,16;209:20,23;
211:17;212:17
opportunity (3)
13:11;239:20,21
order (1)
226:20
Oregon (1)
240:12
org (1)
222:25
organization (4)
24:21;97:4,4;220:7
organizational (1)
84:14
organize (1)
91:5
organized (2)
83:11;146:15
organizer (3)
83:9;86:2;92:1
organizers (1)
93:24
organizing (3)
84:5,9;98:17
orig- (1)
175:13
original (3)
69:16;175:13;239:3
originally (1)
65:1
originals (1)
240:11
out (84)
39:4,9,12;42:3;44:3;
50:10;60:3,4,19,22;
61:6,15,18;62:3;64:24;
65:3,12;66:2,4,16,17;
67:22;68:6,17;69:16;
76:15,19,24;77:1,3,19,
21;80:19;81:22;86:19;
90:11;91:16;95:17;
98:5,10,15,16;101:5,
24;102:10;103:20,23,
25;108:4;110:5,7,23;
122:3;123:3;125:16;
135:15;136:12;137:3;
146:8;147:18;149:12,
14;164:14;168:14;
169:1;173:20;189:2,
11;191:11;199:1,25;
200:7;205:18;209:10;
211:12,15,16;212:10,
10;233:7;235:8,10;
236:25;238:24
outbid (1)
71:24
outside (2)
28:25;42:4

outstanding (3)
75:11,12,15
over (24)
10:18;11:20,22;12:1;
16:19;89:1;118:13;
132:11,15;136:14;
154:23,24;159:5;
162:7,17;163:20,22;
175:7;178:21;181:5;
189:13;202:18;203:24;
204:5
overlaps (1)
41:2
own (8)
24:8;47:10;86:18;
139:24;140:5,8;181:4;
209:12
owned (2)
196:19;199:22
owner (10)
79:10,16,17;104:1,2,
6,14;153:8;196:22;
214:15
ownership (1)
199:17

**P**

page (17)
60:16;62:3;107:22;
108:2;114:4,4;143:1;
157:14;162:22;207:3,
6;213:2;215:11;220:2,
10;225:8;227:12
pages (3)
82:15;107:19,21
paid (25)
74:16,17;75:4,17;
81:20;113:10,12,13,15;
181:10,12,23;182:5,12,
12,17,17,24;183:1,10,
23;184:1,5;185:13;
197:2
painfully (1)
124:7
paper (5)
114:12;116:15;
158:22;178:6;221:7
papers (1)
117:2
parades (1)
20:18
Paradis (11)
23:4,5;25:12,13;
83:14,22;91:20;93:7;
95:24;115:25;116:7
paragraph (3)
152:16,25;153:7
Pardon (3)
92:6;134:22;207:10
parent (4)
19:16,22;40:4;
209:14

parents' (1)
40:21
part (10)
22:7;76:24;111:3;
168:20,21;169:22,23;
207:11;208:12,15
participate (3)
27:23;85:4;86:12
participated (1)
20:9
participates (1)
27:25
participation (1)
26:3
particular (15)
60:23;85:19;102:20;
135:19;136:7;139:6;
158:3;197:20,21;
207:15;208:15;209:17;
216:8;228:4;236:6
parties (1)
128:7
parts (2)
118:11;123:8
party (2)
235:22,25
pass (1)
21:4
past (6)
17:25;18:2;19:9;
85:25;167:11;183:18
patient (3)
96:7;133:24;189:1
pattern (1)
219:24
Pause (6)
28:16;36:3;76:2;
150:21;164:12;178:4
pay (21)
62:1;74:15;75:2;
114:20;115:11,12,14,
20;119:10,13,17,21;
120:15;145:6;146:11;
150:14;163:22;179:20;
180:4;209:2;228:25
payment (1)
79:13
pen (1)
101:11
Pendergrass (8)
35:16,17;84:6;88:9;
91:21;116:1,9,10
pending (1)
10:16
Penn (2)
21:22,24
pens (3)
101:3,5,8
people (42)
24:1;38:12;42:15,20,
21,22,25;44:4;55:16;
61:14;62:2;66:3,12,13,
14;70:21;71:4,6;89:16;

90:16,24;91:1,5,9,11,
18;97:5;98:12;115:8,
11,22,23;116:3;120:3,
7;127:14,18;135:14;
145:16;146:16,22;
218:7
**Perfect (1)**
227:8
**perfectly (1)**
191:10
**period (11)**
144:10;157:19,24;
167:20;173:4;175:25;
196:2;198:16;202:22;
215:10;234:16
**permanent (1)**
91:17
**permission (2)**
37:15;193:20
**person (12)**
24:25;35:11;63:10;
88:1;93:9;104:2;
106:18;136:13;202:18;
218:3;228:9;236:8
**personal (5)**
147:3;155:24;
157:21;211:17;213:16
**personally (8)**
38:6;57:18,21;87:3;
155:21;162:10;172:5;
210:22
**person's (1)**
35:14
**Pertaining (3)**
156:5;20;157:1
**phone (85)**
27:11,13;44:16;51:1,
4;54:11,12;56:16;
62:18,19,21;66:8;
67:17;131:1,2,4,18;
132:13;136:14;146:22,
25,25;147:1,3;150:8;
156:10,12,13;157:13,
14,15,17,21,23;158:4;
159:6,10,12,17,22,25;
160:10,15;163:9;
165:3,18,20;166:16,19,
20,21,25;173:3,12,19;
186:4,19;188:14,17,24;
189:5,25;190:5,15;
191:1,15;195:2;
202:18;203:25;204:6;
207:22,25;208:2;
220:10,12,17;221:25;
223:4;224:19,23;
225:5;228:5,6;230:23;
236:13
**phones (1)**
156:9
**picked (3)**
73:23;74:2;132:18
**piece (3)**
178:6;225:10,15

**pig (2)**
145:12;226:21
**place (6)**
69:14;132:15;169:1;
196:1,2;197:23
**Plaintiffs (4)**
8:1;177:18;182:11,
14
**Plaintiffs' (1)**
8:2
**plan (2)**
169:23;172:6
**planned (1)**
150:3
**planning (2)**
149:10;150:5
**plate (1)**
205:11
**play (2)**
223:25;224:5
**played (2)**
222:10;224:6
**please (13)**
8:16;9:5;28:15;
56:13;70:11;83:13;
126:15;138:5;189:12;
201:19;238:12,21,23
**plural (1)**
222:25
**pm (9)**
154:15,15;206:15,
15;223:21,21;234:6,6;
240:14
**pocketing (1)**
85:1
**POD (2)**
225:6,6
**point (46)**
9:16;46:15;47:4;
48:2;69:10;73:13;93:1;
98:10;99:11;100:16,
17;103:15,17;105:4;
106:17;108:18,21;
110:1;133:20;134:2;
137:5;161:5;162:2,16;
163:19;166:11;174:25;
180:8;182:25;183:10;
184:5;185:12;190:5,
19;195:22;196:17;
197:17;198:5;199:16;
208:13;216:1,7,12;
234:12;236:16,19
**police (8)**
121:16,19;126:2,21;
136:10,12;137:6;
150:11
**political (3)**
171:3;172:2,3
**pop (1)**
50:10
**popped (3)**
140:11;233:14,16
**portion (2)**

76:16,17
**portions (4)**
114:11;116:15;
117:1;144:13
**POS (3)**
225:9,9,12
**position (4)**
16:13;179;83:5;
119:16
**positions (2)**
17:13;22:24
**Possession (1)**
139:21
**possible (4)**
69:15;188:21;190:8,
9
**possibly (28)**
35:12;48:3;73:20;
127:3,4,8,9,9,20;128:9,
10;129:6,8,9,16;
130:19,25;136:18;
157:16;174:3;188:20,
21;189:7,8,9;190:11;
196:15;207:20
**post (11)**
168:12,13;177:4,6,
12;178:2,9,11;179:3,5;
185:23
**posted (2)**
168:11,12
**posts (3)**
176:22,23;177:24
**potentially (5)**
42:24;43:14;89:6;
91:19;127:16
**preach (1)**
210:2
**precede (1)**
148:16
**preceding (1)**
203:9
**predate (2)**
40:15,22
**predecessor (1)**
41:19
**preemptively (1)**
124:2
**premises (3)**
100:15,18;102:15
**preplanned (12)**
168:23,25;169:2,6,9,
14;170:5,7,9,22;171:4;
172:1
**present (2)**
40:11;120:6
**preserving (1)**
14:5
**President (7)**
16:14,15,16;17:11;
94:2,9,11
**press (6)**
137:19;138:2;
139:12,16;169:23;

170:1
**presumably (19)**
13:9;15:17;16:25;
25:15;45:5;73:15;
77:20;87:13;94:25;
123:22;133:10;156:17;
158:16;165:10;175:8;
176:3;199:24;209:9;
210:24
**presume (6)**
10:12;18:12;31:21;
130:4;173:16;203:9
**pretty (1)**
220:2
**previous (2)**
61:24;66:14
**previously (2)**
23:15;143:24
**primary (1)**
155:13
**prime (1)**
193:22
**principle (1)**
208:24
**print (3)**
73:11;75:20;185:8
**printed (1)**
114:12
**prior (7)**
58:5;59:4;67:7;
143:23;214:9;236:18,
19
**privacy (1)**
14:17
**private (3)**
235:22,22,25
**privy (1)**
72:21
**probably (22)**
15:10;45:12,13;
90:23,23;109:10,11;
132:5,8;172:24;
178:21;193:4;195:8;
208:6,7;212:9,10;
218:3;221:20;236:4,
10,11
**problem (5)**
157:12,15,16;
160:22;205:15
**problems (1)**
165:20
**procedure (1)**
61:5
**proceeded (1)**
165:15
**proceedings (6)**
28:16;36:3;76:2;
150:21;164:12;178:4
**proceeds (1)**
97:21
**processed (1)**
136:3
**produce (2)**

154:24;157:10
**produced (4)**
157:4,25;172:21;
219:16
**production (1)**
72:17
**Productions (1)**
240:12
**professional (5)**
39:1,2,3;41:25;42:2
**program (5)**
21:5;24:3,5;26:3,5
**project (3)**
26:18;145:6;146:9
**projects (9)**
24:11;26:7,8;145:6,
7,8,11;146:5,8
**promise (1)**
213:25
**proofs (1)**
225:12
**proper (1)**
61:5
**property (9)**
78:24;79:3;104:7;
194:1,1,2;204:23,23;
234:24
**proposition (2)**
211:12,16
**prosecute (4)**
161:6;217:20;
228:22;229:2
**prosecuted (7)**
103:1;105:17,20;
161:15;163:21;216:22,
22
**prosecution (6)**
162:3,7,18;216:25;
217:4;227:24
**provide (5)**
62:14,16;68:4;
184:10,11
**provided (3)**
62:15;184:14;185:10
**provides (1)**
184:9
**prudent (1)**
239:21
**public (4)**
15:20;72:16;99:1,4
**publication (2)**
233:4,12
**publicly (1)**
229:17
**published (1)**
233:11
**punished (1)**
230:1
**punishment (1)**
229:11
**pur- (1)**
170:12
**purchase (4)**

46:24;47:2;79:9,12
**purchased (7)**
45:21,22;46:3;75:17;
78:23;174:4,5
**pure (1)**
224:15
**purely (1)**
41:24
**purports (1)**
81:9
**purpose (5)**
170:7,8,10,13,15
**pursuant (1)**
206:23
**push (1)**
165:14
**put (5)**
33:15;123:5;213:24;
222:14;225:12
**putting (2)**
13:22;32:22

## Q

**quickly (3)**
211:8,23;212:8
**quit (2)**
104:20,22
**quite (2)**
17:21;48:3

## R

**rabbit (2)**
27:4;145:15
**rabbits (2)**
145:16,19
**raise (5)**
8:16;145:16;149:13,
15,20
**raised (1)**
193:23
**ran (3)**
86:12,13,15
**rather (2)**
107:21;175:18
**Ray (1)**
150:17
**re- (1)**
147:17
**rea- (1)**
224:11
**reach (4)**
110:5;147:18;200:7;
236:25
**reached (1)**
110:7
**react (1)**
178:14
**reaction (6)**
45:25;46:3;49:20;
52:2;178:11;224:12
**read (20)**

58:12,13;59:3;81:19;
164:18;168:21;177:14;
191:7;193:2;195:8;
203:23;209:9;210:25;
218:21;220:1;227:2;
232:19;233:6;239:9,16
**reading (2)**
116:14;168:20
**reads (1)**
104:11
**ready (2)**
131:23;212:10
**real (2)**
9:12;228:9
**Really (7)**
59:10;121:18;124:1;
163:20;180:12;189:20;
225:13
**reason (16)**
15:6;60:23;136:1;
149:23,25;157:10;
161:9;162:6;164:2;
183:22;193:7;197:22;
200:16;215:1,4;233:21
**reasons (1)**
15:3
**rec- (1)**
188:16
**recall (82)**
17:21;43:12,15;45:4;
47:13;48:24;49:21,22;
50:6,7;51:11;53:2;
54:25;55:6,7,8,25;
56:2;57:19;66:18,19,
22;67:24,25;68:5;
103:7,22;106:6,7;
108:11,12;109:1,5;
110:2;114:22,23;
121:7,10;122:6,7,8;
124:22;125:21,25;
126:6;129:15,16,18;
130:5,19;131:22;
134:17,18,20;138:4;
148:15;150:12,15;
158:19,25;159:2;
160:7,24;166:4,5;
168:17;173:25;175:15;
180:12;187:13;188:15;
189:4;190:22;192:10;
203:11,24;204:7;
208:1;219:7;231:20;
235:10;236:16
**receive (12)**
13:8;26:9,13;73:9,
14;78:14;123:6,7;
183:5,16;201:20;
228:17
**received (8)**
27:7;73:12,14;78:13;
123:6;183:13;192:10;
221:11
**receiving (3)**
192:10;195:4;211:19

**recent (1)**
107:20
**recently (1)**
18:21;19:8
**recess (8)**
58:18;107:3;128:18;
151:12;154:14;206:14;
223:20;234:5
**recognize (1)**
72:19
**recollection (11)**
43:16;68:3;127:4,6;
128:4;129:7,10;
132:22;179:18,19;
188:16
**record (37)**
9:6;12:2;13:23;21:7,
8;27:16;32:21;35:4;
58:11,16,20;59:4;
70:24;81:4;96:13;
106:24;107:1,6;
128:16,21;151:8,10,14;
154:11,12,17,19;
206:11,12,17;223:19,
23;234:3,7;237:13;
238:4;240:13
**recorded (1)**
11:24
**recording (1)**
221:9
**records (4)**
14:5;72:16;188:25;
190:15
**recross (1)**
237:9
**Red (1)**
168:16
**Redding (1)**
240:12
**refer (1)**
213:8
**Reference (1)**
232:21
**referenced (5)**
83:6;221:9;224:1,3,4
**referring (11)**
96:19;130:10;131:9;
139:8;153:22;169:11;
207:12;217:18;224:16;
226:11,12
**Refresh (3)**
141:9;158:14;187:15
**refreshed (1)**
138:16
**regard (1)**
143:23
**Regarding (9)**
34:19,20,22;48:17,
18;108:5,22;110:1;
112:16
**register (1)**
60:1
**reimburse (3)**

120:13;196:24;
208:20
**reimbursement (1)**
205:12
**rejoined (1)**
164:9
**related (37)**
10:9,10;28:24;29:3,
5,11,14,18,23;30:4,8,
12;31:1,9,24;32:12,14,
17,24;33:2,5,8,16,19,
25;34:3,6,9,12;35:1,18,
21;41:25;46:21;129:6,
23;173:6
**relating (1)**
33:22
**relation (5)**
22:5;124:19;126:1;
127:2;147:10
**relationship (13)**
37:2,8,11;39:1;
41:24;43:6;44:18;45:8;
56:5;57:6;141:21,23;
213:16
**relaying (1)**
216:16
**relevance (1)**
186:15
**rely (1)**
159:7
**remedy (1)**
105:4
**remember (38)**
12:7;14:20;17:18;
48:5;51:21;60:3;64:10,
11,12;77:11,15;
105:15;120:24;124:3,
4,12;125:23,23;129:1;
130:8;131:18;133:17,
18;136:16;137:11;
158:23;160:12,14;
161:13,14;188:25;
219:4;228:7;230:23;
231:8;232:4,4;236:17
**removal (6)**
108:22;148:5,7,10,
21,24
**removed (10)**
47:3;50:24;99:11,13;
101:25;102:14;103:17,
21;104:3;106:18
**removing (3)**
99:6;147:11;148:21
**rent (7)**
86:4,5,19;95:13;
141:5,7;142:6
**rental (3)**
95:18,21;96:1
**rented (2)**
95:16;141:13
**renting (1)**
95:25
**rents (3)**

86:5,7,22
**repay (1)**
120:8
**repeat (2)**
39:11;80:11
**rephrase (3)**
14:11;65:19;144:2
**replaced (4)**
204:24;205:1,1,16
**replacement (5)**
122:16,17;123:11,
18;205:18
**report (7)**
24:19;25:9,11;84:8;
136:10,12;150:11
**reported (1)**
226:5
**REPORTER (38)**
8:16,23;11:4;28:14;
56:12;58:25;59:8,11;
70:10;72:8;76:7,9;
80:11;82:23;83:1;
107:9;117:13;126:15;
151:23;154:5;163:14,
17;164:11;167:4;
176:16;189:12;227:12,
17;232:13;238:15,22;
239:8,12,16,23,24;
240:2,7
**reporting (2)**
168:20,22
**reposting (1)**
168:17
**represent (4)**
74:10;117:11;
136:25;179:3
**representation (1)**
159:7
**representative (1)**
152:21
**represents (1)**
215:9
**request (3)**
32:20;72:16;155:3
**requested (1)**
154:23
**requests (1)**
32:21
**research (1)**
230:7
**resell (1)**
227:3
**reserve (1)**
237:9
**reside (1)**
152:17
**resolved (2)**
18:13,19
**respect (9)**
22:2;27:8;81:18;
83:8;124:17,18;125:3;
129:14;130:5
**respond (13)**

46:5;61:12;147:20;
160:12,22;177:22;
185:23,24;212:3,9;
213:2;225:5,19
**responded (2)**
160:9;211:20
**responding (1)**
212:2
**responds (10)**
160:17;161:17,25;
187:18;190:17;191:7;
195:25;211:1;217:7;
220:12
**respons- (1)**
37:18
**response (10)**
12:4;49:14;165:24;
189:5;195:24;207:9;
212:8;215:18;220:16;
225:4
**responses (2)**
32:22;140:16
**responsibilities (1)**
84:16
**responsibility (1)**
79:13
**responsible (2)**
37:21;61:25
**responsive (1)**
28:22
**restrain (1)**
68:16
**restroom (3)**
58:15;106:24;206:11
**retain (7)**
68:16,20,22;70:5;
78:1,4;110:15
**retained (1)**
240:11
**retaliating (1)**
170:25
**retired (2)**
83:25;84:1
**retrieved (3)**
121:6;231:18;232:5
**return (2)**
105:19,25
**returned (2)**
122:5,5
**returns (1)**
97:16
**review (2)**
58:4;239:20
**reviewed (3)**
57:23;58:3,4
**revolunteered (1)**
19:16
**rgordon (1)**
222:24
**ride (1)**
20:19
**right (380)**
8:17;9:3,10,20,24;

10:2,15;11:12,14,18,
19,21;13:7,19;14:12;
15:5,11,11,19;16:3,21;
17:9,12,15,15;18:12,
12,24,25;20:5,11;21:3,
10;22:1,18;23:18;
24:18,18;25:17,21,25;
26:9;27:5;30:3,12,22,
25;31:5,14,23;32:2,5,
11,17,20,24;33:2,5,14,
21;34:6,9,25;35:9,24;
36:2,2,16,23,25,25;
38:20;39:19;40:8;41:5;
42:3,6;43:5,24;45:7,
10;47:12;49:25;50:9,
12;51:20;52:9,15,20,
23;53:4,16;54:3,10,23;
55:7;56:1,2,4;57:4;
58:7,14,14;59:15,17;
60:9,16,23,25;61:3;
64:12;68:8;70:18,19;
71:7,18,24;72:5,10,25,
25;74:6,8,14;75:22,24;
76:3;77:8,11,18,25;
78:7,10,20;79:2,22;
80:3,10,21;81:2,25;
82:4,11,19,22;84:13,
25;85:5,16;86:1;87:10;
89:3,10,19;90:2;91:7;
92:22;94:20;95:4;96:1;
97:9,14,18;98:9,11,20,
25;99:5,10;100:7;
101:8,19,19;103:2,14;
104:18;106:22;107:10;
108:16;109:7,19,22,23;
110:4,9,14;112:3,7,25;
113:25;114:3,16;
115:19;117:4,4,6,23;
118:19;120:23;122:4,
9,15,19;123:8,25;
124:1,19,25;125:6,24;
126:20,25;128:3,13,15,
24;130:2,9;131:22,24;
132:10;133:3,6,10;
134:13,17;135:23;
136:9,10;139:19;
140:4,14,14;142:11,11;
143:13,21;144:12,16;
145:25,25;146:3,13,13,
20,20;147:9,15,17;
150:2,16,20;152:2,7,
20,24;153:5,5;154:4,5,
22;155:19;156:1,21;
158:13;160:5,9;
161:21;162:21;164:2;
165:17;167:2,6,22;
168:11,19;171:7,19;
173:18;174:16;176:13,
17,18,25,25;177:4;
178:1,6,24;179:2;
184:3,7;185:16,22,22;
187:14,17,17;190:14,
17;191:6,6;193:7,15;

194:23;195:6;197:17;
198:1,9,12;200:4,12;
201:4,4,12,14;204:9,9;
206:9,19;207:3,17,21;
208:7,12;209:18;
210:17,19,23;211:7;
212:13,18;213:1,13;
214:14;215:9,22;
216:4,11;217:10;
218:6,9,17;219:13,20,
24;221:3;222:4;
223:18,24;224:8,19;
225:1,14,18;226:8,13;
227:2,8,9,18;228:17;
229:8;230:4;231:8;
232:3,3,8;233:6,9,17;
234:23;235:5;236:11,
18;237:2;238:2,25;
240:4,9
**right-hand (1)**
63:10
**ringing (1)**
220:12
**role (10)**
20:12;23:7,9,14,22;
25:18;27:6,6;63:6;89:4;
93:23
**Rolland (2)**
25:2,6
**room (1)**
197:24
**rosters (1)**
35:7
**round (1)**
208:19
**rule (1)**
210:11
**rules (8)**
11:20;104:13,19;
105:1,5,7,10,12
**run (7)**
10:13;16:10;86:17;
94:24;96:21;101:1;
200:25
**runners (1)**
77:13
**running (2)**
43:18;86:23
**runs (1)**
96:19

## S

**Sacramento (6)**
162:23,25;163:4,8,
24;185:4
**sale (3)**
35:6;227:5;230:8
**sales (1)**
78:1
**same (47)**
12:23;15:2;18:16,17;
29:14;30:4;31:1,7;

32:9,9;35:24;39:6;
41:23;45:1,2,7;50:15,
20;51:15,25;57:1;65:6,
10;67:9;75:25;92:10;
99:24;105:10;108:2;
112:6,7;126:17,25;
128:5;129:12;130:2;
132:7;151:2;153:19;
156:8;160:9;210:15,
25,25;219:18,19;
231:23
**Saturday (1)**
59:23
**save (9)**
73:21;119:9;177:17;
178:10,17,18;201:19;
202:8;223:15
**saved (8)**
69:14;70:14;159:11,
14,16,25;202:1,2
**savvy (1)**
167:25
**saw (11)**
41:20;54:19;118:17,
20;144:7;146:17;
177:23;178:9;181:13;
209:7,9
**saying (15)**
11:7;14:2,10;46:2;
50:16;62:10;69:12;
81:10;94:17;111:1;
186:22,25;187:8;
189:8;225:17
**schedule (1)**
44:13
**Schmitt (2)**
9:17,18
**school (5)**
15:20,21,22,24,25
**scratch (1)**
172:11
**screen (1)**
168:13
**screwed (1)**
142:14
**Searchlight (2)**
58:11;59:5
**second (10)**
14:16;18:15;28:2;
60:16;62:3;75:25;
114:4;151:8,18;201:16
**secretary (6)**
23:8,9;25:18;89:21,
25;94:14
**seeing (2)**
56:2;178:14
**seek (2)**
111:8,9
**seeking (1)**
110:22
**seem (2)**
50:2
**seized (1)**

131:12
**seizure (1)**
124:3
**sell (3)**
85:4;97:18;171:1
**selling (3)**
46:8;104:20,23
**sells (1)**
104:6
**Senator (2)**
76:24;153:2
**send (6)**
82:1;211:7;221:7,8;
239:5,11
**sending (4)**
158:25;160:7;
207:22,25
**sense (4)**
169:17;171:20;
207:5;219:21
**sensitive (2)**
153:25;196:21
**sent (17)**
56:17;73:1,3;74:20;
116:13;117:8;142:21;
152:12;177:8,10;
185:2,2,18;211:1;
221:12;222:20;224:2
**sentence (1)**
201:16
**separate (4)**
86:9;96:24;153:17;
156:15
**September (14)**
51:19,23;160:19;
161:2,24;162:22;
164:16;174:23;218:15;
220:1,23,24;224:3;
225:19
**ser- (1)**
228:8
**series (1)**
128:25
**served (7)**
57:25;58:5;59:3;
176:3;205:4,7;215:17
**service (1)**
225:12
**set (1)**
95:25
**settled (1)**
164:13
**seven (2)**
72:4;85:9
**several (4)**
59:18;203:6,7
**shake (1)**
206:10
**Shakib (7)**
8:2,2;157:6;176:22;
218:23;223:1;238:17
**shaking (3)**
10:1;118:6,7

**shared (1)**
117:23
**Shasta (27)**
8:12;15:12,24,25;
16:5,6;29:11,15,18,23;
30:5;38:11;57:12;81:9;
114:7;143:2,6,6;144:7;
152:17;168:15;174:11;
186:11,13;204:16;
205:12;236:4
**sheep (1)**
27:1
**sheriff (29)**
8:9;56:5;160:3;
191:8,13,18,21,25;
192:17,19,19,20,20,21,
22;193:4,5,6,10,11,16,
18;194:17;198:15;
204:6;206:24;236:22,
23,24
**sheriffs (15)**
126:21;129:4;
187:18,19,21;196:16;
197:7;198:6;199:24;
202:6,9;203:20;
214:17;231:19;234:12
**Sheriff's (22)**
8:9;29:23;30:2,5,9;
57:5,10,14;126:23;
127:12;136:11;137:8;
187:23;191:19;194:8;
197:9,10;199:13;
207:7;214:10;230:11;
235:3
**sheriffs's (1)**
72:17
**Sherry (7)**
35:16;84:6;88:9;
89:10;91:21;116:1,8
**shit (7)**
200:20;201:2;
207:10,11;208:8;
225:10,15
**short (9)**
55:9;106:9,11;
123:17,20,21,22;188:4;
220:3
**shorthand (1)**
239:24
**shoulder (1)**
159:5
**show (5)**
71:25;106:22;
114:16;200:20;201:2
**showed (3)**
21:1;118:1;184:8
**shows (1)**
20:18
**sidebar (1)**
210:9
**sign (6)**
69:5;79:9,12;86:1;
239:9,17

**signature (1)**
79:11
**signed (11)**
47:10;68:11;77:24;
88:23;95:16,18,21,23,
24;181:5;209:14
**signing (1)**
79:15
**Silva (26)**
8:13;32:25;33:3,6;
41:6,24;107:23;108:8,
10,18,20;109:25;110:5,
10;114:16,19,20;
115:2;119:5;120:21;
126:1,3;127:1;143:17;
159:19;211:3
**Silva's (1)**
143:15
**similar (5)**
21:13;27:18;36:11;
51:15;146:17
**similarly (1)**
15:2
**sit (3)**
38:5;90:19;237:3
**site (1)**
220:2
**sits (1)**
38:1
**situation (1)**
178:22
**six (3)**
45:13;72:4;126:17
**Sixty-four (2)**
15:15,16
**skipped (1)**
82:11
**slaughter (3)**
199:6;207:8;235:1
**slaughtering (2)**
195:15,16
**sleep (1)**
32:23
**slow (4)**
10:19;56:12;70:10;
71:1
**smiling (1)**
61:8
**Snowden (77)**
8:4,4;10:19,21,24;
11:2;14:16,22;28:7;
59:1,9,12;60:11;61:12,
19;64:15,18;65:15;
68:2;72:12;81:3;82:10;
96:6,9,12;107:14;
111:5;112:11,17,21,24;
113:1,5;125:13,15;
133:24;143:22;158:21,
24;168:9;171:17;
172:14;176:21;177:1;
181:20;189:1,11;
198:19;212:20;218:2,
7,18,21;219:14,18;

222:1,4,9,11,14,17,19,
23;223:5,8;229:6;
232:17;237:14,17;
238:1,22,23;239:5,10,
14,19;240:5
**social (10)**
35:18,22,24;39:1;
44:18;45:7;57:6;167:7,
9;168:6
**socialize (2)**
39:4;42:4
**sold (12)**
35:13;74:11;77:22;
84:20,22;104:3;
122:10;123:3;168:22;
178:22;229:18;230:6
**some- (3)**
100:21;193:16;
231:25
**Somebody (9)**
18:10,11;100:15;
150:17;177:8;195:19;
196:24;205:15;229:18
**somehow (1)**
219:11
**someone (22)**
14:1;16:19;18:9,17;
63:12;68:17;77:2,8;
92:4,7;95:20;100:17;
107:23;112:14;139:15;
163:14;164:17;193:16;
195:20;199:12;205:19;
230:18
**Someone's (2)**
27:13;69:1
**sometime (6)**
51:17;121:23,24;
194:16;203:4;215:17
**Sometimes (4)**
68:20;22;69:22;
218:8
**somewhat (3)**
124:21;213:14,15
**somewhere (5)**
87:13,14;145:24;
205:4;231:25
**Son (1)**
17:3
**soon (2)**
77:21;160:20
**sorry (20)**
25:18;40:6;65:18;
67:3;74:22;76:1;95:15;
134:10;144:5;151:6;
152:25;155:6;178:3;
180:2;229:24;235:6,
19;237:15;238:1,19
**sort (3)**
18:25;26:13;141:23
**sorts (6)**
23:24;24:1,5;146:4,
4,11
**sought (1)**

112:8
**sound (1)**
172:22
**Sounds (4)**
44:13;160:13;
169:11,21
**source (3)**
232:21,22;233:18
**space (7)**
86:19;95:13,17;
141:5,7,13;142:6
**speak (39)**
11:10;46:17,18;
50:12,15,19,22,24;
51:24;54:3;55:8;62:24;
63:18;112:13;125:16;
126:22;129:13;131:15,
21;134:9,12,19;147:10,
23,23,25;148:6;150:23,
24;174:1,24;175:12;
176:2,8;190:5;226:1;
230:10;236:21,23
**speaker (2)**
51:1,4
**speaking (6)**
55:12;147:4;189:4;
203:24;214:16;230:18
**special (1)**
71:13
**species (1)**
122:25
**specific (2)**
44:14;173:9
**specifically (3)**
109:8;155:2;189:24
**specify (1)**
70:25
**speculate (3)**
13:4;68:2;126:8
**speculation (3)**
61:20;192:4;198:20
**spell (5)**
9:8;171:12,15,18;
174:17
**spelled (1)**
89:20
**spellings (1)**
240:5
**spells (1)**
220:13
**Spit (2)**
90:11;98:9
**spoke (22)**
46:23;50:14;51:24;
53:21;54:13;63:1;
111:6;131:19;132:3;
133:6;148:4;166:3;
174:24;175:5,19,19;
176:7;179:13;191:13;
215:16;218:13;228:7
**spoken (12)**
45:15,16;53:25;
56:16;129:3;150:16;

166:5;173:24;175:9;
214:23;219:5;228:11
**spun (1)**
211:15
**staff (4)**
63:13,23;163:3;
168:15
**stamp (1)**
108:1
**stamped (2)**
72:14;142:25
**standing (1)**
55:16
**stands (1)**
183:22
**start (11)**
10:25;17:19;19:10;
67:1;72:1,1;118:13;
124:8,17,20;128:21
**started (13)**
41:7,11,12;65:2;
87:25;93:21,22,23;
94:12,19;95:11;
116:14;215:5
**starts (3)**
107:19;114:7;143:1
**state (8)**
9:5;21:22,24;89:21;
90:1;94:14;174:14;
210:10
**stated (1)**
143:24
**statement (8)**
46:5;64:16;171:3,5;
172:2,3;173:1;204:2
**states (2)**
136:25;157:12
**stating (1)**
152:13
**station (2)**
220:8,9
**status (3)**
196:16;197:15;
198:14
**statutes (1)**
239:15
**stay (1)**
97:16
**steer (1)**
145:12
**steers (1)**
27:1
**Stephanie (1)**
228:12
**still (35)**
10:16;26:19;38:10;
48:6,11;59:14;69:15;
75:10,12;94:24;108:2;
123:20,21;154:20;
159:7;162:2,3,17,18;
172:14;181:23;196:11,
12;200:1,1;201:15;
204:10;206:19;213:2;

215:25,25;220:24;
221:14;226:9;229:1
**stips (1)**
239:2
**stipulate (1)**
239:24
**stolen (5)**
52:14,15,19,21;
109:11
**stop (2)**
173:8;223:14
**stopped (3)**
112:21;220:10,12
**store (1)**
197:22
**straight (2)**
217:8,13
**strange (3)**
98:6,7,8
**strangle (1)**
189:12
**streamline (1)**
91:14
**strike (4)**
53:20;62:13;108:19;
118:15
**strong (1)**
213:14
**structure (2)**
22:4,5
**stuff (2)**
167:25;189:23
**subpoena (3)**
28:5;176:4;190:15
**subpoenaing (1)**
188:24
**subscribe (1)**
233:12
**subsequent (2)**
139:14;215:3
**subsequently (1)**
20:9
**substance (1)**
65:9
**successful (1)**
71:21
**successfully (1)**
175:2
**sudden (1)**
125:22
**sued (3)**
208:13;210:15,18
**suggest (2)**
81:16;181:18
**suggestion (1)**
132:14
**suggests (2)**
81:17;181:14
**suit (4)**
48:23;140:5;215:11,
12
**suite (1)**
215:11

**suits (1)**
17:19
**summary (1)**
136:25
**Sun- (1)**
106:12
**Sunday (7)**
99:25;102:1;103:4,9,
13,25;106:12
**superior (1)**
84:9
**supervisors (1)**
42:8
**suppose (1)**
129:2
**supposed (4)**
61:8,17;69:1;196:7
**sure (24)**
11:15;15:23;28:12;
30:18;46:23;50:2;65:8;
67:21;70:13;72:3,12;
90:18;97:25;112:24;
115:5;178:1;182:2;
197:2;202:2,7;208:19;
220:5;229:6;235:7
**surviving (1)**
226:9
**sus- (2)**
170:15;193:2
**suspect (11)**
100:22;124:11;
170:13,16;186:20,23;
187:9;192:1,7,9;
218:18
**suspected (1)**
182:24
**suspicion (2)**
170:2;233:18
**suspicions (1)**
170:20
**swapped (3)**
235:8,9,12
**Swine (2)**
27:1;145:12
**sworn (2)**
8:17,20

**T**

**table (4)**
12:16,18,20,22
**tag (1)**
206:22
**tagging (1)**
154:6
**tags (6)**
201:20,21;202:3,8;
204:10;206:23
**talk (38)**
11:22;12:1;27:17;
44:16;45:10,12,13;
48:3;51:3;55:2;108:9,
17,20;109:2,7,13;

121:18;125:6,10;
126:1,2,2,23;129:8;
130:7;138:21;147:21;
148:8;165:1;188:13;
193:11,18;195:3;
207:21,24;208:2;
214:16;225:23
**talked (57)**
23:1,25;49:9;53:19;
54:25;108:8,13;109:3,
10,11,25;111:17;
112:15;121:15,17;
126:3,4,11,13,18,24;
127:1,8,9,11,12,13;
130:20;131:1,16;
132:24;133:8,15,18;
134:15;137:20;139:4,
7;148:9,18,22;166:7;
173:22;175:21;179:9;
188:17;189:24;191:8,
21;213:21,22;215:19;
217:8,13,14;219:11;
232:8
**talking (23)**
14:11;19:8;24:2;
48:19;65:1;70:23;79:2;
93:8;109:5;127:7,15;
181:7;187:19;192:8,
12;193:10;196:23;
201:13,16;215:25;
217:18;225:14;235:11
**talks (6)**
191:10,20,22,24;
193:17,25
**tall (1)**
101:8
**tandem (1)**
72:5
**taxable (1)**
141:10
**taxpayer (1)**
212:14
**teaching (1)**
116:24
**technically (1)**
47:9
**tedious (1)**
124:1
**tediously (1)**
128:25
**telling (4)**
149:25;196:10;
199:14;203:25
**tells (2)**
101:20;194:3
**temporary (1)**
195:11
**ten (1)**
43:10
**term (4)**
40:17;131:13;
134:10;140:20
**testified (17)**

8:20;36:6;40:10;
54:12;118:17;129:3;
132:11;146:14,21;
147:22;149:17,23;
156:3;184:12;214:4,4;
217:3
**testify (2)**
161:20;213:19
**testimony (13)**
13:10,17;90:5;
112:12;117:5;119:11;
125:20;140:16;143:23;
149:19;181:20;203:25;
204:3
**texted (3)**
66:12;158:18;186:19
**texting (2)**
158:11;197:14
**texts (7)**
131:5;157:11,20,23;
190:2;218:16;236:16
**Thanks (7)**
28:15;160:21;
165:21;168:9;187:25;
217:25;227:8
**Thanksgiving (2)**
12:25;13:2
**theft (5)**
108:6;110:1,2,12;
217:4
**theirs (1)**
102:23
**thereabouts (6)**
59:19;146:16;
173:10;174:23;215:17;
220:24
**thinking (4)**
193:3;216:4;217:8,
13
**third (2)**
93:8;210:17
**Thirty (1)**
41:1
**though (21)**
31:15;32:8;53:5;
85:17;97:15,16;99:1;
122:5;129:17;132:5;
140:8;147:13;162:16;
163:22;181:11;186:20;
202:18;203:14,21;
208:25;231:12
**thought (24)**
41:20;55:5;90:25;
103:1;109:12;131:4;
136:22;162:3,3;
170:24;171:2,22;
172:1;192:15;201:7;
211:14;213:20;217:4;
224:9,10;225:1,2;
235:19,20
**thoughts (4)**
170:21;209:11,12,17
**thread (1)**

158:3
**threat (5)**
221:11,22;224:10,
15;225:3
**three (29)**
33:14,21;44:12,16;
45:11;84:4,12;86:24;
89:16;91:1,3,5;97:17;
98:12,18;101:10;
121:20,21,23,24;
127:17;146:15;172:9;
173:14;175:19;176:2;
192:18;210:18;228:3
**three- (1)**
101:11
**three-week (1)**
122:1
**throughout (2)**
40:13;146:21
**throw (1)**
78:18
**throwing (2)**
37:13,15
**thumbs (3)**
218:1,3,11
**Thursday (1)**
160:18
**ticket (6)**
35:6;99:1;135:4,6,7,
12
**tickets (7)**
35:13;82:16,17,20;
84:20;85:4;97:18
**till (4)**
166:6;191:8,11;
204:13
**timeline (1)**
234:10
**times (10)**
10:5;54:21;67:6;
81:21;109:2,3;162:7;
165:7;210:18;229:1
**title (8)**
23:16;63:3,11,15;
94:6,7,8;230:8
**titles (1)**
88:17
**today (12)**
9:3;13:17;14:3;15:3,
7;28:5;154:24;161:18;
172:21;200:14;226:10;
237:3
**together (5)**
21:1;37:10;39:5;
86:17,18
**token (1)**
210:15
**told (60)**
19:19;45:20,22;46:6,
11;47:9;48:6;49:3;
52:13;54:25;63:17;
64:3,5,8;99:20,22;
100:8,9;102:2,12,14,

19,20,22;105:16;
115:17;119:2,8;
120:19,20,25;121:9;
133:12,14;150:1,3;
173:17;180:20;194:4,
5,6,9,17;202:2,4,5,5,7,
9,12,13,14,14,24;
204:5,6,8,8;205:14;
211:7
**tomorrow (3)**
122:8;160:14;191:8
**took (15)**
19:15,20,20;21:24;
105:17;124:18;129:5,
5;149:3;168:22;169:3,
4,5,22;229:17
**top (7)**
57:16,17;76:24;
142:15;168:13;186:4;
207:6
**topics (1)**
151:2
**total (2)**
79:13,14
**touch (1)**
191:12
**towards (1)**
11:13
**town (5)**
22:14;173:20;
174:10,10,11
**Trail (1)**
240:12
**training (4)**
26:10,13;27:7;79:23
**transcribed (1)**
12:5
**transcribing (2)**
11:23;59:6
**transcript (6)**
11:6,13;238:12,18,
21,23
**transfers (1)**
230:8
**traveling (1)**
173:20
**treasurer (11)**
24:13,20;25:19;26:1;
88:7,14,16,18,20,22;
94:4
**treasury (2)**
145:1,4
**trial (2)**
13:14;125:22
**trick (1)**
75:18
**tried (2)**
197:13,18
**trip (2)**
40:7;208:20
**truck (2)**
18:5,6
**Trucking (7)**

10:14,15;16:10,12,
16;17:10;84:23
**true (3)**
52:11;172:25;173:2
**truly (1)**
14:9
**trust (4)**
62:2;69:2,4,6
**trusted (1)**
62:9
**try (5)**
11:7;55:2;96:6;
124:14;189:2
**trying (14)**
20:6;40:7;44:3;
80:18;91:14;98:5;
102:10;137:2;177:17;
178:10,16,18;213:24;
219:24
**T-shirts (1)**
146:9
**Tuesday (1)**
161:18
**turn (6)**
68:20,22;70:8;
132:11,14;205:16
**turned (1)**
70:15
**TV (2)**
220:8,9
**twenty- (1)**
117:11
**Twenty-three (1)**
16:18
**Twenty-two (2)**
104:24,25
**Twice (1)**
10:6
**two (29)**
11:19;28:6,19;67:15,
16;78:6,7;81:21;82:15;
90:6;106:22;118:4,8,
11;126:18;139:19;
142:12,12;144:5,9;
152:8;155:11,12;
189:22;203:11;206:1;
223:15;228:3;234:25
**type (3)**
123:17;213:11,12
**types (1)**
27:8
**typically (1)**
51:3

## U

**UC (2)**
22:8,8
**Uh (1)**
42:19
**ultimately (1)**
235:8
**umbrella (2)**

97:10;206:4
**uncertain (1)**
137:1
**under (8)**
94:21,25;97:10;
154:20;155:3;169:9;
206:3;239:25
**undergrad (1)**
21:22
**underneath (1)**
119:13
**understands (1)**
11:12
**Understood (10)**
13:5,17;82:22;
177:11,16;215:13,19;
217:15,21,24
**unique (1)**
71:14
**University (4)**
22:9,13,15;83:18
**unless (2)**
13:24;14:5
**up (40)**
21:16;23:16;39:8;
40:7;44:3,6;49:7,8;
60:11;73:23;74:2;76:8;
89:20;95:25;115:3,10;
120:3,9;124:3;132:19;
137:18,20;139:16;
142:14;146:17;162:6;
165:7;166:6;175:18;
184:4;187:25;196:6,
10;198:4;218:1,3,11;
228:1;233:14,16
**upcoming (1)**
176:11
**update (1)**
164:18
**updated (1)**
187:25
**upper (1)**
225:17
**upset (7)**
50:5,6;208:15;212:3,
18;228:21;229:1
**use (11)**
58:15;96:21,24;97:6;
106:24;131:14;155:10,
16,21;156:9;167:7;
197:21;206:11;208:10;
211:16
**used (11)**
13:14;21:24;40:21;
42:14;95:11;122:11;
136:5;141:5,7,8;147:5
**using (4)**
94:18;140:20,23;
141:20
**usually (4)**
145:5;182:17;183:4,
20

## V

**vague (1)**
14:1
**Valley (18)**
21:17,18,21,23;
24:14,25;26:19;40:17;
94:17,20,21;95:4,5;
96:3,19;97:6;141:4;
145:2
**Valley's (2)**
94:19;97:10
**Vanessa (2)**
8:2;172:17
**various (2)**
97:20;146:22
**verbal (1)**
12:4
**verbally (2)**
120:19,20
**verbiage (1)**
47:18
**verify (1)**
105:14
**Verizon (2)**
147:8,9
**version (2)**
59:4;239:6
**versions (1)**
58:5
**Vibrating (2)**
27:11;67:17
**Vice (1)**
17:11
**video (6)**
238:5,11,20,24;
240:11,12
**VIDEOGRAPHER (30)**
58:16,20;107:1,5;
124:8,13;128:11,15,20;
151:10,14;154:12,16;
206:12,16;223:11,16,
18,22;234:3,7;237:8,
12,16;238:2,8,13,16,
25;240:9
**Videotaped (1)**
240:14
**vigil- (1)**
240:10
**violation (1)**
161:7
**virtue (1)**
123:4
**voice (1)**
226:2
**voicemail (10)**
221:4,5,8,12;222:10;
224:1,6;225:21,24;
226:5
**voicemail-22- (1)**
221:5
**volun- (1)**

91:10
**volunteer (18)**
19:4,7;24:4,9;26:1,
10;27:6,21;36:19;84:1;
90:12,24;98:13;
144:18,20,23;152:22,
23
**volunteered (1)**
49:18
**volunteering (1)**
24:5
**volunteers (8)**
89:13;90:7,8;91:2,6,
8,15;98:22
**vote (1)**
44:4
**votes (1)**
44:3

## W

**wait (10)**
10:21;96:9;175:16;
191:9,9,22;193:16;
203:6,7;240:3
**waited (1)**
234:25
**waiting (2)**
193:24;194:2
**walk (2)**
61:4;136:11
**Wallace (1)**
233:3
**waste (3)**
208:18,21;212:14
**watching (1)**
223:10
**water (1)**
191:4
**way (16)**
14:18;19:9;32:9;
47:19;102:6;129:7;
130:21;133:22;171:8;
183:25;190:16;194:24;
200:25;201:13,14;
229:5
**website (3)**
89:21;90:1;207:9
**Wednesday (1)**
138:11
**week (2)**
161:19;175:21;
185:11;195:9
**weekend (3)**
134:19;161:20,23
**weeks (15)**
45:13;78:6,7;121:20,
21,23,25;161:22;
173:14;175:19;176:2,
6;197:13;203:6,7
**weird (1)**
172:23
**weren't (11)**

11:19;55:22;56:1;
93:25;115:12;119:24;
165:13;208:13;210:18,
20;228:21
**what's (12)**
17:4,4,9;23:14;
30:11;35:14;61:8;
81:21,22;87:19;147:7;
200:22
**whatsoever (1)**
90:3
**whenever (8)**
41:7;79:18;122:3;
139:7,9,10;160:22;
176:6
**Whereupon (12)**
58:18;107:3;128:18;
151:12;154:14;163:13;
164:9;206:14;222:10;
223:20;224:6;234:5
**whoa (1)**
171:19
**whoever's (1)**
194:2
**whole (9)**
15:16;85:7;152:9,15;
166:25;219:25;220:2,
6;227:3
**whooo (1)**
171:9
**who's (6)**
25:1;42:8;63:2;88:7,
7;226:14
**whose (1)**
112:13
**wife (7)**
44:22;53:4;55:24;
150:25;159:25;214:1,5
**wife's (1)**
150:24
**willing (1)**
120:14
**wish (1)**
237:4
**Within (10)**
66:19;121:20,21,23;
139:10;174:1;183:20;
185:11;203:8;231:23
**WITNESS (33)**
8:22;10:1,20,23;
11:1;14:21;59:1;61:14,
24;68:5;96:8,11,15;
111:9,11;112:15,19;
125:17;133:25;143:24;
158:23;159:2;176:23;
181:22;189:13;212:22;
219:17,19;222:13,18;
223:10;239:6,18
**WLJ (1)**
233:4
**woe (4)**
171:9,12,13,15
**W-O-E (2)**

171:17,19
**woman (1)**
224:17
**word (5)**
98:9;140:23;162:23;
213:2,15
**words (7)**
49:21,23;103:7,8;
119:1;211:16;213:25
**work (11)**
16:24;26:10;44:7;
61:8;64:1;79:7;113:21;
121:15;161:18;165:16;
189:23
**worked (1)**
90:17
**working (6)**
41:8,12;172:23;
187:18;197:10;216:8
**works (6)**
63:4,7,9;83:16,17,18
**worried (1)**
215:10
**wow (1)**
228:4
**wrangle (1)**
44:3
**Writ (1)**
139:21
**write (6)**
164:18;196:5;201:5;
212:7;219:3;220:1
**writes (4)**
115:2;215:11;
224:20;225:5
**writing (2)**
144:5;229:1
**wrong (2)**
78:22;220:13
**wrote (4)**
76:22,23;219:9;
224:13

## Y

**year (29)**
20:6;26:15;37:3;
53:23;54:13;65:6,10,
14,16;66:24;67:2,4,7;
85:19,24;90:15;92:18;
95:2,17,18;109:20,20;
135:19,24;136:7;
166:10;174:2;189:13;
227:23
**years (30)**
15:15,16;16:17,18;
19:13,17,19;20:7;
25:20,21;38:24,25;
39:21,21;40:9,14;41:1;
42:25;43:10;66:20;
67:23;85:22;92:21;
93:19;104:24,25;
105:12;135:20;146:17;

201:14
**Yep (2)**
60:8;78:19
**yesterday (2)**
121:8;178:5
**Yup (2)**
212:7,9

## Z

**Zoom (3)**
163:13;164:9;238:9

## 0

**00001 (1)**
72:14
**006 (1)**
108:1

## 1

**1 (3)**
11:2;96:12;128:17
**1:09 (1)**
154:15
**1:57 (1)**
206:15
**10:02 (2)**
58:19,21
**10:48 (2)**
107:2,4
**10:56 (2)**
107:4,6
**11:17 (2)**
128:16,19
**11:36 (2)**
128:19,21
**11:58 (2)**
151:11,13
**11:59 (2)**
151:13,15
**11th (8)**
190:4,4,6;191:7;
194:17;198:13,14;
203:4
**12:03 (2)**
154:13,15
**13 (1)**
231:15
**13:57 (1)**
206:13
**1309 (1)**
154:17
**13th (1)**
227:23
**1407 (1)**
206:17
**1424 (1)**
223:19
**1428 (1)**
223:23
**1438 (1)**

234:4
**1446 (1)**
234:8
**1452 (1)**
240:13
**15 (1)**
152:16
**1543 (3)**
81:13,15,16
**15th (2)**
162:22;164:16
**17 (4)**
92:20,22;93:19;
146:17
**17th (1)**
92:20
**18 (2)**
146:17;215:10
**18th (1)**
122:3
**19 (1)**
32:20
**1st (7)**
127:6;160:19;
218:15;220:1,23,24;
224:3

## 2

**2 (3)**
11:4;96:13;128:22
**2:07 (1)**
206:15
**2:24 (1)**
223:21
**2:28 (1)**
223:21
**2:38 (1)**
234:6
**2:46 (1)**
234:6
**2:52 (1)**
240:14
**20- (1)**
33:18
**2000s (1)**
17:23
**2010 (1)**
17:25
**2015 (1)**
18:2
**2017 (1)**
18:4
**2018 (1)**
18:4
**2022 (17)**
34:18;46:25;51:17,
19,23,23;54:4;59:17;
65:20;67:4;95:2;114:7;
121:25;144:22;177:5;
182:13;231:25
**2023 (2)**
109:20;231:16

**21st (1)**
59:19
**22 (12)**
53:24,25;70:23,24;
71:3;90:14;92:20;
95:18;105:9,12;
174:22;180:19
**2267m4 (1)**
221:5
**23 (2)**
16:17;33:18
**23rd (4)**
165:22;166:2,3,6
**24 (1)**
33:20
**25 (1)**
223:12
**25th (10)**
34:18;46:25;59:19;
108:21;121:24,25;
138:6;144:8;196:5;
198:3
**26 (4)**
66:3;70:20;71:4,6
**26th (2)**
103:13;180:2
**26-year (1)**
19:20
**27th (5)**
103:13;114:6;125:9;
142:3;180:3
**28th (21)**
117:10;126:14;
143:16;177:5,17;
180:8;182:13;183:12,
13,23;198:2,4;200:13;
202:21;203:5,6,9,15,
22;204:13;206:9
**29 (1)**
152:25
**29th (8)**
108:9;109:24;
117:12;138:7,8,15,19;
139:9
**2nd (4)**
128:5;129:3;161:2;
225:19

## 3

**3 (1)**
157:14
**30 (8)**
19:13,19;20:6,7;
39:21,21;40:9;42:25
**30- (1)**
218:13
**30/30/30 (1)**
187:4
**30th (5)**
47:24;48:14,22;
50:14;138:7
**31st (12)**

48:15;158:15;207:5;
211:1;213:2;215:4,17;
218:20;219:3,6;
236:14,19
**367 (2)**
74:8,10
**3rd (2)**
129:13;136:4

## 4

**4- (1)**
86:10
**40 (1)**
153:7
**4-H (73)**
19:1,4,12,16,25;20:2,
3,8;21:13;22:2,5;
23:10,15;24:3,14,21,
25;26:10,11;27:8;37:5,
8,15;39:20;40:20;42:1;
78:24;82:6;83:16,17;
85:3,11;86:5,11,12,13,
17;87:2;89:7,14;92:14,
25;94:19,22,23;95:7;
96:18;97:17,20,22;
98:13;99:2;112:17;
113:3,16,21;127:22;
141:4,6;144:18,24;
145:2;152:21;153:8,
11,11,16;170:23,25;
182:16;183:5;193:21;
194:1
**4-H/FFA (26)**
79:1;86:7,20,24;
95:20;98:13;108:4;
110:6,16,19;112:8,18,
22;113:10;114:1;
140:18;141:1,14,22,24;
153:13,18;181:6;
196:20,21;214:15
**4th (1)**
130:18

## 5

**50 (4)**
90:24;91:1,3;122:14
**50/50 (2)**
186:25;187:2
**500 (1)**
208:19
**501c- (1)**
95:8
**501c3 (2)**
87:8;95:5
**510-9107 (1)**
147:6
**530 (1)**
147:6
**5th (5)**
73:8,9,10,12;130:17

## 6

**6/26 (3)**
124:17,20;125:1
**6/28 (1)**
125:25
**6/29 (1)**
126:17
**6/30 (1)**
126:25
**60 (4)**
90:24;91:1,4;98:22
**6th (6)**
73:11;74:14;75:13,
14;130:24;185:9

## 7

**7 (2)**
114:4;142:25
**7/4 (1)**
130:3
**7/5 (1)**
130:3
**7/9 (1)**
134:8

## 8

**838.86 (1)**
81:23
**8954 (1)**
240:12
**8th (9)**
108:22;121:3;
131:11,17;132:21;
136:18;137:1;144:8;
234:12

## 9

**9:30 (2)**
100:4;101:20
**9:53 (2)**
58:17,19
**90s (1)**
20:7
**9th (4)**
161:24;188:7;190:6;
194:16