# EXHIBIT "C"

# In The Matter Of:

## *LONG vs.*
## *FERNANDEZ*

---

## *LIEUTENANT JERRY FERNANDEZ*
### *August 21, 2023*

---

### *Challe, Fisher & Morfin*
### *1828 South Street*
### *Redding, California  96001*
### *(530)246-0942*
### *cfmdepos@att.net*

Original File J. Fernandez.txt

Min-U-Script® with Word Index

Page 3

```
    UNITED STATES DISTRICT COURT

  EASTERN DISTRICT OF CALIFORNIA

      SACRAMENTO DIVISION

         ---oOo-

E.L. a minor, by and through her general
guardian, JESSICA LONG; JESSICA LONG, an
individual,

          Plaintiffs,
                         Case No. 2:22-cv
              2:22-cv-01527
vs.

LIEUTENANT JERRY FERNANDEZ individually
and in his individual capacity as
Sheriff for the County of Shasta;
DETECTIVE JACOB DUNCAN, individually and
in his individual capacity as Sheriff for
the County of Shasta; DETECTIVE JEREMY
ASHBEE, individually and in his
individual capacity for the County of
Shasta; SHASTA DISTRICT FAIR AND EVENT
CENTER, a district agricultural
association; COUNTY OF SHASTA; SHASTA
COUNTY SHERIFF'S DEPARTMENT; MELANIE
SILVA, in her individual capacity; BJ
MACFARLANE, in his individual capacity;
and DOES 1 through 10,

          Defendants.
_____/

     VIDEO RECORDED DEPOSITION OF

     LIEUTENANT JERRY FERNANDEZ

     MONDAY, AUGUST 21, 2023

          9:41 a.m.


Reported by:  JULIE BANGHART, CSR NO. 10547
```

Page 2

**A P P E A R A N C E S**

For The Plaintiffs E.L. and JESSICA LONG:

ADVANCING LAW FOR ANIMALS
BY:  RYAN R. GORDON, ESQ.
BY:  VANESSA T. SHAKIB, ESQ.
407 N. Pacific Coast Highway #267
Redondo Beach, CA   90277
(202) 996-8389
Tgordon@advancinglawforanimals.Org
Vshakib@advancinglawforanimals.Org

For The Defendant LIEUTENANT JERRY FERNANDEZ
DETECTIVE JACOB DUNCAN; DETECTIVE JEREMY ASHBEE
and SHASTA COUNTY:

BEST BEST & KRIEGER
BY:  DAMIAN A. NORTHCUTT, ESQ.
2855 East Guasti Road, Suite 400
Ontario, CA   91761
(909) 989-8584
Damian.Northcutt@bbklaw.Com

For The Defendant SHASTA DISTRICT FAIR:

(Present via telephone.)

CALIFORNIA ATTORNEY GENERAL'S OFFICE
BY:  JOHN C. BRIDGES, ESQ.
1300 I Street
Sacramento, CA  95814-2963
(916) 210-7529
JOHN.BRIDGES@DOJ.CA.GOV

ALSO PRESENT:  TERRY FOX
               REDDING VIDEO PRODUCTIONS

Page 3

I N D E X

WITNESS:  LIEUTENANT JERRY FERNANDEZ

INDEX OF EXAMINATION(S)                          PAGE

Examination by Ryan Gordon . . . . . . . . . .   5, 312

Examination by Damian A. Northcutt . . . . . .   303


          INDEX OF EXHIBIT(S)

EXHIBITS     DESCRIPTION                         PAGE

A        Notice of Deposition                    93

B        Narratives                              94

C        2022 State Fair Rules                   134

D        SDF Jr. Livestock Auction
         Absentee Buyer Form                     149

E        Audio File                              282

F        Text Message
         FERN 000125, 000127, 000129             282

G        Text Message
         FERN 000126                             301

H        Email with Photograph
         FERN 000078-000081                      301

I        Text Messages
         Fern 000128                             301

Page 4

**THE VIDEOGRAPHER:** Ladies and gentlemen, we're on video record with the deposition of Lieutenant Jerry Fernandez.  The Date is August 21st, 2023, and the time is 9:41 a.m.  I'm Terry Fox, the Video Specialist, from the firm of Redding Video Productions.  This is the beginning of Media No. 1 regarding Case No. 2:22-CV-01527-DAD-AC of the United States Eastern District Court of the Sacramento Division.

This deposition is being taken at the office of Challe Fisher & Morfin, 1828 South Street, Redding, California.  The Court Reporter is Julie Banghart, CSR 10547, associated with Challe Fisher & Morfin.

Counsel will now introduce themselves, who they represent and the witness will then be sworn in by the Court Reporter.

**MR. NORTHCUTT:** Damian Northcutt on behalf of the County Defendants.

**MR. GORDON:** Ryan Gordon on behalf of Plaintiff.

Page 5

1    VIDEO RECORDED DEPOSITION OF LIEUTENANT JERRY
2    FERNANDEZ, taken on behalf of the Plaintiff, at Challe
3    Fisher and Morfin Deposition Reporters, 1828 South Street,
4    Redding, California 96001, on Monday, the 21st of
5    August, 2023, commencing at the hour of 9:41 a.m., before
6    JULIE BANGHART, a Certified Shorthand Reporter of the State
7    of California, License No. 10547, taken pursuant to notice.
8                         ---oOo---
9
10              LIEUTENANT JERRY FERNANDEZ,
11          being first duly sworn, was examined and
12                 testified as follows:
13
14          EXAMINATION BY Mr. GORDON
15  Q.    All right.  Thanks for being here today, Officer
16  Fernandez.
17       Should I say Officer Fernandez or Lieutenant
18  Fernandez?
19  A.    **Lieutenant's fine.**
20  Q.    Lieutenant's fine.  Okay.  All right.
21       Anyone just go by LT or anything like that?
22  A.    **No.  You can just call me Mr. Fernandez or whatever**
23  **you want.**
24  Q.    Well, I don't want to offend you if I slip and say
25  "Jerry" or something like that.  There's not meant to be any

Page 6

1    form of disrespect to your title.  It's the first time I've
2    met you, but I'll endeavor to use "Lieutenant."
3  A.    **Thank you.**
4  Q.    Please state your name for the record.
5  A.    **It is Jerry Fernandez, spelled J-E-R-R-Y, Fernandez,**
6  **F-E-R-N-A-N-D-E-Z.**
7  Q.    Do you have a middle name?
8  A.    **Michael.  Sorry.  M-I-C-H-A-E-L.**
9  Q.    Have you ever gone by any other names?
10  A.    **No, sir.**
11  Q.    Okay.  Are you known by any other names?  Someone
12  calls you "JF" or something like that?  A nickname you are
13  commonly known by?
14  A.    **No, sir.**
15  Q.    I didn't think so, but gotta ask.
16       So have you ever been a defendant in a lawsuit
17  before?
18  A.    **Yes.**
19  Q.    Okay.  When?
20  A.    **Roughly 2009.**
21  Q.    So was this in your individual capacity -- well,
22  strike that.
23       Was this you like personally or was it related to
24  your work?
25  A.    **Work related.**

Page 7

1  Q.    Work related.
2       And what was the suit about?
3  A.    **Traffic collision.**
4  Q.    Traffic collision.  Okay.
5       And were you -- can you tell me about it?  Were you
6  the responding officer?  What happened in this traffic
7  collision?
8  A.    **Yes.  I was the responding officer and it went to a**
9  **deposition, like this, over me issuing the juvenile a**
10  **citation for being in the roadway and being struck by a**
11  **vehicle.**
12  Q.    Okay.  So the juvenile sued you --
13  A.    **The parents.**
14  Q.    The parents sued you and any other officers?
15  A.    **No.**
16  Q.    And what happened with the case?
17       **MR. NORTHCUTT:** Objection.  Relevance.
18       But go ahead.
19       **THE WITNESS:** I don't really know what happened with
20  the case.  I just know I gave a deposition and never heard
21  from him again.
22       MR. GORDON:  Okay.  All right.  So you have been
23  deposed before?
24  A.    **Yes, sir.**
25  Q.    All right.  And only that one time?

Page 8

1  A.    **Yes, sir.**
2  Q.    All right.  So I'm going to give you some ground
3  rules to the deposition.  You probably already know them.
4  I'm sure Damian has gone over with them -- gone over the
5  rules as well with you, but we're going to go through them.
6       We don't talk over each other.  I'm going to ask a
7  question.  You're going to respond.  The reporter is
8  transcribing everything you say.  And although you are being
9  videoed, please answer "yes" or "no" or whatever response
10  the question calls for, you know, give a sentence or
11  something.  So you don't just want to nod your head because
12  she's got to write it down.  All right?
13  A.    **Yes, sir.**
14  Q.    And I may ask you about certain things that happened
15  that you might not remember, but I'm entitled to your best
16  estimate.  So the example lawyers always give is, you know,
17  if I was to ask, you know, you to estimate the -- are you
18  familiar with the difference to an estimate and a guess?
19  A.    **Yes.**
20  Q.    Okay.  What is the difference?
21  A.    **So an estimate to me would be based on where we were**
22  **going, if I was to estimate --**
23  Q.    You know the analogy.
24  A.    **Right.  But a guess is something that I'm trying to**
25  **forecast and just come up with, which I'm not going to try**

Page 9

1  **to do.**
2  Q.    So if I asked you to guess the size of the table in
3  my house, for example?
4  **A.    Right.**
5  Q.    You would -- you would --
6  **A.    I would have no idea.**
7  Q.    Okay.  Or the same with a date.  So if you say
8  something happened at a certain time and you don't remember
9  when, but you might remember it was between Memorial Day and
10 July 4th, I'm entitled to your best estimate.  All right?
11 **A.    Yes, sir.**
12 Q.    All right.  So at the end of the depo, you're going
13 to receive a booklet of your -- with your responses in it
14 and you're going to have -- I have to double check the time.
15 You can review this with your attorney.
16       But in federal court, how much time will he have to
17 augment his answers?
18       **MR. NORTHCUTT:** I don't recall the time.
19 Q.    **MR. GORDON:** You're going to have some period of
20 time.  Your attorney can advise you on how much time to
21 update your answers if you want to make any changes or add
22 anything you missed.  However, I get to comment on that at
23 trial or at any other point in time, so it's important to
24 give your best testimony today so you don't have to go back
25 and change things later.  It could prove embarrassing to you

Page 10

1  later and bad for the case.
2  **A.    Yes, sir.**
3  Q.    So I'm going to ask you questions and you're going to
4  give an answer.  Your attorney is going to interpose
5  objections as I ask the questions.  Now, that doesn't mean
6  you don't answer the question.  He's going to give an
7  objection, but unless he instructs you not to answer, you
8  have to answer the question, because we're going to have a
9  conversation.  Sometimes I'm going to say something that --
10 maybe it's slightly vague, but in normal conversational
11 parlance, we understand what each person is saying.
12       So -- do you understand?  So even -- unless he
13 instructs you not to answer, you have to answer the
14 question.  If you really don't understand what I'm asking,
15 tell me "That makes no sense to me" or however you want to
16 phrase.  Let me know if I'm not being clear.
17 **A.    Yes, sir.**
18 Q.    All right.  And I'll do my best to rephrase it.
19       All right.  So are you on any meds currently?
20 **A.    No, sir.**
21 Q.    And did you drink today?
22 **A.    No, sir.**
23 Q.    Okay.  No drugs?
24 **A.    So I've had no alcohol today and no drugs.**
25 Q.    So you've taken nothing that would interfere with

Page 11

1  your ability to testify today?
2  **A.    No, sir.**
3  Q.    Any other reason you can think of the depo shouldn't
4  go forward today?
5  **A.    No, sir.**
6  Q.    Other than just no one wants to be here.
7        All right.  So -- all right.  And -- yeah, I
8  appreciate you being civil.  I know this is a stressful
9  situation, no doubt, so thank you.  And we'll try to get
10 through this as fast as we can, so -- all right.
11 **A.    I do have a question.  If at any point if I feel like**
12 **I've said something and need to come back to that, can I do**
13 **that?**
14 Q.    Yeah, if you want to correct something.
15 **A.    Okay.**
16 Q.    Yeah, it's your testimony, so if you say something
17 wrong and you want to say -- and I'm entitled to
18 cross-examine you on it.
19 **A.    Absolutely.**
20 Q.    But you want to say I said something -- I want to say
21 something differently or -- I mean, yeah, of course,
22 absolutely.  Your attorney might even ask you questions to
23 fix it up, so he has that right.
24 **A.    OKay.**
25 Q.    All right?

Page 12

1  **A.    Yes, sir.**
2  Q.    Yeah, yeah.  So this -- and as you know, this has the
3  same -- we're not in court, but this has the same effect as
4  being in court.  There's no judge here, but you're still
5  under oath.
6  **A.    Yes, sir.**
7  Q.    Under duty to tell the truth and -- yes.  So even
8  though we're not in court, you're still under oath and it
9  has the same effect.
10       All right.  Do you currently live in Shasta County?
11 **A.    Yes, sir.**
12 Q.    Okay.  How long have you lived here?
13 **A.    Pretty much my entire life.**
14 Q.    So you were born in Shasta County?
15 **A.    Yes, sir.**
16 Q.    Okay.  All right.  Have you lived elsewhere?
17 **A.    Yes, sir.**
18 Q.    Where else have you lived?
19 **A.    I've lived -- it's going to take a little while.  San**
20 **Diego, Virginia, Washington D.C., a little bit of time in**
21 **Sacramento and several other little towns up and down the**
22 **I-5 corridor to Sacramento.**
23 Q.    Okay.  All right.  And how long -- so you're
24 currently in Shasta.
25       How long have you been back in Shasta since one or

Page 13

1 more of those destinations?
2 A.  Since 2007.
3 Q.  2007.
4     And you were born here, and when did you first move
5 away?
6 A.  I was born here.  I first moved away throughout my
7 childhood, and then as an adult I moved away when I was in
8 the military.
9 Q.  Okay.  All right.  That's what I figured.  You moved
10 around for that.
11 A.  Yes, sir.
12 Q.  Okay.  All right.  What branch of the military were
13 you in?
14 A.  United States Marine Corps.
15 Q.  Marine Corps.  All right.
16     And -- so where were you stationed in the Marine
17 Corps then?
18 A.  So my first duty station through boot camp, school
19 infantry was Camp Pendleton, which is San Diego.  Then I was
20 selected to go to Marine Barracks 8th and I in Washington
21 D.C.
22 Q.  All right.
23 A.  And then I traveled all over with that.  I was
24 assigned drill platoon member for roughly a year and a half,
25 then stationed back to Pendleton for the remainder of my

Page 14

1 time.
2 Q.  Okay.  All right.  And what is your highest
3 educational level?
4 A.  Some college.
5 Q.  Some college.  Okay.
6     So you started a program and didn't finish?
7 A.  No.  So I got the California POST, so the POST
8 Academy, which is six months of basically college.  And then
9 a little bit -- I don't have an AA, but I have over 60
10 semester unites.
11 Q.  OKay.
12 A.  But as far as starting a program and not finishing
13 it, I've -- whatever program I started, I've completed,
14 other than getting an AA or a Bachelors.
15 Q.  Gotcha.  And where did you take these programs?  Was
16 it at a university?
17 A.  Community colleges.
18 Q.  Community college.  Okay.  All right.
19     Which ones?
20 A.  College of the Redwoods and Shasta College, and then
21 some police trainings you get college credits.  So some of
22 the Bay Area Regional Training Facilities is where I got
23 some of my units as well.
24 Q.  Okay.  All right.  And when is the last time you had
25 -- when did you complete these courses?  What time frame,

Page 15

1 start to finish?
2 A.  2007 or '08.  I would say 2008, so probably last
3 year, roughly.
4 Q.  Okay.  All right.  All right.  And -- so when did
5 you -- did you go right into law enforcement right after the
6 Marine Corps?
7 A.  Yes, sir.
8 Q.  Okay.  And so what year did you -- what was your
9 last -- when did you stop working at the Marine Corps?  Is
10 "working" the right term?
11 A.  End of service -- end of active service was June of
12 '07.
13 Q.  June of '07.  And you went immediately into law
14 enforcement?
15 A.  Yes, sir.
16 Q.  What branch?
17 A.  I went to -- well, I went to an academy.
18 Q.  Okay.
19 A.  I graduated the academy from College of the Redwoods
20 in December of '07, and then was hired on by the Red Bluff
21 Police Department in January of '08.
22 Q.  Okay.  January of '08.
23     So how long did you work for Red Bluff Police
24 Department?
25 A.  Until May of 2012.  And it was roughly over four

Page 16

1 years.
2 Q.  All right.  And what was your title or position at
3 the Red Bluff Police Department?
4 A.  I was just a patrol officer.
5 Q.  Patrol officer.
6     What were your duties as a patrol officer?
7 A.  At that point I was a rifle instructor, a taser
8 instructor.  I was also, my last year there, a traffic
9 officer overseeing a traffic grant.
10 Q.  So did you have -- you were -- it looks like you were
11 and instructor -- oh, you said traffic officer, too.  So you
12 were an instructor, but you were also a traffic officer.  So
13 would it be fair to say your beat was traffic?  Is that term
14 even used anymore?
15 A.  Yes.
16 Q.  Okay.
17 A.  Yeah, my last year that's all I did was traffic
18 enforcement, collision reports.
19 Q.  Okay.  So someone gets in an accident.  They call the
20 Red Bluff police department.  You show up or some officer in
21 your position?
22 A.  Yes, sir.
23 Q.  Okay.  All right.  Taser instructor.  I see them fail
24 a lot.  I assume they do need a lot of instruction.
25 A.  Yes, everything with the use of force options needs a

Page 17

1  lot of instruction.
2  Q.   Do they have -- this is irrelevant, but I'm just
3  going to ask because I've competed in Brazilian Jiu-Jitsu
4  and wrestling most my life.
5      Do they do any of that for...
6  A.   They should.
7  Q.   They should, yeah.
8  A.   I would say -- this is off the record.
9  Q.   You're on record, but this doesn't matter.  I'm just
10 curious.
11 A.   They should probably do more of it.  So what a lot of
12 agencies do is we have guys that get together and they go
13 and they practice Jiu-Jitsu and stuff like that through gyms
14 in town.
15 Q.   We had an officer at one of the places I used to
16 train.  He always told me he was worried about someone being
17 that close to his firearm, though, which I assume is a real
18 worry.
19 A.   But most altercations are going to end up on the
20 ground --
21 Q.   Yeah, sure.
22 A.   -- and you've got to know how to defend yourself.
23 Q.   Oh, absolutely.  Yeah, I'm not -- yeah, yeah.
24 Absolutely.  I don't -- some of the choke holds that are
25 becoming illegal, I think that's just completely bonkers.

Page 18

1  It's how you put someone -- whatever.  All right.  Neither
2  here nor there, it's just a sheer morbid of curiosity.
3  A.   Okay.
4  Q.   All right.  So in your role as a -- All right.  So
5  you're traffic officer.  You worked there until -- refresh
6  my memory.  When did you say?  2012?
7  A.   2012, yes.
8  Q.   Okay.  And then after 2012, did you -- where did you
9  go next?
10 A.   I came to the Shasta County Sheriff's Office.
11 Q.   Okay.  And what was your -- what position were you
12 hired for?
13 A.   Patrol -- or a Deputy Sheriff.
14 Q.   Deputy Sheriff.  Okay.  Okay.  And so -- Deputy
15 Sheriff.
16     What were your roles as a Deputy Sheriff?
17 A.   So collateral assignments I've held for --
18 Q.   What do you mean "collateral assignments"?
19 A.   So like I relate what you're saying your roles is to
20 collaterals.  So, obviously, a Deputy Sheriff is whatever
21 was in the job description.  I patrol the streets of Shasta
22 County, enforce the criminal laws.
23 Q.   It's very broad.
24 A.   Right.  But as far as my roles that I've had within
25 the Sheriff's Office, I was a canine handler.  I was a field

Page 19

1  training officer.  I was a -- deemed a livestock
2  investigator for the Sheriff's Office.  I'm trying to think.
3  I was a Reserve Coordinator.
4  Q.   What's a Reserve Coordinator?
5  A.   So we have reserve deputies.  When I promoted to
6  Sergeant, that was one of the collaterals I was assigned was
7  a Reserve Coordinator.
8  Q.   So if you have to call people out to handle --
9  A.   Right.  A cadet advisor, coordinator.  So we have
10 cadets.  A lot of agencies have cadets.
11 Q.   Yeah.
12 A.   I also was a range instructor here.
13 Q.   Okay.
14 A.   I worked a little bit in the domestic highway
15 enforcement, but never really assigned out there, just a lot
16 of overtime when we had that.  I've been the field
17 training -- when promoted to Sergeant, I was a field
18 training supervisor, so I oversaw the field training
19 officers, train new people.
20 Q.   So you were promoted to Sergeant at some point?
21 A.   Yes.
22 Q.   About what year was that?
23 A.   Oh, I want to say around the end of '16 or the
24 beginning of '17.  I think it was '17, the beginning of '17.
25 Q.   And what -- how -- how did your duties or obligations

Page 20

1  change as Sergeant?
2  A.   Essentially, my duties changed from being responsible
3  for myself and making sure that my work products and my
4  reports were adhered to to now basically being in charge of
5  a patrol shift.
6  Q.   So you had oversight.
7  A.   Oversight over a patrol shift, yes.
8  Q.   All right.  All right.  So how long were -- how long
9  were you a Sergeant?
10 A.   I believe roughly four years.
11 Q.   Roughly four years.  Okay.
12     So you -- 2021 you were promoted to Lieutenant?
13 A.   I think it was February of last year.  So 2022.  So
14 maybe five years as a Sergeant, four years, four-and-a-half
15 years.
16 Q.   Okay.  Okay.  2022.  Okay.  All right.
17     So shortly before the events that we're going to
18 discuss today occurred, you were promoted to Lieutenant?
19 A.   Yes, sir.
20 Q.   Okay.  All right.  And how high up in the chain is
21 Lieutenant?
22 A.   So --
23 Q.   Who are your, you know, superiors?
24 A.   Relatively high.  So you have a Sheriff and Under
25 Sheriff.

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

---

Page 21

1 Q.   Okay.
2 A.   Then you got three Division Commanders, which are
3   Captains.  And then I fall under the Enforcement Division
4   Commander, which is a Captain.  So there are -- within my
5   rank I basically run -- I'm a commander of a station, so I
6   run one of three stations for the Sheriff's Office.
7 Q.   So Sheriff, Under Sheriff, three Captains, and then
8   Commander.
9     And I presume you report to one of the Captains?
10 A.   Yes, sir.
11 Q.   Okay.  And that's the role you are currently in?
12 A.   Yes, sir.
13 Q.   All right.  All right.  So how many times have -- I
14   know you said you were deposed once, but how many times have
15   you testified at trials?
16 A.   Over the last couple years not a whole lot, but I
17   would say hundreds of times.
18 Q.   Hundreds of times.  Wow.  Okay.  All right.
19 A.   Maybe not trials.  Prelims.
20 Q.   Okay.
21 A.   You know.  So trials, not even close to hundreds.
22 Q.   Yeah, because most stuff --
23 A.   Going to court on traffic or preliminary hearings or
24   motion to suppress is probably several hundred times.
25 Q.   Okay.  Several hundred times.  I was going to ask you

---

Page 22

1   some questions about that, but that's a lot to ask.
2     What percentage of these -- of these times you
3   testified would you -- in my head or when I look at -- when
4   I look at, you know, various breakdowns from Department of
5   Justice, it will have violent, crimes property crimes,
6   right.
7     What percentage would you say that you testified were
8   violent crimes?
9     MR. NORTHCUTT: If you can give an estimate.
10     THE WITNESS: That's a -- I don't know if I could
11   give an estimate for that.
12 Q.   MR. GORDON:  But there's been many, at least, safe to
13   say?
14 A.   Yeah, I would say like more the violent crimes.
15 Q.   Than property crimes?
16 A.   Yes, sir.
17 Q.   Is that because they're -- in your opinion, are they
18   prioritized for prosecution?
19 A.   I wouldn't say they're prioritized.  I would just say
20   that they -- yeah, they carry with them some weight as far
21   as more, what do I want to say, abilities for people to go
22   to prison on.
23 Q.   Sure.  Yeah.
24 A.   Especially with the different changing in the laws
25   over the last decade.

---

Page 23

1 Q.   Yeah.
2 A.   So I would say more -- more -- more times than not,
3   it was probably either violent crimes.  But then working
4   traffic, it could have been a lot of times where I'm just
5   dealing with misdemeanor traffic stuff, so...
6 Q.   Yeah.  So have you ever been -- have you ever been
7   disciplined by your -- let's go back in time.
8     Have you ever been disciplined by the Armed -- or the
9   Marines?
10     MR. NORTHCUTT: Objection.  Relevance.
11     THE WITNESS: No.
12 Q.   MR. GORDON:  Have you ever been disciplined in your
13   role at the Red Bluff Police Department?
14     MR. NORTHCUTT: Objection.  Relevance.  The same.
15     THE WITNESS: Yes.
16 Q.   MR. GORDON:  Yes, you have.  And tell me about that.
17 A.   So there was a like documented performances, I guess,
18   you'd called them.  We called them -- instead of like an
19   atta boy, you get a write-up.  So --
20 Q.   Okay.
21     MR. NORTHCUTT:  Sorry.  I'm just going to also throw
22   in a late objection based on privacy.
23     MR. GORDON:  Sure.
24     THE WITNESS: Continue?
25     MR. NORTHCUTT:  Yeah, go ahead.

---

Page 24

1     THE WITNESS: So, you know, let's say you towed a
2   vehicle when you weren't supposed to.  Maybe the return came
3   back and -- the DMV return came back, which would have
4   justified you to tow it, but when the person went to DMV and
5   came back in, they had paperwork.  So then you would get a
6   comment card or something like that.  But that was it.
7   There was -- I also had a letter of reprimand.
8 Q.   MR. GORDON:  So before we go past it, so you wrongly
9   towed a car?
10 A.   Yeah, based on this misinformation, like you get from
11   like a dispatcher because you're in the field.  So you
12   wrongly, you know, tow a vehicle.
13 Q.   And they gave you the equivalent of a write-up for
14   that?
15 A.   Yeah, like a documented performance.
16 Q.   Okay.  All right.  Was the car just returned to the
17   person?
18 A.   Yeah.  So they -- basically the city just pays for
19   the tow and they releases it to the person.
20 Q.   Okay.  All right.  That's not the end of the world,
21   although I have had my car towed once.  It is extremely
22   frustrating.
23 A.   It is.
24 Q.   You will appreciate this, because I was in -- I went
25   to Loyola and it was downtown L.A.  And you know how when

---

**Page 25**

1  you're in law like where you get in the -- you get in the --
2  I might have been studying for the bar, I don't remember,
3  but I was in the zone reading. And then I did see the sign
4  out front, like "Move this car by X time," because the --
5  you know, no parking on that side of the road, and I did not
6  and -- oh, God. It was like I was completely broke at the
7  time in law school, too. It wound up costing like 900 bucks
8  that day to get the car out. I was so frustrated. It was
9  my fault, but what can I do. So anyway -- all right.
10  Although, when you come out of -- you know, the building in
11  L.A. and your car's missing, the first thing you think is
12  someone stole my car.
13        Okay. So what was the -- you were going to proceed
14  to a different example of discipline?
15        **MR. NORTHCUTT:** Same objections. Relevance and
16  Privacy.
17        Go ahead.
18        **THE WITNESS:** A letter of reprimand.
19 Q.    **MR. GORDON:** For what?
20 A.    **Not getting a report done in a timely matter.**
21 Q.    Paperwork. Okay.
22 A.    **Yeah.**
23 Q.    Were there any consequence of the case of not getting
24  the paperwork done on time?
25 A.    **No. They were -- it was a juvenile case, so there**

**Page 26**

1  **was no one -- there was no set court date until the citation**
2  **and the report goes over anyways. I hadn't arrested any**
3  **juveniles. I basically cited them out. But those are to be**
4  **notified, so there was no hiccup in the court processes,**
5  **just, you know, just being a young patrol officer learning,**
6  **you know, time management.**
7 Q.    You missed the date line. All right. Gotcha.
8  And -- okay. So that was Red Bluff, so that was some time
9  between 2008 and 2012.
10 A.    **Right.**
11 Q.    So what about that -- so then you proceeded to the
12  Sheriff's Department.
13        Have you ever been disciplined there?
14        **MR. NORTHCUTT:** Same objections. Relevance and
15  privacy.
16        **THE WITNESS:** Yeah, I received one documented
17  performance since I've been here.
18 Q.    **MR. GORDON:** A documented performance?
19 A.    **Document -- documentation of performance or**
20  **documented performance.**
21 Q.    And what was that about?
22 A.    **I missed a training. So I basically missed the**
23  **training. It was a simulator training put on by POST.**
24  **Well, it's a POST course for driver simulator training.**
25 Q.    Okay.

**Page 27**

1 A.    **So instead of coming in at the 7:00 one, I came at**
2  **the one that started at 1:00.**
3 Q.    Okay. You were out drinking the night before and you
4  just decided to miss your -- I'm just kidding.
5 A.    **Yeah, no. A lot of us got written up. So I'm not**
6  **going to argue why I got written up, but a lot of us got**
7  **written up. I would say the proper notification --**
8 Q.    That was a joke. I didn't mean that. It might have
9  some truth in it?
10 A.    **No, no truth in it.**
11 Q.    Okay. All right. Okay. So you were named in one
12  other lawsuit and then you've had some, you know, minor
13  write-ups is a fair description. Okay.
14        So how long have you been a livestock investigator?
15 A.    **Since roughly two thousand -- I'm trying to think of**
16  **when I went to the -- '13 or '14. 2013 or 2014 is when they**
17  **sent me to the school.**
18 Q.    There's a school for being a livestock investigator?
19 A.    **Yes.**
20 Q.    What's the school?
21 A.    **It's like a rural crimes investigative school. It's**
22  **a 40-hour course, POST accredited course. I believe I took**
23  **that one in Tulare County.**
24 Q.    Okay. At a -- what school there?
25 A.    **It was a -- I want to say it was like a -- it wasn't**

**Page 28**

1  **a school. It was an agricultural building or something like**
2  **that within the community and they just hosted the school,**
3  **or the-training.**
4 Q.    Okay. Okay. All right. So POST doesn't -- it's
5  just a meeting place.
6 A.    **Yeah, it can. And what I mean by "POST" is I could**
7  **be a --**
8 Q.    Police Officer Training --
9 A.    **Standards.**
10 Q.    Standards, yeah.
11 A.    **So I could basically have syllabus, as long as it's**
12  **accredited or approved through POST. Then I can run that**
13  **training and just finding a location.**
14 Q.    I see. So someone gets credit, or you in this case.
15  Okay. All right. All right. So someplace in Tulare County. All
16  right. Okay.
17        I was driving a few weeks ago and I tried to find the
18  reemergence of the lake, but I -- it was too far from where
19  I pulled off the highway. I wanted to see that.
20        Have you seen that?
21        **MR. NORTHCUTT:** On the news.
22        **MR. GORDON:** Yeah. It's crazy.
23 Q.    All right. Okay. So 2013 you become a livestock
24  investigator.
25        All right. And you've been in the same -- who was

Page 29

1  your predecessor?
2  A.    So my predecessor to that was -- I believe it was
3  Deputy -- I know he was one, was Deputy Armstrong.
4  Q.    Is there only one livestock investigator serving at a
5  time?
6  A.    There -- at the time of all this?
7  Q.    Yeah.
8  A.    Yes.
9  Q.    Okay.  But usually is there more than one?
10  A.    No.  It's always just been kind of one.
11  Q.    Just one.  Okay.  All right.
12        So in your role as livestock investigator, how
13  many -- what type -- apart from animal theft, what else do
14  you investigate?
15  A.    So any type of rural crimes.  You could investigate
16  hay theft, wire theft, agricultural equipment theft.
17  Q.    Bee theft?
18  A.    Yeah.  Apiary type of theft, which can be kind of
19  big.  We see a lot of, you know, telecommunications wire
20  theft occur in our rural parts of the county.
21  Q.    What do you mean by that?
22  A.    People drive into the rural parts of the county at
23  night.  They'll cut hundreds, if not thousands, of feet of
24  wire down.
25  Q.    Really?

Page 30

1  A.    Yeah.  And then they steal it.  So that would fall
2  within a purview.  If it gets to a certain point, then I
3  will get tasked with that and conduct an investigation, you
4  know, coupled with like major crimes detectives, stuff like
5  that.
6  Q.    Okay.  All right.  Okay.  Why do they -- so they call
7  it livestock investigator, but your task was investigating
8  much more than livestock?
9  A.    Yeah, just basically rural -- rural crimes.
10  Q.    Rural crimes.
11  A.    So there's crimes everywhere --
12  Q.    Sure.  I understand.
13  A.    -- but it' more of rural crimes.
14  Q.    I understand.  Yeah, yeah.  I understand.  The
15  definitions usually have soft boundaries --
16  A.    Right.
17  Q.    -- that overlap.  I gotcha.
18        Okay.  I'm guessing the answer is no, but that's why
19  I'm going to ask.
20        Do you investigate animal cruelty also as a livestock
21  investigator?
22  A.    Yes.
23  Q.    Yes.  Okay.  All right.  All right.  And how many --
24  how many instances of -- so -- strike that.
25        So Penal Code 487 is the -- is the livestock theft

Page 31

1  statute.
2        Are there any other ones that you know of?
3  A.    Off the top of my head, I mean, as far as animals?
4  Q.    Yeah.
5  A.    You've got 597, which is like animal cruelty, which
6  you're taking -- referencing.  And there's a whole slew of
7  other ones.  So to better answer that question, if I can --
8  Q.    I more meant related just to theft or confiscating,
9  not to cruelty.  Ignore the cruelty for a moment.
10        Just 487 is the focal point.
11  A.    No.  I would say-- I would say that there's others.
12  I just can't recall them off the top of my head.
13  Q.    Okay.  That's fine.  So there are others.
14        So how many instances of animal theft in your role as
15  livestock investigator have you investigated?
16  A.    So not a whole lot because we do have animal resource
17  officers that work for the Sheriff's Office.
18  Q.    And they overlap with the livestock investigator?
19  A.    Correct.
20  Q.    What do the animal resource officers do?
21  A.    So animal resource officers, they're pretty much like
22  what you would see, you know, in the cities.  They're like,
23  you know, loose dog complaints.  If we do have livestock
24  that get out in roadways, they'll go assist with putting
25  them back away.  They do have the authority under the law to

Page 32

1  issue citations for like stray dogs, stuff like that.
2  Q.    So is an animal resource officer --
3  A.    Animal regulation officer.
4  Q.    Whatever term you're referring to now, is that the --
5  in the -- you might not know this part.  This is -- but
6  you'll see where I'm going.
7        There's in the corporations code, you can incorporate
8  humane societies and they can get.  They can basically have
9  quasi police officers issue citations and the court has to
10  approve them.
11        Is that what you're referring to?
12  A.    So yes and no.  They work for the Sheriff's Office.
13  Q.    You work for the Sheriff's Office.
14  A.    The Haven Humane Society that you're talking about,
15  that's actually -- we have a Haven Humane shelter here,
16  which those employs that work for them don't work for us and
17  they also do like the City of Redding.  But for anything
18  within the Sheriff's Office boundaries, the animal
19  regulation officers that we employ cover those areas.
20  Q.    Okay.  So these animal resource officers work for the
21  Sheriff and -- but they're not -- they're not Sheriff's
22  deputies.
23  A.    No, they're non-sworn staff, but we do send them to
24  832, arrest and control, as well as search and seizure, so
25  they can author citations.

Page 33

1 Q.  Okay. So they can give citations. They don't --
2 they can't make an arrest.
3 A.    Right. So to better answer the several questions
4 before, they may handle certain cases to a certain point.
5 Either myself or just an actual deputy, sworn deputy, will
6 take over that case. So if it's just a simple animal --
7 animal cruelty case, depending on if I was on days off or
8 not, that didn't have to wait for me. They could -- you
9 know, the deputy could affect the arrest, based on what
10 their investigation was, and then take it over from that
11 point.
12 Q.   I see. Okay. All right. Okay. All right.
13      So how many animals would you say you have -- or how
14 many investigations have you done for animal theft as a --
15 as a resource officer?
16 A.    Roughly a handful.
17 Q.    A handful.
18      Like 10?
19 A.    Probably less than that.
20 Q.    Less than 10.
21      More than five?
22 A.    I would say roughly about five.
23 Q.    Roughly about five. Okay. All right. And --
24      All right. Do you remember what kind of animals they
25 were?

Page 34

1 A.    Yes. They were bovine or cattle.
2 Q.    Sure.
3 A.    And then obviously this case, which is goat or
4 caprine per the statute and then a horse case.
5 Q.    A horse case.
6 A.    Equestrian.
7 Q.    I gotcha. All right. Did you -- were you able to
8 re-acquire the animals for the bovine and the horse case?
9 A.    For the --
10 Q.    So there's A few bovine, a few cows?
11 A.    Yeah, there were multiple that were stolen. No, we
12 weren't able to locate the animals.
13 Q.    Are those cases still open?
14 A.    No. They're -- basically the one case we could never
15 find the cattle, so we just write the -- I write the
16 investigation, and then whatever the owner, whatever
17 insurance or whatever. The one case I did do within the
18 last couple of years, we were actually able to seek animals.
19 I'm trying to think of his name. But basically the brand
20 inspector for the county was able to get DNA testing done
21 and then prove that they were the victim's animals and the
22 animals were returned.
23 Q.    They didn't have a brand on them or anything like
24 that?
25 A.    So it's tricky, right, because animals aren't born

Page 35

1 with brands.
2 Q.    Sure.
3 A.    So a lot of times that's when they get stolen.
4 Q.    I see.
5 A.    Or a lot of times what people do is they'll steal an
6 animal with a brand, but then they'll put a different brand
7 on them.
8 Q.    I get it how it's easy to swap the tags.
9 A.    It's pretty easy to steal cattle or any kind of
10 livestock within the county actually.
11 Q.    If they're on a cattle operation --
12 A.    Yeah, it's --
13 Q.    -- out in the mountains.
14 A.    Yeah, down in the mountains, being seen every once in
15 a while.
16 Q.    All right. Interesting. All right.
17      Can we go off the record for one second?
18      THE VIDEOGRAPHER: We are off the record and the time
19 is 10:15.
20      (Off the record.)
21      THE VIDEOGRAPHER: We are back on the record and the
22 time is 10:22.
23 Q.    All right. Back on the record.
24      Do you understand you are still under oath, Officer
25 Fernandez?

Page 36

1 A.    Yes.
2 Q.    Lieutenant Fernandez. Apologies.
3      All right. So -- where did we leave off.
4      So -- you were telling me you investigated five other
5 instances approximately of animal theft in your role as
6 livestock investigator.
7      And aside from this issue with Jessica Long, were
8 these reported by private individuals?
9 A.    Yes.
10 Q.    Okay. It wasn't like another fair or anything like
11 that?
12 A.    No, sir.
13 Q.    Has -- have you ever investigated an alleged instance
14 of theft, other than the current situation with Jessica
15 Long, from an auction?
16 A.    Not theft from an auction, but theft of cattle, and
17 I've used auction yards to conduct my investigation. If
18 I -- I can better explain that, if you like.
19 Q.    Yeah, explain it, please. Yeah.
20 A.    So cattle were stolen. Let's say they were stolen up
21 here in the City of Shasta Lake where they were stolen from.
22 They were taken to the Shasta Livestock Auction Yard.
23 Q.    Oh, I see.
24 A.    So then I have to go down there to get bill of sales
25 and records to basically build a case against -- and try to

---

**Page 37**

1   track down who the suspect was.
2 Q.   I understand. Someone stole them to sell them.
3 A.   Right.
4 Q.   Which makes sense. And an auction yard would be
5   where you would want to do that if you were a thief.
6 A.   Correct.
7 Q.   All right. And you said there were no prosecutions
8   for those other cases. Is that accurate?
9 A.   Prosecutions?
10 Q.   Yeah. Were any charges filed?
11 A.   Yes. I filed charges against several different
12   people.
13 Q.   Oh, I misunderstood. You didn't find the animals,
14   but you found the culprits.
15      MR. NORTHCUTT: Objection. Misstates testimony.
16 Q.   MR. GORDON: Did I misstate your --
17 A.   Yeah.
18 Q.   I thought you said you did not locate the animals.
19 A.   On one of the -- yeah, on several of the occasions,
20   but some of them I found the cases -- or found the animal,
21   too.
22 Q.   Okay. So did -- were charges filed in any of these
23   cases then?
24 A.   Yes.
25 Q.   Okay. How many of them?

**Page 38**

1 A.   So the one I just referenced from City of Shasta
2   Lake, I filed charges on that suspect. I filed charges on
3   another one from the Anderson area. Roughly three, four.
4   And then if I wasn't able to find obviously a nexus or
5   suspect or burden of proof as far as evidence, then
6   obviously I wasn't able to file.
7 Q.   Okay. And were there any convictions?
8 A.   Yes.
9 Q.   How many?
10      MR. NORTHCUTT: Objection. Relevance.
11   But go ahead if you know.
12      THE WITNESS: I would say roughly the ones I filed
13   on, except for this one we're going to talk about today.
14 Q.   MR. GORDON: Yeah, yeah. I know it's odd, but, you
15   know, in depositions, unless it becomes harassing, I'm
16   allowed to -- I ask irrelevant questions.
17 A.   No, I -- I don't know. And it's hard, too, because I
18   don't think most law enforcement officers track all their
19   cases. So like to know every case or every citation I've
20   written, I don't know the actual disposition.
21 Q.   Sure. I imagine it's a lot.
22   At a certain point it's out of your hands. Right?
23 A.   Right.
24 Q.   I understand. Okay.
25   So for -- you said there was a conviction.

**Page 39**

1   Do you remember what the sentence or penalty was for
2   it?
3 A.   I think on that one, because I was -- I was -- I was
4   following that one --
5 Q.   Yeah.
6 A.   -- she got like 36 months probation, which I thought
7   was -- the suspect did. I thought that was very miniscule
8   because every animal that was stolen is its own felony, so
9   that was like 16 felony counts. But the big one that I
10   really was -- but it's not -- right. There's a justice
11   system. I thought it was -- there was elder abuse involved
12   because the victim, the owner of the cattle, was an elder.
13   So I thought, you know, 36 months for taking basically his
14   retirement, you know, cattle. But basically stealing from
15   an elder. I believe that one was like 36 months --
16 Q.   Yeah, yeah.
17 A.   Probation.
18 Q.   That does seem --
19 A.   No jail time, nothing.
20 Q.   Did she have to pay restitution?
21 A.   I think, yeah. I think that was part of it, but who
22   knows.
23 Q.   But what does that actually mean?
24 A.   I don't know.
25 Q.   Probably a deadbeat with no money.

**Page 40**

1 A.   Yeah, I don't know.
2 Q.   Gotcha. All right. Okay.
3   Were there any reports of theft that you received
4   that you deemed that's not criminal?
5 A.   So I would say like there was a horse one -- that's
6   probably me. I apologize.
7 Q.   Do you need to take it? We can go off the record.
8 A.   No.
9   Do you mind if I look at it? I don't want it to look
10   bad.
11 Q.   Yeah. No, go ahead.
12 A.   Actually it's not me. It's someone else.
13 Q.   Someone else. All right. Not me. Okay.
14 A.   I apologize for having it on the table, but I do have
15   a wife and kids, so...
16 Q.   I understand. I just had a lecture.
17 A.   So if I understood the question right, yeah, I mean,
18   one of them was a horse one where -- once you get all the
19   information, right, you take -- you know, you take the
20   investigation. You pile through all the veterinary stuff.
21   You deem that it's really not a criminal matter. It's a
22   civil matter. You still document it. You do an information
23   report and you let the person, the complainant, you let them
24   know that hey, unfortunately there's -- it's not criminal.
25 Q.   I see.

Page 41

1 A.   So --
2 Q.   Okay. And you tell them presumably to go find an
3   attorney or file something in civil court?
4 A.   That's -- that's not my job either to tell them that,
5   so I can't give legal advice.
6 Q.   Sure.
7 A.   So I just let them know that there's nothing within
8   my scope of my duties that I can do for them.
9 Q.   Okay.
10 A.   That it's a civil matter.
11 Q.   I'm not sure saying you should talk to an attorney is
12   legal advice, but I understand.
13     So this person for this report that you declined to
14   prosecute because you thought it wasn't criminal, it might
15   be civil, any other instances of -- similar to that?
16 A.   No, I think that was probably the only one.
17 Q.   And that involved, you said, a horse?
18 A.   It involved a horse, yeah.
19 Q.   Okay. All right. Okay. And what is the -- what is
20   the -- if you know, what is the clearance rate of -- in the
21   Sheriff's Department for crimes?
22     MR. NORTHCUTT: Objection. Vague and ambiguous.
23 Q.   MR. GORDON: What was the clearance rate for violent
24   crimes if you know?
25 A.   I don't know that information.

Page 42

1 Q.   It's not a hundred percent. Right?
2 A.   I don't think anyone's a hundred percent.
3 Q.   No. No one's a hundred percent.
4     Okay. Below 50, do you know?
5 A.   I have -- I can't answer that. Sorry.
6 Q.   No, it's fine. It's fine. All right. Okay.
7     So do you do any work that takes you out of your --
8   out of the jurisdiction of Shasta County?
9 A.   Yes.
10 Q.   That was a terrible question.
11     Do you do any work that takes you out of the
12   boundaries of Shasta County as -- in your role as a Sheriff?
13 A.   Yes.
14 Q.   Okay. What other -- what other -- okay.
15     What work takes you out of this county?
16 A.   Law enforcement.
17 Q.   Okay. So how often do you wind up doing cases --
18   investigating cases or doing your duties outside of this
19   county?
20 A.   So I think the better answer to that question would
21   be, right, if I get in a pursuit right here in Redding,
22   there's a good likelihood if we're southbound I-5 I can end
23   up in six different counties --
24 Q.   Sure.
25 A.   -- depending on how bad the severity of the crime,

Page 43

1   right. If he's a homicide suspect, we're chasing it to the
2   Willows fall off.
3 Q.   Sure.
4 A.   But it it's a stolen vehicle and I see it, we're
5   going to make to it from here to the train tracks and we're
6   not even chasing that.
7 Q.   Really. Oh, okay.
8 A.   Right.
9 Q.   Interesting. Because -- that's not a criticism. I
10   just -- I would have assumed you would chase.
11 A.   It's property crime. It's --
12 Q.   It's a stolen vehicle.
13 A.   It's a stolen vehicle. Your life or her life or any
14   one's room -- in this room's life is not important over that
15   vehicle.
16 Q.   Sure.
17 A.   So we're not going to chase it.
18 Q.   I see.
19 A.   So as far as the question is take me outside of the
20   boundaries, I think it depends on the circumstance within
21   the -- whatever the case may be that I'm working or the
22   in-progress crime that we're currently pursuing.
23 Q.   Okay. All right. So it's usually some sort of
24   exigency?
25 A.   It could be exigency or it could be an investigation

Page 44

1   that leads us out of this -- our boundaries. I know our
2   detective bureau, they'll fly to the east coast to interview
3   witnesses in homicide cases and stuff like that. So they
4   can take you throughout the United States.
5 Q.   Yeah, interesting.
6     So when I'm seeing a car chase on TV -- you know, in
7   L.A. they broadcast them all the time -- is it -- and then
8   they say this stole a car, are they -- you know, when you
9   view that, do you think "Oh, they're just chasing him
10   because he just stole the car or he probably also has some
11   other -- you know, a rap sheet this long.
12     MR. NORTHCUTT: Objection. Calls for speculation.
13 Q.   MR. GORDON: You can speculate. This is not...
14 A.   Is this like --
15 Q.   Yeah, I'm just asking.
16 A.   There's probably more to it. But every agency has
17   their own policies and procedures on what they're going to
18   do and not do.
19 Q.   Okay. Gotcha. All right. I mean, grand theft auto
20   seems -- that seems like a big deal, but I get -- well, just
21   stealing a car isn't -- they didn't actually rob the person
22   for it. They just -- if it's armed robbery and someone
23   steals a car, do you pursue?
24 A.   Yeah -- well, you could pursue, depending on how out
25   of control it's getting.

Page 45

1 Q.   Gotcha.
2 A.   Right. Or how much -- you know, because that's a
3   215, right, it's carjacking. It's a violent felony. That
4   could be something that we would pursue further. But now,
5   if he's going the wrong way in a one-way and, you know, we
6   don't know who the guy is or we know who is it or --
7 Q.   Exercise your discretion.
8 A.   Pretty much. And it's a reasonable standard, like --
9 Q.   Yeah.
10 A.   You know, the person's fine. They're on the side of
11   the road. We got them. Let them go. Hopefully we can get
12   the helicopter up. I mean, there's a lot of things we can
13   do to stop the pursuit --
14 Q.   Yeah. Okay. All right.
15 A.   -- to not subject more people to harm.
16 Q.   Okay. All right. Interesting.
17      So those -- you know, when you see one of those old
18   movies and they say someone crosses the county line, that's
19   not true.
20 A.   No, it's not.
21 Q.   Stop. Okay.
22      So what did you do to prepare for this depo today?
23 A.   What did I do to prepare for the depo.
24 Q.   Yeah.
25 A.   Talked with my attorney.

Page 46

1      MR. NORTHCUTT: Aside from those conversations.
2 Q.   MR. GORDON: Yeah, I'm not going to --
3 A.   Right. I think throughout the course of this, every
4   time I got information from your office, I would look at the
5   interrogatories and stuff like that. That was about it.
6 Q.   Okay. Did you review the Complaint?
7 A.   The -- I reviewed everything that you've -- that your
8   office has sent.
9 Q.   Well, you would have been served a Complaint long
10   ago.
11 A.   I have.
12 Q.   I don't know if you were because I think -- I think
13   County Counsel accepted service. So the Complaint would
14   be -- has, you know, the allegations and -- I mean, it would
15   be equivalent of an information, I guess, in your -- it has
16   this and this and this and we allege this.
17      MR. NORTHCUTT: Maybe I can clarify.
18      THE WITNESS: Yeah.
19      RIGHT: So at some point you've probably seen the
20   First Amended Complaint in this case.
21      Did you -- did you review that prior to coming here
22   for your deposition today?
23      THE WITNESS: Yes, I did.
24 Q.   MR. GORDON: Okay. All right. So you know what I'm
25   talking about.

Page 47

1 A.   Yeah.
2 Q.   Okay. All right. Okay. And did you review it --
3   sorry.
4      Did you review anything else?
5 A.   Just my report.
6 Q.   Your report. Okay. All right. I think I know what
7   you're talking about, but we'll get into that shortly so...
8      Okay. And so what is -- so you grew up here.
9      Did you grow up having any involvement with
10   agriculture? Perhaps, working on a farm or doing 4-H
11   yourself or anything like that?
12 A.   Yes.
13 Q.   Yes. Okay. All right. So which one?
14 A.   Both.
15 Q.   You grew up on a farm?
16 A.   Well, I've green up -- I have a quasi ranch. I have
17   cattle.
18 Q.   Yeah.
19 A.   I was in FFA growing up. My kids are in 4-H. My
20   wife was in FFA and 4-H.
21 Q.   Okay. What is the difference between 4-H and FFA?
22   They seem just -- same thing, different group?
23 A.   No, they're separate. FFA Is more for high school
24   and 4-H is -- they're different organizations. Future
25   Farmers of America, right.

Page 48

1 Q.   Yeah.
2 A.   So they're different -- they're different. I cannot
3   cite to you exactly how they're different. I just know that
4   they're different organizations.
5 Q.   Yeah.
6 A.   But they pretty much represent the same stuff.
7 Q.   Yeah, I tried to -- every year my firm will get calls
8   from some kid trying to save an animal, because we were
9   successful in getting one out a few years ago from a
10   slaughter house, and -- I've tried at different times to
11   figure out -- it's so -- it's very complicated, the -- all
12   the -- everything governing 4-H and FFA and the relationship
13   with USDA and the relationship with the state. It's -- so
14   that you can't explain. It's fine. I can't explain it.
15      So then in your mind, FFA is more for high school
16   kids?
17 A.   Yeah, you have to be in high school or enrolled in an
18   early FFA program with like parental authority like when
19   you're like in junior high.
20 Q.   Okay.
21 A.   But you can't really show as FFA, but you can be part
22   of like FFA classes or stuff like that.
23 Q.   So do children in 4-H go on to FFA?
24 A.   They can. They can stay -- so they can stay in 4-H
25   all the way through high school, or when they become a

Page 49

1 freshman they can elect to go to FFA.
2 Q.    Okay. All right. All right. So you grew up on a
3 farm -- or a ranch, you said?
4 A.    Well, yeah, property, yeah.
5 Q.    Okay. So you had cattle on your ranch, I presume?
6 A.    Uh-huh.
7 Q.    Okay. What other types of animals do you have?
8 A.    Currently?
9 Q.    Let's say growing up.
10 A.   Okay. Growing up.
11 Q.   Yeah.
12 A.   Cattle, swine, chickens, obviously dogs, cats.
13 Q.   Was the dogs and cats your pets, or the cats like
14 ratters and the dogs were herding or something like that?
15 A.   Yeah. So you're talking like barn cats?
16 Q.   Yeah.
17 A.   Yeah, no, I never owned a cat so -- personally. So I
18 would say they would be like barn cats. And then dogs
19 either personally owned or family pets.
20 Q.   All right. So -- okay. So you raised cattle then
21 growing up and swine.
22       How many heads of cattle do you have?
23 A.   I didn't have. My parents or whatever, roughly 75.
24 And then -- until the drought last year, me and my wife
25 personally owned roughly 25 head.

Page 50

1 Q.    That doesn't seem like a lot, but is it a lot in
2 your --
3 A.    It's not a lot. I'm not a full-time rancher.
4 Q.    Yeah, yeah. I know you have another job. Well, I'm
5 assuming ranching is a full-time job, you know, when
6 people -- because obviously, I have a lot of connections in
7 the animal rights community. When people say that you
8 don't -- you know, farmers say you don't know about animals.
9 I know farmers do know a lot about animals. They're with
10 them all the time. It is a lot of work.
11       We just have domesticated animals in my house and
12 it's a lot of work so -- fostering cats. My wife had a
13 heart attack last night because two kittens we were
14 fostering, they were like five days old, died, so...
15 A.   I'm sorry to hear that.
16 Q.   Yeah, it's okay. Well, they -- you know, a third of
17 the litter dies usually. It's very common. So anyway.
18       All right. So you grew up with livestock and you
19 were in -- you were in 4-H growing up?
20 A.   FFA.
21 Q.   FFA. Okay. I apologize. Okay.
22       Okay. And you said your wife is involved with 4-H
23 and your daughter is involved with 4-H.
24       MR. NORTHCUTT: Objection. Relevance.
25       THE WITNESS: My -- yeah, my children are in 4-H and

Page 51

1 FFA, and my wife also is a community leader.
2 Q.    MR. GORDON: A community leader. Okay. Okay.
3       A community leader -- now, so the way I know that --
4 you know, in this case one of the witnesses, Chad Fouler,
5 he's a community leader. Correct me if I'm wrong.
6 A.    Right.
7 Q.    He's a community leader.
8       So is your wife's role the same as his? Is it
9 community leader?
10 A.   If I could -- the best I can explain it is there's
11 chapters. So like our chapter is West Valley 4-H. She
12 would be the community leader. And then, I think, Chad
13 Fouler is also like the actual leader of that group for
14 goats. So he's the goat leader. So within that group --
15 Q.   There's subdivisions?
16 A.   There's subdivisions, yes, swine, goats, steers,
17 pigs.
18 Q.   Whatever market project the child has. Okay. All
19 right.
20 A.   Yeah.
21 Q.   So is your wife, let's say, a sub leader as you
22 describe, or is she the full-blown head honcho of this
23 group?
24 A.   She's the community leader.
25 Q.   Okay. So she's in charge of all the -- of all the --

Page 52

1 A.    She's in charge of the group.
2 Q.    Of the group. Okay.
3       So she has people -- Chad Fouler's position managing
4 different projects for her?
5 A.    Yeah. So she basically makes sure that everything is
6 reported to her and to the actual 4-H office here in town.
7 Q.    I see. Oh, there's a 4-H office in town.
8 Interesting. All right.
9       Is that common for towns to have a 4-H office?
10 A.   I don't know that.
11 Q.   You don't know that. All right. I'm just curious.
12       How long has the 4-H office been here?
13 A.   I don't know that answer.
14 Q.   Was it here when you were a kid?
15 A.   I don't know. They -- I do know that they were --
16 it's been here since my kids have been doing it.
17 Q.   How long has that been?
18 A.   Six years.
19 Q.   Six years. Okay. All right.
20       How many -- so you said "kids." I assume you have
21 multiple kids in 4-H then?
22 A.   I do.
23 Q.   Okay. All right. It's your kids. I get it.
24       May I -- may I -- how old are your children?
25       MR. NORTHCUTT: Objection. Relevancy. I don't know

Page 53

1  where you're going with this. The kids have nothing to do
2  with this lawsuit.
3  **MR. GORDON:** I mean, relevancy is not technically a
4  proper objection. It's just -- you know.
5  **MR. NORTHCUTT:** Well, I don't -- I don't --
6  **MR. GORDON:** I asked about his relationship with
7  farming and it goes to multiple things in this case.
8  **MR. NORTHCUTT:** I don't his kids' or his wife's
9  involvement in this case is --
10  **MR. GORDON:** Well, I'm going to ask. If you want to
11  instruct him not to answer, we can revisit it later, but I'm
12  going to pose the question.
13  **MR. NORTHCUTT:** Okay. I'm going to instruct him not
14  to answer on this.
15  **MR. GORDON:** On which grounds?
16  **MR. NORTHCUTT:** I'm going to instruct him not to
17  answer on the grounds of relevancy and privacy.
18  **MR. GORDON:** Well, we could put it under the
19  protective order for that -- you know, this portion of his
20  testimony.
21  **MR. NORTHCUTT:** I don't think -- I think -- don't we
22  have to revisit with the court in order to amend or revise
23  the protective order?
24  **MR. GORDON:** Not to -- no, no, no, no, no. Just to
25  declare the testimony -- because it's bilateral. Isn't it?

Page 54

1  So we wouldn't need to amend or revise it. So you have --
2  **MR. NORTHCUTT:** I would have to look at the terms of
3  the protective order to see. I think I may have a copy.
4  **MR. GORDON:** Yeah, do you want to just check because
5  it's -- avoid the problem.
6  **MR. NORTHCUTT:** I just don't understand why it's so
7  important to know either their age or their involvement when
8  it has nothing to do with either Jessica Long, Eliza Long,
9  Cedar the goat. Other than the fact that they participate
10  in 4-H, I just don't --
11  **MR. GORDON:** Well, I'm entitled to know his
12  participation with these organizations that --
13  **MR. NORTHCUTT:** Well, his participation, yes.
14  **MR. GORDON:** Yeah, but That's still family
15  participation.
16  **MR. NORTHCUTT:** Well, I don't see what his family's
17  involvement is in this.
18  **MR. GORDON:** I mean, it doesn't mean it comes into
19  the case, of course, but I'm entitled to do discovery just
20  asking -- I mean, these are pretty benign questions.
21  **MR. NORTHCUTT:** Do you happen to have a copy of that?
22  **MR. GORDON:** I can --
23  **MR. NORTHCUTT:** Wait a second. I'll tell you what.
24  I'll proceed. We'll come back to it later. I'm reserving
25  my rights on it.

Page 55

1  Off the record?
2  **THE VIDEOGRAPHER:** We're on the record.
3  **MR. GORDON:** We're off the record for a moment.
4  **THE VIDEOGRAPHER:** We're off the record and the time
5  is
6  (Off the record.)
7  **THE VIDEOGRAPHER:** We're back on the record the time
8  is 10:49.
9  **MR. GORDON:** I lost -- every time I go to Vegas,
10  unless my friends are with me, I'm not gambling. Down like
11  500 bucks and you just feel nauseous, because I burn that
12  money.
13  Q.   All right. So we're going through some professional,
14  social relationships at the moment. We discussed your kids.
15  We're moving past that. With reservation rights, but moving
16  past that.
17  All right. Do you know a person named Kathi Muse?
18  A.   I do.
19  Q.   Okay. All right. And how long have you known her?
20  A.   I've known of her name for a long time, but I
21  don't -- I've only actually met her and talked to her
22  recently.
23  Q.   Okay. So when was the -- you've known of her name.
24  How did you know of her name for a long time?
25  A.   Just from Muse Trucking. She's a business -- it's a

Page 56

1  business here. And then she's been a big time buyer, or her
2  company's been a buyer at the county fair for years.
3  Q.   A big time buyer of what?
4  A.   I'm sorry. She's been a buyer at the fair of
5  livestock.
6  Q.   I assumed you meant that. Clarifying for the record.
7  Okay. So how -- when you say "big time buyer," what
8  do you mean by that?
9  A.   So she'll buy animals, but she also buys animals for
10  other people that are like absentee.
11  Q.   I see. So big time buyer at the fair. All right.
12  A.   You said it two times. I probably shouldn't have
13  said "big time buyer." She's just a buyer at the fair.
14  Q.   You just mean that she purchases more than other
15  people by some order of magnitude. "Order of magnitude" is
16  probably even a worse word, but by a bit more in your
17  estimation?
18  A.   I would just say that she buys and supports the
19  children by buying multiple animals at the fair.
20  Q.   Okay. Okay. All right. And so you met her --
21  you've known of her for how long?
22  A.   If I really try to dig into that question, I would
23  say I've probably heard of the name since I started going to
24  school, like high school. I went to school with one of her
25  sons.

---

Page 57

1 Q.  Oh, okay.  Were you friends with her son?

2 A.  **Acquaintances.**

3 Q.  Acquaintances.  Okay.

4 A.  **Yeah.**

5 Q.  How many kids were in your class?

6 A.  **A rough estimate would probably -- I think when I**
7 **graduated there was 160.**

8 Q.  Okay.  So normal.  I ask because I had a thousand
9 kids in my graduating class, so I always want to know -- it
10 just gives me an estimate of how well did you actually know
11 your classmates because for me, I did not.

12     So you've heard of her name.

13     Is she married, to your knowledge?

14 A.  **I don't want to guess at that.**

15 Q.  Okay.

16 A.  **I'm positive she's married, but I don't know.  I**
17 **don't know her that well.**

18 Q.  You don't know her that well.  You're not positive
19 she's married.

20 A.  **No.**

21 Q.  Okay.  Okay.  So you don't know if her -- there's no
22 Mr. Muse?

23 A.  **There is a Mr. Muse.  I just don't know if they're**
24 **married.  I don't know.**

25 Q.  Oh.

---

Page 58

1 A.  **So, yeah, I would say she's married.**

2 Q.  Okay.

3 A.  **I mean --**

4     MR. NORTHCUTT: Do you know or are you speculating?

5     THE WITNESS: I'm speculating.  Sorry.

6 Q.  MR. GORDON:  Why do you -- why do you think you know?
7 We'll determined if it's speculation.

8 A.  **Just because when we were in school, I'm pretty sure**
9 **the dad was around and he's still around now, so imagine**
10 **she's married.**

11 Q.  Okay.  Well, that's a good reason.  It doesn't seem
12 like speculation.

13     All right.  So do you still keep in touch with her
14 son?

15 A.  **No.**

16 Q.  No.  You didn't before.  He was an acquaintance.
17     Okay.  All right.  So Muse Trucking you had heard
18 of -- you've heard of that.

19     So you've heard of the name "Muse" in some capacity
20 since high school?

21 A.  **Yes.**

22 Q.  Okay.  But you only met her recently?

23 A.  **Talked to her, yes.**

24 Q.  Talked to her.

25     Did you meet her before and not speak with her?

---

Page 59

1 A.  **I've never -- yeah, prior to what date?**

2 Q.  Well, when did -- okay.  So when did you first talk
3 to her?

4 A.  **During this.**

5 Q.  During this investigation, okay, with Jessica Long?

6     Okay.

7 A.  **Yes.**

8 Q.  And -- so that was the first time you spoke with her?

9     Had you met her beforehand?

10 A.  **I had seen her from a distance, but never interacted**
11 **with her, no.**

12 Q.  Okay.  All right.  Okay.  All right.  So would you --
13 how would you categorize your relationship with her?
14 Social?  Professional?

15 A.  **Professional.**

16 Q.  Professional.  Okay.  All right.

17     So -- and she's a buyer of 4-H, but does she have
18 involvement with 4-H, do you know?

19 A.  **I do not know that.**

20 Q.  You do not know that.  Okay.

21     But she's not a -- she's not a community leader or, I
22 don't know the positions in 4-H, or anything like that?

23 A.  **I don't know if she's a community leader.  I do know**
24 **that she runs it's like a nonprofit, the Friends of the**
25 **Fair.  It's a 4-H FFA community barbecue.**

---

Page 60

1 Q.  Oh, okay.  I've heard of that.  I didn't realize that
2 was her, okay, when I was trying to figure out how to serve
3 the fair, because it's a -- you know, trying to get the
4 Secretary of State address that popped up.

5     MR. NORTHCUTT: Do you know if someone from the fair
6 is going to be on the call here?

7     MR. GORDON: We can go off the record for a moment.

8     THE VIDEOGRAPHER: We're off the record and the time
9 is 10:55.

10     (Off the record.)

11     THE VIDEOGRAPHER: We're back on the record and the
12 time is 10:56.

13 Q.  MR. GORDON: Okay.  All right.  Okay.  So she runs an
14 organization called Friends of the Fair, which to your
15 knowledge is a nonprofit.

16     And it does what?  It facilitates?  Buys?  Do you
17 know what the nonprofit's what its mission is?

18 A.  **So my understanding of it is there's a community**
19 **barbecue.  So some time after the district fair concludes**
20 **and the livestock auction is --**

21 Q.  Annually?

22 A.  **Yes.**

23 Q.  Okay.

24 A.  **There is basically like a drive-through barbecue.**

25 Q.  Okay.

---

Page 61

1 A.   Where you can buy tickets, and you show up and you
2 collect basically barbecue to eat. And then those profits
3 from that barbecue go back to 4-H and FFA clubs, I think,
4 equally within Shasta County.
5 Q.   Okay. All right. So she's got some relationship to
6 4-H, but you're -- to your knowledge she's not a part of
7 4-H, but she helps run a charity that are nonprofit to give
8 funds to 4-H and FFA?
9 A.   To my -- yeah, that's about the extent I know of her
10 involvement in anything. I don't know if she is or isn't
11 involved in 4-H.
12 Q.   Okay. Understood. Okay.
13       So she might be?
14 A.   Right.
15 Q.   But you don't -- you don't think so.
16       All right. And -- all right. So does your -- is
17 your wife friends with Kathi Muse?
18 A.   I would say acquaintances.
19 Q.   Acquaintances. Okay. All right.
20       How long has she known her?
21 A.   Probably since high school as well, showing animals.
22 Q.   Okay. Okay. So she -- so she's known Kathi Muse
23 since high school?
24 A.   Yes.
25 Q.   Obviously, your wife didn't go to high school with

Page 62

1 Kathi Muse, because Kathi Muse, at least from the photo I've
2 seen, she looks significantly older.
3 A.   No, they didn't go to high school together.
4 Q.   Okay. Okay. All right. Yeah. No judgment if your
5 wife is that much older than you. I did not think so.
6       Okay. So your wife has, would you describe, a social
7 relationship with Kathi Muse?
8 A.   No.
9 Q.   No.
10       Is it professional? How would you describe their
11 relationship?
12 A.   I would say professional as a community leader.
13 Q.   So she -- so it's through Kathi Muse's -- whatever
14 word you want to take her relationship with 4-H, whether she
15 facilitates 4-H somehow, gives it money, that's the
16 relationship. It's through --
17 A.   It's through a project, yeah, through 4-H.
18 Q.   Through a -- "through a project." What do you mean?
19 A.   If I can better explain. Probably the only time my
20 wife even talks to Kathi Muse, or several other business
21 owners within the community, would be when my children are
22 going around doing introductions regarding their project and
23 dropping off buyer letters, basically notifying business
24 owners of the upcoming fair.
25 Q.   Come and bid.

Page 63

1 A.   And come and bid on my animal, please. And this is
2 who I am and these are all the great things that I do within
3 my community and that.
4 Q.   Okay. Okay. But -- but Kathi Muse, to your
5 knowledge -- okay.
6 A.   That would be the limit to my wife's scope with Kathi
7 Muse.
8 Q.   Of interacting with her.
9 A.   Yeah, she doesn't -- they don't go out and have
10 drinks together, go have dinners together or anything like
11 that.
12 Q.   She doesn't call her up on the phone, chat her up?
13 A.   Not to my knowledge.
14 Q.   Not to your knowledge. Okay. So it's professional.
15       How often annually does your wife even see Kathi
16 Muse then?
17 A.   At least once a year.
18 Q.   At least once a year. Maybe more? At least once a
19 year.
20 A.   Maybe twice, depending on, yeah, what -- what their
21 schedule is.
22 Q.   Is it always in relation to the fair?
23 A.   Yes.
24 Q.   Okay. Any instances where it wasn't in relation to
25 the fair?

Page 64

1 A.   Not that I can recall.
2 Q.   Not that you can recall. Okay. All right.
3       And this has -- so how -- I'm not going to ask
4 questions about your kids at the moment, but how long has
5 your wife been a community leader for 4-H?
6 A.   This will be her third year.
7 Q.   Third year.
8       So has her relationship -- so is -- has she had --
9 the relationship you're describing with Kathi Muse, that's
10 existed that entire -- those entire three years?
11 A.   Yes.
12 Q.   Okay. And was there any relationship predating that?
13 Well, you said she knew her since high school.
14 A.   Right.
15 Q.   Okay. Did she work with Kathi Muse or anything like
16 that after that?
17 A.   No. She was an exhibitor, like myself, so she would
18 go in and basically sell her project -- or try to sell her
19 project to Kathi Muse.
20 Q.   I see. I see. Okay.
21       So when your wife was participating in 4-H as an
22 exhibitor --
23 A.   Right.
24 Q.   -- she would try to sell to Kathi Muse.
25       And did you ever try when you were an exhibitor ever

Page 65

1  try to sell to Kathi Muse?
2  A.    No.
3  Q.    No. Okay. All right.
4        Is there a set -- for exhibitors do they generally
5  have like a set group of people that they go give buyer
6  letters to every year, or is it wherever you wind up, you
7  just give someone a letter?
8  A.    Correct. The more ground you cover --
9  Q.    Yeah.
10 A.    -- the more successful you're going to be.
11 Q.    I see.
12 A.    So some people handwrite letters or type letters and
13 just mail them. They don't even go sit down or --
14 Q.    Yeah.
15 A.    Right. And it all depends on the business owner.
16 Are they in the office or not in the office. Maybe you're
17 just talking to a -- maybe you're just talking to a manager
18 of the company.
19 Q.    Yeah.
20 A.    So that would be the relation there.
21 Q.    Okay. All right. But -- okay. Do exhibitors --
22 okay. All right. That's fine.
23       So exhibitors, they go around, they hand the buyer a
24 letter and your wife met Kathi Muse in that capacity.
25       Did she frequent Kathi Muse as a potential buyer

Page 66

1  because Kathi Muse was a big time buyer?
2  A.    I would say that my wife, yes.
3  Q.    Okay. So in town you want to sell, you go to Kathi.
4  A.    Yeah, that's one of them, yeah.
5  Q.    One of them.
6        There's a few others?
7  A.    Yeah.
8  Q.    All right. I don't know their names.
9  A.    Yeah, it's -- the community here is pretty -- they're
10 really good --
11 Q.    Yeah.
12 A.    -- for the kids, yeah.
13 Q.    Okay. All right. All right. So do you know a
14 person named Bruce Macfarlane?
15 A.    I do.
16 Q.    Okay. All right. And how long have you known Bruce
17 Macfarlane?
18 A.    I've known Mr. Macfarlane roughly -- I'm trying to
19 think of how long my -- one of my children's been doing
20 it -- five years, six years.
21 Q.    Five or six years. Okay.
22       And how did you meet him?
23 A.    Through a project that my daughter was doing.
24 Q.    Okay. All right.
25       And this was -- was Bruce Macfarlane involved in 4-H

Page 67

1  at the time?
2  A.    He was -- I don't think he was involved in 4-H, but
3  he was --
4  Q.    Or FFA?
5  A.    So how I came to know him was through going to the
6  fair and he was the barn manager for the steer barn.
7  Q.    Okay. So your daughter had a project, I assume it
8  was a steer, and he was --
9  A.    He was in charge of the steer barn.
10 Q.    The steer barn. Okay.
11       And this is only because, of course, I Googled his
12 name at some point, but was he the CEO at the fair at some
13 point in time?
14 A.    Yes.
15 Q.    Okay. Is that before you met him?
16 A.    No, that was after.
17 Q.    After he became.
18       So at first you met him he was a barn manager --
19 A.    Correct.
20 Q.    -- to your understanding?
21 A.    Correct.
22 Q.    And then he became the CEO. Okay.
23       So you met him five or six years ago through your
24 daughter's involvement in 4-H.
25       So -- do you ever -- okay. And have you

Page 68

1  maintained -- so you met him. Do you -- that was in
2  relation to the annual fair that year. Yes?
3  A.    Meeting him?
4  Q.    Yeah.
5  A.    Yeah.
6  Q.    Like she was there with -- her project was in
7  relation to the auction at the fair that year?
8  A.    Yes.
9  Q.    Okay. So did you -- do you speak -- and do you see
10 him or speak with him every annual fair thereafter?
11 A.    That he was there? Yes.
12 Q.    Yeah. Okay. All right.
13       And did you ever talk with him socially?
14 A.    Yes.
15 Q.    Is he -- is he a friend?
16 A.    He's an acquaintance.
17 Q.    He's an acquaintance.
18       Do you ever go out to dinner with him or anything
19 like that?
20 A.    No.
21 Q.    Grab a beer?
22 A.    I'm trying to think if I've had a beer with him.
23 Q.    Or a Scotch or whiskey, whatever it is.
24 A.    No, I don't think, because the only time I've really
25 seen him has either been, which you'll probably get to, but

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 69

1  no.
2  Q.   Yeah.  Okay.  All right.  So you don't think you ever
3  went out -- have you ever gone out socially with him for
4  anything?
5  A.   No.  I've only seen him in sporting events.
6  Q.   Sporting events.
7        So what sporting events?
8  A.   So without -- I'm doing this, but I don't think we're
9  going to go into it because we already covered this.  But
10  it's a small town, so his daughter and my daughter were on
11  the same high school basketball team.
12  Q.   Okay.
13  A.   So, obviously, we would be at sporting events.  If he
14  was there and I was there, we'd say hi, maybe talk about
15  life.
16  Q.   Life.  Gotcha.  All right.
17  A.   But as far as going and having dinners or going out
18  to have drinks, no.
19  Q.   Okay.  Gotcha.  All right.
20  A.   I don't even do that in my professional life with
21  people from work.
22  Q.   Oh, okay.  All right.  Is there a reason for that or
23  just --
24  A.   Yeah.  I try to keep -- try to keep it professional,
25  especially being a station commander.

Page 70

1  Q.   Yeah, that's true.  You're in charge now.  I guess
2  you can't look like you're playing favorites or anything
3  like that.  That makes -- that makes sense.
4        All right.  So you've known Bruce Macfarlane five or
5  six years.  You see him at school activities sometimes when
6  there's a -- the, you know, intersection being your daughter
7  and his daughter that are on the same sporting events, and
8  you consider him an acquaintance.
9        And do you -- when was the last time you spoke with
10  him?
11  A.   The last time I spoke to him was at some point during
12  all this.  He had received some paperwork.  It was shortly
13  after I had received paperwork as well, as far as I believe
14  it was -- I forget the term of it.
15  Q.   Service process?
16  A.   Yeah, probably, and retaining all documents and all
17  that kind of stuff at that point.  So he had called me kind
18  of in a panic.  And I said hey, I can't talk to you really
19  about this.  You probably need to seek legal counsel to be
20  fair.
21  Q.   Yeah, yeah.  I believe the DOJ's representing him.
22        Okay.  All right.  So the last time you spoke to --
23  so that would have been -- when was he named in the
24  complaint.
25  A.   It would have been earlier this year, I would have

Page 71

1  thought.
2  Q.   Yeah, I think it was around -- it wasn't August when
3  you were first named in the Complaint?
4  A.   No, it was months and months after that.
5  Q.   It was like December or something like that.  Yeah,
6  because we had to go through the Government Claims Act
7  procedure.  We couldn't name him right away.
8        Okay.  All right.  So -- and that was the last time
9  you spoke with him?
10  A.   Yes.
11  Q.   Okay.  All right.  And when was the last time you
12  spoke with Kathi Muse?
13  A.   The beginning of July of last year, right about the
14  time we were figuring out where the goat was and going and
15  collecting the goat.  I take that back.
16  Q.   Which one?
17  A.   I last talked with her and saw her was at the fair
18  this year.
19  Q.   Oh, okay.  All right.  Okay.  So you spoke with Kathi
20  at the fair this year.
21  A.   Correct, in 2023.
22  Q.   Did you speak about this case?
23  A.   No, I did not.
24  Q.   So she did?
25  A.   I think maybe she was trying to bring it up, but I

Page 72

1  said "Look, it is what it is.  We'll have our day in court,"
2  or whatever.
3  Q.   What did she say?
4  A.   I can't recall.
5  Q.   Okay.  Was she -- did she ask how it went or how it's
6  going?
7        MR. NORTHCUTT:  Objection.  Asked and answered.
8  Q.   MR. GORDON:  Did she seem upset about it?
9  A.   You know, it's -- I don't know if she was upset about
10  it.  I would say in the beginning she was like "Look, I have
11  attorneys.  I'll take this all the way to court."
12  Q.   Yeah.
13  A.   So that's -- I mean, I don't speculate on how she
14  feels or what she felt.
15  Q.   Okay.
16  A.   We said hi.  I think she -- I don't want to speculate
17  on what she said, but I know she's like "Hey, you know, it's
18  crazy you have to go through this."
19        And I said "Look, it's fine."
20  Q.   Yeah.  So you cut her off -- you were trying to cut
21  off the conversation basically?
22  A.   Yeah.  I may have said hi or whatever.  I mean, I
23  still live in this community and plan on living here until I
24  retire.  So people need to understand work and business and
25  professionalism.  And I can still have a conversation with

---

Page 73

1  someone, but as long as we're not talking about it, I can do
2  that.
3  Q.    Understood.
4        So how long was your interaction with her, would you
5  say?
6  A.    **Oh, roughly, I don't know, two to five minutes.**
7  Q.    Two to five minutes. All right.
8        So you basically just shut down the discussion about
9  the case?
10 A.    **Yes.**
11 Q.    Okay. All right. Okay. All right. What is your --
12 so Bruce Macfarlane was the CEO and he's not the CEO now.
13 Melanie Silva is. Correct?
14 A.    **Correct.**
15 Q.    And what is your relationship with Melanie Silva?
16 A.    **Strictly professional involving this case.**
17 Q.    Yeah, okay. How long have you known her?
18 A.    **Since this case began.**
19 Q.    Okay. Did she work for the fair before this case?
20 A.    **I do not know that.**
21 Q.    You don't know that. Okay. All right.
22       You don't know if she's -- do you know if she's from
23 Shasta?
24 A.    **I don't know that either.**
25 Q.    You don't know that either. Okay. So she just

---

Page 74

1  appeared out of the blue.
2        Did -- okay. Do you know if she was on the board
3  beforehand for the fair?
4  A.    **I don't know that, sir.**
5  Q.    Okay. All right. Do you -- okay. So the first time
6  you met her was -- so it would have been like June and July
7  of 2022?
8  A.    **Yeah, at the end of June, beginning of July of '22,**
9  **right after this fair.**
10 Q.    Okay. Gotcha. All right. Okay.
11       Do you -- so there's a -- the fair is a Board of
12 Directors. Are you -- actually strike that.
13       Are you familiar -- do you know how a corporate
14 structure works?
15 A.    **Yes.**
16 Q.    Okay. So there's -- that wasn't meant to sound
17 offensive.
18 A.    **No, no.**
19 Q.    There's the Board of Directors. Then there's
20 officers like the CEO and whatever, treasurer, secretary,
21 maybe some other officers that are named. So she's the CEO.
22       Do you know any of the -- do you have a relationship
23 with any -- are you aware of any of the other officers for
24 the fair? Like a treasurer or a vice president?
25 A.    **There is -- I don't know if he still is though an**

---

Page 75

1  **RPD, a former RPD officer.**
2  Q.    What's an -- oh, Redding Police Department?
3  A.    **Yeah, Redding Police Department officer. I can't**
4  **remember his first name. Last name was Lomas. I think he**
5  **was part of the board.**
6  Q.    Okay. Is he still?
7  A.    **I don't know if he is. I don't think he is.**
8  Q.    Okay. So of the people that are employed by the
9  fair, who do you know besides Melanie Silva and, I guess,
10 Bruce?
11 A.    **Nobody.**
12 Q.    Nobody. Just those two. All right. None of the --
13 do they -- okay. That's fine. All right.
14       So of the Board of Directors, aside from Lomas, do
15 you know anyone else who is currently or formerly on the
16 Board of Directors?
17 A.    **I was talking to one of them during weigh-ins.**
18 Q.    weigh-ins. Oh, for the --
19 A.    **Weigh-in for animals.**
20 Q.    I wrestled for so long, weigh-ins.
21 A.    **No, I can't -- I don't know his name now. He was an**
22 **old timer. He was previously on the board. So to answer**
23 **that question. But I don't know his name.**
24 Q.    You don't know the person's name?
25 A.    **No.**

---

Page 76

1  Q.    Okay. All right. So you don't know who currently
2  sits on the board then?
3  A.    **No, I do not.**
4  Q.    Okay. All right. Okay. So did you know -- before
5  the incident with Ms. Long, did you know Jessica Long prior
6  to that?
7  A.    **No, I did not.**
8  Q.    Okay. Did you know her daughter prior to that?
9  A.    **No, sir.**
10 Q.    Okay. All right. Do -- does her daughter have a --
11 does her daughter have a relationship with any of your kids?
12 Do they know each other?
13 A.    **No, not to my knowledge, no.**
14 Q.    Okay. All right. And -- okay.
15       Can we go on a break for a moment? I do need to use
16 the restroom again.
17       **THE VIDEOGRAPHER:** We're off the record and the time
18 is 11:14.
19       (Off the record.)
20       **THE VIDEOGRAPHER:** We're back on the record and the
21 time is 11:26. We've got about 37 minutes until we got to
22 change media.
23       **MR. GORDON:** Okay. How much time will have gone
24 past? Two hours?
25       **THE VIDEOGRAPHER:** An hour and 19 minutes.

---

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 22 of 116

LONG vs.
FERNANDEZ
LIEUTENANT JERRY FERNANDEZ
August 21, 2023

---

**Page 77**

1    MR. GORDON: Hour and 19 minutes. All right. Just
2  trying to get a gauge on the time here.
3  Q.   Okay. So when we left off, Lieutenant, you said that
4  you did not know Jessica Long before the events of --
5  leading up to this case. Correct?
6  A.   Yes, sir.
7  Q.   Nor did you know her daughter E.L. Of course, you
8  know the daughter's name, but for the lawsuit we need to use
9  the abbreviation.
10    Okay. So when did you first learn of Jessica
11  removing Cedar from the -- when I say "the fair," I mean the
12  2022 Shasta County District Fair.
13  A.   I first learned about it when -- I want to say it was
14  either the very end of June or beginning of July.
15  Q.   And who told you?
16  A.   I was -- the Sheriff, Michael Johnson, told me that I
17  needed to reach out to the fair or people from the fair in
18  regards to a theft of a goat.
19  Q.   Okay. Michael Johnson. You said the Sheriff.
20    So he's the elected Sheriff?
21  A.   He is the elected Sheriff, yes.
22  Q.   Okay. Do you know who told him?
23  A.   I do not.
24  Q.   Okay. Did you ask?
25  A.   I did not.

---

**Page 78**

1  Q.   Okay. All right. And this is end of July -- no, I'm
2  sorry. I apologize -- end of June, beginning of July?
3  A.   Yes, sir.
4  Q.   Okay. Thank you. Okay. So did he give you any --
5  what other details did Michael Johnson give you? Sheriff
6  Johnson. I'm not trying to be disrespectful. Whatever the
7  proper term is.
8  A.   Sheriff Johnson.
9  Q.   Sheriff Johnson.
10    Is that what you call him? Sheriff Johnson?
11  A.   Yes, Sheriff. Just that the goat was stolen and that
12  because of my collateral assignment as a livestock
13  investigator, that I needed to reach out to the people from
14  the fair and basically conduct an investigation.
15  Q.   Okay. So I didn't ask you this earlier, so I'm sorry
16  to bounce back chronologically. Your collateral assignment
17  is a livestock investigator.
18    What are your other current assignments?
19  A.   So my current assignment is I'm a Station Commander
20  for the Sheriff's Office, the South County Station.
21  Q.   Okay.
22  A.   So I oversee that station.
23  Q.   Okay. How many stations are there in Shasta?
24  A.   Three stations.
25  Q.   Which ones? Like South, North and West or something?

---

**Page 79**

1  A.   So there's the South County Station, which I'm in
2  charge of, there's the Burney Station and then there's the
3  City of Shasta Lake Station.
4  Q.   Okay. Gotcha.
5    So what other types of -- so you're a livestock
6  investigator.
7    What other types -- what other types of crimes do you
8  investigate? Just anything?
9  A.   Yeah, any crimes. I mean, as a Lieutenant, I'm not
10  really out responding to calls for service anymore.
11  Q.   Okay.
12  A.   But at that time I was still the only livestock
13  Investigator for the county.
14  Q.   Okay. Okay. So ordinarily you no longer respond to
15  crimes for -- except as livestock investigator?
16  A.   Correct.
17  Q.   Okay. Okay. Now, you said "ordinarily."
18    Do you occasionally still?
19  A.   Yes. I mean, if I'm -- I'm still a sworn peace
20  officer within the State of California. So if I -- right
21  now if someone was trying to hurt us, I would take action
22  and conduct that investigation.
23  Q.   Yeah. Okay. All right. Okay. So for your -- I
24  know you said you don't -- when you do investigate a crime,
25  do you do the full investigation or do you do a hand-off to

---

**Page 80**

1  one of your subordinates to take over?
2  A.   So currently.
3  Q.   Yeah.
4  A.   If it's something that -- you know, it's something
5  that I -- it depends on the crime.
6  Q.   Okay.
7  A.   Or it depends on the amount of time it's going to
8  take.
9  Q.   Okay.
10  A.   But in regards to like livestock, I would take the
11  whole thing. So they would be handing off the investigation
12  to me.
13  Q.   Are there any -- and I won't ask you about details
14  about who was in it because you can't talk about it.
15    Are there any crimes you are currently investigating
16  by yourself?
17  A.   No.
18  Q.   No. Okay. All right.
19    Were there other ones at the time of June and July of
20  last year, were there crimes you were investigating by
21  yourself?
22  A.   Not that I can recall, no.
23  Q.   Okay. Would it -- would it be written down anywhere
24  if there was -- would there be a record of it somewhere,
25  like your notes or something, that you were investigating

---

Page 81

1  other crimes at the time?
2  A.    There may be like -- like in our case management
3  there may be something that shows up, like our -- it's like
4  our records management system. There may be something out
5  of that, may say that there's open cases or something like
6  that. But at the time I don't recall investigating any
7  other crimes.
8  Q.    You were -- you were just delegating? Is that how
9  you would describe?
10 A.    I wouldn't even say delegating, right. So I'm in
11 charge of operations as far as, you know, my budget, making
12 sure my sergeant's -- the main focal point of like
13 responding and investigating crimes is going to fall on my
14 deputy sheriffs that fall within in my station.
15 Q.    Okay. All right. Are you -- are you at full staff?
16 A.    We're not at full staff, and we are getting there.
17 Q.    Getting there. Okay. All right.
18        Is -- I see in the news sometimes a lack of staffing,
19 but it's usually in relation to the jail.
20        Is that -- is that -- do you know what I'm talking
21 about?
22 A.    Yeah.
23 Q.    Yeah, okay. Is that -- are the jail sheriff's
24 separate from your -- like your department?
25 A.    So they're the same department, same office, but they

Page 82

1  are -- yes, they're correctional officers and then there's
2  deputy sheriffs. So correctional officers are not --
3  they're not -- they're sworn, but they're on duty. They're
4  not -- they don't have the same peace officer powers as we
5  do when we're off duty.
6  Q.    I see. Okay. So is it the correctional officers
7  then that are understaffed, to your knowledge.
8  A.    Yeah, I think -- yes.
9        MR. NORTHCUTT: Objection. Vague and ambiguous.
10       Are you talking about here in Shasta County?
11 Q.    MR. GORDON: Yes, yes. Yeah, yeah. You know better
12 than me. There's -- you just see it in the paper a lot, you
13 know, the understaffing, but it's usually in relation to
14 correctional officers. So I don't know if that has any
15 relationship to his division or whatever the...
16 A.    Yeah, we're not at full staffing.
17 Q.    You're not a full staff either. Okay. All right.
18 A.    No.
19 Q.    How -- how many sheriff's are absent or not -- what
20 would it take to be a full staff? How many more sheriffs?
21 A.    Roughly, I think, we have four positions available
22 still to fill.
23 Q.    Okay. All right. And what would that bring the
24 total to, if you know?
25 A.    Roughly, I think, it's 70 or 65 sworn deputies.

Page 83

1  Q.    Okay. Okay.
2  A.    Somewhere around there.
3  Q.    You don't need to do the math.
4  A.    I'm not good at math. I always joke about that.
5  Q.    All right. So Sheriff Johnson tells you to go
6  investigate this. And you don't know who told -- do you
7  know when he learned of this?
8  A.    It was the same time that I conducted the -- or began
9  the investigation. So that was the same time frame, end of
10 June, beginning of July.
11 Q.    Okay. And what narrative or facts did he tell you?
12 A.    Just that the -- that the goat had been stolen and to
13 reach out to whoever I know at the fair to basically
14 conduct -- start the investigation.
15 Q.    Okay. All right. Do you know -- did he cite any
16 Penal Code when he said that?
17 A.    No.
18 Q.    And did he tell you anything about Jessica Long in
19 that conversation?
20 A.    No.
21 Q.    No.
22        Anything about her daughter?
23 A.    No.
24 Q.    Okay. Did he say it was in relationship to the
25 livestock auction at the fair.

Page 84

1  A.    It had to with -- I don't recall if he said that or
2  not.
3  Q.    Okay. Did you assume that?
4  A.    Yeah, because it's an exhibitor and it was stolen
5  from the fair, so I assumed it was --
6  Q.    Oh, I thought you said he didn't say it was an
7  exhibitor or --
8  A.    No, it had to with a goat, so I assumed it was to do
9  with an exhibitor.
10 Q.    Oh, okay. You hear "goat." You say well, that must
11 be an exhibitor. Okay. I understand. All right. Okay.
12        And this was end of June, beginning of July.
13        What were -- what was the first step you took in
14 investigating this alleged removal?
15 A.    I contacted Mr. Macfarlane.
16 Q.    Okay. Did you already have his number?
17 A.    Yes.
18 Q.    Okay. So you -- did you -- you had it personally
19 already?
20 A.    Well, I had it -- I had his phone number, yes.
21 Q.    You had his phone number. Okay. All right.
22        And how did you acquire his phone number?
23 A.    Through just knowing him.
24 Q.    Okay. All right. Had you ever called him before on
25 the phone?

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 85

1 A.   Prior to that?
2 Q.   Yeah.
3 A.   I think, yes.
4 Q.   Okay.  For what?
5 A.   It probably had to do with like my -- I know one time
6   we had called him.  It was because my -- one of our steers,
7   our show steers, had bloated.
8 Q.   Okay.
9 A.   So I'm not a vet.  He had been around show cattle
10   longer than me, so he happened to actually come over to the
11   house to help us with the bloated animal.
12 Q.   Oh, okay.  Free of charge?
13 A.   Yeah.
14 Q.   Okay.  All right.  Is he a vet or anything, you know,
15   or just experienced with cattle?
16 A.   I don't know if he's a vet.  He doesn't work as a
17   vet, so I think just prior experience with cattle.
18 Q.   Okay.  All right.  Okay.  So he came over to help you
19   with one of your injured cattle.  Okay.
20       And you didn't have a beer with him after that?
21 A.   No.
22 Q.   No.  Okay.  He just came and left?
23 A.   Yes.
24 Q.   Okay.  All right.  All right.  And you didn't -- did
25   you pay him for his assistance?

Page 86

1 A.   No.
2 Q.   No.
3       He was just being kind?
4 A.   Yes.
5 Q.   Okay.  What happened to the animal?
6 A.   It survived.
7 Q.   It survived?
8 A.   Yeah.
9 Q.   Okay.  So you had Bruce -- and when abouts was that?
10 A.   What part?
11 Q.   When did he come over to help the animal?
12 A.   I want to say that was like four or five years ago.
13   It was probably about the time that first year, I think, I
14   met him.
15 Q.   Okay.  Okay.  And did you have his phone number at
16   that time?
17 A.   At that time, yes.  That's -- I think my wife had it.
18   I think either her or I called him.
19 Q.   Okay.  Did your wife have a relationship with Bruce
20   Macfarlane also?
21 A.   Same as mine.
22 Q.   Same as yours?
23 A.   Yeah.
24 Q.   So she's only known him for five or six years?
25 A.   Yes.

Page 87

1 Q.   All right.  And basically through school activities
2   that might have involved both your children?
3 A.   Yes.
4 Q.   Okay.  All right.  Okay.  Does -- does Bruce have
5   children?
6 A.   Yes.
7 Q.   Yes.  Okay.  All right.
8       Are they involved in 4-H also or FFA?
9 A.   They're -- no, I don't -- I think they show
10   independent.
11 Q.   Independently.
12       So they go around to other non 4-H auctions and show?
13 A.   No, they show at the fair, but they're independent.
14   So you can show 4-H, FFA or independent.
15 Q.   Okay.  I remember seeing something like that in the
16   rules.
17       So you called Bruce Macfarlane.  You already had his
18   number.  And he was the first person you called?
19 A.   Back then?
20 Q.   No, no, for the investigation.
21 A.   Yes.  So we're back on the investigation.
22 Q.   It's like a movie.  We're jumping through different
23   times.  My apologies.  If you get confused, tell me.
24       So he was the first person you called.
25       And do you remember what day you called him?

Page 88

1 A.   I can't remember.  I'd have to refer to a report as
2   far as when I actually called him.
3 Q.   Okay.  We'll get to that.  I think I know the report
4   you're referring to.  I just want to see what you recall.
5       Do you remember what he told you when you spoke with
6   him?
7 A.   I recall him saying that they were -- the day of the
8   sale, which was June 25th of 2022, they were loading up the
9   animals that were auctioned at the sale that day, and it was
10   roughly like 10:00 or 10:30 in the evening they had learned
11   that they were missing a goat.  And then through the course
12   of that conversation, he had reached out to the community
13   leader, Chad Fowler, who advised that the goat that was
14   missing belonged to E.L. and Jessica Long and that he
15   suspected that the mom must have stolen the goat.
16 Q.   Okay.  That Fouler suspected it?
17 A.   Right.  And that obviously now Mr. Macfarlane was
18   suspecting that she had stolen the goat.  Obviously, the
19   goat was stolen off of the property or missing from the
20   property.  It was missing from the property.
21 Q.   Yeah.  Okay.  All right.  All right.  All right.
22   Okay.  Anything else?
23 A.   Yeah.  We had talked about he had mentioned that --
24   because by this time there was already communication between
25   Ms. Long and the fair via email.  So he told me about an

Page 89

1  email. She admitted to stealing -- or stealing the goat.
2  Q.    Removing. But it's fine.
3  A.    In the email she admits to taking the goat from the
4  fair and that was basically trying to see if the fair would
5  allow them to keep the goat or come up with some other
6  option. He had told me that they had responded and said no,
7  that the goat, right, based on rules and everything else and
8  the law, needed to be returned immediately. Obviously, she
9  didn't, which is why then law enforcement was notified.
10      So at that point that was my recollection of that
11  conversation. I asked him to please provide me with any
12  documentations from the fair and any documentations that
13  Ms. Long had sent them.
14  Q.    Okay.
15  A.    Which he did later that -- within a day or two or
16  that same day. I can't remember.
17  Q.    What -- what did he provide you?
18  A.    He provided me with a -- so there was the email from
19  Ms. Long, the initial email from Ms. Long.
20  Q.    The long one. Not in her last name, but it's fairly
21  lengthy.
22  A.    Yes. So a lengthy one where she -- so he provided me
23  with that first email.
24  Q.    Okay.
25  A.    He provided me with Ms. Silva's response to that

Page 90

1  email.
2  Q.    Okay.
3  A.    He provided me with the liability, accountability
4  waiver information as well as the online registration form
5  that was completed by Ms. Long.
6  Q.    Okay.
7  A.    And then he provided me with the bill of sale from
8  the auction.
9  Q.    When you say "bill of sale," do you mean the --
10  A.    The sale invoice.
11  Q.    -- sales invoice on top?
12  A.    Yeah, the sales invoice.
13  Q.    All right.
14  A.    Excuse me.
15  Q.    Do you want to get some water?
16  A.    No. I probably should have ate breakfast this
17  morning.
18  Q.    I never eat breakfast.
19  A.    It's hard sometimes.
20  Q.    I do that time-restricted eating thing.
21  A.    Oh, yeah. You're on that.
22  Q.    A few years, yeah. You get -- you actually -- it's
23  not effective after a certain point because you get used to
24  just not eating and then it -- you want to like shock your
25  body. So I'm supposed to be uncomfortable, but I -- I'll go

Page 91

1  to like 3:00 everyday and I'll eat. And then I'll pig out.
2  But anyway, yeah. We will break for a lunch break at some
3  point in time.
4      All right. So again, just to recap, he gave you the
5  initial email where Jessica says -- I'll show you the one I
6  believe it is in a moment.
7      But he gave you the initial email, Melanie Silva's
8  response, liability accountability waiver, online
9  registration form and a sales invoice.
10      Did he give you another -- any other emails for
11  Jessica Long?
12  A.    There was a second email. And I don't -- I'm not
13  positive he actually provided them or -- I'd have to look at
14  that report if we get to it.
15  Q.    Okay.
16  A.    Either he sent them or Silva sent them.
17  Q.    Okay. One of them --
18  A.    There was another email that Ms. Long had generated
19  after her response of you need to return it immediately.
20  Q.    With the letter attached. Correct?
21  A.    It was like written as a letter.
22  Q.    Yes. I've seen the attachment to the email. The
23  content of the second email was not in the email itself. It
24  was in an attachment to it.
25  A.    I don't know about that. I just -- I had it printed

Page 92

1  off.
2  Q.    Okay. Fair enough. All right.
3      So either Silva or Macfarlane gave it to you, gave
4  you those documents?
5  A.    Correct.
6  Q.    Okay. And -- all right. So they gave you those
7  documents and what did you do next?
8  A.    So I, obviously, I perused through those documents.
9  Q.    And this is still the same day when they --
10  A.    I wouldn't say the same day. At some point after I
11  received them, I started going through the documents.
12  Q.    Yeah.
13  A.    I can't say if it was the same day. Obviously, I
14  read them.
15  Q.    About the same day?
16  A.    Yeah, same time frame.
17  Q.    Okay. All right.
18  A.    So I reviewed the documentation that I received.
19  Q.    Okay.
20  A.    And then I also went online and pulled the fair
21  rules, the handbook for the fair, and basically put all that
22  together and then documented, based on everything, my
23  investigation.
24  Q.    And your conclusion?
25  A.    Yeah, and my conclusion.

Page 93

1 Q.    Okay all right.  Okay.  So -- okay.  All right.
2 Let's get into the documents here.  Help you to dissent.
3 Correct?
4 A.    Yeah, it's been a while.
5 Q.    Well, I'm sure you're muted for the day, but --
6 A.    Hey, I'm not Rain Man.  I can't.
7 Q.    You can't do that?
8 A.    I don't remember everything.
9 Q.    All right.  Oh, before we do that, have you seen this
10 document before?  I should have done this in the inception.
11 A.    Yes, in regards to being here today for the
12 deposition.
13 Q.    Yeah, yeah.  Okay.  So you're understanding you're
14 here for the deposition in relation to this -- in response
15 to this document.
16        So, Madam Court Reporter, I'm marking this Exhibit A.
17        (Exhibit A was marked.)
18        MR. GORDON: I have another one.  I'll give that to
19 the Court Reporter when it's done.  Hold on one moment.
20        Damian, here's your copy as well.
21        MR. NORTHCUTT: I know what he's looking at.  That's
22 fine.
23        MR. GORDON: You're okay?
24        MR. NORTHCUTT: Yeah, that's fine.
25        You're going to put me to shame on Thursday because I

Page 94

1 only have one copy.
2        MR. GORDON: Yeah, I -- no, getting through --
3        MR. NORTHCUTT: Printing them.
4        MR. GORDON: Yeah, printing them is a pain in the
5 ass.  Sorry.  Shouldn't curse on the record.
6        (Exhibit B was marked.)
7 Q.    MR. GORDON: Lieutenant Fernandez, you see where it
8 says page whatever number of 11, is that only 11 pages or
9 are there other documents that should be attached to that?
10 Because your -- your production -- you produced that in this
11 case.  Do you recall?
12 A.    Yes.
13 Q.    Okay.  So are there any other documents that should
14 be attached to that?  Because -- because that is -- I have
15 all the pages in there of 1 to 11.  I just don't know if
16 that document is complete of itself or if there should be
17 other documents attached to it.
18 A.    This is just the written narratives of the
19 investigation.
20 Q.    Sure.  But -- so would you say that document is
21 complete.  It says page 1 to 11.  I have all 11 pages?
22 A.    Yes.
23 Q.    There's not -- even if it references other things,
24 they are not --
25 A.    Correct.

Page 95

1 Q.    -- attached to that?  Okay.  Okay.  All right.
2 A.    Yes, there's 1 through 11.  There's 11 pages.
3 Q.    But, you know, you reference other things in there.
4 I didn't know if you were to print it out from your system
5 at work, if perhaps it generates other documents with it or
6 what.
7        But in your estimation, that is a complete document?
8 A.    Right, minus attachments to this case.
9 Q.    That's what I'm asking.  Are there attachments to
10 that document?
11 A.    Yes, there should be.
12 Q.    What are they?
13 A.    So that would be the things that I just talked about,
14 like the emails.
15 Q.    Okay.  Well, that wasn't produced with an attached.
16 That's why I'm confused.  So -- okay.
17 A.    Yeah, because it's the -- I'm not a computer expert,
18 but -- so when you print this, this is like the -- through
19 our records management system.  This would be the actual
20 written narratives and then you would have to print the
21 other evidence or the other attachments.
22 Q.    So if someone goes and requests that document, do
23 they get the attachments with it or does just that generate?
24 A.    Records.  It's a records question.  If they are
25 legally allowed to have everything, they should be releasing

Page 96

1 with -- in regards to that case, like the attachments,
2 evidence.
3 Q.    Okay.  Okay.  All right.  Okay.  But for the sake of
4 just the page 1 to 11, you would say that is complete?
5 A.    This is complete in regards to the narratives, yes.
6 Q.    Okay.  All right.  So we'll -- Exhibit A will be
7 the -- or Exhibit B, rather, which I will stamp that Exhibit
8 B, will be the narratives.
9        But just so I'm clear, the -- so, for example, on
10 here you reference the invoice, the entry form, those things
11 should be included with this?  Maybe this isn't complete in
12 itself.
13 A.    So those would be attachments.
14 Q.    They would be attachments to it.
15        MR. NORTHCUTT: Can I ask a question?
16        MR. GORDON: Yeah, sure.
17        MR. NORTHCUTT: So we produced the same document.
18        MR. GORDON: Yeah.
19        MR. NORTHCUTT: The 1 through 11.  But then there's
20 all this stuff behind it.  So there's --
21        MR. GORDON: Is all that attached?
22        MR. NORTHCUTT: Attachment B and the copy, is that
23 all attached?
24        MR. GORDON: Yeah.  Off the record for one second.
25        THE VIDEOGRAPHER: We're off the record and the time

Page 97

1  is 11:50.
2      (Off the record.)
3      THE VIDEOGRAPHER: We're back on the record and the
4  time is 11:59.
5  Q.   MR. GORDON: Lieutenant Fernandez, you now have a
6  document in front of you which we have labeled Exhibit B
7  which is complete.
8      And what would the name of that document package be?
9  What should we call that for shorthand?
10 A.   It would be the criminal investigation in regards to
11 this case or the report.
12 Q.   The report. Okay. Like the report of a criminal
13 investigation?
14 A.   I believe so.
15 Q.   Is there a shorthand they use for that in your -- in
16 your office?
17 A.   It's just report.
18 Q.   It's just report?
19 A.   Yeah.
20 Q.   When we call it a report, we'll know we're talking
21 about that document and everything in there.
22     MR. NORTHCUTT: Can we get the Bates numbers read?
23     MR. GORDON: Yes. That's a good idea. So it is
24 Bates stamped F -- FERN, F-E-R-N, 00001 to No. 68. And I
25 know you can't see 68 on there, Officer Fernandez because

Page 98

1  it's probably blacked out on the photos, but your counsel
2  can confirm, if you would, Damian, that the subsequent page
3  is page 69 -- or sixty -- yeah, 69. So it should be 68.
4      MR. NORTHCUTT: Yeah, it does appear to be 68.
5  Q.   MR. GORDON: Okay Great.
6      Okay. So let's go through this and you can tell
7  me -- you can tell me what's what. All right.
8  So the first page, which it says -- just for clarity, I'm
9  going to go by the Bates stamp numbers, not -- so, yes,
10 exactly. Not the numbers up top of 1 to 11 or page 1 of --
11 A.   The FERN --
12 Q.   The one that starts with the first few letters of
13 your sur name.
14     So -- okay. So -- what -- so it says "incident" --
15 at the very top it says "Incident 22S09984."
16     What is this number?
17 A.   That would be the case number.
18 Q.   This is the case number. Okay.
19     Do the -- do the numbers or the sole letter indicate
20 anything or is it -- are these just generated
21 chronologically?
22 A.   So the first, the "22," would indicate the year of
23 when the case our investigation was.
24 Q.   Okay.
25 A.   So 2022.

Page 99

1  Q.   Okay.
2  A.   And then the rest of the numbers, yes, they would
3  just be generated automatically based on...
4  Q.   The "S" does it stand for like Sheriff?
5  A.   Yeah, Sheriff.
6  Q.   Oh, it does stand for Sheriff. Okay.
7  A.   So Redding would be "R" if it was a Redding Police
8  report. If it was Anderson, it would be an "A" Adam.
9  Q.   I see. So that way when it goes to court, the court
10 knows this is Sheriff, this is -- okay. I understood. All
11 right. Okay.
12     Okay. It says "Report Date" -- so is this where it
13 says "Report Time," is this the time the report was
14 initially created?
15 A.   Yes.
16 Q.   So this is the --
17 A.   So this -- this would have been me calling because
18 there wasn't someone that actually called in. This would
19 have been me calling dispatch or ShasCom and creating a case
20 report. So they would have created it on that date and
21 time.
22 Q.   So the Sheriff, Sheriff Mike -- or what was his -- I
23 don't recall his last name.
24 A.   Sheriff Johnson.
25 Q.   Sheriff Johnson. I apologize.

Page 100

1      His first name was Michael. Wasn't it?
2  A.   Yeah, Michael.
3  Q.   Sheriff Johnson didn't create a -- didn't create a
4  case number?
5  A.   No.
6  Q.   No. Okay. All right.
7      All right. So moving down, it says, you know,
8  "Incident." This is the middle quarter of the -- in the top
9  quarter of the -- of the middle two quarters, the top one.
10 "Incident." It says "Grand theft report." It has an
11 address. That's the address of the fairgrounds, yes, 1890
12 Briggs Street?
13 A.   Yes.
14 Q.   Okay. "Occurred From." So what is this date?
15 A.   So this "Occurred From" is for -- well, it's for
16 tracking, but it occurred on -- from 6/25 of 2022 at 09:00.
17 "Occurred To" was when it was obviously deemed -- when it
18 was -- and this is stuff I would have entered into the
19 investigation.
20 Q.   Yeah.
21 A.   So "Occurred To," which is the line below that --
22 Q.   Yeah.
23 A.   -- the same day at 22:30 hours because it was 22:30
24 hours is when they found the goat missing.
25 Q.   Okay.

Page 101

1 A.    So I believe I picked 09 because if I go to the sales
2 invoice, I believe, she sold the -- the goat was sold at --
3 Q.    Well, object to the term "sold," but you mean the bid
4 was accepted at that point in time at 9:00 a.m. presumably,
5 is what you were going to say?
6 A.    I'm trying to find it.
7 Q.    I think it's --
8 A.    I don't know if it's even time stamped, but...
9 Q.    I think it's in here.
10 A.    It's right here.
11 Q.    What Bate?
12 A.    38.
13 Q.    38. Okay. All right. So on Bates 38, at FERN 38,
14 it has the 9:00 -- you got the 9:00 a.m. from that?
15 A.    I don't see where it says 9:00 a.m. Maybe that was
16 just via talking to them that it sold sometime after 9:00.
17 Q.    Okay. Okay. Gotcha.
18 A.    Because they'll have that in their records.
19 Q.    Understood. It says "Received by Reed
20 Severson."
21        Who is he?
22 A.    So he would have been -- Reed Severson. Probably a
23 dispatcher.
24 Q.    He's a dispatcher.
25 A.    Yeah, dispatcher.

Page 102

1 Q.    So you would have called him and he would have
2 generated the case number?
3 A.    Uh-huh.
4 Q.    How many dispatchers are there?
5 A.    Oh, I don't -- I don't know.
6 Q.    Do you know any of them on a personal level?
7 A.    I know some of them on a personal level.
8 Q.    Do you -- you know, when you call in, do you get the
9 same person a lot?
10 A.    It depends. Yes. They have stations, so usually the
11 same dispatcher will work the same station, but they rotate.
12 Q.    Okay. Okay. But you don't know who Reed Severson
13 is?
14 A.    I know that he's a dispatcher, Reed, just from "hey,
15 this is Reed."
16 Q.    Okay. Okay. Gotcha. All right. What does "On
17 View" mean?
18 A.    So it's how received.
19 Q.    How received. Sorry. I apologize.
20 A.    So "on view" would be -- basically it's on view, so
21 I'm calling him. It wasn't dispatched. So if it was a
22 dispatched call for service or 911, it would show that.
23 That's just showing how the call came in. So the reason why
24 it says "On View" is because I on viewed it. Right. So if
25 I saw a crime occurring right now, "how received" would be

Page 103

1 "on viewed." So because I called him and say, "Hey, I need
2 you to generate a case number for me," it's just clarified
3 as an on view.
4 Q.    So just so I'm clear, when you see a crime occurring,
5 it's on view?
6 A.    Yes. Like if I'm driving and I'm not dispatched to a
7 call and I see a crime occurring in front of me and I say,
8 you know, "ShasCom 109 show me out with a 415 physical
9 disturbance at Walk and Don't Walk," that would be clarified
10 as an on view.
11 Q.    What if -- what are the other categories that you
12 could be --
13 A.    Dispatched, 911. I don't know all of them.
14 Q.    Okay. Why would this one be on view though if none
15 of the sheriffs, you know, sheriffs witnessed it?
16 A.    I think it's for their -- I can't really answer that.
17 I just know that it's because I called him and --
18 Q.    He elected this is what you're saying.
19 A.    Yeah, it's probably the way it's created in the -- in
20 Their CAD system. It's how it probably generates the call.
21 Q.    I understand.
22        What is a CAD system?
23 A.    A CAD system is like a dispatching system.
24 Q.    Is it an acronym for something?
25 A.    It is.

Page 104

1 Q.    Something dispatch?
2 A.    Yeah, I don't know. I don't work for dispatch or
3 ShasCom.
4 Q.    All right. Okay. Moving on. Okay.
5        And so disposition date, July 8, 2022. I'm assuming
6 that is because that was the date Cedar was confiscated?
7 A.    Yeah, obtained.
8 Q.    Obtain. Okay.
9        And "Disposition: Case closed."
10        Does that mean it's -- does this mean the case is
11 done, no prosecution, or just your investigation is done?
12 A.    Yeah, it means that it's closed and went forward to
13 the DA's Office.
14 Q.    Okay. Understood. Okay. So it's not actually
15 closed. It just means forwarded potentially.
16        Do you write "Closed" regardless if it's forwarded to
17 the DA? Does -- are there other Incident Reports where it
18 says case close -- or "Closed Case," but it's not forwarded
19 to the DAs?
20 A.    Yeah, it's like if you have no investigative leads,
21 or it's --
22 Q.    Yeah.
23 A.    Right. Then the case is closed. Or like in this
24 circumstance I forward it to the District Attorney's Office,
25 so at that point the case is closed. But any case can be

Page 105

1   opened for further follow up at any point.
2 Q.   Oh, okay. So a closed case is not set in stone?
3 A.   Correct.
4 Q.   All right. Gotcha.
5      All right. "Cleared." What does "N" mean?
6 A.   I don't know what that clearance is.
7 Q.   And "Clearance report required," what does that mean?
8 A.   So that just indicates that a written report is
9   required.
10 Q.   A written report by who?
11 A.   By the officer. So reporting officer.
12 Q.   It must be you in this case?
13 A.   And it could be, you know, supplemental reports,
14   anyone involved in that investigation.
15 Q.   Okay. All right. Okay.
16      And "Cargo theft related."
17      Is that self-evident? That's when someone -- maybe
18   it's not. What is cargo theft?
19 A.   Cargo theft?
20 Q.   Yeah.
21 A.   Would be like, you know, a theft of cargo.
22 Q.   Like in Fast and Furious and they're trying to run?
23 A.   Yeah, it happens a lot probably in the L.A. area at
24   the harbor.
25 Q.   Sure. Oh, yeah.

Page 106

1 A.   But yeah. So no, it's not cargo theft related.
2 Q.   So the "N" means no.
3      So up here where it says "Cleared," I'm assuming that
4   means no also? The "N"? You said you weren't sure.
5 A.   I wasn't -- I'm not sure on that.
6 Q.   Okay. All right. But you don't know. Okay.
7 A.   The records specialist would know.
8 Q.   Okay. All right. So "Offenses." If we go down it
9   says "Responding Officer," you. "Offenses" and "All other
10   larceny." Okay. "Completed." C. What does "C" stand for
11   under "Completed"?
12 A.   I don't know. This is probably like more NIBERS.
13 Q.   What is NIBERS?
14 A.   National -- national something -- so NIBERS -- I
15   should know this.
16 Q.   Is NIBERS N-I-B-E-R?
17 A.   Yes.
18 Q.   Okay.
19 A.   So all law enforcement is required to report to
20   NIBERS. So I know like down here, like the basis -- or
21   "Bias, Motivation" and --
22 Q.   Okay.
23 A.   -- "Offense used" and all that kind of stuff.
24 Q.   We'll get to that.
25 A.   That will all be --

Page 107

1 Q.   So this is for some other database?
2 A.   Correct. National Incident -- something Reporting is
3   NIBERS. And the reason why I should know that is I'm a
4   project manager right now on our new CAD/RMS system that we
5   switched over to recently.
6 Q.   Gotcha. All right.
7 A.   I think it's National Incident something Reporting.
8 Q.   I didn't sign in to the wifi or I'd check. So it's
9   some national reporting database that law enforcement has
10   to --
11 A.   Right, report to DOJ.
12 Q.   I understand.
13      MR. NORTHCUTT: National Incident Based Reporting
14   System. Is that right?
15 Q.   MR. GORDON: Okay. All right. I'll ask one more
16   question and then switch out.
17      So Statute 487. I'm assuming this means Penal Code
18   487(a), even though I think the (a) is lower case. Maybe
19   both As are.
20      What is PCF?
21 A.   PC stands for Penal Code. "F" is it's a felony.
22 Q.   Okay. What is 22 -- what is 23248?
23 A.   That's -- I don't want to -- I don't know, but I know
24   it has to do with the NIBERS.
25 Q.   Okay.

Page 108

1 A.   It's a beast.
2 Q.   So it's some --
3 A.   It's probably cross referencing that number to the
4   487. Then if it was 487, let's say hypothetically just 487,
5   that number there --
6 Q.   Would be a different number?
7 A.   Would be a different number.
8 Q.   Understood.
9      MR. GORDON: We're going to stop for a moment because
10   he's got to change out the media.
11      THE VIDEOGRAPHER: We're going off the record. The
12   time is 12:12. This is the end of Media No. 1.
13      (Off the record.)
14      THE VIDEOGRAPHER: We are back on the record. The
15   time is
16 Q.   MR. GORDON: All right. Back on the record.
17      Lieutenant Fernandez, as you know you're still under
18   oath. So we were going through Bates stamp number FERN
19   00001, FERN 1, let's say for shorthand. And we stopped at
20   going over where it says the category "Statute" and you were
21   explaining NIBERS.
22      So to the right of that it says "Description: Grand
23   theft animal."
24      Is that something you said to put in or is that -- is
25   that just the default?

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 30 of 116

LONG vs.
FERNANDEZ
LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 109

1 A.  It's default.
2 Q.  And "Category: PC" I'm assuming that means Penal
3  Code?
4 A.  Yes.
5 Q.  "Bias Motivation" below that.
6  What does that mean?
7 A.  That would be a NIBERS coding. 88 would be that
8  there's no bias.
9 Q.  No bias. What would a --
10 A.  So it could change if it was like racially motivated.
11 Q.  I see.
12 A.  Then it could change and that would be a NIBERS
13  coding.
14 Q.  Okay. So if there's like a hate crime or something
15  like that?
16 A.  Yeah, if was a hate crime, it's kind of unique that
17  it's an 88.
18 Q.  So this is in relation to the offense, not
19  anything --
20 A.  No. This is --
21 Q.  It's not like you --
22 A.  None of this below here is really -- like where it's
23  saying "Bias motivated,"
24 Q.  Gotcha.
25 A.  Anything like that, it's all just reporting for DOJ.

Page 110

1 Q.  Understood.
2  So "Offender used" What does that mean? A weapon?
3 A.  "Offender used" would be like -- it could be a
4  person, right, so --
5 Q.  Used a person?
6 A.  Yeah. Like let's say, I think, if it was an assault
7  case --
8 Q.  Okay.
9 A.  -- right, then offender used it could be a weapon.
10 Q.  Oh, I see. Okay.
11 A.  No, yeah. So there's nothing there. So, no, no
12  weapon.
13 Q.  I thought you meant a used person, like a used car.
14 A.  Oh, sorry.
15 Q.  Yeah, yeah. It's fine. So it could say "knife"
16  or --
17 A.  Billy club.
18 Q.  Billy club. Okay.
19  So next page. So -- and you created this document
20  on, as you said, on page 1 on 6/29 -- on June 29th, 2022, at
21  11:00 a.m.?
22 A.  That's when -- yeah, that's when I generated --
23 Q.  Generated the --
24 A.  -- the case report.
25 Q.  But you added to the report after that date. Yes?

Page 111

1 A.  Yes.
2 Q.  Okay. All right. So when did you input these
3  witnesses into the report?
4 A.  Probably when I was getting ready to type my report,
5  so probably after the 8th.
6 Q.  Okay. So you didn't type -- so let's go to page --
7  page 4. So FERN 4.
8 A.  Okay.
9 Q.  So is this the typed-up report you're referring to?
10 A.  Yes.
11 Q.  Okay. Why does it say July 26, 2022, at 12:14:17
12  if -- why that date if you were typing up on the 8th?
13 A.  That's probably -- I can't remember the -- because
14  it's a new reporting system. This may have been the last
15  time I touched this narrative.
16 Q.  Okay. But you didn't write up the narrative until --
17  so it's not like you wrote this up as it went along, or did
18  you -- you went on the 8th and gave the whole --
19 A.  No, it -- it's iterative. Right. So I can add to the
20  investigation. I can add. And then this is a time stamp of
21  when it was -- when I last like added anything to it.
22 Q.  Okay.
23 A.  You know, as I was chronologically trying to add
24  stuff to the report. So like if you go to No. 8 --
25 Q.  Number -- where are you referring to No. 8? Page 8,

Page 112

1  you mean?
2 A.  Yeah, page 8. Sorry.
3 Q.  It's okay.
4 A.  If you look at Duncan, so he -- his was on the 12th
5  when he did his supplement.
6 Q.  Gotcha.
7 A.  And if you were to look at like his second
8  supplement, it was on the 13th at whatever time.
9 Q.  So why is Duncan adding in supplements? So he has
10  like one addition. Then he adds another supplement when he
11  wants to make another addition. But you get -- for your
12  narrative, you can go in and change what you originally
13  wrote?
14 A.  No. I can.
15 Q.  So --
16 A.  It's kind of a tricky question. I can go in and I
17  can add to my investigation.
18 Q.  Can you delete things?
19 A.  Yeah, I can delete things. But once I can't -- like
20  once it's passed off to records --
21 Q.  Okay.
22 A.  -- there's no changing the report, right. We all go
23  through our reports and review them and "Oh, that doesn't
24  make sense," and "I need to fix that grammar," or whatever.
25 Q.  Sure.

Page 113

1 A.    So the reason why you see him in here having
2 different supplemental reports is because he's a detective.
3 So anytime he does anything, he bifurcates it.
4 Q.    I see.
5 A.    So he's bifurcating this person's statement. He's
6 bifurcating the evidence he booked and the --
7 Q.    So he's just trying to create in your mind a clean
8 record.
9 A.    Yes, yeah. In mine --
10 Q.    I'm not saying you're being sloppy, but this is how
11 you usually -- do you usually create supplemental narratives
12 for yours or just stick with your original?
13 A.    No. I can, but I just type the whole investigation
14 at once.
15 Q.    Okay. Here -- okay. You typed the whole
16 investigation at once and you believe it was around July
17 8th. Yes?
18 A.    That's when I began writing it, somewhere around
19 there or thereafter.
20 Q.    Okay. And you finished it on July 26th?
21 A.    That would have been -- yes. That would have been --
22 yes, that probably would have been -- that time stamp is
23 probably the last time I did anything with this.
24 Q.    Okay.
25 A.    And sent it.

Page 114

1 Q.    Okay. Do you remember what the last thing you did
2 with it was on here?
3 A.    That probably would have been like adding the
4 attachments and then probably just proofing it one last
5 time, making sure what I'm trying to articulate in my
6 written narrative is there and then submitting it to the
7 District Attorney.
8 Q.    Okay. Why not do it in, you know, closer to the time
9 of the events?
10 A.    You mean, submit it, you mean?
11 Q.    Well, no. July 8th is when the -- when you guys
12 confiscated Cedar. And then you know -- how many days later
13 is that?
14 A.    Roughly --
15 Q.    Yeah, it's 22 --
16 A.    18 days.
17 Q.    18 days later, yeah, 18 days later, you know. It's
18 not a criticism. I'm just curious why not do it closer to
19 the --
20 A.    I can't recall exactly what was going on in my
21 schedule or what was going on.
22 Q.    Is there a rule to do it within a certain amount of
23 time or is it just, you know, you're busy as time permits?
24 A.    So, yeah. I mean, if it's an in custody, it's got to
25 be before arraignment.

Page 115

1 Q.    Okay.
2 A.    But this isn't in custody. I'm filing charges. And
3 then, obviously, being a station commander, I can't look
4 back on my schedule and say what I had going on. This is
5 just showing that when I was finalized with my investigation
6 it was that date.
7 Q.    Okay. Okay. All right. But you don't remember what
8 you actually did that day. You think it was maybe
9 submitting evidence with it?
10 A.    Either adding an attachment or just perusing through
11 it again and rereading it, yeah, making sure that, you know,
12 it's best articulated the best that I could.
13 Q.    Understood. Okay. All right. So on page -- All
14 right. So you added these witnesses in?
15 A.    Throughout, yeah.
16 Q.    Throughout.
17     So at some point between 7/08 and 7/26 you inputted
18 these witnesses?
19 A.    Yes.
20 Q.    And suspects and whatever other categories are on
21 here. So on page -- page FERN 2 through -- 2 and 3, it
22 looks like, these names, Kathi Muse, Donald Maiden and Bruce
23 Macfarlane, you know, Justin Starkey, etcetera, on page 2,
24 Fouler, Long, Stover, Allen. You added these names at some
25 point between July 8th and July 26th?

Page 116

1 A.    Correct.
2 Q.    Okay. All right. Okay. What else.
3     Who is Donald Maiden?
4 A.    He is a -- yeah, he's a Lieutenant with Napa County
5 SO.
6 Q.    Okay. Oh, that's right. The name looked familiar,
7 but I couldn't -- we'll get to that. Okay.
8     When you say "SO" is Napa --
9 A.    Sheriff's Office.
10 Q.    Okay. All right. Now, on page 4 where it says
11 "Audio CD," you know, "Brand 378-1 Interview," is this
12 referring to the sole audio file you produced in discovery,
13 which was an interview between Bleating Hearts Farm?
14 A.    I didn't -- I didn't enter that evidence. It would
15 have been -- so the brand, the 378-1 --
16 Q.    Okay.
17 A.    -- that would have been entered by Detective Duncan.
18 Q.    Okay. So this is Duncan's evidence?
19 A.    Yeah. In regards to this, yeah, in regards to this
20 investigation.
21 Q.    Duncan. You didn't enter the evidence. He entered
22 the evidence.
23 A.    Correct. So anywhere where you see the 378.
24 Q.    That's a Duncan?
25 A.    That would have been Duncan.

Page 117

1  Q.   Duncan.  Okay.
2       What is the \1 mean?
3  A.   So that's just item one.
4  Q.   Gotcha.
5  A.   Then item two.
6  Q.   Okay.  Okay.  So what would your code be, if his is
7  378?  Do you have a...
8  A.   At that time it would have been, wow, 109.  So it's
9  your ID number.
10 Q.   It's your ID number.  Okay.
11      It's Duncan's ID number?  Okay.
12 A.   At the time, yeah.
13 Q.   Do you have a different ID number now?
14 A.   I'm trying to think if back then it was different,
15 too.
16 Q.   Do you regularly have your ID numbers changed?
17 A.   Well, we went to a new system, so that's why they
18 updated it.
19 Q.   I see.  So Duncan's ID number is not even this one
20 anymore then?
21 A.   No.
22 Q.   All right.  So your ID number at the time was likely
23 109, but that's not appearing on the page anyways.
24      So did you log in the evidence in this case?
25 A.   Just the -- I don't know if I logged it or if I just

Page 118

1  made them attachments, which was photos of the goat at this
2  location in Petaluma.
3  Q.   Yeah.
4  A.   And then photos of the goat in the possession of BJ
5  Macfarlane, which we've already discussed.
6  Q.   So the various pictures which we'll get to in here.
7  A.   Yeah.
8  Q.   So what -- any reason you didn't log them?
9  A.   Because they're attachments.  They're part of the
10 case.  So it wasn't like they're -- they're not hidden.
11 They're part of this whole folder.
12 Q.   Yeah.  So -- but the emails are also in this packet
13 and they're logged?
14 A.   Right.
15 Q.   So --
16 A.   No, those are --
17 Q.   These are separate emails?
18 A.   These are emails -- so these emails that he's
19 referencing are the emails that he took pictures of.
20 Q.   Yeah.  No, I understand.
21 A.   So yeah.
22 Q.   I understand.  But they're in the packet also?
23 A.   Yeah.
24 Q.   Aren't they?
25 A.   Yeah.  So because when you guys requested

Page 119

1  discovery --
2  Q.   Yeah.
3  A.   -- anything that was booked into evidence, gets data
4  dumped --
5  Q.   Oh, I see.
6  A.   -- and then it gets processed out and it's forwarded.
7  Q.   Okay.  Okay.  So your original -- let me ask you this
8  then.
9       On 7/26 when you completed your report --
10 A.   Uh-huh.
11 Q.   -- what was attached to this document?
12 A.   Anything and everything related to the document was
13 either attached or bifurcated in evidence.
14 Q.   But that buyers letter wouldn't have been attached
15 then, because it didn't come in.
16 A.   No, not at that time.
17 Q.   Okay.  But the other emails from the Starkeys that --
18 A.   Yeah.
19 Q.   -- it appeared were a snapshot on someone's phone,
20 they were attached.
21      Okay.  So he just -- he just didn't log -- you didn't
22 log your emails the same as him for --
23 A.   Right.
24 Q.   -- whatever reason.
25 A.   Yeah.  They were hard copies, so I upload them as

Page 120

1  attachments.
2  Q.   I see.  Okay.  All right.
3  A.   So he did them as --
4  Q.   It's not a gotcha.
5  A.   No.  There's different ways to do it.  He did it
6  as -- you know, I think he probably booked them as like a --
7  so like this one is a CD Rom.
8  Q.   Yeah.
9  A.   So he, you know, took everything and put it on a CD
10 Rom and then booked it that way.
11 Q.   I see.  Okay.  All right.  Okay.  That makes -- that
12 makes sense.  All right.
13      Okay.  So moving to your investigative narrative.
14 Earlier you testified about that you had called after
15 Sheriff Johnson, correct, Sheriff Johnson, told you to go
16 investigate a goat theft at the fair, you called BJ
17 Macfarlane.
18      In the first paragraph here it says "On Wednesday,
19 June 29th at about 11:50 hours I contacted Shasta District
20 fairgrounds Livestock Superintendent Bruce Macfarlane
21 regarding theft of a goat."
22      Is this the contact you're referring to earlier?
23 A.   Yes.
24 Q.   The phone call?  All right.  The following statements
25 that on June 25th at about -- I'm paraphrasing here, but if

Page 121

1  I mischaracterize it, stop me. June 25th at 23 -- or about
2  22:30 hours, fairgrounds -- or fair staff, along with
3  volunteers, found a missing goat from the barn of the Shasta
4  fairgrounds.
5      Did he tell you who the fair staff was that found the
6  missing goat -- or found the goat missing?
7  A.  None.
8  Q.  No names?
9  A.  No names.
10 Q.  All right. Did he tell you the names of volunteers?
11 A.  No.
12 Q.  Okay. "Staff found the goat missing while they were
13 attempting to load livestock for transportation." Okay.
14 But, again, no names.
15     Do you know who they were -- where they were being
16 transported to?
17 A.  No.
18 Q.  Okay. "He advised that the goat was sold earlier in
19 the day during the Junior Livestock Auction. In the process
20 of trying to locate the goat, Macfarlane determined the goat
21 was from Cow Creek 4-H club."
22     So when you heard Cow Creek -- were you already
23 familiar with Cow Creek 4-H club when he told this to you?
24 A.  No.
25 Q.  Okay. All right. "Macfarlane contacted Chad Fouler,

Page 122

1  who was the community leader and goat leader for the Cow
2  Creek 4-H. Macfarlane stated based on his conversation with
3  Fouler, Fouler suspected the mother of the junior
4  livestock -- I'm sorry -- the junior exhibitor stole the
5  goat from the fairgrounds to prevent it from being
6  transported and slaughtered."
7      Okay. This -- is that an -- so far -- so this is
8  consistent with your memory? Nothing -- this is what you
9  remember happening?
10 A.  Yes.
11 Q.  Okay. And were -- were -- did you say you weren't
12 familiar with the Cow Creek 4-H club at all?
13 A.  No. I had no dealings with them prior to that.
14 Q.  Okay. Did you know it existed? Like had you heard
15 of it before?
16 A.  Yeah, I probably saw their banner.
17 Q.  Okay. All right. Did you know who Chad Fowler was?
18 A.  Prior to this?
19 Q.  Yes.
20 A.  No.
21 Q.  Okay. All right. Okay. "Around this time
22 Macfarlane informed me the junior exhibitor was Eliza Long
23 and her mother was Jessica Long. Macfarlane advised Jessica
24 had sent an email to the fairgrounds office on Monday 6/27,
25 admitting she had taken the goat from the fairgrounds.

Page 123

1  Jessica was requesting to resolve this incident and the CEO
2  of the Shasta District Fair, Melanie Silva, responded in an
3  email, informing Jessica she needed to return the goat.
4  Jessica responded by" -- well, let's stop there for a
5  second.
6      The email that you're referring to in that paragraph
7  is -- let's see. Let me find it faster here. I believe it
8  is Bates stamped No. 41 and 42. Tell me if that's correct.
9  A.  I think it's in here several time. It's in Bates
10 stamped 28 as well. Let me go to 41.
11 Q.  Yeah, that's attached to the warrant.
12 A.  Yeah, that's attached to the warrant.
13     Yes.
14 Q.  Okay. And did you read this email?
15 A.  I did.
16 Q.  Okay. All right. Give me one second. I had a
17 marked-up version.
18     Do have the email in front of you?
19 A.  I do.
20 Q.  Okay. All right. So -- and you read -- you read the
21 whole email, so you --
22 A.  Yeah, it's 41 and 42.
23 Q.  Yeah, 41 and 42.
24     I had a marked-up version and I don't know where that
25 has gone. I had a couple questions to ask. Let me just

Page 124

1  refresh your memory on what I wanted to ask you.
2      Okay. So you saw in this email that she did say she
3  could bring the goat back. Yes? I think -- I believe it's
4  on page 42. "If the only solution is to return the goat for
5  slaughter and barbeque meat, then I will return it so I
6  won't be charged with a felony."
7  A.  I see where she wrote that, yes.
8  Q.  But you read the whole email before, so you read
9  that, too. Yes?
10 A.  Yes.
11 Q.  Okay. All right. And did you -- did you ask who the
12 buyer was when you spoke with -- you spoke with Macfarlane?
13 A.  Yes.
14 Q.  Okay. Did Macfarlane tell you who the -- I'm going
15 to say bidder so there's no confusion, because obviously we
16 have a dispute on whether a sale occurred.
17     But did -- did he tell you who the bidder was?
18 A.  Yes.
19 Q.  Okay. So he did -- so there was -- what else did he
20 tell you on his initial phone call?
21 A.  Well, that was the information on the -- I learned
22 that when I got all the -- the sales invoice.
23 Q.  I see. So he didn't say the bidder was the Dahles?
24 A.  Yeah, I didn't know any of that at that point.
25 Q.  And you didn't ask?

Page 125

1  A.    No.
2  Q.    No.  Okay.  All right.  Okay.  Okay.
3        All right.  So Jessica writes on here "I've
4  communicated with the buyer, Senator Brian Dahle.  They
5  bought the goat to support the community and are okay with
6  the alternative solution of the goat getting donated to a
7  farm that does weed abatement."
8        Did you -- do you remember reading that?
9  A.    I do.
10 Q.    Okay.  All right.  And did you -- what effect do you
11 think that had on the sale?
12 A.    As far as my investigation?
13 Q.    Yeah.
14 A.    No bearing.
15 Q.    Okay.  And why not?
16 A.    Because it was sold at auction to Megan and Brian
17 Dahle and immediately donated to Kathi Muse.
18 Q.    Okay.
19 A.    So Kathi Muse was the owner at that time of the goat.
20 Q.    Okay.  Did you -- did you reach the Dahles?  Did you
21 reach out to the Dahles?
22 A.    No.
23 Q.    No.  Okay.  All right.  So you didn't reach out to
24 the Dahles.
25        We might go back to this because, like I said, I had

Page 126

1  a marked-up version which has disappeared on me, so --
2  A.    And this one's not marked up either, just so you
3  know.
4  Q.    Oh, I didn't give you the marked-up version.
5  A.    I know.
6  Q.    That would be funny.
7        And you do see in here where Jessica offered to pay
8  for any costs associated with her removal of Cedar?
9  A.    I do see that in there.
10 Q.    Okay.  All right.  Okay.  Are you familiar with the
11 concept of efficient breach in contracts?
12 A.    No, sir.
13      MR. GORDON: Off the record for one second.
14      THE VIDEOGRAPHER: We're off the record.  The time is
15
16      (Off the record.)
17      THE VIDEOGRAPHER: We're back on the record.  The
18 time is 12:45.
19 Q.    MR. GORDON: All right.  So let's go back to your
20 Incident Report on page 5 where we left off.
21 A.    Okay.
22 Q.    Do you want a clip, so you can --
23 A.    No.  I got it.
24 Q.    All right.  That's going to be her exhibit, so that's
25 got to stay in order.

Page 127

1  A.    Yeah, we'll keep it in order.
2  Q.    So back to page 5.
3  A.    5?
4  Q.    Yeah.  Okay.  So "At about this time Macfarlane
5  informed me the junior exhibitor was" -- okay.  We already
6  went through this.
7        Okay.  So then Jessica was requesting to resolve this
8  incident and the CEO -- and the CEO of the Shasta District
9  Fair, Melanie Silva, responded by email informing Jessica
10 she needed to return the goat.
11       So let's just go to that email from Silva.  It should
12 be --
13 A.    43.
14 Q.    43, yeah, probably.
15       Okay.  Are you on it?
16 A.    I am, sir.
17 Q.    All right.  So here she says, and I'm paraphrasing,
18 I'm not unsympathetic regarding your daughter, but having
19 said that, please understand the fair industry is set up
20 to teach your youth responsibility and for the future
21 generations of ranchers and farmers to learn the process and
22 effort it takes to raise quality meat.  Making an exception
23 for you will only teach youth that they do not have to abide
24 by the rules that are set up for all participants.
25       Okay.  Did you -- did you talk to Melanie Silva?

Page 128

1  A.    I did.
2  Q.    Okay.  When did you talk to her?
3  A.    I think it was in regards to sending me this
4  information.
5  Q.    Okay.  So you think she sent you this information?
6  A.    Yeah, I'm pretty sure she sent me this information.
7  Q.    Okay.  Did you ask about this letter?
8  A.    No.
9  Q.    Okay.  Did you -- what was your -- did she say
10 in your conversation with you?
11 A.    I think, if I recall, BJ had given me her contact
12 information because he said that she was going to have all
13 those things that I asked for.  And then that was what was
14 forwarded to me on the 29th.
15 Q.    Did you -- okay.  But did you speak with her on the
16 phone?
17 A.    Yes.
18 Q.    Okay.
19 A.    Yeah, never in person.
20 Q.    Never in person.  All right.
21       And what did she say to you on the phone?
22 A.    Just that she had received this letter and this
23 letter and that their stance was that the goat needed to be
24 returned because it was stolen.
25 Q.    Okay.  Did she give any other details?

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 35 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                          August 21, 2023

Page 129

1  A.    No. I just asked that, hey, just send me all the
2  information you have on it.
3  Q.    Okay. How long was the phone call?
4  A.    Relatively quick, a minute, two minutes maybe.
5  Q.    Two minutes.
6        So did you -- okay. Did you -- okay.
7        So you didn't ask her then if they ever -- if other
8  kids have always had been forced to abide by the rules who
9  wanted to exit the fair?
10 A.    No, this is -- you know, I -- no, I didn't.
11 Q.    You didn't ask her that. Okay.
12       Did you ask if they ever made any other exceptions?
13 A.    No, I didn't ask that.
14 Q.    Did you ask that to anyone at the fair?
15 A.    No.
16 Q.    No. Okay. All right.
17       Did you ask Melanie Silva what rules govern the
18 auction?
19 A.    I did not ask. I did my research myself. I don't
20 recall asking her, but I did my research, which is also one
21 of the attachments.
22 Q.    Okay. And did you -- did you ask -- well, same
23 question with anyone else.
24       Did you ask anyone else what rules govern?
25 A.    No.

Page 130

1  Q.    No. Okay. All right.
2        But you felt comfortable doing your own research
3  because you're familiar with the auction presumably?
4  A.    Yeah.
5  Q.    Okay. All right. Okay. So we don't know if any
6  exceptions had been granted to any other kids. You don't
7  know that? I'm sure someone knows, but you don't know.
8  A.    No, I don't know. I --
9  Q.    Okay. No, that's fine.
10 A.    Okay.
11 Q.    Okay. All right. So going back to page 5 -- so this
12 is the email you're referring to in this paragraph is in
13 fact FERN 43, that email. Yes?
14 A.    Yes.
15 Q.    I know it's a silly question, because there's no
16 other Silva email, but I have to establish a record.
17       "Jessica responded by sending an email correspondence
18 on the morning of June 29th and has not returned the goat."
19       So the correspondence of June 29th, is that the email
20 you're referring to on page 44, FERN 44 through 48? FERN
21 48?
22 A.    Yes.
23 Q.    Okay. All right. And did you review this email?
24 A.    I did.
25 Q.    Okay. And the attachment to it, which is page 45-48?

Page 131

1  A.    Yes.
2  Q.    Okay. All right. Okay. Okay. So did you -- so you
3  see in her -- Jessica, on page 46 --
4  A.    46?
5  Q.    Yeah, FERN 46. If you want to read the first one to
6  refresh your memory, that's fine, but I'm on page 46.
7  A.    That's fine.
8  Q.    So she references the 2022 State Rules for California
9  Fairs.
10       Did you read those rules?
11 A.    I read the handbook rules governed by the Shasta
12 District Fair, yes.
13 Q.    The state rules or the local rules?
14 A.    The handbook for the --
15 Q.    Is the handbook -- we'll go back to this, but is the
16 handbook the document you're referring to on -- is it on
17 page 32. FERN 32 through -- actually I apologize. 30. 30
18 through 42. I'm sorry. 30 through 37.
19 A.    Yes.
20 Q.    All right. So you're calling the -- even though it
21 says -- we lost him.
22       (Attorney Mr. Bridges was disconnected on the phone.)
23       MR. GORDON: For the record, it appears DOJ attorney
24 Jim Bridges just got disconnected, who is appearing through
25 conference call.

Page 132

1        So, Lieutenant Fernandez, you're call -- even though
2  this says "All General Livestock Rules and Guidelines,"
3  you're calling these the -- what term did you use to
4  describe these?
5  A.    They're rules of the handbook. And then --
6  Q.    Is there a handbook somewhere? I've seen the
7  "handbook" other places, too, but it's --
8  A.    Yeah, I think that's what -- it's the -- it's what
9  they call it, the rules or the handbook. That's what the
10 fair uses. And then --
11 Q.    Why don't they have "handbook" written on here then?
12 A.    I don't know. I do recall going on the Internet and
13 looking up, trying to find this information. And I -- if I
14 recall right, it refers everything back to the local fair
15 and whatever the handbooks are within that fair.
16 Q.    I believe it refers -- it says that there's
17 conflicting information?
18 A.    That's based on my memory.
19 Q.    Okay. Are you saying you did review the 2022 state
20 fair rules?
21 A.    Yeah, I remember going on the CDF, I think is what it
22 is, and then trying to find that. And then I remember, if I
23 recall right, there being like language that referred it to,
24 you know, basically every county has their own ordinances.
25 Q.    Sure.

Page 133

1  A.    Basically refer to that handbook.
2  Q.    Yeah, I believe it says --
3  A.    Which is why I went -- which is why my investigation
4  leads on this handbook or rules of the fair, Shasta District
5  Fair.
6  Q.    Okay. All right. Okay. So you -- you -- you claim
7  you did look at the state rules and you determined they did
8  not apply?
9  A.    I did. If I -- I don't recall them applying.
10 Q.    You don't recall them applying.
11       But you did look at them?
12 A.    Yes.
13       MR. GORDON: Off the record for a second.
14       THE VIDEOGRAPHER: We're off the record and the time
15 is
16       (Off the record.)
17       THE VIDEOGRAPHER: We're back on the record and the
18 time is 12:55.
19 Q.    MR. GORDON: Okay. All right. So we're still on
20 Exhibit B and we're on page 46.
21       And you said you looked at the 2022 State Fair Rules
22 and briefly concluded they did not occur -- or did not --
23 did not govern. Is that accurate?
24 A.    To the best of my recollection.
25       MR. GORDON: I'm going to label this Exhibit C.

Page 134

1        (Exhibit C was marked.)
2  Q.    MR. GORDON: I'll represent it's a copy of the 2022
3  State Fair Rules. I have another -- do you need a copy?
4        MR. NORTHCUTT: Sure.
5        MR. GORDON: I have a copy for you.
6        MR. NORTHCUTT: Thanks.
7  Q.    MR. GORDON: So that's a copy of the document you
8  looked at, you believe, or to the best of your recollection?
9  A.    To the best of my recollection, yes.
10 Q.    So do you see -- I'm sorry, guys. I made the mistake
11 last night of shutting my computer down just so, you know,
12 give it a break and then I thought it would -- I had
13 everything set up to reappear when I reopened it, but it
14 didn't -- it didn't happen.
15       So on page -- where is it. All right. So page 4.
16 It's almost the opening page, page 4 of the PDF. I'm on a
17 PDF. You're on a hard copy. But just go to page -- should
18 say page 4 at the bottom. 2022 State Rules, page 4.
19       Do you see that, Lieutenant Fernandez?
20 A.    Yes, sir.
21 Q.    All right. Do you see Paragraph No. 7?
22 A.    Yes.
23 Q.    "Fairs may create local rules that may be stricter
24 than the state rules, but they may not circumvent state
25 rules."

Page 135

1        Did you review that provision before making your
2  conclusion, if you can recall?
3  A.    I can't recall.
4  Q.    Okay. All right. Okay. So back to page 46. And
5  you're in Exhibit B. So we're going to mark that Exhibit C.
6  You can hold on to it because we're going to give it to the
7  Court Reporter at the end as the exhibits you looked at.
8        So the last -- let's go to page 48 of it.
9  A.    Okay.
10 Q.    It says "This letter is not a waiver of my rights.
11 Further, while it's purpose is in anticipation of
12 litigation. I'm equally sending this letter to resolve the
13 matter."
14       The phrase "anticipation of litigation," what does
15 that suggest to you, or what did it suggest to you at the
16 time?
17 A.    So her writing this "Further, while it's purpose is
18 in anticipation of litigation," that's telling me that she's
19 planning to go to court on this.
20 Q.    Yeah. That she's claiming a property dispute. Yes?
21       MR. NORTHCUTT: Misstates testimony.
22       MR. GORDON: Well, I'm stating it.
23 Q.    She's claiming a property dispute. Yes?
24 A.    She's anticipating some sort of legalities or court.
25 Q.    Over the property?

Page 136

1  A.    Based on what she's writing.
2  Q.    Yes.
3  A.    Yes.
4  Q.    But over property?
5  A.    Yes.
6  Q.    Gotcha. I'm just staying somewhat on the same page
7  here. Okay. All right. Okay. So let's go back to page --
8  in your narrative. Narrative? That's the correct word,
9  narrative?
10 A.    Yeah, report, narrative.
11 Q.    Report, narrative. All right. Okay. I don't want
12 to say narrative. That sounds like it's a narrative,
13 diminishing or something.
14       Anyway, just to confirm, the second paragraph of page
15 5, Jessica responded by an email correspondence.
16       That is the email you are referring to in that
17 paragraph. Yes? The one that said "anticipation of
18 litigation"?
19 A.    Yes.
20 Q.    Do you know if the fair ever responded to that email?
21 A.    I do not.
22 Q.    Okay. Did you ask?
23 A.    I did not.
24 Q.    Did you ask Melanie Silva like, well, you know --
25 strike that.

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 37 of 116

LONG vs.                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                              August 21, 2023

Page 137

1    Who were you speaking with at the fair on this topic?
2 Just Melanie Silva and Bruce Macfarlane?
3 A.   Yes, sir.
4 Q.   Okay. All right. Did you ask any of them why not
5 just let her pay for the goat? She's offering?
6 A.   No. That's not -- no.
7 Q.   All right. So moving to the next paragraph. So this
8 date was -- was this the same date that you -- you received
9 the -- actually, strike that. We'll get to it.
10    "At this time I provided Macfarlane with my
11 department email address and requested any and all
12 documentation be forwarded to me regarding the sale of the
13 goat and Jessica Long and the Shasta Fair."
14    Below that "On 6/29 at about 12:30 Silva emailed me
15 the following items."
16    So this is the email package that Melanie Silva --
17 that you were referring to earlier?
18 A.   Yes.
19 Q.   And do you still have that email from her?
20 A.   I believe, yes.
21 Q.   Okay. It wasn't produced in discovery.
22 A.   Then maybe I don't.
23 Q.   Maybe you don't?
24 A.   So if -- well, if I had it still, it would have been
25 produced in discovery.

Page 138

1 Q.   Is there a reason why it no longer exists? It was
2 deleted at some point, but it --
3 A.   So I delete emails all the time out of my -- what do
4 you call that, my Microsoft Exchange account.
5 Q.   Okay.
6 A.   Work-related emails.
7 Q.   Is this because you just do it as a matter of your
8 procedure or does the department have you do it?
9 A.   No, it's like a department procedure. And a lot of
10 times, IT, because it takes up a bunch of -- I don't know.
11 I'm not an IT person.
12 Q.   Data?
13 A.   Data. They want you to purge your stuff and like
14 your P files and stuff like that.
15 Q.   How often do you purge them?
16 A.   You can have them set. It just depends. Probably
17 every month or so I just go through. Or what I typically do
18 is I'm sitting there and I'm no longer dealing with
19 something, once I print this as part of my investigation,
20 attach it, then at some point that week or within several
21 weeks I'll go through and I'll purge my emails.
22 Q.   Okay. So you're doing it on your own time frame?
23 A.   Yeah.
24 Q.   Do you have any other emails about from in your inbox
25 from six -- you know, about this time, six -- June 2022,

Page 139

1 July 2022?
2 A.   I may have some that are specific to like work or
3 something like that.
4 Q.   Okay. Okay. So you don't delete all your emails
5 from that time. It's case specific?
6 A.   Yeah.
7 Q.   Was there a reason you can think of why you would
8 have deleted this email from her?
9 A.   No.
10 Q.   Okay. What did she say in the email?
11 A.   It's all here.
12 Q.   No, I'm asking you though what you were thinking.
13 A.   Oh, just this information. Right.
14 Q.   So she had -- I mean, this doesn't say that she said
15 anything in the email. It just says "she emailed me the
16 following items." Was there --
17 A.   Yeah, and then I can't recall what she said or didn't
18 say in the email, just that the attachment's up here that
19 she produced.
20 Q.   Okay. "I reviewed the documents Silva sent me," is
21 the next sentence.
22    When abouts did you do that, if you know the day?
23 A.   Probably within this -- within 24 hours or the same
24 day.
25 Q.   Within 24 hours. Okay.

Page 140

1    All right. So -- and these are the only three
2 documents she sent you. So it was -- so starting from the
3 bottom, it was the email correspondences that we just went
4 through within the last five minutes. Yes?
5 A.   Yes.
6 Q.   The Fair Entry Form, what document is that?
7 A.   That's going to be --
8 Q.   I think I know which one.
9 A.   This is like the liability one. It may be back here.
10 Q.   Is it 40?
11 A.   So the Fair Entry Form. So it would have been 39,
12 40.
13 Q.   So this is one -- how did this come in? As a PDF?
14 A.   It must have been a PDF.
15 Q.   Were these -- were these documents together, the Fair
16 Entry Form and The Accountability and Liability Waiver?
17 A.   To the best of my recollection, yes.
18 Q.   And then someone wrote on here "Mom is Jessica Long."
19 Who wrote this?
20 A.   I don't know who wrote that.
21 Q.   Was it on here when you received it?
22 A.   Yes. Yeah, that is not my handwriting.
23 Q.   I've did nothing.
24    Do you presume it was Melanie Silva's?
25 A.   Yes. I don't think Bruce Macfarlane writes that way,

Page 141

1 but maybe. I don't know Bruce.
2 Q.    Okay. All right. So then you went to the -- let's
3 go to -- and then the sale, the fair sale invoice, and that
4 is --
5 A.    It's right before that.
6 Q.    Yeah. So that's at page 38?
7 A.    Yes.
8 Q.    Okay. All right. Let's talk about this for a
9 second.
10       So buyer's name, 920 and 119. So there's buyer's
11 numbers 920 and 919.
12       What do they mean, if you know?
13 A.    So a buyer's number is when you go to the fair to the
14 auction, any auction, you have to register. And that's
15 the -- that's the number they provide you. So when you're
16 bidding and they say "Hey, sold." And then that's how they
17 know how to track who basically owes them money for that
18 animal.
19 Q.    Okay. All right. Okay.
20 A.    So it's basically like the registration number as a
21 buyer at the fair.
22 Q.    I see. Okay. So the -- so did you check if these
23 were, in fact, were the Dahle's registration numbers?
24 A.    No, I did not.
25       Okay. All right. And then -- okay. And then 4-H

Page 142

1 and FFA community barbecue. It says "Donate to." There's a
2 checkmark there. Okay. And Kent's Meats.
3       What is Kent's Meats?
4 A.    Kent's Meats is -- that's a local gas station
5 slash -- they're like a deli, meat market and they do custom
6 butchering there, so --
7 Q.    Okay.
8 A.    I would -- based on this --
9 Q.    Is that the abattoir?
10 A.    A what?
11 Q.    Slaughter house. Isn't that the term?
12 A.    No, none of these animals get slaughtered locally.
13 Q.    Oh, I see.
14 A.    So they just get processed there, butchered there, so
15 they all get slaughtered out of the area.
16 Q.    Okay. Do you know where they're slaughtered?
17 A.    When I was growing up, I know like red meat or goats
18 and steers were on Redwood Meat Company over on the
19 coast, but I don't know where they go know.
20 Q.    Okay. You didn't know where this transport was
21 going. Did you ask?
22 A.    No.
23 Q.    Okay. So they would have gotten the cuts and then
24 prepared them at Kent's Meats then?
25 A.    They would have gotten the slaughtered animal and

Page 143

1 then they would have processed them and create the cuts.
2 Q.    Gotcha. Okay. All right.
3       No amount of sale is listed. It says "Total amount
4 of Sale." That's absent. "Price Per Pound" above it.
5       Do you know what that means?
6 A.    Where are we at?
7 Q.    Go -- same page. So just scroll up. It says "Seller
8 Name: Eliza Long."
9 A.    Yeah.
10 Q.    And then below that.
11 A.    It says "Sale Weight Units: 82. Save two pounds."
12 Q.    Okay. And did it -- the buyer -- there's no buyer's
13 name listed beneath that.
14       Is that -- have you looked at -- have you seen these
15 sale orders before in your experience with the fair? Is
16 that typical?
17 A.    This is the first time I've done it for the fair,
18 looking at it.
19 Q.    Okay. Okay. So you didn't receive it. You didn't
20 got a copy of the sale invoice when you were a participant?
21 A.    No.
22 Q.    No. Okay. All right. Interesting.
23       Okay. So -- all right. But this is in fact the
24 document that you're referring to for Melanie Silva. Yes?
25 A.    Yes, on the Shasta District Fair sale invoice.

Page 144

1 Q.    Okay. All right. Go back to the narrative.
2       Okay. So I'm now reading from your narrative. The
3 seller name was Eliza Long and the goat weighed 82 pounds
4 and sold for $11 per pound for a total of 902. It doesn't
5 say "902."
6       Did you -- how did you determine that?
7 A.    I just added it, added it up.
8 Q.    So besides what Silva emailed you, you said you
9 looked at the 2022 rules. Did you investi -- sorry. I
10 apologize.
11       You looked at the state rules; determined they didn't
12 apply. You looked at the -- I'm calling it the local rules
13 because it's just come out that way, but you're -- what
14 you're calling the handbook, it was Bates stamp number -- is
15 it 38? 30 to 40? Within that range?
16 A.    I think it's 30 through -- yeah, it's 30 through --
17 Q.    Starts on 30.
18 A.    Yeah.
19 Q.    The one starting on 30 --
20 A.    To 37.
21 Q.    And the emails and the fair entry form and the
22 invoice, what else did you review?
23 A.    Penal Code 487(a).
24 Q.    Okay. All right. Anything else?
25 A.    That's it.

Page 145

1 Q.   That's it. Okay. All right.
2       Okay. And I know -- I think I asked you this before,
3 but you call it the -- is there an actual handbook at the
4 fairgrounds that has those local rules in it?
5 A.   It's an electronic form.
6 Q.   Okay.
7 A.   And then --
8 Q.   What else is in the handbook besides local rules
9 or -- you know what I mean by local rules.
10 A.   You know, I don't know what all else is in there, but
11 I know it governs -- part of it governs like the rules of
12 the fair. So it's like the rules of the fair. It probably
13 has to do with some of the -- that's all I -- I can't
14 recall.
15 Q.   But you didn't actually go to the fair and look at
16 this handbook.
17 A.   No.
18 Q.   You just downloaded the --
19 A.   Because it's posted on their website. And, too,
20 that's part of this registration is they have to review the
21 handbook, which is online.
22 Q.   Do you know if they were provided the handbook when
23 they -- on the registration?
24 A.   I don't know if they were provided it or not.
25 Q.   Did you find any -- did you find any --

Page 146

1 A.   Are you talking about like the exhibitors?
2 Q.   Yes.
3 A.   They provided it?
4 Q.   Yeah.
5 A.   I don't know. It just says that you -- they have to
6 agree that they reviewed the handbook.
7 Q.   Yeah.
8 A.   So that's why I went online, which would have been
9 the same -- as I was conducting my investigation, I would
10 have looked at it the same as probably my family does when
11 we register our kids for fair.
12 Q.   Yeah. So when you register your kids for fair -- I'm
13 not getting into your family affairs, but just because
14 you're talking about the procedure at the moment -- if
15 there's -- Did you find online where it says "handbook" or
16 did you just find local rules?
17       The reason is -- look. If it says -- if -- the
18 accountability or the liability form that you were referring
19 to uses the term "handbook," but we're referring to these
20 things that say all livestock guidelines and general rules,
21 or whatever it says, something like that. You know, if
22 you're looking for a handbook, would you --
23 A.   So to answer that question --
24 Q.   Yeah. All General Livestock Rules and Guidelines.
25 A.   -- I don't know if it's just labeled. I don't

Page 147

1 recall. I bet if we went onto their website right now, we
2 could see what it's actually called.
3 Q.   Yeah.
4 A.   And I don't know if it's called "Handbook" or if it's
5 "Handbook" and then this is subtitled underneath there and
6 that's what you have to review.
7 Q.   You don't know. All right.
8       I only found this. I didn't find a handbook, but,
9 you know, that doesn't mean I'm right. I just didn't find
10 it.
11 A.   Okay.
12 Q.   Okay. But you only found -- you didn't find the
13 handbook. You didn't look for a handbook. You only found
14 these and you're assuming these.
15       And you're assuming these are in the handbook. Yes?
16 A.   Yes. This is what I got off their website.
17 Q.   Yes. Okay.
18       You're assuming it -- you were calling it a handbook.
19 You're assuming this is a component of it?
20 A.   Yes, sir.
21 Q.   All right. Okay. All right. Okay.
22       Did you review -- in your investigation, did you
23 review or see this document? I don't -- I would give it a
24 name, but we can do that afterwards.
25       Do you want a copy, Damian? Mine was produced in

Page 148

1 discovery, but...
2       MR. NORTHCUTT: Yeah, I can just look at --
3       MR. GORDON: You know what I'm talking about?
4       MR. NORTHCUTT: Yeah.
5       THE WITNESS: What was your question? I'm sorry.
6 Q.   MR. GORDON: Did you review that? Or have you seen
7 that document before, let's say?
8 A.   I don't recall if I've ever seen this. This looks
9 like something that is provided to the exhibitors. But, no,
10 I don't recall reviewing this as part of my investigation.
11 Q.   That's fine. Okay.
12       And Melanie Silva -- this wasn't provided within
13 Melanie Silva's emails?
14 A.   No, it was not.
15 Q.   Okay. And did you -- apart from -- you said you did
16 your own research to determine what applied, but you didn't
17 ask Melanie Silva or Bruce Macfarlane if anything other than
18 what they said applied. Right?
19 A.   I'm trying to see how I might answer that.
20       MR. NORTHCUTT: Objection. Vague and ambiguous.
21 Q.   MR. GORDON: I can restate it.
22       You did your own research to determine what applied,
23 what rules governed?
24 A.   Yeah, within the confines of the law, yes.
25 Q.   Okay. And you did not -- when Melanie Silva sent you

| Page 149 |
| --- |

1  those documents that Bruce Macfarlane apparently instructed
2  her to, you didn't ask either of them if there were other
3  things to look at, other potential rules to look at?
4  A.   No, that was it.
5  Q.   Okay. We're going to mark -- may have that? What
6  are we up to? D?
7  A.   D. Because this was C.
8       (Exhibit D was marked.)
9  Q.   MR. GORDON: Let's go back to your narrative here for
10  a moment.
11      All right. So, Lieutenant, we're on page 5 still on
12  your narrative also.
13  A.   Okay.
14  Q.   Okay. So after 902. There were two buyers listed on
15  the invoice, Megan Dahle and Brian Dahle, who donated the
16  goat to the 4-H community barbeque.
17      Based on this invoice at the time of sale, Kathi Muse
18  became the responsible owner. Okay. So where -- so let's
19  go to the invoice, which is on page -- you might get to it
20  before me.
21  A.   I think it's 38.
22  Q.   38. All right.
23      What language on here does it say that she became the
24  responsible owner?
25  A.   So it's a sales invoice and then just at the bottom

| Page 150 |
| --- |

1  where she signed it. "I certify that I am authorized to
2  sign for the purchase and accept responsibility for total
3  payment due and/or collection of the total amount due."
4  Q.   So she's signed for responsibility for payment due.
5  A.   Right.
6  Q.   But how does that make her the owner?
7  A.   Because it was donated to her through the 4-H and FFA
8  community barbecue.
9  Q.   Okay. All right. It was donated before he's dead to
10  the barbeque?
11  A.   At time of sale it was donated to her.
12  Q.   Okay. Let's talk about time of sale.
13      When does the sale occur under the law? Actually,
14  let's strike that. We'll get to that.
15      Okay. Sir, have you had any training on contracts?
16  A.   On contracts?
17  Q.   Yes.
18  A.   Not that I can recall.
19  Q.   Okay. Has -- so I assume -- in any capacity as an
20  individual or as an officer?
21  A.   Right.
22  Q.   No. Okay. All right.
23      What protocols are you supposed to follow in the
24  department when there's a contractual dispute?
25  A.   So if there's a contractual dispute --

| Page 151 |
| --- |

1  Q.   Yeah.
2  A.   -- then it will become a civil matter.
3  Q.   So why didn't this contractual dispute become a civil
4  matter?
5  A.   Because I didn't deem it as a contractual dispute.
6  Q.   Okay. Because you thought the sale was done. Right?
7  A.   Right.
8  Q.   Okay. All right. How did you determine what -- do
9  you know what laws apply to govern whether there's a sale?
10      MR. NORTHCUTT: Calls for a legal conclusion.
11  Q.   MR. GORDON: You may answer.
12  A.   I can't answer that question.
13  Q.   Well, did you check the California Commercial Code?
14  A.   No.
15  Q.   Did you check the Uniform Commercial Code?
16  A.   No.
17  Q.   Civil Code?
18  A.   No.
19  Q.   Okay. You checked -- it was only the -- we've
20  already -- nothing other than what we've already gone over.
21  A.   But based on my experience, buying animals at the
22  fair, I have to pay them before I leave the fair.
23  Q.   Okay.
24  A.   So --
25  Q.   Did you -- when you're -- when you're -- do you know

| Page 152 |
| --- |

1  if -- well, okay.
2      Well, do you know if Eliza Long was paid?
3  A.   No. I have to pay the fair.
4  Q.   Strike that. E.L. Sorry.
5  A.   You said that this morning, too.
6  Q.   Do you know if they were paid?
7  A.   So I don't know if they were paid. I know that
8  checks don't go out for months after the fair, which would
9  have been after all this was done. For example, my kids --
10  Q.   So you assume they weren't paid?
11  A.   No, I assumed that the fair wrote them a check and
12  sent them a check.
13  Q.   No, no, no. Did you ask?
14  A.   I did not.
15  Q.   Did you -- so I take it by extension, you didn't ask
16  if E.L. was paid at that time. But you wouldn't have
17  expected her to be anyway, as you just said, but you didn't
18  ask.
19  A.   No, but the fair would have been paid that day by the
20  buyers before they left.
21  Q.   Did you check though?
22  A.   No.
23  Q.   Okay. So -- all right. So do you know, again -- do
24  you know if there's a dispute over a purchase, a contractual
25  dispute, what typically the remedy is.

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 41 of 116
LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 153

1    MR. NORTHCUTT: Vague and ambiguous as to "typically"
2  and the term "remedy."
3    THE WITNESS: If it's a contractual dispute, people
4  can either settle it between themselves or they can go to a
5  court if they file for that.
6  Q.   MR. GORDON: Okay. Okay. But it's -- the remedy is
7  usually money. Yes?
8  A.   Yeah, usually.
9  Q.   Yeah. Okay. All right. Okay. So -- but one thing,
10  if someone's going to hear though, you were enforcing the
11  sales contract. Yes?
12  A.   Yes.
13  Q.   Because you said it was done. Yes, okay.
14       Do you know -- so if you're going to enforce the
15  sales contract, did you check to see if the parties that
16  wanted this contract enforced, if they had fully performed?
17    MR. NORTHCUTT: Objection. Vague and ambiguous as to
18  "performed."
19       But okay. Go ahead.
20    THE WITNESS: So to the best of my recollection and
21  based on, I guess, my training and experience, was that
22  the -- right, because if you go to like a livestock auction
23  anywhere, right, once it's sold, it's sold. That's why you
24  register. That's why you have to show proof of registration
25  and you have to register and put a credit card or debit card

Page 154

1  or whatever on file.
2  Q.   MR. GORDON: Yeah.
3  A.   So that people can't basically say hey, I'm going to
4  buy all these animals, and not buy them, right. There's a
5  process to register to be a buyer. So I also, based on that
6  and based on other, right, my determination was that it
7  wasn't a contractual dispute. That it was a sold animal
8  bought for, paid. Maybe she hadn't got her check yet,
9  because I know she wouldn't have had her check yet, because,
10  for example, my kids just got their check last week, and the
11  fair was in June.
12       So -- but I knew that that process was there and that
13  the sale was final. She had admitted those things, which is
14  why I wasn't looking at it as a contractual disagreement.
15  She can write an email saying that I'm disputing this in
16  future litigation. That's fine. But I was looking at it as
17  a theft, not a contractual dispute.
18  Q.   I understand that's how you were.
19  A.   So yeah.
20  Q.   Okay. Are you -- were you familiar at the time with
21  the minor's right to disaffirm the contract?
22    MR. NORTHCUTT: Objection. Calls for a legal
23  conclusion.
24       Go ahead.
25    THE WITNESS: No.

Page 155

1  Q.   MR. GORDON: No. So you did not determine -- you did
2  not determine -- or you did not investigate what
3  obligations, if any, the auction or the fair or the buyer
4  had to -- for this contract. Correct? You assumed they
5  were all performed.
6  A.   Correct.
7  Q.   So I want to ask you a few questions about -- hold on
8  a second.
9       So the -- who would you say was calling -- so the
10  fair reported that Cedar was removed. So the fair was
11  saying there was a theft of its goat? How did they -- how
12  did they qualify it?
13  A.   That the -- that it was stolen from the fair.
14  Q.   Okay. It was stolen from the fair. So the fair had
15  its own possessory right.
16       Is that you're understanding?
17  A.   That's a tricky question.
18  Q.   Yeah, yeah. I'm not trying to --
19  A.   I know. I just --
20  Q.   I want to know what you think.
21  A.   Well, yeah. So --
22  Q.   I know technically it is a gotcha. It's not -- It's
23  not me trying to be --
24  A.   Right. So you're asking if fair, right, was the
25  one --

Page 156

1  Q.   The fair reported it.
2  A.   Right. They reported it.
3  Q.   Yeah.
4  A.   Right.
5  Q.   They said "Our goat was stolen. Our goat was stolen
6  from our property." Right?
7  A.   Right.
8  Q.   Okay. So they're claiming they lost their right to
9  the goat or something. I mean, what were you thinking at
10  the time.
11       So at the time what I was thinking was this goat was
12  sold. The legal owner is Kathi Muse. Right. She's been in
13  contact with the fair, she being Jessica Long. She's
14  admitting that. She took the goat and that she'll bring it
15  back if they can't come up with -- what she wants to do is
16  like resolve it outside of anything and that basically --
17  Q.   And money.
18  A.   Yeah. And Silva is basically saying no, per the
19  rules and everything. You need to bring the goat back. So
20  she didn't, so then --
21  Q.   Yeah.
22  A.   So then Kathi Muse is the victim and we move forward
23  and me trying to find the goat.
24  Q.   You didn't -- you didn't -- so let's just go through
25  some -- you already -- you testified that you didn't

---

Page 157

1  determine -- you assumed that the fair and Kathi Muse
2  presumably had adhered to the rules. Yes?
3  A.    Yes.
4  Q.    Your universe of rules was the -- the all general
5  livestock rules and guidelines. Yes? You weren't looking
6  at what is now Exhibit D.
7        You're looking at these ones. Yes?
8  A.    Yes.
9  Q.    Okay. All right. Okay. So on -- give me a moment.
10 All right. Sorry, guys. I had a marked up version and it
11 disappeared. I'm trying to find where my question was.
12       Okay. So let's go to page -- it's Bates stamped 35.
13       You see the heading, and you might not see it
14 immediately, where it says "Exhibitor" and "Public Safety."
15 A.    **"Exhibitor" and "Public Safety"?**
16 Q.    Yeah.
17 A.    **At the top?**
18 Q.    Do you see that? Yeah.
19       Now, do you see below that there's no space between
20 it, but it appears to be another paragraph where it says
21 "Rule Compliance"?
22 A.    Yes.
23 Q.    "Any exhibitor who fails to conform to accept its
24 standards of conduct will be removed immediately with
25 livestock from the fairgrounds and all premiums and auction

---

Page 158

1  proceeds forfeited in situations of a serious nature."
2        It seems like this contract or these rules build
3  in -- build in a remedy for noncompliance with the rules.
4        Did you review this rule compliance for -- at the
5  time when you were reviewing this document?
6  A.    **I know I read through this, yes, so I -- there's a**
7  **good likelihood I saw that.**
8  Q.    Okay. Why wouldn't -- why didn't you just tell them
9  look, she broke the rules. The rules are she just loses her
10 money?
11 A.    **Because I'm pretty sure, if I take time to go through**
12 **this, there's other language in here.**
13 Q.    Yeah, there's "All sales are final" language.
14 A.    **Yeah.**
15 Q.    I'm not trying to run from that.
16 A.    **So that's -- that's what I'm going off of because it**
17 **was sold. So I think if she -- in my mind --**
18 Q.    But you would -- but this one says "All premiums and
19 auction proceeds forfeited." So this rule would envision
20 the situation where that sale had already, in your mind, had
21 already occurred, or else they would have nothing to
22 forfeit.
23 A.    **Right. Maybe that one just didn't stick with me as I**
24 **reviewed it.**
25 Q.    Okay. All right. So the next one I want to talk

---

Page 159

1  about, so let's go to where it says "4-H members" on page
2  36. All right. Let's go to the underlined language. Let
3  me know when you're at it.
4  A.    **You said "46"?**
5  Q.    I'm sorry. 36. 36. I apologize.
6  A.    **So what portion, sir?**
7  Q.    All right. Do you see where the -- the middle
8  paragraph that says "4-H members"?
9  A.    **Yes.**
10 Q.    All right. Do you see there's bolded and underlined
11 text in there?
12 A.    **Yes.**
13 Q.    Okay. So "Youth under nine years of age" -- I'm just
14 going to read it.
15       "Youth under nine years of age as of midnight on
16 December 31st, 2020, may not enter large animals or
17 participate in the auction. Exhibitor must be nine years
18 old as of December 31st, 2020, to sell at the auction."
19       Did you determine if Eliza was that age as of that
20 date?
21 A.    **Now that you pointed that out, no, but I would have**
22 **to go to her --**
23 Q.    She wasn't, but -- right. I just wanted to see if
24 you -- you didn't review that provision.
25 A.    **Right.**

---

Page 160

1  Q.    Okay. Okay. So -- okay.
2  A.    **Then that would have meant she shouldn't have been**
3  **even been able to enter the animal into the auction. Right?**
4  Q.    Potentially, yeah. You're the one -- your office was
5  enforcing the contract that apparently shouldn't have been
6  enforced.
7  A.    **I was enforcing the law, not the contract.**
8        **MR. NORTHCUTT:** Objection. Argumentative.
9  Q.    MR. GORDON: Understood. Okay. Well, it's not going
10 into evidence. We're just talking, but -- all right. Okay.
11 So -- I meant to disrespect.
12 A.    **No, it's fine. I wasn't enforcing a contract.**
13 Q.    Yeah, you're smiling.
14 A.    **We don't enforce contracts.**
15 Q.    I understand. I understand. Well, effectively
16 enforcing a contract. Are you not?
17 A.    **Well, the rules and the law.**
18 Q.    Because she only has it by -- the buyer in this case,
19 Kathi Muse, only has it by virtue of a sales invoice, which
20 is a contract.
21       So -- all right. So -- now, did you -- let's go back
22 to the 38, which is the invoice, for a moment. So -- now,
23 it's Kathi Muse's signature at the bottom. Yes? Or at
24 least it purports to be.
25       Do you know if that is in fact her signature?

---

Page 161

1  A.   Like you just said, I take it as her signature.
2  Q.   Okay. Did you call her and ask her if it was?
3  A.   No.
4  Q.   And there's no date on it. So do you know what date
5  she signed this?
6  A.   It would have been the time of the sale.
7  Q.   Did you ask?
8  A.   Yeah, because she bought -- she bought this for the
9  Dahles. She's the one that bid for them.
10 Q.   Yeah, I understand.
11       But do you know if she signed this document that day?
12 A.   Yeah, this is the sale invoice. So they bring this
13 over to you.
14 Q.   But did you --
15 A.   No, I didn't ask, no.
16 Q.   Okay. All right. But you assume she did, but you
17 didn't --
18 A.   Yeah, absolutely.
19 Q.   -- didn't take steps to find out. I'm not saying
20 it's an unsafe assumption. I'm just saying you didn't --
21 A.   Yeah, no. I didn't ask that specific question.
22 Q.   Okay. All right. For the state rules, you
23 already -- we already went through them, the 2020 state
24 rules. We didn't go through the rules, but you say you had
25 determined.

Page 162

1        Do you know what you found in there or if you can
2  point to me what you found in there that says -- that made
3  you think that they didn't apply? If you want to take a
4  look through for a moment, fire away, but --
5  A.   It's going to take a while. And I think I stated
6  that I -- that if I recalled correctly, that there was
7  something in it that, right. And I think you hit on it in
8  the beginning.
9  Q.   Okay.
10 A.   Fairs may create local rules that may be stricter
11 than state rules.
12 Q.   But they can't circumvent them.
13 A.   Right.
14 Q.   Well, let's go to --
15 A.   I do want to go through it, if you'd like.
16 Q.   No, no. It's fine. It's fine. I'm not trying to --
17 look, it says what it says.
18       So -- but you determined they didn't apply and just
19 didn't look at those items in there, so --
20 A.   I think I -- no, I think I looked through it and the
21 best I could determine it and then went back to the
22 livestock rules for the fair.
23 Q.   Okay. It's fine. It's fine. Yeah.
24       So -- okay. In her letter on -- Jessica's letter,
25 which is her second email, she referenced -- this is where

Page 163

1  we started talking about the 2022 rules. Actually, scratch
2  that.
3        So the goat was removed on -- to your knowledge was
4  removed on June 25th. Correct?
5  A.   Yes.
6  Q.   And that was still the show date. Yes?
7  A.   That was --
8  Q.   The auction was that morning.
9  A.   If it's an auction date.
10 Q.   Auction date. Okay. All right.
11 A.   Show days end on Friday.
12 Q.   Show days end on Friday.
13       When it says in the state rules when it says -- let
14 me find it -- "Exhibitors must maintain ownership through
15 the show dates."
16 A.   Right.
17 Q.   That's a different thing, in your mind?
18 A.   Yes.
19 Q.   Okay.
20 A.   Because the show dates -- they're showing which ends
21 on Friday. Actually, I think goats are either Wednesday or
22 Thursday they're done showing.
23 Q.   Okay.
24 A.   And then steers are always on Friday, and then sale,
25 the only thing they do Saturday, which was the 25th, is the

Page 164

1  auction. That's all they do.
2  Q.   Okay. All right. So -- so let's go to -- you
3  already said you didn't -- you hadn't seen Exhibit D
4  beforehand. Correct?
5  A.   No, sir.
6  Q.   So in Exhibit D, if we go to it for a moment.
7  A.   Back page?
8  Q.   Yeah, the second page.
9        Okay. So there's this Absentee Buyer Form.
10       Did -- do you know if Kathi Muse filled one of these
11 out?
12 A.   I do not know.
13 Q.   You do not know that.
14       Or would the Dahles have filled it out then?
15 A.   Yeah, I don't know if they did or didn't.
16 Q.   You don't know. Okay.
17       And you didn't ask for any Absentee Buyer Form?
18 A.   No.
19 Q.   Okay. So did you do any -- in your investigation of
20 this matter, did you do any research or what laws operate
21 when a parent signs for a child?
22 A.   No, I just went off of the -- what do you call that,
23 the registration form.
24 Q.   The registration form. Okay. All right.
25       Okay. Did you -- when you were doing your

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 44 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                              August 21, 2023

Page 165

1 investigation, do you consult with any -- did you
2 consult with County Counsel on any of these matters?
3 A.   Not with County Counsel. There was a phone
4 conversation with the -- with myself and the District
5 Attorney.
6 Q.   At what point in time?
7 A.   I think it was after we had went and got the goat.
8 Q.   Okay.
9 A.   Collected the goat.
10 Q.   So like that weekend, you mean, or you mean on the
11 call back up to Redding?
12 A.   No, no. It would have been after, like probably the
13 next week or maybe when it started getting a lot of public
14 attention.
15 Q.   Okay. Okay. All right. So there were some emails
16 which you might have noticed from -- that were produced
17 by -- is it Detective Ashbee?
18 A.   Detective Ashbee is one of the people on this
19 investigation.
20 Q.   Yeah. Is he a detective?
21 A.   Yeah, detective.
22 Q.   Between him and Eamon?
23 A.   Oh, Eamon Fitzgerald.
24 Q.   Eamon Fitzgerald. You didn't talk to Eamon
25 Fitzgerald?

Page 166

1 A.   No.
2 Q.   Okay. So you didn't research what laws operate when
3 parents signed their children, and you didn't -- you didn't
4 talk to County Counsel or any other attorney?
5 A.   No, sir.
6 Q.   Okay. All right. Okay. So -- and when you -- when
7 was the first time you spoke with Kathi Muse during this
8 investigation?
9 A.   It was sometime -- sometime after I took the initial
10 investigation, so before I went and got the goat.
11 Q.   Do you know about when? I mean, I figured it was at
12 some point in there.
13 A.   If I can recall, it was probably -- because I don't
14 think I really documented it in the report, probably the
15 week -- the week before I went and got the goat.
16 Q.   What did you discuss?
17 A.   Just that -- I believe it was -- I think we located
18 where the goat's at. We're looking at getting a search
19 warrant, and just the communication about how we're going to
20 get the goat back when we found the goat.
21 Q.   Okay. All right.
22 A.   And then, you know, there was -- I think at that -- I
23 don't know if it was at that point. No.
24 Q.   Okay. All right. Okay. And this isn't me
25 browbeating you. I'm verifying. I think I asked you this.

Page 167

1 We went through the -- we discussed time of sale and you
2 said you hadn't reviewed the, you know, commercial code or
3 civil code or any of the laws. You're just purely going by
4 the sale invoice and local rules.
5 A.   Correct.
6 Q.   So how many other cases have you had -- so let's
7 go -- do you see the paragraph on page 5, FERN 5, where it
8 says "Upon reviewing," the fair entry form, the first
9 sentence of it?
10 A.   Uh-huh.
11 Q.   And then the next paragraph also. So -- and then
12 even the one following that, which is on the entry form.
13 They listed Eliza Long as the exhibitor, blah, blah, blah.
14 I've read the rules...
15   Have you ever in any of your years as a -- in law
16 enforcement had to do such a contractual analysis for a
17 criminal case?
18   MR. NORTHCUTT: Objection. Vague and ambiguous.
19   THE WITNESS: Probably like on an embezzlement and
20 fraud case probably. Right.
21 Q.   MR. GORDON: Yeah. Have you?
22 A.   Yes.
23   Probably. Okay. Okay. Interesting.
24   Were there charges pressed on it?
25 A.   Yes.

Page 168

1 Q.   Yes. Okay. All right. Well, I've already -- this
2 next part is going to be tedious, but I preemptively
3 apologize. We're just going to go day by day because I want
4 to see what you did each day. All right. So this was 6/29.
5 You get the fair, the -- you get all the invoice -- the
6 materials from Silva. Right?
7 A.   Uh-huh.
8 Q.   Okay. And then was there anything else you did that
9 day other than review -- other than receive these documents
10 from Silva? With respect to the investigation. I know
11 there was other things you did.
12 A.   I probably received them. I may have started looking
13 through them.
14 Q.   Okay. All right. And so the next day would have
15 been June 30th.
16   Did you do anything that day?
17 A.   I probably would have --
18 Q.   If you want to look at this to refresh your memory,
19 that's fine. I mean, I'm looking at the same thing you are,
20 your write-up.
21 A.   Are you referencing a specific part of my
22 investigation?
23 Q.   I just want to know what you did on your
24 investigation apart from what you've written here on every
25 day between the start of it and the day Cedar was taken into

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 45 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                              August 21, 2023

Page 169

1  your custody.
2  A.    Okay. So the second after I received these, I may
3  have --
4  Q.    Which would be --
5  A.    What's what?
6  Q.    Yeah, it would be the 30th. Correct?
7  A.    Yeah.
8  Q.    Okay. All right.
9  A.    Then I probably would have reviewed them some more,
10  maybe started looking in and trying to find this other
11  information, you know, the handbook information, the
12  laws for -- the rules of the fair.
13  Q.    But you didn't -- you didn't speak with anyone
14  related -- anyone of interest in this investigation? That's
15  a bad way to put it. Apart from --
16      I want to know if you spoke with anyone about this
17  investigation, you know, like Kathi Muse or Bruce Macfarlane
18  or anyone that might be relevant to it.
19  A.    I'm trying to think about conversations because I
20  know there was a lapse in time, right, between --
21  Q.    Sure.
22  A.    When we -- when I initiated the investigation versus
23  when we went and got the goat.
24  Q.    Yeah, it looks like a gap occurs, which we'll get to
25  in a moment.

Page 170

1  A.    Yeah, so I can't recall anything specific on that
2  day.
3  Q.    Okay. All right. Your notes here say on 6/30 about
4  17:41 hours "I again attempted to contact Jessica on her
5  cell phone." It says "again."
6      Did you attempt to contact her previously? I didn't
7  see that.
8  A.    Yes, I did.
9  Q.    Oh, on 6/29. Oh, so you went -- okay.
10  A.    Yeah, I went there. So once I got all this stuff, so
11  yeah.
12  Q.    Did you call her first before going to her residence?
13  A.    No.
14  Q.    Okay. Why not?
15  A.    Well, I'm conducting an investigation of stolen
16  property, so I wouldn't call a suspect.
17  Q.    Do you ever call first? I mean --
18  A.    No.
19  Q.    Okay.
20  A.    So I wouldn't call a suspect and think -- right.
21  Q.    But you see she's trying to work it out amicably?
22  A.    Yeah, that doesn't...
23  Q.    It doesn't change your protocol?
24  A.    No, it doesn't change the fact. So I get what she's
25  trying to do.

Page 171

1  Q.    Yeah.
2  A.    She can write what she wants, but I'm looking at
3  the -- I'm looking at it that it's a theft, a felony. So I
4  would not call a suspect. We never call suspects before we
5  show up to their houses, unless it's something where -- I'm
6  not going to say never, but in this circumstance I would not
7  call her and say, "Hey, by the way we'll need to come to
8  your house," and tip her off if this animal was there.
9  Because if it's there, I want to collect it.
10  Q.    I see.
11  A.    Right. So I just -- I responded to her residence
12  prior to calling.
13  Q.    Okay. Okay. All right.
14  A.    Officer safety and everything else is a part of that.
15  Q.    All right. Okay.
16  A.    Because I don't know who she is. Right.
17  Q.    Well, you must -- you didn't do any investigation
18  into her about it before?
19  A.    No, I mean -- yeah, I had to figure out where she
20  lived.
21  Q.    Yeah.
22  A.    But I don't know, right. You run a criminal rap. It
23  doesn't show anything.
24  Q.    Yeah.
25  A.    So...

Page 172

1  Q.    Yeah. It's a dangerous job. I'm not trying to
2  minimize that at all.
3  A.    But that's -- to answer your question as to why I
4  didn't call before I went.
5  Q.    Okay.
6  A.    I just -- I want to end this circumstance.
7  Q.    Okay.
8  A.    Not to mean I want to end every circumstance.
9  Q.    Did it -- did it cross your mind that she might
10  potentially be scared of criminal charges at that point in
11  time? Just government worker, doesn't have -- you know.
12  A.    Yeah, I mean -- yeah, I think she works at like a
13  hydroplant or something.
14  Q.    I believe so.
15  A.    Yeah. And I didn't want to go to her work. I didn't
16  want to do those things.
17  Q.    Okay.
18  A.    There's a lot of things I could have done. I could
19  have gone to her work and arrested her. I didn't want to do
20  that.
21  Q.    Okay.
22  A.    So I know in here she talks about, you know, being --
23  in her email, right, she's talking about Macfarlane, like
24  being threatening towards her about bringing the animal
25  back.

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 46 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                            August 21, 2023

Page 173

1 Q.   Yeah.
2 A.   But that she's never had any trouble with law
3   enforcement.
4 Q.   Yeah, your counsel would have to ask her.
5 A.   Yeah, I know.
6 Q.   Okay.  All right.  But you didn't call her before and
7   it didn't cross your mind that -- did you consider calling
8   her and just elected not to or just didn't even cross your
9   mind to because you're just -- this is the way you usually
10  go about doing it?
11 A.  Yeah, I didn't think about calling her beforehand.
12 Q.  Okay.  That's fine.  All right.  So that's 6/29.
13        Anything else on 6/29 here happen of merit or of
14  importance, other than what you wrote down?
15 A.  Yeah, I went to her house.
16 Q.  You wrote that down.  Didn't you?
17 A.  Yeah.
18 Q.  Okay.  All right.  And she wasn't home?
19 A.  No, she wasn't.
20 Q.  Okay.  All right.
21 A.  It didn't appear she was home.  I mean, there was a
22  car miss -- like, you know, there wasn't a vehicle in front
23  of the garage.
24 Q.  I believe she went out of town for the holidays.
25  July 4th was approaching.  So -- all right.

Page 174

1 A.   And then I -- and then I did call her.
2 Q.   You called and left a message?
3 A.   Yeah.
4 Q.   Did you call her -- did you send her -- did you try
5   to send her an email or anything else or any other ways you
6   communicate with her?
7 A.   No.
8 Q.   Okay.  All right.  So on 6/30, again -- we're going
9   to 6/30 now, so scroll -- go down the page a little bit.
10  You again --
11 A.  Which page are you on?
12 Q.  The same one.
13 A.  5 or 6?
14 Q.  7.
15 A.  See, I was on page 5.  So that's why I'm like looking
16  at this stuff.  So we're on page 7 now?
17 Q.  Yeah.  Well, I was before because that's where you
18  have that you called her -- all right.  Well...
19 A.  Sorry.
20 Q.  What were you referring to in this?
21 A.  No, I didn't -- okay.  You remembered correctly, but
22  I was reading from a paragraph on page 7 when I was asking
23  about you calling her, so that's -- we're on 7.
24        Going down to 6/30, what -- "I again attempted to
25  contact Jessica via her cell phone.  I tried -- her mail box

Page 175

1   full and did not" -- did you send her a text?
2 A.   No.
3 Q.   Did you consider sending her a text?
4 A.   No, sir.
5 Q.   All right.  Okay.  All right.  So then we have this
6   gap.  So 31 days in June or it's just 30?  Right?
7 A.   Yeah.
8 Q.   Okay.
9 A.   I don't know.  I don't know if that's like a Friday
10  or something.
11 Q.  I'll just check because we're going to go day by day.
12 A.  Or a Thursday.
13 Q.  All right.  It's 30 days.  So that's a Friday.  Yeah,
14  yeah.  6/30 is a Friday.
15 A.  Okay.
16 Q.  All right.  So Saturday July 1st, did you do anything
17  in relation to this case?
18 A.  No.
19 Q.  No.  Okay.  All right.
20        Do you have any notes elsewhere or anything that
21  would say that you did XYZ on the case?
22 A.  No.
23 Q.  No.  Okay.  All right.
24        And you didn't speak with, you know, anyone of Kathi
25  or Bruce or the -- melanie on those dates?

Page 176

1 A.   Not that I can recall.
2 Q.   Okay.  All right.  And on 7/02, so that would be a
3   Sunday, do you do -- I realize the holiday would have been
4   coming up at the time, but did you do anything in relation
5   to this case on that date?
6 A.   I don't recall.
7 Q.   Were you working?
8 A.   No.
9 Q.   No, you were off?
10 A.  Uh-huh.
11 Q.  Did you go out of town?
12 A.  I don't know if we left town or not.
13 Q.  Okay.
14 A.  We usually do.
15 Q.  Yeah.
16 A.  Usually after the fair.
17 Q.  Okay.  Okay.
18 A.  Family vacation.
19 Q.  All right.  Gotcha.  All right.
20 A.  But I wouldn't have worked.
21        So the 4th was what day?
22 Q.  The 4th was Tuesday, I believe.
23 A.  A Tuesday?
24 Q.  Yeah, Tuesday.
25 A.  So they probably would have given us -- I don't know.

Page 177

1  It's kind of weird. I'm trying to think. I don't know. We
2  either had that Monday off or we worked that Monday or I
3  took it off because why come to work on a Monday and then be
4  off Tuesday.
5  Q.   Yeah.
6  A.   So...
7  Q.   Okay. So you -- so you -- did you say you did work
8  Sunday or didn't?
9  A.   I did not. I don't work the weekends --
10 Q.   You don't work the weekends.
11 A.   -- unless I get called out.
12 Q.   That's good. That's good. Okay. So you -- and then
13 Monday you likely had off, you think?
14 A.   I think so.
15 Q.   You didn't do any work on your day off on the case?
16 A.   No.
17 Q.   Okay.
18 A.   No, no.
19 Q.   Not paid --
20 A.   No.
21 Q.   Is -- okay. And then Tuesday, you didn't -- you
22 didn't work Tuesday or did you work Tuesday?
23 A.   That's a holiday?
24 Q.   Yeah.
25 A.   I wouldn't have been working that day.

Page 178

1  Q.   There must be some sheriffs working out there.
2  A.   Yeah, patrol guys?
3  Q.   Patrol guys.
4       Everyone else is just off?
5  A.   Yeah, it's a 24/7 office.
6  Q.   Okay. All right. Okay. Is it there a parade in
7  town here or anything on the 4th?
8  A.   I don't know.
9  Q.   No? You don't know. Okay. I would think there'd
10 be. I don't know. It's a nice downtown area, do something.
11      Okay. So then the 5th did you go back to work?
12 A.   To the best of my recollection, yes.
13 Q.   Yes. Okay. All right. Okay.
14      Did you do anything related to this case on the 5th?
15 A.   Not that I can recall.
16 Q.   You didn't speak with, you know, Bruce or Kathi or
17 Melanie? Didn't try to contact Jessica again?
18 A.   I could refer -- I know I -- we provided you some
19 like text messages. Or was that --
20 Q.   Yeah, I don't think they come with dates.
21 A.   I don't know. I can't recall.
22 Q.   Okay. All right. But you don't -- you don't believe
23 so. Okay.
24      And then -- so then the next day would be the 6th.
25 Did you -- which would be -- what day of the week is that?

Page 179

1  It's a -- the 6th is a Thursday.
2       So did you -- did you work Thursday, July 6th?
3  A.   Yes, I'm pretty sure I did.
4  Q.   Did you do anything with respect to this
5  investigation on the 6th?
6  A.   I probably would have been, you know, compiling some
7  stuff and maybe starting to write out wrote my narrative,
8  you know.
9  Q.   Oh, so you think you wrote some of this down on the
10 6th?
11 A.   Yeah.
12 Q.   Okay. All right. But you didn't -- you didn't speak
13 with anyone or try to contact Jessica again or go by her
14 house again or...
15 A.   No.
16 Q.   Okay. All right. Did any of the other sheriffs --
17 were you the only one working on the case?
18 A.   I was the only one working the case.
19 Q.   Okay. So no one else, to your knowledge, had any
20 involvement saying go investigate XYZ.
21 A.   Right.
22 Q.   And presumably Reed Severson taking your opening --
23 generating the case number, etcetera.
24 A.   Correct.
25 Q.   Okay. All right. So then 7/07 comes.

Page 180

1       So on 7/7 "SDF" -- this is Shasta District Fair,
2  presumably?
3  A.   Yes.
4  Q.   "Informed me of a post on social media. The social
5  media post is made on Instagram at Bleating Hearts Farm.
6       Okay. Did you -- did she send you a copy of this
7  post?
8  A.   I think we pulled it off of -- she didn't send it to
9  me. I think we -- we pulled it off of the social media.
10 Q.   Yeah. All right. So I want to go to the post for a
11 moment.
12      Is it in your production of the warrant?
13 A.   No.
14 Q.   No. Okay. It's just in the warrant. All right.
15      Was that the first time you saw the post?
16 A.   Yes, sir.
17 Q.   Okay. It's -- it's -- do you know it says "Dated
18 June 27th," the post? So it had been up for, at that point
19 in time now, ten days or so.
20 A.   Where do you see that at, sir?
21 Q.   It's at -- so it's -- your on the post, page 13?
22 Yeah, at the bottom.
23 A.   13 or --
24 Q.   No, no. You're looking at it. So just -- move your
25 finger. There you go.

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 48 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                              August 21, 2023

Page 181

1 A.   Right here?
2 Q.   Yeah.
3 A.   Did I say June 27th?
4 Q.   Yes.
5 A.   Okay.  Yeah, I don't -- I'm not a social media --
6 but, yeah.
7 Q.   You probably think I am, but I hate it with a
8 passion.
9 A.   Yeah, I can see where it says "June 27th."
10 Q.   Okay.  All right.  Did you ask Silva any questions
11 about this post?
12 A.   I don't think so.  Oh, yeah.  I think she -- well, if
13 we go through there to that paragraph.
14 Q.   Which one?
15 A.   The paragraph on page 7.
16 Q.   Yeah.  Do you want to go through it?
17 A.   Yeah.
18 Q.   "Social media post is made in Instagram on Bleating
19 Hearts Farm.  In the post the goat is pictured with an SDF
20 ear tag and a Scrapie.  A Scrapie ear tag is a breeder ear
21 tag that identifies the flock and the individual animal
22 number.  Silva advised Bleating Hearts Farm is located in
23 Napa.  I asked Silva to contact the breeder of the goat that
24 was taken to obtain the Scrapie ear tag.  Silva later
25 provided me of the number of the Scrapie ear tag number of

Page 182

1 CALOZA 0700.  The SDF ear tag was 367."
2 So this is the first time you've seen this social
3 media post.  In Silva's email, which you -- which we went
4 through earlier, which is -- so it's 43, FERN 43.
5 A.   Uh-huh.
6 Q.   She mentions Facebook and Instagram on this with --
7 with this.
8 Did you not ask for the Facebook and Instagram posts
9 or whatever, you know, the negative experience for the
10 fairgrounds?  This has been all over Facebook and Instagram.
11 I'm assuming you see that language in her email.
12 Did you not ask for those posts at that time?
13 A.   No, I did not.
14 Q.   Okay.  All right.  So to my knowledge this is the
15 only post.
16 Is there any reason why she waited until 7/7 to send
17 it to you, even though it had been posted for 10 days?
18 A.   I can't answer that.  I don't know why.
19 Q.   Okay.  You didn't notice the date on the post at the
20 time?
21 A.   No.
22 Q.   Okay.  All right.  Okay.  So -- so the next day is --
23 did anything else happen on 7/07?
24 A.   No.
25 Q.   Did you investigate Bleating Hearts -- by

Page 183

1 "investigate," start doing research on Bleating Hearts Farm
2 or anything like that?
3 A.   Yeah, I believe at some point.  I don't know if it
4 was the 7th --
5 Q.   Yeah.
6 A.   -- or if it was the 8th that we started doing the
7 research on Bleating Hearts Farm.
8 Q.   Okay.  And what did you -- what did you do to
9 research them?
10 A.   Looked them up, noticed that it was in Napa --
11 Q.   Yeah.
12 A.   -- California at a location, kind of looked at Google
13 earth, and then Basically reached out to Mr. Maiden on the
14 8th.
15 Q.   He's the Napa Sheriff?
16 A.   He's a Lieutenant down there, yes.
17 Q.   Okay.  All right.  And so -- Officer, what page was
18 the post on again, if you have it?  I've got it.  I've got
19 it.  27.
20 So what in here -- you've read this and you presumed
21 that Cedar was there, or did Melanie Silva tell you Cedar
22 was there?
23 A.   No, we believed -- I believed that it was there.
24 Q.   You believed it was there.  Okay.
25 Based -- just because they had posted it?  And

Page 184

1 anything they say specifically?
2 A.   No, not that I can recall, no.
3 Q.   Okay.  All right.  And, again, it mentions contacting
4 Brian Dahle and the Shasta Fair, but -- okay.  All right.
5 So -- so then you might have done some research.
6 Is there anything else you might have done on 7/7 or
7 did do on 7/07 that you can think of?
8 A.   No, I think -- if I can recall, too, I think the post
9 also, right, because we've -- all right.  Napa -- at some
10 point, if I can recall, like someone mentioning like, hey --
11 I don't know if it's documented on my report though, so
12 that's kind of a problem.
13 Q.   Well, if you can remember it.  It's on the record
14 here, so...
15 A.   Yeah, I don't.  Something about it being taken -- you
16 know, she took the goat out of the area, suspected it was
17 taken out of the area, but --
18 Q.   Yeah.
19 A.   Right.  So that's all I have.
20 Q.   So you don't remember speaking with on 7/07, like did
21 you call up Kathi Muse on 7/07, say "Hey, we know where he
22 is"?
23 A.   No, I think that wasn't until the 8th.
24 Q.   Okay.  All right.  And -- okay.  So you did call her
25 on the 8th?

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 49 of 116

LONG vs.                                                LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                            August 21, 2023

Page 185

1  A.   I'm pretty sure, yeah.
2  Q.   Okay.
3  A.   I know I talked with her.
4  Q.   You talked with her.  Okay.
5  A.   We may have talked sometime before then, too, but --
6  Q.   Do you have a recollection of any conversation?
7  A.   No.
8  Q.   No.  Okay.
9       So you think -- was the 8th the first time you had
10  ever spoken to her about this then?
11  A.   I can't recall that, no.
12  Q.   When -- okay.  But you said --
13  A.   I think --
14  Q.   -- you remember speaking with her on the 8th.
15       Did you speak with her beforehand?
16  A.   Yeah, it was before I was responding, like when we
17  were like "Hey, this is where we think the goat is.  We're
18  getting a search warrant.  We're going down there."
19  Q.   So that -- so this is either 7/07 or the 7/08?
20  A.   7/08.
21  Q.   Okay.
22  A.   Because that was all the same day.
23  Q.   Okay.
24  A.   And I know I had talked to her prior to that.
25  Q.   Okay.

Page 186

1  A.   So I don't recall what exact day I talked to her.
2  Q.   Okay.
3  A.   She may at some point.
4  Q.   Okay.  Did your -- did your wife talk to her at that
5  time, too, at all?
6  A.   About this?
7  Q.   Yeah, about like -- about the goat.
8  A.   No.
9  Q.   If she had a relationship enough with her because
10  of the barbecue?
11  A.   No.
12  Q.   Okay.  All right.  So -- all right.  So you go -- so
13  7/08 comes.
14  A.   Right.
15  Q.   What time did you leave -- let's just -- we'll just
16  read it.
17       It says "7/08 I acted Lieutenant Donald Maiden in the
18  Napa County Sheriff's Department."
19       Do you know about what time that was?
20  A.   I want to say it was mid to late afternoon.  Mid
21  noon, a little after noon probably.
22  Q.   Okay.  So like --
23  A.   Lunch time.
24  Q.   Okay.  All right.  Lunch time.
25       Okay.  And what did -- what did you tell him in that

Page 187

1  conversation?
2  A.   I basically gave him a rundown on my investigation.
3  Q.   Yeah.
4  A.   That we had a goat stolen.
5  Q.   Did he give any comment, like "Just let her pay the
6  damn money"?
7  A.   I mean, people are going to make comments.  It's
8  not -- it's not -- it's not the crime of the century.
9  Right.
10  Q.   No.
11       So then I had requested -- we gave him this
12  information and that was requesting him to basically go
13  there.  See if the goat's there.  If it is, collect the
14  goat.
15  Q.   Oh, so you wanted him to go solo?
16  A.   I wanted him to go -- I wanted his office to go --
17  Someone from his office without you going down there.
18  A.   Yeah, someone from his office, his agent.
19  Q.   Yeah.  And -- okay.  And what did he -- did he then?
20  I'm sorry.  I cut you off.
21  A.   Yeah.  So why didn't he?
22  Q.   Well, you were -- you were telling me what you asked
23  in the conversation, what you talked about, and I cut you
24  off, so go ahead.
25  A.   So then he -- he said he would call me back.

Page 188

1  Q.   Yeah.
2  A.   He had the location, so he started doing research on
3  the location.  He called me back.  He informed me that one
4  of their staff that works in their records unit actually
5  resided there, and I believe was like the listed person --
6  Q.   Yeah.
7  A.   -- as the owner of Bleating Hearts.
8  Q.   The male.
9  A.   Yeah.  Starkey.
10  Q.   Not Kristin.
11       Was his last name Starkey?
12  A.   Starkey, yeah.
13  Q.   I thought it was Kristin Starkey.  Is the guy's name
14  Starkey, too?
15  A.   No, it's Kristin Stover and then Justin Starkey.
16  Q.   Oh, Stover.
17  A.   Yeah.
18  Q.   And Justin Starkey.  I remember.  I apologize.
19       So then what did you discuss with him?
20  A.   So what we discussed, which isn't part of this,
21  because it's more of an internal -- so because I was
22  charging a felony, we elected -- he -- instead of -- he was
23  all for going, doing my initial request, which was to go out
24  to the residence, see if it it's there.
25  Q.   Yeah.

Page 189

1  A.    See if he could acquire it. If he couldn't, we could
2  draft a warrant.
3  Q.    Yeah.
4  A.    You know, do it all telephonically through him.
5  Q.    Yeah.
6  A.    But once he determined that one of his staff members
7  of the Sheriff's office down there lived there and was part
8  of the Bleating Hearts Farm --
9  Q.    Yeah.
10  A.    -- then that adds a bigger issue because now if he's
11  charged with a felony, they can't really -- you shouldn't
12  investigate your own people. So that may potentially could
13  have turned into a potential internal affairs investigation,
14  a personnel matter.
15  Q.    I see.
16  A.    So to make it cleaner for both parties, in case the
17  goat was there --
18  Q.    Yeah.
19  A.    -- which we suspected it was.
20  Q.    Yeah.
21  A.    Any criminal stuff we would have handled, and then
22  the internal personnel matters, i.a., would have been
23  handled through their office.
24  Q.    Okay.
25  A.    So that kind of hit like a pause. So once he related

Page 190

1  that information to me, had a conversation with the higher
2  up in my organization, explained the situation, hey, it's
3  not going to be as simple as them going and seeing if the
4  goat's there and collecting it under a warrant --
5  Q.    Yeah.
6  A.    -- we're going to have to go because -- and the
7  reason why is because it's an -- it could potentially be an
8  internal investigation --
9  Q.    I see.
10  A.    -- which is muddied. It muddies the water. They're
11  protected under POBAR --
12  Q.    Okay.
13  A.    Right. Well, maybe not because it's a civilian
14  staff, but you have to afford your people certain rights.
15  Q.    Okay.
16  A.    And it wouldn't look good if they were --
17  Q.    So you had to go down there and do the search then?
18  A.    It was cleaner that way.
19  Q.    It was cleaner that way.
20  A.    Yeah.
21  Q.    Okay. All right.
22         But you could have potentially charged him with a
23  felony?
24  A.    Yeah, if the goat was there and he's -- and if he
25  would have known it was stolen, then he potentially could

Page 191

1  have been charged with a felony as well.
2  Q.    Receiving stolen property or something.
3  A.    Yeah.
4  Q.    Okay. All right.
5  A.    So to keep it cleaner --
6  Q.    Yeah.
7  A.    -- that's why --
8  Q.    That all assumed the --
9  A.    -- the Sheriff's Office responded to Napa County.
10  Q.    I gotcha. All right. So you spoke with him and that
11  was around lunch time.
12         At what point did you determine -- so was this all
13  the same conversation?
14  A.    No. It's back and forth --
15  Q.    Back and forth.
16  A.    -- phone calls.
17  Q.    How many times did you speak with him that day, do
18  you think?
19  A.    Oh --
20  Q.    It sounds like a lot.
21  A.    Well, yeah, on the response down to like, hey, we're
22  leaving, probably a handful of times at least and then in
23  person.
24  Q.    Yeah.
25  A.    Yeah, at least five times, I think, we talked on the

Page 192

1  phone in person.
2  Q.    Okay. So what time did you leave, you know, what
3  time did you start your trip down there?
4         Just so the record is clear, what my question is you
5  left Shasta County to go down to Bleating Hearts Farm to
6  confiscate the goat yourself at some point in time.
7  Correct?
8  A.    Right.
9  Q.    And what time did you leave?
10  A.    Roughly mid afternoon, like 3:00, I want to say, 3:00
11  or 4:00.
12  Q.    Okay. Why did it have to be done that day?
13  A.    I wasn't alone.
14  Q.    Duncan was with you. Right?
15  A.    Yeah.
16  Q.    Why it have to be done that day?
17  A.    Honest answer?
18  Q.    Honest answer. You don't want to lie to me.
19  A.    Because I'm an honest person?
20  Q.    Yeah.
21  A.    Because I don't work Saturday, and this was a Friday.
22  Q.    Okay.
23  A.    And it's evidence, right. So if I think it's there,
24  the longer we wait, the more likelihood it could potentially
25  go somewhere else, because it's not real -- it's not a

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 51 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                               August 21, 2023

Page 193

1  fixated property.  It's not a lot of land.
2  Q.    Okay.
3  A.    It's an actual piece of property.
4  Q.    I understand.
5  A.    Right.  So you kind of got to jump on those things.
6  Q.    It wasn't because there was a barbecue on Sunday?
7  A.    No.
8  Q.    No?
9  A.    No.  I had no -- no.
10       MR. NORTHCUTT: Objection.  Argumentative.
11       THE WITNESS: No, no.
12 Q.    MR. GORDON:  No.  Okay.  All right.  Okay.
13  Okay.  So was -- did Melanie Silva request you go get
14  Cedar immediately on the 8th -- or the 7th through the 8th?
15 A.    No.  And I don't answer to Ms. Silva.
16 Q.    I didn't -- but she didn't ask?
17 A.    No.  I got that information, right, we think it's
18  here.  It's kind of --
19 Q.    I mean no disrespect.
20 A.    Yeah, no, I know.
21 Q.    Did Kathi Muse ask?
22 A.    I think she wanted her property, yeah.
23 Q.    Okay.  Okay.  All right.  Objection to "her
24  property," but fair.
25       She wanted you to go down there and get him.  Okay.

Page 194

1  All right.  Okay.
2       What else do you -- so you think you -- you said you
3  had a conversation with Kathi Muse.
4       Was it the morning of the 8th?
5  A.    To go back on your last question, why I just -- you
6  know, why we went.
7  Q.    Yeah.
8  A.    The original plan wasn't to -- right.  Ideally, Napa
9  County SO would have went there, collected it, thrown it in
10  their -- wherever their shelter is.
11       (Indecipherable simultaneous talking.)
12       You can't thrown an animal on that.  Yeah.
13 Q.    Because you can't put it in an evidence locker.
14 A.    Right.
15 Q.    Got it.
16 A.    And then we would have sent -- and then we could have
17  sent people down that following week.
18 Q.    Yeah.
19 A.    Monday, Tuesday, Wednesday, whenever we had staff
20  available to drive down there and collect it and bring it
21  back.
22 Q.    Okay.  Okay.  All right.
23 A.    But that employee issue kind of threw a wrench in
24  everything.  It's like -- well, they don't want to go,
25  right, and because --

Page 195

1  Q.    Couldn't you have had another -- could you have had
2  another Sheriff's Department down there do it for you so
3  they didn't the issue?
4  A.    But then we're getting -- but then we're getting
5  three different agencies involved.
6  Q.    Sure.  No, I'm just -- is that a possibility?
7  A.    It's absolutely a possibility.
8  Q.    Okay.  So it does -- those sorts of coordinations do
9  happen sometimes?
10 A.    It can, yeah.
11 Q.    Okay.  All right.  So -- and you elected to go down
12  on 7/08 -- you were laughing at the time, so I don't
13  think -- because I thought you were going to say something
14  else.
15       You said because you said you don't work on Saturday?
16 A.    Yeah.
17 Q.    But wasn't 7/08 a Saturday, or am I hallucinating
18  here?
19 A.    I thought it was a Friday, based on what we're doing
20  here.
21 Q.    No, 7/08 was a Saturday -- no, wait.  Hold on.  One
22  second here.
23 A.    So go back one day?
24 Q.    Yeah, yeah.
25 A.    It's a Friday.

Page 196

1  Q.    You're correct.  It's Friday.  Okay.  All right.
2  Okay.  So it's a Friday.
3       So you left -- so you didn't -- so you wanted to go
4  that day because you didn't want have to go on the weekend?
5  A.    Right.
6  Q.    Why couldn't have it just waited until Monday?  Oh,
7  you answered it.
8  A.    We already answered that.
9  Q.    You can answer it again.
10 A.    Because I didn't want the likelihood of the evidence
11  disappearing and going somewhere else -- or the property --
12  the goat disappearing.
13 Q.    Did anyone -- did you have any reason to think it was
14  going to be moved again -- or he was going to be moved
15  again?
16 A.    I don't know why people do what they do.
17 Q.    Are you quoting Dondre (phonetic) --
18 A.    I mean, she drove it all the way from here to Napa --
19 Q.    Yeah.
20 A.    -- or eventually somewhere else.  It's just if we
21  know where it is now, we should probably go try to get
22  it now.
23 Q.    How many other crimes are you investigating at the
24  time?
25 A.    Me?

Page 197

1  Q.   Yeah.
2  A.   None.
3  Q.   None. This is the --
4  A.   Yeah.
5  Q.   This is the only one. Okay. All right.
6       Okay. How many other crimes was Duncan investigating
7  at the time?
8       MR. NORTHCUTT: Objection. Calls for speculation.
9  MR. GORDON: If you know.
10 A.   I don't know.
11 Q.   You don't know.
12 A.   Yeah, I don't oversee Detective Duncan.
13 Q.   But more than zero. Correct?
14 A.   I would imagine so, yes.
15 Q.   All right. Why did he go with you?
16 A.   So it's, quite frankly, circumstance. He was signed
17 up to work overtime shift that night, doing what we call
18 campground patrol.
19 Q.   Okay.
20 A.   So we have a -- I don't know if I to need give this
21 long of an answer -- but essentially it's grant funded. If
22 we can do it, we can do it. If we can't, we can't. Guys
23 sign up or girls sign up, deputies sign up to work. It's
24 either a Saturday or Friday or if it's a holiday weekend --
25 Q.   Yeah.

Page 198

1  A.   -- and they just drive around to our campgrounds.
2       So when this was occurring, and, you know, having
3  those conversations with like Ashbee about this, he's part
4  of the Detective Bureau, he overheard.
5  Q.   Yeah.
6  A.   He elected "Hey, do you want me to go with you?"
7       And I said "Clear it with your boss," which is
8  another lieutenant.
9  Q.   Yeah.
10 A.   And then he went with me.
11 Q.   So he wanted the OT?
12 A.   He was already working OT.
13 Q.   Did you get OT for this drive?
14 A.   No. I'm salary, so it's all free.
15 Q.   It's all free.
16 A.   Yeah. Not -- until 5:00 it was.
17 Q.   Yeah. Okay. All right. Fair enough. I know what
18 you mean. Okay. All right.
19      So you said you set off towards Napa at about 3:00.
20 A.   Roughly, yes.
21 Q.   Roughly 3:00.
22      And how long did it take you to get down there?
23 A.   Roughly, I think, it's about a three-hour drive.
24 Q.   Oh, I forgot -- well, I don't know if I got an answer
25 to this.

Page 199

1       You spoke -- what time abouts did you speak with
2  Kathi Muse on July 8th?
3  A.   It would have been before our departure.
4  Q.   Okay. And what did you discuss?
5  A.   Just that hey, we have a line on where we believe the
6  goat is.
7  Q.   Yeah.
8  A.   We're working on a search warrant. I'm leaving how
9  with another person. Hopefully, it's there. If it's not,
10 then -- and that was it.
11 Q.   Okay.
12 A.   At that point --
13 Q.   I understand.
14 A.   -- that was it.
15 Q.   Okay. You didn't -- so she didn't -- did she have
16 any follow up or what did she say in response?
17 A.   I can't recall what all she said. I think she's like
18 "Just keep me posted." And I told her I keep her posted.
19 Q.   Yeah.
20 A.   You know, obviously if we find it, if it's there, I'm
21 going to have to get it back to you, so we have to figure
22 that out later.
23 Q.   Okay.
24 A.   So I was -- basically just wait for follow up.
25 Q.   Yeah. Okay. All right. Okay. So -- and -- Ashbee

Page 200

1  wasn't involved in the -- your investigation at all.
2  Correct?
3  A.   He was as far as writing a search warrant.
4  Q.   Why did you have him write this -- write the search
5  warrant?
6  A.   So it's what we do a lot of times. He's part of the
7  Detective Bureau.
8  Q.   Yeah.
9  A.   So our detectives are a lot more proficient at
10 getting them signed quick.
11 Q.   Okay.
12      So I didn't want to spend the time trying to write
13 the search warrant myself, getting it authored by a judge
14 and then waiting for all that to all be done and then leave
15 town.
16 A.   Yeah. So once he had gotten part of that draft over
17 to the DA and said hey, we're good to go, once I got the
18 hey, we're good to go to send it to a judge, I left town.
19 Q.   Did you review the draft?
20 A.   No.
21 Q.   No.
22 A.   Not until I got to Napa.
23 Q.   But it had already been signed at that point. No?
24 A.   At that point, yeah, it had been signed.
25 Q.   Okay. So it was signed by the time you're -- well,

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

---

Page 201

1  how did he know what to put in the --
2  A.  **We had a conversation.**
3  Q.  You had a conversation about it.
4       When did you have that conversation?
5  A.  **On the 8th.**
6  Q.  On the 8th.
7  A.  **Before I left.**
8  Q.  In person before you left?
9  A.  **In person, yeah.**
10 Q.  Okay.
11 A.  **In his office.**
12 Q.  Okay.  Did he read your investigative file?
13 A.  **No.**
14 Q.  Okay.  All right.
15 A.  **Because it wasn't -- this was not done by them.**
16 Q.  Fair point.  Well, this could have been shorter by
17 then.  Right?  It existed in some capacity.  No?
18 A.  **Yeah.**
19 Q.  Your write-up?  Your report?
20 A.  **To the best of my recollection, part of it, but not**
21 **all of it.**
22 Q.  But not all of it okay.  Obviously, it didn't have
23 what happened on 7/8.  Okay.
24      All right.  Did you inform Melanie Silva you were
25 going down on the 8th?

---

Page 202

1  A.  **Not to my recollection, no.**
2  Q.  What about Bruce Mcfarlane?
3  A.  **I don't know if I informed him or if Kathi did.  I**
4  **can't recall that part of it.**
5  Q.  Did you ask Kathi to inform him?
6  A.  **Not that I recall, no.**
7  Q.  Okay.  All right.  So you don't remember talking to
8  him that day, but you might have?
9  A.  **No, I know I talked to him.**
10 Q.  You know you talked to him that day.
11 A.  **I just -- but you asked if I notified him, and I**
12 **don't recall if I notified him or not or if Kathi did.**
13 Q.  Oh, when did you -- when did you speak with Bruce
14 that day then?
15 A.  **Regarding this?**
16 Q.  Yes.
17 A.  **Yeah.  And I just don't -- I don't remember if it**
18 **was -- it was -- I know we had talked once before we arrived**
19 **in Napa.  And I know after we left Petaluma, I communicated**
20 **with him.  But as far as times, I don't recall that.**
21 Q.  A moment ago you said "regarding this."
22      Did you speak with him about something else that day?
23 A.  **No, just regarding this.**
24 Q.  Just regarding this.  All right.
25 A.  **No.**

---

Page 203

1  Q.  Okay.  I would assume it would only be --
2  A.  **Yeah, this.**
3  Q.  -- regarding this.  Okay.  Okay.  All right.
4       Okay.  So about what time did you arrive at --
5  scratch that.
6       So let's go through the -- let's go through the
7  warrant.  You received the warrant, the executed warrant, at
8  some point on your drive down there to Napa.  Yes?
9  A.  **No.**
10 A.  **No.**
11      When did you receive it?
12 A.  **I received it once I got to the Sheriff's Office in**
13 **Napa County.**
14 Q.  Okay.  So you were already down there.  So were you
15 going to go to the house.
16      Was the original plan to go without a warrant?
17 A.  **No.**
18 Q.  Okay.
19 A.  **I was going to go there with the warrant.**
20 Q.  And just -- well, what if you got down there and the
21 warrant wasn't ready?  Were you going to wait?
22 A.  **Yeah.**
23 Q.  Okay.  Let's go to the warrant for a moment.  All
24 right.  So we're on FERN 15.  Yes?
25 A.  **Yes.**

---

Page 204

1  Q.  Okay.  And this is the -- this is the final executed
2  warrant.  Correct?  This is not the -- because there was
3  some emails where there, you know, some -- maybe some slight
4  alterations to it before it was submitted to Judge Mckee.
5       So this is the final one.  Yes?
6  A.  **To the best of my recollection, yes.**
7  Q.  She signed it somewhere.
8       MR. NORTHCUTT: 21.
9       MR. GORDON: 21.  Thank you.
10 Q.  Okay.  All right.  So -- all right.  So sealing
11 requested, no.  Night search requested, no.
12      Was it -- so this was actually -- so what time did
13 you arrive in Napa?
14 A.  **It's in my narrative.  Can I refer to that?**
15 Q.  Yeah.  I mean --
16 A.  **At about 19:32 hours.  Me and Duncan met with the**
17 **Lieutenant --**
18 Q.  Well, you're reading it.  But that's accurate?  That
19 refreshes your memory?
20 A.  **That's actually probably before then because when we**
21 **went to the property.  So probably like 7:00.**
22 Q.  7:00.
23 A.  **7:00, 6:30.**
24 Q.  Do you recall that, or are you just estimating it
25 from --

---

Page 205

1 A.   Estimating it from my report.
2 Q.   Yeah.  You believe it's accurate at 7:00?
3 A.   Yeah.
4 Q.   Okay.  All right.  You're supposed to testify to your
5 memory, not just read something.
6 A.   Yeah, sorry.
7 Q.   So I just want to make sure.  When -- if I'm asking
8 follow-ups, I'm not trying to be a pain.  I just want you to
9 say yes, that's consistent with my memory.
10 A.  I should have asked to refer to it.
11 Q.  Yeah -- no, you can refer to it.  If it help -- if it
12 refreshes your memory, you can refer to it.  Please do.
13 We'll get stuff moving faster.
14 A.  It's a long day.
15 Q.  I understand.
16      Okay.  All right.  So you got down there about 7:00.
17      Was it still -- it would have been pretty light out
18 then.
19 A.  Yeah, summertime.  It was still light out.
20 Q.  Still light out.
21      Okay.  So what time did you arrive at -- and what
22 time did you receive the warrant?
23 A.  When I went into the Sheriff's Office, roughly that
24 same time.
25 Q.  Roughly that same time.  Okay.  All right.  Okay.

Page 206

1      Okay.  So "Night search requested:  No."
2      Does -- if it was getting dark, does that mean in
3 your understanding that the warrant doesn't operate at
4 night?
5 A.  No, there's a time frame.  22:00 hours is what I
6 recall it being.  It needed to be night serviceable.
7 Q.  So a night warrant would have to be like after 10:00
8 p.m.?
9 A.  Yes, yes.  I hope I didn't butcher that answer.
10 Q.  No.
11 A.  It's 10:00 or 11:00.
12 Q.  10:00 or 11:00.
13 A.  Yeah, but not where we were at.
14 Q.  Okay.  Okay.  It's not necessarily related to the sun
15 in the sky.
16 A.  No.
17 Q.  It's related to --
18 A.  An actual hard time.
19 Q.  Okay.  Okay.
20 A.  And I'm pretty sure it's 10:00.
21 Q.  Gotcha.  All right.
22 A.  22:00 hours.
23 Q.  All right.  So X is checked off for "The property was
24 stolen or embezzled."
25      That is accurate?

Page 207

1 A.   Yeah, we're jumping all over the place.
2 Q.   I'm still on the warrant, page --
3 A.   I know, but there's multiple pages.
4 Q.   Oh, my apologies.
5 A.   I don't want to say yes to something.
6 Q.   Yeah.
7 A.   So on page 15.
8 Q.   Yeah.  Well, page 1 of -- the first page of the
9 warrant, page 1500 Bates stamped.
10 A.  Yeah.
11 Q.  So the first page of the warrant.  Yes.  Okay.  Yeah.
12      So just, you know, where it says "Search Warrant," he
13 has "Property was stolen or embezzled."
14      That's -- that's accurate for your investigation of
15 what you contended at the time?
16 A.  Yes, sir.
17 Q.  Okay.  Stolen or embezzled.  All right.
18      Now -- so if you go down on where it says the
19 property is stolen or embezzled, so it's one, two, three --
20 so the fourth box down or the third box from the one that's
21 checked, it says "The property or things to be seized
22 consists of an item or constitute evidence that tends to
23 show a felony has been committed or tends to show a
24 particular person has committed a felony."
25      Is there any reason why this box isn't checked?

Page 208

1 A.   I can't answer that, no.
2 Q.   Okay.  All right.  And none of the -- so on page 16
3 or page 2 of the warrant now, none of these boxes are
4 checked.
5      Is that -- these just concern other -- other types of
6 crimes, other issues, that weren't relevant?
7 A.   To the best of my recollection.
8 Q.   It sounds like a quiz, you know, quiz question.  You
9 have more experience with warrants than me, obviously, so
10 I'm just generally asking.  Okay.  Thank you.
11      Okay.  So none of them are relevant to this
12 investigation.  All right.
13      Okay.  So then moving to the next page, on 17.  So --
14 okay.  The same -- the three -- the three boxes up top, all
15 the following -- all the property to be seized, you know.
16 And then "The property or things to be seized consists of
17 evidence that tends to show the violation of" -- none of
18 these -- for the three options up top, none of them apply to
19 this matter.
20 A.  To the best of my knowledge.
21 Q.  To the best of your knowledge.  Okay.  All right.
22 All right.
23      So then we get to the punch line here, "You are
24 therefore commanded to search Bleating Hearts Farm and
25 Sanctuary," and gives the address and --

Page 209

1 A.    A description.
2 Q.    Yes, and a description.
3       So the residence includes -- so where it says "The
4  residence, including all rooms," this is the -- these are
5  the areas you are allowed to search. Yes?
6 A.    Yes.
7       MR. GORDON: Okay. All right. We're going to stop
8  for, not the day, but he has to replace the film.
9       Do you want to go get some food or something? It's
10  2:20.
11      THE WITNESS: It's 2:20. How long is this --
12      MR. GORDON: Well, I was just going to suggest we
13  break for a short lunch, and then Vanessa will be here and
14  we can just go until, you know -- I don't know what time.
15      MR. NORTHCUTT: Can we go off the record?
16      MR. GORDON: Yeah, we can go off the record.
17      THE VIDEOGRAPHER: We're off the record. The time is
18  14:21. This is the end of Media No. 2.
19      (Off the record.)
20      THE VIDEOGRAPHER: We're back on the record. The
21  time is 15:25 and this is the start of Media No. 3.
22      MR. GORDON: How many hours is there approximately?
23      THE VIDEOGRAPHER: Right close to four.
24      MR. GORDON: Okay. All right. Okay. So what was
25  my -- the last question I asked, Julie?

Page 210

1       COURT REPORTER: I have to get back into that file.
2       MR. GORDON: I think I generally remember.
3       "COURT REPORTER: "Q. So the residence includes --
4   so where it says "The residence, including all
5   rooms," this is the -- these are the areas you are
6   allowed to search." Yes?"
7       "A.    Yes."
8 Q.    MR. GORDON: These are all the areas you were
9  authorized to search. Yes?
10 A.    Yes, sir.
11 Q.    Residence, including all rooms, attic, basement --
12  all right.
13      Did you draft this search request or did -- did
14  Ashbee?
15 A.    Ashbee.
16 Q.    Did you tell him these are what you wanted to search?
17 A.    No, those are just canned language.
18 Q.    Canned language. Okay. All right.
19      So have you used other -- so have you used other
20  warrants or -- that contain the same language?
21 A.    Yes, but anywhere -- you know, you start trying to
22  think of -- yes. Yes is the answer.
23 Q.    Yeah. Okay. All right. If that goat was in the
24  attic, that would have been funny.
25 A.    Yes.

Page 211

1 Q.    All right. So it looks like she signed -- do you
2  know how long approximately -- Ashbee signed this at 6:25
3  p.m. Yes? At least according to DocuSign?
4 A.    That's on what page?
5 Q.    It's on page 50. And I apologize.
6 A.    Yes.
7 Q.    Is that about when you think he signed it or that's
8  when he would have been done with it to submit it to the
9  judge?
10 A.    That's probably when it was like the final --
11 Q.    Version?
12 A.    -- version.
13 Q.    Okay. All right. And go to page 21. All right.
14      So Judge Mckee. So 6:33 p.m., eight minutes later.
15      Did she just review this in eight minutes?
16 A.    I can't answer that.
17      MR. NORTHCUTT: Objection. Calls for speculation.
18 Q.    MR. GORDON: Okay. But she -- she -- her signature
19  is -- the warrant was approved eight minutes later. You can
20  verify that.
21 A.    Right.
22 Q.    All right. Are warrants often issued so quickly --
23      MR. NORTHCUTT: Objection.
24      MR. GORDON: -- or within eight minutes? Is that a
25  fast time frame?

Page 212

1       MR. NORTHCUTT: Objection. Vague and ambiguous.
2       MR. GORDON: You can answer. It's fine.
3       MR. NORTHCUTT: Calls for speculation.
4       THE WITNESS: All right. So --
5 Q.    MR. GORDON: You can answer.
6 A.    So -- yes, but I don't know -- I would say that's a
7  quick time.
8 Q.    Quick time. Okay.
9       How long -- on average, how long generally would you
10  say it takes for warrants to get approved?
11 A.    Well, now with DocuSign, not as long as it used to.
12 Q.    How long did it used to take?
13 A.    You know, you had to fine a DA to review it. Then
14  you had to hand deliver it to a judge and sit in -- sit in
15  with the judge while they reviewed it.
16 Q.    Yeah.
17 A.    It could take anywhere, depending on how big the case
18  is, anywhere from -- you know, if it's a simple case, like a
19  DUI warrant, five minutes to, you know, 45 to an hour. But
20  I don't know if -- you know, because you said earlier that
21  this was -- they made an amendment to the search warrant. I
22  don't know if she had already reviewed it and she just
23  needed to look at whatever specific canned language was
24  changed and then authored it.
25 Q.    Okay. So --

Page 213

1 A.   I don't know if -- I don't know if she --
2 Q.   You don't know if this is the final -- this is the
3 version that she --
4 A.   I don't know.
5 Q.   I understand what you're saying. You're saying you
6 don't know if --
7 A.   I don't know if she had already seen a version of
8 this and then the correction that was made, this canned
9 timestamped with the final corrected version, so she's
10 already seen the meats and potatoes of it. I don't know
11 that.
12 Q.   So your -- you and your office, you can resubmit a
13 warrant with --
14 A.   Yeah, DocuSign. It gets -- you know, it can get
15 rejected back, and then whatever needs to be corrected, you
16 can send it back through DocuSign.
17 Q.   Okay. Okay. All right. Well, I'll figure that out
18 with Ashbee, I suppose.
19       Okay. And so let's go to page 22, which is page 8 of
20 the warrant, but page 22.
21 A.   Yes, sir.
22 Q.   Okay. All right. So on Friday, July -- and so let's
23 go to Narrative and Probable Cause.
24       "On Friday, July 8th, 2022, Kathi Muse reported a
25 livestock left to the Shasta County Sheriff's office."

Page 214

1       Is this referring to the call you had with Kathy Muse
2 earlier in the day?
3 A.   So this is referring to like the overall summary of
4 my investigation, yes, that Kathi Muse is the --
5 essentially, the victim. She's the owner of the goat, and
6 that Brian Dahle actually purchased the goat. She basically
7 purchased it for Brian Dahle at auction, which was donated
8 to her.
9 Q.   Okay. That's nonresponsive, but -- motion to strike.
10 Nonresponsive.
11       My question is did she actually call and report this
12 on that date? Was this the phone call you received from
13 her, or did she call and speak with Ashbee?
14 A.   So, no. So she didn't actually call and report this
15 on the date.
16 Q.   Because your narrative says -- what did it say? The
17 29th Mcfarlane and you --
18 A.   Yeah, I talked to --
19 Q.   You're -- I'm sorry. He called. Mcfarlane called,
20 presumably your Sheriff, and the Sheriff told you to
21 investigate?
22 A.   Yeah. I don't know who called the Sheriff. The
23 Sheriff told me and that's when I called Mcfarlane.
24 Q.   And you called Mcfarlane.
25 A.   Yeah.

Page 215

1 Q.   Okay. So Kathi Muse didn't report a livestock on --
2 theft on the 8th?
3 A.   No, not to my knowledge, no.
4 Q.   Okay. All right. "According to Muse" -- so, again,
5 she didn't call. "Brian Dahle purchasing a goat at the
6 Shasta Fair Livestock Auction for $902 and donated the
7 animal to Muse for the 4-H FFA barbecue."
8       Okay. And did you -- how did -- Ashbee wrote this.
9 Yes?
10 A.   Yes, he did.
11 Q.   Okay. How did he discern these facts or where did he
12 get these facts from?
13 A.   Summary from me.
14 Q.   Summary from you. Okay. So he -- okay.
15       So you didn't -- did you tell Ashbee that Muse --
16 that Brian Dahle purchased the goat and donated the animal
17 to Muse for the auction, or did he just infer that from your
18 summary?
19 A.   From my summary, me telling him that.
20 Q.   Okay. Does your summary say that?
21 A.   No, from -- what I mean, summary is --
22 A.   Your verbal summary.
23 A.   Verbal -- yeah, verbal summary.
24 Q.   You told him. Okay. You said "summary." I
25 thought --

Page 216

1 A.   Yeah, no --
2 Q.   I thought you meant your report.
3 A.   Yeah. No, not my report.
4 Q.   Okay. All right. So you told him she purchased this
5 goat and -- sorry. I had a few peanuts in my car and now
6 they're in my throat.
7       You told him that he -- that Brian Dahle purchased
8 the goat and donated it to Muse for the 4-H fair. Okay.
9       Did he ask for any proof of that?
10 A.   Who? Ashbee?
11 Q.   Yes.
12 A.   No, sir.
13 Q.   Okay. Did you show him the sales receipt?
14 A.   No.
15 Q.   Okay. So he's -- he's purely taking it on your
16 analysis?
17 A.   Yes, sir.
18 Q.   All right. "The seller of the auction's goat,
19 jessica Long" -- so did -- "took the goat from the
20 fairgrounds."
21       Now, you mention Jessica Long is the seller. It
22 doesn't say -- why not say the daughter's name?
23 A.   That's a good question. Because she's the adult.
24 She's the one -- I could have, right. Technically it could
25 have been her, but I'm charging Jessica Long with the crime,

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 217

1 not the juvenile.
2 Q.   Okay. All right. So this -- this narrative doesn't
3 mention that a minor sold the -- sold the -- Cedar at the
4 fair.
5       MR. NORTHCUTT: Objection. Assumes facts not in
6 evidence.
7       Go ahead.
8       MR. GORDON: Well, if it does, please point it out to
9 me. Maybe it does and I'm not seeing it. I don't see it.
10 Q.   Did you -- did you tell --
11 A.   Ashbee.
12 Q.   Thank you. I appreciate it.
13       Did you tell Ashbee that was the daughter's goat?
14 A.   Well, based on my recollection --
15 Q.   I'll rephrase it. I'm not trying to put words in
16 your mouth.
17 A.   Yeah. I mean, I don't know exactly what I told him,
18 but basically a girl sold the goat and the mom stole it.
19 Q.   Okay. But that -- that sentiment didn't migrate into
20 the narrative?
21 A.   It doesn't appear to have.
22 Q.   Okay. All right. "So then Long drove the goat to an
23 animal sanctuary, Bleating Hearts, in Napa, to hide it from
24 the -- the animal from the new owner."
25       Okay. So "new owner." Is that an accurate

Page 218

1 description? I mean, she was just getting its cuts. She
2 was never going to own Cedar. She was just getting after he
3 was butchered. Correct?
4 A.   Right. She's the owner of the animal.
5 Q.   Of the cuts. Right?
6 A.   Well, I would agree to disagree. It's the owner's --
7 Q.   Dispute?
8 A.   The owner that -- yeah, I would say the owner of the
9 animal.
10 Q.   You would say the owner of the animal.
11 A.   Which -- which would entail the cuts.
12 Q.   But you admit she's getting the cuts, so -- she's
13 not going to be able to take him. She's just getting -- you
14 know, any right that she had would just be to the meat
15 itself. Yes?
16 A.   Legal ownership of the animal, either meat, cuts,
17 just legal owner. That's how I look at it. I don't --
18 Q.   Okay. But she can't take him. She's got -- she
19 doesn't have full ownership rights, because she can't --
20 Kathi Muse, by the logic of this whole investigation, can't
21 take Cedar out of the slaughter -- the chains of slaughter,
22 right, whatever. That's a terrible expression.
23       But she can't -- he has to be slaughtered. She can't
24 stop that as the owner. Right? Or can she?
25 A.   I guess that answer -- if you're asking me if she can

Page 219

1 stop it from being slaughtered?
2 Q.   Yeah, Cedar, yeah.
3 A.   No, because that would be part of that. Right?
4       That's part of -- part of what she's buying it for is for
5 slaughter.
6 Q.   But she was never going to get him intact. She was
7 just going to get cuts of meat. Right?
8 A.   Right. Yes.
9 Q.   Okay. So I just mean her ownership would have
10 consisted of only cuts of meat. It wouldn't have consisted
11 of any other rights with respect to Cedar.
12       MR. NORTHCUTT: Objection. Vague and ambiguous.
13       Asked and answered.
14       THE WITNESS: Yes.
15 Q.   MR. GORDON: Yes. Thank you. Okay. Yeah, if he
16 objects, he's putting it on the record. But as long as you
17 understand, you still answer, unless he instructs you not to
18 answer, which in case you don't.
19 A.   Correct.
20 Q.   So -- all right. Okay. So -- there's an Attachment
21 A, which Ashbee provides, which is -- what is this, the
22 Instagram post, I believe? Yes, Instagram post. Okay. And
23 then -- which is on page 27. So -- and then he also
24 attaches -- he also attaches the first email, which is
25 Attachment B.

Page 220

1       And do you know if Ashbee reviewed this email?
2 A.   I believe he did, yeah.
3 Q.   Did you give Ashbee any other documents to review?
4 A.   I can't recall. He may have seen -- you know what.
5       He may have seen this. He may have seen everything that I
6 got from Silva. I can't recall though.
7 Q.   Okay.
8 A.   He'd probably have a better recollection of that.
9 Q.   Okay. Why didn't -- if that's the case -- so you
10 think you might have given it to him.
11       Is there a way you can check?
12 A.   Not if I -- well --
13 Q.   Would that email to him still exist? I'm assuming it
14 was email.
15 A.   If he retained it or if I retained it, then that
16 would be a way to find it, but --
17 Q.   Okay.
18 A.   -- that was part of our discovery. And if it wasn't
19 part of it, then it probably doesn't exist.
20 Q.   Well, maybe when the depo's over, confer with your
21 counsel and check again and see if it's --
22 A.   Okay.
23 Q.   -- there for production. Okay.
24       So I'm wondering why -- so Jessica's second email,
25 which is, to refresh your memory, it was on -- you know,

Page 221

1  it's FERN 44 through 47, where she says "This is in
2  anticipation of litigation"
3       I'm wondering why that wasn't part -- why that wasn't
4  shown to the judge.
5  A.   I'm sorry. Is it a question?
6  Q.   Yeah. Why wasn't that shown to the judge?
7  A.   I don't know.
8  Q.   You don't know. Okay.
9       But you don't -- but you might have shown it to
10  Ashbee. You're not sure?
11  A.   I'm not positive, no.
12  Q.   Okay. All right. Did -- okay. All right. All
13  right. You don't know. But you will check if you retained
14  the email. All right. Okay. Thank you.
15       So next it says you are -- below this, it says "You
16  are authorized to." So this is -- this is a statement of
17  probable cause.
18       Why are there -- why is there language in here that
19  you are -- of -- that a judge would presumably have to write
20  on the section of the warrant where they approve it that you
21  are authorized to use -- you know, let's look at the second
22  one. "Utilize breaching equipment to force open doorways,
23  entry doors, exit doors."
24       Why is that on the Statement of Probable Cause, as
25  opposed to what you are authorized to do by the warrant?

Page 222

1  A.   That's probably -- was, right, the Statement of
2  Probable Cause ended here.
3  Q.   Yeah.
4  A.   That probably would have been on the second page or a
5  different page. Right.
6  Q.   So, I guess, my question is there's this warrant.
7  A.   Right.
8  Q.   You can find, you know, bank templates of them on
9  line. Perhaps, I should have bought one -- brought one.
10  But do you know what I'm talking about, where it will
11  have the first -- it will have a -- you know, if you go to
12  FERN 0015 through 17, it will have this section of the
13  warrant, but it won't be filled out, right. Nothing will be
14  checked off. And then it will have, you know, a blank
15  section for Statement of Probable Cause. It doesn't have
16  "You are authorized to" -- I don't believe it has "You are
17  authorized to do," in that section.
18       So is this -- is this --
19  A.   Might be specific to --
20  Q.   Yeah, is it specific to this case? Why is this --
21  why is this language on there?
22  A.   So that language is --
23  Q.   It seems out of place for a Statement of Probable
24  Cause.
25  A.   Well, I don't think it's meant to be a Statement of

Page 223

1  Probable Cause. That's why it's highlighted and different,
2  but it's -- it's obviously authorizing us to use breaching
3  equipment to force open doors if we are executing the
4  warrant.
5  Q.   So if a judge signs off on the warrant, is -- in your
6  mind, is she authorizing you to use breaching equipment, for
7  example?
8  A.   Yes.
9  Q.   Okay. All right. Why doesn't that -- why wouldn't
10  the judge write that on the, you know, the first page where
11  it says, you know, you are authorized to... Why wouldn't
12  that -- you know, "You are therefore commanded to search,"
13  on, you know, page 17.
14       Why does this language of all this appear there?
15  A.   I don't know.
16  Q.   You don't know.
17       Is it often -- these sorts of, you know,
18  authorizations, like breaching equipment, doorways, locked
19  containers, etcetera, are they -- in other warrants you've
20  seen, are they in this Statement of Probable Cause also?
21  A.   It's canned language, yes.
22  Q.   Canned language. Okay.
23       So this is -- you've seen this before?
24  A.   Yes, sir.
25  Q.   Okay. All right. Okay. All right. All right. One

Page 224

1  second, Officer. So let's go back to FERN -- FERN 21.
2  Okay. All right. So -- let me know when where you're at.
3  A.   I'm there, sir.
4  Q.   All right. So -- and if -- so do you see where it
5  starts, "and if you -- if you find the same or any part
6  thereof," comma.
7  A.   Yep.
8  Q.   Yes. Okay.
9       "...to hold such property in your possession under
10  California Penal Code 1536."
11       Are you familiar with California Penal Code 1536?
12  A.   Vaguely, yes.
13  Q.   Vaguely. Okay. Doesn't this appear on every single
14  -- how many warrants have you executed in your career?
15  A.   Executed? I don't know. Myself written, probably
16  ten, but been part of and executed, I don't know, quite a
17  bit.
18  Q.   Quite a bit. Like hundreds?
19  A.   I would say at least a hundred.
20  Q.   Okay. Does -- isn't -- this Penal Code reference for
21  15:36, isn't that on every single warrant you're executing?
22  A.   Yes.
23  Q.   Okay. But did you ever read it?
24  A.   Yeah, I've read it. That's why I'm -- but if
25  you're -- I can't recite it.

Page 225

1 Q.    You can't recite it.
2       What are your -- just generally, what are your
3 obligations under it?
4 A.    So you -- I believe on this one, because there's
5 multiple, right, anything collected as evidence has to be
6 held into evidence and brought forth before the magistrate
7 or the court, the judge, to determine, you know, in a case
8 matter what the deposition of that evidence would be at a
9 later time.
10 Q.   Yeah. You're pretty good. And you said you couldn't
11 remember. That's pretty close.
12 A.   Yeah, but I'm now thinking you're wanting like what
13 does it state.
14 Q.   No, no. But you've retained the evidence under a
15 federal warrant.
16 A.   Yes.
17 Q.   It's not a gotcha. I just want to, you know, see
18 what you -- I guess, in your mind it is, but it's not meant
19 to be. I just got to be thorough of what's on here.
20       All right. So -- but you paraphrased it pretty well.
21 That's pretty close. You have to hold the evidence. Okay.
22 A.   So -- what page was that on?
23 Q.   All right. So on the same page are you familiar with
24 Penal Code 1407?
25 A.   Yes.

Page 226

1 Q.   Okay. Do you understand your obligations under that
2 statute?
3 A.   I believe 1407 is similar. Or is that the one that
4 talks about stolen or embezzeled? I think 1407 says "Stolen
5 or embezzled property --"
6 Q.   That comes into your custody, yeah.
7 A.   -- "that comes into your custody."
8 Q.   Yeah.
9 A.   Right.
10 Q.   Okay. But same thing, any stolen or embezzled
11 property that comes into your custody is supposed to be
12 retained. Correct?
13 A.   That's 1407. Right?
14 Q.   That's 1407, yeah.
15 A.   And all the 15s are search warrant specific.
16 Q.   Yes. 1407 is not dependent on a search warrant.
17       Okay. All right. So you are familiar with those
18 obligations. Okay. And -- okay. And they're written into
19 the warrant also.
20       Okay. So let's go to page 26.
21 A.   Okay.
22 Q.   All right. So Concluding Opinion.
23       "Based on the information provided by the Napa County
24 Sheriff's Office, the stolen goat is currently located at
25 the above location. It is my opinion that a search of the

Page 227

1 above mentioned property will allow deputies to locate and
2 recover the aforementioned stolen property and return that
3 property to its rightful owner. Furthermore, location of
4 the stolen animal will provide evidence to assist the
5 deputies and detectives with the 487(a) and the PC
6 investigation."
7       Okay. So allow -- okay. So why does this warrant
8 presumably allow -- allow Cedar to be confiscated and then
9 returned to its rightful owner, but at the same time state
10 he has to be retained as evidence?
11 A.   What part of that are you referring to?
12 Q.   Well, it says "It is my opinion that a search of the
13 above mentioned property will allow deputies to locate and
14 recover the aforementioned stolen property, Cedar, and
15 return that property to its rightful owner."
16 A.   Right. It's because it's -- I'm trying to think.
17 Detective Ashbee was an Animal Regulation Officer before he
18 became a deputy with us.
19 Q.   Okay.
20 A.   And, I think, it's because it's a living animal,
21 because I know it's -- and we haven't gone over it, but I
22 know it's in the warrant where we're allowed to release it
23 to the owner as well.
24 Q.   Where -- okay. So -- well, we're reading the
25 warrant.

Page 228

1 A.   Yeah.
2 Q.   So do you know of any code section that says hey, if
3 it's -- if it's stolen or embezzled property and it's in
4 your custody, but it's an animal, then it goes back to the
5 owner?
6 A.   I can't cite one off the top of my head, but I know
7 everyday in law enforcement we release property to the
8 owners daily in law enforcement without it --
9 Q.   Without complying with 1407?
10 A.   Yes, sir.
11 Q.   Okay. All right. What are some other times you've
12 done that in your career?
13 A.   Stolen vehicle recoveries, stolen property
14 recoveries, shoplifter in custody. Pretty much any active
15 type of theft case where we have real property and we know
16 who the owner is, we document it in photos.
17 Q.   Okay.
18 A.   That's kind of like an SOP.
19 Q.   Isn't it for the judge to determine who the owner is
20 or a court?
21 A.   Yes, but I would say that in those circumstances we
22 have like, for an example, of like a stolen vehicle, we know
23 who the owner of the vehicle is, and we catch someone in
24 that vehicle, so we just call them, the owner, "Hey, we got
25 your vehicle here at Walk and Don't Walk. Please respond

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 60 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                              August 21, 2023

Page 229

1 and collect your vehicle," so that they don't incur further
2 charges, because then we would have to tow it. But we never
3 book those vehicles into evidence.
4 Q. Okay.
5 A. If a burglary in proc -- so if we get an alarm call
6 or someone calls in and says "Hey, my neighbor's house is
7 getting burglarized. There's a white truck loading up all
8 their property."
9     The deputy's responding, "Hey, the truck just left."
10 The deputies spot the truck a quarter mile down the road, a
11 mile. They stop that truck and it's full of stolen
12 property. We don't book all that into property as well. We
13 don't hold that before a judge to see it all. We just
14 document it all and then we submit our cases.
15     And then once it finally gets through the system and
16 gets to the judge, that's how they have that stuff.
17 Q. Okay.
18 A. So that's -- I've been doing that in law
19 enforcement -- I understand 1407. That's more of a, I would
20 say, like color -- or there's color of the law and letter --
21 or there's letter of the law and spirit of the law.
22     I would say that that -- any agency you go to in that
23 circumstance, that's what they're doing. Otherwise, it
24 clogs your -- you physically can't do it. You cannot book
25 every piece of evidence that you come across.

Page 230

1 Q. Yeah.
2 A. You just wouldn't have a large enough facility.
3 Q. You're saying there's a practical reality to it --
4 A. Right.
5 Q. -- and you can't do it. I understand.
6 A. And -- so that would be my best way to answer that in
7 regards to this.
8 Q. But to your knowledge, 1407 does say --
9 A. Yeah, and you're absolutely right, that a judge makes
10 the final determination. I'm going off of probable cause
11 based on my investigation in determining who the owner was.
12 Q. But here, Cedar was to be seized, warrant or not,
13 because he's evidence. Correct? Per this crime?
14 A. Right. So -- and I did --
15 Q. Or confiscated Cedar, whatever term we're using.
16 A. Yeah, I took him into custody and then released him
17 to what I deemed was the --
18 Q. I know. You told me on the phone. I don't know if
19 you remember that when I called. You didn't want to talk to
20 me.
21 A. Well, rightfully so.
22 Q. I just wanted to find out if he was alive at that
23 point.
24 A. And I didn't know.
25 Q. You didn't know?

Page 231

1 A. I didn't know and I still don't know.
2 Q. Well, you know now he's not.
3 A. I haven't talked -- to a hundred percent, I don't
4 know if he's alive or not. No one has told me to my face.
5 Q. Well, that would be quite the scene if someone barged
6 through here with Cedar.
7 A. Right.
8 Q. So in any of those cases that you mentioned where
9 you -- where you, you know, you determined ownership on your
10 own -- and I'm not trying to question the judgment on those
11 cases, someone steals a car or whatever. This isn't me
12 questioning your judgment.
13     Has any of them ever resulted in a civil case where
14 someone, you know, raised the statute?
15 A. No.
16 Q. No?
17 A. This is the first time.
18 Q. First time.
19 A. In almost 15 years, over 15 years.
20 Q. Yeah, yeah. Okay. So -- but in your opinion, this
21 sort of stuff just happens routinely because there's just a
22 reality to it?
23 A. If the -- where it never happens is on a search
24 warrant.
25 Q. Okay.

Page 232

1 A. So if I go out -- I want to make that clear.
2     If I go out on a search warrant -- just like we had
3 our marijuana team out on warrant warrants this morning --
4 Q. Yeah.
5 A. -- in eastern Shasta County.
6 Q. Yeah.
7 A. They're not even taking 4,000 plus marijuana plants
8 back to evidence. They're taking a sample, a 10-pound
9 sample.
10 Q. Yeah.
11 A. The rest of that's getting destroyed on scene with
12 equipment.
13 Q. Yeah.
14 A. But nine times out -- or a hundred percent out of the
15 time out of a search warrant, whatever you're collecting as
16 part of that search warrant --
17 Q. Yeah.
18 A. -- you are obligated to return a property sheet to
19 the court within a set amount of time and retain that --
20 Q. I see.
21 A. -- for later for court purposes.
22 Q. Well, then why does -- why does this warrant exempt
23 that? Or why -- I mean, on page 26, it says you can return
24 it to the owner.
25 A. It also says it on page 23.

Page 233

1 Q.    On 22 it says it there also?
2 A.    23, under "...and to seize the described items or
3 property or any part thereof," the second paragraph down.
4 Q.    Okay. So this is then -- yeah. So -- okay. So
5 this -- although all the other warrants required retention
6 of the property --
7 A.    Right. This one --
8 Q.    -- this one --
9 A.    And I think the -- Ashbee could probably best answer
10 that, but based on what this language says here, which is
11 kind of unique to this warrant --
12 Q.    Yeah.
13 A.    -- it's because it's a living animal.
14 Q.    Well, if the judge is approving a language --
15 A.    Right.
16 Q.    -- why don't they -- Well, I'm a bit -- I understand
17 there's a -- there's a statement in that of probable cause,
18 or an affidavit of probable cause, but that is not
19 technically the judge's order. The judge's order is that
20 you are therefore commanded to search thing. In the canned
21 language in here it says to retain it. I mean, it says
22 "1536." It doesn't -- you can't -- but in your opinion --
23 it's your position you -- Ashbee can write in an exemption
24 to the statute of 1536 or 1407 to say well, it doesn't apply
25 here.

Page 234

1 MR. NORTHCUTT: Objection. Misstates testimony.
2 THE WITNESS: Yeah, I can't --
3 MR. GORDON: That's why I asked his position.
4 THE WITNESS: Yeah, I can't answer why he would do
5 that or...
6 Q.    MR. GORDON: Okay. But your position is that this
7 warrant allows an exemption to 1536?
8 MR. NORTHCUTT: Objection. Calls for a legal
9 conclusion.
10 THE WITNESS: I mean, the judge signed it, so...
11 Q.    MR. GORDON: Yes or no.
12 A.    I would say yes.
13 Q.    Okay. Thank you. All right. Okay. And although
14 1407 applies, regardless of warrant, the same thing would
15 apply here because it's a living animal. You thought you
16 could -- it's your position that it can just be confiscated
17 and turned over?
18 MR. NORTHCUTT: Objection. Misstates testimony.
19 Q.    MR. GORDON: Well, that's what I'm asking.
20 A.    Well, yes, but what I said earlier, right, in my
21 examples of property that we daily take custody of, document
22 it and then release it to an owner.
23 Q.    Okay. Okay. Okay. Okay. All right. So the
24 judge -- you gave her this -- or Ashbee gave her Exhibit B,
25 which is on page 28. So -- and this -- this is her first

Page 235

1 email, you know, where she says, you know, I removed the
2 goat and, you know, the Dahles let me -- are okay with me
3 let me not having him slaughtered and -- etcetera, etcetera.
4 So -- and it also says she'll bring him back if -- you
5 know, to avoid felony charges.
6 Q.    Does -- you obviously gave that to Ashbee and he put
7 it on here to Mckee, but -- actually, never mind.
8 So was -- was Ashbee aware of -- strike that.
9 Did you tell Ashbee that Jessica was disputing
10 ownership of the Fair -- by the Fair?
11 A.    I can't recall if I did or didn't based on my
12 investigation.
13 Q.    But if he had Exhibit B and attached it, he must have
14 known there was a property dispute.
15 A.    Yeah, I don't think he -- I don't think we would
16 have. If I would have given it to him or if we talked about
17 it, I don't think he would have purposely withheld that from
18 the probable cause or the search warrant.
19 Q.    Okay.
20 A.    And based on that second email, based on my
21 investigation, it was frivolous in the fact that she's
22 committed a crime under the Penal Code and now she's trying
23 to say I'm going to potentially handle this in litigation.
24 Okay. Well, that's not -- it has no bearing on my
25 investigation or the fact that you stole a goat.

Page 236

1 Q.    Okay. Well --
2 A.    To a certain degree. I get that.
3 Q.    Yeah. Okay. But you -- you knew she had a property
4 dispute. Ashbee knew she was a certain --
5 A.    No.
6 Q.    You knew -- you knew my client was asserting a
7 property right still at that time, at the time of this
8 warrant --
9 A.    I -- so the way -- that's a tricky one, because the
10 way I looked at it was that there was a Penal Code
11 violation, which is what I investigated.
12 Q.    Sure.
13 A.    Right. And she can write whatever she wants after
14 the fact. So here, she's very much admitting in
15 Exhibit B --
16 Q.    Yeah.
17 A.    -- of the search warrant she's -- or attachment B.
18 She's very much admitting to everything, right. Taking the
19 goat, dealing with the consequences later, willing to bring
20 it back so she doesn't face felony crimes.
21 Q.    Yeah.
22 A.    Once she gets a response from Silva at the Fair
23 saying no, you need to bring it back, then she's now
24 drafting another email, talking about civil litigation and
25 everything else. And that's -- that doesn't change my

Page 237

1  direction on my investigation. She still committed a
2  felony, in my opinion.
3  Q.   But you are -- my question is you're aware that she's
4  asserting a property right at that time though?
5  A.   Yes.
6  Q.   Yes. Okay. Okay. So --
7  A.   So --
8  Q.   No, go ahead.
9  A.   So, yes, but -- how do I answer that. Yes, she's
10  asserting that --
11  Q.   But it was irrelevant to you.
12  A.   Yes, because it's -- any -- people can say whatever
13  they want after they've committed a crime to try to make
14  themselves -- whatever, you know. I don't want to say.
15  Q.   Yeah.
16  A.   Try to play it down.
17  Q.   Yeah.
18  A.   Because maybe she really thought that. Maybe she
19  really thought that it was a civil dispute, but in my
20  opinion it was grand theft, a felony.
21  Q.   Yeah. But, again, isn't that for a judge to decide?
22  A.   Yeah, but I have to make decisions daily, right,
23  based on probable cause and based on the Penal Code and so
24  that's what I did, sir.
25  Q.   Yeah. No, that's, you know -- all right.

Page 238

1       Okay. So the warrant is issued around, you know,
2  six -- when you're at the Napa Sheriff's Office.
3       And then you proceed to Bleating Hearts Farm.
4  Correct?
5  A.   Yes, sir.
6  Q.   Okay. All right. So who went with you to Bleating
7  Hearts Farm?
8  A.   Detective Duncan, myself, the Lieutenant from the
9  Napa County Sheriff's Office. I want to say two other Napa
10  County Sheriff's Office employees.
11  Q.   Who were the other two employees?
12  A.   I did not list them in my report. I think one of
13  them --
14  Q.   Any reason for that or just didn't?
15  A.   I just -- I didn't think it was relevant.
16  Q.   Okay.
17  A.   And then I want to say they were part of the
18  Detective Bureau.
19  Q.   Part of the Detective Bureau. Okay.
20  A.   Yeah. I think -- I think they worked under the
21  Lieutenant, which was that Lieutenant I believe was in
22  charge or one of the administrators in charge of the
23  investigative bureau down there.
24  Q.   Okay. And did -- was his name Maiden?
25  A.   It's Maiden, yes.

Page 239

1  Q.   Did he -- did he accompany you to Bleating Hearts?
2  A.   He did.
3  Q.   He did. Okay.
4       And two others from Napa?
5  A.   And two others from Napa, yes.
6  Q.   Why so many people?
7  A.   You know --
8  Q.   Because he was employed there potentially?
9  A.   Yeah, and they just didn't know how it was going to
10  go. I mean, I didn't -- I didn't think it was going to
11  be -- I don't know why that many people went.
12  Q.   Yeah.
13  A.   Probably the administrator to kind of oversee
14  everything.
15  Q.   Yeah.
16  A.   And then maybe --
17       MR. NORTHCUTT: Don't speculate if you don't know.
18       THE WITNESS: Yeah, then I don't know.
19  Q.   MR. GORDON: Okay. But -- okay. Yeah. All right.
20  So you don't know why that many people went there?
21  A.   No.
22  Q.   Okay. All right. But it was three total, including
23  Maiden.
24       Do -- did you speak to the other two?
25  A.   I mean, we probably had like casual conversations,

Page 240

1  but I can't recall the conversation.
2  Q.   Yeah. Did any of them mention "What the hell did you
3  come down here for a goat for?"
4  A.   I think everyone involved kind of was like it's not
5  really the crime of the century, right.
6  Q.   Sure.
7  A.   There may have been some comments. They weren't
8  giving me a hard time about my job --
9  Q.   No, I understand.
10  A.   -- but they understand, too, there's a principle to
11  it all and perceptions and all that, so...
12  Q.   So -- okay. All right. So two detectives, you don't
13  remember their names, and Maiden.
14       Did they search the -- so you were -- okay.
15       What time did you arrive at Bleating Hearts?
16  A.   Like 7:30-ish, around there roughly.
17  Q.   And who were -- did you apprise Stover and Starkey
18  that you were coming?
19  A.   No.
20  Q.   No. They didn't -- Napa didn't apprise him, even
21  though he worked as a records coordinator?
22  A.   Yeah, that's kind of SOP in law enforcement.
23  Q.   Okay.
24  A.   Not to -- you don't ever want to forewarn your --
25  Q.   I understand.

Page 241

1 A.   -- potential suspect.
2 Q.   I understand.
3 A.   Because he was potentially going to be a suspect --
4 Q.   Yeah.
5 A.   -- of our imminent arrival.  It's not safe or sound
6   to do.
7 Q.   Yeah.  Okay.  I gotcha.  I've seen it in movies where
8   they're flushing the goat down the toilet.
9 A.   Yeah.  That's in the movies, but it happens.
10 Q.   I'm sure it does happen.  Right?
11 A.   Yeah.
12 Q.   Okay.  All right.  So walk me through this.  You
13   arrive there, and I know some of it is already recorded, but
14   I can't see.  I don't have any recording on this.
15       What happens?  You walk in.  Who do you greet first?
16 A.   So based on memory?
17 Q.   Yeah.  If you want -- if you want to refresh your
18   memory with your narrative, go nuts.
19 A.   I just remember, you know, we pull into the driveway.
20   Obviously, there's a law enforcement presence.  There's a
21   Shasta County Sheriff's Office Animal Regulation vehicle
22   there, so --
23 Q.   There was already a vehicle there?
24 A.   No, our vehicle.
25 Q.   Your vehicle.

Page 242

1 A.   Yeah.  So that drew the people from inside outside,
2   you know, because now there's -- I think there was three or
3   four vehicles that pulled in the driveway, law enforcement.
4 Q.   Okay.
5 A.   So they're -- they're exited.  We announced as to why
6   we were there.
7 Q.   Yeah.
8 A.   We're here to affect a search warrant.
9 Q.   Yeah.
10 A.   Explained who we were and why we were there.  And
11   then we were contacted by Mr. Starkey and -- he called her
12   his wife, but they have two different last names.
13 Q.   Are they married or you don't know?
14       But he called her his wife?
15 A.   Yeah.  So I informed him of everything, provided him
16   with a copy of the search warrant, at which point they
17   denied the goat ever being there.
18 Q.   Yeah.
19 A.   Any involvement.  While we were still there out
20   front -- obviously, we didn't kick doors in or do any of
21   that stuff.
22 Q.   Sure.
23 A.   We didn't search the inside of their house.
24 Q.   Yeah.
25 A.   We asked "Hey, where do you keep the goats?"

Page 243

1       "In the back."
2       "Can we go look at the goats?"
3       So me and Starkey, he went with me.  The Napa County
4   SO personnel, which is kind of overviewing everything,
5   taking a step back and letting us do everything.
6 Q.   Yeah.
7 A.   I walked onto the property deeper into the back yard,
8   into the back pens, looking for the --
9 Q.   Cedar.
10 A.   Cedar, and talking with him during that.  Didn't find
11   him, so then I interviewed him.  And while I was doing that,
12   Detective Duncan was talking with Ms. Stover and
13   interviewing her.
14 Q.   Okay.  Now, did you -- I have one recording and it's
15   Duncan's.  Yes?
16 A.   Yes.
17 Q.   So that's mostly him speaking on it.  There's -- I
18   think your voice is captured a few times.  But you didn't
19   have your --
20 A.   I didn't -- I didn't have a recorder going, no, I did
21   not, sir.
22 Q.   Any reason?
23 A.   I did not have one, other than my cell phone.  I
24   could have used my cell phone --
25 Q.   Sure.

Page 244

1 A.   -- but I didn't have a recorder with me.
2 Q.   Cops do that?  Use their cell phone to record?
3 A.   Sometimes, yeah.
4 Q.   Okay.
5 A.   I've done it when I was an IN investigator.
6 Q.   IN.  What's that?
7 A.   Internal Affairs.  You just can't get calls when --
8   when you're -- because you got to turn it to airplane mode.
9 Q.   Okay.
10 A.   So, yeah, I didn't have a recorder with me other than
11   my cell phone.
12 Q.   I see.  So you didn't record the interaction.
13 A.   No.
14 Q.   Okay.  So you were -- you were in the back, looking
15   with Justin looking for Cedar to verify that he wasn't
16   there.  Correct?
17 A.   Yes.
18 Q.   Okay.  What did you discuss with him?
19 A.   You know, basically hey, why we're here, the goat.  I
20   want to -- if I can review my report real quick?
21 Q.   Yeah, please.
22 A.   So while talking with him, he admitted --
23 Q.   But you can actively recall this now.  Yes?
24 A.   Yeah.
25 Q.   Your memory is refreshed.  Right?

Page 245

1 A.   Yeah, my memory is refreshed.
2        So he makes mention that he does -- he recalled
3    Ms. Long reaching out to him --
4 Q.    Yeah.
5 A.    -- and that they were going to --
6 Q.    To him or to his wife?
7 A.    To them.
8 Q.    The same, their organization?
9 A.    Them, their organization, Bleeding Hearts Farm, and
10   that they were willing to take the goat.  However, once he
11   learned that it was taken from a terminal sale fair, he
12   wanted no part of that.
13 Q.   Yeah.
14 A.   And then I was informed during all of this from
15   Detective Duncan that he had learned where the animal was
16   actually taken to.
17 Q.   That you learned from -- that Duncan --
18 A.   Duncan, yeah, had learned that information from
19   Ms. Stover where the animal was actually taken to.
20 Q.   Okay.  Okay.  All right.  So about what time was
21   this?
22 A.   Oh, I don't know.  Roughly 20, 30 minutes after our
23   arrival there, 30 minutes after our arrival there.
24 Q.   Yeah.  Okay.  All right.  So then at that point what
25   did you proceed to do?

Page 246

1 A.   So at that point we had learned Ms. Stover admitted
2    that she had communicated with Jessica and suggested -- I
3    remember the name of the farm was like Billy's Mini Farm,
4    something like that, which was located in Sonoma County.
5 Q.    Yeah.
6 A.    So while we were on scene, we looked up that farm.
7    We were able to find an address in Petaluma.
8 Q.    Okay.
9 A.    We were also able to find a contact information phone
10   number.
11 Q.   Okay.
12 A.   So at that time I thanked everyone for, you know, the
13   inconvenience, obviously.  And then --
14 Q.   Yeah, she sounded like she was having a borderline
15   panic attack.
16 A.   Yeah.  I mean, she wasn't really forthcoming with us
17   in the beginning.  Luckily, Detective Duncan pried a little
18   bit deeper and was able to figure out where it was.  So then
19   we researched where the location was through like Google
20   Earth or Maps.
21 Q.   Yeah.
22 A.   I determined that it was roughly like 40 minutes
23   away, 45 minutes away.
24 Q.   Yeah.
25 A.   So we decided to leave there and drive towards that

Page 247

1    location with -- it's really only four options at that
2    point.  So first option being that we get there and we can't
3    see the goat, we can't see the property or whatever and
4    we're done.  We head home.
5        The second option being that we can see the goat, but
6    no one's home, so we have to get a search warrant, an
7    amended search warrant, based on what our new investigative
8    leads have led us to gain access to the property and collect
9    the goat.
10       The third option being the same process, getting the
11   search warrant because, let's say, the property owner is
12   there, but doesn't want us to enter his property to get the
13   goat.
14       And then the fourth option being that we contact a
15   responsible for the property and they give us consent to
16   take the goat.
17 Q.   Okay.  So why didn't you -- why didn't you just get a
18   new warrant?  Couldn't you have called the judge and said we
19   got a new address.  Switch it to this?
20 A.   Because if someone gives us consent, then that saves
21   a lot of time and effort.
22 Q.   I know.  But you didn't know he was going to do that.
23 A.   I didn't know that, so there was -- it was a gamble,
24   right, and we even thought about that driving over there,
25   like, hey, do we just automatically get a warrant, you

Page 248

1    know --
2 Q.    Yeah.
3 A.    -- based on this new information, or the best thing
4    to do now is see if we can get consent.
5 Q.    Yeah.
6 A.    Worst case scenario, we get an amendment to this and
7    we're sitting on scene for 40 minutes while this warrant's
8    being redrafted with the new information and a judge signing
9    it off, so...
10 Q.   So you just rolled the dice and went over?
11 A.   Yeah.
12 Q.   Okay.  And one of you, I'm not sure who, in the audio
13   recording told Stover and Justin not to contact Jessica?
14 A.   Correct.
15 Q.   And why did you do that?
16 A.   Because it's -- we're trying to collect the evidence,
17   so we were afraid that by telling them not to notify
18   Jessica, one, that we're there and, two, that we're headed
19   to where we now knew the goat was taken to, because there
20   was emails that he would have reviewed between her --
21   between Jessica and Stover.
22 Q.   Yeah.
23 A.   We didn't want her to tip off -- one, I don't know
24   where Jessica's at, right.  I don't know if she's there.  I
25   don't know if she's in the vicinity.

Page 249

1 Q.   You thought she was down there, really?
2 A.   **I didn't know where she was at, right.**
3 Q.   But you didn't suspect that she was down there.
4 A.   **I didn't want the goat to disappear from that.**
5 Q.   I understand. But you didn't think Jessica was down
6   there. You presumed she was in --
7 A.   **She could have been anywhere. But I didn't want her**
8   **to tip off, right, this person, this Billy's Farm people. I**
9   **didn't want them to tip them off, because I knew we had to**
10  **commute 40 minutes roughly --**
11 Q.  Sure.
12 A.  **-- to get to that location, which is no time to load**
13  **up an animal and leave.**
14 Q.  Okay.
15 A.  **You can load up a whole stock trailer full of cows.**
16 Q.  And I'm assuming it's the same reason why you
17  didn't -- you also said don't contact Ray's -- I don't
18  remember the gentleman's name. You told Stover don't
19  contact Ray's Billy Goat Farm either. You said don't
20  contact Jessica. Don't contact --
21 A.  **I don't remember -- I don't remember him saying not**
22  **to contact -- I don't remember. Did he say that?**
23 Q.  Yes.
24 A.  **Then, yeah, that would be the same reason, too.**
25 Q.  Okay. All right.

Page 250

1 A.   **Because we don't know. We don't know these people.**
2 Q.   Yeah.
3 A.   **We don't know -- we don't know what they're going to**
4   **do.**
5 Q.   Okay. Okay. All right. So about what time did you
6   arrive at the Ray's Billy Goats? Rephrase it. Strike that
7   for a moment.
8       What time did you -- yeah, okay. What time did you
9   arrive there?
10 A.  **The exact time?**
11 Q.  Well, you know, estimate roughly.
12 A.  **It still wasn't dark out. I mean, the sun had set,**
13  **but it still wasn't dark. So somewhere between -- I'm**
14  **trying to think of that time of the year. Somewhere between**
15  **probably 8:45 and like 9:15.**
16 Q.  Okay. And -- okay. Before we -- before we get to
17  that, let me ask you -- I'm going to play -- off the record
18  for one moment.
19       THE VIDEOGRAPHER: We're off the record and the time
20  is 16:14.
21       (Off the record.)
22       THE VIDEOGRAPHER: We're back on the record and the
23  time is 16:15.
24 Q.  MR. GORDON: Thank you for your patience, Officer.
25 A.  **No worries.**

Page 251

1 Q.   All right. So I'm just going to -- if you can't hear
2   this -- I'm going to play it from my computer. Sound
3   travels. I expect you'll be able to hear it, but if you
4   have a problem, you know -- I'm going to -- because it's a
5   23-minute recording. I'm just going to go to the sections
6   where I have questions about it, and you can tell me, yeah,
7   that's me talking or that's not me talking.
8 A.   **Okay.**
9 Q.   Or etcetera, whatever questions I might ask from it.
10  All right?
11 A.  **That's fair.**
12 Q.  I suspect most of it's Duncan, but I don't know.
13       (Audio recording is played.)
14 Q.  MR. GORDON: Is that Duncan? Okay. All right.
15  So let me go to a few timestamps.
16       (Court Reporter asks for clarification of answer.)
17       THE WITNESS: Yes, yes.
18 Q.  MR. GORDON: Thank you.
19 A.  **That was -- the voice I just heard stating "19:32**
20  **hours" was Deputy -- Detective Duncan.**
21 Q.  Detective Duncan. Okay. All right. Okay.
22       So I think this is about -- about it. Okay. You
23  tell me -- let's play it. I'm going to hit stop and you can
24  tell me. Then I'll ask me questions.
25 A.  **Okay.**

Page 252

1       (Audio record is played.)
2 Q.   MR. GORDON: Is that you speaking with her during
3   that conversation?
4 A.   **No.**
5 Q.   That's Duncan?
6 A.   **That's Duncan.**
7 Q.   Did -- so she said the last you heard she was -- she
8   said "The last I heard she was talking to an attorney."
9       Did he tell -- did Duncan tell you that?
10 A.  **No.**
11 Q.  No. Would that have derailed the plan if he did?
12 A.  **From -- no.**
13 Q.  No. Okay. You were already committed at that point?
14 A.  **Yeah, I'm going. Yeah.**
15 Q.  Okay. All right. But he didn't tell you that she --
16  that she said that Jessica was talking to a lawyer?
17 A.  **Not that I can recall, no, he didn't tell me that.**
18  **Defendants can talk to attorneys all they want.**
19 Q.  Sure. Yeah. Okay. All right. But just curious of
20  that.
21 A.  **Yeah. And just for the record, he's talking to**
22  **Stover, Christine Stover. That appears to be --**
23 Q.  Okay. Thank you.
24 A.  **Yeah, that female voice is Ms. Stover.**
25 Q.  Okay. All right.

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 66 of 116

LONG vs.                                                LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                              August 21, 2023

Page 253

1    (Audio recording is played.)
2 Q.    MR. GORDON: Is that you or Duncan?
3 A.    That's Duncan.
4    (Audio recording is played.)
5 Q.    MR. GORDON: So "Because of your husband's job," did
6    you hear Duncan say that?
7 A.    Yeah.
8 Q.    Okay. Not now, but in real time when you were there.
9 A.    Oh, no, I didn't hear it in real time.
10 Q.    Were you -- okay. You heard that here.
11 A.    I heard it now.
12 Q.    Were you -- where were you when that part of the
13    conversation was happening?
14 A.    Probably within eyesight of him.
15 Q.    But you weren't --
16 A.    No.
17 Q.    -- in conversational distance?
18 A.    No.
19 Q.    Okay. All right. Were you talking --
20 A.    Well, I mean, I can probably "Hey, Duncan," like
21    that.
22 Q.    Sure, sure. Okay. But it's not like -- you were not
23    overhearing their conversation?
24 A.    No, sir.
25 Q.    But you knew he was going to tell them don't -- don't

Page 254

1    call Ray's or Jessica, etcetera.
2 A.    Yeah.
3 Q.    Okay. All right. Did you tell him to do that?
4 A.    No, that's just SOP.
5 Q.    Just what you do.
6 A.    We're getting ready to go somewhere else.
7 Q.    Okay. Okay. All right. So you leave the farm --
8    Madam Court Reporter, I will email you a -- the time stamps
9    on those links, by the way, for the record, were -- started
10    playing at 7:05 and -- for the first clip. And then the
11    second clip was 21:35 approximately. So if anyone needs to
12    access it.
13    Okay. So you leave -- refresh my memory.
14    What time did you leave Bleating Hearts?
15 A.    Roughly 8:00-ish.
16 Q.    8:00-ish.
17    All right. Was it still light out then?
18 A.    Yeah, it's still light out.
19 Q.    So -- and about how long did it take you to get to
20    Ray's? Because that is where you went.
21    Did you go directly to Ray's?
22 A.    Yeah, we went straight --
23 Q.    Straight.
24 A.    Straight through.
25 Q.    And you had a truck and a trailer, I presume?

Page 255

1    Just a truck. So the truck has -- it's an animal
2    regulation truck, so it has crates, the whole back of the
3    truck. It's on the bed of the truck. It's crates, crates.
4    So we drove straight there. I would say roughly 45 minutes
5    or so it took us to get there, 40 minutes.
6 Q.    And did you call Ray on the way?
7 A.    No.
8 Q.    Did you arrive there and you called him then?
9 A.    After we arrived, yeah. So you want to give me --
10 Q.    Well, in a moment.
11    So you arrived approximately, just for the record,
12    like what time did you say? I'm sorry.
13 A.    That would have put us there about 8:45, 9:00.
14 Q.    8:45, 9:00. Okay.
15    And did you knock on the door?
16 A.    Yes.
17 Q.    Okay. And no one answered?
18 A.    No one answered.
19 Q.    No one answered. Okay.
20    And so what happened then?
21 A.    So at that point Detective Duncan called Ray.
22 Q.    Okay.
23 A.    Identified who Ray was, verified ownership of the
24    property and --
25 Q.    Does Ray own the property? Is that his name, "Ray"?

Page 256

1    I'm calling him Ray.
2 A.    Right. Yeah. So to my knowledge, Ray, yes, is
3    responsible for the property.
4 Q.    Okay.
5    MR. NORTHCUTT: What's Ray's full name?
6    THE WITNESS: I think it's Allen.
7 Q.    MR. GORDON: If you want to check, it's in here.
8 A.    It's on this.
9 Q.    Raymond J. Allen.
10 A.    Yeah.
11 Q.    Is that correct?
12    MR. NORTHCUTT: It's right here.
13    THE WITNESS: It should be on page 2 or 3 here.
14    MR. GORDON: Yeah.
15    MR. NORTHCUTT: I just want to make sure.
16    THE WITNESS: Yeah, Raymond J. Allen. He's 3440
17    Roblar Road.
18 Q.    MR. GORDON: And this is where you went, that
19    address?
20 A.    Yes, sir. And prior to arriving at that location, we
21    met up with -- because you don't play in someone else's back
22    yard without notifying them. So we notified Sonoma County
23    SO.
24 Q.    Okay.
25 A.    So two Sonoma County SO deputies --

Page 257

1  Q.    Is SO Sheriff's Office?
2  A.    Sheriff's Office deputies met us down at the main
3  intersection of this road and -- I can't remember the road.
4  Q.    About how close to his house was that?
5  A.    Within probably two miles.
6  Q.    Now, they don't -- earlier you said because of
7  Justin's position as a -- with the Napa County Sheriffs as a
8  record clerk -- whatever his position was, I believe it was
9  records clerk, whatever his position was -- that was the
10 reason why your team had to execute the search warrant as
11 opposed to Napa.
12         So here, why wouldn't the Sonoma Sheriff's go
13 investigate here and try to do the seizure instead of you?
14 A.    Because we're already there. We're responding there.
15 We touched base with them. We wanted to know, right --
16 those deputy's informed us when we met with them, like
17 there's -- we try not to go into places blind, so we had
18 already reached out to the on-duty watch commander, the
19 Sergeant.
20 Q.    Okay.
21 A.    Briefed -- I want to say it was a him. I don't know
22 if it was a female -- of the situation of what location we
23 were going to. So when we met with those deputies down the
24 road to brief them on what we were doing, they were able to
25 facilitate that they had no -- there was no criminal --

Page 258

1  there was nothing -- no red flags for us to be concerned
2  with going to the property.
3  Q.    What would be like a red flag?
4  A.    So we deal with people where we will --
5  Q.    A Swastika sign or something like that? I don't
6  know.
7  A.    It could be that. It would be a sovereign citizen.
8  They could have prior history at that residence, not law
9  enforcement friendly.
10 Q.    Yeah.
11 A.    We do that all the time here. We flag people. We
12 flag residences.
13 Q.    I'm not trying to laugh. I'm just thinking sovereign
14 citizen.
15 A.    You just never know, right. So they had that
16 information prior to us. They had the location's
17 information prior to us going there. That's why they met us
18 there. And then when we met them, there was no red flags,
19 so they just accompanied us. And same thing. They took a
20 step back and let us...
21 Q.    At about -- okay. So they were waiting outside the
22 property?
23 A.    Yeah, roughly, I want to say, we were like within two
24 miles of the property when we met them.
25 Q.    How big is this property?

Page 259

1  A.    It's hard to -- I really didn't get like a GIS or
2  like a parcel map of it.
3  Q.    Yeah.
4  A.    But when we first turned off the road, I thought it
5  was the entire property, it was pretty impressive, but it
6  wasn't. So you drive past. It's a dirt road all the way to
7  the end.
8  Q.    Yeah.
9  A.    And then the house sat up top. It was quite a few
10 acres though. I would say minimum five acres.
11 Q.    Okay. All right. So you get to the door, no one
12 answers and then Duncan makes a call?
13 A.    Correct.
14 Q.    And then Duncan -- what happened? Duncan tells you
15 what he -- has a conversation with him and then he tells
16 you?
17 A.    Yeah. So Duncan, based on memory, says "Hey, I just
18 got off the phone with Mr. Allen." Didn't know the goat was
19 stolen. Made some comment about it making -- you know, he
20 thought it was kind of odd that she came all the way down
21 there, whatever; that the goat still had the Shasta District
22 Fair ear tag number in it, as well as the breeder ear tag
23 number, and that it was located on his property and we were
24 more than welcome to collect it and leave his property with
25 the goat.

Page 260

1  Q.    Okay. So Duncan reports that to you.
2  A.    Correct.
3  Q.    Duncan has a phone call.
4         About how long was their phone call?
5  A.    Not very long.
6  Q.    Did you hear Duncan questioning him?
7  A.    No.
8  Q.    Were you like next to each other at this point?
9         Where was Duncan?
10 A.    He -- I think he walked off down the driveway or
11 something and I was kind of standing there.
12 Q.    Paces and talks?
13 A.    Yeah.
14 Q.    I do that. I'm just curious. Okay.
15 A.    Just walked off.
16 Q.    Yeah.
17 A.    Yeah, I wasn't standing there like "Hey, ask him
18 this. Ask him this." Hindsight being 2020, I wish I would
19 have asked a few more questions, but --
20 Q.    Yeah.
21 A.    -- as far as --
22 Q.    What would you have asked?
23 A.    How or what she told you when she dropped the goat
24 off probably would have been more prudent --
25 Q.    Yeah.

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

---

Page 261

1  A.    -- to my investigation. So he -- once we told him we
2   were there because it was stolen, I think that changed --
3  Q.    But he took your word for it that it was stolen?
4  A.    Yes.
5  Q.    Okay. So did -- but you didn't -- you didn't
6   actually hear -- I'm calling him Ray. I'm assuming he goes
7   by it.
8  A.    I never heard.
9  Q.    You never heard -- you didn't hear Ray speak?
10  A.    No.
11  Q.    Okay. Did Duncan ask him if Jessica had signed
12   anything?
13  A.    Not to my recollection, no.
14  Q.    Did Duncan ask him why the ear tags are still in?
15  A.    No.
16  Q.    Did you wonder why the ear tags are still in?
17  A.    Yeah, it's a thought of mine, you know, like why
18   wouldn't she have done that. Why wouldn't she have cut them
19   out, right.
20  Q.    I mean, if someone else is getting the goat,
21   presumably. Right?
22  A.    Right.
23  Q.    Yeah.
24  A.    So, yeah, I mean, that's -- you're always going to
25   think like why would you leave the ear tags in them. But...

Page 262

1  Q.    So he didn't ask about -- so -- okay. Some of these
2   questions might be better for Duncan, I understand --
3  A.    Yeah.
4  Q.    -- but I'm still going to ask you?
5  A.    Yeah, that's fine.
6  Q.    So you just assumed that Jessica -- what did you
7   understand to have happened with the delivery of Cedar
8   there?
9  A.    So -- you mean, as far as -- so my -- my
10   interpretation of it was she left the animal, donated it to
11   him --
12  Q.    Okay.
13  A.    -- to be part of this -- because he actually raised
14   her -- Billy's -- oh, gosh. What's the name of the farm.
15   Billy's Mini Farm. They're an actual -- they're an actual
16   like fire mitigation.
17  Q.    Yeah, for like Cal Fire?
18  A.    Yeah. So I -- you know, she had mentioned that
19   earlier in her emails that she wanted to donate it to one of
20   these people. So I figured she had donated or given the
21   animal to him.
22  Q.    Yeah. Okay. And you -- but you didn't confirm that
23   with him?
24  A.    I didn't talk to him, no.
25  Q.    Okay. And Duncan didn't really cross-examine him on

Page 263

1   this? He just said the goat's stolen. And the gentleman
2   said he's in the back, go take a look or go grab him?
3  A.    Yeah, you can take him. If you can catch him, you
4   can take him.
5  Q.    Oh, okay.
6  A.    I'm pretty sure that's -- something like -- that's
7   what was related to me. I don't know if that's what he put
8   in his report.
9  Q.    Okay. Okay. All right. But at that point in time
10   you, based off Jessica's email, both of them, you saw that
11   she had offered to bring him back. Yes?
12  A.    Per her email, yes.
13  Q.    Yes. And -- well, that she had the ability to bring
14   him back.
15  A.    Correct. But she hadn't at that point.
16  Q.    No, she hadn't at that point.
17        But is that -- was that in your mind consistent with
18   a donation? A permanent donation?
19  A.    So there's a lot of factors --
20  Q.    Sure.
21  A.    -- consistent with a donation.
22  Q.    Yeah. You said you thought she donated him.
23  A.    Yeah, I thought she gave it to him. Left, right.
24  Q.    Left him, but she can go get him when she wants to?
25  A.    Yeah, I called her on the 29th. No reply. I tried

Page 264

1   calling her again. No reply. She's obviously avoiding
2   my --
3  Q.    That was -- the second time you called her the voice
4   mail was full though.
5  A.    Right.
6  Q.    So it was really just the first one.
7  A.    Right. So there's the first one, right, where I went
8   to the residence --
9  Q.    Yeah.
10  A.    -- which I'm pretty sure she saw me on camera.
11  Q.    The Ring?
12  A.    The Ring, right.
13  Q.    Yeah, because I think we sent the video of that.
14  A.    Right.
15        MR. NORTHCUTT: I don't think I've seen that one.
16        THE WITNESS: So she had a Ring camera.
17  Q.    MR. GORDON: It's like ten seconds. It's not that
18   long.
19  A.    Yeah, not that very long.
20  Q.    Yeah, he's not screaming at the door or anything --
21  A.    No, no.
22  Q.    -- "Give me the damn goat."
23  A.    No. So it was -- in my professional opinion she was
24   avoiding law enforcement contact.
25  Q.    Yeah.

Page 265

1 A.    And then based on that second letter -- or email that
2 she sent the District Fair, it was evident that she was not
3 returning the goat.
4 Q.    Yeah, but it was not evident that she was not
5 claiming a property right in him. Just that she wasn't
6 going to bring him back.
7 A.    Yeah.
8 Q.    That was your understanding?
9 A.    Right.
10 Q.    All right. Okay. All right.
11        Do you mind if we take a break for a moment because
12 Vanessa's going to be here, I think, soon and I want to
13 confer with her. I'm going to give her a quick call, see
14 where she's at.
15        I'm not going to keep you guys late. What I plan to
16 do -- what I plan to do is probably after I get done,
17 because we have a little bit more to go on the narrative,
18 maybe a quick recap on some things we discussed, just so
19 it's clear for the record. I'm not trying to browbeat you.
20 And then -- and then whatever time I have left, I'm just
21 going to reserve to, you know, to review it when I get the
22 copy, and if I have any follow up, just use the time for
23 that. All right.
24        MR. NORTHCUTT: And if there's -- I mean, if you
25 don't really have a ton that you need to depose him on

Page 266

1 further, we could always do it written discovery as well, if
2 that's appropriate.
3        MR. GORDON: Yeah, potentially. I mean, maybe.
4        MR. NORTHCUTT: Either way.
5        MR. GORDON: Yeah, yeah. But I think it would be
6 actually much faster to do a Zoom or something than written,
7 because it's going to take -- you know, you're going to have
8 to put all the objections and nonsense, so...
9        Off the record.
10        THE VIDEOGRAPHER: We're off the record and the time
11 is 16:34.
12        (Off the record.)
13        THE VIDEOGRAPHER: We're back on the record and the
14 time is 16:47.
15 Q.    MR. GORDON: All right. So Duncan had this
16 conversation with Ray. He represents to you that Ray said
17 you can go take the goat. And so then you and -- Ray's not
18 home at this point in time though, so you and Duncan just
19 proceed to take the goat?
20 A.    Correct.
21 Q.    Correct.
22        And you let yourself in the back yard of his --
23 strike that.
24        Was it in the back yard? Where was Cedar?
25 A.    Yeah, so Detective Duncan advised me we had consent

Page 267

1 from Ray to go get the goat.
2 Q.    I'm sorry.
3 A.    Consent. Detective Duncan advised that Ray gave us
4 consent to collect the goat, so we -- and he told us it was
5 in the -- he actually told us where it was. It was in
6 the -- at the back portion where -- you'll see it. There's
7 a pen full of goats.
8 Q.    Okay.
9 A.    That's how we knew he still had the ear tags. He
10 said you'll identify he still had the ear tags in.
11 Q.    Okay.
12 A.    And we also had like a color scheme of what the goat
13 looked like, pictures, markings.
14 Q.    Okay.
15 A.    So we walked past the residence up the hill further.
16 It's kind of like a bald rolling hill.
17 Q.    Okay.
18 A.    Just like dead grass with pens, and we found a pen
19 with numerous goats in it, but we were able to identify
20 Cedar, at which point I -- it took us a little bit of time,
21 but --
22 Q.    Was he not cooperative? Cedar?
23 A.    He's a goat and he's around a bunch of other goats,
24 so -- they're animals, right. So I was able to get a leash
25 on it.

Page 268

1 Q.    Yeah.
2 A.    And then walk it back. Prior to leaving that pen, we
3 took some photos, which are attached, of the goat and of the
4 ear tags. And then we loaded it up, thanked Sonoma County,
5 and then headed home.
6 Q.    Headed home.
7 A.    Headed northbound.
8 Q.    Headed north. Okay.
9        So the photos you took, just for clarity, what Bates
10 stamp number do they have? And I'm assuming they're in your
11 full report there.
12 A.    They are -- it's going to be these ones starting at
13 65, where you can see the yellow grass below it.
14 Q.    So after the screenshots of the emails and --
15 A.    Correct, so zero -- FERN 000065.
16 Q.    So these are at Ray's?
17 A.    These are at Ray's, correct.
18 Q.    Okay. All right.
19 A.    And it's pretty much just about dark at that time.
20 Q.    That's Ray's also?
21 A.    That's Ray's house.
22 Q.    Okay. That's Ray's house. It's 00 --
23 A.    And I can't read this one.
24 Q.    That's 667.
25 A.    It's the very last one.

Page 269

1 Q. The very last one. Okay. That's 68. This one here
2 that's black and white? Do you see that?
3 A. Yeah.
4 Q. 68.
5 A. So 65 through 68.
6 Q. 65 through 68. That's where it is. Okay.
7 So then at this point you're in Napa County.
8 What time is it at this point?
9 A. 9:00, a little after 9:00 probably.
10 Q. A little after 9:00. Okay.
11 And then you headed back to Redding?
12 A. Yes, sir.
13 Q. Okay. And --
14 A. Well, we headed back towards north.
15 Q. Headed north. Okay.
16 Were you going -- well, someplace on the way?
17 A. Yeah. So we were going to meet -- so at that point I
18 had notified Kathi that we had located the goat and that we
19 were on our way back, as well as BJ Mcfarlane or Bruce
20 Mcfarlane.
21 Q. Yeah.
22 A. And then --
23 Q. We call him BJ. We know who he -- that's the name --
24 A. Yeah, that's how I've known him.
25 Q. -- my client calls him.

Page 270

1 A. And then due to the time of -- projected time of our
2 arrival back into Shasta County, Ms. Muse requested that we
3 leave the goat in the care and custody of Mcfarlane.
4 Q. Okay. So did you speak with Kathi Muse on the phone?
5 A. Yes.
6 Q. Okay. What did you -- what did she say on the phone?
7 A. Just -- I can't recall everything she said. I think
8 she was excited that we got the goat and that to -- based on
9 the time of night, to just leave it with her agent, which
10 would have been Mcfarlane.
11 Q. Okay. Did she give you any -- give any documentation
12 she was -- he was her agent or she just said leave him with
13 Mcfarlane? Did she use the term "agent"?
14 A. No, that's my term. Yeah.
15 Q. All right. All right. And -- now, you called her?
16 A. To the best of my recollection, yes.
17 Q. Okay. And about how long did you speak with her?
18 A. Not very long, like 30 seconds, a minute.
19 Q. Just said "We got him?"
20 A. Yeah. "We got him. We're on our way back. Probably
21 be home around midnight."
22 Q. Okay.
23 A. And then she -- and then I -- either she suggested
24 that I leave him with Mcfarlane, and I reached out to
25 Mcfarlane, let him know per Muse she wanted me to leave him

Page 271

1 with him. I know that that was worked out between the three
2 of us, and then --
3 Q. When was that worked out between the three of you?
4 Before you went down?
5 A. No. It's on the way back.
6 Q. On your way back. Okay.
7 A. Yeah.
8 Q. Did you merge the calls, so they all spoke at once?
9 A. No, no.
10 Q. So you called Kathi first and then you called
11 Bruce --
12 A. Yep.
13 Q. -- afterwards?
14 A. Yes, sir.
15 Q. Okay. And Bruce said was okay with receiving Cedar
16 late at night, presumably?
17 A. Yes.
18 Q. What time did you get to Mcfarlane's?
19 A. Roughly like 12:30 or -- yeah, 12:30. 00:30 hours in
20 the morning. So that would have been Saturday morning.
21 Q. Okay. Did Kathi mention to you on that call or any
22 of the prior calls that -- that she wanted him back by that
23 date for the FFA 4-H barbecue?
24 A. No.
25 Q. Was that your understanding that she wanted him back

Page 272

1 for that date?
2 A. No.
3 Q. Even though the sales slip said -- had for -- you
4 know, the --
5 A. No.
6 Q. The sales slip mentioned the barbecue?
7 A. So it mentions the barbecue, but I don't -- I
8 didn't -- it wasn't until you mentioned it earlier. I don't
9 know if I can say this, but we were talking about it. It
10 was not even a thought in my mind. It didn't even know it
11 was the Sunday until you brought it up.
12 Q. Okay. You were not aware of the barbecue --
13 A. No.
14 Q. -- being on that date?
15 A. Okay. And Kathi Muse didn't mention it to you?
16 A. No, sir.
17 Q. Melanie Silva didn't mention it to you?
18 A. Not that I can recall, no.
19 Q. OKay. And did Bruce Macfarlane mention it to you?
20 A. Not that I can recall, no.
21 Q. All right. So you -- you -- at this point
22 you're -- you're with Duncan still, just you and Duncan.
23 Okay. All right.
24 And what time did you arrive at Mcfarlane's?
25 A. Roughly 12:30.

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 273

1 Q.    Roughly 12:30.  Okay.
2       And did you have a conversation with Duncan at all
3 when you're driving up about retaining Cedar?  This is some
4 of what we discussed earlier.  It was always the plan to
5 just turn him over to --
6 A.    Yeah, I don't recall having a conversation with him
7 pretty much about the goat after that.  The main -- the main
8 conversation was personal conversation.
9 Q.    Okay.
10 A.   That was my first time really working with him.
11 Q.   Okay.
12 A.   Yeah, so a lot of the -- a lot of the drive was his
13 life, my life story.
14 Q.   Yeah.
15 A.   Pretty impressive, so.  And then --
16 Q.   You didn't stop at my wineries on the way?
17 A.   No, no, just for fuel.
18 Q.   Just for fuel.  Okay.  All right.  Okay.
19       So -- and how long were you at Mcfarlane's?
20 A.   Short time.  Five minutes maybe.
21 Q.   Short time.  Okay.
22       So you handed him off Cedar?
23 A.   We arrived at his location; provided him with the
24 goat; took photos of the goat and then left the location,
25 so...

Page 274

1 Q.    After -- after you confiscated Cedar, did you call
2 anyone else besides Kathi and Bruce, or contact anyone else
3 rather?
4 A.    No.
5 Q.    No.  Just those two.  Okay.
6 A.    Yeah.  I think -- well, I don't want to interject,
7 because we've already had this conversation, but I'm pretty
8 sure I called my wife and said I'm on my way home, right.
9 But other than that, no.
10 Q.   Okay.  Did -- okay.  All right.  So did you know
11 Cedar would be -- did you have any idea that Cedar would be
12 killed when you turned him over?
13 A.   I did not know what their plans were at that point.
14 I didn't know if it was too late, if the -- I don't know.
15 Q.   Okay.  Did Bruce Mcfarlane -- what did -- what was
16 your discussion with him about when you arrived?
17 A.   Just I need to get some photos with you with the goat
18 as evidence.
19 Q.   Yeah.  Is that just the page --
20 A.   The one.
21 Q.   -- 64?
22 A.   64?
23 Q.   Yeah, 64.  I apologize.  64, yes.
24 A.   Yeah, 64.
25 Q.   64.  Okay.  FERN 64.

Page 275

1       That's -- that's at Bruce's house or BJ's house?
2 A.    Yes.
3 Q.    Okay.  All right.  And that's where he has Cedar.
4 The look of --
5 A.    Unfortunately --
6 Q.    -- on his face?
7 A.    Yeah.
8 Q.    So did you ask him what he was going to do with
9 Cedar?
10 A.   No.
11 Q.   Did you ask Kathi what she was going to do with
12 Cedar?
13 A.   I did not ask, no.
14 Q.   No.  Okay.
15       Did you -- what was your understanding what was going
16 to be done with him?
17 A.   At that point whatever the owner, her, Kathi, was
18 going to do with it.  I don't know, so...
19 Q.   Okay.  Whatever Kathi was going to do with it.  Okay.
20       And -- okay.  So -- all right.  So then let's move
21 to -- these text messages.
22       So did you ever tell -- this is broadly speaking.
23       Did you ever make any comment to anyone that, you
24 know, something to the effect of "This is a lot of resources
25 devoted to a goat"?

Page 276

1 A.    Did I ever make those statements?
2 Q.    Yeah, even in jest.
3 A.    I don't think I openly said those things.  I don't
4 recall saying anything like that.
5 Q.    Did you internally think it at any point in time?
6       I know you're saying it's not the crime of the
7 century.  You used that expression a couple times.
8 A.    Right.  I've used that, yeah.  I think -- I think
9 people that were involved in the investigation, you know,
10 like Napa County made joke about "Oh, you're here for the
11 pinto," so...
12 Q.   Yeah.
13 A.   So obviously not the caper of a lifetime.  Right.
14 Q.   Yeah.  Yeah.  I assume that you've been involved in
15 murders and other pretty serious things.
16 A.   Officer involved shootings and stuff like that, so --
17 Q.   You were involved in an officer shooting?  Oh, wow.
18 A.   So these are things that I don't think -- it's not
19 really -- I mean, I could -- I could have my feelings on a
20 lot of things.
21 Q.   Sure.
22 A.   However, I have a job to do.  And as long as
23 something falls within my purview of my job then -- I answer
24 to people, too, so I have to do my job.
25 Q.   Yeah.  Okay.  All right.  Did you think when the

Challe, Fisher & Morfin
Redding, California  (530)246-0942

Page 277

1 Sheriff said to -- strike that.
2    Does Sheriff Michael Johnson -- is --
3 A.  That's his --
4 Q.  It is his name.  Okay.
5    Does he have any relationship that you know with the
6 Fair?
7 A.  Not that I know of, no.
8 Q.  No.
9    Or with Kathi Muse?
10 A.  Not that I'm aware of.
11 Q.  Or with, you know, the Dahles?
12 A.  Not that I'm aware of.
13 Q.  Okay.  All right.  Does he have any ties to
14 agriculture?
15 A.  He's a Sheriff, so agriculture in pretty much any
16 county you go to is one of the bigger --
17 Q.  Sure.
18 A.  I think they're going to be at the Board of
19 Supervisors tomorrow.  Usually agriculture has a lot of
20 influence within counties, but I don't know -- I can't speak
21 for my Sheriff.
22 Q.  Okay.  But you would expect -- but you would expect,
23 just because the nature of position that, you know, they
24 have his ear?
25 A.  Right.  Well, they would have his ear and --

Page 278

1    MR. NORTHCUTT: Well, do you know one way or the
2 other or are you speculating?
3    THE WITNESS: That would be a speculation.  I do know
4 from talking with him that it wasn't just a big deal here.
5 It was a big deal with a lot of the fair boards within
6 Shasta County.
7 Q.  MR. GORDON:  Where else was it a big deal?
8 A.  I don't know the names of those fairs.
9 Q.  Do you know -- do you know -- oh, well you said "fair
10 boards."
11 A.  Yeah.
12 Q.  So what other fairs?  Are there other fairs in Shasta
13 County?  I thought it was one per county.
14 A.  No, the State of California.
15 Q.  The State.  Okay.
16    What other fairs was it a big deal with, if you know?
17 A.  I don't know those -- I don't know the particulars on
18 that.
19 Q.  Who did you hear it from?
20 A.  The Sheriff.
21 Q.  The Sheriff.  Okay.
22    That people were pissed that Cedar was removed?
23 A.  Yeah, I think it was -- or from my recollection, it
24 was reported to him that this is -- right, that this is
25 not -- yes, it affects Shasta District Fair and we have to

Page 279

1 investigate it, but there's other fair boards reaching out
2 to our fair board about this is pretty serious stuff, and
3 that --
4 Q.  So other fair boards reached out to Shasta and
5 said --
6 A.  It sounds like it, yeah.
7 Q.  And said put your foot down on this?
8 A.  No, I won't say put your foot down, but if there's a
9 crime, investigate it.  So that's what I did.
10 Q.  Okay.  Okay.  Let's get into -- let's get into some
11 of these text messages here.
12    So, Officer, if you go to 125 they start.  There's
13 not many.
14 A.  Zero zero what?  0025?
15 Q.  Yeah, yeah.  It's the last -- last -- I'm just saying
16 125 for shorthand.  000125.
17    MR. NORTHCUTT: I don't know if we have --
18    MR. GORDON: Oh, I'm sorry.  No, no, no, no.
19    MR. NORTHCUTT: The only think he's got is his
20 investigative report.
21    MR. GORDON: We've been on that exhibit for so long.
22    THE WITNESS: Yeah, sorry.
23    MR. GORDON: My apologies.
24    Do you need -- Damian, do you need copies?
25    MR. NORTHCUTT: Sure.  If you don't have enough, we

Page 280

1 can share.
2    MR. GORDON: I have it in here.  Here we go.  That's
3 from your production.  Damian, I had another set.
4    MR. NORTHCUTT: That's okay.  We can share.
5    MR. GORDON: Give me one second.  That's really
6 strange because it should be -- whatever.  You know, you fly
7 through an airport with several thousand pieces of paper.
8    All right.  Okay.  So -- so this first -- on 125,
9 now, is this a text chain between you and Kathi Muse, I
10 presume?
11 A.  Yes.
12 Q.  Yes.  Okay.
13    Now, the next -- the next one is Tyler on page 126.
14    Now, this is -- you produced an email about a goat
15 buyer letter.  I'm assuming this is the same Tyler?
16 A.  Yes.
17 Q.  All right.  And that -- and then the next page, 127,
18 this is another -- this is a continued -- a different text
19 chain with Kathy Muse, so -- correct?
20 A.  Yes.
21 Q.  Okay.  And then the next page, 128, is a text chain
22 between you and, I'm assuming, it's Ashbee?
23 A.  Yes.
24 Q.  Okay.  All right.  Because he's getting the warrant
25 at that time, right.

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 73 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                              August 21, 2023

Page 281

1    And then the last one is a text chain between you and
2  Kathi -- is this another text chain between you and Kathi
3  Muse from 129?
4  A.    Yes.
5  Q.    Okay. So should the -- so on 129, that's from August
6  31st and September 1st. So this looks like the first, the
7  earliest, text message you sent with Kathi Muse. And then
8  afterwards, it looks like 127 is the next in the chain. Is
9  that correct?
10   So if these were in order, I would read 129 first,
11  then 127 and then 125?
12  A.    Correct.
13  Q.    Is that -- that's correct?
14  A.    Yes, sir.
15  Q.    All right. Okay. So let's just go through --
16  actually, I'm going to make an exhibit. So let's do in that
17  order, 129, 127 and 125, and I'm going to stamp that and
18  staple it, if you don't mind.
19  A.    Yeah. Let me put it in order for you.
20       MR. GORDON: Thank you.
21       Madam Court Reporter --
22       THE WITNESS: Different paper. It's different paper
23  than that.
24       MR. GORDON: Yeah, yeah, yeah. I wonder why. I got
25  it printed at the same spot, so -- all right. So I'll hand

Page 282

1  this back to you in a moment.
2       Okay. Actually, do I need to -- before I label this
3  Exhibit E, the audio recording, is that going to be an
4  exhibit? We didn't label that an exhibit. I guess I can
5  now. So I'll have the audio recording -- let's label that
6  Exhibit E and this will be F.
7       (Exhibits E and F were marked.)
8  Q.    MR. GORDON: Okay. All right. All right. Okay. So
9  August 31st, 5:39 p.m.
10       So Kathi texts you "Is the DA going to do anything
11  with the goat?"
12       Actually, before -- before we get to this -- so after
13  you deliver Cedar, and that's on the 8th, in your write-up
14  on -- on your original report, right, your last date on that
15  was July 26th, right, because we discussed that was your
16  last entry date?
17  A.    Yes.
18  Q.    Okay. So then on page -- page 8, FERN 8, so you --
19  it says "Case status: Closed." But you -- it looks like in
20  your narrative the last sentence is "Based on the totality
21  of the circumstances, I am requesting Jessica Long be
22  charged with 487(a)(a) Penal Code grand theft."
23       Do you see that?
24  A.    Yes, sir.
25  Q.    Okay. So after -- after July 26th, when you were

Page 283

1  done with your report here, did you request the DA pursue
2  this?
3  A.    Yes.
4  Q.    Okay. Around that time or did you do it sooner?
5  A.    No. So it would have been after this time. So
6  there's a -- in this file of mine, right here, FERN 0012 --
7  Q.    Okay. FERN 0012.
8  A.    This is a -- we call it a DA cover letter.
9  Q.    Okay.
10  A.    Basically it's who I'm requesting the charges
11  against, the charges, and then this goes over -- this goes
12  with the case and it goes to the District Attorney's Office.
13  Q.    I see. Okay. So you forwarded this form to the
14  District Attorney's office?
15  A.    Correct.
16  Q.    Okay. And then did you tell Kathi about that?
17  A.    Yes.
18  Q.    Okay. When did you tell her that?
19  A.    It was probably -- probably -- at some point, I don't
20  know if it was after I collected the goat or during the
21  course of the investigation prior to collecting the goat, I
22  had informed her, right, like, you know, I'm going to take a
23  case. It's going to be filed with the District Attorney's
24  Office.
25  Q.    Okay.

Page 284

1  A.    So I think once, obviously, I hadn't been able to
2  find Jessica, but we were able to find the goat, I'm
3  basically at this point -- and even though it's a felony and
4  I could still arrest her, I'm not going to go track her down
5  now and try to arrest her. I think I mentioned that earlier
6  in my deposition that I wasn't going to go to her work and
7  arrest her.
8  Q.    Yeah. You -- I thought you were just telling me you
9  weren't going to go to her work and question her then.
10  A.    No.
11  Q.    You did say "arrest" also.
12  A.    Right. So -- and file it with the District
13  Attorney's Office.
14  Q.    Okay. So if the DA wanted to moved forward, what
15  would have happened then? Would you then have arrested her?
16  A.    No. So if they wanted to move forward, they would
17  have issued a court date, right, and we would have went to a
18  preliminary hearing.
19  Q.    Yeah, just normal --
20  A.    Normal.
21  Q.    -- criminal procedure.
22       But you wouldn't have arrested her. She would have
23  just gotten --
24  A.    Right.
25  Q.    -- notice of it.

Page 285

1  A.   Yeah, we can either file or we can arrest.
2  Q.   Okay.
3  A.   But still file -- the case still gets filed with the
4  court.
5  Q.   The case still goes on, regardless of whether you
6  arrest her then.
7  A.   There's the handful of times you arrest people and it
8  still doesn't get filed.
9  Q.   Yeah.
10 A.   Right. So you get arrested and then it goes in
11 arraignment.
12 Q.   Yeah, they have a revolving door in L.A.
13 A.   Right here, too.
14 Q.   Really?
15 A.   Yeah.
16 Q.   Okay. So -- okay. So you told -- you told -- I'm
17 starting to lose my train of thought here.
18      You were trying to give me your best estimate of when
19 you told this to Kathi.
20 A.   Right. And I -- I can't recall exactly when I told
21 her it was being filed. I want to say it was before we
22 actually collected the goat though.
23 Q.   Okay. Before you -- before you collected the goat.
24      Okay. All right. And did you -- okay.
25      Did you tell anyone -- did you tell anyone else you

Page 286

1  were requesting charges be pressed? It's like "pressed"
2  like they say in the movies, but you know what I mean.
3  A.   Did I talk to anyone else about the purpose?
4  Q.   Yeah, Bruce or Melanie? Anyone else?
5  A.   The Sheriff, the DA.
6  Q.   Obviously, you told the DA. You gave him the request
7  for it.
8  A.   Yeah, we talked about it on the phone with the
9  Sheriff.
10 Q.   When was that?
11 A.   After I collected the goat. I think like within a
12 week after collecting the goat.
13 Q.   Okay. All right. The prior question, you were
14 telling me who else you might have talked to.
15 A.   Yeah.
16 Q.   Besides Kathi Muse.
17 A.   I think Mcfarlane was -- I informed him that, yeah,
18 we would be filing charges.
19 Q.   Did you call him?
20 A.   No. That might have been in person.
21 Q.   Where did you see him?
22 A.   At his house when I dropped the goat off.
23 Q.   Oh, you told him then you were going to.
24 A.   I'm pretty sure that's when I told him, yeah.
25 Q.   But it might have been after?

Page 287

1  A.   I don't think it was after.
2  Q.   Okay. You don't think if was after. All right.
3  Q.   All right. So -- and you told -- how did you
4  inform Kathi? Did you call her or text message?
5  A.   It was over a phone conversation.
6  Q.   Over a phone conversation. Okay.
7       And about what date was that?
8  A.   I want to say it was either that first week before
9  the holiday weekend or it was that week after before we knew
10 where the goat was. You know, that three-day window, that
11 short -- because that holiday was on a Tuesday, so it was
12 right around that timeframe.
13 Q.   Okay. All right. Have you ever seen a case of grand
14 theft -- is it grand theft livestock? Grand theft animal?
15 What do you -- what term do you use? You know what I'm
16 talking about.
17 A.   It's just theft of livestock. It's a felony.
18 Q.   All right. Theft of livestock.
19      Have you ever seen one for $63 in losses?
20 A.   For what?
21 Q.   Have you ever seen a case where it was -- where the
22 damages were $63?
23      MR. NORTHCUTT: Objection. Assumes facts not in
24 evidence, but go ahead.
25      THE WITNESS: This was my first time with that.

Page 288

1  Q.   MR. GORDON: This is your first time. Okay.
2  A.   With that.
3  Q.   Okay. All right. Gotcha.
4       All right. So of any amount this is your first time
5  for -- well, I thought earlier you said that you --
6  A.   No, not at any amount. That -- in regards to an
7  auction, sixty-something dollars is my first time, so...
8  Q.   Okay. But the other cases of -- you said was a horse
9  and some cows.
10 A.   Those were several thousand dollars cases.
11 Q.   Those were thousand dollars cases. Okay.
12      Never one this low. Correct?
13 A.   Correct.
14 Q.   Okay. All right. Okay. Yeah. So you spoke with --
15 okay. You press charges and -- you spoke with Kathi and you
16 were trying to give me an estimate of the date. It was
17 after the confiscation and assumingly before August 31st
18 when she texted you and you called her by phone.
19      Do you remember about when that was?
20 A.   In regard to this?
21 Q.   Yeah.
22 A.   It was probably the next day.
23 Q.   The next day, like the 1st?
24 A.   Probably the 1st. This is the 31st.
25 Q.   Okay. But I mean, after you took -- after you

Page 289

1  confiscated Cedar, about the DA pressing charges, you
2  told -- you called her -- you said you called her.
3  A.    Yeah.
4  Q.    I just didn't hear what date approximately that you
5  called her.
6  A.    Yeah. It was either the week before or the week of
7  when we confiscated, because there was conversations with
8  her about filing charges, that we were going to file charges
9  against her.
10 Q.    Yeah, those conversation.
11 A.    Those were on the onset of my investigation. So that
12 would have been either the end of June when this was
13 reported to me or early July.
14 Q.    So you had been talking with her about filing
15 charges --
16 A.    Yeah.
17 Q.    -- the whole time.
18 A.    Yes.
19 Q.    Was she calling you?
20 A.    I got her number from Mcfarlane --
21 Q.    Okay.
22 A.    -- and I called her, and then we talked and then
23 obviously, she would text me every once in a while after the
24 fact.
25 Q.    Okay. How often do you speak with civilians in law

Page 290

1  enforcement investigations who have an interest in charges
2  being issued?
3  A.    Victims or civilians?
4  Q.    Yeah, both. Here you speak with Mcfarlane, too.
5  A.    I don't speak -- I don't speak to civilians about
6  criminal prosecutions.
7  Q.    Okay.
8  A.    I talk to victims about criminal prosecutions.
9  Q.    Okay. You were talking with Mcfarlane also?
10 A.    Yeah. He's -- yeah. But -- yes. So how often --
11 Q.    Was this -- was that -- was this out of the ordinary?
12 A.    Yeah, because he was part of the fair, and obviously
13 Muse wanted me to release the goat to him.
14 Q.    Yeah.
15 A.    So...
16 Q.    Okay.
17 A.    Yeah.
18 Q.    Okay. All right. Did you ever tell Kathi Muse, you
19 know, since she seems to be the person pressing for this,
20 just calm down and let it go?
21 A.    That's not my job to do that.
22 Q.    No, I understand. But did you ever say to it her
23 nonetheless?
24 A.    No. No, I didn't.
25 Q.    Okay.

Page 291

1  A.    No, I would -- I would never -- I think my -- I think
2  any political Sheriff, which all Sheriffs are pretty much
3  political, if they found out I talked to a victim that
4  way --
5  Q.    Yeah.
6  A.    -- "You need to just let this go" and "This isn't a
7  big deal," it probably wouldn't be good for me.
8  Q.    Okay. So -- so you have this -- all right. So for
9  victims, I know, you said you don't -- you do speak with
10 them.
11       Did you give out your private phone for text messages
12 to most of them also?
13 A.    No. This is my work phone.
14 Q.    This is your work phone. Okay.
15       Do you give out your work phone for text messages to
16 people that are -- purport to be victims of a -- of a crime?
17 A.    I don't give them out my -- for purposes of text
18 messages, but it's point of contact.
19 Q.    Okay. So was Kathi Muse texting you out of the
20 ordinary?
21 A.    Yeah, not -- I don't get a lot of text messages from
22 victims.
23 Q.    OKay. Okay. So this is your work phone she's
24 texting?
25 A.    Yes, sir.

Page 292

1  Q.    Did she ever text your private phone?
2  A.    No.
3  Q.    No.
4  A.    To my knowledge.
5  Q.    Does she have your private number?
6  A.    Not to my knowledge.
7  Q.    Not to your knowledge. Okay.
8        Does she have your -- okay. Does she ever contact
9  your wife to talk to you?
10 A.    No.
11 Q.    No. Okay. All right. Okay.
12       So on August 31st she texts you "Is the DA going to
13 do anything with the goat?"
14       And you respond "Are you available for a call
15 tomorrow mid morning?"
16       "Yep."
17       "Okay. Sounds good. I'll call you tomorrow."
18       Did you call her that day?
19 A.    No.
20 Q.    Okay. Why not?
21 A.    I run -- I was just busy.
22 Q.    Just busy.
23 A.    Right.
24 Q.    All right. Okay. So did you speak with her --
25       that's right.

Page 293

1   You say below "I haven't forgotten to call you. Just
2   busy. I will call you as soon as I can. Thanks."
3       So moving to page -- first of all, on this August
4   31st text, are there any texts -- is this the very first
5   text she sent you, "Is the DA going to do anything with the
6   goat?"
7   A.   Yes.
8   Q.   So no text predating to you on -- on this phone or
9   your private phone?
10  A.   Not that I can recall.
11  Q.   Okay. But there might have been?
12  A.   To my personal phone, absolutely not.
13  Q.   Okay. But to this phone? By "this phone," I mean
14  your work phone.
15  A.   Not that I can recall, no, sir.
16  Q.   Okay. All right. Not that you can recall.
17      Potentially. You just can't recall?
18  A.   Right. When I did the search for discovery, this is
19  what was on my phone.
20  Q.   Okay. Gotcha.
21      Did she have any emails to you prior to August 31st?
22  A.   No.
23  Q.   Okay. So you think your communications with her
24  prior to August 31st were purely telephonic?
25  A.   Yes, sir.

Page 294

1   Q.   Okay. Did you see her in person at all?
2   A.   No.
3   Q.   No. Okay. All right.
4       Okay. So let's go to one -- what was the next one in
5   line?
6   A.   127.
7   Q.   127. All right. Okay.
8       "No problem. Call me."
9       So she responds "No problem. Call me whenever you
10  get a chance. Thank you."
11      All right. So then, presumably, you don't call her
12  on the 1st?
13  A.   Right.
14  Q.   Okay. All right. So the next day, "Hi, Jerry. This
15  is Kathi Muse. Did the DA decide to do anything with the
16  goat?"
17      Okay. And this is a Friday, so not -- you respond
18  "Not at work today. I will have a" -- assuming "a better
19  answer," not "bitter answer."
20  A.   Yeah, auto -- auto correct.
21  Q.   Yeah. Okay. All right.
22      "Tuesday next week. Have a good weekend."
23      All right. So then she texts you -- do you call her
24  on Tuesday?
25  A.   I called her at some point during the investigation.

Page 295

1   And I want to say at this point --
2   Q.   At this -- you mean, you called her at some point --
3   A.   Yeah.
4       (Simultaneous speaking.)
5   Q.   -- during the next exchanges?
6   A.   Yeah. And at some point we had received the -- I
7   don't know what the exact term is, but basically, hey,
8   you're part of a lawsuit and retain everything and
9   everything.
10  Q.   Yeah.
11  A.   And at that point, I think, my conversation was --
12  with her is that hey, your best response is I'm being sued
13  now. I imagine you're going to be sued.
14  Q.   Yeah.
15  A.   You probably need to just go to the DA direct.
16  Q.   Okay.
17  A.   And I think the reason why I was taking so long to
18  get back is I don't think -- I know I had reached out to the
19  District Attorney's Office to figure out who was leading
20  this case --
21  Q.   Yeah.
22  A.   -- and have a DA investigator reach out to her and
23  give her an update, because technically, once it leaves my
24  office, I can try to facilitate that, right. That's part of
25  being professional on service --

Page 296

1   Q.   Okay.
2   A.   -- but ultimately, that office, the District
3   Attorney's Office, is responsible for giving victims updates
4   on their case and what their status is.
5   Q.   Okay. So the DA then you expected to give Kathi Muse
6   updates?
7   A.   Yeah, someone from the DA's office.
8   Q.   Someone from the DA's office.
9   A.   Not the DA specifically.
10  Q.   Not the DA specifically. Okay. All right.
11      Okay. So she texts you again on Friday nonetheless,
12  and "Hi, Jerry. I hate to bother you on the weekend," but
13  Friday the 9th, "but did the DA do anything?"
14      "I will call you" -- you respond "I will call you in
15  a little bit."
16      So we go to 125 then.
17      Is this "Okay" in response to "I will call you in a
18  little bit" at the top of the page?
19  A.   Yeah, that's her response.
20  Q.   Then September 15th.
21      "Hi, Jerry. Any word on the DA? I had just had the
22  Sacramento Bee call."
23      So did you speak with her between the 9th and the
24  15th?
25  A.   Yeah, and I -- I -- to recollection, it's in regards

Page 297

1  to what I just said about hey, you need -- you know.
2  Q.    You need to speak with the -- okay.  Okay.
3         And how did she take that?
4  A.    I think she's fine with it.  I mean, she's -- I
5  don't -- I didn't take it as her being upset with that.
6  Q.    Okay.
7  A.    But I didn't just shun her either --
8  Q.    Yeah.
9  A.    -- and say hey, you know.
10  Q.    But at this point she knew a lawsuit was filed.
11  A.    I believe so.
12  Q.    Okay.  Did she have -- did she give any comment on
13  the lawsuit?
14  A.    No.
15  Q.    No.  Okay.  Really?  Nothing at all?  Nothing?
16  A.    I can't remember the exact language, but she did not
17  appear to be at all intimidated by it, in that she has been
18  attorney.
19  Q.    I hear she's a bulldog.
20  A.    She -- I don't -- I can't speculate on that.
21  Q.    That's fine.  You were about to agree before you
22  decided not to speculate.
23         Okay.  On the 15th then.  All right.
24         So "Hi, Jerry.  Any word from the DA?  I just had the
25  Sacramento Bee call."

Page 298

1         Okay.  And so at this point you respond "Afternoon
2  someone calling from the DA office will be calling you to
3  give an update.  Thanks very much."
4         Okay.  So at this point is your response referencing
5  the conversation you already had before with her, saying the
6  DA is going to have to --
7  A.    Yeah.
8  Q.    Okay.  All right.
9  A.    Yes.  Sorry.
10  Q.    All right.  So why does she continue to text you
11  then?
12         So hi -- the 23rd, "Hi, Jerry.  Will you call me
13  back?  I was having problems with my phone.  Got it fixed.
14  Thanks.  Kathi Muse."
15  A.    I don't know why she continued to text me.
16  Q.    Okay.
17  A.    And I don't want to speculate.
18  Q.    Okay.  All right.  Did she call you at any point at
19  any other times in this period?
20  A.    No, not that I can --
21  Q.    Send you any emails?
22  A.    Not that I can recall, no.  No emails.  That would
23  have been part of discovery.
24  Q.    Okay.  Okay.  Well, assuming they still exist.
25  A.    Yeah.

Page 299

1  Q.    You said you have a --
2  A.    Yeah, we delete a lot of our stuff.
3  Q.    You delete a lot of the stuff.  Okay.
4         But at this point in time you were saving everything.
5         Did you look at this point in time to see if you had
6  any emails from her, just out of curiosity?
7  A.    At -- at this point?
8  Q.    Out of your curiosity, yeah.  Did you look --
9  A.    No, it wasn't until we got the preservation letter.
10  Q.    Okay.
11  A.    The pres. letter that I started going through and
12  preserving everything.
13  Q.    Okay.  All right.  All right.  Did she reach out
14  to -- did she reach out to -- I know you said her
15  relationship with your wife is professional, but did she
16  reach out to your wife at all during this period?
17  A.    Not that I know of.
18  Q.    Okay.  Did your wife speak with her at all during
19  this period, whether -- regardless of who had reached out?
20  A.    Not to my knowledge, no.
21  Q.    Okay.  From the time of the seizure to -- what are we
22  on -- September 23rd here.  So you had no -- your wife
23  didn't communicate with her, and your only communications
24  with her, apart from what you testified to today, is these
25  text messages and the one or two phone calls you had?

Page 300

1  A.    Correct.
2  Q.    Okay.  And you said to her in these phone calls the
3  DA is basically going have to advise you moving forward or
4  someone in the DA's Office.
5  A.    Correct.
6         MR. GORDON:  Okay.  All right.  Okay.  Okay.  All
7  right.  Off the record.
8         THE VIDEOGRAPHER:  We're off the record and the time
9  is 17:25.
10         (Off the record.)
11         THE VIDEOGRAPHER:  We're back on the record and the
12  time is 17:33.
13         MR. GORDON:  So just for clarity, since we did go
14  over these two documents, which are Bates stamped, but we
15  did not enter them as exhibits, I'm going to do that now.
16         So the first one is going to be Exhibit G, and it's
17  a -- it's a text message from someone named Tyler, and the
18  Bates set is FERN 000126.  And that is Exhibit G.
19         And Lieutenant Fernandez stated that this Tyler is
20  the same Tyler who emailed him copies of a buyer letter,
21  which are in -- this is Bates stamp -- what's the Bates
22  stamp number.  You find it first, Lieutenant, and let me
23  know.
24  A.    I don't have it.
25  Q.    Okay.

Page 301

1 A.    **It's not part of this exhibit.**
2 Q.    Oh, yeah.  You're right.  I never gave the letter to
3 you.  All right.  I guess I'm going to have to email these.
4 I know this is an exhibit, too.  Oh, I found it, I believe.
5 So just to -- it's 0000 -- FERN 000078 and -- which I guess
6 that means I need to enter that as an exhibit as well.  So
7 this will be -- once you confirm it.
8       So, Officer, just confirm this is the same Tyler.
9 A.    **Yes, it is.**
10 Q.   Yes, it is.  Okay.
11      So FERN 000078 to 81 will be Exhibit H.  For clarity,
12 I didn't really ask any questions about that.  And then
13 Exhibit -- I don't have -- I have another stapler miss, so
14 we'll figure it out afterwards.
15      And then Exhibit I is the text chain bearing Bates
16 Stamp No. FERN 000128, and this was your conversation with
17 Detective Ashbee.  Correct?
18 A.   **Yes, sir.**
19      **(Exhibits G, H and I were marked.)**
20 Q.   MR. GORDON: Were there any other text messages
21 before or after this that were with Ashbee relevant to this
22 case or concerning this case?
23 A.   **No, sir.**
24 Q.   Okay.  Okay.  Did you talk with Ashbee about this
25 case after -- after you -- after you, you know, took custody

Page 302

1 of the goat and turned him over?
2 A.    **Not really, no.  Just, I think, when we all got**
3 **served, we were just like, hey, it's...**
4 Q.    Was that the first time you spoke with him afterwards
5 of when you were served with the complaint?
6 A.    **No.  I mean, I probably talked to him about -- I**
7 **don't -- about this case?**
8 Q.    About this case, yeah.  I don't care what else you
9 talked with him.
10 A.   **No.  I think I -- I think -- because he wrote the**
11 **warrant for me, I think like that next week I did give him**
12 **like a rundown of like where we found it and how we found it**
13 **and stuff like that, and that it wasn't actually there.  It**
14 **was at another property.**
15 Q.   Okay.
16 A.   **But that's about it, the gist of it.**
17 Q.   Okay.  Okay.  Did he mention to you that he knew what
18 happened to Cedar at that point in time?
19 A.   **No.**
20 Q.   No.  Okay.
21      Did he give -- did he talk about -- was Ashbee
22 ever -- earlier you said that -- has Ashbee ever met Kathi
23 Muse or does he -- is he friendly with her?
24 A.   **I have no idea.**
25      MR. GORDON: Okay.  All right.  That's it for me.

Page 303

1       Go head, Damian.
2       **EXAMINATION BY MR. NORTHCUTT:**
3 Q.    Okay.  Lieutenant, did anyone from the Shasta
4 District Fair decide that they wanted to have charges
5 pressed for -- for Jessica Long's actions?
6 A.    **Yes.**
7 Q.    Okay.  Who was that specifically?
8 A.    **Silva.**
9 Q.    Okay.  Anyone else?
10 A.   **Just Kathi Muse.**
11      MR. GORDON: Is Kathi -- Well, I'm sorry, Damian.  Go
12 ahead.
13      MR. NORTHCUTT: You can interject a question if you
14 want to.
15      MR. GORDON: You don't mind.  Okay.
16      Is Kathi Muse part of the fair though?
17      MR. NORTHCUTT: No, she's not.
18      MR. GORDON: Okay.  Okay.  Okay.  So you heard his
19 question is anyone --
20      THE WITNESS: Anyone else.
21      MR. GORDON: -- in relation.  All right.
22      THE WITNESS: Sorry.
23      MR. GORDON: Okay.
24 Q.   MR. NORTHCUTT: Earlier there was some discussion
25 about the second letter that Jessica Long sent where she

Page 304

1 kind of said there is a property dispute or contractual
2 dispute.  I think it was the letter dated June 28, 2022.
3      In your opinion, does someone asserting that it's a
4 contractual dispute make it so?
5 A.    **No.**
6      MR. GORDON: Objection.  Calls for expert testimony.
7      THE WITNESS: No.
8 Q.    MR. NORTHCUTT: There was also some discussion in
9 terms of the -- I believe it was the first email that she
10 sent Attachment B to the actual warrant, where basically she
11 was saying she was willing to return the goat or possibly
12 pay instead.
13      If property is stolen, does simply returning it mean
14 the investigation doesn't go on?
15 A.   **No.**
16 Q.   So if you're being -- if the criminal is simply
17 saying "I'll return the property" is insufficient to stop
18 the criminal charges from being brought against you; is that
19 correct?
20 A.   **That's correct.**
21 Q.   Now, there was also an attachment.  I think it was to
22 the warrant.  It was a waiver, I believe, on page 23 FERN,
23 FERN 23.  I'm sorry.  I'm jumping all over the place.  Let
24 me get you the correct number.
25 A.   **FERN 23?**

Page 305

1 Q. Yeah, we'll get to FERN 23 in just a second.
2 FERN. It's FERN 39.
3 Was this document provided to you by Silva?
4 A. Yes.
5 Q. Okay. And what is your understanding of this
6 document?
7 A. **It's an accountability and liability waiver.**
8 MR. GORDON: Well, objection. Calls for -- the
9 document speaks for itself. Calls for expert testimony.
10 MR. NORTHCUTT: I'm asking what his understanding is.
11 MR. GORDON: I understand. I'm just putting my
12 objection on.
13 THE WITNESS: That basically by registering -- if
14 you're under 18 years of age and you register your child,
15 that you're taking responsibility and that everything that
16 you're agreeing to is true and correct; that you agree to
17 adhere to the rules of the fair and not with the state.
18 Q. MR. NORTHCUTT: Is it your understanding that
19 Ms. Silva provided this document to you because it was
20 something that Jessica Long had consented to or reviewed?
21 A. Yes.
22 Q. And now, you see the part that says -- it's in the
23 first paragraph, Accountability and Liability, "Under
24 penalty of perjury I certify that the information provided
25 is true and I agree to defend, indemnify and hold harmless

Page 306

1 the Fair, the County and the State of California, its
2 officers, agents, employees from and against any liability
3 claim, loss or expense arising out of any injury or damage
4 which is caused by, arises from or is in any way connected
5 to participation in the program or event."
6 Do you see that language there?
7 A. I do.
8 Q. So is it your understanding that Jessica Long agreed
9 to that language?
10 A. Yes.
11 Q. And also the section below it talking about
12 confirming that are at least 18 years of age and that
13 you agree to the rules and regulations of the fair?
14 A. Yes.
15 Q. So is it your understanding that if there was a
16 contract at issue here, that that contract was -- that if
17 there was any sort of contract, let's say, that it was with
18 the mother, or is it your understanding it would be with the
19 daughter? Or both?
20 A. **I would be with -- it would have been with the mother
21 because she's the adult.**
22 Q. Now, you claimed earlier, and I guess I'm
23 paraphrasing here, this wasn't the crime of a lifetime, but
24 as a peace officer, your job is to investigate all
25 violations of the Penal Code, and if there's evidence

Page 307

1 supporting it, to then prosecute. Is that correct?
2 A. Yes.
3 THE VIDEOGRAPHER: We're going to have to go off
4 here.
5 MR. NORTHCUTT: I've got a couple more questions, so
6 we might have to reload. It's not going to be more than
7 honestly ten minutes.
8 MR. GORDON: We're off the record. The time is 17:42
9 and this is the end of Media No. 3.
10 (Off the record.)
11 THE VIDEOGRAPHER: We are back on the record. The
12 time is 17:52 and this is the start of Media No. 4.
13 Q. MR. NORTHCUTT: Earlier, I guess, counsel referenced
14 part of the General Livestock Rules and Guidelines. I
15 believe it's FERN 34 and 35.
16 But specifically on 35 it says "Rule combines any
17 exhibitor who fails to conform to the accepted standards of
18 conduct will be removed immediately with livestock from the
19 fairgrounds. All premiums and auction's proceeds forfeited
20 if the situation is of a serious nature."
21 It appears to me that this provision comes under the
22 Ethics Courtesy and Public Safety section.
23 Do you see that section under FERN 34?
24 MR. GORDON: Objection. The document speaks for
25 itself.

Page 308

1 Q. MR. NORTHCUTT: You can go ahead and answer.
2 A. Yes.
3 Q. So what is your understanding of that rule compliance
4 section as it pertains to that?
5 A. **So my interpretation is that -- that stating on 35 is
6 in regards to ethics, courtesy and public safety and not in
7 regards to the sale of the animal, which is earlier on in
8 this documentation.**
9 Q. I'm sorry if I bounce around a little bit, but I'm
10 just -- these are all notes that I've taken throughout the
11 deposition.
12 Earlier, also, plaintiff's counsel talked about the
13 fact that Ms. Stover had mentioned that Ms. Jessica Long was
14 talking with an attorney.
15 Is it my under -- can you tell me what's your
16 interpretation of Ms. Stover's, I guess, credibility based
17 on your conversations with Detective Duncan?
18 A. **Just that she wasn't forthcoming and was lying to us
19 from our initial contact with her.**
20 Q. So would you have one way or the other of knowing
21 whether that statement that she was talking with an attorney
22 was true?
23 A. **No, I would not.**
24 Q. Even if she was talking with an attorney, you
25 mentioned that defendants talk with attorneys all the time.

Page 309

1 Correct?
2 A.   Correct.
3 Q.   Now, we briefly talked about the fact that if you
4 thought there was a contract at all, that contract was with
5 Jessica Long and not her daughter.  Correct?
6 A.   Yes.
7 Q.   Okay.  And now -- why did I write this number down is
8 a very good question.  Ah, I remember.  So give me one
9 second.
10      MR. GORDON: It's fine.
11 Q.   MR. NORTHCUTT: So FERN 28.  This is Attachment B
12 from Jessica Long, or Dong.  I guess, that's a former name.
13 June 27th.  This is attached to the warrant.
14      Do you see the section that says "I have communicated
15 with the buyer, Senator Brian Dahle's office.  They bought
16 the goat to support its community."
17      Do you see that section?
18 A.   I do see that paragraph.
19 Q.   So is it your understanding that after the bid was
20 accepted and the goat was therefore sold --
21      MR. GORDON: Objection.  Misstates the procedures of
22 sale, but yeah.
23 Q.   MR. NORTHCUTT: That thereafter, that the property no
24 longer belonged to either Jessica Long or her daughter?
25 A.   Correct.

Page 310

1 Q.   Was it your understanding that the -- that the fair
2 itself was a terminal sale?
3 A.   Yes.
4 Q.   Okay.  And, in fact, if you look at FERN 31, do you
5 see where it says "Auction Guidelines:  This is a terminal
6 sale," in bold lettering and underlined on the first page?
7 A.   Yes, with a date of June 25th, 2022, commencing at
8 8:00 a.m.
9 Q.   Okay.  As a peace officer are you -- do you have
10 authority to make determinations whether there's been a
11 violation under the Penal Code?
12 A.   Yes.
13 Q.   And do you -- does that require you to know
14 aspects -- all aspects of the civil code, commercial code,
15 Code of Civil Procedure, or are you able to make a
16 determination based off of facts in front of you whether a
17 Penal Code violation has been committed?
18 A.   Correct, based off the facts presented to me.
19 Q.   Lastly, we talked about briefly Penal Code 1536 and
20 1407, I think.  If I remember correctly, if you turn to FERN
21 23, you pointed out the fact that the warrant
22 stated, and this is the third paragraph down, "Due to the
23 fact that the items to be seized include living animals,
24 deputies shall secure the property and contain an
25 appropriate location, and the rightful owner of said

Page 311

1 property shall be notified of location of property and the
2 property may be released to the owner upon seizure."
3      So is it your understanding that upon seizing -- or
4 upon obtaining Cedar the goat, that you were able to return
5 the property to the owner?
6 A.   Yes.
7 Q.   Is that what you did when you returned the property
8 to BJ Mcfarlane?
9 A.   Yes, sir.
10      MR. GORDON: Objection.  Misstates testimony.
11      It is her agent, the owner's agents.  Correct?
12      THE WITNESS: Well, we asked what agents was and it
13 was.
14 Q.   MR. NORTHCUTT: Is it your understanding that when
15 you were returning the property to BJ Mcfarlane, you were
16 reality returning the property to its rightful owner,
17 Katherine Muse?
18 A.   Yes.
19 Q.   And that he was acting in some capacity on her
20 behalf?
21 A.   Correct.
22      MR. NORTHCUTT: That's it for me, unless I need to
23 follow up on something that you say.
24      MR. GORDON: Let me talk with Vanessa really quick.
25 Off the record for a moment.

Page 312

1      THE VIDEOGRAPHER: We're off the record.  The time is
2 18:00.
3      (Off the record.)
4      THE VIDEOGRAPHER: We're back on the record.  The
5 time is 18:08.
6      EXAMINATION BY MR. GORDON:
7 Q.   All right.  So, Lieutenant, go to go to Exhibit B.
8 A.   Yes, sir.
9 Q.   Give me a moment to find the Bates numbers.  It's in
10 the warrant.  So a moment ago -- well, a few moments ago at
11 this point, but your counsel pointed out that this warrant
12 allowed you to turn over Cedar and he cited, I believe,
13 page -- FERN 23.  Correct?  FERN 0023.
14      It says "Due to the fact that the items to be seized
15 include living animals, deputies shall" -- correct?
16 A.   Yes, sir.
17 Q.   Okay.  All right.  So and we went over 1536, penal
18 Code 1536 and your duties under it and Penal Code 1407 and
19 your duties under that, 1408, earlier.
20      So on FERN 21 -- if you can just hold FERN 23 and
21 FERN 21.  Look at those pages.
22      So on FERN 21 -- let me know when you're at it,
23 Officer.
24 A.   Yeah.
25 Q.   It says it's further -- "It is further ordered that

Page 313

1  upon adjudication of the case in this action, including the
2  resolution of any appeals, the property in accordance with
3  the procedures set forth" -- I skipped over several things.
4  You can see the paragraph I'm talking about.
5  A.    Yes, sir.
6  Q.    Would the property -- be disposed in accordance with
7  the procedures set forth in California Penal Code 1407 to
8  1422.
9        So earlier you discussed how -- your duties to
10 maintain the property under 1536 and 1407.
11       So the judge signed that page and then the provision
12 your attorney pointed out on FERN 23, these provisions are
13 in conflict.
14       How do you resolve a conflict when you're executing a
15 warrant?
16 A.    How do I resolve a conflict?
17 Q.    Yeah, because it says here you have to keep the
18 property basically on 21, and then the other at this one,
19 23, it says that you can turn it over to who you deem to be
20 the rightful owner.
21       What do you do if there's a conflict?
22 A.    So if I -- like, if I would have noted this at the
23 time, you would obviously just contact the magistrate.
24 Q.    Okay.
25 A.    Right.

Page 314

1  Q.    So you didn't note it -- note this at the time?
2  A.    No, I didn't note -- well, you would just contact the
3  magistrate and make sure that we're clear on what we're
4  supposed to be doing with the animal.
5  Q.    Okay.  Can a magistrate -- I think I asked you this
6  before, but I apologize.  Answer it again, if you would.
7        A magistrate, in your opinion, can relieve you of
8  your obligations under 1407 or 1408?
9  A.    So that's --
10 Q.    Or 1536 also?
11 A.    Right.
12 Q.    Yeah.  They say you don't have to -- you can turn the
13 property over.
14 A.    So I'm trying to think of what I said earlier on
15 that.
16 Q.    I thought you said that that was your -- I don't want
17 to put words in your mouth --
18 A.    Right.
19 Q.    -- but I thought you said yeah, when I asked that.
20 A.    So a magistrate, I can't -- I think I said
21 something --
22 Q.    Or a judge.
23 A.    -- to the effect the judge, right, can make whatever
24 determination.
25 Q.    Yeah.  I'm not --

Page 315

1  A.    And I know -- and I know we're spending a lot of time
2  on the warrant, but I didn't seize the animal or collect the
3  animal under the warrant.
4  Q.    Took custody.
5  A.    So the -- yeah, I didn't take custody under the
6  warrant.  1407, I believe, we talked about being a stolen or
7  embezzled.
8  Q.    Yeah.
9  A.    Right.  And we talked about all those circumstances
10 that I know of deputies today are probably doing regarding
11 evidence.
12 Q.    Yeah, when it comes into their custody.
13 A.    Right.
14 Q.    Yeah.
15 A.    So...
16 Q.    But my question, regardless --
17 A.    Right.
18 Q.    -- is when there's a potential conflict.  So your
19 answer is you would call the magistrate or the judge,
20 whoever executed the warrant, try to sort it out.
21 A.    If you seemed it a conflict, yes, you could call the
22 magistrate.
23 Q.    But you didn't -- in this instance you didn't deem
24 this a conflict.  You didn't really even pay attention to
25 this paragraph here.  You focused on 23.

Page 316

1  A.    Yes, sir.
2  Q.    Okay.  All right.  Okay.  So also, your counsel went
3  over the -- the liability account -- what was the title of
4  the document?  Accountability --
5  A.    I think it was Liability and Accountability Form.
6  Q.    Yeah.  Damian, do you remember the -- oh I found it.
7  39.  39.
8        All right.  So even assuming the waiver -- even
9  assuming this waiver is valid, does a waiver, in your mind,
10 negate someone's due process rights or otherwise
11 Constitutional rights?
12       MR. NORTHCUTT: Objection.  Calls for a legal
13 conclusion.  Fact not in evidence.  Borderline
14 argumentative.
15       But go ahead.
16       THE WITNESS: Can you ask it again?  Sorry.
17       MR. GORDON: Yeah, sure.
18       Your objection stands.
19       MR. NORTHCUTT: Same objections.
20 Q.    MR. GORDON: Yeah, same objection.  Yeah, yeah.  You
21 don't need to repeat it when I ask you that.
22 A.    Right.
23 Q.    So does -- does a waiver, assuming this waiver is --
24 assuming this waiver is valid, does that negate someone's
25 Constitutional rights?  Their due process rights?

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 317

1  A.    It wouldn't, but it would definitely steer my
2  judgment as far as what I'm investigating.
3  Q.    Steer your judgment how? What do you mean, steer
4  your judgment?
5  A.    Well, I guess, what I'm trying to say with that is so
6  here I have an adult that reviewed this or is saying that
7  they reviewed it and that they're agreeing to that by saying
8  "I agree to" or parent guardian on the next page, 40, of
9  that waiver. My belief and what I deem is that they should
10 have known everything that was in dispute today.
11 Q.    Okay. I mean --
12 A.    It's kind of broad.
13 Q.    Yeah, yeah. Move to strike. Nonresponsive.
14        I understand, but I just want -- in your mind -- but
15 does it negate -- and if you don't know, you don't know,
16 it's fine, but does it negate someone's due process, you
17 know, a waiver such as this?
18        MR. NORTHCUTT: Asked and answered. He just said no.
19 Q.    MR. GORDON: Did you say no?
20 A.    Yeah.
21 Q.    Oh, okay. I apologize. I'm not trying to browbeat
22 him.
23 A.    No, I said no and then kind of gave my --
24 Q.    You went on. Okay. All right. Okay.
25        So I certainly asked this earlier, and I apologize if

Page 318

1  I did, but up to the auction -- I think I did. I can't
2  recall. We've asked so many questions.
3  A.    Right. It's been a long day.
4  Q.    I assume I did. It was in my notes, yeah.
5        So in your mind was the -- was Cedar Jessica's
6  property, Eliza's property or both? How did you view them?
7  A.    So, I view them as Jessica's property because she's
8  the one that signed the contract with the fair.
9  Q.    Even though the livestock rules --
10 A.    She's --
11 Q.    -- says the exhibitor --
12 A.    Yeah, the exhibitor.
13 Q.    But you agree that Eliza's is the exhibitor.
14 Correct?
15 A.    She's the exhibitor, absolutely.
16 Q.    But you, for your investigation, viewed Jessica as
17 the owner?
18 A.    As the responsible -- like, juvenile's can't sign
19 contracts. They can't sign, right, agreements because
20 they're not 18 of age -- or years old.
21 Q.    Why does the fair list them as the owner then?
22 A.    I don't know why the fair does that.
23 Q.    You didn't do it. I was just curious.
24 A.    Yeah, I don't know.
25 Q.    Okay. All right. Okay. So you also mentioned that

Page 319

1  you can make a determination of a Penal Code violation, if
2  I'm miss phrasing that. I believe that's how you phrased it
3  to him, that you have the authority to make a Penal Code
4  determination if there's a violation. Correct?
5  A.    Yes, but more to that, yeah. Probable cause,
6  right --
7  Q.    Probable cause --
8  A.    -- and I believe a Penal Code violation has been
9  violated.
10 Q.    You have the authority to do that for purposes of
11 investigation and making a reference -- and making a
12 recommendation to the DA, correct, to prosecute?
13 A.    And/or making an arrest.
14 Q.    Yes, and/or making an arrest. Yeah.
15        But you don't have authority to make a determination
16 to resolve the entire matter. Correct?
17 A.    No.
18        MR. GORDON: Okay. All right. No further questions.
19        MR. NORTHCUTT: I asked the fair's attorney on line
20 whether he had any questions during our break. He said no,
21 but perhaps on the record do you want the chime in here?
22        MR. BRIDGES: This is John Bridges. I don't have any
23 questions. Thank you.
24        MR. GORDON: Okay. John, I'll give you a call next
25 week.

Page 320

1        THE VIDEOGRAPHER: Are we done?
2        MR. GORDON: Yeah, we're done. Well -- yeah. Not
3  done with the depo and reserving the rest of my time, which
4  how much time do we have left? It's probably like an hour
5  and a half or so. Out of seven, how much --
6        THE VIDEOGRAPHER: About an hour and 45 minutes.
7        MR. GORDON: An hour 45. Okay.
8        So, Damian, I forget -- I forget the federal stip on
9  this for when --
10        MR. NORTHCUTT: That's fine. I thought it was
11 shorter.
12        THE VIDEOGRAPHER: I'd have to add it up.
13        MR. GORDON: But it's about an hour. Whatever it is,
14 I'm just reserving the rest of the time.
15        MR. NORTHCUTT: Sure. Reserve the rest of the time
16 I'm not going -- I'm not going to dispute.
17        MR. GORDON: Okay. Okay. All right. Whatever it
18 is.
19        MR. NORTHCUTT: We're going to have to work around
20 the Lieutenant's schedule and perhaps --
21        MR. GORDON: No, I understand. Yeah. Well, this
22 isn't going to trial for -- well, there's a discovery
23 cut-off in --
24        MR. NORTHCUTT: Well, we extended it. Correct?
25 Didn't we?

Challe, Fisher & Morfin
Redding, California   (530)246-0942

Page 321

1    **MR. GORDON:** Yeah, November. So it would be before
2  November if we do have any follow up. But it's not going to
3  be a whole day thing. We only have, what, an hour and 45
4  left or something thereabouts?
5    **THE VIDEOGRAPHER:** Something like that. I'll let you
6  know.
7    **MR. GORDON:** And if -- I have no -- you know, we'll
8  see if we even need the whole thing of that, so...
9    So do we need to do -- Madam Court Reporter, do we
10  need to do any -- in state -- state court is so much easier.
11  I don't recall.
12    Mr. NORTHCUTT: We just stip per code.
13    **MR. GORDON:** We just -- is there -- what is the -- we
14  stip per code in state court, but in federal court I don't
15  even know what the code says. Let me just put -- OFF the
16  record for a second. I just want to check.
17    **THE VIDEOGRAPHER:** This is the end of the deposition,
18  of Lieutenant Jerry Fernandez. All original videos --
19    **MR. GORDON:** This ended this session of the
20  deposition.
21    **THE VIDEOGRAPHER:** Right. Well, you've already made
22  that statement.
23    **MR. GORDON:** Okay. Okay. Sorry.
24    **THE VIDEOGRAPHER:** All original videos will be
25  retained at the offices of Redding Video Productions at 8954

Page 322

1  Old Oregon Trail.
2    We're off the record and the time is 18:18.
3    **COURT REPORTER:** Counsel, would you like copies of
4  the transcript?
5    **MR. NORTHCUTT:** We'll take a copy.
6    **MR. GORDON:** Yeah, we would like a copy.
7    **MR. BRIDGES:** For the record, this is John bridges.
8  I would also like a copy of the transcript. Thank you.
9    (Off the record.)
10    **MR. GORDON:** Okay. So back on the record. We are
11  concluding this session of the deposition. This will be
12  presumably session one of Fernandez. We have a little bit
13  of time left for the seven-hour limit. We're reserving our
14  rights to do that at a later date, and I believe all counsel
15  on the call ordered a copy of the deposition transcript --
16  or all counsel at this deposition, including John, ordered a
17  transcript.
18    **MR. NORTHCUTT:** Correct.
19    **MR. GORDON:** He'll review per code and you can advise
20  him on that.
21    **MR. NORTHCUTT:** Sure.
22    So we're going to stipulate on the record here that a
23  certified copy of the deposition transcript, once it's been
24  reviewed by the Lieutenant and made any changes, can be used
25  in this litigation the same as if it was an original.

Page 323

1    **MR. GORDON:** So stipulated.
2  John, are you okay with that?
3    **MR. BRIDGES:** Yeah, that sounds fine with me. Thank
4  you.
5    (The deposition adjourned at 6:22 p.m.)

Page 324

PENALTY OF PERJURY

I, the undersigned, hereby certify that I have read
the foregoing deposition, that I know the contents thereof,
and I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct,
and that there are:

(Check one)    _____ NO CORRECTIONS
               _____ CORRECTIONS AS ATTACHED

Executed this _____ day of _____, 2023.

_____

LIEUTENANT JERRY FERNANDEZ

---oOo---

LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

Page 325

1                    CERTIFICATE OF REPORTER

2

3          I, JULIE BANGHART, a Certified Shorthand Reporter,
    licensed by the State of California, License No. 10547,
4   being empowered to administer oaths and affirmations
    pursuant to Section 2093(b)(1) of the Code of Civil
5   Procedure, do hereby certify:

6          That the witness in the foregoing deposition,
    LIEUTENANT JERRY FERNANDEZ, was present at the time and
7   place specified and was by me sworn to testify to the truth,
    the whole truth, and nothing but the truth;

8
           That said proceeding was taken before me in shorthand
9   writing, and was thereafter transcribed under my direction
    by computer-aided transcription;
10
           That the foregoing transcript constitutes a full,
11  true, and accurate record of the proceedings which took
    place;
12
           That I am not of counsel of attorney for any of the
13  parties hereto, or in any way interested in the event of
    this cause, and that I am not related to any of the parties
14  hereto.

15         IN WITNESS WHEREOF, I have hereunto subscribed my
    signature on this 11th day of October, 2023.
16

17

18

19

20                      _____

21                      JULIE BANGHART, CSR 10547

22

23

24

25

Page 326

1              DEPONENT'S CHANGES OR CORRECTIONS

2   INSTRUCTIONS:  Upon reading the transcript, please note any
    changes or corrections on this sheet.  DO NOT make any marks
3   or notations on the actual transcript.  Use additional pages
    if needed.  If there are no changes, write "No Changes."
4   SIGN AND DATE THIS FORM BELOW.

5   DEPOSITION OF:        LIEUTENANT JERRY FERNANDEZ
    CASE NAME:            E.L. Long vs. Lieutenant Jerry
6                         Fernandez
    DEPOSITION DATE:      August 21, 2023
7

8   PAGE    LINE    CHANGE/CORRECTION

9   ____    ____    _____

10  ____    ____    _____

11  ____    ____    _____

12  ____    ____    _____

13  ____    ____    _____

14  ____    ____    _____

15  ____    ____    _____

16  ____    ____    _____

17  ____    ____    _____

18  ____    ____    _____

19  ____    ____    _____

20  ____    ____    _____

21  ____    ____    _____

22
           I, LIEUTENANT JERRY FERNANDEZ have read my deposition
23  of August 21, 2023, 2023, and hereby affix my signature that
    same is true and correct, except as noted above
24
25  _____        _____
         SIGNATURE                       DATE

Case 2:22-cv-01527-DAD-AC   Document 125-6   Filed 11/19/24   Page 85 of 116
LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

## $

**$11 (1)**
144:4

**$63 (2)**
287:19,22

**$902 (1)**
215:6

## \

**\1 (1)**
117:2

## A

**AA (2)**
14:9,14

**abatement (1)**
125:7

**abattoir (1)**
142:9

**abbreviation (1)**
77:9

**abide (2)**
127:23;129:8

**abilities (1)**
22:21

**ability (2)**
11:1;263:13

**able (19)**
34:7,12,18,20;38:4,
6;160:3;218:13;246:7,
9,18;251:3;257:24;
267:19,24;284:1,2;
310:15;311:4

**abouts (3)**
86:9;139:22;199:1

**above (4)**
143:4;226:25;227:1,
13

**absent (2)**
82:19;143:4

**absentee (3)**
56:10;164:9,17

**Absolutely (9)**
11:19,22;17:23,24;
161:18;195:7;230:9;
293:12;318:15

**abuse (1)**
39:11

**Academy (3)**
14:8;15:17,19

**accept (2)**
150:2;157:23

**accepted (4)**
46:13;101:4;307:17;
309:20

**access (2)**
247:8;254:12

**accident (1)**
16:19

**accompanied (1)**
258:19

**accompany (1)**
239:1

**accordance (2)**
313:2,6

**according (2)**
211:3;215:4

**account (2)**
138:4;316:3

**accountability (8)**
90:3;91:8;140:16;
146:18;305:7,23;
316:4,5

**accredited (2)**
27:22;28:12

**accurate (7)**
37:8;133:23;204:18;
205:2;206:25;207:14;
217:25

**acquaintance (4)**
58:16;68:16,17;70:8

**Acquaintances (4)**
57:2,3;61:18,19

**acquire (2)**
84:22;189:1

**acres (2)**
259:10,10

**acronym (1)**
103:24

**across (1)**
229:25

**Act (1)**
71:6

**acted (1)**
186:17

**acting (1)**
311:19

**action (2)**
79:21;313:1

**actions (1)**
303:5

**active (2)**
15:11;228:14

**actively (1)**
244:23

**activities (2)**
70:5;87:1

**actual (11)**
33:5;38:20;51:13;
52:6;95:19;145:3;
193:3;206:18;262:15,
15;304:10

**actually (41)**
32:15;34:18;35:10;
39:23;40:12;44:21;
55:21;57:10;74:12;
85:10;88:2;90:22;
91:13;99:18;104:14;
115:8;131:17;137:9;
145:15;147:2;150:13;
163:1,21;188:4;
204:12,20;214:6,11,14;

235:7;245:16,19;
261:6;262:13;266:6;
267:5;281:16;282:2,
12;285:22;302:13

**Adam (1)**
99:8

**add (6)**
9:21;111:19,20,23;
112:17;320:12

**added (6)**
110:25;111:21;
115:14,24;144:7,7

**adding (3)**
112:9;114:3;115:10

**addition (2)**
112:10,11

**address (8)**
60:4;100:11,11;
137:11;208:25;246:7;
247:19;256:19

**adds (2)**
112:10;189:10

**adhere (1)**
305:17

**adhered (2)**
20:4;157:2

**adjourned (1)**
323:5

**adjudication (1)**
313:1

**administrator (1)**
239:13

**administrators (1)**
238:22

**admit (1)**
218:12

**admits (1)**
89:3

**admitted (4)**
89:1;154:13;244:22;
246:1

**admitting (4)**
122:25;156:14;
236:14,18

**adult (4)**
13:7;216:23;306:21;
317:6

**advice (2)**
41:5,12

**advise (3)**
9:20;300:3;322:19

**advised (6)**
88:13;121:18;
122:23;181:22;266:25;
267:3

**advisor (1)**
19:9

**affairs (3)**
146:13;189:13;244:7

**affect (2)**
33:9;242:8

**affects (1)**
278:25

**affidavit (1)**
233:18

**afford (1)**
190:14

**aforementioned (2)**
227:2,14

**afraid (1)**
248:17

**afternoon (3)**
186:20;192:10;298:1

**afterwards (5)**
147:24;271:13;
281:8;301:14;302:4

**again (26)**
7:21;76:16;91:4;
115:11;121:14;152:23;
170:4,5;174:8,10,24;
178:17;179:13,14;
183:18;184:3;196:9,
14,15;215:4;220:21;
237:21;264:1;296:11;
314:6;316:16

**against (6)**
36:25;37:11;283:11;
289:9;304:18;306:2

**age (7)**
54:7;159:13,15,19;
305:14;306:12;318:20

**agencies (3)**
17:12;19:10;195:5

**agency (2)**
44:16;229:22

**agent (5)**
187:18;270:9,12,13;
311:11

**agents (3)**
306:2;311:11,12

**ago (8)**
28:17;46:10;48:9;
67:23;86:12;202:21;
312:10,10

**agree (8)**
146:6;218:6;297:21;
305:16,25;306:13;
317:8;318:13

**agreed (1)**
306:8

**agreeing (2)**
305:16;317:7

**agreements (1)**
318:19

**agricultural (2)**
28:1;29:16

**agriculture (4)**
47:10;277:14,15,19

**Ah (1)**
309:8

**ahead (14)**
7:18;23:25;25:17;
38:11;40:11;153:19;
154:24;187:24;217:7;
237:8;287:24;303:12;
308:1;316:15

**airplane (1)**
244:8

**airport (1)**
280:7

**alarm (1)**
229:5

**alcohol (1)**
10:24

**alive (2)**
230:22;231:4

**allegations (1)**
46:14

**allege (1)**
46:16

**alleged (2)**
36:13;84:14

**Allen (5)**
115:24;256:6,9,16;
259:18

**allow (6)**
89:5;227:1,7,8,8,13

**allowed (6)**
38:16;95:25;209:5;
210:6;227:22;312:12

**allows (1)**
234:7

**almost (2)**
134:16;231:19

**alone (1)**
192:13

**along (2)**
111:17;121:2

**alterations (1)**
204:4

**altercations (1)**
17:19

**alternative (1)**
125:6

**although (5)**
8:8;24:21;25:10;
233:5;234:13

**always (11)**
8:16;17:16;29:10;
57:9;63:22;83:4;129:8;
163:24;261:24;266:1;
273:4

**ambiguous (8)**
41:22;82:9;148:20;
153:1,17;167:18;
212:1;219:12

**amend (2)**
53:22;54:1

**Amended (2)**
46:20;247:7

**amendment (2)**
212:21;248:6

**America (1)**
47:25

**amicably (1)**
170:21

**amount (8)**
80:7;114:22;143:3,3;
150:3;232:19;288:4,6

Case 2:22-cv-01527-DAD-AC   Document 125-6   Filed 11/19/24   Page 86 of 116
LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

analogy (1)
8:23
analysis (2)
167:16;216:16
and/or (3)
150:3;319:13,14
Anderson (2)
38:3;99:8
animal (59)
29:13;30:20;31:5,14,
16,20,21;32:2,3,18,20;
33:6,7,14;35:6;36:5;
37:20;39:8;48:8;50:7;
63:1;85:11;86:5,11;
108:23;141:18;142:25;
154:7;160:3;171:8;
172:24;181:21;194:12;
215:7,16;217:23,24;
218:4,9,10,16;227:4,
17,20;228:4;233:13;
234:15;241:21;245:15,
19;249:13;255:1;
262:10,21;287:14;
308:7;314:4;315:2,3
animals (28)
31:3;33:13,24;34:8,
12,18,21,22,25;37:13,
18;49:7;50:8,9,11;
56:9,9,19;61:21;75:19;
88:9;142:12;151:21;
154:4;159:16;267:24;
310:23;312:15
announced (1)
242:5
annual (2)
68:2,10
Annually (2)
60:21;63:15
answered (8)
72:7;196:7,8;219:13;
255:17,18,19;317:18
anticipating (1)
135:24
anticipation (5)
135:11,14,18;
136:17;221:2
anymore (3)
16:14;79:10;117:20
anyways (2)
26:2;117:23
apart (5)
29:13;148:15;
168:24;169:15;299:24
Apiary (1)
29:18
Apologies (4)
36:2;87:23;207:4;
279:23
apologize (16)
40:6,14;50:21;78:2;
99:25;102:19;131:17;
144:10;159:5;168:3;
188:18;211:5;274:23;

314:6;317:21,25
apparently (2)
149:1;160:5
appeals (1)
313:2
appear (6)
98:4;173:21;217:21;
223:14;224:13;297:17
appeared (2)
74:1;119:19
appearing (2)
117:23;131:24
appears (4)
131:23;157:20;
252:22;307:21
applied (3)
148:16,18,22
applies (1)
234:14
apply (8)
133:8;144:12;151:9;
162:3,18;208:18;
233:24;234:15
applying (2)
133:9,10
appreciate (3)
11:8;24:24;217:12
apprise (2)
240:17,20
approaching (1)
173:25
appropriate (2)
266:2;310:25
approve (2)
32:10;221:20
approved (3)
28:12;211:19;212:10
approving (1)
233:14
approximately (6)
36:5;209:22;211:2;
254:11;255:11;289:4
Area (7)
14:22;38:3;105:23;
142:15;178:10;184:16,
17
areas (4)
32:19;209:5;210:5,8
argue (1)
27:6
Argumentative (3)
160:8;193:10;316:14
arises (1)
306:4
arising (1)
306:3
Armed (2)
23:8;44:22
Armstrong (1)
29:3
around (23)
13:10;19:23;58:9,9;
62:22;65:23;71:2;83:2;

85:9;87:12;113:16,18;
122:21;191:11;198:1;
238:1;240:16;267:23;
270:21;283:4;287:12;
308:9;320:19
arraignment (2)
114:25;285:11
arrest (12)
32:24;33:2,9;284:4,
5,7,11;285:1,6,7;
319:13,14
arrested (5)
26:2;172:19;284:15,
22;285:10
arrival (4)
241:5;245:23,23;
270:2
arrive (9)
203:4;204:13;
205:21;240:15;241:13;
250:6,9;255:8;272:24
arrived (5)
202:18;255:9,11;
273:23;274:16
arriving (1)
256:20
articulate (1)
114:5
articulated (1)
115:12
Ashbee (32)
165:17,18;198:3;
199:25;210:14,15;
211:2;213:18;214:13;
215:8,15;216:10;
217:11,13;219:21;
220:1,3;221:10;
227:17;233:9,23;
234:24;235:6,8,9;
236:4;280:22;301:17,
21,24;302:21,22
aside (3)
36:7;46:1;75:14
aspects (2)
310:14,14
ass (1)
94:5
assault (1)
110:6
asserting (4)
236:6;237:4,10;
304:3
assigned (3)
13:24;19:6,15
assignment (3)
78:12,16,19
assignments (3)
18:17,18;78:18
assist (2)
31:24;227:4
assistance (1)
85:25
associated (2)

4:12;126:8
assume (11)
16:24;17:17;52:20;
67:7;84:3;150:19;
152:10;161:16;203:1;
276:14;318:4
assumed (9)
43:10;56:6;84:5,8;
152:11;155:4;157:1;
191:8;262:6
Assumes (2)
217:5;287:23
assuming (22)
50:5;104:5;106:3;
107:17;109:2;147:14,
15,18,19;182:11;
220:13;249:16;261:6;
268:10;280:15,22;
294:18;298:24;316:8,
9,23,24
assumingly (1)
288:17
assumption (1)
161:20
ate (1)
90:16
atta (1)
23:19
attach (1)
138:20
attached (18)
91:20;94:9,14,17;
95:1,15;96:21,23;
119:11,13,14,20;
123:11,12;235:13;
268:3;309:13;324:10
attaches (2)
219:24,24
attachment (11)
91:22,24;96:22;
115:10;130:25;219:20,
25;236:17;304:10,21;
309:11
attachments (12)
95:8,9,21,23;96:1,13,
14;114:4;118:1,9;
120:1;129:21
attachment's (1)
139:18
attack (2)
50:13;246:15
attempt (1)
170:6
attempted (2)
170:4;174:24
attempting (1)
121:13
attention (2)
165:14;315:24
attic (2)
210:11,24
attorney (19)
9:15,20;10:4;11:22;

41:3,11;45:25;114:7;
131:22,23;165:5;
166:4;252:8;297:18;
308:14,21,24;313:12;
319:19
attorneys (3)
72:11;252:18;308:25
Attorney's (7)
104:24;283:12,14,
23;284:13;295:19;
296:3
auction (32)
36:15,16,17,22;37:4;
60:20;68:7;83:25;90:8;
121:19;125:16;129:18;
130:3;141:14,14;
153:22;155:3;157:25;
158:19;159:17,18;
160:3;163:8,9,10;
164:1;214:7;215:6,17;
288:7;310:5;318:1
auctioned (1)
88:9
auctions (1)
87:12
auction's (2)
216:18;307:19
Audio (9)
116:11,12;248:12;
251:13;252:1;253:1,4;
282:3,5
augment (1)
9:17
August (10)
4:3;5:5;71:2;281:5;
282:9;288:17;292:12;
293:3,21,24
author (1)
32:25
authored (2)
200:13;212:24
authority (6)
31:25;48:18;310:10;
319:3,10,15
authorizations (1)
223:18
authorized (8)
150:1;210:9;221:16,
21,25;222:16,17;
223:11
authorizing (2)
223:2,6
auto (3)
44:19;294:20,20
automatically (2)
99:3;247:25
available (3)
82:21;194:20;292:14
average (1)
212:9
avoid (2)
54:5;235:5
avoiding (2)

264:1,24
**aware (6)**
74:23;235:8;237:3;
272:12;277:10,12
**away (8)**
13:5,6,7;31:25;71:7;
162:4;246:23,23

## B

**Bachelors (1)**
14:14
**back (100)**
9:24;11:12;12:25;
13:25;23:7;24:3,3,5;
31:25;35:21,23;54:24;
55:7;60:11;61:3;71:15;
76:20;78:16;87:19,21;
97:3;108:14,16;115:4;
117:14;124:3;125:25;
126:17,19;127:2;
130:11;131:15;132:14;
133:17;135:4;136:7;
140:9;144:1;149:9;
156:15,19;160:21;
162:21;164:7;165:11;
166:20;172:25;178:11;
187:25;188:3;191:14,
15;194:5,21;195:23;
199:21;209:20;210:1;
213:15,16;224:1;
228:4;232:8;235:4;
236:20,23;243:1,5,7,8;
244:14;250:22;255:2;
256:21;258:20;263:2,
11,14;265:6;266:13,22,
24;267:6;268:2;
269:11,14,19;270:2,20;
271:5,6,22,25;282:1;
295:18;298:13;300:11;
307:11;312:4;322:10
**bad (4)**
10:1;40:10;42:25;
169:15
**bald (1)**
267:16
**Banghart (2)**
4:11;5:6
**bank (1)**
222:8
**banner (1)**
122:16
**bar (1)**
25:2
**barbecue (14)**
59:25;60:19,24;61:2,
3;142:1;150:8;186:10;
193:6;215:7;271:23;
272:6,7,12
**barbeque (3)**
124:5;149:16;150:10
**barged (1)**
231:5

**barn (8)**
49:15,18;67:6,6,9,10,
18;121:3
**Barracks (1)**
13:20
**base (1)**
257:15
**based (39)**
8:21;23:22;24:10;
33:9;89:7;92:22;99:3;
107:13;122:2;132:18;
136:1;142:8;149:17;
151:21;153:21;154:5,
6;183:25;195:19;
217:14;226:23;230:11;
233:10;235:11,20,20;
237:23,23;241:16;
247:7;248:3;259:17;
263:10;265:1;270:8;
282:20;308:16;310:16,
18
**basement (1)**
210:11
**basically (48)**
14:8;20:4;21:5;
24:18;26:3,22;28:11;
30:9;32:8;34:14,19;
36:25;39:13,14;52:5;
60:24;61:2;62:23;
64:18;72:21;73:8;
78:14;83:13;87:1;89:4;
92:21;102:20;132:24;
133:1;141:17,20;
154:3;156:16,18;
183:13;187:2,12;
199:24;214:6;217:18;
244:19;283:10;284:3;
295:7;300:3;304:10;
305:13;313:18
**basis (1)**
106:20
**basketball (1)**
69:11
**Bate (1)**
101:11
**Bates (17)**
97:22,24;98:9;
101:13;108:18;123:8,
9;144:14;157:12;
207:9;268:9;300:14,
18,21,21;301:15;312:9
**Bay (1)**
14:22
**bearing (3)**
125:14;235:24;
301:15
**beast (1)**
108:1
**beat (1)**
16:13
**became (5)**
67:17,22;149:18,23;
227:18

**become (4)**
28:23;48:25;151:2,3
**becomes (1)**
38:15
**becoming (1)**
17:25
**bed (1)**
255:3
**Bee (3)**
29:17;296:22;297:25
**beer (3)**
68:21,22;85:20
**beforehand (5)**
59:9;74:3;164:4;
173:11;185:15
**began (3)**
73:18;83:8;113:18
**beginning (12)**
4:5;19:24,24;71:13;
72:10;74:8;77:14;78:2;
83:10;84:12;162:8;
246:17
**behalf (4)**
4:16,18;5:2;311:20
**behind (1)**
96:20
**belief (1)**
317:9
**belonged (2)**
88:14;309:24
**Below (11)**
42:4;100:21;109:5,
22;137:14;143:10;
157:19;221:15;268:13;
293:1;306:11
**beneath (1)**
143:13
**benign (1)**
54:20
**besides (5)**
75:9;144:8;145:8;
274:2;286:16
**best (25)**
8:15;9:10,24;10:18;
51:10;115:12,12;
133:24;134:8,9;
140:17;153:20;162:21;
178:12;201:20;204:6;
208:7,20,21;230:6;
233:9;248:3;270:16;
285:18;295:12
**bet (1)**
147:1
**better (9)**
31:7;33:3;36:18;
42:20;62:19;82:11;
220:8;262:2;294:18
**Bias (5)**
106:21;109:5,8,9,23
**bid (5)**
62:25;63:1;101:3;
161:9;309:19
**bidder (3)**

124:15,17,23
**bidding (1)**
141:16
**bifurcated (1)**
119:13
**bifurcates (1)**
113:3
**bifurcating (2)**
113:5,6
**big (16)**
29:19;39:9;44:20;
56:1,3,7,11,13;66:1;
212:17;258:25;278:4,
5,7,16;291:7
**bigger (2)**
189:10;277:16
**bilateral (1)**
53:25
**bill (3)**
36:24;90:7,9
**Billy (4)**
110:17,18;249:19;
250:6
**Billy's (4)**
246:3;249:8;262:14,
15
**bit (15)**
12:20;14:9;19:14;
56:16;174:9;224:17,
18;233:16;246:18;
265:17;267:20;296:15,
18;308:9;322:12
**bitter (1)**
294:19
**BJ (7)**
118:4;120:16;
128:11;269:19,23;
311:8,15
**BJ's (1)**
275:1
**black (1)**
269:2
**blacked (1)**
98:1
**blah (3)**
167:13,13,13
**blank (1)**
222:14
**Bleating (17)**
116:13;180:5;
181:18,22;182:25;
183:1,7;188:7;189:8;
192:5;208:24;217:23;
238:3,6;239:1;240:15;
254:14
**Bleeding (1)**
245:9
**blind (1)**
257:17
**bloated (2)**
85:7,11
**blue (1)**
74:1

**Bluff (6)**
15:20,23;16:3,20;
23:13;26:8
**board (10)**
74:2,11,19;75:5,14,
16,22;76:2;277:18;
279:2
**boards (4)**
278:5,10;279:1,4
**body (1)**
90:25
**bold (1)**
310:6
**bolded (1)**
159:10
**bonkers (1)**
17:25
**book (3)**
229:3,12,24
**booked (4)**
113:6;119:3;120:6,
10
**booklet (1)**
9:13
**boot (1)**
13:18
**borderline (2)**
246:14;316:13
**born (4)**
12:14;13:4,6;34:25
**boss (1)**
198:7
**Both (8)**
47:14;87:2;107:19;
189:16;263:10;290:4;
306:19;318:6
**bother (1)**
296:12
**bottom (5)**
134:18;140:3;
149:25;160:23;180:22
**bought (6)**
125:5;154:8;161:8,8;
222:9;309:15
**bounce (2)**
78:16;308:9
**boundaries (5)**
30:15;32:18;42:12;
43:20;44:1
**bovine (3)**
34:1,8,10
**box (4)**
174:25;207:20,20,25
**boxes (2)**
208:3,14
**boy (1)**
23:19
**branch (2)**
13:12;15:16
**brand (6)**
34:19,23;35:6,6;
116:11,15
**brands (1)**

35:1
**Brazilian (1)**
17:3
**breach (1)**
126:11
**breaching (4)**
221:22;223:2,6,18
**break (7)**
76:15;91:2,2;134:12;
209:13;265:11;319:20
**breakdowns (1)**
22:4
**breakfast (2)**
90:16,18
**breeder (3)**
181:20,23;259:22
**Brian (10)**
125:4,16;149:15;
184:4;214:6,7;215:5,
16;216:7;309:15
**Bridges (7)**
131:22,24;319:22,
22;322:7,7;323:3
**brief (1)**
257:24
**Briefed (1)**
257:21
**briefly (3)**
133:22;309:3;310:19
**Briggs (1)**
100:12
**bring (13)**
71:25;82:23;124:3;
156:14,19;161:12;
194:20;235:4;236:19,
23;263:11,13;265:6
**bringing (1)**
172:24
**broad (2)**
18:23;317:12
**broadcast (1)**
44:7
**broadly (1)**
275:22
**broke (2)**
25:6;158:9
**brought (4)**
222:9;225:6;272:11;
304:18
**browbeat (2)**
265:19;317:21
**browbeating (1)**
166:25
**Bruce (29)**
66:14,16,25;70:4;
73:12;75:10;86:9,19;
87:4,17;115:22;
120:20;137:2;140:25;
141:1;148:17;149:1;
169:17;175:25;178:16;
202:2,13;269:19;
271:11,15;272:19;
274:2,15;286:4

**Bruce's (1)**
275:1
**bucks (2)**
25:7;55:11
**budget (1)**
81:11
**build (3)**
36:25;158:2,3
**building (2)**
25:10;28:1
**bulldog (1)**
297:19
**bunch (2)**
138:10;267:23
**burden (1)**
38:5
**bureau (6)**
44:2;198:4;200:7;
238:18,19,23
**burglarized (1)**
229:7
**burglary (1)**
229:5
**burn (1)**
55:11
**Burney (1)**
79:2
**business (6)**
55:25;56:1;62:20,23;
65:15;72:24
**busy (4)**
114:23;292:21,22;
293:2
**butcher (1)**
206:9
**butchered (2)**
142:14;218:3
**butchering (1)**
142:6
**buy (4)**
56:9;61:1;154:4,4
**buyer (26)**
56:1,2,3,4,7,11,13,
13;59:17;62:23;65:5,
23,25;66:1;124:12;
125:4;141:21;143:12;
154:5;155:3;160:18;
164:9,17;280:15;
300:20;309:15
**buyers (3)**
119:14;149:14;
152:20
**buyer's (4)**
141:10,10,13;143:12
**buying (3)**
56:19;151:21;219:4
**buys (3)**
56:9,18;60:16

—— C ——

**CAD (3)**
103:20,22,23

**CAD/RMS (1)**
107:4
**cadet (1)**
19:9
**cadets (2)**
19:10,10
**Cal (1)**
262:17
**California (14)**
4:11;5:4,7;14:7;
79:20;131:8;151:13;
183:12;224:10,11;
278:14;306:1;313:7;
324:6
**call (80)**
5:22;16:19;19:8;
30:6;60:6;63:12;78:10;
97:9,20;102:8,22,23;
103:7,20;120:24;
124:20;129:3;131:25;
132:1,9;138:4;145:3;
161:2;164:22;165:11;
170:12,16,17,20;171:4,
4,7;172:4;173:6;174:1,
4;184:21,24;187:25;
197:17;214:1,11,12,13,
14;215:5;228:24;
229:5;254:1;255:6;
259:12;260:3,4;
265:13;269:23;271:21;
274:1;283:8;286:19;
287:4;292:14,17,18;
293:1,2;294:8,9,11,23;
296:14,14,17,22;
297:25;298:12,18;
315:19,21;319:24;
322:15
**called (48)**
23:18;18;60:14;
70:17;84:24;85:6;
86:18;87:17,18,24,25;
88:2;99:18;102:1;
103:1,17;120:14,16;
147:2,4;174:2,18;
177:11;188:3;214:19,
19,22,23,24;231:19;
242:11,14;247:18;
255:8,21;263:25;
264:3;270:15;271:10,
10;274:8;288:18;
289:2,2,5,22;294:25;
295:2
**calling (19)**
99:17,19;102:21;
131:20;132:3;144:12,
14;147:18;155:9;
171:12;173:7,11;
174:23;256:1;261:6;
264:1;289:19;298:2,2
**calls (23)**
6:12;8:10;44:12;
48:7;79:10;151:10;
154:22;191:16;197:8;

211:17;212:3;229:6;
234:8;244:7;269:25;
271:8,22;299:25;
300:2;304:6;305:8,9;
316:12
**calm (1)**
290:20
**CALOZA (1)**
182:1
**came (10)**
18:10;24:2,3,5;27:1;
67:5;85:18,22;102:23;
259:20
**camera (2)**
264:10,16
**camp (2)**
13:18,19
**campground (1)**
197:18
**campgrounds (1)**
198:1
**can (155)**
5:22;7:5;9:15,20;
11:3,10,12;22:9;25:9;
28:6,12;29:18;31:7;
32:7,8,8,25;33:1;
35:17;36:18;40:7;41:8;
42:22;44:4,13;45:11,
12;46:17;48:21,24,24,
24;49:1;51:10;53:11;
54:22;60:7;61:1;62:19;
64:1,2;72:25;73:1;
76:15;80:22;87:14;
96:15;97:22;98:2,6,7;
104:25;111:19,20;
112:12,14,16,17,18,19;
113:13;126:22;135:2,
6;138:16;139:7;
147:24;148:2,21;
150:18;153:4,4;
154:15;162:1;166:13;
171:2;176:1;178:15;
181:9;184:2,7,8,10,13;
195:10;196:9;197:22,
22;204:14;205:11,12;
209:14,15,16;211:19;
212:2,5;213:12,14,16;
218:24,25;220:11;
222:8;232:23;233:23;
234:16;236:13;237:12;
243:2;244:20,23;
247:5;248:4;249:15;
251:6,23;252:17,18;
253:20;263:3,3,4,24;
266:17;268:13;272:9,
18,20;280:1,4;282:4;
285:1,1;293:2,10,15,
16;295:24;298:20,22;
303:13;308:1,15;
312:20;313:4,19;
314:5,7,12,23;316:16;
319:1;322:19,24
**canine (1)**

18:25
**canned (1)**
210:17,18;212:23;
213:8;223:21,22;
233:20
**capacity (6)**
6:21;58:19;65:24;
150:19;201:17;311:19
**caper (1)**
276:13
**caprine (1)**
34:4
**Captain (1)**
21:4
**Captains (3)**
21:3,7,9
**captured (1)**
243:18
**car (15)**
24:9,16,21;25:4,8,
12;44:6,8,10,21,23;
110:13;173:22;216:5;
231:11
**card (3)**
24:6;153:25,25
**care (2)**
270:3;302:8
**career (2)**
224:14;228:12
**Cargo (5)**
105:16,18,19,21;
106:1
**carjacking (1)**
45:3
**carry (1)**
22:20
**car's (1)**
25:11
**Case (92)**
4:6;7:6,20;10:1;
25:23,25;28:14;33:6,7;
34:3,4,5,8,14,17;36:25;
38:19;43:21;46:20;
51:4;53:7,9;54:19;
71:22;73:9,16,18,19;
77:5;81:2;94:11;95:8;
96:1;97:11;98:17,18,
23;99:19;100:4;102:2;
103:2;104:9,10,18,18,
23,25,25;105:2,12;
107:18;110:7,24;
117:24;118:10;139:5;
160:18;167:17,20;
175:17,21;176:5;
177:15;178:14;179:17,
18,23;189:16;212:17,
18;219:18;220:9;
222:20;225:7;228:15;
231:13;248:6;282:19;
283:12,23;285:3,5;
287:13,21;295:20;
296:4;301:22,22,25;
302:7,8;313:1

cases (17)
  33:4;34:13;37:8,20,
  23;38:19;42:17,18;
  44:3;81:5;167:6;
  229:14;231:8,11;
  288:8,10,11
casual (1)
  239:25
cat (1)
  49:17
catch (2)
  228:23;263:3
categories (2)
  103:11;115:20
categorize (1)
  59:13
category (2)
  108:20;109:2
cats (6)
  49:12,13,13,15,18;
  50:12
cattle (17)
  34:1,15;35:9,11;
  36:16,20;39:12,14;
  47:17;49:5,12,20,22;
  85:9,15,17,19
Cause (15)
  213:23;221:17,24;
  222:2,15,24;223:1,20;
  230:10;233:17,18;
  235:18;237:23;319:5,7
caused (1)
  306:4
CD (3)
  116:11;120:7,9
CDF (1)
  132:21
Cedar (43)
  54:9;77:11;104:6;
  114:12;126:8;155:10;
  168:25;183:21,21;
  193:14;217:3;218:2,
  21;219:2,11;227:8,14;
  230:12,15;231:6;
  243:9,10;244:15;
  262:7;266:24;267:20,
  22;271:15;273:3,22;
  274:1,11,11;275:3,9,
  12;278:22;282:13;
  289:1;302:18;311:4;
  312:12;318:5
cell (6)
  170:5;174:25;
  243:23,24;244:2,11
century (3)
  187:8;240:5;276:7
CEO (9)
  67:12,22;73:12,12;
  74:20,21;123:1;127:8,
  8
certain (11)
  8:14;9:8;30:2;33:4,
  4;38:22;90:23;114:22;

190:14;236:2,4
certainly (1)
  317:25
Certified (2)
  5:6;322:23
certify (3)
  150:1;305:24;324:3
Chad (6)
  51:4,12;52:3;88:13;
  121:25;122:17
chain (8)
  20:20;280:9,19,21;
  281:1,2,8;301:15
chains (1)
  218:21
Challe (3)
  4:10,12;5:2
chance (1)
  294:10
change (10)
  9:25;20:1;76:22;
  108:10;109:10,12;
  112:12;170:23,24;
  236:25
changed (4)
  20:2;117:16;212:24;
  261:2
changes (2)
  9:21;322:24
changing (2)
  22:24;112:22
chapter (1)
  51:11
chapters (1)
  51:11
charge (10)
  20:4;51:25;52:1;
  67:9;70:1;79:2;81:11;
  85:12;238:22,22
charged (5)
  124:6;189:11;
  190:22;191:1;282:22
charges (22)
  37:10,11,22;38:2,2;
  115:2;167:24;172:10;
  229:2;235:5;283:10,
  11;286:1,18;288:15;
  289:1,8,8,15;290:1;
  303:4;304:18
charging (2)
  188:22;216:25
charity (1)
  61:7
chase (3)
  43:10,17;44:6
chasing (3)
  43:1,6;44:9
chat (1)
  63:12
check (20)
  9:14;54:4;107:8;
  141:22;151:13,15;
  152:11,12,21;153:15;

154:8,9,10;175:11;
  220:11,21;221:13;
  256:7;321:16;324:9
checked (6)
  151:19;206:23;
  207:21,25;208:4;
  222:14
checkmark (1)
  142:2
checks (1)
  152:8
chickens (1)
  49:12
child (3)
  51:18;164:21;305:14
childhood (1)
  13:7
children (8)
  48:23;50:25;52:24;
  56:19;62:21;87:2,5;
  166:3
children's (1)
  66:19
chime (1)
  319:21
choke (1)
  17:24
Christine (1)
  252:22
chronologically (3)
  78:16;98:21;111:23
circumstance (7)
  43:20;104:24;171:6;
  172:6,8;197:16;229:23
circumstances (3)
  228:21;282:21;315:9
circumvent (2)
  134:24;162:12
citation (3)
  7:10;26:1;38:19
citations (4)
  32:1,9,25;33:1
cite (3)
  48:3;83:15;228:6
cited (2)
  26:3;312:12
cities (1)
  31:22
citizen (2)
  258:7,14
city (5)
  24:18;32:17;36:21;
  38:1;79:3
civil (14)
  11:8;40:22;41:3,10,
  15;151:2,3,17;167:3;
  231:13;236:24;237:19;
  310:14,15
civilian (1)
  190:13
civilians (3)
  289:25;290:3,5
claim (2)

133:6;306:3
claimed (1)
  306:22
claiming (4)
  135:20,23;156:8;
  265:5
Claims (1)
  71:6
clarification (1)
  251:16
clarified (2)
  103:2,9
clarify (1)
  46:17
Clarifying (1)
  56:6
clarity (4)
  98:8;268:9;300:13;
  301:11
class (2)
  57:5,9
classes (1)
  48:22
classmates (1)
  57:11
clean (1)
  113:7
cleaner (4)
  189:16;190:18,19;
  191:5
clear (8)
  10:16;96:9;103:4;
  192:4;198:7;232:1;
  265:19;314:3
clearance (4)
  41:20,23;105:6,7
Cleared (2)
  105:5;106:3
clerk (2)
  257:8,9
client (2)
  236:6;269:25
clip (3)
  126:22;254:10,11
clogs (1)
  229:24
close (7)
  17:17;21:21;104:18;
  209:23;225:11,21;
  257:4
closed (9)
  104:9,12,15,16,18,
  23,25;105:2;282:19
closer (2)
  114:8,18
club (5)
  110:17,18;121:21,
  23;122:12
clubs (1)
  61:3
coast (2)
  44:2;142:19
Code (39)

30:25;32:7;83:16;
  107:17,21;109:3;
  117:6;144:23;151:13,
  15,17;167:2,3;224:10,
  11,20;225:24;228:2;
  235:22;236:10;237:23;
  282:22;306:25;310:11,
  14,14,15,17,19;312:18,
  18;313:7;319:1,3,8;
  321:12,14,15;322:19
coding (2)
  109:7,13
collateral (4)
  18:17,18;78:12,16
collaterals (2)
  18:20;19:6
collect (10)
  61:2;171:9;187:13;
  194:20;229:1;247:8;
  248:16;259:24;267:4;
  315:2
Collected (7)
  165:9;194:9;225:5;
  283:20;285:22,23;
  286:11
collecting (5)
  71:15;190:4;232:15;
  283:21;286:12
collection (1)
  150:3
college (8)
  14:4,5,8,18,20,20,21;
  15:19
colleges (1)
  14:17
collision (4)
  7:3,4,7;16:18
color (5)
  229:20,20;267:12
combines (1)
  307:16
comfortable (1)
  130:2
coming (4)
  27:1;46:21;176:4;
  240:18
comma (1)
  224:6
commanded (3)
  208:24;223:12;
  233:20
Commander (7)
  21:4,5,8;69:25;
  78:19;115:3;257:18
Commanders (1)
  21:2
commencing (2)
  5:5;310:7
comment (6)
  9:22;24:6;187:5;
  259:19;275:23;297:12
comments (2)
  187:7;240:7

**Commercial (4)**
151:13,15;167:2;
310:14
**committed (7)**
207:23,24;235:22;
237:1,13;252:13;
310:17
**common (2)**
50:17;52:9
**commonly (1)**
6:13
**communicate (2)**
174:6;299:23
**communicated (4)**
125:4;202:19;246:2;
309:14
**communication (2)**
88:24;166:19
**communications (2)**
293:23;299:23
**Community (29)**
14:17,18;28:2;50:7;
51:1,2,3,5,7,9,12,24;
59:21,23,25;60:18;
62:12,21;63:3;64:5;
66:9;72:23;88:12;
122:1;125:5;142:1;
149:16;150:8;309:16
**commute (1)**
249:10
**company (2)**
65:18;142:18
**company's (1)**
56:2
**competed (1)**
17:3
**compiling (1)**
179:6
**complainant (1)**
40:23
**Complaint (7)**
46:6,9,13,20;70:24;
71:3;302:5
**complaints (1)**
31:23
**complete (8)**
14:25;94:16;21;95:7;
96:4,5,11;97:7
**completed (5)**
14:13;90:5;106:10,
11;119:9
**completely (2)**
17:25;25:6
**Compliance (3)**
157:21;158:4;308:3
**complicated (1)**
48:11
**complying (1)**
228:9
**component (1)**
147:19
**computer (3)**
95:17;134:11;251:2

**concept (1)**
126:11
**concern (1)**
208:5
**concerned (1)**
258:1
**concerning (1)**
301:22
**concluded (1)**
133:22
**concludes (1)**
60:19
**Concluding (2)**
226:22;322:11
**conclusion (7)**
92:24,25;135:2;
151:10;154:23;234:9;
316:13
**conduct (7)**
30:3;36:17;78:14;
79:22;83:14;157:24;
307:18
**conducted (2)**
83:8
**conducting (2)**
146:9;170:15
**confer (1)**
220:20;265:13
**conference (1)**
131:25
**confines (1)**
148:24
**confirm (5)**
98:2;136:14;262:22;
301:7,8
**confirming (1)**
306:12
**confiscate (1)**
192:6
**confiscated (8)**
104:6;114:12;227:8;
230:15;234:16;274:1;
289:1,7
**confiscating (1)**
31:8
**confiscation (1)**
288:17
**conflict (7)**
313:13,14,16,21;
315:18,21,24
**conflicting (1)**
132:17
**conform (2)**
157:23;307:17
**confused (2)**
87:23;95:16
**confusion (1)**
124:15
**connected (1)**
306:4
**connections (1)**
50:6
**consent (6)**

247:15;20;248:4;
266:25;267:3,4
**consented (1)**
305:20
**consequence (1)**
25:23
**consequences (1)**
236:19
**consider (3)**
70:8;173:7;175:3
**consisted (2)**
219:10,10
**consistent (4)**
122:8;205:9;263:17,
21
**consists (2)**
207:22;208:16
**constitute (1)**
207:22
**Constitutional (2)**
316:11,25
**consult (2)**
165:1,2
**contact (24)**
120:22;128:11;
156:13;170:4,6;
174:25;178:17;179:13;
181:23;246:9;247:14;
248:13;249:17,19,20,
20,22;264:24;274:2;
291:18;292:8;308:19;
313:23;314:2
**contacted (4)**
84:15;120:19;
121:25;242:11
**contacting (1)**
184:3
**contain (2)**
210:20;310:24
**containers (1)**
223:19
**contended (1)**
207:15
**content (1)**
91:23
**contents (1)**
324:4
**Continue (2)**
23:24;298:10
**continued (2)**
280:18;298:15
**contract (17)**
153:11,15,16;
154:21;155:4;158:2;
160:5,7,12,16,20;
306:16,16,17;309:4,4;
318:8
**contracts (2)**
126:11;150:15,16;
160:14;318:19
**contractual (12)**
150:24,25;151:3,5;
152:24;153:3;154:7,

14,17;167:16;304:1,4
**control (2)**
32:24;44:25
**conversation (35)**
10:9;72:21,25;83:19;
88:12;89:11;122:2;
128:10;165:4;185:6;
187:1,23;190:1;
191:13;194:3;201:2,3,
4;240:1;252:3;253:13,
23;259:15;266:16;
273:2,6,8,8;274:7;
287:5,6;289:10;
295:11;298:5;301:16
**conversational (2)**
10:10;253:17
**conversations (6)**
46:1;169:19;198:3;
239:25;289:7;308:17
**conviction (1)**
38:25
**convictions (1)**
38:7
**cooperative (1)**
267:22
**coordinations (1)**
195:8
**Coordinator (5)**
19:3,4,7,9;240:21
**copies (5)**
119:25;279:24;
300:20;322:3
**Cops (1)**
244:2
**copy (20)**
54:3,21;93:20;94:1;
96:22;134:2,3,5,7,17;
143:20;147:25;180:6;
242:16;265:22;322:5,
6,8,15,23
**corporate (1)**
74:13
**corporations (1)**
32:7
**Corps (5)**
13:14,15,17;15:6,9
**corrected (2)**
213:9,15
**correction (1)**
213:8
**correctional (4)**
82:1,2,6,14
**CORRECTIONS (2)**
324:9,10
**correctly (3)**
162:6;174:21;310:20
**correspondence (3)**
130:17,19;136:15
**correspondences (1)**
140:3
**corridor (1)**
12:22
**costing (1)**

25:7
**costs (1)**
126:8
**Counsel (16)**
4:13;46:13;70:19;
98:1;165:2,3;166:4;
173:4;220:21;307:13;
308:12;312:11;316:2;
322:3,14,16
**counties (2)**
42:23;277:20
**counts (1)**
39:9
**County (54)**
4:17;12:10,14;18:10,
22;27:23;28:15;29:20,
22;34:20;35:10;42:8,
12,15,19;45:18;46:13;
56:2;61:4;77:12;78:20;
79:1,13;82:10;116:4;
132:24;165:2,3;166:4;
186:18;191:9;252:4;
194:9;203:13;213:25;
226:23;232:5;238:9,
10;241:21;243:3;
246:4;256:22,25;
257:7;268:4;269:7;
270:2;276:10;277:16;
278:6,13,13;306:1
**couple (5)**
21:16;34:18;123:25;
276:7;307:5
**coupled (1)**
30:4
**course (10)**
11:21;26:24;27:22,
22;46:3;54:19;67:11;
77:7;88:11;283:21
**courses (1)**
14:25
**Court (39)**
4:7,11,14;9:16;12:3,
4,8;21:23;26:1,4;32:9;
41:3;53:22;72:1,11;
93:16,19;99:9,9;135:7,
19,24;153:5;210:1,3;
225:7;228:20;232:19,
21;251:16;254:8;
281:21;284:17;285:4;
321:9,10,14,14;322:3
**Courtesy (2)**
307:22;308:6
**cover (3)**
32:19;65:8;283:8
**covered (1)**
69:9
**Cow (5)**
121:21,22,23;122:1,
12
**cows (3)**
34:10;249:15;288:9
**crates (2)**
255:2,3

**crazy (2)**
28:22;72:18
**create (7)**
100:3,3;113:7,11;
134:23;143:1;162:10
**created (4)**
99:14,20;103:19;
110:19
**creating (1)**
99:19
**credibility (1)**
308:16
**credit (2)**
28:14;153:25
**credits (1)**
14:21
**Creek (5)**
121:21,22,23;122:2,
12
**crime (20)**
42:25;43:11,22;
79:24;80:5;102:25;
103:4,7;109:14,16;
187:8;216:25;230:13;
235:22;237:13;240:5;
276:6;279:9;291:16;
306:23
**crimes (27)**
22:5,5,8,14,15;23:3;
27:21;29:15;30:4,9,10,
11,13;41:21,24;79:7,9,
15;80:15,20;81:1,7,13;
196:23;197:6;208:6;
236:20
**criminal (17)**
18:22;40:4,21,24;
41:14;97:10,12;
167:17;171:22;172:10;
189:21;257:25;284:21;
290:6,8;304:16,18
**criticism (2)**
43:9;114:18
**cross (4)**
108:3;172:9;173:7,8
**crosses (1)**
45:18
**cross-examine (2)**
11:18;262:25
**cruelty (5)**
30:20;31:5,9,9;33:7
**CSR (1)**
4:11
**culprits (1)**
37:14
**curiosity (3)**
18:2;299:6,8
**curious (6)**
17:10;52:11;114:18;
252:19;260:14;318:23
**current (3)**
36:14;78:18,19
**currently (11)**
10:19;12:10,24;

21:11;43:22;49:8;
75:15;76:1;80:2,15;
226:24
**curse (1)**
94:5
**custody (15)**
114:24;115:2;169:1;
226:6,7,11;228:4,14;
230:16;234:21;270:3;
301:25;315:4,5,12
**custom (1)**
142:5
**cut (6)**
29:23;72:20,20;
187:20,23;261:18
**cut-off (1)**
320:23
**cuts (9)**
142:23;143:1;218:1,
5,11,12,16;219:7,10

**D**

**DA (25)**
104:17;200:17;
212:13;282:10;283:1,
8;284:14;286:5,6;
289:1;292:12;293:5;
294:15;295:15,22;
296:5,9,10,13,21;
297:24;298:2,6;300:3;
319:12
**dad (1)**
58:9
**Dahle (10)**
125:4,17;149:15,15;
184:4;214:6,7;215:5,
16;216:7
**Dahles (8)**
124:23;125:20,21,
24;161:9;164:14;
235:2;277:11
**Dahle's (2)**
141:23;309:15
**daily (3)**
228:8;234:21;237:22
**damage (1)**
306:3
**damages (1)**
287:22
**Damian (11)**
4:16;8:4;93:20;98:2;
147:25;279:24;280:3;
303:1,11;316:6;320:8
**damn (2)**
187:6;264:22
**dangerous (1)**
172:1
**dark (4)**
206:2;250:12,13;
268:19
**DAs (1)**
104:19

**DA's (4)**
104:13;296:7,8;
300:4
**data (3)**
119:3;138:12,13
**database (2)**
107:1,9
**Date (36)**
4:3;9:7;26:1,7;59:1;
99:12,20;100:14;
104:5,6;110:25;
111:12;115:6;137:8,8;
159:20;161:4,4;163:6,
9,10;176:5;182:19;
214:12,15;271:23;
272:1,14;282:14,16;
284:17;287:7;288:16;
289:4;310:7;322:14
**Dated (2)**
180:17;304:2
**dates (4)**
163:15,20;175:25;
178:20
**daughter (16)**
50:23;66:23;67:7;
69:10,10;70:6,7;76:8,
10,11;77:7;83:22;
127:18;306:19;309:5,
24
**daughter's (4)**
67:24;77:8;216:22;
217:13
**Day (58)**
9:9;25:8;72:1;87:25;
88:7,9;89:15,16;92:9,
10,13,15;93:5;100:23;
115:8;121:19;139:22,
24;152:19;161:11;
168:3,3,4,9,14,16,25,
25;170:2;175:11,11;
176:21;177:15,25;
178:24,25;182:22;
185:22;186:1;191:17;
192:12,16;195:23;
196:4;202:8,10,14,22;
205:14;209:8;214:2;
288:22,23;292:18;
294:14;318:3;321:3;
324:12
**days (12)**
33:7;50:14;114:12,
16,17,17;163:11,12;
175:6,13;180:19;
182:17
**DC (2)**
12:20;13:21
**dead (2)**
150:9;267:18
**deadbeat (1)**
39:25
**deal (7)**
44:20;258:4;278:4,5,
7,16;291:7

**dealing (3)**
23:5;138:18;236:19
**dealings (1)**
122:13
**debit (1)**
153:25
**decade (1)**
22:25
**December (4)**
15:20;71:5;159:16,
18
**decide (3)**
237:21;294:15;303:4
**decided (3)**
27:4;246:25;297:22
**decisions (1)**
237:22
**declare (2)**
53:25;324:5
**declined (1)**
41:13
**deem (5)**
40:21;151:5;313:19;
315:23;317:9
**deemed (4)**
19:1;40:4;100:17;
230:17
**deeper (2)**
243:7;246:18
**default (2)**
108:25;109:1
**defend (2)**
17:22;305:25
**defendant (1)**
6:16
**Defendants (3)**
4:17;252:18;308:25
**definitely (1)**
317:1
**definitions (1)**
30:15
**degree (1)**
236:2
**delegating (2)**
81:8,10
**delete (6)**
112:18,19;138:3;
139:4;299:2,3
**deleted (2)**
138:2;139:8
**deli (1)**
142:5
**deliver (2)**
212:14;282:13
**delivery (1)**
262:7
**denied (1)**
242:17
**Department (18)**
15:21,24;16:3,20;
22:4;23:13;26:12;
41:21;75:2,3;81:24,25;
137:11;138:8,9;

150:24;186:18;195:2
**departure (1)**
199:3
**dependent (1)**
226:16
**depending (5)**
33:7;42:25;44:24;
63:20;212:17
**depends (7)**
43:20;65:15;80:5,7;
102:10;111:19;138:16
**depo (5)**
9:12;11:3;45:22,23;
320:3
**depo's (1)**
220:20
**depose (1)**
265:25
**deposed (2)**
7:23;21:14
**deposition (21)**
4:2,9;5:1,3;7:9,20;
8:3;46:22;93:12,14;
225:8;284:6;308:11;
321:17,20;322:11,15,
16,23;323:5;324:4
**depositions (1)**
38:15
**deputies (14)**
19:5;32:22;82:25;
197:23;227:1,5,13;
229:10;256:25;257:2,
23;310:24;312:15;
315:10
**Deputy (14)**
18:13,14,14,16,20;
29:3,3;33:5,5,9;81:14;
82:2;227:18;251:20
**deputy's (2)**
229:9;257:16
**derailed (1)**
252:11
**describe (5)**
51:22;62:6,10;81:9;
132:4
**described (1)**
233:2
**describing (1)**
64:9
**description (6)**
18:21;27:13;108:22;
209:1,2;218:1
**destinations (1)**
13:1
**destroyed (1)**
232:11
**details (3)**
78:5;80:13;128:25
**detective (24)**
44:2;113:2;116:17;
165:17,18,20,21;
197:12;198:4;200:7;
227:17;238:8,18,19;

243:12;245:15;246:17;
251:20,21;255:21;
266:25;267:3;301:17;
308:17
**detectives (4)**
30:4;200:9;227:5;
240:12
**determination (7)**
154:6;230:10;
310:16;314:24;319:1,
4,15
**determinations (1)**
310:10
**determine (12)**
144:6;148:16,22;
151:8;155:1,2;157:1;
159:19;162:21;191:12;
225:7;228:19
**determined (9)**
58:7;121:20;133:7;
144:11;161:25;162:18;
189:6;231:9;246:22
**determining (1)**
230:11
**devoted (1)**
275:25
**dice (1)**
248:10
**died (1)**
50:14
**Diego (2)**
12:20;13:19
**dies (1)**
50:17
**difference (3)**
8:18,20;47:21
**different (28)**
22:24;25:14;35:6;
37:11;42:23;47:22,24;
48:2,2,3,4,10;52:4;
87:22;108:6,7;113:2;
117:13,14;120:5;
163:17;195:5;222:5;
223:1;242:12;280:18;
281:22,22
**differently (1)**
11:21
**dig (1)**
56:22
**diminishing (1)**
136:13
**dinner (1)**
68:18
**dinners (2)**
63:10;69:17
**direct (1)**
295:15
**direction (1)**
237:1
**directly (1)**
254:21
**Directors (4)**
74:12,19;75:14,16

**dirt (1)**
259:6
**disaffirm (1)**
154:21
**disagree (1)**
218:6
**disagreement (1)**
154:14
**disappear (1)**
249:4
**disappeared (2)**
126:1;157:11
**disappearing (2)**
196:11,12
**discern (1)**
215:11
**discipline (1)**
25:14
**disciplined (4)**
23:7,8,12;26:13
**disconnected (2)**
131:22,24
**discovery (11)**
54:19;116:12;119:1;
137:21,25;148:1;
220:18;266:1;293:18;
298:23;320:22
**discretion (1)**
45:7
**discuss (5)**
20:18;166:16;
188:19;199:4;244:18
**discussed (8)**
55:14;118:5;167:1;
188:20;265:18;273:4;
282:15;313:9
**discussion (4)**
73:8;274:16;303:24;
304:8
**dispatch (3)**
99:19;104:1,2
**dispatched (4)**
102:21,22;103:6,13
**dispatcher (6)**
24:11;101:23,24,25;
102:11,14
**dispatchers (1)**
102:4
**dispatching (1)**
103:23
**disposed (1)**
313:6
**disposition (3)**
38:20;104:5,9
**dispute (21)**
124:16;135:20,23;
150:24,25;151:3,5;
152:24,25;153:3;
154:7,17;218:7;
235:14;236:4;237:19;
304:1,2,4;317:10;
320:16
**disputing (2)**

154:15;235:9
**disrespect (3)**
6:1;160:11;193:19
**disrespectful (1)**
78:6
**dissent (1)**
93:2
**distance (2)**
59:10;253:17
**District (23)**
4:7;60:19;77:12;
104:24;114:7;120:19;
123:2;127:8;131:12;
133:4;143:25;165:4;
180:1;259:21;265:2;
278:25;283:12,14,23;
284:12;295:19;296:2;
303:4
**disturbance (1)**
103:9
**Division (4)**
4:8;21:2,3;82:15
**DMV (2)**
24:3,4
**DNA (1)**
34:20
**Document (33)**
26:19;40:22;93:10,
15;94:16,20;95:7,10,
22;96:17;97:6,8,21;
110:19;119:11,12;
131:16;134:7;140:6;
143:24;147:23;148:7;
158:5;161:11;228:16;
229:14;234:21;305:3,
6,9,19;307:24;316:4
**documentation (5)**
26:19;92:18;137:12;
270:11;308:8
**documentations (2)**
89:12,12
**documented (8)**
23:17;24:15;26:16,
18,20;92:22;166:14;
184:11
**documents (17)**
70:16;92:4,7,8,11;
93:2;94:9,13,17;95:5;
139:20;140:2,15;
149:1;168:9;220:3;
300:14
**DocuSign (4)**
211:3;212:11;
213:14,16
**dog (1)**
31:23
**dogs (5)**
32:1;49:12,13,14,18
**DOJ (3)**
107:11;109:25;
131:23
**DOJ's (1)**
70:21

**dollars (3)**
288:7,10,11
**domestic (1)**
19:14
**domesticated (1)**
50:11
**Donald (3)**
115:22;116:3;186:17
**Donate (2)**
142:1;262:19
**donated (13)**
125:6,17;149:15;
150:7,9,11;214:7;
215:6,16;216:8;
262:10,20;263:22
**donation (3)**
263:18,18,21
**Dondre (1)**
196:17
**done (31)**
25:20,24;33:14;
34:20;93:10,19;
104:11,11;143:17;
151:6;152:9;153:13;
163:22;172:18;184:5,
6;192:12,16;200:14;
201:15;211:8;228:12;
244:5;247:4;261:18;
265:16;275:16;283:1;
320:1,2,3
**Dong (1)**
309:12
**door (4)**
255:15;259:11;
264:20;285:12
**doors (4)**
221:23,23;223:3;
242:20
**doorways (2)**
221:22;223:18
**double (1)**
9:14
**doubt (1)**
11:9
**down (60)**
8:12;12:21;29:24;
35:14;36:24;37:1;
55:10;65:13;73:8;
80:23;100:7;106:8,20;
134:11;173:14,16;
174:9,24;179:9;
183:16;185:18;187:17;
189:7;190:17;191:21;
192:3,5;193:25;
194:17,20;195:2,11;
198:22;201:25;203:8,
14,20;205:16;207:18,
20;229:10;233:3;
237:16;238:23;240:3;
241:8;249:1,3,5;257:2,
23;259:20;260:10;
271:4;279:7,8;284:4;
290:20;309:7;310:22

**downloaded (1)**
145:18
**downtown (2)**
24:25;178:10
**draft (4)**
189:2;200:16,19;
210:13
**drafting (1)**
236:24
**drew (1)**
242:1
**drill (1)**
13:24
**drink (1)**
10:21
**drinking (1)**
27:3
**drinks (2)**
63:10;69:18
**drive (9)**
29:22;194:20;198:1,
13,23;203:8;246:25;
259:6;273:12
**driver (1)**
26:24
**drive-through (1)**
60:24
**driveway (3)**
241:19;242:3;260:10
**driving (4)**
28:17;103:6;247:24;
273:3
**dropped (2)**
260:23;286:22
**dropping (1)**
62:23
**drought (1)**
49:24
**drove (3)**
196:18;217:22;255:4
**drugs (2)**
10:23,24
**due (9)**
150:3,3,4;270:1;
310:22;312:14;316:10,
25;317:16
**DUI (1)**
212:19
**duly (1)**
5:11
**dumped (1)**
119:4
**Duncan (49)**
112:4,9;116:17,21,
24,25;117:1;192:14;
197:6,12;204:16;
238:8;243:12;245:15,
17,18;246:17;251:12,
14,20,21;252:5,6,9;
253:2,3,6,20;255:21;
259:12,14,14,17;260:1,
3,6,9;261:11,14;262:2,
25;266:15,18,25;

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 93 of 116
LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

267:3;272:22,22;
273:2;308:17
**Duncan's (4)**
116:18;117:11,19;
243:15
**During (15)**
59:4,5;70:11;75:17;
121:19;166:7;243:10;
245:14;252:2;283:20;
294:25;295:5;299:16,
18;319:20
**duties (8)**
16:6;19:25;20:2;
41:8;42:18;312:18,19;
313:9
**duty (4)**
12:7;13:18;82:3,5

**E**

**Eamon (4)**
165:22,23,24,24
**ear (16)**
181:20,20,20,24,25;
182:1;259:22,22;
261:14,16,25;267:9,10;
268:4;277:24,25
**earlier (26)**
70:25;78:15;120:14,
22;121:18;137:17;
182:4;212:20;214:2;
234:20;257:6;262:19;
272:8;273:4;284:5;
288:5;302:22;303:24;
306:22;307:13;308:7,
12;312:19;313:9;
314:14;317:25
**earliest (1)**
281:7
**early (2)**
48:18;289:13
**earth (2)**
183:13;246:20
**easier (1)**
321:10
**east (1)**
44:2
**Eastern (2)**
4:7;232:5
**easy (2)**
35:8,9
**eat (3)**
61:2;90:18;91:1
**eating (2)**
90:20,24
**educational (1)**
14:3
**effect (5)**
12:3,9;125:10;
275:24;314:23
**effective (1)**
90:23
**effectively (1)**

160:15
**efficient (1)**
126:11
**effort (2)**
127:22;247:21
**eight (4)**
211:14,15,19,24
**either (33)**
23:3;33:5;41:4;
49:19;54:7,8;68:25;
73:24,25;77:14;82:17;
86:18;91:16;92:3;
115:10;119:13;126:2;
149:2;153:4;163:21;
177:2;185:19;197:24;
218:16;249:19;266:4;
270:23;285:1;287:8;
289:6,12;297:7;309:24
**EL (4)**
77:7;88:14;152:4,16
**elder (3)**
39:11,12,15
**elect (1)**
49:1
**elected (7)**
77:20,21;103:18;
173:8;188:22;195:11;
198:6
**electronic (1)**
145:5
**Eliza (7)**
54:8;122:22;143:8;
144:3;152:2;159:19;
167:13
**Eliza's (2)**
318:6,13
**else (44)**
12:18;29:13;40:12,
13;47:4;75:15;88:22;
89:7;116:2;124:19;
129:23,24;144:22,24;
145:8,10;158:21;
168:8;171:14;173:13;
174:5;178:4;179:19;
182:23;184:6;192:25;
194:2;195:14;196:11,
20;202:22;236:25;
254:6;261:20;274:2,2;
278:7;285:25;286:3,4,
14;302:8;303:9,20
**else's (1)**
256:21
**elsewhere (2)**
12:16;175:20
**email (63)**
88:25;89:1,3,18,19,
23;90:1;91:5,7,12,18,
22,23,23;122:24;123:3,
6,14,18,21;124:2,8;
127:9,11;130:12,13,16,
17,19,23;136:15,16,20;
137:11,16,19;139:8,10,
15,18;140:3;154:15;

162:25;172:23;174:5;
182:3,11;219:24;
220:1,13,14,24;221:14;
235:1,20;236:24;
254:8;263:10,12;
265:1;280:14;301:3;
304:9
**emailed (4)**
137:14;139:15;
144:8;300:20
**emails (25)**
91:10;95:14;118:12,
17,18,18,19;119:17,22;
138:3,6,21,24;139:4;
144:21;148:13;165:15;
204:3;248:20;262:19;
268:14;293:21;298:21,
22;299:6
**embarrassing (1)**
9:25
**embezzeled (1)**
226:4
**embezzled (8)**
206:24;207:13,17,
19;226:5,10;228:3;
315:7
**embezzlement (1)**
167:19
**employ (1)**
32:19
**employed (2)**
75:8;239:8
**employee (1)**
194:23
**employees (3)**
238:10,11;306:2
**employs (1)**
32:16
**end (24)**
9:12;15:11,11;17:19;
19:23;24:20;42:22;
74:8;77:14;78:1,2;
83:9;84:12;108:12;
135:7;163:11,12;
172:6,8;209:18;259:7;
289:12;307:9;321:17
**endeavor (1)**
6:2
**ended (2)**
222:2;321:19
**ends (1)**
163:20
**enforce (3)**
18:22;153:14;160:14
**enforced (2)**
153:16;160:6
**enforcement (21)**
15:5,14;16:18;19:15;
21:3;38:18;42:16;89:9;
106:19;107:9;167:16;
173:3;228:7,8;229:19;
240:22;241:20;242:3;
258:9;264:24;290:1

**enforcing (5)**
153:10;160:5,7,12,
16
**enough (5)**
92:2;186:9;198:17;
230:2;279:25
**enrolled (1)**
48:17
**entail (1)**
218:11
**enter (7)**
116:14,21;159:16;
160:3;247:12;300:15;
301:6
**entered (3)**
100:18;116:17,21
**entire (5)**
12:13;64:10,10;
259:5;319:16
**entitled (5)**
8:15;9:10;11:17;
54:11,19
**entry (9)**
96:10;140:6,11,16;
144:21;167:8,12;
221:23;282:16
**envision (1)**
158:19
**equally (2)**
61:4;135:12
**Equestrian (1)**
34:6
**equipment (6)**
29:16;221:22;223:3,
6,18;232:12
**equivalent (2)**
24:13;46:15
**Especially (2)**
22:24;69:25
**Essentially (3)**
20:2;197:21;214:5
**establish (1)**
130:16
**estimate (13)**
8:16,17,18,21,22;
9:10;22:9,11;57:6,10;
250:11;285:18;288:16
**estimating (2)**
204:24;205:1
**estimation (2)**
56:17;95:7
**etcetera (7)**
115:23;179:23;
223:19;235:3,3;251:9;
254:1
**Ethics (2)**
307:22;308:6
**even (37)**
10:12;11:22;12:7;
16:14;21:21;43:6;
56:16;62:20;63:15;
65:13;69:20;81:10;
94:23;101:8;107:18;

117:19;131:20;132:1;
160:3;167:12;173:8;
182:17;232:7;240:20;
247:24;272:3,10,10;
276:2;284:3;308:24;
315:24;316:8,8;318:9;
321:8,15
**evening (1)**
88:10
**event (1)**
306:5
**events (8)**
20:17;69:5,6,7,13;
70:7;77:4;114:9
**eventually (1)**
196:20
**everyday (2)**
91:1;228:7
**Everyone (3)**
178:4;240:4;246:12
**everywhere (1)**
30:11
**evidence (36)**
38:5;95:21;96:2;
113:6;115:9;116:14,
18,21,22;117:24;119:3,
13;160:10;192:23;
194:13;196:10;207:22;
208:17;217:6;225:5,6,
8,14,21;227:4,10;
229:3,25;230:13;
232:8;248:16;274:18;
287:24;306:25;315:11;
316:13
**evident (2)**
265:2,4
**exact (4)**
186:1;250:10;295:7;
297:16
**exactly (5)**
48:3;98:10;114:20;
217:17;285:20
**EXAMINATION (3)**
5:14;303:2;312:6
**examined (1)**
5:11
**example (8)**
8:16;9:3;25:14;96:9;
152:9;154:10;223:7;
228:22
**examples (1)**
234:21
**except (2)**
38:13;79:15
**exception (1)**
127:22
**exceptions (2)**
129:12;130:6
**Exchange (1)**
138:4
**exchanges (1)**
295:5
**excited (1)**

270:8
**Excuse (1)**
  90:14
**execute (1)**
  257:10
**executed (7)**
  203:7;204:1;224:14,
  15,16;315:20;324:12
**executing (3)**
  223:3;224:21;313:14
**exempt (1)**
  232:22
**exemption (2)**
  233:23;234:7
**Exercise (1)**
  45:7
**Exhibit (35)**
  93:16,17;94:6;96:6,
  7,7;97:6;126:24;
  133:20,25;134:1;
  135:5,5;149:8;157:6;
  164:3,6;234:24;
  235:13;236:15;279:21;
  281:16;282:3,4,4,6;
  300:16,18;301:1,4,6,
  11,13,15;312:7
**exhibitor (20)**
  64:17,22,25;84:4,7,9,
  11;122:4,22;127:5;
  157:14,15,23;159:17;
  167:13;307:17;318:11,
  12,13,15
**exhibitors (6)**
  65:4,21,23;146:1;
  148:9;163:14
**exhibits (4)**
  135:7;282:7;300:15;
  301:19
**exigency (2)**
  43:24,25
**exist (3)**
  220:13,19;298:24
**existed (3)**
  64:10;122:14;201:17
**exists (1)**
  138:1
**exit (2)**
  129:9;221:23
**exited (1)**
  242:5
**expect (3)**
  251:3;277:22,22
**expected (2)**
  152:17;296:5
**expense (1)**
  306:3
**experience (6)**
  85:17;143:15;
  151:21;153:21;182:9;
  208:9
**experienced (1)**
  85:15
**expert (3)**

95:17;304:6;305:9
**explain (6)**
  36:18,19;48:14,14;
  51:10;62:19
**explained (2)**
  190:2;242:10
**explaining (1)**
  108:21
**expression (2)**
  218:22;276:7
**extended (1)**
  320:24
**extension (1)**
  152:15
**extent (1)**
  61:9
**extremely (1)**
  24:21
**eyesight (1)**
  253:14

**F**

**face (3)**
  231:4;236:20;275:6
**Facebook (3)**
  182:6,8,10
**facilitate (2)**
  257:25;295:24
**facilitates (2)**
  60:16;62:15
**Facilities (1)**
  14:22
**facility (1)**
  230:2
**fact (17)**
  54:9;130:13;141:23;
  143:23;160:25;170:24;
  235:21,25;236:14;
  289:24;308:13;309:3;
  310:4,21,23;312:14;
  316:13
**factors (1)**
  263:19
**facts (7)**
  83:11;215:11,12;
  217:5;287:23;310:16,
  18
**fail (1)**
  16:23
**fails (2)**
  157:23;307:17
**fair (135)**
  16:13;27:13;36:10;
  56:2,4,11,13,19;59:25;
  60:3,5,14,19;62:24;
  63:22,25;67:6,12;68:2,
  7,10;70:20;71:17,20;
  73:19;74:3,9,11,24;
  75:9;77:11,12,17,17;
  78:14;83:13,25;84:5;
  87:13;88:25;89:4,4,12;
  92:2,20,21;120:16;

121:2,5;123:2;127:9,
19;129:9,14;131:12;
132:10,14,15,20;133:4,
5,21;134:3;136:20;
137:1,13;140:6,11,15;
141:3,13,21;143:15,17,
25;144:21;145:12,12,
15;146:11,12;151:22,
22;152:3,8,11,19;
154:11;155:3,10,10,13,
14,14,24;156:1,13;
157:1;162:22;167:8;
168:5;169:12;176:16;
180:1;184:4;193:24;
198:17;201:16;215:6;
216:8;217:4;235:10,
10;236:22;245:11;
251:11;259:22;265:2;
277:6;278:5,9,25;
279:1,2,4;290:12;
303:4,16;305:17;
306:1,13;310:1;318:8,
21,22
**fairgrounds (12)**
  100:11;120:20;
  121:2,4;122:5,24,25;
  145:4;157:25;182:10;
  216:20;307:19
**fairly (1)**
  89:20
**Fairs (7)**
  131:9;134:23;
  162:10;278:8,12,12,16
**fair's (1)**
  319:19
**fall (5)**
  21:3;30:1;43:2;
  81:13,14
**falls (1)**
  276:23
**familiar (11)**
  8:18;74:13;116:6;
  121:23;122:12;126:10;
  130:3;154:20;224:11;
  225:23;226:17
**family (5)**
  49:19;54:14;146:10,
  13;176:18
**family's (1)**
  54:16
**far (18)**
  14:12;18:24;22:20;
  28:18;31:3;38:5;43:19;
  69:17;70:13;81:11;
  88:2;122:7;125:12;
  200:3;202:20;260:21;
  262:9;317:2
**farm (24)**
  47:10,15;49:3;
  116:13;125:7;180:5;
  181:19,22;183:1,7;
  189:8;192:5;208:24;
  238:3,7;245:9;246:3,3,

6;249:8,19;254:7;
262:14,15
**Farmers (4)**
  47:25;50:8,9;127:21
**farming (1)**
  53:7
**fast (3)**
  11:10;105:22;211:25
**faster (3)**
  123:7;205:13;266:6
**fault (1)**
  25:9
**favorites (1)**
  70:2
**February (1)**
  20:13
**federal (4)**
  9:16;225:15;320:8;
  321:14
**feel (2)**
  11:11;55:11
**feelings (1)**
  276:19
**feels (1)**
  72:14
**feet (1)**
  29:23
**felony (18)**
  39:8,9;45:3;107:21;
  124:6;171:3;188:22;
  189:11;190:23;191:1;
  207:23,24;235:5;
  236:20;237:2,20;
  284:3;287:17
**felt (2)**
  72:14;130:2
**female (2)**
  252:24;257:22
**FERN (46)**
  97:24;98:11;101:13;
  108:18,19;111:7;
  115:21;130:13,20,20;
  131:5,17;167:7;182:4;
  203:24;221:1;222:12;
  224:1,1;268:15;
  274:25;282:18;283:6,
  7;300:18;301:5,11,16;
  304:22,23,25;305:1,2,
  2,307:15,23;309:11;
  310:4,20;312:13,13,20,
  20,21,22;313:12
**F-E-R-N (1)**
  97:24
**Fernandez (21)**
  4:3;5:2,10,16,17,18,
  22;6:5,5;35:25;36:2;
  94:7;97:5,25;108:17;
  132:1;134:19;300:19;
  321:18;322:12;324:19
**F-E-R-N-A-N-D-E-Z (1)**
  6:6
**few (14)**
  28:17;34:10,10;48:9;

66:6;90:22;98:12;
155:7;216:5;243:18;
251:15;259:9;260:19;
312:10
**FFA (24)**
  47:19,20,21,23;
  48:12,15,18,21,22,23;
  49:1;50:20,21;51:1;
  59:25;61:3,8;67:4;
  87:8,14;142:1;150:7;
  215:7;271:23
**field (5)**
  18:25;19:16,17,18;
  24:11
**figure (8)**
  48:11;60:2;171:19;
  199:21;213:17;246:18;
  295:19;301:14
**figured (3)**
  13:9;166:11;262:20
**figuring (1)**
  71:14
**file (12)**
  38:6;41:3;116:12;
  153:5;154:1;201:12;
  210:1;283:6;284:12;
  285:1,3;289:8
**filed (11)**
  37:10,11,22;38:2,2,
  12;283:23;285:3,8,21;
  297:10
**files (1)**
  138:14
**filing (4)**
  115:2;286:18;289:8,
  14
**fill (1)**
  82:22
**filled (3)**
  164:10,14;222:13
**film (1)**
  209:8
**final (8)**
  154:13;158:13;
  204:1,5;211:10;213:2,
  9;230:10
**finalized (1)**
  115:5
**finally (1)**
  229:15
**find (33)**
  28:17;34:15;37:13;
  38:4;41:2;101:6;123:7;
  132:13,22;145:25,25;
  146:15,16;147:8,9,12;
  156:23;157:11;161:19;
  163:14;169:10;199:20;
  220:16;222:8;224:5;
  230:22;243:10;246:7,
  9;284:2,2;300:22;
  312:9
**finding (1)**
  28:13

**fine (35)**
5:19,20;31:13;42:6,
6;45:10;48:14;65:22;
72:19;75:13;89:2;
93:22,24;110:15;
130:9;131:6,7;148:11;
154:16;160:12;162:16,
16,23,23;168:19;
173:12;212:2,13;
262:5;297:4,21;
309:10;317:16;320:10;
323:3
**finger (1)**
180:25
**finish (2)**
14:6;15:1
**finished (1)**
113:20
**finishing (1)**
14:12
**fire (3)**
162:4;262:16,17
**firearm (1)**
17:17
**firm (2)**
4:5;48:7
**first (66)**
5:11;6:1;13:4,6,18;
25:11;46:20;59:2,8;
67:18;71:3;74:5;75:4;
77:10,13;84:13;86:13;
87:18,24;89:23;98:8,
12,22;100:1;120:18;
131:5;143:17;166:7;
167:8;170:12,17;
180:15;182:2;185:9;
207:8,11;219:24;
222:11;223:10;231:17,
18;234:25;241:15;
247:2;254:10;259:4;
264:6,7;271:10;
273:10;280:8;281:6,
10;287:8,25;288:1,4,7;
293:3,4;300:16,22;
302:4;304:9;305:23;
310:6
**Fisher (3)**
4:10,12;5:3
**Fitzgerald (3)**
165:23,24,25
**five (19)**
20:14;33:21,22,23;
36:4;50:14;66:20,21;
67:23;70:4;73:6,7;
86:12,24;140:4;
191:25;212:19;259:10;
273:20
**fix (2)**
11:23;112:24
**fixated (1)**
193:1
**fixed (1)**
298:13

**flag (3)**
258:3,11,12
**flags (2)**
258:1,18
**flock (1)**
181:21
**flushing (1)**
241:8
**fly (2)**
44:2;280:6
**focal (2)**
31:10;81:12
**focused (1)**
315:25
**folder (1)**
118:11
**follow (7)**
105:1;150:23;
199:16,24;265:22;
311:23;321:2
**following (7)**
39:4;120:24;137:15;
139:16;167:12;194:17;
208:15
**follows (1)**
5:12
**follow-ups (1)**
205:8
**food (1)**
209:9
**foot (2)**
279:7,8
**force (3)**
16:25;221:22;223:3
**forced (1)**
129:8
**forecast (1)**
8:25
**foregoing (2)**
324:4,6
**forewarn (1)**
240:24
**forfeit (1)**
158:22
**forfeited (3)**
158:1,19;307:19
**forget (3)**
70:14;320:8,8
**forgot (1)**
198:24
**forgotten (1)**
293:1
**form (18)**
6:1;90:4;91:9;96:10;
140:6,11,16;144:21;
145:5;146:18;164:9,
17,23,24;167:8,12;
283:13;316:5
**former (2)**
75:1;309:12
**formerly (1)**
75:15
**forth (5)**

191:14,15;225:6;
313:3,7
**forthcoming (2)**
246:16;308:18
**forward (7)**
11:4;104:12,24;
156:22;284:14,16;
300:3
**forwarded (7)**
104:15,16,18;119:6;
128:14;137:12;283:13
**fostering (2)**
50:12,14
**Fouler (7)**
51:4,13;88:16;
115:24;121:25;122:3,3
**Fouler's (1)**
52:3
**found (20)**
37:14,20,20;100:24;
121:3,5,6,12;147:8,12,
13;162:1,2;166:20;
267:18;291:3;301:4;
302:12,12;316:6
**four (10)**
15:25;20:10,11,14;
38:3;82:21;86:12;
209:23;242:3;247:1
**four-and-a-half (1)**
20:14
**fourth (2)**
207:20;247:14
**Fowler (2)**
88:13;122:17
**Fox (1)**
4:4
**frame (6)**
14:25;83:9;92:16;
138:22;206:5;211:25
**frankly (1)**
197:16
**fraud (1)**
167:20
**Free (3)**
85:12;198:14,15
**frequent (1)**
65:25
**freshman (1)**
49:1
**Friday (18)**
163:11,12,21,24;
175:9,13,14;192:21;
195:19,25;196:1,2;
197:24;212:24;
294:17;296:11,13
**friend (1)**
68:15
**friendly (2)**
258:9;302:23
**friends (5)**
55:10;57:1;59:24;
60:14;61:17
**frivolous (1)**

235:21
**front (7)**
25:4;97:6;103:7;
123:18;173:22;242:20;
310:16
**frustrated (1)**
25:8
**frustrating (1)**
24:22
**fuel (2)**
273:17,18
**full (14)**
79:25;81:15,16;
82:16,17,20;175:1;
218:19;229:11;249:15;
256:5;264:4;267:7;
268:11
**full-blown (1)**
51:22
**full-time (2)**
50:3,5
**fully (1)**
153:16
**funded (1)**
197:21
**funds (1)**
61:8
**funny (2)**
126:6;210:24
**Furious (1)**
105:22
**further (10)**
45:4;105:1;135:11,
17;229:1;266:1;
267:15;312:25,25;
319:18
**Furthermore (1)**
227:3
**Future (3)**
47:24;127:20;154:16

**G**

**gain (1)**
247:8
**gamble (1)**
247:23
**gambling (1)**
55:10
**gap (2)**
169:24;175:6
**garage (1)**
173:23
**gas (1)**
142:4
**gauge (1)**
77:2
**gave (18)**
7:20;24:13;91:4,7;
92:3,3,6;111:18;187:2,
11;234:24,24;235:6;
263:23;267:3;286:6;
301:2;317:23

**General (5)**
132:2;146:20,24;
157:4;307:14
**generally (5)**
65:4;208:10;210:2;
212:9;225:2
**generate (2)**
95:23;103:2
**generated (6)**
91:18;98:20;99:3;
102:2;110:22,23
**generates (2)**
95:5;103:20
**generating (1)**
179:23
**generations (1)**
127:21
**gentleman (1)**
263:1
**gentleman's (1)**
249:18
**gentlemen (1)**
4:1
**gets (10)**
16:19;28:14;30:2;
119:3,6;213:14;
229:15,16;236:22;
285:3
**girl (1)**
217:18
**girls (1)**
197:23
**GIS (1)**
259:1
**gist (1)**
302:16
**given (5)**
128:11;176:25;
220:10;235:16;262:20
**gives (4)**
57:10;62:15;208:25;
247:20
**giving (2)**
240:8;296:3
**goat (147)**
34:3;51:14;54:9;
71:14,15;77:18;78:11;
83:12;84:8,10;88:11,
13,15,18,19;89:1,3,5,7;
100:24;101:2;118:1,4;
120:16,21;121:3,6,6,
12,18,20,20;122:1,5,
25;123:3;124:3,4;
125:5,6,19;127:10;
128:23;130:18;137:5,
13;144:3;149:16;
155:11;156:5,5,9,11,
14,19,23;163:3;165:7,
9;166:10,15,20,20;
169:23;181:19,23;
184:16;185:17;186:7;
187:4,14;189:17;
190:24;192:6;196:12;

199:6;210:23;214:5,6;
215:5,16;216:5,8,18,
19;217:13,18,22;
226:24;235:2,25;
236:19;240:3;241:8;
242:17;244:19;245:10;
247:3,5,9,13,16;
248:19;249:4,19;
259:18,21,25;260:23;
261:20;264:22;265:3;
266:17,19;267:1,4,12,
23;268:3;269:18;
270:3,8;273:7,24,24;
274:17;275:25;280:14;
282:11;283:20,21;
284:2;285:22,23;
286:11,12,22;287:10;
290:13;292:13;293:6;
294:16;302:1;304:11;
309:16,20;311:4
goats (10)
51:14,16;142:17;
163:21;242:25;243:2;
250:6;267:7,19,23
goat's (4)
16:18;187:13;
190:4;263:1
God (1)
25:6
goes (11)
26:2;53:7;95:22;
99:9;228:4;261:6;
283:11,11,12;285:5,10
good (17)
42:22;58:11;66:10;
83:4;97:23;158:7;
177:12,12;190:16;
200:17,18;216:23;
225:10;291:7;292:17;
294:22;309:8
Google (2)
183:12;246:19
Googled (1)
67:11
Gordon (157)
4:18,18;5:14;7:22;
9:19;22:12;23:12,16,
23;24:8;25:19;26:18;
28:22;37:16;38:14;
41:23;44:13;46:2,24;
51:2;53:3,6,10,15,18,
24;54:4,11,14,18,22;
55:3,9;58:6;60:7,13;
72:8;76:23;77:1;82:11;
93:18,23;94:2,4,7;
96:16,18,21,24;97:5,
23;98:5;107:15;108:9,
16;126:13,19;131:23;
133:13,19,25;134:2,5,
7;135:22;148:3,6,21;
149:9;151:11;153:6;
154:2;155:1;160:9;
167:21;193:12;197:9;

204:9;209:7,12,16,22,
24;210:2,8;211:18,24;
212:2,5;217:8;219:15;
234:3,6,11,19;239:19;
250:24;251:14,18;
252:2;253:2,5;256:7,
14,18;264:17;266:3,5,
15;278:7;279:18,21,
23;280:2,5;281:20,24;
282:8;288:1;300:6,13;
301:20;302:25;303:11,
15,18,21,23;304:6;
305:8,11;307:8,24;
309:10,21;311:10,24;
312:6;316:17,20;
317:19;319:18,24;
320:2,7,13,17,21;
321:1,7,13,19,23;
322:6,10,19;323:1
gosh (1)
262:14
Gotcha (29)
14:15;26:7;30:17;
34:7;40:2;44:19;45:1;
69:16,19;74:10;79:4;
101:17;102:16;105:4;
107:6;109:24;112:6;
117:4;120:4;136:6;
143:2;155:22;176:19;
191:10;206:21;225:17;
241:7;288:3;293:20
gotta (1)
6:15
govern (4)
129:17,24;133:23;
151:9
governed (2)
131:11;148:23
governing (1)
48:12
Government (2)
71:6;172:11
governs (2)
145:11,11
Grab (2)
68:21;263:2
graduated (2)
15:19;57:7
graduating (1)
57:9
grammar (1)
112:24
grand (8)
44:19;100:10;
108:22;237:20;282:22;
287:13,14,14
grant (2)
16:9;197:21
granted (1)
130:6
grass (2)
267:18;268:13
great (2)

63:2;98:5
green (1)
47:16
greet (1)
241:15
grew (4)
47:8,15;49:2;50:18
ground (3)
8:2;17:20;65:8
grounds (2)
53:15,17
group (7)
47:22;51:13,14,23;
52:1,2;65:5
grow (1)
47:9
growing (6)
47:19;49:9,10,21;
50:19;142:17
guardian (1)
317:8
guess (20)
8:18,24;9:2;23:17;
46:15;57:14;70:1;75:9;
153:21;218:25;222:6;
225:18;282:4;301:3,5;
306:22;307:13;308:16;
309:12;317:5
guessing (1)
30:18
Guidelines (6)
132:2;146:20,24;
157:5;307:14;310:5
guy (1)
45:6
guys (9)
17:12;114:11;
118:25;134:10;157:10;
178:2,3;197:22;265:15
guy's (1)
188:13
gyms (1)
17:13

H

half (2)
13:24;320:5
hallucinating (1)
195:17
hand (3)
65:23;212:14;281:25
handbook (30)
92:21;131:11,14,15,
16;132:5,6,7,9,11;
133:1,4;144:14;145:3,
8,16,21,22;146:6,15,
19,22;147:4,5,8,13,13,
15,18;169:11
handbooks (1)
132:15
handed (1)
273:22

handful (4)
33:16,17;191:22;
285:7
handing (1)
80:11
handle (3)
19:8;33:4;235:23
handled (2)
189:21,23
handler (1)
18:25
hand-off (1)
79:25
hands (1)
38:22
handwrite (1)
65:12
handwriting (1)
140:22
happen (6)
54:21;134:14;
173:13;182:23;195:9;
241:10
happened (13)
7:6,16,19;8:14;9:8;
85:10;86:5;201:23;
255:20;259:14;262:7;
284:15;302:18
happening (2)
122:9;253:13
happens (5)
105:23;231:21,23;
241:9,15
harassing (1)
38:15
harbor (1)
105:24
hard (7)
38:17;90:19;119:25;
134:17;206:18;240:8;
259:1
harm (1)
45:15
harmless (1)
305:25
hate (4)
109:14,16;181:7;
296:12
Haven (2)
32:14,15
hay (1)
29:16
head (9)
8:11;22:3;31:3,12;
49:25;51:22;228:6;
247:4;303:1
headed (8)
248:18;268:5,6,7,8;
269:11,14,15
heading (1)
157:13
heads (1)
49:22

hear (13)
50:15;84:10;153:10;
251:1,3;253:6,9;260:6;
261:6,9;278:19;289:4;
297:19
heard (17)
7:20;56:23;57:12;
58:17,18,19;60:1;
121:22;122:14;251:19;
252:7,8;253:10,11;
261:8,9;303:18
hearing (1)
284:18
hearings (1)
21:23
heart (1)
50:13
Hearts (18)
116:13;180:5;
181:19,22;182:25;
183:1,7;188:7;189:8;
192:5;208:24;217:23;
238:3,7;239:1;240:15;
245:9;254:14
held (2)
18:17;225:6
helicopter (1)
45:12
hell (1)
240:2
help (5)
85:11,18;86:11;93:2;
205:11
helps (1)
61:7
herding (1)
49:14
hereby (1)
324:3
here's (1)
93:20
hey (34)
40:24;70:18;72:17;
93:6;102:14;103:1;
129:1;141:16;154:3;
171:7;184:10,21;
185:17;190:2;191:21;
198:6;199:5;200:17,
18;228:2,24;229:6,9;
242:25;244:19;247:25;
253:20;259:17;260:17;
295:7,12;297:1,9;
302:3
hi (9)
69:14;72:16,22;
294:14;296:12,21;
297:24;298:12,12
hiccup (1)
26:4
hidden (1)
118:10
hide (1)
217:23

**high (15)**
20:20,24;47:23;
48:15,17,19,25;56:24;
58:20;61:21,23,25;
62:3;64:13;69:11
**higher (1)**
190:1
**highest (1)**
14:2
**highlighted (1)**
223:1
**highway (2)**
19:14;28:19
**hill (2)**
267:15,16
**Hindsight (1)**
260:18
**hired (2)**
15:20;18:12
**history (1)**
258:8
**hit (3)**
162:7;189:25;251:23
**Hold (9)**
93:19;135:6;155:7;
195:21;224:9;225:21;
229:13;305:25;312:20
**holds (1)**
17:24
**holiday (5)**
176:3;177:23;
197:24;287:9,11
**holidays (1)**
173:24
**home (9)**
173:18,21;247:4,6;
266:18;268:5,6;
270:21;274:8
**homicide (2)**
43:1;44:3
**honcho (1)**
51:22
**Honest (3)**
192:17,18,19
**honestly (1)**
307:7
**hope (1)**
206:9
**Hopefully (2)**
45:11;199:9
**horse (8)**
34:4,5,8;40:5,18;
41:17,18;288:8
**hosted (1)**
28:2
**hour (9)**
5:5;76:25;77:1;
212:19;320:4,6,7,13;
321:3
**hours (13)**
76:24;100:24;
120:19;121:2;139:23,
25;170:4;204:16;

206:5,22;209:22;
251:20;271:19
**house (18)**
9:3;48:10;50:11;
85:11;142:11;171:8;
173:15;179:14;203:15;
229:6;242:23;257:4;
259:9;268:21,22;
275:1,1;286:22
**houses (1)**
171:5
**humane (3)**
32:8,14,15
**hundred (8)**
21:24,25;42:1,2,3;
224:19;231:3;232:14
**hundreds (5)**
21:17,18,21;29:23;
224:18
**hurt (1)**
79:21
**husband's (1)**
253:5
**hydroplant (1)**
172:13
**hypothetically (1)**
108:4

**I**

**I-5 (2)**
12:22;42:22
**ia (1)**
189:22
**ID (7)**
117:9,10,11,13,16,
19,22
**idea (4)**
9:6;97:23;274:11;
302:24
**Ideally (1)**
194:8
**Identified (1)**
255:23
**identifies (1)**
181:21
**identify (2)**
267:10,19
**Ignore (1)**
31:9
**illegal (1)**
17:25
**imagine (4)**
38:21;58:9;197:14;
295:13
**immediately (6)**
15:13;89:8;91:19;
125:17;157:14,24;
193:14;307:18
**imminent (1)**
241:5
**importance (1)**
173:14

**important (3)**
9:23;43:14;54:7
**impressive (1)**
259:5;273:15
**inbox (1)**
138:24
**inception (1)**
93:10
**incident (12)**
76:5;98:14,15;100:8,
10;104:17;107:2,7,13;
123:1;126:20;127:8
**include (2)**
310:23;312:15
**included (1)**
96:11
**includes (2)**
209:3;210:3
**including (6)**
209:4;210:4,11;
239:22;313:1;322:16
**inconvenience (1)**
246:13
**incorporate (1)**
32:7
**incur (1)**
229:1
**Indecipherable (1)**
194:11
**indemnify (1)**
305:25
**independent (3)**
87:10,13,14
**Independently (1)**
87:11
**indicate (2)**
98:19,22
**indicates (1)**
105:8
**individual (3)**
6:21;150:20;181:21
**individuals (1)**
36:8
**industry (1)**
127:19
**infantry (1)**
13:19
**infer (1)**
215:17
**influence (1)**
277:20
**inform (3)**
201:24;202:5;287:4
**information (28)**
40:19,22;41:25;46:4,
15;90:4;124:21;128:4,
5,6,12;129:2;132:13,
17;139:13;169:11,11;
187:12;190:1;193:17;
226:23;245:18;246:9;
248:3,8;258:16,17;
305:24
**informed (10)**

122:22;127:5;180:4;
188:3;202:3;242:15;
245:14;257:16;283:22;
286:17
**informing (2)**
123:3;127:9
**initial (7)**
89:19;91:5,7;124:20;
166:9;188:23;308:19
**initially (1)**
99:14
**initiated (1)**
169:22
**injured (1)**
85:19
**injury (1)**
306:3
**in-progress (1)**
43:22
**input (1)**
111:2
**inputted (1)**
115:17
**inside (2)**
242:1,23
**inspector (1)**
34:20
**Instagram (7)**
180:5;181:18;182:6,
8,10;219:22,22
**instance (2)**
36:13;315:23
**instances (5)**
30:24;31:14;36:5;
41:15;63:24
**instead (5)**
23:18;27:1;188:22;
257:13;304:12
**instruct (3)**
53:11,13,16
**instructed (1)**
149:1
**instruction (2)**
16:24;17:1
**instructor (6)**
16:7,8,11,12,23;
19:12
**instructs (3)**
10:7,13;219:17
**insufficient (1)**
304:17
**insurance (1)**
34:17
**intact (1)**
219:6
**interacted (1)**
59:10
**interacting (1)**
63:8
**interaction (2)**
73:4;244:12
**interest (2)**
169:14;290:1

**Interesting (7)**
35:16;43:9;44:5;
45:16;52:8;143:22;
167:23
**interfere (1)**
10:25
**interject (2)**
274:6;303:13
**internal (3)**
188:21;189:13,22;
190:8;244:7
**internally (1)**
276:5
**Internet (1)**
132:12
**interpose (1)**
10:4
**interpretation (3)**
262:10;308:5,16
**interrogatories (1)**
46:5
**intersection (2)**
70:6;257:3
**interview (3)**
44:2;116:11,13
**interviewed (1)**
243:11
**interviewing (1)**
243:13
**intimidated (1)**
297:17
**into (36)**
15:5,13;29:22;47:7;
54:18;56:22;69:9;93:2;
100:18;111:3;119:3;
146:13;160:3,10;
168:25;171:18;189:13;
205:23;210:1;217:19;
225:6;226:6,7,11,18;
229:3,12;230:16;
241:19;243:7,8;
257:17;270:2;279:10,
10;315:12
**introduce (1)**
4:13
**introductions (1)**
62:22
**investi (1)**
144:9
**investigate (17)**
29:14,15;30:20;79:8,
24;83:6;120:16;155:2;
179:20;182:25;183:1;
189:12;214:21;257:13;
279:1,9;306:24
**investigated (4)**
31:15;36:4,13;
236:11
**investigating (11)**
30:7;42:18;80:15,20,
25;81:6,13;84:14;
196:23;197:6;317:2
**investigation (71)**

30:3;33:10;34:16;
36:17;40:20;43:25;
59:5;78:14;79:22,25;
80:11;83:9,14;87:20,
21;92:23;94:19;97:10,
13;98:23;100:19;
104:11;105:14;111:20;
112:17;113:13,16;
115:5;116:20;125:12;
133:3;138:19;146:9;
147:22;148:10;164:19;
165:1,19;166:8,10;
168:10,22,24;169:14,
17,22;170:15;171:17;
179:5;187:2;189:13;
190:8;200:1;207:14;
208:12;214:4;218:20;
227:6;230:11;235:12,
21,25;237:1;261:1;
276:9;283:21;289:11;
294:25;304:14;318:16;
319:11
**investigations (2)**
33:14;290:1
**investigative (7)**
27:21;104:20;
120:13;201:12;238:23;
247:7;279:20
**investigator (18)**
19:2;27:14,18;28:24;
29:4,12;30:7,21;31:15,
18;36:6;78:13,17;79:6,
13,15;244:5;295:22
**invoice (20)**
90:10,11,12;91:9;
96:10;101:2;124:22;
141:3;143:20,25;
144:22;149:15,17,19,
25;160:19,22;161:12;
167:4;168:5
**involved (18)**
39:11;41:17,18;
50:22,23;61:11;66:25;
67:2;87:2,8;105:14;
195:5;200:1;240:4;
276:9,14,16,17
**involvement (9)**
47:9;53:9;54:7,17;
59:18;61:10;67:24;
179:20;242:19
**involving (1)**
73:16
**irrelevant (3)**
17:2;38:16;237:11
**issue (7)**
32:1,9;36:7;189:10;
194:23;195:3;306:16
**issued (4)**
211:22;238:1;
284:17;290:2
**issues (1)**
208:6
**issuing (1)**

7:9
**it' (1)**
30:13
**item (3)**
117:3,5;207:22
**items (6)**
137:15;139:16;
162:19;233:2;310:23;
312:14

**J**

**jail (3)**
39:19;81:19,23
**January (2)**
15:21,22
**Jerry (12)**
4:2;5:1,10,25;6:5;
294:14;296:12,21;
297:24;298:12;321:18;
324:19
**J-E-R-R-Y (1)**
6:5
**Jessica (55)**
36:7,14;54:8;59:5;
76:5;77:4,10;83:18;
88:14;91:5,11;122:23,
23;123:1,3,4;125:3;
126:7;127:7,9;130:17;
131:3;136:15;137:13;
140:18;156:13;170:4;
174:25;178:17;179:13;
216:19,21,25;235:9;
246:2;248:13,18,21;
249:5,20;252:16;
254:1;261:11;262:6;
282:21;284:2;303:5,
25;305:20;306:8;
308:13;309:5,12,24;
318:16
**Jessica's (6)**
162:24;220:24;
248:24;263:10;318:5,7
**jest (1)**
276:2
**JF (1)**
6:12
**Jim (1)**
131:24
**Jiu-Jitsu (2)**
17:3,13
**job (12)**
18:21;41:4;50:4,5;
172:1;240:8;253:5;
276:22,23,24;290:21;
306:24
**John (5)**
319:22,24;322:7,16;
323:2
**Johnson (14)**
77:16,19;78:5,6,8,9,
10;83:5;99:24,25;
100:3;120:15,15;277:2

**joke (3)**
27:8;83:4;276:10
**judge (28)**
12:4;200:13,18;
204:4;211:9,14;
212:14,15;221:4,6,19;
223:5,10;225:7;
228:19;229:13,16;
230:9;233:14;234:10,
24;237:21;247:18;
248:8;313:11;314:22,
23;315:19
**judge's (2)**
233:19,19
**judgment (6)**
62:4;231:10,12;
317:2,3,4
**Julie (3)**
4:11;5:6;209:25
**July (27)**
9:10;71:13;74:6,8;
77:14;78:1,2;80:19;
83:10;84:12;104:5;
111:11;113:16,20;
114:11;115:25,25;
139:1;173:25;175:16;
179:2;199:2;213:22,
24;282:15,25;289:13
**jump (1)**
193:5
**jumping (3)**
87:22;207:1;304:23
**June (28)**
15:11,13;74:6,8;
77:14;78:2;80:19;
83:10;84:12;88:8;
110:20;120:19,25;
121:1;130:18,19;
138:25;154:11;163:4;
168:15;175:6;180:18;
181:3,9;289:12;304:2;
309:13;310:7
**junior (6)**
48:19;121:19;122:3,
4,22;127:5
**jurisdiction (1)**
42:8
**Justice (2)**
22:5;39:10
**justified (1)**
24:4
**Justin (5)**
115:23;188:15,18;
244:15;248:13
**Justin's (1)**
257:7
**juvenile (4)**
7:9,12;25:25;217:1
**juveniles (1)**
26:3
**juvenile's (1)**
318:18

**K**

**Katherine (1)**
311:17
**Kathi (76)**
55:17;61:17,22;62:1,
1,7,13,20;63:4,6,15;
64:9,15,19,24;65:1,24,
25;66:1,3;71:12,19;
115:22;125:17,19;
149:17;156:12,22;
157:1;160:19,23;
164:10;166:7;169:17;
175:24;178:16;184:21;
193:21;194:3;199:2;
202:3,5,12;213:24;
214:4;215:1;218:20;
269:18;270:4;271:10,
21;272:15;274:2;
275:11,17,19;277:9;
280:9;281:2,2,7;
282:10;283:16;285:19;
286:16;287:4;288:15;
290:18;291:19;294:15;
296:5;298:14;302:22;
303:10,11,16
**Kathy (2)**
214:1;280:19
**keep (11)**
58:13;69:24,24;89:5;
127:1;191:5;199:18,
18;242:25;265:15;
313:17
**Kent's (4)**
142:2,3,4,24
**kick (1)**
242:20
**kid (2)**
48:8;52:14
**kidding (1)**
27:4
**kids (20)**
40:15;47:19;48:16;
52:16,20,21,23;53:1;
55:14;57:5,9;64:4;
66:12;76:11;129:8;
130:6;146:11,12;
152:9;154:10
**kids' (1)**
53:8
**killed (1)**
274:12
**kind (29)**
29:10,18;33:24;35:9;
70:17,17;86:3;106:23;
109:16;112:16;177:1;
183:12;184:12;189:25;
193:5,18;194:23;
228:18;233:11;239:13;
240:4,22;243:4;
259:20;260:11;267:16;
304:1;317:12,23

**kittens (1)**
50:13
**knew (13)**
64:13;154:12;236:3,
4,6,6;248:19;249:9;
253:25;267:9;287:9;
297:10;302:17
**knife (1)**
110:15
**knock (1)**
255:15
**knowing (2)**
84:23;308:20
**knowledge (20)**
57:13;60:15;61:6;
63:5,13,14;76:13;82:7;
163:3;179:19;182:14;
208:20,21;215:3;
230:8;256:2;292:4,6,7;
299:20
**known (16)**
6:11,13;55:19,20,23;
56:21;61:20,22;66:16,
18;70:4;73:17;86:24;
190:25;235:14;317:10
**knows (3)**
39:22;99:10;130:7
**Kristin (3)**
188:10,13,15

**L**

**LA (5)**
24:25;25:11;44:7;
105:23;285:12
**label (4)**
133:25;282:2,4,5
**labeled (2)**
97:6;146:25
**lack (1)**
81:18
**Ladies (1)**
4:1
**lake (4)**
28:18;36:21;38:2;
79:3
**land (1)**
193:1
**language (22)**
132:23;149:23;
158:12,13;159:2;
182:11;210:17,18,20;
212:23;221:18;222:21,
22;223:14,21,22;
233:10,14,21;297:16;
306:6,9
**lapse (1)**
169:20
**larceny (1)**
106:10
**large (2)**
159:16;230:2
**last (45)**

14:24;15:2,9;16:8,
17;20:13;21:16;22:25;
34:18;49:24;50:13;
70:9,11,22;71:8,11,13,
17;75:4;80:20;89:20;
99:23;111:14,21;
113:23;114:1,4;
134:11;135:8;140:4;
154:10;188:11;194:5;
209:25;242:12;252:7,
8;268:25;269:1;
279:15,15;281:1;
282:14,16,20
**Lastly (1)**
310:19
**late (5)**
23:22;186:20;
265:15;271:16;274:14
**later (16)**
9:25;10:1;53:11;
54:24;89:15;114:12,
17,17;181:24;199:22;
211:14,19;225:9;
232:21;236:19;322:14
**laugh (1)**
258:13
**laughing (1)**
195:12
**law (29)**
15:5,13;25:1,7;
31:25;38:18;42:16;
89:8,9;106:19;107:9;
148:24;150:13;160:7,
17;167:15;173:2;
228:7,8;229:18,20,21,
21;240:22;241:20;
242:3;258:8;264:24;
289:25
**laws (8)**
18:22;22:24;151:9;
164:20;166:2;167:3;
169:12;324:5
**lawsuit (7)**
6:16;27:12;53:2;
77:8;295:8;297:10,13
**lawyer (1)**
252:16
**lawyers (1)**
8:16
**leader (18)**
51:1,2,3,5,7,9,12,13,
14,21,24;59:21,23;
62:12;64:5;88:13;
122:1,1
**leading (2)**
77:5;295:19
**leads (4)**
44:1;104:20;133:4;
247:8
**learn (2)**
77:10;127:21
**learned (9)**
77:13;83:7;88:10;

124:21;245:11,15,17,
18;246:1
**learning (1)**
26:5
**leash (1)**
267:24
**least (11)**
22:12;62:1;63:17,18,
18;160:24;191:22,25;
211:3;224:19;306:12
**leave (18)**
36:3;151:22;186:15;
192:2,9;200:14;
246:25;249:13;254:7,
13,14;259:24;261:25;
270:3,9,12,24,25
**leaves (1)**
295:23
**leaving (3)**
191:22;199:8;268:2
**lecture (1)**
40:16
**led (1)**
247:8
**left (22)**
77:3;85:22;126:20;
152:20;174:2;176:12;
192:5;196:3;200:18;
201:7,8;202:19;
213:25;229:9;262:10;
263:23,24;265:20;
273:24;320:4;321:4;
322:13
**legal (10)**
41:5,12;70:19;
151:10;154:22;156:12;
218:16,17;234:8;
316:12
**legalities (1)**
135:24
**legally (1)**
95:25
**lengthy (2)**
89:21,22
**less (2)**
33:19,20
**letter (26)**
24:7;25:18;65:7,24;
91:20,21;98:19;
119:14;128:7,22,23;
135:10,12;162:24,24;
229:20,21;265:1;
280:15;283:8;299:9,
11;300:20;301:2;
303:25;304:2
**lettering (1)**
310:6
**letters (5)**
62:23;65:6,12,12;
98:12
**letting (1)**
243:5
**level (3)**

14:3;102:6,7
**liability (10)**
90:3;91:8;140:9,16;
146:18;305:7,23;
306:2;316:3,5
**License (1)**
5:7
**lie (1)**
192:18
**Lieutenant (32)**
4:2;5:1,10,17;6:2;
20:12,18,21;36:2;77:3;
79:9;94:7;97:5;108:17;
116:4;132:1;134:19;
149:11;183:16;186:17;
198:8;204:17;238:8,
21,21;300:19,22;
303:3;312:7;321:18;
322:24;324:19
**Lieutenant's (3)**
5:19,20;320:20
**life (10)**
12:13;17:4;43:13,13,
14;69:15,16,20;273:13,
13
**lifetime (2)**
276:13;306:23
**light (5)**
205:17,19,20;
254:17,18
**likelihood (4)**
42:22;158:7;192:24;
196:10
**likely (2)**
117:22;177:13
**limit (2)**
63:6;322:13
**line (8)**
26:7;45:18;100:21;
199:5;208:23;222:9;
294:5;319:19
**links (1)**
254:9
**list (2)**
238:12;318:21
**listed (5)**
143:3,13;149:14;
167:13;188:5
**litigation (9)**
135:12,14,18;
136:18;154:16;221:2;
235:23;236:24;322:25
**litter (1)**
50:17
**little (16)**
12:19,20,21;14:9;
19:14;174:9;186:21;
246:17;265:17;267:20;
269:9,10;296:15,18;
308:9;322:12
**live (2)**
12:10;72:23
**lived (6)**

12:12,16,18,19;
171:20;189:7
**livestock (46)**
19:1;27:14,18;28:23;
29:4,12;30:7,8,20,25;
31:15,18,23;35:10;
36:6,22;50:18;56:5;
60:20;78:12,17;79:5,
12,15;80:10;83:25;
120:20;121:13,19;
122:4;132:2;146:20,
24;153:22;157:5,25;
162:22;213:25;215:1,
6;287:14,17,18;307:14,
18;318:9
**living (6)**
72:23;227:20;
233:13;234:15;310:23;
312:15
**load (3)**
121:13;249:12,15
**loaded (1)**
268:4
**loading (2)**
88:8;229:7
**local (11)**
131:13;132:14;
134:23;142:4;144:12;
145:4,8,9;146:16;
162:10;167:4
**locally (1)**
142:12
**locate (5)**
34:12;37:18;121:20;
227:1,13
**located (6)**
166:17;181:22;
226:24;246:4;259:23;
269:18
**location (16)**
28:13;118:2;183:12;
188:2,3;226:25;227:3;
246:19;247:1;249:12;
256:20;257:22;273:23,
24;310:25;311:1
**location's (1)**
258:16
**locked (1)**
223:18
**locker (1)**
194:13
**log (4)**
117:24;118:8;
119:21,22
**logged (2)**
117:25;118:13
**logic (1)**
218:20
**Lomas (2)**
75:4,14
**long (88)**
12:12,23,25;15:23;
20:8,8;27:14;28:11;

36:7,15;44:11;46:9;
52:12,17;54:8,8;55:19,
20,24;56:21;59:5;
61:20;64:4;66:16,19;
73:1,4,17;75:20;76:5,
5;77:4;83:18;88:14,25;
89:13,19,19,20;90:5;
91:11,18;115:24;
122:22,23;129:3;
137:13;140:18;143:8;
144:3;152:2;156:13;
167:13;197:21;198:22;
205:14;209:11;211:2;
212:9,9,11,12;216:19,
21,25;217:22;219:16;
245:3;254:19;260:4,5;
264:18,19;270:17,18;
273:19;276:22;279:21;
282:21;295:17;303:25;
305:20;306:8;308:13;
309:5,12,24;318:3
**longer (6)**
79:14;85:10;138:1,
18;192:24;309:24
**Long's (1)**
303:5
**look (38)**
22:3,4;40:9,9;46:4;
54:2;70:2;72:1,10,19;
91:13;112:4,7;115:3;
133:7,11;145:15;
146:17;147:13;148:2;
149:3,3;158:9;162:4,
17,19;168:18;190:16;
212:23;218:17;221:21;
243:2;263:2;275:4;
299:5,8;310:4;312:21
**looked (15)**
116:6;133:21;134:8;
135:7;143:14;144:9,
11,12;146:10;162:20;
183:10,12;236:10;
246:6;267:13
**looking (19)**
93:21;132:13;
143:18;146:22;154:14,
16;157:5,7;166:18;
168:12,19;169:10;
171:2,3;174:15;
180:24;243:8;244:14,
15
**looks (9)**
16:10;62:2;115:22;
148:8;169:24;211:1;
281:6,8;282:19
**loose (1)**
31:23
**lose (1)**
285:17
**loses (1)**
158:9
**loss (1)**
306:3

losses (1)
287:19
lost (3)
55:9;131:21;156:8
lot (46)
16:24,24;17:1,11;
19:10,15;21:16;22:1;
23:4;27:5,6;29:19;
31:16;35:3,5;38:21;
45:12;50:1,1,3,6,9,10,
12;82:12;102:9;
105:23;138:9;165:13;
172:18;191:20;193:1;
200:6,9;247:21;
263:19;273:12,12;
275:24;276:20;277:19;
278:5;291:21;299:2,3;
315:1
low (1)
288:12
lower (1)
107:18
Loyola (1)
24:25
LT (1)
5:21
Luckily (1)
246:17
lunch (5)
91:2;186:23,24;
191:11;209:13
lying (1)
308:18

M

Macfarlane (31)
66:14,17,18,25;70:4;
73:12;84:15;86:20;
87:17;88:17;92:3;
115:23;118:5;120:17,
20;121:20,25;122:2,22,
23;124:12,14;127:4;
137:2,10;140:25;
148:17;149:1;169:17;
172:23;272:19
Madam (4)
93:16;254:8;281:21;
321:9
magistrate (8)
225:6;313:23;314:3,
5,7,20;315:19,22
magnitude (2)
56:15,15
Maiden (8)
115:22;116:3;
183:13;186:17;238:24,
25;239:23;240:13
mail (3)
65:13;174:25;264:4
main (4)
81:12;257:2;273:7,7
maintain (2)

163:14;313:10
maintained (1)
68:1
major (1)
30:4
makes (10)
10:15;37:4;52:5;
70:3,3;120:11,12;
230:9;245:2;259:12
making (11)
20:3;81:11;114:5;
115:11;127:22;135:1;
259:19;319:11,11,13,
14
male (1)
188:8
Man (1)
93:6
management (4)
26:6;81:2,4;95:19
manager (4)
65:17;67:6,18;107:4
managing (1)
52:3
many (30)
21:13,14;22:12;
29:13;30:23,24;31:14;
33:13,14;37:25;38:9;
49:22;52:20;57:5;
78:23;82:19,20;102:4;
114:12;167:6;191:17;
196:23;197:6;209:22;
224:14;239:6,11,20;
279:13;318:2
map (1)
259:2
Maps (1)
246:20
marijuana (2)
232:3,7
Marine (6)
13:14,15,16,20;15:6,
9
Marines (1)
23:9
mark (2)
135:5;149:5
marked (8)
93:17;94:6;126:2;
134:1;149:8;157:10;
282:7;301:19
marked-up (4)
123:17,24;126:1,4
market (2)
51:18;142:5
marking (1)
93:16
markings (1)
267:13
married (7)
57:13,16,19,24;58:1,
10;242:13
materials (1)

168:6
math (2)
83:3,4
matter (14)
17:9;25:20;40:21,22;
41:10;135:13;138:7;
151:2,4;164:20;
189:14;208:19;225:8;
319:16
matters (2)
165:2;189:22
may (33)
8:14;15:25;33:4;
43:21;52:24,24;54:3;
72:22;81:2,3,4,5;
111:14;134:23,23,24;
139:2;140:9;149:5;
151:11;159:16;162:10,
10;168:12;169:2;
185:5;186:3;189:12;
220:4,5,5;240:7;311:2
maybe (36)
10:10;20:14;21:19;
24:2;46:17;63:18,20;
65:16,17;69:14;71:25;
74:21;96:11;101:15;
105:17;107:18;115:8;
129:4;137:22,23;
141:1;154:8;158:23;
165:13;169:10;179:7;
190:13;204:3;217:9;
220:20;237:18,18;
239:16;265:18;266:3;
273:20
Mcfarlane (19)
202:2;214:17,19,23,
24;269:19,20;270:3,10,
13,24,25;274:15;
286:17;289:20;290:4,
9;311:8,15
Mcfarlane's (3)
271:18;272:24;
273:19
Mckee (3)
204:4;211:14;235:7
mean (86)
10:5;11:21;18:18;
27:8;28:6;29:21;31:3;
39:23;40:17;44:19;
45:12;46:14;53:3;
54:18,18,20;56:8,14;
58:3;62:18;72:13,22;
77:11;79:9,19;90:9;
101:3;102:17;104:10,
10;105:5,7;109:6;
110:2;112:1;114:10,
10,24;117:2;139:14;
141:12;145:9;147:9;
156:9;165:10,10;
166:11;168:19;170:17;
171:19;172:8,12;
173:21;187:7;193:19;
196:18;198:18;204:15;

206:2;215:21;217:17;
218:1;219:9;232:23;
233:21;234:10;239:10,
25;246:16;250:12;
253:20;261:20,24;
262:9;265:24;266:3;
276:19;286:2;288:25;
293:13;295:2;297:4;
302:6;304:13;317:3,11
means (8)
104:12,15;106:2,4;
107:17;109:2;143:5;
301:6
meant (10)
5:25;31:8;56:6;
74:16;110:13;160:2,
11;216:2;222:25;
225:18
meat (9)
124:5;127:22;142:5,
17,18;218:14,16;219:7,
10
Meats (5)
142:2,3,4,24;213:10
Media (14)
4:6;76:22;108:10,12;
180:4,5,9;181:5,18;
182:3;209:18,21;
307:9,12
meds (1)
10:19
meet (3)
58:25;66:22;269:17
meeting (2)
28:5;68:3
Megan (2)
125:16;149:15
Melanie (24)
73:13,15;75:9;91:7;
123:2;127:9,25;
129:17;136:24;137:2,
16;140:24;143:24;
148:12,13,17,25;
175:25;178:17;183:21;
193:13;201:24;272:17;
286:4
member (1)
13:24
members (2)
159:1,8;189:6
Memorial (1)
9:9
memory (17)
18:6;122:8;124:1;
131:6;132:18;168:18;
204:19;205:5,9,12;
220:25;241:16,18;
244:25;245:1;254:13;
259:17
mention (9)
216:21;217:3;240:2;
245:2;271:21;272:15,
17,19;302:17

mentioned (11)
88:23;227:1,13;
231:8;262:18;272:6,8;
284:5;308:13,25;
318:25
mentioning (1)
184:10
mentions (3)
182:6;184:3;272:7
merge (1)
271:8
merit (1)
173:13
message (4)
174:2;281:7;287:4;
300:17
messages (9)
178:19;275:21;
279:11;291:11,15,18,
21;299:25;301:20
met (21)
6:2;55:21;56:20;
58:22;59:9;65:24;
67:15,18,23;68:1;74:6;
86:14;204:16;256:21;
257:2,16,23;258:17,18,
24;302:22
Michael (7)
6:8;77:16,19;78:5;
100:1,2;277:2
M-I-C-H-A-E-L (1)
6:8
Microsoft (1)
138:4
mid (4)
186:20,20;192:10;
292:15
middle (4)
6:7;100:8,9;159:7
midnight (2)
159:15;270:21
might (29)
8:15;9:9;11:22;25:2;
27:8;32:5;41:14;61:13;
87:2;125:25;148:19;
149:19;157:13;165:16;
169:18;172:9;184:5,6;
202:8;220:10;221:9;
222:19;251:9;262:2;
286:14,20,25;293:11;
307:6
migrate (1)
217:19
Mike (1)
99:22
mile (2)
229:10,11
miles (2)
257:5;258:24
military (2)
13:8,12
mind (20)
40:9;48:15;113:7;

158:17,20;163:17;
172:9;173:7,9;223:6;
225:18;235:7;263:17;
265:11;272:10;281:18;
303:15;316:9;317:14;
318:5
**mine (5)**
86:21;113:9;147:25;
261:17;283:6
**Mini (2)**
246:3;262:15
**minimize (1)**
172:2
**minimum (1)**
259:10
**miniscule (1)**
39:7
**minor (2)**
27:12;217:3
**minor's (1)**
154:21
**minus (1)**
95:8
**minute (2)**
129:4;270:18
**minutes (24)**
73:6,7;76:21,25;
77:1;129:4,5;140:4;
211:14,15,19,24;
212:19;245:22,23;
246:22,23;248:7;
249:10;255:4,5;
273:20;307:7;320:6
**mischaracterize (1)**
121:1
**misdemeanor (1)**
23:5
**misinformation (1)**
24:10
**miss (4)**
27:4;173:22;301:13;
319:2
**missed (4)**
9:22;26:7,22,22
**missing (10)**
25:11;88:11,14,19,
20;100:24;121:3,6,6,12
**mission (1)**
60:17
**misstate (1)**
37:16
**Misstates (6)**
37:15;135:21;234:1,
18;309:21;311:10
**mistake (1)**
134:10
**misunderstood (1)**
37:13
**mitigation (1)**
262:16
**mode (1)**
244:8
**mom (3)**

88:15;140:18;217:18
**moment (27)**
31:9;55:3,14;60:7;
64:4;76:15;91:6;93:19;
108:9;146:14;149:10;
157:9;160:22;162:4;
164:6;169:25;180:11;
202:21;203:23;250:7,
18;255:10;265:11;
282:1;311:25;312:9,10
**moments (1)**
312:10
**Monday (8)**
5:4;122:24;177:2,2,
3,13;194:19;196:6
**money (8)**
39:25;55:12;62:15;
141:17;153:7;156:17;
158:10;187:6
**month (1)**
138:17
**months (7)**
14:8;39:6,13,15;
71:4,4;152:8
**morbid (1)**
18:2
**more (38)**
13:1;17:11;22:14,21;
23:2,2,2;29:9;30:8,13;
31:8;33:21;44:16;
45:15;47:23;48:15;
56:14,16;63:18;65:8,
10;82:20;106:12;
107:15;169:9;188:21;
192:24;197:13;200:9;
208:9;229:19;259:24;
260:19,24;265:17;
307:5,6;319:5
**Morfin (3)**
4:10,12;5:3
**morning (9)**
90:17;130:18;152:5;
163:8;194:4;232:3;
271:20,20;292:15
**most (6)**
17:4;19:21;22:38:18;
251:12;291:12
**mostly (1)**
243:17
**mother (4)**
122:3,23;306:18,20
**motion (2)**
21:24;214:9
**motivated (2)**
109:10,23
**Motivation (2)**
106:21;109:5
**mountains (2)**
35:13,14
**mouth (2)**
217:16;314:17
**move (7)**
13:4;25:4;156:22;

180:24;275:20;284:16;
317:13
**moved (6)**
13:6,7,9;196:14,14;
284:14
**movie (1)**
87:22
**movies (4)**
45:18;241:7,9;286:2
**moving (10)**
55:15,15;100:7;
104:4;120:13;137:7;
205:13;208:13;293:3;
300:3
**much (22)**
9:16,20;12:13;30:8;
31:21;45:2,8;48:6;
62:5;76:23;228:14;
236:14,18;266:6;
268:19;273:7;277:15;
291:2;298:3;320:4,5;
321:10
**muddied (1)**
190:10
**muddies (1)**
190:10
**multiple (6)**
34:11;52:21;53:7;
56:19;207:3;225:5
**murders (1)**
276:15
**Muse (69)**
55:17,25;57:22,23;
58:17,19;61:17,22;
62:1,1,7,20;63:4,7,16;
64:9,15,19,24;65:1,24,
25;66:1;71:12;115:22;
125:17,19;149:17;
156:12,22;157:1;
160:19;164:10;166:7;
169:17;184:21;193:21;
194:3;199:2;213:24;
214:1,4;215:1,4,7,15,
17;216:8;218:20;
270:2,4,25;272:15;
277:9;280:9,19;281:3,
7;286:16;290:13,18;
291:19;294:15;296:5;
298:14;302:23;303:10,
16;311:17
**Muse's (2)**
62:13;160:23
**must (8)**
84:10;105:12;
140:14;159:17;163:14;
171:17;178:1;235:13
**muted (1)**
93:5
**myself (9)**
20:3;33:5;64:17;
129:19;151:22;165:4;
200:13;224:15;238:8

**N**

**name (40)**
6:4,7;34:19;55:20,
23,24;56:23;57:12;
58:19;67:12;71:7;75:4,
4,21,23,24;77:8;89:20;
97:8;98:13;99:23;
100:1;116:6;141:10;
143:8,13;144:3;
147:24;188:11,13;
216:22;238:24;246:3;
249:18;255:25;256:5;
262:14;269:23;277:4;
309:12
**named (7)**
27:11;55:17;66:14;
70:23;71:3;74:21;
300:17
**names (12)**
6:9,11;66:8;115:22,
24;121:8,9,10,14;
240:13;242:12;278:8
**Napa (20)**
116:4,8;181:23;
183:10,15;184:9;
186:18;191:9;194:8;
196:18;198:19;200:22;
202:19;203:8,13;
204:13;217:23;226:23;
238:2,9,9;239:4,5;
240:20;243:3;257:7,
11;269:7;276:10
**narrative (26)**
83:11;111:15,16;
112:12;114:6;120:13;
136:8,8,9,10,11,12,12;
144:1,2;149:9,12;
179:7;204:14;213:23;
214:16;217:2,20;
241:18;265:17;282:20
**narratives (5)**
94:18;95:20;96:5,8;
113:11
**National (6)**
106:14,14;107:2,7,9,
13
**nature (3)**
158:1;277:23;307:20
**nauseous (1)**
55:11
**necessarily (1)**
206:14
**need (32)**
11:12;16:24;40:7;
54:1;70:19;72:24;
76:15;77:8;83:3;91:19;
103:1;112:24;134:3;
156:19;171:7;197:20;
236:23;265:25;274:17;
279:24,24;282:2;
291:6;295:15;297:1,2;

301:6;311:22;316:21;
321:8,9,10
**needed (8)**
77:17;78:13;89:8;
123:3;127:10;128:23;
206:6;212:23
**needs (3)**
16:25;213:15;254:11
**negate (4)**
316:10,24;317:15,16
**negative (1)**
182:9
**neighbor's (1)**
229:6
**Neither (1)**
18:1
**new (11)**
19:19;107:4;111:14;
117:17;217:24,25;
247:7,18,19;248:3,8
**news (2)**
28:21;81:18
**next (29)**
18:9;92:7;110:19;
137:7;139:21;158:25;
165:13;167:11;168:2,
14;178:24;182:22;
208:13;221:15;260:8;
280:13,13,17,21;281:8;
288:22,23;294:4,14,22;
295:5;302:11;317:8;
319:24
**nexus (1)**
38:4
**N-I-B-E-R (1)**
106:16
**NIBERS (10)**
106:12,13,14,16,20;
107:3,24;108:21;
109:7,12
**nice (1)**
178:10
**nickname (1)**
6:12
**night (12)**
27:3;29:23;50:13;
134:11;197:17;204:11;
206:1,4,6,7;270:9;
271:16
**nine (4)**
159:13,15,17;232:14
**Nobody (2)**
75:11,13
**nod (1)**
8:11
**non (1)**
87:12
**noncompliance (1)**
158:3
**None (12)**
75:12;103:14;
109:22;121:7;142:12;
197:2,3;208:2,3,11,17,

18
**nonetheless (2)**
290:23;296:11
**nonprofit (3)**
59:24;60:15;61:7
**nonprofit's (1)**
60:17
**nonresponsive (3)**
214:9,10;317:13
**nonsense (1)**
266:8
**non-sworn (1)**
32:23
**noon (1)**
186:21,21
**nor (2)**
18:2;77:7
**normal (4)**
10:10;57:8;284:19,
20
**North (4)**
78:25;268:8;269:14,
15
**northbound (1)**
268:7
**Northcutt (109)**
4:16,16;7:17;9:18;
22:9;23:10,14,21,25;
25:15;26:14;28:21;
37:15;38:10;41:22;
44:12;46:1,17;50:24;
52:25;53:5,8,13,16,21;
54:2,6,13,16,21,23;
58:4;60:5;72:7;82:9;
93:21,24;94:3;96:15,
17,19,22;97:22;98:4;
107:13;134:4,6;
135:21;148:2,4,20;
151:10;153:1,17;
154:22;160:8;167:18;
193:10;197:8;204:8;
209:15;211:17,23;
212:1,3;217:5;219:12;
234:1,8,18;239:17;
256:5,12,15;264:15;
265:24;266:4;278:1;
279:17,19,25;280:4;
287:23;303:2,13,17,24;
304:8;305:10,18;
307:5,13;308:1;
309:11,23;311:14,22;
316:12,19;317:18;
319:19;320:10,15,19,
24;321:12;322:5,18,21
**note (3)**
314:1,1,2
**noted (1)**
313:22
**notes (5)**
80:25;170:3;175:20;
308:10;318:4
**notice (3)**
5:7;182:19;284:25

**noticed (2)**
165:16;183:10
**notification (1)**
27:7
**notified (7)**
26:4;89:9;202:11,12;
256:22;269:18;311:1
**notify (1)**
248:17
**notifying (2)**
62:23;256:22
**November (2)**
321:1,2
**number (42)**
84:16,20,21,22;
86:15;87:18;94:8;
98:16,17,18;100:4;
102:2;103:2;108:3,5,6,
7,18;111:25;117:9,10,
11,13,19,22;141:13,15,
20;144:14;179:23;
181:22,25,25;246:10;
259:22,23;268:10;
289:20;292:5;300:22;
304:24;309:7
**numbers (9)**
97:22;98:9,10,19;
99:2;117:16;141:11,
23;312:9
**numerous (1)**
267:19
**nuts (1)**
241:18

## O

**o0o- (2)**
5:8;324:21
**oath (4)**
12:5,8;35:24;108:18
**object (1)**
101:3
**Objection (40)**
7:17;10:7;23:10,14,
22;37:15;38:10;41:22;
44:12;50:24;52:25;
53:4;72:7;82:9;148:20;
153:17;154:22;160:8;
167:18;193:10,23;
197:8;211:17,23;
212:1;217:5;219:12;
234:1,8,18;287:23;
304:6;305:8,12;
307:24;309:21;311:10;
316:12,18,20
**objections (5)**
10:5;25:15;26:14;
266:8;316:19
**objects (1)**
219:16
**obligated (1)**
232:18
**obligations (6)**

19:25;155:3;225:3;
226:1,18;314:8
**Obtain (2)**
104:8;181:24
**obtained (1)**
104:7
**obtaining (1)**
311:4
**obviously (31)**
18:20;34:3;38:4,6;
49:12;50:6;61:25;
69:13;88:17,18;89:8;
92:8,13;100:17;115:3;
124:15;199:20;201:22;
208:9;223:2;235:6;
241:20;242:20;246:13;
264:1;276:13;284:1;
286:6;289:23;290:12;
313:23
**occasionally (1)**
79:18
**occasions (1)**
37:19
**occur (3)**
29:20;133:22;150:13
**occurred (8)**
20:18;100:14,15,16,
17,21;124:16;158:21
**occurring (4)**
102:25;103:4,7;
198:2
**occurs (1)**
169:24
**odd (2)**
38:14;259:20
**off (98)**
17:8;28:19;31:3,12;
33:7;35:17,18,20;36:3;
40:7;43:2;55:1,3,4,6;
60:7,8,10;62:23;72:20,
21;76:17,19;77:3;
80:11;82:5;88:19;92:1;
96:24,25;97:2;108:11,
13;112:20;126:13,14,
16,20;133:13,14,16;
147:16;158:16;164:22;
171:8;176:9;177:2,3,4,
13,15;178:4;180:8,9;
187:20,24;198:19;
206:23;209:15,16,17,
19;222:14;223:5;
228:6;230:10;248:9,
23;249:8,9;250:17,19,
21;259:4,18;260:10,15,
24;263:10;266:9,10,
12;273:22;286:22;
300:7,8,10;307:3,8,10;
310:16,18;311:25;
312:1,3;321:15;322:2,
9
**offend (1)**
5:24
**Offender (3)**

110:2,3,9
**Offense (2)**
106:23;109:18
**Offenses (2)**
106:8,9
**offensive (1)**
74:17
**offered (2)**
126:7;263:11
**offering (1)**
137:5
**office (57)**
4:9;18:10,25;19:2;
21:6;31:17;32:12,13,
18;46:4;8;52:6,7,9,12;
65:16,16;78:20;81:25;
97:16;104:13,24;
116:9;122:24;160:4;
178:5;187:16,17,18;
189:7,23;191:9;
201:11;203:12;205:23;
213:12,25;226:24;
238:2,9,10;241:21;
257:1,2;283:12,14,24;
284:13;295:19,24;
296:2,3,7,8;298:2;
300:4;309:15
**Officer (41)**
5:15,17;7:6,8;16:4,5,
6,9,11,12,20;17:15;
18:5;19:1;26:5;28:8;
32:2,3;33:15;35:24;
75:1,3;79:20;82:4;
97:25;105:11,11;
106:9;150:20;171:14;
183:17;224:1;227:17;
250:24;276:16,17;
279:12;301:8;306:24;
310:9;312:23
**officers (17)**
7:14;19:19;31:17,20,
21;32:9,19,20;38:18;
74:20,21,23;82:1,2,6,
14;306:2
**offices (1)**
321:25
**often (7)**
42:17;63:15;138:15;
211:22;223:17;289:25;
290:10
**old (7)**
45:17;50:14;52:24;
75:22;159:18;318:20;
322:1
**older (2)**
62:2,5
**once (30)**
21:14;24:21;35:14;
40:18;63:17,18,18;
112:19,20;113:14,16;
138:19;153:23;170:10;
189:6,25;200:16,17;
202:18;203:12;229:15;

236:22;245:10;261:1;
271:8;284:1;289:23;
295:23;301:7;322:23
**on-duty (1)**
257:18
**one (147)**
7:25;11:6;12:25;
17:15;19:6;21:6,9;
26:1,16;27:1,2,11,23;
29:3,4,9,10,11;34:14,
17;35:17;37:19;38:1,3,
13;39:3,4,9,15;40:5,18,
18;41:16;45:17;47:13;
48:9;51:4;56:24;66:4,
5,19;71:16;75:17;80:1;
85:5,6,19;89:20,22;
91:5,17;93:18,19;94:1;
96:24;98:12;100:9;
103:14;107:15;112:10;
114:4;117:3,19;120:7;
123:16;126:13;129:20;
131:5;136:17;140:8,9,
13;144:19;153:9;
155:25;158:18,23,25;
160:4;161:9;164:10;
165:18;167:12;174:12;
179:17,18,19;181:14;
188:3;189:6;195:21,
23;197:5;204:5;
207:19,20;216:24;
221:22;222:9,9;
223:25;225:4;226:3;
228:6;231:4;233:7,8;
236:9;238:12,22;
243:14,23;248:12,18,
23;250:18;255:17,18,
19;259:11;262:19;
264:6,7,15;268:23,25;
269:1,1;274:20;
277:16;278:1,13;
280:5,13;281:1;
287:19;288:12;294:4,
4;299:25;300:16;
308:20;309:8;313:18;
318:8;322:12;324:9
**ones (8)**
14:19;31:2,7;38:12;
78:25;80:19;157:7;
268:12
**one's (4)**
42:3;43:14;126:2;
247:6
**one-way (1)**
45:5
**online (6)**
90:4;91:8;92:20;
145:21;146:8,15
**only (33)**
7:25;29:4;41:16;
55:21;58:22;62:19;
67:11;68:24;69:5;
79:12;86:24;94:1,8;
124:4;127:23;140:1;

147:8,12,13;151:19;
160:18,19;163:25;
179:17,18;182:15;
197:5;203:1;219:10;
247:1;279:19;299:23;
321:3
onset (1)
289:11
onto (2)
147:1;243:7
open (4)
34:13;81:5;221:22;
223:3
opened (1)
105:1
opening (2)
134:16;179:22
openly (1)
276:3
operate (3)
164:20;166:2;206:3
operation (1)
35:11
operations (1)
81:11
opinion (11)
22:17;226:22,25;
227:12;231:20;233:22;
237:2,20;264:23;
304:3;314:7
opposed (2)
221:25;257:11
option (5)
89:6;247:2,5,10,14
options (3)
16:25;208:18;247:1
order (13)
53:19,22,23;54:3;
56:15,15;126:25;
127:1;233:19,19;
281:10,17,19
ordered (3)
312:25;322:15,16
orders (1)
143:15
ordinances (1)
132:24
ordinarily (2)
79:14,17
ordinary (2)
290:11;291:20
Oregon (1)
322:1
organization (4)
60:14;190:2;245:8,9
organizations (3)
47:24;48:4;54:12
original (8)
113:12;119:7;194:8;
203:16;282:14;321:18,
24;322:25
originally (1)
112:12

OT (3)
198:11,12,13
others (5)
31:11,13;66:6;239:4,
5
Otherwise (2)
229:23;316:10
out (111)
19:8,15;25:4,8,10;
26:3;27:3;31:24;35:13;
38:22;42:7,8,11,15;
44:1,24;48:9,11;60:2;
63:9;68:18;69:3,3,17;
71:14;74:1;77:17;
78:13;79:10;81:4;
83:13;88:12;91:1;95:4;
98:1;103:8;107:16;
108:10;119:6;125:21,
23;138:3;142:15;
144:13;152:8;159:21;
161:19;164:11,14;
170:21;171:19;173:24;
176:11;177:11;178:1;
179:7;183:13;184:16,
17;188:23;199:22;
205:17,19,20;213:17;
217:8;218:21;222:13,
23;230:22;232:1,2,3,
14,14,15;242:19;
245:3;246:18;250:12;
254:17,18;257:18;
261:19;270:24;271:1,
3;279:1,4;290:11;
291:3,11,15,17,19;
295:18,19,22;299:6,8,
13,14,16,19;301:14;
306:3;310:21;312:11;
313:12;315:20;320:5
outside (5)
42:18;43:19;156:16;
242:1;258:21
over (50)
7:9;8:4,4,6;13:23;
14:9;15:25;20:7;21:16;
22:25;26:2;33:6,10;
43:14;80:1;85:10,18;
86:11;107:5;108:20;
135:25;136:4;142:18,
18;151:20;152:24;
161:13;182:10;200:16;
207:1;220:20;227:21;
231:19;234:17;247:24;
248:10;273:5;274:12;
283:11;287:5,6;
300:14;302:1;304:23;
312:12,17;313:3,19;
314:13;316:3
overall (1)
214:3
overheard (1)
198:4
overhearing (1)
253:23

overlap (2)
30:17;31:18
oversaw (1)
19:18
oversee (3)
78:22;197:12;239:13
overseeing (1)
16:9
oversight (2)
20:6,7
overtime (2)
19:16;197:17
overviewing (1)
243:4
owes (1)
141:17
own (12)
39:8;44:17;130:2;
132:24;138:22;148:16,
22;155:15;189:12;
218:2;231:10;255:25
owned (3)
49:17,19,25
owner (39)
34:16;39:12;65:15;
125:19;149:18,24;
150:6;156:12;188:7;
214:5;217:24,25;
218:4,8,8,10,17,24;
227:3,9,15,23;228:5,
16,19,23,24;230:11;
232:24;234:22;247:11;
275:17;310:25;311:2,
5,16;313:20;318:17,21
owners (3)
62:21,24;228:8
owner's (2)
218:6;311:11
ownership (7)
163:14;218:16,19;
219:9;231:9;235:10;
255:23

P

Paces (1)
260:12
package (2)
97:8;137:16
packet (2)
118:12,22
page (98)
94:8,21;96:4;98:2,3,
8,10;110:19,20;111:6,
7,25;112:2;115:13,21,
21,23;116:10;117:23;
124:4;126:20;127:2;
130:11,20,25;131:3,6,
17;133:20;134:15,15,
16,16,17,18,18;135:4,
8;136:6,7,14;141:6;
143:7;149:11,19;
157:12;159:1;164:7,8;

167:7;174:9,11,15,16,
22;180:21;181:15;
183:17;207:2,7,8,8,9,
11;208:2,3,13;211:4,5,
13;213:19,19,20;
219:23;222:4,5;
223:10,13;225:22,23;
226:20;232:23,25;
234:25;256:13;274:19;
280:13,17,21;282:18,
18;293:3;296:18;
304:22;310:6;312:13;
313:11;317:8
pages (6)
94:8,15,21;95:2;
207:3;312:21
paid (8)
152:2,6,7,10,16,19;
154:8;177:19
pain (2)
94:4;205:8
panic (2)
70:18;246:15
paper (4)
82:12;280:7;281:22,
22
paperwork (5)
24:5;25:21,24;70:12,
13
parade (1)
178:6
paragraph (20)
120:18;123:6;
130:12;134:21;136:14,
17;137:7;157:20;
159:8;167:7,11;
174:22;181:13,15;
233:3;305:23;309:18;
310:22;313:4;315:25
paraphrased (1)
225:20
paraphrasing (3)
120:25;127:17;
306:23
parcel (1)
259:2
parent (2)
164:21;317:8
parental (1)
48:18
parents (4)
7:13,14;49:23;166:3
parking (1)
25:5
parlance (1)
10:11
part (47)
32:5;39:21;48:21;
61:6;75:5;86:10;118:9,
11;138:19;145:11,20;
148:10;168:2,21;
171:14;188:20;189:7;
198:3;200:6,16;

201:20;202:4;219:3,4,
4;220:18,19;221:3;
224:5,16;227:11;
232:16;233:3;238:17,
19;245:12;253:12;
262:13;290:12;295:8,
24;298:23;301:1;
303:16;305:22;307:14;
310:21
participant (1)
143:20
participants (1)
127:24
participate (2)
54:9;159:17
participating (1)
64:21
participation (4)
54:12,13,15;306:5
particular (1)
207:24
particulars (1)
278:17
parties (2)
153:15;189:16
parts (2)
29:20,22
passed (1)
112:20
passion (1)
181:8
past (6)
24:8;55:15,16;76:24;
259:6;267:15
patience (1)
250:24
patrol (11)
16:4,5,6,18:13,21;
20:5,7;26:5;178:2,3;
197:18
pause (1)
189:25
pay (9)
39:20;85:25;126:7;
137:5;151:22;152:3;
187:5;304:12;315:24
payment (2)
150:3,4
pays (1)
24:18
PC (3)
107:21;109:2;227:5
PCF (1)
107:20
PDF (4)
134:16,17;140:13,14
peace (4)
79:19;82:4;306:24;
310:9
peanuts (1)
216:5
pen (3)
267:7,18;268:2

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 104 of 116

LONG vs.                                                    LIEUTENANT JERRY FERNANDEZ
FERNANDEZ                                                           August 21, 2023

**Penal (24)**
30:25;83:16;107:17,
21;109:2;144:23;
224:10,11,20;225:24;
235:22;236:10;237:23;
282:22;306:25;310:11,
17,19;312:17,18;
313:7;319:1,3,8
**penalty (4)**
39:1;305:24;324:1,5
**Pendleton (2)**
13:19,25
**pens (2)**
243:8;267:18
**people (42)**
19:8,19;22:21;29:22;
35:5;37:12;45:15;50:6,
7;52:3;56:10,15;65:5,
12;69:21;72:24;75:8;
77:17;78:13;153:3;
154:3;165:18;187:7;
189:12;190:14;194:17;
196:16;237:12;239:6,
11,20;242:1;249:8;
250:1;258:4,11;
262:20;276:9,24;
278:22;285:7;291:16
**per (11)**
34:4;143:4;144:4;
156:18;230:13;263:12;
270:25;278:13;321:12,
14;322:19
**percent (5)**
42:1,2,3;231:3;
232:14
**percentage (2)**
22:2,7
**perceptions (1)**
240:11
**performance (5)**
24:15;26:17,18,19,
20
**performances (1)**
23:17
**performed (3)**
153:16,18;155:5
**Perhaps (5)**
47:10;95:5;222:9;
319:21;320:20
**period (4)**
9:19;298:19;299:16,
19
**perjury (3)**
305:24;324:1,5
**permanent (1)**
263:18
**permits (1)**
114:23
**person (30)**
10:11;24:4,17,19;
40:23;41:13;44:21;
55:17;66:14;87:18,24;
102:9;110:4,5,13;

128:19,20;138:11;
188:5;191:23;192:1,
19;199:9;201:8,9;
207:24;249:8;286:20;
290:19;294:1
**personal (4)**
102:6,7;273:8;
293:12
**personally (5)**
6:23;49:17,19,25;
84:18
**personnel (3)**
189:14,22;243:4
**person's (3)**
45:10;75:24;113:5
**pertains (1)**
308:4
**perused (1)**
92:8
**perusing (1)**
115:10
**Petaluma (3)**
118:2;202:19;246:7
**pets (2)**
49:13,19
**phone (50)**
63:12;84:20,21,22,
25;86:15;119:19;
120:24;124:20;128:16,
21;129:3;131:22;
165:3;170:5;174:25;
191:16;192:1;214:12;
230:18;243:23,24;
244:2,11;246:9;
259:18;260:3,4;270:4,
6;286:8;287:5,6;
288:18;291:11,13,14,
15,23;292:1;293:8,9,
12,13,13,14,19;298:13;
299:25;300:2
**phonetic (1)**
196:17
**photo (1)**
62:1
**photos (8)**
98:1;118:1,4;228:16;
268:3,9;273:24;274:17
**phrase (2)**
10:16;135:14
**phrased (1)**
319:2
**phrasing (1)**
319:2
**physical (1)**
103:8
**physically (1)**
229:24
**picked (1)**
101:1
**pictured (1)**
181:19
**pictures (3)**
118:6,19;267:13

**piece (2)**
193:3;229:25
**pieces (1)**
280:7
**pig (1)**
91:1
**pigs (1)**
51:17
**pile (1)**
40:20
**pinto (1)**
276:11
**pissed (1)**
278:22
**place (4)**
28:5;207:1;222:23;
304:23
**places (3)**
17:15;132:7;257:17
**Plaintiff (2)**
4:18;5:2
**plaintiff's (1)**
308:12
**plan (7)**
72:23;194:8;203:16;
252:11;265:15,16;
273:4
**planning (1)**
135:19
**plans (1)**
274:13
**plants (1)**
232:7
**platoon (1)**
13:24
**play (5)**
237:16;250:17;
251:2,23;256:21
**played (4)**
251:13;252:1;253:1,
4
**playing (2)**
70:2;254:10
**Please (10)**
6:4;8:9;36:19;63:1;
89:11;127:19;205:12;
217:8;228:25;244:21
**plus (1)**
232:7
**pm (5)**
206:8;211:3,14;
282:9;323:5
**POBAR (1)**
190:11
**point (81)**
9:23;11:11;16:7;
19:20;30:2;31:10;33:4,
11;38:22;46:19;67:12,
13;70:11,17;81:12;
89:10;90:23;91:3;
92:10;101:4;104:25;
105:1;115:17,25;
124:24;138:2,20;

162:2;165:6;166:12,
23;172:10;180:18;
183:3;184:10;186:3;
191:12;192:6;199:12;
200:23,24;201:16;
203:8;217:8;230:23;
242:16;245:24;246:1;
247:2;252:13;255:21;
260:8;263:9,15,16;
266:18;267:20;269:7,
8,17;272:21;274:13;
275:17;276:5;283:19;
284:3;291:18;294:25;
295:1,2,6,11;297:10;
298:1,4,18;299:4,5,7;
302:18;312:11
**pointed (4)**
159:21;310:21;
312:11;313:12
**police (11)**
14:21;15:21,23;16:3,
20;23:13;28:8;32:9;
75:2,3;99:7
**policies (1)**
44:17
**political (2)**
291:2,3
**popped (1)**
60:4
**portion (3)**
53:19;159:6;267:6
**pose (1)**
53:12
**position (12)**
16:2,21;18:11;52:3;
233:23;234:3,6,16;
257:7,8,9;277:23
**positions (2)**
59:22;82:21
**positive (4)**
57:16,18;91:13;
221:11
**possession (2)**
118:4;224:9
**possessory (1)**
155:15
**possibility (2)**
195:6,7
**possibly (1)**
304:11
**POST (25)**
14:7,7;26:23,24;
27:22;28:4,6,12;180:4,
5,7,10,15,18,21;
181:11,18,19;182:3,15,
19;183:18;184:8;
219:22,22
**posted (5)**
145:19;182:17;
183:25;199:18,18
**posts (2)**
182:8,12
**potatoes (1)**

213:10
**potential (5)**
65:25;149:3;189:13;
241:1;315:18
**potentially (13)**
104:15;160:4;
172:10;189:12;190:7,
22,25;192:24;235:23;
239:8;241:3;266:3;
293:17
**Pound (2)**
143:4;144:4
**pounds (2)**
143:11;144:3
**powers (1)**
82:4
**practical (1)**
230:3
**practice (1)**
17:13
**predating (2)**
64:12;293:8
**predecessor (2)**
29:1,2
**preemptively (1)**
168:2
**preliminary (2)**
21:23;284:18
**Prelims (1)**
21:19
**premiums (3)**
157:25;158:18;
307:19
**prepare (2)**
45:22,23
**prepared (1)**
142:24
**pres (1)**
299:11
**presence (1)**
241:20
**presented (1)**
310:18
**preservation (1)**
299:9
**preserving (1)**
299:12
**president (1)**
74:24
**press (1)**
288:15
**pressed (4)**
167:24;286:1,1;
303:5
**pressing (2)**
289:1;290:19
**presumably (13)**
41:2;101:4;130:3;
157:2;179:22;180:2;
214:20;221:19;227:8;
261:21;271:16;294:11;
322:12
**presume (5)**

21:9;49:5;140:24;
254:25;280:10
**presumed (2)**
183:20;249:6
**Pretty (31)**
12:13;31:21;35:9;
45:8;48:6;54:20;58:8;
66:9;128:6;158:11;
179:3;185:1;205:17;
206:20;225:10,11,20,
21;228:14;259:5;
263:6;264:10;268:19;
273:7,15;274:7;
276:15;277:15;279:2;
286:24;291:2
**prevent (1)**
122:5
**previously (2)**
75:22;170:6
**Price (1)**
143:4
**pried (1)**
246:17
**principle (1)**
240:10
**print (4)**
95:4,18,20;138:19
**printed (2)**
91:25;281:25
**Printing (2)**
94:3,4
**prior (20)**
46:21;59:1;76:5,8;
85:1,17;122:13,18;
171:12;185:24;256:20;
258:8,16,17;268:2;
271:22;283:21;286:13;
293:21,24
**prioritized (2)**
22:18,19
**prison (1)**
22:22
**privacy (4)**
23:22;25:16;26:15;
53:17
**private (5)**
36:8;291:11;292:1,5;
293:9
**Probable (15)**
213:23;221:17,24;
222:2,15,23;223:1,20;
230:10;233:17,18;
235:18;237:23;319:5,7
**probably (88)**
8:3;15:2;17:11;
21:24;23:3;33:19;
39:25;40:6;41:16;
44:10,16;46:19;56:12,
16,23;57:6;61:21;
62:19;68:25;70:16,19;
85:5;86:13;90:16;98:1;
101:22;103:19,20;
105:23;106:12;108:3;

111:4,5,13;113:22,23;
114:3,4;120:6;122:16;
127:14;138:16;139:23;
145:12;146:10;165:12;
166:13,14;167:19,20,
23;168:12,17;169:9;
176:25;179:6;181:7;
186:21;191:22;196:21;
204:20,21;211:10;
220:8,19;222:1,4;
224:15;233:9;239:13,
25;250:15;253:14,20;
257:5;260:24;265:16;
269:9;270:20;283:19,
19;288:22,24;291:7;
295:15;302:6;315:10;
320:4
**probation (2)**
39:6,17
**problem (5)**
54:5;184:12;251:4;
294:8,9
**problems (1)**
298:13
**proc (1)**
229:5
**procedure (6)**
71:7;138:8,9;146:14;
284:21;310:15
**procedures (4)**
44:17;309:21;313:3,
7
**proceed (5)**
25:13;54:24;238:3;
245:25;266:19
**proceeded (1)**
26:11
**proceeds (3)**
158:1,19;307:19
**process (9)**
70:15;121:19;
127:21;154:5,12;
247:10;316:10,25;
317:16
**processed (3)**
119:6;142:14;143:1
**processes (1)**
26:4
**produced (10)**
94:10;95:15;96:17;
116:12;137:21,25;
139:19;147:25;165:16;
280:14
**production (4)**
94:10;180:12;
220:23;280:3
**Productions (2)**
4:5;321:25
**products (1)**
20:3
**professional (13)**
55:13;59:14,15,16;
62:10,12;63:14;69:20,

24;73:16;264:23;
295:25;299:15
**professionalism (1)**
72:25
**proficient (1)**
200:9
**profits (1)**
61:2
**program (5)**
14:6,12,13;48:18;
306:5
**programs (1)**
14:15
**project (10)**
51:18;62:17,18,22;
64:18,19;66:23;67:7;
68:6;107:4
**projected (1)**
270:1
**projects (1)**
52:4
**promoted (5)**
19:5,17,20;20:12,18
**proof (3)**
38:5;153:24;216:9
**proofing (1)**
114:4
**proper (3)**
27:7;53:4;78:7
**property (88)**
22:5,15;43:11;49:4;
88:19,20,20;135:20,23,
25;136:4;156:6;
170:16;191:2;193:1,3,
22,24;196:11;204:21;
206:23;207:13,19,21;
208:15,16;224:9;
226:5,11;227:1,2,3,13,
14,15;228:3,7,13,15;
229:8,12,12;232:18;
233:3,6;234:21;
235:14;236:3,7;237:4;
243:7;247:3,8,11,12,
15;255:24,25;256:3;
258:2,22,24,25;259:5,
23,24;265:5;302:14;
304:1,13,17;309:23;
310:24;311:1,1,2,5,7,
15,16;313:2,6,10,18;
314:13;318:6,6,7
**prosecute (3)**
41:14;307:1;319:12
**prosecution (2)**
22:18;104:11
**prosecutions (4)**
37:7,9;290:6,8
**protected (1)**
190:11
**protective (3)**
53:19,23;54:3
**protocol (1)**
170:23
**protocols (1)**

150:23
**prove (2)**
9:25;34:21
**provide (4)**
89:11,17;141:15;
227:4
**provided (20)**
89:18,22,25;90:3,7;
91:13;137:10;145:22,
24;146:3;148:9,12;
178:18;181:25;226:23;
242:15;273:23;305:3,
19,24
**provides (1)**
219:21
**provision (4)**
135:1;159:24;
307:21;313:11
**provisions (1)**
313:12
**prudent (1)**
260:24
**Public (5)**
157:14,15;165:13;
307:22;308:6
**pull (1)**
241:19
**pulled (5)**
28:19;92:20;180:8,9;
242:3
**punch (1)**
208:23
**purchase (2)**
150:2;152:24
**purchased (5)**
214:6,7;215:16;
216:4,7
**purchases (1)**
56:14
**purchasing (1)**
215:5
**purely (3)**
167:3;216:15;293:24
**purge (3)**
138:13,15,21
**purport (1)**
291:16
**purports (1)**
160:24
**purpose (3)**
135:11,17;286:3
**purposely (1)**
235:17
**purposes (5)**
232:21;291:17;
319:10
**pursuant (1)**
5:7
**pursue (4)**
44:23,24;45:4;283:1
**pursuing (1)**
43:22
**pursuit (2)**

42:21;45:13
**purview (2)**
30:2;276:23
**put (22)**
18:1;26:23;35:6;
53:18;92:21;93:25;
108:24;120:9;153:25;
169:15;194:13;201:1;
217:15;235:6;255:13;
263:7;266:8;279:7,8;
281:19;314:17;321:15
**putting (3)**
31:24;219:16;305:11

**Q**

**qualify (1)**
155:12
**quality (1)**
127:22
**quarter (3)**
100:8,9;229:10
**quarters (1)**
100:9
**quasi (2)**
32:9;47:16
**quick (8)**
129:4;200:10;212:7,
8;244:20;265:13,18;
311:24
**quickly (1)**
211:22
**quite (5)**
197:16;224:16,18;
231:5;259:9
**quiz (2)**
208:8,8
**quoting (1)**
196:17

**R**

**racially (1)**
109:10
**Rain (1)**
93:6
**raise (1)**
127:22
**raised (3)**
49:20;231:14;262:13
**ranch (3)**
47:16;49:3,5
**rancher (1)**
50:3
**ranchers (1)**
127:21
**ranching (1)**
50:5
**range (2)**
19:12;144:15
**rank (1)**
21:5
**rap (2)**

44:11;171:22
**rate (2)**
41:20,23
**rather (2)**
96:7;274:3
**ratters (1)**
49:14
**Ray (13)**
255:6,21,23,25,25;
256:1,2;261:6,9;
266:16,16;267:1,3
**Raymond (2)**
256:9,16
**Ray's (13)**
249:17,19;250:6;
254:1,20,21;256:5;
266:17;268:16,17,20,
21,22
**reach (10)**
77:17;78:13;83:13;
125:20,21,23;295:22;
299:13,14,16
**reached (7)**
88:12;183:13;
257:18;270:24;279:4;
295:18;299:19
**reaching (2)**
245:3;279:1
**re-acquire (1)**
34:8
**read (22)**
92:14;97:22;123:14,
20,20;124:8,8;131:5,
10,11;158:6;159:14;
167:14;183:20;186:16;
201:12;205:5;224:23,
24;268:23;281:10;
324:3
**reading (6)**
25:3;125:8;144:2;
174:22;204:18;227:24
**ready (3)**
111:4;203:21;254:6
**real (6)**
17:17;192:25;
228:15;244:20;253:8,9
**reality (3)**
230:3;231:22;311:16
**realize (2)**
60:1;176:3
**really (36)**
7:19;10:14;19:15;
29:25;39:10;40:21;
43:7;48:21;56:22;
66:10;68:24;70:18;
79:10;103:16;109:22;
166:14;189:11;237:18,
19;240:5;246:16;
247:1;249:1;259:1;
262:25;264:6;265:25;
273:10;276:19;280:5;
285:14;297:15;301:12;
302:2;311:24;315:24

**reappear (1)**
134:13
**reason (21)**
11:3;58:11;69:22;
102:23;107:3;113:1;
118:8;119:24;138:1;
139:7;146:17;182:16;
190:7;196:13;207:25;
238:14;243:22;249:16,
24;257:10;295:17
**reasonable (1)**
45:8
**recall (65)**
9:18;31:12;64:1,2;
72:4;80:22;81:6;84:1;
88:4,7;94:11;99:23;
114:20;128:11;129:20;
132:12,14,23;133:9,10;
135:2,3;139:17;
145:14;147:1;148:8,
10;150:18;166:13;
170:1;176:1,6;178:15,
21;184:2,8,10;185:11;
186:1;199:17;202:4,6,
12,20;204:24;206:6;
220:4,6;235:11;240:1;
244:23;252:17;270:7;
272:18,20;273:6;
276:4;285:20;293:10,
15,16,17;298:22;
318:2;321:11
**recalled (2)**
162:6;245:2
**recap (2)**
91:4;265:18
**receipt (1)**
216:13
**receive (5)**
9:13;143:19;168:9;
203:11;205:22
**received (19)**
26:16;40:3;70:12,13;
92:11,18;101:19;
102:18,19,25;128:22;
137:8;140:21;168:12;
169:2;203:7,12;
214:12;295:6
**Receiving (2)**
191:2;271:15
**recently (3)**
55:22;58:22;107:5
**recite (2)**
224:25;225:1
**recollection (18)**
89:10;133:24;134:8,
9;140:17;153:20;
178:12;185:6;201:20;
202:1;204:6;208:7;
217:14;220:8;261:13;
270:16;278:23;296:25
**recommendation (1)**
319:12
**record (87)**

4:2;6:4;17:8,9;35:17,
18,20,21,23;40:7;55:1,
2,3,4,6,7;56:6;60:7,8,
10,11;76:17,19,20;
80:24;94:5;96:24,25;
97:2,3;108:11,13,14,
16;113:8;126:13,14,16,
17;130:16;131:23;
133:13,14,16,17;
184:13;192:4;209:15,
16,17,19,20;219:16;
244:2,12;250:17,19,21,
22;252:1,21;254:9;
255:11;257:8;265:19;
266:9,10,13;300:7,
8,10,11;307:8,10,11;
311:25;312:1,3,4;
319:21;321:16;322:2,
7,9,10,22
**RECORDED (2)**
5:1;241:13
**recorder (3)**
243:20;244:1,10
**recording (9)**
241:14;243:14;
248:13;251:5,13;
253:1,4;282:3,5
**records (11)**
36:25;81:4;95:19,24,
24;101:18;106:7;
112:20;188:4;240:21;
257:9
**recover (2)**
227:2,14
**recoveries (2)**
228:13,14
**Red (10)**
15:20,23;16:3,20;
23:13;26:8;142:17;
258:1,3,18
**Redding (12)**
4:5,10;5:4;32:17;
42:21;75:2,3;99:7,7;
165:11;269:11;321:25
**redrafted (1)**
248:8
**Redwood (1)**
142:18
**Redwoods (2)**
14:20;15:19
**Reed (6)**
101:19,22;102:12,
14,15;179:22
**reemergence (1)**
28:18
**refer (7)**
88:1;133:1;178:18;
204:14;205:10,11,12
**reference (4)**
95:3;96:10;224:20;
319:11
**referenced (3)**
38:1;162:25;307:13

**references (2)**
94:23;131:8
**referencing (5)**
31:6;108:3;118:19;
168:21;298:4
**referred (1)**
132:23
**referring (20)**
32:4,11;88:4;111:9,
25;116:12;120:22;
123:6;130:12,20;
131:16;136:16;137:17;
143:24;146:18,19;
174:20;214:1,3;227:11
**refers (2)**
132:14,16
**refresh (7)**
18:5;124:1;131:6;
168:18;220:25;241:17;
254:13
**refreshed (2)**
244:25;245:1
**refreshes (2)**
204:19;205:12
**regard (1)**
288:20
**regarding (11)**
4:6;62:22;120:21;
127:18;137:12;202:15,
21,23,24;203:3;315:10
**regardless (5)**
104:16;234:14;
285:5;299:19;315:16
**regards (14)**
77:18;80:10;93:11;
96:1,5;97:10;116:19,
19;128:23;307:8;288:6;
296:25;308:6,7
**Regional (1)**
14:22
**register (7)**
141:14;146:11,12;
153:24,25;154:5;
305:14
**registering (1)**
305:13
**registration (9)**
90:4;91:9;141:20,23;
145:20,23;153:24;
164:23,24
**regularly (1)**
117:16
**regulation (5)**
32:3,19;227:17;
241:21;255:2
**regulations (1)**
306:13
**rejected (1)**
213:15
**relate (1)**
18:19
**related (13)**
6:23,25;7:1;31:8;

references (2)
94:23;131:8
referencing (5)
31:6;108:3;118:19;
168:21;298:4
referred (1)
132:23
referring (20)
32:4,11;88:4;111:9,
25;116:12;120:22;
123:6;130:12,20;
131:16;136:16;137:17;
143:24;146:18,19;
174:20;214:1,3;227:11
refers (2)
132:14,16
refresh (7)
18:5;124:1;131:6;
168:18;220:25;241:17;
254:13
refreshed (2)
244:25;245:1
refreshes (2)
204:19;205:12
regard (1)
288:20
regarding (11)
4:6;62:22;120:21;
127:18;137:12;202:15,
21,23,24;203:3;315:10
regardless (5)
104:16;234:14;
285:5;299:19;315:16
regards (14)
77:18;80:10;93:11;
96:1,5;97:10;116:19,
19;128:23;307:8;288:6;
296:25;308:6,7
Regional (1)
14:22
register (7)
141:14;146:11,12;
153:24,25;154:5;
305:14
registering (1)
305:13
registration (9)
90:4;91:9;141:20,23;
145:20,23;153:24;
164:23,24
regularly (1)
117:16
regulation (5)
32:3,19;227:17;
241:21;255:2
regulations (1)
306:13
rejected (1)
213:15
relate (1)
18:19
related (13)
6:23,25;7:1;31:8;

105:16;106:1;119:12;
169:14;178:14;189:25;
206:14,17;263:7
**relation (12)**
63:22,24;65:20;68:2,
7;81:19;82:13;93:14;
109:18;175:17;176:4;
303:21
**relationship (21)**
48:12,13;53:6;59:13;
61:5;62:7,11,14,16;
64:8,9,12;73:15;74:22;
76:11;82:15;83:24;
86:19;186:9;277:5;
299:15
**relationships (1)**
55:14
**Relatively (2)**
20:24;129:4
**release (4)**
227:22;228:7;
234:22;290:13
**released (2)**
230:16;311:2
**releases (1)**
24:19
**releasing (1)**
95:25
**Relevance (7)**
7:17;23:10,14;25:15;
26:14;38:10;50:24
**Relevancy (3)**
52:25;53:3,17
**relevant (5)**
169:18;208:6,11;
238:15;301:21
**relieve (1)**
314:7
**reload (1)**
307:6
**remainder (1)**
13:25
**remedy (4)**
152:25;153:2,6;
158:3
**remember (42)**
8:15;9:8,9;25:2;
33:24;39:1;75:4;87:15,
25;88:1,5;89:16;93:8;
111:13;114:1;115:7;
122:9;125:8;132:21,
22;184:13,20;185:14;
188:18;202:7,17;
210:2;225:11;230:19;
240:13;241:19;246:3;
249:18,21,21,22;257:3;
288:19;297:16;309:8;
310:20;316:6
**remembered (1)**
174:21
**removal (2)**
84:14;126:8
**removed (7)**

155:10;157:24;
163:3,4;235:1;278:22;
307:18
removing (2)
77:11;89:2
reopened (1)
134:13
repeat (1)
316:21
rephrase (3)
10:18;217:15;250:6
replace (1)
209:8
reply (2)
263:25;264:1
report (54)
21:9;25:20;26:2;
40:23;41:13;47:5,6;
88:1,3;91:14;97:11,12,
12,17,18,20;99:8,12,
13,13,20;100:10;105:7,
8,10;106:19;107:11;
110:24,25;111:3,4,9,
24;112:22;119:9;
126:20;136:10,11;
166:14;184:11;201:19;
205:1;214:11,14;
215:1;216:2,3;238:12;
244:20;263:8;268:11;
279:20;282:14;283:1
reported (8)
36:8;52:6;155:10;
156:1,2;213:24;
278:24;289:13
Reporter (14)
4:11,15;5:6;8:7;
93:16,19;135:7;210:1,
3;251:16;254:8;
281:21;321:9;322:3
Reporters (1)
5:3
reporting (7)
105:11;107:2,7,9,13;
109:25;111:14
reports (8)
16:18;20:4;40:3;
104:17;105:13;112:23;
113:2;260:1
represent (3)
4:14;48:6;134:2
representing (1)
70:21
represents (1)
266:16
reprimand (2)
24:7;25:18
request (5)
188:23;193:13;
210:13;283:1;286:6
requested (7)
118:25;137:11;
187:11;204:11,11;
206:1;270:2

requesting (6)
123:1;127:7;187:12;
282:21;283:10;286:1
requests (1)
95:22
require (1)
310:13
required (4)
105:7,9;106:19;
233:5
rereading (1)
115:11
research (12)
129:19,20;130:2;
148:16,22;164:20;
166:2;183:1,7,9;184:5;
188:2
researched (1)
246:19
reservation (1)
55:15
Reserve (6)
19:3,4,5,7;265:21;
320:15
reserving (4)
54:24;320:3,14;
322:13
resided (1)
188:5
residence (11)
170:12;171:11;
188:24;209:3,4;210:3,
4,11;258:8;264:8;
267:15
residences (1)
258:12
resolution (1)
313:2
resolve (7)
123:1;127:7;135:12;
156:16;313:14,16;
319:16
resource (6)
31:16,20,21;32:2,20;
33:15
resources (1)
275:24
respect (3)
168:10;179:4;219:11
respond (7)
8:7;79:14;228:25;
292:14;294:17;296:14;
298:1
responded (9)
89:6;123:2,4;127:9;
130:17;136:15,20;
171:11;191:9
responding (8)
7:6,8;79:10;81:13;
106:9;185:16;229:9;
257:14
responds (1)
294:9

response (12)
8:9;89:25;91:8,19;
93:14;191:21;199:16;
236:22;295:12;296:17,
19;298:4
responses (1)
9:13
responsibility (4)
127:20;150:2,4;
305:15
responsible (7)
20:2;149:18,24;
247:15;256:3;296:3;
318:18
rest (5)
99:2;232:11;320:3,
14,15
restate (1)
148:21
restitution (1)
39:20
restroom (1)
76:16
resubmit (1)
213:12
resulted (1)
231:13
retain (3)
232:19;233:21;295:8
retained (7)
220:15,15;221:13;
225:14;226:12;227:10;
321:25
retaining (2)
70:16;273:3
retention (1)
233:5
retire (1)
72:24
retirement (1)
39:14
return (14)
24:2,3;91:19;123:3;
124:4,5;127:10;227:2,
15;232:18,23;304:11,
17;311:4
returned (7)
24:16;34:22;89:8;
128:24;130:18;227:9;
311:7
returning (4)
265:3;304:13;
311:15,16
review (25)
9:15;46:6,21;47:2,4;
112:23;130:23;132:19;
135:1;144:22;145:20;
147:6,22,23;148:6;
158:4;159:24;168:9;
200:19;211:15;212:13;
220:3;244:20;265:21;
322:19
reviewed (15)

46:7;92:18;139:20;
146:6;158:24;167:2;
169:9;212:15,22;
220:1;248:20;305:20;
317:6,7;322:24
reviewing (3)
148:10;158:5;167:8
revise (2)
53:22;54:1
revisit (2)
53:11,22
revolving (1)
285:12
rifle (1)
16:7
right (658)
5:15,20;7:22,25;8:2,
12,24;9:4,10,12;10:18,
19;11:7,7,10,23,25;
12:10,16,23;13:9,12,
15,22;14:2,18,24;15:4,
4,5,5,10;16:2,23;18:1,
4,4,24;19:9;20:8,8,16,
20;21:13,13,18;22:6;
24:16,20;25:9;26:7,10;
27:11;28:4,15,16,23,
25;29:11;30:6,16,23,
23;33:3,12,12,23,24;
34:7,25;35:16,16,23;
36:3;37:3,7;38:22,23;
39:10;40:2,13,17,19;
41:19;42:1,6,21,21;
43:1,8,23;44:19;45:2,3,
14,16;46:3,19,24;47:2,
6,13,25;49:2,2,20;
50:18;51:6,19;52:8,11,
19,23;55:13,17,19;
56:11,20;58:13,17;
59:12,12,16;60:13;
61:5,14,16,16,19;62:4;
64:2,14,23;65:3,15,21,
22;66:8,13,13,16,24;
68:12;69:2,16,19,22;
70:4,22;71:7,8,11,13,
19;73:7,11,11,21;74:5,
9,10;75:12,13;76:1,4,
10,14;77:1;78:1;79:20,
23;80:18;81:10,15,17;
82:17,23;83:5,15;
84:11,21,24;85:14,18,
24,24;87:1,4,7;88:17,
21,21,21;89:7;90:13;
91:4;92:2,6,17;93:1,1,
9;95:1,8;96:3,6;98:7;
99:11;100:6,7;101:10,
13;102:16,24,25;104:4,
23;105:4,5,15;106:6,8;
107:4,6,11,14,15;
108:16,22;110:4,9;
111:2,19;112:22;
115:7,13,14;116:2,6,
10;117:22;118:14;
119:23;120:2,11,12,24;

121:10,25;122:17,21;
123:16,20;124:11;
125:2,3,10,23;126:10,
19,24;127:17;128:20;
129:16;130:1,5,11,23;
131:2,20;132:14,23;
133:6,19;134:15,21;
135:4;136:7,11;137:4,
7;139:13;140:1;141:2,
5,8,19,25;143:2,22,23;
144:1,24;145:1;147:1,
7,9,21,21;148:18;
149:11,22;150:5,9,21,
22;151:6,7,8;152:23;
153:9,22,23;154:4,6,
21;155:15,24,24;156:2,
4,6,7,8,12;157:9,10;
158:23,25;159:2,7,10,
23,25;160:3,10,21;
161:16,22;162:7,13;
163:10,16;164:2,24;
165:15;166:6,21,24;
167:20;168:1,4,6,14;
169:8,20;170:3,20;
171:11,13,15,16,22;
172:23;173:6,12,18,20,
25;174:8,18;175:5,5,6,
13,16,19,23;176:2,19,
19;178:6,13,22;179:12,
16,21,25;180:10,14;
181:1,10;182:14,22;
183:17;184:3,4,9,9,19,
24;186:12,12,14,24;
187:9;190:13,21;
191:4,10;192:8,14,23;
193:5,12,17,23;194:1,
8,14,22,25;195:11;
196:1,5;197:5,15;
198:17,18;199:25;
201:14,17,24;202:7,24;
203:3,24;204:10,10;
205:4,16,25;206:21,23;
207:17;208:2,12,21,22;
209:7,23,24;210:12,18,
23;211:1,13,13,21,22;
212:4;213:17,22;
215:4;216:4,18,24;
217:2,22;218:4,5,14,
22,24;219:3,7,8,20;
221:12,12,13,14;222:1,
5,7,13;223:9,25,25,25;
224:2,4;225:5,20,23;
226:9,13,17,22;227:16;
228:11;230:4,9,14;
231:7;233:7,15;
234:13,20,23;236:7,13,
18;237:4,22,25;238:6;
239:19,22;240:5,12;
241:10,12;244:25;
245:20,24;247:24;
248:24;249:2,8,25;
250:5;251:1,10,14,21;
252:15,19,25;253:19;

254:3,7,17;256:2,12;
257:15;258:15;259:11;
261:19,21,22;263:9,23;
264:5,7,7,12,14;265:5,
9,10,10,23;266:15;
267:24;268:18;270:15,
15;272:21,23;273:18;
274:8,10;275:3,20;
276:8,13,25;277:13,25;
278:24;280:8,17,24,25;
281:15,25;282:8,8,14,
15;283:6,22;284:12,17,
24;285:10,13,20,24;
286:13;287:2,3,12,13,
18;288:3,4,14;290:18;
291:8;292:11,23,24,25;
293:16,18;294:3,7,11,
13,14,21,23;295:24;
296:10;297:23;298:8,
10,18;299:13,13;300:6,
7;301:2,3;302:25;
303:21;312:7,17;
313:25;314:11,18,23;
315:9,13,17;316:2,8,
22;317:24;318:3,19,
25;319:6,18;320:17;
321:21

**rightful (6)**
227:3,9,15;310:25;
311:16;313:20

**rightfully (1)**
230:21

**rights (12)**
50:7;54:25;55:15;
135:10;190:14;218:19;
219:11;316:10,11,25,
25;322:14

**Ring (1)**
264:11,12,16

**road (9)**
25:5;45:11;229:10;
256:17;257:3,3,24;
259:4,6

**roadway (1)**
7:10

**roadways (1)**
31:24

**rob (1)**
44:21

**robbery (1)**
44:22

**Roblar (1)**
256:17

**role (8)**
18:4;21:11;23:13;
29:12;31:14;36:5;
42:12;51:8

**roles (3)**
18:16,19,24

**rolled (1)**
248:10

**rolling (1)**
267:16

**Rom (2)**
120:7,10

**room (1)**
43:14

**rooms (3)**
209:4;210:5,11

**room's (1)**
43:14

**rotate (1)**
102:11

**rough (1)**
57:6

**Roughly (37)**
6:20;13:24;15:3,25;
20:10,11;27:15;33:16,
22,23;38:3,12;49:23,
25;66:18;73:6;82:21,
25;88:10;114:14;
192:10;198:20,21,23;
205:23,25;240:16;
245:22;246:22;249:10;
250:11;254:15;255:4;
258:23;271:19;272:25;
273:1

**routinely (1)**
231:21

**RPD (2)**
75:1,1

**rule (6)**
114:22;157:21;
158:4,19;307:16;308:3

**rules (63)**
8:3,5;87:16;89:7;
92:21;127:24;129:8,
17,24;131:8,10,11,13,
13;132:2,5,9,20;133:4,
7,21;134:3,18,23,24,
25;144:9,11,12;145:4,
8,9,11,12;146:16,20,
24;148:23;149:3;
156:19;157:2,4,5;
158:2,3,9,9;160:17;
161:22,24,24;162:10,
11,22;163:1,13;167:4,
14;169:12;305:17;
306:13;307:14;318:9

**run (8)**
21:5,6;28:12;61:7;
105:22;158:15;171:22;
292:21

**rundown (2)**
187:2;302:12

**runs (2)**
59:24;60:13

**rural (8)**
27:21;29:15,20,22;
30:9,9,10,13

**Ryan (1)**
4:18

**S**

**Sacramento (5)**

4:7;12:21,22;296:22;
297:25

**safe (2)**
22:12;241:5

**Safety (5)**
157:14,15;171:14;
307:22;308:6

**sake (1)**
96:3

**salary (1)**
198:14

**sale (34)**
88:8,9;90:7,9,10;
124:16;125:11;137:12;
141:3,3;143:4,11,15,
20,25;149:17;150:11,
12,13;151:6,9;154:13;
158:20;161:6,12;
163:24;167:1,4;
245:11;308:7;309:22;
310:2,6

**sales (14)**
36:24;90:11,12;91:9;
101:1;124:22;149:25;
153:11,15;158:13;
160:19;216:13;272:3,4

**same (64)**
9:7;12:3,3,9;23:14;
25:15;26:14;28:25;
47:22;48:6;51:8;69:11;
70:7;81:25,25;82:4;
83:8,9;86:21,22;89:16;
92:9,10,13,15,16;
96:17;100:23;102:9,
11,11;119:22;129:22;
136:6;137:8;139:23;
143:7;146:9,10;
168:19;174:12;185:22;
191:13;205:24,25;
208:14;210:20;224:5;
225:23;226:10;227:9;
234:14;245:8;247:10;
249:16,24;258:19;
280:15;281:25;300:20;
301:8;316:19,20;
322:25

**sample (2)**
232:8,9

**San (2)**
12:19;13:19

**Sanctuary (2)**
208:25;217:23

**sat (1)**
259:9

**Saturday (8)**
163:25;175:16;
192:21;195:15,17,21;
197:24;271:20

**save (2)**
48:8;143:11

**saves (1)**
247:20

**saving (1)**

299:4

**saw (8)**
71:17;102:25;
122:16;124:2;158:7;
180:15;263:10;264:10

**say- (1)**
31:11

**saying (27)**
10:11;18:19;41:11;
88:7;103:18;109:23;
113:10;132:19;154:15;
155:11;156:18;161:19,
20;179:20;213:5,5;
230:3;236:23;249:21;
276:4,6;279:15;298:5;
304:11,17;317:6,7

**scared (1)**
172:10

**scenario (1)**
248:6

**scene (4)**
231:5;232:11;246:6;
248:7

**schedule (4)**
63:21;114:21;115:4;
320:20

**scheme (1)**
267:12

**school (26)**
13:18;25:7;27:17,18,
20,21,24;28:1,2;47:23;
48:15,17,25;56:24,24,
24;58:8,20;61:21,23,
25;62:3;64:13;69:11;
70:5;87:1

**scope (2)**
41:8;63:6

**Scotch (1)**
68:23

**Scrapie (4)**
181:20,20,24,25

**scratch (2)**
163:1;203:5

**screaming (1)**
264:20

**screenshots (1)**
268:14

**scroll (2)**
143:7;174:9

**SDF (3)**
180:1;181:19;182:1

**sealing (1)**
204:10

**search (39)**
32:24;166:18;
185:18;190:17;199:8;
200:3,4,13;204:11;
206:1;207:12;208:24;
209:5;210:6,9,13,16;
212:21;223:12;226:15,
16,25;227:12;231:23;
232:2,15,16;233:20;
235:18;236:17;240:14;

242:8,16,23;247:6,7,
11;257:10;293:18

**second (32)**
35:17;54:23;91:12,
23;96:24;112:7;123:5,
16;126:13;133:13;
136:14;141:9;155:8;
162:25;164:8;169:2;
195:22;220:24;221:21;
222:4;224:1;233:3;
235:20;247:5;254:11;
264:3;265:1;280:5;
303:25;305:1;309:9;
321:16

**seconds (2)**
264:17;270:18

**Secretary (2)**
60:4;74:20

**section (11)**
221:20;222:12,15,
17;228:2;306:11;
307:22,23;308:4;
309:14,17

**sections (1)**
251:5

**secure (1)**
310:24

**seeing (4)**
44:6;87:15;190:3;
217:9

**seek (2)**
34:18;70:19

**seem (5)**
39:18;47:22;50:1;
58:11;72:8

**seemed (1)**
315:21

**seems (5)**
44:20,20;158:2;
222:23;290:19

**seize (2)**
233:2;315:2

**seized (6)**
207:21;208:15,16;
230:12;310:23;312:14

**seizing (1)**
311:3

**seizure (4)**
32:24;257:13;
299:21;311:2

**selected (1)**
13:20

**self-evident (1)**
105:17

**sell (7)**
37:2;64:18,18,24;
65:1;66:3;159:18

**Seller (4)**
143:7;144:3;216:18,
21

**semester (1)**
14:10

**Senator (2)**

125:4;309:15

**send (11)**
32:23;129:1;174:4,5;
175:1;180:6,8;182:16;
200:18;213:16;298:21

**sending (4)**
128:3;130:17;
135:12;175:3

**sense (5)**
10:15;37:4;70:3;
112:24;120:12

**sent (21)**
27:17;46:8;89:13;
91:16,16;113:25;
122:24;128:5,6;
139:20;140:2;148:25;
152:12;194:16,17;
264:13;265:2;281:7;
293:5;303:25;304:10

**sentence (5)**
8:10;39:1;139:21;
167:9;282:20

**sentiment (1)**
217:19

**separate (3)**
47:23;81:24;118:17

**September (3)**
281:6;296:20;299:22

**Sergeant (7)**
19:6,17,20;20:1,9,
14;257:19

**sergeant's (1)**
81:12

**serious (4)**
158:1;276:15;279:2;
307:20

**serve (1)**
60:2

**served (3)**
46:9;302:3,5

**service (7)**
15:11,11;46:13;
70:15;79:10;102:22;
295:25

**serviceable (1)**
206:6

**serving (1)**
29:4

**session (3)**
321:19;322:11,12

**set (15)**
26:1;65:4,5;105:2;
127:19,24;134:13;
138:16;198:19;232:19;
250:12;280:3;300:18;
313:3,7

**settle (1)**
153:4

**seven (1)**
320:5

**seven-hour (1)**
322:13

**several (12)**

12:21;21:24,25;33:3;
37:11,19;62:20;123:9;
138:20;280:7;288:10;
313:3

**severity (1)**
42:25

**Severson (4)**
101:20,22;102:12;
179:22

**shall (3)**
310:24;311:1;312:15

**shame (1)**
93:25

**share (2)**
280:1,4

**ShasCom (3)**
99:19;103:8;104:3

**Shasta (40)**
12:10,14,24,25;
14:20;18:10,21;36:21,
22;38:1;42:8,12;61:4;
73:23;77:12;78:23;
79:3;82:10;120:19;
121:3;123:2;127:8;
131:11;133:4;137:13;
143:25;180:1;184:4;
192:5;213:25;215:6;
232:5;241:21;259:21;
270:2;278:6,12,25;
279:4;303:3

**sheer (1)**
18:2

**sheet (2)**
44:11;232:18

**shelter (2)**
32:15;194:10

**Sheriff (46)**
18:13,14,15,16,20;
20:24,25;21:7,7;32:21;
42:12;77:16,19,20,21;
78:5,8,9,10,11;83:5;
99:4,5,6,10,22,22,24,
25;100:3;120:15,15;
183:15;214:20,20,22,
23;277:1,2,15,21;
278:20,21;286:5,9;
291:2

**sheriffs (9)**
81:14;82:2,20;
103:15,15;178:1;
179:16;257:7;291:2

**Sheriff's (30)**
18:10,25;19:2;21:6;
26:12;31:17;32:12,13,
18,21;41:21;78:20;
81:23;82:19;116:9;
186:18;189:7;191:9;
195:2;203:12;205:23;
213:25;226:24;238:2,
9,10;241:21;257:1,2,12

**shift (3)**
20:5,7;197:17

**shock (1)**

90:24

**shooting (1)**
276:17

**shootings (1)**
276:16

**shoplifter (1)**
228:14

**short (4)**
209:13;273:20,21;
287:11

**shorter (2)**
201:16;320:11

**Shorthand (5)**
5:6;97:9,15;108:19;
279:16

**shortly (3)**
20:17;47:7;70:12

**show (4)**
16:20;48:21;61:1;
85:7,9;87:9,12,13,14;
91:5;102:22;103:8;
153:24;163:6,11,12,15,
20;171:5,23;207:23,
23;208:17;216:13

**showing (5)**
61:21;102:23;115:5;
163:20,22

**shown (3)**
221:4,6,9

**shows (1)**
81:3

**shun (1)**
297:7

**shut (1)**
73:8

**shutting (1)**
134:11

**side (2)**
25:5;45:10

**sign (9)**
25:3;107:8;150:2;
197:23,23,23;258:5;
318:18,19

**signature (4)**
160:23,25;161:1;
211:18

**signed (18)**
150:1,4;161:5,11;
166:3;197:16;200:10,
23,24,25;204:7;211:1,
2,7;234:10;261:11;
313:11;318:8

**significantly (1)**
62:2

**signing (1)**
248:8

**signs (2)**
164:21;223:5

**silly (1)**
130:15

**Silva (38)**
73:13,15;75:9;91:16;
92:3;123:2;127:9,11,

25;129:17;130:16;
136:24;137:2,14,16;
139:20;143:24;144:8;
148:12,17,25;156:18;
168:6,10;181:10,22,23,
24;183:21;193:13,15;
201:24;220:6;236:22;
272:17;303:8;305:3,19

**Silva's (5)**
89:25;91:7;140:24;
148:13;182:3

**similar (2)**
41:15;226:3

**simple (3)**
33:6;190:3;212:18

**simply (2)**
304:13,16

**simulator (2)**
26:23,24

**simultaneous (2)**
194:11;295:4

**single (2)**
224:13,21

**sit (3)**
65:13;212:14,14

**sits (1)**
76:2

**sitting (2)**
138:18;248:7

**situation (6)**
11:9;36:14;158:20;
190:2;257:22;307:20

**situations (1)**
158:1

**six (12)**
14:8;42:23;52:18,19;
66:20,21;67:23;70:5;
86:24;138:25,25;238:2

**sixty (1)**
98:3

**sixty-something (1)**
288:7

**size (1)**
9:2

**skipped (1)**
313:3

**sky (1)**
206:15

**slash (1)**
142:5

**slaughter (6)**
48:10;124:5;142:11;
218:21,21;219:5

**slaughtered (8)**
122:6;142:12,15,16,
25;218:23;219:1;235:3

**slew (1)**
31:6

**slight (1)**
204:3

**slightly (1)**
10:10

**slip (3)**

5:24;272:3,6

**sloppy (1)**
113:10

**small (1)**
69:10

**smiling (1)**
160:13

**snapshot (1)**
119:19

**social (9)**
55:14;59:14;62:6;
180:4,4,9;181:5,18;
182:2

**socially (2)**
68:13;69:3

**societies (1)**
32:8

**Society (1)**
32:14

**soft (1)**
30:15

**sold (17)**
101:2,2,3,16;121:18;
125:16;141:16;144:4;
153:23,23;154:7;
156:12;158:17;217:3,
3,18;309:20

**sole (2)**
98:19;116:12

**solo (1)**
187:15

**solution (2)**
124:4;125:6

**somehow (1)**
62:15

**Someone (37)**
6:11;16:19;17:16;
18:1;25:12;28:14;37:2;
40:12,13;44:22;45:18;
60:5;65:7;73:1;79:21;
95:22;99:18;105:17;
130:7;140:18;184:10;
187:17,18;228:23;
229:6;231:5,11,14;
247:20;256:21;261:20;
296:7,8;298:2;300:4,
17;304:3

**someone's (5)**
119:19;153:10;
316:10,24;317:16

**someplace (2)**
28:15;269:16

**sometime (4)**
101:16;166:9,9;
185:5

**Sometimes (6)**
10:9;70:5;81:18;
90:19;195:9;244:3

**somewhat (1)**
136:6

**somewhere (11)**
80:24;83:2;113:18;
132:6;192:25;196:11,

20;204:7;250:13,14;
254:6
**son (2)**
57:1;58:14
**Sonoma (5)**
246:4;256:22,25;
257:12;268:4
**sons (1)**
56:25
**soon (2)**
265:12;293:2
**sooner (1)**
283:4
**SOP (3)**
228:18;240:22;254:4
**Sorry (38)**
6:8;23:21;42:5;47:3;
50:15;56:4;58:5;78:2,
15;94:5;102:19;
110:14;112:2;122:4;
131:18;134:10;144:9;
148:5;152:4;157:10;
159:5;174:19;187:20;
205:6;214:19;216:5;
221:5;255:12;267:2;
279:18,22;298:9;
303:11,22;304:23;
308:9;316:16;321:23
**sort (5)**
43:23;135:24;
231:21;306:17;315:20
**sorts (2)**
195:8;223:17
**sound (3)**
74:16;241:5;251:2
**sounded (1)**
246:14
**sounds (6)**
136:12;191:20;
208:8;279:6;292:17;
323:5
**South (5)**
4:10;5:3;78:20,25;
79:1
**southbound (1)**
42:22
**sovereign (2)**
258:7,13
**space (1)**
157:19
**speak (29)**
58:25;68:9,10;71:22;
128:15;169:13;175:24;
178:16;179:12;185:15;
191:17;199:1;202:13,
22;214:13;239:24;
261:9;270:4,17;
277:20;289:25;290:4,
5,5;291:9;292:24;
296:23;297:2;299:18
**speaking (7)**
137:1;184:20;
185:14;243:17;252:2;

275:22;295:4
**speaks (2)**
305:9;307:24
**Specialist (2)**
4:4;106:7
**specific (9)**
139:2,5;161:21;
168:21;170:1;212:23;
222:19,20;226:15
**specifically (5)**
184:1;296:9,10;
303:7;307:16
**speculate (7)**
44:13;72:13,16;
239:17;297:20,22;
298:17
**speculating (3)**
58:4,5;278:2
**speculation (7)**
44:12;58:7,12;197:8;
211:17;212:3;278:3
**spelled (1)**
6:5
**spend (1)**
200:12
**spending (1)**
315:1
**spirit (1)**
229:21
**spoke (18)**
59:8;70:9,11,22;
71:9,12,19;88:5;
124:12,12;166:7;
169:16;191:10;199:1;
271:8;288:14,15;302:4
**spoken (1)**
185:10
**sporting (5)**
69:5,6,7,13;70:7
**spot (2)**
229:10;281:25
**staff (12)**
32:23;81:15,16;
82:17,20;121:2,5,12;
188:4;189:6;190:14;
194:19
**staffing (2)**
81:18;82:16
**stamp (11)**
96:7;98:9;108:18;
111:20;113:22;144:14;
268:10;281:17;300:21,
22;301:16
**stamped (7)**
97:24;101:8;123:8,
10;157:12;207:9;
300:14
**stamps (1)**
254:8
**stance (1)**
128:23
**stand (3)**
99:4,6;106:10

**standard (1)**
45:8
**Standards (4)**
28:9,10;157:24;
307:17
**standing (2)**
260:11,17
**stands (2)**
107:21;316:18
**staple (1)**
281:18
**stapler (1)**
301:13
**Starkey (11)**
115:23;188:9,11,12,
13,14,15,18;240:17;
242:11;243:3
**Starkeys (1)**
119:17
**start (9)**
15:1;83:14;168:25;
183:1;192:3;209:21;
210:21;279:12;307:12
**started (13)**
14:6,13;27:2;56:23;
92:11;163:1;165:13;
168:12;169:10;183:6;
188:2;254:9;299:11
**starting (6)**
14:12;140:2;144:19;
179:7;268:12;285:17
**starts (3)**
98:12;144:17;224:5
**State (29)**
5:6;6:4;48:13;60:4;
79:20;131:8,13;
132:19;133:7,21;
134:3,18,24,24;144:11;
161:22,23;162:11;
163:13;225:13;227:9;
278:14,15;305:17;
306:1;321:10,10,14;
324:6
**stated (4)**
122:2;162:5;300:19;
310:22
**statement (11)**
113:5;221:16,24;
222:1,15,23,25;223:20;
233:17;308:21;321:22
**statements (2)**
120:24;276:1
**States (3)**
4:7;13:14;44:4
**stating (3)**
135:22;251:19;308:5
**station (13)**
13:18;21:5;69:25;
78:19,20,22;79:1,2,3;
81:14;102:11;115:3;
142:4
**stationed (2)**
13:16,25

**stations (4)**
21:6;78:23,24;
102:10
**status (2)**
282:19;296:4
**statute (7)**
31:1;34:4;107:17;
108:20;226:2;231:14;
233:24
**stay (3)**
48:24,24;126:25
**staying (1)**
136:6
**steal (3)**
30:1;35:5,9
**stealing (4)**
39:14;44:21;89:1,1
**steals (2)**
44:23;231:11
**steer (7)**
67:6,8,9,10;317:1,3,3
**steers (5)**
51:16;85:6,7;142:18;
163:24
**step (3)**
84:13;243:5;258:20
**steps (1)**
161:19
**stick (2)**
113:12;158:23
**still (50)**
12:4,8;34:13;35:24;
40:22;54:14;58:9,13;
72:23,25;74:25;75:6;
79:12,18,19;82:22;
92:9;108:17;133:19;
137:19,24;149:11;
163:6;205:17,19,20;
207:2;219:17;220:13;
231:1;236:7;237:1;
242:19;250:12,13;
254:17,18;259:21;
261:14,16;262:4;
267:9,10;272:22;
284:4;285:3,3,5,8;
298:24
**stip (3)**
320:8;321:12,14
**stipulate (1)**
322:22
**stipulated (1)**
323:1
**stock (1)**
249:15
**stole (7)**
25:12;37:2;44:8,10;
122:4;217:18;235:25
**stolen (46)**
34:11;35:3;36:20,20,
21;39:8;43:4,12,13;
78:11;83:12;84:4;
88:15,18,19;128:24;
155:13,14;156:5,5;

170:15;187:4;190:25;
191:2;206:24;207:13,
17,19;226:4,4,10,24;
227:2,4,14;228:3,13,
13,22;229:11;259:19;
261:2,3;263:1;304:13;
315:6
**stone (1)**
105:2
**stop (13)**
15:9;45:13,21;108:9;
121:1;123:4;209:7;
218:24;219:1;229:11;
251:23;273:16;304:17
**stopped (1)**
108:19
**story (1)**
273:13
**Stover (14)**
115:24;188:15,16;
240:17;243:12;245:19;
246:1;248:13,21;
249:18;252:22,22,24;
308:13
**Stover's (1)**
308:16
**straight (4)**
254:22,23,24;255:4
**strange (1)**
280:6
**stray (1)**
32:1
**Street (3)**
4:10;5:3;100:12
**streets (1)**
18:21
**stressful (1)**
11:8
**stricter (2)**
134:23;162:10
**Strictly (1)**
73:16
**strike (13)**
6:22;30:24;74:12;
136:25;137:9;150:14;
152:4;214:9;235:8;
250:6;266:23;277:1;
317:13
**struck (1)**
7:10
**structure (1)**
74:14
**studying (1)**
25:2
**stuff (30)**
17:13;21:22;23:5;
30:4;32:1;40:20;44:3;
46:5;48:6,22;70:17;
96:20;100:18;106:23;
111:24;138:13,14;
170:10;174:16;179:7;
189:21;205:13;229:16;
231:21;242:21;276:16;

Case 2:22-cv-01527-DAD-AC    Document 125-6    Filed 11/19/24    Page 111 of 116
LONG vs.
FERNANDEZ

LIEUTENANT JERRY FERNANDEZ
August 21, 2023

279:2;299:2,3;302:13
**sub** (1)
    51:21
**subdivisions** (2)
    51:15,16
**subject** (1)
    45:15
**submit** (3)
    114:10;211:8;229:14
**submitted** (1)
    204:4
**submitting** (2)
    114:6;115:9
**subordinates** (1)
    80:1
**subsequent** (1)
    98:2
**subtitled** (1)
    147:5
**successful** (2)
    48:9;65:10
**sued** (4)
    7:12,14;295:12,13
**suggest** (3)
    135:15,15;209:12
**suggested** (2)
    246:2;270:23
**suit** (1)
    7:2
**summary** (10)
    214:3;215:13,14,18,
    19,20,21,22,23,24
**summertime** (1)
    205:19
**sun** (2)
    206:14;250:12
**Sunday** (4)
    176:3;177:8;193:6;
    272:11
**Superintendent** (1)
    120:20
**superiors** (1)
    20:23
**supervisor** (1)
    19:18
**Supervisors** (1)
    277:19
**supplement** (3)
    112:5,8,10
**supplemental** (3)
    105:13;113:2,11
**supplements** (1)
    112:9
**support** (2)
    125:5;309:16
**supporting** (1)
    307:1
**supports** (1)
    56:18
**suppose** (1)
    213:18
**supposed** (6)
    24:2;90:25;150:23;

205:4;226:11;314:4
**suppress** (1)
    21:24
**sur** (1)
    98:13
**sure** (61)
    8:4;17:21;20:3;
    22:23;23:23;30:12;
    34:2;35:2;38:21;41:6,
    11;42:24;43:3,16;52:5;
    58:8;81:12;93:5;94:20;
    96:16;105:25;106:4,5;
    112:25;114:5;115:11;
    128:6;130:7;132:25;
    134:4;158:11;169:21;
    179:3;185:1;195:6;
    205:7;206:20;221:10;
    236:12;240:6;241:10;
    242:22;243:25;248:12;
    249:11;252:19;253:22,
    22;256:15;263:6,20;
    264:10;274:8;276:21;
    277:17;279:25;286:24;
    314:3;316:17;320:15;
    322:21
**survived** (2)
    86:6,7
**suspect** (12)
    37:1;38:2,5;39:7;
    43:1;170:16,20;171:4;
    241:1,3;249:3;251:12
**suspected** (5)
    88:15,16;122:3;
    184:16;189:19
**suspecting** (1)
    88:18
**suspects** (2)
    115:20;171:4
**swap** (1)
    35:8
**Swastika** (1)
    258:5
**swine** (3)
    49:12,21;51:16
**switch** (2)
    107:16;247:19
**switched** (1)
    107:5
**sworn** (6)
    4:14;5:11;33:5;
    79:19;82:3,25
**syllabus** (1)
    28:11
**system** (13)
    39:11;81:4;95:4,19;
    103:20,22,23,23;107:4,
    14;111:14;117:17;
    229:15

---

**T**

**table** (2)
    9:2;40:14

**tag** (8)
    181:20,20,21,24,25;
    182:1;259:22,22
**tags** (7)
    35:8;261:14,16,25;
    267:9,10;268:4
**talk** (26)
    8:6;38:13;41:11;
    59:2;68:13;69:14;
    70:18;80:14;127:25;
    128:2;141:8;150:12;
    158:25;165:24;166:4;
    186:4;230:19;252:18;
    262:24;286:3;290:8;
    292:9;301:24;302:21;
    308:25;311:24
**Talked** (31)
    45:25;55:21;58:23,
    24;71:17;88:23;95:13;
    185:3,4,5,24;186:1;
    187:23;191:25;202:9,
    10,18;214:18;231:3;
    235:16;286:8,14;
    289:22;291:3;302:6,9;
    308:12;309:3;310:19;
    315:6,9
**talking** (41)
    32:14;46:25;47:7;
    49:15;65:17,17;73:1;
    75:17;81:20;82:10;
    97:20;101:16;146:1,
    14;148:3;160:10;
    163:1;172:23;194:11;
    202:7;222:10;236:24;
    243:10,12;244:22;
    251:7,7;252:8,16,21;
    253:19;272:9;278:4;
    287:16;289:14;290:9;
    306:11;308:14,21,24;
    313:4
**talks** (4)
    62:20;172:22;226:4;
    260:12
**taser** (2)
    16:7,23
**task** (1)
    30:7
**tasked** (1)
    30:3
**teach** (2)
    127:20,23
**team** (3)
    69:11;232:3;257:10
**technically** (5)
    53:3;155:22;216:24;
    233:19;295:23
**tedious** (1)
    168:2
**telecommunications** (1)
    29:19
**telephonic** (1)
    293:24
**telephonically** (1)

189:4
**telling** (7)
    36:4;135:18;187:22;
    215:19;248:17;284:8;
    286:14
**tells** (3)
    83:5;259:14,15
**templates** (1)
    222:8
**ten** (4)
    180:19;224:16;
    264:17;307:7
**tends** (3)
    207:22,23;208:17
**term** (15)
    15:10;16:13;32:4;
    70:14;78:7;101:3;
    132:3;142:11;146:19;
    153:2;230:15;270:13,
    14;287:15;295:7
**terminal** (3)
    245:11;310:2,5
**terms** (2)
    54:2;304:9
**terrible** (2)
    42:10;218:22
**Terry** (1)
    4:4
**testified** (7)
    5:12;21:15;22:3,7;
    120:14;156:25;299:24
**testify** (2)
    11:1;205:4
**testimony** (11)
    9:24;11:16;37:15;
    53:20,25;135:21;
    234:1,18;304:6;305:9;
    311:10
**testing** (1)
    34:20
**texted** (1)
    288:18
**texting** (2)
    291:19,24
**texts** (5)
    282:10;292:12;
    293:4;294:23;296:11
**thanked** (2)
    246:12;268:4
**Thanks** (5)
    5:15;134:6;293:2;
    298:3,14
**theft** (39)
    29:13,16,16,16,17,
    18,20;30:25;31:8,14;
    33:14;36:5,14,16,16;
    40:3;44:19;77:18;
    100:10;105:16,18,19,
    21;106:1;108:23;
    120:16,21;154:17;
    155:11;171:3;215:2;
    228:15;237:20;282:22;
    287:14,14,14,17,18

189:4
**thereabouts** (1)
    321:4
**thereafter** (2)
    68:10;113:19;309:23
**there'd** (1)
    178:9
**therefore** (4)
    208:24;223:12;
    233:20;309:20
**thereof** (2)
    224:6;233:3;324:4
**the-training** (1)
    28:3
**thief** (1)
    37:5
**thinking** (5)
    139:12;156:9,11;
    225:12;258:13
**third** (6)
    50:16;64:6,7;207:20;
    247:10;310:22
**thorough** (1)
    225:19
**though** (23)
    12:8;17:17;74:25;
    103:14;107:18;131:20;
    132:1;139:12;152:21;
    153:10;182:17;184:11;
    220:6;237:4;240:21;
    259:10;264:4;266:18;
    272:3;284:3;285:22;
    303:16;318:9
**thought** (35)
    37:18;39:6,7,11,13;
    41:14;71:1;84:6;
    110:13;134:12;151:6;
    188:13;195:13,19;
    215:25;216:2;234:15;
    237:18,19;247:24;
    249:1;259:4,20;
    261:17;263:22,23;
    272:10;278:13;284:8;
    285:17;288:5;309:4;
    314:16,19;320:10
**thousand** (5)
    27:15;57:8;280:7;
    288:10,11
**thousands** (1)
    29:23
**threatening** (1)
    172:24
**three** (16)
    21:2,6,7;38:3;64:10;
    78:24;140:1;195:5;
    207:19;208:14,14,18;
    239:22;242:2;271:1,3
**three-day** (1)
    287:10
**three-hour** (1)
    198:23
**threw** (1)
    194:23
**throat** (1)

216:6
throughout (6)
13:6;44:4;46:3;
115:15,16;308:10
throw (1)
23:21
thrown (2)
194:9,12
Thursday (5)
93:25;163:22;
175:12;179:1,2
tickets (1)
61:1
ties (1)
277:13
timeframe (1)
287:12
timely (1)
25:20
timer (1)
75:22
time-restricted (1)
90:20
times (26)
21:13,14,17,18,24,
25;22:2;23:2,4;35:3,5;
48:10;56:12;87:23;
138:10;191:17,22,25;
200:6;202:20;228:11;
232:14;243:18;276:7;
285:7;298:19
timestamped (1)
213:9
timestamps (1)
251:15
tip (4)
171:8;248:23;249:8,
9
title (3)
6:1;16:2;316:3
today (15)
5:15;9:24;10:21,24;
11:1,4;20:18;38:13;
45:22;46:22;93:11;
294:18;299:24;315:10;
317:10
together (6)
17:12;62:3;63:10,10;
92:22;140:15
toilet (1)
241:8
told (34)
17:16;77:15,16,22;
83:6;88:5,25;89:6;
120:15;121:23;199:18;
214:20,23;215:24;
216:4,7;217:17;
230:18;231:4;248:13;
249:18;260:23;261:1;
267:4,5;285:16,16,19,
20;286:6,23,24;287:3;
289:2
tomorrow (3)

277:19;292:15,17
ton (1)
265:25
took (20)
27:22;84:13;118:19;
120:9;156:14;166:9;
177:3;184:16;216:19;
230:16;255:5;258:19;
261:3;267:20;268:3,9;
273:24;288:25;301:25;
315:4
top (13)
31:3,12;90:11;98:10,
15;100:8,9;157:17;
208:14,18;228:6;
259:9;296:18
topic (1)
137:1
total (6)
82:24;143:3;144:4;
150:2,3;239:22
totality (1)
282:20
touch (1)
58:13
touched (2)
111:15;257:15
tow (4)
24:4,12,19;229:2
towards (4)
172:24;198:19;
246:25;269:14
towed (3)
24:1,9,21
town (11)
17:14;52:6,7;66:3;
69:10;173:24;176:11,
12;178:7;200:15,18
towns (2)
12:21;52:9
track (4)
37:1;38:18;141:17;
284:4
tracking (1)
100:16
tracks (1)
43:5
Traffic (13)
7:3,4,6;16:8,9,11,12,
13,17;18:5;21:23;23:4,
5
Trail (1)
322:1
trailer (2)
249:15;254:25
train (4)
17:16;19:19;43:5;
285:17
Training (13)
14:22;19:1,17,18,18;
26:22,23,23,24;28:8,
13;150:15;153:21
trainings (1)

14:21
transcribing (1)
8:8
transcript (5)
322:4,8,15,17,23
transport (1)
142:20
transportation (1)
121:13
transported (2)
121:16;122:6
traveled (1)
13:23
travels (1)
251:3
treasurer (2)
74:20,24
trial (2)
9:23;320:22
trials (3)
21:15,19,21
tricky (4)
34:25;112:16;
155:17;236:9
tried (5)
28:17;48:7,10;
174:25;263:25
trip (1)
192:3
trouble (1)
173:2
truck (10)
229:7,9,10,11;
254:25;255:1,1,2,3,3
Trucking (2)
55:25;58:17
true (6)
45:19;70:1;305:16,
25;308:22;324:6
truth (3)
12:7;27:9,10
try (21)
8:25;11:9;36:25;
56:22;64:18,24,25;
65:1;69:24,24;174:4;
178:17;179:13;196:21;
237:13,16;257:13,17;
284:5;295:24;315:20
trying (53)
8:24;19:2;27:15;
34:19;48:8;60:2,3;
66:18;68:22;71:25;
72:20;77:2;78:6;79:21;
89:4;101:6;105:22;
111:23;113:7;114:5;
117:14;121:20;132:13,
22;148:19;155:18,23;
156:23;157:11;158:15;
162:16;169:10,19;
170:21,25;172:1;
177:1;200:12;205:8;
210:21;217:15;227:16;
231:10;235:22;248:16;

250:14;258:13;265:19;
285:18;288:16;314:14;
317:5,21
Tuesday (11)
176:22,23,24;177:4,
21,22,22;194:19;
287:11;294:22,24
Tulare (2)
27:23;28:15
turn (6)
244:8;273:5;310:20;
312:12;313:19;314:12
turned (5)
189:13;234:17;
259:4;274:12;302:1
TV (1)
44:6
twice (1)
63:20
two (29)
27:15;50:13;56:12;
73:6,7;75:12;76:24;
89:15;100:9;117:5;
129:4,5;143:11;
149:14;207:19;238:9,
11;239:4,5,24;240:12;
242:12;248:18;256:25;
257:5;258:23;274:5;
299:25;300:14
Tyler (6)
280:13,15;300:17,
19,20;301:8
type (8)
29:13,15,18;65:12;
111:4,6;113:13;228:15
typed (1)
113:15
typed-up (1)
111:9
types (5)
49:7;79:5,7,7;208:5
typical (1)
143:16
typically (3)
138:17;152:25;153:1
typing (1)
111:12

U

ultimately (1)
296:2
uncomfortable (1)
90:25
under (37)
12:5,7,8;20:24;21:3,
7;31:25;35:24;53:18;
106:11;108:17;150:13;
159:13,15;190:4,11;
224:9;225:3,14;226:1;
233:2;235:22;238:20;
305:14,23;307:21,23;
308:15;310:11;312:18,

19;313:10;314:8;
315:3,5;324:5,5
underlined (3)
159:2,10;310:6
underneath (1)
147:5
undersigned (1)
324:3
understaffed (1)
82:7
understaffing (1)
82:13
understood (10)
40:17;61:12;73:3;
99:10;101:19;104:14;
108:8;110:1;115:13;
160:9
unfortunately (2)
40:24;275:5
Uniform (1)
151:15
unique (2)
109:16;233:11
unit (1)
188:4
United (3)
4:7;13:14;44:4
unites (1)
14:10
units (2)
14:23;143:11
universe (1)
157:4
university (1)
14:16
unless (8)
10:7,12;38:15;55:10;
171:5;177:11;219:17;
311:22
unsafe (1)
161:20
unsympathetic (1)
127:18
up (84)
8:25;11:23;12:21;
16:20;17:19;20:20;
25:7;27:5,6,7;36:20;
42:17,23;45:12;47:8,9,
15,16,19;49:2,9,10,21;
50:18,19;60:4;61:1;
63:12,12;65:6;71:25;
77:5;81:3;88:8;89:5;
98:10;105:1;106:3;
111:12,16,17;126:2;
127:19,24;132:13;
134:13;138:10;139:18;
142:17;143:7;144:7;
149:6;156:15;157:10;
165:11;171:5;176:4;
180:18;183:10;184:21;
190:2;197:17,23,23,23;
199:16,24;208:14,18;
229:7;246:6;249:13,

15;256:21;259:9;
265:22;267:15;268:4;
272:11;273:3;311:23;
318:1;320:12;321:2
**upcoming (1)**
62:24
**update (3)**
9:21;295:23;298:3
**updated (1)**
117:18
**updates (2)**
296:3,6
**upload (1)**
119:25
**Upon (5)**
167:8;311:2,3,4;
313:1
**upset (3)**
72:8,9;297:5
**USDA (1)**
48:13
**use (13)**
6:2;16:25;76:15;
77:8;97:15;132:3;
221:21;223:2,6;244:2;
265:22;270:13;287:15
**used (19)**
16:14;17:15;36:17;
90:23;106:23;110:2,3,
5,9,13,13;210:19,19,6;
212:11,12;243:24;
276:7,8;322:24
**uses (2)**
132:10;146:19
**using (1)**
230:15
**usually (15)**
29:9;30:15;43:23;
50:17;81:19;82:13;
102:10;113:11,11;
153:7,8;173:9;176:14,
16;277:19
**Utilize (1)**
221:22

---

**V**

**vacation (1)**
176:18
**vague (9)**
10:10;41:22;82:9;
148:20;153:1,17;
167:18;212:1;219:12
**Vaguely (2)**
224:12,13
**valid (2)**
316:9,24
**Valley (1)**
51:11
**Vanessa (2)**
209:13;311:24
**Vanessa's (1)**
265:12

**various (2)**
22:4;118:6
**Vegas (1)**
55:9
**vehicle (18)**
7:11;24:2,12;43:4,
12,13,15;173:22;
228:13,22,23,24,25;
229:1;241:21,23,24,25
**vehicles (2)**
229:3;242:3
**verbal (3)**
215:22,23,23
**verified (1)**
255:23
**verify (2)**
211:20;244:15
**verifying (1)**
166:25
**version (10)**
123:17,24;126:1,4;
157:10;211:11,12;
213:3,7,9
**versus (1)**
169:22
**vet (4)**
85:9,14,16,17
**veterinary (1)**
40:20
**via (3)**
88:25;101:16;174:25
**vice (1)**
74:24
**vicinity (1)**
248:25
**victim (4)**
39:12;156:22;214:5;
291:3
**Victims (6)**
290:3,8;291:9,16,22;
296:3
**victim's (1)**
34:21
**video (6)**
4:2,4,5;5:1;264:13;
321:25
**videoed (1)**
8:9
**VIDEOGRAPHER (39)**
4:1;35:18,21;55:2,4,
7;60:8,11;76:17,20,25;
96:25;97:3;108:11,14;
126:14,17;133:14,17;
209:17,20,23;250:19,
22;266:10,13;300:8,
11;307:3,11;312:1,4;
320:1,6,12;321:5,17,
21,24
**videos (2)**
321:18,24
**view (11)**
44:9;102:17,20,20,
24;103:3,5,10,14;

318:6,7
**viewed (3)**
102:24;103:1;318:16
**violated (1)**
319:9
**violation (7)**
208:17;236:11;
310:11,17;319:1,4,8
**violations (1)**
306:25
**violent (6)**
22:5,8,14;23:3;
41:23;45:3
**Virginia (1)**
12:20
**virtue (1)**
160:19
**voice (4)**
243:18;251:19;
252:24;264:3
**volunteers (2)**
121:3,10

---

**W**

**wait (6)**
33:8;54:23;192:24;
195:21;199:24;203:21
**waited (2)**
182:16;196:6
**waiting (2)**
200:14;258:21
**waiver (14)**
90:4;91:8;135:10;
140:16;304:22;305:7;
316:8,9,9,23,23,24;
317:9,17
**Walk (7)**
103:9,9;228:25,25;
241:12,15;268:2
**walked (4)**
243:7;260:10,15;
267:15
**wants (6)**
11:6;112:11;156:15;
171:2;236:13;263:24
**warrant (82)**
123:11,12;166:19;
180:12,14;185:18;
189:2;190:4;199:8;
200:3,5,13;203:7,7,7,
16,19,21,23;204:2;
205:22;206:3,7;207:2,
9,11,12;208:3;211:19;
212:19,21;213:13,20;
221:20,25;222:6,13;
223:4,5;224:21;
225:15;226:15,16,19;
227:7,22,25;230:12;
231:24;232:2,3,15,16,
22;233:11;234:7,14;
235:18;236:8,17;
238:1;242:8,16;247:6,

7,11,18,25;257:10;
280:24;302:11;304:10,
22;309:13;310:21;
312:10,11;313:15;
315:2,3,6,20
**warrants (8)**
208:9;210:20;
211:22;212:10;223:19;
224:14;232:3;233:5
**warrant's (1)**
248:7
**Washington (2)**
12:20;13:20
**watch (1)**
257:18
**water (2)**
90:15;190:10
**way (36)**
45:5;48:25;51:3;
72:11;99:9;103:19;
120:10;140:25;144:13;
169:15;171:7;173:9;
190:18,19;196:18;
220:11,16;230:6;
236:9,10;254:9;255:6;
259:6,20;266:4;
269:16,19;270:20;
271:5,6;273:16;274:8;
278:1;291:4;306:4;
308:20
**ways (2)**
120:5;174:5
**weapon (3)**
110:2,9,12
**website (3)**
145:19;147:1,16
**Wednesday (3)**
120:18;163:21;
194:19
**weed (1)**
125:7
**week (15)**
138:20;154:10;
165:13;166:15,15;
178:25;194:17;286:12;
287:8,9;289:6,6;
294:22;302:11;319:25
**weekend (6)**
165:10;196:4;
197:24;287:9;294:22;
296:12
**weekends (2)**
177:9,10
**weeks (2)**
28:17;138:21
**weighed (1)**
144:3
**Weigh-in (1)**
75:19
**weigh-ins (3)**
75:17,18,20
**weight (2)**
22:20;143:11

**weird (1)**
177:1
**welcome (1)**
259:24
**weren't (10)**
24:2;34:12;106:4;
122:11;152:10;157:5;
208:6;240:7;253:15;
284:9
**West (2)**
51:11;78:25
**What's (11)**
19:4;27:20;75:2;
98:7;169:5;225:19;
244:6;256:5;262:14;
300:21;308:15
**whenever (2)**
194:19;294:9
**wherever (2)**
65:6;194:10
**whiskey (1)**
68:23
**white (2)**
229:7;269:2
**whole (16)**
21:16;31:6,16;80:11;
111:18;113:13,15;
118:11;123:21;124:8;
218:20;249:15;255:2;
289:17;321:3,8
**wife (29)**
40:15;47:20;49:24;
50:12,22;51:1,21;
61:17,25;62:5,6,20;
63:15;64:5,21;65:24;
66:2;86:17,19;186:4;
242:12,14;245:6;
274:8;292:9;299:15,
16,18,22
**wife's (3)**
51:8;53:8;63:6
**wifi (1)**
107:8
**willing (3)**
236:19;245:10;
304:11
**Willows (1)**
43:2
**wind (2)**
42:17;65:6
**window (1)**
287:10
**wineries (1)**
273:16
**wire (3)**
29:16,19,24
**wish (1)**
260:18
**withheld (1)**
235:17
**within (35)**
18:24;21:4;28:2;
30:2;32:18;34:17;

35:10;41:7;43:20;
51:14;61:4;62:21;63:2;
79:20;81:14;89:15;
114:22;132:15;138:20;
139:23,23,25;140:4;
144:15;148:12,24;
211:24;232:19;253:14;
257:5;258:23;276:23;
277:20;278:5;286:11
**without (6)**
69:8;187:17;203:16;
228:8,9;256:22
**witness (42)**
4:14;7:19;22:10;
23:11,15,24;24:1;
25:18;26:16;38:12;
46:18,23;50:25;58:5;
148:5;153:3,20;
154:25;167:19;193:11;
209:11;212:4;219:14;
234:2,4,10;239:18;
251:17;256:6,13,16;
264:16;278:3;279:22;
281:22;287:25;303:20,
22;304:7;305:13;
311:12;316:16
**witnessed (1)**
103:15
**witnesses (5)**
44:3;51:4;111:3;
115:14,18
**wonder (2)**
261:16;281:24
**wondering (2)**
220:24;221:3
**word (6)**
56:16;62:14;136:8;
261:3;296:21;297:24
**words (2)**
217:15;314:17
**work (50)**
6:24,25;7:1;15:23;
20:3;31:17;32:12,13,
16,16,20;42:7,11,15;
50:10,12;64:15;69:21;
72:24;73:19;85:16;
95:5;102:11;104:2;
139:2;170:21;172:15,
19;177:3,7,9,10,15,22,
22;178:11;179:2;
192:21;195:15;197:17,
23;284:6,9;291:13,14,
15,23;293:14;294:18;
320:19
**worked (8)**
18:5;19:14;176:20;
177:2;238:20;240:21;
271:1,3
**worker (1)**
172:11
**working (13)**
15:9,10;23:3;43:21;
47:10;176:7;177:25;

178:1;179:17,18;
198:12;199:8;273:10
**Work-related (1)**
138:6
**works (3)**
74:14;172:12;188:4
**world (1)**
24:20
**worried (1)**
17:16
**worries (1)**
250:25
**worry (1)**
17:18
**worse (1)**
56:16
**Worst (1)**
248:6
**wound (1)**
25:7
**Wow (3)**
21:18;117:8;276:17
**wrench (1)**
194:23
**wrestled (1)**
75:20
**wrestling (1)**
17:4
**write (16)**
8:12;34:15,15;
104:16;111:16;154:15;
171:2;179:7;200:4,4,
12;221:19;223:10;
233:23;236:13;309:7
**writes (2)**
125:3;140:25
**write-up (5)**
23:19;24:13;168:20;
201:19;282:13
**write-ups (1)**
27:13
**writing (4)**
113:18;135:17;
136:1;200:3
**written (17)**
27:5,6,7;38:20;
80:23;91:21;94:18;
95:20;105:8,10;114:6;
132:11;168:24;224:15;
226:18;266:1,6
**wrong (3)**
11:17;45:5;51:5
**wrongly (2)**
24:8,12
**wrote (13)**
111:17;112:13;
124:7;140:18,19,20;
152:11;173:14,16;
179:7,9;215:8;302:10

**X**

**XYZ (2)**

175:21;179:20

**Y**

**Yard (6)**
36:22;37:4;243:7;
256:22;266:22,24
**yards (1)**
36:17
**year (25)**
13:24;15:3,8;16:8,
17;19:22;20:13;48:7;
49:24;63:17,18,19;
64:6,7;65:6;68:2,7;
70:25;71:13,18,20;
80:20;86:13;98:22;
250:14
**years (30)**
16:1;20:10,11,14,14,
15;21:16;34:18;48:9;
52:18,19;56:2;64:10;
66:20,20,21;67:23;
70:5;86:12,24;90:22;
159:13,15,17;167:15;
231:19,19;305:14;
306:12;318:20
**yellow (1)**
268:13
**Yep (3)**
224:7;271:12;292:16
**young (1)**
26:5
**youth (4)**
127:20,23;159:13,15

**Z**

**zero (4)**
197:13;268:15;
279:14,14
**zone (1)**
25:3
**Zoom (1)**
266:6

**0**

**00 (1)**
268:22
**00:30 (1)**
271:19
**0000 (1)**
301:5
**00001 (2)**
97:24;108:19
**000065 (1)**
268:15
**000078 (2)**
301:5,11
**000125 (1)**
279:16
**000126 (1)**
300:18

**000128 (1)**
301:16
**0012 (2)**
283:6,7
**0015 (1)**
222:12
**0023 (1)**
312:13
**0025 (1)**
279:14
**07 (3)**
15:12,13,20
**0700 (1)**
182:1
**08 (3)**
15:2,21,22
**09 (1)**
101:1
**09:00 (1)**
100:16

**1**

**1 (12)**
4:6;94:15,21;95:2;
96:4,19;98:10,10;
108:12,19;110:20;
207:8
**1:00 (1)**
27:2
**10 (3)**
33:18,20;182:17
**10:00 (4)**
88:10;206:11,12,20
**10:15 (1)**
35:19
**10:22 (1)**
35:22
**10:30 (1)**
88:10
**10:49 (1)**
55:8
**10:55 (1)**
60:9
**10:56 (1)**
60:12
**10547 (2)**
4:12;5:7
**109 (3)**
103:8;117:8,23
**10-pound (1)**
232:8
**11 (10)**
94:8,8,15,21,21;95:2,
2;96:4,19;98:10
**11:00 (3)**
110:21;206:11,12
**11:14 (1)**
76:18
**11:26 (1)**
76:21
**11:50 (2)**
97:1;120:19

**11:59 (1)**
97:4
**119 (1)**
141:10
**12:11 (1)**
108:12
**12:30 (5)**
137:14;271:19,19;
272:25;273:1
**12:45 (1)**
126:18
**12:55 (1)**
133:18
**125 (6)**
279:12,16;280:8;
281:11,17;296:16
**126 (1)**
280:13
**127 (6)**
280:17;281:8,11,17;
294:6,7
**128 (1)**
280:21
**129 (4)**
281:3,5,10,17
**12th (1)**
112:4
**13 (3)**
27:16;180:21,23
**13th (1)**
112:8
**14 (1)**
27:16
**14:21 (1)**
209:18
**1407 (17)**
225:24;226:3,4,13,
14,16;228:9;229:19;
230:8;233:24;234:14;
310:20;312:18;313:7,
10;314:8;315:6
**1408 (2)**
312:19;314:8
**1422 (1)**
313:8
**15 (4)**
203:24;207:7;
231:19,19
**15:25 (1)**
209:21
**15:36 (1)**
224:21
**1500 (1)**
207:9
**1536 (10)**
224:10,11;233:22,
24;234:7;310:19;
312:17,18;313:10;
314:10
**15s (1)**
226:15
**15th (3)**
296:20,24;297:23

16 (3)
19:23;39:9;208:2
16:14 (1)
250:20
16:15 (1)
250:23
16:34 (1)
266:11
16:47 (1)
266:14
160 (1)
57:7
17 (6)
19:24,24,24;208:13;
222:12;223:13
17:25 (1)
300:9
17:33 (1)
300:12
17:41 (1)
170:4
17:52 (1)
307:12
18 (6)
114:16,17,17;
305:14;306:12;318:20
18:00 (1)
312:2
18:08 (1)
312:5
18:18 (1)
322:2
1828 (2)
4:10;5:3
1890 (1)
100:11
19 (2)
76:25;77:1
19:32 (1)
204:16
1st (5)
175:16;281:6;
288:23,24;294:12

**2**

2 (6)
115:21,21,23;208:3;
209:18;256:13
2:20 (2)
209:10,11
2:22-CV-01527-DAD-AC (1)
4:6
20 (1)
245:22
2007 (3)
13:2,3;15:2
2008 (2)
15:2;26:9
2009 (1)
6:20
2012 (5)
15:25;18:6,7,8;26:9

2013 (2)
27:16;28:23
2014 (1)
27:16
2020 (2)
159:16,18;161:23;
260:18
2021 (1)
20:12
2022 (22)
20:13,16;74:7;77:12;
88:8;98:25;100:16;
104:5;110:20;111:11;
131:8;132:19;133:21;
134:2,18;138:25;
139:1;144:9;163:1;
213:24;304:2;310:7
2023 (4)
4:3;5:5;71:21;
324:12
21 (8)
204:8,9;211:13;
224:1;312:20,21,22;
313:18
21:35 (1)
254:11
215 (1)
45:3
21st (2)
4:3;5:4
22 (7)
74:8;98:22;107:22;
114:15;213:19,20;
233:1
22:00 (2)
206:5,22
22:30 (1)
121:2
22S09984 (1)
98:15
23 (13)
121:1;232:25;233:2;
304:22,23,25;305:1;
310:21;312:13,20;
313:12,19;315:25
23248 (1)
107:22
23-minute (1)
251:5
23rd (2)
298:12;299:22
24 (2)
139:23,25
24/7 (1)
178:5
25 (1)
49:25
25th (6)
88:8;120:25;121:1;
163:4,25;310:7
26 (3)
111:11;226:20;
232:23

26th (4)
113:20;115:25;
282:15,25
27 (2)
183:19;219:23
27th (4)
180:18;181:3,9;
309:13
28 (4)
123:10;234:25;
304:2;309:11
29th (7)
110:20;120:19;
128:14;130:18,19;
214:17;263:25

**3**

3 (4)
115:21;209:21;
256:13;307:9
3:00 (5)
91:1;192:10,10;
198:19,21
30 (13)
131:17,17,18;
144:15,16,16,17,19;
175:6,13;245:22,23;
270:18
30th (2)
168:15;169:6
31 (2)
175:6;310:4
31st (10)
159:16,18;281:6;
282:9;288:17,24;
292:12;293:4,21,24
32 (2)
131:17,17
34 (2)
307:15,23
3440 (1)
256:16
35 (4)
157:12;307:15,16;
308:5
36 (6)
39:6,13,15;159:2,5,5
367 (1)
182:1
37 (3)
76:21;131:18;144:20
378 (2)
116:23;117:7
378-1 (2)
116:11,15
38 (9)
101:12,13,13,13;
141:6;144:15;149:21,
22;160:22
39 (4)
140:11;305:2;316:7,
7

**4**

4 (8)
111:7,7;116:10;
134:15,16,18,18;
307:12
4,000 (1)
232:7
4:00 (1)
192:11
40 (8)
140:10,12;144:15;
246:22;248:7;249:10;
255:5;317:8
40-hour (1)
27:22
41 (4)
123:8,10,22,23
415 (1)
103:8
42 (5)
123:8,22,23;124:4;
131:18
43 (5)
127:13,14;130:13;
182:4,4
44 (3)
130:20,20;221:1
45 (6)
212:19;246:23;
255:4;320:6,7;321:3
45-48 (1)
130:25
46 (7)
131:3,4,5,6;133:20;
135:4;159:4
47 (1)
221:1
48 (3)
130:20,21;135:8
487 (6)
30:25;31:10;107:17;
108:4,4,4
487a (3)
107:18;144:23;227:5
487aa (1)
282:22
4-H (51)
47:10,19,20,21,24;
48:12,23,24;50:19,22,
23,25;51:11;52:6,7,9,
12,21;54:10;59:17,18,
22,25;61:3,6,7,8,11;
62:14,15,17;64:5,21;
66:25;67:2,24;87:8,12,
14;121:21,23;122:2,
12;141:25;149:16;
150:7;159:1,8;215:7;
216:8;271:23
4th (5)
9:10;173:25;176:21,
22;178:7

**5**

5 (10)
126:20;127:2,3;
130:11;136:15;149:11;
167:7,7;174:13,15
5:00 (1)
198:16
5:39 (1)
282:9
50 (2)
42:4;211:5
500 (1)
55:11
597 (1)
31:5
5th (2)
178:11,14

**6**

6 (1)
174:13
6/25 (1)
100:16
6/27 (1)
122:24
6/29 (6)
110:20;137:14;
168:4;170:9;173:12,13
6/30 (5)
170:3;174:8,9,24;
175:14
6:22 (1)
323:5
6:25 (1)
211:2
6:30 (1)
204:23
6:33 (1)
211:14
60 (1)
14:9
64 (7)
274:21,22,23,23,24,
25,25
65 (4)
82:25;268:13;269:5,
6
667 (1)
268:24
68 (8)
97:24,25;98:3,4;
269:1,4,5,6
69 (2)
98:3,3
6th (5)
178:24;179:1,2,5,10

**7**

7 (6)


134:21;174:14,16,
  22,23;181:15
**7/02 (1)**
  176:2
**7/07 (6)**
  179:25;182:23;
  184:7,20,21;185:19
**7/08 (8)**
  115:17;185:19,20;
  186:13,17;195:12,17,
  21
**7/26 (2)**
  115:17;119:9
**7/7 (3)**
  180:1;182:16;184:6
**7/8 (1)**
  201:23
**7:00 (6)**
  27:1;204:21,22,23;
  205:2,16
**7:05 (1)**
  254:10
**7:30-ish (1)**
  240:16
**70 (1)**
  82:25
**75 (1)**
  49:23
**7th (2)**
  183:4;193:14

---

### 8

**8 (8)**
  104:5;111:24,25,25;
  112:2;213:19;282:18,
  18
**8:00 (1)**
  310:8
**8:00-ish (2)**
  254:15,16
**8:45 (3)**
  250:15;255:13,14
**81 (1)**
  301:11
**82 (2)**
  143:11;144:3
**832 (1)**
  32:24
**88 (2)**
  109:7,17
**8954 (1)**
  321:25
**8th (23)**
  13:20;111:5,12,18;
  113:17;114:11;115:25;
  183:6,14;184:23,25;
  185:9,14;193:14,14;
  194:4;199:2;201:5,6,
  25;213:24;215:2;
  282:13

---

### 9

**9:00 (10)**
  101:4,14,14,15,16;
  255:13,14;269:9,9,10
**9:15 (1)**
  250:15
**9:41 (2)**
  4:4;5:5
**900 (1)**
  25:7
**902 (3)**
  144:4,5;149:14
**911 (2)**
  102:22;103:13
**919 (1)**
  141:11
**920 (2)**
  141:10,11
**96001 (1)**
  5:4
**9th (2)**
  296:13,23