1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JESSICA LONG, et al.,                          No.  2:22-cv-01527-DAD-AC

12                Plaintiffs,

13          v.                                       ORDER GRANTING DEFENDANTS'
                                                     MOTIONS FOR SUMMARY JUDGMENT
14   JERRY FERNANDEZ, et al.,                        AND DENYING PLAINTIFFS' MOTION
                                                     FOR PARTIAL SUMMARY JUDGMENT
15                Defendants.
                                                     (Doc. Nos. 119, 122, 125)
16

17

18          This matter came before the court on June 26, 2025 for a hearing on the motion for

19   summary judgment filed by defendants BJ MacFarlane, Melanie Silva, and Shasta Fair and Event

20   Center (collectively, "the Fair defendants") (Doc. No. 119), the motion for summary judgment

21   filed by defendant Kathie Muse (Doc. No. 125), and the motion for partial summary judgment

22   filed by plaintiffs (Doc. No. 122).  Attorneys Ryan Gordon and Vanessa Tamara Shakib appeared

23   on behalf of plaintiffs; Deputy Attorney General John C. Bridges appeared on behalf of the Fair

24   defendants; and attorney Ian S. Collins appeared on behalf of defendant Muse.  For the reasons

25   explained below, the motions for summary judgment filed on behalf of the Fair defendants and

26   defendant Muse will be granted, and plaintiffs' motion for partial summary judgment will be

27   denied.

28   /////

                                                    1

1

**BACKGROUND**

2

**A.     Factual Background**[1]

3

In October 2021, plaintiff Jessica Long ("plaintiff Long") entered her daughter, plaintiff

4

E.L., in a local 4-H program in which minors would auction off animals that they had raised at the

5

2022 Shasta District Fair ("the Fair").  (FUF ¶¶ 1, 7, 11; POUF ¶ 79; PUF ¶ 3.)  The Fair ran from

6

June 22 through June 25, 2022.  (PUF ¶ 3.)  Defendant Melania Silva was the CEO of defendant

7

Shasta Fair and Event Center ("defendant Fair Association"), formally known as the 27th District

8

Agricultural Association, at all relevant times.  (PUF ¶ 4.)  Defendant BJ MacFarlane was the

9

livestock manager for defendant Fair Association at all relevant times.  (PUF ¶ 5.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] The relevant facts that follow are undisputed unless otherwise noted and are derived from the undisputed facts as stated by the Fair defendants in support of their motion for summary judgment, responded to by plaintiffs, and replied to by the Fair defendants (Doc. No. 138 at 1–82 ("FUF")); the additional material facts as stated by plaintiffs in opposition to the Fair defendants' motion for summary judgment and responded to by the Fair defendants (Doc. No. 138 at 82–103 ("POUF")); the undisputed facts as stated by plaintiffs in support of their motion for partial summary judgment and responded to by the Fair defendants (Doc. No. 132-1 at 3–11 ("PUF")); the additional material facts as stated by the Fair defendants in opposition to plaintiffs' motion for partial summary judgment and responded to by plaintiffs (Doc. No. 139-1 ("FOUF")); the undisputed facts as stated by defendant Muse and responded to by plaintiffs (Doc. No. 134-1 ("MUF")); the additional material facts as stated by plaintiffs in opposition to defendant Muse's motion for summary judgment and replied to by defendant Muse (Doc. No. 136-1 ("PMUF")); the exhibits attached to the affidavits filed by the parties in support of their respective briefs (Doc. Nos. 119-3; 120; 122-3; 122-4; 125-5; 125-6; 133-9; 133-10; 133-29; 133-42; 133-44; 133-46; 136-1); and the complete copies of various deposition transcripts lodged with the court. Additionally, the court notes that in many of the statements of material facts and responses thereto, plaintiffs purport to dispute many of the facts proposed by defendants, often regarding the subjective beliefs of various individuals.  Plaintiffs then do not point to any evidence disputing the facts in question and instead provide many pages of analysis and argument regarding legal issues related to the aforementioned facts.  For instance, the Fair defendants offer as a material fact that after plaintiffs left the goat at the center of this case with a farmer in Petaluma, California, the farmer's "understanding of why plaintiff Long was giving the goat to him was 'to donate it to me,' and 'she wanted to donate us a goat.'"  (FUF ¶ 33.)  Plaintiffs purport to dispute this fact but only offer several paragraphs of argument as to why plaintiff Long did not in fact donate the goat to the farmer.  (*Id.*)  As the Fair defendants note in reply, "the underlying fact is that [the farmer] understood that the plaintiffs donated the goat to him.  [Plaintiffs'] contentions are unrelated to that undisputed fact."  (*Id.*)  The court will treat this fact, as well as the other facts that plaintiffs label as "Disputed" but which plaintiffs do not actually dispute, as undisputed for the purposes of the pending motions.  Finally, plaintiffs filed objections to certain evidence submitted by the Fair defendants in support of their pending motion.  (Doc. No. 133-50.)  The court does not rely on the evidence objected to by plaintiffs in resolving the pending motions. Accordingly, plaintiffs' objections are overruled as having been rendered moot.

2

Defendant Kathie Muse is the president of Muse Trucking and is not employed by any 4-H club, the Future Farmers of America ("FFA"), or defendant Fair Association.  (MUF ¶ 1.)  She was a volunteer organizer of the 2022 4-H/FFA Community BBQ ("the Barbecue").  (MUF ¶ 2.)  The Barbecue raised money for participating 4-H and FFA clubs.  (MUF ¶ 2.)  The 4-H and FFA organizations had scheduled the Barbecue to take place on July 9, 2022, two weeks after the conclusion of the Fair.  (PMUF ¶ 21.)

The Fair was governed by a set of rules published by the California Department of Food and Agriculture ("the State Rules") and a set of rules contained in a handbook published by defendant Fair Association ("the Exhibitor Rules").  (POUF ¶ 82.)

The State Rules provide as follows in relevant part:

> Fairs may create "Local Rules" [the Exhibitor Rules] that may be stricter than the State Rules but that may not circumvent the State Rules. . . .
>
> **I.    DEFINITIONS** . . .
>
> 6.  **Entry** – An object, animal or collection of objects or animals intended for exhibit.
>
> 7.  **Exhibit** – An entry becomes an exhibit when it is shown or judged at the fair. . . .
>
> 9.  **Exhibitor** – The owner of the exhibit. . . .
>
> 12. **Junior Department** – A department provided for youth.  *See also Junior Department.* . . .
>
> **II.    ELIGIBILITY** . . .
>
> 1.  By signing and submitting an entry form the exhibitors and their agents, parents and leaders acknowledge and agree that they:
>
>   a.  Understand and have read these State Rules and local fair rules;
>
>   b.  Agree to abide by them;
>
>   c.  Certify that all information on the entry form is true and accurate; and
>
>   d.  Agree to comply with the fair's decision regarding any alleged violation of the state or [Exhibitor] Rules. . . .
>
> **Ownership**.  Unless otherwise allowed in the [Exhibitor Rules], exhibitors must be legal owners of all entries. . . . *See also Junior*

3

1   *Department* . . . .

2   Exhibitors, leaders, advisors, and parents found, after a chance to provide evidence and be heard before the Fair Management (CEO
3   and staff) of unethical practices as set forth in the State and [Exhibitor] Rules or in actions inimical with the fair program shall
4   result in the exhibit being disqualified and the forfeiture of any awards and/or privileges as may be deemed appropriate to the
5   circumstances by the Fair Management. . . .

6   **VII. JUNIOR DEPARTMENT**

7   **Definitions.** *See also Section I, Definitions.*

8       1. **Exhibitor** – The owner of the exhibit. . . .

9       5. **Ownership** – The growing, construction or purchase of exhibits as verified by the adult leader, teacher, or
10      parent/guardian signature on the entry form for non-livestock exhibits, or as otherwise stated in the [Exhibitor Rules]. . . .

11  **Livestock and Horse Exhibits, Ownership**

12  1. Animals and horse projects must be owned . . . solely by and
13      under the exhibitor's care and management . . . .

14  **VIII. LIVESTOCK DEPARTMENT** . . .

15  **Market Animals** . . .

16      2. If the fair requires a terminal sale, the [Exhibitor Rules] must state it in the exhibitor handbook. *Exhibitors and their*
17      *parents or guardians must agree that upon entry into market competition and qualification by the market judge, the*
18      *animal(s) will be sold and processed.* [emphasis added]

19  (Doc. No. 122-3 at 5–8, 13, 15, 16, 18.)

20      The Exhibitor Rules provide as follows in relevant part:

21      <u>STATE RULES:</u>  All [Exhibitor] & State Rules . . . apply to all entries of this Fair. . . .

22
23      **<u>AUCTION GUIDELINES – THIS IS A TERMINAL SALE</u>** . . . .

24  LIVESTOCK OWNERSHIP:  Junior Exhibitors <u>MUST</u> prove ownership of animals to be able to exhibit in the Junior Livestock
25  Department. . . .

26  All Junior Livestock Animals must be owned and under the control and supervision of the Exhibitor . . . .

27  ALL ANIMALS . . . ENTERED IN MARKET CLASSES & QUALIFYING FOR THE JUNIOR LIVESTOCK AUCTION
28

4

1    MUST BE SOLD as listed on the Sale Order.  There will be no set
     prices (or STOPS) and no "NO-SALES" at any time during the Sale.
2    . . .

3    ALL ANIMALS sold in the Shasta Junior Livestock Auction sale
     MUST go to processing, directly from the Fairgrounds and will be
4    transported on the trucks provided by the Fair on Saturday, June 25,
     2022.  No Junior Exhibitors will be allowed in barns while the
5    animals are loading, failure to leave the barn when asked may result
     in the loss of premiums.  . . .
6
     Any animal removed from the grounds prior to release times, without
7    permission and proper release forms will forfeit all premiums and
     awards.  . . .
8
     ANIMALS . . . :  May NOT be . . . removed from the grounds prior
9    to Sunday, June 26, 2022 according to the release times shown above
     (Premiums will be forfeited if any are removed early).  . . .
10
     RULE COMPLIANCE:  Any Exhibitor, who fails to conform to
11   accepted standards of conduct, will be removed immediately (with
     livestock) from the Fairgrounds and all premiums and auction
12   proceeds forfeited, if the situation is of a serious nature.

13   (Doc. No. 122-4 at 2–4, 6, 7.)[2]

14          Plaintiff Long purchased Cedar the goat in April 2022.  (FUF ¶ 3.)  On May 17, 2022,

15   plaintiff Long registered plaintiff E.L. as an exhibitor to exhibit Cedar at the terminal auction that

16   would take place during the Fair ("the Auction").  (FUF ¶¶ 11, 13.)  The online registration form

17   indicated that plaintiffs would be bound by the Exhibitor Rules for the Fair, which were

18   /////

19   /////

20   /////

21

22   [2]  Plaintiffs request that the court take judicial notice of several documents and court filings, such
     as the State Rules, Exhibitor Rules, plaintiffs' second amended complaint, and the Fair
23   defendants' answer.  (See Doc. Nos. 122-26, 133-49, 134-44.)  These documents have also been
     authenticated by declarations and submitted as exhibits in support of plaintiffs' motion for
24   summary judgment and plaintiffs' oppositions to defendants' motions.  (See id.)  Defendants have
     not filed any opposition to plaintiffs' requests.  Indeed, defendants also rely on many of these
25   documents, such as the State Rules and Exhibitor Rules.  The court finds that these documents are
     properly subject to judicial notice and accordingly grants plaintiffs' unopposed request for
26   judicial notice.  See Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994) (noting that district
     courts may take judicial notice of "[r]ecords and reports of administrative bodies"); Burbank-
27   Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1364 (9th Cir. 1998)
     (granting the defendant's request for judicial notice as to court filings).

28                                            5

1   hyperlinked in the registration form.[3]  (FUF ¶ 14.)  Plaintiff Long selected a box stating "I agree"

2   to comply with the Exhibitor Rules and submitted the form without reading the Exhibitor Rules.

3   (FUF ¶ 15.)

4          On June 25, 2022, plaintiff E.L. participated in the Auction.  (FUF ¶ 25.)  Defendant

5   Muse, acting as a representative for two buyers, placed the winning bid of $902 for Cedar at the

6   Auction.  (PUF ¶ 10.)  The sale invoice for Cedar does not list a "Seller Name."  (Doc. No. 125-5

7   at 2.)  The exhibitor name listed on the sale invoice is that of plaintiff E.L.  (*Id.*)  The buyers had

8   previously arranged for the goat to be donated to the Barbecue for use at its annual fundraiser.

9   (*Id.*; FUF ¶ 27; PUF ¶ 12.)  At approximately 9 p.m. that night, while the livestock was being

10  loaded for transport from the Fair pursuant to the Exhibitor Rules, plaintiffs removed Cedar from

11  the fairgrounds.  (PUF ¶ 14; FUF ¶ 29.)

12         The next day, June 26, 2022, plaintiff Long texted the following to the owner of a farm in

13  Petaluma, California ("the Farm"):  "I called earlier this week about a 4-H goat that we'd like to

14  donate to your farm."  (FUF ¶¶ 31, 32.)  Plaintiffs drove Cedar to the Farm and left the goat with

15  the owner of the Farm.  (FUF ¶ 31.)  The parties dispute whether plaintiffs intended to donate the

16  goat to the Farm or whether plaintiffs were merely keeping the goat at the Farm temporarily while

17  they resolved the situation with the Fair defendants.  (*See* FUF ¶ 31.)

18         Also on June 26, 2022, a Fair employee texted plaintiff Long and directed her to call

19  defendant MacFarlane regarding Cedar.  (Doc. Nos. 133-44 at 2–3; 133-42 at ¶ 34.)  Plaintiff

20  Long then called defendant MacFarlane.  (Doc. No. 133-42 at ¶ 35.)  During that call, defendant

21  MacFarlane told plaintiff Long that she needed to return Cedar or she would be prosecuted for

22  theft.  (PUF ¶ 15; Doc. No. 133-42 at ¶ 15.)  Plaintiff Long replied that plaintiffs "were not going

23  to proceed with selling Cedar" and would pay for any damages that they had caused.  (Doc.

24  No. 133-42 at ¶ 35.)  Defendant MacFarlane told defendant Muse that the goat had been removed

25  from the fairgrounds.  (MUF ¶ 7.)  Defendant Muse responded that the goat belonged to the

26  ─────────────
27  [3]  Plaintiffs purport to dispute this fact but do not offer any evidence in support of their argument in this regard.  (*See* FUF ¶ 14) ("Plaintiff Mrs. Long does not dispute she clicked 'I agree' to be bound by the rules of the Fair, but has no knowledge and does not recall any hyperlink to the

28  rules.").

Barbecue—not the buyers—because the buyers had already donated it to the Barbecue; defendant Muse told the buyers this as well.  (MUF ¶¶ 7, 8.)  Defendant Muse initially believed that the goat belonged to the Barbecue and that it had been stolen.  (MUF ¶ 9.)  The parties dispute whether defendant Muse eventually changed her mind and came to believe that the goat had not been stolen and that it did not belong to the Barbecue.  (MUF ¶ 9.)  Defendant Muse wanted plaintiff Long to be prosecuted for removing Cedar from the fairgrounds.  (MUF ¶ 11.)

On June 27, 2022, the Bleating Hearts Farm in Napa, California posted a picture of the goat, Cedar, on Instagram and asked for the public's sympathy ("the Post").  (POUF ¶ 95.) Plaintiffs provided Bleating Hearts with the information and picture used in the Post, but they did not instruct or authorize Bleating Hearts to create the Post.  (FUF ¶ 66.)  Plaintiffs were not aware of the Post until after the fact, were unhappy that it had been made, and wanted Bleating Hearts to take it down.  (FUF ¶ 67.)  Defendants MacFarlane and Silva saw the Post.  (PUF ¶ 16; POUF ¶ 97.)  Defendant MacFarlane believed plaintiffs were working with activists in the animal rights community.  (POUF ¶ 97.)  Defendant Muse believed that plaintiff Long was making a "political statement" by removing Cedar and disagreed with plaintiff Long's viewpoint.  (PMUF ¶ 39.) Defendant Fair Association forwarded all phone calls to voicemail following the removal of Cedar due to a high volume of calls related to the situation (POUF ¶ 96), though defendants argue that it is speculative whether the Post in particular caused this high volume of calls (POUF ¶ 96).

Also on June 27, 2022, defendant MacFarlane texted plaintiff Long stating that "[w]e need to make arrangements to get goat back today.  If not law enforcement is going to be brought in on this."  (POUF ¶ 100.)  Plaintiff Long responded, "I have made arrangements to pick up the goat tomorrow.  I can't get it sooner."  (Doc. No. 133-46 at 2.)

Later that day, plaintiff Long emailed defendant Silva the following message in relevant part:

> I am the mom who took my daughter's goat from the fairgrounds and wanted to explain myself and look for solutions with you.  If we can't come up with any other solution, I will bring the goat back for slaughter. . . .
>
> I started asking people if I could give the goat to them so we didn't have to sell it for slaughter. . . .

1
2
> I had heard back from someone that I had emailed a few days prior. It was a farm to donate my daughter's goat to where he would clear land for fire prevention. . . .

3
4
5
> [A]t the last minute I decided to break the rules and take the goat that night and deal with the consequences later.  I knew when I took it that my next steps were to make it right with the buyer and the fairgrounds. . . .

6
7
> [The buyers] are okay with the alternative solution of the goat getting to be donated to a farm that does weed abatement.  They said they were told that it's up to the fair, who has said that it has to be brought back and slaughtered. . . .

8
> I will pay you back for the goat and any other expenses I caused. . . .

9
10
> I hope that Shasta County District Fair will make changes to let our kids have a non-terminal options [sic].

11
12
> The live stock [sic] manager has been in contact with me and is threatening to have me arrested for a felony of stealing livestock unless I return the goat for slaughter immediately. . . .

13
14
> If the only solution is to return the goat for slaughter and bbq meat, then I will return it so that I am not charged with a felony.  I hope that I will gain your support to donate our goat to a fire clearing team . . . .

15  (Doc. No. 120 at 55–56.)

16      On June 28, 2022, defendant MacFarlane again texted plaintiff Long to ask when the two

17  could meet that day for the return of Cedar, asked plaintiff Long to respond, and again stated,

18  "Please respond or the fair has informed me they will be calling the authorities."  (POUF ¶ 102;

19  Doc. No. 133-46 at 2.)  Plaintiff Long replied, "I sent an email to [defendant Silva].  Was it

20  received?"  (Doc. No. 133-46 at 2.)  Defendant MacFarlane acknowledged the receipt of the

21  email.  (*Id.* at 3.)  In the afternoon, defendant Silva emailed plaintiff Long the following in

22  relevant part:

23
24
25
> Thank you Jessica for taking the time to contact me regarding this issue.  As a mother I am not unsympathetic regarding your daughter and her love for her animal.  . . .  Making an exception for you will only teach out [sic] youth that they do not have to abide by the rules that are set up for all participants. . . .

26
27
28
> I have spoken with the California Department of Food and Agriculture and they have informed me that for the good of all we have to stick to the State Rules.  You will need to bring the goat back to the Shasta District Fair immediately.

1    (Doc. No. 133-9 at 4.)  That evening, defendant MacFarlane texted plaintiff Long again:  "The

2    fair has instructed me to contact you to get the goat to the fairgrounds by 10 am Wednesday

3    June 29th.  If this does not happen they will be forced to contact authorities."  (POUF ¶ 106.)

4        On June 29, 2022, plaintiff Long sent an email to defendant Silva stating that felony theft

5    charges were unwarranted because Cedar was the personal property of plaintiff E.L. based on the

6    Exhibitor and State Rules, and stating that the email was sent in anticipation of litigation.  (POUF

7    ¶ 108; Doc. No. 133-10 at 6–9.)  Plaintiff Long expressed interest in "resolv[ing] this situation

8    with Cedar not being brought in for slaughter."  (Doc. No. 133-10 at 9.)

9        On or about June 29, 2022, Lieutenant Jerry Fernandez ("Lt. Fernandez") of the Shasta

10   County Sheriff's Office was contacted regarding the theft of livestock from the Fair.  (FUF ¶ 39.)

11   The parties dispute whether defendant Muse made the initial report to law enforcement that Cedar

12   had been taken from the Fair.[4]  (*See* MUF ¶ 13; FUF ¶ 41.)  Lt. Fernandez contacted defendant

13   MacFarlane, who informed Lt. Fernandez that he believed Cedar had been stolen.  (FUF ¶ 40.)

14   Lt. Fernandez initiated an investigation into the alleged theft of Cedar.  (FUF ¶ 41.)  Through his

15   investigation, Lt. Fernandez came to believe that plaintiff Long had committed grand theft in

16   violation of California Penal Code § 487a.[5]  (FUF ¶ 43.)  Lt. Fernandez relayed his belief to

---

17   [4]  The Fair defendants propose as an undisputed fact that defendant Muse first reported the
18   alleged theft to Lt. Fernandez.  (FUF ¶ 41.)  Defendant Muse proposes as an undisputed fact that
     she did not make the initial report and was instead contacted by Lt. Fernandez after the
19   investigation had already begun.  (MUF ¶ 13.)  Plaintiffs dispute both of these facts.  (*See* FUF
     ¶ 41, MUF ¶ 13.)
20

21   [5]  In their response to the Fair defendants' statement of undisputed facts, plaintiffs argue that Lt.
     Fernandez "did not 'determine' Jessica Long committed grand theft under [Penal Code § 487a],
22   nor could he.  That is the role and duty of the judicial process[.]"  (FUF ¶ 43.)  As the Fair
     defendants point out in reply, plaintiffs' contentions in this regard are non-responsive to whether
23   Lt. Fernandez subjectively believed that the goat had been stolen.  (*Id.*)  Similarly, in their
     response to defendant Muse's statement of undisputed facts, plaintiffs ambiguously "dispute . . .
24   Lieutenant Fernandez'[s] belief that Cedar was stolen."  (MUF ¶ 15.)  It is unclear whether
     plaintiffs intend thereby to dispute (a) whether Lt. Fernandez subjectively believed that the goat
25   had been stolen, or (b) whether Lt. Fernandez's belief in this regard was correct.  Plaintiffs refer
     to Lt. Fernandez's belief as "wrongful" and argue only that he "had no training in contract law,
26   did not review any relevant statutes governing sales or auctions, did not consult an attorney on
     these issues, and did not even verify if the bidders paid for Cedar."  (MUF ¶ 15.)  That is,
27   plaintiffs provide evidence and argument only regarding the accuracy, not the fact, of Lt.
     Fernandez's beliefs.  Notably, as will be discussed later in this order, plaintiffs subsequently
28

9

Detective Jeremy Ashbee ("Det. Ashbee"), also of the Shasta County Sheriff's Office, who prepared an application seeking a warrant authorizing law enforcement to search a farm in Napa, California for Cedar the goat and to seize the animal.  (FUF ¶¶ 44, 45.)  The warrant application prepared by Det. Ashbee and submitted on July 8, 2021, included the following language in its statement of probable cause:  "Due to the fact the item(s) to be seized include living animals, Deputies shall secure the property in a humane and appropriate location, and the rightful owner of said property shall be notified of the location of the property.  The property may be released to the owner upon seizure."  (Doc. No. 133-29 at 24.)  The search warrant that was signed, also on July 8, 2021, by a Shasta County Superior Court Judge provided the following regarding the disposition of the allegedly stolen property:

> And if you find the same or any party thereof, to hold such property in your possession under California Penal Code § 1536 . . . .
>
> It is further ordered that upon adjudication of the case(s) against all defendant(s) in this action, including the resolution of any and all appeals, and the written concurrence of the Shasta County District Attorney's Office, the property be disposed of in accordance with the procedures set forth in California Penal Code § 1407-1422, without the necessity of a further Court Order issued pursuant to California Penal Code § 1536.

(Doc. No. 133-29 at 22.)  However, the undersigned notes that Det. Ashbee's statement of probable cause including the language authorizing the property seized to be secured in a humane and appropriate location was specifically attached to and incorporated by reference into the search warrant and affidavit.  (Doc. No. 133-29 at 16.)

/////

---

argued at length in their supplemental briefing that the evidence is overwhelming and consistent that Lt. Fernandez—as well as defendants MacFarlane and Silva—did in fact believe the goat was stolen.  (*See* Doc. No. 151 at 18–20.)  When questioned on this issue at the June 26, 2025 hearing, plaintiffs' counsel stated "if you're looking for something as to their state of mind at the time, yes, at deposition they all stated—you know, unequivocally, that the goat was stolen.  It wasn't hers.  She had no rights to it.  But, again, it's our position that that's not their call to make."  While it remains unclear to the court whether plaintiffs purport to dispute the fact of Lt. Fernandez's subjective beliefs, the court concludes that plaintiffs have not pointed to any evidence from which a finder of fact could reasonably conclude that Lt. Fernandez did not believe the goat had been stolen.

On July 8, 2022, Lt. Fernandez and Detective Jacob Duncan ("Det. Duncan") executed the search pursuant to the warrant at the farm in Napa but were unable to locate Cedar. (FUF ¶¶ 48, 49.) Lt. Fernandez and Det. Duncan learned from the owners of the farm in Napa that Cedar was instead at the Farm in Petaluma. (FUF ¶¶ 50–53.) The officers drove to that Farm. (FUF ¶ 54.) Det. Duncan called the owner of the Farm, explained that the officers were investigating the theft of a goat, and asked whether Cedar was on his property. (FUF ¶¶ 55–57.) The owner of the Farm stated that plaintiffs had given Cedar to him and told him it was a donation. (FUF ¶ 58; Doc. No. 133-29 at 11.) The owner of the farm gave his consent to the officers searching his Farm, retrieving Cedar, and taking the goat into their possession. (FUF ¶¶ 59, 60.)

Lt. Fernandez and Det. Duncan drove the goat back to Shasta County. (FUF ¶ 61.) During the drive, Lt. Fernandez called defendant Muse and notified her that he had recovered the goat. (MUF ¶ 14.) Lt. Fernandez asked defendant Muse where to take the goat because he believed she was its owner. (MUF ¶ 15.) Defendant Muse requested that the officers leave the goat with defendant MacFarlane. (MUF ¶ 16.) Lt. Fernandez then called defendant MacFarlane. (Doc. No. 125-6 at 70.) Defendant MacFarlane agreed to house the goat on behalf of defendant Muse. (Doc. No. 125-6 at 70.) Lt. Fernandez told defendant MacFarlane that defendant Muse was the legal owner of the goat. (Doc. No. 119-3 at ¶ 3.) Late at night on July 8, 2022 or early in the morning on July 9, 2022, Lt. Fernandez turned the goat over to defendant MacFarlane. (POUF ¶ 113.) Lt. Fernandez did not ask defendant MacFarlane or defendant Muse what they intended to do with Cedar.[6] (Doc. No. 125-6 at 71.)

At some point, defendant Muse received replacement goat meat from defendant Fair Association, which was used at the fundraising Barbecue on July 9, 2022. (POUF ¶ 111.)

On July 11, 2022, defendant MacFarlane texted defendant Muse: "Talked to sheriff and he said to wait until he talks to DA before we kill goat. It is perfectly fine at my house till we figure it out." (Doc. No. 136-1 at ¶ 59.)

---

[6] When asked during his deposition "what was your understanding what was going to be done with" the goat, Lt. Fernandez replied "whatever the owner, her, Kathi [Muse], was going to do with it. I don't know[.]" (Doc. No. 125-6 at 71.)

1    Between July 15 and July 27, 2022, plaintiffs contacted the Shasta County Sheriff's Office

2    and the Shasta County Office of County Counsel regarding Cedar's location, and those offices

3    "refused to provide information." (Doc. No. 133-42 at ¶ 58.)

4    Under the rules governing the Auction, payments for auctioned animals were due by

5    July 15, 2022. (POUF ¶ 85.) No bidder ever paid for Cedar.[7] (POUF ¶¶ 92, 110.)

6    On July 22, 2022, defendant Fair Association CEO Silva called defendant Fair

7    Association livestock manager MacFarlane at 11:17 a.m.; defendant MacFarlane then called

8    defendant Barbecue volunteer organizer Muse at 11:22 a.m.; while speaking with defendant

9    Muse, defendant MacFarlane requested from defendant Silva the name of an employee at a

10   slaughter company. (POUF ¶ 116.) Defendant MacFarlane texted defendant Silva that

11   "[defendant Muse] said ok but no one needs to know this. U me and [defendant Muse] are the

12   only ones. It got killed and donated to non profit if anyone asks." (POUF ¶ 116.) Defendant

13   MacFarlane testified at his deposition that this text message reflected defendants' desire to shield

14   the ultimate recipient of the goat meat from public backlash. (MacFarlane Dep. Tr. Vol. II,

15   348:14–359:21.)

16   On July 28, 2022, Cedar the goat was slaughtered by a meat company at defendant

17   MacFarlane's property. (POUF ¶ 118.) Defendant MacFarlane helped defendant Muse arrange

18   for the slaughter of the goat because he believed that it was sold to her at the Auction, because Lt.

19   Fernandez told him that defendant Muse was the goat's legal owner, and because he believed that

20   the Exhibitor Rules required that all market animals sold at the Auction must be slaughtered for

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27

28

---

[7] Defendant Muse purports to dispute this fact but the evidence to which she cites does not support her contention in this regard. (*See* PMUF ¶ 74.)

1  meat.  (FUF ¶ 72.)  Likewise, defendant Silva believed that the goat had been sold at the Auction

2  and that plaintiffs did not own the goat at any time after the Auction.  (FUF ¶ 78.)[8]

3      The parties dispute whether defendant MacFarlane, defendant Silva, or defendant Muse

4  spoke to anyone in the Shasta County District Attorney's Office or the Shasta County Sheriff's

5  Office prior to the slaughter of the goat, as well as whether any of those defendants told the others

6  that they had spoken to those offices.  (POUF ¶¶ 119–23; FOUF ¶¶ 24–26; MUF ¶¶ 14, 17.)  The

7  parties dispute the extent to which defendant Silva was involved in the authorization or carrying

8  out of Cedar's slaughter.  (*See, e.g.*, POUF ¶ 114.)

9      On August 1, 2022, plaintiff Long emailed defendant Silva to ask if the goat was still

10  alive.  (POUF ¶ 130.)

11      At the 2022 Fair, 41 market goats other than Cedar were sold at the Auction, and all 41

12  were slaughtered without exception.  (FOUF ¶ 21.)

13  **B.    Procedural Background**

14      On August 31, 2022, plaintiffs filed the complaint initiating this action.  (Doc. No. 1.)  On

15  March 2, 2023, plaintiffs filed their first amended complaint pursuant to the court's February 27,

16  2023 minute order granting the parties' stipulation to amendment.  (Doc. No. 16.)  On

17  /////

18

19  [8]  Plaintiffs label the proposed facts regarding the beliefs of defendants MacFarlane and Silva as "Disputed."  (*See* FUF ¶¶ 72, 78.)  However, as with the purported dispute regarding Lt.

20  Fernandez's subjective beliefs, plaintiffs only provide evidence and argument that the purported beliefs of defendants MacFarlane and Silva were inaccurate because plaintiffs, not defendant

21  Muse, were the legal owners of the goat.  (*See* FUF ¶¶ 72, 78.)  It is again unclear whether plaintiffs intend thereby to dispute whether defendants MacFarlane and Silva subjectively

22  believed that the goat was stolen.  Plaintiffs' initial briefing is almost entirely devoted to the reasonableness and correctness of defendants' beliefs and contains only one ambiguous

23  suggestion that plaintiffs are disputing whether defendants subjectively believed that the goat was stolen.  (*See* Doc. No. 133 at 26 ("Nor could Fair defendants in good faith, and factually, believe

24  Mrs. Muse owned Cedar when no one ever paid.").)  As mentioned above, in their supplemental briefing, plaintiffs emphasize that defendants MacFarlane and Silva "believed, in real time, that

25  Cedar was stolen, so Plaintiffs simply had no rights to him at all, whether under the 14th Amendment or otherwise."  (Doc. No. 151 at 18; *see also id.* at 20 ("Their unshakeable belief that

26  Plaintiffs stole Cedar . . . led them all to conclude that Plaintiffs lacked *any* rights to Cedar[.]").)

27  In any event, the court concludes that plaintiffs have not come forward with any evidence on summary judgment from which a jury could reasonably conclude that defendants MacFarlane and

28  Silva did not believe the goat had been stolen.

13

1  October 12, 2023, plaintiffs filed their operative second amended complaint ("SAC") pursuant to

2  the court's October 12, 2023 minute order adopting the parties' stipulation.  (Doc. No. 25.)

3          In their SAC, plaintiffs asserted the following claims:  (1) unreasonable search and seizure

4  in violation of the Fourth Amendment, brought against defendants Jeremy Ashbee, Jerry

5  Fernandez, and Jacob Duncan; (2) violation of plaintiffs' Fourteenth Amendment procedural due

6  process rights, brought against defendants Ashbee, Fernandez, and Duncan; (3) unreasonable

7  search and seizure in violation of the Fourth Amendment, brought against defendants

8  MacFarlane, Silva, and Muse in their individual capacities; (4) violation of plaintiffs' Fourteenth

9  Amendment procedural due process rights, brought against defendants MacFarlane, Silva, and

10  Muse in their individual capacities; (5) unreasonable search and seizure in violation of California

11  Constitution Article I, § 13, brought against defendants County of Shasta, Shasta County Sheriff's

12  Department, Fernandez, and Duncan (collectively, "the Sheriff defendants"); (6) violation of

13  plaintiffs' procedural due process rights under California Constitution Article I, § 7, brought

14  against the Sheriff defendants; (7) unreasonable search and seizure in violation of California

15  Constitution Article I, § 13, brought against defendant Fair Association; (8) violation of plaintiffs'

16  procedural due process rights under California Constitution Article I, § 7, brought against

17  defendant Fair Association; (9) conversion, brought against the Sheriff defendants;

18  (10) conversion, brought against defendant Fair Association; (11) negligence, brought against the

19  Sheriff defendants; (12) negligence, brought against defendant Fair Association; (13) intentional

20  infliction of emotional distress, brought against defendant Fair Association; (14) declaratory

21  relief, brought against defendants MacFarlane and Silva in their official capacity, as well as

22  against defendant Fair Association; and (15) viewpoint discrimination in violation of the First

23  Amendment, brought against defendants MacFarlane and Silva in their individual and official

24  capacities and against defendant Muse in her individual capacity.  (Doc. No. 25 at ¶¶ 93–188.)

25          On August 28, 2024, plaintiffs filed a notice of settlement with defendants Jeremy

26  Ashbee, Jacob Duncan, Jerry Fernandez, Shasta County Sheriff's Department, and County of

27  /////

28  /////

1    Shasta.  (Doc. No. 105.)  On November 1, 2024, the court issued an order approving the

2    settlement of minor plaintiff E.L.'s claims asserted against those defendants.  (Doc. No. 113.)[9]

3          On November 15, 2024, the Fair defendants and plaintiffs filed their pending motions for

4    summary judgment in their favor.  (Doc. Nos. 119, 122.)  Defendant Muse filed her pending

5    motion for summary judgment in her favor on November 19, 2024.  (Doc. No. 125.)  The Fair

6    defendants filed their opposition to plaintiffs' motion for summary judgment on December 11,

7    2024; plaintiffs filed their oppositions to the Fair defendants' and defendant Muse's motions for

8    summary judgment that same day.  (Doc. Nos. 133, 134.)  On December 23, 2024, all parties filed

9    their respective replies.  (Doc. Nos. 136, 137, 139.)  On May 12, 2025, the court issued an order

10   directing plaintiffs and the Fair defendants to file supplemental briefing addressing certain issues

11   identified in that order; those parties filed their supplemental briefs on June 6, 2025.  (Doc.

12   Nos. 145, 150, 151.)  The hearing on the pending motions was held on June 26, 2025.  (Doc.

13   No. 153.)

14                                  **LEGAL STANDARD**

15   **A.     Summary Judgment**

16         Summary judgment is appropriate when the moving party "shows that there is no genuine

17   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

18   Civ. P. 56(a).

19         Each party's position, whether it be that a fact is disputed or undisputed, must be

20   supported by (1) "citing to particular parts of materials in the record, including depositions,

21   documents, electronically stored information, affidavits or declarations, stipulations (including

22   those made for purposes of the motion only), admissions, interrogatory answers, or other

23   materials"; or (2) showing that such materials "do not establish the absence or presence of a

24   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

25   Fed. R. Civ. P. 56(c)(1)(A), (B).   The court may consider other materials in the record, even if

26   /////

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [9]  Those defendants were terminated from this action on November 21, 2024.  (Doc. No. 128.)

1   not cited by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F.*

2   *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

3           When resolving cross-motions for summary judgment, the court has an "independent duty

4   to review each cross-motion and its supporting evidence . . . to determine whether that evidence

5   demonstrates a genuine issue of material fact."  *Fair Hous. Council of Riverside County, Inc. v.*

6   *Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001).  Therefore, each motion is evaluated

7   separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences."

8   *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (citation omitted).  If the

9   moving party will bear the burden of proof on an issue at trial, "the movant must affirmatively

10  demonstrate that no reasonable trier of fact could find other than for the moving party."

11  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  However, when the non-

12  moving party will bear the burden of proof on an issue, "the movant can prevail merely by

13  pointing out that there is an absence of evidence to support the nonmoving party's case."  *Id.*; *see*

14  *also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (stating that when the non-

15  moving party bears the burden of proof at trial, "the moving party need only prove that there is an

16  absence of evidence to support the non-moving party's case") (citing *Celotex Corp. v. Catrett*,

17  477 U.S. 317, 325 (1986)); Fed. R. Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery

18  and upon motion, summary judgment should be entered against a party who fails to make a

19  showing sufficient to establish the existence of an element essential to that party's case and on

20  which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A]

21  complete failure of proof concerning an essential element of the nonmoving party's case

22  necessarily renders all other facts immaterial."  *Id.* at 322–23.  In such a circumstance, summary

23  judgment should be granted, "so long as whatever is before the district court demonstrates that the

24  standard for the entry of summary judgment . . . is satisfied."  *Id.* at 323.

25          If the moving party meets its initial responsibility, the burden then shifts to the opposing

26  party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

27  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

28  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

1  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

2  admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

3  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr*, 285 F.3d at 773 ("A trial court can only

4  consider admissible evidence in ruling on a motion for summary judgment.").  The opposing

5  party must demonstrate that the fact in contention is material, i.e., a fact that might affect the

6  outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is

7  such that a reasonable jury could return a verdict for the non-moving party.  *See Anderson v.*

8  *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

9       In the endeavor to establish the existence of a factual dispute, the opposing party need not

10  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

11  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

12  trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

13  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

14  order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations

15  omitted).

16       "In evaluating the evidence to determine whether there is a genuine issue of fact," the

17  court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v.*

18  *Cent. Contra Costa County Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing

19  party's obligation to produce a factual predicate from which the inference may be drawn.  *See*

20  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d

21  898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do

22  more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where

23  the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

24  there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

25  **B.     Qualified Immunity**

26       Government officials are immune "from liability for civil damages insofar as their

27  conduct does not violate clearly established statutory or constitutional rights of which a

28  reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also*

1   *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (same) (quoting *Reichle v. Howards*,

2   566 U.S. 658, 664 (2012)); *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (qualified immunity

3   "shield[s] an officer from personal liability when an officer reasonably believes that his or her

4   conduct complies with the law").  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set

5   forth a two-part inquiry for determining whether qualified immunity applies.  First, a court must

6   ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show

7   the officer's conduct violated a constitutional right?"  *Id*.  If so, the court must ask whether the

8   constitutional right was "clearly established."  *Id.*  This second inquiry must be undertaken in the

9   specific context of the case.  *Id*.  In *Pearson v. Callahan*, the Supreme Court removed any

10  requirement that the *Saucier* test be applied in a rigid order, holding that "[t]he judges of the

11  district courts and the courts of appeals should be permitted to exercise their sound discretion in

12  deciding which of the two prongs of the qualified immunity analysis should be addressed first in

13  light of the circumstances in the particular case at hand."  555 U.S. at 236.

14      For a right to be "clearly established," the "precedent must be clear enough that every

15  reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."

16  *Wesby*, 583 U.S. at 63; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("A Government

17  official's conduct violates clearly established law when, at the time of the challenged conduct,

18  '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have]

19  understood] that what he is doing violates that right.'") (alterations in original) (*quoting Anderson

20  v. Creighton*, 483 U.S. 635, 640 (1987)).  "To meet this standard the very action in question need

21  not have previously been held unlawful."  *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir.

22  2014) (internal citation and quotation marks omitted); *see also Mullenix v. Luna*, 577 U.S. 7, 12

23  (2015) ("We do not require a case directly on point, but existing precedent must have placed the

24  statutory or constitutional question beyond debate.") (quoting *al–Kidd*, 563 U.S. at 741).  This

25  inquiry must be undertaken in light of the specific context of the particular case, rather than as a

26  broad general proposition.  *Mullenix*, 577 U.S. at 12.  This is especially the case in the context of

27  alleged Fourth Amendment violations, where the constitutional standard of "reasonableness"

28  requires a fact-specific inquiry.  *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc).

18

1    Thus, the court must determine whether "existing case law [would] have put 'every reasonable

2    official' on notice that their conduct was unconstitutional." *Martinez v. High*, 91 F.4th 1022,

3    1031 (9th Cir. 2024); *see also Mullenix*, 577 U.S. at 12 ("Put simply, qualified immunity protects

4    'all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Malley v.*

5    *Briggs*, 475 U.S. 335, 341 (1986)).

6                                        **ANALYSIS**

7    **A.    The Fair Defendants' Motion for Summary Judgment**

8            The Fair defendants move for summary judgment in their favor as to all of plaintiffs'

9    claims asserted against them.  (Doc. No. 119.)

10           1.    Fourteenth Amendment Claim Against Defendants MacFarlane and Silva

11           "To show a procedural due process violation," a plaintiff "must prove 'two distinct

12   elements:  (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a

13   denial of adequate procedural protections.'"  *United States v. 101 Houseco, LLC*, 22 F.4th 843,

14   851 (9th Cir. 2022) (citation omitted).  As to the first element, plaintiffs argue that they were

15   deprived of a property interest in Cedar when defendant MacFarlane took possession of Cedar

16   from Lt. Fernandez and when defendant MacFarlane arranged for Cedar's slaughter.  (Doc.

17   No. 122 at 26–27.)  As to the second element, plaintiffs argue that defendants MacFarlane and

18   Silva failed to provide plaintiffs with notice or the opportunity to be heard at any time.  (*Id.* at 27–

19   28.)

20           Defendants MacFarlane and Silva move for summary judgment in their favor as to

21   plaintiffs' claims brought against them pursuant to 42 U.S.C § 1983 for violation of the right to

22   procedural due process under the Fourteenth Amendment.  (Doc. No. 119-1 at 16–22, 25–26.)

23   The Fair defendants argue, among other things, that defendants MacFarlane and Silva are entitled

24   to qualified immunity.  (*Id.* at 25–26.)  In opposition, plaintiffs argue that officials "can still be on

25   notice that their conduct violates established law even in novel factual circumstances" (Doc.

26   No. 133 at 23) (quoting *Mattos*, 661 F.3d at 442) and that the "right to notice and hearing prior to

27   terminating an individual's interest in their animal has been clearly established" for decades,

28   "even if the animal is agricultural" (*id.* at 24).  Plaintiffs cite several decisions from various state

                                          19

1    and federal courts in support of this proposition.  (*Id.* at 24–25.)  Additionally, plaintiffs contend

2    that any reasonable government official in defendant MacFarlane and Silva's places would have

3    known that they were violating plaintiffs' procedural due process rights because those defendants

4    knew that no buyer had ever paid for Cedar and that defendant Muse had been "unjustly enriched

5    with replacement meat" in violation of various contracts.  (*Id.* at 25–26.)

6                      *a.      Clearly Established Law*

7          Under the circumstances of this case the court finds it appropriate to take up the second

8    prong of the qualified immunity analysis.  This is because under the unique circumstances of this

9    case, the court cannot find that "any reasonable official in the [defendants'] shoes would have

10   understood that he was violating" plaintiffs' rights.  *Kisela v. Hughes*, 584 U.S. 100, 105 (2018);

11   *see also Martinez v. City of Clovis*, 943 F.3d 1260, 1276 (9th Cir. 2019) ("In light of this muddled

12   legal terrain, we cannot hold that that 'every reasonable official would have understood . . .

13   beyond debate,' that the officers' conduct here violated Martinez's right to due process.").[10]

14         As recognized above, the Supreme Court has often reiterated that "'clearly established

15   law' should not be defined 'at a high level of generality.'"  *White v. Pauly*, 580 U.S. 73, 79

16   (2017).  Rather, "the clearly established law must be 'particularized' to the facts of the case."  *Id.*

17   In the context of Fourteenth Amendment claims, the Ninth Circuit has noted the following:

18   
19              [B]ecause procedural due process analysis essentially boils down to
               an ad hoc balancing inquiry, the law regarding procedural due
20             process claims "can rarely be considered 'clearly established' at least
               in the absence of closely corresponding factual and legal precedent."
               Indeed, without specific direction from cases applying it, the
21             *Mathews* [*v. Eldridge*, 424 U.S. 319 1976)] standard is perhaps even
               less amenable to the discovery of clearly established law than are . . .
22             other multifactor balancing tests that arise in constitutional
               jurisprudence.  Not only does the *Mathews* inquiry require a delicate
23             balancing of several competing interests, it requires that balancing at
               several separate stages of the procedural due process calculus.  . . .
24             [C]ourts look to *Mathews* in determining the specific procedures that
               the hearing (whether pre- or postdeprivation) should entail.  Finally,
25             if a court determines that a formal adversarial hearing is required, it
               will consult the *Mathews* standard in establishing the appropriate
26             standard of proof that the government must meet.  The result of

27   ─────────────────────
     [10]  Because the court finds that qualified immunity is applicable as to plaintiffs' Fourteenth
28   Amendment claim at the second step of the analysis, the court does not consider whether
     plaintiffs' Fourteenth Amendment rights were in fact violated.  *See Pearson*, 555 U.S. at 236.

                                            20

1    combining the *Mathews* test's ambiguity with its ubiquity is
2    unsurprising: "[O]ne cannot accurately predict how any specific case
     will be decided." . . .

3    The Supreme Court has made clear that in circumstances in which a
     predeprivation hearing is required by due process, it "need not be
4    elaborate." The hearing need not even approximate a trial-like
     proceeding; in fact, it may be "very limited" and still pass
5    constitutional muster. A predeprivation hearing serves only as "an
     initial check against mistaken decisions—essentially, a
6    determination of whether there are reasonable grounds to believe that
     the charges are true and support the proposed action." To that end, a
7    plaintiff need only be accorded "oral or written notice of the charges
     against him, an explanation of the [government's] evidence, and an
8    opportunity to present his side of the story."

9    *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983–85 (9th Cir. 1998)

10   (internal citations omitted) (fourth alteration in original); *see also Pavel v. Univ. of Or.*, 774 F.

11   App'x 1022, 1025 (9th Cir. 2019).[11]

12   Plaintiffs contend that the Fair defendants provided them with no notice or opportunity to

13   be heard whatsoever. (*See* Doc. No. 122 at 28.) However, it is undisputed that an employee of

14   the Fair texted plaintiff Long regarding Cedar on June 26 and directed her to contact defendant

15   MacFarlane (Doc. No. 133-44 at 2); that plaintiff Long then called defendant MacFarlane, who

16   requested that she return Cedar for slaughter because MacFarlane believed that plaintiff Long's

17   actions constituted theft under Penal Code § 487a (Doc. No. 133-42 at ¶ 35); that on June 27,

18   plaintiff texted defendant MacFarlane that she had "made arrangements to pick up the goat

19   tomorrow" (Doc. Nos. 133-42 at ¶ 40; 133-46 at 2); that plaintiff Long emailed the Fair on

20   June 27 stating she had "decided to break the rules and take the goat that night and deal with the

21   consequences later" and that "[i]f the only solution is to return the goat for slaughter and bbq

22   meat, then I will return it" (Doc. No. 133-9 at 5–6); that defendant Silva responded via email on

23   June 28 (Doc. No. 133-9 at 4); that in that email defendant Silva thanked plaintiff Long for

24   contacting her and explained that, while she was "not unsympathetic," the Fair would

25   nevertheless not be "[m]aking an exception" and that plaintiff Long "will need to bring the goat

26   back" (*id.*); that also on June 28, defendant MacFarlane asked to meet with plaintiff Long that day

27

28   ---
     [11] Citation to the unpublished Ninth Circuit opinions cited throughout this order is appropriate
     pursuant to Ninth Circuit Rule 36-3(b).

     21

1    and twice asked her to "[p]lease respond" (Doc. No. 133-46 at 2); and that on June 29 plaintiff

2    Long sent defendant Silva a letter in which she argued that Cedar was the property of plaintiff

3    E.L., not the property of the Fair (Doc. Nos. 133-10 at 6–9; 133-42 at ¶ 50).

4         At the June 26, 2025 hearing on the pending motions, plaintiffs' counsel clarified that they

5    were arguing that the Fair defendants were obligated to provide notice and opportunity to be

6    heard after July 8, 2022, when defendants MacFarlane and Silva took possession of Cedar.

7    Plaintiffs' counsel argued that the communications described above between plaintiffs and

8    defendants MacFarlane and Silva prior to July 8, 2022 did not satisfy the Due Process Clause of

9    the Fourteenth Amendment because MacFarlane and Silva did not have the goat in their

10   possession at that time.  Plaintiffs' counsel also argued at the hearing that the Ninth Circuit's

11   decision in *Wright v. Beck*, 981 F.3d 719 (2020) supports their contention in this regard.  In fact,

12   in *Wright* the Ninth Circuit merely concluded that notice to the plaintiff of the seizure of his

13   property did not also satisfy the need for a separate notice of destruction of that property.

14   Nothing in the Ninth Circuit's decision in *Wright* suggests, as plaintiffs suggest here, that notice

15   to an individual and the providing of an opportunity to be heard regarding the destruction of their

16   property would somehow be categorically insufficient if the notice and opportunity to be heard

17   were provided while the individual was still in possession of that property.  The court therefore

18   rejects plaintiffs' argument that "absolutely no notice or hearing were provided" to them.  (*See*

19   Doc. No. 122 at 28.)  Instead, considering the communications between the parties described

20   above in conducting the balancing test under *Mathews*, the court finds that defendants

21   MacFarlane and Silva provided at least some minimal form of notice that they intended to

22   slaughter Cedar, an explanation of why they intended to do so, and an invitation to respond and

23   discuss the matter.

24        The court concludes that there was no clearly established law standing for the proposition

25   that defendants MacFarlane and Silva owed plaintiffs greater process under *Mathews* than that

26   which was provided here.  Plaintiffs have not pointed to any authority addressing remotely similar

27   circumstances to the facts of this case where a sale of an animal appeared to occur, the seller later

28   removed that property and expressly stated that they had broken the rules of the sale, the seller

1    then reversed their position and informed the defendants that the seller was the lawful owner of

2    the animal, law enforcement seized the animal in alleged violation of the plaintiff's procedural

3    due process rights and then at the direction of the purported owner turned the animal over to a

4    livestock manager, law enforcement told the livestock manager that the buyer was the legal owner

5    of the animal, and the livestock manager subsequently destroyed the animal at the direction of the

6    purported owner.  Not surprisingly, nor has the court located any such authority.  To the contrary,

7    one of the decisions cited by plaintiffs appears to contemplate the possibility that process similar

8    to that provided in this case might well satisfy the Fourteenth Amendment:

9        Severino waited 72 hours before seizing the horses and during that
         time the Sieberts contacted his office in order to discuss the situation
10       . . . .  That is not to say that a full-blown hearing is required, but at a
         minimum Pamela had the right to some sort of pre-deprivation
11       opportunity to be heard.  Of exactly what sort, we need not decide.
         It may well be that had Severino met with Pamela, allowing her an
12       opportunity to present her side of the case, that would be enough.
         We need not reach this question, however, because in this case not
13       only did Severino never meet with Pamela before he took the horses,
         but his office expressly told Pamela not to remove the horses from
14       the pasture and that he would contact her.  But Severino never did,
         instead removing the horses the next day.

15

16    *Siebert v. Severino*, 256 F.3d 648, 660 (7th Cir. 2001) (internal citations omitted).  The "absence

17    of closely corresponding factual and legal precedent" strongly supports the application of

18    qualified immunity to plaintiffs' procedural due process claim.  *Brewster*, 149 F.3d at 983; *see*

19    *also Pavel*, 774 F. App'x at 1025 ("Pavel has not presented any closely corresponding factual and

20    legal precedent to the circumstances where a formal administrative and police complaint had been

21    made by a student about a tenured professor who had access to a robust post-termination process.

22    . . .  The additional and nuanced due process rights which Pavel desires are not clearly established

23    in the law.  Consequently, the individual defendants merit qualified immunity.").

24        The court emphasizes that the relevant conduct here is that of defendants MacFarlane and

25    Silva, not that of Lt. Fernandez.  The decisions cited by plaintiffs regarding due process rights in

26    the context of the destruction of animals are therefore all far afield from the facts of this case.  *See*

27    *Porter v. DiBlasio*, 93 F.3d 301, 303–04 (7th Cir. 1996) (the defendant humane officer seized the

28    plaintiff's horses from a third-party's farm, treated the horses as strays, and then terminated the

plaintiff's property interests in the horses); *Siebert*, 256 F.3d at 652–53 (the defendant volunteer

for the Illinois Department of Agriculture entered the plaintiffs' fenced-in paddock without a

search warrant and seized the plaintiffs' horses with the assistance of several police officers);

*O'Neill v. Louisville/Jefferson County Metro Gov't*, 662 F.3d 723, 726 (6th Cir. 2011) ("[S]everal

uniformed officers of the Louisville Metro Animal Services (LMAS) intruded into the O'Neills'

home without a warrant and without consent, confiscated the O'Neills' two adult dogs and the

dogs' litter of seven puppies, neutered and spayed the adult dogs and implanted microchips in all

nine animals, and then required the O'Neills to pay over $1,000 to retrieve them, all without any

formal charges ever being lodged against the O'Neills."); *Phillips v. San Luis Obispo County*

*Dep't of Animal Regul.*, 183 Cal. App. 3d 372, 374–75 (1986) (the county department of animal

regulation seized the plaintiff's dog after it bit a child and ordered the dog to be destroyed);

*Carrera v. Bertaini*, 63 Cal. App. 3d 721, 724 (1976) ("[T]he Kings County ordinance allowing

the impoundment and sale of farm animals found to be 'at large' upon any street or public place

or upon any private property against the wishes of the owner of the property, and Penal Code

section 597f, to the extent that it commands the impoundment of any farm animal 'neglected' by

its owner, are constitutionally invalid . . . ."); *Recchia v. City of L.A. Dep't of Animal Servs.*,

No. 12-cv-07468-DDP-MRW, 2022 WL 845107, at *1–6 & n.3 (C.D. Cal. Mar. 22, 2022)

(considering allegations that police officers seized the plaintiff's birds without a warrant on health

and safety grounds and that a city veterinarian concluded that the birds had been exposed to

serious diseases and needed to be euthanized, but not addressing whether the veterinarian was

entitled to qualified immunity because the veterinarian was sued only in his official capacity).[12]

---

[12]  The district court's decision in *Recchia* that plaintiffs cite was issued after the Ninth Circuit had reversed in part the district court's prior decision and remanded the case.  2022 WL 845107, at *2.  Notably, the Ninth Circuit did not consider the viability of any claim against the veterinarian predicated on his involvement in euthanizing the birds.  *See Recchia v. L.A. Dep't of Animal Servs.*, 889 F.3d 553, 561 (9th Cir. 2018) ("However, Recchia alleges a Fourteenth Amendment violation against only the Officers, not the veterinarian.").  Plaintiffs do not cite the Ninth Circuit's decision in *Recchia* and for good reason—it does not supply any clearly established law relevant to the Fair defendants in this regard.  *Cf. Borenstein v. Animal Found.*, 526 F. Supp. 3d 820, 842–43 (D. Nev. 2021) ("Borenstein sues Zavala . . . for substantive due process, procedural due process, equal protection, and unreasonable seizure.  . . .  There are few cases that deal with constitutional issues related to a local government taking animals, and they

24

None of the cases listed above and relied upon by plaintiffs here involved, for example, a claim against an official who destroyed an animal pursuant to the direction of an individual that law enforcement had stated was the animal's legal owner.

The decision cited by plaintiffs involving animals that addresses arguably the most analogous circumstances to those presented here is *Hollandsworth v. City and County of Honolulu*, 489 F. Supp. 3d 1085 (D. Haw. 2020). In that case, the plaintiff alleged that the defendant Wolfram, a police officer, "gave [the plaintiff] a horse, then later changed her mind and used police assistance to retrieve that horse." 489 F. Supp. 3d at 1090. However, in that case the district court was only addressing the sufficiency of the allegations against the officer who assisted defendant Wolfram in retrieving the horse:

> Whatever process the *Mathews* test requires in this case, more is required than Defendant Lum's personal conviction that Defendant Wolfram was the proper legal owner. . . . Defendant Lum arrived on the scene before any dispute had occurred (indeed before Plaintiff herself had arrived), and he asserted that he was in charge of the situation and entitled to determine who would take the horse. The Court again emphasizes the default rule that notice and opportunity to be heard should be provided prior to the state assisting in depriving a person of property. . . . [T]he default rule applies to police providing standby assistance during a private repossession. Accordingly, defendant Lum is not entitled to qualified immunity because the law is clearly established.

*Id.* at 1095, 1097–98. The claims remaining in this action do not involve police providing standby assistance. In their supplemental briefing, the Fair defendants argue that "[t]o the extent that these cases [cited by plaintiffs] establish a consensus of the courts, that consensus does not extend beyond the proposition that animals are property for which due process is required prior to seizure. If Lieutenant Fernandez was an active defendant in this case, these cited cases may be

---

do not reveal any consensus or clear application to this case. *See, e.g.*, *Recchia v. City of Los Angeles Dep't of Animal Servs.*, 889 F.3d 553 (9th Cir. 2018) (seizure and due process claims for euthanized birds); *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996) (seizure and due process claims for horses). . . . Because . . . there is no clearly established law, Zavala is entitled to qualified immunity."); *Huemer v. Santa Cruz County Animal Shelter Found.*, No. 21-cv-07372-SVK, 2022 WL 2276891, at *5 (N.D. Cal. June 23, 2022) (dismissing the plaintiffs' procedural due process claim with leave to amend because the Ninth Circuit's decision in *Recchia* "left open the issue of whether a similar plaintiff could state a claim against persons involved in the decision to euthanize the birds, such as the veterinarian Doe Defendants in this case").

1    applicable.  He is not, and they are not."  (Doc. No. 150 at 8.)  The court agrees with the Fair

2    defendants in this regard.

3        In their own supplemental briefing, plaintiffs argue that "it is also clearly established an

4    additional, separate notice is required before the seized property can actually be destroyed."

5    (Doc. No. 151 at 21–22) (citing *Wright*, 981 F.3d at 731; *Schneider v. County of San Diego*, 28

6    F.3d 89, 93 (9th Cir. 1994)).  Indeed, the Ninth Circuit has held "that the obligation to provide

7    notice was clearly established" where the defendant police officer "was seeking ex parte

8    permission to *destroy* the firearms—a permanent kind of deprivation."  *Wright*, 981 F.3d at 736;

9    *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) ("[T]he State may not finally

10   destroy a property interest without first giving the putative owner an opportunity to present his

11   claim of entitlement.").

12       However, the facts of *Wright* are again much different from those presented here:  In

13   *Wright*, the Los Angeles police department ("LAPD") seized the plaintiff's firearms pursuant to a

14   search warrant; one defendant, officer Edwards, spent seven years negotiating with the plaintiff

15   over whether the plaintiff could prove his ownership of the firearms; the plaintiff filed a motion in

16   state court for return of his firearms; the court instructed the parties to try to resolve the

17   ownership status informally amongst themselves; the defendant officer Edwards nevertheless

18   submitted an *ex parte* application to a different state court for an order permitting destruction of

19   the firearms; that court granted the application; and "the LAPD destroyed the remaining 300-plus

20   firearms, over which Wright continued to assert ownership."  981 F.3d at 723–725.  That is, the

21   defendant in *Wright* applied *ex parte* for an order to destroy the plaintiff's property "despite

22   knowing that [the plaintiff] had a pending claim of ownership."  *Id.* at 737; *see also id.* at 736

23   ("Further, the obviousness of the constitutional violation is especially evident given the Ventura

24   Court's September 2011 instruction to attempt to resolve the dispute informally and to return to

25   court, if necessary.").

26       The plaintiff in *Wright* did not, for instance, assert claims against those in the LAPD who

27   received and destroyed the firearms pursuant to the state court's order.  *See id.* at 726.  The Ninth

28   Circuit therefore did not consider whether or what process those individuals would be required to

1   provide or, for instance, to what extent those individuals would need to verify that the defendant

2   officer Edwards had resolved the ownership of the firearms in accordance with the requirements

3   of due process.  In this action, the undisputed evidence before the court on summary judgment

4   establishes that defendants MacFarlane and Silva believed that Cedar had been stolen from

5   defendant Muse; that Lt. Fernandez contacted MacFarlane in the course of his investigation

6   regarding Cedar; that approximately two weeks later law enforcement retrieved Cedar; that Lt.

7   Fernandez believed defendant Muse to be the legal owner of Cedar and therefore called defendant

8   Muse to ask where Cedar should be placed; that defendant Muse directed Lt. Fernandez to leave

9   Cedar in the care of defendant MacFarlane; and that Lt. Fernandez told defendant MacFarlane

10  that defendant Muse was the legal owner of Cedar.  (FUF ¶¶ 40, 43, 60, 72, 78; MUF ¶¶ 15, 16.)

11  No evidence presented on summary judgment suggests that plaintiffs contacted defendants

12  MacFarlane, Silva, or Muse regarding Cedar's ownership between the time that defendant

13  MacFarlane took possession of Cedar and the time that defendants arranged for Cedar's

14  slaughter.[13]  (*See* Doc. No. 133-42 at ¶¶ 53–59.)

15          Under these highly unusual facts, the court cannot say that every reasonable livestock

16  manager or fair supervisor would have known that they were required to provide plaintiffs with

17  more notice and opportunity to be heard than had already been provided to them.[14]  Consequently,

18  the court cannot find in these unique circumstances that the Fair defendants "had 'fair notice that

19  [their] conduct was unlawful' but still engaged in it."  *Wright*, 981 F.3d at 734; *see also White*,

20  580 U.S. at 80 (noting that the court of appeals had "recognized that 'this case presents a unique

---

21  [13]  Between July 15 and July 27, 2022, plaintiffs did contact the Shasta County Sheriff's Office
22  and the Shasta County Office of County Counsel regarding Cedar's location, and those offices
    "refused to provide information."  (Doc. No. 133-42 at ¶ 58.)  However, as noted above, plaintiffs
23  have already dismissed their claims originally brought against defendants County of Shasta,
    Shasta County Sheriff's Department, and various law enforcement officers pursuant to the
24  parties' settlement agreement approved by the court in its November 1, 2024 order.  (*See* Doc.
    No. 113.)
25

26  [14]  To reiterate, the court does not assess whether the Fair defendants in fact were required to
    provide plaintiffs with additional notice and opportunity to be heard under *Mathews*.  The court
27  merely concludes that, even if the Fourteenth Amendment did require such additional process,
    every reasonable official in the position of defendant MacFarlane or defendant Silva would not
28  have known that such additional process was required under these unusual circumstances.

1    set of facts and circumstances'" and that "[t]his alone should have been an important indication to

2    the [Tenth Circuit] majority that White's conduct did not violate a 'clearly established right'").

3          Accordingly, defendant MacFarlane and Silva's motion for summary judgment in their

4    favor as to plaintiffs' Fourteenth Amendment claim asserted against them will be granted on

5    qualified immunity grounds.[15]

6                    *b.    Sham Affidavits*

7          Plaintiffs contend for the first time in their reply in support of their motion for summary

8    judgment that qualified immunity is not appropriate here because the affidavits of MacFarlane

9    and Silva attached to the Fair defendants' motion for summary judgment are shams.  (Doc.

10   No. 139 at 10.)  The court rejects plaintiffs' arguments based upon the sham affidavit rule.

11         "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an

12   affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d

13   262, 266 (9th Cir. 1991).  "The rationale underlying the sham affidavit rule is that a party ought

14   not be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment."

15   *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009).  Specifically, plaintiffs challenge

16   several portions of the affidavits submitted in support of defendants' motion for summary

17   judgment addressing whether and when defendants MacFarlane and Silva ever communicated

18   with law enforcement or the district attorney's office.  (Doc. No. 139 at 10–13.)

19         The court rejects plaintiffs' argument as improperly raised for the first time in a reply

20   brief.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("[A] district court need not

21   consider arguments raised for the first time in a reply brief.").  The court also rejects plaintiffs'

22   _____

23   [15]  In a one-sentence footnote in their opposition to the Fair defendants' motion for summary
     judgment, plaintiffs argue that plaintiff Long "had a right to inspect Cedar as evidence of the
24   crime for which she was being investigated; Cedar's slaughter by Fair Defendants amounted to
     destruction of evidence and is a further a [sic] due process violation under *Arizona v. Youngblood*,
25   488 U.S. 51 (1988)."  (Doc. No. 133 at 17 n.7.)  In its decision in *Youngblood*, the Supreme Court
     held "that unless a criminal defendant can show bad faith on the part of the police, failure to
26   preserve potentially useful evidence does not constitute a denial of due process of law."  488 U.S.
     at 58.  Plaintiffs do not provide any explanation or argument in support of their contention in this
27   regard, nor does such a theory or similar factual allegations even appear in plaintiffs' SAC.  The
     court rejects plaintiffs' conclusory and unexplained argument, which provides no basis upon
28   which to deny the Fair defendants' motion for summary judgment.

                                    28

1    argument on the merits for at least two separate reasons.  First, whether or not defendants

2    MacFarlane and Silva communicated with, or relied on statements from, law enforcement or the

3    district attorney's office is immaterial to the resolution of the pending motions.  That is,

4    regardless of the resolution of the facts addressed in the affidavits, defendants MacFarlane and

5    Silva are still entitled to qualified immunity on the basis of the total absence of clearly established

6    law as to what due process requires in these circumstances.  Second, as to several portions of the

7    affidavits which they challenge, plaintiffs do not point to any relevant prior deposition testimony

8    of defendants MacFarlane and Silva, let alone prior deposition testimony that is clearly and

9    unambiguously inconsistent with defendants' statement in their affidavit as required by the sham

10    affidavit rule.  *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009) ("[T]he

11    inconsistency between a party's deposition testimony and subsequent affidavit must be clear and

12    unambiguous to justify striking the affidavit.").

13         Plaintiffs' arguments regarding the sham affidavit rule therefore provide no basis upon

14    which to deny the Fair defendants' motion for summary judgment as to plaintiffs' procedural due

15    process claim brought against defendants MacFarlane and Silva.

16         2.    Fourth Amendment Claim Against Defendants MacFarlane and Silva

17         The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure

18    in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

19    Const. amend. IV.  "The Fourth Amendment does not proscribe all state-initiated searches and

20    seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248,

21    250 (1991) (citations omitted).

22         In their pending motion, the Fair defendants argue without citation to authority that

23    plaintiffs lack standing to assert their Fourth Amendment claims because Cedar was no longer

24    plaintiffs' property after the Auction.  (Doc. No. 119-1 at 20.)  At the June 26, 2025 hearing on

25    the pending motions, the Fair defendants withdrew this argument.  In any event, plaintiffs do not

26    lack standing to assert their Fourth Amendment claim.  *See Lavan v. City of Los Angeles*, 693

27    F.3d 1022, 1027–28 (9th Cir. 2012) ("A 'seizure' of property occurs when there is some

28    meaningful interference with an individual's possessory interests in that property."); *Terry v.*

1   *Enomoto*, 723 F.2d 697, 699 (9th Cir. 1984) ("It is hornbook law that even a thief has a

2   possessory interest in property that he has stolen."); *Lavan*, 695 F.3d at 1030 ("Indeed, the

3   Supreme Court has recognized protected possessory interests even in contraband . . . . [T]he City

4   meaningfully interfered with Appellees' possessory interests in that property.  No more is

5   necessary to trigger the Fourth Amendment's reasonableness requirement.").

6           However, the court concludes that defendants MacFarlane and Silva are also entitled to

7   qualified immunity as to plaintiffs' Fourth Amendment claim brought against them for similar

8   reasons to those discussed above, namely the absence of clearly established law.[16]  Plaintiffs

9   argue that it is clearly established that a warrantless seizure is presumptively unreasonable.  (Doc.

10  No. 122 at 32–33.)  Clearly, that principle is at too high a level of generality to support the denial

11  of qualified immunity in these circumstances.  *See Hill v. City of Fountain Valley*, 70 F.4th 507,

12  517 n.6 (9th Cir. 2023) ("The dissent minimizes the unique nature of this case by saying that it is

13  clearly established precedent that a warrantless in-home arrest is illegal when there is not

14  probable cause and exigent circumstances.  But the Supreme Court has cautioned us, especially in

15  the Fourth Amendment context, from reciting a general rule and using it to deny qualified

16  immunity.  Rather, 'clearly established law' usually means there is a case 'where an officer acting

17  under similar circumstances was held to have violated the Fourth Amendment.'") (internal

18  citations omitted); *see also Est. of Hernandez by and through Hernandez v. City of Los Angeles*,

19  139 F.4th 790, 802 (9th Cir. 2025) (en banc) ("Although 'general statements of the law are not

20  inherently incapable of giving fair and clear warning,' 'specificity is especially important in the

21  Fourth Amendment context, where the [Supreme] Court has recognized that "it is sometimes

22  difficult for an officer to determine how the relevant legal doctrine . . .  will apply to the factual

23  situation the officer confronts[.]" ' ") (alterations in original) (internal citations omitted).

24          Plaintiffs have not presented any Fourth Amendment authority addressing circumstances

25  comparable to those presented here, nor has the court located any.  For instance, nearly all of the

26  ────────────────────

27  [16]  The court also finds that plaintiffs' arguments regarding the sham affidavit rule provide no
    basis upon which to deny the Fair defendants' motion for summary judgment as to plaintiffs'
    Fourth Amendment claim, for the same reasons discussed above as to plaintiffs' Fourteenth

28  Amendment due process claim.

1   decisions relied upon by plaintiffs in this regard considered circumstances where law enforcement

2   officers shot the plaintiffs' dogs.  *See, e.g.*, *Fuller v. Vines*, 36 F.3d 65, 66 (9th Cir. 1994) ("James

3   Fuller, Sr. contends that he pleaded with the officers not to shoot his dog and told them that he

4   could control him.  Nonetheless, the officers shot Champ twice, and Champ died shortly

5   thereafter."); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d

6   962, 967–68 (9th Cir. 2005) ("The role of the [San Jose police officers] was to effect entry and

7   secure the premises at the various locations for the search teams.  The Vieiras and Souza both had

8   large, aggressive dogs.  The SJPOs shot and killed dogs at both residences."); *Criscuolo v. Grant

9   County*, 540 F. App'x 562, 563 (9th Cir. 2013) ("Criscuolo and other witnesses claim that right

10  before [the defendant deputy sheriff] Lamens fired, [the plaintiff's dog] Slyder was not springing

11  toward [the police dog] Maddox, Slyder was stationary or retreating at a distance of 10–20 feet

12  from Lamens and Maddox, and Criscuolo was one to two feet away and about to leash Slyder.").

13  In these cases, and many others, the defendant officials killed or wounded the animals without the

14  permission of the animals' owners, not—at least in the officials' minds—at the direction of those

15  owners.

16      None of the cases cited by plaintiffs addresses circumstances like those here, where law

17  enforcement told the livestock manager that the legal owner of the animal had requested that it be

18  delivered to the livestock manager, and then the livestock manager arranged for the slaughter of

19  the animal with the approval of the purported legal owner.  The court cannot find that every

20  reasonable livestock manager, or their supervisor, would know that the slaughter of the animal in

21  these unique circumstances would violate plaintiffs' Fourth Amendment rights absent a warrant

22  or judicial order.  *See Recchia*, 889 F.3d at 560 ("[I]n assessing reasonableness, we look at what

23  was known to the [officials] at the time of seizure.").  The court's conclusion is strengthened by

24  the specificity with which the Ninth Circuit has conducted the second step of the qualified

25  immunity analysis with regard to Fourth Amendment claims.  *See, e.g.*, *Sabbe v. Wash. County

26  Bd. of Comm'rs*, 84 F.4th 807, 826 (9th Cir. 2023) ("We are unaware of any Supreme Court or

27  federal court of appeals decision quantifying or characterizing the degree of force involved in

28  using an armored vehicle to execute a low-speed PIT maneuver, let alone any precedent that

31

would have clearly established that the officers' use of the V150 under these circumstances was unconstitutional."); *see also Bernal v. Sacramento County Sheriff's Dep't*, 73 F.4th 678, 698 (9th Cir. 2023) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12–13 (2021)); *Seidner v. de Vries*, 39 F.4th 591, 601 (9th Cir. 2022).

Plaintiffs additionally argue that defendants MacFarlane and Silva's belief that defendant Muse was the legal owner of Cedar was objectively unreasonable because plaintiffs offered to pay damages for Cedar and asserted their property rights in the animal, because neither defendant Muse nor anyone else ever paid for Cedar, and because defendant Muse had already been "unjustly enriched with replacement meat." (Doc. No. 133 at 25–26.) The court construes plaintiffs' argument to be that the true ownership of the goat was sufficiently clear that any reasonable official would have known that they were violating plaintiffs' Fourth Amendment rights by slaughtering Cedar. (*See id.* at 26) (citing *Recchia*, 2022 WL 845107, at *4).

The court is not persuaded by this argument. A livestock manager in the position of defendant MacFarlane, or a supervisor in the position of defendant Silva, could be aware of the apparent sale of Cedar at the Auction, be aware that plaintiffs removed Cedar from the fairgrounds later that night, be aware that law enforcement investigated the matter as one involving stolen property, and be aware that the results of that investigation were law enforcement turning Cedar over to defendant Muse—described by law enforcement as the animal's legal owner—and on that basis reasonably believe that defendant Muse was in fact the legal owner of the auctioned goat.[17] Plaintiffs devote four pages of their opposition to various issues regarding Cedar's ownership, including whether the failure of any bidder to ultimately pay for Cedar meant that "no sale occurred as a matter of law"; whether title to Cedar passed to defendant Muse only upon delivery pursuant to California Commercial Code § 2401(2)(b) and the

/////

/////

---

[17]  The Fair defendants also contend that defendants MacFarlane and Silva knew that Lt. Fernandez had recovered Cedar from a third party, i.e., the owner of the Farm. (Doc. No. 119-1 at 26.) However, the evidence cited by the Fair defendants does not support their contention in this regard.

1   Ninth Circuit's decision in *In re Western States Wire Corp.*, 490 F.2d 1065 (9th Cir. 1974);[18]

2   whether plaintiff E.L. had the right to disaffirm the sale of Cedar despite plaintiff Long signing a

3   fair registration form on plaintiff E.L.'s behalf; and whether plaintiffs had "the right to commit an

4   efficient breach of the contract and offer to pay damages." (*Id.* at 17–21.)  The court simply

5   cannot conclude that every reasonable livestock manager or fair supervisor would have navigated

6   this tangled web of California contract law in the manner proposed by plaintiffs and come to

7   conclude that their conduct would violate plaintiffs' Fourth Amendment rights.[19]  *See Mullenix*,

8   577 U.S. at 11 ("A clearly established right is one that is 'sufficiently clear that every reasonable

9   official would have understood that what he is doing violates that right.'"); *al-Kidd*, 563 U.S. at

10  742; *Regino v. Staley*, 133 F.4th 951, 962 (9th Cir. 2025).

11          Notably, plaintiffs provide no authority in support of their argument in this regard.

12  Plaintiffs cite only the district court's decision in *Recchia*, arguing that there the court had held

13  "government conduct unreasonable where officials seized birds belonging to [the] unhoused

14  plaintiff, and, after deeming them unhealthy, euthanized them without a hearing." (Doc. No. 133

15  at 26) (citing *Recchia*, 2022 WL 845107, at *4); *see also Recchia*, 2022 WL 845107, at *4

16  ("Thus, the dispositive issue before the court is whether it would have been clear to a reasonable

17  official that Plaintiff had a cognizable property interest in his pigeons at the time they were seized

18  and euthanized.").  But as noted above, the plaintiff in *Recchia* asserted claims against the

19  veterinarian who euthanized the birds only in his official capacity.  *See Recchia*, 2022 WL

20  845107, at *2, *5 n.3.  Qualified immunity was therefore not at issue as to the veterinarian in that

21  case.  *See id.*; *Wright*, 981 F.3d at 737 ("Qualified immunity is, however, 'available only to

22  government officials sued in their individual capacities' and is '*not* available to those sued only in

23

---

24  [18]  In that decision, the Ninth Circuit addressed at what point a sale by auction is complete and at
    what time title to goods sold at auction passes to the buyer.  *See In re W. States Wire Corp.*, 490
25  F.2d at 1067–68.  As noted, the court need not address the issue of whether and when title to the
    goat was transferred in order to resolve the pending motions.
26

27  [19]  Because the court concludes that the defendants are entitled to summary judgment on qualified
    immunity grounds regardless of who actually owned Cedar as a matter of law, the court does not
28  address whether plaintiffs' analysis in this regard is in fact correct.

1    their official capacities.'") (citation omitted).  Rather, the district court in *Recchia* denied

2    qualified immunity only as to the defendant police officers who had initially seized the plaintiff's

3    birds.  *See* 2022 WL 845107, at \*1, \*4–5.

4        Accordingly, the Fair defendants' motion for summary judgment in their favor as to

5    plaintiffs' Fourth Amendment claim asserted against them will be granted.[20]

6        3.    First Amendment Claim Against Defendants MacFarlane and Silva

7        As noted, plaintiffs also assert a claim against defendants MacFarlane and Silva for

8    viewpoint discrimination in violation of the First Amendment on the grounds that those

9    defendants arranged for the slaughter of Cedar in retaliation for plaintiffs' view "that Cedar was

10   more than cuts of meat and deserved to live."  (Doc. No. 25 at 30–31.)  Plaintiffs argue that their

11   emails received by or forwarded to defendants MacFarlane and Silva offering to pay damages for

12   removing Cedar from the fairgrounds constituted protected activity, as did the Instagram Post.

13   (Doc. No. 133 at 27.)

14       "To recover under § 1983 for such retaliation [in violation of the First Amendment], a

15   plaintiff must prove:  (1) he engaged in a constitutionally protected activity; (2) as a result, he was

16   subject to adverse action by the defendant that would chill a person of ordinary firmness from

17   continuing to engage in the protected activity; and (3) there was a substantial causal relationship

---

18   [20]  In their opposition to the Fair defendants' motion for summary judgment, plaintiffs argue in a
19   one-sentence footnote that "Ms. Silva and Mr. Macfarlane violated their ministerial duties when
     they forewent compliance with the Mandatory Forfeiture Provisions in Local Rules and State
20   Rules, making qualified immunity inappropriate."  (Doc. No. 133 at 24 n.12) (citing *Groten v.*
     *California*, 251 F.3d 844, 851 (9th Cir. 2001)).  "Qualified immunity shields only actions taken
21   pursuant to discretionary functions."  *F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1314 (9th Cir.
     1989).  The Ninth Circuit's decision in *Groten*, cited by plaintiffs, reversed the district court's
22   grant of qualified immunity at the motion to dismiss stage of the litigation.  *Cf. O'Brien v. Welty*,
     818 F.3d 920, 936 (9th Cir. 2016) ("When . . . defendants assert qualified immunity in a motion
23   to dismiss under Rule 12(b)(6), 'dismissal is not appropriate unless we can determine, based on
     the complaint itself, that qualified immunity applies.'").  Moreover, the Ninth Circuit's decision
24   in *Groten* was issued under the more liberal pleading standard that applied prior to the Supreme
     Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  The court finds that
25   plaintiffs' conclusory argument regarding ministerial duties provides no basis upon which to deny
     the Fair defendants' motion for summary judgment here.  *See F.E. Trotter*, 869 F.3d at 1314 ("[I]f
26   an official is required to exercise his judgment, even if rarely or to a small degree, the Court
27   would apparently not find the official's duty to be ministerial in nature.") (alterations in original).

28

34

1    between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*,

2    608 F.3d 540, 543 (9th Cir. 2010).  As to the third element, "[i]f there is a finding that retaliation

3    was not the but-for cause of the [adverse action], the claim fails for lack of causal connection

4    between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in

5    the official's mind." *Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (second alteration in

6    original).  "[I]f the government officials would have taken the same adverse action even in the

7    absence of their animus or retaliatory motive arising from the plaintiff's speech, then the officials'

8    animus was not a but-for cause of the adverse action, and there was no violation of the plaintiff's

9    constitutional rights." *Id.*; *see also Gallagher v. San Diego Unified Port Dist.*, 668 F. App'x 786,

10   786 (9th Cir. 2016) ("Gallagher's evidence does not show that retaliation was *the* cause of the

11   non-renewal of his anchorage permit, as the but-for test requires."); *T.B. ex rel. Brenneise v. San*

12   *Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015) ("There was no evidence that the

13   district's actions were connected to Mrs. Brenneise's advocacy.  As discussed above, there were

14   many plausible explanations why the district may have failed to provide a nurse, SEHT or SET.

15   Retaliation was not one of them.").

16          The Fair defendants argue that there is no genuine dispute of material fact that plaintiffs

17   did not engage in protected activity prior to defendants' acts and that plaintiffs' views were not a

18   but-for cause of defendants' conduct.  (Doc. No. 119-1 at 23–25.)  Plaintiffs argue in opposition

19   that without the impetus to retaliate, the Fair defendants would have enforced certain provisions

20   in the Exhibitor and State Rules purportedly governing the return of livestock under these

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

35

1   circumstances,[21] returned Cedar to plaintiffs pursuant to those Rules, and not have arranged for

2   the goat's slaughter.  (Doc. No. 133 at 29.)

3          It is undisputed that defendants MacFarlane and Silva intended to slaughter Cedar before

4   they became aware of plaintiffs' purported protected activity, and that they continued to intend to

5   do so afterwards.  *Cf. Villanueva v. County of Los Angeles*, No. 2:24-cv-04979-SVW-JC, 2025

6   WL 1545683, at *10 (C.D. Cal. May 15, 2025) (granting summary judgment on the plaintiff's

7   First Amendment retaliation claim because of, *inter alia*, the timing of the adverse action and the

8   protected activity).  Indeed, in defendant Silva's email cited by plaintiffs in support of their

9   argument, defendant Silva stated that she was "not unsympathetic regarding your daughter and

10  her love for her animal" but that "[m]aking an exception for you will only teach ou[r] youth that

11  they do not have to abide by the rules that are set up for all participants. . . .  I have spoken with

12  the California Department of Food and Agriculture and they have informed me that for the good

13  of all we have to stick to the State Rules.  You will need to bring the goat back to the Shasta

---

14  [21]  The Exhibitor Rules state in relevant part as follows:

15
16              Any animal removed from the grounds prior to release times, without
                permission and proper release forms will forfeit all premiums and
                awards. . . .

17
18              ANIMALS . . . May NOT be . . . removed from the grounds prior to
                Sunday, June 26, 2022, according to the release times shown above
                (Premiums will be forfeited if any are removed early). . . .

19
20              RULE COMPLIANCE:  Any Exhibitor, who fails to conform to
                accepted standards of conduct, will be removed immediately (with
                livestock) from the Fairgrounds and all premiums and auction
21              proceeds forfeited, if the situation is of a serious nature.

22  (POUF ¶ 83.)

23  The State Rules state in relevant part as follows:

24              Exhibitors . . . and parents found, after a chance to provide evidence
                and be heard before the Fair Management (CEO and staff) of
25              unethical practices as set forth in the State and [Exhibitor] Rules or
                in actions inimical with the fair program shall result in the exhibit
26              [animal] being disqualified and the forfeiture of any awards and/or
                privileges as may be deemed appropriate to the circumstances by the
27              Fair Management.

28  (POUF ¶ 84.)

1    District Fair immediately." (Doc. No. 133-9 at 4.) Similarly, it is undisputed that defendant

2    MacFarlane believed that slaughtering Cedar was required by the Exhibitor Rules, because the

3    Fair is a terminal fair. (Doc. No. 119-3 at ¶ 6.) Finally, it is undisputed that all 42 market goats

4    sold at the Fair were in fact slaughtered. No evidence before the court on summary judgment

5    suggests that either defendant at any time intended to pursue any course of action other than

6    slaughtering the goat, nor that either defendant ever viewed Cedar as different from any of the 41

7    other market goats sold at the Fair—all of which were slaughtered.[22]

8          In their opposition, plaintiffs simply assert in conclusory fashion that, absent animus,

9    defendants MacFarlane and Silva would have provided additional due process by applying the

10   Exhibitor and State Rules quoted above. (Doc. No. 133 at 29.) The only evidence cited by

11   plaintiffs in support of their argument in this regard is the text of those Rules. (*Id.*) (citing POUF

12   ¶¶ 83, 84.) Plaintiffs do not cite any evidence before the court on summary judgment suggesting

13   that defendants MacFarlane and Silva believed that those Rules governed their conduct in this

14   situation, that defendants MacFarlane and Silva ever intended to follow those Rules as interpreted

15   by plaintiffs, or even that defendants MacFarlane and Silva were aware of those Rules at the

16   relevant times. To the contrary, when plaintiffs' counsel directed her attention to those Rules at

17   her deposition, defendant Silva testified that she did not believe that those Rules applied to this

18   situation because the goat had already been sold at the Auction.[23] (*See* Silva Dep. Tr. Vol. I,

19   247:25–248:8, 271:8–278:11.) Defendant Silva also testified that she was not aware of the

20   Exhibitor Rule regarding "Rule Compliance" quoted above. (*Id.*)

21   _____

22   [22] Because the court concludes that there is no genuine dispute that defendants MacFarlane and
     Silva "would have taken the same adverse action even in the absence of" any animus, *Boquist*, 32

23   F.4th at 778, the court assumes without deciding both that plaintiffs engaged in protected activity
     and that defendants MacFarlane and Silva harbored some animus or retaliatory motive. *See*

24   *Howard v. City of Coos Bay*, 871 F.3d 1032, 1045, 1047–48 (9th Cir. 2017) (assuming without
     deciding that the plaintiff had demonstrated protected speech but nevertheless affirming the

25   district court's grant of summary judgment in the defendant's favor on the grounds that the
     defendant would have taken the adverse action even absent any animus).

26

27   [23] Defendant MacFarlane testified in his deposition that he did not review the Exhibitor or State
     Rules in June 2022 and that enforcement of the Rules was the responsibility of defendant Silva as

28   the CEO of the Fair. (MacFarlane Dep. Tr. Vol. II, 235:9–236:4.)

1         Moreover, as discussed above, plaintiffs expressly acknowledge in their supplemental

2    briefing that all of the evidence before the court on summary judgment establishes that defendants

3    MacFarlane and Silva never intended to comply with the Rules as interpreted by plaintiffs.

4    Plaintiffs argue therein that "the Fair Defendants did not rely on Lieutenant Fernandez to provide

5    due process (at the time of seizure or after), because all of them believed none was owed.  They

6    believed, in real time, that Cedar was stolen, so Plaintiffs simply had no rights to him at all,

7    whether under the 14th Amendment or otherwise.  They admitted this in depositions and all their

8    statements and papers up to the present are consistent."  (*Id.* at 18; *see also id.* at 19 ("Because of

9    that (erroneous) belief, the Fair Defendants *did not* rely on Lieutenant Fernandez to provide due

10   process (at the time of seizure or after) because *all of them believed none was owed*."), 20 ("Their

11   unshakeable belief that Plaintiffs stole Cedar . . . led them all to conclude Plaintiffs lacked *any*

12   rights to Cedar, including due process . . . .  [] Fair Defendants did not in real time believe, and

13   still do not believe, that Plaintiffs were entitled to any due process for Cedar[.]")).  The court

14   agrees that all of the evidence before it on summary judgment uniformly establishes that

15   defendants MacFarlane and Silva would not have followed the Exhibitor and State Rules as

16   plaintiffs argue they should have, regardless of any animus toward plaintiffs' engagement in

17   protected conduct they may have held.

18        The court finds the Ninth Circuit's decision in *Howard* to be instructive in this regard.  In

19   that decision, the Ninth Circuit noted that "when viewed in isolation, Howard's greater

20   credentials and the City's apparent violation of its own policies might support an inference of

21   retaliation."  *Howard*, 871 F.3d at 1047.  The Ninth Circuit nevertheless affirmed the district

22   court's grant of summary judgment on the grounds that "no reasonable jury could find that

23   Howard's suit was a substantial reason for the City's refusal to consider her for the Finance

24   Director position" in light of the evidence demonstrating that, "[r]ightly or wrongly . . .  the City

25   . . . would have rejected Howard's application . . . irrespective of her suit, and hired Baker

26   instead."  *Id.* at 1047–48.

27   /////

28   /////

1    Because the Fair defendants have shown no genuine dispute that any animus was the but-

2    for cause of defendants MacFarlane and Silva's conduct, the Fair defendants' motion for

3    summary judgment as to plaintiffs' First Amendment retaliation claim will also be granted.

4    **B.      Plaintiffs' Motion for Partial Summary Judgment**

5    Plaintiffs have moved for partial summary judgment in their favor as to their Fourth and

6    Fourteenth Amendment claims asserted against defendants MacFarlane and Silva.  (Doc.

7    No. 122.)  Because summary judgment will be granted in defendants' favor as to those claims for

8    the reasons discussed above, plaintiff's motion will be denied.

9    **C.      Defendant Muse's Motion for Summary Judgment**

10    Plaintiffs assert their First, Fourth, and Fourteenth Amendment claims against defendant

11    Muse, a private individual, pursuant to 42 U.S.C. § 1983 under theories of joint action and

12    conspiracy.  (*See* Doc. No. 134 at 19 ("Although the Supreme Court has articulated four tests for

13    determining whether a private individual's actions amount to state action, one of those tests, the

14    joint action test, is applicable here.")).

15    "A private individual may be liable under § 1983 if she conspired or entered joint action

16    with a state actor."  *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002), *overruled in part on other*

17    *grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009).  "To prove a conspiracy between the [state]

18    and [the private party] under § 1983, [the plaintiff] must show 'an agreement or "meeting of the

19    minds" to violate constitutional rights.'"  *Id.*; *accord O'Handley v. Weber*, 62 F.4th 1145, 1159

20    (9th Cir. 2023).  "The defendants must have, 'by some concerted action, intend[ed] to accomplish

21    some unlawful objective for the purpose of harming another which results in damage.'"

22    *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999).  "Such an

23    agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as

24    the actions of the defendants."  *Id.*  "For example, a showing that the alleged conspirators have

25    committed acts that 'are unlikely to have been undertaken without an agreement' may allow a

26    jury to infer the existence of a conspiracy."  *Id.*  "To be liable, each participant in the conspiracy

27    need not know the exact details of the plan, but each participant must at least share the common

28    objective of the conspiracy."  *Franklin*, 312 F.3d at 441.

39

1    Defendant Muse argues in her pending motion for summary judgment that all of plaintiffs'

2    claims asserted against her fail due to lack of state action, i.e., because defendant Muse is a

3    private individual and is not subject to suit under § 1983.  (Doc. No. 125.)  Specifically, she

4    argues that there is no evidence before the court on summary judgment suggesting that she

5    entered into any agreement with state actors with the goal of violating plaintiffs' constitutional

6    rights.  (Doc. No. 125 at 6–7.)  Defendant Muse does not dispute that she communicated with

7    various state actors, but she argues that these communications were because "she believed that the

8    4-H/FFA Community BBQ had been the victim of a crime."  (*Id.* at 7.)  She argues that her

9    communications "were all in furtherance of that belief, and the desire to have what she saw as

10   stolen property returned to its rightful owner—the [Barbecue].  Therefore, Mrs. Muse did not

11   have a meeting of the mind with any government actor to deprive the plaintiffs of constitutional

12   rights[.]"  (*Id.*)

13   In opposition, plaintiffs argue that a jury could reasonably find from the evidence that

14   defendant Muse knew she was not the victim of a crime, that her true motivation was retaliating

15   against plaintiffs for their belief that "Cedar was not food," and that defendant Muse retaliated

16   against plaintiffs by arranging the slaughter of Cedar without notice or judicial authorization.[24]

17

---

18   [24] Plaintiffs also argue that defendant Muse has failed to meet her burden of production because
     she has not provided an affidavit stating that she did not make any agreement with the Fair
19   defendants.  (Doc. No. 134 at 17–18) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)).
     The court finds this argument to be unpersuasive.  *See United Steelworkers of Am. v. Phelps*
20   *Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) ("The Steelworkers rely primarily on *Adickes*.
     . . . But the Supreme Court has given additional guidance in two subsequent decisions:  *Anderson*
21   *v. Liberty Lobby, Inc.*, 477 U.S. 242 [(1986)], and *Celotex Corp. v. Catrett*, 477 U.S. 317
     [(1986)].").  The Ninth Circuit rejected a similar argument to that advanced by plaintiffs in its
22   decision in *United Steelworkers*:

23

24                In *Celotex*, the court of appeals had relied on *Adickes* to reverse the
                  entry of summary judgment by the district court.  The Court held that
25                the *Adickes* language relied on by the court of appeals ["]should [not]
                  be construed to mean that the burden is on the party moving for
26                summary judgment to produce evidence showing the absence of a
                  genuine issue of material fact, even with respect to an issue on which
                  the nonmoving party bears the burden of proof.  Instead, as we have
27                explained, the burden on the moving party may be discharged by
                  'showing'—that is, pointing out to the district court—that there is an
28                absence of evidence to support the nonmoving party's case."

40

1    (Doc. No. 134 at 18.)  In reply, defendant Muse argues that plaintiffs have failed to come forward

2    with evidence on summary judgment suggesting that any of her communications with

3    MacFarlane, Silva, or Lt. Fernandez were undertaken for any reason other than reclaiming what

4    she believed to be her stolen property.  (Doc. No. 136 at 4–7.)

5          Plaintiffs' claims asserted against defendant Muse fail on summary judgment for several

6    independently sufficient reasons.  First, as discussed above and as plaintiffs argue at length in

7    their supplemental briefing, there is no genuine dispute that MacFarlane, Silva, and Lt.

8    Fernandez—the state actors with which defendant Muse allegedly conspired—believed at all

9    times that Cedar had been stolen.  (*See, e.g.*, Doc. No. 151 at 18 ("[W]hether Fair Defendants had

10   an objectively reasonable belief . . . is based on resolution of disputed facts, and is inappropriate

11   on summary judgment.  Indeed, the only relevant fact these parties actually agree on is that they

12   all believed, in real time, that Plaintiffs had no rights to Cedar whatsoever."); 19 ("Lieutenant

13   Fernandez, Ms. Silva, and Mr. MacFarlane, individually and collectively, echoed this same

14   sentiment in deposition, and there are simply too many examples to provide.")).  Plaintiffs

15   therefore cannot "show a 'meeting of the minds' between the government and the private party to

16   'violate constitutional rights.'"  *O'Handley*, 62 F.4th at 1159; *see also Franklin*, 312 F.3d at 441

17   ("[The plaintiff] has failed to provide any evidence that [detectives] Morse and Cassandro

18   conspired to violate [the plaintiff's] constitutional rights, much less that they entered such a

19   conspiracy with [private individual] Franklin-Lipsker."); *Radcliffe v. Rainbow Constr. Co.*, 254

20   F.3d 772, 783 (9th Cir. 2001) ("[T]here is insufficient evidence to raise a triable issue that [school

21   district official] Daniels conspired with the [non-state actor] Rainbow defendants.  The

_____

23
         Here, the burden of proof was on the Steelworkers to prove that
24       Phelps Dodge was a part of the conspiracy. Phelps Dodge, in moving
         for summary judgment, needed only to point to shortfalls in the
25       Steelworkers' case to demonstrate the absence of evidence
         connecting it to the conspiracy.

26
     865 F.2d at 1543 (internal citations omitted) (second alteration in original).  As explained in this
27   order, defendant Muse has both pointed to shortfalls in plaintiffs' case and come forward with her
     own evidence that at all times she lacked any intent to violate plaintiffs' constitutional rights.
28   Defendant Muse has thereby met her burden of production on summary judgment.

1    constitutional claims against Rainbow therefore depend on evidence that the Rainbow defendants

2    conspired with [district attorney] Massini to violate the plaintiffs' Fourth Amendment rights.").

3    Indeed, plaintiffs provide no explanation as to how the relevant state actors could have intended

4    to violate plaintiffs' constitutional rights despite plaintiffs' repeated argument that those state

5    actors believed "that Plaintiffs lacked *any* rights to Cedar" (Doc. No. 151 at 20) in the first place.

6    *Cf. O'Handley*, 62 F.4th at 1162–63 ("O'Handley has not alleged that Twitter and Secretary

7    Weber shared a goal of violating his or anyone else's constitutional rights.  There is no

8    unconstitutional conspiracy without this shared specific intent").[25]

9          Second, plaintiffs' claims asserted against defendant Muse fail because plaintiffs have

10    failed to provide any evidence that defendant Muse herself harbored any objective to violate

11    plaintiffs' constitutional rights.  Plaintiffs "do not dispute [that defendant Muse] *initially* held the

12    asserted belief that the goat had been stolen."  (MUF ¶ 9.)  However, they contend in their

13    opposition to defendant Muse's motion for summary judgment that defendant Muse realized at

14    some unspecified time that Cedar had not been stolen, or so a reasonable jury could find.[26]  (Doc.

15    No. 134 at 20.)  Plaintiffs advance four familiar arguments in support of this contention:

16    (1) Defendant Muse knew that no bidder ever paid for Cedar, meaning that no sale occurred as a

_____

17
18    [25]  At the June 26, 2025 hearing, the court granted plaintiffs leave to file a one-page letter brief of
      citations to authority establishing that specific intent was not required for a § 1983 conspiracy
      claim.  Plaintiffs subsequently filed a four-page brief arguing that specific intent is not a
19    prerequisite to § 1983 liability and that the Ninth Circuit's decision in *O'Handley* contains only a
      "cursory analysis" and "is not supported by its cited authority, or any authority."  (Doc. No. 156.)
20    Of course, the court has no occasion to consider whether the Ninth Circuit's binding decision in
      *O'Handley* is persuasive.  In any event, regardless of whether specific intent is required to
21    establish a conspiracy under § 1983, plaintiffs do not dispute that a meeting of the minds to
      violate constitutional rights is required.  The court concludes that no dispute of material fact
22    exists as to the absence of such an agreement for the reasons discussed above.

23
24    [26]  To be precise, plaintiffs again argue in somewhat unclear fashion that defendant Muse "could
      not have reasonably believed" that plaintiffs had stolen the goat because "that position very
25    quickly devolves into absurdity."  (Doc. No. 134 at 20.)  However, the objective reasonableness
      of defendant Muse's beliefs are immaterial to whether she subjectively held the goal of violating
26    plaintiffs' constitutional rights, as required by the conspiracy and joint action tests for § 1983
      liability as to private individuals.  Nevertheless, because plaintiffs do clearly dispute whether
27    defendant Muse maintained her initial belief that Cedar was stolen—in notable contrast to
      plaintiffs' positions regarding the beliefs of MacFarlane, Silva, and Lt. Fernandez—the court
28    considers whether a jury could reasonably so find.

1   matter of California contract and auction law; (2) defendant Muse knew that she received

2   "replacement meat"; (3) defendant Muse knew that plaintiffs sought to resolve this matter by

3   paying monetary damages; and (4) no sale occurred as a matter of California contract and auction

4   law pursuant to the interaction of the Ninth Circuit's decision in *In re Western States Wire Corp.*,

5   490 F.2d 1065 (1974), California Commercial Code § 2401(2)(b), and a specific provision in the

6   Exhibitor Rules.  (Doc. No. 134 at 20–22.)  As to plaintiffs' second and third arguments,

7   defendant Fair Association providing defendant Muse with replacement goat meat and plaintiffs

8   offering to pay for the goat are immaterial to whether the goat was stolen, as well as to whether

9   defendant Muse believed it to have been stolen.  As to plaintiffs' first and fourth arguments,

10  defendant Muse argues in reply that "it is in fact plaintiffs' position that is absurd—that a belief

11  that one has been the victim of a crime can only be held in good faith if that belief strictly

12  complies with California law" and with plaintiffs' "pages-long analysis of why it was *not* a theft

13  under . . . the [Exhibitor Rules] and California statutory and case law[.]"  (Doc. No. 136 at 5.)

14  Notably, plaintiffs provide no evidence on summary judgment that defendant Muse, the owner of

15  a trucking company and a private individual, had any knowledge of any of the California contract

16  law or Exhibitor Rules discussed by plaintiffs, let alone that she agreed with plaintiffs' analysis of

17  the many complex legal questions posed by the circumstances of this case.[27]

18          It is undisputed that defendant Muse communicated extensively with MacFarlane, Silva,

19  and Lt. Fernandez in arranging the return and eventual slaughter of the goat.  There is no evidence

20  before the court, however, from which a reasonable jury could find that defendant Muse

21  communicated with those state actors in order to violate plaintiffs' constitutional rights.  *See*

22  *Crowe v. County of San Diego*, 608 F.3d 406, 440–41 (9th Cir. 2010) ("A 'common objective' to

23  merely prosecute the boys is insufficient; fair prosecution would not violate the boys'

24  constitutional rights.  It is too great a leap to conclude that help in obtaining a confession—even a

---

[27]  Indeed, after reviewing over 50 pages of briefing and hundreds of pages of documents
submitted by the parties, including the parties' supplemental briefing addressing particularly
thorny issues of California contract law, the undersigned cannot say it is obvious who owned
Cedar at various relevant times.  Reportedly, at least one law school has used the facts of this case
to teach contract law.  The court rejects any argument advanced by plaintiffs that a private
individual could navigate the relevant legal issues in this action with any degree of confidence.

1    coerced confession—suggests that McDonough shared the common objective of falsely

2    prosecuting the boys.  The district court's grant of summary judgment in favor of McDonough is

3    affirmed as to the Fourth Amendment conspiracy claims."); *see also Matsushita*, 475 U.S. at 586–

4    87 ("[T]o demonstrate a genuine issue, the opposing party "must do more than simply show that

5    there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole

6    could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

7    for trial.'"); *cf. O'Handley*, 62 F.4th at 1159 ("O'Handley's allegations establish, at most, a

8    meeting of the minds to promptly address election misinformation, not a meeting of the minds to

9    violate constitutional rights.").  Regardless of whether plaintiffs have provided no evidence

10   whatsoever or have provided a "mere scintilla," the court concludes that a jury could not

11   reasonably conclude from the evidence before the court on summary judgment that defendant

12   Muse—or defendant MacFarlane, defendant Silva, or Lt. Fernandez—"intend[ed] to accomplish

13   some unlawful objective for the purpose of harming another which results in damage."

14   *Mendocino*, 192 F.3d at 1301; *see also F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009)

15   ("A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient

16   to withstand summary judgment.").  Rather, the evidence on summary judgment demonstrates

17   that all defendants believed the following:  Muse had bid on the goat at a terminal auction, law

18   enforcement had investigated the taking of the goat as a crime, and law enforcement had returned

19   the goat to the care of defendant MacFarlane as the stolen property of defendant Muse.

20   Defendant Muse then approved the slaughter of the goat, as she had always intended to.[28]

21        Accordingly, defendant Muse's motion for summary judgment in her favor as to all of

22   plaintiffs' claims asserted against her will be granted.  *See Garcia v. Grimm*, No. 06-cv-00225-

23   _____

24   [28]  Plaintiffs' First Amendment claim asserted against defendant Muse also fails for lack of but-
     for causation.  *See Hart v. Parks*, 450 F.3d 1059, 1071–72 (9th Cir. 2006) ("Hart has not shown

25   any 'actual deprivation of his constitutional rights resulted from the alleged conspiracy.'  The
     district court properly granted summary judgment on Hart's conspiracy claim as well.") (internal

26   citations omitted).  As with defendants MacFarlane and Silva, the undisputed evidence before the
     court on summary judgment shows that defendant Muse intended at all times to slaughter the

27   goat.  There is also no evidence suggesting that defendant Muse was aware of the Exhibitor and
     State Rules which, according to plaintiffs, defendants chose not to follow in retaliation for

28   plaintiffs' protected speech activity.

WQH-PCL, 2011 WL 817426, at *10 (S.D. Cal. Mar. 2, 2011) ("Plaintiff has failed to submit evidence showing that the actions of Defendants are 'unlikely to have been undertaken without an agreement.' The Court concludes that there are no material facts in dispute and Defendants are entitled to judgment as a matter of law as to Plaintiff's claim of conspiracy . . . .") (internal citations omitted).[29]

## D.    Supplemental Jurisdiction

Subject matter jurisdiction in this action is premised on federal question jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a), respectively. (Doc. No. 25 at ¶ 3.) It does not appear from the allegations of plaintiffs' SAC, the evidence before the court on summary judgment, or the parties' representations at the June 26, 2025 hearing that the court has diversity jurisdiction over any of plaintiffs' claims. (See, e.g., id. at ¶¶ 5–15.)

For the reasons discussed above, the court will grant summary judgment in favor of defendants as to all of plaintiffs' federal claims asserted against all remaining defendants. Plaintiffs' remaining claims—for unreasonable search and seizure in violation of the California

---

[29]    The court notes that the undisputed evidence, namely that Lt. Fernandez turned Cedar over to defendant MacFarlane to do "whatever the owner, her, Kathi [Muse], was going to do with it" (Doc. No. 125-6 at 71), also appears to establish the elements of a good faith defense. See Danielson v. Inslee, 945 F.3d 1096, 1099 (9th Cir. 2019) ("[P]rivate parties may invoke a good faith defense to liability under § 1983."); Est. of Esche v. Renown Reg'l Med. Ctr., No. 21-cv-00520-MMD-CLB, 2024 WL 4168618, at *8 (D. Nev. Sept. 12, 2024) ("[A] private party who acted upon the instructions of a local police department may also invoke a good faith defense.") (citing Clement v. City of Glendale, 518 F.3d 1090, 1096–97 (9th Cir. 2008)); Clement, 518 F.3d at 1097 ("The responsibility to give notice falls on the police, thus the constitutional violation arose from the inactions of the police rather than from any act or omission by the towing company."); Deligiannis v. City of Anaheim, No. 06-cv-00720-DOC-JC, 2010 WL 1444538, at *13 (C.D. Cal. Mar. 2, 2010) ("The fact that plaintiff protested and threatened to sue— particularly where no then clearly established law suggested that plaintiff had a viable claim— does not alter the fact that the Towing Company driver acted in response to what appeared to be a lawful direction from the police."), report and recommendation adopted, 2010 WL 1444535 (C.D. Cal. Apr. 3, 2010), aff'd, 471 F. App'x 603 (9th Cir. 2012). However, because the analysis set forth above in the body of this order provides a sufficient basis upon which to grant defendant Muse's motion for summary judgment, the court does not consider whether defendant Muse has presented or waived the affirmative defense of good faith. See Tarantino v. Syputa, 270 F. App'x 675, 677 (9th Cir. 2008) ("The towing companies' filings in the district court did not articulate the defense as clearly as might be desired, but they sufficiently placed Tarantino on notice that the companies were raising a good faith defense.").

state constitution; violation of procedural due process rights under the California state

constitution; conversion; negligence; and intentional infliction of emotional distress—all arise

under state law.[30]

The court will decline to exercise supplemental jurisdiction over plaintiffs' state law

claims.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental

jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over

which it has original jurisdiction[.]"); *Jones v. Cmty. Redev. Agency of L.A.*, 733 F.2d 646, 651

(9th Cir. 1984) ("When federal claims are dismissed before trial, as Jones' section 1983 claim

was here, pendant state claims also should be dismissed.").  This is not an instance where the

court "has effectively already decided" the remaining state law claims.  *Arroyo v. Rosas*, 19 F.4th

1202, 1214 (9th Cir. 2021); *cf. id.* at 1215 (finding that the district court abused its discretion in

declining to exercise supplemental jurisdiction where "the correct disposition of Arroyo's Unruh

Act claim follows obviously and ineluctably from the findings that the district court has already

made" because "a violation of the ADA is automatically, without more, a violation of the Unruh

Act").  Rather, resolution of plaintiffs' state law claims would require further detailed analysis of

several complex state law issues, many in areas of the law with little relevant California Supreme

Court or California Court of Appeal authority on point.

---

[30]  The court has not addressed plaintiffs' claim for declaratory relief.  (*See* Doc. Nos. 25 at 29; 133 at 34.)  Plaintiffs did not specify pursuant to which statute, state or federal, this claim is brought.  (*See* Doc. No. 25 at 29.)  But as the parties here agree, "[n]either the federal Declaratory Judgment Act nor its state analog can provide an independent basis for federal jurisdiction." *Tule Lake Comm. v. Fed. Aviation Admin.*, No. 20-16955, 2023 WL 3171564, at *2 (9th Cir. May 1, 2023) (internal citations omitted).  Moreover, plaintiffs' claim for declaratory relief regarding hypothetical future contracts and auctions is not ripe.  *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (internal quotation marks omitted).  When this issue was highlighted by the court, plaintiffs failed to point to any evidence or advance any argument in their supplemental briefing that this claim was in fact ripe for decision.  (*See* Doc. No. 151 at 26–27.)  The court concludes that plaintiffs' claim for declaratory relief must be dismissed without prejudice for lack of subject matter jurisdiction, both because the court declines to exercise supplemental jurisdiction over the claim and because the claim is not ripe. *See Foster v. Cantil-Sakauye*, 744 F. App'x 469, 469 (9th Cir. 2018) (affirming the district court's dismissal of the plaintiff's claim because it was not ripe and noting that "a dismissal for lack of subject matter jurisdiction should be without prejudice").

1    Accordingly, plaintiffs' state law claims are dismissed without prejudice.

2                                      **CONCLUSION**

3    For the reasons explained above:

4    1.    The motion for summary judgment in their favor filed by defendants BJ

5          MacFarlane, Melanie Silva, and Shasta Fair and Event Center (collectively, "the

6          Fair defendants") (Doc. No. 119) is GRANTED as follows:

7          a.    The Fair defendants' motion for summary judgment in their favor as to

8                plaintiffs' First Amendment, Fourth Amendment, and Fourteenth

9                Amendment claims is granted;

10         b.    All of plaintiffs' remaining claims asserted against the Fair defendants—

11               for unreasonable search and seizure in violation of the California state

12               constitution; violation of procedural due process rights under the California

13               state constitution; conversion; negligence; intentional infliction of

14               emotional distress; and declaratory relief—are dismissed without prejudice

15               for lack of subject matter jurisdiction;

16   2.    Plaintiffs' motion for partial summary judgment (Doc. No. 122) is DENIED;

17   3.    The motion for summary judgment in her favor filed by defendant Kathie Muse

18         (Doc. No. 125) is GRANTED; and

19   4.    The Clerk of the Court is directed to close this case.

20   IT IS SO ORDERED.

21   Dated:   **August 7, 2025**

22                                         DALE A. DROZD
                                           UNITED STATES DISTRICT JUDGE